1   Naomi A. Igra, SBN 269095
    naomi.igra@sidley.com
2   SIDLEY AUSTIN LLP
    555 California Street, Suite 2000
3   San Francisco, CA 94104
    Telephone:  +1 415 772 1200
4   Facsimile:  +1 415 772 7400

5   Sabrineh Ardalan (*pro hac vice* forthcoming)
    sardalan@law.harvard.edu
6   Philip L. Torrey (*pro hac vice* forthcoming)
    ptorrey@law.harvard.edu
7   HARVARD LAW SCHOOL
    HARVARD IMMIGRATION AND REFUGEE
8   CLINICAL PROGRAM
    6 Everett Street, WCC 3103
9   Cambridge, MA 02138
    Telephone:  +1 617 384 7504
10  Facsimile:  +1 617 495 8595

Sirine Shebaya (*pro hac vice* forthcoming)
sirine@nipnlg.org
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue N.W., Suite 200
Washington, D.C. 20007
Telephone:  +1 202 656 4788
Facsimile:  +1 617 227 5495

Leila Kang (*pro hac vice* forthcoming)
leila@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone:  +1 646 762 8428

11

12   *Attorneys for Plaintiffs*
     (Additional counsel listed on signature page)

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                      SAN FRANCISCO

16   PANGEA LEGAL SERVICES; DOLORES
     STREET COMMUNITY SERVICES, INC.;
17   CATHOLIC LEGAL IMMIGRATION NET-
     WORK, INC.; and CAPITAL AREA IMMI-
18   GRANTS' RIGHTS COALITION,

19            Plaintiffs,

20       v.

21   U.S. DEPARTMENT OF HOMELAND
     SECURITY;
22   CHAD F. WOLF, *under the title of Acting
     Secretary of Homeland Security*;
23   KENNETH T. CUCCINELLI, *under the title of
     Senior Official Performing the Duties of the
24   Deputy Secretary for the Department of
     Homeland Security;*
25   U.S. CITIZENSHIP AND IMMIGRATION
     SERVICES;
26   U.S. IMMIGRATION AND CUSTOMS
     ENFORCEMENT;

27

28

Case No. _____

Hon. _____

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND
ADMINISTRATIVE PROCEDURE ACT
CASE**

**DEMAND FOR JURY TRIAL**

TONY H. PHAM, *under the title of Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement*;
U.S. CUSTOMS AND BORDER PROTECTION;
MARK A. MORGAN, *under the title of Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection*;
U.S. DEPARTMENT OF JUSTICE;
WILLIAM P. BARR, *under the title of U.S. Attorney General*;
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and
JAMES MCHENRY, *under the title of Director of the Executive Office for Immigration Review,*

Defendants.

1

## **INTRODUCTION**

2      1.      This action challenges a final rule issued by the Departments of Justice and Homeland

3  Security (the "Rule").  *See* Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202

4  (Oct. 21, 2020).  The Rule imposes several vague and sweeping new bars to asylum eligibility, frus-

5  trates the purpose of state criminal dispositions, and strips asylum-seekers of protections set forth in

6  the Immigration and Nationality Act ("INA").  These changes will dramatically curtail the availability

7  of asylum to people fleeing persecution, in contravention of the INA's plain language and the United

8  States' international commitments.  The Rule will thus have a devastating impact on asylum-seekers

9  and immigration legal services providers—including Plaintiffs and the communities they serve.

10      2.      The toll the Rule will take is best illustrated by the stories of real clients represented by

11  Plaintiffs.  For example, Dolores Street Community Services, Inc.'s ("DSCS") client, Bryan*, has

12  been a lawful permanent resident for many years.[1]  Bryan suffers from psychotic disorder and related

13  substance abuse issues; as a result of these mental health challenges, he was arrested multiple times

14  and sustained several convictions that threatened his lawful permanent resident status.  Bryan was

15  placed in removal proceedings, where he sought asylum, among other forms of relief.  With DSCS's

16  help, Bryan has been able to access—for the first time—substance abuse and mental health treat-

17  ment.  DSCS has also helped Bryan vacate some of his prior convictions, because he did not under-

18  stand the nature or immigration consequences of the proceedings at the time.  Under current law, these

19  vacaturs carry legal weight even though they were obtained after Bryan was placed in removal pro-

20  ceedings, as they should:  Bryan's constitutional rights were violated at the time of his criminal cases,

21  and he should not now suffer immigration consequences as a result of those unlawful convictions.  The

22  Rule, however, would severely prejudice respondents like Bryan by requiring him to demonstrate these

23  illegalities yet again in immigration court.

24      3.      At least six aspects of the Rule are unlawful.  *First*, the Rule would create several new

25  categorical bars to asylum eligibility that conflict with the INA's text and structure and the United

26

27  ───────────────

28  [1] This name has been changed to protect the client's safety and preserve confidentiality.

States' international treaty obligations, which Congress has directly incorporated into U.S. law.  These bars would categorically exclude from asylum eligibility any person with:

- any conviction for bringing in or harboring certain aliens under 8 U.S.C. § 1324(a)— even if the asylum-seeker was just bringing their own spouse, child, or parent to safety;

- any conviction for illegal reentry under 8 U.S.C. § 1326;

- any conviction for an offense the adjudicator knows or has some unspecified "*reason to believe* was committed in support, promotion, or furtherance of the activity of a criminal street gang";

- any conviction for an offense involving driving while intoxicated or impaired that results in serious bodily injury or death, or any second offense for driving while impaired, even if there is no injury to any person or property;

- any felony conviction under federal, state, or local law;

- any conviction under several newly defined categories of misdemeanor offenses, including any controlled substance-related offense except for a first-time marijuana simple possession offense, any offense involving possession or use of a false identification document, and any offense involving the receipt of public benefits without lawful authority;

- any conviction for an offense involving domestic violence; and

- any *accusation* of battery or extreme cruelty involving a domestic relationship, even if it does not result in a conviction.

4. The Rule asserts that these new categorical bars are proper exercises of the Attorney General's power to "establish additional limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C) (emphasis added). But the Rule's new bars are *not* "consistent with" the statutory eligibility scheme, which is narrowly drawn to exclude people "who pose a threat to society." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 846 (9th Cir. 2020). The Rule sweeps in everything from a second misdemeanor conviction for marijuana possession, to a misdemeanor conviction for using a fake ID to enter a bar, to unlawfully exporting fish—a federal felony. The Rule's bars thus bear no resemblance to those Congress wrote into the statute, which in turn reflect our international treaty obligations. The Rule also ignores Congress's

careful drafting, for example by treating *every* illegal reentry conviction under § 1326 as a categorical bar, even though Congress specified that such a conviction bars asylum eligibility *only* when "committed by an alien who was previously deported" based on an aggravated-felony conviction.  8 U.S.C. § 1101(a)(43)(O).  The Rule's categorical bars thus exceed Defendants' authority and conflict with the governing statute.

5.      *Second*, the Rule adopts a novel presumption:  a criminal conviction still triggers asylum ineligibility even if vacated, expunged, or modified—and even if the vacatur or modification was *to correct constitutional or substantive defects*—so long as (i) the vacatur or modification order was entered after removal proceedings began, or (ii) the applicant moved for the order more than a year after conviction or sentencing.  85 Fed. Reg. at 67259–60 (to be codified at 8 C.F.R. §§ 208.13(c)(7)–(8), 1208.13(c)(7)–(8)).  The asylum-seeker must try to rebut this presumption by showing that any modification was not made (i) for rehabilitative reasons or (ii) "for purposes of ameliorating the immigration consequences."  *Id.*  But Congress nowhere authorized Defendants to disregard state court orders curing constitutional errors based purely on their assumptions about judges' subjective reasons for ruling.  This aspect of the Rule thus clashes with the text of the INA and with basic federalism principles.

6.      *Third*, the Rule violates the Administrative Procedure Act ("APA") in at least three respects.  First, the Rule departs dramatically from decades of consistent agency precedent without adequate explanation.  For example, the Rule discards the agency's longstanding practice of treating criminal convictions (or conduct) beyond the statutory eligibility bars as merely part of "the totality of the circumstances" that "should be examined in determining whether a favorable exercise of discretion is warranted," and not a basis "to deny relief in [ ] all cases."  *Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987).  Yet the Rule fails to explain why the agencies' good reasons for that approach no longer hold true.  This unexplained departure is a textbook example of arbitrary and capricious rulemaking.  Second, in issuing the Rule, Defendants entirely failed to consider important aspects of the problem, repeatedly dismissing comments and data about the Rule's harmful effects as "outside the scope of [the] rulemaking."  *See, e.g.*, 85 Fed. Reg. at 67226.  Third, Defendants did not provide sufficient opportunity for public comment.  They provided just 30 days, spanning the 2019 end-of-

1   year holidays, to comment on this major overhaul of the asylum system.  That is not long enough for

2   the public to digest and comment on a sweeping proposal with such significant impacts.  The Rule

3   was also part of an improperly staggered rulemaking process, which prevented the public from seeing

4   and commenting on the whole picture at once.

5         7.     *Fourth*, the Rule is procedurally invalid for another three reasons.  First, Defendant

6   Chad Wolf—who purported to issue the proposed and final Rule in conjunction with Defendant Wil-

7   liam Barr—unlawfully assumed the role of Acting Secretary of Homeland Security in violation of the

8   Appointments Clause of the U.S. Constitution, the Homeland Security Act of 2002 ("HSA"), and the

9   Federal Vacancies Reform Act of 1998 ("FVRA").  Wolf thus lacked the authority to propose or issue

10  the Rule.  Second, the Rule violates the Regulatory Flexibility Act ("RFA"), which requires federal

11  agencies to analyze the effects of their rules on "small entities."  5 U.S.C. §§ 603–604.  Here, the

12  Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") failed to do so,

13  stating only that the Rule "will not have a significant economic impact on a substantial number of

14  small entities" because "[o]nly individuals, rather than entities, are eligible to apply for asylum."  85

15  Fed. Reg. at 67255.  This conclusory statement entirely fails to acknowledge the impact the Rule will

16  have on immigration legal services providers like Plaintiffs.  Third, the Rule fails to comply with the

17  federalism certification requirement set forth in Executive Order 13132, notwithstanding the signifi-

18  cant federalism concerns the Rule raises.  *See* 64 Fed. Reg. 43255 §1(a) (Aug. 4, 1999).

19        8.     *Fifth*, the Rule is unconstitutionally vague, in violation of the Due Process Clause, be-

20  cause it fails to "give ordinary people fair warning about what the law demands of them."  *United*

21  *States v. Davis*, 139 S. Ct. 2319, 2323 (2019).  For example, the Rule bars asylum based on a convic-

22  tion of *any* offense the adjudicator "has reason to believe" was committed "in support, promotion, or

23  furtherance" of the activity of a criminal street gang.  85 Fed. Reg. at 67258–59 (to be codified at 8

24  C.F.R. §§ 208.13(c)(6)(ii), 1208.13(c)(6)(ii)).  The Rule does not describe what behaviors, associa-

25  tions, or statuses might meet this standard.  Nor does it provide any guidance on the types of offenses

26  or circumstances that may trigger such an inquiry, or the sorts of evidence that might be considered.

27  These vague standards fail to provide fair notice and invite arbitrary and discriminatory enforcement.

28

9. *Sixth*, the Rule violates the equal protection component of the Fifth Amendment because it was motivated by discriminatory animus toward certain racial and ethnic groups and people of certain national origins. The discriminatory intent underlying this Rule is evinced by two primary factors. First, the Rule will disproportionately harm non-white immigrants relative to their counterparts from predominantly white countries—a concern that Defendants acknowledged, but did not seek to mitigate or resolve, in issuing the Rule. Second, the Rule was promulgated in the context of years of repeated, racist statements by members of the Trump Administration casting non-white immigrants as dangerous criminals, including statements made in the days and weeks immediately surrounding the publication of the proposed Rule in December 2019 and the final Rule in October 2020.

10. In short, the Rule is inconsistent with the INA; is arbitrary, capricious, and procedurally invalid under the APA, the HSA, the FVRA, and the RFA; and violates (i) the Appointments Clause and (ii) the Fifth Amendment's Due Process Clause, including its equal protection component. It also conflicts with the international law obligations that Congress directly incorporated into U.S. law and on which our asylum system is founded. The Rule thus threatens to send bona fide asylum-seekers to countries where they will likely face violence, torture, and even death. The Court should hold the Rule unlawful, set it aside, and enjoin its enforcement.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and federal statutes, including the INA, 8 U.S.C. § 1101 *et seq.*, and the APA, 5 U.S.C. § 551 *et seq.* This Court also has subject matter jurisdiction under 5 U.S.C. § 702. Additionally, the Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

12. Defendants' promulgation of the final Rule in the Federal Register on October 21, 2020 constitutes final agency action and is therefore subject to judicial review. 5 U.S.C. §§ 704, 706.

13. Plaintiffs have standing to challenge the Rule under 5 U.S.C. § 702 because they have been and will be injured by the Rule's operation. Plaintiffs are also within the zone of interest of the INA, which establishes asylum eligibility requirements. *See, e.g.*, *E. Bay Sanctuary Covenant v.*

1  *Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020); *La Clinica de la Raza v. Trump*, No. 19-cv-04980-PJH,

2  2020 WL 4569462, at *9–11 (N.D. Cal. Aug. 7, 2020).

3      14.    Venue is proper in this District because Defendants are officers or employees of the

4  United States or agencies thereof acting in their official capacity or under color of legal authority, or

5  are federal agencies of the United States.  28 U.S.C. § 1391(e)(1).  Venue is also proper because both

6  Pangea Legal Services and DSCS have their principal place of business in San Francisco, California.

7  Consequently, both reside in this judicial district under 28 U.S.C. § 1391(c)(2).

8                                      **PARTIES**

9      15.    Plaintiff Pangea Legal Services ("Pangea") is a non-profit organization based in Cali-

10  fornia's Bay Area with offices in San Francisco and San Jose.  Pangea's mission is to stand with

11  immigrant communities and to provide services through direct legal representation.  Pangea serves the

12  immigrant community in the Bay Area by providing direct legal services, including filing both affirm-

13  ative and defensive asylum applications, engaging in policy advocacy, and providing educational pro-

14  grams aimed at legal empowerment.  The publication and impending effective date of the Rule has

15  required Pangea to divert resources from its core activities to address the impact of the Rule on the

16  communities it serves.

17      16.    Plaintiff DSCS is a non-profit organization based in San Francisco, California, that

18  provides a variety of services to low-income and immigrant communities in San Francisco, including

19  through its Deportation Defense & Legal Advocacy Program.  DSCS's mission is to cultivate collec-

20  tive power among low-income and migrant communities to create a more just society.  DSCS serves

21  San Francisco's immigrant community in part by providing direct legal services—including filing both

22  affirmative and defensive asylum applications—and by partnering with other organizations to carry

23  out local and national advocacy.  The publication and impending effective date of the Rule has required

24  DSCS to divert resources from its core activities to address the impact of the Rule on the communities

25  it serves.

26      17.    Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") promotes the dignity

27  and protects the rights of immigrants in partnership with its network organizations.  CLINIC imple-

28  ments its mission by providing substantive legal and program management training and support for

organizations within its network, including organizations engaged in completing affirmative and defensive applications for asylum; providing direct representation and legal orientation to asylum-seekers; and engaging in advocacy and providing advocacy support to network organizations at state, local, and national levels.  CLINIC is the largest charitable legal immigration network in the United States, with almost 400 nonprofit organizations spanning 48 states, including the state of California.  Many of its affiliates appear on the List of Pro Bono Legal Service Providers maintained by the Executive Office for Immigration Review ("EOIR") as required by 8 C.F.R. § 1003.61.  CLINIC maintains an office with three staff members in Oakland, California, and has staff in a dozen states around the country.  The publication and impending effective date of the Rule has required CLINIC to divert resources from its core activities to address the impact of the Rule on the communities it serves.

18.     Plaintiff Capital Area Immigrants' Rights Coalition ("CAIR Coalition") is a non-profit organization serving the Washington, D.C. region.  It appears on the List of Pro Bono Legal Service Providers maintained by the EOIR as required by 8 C.F.R. § 1003.61.  CAIR Coalition's mission is to ensure equal justice for all immigrant adults and children at risk of detention and deportation in the Washington, D.C. region and beyond.  CAIR Coalition implements its mission by providing direct legal representation to children and adults in immigration proceedings, including representing unaccompanied alien children ("UACs") in interviews before the Asylum Office; conducting educational programming, including know your rights presentations and training of attorneys to defend immigrants; and engaging in impact litigation and advocacy on key policy issues.  The publication and impending effective date of the Rule has required CAIR Coalition to divert resources from its core activities to address the impact of the Rule on the communities it serves.

19.     Defendant DHS is a cabinet-level department that enforces the immigration laws of the United States.

20.     Defendant Chad F. Wolf is purportedly the Acting Secretary of DHS.  He is being sued in his official capacity.  In this capacity, he directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP").  The

Secretary of DHS is responsible for the administration and enforcement of immigration laws under 8 U.S.C. § 1103(a).

21.     Defendant Kenneth T. Cuccinelli is the Senior Official Performing the Duties of the Deputy Secretary for DHS.  He is being sued in his official capacity.

22.     Defendant USCIS is the agency within DHS responsible for adjudicating affirmatively filed asylum applications and conducting credible and reasonable fear interviews.

23.     Defendant ICE is the agency within DHS responsible for carrying out removal orders and overseeing immigration enforcement and detention.

24.     Defendant Tony H. Pham is the Senior Official Performing the Duties of the Director of ICE.  He is being sued in his official capacity.

25.     Defendant CBP is the agency within DHS responsible for the initial processing and detention of noncitizens who are apprehended at or near the border and placed in expedited removal or reinstatement of removal proceedings.

26.     Defendant Mark A. Morgan is the Senior Official Performing the Duties of the Commissioner of CBP.  He is being sued in his official capacity.

27.     Defendant DOJ is a cabinet-level department of the federal government.

28.     Defendant William P. Barr is the U.S. Attorney General.  He is being sued in his official capacity.  Under 8 U.S.C. § 1103(g), the Attorney General is responsible for the administration of immigration law.

29.     Defendant EOIR is a sub-agency of DOJ responsible for adjudicating administrative claims concerning federal immigration laws, including asylum applications filed in immigration court.

30.     Defendant James McHenry is the Director of EOIR.  He is being sued in his official capacity.

## GENERAL ALLEGATIONS

### I.     Background on the INA

31.     Federal law affords several humanitarian protections for non-citizens who fear persecution and violence in their home countries.  Congress incorporated international humanitarian principles into U.S. law through the INA, which ensures that asylum and related protections are accessible

to asylum-seekers who fear returning to their home country because of the persecution, torture, or other harm they would endure.

32. The U.S. asylum system was founded on its international obligations under the 1951 Convention Relating to the Status of Refugees ("Refugee Convention") and the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol"). Opened for signature in 1951, the Refugee Convention was designed to avoid the horrors experienced by refugees during World War II. The 1967 Protocol, which the United States ratified in 1968, expanded the Convention's protections, allowing them to be applied universally.

33. Congress incorporated the 1967 Protocol into U.S. law with the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. The Refugee Act amended the INA to include a formal process for people fearing persecution in their home country to apply for asylum. *Id.* § 101(a) (codified at 8 U.S.C. § 1521 Note).

34. The Refugee Act thus codified the United States' longstanding tradition of "welcoming the oppressed of other nations." H.R. Rep. No. 96-781, at 17–18 (1980) (Conf. Rep.). Congress deliberately sought to bring the United States into compliance with its international obligations under the 1967 Protocol and the Refugee Convention. *See* H.R. Rep. No. 96-608, at 17 (1979) (noting that proposed asylum and withholding provisions were designed to "conform[] United States statutory law to our obligations under Article 33 [of the Refugee Convention]"); S. Rep. No. 96-256, at 4 (1979) (same). "Congress imbued these international commitments with the force of law when it enacted the Refugee Act . . ." *R-S-C- v. Sessions*, 869 F.3d 1176, 1178 (10th Cir. 2017); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987) (explaining that Congress enacted the Refugee Act of 1980 "to bring United States refugee law into conformance with the [1967 Protocol]").

35. Today, asylum may be granted to a person who has suffered persecution or who has a "well-founded fear of persecution" on account of one of five enumerated protected grounds: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(B); *id.* § 1101(a)(42)(A). Among other requirements, to be eligible for asylum, a person must not fall within any mandatory bars to asylum. Specifically, they must not (i) have participated in the persecution of others; (ii) have been convicted of a "particularly serious crime" that makes them

a danger to the United States; (iii) have committed a "serious nonpolitical crime outside the United States"; (iv) represent a danger to the security of the United States; (v) have engaged in "terrorist activity"; or (vi) have resettled in a third country prior to arriving in the United States.  *See id.* § 1158(b)(2)(A)(i)–(vi).

## II.   Criminal Bars to Asylum Eligibility under the INA

36.   The INA specifies two crime-related bars to asylum eligibility:  (i) the particularly serious crime ("PSC") bar, and (ii) the serious nonpolitical crime bar.  *See id.* § 1158(b)(2)(A)(ii) (PSC bar); *id.* § 1158(b)(2)(A)(iii) (serious nonpolitical crime bar).  Both bars have specific definitions and scopes of application.

37.   Like most of the asylum provisions in the INA, the PSC bar closely mirrors the language of the same bar in the Refugee Convention.  The Refugee Convention's bar was designed to be narrow, so as not to preclude a bona fide refugee from protection unless they had been convicted of a very serious criminal offense and thus posed a danger to the community.  The INA PSC bar thus requires a conviction for a "*particularly* serious crime" that renders the applicant "a danger to the community of the United States." *Id.* § 1158(b)(2)(A)(ii) (emphasis added).

38.   The United Nations High Commissioner for Refugees (UNHCR) has noted that, to be considered a serious crime, an offense must generally be a "capital crime or a very grave punishable act," such as murder, arson, rape, or armed robbery.  UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees*, U.N. Doc. HCR/4/IP/Eng/REV. ¶¶ 154–155 (1979, reissued 2019) ("*UNHCR Handbook*").  The danger to the community must be both serious and posed by the asylum-seeker themselves.  Convention Relating to the Status of Refugees art. 33(2), Apr. 22, 1954, 189 U.N.T.S. 150.

39.   Under the Refugee Convention, adjudicators determining whether an offense is a PSC must conduct an individualized analysis, considering the nature of the act, the actual harm inflicted, how the offense is prosecuted, and whether most jurisdictions would consider the act a serious crime. UNHCR, *Criminal Justice and Immigration Bill:  Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf.  Adjudicators must also consider

mitigating or extenuating factors in their determinations.  UNHCR, *The Nationality, Immigration and Asylum Act 2002:  UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004* 4 (2004).

40.     Adjudicators in the United States similarly apply a fact-specific analysis to determine whether an offense is a PSC under the INA (except for aggravated felonies, *see* 8 U.S.C. § 1158(b)(2)(B)(i)).  This analysis considers, among other things, the nature of the offense, the criminal sentence imposed, and whether the offense itself indicates that the person is likely to be a danger to the community.  *See Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982), *superseded on other grounds by statute*, Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, *as recognized in Matter of N-A-M-*, 24 I. & N. Dec. 336, 339 (BIA 2007).

41.     Moreover, the INA PSC bar requires a "convict[ion] by a final judgment" of a PSC.  8 U.S.C. § 1158(b)(2)(A)(ii).  Accusations of criminal activity, or reasonable suspicion of criminal activity, do not trigger the PSC bar.

42.     The "serious nonpolitical crime" bar requires a showing that "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States."  *Id.* § 1158(b)(2)(A)(iii).  This provision also corresponds to an exclusion clause in the 1951 Refugee Convention:  Article 1F(b) provides that the Convention does not apply to "any person with respect to whom there are serious reasons for considering that . . . [h]e has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee."  Convention Relating to the Status of Refugees art. 1F(b).

43.     This treaty provision serves a dual purpose:  (i) "to protect the community of a receiving country from the danger of admitting a refugee who has committed a serious common crime," and (ii) "to render due justice to a refugee who has committed a common crime (or crimes) of a less serious nature or has committed a political offence."  UNHCR Handbook  ¶ 151.  Under the treaty, reconciliation of these twin purposes demands an individualized analysis that accounts for all factors relating to "the nature of the offence presumed to have been committed"—including all aggravating or mitigating circumstances—balanced against "the degree of persecution feared," such that "[i]f a person

1  has well-founded fear of very severe persecution . . . a crime must be very grave in order to exclude

2  him." *Id.* ¶¶ 155–157.

3      44.   Adjudicators in the United States similarly apply an individualized, fact-specific anal-

4  ysis in determining whether an offense qualifies as a serious nonpolitical crime.  That analysis requires

5  judges to assess in each case whether the "political aspect of his offense may not fairly be said to

6  predominate over its criminal character."  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 429–30 (1999); *see

7  also McMullen v. INS*, 788 F.2d 591, 596 (9th Cir. 1986) (noting that "a balancing approach including

8  consideration of the offense's 'proportionality' to its objective and its degree of atrocity makes good

9  sense"), *overruled on other grounds by Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2000).

10  **III.   The Rule**

11      **A.   The Rulemaking Process**

12      45.   Defendants DOJ and DHS jointly published the proposed Rule in the Federal Register

13  on December 19, 2019.  *See* Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg.

14  69640 (Dec. 19, 2019).  The Rule proposed parallel amendments to the immigration regulations ad-

15  ministered by DHS (8 C.F.R. pt. 208) and those administered by EOIR, a sub-agency of DOJ (8 C.F.R.

16  pt. 1208).  Defendants' stated purposes in issuing the proposed Rule were to (i) amend regulations

17  governing the bars to asylum eligibility; (ii) clarify the effect of criminal convictions; and (iii) remove

18  regulations governing the automatic reconsideration of discretionary denials of asylum.  *Id.* at 69640.

19      46.   Although the RFA requires federal agencies to analyze the effects of their rules on

20  "small entities," the proposed Rule disposed of this requirement by stating that "[the] rule will not

21  have a significant economic impact on a substantial number of small entities" because "[o]nly indi-

22  viduals, rather than entities, are eligible to apply for asylum."  *Id.* at 69657.

23      47.   Defendants gave the public just 30 days to comment on the proposed Rule, ending

24  January 21, 2020.  This already-brief period included multiple federal and religious holidays, including

25  Hanukkah, Christmas Eve, Christmas Day, New Year's Day, and the Birthday of Martin Luther King,

26  Jr., leaving just 15 business days for comment.  Even so, Defendants ignored requests to extend the

27  comment period.

28

48.     On October 21, 2020, the final Rule was published in the Federal Register.  *See* Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202 (Oct. 21, 2020).  Despite 581 comments on the proposed Rule, most of which opposed it—including 78 comments from organizations such as legal advocacy groups, non-profit organizations, and religious organizations, *all* of which opposed it—the final Rule is nearly identical to the proposed text published ten months earlier.

49.     The proposed Rule cited two purported sources of authority for the new bars to asylum eligibility:  8 U.S.C. § 1158(b)(2)(B)(ii), which allows the Attorney General to "designate by regulation offenses that will be considered" particularly serious crimes that trigger the PSC bar, and § 1158(b)(2)(C), which allows the Attorney General to "establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum."  The final Rule reflects that commenters raised numerous concerns about the invocation of the PSC bar:

> In general, commenters alleged that the [notice of proposed rulemaking] was untethered to the approach set out by Congress regarding particularly serious crimes and that if Congress had sought to sweepingly bar individuals from asylum eligibility based on their conduct or felony convictions, as outlined in the [notice of proposed rulemaking], it would have done so in the Act.  Commenters stated that adding seven new categories of barred conduct rendered the language of section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)) essentially meaningless and drained the term "particularly serious crime" of any sensible meaning because the Departments were effectively considering all offenses, regardless of seriousness, as falling under the particularly serious crime bar to asylum.

85 Fed. Reg. at 67206.  Rather than revising the scope of the Rule to address these concerns, Defendants simply disclaimed reliance on the Attorney General's power to designate PSCs in the final Rule.  Although the final Rule repeatedly draws analogies to the PSC bar, stating that the new bars are "similar to" PSCs, Defendants dismissed commenters' concerns by stating that the rule "does not designate any offenses . . . as specific particularly serious crimes," rather, it "sets out seven new 'additional limitations' . . . on asylum eligibility."  *Id.* at 67207.

50.     On many other issues raised by commenters—including issues that go to the heart of the Rule—Defendants failed to provide a meaningful response, stating that various comments and concerns were "beyond the scope of" the rulemaking.  Supposedly "outside the scope" were comments and data showing the Rule "will exacerbate harms caused by racially disparate policing practices or that the result of this rule will disproportionately affect people of color," *id.* at 67226, "barriers" that

prevent domestic violence victims from seeking waivers that would prevent the Rule's bars from applying to them, *id*. at 67230, "how the rule might affect working conditions of aliens," *id*. at 67233, "issues involving evidence gathering" under the Rule's vacatur presumption, *id*. at 67239, "humanitarian concerns for asylum seekers," *id*. at 67243, "treatment, support, and services for children who have experienced trauma," *id*. at 67244, the "complex 'web' of asylum laws and regulations," *id*., "dangerous conditions in Mexico, the effects of the ['migrant protection protocol'], and the third-country transit bar," *id*. at 67245, "access to healthcare, food, and housing," *id*. at 67246, "increased likelihood of convictions for minor offenses for certain vulnerable groups," *id*. at 67247, and "representation in immigration proceedings or during asylum adjudications," *id*. at 67249.  On most of these points, Defendants just "reiterate[d] their statutory authority to limit and condition asylum eligibility." *Id*. at 67239.

51.     Moreover, like the proposed Rule, the final Rule did not analyze the effects of the Rule on "small entities" as required by the RFA.  Rather, the final Rule concluded without analysis that "[the] rule will not have a significant economic impact on a substantial number of small entities" because "[o]nly individuals, rather than entities, are eligible to apply for asylum."  *Id.* at 67255.

52.     The Rule is currently scheduled to take effect on November 20, 2020.

**B.     Additional Categorical Bars to Asylum Eligibility**

53.     Although the Attorney General may impose additional "limitations and conditions" on asylum eligibility, those limitations must be "consistent with" the INA's asylum provisions.  *See* 8 U.S.C. § 1158(b)(2)(C).  None of the Rule's new asylum eligibility bars pass this test.

54.     The Rule purports to establish several new categorical bars to asylum eligibility, regardless of the circumstances of the crime, the punishment imposed, or whether the offense indicates dangerousness to the community—in direct contravention of Congress's intent in establishing asylum protection.  While the Rule asserts similarities between these new bars and the PSC bar, *see* 85 Fed. Reg. at 67216 & n. 16, the new bars are not tailored to address the touchstone of the statutory eligibility bars, including the PSC bar:  dangerousness to the community or the nation.  The Rule thus attempts to add new criminal bars that ignore the boundaries Congress articulated in the statute.

55.     The Rule radically expands the list of offenses triggering a categorical bar to asylum eligibility to include:

- any conviction for bringing in or harboring certain aliens under 8 U.S.C. § 1324(a);

- any conviction for illegal reentry under 8 U.S.C. § 1326;

- any conviction for an offense the asylum officer knows or has some unspecified "*reason to believe* was committed in support, promotion, or furtherance of the activity of a criminal street gang";

- any conviction for an offense involving driving while intoxicated or impaired that results in serious bodily injury or death, or any second offense for driving while impaired, even if no injury results;

- any felony conviction under federal, state, or local law;

- any conviction under several newly defined categories of misdemeanor offenses, including any controlled substance-related offense except for a first-time marijuana possession offense, any offense involving possession or use of a false identification document, or any offense involving the receipt of public benefits without lawful authority;

- any conviction for an offense involving domestic violence; and

- any *accusation* of battery or extreme cruelty involving a domestic relationship, even if it does not result in a conviction.

56.     These new bars are inconsistent with the INA's asylum provisions because they (i) involve offenses (or alleged conduct) far less serious, and less dangerous, than Congress deemed necessary to deny asylum eligibility; (ii) allow people to be barred from asylum eligibility based on mere accusation or suspicion of misconduct; and (iii) seek to impose *categorical* eligibility bars, with no individualized analysis (for example, to determine whether the asylum-seeker constitutes a danger to the community).

57.     Nor can this inconsistency be remedied by vague references to the Attorney General's authority to "designate by regulation offenses that will be considered" PSCs.  8 U.S.C. § 1158(b)(2)(B)(ii).  The PSC bar applies only where the person (i) is "convicted by final judgment" (ii) of a "*particularly* serious crime" and (iii) "constitutes a danger to the community of the United

States."  8 U.S.C. § 1158(b)(2)(A)(ii).  The Rule's categorical bars involve crimes that are not serious, let alone *particularly* serious; they are largely unrelated to whether the asylum-seeker poses a danger to the community; and some of them apply even absent a conviction.

58.    Some of these new categorical bars also fail to provide fair notice of what convictions—or what suspicions, based on which materials—will trigger them.  For example, the Rule says that an asylum-seeker is barred if they are convicted of *any* crime the adjudicator "knows or has reason to believe" was committed in "support, promotion, or furtherance" of the activity of a criminal street gang.  The Rule does not explain these nebulous standards or otherwise cabin adjudicators' discretion in a way that would provide fair notice to asylum-seekers or stave off discriminatory or arbitrary enforcement.

### C.    Change in the Effect of Vacated, Modified, and Expunged Criminal Convictions

59.    The Rule presumes that criminal convictions remain effective (and thus trigger the asylum bars) despite any vacatur, expungement, or modification, if (i) the vacatur or modification order was entered after removal proceedings began or (ii) the applicant moved for the order more than a year after conviction or sentencing, even if the modification was made to correct constitutional or legal defects.  85 Fed. Reg. at 67259–60 (to be codified at 8 C.F.R. §§ 208.13(c)(7)–(8), 1208.13(c)(7)–(8)).  The Rule places the burden on the asylum-seeker to establish that any modification to their underlying criminal conviction or sentence was not made for rehabilitative purposes or "for purposes of ameliorating the immigration consequences of the [underlying] conviction or sentence."  *Id.*  Moreover, the Rule empowers immigration adjudicators to consider evidence beyond the face of the court order itself to determine the ruling state judge's "purposes."  *Id.* at 67259–60 (to be codified at 8 C.F.R. §§ 208.13(c)(9), 1208.13(c)(9)).

60.    This portion of the Rule does not reflect a permissible interpretation of the INA.  Treating as valid a conviction vacated to correct a constitutional error is "so foreign, so antithetical, to the long-standing principles underlying our criminal justice system and our notions of due process that we would expect Congress to have spoken very clearly if it intended to effect such results."  *Alim v. Gonzales*, 446 F.3d 1239, 1249 (11th Cir. 2006).  Yet Congress nowhere authorized defendants to do

so.  Nor does the INA contain the clear statement that courts require before they allow federal agencies to upset the federal–state balance.  Indeed, this novel regime may violate the Full Faith and Credit Act, 28 U.S.C. § 1738, and the underlying constitutional guarantees thereof, U.S. Const. art. IV, § 1.

**D.     Elimination of Automatic Review of Discretionary Denials of Asylum**

61.     Finally, the Rule eliminates 8 C.F.R. §§ 208.16(e) and 1208.16(e), which provide for automatic review of a discretionary denial of asylum where an asylum-seeker is denied asylum but granted withholding of removal under 8 U.S.C. § 1231(b)(3), and the refugee is thereby precluded from reuniting with their spouse and/or children and from obtaining permanent residence or citizenship.

62.     If asylum is granted to an applicant, they may petition to have their spouse and/or minor children admitted as derivative asylees.  8 U.S.C. § 1158(b)(3).  Recipients of withholding of removal are not able to do the same.  *Id.*; *see also id.* § 1231.  As a result of the Rule, an asylum applicant who is denied asylum solely in the exercise of discretion, but who is then granted withholding of removal, will not receive automatic review of that decision, even if it results in the inability to petition for their spouse and/or minor children.

63.     Defendants have failed to offer any satisfactory justification for this fundamental change in policy.  The Rule relies primarily on unsubstantiated assertions that §§ 208.16(e) and 1208.16(e) are "inefficient, unclear, and unnecessary," 85 Fed. Reg. 67251; however, instead of adding detail or clarifying language to resolve any such confusion, Defendants have eliminated these regulatory provisions entirely.  In so doing, Defendants have not articulated any explanation for the provisions' alleged inefficiency.  Nor have they articulated a basis for depriving applicants who are not granted asylum solely in the exercise of discretion but who later win withholding of removal the opportunity to achieve family unity.  Family unity has been a cornerstone of U.S. immigration policy for decades, and this change would prevent spouses and children from finding safety in the United States.

**IV.    Defendant Chad Wolf Lacked Authority to Propose or Issue the Rule**

64.     The Rule was jointly issued by DHS and DOJ and sets forth parallel provisions to amend 8 C.F.R. pt. 208, which operationalizes immigration laws administered by DHS (including

those that govern affirmative asylum applications), and 8 C.F.R. pt. 1208, which operationalizes immigration laws administered by the EOIR, a sub-agency of DOJ.

65.    Insofar as the Rule relies on authority from DHS—including to implement amendments to 8 C.F.R. pt. 208—the Rule was not validly issued because Defendant Chad Wolf lacked authority under the Appointments Clause of the U.S. Constitution, the HSA, and/or the FVRA to propose or issue the Rule.

66.    On August 14, 2020, the U.S. Government Accountability Office ("GAO") issued a decision stating that the "incorrect official assumed the title of Acting Secretary" when former DHS Secretary Kirstjen Nielsen resigned in April 2019 and that "subsequent amendments to the order of succession made by [Kevin McAleenan] were invalid and officials who assumed their positions under such amendments, including Chad Wolf and Kenneth Cuccinelli, were named by reference to an invalid order of succession."  GAO, *Decision in the Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* 1 (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf ("GAO Decision").

67.    While the GAO decision focused primarily on the validity of Wolf's appointment pursuant to the HSA, Wolf's claim to the role of Acting Secretary fares no better under the FVRA.  The FVRA states that a person serving as an acting officer may serve in the office "for no longer than 210 days *beginning on the date the vacancy occurs*," except under narrow circumstances.  5 U.S.C. § 3346(a)(1) (emphasis added).

68.    The relevant vacancy occurred, at the latest, by  April 10, 2019, the purported effective date of former DHS Secretary Kirstjen Nielsen's resignation.

69.    Kevin McAleenan resigned, and Wolf purported to assume the role of Acting Secretary of DHS, on November 13, 2019—217 days after April 10, 2019, and thus beyond the 210-day period set forth in the FVRA.  Accordingly, Wolf's assumption of the role of Acting Secretary was not lawful pursuant to the FVRA.

70.     On December 19, 2019, DOJ and DHS jointly released the proposed Rule.  *See* 84 Fed. Reg. 69640.  Wolf signed the proposal, notwithstanding that—as the GAO Decision explained—he lacked the authority to do so.

71.     On October 21, 2020, the Departments jointly released the final Rule.  Defendant Wolf signed the final Rule under his purported authority as Acting Secretary of DHS.  Specifically, Wolf, "having reviewed and approved" the Rule, "delegated the authority to electronically sign" the Rule to Chad R. Mizelle (the Senior Official Performing the Duties of the General Counsel for DHS).

72.     Because Defendant Wolf is not validly serving as Acting Secretary of DHS, he could not lawfully exercise the authority of that office, including by proposing or issuing the Rule.  To the extent the Rule relies on authority from DHS, including to amend the procedures for asylum and withholding of removal set forth at 8 C.F.R. pt. 208, the Rule must be set aside.

## V.     <u>The Rule Is Motivated by Racial Animus</u>

73.     Additionally, the Rule is motivated by racial, ethnic, and national origin-based animus.  As a threshold matter, the Rule reflects that DHS and DOJ received a number of comments expressing concern about the ways in which it would disproportionately harm non-white immigrants.  *See, e.g.*, 85 Fed. Reg. at 67223 (describing comments about the disparate racial impact that a bar based on allegations that an offense was committed in "furtherance of criminal street gang activity" may have).  The Departments did not refute these comments, did not meaningfully engage with them, and did not revise the Rule to address these concerns.  Rather, the Rule includes only a hollow assertion that "[t]o the extent that the rule disproportionally affects any group referenced by the commenters, any such impact is beyond the scope of this rule, as this rule was not drafted with discriminatory intent toward any group, and the provisions of the rule apply equally to all applicants for asylum."  *Id.* at 67226.  This statement is belied by countless racist, xenophobic comments made by members of the Trump Administration and by the outsized impact that the Rule will have—and that DHS and DOJ were made aware the Rule will have—on non-white immigrants.

74.     Statements by President Trump and others lay bare the Trump Administration's discriminatory motives against non-white, non-European immigrants, especially those accused or convicted of criminal conduct.  The statements below are just a few examples; there are many more.

75.     President Trump launched his 2016 campaign by raising the specter of violence from supposedly criminal immigrants.  When he announced his presidential bid, he infamously said: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with [*sic*] us.  They're bringing drugs.  They're bringing crime.  They're rapists.  And some, I assume, are good people."  *Donald Trump Announces a Presidential Bid*, Wash. Post (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/.   Three days later, he repeated a variation of the same statement on Twitter, writing, "Druggies, drug dealers, rapists and killers are coming across the southern border.  When will the U.S. get smart and stop this travesty?" President Donald Trump (@realDonaldTrump), Twitter (June 19, 2015, 10:22 PM), https://twitter.com/realdonaldtrump/status/612083064945180672.

76.     President Trump has continued to make similar remarks throughout his presidency.  For example, in 2018, reports circulated that a group of several thousand asylum-seekers were approaching the U.S.-Mexico border seeking refuge.  President Trump tweeted about the event repeatedly over the next several weeks, writing:

- "I am watching the Democrat Party led . . . assault on our country by Guatemala, Honduras and El Salvador, whose leaders are doing little to stop this large flow of people, INCLUDING MANY CRIMINALS, from entering Mexico to U.S....."  President Donald Trump (@realDonaldTrump), Twitter (Oct. 18, 2018, 7:25 AM), https://twitter.com/realdonaldtrump/status/1052883467430694912.

- "Sadly, it looks like Mexico's Police and Military are unable to stop the Caravan heading to the Southern Border of the United States.  Criminals and unknown Middle Easterners are mixed in.  I have alerted Border Patrol and Military that this is a National Emergy [*sic*].  Must change laws!"  President Donald Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 8:37 AM), https://twitter.com/realdonaldtrump/status/1054351078328885248.

- "There are a lot of CRIMINALS in the Caravan.  We will stop them.  Catch and Detain! Judicial Activism, by people who know nothing about security and the safety of our citizens,

1
2
3

is putting our country in great danger.  Not good!"  President Donald Trump (@real-DonaldTrump), Twitter (Nov. 21, 2018, 4:42 PM), https://twitter.com/realdonaldtrump/status/1065359825654169600.

4
5
6
7
8
9
10
11

77.     Around the same time, President Trump aired a midterm campaign ad that featured footage of an undocumented Mexican immigrant, Luis Bracamontes, bragging about his murder of two police officers in California.  It juxtaposed footage of Bracamontes with images of the so-called "migrant caravan" moving toward the United States border—even though Bracamontes had nothing to do with the caravan—and stated:  "Dangerous illegal criminals like cop-killer Luis Bracamontes don't care about our laws."  Michael M. Grynbaum & Niraj Chokshi, *Even Fox News Stops Running Trump Caravan Ad Criticized as Racist*, N.Y. Times (Nov. 5, 2018), https://www.ny-times.com/2018/11/05/us/politics/nbc-caravan-advertisement.html.

12
13
14
15
16
17
18
19
20
21
22

78.     President Trump's attempts to paint immigrants (particularly those from Central America) as gang members and dangerous people continued into the weeks surrounding the publication of the proposed Rule in 2019.  Less than two weeks before the proposed Rule was published in the Federal Register, President Trump posted a tweet reading in part, "Without the horror show that is the Radical Left . . . the Border would be closed to the evil of Drugs, Gangs and all other problems!"  President Donald Trump (@realDonaldTrump), Twitter (Dec. 6, 2019, 11:00 AM), https://twitter.com/realdonaldtrump/status/1202981139155210241.  The day after the proposed Rule was published, President Trump took to Twitter to share a link to an article about a number of purported gang-related arrests in New York, writing, "We are getting MS-13 gang members, and many other people that shouldn't be here, out of our Country!"  President Donald Trump (@realDonaldTrump), Twitter (Dec. 20, 2019, 5:41 PM), https://twitter.com/realDonaldTrump/status/1208155412962447360.

23
24
25
26
27

79.     Similarly, during a presidential debate held on October 22, 2020—the day after the final Rule was published—President Trump described noncitizen children separated from their parents at the U.S. border as having been brought to the United States "through cartels and through coyotes and through gangs."  ABC News, *Biden and Trump Discuss Their Views on Immigration Policy*, YouTube (Oct. 22, 2020), https://www.youtube.com/watch?v=DZ9vIzVZjS4.  In criticizing "catch

28

and release" (the practice of allowing asylum-seekers to await their immigration hearings in the community rather than detaining them), President Trump further stated, "Catch and release is a disaster. A murderer would come in, a rapist would come in, a very bad person would come in . . . we [would] have to release them into *our* country." *Id.* (emphasis added).

80.    These comments are part of a broader pattern of racist and xenophobic remarks made by members of the Trump Administration.  For example, in 2017, at the height of litigation surrounding the Administration's travel bans, President Trump tweeted, "That's right, we need a TRAVEL BAN for certain DANGEROUS countries, not some politically correct term that won't help us protect our people!"   President Donald Trump (@realDonaldTrump), Twitter (June 5, 2017, 9:20 PM), https://twitter.com/realdonaldtrump/status/871899511525961728.   A few months later, he tweeted again, "The travel ban into the United States should be far larger, tougher and more specific – but stupidly, that would not be politically correct!"  President Donald Trump (@realDonaldTrump), Twitter (Sept. 15, 2017, 6:54 AM), https://twitter.com/realdonaldtrump/status/908645126146265090.

81.    Around January 2018, President Trump met with lawmakers to discuss protections for immigrants from Haiti, El Salvador, and African countries.  According to those present at the meeting, the President asked, "Why are we having all these people from shithole countries come here?"  Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan. 12, 2018),      https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.  He also suggested that the United States should allow more people from countries like Norway instead.  Alan Fram & Jonathan Lemire, *Trump:  Why Allow Immigrants from 'Shithole    Countries'?*,    AP    News    (Jan.    12,    2018),    https://apnews.com/fdda2ff0b877416c8ae1c1a77a3cc425/Trump:-Why-allow-immigrants-from-'shithole-countries'.

82.    Similarly, Defendant Kenneth Cuccinelli has made a number of troubling comments about immigrants and their families.  During a radio interview in 2012, Cuccinelli criticized Washington, D.C.'s pest control policy, stating that "it is worse than our immigration policy," and noting, "You can't break up rat families.  Or raccoons, and all the rest, and you can't even kill 'em."  Nick Wing,

*Ken Cuccinelli Once Compared Immigration Policy to Pest Control, Exterminating Rats*, Huffington Post (July 26, 2013), https://www.huffpost.com/entry/ken-cuccinelli-immigration-rats_n_3658064?guccounter=1.

83.     More recently, in August 2019, Cuccinelli was asked whether he agreed that the words of Emma Lazarus appearing on the Statue of Liberty, "Give me your tired, your poor," are part of the American ethos.  Devan Cole & Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make Case for Limiting Immigration*, CNN (Aug. 13, 2019), https://www.cnn.com/2019/08/13/politics/ken-cuccinelli-statue-of-liberty/index.html.  He responded, "They certainly are:  'Give me your tired and your poor who can stand on their own two feet and who will not become a public charge.'"  *Id.*  He later noted that Lazarus's poem "was referring back to people coming from Europe."  *Id.*

84.     The Trump Administration has repeatedly used racist rhetoric to cast non-white immigrants as dangerous and to curb their entry into the United States.  These statements leave no doubt about the racial, ethnic, and national origin-based animus driving the new Rule, which will dramatically expand bars to asylum eligibility for people convicted—or simply *accused*—of various relatively minor offenses.  The Rule will cause significant harm to non-white immigrants.

85.     It is well documented that current law enforcement policies harm immigrants of color.  For example, as a result of racially biased policing practices, Black people are disproportionately likely to be arrested, convicted, and imprisoned in the United States.  *See* NYU Law Immigrant Rights Clinic, *The State of Black Immigrants Part II:  Black Immigrants in the Mass Criminalization System* at 15, https://www.immigrationresearch.org/system/files/sobi-fullreport-jan22.pdf (last visited Nov. 1, 2020) (noting in part, "These disparities exist even when crime rates are the same; for example, although Blacks and whites use marijuana at roughly equal rates, Black people are 3.7 times more likely than whites to be arrested for marijuana possession.").

86.     The harm caused by racial bias in policing is further compounded by the immigration consequences that often accompany arrests and convictions.  *See, e.g.*, Elizabeth Aranda & Elizabeth Vaquera, *Racism, the Immigration Enforcement Regime, and the Implications for Racial Inequality in the Lives of Undocumented Young Adults*, Soc. of Race and Ethnicity 88 (2015) ("[W]ith the exception of Salvadorans, Latino and black immigrants are disproportionately represented among those being

apprehended, detained, and deported from the country when compared with their shares of the undoc-umented population"); *see also* Refugee and Immigrant Ctr. for Educ. and Legal Servs., *Black Immigrant Lives Are Under Attack*, https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/ (last visited Nov. 1, 2020) ("While 7% of non-citizens in the U.S. are Black, they make up a full 20% of those facing deportation on criminal grounds[.]").

87.     The specific nature of several of the newly imposed bars to asylum eligibility is likely to augment these harms.  For example, the use of convictions for bringing in or harboring certain aliens as a bar to asylum eligibility will be particularly harmful to people entering the country through the Southwest border of the United States.  In fiscal year 2019, 3,487 convictions for "alien smuggling" offenses were reported to the United States Sentencing Commission.  *See* U.S. Sentencing Comm'n, *Quick Facts: Alien Smuggling Offenses* (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Alien_Smuggling_FY19.pdf.  A staggering 94% of those convictions were brought in districts along the Southwest border.  *Id.*  Data from CBP reflects that in the same year, nearly 88% of single adults apprehended at the Southwest border—i.e., the population of people statistically most likely to be convicted for smuggling or harboring illegal aliens—came from the same four countries:  El Salvador, Guatemala, Honduras, and Mexico.  *See* U.S. Customs and Border Prot., *U.S. Border Patrol Southwest Border Apprehensions by Sector:  Fiscal Year 2019* (Nov. 14, 2019), https://www.cbp.gov/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions-fy2019.

88.     Similarly, barring asylum where a person is convicted of a crime that the adjudicator knows or "has reason to believe" was committed in furtherance of gang activity—an extremely low standard—will harm asylum-seekers from communities of color.[2]  *See* 85 Fed. Reg. at 67258–59 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(ii), 1208.13(c)(6)(ii)).  For example, the Boston Regional Intelligence Center ("BRIC") maintains a "Gang Assessment Database" that tracks suspected gang members.  *See* Bos. Police Dep't, *Rule 335 – Gang Assessment Database* (Mar. 23, 2017),

---

[2] This harm will only be exacerbated by the Executive Order on Combating Race and Sex Stereotyping issued by President Trump on September 22, 2020.  The Executive Order prohibits, in part, training on implicit bias for certain federal employees, characterizing such training—perplexingly—as "promot[ing] race or sex stereotyping or scapegoating."  As a result of the interplay between the Rule and this Executive Order, adjudicators will now be empowered to make a subjective determination about whether an offense was committed in furtherance of gang activity without the benefit of any training on the impacts of implicit bias on such determinations.

https://bpdnews.com/rules-and-procedures. People are added to the BRIC Gang Assessment Database based on a highly flawed point system, pursuant to which law enforcement officers assign people a "score" based on various purported markers for gang involvement. *Id.* at 2 (describing the "10 Point Verification System"). The point system allows law enforcement officers to assign points to a person even where there is no allegation that the person has engaged in criminal activity. For example, a person may receive points against them based on nicknames, attire, "drawings," tattoos, or "[w]alking, eating, recreating, communicating, or otherwise associating with" a purported gang member—even if that person is a friend, neighbor, or family member. *Id.* at 3, 5–6. Data from the Boston Police Department reflects that 66% of the people tracked in the BRIC Gang Assessment Database are Black, 24% are Latino, and just 2% are white, notwithstanding that Black and Latino residents make up 25% and 20% of the Boston population, respectively. Phillip Marcelo*, Inside The Boston Police Gang Database*, WGBH (July 30, 2019), https://www.wgbh.org/news/local-news/2019/07/30/inside-the-boston-police-gang-database.

89.     Moreover, available data suggest that empowering immigration adjudicators to determine whether there is "reason to believe" that a crime was gang-related is likely to result in harm to people from communities of color, who are often labeled by police as gang-involved even when they are not. Government audits of gang databases have routinely found significant error rates. *See, e.g.*, Cal. State Auditor, The CalGang Criminal Intelligence System 2 (Aug. 2016), https://www.auditor.ca.gov/pdfs/reports/2015-130.pdf (finding that 23% of the CalGang designations reviewed lacked adequate support); City of Chi. Office of Inspector Gen., Review of the Chicago Police Department's "Gang Database" 2 (Apr. 2019), https://igchicago.org/wp-content/uploads/2019/04/OIG-CPD-Gang-Database-Review.pdf (finding that over 15,000 people designated as gang members in Chicago's gang database "had no specific gang membership listed and no reason provided for why the individual was listed as a gang member").

90.     By way of additional example, in April 2016, officers in New York arrested 120 people in the Bronx (the "Bronx 120") in what was then-described as the "largest gang takedown in New York City history." Babe Howell & Priscilla Bustamante, CUNY Sch. Of Law, *Report on the Bronx*

*120 Mass "Gang" Prosecution* 4 (Apr. 2019), https://bronx120.report/.  Notwithstanding this charac-terization, approximately half of those arrested were not ultimately alleged to be gang members in the indictment.  *Id.* at 9.  88% of those arrested were Black, and not one was identified as white.  *Id.* at 13.  The outcome of the Bronx 120 incident is emblematic of both the impact that a bar to asylum eligibility based on purported gang activity will have on non-white immigrants and the unreliable nature of sub-jective determinations of whether conduct is gang-related.

91.     The Rule does not articulate a standard to be applied in determining whether an offense was committed in furtherance of gang activity, nor even criteria for what should prompt such an in-quiry.  Under the Rule, a conviction for something minor, like disorderly conduct, could lead to de-portation of a young person to a country where they face persecution when paired with even minimal evidence or a mere allegation of gang involvement.  This outcome is manifestly unjust and exemplifies the harm the Rule will cause asylum-seekers from low-income communities and communities of color.

## VI.     The Rule's Harm to Plaintiffs

92.     Plaintiffs are non-profit organizations that provide direct representation to, and advo-cate on behalf of, immigrant communities, and provide training and educational programming to im-migration practitioners and/or immigrant communities.  The significant changes the Rule will im-pose—including by creating several new categorical bars to asylum eligibility and eroding protections set forth in the INA—will harm Plaintiffs in a number of ways.

### A.     The Rule Frustrates Plaintiffs' Missions

93.     Each of the Plaintiffs shares a mission to support and provide legal services to as many low income and vulnerable noncitizens as possible, including to asylum-seekers.  For example, CLINIC operates the nation's largest network of nonprofit legal immigration services programs as part of its mission to embrace the Gospel value of welcoming the stranger by promoting the dignity and protecting the rights of immigrants.  The Rule frustrates Plaintiffs' missions by establishing a number of new barriers to asylum eligibility that will make it far more difficult for Plaintiffs to serve their clients—many of whom the Rule will render ineligible for asylum.

94.     For CLINIC (and the nearly 400 affiliated immigration programs in its network), the Rule will impede its core aims of "welcoming the stranger" and protecting the rights of immigrants by

categorically excluding many from asylum eligibility, leaving CLINIC and its affiliates without a means of securing a pathway to permanent residency for many of the people it serves.

95.     Moreover, the Rule allows immigration adjudicators to undertake a number of subjective inquiries, including determining whether an offense was committed in furtherance of the activity of a criminal street gang, whether a person engaged in battery or extreme cruelty involving a domestic relationship (even if it did not result in a conviction), and the purposes for which a prior conviction was vacated or modified.  These changes will increase the proportion of resource-intensive cases arising within the communities Plaintiffs serve, necessarily reducing the number of asylum-seekers Plaintiffs are able to assist and causing ripple effects felt throughout Plaintiffs' organizations.

96.     For example, in 2019 alone, CAIR Coalition was able to provide 4,090 individual consultations for adults and children in detention to ascertain their asylum options, spending 4,000 hours conducting jail visits.  As a result of the sweeping impact of the new Rule, each consultation is likely to take significantly more time—indeed, CAIR Coalition estimates that the number of adults its staff could prepare during each jail visit will be reduced by a third.

97.     Similarly, the number of intake interviews CAIR Coalition has traditionally been able to provide is driven in part by its ability to rely on appropriately supervised legal assistants and law student volunteers to conduct such interviews.  Given the increased complexity resulting from the new Rule (including the need to assess the applicability of a number of new categorical bars to asylum eligibility and the impact of any prior convictions an asylum-seeker may have), CAIR Coalition anticipates that it will no longer be able to staff client intake interviews with legal assistant or law student volunteers.  The new need to staff such interviews with CAIR Coalition staff members and volunteer lawyers will (i) significantly reduce the overall amount of intake interviews CAIR Coalition is able to conduct and (ii) reduce CAIR Coalition's capacity to assist as many clients as possible in other aspects of the asylum process, including in trial-stage proceedings.

98.     The Rule will significantly reduce the amount of cases in which Plaintiffs can support and represent asylum-seekers going forward, as their attorneys will need to expend an increased amount of time and resources on each client's case to establish eligibility under the Rule (including, among other things, the time and resources required to obtain and assess criminal conviction and arrest

1    records, prepare for and put on a "mini-trial" in immigration court regarding whether there is a "reason

2    to believe" an offense was committed in furtherance of gang activity or is a domestic violence offense,

3    and engage expert witnesses).  The Plaintiffs will also need to expend an increased amount of time

4    and resources on the cases of applicants who are barred from asylum by the Rule and bear the burden

5    to meet a higher standard under withholding of removal than asylum.

6    99.    The ability of the Plaintiffs to take on new clients will also be harmed by the Rule's

7    impact on family members of the asylum-seekers the Plaintiffs serve, many of whom are parents who

8    fled their home countries with their young children.  If a parent who flees to the United States is subject

9    to one of the Rule's new eligibility bars, and thereby forced to seek withholding of removal, they will

10   no longer be able to ensure that their child or spouse can also obtain protection in the United States,

11   regardless of whether the parent is granted withholding of removal.  The de facto decoupling of family

12   cases contemplated by the new Rule will likely result in increased family separation, as family mem-

13   bers who no longer qualify for asylum are removed, but will also have a significant impact on the

14   Plaintiffs, who will be faced with an increased number of cases where they must assist each family

15   member in seeking asylum as a principal, rather than being able to rely on derivative status, at the

16   same time as they face a decrease in the number of resources they have available.

17   100.    The resulting reduction in the number of people Plaintiffs are able to support will frus-

18   trate their missions, including by directly conflicting with CAIR Coalition's mission to expand access

19   to counsel within the population it serves.

20   **B.    The Rule Diverts Resources from Plaintiffs' Core Programs**

21   101.    The Rule is also causing and will continue to cause Plaintiffs to divert resources from

22   their core programs.  Before the effective date of the Rule, each Plaintiff will need to expend signifi-

23   cant resources—including by diverting resources from its core programs—to analyze and interpret the

24   Rule, create new informational materials and resources to address the Rule, and provide training to its

25   staff and, in the case of CLINIC, its large network of affiliates, almost half of whom provide asylum

26   representation.  For example, CAIR Coalition will need to update its client database and intake process

27   to add questions and responses relevant to the new Rule's asylum eligibility bars, a process that will

28

take days of staff member time and require deferring previously planned updates due to cost and timing reasons.

102.    Additionally, several of the Plaintiffs provide training and support to other practitioners and/or directly to immigrant communities, which will require them to expend substantial resources in the near term on tasks such as drafting client alerts, designing and hosting webinars, and updating any website content concerning asylum eligibility.  For example, Pangea provides Know Your Rights presentations to hundreds of immigrants each year, and DSCS conducts advocacy work for ICE detainees and assists undocumented youth with DACA registrations.  In 2020, Pangea piloted a program that provides in-depth assistance to *pro se* asylum applicants that has already served ten clients, while CAIR Coalition hosted 182 workshops for *pro se* asylum-seekers and provided *pro se* assistance to 241 individuals in 2019 alone.  To continue offering these programs, Pangea, CAIR Coalition, and DSCS will need to analyze the new Rule, revise their training materials, and create new curricula promptly.  They will also need to spend more staff time on each workshop to explain the complexities of the rule to *pro se* asylum-seekers.

103.    Likewise, all Plaintiffs anticipate needing to rework their existing training materials to ensure their staff understand the Rule's new eligibility and processing framework requirements, and especially on the complexities of criminal law, which will take a tremendous amount of time and workforce effort that the Plaintiffs cannot afford to spare.

104.    Moreover, because CLINIC is the hub of the largest network of immigration legal services providers in the nation, its affiliate programs will look to it to provide real-time guidance regarding the new Rule, including through in-depth articles and news alerts and multi-platform social media announcements.  Among other tools, CLINIC provides its affiliates with access to the "Ask-the-Experts" portal on its website, which allows attorneys and accredited representatives at its affiliates to submit inquiries regarding individual immigration matters.  In order to ensure that it is adequately prepared to field questions from affiliate legal staff about the impact of the Rule on asylum-seeking clients, CLINIC will need to devote substantial resources to training its legal staff.  If a submitted question is broadly applicable, CLINIC staff may also spend additional weeks developing trainings or written resources designed to answer it.  Indeed, due to the substantial number of questions CLINIC

has already received from its affiliates regarding the intersection of criminal law and immigration law, CLINIC hired a consulting attorney who specializes in this area to respond specifically to such inquiries. Because the attorney charges CLINIC an hourly rate, CLINIC expects to realize a negative impact to its budget, especially given the number of queries the organization will continue to receive regarding the implications of the new Rule alone.

105.    Each of the tasks and expenses necessary to respond to the new Rule—including those described above—requires Plaintiffs to divert their finite resources from other aspects of the programs they provide. As a result of the Rule, Plaintiffs anticipate the need to make changes including reallocating staffing, devoting less time to advocacy projects and community initiatives, and taking on fewer cases.

**C.    The Rule Jeopardizes Plaintiffs' Funding**

106.    The Rule will also jeopardize Plaintiffs' funding. Plaintiffs rely in part on grants from sources such as states, counties, and foundations. Such grants are often conditioned on Plaintiffs' ability to achieve certain targets, such as a total number of clients served or asylum applications filed each year. In 2020, grants of this nature constituted approximately 65% of Pangea's budget and approximately 95% of the budget for DSCS's Deportation Defense & Legal Advocacy Project. CAIR Coalition, too, receives funding from grants and foundations tied to the number of adults CAIR Coalition is able to represent each year. Because the Rule will necessarily reduce the number of Plaintiffs' clients eligible for asylum, and will require Plaintiffs to spend significantly more time on each client's case, Plaintiffs are unlikely to be able to comply with existing funding requirements—and thus expect to lose a substantial amount of their funding once this Rule goes into effect.

107.    Similarly, CAIR Coalition has established pro bono partnerships with a number of law firms with which it places asylum cases. In addition to providing pro bono legal services, many of these law firms donate money to CAIR Coalition, often in exchange for opportunities to provide direct assistance with and staffing of asylum matters. Currently, law firm donations of this kind account for close to 5% of CAIR Coalition's annual budget. Under the new Rule, fewer of CAIR Coalition's clients will be eligible for asylum, as a result of which it will necessarily have fewer asylum cases to place with partner law firms. CAIR Coalition expects that this shift could result in a decrease in the

amount of law firm donations it receives.  CLINIC expects to see a similar decrease in law firm dona-

tions in connection with the impact the Rule may have on its BIA Pro Bono Project, through which

CLINIC matches vulnerable immigrants with pro bono counsel to defend their cases before the Board

of Immigration Appeals ("BIA").

108.    Even under the best of circumstances, the loss of a significant source of funding could

have devastating impacts for the Plaintiffs.  With respect to the new Rule, the harm caused by the loss

of funding will be further exacerbated by the concomitant increase in demands on Plaintiffs' resources.

**D.    The Rule Harms the Populations Plaintiffs Serve**

109.    In addition to the harmful outcomes described above, if permitted to take effect, the

Rule will cause serious harm to the populations Plaintiffs serve.

110.    To start, the harm caused by the Rule will be exacerbated by the manner in which it

intersects with other rules recently issued by DHS.  For example:  the Rule will impose a categorical

bar against asylum-seekers convicted of "possession or use of an identification document, authentica-

tion feature, or false identification document without lawful authority." 85 Fed. Reg. at 67258–60 (to

be codified at 8 C.F.R. §§ 208.13(c)(6)(vi), 1208.13(c)(6)(vi)).  However, this Rule follows close be-

hind a separate rule entitled Asylum Application, Interview, and Employment Authorization for Ap-

plicants, published on June 26, 2020, which prohibits asylum-seekers from applying for work author-

ization until at least one year after submission of an asylum application.  *See* 85 Fed. Reg. 38532,

38626 (June 26, 2020) ("EAD Rule").  At the same time, asylum-seekers are generally not eligible to

receive federal public benefits until they are granted asylum.  *Id.* at 38566.  As a result of the EAD

Rule, asylum-seekers will be unable to work *or* to receive federal public benefits for a prolonged

period of time, which may drive some to seek and/or use false identification out of necessity.  This

harm will be further exacerbated by the ongoing unemployment and health impacts of the coronavirus

pandemic.  Under the Rule, even people seeking false identification as a means of survival (due to the

impacts of the EAD Rule) may be barred from asylum eligibility as a result.

111.    Moreover, the Rule will summarily exclude many people from asylum eligibility in

violation of U.S. asylum laws, decades of asylum jurisprudence, and international treaty obligations.

As a direct result of the Rule, thousands of people fleeing persecution, violence, and even death in

their countries of origin will be ineligible for the life-saving relief asylum is meant to provide, in direct contravention of the Refugee Convention and the Refugee Act of 1980. The Rule will also impact their family members, who will be rendered ineligible for derivative asylum and family reunification. Moreover, the Rule will leave thousands ineligible for adjustment of status based on asylum, as a result of which—even if they are permitted to remain in the United States—they will no longer have a pathway to citizenship.

112. The Rule will disproportionately impact the most vulnerable people who are fleeing persecution and seeking asylum. Asylum-seekers are often impacted by the trauma of persecution, ranging from torture, rape, and severe bodily injury to death threats, pervasive discrimination, imprisonment, and subjugation of their beliefs and identities. These populations have also often suffered the additional traumas of witnessing the persecution of family members and friends; harrowing journeys from their countries of origin to the United States; and even facing additional discrimination and hardship once they arrive here.

113. The trauma refugees and asylum-seekers have faced frequently manifests as mental illness, and studies suggest that more than one out of every three asylum-seekers struggles with depression, anxiety, and/or post-traumatic stress disorder. Giulia Turrini et al., *Common Mental Disorders in Asylum Seekers and Refugees: Umbrella Review of Prevalence and Intervention Studies*, 11 Int'l J. Mental Health Sys. 51 (Aug. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/. In many cases, the behavior that serves as the basis for criminal convictions is a direct result of these traumatic experiences. For example, asylum-seekers, and even asylum-seeking unaccompanied children, often have little or no access to mental health care and may turn to self-medication through drugs or alcohol.[3] This behavior, in turn, places them at high risk for substance-related convictions; *e.g.*, convictions for drug possession or driving under the influence. Under the new Rule, any such conviction could bar someone from eligibility for asylum, even if it were a one-time offense and the applicant demonstrated extensive evidence of rehabilitation. The Rule eliminates

---

[3] Moreover, many may refrain from seeking help due to concerns about the applicability of the Inadmissibility on Public Charge Grounds Rule (the "Public Charge Rule"). *See* 84 Fed. Reg. 41292 (Aug. 14, 2019). Under the Public Charge Rule, a person may be rendered inadmissible to the United States if they are "likely at any time to become a public charge." *Id.* at 41294; *see also* 8 U.S.C. § 1182(a)(4).

1   immigration adjudicators' discretion to consider the underlying circumstances of these types of of-

2   fenses and thus to treat these asylum-seekers with the compassion that trauma-related addiction issues

3   deserve.

4          114.    The Rule's categorical bar against asylum-seekers convicted or accused of acts of do-

5   mestic violence will similarly impact the most vulnerable applicants.  While plaintiffs unequivocally

6   condemn domestic violence in all of its forms, the Rule as drafted fails to account for the complex

7   dynamics of such violence and its treatment under criminal law—a failure that puts even survivors of

8   domestic violence at risk.  For example, in many states, any incident involving intimate partners, or

9   parents and children, is treated as a domestic violence case from the outset, regardless of circumstance.

10   *See* Kari Hong & Philip L. Torrey, *What* Matter of Soram *Got Wrong:  "Child Abuse" Crimes that*

11   *May Trigger Deportation Are Constantly Evolving and Even Target Good Parents*, Harv. Civ. Rts.

12   Civ. L. Rev. (Oct. 15, 2019) ("In 1999, Minnesota enacted legislation requiring a child's exposure and

13   proximity to domestic violence to be 'a statutorily specified form of reportable child abuse and ne-

14   glect.' . . . 'Parents, primarily mothers, who themselves were victims of domestic violence thus be-

15   came the subjects of neglect reports based on their alleged failure to protect their children from expo-

16   sure to the violence.'").  Additionally, instances of domestic violence often result in the arrest of *both*

17   the victim and the perpetrator, and victims may face criminal charges for harming perpetrators in self-

18   defense.  Even if these charges are eventually dropped, the sweeping language of the Rule could render

19   these people ineligible for asylum simply as a result of having been charged in the first instance.

20          115.    As the Rule reflects, commenters noted that this portion of the Rule could be particu-

21   larly harmful for populations with overlapping vulnerabilities, such as members of the LGBTQ com-

22   munity (who are prone to experience inaction by law enforcement in response to domestic violence

23   and may be more likely to have both partners arrested) and people with limited English proficiency,

24   who may be unable to describe the abuse to police officers.  85 Fed. Reg. at 67228.  Critically, the

25   Rule permits immigration adjudicators to determine that a person is ineligible for asylum if the adju-

26   dicator "knows or has reason to believe" that the applicant engaged in battery or extreme cruelty in-

27   volving a domestic relationship even if the alleged conduct did not result in a conviction.  *Id.* at 67258–

28   60.  The Rule does not articulate a standard to be applied in making such determinations, nor even

criteria for what should prompt such an inquiry.  The end result is that any asylum-seeker arrested for any offense, whether convicted or not, could be subject to a nebulous, subjective inquiry—without fair notice as to what such an inquiry may entail—and could be barred from asylum eligibility as a result. The exceptionally far reach of this portion of the Rule harms asylum-seekers by leaving them vulnerable to assessments of their culpability by an immigration adjudicator without the same level of due process protection they would receive in court.  Moreover, such assessments may involve the adjudicator's consideration of alleged conduct that is years old and that never resulted in a conviction.

116.   Although the Rule purportedly provides an exception from the domestic violence bar for survivors who "have been battered or subjected to extreme cruelty and aliens who were not the primary perpetrators of violence in the relationship," *id.* at 67230, this weak exemption does not mitigate the damage done by the Rule.  Even for those who may seek to avail themselves of this exception, the reality is that many abusers isolate, intimidate, and control their victims in ways that will make it very difficult for survivors to produce evidence of being "battered or subjected to extreme cruelty" such that they can successfully rely upon the exception.

117.   Similarly, using convictions for "harboring certain aliens" as a bar to asylum eligibility disproportionately targets the most vulnerable.  When asylum-seekers flee, their family members are often also in danger and being persecuted; thus, asylum-seekers may help their relatives seek safety in the United States as well.  Under the new Rule, asylum-seekers will be rendered ineligible for asylum if they assist loved ones in dire circumstances.  For example, parents who are trying to help their minor children escape life-threatening situations—something virtually every parent would feel compelled to do—will be barred from asylum eligibility.   *Id.* at 67258–59 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(i), 1208.13(c)(6)(i)).

118.   The Rule's provision on conviction and sentence vacaturs and modifications will also lead to the expulsion of countless people.  The Rule will bar many people who no longer have convictions at all by creating a temporally-based presumption that orders vacating, expunging, or modifying criminal convictions were entered "for the purpose of ameliorating immigration consequences" if the relevant order was entered (i) after the initiation of removal proceedings or (ii) more than one year after the date of the original order of conviction or sentencing.   *Id.* at 67259–60 (to be codified at 8

C.F.R. §§ 208.13(c)(7)–(8), 1208.13(c)(7)–(8)).  The Rule will thus preclude from asylum eligibility countless people who have appropriately had their sentences modified because of their rehabilitation and/or their efforts to overcome addiction or escape from domestic violence or gang pressure—people who have turned their lives around and who do not pose any danger to their community.

119.    This provision will also impact those immigrants whose convictions and sentences are procedurally or substantively defective, but who only realized that fact (i) more than one year after they were convicted or sentenced and/or (ii) at the time of their immigration proceedings, or those who lack the legal resources and evidence to ensure that the change to their criminal record conforms to this contorted interpretation of the law.  As with other provisions of the Rule, this provision will dis-proportionately impact the most vulnerable asylum-seekers:  those who are low income, who speak the least English, or who have limited education and resources.  Moreover, the Rule will unlawfully deny essential protection to asylum-seekers by refusing to give full faith and credit to valid criminal court decisions and allowing an adjudicator to "look beyond the face of" any such court order to determine the purpose for which it was issued.  *Id*. at 67259–60.

120.    The Rule's rescission of automatic review of discretionary asylum denials under 8 C.F.R. §§ 208.16(e) and § 1208.16(e) will also have a devastating impact on the families of asylum-seekers.  People will face the impossible choice of either abandoning their spouse and children or risking return to a country where their lives or freedom would be threatened in order to reunite.  Those spouses and children may also face persecution themselves.  This provision—like all the others set forth in the Rule—will thus leave more vulnerable people unprotected, particularly if those spouses and children lack the resources or are otherwise unable to travel to the United States and apply for asylum independently.  The Rule contravenes the principles of family cohesion and unification that underpin United States immigration law, that have been part of our country's tradition since its founding, and that were first codified more than fifty years ago in 1965 and later expanded in 1980.  *See* Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 911; *see also* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

121.    Jointly, the three provisions of this Rule will upend the United States' entire regime for asylum protection.  It will place thousands of bona fide refugees in peril of persecution, bodily harm,

and even death.  The Rule violates our country's obligations under international and domestic law and runs counter to our country's proud history and tradition of providing refuge for the oppressed.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**The Rule is not in accordance with law, or is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under the INA and the APA**

122.    Plaintiffs incorporate and reallege the allegations above.

123.    The APA requires a court to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)–(C).

124.    The Rule's new categorical eligibility bars exceed the Attorney General's authority to set further conditions and limitations on asylum eligibility and conflict with the text, structure, and history of the INA's asylum provisions.  The only domestic crimes that render a refugee ineligible for asylum under Section 1158 are "particularly serious crimes"—that is, those crimes that (i) correspond to an actual conviction, rather than suspicions or accusations; (ii) are "*particularly* serious"; and (iii) reflect a danger to the community.  *See* 8 U.S.C. § 1158(b)(2)(A)(ii) (emphasis added).  Likewise, the other statutory eligibility bars (apart from the firm-resettlement bar, which is irrelevant here) involve serious conduct that renders someone a danger to others or to the nation.

125.    The Rule's new categorical bars, by contrast, sweep in offenses that are not serious— let alone particularly serious—and do not suggest a danger to others or to the community.  Some of them are also triggered by mere "reason to believe" that domestic criminal conduct occurred or had certain characteristics, a dynamic found nowhere in the asylum statute.  The bars are thus not "consistent with" the statutory scheme, as required by the sole provision on which the Rule relies for its authority.  *Id*. § 1158(b)(2)(C).  For the same reasons, they conflict with the governing statutory language.

126.    The Rule also conflicts with Section 1158 because categorical bars to asylum eligibility are inconsistent with the Refugee Convention, as incorporated by the INA.  "Where fairly possible, a United States statute is to be construed as not to conflict with international law or with an international

agreement with the U.S." *Serra v. Lappin*, 600 F.3d 1191, 1198 (9th Cir. 2010) (alteration omitted) (quoting *Munoz v. Ashcroft*, 339 F.3d 950, 958 (9th Cir. 2003)). The Refugee Convention—relevant portions of which are incorporated into the INA—requires an individualized analysis of whether a particular crime disqualifies an asylum applicant, no matter which of the criminal bars is at issue. The government's proposed categorical bars simply ignore that requirement, and raise concerns about compliance with the United States' non-refoulement obligation. The bars are accordingly in conflict with the INA and the treaty obligations it effectuates.

127.    The Rule's presumption that criminal convictions vacated to cure substantive or constitutional errors remain valid based purely on when they were vacated has no basis in the INA, conflicts with basic due process principles, and fails to give full faith and credit to state court rulings.

## SECOND CLAIM FOR RELIEF

### The Rule is arbitrary, capricious, or an abuse of discretion under the APA

128.    Plaintiffs incorporate and reallege the allegations above.

129.    Under the APA, an agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

130.    The agency's broad shift away from individualized, multi-factor asylum determinations and toward categorical bars—in violation of the Refugee Convention—represents a dramatic and unexplained break. In *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), the BIA concluded that asylum determinations call for an examination of "the totality of the circumstances" in which no one factor "should be considered in such a way that the practical effect is to deny relief in virtually all cases," *id.* at 473, and "the danger of persecution should generally outweigh all but the most egregious of adverse factors," *id.* at 474; *see also In re Kasinga*, 21 I. & N. Dec. 357, 367–68 (BIA 1996) (applying *Matter of Pula* and holding same); *Hussam F. v. Sessions*, 897 F.3d 707, 718–19 (6th Cir. 2018) (per curiam) (summarizing BIA precedent and concluding that "failure to disclose that . . . passport was not obtained in the usual manner" could not "be reasonably termed the 'most egregious' of adverse factors"). Nevertheless, the agency has departed from this precedent by determining that the conditions that are the subject of each of its categorical bars are the only factors of importance in any circumstance in which

one of those conditions is satisfied.  The agency explanation does not account for the sudden unim-
portance of the expressed considerations that drove its prior policy for decades, does not provide a
reasoned explanation for disregarding such policy, does not meaningfully discuss the consequences of
this shift on populations relevant to Congress's statutory purpose, and does not adequately explain
what statutorily grounded objectives would be achieved by the shift.  The agency's failure to consider
these and other significant factors renders the Rule arbitrary and capricious.  *See Encino Motorcars,
LLC v. Navarro*, 136 S. Ct. 2117, 2125–27 (2016).

131.    The Rule is also arbitrary and capricious because DHS and DOJ have failed to "exam-
ine[ ] [the] relevant data" in issuing it.  *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311–12 (D.C. Cir.
2018) (alterations in original) (quoting *Carus Chem. Co. v. EPA*, 395 F.3d 434, 441 (D.C. Cir. 2005)).
The agencies do not fully consider the effects of the Rule on asylum-seekers, as they fail to give any
kind of estimate of the additional number or percentage of asylum-seekers who would be barred from
asylum based on the mandatory bars and their serious reliance interests in the agencies' prior position.[4]
*See Encino Motorcars*, 136 S. Ct. at 2125–27.  DHS and DOJ instead unhelpfully note that "[t]he
[proposed] expansion of the mandatory bars for asylum would likely result in fewer asylum grants
annually" and allege that they are unable to provide any estimates of "the expected decrease" "because
asylum applications are inherently fact-specific, and because there may be multiple bases for denying
an asylum application."  85 Fed. Reg. at 67256.  The Departments further admit that "the full extent
of the impacts [of the Rule] . . . is unclear."  *Id.* at 67257.

132.    The Rule also fails to offer any substantial evidence or reasoned explanation to support
how its provisions will serve the stated purposes of more predictable results and judicial efficiency.
*See* 85 Fed. Reg. at 67209 (asserting that the Rule will "create a more streamlined and predictable
approach that will increase efficiency in immigration adjudications" (citing 84 Fed. Reg. at 69647)).
In the absence of evidence to the contrary, it is difficult to see how proposing a categorical bar based

---

[4] *See* 84 Fed. Reg. at 69658.  DHS and DOJ provide an estimate of the number of cases that will be
impacted by a section of the proposed Rule that removes the provisions at 8 CFR §§ 208.16(e),
1208.16(e) regarding reconsideration of discretionary denials of asylum but do not provide any
estimate for the number of cases affected by these other changes.  *See also* 85 Fed. Reg. at 67256–57
(noting the absence of data).

on circumstances described in unreliable documents—including police reports, rap sheets, and probation reports—rather than actual convictions could avoid creating additional burdens for the already overwhelmed immigration court system by tasking adjudicators with additional, highly nuanced, resource-intensive assessments. The agency's failure to provide any evidence or explanation addressing how efficiency would be improved by a requirement for adjudicators to engage in mini-trials on the applicability of categorical criminal bars is arbitrary and capricious. *See Moncrieffe v. Holder*, 133 S.Ct. 1678, 1690 (2013) (describing how the avoidance of "minitrials" "promotes judicial and administrative efficiency").

133.    The Rule fails to offer any substantial evidence or reasoned explanation to support its conclusions relating to the "seriousness" or "dangerousness" of the offenses (or conduct) that are the subject of its automatic bars. For instance, the Rule's reliance on criminal history, recidivism, and their connection to "dangerousness" in general establishes nothing about the danger to the community associated with the specific offense of illegal reentry. *See* 84 Fed. Reg. at 69648; 85 Fed. Reg. at 67243. The same is true of the Rule's reliance on decade-old, non-targeted studies to support its bar on offenses involving criminal street gangs. 84 Fed. Reg. at 69649–50; 85 Fed. Reg. at 67225. This absence of substantial evidence or reasoned explanation renders the rule arbitrary and capricious.

134.    Finally, the Rule also entirely fails to consider numerous important aspects of the problem. The Rule repeatedly states that material and foreseeable impacts associated with its novel constraints on asylum eligibility were "outside the scope of the rulemaking"—including the effect of the rule on the asylum system itself. *See* 85 Fed. Reg. 67244–45. The agency's failure to acknowledge and consider these matters renders the rule arbitrary and capricious.

### THIRD CLAIM FOR RELIEF

### Defendants failed to provide adequate notice and opportunity to comment under the APA

135.    Plaintiffs incorporate and reallege the allegations above.

136.    The APA requires a court to hold unlawful and set aside agency action that is arbitrary, capricious, or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

137.    The APA also requires an agency proposing a new rule to provide public notice and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).

138.    The 30-day notice-and-comment period provided was inadequate in light of the proposed rule's evident complexity and potential for far-reaching impact.  The Rule was also part of an improperly staggered rulemaking process, which prevented the public from understanding and commenting on the final regulatory regime.  Further, the Agency did not respond adequately to public comments, repeatedly declaring that foreseeable impacts of the Rule—including "humanitarian concerns for asylum seekers" facing deportation to countries in which they face persecution—were "outside of the scope of this rulemaking."  85 Fed. Reg. at 67243.  The Rule is therefore invalid.

### FOURTH CLAIM FOR RELIEF

**Defendant Wolf lacked the authority to issue the Rule under the Appointments Clause of the U.S. Constitution, the Homeland Security Act, and the Federal Vacancies Reform Act**

139.    Plaintiffs incorporate and reallege the allegations above.

140.    The Secretary of Homeland Security is a principal officer of the United States whose appointment requires Presidential nomination and Senate confirmation.  *See* 6 U.S.C. § 112(a)(1); *see also* U.S. Const. art. II, § 2, cl. 2.

141.    Defendant Chad Wolf purports to serve as the Acting Secretary of DHS; however, he has not been confirmed by the Senate to hold that office and has no valid legal claim to the role.

142.    The HSA mandates that, in the event of the "absence, disability, or vacancy in office" of the DHS Secretary, the Deputy DHS Secretary is first in the order of succession, followed by the Under Secretary for Management.  6 U.S.C. § 113(g)(1).  After the Deputy Secretary and the Under Secretary for Management, the HSA allows the Secretary to "designate such other officers of the Department in further order of succession to serve as acting secretary."  *Id.* § 113(g)(2).

143.    Although Wolf's predecessor, Kevin McAleenan, attempted to invoke § 113(g)(2) to amend the order of succession on November 8, 2019, the GAO has since issued a decision concluding that the "incorrect official assumed the title of Acting Secretary at [the time of former Secretary Nielsen's resignation]" and that "subsequent amendments to the order of succession made by [McAleenan]

were invalid and officials who assumed their positions under such amendments, including Chad Wolf and Kenneth Cuccinelli, were named by reference to an invalid order of succession." *See* GAO Decision 1.  The GAO's interpretation is correct.

144.    Wolf's claim to the role of Acting Secretary fares no better under the FVRA.  The FVRA states that a person serving as an acting officer may serve in the office "for no longer than 210 days *beginning on the date the vacancy occurs*," except under narrow circumstances.  5 U.S.C. § 3346(a)(1) (emphasis added).

145.    The relevant vacancy occurred, at the latest, by April 10, 2019, the purported effective date of former Secretary Kirstjen Nielsen's resignation.

146.    Wolf purported to assume the role of Acting Secretary of DHS on November 13, 2019, after the 210-day period set forth in the FVRA had passed.  Both the proposed and final Rule were also issued well beyond the statutory time limit.

147.    Because Defendant Wolf is performing the functions and duties of the Secretary of DHS without having been confirmed by the Senate, in reliance on invalid orders of succession, and far past the 210-day period set forth in the FVRA, he did not have valid authority to issue the Rule under the Appointments Clause of the U.S. Constitution, the HSA, and/or the FVRA.

148.    The Rule, to the extent it relies on authority from DHS and/or Defendant Wolf, is thus invalid and should not be permitted to take effect.

### FIFTH CLAIM FOR RELIEF

### The Rule violates the Regulatory Flexibility Act

149.    Plaintiffs incorporate and reallege the allegations above.

150.    The RFA requires federal administrative agencies to analyze the effects on "small entities" of rules they promulgate, and to publish initial and final versions of those analyses.  *See* 5 U.S.C. §§ 603–604.

151.    Under the RFA, the court may set aside, stay, or grant other relief for agency action in violation of the RFA, *id.* §§ 601, 604, 605(b), 608(b), and 610.  *Id.* 5 U.S.C. § 611.

152.    The Rule is a "rule" within the meaning of the RFA.  *Id.* § 601(2).

153.   The RFA defines "small entities" to include small businesses, small nonprofit organizations, and small governmental jurisdictions.  *Id.* § 601(6).  Each of the Plaintiffs is a "small entity" within the meaning of the RFA and is directly affected by the Rule, which, among other things, will require them to devote substantial resources to addressing the new restrictions on asylum eligibility imposed by the Rule and will jeopardize their funding.

154.   DOJ and DHS's regulatory flexibility analysis does not comply with the RFA because DOJ and DHS concluded that the Rule will not have a significant impact on small entities.  In lieu of an adequate explanation, the Rule simply asserts that "[o]nly individuals, rather than entities, are eligible to apply for asylum," a statement that wholly ignores the impact of the Rule on Plaintiffs and other organizations that serve asylum-seekers.  85 Fed. Reg. at 67255.

155.   The RFA requires DOJ and DHS to describe and estimate the number of small entities that would be affected by the Rule.  5 U.S.C. § 604(a)(4).  DOJ and DHS did not do so and refused to include small nonprofit organizations affected by the Rule.  85 Fed. Reg. at 67255.

156.   The RFA requires DOJ and DHS to describe "the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the [Rule] and why each one of the other significant alternatives to the [Rule] considered by the agency which affect the impact on small entities was rejected."  5 U.S.C. § 604(a)(6).  Again, DOJ and DHS failed to describe any such steps and failed to consider the "stated objectives of applicable statutes," *id.*, including the INA, the Refugee Act, and the HSA.  85 Fed. Reg. at 67255.

157.   As a result of the foregoing, the Rule's regulatory flexibility analysis does not comply with the RFA.

158.   The Rule's regulatory flexibility analysis is also arbitrary and capricious because it does not reflect reasoned decision-making and fails to support its conclusions with substantial evidence.

159.   The Rule is therefore unlawful and must be set aside.  *See* 5 U.S.C. § 611; *id.* § 706.

**SIXTH CLAIM FOR RELIEF**

1

**The Rule violates the Fifth Amendment's Due Process Clause**

2

160.    Plaintiffs incorporate and reallege the allegations above.

3

161.    The Due Process Clause of the Fifth Amendment prohibits laws and regulations that

4 fail to "give ordinary people fair warning about what the law demands of them."  *United States v.*

5 *Davis*, 139 S. Ct. 2319, 2323 (2019).  The requirement of fair notice applies in civil contexts just as in

6 criminal.  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212–13 (2018) (plurality opinion).  Given the "grave

7 nature of deportation," the "most exacting vagueness standard" applies in the immigration context."

8 *Id*. at 1213.

9

162.    The Rule is unconstitutionally vague.  It fails to provide fair notice of the conduct that

10 may result in a bar to asylum eligibility and invites arbitrary enforcement by immigration adjudicators.

11

163.    For example, the Rule suggests that an asylum-seeker may be barred from eligibility if

12 they are convicted of *any* crime the adjudicator "knows or has reason to believe" was committed in

13 support, promotion, or furtherance of the activity of a criminal street gang.  85 Fed. Reg. at 67258–59

14 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(ii), 1208.13(c)(6)(ii)).  The Rule provides no description

15 of what behaviors, associations, or statuses could lead an adjudicator to find that an asylum-seeker

16 was involved in gang activity or that their conduct was in furtherance of the activity of a criminal street

17 gang.  Nor does it provide any guidance on the types of offenses or circumstances that may trigger

18 such an inquiry, or any limitation on the evidence to which an adjudicator may look to make such a

19 determination.

20

164.    Similarly, the Rule allows adjudicators to determine whether a conviction amounts to

21 a domestic violence offense (for purposes of triggering an asylum eligibility bar) and, even where the

22 asylum-seeker has *not* been convicted, allows the adjudicator to determine that an asylum-seeker is

23 barred from eligibility if the adjudicator "knows or has reason to believe" that the person engaged in

24 battery or extreme cruelty involving a domestic relationship.  *Id*. at 67258–60 (to be codified at 8

25 C.F.R. §§ 208.13(c)(6)(vii), 1208.13(c)(6)(vii)).  The Rule again provides no guidance for this assess-

26 ment, including when such an assessment is appropriate; what factors should be considered in deter-

27 mining whether conduct amounts to domestic violence; and what standard should be applied.

28

**SEVENTH CLAIM FOR RELIEF**

43

**The Rule violates the Fifth Amendment's Equal Protection Component**

165.    Plaintiffs incorporate and reallege the allegations above.

166.    The equal protection component of the Fifth Amendment prohibits Defendants from denying equal protection of laws to persons residing in the United States.  Official actions that reflect a racially discriminatory intent or purpose thus violate the Fifth Amendment's equal protection component.  *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954), *supplemented sub. nom. Brown v. Bd. of Educ.*, 349 U.S. 294 (1955); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).  Even facially neutral policies and practices are unconstitutional if they reflect racial animus or discrimination.  *Id.* at 266.

167.    In the instant case, Defendants violated the Fifth Amendment because they acted with a discriminatory purpose based on race, ethnicity, and national origin in issuing the Rule.  The Rule thus violates the guarantee of equal protection under the Fifth Amendment.

168.    Defendants' discriminatory intent in promulgating this Rule is evinced by, among other things, the Rule's impact on non-white immigrants and DHS and DOJ's complete dismissal of and failure to contend with this disproportionate impact as falling "beyond the scope of [the] rule."  85 Fed. Reg. at 67226.

169.    Moreover, the Rule was promulgated following years of repeated comments by President Trump and others within the Trump Administration reflecting racial, ethnic, and national origin-based animus, including referring to immigrants as "rapists," "druggies," and "killers" and comparing immigrants to rats and other pests.

170.     Defendants have failed to articulate a compelling governmental interest justifying the promulgation of the Rule, and they have not tailored the Rule to address any legitimate interest.

171.    Plaintiffs and the communities they serve will suffer severe harm as a result of the implementation of the Rule.

## JURY DEMAND

172.    Plaintiffs demand a jury trial on all counts triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

A.      Hold unlawful and set aside the Rule under 5 U.S.C. § 706(2);

B.      Declare the Rule arbitrary, capricious, an abuse of discretion, otherwise not in accord-ance with law, and without observance of procedure as required by law, in violation of the APA, INA, and RFA;

C.      Declare the Rule invalid for being co-issued by Defendant Chad Wolf, who lacked the authority to do so pursuant to the Appointments Clause of the United States Constitution, the HSA, and the FVRA;

D.      Declare the Rule unconstitutional for violating the Due Process and Equal Protection guarantees of the Fifth Amendment of the United States Constitution;

E.      Enter a preliminary and permanent nationwide injunction, without bond, enjoining De-fendants, their officials, agents, employees, and assigns from implementing or enforcing the Rule;

F.      Stay the implementation or enforcement of the Rule;

G.      Award Plaintiffs reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

H.      Grant any other and further relief this Court may deem just and proper.

Respectfully submitted,

DATE:  November 2, 2020
Sirine Shebaya (*pro hac vice* forthcoming)
sirine@nipnlg.org
Cristina Velez*
*Not admitted in DC; working remotely from and barred in New York
cristina@nipnlg.org (*pro hac vice* forthcoming)
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue N.W., Suite 200
Washington, D.C. 20007
Telephone:  +1 202 656 4788
Facsimile:  +1 617 227 5495

Sabrineh Ardalan (*pro hac vice* forthcoming)
sardalan@law.harvard.edu
Philip L. Torrey (*pro hac vice* forthcoming)
ptorrey@law.harvard.edu
Sameer Ahmed, SBN 319609
sahmed@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE

_/s/ Naomi A. Igra_____
Naomi A. Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone:  +1 415 772 1200
Facsimile:  +1 415 772 7400

Tobias S. Loss-Eaton
(*pro hac vice* forthcoming)
tlosseaton@sidley.com
Chike B. Croslin (*pro hac vice* forthcoming)
ccroslin@sidley.com
Alice A. Wang (*pro hac vice* forthcoming)
alice.wang@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  +1 202 736 8000
Facsimile:  +1 202 736 8711

CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone:  +1 617 384 7504
Facsimile:  +1 617 495 8595

Leila Kang (*pro hac vice* forthcoming)
leila@immdefense.org
Nabilah Siddiquee (*pro hac vice* forthcoming)
nabilah@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone:  +1 646 762 8428

Jack W. Pirozzolo (*pro hac vice* forthcoming)
jpirozzolo@sidley.com
Kenyon C. Hall (*pro hac vice* forthcoming)
kenyon.hall@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Telephone:  +1 617 223 0300
Facsimile:  +1 617 223 0301

*Attorneys for Plaintiffs*