Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Sirine Shebaya (*pro hac vice* pending)
sirine@nipnlg.org
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788

Sabrineh Ardalan (*pro hac vice* pending)
sardalan@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504

Leila Kang (*pro hac vice* pending)
leila@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

*Attorneys for Plaintiffs*

(Additional counsel listed on signature page)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO

| | |
|---|---|
| PANGEA LEGAL SERVICES, *et al.*, | Case No. 3:20-cv-7721 |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY *et al.*, | Assigned to Hon. |
| Defendants. | Date:<br>Time:<br>Courtroom: |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................2

        A.      The INA's asylum provisions. ...................................................................2

        B.      The proposed Rule. ....................................................................................3

        C.      The final Rule. ...........................................................................................4

III.    LEGAL STANDARD ...........................................................................................5

IV.     ARGUMENT ........................................................................................................5

        A.      Plaintiffs are likely to succeed on the merits. ...........................................5

                1.      The Rule conflicts with the governing INA provisions. ..................5

                        a.      The Rule's new categorical asylum bars are not "consistent with" Congress's carefully drawn regime. ........................................................5

                        b.      The Rule's treatment of conviction vacaturs or modifications is inconsistent with the statute. ................................................................13

                2.      Some of the Rule's categorical bars are unconstitutionally vague. .................15

                3.      The Rule is arbitrary and capricious. ............................................16

                        a.      The Rule does not articulate a satisfactory explanation..................16

                        b.      The rule fails to consider important aspects of the problem.............17

                4.      The Rule is procedurally invalid....................................................21

                        a.      The Rule was adopted without sufficient opportunity for public comment...........................................................................21

                        b.      The Rule does not properly analyze its impacts on federalism. ..........22

                        c.      The Rule does not comply with the Regulatory Flexibility Act. .........23

        B.      The Rule will irreparably harm Plaintiffs and the people they serve. ........................24

        C.      The equities and the public interest favor injunctive relief..........................25

        D.      The Court should enjoin the Rule's national implementation. ...................25

V.      CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Commonwealth,*
    46 S.W.3d 572 (Ky. Ct. App. 2000) ........................................................................ 7

*Alim v. Gonzales,*
    446 F.3d 1239 (11th Cir. 2006) .............................................................................. 14

*Alphonsus v. Holder,*
    705 F.3d 1031 (9th Cir. 2013) ............................................................................ 6, 7

*Am. Fed. of Labor v. Chertoff,*
    552 F. Supp. 2d 999 (N.D. Cal. 2007) .................................................................. 23

*Am. Min. Congress v. EPA,*
    965 F.2d 759 (9th Cir. 1992) ................................................................................ 18

*Barapind v. Reno,*
    225 F.3d 1100 (9th Cir. 2000) ................................................................................ 3

*Cal. ex rel. Becerra v. Dep't of Interior,*
    381 F. Supp. 3d 1153 (N.D. Cal. 2019) ................................................................ 21

*Cal. PUC v. FERC,*
    879 F.3d 966 (9th Cir. 2018) ................................................................................ 16

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ................................................................................ 22

*Delgado v. Holder,*
    648 F.3d 1095 (9th Cir. 2011) (en banc) ............................................................. 10

*Doe #1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) .............................................................................. 25

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) (*EBSC I*) .............................................................. 9, 25

*E. Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020) (*EBSC II*) ........................................................ *passim*

*E. Bay Sanctuary Covenant v. Barr,*
    964 F.3d 832 (9th Cir. 2020) (*EBSC III*) ........................................................ *passim*

*Guerrero v. Whitaker,*
    908 F.3d 541, 544 (9th Cir. 2018) .................................................................. 6, 7, 15

*Idaho Farm Bureau Fed'n v. Babitt*,
  58 F.3d 1392 (9th Cir. 1995) ................................................................................ 21

*In re L-S-*,
  22 I. & N. Dec. 645 (BIA 1999) ............................................................................... 9

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ............................................................................................... 13

*Johnson v. United States*,
  135 S. Ct. 2551 (2015) ........................................................................................... 15

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ............................................................................................... 16

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................................... 25

*M.R. v. Dreyfus*,
  735 F.3d 1058 (9th Cir. 2011) ................................................................................. 5

*Matthews v. State*,
  296 So. 3d 887 (Ala. Crim. App. 2019) .................................................................. 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................... 16, 18

*N.C. Growers' Ass'n v. UFW*,
  702 F.3d 755 (4th Cir. 2012) ................................................................................. 21

*NAM v. Dep't of Def.*,
  138 S. Ct. 617 (2018) ............................................................................................. 11

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) ............................................................................................... 14

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011) ......................................................................... 19, 21

*Matter of Pula*,
  19 I. & N. Dec. 467 (BIA 1987) ....................................................................... 16, 17

*R-S-C v. Sessions*,
  869 F.3d 1176 (10th Cir. 2017) ............................................................................... 7

*Ramirez-Castro v. INS*,
  287 F.3d 1172 (9th Cir. 2002) ............................................................................... 14

*San Francisco v. USCIS*,
  408 F. Supp. 3d 1057 (N.D. Cal. 2019) .................................................................. 5

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) ................................................................................................. 15

*Solid Waste Agency of N. Cook. Cnty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ..................................................................................................... 15

*Specialty Equip. Market Ass'n v. Ruckelshaus*,
  720 F.2d 124 (D.C. Cir. 1983) ..................................................................................... 18

*State v. Hittle*,
  257 Neb. 344 (Neb. 1999) .............................................................................................. 7

*United States v. Davis*,
  139 S. Ct. 2319 (2019) ................................................................................................. 15

*Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*,
  435 U.S. 519 (1978) ..................................................................................................... 21

*Waits v. State*,
  56 S.W.3d 894 (Tex. App. 2001) ................................................................................... 8

**Statutes**

5 U.S.C. §§ 603–604 ........................................................................................................... 23

  § 604(a)(6) ..................................................................................................................... 23

  § 705 ................................................................................................................................ 5

  § 706(2) ............................................................................................................................ 5

8 U.S.C. § 1101(a)(42)(A) ..................................................................................................... 3

  § 1101(a)(43)(B) .............................................................................................................. 8

  § 1101(a)(43)(B), (F), (K), (U) ...................................................................................... 12

  § 1101(a)(43)(N) .......................................................................................................... 6, 9

  § 1101(a)(43)(O) ............................................................................................................ 10

  § 1158(a)(1) ..................................................................................................................... 9

  § 1158(b)(1)(A) ................................................................................................................ 3

  § 1158(b)(2)(A) ............................................................................................................ 1, 6

  § 1158(b)(2)(A)(i)–(vi) .................................................................................................... 3

  § 1158(b)(2)(A)(ii) ........................................................................................................... 6

  § 1158(b)(2)(A)(ii), (b)(2)(B)(i) .................................................................................... 11

  § 1158(b)(2)(A)(vi) .......................................................................................................... 6

  § 1158(b)(2)(B)(i) ............................................................................................................ 6

  § 1158(b)(2)(B)(ii) ..................................................................................................... 4, 13

§ 1158(b)(2)(C) ..................................................................................................... 6, 7

§ 1227(a)(7)(A) ......................................................................................................... 11

§ 1231(b)(3) ............................................................................................................... 4

§ 1252(a)(2)(A)(iii) ............................................................................................. 19, 20

§ 1324(a) ................................................................................................................. 3, 9

§ 1324(a)(1)(A), (a)(2) .............................................................................................. 9

§ 1326 .................................................................................................................... 3, 10

§ 1326(a) ..................................................................................................................... 9

16 U.S.C. § 3373(d)(1) ...................................................................................................... 8

18 U.S.C. § 521(c) ........................................................................................................... 12

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ................................................... 3

Ariz. Rev. Stat. § 13-1604(A)(2), (B)(1)(a) ...................................................................... 8

Fla. Stat. § 784.048(1)(d), (2) ......................................................................................... 12

Md. Code, Alco. Bev. § 6-307 ........................................................................................... 8

Md. Crim. L. § 3-804(a)(l) ................................................................................................ 8

§ 7-203 ................................................................................................... 8

Nev. Rev. Stat. 453.411(1), (3)(a) ..................................................................................... 8

**Regulatory Materials**

8 C.F.R. § 208.16(e) ........................................................................................................... 4

*Procedures for Asylum and Bars to Asylum Eligibility,*
84 Fed. Reg. 69640 (Dec. 19, 2020) .................................................................*passim*

*Procedures for Asylum and Bars to Asylum Eligibility,*
85 Fed. Reg. 67202 (Oct. 21, 2020) ..................................................................*passim*

*Asylum Application, Interview, and Employment Authorization for Applicants,*
84 Fed. Reg. 62396 (Nov. 14, 2019) ........................................................................ 19

*Asylum Application, Interview, and Employment Authorization for Applicants,*
85 Fed. Reg. 38532 (June 26, 2020) ........................................................................ 19

*U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain
Other Immigration Benefit Request Requirements,*
85 Fed. Reg. 4243 (Jan. 24, 2020) ........................................................................... 21

*Procedures for Asylum and Withholding of Removal, Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 36264 (June 15, 2020)..................................................................19

**Legislative and Executive Materials**

H.R. Conf. Rep. 96-781, at 17–18 (1980)...................................................................3

H.R. Rep. No. 96-608 (1979).................................................................................3, 6

*Exec. Order No. 13132*, 64 Fed. Reg. 43,255 (Aug. 10, 1999) .............................23

*Exec. Order No. 13563*, 76 Fed. Reg. 3,821 (Jan. 21, 2011) ................................21

*Exec. Order No. 12866*, 58 Fed. Reg. 190 (Sept. 30, 1993) .................................21

**Other Authorities**

Immig. Legal Res. Ctr., *Deportation by any Means Necessary: How Immigration Officials are Labeling Immigrant Youth as Gang Members* (2018), https://bit.ly/31TBNSD ..............................................................................................12

U.S. Comm'n on Int'l Relig. Freedom, *Serious Flaws in U.S. Treatment of Asylum Seekers in Expedited Removal: Children Especially Harmed* (Aug. 2, 2016), https://bit.ly/2Jeaigc ...................................................................................................20

UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* (July 2007), http://www.unhcr.org/enus/576d237f7.pdf ................8

UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979), https://www.unhcr.org/4d93528a9.pdf ...........................................................7

HARVEY SILVERGLATE, THREE FELONIES A DAY (2011)..........................................8

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

## I.      INTRODUCTION

The Departments of Justice and Homeland Security have—without proper procedure or reasoned decision-making—issued a Rule that conflicts directly with the statutory asylum regime.  The Rule would impose several new categorical bars to asylum eligibility based on convictions for—or mere suspicion of—generally minor criminal offenses.  A second misdemeanor conviction for marijuana possession; a misdemeanor conviction for using a fake ID; a misdemeanor vandalism conviction for graffiti that the government has "reason to believe" is a gang sign; literally *any* felony, from driving with a suspended license to unlawfully exporting fish—all would now bar people from asylum in the United States, even if they could show a well-founded fear of persecution in their home countries.  The Rule also empowers asylum adjudicators to second-guess judges' reasons for vacating or modifying criminal convictions, and it removes regulations governing automatic reconsideration of discretionary asylum denials.  If allowed to take effect, these unprecedented changes will force countless people to return to countries where they will likely be beaten, tortured, or even killed.

The Rule violates the APA because it conflicts with the Immigration and Nationality Act (INA).  Consistent with the international obligations that undergird our asylum system, Congress in the INA made only narrow categories of people ineligible for asylum based on their conduct:  Those who have persecuted others, who have committed a "serious nonpolitical crime" abroad or been convicted of a "particularly serious crime," who are a "danger to the security of the United States," or who have engaged in terrorist activity.  8 U.S.C. § 1158(b)(2)(A).  These bars all address people "who pose a threat to society." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 846 (9th Cir. 2020) (*EBSC III*).  And any additional regulatory bars must be "consistent with" this "core principle." *Id*. at 848 (quoting 8 U.S.C. § 1158(b)(2)(C)).  The Rule's new bars flunk that test.  They address conduct that does not come close to the level Congress specified, and they are not remotely tailored to address dangerousness.  And apart from conclusory and unsupported assertions, Defendants do not really try to show otherwise.  Instead, they declare that these bars exclude people who show "a disregard for the societal values of the United States" and thus "should not be rewarded with asylum." 85 Fed. Reg. at 67225, 67242.  But that is not the statutory principle.  Nor is it the humanitarian commitment we made to refugees and other nations.  The Rule thus conflicts with Congress's carefully drawn asylum regime.

The Rule is unlawful for other reasons, too.  The INA provides no support for the presumption that state court orders vacating convictions to cure constitutional or substantive errors can be ignored because they actually have other purposes.  And some of the Rule's bars are so vague that they violate due process.  The Rule is also arbitrary and capricious:  It departs from longstanding agency precedent without adequate explanation and fails to offer substantial evidence to support its conclusions or to consider important aspects of the issues presented.  What is more, the Rule is procedurally invalid. Defendants provided just 30 days, spanning the 2019 end-of-year holidays, to comment on this major overhaul of the asylum system, which was also part of an improperly staggered rulemaking process. Nor does the Rule conduct the federalism or regulatory-flexibility analyses that federal law required.

Unless this Court stops the Rule from taking effect on November 20, it will cause immediate, irreparable harm.  Under the Rule, Plaintiffs—nonprofits that help low-income immigrants seek asylum and provide resources and training to others who help asylum-seekers—will be forced to "divert resources away from [their] core programs to address the new policy." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) (*EBSC II*).  They will have to devote significant resources to analyzing and interpreting the Rule, creating new informational materials and resources, and re-training thousands of people.  The Rule's changes will also make it more difficult (or impossible) for legal assistants and law students to perform tasks like client intake.  And it will cause "ongoing harms to [Plaintiffs'] organizational missions," *EBSC III*, 964 F.3d at 854, by increasing the time spent on each asylum seeker's case.  Plaintiffs will thus "provid[e] fewer services to fewer individuals," frustrating their missions.  *Id*.  For the same reasons, the Rule "directly threatens their standard caseload, and consequently, their caseload[] dependent funding." *Id*.  These harms are all irreparable.

The public interest and equities also favor relief.  There is a strong interest in preventing the wrongful removal and possible deaths of asylum-seekers, and in ensuring that the government follows the law.  The Court should enjoin or stay the Rule's effectiveness before November 20.

## II.    BACKGROUND

### A.    The INA's asylum provisions.

The U.S. asylum system is founded on the 1951 Convention Relating to the Status of Refugees (Refugee Convention) and the 1967 U.N. Protocol Relating to the Status of Refugees (1967 Protocol),

by way of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.  "In enacting the Refugee Act, Congress sought to bring United States refugee law into conformity with the" 1967 Protocol, which in turn "incorporates the substantive provisions" of the Refugee Convention.  *Barapind v. Reno*, 225 F.3d 1100, 1106 (9th Cir. 2000).  The Refugee Act amended the INA to include a formal process for people fearing persecution to apply for asylum, thus codifying our long tradition of "welcoming the oppressed of other nations."  H.R. Conf. Rep. 96-608, at 17 (1979).

Today, a person may seek asylum in the United States "because of persecution or a well-founded fear of persecution" on a protected ground.  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). Among other criteria, a person must not (i) have participated in the persecution of others; (ii) have "been convicted by a final judgment of a particularly serious crime," thus "constitut[ing] a danger to the community of the United States"; (iii) have committed a "serious nonpolitical crime outside the United States"; (iv) be "a danger to the security of the United States"; (v) have engaged in terrorist activity or been part of a terrorist group; or (vi) have "firmly resettled in another country."  *See id.* § 1158(b)(2)(A)(i)–(vi).  Congress codified these provisions "so that U.S. statutory law clearly reflects our legal obligations under international agreements."  *See* H.R. Rep. No. 96-608, at 18 (1979).

## B.  The proposed Rule.

Defendants proposed the Rule on December 19, 2019, just before the year-end holidays.  *See* 84 Fed. Reg. 69640.  The proposal included several new categorical bars to asylum eligibility:

(i)  any felony conviction under federal, state, or local law;

(ii)  any conviction for specified misdemeanor offenses, including any drug-related offense (except first-time marijuana possession), any offense involving possession or use of a false identification document, or unlawfully receiving public benefits.

(iii)  any conviction for "smuggling or harboring" non-citizens under 8 U.S.C. § 1324(a);

(iv)  any conviction for illegal reentry under 8 U.S.C. § 1326;

(v)  any conviction for a DUI offense that resulted in serious bodily injury or death, or for any second or subsequent DUI offense, even if no one was injured;

(vi)  any conviction for various family- or child-related offenses like stalking or child neglect, or any situation where there are "serious reasons for believing" the person engaged in "acts of battery or extreme cruelty" in a domestic relationship, even without a conviction; and

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

(vii)   any conviction for an offense the asylum adjudicator "knows *or has reason to believe* was committed in support, promotion, or furtherance of the activity of a criminal street gang."

84 Fed. Reg. at 69659–60 (emphasis added).  As authority for these new bars, the proposal invoked 8 U.S.C. § 1158(b)(2)(B)(ii), which allows the Attorney General to designate "offenses that will be considered" particularly serious crimes, and § 1158(b)(2)(C), which allows the Attorney General to "establish additional limitations and conditions, consistent with this section, under which [a noncitizen] shall be ineligible for asylum."  *See* 84 Fed. Reg. at 69643–44.

The proposed Rule also presumed that criminal convictions remain effective (and thus trigger the asylum bars) despite any vacatur, expungement, or modification, if (a) the vacatur or modification order was entered after removal proceedings began or (b) the applicant moved for the order more than a year after conviction or sentencing—even if the order was made to correct constitutional or substantive legal defects.  *See id.* at 69654–55.  It placed the burden on the asylum-seeker to establish that any vacatur or modification to the underlying conviction or sentence was not made for rehabilitative or "immigration purposes," and it empowered asylum adjudicators to consider evidence beyond the face of the court order to determine the ruling state judge's "purposes."  *See id.*

Finally, Defendants proposed to eliminate 8 C.F.R. § 208.16(e), which provides for automatic review of a discretionary denial of asylum where an asylum-seeker is denied asylum but granted withholding of removal under 8 U.S.C. § 1231(b)(3), and bona fide refugees are thus precluded from reuniting with their spouses and minor children.  *See id.* at 69656–57.

Defendants gave the public just 30 days to comment on these major changes, ending January 21, 2020.  *Id.* at 69640.  This already-brief period spanned Christmas Eve, Christmas Day, New Year's Day, Hanukkah, Kwanzaa, and the birthday of Martin Luther King, Jr.  The comment period thus included just 15 business days.  Even so, Defendants ignored requests to extend it.

**C.    The final Rule.**

The final Rule—published on October 21, with an effective date of November 20—is essentially unchanged from the proposal.  Defendants merely replaced the "serious reasons for believing" standard in the new suspicion-of-domestic-violence bar with "knows or has reason to believe."  *See*

85 Fed. Reg. at 67255.  Otherwise, they made only technical changes to the regulatory text.  And they largely brushed aside comments opposing the rule, declaring that many issues commenters raised "are outside the scope of this rulemaking."  *E.g.*, *id.* at 67226.  They also backpedaled on the authority for the Rule's new eligibility bars; while the proposal said most of the bars were supported by the Attorney General's power to designate new "particularly serious crimes," the final Rule disclaims that authority, even as it continues to argue that the new bars are "similar" to particularly serious crimes.  *Id.* at 67207.

## III.    LEGAL STANDARD

To obtain a temporary restraining order, a preliminary injunction, or a stay under 5 U.S.C. § 705, plaintiffs must show that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm" absent relief, (3) "the balance of equities tips in [their] favor," and (4) relief "is in the public interest."  *San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019).  Also, "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support" injunctive relief.  *Id.*; *M.R. v. Dreyfus*, 735 F.3d 1058, 1059 (9th Cir. 2011).

## IV.    ARGUMENT

### A.    Plaintiffs are likely to succeed on the merits.

The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious," "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2).  The Rule is invalid on all of these grounds.

#### 1.    The Rule conflicts with the governing INA provisions.

"Federal courts are 'the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.'"  *EBSC II*, 950 F.3d at 1272.  That is the case here, as the INA's text, structure, and history show.

##### a.    The Rule's new categorical asylum bars are not "consistent with" Congress's carefully drawn regime.

The Rule's new asylum bars, based on broad categories of criminal convictions or suspected conduct, conflict with the INA.  The final Rule asserts that these unprecedented measures are a valid exercise of the Attorney General's authority to "establish additional limitations and conditions" on

asylum eligibility. *E.g.*, 85 Fed. Reg. at 67236. But any such limitations must be "consistent with this section." 8 U.S.C. § 1158(b)(2)(C). The "words 'consistent with'" thus "limit[ ] the scope of that authority." *EBSC III*, 964 F.3d at 848. In fact, "Congress went out of its way to insert the 'consistent with' language," underscoring "the importance Congress attached to the constraints on the Attorney General's discretion to prescribe criteria for asylum eligibility." *Id.* at 849. Thus, any "additional limitations and conditions under § 1158(b)(2)(C) must be consistent with the core principle of" § 1158(b)'s statutory eligibility bars. *Id.* at 848.

That core principle is protecting "the safety of those already in the United States," *EBSC II*, 950 F.3d at 1275, by excluding people "who pose a threat to society," *EBSC III*, 964 F.3d at 846. The statutory eligibility bars apply if the asylum applicant (i) persecuted others, (ii) was convicted of "a particularly serious crime" and thus "constitutes a danger to the community of the United States"; (iii) "committed a serious nonpolitical crime outside the United States"; (iv) is "a danger to the security of the United States"; or (v) has engaged in terrorist activity.[1] 8 U.S.C. § 1158(b)(2)(A). Categorical exclusion is thus reserved for the most serious offenses: Terrorists, "war crim[inals]," and people who are explicitly "a danger" to domestic or national security are ineligible. *See* H.R. Rep. No. 96-608, at 10, 18. Consistent with that principle, a U.S. criminal conviction bars eligibility only if it is "particularly serious" and makes the applicant "a danger." 8 U.S.C. § 1158(b)(2)(A)(ii). And in this context, "*a 'serious' crime must be a capital crime or a very grave punishable act*." *Alphonsus v. Holder*, 705 F.3d 1031, 1038 (9th Cir. 2013) (quoting *Matter of Frentescu*, 18 I. & N. Dec. 244, 246 (BIA 1982), in turn quoting UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979)), *abrogated on other grounds*, *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018).[2]

This high standard is unsurprising. These INA provisions implement Article 33(2) of the Refugee Convention, which renders ineligible "a refugee whom there are reasonable grounds for regarding as a danger to the security of the country" or "who, having been convicted by a final judgment of

---

[1] The exception is § 1158(b)(2)(A)(vi)'s bar for people "firmly resettled" in other countries, who "do not need" asylum. *EBSC III*, 964 F.3d at 846–47. The Rule does not invoke § 1158(b)(2)(A)(vi).

[2] Congress also provided that a noncitizen "who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime." 8 U.S.C. § 1158(b)(2)(B)(i); *see id.* § 1101(a)(43) (listing aggravated felonies).

a particularly serious crime, constitutes a danger to the community of that country." This provision—a narrow exception to Article 33(1)'s commitment not to return people to persecution—is aimed at crimes showing "a complete or near complete lack of social and moral inhibitions," like "blowing up [ ] a passenger airplane in order to collect life insurance," or "wanton killing in a public place." *Al-phonsus*, 705 F.3d at 1037 n.6. A "common crime (or crimes) of a less serious nature" do not warrant the harsh penalty of asylum ineligibility. *See UNHCR Handbook* ¶ 151. And "Congress imbued these international commitments with the force of law when it enacted the Refugee Act." *R-S-C v. Sessions*, 869 F.3d 1176, 1178 (10th Cir. 2017). In turn, "the categorical bars on eligibility in the INA are interpreted with lenience toward migrants to avoid infringing on [these] commitments." *EBSC II*, 950 F.3d at 1275.

As the Rule concedes, any new regulatory bar must be "consistent" with these standards. 8 U.S.C. § 1158(b)(2)(C); 85 Fed. Reg. at 67236. So, for example, the Ninth Circuit recently held that a categorical bar based on "method of entry" was "inconsistent with the INA" because "a migrant's method of entry" does not "per se create a danger to the United States, serve as a useful proxy for terrorist activity, or suggest the persecution of another." *EBSC II*, 950 F.3d at 1261, 1276. So too here. The Rule's new eligibility bars are not "a useful proxy" for dangerousness and do not involve "particularly serious" or "very grave" criminal acts. Instead, they would arbitrarily deny eligibility to countless bona fide refugees, contrary to our basic international and statutory commitments.

**Any felony.** The Rule reaches "[a]ny felony under Federal, State, tribal, or local law," 85 Fed. Reg. at 67258, meaning "any crime defined as a felony by the relevant jurisdiction" or "punishable by more than one year of imprisonment," *id*. at 67260. But Congress made only certain specified felonies an eligibility bar. *Supra* p. 6 n.2. And many felonies do not "per se create a danger" to others, *EBSC II*, 950 F.3d at 1276, and do not approach the seriousness Congress required.

In some states, "driving under a suspended license" can be a felony. *E.g.*, *State v. Hittle*, 257 Neb. 344, 355 (Neb. 1999); *Adams v. Commonwealth*, 46 S.W.3d 572, 574 (Ky. Ct. App. 2000); *cf. Guerrero*, 908 F.3d at 545 (noting that "a minor traffic infraction is not 'particularly serious'"). In Maryland, selling alcohol to a visibly intoxicated person, Md. Code, Alco. Bev. § 6-307, using a tele-

phone to make a single anonymous call to annoy or embarrass, Md. Crim. L. § 3-804(a)(l), and temporarily using someone else's car without their consent, *id.* § 7-203, are all punishable by more than a year's imprisonment.  In Arizona, "recklessly . . . [d]efacing" a school building—something countless teenaged pranksters have done—is a felony.  Ariz. Rev. Stat. § 13-1604(A)(2), (B)(1)(a).  Federal law, too, includes many felonies that involve no danger.  *See generally* HARVEY SILVERGLATE, THREE FELONIES A DAY (2011).  For example, knowingly and unlawfully "export[ing] any fish or wildlife" is punishable by up to five years' imprisonment.  16 U.S.C. § 3373(d)(1).  None of these offenses approach the seriousness required to categorically deny asylum eligibility.

What is more, some states punish simple drug possession or use as a felony.  *E.g.*, *Waits v. State*, 56 S.W.3d 894, 895 (Tex. App. 2001) ("possession of less than one gram of cocaine"); Nev. Rev. Stat. 453.411(1), (3)(a) (using any amount of certain controlled substances); *Matthews v. State*, 296 So. 3d 887, 889 (Ala. Crim. App. 2019) ("unlawful possession of a controlled substance").  The Rule thus sweeps in many minor drug offenses.  That result clashes with Congress's choice to make only drug *trafficking* an aggravated felony, 8 U.S.C. § 1101(a)(43)(B), and ignores that drug "possession for personal use . . . would not meet the threshold of seriousness" under the Refugee Convention.[3] A categorical bar reaching *any* felony conflicts with both the "core principle" of the statutory eligibility bars, *see EBSC III*, 964 F.3d at 848, and with Congress's inclusion of only certain, specified felonies.

**Misdemeanors**.  The Rule's misdemeanor bar is equally improper.  This bar would reach anyone with a misdemeanor conviction for "[p]ossession . . . of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana."  85 Fed. Reg. at 67260.  Thus, a second misdemeanor conviction for marijuana possession—or a first conviction for possessing *any* amount of any other drug—would make someone ineligible for asylum.  So would a first misdemeanor conviction for possessing "controlled-substance paraphernalia," *id.*, for example, any "object that can be used to unlawfully inject or smoke a controlled substance," Judicial Council of Cal., Crim. Jury Instr. No. 2410.  Again, that result clashes with the statutory principle, Congress's treatment of drug offenses, and our treaty obligations.

---

[3] *See* UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

The misdemeanor bar would also reach "possession or use of an identification document, authentication feature, or false identification document without lawful authority." 85 Fed. Reg. at 67260. So a 20-year-old convicted of using a fake ID to enter a bar, or an asylum-seeker using a false SSN to get a job to feed her family (because other recent rules make work permits harder to get), would be barred from asylum. And the bar would reach any misdemeanor conviction for "receipt of . . . public benefits" from any governmental entity "without lawful authority." *See id*. These offenses involve no danger to anyone and do not approach the "grave" seriousness required to deny asylum eligibility.

**Immigration offenses.** The Rule's bar for immigration-related convictions under 8 U.S.C. §§ 1324(a)(1)(A), (a)(2), and 1326 likewise clashes with Congress's design. *See* 85 Fed. Reg. at 67259. As relevant, § 1324 addresses "[b]ringing in and harboring" certain noncitizens who are not authorized to enter the country. 8 U.S.C. § 1324(a)(1)(A), (a)(2). These provisions would cover, for example, an asylum-seeker who entered the country unlawfully and brought her own spouse, child, or parent to safety in the process. Barring eligibility on that basis is not consistent with the statute. The Board of Immigration Appeals itself has recognized that such an offense can be "motivated by love, charity, or kindness, or by religious principles." *In re L-S-*, 22 I. & N. Dec. 645, 655 (BIA 1999). This bar also ignores Congress's careful drafting: A violation of § 1324(a)(1)(A) or (a)(2) is an aggravated felony *unless* the noncitizen "committed the offense for the purpose of assisting, abetting, or aiding only the [noncitizen's] spouse, child, or parent (and no other individual) to violate a provision of this chapter." 8 U.S.C. § 1101(a)(43)(N). But the Rule contains no similar carve-out, and thus denies asylum eligibility based on violations that Congress specifically exempted. That is improper.

Section 1326(a) addresses illegal reentry. *See* 8 U.S.C. § 1326(a). But as already noted, a rule "categorically denying refugees an opportunity to seek asylum only because of their method of entry" is "inconsistent with the INA." *See EBSC II*, 950 F.3d at 1261, 1276; 8 U.S.C. § 1158(a)(1). Such a rule is also "inconsistent with the treaty obligations that the United States has assumed and that Congress has enforced" by statute. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773 (9th Cir. 2018) (*EBSC I*). And Defendants again ignore Congress's choices. A violation of § 1326 is an aggravated felony that bars eligibility—but *only* when "committed by [a noncitizen] who was previously deported" for another aggravated felony. 8 U.S.C. § 1101(a)(43)(O). By treating *every* conviction

9

1   under § 1326 as a bar to asylum, Defendants overstep Congress's boundary.  And their rationale is

2   faulty.  They say this bar ensures "the orderly and lawful admission of aliens into the United States."

3   85 Fed. Reg. at 67222.  But that is not the principle of § 1158(b)'s eligibility bars.

4       **Driving under the influence**.  The DUI bars fare no better.  *See* 85 Fed. Reg. at 67259.  They

5   apply to any conviction for driving under the influence of "alcohol or drugs," whether "misdemeanor

6   or felony," that either (i) "was a cause of serious bodily injury or death of another person" or (ii) was

7   "a second or subsequent offense."  *Id*.  So even a second DUI misdemeanor would qualify—no matter

8   the circumstances, no matter how long the gap between the two convictions, and even if no one was

9   hurt.  But DUI is not akin to the "particularly serious crimes" the Refugee Act contemplates or the

10  aggravated-felony definition.  "Driving under the influence has little in common with these sorts of

11  crimes."  *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (Reinhardt, J., concurring).

12  "It has not been specially targeted through federal legislation, nor is it mentioned elsewhere in the

13  immigration laws, nor does it involve violence."  *Id*.  Indeed, "American voters would be unlikely to

14  elect a president or vice president who had committed a particularly serious crime, yet they had no

15  difficulty in recently electing to each office a candidate with a DUI record."  *Id*.

16      **Family-related offenses**.  The family-related-offense bars also clash with the statute.  *See* 85

17  Fed. Reg. at 67259–60.  These bars again sweep in conduct that does not approach the "particularly

18  serious" level Congress deemed necessary to deny asylum eligibility.  For example, denying asylum

19  eligibility based on "child neglect," *id*. at 67259—and thus ensuring that the child is either permanently

20  separated from the parent or is returned to her home country to face possible persecution too—is per-

21  verse.  Child neglect is tragic, but it does not suggest that the asylum-seeker is *dangerous*; there are

22  countless reasons why a person with limited means who fled persecution elsewhere might be accused

23  of neglecting a child.  Such conduct is nothing like the criminal offenses that bar eligibility by statute.

24      Likewise, the bar related to domestic "battery or extreme cruelty" is improper.  To start, this

25  bar "does not necessarily require a criminal conviction or criminal conduct."  85 Fed. Reg. at 67256

26  n.44.  It instead applies if the adjudicator merely "has *reason to believe*" that the asylum-seeker "en-

27  gaged" in such acts.  *Id*. at 67260 (emphasis added).  That is inconsistent with Congress's approach.

28  Neither of the statutory eligibility bars based on criminal conduct in the United States apply based on

mere "reason to believe"—both require a final "convict[ion]."  *See* 8 U.S.C. § 1158(b)(2)(A)(ii), (b)(2)(B)(i).  And Defendants "are required to give effect to Congress' express inclusions and exclusions, not disregard them."  *NAM v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018).

But even if the "reason to believe" standard were proper, this bar sweeps too broadly.  Domestic-violence incidents often result in the arrest of both the primary abuser and the survivor.  These "cross-arrests" do not always yield clear determinations of victim and perpetrator.  *See* 85 Fed. Reg. at 67228.  Yet an arrest or a police report from such an incident could easily supply "reason to believe" that the victim "engaged . . . in acts of battery" against a "current or former spouse."  *See id.* at 67260.  The Rule would thus require asylum adjudicators to bar domestic-violence victims from asylum.  The Rule's incorporation of the narrow exception for "victims of domestic violence" in 8 U.S.C. § 1227(a)(7)(A) does not solve this problem, *contra id.* at 67230, including because it involves a complex waiver process that applicants must know to undertake, and the waiver applies to a narrower set of offenses than the Rule does.  In any event, Defendants do not and cannot contend that all domestic-violence offenses make the perpetrator a danger to the community or to national security.  Instead, they argue that "such conduct must not be tolerated in the United States."  85 Fed. Reg. at 67229.  Everyone can agree on that—but whether conduct should be "tolerated" is not the statutory principle.

The Rule also applies to "a crime that *involves conduct amounting to* a crime of stalking . . . or that *involves conduct amounting to* a domestic assault or battery offense."  85 Fed. Reg. at 67259 (emphasis added).  As with the "reason to believe" standard, allowing asylum adjudicators to bar applicants based on unadjudicated conduct in the United States clashes with Congress's statutory approach, which nowhere incorporates such a malleable concept.  In any event, the underlying conduct described here also does not rise to the level of the statutory eligibility bars.  For example, many states' stalking laws can be violated by "cyberstalking," *i.e.*, maliciously engaging "in a course of conduct" through "electronic communication, directed at a specific person . . . causing substantial emotional distress to that person and serving no legitimate purpose."  *E.g.*, Fla. Stat. § 784.048(1)(d), (2).  That is not the kind of serious criminal violation required to bar asylum.

**Suspected gang offenses.**  Finally, the "criminal street gang" bar is improper.  This bar reaches anyone convicted of *any* offense that the adjudicator "knows or has reason to believe was committed

in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined" in federal, state, or local law.  85 Fed. Reg. at 67259.  So, for example, a misdemeanor vandalism conviction for graffiti would render someone ineligible for asylum if there were "reason to believe" the graffiti "promot[ed]" a gang.  *Id.*  Likewise, committing a petty crime while wearing a certain color or style of clothing that the government associates with a gang could exclude someone from asylum.[4] The applicant need not actually be a member of a gang or participate in any of the criminal conduct that makes it a "criminal street gang."

Contrary to the Rule's conclusory assertion, this sort of conduct is not remotely "similar" to the serious, dangerous acts Congress addressed by statute.  85 Fed. Reg. at 67225.  Indeed, all of the "series of offenses" that a group of people must commit to be a "criminal street gang" under federal law, *see* 18 U.S.C. § 521(c), are already aggravated felonies, *see* 8 U.S.C. § 1101(a)(43)(B), (F), (K), (U).  So if Defendants are concerned about "extortion threats, murders, kidnappings, and sexual as-saults by organized criminal groups," 85 Fed. Reg. at 67205, they can rest easy—Congress has acted. But the Rule's street-gang bar is vastly overinclusive and thus is not tailored to address dangerousness. And the street-gang bar's "reason to believe" standard is also inconsistent with the statute:  None of the statutory bars turn on offenses for which there is mere "reason to believe" some connection with some other kind of criminal conduct or group.  In fact, as used in the street-gang bar, this standard is so vague that it violates due process, as explained below.  *Infra* § IV.A.2.

*             *             *

In sum, the Rule sweeps in offenses (or conduct) that do not rise to the level Congress deemed necessary to bar asylum.  The new bars include many crimes that in no way suggest a danger to others or to the community.  Indeed, Defendants themselves describe the Rule as barring people who demon-strate "disregard" for "societal values."  85 Fed. Reg. at 67242.  But that is a radically different and broader view of ineligibility than Congress adopted—or our international obligations allow.  Defend-ants also err by declaring that people covered by the Rule's new bars "should not be rewarded with asylum."  *Id.* at 67225.  Asylum is not a reward; it is a humanitarian commitment.  And Congress has

---

[4] *See* Immig. Legal Res. Ctr., *Deportation by any Means Necessary: How Immigration Officials are Labeling Immigrant Youth as Gang Members* 10–14 (2018), https://bit.ly/31TBNSD.

decided, consistent with our international obligations, that domestic criminal conduct must be *particularly serious* before it justifies consigning someone to persecution.

Indeed, Defendants effectively admit they cannot shoehorn the Rule's new bars into those Congress prescribed.  The proposed Rule said the new bars were authorized in part by the Attorney General's power under § 1158(b)(2)(B)(ii) to "designate" particularly serious crimes.  84 Fed. Reg. at 69643.  But the final Rule disclaims this authority, declaring that it "does not actually designate" any particularly serious crimes and instead relying solely on the power to set "additional limitations and conditions."  85 Fed. Reg. at 67207.  This retreat confirms the Rule's true purpose:  Defendants are trying exclude people from asylum based on domestic criminal convictions (or allegations) that do not meet the threshold Congress adopted "to conform . . . our asylum law to the United Nations Protocol to which the United States [is] bound."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987).

Nor do Defendants succeed in arguing that they need not "tailor the bar[s] to precisely identify serious conduct, [or] evaluate severity of conduct," 85 Fed. Reg. at 67227, because their power to set "additional limitations and conditions" supposedly "does not require that the offenses meet a threshold of dangerousness or seriousness," *id*. at 67224.  As already explained—and as the Ninth Circuit has held—§ 1158(b)(2)(C) requires that any regulatory limitations be "consistent with the core principle of" the statutory bars.  *EBSC III*, 964 F.3d at 848.  And again, the core statutory principle, consistent with the underlying treaty obligations, is to exclude people "who pose a threat to society."  *Id.* at 846.  Because the Rule's new bars fall far short of that threshold, they are unlawful.  And if any doubt remains, the Court should construe § 1158(b) "with lenience toward migrants," both to "avoid infringing" on our international commitments not to return people to persecution, *EBSC II*, 950 F.3d at 1275, and to respect the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of" noncitizens, *Cardoza-Fonseca*, 480 U.S. at 449.

### b. The Rule's treatment of conviction vacaturs or modifications is inconsistent with the statute.

The Rule also adopts a novel presumption:  A criminal conviction still triggers asylum ineligibility even if vacated, expunged, or modified—and even if the vacatur was *to correct constitutional or substantive defects*—so long as (1) the vacatur or modification order was entered after removal

proceedings began, or (2) the asylum-seeker moved for the order more than a year after conviction or sentencing.  85 Fed. Reg. at 67259–60.  The asylum-seeker must try to rebut this presumption by showing that any modification was not made for (i) rehabilitative reasons or (ii) "for purposes of ameliorating the immigration consequences."  *Id.*  Nothing in the INA allows this bizarre regime.

The BIA previously held that if "vacatur occurs because there was a legal defect in the underlying proceeding (*i.e.*, a violation of a constitutional or statutory right), then there is no longer a conviction for purposes of the INA."  *See Alim v. Gonzales*, 446 F.3d 1239, 1249–50 (11th Cir. 2006); *Ramirez-Castro v. INS*, 287 F.3d 1172, 1174 (9th Cir. 2002).  But the Rule goes further.  It presumes that a state court order vacating a conviction *expressly because the conviction was unconstitutional* is a nullity, and thus the conviction remains valid.  That view cannot be squared with the INA or with basic due process or federalism principles.  Treating as valid a conviction vacated to correct a constitutional error is "so foreign, so antithetical, to the long-standing principles underlying our criminal justice system and our notions of due process that we would expect Congress to have spoken very clearly if it intended to effect such results."  *Alim*, 446 F.3d at 1249.  Yet the INA says no such thing.

Take this example.  A noncitizen pleads guilty because he is advised—wrongly—that doing so will not affect his immigration status.  This violates the Sixth Amendment, *see Padilla v. Kentucky*, 559 U.S. 356, 359 (2010), but he does not realize it until more than a year later, or (as is common) until removal proceedings begin.  He then obtains an order vacating his conviction for the express reason that it violated his Sixth Amendment rights.  Even so, the Rule presumes that his conviction remains valid and bars him from asylum—and puts the burden on him to prove otherwise.  Even worse, the Rule empowers the asylum adjudicator "to look beyond the face of" the court order, and even beyond the court record, to divine its true "purposes."  85 Fed. Reg. at 67260.  So, for example, if the non-citizen's vacatur motion notes that he will be deported unless his unconstitutional conviction is vacated, the asylum adjudicator can decide that the order was entered "for purposes of ameliorating [ ] immigration consequences" and ignore it—even if the state judge said no such thing.

Congress authorized none of this.  That silence forecloses the rule, both because of the "long-standing principles" *Alim* noted, 446 F.3d at 1249, and because the Supreme Court requires a "clear indication" of congressional intent to uphold an "administrative interpretation [that] alters the federal-

state framework by permitting federal encroachment upon a traditional state power," *see Solid Waste Agency of N. Cook. Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). It is hard to imagine a more obvious agency encroachment than (a) presuming the invalidity of a state order entered on constitutional grounds and (b) authorizing a federal employee to ignore a state court order because he doesn't believe the state judge's express reasons for ruling. This Rule provision is unlawful.

### 2. Some of the Rule's categorical bars are unconstitutionally vague.

Some of the Rule's bars also "contravene the 'first essential of due process'" because they fail to "give people 'of common intelligence' fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). This vagueness doctrine "guards against arbitrary or discriminatory law enforcement." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (plurality).[5]

First, as described above, the street-gang bar applies to any conviction the adjudicator "knows *or has reason to believe* was committed *in support, promotion, or furtherance* of" gang activity. 85 Fed. Reg. at 67259 (emphasis added). The Rule says the "reason to believe" language is "used elsewhere in the INA," *id*. at 67239, and that it allows "all reliable evidence," which is "not a new standard in immigration proceedings," *id*. at 67225. But the vagueness problem here arises from the combination of the already-malleable "reason to believe" standard with the "support, promotion, or furtherance" language. As the Supreme Court has explained, "combining" two "indetermin[ate]" standards that might be constitutional on their own can result in unconstitutional vagueness. *Johnson v. United States*, 135 S. Ct. 2551, 2558 (2015). That is the case here. The phrase "support, promotion, or furtherance" appears nowhere in any federal law or rule. And while the Rule insists that this language "conveys sufficiently definite warning as to the proscribed conduct," it does not even attempt an explanation, instead "leav[ing] the determination . . . to adjudicators in the first instance." 85 Fed. Reg.

---

[5] The Rule says its bars "do not implicate due process" because "aliens have no cognizable due process interest in the discretionary benefit of asylum." 85 Fed. Reg. at 67237. But while asylum itself is discretionary, asylum *eligibility* is not. And the Supreme Court and the Ninth Circuit have both applied the "most exacting vagueness standard" in immigration cases, *see Dimaya*, 138 S. Ct. at 1213, including in considering "particularly serious crimes," *Guerrero*, 908 F.3d at 544.

at 67225.  In combination with the "reason to believe" standard, this is precisely the sort of "'stand-ardless sweep'" that improperly allows the government and adjudicators "to pursue their personal predilections" and indulge improper biases.  *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

Second, as noted, the domestic-offense bar applies to "a crime that involves conduct amounting to a crime of stalking . . . or that involves conduct amounting to a domestic assault or battery of-fense[.]"  85 Fed. Reg. at 67258.  The "involves conduct amounting to" standard exists nowhere else in U.S. immigration law.  And again, the Rule makes no effort to explain it, saying only that "the underlying conduct of the crime may be considered and the immigration judge is not limited to facts found by the criminal court or provided in the underlying record of conviction."  *Id.* at 67259.  It is not even clear what version of the "crime" adjudicators will measure "conduct" against—a federal version, the version of the state of conviction, the version of the state of residence, or some generic or ordinary-case version.  This, too, is the kind of indeterminate standard that fails due process scrutiny.

### 3.	The Rule is arbitrary and capricious.

#### a.	*The Rule does not articulate a satisfactory explanation.*

An agency "must examine the relevant data and articulate a satisfactory explanation for its action," including a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  It cannot "offer[ ] an explana-tion for its decision that runs counter to the evidence."  *Id*.  And it must adequately explain any "de-parture" from prior policy or precedent.  *Cal. PUC v. FERC*, 879 F.3d 966, 978 (9th Cir. 2018).

Before the Rule, committing a crime outside the statutory eligibility bars was simply part of "the totality of the circumstances" that "should be examined in determining whether a favorable exer-cise of discretion is warranted," and not a basis "to deny relief in [ ] all cases."  *Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987).  The Rule departs dramatically from that regime by denying eligibility based on all manner of crimes (or conduct).  And it declares that adjudicators should not "readjudicate an alien's criminal culpability"; conviction is now dispositive.  85 Fed. Reg. at 67220.  To justify this sweeping change, Defendants assert that "defer[ring] to" the original prosecution and conviction will "promote adjudicative efficiency."  *Id*.  That explanation is insufficient, for two reasons.

1    First, it simply fails to grapple with the good reasons the government previously did not deny

2  eligibility based on crimes outside the statutory bars: "[I]n light of the unusually harsh consequences

3  which may befall an alien who has established a well-founded fear of persecution[,] *the danger of*

4  *persecution should generally outweigh all but the most egregious of adverse factors*." *Pula*, 19 I. &

5  N. Dec. at 474 (emphasis added).  The Rule turns that regime on its head, and never explains why this

6  prior reasoning no longer holds.  Nor does it explain why this new approach is supposedly consistent

7  with the international obligations codified in the INA.  Agencies can change policy, but "the incumbent

8  administration's view of wise policy," 85 Fed. Reg. at 67207, is not a sufficient explanation for doing

9  so.  The supposed seriousness of the new criminal bars is not enough either.  Those crimes are no more

10  serious today than they have been for the past three decades, during which the agency recognized that

11  such offenses could and often should be "outweigh[ed]" by the "the danger of persecution." *Pula*, 19

12  I. & N. Dec. at 474.  In any event, apart from conclusory assertions, the Rule offers nothing to sub-

13  stantiate Defendants' view that these offenses are indeed serious or dangerous.

14    Second, the Rule's efficiency rationale is faulty on its face.  While "rule-based approaches"

15  can "promote more efficient administration than wholly discretionary, case-by-case determinations,"

16  85 Fed. Reg. at 67246, several of the Rule's bars are vague, subjective, and fact-intensive.  In partic-

17  ular, the street-gang bar, the suspicion-of-domestic-violence bar, and the vacatur-presumption provi-

18  sion all create new, unpredictable and fact-intensive inquiries—with extremely high stakes.  Before,

19  if an asylum-seeker was accused of a misdemeanor that supposedly had a gang connection, the adju-

20  dicator could simply take all the facts into account in reaching a discretionary asylum determination.

21  Now, everything turns on whether the offense "promoted" gang activity, and the asylum-seeker will

22  have life-and-death reasons to try to prove it did not.  Likewise, the vacatur presumption now requires

23  adjudicators to look behind a facially valid and complete state court order to determine what "purpose"

24  the judge really had.  None of this is efficient or predictable.  The Rule is thus arbitrary and capricious.

### b.    *The rule fails to consider important aspects of the problem.*

26    An agency also acts arbitrarily and capriciously when it "entirely fail[s] to consider an im-

27  portant aspect of the problem." *State Farm*, 463 U.S. at 43.  That happened here, for two reasons.

28

1.     An agency must "respond to 'significant' comments, *i.e.*, those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." *Am. Min. Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992).  But Defendants brushed aside many commenters' concerns with a series of non-sequiturs and conclusory assertions.

To start, the final Rule "decline[s] to respond" to comments explaining that the new bars are inconsistent with the "particularly serious crime" bar because (contrary to the proposed Rule) the final Rule does not "actually designate" particularly serious crimes.  85 Fed. Reg. at 67238; *id*. at 67207. But the final Rule repeatedly argues that its new bars are permissible in part because they are "similar to 'particularly serious crimes.'"  *E.g.*, *id*. at 67207.  Defendants cannot justify the new bars as "similar" while refusing to engage with comments explaining that they are not, in fact, similar.

The Rule likewise declares many other topics "outside the scope," including whether current administrative practices prevent asylum-seekers from lawfully presenting themselves at the border— which is directly relevant to barring eligibility based on manner of entry.  85 Fed. Reg. at 67222.  Also supposedly "outside the scope" are comments and data showing the Rule "will exacerbate harms caused by racially disparate policing practices or that the result of this rule will disproportionately affect people of color," *id*. at 67226, "barriers" that prevent domestic-violence victims from seeking waivers that would prevent the Rule's bars from applying to them, *id*. at 67230, "how the rule might affect working conditions of aliens," *id*. at 67233, "issues involving evidence gathering" under the Rule's vacatur presumption, *id*. at 67239, "humanitarian concerns for asylum seekers," *id*. at 67243, "services for children who have experienced trauma," *id*. at 67244, the "complex 'web' of asylum laws and regulations," *id*., "dangerous conditions in Mexico, the effects of the [migrant protection protocol], and the third-country transit bar," *id*. at 67245, "access to healthcare, food, and housing," *id*. at 67246, "increased likelihood of convictions for minor offenses for certain vulnerable groups," *id*. at 67247, and "representation in immigration proceedings or during asylum adjudications," *id*. at 67249.  On most of these points, Defendants just "reiterate[d] their statutory authority to limit and condition asylum eligibility."  *E.g.*, *id*. at 67239.  That is no answer.  Even if Defendants had the authority to issue these bars, they must also consider and address comments explaining that doing so is bad policy and will harm people.  *See Specialty Equip. Market Ass'n v. Ruckelshaus*, 720 F.2d 124,

131 (D.C. Cir. 1983) (agency "acted arbitrarily and capriciously by failing to address adequately the practical effect of its regulations").  They failed to do so.

2.  Defendants did not consider problems that arise from the Rule's interaction with other rules, and thus violated the principle that "an agency's right hand" must "take account of what its left hand is doing." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011).  From November 2019 to June 2020, the government proposed three rules limiting noncitizens' ability to apply for asylum and related benefits based on criminal convictions or allegations, including this Rule.[6]  The other two rulemakings extended this Rule's eligibility bars to apply to employment authorization documents (EADs), credible fear interviews (CFIs), and reasonable fear interviews (RFIs).[7]  The rules doing so were released after the comment period on this Rule closed, but before the final Rule was issued.  When this Rule was proposed in December 2019, the agencies were still accepting comments to the proposed EAD rule published a month earlier, which contained an overlapping-but-distinct set of criminal bars making asylum applicants ineligible for employment authorization.  84 Fed. Reg. at 62390.  But the final EAD rule, issued in June 2020, dispensed with the separate set of criminal bars and incorporated this Rule's bars in full, *see* 85 Fed. Reg. 38532, 38537 (June 26, 2020), even though the final Rule had not yet been issued.  Also in June 2020, Defendants published a proposed rule comprehensively limiting asylum eligibility and expanding the Rule's criminal bars to initial CFI and RFI screening processes that had only previously been used to flag *potential* eligibility bars for later consideration.  *See id.* at 36284.  This process both violated the APA's notice-and-comment requirements, as explained below, and prevented Defendants from considering two important issues.

*First*, belatedly incorporating the Rule's criminal bars into the final EAD rule prevented the agency from considering concerns about non-specialists applying the bars and thus wrongfully denying employment authorization—leaving asylum seekers without any means of legally supporting

---

[6] *See Asylum Application, Interview, and Employment Authorization for Applicants*, 84 Fed. Reg. 62374 (Nov. 14, 2019) (EAD proposal), *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 36264 (June 15, 2020) (proposed asylum rule).

[7] CFI screenings are conducted by asylum officers to determine if a noncitizen subject to expedited removal can demonstrate "a significant possibility" of establishing asylum eligibility.  RFI screenings are conducted in the same fashion, but the applicable standard is "reasonable possibility."  Noncitizens denied the opportunity to seek asylum after a negative CFI or RFI determination may seek review by an Immigration Judge, from which no statutory appeal is possible.  8 U.S.C. § 1252(a)(2)(A)(iii).

themselves and their families while they await a decision.  Government employees adjudicate EAD applications remotely and do not receive specialized training relevant to applying the Rule's bars.  The final EAD rule seemed to recognize that errors would result, saying that DHS "does not view this alignment" with the criminal bars "as . . . legally obligating DHS to adopt the interpretations or pro-cedures used by" asylum adjudicators "to determine when and if an alien's conduct bars his or her eligibility for asylum," and leaving open the possibility that an asylum adjudicator may disagree with a determination in the EAD context about whether the Rule's bars apply.  85 Fed. Reg. at 38572.  That kind of error would have serious consequences.  Erroneously denying work authorization (which is not appealable) could force asylum-seekers to obtain false ID papers to feed themselves and their families—which bars asylum under the Rule.  Defendants should have considered these issues.

*Second*, the proposed incorporation of the Rule's criminal bars into the CFI and RFI screening processes prevented consideration of important due process concerns.  The CFI and RFI processes are limited in scope and provide only limited appellate rights.  8 U.S.C. § 1252(a)(2)(A)(iii).  Applying the Rule's bars in CFI and RFI proceedings would result in summary asylum denials, without full and fair hearings or access to meaningful judicial review.  Currently, no mandatory bars apply at this stage.  But if the proposed asylum rule is adopted (incorporating this Rule), the officers conducting these screenings will deny anyone they deem covered by these criminal bars the opportunity to seek asylum.  The Rule's bars are problematic enough without shoehorning the extensive factual and credibility evaluations they require into the flawed and truncated CFI and RFI processes.[8]  Defendants should have considered these issues before the Rule became final.

Moreover, in the broader asylum rule proposed in June, the agencies justified extending the Rule's eligibility bars to CFI and RFI screenings because "it is pointless and inefficient to adjudicate claims for relief in [removal proceedings] when it is determined that [a noncitizen] is subject to one or more of the mandatory bars to asylum . . . at the screening stage."  85 Fed. Reg. at 36272.  In other words, months after the comment period on this Rule closed, Defendants declared that the central issues commenters debated would be mooted or dramatically altered by the incorporation of the Rule's

---

[8] *See* U.S. Comm'n on Int'l Relig. Freedom, *Serious Flaws in U.S. Treatment of Asylum Seekers in Expedited Removal: Children Especially Harmed* (Aug. 2, 2016), https://bit.ly/2Jeaigc.

bars into the CFI and RFI screenings.  Agencies cannot ignore the "collateral impact[s]" of "interdependent" rules in this way.  *See Portland Cement*, 665 F.3d at 185, 187 (invalidating a rulemaking whose effect the agency altered in a subsequent rulemaking before the final rule issued).

### 4.   The Rule is procedurally invalid.

#### a.   The Rule was adopted without sufficient opportunity for public comment.

1.   Agencies must "provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed'n v. Babitt*, 58 F.3d 1392, 1404 (9th Cir. 1995).  The government has consistently recognized that "a meaningful opportunity to comment" requires "a comment period of not less than 60 days." *See, e.g., Exec. Order No. 12866*, 58 Fed. Reg. 51735 (Sept. 30, 1993); *Exec. Order No. 13563*, 76 Fed. Reg. 3821 (Jan. 18, 2011).  The "usual" period is 90 days.  *See Cal. ex rel. Becerra v. Dep't of Interior*, 381 F. Supp. 3d 1153, 1176 (N.D. Cal. 2019).

Defendants provided just 30 days.  And that 30-day window spanned several year-end holidays, and thus included only 15 business days.  As a result, Defendants received just 581 comments on this major rule—a small fraction of the number received on proposed asylum rules with 60-day comment periods.  *E.g.*, 84 Fed. Reg. 62,374 (3,200 comments on the EAD proposal); *cf. N.C. Growers' Ass'n v. UFW*, 702 F.3d 755, 770 (4th Cir. 2012) (the contrast between 800 comments in a 10-day window and 11,000 comments in a 60-day window showed the 10-day window was too short).  What is more, Defendants refused multiple requests to extend the 30-day period, despite extending other rulemakings over the same time period.  *E.g.*, 85 Fed. Reg. 4243 (Jan. 24, 2020) (comment period ending December 16 was extended to December 30 and then to February 10).

This too-short comment period violated the APA.  *Becerra* held that the Interior Department's "failure to provide a meaningful opportunity to comment [was] underscored by the brevity of the [30-day] comment period."  381 F. Supp. 3d at 1176.  That reasoning applies even more strongly here, both because the comment period here spanned the holidays and because of the vital subject matter.  The rule in *Becerra* addressed payments under oil-and-gas leases, *id*. at 1158, while this Rule concerns eligibility for the life-saving protection of asylum.  "Matters of great import . . . should naturally be accorded more elaborate public procedures."  *Vt. Yankee Nuclear Power Corp. v. NRDC, Inc*., 435

U.S. 519, 545 (1978).  Yet here, the agencies shortchanged the public in commenting on sweeping provisions governing matters of life and death.  Adding insult to injury, Defendants concede that the proposed Rule "resulted in confusion regarding which authority the Departments relied on in promulgating this rule."  85 Fed. Reg. at 67207.  So Defendants did not explain themselves clearly and then provided too short a time to respond.  The Rule thus violates the APA and is invalid.

2.    Defendants also failed to fairly apprise the public of the Rule's impact on matters beyond pure asylum eligibility.  As explained above, this is one of three interrelated rules issued or proposed over the past year; the other two incorporate the Rule's bars into the EAD, CFI, and RFI processes.  These staggered rulemakings formed a puzzle.  The full picture, depicting just how drastically asylum-seekers were impacted, only became visible months after the comment period on this Rule closed.  This piecemeal process prevented the public from ever commenting on the eligibility bars' full impact.  *Cf. California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) (rejecting the government's argument that a comment period was unnecessary because the public had an opportunity to respond to similar prior rulemakings).  And these new applications of the Rule's eligibility bars are not a "logical outgrowth" of the proposed Rule.  *See id*.  The EAD, CFI, and RFI processes offer much more limited procedural protections than an asylum interview or hearing, and have not before been used to evaluate the effect of criminal convictions or alleged criminal conduct on applications for relief.  The proposed Rule did not address, or even hint at, this use of the proposed bars.  The public was thus unable to comment on the full extent and impact of the resulting regulatory regime.  For example, the final Rule dismisses commenters' objections that asylum adjudicators are unsuited to make "reliability determinations of evidence already made by judicial courts," concluding that "adjudicators are well experienced at separating reliable from unreliable evidence, . . . and this rule neither inhibits their ability to do so nor changes the process for assessing evidence."  85 Fed. Reg. at 67238.  But commenters had no chance to address, and no reason to anticipate, how these bars would be applied in very different procedural settings by different personnel.

### b.    The Rule does not properly analyze its impacts on federalism.

An agency must include a federalism certification in any final rule that will have "substantial direct effects on the States, on the relationship between the national government and the States, or on

the distribution of power and responsibilities among the various levels of government." *Exec. Order No. 13132*, § 1(a), 64 Fed. Reg. 43,255 (Aug. 4, 1999). If the rule triggers federalism concerns, the agency must also consult with state and local officials about its potential impact and publish a federalism summary impact statement in the rule. Here, the Rule raises significant federalism concerns by presuming that state court orders vacating convictions to cure constitutional or substantive defects are invalid based purely on their timing. Yet the Rule does not include a federalism impact statement or certification. Instead, it simply states that it "does not have sufficient federalism implications[.]" 85 Fed. Reg. at 67257. The Rule therefore violates the federalism certification requirements.

### c.     *The Rule does not comply with the Regulatory Flexibility Act.*

The Regulatory Flexibility Act requires agencies to analyze their rules' effects on "small entities, 5 U.S.C. §§ 603–604, including small nonprofits, *id*. § 601(4). In particular, an agency must describe "the steps the agency has taken to minimize the significant economic impact on small entities" and "the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." *Id*. § 604(a)(6). Defendants did not do so.

The proposed Rule declares, and the final Rule simply repeats, that "this rule will not have a significant economic impact" on small entities because "only individuals are eligible to apply for asylum," so the rule does "not regulate 'small entities.'" 85 Fed. Reg. at 67255. But the RFA is not limited to rules that "regulate" small entities, *see* 5 U.S.C. § 604(a)(6), and Defendants ignore the Rule's impacts on immigration service providers like Plaintiffs. The Rule will require Plaintiffs to divert resources and staff and expend substantial sums of money on training, and will limit the overall number of clients Plaintiffs are able to service. *See infra* § IV.B. This kind of impact—making small entities' operations more expensive or burdensome—is what the RFA requires agencies to consider. *See Am. Fed. of Labor v. Chertoff*, 552 F. Supp. 2d 999, 1013 (N.D. Cal. 2007) (finding "serious questions whether DHS violated the RFA by refusing to conduct a final flexibility analysis" where the rule effectively "mandates costly compliance" measures, including "paying for the training of in-house counsel" and "dedicating . . . staff" to new tasks). The Rule is procedurally invalid.

**B.**     **The Rule will irreparably harm Plaintiffs and the people they serve.**

The Rule is scheduled to take effect on November 20, 2020. Plaintiffs are already suffering irreparable harm because they have been forced to "divert resources away from [their] core programs to address the new policy." *EBSC II*, 950 F.3d at 1280.  Unless the Rule is enjoined, Plaintiffs will be compelled to devote even greater resources to analyzing and interpreting the Rule, creating new materials and resources, and retraining thousands of practitioners, who not only represent clients but also advise other attorneys in affiliate groups.  (Ex. A ¶¶ 17–19; Ex. B ¶¶ 21–23; C ¶¶ 16–24, 27; Ex. D ¶ 15–22.)  The Rule requires highly fact-intensive and subjective inquiries, including whether an offense was committed in furtherance of gang activity, or why a prior conviction was vacated or modified.  These complexities will require additional training for the new criminal law expertise required (Ex. A ¶¶ 13, 18; Ex. C ¶ 20–21, 24; Ex. D ¶¶ 13, 24) and make it difficult or impossible for legal assistants and law students to perform tasks like intake (Ex. D ¶¶ 23–25; *see* Ex. C ¶ 20).  Indeed, the Rule "has already prompted [Plaintiffs] to change their core missions," *EBSC II*, 950 F.3d at 1280, by requiring them to divert resources in response (Ex. B ¶¶ 22–23; Ex. C ¶¶ 17–20).

The Rule will also cause "ongoing harms to [Plaintiffs'] organizational missions," *EBSC III*, 964 F.3d at 854, to support and provide legal services to as many low income and vulnerable noncitizens as possible (Ex. A ¶¶ 4–5, 12; Ex. B ¶¶ 11, 16; Ex. C ¶¶ 4–5, 15, 30; Ex. D ¶¶ 8–11, 29).  The Rule's new eligibility bars and complexities will increase the time spent on each case, including at intake and briefing, and in obtaining records of prior convictions.  (Ex. A ¶¶ 12–18; Ex. B ¶¶ 12–14; Ex. C ¶ 25; Ex. D ¶¶ 13–22.)  The Rule will also prevent people from applying for asylum as a family unit if a parent is ineligible under a new bar.  (Ex. A ¶ 16; Ex. B ¶ 17–18; Ex. C ¶ 26.)  The cumulative effect is that Plaintiffs would "provid[e] fewer services to fewer individuals," frustrating their missions.  *EBSC III*, 964 F.3d at 854.

And the Rule will harm Plaintiffs' funding.  All Plaintiffs rely in part on grants and donations related to their ability to achieve certain numerical targets, such as total clients served or applications filed.  (Ex. A ¶¶ 20–22; Ex. B ¶ 24; Ex. C ¶¶ 28–29; Ex. D ¶¶ 27–28.)  By shrinking the pool of eligible applicants and reducing Plaintiffs' capacity, the Rule "directly threatens their standard caseload, and consequently, their caseload[] dependent funding." *EBSC III*, 964 F.3d at 854.

### C.      The equities and the public interest favor injunctive relief.

Finally, the equities and the public interest favor relief.  "Relevant equitable factors include the value of complying with the APA, the public interest in preventing the deaths and wrongful removal of asylum-seekers, preserving congressional intent, and promoting the efficient administration of our immigration laws . . . ."  *EBSC II*, 950 F.3d at 1280.  These interests all weigh in Plaintiffs' favor.  Most obviously, "the public has an interest in 'ensuring that we do not deliver [refugees] into the hands of their persecutors,' and 'preventing [refugees] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'"  *Id*. at 1281 (citation omitted); *see EBSC III*, 964 F.3d at 854 (district court properly "found that there was a public interest in not returning refugees to their persecutors or to a country where they would be endangered").  Further, "maintaining the *status quo*" serves the important interest in "a stable immigration system."  *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020).  Allowing the rule to take effect will also harm immigrant communities and public safety.  *E.g.*, Ex. E at 2–6 (N.Y.C. Comment Letter).  And "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

### D.      The Court should enjoin the Rule's national implementation.

The Court should enjoin the Rule's implementation nationally.  "In immigration matters," the Ninth Circuit has "consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis."  *EBSC I*, 932 F.3d at 779.  "Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress."  *Id*.  Together, Plaintiffs work with asylum applicants across the nation.  Indeed, Plaintiff CLINIC has affiliates in 48 states and the District of Columbia.  (Ex. D ¶ 5.)  Nationwide relief is warranted.

## V.      CONCLUSION

The Court should enjoin or stay the Rule's national implementation before November 20.

November 3, 2020

Respectfully submitted,

/s/ *Naomi Igra*
Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Sirine Shebaya (*pro hac vice* pending)
sirine@nipnlg.org
Cristina Velez*
cristina@nipnlg.org (*pro hac vice* pending)
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788
*Not admitted in D.C.; working remotely from
and barred in New York*

Tobias S. Loss-Eaton (*pro hac vice* pending)
tlosseaton@sidley.com
Chike B. Croslin (*pro hac vice* pending)
ccroslin@sidley.com
Alice A. Wang (*pro hac vice* pending)
alice.wang@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: +1 202 736 8000

Sabrineh Ardalan (*pro hac vice* pending)
sardalan@law.harvard.edu
Philip L. Torrey (*pro hac vice* pending)
ptorrey@law.harvard.edu
Sameer Ahmed, SBN 319609
sahmed@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504

Jack W. Pirozzolo (*pro hac vice* pending)
jpirozzolo@sidley.com
Kenyon C. Hall (*pro hac vice* pending)
kenyon.hall@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Telephone: +1 617 223 0300

Leila Kang (*pro hac vice* pending)
leila@immdefense.org
Nabilah Siddiquee (*pro hac vice* pending)
nabilah@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

*Attorneys for Plaintiffs*