# EXHIBIT A

Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Sabrineh Ardalan (*pro hac vice* forthcoming)
sardalan@law.harvard.edu
Philip L. Torrey (*pro hac vice* forthcoming)
ptorrey@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504
Facsimile:  +1 617 495 8595

Sirine Shebaya (*pro hac vice* forthcoming)
sirine@nipnlg.org
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788
Facsimile:  +1 617 227 5495

Leila Kang (*pro hac vice* forthcoming)
leila@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

*Attorneys for Plaintiffs*
(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| PANGEA LEGAL SERVICES; DOLORES STREET COMMUNITY SERVICES, INC.; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; and CAPITAL AREA IMMIGRANTS' RIGHTS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, *under the title of Acting Secretary of the Department of Homeland Security*; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security*; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; | Case No. 3:20-cv-07721<br><br>**DECLARATION OF ETAN NEWMAN** |

DECLARATION OF ETAN NEWMAN - CASE NO. 3:20-cv-07721

| | |
|---|---|
| 1 | U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; |
| 2 | TONY H. PHAM, *under the title of Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement*; |
| 3 | |
| 4 | U.S. CUSTOMS AND BORDER PROTECTION; |
| 5 | MARK A. MORGAN, *under the title of Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection*; |
| 6 | |
| 7 | U.S. DEPARTMENT OF JUSTICE; WILLIAM P. BARR, *under the title of U.S. Attorney General*; |
| 8 | |
| 9 | EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and |
| 10 | JAMES MCHENRY, *under the title of Director of the Executive Office for Immigration Review*, |
| 11 | Defendants. |

I, Etan Newman, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Stay.

2. I serve as an Immigration Attorney and Co-Director at Pangea Legal Services ("Pangea"), where I conduct intake consultations and represent individuals facing removal proceedings, in addition to coordinating Pangea's appellate and federal litigation efforts. I have worked at Pangea since 2016.

3. Pangea is a 501(c)(3) non-profit corporation, with its main office in San Francisco, CA, and an office in San Jose, CA.

4. Pangea's mission is to stand with immigrant communities and to provide services through direct legal representation, especially in the area of deportation defense. In addition to direct legal services, Pangea is committed to advocating on behalf of the community it serves through policy advocacy, education, and legal empowerment efforts. Pangea's efforts focus primarily on Northern California's Bay Area; however, in some instances, Pangea has also collaborated with other immigration services organizations across the nation.

5. Pangea was founded to help address the critical need for the representation of detained and non-detained individuals in the San Francisco immigration court system. That need arises from a number of factors, including (but not limited to) the complexity of immigration law, the grave negative consequences that may result from deportation, and the fact that many immigrants in removal proceedings are eligible for relief or protection under the law.

6. Pangea provides a number of immigration legal services to its clients, including: representing noncitizens completing affirmative asylum applications and other applications for relief; conducting intake consultations and referrals for noncitizens who need attorneys; representing noncitizens in immigration court removal proceedings; providing on-call, same-day legal assistance to noncitizens who are arrested by U.S. Immigration and Customs Enforcement ("ICE")

in the Bay Area; representing noncitizens in federal litigation, including in habeas corpus petitions and appeals; and, recently, representing individuals in post-conviction relief petitions in state criminal court.

7. Pangea provides direct legal services to over 400 clients annually. At present, almost 250 of Pangea's clients have asylum applications pending in either immigration court or at United States Citizenship and Immigration Services ("USCIS"), and dozens of others are either eligible for asylum, but have yet to submit an application, or have been denied asylum and are on appeal. Pangea also provides in-depth assistance to *pro se* asylum applicants, a newly launched program that has already served approximately 10 clients since its inception in 2020.

8. In addition to providing direct legal services and *pro se* assistance, Pangea advocates for and works to empower noncitizens by engaging in policy advocacy, education, and legal empowerment efforts. Pangea's community education efforts include, among others, providing Know-Your-Rights ("KYR") presentations to immigrant communities, which were attended by hundreds of individuals annually prior to the COVID-19 pandemic.

9. Pangea also provides training to other attorneys to equip them to provide further services to noncitizen communities. Pangea works closely with at least one other similarly situated non-profit organization, providing case supervision and assistance as needed. Pangea's attorneys also frequently participate in trainings hosted by organizations such as the Public Law Institute, which are open to other attorneys and to the public.

10. Pangea also participates in local and statewide advocacy for immigrants' rights. This includes partnering with coalitions to advocate for the enactment of legislation that protects immigrant communities from detention and deportation. As part of these efforts, Pangea's Community Forum Project focuses on creating forums for clients to share experiences and common fears without feeling targeted or exposed.

11. The Rule challenged in the Complaint, *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67202 (October 21, 2020) ("Rule"), would irreparably harm Pangea in multiple ways, including by frustrating Pangea's mission to serve as many immigrants lawfully

seeking asylum as possible.

12. As described in the paragraphs below, the Rule would also significantly limit the overall number of clients Pangea is able to serve, placing the organization in an impossible position: it would need to divert staff time and resources towards raising more funds to serve the same number of clients, or reduce the total number of clients it serves to fit within the organization's current budget.

13. Under the new Rule, the number of individuals potentially subject to criminal bars to asylum eligibility would increase dramatically. Consequently, Pangea's staff would have to expend more time and resources at the outset of each case to determine whether any of the asylum bars could be triggered and to assess the potential impact of any prior convictions (including those that have been modified, vacated, or expunged). Indeed, under the new Rule, asylum seekers can be categorically barred from obtaining protection on the basis of mere allegations of certain conduct without any adjudication of guilt.

14. Contrary to what including "categorical" bars may imply, the new Rule makes it significantly *less* clear as to whether someone is eligible for asylum. Many of the new bars inherently involve subjective adjudication, while simultaneously removing from the adjudicator any discretion in determining whether the circumstances merit such a harsh penalty. For these reasons, the Rule would significantly increase the amount of time and resources each asylum-seeker's case requires, including time spent on briefing eligibility issues; time and resources spent on obtaining any records of arrests and/or convictions; and resources spent on finding and preparing witnesses and experts.

15. For example, the Rule would impose a categorical bar on asylum against someone on the basis of mere allegations of domestic-violence related conduct, regardless of whether there had been any adjudication of guilt. Likewise, asylum seekers with two DUI convictions would be barred, regardless of whether they have sought treatment for alcohol addiction, and asylum-seeking mothers would be barred if they were convicted for bringing their own child across the border. Indeed, the Rule fails to address or account for the fact that a significant number of people may

agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, it does not address and makes no exception for convictions for conduct influenced by mental illness or duress. Not only would Pangea's staff have to spend significant time determining the impact of these bars on their current clients, increased time and resources would have to be expended on behalf of each new potential client Pangea contemplated taking on to ensure that none of these new bars applied.

16. Moreover, the new Rule would adversely impact Pangea's ability to represent families. Pangea's current clients include many individuals seeking asylum as a family unit. At present, if an individual is granted asylum, their spouse and children already in the United States who they included on their asylum application may also be granted asylum, and they can file a petition to bring remaining eligible family members *not* in the United States to the United States. Unlike asylum, withholding of removal does not provide any relief for an eligible individual's family members, whether they are in the United States or in another country. If a parent is suddenly subject to one of the Rule's expanded asylum bars, and thus forced to seek withholding of removal only, they will no longer be able to ensure that their children will be able to obtain protection in the United States, regardless of whether they are granted withholding of removal. Instead, if their children are still in their home country, they will have to come to the United States and seek asylum on their own, likely as unaccompanied children. If their children fled to the United States with them, they will need to establish their own eligibility for protection, regardless of their age. Often, Pangea is able to present a single case on behalf of such families, because the children's claims are treated as derivative of their parents' claims. However, if parents were rendered ineligible for asylum under the new Rule, their children would no longer have a derivative claim and their cases could not be combined. Pangea would thus have to expend its already-limited resources to handle all such newly individualized cases for current clients and/or apply for additional grants and funding. This decoupling of Pangea's current cases would also impact its ability to take on new clients.

17. The added complexities posed by the new Rule will require the Pangea staff to

revise all current training materials, including in connection with recent programming launched by Pangea to provide assistance to *pro se* asylum applicants. The Rule would require Pangea to revise its training templates and spend more time educating *pro se* applicants on the nuances of the Rule's eligibility requirements.

18. Pangea will also have to continue to divert substantial time and resources to training its staff and attorneys on these new asylum eligibility and processing framework requirements, particularly in light of the nuanced and complex nature of the new bars.

19. Additionally, the Rule would force Pangea to divert resources away from other initiatives to compensate for the time and staffing resources required to respond to it. For example, Pangea is a member of formal rapid response networks in the California counties of Santa Clara, San Mateo, and San Francisco. The aim of these rapid response networks is to provide attorney response and consultations to newly-detained individuals from those counties. As part of these networks, Pangea attorneys take shifts in which they are on-call to provide consultation and representation to detained individuals, including on weekends. Pangea's ability to contribute to this and other important initiatives could be hampered if it is forced to reallocate already-scarce resources in light of the Rule.

20. The Rule would also jeopardize Pangea's funding and budget. In 2020, sixty-five percent of the organization's funding was tied to grants requiring some form of deliverables (e.g., a specific number of asylum applications filed or clients represented). If permitted to take effect, the Rule would necessarily reduce the number of Pangea's clients eligible for asylum. Moreover, the increased hours Pangea would be required to spend both assessing the impact of the Rule on its current clients and representing those impacted by the Rule would reduce the overall number of clients served. As a result, it is unclear whether Pangea could continue to comply with existing funding conditions.

21. Pangea generates approximately nine percent of its income through the low-cost services it provides to asylum-seekers who are not eligible for government or foundational grants due to prior convictions, certain geographic restrictions, or because of income or their ability to

pay. While such convictions may not have previously triggered a bar to asylum eligibility, under the new Rule, those same clients may no longer be eligible for asylum. For any current clients rendered ineligible for asylum by the new Rule, Pangea would forfeit future payments on collateral matters for which the clients would no longer be eligible, such as applications for employment authorization or obtaining a refugee travel document (both items Pangea charges for separately from court representation). This, too, would have a significant detrimental effect on Pangea's budget.

22. Pangea also generates income through services it provides to former clients who successfully obtain asylum and want to adjust their status (e.g., those who become eligible for permanent residency). Pangea typically handles approximately fifteen or twenty such cases a year, and may handle more, depending on how many derivative claims there are (for which Pangea generally charges separately). If the rule decreases the number of adults and children eligible for asylum, it will necessarily decrease Pangea's revenue stream tied to these post-asylum status changes.

23. The relief requested in the Plaintiffs' Complaint would properly address the injuries to Pangea described above. If Plaintiffs prevail in this action, Pangea would be able to devote its staff time and resources to more clients than it would be able to if the Rule were permitted to take effect.

24. Pangea is unaware of any way it can recover the increased costs that the Rule will impose on Pangea as an organization, and would suffer immediate and irreparable injury under the Rule if the rule were permitted to take effect.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 2, 2020

San Francisco, CA

*/s/ Etan Newman*
Etan Newman