# EXHIBIT B

Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Sabrineh Ardalan (*pro hac vice* forthcoming)
sardalan@law.harvard.edu
Philip L. Torrey (*pro hac vice* forthcoming)
ptorrey@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504
Facsimile:  +1 617 495 8595

Sirine Shebaya (*pro hac vice* forthcoming)
sirine@nipnlg.org
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788
Facsimile:  +1 617 227 5495

Leila Kang (*pro hac vice* forthcoming)
leila@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

*Attorneys for Plaintiffs*
(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| PANGEA LEGAL SERVICES; DOLORES STREET COMMUNITY SERVICES, INC.; CATHOLIC LEGAL IMMIGRATION NET-WORK, INC.; and CAPITAL AREA IMMI-GRANTS' RIGHTS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, *under the title of Acting Secretary of the Department of Homeland Security*; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security;* U.S. CITIZENSHIP AND IMMIGRATION SERVICES; | Case No.  3:20-cv-07721<br><br><br><br>**DECLARATION OF KATHERINE MAHONEY** |

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT;
TONY H. PHAM, *under the title of Senior
Official Performing the Duties of the Director of
U.S. Immigration and Customs Enforcement*;
U.S. CUSTOMS AND BORDER PROTECTION;

MARK A. MORGAN, *under the title of Senior
Official Performing the Duties of the
Commissioner of U.S. Customs and Border
Protection*;
U.S. DEPARTMENT OF JUSTICE;
WILLIAM P. BARR, *under the title of U.S.
Attorney General*;
EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW; and
JAMES MCHENRY, *under the title of Director
of the Executive Office for Immigration Review*,

Defendants.

I, Katherine Mahoney, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.  I submit this sworn declaration in support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Stay.

2.      Paragraph 2 of the Complaint filed in connection with the above-captioned action on November 2, 2020 (the "Complaint") accurately describes a current client of Dolores Street Community Services, Inc. ("DSCS").  The client is referred to in the Complaint by a pseudonym, Bryan, to protect his safety and preserve confidentiality.

3.      I serve as the Litigation Director at DSCS, where I have worked since 2019.

4.      DSCS is a 501(c)(3) non-profit organization located in San Francisco, CA.

5.      DSCS is a multi-issue, multi-strategy organization focused on improving the lives of low-income individuals in San Francisco, CA, and the surrounding Bay Area, by providing services spanning four interconnected areas:  (i) housing and shelter; (ii) immigrants' rights; (iii) workers' rights; and (iv) community organizing and advocacy.  DSCS provides immigration legal services and direct legal representation to its clients, but also partners with local and national organizations to further its mission and carry out larger-scale advocacy initiatives.

6.      DSCS's immigration-focused services fall into two main programs:  the Deportation Defense & Legal Advocacy Program ("DDLAP"), which was founded in 2008, and the Immigrant Rights and Community Empowerment Program ("IRCE"), which was founded in 2018.

7.      IRCE was founded in 2018 and works primarily in partnership with other local collaboratives—the San Francisco Immigrant Legal and Education Network ("SFILEN"), the San Francisco Rapid Response Network ("SFRRN"), and the Northern California Rapid Response and Immigrant Defense Network ("NCRRIDIN") for the Bay Area region—to amplify the impact of DSCS's immigrant rights work in San Francisco and Northern California.  DSCS is the lead organization for SFILEN and the fiscal lead for SFRRN.  Through these collaboratives, DSCS works with other advocacy and legal organizations to provide legal representation and advocacy to community members throughout Northern California.

DECLARATION OF KATHERINE MAHONEY - CASE NO. 3:20-cv-07721

8.      The Deportation Defense & Legal Advocacy Program was founded in response to immigration enforcement raids in San Francisco's Mission District in 2008.  Through DDLAP, DSCS provides direct legal representation to individuals facing deportation, including individuals detained by U.S. Immigration and Customs Enforcement ("ICE") and individuals—primarily survivors of labor trafficking—filing affirmative asylum applications.  DDLAP also provides limited immigration-related legal services to members of the community, including free immigration consultations and regular clinics, assistance with time-sensitive legal filings, and filing Deferred Action for Childhood Arrivals ("DACA") applications and renewals, as well as undertaking significant advocacy work through partnerships with local and national organizations and coalitions. Like IRCE, DDLAP works with regional collaboratives, including the San Francisco Immigrant Legal Defense Collaborative ("SFILDC") and the California Collaborative for Immigrant Justice ("CCIJ") to expand pro bono representation to individuals facing removal in Northern California.

9.      DSCS provides full-scope direct legal services to roughly 150 clients annually, a number that includes filing approximately 25 new asylum applications, including affirmative applications, per year.  Approximately 45 percent of DSCS's current clients have had some contact with the criminal justice system.

10.     DSCS provides other immigration services, such as free clinics, consultations, and limited-scope representation, to roughly 240 individuals annually.

11.     The Rule challenged in the Complaint, *see Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67202 (October 21, 2020) ("Rule"), would irreparably harm DSCS in multiple ways absent enjoinder of the Rule.  Whatever the intent of the Rule, the impact is clear: by imposing new categorical bars to asylum eligibility, the Rule disproportionately impacts some of DSCS's most vulnerable clients and frustrates the DSCS mission of helping obtain protection for people who meet the definition of refugee and others fleeing persecution in their home countries.  As a result of this Rule, asylum eligibility will become even more limited and the immigrants served by DSCS who are subject to these new bars will face continued instability and uncertainty, and the possibility of removal to countries where they face severe harm or even death.

12.     The Rule would significantly limit the overall number of clients DSCS is able to

serve, placing the organization in an impossible position: it would need to raise more funds and hire more staff to serve the same number of clients, or reduce the number of clients it serves to fit within its current budget. The numerous recent changes to asylum eligibility and processing, including this Rule, further frustrate DSCS's ability to carry out its mission, as the organization is forced to expend significant time and its limited resources on making adjustments to its internal processes to keep up-to-date with the frequency and scope of changes to the legal asylum framework.

13.    If permitted to take effect, the Rule would dramatically increase the number of individuals potentially barred from obtaining asylum. Consequently, DSCS's staff would have to expend more time and resources at both the outset of each case, and throughout the pendency of each case, to determine whether any of the new asylum bars could be triggered and to assess the potential impact of any prior convictions, arrests, or even mere allegations. Indeed, under the new Rule, asylum seekers can be categorically barred from obtaining protection on the basis of even modified, vacated, or expunged convictions.

14.    Moreover, the Rule would significantly increase the amount of DSCS staff time and resources each asylum-seeker's case requires, including time spent on analyzing and briefing eligibility issues; time and resources spent on obtaining any records of arrests and/or convictions; and resources spent on finding and preparing witnesses and experts.

15.    DSCS's clients are survivors of community and domestic violence, workplace exploitation and human trafficking, and homelessness or housing instability—all populations typically subject to over-policing and over-criminalization. Under the new Rule's categorical bars, asylum seekers—and particularly clients of DSCS—will be precluded from obtaining protections on the basis of a vast array of conduct. Indeed, in the case of domestic-violence related grounds, the categorical bar will be imposed on the basis of mere allegations of conduct without any adjudication of guilt.

16.    In addition, many of DSCS's clients suffer from severe mental illness, including Post-Traumatic Stress Disorder ("PTSD"). This Rule, whose new categorical bars to asylum in-

DECLARATION OF KATHERINE MAHONEY - CASE NO. 3:20-cv-07721

clude any drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence, would likely have a disproportionate impact on these particularly vulnerable populations.  Asylum seekers are an inherently vulnerable population because of the trauma they experienced in their countries of origin and, often, along the journey to find safety, and studies show that at least one out of every three asylum seekers struggles with anxiety, depression, and/or PTSD.  It has also been shown that there is a high prevalence of comorbidity of PTSD and substance use disorders: individuals with PTSD are up to 14 times more likely to struggle with substance use disorder.  DSCS's clients are often unable to access affordable medical care and treatments for complex trauma and may turn to drugs and alcohol in an effort to self-medicate.  The approach taken by the new Rule ignores the evidence around the vulnerabilities of the asylum-seeking population and would significantly frustrate the mission of organizations like DSCS, whose clients are typically very low income and at-risk individuals.

17.     This Rule would also have a significant negative impact on the families DSCS serves, many of whom are mothers and fathers who fled their home countries with their young children.  At present, if an individual is granted asylum, any of their family members already in the United States whom they included on their asylum application may also be granted asylum, and they can file a petition to bring remaining eligible family members *not* in the United States to the United States.  Unlike asylum, however, withholding of removal does not provide any relief for an eligible individual's family members, whether they are in the United States or in another country.  Moreover, although withholding of removal is available to those individuals who can establish that being removed to the proposed countries would "more likely than not" result in persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, the individual still can be removed to a third country if doing so would not threaten their life or freedom.

18.     Thus, under the new Rule, if a mother who flees to the United States is suddenly subject to one of the Rule's expanded asylum bars, and thus forced to seek withholding of removal only, she will no longer be able to ensure that her children can also obtain protection in the United

4

States, regardless of whether she is granted withholding of removal.  Instead, if her children are still in her home country, they would have to come to the United States and seek asylum on their own, likely as unaccompanied children.  If her children fled to the United States with her, they would need to establish their own eligibility for protection, regardless of their age.  In some cases, a child's reasons for fearing return may be derivative of their parent's fear, and thus too attenuated to meet the asylum requirements independently.  Because separation from one's parents is *not*, standing alone, generally considered a basis for asylum, this de facto decoupling of family cases is likely to result in increased family separation, where some family members qualify for asylum and others do not, so are removed.  The practical impact for organizations including DSCS is that the organization will see an increase in cases where it must seek relief for every member of a family as a principal, rather than being able to rely on derivative status, alongside a decrease in the number of resources the organization actually has available.  This decoupling of DSCS's current cases would also impact its ability to take on new clients.

19.     DSCS raised the above concerns and others in the comment it submitted in opposition to the then-proposed Rule.  However, in response to those comments, the final Rule says only that the categorical bars will "create a more streamlined and predictable approach that will increase efficiency in immigration adjudications" and "increase predictability", a response which ultimately ignores the realities faced by immigration attorneys, like the staff at DSCS.  To the contrary, some of the bars are so subjective that they will inevitably be applied disparately depending on the adjudicator.  This will create more unpredictability for clients and result in tireless litigation over the legal questions raised by these new bars.

20.     Likewise, in response to comments from DSCS and other organizations alleging that the proposed Rule violated the United States' obligations to protect refugees and asylum seekers under international law, the final Rule states only that because it does not affect withholding of removal or CAT protection, it is consistent with international law and, furthermore, that agreements like the Universal Declaration of Human Rights are non-binding and do not impose legal obligations on the United States.  Again, however, this ignores the realities faced not only by immigration attorneys, but also by refugees and asylum seekers.  As discussed above and in its public

5

DECLARATION OF KATHERINE MAHONEY - CASE NO. 3:20-cv-07721

comment, while withholding of removal may not be *directly* impacted by this Rule, the interplay between withholding of removal and the Rule's sweeping categorical bars can easily lead to cruel results, like the separation of parents and children, which will have a particularly adverse impact on DSCS's clients.

21.    The added complexities posed by the new Rule—sections of which purport to allow immigration adjudicators to conduct their own subjective inquiries into conduct that may never have resulted in a conviction—will require the DSCS staff to review its current client list to determine which of its current clients may be affected by the Rule; how the Rule might impact those cases; how to communicate that impact to those clients; and how to revise its legal strategy, if DSCS could even continue representing those clients.

22.    In response to this Rule, DSCS has already begun to divert substantial time and resources to train its staff and legal assistants on the changes to asylum eligibility, as well as to undertake a review of all of its training materials and templates, to ensure their accuracy. Likewise, DSCS staff has begun to spend more time providing consultations on the nuances of the Rule's eligibility requirements and expects to expend more time and resources on consultations in the near future.

23.    Additionally, the Rule is forcing DSCS to divert resources away from other initiatives to compensate for the time and staffing resources required to respond to the rule. For example, the DSCS team conducts significant advocacy work around conditions for detainees in ICE, and also assists undocumented youth in applying for and renewing their DACA registration. DSCS's legal team also provides consultations and representation to participants in the organization's other programs, such as shelter residents and members of the organization's worker's collaborative. DSCS's ability to continue supporting these communities will be significantly impeded if it is forced to reallocate its already scarce resources in light of the new Rule.

24.    The Rule would also jeopardize DSCS's funding and budget. In 2019, roughly ninety-five percent of DSCS's legal team's funding was tied to state or local funding or grants requiring some form of deliverable (e.g., a specific number of asylum applications filed or clients represented). If permitted to take effect, the Rule would necessarily reduce the number of DSCS's

6

DECLARATION OF KATHERINE MAHONEY - CASE NO. 3:20-cv-07721

clients eligible for asylum. Defending a client against even the existing criminal bars to asylum can require substantially more hours and resources as presenting a claim with no bars; because such a high percentage of our clients have had contact with the criminal justice system, the Rule would drastically increase the resources needed per case. The increased hours DSCS would be required to spend both assessing the impact of the Rule on its current clients and representing those impacted by the Rule would reduce the overall number of clients served. As a result, DSCS could not comply with existing funding conditions and would likely lose funding.

25.     The relief requested in the Plaintiffs' Complaint would properly address the injuries to DSCS described above and in the public comment submitted by DSCS in opposition to the Rule. If Plaintiffs prevail in this action, DSCS would be able to devote its staff time and resources to more clients than it would be able to if the Rule were permitted to take effect.

26.     DSCS is unaware of any way they can recover the increased costs that the Rule will impose on them as an organization, and would suffer immediate and irreparable injury under the Rule if the rule were permitted to take effect.

7

1       I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3

4       Dated: November 2, 2020

5       San Francisco, CA

6

7

8       _____
     Katherine Mahoney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KATHERINE MAHONEY - CASE NO. 3:20-cv-07721