# EXHIBIT C

Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Sabrineh Ardalan (*pro hac vice* forthcoming)
sardalan@law.harvard.edu
Philip L. Torrey (*pro hac vice* forthcoming)
ptorrey@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504
Facsimile:  +1 617 495 8595

Sirine Shebaya (*pro hac vice* forthcoming)
sirine@nipnlg.org
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788
Facsimile:  +1 617 227 5495

Leila Kang (*pro hac vice* forthcoming)
leila@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

*Attorneys for Plaintiffs*
(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| PANGEA LEGAL SERVICES; DOLORES STREET COMMUNITY SERVICES, INC.; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; and CAPITAL AREA IMMIGRANTS' RIGHTS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, *under the title of Acting Secretary of the Department of Homeland Security*; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security;* U.S. CITIZENSHIP AND IMMIGRATION SERVICES; | Case No.  3:20-cv-07721<br><br>**DECLARATION OF MICHELLE N. MENDEZ** |

| | |
|---|---|
| 1 | U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; |
| 2 | TONY H. PHAM, *under the title of Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement*; |
| 3 | |
| 4 | U.S. CUSTOMS AND BORDER PROTECTION; |
| 5 | MARK A. MORGAN, *under the title of Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection*; |
| 6 | |
| 7 | U.S. DEPARTMENT OF JUSTICE; |
| 8 | WILLIAM P. BARR, *under the title of U.S. Attorney General*; |
| 9 | EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and |
| 10 | JAMES MCHENRY, *under the title of Director of the Executive Office for Immigration Review*, |
| 11 | |
| 12 | Defendants. |

I, Michelle N. Mendez, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Stay.

2. I am the Director of the Defending Vulnerable Populations Program at the Catholic Legal Immigration Network, Inc. ("CLINIC" or the "Organization"), whose main office is located in Silver Spring, Maryland. I have worked at CLINIC since January 2015.

3. CLINIC is a 501(c)(3) non-profit organization, with a national office in Silver Spring, Maryland, an office in Oakland, California, and attorneys and other staff who work remotely across the United States. Three attorneys with CLINIC's Training and Legal Support ("TLS") team work from the Oakland, California office, providing technical assistance to CLINIC's *entire* network of immigration legal services providers and other nonprofit agency staff throughout the United States, conducting web-based trainings on a variety of immigration matters, and issuing written resources for practitioners on immigration matters.

4. CLINIC is the nation's largest network of nonprofit legal immigration services programs. CLINIC's mission is to provide immigration legal services to low income and vulnerable populations through our network. This mission is part of CLINIC's broader purpose of embracing the Gospel value of welcoming the stranger, and promoting the dignity and protecting the rights of immigrants. CLINIC believes the United States has a moral imperative to accept asylum seekers as well as obligations under domestic and international law. Asylum seekers come to the United States fleeing persecution and many arrive with nothing more than the clothes on their back. Consequently, due to the severity of past harm suffered, many asylum seekers endure ongoing trauma-related mental health issues and those asylum seekers who lack adequate support and mental health treatment may self-medicate through substance abuse and become involved in the criminal justice system. However, this Rule places them further away from the support and treatment they need and instead places them on a path to asylum denial and deportation to the country they fled.

5. The CLINIC network includes almost 400 affiliated immigration programs, which operate in 48 states and the District of Columbia. The network includes faith-based institutions, farmworker programs, domestic violence shelters, ethnic community-focused organizations, libraries and other entities that serve immigrants. In total, CLINIC's network employs more than 2,300 attorneys, accredited representatives, and paralegals who, in turn, serve hundreds of thousands of low-income immigrants each year. Many CLINIC affiliates are on the "List of Pro Bono Service Providers" that the Executive Office for Immigration Review ("EOIR") provides to asylum seekers. For example, Catholic Charities of the East Bay in Oakland, California, is on the EOIR list and is a CLINIC affiliate. Providing free and low-cost legal services to asylum seekers is a critical part of the mission of CLINIC and our affiliates.

6. In addition to employing attorneys, members of CLINIC's network, referred to as "affiliates," employ United States Department of Justice ("DOJ") "accredited representatives." Accredited representatives are non-attorney staff or volunteers who are approved by the DOJ to represent noncitizens before the Department of Homeland Security ("DHS"), and, in some instances, in removal proceedings before the immigration court and the Board of Immigration Appeals ("BIA"). An accredited representative must work for a non-profit religious, charitable, social service, or similar organization that provides low- or no-cost immigration legal services.

7. CLINIC provides critical training and mentorship to the attorneys and DOJ-accredited representatives who work at our affiliates. CLINIC's trainings encompass topics such as courtroom skills, updates to asylum law, and changes to removal proceedings. Additionally, CLINIC staff write in-depth practice advisories to assist affiliates and other immigration practitioners to stay abreast of rapidly changing rules.

8. In addition to providing direct legal services, CLINIC provides technical support to our affiliates through the "Ask-the-Experts" portal on our website. Attorneys and accredited representatives at affiliate organizations submit inquiries regarding individual immigration matters that are particularly complex, and CLINIC staff provide expert consultations. If a submitted ques-

tion is broadly applicable, CLINIC's staff may spend weeks developing trainings or written resources designed to answer it.

9. CLINIC's affiliates provide pro bono or low-cost immigration-related services using materials, training, education, best practices, and sometimes, funding provided by CLINIC. A significant percentage of CLINIC affiliates provide legal services related to asylum claims, and CLINIC's affiliate network assists with thousands of asylum applications per year, including providing direct legal representation.

10. CLINIC is aware that gaining asylum in the United States is highly dependent on access to competent counsel. CLINIC's Defending Vulnerable Populations Program's staff leverages the organization's substantial asylum expertise to provide support to CLINIC's affiliates on asylum matters, including through trial skills trainings on representing asylum seekers in immigration court, practice advisories, and technical assistance. The Defending Vulnerable Populations Program also works to increase the number of fully accredited representatives and attorneys who are qualified to represent immigrants in immigration court proceedings through specialized curricula and training programs on immigration court trial skills. The curriculum includes training based on complicated asylum scenarios, such as how to handle an asylum case file involving a Latino youth with false gang allegations.

11. The Defending Vulnerable Populations Program has created several in-depth written resources on asylum over the past two years. These include practice advisories such as: Practice Advisory: LGBTI DACA Recipients and Options for Relief under Asylum Law (June 25, 2020); Practice Advisory: Overcoming the Asylum One-Year Filing Deadline for DACA Recipients (June 25, 2020); Practice Pointer: *Matter of L-E-A-* (April 20, 2020); A Guide to Assisting Asylum-Seekers with In Absentia Removal Orders (July 10, 2019); Practice Advisory: Asylum Seekers Stranded in Mexico Because of the Trump Administration's Restrictive Policies: Firm Resettlement Considerations (April 24, 2019). CLINIC's Defending Vulnerable Populations Program has also conducted webinars on, among other topics: changes to particular social group case law; writing asylum declarations; and motions to reopen based on changed country conditions.

12. In addition to the support provided to organizational affiliates, CLINIC's Defending Vulnerable Populations Program provides guidance and orientation to families separated pursuant to the Trump administration's "Zero Tolerance Policy" who are pursuing asylum in the United States; mentorship to the formerly separated families' legal counsel; representation on the initial I-765 employment authorization applications; and asylum application assistance for those formerly separated families who lack legal counsel.

13. CLINIC's Defending Vulnerable Populations Program also has a Remote Motion to Reopen Project, which has provided representation to formerly separated families, families released from family detention, asylum seekers, and other vulnerable people around the country, in filing motions to reopen before the immigration courts and the Board of Immigration Appeals since 2016. Through this project, CLINIC partners with pro bono attorneys to provide high quality representation on motions to reopen, and once the case is successfully reopened, CLINIC places the case with competent local counsel, providing further mentorship assistance as needed.

14. CLINIC's Defending Vulnerable Populations Program provides pro bono legal counsel to asylum seekers appealing to the BIA and the U.S. courts of appeals through our BIA Pro Bono Project, and, to a lesser extent, direct representation for asylum seekers in immigration court on a pro bono basis. If CLINIC is unable to assign pro bono matters, such as asylum applications, to a member of its network of affiliates, CLINIC staff—working individually or as part of a larger team—will often undertake the direct representation themselves.

15. The Rule challenged in the Complaint, *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67202 (October 21, 2020) ("Rule"), would irreparably harm CLINIC in multiple ways unless it is enjoined, including by frustrating CLINIC's mission to serve and support as many immigrants—and affiliate organizations providing immigration services—as possible.

16. As the hub of the largest network of immigration legal service providers in the United States, CLINIC is tasked with analyzing every significant change to immigration law and policy and creating digestible information to hundreds of organizations and thousands of practitioners nationwide. The Rule will require this analysis and creation of training materials, but at a

much larger scale because asylum-related services (including the filing of affirmative asylum applications) account for a large percentage of the services provided by CLINIC and our affiliates, approximately 45 percent of which provide asylum representation. CLINIC will also need to devote significant time and resources to informing the communities it serves, participating in further advocacy, and updating our resources.

17. As a result of the Rule, CLINIC will need to divert significant resources, prior even to the Rule's effective date, as many asylum seekers may rush to file before the new requirements take effect. CLINIC has already diverted our employees' time and efforts in advocating against this Rule, including submitting a comment during the notice and comment period, commenting on multiple subsequent proposed Rules that would affect asylum seekers, and analyzing the substantial overlap and consequences between this then-proposed Rule and the other proposed rules. Additionally, CLINIC will continue to devote significant time and resources to informing the communities it serves, participating in further advocacy, and updating relevant resources.

18. The Rule will have an immediate and tangible impact on the day-to-day work of CLINIC affiliates. Each practitioner will immediately need to know how to assist clients under the new Rule and CLINIC's job will be to provide this information. All 2,000-plus affiliate legal staff and their volunteers will need to be trained on the Rule's impact on asylum-seeking clients and prospective clients. CLINIC has already allocated considerable staff time to reviewing the proposed Rule and anticipates incurring significant additional expenses if this Rule goes into effect, as the organization will have to develop new training and legal support resources for, and respond to, technical support inquiries from our affiliate network.

19. CLINIC's affiliates depend on CLINIC to provide real-time and up-to-date guidance on immigration law and policy, a service which has become both increasingly critical and increasingly difficult in light of the volume and scope of changes to the asylum process—and the resulting interplay between these regulatory changes—that have occurred even just over the last four years. CLINIC delivers this guidance via emails, webinars, and our website.

20. In response to the large number of questions relating to the intersection of criminal

law and immigration law that CLINIC has *already* received via our network of affiliates, CLINIC hired a consulting attorney specializing in this area of law to respond to such inquiries. Because this consulting attorney charges CLINIC an hourly rate, CLINIC expects this Rule to necessarily have a negative impact on our budget, as CLINIC expects to receive a marked increase in the number of queries regarding the implications of this Rule for the consulting attorney to analyze. Furthermore, the complex and nuanced factors contemplated by *this* new Rule will require CLINIC to devote significant additional resources and staffing to develop and provide timely training on how to evaluate immigrants' eligibility for asylum, including the impact of any prior convictions, and, in some instances, criminal allegations without convictions.

21. In the past year alone, CLINIC has had to publish numerous substantive trainings and practice alerts in response to changes to the asylum framework, including a fact sheet for practitioners navigating immigration court proceedings for unaccompanied child clients pursuing initial asylum jurisdiction with USCIS; an in-depth analysis and year-to-year comparison of both the annual Human Rights Report published by the U.S. Department of State and the USCIS Asylum Office's Credible Fear Lesson Plan, which is designed to train asylum officers and set forth standards to be followed when conducting credible fear interviews; summary analysis on the "Security Bars and Processing" proposed rule that aims to bar entry of asylum applicants who have tested positive for COVID-19, come from a country where COVID-19 is prevalent, and/or exhibit COVID-19 symptoms; answers to FAQs regarding multiple changes to the employment authorization rules for asylum seekers; practical guidance regarding representation of asylum seekers with family-based claims; and a practice manual containing an overview of applicable laws, regulations, and guidance concerning the I-730 petition process for asylees and refugees to petition for family members, as well as practical information on how to navigate the application process from completing the form I-730, to compiling evidence, to troubleshooting with government agencies. In addition, CLINIC filed numerous comments on proposed rules impacting the asylum process, as well as filing several amicus briefs in matters concerning asylum.

22. As a result of the new Rule, in addition to providing the above-mentioned practical

alerts and updates, CLINIC will likely have to re-work our core existing trainings and materials to account for the proposed changes. For example, CLINIC would have to re-work its asylum e-learning course, the criminal consequences on immigration status webinars and webinar series, our legal practitioner toolkit and removal defense toolkit, and the "Representing Clients in Immigration Court" publication issued by the American Immigration Lawyers Association. Additionally, CLINIC will have to rewrite portions of existing written materials, which will need to be reviewed for potential changes in light of the new Rule, and it is likely that some will need to be fully rewritten. CLINIC will also need to write an in-depth article on the final Rule.

23. In general, the Rule will result in a significant expenditure of staff resources to respond to the various changes to the asylum eligibility guidelines. This diversion of resources will take staff away from other CLINIC initiatives. CLINIC has already had to divert resources to respond to numerous changes to immigration regulations including changes to public charge determinations, fee waivers and increases, responding to Requests for Evidence in cases pending before USCIS, and additional near-constant changes to long-established immigration practice. These changes are detrimental to immigrant clients and have resulted in CLINIC having to significantly increase the staffing levels in our Defending Vulnerable Populations Programs. CLINIC anticipates that the need to continue increasing staffing and diverting existing resources will only intensify due to the Rule, although the organization's actual ability to hire such staff may not be commensurate with demand. Much of the work that CLINIC will have to initiate in response to the changes will be brand new work. But for the need to respond to the changes in the Rule, CLINIC staff would otherwise be devoting time to helping affiliates tackle difficult legal problems under existing law, or training and teaching on other important issues including removal defense, asylum, naturalization, adjustment of status, Special Immigrant Juvenile Status, Violence Against Women Act ("VAWA") self-petitions, T and U visas, Temporary Protected Status, Deferred Action for Childhood Arrivals ("DACA"), and Liberian Refugee Immigration Fairness ("LRIF").

24. As discussed above, CLINIC expects that the Rule will increase the number of queries submitted through its ask-the-expert website portal concerning the intersection of criminal and

immigration law.  Indeed, while recent regulatory changes have made it more difficult to assess asylum eligibility, this new Rule imposes substantial—and previously untested—challenges for any immigration law practitioner, including CLINIC and our affiliates.  The new Rule will require immigration practitioners to engage in a more complicated analysis of whether an asylum seeker is barred from asylum eligibility, based on analyzing both state and federal criminal law, pushing immigration practitioners even further outside of their areas of expertise.

25.     Moreover, the Rule would significantly increase the amount of time and resources each asylum seeker's case requires, including time spent on briefing eligibility issues; time and resources spent on obtaining any records of arrests and/or convictions; and resources spent on finding and preparing witnesses and experts.  The Rule will also impact the length of the adjudication process itself.  Indeed, as a result of recent decisions, even if the parties stipulate to a particular issue before the immigration judge, the asylum seeker will still have to present evidence and arguments to prove that element of asylum in order to prevent reversal by the BIA in the event of an appeal.

26.     The current clients of CLINIC, our affiliates and our pro bono partners include many individuals seeking asylum as a family unit.  Often, CLINIC and our affiliates are able to present a single case on behalf of such families, because the children's claims are treated as derivative of their parents' claims.  However, if parents were rendered ineligible for asylum under the new Rule, their children would no longer have a derivative claim and each child would have to independently prove eligibility for asylum.  The Rule will likely lead to some parents winning withholding of removal, but not asylum.  With no ability to seek derivative benefits under withholding, children who do not have independent persecution-based claims would be ordered removed, forcing parents to choose between being returned to countries where they will be persecuted or being permanently separated from their children.  CLINIC would have to explain these more complicated procedural postures, as well as the ethical concerns they raise, to affiliates who may have to either accept fewer cases as each family's case involves more preparation time, or figure out how to stretch their already-limited resources to handle such cases for current clients

8
DECLARATION OF MICHELLE N. MENDEZ  - CASE NO. 3:20-cv-07721

27. In summary, at a minimum, the new Rule will require CLINIC to do the following: analyze the Rule for consequences to our affiliates and their client base; write a legal analysis of the Rule for practitioners; write an update about the Rule for our mass communications; create a webinar on the changes; update website content where asylum application language exists; update any relevant toolkits and/or other documents; field affiliate inquiries to our portals; provide program management consultations to affiliates struggling to serve low-income immigrants due to policy changes resulting in a lower number of people served and declining revenue, if not also staff reductions; and provide technical support to affiliates needing to fundraise more through grant applications due to declining numbers of open cases.

28. The Rule could also jeopardize CLINIC's funding and budget. CLINIC receives funding from a variety of sources, including funding in exchange for services such as trainings, written resources, and technical assistance. This Rule will force CLINIC to spend more time than previously planned for on asylum services. If CLINIC has to spend more time on asylum services, our funding will not extend as far, thus forcing CLINIC to seek new funding to cover this gap. However, seeking such new funding takes time and bona fide attempts to find new funding are often futile.

29. Similarly, loss of, or even reduced, funding may cause CLINIC affiliates to reduce the number of full-time staff positions available. Loss of staff time or positions altogether, in turn, will create a longer wait for one-on-one appointments and mean that those affiliates will be able to serve fewer clients. That reduced output will, in turn, give funders less cause to use their money to support CLINIC affiliates as funders seek to maximize the outcomes of their donations.

30. The changes to the Rule will undermine CLINIC's and our affiliates' ability to fulfill one of their central functions of providing asylum-related assistance, thereby dramatically disrupting CLINIC's broader mission of providing immigration legal services to low-income and vulnerable populations. As described above, if the Rule is permitted to take effect, CLINIC and our affiliates will be required to divert significant resources to address the Rule. This diversion of existing resources, combined with a concomitant loss in funding, will further exacerbate the harm

to CLINIC caused by the Rule.

31. The relief requested in the Plaintiffs' Complaint would properly address the injuries to CLINIC described above, and in the public comment CLINIC submitted in opposition to the Rule. If Plaintiffs prevail in this action, CLINIC would be able to devote our staff time and resources to more clients than it would be able to if the Rule were permitted to take effect.

32. CLINIC is unaware of any way it can recover the increased costs that the Rule will impose on CLINIC as an organization, and would suffer immediate and irreparable injury under the Rule if the rule were permitted to take effect.

1  I declare under penalty of perjury under the laws of the United States of America that the
2  foregoing is true and correct.

4  Dated: November 2, 2020
5  Baltimore, Maryland

_____
Michelle N. Mendez