# EXHIBIT D

Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Sabrineh Ardalan (*pro hac vice* forthcoming)
sardalan@law.harvard.edu
Philip L. Torrey (*pro hac vice* forthcoming)
ptorrey@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504
Facsimile:  +1 617 495 8595

Sirine Shebaya (*pro hac vice* forthcoming)
sirine@nipnlg.org
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788
Facsimile:  +1 617 227 5495

Leila Kang (*pro hac vice* forthcoming)
leila@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

*Attorneys for Plaintiffs*
(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| PANGEA LEGAL SERVICES; DOLORES STREET COMMUNITY SERVICES, INC.; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; and CAPITAL AREA IMMIGRANTS' RIGHTS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, *under the title of Acting Secretary of the Department of Homeland Security*; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security;* U.S. CITIZENSHIP AND IMMIGRATION SERVICES; | Case No.  3:20-cv-07721<br><br>**DECLARATION OF CLAUDIA CUBAS** |

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
TONY H. PHAM, *under the title of Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement*;
U.S. CUSTOMS AND BORDER PROTECTION;
MARK A. MORGAN, *under the title of Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection*;
U.S. DEPARTMENT OF JUSTICE;
WILLIAM P. BARR, *under the title of U.S. Attorney General*;
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and
JAMES MCHENRY, *under the title of Director of the Executive Office for Immigration Review,*

Defendants.

I, Claudia Cubas, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Stay.

2. I serve as the Litigation Director for the Capital Area Immigrants' Rights Coalition ("CAIR Coalition"), an organizational plaintiff in this action. Prior to serving as Litigation Director, I was the Senior Program Director for the Detained Adult Program at CAIR Coalition. I have worked for CAIR Coalition since 2011. I manage and coordinate litigation across the organization, involving issues related to access to justice, detention, and eligibility for relief for adults and children who are detained by U.S. Immigration and Customs Enforcement ("ICE") and the Office of Refugee and Resettlement ("ORR").

3. CAIR Coalition is a 501(c)(3) nonprofit organization headquartered in Washington, D.C., with an additional office in Baltimore, Maryland, and is listed on the Executive Office for Immigration Review's list of Pro Bono Legal Service Providers. We represent clients primarily before the two local immigration courts in our regions the Arlington, Virginia and the Baltimore, Maryland immigration courts, but also have a number of clients who are detained or live in other parts of the country.

4. CAIR Coalition is the only organization solely dedicated to providing legal services to immigrant men, women, and children who are detained by ICE or the ORR in Virginia and Maryland. CAIR Coalition strives to ensure equal justice for all migrant men, women, and children at risk of detention and deportation in the Washington, D.C. metropolitan area and beyond.

5. CAIR Coalition is comprised of three main programs: the Detained Adult Program, the Detained Children's Program, and the Immigration Impact Lab. The Detained Adult and Children's programs are the backbone of the organization and are focused on providing direct services; the Lab program is focused on impact and federal court work.

6. The Detained Adult Program has four main work components: (1) providing educational services in the form of "know your rights" presentations, conducting individual consultations (intakes), and conducting pro se workshops with unrepresented detained noncitizens in the custody of ICE at facilities located in Virginia and Maryland; (2) connecting unrepresented detained migrants who cannot afford a lawyer with pro bono attorneys from CAIR Coalition's various pro bono partners; (3) representing detained immigrants found legally incompetent while appearing pro se before an immigration judge as part of the National Qualified Representative Program ("NQRP"); and the newest component, (4) providing in-house direct representation to indigent immigrants from various local regions throughout the course of their removal proceedings applying a universal representation model.

7. The Detained Children's Program has three main work components: (1) providing educational services in the form of "know your rights" presentations and conducting individual consultations (intakes) with unrepresented detained noncitizens in the custody of ORR at facilities located in Virginia and Maryland; (2) connecting unrepresented detained immigrants who cannot afford a lawyer with pro bono attorneys from CAIR Coalition's various pro bono partners; and, (3) providing in-house direct legal representation to immigrant children throughout the course of their removal proceedings.

8. Asylum applications represent a vital component of CAIR Coalition's organizational mission and account for much of the legal services it provides. While a majority of CAIR Coalition's work focuses on assistance and representation of people before the two local immigration courts in the region, the organization also represents unaccompanied immigrant children ("UACs") in interviews before U.S. Citizenship and Immigration Services ("USCIS") Asylum Offices.

9. CAIR Coalition works with the thousands of adults and children detained by ICE in the Washington, D.C. and Virginia areas to provide information, support, and representation during Immigration Court proceedings. In 2019, CAIR Coalition helped represent 477 individuals

(eleven percent of CAIR Coalition's total intake) in such proceedings, and provided *pro se* assistance to an additional 241 people.  Also in 2019, CAIR Coalition conducted 4,090 individual consultations with children and adults in detention, and provided pro bono representation or significant *pro se* assistance to eighteen percent of people we met in detention.

10. The Rule challenged in the Complaint, *see Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67202 (October 21, 2020) ("Rule"), would irreparably harm CAIR Coalition in multiple ways absent enjoinder of the Rule, including by frustrating CAIR Coalition's mission to serve as many detained immigrants lawfully seeking asylum as possible.

11. The Rule would significantly limit the overall number of clients CAIR Coalition is able to service.  In 2019, CAIR Coalition provided direct representation to, and/or obtained pro bono representation for, approximately 477 immigrants, and as of the date of this declaration, for the year 2020, has connected 310 people to in-house or pro bono attorneys.  For 2019, approximately seventy-five percent of the adults and five percent of the children CAIR Coalition connected with a lawyer had some type of a criminal conviction or other involvement with the criminal justice system.  These percentages have not significantly changed based on a review of CAIR Coalition's current 2020 placement data.

12. There are two key factors that contribute to these percentages described above:  (1) Unlike legal service providers at the border, who mainly provide asylum assistance to newly arrived asylum seekers, many who do not have criminal histories, CAIR Coalition's clients tend to have deeper ties to the United States, as CAIR Coalition provides services to a large population of detained immigrants who have been the subject of internal arrests by ICE; and (2) CAIR Coalition's children's program provides services to the only secure detention center for immigrant children in the nation.

13. It is generally the case that matters involving individuals with criminal histories typically require significantly more resources than matters without a criminal justice component (e.g. representation of a recent arriving immigrant seeking asylum).  For instance, CAIR Coalition staff aims to complete initial intake in eight minutes, but these may increase by two to five minutes,

depending on the length of the person's criminal history. After intake, CAIR Coalition staff spend on average two to three minutes entering intake information in their database and verifying certain basic information such as when the individual's next court date is and what their current status is. If an individual has a criminal history, this process can take an additional ten minutes, as CAIR Staff must search various local case search systems to confirm any arrests self-reported during the intake process. At the trial representation stage, a typical case may take approximately forty to fifty hours to complete, an amount that can easily increase by ten to twenty hours if the individual has *any* criminal history. If the individual's criminal history is lengthy or serious in nature, a case may exceed one hundred hours of work, as CAIR Coalition staff must engage in significant analysis to determine arguments against bars to asylum or withholding of removal. The above are average work times for the representation of clients with criminal histories based on the asylum criminal bar framework in place *prior* to the Rule.

14. By dramatically increasing the number of individuals potentially subject to criminal bars to asylum eligibility, the Rule would undoubtably increase the proportion of cases requiring resource-intensive assistance by CAIR Coalition staff. The Rule would thus put the organization in an impossible position: CAIR Coalition would either need to raise more funds simply to be able to continue serving the same number of clients, or reduce the number of clients it serves to fit within its current budget.

15. Additionally, CAIR Coalition would be forced to divert significant staff resources to analyzing and interpreting the Rule, overhauling its client information database, and preparing new informational and advocacy materials.

16. For example, even updating CAIR Coalition's client database to include information relevant to the new Rule's asylum eligibility bars would take a single staff member between three to five days to complete, as this information would need to be retrieved for each active client. CAIR Coalition uses Salesforce to keep track of client and case information. Currently, CAIR Coalition staff are only required to input an individual's criminal offense history as part of their client database profile if the offense could be categorized as a removability ground, as the current

bars to relief are based on those grounds (*e.g.*, aggravated felonies, crimes involving moral turpitude, crimes related to controlled substances or firearms offenses). Because the Rule bars people from asylum for non-removability offenses, as well as for conduct that is generally not provided in online case search records, CAIR Coalition staff expect to spend significantly more time entering an individual's complete criminal history, in addition to having to spend more time pulling criminal records from local state courts.

17. Additionally, the base framework of the database and CAIR Coalition's intake process would need to be retooled to add questions and responses relevant to the new bars. It takes approximately five to ten hours to customize, test, and implement small changes to CAIR Coalition's database and an additional three to five hours to train staff on the changes. Given the number of criminal bars newly imposed by this Rule, CAIR Coalition estimates that the changes required to fully customize and update its database to track the new bars and train its staff will exceed twenty hours.

18. Although CAIR Coalition has contracted with a Salesforce systems consultant to assist with such changes, this assistance is subject to a monthly time cap due to cost restrictions. Given the substantial changes required by the Rule, the necessary changes to the Salesforce database could easily take the consultant far longer than their monthly cap permits, requiring CAIR Coalition to expend additional time and money simply to update their database. The opportunity cost of these updates cannot be ignored, especially as CAIR Coalition was already in the midst of several other technological updates, including streamlining volunteer applications, programmatic technical updates identified in the middle of 2020, and transitioning CAIR Coalition staff onto Salesforce's Lightening Platform, many or all of which may need to be deferred in order to prioritize changes to account for the asylum eligibility bars implemented by the Rule, which are set to go into effect in less than a month's time.

19. Additionally, under the Rule, CAIR Coalition's staff would spend substantial resources identifying and sorting asylum-seekers impacted by the Rule from other asylum seekers (i.e., those who would not be subject to the categorical bars or other changes contemplated by the

1  Rule). Many of CAIR Coalition's adult clients came to CAIR Coalition following arrests or convictions within the U.S. criminal legal system, so, as stated earlier, the Rule will necessarily significantly impact a large portion of CAIR Coalition's client base.

20. Consequently, CAIR Coalition would need to expend more time and resources to assess clients during intakes and/or to prepare clients—both adults and children—for their asylum interviews, including to elicit and prepare more facts to determine eligibility based on the Rule's vaguely defined categorical bars and proposed multi-factor test for assessing prior criminal convictions.

21. In 2019, CAIR Coalition provided 4,090 individual consultations with adults and children to ascertain their asylum options, spending 4,000 hours conducting jail visits. The additional time required to account for the sweeping impact of the new Rule would likely cut by a third the number of adults CAIR Coalition could prepare during each jail visit. Although CAIR Coalition has paused in-person jail visits in light of the COVID-19 pandemic, CAIR Coalition staff are still conducting intakes by phone. However, phone intakes require more time than in-person intakes for several reasons: (a) facility staff do not always provide private phone call spaces for such calls; (b) phone use is in high demand inside housing units due to COVID-19; and (c) it takes significantly longer to gain someone's trust and get them to share personal information over the phone, especially when they are inconsistently afforded privacy for such calls. There is no way for CAIR Coalition to compensate for this loss; it has finite resources and only has permission to make jail visits a few times a month, so, together with the limited phone access, time is at a premium.

22. CAIR Coalition's staff also would spend added time and resources on each asylum-seeker's case, including the time and resources required to analyze and brief eligibility issues and obtain any records of arrests and/or convictions that may be needed. Whereas in 2019, CAIR Coalition was able to represent 365 detained adults and children in court, bring 312 full merits hearings, including asylum proceedings, and bring 42 appeals to the Board of Immigration Appeals and the Fourth Circuit Court of Appeals, the Rule would significantly reduce the amount of cases

in which CAIR Coalition could support and represent asylum-seekers going forward.

23. Given the increased complexity resulting from the new Rule (including, *inter alia*, the need to assess the applicability of a number of new bars to asylum eligibility and the impact of any prior convictions an asylum-seeker may have), CAIR Coalition also anticipates that it would not be able to staff client intake interviews with legal assistant or law student volunteers, as it has sometimes been able to do in the past.

24. The inability to rely on legal assistant or law student volunteers for intake interviews will cause a ripple effect felt throughout the organization. For example, CAIR Coalition staff members and volunteer lawyers will be required to redirect their time and energy to intake and preliminary interviews and will thus be unable to assist as many clients in other aspects of the asylum process. Because CAIR Coalition's organizational model relies on volunteer lawyers to represent clients in trial-stage proceedings, a reduction in overall volunteer capacity will necessarily reduce CAIR Coalition's capacity to represent as many clients as possible. Additionally, CAIR Coalition staff members and lawyers, who are trained in immigration work, may not have the criminal expertise required to navigate the complexities of the Rule's *new* bars to asylum, although many have developed some level of expertise as to the *existing* criminal bars. As a result, these new bars will likely require CAIR Coalition's staff members and lawyers to undergo substantial additional training, resulting in further reductions in CAIR Coalition's capacity to represent as many clients as possible.

25. Reduced volunteer capacity would also result in the diversion of resources from other CAIR Coalition initiatives, such as providing translation services, conducting country conditions research. While significant majorities of CAIR Coalition's funds come from federal and local state contracts and foundation grants, the organization still depends on large and small-scale donors, whose contributions primarily go towards non-earmarked operational funds. Maintaining an engaged volunteer workforce not only helps CAIR Coalition with cases, but is also a significant factor in the organization's ability to attract small and large donors, as volunteers often also donate or connect the organization with donors. Fewer volunteer opportunities directly translates into

reduced volunteer engagement and, often, a decrease in the organization's ability to recruit and maintain donors.

26. In addition to providing direct representation to adults and children, CAIR Coalition also hosts workshops for underrepresented individuals and assists detained adults with their *pro se* asylum applications by gathering country conditions, helping them prepare testimony, and serving as a resource for specific questions. In 2019, CAIR Coalition hosted 182 such workshops and assisted 241 adults with their *pro se* applications. The added complexities posed by the new Rule—sections of which purport to allow immigration adjudicators to conduct their own subjective inquiries into conduct that may never have resulted in a conviction—will require the CAIR Coalition staff to revise all current training materials and to spend significantly more time assisting and advising each *pro se* applicant instead of hosting group workshops, thus reducing the total number of applicants it is able to serve.

27. The Rule also will jeopardize CAIR Coalition's already tight budget. If the organization places fewer asylum cases with volunteers at law firms, it is likely to receive fewer of the much-needed firm donations upon which it depends for close to five percent of its annual budget. Much of CAIR Coalition's funding from law firm donations comes from CAIR Coalition giving them opportunities to provide direct assistance with and staffing of with asylum matters; to the extent many clients are no longer eligible for asylum, CAIR Coalition expects that such donations could decrease.

28. Moreover, some of CAIR Coalition's funding is tied to the number of adult clients that the organization serves each year. CAIR Coalition currently has four contracts with local government entities to represent immigrant residents who are in detention. As part of each of these funding contracts, CAIR Coalition agreed to represent a certain number of immigrants per year, a representation goal which was based on the average number of hours and representation capacity for one staff attorney. The increased hours that each asylum-seeker would require if the Rule were permitted to take effect would reduce the overall number of people served, placing this future funding in jeopardy. Indeed, because the Rule would reduce the number of clients CAIR Coalition

could serve in court proceedings per staff member, it is unclear whether CAIR Coalition would be able to comply with existing funding conditions tied to the number of individuals it represents in such proceedings.

29. In sum, the Rule would irreparably harm CAIR Coalition, including by frustrating its fundamental organizational mission to serve as many detained noncitizens as possible. CAIR Coalition would be unable to represent the same number of clients that it has traditionally, both because fewer clients would be eligible for asylum relief and because the organization would have to spend more of its limited resources on each individual case. The Rule also would force CAIR Coalition to divert scarce resources away from other important programs to compensate for the additional time and staffing resources required to continue serving clients under the Rule.

30. The relief requested in the Plaintiffs' Complaint would properly address the injuries to CAIR Coalition described above and in the public comment CAIR Coalition submitted in opposition to the Rule. If Plaintiffs prevail in this action, CAIR Coalition would be able to devote its staff time and resources to more clients than it would be able to if the Rule were permitted to take effect.

31. CAIR Coalition is unaware of any way they can recover the increased costs that the Rule will impose on them as an organization, and would suffer immediate and irreparable injury under the Rule if the rule were permitted to take effect.

1 | I declare under penalty of perjury under the laws of the United States of America that the
2 | foregoing is true and correct.

4 | Dated: November 2, 2020

6 | Washington, D.C.

_____
Claudia Cubas