# EXHIBIT E



**THE CITY OF NEW YORK**
OFFICE OF THE MAYOR

January 21, 2020

Department of Justice, Executive Office for Immigration Review,
Department of Homeland Security, U.S. Citizenship and Immigration Services
*Via electronic submission*

**Re:    Procedures for Asylum and Bars to Asylum Eligibility**
        EOIR Docket No. 18-0002; A.G. Order No. 4592-2019

The City of New York ("the City") submits this comment to oppose the Department of Homeland Security's ("DHS") proposed rule entitled "Procedures for Asylum and Bars to Asylum Eligibility," which was published in the Federal Register on December 19, 2019 ("Proposed Rule").

The Proposed Rule joins a slew of attacks on the asylum application process, such as the Migrant Protection Protocol ("MPP") and the Third Country Transit Bar, as well as other recently published proposed rules related to employment authorization for asylum-seekers.[1] This latest Proposed Rule would do further damage to an already vulnerable population by impeding those fleeing persecution from receiving due process in the asylum adjudication process. The Proposed Rule is organized into three sections. The first proposes to add seven unprecedented categorical bars to asylum eligibility altogether. The second proposes a multi-factor test for adjudicators to determine whether the applicant's criminal conviction or sentence is relevant for purposes of determining asylum eligibility. The third seeks to rescind a critical provision in current rules regarding the reconsideration of discretionary asylum. Cumulatively, these proposed changes seek to further dismantle the existing asylum protections rooted in United States and international law, and to create unjustified, punitive bars to asylum for the most vulnerable. This Proposed Rule would harm immigrant New Yorkers who are seeking asylum as well as their families—including U.S. citizens—and their local communities. In turn, the Proposed Rule would harm the social and economic well-being of New York City. For these

---

[1] *See comment in opposition to Asylum Eligibility and Procedural Modifications (8/15/2019); 83 FR 55934 (Nov. 9, 2019); 84 FR 62280 (Nov. 14, 2019), 84 FR 67243 (Dec. 9, 2019); Policy Guidance for Implementation of the Migrant Protection Protocols,* (January 25, 2019) *available at* https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf; See comment in opposition to Asylum Application, Interview, and Employment Authorization for Applicants  CIS No. 2648-19; DHS Docket No. USCIS-2019-0011 (January 13, 2019) *available at* https://www.regulations.gov/document?D=USCIS-2019-0011-0656 *also available at* https://www1.nyc.gov/assets/immigrants/downloads/pdf/comments/DHS-Docket-No-USCIS-2019-0011-NYC-Comment.pdf.

reasons, the City strongly opposes the Proposed Rule, and calls upon DHS to withdraw it in its entirety.

**I.     The Proposed Rule Harms the Most Vulnerable in New York City and Stands in Stark Contrast to Local Policy and International Treaty Obligations.**

The United States asylum system, which was codified in statute through the Refugee Act of 1980, sought to ensure that the United States legal code would comply with the 1967 Protocol Relating to the Status of Refugees[2] which binds parties to the United Nations Convention Relating to the Status of Refugees.[3] Asylum protections are critical to ensure that those fleeing persecution have due process safeguards in place as they seek safety and stability for themselves and their families. As is, the process of seeking asylum is complex and challenging because the evidentiary burden rests on the asylum-seeker to navigate a complex system with no right to counsel. This new Proposed Rule joins the many other changes that have and will continue to impede asylum seekers from achieving stability.

New York City is the ultimate city of immigrants, with immigrants making up almost 40% of its population, or over 3.2 million people. This immigrant population is deeply tied to the City as a whole, with nearly 60% of New Yorkers living in households that have at least one immigrant.[4] Asylum seekers are a particularly vulnerable population in the City, having often made the perilous journey to the United States to flee persecution in their home countries or who have a well-founded fear of future persecution. The Proposed Rule would have grave consequences to those immigrant New Yorkers who are asylum seekers by creating unprecedented barriers to eligibility for asylum that fly in the face of due process and long-standing policy. It also runs contrary to the country's moral obligation to protect those fleeing from persecution.

The City has long recognized that policies that welcome immigrants lead to a stronger and more prosperous community. As such, the City has taken great strides to welcome those fleeing persecution and provide them with a safe home.[5] In addition, the City has invested in immigration legal services, so that immigrants—including those fleeing persecution—are provided with much needed support as they rebuild their lives here. Additional barriers for asylum seekers undermine the City's commitment to immigrants and are inconsistent with the City's and the country's core values.

---

[2] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.
[3] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").
[4] *New York City Mayor's Office of Immigrant Affairs, State of Our Immigrant City: MOIA Annual Report for Calendar Year 2018, 11, available at* https://www1.nyc.gov/assets/immigrants/downloads/pdf/moia_annual_report%202019_final.pdf.
[5] *See e.g.,* https://www.nbcnewyork.com/news/local/syria-refugee-new-york-mayor-bill-de-blasio-immigrant/1274304/; https://www.nytimes.com/2016/09/20/opinion/our-immigrants-our-strength.html.

As it stands now, the U.S. asylum system already applies asylum bars in a manner that is overly broad in the context of our obligations under the Refugee Convention.[6] The drafters of the Refugee Convention intended the particularly serious crime exception to non-refoulement to apply only to refugees who constitute a serious threat to the host country's national security.[7] While many countries around the world have adopted the United Nation's High Commissioner for Refugees' interpretations of the original intent of Article 33(2),[8] the United States has deviated substantially from this norm. In the United States, refugees can be barred from relief from removal by statute for relatively minor, nonviolent offenses like theft, filing a false tax return or failing to appear in court, with no individualized assessment of the circumstances surrounding those offenses and whether such individuals currently pose a credible threat to national security.[9] Given that the current bars are already extremely overbroad, the City opposes the federal administration's efforts to further expand the bars to asylum.

## II. The Proposed Rule Undermines the City's Investments in Ensuring Due Process for Immigrants and Public Safety.

Were the Proposed Rule to go into effect, it could threaten public safety in the City by imposing a chilling effect on victims, witnesses, and defendants. For example, adding "any accusation of conduct for acts of battery involving a domestic relationship" as a bar to asylum could have the unintended consequence of disincentivizing victims of domestic violence from reporting their abuse to law enforcement.[10] All survivors of domestic violence face difficult and complex choices when deciding to report to the police, as reporting abuse can result in loss of housing, financial resources, and child custody for the victim. For undocumented survivors, the decision involves even greater risk, including the possibility of deportation for the victim. For example, abusers often cross-claim allegations of violence or mutual combat against survivors who are subsequently charged with acts constituting domestic violence, which could result in the denial of the survivor's asylum claim. These additional risks are reflected in the already lower reporting rates of domestic violence among that population.[11] Given these complex dynamics,

---

[6] *See* Philip L. Torrey, Clarissa Lehne, Collin Poirot, Manuel D. Vargas, Jared Friedberg, *United States Failure to Comply with the Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugees Protection from Removal to Countries Where Their Life or Freedom is Threatened*, (2018) *available at* https://www.immigrantdefenseproject.org/wp-content/uploads/IDP_Harvard_Report_FINAL.pdf.

[7] Id.

[8] See Convention Relating to the Statute of Refugees art. 33(2), July 28, 1951, 140 U.N.T.S. 1954.

[9] *See United States Failure to Comply with the Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugees Protection from Removal to Countries Where Their Life or Freedom is Threatened*, (2018) *available at* https://www.immigrantdefenseproject.org/wp-content/uploads/IDP_Harvard_Report_FINAL.pdf.

[10] Given that domestic violence is already underreported, the Proposed Rule could further limit law enforcement's ability to track and respond to complaints in domestic violence cases, of which there were more than 86,000 filed in 2018 alone. See NYPD's annual report on Domestic Violence Complaints: https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/domestic-violence/dv-local-law-38-annual-2018.pdf (last accessed January 14, 2020).

[11] N,Y. Times, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation* https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html (last accessed January 13, 2020).

barring asylum to anyone who is merely *accused* of domestic violence without conviction would further discourage a reluctant, vulnerable population from seeking necessary services and support, jeopardizing the safety of all New Yorkers. Moreover, this rule would in effect further remove protections for domestic violence survivors who have already escaped violence and are seeking to adjust their status.

Similarly, the addition of criminal offenses "involving criminal street gangs" broadly as a bar to asylum could discourage at-risk persons from participating in programs that seek to curb violence and reduce recidivism. Without definition or parameters, designating offenses "involving criminal street gangs" as a bar to asylum would undermine the ability of any programs that might seek to recruit and engage at-risk individuals, youth especially, as involvement with the programs could be viewed as creating a record of gang contact or affiliation. This chilling effect could undermine efforts to reduce violence and recidivism and prevent crime through holistic, long-term solutions.

Further, the Proposed Rule's addition of very broad and undefined categories of offenses would undermine the City's investments in ensuring that immigrant defendants receive adequate counsel. In 2010, the Supreme Court held that criminal defendants must be informed of the possible immigration consequences of their criminal convictions.[12] New York State has long afforded similar protections to immigrant defendants.[13] Consistent with these standards, the City spends millions of dollars per year to fund access to immigration-related advisals and training and education for practitioners representing criminal defendants. The Proposed Rule would impose added burdens on City-funded legal service providers to fulfill constitutionally mandated immigration-related responsibilities to criminal defendants.

In addition, the Proposed Rule would burden and clog the City's courts because increased uncertainty as to the consequences of criminal convictions would delay reasonable dispositions. As the Supreme Court has recognized, immigration consequences are often more important than any possible term of imprisonment to a non-citizen.[14] It reasonably follows that uncertainty as to the consequences accompanying a plea or allocution would unnecessarily prolong the life of a criminal case, prevent the parties from entering into a reasonable plea negotiation, and force costly and resource-draining trials.[15] In sum, the proposed sweeping change to asylum law would prove costly and threaten the courts' ability to serve all New Yorkers—citizens and non-citizens—with the timely adjudication and process justice and the Constitution demands.

Lastly, the Proposed Rule unreasonably cuts against the City's authority to evaluate the impact and consequences certain conduct should have on its residents by adding broad misdemeanor offenses as a bar to asylum relief. In 2017, the City Council enacted

---

[12] *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010) (holding that Constitutional right to effective assistance of counsel requires that counsel inform their clients whether a criminal plea carries a risk of deportation).
[13] *People v. McDonald*, 1 NY3d 109, 115 (N.Y. 2003) (finding that petitioner's criminal defense attorney failed to meet an "objective standard of reasonableness" when he misinformed petitioner as to the possible immigration consequences of his plea).
[14] *See Padilla*, 559 U.S. at 368 (acknowledging that a defendant's right to remain in the United States could be more important to the defendant than any potential jail sentence).
[15] *See Padilla*, 559 U.S. at 373 (noting that an understanding of the immigration consequences of criminal convictions is closely linked to "satisfying the interests" of both the prosecution and the defendant and ensuring the efficient use of court resources).

Administrative Code 10-179,[16] which created the civil offense of Disorderly Behavior. After engaging stakeholders in the City's criminal justice system, the Council enacted this law to reduce the number of arrests associated with Disorderly Conduct, Penal Law Section 240.20, thereby reducing unnecessary criminalization and unfair collateral exposure for non-citizen New Yorkers.[17] The law was drafted taking into consideration established principles of immigration-related consequences of arrests. The Proposed Rule would upend those principles. In so doing, it would undermine the City's sovereign prerogative to shape its law enforcement policies to best account for its complex social and political realities.

### III. The Proposed Rule Criminalizes Vulnerable Populations Fleeing Persecution, Including Parents and Caregivers.

The Proposed Rule would expand the criminal bars to asylum to include offenses related to the harboring and smuggling of noncitizens by parents and family members and those previously removed. In particular, this would impact parents and other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed change would serve to further criminalize vulnerable populations fleeing persecution[18] and further punish those trying to help children while being in danger themselves. Furthermore, this proposed bar comes at a time that now-public documents have revealed this administration's efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[19] This expansion of criminal bars to asylum would expand on this reprehensible strategy by barring parents who have already been prosecuted from obtaining asylum protections for themselves and their children. This cruelly targets parents and caregivers and continues the separation of families.

The Proposed Rule would also expand the asylum bar to those who have fled persecution and returned to the United States after a previous deportation, many of whom have been convicted of illegal reentry as a result.[20] As justification for this change, the agency offers only

---

[16] For the full text of Disorderly Behavior, see NYC Administrative Code 10-179: https://nycadministrativecode.readthedocs.io/en/latest/c09/#chapter-1-public-safety (last accessed January 14, 2020).

[17] See City Council Committee Report dated October 16, 2017: https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3028942&GUID=1058179C-1264-44A8-A9D0-D3B4A3C66B59&Options=&Search=, (last accessed January 13, 2020).

[18] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. See Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[19] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[20] See John Gramlich, *Far more immigration cases are being prosecuted criminally under Trump administration*, (Sept. 27, 2019) *available at* https://www.pewresearch.org/fact-tank/2019/09/27/far-more-immigration-cases-are-being-prosecuted-criminally-under-trump-administration/ (demonstrating

conclusory statements regarding the dangerousness of recidivist offenders. However, this discussion entirely lacks consideration of the seriousness of prior convictions.[21] All immigration violations are characterized as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute and does nothing to further the safety of our country.

The agency further conflates multiple entries by noncitizens who have prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution were not aware of the complex statutory regime that governs asylum claims and did not knowingly abandoned their right to apply for asylum. Additionally, immigrants can be wrongly assessed in prior credible-fear interviews, and others may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

## IV.    Conclusion

In creating more barriers for asylum seekers, the Proposed Rule continues this federal administration's trend of making the United States a hostile place for immigrants to the detriment of everyone in our communities. It is well documented that hostile climates for immigrants make the City less safe[22] and less prosperous.[23] As the City's Comptroller stated, "when immigrants are threatened, when their ability to live, work, and raise their families is compromised—our entire City pays a costly price."[24] For these reasons, and those articulated above, we call upon DHS to withdraw the Proposed Rule.

---

large increases in number of people arrested and criminally prosecuted for immigration offenses such as entering and reentering the United states illegally).

[21] Proposed Rules at 69648.

[22] Mike Males, *White Residents of Urban Sanctuary Counties are Safer From Deadly Violence Than White Residents in Non-Sanctuary Counties*, http://www.cjcj.org/uploads/cjcj/documents/white_residents_of_urban_sanctuary_counties.pdf?utm_content=%7BURIENCODE%5bFIRST_NAME%5d%7D&utm_source=VerticalResponse&utm_medium=Email&utm_term=CJCJ%27s%20report&utm_campaign=New%20Report%3A%20Sanctuary%20Counties%20Safer%20for%20White%20Residents (2017); *see* TCR Staff, *You're Safer in a 'Sanctuary City,' says New Study*, https://thecrimereport.org/2017/12/13/youre-safer-in-a-sanctuary-city-says-new-study/ (2017); Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (2017).

[23] *See* https://immigrationforum.org/article/immigrants-as-economic-contributors-immigrant-tax-contributions-and-spending-power/; https://research.newamericaneconomy.org/report/from-struggle-to-resilience-the-economic-impact-of-refugees-in-america/.

[24] Scott Stringer, *Immigrant Population Helps Power NYC Economy*, (Jan. 11, 2017) *available at* https://comptroller.nyc.gov/newsroom/press-releases/comptroller-stringer-analysis-immigrant-population-helps-power-nyc-economy/.