# EXHIBIT G

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 208**

**RIN 1615–AC41**

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Part 1208**

**[EOIR Docket No. 18–0002; A.G. Order No. 4873–2020]**

**RIN 1125–AA87**

## Procedures for Asylum and Bars to Asylum Eligibility

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** On December 19, 2019, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") (collectively, "the Departments") published a notice of proposed rulemaking ("NPRM") that would amend their respective regulations governing the bars to asylum eligibility. The Departments also proposed to clarify the effect of criminal convictions and to remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications. This final rule ("final rule" or "rule") responds to comments received and adopts the provisions of the NPRM with technical corrections to ensure clarity and internal consistency.

**DATES:** This rule is effective on November 20, 2020.

**FOR FURTHER INFORMATION CONTACT:**
Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 1800, Falls Church, VA 22041, telephone (703) 305–0289 (not a toll-free call).

Maureen Dunn, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services ("USCIS"), DHS, 20 Massachusetts Avenue NW, Washington, DC 20529–2140; telephone (202) 272–8377 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Proposed Rule

On December 19, 2019, the Departments published an NPRM that would amend their respective regulations governing the bars to asylum eligibility, clarify the effect of criminal convictions, and remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications. Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640 (Dec. 19, 2019).

### A. Authority and Legal Framework

The Departments published the proposed rule pursuant to their respective authorities regarding the adjudication of asylum applications. 84 FR at 69641–42, 69644–45.

Regarding the DOJ, the Attorney General, through himself and the Executive Office for Immigration Review ("EOIR"), has authority over immigration adjudications. *See* 6 U.S.C. 521; section 103(g) of the Immigration and Nationality Act ("INA" or "the Act") (8 U.S.C. 1103(g)). Immigration judges in DOJ adjudicate defensive asylum applications filed during removal proceedings[1] and affirmative asylum applications referred to the immigration courts by USCIS within DHS. INA 101(b)(4) (8 U.S.C. 1101(b)(4)); 8 CFR 1003.10(b), 1208.2. The Board of Immigration Appeals ("BIA" or "the Board") hears appeals from immigration judges' decisions, including decisions related to the relief of asylum. 8 CFR 1003.1.

The immigration laws further provide the Attorney General with authority regarding immigration adjudications and determinations. For example, the Attorney General's determination with respect to all questions of law is "controlling." INA 103(a)(1) (8 U.S.C. 1103(a)(1)). The Attorney General possesses a general authority to "establish such regulations * * * as the Attorney General determines to be necessary for carrying out" his authorities under the INA. INA 103(g)(2) (8 U.S.C. 1103(g)(2)). In addition, the INA authorizes the Attorney General to (1) "by regulation establish additional limitations and conditions, consistent with [INA 208 (8 U.S.C. 1158)], under which an alien shall be ineligible for asylum under," INA 208(b)(1) (8 U.S.C. 1158(b)(1)); and (2) "provide by regulation for * * * conditions or limitations on the consideration of an application for asylum not inconsistent with the Act." INA 208(b)(2)(C) and (d)(5)(B) (8 U.S.C. 1158(b)(2)(C) and (d)(5)(B)).

Regarding the Department of Homeland Security, the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, transferred many functions related to the execution of Federal immigration law to the newly created DHS. The HSA charges the Secretary of Homeland Security ("the Secretary") "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1) (8 U.S.C. 1103(a)(1)), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the immigration and nationality laws, INA 103(a)(3) (8 U.S.C. 1103(a)(3)). The HSA also transferred to USCIS responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). If an alien is not in removal proceedings, USCIS asylum officers determine in the first instance whether an alien's asylum application should be granted. *See* 8 CFR 208.2.

### B. Provisions of the Proposed Rule

The NPRM proposed to amend 8 CFR 208.13 and 1208.13 by adding new paragraphs (c)(6)–(9) and amending 8 CFR 208.16 and 1208.16 by removing and reserving paragraphs (e) in each section.

#### 1. Bars to Asylum Eligibility

Pursuant to the authorities outlined above, the Departments proposed to revise 8 CFR 208.13 and 1208.13 in each section to add paragraphs (c)(6) to add the following bars on eligibility for asylum for the following aliens:

• Aliens who have been convicted of an offense arising under INA 274(a)(1)(A) or (a)(2) or INA 276 (8 U.S.C. 1324(a)(1)(A) or (a)(2) or 1326) (convictions related to alien harboring, alien smuggling, and illegal reentry). *See* 8 CFR 208.13(c)(6)(i) and 1208.13(c)(6)(i) (proposed); 84 FR at 69647–49.

• Aliens who have been convicted of a Federal, State, tribal, or local crime that the Attorney General or Secretary knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined under the law of the jurisdiction where the conviction occurred or as in 18 U.S.C. 521(a). *See* 8 CFR 208.13(c)(6)(ii) and 1208.13(c)(6)(ii) (proposed); 84 FR at 69649–50.

• Aliens who have been convicted of an offense for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where

---

[1] One exception is that asylum officers in DHS have initial jurisdiction to adjudicate asylum applications filed by unaccompanied alien children ("UAC") in removal proceedings. INA 208(b)(3)(C) (8 U.S.C. 1158(b)(3)(C)); *see also* 6 U.S.C. 279(g)(2) (UAC defined).

the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person. *See* 8 CFR 208.13(c)(6)(iii) and 1208.13(c)(6)(iii) (proposed); 84 FR at 69650–51.

• Aliens who have been convicted of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(iv)(A) and 1208.13(c)(6)(iv)(A) (proposed); 84 FR at 69650–51.[2]

• Aliens who have been convicted of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by (a) the person's current or former spouse, (b) an alien with whom the person shares a child in common, (c) an alien who is cohabitating with or who has cohabitated with the person as a spouse, (d) an alien similarly situated to a

spouse of the person under the domestic or family violence laws of the jurisdiction, or (e) any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government. *See* 8 CFR 208.13(c)(6)(v)(A), 1208.13(c)(6)(v)(A) (proposed); 84 FR at 69651–53. The NPRM also provided that an alien's conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act (8 U.S.C. 1227(a)(2)(E)(i)–(ii)) would not disqualify him or her from asylum under this provision if a determination was made that the alien satisfies the criteria in section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)). *See* 8 CFR 208.13(c)(6)(v)(C), 1208.13(c)(6)(v)(C) (proposed); 84 FR at 69651–53.

• Aliens who have been convicted of any felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed); 84 FR at 69645–47.

• Aliens who have been convicted of any misdemeanor offense under Federal, State, tribal, or local law that involves (1) possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry; (2) the receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or (3) possession or trafficking of a controlled substance or controlled substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana. *See* 8 CFR 208.13(c)(6)(vi)(B), 1208.13(c)(6)(vi)(B) (proposed); 84 FR at 69653–54.

• Aliens for whom there are serious reasons to believe have engaged in acts of battery or extreme cruelty, as defined in 8 CFR 204.2(c)(1)(vi), upon a person and committed by the same list of aliens as set forth above regarding domestic-violence convictions. *See* 8 CFR 208.13(c)(6)(vii)(A)–(E), 1208.13(c)(6)(vii)(A)–(E) (proposed); 84

FR at 69651–53. The NPRM further provided that an alien's offense would not disqualify him or her from asylum under this provision for crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) and (ii) of the Act if a determination was made that the alien satisfies the criteria in section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)) (8 U.S.C. 1227(a)(2)(E)(i)–(ii)). *See* 8 CFR 208.13(c)(6)(vii)(F), 1208.13(c)(6)(vii)(F) (proposed); 84 FR at 69651–53.

## 2. Additional Instruction and Definitions for Analyzing the New Bars to Eligibility

The Departments proposed to revise 8 CFR 208.13 and 1208.13 by adding paragraphs (c)(7) through (9), which would have provided relevant definitions and other procedural instructions for the implementation of the proposed bars to eligibility discussed above.

First, this proposed revision would have defined the terms "felony" ("any crime defined as a felony by the relevant jurisdiction * * * of conviction, or any crime punishable by more than one year of imprisonment") and "misdemeanor" ("any crime defined as a misdemeanor by the relevant jurisdiction * * * of conviction, or any crime not punishable by more than one year of imprisonment"). 8 CFR 208.13(c)(7)(i)–(ii), 1208.13(c)(7)(i)–(ii) (proposed); 84 FR at 69646, 69653.

The proposed rule further would have provided instructions that whether an activity would constitute a basis for removability is irrelevant to determining whether the activity would make an alien ineligible for asylum and that all criminal convictions referenced in the proposed bars to eligibility would include inchoate offenses. 8 CFR 208.13(c)(7)(iii)–(iv), 1208.13(c)(7)(iii)–(iv) (proposed).

Regarding convictions that have been modified, vacated, clarified, or otherwise altered, the proposed rule would have instructed that such modifications, vacaturs, clarifications, or alterations do not have any effect on the alien's eligibility for asylum unless the court issuing the order had jurisdiction and authority to do so, and the court did not do so for rehabilitative purposes or to alleviate possible immigration-related consequences of the conviction. 8 CFR 208.13(c)(7)(v), 1208.13(c)(7)(v) (proposed); 84 FR at 69654–56. The rule would have further provided that the modification, vacatur, clarification, or other alteration is presumed to be for the purpose of ameliorating the immigration

---

[2] When determining whether an alien's offense qualifies under this provision, the NPRM further provided that the adjudicator would not be required to find the initial conviction as a predicate offense. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B) (proposed). Further, the NPRM provided that the adjudicator would be permitted to consider the underlying conduct of the crime and would not be limited to those facts found by the criminal court or otherwise contained in the record of conviction. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B) (proposed). Instead, the adjudicator would be required only to make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where the convictions occurred. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B).

consequences of a conviction if it was entered subsequent to the initiation of removal proceedings or if the alien moved for the order more than one year following the original order of conviction or sentencing. 8 CFR 208.13(c)(8), 1208.13(c)(8) (proposed); 84 FR at 69654–56. Finally, the proposed rule would have specifically allowed the asylum officer or immigration judge to "look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence" to determine what effect such order should be given under proposed 8 CFR 208.13(c)(7)(v) and 1208.13(c)(7)(v). 8 CFR 208.13(c)(9),1208.13(c)(9) (proposed); 84 FR at 69654–56.

### 3. Reconsideration of Discretionary Denials

Lastly, the proposed rule would have removed and reserved 8 CFR 208.16(e) and 1208.16(e), which provide for the automatic review of a discretionary denial of an alien's asylum application if the alien is subsequently granted withholding of removal. 84 FR at 69656–57.

## II. Public Comments on the Proposed Rule

### A. Summary of Public Comments

The comment period for the NPRM closed on January 21, 2020, with 581 comments received.[3] Individual commenters submitted 503 comments, and 78 comments were submitted by organizations, including non-government organizations, legal advocacy groups, non-profit organizations, religious organizations, congressional committees, and groups of members of Congress. Most individual commenters opposed the NPRM. All organizations opposed the NPRM.

### B. Comments Expressing Support for the Proposed Rule

*Comment:* One commenter supported the final rule to ensure that individuals who qualify for asylum are granted that status only when merited in the exercise of discretion and to provide a uniform and fair standard to prevent criminal aliens from "gaining a foothold in the United States."

One commenter stated that the NPRM was an appropriate exercise of discretionary authority. The commenter

stated that asylum is an extraordinary benefit that offers a path to lawful permanent residence and United States citizenship and, thus, should be discretionary. The commenter stated that asylees are protected from removal, authorized to work in the United States, and may travel under certain circumstances, and that asylees' spouses and children are eligible for derivative status in the United States. The commenter stated that the United States asylum system is generous, asserting that, in fiscal year 2018, 38,687 individuals were granted asylum, including 25,439 affirmative grants and 13,248 defensive grants. The commenter stated that this was the highest number of grants since fiscal year 2002.

The commenter cited the BIA: "The ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief, or in this case protection, appears to be in the best interest of the United States." *Matter of D–A–C–,* 27 I&N Dec. 575, 578 (BIA 2019) (citing *Matter of C–V–T–,* 22 I&N Dec. 7, 11 (BIA 1998) and *Matter of Mendez,* 21 I&N Dec. 296, 305 (BIA 1996)). The commenter stated that criminal aliens, as described in the NPRM, should not be granted the benefit of asylum because their admission would not be in the best interest of the United States.

The commenter emphasized that the NPRM would not bar individuals from all forms of fear-based protection and that individuals who were barred from asylum under the NPRM could still apply for withholding of removal under the INA or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT" and "CAT regulations").[4] The commenter opined that the NPRM would improve the integrity of the asylum system.

The commenter stated that the crimes and conduct listed in the NPRM should constitute a "conclusive determination that an applicant does not merit asylum in the exercise of discretion." The commenter stated that the NPRM would ensure fair and uniform application of the immigration laws because aliens who have been convicted of similar crimes would not receive different

outcomes depending on their adjudicator.

The commenter stated that the NPRM was authorized by the Act, which the commenter stated provides for regulations establishing additional conditions or limitations on asylum. The commenter stated that the NPRM was consistent with existing limitations on asylum eligibility in the statute because several statutory provisions exclude individuals from asylum eligibility on the basis of criminal conduct or other conduct indicating that the applicant does not merit asylum. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (particularly serious crime); INA 208(b)(2)(A)(iii) (8 U.S.C. 1158(b)(2)(A)(iii)) (serious nonpolitical crime outside the United States); INA 208(b)(2)(B)(i) (8 U.S.C. 1158(b)(2)(B)(i)) (conviction for aggravated felony); INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)) (offenses designated as particularly serious crimes or serious nonpolitical crimes by regulation); INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (alien engaged in persecution of another on account of a protected ground); INA 208(b)(2)(A)(iv) (8 U.S.C. 1158(b)(2)(A)(iv)) (reasonable grounds to regard alien as a danger to the security of the United States); INA 208(b)(2)(A)(v) (8 U.S.C. 1158(b)(2)(A)(v)) (alien presents national security concerns or engaged in terrorist activity).

The commenter supported the NPRM's proposed limitation on asylum eligibility for those who have been convicted of a felony, stating that felonies are categorized as such because they present more serious criminal conduct, which has a higher social cost. The commenter asserted that a felony conviction should be such a heavily weighted negative factor that it should conclusively establish that an alien does not merit asylum. The commenter supported defining a crime by the maximum possible sentence, as opposed to the actual sentence imposed, because of the variability of sentences that can be imposed on individuals who commit the same crime yet appear before different judges or are charged in different jurisdictions. The commenter asserted that immigration consequences should not vary based on the jurisdiction or a judge's "individual personality" and instead should be standardized in the interest of fairness, uniformity, and efficiency.

Commenters also supported the NPRM's proposed limitation on eligibility for individuals convicted of alien harboring in violation of section 274(a)(1)(A) of the Act (8 U.S.C. 1324(a)(1)(A)). Specifically, the

---

[3] The Departments reviewed all 581 comments submitted in response to the rule; however, the Departments did not post 5 of the comments to regulations.gov for public inspection. Of these comments, three were duplicates of another comment written by the same commenter, and two were written in Spanish. Accordingly, the Departments posted 576 comments.

[4] Adopted and opened for signature Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) (implemented in the immigration context in principal part at 8 CFR 208.16(c) through 208.18 and 8 CFR 1208.16(c) through 1208.18). *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Public Law 105–277, div. G, sec. 2242, 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note).

commenters stated that smuggling involves a business where people are routinely treated not as human beings, but as chattel. The commenters stated that individuals who participate in smuggling, or who place others into the hands of smugglers, should not be eligible for asylum because the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life. Commenters similarly supported the NPRM's proposed limitation on eligibility for asylum for aliens who have been convicted of illegal reentry in violation of section 276 of the Act (8 U.S.C. 1326). Commenters stated that such individuals have demonstrated contempt for U.S immigration law and should not be granted asylum. Commenters stated that a conviction under section 276 of the Act (8 U.S.C. 1326) requires that an alien repeatedly violated the immigration laws because such a conviction requires that the alien illegally reentered after a prior removal and intentionally chose not to present himself or herself at a port of entry. The commenters stated that whether or not the final rule includes the felony bar to asylum, it should incorporate a mandatory bar for those convicted of illegal reentry.

Commenters also expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who have committed criminal acts on behalf of or in furtherance of a criminal street gang. The commenters stated that such activity is an indicator of ongoing danger to the community. The commenters noted that, although widespread criminal activity is not a sufficient legal basis to receive asylum protection, adjudicators routinely hear testimony about the harm suffered by people subjected to extortion threats, murders, kidnappings, and sexual assaults by organized criminal groups. The commenters stated that the United States immigration system should not award a discretionary benefit to those who would destabilize communities at home and abroad through violence.

Commenters supported the NPRM's approach authorizing adjudicators to determine—on the basis of sufficient evidence—whether a particular criminal act was committed "in support, promotion, or furtherance of a criminal street gang." Specifically, the commenters stated that the range of crimes committed by street gangs is broad and that not all gang members are convicted of a gang participation offense even when they commit a crime on behalf of the gang. The commenters noted that such a determination would

not be based on "mere suspicion" but would only occur where the adjudicator knows or has reason to believe that the crime was committed in furtherance of gang activity on the basis of competent evidence. The commenters stated that "[g]ang violence is a scourge on our communities, and those who further the goals of criminal street gangs should not be put on a path to citizenship."

Commenters expressed support for the NPRM's proposed limitation on asylum eligibility where an individual has been convicted of multiple driving-under-the-influence ("DUI") offenses or a single offense resulting in death or serious bodily injury. The commenters stated that drunk and impaired driving is a dangerous activity that kills more than 10,000 people in the United States each year and injures many more. The commenters stated that individuals with recidivist DUI records, or who have already caused injury or death, should not be rewarded with asylum. The commenters expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who have been convicted of certain misdemeanors. The commenters encouraged the Departments to consider including misdemeanor offenses involving sexual abuse or offenses reflecting a danger to children, asserting that such offenses are indicative of an ongoing danger to the community.

The commenters expressed support for the NPRM's approach to treating vacated, expunged, or modified convictions and sentences. The commenter stated that the approach is consistent with the Attorney General's decision in *Matter of Thomas and Thompson,* 27 I&N Dec. 674 (A.G. 2019). The commenters also stated that such an approach would be appropriate in the interests of uniform application of the law across jurisdictions by helping to ensure that aliens convicted of the same or similar conduct receive the same consequence with respect to asylum eligibility.

The commenters expressed support for the NPRM's proposed removal of 8 CFR 208.16(e) and 1208.16(e), stating that these provisions are unnecessary. Specifically, the commenters stated that the current regulations require an adjudicator who denies an asylum application in the exercise of discretion to revisit and reconsider that denial by weighing factors that would already have been considered in the original discretionary analysis. The commenters stated that there should not be a presumption that the adjudicator did not properly weigh discretionary factors in the first instance. The commenters stated that, as noted by the NPRM, such

a requirement is inefficient, requiring additional adjudicatory resources to re-evaluate a decision that was only just decided by the same adjudicator. The commenters also stated that an alien already has opportunities to seek review of that discretionary decision through motions or an appeal.

Other commenters expressed general support for the NPRM. Some commenters stated that such a rule would make America safer. One commenter stated that further restrictions on asylum were necessary because individuals who have no basis to remain in the United States "routinely ask to use political asylum as a last ditch effort to remain." At least one commenter stated that the NPRM would not adversely affect "innocent asylum seeker[s] truly escaping political persecution." Other commenters stated that all applications for relief should require at least a minimum of good character and behavior. One commenter stated that the NPRM "is a direct result of state and local governments working to nullify undocumented criminal activity by dropping charges, expunging records or pardoning crimes, including serious crimes like armed robbery * * * sex assault, domestic abuse, wire fraud, identity theft etc."

One commenter expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who are convicted of offenses related to controlled substances, stating that the United States must bar those who engage in drug trafficking into the United States. Another commenter expressed support for the proposed limitations on asylum eligibility for individuals who are convicted of domestic violence offenses or who engage in identity theft, stating that such individuals should not have the opportunity to be lawfully present in the United States.

*Response:* The Departments note the commenters' support for the rule. The Departments have taken the commenters' recommendations under advisement.

## C. Comments Expressing Opposition to the Proposed Rule

### 1. General Opposition

*Comment:* Many commenters expressed general opposition to the NPRM. Some provided no reasoning, simply stating, "I oppose this proposed rule" with varying degrees of severity. Many commenters also asked the Departments to withdraw the NPRM. Others, as explained in the following sections, provided specific points of

opposition or their reasoning underlying their opposition.

*Response:* The Departments are unable to provide a detailed response to comments that express only general opposition without providing reasoning for their opposition. The following sections of this final rule provide the Departments' responses to comments that offered specific points of opposition or reasoning underlying their opposition.

2. Violation of Law

a. Violation of Domestic Law

Commenters asserted that the proposed rule violated United States law in three main ways: First, it violated law regarding particularly serious crimes; second, it improperly disposed of the categorical approach to determine immigration consequences of criminal offenses; and third, it violated law regarding the validity of convictions for immigration purposes. Overall, commenters were concerned that the NPRM's provisions contradicting case law would result in the "wrongful exclusion" of immigrants from asylum eligibility.

i. Law Regarding "Particularly Serious Crime" Bar

*Comment:* Commenters opposed the NPRM, stating that it violates domestic law and contravenes existing case law from the BIA, the circuit courts of appeals, and the Supreme Court of the United States regarding the particularly serious crime bar to asylum for multiple reasons. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)). In general, commenters alleged that the NPRM was untethered to the approach set out by Congress regarding particularly serious crimes and that if Congress had sought to sweepingly bar individuals from asylum eligibility based on their conduct or felony convictions, as outlined in the NPRM, it would have done so in the Act. Commenters stated that adding seven new categories of barred conduct rendered the language of section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)) essentially meaningless and drained the term "particularly serious crime" of any sensible meaning because the Departments were effectively considering all offenses, regardless of seriousness, as falling under the particularly serious crime bar to asylum. One organization asserted that this violated the Supreme Court's requirements for statutory interpretation, citing *Corley* v. *United States,* 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons[ ] [is] that a statute should be construed so

that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (alterations and quotation marks omitted)).

At the same time, commenters also asserted that the additional crimes to be considered particularly serious by the proposed rule have been repeatedly recognized as not particularly serious. For example, commenters cited *Matter of Pula,* 19 I&N Dec. 467, 474 (BIA 1987), and noted the BIA's conclusion that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Paraphrasing *Delgado* v. *Holder,* 648 F.3d 1095, 1110 (9th Cir. 2010) (Reinhardt, J., concurring in part and concurring in the judgment), commenters stated that, outside of the aggravated felony context, "it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, 'run-of-the-mill' offenses do not constitute particularly serious crimes."

Commenters asserted that low-level offenses like misdemeanor DUI with no injury or simple possession of a controlled substance cannot constitute a particularly serious crime. In support of this proposition, commenters cited *Mellouli* v. *Lynch,* 575 U.S. 798 (2015) (possession of drug paraphernalia was not a controlled substances offense); *Carachuri-Rosendo* v. *Holder,* 560 U.S. 563 (2010) (subsequent marijuana possession offense is not an aggravated felony); and *Leocal* v. *Ashcroft,* 543 U.S. 1 (2004) (conviction for DUI was not an aggravated felony crime of violence). Commenters asserted that if the Departments wished to abrogate the Supreme Court's interpretation of the statute, they should do so by passing new legislation, not by proposing what the commenters consider to be unlawful rules.

Moreover, commenters asserted that the "essential key to determining whether a crime is particularly serious * * * is whether the nature of the crime is one which indicates that the alien poses a danger to the community." *Matter of G–G–S–,* 26 I&N Dec. 339 (BIA 2014) (quotation marks omitted). Commenters argued that despite this analytical requirement, the proposed rule arbitrarily re-categorizes many offenses as particularly serious without consideration of whether the nature of the crime indicates that the alien poses a danger to the community. Commenters expressed additional concern that this categorization removes all discretion

from the adjudicator to determine whether an individual's circumstances merit such a harsh penalty.

Commenters further asserted that, because Congress made commission of a "particularly serious crime" a bar to asylum but did not make commission of other categories of crimes such a bar, Congress intended to preclude that result. Commenters alleged that the NPRM violated the canon of construction articulated in *United States* v. *Vonn,* 535 U.S. 55, 65 (2002), *expressio unius est exclusio alterius,* which means that "expressing one item of a commonly associated group or series excludes another left unmentioned," because it attempted to create additional categories of crime bars to asylum eligibility in a manner inconsistent with the statute and congressional intent. Commenters analogized these NPRM provisions to another rule that had categorically barred "arriving aliens" from applying for adjustment of status in removal proceedings. *See* 8 CFR 245.1(c)(8) (1997). The Federal courts of appeals were split over whether that now-rescinded rule circumvented the Act and congressional intent because adjustment of status was ordinarily a discretionary determination.[5]

Commenters further alleged that the NPRM unlawfully categorically exempted a wide range of offenses from a positive discretionary adjudication of asylum. Commenters acknowledged that the Attorney General can provide for "additional limitations and conditions" on asylum applications consistent with the asylum statute by designating offenses as per se particularly serious, *see* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), but commenters emphasized that crimes that are not particularly serious are still subject to a discretionary determination. Commenters stated that Congress did not intend to authorize the Attorney General to categorically bar "large swaths of asylum seekers from protection." Commenters alleged that the Departments purposefully wrote the NPRM in this way (designating the bars as both particularly serious crimes and categorical exceptions to positive

---

[5] *Compare Scheerer* v. *U.S. Att'y Gen.,* 445 F.3d 1311, 1321–22 (11th Cir. 2006) (holding that the regulation was unlawful); *Bona* v. *Gonzales,* 425 F.3d 663, 668–71 (9th Cir. 2005) (same); *Zheng* v. *Gonzales,* 422 F.3d 98, 116–20 (3d Cir. 2005) (same), *and Succar* v. *Ashcroft,* 394 F.3d 8, 29 (1st Cir. 2005) (same), *with Akhtar* v. *Gonzales,* 450 F.3d 587, 593–95 (5th Cir. 2006) (upholding validity of the regulation), *rehearing en banc granted and remanded on other grounds,* 461 F.3d 584 (2006) (en banc), *and Mouelle* v. *Gonzales,* 416 F.3d 923, 928–30 (8th Cir. 2005) (same), *vacated on other grounds,* 126 S. Ct. 2964 (2006).

discretionary adjudication) to "insulate the Proposed Rules from review."

*Response:* The Departments disagree with comments asserting that the rule violates domestic law. Commenters asserted that Congress did not intend for the Attorney General to categorically bar "large swaths of asylum seekers from protection." However, Congress, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), vested the Attorney General with broad authority to establish conditions or limitations on asylum. Public Law 104–208, div. C, 110 Stat. 3009, 3009–546.

At that time, Congress created three categories of aliens who are barred from applying for asylum and adopted six other mandatory bars to asylum eligibility. IIRIRA, sec. 604(a), 110 Stat. at 3009–690 through 3009–694 (codified at INA 208(a)(2)(A)–(C), (b)(2)(A)(i)–(vi) (8 U.S.C. 1158(a)(2)(A)–(C), (b)(2)(A)(i)–(vi))). Congress further expressly authorized the Attorney General to expand upon two bars to asylum eligibility—the bars for "particularly serious crimes" and "serious nonpolitical crimes." INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)). Congress also vested the Attorney General with the ability to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Significantly, "[t]his delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1)," as "the statute clearly empowers" the Attorney General and the Secretary to "adopt[ ] further limitations" on eligibility to apply for or receive asylum. *R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 & n.9 (10th Cir. 2017). In authorizing "additional limitations and conditions" by regulation, the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The Act instructs only that additional limitations on eligibility are to be established "by regulation," and must be "consistent with" the rest of section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)); *see also* INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Moreover, a long-held principle of administrative law is that an agency, within its congressionally delegated policymaking responsibilities, may "properly rely upon the incumbent administration's view of wise policy to inform its judgments." *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 865 (1984). Accordingly, an agency may make policy choices that Congress either inadvertently or intentionally left to be resolved by the agency charged with administration of the statute, given the current realities faced by the agency. *See id.* at 865–66. Through the publication of the NPRM, the Departments have properly exercised this congressionally delegated authority. Such policymaking is well within the confines of permissible agency action. Additionally, despite commenters' assertions that the Departments should pursue these changes through legislative channels, the Departments, as part of the Executive Branch, do not pursue legislative changes but instead rely on regulatory authority to interpret and enforce legislation as enacted by Congress.

As explained in the NPRM, Congress granted the Attorney General and the Secretary broad authority to determine additional "limitations and conditions" on asylum. For example, the Attorney General and the Secretary have authority to impose procedural requirements for asylum seekers and to designate by regulation additional crimes that could be considered particularly serious crimes or serious nonpolitical crimes. *See* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)); *see also* INA 208(2)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Based on the comments received, the Departments realize that the preamble to the NPRM resulted in confusion regarding which authority the Departments relied on in promulgating this rule. Specifically, commenters raised concerns regarding the Departments' reliance on section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) in support of some of the new bars to asylum eligibility. In response to these concerns and confusion, the Departments emphasize that, as in the proposed rule, the regulatory text itself does not designate any offenses covered in 8 CFR 208.13(c)(6) or 1208.13(c)(6) as specific particularly serious crimes.[6] Instead, this rule, like the proposed rule, sets out seven new "additional limitations," consistent with the Departments' authority at INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) to establish "additional limitations and conditions" on asylum

eligibility. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6).

This reliance on the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) is consistent with the proposed rule. There, although the Departments cited the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes, the Departments also cited the authority at section 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) in support of each category of bars included in the rule. *See generally* 84 FR at 69645–54. The references throughout the preamble in the NPRM to the Attorney General's and the Secretary's authorities to designate additional particularly serious crimes accordingly highlighted one of two alternative bases for the inclusion of most of the new bars to asylum eligibility and sought to elucidate the serious nature of these crimes and the Departments' reasoning for including these offenses in the new provisions. In other words, although the Departments are not specifically designating any categories of offenses as "particularly serious crimes," the authority of the Attorney General and the Secretary to deny eligibility to aliens convicted of such offenses helps demonstrate that the new bars are "consistent with" the INA because the offenses to which the new bars apply—similar to "particularly serious crimes"—indicate that the aliens who commit them may be dangerous to the community of the United States or otherwise may not merit eligibility for asylum. As a result, the Departments need not address in detail commenters' concerns about whether discrete categories of offenses should constitute "particularly serious crimes" because (1) the new rule does not actually designate any specific offense as such crimes; and (2) section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)), as already discussed and as recognized by the Departments, independently authorizes the Attorney General and the Secretary to establish additional limitations and conditions on asylum eligibility.

Commenters asserted that Congress intended for the only criminal bars to asylum to be those contemplated by the particularly serious crime and serious nonpolitical crime bars. The Departments, however, disagree. Although the INA explicitly permits the Attorney General and the Secretary to designate additional crimes as particularly serious crimes or serious nonpolitical crimes, this does not mean that any time the Attorney General and the Secretary decide to limit eligibility for asylum based on criminal activity,

---

[6] The Departments do not intend, however, to imply that an immigration adjudicator could not or should not find these offenses to be particularly serious crimes in the context of adjudicating individual asylum applications on a case-by-case basis.

the limit must be based on either a particularly serious crime or a serious nonpolitical crime. Rather, the Attorney General and the Secretary may choose to designate certain criminal activity as a limitation or condition on asylum eligibility separate and apart from the scope of crimes considered particularly serious. These additional limitations must simply be established by regulation and must be consistent with the rest of section 208 of the Act (8 U.S.C. 1158).

Nothing in the Act suggests that Congress intended for the particularly serious crime bar at section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(A)(ii)) or the serious nonpolitical crime bar at section 208(b)(2)(A)(iii) of the Act (8 U.S.C. 1158(b)(2)(A)(iii)) to be the sole bars to asylum based on criminal activity. The Departments disagree with comments suggesting that existing exceptions to asylum eligibility occupy the entire field of existing exceptions. The Attorney General and the Secretary have the authority to impose additional limitations on asylum eligibility that are otherwise consistent with the limitations contained section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)). Those existing limitations on eligibility include limitations because of criminal conduct. *See, e.g.,* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime)) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Deciding to impose additional limitations on asylum eligibility that are also based on criminal conduct, as the Departments are doing in this rulemaking, is accordingly consistent with the statute. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).

Of note, in *Trump* v. *Hawaii,* the Supreme Court determined that the INA's provisions regarding the entry of aliens "did not implicitly foreclose the Executive from imposing tighter restrictions," even in circumstances in which those restrictions concerned a subject "similar" to the one that Congress "already touch[ed] on in the INA." 138 S. Ct. 2392, 2411–12 (2018). Thus, by the same reasoning, Congress's statutory command that certain aliens are ineligible for asylum based on a conviction for a particularly serious crime or serious nonpolitical crime does not deprive the Attorney General and Secretary of authority, by regulation, to deny asylum eligibility for certain other aliens whose circumstances may—in a general sense—be "similar."

Commenters' references to the proposed rule revising 8 CFR 245.1(c)(8) (1997) (limitations on eligibility for adjustment of status) and subsequent case law striking down that proposed rule are inapposite. The First Circuit explained that the adjustment of status statute grants the Attorney General discretion to grant applications, but that this authority does not extend to grant the Attorney General authority to define eligibility for that relief. *Succar,* 394 F.3d at 10. However, unlike the adjustment of status statute, INA 245(a) (8 U.S.C. 1255(a)), the asylum statute explicitly grants the Attorney General authority to define additional limitations on eligibility for relief that are "consistent with this section." [7] INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). This express grant of authority contradicts any implied limitation on the Attorney General's authority that might otherwise be inferred from Congress's delineation of certain statutory bars.

ii. Law Regarding the Categorical Approach

*Comment:* Commenters asserted that the proposed rule violated the Supreme Court's longstanding categorical approach. Commenters stated that "federal courts have repeatedly embraced the 'categorical approach' to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court." Additionally, commenters noted that the Supreme Court has "long deemed undesirable" a "*post hoc* investigation into the facts of the predicate offenses." *Moncrieffe* v. *Holder,* 569 U.S. 184, 200 (2013). Commenters argued that the proposed rule directly contravenes this directive to avoid post hoc investigations.

---

[7] Moreover, at least two Federal courts of appeals rejected the reasoning in *Succar. See supra* note 5; *see also Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) ("We also reject [the] argument * * * that the agency must not make categorical exclusions, but may rely only on case-by-case assessments. Even if a statutory scheme requires individualized determinations, which this scheme does not, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority. The approach pressed by [the petitioner]—case-by-case decisionmaking in thousands of cases each year—could invite favoritism, disunity, and inconsistency. The [agency] is not required continually to revisit issues that may be established fairly and efficiently in a single rulemaking proceeding." (citations, footnote, and quotation marks omitted)); *Fook Hong Mak* v. *INS,* 435 F.2d 728, 730 (2d Cir. 1970) ("We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis * * * .").

Commenters emphasized that the categorical approach promotes fairness and due process, as well as judicial and administrative efficiency by avoiding "pseudo-criminal trials." Citing *Moncrieffe,* commenters noted concern that if an immigration adjudicator were required to determine the nature and amount of remuneration involved in, for example, a marijuana-related conviction, the "overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary." *Id.* at 201. Commenters noted that this would result in a disparity of outcomes based on the presiding immigration judge and would further burden the immigration court system. Moreover, commenters noted that the Supreme Court has repeatedly applied the categorical approach and found that its virtues outweigh its shortcomings. Citing *Mathis* v. *United States,* 136 S. Ct. 2243, 2252–53 (2016), commenters noted that the Supreme Court articulated basic reasons for adhering to the elements-only inquiry of the categorical approach, including "serious Sixth Amendment concerns" and "unfairness to defendants" created by alternative approaches.

Commenters asserted that the Departments' concern regarding the unpredictable results of the categorical approach is misleading because immigration adjudicators may already utilize a facts-based analysis to determine whether an offense is a "particularly serious crime" that would bar asylum. Commenters further alleged that the Departments recognized that this was a red herring by noting that the BIA has rectified some anomalies by determining that certain crimes, although not aggravated felonies, nonetheless constitute particularly serious crimes. *See* 84 FR at 69646.

Commenters further noted that, even if an offense does not rise to the level of a particularly serious crime, immigration adjudicators may deny asylum as a matter of discretion. In addition, commenters averred that for gang-related and domestic violence offenses, the proposed rule undermined criminal judgments and violated due process because the proposed rule disregarded the established framework for determining whether a conviction is an aggravated felony. Rather than looking to the elements of the offense, as currently required by the categorical approach, commenters noted that the proposed rule required adjudicators to consider "gang-related" or "domestic violence" conduct that may not have been one of the required elements for a

conviction and therefore not objected to by the asylum applicant or his or her attorney during the criminal proceeding.

*Response:* The Departments first note that the traditional elements-to-elements categorical approach extolled by the commenters and as set out in *Mathis* by the Supreme Court is an interpretive tool frequently applied by the courts to determine the immigration-related or penal consequences of criminal convictions. *Cf. Mathis,* 136 S. Ct. at 2248 ("To determine whether a prior conviction is for generic burglary (or other listed crime) courts apply what is known as the categorical approach * * *."). However, this traditional categorical approach is not the only analytical tool blessed by the Supreme Court, and the exact analysis depends on the language of the statute at issue. For example, in *Nijhawan* v. *Holder,* 557 U.S. 29, 38 (2009), the Court held that the aggravated felony statute at section 101(a)(43) of the Act (8 U.S.C. 1101(a)(43)) "contains some language that refers to generic crimes and some language that almost certainly refers to the specific circumstances in which a crime was committed." Based on the language of section 101(a)(43)(M)(i) of the Act (8 U.S.C. 1101(a)(43)(M)(i)), the Supreme Court held that the INA required a "circumstance-specific" analysis to determine whether an aggravated felony conviction for a fraud or deceit offense involved $10,000 or more under INA 101(a)(43)(M)(i) (8 U.S.C. 1101(a)(43)(M)(i)). *Id.* at 40. And in *Mathis* itself, the Supreme Court observed that the categorical approach is not the only permissible approach: Again relying on the language as written in a statute by Congress, the Supreme Court explained that "Congress well knows how to instruct sentencing judges to look into the facts of prior crimes: In other statutes, using different language, it has done just that." *Mathis,* 136 S. Ct. at 2252 (noting the determination in *Nijhawan* that a circumstance-specific approach applies when called for by Congress).

Nevertheless, the Departments did not purport to end the use of the traditional categorical approach for determining asylum eligibility through the proposed rule. Instead, the Departments explained that the use of the categorical approach has created inconsistent adjudications and created inefficiencies through the required complexities of the analysis in immigration adjudications. *See* 84 FR at 69646–47. The Departments' concerns with the categorical approach are in line with those of an increasing number of Federal judges and others who are required to work within its confines. *See, e.g., Lopez-Aguilar* v. *Barr,* 948

F.3d 1143, 1149 (9th Cir. 2020) (Graber, J., concurring) ("I write separately to add my voice to the substantial chorus of federal judges pleading for the Supreme Court or Congress to rescue us from the morass of the categorical approach. * * * The categorical approach requires us to perform absurd legal gymnastics, and it produces absurd results."); *see also Lowe* v. *United States,* 920 F.3d 414, 420 (6th Cir. 2019) (Thapar, J., concurring) ("[I]n the categorical-approach world, we cannot call rape what it is. * * * [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent.").

As a result, the Departments proposed, for example, that an alien who has been convicted of "[a]ny felony under Federal, State, tribal, or local law" would be ineligible for asylum. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed). This provision would not require an adjudicator to conduct a categorical analysis and compare the elements of the alien's statute of conviction with a generic offense. As explained in the NPRM, the Departments believe this will create a more streamlined and predictable approach that will increase efficiency in immigration adjudications. 84 FR at 69647. It will also increase predictability because it will be clear and straightforward which offenses will bar an individual from asylum.

The Attorney General and the Secretary have the authority to place additional limitations on eligibility for asylum, provided that they are consistent with the rest of section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). There is no obligation that any criminal-based limitation implemented pursuant to this authority must correspond with a particular generic offense to which an adjudicator would compare the elements of the alien's offense using the categorical approach, particularly when not every criminal provision implemented by Congress itself requires such an analysis. *See Nijhawan,* 557 U.S. at 36; *see also United States* v. *Keene,* 955 F.3d 391, 393 (4th Cir. 2020) (holding that Congress did not intend for the violent crimes in aid of racketeering activity statute (18 U.S.C. 1959) to require a categorical analysis because "the statutory language * * * requires only that a defendant's *conduct,* presently before the court, constitute one of the enumerated federal offenses as well as the charged state crime" (emphasis in original)). Additionally, prior case law interpreting and applying the categorical approach

to determine whether a crime is particularly serious does not apply where, like here, the Departments are designating additional limitations on eligibility for asylum under the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).[8]

Finally, the Departments expect immigration adjudicators to determine whether an alien is barred from asylum eligibility under the other provisions of the proposed rule due to the alien's conviction or conduct in keeping with case law. For example, in order to determine whether an alien's misdemeanor conviction is a conviction for an offense "involving * * * the possession or trafficking of a controlled substance or controlled substance paraphernalia," the adjudicator would be required to review the specific elements of the underlying offense as required by the categorical approach. On the other hand, the inquiry into whether conduct is related to street-gang activity or domestic violence as promulgated by the rule is similar to statutory provisions that already require an inquiry into conduct-based allegations that may bar asylum but that do not require a categorical approach analysis. *See* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (bar to asylum based on persecution of others); INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) (immigration benefits for aliens who are battered or subjected to extreme cruelty).

iii. Law Regarding the Validity of Convictions

*Comment:* Commenters also asserted that the proposed rule's establishment of criteria for determining whether a conviction or sentence is valid for immigration purposes exceeded the Act's statutory grant of authority, violated case law, and violated the Constitution. Broadly speaking,

---

[8] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the inclusion of the new categories of bars in the proposed rule. *See* 84 FR at 69645–54. The regulatory text, however, does not actually designate any additional offenses as "particularly serious crimes." The text instead aligns with section 208(b)(2)(C) by setting out "[a]dditional limitations on asylum eligibility." *See id.* at 65659. Section 208(b)(2)(B)(ii) remains relevant to the current rule in that the new bars are "consistent with" the INA partly because they deny eligibility as a result of crimes or conduct that share certain characteristics with "particularly serious crimes," but the Departments clarify that they are promulgating this rule under section 208(b)(2)(C). Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

commenters asserted that the NPRM is contrary to the intent of Congress because it attempts to "rewrite immigration law." First, commenters asserted that the proposed rule violated the full faith and credit owed to State court decisions. Second, commenters asserted that the Departments misread and misinterpreted applicable case law in justifying the presumption against the validity of post-conviction relief. Third, commenters expressed concern with the rebuttable presumption against the validity of post-conviction relief in certain circumstances created by the proposed rule.

Commenters expressed opposition to the NPRM's rebuttable presumption that an order vacating a conviction or modifying, clarifying, or otherwise altering a sentence are for the purpose of ameliorating the conviction's immigration consequences in certain circumstances, *see* 8 CFR 208.13(c)(8), 1208.13(c)(8) (proposed), because they alleged that it could violate principles of federalism under the Constitution's Full Faith and Credit Clause, U.S. Const. art. IV, sec. 1, as codified by the Full Faith and Credit Act, 28 U.S.C. 1738. Commenters asserted that the proposed rule abandoned the presumption of regularity that should accompany State court orders. By precluding an adjudicator from considering a post-conviction order entered to cure substantive or procedural constitutional deficiencies, adjudicators are effectively given permission to second-guess State court decisions, which would undermine the authority of and attribute improper motives to State and Federal tribunals. Commenters alleged that, in this way, immigration judges would become fact-finders who look beyond State court records. Further, one commenter contended that the NPRM undermined local authority to "evaluate the impact and consequences certain conduct should have on its residents by adding broad misdemeanor offenses as a bar to asylum relief," which the commenter asserted would interfere with a local authority's "sovereign prerogative to shape its law enforcement policies to best account for its complex social and political realities."

Commenters averred that the Departments cited "a misleading quote" from *Matter of F–*, 8 I&N Dec. 251, 253 (BIA 1959), which would allow asylum adjudicators to look beyond the face of the State court order. *See* 84 FR at 69656. Commenters asserted that the Departments failed to read *Matter of F-* in its entirety and that, if they had, they would have noted that the BIA instead offered support in favor of presuming the validity of a State court order unless

there is a reason to doubt it. *Matter of F–*, 8 I&N Dec. at 253 ("Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself.").

Additionally, commenters stated the proposed rule violates circuit courts of appeals case law holding that the BIA may not consider outside motives. Commenters cited *Pickering* v. *Gonzales*, 465 F.3d 263, 267–70 (6th Cir. 2006), which held that the BIA was limited to reviewing the authority of the court issuing a vacatur and was not permitted to review outside motives, such as avoiding negative immigration consequences. Commenters also cited *Reyes-Torres* v. *Holder*, 645 F.3d 1073, 1077–78 (9th Cir. 2011), and noted that the court held that the respondent's motive was not relevant to the immigration court's inquiry into whether the decision vacating his conviction was valid. Finally, commenters cited *Rodriguez* v. *U.S. Attorney General*, 844 F.3d 392, 397 (3d Cir. 2006), which held that the immigration judge may rely only on "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Commenters asserted that, in direct contravention of these cases, the proposed rule grants "vague and indefinite authority to look beyond a facially valid vacatur," which violates asylum seekers' rights to a full and fair proceeding.

Commenters also asserted that the Departments improperly extended the decision in *Matter of Thomas and Thompson*, 27 I&N Dec. 674, to all forms of post-conviction relief. By extending this decision, commenters stated that the proposed rule imposes an ultra vires and unnecessary burden on asylum seekers. Commenters first asserted that the Attorney General's decision in *Matter of Thomas and Thompson* had no justification in the text or history of the Act. Specifically, commenters stated that the Act does not limit the authority of immigration judges by requiring them to consider only State court sentence modifications that are based on substantive or procedural defects in the underlying criminal proceedings. Rather, commenters asserted, the Act requires a "convict[ion] by a final judgment." Commenters argued that, because a vacated judgment is neither "final" nor a "judgment," it would have

no effect on immigration proceedings. Commenters argued therefore that the Act does not permit immigration judges to treat a vacated judgment as valid and effective based on when, how, or why it was vacated. Moreover, commenters asserted that "[c]ourt orders are presumptively valid, not the other way around."

Commenters asserted that the BIA, in *Matter of Cota-Vargas*, 23 I&N Dec. 849, 852 (BIA 2005), *overruled by Matter of Thomas and Thompson*, 27 I&N Dec. 674, relied on the text of the Act and the legislative history behind Congress's definition of "conviction" and "sentence" in section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)) to hold that proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Commenters argued that, as a result, neither the text of the Act nor the legislative history supports the conclusion reached in *Matter of Thomas and Thompson*, and hence that the decision should not be extended to the proposed rule. Commenters stated that the same is true of orders modifying, clarifying, or altering a judgment or sentence, as recognized by the BIA in *Matter of Cota-Vargas*, 23 I&N Dec. at 852. Specifically, commenters quoted *Matter of Cota-Vargas* in noting that the NPRM's approach to "sentence modifications has no discernible basis in the language of the Act."

Commenters also objected to the two situations in which the rebuttable presumption against the validity of an order modifying, clarifying, or altering a judgment or sentence arises: When a court enters a judgment or sentencing order after the asylum seeker is already in removal proceedings; or when the asylum seeker moves the court to modify, clarify, or alter a judgment or sentencing order more than one year after it was entered. Commenters cited the holding in *Padilla* v. *Kentucky*, 559 U.S. 356, 374 (2010), that noncitizen defendants have a Sixth Amendment right to be competently advised of immigration consequences before agreeing to a guilty plea. Commenters alleged that the presumption is unlawful under *Padilla* because it holds asylum applicants whose rights were violated under *Padilla* to a different standard. Commenters similarly asserted that the presumption would prejudice asylum seekers who have not had an opportunity to seek review of their criminal proceedings until applying for asylum. Commenters stated that asylum applicants would be forced to rebut the presumption that an order, entered after the asylum seeker was

placed in removal proceedings or requested more than one year after the date of conviction or sentence was entered, is invalid. In this way, commenters alleged, the NPRM would "compound the harm to immigrants who * * * have been denied constitutionally compliant process in the United States criminal legal system."

One commenter asserted that some orders changing a sentence or conviction are entered after removal proceedings began because the alien had not received the constitutionally required advice regarding immigration consequences stemming from his or her criminal convictions. Other commenters explained that because criminal defendants oftentimes lack legal representation in post-conviction proceedings, they may have lacked knowledge of their constitutional rights or resources to challenge their convictions or related issues. Commenters also explained that asylum applicants may not have had reason to suspect defects in their criminal proceedings until they applied for asylum and met with an attorney. Commenters asserted that the NPRM would also harm those people if they realized these defects more than one year after their convictions were entered.

Another commenter explained that "state and federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings. Collateral sanctions imposed on persons convicted of crimes—such as ineligibility to apply for relief from removal and other immigration consequences—should be subject to waiver, modification, or another form of relief if the sanctions are inappropriate or unfair in a particular case."

*Response:* The Attorney General and the Secretary are granted general authority to "establish such regulations [as each determines to be] necessary for carrying out" their authorities under the INA. INA 103(a)(1), (a)(3), and (g)(2) (8 U.S.C. 1103(a)(1), (a)(3), and (g)(2)); *see also Tamenut* v. *Mukasey,* 521 F.3d 1000, 1004 (8th Cir. 2008) (en banc) (per curiam) (describing INA 103(g)(2) (8 U.S.C. 1103(g)(2)) as "a general grant of regulatory authority"); *cf. Narenji* v. *Civiletti,* 617 F.2d 745, 747 (DC Cir. 1979) ("The [INA] need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him."). As stated above, the Attorney General and the Secretary also have the congressionally provided

authority to place additional limitations and conditions on eligibility for asylum, provided that they are consistent with section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Prescribing the effect to be given to vacated, expunged, or modified convictions or sentences is an ancillary aspect of prescribing additional limitations or conditions on asylum eligibility.

As explained in the NPRM, the rule codifies the principle set forth in *Matter of Thomas and Thompson,* 27 I&N Dec. at 680, that, if the underlying reasons for the vacatur, expungement, or modification were for "rehabilitation or immigration hardship," the conviction remains effective for immigration purposes. *See* 84 FR at 69655. Even before *Matter of Thomas and Thompson* was decided, courts of appeals repeatedly accepted the result reached in that case. *See id.; see also Saleh* v. *Gonzales,* 495 F.3d 17, 24 (2d Cir. 2007); *Pinho* v. *Gonzales,* 432 F.3d 193, 215 (3d Cir. 2005). Therefore, the Departments reject commenters' assertions that the rule improperly relies on or extends *Matter of Thomas and Thompson.*[9] In addition, the Departments note that agencies may decide whether to announce reinterpretations of a statute through rulemaking or through adjudication. *Matter of Thomas and Thompson,* 27 I&N Dec. at 688 (citing, *inter alia, NLRB* v. *Bell Aerospace Co.,* 416 U.S. 267, 294 (1974)). In *Matter of Thomas and Thompson,* the Attorney General elected to address prior BIA precedent regarding the validity of modifications, clarifications, or other alterations through administrative adjudication. *Id.* at 689. That the Attorney General declined to consider additional issues on this topic through the administrative adjudication does not foreclose him from later promulgating additional interpretations or reinterpretations of the Act through rulemaking, as is being

done in this final rule. *See Bell Aerospace Co.,* 416 U.S. at 294.

The Departments also reject commenters' claims that the approach set forth by the rule violates the Full Faith and Credit Clause, U.S. Const. art. IV, sec. 1, or the Full Faith and Credit Act, 28 U.S.C. 1738. The Full Faith and Credit provisions of 28 U.S.C. 1738 apply to courts and not administrative agencies. *See NLRB* v. *Yellow Freight Sys., Inc.,* 930 F.2d 316, 320 (3d Cir. 1991) (federal administrative agencies are not bound by section 1738 because they are not "courts"); *see also Am. Airlines* v. *Dep't. of Transp.,* 202 F.3d 788, 799 (5th Cir. 2000) (28 U.S.C. 1738 did not apply to the Department of Transportation because it is "an agency, not a 'court'").

Moreover, as explained by the Second Circuit, and as reiterated by the Attorney General in *Matter of Thomas and Thompson,* when an immigration judge reviews a State conviction for an offense, the immigration judge is merely comparing the State conviction to the Federal definition of an offense under the Act. *Saleh,* 495 F.3d at 26 ("[T]he BIA is simply interpreting how to apply Saleh's vacated State conviction for receiving stolen property to the INA and is not refusing to recognize or relitigating the validity of Saleh's California state conviction."); *Matter of Thomas and Thompson,* 27 I&N Dec. at 688 ("[T]he immigration judge in such a case simply determines the effect of that order for the purposes of federal immigration law."). As a result, because the State court order remains effective and unchallenged for all other purposes, there is no intrusion on State law and no violation of the principles of federalism and comity. *Matter of Thomas and Thompson,* 27 I&N Dec. at 688.

The Departments reject commenters' assertions that the NPRM improperly quotes *Matter of F–,* 8 I&N Dec. 251. The NPRM cites *Matter of F-* only to support the proposition that the alien must establish that a court issuing an order vacating or expunging a conviction or modifying a sentence had jurisdiction and authority to do so. 84 FR at 69656. No law compels the Departments to accept State court orders entered without jurisdiction, and there is no sound public policy reason for doing so. Further, adopting such a policy would also potentially raise difficulties for the faithful and consistent administration of the immigration laws, as the Departments could be required to accept a State court judgment declaring an alien to be a United States citizen, even though a State court cannot confer or establish United States citizenship. Both

---

[9] To the extent the commenters disagree with the substance of the Attorney General's decision in *Matter of Thomas and Thompson,* the Departments note that this rulemaking is not the mechanism for expressing such criticisms. The Attorney General has the authority to review administrative determinations in immigration proceedings, which includes the power to refer cases for review. INA 103(a)(1), (g) (8 U.S.C. 1103(a)(1), (g)); 8 CFR 1003.1(h)(1); *see also Xian Tong Dong* v. *Holder,* 696 F.3d 121, 124 (1st Cir. 2012) (the Attorney General is authorized to direct the BIA to refer cases to him for review and, given this authority, his decisions are entitled to *Chevron* deference). When the Attorney General certifies a case to himself, he has broad discretion to review the issues before him. *See Matter of J–F–F–,* 23 I&N Dec. 912, 913 (A.G. 2006).

*Matter of F-* and the regulatory language simply restate the longstanding proposition that adjudicators in the Departments are not bound by judgments rendered by courts without jurisdiction, and even the full language noted by commenters from *Matter of F-* adheres to that proposition. *Matter of F-,* 8 I&N Dec. at 253 (explaining that, although "familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court," the "presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself").

Commenters' statements that the Departments' interpretation of "conviction" runs contrary to Congress's intent in defining the term are similarly misplaced. As explained by the Attorney General, in enacting section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)), Congress made clear that immigration consequences should flow from the original determination of guilt. *Matter of Thomas and Thompson,* 27 I&N Dec. at 682 (describing subsequent case law analyzing Congress's intent in enacting a definition for conviction). To the extent that commenters relied on *Matter of Cota-Vargas,* 23 I&N Dec. 849, the Attorney General expressly overruled that decision and explained that Congress did intend to clarify the definition of "conviction" for immigration purposes. *Matter of Thomas and Thompson,* 27 I&N Dec. at 679, 682.

Regarding commenters' concerns about the creation of a rebuttable presumption against the validity of an order modifying, clarifying, or altering a judgment or sentence, the Departments reiterate that this is merely a presumption. Individuals will be able to overcome the presumption by providing evidence that the modification, clarification, or vacatur was sought for genuine substantive or procedural reasons. As noted in the NPRM, the purpose of this presumption is to promote finality in immigration proceedings by encouraging individuals to pursue legitimate concerns regarding the validity of prior convictions. 84 FR 69656.

The Departments disagree that creating a rebuttable presumption is unlawful under *Padilla* v. *Kentucky,* 559 U.S. 356. In *Padilla,* the Supreme Court held that noncitizen defendants have a Sixth Amendment right to be competently advised of immigration consequences before agreeing to a guilty plea. *Id.* at 374. The rule does not affect this right, and noncitizen defendants continue to retain this right in criminal proceedings. Moreover, if a noncitizen

defendant is not properly apprised of the immigration consequences of a guilty plea, that individual continues to have the right to pursue the necessary action to address that error through the criminal justice system. Similarly, an individual whose Sixth Amendment rights were determined to have been violated in contravention of *Padilla* would be able to present this evidence in immigration proceedings and, if the evidence is sufficient, overcome the presumption that the individual was seeking a modification, clarification, or vacatur for immigration purposes.

Regarding commenters' assertions that State and Federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings, the Departments disagree. Administration and enforcement of the nation's immigration laws as written by Congress are entirely within the purview of the Executive Branch, specifically the Attorney General and the Secretary. *See* INA 103 (8 U.S.C. 1103). The Attorney General and the Secretary are granted discretion and authority to determine the manner in which to administer and enforce the immigration laws. *Id.* At the same time, this rule will not have any bearing on how States or other jurisdictions implement their criminal justice system because, as explained, any post-conviction relief remains valid for all other purposes.

b. Violation of International Law

*Comment:* Numerous commenters alleged that the proposed rule violates the United States' obligations to protect refugees and asylum seekers under international law, including obligations flowing from the Protocol relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223 ("the Protocol" or "the 1967 Protocol"), which incorporates Articles 2 to 34 of the 1951 Convention relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6233, 6259–76 ("the Refugee Convention"). Commenters stated that, by virtue of signing the Protocol, the United States is bound to create refugee laws that comply with the Protocol. Commenters asserted that the current laws, regulations, and processes governing asylum adjudications are already exceedingly harsh and are not compliant with international obligations. Commenters claimed that, rather than working to better align the United States with international obligations, the proposed rule's new categorical bars to asylum violate both the language and spirit of the Refugee Convention.

Commenters speculated that the proposed rule will violate the principle of non-refoulement, as described in Article 33(1) of the Refugee Convention, which requires that "[n]o contracting state shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Commenters noted that, in considering non-refoulement, the United States is obligated to ensure a heightened consideration to children. Commenters also claimed that the exception to refugee protection contained in Article 33(2) of the Refugee Convention [10] does not affect non-refoulement obligations. Commenters also outlined the United States' obligations to protect migrants, irrespective of migration status, as outlined in the Universal Declaration of Human Rights and other human rights instruments. Commenters stated that to comply with these protection obligations, the United States must respond to the protection needs of migrants, with a particular duty of care for migrants in vulnerable situations.

Commenters also asserted that the proposed rule violates the United States' obligations under customary international law. Commenters cited Article III of the U.S. Constitution and *Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 729 (2004), in asserting that customary international law is recognized as and must be applied as U.S. law. Commenters stated that, unlike treaty law, customary international law cannot be derogated by later legislation and remains in full force at all times. Commenters claimed that even good faith efforts by States to change a rule are violations of customary international law until the rule has been changed by a consensus of States through *opinio juris* and state practice. Despite this summary of customary international law, these commenters did not specify how the proposed rule violates customary international law.

Other commenters averred that the proposed rule violates international law by expanding the definition of a "particularly serious crime" beyond the parameters of the term as defined by the United Nations High Commissioner for

---

[10] Article 33(2) of the Refugee Conviction provides: "The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."

Refugees ("UNHCR") by rendering nearly all criminal convictions bars to asylum. Commenters recognized that Article 33(2) of the Refugee Convention allows states to exclude or expel individuals from refugee protection if they have been "convicted by a final judgment of a particularly serious crime" and "constitute[] a danger to the community of that country." However, commenters asserted that this clause is intended only for "extreme cases," in which the particularly serious crime is a "capital crime or a very grave punishable act." Commenters cited UNHCR's statement that the crime "must belong to the gravest category" and that the individual must "become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." Again citing UNHCR, commenters further asserted that this exception does not include less extreme crimes such as "petty theft or the possession for personal use of illicit narcotic substances."

Commenters also expressed concern that the proposed rule's categorical bars do not allow for an individualized analysis as to whether an individual who has been convicted of a particularly serious crime also presents a danger to the community. Commenters noted that, in the proposed rule, the Departments cited the need for increased efficiency as a justification for creating these additional bars. However, commenters responded that an individualized determination is exactly what is required by the Refugee Convention. Specifically, commenters claimed that the Departments ignored UNHCR guidelines,[11] which require not only a conviction for a particularly serious crime but also a determination that the individual constitutes a danger to the community of the country of refuge. Commenters averred that a conviction, without more, does not make an individual a present or future danger to the community. Commenters accordingly asserted that the Refugee Convention's "particularly serious crime" bar should apply only after a determination that an individual was convicted of a particularly serious crime and a separate assessment demonstrates that he or she is a present or future danger.

In addition, commenters alleged that the Act, in combination with subsequent agency interpretations, have

already expanded the term "particularly serious crime" far beyond its contemplated definition by creating the categorical "particularly serious crime" bar that incorporates the aggravated felony definition. Similarly, commenters stated that adjudicators already have overly broad discretion to deny asylum based on alleged criminal conduct. These commenters claimed that the proposed rule would cause the United States to further depart from its international obligations by creating additional bars without consideration of other factors, such as dangerousness. Commenters alleged that, in justifying the proposed rule, the Departments improperly cited the "serious non-political crime" bar that applies only to conduct that occurred outside the United States.

In addition to these alleged violations of international law, commenters also asserted that the Departments' emphasis on the discretionary nature of asylum violates U.S. treaty obligations, congressional intent, and case law. Commenters noted that, although a refugee seeking protection in the United States does not always have a claim to mandatory protection, Congress's intent, in enacting the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("the Refugee Act"), was to expand the availability of refugee protection and bring the United States into compliance with its obligations under the 1967 Protocol. Commenters alleged that the proposed rule does the opposite by providing seven categorical bars to asylum and, as a result, violates the spirit and intent of the Refugee Act.

Commenters alleged that the Departments' reliance on the Attorney General's discretion to enact the proposed changes is ultra vires because the Attorney General, even in his discretion, may not violate domestic law, international treaties, or fundamental human rights. Specifically, commenters averred that the Attorney General's discretion is limited by the criteria in sections 208(b) and (d) of the Act (8 U.S.C. 1158(b) and (d)) as well as the legislative history regarding these sections, which, according to the commenters, clearly incorporate international law and legal norms. Commenters stated, moreover, that where the United States is a party to a treaty, any decision to abrogate the treaty must be clearly expressed by Congress.

One commenter expressed concern with the Departments' interpretation and reliance on Article 34 of the Refugee Convention, which provides that parties "shall as far as possible facilitate the assimilation and

naturalization of refugees." This commenter criticized the Departments' analysis regarding the availability of alternative relief for individuals barred from asylum under the proposed rule. Specifically, the commenter noted that, although Article 34 requires the United States only to make efforts to naturalize refugees, not to naturalize all refugees, this does not mean that the United States then has the discretion to limit access to the asylum system in the first place.

*Response:* As explained in the NPRM, this rule is consistent with the United States' obligations as a party to the 1967 Protocol, which incorporates Articles 2 through 34 of the 1951 Refugee Convention.[12] This rule is also consistent with U.S. obligations under Article 3 of the CAT, as implemented in the immigration regulations pursuant to the implementing legislation.

As an initial matter, the rule affects eligibility for asylum but does not place any additional limitations on statutory withholding of removal or protection under the CAT regulations. The United States implemented the non-refoulement provision of Article 33(1) of the Refugee Convention through the withholding of removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the non-refoulement provision of Article 3 of the CAT through the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 429, 440–41 (1987); *Matter of C-T-L–,* 25 I&N Dec. 341 (BIA 2010) (applying section 241(b)(3)); *see also* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Public Law 105–277, div. G, sec. 2242, 112 Stat. 2681, 2631–822; 8 CFR 208.16 through 208.18; 1208.16 through 1208.18. The Supreme Court has explained that asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34," which provides that contracting States "'shall as far as possible facilitate the assimilation and naturalization of refugees.'" *Cardoza-Fonseca,* 480 U.S. at 441. Article 34 "is

[11] Commenters cited paragraph 154 the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees.

[12] The Departments also note that neither of these treaties is self-executing, and that they are therefore not directly enforceable in U.S. law except to the extent that they have been implemented by domestic legislation. *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (CAT "was not self-executing"); *see also INS* v. *Stevic,* 467 U.S. 407, 428 n.22 (1984) ("Article 34 merely called on nations to facilitate the admission of refugees to the extent possible; the language of Article 34 was precatory and not self-executing.").

precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible.'' *Id.*

Because the rule does not affect statutory withholding of removal or CAT protection, the proposed rule is consistent with the non-refoulement provisions of the 1951 Refugee Convention, the 1967 Protocol, and the CAT. *See Matter of R–S–C–,* 869 F.3d at 1188 & n.11 (explaining that ''the Refugee Convention's non-refoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution— is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016); *Maldonado* v. *Lynch,* 786 F.3d 1155, 1162 (9th Cir. 2015) (explaining that Article 3 of the CAT, which sets out the non-refoulement obligations of parties, was implemented in the United States by FARRA and its implementing regulations).

The rule does not affect the withholding of removal process or standards. INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 208.16, 1208.16. An alien who can demonstrate that he or she would more likely than not face persecution on account of a protected ground or torture may qualify for statutory withholding of removal or CAT protection. Therefore, because individuals who may be barred from asylum by the rule remain eligible to seek statutory withholding of removal and CAT protection, the rule does not violate the principle of non-refoulement. *Cf. Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) (discussing the distinction between asylum and withholding of removal and explaining that ''withholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood'').

Commenters asserted, without support, that the United States must respond to the needs of migrants to comply with the 1948 Universal Declaration of Human Rights. *See* Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948) (''UDHR''). The UDHR is a non-binding human rights instrument, not an international agreement, and thus it does not impose legal obligations on the United States. *Alvarez-Machain,* 542 U.S. at 728, 734–35 (citing John P. Humphrey, The U.N. Charter and the Universal Declaration of Human Rights, in The International Protection of Human Rights 39, 50 (Evan Luard ed., 1967) (quoting Eleanor Roosevelt as

stating that the Declaration is ''''a statement of principles * * * setting up a common standard of achievement for all peoples and all nations' and 'not a treaty or international agreement * * * impos[ing] legal obligations.' ''')). In any case, although the UDHR proclaims the right of ''[e]veryone'' to ''seek and to enjoy'' asylum, UDHR Art. 14(1), it does not purport to state specific standards for establishing asylum eligibility, and it certainly cannot be read to impose an obligation on the United States to grant asylum to ''everyone,'' *see id.,* or to prevent the Attorney General and the Secretary from exercising their discretion granted by the INA, consistent with U.S. obligations under international law as implemented in domestic law. *See* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol* 3 (Jan. 26, 2007), *https://www.unhcr.org/4d9486929.pdf* (''The principle of *non-refoulement* as provided for in Article 33(1) of the 1951 Convention does not, as such, entail a right of the individual to be granted asylum in a particular State.''). The United States' overall response to the needs of migrants extends beyond the scope of this rulemaking.

To the extent that commenters made blanket assertions that the rule violates customary international law or other international documents and statements of principles, the commenters ignore the fact that the rule leaves the requirements for an ultimate grant of statutory withholding of removal or CAT withholding or deferral of removal unchanged.

As explained in additional detail in section II.C.2.a.i of this preamble, the rule did not designate additional particularly serious crimes in the regulatory text. Because the Departments have the independent authority for these changes under INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)), the Departments need not further respond to comments regarding the current ''particularly serious crime'' bar, as those comments extend beyond the scope of this rulemaking. Nevertheless, commenters' assertions that the proposed rule improperly and unlawfully expands the definition of ''particularly serious crime'' beyond the definition provided by UNHCR are misguided. UNHCR's interpretations of or recommendations regarding the Refugee Convention and the Protocol, such as set forth in the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967

Protocol Relating to the Status of Refugees (Geneva 1992) (reissued Feb. 2019), are ''not binding on the Attorney General, the BIA, or United States courts.'' *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). ''Indeed, the Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol * * * is incumbent upon the Contracting State in whose territory the refugee finds himself.' '' *Id.* at 427–28. To the extent such guidance ''may be a useful interpretative aid,'' *id.* at 427, it would apply to statutory withholding of removal—which is the protection that implements Article 33 of the Convention—and which, as discussed above, this rule does not affect.

Commenters also relied on the advisory opinion UNHCR Handbook to assert that an adjudicator must make an individualized assessment as to whether an asylum applicant presents or will present a danger to the community. Again, as noted above, the Departments clarify in section II.C.2.a.i that the rule did not designate additional particularly serious crimes in the regulatory text. Regardless, the Departments have longstanding authority under U.S. law to create asylum-related conditions without an individualized consideration of present or future danger to the community.[13] For example, in 2000, Attorney General Janet Reno limited asylum eligibility pursuant to the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) based on ''a fundamental change in circumstances'' or the ability of an alien to reasonably relocate within the alien's country of nationality or last habitual residence, even where that alien had established he or she had suffered past persecution. *See* Asylum Procedures, 65 FR 76121, 76133–36 (Dec. 6, 2000) (adding 8 CFR 208.13(b)(1)(i)–(iii)). As outlined in the NPRM, the Attorney General and Congress have previously established several mandatory bars to asylum eligibility. 84 FR at 69641. The Departments note that the adjudicator must still make an individualized determination as to whether a given offense falls into the category of conduct

---

[13] In addition, even if this rulemaking did enact regulatory provisions requiring an interpretation of particularly serious crimes, U.S. law has long held that, once an alien is found to have been convicted of a particularly serious crime, there is no need for a separate determination whether he or she is a danger to the community. *See Matter of N–A–M–,* 24 I&N Dec. 336, 343 (BIA 2007), *aff'd, N-A-M-* v. *Holder,* 587 F.3d 1052 (10th Cir. 2009), *cert. denied,* 562 U.S. 1141 (2011); *Matter of Q-T-M-T–,* 21 I&N Dec. 639, 646–47 (BIA 1996); *Matter of K–,* 20 I&N Dec. 418, 423–24 (BIA 1991); *Matter of Carballe,* 19 I&N Dec. 357, 360 (BIA 1986).

contemplated by an individual bar. *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly serious crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009). In addition, as explained above, the UNHCR Handbook is not binding on the Attorney General, the BIA, or United States courts, although it ''may be a useful interpretative aid.'' *Aguirre-Aguirre,* 526 U.S. at 427.

The Departments disagree with commenters' assertions that, by relying on the discretionary nature of asylum, the rule violates U.S. treaty obligations, congressional intent, and case law. As explained above, because the rule does not alter eligibility for withholding of removal or CAT protection, the rule does not violate U.S. treaty obligations and ensures continued compliance with U.S. non-refoulement obligations. Additionally, Congress's intent in enacting the Refugee Act was ''a desire to revise and regularize the procedures governing the admission of refugees into the United States.'' *Stevic,* 467 U.S. at 425. Rather than expanding the availability of refugee protection, as asserted by commenters, the Refugee Act's definition of refugee does ''not create a new and expanded means of entry, but instead regularizes and formalizes the policies and practices that have been followed in recent years.'' *Id.* at 426 (quoting H.R. Rep. No. 96–608, at 10 (1979)). Moreover, case law supports the Attorney General's authority under U.S. law to limit asylum. *See Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding regulatory implementation of the firm resettlement bar); *see also Komarenko,* 35 F.3d at 436 (upholding regulatory implementation of the ''particularly serious crime'' bar).

Regarding the Attorney General's and the Secretary's discretion to enact the rule, the Departments disagree that the rule is ultra vires because, as explained above, Congress has granted the Attorney General and the Secretary the authority to limit eligibility for asylum. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Moreover, the rule does not violate applicable obligations under domestic law or international treaties for the reasons discussed above.

3. Concerns With Categorical Bars

In addition to comments generally opposing the seven bars proposed by the NPRM, commenters also raised concerns related to specific bars.

a. Felonies

*Comment:* Commenters opposed the proposed limitation on asylum eligibility for individuals who have been convicted of any felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed). Commenters generally stated that the proposed limitation was overbroad and that the Departments failed to support their stated position that offenses carrying potential sentences of more than one year correlate to recidivism and dangerousness. Commenters asserted that the proposed limitation would ''sweep in'' minor conduct, including some State misdemeanors.

Commenters also opposed the Departments' proposed definition of the term ''felony,'' *see* 8 CFR 208.13(c)(7)(i), 1208.13(c)(7)(i) (proposed), as any crime defined as a felony by the relevant jurisdiction of conviction, or any crime punishable by more than one year imprisonment. Commenters objected to both portions of the proposed definition.

Specifically, commenters opposed the definition's reliance on the maximum possible sentence of an offense over the actual sentence imposed. Commenters opposed the Departments' reasoning for that determination. *See* 84 FR at 69646 (''[T]he sentence actually imposed often depends on factors such as offender characteristics that may operate to reduce a sentence but do not diminish the gravity of the crime.'' (alteration and quotation marks omitted)). Commenters stated that imposing a sentence requires careful consideration of numerous factors, including any mitigating circumstances, and that the proposed definition dismissed careful sentencing considerations by prosecutors and criminal sentencing courts, which are charged with considering public safety. Commenters stated that the actual sentence imposed is a more faithful and accurate measure of whether an individual's conduct was ''particularly serious'' and that not every offense that would be a felony under the proposed definition is or should be considered a ''particularly serious crime.'' Commenters also stated that not every alien convicted of a crime that is punishable by more than one year of imprisonment is a danger to the community who should be barred from asylum eligibility.

Commenters also opposed the proposal that the definition of felony include any offense that is labeled as a felony in its respective jurisdiction, regardless of the maximum term of imprisonment or other factors. Commenters stated that, with certain types of offenses, the difference between misdemeanors and felonies does not necessarily involve aggravated conduct or heightened risk to the public but rather factual elements, such as the alleged dollar value of a stolen good. Accordingly, commenters stated, it would be inappropriate to categorically bar eligibility for asylum on this basis.

Commenters asserted that a categorical bar against all felonies, as defined by the NPRM, would result in drastic inconsistencies and unfair results and would undermine the Departments' stated goal of uniformity and consistency. Commenters stated that the proposed definition would improperly treat a broad range of offenses as equally severe. Additionally, commenters stated, a broad range of criminal conduct encompassing varying degrees of severity or dangerousness could be charged under the same disqualifying offense.

At the same time, commenters suggested that identical conduct in different States (or other jurisdictions) would have different consequences on eligibility for asylum, depending on whether the jurisdiction labeled the crime as a felony or set a maximum penalty of over one year of imprisonment. As an example, one commenter asserted that felony theft threshold amounts among the States vary considerably, ranging from $200 to $2,500 or more, but noted that the proposed rule would treat these varying offenses equally under the proposed definition. The commenter stated that the definition was overbroad and did not exercise the ''special caution'' that should be taken with asylum cases given the high stakes involved. Other commenters stated that the desire for consistency should not be elevated over ''legitimate concerns of fairness and accurate assessments of dangerousness.''

One commenter opined that the proposed limitation would ignore the federalist nature of the U.S. criminal justice system, where each State has its own criminal code and makes individual determinations about which conduct should be criminalized, and how.

Commenters stated that the ''harsh inequities'' created by the rule would dissuade aliens who are fleeing persecution to plead guilty to misdemeanor charges that could carry a one-year sentence, even if the plea agreement would not include any incarceration, which could in turn have a host of unintended collateral consequences in the criminal justice system. Numerous commenters offered specific examples of State laws that they asserted would improperly be considered disqualifying offenses under the proposed limitation and accompanying definition. For example,

commenters stated that some States, such as Massachusetts, define misdemeanors, which may carry a sentence of one year or more in a ''house of correction,'' much more broadly than many other States. Commenters also listed statutes from New York,[14] Maryland,[15] and several other States that they believed should not qualify as a basis for limiting eligibility to asylum.

*Response:* The Departments disagree with commenters' opposition to the inclusion of any felony conviction as a bar to asylum eligibility and to the corresponding proposed definition of ''felony'' for the purposes of determining whether the bar applies. As an initial matter, to the extent commenters expressed concern that the inclusion of any felony is an inaccurate measure of whether an individual's conduct was ''particularly serious'' or that not every offense that would be a felony under the proposed definition is or should be considered a ''particularly serious crime,'' the Departments need not address these concerns in detail because this rule, like the proposed rule, designates these offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[16] *See* 8 CFR 208.13(c)(6), 1208.13(c)(6).

As explained above, the Departments reiterate the explanation in the NPRM that the inclusion of any felony conviction as a bar to asylum eligibility is intended to avoid inconsistencies, inefficiencies, and anomalous results that often follow from the application of the categorical approach. 84 FR at 69645–46. In addition, the felony limitation on eligibility for asylum is consistent with other losses of benefits for felony convictions. *See* 84 FR at 69647 (explaining that treating a felony conviction as disqualifying for purposes of obtaining the discretionary benefit of asylum would be consistent with the disabilities arising from felony convictions in other contexts and would reflect the ''serious social costs of such crimes'').

The Departments disagree with commenters' concerns that the felony limitation and related definition of ''felony'' would result in drastic inconsistencies and unfair results, undermining the stated purpose of the rule. As described in the NPRM, the existing reliance on the categorical approach to determine the immigration consequences of convictions has far too often resulted in seemingly inconsistent or anomalous results. 84 FR at 69645–46.[17] The rule will significantly help to curtail inconsistencies and confusion over what offenses may be disqualifying for purposes of asylum, as all aliens who have been convicted of the same level of offense will receive the same treatment during asylum proceedings.

The Departments understand that the States have different criminal codes with different definitions of crimes, levels of offense, and other differences. With respect to commenters' federalism concerns, Congress has plenary authority over aliens, and that authority has been delegated the Departments. *See Zadvydas* v. *Davis,* 533 U.S. 678, 695

(2001) (citing *INS* v. *Chadha,* 462 U.S. 919, 941–42 (1983), for the proposition that Congress must choose ''a constitutionally permissible means of implementing'' that power); INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Additionally, as stated in the NPRM and above in section II.C.2.A.ii, the categorical approach is overly complex, leads to inconsistent treatment of aliens who have been convicted of serious criminal offenses, and presents a strain on judicial and administrative resources. Although some aliens who have been convicted of serious criminal offenses are appropriately barred from discretionary benefits under the Act, such as asylum, others are not. *See, e.g., Lowe,* 920 F.3d at 420 (Thapar, J., concurring) (''[I]n the categorical-approach world, we cannot call rape what it is. * * * [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent.''). This rule will provide certainty by establishing a bright-line rule that is both easy to understand and will apply uniformly to all applicants who have been convicted of felonies, which the Departments believe to be significant offenses. Aliens are being given advance notice through the NPRM, which was published on December 19, 2019, 84 FR at 69646, and by this publication of the final rule, that any felony conviction will be a bar to eligibility for the discretionary benefit of asylum. *Cf.* 8 CFR 208.3(c)(6)(vi)(A), 8 CFR 1208.3(c)(6)(vi)(A) (proposed) (barring aliens who have been convicted of felonies ''on or after [the effective date'').

The Departments disagree that the proposed definition of ''felony'' implicates federalism concerns by defining the term ''felony,'' as it is to be used in this context, differently from States' (or other jurisdictions') definitions of felonies. In fact, the Departments believe that the felony definition is consistent with principles of federalism by primarily deferring to each State's choice of what offenses to define as felonies. Similarly, the alternative definition capturing any crime punishable by more than one year of imprisonment is consistent with the Federal definition and many States' definitions of ''felony.'' *See, e.g.,* 18 U.S.C. 3559 (defining ''felonies'' as offenses with a maximum term of imprisonment of more than one year); 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying State laws).

Congress has delegated to the Departments, not the States or other jurisdictions, the authority to set additional limitations on eligibility for

---

[14] *See* N.Y.P.L. 145.05. (criminalizing the causing of $250 worth of property damage); N.Y.P.L. 275.34 (criminalizing the recording of a movie in a theater two times); N.Y.P.L. 220.06 (criminalizing simple possession of more than half an ounce of a narcotic).

[15] *See* MD. CODE, ALCO. BEV. 6–307; MD. CODE, ALCO. BEV. 6–402 (criminalizing the sale of alcohol to a visibly intoxicated person with a sentence of up to two years); MD. CODE, CRIM. LAW 3–804 (criminalizing the use of a telephone to make a single anonymous phone call to annoy or embarrass another person with a sentence of up to three years); MD. CODE, CRIM. LAW 4–101 (criminalizing the simple possession of a ''dangerous weapon,'' including a utility knife, on one's person, with a sentence of up to three years); MD. CODE, CRIM. LAW 6–105 (criminalizing the burning of property under $1,000 with a sentence of up to 18 months); MD. CODE, CRIM. LAW 6–205 (criminalizing the unauthorized entry into a dwelling with a sentence of up to three years); MD. CODE, CRIM. LAW 7–203 (criminalizing the temporary use of another person's vehicle without his or her consent (*i.e.,* ''joyriding'') with a sentence of up to four years); MD. CODE, TAX–GEN. 13–1015 (criminalizing the import, sale or transportation of unstamped cigarettes within the state of Maryland with a sentence of up to two years).

[16] The proposed rule's preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of all felonies as bars to asylum eligibility. *Compare* 84 FR at 69645 (explaining that the Attorney General and the Secretary could reasonably exercise their discretion to ''classify felony offenses as particularly serious crimes for purposes of 8 U.S.C.

1158(b)(2)(B)(ii)''), *with id.* at 69647 (explaining that, in addition to their authority under section 208(b)(2)(C), ''the Attorney General and the Secretary ''further propose relying on their respective authorities under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), to make all felony convictions disqualifying for purposes of asylum eligibility''). The regulatory text, however, does not actually designate any additional offenses as ''particularly serious crimes.'' Instead, the discussion of particularly serious crimes helps illustrate how issuing the new bars pursuant to section 208(b)(2)(C) is ''consistent with'' the rest of the INA because the new bars—similar to the ''particularly serious crime'' bar—exclude from eligibility those aliens whose conduct demonstrates that they are dangerous to the United States or otherwise do not merit eligibility for asylum. Further discussion of the interaction of the rule with the ''particularly serious crime'' bar is set out above in section II.C.2.a.i.

[17] Further discussion of the problems with the categorical approach is set out above in section II.C.2.a.ii.

asylum, and the Departments have reasonably determined that the offenses encompassed within the definition should be disqualifying offenses. This rule will not have any direct bearing on how States or other jurisdictions implement their criminal justice system.

With respect to commenters' concerns that the rule will affect how and when aliens enter into plea deals for criminal offenses, such pleadings take place during criminal proceedings, not immigration proceedings. Although asylum adjudications may rely on the information derived from criminal proceedings, the Departments believe that any effects that the rule might have outside of the immigration context are beyond the context of this rulemaking. *Cf. San Francisco* v. *USCIS,* 944 F.3d 773, 804 (9th Cir. 2019) ("Any effects [of a DHS rule] on [healthcare] entities are indirect and well beyond DHS's charge and expertise."). Additionally, the Departments believe that this rule would actually provide more clarity in the pleading process because the rule sets forth straightforward guidelines about what offenses would and would not be disqualifying offenses for purposes of asylum. In turn, criminal defense attorneys will be better able to advise their clients on the predictable immigration consequences of a conviction. *Cf. Padilla,* 559 U.S. at 357 ("There will, however, undoubtedly be numerous situations in which the deportation consequences of a plea are unclear. In those cases, a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry adverse immigration consequences. But when the deportation consequence is truly clear, as it was here, the duty to give correct advice is equally clear.").

Second, regarding the commenters' concerns with the definition for the term "felony," *see* 8 CFR 208.13(c)(7)(i), 1208.13(c)(7)(i) (proposed), the Departments disagree that the definition should look to the actual sentence imposed instead of the maximum possible sentence. As noted in the NPRM, consideration of an offense's maximum possible sentence is generally consistent with the way other Federal laws define felonies. *See* 84 FR at 69646; *see also, e.g.,* 5 U.S.C. 7313(b) ("For the purposes of this section, 'felony' means any offense for which imprisonment is authorized for a term exceeding one year."); *cf.* U.S.S.G. 2L1.2 cmt. n.2 ("'Felony' means any federal, state, or local offense punishable by imprisonment for a term exceeding one year."). The Model Penal Code and most States likewise define a felony as a crime with a possible sentence in

"excess of one year." Model Penal Code § 1.04(2); *see also* 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying State laws).

In addition, as recognized by the commenters, sentencing courts and prosecutors consider a number of factors when imposing a sentence, many of which have no bearing on the seriousness of the crime committed. Specifically, in *Matter of N-A-M-,* 24 I&N Dec. 336 (BIA 2007), the BIA explained that the sentence imposed might be based on conduct "subsequent and unrelated to the commission of the offense, such as cooperation with law enforcement authorities," or "offender characteristics." *Id.* at 343 (determining that the respondent had been convicted of a particularly serious crime even where no term of imprisonment was imposed); *see also Holloway* v. *Att'y Gen. U.S.,* 948 F.3d 164, 175 (3d Cir. 2020) ("[T]he maximum penalty that may be imposed often reveals how the legislature views an offense. Put succinctly, the maximum possible punishment is certainly probative of a misdemeanor's seriousness." (footnote and internal quotation marks omitted)). Such considerations are necessarily unrelated to the seriousness of the actual crime, and the sentence imposed is "not the most accurate or salient factor to consider in determining the seriousness of an offense." *Matter of N-A-M-,* 24 I&N Dec. at 343; *see also Holloway,* 948 F.3d at 175 n.12 (stating that the penalty imposed may be more reflective of how a sentencing judge viewed an offender than the offense itself).

The Departments therefore reject recommendations to consider the sentence imposed when determining whether a conviction is a felony, as opposed to the NPRM's proposal to consider the maximum possible sentence associated with a given offense. The Departments are persuaded by the reasoning of the U.S. Court of Appeals for the Third Circuit, which recognized that, in cases where the analysis centers around an offense, and not the offender (as in the "particularly serious crime" analysis), "the maximum punishment is a more appropriate data point because it provides insight into how a state legislature views a crime—not how a sentencing judge views an individual." *Holloway,* 948 F.3d at 175 n.12. Thus, the Departments continue to believe that lengthier maximum sentences are associated with more serious offenses that appropriately should have consequences when determining asylum eligibility. 84 FR at 69646.

Furthermore, as noted above, the Departments are acting within their designated authority pursuant to section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) (authority to establish additional limitations and conditions on eligibility for asylum) to designate felonies, as defined in the rule, as disqualifying offenses for purposes of asylum eligibility. *See* section II.C.2.a.i. Assuming, arguendo, that the commenters are correct that felonies as defined by the final rule do not necessarily reflect an alien's dangerousness, the Departments' authority to set forth additional limitations and conditions on asylum eligibility under this provision requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to these additional conditions or limitations first meet a particular dangerousness threshold. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of felonies as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars on eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Indeed, by expressly including "serious nonpolitical crimes" as a statutory basis for ineligibility, Congress indicated that "particularly serious crimes" need not be the only crime-based bar on asylum

eligibility. And by further excluding from eligibility aliens who engage in certain harmful conduct, regardless of whether those aliens pose a danger to the United States, *see* INA 208(b)(2)(A)(i) (persecutor bar) (8 U.S.C. 1158(b)(2)(A)(i)), Congress indicated that ''dangerousness'' need not be the only criterion by which eligibility for asylum is to be determined.

b. Alien Smuggling or Harboring

*Comment:* Commenters raised several concerns with respect to the NPRM's proposed bar to asylum eligibility for aliens convicted of harboring or smuggling offenses under sections 274(a)(1)(A) and (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A), (a)(2)). *See* 8 CFR 208.13(c)(6)(i), 1208.13(c)(6)(i) (proposed).

First, commenters asserted that the NPRM improperly broadened the existing statutory bar to asylum for many individuals who have been convicted of alien smuggling or harboring under sections 274(a)(1)(A) and (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A), (a)(2)). Specifically, commenters noted that such convictions already constitute aggravated felonies under the Act that would bar an alien from eligibility for asylum,[18] ''except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual).'' *See* INA 101(a)(43)(N) (8 U.S.C. 1101(a)(43)(N)). Commenters opposed the NPRM, asserting that it improperly proposed removing the limited exception to this bar and imposing a blanket bar against anybody convicted of such an offense. Commenters asserted that adjudicators should have the discretion to decide whether individuals convicted of such offenses, who are not already statutorily precluded because their convictions are not considered aggravated felonies, should be barred from asylum.

Commenters also asserted that the proposed limitation undermined congressional intent. Specifically, commenters stated that Congress intended to make asylum available to those present in the United States, without regard to how they entered, and would not have intended to bar from asylum first-time offenders who were convicted for helping their family

members escape persecution. *See* INA 208(a)(1) (8 U.S.C. 1158(a)(1)) (providing that an alien ''who arrives in the United States (whether or not at a designated port of arrival * * *)'' may apply for asylum in accordance with the rest of the section). Commenters stated that this congressional intent is demonstrated by the fact that Congress did not consider such offenses to be aggravated felonies and thus, in turn, particularly serious crimes that would bar asylum eligibility.

Commenters also asserted that the proposed limitation undermined UNHCR's recognition that aliens must sometimes commit crimes ''as a means of, or concomitant with, escape from the country where persecution was feared,'' and that the fear of persecution should be considered a mitigating factor when considering such convictions. However, the commenters did not elaborate on how this assertion pertains to aliens who commit crimes concomitant with another person's escape from a country where persecution may be feared.

Commenters asserted that the Departments failed to properly explain how all smuggling and harboring convictions under section 274 of the Act (8 U.S.C. 1324) reflected a danger to the community that should result in a categorical bar to asylum.

Numerous commenters stated that they opposed the proposed limitation because it unfairly penalized asylum seekers for helping their family members, such as minor children and spouses, to come to the United States for any reason, including to escape from persecutors, traffickers, or abusers. Commenters stated that the proposed bar would force family members to choose between their loved ones remaining in danger in their countries of origin and themselves or their family being barred from asylum and returned to their persecutors. At least one commenter stated that the Departments illogically concluded that the hazard posed to a child or spouse being smuggled is greater than the harm the same child or spouse would face in the country of origin.

At least one commenter suggested that children in particular would be harmed by the proposed bar because children are often derivatives on their parents' asylum application and may have nobody else to care for them in the United States if their parents are deported. Commenters also stated that asylum seekers often travel to the United States in family units and that some types of persecution are ''familial by nature, culture, and law.'' Commenters suggested that the proposed limitation would undermine

the sanctity of the family and eliminate family reunification options, which would result in permanent separation of families.

Commenters asserted that survivors of domestic violence who are forced to flee to the United States without their children should not be barred from asylum for trying to later reunite the family.

Commenters also objected to the Departments' assertion that families could present themselves at the United States border, stating that this may not be possible due to recently implemented policies and regulations. Some commenters asserted that the proposed bar ''is particularly insidious'' in light of documents [19] that they claimed revealed efforts to utilize smuggling prosecutions against parents and caregivers as part of a strategy to deter families from seeking asylum in the United States and that the NPRM proposed an expansion of those efforts.

At least one commenter stated that the proposed bar, in addition to the above-described policies, would harm good Samaritans who provide humanitarian aid to migrants traversing deserts with harsh conditions. At least one commenter expressed concerns that existing prohibitions against harboring, which include ''transportation,'' could be applied to punish those who engage in routine conduct like driving someone to work or to a doctor's appointment. *See* INA 274(a)(1)(A)(iii) (8 U.S.C. 1324(a)(1)(A)(iii)) (establishing criminal penalties for an individual who ''conceals, harbors, or shields from detection [or attempts to do so], [an] alien in any place, including * * * any means of transportation'').

Commenters also generally asserted that the proposed limitation would multiply the harms that asylum seekers face in coming to the United States.

*Response:* The Departments disagree with comments suggesting that the additional limitation on eligibility for asylum for aliens who have been convicted of bringing in or harboring certain aliens pursuant to sections 274(a)(1)(A), (2) of the Act (8 U.S.C. 1324(a)(1)(A), (2)) is inappropriate or unlawful.

The Departments reject commenters' concerns that the additional limitation is an unlawful expansion of existing bars to asylum eligibility set forth at

---

[18] A conviction for an aggravated felony is automatically considered a conviction for a particularly serious crime that would bar an alien from asylum eligibility under section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(A)(ii)). INA 208(b)(2)(B)(i) (8 U.S.C. 1158(b)(2)(B)(i)).

[19] Commenters cited Ryan Devereaux, *Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers,* The Intercept (Apr. 29, 2019), *https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/* (describing how, in May 2017, DHS allegedly set out to target parents and family members of unaccompanied minors for prosecution).

section 101(a)(43)(N) of the Act (8 U.S.C. 1101(a)(43)(N)). It is within the Departments' delegated authority to set forth additional limitations on asylum eligibility. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). In other words, the Departments may expand upon the existing grounds for ineligibility and the disqualifying offenses, even when those or similar grounds have already been assigned immigration consequences, and the Departments have done so in this rulemaking. *Cf. Hawaii,* 138 S. Ct. 2411–12 (holding that Congress "did not implicitly foreclose * * * tighter restrictions," even in circumstances in which those restrictions concerned a subject "similar" to the one that Congress "already touch[ed] on in the INA").

The Departments disagree with commenters that adjudicators should have the discretion to determine whether aliens who have been convicted of offenses under sections 274(a)(1)(A), (2) of the Act (8 U.S.C. 1324(a)(1)(A), (2)) should be eligible for asylum. Convictions for such offenses are serious and harmful. As noted in the NPRM, even first-time alien smuggling offenses display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse. 84 FR at 69648. And as also noted in the NPRM, the Act already bars most individuals who have been convicted of this offense from asylum eligibility, thus demonstrating congressional recognition of the seriousness of such offenses. *Id.* at 69647. Accordingly, the Departments have concluded that no aliens who have been convicted of such offenses should merit the discretionary benefit of asylum.

The Departments disagree with commenters that an additional limitation on eligibility for aliens who have been convicted of alien smuggling or harboring offenses contravenes the "whether or not at a designated port of arrival" language in the asylum statute at section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)). The Departments stress that this additional limitation has no bearing on the asylum applicant's manner of entry; rather it involves the asylum applicant's conduct with respect to unlawful entry of others. Thus, the Departments do not further address these comments.

Comments concerning statements or guidance from UNHCR are misplaced. UNHCR's interpretations of or recommendations regarding the Refugee Convention and Refugee Protocol "may be a useful interpretative aid," but they are "not binding on the Attorney General, the BIA, or United States courts.'' *Aguirre-Aguirre,* 526 U.S. at 427. Indeed, as noted already, "the Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol * * * is incumbent upon the Contracting State in whose territory the refugee finds himself.' " *Id.* at 427–28.

The Departments disagree with commenters who stated that the Departments failed to explain how all smuggling and harboring convictions reflected a danger to the community that should result in a categorical bar to asylum.[20] The Departments believe that they adequately explained their reasoning in the NPRM that such offenses place others, including children, in potentially hazardous situations that could result in injury or death, and that they reflect a flagrant disregard for immigration laws. As a result, those people who commit these offenses present a danger to the community. 84 FR at 69648.

Additionally, as stated above, the Departments have designated such alien smuggling or harboring offenses as discrete bases for ineligibility pursuant to the authority provided by section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) (authority to establish additional limitations and conditions on eligibility for asylum). Assuming, arguendo, that commenters are correct that the offenses designated by the rule do not accurately reflect an alien's dangerousness, the Departments' authority to set forth additional limitations and conditions on asylum eligibility under this provision requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to the conditions or limitations meet a threshold of dangerousness. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by

regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of the alien smuggling and harboring offenses included in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). And, as explained previously, Congress's inclusion of statutory bars on eligibility for aliens who engage in certain harmful conduct or commit certain types of crimes that are not "particularly serious," *see* INA 208(b)(2)(A)(i), (iii) (8 U.S.C. 1158(b)(2)(A)(i), (iii)), demonstrates that the "dangerousness" associated with the conduct is not the sole criterion by which the Departments may consider whether an alien should be eligible for asylum.

The Departments disagree that this rule would undermine family values or particularly harm children. The Departments believe that the rule helps families and children by discouraging the dangerous practices of alien smuggling and harboring. The Departments disagree with commenters' assertions that current administrative policies or practices prevent families from presenting themselves at the border. In any event, commenters' concerns referencing such policies or practices are outside the scope of this rulemaking.

Finally, regarding commenters' concerns for good Samaritans, the Departments note again that the bar requires a conviction for it to apply in a particular case. As a result, an individual who leaves provisions or other assistance for individuals traversing the harsh terrain at the southern border would not be ineligible for asylum under this bar unless he or she is in fact prosecuted and convicted. As with the other bars, the Departments understand that the individual circumstances surrounding each offense will vary and that some cases may involve mitigating circumstances, but

[20] In addition, the Departments note that some commenters agreed with the Departments' determination regarding the dangerousness of these offenses. For example, one organization stated that "the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life."

the Departments find that in the context of asylum eligibility, adjudicators should not look behind a conviction to readjudicate an alien's criminal culpability. Although the individual circumstances behind an alien's prosecution may vary, the Departments have concluded that, to promote adjudicative efficiency, it is appropriate to provide a clear standard that defers to the original prosecutor's determination to pursue a conviction of the alien for his or her conduct, as well as the criminal court's existing determination of proof beyond a reasonable doubt that the alien engaged in the conduct.

c. Illegal Reentry

*Comment:* Commenters specified several reasons for opposing the NPRM's proposed limitation on eligibility for asylum for aliens convicted of illegal reentry under section 276 of the Act (8 U.S.C. 1326). *See* 8 CFR 208.13(c)(6)(i), 1208.13(c)(6)(i) (proposed). Under section 276(a) of the Act (8 U.S.C. 1326(a)), aliens who unlawfully reenter the United States after having been previously removed are subject to fines and to a term of imprisonment of two years or less. Section 276(b) of the Act (8 U.S.C. 1326(b)) describes certain aliens, such as those who have been removed after commission of an aggravated felony, who face significantly higher penalties for unlawfully reentering the United States after previously having been removed and authorizes sentences of imprisonment up to 20 years as possible penalties.

Some commenters asserted that the Departments improperly concluded that aliens who have been convicted of such offenses are *per se* dangers to the community, as recidivist offenders of the law, because the NPRM did not consider whether an alien's prior offenses were serious. *See* 84 FR at 69648.

Commenters asserted that the proposed limitation would violate Article 31(1) of the Refugee Convention, which generally prohibits imposing penalties based on a refugee's manner of entry or presence in the country. Commenters stated that this is a critical principle of the Convention because "it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge." Commenters stated that the NPRM did not sufficiently explain how the proposed limitation was consistent with the Convention.

Commenters also asserted that the proposed limitation undermined congressional intent and was not consistent with other provisions in the Act. Specifically, commenters stated that Congress, in accordance with international treaty obligations, has "clearly supported the right to claim asylum anywhere on the U.S. border or at a land, sea, or air port of entry" for almost 40 years. The commenters cited the Refugee Act, where, they stated, Congress authorized asylum claims by any foreign national "physically present in the United States or at a land border or port of entry." The commenters stated that Congress later expressly reaffirmed this position in enacting section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)), which states that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival * * *)" may apply for asylum. Commenters believed that this provision "reflected Congress's ongoing intent to comply with international law, as well as its recognition that allowing an applicant for refugee status to assert a claim for asylum at any point along a land border is a necessary component of essential refugee protections."

Commenters also asserted that the proposed limitation was inconsistent with the Act because it would treat all immigration violations as just as serious as those violations that should fall under the particularly serious crime bar, thus rendering meaningless the limiting language of "particularly serious crimes" in the statute. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)).

Commenters asserted that the proposed limitation was inconsistent with any of the other bars previously recognized by the BIA or the circuit courts because the crime of illegal reentry under section 276 of the Act (8 U.S.C. 1326) has no element of danger or violence to others and has no victim.

Commenters stated that the BIA and the circuit courts have also recognized that an alien's manner of entry should have little effect on eligibility for asylum. *See, e.g., Hussam F.* v. *Sessions,* 897 F.3d 707, 718 (6th Cir. 2018) (holding that it was an abuse of discretion to deny asylum as a matter of discretion when the only negative factor was the alien's "intentional failure to disclose that his passport was obtained in a non-traditional manner"); *Zuh* v. *Mukasey,* 547 F.3d 504, 511 n.4 (4th Cir. 2008) ("When an alien uses fraudulent documents to escape imminent capture or further persecution, courts and [immigration judges] may give this

factor little to no weight."); *Huang* v. *INS,* 436 F.3d 89, 100 (2d Cir. 2006) ("As with peripheral embellishments, if illegal manner of flight and entry are enough independently to support a denial of asylum, we can readily take notice, from the facts in numerous asylum cases that come before us, that virtually no persecuted refugee would obtain asylum. It follows that Wu's manner of entry, on the facts in this record, could not bear the weight given to it by the [immigration judge]."); *Mamouzian* v. *Ashcroft,* 390 F.3d 1129, 1138 (9th Cir. 2004) ("[I]n order to secure entry to the United States and to escape their persecutors, genuine refugees may lie to immigration officials and use false documentation."); *Matter of Pula,* 19 I&N Dec. at 473–74 (holding that the circumvention of the immigration laws is one factor for consideration).

Commenters stated that asylum seekers are often motivated to illegally reenter the United States after having been deported to seek protection from harm rather than for criminal purposes, and that individuals who legitimately fear returning to their countries of origin have been criminally prosecuted under section 276 of the Act (8 U.S.C. 1326). Commenters were concerned that the proposed bar would further criminalize vulnerable individuals fleeing persecution and would result in denial of meritorious claims for asylum. Commenters opined that such individuals should not be barred from asylum.

Commenters stated that the Departments did not take into consideration that trafficking victims may have reentered the United States without authorization "either because they were smuggled in by [a] trafficker, or because they were removed by the U.S., and then returned to find safety."

Commenters stated that "racial and ethnic disparity in the number of sentenced offenders is even more pronounced in the context of illegal reentry" and that "latinx immigrants are disproportionately impacted by over-prosecution of illegal reentry offenses and harsh sentencing of illegal reentry convictions."

Some commenters described anecdotes of "clients who have had to enter the United States without inspection due to cartel kidnappings, fears of being separated at the border, or misinformation by coyotes." One commenter stated that juveniles who were apprehended at the border and placed in Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") custody might request to return to their country

of origin due to "detention fatigue." The commenter stated that, upon return, these juveniles might face the same or new persecution, forcing them to flee once again.

One commenter stated that this proposed limitation was unnecessary because many convictions under section 276 of the Act (8 U.S.C. 1326) already qualify as aggravated felonies. INA 101(a)(43)(O) (8 U.S.C. 1101(a)(43)(O)) (providing that "an offense described in section 1325(a) [illegal entry] or 1326 of this title [illegal reentry] committed by an alien who was previously deported on the basis of an [aggravated felony as defined by section 101(a)(43) of the Act (8 U.S.C. 1101(a)(43))]" is an aggravated felony). Additionally, commenters stated that the proposed limitation was unnecessary because individuals who are convicted under section 276 of the Act (8 U.S.C. 1326) are also subject to reinstatement of a prior order of removal under section 241(a)(5) of the Act (8 U.S.C. 1231(a)(5)), and, thus, are barred from applying for asylum if the prior order is reinstated. *See* INA 241(a)(5) (8 U.S.C. 1231(a)(5)) (stating that an alien whose "prior order of removal is reinstated * * * is not eligible and may not apply" for any relief under the INA); 8 CFR 1208.31(e), (g)(2), 1241.8(e). The commenters suggested that the Departments inappropriately expanded the bar to categorically exclude anyone convicted of illegal reentry.

Some commenters stated that the proposed limitation was improper because underlying removal orders that are the basis for an illegal reentry conviction are often incorrectly issued and do not withstand legal scrutiny.

Commenters expressed concern that individuals who attempt illegal reentry into the United States to flee persecution may have been previously removed from the United States without being aware of their right to apply for asylum. Commenters opined that such individuals "would not have knowingly abandoned their right." Commenters also stated that some individuals may have been prevented from seeking asylum during prior entries.

Commenters asserted that asylum seekers who illegally reenter could have been incorrectly found to lack a credible fear in prior credible fear interviews. Some commenters stated that asylum seekers with legitimate claims may have been previously removed because they were unable to establish eligibility for relief without adequate access to legal representation. Some commenters asserted that there are credible reports that DHS officers do not comply with requirements to inform individuals subject to expedited removal of their

rights or to refer those with a fear of return to asylum officers for credible fear screenings, even when requested, and that DHS officers have engaged in harassment or the spread of misinformation that interferes with individuals' abilities to pursue asylum. One commenter stated that there is a higher risk that credible fear interviews may result in erroneous denial because border patrol officers, not asylum officers, have been conducting asylum interviews. Commenters proposed that the illegal reentry bar to asylum eligibility would "essentially punish asylum seekers for the failure of DHS officers to follow the agency's own rules.'' Commenters stated that preserving discretion, rather than implementing a categorical bar, would ensure that meritorious asylum claims are heard and correct previous errors.

Some commenters stated that the Departments did not take into account that illegal reentry "may be the only possible option" for asylum applicants. Commenters asserted that "current U.S. violations of international and domestic law regarding access to territory" further intensified this proposition. Commenters stated that they believed that a number of the Executive Branch's administrative policies—such as (1) "metering" at the border; (2) the Migrant Protection Protocols ("MPP"), *see* DHS, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019), *https://www.dhs.gov/sites/ default/files/publications/19_0129_ OPA_migrant-protection-protocols- policy-guidance.pdf;* (3) the "third- country transit bar," *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019); and (4) international asylum cooperative agreements, *see* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 FR 63994 (Nov. 19, 2019)—drive asylum seekers to enter illegally rather than wait to present themselves at a port of entry, which in turn subjects them to the illegal reentry bar. Commenters suggested that, given these policies, the Departments incorrectly asserted that aliens who have previously been removed from the United States may present themselves at a port of entry. *See* 84 FR at 69648. One commenter suggested that many individuals who are driven to enter the United States unlawfully due to these policies do so with the intention of turning themselves in to U.S. Border Patrol authorities. Commenters also raised concerns that the proposed limitation would "condemn to persecution those who are

simply trying to enter the [United States] to reunite with their family and community." Commenters were also concerned that individuals with convictions under section 276 of the Act (8 U.S.C. 1326) would be punished twice for the same crime by also being barred from asylum.

Some commenters stated that the NPRM unfairly punished individuals who have fled persecution multiple times or who have faced persecution arising after they had been removed, resulting in multiple unlawful entries. Commenters stated that refugee protection principles upon which asylum law is based require newly arising claims to be examined. Commenters specifically stated that, in proposing the illegal reentry bar, the Departments did not consider that immigrant survivors of violence who are removed to their countries of nationality may face violent retaliation and possibly death at the hands of their abusers or perpetrators and may flee the same perpetrators of domestic and sexual violence multiple times. Commenters asserted that a discretionary assessment was necessary to ensure that meritorious claims are heard.

*Response:* The Departments disagree with commenters who oppose the rule's additional limitation on asylum eligibility for those who have been convicted of illegal reentry under section 276 of the Act (8 U.S.C. 1326). The Departments have appropriately exercised their delegated authority to impose additional limitations on asylum eligibility per section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).

First, the Departments clarify that this rule, like the proposed rule, designates these offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[21] *See* 8 CFR 208.13(c)(6), 1208.13(c)(6). Regardless of commenters' concerns regarding the dangerousness of these crimes, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) offers a discrete basis

---

[21] Although the Departments at times cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of a subset of the included bars in the proposed rule, *see* 84 FR at 69645–54, the references to the authority to designate additional particularly serious crimes highlighted an alternative basis for the inclusion of most of the new bars to asylum eligibility and sought to elucidate the serious nature of these crimes and the Departments' reasoning for including these offenses in the new provisions. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

under which the Departments may designate these offenses as bases for ineligibility. Although the ''particularly serious crime'' designation would justify the conclusion that an alien is dangerous, *see* section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(a)(ii)) (''the alien, having been convicted by final judgment of a particularly serious crime, constitutes a danger to the community of the United States''), the Attorney General's and the Secretary's authorities to set forth additional limitations and conditions on asylum eligibility under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) require only that such limitations or conditions be ''consistent with [section 208 of the Act (8 U.S.C. 1158)].'' Thus, even assuming, arguendo, that the offenses designated by the final rule do not necessarily reflect an alien's dangerousness, the Attorney General and the Secretary retain the authority to promulgate the new bar. Accordingly, the Departments are unpersuaded by commenters' concerns regarding whether these offenses may not pose a danger to the community because such a finding is not required under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).

With respect to commenters who expressed concern that the proposed limitation would violate Article 31 of the Refugee Convention, as well as undermine congressional intent and established case law, the Departments note that the rule's limitations on eligibility for asylum are consistent with Article 31 of the Refugee Convention. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to receive asylum does not constitute a prohibited ''penalty'' under Article 31(1) of the Refugee Convention.[22] *Cazun,* 856 F.3d at 257 & n.16; *Mejia,* 866 F.3d at 588.

The proposed rule is also consistent with Article 34 of the Refugee Convention, concerning assimilation of refugees, as implemented by section 208 of the INA, 8 U.S.C. 1158. Section 208 of the INA reflects that Article 34 is

---

[22] The Ninth Circuit recently indicated—erroneously, in the view of the Departments—that removal can be considered a ''penalty'' under Article 31(1) of the Refugee Convention. *E. Bay Sanctuary Covenant* v. *Trump,* 950 F.3d 1242, 1276 (9th Cir. 2020). In doing so, however, the Ninth Circuit cited the Supreme Court's decision in *Padilla,* 559 U.S. at 364, which discussed immigration penalties in terms of criminal proceedings, not Article 31(1) of the Refugee Convention. Further, the Ninth Circuit noted its observation solely in the context of limiting asylum eligibility based on manner of entry, and the court did not reach other asylum restrictions such as this rule.

precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n.16; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *R–S–C, 869* F.3d at 1188; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has long recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation. Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing issuance of international travel documents for refugees ''lawfully staying'' in a country's territory, mandates that every person who might qualify for withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188. Additionally, as noted above, the United States implemented the non-refoulement obligation of Article 33(1) of the Refugee Convention through the withholding-of-removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the non-refoulement obligation of the CAT under the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. Individuals who may be barred from asylum by the rule remain eligible to seek withholding of removal and protection under CAT in accordance with non-refoulement obligations.

Additionally, as noted in the NPRM, the statutory bar on applying for asylum and other forms of relief when an order of removal is reinstated has been upheld by every circuit to consider the question. 84 FR at 69648; *see Garcia* v. *Sessions,* 873 F.3d 553, 557 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 2648 (2018); *R–S–C,* 869 F.3d at 1189; *Mejia,* 866 F.3d at 587; *Garcia,* 856 F.3d at 30; *Cazun,* 856 F.3d at 260; *Perez-Guzman* v. *Lynch,* 835 F.3d 1066, 1082 (9th Cir. 2016); *Jimenez-Morales* v. *U.S. Att'y Gen.,* 821 F.3d 1307, 1310 (11th Cir. 2016); *Ramirez-Mejia* v. *Lynch,* 794 F.3d 485, 489–90 (5th Cir. 2015); *Herrera-Molina* v. *Holder,* 597 F.3d 128, 137–38 (2d Cir. 2010). This reflects a broad understanding that individuals who repeatedly enter the United States unlawfully should not be eligible for the discretionary benefit of asylum and that limiting such eligibility does not conflict with section 208(a) of the Act (8 U.S.C. 1158(a)).

The Departments disagree with commenters' assertions that current administrative practices prevent asylum seekers from lawfully presenting themselves at the border. In any event, commenters' concerns referencing such policies or practices are outside the scope of this rulemaking.

With respect to commenters' concerns that the rule should not apply to those who unlawfully reentered the United States because of their desire to be reunited with family members living in the United States or to individuals who have been victims of trafficking or smuggling, the Departments believe that evaluations of mitigating factors or criminal culpability based on motives are more appropriately reserved for criminal proceedings. As stated in the NPRM, the Departments believe it is reasonable to limit eligibility for asylum to exclude aliens convicted of illegal reentry because this type of offense demonstrates that an alien has repeatedly flouted the immigration laws. *See* 84 FR at 69648. The Departments have a legitimate interest in maintaining the orderly and lawful admission of aliens into the United States. Aliens convicted of illegal reentry have engaged in conduct that undermines that goal.

In response to commenters who suggested that the rule would result in denial of meritorious claims, the Departments note that those with a legitimate fear of persecution or torture may still apply for statutory withholding of removal or CAT withholding and deferral, forms of protection that this final rule does not affect. Additionally, these commenters misapprehend the purpose of this rulemaking. Awarding the discretionary benefit of asylum to individuals described in this rule would, among other things, encourage lawless behavior and subject the United States and its communities to the dangers associated with the crimes or conduct in which such persons have engaged. The Departments have appropriately exercised their authority to impose additional limitations on asylum eligibility to bar such individuals from that relief. Accordingly, those persons do not have meritorious asylum claims. By definition, if an applicant is ineligible for the discretionary benefit of asylum because of this rule, or any other statutory or regulatory limitation, he or she does not have a meritorious claim for asylum.

The Departments disagree with commenters' concerns that individuals with convictions under section 276 of the INA (8 U.S.C. 1326) would be punished twice for the same crime by

being barred from asylum. The Departments emphasize that immigration proceedings are civil in nature, and thus denial of relief from removal is not a punishment, particularly with respect to a discretionary benefit such as asylum. *Cf. Mejia,* 866 F.3d at 588 ("We therefore perceive no basis for concluding that depriving aliens, upon illegal re-entry, additional opportunities to apply for discretionary relief constitutes a 'penalty.'"). In addition, commenters' logic would have far-reaching implications that would undermine the entire statutory scheme that imposes any immigration consequences on account of an alien's criminal convictions, including eligibility for forms of relief or removability from the United States, *see, e.g.,* INA 212(a)(2) (8 U.S.C. 1182(a)(2)) (criminal grounds of inadmissibility); 237(a)(2) (8 U.S.C. 1227(a)(2)) (criminal grounds of deportability), but there has never been any reason to question the framework in such a manner, *see, e.g., Nijhawan,* 557 U.S. at 36 (analyzing whether convictions for certain crimes constituted aggravated felonies for purposes of the INA without questioning whether immigration penalties could be imposed for those convictions).

d. Criminal Street Gang Activity

*Comment:* Several commenters opposed the imposition of a bar to asylum eligibility based on the furtherance of criminal street gang activity.

As an initial matter, commenters noted that, under the current asylum system, a conviction for an offense categorized as a gang-related crime would bar an individual from asylum in most cases. However, commenters expressed concern that the NPRM extends culpability for gang-related crime beyond offenses categorized as gang-related crimes and would also bar individuals from asylum if an adjudicator "knows or has reason to believe the crime was committed in furtherance of criminal street gang activity." Commenters asserted that the standard for this bar is so broad that individuals not associated with gangs could be included in this category and barred from asylum.

At the same time, commenters argued that the proposed rule does not sufficiently detail how an individual qualifies as a street gang member or how an activity is to be categorized as gang-related. As a result, commenters expressed concern that the proposed rule granted immigration adjudicators too much latitude to determine whether

a crime fits into the vague category of supporting, promoting, or furthering the activity of a criminal street gang. Commenters were concerned that information in databases of gang-related crimes or factors such as where the criminal activity occurred may lead to improper categorization of gang-related activity. Commenters were similarly concerned that the bar does not account for the circumstances of the offense, such as whether coercion or threats forced the asylum applicant to undertake the criminal activity. Commenters asserted that immigration adjudicators should, at a minimum, be permitted to consider such factors as coercion or duress prior to granting or denying asylum.

Commenters asserted that the "reason to believe" standard is ultra vires and unconscionably limits asylum eligibility for those most in need of protection. Commenters asserted that the "reason to believe" standard grandly expands the number of convictions for which an eligibility analysis is required and would "sweep[] in even petty offenses that would otherwise not trigger immigration consequences." Commenters asserted, moreover, that the "reason to believe" standard for determining whether there is a sufficient link between the underlying conviction and the gang-related activity is "overly broad and alarmingly vague."

Additionally, commenters argued that the "reason to believe" standard places the adjudicator in the role of a second prosecutor and requires the adjudicator to decide, without the benefit of a criminal trial and attendant due process of law, whether a crime could have been potentially gang-related. At the same time, commenters stated that immigration adjudicators, who are not criminologists, sociologists, or criminal law experts, would be required to analyze past misdemeanor convictions to determine whether there is a link to gang activity, regardless of whether the individual was also charged or convicted of a street gang offense.

Commenters cited concerns regarding the admission of "all reliable evidence" to determine whether there was "reason to believe" that the conduct implicated gang-related matters. They averred that this phrase was potentially limitless and that its scope required both parties to present fulsome arguments regarding an offense's possible gang connections. Moreover, commenters asserted that the proposed rule fails to articulate what type of evidence or non-adjudicated conduct may be considered by an adjudicator when determining whether a bar to asylum applies.

In addition, commenters expressed concern that permitting adjudicators to rely on "all reliable evidence" will result in immigration adjudicators relying on any type of evidence, including police reports, unsubstantiated or subsequently recanted hearsay statements, and discredited methods of gang identification, such as gang databases. Commenters asserted that this will result in a compounded disparate racial impact based on over-inclusion of young people of color in those gang databases. Commenters asserted that gang databases are "notoriously inaccurate, outdated, and infected by racial bias." Additionally, commenters stated that gang databases are unregulated and that an individual may be included in a database simply based on "living in a building or even neighborhood where there are gang members, wearing certain colors or articles of clothing, or speaking to people law enforcement believe to be gang members."

One commenter referenced a decision of the Supreme Judicial Court of Massachusetts holding that the information in gang databases is hearsay, not independently admissible, and raises serious Confrontation Clause concerns. *Commonwealth* v. *Wardsworth,* 124 NE3d 662, 678–79 & nn.24–25 (Mass. 2019). That commenter also asserted that, despite the concern expressed by the Supreme Judicial Court of Massachusetts regarding the use of gang databases, immigration judges continue to regularly rely on such reports. By relying on such unreliable evidence, commenters averred, the proposed rule will exacerbate due process violations already occurring as a result of unsubstantiated gang ties.

Commenters further noted that, because these databases disparately affect young people of color, relying on these databases would multiply the harm already caused by racially disparate policing and racially disparate rates of guilty pleas to minor offenses. Commenters claimed that asylum seekers of color are subject to racially disparate policing, which results in racially disparate rates of guilty pleas to minor offense, and which also results in this population being erroneously entered and overrepresented in gang databases. In support of the inaccuracy of these databases, one commenter cited concerns that police departments falsify gang affiliations of youth encountered by police officers. As a result, commenters asserted, the proposed rule would "invite extended inquiry into the character of young men of color" who

may otherwise have meritorious asylum claims and who are already subject to racially suspect policing practices.

Commenters noted that police reports are inherently unreliable in the absence of the protections offered by the Confrontation Clause of the Sixth Amendment and the Federal Rules of Evidence, neither of which apply in immigration court. Regarding the unreliability of evidence, one commenter provided an example where neither the police officers nor the alleged victims were required to testify. Without this testimony, the commenter alleged, the immigration adjudicator would be unable to determine whether a victim had a motive to lie to the police, whether the victim later recanted his or her statements, or whether the police officer misunderstood some critical fact. Moreover, commenters asserted that, although immigration adjudicators would be unable to rely on uncorroborated allegations such as those contained in arrest reports, adjudicators could nevertheless shield denials based on such information by relying on discretion.

Commenters stated that the proposed rule would exacerbate due process violations that already occur as a result of unsubstantiated information about gang ties. Commenters claimed that asylum applicants are already subjected to wrongful denials of asylum based on allegations of gang activity made by DHS. Commenters alleged that DHS relies on unreliable foreign databases and "fusion" intelligence-gathering centers outside of the United States. For example, one commenter alleged that information regarding gang affiliations gathered from the fusion intelligence-gathering center in El Salvador has already been used against asylum seekers, despite having been found to be inaccurate. At the same time, commenters asserted that immigration adjudicators routinely premise enforcement, detention, and discretionary denials of relief on purported gang membership and often grant deference to gang allegations made by Immigration and Customs Enforcement ("ICE") personnel. Commenters asserted that the already expanded use of gang databases to apprehend and remove foreign nationals has been widely criticized as an overbroad, unreliable, and often biased measure of gang membership and involvement.

Additionally, commenters expressed disagreement with the Departments' position that all gang-related offenses could be considered as particularly serious crimes. Commenters criticized the Departments' reliance on statistics

from up to 16 years ago to demonstrate that gang members commit violent crimes and drug crimes. Commenters disagreed with the Departments' conclusion that all crimes that may be construed as connected to gang activity are particularly serious. Commenters asserted instead that it is illogical to argue that, because gang members may commit some violent crimes and drug crimes, all crimes committed by anyone remotely connected with a gang are particularly serious.

Commenters also asserted that the proposed rule will result in asylum seekers who live in economically distressed areas but who have a minor criminal conviction, for example for a property crime, being excluded from protection. Commenters asserted that including even minor crimes construed as gang-related in the "particularly serious crime" bar and preventing those individuals from accessing asylum is "disingenuous at best, and tinged with racial animus at worst." Commenters asserted that this bar would perpetuate racial bias within the immigration court system.

Commenters asserted that the gang-related-crimes bar should not be introduced at all due to the complex nature of gang ties and the frequency with which individuals are mislabeled as being part of a gang. These commenters argued that the risk of erroneously barring legitimate asylum seekers from eligibility is too high. Another commenter noted that it was "particularly cruel" to create a bar related to gang offenses "in the wake of this Administration's refusal to countenance gang violence as a ground to asylum." Moreover, commenters asserted that the INA and existing regulations already permit immigration adjudicators to deny asylum as a matter of discretion. Adding this new bar based on gang-related activity, according to these commenters, risks excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

Commenters noted that previous attempts to expand the grounds of removal and inadmissibility to include gang membership failed to pass both houses of Congress. One commenter noted concern that an individual could be erroneously convicted of a gang-related crime because of the widespread nature of gang activity in Central America. This commenter also expressed concern that, because gangs in Central America may act with impunity and "often control a corrupt judiciary," an individual could be erroneously convicted of a crime for

refusing to acquiesce to a gang's demands.

*Response:* As explained further in section II.C.2.a.i, the bar based on activity related to criminal street gangs is enacted pursuant to the Attorney General's and the Secretary's designated authorities to establish additional limitations and conditions on asylum. INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[23] This authority requires such conditions and limitations to be consistent with section 208 of the Act (8 U.S.C. 1158) and does not require that the offenses meet a threshold of dangerousness or seriousness. *Compare* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)"), *with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)) *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered a "danger to the community of the United States" by virtue of "having been convicted by a final judgment of a particularly serious crime"). Although the Departments have determined that the included offenses involving criminal street gangs represent dangerous offenses and that the offenders represent particular dangers to society, *see* 84 FR at 69649– 50, the Departments would nevertheless be acting within the authority of section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) if commenters are correct that some offenses included are not connected to dangerousness. Section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of criminal street gang-

---

[23] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of gang-related crimes as bars to asylum eligibility. *Compare* 84 FR at 69650 ("Regardless, criminal street gangs-related offenses—whether felonies or misdemeanors—could reasonably be designated as 'particularly serious crimes' pursuant to 8 U.S.C. 1158(b)(2)(B)(ii)."), *with id.* ("Moreover, even if 8 U.S.C. 1158(b)(2)(B)(ii) did not authorize the proposed bar, the Attorney General and the Secretary would propose designating criminal gang-related offenses as disqualifying under 8 U.S.C. 1158(b)(2)(C)."). Nevertheless, the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) aligns with the regulatory text and was used to support all of the categories of bars set out in the rule.

related offenses as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and the Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Moreover, Congress has expressly excluded from eligibility certain aliens who engage in conduct or commit crimes of a certain character or gravity, regardless of whether those aliens are "dangerous" to the United States, and regardless of whether those crimes have been formally designated as "particularly serious." *See* INA 208(b)(2)(A)(i), (iii) (8 U.S.C. 1158(b)(2)(A)(i), (iii)). The Departments have concluded that criminal street gang-related offenses are sufficiently similar to such conduct and crimes that aliens who commit such offenses should not be rewarded with asylum and the many benefits that asylum confers.

Further, the Departments disagree with comments asserting the criminal street gang-related offenses are not necessarily indicative of a danger to the United States. *See* 84 FR at 69650. Specifically, the Departments believe that such offenses are strong indicators of recidivism and ongoing, organized criminality. *Id.* Based on the data and research articulated in the NPRM, the Departments believe that individuals who enter the United States and are then convicted of a crime related to criminal street gang activity present an ongoing danger to the community and should therefore be ineligible for asylum. Significantly, the Departments reject commenters' assertions that the Departments relied on data that was over 16 years old. Although one of the reports relied upon in the NPRM was published in 2004, additional studies and information were cited ranging from 2010 to 2015. *See* 84 FR at 69650. Additionally, the White House recently issued a fact sheet observing that "[a]pproximately 38 percent of all murders in Suffolk County, New York, between January 2016 and June 2017" were linked to a single criminal gang— MS–13—alone. The White House, *Protecting American Communities from the Violence of MS–13* (Feb. 6, 2020), *https://www.whitehouse.gov/briefings-statements/protecting-american-communities-violence-ms-13/; see also*

Alan Feuer, *MS–13 Gang: 96 Charged in Sweeping Crackdown on Long Island,* N.Y. Times (Dec. 20, 2019), *https://www.nytimes.com/2019/12/20/nyregion/ms-13-long-island.html;* Proc. No. 9928, 84 FR 49187, 49187 (Sept. 13, 2019) (explaining that the DOJ is working with law enforcement in El Salvador, Guatemala, and Honduras to "help coordinate the fight against MS–13, the 18th Street Gang, and other dangerous criminal organizations that try to enter the United States in an effort to ravage our communities," and that this partnership "targets gangs at the source and works to ensure that these criminals never reach our borders"); *id.* (observing that, in 2017 and 2018, ICE officers "made 266,000 arrests of aliens with criminal records, including those charged or convicted of 100,000 assaults, nearly 30,000 sex crimes, and 4,000 violent killings"). These more recent examples demonstrate the continued threat posed by gang-related crime.

The Departments disagree with commenters' assertions that the rule fails to sufficiently detail how an individual qualifies as a street gang member or how an activity is to be categorized as a gang-related event. As an initial matter, the rule does not purport to categorize individuals as street gang members. Rather, the inquiry is limited into whether an adjudicator knows or has reason to believe that a prior conviction for a Federal, State, tribal, or local crime was committed in support, promotion, or furtherance of criminal street gang activity. 84 FR at 69649. This rule defines "criminal street gang" by referencing how that term is defined in the convicting jurisdiction or, alternatively, as the term is defined in 18 U.S.C. 521(a). The Departments believe that the language of the Federal statute conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices, as do the definitions in the convicting jurisdictions. This rule leaves the determination of whether a crime was in fact committed "in furtherance" of gang-related activity to adjudicators in the first instance. As noted in the NPRM, to the extent that this type of inquiry may lead to concerns regarding inconsistent application of the bar, the Departments reiterate that the BIA is capable of ensuring a uniform approach. *See* 8 CFR 1003.1(e)(6)(i).

In response to commenters who suggested that the rule would result in denial of meritorious claims, the Departments note that those with legitimate fear of persecution or torture may still apply for statutory

withholding of removal or protection under the CAT regulations, as discussed in section II.C.5. In addition, and as explained previously, these commenters misapprehend the purpose of this rulemaking. The Departments have concluded that persons subject to the new bars do not warrant asylum because awarding the discretionary benefit of asylum to such individuals would encourage lawless behavior, subject the United States to certain dangers, and otherwise undermine the policies underlying the statutory framework for asylum. These persons accordingly do not have meritorious asylum claims. And, because nothing in the INA precludes the imposition of these new bars, the fact that these persons' claims might otherwise be meritorious is irrelevant.

Regarding commenters' concerns with the "reason to believe" standard articulated in the rule, the Departments note that this standard is used elsewhere in the INA. For example, when considering admissibility, immigration judges consider whether there is reason to believe that the individual "is or has been an illicit trafficker in any controlled substance." INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C)). In accordance with this provision, courts have upheld findings of inadmissibility in the absence of a conviction. *See Cuevas* v. *Holder,* 737 F.3d 972, 975 (5th Cir. 2013) (holding "that an alien can be inadmissible under [INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C))] even when not convicted of a crime"); *Garces* v. *U.S. Att'y Gen.,* 611 F.3d 1337, 1345 (11th Cir. 2010) (stating that section 1182(a)(2)(C) of the Act (8 U.S.C. 1182(a)(2)(C)) renders an alien inadmissible based on a "reason to believe" standard, which does not require a conviction); *Lopez–Umanzor* v. *Gonzales,* 405 F.3d 1049, 1053 (9th Cir. 2005) ("Section 1182(a)(2)(C) does not require a conviction, but only a 'reason to believe' that the alien is or has been involved in drug trafficking."). The bar on criminal street gang-related activity is narrower in scope than the inadmissibility charge based on illicit trafficking in that the bar in this rule still requires a conviction. As such, the Departments believe that the "reason to believe" standard is appropriately applied to the final rule.

Similarly, the "all reliable evidence" standard is not a new standard in immigration proceedings. Immigration judges routinely consider any relevant evidence provided in removal hearings by either party. 8 CFR 1240.1(c). Additionally, the BIA held, in the context of evaluating whether a crime constitutes a particularly serious crime,

that, once the elements of the offense are examined and found to potentially bring the offense within the ambit of a particularly serious crime, the adjudicator may consider all reliable information in making a "particularly serious crime" determination, including but not limited to the record of conviction and sentencing information. *Matter of N–A–M–,* 24 I&N Dec. at 337– 38. The Ninth Circuit has held that the BIA's interpretation in *Matter of N–A–M–* is reasonable. *Anaya-Ortiz* v. *Holder,* 594 F.3d 673, 678 (9th Cir. 2010). Additionally, various circuit courts have applied the "all reliable information" standard articulated in *Matter of N–A–M–* in considering whether crimes are particularly serious. *See, e.g., Luziga* v. *Att'y Gen. U.S.,* 937 F.3d 244, 253 (3d Cir. 2019); *Marambo* v. *Barr,* 932 F.3d 650, 655 (8th Cir. 2019).

The Departments disagree with commenters' concerns about adjudicators' reliance on arrest reports and uncorroborated information. As an initial point, most asylum claims are based significantly on hearsay evidence that is uncorroborated by non-hearsay evidence. Such evidence, however, does not necessarily make an asylum claim unreliable or insusceptible to proper adjudication. Adjudicators assessing asylum applications are well versed in separating reliable from unreliable information, assigning appropriate evidentiary weight to the evidence submitted by the applicant and DHS, and determining whether corroborative evidence needs to be provided. *See* INA 208(b)(1)(B) (8 U.S.C. 1158(b)(1)(B)). Moreover, this rule does not provide adjudicators with unfettered discretion; instead, adjudicators must consider such evidence in the context of making a criminal street gang determination under the "reason to believe" standard. An asylum officer's assessment of eligibility necessarily must explain the consideration of the evidence of record as it applies to the evaluation of bars to asylum and the burden of proof, and it must also explain the exercise of discretion. Similarly, immigration judges are already charged with considering material and relevant evidence. 8 CFR 1240.1(c). To make this determination, immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna* v. *Ashcroft,* 325 F.3d 396, 405 (3d Cir. 2003) (quoting *Bustos-Torres* v. *INS,* 898 F.2d 1053, 1055 (5th Cir. 1990)). Nothing in this rule undermines or withdraws from this standard. Moreover, the Departments would not purport to

impinge on an adjudicator's evidentiary determination or direct the result of such a determination. If aliens have concerns about the reliability of any evidence, aliens may challenge the reliability of that evidence as part of their arguments to the adjudicator. As a result, the Departments have concluded that concerns regarding the reliability of gang databases or other evidence are more properly addressed in front of the immigration judge or asylum officer in individual cases.

The Departments disagree with comments that adjudicators should have the discretion to determine whether factors such as coercion or duress affected an individual's involvement in criminal street gang-related activity. The Departments believe that criminal street gang-related activity is serious and harmful in all circumstances. As stated in the NPRM, "[c]riminal gangs of all types * * * are a significant threat to the security and safety of the American public." 84 FR at 69650. Accordingly, the Departments have concluded that aliens who have been convicted of such offenses do not merit the discretionary benefit of asylum, even if their gang involvement was potentially the result of coercion or some other unique circumstance. In addition, the Departments believe that considerations regarding criminal culpability for criminal street gang-related offenses would be best addressed during the individual's underlying criminal proceedings.

Commenters' assertions that the rule will exacerbate harms caused by racially disparate policing practices or that the result of this rule will disproportionately affect people of color are outside the scope of this rulemaking. *Cf. San Francisco,* 944 F.3d at 803–04 ("Any effects [of the public charge rule] on [healthcare] entities are indirect and well beyond DHS's charge and expertise."). The rulemaking does not address actual or alleged injustices of the criminal justice system, as referenced by the commenters. Moreover, the rule was not racially motivated, nor did racial animus or a legacy of bias play any role in the publication of the rule. Rather, this final rule is being published to categorically preclude from asylum eligibility certain aliens with various criminal convictions because the Departments determined that individuals engaging in criminal activity that is related to criminal street gangs present a sufficient danger to the United States to warrant exclusion from the discretionary benefit of asylum. To the extent that the rule disproportionately affects any group referenced by the commenters, any such

impact is beyond the scope of this rule, as this rule was not drafted with discriminatory intent towards any group, and the provisions of the rule apply equally to all applicants for asylum.

e. Driving Under the Influence of an Intoxicant

*Comment:* Commenters opposed the proposed categorical bar to asylum based on a DUI conviction. Commenters stated that the proposed categorical bars encompass crimes with a wide range of severity, and commenters asserted that DUI does not rise to a comparable level of severity as a particularly serious crime warranting its promulgation as a categorical bar to asylum. Other commenters similarly stated that, because DUI does not involve conduct that is necessarily dangerous on its own, the offense is not serious enough to support a categorical bar to asylum. Commenters provided examples of allegedly low-level convictions for DUI, based on examples such as a court concluding that, when "the key is in the ignition and the engine is running, a person 'operates' a vehicle, even if that person is sleeping or unconscious," *State* v. *Barac,* 558 SW3d 126, 130 (Mo. Ct. App. 2018), or when a person operates a vehicle while under the influence but no injury to another person results. Accordingly, commenters asserted that DUI is not necessarily serious or sufficiently dangerous to warrant a categorical bar. One commenter summarized the concern by stating that offenses related to DUI are "excessively overbroad in the convictions and conduct covered[] and are not tailored to identify conduct that is 'serious' or identify individuals who pose a danger to the community."

Commenters also asserted that creating a blanket categorical bar to asylum based on a DUI conviction would eliminate the opportunity for adjudicators to consider the facts before them in exercising discretion. Commenters stated that adjudicators should consider the severity of the DUI offense given relevant facts, such as the applicant's criminal history, the underlying cause of the applicant's criminal record involving DUI, the applicant's efforts towards rehabilitation, the length of time passed since the conviction, the applicant's potential danger to the community, and the applicant's risk of persecution if returned to his or her home country.

Commenters noted that multiple DUI convictions are not an absolute bar to cancellation of removal under INA 240A(b) (8 U.S.C. 1229b(b)) and cited the Attorney General's opinion that

such offenses were inconclusive of an individual's character, thus allowing individuals to rebut the presumption with evidence of good character and rehabilitation. *Matter of Castillo-Perez,* 27 I&N Dec. 664 (A.G. 2019). Commenters stated that, "if individuals seeking discretionary cancellation of removal are afforded the opportunity to show that they merit permanent residence in spite of their prior convictions for driving under the influence, it is nonsensical to promulgate a rule denying asylum seekers that same opportunity."

Finally, commenters noted that low-income people and people of color are more likely to be pulled over and charged with DUI. These commenters alleged that the proposed rule accordingly exacerbates the unjust criminal justice system by including these provisions as a bar to asylum eligibility.

*Response:* The Departments disagree that DUI does not warrant a categorical bar to asylum eligibility.

Although commenters provided limited examples of times where an individual convicted of a DUI offense fortunately may not have caused actual harm to others, these sorts of DUI convictions alone would not render an alien ineligible for asylum under this rule. The final rule bars aliens with DUI convictions from asylum eligibility under two grounds in 8 CFR 208.13(c)(6)(iii), (c)(6)(iv) and 1208.18(c)(6)(iii), (c)(6)(iv). First, under 8 CFR 208.13(c)(6)(iii) and 1208.18(c)(6)(iii), a single DUI offense would only be disqualifying if it "was a cause of serious bodily injury or death of another person." Second, under 8 CFR 208.13(c)(6)(iv)(A) and 1208.18(c)(6)(iv)(A), any second or subsequent DUI offense would be disqualifying. Accordingly, a single conviction that does not cause bodily injury or death to another would not be a bar to asylum, but would continue to be considered by adjudicators in determining whether an alien should receive asylum as a matter of discretion.

The Departments maintain that DUI convictions, particularly those covered by this rule (based on actions that cause serious bodily injury or death or that indicate recidivism, along with the risk of harm from such recurrent dangerous behavior), constitute serious, dangerous activity that threatens community safety. First, the Departments reiterate that DUI laws exist, in part, to protect unknowing persons from the dangerous people who "choose to willingly disregard common knowledge that their criminal acts endanger others." 84 FR at 69651. Second, the Supreme Court and

other Federal courts have repeatedly echoed the gravity of such acts. *See Begay* v. *United States,* 553 U.S. 137, 141 (2008) ("Drunk driving is an extremely dangerous crime."), *abrogated on other grounds by Johnson* v. *United States,* 576 U.S. 591 (2015); *United States* v. *DeSantiago-Gonzalez,* 207 F.3d 261, 264 (5th Cir. 2000) ("[T]he very nature of the crime * * * presents a 'serious risk of physical injury' to others[.]"); *Marmolejo-Campos* v. *Holder,* 558 F.3d 903, 913 (9th Cir. 2009) ("[T]he dangers of drunk driving are well established * * * ."); *see also Holloway,* 948 F.3d at 173–74 ("A crime that presents a potential for danger and risk of harm to self and others is 'serious.' * * * 'There is no question that drunk driving is a serious and potentially deadly crime * * * . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases.' " (quoting *Virginia* v. *Harris,* 558 U.S. 978, 979–80 (2009) (Roberts, C.J., dissenting from denial of writ of certiorari))).

It is well within the Departments' authority to condition asylum eligibility based on a DUI conviction. The INA authorizes the Attorney General and the Secretary to establish by regulation additional limitations and conditions on asylum eligibility, INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)), and Federal courts have upheld BIA discretionary denials of asylum based on DUI convictions, even in circumstances where a DUI conviction does not constitute a particularly serious crime. *See, e.g., Kouljinski* v. *Keisler,* 505 F.3d 534, 543 (6th Cir. 2007). For the reasons above, DUI is a serious crime that represents a blatant disregard for the laws and societal values of the United States; accordingly, the final rule limits asylum eligibility by considering a DUI conviction to be a categorical bar to asylum.

For these reasons, the Departments decline to tailor the bar to precisely identify serious conduct, evaluate severity of conduct, identify individuals who pose a danger to communities, or provide discretion to adjudicators, as suggested by commenters. The Departments will no longer afford discretion to adjudicators considering DUI convictions in the circumstances defined by this rule; elimination of such discretion is, again, well within the Departments' authority. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)).

Regarding DUI convictions in the context of cancellation of removal under INA 240A(b) (8 U.S.C. 1229b(b)), the Departments note that cancellation of

removal is separate from asylum, and this rule contemplates asylum only. *See* 84 FR at 69640 (stating that the Departments propose to amend their respective regulations governing the bars to "asylum eligibility"). Although both forms of relief may eventually lead to lawful permanent resident status in the United States, cancellation of removal generally applies to a different class of aliens, and its conditions and requirements are different from asylum relief.[24] *Compare* INA 240A(b) (8 U.S.C. 1229b(b)), *with* INA 208 (8 U.S.C. 1158)). Cancellation of removal requires "good moral character," which asylum relief neither requires nor mentions. Thus, references to DUI convictions and their relative effect on the good moral character requirement for cancellation of removal are irrelevant to asylum eligibility. Commenters conflate two separate forms of relief from removal intended for separate populations with separate eligibility provisions.

Likewise, the Attorney General's statement in *Matter of Castillo-Perez,* 27 I&N Dec. at 671—that multiple DUI convictions were not necessarily conclusive evidence of an individual's character—was made in regards to eligibility for cancellation of removal, not asylum.[25] Accordingly, that case has no bearing on this rulemaking.

---

[24] Generally, cancellation of removal is a discretionary form of relief in which the Attorney General may cancel removal and adjust status to lawful permanent residence ("LPR") of an otherwise inadmissible or deportable alien who has been physically present in the United States for a continuous period of not less than 10 years preceding the date of the application; has been a person of good moral character during such period; has not been convicted of an offense under INA 212(a)(2), 237(a)(2), or 237(a)(3) (8 U.S.C. 1182(a)(2), 1226(a)(2), or 1226(a)(3)); and establishes that removal would result in exceptional and extremely unusual hardship to the applicant's U.S. citizen or LPR spouse, parent, or child. *See* INA 240A(b) (8 U.S.C. 1229b(b)). In contrast, asylum is a discretionary benefit that precludes an alien from removal, creates a pathway to LPR status and citizenship, and affords various ancillary benefits such as work authorization, opportunity for certain family members to obtain derivative asylee and LPR status, and authorization, in some cases, to receive certain financial assistance from the government. *See* INA 208 (8 U.S.C. 1158). Asylum eligibility includes the following factors: The alien must be physically present or arrive in the United States; the alien must meet the definition of "refugee" under INA 101(a)(42)(A) (8 U.S.C. 1101(a)(42)(A)), and the alien must otherwise be eligible for asylum in that no statutory bars or limitations apply. *See* INA 208(a)(1) (8 U.S.C. 1158(a)(1)), INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)), INA 208(b)(2) (8 U.S.C. 1158(b)(2)) and 8 CFR 1240.8(d); *see also* 84 FR at 69642.

[25] Nevertheless, the Attorney General in the context of discussing eligibility for cancellation of removal as a matter of discretion made clear that "[m]ultiple DUI convictions are a serious blemish on a person's record and reflect disregard for the safety of others and for the law." *Castillo-Perez,* 27 I&N Dec. at 670. This reasoning as to the

Continued

In sum, the rulemaking categorically bars asylum eligibility for those with one or more DUI convictions in order to protect communities from the dangers of driving under the influence. *See* 84 FR at 69650–51; *see also* 84 FR at 69640. It does not consider other factors of apparent concern to commenters, such as financial status, race, or nationality. The rulemaking also does not address actual or alleged injustices of the criminal justice system, as referenced by the commenters. Such considerations are outside the scope of this rulemaking.

f. Battery or Domestic Violence

*Comment:* Commenters opposed the proposed bar to asylum based on domestic assault or battery, stalking, or child abuse. Broadly, commenters opposed a bar to asylum based on "mere allegations of conduct without any adjudication of guilt" for several reasons. First, commenters stated that a bar based on conduct, not convictions, violates INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)), which bars noncitizens who, "having been convicted by a final judgment of a particularly serious crime, constitute[ ] a danger to the community of the United States." In accordance with the plain text and judicial interpretation of this section of the Act, commenters asserted, the statute prohibits application of the "particularly serious crime" bar based only on non-adjudicated facts, thereby precluding separation of "the seriousness determination from the conviction." Accordingly, commenters stated that the proposed application of the "particularly serious crime" bar based on conduct involving domestic assault or battery directly contradicts the statute, which requires a final judgment of conviction. Commenters also alleged that the proposed rule violates the Supreme Court's holding that "conviction" refers to the "crime as generally committed," rather than the actual conduct. *See Sessions* v. *Dimaya,* 138 S. Ct. 1204, 1217 (2018); *see also Delgado,* 648 F.3d at 1109 n.1 (Reinhardt, J., concurring in part and concurring in the judgment). One commenter asserted that the statute "only bars asylum seekers for alleged conduct in exceptional circumstances like potential terrorist activity or persecution of others. * * * [C]onduct-based asylum bars should be used only in very limited circumstances, and in this case should not be expanded."

seriousness of DUI offenses supports the type of categorical bar at issue here and does not conflict with the Departments' determination that DUI offenses should categorically bar asylum eligibility.

Relatedly, commenters raised constitutional concerns. Commenters cited constitutional principles that "individuals have a right to defend themselves against criminal charges and are presumed innocent until proven guilty. Individuals should not be excluded from asylum eligibility based on allegations of criminal misconduct that have not been proven in a court of law." Accordingly, commenters opposed the NPRM because it "deprives the individual the opportunity to challenge the alleged behavior and does away with the presumption of innocence." More specifically, a commenter claimed that, under the NPRM, an incident and subsequent arrest related to domestic assault or battery would trigger an inquiry into the alien's conduct, thereby undermining the criminal justice system and constitutional due process protections for criminal defendants who may not have access to counsel. The commenter alleged that, regardless of whether the alien was convicted of the offense, the alien may still be barred from asylum relief following an adjudicator's independent inquiry into the incident.

Commenters also stated that a bar based on conduct alone, especially in the context of domestic assault or battery, could disproportionately penalize innocent individuals and victims, and subsequently their spouses and children, who may be denied immigration status or be left with an abuser. First, commenters explained that specific barriers—including discrimination, community ostracism, community or religious norms, or lack of eligibility for certain services—deter aliens from even initially contacting law enforcement. Second, if law enforcement was involved, commenters expressed concern about cross arrests in which both the perpetrator of abuse and the victim are arrested but no clear determinations of fault are made. Commenters stated that "authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances." Further, commenters alleged that "identifying the primary aggressor is not always consistently nor correctly conducted," especially if survivors acted in self-defense. Commenters also expressed concern that survivors of domestic assault or battery are oftentimes vulnerable, with the result that a bar based on conduct alone could affect populations with overlapping

vulnerabilities. For example, commenters specifically referenced lesbian, gay, bisexual, transgender, and queer or questioning ("LGBTQ") survivors, who are already allegedly prone to experience inaction by law enforcement in response to domestic violence, and limited English proficiency individuals, who may be unable to fully describe the abuse to police officers, prompting officers to then use the offenses' perpetrators for interpretation.

One commenter expressed concern that the NPRM establishes a lower standard by which admission may be denied because other forms of admission require an actual conviction or factual admission to form the basis of denial. Accordingly, the commenter stated that similarly situated persons would be treated inconsistently based upon the mechanism for admission that they choose. This commenter also asserted that U nonimmigrant status and Violence Against Women Act of 1994, Public Law 103–322, 108 Stat. 1902 ("VAWA") relief are insufficient alternative forms of relief because they generally require acknowledgement from a local authority, negating the need for a fact-finding hearing. Presumably then, most individuals affected by the NPRM would be ineligible for these alternative forms of relief. In addition, the commenter noted that granting those benefits is entirely different from making an asylum applicant overcome an asylum bar.

Commenters also identified unintended consequences of the proposed rule, explaining that individuals may act maliciously. One commenter suggested that individuals may file for baseless temporary restraining orders or protective orders to try to block domestic violence victims' applications for employment authorization documents following an asylum application. Another commenter speculated that abusers may falsely accuse or frame survivors of domestic violence to terrorize or control them. One commenter asserted that survivors may be hesitant to report abuse or request a restraining order if it could negatively impact the immigration status of the perpetrator, especially in situations where they share a child. Another commenter stated that it would "undoubtedly embolden[ ] perpetrators more and len[d] more strength to otherwise weak accusations."

Some commenters generally stated that the NPRM too broadly categorized domestic violence offenses as particularly serious crimes. Relatedly, another commenter stated that the bar is too vague and requires adjudicators to

become experts in domestic criminal law jurisdictions of every State to determine whether, for example, conduct "amounts to" domestic assault or battery, stalking, or child abuse. Further, the commenter noted that the NPRM's definition of battery and extreme cruelty is different from the various States' criminal laws, which creates inconsistent application. That commenter also alleged that the proposed exceptions for individuals who have been battered or subjected to extreme cruelty are "insufficient, vague, and place[d] a high burden on victims." Another commenter asserted that it is "unclear how 'serious' will be defined, and whether and how detrimental and potentially false information provided by abusers will be considered in decision-making." One commenter suggested that "the presentation of evidence under oath by adverse parties is a more appropriate forum for adjudications as to whether or not domestic violence took place, and will likely lead to fewer determinations that will cruelly strip immigrant survivors of their right to seek asylum." Another commenter asserted that the NPRM does not include a framework or limits to guide an adjudicator's inquiry, especially in the context of false accusations. For these reasons, commenters opposed the NPRM because it allegedly would cause inconsistent and unjust results.

Some commenters claimed that the proposed bar is unnecessary because the current bars for those with domestic violence convictions or aggravated felony convictions allow for "the denial of asylum protection for these types of crimes when appropriate," whereas the proposed bar denies asylum protection for vulnerable individuals. Accordingly, commenters believed that "immigration judges should retain discretion in these situations and be permitted to grant relief in situations where the asylum seeker is not at fault."

Many commenters alleged that the proposed bar conflicts with VAWA. One commenter alleged that the NPRM "distorts language contained in VAWA * * * in order to create barriers for asylum seekers." Commenters stated that VAWA gives discretion to adjudicators "based on a number of factors and circumstances." Accordingly, commenters stated that the proposed "blunt approach" conflicts with VAWA and lacks "evidence-based justification for treating asylum seekers differently." Commenters were also concerned with the lack of "analogous protections in the asylum context to protect a survivor from the devastating

effects of a vindictive abuser's unfounded allegations."

Commenters also disagreed with the proposed approach towards the burden of proof as compared to VAWA. Because of the "vastly different interests at stake," commenters stated that VAWA's low burden of proof is necessary for several reasons: More harm results from erroneously denying relief than erroneously granting relief, a lower standard maximizes the self-petitioner's confidentiality and safety, certain evidence may be inaccessible to a victim because the abuser blocked access, and no liberty interests are implicated for alleged perpetrators. By contrast, commenters asserted, a "rigorous burden of proof is appropriate when potentially barring applicants from asylum," as the NPRM did, because "[t]he consequences of invoking the bar are dire, with the applicant's life and safety hanging in the balance."

Commenters also disagreed that the exception for asylum applicants who demonstrate eligibility for a waiver under INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) sufficiently protects survivors deemed not to be the primary aggressors. Commenters noted that survivors may be unaware of their eligibility for a waiver, unaware that such a waiver exists, or too fearful to apply.

Commenters also claimed that the waiver application process turns an otherwise non-adversarial inquiry into a "multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency." Commenters also questioned whether adjudicators could conduct such an inquiry and correctly apply the exception because they are removed from the immediate circumstances surrounding an incident. Accordingly, commenters alleged that the waiver fails to adequately protect survivors and, in some cases, inflicts harm.

*Response:* First, commenters are incorrect that the rule's conditioning of asylum eligibility on conduct violated INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)) because that section requires a final judgment of conviction. As discussed above, this rule, like the proposed rule, designates the listed offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[26] *See* 8 CFR 208.13(c)(6),

1208.13(c)(6). This section provides authority to the Attorney General and the Secretary to condition or limit asylum eligibility, consistent with the statute, but does not require any sort of conviction. Accordingly, the bar is consistent with the plain text of that section, and the Supreme Court cases cited by commenters are not specifically relevant.

The Departments disagree with the comment that conduct-based bars should be used only in "very limited circumstances," not including domestic assault or battery, stalking, or child abuse. As explained in the NPRM, the Departments believe that domestic violence is "particularly reprehensible because the perpetrator takes advantage of an 'especially vulnerable' victim." 84 FR at 69652 (quoting *Carillo* v. *Holder,* 781 F.3d 1155, 1159 (9th Cir. 2015)). Accordingly, the Departments emphasize that such conduct must not be tolerated in the United States, and the discretionary benefit of asylum, along with the numerous ancillary benefits that follow, will not be granted to aliens who engage in such acts. *See id.* Further, the statute already contemplates conduct-based bars in sections 208(b)(2)(A)(i), (iii)–(iv) of the Act (8 U.S.C. 1158(b)(2)(A)(i), (iii)–(iv)),[27] and the Departments believe it is

---

[26] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a

particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the inclusion of these domestic violence-related bars at 8 CFR 208.13(c)(6)(vi), (vii), 1208.13(c)(6)(vi), (vii). *See* 84 FR at 69651–53. However, as stated in the proposed rule, the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) provides underlying authority for all these provisions. 84 FR at 69652 (noting that, even if all of the proposed domestic violence offenses would not qualify as particularly serious crimes, convictions for such offenses—as well as engaging in conduct involving domestic violence that does not result in a conviction—"should be a basis for ineligibility for asylum under section 208(b)(2)(C) of the INA"). The Departments acknowledge that the proposed rule stated that the Attorney General and the Secretary were, in part, "[r]elying on the authority under section 208(b)(2)(B)(ii) of the INA." *Id.* at 69651. But the regulatory text of the new bar does not actually designate any additional offense as "particularly serious." The Departments thus clarify that the current bars are an exercise of the authority granted by section 208(b)(2)(C), and that the discussion of the "particularly serious crime" bar merely helps illustrate how the new bars are "consistent with" the statutory asylum scheme. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

[27] These provisions provide as follows: (1) INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) ("the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion"); (2) INA 208(b)(2)(A)(iii) (8 U.S.C. 1158(b)(2)(A)(iii)) ("there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the
Continued

appropriate to also enforce an asylum bar based on conduct involving domestic battery or extreme cruelty.

The rule does not violate the constitutional rights of aliens, nor does it offend constitutional principles referenced by the commenters. First, commenters incorrectly equated denial of a discretionary benefit to "criminal charges." The Departments will not bring "criminal charges" against aliens in this context; rather, the Departments will deny asylum based on certain convictions and conduct, in some limited instances, as stated in the NPRM and authorized by statute. *See* 84 FR at 69640.

The Departments disagree that the rule undermines the criminal justice system and constitutional due process protections in either the civil or criminal context. As an initial matter, aliens have no liberty interest in the discretionary benefit of asylum. *See Yuen Jin* v. *Mukasey,* 538 F.3d 143, 156–57 (2d Cir. 2008); *see also Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) (citing *DaCosta* v. *Gonzales,* 449 F.3d 45, 49–50 (1st Cir. 2006)); *cf. Hernandez* v. *Sessions,* 884 F.3d 107, 112 (2d Cir. 2018) (stating, in the context of duress waivers to the material support bar, that "aliens have no constitutionally-protected 'liberty or property interest' in such a discretionary grant of relief for which they are otherwise statutorily ineligible"); *Obleshchenko* v. *Ashcroft,* 392 F.3d 970, 971 (8th Cir. 2004) (finding that there is no right to effective assistance of counsel with regard to an asylum claim because an alien does not have a liberty interest in a statutorily created, discretionary form of relief, but distinguishing withholding of removal). In other words, "[t]here is no constitutional right to asylum per se." *Mudric* v. *Mukasey,* 469 F.3d 94, 98 (3d Cir. 2006). Further, although aliens may choose to be represented by counsel, the government is not required to appoint counsel. INA 292 (8 U.S.C. 1362).

Second, the Departments reiterate that Congress authorized the Attorney General and the Secretary to, by regulation, limit and condition asylum eligibility under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). The Departments exercise such authority in promulgating the provisions of the rule, 84 FR at 69652, that allow adjudicators to inquire into allegations of conduct to determine whether the conduct constitutes battery

---

United States prior to the arrival of the alien in the United States"); and (3) INA 208(b)(2)(A)(iv) (8 U.S.C. 1158(b)(2)(A)(iv)) ("there are reasonable grounds for regarding the alien as a danger to the security of the United States").

or extreme cruelty barring asylum, similar to current statutory provisions requiring inquiry into other conduct-based allegations that may bar asylum. *See* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)); *see also Meng* v. *Holder,* 770 F.3d 1071, 1076 (2d Cir. 2014) (considering evidence in the record to determine whether it supported the agency finding that an alien's conduct amounted to persecution, thus triggering the persecutor bar under INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i))). A similar inquiry is also conducted under INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) to determine immigration benefits for aliens who are battered or subjected to extreme cruelty. Hence, promulgating an additional conduct-based bar to asylum eligibility, even without a conviction, is consistent with and therefore not necessarily precluded by the INA.

The Departments disagree that the rule disproportionately penalizes innocent individuals, victims, and their spouses or children. First, the Departments emphasize the exceptions for aliens who have been battered or subjected to extreme cruelty and aliens who were not the primary perpetrators of violence in the relationship. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). This exception protects qualified innocent individuals and their spouses or children from asylum ineligibility by providing that individuals whose crimes or conduct were based on "grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act [8 U.S.C. 1227(a)(2)(E)(i)–(ii)]" would nevertheless be not rendered ineligible for asylum if such individuals "would be described in section 237(a)(7)(A) of the Act [8 U.S.C. 1227(a)(7)(A)]." *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). Section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)), in turn, describes individuals who: (1) Were battered or subject to extreme cruelty; (2) were not the primary perpetrator of violence in the relationship; and (3) whose convictions were predicated upon conduct where the individual acted in self-defense, violated a protection order intended to protect that individual, or where the crime either did not result in serious bodily injury or was connected to the individual having been battered or subjected to extreme cruelty.

The Departments disagree with commenters' concerns that the provided exceptions are insufficient. To the extent that the commenters are concerned that individuals might not be able to avail themselves of the exception

because of a lack of awareness of the waiver or their eligibility for it, such concerns are unfounded. Just as aliens are currently informed of eligibility and other asylum requirements through the Act and regulations; the instructions to the I–589 application and the form itself; representatives or other legal assistance projects; or other sources, aliens will similarly be informed of the existence of this exception. The Departments encourage individuals to contact law enforcement if they experience domestic violence; however, potential resolutions to the sort of specific barriers referenced by the commenters are outside the scope of this rulemaking. It is the Departments' aim, however, that the exception to the bar would reduce such barriers.

In regard to commenters' concerns about cross arrests with no definite determinations made, the Departments note that the adjudicatory inquiry into whether acts constitute battery or extreme cruelty is in no way novel. *See, e.g.,* INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) (providing for similar adjudicatory inquiry in the context of cancellation of removal). The Departments are confident in adjudicators' continued ability to conduct such inquiries, which include properly applying exceptions for innocent individuals. The Departments acknowledge that survivors are oftentimes vulnerable individuals. The bar and related exception are specifically promulgated to ensure that aliens with convictions for or who engage in conduct involving domestic assault or battery are ineligible for asylum, thereby reducing subsequent effects on vulnerable individuals.

The Departments may predicate asylum eligibility based on certain convictions or conduct under the statutory authority that allows them to limit or condition asylum eligibility. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Aliens may apply for immigration benefits for which they are eligible, and the INA affords various ancillary benefits in accordance with the specific relief granted. In other words, aliens are generally free to apply (or not to apply) for benefits, and then the relevant provisions of the statute are consistently applied. *See* 8 CFR 208.1(a)(1), 1208.1(a)(1). Accordingly, aliens may be "similarly situated," as phrased by the commenters, but whether "similarly situated" aliens choose to apply for the same benefits under the INA is not a decision for the Departments to make.

The Departments emphasize that the sufficiency of alternative forms of protection or relief, such as U

nonimmigrant status and VAWA relief referenced by the commenters, varies in accordance with the unique facts in each case. For example, although some aliens may be unable to obtain the necessary law enforcement certification, many others are able to successfully meet all the necessary requirements. *See* 8 CFR 214.14. The Departments, however, reiterate that the new bar for convictions or conduct involving domestic assault or battery, stalking, or child abuse, contains an exception that is intended to ensure that innocent victims of violence are not rendered ineligible for asylum relief. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). This exception demonstrates both the Departments' concern for domestic violence victims and their consideration of how best to address those victims' circumstances, and the Departments have concluded that—especially in light of countervailing considerations such as the need to protect the United States from the harms associated with domestic abusers—this exception is sufficient.

The Departments acknowledge the commenters' concerns regarding unintended consequences stemming from the rule. The Departments, however, reiterate that mere allegations alone would not automatically bar asylum eligibility. Rather, an adjudicator will consider the alleged conduct and make a determination on whether it amounts to battery or extreme cruelty, thereby triggering the bar to asylum eligibility. *See* 8 CFR 208.13(c)(6)(vii),1208.13(c)(6)(vii) (proposed); *see also* 84 FR at 69652. Similar considerations are currently utilized in other immigration contexts, including other asylum provisions (INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) and removability (INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)). In conjunction with the exception at 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) (proposed), the Departments believe this inquiry is properly used in this context as well.

Commenters' allegations that the bar is too vague or broad to cover only offenses that constitute "particularly serious crimes" are irrelevant because, although the Departments possess statutory authority under section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii) to designate a "particularly serious crime," the Departments are also authorized to establish additional limitations or conditions on asylum. INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). The only requirement is that these limitations or conditions must be

consistent with section 208 of the Act (8 U.S.C. 1158). Nothing in section 208 of the Act (8 U.S.C. 1158) conflicts with this rule.

The Departments also disagree with commenters who alleged that the rule requires adjudicators to have expertise in all State jurisdictions. The rule requires adjudicators to engage in a fact-based inquiry, and that inquiry accounts for the differences in State law regarding criminal convictions for offenses related to domestic violence. *See* 84 FR at 69652. Further, even if adjudicators must interpret and apply law from various jurisdictions, the Departments are confident that adjudicators will properly do so, as they currently do in other immigration contexts. *See, e.g.,* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (other asylum provisions); INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)) (removability).

The Departments disagree that the exception is "insufficient" or "vague" or "place[s] a high burden on victims." The exception directly references and adapts the statutory requirements in INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)). In the interest of consistency and protection afforded to victims since its enactment, the exceptions to this categorical bar align with those enacted by Congress.

The Departments decline to evaluate the commenters' various examples. A proper inquiry is fact-based in nature; absent the entirety of facts for each unique case, various examples cannot be adequately addressed. The BIA has deemed some domestic violence offenses as "particularly serious crimes." *See* 84 FR at 69652 (providing such examples of BIA decisions). As explained in the proposed rule, that case-by-case approach fails to include all of the offenses enumerated in the rule, and it does not include conduct related to domestic violence. *Id.* Accordingly, the Departments believe this rule-based approach is preferable because it will facilitate fair and just adjudicatory results.

In addition, the Departments disagree with commenters that the bar is unnecessary. The Departments believe the bar and its exception establish important protections for vulnerable individuals, including those not at fault, and clarify the Departments' views on such reprehensible conduct. *See id.*

The rule does not conflict with or distort language in VAWA. The rule is solely applicable to eligibility for the discretionary benefit of asylum. The rule does not expound upon or specifically supplement VAWA. Rather, the rule adds categorical bars to asylum eligibility, clarifies the effect of certain

criminal convictions—and, in one instance, abusive conduct that may not necessarily involve a criminal conviction—on asylum eligibility, and eliminates automatic reconsideration of discretionary denials of asylum. *See generally* 84 FR at 69640. The rule excludes from a grant of asylum and its many ancillary benefits aliens who have been convicted of certain offenses or engaged in certain conduct. Contrary to the commenters' remarks, the rule is not intended to exclude survivors of domestic violence; in fact, the preamble to the rule, 84 FR at 69652, provided an extensive explanation of the Departments' opposition to domestic violence, including an overview of various legislative and regulatory actions that seek to protect victims and to convey strong opposition to domestic violence. Moreover, the rule is fully consonant with other regulations, *see, e.g.,* 8 CFR 204.2(c)(1)(i)(E), designed to ensure that those who commit acts of domestic violence, even if they are not convicted, do not distort or undermine the immigration laws of the United States. Accordingly, although VAWA and the rule may not use the same approach, both are instrumental in the government's efforts to protect victims from domestic violence in the United States.

In that vein, the rule provides protection to victims of domestic violence by way of the exceptions to the bar in 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). The rule also conveys the Departments' opposition to domestic violence by denying asylum eligibility to aliens convicted of or who have engaged in such conduct so that abusers may not stay in the United States. *See* 84 FR at 69652.

Addressing commenters' concerns that the "life and safety" of aliens were "hanging in the balance," the Departments reiterate the alternative forms of relief or protection that may be available to applicants who are ineligible for asylum under the rulemaking—applicants may still apply for statutory withholding of removal or CAT protection. *See* 84 FR at 69642. Accordingly, the Departments disagree that a "vigorous burden of proof" is necessary in this context. On the contrary, asylum is a discretionary benefit in which the alien bears the burden of proof to demonstrate eligibility under the conditions and limitations Congress authorized the Departments to establish. *See* INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)).

To clarify the exception in 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) (proposed),

applicants need not be granted a waiver under INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) to qualify for the exception. Rather, applicants must only satisfy one of the following criteria contained in the Act to the satisfaction of an adjudicator: (1) The applicant was acting in self-defense; (2) the applicant was found to have violated a protection order intended to protect the applicant; or (3) the applicant committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury and where there was a connection between the crime and the applicant's having been battered or subjected to extreme cruelty. 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed); *see also* 84 FR at 69653. Together, the proposed rule and this final rule serve, in part, as notice to the public that such provisions exist—including the exception for applicants who are themselves victims. *See* 84 FR at 69640 (stating that this section of the **Federal Register** contains notices to the public of the proposed issuance of rules and regulations). Accordingly, just like other immigration benefits and relevant exceptions, aliens are on notice upon publication in the **Federal Register**.

Finally, the exceptions provided by 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) do not create an adversarial process. These provisions mirror the text of the statute except that aliens only need to satisfy the criteria, not be actually granted an exception. In this way, the exceptions as stated in the rule are arguably less stringent than the statutory exception. Further, the Departments remain confident that adjudicators will continue to properly apply the exceptions, regardless of commenters' concerns of how far removed adjudicators may be from the immediate circumstances of the conduct at issue. The exceptions are not intended to mitigate harm already suffered by survivors; rather, it is the Departments' hope that the exceptions ensure that the conduct of applicants who are actually victims of domestic violence does not bar their asylum eligibility. Accordingly, the Departments strongly disagree that the exceptions will inflict harm on survivors, as commenters alleged.

g. Document Fraud Misdemeanors

*Comment:* Numerous commenters opposed implementing a categorical limitation on eligibility for asylum for individuals convicted of Federal, State, tribal, or local misdemeanor offenses related to document fraud, stating that it would result in denial of meritorious asylum claims. *See* 8 CFR

208.13(c)(6)(vi)(B)(1), 1208.13(c)(6)(vi)(B)(1) (proposed). Commenters stated that some asylum applicants have necessarily and justifiably used false documents to escape persecution. Commenters stated that the NPRM ignored common circumstances related to convictions involving document fraud, such as when individuals flee their countries of origin with no belongings and "must rely on informal networks to navigate their new circumstances." Some commenters suggested that applicants' use of fraudulent documents in entering the United States can be linked to their financial means but did not offer further detail on that position. Commenters stated that it was "arbitrary and irrational" for the Departments to suggest that such conduct would render somebody unfit to remain in the United States or a threat to public safety.

Commenters also suggested that the proposed limitation contravened long-standing case law establishing that violations of the law arising from an asylum applicants' manner of flight should be just one of many factors to be considered in the exercise of discretion. *Matter of Pula,* 19 I&N Dec. at 474. Some commenters objected to the proposed limitation because it allegedly did not provide a sufficient exception for those who have unknowingly engaged in such conduct, such as those who have unknowingly obtained false documents from bad actors like unscrupulous notarios. Other commenters opposed the proposed limitation because it did not provide a sufficient exception for those who must use false documentation to flee persecution.

Some commenters recognized the NPRM's proposed exception to this limitation on asylum eligibility.[28] Commenters opined that the proposed exception was not sufficient, given the consequences for those who do not fit within the exception. Commenters stated that asylum seekers who obtain false documents when passing through a third country or who may be unable to prove that they fall within an

exception would be adversely affected by the proposed limitation.

Some commenters stated that the proposed exception was unrealistic given circumstances that could prevent asylum seekers from immediately claiming a fear of persecution, such as mistrust of government officials, language barriers, or trauma-induced barriers.

At least one commenter noted that traffickers routinely provide victims with false documents for crossing borders and that trafficking victims may be unable to explain the circumstances of their documentation to law enforcement. The commenter also noted that traffickers regularly confiscate, hide, or destroy their victims' documents to exert control over their victims and that trafficking victims often lack documentation. The commenter opined that trafficking victims were thus particularly vulnerable to bad actors who falsely claim that they can prepare legal documentation.

Commenters stated that the NPRM did not properly consider that some asylum seekers would be required to, or inadvertently, use false documents in the United States while their proceedings were pending, for example, in order to drive or work. Commenters suggested that continued availability of asylum protection to low-wage immigrant workers could encourage them to "step out of the shadows" when faced with workplace exploitation, dangers, and discrimination. By contrast, commenters stated, a categorical limitation would further incentivize some employers to hire and exploit undocumented workers where employers use aliens' immigration status against them and force asylum seekers "deeper into the dangerous informal economy." At least one commenter stated that DHS recently made it harder for asylum seekers with pending applications to survive without using fraudulent documents by proposing a rule that would extend the waiting period for asylum seekers to apply for work authorization from 180 days to one year.

At least one commenter suggested that the proposed limitation related to document-fraud offenses undermined an important policy objective to encourage truthful testimony by asylum seekers.

At least one commenter stated that there was a discrepancy between the Departments' reasoning that the use of fraudulent documents "so strongly undermines government integrity that it would be inappropriate to allow an individual convicted of such an offense

---

[28] *See* 8 CFR 208.13(c)(6)(vi)(B)(1) and 1208.13(c)(6)(vi)(B)(1), which provide that a misdemeanor offense related to document fraud would bar eligibility for asylum unless the alien can establish (1) that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, (2) that the document related to the alien's eligibility to enter the United States, (3) that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and (4) that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry.

to obtain the discretionary benefit of asylum'' and possible availability of adjustment of status for a document-fraud-related conviction if the conviction qualified as a petty offense or if the individual obtained a waiver of inadmissibility.

*Response:* The Departments have considered all comments and recommendations submitted regarding the bar to asylum eligibility for aliens with misdemeanor document fraud convictions. Despite commenters' concerns, the Departments continue to believe this exception is consistent with distinctions regarding certain document-related offenses as recognized by the BIA, *Matter of Pula,* 19 I&N Dec. at 474–75; existing statutes, *see* INA 274C(a)(6) and (d)(7) (8 U.S.C. 1324c(a)(6) and (d)(7)); and existing regulations, *see* 8 CFR 270.2(j) and 1270.2(j), as noted in the NPRM. *See* 84 FR at 69653; *cf. Matter of Kasinga,* 21 I&N Dec. 357, 368 (BIA 1996) (concluding that possession of a fraudulent passport was not a significant adverse factor where the applicant ''did not attempt to use the false passport to enter'' the United States, but instead ''told the immigration inspector the truth''). The Departments will not amend the bar as laid out in the proposed rule and will continue to rely on the justifications provided in the NPRM. *See* 84 FR at 69653.[29]

Further, offenses related to fraudulent documents that carry a potential sentence of at least one year are already aggravated felonies, and thus are disqualifying offenses for purposes of asylum. INA 101(a)(43)(P) (8 U.S.C. 1101(a)(43)(P)). Courts have recognized that proper identity documents are essential to the functioning of immigration proceedings. *See Noriega-Perez* v. *United States,* 179 F.3d 1166, 1173–74 (9th Cir. 1999). Furthermore, in passing the REAL ID Act of 2005, Public Law 109–13, 119 Stat. 231, Congress acknowledged the critical role that identity documents play in protecting national security and public safety.

Regarding the commenters' concerns for aliens who may use fraudulent documents as a means to flee persecution or other harms, the Departments reiterate the exception for this bar in the rule for aliens who can establish (1) that the conviction resulted

[29] The Departments also reject some comments as wholly unfounded. For example, there is no logical or factual indication that the rule, combined with a criminal conviction for document fraud necessary for the bar to apply, would subsequently cause an alien to commit another crime—*i.e.,* perjury—by testifying untruthfully while in immigration proceedings.

from circumstances showing that the document was presented before boarding a common carrier, (2) that the document related to the alien's eligibility to enter the United States, (3) that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and (4) that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry. 8 CFR 208.13(c)(6)(vi)(B)(1), 1208.13(c)(6)(vi)(B)(1).

The Departments agree with commenters that there are certain, limited circumstances under which an individual with a legitimate asylum claim might need to utilize fraudulent documents during his or her flight to the United States, and the Departments provided this exception to the bar to account for such circumstances. The Departments believe that the exception, as proposed in the NPRM, is sufficient to allow individuals who may have committed document-fraud offenses directly related to their legitimate claims of fear to apply for asylum. The Departments believe that this exception, which is consistent with the exception in INA 274C(d)(7), 8 U.S.C. 1324c(d)(7), allowing the Attorney General to waive civil money penalties for document fraud to an alien granted asylum or statutory withholding of removal, strikes the appropriate balance between recognizing the seriousness of document-fraud-related offenses, including the threat they pose to a functioning asylum system, and the very limited instances where a conviction for such an offense should not bar an applicant from eligibility for asylum.

The Departments disagree with concerns that aliens with viable asylum claims might not be able to either immediately disclose their fear of return at a port-of-entry or prove that they fall within an exception to the bar. DHS has, by regulation, established procedures for determining whether individuals who present themselves at the border have a credible fear of persecution or torture, 8 CFR 208.30, and officers who conduct the interviews are required by regulation to undergo ''special training in international human rights law, non-adversarial interview techniques, and other relevant national and international refugee laws and principles,'' 8 CFR 208.1(b). Asylum officers are required to determine that the alien is able to participate effectively in his or her interview before proceeding, 8 CFR 208.30(d)(1), (5), and verify that the alien has received information about the credible fear process, 8 CFR

208.30(d)(2). The alien may consult with others prior to his or her interview. 8 CFR 208.30(d)(4). Such regulations are intended to recognize and accommodate the sensitive nature of fear-based claims and to foster an environment in which aliens may express their claims to an immigration officer.

The Departments disagree with the commenters that this bar to asylum is inconsistent with case law, particularly *Matter of Pula. See* 19 I&N Dec. at 474–75. The Departments first note that *Matter of Pula* pertains to how adjudicators should weigh discretionary factors in asylum applications. *Id.* This rule, by contrast, sets forth additional limitations on eligibility for asylum, which are separate from the discretionary determination. Additionally, *Matter of Pula* stated that whether a fraudulent document offense should preclude a favorable finding of discretion depends on ''the seriousness of the fraud.'' *Id.* at 474. The Departments in this rule are clarifying that the disqualifying offenses, which as provided by the rule must have resulted in a misdemeanor conviction, are serious enough to preclude eligibility for asylum, and have provided an exception for those situations that the Departments have determined should not preclude eligibility.

The Departments further reject some comments as unjustified within the context of a law-abiding society. For example, criticizing the rule because it may discourage participation in criminal activity—*e.g.,* driving without a license—or other activity in violation of the law—*e.g.,* working without employment authorization—is tantamount to saying the Departments should encourage and reward unlawful behavior. The Departments decline to adopt such suggestions. More specifically, the Departments reject commenters' suggestions that the additional limitation should not apply to document-fraud-related offenses that stem from fraudulent driver's licenses or employment authorization. The Departments' position on this matter is both reasonable and justified. As explained in the NPRM, such offenses are serious, ''pos[ing] * * * a significant affront to government integrity'' and are particularly pernicious in the context of immigration law, where the use of fraudulent documents, ''especially involving the appropriation of someone else's identity, * * * strongly undermines government integrity.'' 84 FR at 69653. Commenters' concerns about how the rule might affect working conditions of aliens are beyond the scope of this rulemaking.

Congress has delegated its authority to the Departments to propose additional, *i.e.,* broader, limitations on the existing bars to asylum eligibility, so long as the additional limitations are consistent with the Act. INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). The Departments are acting pursuant to their authority to create additional limitations on asylum eligibility and are not designating additional offenses as particularly serious crimes pursuant to INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), as discussed above. Accordingly, the Departments do not address commenters' concerns that the disqualifying offenses are not or should not be particularly serious crimes.

The Departments disagree with commenters' assertions that the rule would unfairly affect trafficking victims because traffickers force them to use fraudulent documents when they are crossing the border. The Departments recognize the serious nature of such circumstances, but they believe that considerations regarding criminal culpability for document-fraud-related offenses would be best addressed during criminal proceedings.

Finally, regarding commenters' points about the effect of document-fraud-related convictions in the context of adjustment of status under INA 245(a) (8 U.S.C. 1255(a)), the Departments note that adjustment of status is separate from asylum, and the rule contemplates asylum only. *See* 84 FR at 69640 (stating that the Departments propose to amend their respective regulations governing the bars to "asylum" eligibility). The adjustment of status conditions and consequent benefits are different from asylum. *See Mahmood* v. *Sessions,* 849 F.3d 187, 195 (4th Cir. 2017) (observing that, although "strong policies underlie" both asylum and adjustment of status, "[t]hese policies serve different purposes"). *Compare* INA 209(b) (8 U.S.C. 1159(b)) *and* 245(a) (8 U.S.C. 1255(a)), *with* INA 208 (8 U.S.C. 1158). The Departments do note, however, that, because adjustment of status is a discretionary form of relief, an alien's document-fraud-related conviction that would bar the alien from asylum eligibility under this rule could also separately be the basis for a denial of adjustment of status. *See, e.g., Matter of Hashmi,* 24 I&N Dec. 785, 790 (BIA 2009) (instructing immigration judges to consider "whether the respondent's application for adjustment merits a favorable exercise of discretion" when considering whether to continue proceedings).

### h. Unlawful Public Benefits Misdemeanors

*Comment:* Commenters opposed the NPRM's proposed limitation on asylum eligibility based on convictions for misdemeanor offenses involving the "unlawful receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority." *See* 8 CFR 208.13(c)(6)(vi)(B)(2), 1208.13(c)(6)(vi)(B)(2). Commenters stated that this proposed limitation would disproportionately impact low-income individuals and people of color. Commenters stated that complex evaluations involving assets, income, household composition, and changing circumstances, such as employment or housing, could easily result in overpayments and miscalculations of benefits by both case workers for recipients and recipients themselves. Commenters asserted that these calculations could be especially confusing and difficult for low-income persons who may have literacy challenges, low education levels, or limited English proficiency.

One commenter stated that this proposed limitation was overbroad because there is no requirement that any convictions related to the unlawful receipt of public benefits be linked to fraud or require intentionality.

Commenters asserted that unlawful receipt of public benefits is not a "particularly serious crime." The commenters stated that the proposed limitation fails to differentiate between dangerous offenses and those committed out of desperation and observed that such offenses do not involve an element of intentional or threatened use of force. One commenter stated that the Departments' assertions that such offenses burden taxpayers and drain resources from lawful beneficiaries was not sufficient to render these offenses "particularly serious crimes." Specifically, the commenter stated that this was inconsistent with the intent of the Act and the 1967 Protocol, as well as BIA precedent, citing the following: United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.1.A.S. No. 6577, 606 U.N.T.S. 268 ("The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that

country."); *Delgado,* 648 F.3d at 1110 (Reinhardt, J., concurring in part and concurring in the judgment) ("The agency's past precedential decisions also help to illuminate the definition of a 'particularly serious crime.' Crimes that the Attorney General has determined to be 'particularly serious' as a categorical matter, regardless of the circumstances of an individual conviction, include felony menacing (by threatening with a deadly weapon), armed robbery, and burglary of a dwelling (during which the offender is armed with a deadly weapon or causes injury to another). Common to these crimes is the intentional use or threatened use of force, the implication being that the perpetrator is a violent person." (footnotes omitted)).

Commenters stated that the Departments greatly overstated the scope of this issue and failed to support their assertions that such crimes are of an "inherently pernicious nature." *See* 84 FR at 69653. Commenters stated that, by contrast, "data demonstrates that the incidents of these types of fraud crimes are minimal. For example, the incidence of fraud in the Supplemental Nutrition Assistance Program is estimated at 1.5% for all incidents of fraud, including individuals of all citizenship categories and including both fraud committed by agencies, retailers/shops and individuals." *See* Randy Alison Aussenberg, Cong. Research Serv., R45147, *Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)* (2018), *https://fas.org/sgp/crs/misc/R45147.pdf.*

*Response:* The Departments have considered all of the comments received, and have chosen not to make any changes to the NPRM's regulatory language establishing an additional limitation on asylum eligibility for individuals who have been convicted of an offense related to public benefits. *See* 8 CFR 208.13(c)(6)(vi)(B)(2), 1208.13(c)(6)(vi)(B)(2).

The Departments disagree with commenters who believe that the rule would unfairly impact low-income individuals. By contrast, the rule is designed to limit asylum eligibility for those who criminally take advantage of benefits designed to assist low-income individuals. The Departments recognize commenters' concerns that individuals might be unaware of the complex systems that might result in miscalculation and overpayment of benefits; however, the Departments believe that it would be more appropriate for criminal culpability for such offenses to be determined during criminal proceedings.

In response to comments that such offenses are not particularly serious crimes, the Departments again note that the Departments' authority to set forth additional limitations and conditions on asylum eligibility requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158) and does not require that the offenses be particularly serious crimes or involve any calculation of dangerousness. *Compare* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."), *with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). As discussed in the NPRM, limiting asylum eligibility for those who have been convicted of such offenses, which are of an "inherently pernicious nature," is consistent with previous Government actions to prioritize enforcement of the immigration laws against such offenders. 84 FR at 69653.

Regardless of the relative frequency of public benefits fraud, the Departments have concluded that convictions for such crimes, however often they occur, should be disqualifying for eligibility for the discretionary benefit of asylum. For example, the Departments are encouraged by the data cited by commenters indicating that the rate of fraud in certain programs may be low, but low rates of fraud do not support countenancing the abuse of public benefits by the remainder of the programs' participants.

i. Controlled Substance Possession or Trafficking Misdemeanors [30]

*Comment:* Commenters also opposed designation of misdemeanor possession or trafficking of a controlled substance or controlled-substance paraphernalia as categorical bars to asylum eligibility. *See* 8 CFR 208.13(c)(6)(vi)(B)(3), 1208.13(c)(6)(vi)(B)(3) (proposed). Commenters asserted that the proposed limitation would be unnecessary, overbroad, and racially discriminatory.

Commenters remarked that the proposed limitation was overbroad with respect to the convictions and conduct covered and was not tailored to bar only those who have engaged in "serious" conduct or otherwise posed a danger to the community. Commenters also stated that the proposed limitation was overbroad because it did not account for jurisdictions that had decriminalized certain drugs, like cannabis.

Commenters said that, given the stakes at issue in asylum claims, protection should not be predicated on an applicant's abstinence from drugs. Commenters also stated that this proposed limitation was particularly inappropriate "at a time of such inconsistency in federal laws surrounding drug legalization." Commenters generally expressed concern about the Federal government's perpetuation of the "war on drugs."

Commenters stated that the proposed limitation would not make anybody safer but rather result in the denial of bona fide asylum claims. Commenters stated that the proposed limitation would "go beyond any common sense meaning" of the term "particularly serious crime." Commenters were particularly concerned with the implications of this proposed limitation because it would eliminate the opportunity for applicants to present mitigating circumstances that, commenters stated, are commonly associated with such convictions, such as addiction, self-medication, and any subsequent treatment or rehabilitation. Commenters asserted that the proposed limitation would improperly expand bars to asylum eligibility based on laws where enforcement decisions are "heavily tainted" by racial profiling.

Commenters also expressed concern that the proposed limitation would unfairly punish asylum seekers who might be vulnerable to struggles with addiction as a coping mechanism after facing significant trauma, particularly in light of obstacles to accessing medical or psychological treatment. Commenters stated that the proposed limitation eliminated any possibility of a treatment- and compassion-based approach to addiction. Commenters stated that the Departments' position on this matter was at odds with national trends to "move toward a harm reduction approach to combating drug and alcohol addiction." Some commenters noted that treatment of misdemeanor offenses relating to controlled substances, particularly with respect to offenses involving possession of marijuana or prescription drugs, was "wildly disproportionate to the severity of these offenses." One commenter asserted that these offenses do not have an element of violence or dangerousness and stated that the "only victims are the offenders themselves."

One commenter remarked that the Departments relied on "misleading evidence that does not create a link between dangerousness" and the disqualifying offense. The commenter stated that widespread opioid abuse is "rooted in over-prescription by healthcare providers based on the assurances of pharmaceutical companies" and does not serve as a relevant justification for the additional limitation.

One commenter stated that courts and statutes, including the Supreme Court, have treated varying simple possession drug offenses differently. For example, the commenter read the Supreme Court's decision in *Lopez* v. *Gonzales,* 549 U.S. 47 (2006), to mean that simple possession of a controlled substance is not a "drug trafficking crime unless it would be treated as a felony if prosecuted under federal law." The commenter also remarked that a single incident of simple possession of any controlled substance except for Flunitrazepam is not treated as a felony and is thus not considered an aggravated felony, *see* 21 U.S.C. 844; and that some second convictions for possession have been recognized as drug trafficking aggravated felonies, but not all, *see Carachuri-Rosendo* v. *Holder,* 560 U.S. 563, 566 (2010); *Berhe* v. *Gonzales,* 464 F.3d 74, 85–86 (1st Cir. 2006). The commenter asserted that the nuanced and varying assessments related to such offenses suggest "they do not merit blanket treatment of the same severity."

Some commenters objected to existing aggravated felony bars with respect to drug-related offenses in addition to the proposed limitation. Commenters stated that immigration judges should continue to be able to exercise discretion over those controlled-substance-related offenses that are not already subject to an existing bar to asylum. Commenters also generally objected to criminalizing possession of drugs for personal use, given the medical value and current inconsistent treatment among states, but no analysis was provided connecting these comments to the NPRM, specifically.

---

[30] In addition to the comments regarding the bar to asylum discussed in this section, multiple commenters shared their opinion that marijuana should be legalized, without reference to a particular provision of the proposed rule. The Departments note that broad questions of national drug policy, including the legalization of marijuana at the national or State level, are outside the scope of this rulemaking. Marijuana remains a controlled substance, with the resulting penalties that may flow from its possession, trafficking, or other activities involving it. *See* 21 CFR 1308.11 (Schedule I controlled substances).

*Response:* The Departments have considered all comments and recommendations submitted regarding the NPRM. The final rule does not alter the regulatory language set forth in the NPRM with respect to the limitation on misdemeanor offenses involving possession or trafficking of a controlled substance or controlled-substance paraphernalia. *See* 8 CFR 208.13(c)(6)(vi)(B)(3), 1208.13(c)(6)(vi)(B)(3).

Consistent with the INA's approach toward controlled substance offenses, for example in the removability context under INA 237(a)(2)(B)(i) (8 U.S.C. 1227(a)(2)(B)(i)), this rule does not penalize a single offense of marijuana possession for personal use of 30 grams or less. *See* 84 FR at 69654. However, as discussed in the NPRM, the Departments have determined that possessors and traffickers of controlled substances "pose a direct threat to the public health and safety interests of the United States." *Id.* Accordingly, the Departments made a policy decision to protect against such threats by barring asylum to such possessors and traffickers, and Federal courts have agreed with such treatment in the past. *See Ayala-Chavez* v. *U.S. INS,* 944 F.2d 638, 641 (9th Cir. 1991) ("[T]he immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." (quoting *Blackwood* v. *INS,* 803 F.2d 1165, 1167 (11th Cir. 1988))).

The Departments note that aliens barred from asylum eligibility as a result of this provision may still be eligible for withholding of removal under the Act or CAT protection, provisions that would preclude return to a country where they experienced or fear torture or persecution. *See* 84 FR at 69642.

The Departments disagree with comments suggesting that the bar is overbroad and not appropriately tailored only to aliens who have engaged in serious conduct or pose a danger to the community. Similarly, the Departments strongly disagree with commenters who asserted that this additional limitation will not make communities safer. Despite commenters' arguments, the Departments reiterate that controlled substance offenses represent significant and dangerous offenses that are damaging to society as a whole. *See Matter of Y–L–,* 23 I&N Dec. 270, 275 (A.G. 2002) (noting that "[t]he harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes"). The illicit use of controlled substances imposes substantial costs on society from loss of life, familial disruption, the costs of treatment or incarceration, lost economic productivity, and more. *Id.* at 275–76 (citing *Matter of U–M–,* 20 I&N Dec. 327, 330–31 (BIA 1991) ("This unfortunate situation has reached epidemic proportions and it tears the very fabric of American society.")); 84 FR at 69654; *see also* Office of Nat'l Drug Control Policy, *National Drug Control Strategy* 11 (Feb. 2020), *https://www.whitehouse.gov/wp-content/uploads/2020/02/2020-NDCS.pdf* (explaining, in support of the national drug control strategy, the devastating effects of drug use and the necessity for treatment that includes "continuing services and support structures over an extended period of time"). Increased controlled substance prevalence is often correlated with increased rates of violent crime and other criminal activities. *See* 84 FR at 69650 (explaining that perpetrators of crimes such as drug trafficking are "displaying a disregard for basic societal structures in preference of criminal activities that place other members of the community * * * in danger").

Even assuming, arguendo, the commenters are correct that such offenses do not reflect an alien's dangerousness to the same extent as those offenses that are formally designated "particularly serious crimes," the Departments' authority to set forth additional limitations and conditions on asylum eligibility under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to these additional conditions or limitations first meet a particular level of dangerousness. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of certain drug-related offenses as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Further, as discussed at length in the NPRM, this additional limitation on asylum eligibility is consistent with the Act's treatment of controlled-substance offenses as offenses that may render aliens removable from or inadmissible to the United States. 84 FR at 69654.

### 4. Due Process and Fairness Considerations

*Comment:* The Departments received numerous comments asserting that the rule violates basic notions of fairness and due process. One commenter asserted that anything that makes the asylum process harder, which the NPRM does according to the commenter, is a denial of due process. Commenters claimed that the Departments' true goal in promulgating these rules is to reduce the protections offered by existing asylum laws and to erode "any semblance of due process and justice for those seeking safety and refuge in this country."

In addition to general objections regarding due process, commenters asserted various constitutional problems with the proposed rule. Citing *United States* v. *Davis,* 139 S. Ct. 2319, 2323 (2019), commenters specified that due process requires laws and regulations to "give ordinary people fair warning about what the law demands of them." These commenters argued that the proposed rule fails to give affected individuals fair notice of which offenses will bar asylum. Commenters also noted that equal protection principles require the government to treat similarly situated people in the same manner but averred that the proposed rule, as applied, would result in similarly situated applicants being treated differently.

Commenters stated that requiring immigration adjudicators to deny a legal benefit, even a discretionary one, based on alleged and uncharged conduct is a clear violation of the presumption of innocence, which the commenters

argued is a fundamental tenet of our democracy.

Commenters alleged that immigration proceedings are not the proper venue for the sort of evidentiary considerations required by the rule. Commenters argued that asylum applicants will not have the opportunity to be confronted by evidence or to contest such evidence in a criminal court. These commenters noted that criminal courts afford defendants additional due process protections not found in immigration court, such as the right to counsel, the right to discovery of the evidence that will be presented, and robust evidentiary rules protecting against the use of unreliable evidence.

Similarly, commenters alleged that, due to the "lack of robust evidentiary rules in immigration proceedings," many applicants would be unable to rebut negative evidence submitted against them, even if the evidence submitted is false. One commenter claimed, without more, that there is a high likelihood that such evidence is false. Commenters were concerned that unreliable evidence would be submitted in support of the application of the additional bars. Alternatively, commenters stated that immigration adjudicators might rely on evidence where a judicial court had already evaluated reliability and not credited the evidence based on a lack of reliability. In addition, commenters were concerned that the rule authorizes adjudicators to seek out unreliable evidence obtained in violation of due process to determine whether an applicant's conduct triggers the particularly serious crime bar.

Commenters were concerned that requiring applicants to disprove allegations of gang-related activity or domestic violence would result in re-litigation of convictions or litigation of conduct that fell outside the scope of prior convictions. Similarly, commenters were concerned that the rule violates due process because it requires adjudicators to consider an applicant's conduct, separate and apart from any criminal court decision, that may trigger a categorical bar to asylum. One commenter asserted that "people seeking asylum should have the right to be considered innocent until proven guilty, and should not be denied asylum based on an accusation." Moreover, commenters alleged that this consideration extends to whether a vacated or modified conviction or sentence still constitutes a conviction or sentence triggering the bar to asylum.

Commenters alleged that adjudicators might improperly rely on uncorroborated allegations in arrest reports and shield the ensuing decision from judicial review by claiming discretion. Commenters stated that the rule lacks safeguards to prevent such erroneous decisions.

Commenters expressed concern that asylum applicants, especially detained applicants, would struggle to find evidence related to events that may have occurred years prior to the asylum application. One organization noted that the rule would be particularly challenging for detained respondents because they often lack representation and would be required to rebut circumstantial allegations with limited access to witnesses and evidence.

The Departments also received numerous comments stating that asylum hearings, which typically last three or fewer hours, provide insufficient time to permit both parties to present full arguments on these complex issues, as effectively required by the rule, thereby resulting in due process violations.

One commenter raised due process and constitutional concerns if the rule fails to provide proper notice to the alien. In that case, commenters alleged that the Sixth Amendment right to "be accurately apprised by defense counsel of the immigration consequences of his guilty plea to criminal charges" applies but that the rule fails to account for those consequences.

*Response:* The rule does not violate notions of fairness or due process. As an initial matter, asylum is a discretionary benefit, as demonstrated by the text of the statute, which states the Departments "may" grant asylum, INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)), and which provides authority to the Attorney General and the Secretary to limit and condition, by regulation, asylum eligibility under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Courts have found that aliens have no cognizable due process interest in the discretionary benefit of asylum. *See Yuen Jin,* 538 F.3d at 156–57; *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50). In other words, "[t]here is no constitutional right to asylum per se." *Mudric,* 469 F.3d at 98. Thus, how the Departments choose to exercise their authority to limit or condition asylum eligibility and an adjudicator's consideration of an applicant's conduct in relation to asylum eligibility do not implicate due process claims.

The rule does not "reduce the protections offered by the asylum laws." In fact, the rule makes no changes to asylum benefits at all; rather, it changes who is eligible for such benefits. *See* 84 FR at 69640. Further, the rule is not intended to "erode" due process and justice for aliens seeking protection; instead, the rule revises asylum eligibility by adding categorical bars to asylum eligibility, clarifying the effect of certain criminal convictions and conduct on asylum eligibility, and removing automatic reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. Although some of these changes may affect aliens seeking protection in the United States, these effects do not constitute a deprivation of due process or justice, and alternative forms of protection—withholding of removal under the Act along with withholding of removal or deferral of removal under the CAT regulations— remain available for qualifying aliens. *See* 84 FR at 69642.

Regarding commenters' concerns that the rule does not sufficiently provide notice to aliens regarding which offenses would bar asylum eligibility, the Departments first note that the publication of the NPRM and this final rule serves, in part, as notice to the public regarding which offenses bar asylum eligibility. *See* 5 U.S.C. 552. Courts have held that an agency's informal rulemaking pursuant to 5 U.S.C. 553 constitutes sufficient notice to the public if it "fairly apprise[s] interested persons of the 'subjects and issues' involved in the rulemaking[.]" *Air Transport Ass'n of America* v. *FAA,* 169 F.3d 1, 6 (D.C. Cir. 1999) (quoting *Small Refiner Lead Phase-Down Task Force* v. *EPA,* 705 F.2d 506, 547 (D.C. Cir. 1983)).

To the extent that commenters argued that the rule is insufficiently clear with regards to the substance of what offenses are disqualifying,[31] the Departments disagree. This rule clearly establishes which offenses bar asylum by listing such offenses in detail in the regulatory text at 8 CFR 208.13(c)(6)–(9) and 1208.13(c)(6)–(9). Unlike other statutory provisions that have been found unconstitutionally vague,[32] this rule clearly establishes grounds for mandatory denial of request for asylum. 8 CFR 208.13(c)(6)–(9), 1208.13(c)(6)– (9). The regulatory text adds paragraph (c)(7) to specifically define terms used

---

[31] *Cf. Dimaya,* 138 S. Ct. at 1225 ("Perhaps the most basic of due process's customary protections is the demand of fair notice.").

[32] For example, the Court in *Dimaya,* 138 S. Ct. at 1222–23, held that the Federal criminal code provision at issue was unconstitutionally vague in part because it failed to provide definitions for or explain such terms as "ordinary case" and "violent." On the other hand, the term "crime involving moral turpitude" has continuously been upheld as not unconstitutionally vague, despite repeated judicial criticism. *See, e.g., Islas-Veloz* v. *Whitaker,* 914 F.3d 1249, 1250 (9th Cir. 2019) ("the phrase 'crime involving moral turpitude' [is] not unconstitutionally vague").

in 8 CFR 208.13 and 1208.13, and the regulatory text otherwise references applicable definitions for terms not found in paragraph (c)(7). *See, e.g.,* 8 CFR 1208.13(c)(6)(iv)(A) (defining driving while intoxicated or impaired "as those terms are defined under the jurisdiction where the conviction occurred"). Further, just as the INA contains various criminal grounds for ineligibility without specified elements, *see generally* INA 101(a)(43) (8 U.S.C. 1101(a)(43)), here, the Departments have provided a detailed list of particular criminal offenses or related activities that would render an alien ineligible for asylum. Accordingly, despite the commenter's argument that the regulatory text fails to give "fair warning" of which offenses would bar asylum eligibility, the regulatory text is sufficiently clear to provide the public with the requisite notice. *See Davis,* 139 S. Ct. at 2323.

The Departments acknowledge the commenters' general equal protection concerns; however, without more detailed comments providing for the specific concerns of commenters, the Departments are unable to provide a complete response to these comments. The Departments note, however, that categorical bars to asylum apply equally to all asylum applicants and do not classify applicants on the basis of any protected characteristic, such as race or religion.

Immigration proceedings are civil in nature; thus constitutional protections for criminal defendants, including evidentiary rules, do not apply. *See INS* v. *Lopez-Mendoza,* 468 U.S. 1032, 1038 (1984); *Dallo* v. *INS,* 765 F.2d 581, 586 (6th Cir. 1985); *Baliza* v. *INS,* 709 F.2d 1231, 1233 (9th Cir. 1983); *Longoria-Castaneda* v. *INS,* 548 F.2d 233 (8th Cir. 1977). In addition, any determinations regarding evidence or other related procedural issues by a criminal court do not automatically apply in a subsequent immigration proceeding or asylum interview. The Departments emphasize that the NRPM did not propose and the final rule does not enact any changes to the immigration court or asylum interview rules of procedure or evidentiary consideration processes. Accordingly, adjudicators will continue to receive and consider "material and relevant evidence," and it is the adjudicator who determines what evidence so qualifies. 8 CFR 1240.1(c). Immigration adjudicators regularly consider and receive evidence regarding criminal offenses or conduct in the context of immigration adjudications, including asylum applications, where such evidence has been frequently considered as part of the "particularly

serious crime" determination or as part of the ultimate discretionary decision. *Cf. Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (holding that aliens convicted of violent or dangerous offenses generally do not merit asylum as a matter of discretion).

Many of the commenters' concerns rely on circumstances that are purely speculative or that are only indirectly implicated by the rule. For example, commenters' concerns regarding an alien's hypothetical inability to confront evidence require first that concerning evidence is at issue, that such evidence is false, and finally that the alien is unable (for reasons unspecified by commenters) to rebut such evidence. Likewise, commenters' concerns regarding evidence supporting the bars rest on the premise that such specific evidence is submitted in the future, that such evidence has not been tested, and that such evidence is thus unreliable. Regarding these concerns, the Departments are unable to comment on speculative examples.

In regard to commenters' concerns about the reliability determinations of evidence already made by judicial courts, the regulations require that immigration judges consider material and relevant evidence. *See* 8 CFR 1240.1(c). Immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna,* 325 F.3d at 405 (quoting *Bustos-Torres,* 898 F.2d at 1055). The rule does not undermine or revise that standard; thus, commenters' concerns are unwarranted.

In general, commenters' concerns are no different than existing concerns regarding the reliability of evidence submitted by aliens in asylum cases, which is generally rooted in hearsay, frequently cannot be confronted or rebutted, and is typically uncorroborated except by other hearsay evidence. *See, e.g., Angov* v. *Lynch,* 788 F.3d 893, 901 (9th Cir. 2015) ("The specific facts supporting a petitioner's asylum claim—when, where, why and by whom he was allegedly persecuted—are peculiarly within the petitioner's grasp. By definition, they will have happened at some time in the past—often many years ago—in a foreign country. In order for [DHS] to present evidence 'refuting or in any way contradicting' petitioner's testimony, it would have to conduct a costly and often fruitless investigation abroad, trying to prove a negative—that the incidents petitioner alleges did not happen." (quoting *Abovian* v. *INS,* 257 F.3d 971, 976 (9th Cir. 2001) (Kozinski, J., dissenting from denial of petition for

rehearing en banc))); *Mitondo* v. *Mukasey,* 523 F.3d 784, 788 (7th Cir. 2008) ("Most claims of persecution can be neither confirmed nor refuted by documentary evidence. Even when it is certain that a particular incident occurred, there may be doubt about whether a given alien was among the victims. Then the alien's oral narration must stand or fall on its own terms. Yet many aliens, who want to remain in the United States for economic or social reasons unrelated to persecution, try to deceive immigration officials."). Asylum adjudicators are well experienced at separating reliable from unreliable evidence, regardless of its provenance, and this rule neither inhibits their ability to do so nor changes the process for assessing evidence.

Further, as discussed in the preamble to the proposed rule, the rule contemplates the consideration of all "reliable" evidence and authorizes adjudicators to assess all "reliable" evidence. 84 FR at 69649 and 69652. The rule does not encourage adjudicators to "seek out unreliable evidence," as commenters alleged. Accordingly, the Departments disagree with commenters that adjudicators will improperly rely on information in arrest reports that the adjudicators have determined is unreliable, and the Departments further disagree that adjudicators would seek to protect such decisions by claiming discretion.

As explained in section II.C.2.a.i, the rule establishes limits and conditions on asylum eligibility; it does not add offenses to the "particularly serious crime" bar. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6) (both using prefatory language that reads "[a]dditional limitations on eligibility for asylum"). To the extent that commenters' concerns relate specifically to the "particularly serious crime" bar, the Departments decline to respond because those concerns are outside the scope of this rulemaking.

Regarding commenters' concerns that the domestic violence and gang-related bars to asylum eligibility would violate due process due to the requirement that the adjudication re-litigate the offense or consider conduct separate and apart from a criminal conviction, the Departments first note that there has never been a prohibition on the consideration of conduct when determining the immigration consequences of an offense or action.[33]

---

[33] To the extent the issues raised by commenters relate to the domestic violence provision of the rule that is not based on a criminal conviction, the Departments note that regulations have considered

Further, the consideration of conduct in this manner matches certain bars to admissibility or bases of deportability under the INA. *See, e.g.,* INA 212(a)(2)(C)(i) (8 U.S.C. 1182(a)(2)(C)(i)) (instructing that an alien who the relevant official "knows or has reason to believe * * * is or has been an illicit trafficker in any controlled substance" is inadmissible); INA 212(a)(2)(H) (8 U.S.C. 1182(a)(2)(H)) (instructing that an alien who the relevant official "knows or has reason to believe is or has been * * * a trafficker in severe forms of trafficking in persons" is inadmissible); INA 237(a)(2)(F) (8 U.S.C. 1227(a)(2)(F)) (instructing that an alien described in section 212(a)(2)(H) of the Act (8 U.S.C. 1182(a)(2)(H)) is deportable); *see also, e.g., Lopez-Molina* v. *Ashcroft,* 368 F.3d 1206, 1207–08 & n.1 (9th Cir. 2004) (explaining that the immigration judge found the respondent removable due to a reason to believe he was a controlled substance trafficker on account of a prior arrest report and information surrounding his conviction for misprision of a felony). In addition, the consideration of the alien's conduct in these circumstances is consistent with the consideration of conduct when reviewing a circumstance-specific ground of removability or deportability. *See Nijhawan,* 55 U.S. at 38.

Further, as discussed above, the rule does not violate due process because asylum is a discretionary benefit that does not implicate a liberty interest. *See Yuen Jin,* 538 F.3d at 156–57 (collecting cases); *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50); *cf. Hernandez,* 884 F.3d at 112 (stating, in the context of duress waivers to the material support bar, that "aliens have no constitutionally-protected 'liberty or property interest' in such a discretionary grant of relief for which they are otherwise statutorily ineligible"); *Obleshchenko,* 392 F.3d at 971 (finding that an alien has no right to effective assistance of counsel with regard to an asylum claim because there is no liberty interest in a statutorily created, discretionary form of relief, but distinguishing withholding of removal). In addition, aliens may provide argument and evidence that they are not subject to an asylum bar. *See* 8 CFR 1240.8(d) (providing that the alien bears the burden of proof to show that a basis for mandatory denial does not apply); *see also* 84 FR at 69642.

Finally, commenters' Sixth Amendment concerns, including the

similar conduct in the context of immigration law for nearly 25 years with no recorded challenges to the provisions of 8 CFR 204.2(c)(1)(i)(E) as a violation of due process.

presumption that a person is "innocent until proven guilty" are inapposite. The protections afforded by that amendment apply to criminal defendants, and asylum applicants in immigration proceedings are not criminal defendants. *See, e.g., Ambati* v. *Reno,* 233 F.3d 1054, 1061 (7th Cir. 2000) ("Deportation hearings are civil proceedings, and asylum-seekers, therefore, have no Sixth Amendment right to counsel."); *Lavoie* v. *Immigration and Naturalization Service,* 418 F.2d 732, 734 (9th Cir. 1969) ("[D]eportation proceedings are civil and not criminal, in nature, and [] the rules * * * requiring the presence of counsel during interrogation, and other Sixth Amendment safeguards, are not applicable to such proceedings."); *Lyon* v. *U.S. Immigr. and Customs Enf't,* 171 F. Supp. 3d 961, 975 (N.D. Cal 2016) ("[T]he Ninth Circuit has never so held, and the Court is reluctant to so interpret the INA absent any indication that Congress intended to import full Sixth Amendment standards into the INA.").

The Departments maintain that they have correctly concluded that convictions pursuant to expunged or vacated orders or modified sentences remain effective for immigration purposes if the underlying reason for expungement, vacatur, or modification was for "rehabilitation or immigration hardship." *Matter of Thomas and Thompson,* 27 I&N Dec. at 680; *see also* 84 FR at 69655. Courts also support this principle, stating that it is "entirely consistent with Congress's intent * * * [to] focus[ ] on the original attachment of guilt (which only a vacatur based on some procedural or substantive defect would call into question)" and to "impose[ ] uniformity on the enforcement of immigration laws." *Saleh,* 495 F.3d at 24.

Next, contrary to commenters' concerns, this rule does not violate principles such as being "innocent until proven guilty." Convictions and sentences are not re-litigated during immigration proceedings. Rather, convictions and sentences at issue in immigration proceedings have already been determined in a separate hearing, consistent with due process, and "[l]ater alterations to that sentence that do not correct legal defects[ ] do not change the underlying gravity of the alien's action." *Matter of Thomas and Thompson,* 27 I&N Dec. at 683. Congress determined that immigration consequences should attach to an alien's original conviction and sentencing, pursuant to section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)). *See id.* Thus, the Departments do not deprive an alien of due process or presume guilt when an

alien's conviction or sentence, if expunged, vacated or modified for rehabilitation or immigration purposes, remains effective for immigration proceedings, including asylum adjudications, because such an expungement, vacatur, or modification does not call into question whether the underlying criminal proceedings themselves complied with due process.

The Departments once again reiterate their statutory authority to limit and condition asylum eligibility consistent with the statute. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). In accordance with that authority, the Departments promulgated the NPRM and believe that the provisions of this final rule are sufficient without commenters' recommended safeguards.

Finally, issues involving evidence gathering are beyond the scope of this rulemaking. For issues regarding representation, *see* section II.C.6.h. The Departments disagree that hearings lack sufficient time for both parties to present arguments. *See* Office of the Chief Immigration Judge, *Immigration Court Practice Manual,* 68–69 (Mar. 17, 2020), *https://www.justice.gov/eoir/page/file/1258536/download* (noting that, at a master calendar hearing, a respondent should be prepared "to estimate (in hours) the amount of time needed to present the case at the individual calendar hearing"). Moreover, if parties believe additional time is needed, the regulations provide a mechanism for them to seek additional time through a motion for continuance. *See* 8 CFR 1003.29.

## 5. Insufficient Alternative Protection From Removal

*Comment:* The Departments received numerous comments alleging that withholding of removal under the Act and protection under the CAT regulations are insufficient alternative forms of protection for individuals barred from asylum pursuant to the proposed rule. Overall, commenters believed that refugees "should not be required to settle for these lesser forms of relief." Commenters averred that the availability of these forms of protection does not justify the serious harm caused by the proposed rule's "overly harsh and broad limits on asylum." Specifically, statutory withholding of removal and protection under the CAT regulations are much narrower in scope and duration than asylum and require applicants to establish a higher burden of proof. One commenter noted that, even if an applicant was able to meet the higher burden of proof for statutory withholding of removal or protection

under the CAT regulations, the individual would not then be accorded the benefits required by the Refugee Convention.

Commenters cited a number of limitations imposed on recipients of these forms of protection to demonstrate why they are insufficient alternatives to asylum. For example, commenters expressed concern regarding the prohibition on international travel for recipients of statutory withholding of removal and CAT protection. Commenters noted that, unlike recipients of asylum, these individuals are not provided travel documents. At the same time, because these individuals have been ordered removed but that removal has been withheld or deferred, any international travel would be considered a "self-deportation," foreclosing any future return to the United States. Commenters stated that this conflicts with the Refugee Convention, which requires that contracting states issue travel documents for international travel to refugees lawfully staying in their territory.

Commenters also claimed the proposed rule contravenes the Refugee Convention by failing to ensure "that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country." Commenters alleged that individuals who are granted statutory withholding of removal or protection under the CAT regulations would be unable to reunite with family in the United States because these forms of relief do not allow the recipient to petition for derivative beneficiaries. Due to this, commenters stated that the proposed rule instituted another formal policy of family separation that permanently separate spouses and children from their family members.

Commenters also stated that the proposed rule would lead to additional forms of family separation because spouses and minor children who traveled with the primary asylum seeker would still need to establish individual eligibility for statutory withholding of removal or protection under the CAT regulations because there is no derivative application available in such circumstances. Also, commenters expressed concern that, without the ability to petition for additional family members, the proposed rule would force family members who remain in danger abroad to make the journey to the United States alone, likely endangering children who might be forced to make the journey as unaccompanied minors.

As another example of the lesser benefits of statutory withholding of removal and protection under the CAT regulations, commenters noted that recipients of withholding of removal must apply annually for work authorization. Commenters explained that individuals not only have to pay for these work authorization applications, but also face delays in adjudication of work authorization applications, which often results in the loss of legal authorization to work.

Similarly, commenters noted that recipients of statutory withholding of removal or protection under the CAT regulations may lose access to Federal public benefits, including "supplemental security income, food stamps, Medicaid, and cash assistance." Commenters expressed concern that, although recipients of withholding of removal may be eligible for a period of seven years to receive Federal means-tested public benefits, after seven years, the presumption is that the alien would have adjusted status. However, because recipients of withholding of removal are not provided a pathway to lawful permanent residency, commenters expressed concern that vulnerable individuals such as those who are disabled or elderly would be at risk of losing those public benefits.

Commenters also noted that recipients of statutory withholding of removal and protection under the CAT regulations remain in a tenuous position because they are not granted lawful status to remain in the United States indefinitely. Commenters averred that this contravenes the Refugee Convention by failing to "as far as possible facilitate the assimilation and naturalization of refugees." Recipients of statutory withholding of removal or protection under the CAT regulations may have their status terminated at any time based on a change in the conditions of their home country. Commenters explained that, because these individuals have no access to permanent residence or citizenship, they may be required to check in with immigration officials periodically. Commenters claimed that, at these check-ins, individuals may be required to undergo removal to a third country to which the individual has no connection.

Because of the constant prospect of deportation or removal, commenters stated that recipients of withholding or CAT protection are in a constant state of uncertainty. This uncertainty, commenters alleged, is particularly harmful to asylum seekers who have experienced severe human rights abuses. Commenters argued that certainty of a safe place to live forever is one of the most important aspects of the treaties establishing the refugee system. Commenters claimed that uncertainty and limbo discourage recipients from establishing connections to the United States, which in turn generates community instability. Commenters alleged that a lack of community stability will result in increased criminal activity as individuals are less incentivized to invest in the community or keep the community safe. Additionally, this uncertainty may reduce the incentive for individuals to invest in their community by, for example, opening businesses, hiring others, or paying taxes.

Commenters were concerned that increasing the population of people who are ineligible to receive asylum may create a cohort of individuals who will later need a "legislative fix" to adjust their status and grant them full rights as citizens.

Finally, commenters noted that both statutory withholding of removal and protection under the CAT regulations require a higher burden of proof than asylum. Commenters explained that asylum requires only that the applicant demonstrate at least a 10 percent chance of being persecuted if removed. Withholding of removal, either under the Act or under the CAT regulations, however, requires the applicant to demonstrate that it is more likely than not that he or she would be persecuted or tortured if returned—*i.e.*, he or she must show a more than fifty percent chance of being persecuted or tortured if removed. Commenters noted that, because of this higher burden of proof, an applicant may have a valid and strong asylum claim but be unable to meet the burden for statutory withholding of removal or protection under the CAT regulations. As a result, commenters alleged that an individual may be returned to a country where he or she would face persecution or even death.

Commenters averred that the Departments failed to provide an assessment of how many individuals subject to the new categorical bars could meet the higher burdens required for statutory withholding of removal and protection under the CAT regulations.

*Response:* The Departments maintain that statutory withholding of removal under the Act and protection under the CAT regulations are sufficient alternatives for individuals who are barred from asylum by one of the new bars. As stated, asylum is a discretionary form of relief subject to regulation and limitations by the Attorney General and the Secretary. *See*

INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Significantly, the United States implemented the non-refoulement provisions of Article 33(1) of the Refugee Convention and Article 3 of the CAT through the withholding of removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41; *see also* 8 CFR 208.16 through 208.1; 1208.16 through 1208.18.

As recognized by commenters, asylum recipients are granted additional benefits not granted to recipients of statutory withholding of removal or CAT protection. Although the Attorney General and the Secretary are authorized to place limitations on those who receive asylum, it is Congress that delineates the attendant benefits to receiving relief or protection under the INA. *See, e.g.,* INA 208(c)(1)(A), (C) (8 U.S.C. 1158(c)(1)(A), (C)) (asylees cannot be removed and can travel abroad without prior consent); INA 208(b)(3) (8 U.S.C. 1158(b)(3)) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b) (8 U.S.C. 1159(b)) (allowing the Attorney General or the Secretary to adjust the status of an asylee to that of a lawful permanent resident). Commenters identified various benefits that would be denied to individuals who receive statutory withholding of removal or protection under the CAT regulations as opposed to asylum. Congress chose not to provide the identified immigration benefits to recipients of statutory withholding of removal under the Act or protection under the CAT regulations. Congress, of course, may always revisit its decision; however, that is not the proper role of the Executive Branch.

Moreover, the United States is not required under U.S. law to provide the benefits identified by commenters to all individuals who seek asylum. For example, the valuable benefit of permanent legal status is not required under the United States' international treaty obligations.

In addition, recipients of statutory withholding of removal are eligible for numerous public benefits. Specifically, recipients of statutory withholding are eligible for Supplemental Security Income (''SSI''), the Supplemental Nutrition Assistance Program (''SNAP,'' also known as food stamps), and Medicaid for the first seven years after their applications are granted,[34] and for

Temporary Assistance to Needy Families (''TANF'') during the first five years after their applications are granted.[35] Although asylees are eligible for additional benefits administered by HHS and ORR, the Departments believe that it is reasonable to exercise their discretion under U.S. law to limit these benefits to asylum recipients who do not have or who have not been found to have engaged in the sort of conduct identified in the bars to asylum eligibility being implemented in this rule because doing so incentivizes lawful behavior.

Commenters' assertions that statutory withholding of removal and protection under the CAT regulations essentially trap individuals in the United States is misplaced. Although an individual who has been granted these forms of protection is not guaranteed return to the United States if he or she leaves the country, these forms of protection do not prevent individuals from traveling outside the United States. *See Cazun,* 856 F.3d at 257 n.16.

To the extent commenters raised concerns that recipients of statutory withholding and CAT protection must apply annually for work authorization, the United States is permitted to place restrictions on work authorization. As required by Article 17 of the Refugee Convention, the United States must accord refugees ''the most favourable treatment accorded to nationals of a foreign country in the same circumstances.'' Individuals who have received a grant of withholding of removal or protection under the CAT regulations are not in the same position as an individual who has been granted lawful permanent resident status. Rather, these individuals have been ordered removed and had their removal withheld or deferred pursuant to a grant of withholding of removal or protection under the CAT regulations. The United States has opted to grant these individuals work authorization, despite their lack of permanent lawful status. However, because these individuals are not accorded permanent lawful status, the United States has determined that they must submit a yearly renewal for that work authorization.

Significantly, although the burden of proof to establish statutory withholding of removal or protection under the CAT regulations is higher than to establish asylum, this burden remains in compliance with the Protocol and Refugee Convention, which require that

''[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion,'' and Article 3 of the CAT, which similarly requires that ''[n]o State Party shall expel, return * * * or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.'' As explained by the Supreme Court with respect to statutory withholding of removal, the use of the term ''would'' be threatened as opposed to ''might'' or ''could'' indicates that a likelihood of persecution is required. *Stevic,* 467 U.S. at 422. Citing congressional intent to bring the laws of the United States into compliance with the Protocol, the Court concluded that Congress intended withholding of removal to require a higher burden of proof and that the higher burden complied with Article 33 of the Refugee Convention. *Id.* at 425–30. Similarly, the ''burden of proof for an alien seeking CAT protection is higher than the burden for showing eligibility for asylum.'' *Lapaix* v. *U.S. Att'y Gen.,* 605 F.3d 1138, 1145 (11th Cir. 2010). As with statutory withholding of removal and the risk of persecution, the burden of proof for CAT protection and the risk of torture is ''more likely than not.'' *Compare* 8 CFR 1208.16(b)(2) (statutory withholding), *with* 1208.16(c)(2) (CAT protection).[36]

In response to commenters who asserted that the Departments failed to provide an assessment of how many individuals subject to the new categorical bars could meet the higher burdens required for statutory withholding of removal and protection under the CAT regulations, the Departments note that such an assessment would not be feasible. The Departments do not maintain data on the number of asylum applicants with criminal convictions or, more specifically, with criminal convictions or pertinent criminal conduct that would be subject to the bars added by this rule. Without this data, the

[34] 8 U.S.C. 1612(a)(1), (a)(2)(A)(iii), (a)(3) (SSI & SNAP); 8 U.S.C. 1612(b)(1), (b)(2)(A)(i)(III), (b)(3)(C) (Medicaid).

[35] 8 U.S.C. 1612(b)(1), (b)(2)(A)(ii)(III), (b)(3)(A)–(B) (TANF and Social Services Block Grant); 8 U.S.C. 1622(a), (b)(1)(C); 8 U.S.C. 1621(c) (state public assistance).

[36] The burden associated with the CAT regulations is consistent with congressional intent. As the Third Circuit has noted, the U.S. Senate gave its advice and consent to ratification of the CAT subject to several reservations, understandings, and declarations, including that the ''United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' '' *Auguste,* 395 F.3d at 132.

Departments cannot reliably estimate the population affected by this rule. In addition, even with these statistics, it is impossible to accurately predict in advance whether immigration judges would grant these individuals statutory withholding of removal or protection under the CAT regulations due to the fact-bound nature of such claims, the various factors that must be established for each claim (*e.g.*, credibility), independent nuances regarding the claim, evidence submitted, and myriad other factors.

6. Policy Concerns

a. Unfair, Cruel Effects on Asylum Seekers

*Comment:* Commenters opposed the rule because, among many reasons, they alleged that it imposes unfair, cruel effects on aliens who would otherwise be eligible for asylum. Commenters alleged that the rule constitutes an "unnecessary, harsh, and unlawful gutting of [ ] asylum protections." Commenters also alleged that the rule disadvantages asylum seekers because, in comparison to other forms of relief, no waiver of inadmissibility is available to waive misdemeanor convictions, rendering asylum "disproportionately and counterintuitively more difficult to obtain for some of the most vulnerable people." Many commenters were also concerned that the rule denies protection to people who most need it and whom the asylum system was designed to protect. For those people, commenters stated, asylum is their "only pathway to safety and protection."

Many commenters expressed opposition to the rule by claiming that the rule will exclude bona fide refugees from asylum eligibility. Relatedly, commenters also opposed the rule because they alleged that it prevents aliens from presenting meritorious, legitimate claims. Overall, most commenters asserted that the consequence of asylum ineligibility was "disproportionately harsh." In support, commenters provided various examples of offenses that would, in their view, unjustly render an alien ineligible for asylum under the rule: An alien in Florida who stole $301 worth of groceries; an alien with two convictions for DUI, regardless of whether the alien seeks treatment for alcohol addiction or the circumstances of the convictions; an alien defensively seeking asylum who has been convicted of a document fraud offense related to his or her immigration status; or a mother convicted for bringing her own child across the southern border seeking safety.

Commenters alleged that aliens seeking asylum are typically fleeing persecution or death, so ineligibility based on such minor infractions constitutes "punishment that clearly does not fit the crime." As stated by one commenter, "Congress designed our current laws to provide a safe haven for asylum seekers and their immediate family members who are still in danger abroad. If an asylum claim is denied, those individuals may be killed, tortured, or subjected to grave harm after being deported."

Commenters also opposed the rule by claiming that it bars asylum for aliens "simply accused" of engaging in battery or extreme cruelty; commenters believed it to be unfair that the rule could bar asylum based on conduct without a conviction.[37] Commenters opposed barring asylum relief based on "mere allegations" without any "adjudication of guilt." One commenter stated that the rule exceeds the scope of the Act because, the commenter claimed, the INA allows asylum bars to be based only on convictions for particularly serious crimes.

Many commenters expressed opposition to a wide range of issues related to asylum seekers. One commenter expressed concern with the treatment of immigrants, stating that mistreatment "increases blood pressure, diabetes, and risks for acute crises like heart attacks[,] which harm immigrant communities and negatively impact our healthcare system." Another commenter expressed opposition to the United States' allocation of resources, stating that the redirection of tax cuts and expanded military budgets could help to assist asylum seekers. Others more broadly expressed general opposition to family separation without relating that concern to this rule.

*Response:* The Departments disagree that the rule "guts" asylum protections or that the rule affects otherwise eligible asylum applicants in an unfair or otherwise cruel manner. First, as discussed elsewhere, asylum is a discretionary form of relief. *See* INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)). Accordingly, aliens who apply for asylum must establish that they are statutorily eligible for asylum and merit a favorable exercise of discretion. *See id.;* INA 240(c)(4)(A) (8 U.S.C. 8 U.S.C. 1229a(c)(4)(A)); *see also Matter of A–B–,* 27 I&N Dec. 316, 345 n.12 (A.G. 2018), *abrogated on other grounds by Grace* v. *Whitaker,* 344 F. Supp. 3d 96, 140

(D.D.C. 2018), *aff'd in part, Grace* v. *Barr,* 965 F.3d 883 (D.C. Cir. 2020). Over time, Congress, the Attorney General, and the Secretary have established various categories of aliens who are barred from asylum and have established additional limitations and conditions on asylum eligibility in keeping with the Departments' congressionally provided authority. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)); *see also* 84 FR at 69641.

Rather than "gut" asylum protections, the rule narrows asylum eligibility by adding categorical bars for aliens who have engaged in certain criminal conduct that the Departments have determined constitutes a disregard for the societal values of the United States; clarifies the effect of criminal convictions on asylum eligibility; and removes reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. The Departments establish these changes as additional limitations and conditions on asylum eligibility, pursuant to their statutory authority in sections 208(b)(2)(C) and (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)).

Further, the Departments promulgate this rule to streamline determinations for asylum eligibility so that those who qualify for and demonstrate that they warrant a favorable exercise of discretion might be granted asylum and enjoy its ancillary benefits in a more timely fashion. Given the rule's clarified conditions and limitations on asylum eligibility, the Departments anticipate more timely adjudications for two reasons. First, non-meritorious claims will more quickly be resolved because the rule eliminates the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies, thereby freeing up time and resources that can be subsequently allocated towards adjudication of meritorious asylum claims. Second, the Departments believe that, because fewer people would be eligible for asylum, fewer applications may be filed overall, thereby reducing the total number of asylum applications requiring adjudication. As a result, the Departments could allocate their time and resources to asylum applications that are more likely to be meritorious. In this way, the rule does not eliminate protection for those who need it most or the benefits available to asylees; instead, it may equitably allow for those people to more quickly receive protection.

In response to commenters who claim that the rule prevents aliens from seeking asylum who otherwise have meritorious claims, the Departments

---

[37] Further discussions of comments specifically regarding allegations of gang-related activity and domestic violence are contained in sections II.C.3.d and II.C.3.f, respectively.

emphasize that the rule changes asylum eligibility. Accordingly, despite commenters' assertions, an alien who is ineligible under the provisions of this rule would not, in fact, have a meritorious claim.

The Departments do not believe that the examples of misdemeanors that commenters provided in response to the request for public feedback about whether the proposed rule was over-inclusive warrant altering the scope of the proposed rule. Regarding certain referenced examples, the Departments strongly disagree that the rule employs too harsh a consequence or that the "punishment does not fit the crime." The bars articulated in this rule indicate the Departments' refusal to harbor individuals who have committed conduct that the Departments have determined is undesirable. This is not a punishment. For example, the Departments strongly oppose driving under the influence and disagree that two DUI convictions, regardless of the circumstances or harm caused to others, do not warrant ineligibility for asylum. As previously stated, driving under the influence represents a blatant disregard for the laws of the United States. Further, the Departments disagree that document fraud does not warrant ineligibility for asylum, as it undermines the integrity of our national security and the rule of law. Overall, the Departments disagree that such examples demonstrate that revision of the rule is warranted.

The Departments further disagree that the rule disadvantages asylum seekers by failing to provide a waiver of inadmissibility for misdemeanor convictions. No such waiver is required by statute in the asylum eligibility context. Further, the Departments reiterate that alternative forms of relief or protection may still be available for aliens who are ineligible for asylum under the rule. *See* 84 FR at 69658 (explaining that an alien will still be eligible to apply for statutory withholding of removal or protection under regulations implementing U.S. obligations under Article 3 of the CAT); *see also* INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 208.16 through 208.18; 1208.16 through 1208.18; *cf. Negusie* v. *Holder,* 555 U.S. 511, 527–28 (2009) (Scalia, J. and Alito, J., concurring) (noting that, if asylum is denied under the persecutor bar to an alien who was subject to coercion, that alien "might anyway be entitled to protection under the Convention Against Torture"). Accordingly, aliens who are ineligible for asylum under the rule will not "automatically" be returned to countries where they fear

persecution or torture, contrary to commenters' assertions.

The Departments emphasize that the rule changes the asylum eligibility regulations, but it does not affect the regulatory provisions for refugee processing under 8 CFR parts 207, 209, 1207, and 1209. Further, it does not categorically exclude "bona fide refugees" from the United States.

The INA does not preclude conduct-based bars. In fact, the statute already contemplates conduct-based bars in sections 208(b)(2)(A)(i), (iii)–(v) of the Act (8 U.S.C. 1158(b)(2)(A)(i), (iii)–(v)). Thus, commenters' concerns that the rule exceeds the scope of the statute are unwarranted, and the Departments choose, pursuant to statutory authority, to condition and limit asylum eligibility using conduct-based bars.

Relating to commenters' general humanitarian concerns for asylum seekers, such concerns are outside of the scope of this rulemaking, and the Departments decline to address them. Whether the current statutory framework appropriately addresses all aspects of the problems faced by aliens seeking asylum is a matter for Congress; here, the Departments merely exercise their authority under the discretion afforded to them by the existing statutes.

### b. Incorrect Assumptions Regarding Criminal Convictions

*Comment:* Commenters alleged that the Departments promulgated the proposed rule based on incorrect assumptions regarding criminal convictions. Generally, commenters asserted that a conviction, without more, is both an unreliable predictor of future danger and an unreliable indicator of past criminal conduct. As an example, commenters stated that an alien may plead guilty to certain crimes to avoid the threat of a more severe sentence.

Commenters also asserted that not every noncitizen convicted of a crime punishable by more than one year in prison constitutes a danger to the community, which relates to the more general proposition advanced by commenters that the length of a sentence does not necessarily correlate with the consequential nature of the crime. One commenter mentioned that innocence and biased enforcement concerns underlie convictions and that there is a "growing understanding domestically that a criminal conviction is a poor metric for assessing current public safety risk." Another commenter disagreed with the Departments' use of "public safety" as a justified reason for restricting liberty—in this case, liberty of asylum seekers.

Commenters claimed that the Departments provided no evidence underlying these assumptions. Further, commenters alleged that the proposed rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA") because of these faulty assumptions.

*Response:* The Departments disagree that this rule was based on incorrect assumptions. The Departments have concluded that convictions with longer sentences tend to be associated with more consequential crimes and that offenders who commit such crimes are generally more likely to be dangerous to the community, and less deserving of the benefit of asylum, than offenders who commit crimes punishable by shorter sentences. *See* 84 FR at 69646. This determination is supported throughout the nation's criminal law framework. For example, for sentencing for Federal crimes, criminal history serves as a "proxy" for the need to protect the public from the defendant's future crimes. *See United States* v. *Hayes,* 762 F.3d 1300, 1314 n.8 (11th Cir. 2008); *see also* U.S. Sentencing Guidelines Manual § 4A1.2 cmt. Background (U.S. Sentencing Comm'n 2018). Further, in numerous Federal statutes and the Model Penal Code, crimes with a possible sentence exceeding one year constitute "felonies" regardless of the assumptions and implications referenced by the commenters. *See, e.g.,* 84 FR at 69646 (providing 5 U.S.C. 7313(b); Model Penal Code § 1.04(2); and 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) as exemplary authorities that define "felony," in part, by considering whether the sentence may exceed one year). Accordingly, and pursuant to their statutory authority, the Departments have determined that similarly conditioning asylum eligibility on criminal convictions with possible sentences of more than one year is proper and reasonable because such convictions are general indicators of social harm and conduct that the Departments have deemed undesirable.

Regarding commenters' claims that the proposed rule is arbitrary and capricious because it is based on faulty assumptions, the Departments respond in section II.D.1, which addresses comments related to the APA and other regulatory requirements.

### c. Disregards Criminal Activity Linked to Trauma

*Comment:* Many commenters expressed opposition to the rule by alleging that it disregards the reality that criminal activity is oftentimes linked to trauma experienced by asylum seekers

in their countries of origin or on their journey to safety. Citing statistics and evidence regarding the vulnerability of asylum seekers and the high likelihood that they have experienced various forms of trauma related to the circumstances from which they are trying to escape and a lack of affordable healthcare, commenters asserted that asylum seekers are at a higher risk of self-medicating with drugs or alcohol, which in turn would increase the likelihood for asylum seekers to be involved in the criminal justice system and, as a result of the rule, ineligible for asylum. Commenters stated that aliens with substance use disorders, drug-related convictions, and other related addictions should be provided with "treatment and compassion" and not barred from asylum eligibility. A commenter stated that the rule renders aliens who have experienced persecution and subsequent trauma "at greater risk of being returned to a country where they will only be further tortured and harmed."

Commenters claimed that denying aliens who have experienced such trauma the opportunity to present countervailing factors regarding their subsequent or associated criminal activity was "simply cruel." Commenters alleged that the rule ignores the fact that these aliens likely struggle with post-traumatic stress disorder, other untreated mental health problems such as anxiety or depression, substance use disorders or addictions, self-medication, poverty, and over-policing. Accordingly, commenters stated that the rule would "further marginalize asylum seekers already struggling with trauma and discrimination" and exclude "those convicted of offenses that are coincident to their flight from persecution."

Some commenters emphasized the trauma experienced by children prior to arriving in the United States and in ORR custody. Those commenters also emphasized that many children are then convicted and tried as adults for crimes stemming from that trauma, which, under the NPRM, would bar them from asylum. The commenters stated that such children, if given appropriate treatment, support, and services, are able to recover rather than remain in the juvenile or criminal justice systems. Accordingly, commenters disagreed with the NPRM's approach of categorically barring such individuals and preventing them from presenting context and mitigating evidence for their crimes.

*Response:* The Departments acknowledge the trauma aliens may face but note that aliens barred from asylum

eligibility may still be eligible for alternative measures of protection precluding their return to a country where they experienced torture or persecution resulting in trauma. *See* 84 FR at 69642. The Departments, however, disagree that the possibility of personal trauma or other strife is sufficient to overcome the dangerousness or harms to society posed by the offenders subject to the sorts of bars to asylum implemented by the rule because, as discussed in the proposed rule, possessors and traffickers of controlled substances "pose a direct threat to the public health and safety interests of the United States." 84 FR at 69654; *accord Ayala-Chavez,* 944 F.2d at 641 ("[T]he immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." (quoting *Blackwood,* 803 F.2d at 1167)). Also, commenters' suggestions regarding treatment, support, and services for children who have experienced trauma are outside the scope of this rulemaking.

Finally, the Departments note that, consistent with the INA's approach to controlled substance offenses, for example in the removability context under INA 237(a)(2)(B)(i) (8 U.S.C. 1227(a)(2)(B)(i)), the rule does not penalize a single offense of marijuana possession for personal use of 30 grams or less. *See* 84 FR at 69654. The Departments have concluded that allowing this limited exception to application of the new bar appropriately balances the competing policy objectives of protecting the United States from the harms associated with drug trafficking and possession, on the one hand, and the goal of not imposing unduly harsh penalties on persons subject to the new bars, on the other.

d. Problems With Existing Asylum System

*Comment:* Commenters opposed the NPRM because they alleged that the current overall asylum system is too harsh. Specifically, commenters stated that the current bars to asylum are too harsh and overly broad, given that all serious crimes are already considered as part of the discretionary analysis and that asylum seekers are already heavily vetted and scrutinized. Accordingly, commenters stated that the asylum restrictions should be narrowed rather than expanded.

Specifically, commenters asserted that the current "harsh system" places a high evidentiary burden on applicants to establish eligibility and disregards the danger they may face if they are sent

back to their countries.[38] Commenters claimed that conditions in Mexico, where many asylum seekers are sent, are dangerous, and that asylum seekers are killed or experience other harms. In addition, commenters referenced numerous other barriers to asylum—the complex "web" of laws and regulations that asylum seekers must navigate, sometimes from jail or without counsel, and other recent policies such as the MPP, *see* DHS, *Policy Guidance for Implementation for the Migrant Protection Protocols* (Jan. 25, 2019), *https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf,* and the "third-country transit bar," *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019).

Further, commenters asserted that the current criminal bars to asylum eligibility are too broad, emphasizing, for example, that the term "aggravated felony," which is a "particularly serious crime" that renders the applicant ineligible for asylum, has come to encompass "hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses and misdemeanors * * *. A single one of these past offenses eliminates an individual's eligibility for asylum, with no regard to the danger that person will face if sent back to their country."

Commenters also explained that immigration judges currently have full discretion to deny asylum to any alien who is not categorically barred from relief but who has been convicted of criminal conduct. Accordingly, commenters asserted that the existing system is sufficient to ensure that relief is denied to those who may be dangerous to a community, while at the same time providing latitude for adjudicators to consider unique challenges that asylum seekers face resulting from the harm they have faced. In light of these facts, commenters opposed adding more bars and encouraged the Departments to instead narrow the bars.

*Response:* Commenters' concerns regarding the entire asylum system, including the asserted complex "web" of asylum laws and regulations, are outside the scope of this rulemaking. The rule adds categorical bars to asylum

---

[38] Commenters also mentioned numerous other alleged barriers to asylum unrelated to the NPRM, including the required time between an application's submission and the attached photo's taking, English-only application forms, and additional concerns. The Departments acknowledge the general concerns with the asylum system, but because these concerns do not relate to particular provisions of the NPRM, the Departments do not address them further.

eligibility; clarifies the effect of criminal convictions and, in one instance, criminal conduct, on asylum eligibility; and removes automatic reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. The Departments do not otherwise propose to amend the asylum system established by Congress and implemented by the Departments through rulemaking and policy over the years.

The Departments note here, and the proposed rule acknowledged, in part, *see, e.g.,* 84 FR at 69645–46, that, although immigration judge discretion, BIA review, and scrutiny of asylum applicants could achieve results similar to some of the proposed provisions, the rule streamlines the system to increase efficiency. By eliminating the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies, the Departments anticipate that adjudication of asylum claims will be a much quicker process. In addition, the Departments believe that, given the clarified conditions and limitations on asylum eligibility, fewer non-meritorious or frivolous asylum claims may be filed overall, with the result that the Departments' adjudication resources would be allocated, from the beginning, to claims that are more likely to have merit. Overall, the Departments maintain that a rule-based approach to accomplish that goal is preferable. *See* 84 FR at 69646.

The Departments reiterate that asylum is a discretionary benefit; the Departments work in coordination to establish requirements, limits, and conditions, which may include evidentiary burdens. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Contrary to the commenters' assertions that the rule disregards the dangers faced by aliens, the rule noted alternative forms of protection for which aliens may apply, even if they are subject to an asylum bar. *See* 84 FR at 69642. Nevertheless, many commenters' concerns referencing allegedly dangerous conditions in Mexico, the effects of the MPP, and the third-country transit bar are also outside the scope of this rulemaking.

The Departments disagree with commenters' assertions that the asylum bars should be narrowed. Given efficiency interests, the Departments posit that expanded categorical bars will streamline the asylum system, with the result that asylum benefits may be granted more quickly to eligible aliens.

### e. Inefficiencies in Immigration Proceedings

*Comment:* Commenters opposed the rule because they alleged that various provisions would result in inefficiencies and exacerbate an already inefficient, backlogged, and under-staffed immigration system.

First, commenters stated that requiring adjudicators to make "complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct," would lead to inefficiencies. Many commenters stated that the rule effectively requires adjudicators to "engage in mini-trials into issues already adjudicated by the criminal law system based on evidence that may not have been properly tested for its veracity in the criminal process," thereby decreasing efficiency. Further, commenters stated that adjudicators will have to "conduct a separate factual inquiry into the basis for a criminal conviction or allegations of criminal conduct to determine whether the individual is eligible for asylum," instead of relying on adjudications from the criminal legal system.

Other commenters stated that the rule is especially inefficient in the case of family members' asylum eligibility. Commenters alleged that, under the proposed rule, family members' claims will be adjudicated separately and potentially before different adjudicators. Given that family members' claims are oftentimes interrelated and children are less able to sufficiently explain asylum claims, commenters concluded that the rule, especially as it relates to family claims, further increases inefficiencies in the system.

Commenters also stated that these ramifications directly contradict one of the rule's stated justifications of increased efficiency and alleged that the rule increased the time and expense necessary to process asylum claims. One commenter alleged that this will decrease the ability of asylum seekers to access healthcare, food, and housing. That commenter also averred that asylum seekers will likely have to request to reschedule interviews, which will introduce further delay, because the rule's filing deadlines restrict applicants' ability to provide supplementary evidence. Further, commenters alleged that the Departments failed to provide information or research to explain how the rule would increase efficiencies in the system.

Many commenters asserted that the rule will require a highly nuanced, resource-intensive inquiry that will

prolong asylum proceedings and "invariably lead to erroneous determinations" or disparate results, with the consequence that appeals will increase and consume further Departmental resources.

*Response:* The Departments disagree with the commenters' assertions regarding inefficiencies.

First, adjudicators currently conduct a factual inquiry similar to the inquiry contemplated by the new bars in other immigration contexts. *See* 84 FR at 69652 (providing, as examples, the removability context in INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)) and consideration of the persecutor bar in INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i))). Thus, adjudicators are adequately trained and equipped to conduct such analyses.

Second, the Departments emphasize that this rule is just one tool for increasing efficiencies in the immigration adjudications process and for correcting what the Departments view as problematic rules regarding asylum eligibility. This rule is not intended to correct all inefficiencies or to be a complete panacea, and DOJ has implemented numerous initiatives recently to address inefficiencies where appropriate. *See, e.g.,* EOIR, *Policy Memorandum 20–07: Case Management and Docketing Practices* (Jan. 31, 2020), *https://www.justice.gov/eoir/page/file/1242501/download* (implementing efficient docketing practices); EOIR, *Policy Memorandum 19–11:* "*No Dark Courtrooms*" (Mar. 31, 2019), *https://www.justice.gov/eoir/file/1149286/download* (providing policies to reduce and minimize the impact of unused courtrooms and docket times to address the caseload and backlog); EOIR, *Policy Memorandum 19–05: Guidance Regarding the Adjudication of Asylum Applications Consistent with INA § 208(d)(5)(A)(iii)* (Nov. 19, 2018), *https://www.justice.gov/eoir/page/file/1112581/download* (providing policy guidance to effectuate the statutory directive to complete asylum adjudications within 180 days of filing, absent extraordinary circumstances); *see also* DOJ, *Memorandum for the Executive Office for Immigration Review: Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest* (Dec. 5, 2017), *https://www.justice.gov/opa/press-release/file/1015996/download* (reiterating EOIR's commitment to efficient adjudication).

Although the Departments agree that the current system for adjudicating asylum applications frequently fails to meet the statutory deadline of completing such cases within 180 days

absent exceptional circumstances, INA 208(d)(5)(A)(iii) (8 U.S.C. 1158(d)(5)(A)(iii)) the Departments believe this rulemaking will improve efficiency. The Departments direct commenters to the proposed rule at 84 FR at 69645–46 for an extensive explanation of inefficiencies addressed through this rulemaking, which provides adequate "information and research" describing how the rule will increase efficiencies. Notably, courts have often recognized that rule-based approaches promote more efficient administration than wholly discretionary, case-by-case determinations. *See Lopez* v. *Davis,* 531 U.S. 230, 244 (2001) (observing that "a single rulemaking proceeding" may allow an agency to more "fairly and efficiently" address an issue than would "case-by-case decisionmaking" (quotation marks omitted)); *Marin-Rodriguez* v. *Holder,* 612 F.3d 591, 593 (7th Cir. 2010) ("An agency may exercise discretion categorically, by regulation, and is not limited to making discretionary decisions one case at a time under open-ended standards."); *cf. Baylor Cty. Hosp. Dist.* v. *Price,* 850 F.3d 257, 263 (5th Cir. 2017) ("DHHS opted for a bright-line rule after considering its lack of agency resources to make case-by-case judgments" because "the statutory text had to be articulated properly and in an administratively efficient way."). The Departments acknowledge the backlog in asylum applications, *see* EOIR, *Adjudication Statistics: Total Asylum Applications* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1106366/download,* and the Departments, as a matter of policy, choose to address this backlog and resulting inefficiencies in part through this rulemaking.

The backlogged asylum system presents challenges; however, the Departments disagree with commenters regarding how best to address the backlog. The Departments disagree that the rule will prolong proceedings and lead to erroneous determinations, thus allegedly prompting more appeals. On the contrary, the Departments have concluded that the rule will increase efficiencies by eliminating the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies as they apply to asylum adjudications. *See* 84 FR at 69646–47. The Departments have determined that this rule-based approach is preferable, partly because, given the specific context of asylum eligibility, it will result in consistent treatment of asylum

seekers with respect to criminal convictions. *See id.*

Finally, concerns regarding access to healthcare, food, and housing, are outside the scope of this rulemaking.

f. Disparate Impact on Certain Persons

*Comment:* Many commenters opposed the rule because they claimed it will harm or disparately affect asylum applicants whom commenters deem the most vulnerable people in society. Commenters explained that, although asylum seekers and refugees are generally vulnerable, the rule further implicates other vulnerable groups, such as LGBTQ individuals; victims of trafficking; communities of color, especially youth, and other minority ethnic groups; individuals who have experienced trauma, coercion, abuse, or assault; people with mental illness, especially those lacking adequate mental health services, such as children in ORR custody; people struggling with addictions and related convictions, regardless of whether they have sought treatment; parents who cross the border with children to seek safety; individuals convicted of document fraud who unknowingly use fraudulent documents or unscrupulous services to procure immigration documents; victims of domestic or intimate violence; people from Central America and the "Global South"; and low-income people. Commenters were concerned that the rule categorically bars these populations without consideration of mitigating factors, thereby potentially resulting in the return of such people to countries and communities where they initially experienced discrimination, bias, trauma, and violence. In a related vein, commenters were concerned that these populations are more prone to be convicted of minor offenses that will, under the rule, preclude them from asylum relief. For example, one commenter speculated that a trafficking victim who leaves a child alone at home while on a brief trip to a store could be convicted of "endangering the welfare of a child" and then barred from asylum.

Commenters especially emphasized concerns regarding the effect of the rule on two groups: LGBTQ individuals, especially transgender women; and trafficking individuals.[39] Regarding LGBTQ individuals, multiple commenters asserted that the rule constitutes a

"unique threat" because those individuals have likely faced:

a high degree of violence and disenfranchisement from economic and political life in their home countries. * * * Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave[s] many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices.

One commenter explained that some LGBTQ individuals are charged with a variety of crimes in connection with their private, consensual conduct because of differences in discriminatory laws regarding this population around the world.

For trafficking victims, commenters explained that the rule bars them from asylum when they are only involuntarily part of a trafficking scheme and will likely face subsequent retaliation and other harms from their traffickers. Commenters were especially concerned that the rule denies asylum benefits to people who desperately need and will greatly benefit from them. Further, commenters asserted that alternative forms of relief are oftentimes insufficient for trafficking victims. For example, commenters explained that trafficking victims who have been removed are not eligible for T nonimmigrant status. Similarly, commenters explained that trafficking victims who are forced by their traffickers to commit other crimes may then be ineligible for other forms of relief under certain crime bars. Commenters also explained that trafficking victims typically receive intervention and other support services only after coming into contact with law enforcement; thus, this rule would preclude them from such resources.

Commenters explained that, not only are these people more prone to experiencing harms if they are barred from asylum, but also these people are more prone to initially experience harms that subsequently result in their involvement in the criminal justice system, which would, under this rule, bar them from asylum. For these reasons, commenters opposed the rule.

*Response:* To the extent that commenters ask the Departments to establish unique protections for these referenced groups, such protections are outside the scope of this particular rulemaking. Congress has chosen to provide special protections for certain groups, such as unaccompanied alien children, and Congress could choose to

---

[39] Commenters also expressed concerns for communities of color. These concerns, however, are addressed in section II.C.3.d because commenters' concerns on this point were primarily connected to concerns regarding the gang-related offenses included in the rule.

similarly extend protections to LGBTQ persons or other groups. Without such congressional action, however, the Departments are merely implementing the statutory framework as it currently exists. Further, to the extent that the commenters posit that the noted groups are more prone to engage in criminal conduct implicated by the rule—*e.g.,* fraud, DUI, human smuggling, gang activity, drug-related crimes—the Departments have no evidence that such groups are more likely to commit such crimes than any other groups of asylum applicants, and commenters did not provide evidence that would suggest otherwise. Thus, the Departments reject the assertion that the rule would have a disparate impact on discrete groups, absent evidence such groups are more likely to engage in criminal behavior addressed by the rule.

The rule includes several provisions that act, in part, to preclude returning vulnerable persons, including LGBTQ individuals and trafficking victims, to countries where they may have experienced or fear, as referenced by the commenters, discrimination, bias, trauma, and violence. As an initial matter, regardless of asylum eligibility, vulnerable persons may be eligible for statutory withholding of removal and protection under the CAT regulations. *See* 84 FR at 69642. Next, the rule includes an exception to the bar based on domestic assault or battery, stalking, or child abuse. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F). The exception mirrors the provisions in the statute at INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) (removability context), but has one significant difference. In the removability context, applicants claiming this exception must satisfy the statutory criteria and be granted a discretionary waiver. Under the rule, however, applicants claiming the exception must only satisfy the criteria; no waiver is required. *See* 84 FR at 69653. This exception exists so that proper considerations can be taken of the vulnerability of domestic violence victims. The Departments believe this exception strikes the proper balance between providing protections for domestic violence victims while advancing the goals of reducing the incidence of domestic violence and protecting the United States from the sorts of conduct that would subject offenders to the new bars.

Commenters' concerns regarding vulnerable individuals' increased likelihood of convictions for minor offenses for certain vulnerable groups relate to the larger criminal justice system and accordingly fall outside the scope of this rulemaking. *See* section II.C.6.k for further discussion. Moreover, as noted above, the Departments have no evidence—and commenters provided none—that the groups identified by commenters are more prone to engage in criminal conduct implicated by the rule that would increase the likelihood of a conviction for, *e.g.,* fraud, DUI, human smuggling, gang activity, or drug-related crimes.

Next, this rule expands asylum ineligibility based on offenses committed in the United States, not abroad. *See* 84 FR at 69647 n.5. Thus, the rule does not expand asylum ineligibility for trafficking victims forced to commit crimes abroad or LGBTQ individuals whose private, consensual acts are criminalized abroad. Indeed, case law has long recognized that some criminal prosecutions abroad, if pretextual, can, for example, form the basis of a protection claim. *See, e.g., Fisher* v. *INS,* 79 F.3d 955, 962 (9th Cir. 1996) (noting "two exceptions to the general rule that prosecution does not amount to persecution—disproportionately severe punishment and pretextual prosecution"); *Matter of S–P–,* 21 I&N Dec. 486, 492 (BIA 1996) (noting that "prosecution for an offense may be a pretext for punishing an individual" on account of a protected ground). The rule does not alter such case law.

### g. Adjudicator Discretion

*Comment:* Many commenters opposed the rule out of concern that it strips adjudicators of discretion. First, commenters stated that it is crucial that adjudicators consider countervailing factors "to determine whether the circumstances merit such a harsh penalty." Another commenter explained that "[d]iscretion allows an adjudicator to consider a person's entire experience, including those factors that led to criminal behavior as well as the steps towards rehabilitation that individuals have taken." Commenters claimed that effective use of discretion is crucial in these circumstances: "The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community." Thus, commenters alleged that the rule's removal of that discretion is punitive and unnecessary. One commenter stated that the purpose of the NPRM seems to be to remove all discretion from adjudicators to consider each case on a case-by-case basis. Another commenter underscored the importance of adjudicators retaining discretion to make individualized

determinations because Congress established asylum as a discretionary form of relief.

One commenter alleged that the rule diminishes due process protections, stating that, "by preventing the use of discretion in such cases[,] the proposed rules have a chilling effect on due process. Ensuring adjudicators have discretion to grant asylum under such circumstances allows asylum seekers to have a fair day in court and guards against further injustice resulting from errors that might have occurred in the criminal legal system."

Commenters also alleged that the proposed rule incorrectly raises the burden of proof to establish that a favorable grant of discretion is warranted so that it is equivalent to the burden required to establish a well-founded fear of persecution. These commenters averred that this is problematic in the face of contrary case law that requires a more cautious, restrained view of the Attorney General's and the Secretary's discretion and that cautions against permitting the Departments unchecked power and unrestrained discretion in making asylum determinations. Commenters first cited *Matter of Pula,* 19 I&N Dec. at 474, arguing that it encouraged a restrained view of discretion because the Board asserted that "the danger of persecution should generally outweigh all but the most egregious of adverse factors." Commenters averred that the Supreme Court cautioned against unlimited discretion in *Moncrieffe,* 569 U.S. at 200–01, by holding that the government must follow the categorical approach. Similarly, commenters cited *Delgado,* 648 F.3d at 1097, to support this proposition because the Ninth Circuit "first assert[ed] its jurisdiction to review the Attorney General's discretionary authority" and overruled an earlier decision that the jurisdiction-stripping provision at 8 U.S.C. 1252 barred the court's judicial review.

On the other hand, in the context of convictions or conduct related to domestic violence, battery, or extreme cruelty, commenters also opposed the amount of discretion afforded to adjudicators because the rule allegedly provides no clear guidance for the adjudicator's inquiry, analysis, and resulting determination. For example, commenters asserted that it is unclear what constitutes "reliable evidence" under the rule. Commenters were concerned that this would result in inconsistent decisions or diminished due process. Further, commenters were also concerned because determinations under the rule would be discretionary

and therefore non-appealable in most cases.

*Response:* Congress has authorized the Attorney General and the Secretary to, by regulation, limit and condition asylum eligibility consistent with the statute. INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Through this rule, the Departments exercise such authority by establishing categorical bars to asylum that constitute such limits and conditions. The Departments disagree that adjudicators must be afforded discretion to consider mitigating factors in determining asylum eligibility in all circumstances. Given the challenges faced by the agencies and the operative functioning of current categorical bars, *see* INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)), the Departments add the new categorical bars, in part, to improve the efficient processing of asylum claims. The regulatory changes are not punitive or intended to revoke all discretion from adjudicators, as commenters alleged; rather, the Departments promulgate this rule to facilitate and streamline processing of asylum claims. *See e.g.,* 84 FR at 69646–47, 69657.

The rule does not diminish due process. As discussed above, the discretionary benefit of asylum is not a liberty or property interest subject to due process protections. *See Yuen Jin,* 538 F.3d at 156–57; *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50). In other words, "[t]here is no constitutional right to asylum per se." *Mudric,* 469 F.3d at 98. The Departments disagree that affording discretion to adjudicators in lieu of promulgating the additional bars is a preferable way to process asylum applications. Moreover, nothing in this rule prevents individuals from appealing the immigration judge's determination. *See* 8 CFR 1003.38 (appeals with the BIA). Further, as explained in section II.C.6.k, resolving errors in the criminal justice system is beyond the scope of this rulemaking.

The Departments reiterate their authority to limit and condition asylum eligibility consistent with the statute. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Accordingly, the Departments may promulgate bars that govern determinations regarding asylum eligibility. In light of this authority, the Departments also disagree with commenters that the rule provides adjudicators with insufficient guidance for the sound exercise of their judgment in determining eligibility for asylum. For example, the proposed rule provides clarity surrounding determinations whether a conviction is a felony by applying the relevant jurisdiction's

definition; also, it provides detailed guidance on vacated or expunged convictions, and modified convictions and sentences. 84 FR at 69646, 69654–55. Immigration judges and asylum officers currently exercise discretion to determine whether an asylum seeker merits relief for a wide range of reasons, many of which are not similarly set out or defined in the Act or by regulation. *See, e.g., Matter of A–B–,* 27 I&N Dec. 316 at 345 n.12 (outlining factors for consideration in discretionary asylum determinations). The Departments accordingly do not believe that the new bars require immigration judges or asylum officers to exercise significantly more discretion than those judges or officers already do.

Further, the Departments note that providing more exacting guidance, as some commenters suggested, would impede the very nature of legal discretion, as demonstrated by its definition: "[f]reedom in the exercise of judgment," or "the power of free decision-making." Black's Law Dictionary (11th ed. 2019); *see also* "Discretion," Merriam-Webster, *https://www.merriam-webster.com/dictionary/discretion* (last updated Feb. 15, 2020) (defining "discretion" as the "power of free decision or latitude of choice within certain legal bounds"). Doing so would thus aggravate the problems that some commenters perceived in the rule's alleged lack of sufficient flexibility.

Next, nothing in the final rule changes the standard of proof as regards an individual's ability to demonstrate that he or she warrants a positive grant of discretion. As an initial matter, citing a standard of proof for discretion is a misnomer. Rather, the determination of whether an alien warrants a discretionary grant of asylum is an analysis that requires reviewing the circumstances of the case. In determining whether the alien warrants a discretionary grant of asylum, the immigration judge considers a number of factors and considerations. *See Matter of Pula,* 19 I&N Dec. at 473–74 (outlining how adjudicators should weigh discretionary factors in applications for asylum). By contrast, the final rule sets forth additional limitations on eligibility for asylum, which are separate from the discretionary determination. As a result, the final rule does not create a standard of proof for establishing that an alien warrants a discretionary grant of asylum.

Similarly, the Departments disagree with commenters' assertions that the final rule violates Supreme Court and court of appeals precedent regarding the

amount of discretion granted to the Attorney General and the Secretary. As explained, Congress, in IIRIRA, vested the Attorney General with broad authority to establish conditions or limitations on asylum. *See* 110 Stat. at 3009–692. Congress also vested the Attorney General with the authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)). This broad authority is not undercut by the cases cited by commenters. Neither *Moncrieffe* nor *Delgado* presumes to limit the Attorney General's discretion to place limits on asylum. Rather, *Moncrieffe* addressed whether a conviction for possession of a small amount of marijuana with intent to distribute qualified as an aggravated felony. 569 U.S. at 206. Similarly, the *Delgado* court held that it had authority to review certain discretionary determinations made by the Attorney General when not explicitly identified in the INA. 648 F.3d at 1100. However, this inquiry was based on statutory interpretation to determine whether the court had jurisdiction to review a BIA decision. Apart from disagreeing with the Department's legal arguments on appeal, neither of these two decisions purported, even in dicta, to place additional limitations on the Attorney General's ability to consider whether to grant asylum as a matter of discretion.

h. Issues With Representation

*Comment:* Commenters opposed the NPRM because they alleged that it made the asylum system more arduous for asylum seekers, especially children, to navigate alone. One commenter claimed that 86 percent of detainees lack access to counsel. Overall, commenters were concerned that the rule's changes disadvantage asylum seekers by making it more difficult for them to proceed without representation and for organizations, in turn, to provide representation and assistance to aliens.

Commenters pointed out that asylum seekers lack the benefit of appointed counsel, which is especially significant for pro se aliens affected by the rule, particularly in regard to gathering evidence and developing responses to refute the "extremely broad grounds" for the denial of asylum.

Commenters also alleged that it will be more difficult for organizations to represent and assist aliens in accordance with the rule's provisions. Commenters stated that backlogs at USCIS are detrimental to organizations and the aliens they represent because

aliens may wait years for a decision on their applications, while organizations have limited resources to assist immigrants and must seek to prioritize spending for emergency situations.

Commenters also stated that the system is already complicated; further complicating it with additional barriers will require much time, funding, and effort by immigration advocates. Finally, commenters stated that an asserted "lack of predictability" in application of the rule would "create a substantial burden on immigration legal services providers, who [would] be unable to advise their clients as to their asylum eligibility, a long-term and stable form of protection from persecution."

*Response:* The commenters' particular concerns regarding representation in immigration proceedings or during asylum adjudications are outside the scope of this rulemaking. The rule does not involve securing or facilitating representation, and Congress has already directed that aliens have a right to counsel in removal proceedings but at no expense to the government. INA 292 (8 U.S.C. 1362). Moreover, 87 percent of asylum applicants in pending asylum cases have representation, and there is nothing in the rule that would cause a reduction in that representation rate. *See* EOIR, *Adjudication Statistics: Representation Rate* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/ 1062991/download.*

In addition, the Departments continue to maintain resources designed to assist aliens in proceedings find representation or otherwise help themselves in their proceedings. *See* EOIR, *Find Legal Representation, https://www.justice.gov/eoir/find-legal- representation* (last updated Nov. 29, 2016). Further, the Office of Legal Access Programs within EOIR works to increase access to information and raise the level of representation for individuals in immigration proceedings. *See* EOIR, *Office of Legal Access Programs, https://www.justice.gov/eoir/ office-of-legal-access-programs* (last updated Feb. 19, 2020).

In regard to commenters' concerns regarding the backlog at USCIS, the rule facilitates a more streamlined approach by eliminating inefficiencies. *See, e.g.,* 84 FR at 69647, 69656–57. For example, the rule's established definition for "felony" will create greater uniformity by accounting for "possible variations in how different jurisdictions may label the same offense" and avoid anomalies in the asylum context "that arise from the definition of 'aggravated felonies.'" *Id.* at 69647. Significantly, that definition eliminates the need for adjudicators and courts alike to engage

in the categorical approach for aggravated felonies. *See id.* These improvements to the asylum system will increase predictability, therefore rendering representation less complicated and potentially requiring less funding by immigration advocates.

The Departments emphasize that the rule does not create an entirely new system. As with any other change to the regulations, the Departments anticipate that immigration advocates and organizations will adjust and adapt their strategies to continue to provide effective representation for their selected clients.

### i. Against American Ideals

*Comment:* Commenters opposed the rule because they alleged that it conflicts with American ideals. Commenters remarked that the rule conflicts with the United States' tradition and moral obligation of providing a "haven for persons fleeing oppression" and a "beacon of hope" for vulnerable people, and that it violates principles that people should have freedom and equal rights under the law "regardless of skin color or birthplace." Many commenters characterized these concerns as humanitarian, religious, and American ideals of showing compassion, fairness, and respect for human rights. Another commenter claimed that the rule "eviscerated the spirit and overall purpose of the U.S. asylum system by categorically refusing protection to large groups of vulnerable people who are neither a danger to the public nor a threat to U.S. national security interests, and who have no other safe and reasonable option for protection."

Other commenters expressed opposition by claiming that the rule would diminish the United States' role as a world leader, hurt the country's international reputation, and undermine foreign policy interests abroad. One commenter stated that the rule would diminish the "country's historical role as a defender of human rights."

*Response:* The rule does not conflict with American traditions or moral obligations related to caring for vulnerable people. On the contrary, the rule streamlines the asylum system to improve the consistency and predictability of the adjudication of claims, thereby enabling applicants who qualify for asylum eligibility to swiftly access the benefits that follow a grant of asylum. Those benefits include, among many, preclusion from removal, a path to lawful permanent resident status and citizenship, work authorization, the possibility of derivative lawful status for certain family members, and access to

certain financial assistance from the Federal government. *See R–S–C,* 869 F.3d at 1180; INA 208(c)(1)(A), (C) (8 U.S.C. 1158(c)(1)(A), (C)); INA 208(c)(1)(B), (d)(2) (8 U.S.C. 1158(c)(1)(B), (d)(2)); *see also* 84 FR at 69641. The availability of these benefits demonstrates American ideals of compassion realized through the asylum system.

Aliens with certain criminal convictions demonstrate a disregard for the societal values of the United States and may constitute a danger to the community or threaten national security. The Departments have concluded that limiting asylum eligibility for these aliens furthers American ideals of the rule of law and a commitment to public safety. Although such aliens are not eligible for asylum under the rule, they may still be eligible for withholding of removal under the Act (INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 1208.16(b)), or protection under the CAT regulations (8 CFR 1208.16(c)). These forms of protection limit removal to a country where the alien is more likely than not to be persecuted based on protected grounds or tortured, thereby affording protection to aliens, even if they are ineligible for asylum.

The Departments do not agree that the rule diminishes the United States' international reputation for caring for the less fortunate. On the contrary, the Departments believe the rule strengthens the United States' ability to care for those who truly deserve the discretionary benefit of asylum and may take full advantage of the numerous benefits that follow.

### j. Bad Motives

*Comment:* Commenters opposed the NPRM because they alleged that the Departments published it with racist motives. Commenters stated that the rule was published "out of animus to asylum seekers and [with] a desire to undermine the asylum system through an end-run around Congress" because the rule would "necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors." One commenter specifically stated the rule was based upon a "dark legacy" of bias against Latin American countries and violated the Equal Protection Clause of the Fourteenth Amendment.

One commenter stated that "the [A]dministration has targeted low- income, immigrant communities of color to further their white supremacist

agenda of maintaining a white majority in the United States.'' Other commenters alleged that DHS and ICE have relied on racist policing techniques to identify gang activity, which rarely result in criminal convictions.

Commenters also opposed the rule because they alleged that it is an attempt to ''drastically limit asylum eligibility,'' ''exclude refugees from stability and security,'' and make the United States more ''hostile'' towards immigrants. In other words, commenters alleged that the rule ''represent[ed] a thinly veiled attempt to prevent otherwise eligible asylum seekers from lawfully seeking refuge in the United States.'' Commenters referenced public documents allegedly revealing the Administration's efforts to utilize smuggling prosecutions against parents and caregivers as part of its overall strategy to deter families from seeking asylum. Commenters were concerned that the rule threatens to ''magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.''

*Response:* The rule is not racially motivated, nor did racial animus or a ''legacy of bias'' play a role in the rule. Rather, the rule categorically precludes from asylum eligibility certain aliens based on the aliens' various criminal convictions and, in one limited instance, criminal conduct, because the Departments believe that the current case-by-case adjudicatory approach yields inconsistent results that are both ineffective to protect communities from danger and inefficient in regard to overall case processing. *See* 84 FR at 69640.

To the extent that the rule disproportionately affects any group referenced by the commenters, the rule was not intentionally drafted to discriminate against any group. The provisions of the rule apply equally to all asylum applicants without regard to any applicant's ethnic or national background, or any other personal characteristics separate and apart from the criminal or conduct history laid out in the rule. Accordingly, the rule does not violate the Equal Protection Clause of the Fourteenth Amendment. *See Washington* v. *Davis,* 426 U.S. 229, 242 (1976) (''[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial

discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.'' (citation omitted)); *cf. United States* v. *Smith,* 818 F.2d 687, 691 (9th Cir. 1987) (''We begin our review of this challenge by holding that persons convicted of crimes are not a suspect class.'').

As explained in the proposed rule, Congress expressly authorized the Attorney General and the Secretary to establish conditions or limitations for the consideration of asylum applications under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)) that are not inconsistent with the statute. *See* 84 FR at 69643. The Departments promulgate this final rule in accordance with those statutory sections, and in doing so, have promulgated a rule that is equally applicable to all races. The Departments strongly disavow any allegation of white supremacy.

The Departments reiterate that the rule does not encourage or facilitate hostility towards immigrants. Instead, the rule categorically precludes from asylum eligibility certain aliens based on criminal convictions, and, in one limited instance, criminal conduct, because the Departments believe the current case-by-case adjudicatory approach yields inconsistent results that are both ineffective to protect the American public from danger and inefficient in regard to overall case processing. The rule retains the current general statutory asylum system, *see* 84 FR at 69640, with the result that applicants for asylum must prove that they are (1) statutorily eligible for asylum, and (2) merit a favorable exercise of discretion. INA 208(b)(1)(A), 240(c)(4)(A) (8 U.S.C. 1158(b)(1)(A) 1229a(c)(4)(A)); *see also Matter of A–B–,* 27 I&N Dec. at 345 n.12. That framework continues to be equally applicable to persons of all races.

The rule does not affect regulatory provisions regarding refugee processing under 8 CFR parts 207, 209, 1207, and 1209, and it does not categorically exclude refugees from the United States or facilitate hostility towards immigrants. The Departments disavow allegations that the government used smuggling prosecutions against parents and caregivers specifically to deter families from seeking asylum. Rather, the Departments anticipate that the rule will better facilitate efficient processing of asylum applications by introducing a more streamlined approach, thus helping families who qualify for asylum

and demonstrate their applications merit a favorable decision.

k. Problems With the Criminal Justice System

*Comment:* Commenters opposed the proposed rule because they alleged that it implicates a criminal justice system that suffers from structural challenges such as racial profiling, unjust outcomes, barriers to equal justice, and incentives to plead guilty, especially in the context of misdemeanors.

Related to commenters' concerns regarding racism in the NPRM,[40] commenters explained their concern that the NPRM imports racial disparities prevalent in the criminal justice system into the immigration system, stating, ''[a]sylum seekers of color, like all communities of color in the United States, are already disproportionately targeted and punished by the criminal justice system.'' Particularly, commenters stated that both undocumented and documented non-white immigrants are arrested, convicted of drug crimes, given longer sentences, and deported more frequently than their white counterparts. Further, commenters stated that LGBTQ aliens are more prone to experiencing violence from police.

One commenter opposed the NPRM, stating that it would exacerbate problems in our criminal justice system, such as increased incarceration, deportations, and racial profiling, which would, in turn, exacerbate health concerns for individuals and communities.

*Response:* The final rule amends the Departments' respective regulations governing bars to asylum eligibility. The rule clarifies the effect of criminal convictions and, in one instance, criminal conduct, in the asylum context and removes regulations governing automatic reconsideration of discretionary denials of asylum applications. *See* 84 FR at 69640. Accordingly, commenters' concerns regarding structural challenges to the criminal justice system are outside the scope of this rulemaking. The rule does not seek or intend to address actual or alleged injustices of the criminal justice system as a whole, as referenced by the commenters, including racial profiling, disparities based on race and sexual orientation, unjust outcomes, barriers to equal justice, incentives to plead guilty, and health concerns following alleged increases in incarceration, deportations, and racial profiling.

---

[40] *See* section II.C.6.j for further discussion.

l. Automatic Review of Discretionary Denials

*Comment:* Many commenters expressed strong opposition to the rule because it eliminates automatic review of discretionary denials. Commenters were concerned that language barriers and lack of financial resources may prevent applicants with meritorious claims from adequately presenting their cases. According to commenters, "[m]aintaining reconsiderations of discretionary denials of asylum is therefore absolutely critical to ensuring that immigrant survivors who are eligible for asylum have another opportunity to defend and prove their right to obtain asylum protections."

*Response:* The Departments disagree that reconsideration of discretionary denials of asylum is necessary and find that commenters' concerns regarding removal of these provisions are unwarranted. First, the current regulations providing for automatic reconsideration of discretionary denials at 8 CFR 208.16(e) and 1208.16(e) are inefficient, unclear, and unnecessary. *See* 84 FR at 69656. Federal courts have expressed similar sentiment as they approach related litigation. *See Shantu* v. *Lynch,* 654 F. App'x 608, 613–14 (4th Cir. 2016) (discussing unresolved anomalies of the regulations regarding reconsideration of discretionary denials); *see also* 84 FR at 69656–57.

Further, there are currently multiple avenues through which an asylum applicant may challenge a discretionary denial, with the result that removing the regulations providing for reconsideration (8 CFR 208.16(e) and 1208.16(e)) does not effectively render asylum eligibility determinations final. *See* 84 FR at 69657. First, under 8 CFR 1003.23(b)(1), an immigration judge may reconsider a decision upon his or her own motion.[41] Second, also under 8 CFR 1003.23(b)(1), an alien may file a motion to reconsider with the immigration judge. Third, under 8 CFR 1003.38, an alien may file an appeal with the BIA. The Departments have concluded that these alternatives sufficiently preserve the alien's ability to obtain review of the immigration judge's discretionary asylum decision, while removing the confusing,

inefficient, and unnecessary automatic review provisions at 8 CFR 208.16(e) and 1208.16(e).

7. Recommendations

*Comment:* Commenters provided numerous recommendations to the Departments.

First, several commenters suggested that the Departments provide annual bias training to all immigration judges and prosecutors.

Next, two commenters recommended that the sentencing guidelines as provided in the Washington Adult Sentencing Guidelines Manual be incorporated into the NPRM to provide clarity and guidance to immigration judges.

Another commenter asserted that international human rights law obligations required the Departments to

(1) put in place and allocate resources to the identification and assessment of protection needs; and (2) establish mechanisms for entry and stay of migrants who are considered to have protection needs prohibiting their return under international human rights law, including non-refoulement, as well as the rights to health, family life, best interests of the child, and torture rehabilitation.

A commenter suggested the Departments should incorporate recent innovative criminal justice reforms. For example, the commenter pointed to special drug trafficking courts that "recognize the need for discretion in the determination of criminal culpability" and suggested that the Departments should create specialized asylum eligibility courts.

Another commenter emphasized the effects of climate change, claiming that the United States should be "creating new categories of asylum given the predictions on climate change migrants and the latest UN human rights ruling declaring governments cannot deport people back to countries if their lives are in danger due to climate change."

One commenter recommended that the Departments continue to hire more immigration judges and asylum officers and to retain discretion with immigration adjudicators to make determinations on a case-by-case basis rather than expand the categorical bars.

Some commenters emphasized the general need for comprehensive, compassionate immigration reform. One commenter specifically urged the Departments to support the New Way Forward Act, which, according to the commenter, "rolls back harmful immigration laws [because] it proposes immigration reform measures that dismantle abuses of our system and our asylum seeking community."

Some commenters urged the Departments to take a more "welcoming" approach, citing the positive effects of diversity and economic advantages.

Another commenter, despite opposing the NPRM, provided several recommendations regarding the domestic violence crime bar and primary perpetrator exception should the Departments publish the rule as final. First, the commenter recommended that all immigration adjudicators should receive specialized training developed with input from stakeholders regarding domestic violence and the unique vulnerabilities faced by immigrants. Second, the commenter recommended that an automatic supervisory review should follow any determination that an applicant does not meet an exception to an asylum bar. Third, the commenter recommended that adjudicators should be required to provide written explanations of (1) the factual findings, weighed against the evidence, if a determination is made that an applicant does not meet an exception to the asylum bar and (2) their initial decisions to apply the bar, including what "'serious reasons' existed for believing that the applicant engaged in acts of domestic violence or extreme cruelty." Fourth, when applicants do not meet the exception, the commenter recommended that adjudicators identify what evidence, if any, was provided by the alleged primary perpetrator, how it was weighed, and what the adjudicator did to determine whether it was false or fabricated. Fifth, the commenter requested that agencies regularly engage with stakeholders to assess the impact of the bar and the exception on survivors.

Several commenters urged the Departments to dedicate their efforts to ensuring that individuals fleeing violence would be granted full asylum protections. One commenter suggested that the bars to asylum be narrowed by eliminating the bar related to convictions in other countries.

Some commenters suggested that families, especially children, be allowed to apply for asylum together, rather than require each person to file a separate application.

*Response:* The Departments note the commenters' recommendations.

Some commenters' suggestions involved issues or topics outside the scope of the rule, such as the suggestions that immigration judges should be provided certain types of training or to allow for additional flexibilities for family-based versus individual asylum applications. The

---

[41] On August 26, 2020, the Department of Justice proposed restricting the ability of an immigration judge to reconsider a decision upon his or her own motion. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 52491, 52504–06 (Aug. 26, 2020). That rule has not yet been finalized, but even if the proposal is adopted in the final rule, asylum applicants would still remain able to file a motion to reconsider or an appeal in order to challenge an immigration judge's discretionary denial in these circumstances.

Departments may consider these recommendations in the event of additional rulemakings, but do not take any further action in response to these out-of-scope suggestions at this point.

Other commenters' suggestions involved topics outside the authority of the Departments, such as suggestions that there should be new asylum-related protections due to concerns surrounding climate change or that legislative changes to the immigration laws should be enacted. If Congress enacts these or other changes to the immigration laws, the Departments' regulations will reflect such changes in future rules. However, this rule is designed to implement the immigration laws currently in force.

Regarding the remaining suggestions related to the provisions of this rule, the Departments decline to adopt the recommendations or make changes to the proposed rule except as set out below in section III. Overall, the Departments find that the commenters' recommendations would frustrate the rule's purpose by slowing and prolonging the adjudicatory process, thereby undermining the goal of more efficiently processing asylum claims. Further, the Departments have determined, as discussed above, that the included offenses are significant offenses that warrant rendering aliens described by the rule ineligible for asylum.

For example, the Departments decline to adopt one commenter's requests to automatically require supervisory review of an asylum officer's decision to apply a bar, or to require the asylum officer or immigration judge to issue a written decision explaining the application of the bars. The Departments believe that the existing processes for issuing decisions and providing review of asylum determinations give sufficient protections to applicants. *See, e.g.,* 8 CFR 208.14(c)(1) (explaining that, for a removable alien, when an asylum officer cannot grant an asylum application, the officer shall refer the application for adjudication in removal proceedings by an immigration judge); 8 CFR 1003.3(a)(1) (providing for appeals of immigration judge decisions to the BIA); 8 CFR 1003.37(a) (explaining that a "decision of the Immigration Judge may be rendered orally or in writing," and that, if the decision is oral, it shall be "stated by the Immigration Judge in the presence of the parties" and a memorandum "summarizing the oral decision shall be served on the parties"). Requiring additional steps beyond these long-standing processes would only create inefficiencies that this rule seeks to avoid. For example,

this rule removes the automatic review of a discretionary denial of asylum specifically because "mandating that the decision maker reevaluate the very issue just decided is an inefficient practice that * * * grants insufficient deference to the original fact finding and exercise of discretion." 84 FR at 69657.

The Departments also decline to incorporate a commenter's suggestion to include the Washington Adult Sentencing Guidelines Manual into the rule, as the Departments believe the rule provides sufficient guidance to adjudicators without adding a specific state's criminal law manual, which would only add confusion to the immigration adjudication process.

*D. Comments Regarding Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* Commenters raised concerns that this rule violated the APA's requirements, as set forth in 5 U.S.C. 553(b) through (d). First, commenters stated that the 30-day comment period was not sufficient for such a significant rule and that, at a minimum, the comment period should have been 60 days. Commenters cited the complexity of the legal and policy issues raised by the rule, the impact of the rule on asylum-seekers, and the potential implications of the rule regarding the United States' compliance with international and domestic asylum law. In support, commenters referenced Executive Orders 12866 and 13563, both of which recommend a "meaningful opportunity to comment" with a comment period of not less than 60 days "in most cases." They also noted that the comment period for this rule ran through the winter holiday season, with multiple Federal holidays.

Commenters also stated that the rule was arbitrary and capricious under the APA because the Departments did not provide sufficient evidence to support such significant changes. For example, commenters noted the lack of statistics regarding the number of asylum seekers that would be affected by the rule and expressed concerned that the Departments were relying on conclusory statements in support of the rule.

Commenters further stated that the reasons given for the rule were insufficient and, therefore, arbitrary and capricious. For example, commenters took issue with the Departments' explanation that the additional categories of criminal bars were necessary to address the "inefficient" and "unpredictable" case-by-case adjudication process. Instead, commenters stated that the case-by-case

process ensured that the adjudicator takes into account all of the relevant factors in making a determination.

Commenters had specific concerns with the rule's provision that all felony convictions constitute a particularly serious crime. Commenters stated that the rule provided no evidence to support the provision, and that a criminal record in and of itself does not reliably predict future dangerousness. Further, the provision does not address persons who accept plea deals to avoid lengthy potential sentences; who have rehabilitated since the conviction; or who have committed a crime that does not involve a danger to the community or circumstances when a Federal, State, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence.

Commenters stated that the rule was arbitrary and capricious because it is inconsistent with the statute, *see* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)), which requires a separate showing from the particularly serious crime determination that the alien constitutes a danger to the community.

Commenters also raised concerns with the "reason to believe" standard for gang-related crime determinations. The commenters asserted that the standard relied on ineffective, inaccurate, and discriminatory practices and was therefore arbitrary and capricious.

*Response:* The Departments believe the 30-day comment period was sufficient to allow for a meaningful public input, as evidenced by the significant number of public comments received, including almost 80 detailed comments from interested organizations. The APA does not require a specific comment period length. *See* 5 U.S.C. 553(b)–(c). Similarly, although Executive Orders 12866 and 13563 recommend a comment period of at least 60 days, such a period is not required. Federal courts have presumed 30 days to be a reasonable comment period length. For example, the D.C. Circuit recently stated that, "[w]hen substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n* v. *Fed. Commc'ns Comm'n,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)). Litigation has mainly focused on the reasonableness of comment periods shorter than 30 days, often in the face of exigent circumstances, and the Departments are unaware of any case

law holding that a 30-day comment period was insufficient. *See, e.g., N. Carolina Growers' Ass'n, Inc.* v. *United Farm Workers,* 702 F.3d 755, 770 (4th Cir. 2012) (analyzing the sufficiency of a 10-day comment period); *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 629–30 (D.C. Cir. 1996) (15-day comment period); *Northwest Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (7-day comment period).

The Departments also believe that the 30-day comment period was preferable to a longer comment period since this rule involves public safety concerns. *Cf. Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (noting that the Federal Aviation Administration had good cause to not engage in notice-and-comment rulemaking because the rule was needed to protect public safety as demonstrated by numerous then-recent helicopter crashes). By proceeding with a 30-day comment period rather than a 60-day period, the Departments are able to more quickly finalize and implement this rule, which prevents persons with certain criminal histories, such as domestic violence or gang-related crimes, from receiving asylum and potentially residing or prolonging their presence in the United States on that basis during the pendency of the asylum process.

Regarding commenters' APA concerns about the statistical analysis in this rule, the Departments reiterate that they are unable to provide precise data on the number of persons affected by the rule because the Departments do not maintain data on the number of asylum applicants with criminal convictions or, more specifically, with criminal convictions and pertinent criminal conduct, that would be subject to the bars added by this rule. An attempt to quantify the population affected would risk providing the public with inaccurate data that at best would be unhelpful. As a general matter, the rule will likely result in fewer asylum grants annually, but the Departments do not believe that further analysis—in the absence of any reliable data—is warranted. *See Stilwell* v. *Office of Thrift Supervision,* 569 F.3d 514, 519 (D.C. Cir. 2009) ("The APA imposes no general obligation on agencies to produce empirical evidence. Rather, an agency has to justify its rule with a reasoned explanation."); *see also id.* (upholding an agency's decision to rely on its "long experience" and "considered judgment," rather than statistical analyses, in promulgating a rule).

Likewise, the Departments disagree with commenters that the NPRM did not sufficiently explain the reasons for adding additional per se criminal bars. As explained in the NPRM, immigration judges and the BIA have had difficulty applying the "particularly serious crime" bar and, therefore, the Departments believe additional standalone criminal bars will provide a clear and efficient process for adjudicating asylum applications involving criminal convictions. *See* 84 FR at 69646. The Attorney General and the Secretary have not issued regulations identifying additional categories of convictions that qualify as particularly serious crimes, which has in turn resulted in adjudicators and the courts analyzing on a case-by-case basis whether individual criminal statutes qualify as particularly serious crimes. However, this statute-by-statute determination has not provided adjudicators with sufficient guidance in making "particularly serious crime" determinations due to the individualized nature of the BIA's determinations. *See id.* By adding these standalone criminal bars, the rule helps ensure that immigration adjudicators will be able to apply clear standards outside of applying the particularly serious crime bar. In regards to commenters' concerns about the blanket felony conviction bar, the Departments chose to include a bar for all felony convictions because it provides a clear standard to apply in adjudicating the effect to be given to criminal offenses as part of asylum determinations.

Adjudicators will be able to efficiently determine the effect of criminal convictions without resort to complex legal determinations as to the immigration effects of a specific criminal statute. The Departments are aware that the particular personal circumstances and facts of each case are unique; however, the Departments believe that the clarity and consistency of a per se rule outweigh any benefits of a case-by-case approach.

Further, adding a bar to asylum eligibility for all felony convictions recognizes the significance of felony convictions. For example, Congress recognized the relationship between felonies and the seriousness of criminal offenses when it explicitly defined "aggravated felony" to include numerous offenses requiring a term of imprisonment of at least one year. *See* INA 101(a)(43)(F), (G), (J), (P), (R), (S) (8 U.S.C. 1101(a)(43)(F), (G), (J), (P), (R), (S)). Similarly, Congress focused on the importance of felonies in the Armed Career Criminal Act, a sentencing enhancement statute for persons who have been convicted of three violent felonies, which requires the predicate offenses to be punishable by imprisonment for terms exceeding one year. *See* 18 U.S.C. 924(e)(2)(B).

The Departments also disagree that the use of the "reason to believe" standard for gang-related crime determinations is arbitrary and capricious. The "reason to believe" standard is used in multiple subsections of section 212 of the Act (8 U.S.C. 1182) in making inadmissibility determinations, and the Federal circuit courts have had no issues reviewing immigration judges' "reason to believe" inadmissibility determinations. *See, e.g., Chavez-Reyes* v. *Holder,* 741 F.3d 1, 3–4 (9th Cir. 2014) (reviewing "reason to believe" determination for substantial evidence); *Lopez-Molina,* 368 F.3d at 1211 (same). There is no reason that the Departments cannot apply this same standard when determining whether a criminal conviction involves gang activity.

In addition, the Departments disagree with commenters that the use of the "reason to believe" standard would enable adjudicators to rely on inaccurate, ineffective, or discriminatory evidence when making determinations regarding gang-related crimes. As discussed above, immigration judges are already charged with considering material and relevant evidence. 8 CFR 1240.1(c). To make this determination, immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna,* 325 F.3d at 405 (quoting *Bustos-Torres,* 898 F.2d at 1055). Nothing in the rule undermines or withdraws from this standard. If an alien believes that an adjudicator has relied on inaccurate, ineffective, or discriminatory evidence in making this determination, such decision would be subject to further review.

Finally, the Departments clarify that this rule creates additional standalone criminal bars to asylum and does not alter the definitions of the "particularly serious crime" bar. As a result, this rule does not create any inconsistencies with the "particularly serious crime" bar statutory language regarding dangerousness, which, the Departments note, does not require a separate finding of dangerousness. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)); *see also, e.g., Matter of R–A–M–,* 25 I&N Dec. 657, 662 (BIA 2012) (explaining that, for purposes of the "particularly serious crime" bar, "it is not necessary to make a separate determination whether the alien is a danger to the community").

2. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

*Comment:* Commenters raised concerns that the Departments' cost-benefit analysis presented no evidence that potential benefits from the rule exceed the potential costs. For example, commenters explained that the Departments' primary stated reason for adopting new categorical bars was that the exercise of discretion has created inefficiency and inconsistency. However, commenters stated that the Departments' cost-benefit estimates failed to account for new assessments regarding numerous questions of law and fact that the rule would require. Accordingly, commenters argued that the Departments' cost-benefit analysis was unreliable.

Further, commenters stated that the agencies did not comply with Executive Orders 12866, 13563, and 13771, which require agencies to quantify potential costs to the fullest extent possible. Commenters explained that the Departments noted that the rule would likely result in fewer asylum grants annually but failed to quantify or evaluate the impact of the decrease and did not provide any evidence or indication that an attempt was made at quantifying this impact. Commenters explained that the Departments are required to use the best methods available to estimate regulatory costs and benefits, even if those estimates cannot be precise. Commenters also noted that the Departments did not attempt to provide a high and low estimate for the rule's potential impacts despite such an estimation being common practice in rulemaking.

Commenters noted that public comments on this rule and other recent asylum-related rulemakings provided the Departments with data regarding the impacts of asylum denials. Commenters gave examples of potential costs that the Departments failed to consider, including, for example, costs from the differences in benefits for individuals who may obtain only lesser protection in the form of statutory withholding of removal or protection under the CAT regulations; costs from the detention and deportation of individuals who would otherwise have meritorious asylum claims; economic and non-economic costs to asylum-seekers' families; costs to businesses that currently employ or are patronized by asylum-seekers; costs from the torture and killings of deported asylum-seekers;

and intangible costs from the diminution of respect for U.S. treaty obligations and diminution of respect for human life and the safety of asylum-seekers, among others. As a result, commenters stated that the Departments did not support their conclusion that "the expected costs of this proposed rule are likely to be de minimis."

*Response:* The Departments disagree that the rule will create additional adjudicatory burdens that will outweigh the rule's benefits. The purpose of the rule is to limit asylum eligibility for persons with certain criminal convictions, which in turn will lessen the burdens on the overtaxed asylum system. There are currently more than one million pending cases at the immigration courts, with significant year over year increases, despite a near doubling of the number of immigration judges over the past decade and the completion of historic numbers of cases. *See* EOIR, *Adjudication Statistics: Pending Cases* (July 14, 2020), *https:// www.justice.gov/eoir/page/file/1242166/ download;* EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (June 2020), *https://www.justice.gov/ eoir/page/file/1242156/download;* EOIR, *Adjudication Statistics: New Cases and Total Completions* (July 14, 2020), *https://www.justice.gov/eoir/page/file/ 1060841/download*). Of these pending cases, over 575,000 include an asylum application.

These new bars will help achieve the goal of alleviating the burden on the immigration system while retaining the existing framework for asylum adjudications. As stated in the NPRM, this rule does not change the role of an immigration judge or asylum officer in adjudicating asylum applications; immigration judges and asylum officers currently consider an applicant's criminal history to determine the associated immigration consequences, if any, and whether the applicant warrants asylum as a matter of discretion. *See* 84 FR at 69657–58. These additional bars will be considered under that existing framework and, therefore, the Departments do not anticipate additional costs to the adjudication process.

In addition, the Departments believe the rule complies with the cost-benefit analysis required by Executive Orders 12866, 13563, and 13771. Executive Order 12866 requires the Departments to quantify costs "to the fullest extent that these can be usefully estimated." *See* E.O. 12866, 58 FR 51735, 51735, sec. 1(a) (Sept. 30, 1993). As explained in the NPRM, the Departments do not maintain data on the number of asylum applicants with criminal convictions or,

more specifically, with criminal convictions and pertinent criminal conduct, that would be subject to the bars added by this rule. Without this data, the Departments cannot reliably estimate the population effected by this rule, outside of identifying the group likely affected by the rule: Asylum applicants with criminal convictions and pertinent criminal conduct, barred under this rule, and asylum applicants denied asylum solely as a matter of discretion that will no longer receive automatic review of such decisions.

Based on this identified population, commenters provided a number of potential ancillary costs to the likely increase in asylum denials under these additional bars, which the Departments have reviewed. As explained in the NPRM, a main effect of the likely increase in asylum denials is a potential increase in grants of statutory withholding of removal or protection under the CAT regulations. 84 FR at 69658. These forms of protection do not provide the same benefits as asylum, including the ability to gain permanent status in the United States, obtain derivative status for family members, or travel outside the country. Such non-monetary costs are difficult to quantify, but the Departments believe that the similarly difficult-to-quantify benefits associated with the rule—such as a reduction in the risks associated with dangerous aliens and an increase in adjudicative efficiency—outweigh these costs.

Commenters also cited other potential costs, such as the effects that the bars could have on businesses employing or patronized by asylum applicants. However, such projections were general, tenuous, and unsupported by data, and the Departments are unaware of any reliable data parsing business income attributable to individuals affected by this rule—*i.e.,* asylum applicants who have been convicted of or engaged in certain types of criminal behavior—as opposed to non-criminal asylum applicants, asylees, refugees, aliens granted statutory withholding of removal or protection under the CAT, or other groups of aliens in general. Moreover, because aliens may still obtain work authorization if granted withholding of removal or protection under the CAT, 8 CFR 274a.12(a)(10), this rule would not necessarily foreclose employment or patronage opportunities for aliens subject to its parameters. Finally, even if there were identifiable economic costs for these aliens, the Departments believe that the benefits associated with limiting asylum eligibility based on certain criminal conduct would outweigh them because

of (1) the rule's likely impact in improving adjudicatory efficiency, and (2) the intangible benefits associated with promotion of the rule of law. *See* E.O. 12866, 58 FR at 51734 (directing agencies to account for "qualitative" benefits that are "difficult to quantify," but which are "essential to consider"). The Departments further disagree with commenters' assertions that these bars will have a negative intangible cost on the United States' interests or international standing, as Congress expressly conferred on the Attorney General and the Secretary the authority to provide these additional asylum limitations, which—as explained in the NPRM—are consistent with U.S. treaty obligations. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)); 84 FR at 69644.

## III. Provisions of the Final Rule

The Departments have considered and responded to the comments received in response to the NPRM. In accordance with the authorities discussed above in section I.A, the Departments are now issuing this final rule to finalize the NPRM. The final rule adopts the provisions of the NPRM as final, with the following minor edits for clarity, for the reasons discussed above in section II in response to the comments received.[42]

### A. 8 CFR 208.13(c)(6)(ii)

As drafted in the NPRM, 8 CFR 208.13(c)(6)(ii) would have included a reference to "the Secretary:" "The alien has been convicted [of a crime] that the Secretary knows or has reason to believe * * * ." For internal consistency within 8 CFR 208.13(c)(6)(ii) and for specificity, the Departments are replacing this reference to "the Secretary" with "the asylum officer," the officials in DHS who adjudicate asylum applications.

### B. 8 CFR 1208.13(c)(6)(ii)

Regulations in chapter V of 8 CFR govern proceedings before EOIR and not before DHS. The Departments, however, mistakenly listed both the Attorney General and the Secretary in 8 CFR 1208.13(c)(6)(ii) as drafted in the NPRM: "The alien has been convicted [of a crime] that the Attorney General or Secretary knows or has reason to believe * * * ." This final rule removes the reference to the Secretary so that 8 CFR 208.13(c)(6)(ii), governing DHS, references the Secretary, and 8 CFR 1208.13(c)(6)(ii) references only officials within DOJ. It further changes "Attorney

General" to "immigration judge" for internal consistency within the rest of 8 CFR 1208.13.

### C. 8 CFR 1208.13(c)(6)(v)(B)

This rule amends the cross-reference in 8 CFR 1208.13(c)(6)(v)(B) so that it reads "under paragraph (c)(6)(v)(A)" instead of "under paragraph (c)(6)(v)" as published in the NPRM. This change provides clarity and matches the same cross-reference in 8 CFR 208.13(c)(6)(v)(B)–(C) and 8 CFR 1208.13(c)(6)(v)(C).

In addition, this rule changes "adjudicator" to "immigration judge" for specificity and clarity. This matches the specific reference to "asylum officer," who is the relevant adjudicating entity for DHS, in 8 CFR 208.13(c)(6)(v)(B).

### D. 8 CFR 1208.13(c)(7)(v)

As with the change discussed above to 8 CFR 1208.13(c)(6)(v)(B), this rule corrects the reference to the "asylum officer" to read "immigration judge" in 8 CFR 1208.13(c)(7)(v). The immigration judge is the relevant adjudicator for DOJ's regulations.

### E. 8 CFR 1208.13(c)(9)

As with the change discussed above regarding 8 CFR 1208.13(c)(6)(v)(B), this rule removes "or other adjudicator" from the proposed text for 8 CFR 1208.13(c)(9). This change provides clarity because the immigration judge is the relevant adjudicator for DOJ's regulations and matches the specific reference to only an "asylum officer" in 8 CFR 208.13(c)(9).

### F. 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii)

This rule amends the same language in both 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii) so that the provisions instruct that an alien will be barred from asylum if the immigration judge or asylum officer "knows or has reason to believe" that the alien has engaged in or after the effective date in certain acts of battery or extreme cruelty. Previously, these provisions provided "[t]here are serious reasons for believing" the alien has engaged in such conduct. In other words, the Departments have replaced the "serious reasons for believing" standard in proposed 8 CFR 208.13(c)(6)(vii) and proposed 1208.13(c)(6)(vii) with a "knows or has reason to believe" standard.

This change is intended to prevent confusion and ensure the rule's consistency, both within the new provisions it adds to 8 CFR and with the INA more generally. As discussed

above, the "reason to believe" standard is used in multiple subsections of section 212 of the Act (8 U.S.C. 1182) in making inadmissibility determinations. *See, e.g.,* INA 212(a)(2)(C)(i) (8 U.S.C. 1182(a)(2)(C)(i)) (providing that an alien who "the consular officer or the Attorney General knows or has reason to believe" is an illicit trafficker of controlled substances is inadmissible). The Federal circuit courts have had no issues reviewing immigration judges' "reason to believe" inadmissibility determinations. *See, e.g., Chavez-Reyes,* 741 F.3d at 3–4 (reviewing "reason to believe" determination for substantial evidence); *Lopez-Molina,* 368 F.3d at 1211 (same). Further, without this change, the rule may have created additional unintended questions regarding what sort of reasons to believe are sufficient to qualify as "serious" reasons. Although the Departments are modifying the language in the final rule to reduce the likelihood of confusion, they reiterate that the language in 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii) is intended to be analogous to similar provisions in 8 CFR 204.2.

## IV. Regulatory Requirements

### A. Regulatory Flexibility Act

The Departments have reviewed this proposed rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) and have determined that this rule will not have a significant economic impact on a substantial number of small entities. The rule would not regulate "small entities" as that term is defined in 5 U.S.C. 601(6). Only individuals, rather than entities, are eligible to apply for asylum, and only individuals are eligible to apply for asylum or are otherwise placed in immigration proceedings.

### B. Administrative Procedure Act

This final rule is being published with a 30-day effective date as required by the Administrative Procedure Act. 5 U.S.C. 553(d).

### C. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. *See* 2 U.S.C. 1532(a).

---

[42] In addition, the final rule makes clarifying grammatical edits to the punctuation of the proposed rule, such as by replacing semicolons with periods where relevant.

*D. Congressional Review Act*

The Office of Information and Regulatory Affairs has determined that this rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804(2). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

*E. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)*

The Office of Information and Regulatory Affairs, Office of Management and Budget ("OMB"), has designated this rule a "significant regulatory action" under section 3(f)(4) of Executive Order 12866, but not an economically significant regulatory action. Accordingly, the rule has been submitted to OMB for review. The Departments certify that this rule has been drafted in accordance with the principles of Executive Order 12866, section 1(b); Executive Order 13563; and Executive Order 13771.

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of using the best available methods to quantify costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Similarly, Executive Order 13771 requires agencies to manage both the public and private costs of regulatory actions.

Because this final rule does not make substantive changes from the NPRM that would impact the rule's expected costs and benefits, the Departments have performed the same analysis as set out in the NPRM. 84 FR at 69657–59.

This rule provides seven additional mandatory bars to eligibility for asylum pursuant to the Attorney General's and the Secretary's authorities under sections 208(b)(2)(C) and 208(d)(5) of the INA (8 U.S.C. 1182(b)(2)(C) and

1182(d)(5)).[43] This rule adds bars on eligibility for aliens who commit certain offenses in the United States after entering the country. Those bars would apply to aliens who are convicted of, or engage in criminal conduct, as appropriate, with respect to: (1) A felony under Federal, State, tribal, or local law; (2) an offense under section 274(a)(1)(A) or (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A) or 1324(a)(2)) (Alien Smuggling or Harboring); (3) an offense under section 276 of the Act (8 U.S.C. 1326) (Illegal Reentry); (4) a Federal, State, tribal, or local crime involving criminal street gang activity; (5) certain Federal, State, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant; (6) a Federal, State, tribal, or local domestic violence offense; and (7) certain misdemeanors under Federal, State, tribal, or local law for offenses related to false identification; the unlawful receipt of public benefits from a Federal, State, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia.

The seven bars are in addition to the existing mandatory bars relating to the persecution of others, convictions for particularly serious crimes, commission of serious nonpolitical crimes, security threats, terrorist activity, and firm resettlement in another country that are currently contained in the INA and its implementing regulations. *See* INA 208(b)(2) (8 U.S.C. 1158(b)(2)); 8 CFR 208.13, 1208.13. Under the current statutory and regulatory framework, asylum officers and immigration judges consider the applicability of mandatory bars to the relief of asylum in every proceeding involving an alien who has submitted a Form I–589 application for asylum. Although this rule expands the mandatory bars to asylum, it does not change the nature or scope of the role of an immigration judge or an asylum officer during proceedings for consideration of asylum applications. Immigration judges and asylum officers are already trained to consider both an alien's previous conduct and criminal record to determine whether any immigration consequences result, and this rule does not propose any adjudications that are more challenging than those that are already conducted. For example, immigration judges already consider the documentation of an alien's criminal record that is filed by

the alien, the alien's representative, or the DHS representative in order to determine whether one of the mandatory bars applies and whether the alien warrants asylum as a matter of discretion. Because the new bars all relate to an alien's criminal convictions or other criminal conduct, adjudicators will conduct the same analysis to determine the applicability of the bars proposed by the rule.[44] The Departments do not expect the additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications.

The expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually;[45] however, because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application, neither DOJ nor DHS can quantify precisely the expected decrease. An alien who would be barred from asylum as a result of the rule may still be eligible to apply for the protection of withholding of removal under section 241(b)(3) of the INA (8 U.S.C. 1231(b)(3)) or withholding of removal or deferral of removal under regulations implementing U.S. obligations under Article 3 of the CAT. *See* INA 241(b)(3) (8 U.S.C. 1231(b)(3));

---

[43] As discussed further below, this rule will not otherwise impact the ability of an alien who is denied asylum to receive the protection of withholding of removal under the Act or withholding of removal or deferral of removal under the CAT.

[44] The Departments note that one of the new bars, regarding whether the alien has "engaged" in certain acts of battery or extreme cruelty, does not necessarily require a criminal conviction or criminal conduct. The Departments believe that a criminal arrest or conviction is the most likely evidence to be filed with the immigration court related to this bar, but even in cases where no such evidence is available, the analysis by immigration judges related to this bar is an expansion from the current analysis immigration judges employ in determining whether conduct rises to level of "extreme cruelty" under 8 CFR 204.2(c)(1)(vi) in other contexts during removal proceedings. *See, e.g., Bedoya-Melendez v. U.S. Atty. Gen.*, 680 F.3d 1321, 1326–28 (11th Cir. 2012) (demonstrating that, although there is a circuit split as to whether the "extreme cruelty" analysis is discretionary, all circuits look to conduct and not convictions in conducting the "extreme cruelty" analysis); *Stepanovic v. Filip*, 554 F.3d 673, 680 (7th Cir. 2009) (explaining that, in analyzing whether conduct rises to the level of "extreme cruelty," the immigration judge "must determine the facts of a particular case, make a judgment call as to whether those facts constitute cruelty, and, if so, whether the cruelty rises to such a level that it can rightly be described as extreme"). In addition, adjudicators have experience reviewing questions of an alien's conduct in other contexts during the course of removal proceedings. *See* INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C)) (providing that an alien is inadmissible if "the Attorney General knows or has reason to believe" that the alien is an illicit trafficker of a controlled substance, regardless of whether the alien has a controlled substance-related conviction).

[45] In Fiscal Year ("FY") 2018, DOJ's immigration courts granted over 13,000 applications for asylum. *See* EOIR, *Adjudication Statistics: Asylum Decision Rates*, (July 14, 2020), *https://www.justice.gov/eoir/page/file/1248491/download*.

8 CFR 208.16 through 208.18; 1208.16 through 1208.18. For those aliens barred from asylum under this rule who would otherwise be positively adjudicated for asylum, it is possible they would qualify for withholding (provided a bar to withholding did not apply separate and apart from this rule) or deferral of removal.[46] To the extent this rule has any impacts, they would almost exclusively fall on that population.[47]

The full extent of the impacts on this population is unclear and would depend on the specific circumstances and personal characteristics of each alien, and neither DHS nor DOJ collects such data at such a level of granularity. Both asylum applicants and those who receive withholding of removal or protection under CAT may obtain work authorization in the United States. Although asylees may apply for lawful permanent resident status and later citizenship, they are not required to do so, and some do not. Further, although asylees may bring certain family members to the United States, not all asylees have family members or family members who wish to leave their home countries. Moreover, family members of aliens granted withholding of removal may have valid asylum claims in their own right, which would provide them with a potential path to the United States as well. The only clear impact is that aliens granted withholding of removal generally may not travel outside the United States without executing their underlying order of removal and, thus, may not be allowed to return to the United States; however, even in that situation—depending on the destination of their travel—they may have a prima facie case for another grant of withholding of removal should they attempt to reenter. In short, there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole.

Applications for withholding of removal typically require a similar amount of in-court time to complete as an asylum application due to a similar nucleus of facts. 8 CFR 1208.3(b) (an asylum application is deemed to be an application for withholding of removal). In addition, this rule does not affect the eligibility of applicants for the employment authorization documents available to recipients of those protections and during the pendency of the consideration of the application in accordance with the current regulations and agency procedures. *See* 8 CFR 274a.12(c)(8), (c)(18), 208.7, 1208.7.

This rule removes the provision at 8 CFR 208.16(e) and 1208.16(e) regarding automatic reconsideration of discretionary denials of asylum. This change has no impact on DHS adjudicative operations because DHS does not adjudicate withholding requests. DOJ estimates that immigration judges nationwide must apply 8 CFR 1208.16(e) in approximately 800 cases per year on average.[48] The removal of the requirement to reconsider a discretionary denial will increase immigration court efficiencies and reduce any cost from the increased adjudication time by no longer requiring a second review of the same application by the same immigration judge. This impact, however, would likely be minor because of the small number of affected cases, and because affected aliens have other means to seek reconsideration of a discretionary denial of asylum. Accordingly, DOJ has concluded that removal of paragraphs 8 CFR 208.16(e) and 1208.16(e) would not increase the costs of EOIR's operations, and would, if anything, result in a small increase in efficiency. Removal of 8 CFR 208.16(e) and 1208.16(e) may have a marginal cost for aliens in immigration court proceedings by removing one avenue for an alien who would otherwise be denied asylum as a matter of discretion to be granted that relief. However, of the average of 800 aliens situated as such each year during the last 10 years, an average of fewer than 150, or 0.4 percent, of the average 38,000 total asylum completions[49] each year filed an appeal in their case, so the affected population is very small, and the overall impact would be nominal at most.[50]

Moreover, such aliens would retain the ability to file a motion to reconsider in such a situation and, thus, would not actually lose the opportunity for reconsideration of a discretionary denial.

For the reasons explained above, the expected costs of this rule are likely to be *de minimis.* This rule is accordingly exempt from Executive Order 13771. *See* OMB, *Guidance Implementing Executive Order 13771, titled "Reducing Regulation and Controlling Regulatory Costs"* (2017), *https://www.whitehouse .gov/sites/whitehouse.gov/files/omb/ memoranda/2017/M-17-21-OMB.pdf.*

### F. Executive Order 13132 (Federalism)

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Paperwork Reduction Act

This rule does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. 3501 *et seq.,* and its implementing regulations, 5 CFR part 1320.

### I. Signature

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, has delegated the authority to electronically sign this document to Chad R. Mizelle, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the **Federal Register**.

### List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

---

[46] Because asylum applications may be denied for multiple reasons and because the proposed bars do not have exact analogues in existing immigration law, there is no precise data on how many otherwise grantable asylum applications would be denied using these bars and, thus, there is no way to calculate precisely how many aliens would be granted withholding. Further, because the immigration judge would have to adjudicate the application in either case, there is no cost to DOJ.

[47] In FY 2018, DOJ's immigration courts completed 45,923 cases with an application for asylum on file. For the first three quarters of FY 2018, 622 applicants were denied asylum but granted withholding.

[48] This approximation is based on the number of initial case completions with an asylum application on file that had a denial of asylum but a grant of withholding during FYs 2009 through the third quarter of 2018.

[49] Thirty-eight thousand is the average of completions of cases with an asylum application on file from FY 2008 through FY 2018. Completions consist of both initial case completions and subsequent case completions.

[50] Because each case may have multiple bases for appeal and appeal bases are not tracked to specific levels of granularity, it is not possible to quantify precisely how many appeals were successful on this particular issue.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble and pursuant to the authority vested in the Acting Secretary of Homeland Security, part 208 of title 8 of the Code of Federal Regulations is amended as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229, 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by adding paragraphs (c)(6) through (9) to read as follows:

### § 208.13   Establishing asylum eligibility.

\*      \*      \*      \*      \*

(c) \* \* \*

(6) *Additional limitations on eligibility for asylum.* For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the asylum officer knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local crime in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the asylum officer to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The asylum officer need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) An alien who is a current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The asylum officer knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local

government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

§ 208.16    [Amended]

■ 3. Amend § 208.16 by removing and reserving paragraph (e).

**Department of Justice**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 4. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; Pub. L. 115–218.

■ 5. Amend § 1208.13 by adding paragraphs (c)(6) through (9) to read as follows:

§ 1208.13    Establishing asylum eligibility.

*    *    *    *    *

(c) * * *

(6) *Additional limitations on eligibility for asylum.* For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the immigration judge knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the immigration judge to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The immigration judge need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) An alien who is a current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the immigration judge is not limited to facts found by the criminal court or

provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The immigration judge knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the immigration judge determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An immigration judge is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

### § 1208.16 [Amended]

■ 6. Amend § 1208.16 by removing and reserving paragraph (e).

Approved:

**Chad R. Mizelle,**

*Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security.*

Approved:

Dated: October 14, 2020.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2020–23159 Filed 10–20–20; 8:45 am]

**BILLING CODE 4410–30–P 9111–97–P**