Joel A. Fleming (CA Bar No. 281264)
Lauren Godles Milgroom
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(t) (617) 398-5600
(f) (617) 507-6020
joel@blockleviton.com
lauren@blockleviton.com

*Attorneys For Amici Curiae*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| PANGEA LEGAL SERVICES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | Case No. 3:20-cv-7721 <br><br> **BRIEF OF AMICI CURIAE 20 IMMIGRATION LEGAL SERVICES ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** <br><br> Assigned to Hon. Susan Ilston <br><br> Hearing Date: November 18, 2020 <br> Time: 11:00am |

# TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE ................................................................................................ 1

DISCLOSURE STATEMENTS .................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    A.    The Rule Abandons the Totality of the Circumstances Framework for Asylum Eligibility and Triggers Disproportionately Harsh Punishments for Asylum Seekers ..... 2

    B.    The Stories of Amici's Clients Show How the Rule Excessively Penalizes Asylum Seekers Who Have Not Committed Particularly Serious Crimes and Are Not Dangerous ............................................................................................................................ 4

        i.    All Offenses Defined as Felonies Under Federal Law ................................................... 4

        ii.    Drug Possession and DUIs ............................................................................................. 6

        iii.    Family and Child-Related Offenses ............................................................................... 9

        iv.    Suspicions of Gang Related Activity ............................................................................ 11

        v.    Misdemeanor Use or Possession of False Identification Documents ......................... 12

CONCLUSION ............................................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Bochart v. City of Lowell*,
No. CV 13-11753-FDS, 2016 WL 696087 (D. Mass. Feb. 19, 2016) ......................................... 5

*Comm. v. Villalobos*,
777 N.E.2d 116 (Mass. 2002) ..................................................................................................... 5

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ....................................................................................................... 2

*INS v. Stevic*,
467 U.S. 407 (1984) ..................................................................................................................... 3

*Matter of Pula*,
19 I. & N. Dec. 467 (BIA 1987) .................................................................................................. 2

*R-S-C v. Sessions*,
869 F.3d 1176 (10th Cir. 2017) ................................................................................................... 2

**Statutes**

8 U.S.C. § 1158(b)(2)(A) ............................................................................................................ 3

8 U.S.C. § 1231(b)(3) .................................................................................................................. 3

MD Crim. Code § 3-203 .............................................................................................................. 4

MD Crim. Code § 3-608(b) ......................................................................................................... 4

MD Crim. Code § 6-308 .............................................................................................................. 4

MD Crim. Code § 6-319 .............................................................................................................. 4

Mass. Gen. L. c. 266 § 30A ......................................................................................................... 4

Mass. Gen. L. c. 90 § 24(2)(a) ..................................................................................................... 4

**Regulations**

8 C.F.R. § 1208.16(c)(2) .............................................................................................................. 4

85 Fed. Reg. 67202 (Oct. 21, 2020)…………………………………………………..2, 4, 6, 9, 11, 12

**Treaties**

1951 Convention Relating to the Status of Refugees,
July 28, 1951, 189 U.N.T.S. 150……………………………………………………………………….2

**Other Authorities**

Ryan Autullo and Taylor Goldenstein, *Immigrant taken by ICE from Austin courthouse was killed in Mexico*, AUSTIN AMERICAN-STATESMEN (Sept. 20, 2017), https://bit.ly/3n5Qc6s .................. 3

Richard G. Dudley, Jr., *Childhood Trauma and Its Effects: Implications for Police*, New Perspectives in Policing Bulletin, DEPT. OF JUSTICE, NAT'L INST. OF JUSTICE (2015), NCJ 248686........................................................................................................................ 3

Lamya Khoury *et al.*, *Substance Use, Childhood Traumatic Experience, and Posttraumatic Stress Disorder in an Urban Civilian Population*, 27 DEPRESSION AND ANXIETY 1077 (2010), https://bit.ly/32sQoVr ....................................................................................................... 3

David Murphey, *Moving Beyond Trauma: Child Migrants and Refugees in the United States*, CHILD TRENDS (Sept. 7, 2016), https://bit.ly/32rD3Nb................................................................. 3

Giulia Turrini *et al.*, *Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies*, INT'L J. OF MENTAL HEALTH SYSTEMS 11 (Aug. 2017) 51, https://bit.ly/35i96B1 .................................................................................................... 3

## INTERESTS OF AMICI CURIAE

Amici are public defender offices, a private immigration law firm, and multiple non-profit organizations that assist persecuted immigrants from all over the world. Amici also assist immigrants in overcoming a daunting array of linguistic, economic, cultural, and legal challenges to secure asylum in the United States. The Rule will have devastating effects on amici's asylum-seeking clients, most of whom have faced persecution in their countries of origin and risk serious harm or even death if they are forced to return. The Rule will also harm amici themselves because it will force amici to shift resources into addressing the Rule and necessarily reduce their capacity to assist vulnerable asylum seekers. By severely limiting the number of individuals eligible for asylum, the Rule will jeopardize the funding of non-profit amici whose funding depends on the number of clients represented or number of applications filed. Many amici also train and depend upon pro bono partners to represent asylum seekers. The added complexities of asylum eligibility under the Rule are likely to discourage pro bono attorneys, who are largely not immigration specialists, from taking on these cases.

## DISCLOSURE STATEMENTS

No counsel for a party authored this brief in whole or in part, and no person other than amici curiae and their counsel made a monetary contribution to fund the preparation or submission of this brief. In addition, amici do not have any parent corporations or issue stock, and there is no publicly held corporation owning 10% or more of their stock, with the exception of the following:

- The Justice Center of Southeast Massachusetts is a subsidiary of the non-profit organization South Coastal Counties Legal Services; and

- National Immigrant Justice Center is a subsidiary of the non-profit organization Heartland Alliance.

# ARGUMENT

The Rule[1] will excessively punish immigrants who have fled horrific circumstances, seeking sanctuary in the United States under the protections of our asylum laws. There are likely to be thousands of asylum seekers who will be denied life-saving relief under the Rule. This brief tells the stories of just a dozen of those people who, despite having strong claims, would have been barred from seeking asylum if subject to the Rule.

A. *The Rule Abandons the Totality of the Circumstances Framework for Asylum Eligibility and Triggers Disproportionately Harsh Punishments for Asylum Seekers*

The Department of Justice ("DOJ") and Department of Homeland Security ("DHS") justify the Rule's unforgiving treatment of people with convictions for (or even suspicion of) virtually any kind of offense by stating that they "should not be rewarded with asylum and the many benefits that asylum confers." 85 Fed. Reg. at 67242. But asylum is not a "reward"—it is a commitment grounded in international law that "the United States has acceded to, and agreed to be bound by," because sheltering oppressed persons is consistent with American law and ideals. *R-S-C v. Sessions*, 869 F.3d 1176, 1178 (10th Cir. 2017). Nor does the United States deny asylum to those who have committed "particularly serious crimes" as a punishment. Rather, the current criminal bars to asylum eligibility are circumscribed to instances in which an applicant's crime is so serious that it "constitutes a danger to the community of that country." 1951 Convention Relating to the Status of Refugees art. 33, July 28, 1951, 189 U.N.T.S. 150; *see E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 757 (9th Cir. 2018) ("Congress enacted the Refugee Act of 1980 . . . to bring the [Immigration and Naturalization Act] into conformity with the United States's obligations under the Convention and Protocol [Relating to the Status of Refugees].").

The stories of amici's clients below reinforce the importance of the "totality of the circumstances" approach that has been used to evaluate asylum eligibility for decades, *see Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987), unless one of the few and narrowly proscribed bars

---

[1] References to the "Rule" are to the final rule published in *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67202 (Oct. 21, 2020).

to eligibility apply.[2] This holistic approach is critical in the asylum context, because the very trauma and persecution that asylum seekers have fled may, in turn, increase their chances of interactions with law enforcement. *See, e.g.*, Giulia Turrini *et al.*, *Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies*, INT'L J. OF MENTAL HEALTH SYSTEMS 11 (Aug. 2017) 51, https://bit.ly/35i96B1; Richard G. Dudley, Jr., *Childhood Trauma and Its Effects: Implications for Police*, New Perspectives in Policing Bulletin, DEPT. OF JUSTICE, NAT'L INST. OF JUSTICE (2015), NCJ 248686 at 10. Violent experiences may lead to "toxic stress," particularly in children, and "reach into the brain's structure and function, impairing cognitive, [and] social and emotional skills." David Murphey, *Moving Beyond Trauma: Child Migrants and Refugees in the United States*, CHILD TRENDS (Sept. 7, 2016), https://bit.ly/32rD3Nb; *see* Lamya Khoury *et al.*, *Substance Use, Childhood Traumatic Experience, and Posttraumatic Stress Disorder in an Urban Civilian Population*, 27 DEPRESSION AND ANXIETY 1077, 1078 (2010), https://bit.ly/32sQoVr. The Rule eliminates the possibility for an adjudicator to consider the psychological and developmental effects of persecution that, by definition, all asylum seekers have experienced or fear. For asylum seekers, the denial of relief could mean a return to the place of their persecution and possibly a death sentence. *See, e.g.*, Ryan Autullo and Taylor Goldenstein, *Immigrant taken by ICE from Austin courthouse was killed in Mexico*, AUSTIN AMERICAN-STATESMEN (Sept. 20, 2017), https://bit.ly/3n5Qc6s (reporting that deported Mexican man was "killed by the same gangs that had prompted the family's move to [the United States] in the first place").[3]

---

[2] 8 U.S.C. § 1158(b)(2)(A) bars asylum for those who have been convicted of a "particularly serious crime;" have committed a "serious nonpolitical crime" outside the U.S.; are a "danger to the security of the United States;" or have engaged in terrorist activity.

[3] Although individuals retain eligibility for withholding of removal and the Convention Against Torture ("CAT"), these forms of relief are limited in scope and duration and demand a higher level of proof than asylum claims. *INS v. Stevic*, 467 U.S. 407, 411 (1984); 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(c)(2). An individual with a valid asylum claim could be unable to meet the higher standard for withholding and CAT and thus be deported. Moreover, withholding and CAT provide fewer benefits than asylum, such as eligibility to petition to reunite with family members.

The Rule will result in the most severe consequences—deportation with the possibility of persecution and even death—for the most minor infractions. For example, in Maryland and Massachusetts, where many of amici's clients reside, the following misdemeanors carry a potential sentence of more than one year and, under the Rule, constitute automatic bars to asylum:

- Providing or selling an alcoholic beverage to someone younger than twenty-one years old (MD Crim. Code § 6-304); allowing any individual to consume an alcoholic beverage not purchased on licensed property (*Id.* § 6-308); consuming an alcoholic beverage on licensed property that was not purchased on the property (*Id.* § 6-319);

- Second-degree assault; does not require physical injury (*Id.* § 3-203);

- Having custody of a child younger than thirteen and failing to report the child missing within twenty-four hours (*Id.* § 3-608(b));

- Unauthorized use of a motor vehicle (Mass. Gen. L. c. 90 § 24(2)(a));

- Leaving the scene of property damage (*Id.*); and

- Shoplifting over $250 (Mass. Gen. L. c. 266 § 30A).

B. *The Stories of Amici's Clients Show How the Rule Excessively Penalizes Asylum Seekers Who Have Not Committed Particularly Serious Crimes and Are Not Dangerous*

The Rule will excessively punish people like amici's clients, whose relatively minor infractions fall into the following, new categorial bars to asylum: (i) all offenses that are defined as felonies under federal law, even if the relevant state defines them as misdemeanors, (ii) drug possession and driving under the influence ("DUI") offenses, (iii) family and child-related offenses, (iv) suspicions of gang activity, and (v) the use of false documents. The following clients of amici are emblematic of the types of asylum seekers who will be barred under the Rule.

i. <u>All Offenses Defined as Felonies Under Federal Law</u>

*Under the Rule, "[t]he term 'felony' means any crime . . . punishable by more than one year of imprisonment." 85 Fed. Reg. at 67259.*

**Armando**[4] is a fifty-two-year-old gay man of African descent who suffered a lifetime of violence in his native Honduras because of his sexual orientation and his race. Armando's body is covered in scars that tell a story of constant abuse and suffering. Beginning when he was a

---

[4] All names and identifying information have been changed to protect clients' privacy and safety.

young child, Armando was threatened, raped, beaten, and nearly killed on multiple occasions by family, community members, police officers, and gangs in Honduras. In 1988, Armando was beaten nearly to death. He fled to the United States, seeking safety. But the road forward was not easy. Armando's relatives in the U.S. turned their backs on him because of his sexual orientation, and Armando became homeless. He slept on the streets or in shelters and went hungry on many nights. In 2000, Armando was diagnosed with HIV/AIDS and suffered multiple devastating parasitic brain infections. In addition to the serious health complications brought on by HIV/AIDS, Armando has been diagnosed with chronic/severe Post-Traumatic Stress Disorder ("PTSD") and Major Depressive Disorder.

Two decades ago, Armando was staying at a homeless shelter when a large altercation erupted. The police came and arrested a group of men, including Armando. Armando was released almost immediately, but the incident still resulted in a continuance without a finding ("CWOF")[5] on charges of assault and battery with a dangerous weapon (here, Armando's shoe). That charge carries a maximum possible penalty of two and a half years of incarceration in Massachusetts. In 2000, also while homeless and chronically hungry, Armando agreed to a CWOF after he stole food from a convenience store.

In December of 2016, while he was in immigration detention and subject to removal proceedings, Armando obtained pro bono counsel. With counsel's help, Armando applied for asylum, and was granted relief in March of 2017. Under the Rule, however, Armando would not have been eligible for asylum because of two incidents that occurred some twenty years ago. No other aspect of Armando's fifty-two years of life could be considered, including the twenty years of suffering he experienced in Honduras or the thirty-two years he spent in the United States with only a negligible criminal record.

---

[5] A CWOF "is not a 'conviction' under Massachusetts law," *Comm. v. Villalobos*, 777 N.E.2d 116, 120 (Mass. 2002), but is "treated as a conviction for some purposes under federal law," including immigration laws, *Bochart v. City of Lowell*, No. CV 13-11753-FDS, 2016 WL 696087, at *3 & n.2 (D. Mass. Feb. 19, 2016).

ii. Drug Possession and DUIs

*Under the Rule, asylum seekers are barred from relief for any conviction for "[p]ossession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana."* 85 Fed. Reg. at 67258.

*Asylum seekers are also categorically barred for any DUI offense that resulted in serious bodily injury or death, or for any subsequent DUI offense, even if no one was injured. Id.*

**Chris** is an indigenous Guatemalan who survived a government massacre and burning of his indigenous community during the Guatemalan Civil War. After the war, Chris helped lead his community's rebuilding efforts. But this newfound status made Chris a target for the guerrillas who continued to terrorize indigenous peoples. Chris was forced to flee and he found sanctuary in the United States. Although he is now safe from paramilitaries here, Chris has nonetheless faced his share of hardship. Since coming to the United States, Chris has struggled with alcoholism, which led to several DUI convictions in the 1990s and early 2000s.

Chris is now in his 70s and has been sober for over a decade. He has also developed severe dementia and lives in extreme poverty. During his recent asylum proceedings, DHS stipulated that Chris's DUIs did not constitute "particularly serious crime[s]." The immigration judge conducted a holistic analysis of Chris' case and granted him humanitarian asylum. The judge found it likely that he would suffer grave harm in Guatemala due to his cognitive decline. Had the Rule been in effect, however, it would have made no difference that DHS stipulated to Chris's DUIs not being "particularly serious" or that the immigration judge believed that humanitarian concerns weighed in favor of granting him sanctuary. Under the Rule, the United States would have been required to automatically eject an elderly man with a failing memory back to the country where he had narrowly escaped the systematic extermination of his people.

**Jesus** is an asylum seeker who would be excluded from asylum under the Rule's provisions on DUIs. Jesus is a Mexican man in his 60s who fled to the United States after cartel members stalked him, murdered his son, and beat his brother. Jesus struggled with alcoholism and was convicted of several DUIs in the early 2000s, none of which resulted in physical injury to others. Since entering Alcoholics Anonymous almost 20 years ago, Jesus has not had any

additional alcohol-related convictions and has been diligently pursuing his asylum case. Under the Rule, however, the judge would not be permitted to consider his application on the merits.

**Mary** is a transgender woman from Mexico who endured severe physical and sexual abuse by both family members and government officials due to her gender identity. In one incident, police officers tied Mary to a truck, beat her, and jailed her overnight. Mary fled and sought refuge in the United States. While living in Arizona, Mary was twice convicted of driving under the influence. In neither case was anyone injured. Mary was detained because of these DUIs, but an immigration judge decided that she was not a danger to the community. She was released from detention more than four years ago and has not received any other citations. Under the Rule, she would be ineligible for asylum.

**James** is a Liberian refugee who came to the United States when he was thirteen. James and his family belong to an ethnic group known as the Krahn. During the Liberian Civil War, Charles Taylor and his rebel forces targeted and massacred the Krahn. James's family was no exception. The rebels murdered James's parents and burned down his home. They beat James and cut off his ear. Thankfully, James survived the attack and was able to reach a refugee camp with his grandmother and siblings. James was not yet free of the horror, though. In the camp, James regularly saw men being beaten and even burned alive.

James and his grandmother eventually came to this country as refugees. After his grandmother died in 2011, James, who was still experiencing symptoms of trauma from the war, struggled to cope with her loss. Depressed, he turned to drug use. James was ultimately convicted of possession of a controlled substance, and ICE placed James in removal proceedings. James applied for asylum, which was ultimately granted in October 2018. Under the Rule, however, James's asylum application could not be considered on the merits because of his conviction for possession of a controlled substance. The United States would be forced to deny James asylum, in a cruel and twisted continuation of the oppression that Charles Taylor set in motion so many years ago.

7
Case No. 3:20-cv-07721
Brief of Amici Curiae in Support of Plaintiffs' Motion for a Temporary Restraining Order

**Carlos** is a gay man from Mexico who fled persecution based on his sexual orientation. After arriving in the United States, Carlos was diagnosed with HIV. Feeling desperate and lost, Carlos turned to drugs. He was placed into removal proceedings after receiving a single conviction for possession of cocaine. An immigration judge heard Carlos's testimony about the nature and circumstances of his conviction and the mental health effects of his HIV diagnosis. The judge determined, based on the totality of the circumstances, that Carlos was entitled to asylum, which would have been impossible under the Rule.

**Felipe** is also a gay man from Mexico who sought sanctuary in the United States. When Felipe was eight years old, his parents came to the United States, leaving Felipe and his three brothers in the care of his grandparents in Mexico. What followed were two very difficult years. Felipe's grandparents physically abused him and neglected his basic needs. Felipe often had nothing to eat and frequently missed school, because his grandparents would keep him confined to the house for weeks at a time. Meanwhile, Felipe's uncle began to sexually abuse the young boy, while threatening to rape Felipe's younger brothers if Felipe told anyone. The abuse continued for a year.

Finally, when Felipe was about ten years old, he and his brothers reunited with their parents in the United States. Felipe carried his pain with him. He could not stand being touched by anyone, including his own parents, and struggled to accept his sexuality. He mostly kept to himself in school, causing his peers to bully him mercilessly. The stresses compounded, and Felipe developed anger management issues. As he grew older, he turned to alcohol to cope.

Felipe began working at a grocery store after high school, where two of his co-workers constantly harassed him. When he asked his manager to intervene, the manager instead fired Felipe. That same day, Felipe went to the house of one of his tormentors, broke in, and began to throw items on the ground. Felipe was arrested and convicted of felony burglary. Around that time, Felipe was also arrested and convicted on two DUI charges. When Felipe was placed in removal proceedings, he applied for asylum. During the asylum process, Felipe was finally able to speak with a therapist, who diagnosed him with depression and PTSD.

After receiving the help he had long needed, Felipe turned a corner. He stopped drinking and has had no arrests since his DUI in 2013. A judge granted Felipe's asylum request in 2018 based on the persecution he suffered in Mexico and his well-founded fear of future persecution because of his sexual orientation. Felipe is now married, enrolled in community college, and working as a medical receptionist—none of which would have been possible under the Rule.

### iii. Family and Child-Related Offenses

*Under the Rule, asylum seekers are barred from relief for any conviction for "stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence . . . ."* 85 Fed. Reg. at 67258.

**Jose** is an indigenous man from Central America who came to the United States as a teenager. Jose was diagnosed with a cognitive disability, and his low IQ puts his intellectual functioning in the "extremely low" range. Because of his disability, Jose suffered severe abuse as a child and eventually fled to the United States. Maltreatment of persons with severe cognitive limitations remains widespread in his country of origin, so Jose is currently seeking asylum here.

Jose has had only one interaction with the criminal justice system in his time in the United States. Five years ago, Jose was convicted of the misdemeanor of endangering the welfare of a child in New York. Jose is currently pursuing post-conviction relief, however, because of defects in his original plea. Had it happened after the Rule went into effect, this single, contested conviction would almost certainly bar Jose from asylum. Although Jose's conviction was a misdemeanor, it could still be considered "a crime that involves conduct amounting to . . . child abuse, child neglect, or child abandonment"—a categorical bar under the Rule. And even if Jose's challenge is successful and his conviction is vacated, Jose would still have to overcome a presumption that the vacatur was not granted by a state court "for the purpose of ameliorating immigration consequences." *Id.* at 67259. This single conviction would override all other factors to bar Jose from asylum. An immigration judge could not consider Jose's cognitive disability or any role it may have played in his conviction. Nor could the judge consider that Jose has not been convicted of any other offense.

**Kojo** experienced severe trauma as a child in Ghana. His mother, who suffered from mental illness, abandoned him, and a neighbor sexually abused him. Nonetheless, he excelled in school and was able to come to the United States to study. In his early 20s, he began experiencing symptoms of what he would later learn were bipolar disorder and PTSD. Kojo struggled to accept his mental illness, which is widely stigmatized in Ghana and viewed as a demonic affliction.

Despite everything, Kojo graduated from college, launched a career in healthcare, and got married. Unfortunately, his marriage did not last, and the stress caused by its breakdown exacerbated his mental illness. During a manic episode, Kojo came to his wife's workplace, and an observer called the police. Although no one was injured, the officers arrested Kojo for assault and battery on a family member. Kojo realized that he needed help and checked himself into the hospital immediately after this incident. Prosecutors dismissed the charges at his wife's request.

Kojo applied for and was granted asylum based on his well-founded fear of persecution in Ghana due to his disability. In his declaration and his testimony, Kojo explained the circumstances surrounding his dismissed domestic violence charge. He took responsibility for failing to take his medications consistently and explained his new-found understanding of how his manic behavior frightened his wife. Since Kojo was granted asylum, he has made great progress. He has kept his distance from his (now former) wife and resumed working in healthcare—providing essential services during the COVID-19 pandemic. He has also returned to school and made the dean's list. Kojo could not have made these strides under the Rule.

**Abraham** came from a family that was vocally opposed to his country's authoritarian regime. Abraham's father was an educator and a reform-minded political activist who died in 1991 after police beat him severely. Although shaken, Abraham's family continued to pursue justice and democratic reform. In late 2002, Abraham and his brother participated in a strike. Once again, the police resorted to radical violence, beating Abraham so viciously that he fell into a coma. Fortunately, he survived, but his brother would not be so lucky. In 2004, the police abducted Abraham's brother and beat him to death, just like his father. When Abraham's mother

bravely took to the airwaves to condemn the government's murders, the government turned its wrath on her. Government forces harassed and threatened her repeatedly.

Abraham fled to the United States in 2006 to escape the fate of his father and brother. But the road ahead would not be easy for Abraham. After arriving in the United States, Abraham learned that his sister, who had stayed behind, had been raped by government officials. Abraham drank to try to numb the pain and soon fell into alcohol dependency. His alcoholism precipitated a spiral of bad decisions that resulted in convictions for driving under the influence, harassment, and violation of a non-contact order. Because of these convictions, Abraham found himself subject to removal proceedings in 2011.

Fearing for his life, Abraham applied for asylum. An immigration judge initially denied Abraham's application, but the Board of Immigration Appeals overturned the decision and granted Abraham asylum in May 2019. With his safety now assured, Abraham has greatly improved and atoned for the harm he has caused. He has entered into a treatment program for his alcohol dependence, has a steady job, and has begun rekindling his relationship with his children.

Abraham's story is one of redemption. Under the Rule, it would simply be a tragedy.

### iv. Suspicions of Gang Related Activity

*Under the Rule, asylum seekers are barred from relief for any conviction "that the immigration judge knows <u>or has reason to believe</u> was committed in support, promotion, or furtherance of the activity of a criminal street gang."* 85 Fed. Reg. at 67259 (emphasis added).

**Raul** is the son of an influential community organizer in El Salvador. Because of his father's leadership, gangs have long targeted Raul's family. His father, in turn, targeted Raul—beating him with sticks and ropes, locking him up, burning him, and starving him. Raul was also threatened and shot at by gang members who targeted him for being his father's son. When Raul was fifteen, he fled to the United States.

Life in the United States was not easy for Raul, in large part due to the lingering trauma of his childhood. He was not able to enroll in school. In 2015, when Raul was eighteen and struggling with homeless, he pled to a CWOF for assault with a dangerous weapon, assault and battery with a dangerous weapon, and malicious destruction of property. DHS introduced a "gang

packet" in his case, which was sparsely supported with photos from Facebook—including a photo that misidentified another person as Raul.

By his early twenties, Raul had turned his life around. He had a long-term partner, whom he supported while she finished school, and a steady job in construction. But in 2019, ICE picked him up and detained him. Raul applied for asylum, was found credible, and qualified for an exception to the one-year deadline. Because of an evolving legal question on the cognizability of his family-based claim, however, he lost his initial case, and his appeal is pending. Raul has not had any arrests, charges, or convictions since the incident in 2015. Moreover, this year, the CWOF was vacated due to ineffective assistance of counsel. A federal judge also recently found that the government had not met its burden to show he was a danger, and Raul was released from immigration detention.

Despite Raul's persuasive claim for asylum, he could be automatically barred under the Rule. First, because Raul's CWOF was vacated after the initiation of removal proceedings against him, he would face the Rule's presumption that the vacatur was granted "for the purpose of ameliorating immigration consequences." 85 Fed. Reg. at 67259. If he were unable to overcome this presumption, his vacated conviction would nevertheless be treated as a conviction for immigration purposes. Second, although his CWOF was vacated, a judge with a "reason to believe" the CWOF was gang-related would be forced to automatically deny Raul relief—without hearing any evidence, including about the photo misidentification

### v. Misdemeanor Use or Possession of False Identification Documents

*Under the Rule, asylum seekers are barred from relief for any conviction for "the possession or use of an identification document, authentication feature, or false identification document without lawful authority."* 85 Fed. Reg. at 67258.

**Paula** is a mother of two American citizens. For many years, while living in Mexico, Paula tried unsuccessfully to reunite with her children in the United States. Paula's efforts resulted in a 2009 misdemeanor for using another person's identification to enter the United States, a 2010 misdemeanor conviction for unlawful entry, and a 2011 felony conviction for re-entry after deportation. In 2014, back in Mexico, Paula reported the activities of organized criminals to

Mexican law enforcement. Unfortunately, the officials were corrupt and turned Paula's life into a nightmare. Uniformed police officers abducted Paula and confined her in an unregulated drug rehabilitation center. There, the officers tortured, beat, asphyxiated, and mock-executed Paula.

Paula fled to the United States and properly presented herself at a port of entry seeking sanctuary. She was granted asylum in 2017. Under the Rule, however, Paula could not have qualified for asylum because of her prior convictions for illegal reentry to see her children. Had it been in place when Paula applied for asylum, the Rule would have put two U.S. citizens in danger of losing their mother—even though she had endangered no one.

## CONCLUSION

These stories represent countless individuals who have been granted or have applied for asylum under the existing, holistic framework that is consistent with the United States' international obligations. The protection of asylum would not be available to these same individuals under the Rule. For the safety of amici's clients and the countless persecuted immigrants like them, amici urge the Court to enjoin or stay the Rule's implementation.

Dated November 10, 2020

**BLOCK & LEVITON LLP**

/s/ Joel A. Fleming
Joel A. Fleming (CA Bar No. 281264)
Lauren Godles Milgroom
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(t) (617) 398-5600
(f) (617) 507-6020
joel@blockleviton.com
lauren@blockleviton.com

*Attorneys For Amici Curiae*

Wendy S. Wayne*
Jennifer Klein*
Claire Valentin*
**Committee for Public Counsel Services**
**Immigration Impact Unit**
21 McGrath Highway
Somerville, MA 02143
(t) (617) 623-0591
(f) (617) 623-0936
iiu@publiccounsel.net
**not admitted in this jurisdiction*