2009 Daily Journal D.A.R. 141

States temporarily left the country, he could be excluded from re-entry. Lawful permanent residents ("LPRs") are, of course, non-citizens who have successfully satisfied statutory requirements and earned the favorable exercise of discretion by the government to be allowed to reside in the United States permanently. Although a permanent resident, an LPR still could be deported if he committed a qualifying crime. If he left the country temporarily, he could also be excluded upon return if he had committed a qualifying offense. An LPR, as a non-citizen seeking entry, would generally be subject to the same proceedings and grounds of exclusion if he traveled abroad and returned to the United States. *See* INA §§ 101(a)(3) & (13), 66 Stat. 166, 167 (1952). Facing a large volume of cases in which a waiver of exclusion was sought in compassionate cases involving LPRs, Congress afforded certain qualifying LPRs the protection of subsection (c):

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of paragraph (1) through (25) and paragraphs (30) and (31) of subsection (a).

INA § 212(c), 66 Stat. 187.

By its terms, former INA § 212(c), 8 U.S.C. § 1182(c) (repealed 1996), applies only to persons in exclusion proceedings. The Board of Immigration Appeals ("BIA") first recognized a problem with making section 212(c) relief available to excludables but not deportables in 1940, in the context of section 212(c)'s precursor statute. [1] *See Matter of L,* 1 I. & N. Dec. 1 (1940). In *Matter of L,* the BIA held that relief under section 212(c)'s precursor was available in a deportation proceeding where the alien had departed and returned to the United States after the ground for exclusion/ deportation arose. To hold otherwise, the BIA noted, would render the statute "capricious and whimsical." *Id. at 5.* The Second Circuit took this interpretation to its logical extension

in *Francis,* 532 F.2d 268, holding that section 212(c) relief must be available to all persons in deportation proceedings who would be excludable on the same grounds, not just those who had actually left the country and reentered. Immediately following *Francis,* the BIA embraced the *Francis* analysis. *Matter of Silva,* 16 I. & N. Dec. 26, 30 (BIA 1976).

When the question then reached our Court, the matter had been so clearly determined that when we initially affirmed, in an unpublished disposition, a denial of section 212(c) relief to an alien in a deportation proceeding, the Supreme Court granted certiorari and remanded the case to us for reconsideration in light of the Solicitor General's position in its brief before the Supreme Court. The Solicitor General's Brief on Petition for a Writ of **\*1215** Certiorari asserted "the government's current position that these precedents [which limit section 212(c) to exclusion proceedings] are erroneous and should be overruled." Brief for the Respondent at 6, *Tapia–Acuna v. INS,* 449 U.S. 945, 101 S.Ct. 344, 66 L.Ed.2d 209 (1980). The Solicitor General further stated that "[i]n the government's view, the Ninth Circuit's position is without support in either the statutory language of [section 212(c) ] or the case law on which the court of appeals has relied." *Id. at 6.* On remand, we followed *Francis* and held that "eligibility for [§ 212(c) ] relief cannot constitutionally be denied to an otherwise eligible alien who is deportable under [§ 241(a)(11) (narcotics conviction) ], whether or not the alien has departed from and returned to the United States after the conviction." *Tapia–Acuna v. INS,* 640 F.2d 223, 225 (9th Cir.1981).

To this date, every court to consider the issue has determined that due process requires that section 212(c) must be applied to deportation proceedings as well as exclusion proceedings. *See Blake v. Carbone,* 489 F.3d 88, 103–04 (2d Cir.2007) (discussing cases).

### A

Our sister circuits are right. The Supreme Court has long held that the constitutional promise of equal protection of the laws applies to aliens as well as citizens. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Under the minimal scrutiny test, which is applicable in this case, distinctions between different classes of persons "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object

of the legislation, so that all persons similarly circumstanced shall be treated alike." *Stanton v. Stanton,* 421 U.S. 7, 14, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). As the Second Circuit recognized in *Francis,* "[r]eason and fairness would suggest that an alien whose ties with this country are so strong that he has never departed after his initial entry should receive at least as much consideration as an individual who may leave and return from time to time." 532 F.2d at 273.

Throughout this litigation, the government has been unable to provide a rational basis for this unequal treatment. The majority attempts to conjure one, urging that the rational basis for making section 212(c) relief available only to aliens in exclusion proceedings is to encourage "self-deportation" and thus save government resources. There is no record support for this rationale, and the majority's reasoning contains two fundamental flaws. First, there is no support for the contention that encouraging "self-deportation," as described by the majority, would actually further the interest of saving government resources. Second, the rational reason the majority prescribes to Congress presumes an interest which is actually in conflict with the statute itself. While the majority correctly notes that we do not have to look to the actual rationale for the legislation, in order to be rational, the reason must be consistent.

When an LPR leaves and attempts to reenter the country and is deemed excludable yet potentially eligible for a section 212(c) waiver, the LPR is generally allowed to enter and to apply for the waiver from within the country. If the alien is ultimately denied the waiver, the government must remove him. No fewer government resources are exerted than if the alien applied for a § 212(c) waiver during a deportation proceeding. Moreover, if the statute were to actually function as the majority presumes and encourage aliens to voluntarily place themselves in this position ***1216** —a contention which I find dubious—this would increase the number of removal proceedings, which would, in turn, spend *more* government resources. [2] There is no support in the record for the assertion that treating returning LPRs differently from those who remain would save government resources.

Second, implicit in the majority's argument that a rational Congress would want to encourage aliens who are excludable but eligible for section 212(c) waiver to place themselves in exclusion proceedings is the assumption that a rational Congress would want these persons to leave the country. This is inconsistent with the fact that, by creating section 212(c)

waiver, Congress explicitly identified this group of aliens as desirable for reentry to the country, subject to the Attorney General's discretion. This is not a group of aliens who, if they are identified, will necessarily be removed from the country. Rather, this is a group of aliens whom Congress has deemed worthy to remain in the country, in spite of having been convicted of particular crimes. [3] This is the group that is being sorted based on whether or not they have recently departed and reentered the country. There is simply no logical reason to discriminate between persons whom Congress has deemed worthy—subject to the discretion of the Attorney General—of remaining in the country based on whether or not they have recently departed the country. [4] As low a threshold as the rational basis test is, this statutory scheme does not pass.

B

The majority's dismissal of the constitutional problem in the text of section 212(c) also implicitly casts considerable doubt on the constitutionality of a federal regulation. After the Supreme Court held that IIRIRA does not apply retroactively to deny section 212(c) relief to aliens who plead guilty to a charge which would otherwise make them eligible for a section 212(c) waiver prior to the enactment of IIRIRA, *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), the Department of Homeland Security ("DHS") promulgated 8 C.F.R. § 1212.3 to codify the holding in *St. Cyr.* That regulation ***1217** provides that, assuming an alien in a deportation proceeding meets other requirements, the alien is eligible for section 212(c) relief unless "[t]he alien is deportable under former section 241 of the Act or removable under section 237 of the Act on a ground which does not have a statutory counterpart in section 212 of the Act." 8 C.F.R. § 1212.3(f)(5). [5] The regulation thus proceeds on the long-standing assumption, which the majority has now overruled in our Circuit, that section 212(c) is applicable to both deportation and exclusion proceedings.

By holding that the statutory language of section 212(c) is clear and that *Francis* and *Tapia–Acuna* did not "accord[ ] sufficient deference" to Congress, the majority has implicitly questioned DHS's authority to enact the above regulation. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ( "If the intent of Congress is clear, that is the end of the matter; for the agency, must give effect to

the unambiguously expressed intent of Congress."). Under the majority rule, the regulation that has been applied in thousands of cases cannot survive. Those who were eligible to apply for relief yesterday under the regulation are on very uncertain ground today.

### C

There is, in sum, no reason to depart from our long-established precedent, developed over many decades in this Circuit and every other. The BIA has acted in reliance on it, and the government has exercised its discretion based on this precedent to grant relief to thousands of individuals. There is no justification for casting the system aside now and throwing thousands of pending applications for section 212(c) relief into question, particularly when it is unnecessary to the resolution of this petition to do so.

### II

Applying the constitutional analysis discussed in Part I to the present case, I would hold that Abebe is eligible for section 212(c) relief because the specific offense which makes him deportable would also make him excludable. Equal protection demands that we treat equally aliens similarly situated. In cases such as this, it is the act or offense itself that makes one alien similarly situated to another, not the grounds the government chooses to use to deport the aliens. To clarify our caselaw and to bring it into proper constitutional alignment, I would overrule *Komarenko v. INS,* 35 F.3d 432 (9th Cir.1994) (applying a comparable grounds test), and follow the lead of the Second Circuit's well-articulated opinion in *Blake,* 489 F.3d 88 (applying an offense-specific test).

As Judge Berzon explained in her thoughtful concurrence to the panel opinion in this case, the comparable ground approach adopted in *Komarenko* is irreconcilable with the equal protection analysis discussed in Part I, *supra,* and in *Tapia–Acuna.* Indeed, the comparable ground approach creates new problems. Just as the distinction between deportable aliens who are alike except that one temporarily left the country while the other did not is arbitrary, the comparable grounds test turns on equally arbitrary grounds.

Consider Alien A, who commits assault with a deadly weapon. He is deportable because his offense falls into the category "aggravated felonies." He is also excludable **\*1218** because that same offense falls into the category "crimes involving moral turpitude." In an exclusion proceeding, his offense, as a "crime of moral turpitude," would make Alien A eligible for a § 212(c) waiver. If he ends up in deportation proceedings, however, he is not eligible for § 212(c) relief, under the comparable grounds test, because the category "aggravated felonies" is sufficiently different from the category of "crimes involving moral turpitude." Alien B, on the other hand, who commits a drug offense is also both deportable and excludable, but is eligible for § 212(c) relief in a deportation proceeding simply because drug offenses were described with similar words in the deportation and exclusion statutes.

This type of classification between aliens who are otherwise similarly situated violates equal protection unless it is rationally related to a legitimate government interest. *Jimenez–Angeles v. Ashcroft,* 291 F.3d 594, 603 (9th Cir.2002). Congress is surely informed by important policy considerations when making determinations about which *offenses* make an alien deportable or excludable. Decisions about the size, scope, and overlap of *categories* of deportable and excludable offenses have no rational relation to judgments about which aliens should be permitted to remain in our country and which should not.

As Judge Berzon pointed out, there is one additional inconsistency between the comparable grounds test and the way that section 212(c) relief functions as a practical matter. Once an alien receives a waiver of excludability under either section 212(c) or other waiver provisions, the alien cannot be deported or excluded in the future solely due to the offense on which he received the waiver. This is true even if there is a category of deportable crimes that applies to his offense which is different from the category that permitted the waiver. *See, e.g.,* *Matter of Balderas,* 20 I. & N. Dec. 389, 392 (BIA 1991). In other words, section 212(c) relief is itself offense-specific, not ground-specific.

### III

Additionally, I respectfully dissent from the majority's holding that Abebe did not exhaust his claim for withholding of removal. Abebe raised this claim in his notice of appeal before the BIA. The purpose of the administrative exhaustion requirement is so that the "administrative agency[may] have

a full opportunity to resolve a controversy or correct its own errors before judicial intervention." *Sagermark v. INS,* 767 F.2d 645, 648 (9th Cir.1985). When a petitioner raises an issue in his notice of appeal, the BIA has a "full opportunity to resolve [the] controversy," particularly in light of the fact that the petitioner is not required to file an accompanying brief. *See* 8 C.F.R. § 3.38(f) (1999) ("Briefs *may* be filed by both parties ...." (emphasis added)). *Ladha v. INS,* 215 F.3d 889, 903 (9th Cir.2000), was correctly decided. I would hold that Abebe exhausted his claim for withholding of removal and would thus remand to the BIA for consideration of the claim in the first instance.

## IV

For all of these reasons, I would find Abebe eligible for section 212(c) relief. To classify aliens based on the happenstance of whether they have recently departed the country and reentered furthers no logical government interest. Similarly, to classify aliens in deportation proceedings whose deportable offense is also a ground for exclusion based on the agency-created category into which the offense happens to fall serves no legitimate government interest. I would hold, following the Second Circuit in *Blake,* 489 F.3d 88, that an alien **\*1219** in a deportation proceeding is eligible for section 212(c) relief if the offense which makes him deportable would also render him excludable. Applying section 212(c) relief to deportation proceedings using an offense-based analysis is the only constitutional interpretation of the statute. In addition, I would hold that Abebe exhausted his claim for withholding of removal and allow him to pursue that claim on remand. *Tapia–Acuna,* 640 F.2d 223, and *Ladha,* 215 F.3d 889, were rightly decided. *Komarenko,* 35 F.3d 432, should be overruled.

Like the Second Circuit in *Blake,* 489 F.3d at 91, I find Judge Learned Hand's caution particularly apt here: "It is well that we should be free to rid ourselves of those who abuse our hospitality; but it is more important that the continued enjoyment of that hospitality once granted, shall not be subject to meaningless and irrational hazards." *Di Pasquale v. Karnuth,* 158 F.2d 878, 879 (2d Cir.1947). There is no rational basis for treating a lawful permanent resident who steps across the border for a day better than one who does not.

For these reasons, I respectfully dissent.

## All Citations

554 F.3d 1203, 2009 Daily Journal D.A.R. 141

## Footnotes

1  Even though section 212(c) was repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. 104–208, the Supreme Court held that this repeal can't be applied retroactively to aliens, such as petitioner, who pled guilty to deportable crimes before IIRIRA took effect. *INS v. St. Cyr,* 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

2  Inadmissibility (or "exclusion" under pre-IIRIRA law) applies to an alien outside the United States who is not allowed to enter, 8 U.S.C. § 1182(a), whereas deportation applies to an alien who is already in the United States and is ejected, *id.* § 1227. *See Guzman–Andrade v. Gonzales,* 407 F.3d 1073, 1076 (9th Cir.2005). Under IIRIRA, both inadmissible and deportable aliens go through the same process, called "removal proceedings." *Id.* (citing *Romero–Torres v. Ashcroft,* 327 F.3d 887, 889 (9th Cir.2003)).

3  IIRIRA changes somewhat the nomenclature applicable to immigration cases. What used to be "excludability" is now "inadmissibility"; what used to be "deportation" is now "removal." We use these terms interchangeably.

4  In making this determination, we do not look to the actual rationale for the legislation, as it is often very difficult or impossible to determine what a collective body, such as Congress, has in mind. The task would be particularly difficult in a case like ours where the statutory scheme now in force is the product of repeated

layers of congressional enactments and judicial interpretations, so it is quite likely that no one anticipated the existing Byzantine structure. Our inquiry therefore focuses on whether a hypothetically rational Congress could have adopted the statutory scheme, not on whether Congress actually adopted the statute with that particular reason in mind.

5    The dissent also claims that this will somehow "increase the number of removal proceedings, which would, in turn, spend *more* government resources," dissent at 1216, but it doesn't explain how or why this would be the case.

6    The dissent's citation to 🏴 *Stanton v. Stanton,* 421 U.S. 7, 14, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), dissent at 1215 is misplaced. This case involved sex discrimination, and distinctions based on sex have been subjected to far more searching scrutiny for the last 4 decades or so. *See also* 🏴 *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Here we are not dealing with sex discrimination, or discrimination based on any other suspect category. And we're dealing with an area where federal power is at its zenith; indeed, the Supreme Court has instructed us that we must exercise "special judicial deference to congressional policy choices in the immigration context." 🏴 *Fiallo v. Bell,* 430 U.S. 787, 793, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (footnote omitted). It would thus be a rare case, indeed, where we could find irrationality in a congressional decision to distinguish among classes of aliens (other than along suspect lines).

7    For the reasons given in the three-judge panel opinion, the BIA didn't erroneously or inconsistently apply 🏴 8 U.S.C. § 1182(c) (repealed 1996), or 8 C.F.R. § 1213(f). 🏴 *Abebe,* 493 F.3d at 1101–04. Likewise, we reject petitioner's due process retroactivity argument. 🚩 *Id.* at 1105.

1    I do join in Part 3 of the majority opinion, because I agree that petitioner did not exhaust his withholding of removal claim before the agency.

2    Perhaps the majority believes that equal protection should have force only in cases involving some form of invidious discrimination, and that all laws should survive rational basis review, but this case is a particularly poor vehicle to stake out that position given the growing irrelevance of section 212(c) and the need to break away from all of our sister circuits and reverse our own precedent to do so.

1    Section 212(c) grew out of the Seventh Proviso to Section 3 of the Immigration Act of 1917, 39 Stat. 874. *See* 🏴 *Francis v. INS,* 532 F.2d 268 (2d Cir.1976).

2    The majority responds that the government may "exclude those it believes are less likely to obtain relief." If we are going to assume that LPRs will be fully informed, in advance, about the differing availabilities of relief in deportation and exclusion proceedings and will make rational, calculated decisions about voluntarily leaving the country in order to initiate an exclusion proceeding, we should also assume these individuals will take into account the likelihood of obtaining relief. Those unlikely to obtain relief are equally unlikely to take the risk of leaving the country. The majority's speculation does nothing to undermine the point that there is no support for the notion that encouraging "self-deportation" will save government resources.

3    At the risk of stating the obvious, making section 212(c) relief available only in exclusion proceedings would not encourage aliens to leave the country permanently, but would only encourage them—again, if at all—to leave and immediately reenter so as to take advantage of section 212(c) waiver.

4    The majority responds that "it makes perfect sense to want [an LPR] to be outside our borders when" he learns that he will not receive relief. However, as discussed above, an LPR who is stopped at the border for being excludable but who is also eligible for § 212(c) relief will generally be admitted and continue the relief application from within the country. Thus, if he is ultimately denied relief, he will, in fact, be inside our borders when he gets "the bad news."
The majority, I respectfully suggest, quotes Judge Posner out of context. Judge Posner was addressing the rationale for allowing the option of voluntary departure, which occurs *after* a deportation proceeding has been initiated. *See* 🏴 *LaGuerre v. Reno,* 164 F.3d 1035, 1041 (7th Cir.1998).

5    The BIA relied on this regulation in affirming the denial of section 212(c) relief to Abebe.

**Abebe v. Mukasey, 554 F.3d 1203 (2009)**

2009 Daily Journal D.A.R. 141

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Called into Doubt by U.S. v. Clarke, 8th Cir.(Mo.), April 8, 1997

80 S.Ct. 683
Supreme Court of the United States

Rudolf Ivanovich ABEL, also known as 'Mark' and also
known as Martin Collins and Emil R. Goldfus, Petitioner,

v.

UNITED STATES of America.

No. 2.
|
Argued Nov. 9, 1959.
|
Decided March 28, 1960.

**Synopsis**

Prosecution for conspiracy to commit espionage. The United States District Court for the Eastern District of New York, 155 F.Supp. 8, denied a motion to suppress certain items as evidence, and after a trial, a judgment of conviction was entered and defendant appealed. The Court of Appeals, 258 F.2d 485, affirmed, and defendant was granted certiorari. The Supreme Court, Mr. Justice Frankfurter, held, inter alia, that an item consisting of a forged New York birth certificate for one of the false identities which defendant assumed in the country in order to keep his presence undetected, was seizable by immigration officers when come upon during a proper search of defendant's premises without a warrant, following his arrest under an administrative deportation warrant, not only as a forged official document by which defendant sought to evade his obligation to register as an alien, but also as a document which defendant was using as an alien in the commission of espionage.

Affirmed.

Mr. Justice Brennan, Chief Justice Warren, Mr. Justice Black, and Mr. Justice Douglas, dissented.

West Headnotes (27)

**[1]    War and National Emergency    🗝 Espionage**

Fact that a case was a prosecution for espionage had no bearing whatever upon legal considerations relevant to admissibility of evidence.

1 Cases that cite this headnote

**[2]    Criminal Law    🗝 Search or Seizure Under Warrant**

**Searches and Seizures    🗝 Administrative warrants**

Deliberate use by the government of an administrative warrant, for purpose of gathering evidence in a criminal case, must meet stern resistance by the courts.

33 Cases that cite this headnote

80 S.Ct. 683, 4 L.Ed.2d 668

**[3]    Arrest** 👈 Officers and Assistants, Arrest Without Warrant

The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of United States.

8 Cases that cite this headnote

**[4]    Criminal Law** 👈 Warrant requirements; probable cause

In prosecution for conspiracy to violate espionage laws, evidence sustained finding that immigration agents who effected defendant's arrest based on information furnished by agents of the F.B.I., who received permission to question defendant prior to his arrest, did not use an administrative arrest warrant they had obtained, merely as a tool for the F.B.I. in building a criminal prosecution against defendant, but that the immigration service in arresting defendant under the warrant was exercising its powers in the lawful discharge of its own responsibilities, and therefore articles seized as a consequence of use of the warrant were not subject to suppression. Immigration and Nationality Act, § 242(a), 🚩 8 U.S.C.A. § 1252(a); U.S.C.A. Const.Amend. 4.

17 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 👈 Arrest warrants

Administrative arrest of defendant pursuant to a deportation warrant was not rendered unlawful merely because the F.B.I. solicited defendant's cooperation in regard to espionage charges before defendant's arrest took place, stood by while such arrest occurred, and searched defendant's vacated room after his arrest on the warrant. Immigration and Nationality Act, § 242(a), 🚩 8 U.S.C.A. § 1252(a).

19 Cases that cite this headnote

**[6]    Criminal Law** 👈 Intervention of Public Officers

The F.B.I. was not barred from continuing its investigation of defendant in the hope that it might result in the prosecution of defendant for espionage, merely because the immigration service in the discharge of its duties, had embarked upon an independent decision to initiate proceedings for deportation of defendant.

2 Cases that cite this headnote

**[7]    Criminal Law** 👈 Search or seizure following arrest in general

**Searches and Seizures** 👈 Aliens and enemies

The Constitution does not require that honest law enforcement be put to an irrevocable choice between either bringing espionage charges, or deportation proceedings against an alien, but the Department of Justice may cooperate in pursuing one course of action or the other, once it has honestly decided what course is to be preferred, and the test of admissibility of evidence discovered in a search conducted as an incident to an administrative arrest of an alien, under a deportation warrant, is whether the decision to proceed administratively toward deportation was influenced by and carried out for purpose of amassing evidence in the prosecution for crime, rather than as a bona fide preliminary step in a deportation proceeding. Immigration and Nationality Act, § 242(a), 🚩 8 U.S.C.A. § 1252(a).

100 Cases that cite this headnote

**[8]    Criminal Law** 👈 In Preliminary Proceedings

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 9 of 1384

80 S.Ct. 683, 4 L.Ed.2d 668

Where claimed invalidity of an administrative warrant on ground it did not satisfy requirements for warrants under the Fourth Amendment was not made by defendant below, and such claim was expressly disavowed by defendant's counsel, such claim was not entitled to consideration by the Supreme Court. Immigration and Nationality Act § 242(a),

🚩 8 U.S.C.A. § 1252(a); U.S.C.A. Const.Amend. 4.

12 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship** 🔑 Constitutional and statutory provisions

Statutes authorizing administrative arrest to achieve detention pending deportation proceedings have the sanction of time. Immigration and Nationality Act, § 242(a), 🚩 8 U.S.C.A. § 1252(a); U.S.C.A.Const. Amend. 4.

12 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** 🔑 Arrest warrants

Where before an immigration warrant and order for arrest of an alien were issued, two immigration officers related to a district director of immigration that they had learned from the F.B.I. of alien's status, and the order to show cause recited that alien had failed to register, and alien was a suspected spy who had never acknowledged his residence in the United States to the government or openly admitted his presence, there was ample reason to believe that his arrest pending deportation was necessary and desirable, and his arrest by immigration officers on such warrant fully complied with statute and regulations giving authority to the Attorney General or his delegate to arrest aliens pending deportation proceedings under an administrative warrant rather than a judicial warrant within the scope of the Fourth Amendment. Immigration and Nationality Act, § 242(a), 🚩 8 U.S.C.A. § 1252(a); U.S.C.A.Const. Amends. 4, 5.

33 Cases that cite this headnote

**[11]    Criminal Law** 🔑 Searches and seizures in general

If items were seized as a result of an unlawful search, whatever the nature of such articles, and however proper it would have been to seize them during a valid search, they should have been suppressed in a prosecution of defendant on espionage charges, as the fruits of activity in violation of the Fourth Amendment. U.S.C.A. Const.Amend. 4.

37 Cases that cite this headnote

**[12]    Searches and Seizures** 🔑 Scope of Search

Not every item may be seized which is properly inspectable by the government in the course of a legal search, for example, private papers desired by the government merely for use as evidence may not be seized, no matter how lawful the search which discovers them, nor may the government seize, wholesale, the contents of a house it might have searched.

27 Cases that cite this headnote

**[13]    Aliens, Immigration, and Citizenship** 🔑 Arrest warrants
**Aliens, Immigration, and Citizenship** 🔑 Searches incident to arrest

A deportation warrant is not a judicial warrant, and a search incidental to a deportation arrest is therefore without the authority of a judge or commissioner.

Abel v. U.S., 362 U.S. 217 (1960)

80 S.Ct. 683, 4 L.Ed.2d 668

3 Cases that cite this headnote

[14]    **Arrest**    Probable Cause; Offense in Officer's Presence

A search incidental to a criminal arrest made upon probable cause without a warrant is without the authority of a judge or commissioner, but such a search does not require a judicial warrant for its validity.

35 Cases that cite this headnote

[15]    **Aliens, Immigration, and Citizenship**    Civil proceedings in general

Deportation proceedings are not subject to the constitutional safeguards for criminal prosecutions.

12 Cases that cite this headnote

[16]    **Searches and Seizures**    Fourth Amendment and reasonableness in general

Searches for evidence of crime present situations demanding the greatest, not the least restraint upon the government's intrusion into privacy, and although its protection is not limited to them, it was at such searches that the Fourth Amendment was primarily directed. U.S.C.A. Const.Amends. 4, 5.

159 Cases that cite this headnote

[17]    **Aliens, Immigration, and Citizenship**    Searches incident to arrest

Government officers who effect a deportation arrest under an administrative warrant have a right of incidental search analogous to the search permitted criminal law-enforcement officers, including the right to search for weapons and materials proving the deportability of an alien. Immigration and Nationality Act, § 242(a), 8 U.S.C.A. § 1252(a); U.S.C.A.Const. Amends. 4, 5.

8 Cases that cite this headnote

[18]    **Aliens, Immigration, and Citizenship**    Searches incident to arrest

Where an alien was arrested by immigration officials under an administrative deportation warrant, search of alien's hotel room, without a search warrant for weapons, and documents connected with his status as an alien, was justified, as the latter items could be considered as instruments or means for accomplishing his illegal status, and thus were proper subjects of search. Immigration and Nationality Act, § 242(a), 8 U.S.C.A. § 1252(a); U.S.C.A.Const. Amends. 4, 5.

40 Cases that cite this headnote

[19]    **Aliens, Immigration, and Citizenship**    Searches incident to arrest

An item consisting of a forged New York birth certificate for one of the false identities which defendant, who was charged with espionage, assumed in this country in order to keep his presence undetected, was seizable by immigration officers when come upon during a proper search of defendant's premises without a search warrant, following his arrest under an administrative deportation warrant, not only as a forged official document by which defendant sought to evade his obligation to register as an alien, but also as a document which defendant was using as an alien in the commission of espionage. Immigration and Nationality Act, § 242(a), 8 U.S.C.A. § 1252(a); U.S.C.A.Const. Amends. 4, 5.

19 Cases that cite this headnote

[20]    **Searches and Seizures** 👈 Permissible subjects, objects, and purposes

Documents used as a means to commit crime are the proper subjects of search warrants, and are seizable when discovered in the course of a lawful search.

10 Cases that cite this headnote

[21]    **Arrest** 👈 Scope of Search

An arresting officer, without a search warrant, is free to take hold of articles which he sees an accused deliberately trying to hide, and such power derives from the dangers that a weapon will be concealed or that relevant evidence will be destroyed.

60 Cases that cite this headnote

[22]    **Aliens, Immigration, and Citizenship** 👈 Searches incident to arrest

When a piece of graph paper came into an arresting officer's hands when he seized it after detecting defendant deliberately trying to hide it, it was not necessary for him to return it, in view of fact it was an instrumentality for commission of espionage, and this was true even though the arresting officer was not only not looking for items connected with espionage but, as an immigration officer acting under a deportation warrant, could not properly have been searching for the purpose of finding such items. Immigration and Nationality Act, § 242(a), 🚩 8 U.S.C.A. § 1252(a); U.S.C.A.Const. Amends. 4, 5.

23 Cases that cite this headnote

[23]    **Searches and Seizures** 👈 Disposition of property seized

When an article subject to lawful seizure properly comes into an officer's possession in the course of a lawful search without a search warrant, it does not have to be returned merely because it was not one of the things it was arresting officer's business to look for.

53 Cases that cite this headnote

[24]    **Criminal Law** 👈 Relevancy in General

Good reason must be shown for prohibiting the government from using relevant, otherwise admissible, evidence in a criminal prosecution.

5 Cases that cite this headnote

[25]    **Criminal Law** 👈 Causal nexus;  independent discovery or basis or source

Where items of evidence introduced in prosecution of defendant for espionage were seized as a consequence of wholly lawful conduct and came into the government's possession through lawful searches and seizures, they were not subject to suppression even though they were obtained without a search warrant and as the result of an arrest by immigration officers acting under an administrative warrant. Immigration and Nationality Act, § 242(a), 🚩 8 U.S.C.A. § 1252(a).

20 Cases that cite this headnote

80 S.Ct. 683, 4 L.Ed.2d 668

[26]    **Criminal Law** ⚷ Extent of Exclusion; "Fruit of the Poisonous Tree"

No consideration of civil liberties commends discouragement of cooperation between the branch of the Department of Justice dealing with criminal law enforcement, and the branch dealing with immigration laws, through the turning over of evidence obtained by one department to another, where such cooperation is undertaken in good faith, although if undertaken in bad faith to avoid constitutional restraints upon criminal law enforcement, evidence obtained by one of the departments from the other, in such manner, must be suppressed, but individual cases of bad faith cooperation should be dealt with by findings to that effect in cases as they arise, and not by an exclusionary rule preventing effective cooperation when undertaken entirely in good faith.

6 Cases that cite this headnote

[27]    **Criminal Law** ⚷ Abandoned property

**Criminal Law** ⚷ Consent by person other than the accused

**Searches and Seizures** ⚷ Abandoned, surrendered, or disclaimed items

**Searches and Seizures** ⚷ Hotels and motels

Where the F.B.I. undertook a search of a hotel room formerly occupied by defendant charged with espionage, without a warrant, for the purpose of gathering evidence of the crime, and at time of the search defendant had vacated the room, and the hotel had the exclusive right to its possession, and its management freely gave its consent that the search be made, such search although made without a search warrant was lawful, and it also was not unlawful to seize the contents of a wastepaper basket in the room, even though some of its contents had no connection with crime, in view of fact defendant had abandoned such articles, and an item consisting of a hollowed-out pencil containing microfilm, and a block of wood containing a "cipher" pad, were themselves seizable as means for the commission of the crime, and such items were therefore properly admitted into evidence. U.S.C.A.Const. Amends. 4, 5.

331 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*686**  Mr.  **\*218**  James B. Donovan, New York City, for petitioner.

Mr. J. Lee Rankin, Sol. Gen., Washington, D.C., for respondent.

**Opinion**

Mr. Justice FRANKFURTER delivered the opinion of the Court.

The question in this case is whether seven items were properly admitted into evidence at the petitioner's trial for conspiracy to commit espionage. All seven items were seized by officers of the Government without a search warrant. The seizures did not occur in connection with the exertion of the criminal process against petitioner. They arose out of his administrative arrest by the United States Immigration and Naturalization Service as a preliminary to his deportation. A motion to suppress these items as evidence, duly made in the District Court, was denied after a full hearing. 155 F.Supp. 8. Petitioner was tried, convicted and

sentenced to thirty years' imprisonment and to the payment of a fine of $3,000. The Court of Appeals affirmed, 🔶 2 Cir., 258 F.2d 485. We granted certiorari, 358 U.S. 813, 79 S.Ct. 59, 3 L.Ed.2d 56, limiting the grant to the following two questions:

'1. Whether the Fourth and Fifth Amendments to the Constitution of the United States are violated  **\*\*687**  by  **\*219**  a search and the seizure of evidence without a search warrant, after an alien suspected and officially accused of espionage has been

80 S.Ct. 683, 4 L.Ed.2d 668

taken into custody for deportation, pursuant to an administrative Immigration Service warrant, but has not been arrested for the commission of a crime?

'2. Whether the Fourth and Fifth Amendments to the Constitution of the United States are violated when articles so seized are unrelated to the Immigration Service warrant and, together with other articles obtained from such leads, are introduced as evidence in a prosecution for espionage?'

Argument was first heard at October Term, 1958. The case having been set down for reargument at this Term, 359 U.S. 940, 79 S.Ct. 720, 3 L.Ed.2d 674, counsel were asked to discuss a series of additional questions, set out in the margin. *

 [1]   We have considered the case on the assumption that the conviction must be reversed should we find challenged items of evidence to have been seized in violation of the Constitution and therefore improperly admitted into evidence. We find, however, that the admission of these items was free from any infirmity and we affirm the judgment. (Of course the nature of the case, the fact that it was a prosecution for espionage, has no bearing  **220**  whatever upon the legal considerations relevant to the admissibility of evidence.)

The seven items, all in petitioner's possession at the time of his administrative arrest, the admissibility of which is in question were the following:

(1) a piece of graph paper, carrying groups of numbers arranged in rows, allegedly a coded message;

(2) a forged birth certificate, certifying the birth of 'Martin Collins' In New York County in 1897;

(3) a birth certificate, certifying the birth of 'Emil Goldfus' in New York in 1902 (Emil Goldfus died in 1903);

(4) an international certificate of vaccination, issued in New York to 'Martin Collins' in 1957;

(5) a bank book of the East River Savings Bank containing the account of 'Emil Goldfus';

(6) a hollowed-out pencil containing 18 microfilms; and

(7) a block of wood, wrapped in sandpaper, and containing within it a small booklet with a series of numbers on each page, a so-called 'cipher pad.'
Items (2), (3), (4) and (5) were relevant to the issues of the indictment for which petitioner was on trial in that they corroborated petitioner's use of false identities. Items (1), (6) and (7) were incriminatory as useful means for one engaged in espionage.

The main claims which petitioner pressed upon the Court may be thus summarized: (1) the administrative arrest was used by the Government in bad  **688**  faith; (2) administrative arrests as preliminaries to deportation are unconstitutional; and (3) regardless of the validity of the administrative arrest here, the searches and seizures through which the challenged items came into the Government's possession were not lawful ancillaries to such an arrest. These claims cannot be judged apart from the circumstances leading up to the arrest and the nature of  **221**  the searches and seizures. It becomes necessary to relate these matters in considerable detail.

Petitioner was arrested by officers of the Immigration and Naturalization Service (hereafter abbreviated as I.N.S.) on June 21, 1957, in a single room in the Hotel Latham in New York City, his then abode. The attention of the I.N.S. had first been drawn to petitioner several days earlier when Noto, a Deputy Assistant Commissioner of the I.N.S., was told by a liaison officer of the Federal Bureau of Investigation (hereafter abbreviated as F.B.I.) that petitioner was believed by the F.B.I. to be an alien residing illegally in the United States. Noto was told of the F.B.I.'s interest in petitioner in connection with espionage.

An uncontested affidavit before the District Court asserted the following with regard to the events leading up to the F.B.I.'s communication with Noto about petitioner. About one month before the F.B.I. communicated with Noto, petitioner had been

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

mentioned by Hayhanen, a recently defected Russian spy, as one with whom Hayhanen had for several years cooperated in attempting to commit espionage. The F.B.I. had thereupon placed petitioner under investigation. At the time the F.B.I. communicated with the I.N.S. regarding petitioner, the case against him rested chiefly upon Hayhanen's story, and Hayhanen, although he was later to be the Government's principal witness at the trial, at that time insisted that he would refuse to testify should petitioner be brought to trial, although he would fully cooperate with the Government in secret. The Department of Justice concluded that without Hayhanen's testimony the evidence was insufficient to justify petitioner's arrest and indictment on espionage charges. The decision was thereupon made to bring petitioner to the attention of the I.N.S., with a view to commencing deportation proceedings against him.

 **\*222**  Upon being notified of the F.B.I.'s belief that petitioner was residing illegally in this country, Noto asked the F.B.I. to supply the I.N.S. with further information regarding petitioner's status as an alien. The F.B.I. did this within a week. The I.N.S. concluded that if petitioner were, as suspected, an alien, he would be subject to deportation in that he had failed to comply with the legal duty of aliens to notify the Attorney General every January of their address in the United States. 8 U.S.C. s 1305, 8 U.S.C.A. s 1305. Noto then determined on petitioner's administrative arrest as a preliminary to his deportation. The F.B.I. was so informed. On June 20, two I.N.S. officers, Schoenenberger and Kanzler, were dispatched by Noto to New York to supervise the arrest. These officers carried with them a warrant for petitioner's arrest and an order addressed to petitioner directing him to show cause why he should not be deported. They met in New York with the District Director of the I.N.S. who, after the information in the possession of the I.N.S. regarding petitioner was put before him, signed the warrant and the order. Following this, Schoenenberger and Kanzler went to F.B.I. headquarters in New York where, by prearrangement with the F.B.I. in Washington, they were met by several F.B.I. officers. These agreed to conduct agents of the I.N.S. to petitioner's hotel so that the I.N.S. might accomplish his arrest. The F.B.I. officer in charge asked whether, before the petitioner was arrested, the F.B.I. might 'interview' him in an attempt to persuade him to 'cooperate' with regard to his espionage. To this Schoenenberger agreed.

 **\*\*689**  At 7 o'clock the next morning, June 21, two officers of the I.N.S. and several F.B.I. men gathered in the corridor outside petitioner's room at the Hotel Latham. All but two F.B.I. agents, Gamber and Blasco, went into the room next to petitioner's, which the F.B.I. had occupied in the course of its investigation of petitioner. **\*223**  Gamber and Blasco were charged with confronting petitioner and soliciting his cooperation with the F.B.I. They had no warrant either to arrest or to search. If petitioner proved cooperative their instructions were to telephone to their superior for further instructions. If petitioner failed to cooperate they were to summon the waiting I.N.S. agents to execute their warrant for his arrest.

Gamber rapped on petitioner's door. When petitioner released the catch, Gamber pushed open the door and walked into the room, followed by Blasco. The door was left ajar and a third F.B.I. agent came into the room a few minutes later. Petitioner, who was nude, was told to put on a pair of undershorts and to sit on the bed, which he did. The F.B.I. agents remained in the room questioning petitioner for about twenty minutes. Although petitioner answered some of their questions, he did not 'cooperate' regarding his alleged espionage. A signal was thereupon given to the two agents of the I.N.S. waiting in the next room. These came into petitioner's room and served petitioner with the warrant for his arrest and with the order to show cause. Shortly thereafter Schoenenberger and Kanzler, who had been waiting outside the hotel, also entered petitioner's room. These four agents of the I.N.S. remained with petitioner in his room for about an hour. For part of this time an F.B.I. agent was also in the room and during all of it another F.B.I. agent stood outside the open door of the room, where he could observe the interior.

After placing petitioner under arrest, the four I.N.S. agents undertook a search of his person and of all of his belongings in the room, and the adjoining bathroom, which lasted for from fifteen to twenty minutes. Petitioner did not give consent to this search; his consent was not sought. The F.B.I. agents observed this search but took no part in it. It was Schoenenberger's testimony to **\*224**  the District Court that the purpose of this search was to discover weapons and documentary evidence of petitioner's 'alienage'—that is, documents to substantiate the information regarding petitioner's status as an alien which the I.N.S. had received from the F.B.I. During this search one of the challenged items of evidence, the one we have designated (2), a birth certificate for 'Martin Collins,' was seized. Weapons were not found, nor was any other evidence regarding petitioner's 'alienage.'

When the search was completed, petitioner was told to dress himself, to assemble his things and to choose what he wished to take with him. With the help of the I.N.S. agents almost everything in the room was packed into petitioner's baggage. A

80 S.Ct. 683, 4 L.Ed.2d 668

few things petitioner deliberately left on a window sill, indicating that he did not want to take them, and several other things which he chose not to pack up into his luggage he put into the room's wastepaper basket. When everything had been assembled, petitioner asked and received permission to repack one of his suitcases. While petitioner was doing so, Schoenenberger noticed him slipping some papers into the sleeve of his coat. Schoenenberger seized these. One of them was the challenged item of evidence which we have designated (1), a piece of graph paper containing a coded message.

When petitioner's belongings had been completely packed, petitioner agreed to check out of the hotel. One of the F.B.I. agents obtained his bill from the hotel and petitioner paid it. Petitioner was then handcuffed and taken, along with his baggage, to a waiting automobile and thence to the headquarters of the I.N.S. **690 in New York. At I.N.S. headquarters, the property petitioner had taken with him was searched more thoroughly than it had been in his hotel room, and three more of the challenged items were discovered and seized. These were the ones we have designated (3), (4) and (5), the 'Emil *225 Goldfus' birth certificate, the international vaccination certificate, and the bank book.

As soon as petitioner had been taken from the hotel an F.B.I. agent, Kehoe, who had been in the room adjoining petitioner's during the arrest and search and who, like the I.N.S. agents, had no search warrant, received permission from the hotel management to search the room just vacated by petitioner. Although the bill which petitioner had paid entitled him to occupy the room until 3 p.m. of that day, the hotel's practice was to consider a room vacated whenever a guest removed his baggage and turned in his key. Kehoe conducted a search of petitioner's room which lasted for about three hours. Among other things, he seized the contents of the wastepaper basket into which petitioner had put some things while packing his belongings. Two of the items thus seized were the challenged items of evidence we have designated (6) and (7): a hollow pencil containing microfilm and a block of wood containing a 'cipher pad.'

Later in the day of his arrest, petitioner was taken by airplane to a detention center for aliens in Texas. He remained there for several weeks until arrested upon the charge of conspiracy to commit espionage for which he was brought to trial and convicted in the Eastern District of New York.

## I.

The underlying basis of petitioner's attack upon the admissibility of the challenged items of evidence concerns the motive of the Government in its use of the administrative arrest. We are asked to find that the Government resorted to a subterfuge, that the Immigration and Naturalization Service warrant here was a pretense and sham, was not what it purported to be. According to petitioner, it was not the Government's true purpose in arresting him under this warrant to take him into custody pending *226 a determination of his deportability. The Government's real aims, the argument runs, were (1) to place petitioner in custody so that pressure might be brought to bear upon him to confess his espionage and cooperate with the F.B.I., and (2) to permit the Government to search through his belongings for evidence of his espionage to be used in a designed criminal prosecution against him. The claim is, in short, that the Government used this administrative warrant for entirely illegitimate purposes and that articles seized as a consequence of its use ought to have been suppressed.

[2]  [3]  [4]  Were this claim justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States. A finding of bad faith is, however, not open to us on this record. What the motive was of the I.N.S. officials who determined to arrest petitioner, and whether the I.N.S. in doing so was not exercising its powers in the lawful discharge of its own responsibilities but was serving as a tool for the F.B.I. in building a criminal prosecution against petitioner, were issues fully canvassed in both courts below. The crucial facts were found against the petitioner.

On this phase of the case the district judge, having permitted full scope to the elucidation of petitioner's claim, having seen and heard witnesses, in addition to **691 testimony by way of affidavits, and after extensive argument, made these findings:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

'(T)he evidence is persuasive that the action taken by the officials of the Immigration and Naturalization Service is found to have been in entire good faith.  **\*227**  The testimony of Schoenenberger and Noto leaves no doubt that while the first information that came to them concerning the (petitioner) * * * was furnished by the F.B.I.—which cannot be an unusual happening— the proceedings taken by the Department differed in no respect from what would have been done in the case of an individual concerning whom no such information was known to exist.

'The defendant argues that the testimony establishes that the arrest was made under the direction and supervision of the F.B.I., but the evidence is to the contrary, and it is so found.

'No good reason has been suggested why these two branches of the Department of Justice should not cooperate, and that is the extent of the showing made on the part of the defendant.' D.C., 155 F.Supp. 8, 11.

The opinion of the Court of Appeals, after careful consideration of the matter, held that the answer 'must clearly be in the affirmative' to the question 'whether the evidence in the record supports the finding of good faith made by the court below.' 2 Cir., 258 F.2d 485, 494.

Among the statements in evidence relied upon by the lower courts in making these findings was testimony by Noto that the interest of the I.N.S. in petitioner was confined to petitioner's illegal status in the United States; that in informing the I.N.S. about petitioner's presence in the United States the F.B.I. did not indicate what action it wanted the I.N.S. to take; that Noto himself made the decision to arrest petitioner and to commence deportation proceedings against him; that the F.B.I. made no request of him to search for evidence of espionage at the time of the arrest; and that it was 'usual and mandatory' for the F.B.I. and I.N.S. to work together in the manner they did. There was also the testimony of Schoenenberger, regarding the purpose of the search he  **\*228**  made of petitioner's belongings, that the motive was to look for weapons and documentary evidence of alienage. To be sure, the record is not barren of evidence supporting an inference opposed to the conclusion to which the two lower courts were led by the record as a whole: for example, the facts that the I.N.S. held off its arrest of petitioner while the F.B.I. solicited his cooperation, and that the F.B.I. held itself ready to search petitioner's room as soon as it was vacated. These elements, however, did not, and were not required to, persuade the two courts below in the face of ample evidence of good faith to the contrary, especially the human evidence of those involved in the episode. We are not free to overturn the conclusion of the courts below when justified by such solid proof.

Petitioner's basic contention comes down to this: even without a showing of bad faith, the F.B.I. and I.N.S. must be held to have cooperated to an impermissible extent in this case, the case being one where the alien arrested by the I.N.S. for deportation was also suspected by the F.B.I. of crime. At the worst, it may be said that the circumstances of this case reveal an opportunity for abuse of the administrative arrest. But to hold illegitimate, in the absence of bad faith, the cooperation between I.N.S. and F.B.I. would be to ignore the scope of rightful cooperation between two branches of a single Department of Justice concerned with enforcement of different arges of law under the common authority of the Attorney General.

**[5]**  **[6]**  **[7]**  The facts are that the F.B.I. suspected petitioner both of espionage  **\*\*692**  and illegal residence in the United States as an alien. That agency surely acted not only with propriety but in discharge of its duty in bringing petitioner's illegal status to the attention of the I.N.S., particularly after it found itself unable to proceed with petitioner's prosecution for espionage. Only the I.N.S. is authorized to initiate deportation proceedings, and certainly the  **\*229**  F.B.I. is not to be required to remain mute regarding one they have reason to believe to be a deportable alien, merely because he is also suspected of one of the gravest of crimes and the F.B.I. entertains the hope that criminal proceedings may eventually be brought against him. The I.N.S., just as certainly, would not have performed its responsibilities had it been deterred from instituting deportation proceedings solely because it became aware of petitioner through the F.B.I., and had knowledge that the F.B.I. suspected petitioner of espionage. The Government has available two ways of dealing with a criminally suspect deportable alien. It would make no sense to say that branches of the Department of Justice may not cooperate in pursuing one course of action or the other, once it is honestly decided what course is to be preferred. For the same reasons this cooperation may properly extend to the extent and in the manner in which the F.B.I. and I.N.S. cooperated in effecting petitioner's administrative arrest. Nor does it taint the administrative arrest that the F.B.I. solicited petitioner's cooperation before it took place, stood by while it did, and searched

80 S.Ct. 683, 4 L.Ed.2d 668

the vacated room after the arrest. The F.B.I. was not barred from continuing its investigation in the hope that it might result in a prosecution for espionage because the I.N.S., in the discharge of its duties, had embarked upon an independent decision to initiate proceedings for deportation.

The Constitution does not require that honest law enforcement should be put to such an irrevocable choice between two recourses of the Government. For a contrast to the proper cooperation between two branches of a single Department of Justice as revealed in this case, see the story told in ⚑ Colyer v. Skeffington, D.C., 265 F. 17. That case sets forth in detail the improper use of immigration authorities by the Bureau of Investigation of the Department of Justice when the immigration service was **\*230** a branch of the Department of Labor and was acting not within its lawful authority but as the cat's pay of another, unrelated branch of the Government.

We emphasize again that our view of the matter would be totally different had the evidence established, or were the courts below not justified in not finding, that the administrative warrant was here employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions, rather than as a bona fide preliminary step in a deportation proceeding. The test is whether the decision to proceed administratively toward deportation was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime. The record precludes such a finding by this Court.

II.

 [8]    [9]    The claim that the administrative warrant by which petitioner was arrested was invalid, because it did not satisfy the requirements for 'warrants' under the Fourth Amendment, is not entitled to our consideration in the circumstances before us. It was not made below; indeed, it was expressly disavowed. Statutes authorizing administrative arrest to achieve detention pending deportation proceedings have the sanction of time. It would emphasize the disregard for the presumptive respect the Court owes to the validity of Acts of Congress, especially when confirmed by uncontested historical legitimacy, to bring into question for the first time such a long-sanctioned practice of government at the behest of a party who not only did not challenge the exercise of authority below, **\*\*693** but expressly acknowledged its validity.

The grounds relied on in the trial court and the Court of Appeals by petitioner were solely (in addition to the insufficiency of the evidence, a contention not here for review) (1) the bad faith of the Government's use of **\*231** the administrative arrest warrant and (2) the lack of a power incidental to the execution of an administrative warrant to search and seize articles for use as evidence in a later criminal prosecution. At no time did petitioner question the legality of the administrative arrest procedure either as unauthorized or as unconstitutional. Such challenges were, to repeat, disclaimed. At the hearing on the motion to suppress, petitioner's counsel was questioned by the court regarding the theory of relief relied upon:

'The Court: They (the Government) were not at liberty to arrest him (petitioner)?

'Mr. Fraiman: No, your Honor.

'They were perfectly proper in arresting him.

'We don't contend that at all.

'As a matter of fact, we contend it was their duty to arrest this man as they did.

'I think it should show or rather, it showed admirable thinking on the part of the F.B.I. and the Immigration Service.

'We don't find any fault with that.

'Our contention is that although they were permitted to arrest this man, and in fact, had a duty to arrest this man in a manner in which they did, they did not have a right to search his premises for the material which related to espionage.

'* * * He was charged with no criminal offense in this warrant.

'The Court: He was suspected of being illegally in the country, wasn't he?

'Mr. Fraiman: Yes, your Honor.

'The Court: He was properly arrested.

'Mr. Fraiman: He was properly arrested, we concede that, your Honor.'

**\*232** Counsel further made it plain that the arrest warrant whose validity he was conceding was 'one of these Immigration warrants which is obtained without any background material at all.' Affirmative acceptance of what is now sought to be questioned could not be plainer.

 **[10]** The present form of the legislation giving authority to the Attorney General or his delegate to arrest aliens pending deportation proceedings under an administrative warrant, not a judicial warrant within the scope of the Fourth Amendment, is s 242(a) of the Immigration and Nationality Act of 1952. 8 U.S.C. s 1252(a), 8 U.S.C.A. s 1252(a). The regulations under this Act delegate the authority to issue these administrative warrants to the District Directors of the I.N.S. '(a)t the commencement of any proceeding (to deport) * * * or at any time thereafter * * * whenever, in (their) * * * discretion, it appears that the arrest of the respondent is necessary or desirable.' 8 CFR s 242.2(a). Also, according to these regulations, proceedings to deport are commenced by orders to show cause issued by the District Directors or others; and the 'Operating Instructions' of the I.N.S. direct that the application for an order to show cause should be based upon a showing of a prima facie case of deportability. The warrant of arrest for petitioner was issued by the New York District Director of the I.N.S. at the same time as he signed an order to show cause. Schoenenberger testified that, before the warrant and order were issued, he and Kanzler related to the District Director what **\*\*694** they had learned from the F.B.I. regarding petitioner's status as an alien, and the order to show cause recited that petitioner had failed to register, as aliens must. Since petitioner was a suspected spy, who had never acknowledged his residence in the United States to the Government or openly admitted his presence here, there was ample reason to believe that his arrest pending deportation was 'necessary or desirable.' The arrest procedure followed **\*233** in the present case fully complied with the statute and regulations.

Statutes providing for deportation have ordinarily authorized the arrest of deportable aliens by order of an executive official. The first of these was in 1798. Act of June 25, 1798, c. 58, s 2, 1 Stat. 571. And see, since that time, and before the present Act, Act of Oct. 19, 1888, c. 1210, 25 Stat. 566; Act of Mar. 3, 1903, c. 1012, s 21, 32 Stat. 1218; Act of Feb. 20, 1907, c. 1134, s 20, 34 Stat. 904; Act of Feb. 5, 1917, c. 29, s 19, 39 Stat. 889; Act of Oct. 16, 1918, c. 186, s 2, 40 Stat. 1012; Act of May 10, 1920, c. 174, 41 Stat. 593; Internal Security Act of 1950, c. 1024, Title I, s 22, 64 Stat. 1008, 8 U.S.C.A. s 1182(a)(28). To be sure, some of these statutes, namely the Acts of 1888, 1903 and 1907, dealt only with aliens who had landed illegally in the United States, and not with aliens sought to be deported by reason of some act or failure to act since entering. Even apart from these, there remains overwhelming historical legislative recognition of the propriety of administrative arrest for deportable aliens such as petitioner.

The constitutional validity of this long-standing administrative arrest procedure in deportation cases has never been directly challenged in reported litigation. Two lower court cases involved oblique challenges, which were summarily rejected. Podolski v. Baird, D.C., 94 F.Supp. 294; Ex parte Avakian, D.C., 188 F. 688, 692. See also the discussion in Colyer v. Skeffington, D.C., 265 F. 17, reversed on other grounds sub nom. Skeffington v. Katzeff, 1 Cir., 277 F. 129, where the District Court made an exhaustive examination of the fairness of a group of deportation proceedings initiated by administrative arrests, but nowhere

80 S.Ct. 683, 4 L.Ed.2d 668

brought into question the validity of the administrative arrest procedure as such. This Court seems never expressly to have directed its attention to the particular question of the constitutional validity of administrative deportation warrants. It has **\*234** frequently, however, upheld administrative deportation proceedings shown by the Court's opinion to have been begun by arrests pursuant to such warrants. See Kaoru Yamataya v. Fisher, The Japanese Immigrant Case, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721; Zakonaite v. Wolf, 226 U.S. 272, 33 S.Ct. 31, 57 L.Ed. 218; United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221; Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547. In Carlson v. Landon, the validity of the arrest was necessarily implicated, for the Court there sustained discretion in the Attorney General to deny bail to alien Communists held pending deportation on administrative arrest warrants. In the presence of this impressive historical evidence of acceptance of the validity of statutes providing for administrative deportation arrest from almost the beginning of the Nation, petitioner's disavowal of the issue below calls for no further consideration.

III.

[11]  [12]  Since petitioner's arrest was valid, we reach the question whether the seven challenged items, all seized during searches which were a direct consequence of that arrest, were properly admitted into evidence. This issue raises three questions: (1) Were the searches which produced these items proper searches for the Government to have made? If they were not, then whatever the nature of the seized articles, and however proper it would have been to seize them during **\*\*695** a valid search, they should have been suppressed as the fruits of activity in violation of the Fourth Amendment. E.g., Weeks v. United States, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652. (2) Were the articles seized properly subject to seizure, even during a lawful search? We have held in this regard that not every item may be seized which is properly inspectible by the Government in the course of a legal search; for example, private papers desired by the Government merely for use as evidence may not be seized, no matter how lawful the search which **\*235** discovers them, Gouled v. United States, 255 U.S. 298, 310, 41 S.Ct. 261, 265, 65 L.Ed. 647, nor may the Government seize, wholesale, the contents of a house it might have searched, Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876. (3) Was the Government free to use the articles, even if properly seized, as evidence in a criminal case, the seizures having been made in the course of a separate administrative proceeding?

The most fundamental of the issues involved and seizures made in petitioner's room and seizures made in petitioners room in the Hotel Latham. The ground of objection is that a search may not be conducted as an incident to a lawful administrative arrest.

We take as a starting point the cases in this Court dealing with the extent of the search which may properly be made without a warrant following a lawful arrest for crime. The several cases on this subject in this Court cannot be satisfactorily reconciled. This problem has, as is well-known, provoked strong and fluctuating differences of view on the Court. This is not the occasion to attempt to reconcile all the decisions, or to re-examine them. Compare Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, with Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374, and United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, compare Go-Bart, supra, and Lefkowitz, supra, with Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; compare also Harris, supra, with Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, and Trupiano with Rabinowitz, supra (overruling Trupiano). Of these cases, Harris and Rabinowitz set by far the most permissive limits upon searches incidental to lawful arrests. In view of their judicial context, the trial judge and the Government justifiably relied upon these cases for guidance at the trial; and the petitioner himself accepted the Harris case on the motion to suppress, nor does he ask this Court to reconsider Harris and Rabinowitz. It would, under these circumstances, be unjustifiable retrospective **\*236** lawmaking for the Court in this case to reject the authority of these decisions.

80 S.Ct. 683, 4 L.Ed.2d 668

Are there to be permitted incidental to valid administrative arrests, searches as broad in physical area as, and analogous in purpose to, those permitted by the applicable precedents as incidents to lawful arrests for crime? Specifically, were the officers of the I.N.S. acting lawfully in this case when, after his arrest, they searched through petitioner's belongings in his hotel room looking for weapons and documents to evidence his 'alienage'? There can be no doubt that a search for weapons has as much

justification here as it has in the case of an arrest for crime, where it has been recognized as proper. E.g., Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L.Ed. 145. It s no less important for government officers, acting under established procedure to effect a deportation arrest rather than one for crime, to protect themselves and to insure that their prisoner retains no means by which to accomplish an escape.

[13]  [14]  [15]  [16]  [17]  Nor is there any constitutional reason to limit the search for materials proving the deportability of an alien, when validly arrested, more severely **696 than we limit the search for materials probative of crime when a valid criminal arrest is made. The need for the proof is as great in one case as in the other, for deportation can be accomplished only after a hearing at which deportability is established. Since a deportation arrest warrant is not a judicial warrant, a search incidental to a deportation arrest is without the authority of a judge or commissioner. But so is a search incidental to a criminal arrest made

upon probable cause without a warrant, and under Rabinowitz, 339 U.S. at page 60, 70 S.Ct. at page 432, such a search does not require a judicial warrant for its validity. It is to be remembered that an I.N.S. officer may not arrest and search on his own. Application for a warrant must be made to an independent responsible officer, the District Director *237 of the I.N.S., to whom a prima facie case of deportability must be shown. The differences between the procedural protections governing criminal and deportation arrests are not of a quality or magnitude to warrant the deduction of a constitutional difference regarding the right of incidental search. If anything, we ought to be more vigilant, not less, to protect individuals and their property from warrantless searches made for the purpose of turning up proof to convict than we are to protect them from searches for matter bearing on deportability. According to the uniform decisions of this Court deportation proceedings are not subject to the constitutional safeguards for criminal prosecutions. Searches for evidence of crime present situations demanding the greatest, not the least, restraint upon the Government's intrusion into privacy; although its protection is not limited to them, it was at these searches which the Fourth Amendment was primarily directed. We conclude, therefore, that government officers who effect a deportation arrest have a right of incidental search analogous to the search permitted criminal law-enforcement officers.

[18]  Judged by the prevailing doctrine, the search of petitioner's hotel room was justified. Its physical scope, being confined to the petitioner's room and the adjoining bathroom, was far less extensive than the search in Harris. The search here was less intensive than were the deliberately exhaustive quests in Harris and Rabinowitz, and its purpose not less justifiable. The only things sought here, in addition to weapons, were documents connected with petitioner's status as an alien. These may well be

considered as instruments or means for accomplishing his illegal status, and thus proper objects of search under Harris, supra, 331 U.S. at page 154, 67 S.Ct. at page 1103.

[19]  [20]  Two of the challenged items were seized during this search of petitioner's property at his hotel room. The first was item (2), a forged New York birth certificate *238 for 'Martin Collins,' one of the false identities which petitioner assumed in this country in order to keep his presence here undetected. This item was seizable when found during a proper search, not only as a forged official document by which petitioner sought to evade his obligation to register as an alien, but also as a document which petitioner was using as an aid in the commission of espionage for his undetected presence in this country was vital to his

work as a spy. Documents used as a means to commit crime are the proper subjects of search warrants, Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647, and are seizable when discovered in the course of a lawful search, Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231.

[21]  [22]  [23]  The other item seized in the course of the search of petitioner's hotel room was item (1), a piece of graph paper containing a coded message. This was seized by Schoenenberger as petitioner, while packing his suitcase, was seeking to hide it in his sleeve. An arresting officer is free to take hold of articles **697 which he sees the accused deliberately trying to hide. This power derives from the dangers that a weapon will be concealed, or that relevant evidence will be destroyed. Once

this piece of graph paper came into Schoenberger's hands, it was not necessary for him to return it, as it was an instrumentality for the commission of espionage. This is so even though Schoenberger was not only not looking for items connected with espionage but could not properly have been searching for the purpose of finding such items. When an article subject to lawful seizure properly comes into an officer's possession in the course of a lawful search it would be entirely without reason to say that he must return it because it was not one of the things it was his business to look for. See Harris, supra, 331 U.S. at pages 154—155, 67 S.Ct. at page 1103.

[24] Items (3), (4), and (5), a birth certificate for 'Emil Goldfus' who died in 1903, a certificate of vaccination for 'Martin Collins,' and a bank book for 'Emil Goldfus' *239 were seized, not in petitioner's hotel room, but in a more careful search at I.N.S. headquarters of the belongings petitioner chose to take with him when arrested. This search was a proper one. The property taken by petitioner to I.N.S. headquarters was all property which, under Harris, was subject to search at the place of arrest. We do not think it significantly different, when the accused decides to take the property with him, for the search of it to occur instead at the first place of detention when the accused arrives there, especially as the search of property carried by an accused to the place of detention has additional justifications, similar to those which justify a search of the person of one who is arrested. It is to be noted that this is not a case, like Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876, where the entire contents of the place where the arrest was made were seized. Such a mass seizure is illegal. The Government here did not seize the contents of petitioner's hotel room. Petitioner took with him only what he wished. He chose to leave some things behind in his room, which he voluntarily relinquished. And items (3), (4), and (5) were articles subject to seizure when found during a lawful search. They were all capable of being used to establish and maintain a false identity for petitioner, just as the forged 'Martin Collins' birth certificate, and were seizable for the same reasons.

[25] Items (1)—(5) having come into the Government's possession through lawful searches and seizures connected with an arrest pending deportation, was the Government free to use them as evidence in a criminal prosecution to which they related? We hold that it was. Good reason must be shown for prohibiting the Government from using relevant, otherwise admissible, evidence. There is excellent reason for disallowing its use in the case of evidence, though relevant, which is seized by the Government in violation of the Fourth Amendment to the Constitution. 'If letters and private documents can thus *240 be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.' Weeks v. United States, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652.

[26] These considerations are here absent, since items (1)—(5) were seized as a consequence of wholly lawful conduct. That being so, we can see no rational basis for excluding these relevant items from trial: no wrongdoing police officer would thereby be indirectly condemned, for there were no such wrongdoers; the Fourth Amendment would not thereby be enforced, for no illegal search or seizure was made; the Court would be lending its aid to no lawless government **698 action, for none occurred. Of course cooperation between the branch of the Department of Justice dealing with criminal law enforcement and the branch dealing with the immigration laws would be less effective if evidence lawfully seized by the one could not be used by the other. Only to the extent that it would be to the public interest to deter and prevent such cooperation, would an exclusionary rule in a case like the present be desirable. Surely no consideration of civil liberties commends discouragement of such cooperation between these two branches when undertaken in good faith. When undertaken in bad faith to avoid constitutional restraints upon criminal law enforcement the evidence must be suppressed. That is not, as we have seen, this case. Individual cases of bad faith cooperation should be dealt with by findings to that effect in the cases as they arise, not by an exclusionary rule preventing effective cooperation when undertaken in entirely good faith.

[27] We have left to the last the admissibility of items (6) and (7), the hollowed-out pencil and the block of wood containing a 'cipher pad,' because their admissibility is founded upon an entirely different set of considerations. *241 These two items were found by an agent of the F.B.I. in the course of a search he undertook of petitioner's hotel room, immediately after petitioner had paid his bill and vacated the room. They were found in the room's wastepaper basket, where petitioner had put them while packing his belongings and preparing to leave. No pretense is made that this search by the F.B.I. was for any purpose other

than to gather evidence of crime, that is, evidence of petitioner's espionage. As such, however, it was entirely lawful, although undertaken without a warrant. This is so for the reason that at the time of the search petitioner had vacated the room. The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made. Nor was it unlawful to seize the entire contents of the wastepaper basket, even though some of its contents had no connection with crime. So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were bona vacantia. There can be nothing unlawful in the Government's appropriation of such abandoned property. See Hester v. United States, 265 U.S. 57, 58, 44 S.Ct. 445, 446, 68 L.Ed. 898. The two items which were eventually introduced in evidence were assertedly means for the commission of espionage and were themselves seizable as such. These two items having been lawfully seized by the Government in connection with an investigation of crime, we encounter no basis for discussing further their admissibility as evidence.

Affirmed.

Mr. Justice DOUGLAS, with whom Mr. Justice BLACK concurs, dissenting.

Cases of notorious criminals—like cases of small, miserable ones—are apt to make bad law. When guilt permeates a record, even judges sometimes relax and let the police take shortcuts not sanctioned by constitutional **\*242** procedures. That practice, in certain periods of our history and in certain courts, has lowered our standards of law administration. The harm in the given case may seem excusable. But the practices generated by the precedent have far-reaching consequences that are harmful and injurious beyond measurement. The present decision is an excellent example.

The opening wedge that broadened the power of administrative officers—as distinguished from police—to enter and search peoples' homes was Frank v. State of Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877. That case allowed a health inspector to enter a home without a warrant, even though he had ample time to get one. The officials of the Immigration and Naturalization Service (I.N.S.) are now added to the preferred list. They are preferred because their **\*\*699** duties, being strictly administrative, put them in a separate category from those who enforce the criminal law. They need not go to magistrates, the Court says, for warrants of arrest. Their warrants are issued within the hierarchy of the agency itself. [1] Yet, as I attempted to show in my dissent in the Frank case, the Fourth Amendment in origin had to do as much with ferreting out heretics and collecting taxes as with enforcement of the criminal laws. 359 U.S., at pages 376—379, 79 S.Ct., at pages 813—815.

Moreover, the administrative officer who invades the privacy of the home may be only a front for the police who are thus saved the nuisance of getting a warrant. We need not go far to find examples. In Maryland v. Pettiford, Sup. Bench Balt. City, The Daily Record, Dec. 16, 1959, the police used the mask of a health inspector **\*243** to make the Frank case serve as an easy way to get a search without a warrant. Happily, they were rebuked. [2] But that case shows the kind of problems the Frank doctrine generates. The present case is another example of the same kind, although here the police are not rebuked. The administrative official with an administrative warrant, over which no judicial official exercises any supervision and which by statute may be used only for deportation, performs a new role. The police wear his mask to do police work. That, in my view, may not be done, even though we assume that the administrative warrant **\*244** issued by an administrative rather than a judicial officer is valid for an arrest for the purpose of deportation. We take liberties with an Act of Congress, as well as the Constitution, when we permit this to be done. The statute permits the arrest of an alien on an administrative warrant '(p)ending a determination of deportability.' [3] The Court now reads the Act as if it read 'Pending an investigation of criminal conduct.' Such was the nature of the arrest.

With due deference to the two lower courts, I think the record plainly shows that F.B.I. agents were the moving force behind this arrest and search. For at least a month they investigated the espionage **\*\*700** activities of petitioner. They were tipped off concerning this man and his role in May; the arrest and search were made on June 21. The F.B.I. had plenty of time to get a search warrant, as much if not more time than they had in Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed.

436, and ⬛ Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876, where the Court held warrantless searches illegal. But the F.B.I. did not go to a magistrate for a search warrant. They went instead to the I.N.S. and briefed the officials of that agency on what they had discovered. On the basis of this data a report was made to John Murff, Acting District Director of the I.N.S., who issued the warrant of arrest.

No effort was made by the F.B.I. to obtain a search warrant from any judicial officer, though, as I said, there was plenty of time for such an application. The administrative warrant of arrest was chosen with care and calculation as the vehicle through which the arrest and search were to be made. The F.B.I. had an agreement with the officials of I.N.S. that this warrant of arrest would not be served at least until petitioner refused to **\*245** 'cooperate.' The F.B.I. agents went with agents of the I.N.S. to apprehend petitioner in his hotel room. Again, it was the F.B.I. agents who were first. They were the ones who entered petitioner's room and who interrogated him to see if he would 'cooperate'; and when they were unable to get him to 'cooperate' by threatening him with arrest, they signaled agents of the I.N.S. who had waited outside to come in and make the arrest. The search was made both by the F.B.I. agents and by officers of the I.N.S. And when petitioner was flown 1,000 miles to a special detention camp and held for three weeks, the agents of the F.B.I. as well as I.N.S. interrogated him. [4]

Thus the F.B.I. used an administrative warrant to make an arrest for criminal investigation both in violation of s 242(a) of the Immigration and Nationality Act [5] and in violation of the Bill of Rights.

The issue is not whether these F.B.I. agents acted in bad faith. Of course they did not. The question is how far zeal may be permitted to carry officials bent on law enforcement. As Mr. Justice Brandeis once said, 'Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent.' 🚩 Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (dissenting opinion). The facts seem to me clearly to establish that the F.B.I. agents wore the mask of I.N.S. to do what otherwise they could not have done. They did what they could do only if they had gone to a judicial officer pursuant to the requirements of the Fourth Amendment, disclosed **\*246** their evidence, and obtained the necessary warrant for the searches which they made.

If the F.B.I. agents had gone to a magistrate, any search warrant issued would by terms of the Fourth Amendment have to 'particularly' describe 'the place to be searched' and the 'things to be seized.' How much more convenient it is for the police to find a way around those specific requirements of the Fourth Amendment! What a hindrance it is to work laboriously through constitutional procedures! How much easier to go to another official in the same department! The administrative officer can give a warrant good for unlimited search. No more showing of probable cause to **\*\*701** a magistrate! No more limitations on what may be searched and when!

In ⬛ Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 294, 100 L.Ed. 233, federal police officers, who obtained evidence in violation of federal law governing searches and seizures and so lost their case in the federal court, repaired to a state court and proposed to use it there in a state criminal prosecution. The Court held that the Federal District Court could properly enjoin the federal official from using the illegal search and seizure as basis for testifying in the state court. The federal rules governing searches and seizures, we held, are 'designed as standards for federal agents' no more to be defeated by devious than by direct methods. The present case is even more palpably vulnerable. No state agency is involved. Federal police seek to do what immigration officials can do to deport a person but what our rules, statutes, and Constitution forbid the police from doing to prosecute him for a crime.

The tragedy in our approval of these short cuts is that the protection afforded by the Fourth Amendment is removed from an important segment of our life. We today forget what the Court said in ⬛ Johnson v. United States, supra, 333 U.S. at page 14, 68 S.Ct. at page 369, that the Fourth Amendment provision **\*247** for 'probable cause' requires that those inferences 'be drawn by a neutral and detached magistrate' not 'by the officer engaged in the often competitive enterprise of ferreting out crime.' This is a protection given not only to citizens but to aliens as well, as the opinion of the Court by implication holds. The right 'of the people' covered by the Fourth Amendment certainly gives security to aliens in the same degree that 'person'

in the Fifth and 'the accused' in the Sixth Amendments also protects them. See Wong Wing v. United States, 163 U.S. 228, 242, 16 S.Ct. 977, 982, 411 L.Ed. 140. 411 L.Ed. 140. Here the F.B.I. works exclusively through an administrative agency—the I.N.S.—to accomplish what the Fourth Amendment says can be done only by a judicial officer. A procedure designed to serve administrative ends—deportation—is cleverly adapted to serve other ends—criminal prosecution. We have had like examples of this same trend in recent times. Lifting the requirements of the Fourth Amendment for the benefit of health inspectors was accomplished by Frank v. State of Maryland, as I have said. Allowing the Department of Justice rather than judicial officers to determine whether aliens will be entitled to release on bail pending deportation hearings is another. See Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547.

Some things in our protective scheme of civil rights are entrusted to the judiciary. Those controls are not always congenial to the police. Yet if we are to preserve our system of checks and balances and keep the police from being all-powerful, these judicial controls should be meticulously respected. When we read them out of the Bill of Rights by allowing short cuts as we do today and as the Court did in the Frank and Carlson cases, police and administrative officials in the Executive Branch acquire powers incompatible with the Bill of Rights.

The F.B.I. agents stalked petitioner for weeks and had plenty of time to obtain judicial warrants for searching the **\*248** premises he occupied. I would require them to adhere to the command of the Fourth Amendment and not evade it by the simple device of wearing the masks of immigration officials while in fact they are preparing a case for criminal prosecution.

Mr. Justice BRENNAN, with whom THE CHIEF JUSTICE, Mr. Justice BLACK and Mr. Justice DOUGLAS join, dissenting.

This is a notorious case, with a notorious defendant. Yet we must take care to enforce the Constitution without regard to the nature of the crime or the nature of the criminal. The Fourth **\*\*702** Amendment protects 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' This right is a basic one of all the people, without exception; and this Court ruled in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, that the fruits of governmental violation of this guarantee could not be used in a criminal prosecution. The Amendment's protection is thus made effective for everyone only by upholding it when invoked by the worst of men.

The opinion of the Court makes it plain that the seizure of certain of the items of petitioner taken from his room at the Hotel Latham and used in evidence against him must depend upon the existence of a broad power, without a warrant, to search the premises of one arrested, in connection with and 'incidental' to his arrest. This power is of the sort recognized by Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, and later asserted even where the arresting officers, as here, had ample time and opportunity to secure a search warrant. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, overruling Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663. The leading early cases do not recognize any such power to make a search generally through premises attendant upon an arrest. See **\*249** Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877. [1]

The general question has been extensively canvassed here, in the general context of an arrest for crime, in the Harris, Trupiano and Rabinowitz cases. Whether Harris and Rabinowitz should now be followed on their own facts is a question with which the Court is not now faced. Rather the question is whether the doctrine of those cases should be extended to a new and different set of facts—facts which present a search made under circumstances much less consistent with the Fourth Amendment's prohibition against unreasonable searches than any which this Court has hitherto approved. Factual differences weigh heavily in this area: 'There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances.' Go-Bart Importing Co. v. United States, supra, 282 U.S. at page 357, 51 S.Ct. at page 158. In Harris and Rabinowitz, the

broad search was performed as an incident to an arrest for crime under warrants lawfully issued. 331 U.S. at page 148, 67 S.Ct. at page 1100; 339 U.S. at page 58, 70 S.Ct. at page 431. The issuance of these warrants is by no means automatic—it is controlled by a constitutionally prescribed standard. It thus could be held that sufficient protection was given the individual without the execution of a second warrant for the search. Cf. Clark, J., dissenting in United States v. Rabinowitz, 2 Cir., 176 F.2d 732, 736, reversed 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. And while a search generally through premises 'incident' to an arrest for crime without a warrant has been sanctioned only inferentially here, [2] even if such a search be deemed permissible under the Fourth Amendment, it would not go so far as the result here. Such an arrest may **\*250** constitutionally be made only upon probable cause, the existence of which is subject to judicial examination, see **\*\*703** Henry v. United States, 361 U.S. 98, 100, 80 S.Ct. 168, 169, 4 L.Ed.2d 134, and such an arrest demands the prompt bringing of the person arrested before a judicial officer, where the existence of probable cause is to be inquired into. Fed.Rules Crim.Proc., 5(a) and (c), 18 U.S.C.A. This Court has been astute to fashion methods of ensuring the due observance of these safeguards. Henry v. United States, supra; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

Even assuming that the power of Congress over aliens may be as great as was said in Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911, and that deportation may be styled 'civil,' Harisiades v. Shaughnessy, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586, it does not follow that Congress may strip aliens of the protections of the Fourth Amendment and authorize unreasonable searches of their premises, books and papers. Even if Congress could make the exclusionary sanction of the Amendment inapplicable in deportation proceedings, the fruits of the search here were used in a prosecution whose criminal character no dialectic can conceal. Clearly the consequence of the Fourth Amendment in such a trial is that the fruits of such a search may not be given in evidence, under the rule declared in Weeks v. United States, supra. We need not, in my view, inquire as to whether the sort of 'administrative' arrest made here is constitutionally valid as to permit the officers to hold petitioner's person for deportation proceedings. With the Court, this issue may be treated as not properly before us for our consideration, and the arrest may be treated for the purposes of this case as lawful in itself. But even with Harris and Rabinowitz, that does not conclude the matter as to the search. It is patent that the sort of search permitted by those cases, and necessary to sustain the seizures here, goes beyond what is reasonably related **\*251** to the mechanics of the arrest itself—ensuring the safety of the arresting officers and the security of the arrest against the prisoner's escape. Since it does, I think it plain that before it can be concluded here that the search was not an unreasonable one, there must be some inquiry into the over-all protection given the individual by the totality of the processes necessary to the arrest and the seizure. Here the arrest, while had on what is called a warrant, was made totally without the intervention of an independent magistrate; it was made on the authorization of one administrative official to another. And after the petitioner was taken into custody, there was no obligation upon the administrative officials who arrested him to take him before any independent officer, sitting under the conditions of publicity that characterize our judicial institutions, and justify what had been done. [3] Concretely, what happened instead was this: petitioner, upon his arrest, was taken to a local administrative headquarters and then flown in a special aircraft to a special detention camp over 1,000 miles away. He was incarcerated in solitary confinement there. As far as the world knew, he had vanished. He was questioned daily at the place of incarceration for over three weeks. An executive procedure as to his deportability was had, at the camp, after a few days, but there was never any independent inquiry or judicial control over the circumstances of the arrest and the seizure till over five weeks after his arrest, when, at the detention camp, he was served with a bench warrant for his arrest on criminal charges, upon an indictment.

The Fourth Amendment imposes substantive standards for searches and seizures; but with them one of the important safeguards it establishes is a procedure; and **\*252** central to this procedure is an independent control over the actions **\*\*704** of officers effecting searches of private premises. 'Indeed, the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests.' United State v. Lefkowitz, supra, 285 U.S. at page 464, 52 S.Ct.

80 S.Ct. 683, 4 L.Ed.2d 668

at page 423. 'Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police.' McDonald v. United States, 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153. It is one thing to say that an adequate substitute for this sort of intervention by a magistrate can be found in the strict protections with which federal criminal procedure surrounds the making of a criminal arrest—where the action of the officers must receive an antecedent or immediately subsequent independent scrutiny. It goes much further to say that such a substitute can be found in the executive processes employed here. The question is not whether they are constitutionally adequate in their own terms—whether they are a proper means of taking into custody one not charged with crime. The question is rather whether they furnish a context in which a search generally through premises can be said to be a reasonable one under the Fourth Amendment. These arrest procedures, as exemplified here, differ as night from day from the processes of an arrest for crime. When the power to make a broad, warrantless search is added to them, we create a complete concentration of power in executive officers over the person and effects of the individual. We completely remove any independent control over the powers of executive officers to make searches. They may take any man they think to be a deportable alien into their own custody, hold him without arraignment or bond, and, having been careful to apprehend him at home, make a search generally through his premises. I cannot see **\*253** how this can be said to be consistent with the Fourth Amendment's command; it was, rather, against such a concentration of executive power over the privacy of the individual that the Fourth Amendment was raised. I do not think the Harris and Rabinowitz cases have taken us to this point.

If the search here were of the sort the Fourth Amendment contemplated, there would be no need for the elaborate, if somewhat pointless, inquiry the Court makes into the 'good faith' of the arrest. Once it is established that a simple executive arrest of one as a deportable alien gives the arresting offices the power to search his premises, what precise state of mind on the part of the officers will make the arrest a 'subterfuge' for the start of criminal proceedings, and render the search unreasonable? We are not, I fear, given any workable answer, and of course the practical problems relative to the trial of such a matter hardly need elaboration; but the Court verbalizes the issue as 'whether the decision to proceed administratively toward deportation was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime.' But under today's ruling, every administrative arrest offers this possibility of a facile search, theoretically for things connected with unlawful presence in the country, that may turn up evidence of crime; and this possibility will be well known to arresting officers. Perhaps the question is how much basis the officers had to suspect the person of crime; but it would appear a strange test as to whether a search which turns up criminal evidence is unreasonable, that the search is the more justifiable the less there was antecedent probable cause to suspect the defendant of crime. If the search were made on a valid warrant, there would be no such issue even if it turned up matter relevant to another crime. See Gouled v. United States, 255 U.S. 298, 311—312, 41 S.Ct. 261, 265—266, 65 L.Ed. 647. External procedural control in accord with the **\*705** **\*254** basic demands of the Fourth Amendment removes the grounds for abuse; but the Court's attitude here must be based on a recognition of the great possibilities of abuse its decision leaves in the present situation. These possibilities have been recognized before, in a case posing less danger: 'Arrest under a warrant for a minor or a trumped-up charge has been familiar practice in the past, is a commonplace in the police state of today, and too well-known in this country. * * * The progress is too easy from police action unscrutinized by judicial authorization to the police state.' United States v. Rabinowitz, supra, 339 U.S. at page 82, 70 S.Ct. at page 442, 94 L.Ed. 653 (dissenting opinion). Where a species of arrest is available that is subject to no judicial control, the possibilities become more and more serious. The remedy is not to invite fruitless litigation into the purity of official motives, or the specific direction of official purposes. One may always assume that the officers are zealous to perform their duty. The remedy is rather to recognize that the power to perform a search generally throughout premises upon a purely executive arrest is so unconfined by any safeguards that it cannot be countenanced as consistent with the Fourth Amendment.

One more word. We are told that the governmental power to make a warrantless search might be greater where the object of the search is not related to crime but to some other 'civil' proceeding—such as matter bearing on the issue whether a man should forcibly be sent from the country. The distinction is rather hollow here, where the proofs that turn up are in fact given in evidence in a criminal prosecution. And the distinction, again, invites a trial of the officers' purposes. But in any event, I think it perverts the Amendment to make this distinction. The Amendment states its own purpose, the protection of the privacy of the individual and of his property against the incursions of officials: the 'right of the people to be secure in their persons, houses,

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

80 S.Ct. 683, 4 L.Ed.2d 668

papers, and effects.' See **\*255** 🚩 Boyd v. United States, 116 U.S. 616, 627, 6 S.Ct. 524, 530, 538, 29 L.Ed. 746. Like most of the Bill of Rights it was not designed to be a shelter for criminals, but a basic protection for everyone; to be sure, it must be upheld when asserted by criminals, in order that it may be at all effective, but it 'reaches all alike, whether accused of crime or not.' 🚩 Weeks v. United States, supra, 232 U.S. at page 392, 34 S.Ct. at page 344, 58 L.Ed. 652. It is the individual's interest in privacy which the Amendment protects, and that would not appear to fluctuate with the 'intent' of the invading officers. It is true that the greatest and most effective preventive against unlawful searches that has been devised is the exclusion of their fruits from criminal evidence, see Weeks v. United States, supra; Boyd v. United States, supra; but it is strange reasoning to infer from this that the central thrust of the guarantee is to protect against a search for such evidence. The argument that it is seems no more convincing to me now than when it was made by the Court in 🚩 Frank v. State of Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877. To be sure, the Court in Boyd v. United States, supra, and in subsequent cases [4] has commented upon the intimate relationship between the privilege against unlawful searches and seizures and that against self-incrimination. This has been said to be erroneous history; [5] if it was, it **\*\*706** was even less than a harmless error; it was part of the process through which the Fourth Amendment, by means of the exclusionary rule, has become more than a dead letter in the federal courts. Certainly this putative relationship between the guarantees is not to be used as a **\*256** basis of a stinting construction of either—it was the Boyd case itself [6] which set what might have been hoped to be the spirit of later construction of these Amendments by declaring that the start of abuse can 'only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.' 116 U.S. at page 635, 6 S.Ct. at page 535.

Since evidence was introduced against petitioner which had been obtained in violation of his constitutional guarantees as embodied in the Fourth Amendment, I would reverse his conviction for a new trial on the evidence not subject to this objection.

**All Citations**

362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668

## Footnotes

\*    '1. Whether under the laws and Constitution of the United States (a) the administrative warrant of the New York Acting District Director of the Immigration and Naturalization Service was validly issued, (b) such administrative warrant constituted a valid basis for arresting petitioner or taking him into custody, and (c) such warrant furnished a valid basis for the searches and seizures affecting his person, luggage, and the room occupied by him at the Hotel Latham.

'2. Whether, independently of such administrative warrant, petitioner's arrest, and the searches and seizures affecting his person, luggage, and the room occupied by him at the Hotel Latham, were valid under the laws and Constitution of the United States.

'3. Whether on the record before us the issues involved in Questions '1(a),' '1(b),' and '2' are properly before the Court.'

1    Section 242(a) of the Immigration and Nationality Act of 1952, 66 Stat. 208, 🚩 8 U.S.C. s 1252(a), 🚩 8 U.S.C.A. s 1252(a), provides 'Pending a determination of deportability in the case of any alien * * * such alien may, upon warrant of the Attorney General, be arrested and taken into custody.'

2    In the Pettiford case it appears that a police officer assigned to the Sanitation Division gained entrance into a home without a warrant and discovered that the defendant who occupied the premises was engaged in lottery activities. He then signaled to a policeman in charge of gambling activities who was waiting outside in accordance with a prior agreement. Lottery slips were seized and over the defendant's objection were received in evidence in a criminal trial. A motion for a new trial was granted. The Supreme Bench of Baltimore City said in its opinion:

'Section 120 of Article 12, of the Baltimore City Code provides that if the Commissioner of Health has cause to suspect that a nuisance exists in any home, he may demand entry therein in the daytime and the owner or occupier is subject

80 S.Ct. 683, 4 L.Ed.2d 668

to a fine if entry is denied. A conviction under this Section by the Criminal Court of Baltimore City was sustained by the Supreme Court of the United States in a five to four decision. Frank vs. (State of) Maryland (359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877). * * *

'In this case, it is evident that a principal, if not the chief purpose of the entry of the police officer assigned to the sanitation division was to endeavor to secure evidence of a lottery violation for his colleague. 'The security of one's privacy against arbitrary intrusion by the police * * * is basic to a free society.' Wolf vs. (People of State of) Colorado, 338 U.S. 25, 27 (69 S.Ct. 1359, 1361, 93 L.Ed. 1782). An exception to that security, upheld because indispensible for the maintenance of the community health, is not to be used to cover searches without warrants inconsistent with the conceptions of human rights (embodied) in our State and Federal Constitutions.'

3    Note 1, supra.

4    Immigration officials (who often claim that their actions have an administrative finality beyond the reach of courts, see Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881; Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242) have no authority to detain suspects for secret interrogation. See United States v. Minker, 350 U.S. 179, 76 S.Ct. 281, 100 L.Ed. 185.

5    Note 1, supra.

1    Earlier expressions looking the other way, Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L.Ed. 145; Marron v. United States, 275 U.S. 192, 198—199, 48 S.Ct. 74, 76—77, 72 L.Ed. 231, were put in proper perspective by their author in Go-Bart and Lefkowitz. See 282 U.S. at page 358, 51 S.Ct. at page 158; 285 U.S. at page 465, 52 S.Ct. at page 423.

2    See United States v. Rabinowitz, supra, 339 U.S. at page 60, 70 S.Ct. at page 432.

3    This procedure is statutorily based on s 242(a) of the Immigration and Nationality Act of 1952, 66 Stat. 208, 8 U.S.C. s 1252(a), 8 U.S.C.A. s 1252(a).

4    See, e.g., Gouled v. United States, supra, 255 U.S. at page 306, 41 S.Ct. at page 263; United States v. Lefkowitz, supra, 285 U.S. at pages 466—467, 52 S.Ct. at pages 423—424, 76 L.Ed. 877. The Weeks case itself, though drawing great support from Boyd, appears to rest most heavily on the Fourth Amendment itself.

5    The famous attack on the Boyd case's historical basis is, of course, to be found in 8 Wigmore, Evidence (3d ed. 1940), ss 2184, 2264. The attack is incident to Wigmore's strictures on the exclusionary rule. Id., ss 2183—2184.

6    It is not without interest to note, too, that the Boyd case itself involved a search not in connection with a prosecution to impose fine or imprisonment, but simply with an action to forfeit 35 cases of plate glass said to have been imported into the country under a false customs declaration.

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

00 Cal. Daily Op. Serv. 6114, 2001 Daily Journal D.A.R. 7473

257 F.3d 971
United States Court of Appeals,
Ninth Circuit.

Soghomon ABOVIAN; Lousine
Abovian; Iskoui Abovian, Petitioners,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 98–70934.
|
Order Filed July 20, 2001
|
Order Filed July 5, 2001

Before: WALLACE, PREGERSON and THOMAS, Circuit
Judges.


### ORDER

The order denying rehearing filed July 5, 2001 and the dissent
are designated for publication.


### ORDER

A sua sponte call for en banc was made by a member of the
Court.

The full court was advised of the call on whether to rehear
the matter en banc. The matter failed to receive a majority of
the votes of the nonrecused active judges in favor of en banc
consideration. Fed. R.App. P. 35(b).

The brief filed by respondent urging en banc is denied and the
petition for rehearing en banc is rejected.


KOZINSKI, Circuit Judge, with whom Circuit Judges
O'SCANNLAIN, TROTT, T.G. NELSON, KLEINFELD,
GRABER, RICHARD C. TALLMAN and RAWLINSON
join, dissenting from the order denying the petition for
rehearing en banc:

The majority overthrows a perfectly reasonable BIA decision
by invoking novel rules divorced from administrative law,
Supreme Court precedent and common sense. While this
is a particularly egregious case, it is not the first one
where we have whittled away the authority and discretion
of immigration judges and the BIA, imposing ever more
stringent standards on how these adjudicatory officers must
perform their functions. What the majority does here is the
antithesis of administrative deference.

The majority doesn't defer to the Supreme Court either.
While reciting that we may only reverse the BIA if petitioner
has presented evidence "so compelling that no reasonable
factfinder could fail to find the requisite fear of persecution,"
the majority reverses based on a story so wild, implausible and
uncorroborated that no reasonable factfinder could believe
it. [1] Abovian v. INS, 219 F.3d 972, 977–78 (9th Cir.2000)
(quoting INS v. Elias–Zacarias, 502 U.S. 478, 483–84, 112
S.Ct. 812, 117 L.Ed.2d 38 (1992)). The majority effectively
inverts the standard by saddling the BIA with the burden of
proving that petitioner is *not* entitled to relief.

Abovian testified that Levon Ter–Petrosyan, who then was
the President of Armenia, had met with him in a hotel
more than fifteen times to recruit him for service in the
KGB. He made no mention of such extraordinary interviews
in his written **\*972** asylum application. Nor did he try
to reconcile his story with our State Department's Country
Report for Armenia, which observes that Ter–Petrosyan led
his country to independence from the Soviet Union and is
a political adversary of the Communists. *See* U.S. Dep't
of State, Bureau of Democracy, Human Rights & Labor,
Armenia–Profile of Asylum Claims & Country Conditions 6
(May 1996) ("Country Report"). Although Abovian testified
that "everybody knows" that independence is a fiction and
that Ter–Petrosyan works for the Russians, he presented
no affidavits, letters or articles in support. A.R. 160. In
fact, Abovian presented nothing but his own testimony to
document this fantastic claim. His wife and daughter testified,
yet neither corroborated his story.

Abovian's testimony was marked by internal inconsistencies
and material departures from his asylum application. He
testified he was beaten when he went to Cuba, then said that he
was jailed as a traitor because he refused to go there. He wrote
that the KGB tried to coerce his assistance by placing him in a
small hole in the ground filled with water and snakes, but later
admitted he couldn't be sure it was the KGB that had abused
him. He wrote that the KGB restricted him to menial labor
jobs, but later said he had been in demand for his expertise

AR.03870

in the air conditioning business. He wrote that his daughter had been struck by a car and could not identify the driver until twelve days after the accident, but later testified that she did so after only two days. While Abovian described his daughter as completely paralyzed in his application, she testified that only half her body had been paralyzed. He testified that the KGB kidnapped his daughter and warned him not to tell the police, even though he also testified that the KGB ran the country. *See* n. 5 *infra.*

The BIA found Abovian's testimony "disjointed, incoherent, and implausible." It faulted him for his inconsistencies; his failure to produce any supporting documents or explain why he couldn't; his failure to mention the Armenian President in his application; and the general implausibility of the whole tale. Despite these problems with Abovian's story, the majority sets aside the BIA ruling for four reasons, none of which can be found in the immigration laws or regulations, or for that matter in any caselaw outside this circuit: the BIA violated Abovian's due process rights by failing to give him a chance to clean up his story; the BIA erred by holding Abovian's failure to provide corroborating evidence against him; the BIA erred by concluding that Abovian's numerous inconsistencies cast doubt on his credibility; and the BIA erred by taking into account the general implausibility of his tale.

As Judge Wallace notes in his lucid dissent, the majority's due process ruling is especially curious because Abovian himself never raised it. The majority could have avoided this constitutional issue because Abovian waived it, or because the majority throws out the BIA's decision on another ground. But the majority instead chooses to ignore well-established principles of judicial restraint and holds that Abovian's hearing was fundamentally unfair, because the BIA decided to disbelieve his testimony, without first giving him a chance to explain away inconsistencies and supplement the record.

*See* 📖 *Abovian,* 219 F.3d at 980 (BIA must give Abovian "a reasonable opportunity to explain the perceived deficiencies in his testimony" and remand the case to the IJ "[i]f further factual development of [the] record is required.").

This constitutional rule exists nowhere outside the Ninth Circuit. The majority contends that the BIA violated Abovian's right to a fair hearing, but what kind of **\*973** unfairness can there be when the BIA uses the petitioner's own words against him? A petitioner who testifies, like any other witness, puts his credibility at issue. *See, e.g.,*

📖 *Stewart v. United States,* 366 U.S. 1, 6 n. 13, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961) ("[T]he defendant's credibility is in issue whenever he testifies."); 📖 *United States v. West,* 826 F.2d 909, 912 (9th Cir.1987) (same). Abovian and his lawyer knew that, by taking the stand, petitioner would risk being faulted for inconsistencies in his testimony, implausible failures of memory, hesitations and omissions. Counsel for the INS was entitled to probe for such weaknesses through cross-examination, and petitioner's counsel could try to rehabilitate him on redirect. If the IJ had then chosen to disbelieve petitioner, he would have had no constitutional right to get back on the stand and patch up his story.

The result should be no different when it is the BIA that makes the adverse credibility determination. Congress gave the BIA authority to "conduct a de novo review of the record, to make its own findings, and to determine independently the sufficiency of the evidence." *Castillo v. INS,* 951 F.2d 1117, 1120–21 (9th Cir.1991) (emphasis omitted). The BIA may disregard the IJ's credibility judgment and, should it do so, we review only the BIA's decision, not that of the IJ. *See* 📖 *Pal v. INS,* 204 F.3d 935, 937 n. 2 (9th Cir.2000). Petitioner had ample notice of the BIA's authority, and he had a full opportunity to develop the record. Moreover, he was well aware that his credibility was in doubt because counsel for the INS challenged his story on cross-examination before the IJ. *See* A.R. 158–61.[2] How then can Abovian complain that the BIA deprived him of his right to a fair hearing by faulting him for inconsistencies in the record? He can't and he didn't; the majority does it for him.

The majority's second reason for reversing the BIA also has no support in the immigration laws and pushes our court even further adrift from the law of other circuits. The majority holds that the BIA cannot fault a petitioner for inexplicably failing to corroborate his story with documents or other evidence one might expect him to have available. Because asylum petitioners have the burden of proving they are entitled to relief, *see* 📖 *Meza–Manay v. INS,* 139 F.3d 759, 763 (9th Cir.1998), it's entirely appropriate for the trier of fact to expect the petitioner to gather such proof as is available, or explain why it's not. A petitioner's failure to do one or the other strikes me as a perfectly legitimate (and sensible) reason for rejecting his story.

The BIA has endorsed this approach and held that corroborating evidence will not be necessary where

AR.03871

00 Cal. Daily Op. Serv. 6114, 2001 Daily Journal D.A.R. 7473

impossible to provide, but "where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided." *In re S–M–J,* Int. Dec. 3303, 1997 WL 80984, at 5 (BIA Jan. 31, 1997) (en banc). Because federal courts must defer to the BIA's reasonable interpretation of immigration law, the two other circuits that have passed on this issue have endorsed this rule and held that the BIA **\*974** might reasonably question why a petitioner giving apparently credible testimony would fail to produce evidence that should have been available. *See Abdulai v. Ashcroft,* 239 F.3d 542, 554 (3d Cir.2001) ("[T]he BIA may sometimes require otherwise-credible applicants to supply corroborating evidence in order to meet their burden of proof."); *Diallo v. INS,* 232 F.3d 279, 285 (2d Cir.2000) ("[E]vidence corroborating his story, or an explanation for its absence, may be required where it would be reasonably expected.").

In conflict with these circuits, we have rejected the BIA's interpretation of the governing regulation and held that, where a petitioner gives credible testimony, the BIA may not deny him relief because he failed to provide corroboration.

*See Ladha v. INS,* 215 F.3d 889, 899 (9th Cir.2000). Our interpretation conflicts with the regulation, which provides that the "testimony of the applicant, if credible, *may* be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a) (emphasis added). Nevertheless, we have held that if the BIA cannot find a reason to reject petitioner's testimony, the testimony alone *must* be sufficient to sustain his burden of proof. As the Second Circuit recognized, our rule "renders corroborating evidence unnecessary" and "run[s] contrary to the permissive language of the applicable INS regulations." *Diallo,* 232 F.3d at 286.

While our past cases put us on the wrong side of this circuit conflict, the majority takes our law one step farther and holds that the BIA can't consider the fact that petitioner has failed to present corroborating evidence even in deciding whether to believe him. Abovian claimed that everyone in Armenia knew the president was a KGB stooge, yet he didn't present a single newspaper article or human rights report that supported that claim. Although Abovian testified that "every Armenian you ask, they'll say the same thing," A.R. 160, his own wife and daughter did not corroborate this "fact." Surely, there are other Armenian immigrants in this country, yet Abovian didn't call any of them to testify, nor did he present any affidavits. Abovian testified that his daughter was hospitalized for twenty days after being hit by a KGB car, yet he offered no hospital records. [3] His daughter testified that she was knocked unconscious, was paralyzed in half her body and spent three weeks in the hospital yet, less than three years later, she could show no scars or other visible signs of injury. *See* A.R. 167–68. Abovian testified that he reported the accident to the police, yet produced no police report. [4] He testified that his daughter was kidnapped for eighteen days and that he also reported this incident to the police, but again offered no police record of the incident. [5]

**\*975**  Shortly before the IJ made his decision, petitioner submitted an amended application with an Amnesty International report, a State Department human rights report and fifteen newspaper articles documenting human rights abuses and political turmoil in Armenia. Amnesty International reports that eighteen political prisoners faced criminal proceedings falling short of international standards, and lawyers, opposition journalists and religious minorities were beaten by people linked to the government. *See* A.R. 282 (reprinting Amnesty Int'l, Armenia, Report 1996, at 78). The State Department also reports that "[s]ome members of the security forces committed serious human rights abuses," and that the Armenian Government had suspended an opposition political party, the Armenian Revolutionary Federation. A.R. 288 (reprinting U.S. Dep't of State, Armenia Human Rights Practices, 1995). Neither report suggests that the Russian KGB has infiltrated the highest levels of the Armenian Government, or that President Ter–Petrosyan engages in violent recruitment efforts on behalf of the KGB.

These reports do suggest that the Government of Armenia, like many other governments in the world, occasionally resorts to force in order to preserve its hold on power. But, under our law, a petitioner must do more than show that his home country is generally repressive in order to merit asylum; he must show that *he* was the object of oppression on account of the enumerated grounds. *See Prasad v. INS,* 47 F.3d 336, 340 (9th Cir.1995) ( "Particularized individual persecution, not merely conditions of discrimination in the country of origin, must be shown before asylum will be granted."); *see also Safaie v. INS,* 25 F.3d 636, 640 (8th Cir.1994) (asylum petitioner "cannot merely contend that the government's policies are repressive or that she disagrees with the policies; she must demonstrate that she fears particularized persecution directed at her...."); *Huaman–Cornelio v. BIA,* 979 F.2d 995,

1000 (4th Cir.1992) (asylum is not available "to anyone who fears the general danger that inevitably accompanies political ferment and factional strife").

Fourteen of the fifteen newspaper articles describe repressive measures the Armenian Government has taken against political opponents. Three articles concern the Armenian Government's alleged persecution of members of the Armenian Revolutionary Front. *See* A.R. 339–45. Eleven concern the political tumult that followed the September 1996 parliamentary elections, which were allegedly rigged by the government. *See* A.R. 298–333. In ensuing political demonstrations, opposition demonstrators stormed Parliament and assaulted legislators, and the police fired into the crowd. The government prohibited demonstrations and arrested several opposition politicians. But Abovian does not claim to be a member of any of these opposition parties, so the stories don't help his asylum claim. In fact, these events all happened after he left the country on February **\*976** 17, 1994. The only article that even mentions the KGB is an editorial from a Russian newspaper arguing that the Russian internal security service employs tactics reminiscent of the KGB. *See* A.R. 335–37. The editorial does not allege that the service is active in Armenia or any other foreign country. So it in no way helps Abovian's claim. [6]

The majority holds that the total absence of corroborating evidence is irrelevant to whether petitioner's story is believable. [7] The only time the BIA may fault a petitioner for the absence of corroboration is where the INS already has "evidence refuting or in any way contradicting [his] testimony." *Abovian,* 219 F.3d at 978. [8] The majority's rule relieves petitioner of any burden of proving his story and saddles the INS with the burden of *dis* proof. This conflicts directly with the Supreme Court's admonition in *Elias–Zacarias* that we may reverse the BIA's denial of asylum only where the petitioner presents evidence "so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." 502 U.S. at 483–84, 112 S.Ct. 812.

It also puts the INS in an impossible position. The specific facts supporting a petitioner's asylum claim—when, where, why and by whom he was allegedly persecuted—are peculiarly within the petitioner's grasp. By definition, they will have happened at some time in the past—often many years ago—in a foreign country. In order for the INS to present evidence "refuting or in any way contradicting" petitioner's testimony, it would have to conduct a costly

and often fruitless investigation abroad, trying to prove a negative-that the incidents petitioner alleges did not happen. The task is made even more difficult if (as we have held) the INS is barred from casting doubt on petitioner's story because it is inconsistent with the State Department Country Report, *see* p. 979 *infra,* or if (as we have also held) **\*977** petitioner is free to present significant facts at the asylum hearing that were not alluded to in his application, *see* pp. 978–79 *infra.* I find it hard to accept that, in passing the asylum statute, Congress meant for the BIA to believe every applicant's story, no matter how wild and implausible, unless the INS chases all over the world and finds contrary evidence.

The majority opinion eliminates all incentive for a petitioner in our circuit to present corroboration, because anything he presents in addition to his own testimony could give the INS grounds for disbelieving him. *See, e.g., Akinmade v. INS,* 196 F.3d 951, 955 (9th Cir.1999). Far better for him to present nothing but his own testimony. So long as he can craft a story, plausible or not, *see* p. 979 *infra,* the BIA will be barred from holding it against him that he did not present witnesses, documents or other corroborating evidence, even where such evidence should be readily available to him. A rule of law that encourages parties to withhold relevant evidence is unwise. That this rule conflicts with the immigration regulations and requires us to break with other circuits makes it indefensible.

While, with the corroboration rule, the majority prohibits the BIA from faulting petitioner for what he does not present, with its third rule, it blocks the BIA from faulting him for what he does present. Under this rule, the BIA may not doubt a petitioner on the basis of inconsistencies that concern matters of "less than substantial" importance. *Abovian,* 219 F.3d at 979. As we have said in the past, "[m]inor inconsistencies in the record such as discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." *Vilorio–Lopez v. INS,* 852 F.2d 1137, 1142 (9th Cir.1988). Like the rule about corroborating evidence, this is another evidentiary rule that has no ready analogue outside the immigration context.

We have justified our materiality requirement on the ground that minor inconsistencies raise no suspicions because there is no reason a petitioner " 'would intentionally have provided incorrect information on such trivial points.' " *Shah v. INS,* 220 F.3d 1062, 1068 (9th Cir.2000) (quoting *Damaize–Job v. INS,* 787 F.2d 1332, 1337 (9th Cir.1986)). But the trier of

fact doesn't deny relief because it believes the petitioner made up only the minor details. Rather, inadvertent contradictions as to details can give rise to the suspicion that the petitioner made up the whole story, and the minor inconsistencies reflect the difficulty in telling a good lie.

Details are the stuff of effective cross-examination. After a petitioner testifies on direct, opposing counsel tries to shake his story by asking him to recall specifics. Petitioner's counsel can't object to such questions as irrelevant. That's because cross-examining a witness on the finer details is a time-honored way of testing the veracity of the critical points of his testimony. While anyone can invent a story to support an asylum claim, cross-examination forces the witness to describe small details that someone would know right away from being there, but that a liar might stumble over when put on the spot.

Because a witness will never testify exactly the same way twice, certain inconsistencies may reveal merely the limits of memory. In immigration cases, inconsistencies might also arise because the petitioner had trouble understanding English or because the translator made a mistake. But while such inconsistencies may be innocent, they may also signal that the petitioner is telling a tale. When a petitioner fails to recall how he was tortured, when he mixes up the chronology of events, or when he embellishes his story with new details, the trier of fact may reasonably **\*978** infer that the petitioner is fibbing. Ultimately, it falls to immigration judges and the BIA to sort out whether those inconsistencies are innocent or not; our job does not include making credibility judgments.

Our opinions make liberal use of this materiality requirement to upset credibility determinations with which we disagree. In numerous cases, we have applied this rule to substitute our own reading of the facts for those of the BIA:

• In *Vilorio–Lopez,* petitioner and his cousin testified that they had fled from a right-wing death squad and taken shelter before fleeing to 🚩 America. *See 852 F.2d at 1142.* Petitioner testified that the incident happened the previous year, yet his cousin testified it had happened three years before. *See* 🚩 *id.* at 1143. In petitioner's account, they hid for one hour, but his cousin said they hid for an entire night and the following day. *See id.* We concluded that, because such discrepancies merely concerned issues of timing, they said nothing about whether the two were making up the story.

• In 🚩 *Garrovillas v. INS,* 156 F.3d 1010, 1013–14 (9th Cir.1998),* petitioner stated in his application that vengeful guerrillas had shot at him, but he later testified that he had never been shot at. When asked to explain the discrepancy, he said he had never actually read his application. We concluded that the BIA could not fault petitioner for such a minor inconsistency.

• In 🚩 *Bandari v. INS,* 227 F.3d 1160 (9th Cir.2000),* petitioner wrote in his application that an Iranian judge sentenced him to 75 lashes, yet he testified that the police summarily whipped him 75 times right after his arrest. *See* 🚩 *id.* at 1165. He testified on direct that the police whipped him on the street, yet he testified on cross that the beating took place in the police station. We concluded that these discrepancies were too minor because where he was whipped didn't matter, as though the fact that petitioner couldn't keep the details straight had no bearing on whether the beatings ever took place at all. [9]

In this case, Abovian wrote a lengthy application where he described the KGB's persistent efforts to recruit him, but he failed to mention that this included more than fifteen meetings with the President of Armenia who personally entreated him to join the KGB. [10] Abovian recalled this part **\*979** of his story only after taking the stand, but the majority regards this omission on the asylum application as not worth mention. *But see* 🚩 *Abovian,* 219 F.3d at 982–83 (Wallace, J., dissenting) (agreeing with the BIA which recognized this as a "material omission that goes to the heart of the respondent's claim" (internal quotation marks omitted)). Abovian's story also contained contradictory details about whether the KGB had ever physically abused him; about his employment history in Armenia; and about the nature and duration of his daughter's injuries. [11] The majority dismisses these as involving matters that were merely incidental to his asylum claim. But a case like this—where the *only* evidence petitioner presents is his own testimony—turns entirely on petitioner's sincerity. There can be nothing more relevant than whether he sticks to one story.

Lastly, the majority concludes that the plausibility of Abovian's tale has no bearing on the BIA's evaluation of his credibility. In the majority's view, the BIA cannot count the implausibility of Abovian's story against him, because such a judgment is "solely a matter of conjecture." 🚩 *Abovian,*

00 Cal. Daily Op. Serv. 6114, 2001 Daily Journal D.A.R. 7473

219 F.3d at 979. What the majority calls "conjecture," others would call common sense. Whether to credit the testimony of a witness always involves some uncertainty, yet we must constantly make decisions without full information. We often rely on common sense—our understanding of how the world works—to fill the gap. When you meet a man on the Brooklyn Bridge, you are much more likely to believe that he owns the clothes on his back than the bridge on which you are standing. The majority bars the BIA from drawing precisely this kind of inference when a petitioner testifies that the elected president of a foreign country is, in fact, a spy for the Russians.

We defer to the BIA in part because of its experience in hearing claims involving the conditions in foreign countries. See Sanon v. INS, 52 F.3d 648, 651 (7th Cir.1995). In addition, the BIA may look to the State Department Country Report, "which has been described as 'the most appropriate and perhaps the best resource' for 'information on political situations in foreign nations.' " Kazlauskas v. INS, 46 F.3d 902, 906 (9th Cir.1995) (quoting Rojas v. INS, 937 F.2d 186, 190 n.1 (5th Cir.1991)). By concluding that the BIA cannot take into account the plausibility of petitioner's tale, we prevent it from relying on its own experience and that of the State Department in evaluating petitioner's story. I can see no reason for such a rule except that, once again, it forces the BIA and the IJ to accept petitioner's testimony by foreclosing one of the traditional reasons for doubting him.

When taken together, these four rules take the asylum decision from the BIA and put it in the hands of our court. Except in the rare case where the petitioner breaks down under cross-examination and admits that his story is fabricated, there will be nothing the BIA or the IJ can do to insulate its exercise of discretion from reversal *980 by our court. The petitioner will be entitled to spin a tale that bears no resemblance to reality, and his most implausible explanations have to be accepted. If the IJ does not believe petitioner's story, the judge must give cogent reasons, which cannot include internal inconsistencies, lack of corroboration, his failure to raise important points in his petition, the fact that his story contradicts the State Department Country Report or that it is otherwise wholly implausible. One might wonder what those cogent reasons might possibly be that the IJ can offer for disbelieving a petitioner's story.

If the IJ decides there's no point trying to make an adverse credibility determination because it won't be upheld by our court, petitioner's story is treated as the truth and must be

deemed sufficient to carry his burden. If the BIA decides to be bolder and makes an adverse credibility determination, where the IJ didn't, we hit it with a double-whammy: First, they can't find petitioner to be lying unless and until they give him a chance to plug up any holes the BIA may have found. And, second, it doesn't matter anyway, because there really are no reasons cogent enough to support an adverse credibility determination, and absent such cogent reasons, petitioner's testimony must be accepted as sufficient to support his asylum petition. See Aguilera–Cota v. INS, 914 F.2d 1375, 1383 (9th Cir.1990) ("[W]e presume that if the IJ had any additional reasons to doubt [petitioner's] credibility, the IJ would have stated so in the decision below." (internal citation omitted)).

So it is unclear why the majority chooses to send this case back to the BIA, rather than grant Abovian asylum outright. What, precisely, could happen on remand? The BIA is supposed to give Abovian another chance to testify, but petitioner has absolutely no reason for doing so, in view of the majority opinion which holds that there is no plausible reason for disbelieving his story: His inconsistencies are not enough; his lack of corroboration is not enough; the utter implausibility of his story is not enough; the inconsistency with the State Department Country Report is not enough. By reopening his case, Abovian can only shoot himself in the foot as the BIA might seize on any new evidence he presents as grounds for making a renewed adverse credibility determination. Abovian would be a fool to run back to third base when he's already safe at home. As the record stands now, the BIA has no choice but to grant petitioner asylum on remand, or face another excoriation from our court when the case returns to the same panel a year or two from now.

While today's opinion is particularly egregious, this case is hardly atypical of our circuit's immigration law jurisprudence. Rather, it is one more example of the nitpicking we engage in as part of a systematic effort to dismantle the reasons immigration judges give for their decisions. See, e.g., Martirosyan v. INS, 229 F.3d 903 (9th Cir.2000), vacated and reh'g en banc granted, 242 F.3d 905 (9th Cir.2001) (the IJ could not dismiss as "speculative" a draft dodger's claim that had he remained in Armenia he would have been forced to commit war crimes, despite the complete absence of evidence that any Armenian soldier had ever been compelled to commit such acts); Shoafera v. INS, 228 F.3d 1070 (9th Cir.2000) (petitioner established her eligibility for asylum where she first testified to being raped for a nondiscriminatory reason and only after coaching by her counsel said that she was also

raped because of her ethnicity); *Bandari,* 227 F.3d 1160 (the IJ may not doubt petitioner's credibility after he made numerous inconsistent statements between his application and his testimony about how and when he was beaten by the police); **\*981** *Avetova–Elisseva v. INS,* 213 F.3d 1192 (9th Cir.2000) (despite the admission of petitioner's expert, the BIA lacked substantial evidence to conclude that Armenians in Russia were not subject to a pattern or practice of persecution). None of this has anything to do with administrative law, as that concept is known anywhere outside the Ninth Circuit. Nor has it anything to do with the laws Congress has passed and the Supreme Court has interpreted. I emphatically dissent.

**All Citations**

257 F.3d 971 (Mem), 00 Cal. Daily Op. Serv. 6114, 2001 Daily Journal D.A.R. 7473

## Footnotes

1    The Supreme Court recently reminded us that it's not enough to recite the correct legal standard; we must actually apply it. *See* *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) (per curiam) ("To be sure, the Court of Appeals here recited these principles, but its application of them is nothing short of baffling.").

2    The IJ also expressed skepticism with Abovian's story, asking him questions at various points of his testimony that gave petitioner further notice, if any more was needed, that his story was not being taken at face value. *See* A.R. 134 (IJ: "[B]ut the question is, why is [it] that they are interested in you? Is it because of your father or is it because you say you speak Arabic?"); *id.* at 137 (IJ: "Sir, why would the KGB care whether you told the police or not if the KGB are in control?"); *id.* at 142 (IJ: "But, since the day that-we're pretending that Armenia became a country, were you ever physically interfered with [in] any anyway?"); *id.* at 155 (IJ: "And [President of Syria] Hafez al-Assad worked for the KGB?"); *see also* n. 5 *infra.*

3    When asked if she had the records, Abovian's daughter testified, "I have papers. I don't know if they're with me or I left them there." A.R. 173. After the testimony, the IJ twice continued the proceedings so that Abovian could present the opinion of the State Department and seventeen other documents describing conditions in Armenia. *See* pp. 9142–44 *infra.* However, he never presented his daughter's hospital records, nor did he explain why he was unable to produce them in the more than nine months between her testimony and the IJ's decision. *See also* n. 7 *infra.*

4    We don't know how difficult it would be for Abovian to have obtained such a police report or to have sent for it after he left Armenia. But the asylum petitioner bears the burden of proof, and if he is unable to provide foreign government records, he has the duty to credibly explain why they were unavailable.

5    The IJ's frustration with the slipperiness of Abovian's story is evident from his reaction to Abovian's description of the kidnapping. Abovian testified that he immediately reported the incident to the police, but then said that the KGB, which he alleges ran the country, had warned him against going to the police:

Abovian: They said ... [i]f you tell the police and all these things, you'll never see your daughter again.

IJ: Sir, why would the KGB care whether you told the police or not if the KGB are in control?

Abovian: Because if I tell the police, the neighbors will know and the word will spread and they don't want that. They don't want the people to know.

IJ: But you told me that the KGB is in control. If the KGB is in control, what do they care? Are the people in control or the KGB?

Abovian: They have the power but they don't want the people to—... Even the killer doesn't want us to know that he's a killer.

IJ: I see.

A.R. 137–38.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

6    Abovian did produce a 1962 medical record documenting depression, headaches and irritability, illnesses which he attributes to troubles experienced while in the Soviet Army. That record hardly corroborates his story of persecution by a putatively independent Armenia thirty years later.

7    The majority vaguely suggests that Abovian has an excuse for failing to provide corroborative documents because he claims he was searched on his departure from Armenia. *See* *Abovian,* 219 F.3d at 977. But the BIA was not required to accept that explanation, particularly in the teeth of the State Department Country Report, which lists various documents Armenians should be able to take with them. *See* Country Report, p. 9137 *supra,* at 12. Indeed, Abovian managed to present some documents at the hearing, *see* n. 6 *supra,* which he claims to have sent out with his mother prior to his own departure. Even were the BIA to accept his explanation as to why he didn't bring out any documents himself, nowhere does he explain why such documents were not sent out with his mother, wife or daughter—who all left Armenia at different times. Indeed, when the daughter testified, she said nothing about being unable to take documents such as her hospital records out of the country and thought she might well have done so. *See* n. 3 *supra.* Nor does Abovian explain why his remaining family in Armenia could not obtain and send out the documents—such as his daughter's hospital records—by mail. Petitioner, it will be recalled, has the burden, which includes the burden of showing that he could not provide corroboration where he would otherwise be expected to do so.

8    While the majority claims "there is no evidence refuting or in any way contradicting Abovian's testimony," *Abovian,* 219 F.3d at 978, the State Department Country Report for Armenia describes President Ter–Petrosyan as a political opponent of the Communists who led his country to independence from the Soviet Union. *See* Country Report, p. 9137 *supra,* at 6. This *does* contradict petitioner's claim that Ter–Petrosyan is nothing more than a KGB puppet, but may not be considered under another one of our special rules. *See* p. 979 *infra.*

9    These cases are but the tip of the iceberg, as we have set aside credibility judgments in dozens of others. Moreover, we are the only circuit to do so routinely, which makes life very difficult for the INS because we hear considerably more than our share of asylum appeals. A Westlaw search of immigration cases decided since January 1, 1998, turns up forty-three cases where we have reversed adverse credibility determinations, roughly twenty-three percent of the cases where credibility was at issue. Over that same period, all the other circuits combined have set aside credibility judgments in only four cases, for a reversal rate of about six percent. *See* *Alvarado–Carillo v. INS,* 251 F.3d 44 (2d Cir.2001); *Zubair v. INS,* No. 99–1034, 1999 WL 569024 (7th Cir. July 30, 1999) (unpublished); *Senathirajah v. INS,* 157 F.3d 210 (3d Cir.1998); *Balasubramanrim v. INS,* 143 F.3d 157 (3d Cir.1998). The Fifth Circuit has gone even farther and held that a credibility determination is a factual matter not meaningfully susceptible to appellate review. *See* *Chun v. INS,* 40 F.3d 76, 78 (5th Cir.1994) ("We will not review decisions turning purely on the immigration judge's assessment of the alien petitioner's credibility." (internal quotation marks omitted)).

10   The reasons Abovian gave as to why the president of his country was so eager for one particular individual to join the KGB are themselves quite peculiar. Apparently, one of them was that Abovian speaks Turkish. *See* A.R. 136 ("He told me that you speak fluent Turkish. You know the Turkish songs, the words. Everything .... you can be beneficial to us if you go to Turkey."). It is hard to believe that fluency in Turkish is particularly rare among the residents of a country situated next door to Turkey.

11   Abovian also claimed he knew a KGB agent had driven the car that hit his daughter, because she was able to identify the driver. While Abovian's daughter could give few details as to the accident because of loss of memory, she testified she did remember very clearly who was driving the car. But she also testified that the accident took place at night and it was dark outside. In judging her credibility, the BIA may have wondered about her selective recollection or how she could have seen who was driving the car that was heading right at her. If the headlights were on, they would have blinded her, and if they weren't on, it would have been too dark to see the driver.

00 Cal. Daily Op. Serv. 6114, 2001 Daily Journal D.A.R. 7473

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Physicians for Social Responsibility v. Wheeler, D.C.Cir., April 21, 2020

169 F.3d 1
United States Court of Appeals,
District of Columbia Circuit.

AIR TRANSPORT ASSOCIATION
OF AMERICA, Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION,
United States Department of Transportation,
and United States of America, Respondents.
Port Authority of New York
and New Jersey, Intervenor.

No. 98–1109.
|
Argued Jan. 11, 1999.
|
Decided March 5, 1999.

**Synopsis**

Association of air carriers sought review of Federal Aviation Administration (FAA) order partially approving public airport authority's application to collect passenger facility charge (PFC) and to use resulting revenue to construct a light rail system providing ground access to airport. The Court of Appeals, Silberman, Circuit Judge, held that: (1) conditional approval of PFC does not violate Federal Aviation Act; (2) authority did not have to acquire necessary rights-of-way prior to FAA's approval of project; (3) right-of-way would be part of "airport"; (4) FAA's reliance on information submitted by authority ex parte, after expiration of notice and comment period, violated Federal Aviation Act; and (5) FAA was not required to conduct cost/benefit analysis.

Petition granted; FAA's decision vacated and remanded.

West Headnotes (10)

**[1]** **Aviation** Charges, Fees, and Taxes in General

Partial approval of passenger facility charge (PFC) for airport-related project by Federal Aviation Administration (FAA) did not violate

Federal Aviation Act, although FAA had not specified exact amount of proposed expenditures that it would ultimately disallow as ineligible for PFC funding; rather, FAA reasonably interpreted Act to permit FAA to prune unauthorized expenditures in subsequent decision based on information submitted after original application.

49 U.S.C.A. § 40117(b)(1), (d)(1); 14 C.F.R. § 158.25.

**[2]** **Aviation** Charges, fees, and taxes

Portion of public airport authority's proposed construction of light rail system to provide ground access to airport that involved building elevated railway along side of highway was "airport facility," for purpose of statute allowing Federal Aviation Administration (FAA) to approve passenger facility charge (PFC) for airport-related projects, even though authority had not yet acquired necessary rights-of-way, and FAA thus did not exceed its authority under Federal Aviation Act by partially approving project on assurance that necessary rights-of-way would be acquired. 49 U.S.C.A. §§ 40117(a)(1), 47102(2)(A).

1 Cases that cite this headnote

**[3]** **Aviation** Charges, Fees, and Taxes in General

Rights-of-way that are part of "airport," for purpose of statute permitting Federal Aviation Administration (FAA) to approve passenger facility charge (PFC) for airport-related projects, do not have to be attached to airport's landing area along its entire length, but need only be attached to landing area at some point. 49 U.S.C.A. §§ 40117, 47102(2)(A)(i, ii).

**[4]** **Aviation** Notice and comment

Reliance of Federal Aviation Administration (FAA) on information submitted by public airport authority ex parte, after expiration of notice and comment period on authority's

application for approval of passenger facility charge (PFC) to be used for airport-related light rail project, violated Federal Aviation Act's notice and comment requirement because justification for application that was set forth in supplemental material critically deviated from justification presented in application itself, and challenger to application did not have fair opportunity to comment on that new justification. 49 U.S.C.A. § 40117(c)(3); 14 C.F.R. § 158.27(c)(2), (c)(3)(i), (e)(2).

3 Cases that cite this headnote

**[5]** **Administrative Law and Procedure** Rule differing from published notice

In the rulemaking context, an agency's notice must fairly apprise interested persons of the subjects and issues involved in the rulemaking, but even if the final rule deviates from the proposed rule, so long as the final rule promulgated by the agency is a logical outgrowth of the proposed rule, the purposes of notice and comment have been adequately served and court will find no procedural violation.

6 Cases that cite this headnote

**[6]** **Administrative Law and Procedure** Procedure for Adoption

An agency engaged in informal rulemaking is not obliged to consider only record evidence.

3 Cases that cite this headnote

**[7]** **Administrative Law and Procedure** Procedure for Adoption

Agency's receipt of ex parte information does not necessarily render its decision unlawful outside of informal rulemaking context under Administrative Procedure Act, although, if ex parte material were to lead to an unanticipatable change in the final rule, that would be objectionable. 5 U.S.C.A. § 551 et seq.

2 Cases that cite this headnote

**[8]** **Aviation** Aviation facilities and services; airports

To show prejudice, a petitioner objecting to the late submission of documents, in connection with an application for Federal Aviation Administration (FAA) approval of a passenger facility charge (PFC) for an airport-related project, must indicate with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity. 49 U.S.C.A. § 40117.

2 Cases that cite this headnote

**[9]** **Aviation** Aviation facilities and services; airports

Any process used by Federal Aviation Administration (FAA) to weigh costs of airport-related project against its benefits, in connection with public airport authority's application for approval of passenger facility charge (PFC) to fund such project, would not be governed by executive order requiring a systematic analysis of expected benefits and costs for infrastructure investments of federal agencies, since executive order was not subject to judicial review, in view of its statement that it did not create any enforceable rights. 49 U.S.C.A. § 40117; Executive Order No. 12893, § 1 et seq., 31 U.S.C.A. § 501 note.

8 Cases that cite this headnote

**[10]** **Aviation** Aviation facilities and services; airports

Federal Aviation Administration (FAA) was not required to conduct cost/benefit analysis that was required for certain grants under Airport Improvement Program (AIP) in deciding whether to approve public airport authority's request to impose passenger facility charge (PFC) for airport-related project, since PFC statute did not incorporate cost/benefit provision of AIP statute. 49 U.S.C.A. §§ 40117, 47101–47131.

335 U.S.App.D.C. 85

1 Cases that cite this headnote

**\*2  \*\*86**  On Petition for Review of an Order of the Federal Aviation Administration.

**Attorneys and Law Firms**

Campbell Killefer argued the cause for petitioner. With him on the briefs were Robert E. Cohn and David Berg.

Jacob M. Lewis, Attorney, United States Department of Justice, argued the cause for respondents. With him on the brief were Frank W. Hunger, Assistant Attorney General, Barbara C. Biddle, and Howard S. Scher, Attorneys.

Arthur P. Berg argued the cause for intervenor. With him on the brief was Carlene V. McIntyre.

Scott P. Lewis, Kenneth W. Salinger, Thomas R. Devine, and Patricia A. Hahn were on the brief for amicus curiae Airports Council International–North America.

Before: SILBERMAN, SENTELLE, and GARLAND, Circuit Judges.

**Opinion**

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioner, an association of air carriers, challenges the Federal Aviation Administration's partial approval of the Port Authority of New York and New Jersey's application to collect a passenger fee and to use the resulting revenue to construct a light rail system providing ground access to John F. Kennedy **\*3  \*\*87**  International Airport. We believe the FAA reasonably interpreted the statute governing this matter, except insofar as the FAA thought itself permitted to rely on material submitted *ex parte* by the Port Authority after the notice and comment period on the application had expired. Accordingly, we grant the petition for review.

**I.**

Under a provision of the Federal Aviation Act, local public airport authorities may apply to the FAA for authority to impose a Passenger Facility Charge (PFC) of $1.00, $2.00, or $3.00 on each paying air passenger in order to finance an "eligible airport-related project," such as a project for airport development, airport planning, or terminal development. Each eligible airport-related project must serve one of three purposes: the one relevant here is to preserve or enhance capacity, safety or security of the national air transportation system.[1]  After the airport authority submits its application to the FAA, the FAA must provide notice and an opportunity to air carriers and other interested persons to comment on the application. The FAA does so by publishing a notice in the Federal Register advising that it intends to rule on the application and inviting public comment, and by requiring the applicant to make available to the public, upon request, a copy of the application, notice, and other germane documents. Following review of the application and public comments, the FAA issues a final decision on the application; if the FAA finds, based on the application and public comments, that the proposed project serves one of the three enumerated purposes (such as enhancing capacity), that the amount and duration of the proposed fee will not result in revenue that is more than the amount necessary to finance the specific project, and that "adequate justification" has been shown for the project, the FAA may approve the application in whole or in part. *See* 49 U.S.C. § 40117 (1994); 14 C.F.R. §§ 158.27, 158.29 (1998).

The Port Authority filed an application requesting approval to collect a $3.00 PFC on passengers enplaning at LaGuardia, Newark International, and John F. Kennedy International airports and to use the $1.248 billion in resulting revenue to construct an 8.4 mile light rail system to connect the New York City Transit subway and the Long Island Railroad to JFK airport, apparently the largest single application ever submitted to the FAA. The proposed system consists of three interconnected components: a 3.3 mile railway from the Howard Beach subway station to JFK; a 3.1 mile elevated railway along the Van Wyck Expressway from the Jamaica Long Island Railroad Station and Sutphin Boulevard subway station to JFK; and a two-mile elevated rail loop in the airport's terminal area. Following the FAA's publication of notice in the Federal Register, petitioner filed comments opposing the application, contending that the project did not meet the statutory requirements described above. Petitioner argued, *inter alia,* that the Port Authority had not adequately justified the project's stated purpose of enhancing capacity at JFK. After the close of the 30–day comment period, and at the agency's request, the Port Authority provided additional information to the FAA on the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

project's forecasted effectiveness in enhancing capacity. This additional information was not disclosed to the petitioner or to any other interested party. Shortly thereafter, the FAA issued its decision, in which it partially approved the collection and use of PFC revenue to finance the light rail system.

The FAA found "adequate justification" for the project because it would enhance capacity at JFK. Although it viewed the Port Authority's original application—which claimed that the project would divert 134,000 air passengers annually from LaGuardia and Newark to JFK by the year 2003—as *insufficient* to justify the $1.248 billion expenditure, the FAA was persuaded by the supplemental information provided to it *ex parte* by the Port Authority after the close of the comment period. In that supplemental material, the Port Authority calculated that road access to JFK would reach its limiting capacity by the year 2003, at which time it **\*4** **\*\*88** could accommodate 36 million potential air passengers annually. The airport itself, however, would be able to handle far more passengers—not reaching its capacity of 45 million passengers until 2013. The Authority projected that this gap between landside capacity and airside capacity could be reduced by the construction of the light rail system; it estimated that the project would enable an additional 3.35 million annual air passengers to get to JFK airport in 2013 than would otherwise be able to without the rail system. The FAA found this to be an adequate justification for the project.

The FAA also explained that it was approving the project only in part because it had identified certain costs—such as maintenance and storage facilities and any equipment needed for fare collection—that would be ineligible for PFC revenue. As the precise amount of ineligible costs could not be determined from the generalized plans submitted at this preliminary stage, the FAA approved the total cost of the project under condition that the Port Authority submit adequate detailed design and cost information to the FAA after design is complete and before construction is begun to enable a determination of ineligible costs. The Port Authority was also required to amend its application immediately to decrease the amount of requested revenue to account for any ineligible costs identified by the FAA in the future.

Petitioner also had argued in its comments that the Jamaica component was not an eligible airport-related project because it would not be part of the "airport" as defined in 49 U.S.C. §§ 40117(a)(1) and 47102(2), but would instead consist of a right-of-way along the Van Wyck Expressway.

The FAA explained, however, that airport-owned rights-of-way are within the boundaries of the airport, and therefore, when the Port Authority acquires the necessary rights-of-way, the Jamaica component will be an eligible airport facility. This petition followed.

## II.

Petitioner raises two substantive statutory challenges—that the FAA's decision was *ultra vires* because the agency lacked authority to grant a conditional approval, and that the agency's decision permitted financing of illegal off-airport improvements. It is also argued that the agency solicited and accepted from the Port Authority—*ex parte*—critical, even decisive information, thus illegally circumventing the statute's notice and comment requirements. And if that were not enough, petitioner also claims that the FAA's decision was arbitrary and capricious. We take up the challenges in that order.

**[1]**   It is undisputed that certain of the project's design elements are not eligible for PFC funding. Petitioner claims that because the FAA approved the project, without specifying at the time of the approval the exact amount of the proposed expenditures that will be disallowed, the statute is violated. The FAA explained in its decision, and reiterates before us, that at this stage it is not clear just how much of the total expenditures would be attributed to these ineligible categories. Petitioner relies on 49 U.S.C. § 40117(b)(1), which restricts PFC funds to "eligible airport-related projects," and 49 U.S.C. § 40117(d)(1), which allows the FAA to approve an airport's request "only if the [FAA] finds, *based on the application,* that the proposed passenger facility fee will result in revenue ... that is not more than the amount necessary to finance the specific project" (emphasis added). Petitioner accordingly argues that the FAA must definitively prune any unauthorized expenditures at the time of its approval based on information provided in the application, not in a subsequent decision based on further information.

Although the inference petitioner would draw as to the statute's meaning is not by any means unreasonable, it is also not inevitable. The language does not preclude the FAA's interpretation—that the "finding" can be a conceptual one, subject to subsequent proceedings to insure that the actual costs are consistent with the conceptual boundaries. The statute thus must be thought silent or ambiguous on the

precise issue before us, and we are obliged under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to defer to the agency's interpretation if it is a permissible one. We see nothing in the language, structure **\*5  \*\*89** or legislative history to suggest that it fails that test. Nor are the FAA's regulations inconsistent with the decision; they authorize an airport agency "to apply for authority to impose a PFC *in advance of or concurrent with* an application to use PFC revenue," 14 C.F.R. § 158.25(a) (emphasis added), provided that if the application to impose is made in advance of the application to use, the applicant must include, *inter alia,* a "description of alternative uses of the PFC revenue to ensure such revenue will be used only on eligible projects in the event the proposed project is not [ultimately] approved," *id.* at § 158.25(b)(14)(ii). When the applicant is ready to use the PFC funds, he must again obtain FAA approval. *Id.* at § 158.25(c)(2); *see Northwest Airlines, Inc. v. FAA,* 14 F.3d 64, 71 (D.C.Cir.1994). The FAA is consistent, therefore, in concluding that a concurrent application for collection and use, such as the one at issue here, may also be approved subject to future assurance that any ineligible elements will not be funded. When the design is complete, the Port Authority must submit its amended application for FAA approval as noted in the FAA's decision. And the statute, *see* 49 U.S.C. § 40117(h)(2), and regulations, *see* 14 C.F.R. §§ 158.25(c)(2)(i); 158.27, indicate that this revision process would include additional consultation with the airlines and a new round of notice and comment. In sum, the FAA's interpretation passes muster.

 [2]   Petitioner next contends that the FAA exceeded its statutory authority in approving the project because the Jamaica component of the project does not qualify as an "airport" facility. Section 47102(2)(A) defines airport as

 (i) an area of land or water used or intended to be used for the landing or taking off of aircraft;

 (ii) an appurtenant area used or intended to be used for airport buildings or other airport facilities *or rights of way*; and

 (iii) airport buildings and facilities located in any of those areas.

 49 U.S.C. § 47102(2)(A) (emphasis added).[2] Petitioner argues that because the Port Authority does not currently own the necessary rights-of-way to construct the Jamaica

component, that component cannot be thought part of the "airport." The FAA acknowledged that the Port Authority does not yet own those rights-of-way, but believed that for the purposes of approving the application, the Port Authority's certification that it would take ownership before *use* of PFC funds on that component is adequate. Again the statute is silent as to whether the airport authority must also own the rights-of-way prior to the approval of the application. As with the FAA's decision to approve the application subject to amended cost data, we think it is a permissible interpretation under *Chevron* for the FAA to approve the application on the assurance that the necessary rights-of-way will be acquired. Indeed, it would be *un*reasonable, because likely unworkable, to require airport authorities to expend large sums of money to acquire tracts of land before a project was even partially approved.

 [3]   Alternatively, petitioner contends that even if the Port Authority did own the rights-of-way now, the Jamaica component would still not meet the eligibility requirements. Petitioner's reading of the statute is that "rights of way" is one type of "an appurtenant area," 49 U.S.C. § 47102(2)(A)(ii), which in turn modifies "an area ... used or intended to be used for the landing or taking off of aircraft," *id.* at § 47102(2)(A)(i), meaning that for a right-of-way to be "on-airport," it must be attached to the landing area *along its entire length*. As the Jamaica component of the light rail system would only be attached to JFK airport at its terminus, petitioner argues that this component does not fall within the meaning of "airport." Petitioner would support its interpretation by pointing to another part of the statute which notes that *terminal development* costs are allowable for "moving passengers ... within the airport," *id.* at § 47110(d)(1)(B) (1994); *see also id.* at 40117(a)(3)(B), from which petitioner concludes that the entire right-of-way must be within the airport. The FAA, **\*6  \*\*90** on the other hand, not surprisingly reads the statute as requiring only that the right-of-way be attached to the airport landing area at some point, but not necessarily along the entire length of the right-of-way. The FAA responds to petitioner's emphasis on the words "within the airport," *id.* § 47110(d)(1)(B), by pointing out that once the Port Authority owns the right-of-way, that strip of land is by definition airport-owned and therefore "within the airport." This interpretation is at least reasonable, and it is consistent with the FAA's own regulations and past practice. *See, e.g.,* 56 Fed.Reg. 24,254, 24,258 (1991) (preamble to current regulations, noting that "ground transportation projects are eligible if the public agency acquires the right-

of-way"); *Applications to Use Passenger Facility Charge Revenue,* No. 98–03–U–00–EWR, et al., at 7 (November 6, 1996) (FAA approval for use of PFC funds to construct a transit link between an AMTRAK rail station and the Newark International Airport monorail on to-be-acquired rights-of-way).

Petitioner's citation to legislative history indicating that "off-airport" uses of PFC revenue are prohibited begs the question. The FAA has simply said that airport-owned rights-of-way are *not* off-airport because they are within the boundaries of the airport. Petitioner's reliance on the FAA's interpretive guidelines for evaluating PFC-eligible projects, moreover, is quite unpersuasive. Petitioner points to the FAA's Airport Improvement Program Handbook [3] describing the eligibility criteria for "rapid transit facilities" and "access roads" differently. It states that rapid transit facilities "located *within the airport boundary* that are necessary to provide a connection to a rapid transit system may be eligible if they will primarily serve the airport," Airport Improvement Program Handbook, FAA Order 5100.38A, at ¶ 555 (Oct. 24, 1989) (emphasis added), whereas access roads "must be located on the airport *or* within a right-of-way acquired by the airport," *id.* at ¶ 553(a)(2) (emphasis added). Petitioner thus claims that rapid transit facilities using PFC funds such as this light rail system cannot be constructed on rights-of-way. But there is nothing in the Handbook or the statute or regulations that indicates that airport-owned rights-of-way are outside the "airport boundary," and the FAA is reasonable in construing its own interpretive guidelines to mean that rights-of-way are within the airport boundary. *See* 🔖 *Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579, 584 (D.C.Cir.1997) (citing

🔖 *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997)), *cert. denied sub nom. Pollin v. Paralyzed Veterans of Am.,* 523 U.S. 1003, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998).

### III.

[4]    [5]    Petitioner's procedural argument fares better. The statute requires the FAA to "provide notice and an opportunity to air carriers ... and other interested persons to comment on the application." 🔖 49 U.S.C. § 40117(c)(3). This provision is similar to the notice and comment procedure for informal rulemaking under the Administrative Procedure Act, 🔖 5 U.S.C. § 553 (1994). Here the airport's application

is analogous to a notice of proposed rulemaking.[4] In the rulemaking context, an agency's notice must "fairly apprise interested persons of the 'subjects and issues' " involved in the rulemaking, 🔖 *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983) (quoting

🔖 *American Iron & Steel Inst. v. EPA,* 568 F.2d 284, 293 (3d Cir.1977)), but even if the final rule deviates from the proposed rule, "[s]o long as the final rule promulgated by the agency is a **\*\*91  \*7** 'logical outgrowth' of the proposed rule[,] ... 'the purposes of notice and comment have been adequately served' [and] we will find no procedural violation," 🔖 *Appalachian Power Co. v. EPA,* 135 F.3d 791, 804 n. 22 (D.C.Cir.1998) (quoting 🔖 *Fertilizer Inst. v. EPA,* 935 F.2d 1303, 1311 (D.C.Cir.1991)); *see also* 🔖 *National Black Media Coalition v. FCC,* 791 F.2d 1016, 1022 (2d Cir.1986).

[6]    [7]    The government argues that the supplementary information which the Port Authority provided similarly merely clarified and expanded upon information in the application. After all, an agency itself can rely on such supplemental data not disclosed in a proposed rule. *See*

🔖 *Solite Corp. v. EPA,* 952 F.2d 473, 485 (D.C.Cir.1991) (no procedural error where agency used supplementary data, not disclosed during the notice and comment period, which expanded on and confirmed information in the proposed rulemaking); 🔖 *Air Transp. Ass'n of Am. v. CAB,* 732 F.2d 219, 224 (D.C.Cir.1984) (no procedural error where agency relied on internal staff studies, not disclosed during the notice and comment period, where the methodology *was* disclosed and no major changes in the final rule occurred). As has been often observed, an agency engaged in informal rulemaking is not obliged to consider only record evidence, *see, e.g.,*

🔖 *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 547–48, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System,* 745 F.2d 677, 684–85 (D.C.Cir.1984). But even in the informal rulemaking context, we have cautioned that the most critical factual material that is used to support the agency's position on review must have been made public *in the proceeding* and exposed to refutation. *Association of Data Processing Serv. Orgs.,* 745 F.2d at 677 (emphasis added). Still, the focus in our rulemaking cases is primarily on whether the final rule changes critically from the proposed rule rather than on whether the agency relies on supporting material not

published for comment. [5] The question is typically whether the agency's final rule so departs from its proposed rule as to constitute more surprise than notice. *See* *Air Transp. Ass'n of Am.*, 732 F.2d at 225 n. 12.

Here, the application itself—*including the submitted justification*—is the analogy to the proposed rule. *See* 14 C.F.R. § 158.25(b)(7) (requiring the application to include justification for the project). So, the question in this case is whether the supplemental material provided by the Port Authority *ex parte* as justification for its application critically deviated from the justification presented in the application itself. There seems little doubt that the answer is yes because the FAA itself said so; its own decision explained that but for the new information it would have rejected the application:

> In examining the Port Authority's application, the FAA was concerned that the addition of 134,000 annual air passengers ... in 2003 ... was not a sufficient basis for an informed judgment that the $1.5 billion [light rail system] project was adequately justified on the basis of this measured effect on airport capacity or competition. No other measured effect on airport capacity or competition was provided in the PFC application as submitted. [6]

Recall that the Port Authority's original application set forth as the benefit of the expenditure an increase of JFK air passengers of **\*8  \*\*92** only 134,000 annually by 2003. And that was a measure of how many passengers would be *diverted* from the two other airports operated by the Port Authority. The supplemental information—that a 3.35 million air passenger capacity increase would be obtainable at JFK by 2013—is an order of magnitude greater, and is a measure of something entirely different—the light rail system's ability to increase capacity at JFK (and possibly increase net capacity of all three airports) by closing the gap between airside capacity and landside capacity at JFK. The important point is that because the transmission of this information—in effect a fundamental amendment of the application—was never public, petitioner did not have a fair opportunity to comment

on it. *See* *Independent U.S. Tanker Owners Comm. v. Lewis,* 690 F.2d 908, 926 (D.C.Cir.1982) ("[W]here an agency's analytic task begins rather than ends with a set of forecasts, sound practice would seem to dictate disclosure of those forecasts so that interested parties can comment upon the conclusions properly to be drawn from them.").

**[8]**  Still, the FAA argues that any procedural error stemming from its failure to provide adequate notice and an opportunity to comment was harmless. *See* 5 U.S.C. § 706 (1994). The FAA claims that petitioner was not prejudiced by the lack of notice because petitioner did not rebut the Port Authority's supplemental information. It is true that to show prejudice, a "petitioner objecting to the ... late submission of documents must indicate with 'reasonable specificity' what portions of the documents it objects to and how it might have responded if given the opportunity," *Air Transport Association v. CAB,* 732 F.2d 219, 224 n. 11 (D.C.Cir.1984) (quoting *Small Refiner,* 705 F.2d at 540–41 (in turn quoting 42 U.S.C. § 7607(d)(7)(B))). But here petitioner had no knowledge of the new information until the final decision was made and had no subsequent opportunity to provide comments. [7]

*Compare* *National Ass'n of Regulatory Utility Comm'rs v. FCC,* 737 F.2d 1095, 1121 (D.C.Cir.1984) (agency's failure to release staff study in time for comments during an initial comment period rendered harmless where agency subsequently allowed interested parties ample opportunity to comment and where agency addressed those comments in a reconsideration decision). Petitioner's reply brief does include the nature of its objection to the Port Authority's supplemental information, and it seems rather specific to us.

\* \* \* \*

**[9]**  As noted, petitioner also challenges the agency's decision as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Petitioner claims that the forecasted benefits are based on erroneous assumptions; petitioner submits, for example, that the real constraints on JFK's capacity derive not from limited ground access, but rather from airline "slot" limitations. In other words, air capacity limitations will be reached long prior to any ground capacity constraints. We think it appropriate, in light of the necessity to remand this proceeding to allow the airlines adequate opportunity to comment on the application, that we not decide this issue on the artificially restricted

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

record before us. By the same token, we defer dealing with petitioner's claims that the FAA did not adequately weigh the costs of this project against the benefits. We do think it appropriate now to definitively reject petitioner's assertion that any such process is governed by Executive Order No. 12,893, 59 Fed.Reg. 4233 (1994), which requires a "systematic analysis of expected benefits and costs," *id.* § 2(a), for infrastructure investments of federal agencies. Section 7 of the Order (not reproduced in petitioner's brief) provides that it is "intended only to improve the internal management of the executive branch and does not create any right ... enforceable against the United States." As such, this Executive Order is not subject to judicial review. *See* Meyer v. Bush, 981 F.2d 1288, 1296 n. 8 (D.C.Cir.1993) (citing cases). Although petitioner indicated that it does not seek to assert rights under the order but is merely referencing it to provide evidence of **9 **93 the arbitrary and capricious nature of the FAA's decision, such an argument is nothing more than an indirect—and impermissible—attempt to enforce private rights under the order.

 [10]  Petitioner also claims to find support for its argument that the FAA must conduct a cost/benefit analysis from an interim FAA policy guidance that requires cost/benefit analysis for certain grants under the Airport Improvement Program (AIP). *See* 62 Fed.Reg. 34,108, 34,109 (June 24, 1997). Petitioner thinks that the PFC statute "incorporates" the AIP statute, 49 U.S.C. §§ 47101–47131, so PFC funds should be treated like AIP funds. To be sure, the PFC statute

defines "eligible airport-related project" as, *inter alia,* a project "for airport development or airport planning under subchapter I of Chapter 471 of this title [Airport Improvement Program Statute]," which means that PFC funded projects must meet the same definition for "airport development or airport planning" as do projects funded by AIP monies, *see* 49 U.S.C. § 47102(3), (5). But it is *only* those definitions that are incorporated from the AIP statute into the PFC statute, not the provision of the AIP statute setting forth the standards for approval of an AIP discretionary fund project (or any other provision of the AIP statute for that matter). The interim policy guidance mandating cost/benefit analysis for AIP projects specifically cites that discretionary fund provision as its authorizing statute, *see* 62 Fed.Reg. at 34109, and so it is clear that this interim policy guidance has no bearing on the PFC statute.

\* \* \* \*

Accordingly, we grant the petition for review, vacate the FAA's decision, and remand the case to the FAA for further proceedings not inconsistent with this opinion.

*So ordered.*

**All Citations**

169 F.3d 1, 335 U.S.App.D.C. 85

---

## Footnotes

1    Before submitting an application to the FAA, the airport authority must provide notice to, and an opportunity for consultation with, air carriers operating at the airport.

2    The statutory provision governing PFCs, 49 U.S.C. § 40117(a)(1), defines "airport" by reference to the definition of "airport" found in 49 U.S.C. § 47102. The parties appear to assume that an eligible airport-related project must be on the "airport" as defined under § 47102.

3    The type of "eligible airport-related project" at issue here, for airport development, is defined by reference to 49 U.S.C. § 47102(3), a provision of the Airport Improvement Program statute. *See* 49 U.S.C. § 40117(a)(3)(A).

4    Whereas the APA requires that a notice of proposed rulemaking be published in the Federal Register, 5 U.S.C. § 553(b), the PFC statute does not mandate a specific sort of notice or publication. The FAA's regulations provide for publication in the Federal Register of a notice of a pending application, which includes

a summary description of the application, *see* 14 C.F.R. § 158.27(c)(2), (e)(2), and require the applicant to make the application available, upon request, to the public for inspection, *see id.* § 158.27(c)(3)(i).

5    Petitioner suggests that the Port Authority's *ex parte* contacts with the FAA *per se* rendered the decision unlawful. Although we once held that an agency's receipt of *ex parte* information in an informal rulemaking is itself a violation of law, *see* Home Box Office, Inc. v. FCC, 567 F.2d 9, 57–58 (D.C.Cir.1977), we have since interpreted *Home Box Office* as applying only in the APA informal rulemaking context, *see* Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Authority, 977 F.2d 1472, 1481 (D.C.Cir.1992); *but see* United States Lines, Inc. v. FMC, 584 F.2d 519, 539–40 (D.C.Cir.1978) (applying the reasoning of *Home Box Office* in a quasi-adjudicatory proceeding). *Home Box Office,* which was sharply limited by Sierra Club v. Costle, 657 F.2d 298, 401–02 (D.C.Cir.1981), could be thought to be undermined by Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 546, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). If *ex parte* material were to lead to an unanticipatable change in the final rule, that would be, of course, objectionable.

6    *Applications to Impose a Passenger Facility Charge,* No. 97–04–C–00–EWR, et al. at 22 (Feb. 9, 1998).

7    The FAA counters that petitioner could have sought reconsideration to rebut the FAA's conclusions. But the regulations relevant here make no provision for reconsideration. *Cf.* Darby v. Cisneros, 509 U.S. 137, 146, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993).

---

**End of Document**           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

461 F.3d 584
United States Court of Appeals,
Fifth Circuit.

Raja AKHTAR; Mohammad Salman, Petitioners,

v.

Alberto R. GONZALES, Attorney General
of the United States, Respondent.

Nos. 04-60497, 04-60895.
|
Aug. 17, 2006.

**Attorneys and Law Firms**

Peter D. Williamson (argued), Williamson & Chaves, Houston, TX, for Akhtar.

Sarfraz Aftab Sharif (argued), Sharif & Associates, Houston, TX, for Salman.

Jennifer Paisner (argued), David V. Bernal, Thomas Ward Hussey, Dir., Margaret Kuehne Taylor, U.S. Dept. of Justice, OIL, Joshua E. Braunstein, U.S. Dept. of Justice, Civ.

Div., Imm. Lit., Washington, DC, Caryl G. Thompson, U.S. INS, Attn: Joe A. Aguilar, New Orleans, LA, Sharon A. Hudson, U.S. Citizenship & Imm. Services, Houston, TX, for Gonzales.

Petition for Review of an Order of the Board of Immigration Appeals.

Before HIGGINBOTHAM, DAVIS and STEWART, Circuit Judges.

**Opinion**

PER CURIAM:

Akhtar's petition for panel rehearing is GRANTED and Respondent's motion to remand both cases is GRANTED. Consequently, both cases are REMANDED to the BIA for further consideration in light of 71 Federal Register 27,585 (May 12, 2006).

**All Citations**

461 F.3d 584 (Mem)

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

On Rehearing Akhtar v. Gonzales, 5th Cir., August 17, 2006

450 F.3d 587
United States Court of Appeals,
Fifth Circuit.

Raja AKHTAR, Mohammad Salman, Petitioners,

v.

Alberto R. GONZALES, Attorney General
of the United States, Respondent.

Nos. 04-60497, 04-60895.
|
May 23, 2006.

**Synopsis**

**Background:** Aliens, natives and citizens of Pakistan, challenged Board of Immigration Appeals' upholding of immigration regulation rendering any "arriving alien" in removal proceedings ineligible for adjustment of status.

**Holdings:** The Court of Appeals, Patrick E. Higginbotham, Circuit Judge, held that:

[1] Court had jurisdiction to consider challenge, and

[2] regulation was valid exercise of Attorney General's statutory discretion to grant or deny adjustment-of-status relief.

Affirmed.

West Headnotes (2)

[1] **Aliens, Immigration, and Citizenship** 🔑 Proceedings for Adoption and Review

Court of Appeals had jurisdiction to consider challenge to validity of immigration regulation rendering any "arriving alien" in removal proceedings ineligible for adjustment of status, even though Congress had given Attorney General unreviewable discretion to decide applications for adjustment of status; court's task was one of statutory interpretation, not review of individual decision on application. Illegal Immigration Reform and Immigration Responsibility Act of 1996, 8 U.S.C.A. §§ 1252(a)(2)(B), 1255(a); 8 C.F.R. § 245.1(c)(8).

5 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** 🔑 Validity

Immigration regulation rendering any "arriving alien" in removal proceedings ineligible for adjustment of status was valid exercise of Attorney General's statutory discretion to grant or deny adjustment-of-status relief; Congress had not spoken precisely to issue, Attorney General could exercise via rule the discretion conferred by Congress, and regulation was not unreasonable given unreviewable nature of that discretion. Illegal Immigration Reform and Immigration Responsibility Act of 1996, 8 U.S.C.A. §§ 1252(a)(2)(B)(i), 1255(a); 8 C.F.R. § 245.1(c)(8).

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*588** Peter D. Williamson (argued), Williamson & Chaves, Houston, TX, for Akhtar.

Jennifer Paisner (argued), Thomas Ward Hussey, Dir., David V. Bernal, Margaret Kuehne Taylor, U.S. Dept. of Justice, OIL, Joshua E. Braunstein, U.S. Dept. of Justice, Civ. Div. Imm. Lit., Washington, DC, Caryl G. Thompson, U.S. INS, Attn: Joe A. Aguilar, New Orleans, LA, Sharon A. Hudson, U.S. Citizenship & Imm. Services, Houston, TX, for Gonzales.

Sarfraz Aftab Sharif (argued), Sharif & Associates, Houston, TX, for Salman.

Petition for Review of an Order of the Board of Immigration Appeals.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Before HIGGINBOTHAM, DAVIS and STEWART, Circuit Judges.

**Opinion**

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Raja Akhtar and Mohammad Salman, citizens of Pakistan, are "paroled" "arriving aliens" in removal proceedings. Under a regulation promulgated in 1997, such aliens cannot apply for adjustment of status to become immigrants. Because they mount the same legal challenge to the regulation, a challenge upheld by four of our sister circuits and rejected by one, we consolidated their appeals. We reject the challenge and affirm.

### I. Factual Background

#### A. Raja Akhtar

Raja Akhtar, a native and citizen of Pakistan, entered the United States in 1990 through Texas using a fraudulent passport. He has been living in this country ever since, going abroad once, in 1997, pursuant to a fraudulently obtained advance parole. In 2000, Akhtar married his current wife, Aracely Cuellar Chapa, a United States citizen, with whom he has two citizen children.

The INS, now part of the Department of Homeland Security and the U.S. Customs and Immigration Service (USCIS), commenced removal proceedings against Akhtar on December 9, 2000. In response, Akhtar filed an application for cancellation of removal and an application for adjustment **\*589** of status based on his marriage. He also sent a letter to the INS District Director, asking him to temporarily terminate the removal proceedings because the Immigration Judge lacked jurisdiction to hear the application for adjustment of status while the proceedings continued. The INS asked the IJ to confirm that she lacked such jurisdiction under a regulation forbidding applications from "arriving aliens" in removal proceedings, like Akhtar. The IJ did so. After the District Director refused to terminate removal proceedings, the IJ denied Akhtar's application for cancellation of removal, finding that he failed to establish that removal would cause "exceptional and extremely unusual hardship" to a qualifying family member, and issued a final order of removal. The Board of Immigration Appeals dismissed his appeal without comment. [1]

On appeal to this court, Akhtar argues: 1) that the regulation precluding applications for adjustment of status from "arriving aliens" in removal proceedings is invalid; [2] 2) alternatively, since the USCIS District Director has jurisdiction to adjudicate such applications if removal proceedings are conditionally terminated, that we should "initiate" conditional termination; and 3) that the IJ erred in denying Akhtar's application for cancellation of removal.

#### B. Mohammad Salman

Mohammed Salman, a native and citizen of Pakistan, entered the United States at San Francisco International Airport on April 25, 2001, using another person's passport and visa. He then attempted to assume that person's identity.

The INS detained Salman and commenced removal proceedings against him on May 9, 2001, releasing him from custody and paroling him into the United States on June 19 after he posted bond. The INS transferred his case to Houston after Salman moved to Texas. On August 20, Salman applied for asylum and admitted that he was removable as charged. On November 11, 2002, Salman married his current wife, Senovia Ramiers, a United States citizen, with whom he has one child, an American citizen by birth.

During removal proceedings, the IJ denied Salman's motion for continuance to allow adjudication of an immigrant visa petition based on his marriage. The BIA affirmed, concluding that the IJ did not abuse her discretion in refusing to continue the proceedings because Salman, as an arriving alien in removal proceedings, was ineligible to adjust status under current regulations, [3] rending a continuance pointless. Salman appeals, challenging the validity **\*590** of that regulation and, hence, the IJ's denial of his motion for continuance.

### II. Statutory & Regulatory Background

Before 1960, aliens in the United States without a valid visa had to go abroad to apply for permanent resident (immigrant) status. In 1960, Congress eliminated that burden by expanding eligibility for "adjustment of status" under 8 U.S.C. § 1255(a) to all aliens "inspected and admitted or paroled," [4] allowing people in the country to apply

for immigrant status without leaving, even those in the country without a valid visa. "Paroled" aliens are those aliens allowed to enter the country temporarily, without a valid visa, while authorities investigate their eligibility for admission. Under 🚩 § 1255(a), Respondent may, "in his discretion and under such regulations as he may prescribe," grant such an application. 🚩 8 U.S.C. § 1252(a)(2)(B)(i) makes unreviewable his use of that discretion.

Before 1997, aliens were divided into two categories: "applicants for admission," also called "arriving aliens," those aliens who had not yet "entered"[5] the country, and aliens present in the U.S. who had already "entered," with or without inspection. Paroled aliens were considered arriving aliens. After inspection, arriving aliens were either admitted or "excluded" during "exclusion proceedings;" aliens who had already entered were either admitted or "deported" during "deportation proceedings."

Pursuant to 🚩 § 1255(a), parolees could adjust status with the District Director-even if they were in exclusion proceedings. The BIA held that in exclusion proceedings, the District Director, not the IJ, maintained jurisdiction over applications.[6]

The 1997 Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA)[7] eliminated the concept of "entry" to differentiate aliens, replacing it with the concept of admitted versus non-admitted aliens. The main effect is that aliens present in the U.S. who have not been not been inspected or admitted are added to those considered applicants for admission, or arriving aliens. It also replaced exclusion and deportation with "removal," applicable to all aliens in the country without inspection, inspected but not admitted, or previously admitted but now subject to removal.[8] The IIRIRA did not change 🚩 § 1255(a) or otherwise change the adjustment of status process.

In 1997, Attorney General Janet Reno issued new regulations said to implement the IIRIRA. The regulations created a new definition for "arriving alien," a term that had existed without definition in the **591 old statute: "The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port of entry .... An arriving aliens remains such even if paroled [except aliens paroled before April 1, 1997 or aliens receiving advance parole]...."[9] This definition is not in controversy, merely codifying the

previously understood definition, which under the IIRIRA now encompasses all non-admitted aliens.

The Attorney General made a more substantive change to the adjustment of status regulations, 🚩 8 C.F.R. § 245.1(c)(8), rendering seven categories of aliens "ineligible" to apply for adjustment of status under 🚩 § 1255(a), including "[a]ny arriving alien who is in removal proceedings ...." This regulation dovetails with the new regulation governing adjustment procedure, promulgated at the same time:

> An alien [who believes he is eligible for adjustment of status] shall apply to the director having jurisdiction over his or her place of residence .... After an alien, *other than an arriving alien,* is in deportation or removal proceedings, his or her application ... shall be made and considered only in those proceedings ... An arriving alien, *other than an alien in removal proceedings,* who believes he or she meets the eligibility requirements ... shall apply to the director having jurisdiction over his or her place of arrival .... [An alien on advance parole (hence not an arriving alien) whose application was denied by the District Director may renew that application in removal proceedings.][10]

Thus, 🚩 § 245.1(c)(8) prevents arriving aliens, including parolees, in removal proceedings from filing for adjustment of status, either with the District Director, as they had been able to do in exclusion proceedings before 1997, or the IJ.

The parties agree that Akhtar and Salman are parolees in removal proceedings.[11] Instead, Akhtar and Salman challenge the validity of 🚩 § 245.1(c)(8), arguing that in rendering parolees in removal proceedings ineligible to apply, it conflicts with 🚩 § 1255(a), which makes parolees eligible to apply without mention of removal proceedings.

In promulgating § 245.1(c)(8), the Attorney General explained that she was furthering Congress's intent to expedite removal of arriving aliens by "not favorably exercis[ing]" her unreviewable discretion to adjust status under §§ 1255(a) and 1252(a)(2)(B)(i).[12] She explained further that arriving aliens in removal proceedings eligible for immigrant visas would have to return to their home countries to apply, although she might exercise her "prosecutorial discretion" not to initiate removal proceedings or to terminate removal proceedings to allow applicants to apply to the District Director. Respondent Alberto Gonzalez, Reno's successor, maintains this position.

Akhtar and Salman reply that Respondent cannot by regulation redefine eligibility defined by Congress, despite his unreviewable discretion once the applications are filed. Hence the heart of this case: how to resolve the inherent tension in a statutory scheme that explicitly defines **\*592** who is eligible to apply but gives Respondent unreviewable discretion to review the applications.

### III. Jurisdiction

**[1]** Respondent argues first that 8 U.S.C. § 1252(a)(2)(B), the provision precluding judicial review of discretionary orders, including orders granting or denying adjustment of status, bars our consideration of petitioners' claim. Like our five sister circuits that have addressed the validity of § 245.1(c)(8),[13] we reject this argument because the issue here is one of statutory interpretation, a pure legal task distinct from review of an individual decision on the merits of an application for adjustment. That our analysis centers on the effect of Respondent's discretion does not change this result.

### IV. Previous Challenges to § 245.1(c)(8)

Until recently, we had not examined this issue.[14] In an opinion issued after oral argument in our case, *Momin v. Gonzales*, another panel of this court addressed it head-on and upheld the regulation, as we do.[15] Our opinion builds upon *Momin,* as we will explain.

Five of our sister circuits have passed on § 245.1(c)(8). The First Circuit lead, invalidating the regulation in *Succar v. Ashcroft*[16] after concluding that it violated *Chevron* step one[17] because discretion to adjudicate individual applications is not discretion to *re*define eligibility, citing *INS v. Cardoza-Fonseca*.[18] It held that while an agency may use its discretion to define eligibility where Congress was silent on eligibility, citing *Lopez v. Davis,*[19] Congress was not silent here § 1255 explicitly states who is eligible and creates many carve-ins and carve-outs, highlighting the lack of a carve-out for parolees in removal proceedings.[20] Moreover, the court observed, **\*593** since most parolees are now put in removal proceedings, § 245.1(c)(8) effectively makes all parolees ineligible.[21] The court also noted the larger statutory context, concluding that its explicit grants of discretion highlight the lack of discretion over eligibility. Checking this interpretation against the legislative history of § 1255 from 1960,[22] the court concluded that § 245.1(c)(8) re-institutes the burdensome procedure that § 1255 was designed to eliminate. Finally, the court rejected Respondent's contention that the IIRIRA justifies the regulation, noting that the IIRIRA left § 1255 untouched and that the general policies said to be embodied by the IIRIRA are doubtful, and in any event insufficient to justify such a sharp break from previous practice.

The Eighth Circuit followed with *Mouelle v. Gonzales,*[23] rejecting *Succar* and upholding the regulation. It held first that *Chevron* step one did not control because § 1255(a) gave Respondent discretion to adjust status, and such discretion can be exercised case-by-case or by rule. For this proposition it cited its own case *Bellis v. Davis,*[24] affirmed in *Lopez,* and Judge Friendly's statement about § 1255 that "We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis ...."[25] It rejected *Succar*'s interpretation of *Cardoza-Fonseca*, acknowledging that *Cardoza-Fonseca* distinguished statutory eligibility but

noting that its context was materially different. [26] Turning to *Chevron* step two, the court held § 245.1(c)(8) reasonable as a means to expedite removal proceedings. Finally, the court noted that, unlike *Succar,* it had no evidence that most parolees were put in removal proceedings; to the contrary, Respondent had stated that few were put in removal proceedings. **\*594** In any event, the court stated, the number is irrelevant.

Next came *Zheng v. Gonzales,* where the Third Circuit invalidated the rule, albeit under *Chevron* step two. [27] The court first rejected *Succar*'s rationale, holding that its distinction between eligibility and case-by-case discretion was rejected by the Court in *Lopez* [28] and that *Succar*'s basis for distinguishing *Lopez*-that the statute in *Lopez* was silent as to eligibility criteria-came "perilously close to rejecting" that case. [29] It then held that *Lopez,* though swaying in Respondent's favor by allowing him to exercise discretionary authority by rule, was a "double-edged sword" in putting that discretionary authority "squarely within the second step" of *Chevron.* [30] Turning to step two, the court focused on the percentage of parolees put in removal proceedings. Although it had no statistics, it noted those cited in *Succar* and held that, more importantly, the statutory structure seems to *mandate* that parolees be put in removal proceedings, regardless of Respondent's claim to discretion. [31] Noting that the exception allowing parolees in removal proceedings to renew applications was narrow, and that "renewing" was not "applying," the court held that § 245.1(c)(8) "for all practical purposes" renders parolees ineligible to apply. Citing the language, structure, and legislative history of the immigration statutes, the court explained that Congress clearly intended in § 1255 that most parolees could apply. Given this conflict, it struck down the regulation. In doing so, it noted that the "closeness of the step one question ha[d] some bearing on [its] step two decision."

The Ninth Circuit held the regulation invalid in *Bona v. Gonzales* after succinctly and expressly adopting *Succar* and rejecting *Mouelle.* [32] The Eleventh Circuit ruled last

in *Scheerer v. Attorney General,* expressly adopting the rationale of *Zheng.* [33]

## V. Validity of § 245.1(c)(8)

**[2]**  We agree with *Mouelle* that § 245.1(c)(8) passes both *Chevron* hurdles. Congress did not speak precisely to the issue because it gave Respondent unreviewable discretion to adjudicate individual applications. And there is simply no reason why an agency given such discretion cannot exercise it by rule. *Lopez* concurs, and we find *Succar*'s attempt to distinguish that case unconvincing for the reasons explained by *Zheng.* Furthermore, **\*595** as explained in *Mouelle,* *INS v. Cardoza-Fonseca* does not create some artificial distinction between eligibility and case-by-case discretion such that the latter cannot *de facto* affect, or even "redefine," the former. It merely "held that the BIA's interpretation of the statute in that case failed because Congress did not intend the heightened mandatory-withholding showing to apply to discretionary asylum." [34]

Turning to step two, § 245.1(c)(8) is a reasonable method of exercising that discretion to facilitate removal. The statutory structure and history are insufficient to render it unreasonable because they also highlight Congress's intent to give Respondent unreviewable discretion. That is, while Congress certainly intended to define who is eligible to apply, it just as clearly intended to let Respondent deny many, some, or all applications. [35] Given the tension between those intents, we cannot say that Respondent's interpretation is "unreasonable" under *Chevron.*

We are cautioned to mind the practical effect of striking down § 245.1(c)(8). The question is put, couldn't the Government achieve the same result by instructing all IJs or District Directors to deny all applications from paroled aliens in removal proceedings after allowing such aliens the formality of applying? *Succar* responds that while its holding does not "preclude [Respondent] from adopting a uniform set of criteria for consideration in evaluating applications," Respondent "cannot categorically refuse to exercise discretion favorably for classes deemed eligible by

the statute," although whether an eligible alien is in removal proceedings can be a "consideration in the weighing." [36] But that restraint on Respondent's discretion is unclear, requiring the federal courts to police adjudications on a low level, if not case-by-case, [37] in contravention of § 1252(a)(2)(B)(i). Respondent's reasonable construction of § 1255 allows us to avoid that morass.

We conclude that § 245.1(c)(8) is valid under *Chevron.* Respondent has discretion to adjudicate applications for adjustment of status, and he has done so by a reasonable rule. [38]

**\*596** VI. Akhtar's Remaining Claims

We have disposed of petitioners' primary claim. Akhtar makes two others. First, he argues that we should "initiate" conditional termination of removal proceedings to allow adjudication of his application for adjustment of status. He cites no authority for this request, and, finding no basis for terminating removal proceedings, we dismiss that claim for lack of jurisdiction. Second, he urges us to reverse the IJ's denial of his application for cancellation of removal. Following our precedent, we conclude that we cannot review that discretionary determination and dismiss that claim for lack of jurisdiction as well. [39]

We AFFIRM the judgments of the Board of Immigration Appeals.

**All Citations**

450 F.3d 587

## Footnotes

1    Akhtar had also filed an earlier adjustment of status application based on a previous wife, a wrinkle discussed by the IJ but irrelevant to this appeal.

2    Respondent argues that Akhtar waived this argument by conceding to the IJ and the District Director that the regulation precluded jurisdiction over his application, first arguing invalidity of the regulation to the BIA. We rejected this argument in our January 5, 2005 order denying Respondent's motion to dismiss, and we do not address it again.

3    The BIA held that Salman, "an arriving alien, is not eligible to adjust his status in removal proceedings," leaving open the possibility that he is eligible to adjust status elsewhere-for instance, with the District Director-even though he is in removal proceedings. However, the regulation governing adjustment procedure, 8 C.F.R. § 245.2(a)(1), states that aliens in removal proceedings (albeit in conjunction with the challenged regulation, 8 C.F.R. § 245.1(c)(8), this means non-arriving aliens) must adjudicate their applications in the proceedings, not in front of the District Director. Salman interprets the BIA's ruling to be that arriving aliens in removal proceedings cannot apply anywhere, the position maintained by the Government in this appeal and other cases. We agree with that interpretation.

4    The aliens must also be eligible for and have immediately available an immigrant visa, based on family, employment, or diversity. *See Succar v. Ashcroft,* 394 F.3d 8, 12-19 (1st Cir.2005) (thoroughly detailing the relevant history and statutory structure).

5    An alien may have been physically present in the country but not yet have "entered" for immigration purposes.

6    Historically, the District Director also had jurisdiction over applications by admitted aliens in deportation proceedings. However, in 1961 regulations gave the IJ in a deportation proceeding authority to renew an application denied by the District Director or adjudicate an initial application, divesting the District Director of jurisdiction once deportation proceedings began. The BIA determined, however, that the District Director retained sole jurisdiction during exclusion proceedings.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

7    Pub.L. No. 104-208, 110 Stat. 3009-546; *see generally* Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

8    There are special procedures for stowaways, dangerous people, and people entering who lie or lack proper documents. *See* Succar, 394 F.3d at 13.

9    8 C.F.R. § 1.1(q).

10   8 C.F.R. § 245.2(a)(1) (emphasis added).

11   Akhtar claimed below that he had gone abroad in 1997, returning on advance parole, exempting him the definition of "arriving alien" and allowing him to file under § 245.1(c)(8). Respondent argued that the advance parole was invalid because predicated on Akhtar's original fraudulent entry. We do not address the issue because Akhtar concedes on appeal that he is an arriving alien.

12   *See* Succar, 394 F.3d at 13.

13   *See* Succar v. Ashcroft, 394 F.3d 8, 19-20 (1st Cir.2005) (holding that we have jurisdiction); *Zheng v. Gonzales,* 422 F.3d 98, 111 (3d Cir.2005) (same); *Mouelle v. Gonzales,* 416 F.3d 923, 927-29 (8th Cir.2005) (assuming that we have jurisdiction); *Bona v. Gonzales,* 425 F.3d 663, 667-69 (9th Cir.2005) (same); *Scheerer v. Attorney General,* 445 F.3d 1311, 1318-22 (11th Cir.2006) (same).

14   We had cited the regulation in an unpublished opinion, where the petitioner never challenged its legitimacy, *see Doria v. Ashcroft,* 98 Fed.Appx. 352 (5th Cir.2004), and in another unpublished opinion we had held the argument waived, *see* Diarra v. Gonzales, 137 Fed.Appx. 627 (5th Cir.2005).

15   447 F.3d 447 (5th Cir.2006).

16   394 F.3d 8 (1st Cir.2005).

17   *See* Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (formulating the classic two-step process for evaluating the validity of regulations). Step one asks whether Congress has spoken to the precise question at issue; if so, the inquiry ends and Congress's wishes control. If the statute is silent or ambiguous, step two asks whether the agency's interpretation is "permissible," or reasonable. *Id.* at 842-43, 104 S.Ct. 2778.

18   480 F.3d 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

19   531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001). In *Lopez,* a statute allowed the Bureau of Prisons (BOP) to decrease the sentence of a prisoner who completed a treatment program by up to a year. BOP promulgated a regulation categorically denying reduction to any prisoner whose current offense was a drug felony involving a gun. The Supreme Court upheld the regulation as "delineat[ing] ... an additional category of ineligible inmates," noting that "Congress simply did not address how the Bureau should exercise its discretion within the class of inmates" who are eligible. It noted that "[b]eyond instructing that the Bureau has discretion to [reduce sentence], Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so." *Id.* at 714.

20   The court noted that some of the carve-outs made ineligible certain, but not all, aliens in removal proceedings. It also explained that the carve-outs and ins were added over the years, stressing the lack of Congressional will to make ineligible all parolees in removal proceedings.

21   The court rejected Respondent's contention that paroled aliens in removal proceedings could simply return to their home countries to apply, noting statutory barriers if the aliens were unlawfully present in the United States for certain periods of time or departed "involuntarily." Respondent urges that these barriers are waivable in his discretion.

22  The court noted that some people question whether legislative history should be analyzed during *Chevron* step one, concluding that it should.

23  416 F.3d 923 (8th Cir.2005). Judge Bye dissented, explaining that he would follow *Succar.*

24  186 F.3d 1092, 1094-95 (8th Cir.1999).

25  *Fook Hong Mak v. INS,* 435 F.2d 728, 730 (2d Cir.1970).

26  The BIA in Cardoza-Fonseca had construed the statutory eligibility standard for asylum (a form of discretionary relief) as requiring the same showing-a clear probability of persecution-as the statutory eligibility standard for withholding of deportation (a form of relief that must be given to an eligible alien). The Court reasoned that the BIA's construction did not fit the statutes because the difference between the nature of the relief available under each-discretionary versus mandatory-evinced a congressional intent that the eligibility standard for discretionary asylum would be less demanding than the eligibility standard for mandatory withholding. But the Court did not hold that the Attorney General could not by regulation determine who among the class of aliens that is statutorily eligible for discretionary relief would or would not be afforded such relief. It simply held that the BIA's interpretation of the statute in that case failed because Congress did not intend the heightened mandatory-withholding showing to apply to discretionary asylum.

    *Mouelle,* 416 F.3d at 929-30 (internal citations omitted).

27  *Zheng v. Gonzales,* 422 F.3d 98 (3d Cir.2005).

28  *Zheng* noted that the losing prisoner in Lopez had argued "that, by identifying a class of inmates eligible for sentence reductions ... Congress has barred the [BOP] from identifying further categories of ineligible inmates." *Id.* at 116. In addition, the court implicitly held that *Cardoza-Fonseca* is distinguishable for the reasons stated by the Eighth Circuit.

29  *Id.* n. 14.

30  The court noted that the Supreme Court in *Lopez* analyzed the BOP's exercise of discretion by rule under *Chevron* step two.

31  The court noted that under 8 U.S.C. § 1101(a)(13)(B), parolees are not "admitted aliens" but "applicants for admission." And under § 1225(b)(2)(A), applicants for admission "shall be detailed for a [removal] proceeding" if an officer determines they are "not clearly and beyond a doubt entitled to be admitted." Since parole is a form of relief from detention, not removal, the court believed that Respondent must put into removal proceedings all aliens "not clearly and beyond a doubt entitled to be admitted," regardless of whether he paroles them. In any event, it held, even if Respondent had discretion not to remove such parolees, Congress's clear intent to foster removal would greatly limit that discretion.

32  425 F.3d 663 (9th Cir.2005).

33  445 F.3d 1311, 1320-21 (11th Cir.2006).

34  *Mouelle,* 416 F.3d at 929-30.

35  We note the disagreement over what percentage of paroled aliens are in removal proceedings. Respondent in *Mouelle* suggested 2-3%, while *Succar* thought the number large and *Zheng* thought it 100%. The evidence in our case is unclear, although Respondent stated at oral argument that it is less than 100%. In any event, the number is irrelevant because Respondent has discretion to forbid applications from all paroled aliens in removal proceedings, or all paroled aliens, or all aliens "inspected and admitted," or all aliens "inspected and admitted or paroled." The size of the precluded subset is irrelevant, even to the point of the "subset" being the entire set defined in § 1255. In upholding the regulation, a recent panel of this court explained that it had no evidence of the size of the subset; furthermore, it noted that in practice not all paroled

aliens were put in removal proceedings. 🚩 *Momin,* 447 F.3d at 458 - 60, at *12-*13. We hold the regulation valid *even if* all paroled aliens were put in removal proceedings.

36    🏴 *Succar,* 394 F.3d at 29 n. 28 (citing 🏴 *Lopez,* 531 U.S. at 249, 121 S.Ct. 714 (Stevens, J., dissenting)). Petitioners in our case contended similarly at oral argument.

37    At the very least, we would have to inquire whether the set of criteria promulgated by Respondent "categorically refuse[d]" as a practical matter eligibility to an otherwise eligible class. Would precluding 90% of the class invalidate the criteria? 95%? And even if the criteria were acceptable, but nobody in the class received relief, would we have to inquire whether some unofficial rule or practice was improperly influencing the exercise of discretion?

38    We do not rely on the IIRIRA in upholding the regulation. Respondent could have validly promulgated 🚩 § 245.1(c)(8) before the enactment of that statute.

39    *See* 🏴 *Moosa v. INS,* 171 F.3d 994, 1011-12 (5th Cir.1999).

---

**End of Document**                                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.03897    9

404 F.3d 733
United States Court of Appeals,
Third Circuit.

Said Husni AL–FARA; Bahya Safi, Petitioners

v.

Alberto GONZALES, Attorney General
of the United States * Respondent

No. 02–4580.
|
Submitted Pursuant to Third
Circuit LAR 34.1(a) May 27, 2004.
|
Filed: April 14, 2005.

**Synopsis**
**Background:** Applicant, who was born in the Gaza Strip,
petitioned for review of order of Board of Immigration
Appeals (BIA) denying asylum.

**Holdings:** The Court of Appeals, Cowen, Circuit Judge, held
that:

[1] substantial evidence supported determination that incident
involving Israeli soldiers, along with ensuing encounters
between Israeli forces and applicant's family, did not
constitute persecution;

[2] applicant failed to establish that any persecution of his
family members was because of their familial relationship;

[3] finding that applicant's fear of retaliation was
not objectively reasonable was supported by substantial
evidence; and

[4] applicant failed to establish well-founded fear of
persecution based on his Palestinian nationality.

Petition denied.

West Headnotes (21)

[1]     **Aliens, Immigration, and
Citizenship**  ⚷  Summary affirmance;  single
or multiple member review

**Constitutional Law**  ⚷  Asylum, refugees, and
withholding of removal

Affirmance-without-opinion         procedures
employed by Board of Immigration Appeals
(BIA) in asylum action did not violate due
process. U.S.C.A. Const.Amend. 5; Immigration
and Nationality Act, § 208(b)(1), as amended,
8 U.S.C.A. § 1158(b)(1); 8 C.F.R. §
1003.1(e)(4).

1 Cases that cite this headnote

[2]     **Aliens, Immigration, and
Citizenship**  ⚷  Substantial evidence in
general

Under the substantial evidence standard, the
Court of Appeals must uphold an Immigration
Judge's (IJ) factual findings if they are supported
by reasonable, substantial, and probative
evidence on the record considered as a whole.

[3]     **Aliens, Immigration, and
Citizenship**  ⚷  Fact Questions

Findings of past and future persecution in an
asylum proceeding are factual determinations
and are accordingly subject to deferential review.
Immigration and Nationality Act, § 208(b)(1), as
amended, 8 U.S.C.A. § 1158(b)(1).

3 Cases that cite this headnote

[4]     **Aliens, Immigration, and
Citizenship**  ⚷  Threats, Harassment, and Acts
of Violence

Determination of Immigration Judge (IJ), that
incident in which Israeli soldiers entered asylum
applicant's home in Gaza Strip in 1967, and shot
at him as he fled, along with ensuing encounters
between Israeli forces and applicant's family,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

did not constitute "persecution" for purposes of asylum, was supported by substantial evidence, where neither applicant nor his parents were arrested, detained, abused, or physically harmed, and where war had broken out, such that threat of injury or harm affected entire population in Gaza. Immigration and Nationality Act, § 208(b)(1), as amended, 8 U.S.C.A. § 1158(b)(1).

3 Cases that cite this headnote

**[5]** **Aliens, Immigration, and Citizenship** Acts Constituting Persecution

"Persecution" for purposes of asylum is not a limitless concept; while it includes threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom, it does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

3 Cases that cite this headnote

**[6]** **Aliens, Immigration, and Citizenship** Acts Constituting Persecution

Persecution must be extreme conduct to qualify for asylum protection. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

2 Cases that cite this headnote

**[7]** **Aliens, Immigration, and Citizenship** Grounds for Persecution; Protected Groups

Harm resulting from country-wide civil strife is not persecution on account of a factor enumerated in the asylum statute. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

4 Cases that cite this headnote

**[8]** **Aliens, Immigration, and Citizenship** Humanitarian grant

Because asylum applicant failed to establish past persecution, he was not eligible for discretionary grant of asylum for humanitarian reasons. Immigration and Nationality Act, §§ 101(a)(42)(A), 208(b)(1), as amended, 8 U.S.C.A. §§ 1101(a)(42)(A), 1158(b)(1).

8 Cases that cite this headnote

**[9]** **Aliens, Immigration, and Citizenship** Well Founded Fear of Future Persecution

In the absence of past persecution, an applicant for asylum can establish that he or she has a well-founded fear of persecution. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

5 Cases that cite this headnote

**[10]** **Aliens, Immigration, and Citizenship** Subjective and Objective Tests

An asylum applicant's demonstration of a well-founded fear of persecution carries both a subjective and objective component; the applicant must show a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[11]** **Aliens, Immigration, and Citizenship** Weight and Sufficiency

Testimony alone may be sufficient to satisfy the burden of demonstrating a well-founded fear of persecution, so long as it is found credible. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[12]** **Aliens, Immigration, and Citizenship** 🔑 **Membership in social group**

To qualify for asylum on account of membership in a particular social group requires that an applicant: (1) identify a group that constitutes a particular social group; (2) establish that he or she is a member of that group; and (3) show persecution or a well-founded fear of persecution based on that membership. Immigration and Nationality Act, § 101(a)(42)(A), as amended,

🚩 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[13]** **Aliens, Immigration, and Citizenship** 🔑 **Weight and Sufficiency**

Evidence that asylum applicant's cousin was arrested and tortured in Intifada in 1987, that another cousin who served as judge in Gaza was killed because he refused to unlawfully apply laws to Palestinians before him, and that applicant's parents' house was among the thousands destroyed in 1976 pursuant to Israeli policy, was insufficient to establish that any persecution of his family members was because of their familial relationship, and thus was insufficient to establish applicant's membership in a particular social group. Immigration and Nationality Act, § 101(a)(42)(A), as amended,

🚩 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[14]** **Aliens, Immigration, and Citizenship** 🔑 **Acts Constituting Persecution**

Violence against a family member may support an asylum applicant's claim of persecution, and in some instances is sufficient to establish a well-founded fear of persecution. Immigration and Nationality Act, § 101(a)(42)(A), as amended,

🚩 8 U.S.C.A. § 1101(a)(42)(A).

2 Cases that cite this headnote

**[15]** **Aliens, Immigration, and Citizenship** 🔑 **Weight and Sufficiency**

Substantial evidence supported finding of Immigration Judge (IJ), that asylum applicant's fear of retaliation from Israeli forces as result of his attack on Israeli soldier in Gaza in 1967 was not objectively reasonable, given passage of 38 years since such incident, and 30 years since Israelis last inquired of applicant's whereabouts. Immigration and Nationality Act, § 101(a)(42)

(A), as amended, 🚩 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[16]** **Aliens, Immigration, and Citizenship** 🔑 **Nationality**

Asylum applicant, who was born in Gaza Strip, failed to establish well-founded fear of persecution based on his Palestinian nationality, even if harsh conditions confronted those residing in Gaza, where applicant personally suffered isolated harm or little cumulative harm. Immigration and Nationality Act, § 101(a)(42)

(A), as amended, 🚩 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[17]** **Aliens, Immigration, and Citizenship** 🔑 **Acts Constituting Persecution**

**Aliens, Immigration, and Citizenship** 🔑 **Grounds for Persecution; Protected Groups**

Although an individual who resides in a country where the lives and freedoms of a significant number of persons of a protected group are targeted for persecution may make less of the individual showing required to qualify for asylum, the applicant must do more than rely on a general threat of danger arising from a state of civil strife; some specific showing is required. Immigration and Nationality Act, § 101(a)(42)

(A), as amended, 🚩 8 U.S.C.A. § 1101(a)(42)(A).

3 Cases that cite this headnote

**[18]**  Aliens, Immigration, and Citizenship  Acts Constituting Persecution

Statelessness alone was not sufficient to warrant asylum on part of Palestinian who was born in, but fled, Gaza. Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A).

1 Cases that cite this headnote

**[19]**  Aliens, Immigration, and Citizenship  Asylum, Refugees, and Withholding of Removal

International Law  Self-executing agreements; implementing legislation

Alien could not assert claims under 1967 United Nations Protocol Relating to the Status of Refugees beyond those contained in INA, since Protocol was not self-executing, and did not confer any rights beyond those granted by implementing domestic legislation. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

4 Cases that cite this headnote

**[20]**  Aliens, Immigration, and Citizenship  Exhaustion of remedies in general

Asylum applicant failed to exhaust his available administrative remedies as to claim that he qualified as refugee pursuant to legal opinion of Immigration and Naturalization Service (INS) General Counsel's Office, and judicial review thus was precluded by Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), where he failed to raise it before Immigration Judge (IJ) or on direct appeal to Board of Immigration Appeals (BIA). Immigration and Nationality Act, § 101(a)(42)(A), as amended, 8 U.S.C.A. § 1101(a)(42)(A); Immigration and Nationality Act, § 106(c), as amended, 8 U.S.C.(1994 Ed.) § 1105a(c).

3 Cases that cite this headnote

**[21]**  Aliens, Immigration, and Citizenship  Record

The general rule, applicable across the board to judicial review of administrative action and merely codified for immigration appeals, is that the court may not go outside the administrative record. Immigration and Nationality Act, § 106(a)(4), as amended, 8 U.S.C.(1994 Ed.) § 1105a(a)(4).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*735** Tahani Salama, Philadelphia, PA, Counsel for Petitioners.

Anthony W. Norwood, Earle B. Wilson, Linda S. Wernery, Terri J. Scadron, John M. McAdams, Jr., United States Department of Justice, Office of Immigration Litigation, **\*736** Ben Franklin Station, Washington, DC, Counsel for Respondent.

Before: RENDELL and COWEN, Circuit Judges and SCHWARZER [*], District Judge.

**Opinion**

COWEN, Circuit Judge.

Said Al–Fara ("Petitioner" or "Al–Fara") and Bahya Safi [1] petition for review of an order of the Board of Immigration Appeals ("BIA"), which summarily affirmed an Immigration Judge's ("IJ") decision to deny Al–Fara's applications for asylum and withholding of deportation under the Immigration and Nationality Act ("INA" or "Act"). Al–Fara challenges the propriety of the BIA's summary affirmance in his case. For the following reasons, we will deny the petition for review.

I.

A.

The IJ found Al–Fara to be credible regarding his subjective narrative. The facts below are accordingly taken largely from his testimony.

Petitioner was born on June 24, 1947, in Khan Younis, a town located in the area known as the Gaza Strip of what was then Palestine. During the War of 1967, Israeli forces occupied the Gaza Strip, and entered Petitioner's house by force. In response, Petitioner attacked one of the Israeli soldiers with a stick. Recalling a fearful memory from the 1956 Sinai War where he had witnessed Israeli soldiers lining up and shooting a group of Palestinian youths, Al–Fara fled as the Israeli soldiers shot at him. Petitioner believed that the Israeli soldiers had come to destroy his home, and that if he remained in Gaza they would arrest and kill him in retaliation for his attack on the Israeli soldier. He escaped to Jordan.

From 1967 through 1976, Israeli soldiers approached Petitioner's parents and other family members demanding his whereabouts. Specifically in 1976, Israeli soldiers forced Al–Fara's parents from their home and demolished it. As a result of this ordeal, Al–Fara's mother became mentally ill and was admitted to a psychiatric hospital, where she passed away in 1991. Other relatives were killed by Israeli authorities. Petitioner's cousin, a judge in the Gaza Strip, was tortured and killed by Israeli authorities for refusing to impose unlawful judgments against Palestinian youths. According to Petitioner's testimony and an affidavit from the office of the Palestinian National Liberation Movement, Petitioner's cousin Essam Al–Fara was arrested during the Great Intifada in 1987 but managed to escape. Petitioner testified that Essam was tortured.

Petitioner remained in Jordan until October 1968, when Jordan agreed to issue travel documents to any Palestinian refugee willing to leave. He traveled to Kuwait, where he succeeded in receiving a sponsorship from a Kuwaiti citizen. His residence permit, however, expired in 1983 and the sponsor refused renewal. He next lived in Iraq until December 1985, but returned to Jordan to establish an importing business. Petitioner operated his business from July 1986 until December 1989. During this period he entered the United States on several occasions for business purposes. After his business in Jordan came to a close, Al–Fara traveled to Syria, Turkey, Greece, Bulgaria, Cyprus, and Yugoslavia. He spent five and one-half **737** months in Egypt, where he married his present wife in 1990.

Petitioner testified that Israeli authorities will not permit him to return, and that the Palestinian Authority is powerless. As corroborated by a letter dated March 15, 1997, from the Palestinian National Liberation Movement, the Palestinian National Authority denied his application for reunification with his family in Gaza, because they were not processing applications at the time. He does not possess a Palestinian passport, but has a traveling document from Jordan. His wife, who was also born in Khan Younis but raised in Egypt, has a traveling document from Egypt. Although he may enter Jordan, his wife cannot, and he will be asked to surrender his passport to Jordan authorities. His children, who are all United States citizens, may only enter Jordan on tourist visas. Petitioner believes that neither he nor his wife will be accepted by any other country.

## B.

Petitioners entered the United States on or about April 7, 1991, on a non-immigrant visitor's visa issued with authorization to remain until October 7, 1991. On June 28, 1996, the former Immigration and Naturalization Service ("INS")[2] issued an Order to Show Cause in which it charged Petitioners with remaining in the United States beyond the authorized period. On October 18, 1996, Petitioners admitted the allegations, and the IJ thus concluded that they are subject to deportation pursuant to section 241(a)(1)(B) of the INA. Seeking relief, Petitioners applied for asylum and withholding of deportation.

The IJ found Said Al–Fara to be credible but denied his application for asylum. After identifying Petitioner as a stateless Palestinian, the IJ observed that it was the conditions of unrest and battle brought about by the 1967 war, and not any individualized persecution of Petitioner, that prompted Petitioner's flight from Gaza in 1967. In addition, the IJ recognized that the 1967 war involved attacks and abuses by both Israelis and Palestinians. The IJ reasoned that harm resulting from such violence in a situation of civil strife is not necessarily persecution "on account of" a statutory factor, and thus Petitioner is not a "refugee" by virtue of past persecution. With respect to Petitioner's well-founded fear of future persecution claim, the IJ found that the substantial amount of time that passed between Petitioner's flight and the present renders his subjective fear of retaliation objectively unfounded. Addressing Petitioner's status as stateless, the IJ concluded that statelessness alone does not warrant a grant of asylum, and noted as an additional matter the lack of any

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

evidence, other than Al–Fara's testimony, that the Palestinian Authority would deny him admission into the area it controls. In light of Petitioner's inability to qualify for asylum, the IJ rejected his request for withholding of deportation, but granted the application for voluntary departure. On December 2, 2002, the BIA affirmed without opinion the IJ's decision pursuant to 8 C.F.R. § 1001.3(e)(4). [3]

**\*738** II.

Because Petitioners were placed in deportation proceedings before April 1, 1997, and the final order of deportation was issued by the BIA after October 30, 1996, our jurisdiction arises under 8 U.S.C. § 1105a (1996), as amended by the transitional rules for judicial review in section 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 (Sept. 30, 1996). The BIA's jurisdiction arose under 8 C.F.R. §§ 1003.1(b) and 1240.53 (2003). [4]

**[1]** **[2]** **[3]** The IJ denied Al–Fara's applications for relief, but granted voluntary departure. The BIA affirmed without opinion, pursuant to 8 C.F.R. § 1003.1(e)(4). [5] "[W]hen the BIA issues an [affirmance without opinion] under the streamlining regulations, we review the IJ's opinion and scrutinize its reasoning." *Dia v. Ashcroft,* 353 F.3d 228, 245 (3d Cir.2003) (en banc). Under the substantial evidence standard, we must uphold the IJ's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Findings of past and future persecution are factual determinations and are accordingly subject to this deferential review. *Lukwago v. Ashcroft,* 329 F.3d 157, 167 (3d Cir.2003).

III.

Al–Fara asserts that the BIA erred in its decision to apply the streamlining regulations to his case because the criteria set forth in 8 C.F.R. § 1003.1(e)(4) were not met. [6] Specifically, he contends that (1) the IJ's decision is not correct; (2) the IJ failed to review critical evidence; (3)

the BIA failed to address changed circumstances; and (4) new arguments were presented by Petitioner to the BIA. We conclude that the BIA's decision to streamline was not arbitrary and capricious.

A.

Substantial evidence supports the IJ's determination that Petitioner does not qualify for asylum. Pursuant to 8 U.S.C. § 1158(b)(1), the Attorney General may grant asylum to an otherwise removable alien who demonstrates that he or she meets the definition of "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A):

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is **\*739** outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

Petitioner mounts four specific challenges to the merits of the IJ's decision: (1) the IJ's finding that Petitioner does not qualify as a "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A) by virtue of past persecution is not supported by substantial evidence; (2) the IJ's finding that Petitioner does not qualify as a "refugee" by virtue of a well-founded fear of future persecution on account of membership in a particular social group is not supported by substantial evidence; (3) the IJ's denial of asylum is incorrect because Petitioner qualifies for a discretionary grant of asylum based on humanitarian grounds; and (4) the IJ's denial of asylum is incorrect because Petitioner's status as a stateless Palestinian renders him eligible for asylum.

Turning first to Petitioner's claim of past persecution, "[t]o establish eligibility for asylum on the basis of past persecution, an applicant must show (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Abdulrahman v. Ashcroft,* 330 F.3d 587, 592 (3d Cir.2003) (internal citation and quotation marks omitted).

[4] [5] [6] Substantial evidence supports the IJ's determination that the incident that occurred between Petitioner and the Israeli soldier in 1967 along with the ensuing encounters between the Israeli forces and Petitioner's family do not rise to the level of "persecution" as contemplated by the Act. Persecution is not a limitless concept. While it includes "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom," we have explained that it "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country—and it seems most unlikely that Congress intended such a result." *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir.1993). Persecution must be "extreme conduct" to qualify for asylum protection. *Id.* at 1240 n. 10. In this case, Israeli soldiers entered Petitioner's home by force. Petitioner responded by attacking an Israeli soldier with a stick and fleeing the country. The Israeli forces continued to harass Petitioner's family and demand his whereabouts until 1976, when they expelled Petitioner's parents from their home and demolished the house. Neither Petitioner nor his parents were arrested, detained, abused, or physically harmed as a result of this incident. In addition, the context in which these encounters occurred is extremely significant. At the time of this event in 1967, war had broken out between Israel and what was then Palestine. The record reflects that the threat of injury or harm in Gaza affected the entire population in that region and was a function of the Israeli takeover, occupation, and claim to the lands of Gaza and the West Bank. According to Petitioner's affidavit, his parents' house was among thousands destroyed in 1976 pursuant to an Israeli policy designed to force families to leave and make room for Jewish settlements.

*740 [7] Petitioner's burden in showing persecution is high, and we have held that " 'generally harsh conditions

shared by many other persons' do not amount to persecution." *Fatin,* 12 F.3d at 1240 (quoting *Matter of Acosta,* 19 I. & N. Dec. 211, 222 (BIA 1985)); *see Ambartsoumian v. Ashcroft,* 388 F.3d 85, 93 (3d Cir.2004); *Matter of Sanchez and Escobar,* 19 I. & N. Dec. 276, 284 (BIA 1985), *aff'd sub nom Sanchez–Trujillo v. INS,* 801 F.2d 1571 (9th Cir.1986). While troubling, Petitioner's allegations do not arise to the level of persecution required by *Fatin.* Indeed, the IJ noted that Congress had specifically rejected a definition of "refugee" that would have encompassed "displaced persons," i.e., "individuals who flee widespread conditions of indiscriminative violence resulting from civil war or military strife in a country." *Sanchez and Escobar,* 19 I. & N. Dec. at 284. Furthermore, as the IJ properly noted, harm resulting from country-wide civil strife is not persecution "on account of" an enumerated statutory factor. *See Matter of Maldonado–Cruz,* 19 I. & N. Dec. 509, 513 (BIA 1988), *rev'd on other grounds,* 883 F.2d 788 (9th Cir.1989); *Sanchez and Escobar,* 19 I. & N. Dec. at 282. Petitioner has furnished no evidence, short of speculation, that these past incidents were perpetrated on account of anything other than ongoing civil controversy. This record does not compel a finding that Petitioner suffered past persecution.

[8] This finding extinguishes Al-Fara's claim that the IJ erroneously failed to grant him a discretionary grant of asylum for humanitarian reasons. In *Matter of Chen,* 20 I. & N. Dec. 16 (BIA 1989), the Board acknowledged that in limited circumstances past persecution alone may warrant a grant of asylum, even in the absence of a future threat of persecution. The Board stated:

> If an alien establishes that he has been persecuted in the past for one of the five reasons listed in the statute, he is eligible for a grant of asylum. The likelihood of present or future persecution then becomes relevant as to the exercise of discretion, and asylum may be denied as a matter of discretion if there is a little likelihood of present persecution....
>
> However, there may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution....
>
> "It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate.... Thus, while the likelihood of future persecution is a factor to consider

in exercising discretion in cases where any asylum application is based on past persecution, asylum may in some situations be granted where there is little threat of future persecution."

*Id.* at 18–19 (quoting the Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva, 1979)).

In this case, however, we affirm the IJ's finding that Petitioner did not suffer past persecution. Therefore, he is not eligible for a grant of asylum pursuant to this rationale.

**[9]  [10]  [11]**  In the absence of past persecution, an applicant for asylum can establish that he or she has a well-founded fear of persecution. *Gao v. Ashcroft,* 299 F.3d 266, 272 (3d Cir.2002). Demonstration of a well-founded fear of persecution carries both a subjective and objective component. The applicant must show "a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable **\*741** possibility." *Chang v. INS,* 119 F.3d 1055, 1066 (3d Cir.1997). Testimony alone may be sufficient to satisfy this burden, so long as it is found credible. *Gao,* 299 F.3d at 272.

Taken in conjunction with the documentary evidence of conditions in Israel and the occupied territories, Al–Fara's testimony, while credible, does not establish that a reasonable person in his circumstances would fear persecution on account of social group or nationality.

**[12]  [13]  [14]**  To qualify for asylum on account of membership in a "particular social group" requires that an applicant (1) identify a group that constitutes a "particular social group," (2) establish that he or she is a member of that group, and (3) show persecution or a well-founded fear of persecution based on that membership. *Lukwago v. Ashcroft,* 329 F.3d 157, 170 (3d Cir.2003). Petitioner argues that the IJ erred in failing to find that he has a well-founded fear of persecution based on membership in the social group of his family. It is not clear whether this argument was raised before the IJ, but any error he may have committed in failing to entertain or address it is harmless in light of the failure of the record to substantiate it. While violence against a family member may "support ... a claim of persecution and in some instances is sufficient to establish [a well-founded

fear of] persecution," *Baballah v. Ashcroft,* 335 F.3d 981, 988 (9th Cir.2003), Petitioner has not sufficiently established that his family members suffered persecution *because* of their familial relationship. The record reflects that one of Petitioner's cousins was arrested and tortured in the Intifada in 1987, and that another cousin who served as a judge in Gaza was killed because he refused to unlawfully apply laws to the Palestinians before him. According to Petitioner, his parents' house was among the thousands destroyed in 1976 pursuant to an Israeli policy aimed at emptying Gaza to make room for Jewish settlements.

**[15]**  Substantial evidence supports the IJ's finding that Petitioner's fear of retaliation from Israeli forces as a result of his attack on an Israeli soldier in 1967 is not objectively reasonable. Putting aside that such fear is not "on account of" an acceptable statutory factor, *see Maldonado–Cruz, 19 I. & N. Dec. at 512* ("[A]liens fearing retribution over purely personal matters or those fleeing general conditions of violence and upheaval in their native countries would not qualify for asylum. Such persons may have well-founded fears of harm but such harm would not be on account of [any statutory factor]."), this fear is objectively unreasonable given that approximately thirty-eight years have passed since the incident, and approximately thirty years have passed since the Israelis last inquired of Petitioner's whereabouts. Petitioner has put forth no evidence that the Israeli authorities possess a present interest in him.

**[16]  [17]**  Al-Fara's contention that he possesses a well-founded fear of persecution based on his nationality as a Palestinian is also unpersuasive. This claim is exclusively premised on the harsh conditions confronted by those who reside in Gaza. Although an individual who resides in a country where the lives and freedoms of a significant number of persons of a protected group are targeted for persecution may make less of the individual showing required to qualify for asylum, the applicant must do more than rely on a general threat of danger arising from a state of civil strife; *some* specific showing is required. A Palestinian who has suffered isolated harm, or little cumulative harm, cannot prevail merely because many Palestinians face oppressive conditions.

We certainly cannot say that "a reasonable factfinder would have to conclude," **\*742** based on the record, that the Petitioner, if returned to Gaza, would face treatment amounting to "persecution" simply because he is a

Palestinian. The general political upheaval that has been an unfortunate reality in Gaza is obviously threatening for those who live there, but such conditions in and of themselves do not merit asylum.

Related to this latter claim is Petitioner's contention that the IJ committed reversible error in failing to consider critical evidence regarding the conditions experienced by Palestinians in Israel and the occupied territories. In support of this charge, Petitioner refers to a portion of the IJ's oral statement: "Because as I have explained, the fundamental problem in this case is we have too much background evidence about conditions of Palestinians in occupied territories, but very little from this respondent about what exactly happened to him. And, he has to have both." (R. at 429.) Petitioner asserts that this statement proves that the IJ did not consider all of the background evidence submitted in the case. This claim is without merit and directly belied by the IJ's other statements and written opinion, which discusses the general conditions of the areas controlled by the Palestinian Authority, citing to specific evidence submitted by both Petitioner and the INS. Significantly, Al–Fara does not point to any specific evidence that he contends the IJ ignored.

Petitioner's fear derives not from his nationality or membership in a social group, but from the general instability of the region. Accordingly, substantial evidence supports the IJ's conclusion that Petitioner does not possess a well-founded fear of persecution as defined by the Act.

[18]    Petitioner's challenge to the IJ's failure to grant asylum on the basis of statelessness is without merit. Courts have repeatedly held that "statelessness alone does not warrant asylum." *See, e.g.,* *Ahmed v. Ashcroft,* 341 F.3d 214, 218 (3d Cir.2003).

### B.

Petitioner's argument that streamlining is inappropriate when new arguments are pressed on appeal to the BIA is correct only if the BIA acted arbitrarily in concluding that either "[t]he issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation" or "[t]he factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case." 8 C.F.R. § 1003.1(e)(4). As explained below, the

BIA did not act arbitrarily in applying these standards and streamlining Al–Fara's case.

We have discussed above Al–Fara's contentions, raised on direct appeal to the BIA, that he qualifies for asylum based on humanitarian grounds and that the IJ erroneously failed to review critical evidence of country conditions. In addition to these points, his brief submitted to the BIA on appeal argued that he qualifies as a refugee pursuant to the 1951 Convention Relating to the Status of Refugees ("1951 Convention"). On appeal to this Court, Petitioner argues that he qualifies as a refugee pursuant to the legal opinion of the INS General Counsel's Office, Genco Op. No. 95–14, 1995 WL 1796321 (INS Oct. 27, 1995).

[19]    Petitioner's claim that he qualifies as a refugee pursuant to the 1951 Convention and the 2002 interpretations of the United Nations High Commissioner for Refugees made thereto is without merit. The United States is a signatory to the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol"), which incorporated the 1951 Convention. The Attorney General implemented regulations **\*743** to comply with its terms. *INS v. Stevic,* 467 U.S. 407, 428–30, n. 22, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). In 1980, Congress amended the INA through passing the Refugee Act, which brought the domestic laws of the United States into conformity with its treaty obligations under the 1967 Protocol. *Id.* at 421, 427, 104 S.Ct. 2489. The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation. *See id.* at 428 n. 22, 104 S.Ct. 2489; *Cuban American Bar Ass'n, Inc. v. Christopher,* 43 F.3d 1412, 1426 n. 13 (11th Cir.), *cert. denied sub nom., Haitian Refugee Center, Inc. v. Christopher,* 515 U.S. 1142, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995); *Ming v. Marks,* 505 F.2d 1170, 1171 n. 1 (2d Cir.1974) (per curiam), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1564, 43 L.Ed.2d 776 (1975) (clarifying that 1967 Protocol does not alter or enlarge the effect of existing immigration laws already embracing its principles). Accordingly, Petitioner cannot assert rights beyond those contained in the INA and its amendments.

[20]    Petitioner's claim that he qualifies as a refugee pursuant to the legal opinion of the INS General Counsel's Office, Genco Op. No. 95–14, 1995 WL 1796321 (INS Oct. 27, 1995), was not raised before the IJ or on direct appeal to the BIA. Under 8 U.S.C. § 1105a(c) (repealed), which applies to transitional aliens through incorporation, *see* IIRIRA § 309(c), there shall be no judicial review of a claim "if

the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations." 8 U.S.C. § 1105a(c). Because Al-Fara did not advance this particular claim in his asylum hearing before the IJ or on appeal to the BIA, he has not exhausted his available administrative remedies. Consequently, we do not have jurisdiction to entertain it. [7]

We recognize that pursuant to our recent decision in Smriko v. Ashcroft, 387 F.3d 279 (3d Cir.2004), we have jurisdiction to remand this case to the BIA for a written disposition. Unlike the situation presented in *Smriko,* however, this is not a case where the BIA's institutional knowledge and expertise would be of value to us.

### C.

[21] Al-Fara rightly asserts that conditions in Israel and the occupied territories have changed since 1998. He has submitted a number of articles and reports documenting these changes. Nonetheless, it is axiomatic that we may not foray outside the administrative record in considering this appeal. Indeed, the "general rule, applicable across the board to judicial review of administrative action and merely codified for immigration appeals in section 1105a(a)(4) [ (repealed) ][8], is that the court may not go outside the administrative record." *Osaghae v. INS,* 942 F.2d 1160, 1162 (7th Cir.1991). The appropriate recourse, already taken by Petitioner, is to file a motion to reopen with the BIA on account of new evidence. If the BIA denies Petitioner's motion to reopen, he may appeal that decision to this Court.

**\*744** For the foregoing reasons, the petition for review will be denied.

### All Citations

404 F.3d 733

### Footnotes

| | |
|---|---|
| * | Caption amended pursuant to Rule 43(c), Fed. R.App. P. |
| * | Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation. |
| 1 | Petitioner Bahya Safi is Al-Fara's wife and a derivative applicant on his applications for asylum and withholding of deportation. *See* 8 C.F.R. § 208.3(a) (2004). While our opinion refers to the primary applicant, it is understood to include the derivative applicant as well. |
| 2 | On March 1, 2003, the INS ceased to exist as an agency within the Department of Justice and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (2002). |
| 3 | At the time the BIA acted on Al-Fara's appeal, the streamlining regulations were located at 8 C.F.R. § 3.1(a)(7) (2002). The language of the current streamlining regulation does not significantly differ from that of the former provision, and it is thus to the current regulation that we refer to and cite. 8 C.F.R. § 1003.1(e)(4) provides in pertinent part: |

    (i) The Board member to whom a case is assigned shall affirm the decision of the Service or the immigration judge, without opinion, if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that

    (A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or

    (B) The factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

4 At the time the BIA acted on Al–Fara's appeal, these regulations were found at 8 C.F.R. §§ 3.1(b)(2) and 240.53 (2002).

5 In his brief, Al–Fara argues that the BIA's affirmance-without-opinion procedures violate due process. This argument is foreclosed by our decision in *Dia v. Ashcroft,* 353 F.3d 228, 238–45 (3d Cir.2003) (en banc).

6 In *Smriko v. Ashcroft,* 387 F.3d 279 (3d Cir.2004), this Court held that it has jurisdiction to review the BIA's decision to issue an affirmance-without-opinion in a particular case. We concluded that 8 C.F.R. § 1003.1 provides a "meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 292 (internal quotation marks omitted). We will uphold the BIA's decision to streamline if we find that it was not arbitrary and capricious in light of the requirements of 8 C.F.R. § 1003.1(e)(4).

7 We note, however, that had we jurisdiction to review this claim, we would deny it. Petitioner's claim that Jordan, the country he deems his "last habitual residence" would deny him reentry is purely speculative, contradicts his administrative hearing testimony, and is not linked to an allegation of persecution on account of any protected ground, as required by the opinion on which he relies.

8 The IIRIRA repealed this old rule, but it is still applicable to transitional aliens through incorporation. *See* IIRIRA §§ 309(c)(1) and (4).

---

**End of Document**        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by United States v. Duran, D.Colo., October 7, 2020

950 F.3d 1184
United States Court of Appeals, Ninth Circuit.

Michael ALLEN, Petitioner-Appellant,

v.

Richard IVES, Respondent-Appellee.

No. 18-35001
|
Argued and Submitted April 10, 2019 Seattle, Washington
|
Filed February 24, 2020

**Synopsis**
**Background:** Federal inmate filed petition for writ of habeas corpus alleging that he was actually innocent of his sentence as career offender. The United States District Court for the District of Oregon, Marco A. Hernandez, J., dismissed petition, and inmate appealed.

**Holdings:** The Court of Appeals, William A. Fletcher, Circuit Judge, held that:

[1] inmate's release and reduction in sentence did not render his appeal moot;

[2] inmate could challenge his career offender status pursuant to § 2241 habeas petition;

[3] inmate did not have unobstructed procedural shot at presenting his claim of actual innocence of his sentence as career offender; and

[4] Supreme Court's decisions in Mathis v. United States, 136 S. Ct. 2243, and Descamps v. United States, 133 S.Ct. 2276, applied retroactively to cases on collateral review.

Reversed and remanded.

Callahan, Circuit Judge, dissented and filed opinion.

**Procedural Posture(s):** Appellate Review; Post-Conviction Review.

West Headnotes (10)

[1]    **Habeas Corpus**  Parole or other release

Federal inmate's release and reduction in sentence did not render moot his appeal of district court's order dismissing his habeas petition alleging that he was actually innocent of his sentence as career offender, where inmate was serving

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

period of supervised release, and there was possibility that he could receive reduction in his term of supervised release.
⚑ 28 U.S.C.A. § 2241.

**[2]    Habeas Corpus** 👉 Post-Conviction Motions or Proceedings

Motion to vacate, set aside, or correct sentence is inadequate to test legality of federal prisoner's detention, thus permitting him to file habeas corpus petition pursuant to § 2241, where prisoner (1) makes claim of actual innocence, and (2) has not had unobstructed procedural shot at presenting that claim. ⚑ 28 U.S.C.A. §§ 2241, ⚑ 2255(e).

9 Cases that cite this headnote

**[3]    Habeas Corpus** 👉 Post-Conviction Motions or Proceedings

To establish actual innocence, for purpose of meeting exception to prohibition against federal prisoner filing § 2241 habeas petition, petitioner must demonstrate that, in light of all evidence, it is more likely than not that no reasonable juror would have convicted him. ⚑ 28 U.S.C.A. §§ 2241, ⚑ 2255(e).

5 Cases that cite this headnote

**[4]    Habeas Corpus** 👉 Habitual or Repeat Offenders

Federal inmate who committed crime that was not predicate crime could challenge his career offender status pursuant to § 2241 habeas petition, where finding that inmate was career offender increased his minimum sentence under mandatory Guidelines and disqualified him from receiving otherwise available downward departure. ⚑ 28 U.S.C.A. §§ 2241, ⚑ 2255(e); ⚑ U.S.S.G. § 4B1.2.

**[5]    Habeas Corpus** 👉 Post-Conviction Motions or Proceedings

When deciding whether federal inmate has had unobstructed procedural shot, precluding his entitlement to petition for writ of habeas corpus under escape hatch provision of statute governing motion to vacate, set aside, or correct sentence, court must consider (1) whether legal basis for inmate's claim did not arise until after he had exhausted his direct appeal and first § 2255 motion; and (2) whether law changed in any way relevant to inmate's claim after that first § 2255 motion. ⚑ 28 U.S.C.A. §§ 2241, ⚑ 2255(e).

5 Cases that cite this headnote

**[6]    Habeas Corpus** 👉 Post-Conviction Motions or Proceedings

Federal inmate did not have unobstructed procedural shot at presenting his claim of actual innocence of his sentence as career offender, for purposes of determining his entitlement to § 2241 habeas petition under escape hatch provision of statute governing § 2255 motion to vacate, set aside, or correct sentence, where inmate's claim that his Connecticut conviction for marijuana possession did not qualify as predicate crime for purposes of career criminal sentencing enhancement was foreclosed by existing precedent at time of his direct appeal and § 2255 motion, and decisions upon which inmate's claims were based did not meet standard for second or successive § 2255 motion because they interpreted federal statutes, not Constitution. ⚑ 28 U.S.C.A. §§ 2241, ⚑ 2255(e); Conn. Gen. Stat. Ann. § 21a-277; ⚑ U.S.S.G. § 4B1.2.

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

5 Cases that cite this headnote

[7]    **Courts**    In general; retroactive or prospective operation

Supreme Court's decisions in *Mathis v. United States*, 136 S. Ct. 2243, and *Descamps v. United States*, 133 S.Ct. 2276, which established that categorical approach applied in determining whether state convictions qualified as predicate crimes for purposes of federal career criminal sentencing enhancements, applied retroactively to cases on collateral review; if decisions did not announce new rule, they applied on collateral review whether substantive or procedural, but to extent they did announce new rule, rule was one of substance rather than procedure.

2 Cases that cite this headnote

[8]    **Courts**    In general; retroactive or prospective operation

New rule of criminal law applies retroactively in collateral proceeding only if (1) rule is substantive or (2) rule is watershed rule of criminal procedure implicating fundamental fairness and accuracy of criminal proceeding.

1 Cases that cite this headnote

[9]    **Courts**    In general; retroactive or prospective operation

Rule of criminal law is "substantive" rather than procedural, for purposes of determining its retroactive effect, if it alters range of conduct or class of persons that law punishes.

[10]    **Courts**    In general; retroactive or prospective operation

Decisions that do not announce new rule apply retroactively on collateral review whether substantive or procedural.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1186** Elizabeth G. Daily (argued), Assistant Federal Public Defender, Federal Public Defender's Office, Portland, Oregon, for Petitioner-Appellant.

Amy Potter (argued) and Natalie K. Wight, Assistant United States Attorneys; Kelly A. Zusman, Appellate Chief; Billy J. Williams, United States Attorney, District of Oregon; United States Attorney's Office, Portland, Oregon; for Respondent-Appellee.

Appeal from the United States District Court for the District of Oregon, Marco A. Hernandez, District Judge, Presiding, D.C. No. 3:17-cv-00044-HZ

Before: William A. Fletcher, Consuelo M. Callahan, and Morgan B. Christen, Circuit Judges.

Dissent by Judge Callahan

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

## OPINION

W. FLETCHER, Circuit Judge:

Petitioner Michael Allen appeals the district court's dismissal of his 28 U.S.C. § 2241 habeas corpus petition for lack of jurisdiction. Allen contends that he is "actually innocent" of his sentence as a career offender; that the remedy provided by 28 U.S.C. § 2255 is "inadequate or ineffective" to test his claim of actual innocence; and that the district court may therefore entertain his § 2241 petition. We conclude that Allen's claim of actual innocence is cognizable under § 2241. We therefore reverse the district court's dismissal for lack of jurisdiction and remand.

## I. Background

In 1997, Allen pleaded guilty in federal district court in Connecticut to conspiracy to possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846; carrying a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. § 924(c); and possession of a firearm as a felon in violation 18 U.S.C. § 922(g)(1) and 924(c). When Allen was sentenced, the sentencing guidelines were mandatory. *See United States v. Booker*, 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

Allen's sentence was enhanced under the career offender provisions of U.S.S.G. §§ 4B1.1 and 4B1.2 (1997). The district court concluded that he was a career offender based on two predicate "controlled substance offenses" for which he had previously been convicted under Connecticut law. One of the predicate offenses was a conviction for two sales of marijuana on the same day, treated by the district court as a single conviction for purposes of career offender status. The other was a conviction for possession of narcotics. The Connecticut conviction records are no longer available, but it is clear from the sentencing transcript that at least the marijuana offense was a conviction under Connecticut General Statute 21a-277(a).

Because Allen was found to be a career offender, his base offense level for the conspiracy count increased from 36 to 37, increasing his sentencing range from 235 to 293 months to 262 to 327 months. The district court sentenced Allen to 262 months on the conspiracy count, a mandatory consecutive sentence of 60 months on the carrying-a-firearm count, and a concurrent sentence of 120 months on the felon-in-possession count. Allen was sentenced to a total term of imprisonment of 322 months.

The district court concluded, based on Allen's status as a career offender, that there was no legal basis for imposing a sentence below the guideline range. The **\*1187** court concluded, further, that Allen did not qualify for a downward departure under U.S.S.G. § 5H1.3 because, despite being "persuaded that the physical abuse to which [Allen] was subjected very early in life is extraordinary," and despite finding that Allen had suffered emotional and sexual abuse, the court could not find a sufficient nexus between Allen's abusive upbringing and the crimes of conviction.

In 2003, the federal district court in Connecticut denied Allen's § 2255 motion to vacate his sentence. The Second Circuit affirmed. In January 2017, Allen filed a petition under 28 U.S.C. § 2241 in federal district court in Oregon, where he was incarcerated. (A motion under § 2255 must be filed in the district where the defendant was sentenced. A petition under § 2241 must be filed in the district where the petitioner is incarcerated.) Allen contended in his § 2241 petition that *Mathis v. United States*, —— U.S. ——, 136 S. Ct. 2243, 195 L.Ed.2d 604 (2016), and *Descamps v. United States*, 570 U.S. 254, 133

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

S.Ct. 2276, 186 L.Ed.2d 438 (2013), retroactively established that under the categorical approach of *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), his Connecticut state court marijuana conviction was not a "controlled substance offense" as defined in U.S.S.G. § 4B1.2, and that he was therefore innocent of being a career offender. Allen asked to be resentenced without the enhancement based on career offender status.

The district court in Oregon dismissed Allen's § 2241 petition for lack of jurisdiction. The court concluded that our decision in *Marrero v. Ives*, 682 F.3d 1190, 1193–95 (9th Cir. 2012), had "squarely rejected" jurisdiction under § 2241 to address career offender errors because such claims are "purely legal" and have "nothing to do with factual innocence." Because the court held that it lacked jurisdiction, it did not address Allen's contention that his Connecticut state court conviction was not a predicate conviction for career offender status. The district court granted a Certificate of Appealability "as to whether 28 U.S.C. § 2241 habeas corpus jurisdiction is appropriate."

## II. Mootness

**[1]**  After we heard argument in this case, the district court in Connecticut reduced Allen's sentence under the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), to time served and ordered his immediate release. The court reduced his period of supervised release to four years. The government contends that Allen's release and reduction in sentence renders his appeal moot. We disagree.

The district court in Connecticut was required under 21 U.S.C. § 841(b)(1)(B) to impose a sentence of supervised release of "at least four years." However, 18 U.S.C. § 3583(e) authorizes a district court to terminate the period of supervised release after one year "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." Allen has a nontrivial argument for reducing his supervised release period under § 3583(e). If we hold that the district court in Oregon had jurisdiction over Allen's § 2241 petition, and if Allen is held to be actually innocent of having been a career offender, there is a nontrivial possibility that the district court in Connecticut will reduce his term of supervised release under § 3583(e). *See Mujahid v. Daniels*, 413 F.3d 991, 995 (9th Cir. 2005) ("The 'possibility' that the sentencing court would use its discretion to reduce a term of supervised release under 18 U.S.C. § 3583(e)(2) was enough to prevent the petition from being moot.") (citing **\*1188** *Gunderson v. Hood*, 268 F.3d 1149, 1153 (9th Cir. 2001)); *see also United States v. D.M.*, 869 F.3d 1133, 1137 (9th Cir. 2017).

Allen's appeal therefore is not moot.

## III. Standard of Review

We review de novo a district court's decision that it lacks jurisdiction over a petition under 28 U.S.C. § 2241. *Stephens v. Herrera*, 464 F.3d 895, 897 (9th Cir. 2006).

## IV. Discussion

**[2]**   As a general rule, "a motion under 28 U.S.C. § 2255 is the exclusive means by which a federal prisoner may test the legality of his detention[.]" *Stephens*, 464 F.3d at 897 (internal citations omitted). An exception to the general rule, termed the § 2255(e) "escape hatch," permits a federal prisoner to "file a habeas corpus petition pursuant to § 2241 to contest the legality of a sentence where his remedy under § 2255 is 'inadequate or ineffective to test the legality of his detention.' " *Hernandez v. Campbell*, 204 F.3d 861, 864–65 (9th Cir. 2000) (per curiam) (quoting § 2255(e)). We have held that a remedy under § 2255 is inadequate where "the prisoner '(1) makes a claim of actual innocence, and (2) has not had an unobstructed procedural shot at presenting that claim.' " *Marrero*, 682 F.3d at 1192 (quoting *Stephens*, 464 F.3d at 898).

## A. Actual Innocence

Allen contends under *Mathis* and *Descamps* that his Connecticut marijuana conviction is not a predicate crime for career offender status, and that he is therefore actually innocent of being a career offender under the Sentencing Guidelines. That is, he contends, he has a claim of actual innocence cognizable under § 2241.

**[3]**   In addressing claims of actual innocence under § 2241, we have relied on "the standard articulated by the Supreme Court in *Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)." *Stephens*, 464 F.3d at 899. A "petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623, 118 S.Ct. 1604 (internal quotation marks omitted). At issue in *Bousley* was a claim of actual innocence of the crime of conviction for which a petitioner has been sentenced.

The government conceded at oral argument that if a petitioner is actually innocent of a predicate crime for career offender status in the sense that he did not commit the state-law crime of which he was convicted, *Bousley* applies. In that event, the petitioner would have a claim of actual innocence cognizable under § 2241. This would be the case, for example, if the predicate crime were rape, and DNA evidence later proved petitioner's innocence. The question before us, then, is not whether a petitioner who did not commit a predicate crime of which he was convicted may challenge his career offender status under § 2241. The government has conceded that he may do so. Rather, it is the closely related question whether a petitioner who committed a crime that is not a predicate crime may challenge his career offender status under § 2241.

Allen does not challenge the validity of his conviction for sales of marijuana under Connecticut General Statute 21a-277(a). But he contends under *Mathis* and *Descamps*, which apply retroactively, that his conviction under that statute is not a conviction for a predicate crime. That is, Allen claims that he is actually innocent of a crime that would qualify him for career offender status, and is therefore actually innocent of the sentence that was imposed.

In *Marrero*, we held that a prisoner seeking resentencing based on non-retroactive changes to the treatment of related predicate crimes under the Sentencing **\*1189** Guidelines did not present a claim of actual innocence. 682 F.3d at 1194. Marrero did not contend that he was innocent of the felonies that qualified as crimes of violence or controlled substance offenses under U.S.S.G. § 4B1.2. Nor did he contend that he was improperly classified as a career offender at the time he was sentenced. Rather, he claimed that he was " 'actually innocent' of being a career offender" because under non-retroactive amendments to the Sentencing Guidelines, two of his prior convictions would now be treated as related, rather than separate,

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

predicate crimes. *Id.* at 1193. We held that the fact that his two prior offenses might be related under non-retroactive current law "ha[d] nothing to do with factual innocence." *Id.*

[4]    In *Marrero*, we left open the "question whether a petitioner may ever be actually innocent of a noncapital sentence for the purpose of qualifying for the escape hatch." *Id.* at 1193. We now reach that question and hold that Allen has made a claim of actual innocence that permits jurisdiction over his 🚩 § 2241 petition. If Allen prevails on the merits of his claim that his Connecticut marijuana conviction was not a predicate conviction for career offender status under the Guidelines, the factual predicate for his mandatory sentencing enhancement did not exist. That is, he is actually innocent of the enhancement. In that case, it is beyond dispute that he is not, and was not, a career offender. *See Stephens,* 464 F.3d at 899.

Some of the decisions cited by *Marrero* restricted actual innocence claims to cases in which the sentence exceeded what would otherwise have been the statutory maximum. But the advisory nature of the post- *Booker* guidelines was important to the reasoning in those decisions. *See, e.g., Gibbs v. United States,* 655 F.3d 473, 479 (6th Cir. 2011) ("While the sentencing guidelines are used as a starting point for determining where within the statutorily set range a prisoner's sentence should fall, the guidelines themselves are advisory. A challenge to the sentencing court's guidelines calculation, therefore, only challenges the legal process used to sentence a defendant and does not raise an argument that the defendant is ineligible for the sentence she received."). For prisoners sentenced under the mandatory Guidelines, we doubt such a restriction can survive the Supreme Court's holding in *Alleyne v. United States,* 570 U.S. 99, 107–08, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), that a fact that increases a mandatory minimum sentence is an "element" of the offense. *See* 570 U.S. 99, 107–08, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). In the case before us, the finding that Allen was a career offender increased his minimum sentence under the mandatory Guidelines from 235 months to 262 months and disqualified him from receiving an otherwise available downward departure.

At least one circuit has recognized an actual innocence claim where the petitioner contended that a prior conviction did not qualify as a predicate offense. In *United States v. Maybeck,* 23 F.3d 888, 890–91 (4th Cir. 1994), the sentencing court determined that Maybeck's prior conviction for burglary was a crime of violence based on a mischaracterization in his presentencing interview. In fact, his prior conviction was for third-degree burglary, not armed burglary. The Fourth Circuit concluded that "[t]here is no question ... Maybeck [wa]s actually innocent of being a career offender" because "Maybeck has only one prior felony conviction that was a crime of violence, and he has none that were controlled substance offenses." *Id.* at 892 (footnote omitted). We find this reasoning persuasive.

The dissent relies on language from *Bousley,* 523 U.S. at 623, 118 S.Ct. 1604,    **\*1190**   that actual innocence means more than "mere legal insufficiency." But consistent with *Bousley,* and our cases applying *Bousley,* a retroactive intervening change in the law may render a petitioner factually innocent of a predicate crime. The basis for the claim in *Bousley* was that intervening retroactive case law had defined "use" of a firearm differently than the definition given by the sentencing court at the time of petitioner's guilty plea. *See id.* at 616, 118 S.Ct. 1604. The Court instructed that on remand, the petitioner could establish actual innocence by showing that he did not make "use" of a firearm within the meaning of the statute of conviction. *Id.* at 623–24, 118 S.Ct. 1604. Petitioner could be factually innocent if, on the facts of the case, his conduct did not legally amount to "use" of a firearm. *See, e.g., Alaimalo v. United States,* 645 F.3d 1042, 1047 (9th Cir. 2011) (petitioner showed actual innocence where statute of conviction was subsequently interpreted not to reach petitioner's conduct).

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

We read *Marrero* as consistent with a claim of actual innocence in this case. In *Marrero*, petitioner's claim of actual innocence failed because his claim to actual innocence was based on a non-retroactive interpretation of the Guidelines, and he made no claim to factual innocence of the crimes of which he had been convicted. In this case, by contrast, Allen's claim of actual innocence is based on a retroactive change of law, which transformed his Connecticut marijuana conviction from a predicate crime into a non-predicate crime. In other words, Allen claims that his prior conviction is not a conviction for a predicate crime, that he is therefore actually innocent of a predicate crime, and that he is thus actually innocent of the mandatory sentencing enhancement. If Allen is correct under *Mathis* and *Descamps* that his Connecticut marijuana conviction is not a conviction for a controlled substance offense, he is "actually innocent of a noncapital sentence for the purpose of qualifying for the escape hatch." *Marrero*, 682 F.3d at 1193.

### B. Unobstructed Procedural Shot

**[5]** When deciding whether a petitioner has had an "unobstructed procedural shot," we consider "(1) whether the legal basis for petitioner's claim did not arise until after he had exhausted his direct appeal and first § 2255 motion; and (2) whether the law changed in any way relevant to petitioner's claim after that first § 2255 motion." *Harrison v. Ollison*, 519 F.3d 952, 960 (9th Cir. 2008) (internal quotation marks omitted). If an intervening court decision after a prisoner's direct appeal and first § 2255 motion "effect[s] a material change in the applicable law[,]" then the prisoner did not have an unobstructed procedural shot to present his claim. *Alaimalo*, 645 F.3d at 1047–48 (prisoner lacked unobstructed procedural shot where circuit precedent foreclosed his actual innocence claim when he brought his § 2255 motion); *see* *Stephens*, 464 F.3d at 898 (prisoner lacked unobstructed procedural shot where Supreme Court precedent foreclosed his actual innocence claim when he brought his § 2255 motion).

**[6]** Allen did not have an unobstructed procedural shot at presenting his claim of actual innocence because it was foreclosed by existing precedent at the time of his direct appeal and § 2255 motion. Under the law at the time of his § 2255 motion, his conviction under Connecticut law would have been analyzed under the modified categorical approach because the statute of conviction—Connecticut General Statute § 21a-277—would have been deemed divisible. *See* *United States v. Beardsley*, 691 F.3d 252, 265 (2d Cir. 2012) (statute was "not divisible into predicate and non-predicate offenses" because it did not list these offenses "in separate subsections or a disjunctive **\*1191** list"). Under that approach, Allen's claim would have failed.

Based on the Supreme Court's later decisions in *Mathis* and *Descamps*, Allen is now able to argue that (1) the categorical approach should apply to Connecticut General Statute § 21a-277, and (2) his conviction for marijuana possession is not a "controlled substance offense" under the categorical approach. *See* *United States v. Savage*, 542 F.3d 959, 965–66 (2d Cir. 2008) (definition of "sale" as used in § 21a-277 includes "mere offer[s]" to sell controlled substances, thereby criminalizing "more conduct than falls within the federal definition of a controlled substance offense"). The legal basis for this argument arose only after Allen had appealed and after he had filed his § 2255 motion.

Nor would a second or successive § 2255 motion be adequate to test the legality of Allen's detention. "A second or successive [2255] motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain ... (1) newly discovered evidence ... or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." § 2255(h). Both the Ninth Circuit and the Second Circuit have held that

the decisions in *Mathis* and *Descamps* do not meet the standard for a second or successive § 2255 motion because they interpreted federal statutes, not the Constitution. *See Arazola-Galea v. United States*, 876 F.3d 1257, 1259 (9th Cir. 2017); *Ezell v. United States*, 778 F.3d 762, 766 (9th Cir. 2015); *Washington v. United States*, 868 F.3d 64, 66 (2d Cir. 2017) (per curiam).

Because Allen's claim under *Mathis* and *Descamps* "did not become available until after the [Second] Circuit denied his § 2255 motion, and because that claim does not satisfy the criteria of § 2244 for a second or successive § 2255 motion, [Allen] has not had (and, indeed, will never get) an opportunity to present his ... claim in a § 2255 motion" that his prior convictions were not for predicate crimes under the standard in *Mathis* and *Descamps*. *Stephens*, 464 F.3d at 898. Thus, Allen has not had an unobstructed procedural shot at presenting his actual innocence claim.

## C. Retroactivity

**[7]** Our holding that Allen has made a cognizable claim of actual innocence, and that he did not have an unobstructed procedural shot at presenting that claim, resolves the question of statutory jurisdiction in this case. We take the opportunity to clarify that *Mathis* and *Descamps* apply retroactively when a court reviews a criminal judgment in the course of addressing a § 2241 petition or a first § 2255 motion.

**[8]** **[9]** New rules of criminal law do not always apply retroactively on collateral review of criminal judgments. *See Teague v. Lane*, 489 U.S. 288, 299, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). "A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) (internal quotation marks omitted). "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." *Welch v. United States*, ––– U.S. ––––, 136 S. Ct. 1257, 1264–65, 194 L.Ed.2d 387 (2016) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004)).

**[10]** Our dissenting colleague contends that neither *Mathis* nor *Descamps* announced a new rule at all. If this is so, there is no dispute about whether they apply retroactively. It is black-letter law that they do. Decisions that do not announce **\*1192** a new rule apply retroactively on collateral review whether substantive or procedural. *See Whorton*, 549 U.S. at 416, 127 S.Ct. 1173.

To the extent that *Mathis* and *Descamps* may be thought to have announced a new rule, we have no trouble concluding that the rule is one of substance rather than procedure. Like other decisions interpreting the reach of federal sentencing enhancements, the rule from *Mathis* and *Descamps* alters "the range of conduct ... that the law punishes" and not "only the procedures used to obtain the conviction." *Welch*, 136 S. Ct. at 1266. The Supreme Court in *Welch* expressly rejected the argument —an argument reiterated today by our dissenting colleague—that a new rule may not be deemed substantive merely "because it does not limit Congress' power" to punish certain conduct. *Id.* at 1267. We have previously recognized that decisions that alter the substantive reach of a federal statute apply retroactively in § 2241 proceedings under the escape hatch. *See, e.g., Alaimalo*, 645 F.3d 1042. The Supreme Court's decisions in *Mathis* and *Descamps* therefore will apply retroactively to a review of Allen's sentence on remand.

AR.03917

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

Conclusion

We hold that Allen has made a cognizable claim that he is "actually innocent of a noncapital sentence for purposes of qualifying for the escape hatch," and that he has not had an "unobstructed procedural shot at presenting the claim." He may therefore file a petition for habeas corpus under § 2241. We reverse the district court's dismissal of his § 2241 petition for lack of jurisdiction and remand for consideration of Allen's claim on the merits.

**REVERSED and REMANDED.**

CALLAHAN, Circuit Judge, dissenting:

Allen does not claim to be actually innocent of the crimes for which he was sentenced. Nor does Allen claim to be actually innocent of his prior convictions that, at the time of his sentencing, qualified him as a career offender under the Sentencing Guidelines. Rather, Allen claims that he is "actually innocent" of his career offender designation based on the intervening Supreme Court decisions in *Descamps v. United States*, 570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013), and *Mathis v. United States*, —— U.S. ——, 136 S. Ct. 2243, 195 L.Ed.2d 604 (2016). On that basis, he asserts that he may file a petition pursuant to 28 U.S.C. § 2241 under the escape hatch provision of 28 U.S.C. § 2255(e).

We squarely rejected a similar effort to expand the § 2255(e) escape hatch in *Marrero v. Ives*, 682 F.3d 1190 (9th Cir. 2012), and our holding in *Marrero* is binding on this three-judge panel. *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("[A] later three-judge panel considering a case that is controlled by the rule announced in an earlier panel's opinion has no choice but to apply the earlier-adopted rule; it may not any more disregard the earlier panel's opinion than it may disregard a ruling of the Supreme Court."). Thus, I dissent from the majority's erroneous conclusion that Allen raises a cognizable "actual innocence" claim for purposes of the escape hatch. [1] The majority's expansion **\*1193** of actual innocence jurisdiction is inconsistent with both Supreme Court and Ninth Circuit precedent. I would affirm the district court's dismissal of Allen's petition under 28 U.S.C. § 2241 for lack of jurisdiction.

I.

In general, the "exclusive procedural mechanism" by which a federal prisoner may challenge the legality of his detention is a habeas petition under 28 U.S.C. § 2255. *Ivy v. Pontesso*, 328 F.3d 1057, 1059 (9th Cir. 2003) (citation omitted). Restrictions on the availability of a § 2255 motion generally cannot be avoided through a petition under 28 U.S.C. § 2241. *Stephens v. Herrera*, 464 F.3d 895, 897 (9th Cir. 2006). The only exception to that rule—termed the § 2255(e) "escape hatch" or "savings clause"—permits a federal prisoner to "file a habeas corpus petition pursuant to § 2241 to contest the legality of a sentence where his remedy under § 2255 is 'inadequate or ineffective to test the legality of his detention.' " *Hernandez v. Campbell*, 204 F.3d 861, 864–65 (9th Cir. 2000) (per curiam) (quoting 28 U.S.C. § 2255(e)).

"Along with many of our sister circuits, we have held that a § 2241 petition is available under the 'escape hatch' of § 2255 when a petitioner (1) makes a claim of actual innocence, and (2) has not had an 'unobstructed procedural shot' at presenting

that claim." *Stephens,* 464 F.3d at 898 (quoting *Ivy,* 328 F.3d at 1060) (also citing several other circuit cases). In this circuit, a petitioner's claim of actual innocence for purposes of the escape hatch of § 2255 must meet the standard articulated by the Supreme Court in *Bousley v. United States,* 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998): "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Stephens,* 464 F.3d at 898 (quoting *Bousley,* 523 U.S. at 623, 118 S.Ct. 1604).

Under the *Bousley* standard, "[a]ctual innocence means factual innocence, not mere legal insufficiency." 523 U.S. at 623, 118 S.Ct. 1604. Accordingly, we held in *Marrero* that "the purely legal argument that a petitioner was wrongly classified as a career offender under the Sentencing Guidelines is not cognizable as a claim of actual innocence under the escape hatch." 682 F.3d at 1195. Allen's argument that he is "actually innocent" of being a career offender under the Sentencing Guidelines due to the intervening Supreme Court decisions in *Descamps* and *Mathis* is a "purely legal" claim that is essentially no different than the one we rejected in *Marrero.* As such, Allen fails to raise a cognizable actual innocence claim for purposes of the escape hatch, and the district court properly dismissed his § 2241 petition for lack of jurisdiction. This should be the end of the matter under our authority as a three-judge panel.

## II.

In spite of *Marrero*'s unequivocal holding, the majority makes several attempts to evade its reach, none of which are persuasive. The majority first contends that Allen's actual innocence claim is different from the claim we rejected in *Marrero* because "Marrero did not contend that he was innocent of the felonies that qualified as crimes of violence or controlled substance offenses" under the applicable career offender provision in the Sentencing Guidelines.

But Allen, too, does not claim to be actually innocent of any of his underlying predicate offenses, which, at the time of sentencing, qualified him as a career offender under the Sentencing Guidelines; nor does Allen otherwise challenge the validity of any of his predicate convictions. **\*1194** Rather, like Marrero, Allen claims that his predicate convictions no longer qualify him for the career offender designation due to an intervening change in law. Such a claim, like Marrero's, "is a purely legal claim that has nothing to do with factual innocence." *Marrero,* 682 F.3d at 1193. Put differently, whether Allen's prior convictions constitute "controlled substance offenses" to qualify him as a career offender under the Sentencing Guidelines is as much of a "purely legal" question as whether two of Marrero's prior convictions were "related" offenses for the purposes of qualifying for the same career offender designation under the Guidelines. That Allen dresses his claim in slightly more direct "actual innocence" terms does not hide the true nature of his legal argument.

The majority further attempts to distinguish *Marrero* on the ground that Allen's claim is based on retroactive Supreme Court case law, whereas Marrero's claim was based on a non-retroactive change in the Sentencing Guidelines. This distinction, however, does not place Allen's claim beyond the control of *Marrero.* Our ruling in *Marrero* was not based on any distinction between retroactive and non-retroactive changes in the law, or even on the merits of Marrero's claim. Rather, our conclusion that challenges to wrongful career offender designations are not claims of actual innocence was based entirely on the standard adopted in our circuit for actual innocence claims—which, consistent with the Supreme Court's position in *Bousley,* hinges on factual innocence, and not mere legal insufficiency. *See Marrero,* 682 F.3d at 1193 ("Whatever the merits of Petitioner's argument that he would not qualify as a career offender were he to be sentenced under the post-2007 Guidelines,

AR.03919

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

his claim is not one of actual innocence. 'In this circuit, a claim of actual innocence for purposes of the escape hatch of § 2255 is tested by the standard articulated by the Supreme Court in *Bousley* ....' ").

Under this standard, a retroactive change in the law that arguably undercuts the legal correctness of a petitioner's sentence, but does not render him factually innocent of the convictions underlying his sentence (or sentence enhancement), cannot serve as the basis for a cognizable actual innocence claim. A change in the law, even if retroactively applicable, generally cannot and does not change the facts of the past. Applied to Allen, the Supreme Court decisions in *Descamps* and *Mathis*, while retroactive in nature, do not undo his criminal acts on which his sentence was based. Whether Allen's prior convictions qualify him for a career offender enhancement under the Sentencing Guidelines is a legal matter that is unrelated to any question of Allen's factual innocence of his convictions, and thus does not create a cognizable claim of actual innocence for purposes of the escape hatch.

In fact, we rejected on *Marrero* grounds a near-identical claim to Allen's in *Dorise v. Matevousian*, 692 F. App'x 864, 865 (9th Cir. 2017), *cert. denied*, ––– U.S. ––––, 138 S. Ct. 1023, 200 L.Ed.2d 282 (2018).[2] There, Dorise claimed that he was "actually innocent" of his career offender designation because his two predicate robbery offenses no longer constituted "crimes of violence" under the Sentencing Guidelines based on the intervening Supreme Court decisions in *Johnson v. United States*, ––– U.S. ––––, 135 S. Ct. 2551, 192 L.Ed.2d 569 (2015), and *Welch v. United States*, ––– U.S. ––––, 136 S. Ct. 1257, 194 L.Ed.2d 387 (2016). Like Allen, Dorise alleged "actual innocence" on the ground that his predicate offenses no longer qualified him as a career offender due to a change in law triggered by new Supreme Court decisions *1195 with retroactive application. The panel in *Dorise* rejected the claim, concluding that

> Dorise's claim is not cognizable for the purpose of qualifying to bring a § 2241 petition under the escape hatch. Although presented as an actual innocence claim, Dorise's real argument is that he was incorrectly categorized as a career offender under U.S.S.G. § 4B1.1. As in *Marrero*, this claim is purely legal and "has nothing to do with factual innocence."

*Dorise*, 692 F. App'x at 865. Like Marrero and Dorise, Allen's real claim is that he was incorrectly categorized as a career offender under the Sentencing Guidelines, which is a "purely legal" claim that is not cognizable "for the purpose of qualifying to bring a § 2241 petition under the escape hatch." *Id.*

### III.

The majority's endeavor to reach the question left open in *Marrero*—which is, "whether a petitioner may ever be actually innocent of a noncapital sentence for the purpose of qualifying for the escape hatch"—is likewise misguided. 682 F.3d at 1193–94. In *Marrero*, we noted that other circuits "have recognized exceptions" to this general rule, and briefly summarized three general categories of exceptions, the second of which is the suggestion by some courts that "a petitioner may qualify for the escape hatch if he received a sentence for which he was statutorily ineligible." *Id.* at 1194. The majority suggests that this exception extends to Allen's claim—which *Marrero* did not endorse for our court, but merely recognized from a few extra-circuit cases—because his career offender designation "increased his minimum sentence under the mandatory Guidelines from 235 months to 262 months and disqualified him from receiving an otherwise available downward departure." As the majority admits, however, the cases defining this exception have limited it to claims that the petitioner received a sentence that exceeded the *statutory* maximum, rather than simply an incorrect sentencing range calculation under the Guidelines.[3] And here, Allen received a sentence for which he was eligible, regardless of whether his career offender designation was correct.[4]

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

The majority justifies its leap of logic by contending that this restriction of *Marrero*'s "second exception" turned largely on "the advisory nature of the post-*Booker* guidelines." Thus, according to the majority, this restriction does not apply to prisoners, like Allen, who were sentenced under the mandatory guidelines, particularly after *Alleyne v. United States,* 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). But *Alleyne* said nothing about the meaning of an "actual innocence" claim or the § 2255 escape hatch, and the majority's **\*1196** proposition lacks any direct legal support from *Marrero* or any other relevant cases. Furthermore, if the majority is correct, any challenge to a sentencing factor that increased the petitioner's minimum sentence under the pre-*Booker* guidelines—which is, essentially, any garden-variety challenge to a court's pre-*Booker* sentencing range calculation—would qualify as an "actual innocence" claim for purposes of the escape hatch. Under the majority's reasoning, an exception that the Supreme Court reserved for the "extraordinary case" seems not so extraordinary anymore. *See Schlup v. Delo,* 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.").


IV.

I also take exception to the majority's holding that "to the extent that *Mathis* and *Descamps* may be thought to have announced a new rule ... the rule is one of substance rather than procedure." First, there is no need to reach the question of the retroactivity of *Descamps* and *Mathis* under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), [5] in this case. Neither party raised this issue (either before us or below), and regardless of whether *Teague* applies here, Allen is still unable to meet the first requirement of an "actual innocence" claim for escape hatch jurisdiction.

Second, the majority's holding is wrong because *Descamps* and *Mathis* neither issued a "new rule" nor "one of substance rather than procedure." To start, the majority's holding that these Supreme Court decisions issued a "new rule" is directly contradicted by prior precedent, in which we have held otherwise. *See Ezell v. United States,* 778 F.3d 762, 766 (9th Cir. 2015) ("The Supreme Court did not announce a new rule in *Descamps*. *Descamps* did not impose a new obligation nor did it break new ground."); *Arazola-Galea v. United States,* 876 F.3d 1257, 1259 (9th Cir. 2017) ("We now join our sister circuits in definitively holding that *Mathis* did *not* establish a new rule of constitutional law."). Rather than issuing a new rule, both *Descamps* and *Mathis* simply clarified existing precedent regarding the application of the categorical and modified categorical approach under the Armed Career Criminal Act (ACCA). *See Descamps,* 570 U.S. at 260, 133 S.Ct. 2276 ("Our caselaw explaining the categorical approach and its 'modified' counterpart all but resolves this case."); *Mathis,* 136 S. Ct. at 2257 ("Our precedents make this a straightforward case. For more than 25 years, we have repeatedly made clear that application of ACCA involves, and involves only, comparing elements."); *United States v. Martinez-Lopez,* 864 F.3d 1034, 1039 (9th Cir. 2017) ("*Mathis* did not change the rule stated in *Descamps*; it only reiterated that the Supreme Court meant what it said when it **\*1197** instructed courts to compare elements."); *United States v. Quintero-Junco,* 754 F.3d 746, 751 (9th Cir. 2014) ("As the Supreme Court recently clarified in *Descamps,* courts may employ the modified categorical approach only when the statute of conviction is 'divisible ....' "). [6]

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

Furthermore, even if we were to assume that *Descamps* and *Mathis* announced a "new rule" for the purposes of *Teague*, the majority errs in characterizing the rule as substantive rather than procedural. A rule is "substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." *Schriro v. Summerlin,* 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Substantive rules include "decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Id.* at 351–52, 124 S.Ct. 2519 (citations omitted); *see also Saffle v. Parks,* 494 U.S. 484, 494, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) ("The [substantive rule] exception permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe, or addresses a 'substantive categorical guarante[e] accorded by the Constitution,' such as a rule 'prohibiting a certain category of punishment for a class of defendants because of their status or offense.' " (citations omitted)).

"Procedural rules, by contrast, 'regulate only the *manner of determining* the defendant's culpability,' " and "alter 'the range of permissible methods for determining whether a defendant's conduct is punishable.' " *Welch,* 136 S. Ct. at 1265 (quoting *Summerlin,* 542 U.S. at 353, 124 S.Ct. 2519 (emphasis in original)). "They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Id.*

*Descamps* and *Mathis* did not issue a substantive rule because these decisions did not modify the elements of an offense as defined in a criminal statute, and thereby "alter the range of conduct the statute punishes"—such as the rule recognized in *Bousley.* [7] *See Summerlin,* 542 U.S. at 354, 124 S.Ct. 2519 ("A decision that modifies the elements of an offense is normally substantive rather than procedural. New elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa."). Nor did *Descamps* and *Mathis* issue "constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish," *id.* at 352, 124 S.Ct. 2519, such as the Eighth Amendment rules recognized in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). [8] Instead, **\*1198** *Descamps* and *Mathis* merely instructed sentencing courts how to apply the "categorical approach" set forth in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), in determining whether a defendant's prior state conviction meets a predicate offense under the ACCA. [9] In that way, *Descamps* and *Mathis* "regulate[d] only the *manner of determining*" a defendant's qualification for a sentencing enhancement: specifically, by clarifying the circumstances under which a sentencing court could look to extra-statutory documents in its analysis (*i.e.,* the modified categorical approach) as opposed to only the statutory elements (*i.e.,* the categorical approach). *Welch,* 136 S. Ct. at 1265 (quoting *Summerlin,* 542 U.S. at 353, 124 S.Ct. 2519). Thus, like other procedural rules, the holdings in *Descamps* and *Mathis* did "not produce a class of persons convicted of conduct the law does not make criminal," but only altered "the range of permissible methods for determining" whether a defendant's predicate convictions qualify him for a sentencing enhancement. *Id.*

The majority cursorily asserts that *Descamps* and *Mathis* announced a substantive rule because, like "other decisions interpreting the reach of federal sentencing enhancements," they "altered 'the range of conduct ... that the law punishes,' " citing to *Welch* and *Alaimalo v. United States,* 645 F.3d 1042 (9th Cir. 2011). But neither of these cases support the majority's contention. In *Welch,* the Supreme Court held that its decision in *Johnson*—which ruled that the residual clause of the ACCA was unconstitutionally vague under due process principles—announced a new substantive rule. 136 S. Ct. at 1268.

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

The rule announced in *Johnson* was substantive, however, because it fell within the category of "constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Summerlin,* 542 U.S. at 352, 124 S.Ct. 2519. In contrast, *Descamps* and *Mathis* did not make any constitutional determinations whatsoever. *See* *Ezell,* 778 F.3d at 766 ("But even if the Supreme Court did announce a new rule in *Descamps,* that rule is not constitutional. *Descamps* is a statutory interpretation case ...."). *Alaimalo* is likewise inapposite here. The "new rule" considered in that case came from the Ninth Circuit decision in *United States v. Cabaccang,* 332 F.3d 622, 623 (9th Cir.2003) (en banc), which "held that transporting drugs from one location within the United States (California) to another (Guam) does not constitute importation within the meaning of 21 U.S.C. § 952(a)." **\*1199** *Alaimalo,* 645 F.3d at 1046. This rule from *Cabaccang* was substantive because it fell squarely within the category of "decisions that narrow the scope of a criminal statute by interpreting its terms." *Summerlin,* 542 U.S. at 351, 124 S.Ct. 2519. *Descamps* and *Mathis,* in contrast, did not narrow the substantive elements of a federal criminal statute or otherwise "place[ ] a class of private conduct beyond the power of the State to proscribe." *Parks,* 494 U.S. at 494, 110 S.Ct. 1257.

In short, the majority errs in concluding that, to the extent *Descamps* and *Mathis* announced a new rule under the *Teague* framework, it qualifies as a substantive one. But there is simply no need for the majority to reach this question where the issue has not been raised or contested by any party in this case, and it has no impact on Allen's inability to raise his claim in a § 2241 petition given his failure to allege a claim of actual innocence.

V.

A few final remarks. First, I do not deny the possibility that a petitioner might qualify for the escape hatch by raising a claim of actual innocence based on a new interpretation of the law. For instance, if Allen claimed that he was actually innocent of one of his predicate convictions that triggered his career offender designation because an intervening Supreme Court decision held that the conduct for which he was convicted was not actually criminal, we might have jurisdiction under the escape hatch. *See* *Alaimalo,* 645 F.3d at 1047 (holding that the petitioner "made a showing of actual innocence" because he was convicted of conduct that a later court decision held was "not a crime"); *see also* *Bousley,* 523 U.S. at 620, 118 S.Ct. 1604 ("[D]ecisions of this Court holding that a substantive federal criminal statute does not reach certain conduct ... necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal.' " (citations omitted)). But Allen presents no such case here. An actual innocence claim, even if derived in part from a new interpretation of the law, remains focused on the facts pertaining to the underlying conduct or conviction challenged. Whether Allen's predicate crimes qualify him for the career offender designation under the Sentencing Guidelines is a legal conclusion, not a fact of which Allen can be "actually innocent" for the purposes of the escape hatch. Because Allen's claim is controlled by *Marrero,* the district court properly dismissed Allen's § 2241 petition.

Second, I recognize that there is currently a circuit split on this issue. Some other circuits have allowed sentencing challenges similar to Allen's under the escape hatch. *See, e.g.,* *United States v. Wheeler,* 886 F.3d 415, 419 (4th Cir. 2018); *Hill v. Masters,* 836 F.3d 591 (6th Cir. 2016); *Brown v. Caraway,* 719 F.3d 583 (7th Cir. 2013); *United States v. Wheeler,* 886 F.3d 415, 419 (4th Cir. 2018); *Hill v. Masters,* 836 F.3d 591 (6th Cir. 2016). But these circuits, unlike ours, do not read § 2255(e) to require a petitioner to bring an actual innocence claim in order to be entitled to escape hatch jurisdiction. Thus,

20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

if we want to follow these circuits in their treatment of claims like Allen's, we would need to abandon the actual innocence requirement clearly set forth in our own controlling precedent—which we cannot do as a three-judge panel. The majority's use of the "actual innocence" rubric does not disguise its blunt and unpersuasive departure from both Ninth Circuit and Supreme Court precedent.

Finally, I fear the majority's expansion of actual innocence jurisdiction opens the proverbial floodgate for habeas petitions under the escape hatch. Numerous federal prisoners may be encouraged to file challenges under 28 U.S.C. § 2241 on the **\*1200** ground that some post-sentence development in the law—whether it be by legislation, judicial opinion, or a revision of the Sentencing Guidelines—has rendered them "actually innocent" of a sentencing enhancement that they received. Allowing them to do so undoubtedly circumvents and flouts Congress' intent in establishing the "exclusive procedural mechanism" in 28 U.S.C. § 2255.

I respectfully dissent.

**All Citations**

950 F.3d 1184, 20 Cal. Daily Op. Serv. 1530, 2020 Daily Journal D.A.R. 1451

## Footnotes

1   I agree with the majority that, even though Allen has been released and his sentence reduced to time served pursuant to § 404 of the First Step Act, the certified issue before us is not moot given Allen's current supervised release would.

    See *Mujahid v. Daniels*, 413 F.3d 991, 995 (9th Cir. 2005) ("The 'possibility' that the sentencing court would use its discretion to reduce a term of supervised release ... was enough to prevent the petition from being moot.").

2   An unpublished memorandum disposition may not be precedential, but its existence rebuts the assertion that this is an issue of first impression.

3   See *Gibbs v. United States*, 655 F.3d 473, 479 (6th Cir. 2011) ("A challenge to the sentencing court's guidelines calculation ... only challenges the legal process used to sentence a defendant and does not raise an argument that the defendant is ineligible for the sentence she received. The Supreme Court did not intend the 'actual innocence' exception to save such procedural claims."); *Gilbert v. United States*, 640 F.3d 1293, 1323 (11th Cir. 2011) (en banc) (declining to decide whether a petitioner could bring a § 2241 petition under the savings clause if "he was sentenced to a term of imprisonment exceeding the statutory maximum").

4   At the time of sentencing, Allen was sentenced to 262 months on his conspiracy count, which was the minimum sentence at the bottom of the Guideline range based on his career offender designation. If he had not been designated a career offender, his applicable Guideline range on the conspiracy count would have been 235 to 293 months—meaning, he would have still been eligible for the 262-month sentence he received. Accordingly, Allen would not qualify for relief under this exception.

5   In *Teague,* the Supreme Court laid out a framework for "determining whether a rule announced in one of [its] opinions should be applied retroactively to judgments in criminal cases that are already final on direct review." *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). "Under the *Teague* framework, an old rule applies both on direct and collateral review, while a new rule is generally applicable only to cases that are still on direct review." *Id.* A new rule is one that "breaks new ground," "imposes a new obligation on the States or the Federal Government,"

or was not "*dictated* by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. 1060 (emphasis in original).

6    Because *Descamps* and *Mathis* did not announce a new rule, Allen's *Descamps*/*Mathis* claim is not necessarily governed by the *Teague* doctrine. But whether or not *Teague* applies in this case still has no bearing on whether Allen can raise his claim in a § 2241 petition given that it fails to qualify as a claim of "actual innocence" for purposes of the § 2255 escape hatch.

7    In *Bousley,* the Court concluded that petitioner's *Bailey* claim was not barred by *Teague* because *Bailey* issued a substantive, rather than procedural, new rule. The new rule announced in *Bailey* was that a conviction for use of a firearm under § 924(c)(1) requires the government prove "active employment of the firearm," and not mere possession. *Bailey,* 516 U.S. at 144, 116 S.Ct. 501.

8    In *Penry,* the Supreme Court noted that its prior decisions holding "that the Eighth Amendment, as a substantive matter, prohibits imposing the death penalty on a certain class of defendants because of their status, or because of the nature of their offense," fell within the *Teague* "substantive rule" exception. 492 U.S. at 329–30, 109 S.Ct. 2934 (citations omitted).

9    The *Taylor* categorical approach requires sentencing courts to "look[ ] only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *Taylor,* 495 U.S. at 600, 110 S.Ct. 2143. If the statutory elements under which a defendant was convicted "are the same as, or narrower than, those of the generic offense," the prior conviction qualifies as a predicate offense under the ACCA. *Descamps,* 570 U.S. at 257, 133 S.Ct. 2276. "But if the statute sweeps more broadly than the generic crime, a conviction under that law cannot count as an ACCA predicate, even if the defendant actually committed the offense in its generic form." *Id.* at 261, 133 S.Ct. 2276. The Supreme Court has "approved a variant of this method—labeled (not very inventively) the 'modified categorical approach'—when a prior conviction is for violating a so-called 'divisible statute,' " which is, a statute that "sets out one or more elements of the offense in the alternative." *Id.* at 257, 133 S.Ct. 2276. Under the "modified categorical approach," sentencing courts may look beyond the statutory elements and "consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction." *Id.*

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

233 F.3d 1054
United States Court of Appeals,
Seventh Circuit.

George R. AMBATI and
Pranaykumar Ambati, Petitioners,

v.

Janet RENO, Attorney General, and Immigration
and Naturalization Service, Respondents.

No. 99–3211.
|
Submitted Aug. 9, 2000.
|
Decided Dec. 7, 2000.

**Synopsis**
Applicant, who was a native and citizen of India and a practicing Christian, appealed a decision of the Board of Immigration Appeals (BIA) denying him asylum. The Court of Appeals, Ripple, Circuit Judge, held that: (1) applicant did not suffer past persecution; (2) applicant failed to establish well-founded fear of future persecution; and (3) Immigration Judge (IJ) did not violate applicant's due process rights in denying him second continuance.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (16)

**[1]    Aliens, Immigration, and
Citizenship**  ⚖ Substantial evidence in general

An asylum determination of the Board of Immigration Appeals (BIA) is reviewed under the substantial evidence test. Immigration and Nationality Act, § 208, 8 U.S.C.A. § 1158.

1 Cases that cite this headnote

**[2]    Aliens, Immigration, and
Citizenship**  ⚖ Substantial evidence in general

Findings of the Board of Immigration Appeals (BIA) are disturbed in an asylum proceeding only if the record lacks substantial evidence to support its factual conclusions. Immigration and Nationality Act, § 208, 8 U.S.C.A. § 1158.

3 Cases that cite this headnote

**[3]    Aliens, Immigration, and
Citizenship**  ⚖ Reasonable fear of persecution or clear probability standard

**Aliens, Immigration, and
Citizenship**  ⚖ Past Persecution

**Aliens, Immigration, and
Citizenship**  ⚖ Well Founded Fear of Future Persecution

To prove that he or she is a refugee within the meaning of the asylum statute, an alien must come forward with evidence either of a well-founded fear of future persecution or of past persecution. Immigration and Nationality Act, §§ 101(a)(42)(A), 208, 8 U.S.C.A. §§ 1101(a)(42)(A), 1158.

4 Cases that cite this headnote

**[4]    Aliens, Immigration, and
Citizenship**  ⚖ Past persecution

If an alien establishes past persecution, there is a rebuttable presumption that he or she also has a well-founded fear of future persecution and therefore should be granted asylum. Immigration and Nationality Act, §§ 101(a)(42)(A), 208, 8 U.S.C.A. §§ 1101(a)(42)(A), 1158; 8 C.F.R. § 208(b).

9 Cases that cite this headnote

**[5]    Aliens, Immigration, and
Citizenship**  ⚖ Threats, Harassment, and Acts of Violence

Although the term "persecution," for purposes of asylum, includes actions less severe than threats to life or freedom, actions must rise above the level of mere harassment to constitute

persecution. Immigration and Nationality Act, §§ 101(a)(42)(A), 208, 8 U.S.C.A. §§ 1101(a) (42)(A), 1158.

8 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 🖛 Economic deprivation

**Aliens, Immigration, and Citizenship** 🖛 Weight and Sufficiency

Asylum applicant did not suffer past "persecution" in India based on his Christian beliefs; although he testified about loss of his family's economic livelihood due to physical attacks, thievery, and economic sabotage by Hindu neighbors, he identified no injury to himself, he was employed steadily in government job and regularly attended church while in India, and he offered no evidence of any adverse job actions against him or of physical attacks resulting from his religious beliefs. Immigration and Nationality Act, §§ 101(a)(42)(A), 208, 8 U.S.C.A. §§ 1101(a) (42)(A), 1158.

6 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** 🖛 Weight and Sufficiency

**Aliens, Immigration, and Citizenship** 🖛 Country conditions; official reports

Asylum applicant failed to establish well-founded fear of future persecution, based upon his Christian beliefs, upon being returned to India; although he testified to attacks on his family members and loss of family's livelihood, he had not been target of such attacks, he failed to present evidence that circumstances had changed in India such that he now would be at risk, his wife and daughter had voluntarily returned to India nearly five years ago and had remained there since without incident, and record suggested his unwillingness to return to India stemmed at least in part from fear of diminished earning capacity. Immigration and Nationality

Act, §§ 101(a)(42)(A), 208, 8 U.S.C.A. §§ 1101(a)(42)(A), 1158.

3 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship** 🖛 Subjective and Objective Tests

To have a well-founded fear of persecution, an asylum applicant must show both that he or she genuinely fears being persecuted and that his or her fear is objectively reasonable. Immigration and Nationality Act, §§ 101(a)(42)(A), 208, 8 U.S.C.A. §§ 1101(a)(42)(A), 1158.

**[9]    Aliens, Immigration, and Citizenship** 🖛 Economic deprivation

A diminished earning capacity upon returning to one's native country, standing alone, cannot support a grant of asylum. Immigration and Nationality Act, §§ 101(a)(42)(A), 208, 8 U.S.C.A. §§ 1101(a)(42)(A), 1158.

1 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** 🖛 Time for hearing; continuance

**Constitutional Law** 🖛 Asylum, refugees, and withholding of removal

Immigration Judge (IJ) did not violate asylum applicant's due process rights in denying him second continuance to allow newly hired counsel to prepare his case, after IJ had warned applicant additional continuance would not be granted; applicant retained counsel, offered evidence, and testified, IJ clearly explained applicant's rights in hearing and asked questions to clarify and elicit further testimony from him, hearing had been continued for seven months to allow him time to retain counsel, and applicant offered no evidence that outcome would have been different had he obtained continuance. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 208, 8 U.S.C.A. § 1158.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

5 Cases that cite this headnote

[11]    **Aliens, Immigration, and
Citizenship**   Civil proceedings in general

**Aliens, Immigration, and
Citizenship**   Assistance of counsel

Deportation hearings are civil proceedings,
and asylum-seekers, therefore, have no
Sixth Amendment right to counsel. U.S.C.A.
Const.Amend. 6; Immigration and Nationality
Act, § 208, 8 U.S.C.A. § 1158.

5 Cases that cite this headnote

[12]    **Constitutional Law**   Non-citizens; aliens

Asylum applicants are entitled to protection of
their due process rights. U.S.C.A. Const.Amend.
5; Immigration and Nationality Act, § 208, 8
U.S.C.A. § 1158.

1 Cases that cite this headnote

[13]    **Constitutional Law**   Admission and
exclusion; deportation

The Fifth Amendment's due process clause
mandates that a deportation hearing be
fundamentally fair. U.S.C.A. Const.Amend. 5.

3 Cases that cite this headnote

[14]    **Constitutional Law**   Asylum, refugees, and
withholding of removal

The Fifth Amendment's due process clause
mandates that an alien in asylum proceedings
should be afforded the opportunities to exercise
the right to counsel of the alien's choice at his or
her own expense, to reasonably present his or her
evidence, and to testify. U.S.C.A. Const.Amend.
5; Immigration and Nationality Act, §§ 208, 292,
8 U.S.C.A. §§ 1158, 1362.

1 Cases that cite this headnote

[15]    **Aliens, Immigration, and
Citizenship**   Effect of irregularities;
harmless or prejudicial error

**Constitutional Law**   Admission and
exclusion; deportation

To prevail on a due process claim regarding
a deportation hearing, an alien must produce
concrete evidence indicating that the due process
violation had the potential for affecting the
outcome of the hearing. U.S.C.A. Const.Amend.
5; Immigration and Nationality Act, § 208, 8
U.S.C.A. § 1158.

10 Cases that cite this headnote

[16]    **Aliens, Immigration, and
Citizenship**   Presentation and preservation
of questions at administrative level

Alien waived argument that Immigration Judge
(IJ) wrongly denied him voluntary departure
when he failed to appeal such denial to Board of
Immigration Appeals (BIA).

**Attorneys and Law Firms**

**\*1056** John W. Kearns (submitted), Chicago, IL, for
Petitioners.

Janet Reno, United States Attorney, Washington, DC, Samuel
Der-Yeghiayan, Immigration & Naturalization Service,
Chicago, IL, Quynh Vu, Department of Justice, Civil
Division, Immigration Litigation, Washington, DC, for
Respondent Reno.

Janet Reno, United States Attorney, Washington, DC, Samuel
Der-Yeghiayan, Immigration & Naturalization Service,
Chicago, IL, Nancy E. Friedman, Department of Justice,
Civil Division, Immigration Litigation, Washington, DC, for
Respondent Immigration and Naturalization Service.

Before POSNER, RIPPLE and WILLIAMS, Circuit Judges.

**Opinion**

RIPPLE, Circuit Judge.

George Reddy Ambati and his son, Pranaykumar Ambati ("Pranaykumar"), practicing Christians and natives and citizens of India, seek review of the decision of the Board of Immigration Appeals ("BIA") dismissing their appeals. The Ambatis contend that the BIA lacked substantial evidence for its determination that Mr. Ambati failed to demonstrate either past persecution or fear of future persecution on account of his religion. They further contend that the BIA erred in upholding the Immigration Judge's ("IJ") denial of their request for a continuance to allow their attorney time to prepare their case. They also challenge the Board's conclusion that Pranaykumar's appeal was untimely. **\*1057** For the reasons set forth in the following opinion, we affirm.

# I

## BACKGROUND

The Ambatis are practicing Christians of the Roman Catholic faith. Both Mr. Ambati and his wife come from Christian farming families who still reside in villages in India. They have two children—a son born in India and a daughter born in the United States. Although Mr. Ambati resides with his son in the United States, his wife and daughter reside in India. Mr. Ambati's parents and all six of his brothers and sisters live in India in close proximity to one another. Mr. Ambati supports his parents and siblings from his earnings in the United States.

### A. Mr. Ambati's Testimony before the Immigration Judge

Mr. Ambati completed both high school and college in India. He first arrived in the United States on a nonimmigrant student visa in 1974. He received a master's degree from Oklahoma State University and, in 1977, he returned to India.

Mr. Ambati remained in India until 1991. He lived and worked in Nagpur, a city located 200 miles from his native village where his parents still reside and operate a family farm. While in Nagpur, Mr. Ambati worked as an environmental scientist for the Indian government from 1977 to 1991. During this period, he experienced no difficulties in Nagpur as a result of being Christian and was able to attend church without "physical handling" by those "hostile" to Christians. R.114. However, he was afraid of physical harm during his monthly visits to his parents in their village.

Although Mr. Ambati confirmed that his parents still regularly attended church in their village, he stated that his family had been subject to "religious attacks" for the last ten years. R.115. Mr. Ambati explained that, as Christians, his family was neither liked nor accepted by their neighbors. In fact, on several unspecified occasions, his father and his brothers were attacked and beaten at night while returning from the fields. In addition, Hindu farm workers would steal from Mr. Ambati's father's farm and would prevent other Hindus from working there.

In 1991, Mr. Ambati again entered the United States on a nonimmigrant student visa, this time to pursue a doctorate degree at the Illinois Institute of Technology in Chicago. He explained that becoming a student was the only opportunity for him to leave a country he "very much wanted to ... leave." R.120. Soon after he arrived in Chicago, he experienced serious financial difficulties that caused him to leave school and eventually move with his wife and two children to New York City to work. Shortly after arriving in New York in 1992, he, his wife, and his son applied for asylum [1] because they were alarmed by news from Mr. Ambati's parents that they were having difficulty with their crops and that Mr. Ambati's father had been attacked and beaten one night while returning home from the fields.

### B. Administrative Proceedings

#### 1.

With the help of an attorney, Mr. Ambati filed a request for asylum in September 1992 and included his wife and Pranaykumar in his application. He alleged that, as Christians, he and his family had suffered persecution by Hindus. Responding to an order to show cause, Mr. Ambati appeared at a deportation hearing in October 1996 without an attorney. The Immigration Judge explained in detail the purpose of the hearing as well as Mr. Ambati's rights in the proceedings. The IJ then asked if **\*1058** the Ambatis planned to retain counsel to represent them. When Mr. Ambati replied that they did, the IJ continued the hearing until May 19, 1997. The IJ warned Mr. Ambati, however, that he would grant no further continuances and urged Mr. Ambati to tell his counsel that his hearing date would not be extended.

Mr. Ambati retained counsel two weeks before his scheduled hearing and informed her that he previously had retained an attorney in New York in 1992 to assist him in filing

his application for asylum. On May 19, Mr. Ambati and Pranaykumar appeared at the scheduled hearing, and their newly retained counsel requested a continuance. Counsel explained that she had overestimated the New York attorney's degree of involvement in the Ambatis' case; the case had not been prepared for the hearing, as she had believed, and thus she did not feel prepared to go forward. The IJ suggested to counsel that she could withdraw her notice of appearance and Mr. Ambati could proceed pro se. The IJ stated he would go forward with the hearing because not only had he granted Mr. Ambati a seven-month continuance, but also had explained clearly that no further continuances would be given. When asked by the IJ if he wanted the attorney to represent him, Mr. Ambati stated that he did. During the course of the hearing, the IJ specifically asked Mr. Ambati whether he would leave the United States if ordered to do so. Mr. Ambati replied, "I beg your Honor to help me to live here ... because of the serious problem which we are facing." [2] R.137–38.

After considering the evidence, [3] the IJ concluded that Mr. Ambati's request for asylum fell short of establishing either past persecution or a well-founded fear of future persecution. The IJ determined that there was no basis to find that Mr. Ambati suffered past persecution because Mr. Ambati freely practiced his religion, worked in a government position, and was never tortured, detained, or threatened on account of his Christian faith. Moreover, the IJ reasoned, the economic and physical hardships experienced by Mr. Ambati's father and brothers did not support Mr. Ambati's claim for asylum. Lastly, the IJ opined that Mr. Ambati's application for asylum was nothing more than a mechanism to prolong his stay in the United States. Consequently, the IJ denied Mr. Ambati both asylum and withholding of deportation and ordered him deported to India. The IJ refused to allow Mr. Ambati voluntary departure because he found that Mr. Ambati desired to remain in the United States "at all costs." R.71 (internal quotation marks omitted). As for Pranaykumar, the judge also denied him both asylum and withholding of deportation, but granted him voluntary departure. Finally, the judge terminated the proceedings regarding Mrs. Ambati because she had left the United States before the initial deportation hearing.

**\*1059 2.**

On appeal, the BIA affirmed the IJ's decision and adopted his findings and conclusions insofar as they regarded Mr. Ambati. In addition, the Board found that, because Mr. Ambati was allowed sufficient time to secure an attorney and prepare his case after the first continuance had been granted, the IJ did not abuse his discretion when he refused to grant Mr. Ambati another continuance. The BIA reasoned that Mr. Ambati received due process because he was on notice that the IJ was unwilling to grant further continuances and that Mr. Ambati was able to fully and fairly present his case. Lastly, the BIA determined that Pranaykumar's appeal was untimely because it had been filed well beyond the filing deadline of 30 days after the IJ's decision. Mr. Ambati now seeks review of the BIA's decision.

## II

### ANALYSIS

Mr. Ambati argues that the BIA erroneously concluded that his experiences in India, and those of his family members, did not amount to persecution. [4] In addition, he contends that the BIA erred in upholding the IJ's decision in light of his due process challenge. The IJ's refusal to grant a continuance, Mr. Ambati reasons, deprived him of his right to counsel and his right to present fully his case. Finally, Mr. Ambati challenges the BIA's unwillingness both to overturn the IJ's denial of voluntary departure for him and to consider the merits of Pranaykumar's appeal. We address each of these contentions in turn.

### A. Persecution

[1] [2] Mr. Ambati contends that the BIA erred in denying him asylum because the evidence established not only that Mr. Ambati and his family were harassed and abused, but also that the livelihood of Mr. Ambati's parents was impaired on account of the family's Christianity. We review the BIA's asylum determination under the substantial evidence test. *See* *Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir.2000) (quoting *Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir.1992)). We shall disturb the BIA's findings "only if the record lacks substantial evidence to support its factual conclusions." *Malek v. INS*, 198 F.3d 1016, 1021 (7th Cir.2000).

To be considered for asylum, Mr. Ambati was required to demonstrate that he qualifies as a refugee. Congress has given the Attorney General discretion to grant asylum if an applicant qualifies as a refugee under 8 U.S.C. §

1101(a)(42)(A). *See* 8 U.S.C. § 1158(b)(1);[5] *see also* Kaczmarczyk v. INS, 933 F.2d 588, 593 (7th Cir.1991). The Immigration and Nationality Act defines "refugee" as

any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion....

8 U.S.C. § 1101(a)(42)(A).

**[3]   [4]**   Therefore, to prove that he is a refugee within the meaning of the statute, Mr. Ambati must come forward with evidence **\*1060** either of a well-founded fear of future persecution or of past persecution. *See* Marquez v. INS, 105 F.3d 374, 378 (7th Cir.1997). If an alien establishes past persecution, there is a rebuttable presumption that he also has a well-founded fear of future persecution and therefore should be granted asylum. *See* 8 C.F.R. § 208(b); *see also* Asani v. INS, 154 F.3d 719, 722 (7th Cir.1998). Mr. Ambati bases his asylum claims on both past persecution and a well-founded fear of future persecution. We turn first to Mr. Ambati's claims of past persecution.

### 1.

**[5]   [6]**   This court has described persecution as "punishment or infliction of harm for political, religious, or other reasons." Tamas–Mercea v. Reno, 222 F.3d 417, 424 (7th Cir.2000) (internal quotation marks and citations omitted). Although the term "persecution" includes actions less severe than threats to life or freedom, "actions must rise above the level of mere harassment to constitute persecution." *Id.* (internal quotation marks and citations omitted). Mr. Ambati contends that he established past persecution through his testimony about the loss of his family's economic livelihood due to physical attacks, thievery, and economic sabotage by Hindu neighbors. Mr. Ambati, however, identified no injury to himself, to his wife, or to his children. Indeed, while in India, Mr. Ambati was employed steadily in a government job and regularly attended church. He offered no evidence of any adverse job actions against him, nor evidence of any physical attacks upon him resulting from his religious beliefs. Indeed, Mr.

Ambati's derivative persecution claims are indistinguishable from those we rejected in *Tamas–Mercea* and Bereza v. INS, 115 F.3d 468 (7th Cir.1997).[6]

### 2.

**[7]   [8]**   Mr. Ambati also has failed to establish that the BIA's determination with respect to fear of future persecution is unsupported by the record. "In order to be granted asylum on the basis of future persecution, Mr. [Ambati] must have a 'well-founded' fear of persecution." Tamas–Mercea, 222 F.3d at 426. To have a well-founded fear of persecution, "an applicant must show both that he genuinely fears being persecuted and that his fear is objectively reasonable." Bereza, 115 F.3d at 472 (citations omitted); *see also* Sofinet v. INS, 196 F.3d 742, 746 (7th Cir.1999). In support of his claim of future persecution, Mr. Ambati details the same events and actions that he put forward to support his claim of past persecution: the attacks on his family members and the loss of the family's livelihood. However, as set forth above, Mr. Ambati historically has not been the target of such attacks, and he has not come forward with evidence that circumstances **\*1061** have changed in India such that he now will be at risk. Furthermore, Mr. Ambati's wife and daughter voluntarily returned to India nearly five years ago and have remained there since without incident. The absence of evidence of harm to Mr. Ambati's immediate family undermines his claim of a well-founded fear of persecution. *See* Bhatt v. Reno, 172 F.3d 978, 982 (7th Cir.1999) (citing Lwin v. INS, 144 F.3d 505, 509 (7th Cir.1998)). Consequently, Mr. Ambati has not come forward with evidence that his fears are "objectively reasonable."[7]

**[9]**   In addition, the record suggests that Mr. Ambati's unwillingness to return to India stems, at least in part, from his fear of a diminished earning capacity, rather than a fear of physical danger to himself or to his family. Indeed, Mr. Ambati acknowledges that he "sought the refuge of safety and better opportunities to support his extended family by coming to the United States." Petitioner's Br. at 5. However, a diminished earning capacity, standing alone, cannot support a grant of asylum. *See* Borca, 77 F.3d at 216 (stating that economic harm rises to the level of persecution only if economic disadvantage is both substantial and deliberately

imposed on account of person's affiliation with particular group or set of beliefs).

In sum, the record supports the BIA's conclusion that Mr. Ambati failed to establish past persecution or a well-founded fear of future persecution on the basis of religion. Mr. Ambati's chief evidence of persecution concerns his family members, not himself. Furthermore, Mr. Ambati's stress and frustration over his family's economic situation and the antagonism they experience in their relations with their Hindu neighbors do not rise to the level of persecution for purposes of the statute. *See Skalak v. INS, 944 F.2d 364, 364–65 (7th Cir.1991)* ("mild harassment" by itself does not constitute persecution). Consequently, we will not disturb the BIA's asylum determination.

**B. Lack of Due Process**

[10]   Mr. Ambati also argues that the BIA erred in upholding the IJ's decision not to grant him a second continuance. He contends that the IJ's ruling violated his due process rights because the ruling prevented his counsel from fully presenting his claims. By not allowing his newly hired counsel additional time to prepare his case, Mr. Ambati continues, the IJ placed his counsel "in the position of a passenger on a runaway bus, helplessly watching [the IJ] shred her client" on various issues explored during the hearing. Petitioner's Br. at 12.

[11]   [12]   [13]   [14]   [15]   Deportation hearings are civil proceedings, and asylum-seekers, therefore, have no Sixth Amendment right to counsel. *See Mojsilovic v. INS, 156 F.3d 743, 748 (7th Cir.1998).* They are entitled, however, to protection of their due process rights. The Fifth Amendment's due process clause mandates that the deportation hearing be fundamentally fair. *See Castaneda–Suarez v. INS, 993 F.2d 142, 144 (7th Cir.1993).* Specifically, the alien should be afforded the following opportunities: to exercise his right to counsel of his choice at his own expense, *see 8 U.S.C. § 1362; Batanic v. INS, 12 F.3d 662, 667 (7th Cir.1993);* to reasonably present his evidence, *see Castillo–Perez v. INS, 212 F.3d 518, 526 (9th Cir.2000);* and to testify, *see Mojsilovic, 156 F.3d at 749.* To prevail on a due process claim, a petitioner must produce "concrete evidence" indicating that the due process violation "had the potential for affecting" the outcome of the hearing. *Kuciemba v. INS, 92 F.3d 496, 501 (7th Cir.1996)* (internal quotation marks and citations omitted).

The record suggests that Mr. Ambati was allowed a reasonable opportunity to fully and fairly present his case and, therefore, **\*1062** that he was not denied due process. First, Mr. Ambati retained counsel, offered evidence, and testified, answering questions posed by his counsel, by the IJ, and by opposing counsel. *See Jacinto v. INS, 208 F.3d 725, 728–29, 731–32 (9th Cir.2000)* (suggesting that questioning of alien by the IJ and by attorneys from both sides along with opportunity for alien to present "affirmative testimony" amounts to a reasonable opportunity for alien to present her evidence). Second, the IJ clearly explained to Mr. Ambati his rights in the hearing and several times asked questions to clarify and elicit further testimony from him. *See Michel v. INS, 206 F.3d 253, 259 (2d Cir.2000)* (finding alien not deprived of right to counsel because IJ went "well out of his way" to ensure that alien understood what was occurring in the hearing). Third, Mr. Ambati's hearing had been continued for seven months to allow him time to retain counsel and prepare his case. *See Ghajar v. INS, 652 F.2d 1347, 1348–49 (9th Cir.1981)* (finding petitioner had sufficient time to prepare and upholding denial of further continuance even though attorney was hired only a few days before the end of a one-month continuance). [8] Finally, Mr. Ambati offers no evidence that the outcome of the hearing would have been different had he obtained a continuance. He has not set forth any evidence that would have been presented or arguments that would have been made had his counsel been given additional time to prepare his case. Consequently, assuming a due process violation occurred, Mr. Ambati has not come forward with evidence that the violation affected the outcome of the hearing.

**C. Denial of Voluntary Departure**

[16]   Mr. Ambati next argues that the IJ wrongly denied him voluntary departure and that the BIA erred by not correcting this "arbitrary and capricious" decision. As noted by the BIA and confirmed by our review of the record, however, Mr. Ambati never appealed the denial of voluntary departure to the BIA. Thus, he has waived this argument by failing to present it first to the BIA. *See, e.g., Mojsilovic, 156 F.3d at 748* (stating that the court lacks jurisdiction to consider issues not first presented to the BIA).

**D. Timeliness of Appeal**

Finally, Mr. Ambati argues that the BIA erred when it dismissed Pranaykumar's appeal as untimely. He notes that the BIA plainly considered arguments raised by Pranaykumar's appeal when it decided Mr. Ambati's case. Although it is unclear why the BIA chose to acknowledge Pranaykumar's arguments in deciding Mr. Ambati's appeal, Pranaykumar's appeal was clearly untimely. His appeal was filed on August 4, 1997, nearly two months after the June 18, 1997 deadline for filing. *See* 8 C.F.R. § 3.38(b), (c) (2000). The Ambatis do not challenge the accuracy of these dates, and, consequently, we see no basis for reversing the BIA's decision.

**Conclusion**

For the foregoing reasons, the Ambatis' petition for review is denied, and the BIA's decision is affirmed.

AFFIRMED.

**All Citations**

233 F.3d 1054

**Footnotes**

1   The Ambatis' daughter is a United States citizen; she was born several months after Mr. Ambati began studying in Chicago.

2   Mr. Ambati did not specify the problem to which he referred.

3   Apart from his own testimony and the statements in the Ambatis' applications, Mr. Ambati submitted some documentary evidence: 1) two articles—a 1991 article from a Bombay newspaper reporting recent attacks on Christians by "toughs" due to a dispute over water, R.41, and an undated article from an unspecified source reporting an effort by a Hindu organization to bring Christians who were formerly Hindus back into the Hindu fold, R.40; and 2) an April 1996 affidavit from Mr. Ambati's father confirming attacks on family members and property, in which he stated that "Hindu families bore community feelings against the Christian families [,]" "our living here has become most miserable[,]" and that, because "our family is being harassed at our village[,] it would be better if the case is considered sympathetically for a green card." R.158–60. The INS submitted two documents from the United States Department of State: 1) a May 1997 advisory opinion noting both that there were no "serious outbreaks of anti-Christian violence in recent years" and that Christians "have a high level of acceptance in Indian society," R.153; and 2) a report on human rights practices in India for 1995 containing no mention of anti-Christian activities, R.145–51.

4   Pranaykumar's application for asylum is derivative of his father's; the outcome of Mr. Ambati's case determines the result of Pranaykumar's case. *See* 8 U.S.C. § 1158(b)(3) (2000); 8 C.F.R. § 207.7(a) (2000). Consequently, we address the substantive claims made in this appeal in terms of how they relate to Mr. Ambati. The timeliness of Pranaykumar's appeal, however, is addressed after the common, substantive issues.

5   8 U.S.C. § 1158(b)(1) states: "The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."

6   In those cases, sons of parents who had suffered persecution under former communist regimes argued that they should be granted asylum based on the persecution of their family members. We declined to recognize the derivative claims in those circumstances as meriting asylum. In *Tamas–Mercea*, for example, we stated:
If Mr. Tamas personally had suffered the type of harm inflicted on his family members, we would have little trouble concluding that he had suffered persecution within the meaning of the statute. Mr. Tamas testified that his father, grandfather, and uncle were arrested and beaten for opposing collectivization. As

well, his father was beaten in 1991, when he attempted to recover his family property. However, Mr. Tamas does not argue that he was subjected to this type of treatment. He, instead, claims a type of derivative persecution, that which arose from the physical abuse of his family members and the discrimination he personally endured because of his family's opposition to the communist regime.

...

Here, as in *Bereza*, it was Mr. Tamas' family members who suffered persecution as a result of their political beliefs. Although Mr. Tamas did suffer some economic harm and personal humiliation as a result of his family's activities, the circumstances here are not sufficient to establish his persecution for purposes of the statute.

 *Tamas–Mercea*, 222 F.3d at 424.

7    Because we find that Mr. Ambati's fears are not objectively reasonable, we need not reach the issue of whether Mr. Ambati's fears are genuine.

8    Mr. Ambati gave no reason why he was unable to retain counsel until two weeks before his hearing date.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.     AR.03934     9

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Asheville Jet, Inc. v. City of Asheville, N.C.App., January 19, 2010

202 F.3d 788
United States Court of Appeals,
Fifth Circuit.

AMERICAN AIRLINES, INCORPORATED; City
of Dallas, Texas; Southwest Airlines Company;
Love Field Citizens Action Committee, Petitioners,
v.
DEPARTMENT OF
TRANSPORTATION, Respondent.
The City of Fort Worth; Dallas–Fort Worth
International Airport Board, Petitioners,
v.
Department of Transportation, Respondent.

Nos. 99–60008, 99–60239.
|
Feb. 1, 2000.

**Synopsis**

Parties including two interstate air carriers, cities of Dallas and Fort Worth, and board of Dallas-Fort Worth regional airport petitioned for review of United States Department of Transportation (DOT) declaratory order resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas. Three additional interstate air carriers intervened. The Court of Appeals, Emilio M. Garza, Circuit Judge, held that: (1) order was not a substantive rule subject to notice and comment period under Administrative Procedure Act (APA); (2) DOT was not required to grant preclusive effect to rulings in pending, previously initiated state law suit involving some of same parties and issues; (3) ordinance adopted by Dallas and Fort Worth imposing restrictions on airline passenger service from Love Field airport was preempted by the Airline Deregulation Act (ADA); (4) DOT's interpretation of commuter airline exemption to Wright Amendment to International Air Transportation Competition Act to include reconfigured regional jets was reasonable; and (5) DOT ruling which allowed commuter planes to provide through service if they first flew to a point within Texas was reasonable interpretation of the Wright Amendment.

Affirmed.

**West Headnotes (30)**

**[1]**    **Administrative Law and
Procedure** 👈 Plain, literal, or clear meaning;
ambiguity or silence

In reviewing agency's interpretation of statute under Supreme Court's *Chevron* test, court first determines whether Congress directly spoke to the precise question in issue; if the intent of Congress is clear, then court, and the agency, must give effect to the unambiguously expressed intent of Congress.

3 Cases that cite this headnote

**[2]**    **Administrative Law and
Procedure** 👈 Permissible or reasonable
construction

In reviewing agency's interpretation of statute under Supreme Court's *Chevron* test, if Congress has not directly addressed the precise question in issue, court asks whether the agency's interpretation was based on a permissible construction of the statute.

2 Cases that cite this headnote

**[3]**    **Administrative Law and
Procedure** 👈 Permissible or reasonable
construction

As long as agency's construction of an ambiguous statute is permissible, it must be upheld under *Chevron* test.

**[4]**    **Administrative Law and
Procedure** 👈 Relationship of agency with
statute in general

When reviewing an agency's interpretation of a statute it is not charged with administering, court does not grant agency *Chevron* deference.

**[5]**   **Administrative Law and Procedure**   De novo review; plenary, free, or independent review

Court of Appeals reviews de novo an agency's interpretation and application of the Administrative Procedure Act (APA). 5 U.S.C.A. § 551 et.seq.

**[6]**   **Administrative Law and Procedure**   Procedural correctness or compliance in general

Court of Appeals exercises plenary review over whether agency complied with applicable procedures under the Administrative Procedure Act (APA). 5 U.S.C.A. § 551 et.seq.

1 Cases that cite this headnote

**[7]**   **Administrative Law and Procedure**   Adjudications

In the absence of a statute requiring an agency to conduct its adjudication "on the record after opportunity for agency hearing," an agency, consistent with the Administrative Procedure Act (APA), can define its own procedures for conducting an informal adjudication. 5 U.S.C.A. § 554(a).

2 Cases that cite this headnote

**[8]**   **Aviation**   Air carriers; airlines

United States Department of Transportation (DOT), in connection with its issuance of declaratory order resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, satisfied the minimum procedural notice requirements under the Administrative Procedure Act (APA); DOT issued an order in which it specified legal issues on which it would rule, allowed parties to submit comments on such issues, extended comment period at parties' request, and ruled on precisely the issues that it identified. 5 U.S.C.A. § 554(b).

1 Cases that cite this headnote

**[9]**   **Aviation**   Air carriers; airlines

Fact that United States Department of Transportation (DOT), in connection with issuance of declaratory order resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, neglected to notify parties that it would be considering factual issue of the effect of increased service at airport did not render notice insufficient under Administrative Procedure Act (APA); DOT provided notice of legal issues, which put parties on reasonable notice of increased service factual issue. 5 U.S.C.A. § 554(b).

**[10]**   **Aviation**   Notice and comment
**Aviation**   Air carriers; airlines

Declaratory order of United States Department of Transportation (DOT) resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, constituted adjudication rather than "rulemaking" subject to notice and comment provision of the Administrative Procedure Act (APA). 5 U.S.C.A. §§ 551(7), 553.

2 Cases that cite this headnote

**[11]**   **Administrative Law and Procedure**   Rulemaking, adjudication, or other mechanism

Agencies have discretion to choose between adjudication and rulemaking as a means of setting policy.

2 Cases that cite this headnote

**[12]**   **Administrative Law and Procedure**   Adjudication

In determining whether an agency action constituted adjudication or rulemaking, court looks to the product of the agency action.

1 Cases that cite this headnote

**[13]**  **Administrative Law and Procedure**  Adjudication

In determining whether an agency action constituted adjudication or rulemaking, court accords significant deference to the agency's characterization of its own action.

1 Cases that cite this headnote

**[14]**  **Aviation**  Air carriers; airlines

United States Department of Transportation (DOT), in connection with issuance of declaratory order resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, did not abuse its discretion by acting through an adjudicatory proceeding; order interpreted the rights of a small number of parties properly before it. 5 U.S.C.A. § 551 et seq.

**[15]**  **Aviation**  Air carriers; airlines

Fact that air carriers, who were intervening in petition for review of declaratory order of United States Department of Transportation (DOT) resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, had previously asked DOT to intervene in pending state and federal actions against them involving same issues did not amount to improper ex parte contacts under DOT regulations; contacts occurred before DOT instituted proceedings that led to order, and did not involve merits of proceedings. 14 C.F.R. § 300.2(a).

**[16]**  **Judgment**  Full Faith and Credit

Full faith and credit statute did not apply to invalidate declaratory order of United States Department of Transportation (DOT) resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, even though order was contrary to rulings in pending state

law suit involving some of same parties affected by order; statute applied only to courts, not to agencies. 28 U.S.C.A. § 1738.

**[17]**  **Judgment**  Full Faith and Credit

To determine whether common law preclusion should apply when state court proceedings precede federal agency proceedings, court considers whether the policies favoring full faith and credit, including repose and federalism concerns, outweigh the federal interests present.

3 Cases that cite this headnote

**[18]**  **Judgment**  Full Faith and Credit

United States Department of Transportation (DOT), in connection with its declaratory order resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, was not required to grant preclusive effect to rulings in pending state law suit involving some of same parties affected by order; parallel agency proceedings were already underway when state court issued its rulings, aviation regulation was area of federal concern, and applying full faith and credit principles would lead to inconsistent results.

1 Cases that cite this headnote

**[19]**  **Courts**  Federal-Court Review of State-Court Decisions; Rooker-Feldman Doctrine

*Rooker-Feldman* doctrine holds that inferior federal courts do not have the power to modify or reverse state court judgments.

2 Cases that cite this headnote

**[20]**  **Courts**  Restraining Particular Proceedings

Anti-Injunction Act did not apply to bar United States Department of Transportation (DOT) from issuing declaratory order resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, despite fact that pending state court case addressed some of the same issues and involved some of the same parties

affected by order; Act applied only to federal courts, not agencies. 28 U.S.C.A. § 2283.

8 Cases that cite this headnote

[21]    **Courts** 🔑 **Injunction by United States Court Against Proceedings in State Court**

If an injunction would be barred by the Anti-Injunction Act, such Act would also bar the issuance of a declaratory judgment that would have the same effect as an injunction. 28 U.S.C.A. § 2283.

2 Cases that cite this headnote

[22]    **Courts** 🔑 **Injunction by United States Court Against Proceedings in State Court**

Where an action is ongoing in a federal court, an agency's presence as a party, together with the federal interest the agency represents, can trump the application of the Anti-Injunction Act. 28 U.S.C.A. § 2283.

1 Cases that cite this headnote

[23]    **Environmental Law** 🔑 **Aviation**

United States Department of Transportation (DOT) was not required under National Environmental Policy Act (NEPA) to prepare an environmental impact statement (EIS) before issuing declaratory order resolving nature of air passenger services permissible from Love Field airport in Dallas, Texas, though order allowed for additional flights from Love Field; Congress, rather than DOT, enacted legislation permitting additional flights at Love Field, and DOT was merely implementing that legislation. National Environmental Policy Act of 1969, § 102, 42 U.S.C.A. § 4332.

1 Cases that cite this headnote

[24]    **Environmental Law** 🔑 **Major government action**

Agency decisions which do not entail the exercise of significant discretion do not require an Environmental Impact Statement (EIS) under

National Environmental Policy Act (NEPA). National Environmental Policy Act of 1969, § 102, 42 U.S.C.A. § 4332.

2 Cases that cite this headnote

[25]    **Aviation** 🔑 **Air carriers; airlines**

        **Aviation** 🔑 **Aviation facilities and services; airports**

        **Municipal Corporations** 🔑 **Political Status and Relations**

Ordinance adopted by cities of Dallas and Fort Worth imposing restrictions on airline passenger service from Love Field airport in Dallas, Texas was preempted by the Airline Deregulation Act (ADA), despite fact that Dallas was proprietor of airport; ordinance was not clearly aimed at advancing a local interest, such as alleviating noise, pollution, or congestion. 49 U.S.C.A. § 41713(b)(1, 3).

2 Cases that cite this headnote

[26]    **Aviation** 🔑 **Rates, routes, and services in general**

United States Department of Transportation's (DOT) interpretation of commuter airline exemption to Wright Amendment to International Air Transportation Competition Act, which Act generally banned interstate transportation from Love Field airport in Dallas, to include regional jets reconfigured to meet seating requirements was reasonable. International Air Transportation Competition Act of 1979, § 29, 94 Stat. 35.

[27]    **Aviation** 🔑 **Air carriers; airlines**

        **Aviation** 🔑 **Aviation facilities and services; airports**

        **Municipal Corporations** 🔑 **Political Status and Relations**

Agreements between interstate air carriers and board of Dallas-Fort Worth regional airport, in which carriers agreed to move their services to regional airport from Love Field airport

in Dallas, were preempted by the Airline Deregulation Act (ADA); agreements were entered into to effect ordinance adopted by cities of Dallas and Fort Worth imposing restrictions on airline passenger service from Love Field, and such ordinance was preempted by ADA. 49 U.S.C.A. § 41713(b)(1, 3).

1 Cases that cite this headnote

[28]  **Aviation**  🗝 Rates, routes, and services in general

United States Department of Transportation's (DOT) ruling that Wright Amendment to International Air Transportation Competition Act, which generally banned interstate service from Dallas' Love Field airport, permitted an airline to offer through service from Love Field to points outside the Love Field service area, as long as the airline used a city within Texas as a connecting point and a 56-passenger aircraft to get to that point, was reasonable. International Air Transportation Competition Act of 1979, § 29, 94 Stat. 35.

2 Cases that cite this headnote

[29]  **Administrative Law and Procedure**  🗝 Permissible or reasonable construction

**Administrative Law and Procedure**  🗝 Erroneous or unreasonable construction; conflict with statute

Under *Chevron*, an agency's interpretation of a statute is reasonable if it is not patently inconsistent with the statutory scheme.

2 Cases that cite this headnote

[30]  **Administrative Law and Procedure**  🗝 Permissible or reasonable construction

Court reviewing agency's interpretation of a statute under *Chevron* analysis need not agree with such interpretation in order to uphold it as reasonable.

## Attorneys and Law Firms

**\*792**  Michael Vance Powell (argued), Morris Harrell, Cynthia Keely Timms, Locke, Liddell & Sapp, Dallas, TX, Anne Hogan McNamara, Robert B. Work, American Airlines Inc., Fort Worth, TX, for American Airlines, Inc.

Thomas Lawrence Ray (argued), Paul Maitland Geier, Washington, DC, Marion L. Jetton, Robert B. Nicholson, U.S. Dept. of Justice, Antitrust Div., App. Section, Washington, DC, for Dept. of Transp.

Edward P. Faberman (argued), Ungaretti & Harris, Washington, DC, for Legend Airlines.

R. Bruce Keiner, Jr. (argued), Crowell & Moring, Washington, DC, Randall W. Wilson, Houston, TX, Emery Lawrence Vincent, Susman Godfrey, Dallas, TX, for Continental Express.

Robert W. Kneisley, Washington, DC, Michael Byrd, Dallas, TX, James F. Parker (argued), Southwest Airlines Co., Dallas, TX, for Southwest Airlines Co.

Lee L. Blackman, Richard Karl Simon, McDermott, Will & Emery, Los Angeles, CA, for Airports Council Intern., North America and American Ass'n of Airport Executives, Amicus Curiae.

James E. Coleman, Jr., Lyndon F. Bittle (argued), Carrington, Coleman, Sloman & Blumenthal, Dallas, TX, for City of Dallas, TX.

Alan W. Harris (argued), Andrews & Kurth, Dallas, TX, for Love Field Citizens Action Committee.

Dee J. Kelly, Sr. (argued), Brian Scott Stagner, Kelly, Hart & Hallman, Fort Worth, TX, for City of Fort Worth.

Jonathan Glen Kerr (argued), Joseph Wilson Spence, Steven James Graham, Shannon, Gracey, Ratliff & Miller, Fort Worth, TX, Michael J. Goldman, Bagileo, Silverberg & Gildman, LLP, Washington, DC, for Dallas-Fort Worth Intern. Airport Bd.

Petitions for Review of an Order of the U.S. Department of Transportation.

Before DUHÉ, BARKSDALE and EMILIO M. GARZA, Circuit Judges.

**Opinion**

**\*793** EMILIO M. GARZA, Circuit Judge:

This consolidated appeal involves respondent Department of Transportation's ("DOT's") interpretation of federal law governing airline service at Love Field airport. Petitioners Dallas–Fort Worth International Airport Board ("DFW Board"), City of Fort Worth ("Fort Worth"), American Airlines, Inc. ("American"), City of Dallas ("Dallas"), Southwest Airlines Company ("Southwest"), and Love Field Citizens Action Committee (the "Committee") petition for review of DOT's declaratory, procedural, and reconsideration orders. Legend Airlines, Inc. ("Legend"), Continental Airlines, Inc. ("Continental"), and Continental Express, Inc. ("Continental Express") have intervened. For the reasons set forth below, we affirm.

I

Prior to 1968, Dallas and Fort Worth operated independent and competing airports. One of Dallas's airports was Love Field. DOT's predecessor agency, the Civil Aeronautics Board ("CAB"), found that the competition between Dallas's and Fort Worth's airports was harmful. Accordingly, in 1964 CAB ordered the cities to build a jointly-operated airport that would serve as the region's primary airport. The cities responded by creating the DFW Board and by jointly adopting the 1968 Regional Airport Concurrent Bond Ordinance (the "Ordinance"). The Ordinance authorized the issuance of bonds to finance the Dallas–Fort Worth Airport ("DFW"). Of critical importance here is section 9.5 of the Ordinance, which contained the cities' agreement to "take such steps as may be necessary, appropriate and legally permissible ... to provide for the orderly, efficient and effective phase-out at Love Field, Redbird, GSIA and Meacham Field, of any and all Certificated Air Carrier Services, and to transfer such activities to the [DFW] Regional Airport."

The eight CAB-certified air carriers who were using the Dallas and Fort Worth airports first signed "letter agreements" and then later signed "use agreements" with the DFW Board, agreeing to move their air services to DFW as specified in the Ordinance. Southwest, which was solely running intrastate flights from Love Field and thus was exempt from CAB certification and pressure, refused to move to DFW and did not sign a use agreement. Litigation ensued over efforts to force Southwest from Love Field, terminating with

our statement that "Southwest Airlines Co. has a federally declared right to the continued use of and access to Love Field, so long as Love Field remains open." Southwest Airlines Co. v. Texas Int'l Airlines, Inc., 546 F.2d 84, 103 (5th Cir.1977).

Congress deregulated the airline industry in 1978. Shortly thereafter, Southwest applied for permission to provide interstate service between Love Field and New Orleans. CAB granted the application, concluding that it lacked power to deny it. This prompted Congress to intervene by enacting the Wright Amendment. See Pub.L. No. 96–192, § 29, 94 Stat. 35, 48–49 (1980). The Wright Amendment generally bans interstate service from Love Field. [1] **\*794** However, it provides certain exemptions from this ban, two of which are significant here: (1) the commuter airline exemption allows interstate "air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less"; and (2) the contiguous state exemption allows flights to and from Louisiana, Arkansas, Oklahoma, and New Mexico, if the flights do not "provide any through service or ticketing with another air carrier" and do not "offer for sale transportation to or from ... any point which is outside any such State." Id.

In 1996, Dalfort Aviation, the parent corporation of Legend, announced plans to take advantage of the commuter airline exemption by reconfiguring large commuter planes to hold only 56 seats. In response, the DOT General Counsel issued an opinion holding that the exemption applied only to aircraft originally configured to seat less than 57 passengers. The DOT opinion was mooted by the 1997 passage of the "Shelby Amendment" (collectively with the Wright Amendment, the "Love Field amendments"). The Shelby Amendment defined the term "passenger capacity of 56 passengers or less" in the commuter airline exemption to "include[ ] any aircraft, except aircraft exceeding gross aircraft weight of 300,000 pounds, reconfigured to accommodate 56 or fewer passengers if the total number of passenger seats installed on the aircraft does not exceed 56." See Pub.L. No. 105–66, § 337, 111 Stat. 1425, 1447 (1997). [2] The Shelby Amendment also expanded the contiguous states exemption to allow direct flights between Love Field and airports within Kansas, Alabama, and Mississippi. See id.

The parties in this case responded in various ways to the Shelby Amendment. Southwest began offering flights between **\*795** Love Field and Mississippi and Alabama.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

American Airlines, Inc. v. Department of Transp., 202 F.3d 788 (2000)

Legend has announced plans to offer longhaul service to states outside the Love Field service area using large aircraft reconfigured to have less than 57 seats. Continental Express plans to use regional jets with less than 57 seats to fly between Love Field and Cleveland. Continental Express and American offer intrastate flights from Love Field to their hubs, in Houston and Austin respectively.

In response, Fort Worth sued Dallas, the DFW Board, Legend, Continental, and Continental Express in Texas state court to block the proposed additional service from Love Field. The state court found that the Ordinance was not preempted by federal law and that Dallas was obligated by the Ordinance to preclude airlines from flying between Love Field and areas outside Texas and the four-state service area authorized by the Wright Amendment. The state action is currently on appeal, although the state appellate court has stayed the appeal pending our resolution of this case.

While the state court action was pending, Dallas filed a federal suit against DOT and Fort Worth requesting declaratory relief on essentially the same issues involved in the state action. The federal court has stayed that proceeding pending resolution of the instant case.

At the urging of several of the parties, and while both the federal and state actions were pending, DOT initiated the interpretative proceeding that is the subject of this petition for review. DOT issued an order informing the parties in this action [3] that it intended to rule on four "federal law issues" and allowing the parties an opportunity to submit comments on these issues. In response to the parties' initial comments, DOT issued a procedural order which, *inter alia,* granted the DFW Board's request to resolve a fifth legal issue and granted several parties' request for an extension of time in which to file comments.

DOT ultimately issued a "Declaratory Order" resolving the five questions it had set forth. Specifically, DOT ruled that:

> (i) the City of Fort Worth may not enforce any commitment by the City of Dallas ... to limit operations at Love Field authorized by federal law, and the proprietary powers of the City of Dallas do not allow it to restrict services at Love Field authorized by federal law; (ii) the

ability of the City of Dallas to limit the type of airline service operated at Love Field is preempted by the Wright and Shelby Amendments; (iii) any airline operating aircraft with a passenger capacity of no more than 56 passengers and a gross aircraft weight of no more than 300,000 pounds may operate service with any type of equipment and flights of any length from or to Love Field, notwithstanding any claim that such service violates any agreement between the Cities of Dallas and Fort Worth; (iv) the Dallas–Fort Worth International Airport Board may not enforce any contract provision that allegedly bars an airline from operating interstate airline service at another airport in the Dallas–Fort Worth metropolitan area; and (v) any airline may offer through service between Love Field and any other point to passengers using a flight between Love Field and another point within Texas operated under subsection (a) of the Wright Amendment, as amended by the Shelby Amendment....

Declaratory Order at 58. In an accompanying "Procedural Order," DOT rejected various procedural objections raised by the parties. DOT subsequently reaffirmed its rulings on reconsideration.

## II

[1] [2] [3]    We have jurisdiction to review DOT's declaratory order by this petition **\*796** for review. *See* 49 U.S.C. § 46110(e) ("[A] person disclosing a substantial interest in an order issued by the Secretary of Transportation ... may apply for review of the order by filing a petition for review in the ... court of appeals of the United States for the circuit in which the person resides or has its principal place of business."). The standard of review we apply differs according to the specific action DOT took. Our review of DOT's interpretation of the statutes it is charged with administering is governed by the two-step standard of

review established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We first determine whether Congress directly spoke to the precise question in issue. If the intent of Congress is clear, then we, and the agency, must give effect to the unambiguously expressed intent of Congress. *See id.* at 842–43, 104 S.Ct. at 2781. If Congress has not directly addressed the precise question in issue, we ask whether the agency's interpretation was "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. As long as the agency's construction of an ambiguous statute is permissible, it must be upheld. *See id.; Texas Oil & Gas Assoc. v. EPA,* 161 F.3d 923, 937–38 (5th Cir.1998).

**[4]** However, we only engage in the *Chevron* analysis when reviewing an agency's interpretation of a statute it was charged with administering. When reviewing DOT's interpretation of a statute it is not charged with administering, we do not grant DOT *Chevron* deference. *See American Forest and Paper Ass'n v. EPA,* 137 F.3d 291, 297 (5th Cir.1998) ("We do not, however, accord *Chevron* deference to EPA's interpretation of the ESA, because the ESA is not a statute that EPA is charged with administering.").

### III

Several of the parties challenge DOT's declaratory order on procedural grounds. They argue that: (a) DOT violated the Administrative Procedure Act ("APA"), (b) its order improperly contravened the earlier state court ruling on the same issues, and (c) DOT failed to comply with environmental requirements before issuing its order.

### A

**[5]** Fort Worth and the DFW Board argue that DOT's ruling violated the APA in various ways. *See* 5 U.S.C. § 706 (directing a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law"). Although DOT has already rejected some of these challenges in its earlier rulings, we review *de novo* DOT's interpretation and application of the APA. *See Professional Reactor*

*Operator Soc. v. U.S. Nuclear Regulatory Comm'n,* 939 F.2d 1047, 1051 (D.C.Cir.1991) ("The Supreme Court has indicated, however, that reviewing courts do not owe the same deference to an agency's interpretation of statutes that, like the APA, are outside the agency's particular expertise and special charge to administer.").

### 1

**[6]** Several parties contend that DOT failed to provide them with sufficient notice as required under § 554(b) or, alternatively, § 553, of the APA. We exercise plenary review over whether DOT complied with applicable procedures. *See Chemical Mfrs. Ass'n v. EPA,* 870 F.2d 177, 198 (5th Cir.1989).

**[7]** DOT issued its declaratory order after conducting an informal adjudication, pursuant to its authority under § 554(e) to "issue a declaratory ruling to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e); *see also Texas v. United States,* 866 F.2d 1546, 1555 (5th Cir.1989) ("The ICC's declaratory order was issued after an informal adjudication pursuant to the authority conferred by 5 U.S.C. § 554(e) to 'issue a declaratory ruling to **\*797** terminate a controversy or remove uncertainty.' Rendered in a specific factual context and resolving only the questions presented by [the petitions], it 'belongs to the genre of adjudicatory rulings.' ") (citations omitted). Several parties object to DOT's failure to adhere to the APA's notice requirements for formal adjudications. However, in the absence of a statute requiring an agency to conduct its adjudication "on the record after opportunity for agency hearing," 5 U.S.C. § 554(a), an agency can define its own procedures for conducting an informal adjudication. *See Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 655–56, 110 S.Ct. 2668, 2680–81, 110 L.Ed.2d 579 (1990).

**[8]** While the APA does not expressly require notice in informal adjudications, courts have inferred a requirement that there be "some sort of procedures for notice [and] comment ... as a necessary means of carrying out our responsibility for a thorough and searching review [of agency action]." *Independent U.S. Tanker Owners Committee v. Lewis,* 690 F.2d 908, 923 (D.C.Cir.1982). Here, DOT issued

an order in which it specified the legal issues on which it would rule, allowed the parties to submit comments on these issues, and extended the comment period at the request of several parties. It then ruled on precisely the issues that it identified. We find that DOT's actions satisfied the minimum procedural notice requirements. *See id.*

**[9]**    Fort Worth contends that DOT failed to comply with § 554(b) by neglecting to notify parties that DOT would also be considering a factual issue: the effect of increased service at Love Field on DFW Airport. This argument fails for two reasons. First, as noted, the formal notice requirement of § 554(b) does not apply to an informal adjudication. Second, the parties were effectively on notice of this issue since it was one that they could reasonably expect to arise given the issues of which DOT gave notice. *Cf. Boston Carrier Inc. v. Interstate Commerce Comm'n,* 746 F.2d 1555, 1559 (D.C.Cir.1984) ("The Commission is not burdened with the obligation to give every applicant a complete bill of particulars as to every allegation that carrier will confront."). The fact that Dallas, Continental Express, and Legend all submitted factual evidence to DOT should also have put Fort Worth on notice that it could submit its own factual evidence.

We also note the absence of anything in the record to indicate that Fort Worth possesses any information bearing on the impact of increased service at Love Field. Fort Worth has had three opportunities to present or identify such evidence—during the comment period, in its motion for reconsideration, and in its brief on appeal—but has not demonstrated that it possesses relevant factual information not considered by DOT. This continued failure to identify the evidence it would have submitted indicates that Fort Worth was not prejudiced by any inadequacy in DOT's notice. *See* 5 U.S.C. § 706 (in reviewing an agency determination, "due account shall be taken of the rule of prejudicial error"); *Friends of Iwo Jima v. Nat'l Capital Planning Comm'n,* 176 F.3d 768, 774 (4th Cir.1999) ("Moreover, the party who claims deficient notice bears the burden of proving that any such deficiency was prejudicial.").

**[10]    [11]    [12]    [13]    [14]**    We also reject the DFW Board's argument that DOT's order amounts to a substantive rule subject to the notice and comment provision of § 553. Agencies have discretion to choose between adjudication and rulemaking as a means of setting policy. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,* 416 U.S. 267,

294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *Mobil Exploration and Producing North America, Inc. v. FERC,* 881 F.2d 193, 198 (5th Cir.1989) (citing *Bell Aerospace* ). In determining whether an agency action constituted adjudication or rulemaking, we look to the product of the agency action. We also accord significant deference to an agency's characterization of its own action. *See* **\*798** *British Caledonian Airways, Ltd. v. Civil Aeronautics Bd.,* 584 F.2d 982, 992 (D.C.Cir.1978) ("In the present case we have, moreover, the Board's own assertion that its order is purely interpretive, and this contention in itself is entitled to a significant degree of credence.... While declaratory orders differ in some respects from interpretive rules, the same rationale should apply equally to an agency's characterization of one of its rulings as a declaratory order."). Since the APA defines "adjudication" as the "agency process for formulating an order," 5 U.S.C. § 551(7), and DOT classifies its ruling as a declaratory order, we find that the agency engaged in adjudication rather than rulemaking. Furthermore, because DOT's order interpreted the rights of a small number of parties properly before it, DOT did not abuse its discretion by acting through an adjudicatory proceeding. *See British Caledonian Airways,* 584 F.2d at 992–94; *Mobil Exploration,* 881 F.2d at 199 (finding no abuse of discretion where, *inter alia,* an agency proceeded by adjudication to resolve an issue affecting a small number of parties).

### 2

**[15]**    Fort Worth, joined by American, also argues that it was deprived of its right to a fair agency determination because of *ex parte* contacts between Continental Express, Legend, and DOT. Fort Worth cites specific instances when Continental Express and Legend officials contacted DOT about the pending state and federal court actions and asked DOT to intervene in these actions. The officials suggested specific actions which DOT could take and strongly advocated for DOT's intervention, including by characterizing the state court proceedings in unfavorable terms. DOT responded at one point with a written letter answering four questions posed by Continental. DOT and Legend do not dispute that the contacts took place, but they both argue that the contacts were proper and did not bias DOT's final decision.

DOT regulations prohibit certain *ex parte* contacts between agency personnel and interested parties.[4] *See* 14 C.F.R. § 300.2(a). Most of the contacts here fall outside these

regulations because they occurred before DOT instituted its interpretation proceeding. *See* 14 C.F.R. § 300.2(a) ( "[T]here shall be no substantive communication in either direction between any concerned DOT employee and any interested person outside DOT, concerning a *public proceeding,* until after final disposition of the proceeding.") (emphasis added); *id.* § 300.2(b)(4)(v) (defining a public proceeding as a "proceeding initiated by a docket filing, other than a petition for generally applicable rulemaking, *after the filing in the docket of an identifiable written opposition to the initiating document* ") (emphasis added). Additionally, most of the contacts, including those which occurred after DOT initiated its proceeding, did not involve the merits of the proceedings but rather were permissible requests to intervene in the state and federal action. *See* Texas, 866 F.2d at 1550 (finding that an individual's request for the Interstate Commerce Commission to intervene in a pending state action was not an *ex parte* communication because it did not involve the merits of the case).

### B

The posture of the case presents more serious procedural concerns. DOT and the state court issued contrary rulings on some of the same issues in proceedings involving some of the same parties. [5]

**\*799** Consequently, Fort Worth, the DFW Board, and American (collectively "Fort Worth petitioners") ask us to reverse DOT's action because (1) DOT violated the full faith and credit statute, 28 U.S.C. § 1738, by not granting preclusive effect to the prior state court ruling, and (2) DOT violated the Anti–Injunction Act and corresponding common law principles of federalism by issuing a declaratory order affecting a case currently pending before a state court. DOT rejected these arguments in its earlier rulings, but we do not defer to DOT's ruling on these issues. *See* American Forest and Paper Ass'n, 137 F.3d at 297.

### 1

**[16]** The full faith and credit statute, 28 U.S.C. § 1738, generally requires federal courts to grant preclusive effect to state court judgments: "[t]he records and judicial proceedings of any court of any ... State .... shall have the same full faith and credit in every court within the United States ... as they

have by law or usage in the courts of such State ... from which they are taken." *Id.* The plain language of this section establishes that it does not apply here: § 1738 applies only to "every *court* within the United States," and DOT is an agency, not a "court." *Id.* (emphasis added). The only other circuit to address fully this issue agrees with this reading of § 1738. [6]

*See* NLRB v. Yellow Freight Systems, Inc., 930 F.2d 316, 320 (3d Cir.1991) (finding that the NLRB, by virtue of its status as an agency rather than a court, was not required to give full faith and credit to an earlier state court judgment); *cf.* Consolidated Oil & Gas, Inc. v. FERC, 806 F.2d 275, 280 n. 5 (D.C.Cir.1986) ("We agree with the FERC, though, that '[t]he fact that the state court ruled on the same issue, regardless whether its ruling agreed with the Commission's ruling, does not **\*800** affect the Commission's authority to determine its own jurisdiction.' ").

The Supreme Court adopted this plain reading of § 1738 when presented with the question of whether a federal court must accord full faith and credit to an unreviewed state agency proceeding. *See* University of Tennessee v. Elliott, 478 U.S. 788, 794, 106 S.Ct. 3220, 3224, 92 L.Ed.2d 635 (1986). Reading § 1738's references to "courts" as not including "agencies," the *Elliott* court concluded simply that " § 1738 governs the preclusive effect to be given the judgments and records of state courts, and is not applicable to the unreviewed state administrative factfinding at issue in this case." *Id.* at 794, 106 S.Ct. at 3224.

**[17]** Finding that § 1738 does not apply to agencies does not end our inquiry, however, as courts "have frequently fashioned federal common-law rules of preclusion in the absence of a governing statute." *Id.* at 794, 106 S.Ct. at 3224. The Supreme Court fashioned such a rule in *Elliott,* requiring federal courts to grant preclusive effect to findings of fact by state agencies in most subsequent federal actions. *See* id. at 796–99, 106 S.Ct. at 3224–26 (holding also that no preclusive effect should be given to state administrative agency factfinding in Title VII cases). To determine whether common law preclusion should apply here, we consider whether the policies favoring full faith and credit, including repose and federalism concerns, *see generally* Allen v. McCurry, 449 U.S. 90, 95–96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) ("[R]es judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state

and federal courts that has been recognized as a bulwark of the federal system."), outweigh the federal interests present here, *see* 📄 *Midgett,* 603 F.2d at 845 ("A judgment or decree of a state court whose effect would restrain the exercise of sovereign power of the United States by imposing requirements that are contrary to important and established federal policy would not be given effect in a federal court."); *cf.* 📄 *Yellow Freight,* 930 F.2d at 320 (discussing policy reasons why an agency should not be bound by § 1738). *See generally American Mannex Corp. v. Rozands,* 462 F.2d 688, 690 (5th Cir.1972) (suggesting, in *dicta,* that § 1738 can be trumped by "well-defined [competing] federal policies"); 18 Charles Alan Wright, *et al., Federal Practice and Procedure* § 4469, at 662–63 (1981) ("In various settings, federal courts have found that vital federal interests warrant rejection of the res judicata rules that state courts would apply to their own judgments.").

 **[18]**   Applied here, the competing policy considerations weigh against requiring DOT to grant preclusive effect to the state court proceeding. [7] *Cf.* 📄 *Yellow Freight,* 930 F.2d at 320–22 (holding that the NLRB was not bound by an earlier arbitrator's factfinding, even though the arbitrator's ruling was affirmed by a state court, because essential evidence was not presented to the arbitrator). First, the importance of repose here, while not insubstantial, is limited by the posture of this case. At the time the state court issued its ruling, parallel agency proceedings were already underway.

Second, this case involves aviation regulation, an area where federal concerns are preeminent and where DOT is charged with representing those concerns. *See*  **\*801** *Northwest Airlines, Inc. v. County of Kent,* 510 U.S. 355, 366–67, 114 S.Ct. 855, 863, 127 L.Ed.2d 183 (1994) ("The Secretary of Transportation is charged with administering the federal aviation laws...."); 📄 *Northwest Airlines v. Minnesota,* 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283 (1944) (Jackson, J., concurring) ("Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive."), *quoted in* 📄 *City of Burbank v. Lockheed Air Terminal Inc.,* 411 U.S. 624, 633–34, 93 S.Ct. 1854, 1860, 36 L.Ed.2d 547 (1973); 49 U.S.C. § 46101(a)(2) (granting the Secretary of Transportation discretion to "conduct an investigation ... about ... any question that may arise under this part") Additionally, this case involves the operation of flights from Love Field, a matter on which Congress has twice specifically legislated.

DOT's interpretive order is the first time that DOT, the agency specifically charged with administering the Wright Amendment, has interpreted the Shelby Amendment. *See* 📄 *Cramer v. Skinner,* 931 F.2d 1020, 1024 (5th Cir.1991) (noting that "[t]he individual defendants in their official capacity, DOT, and DOT's Office of Aviation Analysis enforce the [Wright] amendment"); *State of Kansas v. United States,* 16 F.3d 436, 438 (D.C.Cir.1994) (same). To allow the state court effectively to foreclose the administering agency from further consideration of the Shelby Amendment as to the parties which appeared before the state court would trump the key federal interests that motivated Congress to create DOT and give it authority over these laws. [8]

Finally, applying full faith and credit principles to DOT in this case would lead to inconsistent results. *Cf.* 📄 *Access Telecommunications v. Southwestern Bell Tel. Co.,* 137 F.3d 605, 608 (8th Cir.1998) (noting that the primary jurisdiction doctrine, under which courts refer matters to agencies when the matters are within agency jurisdiction, is motivated in part by the desire "to promote uniformity and consistency within the particular field of regulation"). Some of the parties before DOT are litigating these issues for the first time. Forcing DOT to grant preclusive effect to the state court ruling would lead to inconsistent application of the Shelby Amendment to the parties that did not appear before the state court.

 **[19]**   In sum, because of the important federal interests here, we decline to hold that common law preclusion doctrines apply in this case. Instead, DOT properly declined to give preclusive effect to the state court judgment. [9]

### *802 2

 **[20]**   **[21]**   The Fort Worth Petitioners also argue that DOT's actions violated the Anti–Injunction Act, 28 U.S.C. § 2283, which provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. We "follow the weight of authority in holding that [i]f an injunction would be barred by § 2283, this should also bar the issuance of a declaratory judgment that would have the same effect as an injunction." 📄 *Texas Employers' Ins. Ass'n v. Jackson,* 862 F.2d 491, 506 (5th Cir.1988) (*en banc* ) (quotation omitted) (alteration

in original); *see also* Travelers Ins. Co. v. Louisiana Farm Bureau Fed'n, Inc., 996 F.2d 774, 776 (5th Cir.1993) ("[T]he district court may not consider the merits of the declaratory judgment action when 1) a declaratory defendant has previously filed a cause of action in state court against the declaratory plaintiff, 2) the state case involves the same issues as those involved in the federal case, *and* 3) the district court is prohibited from enjoining the state proceedings under the Anti–Injunction Act.") (emphasis in original).

**[22]** As a federal agency, DOT's proceedings are exempt from the terms of § 2283, which applies only to proceedings in a "court of the United States." 28 U.S.C. § 2283; *see also id.* § 451 ("As used in this title [,] [t]he term 'court of the United States' includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of International Trade and any court created by Act of Congress the judges of which are entitled to hold office during good behavior."). Further, even where an action is ongoing in a "court of the United States," an agency's presence as a party, together with the federal interest the agency represents, can trump the application of § 2283. *See* Mitchum v. Foster, 407 U.S. 225, 235–36, 92 S.Ct. 2151, 2158–59, 32 L.Ed.2d 705 (1972) ("[A] third exception [to § 2283], more recently developed permits a federal injunction of state court proceedings when the plaintiff in the federal court is the United States itself, or a federal agency asserting 'superior federal interests.' "); Texas v. United States, 837 F.2d 184, 186 (5th Cir.1988) ("Moreover, because a federal agency seeks the injunction, the ICC's motion is not directly precluded by the strictly enforced rule of the Anti–Injunction Act, 28 U.S.C. § 2283."); United States v. Lemaire, 826 F.2d 387, 388 n. 2 (5th Cir.1987) ("The Act does not prevent the United States, or one of its agencies, from acting to protect a federal interest."). Thus, § 2283 does not restrict our ability to review the agency's decision.

Fort Worth's authority to the contrary is unavailing. The case before us is clearly distinguishable from United Credit Bureau of America, Inc. v. NLRB, 454 U.S. 994, 102 S.Ct. 539, 70 L.Ed.2d 404 (1981) (Rehnquist, J., dissenting from denial of certiorari), where then-Justice Rehnquist dissented from the denial of certiorari to argue that "the concerns of federalism and comity comprehended by the Anti–Injunction Act should ... apply to the NLRB." Id. at 997–98, 102 S.Ct. at 541. [10] In *United Credit,* the NLRB ordered a party

to dismiss a state court action. It did this without "consider [ing] whether the state-court proceeding interfered with its ability to consider or dispose of [the agency petitioner's] charges." United Credit, 454 U.S. at 998, 102 S.Ct. at 541 (noting that the state court had not yet acted). Here, the state court action, at least at the trial level, was completed, thus lessening DOT's intrusion and strengthening its reasons for issuing its own interpretation of the legal issues. **\*803** Also, DOT's interest here is not its interest in resolving an individual petitioner's claim, as in *United Credit,* but rather its interest in avoiding piecemeal application of a federal aviation statute.

Additionally, we do not believe that DOT violated general principles of federalism by issuing its ruling. Although the Fort Worth Petitioners correctly note that state courts are competent to resolve matters of federal law, this does not prevent federal agencies from acting within their authority to protect federal interests. Accordingly, the cases that the Fort Worth Petitioners cite in support of their federalism arguments are clearly distinguishable. *See, e.g.,* Giles v. NYLCare Health Plans, Inc., 172 F.3d 332, 339 (5th Cir.1999) (holding that a district court properly remanded a state law claim after dismissing federal claims, even though one of the state law claims involved a preemption defense, because "state courts, being of equal dignity with federal courts, are equally competent to address that potential defense").

**[23]** As a final procedural objection, the Committee argues that DOT improperly ruled without first preparing an environmental impact statement ("EIS"). The National Environmental Policy Act ("NEPA") directs "all agencies of the Federal Government ... [to] include [an EIS] in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2). DOT found that it did not need to prepare an EIS, but because it is not charged with administering NEPA, its decision to not prepare an EIS is not entitled to deference. *See* American Forest and Paper Ass'n, 137 F.3d at 297.

**[24]** The Committee argues that DOT's "decision" to allow increased flights constitutes a "major Federal action" under NEPA. We disagree. Agency decisions which "do not entail the exercise of significant discretion" do not require an EIS. Atlanta Coalition on Transp. Crisis, Inc. v. Atlanta

*Regional Comm'n,* 599 F.2d 1333, 1344–45 (5th Cir.1979). By enacting the Shelby Amendment, Congress, not DOT, made the decision to allow additional flights at Love Field. DOT merely issued an interpretation of federal law that it was required to adopt under the relevant statutes.[11] *See* *Sugarloaf Citizens Ass'n v. FERC,* 959 F.2d 508, 513 (4th Cir.1992) ("Other Circuits have held that when an agency has no discretion to consider environmental values implementing a statutory requirement, its actions are ministerial and not subject to NEPA."); *Goos v. ICC,* 911 F.2d 1283, 1296 (8th Cir.1990) ("Because the ICC has not been granted any discretion under section 1247(d) to base its issuance of an NITU or CITU on environmental consequences, we agree that it would make little sense to force the ICC to consider factors which cannot affect its decision...."); *Milo Community Hospital v. Weinberger,* 525 F.2d 144, 147 (1st Cir.1975) (finding that no EIS was necessary where "consideration of the factors that the appellant has characterized as 'environmental considerations' could not have **\*804** changed the Secretary's decision").[12]

### IV

The Declaratory Order stated that DOT intended to rule on four "federal law issues." DOT's subsequent Procedural Order added a fifth legal issue to the agency's docket. We review each of DOT's rulings in turn.

### A

We first turn to DOT's ruling that the preemption provision of the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1), preempted Dallas's and Fort Worth's obligations under the Ordinance. In reaching this decision, DOT also determined that Dallas's rights as the proprietor of Love Field did not permit it to bar airlines from operating the services authorized under the Shelby Amendment. On appeal, the Fort Worth Petitioners argue that the power to restrict services at Love Field falls within Dallas's rights as proprietor of the airport. Thus, they argue, Dallas has an existing contractual obligation to restrict service at Love Field so as to block airlines from operating the services permitted under the Shelby Amendment.

### 1

The ADA includes an express preemption provision, § 41713(b)(1), which generally prohibits states from enacting or enforcing a law or regulation "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). At the same time, the ADA reserves the state's authority to carry out its "proprietary powers and rights." 49 U.S.C. § 41713(b)(3) (hereinafter, the "proprietary powers exception").

The proper standard of review to apply to DOT's preemption determination is the subject of extensive debate and briefing among the parties. It is also an issue of first impression before us. The Fort Worth Petitioners contend that DOT's interpretation of the proprietary powers exception should be afforded no deference because DOT lacks both the authority and the expertise to interpret this section of the ADA. DOT, Dallas, and Continental Express argue that DOT's general authority to administer the ADA inherently includes the power to administer the statute's preemption provision. Consequently, they argue for deferential review of DOT's preemption determination under *Chevron.*

The Fort Worth Petitioners present several strong arguments in favor of *de novo* review. A preemption determination does indeed involve legal determinations, which are arguably more within the expertise of the courts. *See* *Colorado Public Utilities Comm'n v. Harmon,* 951 F.2d 1571 (10th Cir.1991) (adopting a *de novo* standard of review because "[a] preemption determination involves matters of law—an area more within the expertise of courts than within the expertise of the Secretary of Transportation"). In reaching its decision, DOT interpreted existing case law, a role more typically— and perhaps more appropriately—left to the courts. Beyond this, the task of defining what constitutes a "proprietary power" has traditionally been left to the courts. *See, e.g.,* *National Helicopter Corp. of America v. City of New York,* 137 F.3d 81 (2d Cir.1998) (assessing the validity of restrictions on operation at a **\*805** heliport). Additionally, Congress appears to have evinced an intent to codify the proprietary rights existing when the ADA was enacted rather than an intent to allow DOT to define proprietary powers. *Cf.* *Western Air Lines v. Port Authority of New York and New Jersey,* 658 F.Supp. 952, 956 (S.D.N.Y.1986) ("The legislative history of Section 1305(b)(1) indicates that the airport proprietor would be permitted to take those actions

'presently accepted as valid exercises of proprietary powers.' ") (internal citation omitted).

DOT, however, presents strong arguments supporting the contrary position. DOT is charged with administering the aviation laws as a whole. *See Northwest Airlines, Inc. v. County of Kent,* 510 U.S. 355, 366–67, 114 S.Ct. 855, 127 L.Ed.2d 183 (5th Cir.1994) ("The Secretary of Transportation is charged with administering the federal aviation laws...."). More significantly, DOT is the "superintending agency" with respect to the administration of the ADA. *See American Airlines v. Wolens,* 513 U.S. 219, 229 n. 6, 115 S.Ct. 817 n. 6, 824, 130 L.Ed.2d 715 (1995). The First Circuit has come close to holding that this power encompasses the authority to interpret the preemption section of the ADA. *See New England Legal Foundation v. Massachusetts Port Authority,* 883 F.2d 157, 167 (1st Cir.1989) (finding that DOT was one of "two judicial actors with apparent jurisdiction over the [preemption] subject matter which they decided" ). Absent any clear evidence to the contrary, we are nearly persuaded that DOT possesses the authority to interpret the preemption provision of the ADA and that, consequently, we should defer to its interpretation of that provision. *See Texas Oil & Gas Ass'n,* 161 F.3d at 937. We need not, however, make this final determination here. Because we conclude that DOT's ruling that § 41713 of the ADA preempted the Ordinance was correct under either standard of review, we decline to decide this issue at this time.

2

Congress passed the ADA in 1978 in an effort both to end federal economic regulation of commercial aviation and to promote competition within the airline industry. Fearful that in the face of federal deregulation, states would enact conflicting laws regulating the airline industry, Congress enacted § 41713(b)(1) of the ADA, which provides that:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a

price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1); *see also New England Legal Foundation,* 883 F.2d at 173 ("In reducing federal economic regulation of the field ... Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local regulation."). When enacting the ADA, however, Congress also recognized that airport proprietors —the majority of which are municipalities, *see City of Burbank,* 411 U.S. at 635, 93 S.Ct. at 1860—were best equipped to handle local problems arising at and around their facilities. Accordingly, the ADA provides that the preemptive effect of § 41713(b)(1) does "not limit a State, political subdivision of a State, or political authority of at least 2 States that owns or operates an airport ... from carrying out its proprietary powers and rights." 49 U.S.C.A. § 41713(b) (3).

**[25]** The restrictions on service at Love Field under the Ordinance appear to operate as limitations "relating to ... routes" within the meaning of § 41713(b)(1), *see Western Air Lines,* 658 F.Supp. at 952 (finding that a perimeter rule "relat[ed] to routes"), and the parties present no significant argument to the contrary. Consequently, the only issue before us is whether the power to enforce the **\*806** restrictions falls within the proprietary powers exception. The Fort Worth petitioners contend that the restrictions on service at Love Field fall within Dallas's proprietary powers.

The precise scope of an airport owner's proprietary powers has not been clearly articulated by any court. *See, e.g., id.* at 956 ("The extent of 'proprietary powers and rights' has not yet been established."). However, several courts have examined when an airport owner's enactment of a "perimeter rule" [13] or similar route restriction falls within the proprietary powers exception. These courts have recognized that local proprietors play an "extremely limited" role in the regulation of aviation. *See, e.g., id.* at 956 ("[A]irport proprietors have an 'extremely limited role' in the system of aviation regulation ....") (quoting *British Airways Bd. v. Port Auth.,* 564 F.2d 1002, 1010 (2d Cir.1977)). In defining the permissible scope of a proprietor's power to regulate

American Airlines, Inc. v. Department of Transp., 202 F.3d 788 (2000)

under § 41713(b)(3), federal courts have repeatedly held that an airport proprietor can issue only "reasonable, nonarbitrary, and nondiscriminatory rules that advance the local interest." *Id.* at 958; *see also National Helicopter Corp. of America,* 137 F.3d at 88–89 (limiting the permissible subject matter of local regulations to "aircraft noise and other environmental concerns at the local level"); *British Airways,* 558 F.2d at 84 (stating that a proprietor "is vested only with the power to promulgate reasonable, non-arbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs."); *cf. City and County of San Francisco v. FAA,* 942 F.2d 1391, 1394 (9th Cir.1990) ("Congress made it clear, however, that the power delegated to airport proprietors to adopt noise control regulations is limited to regulations that are not unjustly discriminatory.").

Courts applying this standard have upheld route restrictions as within proprietary powers when they are targeted at advancing a specific local interest. To date, courts have permitted airport proprietors to enact regulations aimed at monitoring noise levels, *see Santa Monica Airport Ass'n v. City of Santa Monica,* 659 F.2d 100, 104 (9th Cir.1981), tempering environmental concerns, *see National Helicopter of America,* 137 F.3d at 88, and managing congestion, *see Western Air Lines Inc. v. Port Authority of New York and New Jersey,* 817 F.2d 222 (2d Cir.1987). *See generally Cross,* 17 Transp. L.J. at 106 ("An airport authority's proprietary function permits it to enact regulations benefitting citizens who live near the airport, such as airport noise regulations or airport curfews."). In each of these cases, the proposed restriction was targeted at alleviating an existing problem at the airport or in the surrounding neighborhood. For example, in *Western Air Lines,* the Second Circuit upheld a 1,500–mile perimeter rule enacted by the Port Authority at LaGuardia Airport as a reasonable means both of alleviating congestion at LaGuardia and of preserving the shorthaul status of that facility. *See Western Air Lines,* 817 F.2d at 226. More recently, the Second Circuit considered the validity of a special use permit that imposed significant restrictions on the use of a local heliport. *See National Helicopter Corp.* 137 F.3d 81. Finding that the proprietor exception allowed municipalities only to promulgate " 'reasonable, nonarbitrary and non-discriminatory' regulations of noise

and other environmental concerns at the local level," *id.* at 88, the Second Circuit upheld only the restrictions that **\*807** were aimed at reducing noise or other environmental concerns at the heliport. Significantly, the court struck down the restriction on sightseeing routes, finding that "Congress, the Supreme Court, and we have consistently stated that the law controlling flight paths through navigable airspace is completely preempted." *Id.* at 92. [14]

The only case which might support the Fort Worth Petitioners' view of Dallas's proprietary powers at Love Field is *Arapahoe County Public Airport v. Centennial Express Airlines, Inc.,* 956 P.2d 587 (Colo.1998). To the extent that *Arapahoe* holds that it is within an airport owner's proprietary powers to restrict service at a local airport without articulating a viable purpose for the restriction, we view that case as deviating from the generally accepted rule that we adopt here. In *Arapahoe,* the Colorado Supreme Court—without finding any purpose for the restriction beyond the proprietor's bald assertion that it would "strip" the airport Authority "of its ability and authority to manage the Airport," *see id.* at 591—upheld a municipal proprietor's ban on all passenger service at Centennial Airport, *see id.* at 595. We fear that under the rationale of *Arapahoe,* virtually any regional regulation enacted by a proprietor would fall within the proprietary powers exception. This would expand the regulatory role of municipal owners far beyond the "extremely limited role" envisioned by the ADA. [15]

We are not persuaded by the Fort Worth Petitioners' attempt to fit the restrictions at Love Field into the existing federal case law defining the scope of proprietary rights. On its face, the Ordinance is clearly not aimed at alleviating noise, pollution, or congestion at Love Field, nor do the Fort Worth Petitioners assert such claims. Rather, they extract from *Western Air Lines* and *City of Houston* an overly broad rule that it is within an airport owner's proprietary powers to allocate traffic between two airports so as to preserve the shorthaul nature of one facility. Such a contention misses the import of both cases; that a proprietor can enact a perimeter rule *if it articulates a need for the restriction.* The Fort Worth Petitioners seem to overlook the *Western Air Lines* court's repeated emphasis that the primary goal of the restriction was to reduce congestion at LaGuardia, and the allocation of traffic between LaGuardia and Kennedy Airports was a means of attaining this goal. The court specifically held that "a perimeter rule, as imposed by the Port Authority

to manage congestion in a multi-airport system, serves an equally legitimate local need and fits comfortably within that limited role, which Congress has reserved to the local proprietor." *Western Air Lines,* 658 F.Supp. at 958. **\*808** Similarly, to the extent that *City of Houston* touched upon the scope of proprietary powers, we spent the bulk of our opinion emphasizing the fact that allocation of flights between Dulles and National was necessary to encourage use of Dulles Airport and ameliorate the overuse of National. See *City of Houston,* 679 F.2d at 1187. In neither case was re-allocation of flights between airports a goal in and of itself.

The fact that the restrictions in the Ordinance do not advance a local interest articulated in prior case law is not dispositive of this issue. We do not limit the scope of proprietary rights to those which have been previously recognized. *Cf. Western Air Lines,* 658 F.Supp. at 957 ("Section 1304(b)(1) [recodified as 41713(b)(1) ] does not expressly limit proprietary powers to the regulation of noise, although presumably Congress would have so limited the section if that is what it had in mind."). Thus, we are open to assessing whether the restrictions in the Ordinance are reasonable and non-discriminatory rules aimed at advancing a previously unrecognized local interest. The Fort Worth petitioners fail, however, to offer a viable alternative justification for the route limitations that might support extending the recognized scope of a proprietor's powers under § 41713(b)(3). To allow enforcement of the Ordinance under the proprietary powers exception extends that exception beyond its intended limited reach. [16]

In sum, reviewing DOT's ruling *de novo,* we affirm the agency's determination that § 41713(b)(1) of the ADA preempted the Ordinance's restrictions on operations at Love Field. Clearly, under the less stringent *Chevron* review, DOT's interpretation of the preemption provision would also be reasonable. Under either standard, DOT's interpretation is affirmed. [17]

## B

**[26]** We next review DOT's ruling that the Wright Amendment's "commuter aircraft exemption" authorized carriers using jets with passenger capacity of 56 seats or less to engage in long-haul service from Love Field to any city

in the United States. DOT ruled and argues on appeal that the "commuter aircraft exemption" imposes no geographical limitation on the service that can be provided with smaller aircrafts and therefore authorizes longhaul service at Love Field with any aircraft with a capacity of less than 57 passengers. Not surprisingly, intervenors Continental Express and Legend Airlines—each of whom plan to offer longhaul service out of Love Field on regional or reconfigured jets— agree with this position. The Fort Worth Petitioners contend that DOT misinterpreted the Love Field amendments and that the exemption authorizes only short-haul service at Love Field.

Because the DOT is authorized to administer the Wright and Shelby Amendments, *see Continental Air Lines, Inc. v. Dep't of Transp.,* 843 F.2d 1444, 1449 (5th Cir.1988) ("Here, Congress fashioned a specific provision which the agency (once CAB, now DOT) has been called upon to interpret."), we review its decision under the two-step *Chevron* analysis.

This inquiry most logically begins with a review of the statutory text. Subsection (a)(2) of the Wright Amendment exempts from the general ban against interstate flights at Love Field "air transportation **\*809** provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less." § 29, 94 Stat. at 48. Section (a) of the Shelby Amendment defines the term "passenger capacity of 56 passengers or less" to include "any aircraft ... reconfigured to accommodate 56 passengers or fewer if the total number of passenger seats installed on the aircraft does not exceed 56." § 377(a), 111 Stat. at 1447. A plain reading of these provisions appears to permit longhaul service at Love Field on a commuter airline with a passenger capacity of fewer than 57. [18]

The slightly more complicated issue here is what type of aircraft is covered under the "commuter airline" exemption. DOT interpreted the commuter airline exemption as applying to any aircraft—whether a "regional jet" or turboprop plane —with a capacity of 56 passengers or less. Legend and Continental Express agree with this interpretation. The Fort Worth Petitioners, on the other hand, argue that the exemption in subparagraph (a)(2) of the Wright Amendment applies only to "commuter aircrafts" and not to regional jets. These differing views, in addition to Congress's failure to define the term "commuter airline," persuade us that the meaning of that term is ambiguous. See *Continental Air Lines,* 843 F.2d at 1454 ("The language of the [commuter airline exemption]

is, we are persuaded, ambiguous."). Consequently, we turn to step two of *Chevron* and assess the reasonableness of DOT's interpretation.

The Fort Worth Petitioners contend that DOT erred in failing to interpret the phrase "commuter airline" as a limitation on the commuter aircraft exemption. As an initial matter, to the extent that American attempts to resurrect the argument that the term "commuter airlines" cannot refer to an air carrier offering longhaul service, we agree with and adopt the rationale of the District of Columbia Circuit in *Continental Air Lines*. In that case, the court upheld as reasonable DOT's interpretation of the commuter airlines exemption as restricting the type of aircraft that could operate unrestricted service at Love Field rather than the class of airlines that could operate longhaul services at the facility. *See* 📄 *id.* at 1454–55.

Fort Worth presents a different argument, namely, that the term "commuter" limits the type of aircraft to the kind of turboprop aircrafts that were in use at the time the Wright Amendment was enacted. Regional jets, it contends, "cannot qualify as 'commuter' aircraft." We disagree. First, Congress chose not to define "commuter airline" by reference to the kind of planes with a limited passenger capacity in 1979 and we decline to define that term for it here. *Cf.* 📄 *Continental,* 843 F.2d at 1454 ("First, Congress might have defined 'commuter airlines' with greater specificity by explicitly incorporating definitional references to agency regulations, but it chose not to do so. We cannot say that Congress meant to incorporate those regulatory definitions absent indications of its intention to do so in the statute or the legislative history."). Furthermore, to impose such a definition would essentially penalize those airlines who chose to update their technology as the airline industry advanced over the past twenty years.

Second, the Fort Worth Petitioners' definition of a "commuter airline" essentially renders the Shelby Amendment meaningless. The City of Fort Worth's contention that "the Shelby Amendment merely permits the use of reconfigured jet aircraft *if* the aircraft otherwise qualifies as a *commuter* aircraft" is nonsensical since, under **\*810** its own definition of a "commuter airline," a reconfigured jet would *never* qualify as a commuter plane. [19] The more rational view is that the term "operating aircraft with a passenger capacity of 56 passengers or less" as defined by the Shelby Amendment, defines the term "commuter airlines" so as to include all planes weighing less than 300,000 pounds, including regional

jets, with a passenger capacity of less than 57. Thus, our reading of the commuter aircraft exemption leads us to conclude that DOT's interpretation of the commuter aircraft exemption as permitting carriers using jets with a 56–passenger capacity to engage in longhaul service at Love Field is reasonable.

**[27]** DOT found that, "[f]or the same reasons [the cities could not directly limit services from Love Field], the DFW Board may not prohibit or limit an airline's use of a competing airport" through the use agreements. DOT Order 98–12–27 at 52. Continental Express agrees with this ruling, [20] while the DFW Board, Dallas, and Fort Worth argue that the use agreements are not preempted. We again need not decide whether we must defer to DOT's ruling on this point because we would uphold it even if we reviewed it *de novo.*

In determining whether government contracts are subject to preemption, the case law distinguishes between actions a state or municipality takes in a proprietary capacity—actions similar to those a private entity might take—and actions a state or municipality takes that are attempts to regulate. The former type of action is not subject to preemption while the latter is. For example, in 📄 *Building & Trades Council v. Associated Builders,* 507 U.S. 218, 226, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993), the Supreme Court held that a labor contract was not preempted by the National Labor Relations Act because it was not "government regulation" but rather "constitute[d] proprietary conduct." 📄 *Id.* at 232, 113 S.Ct. at 1199. More recently, in 📄 *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Texas,* 180 F.3d 686 (5th Cir.1999), we considered whether a municipal ordinance and a contract entered into pursuant to that ordinance were preempted as "law[s], regulation[s], or other provision[s] having the force and effect of law." 📄 *Id.* at 691. Analyzing the contract and the ordinance in the same manner, we held that neither was preempted because both were valid exercises of proprietary power rather than impermissible attempts to regulate. *See* 📄 *id.* at 693–94; *see also* 📄 *Associated Gen. Contractors of America v. Metropolitan Water Dist. of S. Cal.,* 159 F.3d 1178, 1182–83 (9th Cir.1998) (holding that labor contracts between a state entity and private groups were not "laws" because they were not efforts to regulate but rather "reflect[ed] an owner's desire to contractually assure peace and prosperity on particular projects").

Thus, the critical inquiry here is whether the use agreements represent a valid exercise of the cities' proprietary powers. This question is easily resolved. The use agreements are essentially coextensive with the Ordinance, indicating in their **\*811** breadth an intent to achieve everything achieved by the Ordinance. *Cf.* *Cardinal Towing,* 180 F.3d at 694 (looking to the scope of the contract and the activity it covered to determine whether it represented an attempt to regulate). They were enacted to effect the Ordinance, and the most recent version of the agreements directly links the airlines' obligations to the terms of the Ordinance: "Airline agrees that it shall conduct its Certificated Air Carrier Services serving the Dallas/Fort Worth areas to, from and at the Airport, to the extent required by the terms of the 1968 Regional Airport Concurrent Bond Ordinance." [21] Given this overlap, for the same reasons we have already determined that the Ordinance is preempted as an improper attempt to regulate, we must determine that the use agreements are preempted as an impermissible attempt to regulate in an area where the federal government has preempted state regulation. [22]

*See* *Skydiving Center of Greater Washington, D.C., Inc. v. St. Mary's County Airport Comm'n,* 823 F.Supp. 1273, 1284 (D.Md.1993) (finding that when federal law preempted a municipal corporation's ban on off-site parachute landings, it also preempted lease provisions between the corporation and the skydiving center that incorporated this ban by reference).

The parties favoring the use agreements contend that even if the use agreements were preempted, the signatories waived their preemption rights by voluntarily entering into the agreements. DOT rejected this argument by finding that any waiver was invalid as violative of public policy. *See, e.g.,* *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 702–04, 65 S.Ct. 895, 900–01, 89 L.Ed. 1296 (1945) (noting "that a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy," and holding that in the case before it, employees could not waive their private rights to liquidated damages because of the public interest at stake).

We need not address the waiver issue because we find it inapplicable here. Section 41713 does not expressly announce affirmative rights for airlines, but instead bars states from regulating in certain areas. The airline signatories cannot "waive" this preemption because there is no indication that

the federal preemption is limited to granting them individual rights. *Cf.* *Niswonger v. American Aviation, Inc.,* 411 F.Supp. 769, 771 (E.D.Tenn.1975) (holding, without analysis, that "[t]he lease indenture of June 16, 1969 between American and the authority violates **\*812** 49 U.S.C. § 1349(a), a statute enacted for the protection of the public, in so far as it grants American the exclusive right for the use of the landing area and the air navigation facility at the airport").

D

[28]    Finally, we review DOT's ruling that the Wright Amendment permits an airline to offer through service from Love Field to points outside the Love Field service area as long as the airline uses a city within Texas as a connecting point and a 56–passenger aircraft to get to that point. [23] While DOT, Continental Express, and Legend Airlines argue that we should uphold this ruling, every other party to this action —Dallas, Fort Worth, the DFW Board, Southwest Airlines, and American Airlines—contends that permitting an airline to offer through service between Love Field and "the world" violates both the plain meaning of and the congressional intent behind the Wright Amendment. Once again, since DOT is charged with administering the Wright Amendment, we review its ruling under the two-step *Chevron* analysis. *See* *Texas Oil & Gas Ass'n,* 161 F.3d at 937–38.

This issue arose from Continental Express's decision to offer and advertise through service between Love Field and "the world." Continental Express flies passengers from Love Field to Houston's Intercontinental Airport on an aircraft with a maximum capacity of 56 passengers and then transfers them to worldwide flights on large jets. Passengers taking advantage of this service receive one ticket and, though they must change planes, do not have to reclaim and recheck their luggage at the connecting point.

As discussed above, subsection (a)(2) of the Wright Amendment excludes from section (a)'s general prohibition against interstate transportation flights out of Love Field that are operated on an aircraft with a capacity of 56 passengers or less. Subsection (c) of the Amendment permits flights between Love Field and any point in Texas or one of the four contiguous states (later expanded to seven) on any size aircraft as long as "(1) such air carrier does not offer or provide any through service or ticketing with another air carrier or foreign air carrier, and (2) such air carrier does

not offer for sale transportation to or from, and the flight or aircraft does not serve, any point which is outside any such State." § 29, 94 Stat. at 48.

DOT interpreted subsection (a)(2) as authorizing the service offered by Continental Express. More specifically, DOT reads the commuter airlines exemption to exempt planes with a passenger capacity of less than 57 from all restrictions in the Wright Amendment. Under this interpretation, the restrictions on service in subsection (c)—including the restrictions on through service—do not apply to aircrafts operating under the commuter airline exemption. In contrast, the Fort Worth Petitioners, Southwest Airlines, and the City of Dallas contend that DOT's interpretation violates the plain language of the Wright Amendment. Under their interpretation of the statute, the restrictions on service in subsection (c)(2) apply to both commuter flights under subsection (a)(2) and flights on large aircrafts.

 **[29]   [30]**   These two plausible yet conflicting readings of the relevant provisions **\*813** of the Wright Amendment, coupled with a lack of legislative history illuminating the proper interaction between subsections (a)(2) and (c)(2), convince us that Congress did not speak directly to the issue before us. Accordingly, we move to step two of *Chevron* and inquire whether DOT's interpretation is a reasonable one. Under *Chevron,* an agency's interpretation is "reasonable" if it is "not patently inconsistent with the statutory scheme." *See*

🔖 *Continental,* 843 F.2d at 1452 (citations omitted). We need not agree with DOT's interpretation in order to uphold it as reasonable. *See* 🔖 *Exxon Corp. v. Lujan,* 970 F.2d 757, 761 (10th Cir.1992) ( "The agency's interpretation need not be the only one it could have adopted, or the one that this court would have reached had the question initially arisen in a judicial proceeding.") (citation omitted).

We are persuaded that DOT's interpretation of the Wright Amendment is a permissible one within the meaning of *Chevron.* DOT grounds its ruling largely on the argument that by imposing an express restriction on through service on large jets operating under subsection (c)(2) but declining to impose a similar restriction on commuter planes operating

under section (a)(2), Congress was evincing its intent to permit small aircrafts to fly without such a restriction. [24] We view this reading of the amendment as reasonable and not inconsistent with a statutory scheme aimed at preserving Love Field as a primarily shorthaul facility while still allowing some longhaul service. *See* H.R. Conf. Rep. 96–716, at 24 (1979), *reprinted in* 1980 U.S.C.C.A.N. 78, 86 (stating that the Wright Amendment "embodies a compromise which permits limited commercial passenger service in interstate transportation at Love Field").

This is not to say that we find DOT's interpretation to be the only or the best reading of the Wright Amendment. In order to reach its decision, DOT necessarily defined "air transportation on 56–passenger capacity planes" as including air service provided *in part* by such aircrafts. Similarly, it implicitly defined intrastate service as including flights with only an intrastate portion. These interpretations strain the meaning of both terms. Furthermore, we note with concern the potential impact of DOT's ruling. While it seems unlikely that permitting interstate service outside of the Love Field service area on small planes would have any impact on DFW's role as the Dallas area's primary long-haul facility, it seems significantly more likely that following the DOT ruling, airlines who already operate small aircrafts will commence interlining service connecting in Houston or another Texas airport. However, determinations of this nature are directly within DOT's expertise, not ours, and we will not substitute our judgment on aviation-related issues for their reasonable one. Accordingly, we affirm DOT's ruling as a reasonable interpretation of the Wright Amendment.

V

For the foregoing reasons, we DENY the petitions for review and AFFIRM DOT's orders.

**All Citations**

202 F.3d 788

**Footnotes**

1       In its entirety, the Wright Amendment states:

(a) Except as provided in subsection (c), notwithstanding any other provision of law, neither the Secretary of Transportation, the Civil Aeronautics Board, nor any other officer or employee of the United States shall issue, reissue, amend, revise, or otherwise modify (either by action or inaction) any certificate or other authority to permit or otherwise authorize any person to provide the transportation of individuals, by air, as a common carrier for compensation or hire between Love Field, Texas, and one or more points outside the State of Texas, except (1) charter air transportation not to exceed ten flights per month, and (2) air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less.

(b) Except as provided in subsections (a) and (c), notwithstanding any other provision of law, or any certificate or other authority heretofore or hereafter issued thereunder, no person shall provide or offer to provide the transportation of individuals, by air, for compensation or hire as a common carrier between Love Field, Texas, and one or more points outside the State of Texas, except that a person providing service to a point outside of Texas from Love Field on November 1, 1979 may continue to provide service to such point.

(c) Subsections (a) and (b) shall not apply with respect to, and it is found consistent with the public convenience and necessity to authorize, transportation of individuals, by air, on a flight between Love Field, Texas, and one or more points within the States of Louisiana, Arkansas, Oklahoma, New Mexico, and Texas by an air carrier, if (1) such air carrier does not offer or provide any through service or ticketing with another air carrier or foreign air carrier, and (2) such air carrier does not offer for sale transportation to or from, and the flight or aircraft does not serve, any point which is outside any such State. Nothing in this subsection shall be construed to give authority not otherwise provided by law to the Secretary of Transportation, the Civil Aeronautics Board, any other officer or employee of the United States, or any other person.

(d) This section shall not take effect if enacted after the enactment of the Aviation Safety and Noise Abatement Act of 1979.

*Id.*

2    The Shelby Amendment provides in its entirety that:

(a) IN GENERAL.—For purposes of the exception set forth in section 29(a)(2) of the International Air Transportation Competition Act of 1979 (Public Law 96–192; 94 Stat. 48), the term "passenger capacity of 56 passengers or less" includes any aircraft, except aircraft exceeding gross aircraft weight of 300,000 pounds, reconfigured to accommodate 56 or fewer passengers if the total number of passenger seats installed on the aircraft does not exceed 56.

(b) INCLUSION OF CERTAIN STATES IN EXEMPTION.—The first sentence of section 29(c) of the International Air Transportation Competition Act of 1979 (Public Law 96–192; 94 Stat. 48 et seq.) is amended by inserting "Kansas, Alabama, Mississippi," before "and Texas".

(c) SAFETY ASSURANCE.—The Administrator of the Federal Aviation Administration shall monitor the safety of flight operations in the Dallas–Fort Worth metropolitan area and take such actions as may be necessary to ensure safe aviation operations. If the Administrator must restrict aviation operations in the Dallas–Fort Worth area to ensure safety, the Administrator shall notify the House and Senate Committees on Appropriations as soon as possible that an unsafe airspace management situation existed requiring the restrictions.

*Id.*

3    Notice of this order was not sent to the Committee. The Committee subsequently learned of the proceeding and DOT granted its request for an extension of time to file comments.

4    Fort Worth also relies on the APA ban on *ex parte* communications, but this ban does not apply here, because it does not cover informal adjudications. *See* 5 U.S.C. § 557(a), (d) (stating that the prohibition on *ex parte* contacts applies "when a hearing is required to be conducted in accordance with section 556 "); *id.* § 556 (governing formal hearings).

5    Although the state and DOT proceedings overlapped, neither tribunal made significant efforts to accommodate the views of the other. The state court essentially gave DOT one month to issue its declaratory

order and when DOT failed to do this, the state court ruled without the benefit of DOT's views. DOT, on the other hand, did not issue its declaratory order within the time set by the state court, did not attempt to intervene in the state court action even though some of the parties there asked it to intervene, and did not ask the state court to stay its ruling until DOT ruled on the same issues. Instead, DOT rejected the state court's view in its order, noting only the state court's lack of reasoning in support of its position.

6    The Fort Worth petitioners rely on two district court cases which have arguably held to the contrary. In *Torres v. Gardner,* 270 F.Supp. 1 (D.P.R.1967), the court stated in passing that "[t]he Administrative agencies of the United States are no less bound that he [*sic* ] courts of the United States to give full faith and credit to the decisions of the Courts of Puerto Rico." *Id.* at 4. The court did not cite § 1738, and thus it might have relied instead on the common law preclusion doctrines we discuss below. In *Midgett v. United States,* 221 Ct.Cl. 171, 603 F.2d 835 (Ct.Cl.1979), the court cited *Torres* and stated: "Section 1738 of 28 U.S.C. imposes on a federal court presented with a state court judgment the same force and conclusive effect as it has in the state in which it is rendered. Administrative bodies of the United States as well as courts are required to adhere to this requirement." *Id.* at 845 (citation omitted). The court did not clearly indicate that it based its holding on § 1738, as opposed to merely analogizing to § 1738.

We cannot conclude with certainty whether these cases relied on § 1738. To the extent they did, we believe the better rule, for the reasons stated above and herein, is that § 1738 does not apply to agencies, but the rationale underlying § 1738 extends to agencies through common law preclusion doctrines. This rule is consonant with Supreme Court precedent and the plain text of § 1738, and it accounts for the concerns raised by the *Midgett* and *Torres* courts.

Fort Worth also argues that *United States v. ITT Rayonier, Inc.,* 627 F.2d 996 (9th Cir.1980) addresses the question presented here. In *ITT Rayonier,* the Ninth Circuit held that the Environmental Protection Agency ("EPA") was bound by res judicata from pursuing an enforcement action when a prior enforcement action had been litigated in state court. *See id.* at 999–1004. The Ninth Circuit applied res judicata because it found that the EPA was in privity with the parallel state agency which had pursued the state enforcement action. *See id.* at 1002–04. *ITT Rayonier* is distinguishable from the present case, because Fort Worth has made no showing that DOT was in privity with any party in the state court action.

7    Because we resolve the matter on these grounds, we do not reach DOT's alternative argument that the state court judgment should not be granted preclusive effect because a Texas court would not grant the judgment preclusive effect. *See generally* *Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 374, 116 S.Ct. 873, 878, 134 L.Ed.2d 6 (1996) ("When faced with a state court judgment relating to an exclusively federal claim, a federal court must first look to the law of the rendering State to ascertain the effect of the judgment.").

8    These key federal interests are arguably lessened by the fact that DOT did not attempt to stay or intervene in the state court action; presumably if the federal interests were that important, DOT would have taken one of these actions. DOT's inaction is partially justified by the limited amount of time it had to intervene, as the state court only stayed the proceedings before it for one month.

9    We reject the Fort Worth petitioners' invocation of the so-called *Rooker–Feldman* doctrine for the same reasons. "In a nutshell, the doctrine holds that inferior federal courts do not have the power to modify or reverse state court judgments." *Matter of Reitnauer,* 152 F.3d 341, 343 (5th Cir.1998) (applying the doctrine where "[t]he district court ... made apparent its displeasure with the manner in which the state court interpreted and applied state law [and] such displeasure formed the basis for its reversal of the bankruptcy court's order"). As we have previously noted, the *Rooker–Feldman* doctrine is "very close if not identical to the more familiar principle that a federal court must give full faith and credit to a state court judgment." *Gauthier v. Continental Diving Servs., Inc.,* 831 F.2d 559, 561 (5th Cir.1987). Thus, we have not applied the *Rooker–Feldman* jurisdictional bar in cases where we have found it inappropriate to require a federal court to give

AR.03955

full faith and credit to a state court judgment. *See id.* (not applying the *Rooker–Feldman* doctrine where full faith and credit does not apply because the state court judgment would not be entitled to preclusive effect under state law). We follow this practice here. The Fort Worth petitioners have not cited any cases where the *Rooker–Feldman* doctrine has been applied to an agency ruling on matters of federal law previously addressed by a state court. In light of the above-noted concerns, we see no reason to extend the doctrine to this context.

10    We note in passing that, as a denial of a petition for certiorari, the *United Credit Bureau* opinion is not binding authority. *See* 📙 *Teague v. Lane,* 489 U.S. 288, 296, 109 S.Ct. 1060, 1067, 103 L.Ed.2d 334 (1989).

11    For example, 📙 49 U.S.C. § 41713, which DOT interpreted here, does not grant DOT discretion because Congress has defined the extent of federal preemption and has specified which state rights remain. On the other hand, when DOT applies § 41714(c), governing the award of slots to new entrants, DOT is clearly granted discretion by the statute. *See* 49 U.S.C. § 41714(c) ("If the Secretary *finds it to be in the public interest and the circumstances to be exceptional,* the Secretary *may* by order grant exemptions from the requirements under subparts K and S of part 93 of title 14, Code of Federal Regulations, to enable new entrant air carriers to provide air transportation at high density airports. ") (parentheticals omitted and emphasis added). Thus, when applying § 41714, DOT follows NEPA. *See, e.g., Applications of Trans States Airlines, Inc.,* DOT Order 98–4–21, 1998 DOT Av. LEXIS 159, at \*54–\*55 (1998) (conducting an environmental assessment in a § 41714 determination).

12    The Committee also argues that DOT failed to follow its own environmental procedures. The Committee relies on an FAA statement of "Polices and Procedures on Considering Environmental Impacts" which, as DOT notes, is inapplicable here because it "establishes Federal Aviation Administration (FAA) policies and procedures." DOT was not acting under the auspices of the FAA in this case. Instead, DOT asserts that the relevant DOT guidelines still require major agency action before undertaking an EIS, and we agree. *See* 44 Fed.Reg. 56420, 56424 (1979) ( "An EIS shall be prepared for any proposed major Federal action significantly affecting the environment."); *see also id.* (requiring an environmental assessment when "a decision has not been make [*sic* ] to prepare an EIS," but noting that the environmental assessment describes "the environmental impacts of a proposed action"). The Committee does not cite any contrary authority in its reply brief.

13    An airport perimeter rule "establish[es] maximum permissible distances of non-stop flights into and out of a given airport." *See* Jonathan Whitman Cross, *Airport Perimeter Rules: An Exception to Federal Preemption,* 17 Transp. L.J. 101, 102 (1988). The Wright Amendment itself, by allowing interstate service to only the four states bordering on Texas, operates as a perimeter rule. Similarly, because § 9.5 of the Bond Ordinance has been enforced so as to allow the range of flights permitted under the Wright Amendment, it effectively operates as a perimeter rule.

14    In *City of Houston,* we touched upon the proprietary rights exception when we upheld the FAA's authority to enact a 1,000–mile perimeter rule at Washington National Airport. In that case, the FAA enacted the rule as a means of limiting traffic at National, preserving the short-haul status of National, and assuring the utilization of the flagging Dulles Airport nearby. In relying on *City of Houston* for support, the Fort Worth Petitioners overlook the fact that we explicitly avoided engaging in a full analysis of the preemption provision in that case.

Rather, we found that since the ADA preempted *state* regulation of routes, the restrictions of 📙 § 41713 did not apply to the FAA, a branch of the federal government. Thus, our decision in *City of Houston* does little to advance the Fort Worth Petitioners' argument.

15    *Arapahoe* is also factually distinguishable from the present case. First, while in *Arapahoe,* the court found that the ban on passenger service did not constitute a restriction on "rates, routes or services" within the meaning of the ADA, the restrictions under the Ordinance clearly amount to route restrictions. Second, the passenger service at issue in *Arapahoe* had never been permitted at Centennial Airport. In reaching its conclusion, the court emphasized that "[t]he power to control an airport's size exists at the core of the proprietor's function and is especially strong where, as here, the prohibited use has never been allowed, or even contemplated."

*Arapahoe,* 956 P.2d at 595. In contrast, passenger flights on planes of all sizes have long been permitted at Love Field.

16    Finally, we need not reach the question of whether there is a "multi-airport proprietor" requirement in either the case law or the ADA such that a local proprietor can only enact route restrictions that allocate between two airports if it owns both facilities. Since we find that the restrictions at issue here are impermissible regardless of ownership, the issue of whether Dallas controls both Love Field and DFW is irrelevant to our analysis.

17    DOT alternatively ruled that the Wright and Shelby Amendments impliedly preempt the cities' ability to enforce the Ordinance. Because we find that the amendments expressly preempt enforcement of the Ordinance, we decline to address this issue here.

18    In interpreting the commuter airline exemption in this manner, we keep in mind that Congress enacted the Love Field amendments with the intention of preserving Love Field as a primarily shorthaul facility. *Cf.* *Cramer v. Skinner,* 931 F.2d 1020, 1031 (5th Cir.1991). We are, however, persuaded by DOT's argument that this interpretation will not undermine Love Field's status as a primarily short-haul airport since both the Wright and Shelby Amendments still place significant restrictions on the long-haul service permitted on larger jets.

19    The Fort Worth Petitioners also argue that DOT's interpretation violates the agency's previous ruling that Congress enacted the Wright Amendment in an effort to limit operations at Love Field to shorthaul service. In reality, Congress always permitted limited longhaul service at Love Field. From its inception, the Wright Amendment allowed for limited longhaul service on aircrafts with limited capacity and, as stated above, we do not think that DOT's ruling will radically alter Love Field's status as a primarily shorthaul airport.

20    American filed a request to intervene and a request to file an intervenor's brief. Legend subsequently moved to strike American's proposed intervenor brief. American's request to intervene is untimely, *see* Fed. R.App. P. 15(d), and American has not shown that we should treat its proposed intervenor brief as a supplemental brief under 5th Circuit Local Rule 28.5. Accordingly, we DENY American's motions to intervene and to file a brief as an intervenor and DENY as moot Legend's motion to strike American's intervenor brief.

21    Earlier versions of the use agreements and the original letter agreements contain similar language.

22    Thus, this case is distinguishable from the Supreme Court's recent decision in *Wolens,* where the Court addressed a class action by passengers against an airline over changes the airline made to its air-miles program. *See Wolens,* 513 U.S. at 224–25, 115 S.Ct. at 822. The Court first found that the passengers' state consumer protection act claims were preempted by federal law, because their claims related to "rates" and "services." *See id.* at 228, 115 S.Ct. at 823–24. The Court proceeded to find, however, that the plaintiffs could still pursue contractual claims against the airlines because, unlike the consumer protection statute, the contracts were "privately ordered obligations" which "did not amount to a State's enact[ment] or enforce[ment] [of] any law." *Id.* at 228–29, 115 S.Ct. at 824 (quotations omitted) (alterations in original). It based this finding in part on the fact that "[m]arket efficiency requires effective means to enforce private agreements." *Id.* at 230, 115 S.Ct. at 824.

As several of the parties note, *Wolens* is distinguishable from this case because it did not involve a contract entered into by a state. Instead, the contracting parties in *Wolens* were private actors. Thus, the only question of state regulation in *Wolens* was the more tangential question of whether the contract could be enforced in state court. *See id.* at 229 n. 5, 115 S.Ct. at 824 n. 5.

Additionally, although *Wolens* referred to the importance of contracts in ensuring "market efficiency," there has been no convincing showing here that the parties entered into the use agreements for this purpose. Instead, it seems that they entered into the use agreements to implement an agreement between the cities to regulate airport use in the Dallas–Fort Worth area.

23    As an initial matter, we clarify the precise issue addressed in DOT's Declaratory Order. DOT purportedly determined "[w]hether the Wright and Shelby Amendments allow an airline to offer through service from Love Field to points outside the seven-state area within which unrestricted service is permitted, if the airline uses a city *within the seven-state area* as a connecting point and uses aircraft with no more than 56 seats for its flights between Love Field and the connecting point." Declaratory Order at 18 (emphasis added); *see also* DOT Procedural Order at 3 (Sept. 3, 1998). The substance of DOT's ruling, however, is geared towards the specific service offered by Continental Express and therefore considered solely whether the Love Field amendments permit an airline to offer through service through a point *within Texas.* We limit the scope of our review to the narrower question actually resolved by DOT.

24    Each party opposing DOT's position argues that it conflicts with the agency's 1985 Order holding that Continental could not provide interlining service on a large jet through a connecting point in Texas. *See Love Field Amendment Proceeding, DOT Order 85-12-51,* 1985 WL 57886 (1985). In that interpretive proceeding, DOT addressed whether airlines could provide interlining service exclusively on large planes. There, DOT essentially agreed with an earlier CAB ruling that an air carrier could not "evade the [Wright] Amendment's restrictions by providing flights, for example, between Love Field and Houston and then continuing the flights between Houston and points outside the five-state area." 1985 WL 57886, at *11 (citation omitted). We agree with DOT that its previous interpretation can be distinguished on the grounds that DOT premised its earlier order on an interpretation of section (c)(2) of the Wright Amendment, whereas the agency's decision here relies primarily on an interpretation of section (a).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SL    Document 58-4    Filed 11/10/20    Page 118 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Venson v. Turner, N.D.Ohio, August 27, 2014

568 F.2d 284
United States Court of Appeals,
Third Circuit.

AMERICAN IRON AND STEEL INSTITUTE, Armco Steel Corporation, Bethlehem Steel Corporation,
Inland Steel Company, Jones & Laughlin Steel Corporation, National Steel Corporation, Republic Steel
Corporation, United States Steel Corporation, Wheeling-Pittsburgh Steel Corporation, Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

SIERRA CLUB, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, and Russell E. Train, Administrator, Respondents,
Youngstown Sheet and Tube Company, Republic Steel
Corporation, United States Steel Corporation, Intervenors.
COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Youngstown Sheet and Tube Company, Republic Steel
Corporation, United States Steel Corporation, Intervenors.
ALLEGHENY LUDLUM INDUSTRIES, INC., Atlantic Steel Company, the Babcock& Wilcox Company,
Continental Copper & Steel Industries, Inc., Crucible Inc., Cyclops Corporation, Detroit Steel, Interlake, Inc.,
Lone Star Steel Company, Shanango Incorporated, Sharon Steel Corporation, the Timken Company, Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

YOUNGSTOWN SHEET AND TUBE COMPANY, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY and Russell E. Train, Administrator, Respondents.
CF & I STEEL CORPORATION, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Nos. 76-1386, 76-1749, 76-1751, 76-1757, 76-2176 and 76-2232.
|
Argued May 2, 1977.
|
Final Submission Aug. 17, 1977.
|
Decided Sept. 14, 1977.

**Synopsis**

Proceeding was instituted on petitions to review interim final regulations of Environmental Protection Agency governing certain
manufacturing processes within iron and steel industry. After remand, 526 F.2d 1027, the Court of Appeals, Seitz, Chief
Judge, held that: (1) for want of proper notice, regulations were invalid insofar as they applied to specialty steel industry; (2) case
was remanded for a finding as to bearing of "age" on cost or feasibility of retrofitting plants with pollution control technology;

10 ERC 1689, 7 Envtl. L. Rep. 20,738

(3) a record was to be made showing that Agency had made adequate allowance for certain cost factors which were originally not directly included; (4) financial problems of industry were to be reconsidered; (5) decision to exempt plants in Mahoning Valley of Pennsylvania from effluent limitations based on best practicable control technology currently available was invalid, and (6) further consideration was to be given to whether fin-tube heat exchangers or dry type cooling towers might be employed despite any fouling or scaling problems, assuming that cooling systems of some kind would be employed.

Petitions denied except as directed and case remanded for further proceedings.

West Headnotes (32)

**[1]   Environmental Law** ☞ Particular limitations and guidelines

Advanced notice of proposed rule making (ANPR) published by Environmental Protection Agency in Federal Register with respect to certain manufacturing processes within iron and steel industry was insufficient for failure to provide an interested person with notice of and an opportunity to comment upon fact that proposed regulations dealt with forming and finishing and, hence, making of specialty steel. 5 U.S.C.A. § 553(b, d); Federal Water Pollution Control Act Amendments of 1972, § 301(b)(1)(A), 33 U.S.C.A. § 1311(b)(1)(A).

2 Cases that cite this headnote

**[2]   Environmental Law** ☞ Particular limitations and guidelines

Exemption from statutory rule-making requirement of notice and comment was not applicable with respect to regulations of Environmental Protection Agency governing certain manufacturing processes within iron and steel industry in absence of evidence that providing an interested party with notice and an opportunity to comment upon fact that regulations dealt with forming and finishing and, hence, making of specialty steel was impractical, unnecessary, or contrary to public interest. 5 U.S.C.A. § 553(b, d); Federal Water Pollution Control Act Amendments of 1972, § 301(b)(1)(A), 33 U.S.C.A. § 1311(b)(1)(A).

3 Cases that cite this headnote

**[3]   Environmental Law** ☞ Particular limitations and guidelines

Regulations of Environmental Protection Agency governing certain manufacturing processes within iron and steel industry were invalid insofar as they applied to specialty steel industry where they failed to provide interested party with notice of an opportunity to comment upon fact that regulations dealt with forming and finishing and, hence, making of specialty steel. 5 U.S.C.A. § 553(b, d); Federal Water Pollution Control Act Amendments of 1972, § 301(b)(1)(A), 33 U.S.C.A. § 1311(b)(1)(A).

1 Cases that cite this headnote

**[4]   Administrative Law and Procedure** ☞ Procedure; notice and comment

Submission of a proposed rule for comment does not of necessity bind an agency to undertake a new round of notice and comment before it adopts a rule which is different, even substantially different, from proposed rule. 5 U.S.C.A. § 553(b, d).

AR.03960

10 ERC 1689, 7 Envtl. L. Rep. 20,738

13 Cases that cite this headnote

**[5]**    **Administrative Law and Procedure**    Contents and sufficiency

Adequacy of notice of proposed regulation must be tested by determining whether notice would fairly apprise interested persons of subjects and issues before agency. 5 U.S.C.A. § 553(b, d).

31 Cases that cite this headnote

**[6]**    **Environmental Law**    Particular limitations and guidelines

Advance notice of proposed rule making (ANPR) published by Environmental Protection Agency in Federal Register with respect to certain manufacturing processes within iron and steel industry was sufficient to apprise interested persons that there was an issue as to whether recycling of partially clarified effluent was best practicable control technology currently available (BPCTCA) and, hence, was not insufficient as failing to apprise interested persons of issues involved and decision of Agency to adopt more stringent treatment technologies than those embodied in advance notice. Federal Water Pollution Control Act Amendments of 1972, § 301(b)(1)(A), 33 U.S.C.A. § 1311(b)(1)(A); 5 U.S.C.A. § 553(b, d).

24 Cases that cite this headnote

**[7]**    **Environmental Law**    Particular limitations and guidelines

Though language in advanced notice of proposed rule making (ANPR) published by Environmental Protection Agency in Federal Register with respect to certain manufacturing processes within iron and steel industry was not a model of clarity, notice was sufficient to fairly apprise public that Agency might afford special treatment to facilities in Mahoning Valley in Pennsylvania and, hence, was not insufficient for failure to provide notice and an opportunity for comment on special treatment afforded plants in Mahoning Valley. 5 U.S.C.A. § 533(b, d); Federal Water Pollution Control Act Amendments of 1972, § 301(b)(1)(A), 33 U.S.C.A. § 1311(b)(1)(A).

7 Cases that cite this headnote

**[8]**    **Environmental Law**    Extensions, Exceptions, and Variances for Particular Parties

Statement which was issued by Environmental Protection Agency in exempting plants in Mahoning Valley of Pennsylvania from regulations governing certain manufacturing processes within iron and steel industry was sufficiently detailed to allow for searching judicial scrutiny. 5 U.S.C.A. § 553(c); Federal Water Pollution Control Act Amendments of 1972, § 402, 33 U.S.C.A. § 1342.

1 Cases that cite this headnote

**[9]**    **Environmental Law**    Effluent Limitations and Guidelines

Environmental Protection Agency may specify a maximum permissible level of effluent discharge without providing guidelines as to how permit issuers are to select more stringent levels of control. Federal Water Pollution Control Act Amendments of 1972, §§ 301, 304, 402, 33 U.S.C.A. §§ 1311, 1314, 1342.

10 ERC 1689, 7 Envtl. L. Rep. 20,738

**[10]**    **Environmental Law**    ☞    Particular limitations and guidelines

Interim final regulations of Environmental Protection Agency governing certain manufacturing processes within iron and steel industry were not invalid because they specified only a maximum permissible level of effluent discharge and because they failed to indicate a range of permissible effluent levels by providing guidelines as to how much more severe controls might be required of any particular plant by authority granting a pollution discharge permit. Federal Water Pollution Control Act Amendments of 1972, §§ 301, 304, 402, 🟨 33 U.S.C.A. §§ 1311, 1314, 🟨 1342.

**[11]**    **Administrative Law and Procedure**    ☞    Procedural matters in general

Decision of administrative agency is entitled to presumption of regularity on appeal, but presumption may not act to shield decision from a thorough, probing, in-depth review. 🟨 5 U.S.C.A. § 706.

1 Cases that cite this headnote

**[12]**    **Administrative Law and Procedure**    ☞    Sufficiency of theory or grounds provided by agency

Court of Appeals will not overturn agency action because underlying reasoning is not fully set forth if it can fairly discern a basis for that action. 🟨 5 U.S.C.A. § 706.

2 Cases that cite this headnote

**[13]**    **Administrative Law and Procedure**    ☞    In general;  necessity

Touchstone for review of agency action, both as to agency's consideration of issues and factual predicates of such consideration, must be administrative record. 🟨 5 U.S.C.A. § 706.

4 Cases that cite this headnote

**[14]**    **Administrative Law and Procedure**    ☞    Review limited to administrative record in general

In deciding to accept or reject contentions of petitioners seeking review of agency action, Court of Appeals must look to record that was considered by agency, not to post hoc rationalizations of counsel or even agency members or to evidentiary materials that were not considered by agency. 🟨 5 U.S.C.A. § 706.

5 Cases that cite this headnote

**[15]**    **Environmental Law**    ☞    Particular limitations and guidelines

Given broad discretion of Environmental Protection Agency in weighing costs and benefits, and fact that Agency evaluated several treatment technologies within each category, interim final regulations governing certain manufacturing processes within iron and steel industry were not invalid on ground that Agency failed to properly evaluate cost effectiveness of possible treatment technologies. Federal Water Pollution Control Act Amendments of 1972, §§ 302, 304, 33 U.S.C.A. §§ 1312, 1314.

**[16]**    **Environmental Law**    ☞    Particular limitations and guidelines
              **Environmental Law**    ☞    Remand to administrative agency

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 122 of 1384

10 ERC 1689, 7 Envtl. L. Rep. 20,738

Interim final regulations of Environmental Protection Agency governing certain manufacturing processes within iron and steel industry should have contained a finding as to bearing of "age" on cost of feasibility of retrofitting plants with pollution control technology and, hence, were subject to being remanded to Agency for such a finding. Federal Water Pollution Control Act Amendments of 1972, §§ 302, 304, 33 U.S.C.A. §§ 1312, 1314.

**[17]    Environmental Law** 👈 Technology-based limits

Selecting technology already in place in some plants for best practicable control technology currently available (BPCTCA) and thereafter performing a cost-benefit analysis on technology selected through challenged procedure was all that Environmental Protection Agency was required to do under Federal Water Pollution Control Act Amendments of 1972 and, hence, it was irrelevant that Agency selected BPCTCA by visualizing a control technology that would achieve desired effluent limitations. Federal Water Pollution Control Act Amendments of 1972, §§ 302, 304, 33 U.S.C.A. §§ 1312, 1314.

**[18]    Environmental Law** 👈 Technology-based limits

Determining best practical control technology currently available (BPCTCA) after calculating average effluent load at best plants in each subcategory did not permit Environmental Protection Agency to derive limitations from effluent samples without analyzing how particular treatment levels could be achieved at other plants or investigating why they were not being met by other plants. Federal Water Pollution Control Act Amendments of 1972, §§ 302, 304, 33 U.S.C.A. §§ 1312, 1314.

1 Cases that cite this headnote

**[19]    Environmental Law** 👈 Remand to administrative agency

Environmental Protection Agency was to be allowed, on remand of interim final regulations governing certain manufacturing processes within iron and steel industry, to make a record showing that it had made adequate allowance for certain cost factors which were originally not directly included. Federal Water Pollution Control Act Amendments of 1972, §§ 302, 304, 33 U.S.C.A. §§ 1312, 1314.

**[20]    Environmental Law** 👈 Particular limitations and guidelines
**Environmental Law** 👈 Remand to administrative agency

Ability of iron and steel industry to find funds necessary to install and operate pollution control equipment required to achieve effluent limitations specified in interim final regulations was to be considered by Environmental Protection Agency on remand. Federal Water Pollution Control Act Amendments of 1972, §§ 302, 304, 33 U.S.C.A. §§ 1312, 1314.

1 Cases that cite this headnote

**[21]    Environmental Law** 👈 Particular limitations and guidelines

Record served to establish that, while Environmental Protection Agency could have set forth its reasoning on cost-benefit question with greater clarity, it did give adequate consideration to combined treatment of waste streams (central treatment) in adopting best practicable control technology currently available (BPCTCA) in promulgating regulations governing certain manufacturing processes within iron and steel industry. Federal Water Pollution Control Act Amendments of 1972, §§ 302, 304, 33 U.S.C.A. §§ 1312, 1314.

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 123 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

4 Cases that cite this headnote

**[22]    Environmental Law** 🔑 Particular limitations and guidelines

Record failed to substantiate charge that in promulgating regulations governing certain manufacturing processes within iron and steel industry Environmental Protection Agency ignored comments to contractor's report and to ANPR (advanced notice to proposed rule making) which indicated that data base was unduly narrow and that data from some of sampled plants was incorrect. Federal Water Pollution Control Act Amendments of 1972, § 301, 🟨 33 U.S.C.A. § 1311.

8 Cases that cite this headnote

**[23]    Environmental Law** 🔑 Technology-based limits

Act of Environmental Protection Agency in setting hypothesized flow on which its choice of best practicable control technology currently available (BPCTCA) was based by first calculating average discharge load at best plants in each subcategory and then dividing by what it considered to be lowest concentration of pollutant materials which facilities could be relied on to attain did not amount to an invalid circular procedure even though "calculated" loading of best plants might be arrived at by multiplying flow rate at each plant by discharge rate at plant. Federal Water Pollution Control Act Amendments of 1972, § 301, 🟨 33 U.S.C.A. § 1311.

1 Cases that cite this headnote

**[24]    Environmental Law** 🔑 Technology-based limits

Congress did not intend to preclude Environmental Protection Agency from basing its BPCTCA (best practicable control technology currently available) standards on in-process control measures at least when those measures are considered normal practice within industry. Federal Water Pollution Control Act Amendments of 1972, § 306, 33 U.S.C.A. § 1316.

**[25]    Environmental Law** 🔑 Technology-based limits

Recycling of effluent does not constitute a change "within the manufacturing process itself," but is merely one form of second treatment and, hence, is not precluded from being the best practicable control technology currently available (BPCTCA), since it consists of gathering effluent from existing manufacturing processes, treating it, and returning the treated liquid to the process. Federal Water Pollution Control Act Amendments of 1972, § 306, 33 U.S.C.A. § 1316.

**[26]    Environmental Law** 🔑 Technology-based limits

With respect to recycling of effluent, fact that some plants in industry may have to substantially alter their piping and sewer systems does not mean that recycle is an in-process control and, hence, is precluded from being the best practicable control technology currently available (BPCTCA) since the dislocation of manufacturing processes which the alterations may cause is not the same thing as a change in "operating methods." Federal Water Pollution Control Act Amendments of 1972, § 306, 33 U.S.C.A. § 1316.

**[27]    Environmental Law** 🔑 Substances, Sources, and Activities Regulated

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 124 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

Environmental Protection Agency is not permitted to exempt pollutants from point source limitations established under Federal Water Pollution Control Act Amendments of 1972. Federal Water Pollution Control Act Amendments of 1972, §§ 301, 301(e), 302, 🏴 33 U.S.C.A. §§ 1311, 🏴 1311(e), 1312.

**[28]    Environmental Law** 🔑 Cost;  hardship;  feasibility

Decision of Environmental Protection Agency to exempt point sources located in Mahoning Valley of Pennsylvania from effluent limitations based on best practicable control technology currently available (BPCTCA) was invalid. Federal Water Pollution Control Act Amendments of 1972, §§ 301, 301(e), 302, 🏴 33 U.S.C.A. §§ 1311, 🏴 1311(e), 1312.

2 Cases that cite this headnote

**[29]    Environmental Law** 🔑 Particular limitations and guidelines

Water scarcity was a non-water quality environmental factor which Environmental Protection Agency was required to consider in determining best practicable control technology currently available (BPCTCA) for iron and steel industry being regulated. Federal Water Pollution Control Act Amendments of 1972, §§ 301, 301(e), 304(b)(1)(B), 🏴 33 U.S.C.A. §§ 1311, 🏴 1311(e), 1314(b)(1)(B).

**[30]    Environmental Law** 🔑 Particular limitations and guidelines

It was not arbitrary or capricious for Environmental Protection Agency to consider water scarcity problem for iron and steel industry being regulated by comparing benefits in pollution reduction attributable to each phase of its regulations with loss in water resources attributable to that phase. Federal Water Pollution Control Act Amendments of 1972, §§ 301, 301(e), 304(b)(1)(B), 🏴 33 U.S.C.A §§ 1311, 🏴 1311(e), 1314(b)(1)(B).

**[31]    Environmental Law** 🔑 Particular limitations and guidelines

Environmental Protection Agency, in promulgating interim final regulations by governing certain manufacturing processes within iron and steel industry, was to consider whether fin-tube heat exchangers or dry type cooling towers might be employed despite any fouling or scaling problems, assuming that cooling systems of some kind would be employed, and was also to consider such problems as they might be associated with use of other cooling systems which might be employed. Federal Water Pollution Control Act Amendments of 1972, §§ 301, 301(e), 304(b)(1)(B), 🏴 33 U.S.C.A. §§ 1311, 🏴 1311(e), 1314(b)(1)(B).

**[32]    Environmental Law** 🔑 Particular limitations and guidelines

In promulgating interim final regulations governing certain manufacturing processes within iron and steel industry, Environmental Protection Agency could not decline to estimate water loss due to interim final regulations as accurately as possible on ground that, whatever cost in water consumption, specified effluent limitations were justified. Federal Water Pollution Control Act Amendments of 1972, §§ 301, 301(e), 304(b)(1)(B), 🏴 33 U.S.C.A. §§ 1311, 🏴 1311(e), 1314(b)(1)(B).

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 125 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

## Attorneys and Law Firms

**\*288**  William C. Robb, Welborn, Dufford, Cook & Brown, Denver, Colo., for petitioner in No. 76-2232, CF & I Steel Corp.

Douglas R. Blazey, Maxine T. Woelfling, Harrisburg, Pa., for petitioner in No. 76-1751, Com. of Pa.

**\*289**  Jerome S. Kalur, Weston, Hurd, Fallon, Sullivan & Paisley, Cleveland, Ohio, for petitioner in No. 76-1749, Sierra Club.

Barry L. Malter, Environmental Protection Agency, Washington, D. C., and Raymond W. Mushal, Dept. of Justice, Land and Natural Resources Div., Washington, D. C., for respondents.

William W. Falsgraf, Baker, Hostetler & Patterson, Cleveland, Ohio, for intervenor, Youngstown Sheet and Tube Co., in Nos. 76-1749 and 76-1751.

Patrick F. McCartan, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for intervenor, Republic Steel Corp., in Nos. 76-1749 and 76-1751.

John McN. Cramer, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for intervenor, U. S. Steel Corp., in Nos. 76-1749 and 76-1751.

David McNeil Olds, Blair S. McMillin, Thomas C. Wettach, Thomas J. Duman, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., David S. Watson, Peter G. Veeder, Frank J. Clements, Thorp, Reed & Armstrong, Pittsburgh, Pa., Max N. Edwards, Richard E. Schwartz, Collier, Shannon, Rill, Edwards & Scott, Washington, D. C., for petitioners in Nos. 76-1386, 76-1757 and 76-2176, American Iron & Steel Institute, Allegheny Ludlum Industries and Youngstown Sheet & Tube Co. et al.

Henry H. Korn, Richard E. Nolan, Davis, Polk & Wardwell, New York City, for American Iron & Steel.

Albert J. Slap, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for petitioner, Sierra Club; John D. Hoffman, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., of counsel, Jerome S. Kalur, Weston, Hurd, Fallon, Sullivan & Paisley, Cleveland, Ohio, for petitioner, Sierra Club.

William W. Falsgraf, Evan Jay Cutting, H. Stephen Madsen, Baker, Hostetler & Patterson, Cleveland, Ohio, Donald J. Libert, Youngstown, Ohio, for intervenor, Youngstown Sheet and Tube Co.

David W. Furgason, William C. Robb, Welborn, Dufford, Cook & Brown, Denver, Colo., for petitioner CF & I Steel Corp.

Ray E. McDevitt, Washington, D. C., Alfred T. Ghiorzi, Peter R. Taft, Edmund B. Clark, Raymond W. Mushal, Chief Appellate Section, Dept. of Justice, Land and Natural Resources Div., Washington, D. C., for respondents E.P.A.

Patrick F. McCartan, Marc L. Swartzbaugh, Cleveland, Ohio, for Republic Steel Corp.; Jones, Day, Reavis & Pogue, E. P. Weber, Jr., James D. Donohoe, Cleveland, Ohio, of counsel.

K. Robert Conrad, Charles J. Bloom, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for CF & I Steel Corp.

Before SEITZ, Chief Judge, ROSENN, Circuit Judge and MEANOR, District Judge. [*]

## OPINION OF THE COURT

SEITZ, Chief Judge.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 126 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

These are petitions to review Environmental Protection Agency regulations governing certain manufacturing processes within the iron and steel industry. The regulations, which were published in the Federal Register on March 29, 1976, establish maximum permissible quantities of pollutant which may be discharged by operations performing the designated processes. The regulations also survey the available pollution control techniques, and specify techniques the "best practicable control technology currently available" (BPCTCA) which might be used in meeting the prescribed effluent limitations. In issuing the regulations, the EPA was exercising its statutory mandate to establish effluent limitations requiring the application of the BPCTCA by July 1, 1977.

33 U.S.C. s 1311(b)(1)(A). It is these regulations as to BPCTCA which are under review here. The regulations promulgated by the EPA also contain proposed : a) effluent limitations **\*290** and guidelines as to the application of the "best available technology economically achieveable" by July 1, 1983 b) standards of performance for new point sources and c) pretreatment standards for existing sources and for new sources.

The regulations governing the application of the BPCTCA are in "interim final" form, which is to say that, while they were to take effect immediately upon promulgation, the EPA is now in the process of considering "final" regulations covering the same subject matter. The regulations state that the reasons for this novel procedural form is that "(t)he Agency is subject to an order of the United States District Court for the District of Columbia entered in Natural Resources Defense Council v. Train, et al. (Cv.No.1609-73) which requires the promulgation of regulations for this industry category no later than March 15, 1976." 41 Fed.Reg. 13004.

The regulations deal only with certain processes of the iron and carbon steel and specialty steel (ferroalloy and stainless steel) industries, namely forming and finishing processes, and with certain steelmaking processes within the specialty steel industry. An earlier phase ("phase I") of the regulations, published on June 28, 1974, dealt with steelmaking processes within the iron and carbon steel industries. This court considered the latter regulations in American Iron and Steel Institute v. EPA (AISI I), 526 F.2d 1027 (3d Cir. 1975), and remanded them to the EPA for reconsideration in certain respects.

I.

Some petitioners have argued that the "interim final" regulations are invalid because they were not promulgated in accordance with the Administrative Procedure Act. The relevant procedural history may be outlined as follows.

Since November 15, 1973, the EPA has been under order of the district court for the District of Columbia, in Natural Resources Defense Council v. EPA to promulgate regulations governing the processes of the iron and steel industry covered by the present regulations. The EPA was originally under order to promulgate these regulations in 1974, but it has asked for and received several extensions of the deadlines.

On August 21, 1975, the EPA published in the Federal Register "advance notice of intent to propose and promulgate effluent limitations and guidelines for existing sources." 40 Fed.Reg. 36708. The notice of "proposed rulemaking" (ANPR) then proceeded to list the subcategories of the industry for which tentative regulations were being set forth. The EPA engaged in extensive reevaluation and revision of the tentative limitations and guidelines after they were published, partly in response to substantial sentiment within the agency that they were too lenient. The EPA did not, however, propose the revised regulations for further notice and comment. It also stipulated that the interim final regulations would be effective immediately, and thus did not allow the 30 day interval between publication date and date of effectiveness usually required by the APA. 5 U.S.C. s 553(d). The regulations contain a statement that, due to the pendency of the court order and the need to expedite the effectuation of the Act, the Agency had determined that it was "impracticable and contrary to the public interest" "to develop and publish regulations . . . in proposed form (and) to provide a 30 day comment period." The Agency also stated that there was "good cause . . . for these regulations to become effective immediately upon publication." 41 Fed.Reg. 13004.

Petitioners in Nos. 76-1386, 76-1757 and 76-2176, ("the Companies") who are steel companies and the American Iron and Steel Institute have made two challenges to the validity of the "interim final" regulations under the APA which require discussion. [1]

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

They first argue that any regulations governing specialty steel are invalid because the ANPR failed to give sufficient **\*291** indication that the Agency was considering regulations as to the specialty steel segment of the industry. This court delineated the purposes of the APA's notice and comment requirement in Texaco, Inc. v. FPC, 412 F.2d 740, 744 (1969): "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." In evaluating the Companies' contention that the ANPR was insufficient to enable the public to effectively participate in the rule-making process, we must determine whether the notice given was "sufficient to fairly apprise interested parties" of all significant subjects and issues involved. Senate Rept. No. 752, 79th Congress, 1st Session, at 16 (1945).

The adequacy of the notice as to specialty steel really encompasses two questions: whether there was adequate notice that the making of specialty steel would be covered by the regulations, and whether there was adequate notice that the forming and finishing of specialty steel would be covered by the regulations. With respect to the forming and finishing of specialty steel, the ANPR set forth "Proposed Effluent Guidelines and Standards" for the "Iron and Steel Manufacturing Point Source Category." As noted above, the EPA was making regulations under order of the court in Natural Resources Defense Council v. EPA. In ordering the EPA to make regulations, the court listed various "categories": while category 19 was "Iron and Steel Manufacturing", category 23 was "Ferroalloy Manufacturing" what we have called specialty steel. Thus, an interested person who read that the EPA was giving advance notice of intent to promulgate regulations for the "Iron and Steel Manufacturing Point Source Category" would be misled into thinking that regulations for "Ferroalloy Manufacturing" were not involved. This misimpression would be fostered by the fact that the ANPR said that "(i)n developing the requisite data to support effluent limitations, guidelines and standards EPA commissioned a study and report entitled 'Development Document for Effluent Limitations Guidelines and New Source Performance Standards Iron and Steel Industry: Hot Forming and Cold Finishing Segment' prepared by Cyrus Wm. Rice Division, NUS Corporation." The EPA had commissioned an entirely separate study of the specialty steel industry by Datagraphics, Inc.

[1] Our conclusion that the ANPR would not apprise an interested person that the specialty steel industry would be covered by the regulations on forming and finishing processes applies a fortiori with respect to the portions of the interim final regulations which deal with the making of specialty steel. The ANPR gave no indication that the Agency intended to make any regulations on steelmaking, whether in the carbon steel or specialty steel industry: all the enumerated subcategories of the "iron and steel manufacturing" industry pertained to processes other than steelmaking. The interim final regulations, however, do contain regulations governing three processes by which specialty steel is made. [2] Since the ANPR gave no indication that the regulations would deal with steelmaking, an interested person would not be able to make comments which could assist the EPA in formulating these regulations.

EPA argues that even if the ANPR was insufficient to apprise an interested person that specialty steel would be covered by the regulations, the regulations may be upheld under an exception to the APA's notice and comment requirement. 5 U.S.C. s 553(b) says that:

> "General notice of proposed rule making shall be published in the Federal Register . . . . Except when notice or hearing is required by statute, this subsection does not apply . . . (b) when the agency for good cause finds . . . **\*292** that notice and public procedure are impracticable, unnecessary, or contrary to the public interest."

This exception is to be narrowly construed. As is stated in the Senate Report on a precursor of the final APA:

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

"Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings . . . "Public interest" supplements the terms "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule making warrants an agency to dispense with public procedure. Senate Rept. No. 752, 79th Congress, 1st Session at 16. (1945)

**[2]** In arguing that it was "impracticable and contrary to the public interest" to provide notice and an opportunity for comment, the EPA relies chiefly on the fact that it had been ordered to promulgate regulations by March 15, 1976 by the court in Natural Resources Defense Council v. EPA. But we find this argument unconvincing. The EPA had been under order to promulgate regulations for the specialty steel industry since November 15, 1973, and it received its contractor's study of the specialty steel industry in January, 1974. So EPA was aware of the necessity for rapid promulgation of the limitations on specialty steel in November 1973, and had the basic contractor's study in January of 1974. But the interim final regulations were not published until March of 1976. Moreover, the ANPR did in fact contain detailed tentative regulations on the forming and finishing of iron and carbon steel, a subject on which EPA had obtained its contractor's report in July of 1974 6 months after it received its contractor's report on the carbon steel industry. Under these conditions, EPA has failed to show that it may be exempted from the APA's usual requirement of notice and comment.

**[3]** In sum, EPA may not be exempted from the APA's rulemaking requirement of notice and comment, and it has failed to give adequate notice that the interim final regulations would govern the specialty steel industry.[3] The interim final regulations are thus invalid insofar as they apply to the specialty steel industry.[4]

Apart from their challenge to the regulations concerning specialty steel, the Companies also allege that the ANPR did not give sufficient indication of the following two issues: "(1) whether filtration and tight recycle (the '10/10/5 model') are practicable for the steel industry to construct and operate by July 1, 1977 and (2) if so, the treatment levels achievable by such technology." The history behind the adoption of the 10/10/5 model is as follows. After the ANPR was published, the EPA, in its internal review of the tentative regulations found that:

"there were substantial errors in the limitations. The advance notice was improperly biased; costing inaccuracies caused an invalid comparison between clarifier and filter technologies; plants had already installed both filtration and recycle technology; and, generally, both BPT and BAT were set at improperly low levels, levels at which a quarter of the Nation's steel production would already be at BAT, with many more facilities at BPT . . ." EPA's Brief at 90.

**\*293** The Agency's response was to make the regulations substantially more stringent. The Companies especially question the use of "filtration and tight recycle" technology, which is used in Subparts M (hot forming-primary subcategory), N (hot forming-section subcategory), O (hot forming-flat subcategory and P (pipe and tubes subcategory).[5]

**[4]** **[5]** We agree with the court in International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 428, 478 F.2d 615, 632 n.51 (1973), that the submission of a proposed rule for comment does not of necessity bind an agency to undertake a new round of notice and comment before it adopts a rule which is different even substantially different from the proposed rule. As we have noted above, the adequacy of the notice must be tested by determining whether it would fairly apprise interested persons of the "subjects and issues" before the Agency.

**[6]** Judged by this standard, we conclude that the ANPR was sufficient to apprise interested persons of the issues involved in the EPA's decision to adopt more stringent treatment technologies than had been embodied in the ANPR. The Companies' concern is focussed on the EPA's determination that recycling and filtration technology is BPCTCA with respect to some forming and finishing subcategories. These techniques, as we have noted, are prescribed as BPCTCA for Subparts M through

Case 3:20-cv-07721-SL    Document 58-4    Filed 11/10/20    Page 129 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

P of the industry, and the control technology specified for these subcategories is similar. The chief pollutants produced by all four processes are suspended solids, oil and grease. The interim final regulations specify that the first step of the BPCTCA for all four processes is a primary scale pit a settling unit with oil skimming equipment applied to the effluent in the scale pit. This was also specified as the first step of the BPCTCA in the ANPR. The interim final regulations specify that after the scale pit,[6] part of the effluent is recycled for use in the steel making process; this is one of petitioners' points of concern. The interim final regulations state that the remaining effluent in the scale pit goes to a clarifier; the use of a clarifier was also specified in the ANPR. The underflow from the clarifier is to be vacuumed filtered, as the ANPR had also stated. Finally, the overflow from the clarifier is filtered and discharged. The use of filtration is a second point of concern to petitioners, and is peculiar to the interim final regulations.

We conclude that the ANPR was sufficient to apprise interested persons that there was an issue as to whether recycling of partially clarified effluent was BPCTCA. In the first place, the suggested BPCTCA in the ANPR regulations for three of the four subcategories of the industry here involved N, O and P include some recycling of effluent. Moreover, in surveying the treatment technology currently in place in existing plants, the ANPR notice mentioned recycling with respect to all subcategories of the iron and steel industry for which the interim final regulations later specified recycling as part of the BPCTCA. An interested person thus should have been aware that recycling was potentially a significant component of the ultimate regulations as to BPCTCA.

The use of filtration upon the overflow from the clarifier presents a closer question, since the ANPR did not suggest that filtration of the clarifier overflow would be part of the BPCTCA for any of the hot-forming subcategories (Subparts M, N and O) or the pipe and tubes subcategory (Subpart P). Nevertheless, we conclude that the notice was sufficient, since, as with the use of recycle, the ANPR did inform the public that high rate filtration technology was already in place in plants in those of three subcategories (M, N and O). With respect **294** to the meaning of BPCTCA, the Senate Report to the bill which ultimately became the Federal Water Pollution Control Act Amendments of 1972 said that: "(T)he Administrator should establish the range of best practicable control technology based upon the average of the best existing performance by plants of various sizes, ages, and unit processes within each industrial category."[7] Senate Report No. 92-414, 92d Congress, 1st Session (1971), p. 50. The statements in the ANPR that "a few plants will have high rate filters to treat either scale pit or clarifier effluents",[8] and that the "range of treatment technology currently practiced in existing plants includes all the items discussed above"[9] including the use of high rate filters may not be a full statement that the plants now employing filter technology within each subcategory of the industry are "of various sizes (and) ages." But this is little more than to say that EPA had not yet determined that filtration was BPCTCA when it published the August notice. The notice does fairly apprise interested parties that there was an issue as to whether filtration was BPCTCA because it states that some of the best existing plants use filters.

In sum, we conclude that the use of the 10/10/5 model did not violate the APA's requirement of notice and hearing.[10]

Pennsylvania's Department of Environmental Resources, ("Pennsylvania") the Petitioner in No. 76-1751, questions the sufficiency under the APA of the Agency's decision to exempt plants in the Mahoning River Valley region of Eastern Ohio "from the effluent limitations based on best practicable control technology currently available." We need discuss only two of Pennsylvania's arguments:[11] 1) that the EPA did not provide notice and an opportunity for comment on the special treatment afforded plants in the Mahoning Valley 2) that adequate judicial review of the Mahoning Valley exemption is precluded by the EPA's failure to include a "concise general statement of (the) basis and purpose" of the action as required by the APA. 5 U.S.C. s 553(c).

1. The interim final regulations state that:

> The relief granted from severe economic impact in the Mahoning River Valley region, which impact is likely to occur absent such relief, is the exemption of point sources located within that region from the effluent

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 130 of 1384

limitations based on best practicable control technology currently available. Nevertheless, the Agency fully expects that authorities granting permits, pursuant to section 402 of the Federal Water Pollution Control Act, as amended, shall not allow point sources in  *295  that region to discharge pollutants in any greater amounts than are currently being discharged by those sources. 41 Fed.Reg. 12995.

The only indication in the ANPR that such an action might be taken is the following:

One commenter has claimed that the proposed guidelines will result in the loss of 12,000 jobs from the steel employment in the Mahoning River Valley region. Furthermore, the commenter asserts that "there is ample justification for adding to the guidelines, a subcategory based on the age of the facility."

The Agency intends to secure and evaluate additional information on possible economic impacts in this region and would consider revision of the regulations if the information appears to warrant this action. 40 Fed.Reg. 36723.

Pennsylvania argues that in reading the language "would consider revision of the regulations" an interested member of the public might well come to the conclusion that the EPA would not consider whether to give Mahoning Valley special treatment until the rulemaking then noticed had already been completed. Thus, the public could well have been misled into thinking that comments on the Mahoning Valley question were not appropriate during the present rulemaking proceedings.

 [7]    Pennsylvania's argument hinges on the meaning of the word " regulations" in the ANPR. If the word refers to the regulations to be promulgated at the end of the noticed rulemaking, then a member of the public might indeed be misled into thinking that he should defer comment on the Mahoning Valley question. On the other hand, if the word refers to the regulations then proposed, a member of the public would be on notice that immediate comment was appropriate. We note that the ANPR states that "(t)he regulations set forth below when promulgated will amend 40 CFR, part 420." 40 Fed.Reg. 36708 (emphasis added). This, read in conjunction with the statement that the EPA would consider revision of the "regulations" to take account of any special conditions in the Mahoning Valley would indicate that immediate comment was appropriate. Thus, we conclude that there was sufficient notice to "fairly apprise" the public that the Agency might afford special treatment to facilities in the Mahoning Valley. We confess, however, that the language in the ANPR is hardly a model of clarity.

 [8]    2. Pennsylvania has also argued that the Mahoning Valley exemption is invalid because the EPA did not give a "concise general statement of (the) basis and purpose" of the action as required by the APA. 5 U.S.C. s 553(c). This argument is meritless. The interim final regulations state that:

Tentative analysis of the available data leads to the conclusion that conditions in the Mahoning River Valley region are unique with respect to the physical and geographical characteristics of the region, physical and operating characteristics of the facilities located therein, and the importance of the facilities to the economy of the region. Tentative analysis of the available data and the consultant's evaluation thereof appears to support the contention that mandatory compliance with effluent limitations guidelines which do not take into account these factors is likely to result in severe economic dislocation within the Mahoning River Valley region.

In addition to similar economic disadvantages resulting from age and size characteristics, facilities in the region appear to share economic disadvantages caused by locational characteristics. These include the movement of markets away from the region, constrained access to raw materials due to the unavailability of waterborne transportation and required transshipment by rail, and space limitations which prohibit major expansion of existing facilities. 41 Fed.Reg. 12994.

 *296  This statement is clearly sufficiently detailed to allow for "searching judicial scrutiny." Amoco Oil v. EPA, 163 U.S.App.D.C. 162, 179, 501 F.2d 722, 739 (1974).

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 131 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)
10 ERC 1689, 7 Envtl. L. Rep. 20,738

II.

We now turn to the issues raised by the various petitioners as to whether the EPA has properly carried out its functions under the Water Pollution Control Act. The Companies argue that the regulations are invalid because they specify only a maximum permissible level of effluent discharge, and do not indicate a range of permissible effluent levels by providing guidelines as to how much more severe controls may be required of any particular plant by the authority granting a pollution discharge permit under s 402 of the FWPCA. The argument thus raises questions as to the proper relation between s 301, which is the Agency's authority for promulgating specific effluent limitations requiring application of BPCTCA, and s 304, which directs the Agency to "specify factors to be taken into account in determining the control measures and practices applicable to point sources."

[9]    The Companies rely chiefly on this court's decision in AISI I which held EPA's regulations on iron and carbon steelmaking processes invalid because they failed to provide guidelines "to guide the permit-issuing authorities in deciding whether, and

by how much, the limitation to be applied to any individual point source is more stringent than the base level." 526 F.2d at 1045. Since briefing and oral argument in this case, however, the panel in the earlier case has granted a motion to recall its mandate, and has held that the EPA may specify a maximum permissible level of effluent discharge without providing guidelines as to how permit issuers are to select more stringent levels of control. American Iron and Steel Institute v. EPA, slip opinion

(July 29, 1977). This court now stands with the other courts of appeals which have considered this question. See Hooker

Chemicals v. Train, 537 F.2d 620 (2d Cir. 1976); American Frozen Food Institute v. Train, 176 U.S.App.D.C. 105, 539 F.2d

107 (1976); FMC Corporation v. Train, 539 F.2d 973 (4th Cir. 1976); American Petroleum Institute v. E. P. A., 540 F.2d

1023 (10th Cir. 1976).

[10]    The holding of the prior panel on the motion to recall its mandate is binding upon us, and requires that we reject contentions. Consequently, we need not engage in any discussion of the merits of these contentions.

III.

[11]    [12]    [13]    [14]    The Companies have also argued that EPA did not properly evaluate the costs and benefits relevant to identifying the BPCTCA. In evaluating these arguments, we must follow the familiar [12] standards governing judicial review of

agency action under the APA. s 706 of the APA provides that "(t)he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law . . ." As the Supreme Court said in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823,

28 L.Ed.2d 136 (1971), an agency's "decision is entitled to a presumption of regularity. (citations omitted). But that presumption is not to shield (its) action from a thorough, probing, in-depth review." In conducting this review, we will not overturn agency

action because the underlying reasoning is not fully set forth, if we can fairly discern the basis for the action. Bowman

Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-6, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). But the touchstone of our review, both as to the Agency's consideration of the issues and the factual predicates of this consideration must be the administrative record. In deciding to accept or reject petitioners' contentions we must look "to the record that was considered by the agency not to post hoc rationalizations of counsel or even agency  *297  members and not to evidentiary

materials that were not considered by the agency." Dry Color Mfrs. Assn., Inc. v. Department of Labor, 486 F.2d 98, 104

n.8 (3d Cir. 1973).

Section 304(b) of the FWPCA, as amended, states that, in assessing the BPCTCA, the EPA must consider:

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 132 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

> . . . the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact . . ., and such other factors as the Administrator deems appropriate.

As this court noted in AISI I, Senator Muskie, the Chairman of the Senate Subcommittee on Air and Water Pollution, stated in support of the House-Senate Conference Committee Report:

. . . The balancing test between total cost end effluent reduction benefits is intended to limit the application of technology only where the additional degree of effluent reduction is wholly out of proportion to the costs of achieving such marginal level of reduction for any class or category of sources.

The Conferees agreed upon this limited cost-benefit analysis in order to maintain uniformity within a class and category of point sources subject to effluent limitations and to avoid imposing on the Administrator any requirement to consider the location of sources within a category or to assess water quality impact of effluent controls, or to determine the economic impact of controls on any individual plant in a single community. [13]

Another factor which lead the court in AISI I, 526 F.2d at 1052, to conclude that "the Administrator must have broad discretion in weighing the costs and benefits" is the following passage from the Senate Report which discusses s 302 of the Act where a more specific cost-benefit analysis is required than with s 304:

> The Committee recognizes that no mathematical balance can be achieved in considering relative costs and benefits nor would any precise formula be desirable, but in each case the Administrator or the State will be able to determine whether there is any reasonable connection at all between the costs which a particular effluent limitation would impose and any benefits (including the attainment of natural water quality) which might be derived. [14]

[15]    1. The Companies have argued that the interim final regulations are invalid because the EPA failed to reach any final conclusion as to whether the costs of compliance are justified by the benefits. But the record shows that the EPA did investigate the harmful effects of the various pollutants from iron and steel facilities. Moreover, the Agency calculated the contribution of selected additional levels of technology to eliminating the discharge of the various pollutants, and compared this contribution to the costs of these technologies. The Companies claim that this procedure was an "intellectual fraud" since, as the Agency expressly warned, inferences could not be drawn as to the cost-effectiveness of levels of treatment other than those which the Agency had selected to present. But given the EPA's "broad discretion" in weighing costs and benefits, and the fact that the Agency did evaluate several treatment technologies within each category, we conclude that the regulations are not invalid on the grounds that the Agency did not properly evaluate the cost effectiveness of possible treatment technologies.

2. The Companies have also argued that the EPA failed to properly consider the factors relevant to determining how the iron and steel industry should be broken down into subcategories, prior to identifying the BPCTCA for each subcategory. EPA's methodology may be described as *298 follows. The Agency took a survey of existing treatment facilities and their

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

performances to develop a list of the best plants: the list was ultimately narrowed to 68 plants with 111 operations of various ages, sizes, unit processes and in-place treatment technologies. The industry was studied "for the purpose of determining whether separate limitations are appropriate for different segments within the category." 41 Fed.Reg. 12990. The following factors were considered in determining possible subcategorization of the industry: manufacturing processes and equipment, products, raw materials, wastewater characteristics, waste treatability, gas cleaning equipment, size and age, land availability (location), and process water usage. The EPA ultimately determined that "(t) he individual processes, products, and the wastewater characteristics comprise the most significant factors in the categorization"[15] of the industry, but also concluded that some of the other factors were helpful in supporting its subcategorization on the basis of the above factors. For example, with respect to the relevance of process water usage, the interim final regulations state that:

Examination of the available data indicates that within well defined ranges process water usage can be directly correlated to the various manufacturing operations. This correlation verifies the basis of the subcategorization scheme by manufacturing processes. Differences in scale (see size factor) of a categorized manufacturing process was considered. The results indicated that on a per ton of steel basis, process water usage is not dependent upon the scale of the manufacturing operation. It was observed though, that much larger volumes of process cooling water are generally required to cool the hot forming machinery than that which is needed for the cold forming operations, thus further substantiating the subcategorization by manufacturing process. Considerations of age, location and raw materials revealed no discernible differences in process water usage. Process water usage parallels the subcategorization by final product considerations (see final products factor) where data revealed that for particular product requirements well defined manufacturing processes must be employed. 41 Fed.Reg. 12993-4.

On the other hand, the EPA found that some of the factors considered were not useful bases for subcategorization. As to size and age, the interim final regulations state:

Plant size and age, per se, are not viable factors for subcategorization of the iron and steel industry. Information compiled during this study and previous steel industry investigations do not reveal any discernible relationship between these factors and raw waste loads, effluent quality, treatability, or any other basis for subcategorization.

Although specialty steel plants do tend to be smaller than carbon steel plants, the type of steel produced has a greater impact on the waste loads and water use than does the size per se.

Size was considered as a possible factor for subcategorization but from analysis of the compiled data size, per se, does not justify categorization. Throughout the steel industry mills vary greatly in physical size, layout and product size. However, these considerations revealed no relationship to process water usage, discharge rate, effluent quality or any other pertinent factors.

Age as a factor might be expected to be at least amenable to quantitative identification and interpretation, but the extensive investigation of the industry does not indicate that age alone is a factor. The steel industry is old. Some of the old mills still incorporate early operating ideas and practices. However, other old mills are very new in that they have **299** incorporated the latest operating ideas and practices.

Nevertheless, most older mills have been updated by internal changes in process, design, and equipment. Therefore, to say that a mill was built 50 years ago and is 50 years old is not particularly meaningful in terms of interpreting mill practices. In particular, no consistent pattern between mill age and raw waste characteristics was found. 41 Fed.Reg. 12993.

Contrary to the Companies' contentions, we believe that these passages in the interim final regulations, and others appearing at 41 Fed.Reg. 12992-5, demonstrate that the EPA did consider subcategorizing the iron and steel industry on the basis of factors other than manufacturing processes. Moreover, the Companies have not suggested that the record shows that there is an insufficient factual basis for the EPA's treatment of the subcategorization question. As EPA concedes, the chosen subcategorization like any subdivision of the industry does not take into account all of "the innumerable differences within the particular subcategories."

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 134 of 1384

AISI I, 526 F.2d at 1046. But this does not in itself imply that the EPA has failed to properly exercise its functions under the FWPCA.

[16] We must, however, agree with the Companies' contention that, to the extent it considered age as a relevant factor, the EPA did not consider age as it might pertain to the cost or feasibility of retrofitting plants with new pollution control technology, as required by this court's decision in AISI I, 526 F.2d at 1048. As in the previous case, the interim final regulations recite that the EPA has found that age per se is not relevant to factors such as type of pollutants produced. But the EPA has not specifically found that age has no bearing on the cost or feasibility of retrofitting plants with pollution control technology, and a finding on this issue is mandated by our earlier decision.


The interim final regulations recite that the concept of plant age is not amenable to interpretation because "most older mills have been updated by internal changes in process, design, and equipment. Therefore, to say that a mill was built over 50 years ago and is 50 years old is not particularly meaningful in terms of interpreting mill practices." In its brief, EPA suggests that this is a sufficient answer to the retrofit question: age has little or no bearing on retrofit because the concept of plant age itself is difficult to define.

Were we writing on a clean slate, we might find this argument convincing. But since the facts in this case cannot be properly distinguished from the facts in the earlier case we must reject EPA's contention. The discussion of the bearing of age and size in the interim final regulations does not differ in material respects from EPA's discussion of this issue in the regulations which were reviewed in the previous case. Compare 39 Fed.Reg. 24116 with 41 Fed.Reg. 12993, 13002. EPA argues that new data submitted to it after the earlier regulations were remanded "substantiates (its) conclusion and obviates the need for further investigation." But again, the interim final regulations do not expressly address the retrofit problem. EPA also argues that a study by Arthur D. Little, Inc., which was commissioned by AISI, reinforces the Agency's findings, since this study states that:

> "(i)n the iron and steel industry it is difficult to define the age of a plant, because many of the unit operations were installed at different times and are also periodically rebuilt on different schedules. Thus, by definition, the age of steel facilities should offer only limited benefits as a means of categorizing plants for purposes of standard setting or impact analysis."


But the Companies are not bound to accept the conclusion that age is not relevant to cost or feasibility of retrofit merely because of any conclusion contained in a report commissioned by AISI. They have a right, under our earlier decision, to a finding on the retrofit question by the EPA. We note, however, that we have not dismissed the EPA's resolution of the retrofit question on the merits: we merely require that the **\*300** Agency reexamine the relevance of age specifically as it bears on retrofit. As this court said in AISI I, 526 F.2d at 1048: "(i)f (EPA) concludes on remand that age is not relevant to the cost or feasibility of retrofitting plans (sic), as well as to the processes and treatment system, that conclusion will be valid to the extent it is supported by the record." We note that the reconsideration of the bearing of age on the cost or feasibility of retrofitting plants shall include consideration of standards setting within subcategories as well as altered subcategorization.

3. The Companies have also questioned the EPA's approach to determining BPCTCA within the subcategories. After EPA had decided upon a subcategorization of the industry, it determined the BPCTCA for each of these subcategories by calculating the average waste load at the exemplary plants, and "visualiz(ing)" a treatment model for attaining the calculated effluent load. In visualizing a treatment scenario, the EPA arrived at a projected effluent flow, given an "achievable" concentration level. But it is important to emphasize that the interim final regulations do not require the use of treatment technologies with these particular flow and concentration levels. Indeed, the industry is free to employ any treatment technology it chooses, as long as this technology enables the industry to attain the prescribed level of effluent load.

 **[17]**    The Companies insist that determining BPCTCA by arriving at a maximum permissible load of effluents and "visualizing" a control technology which would meet these limitations is working backward: they argue that EPA should have first examined the technology in existence and then estimate how much this technology can contribute toward cleaning up effluent. We must reject this argument. In the first place, in visualizing control technologies, EPA specified measures which it had found were used in plants in each subcategory. We do not mean to imply that the EPA is always bound to select technologies already in place for BPCTCA: indeed, the legislative history of the FWPCA would seem to indicate that the EPA is not so restricted. [16]  But the fact remains that the EPA did select technology already in place in some plants for BPCTCA. Moreover, the EPA performed a cost-benefit analysis on the technology it selected through the challenged procedure, and this is ultimately what is required by the FWPCA. As long as EPA has performed the cost-benefit analysis required by the Act, and has selected a type of technology which may, under the Act, be a BPCTCA, it is irrelevant that it selected the BPCTCA by visualizing a control technology that would achieve desired effluent limitations.

 **[18]**    The Companies also argue that the EPA's approach of determining the BPCTCA after calculating the average effluent load at the best plants in each subcategory "permitted (it) to derive limitations from effluent samples without analyzing how these particular treatment levels could be achieved at other plants, or investigating why they were not being (met) by other plants." But this argument really amounts to a claim that it was "necessarily an abuse of discretion to base the regulations on results obtained from a few plants which were using the best technology" a claim which was rejected in AISI I, 526 F.2d at 1057. It is true that as long as EPA focuses only on some plants in each subcategory there is a possibility that some differences between plants in the subcategory may be ignored: not all plants within a subcategory are perfectly typical of all plants within the subcategory even once the industry has been subcategorized in a permissible manner. But petitioners have not made an  **\*301** adequate showing that the plants EPA surveyed do not constitute an adequate sampling of the subcategories they represent.

4. The Companies assert that the EPA's cost estimates are defective because they fail to take into account costs for such factors as land acquisition, site clearance, utility interconnection between battery limits and process equipment, sales and use taxes, freight charges, supporting utility requirements such as boilers, instrumentation other than that for pH and fluoride control, and safety systems. They also stress that the Agency's assumptions as to the characteristics of the sites on which plants are located were unrealistic, and that these assumptions thus caused the Agency's cost figures to be inaccurate.

EPA argues that the Companies' contention is satisfactorily disposed of by the following passage from this court's opinion in AISI I :

> A troublesome question is presented by petitioners' contention that the costs estimated by the Administrator were artificially low because certain factors were excluded. Petitioners point to the fact that the Final Development Document listed several factors which admittedly affected costs, but which were excluded from the cost analysis. Petitioners contend that these factors, which include such things as land acquisition and site clearance costs, generate costs which are as large as those which the Administrator included in his estimates. However, petitioners have pointed to no data which would support their allegation as to the magnitude of these excluded costs factors. Furthermore, many of these factors were excluded because they were inherently site-specific or because they could not be evaluated. For these reasons, we do not believe we can conclude that the exclusion of these factors from the costs analysis was arbitrary or capricious. 526 F.2d at 1053. (footnotes omitted).

The present case, however, is different from the situation presented in AISI I in two significant respects. First, the Companies have pointed to record data in the EPA's study of plants in Ohio's Mahoning River Valley which substantiates their claim that these costs are indeed significant. Second, as to whether the costs in question can be evaluated, EPA has presented in its brief a

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 136 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

procedure for comparing its "generous" estimates of cost factors other than site-specific factors with the actual total (including site-specific) costs of reporting plants which meet or exceed the BPCTCA standards.

 [19]    The EPA also argues that its treatment of site-specific costs was adequate because it did in fact include an adequate allowance for these costs. The ANPR states that:

> The most accurate way to determine the water pollution control facility costs and the site specific costs would be to calculate these costs for each operation at each of the many mills and plants. Such a determination is far beyond the scope of this effort and thus a method approximating these costs was developed. The contractor was conservative in estimating both the treatment facilities required to achieve the effluent quality and the cost of these facilities. This is borne out by the data submitted by the companies, relative to the plants visited which were meeting the proposed guidelines (Forming and Finishing Segment), shows that these plants on the average experienced total installation costs (Facility costs plus site-specific costs) and annual operating costs less than the facility costs alone (i. e., not including site specific costs) or the operating costs as estimated by the study contractor. For this analysis actual costs reported were adjusted to August 1971 dollars to be consistent with the costs used by the study contractor. An adjustment was made also to achieve consistency in the production capacity of the actual facility and the typical facility for which the treatment models were costed out. 40 Fed.Reg. 36724.

But while EPA asserts that its contractor's cost estimates were, on the average, adequate to cover site-specific factors, we are  *302  not directed to record evidence which would permit us to verify that the Agency actually employed the procedure set forth in its brief or another procedure to compare its model cost estimates with the actual total (including site-specific) costs of reporting plants which meet or exceed the BPCTCA standards. Indeed, EPA's brief demonstrates that in several subcategories, the costs predicted from the model diverge significantly from the actual cost data from reporting plants. The case will thus be remanded for appropriate consideration of the factors originally not included by the Agency. See EPA's Development Document for the Interim Final Regulations at 526-8. To the extent that the sufficiency of the allowance for certain factors which were excluded may not be adequately checked using the procedure presented in EPA's brief or another procedure, the Agency may continue to exclude these factors.

5. The Companies contend that the EPA did not adequately consider the industry's ability to find the funds necessary to install and operate the pollution control equipment required to achieve the effluent limitations specified in the interim final regulations. As EPA states in its brief, its analysis of the economic impact of its regulations is based upon its analysis of a study by Temple, Barker and Sloane, Inc. (TBS). The following data from the TBS report indicates the magnitude of the burdens EPA's regulations will impose on the industry.

Long run (1975-83) capital expenditures required to comply with the BPCTCA regulations now under review total $1.39 billion (all figures in 1975 dollars); $0.96 billion will be required for operations and maintenance of this equipment over the same period. On the other hand, the capital for capacity expansion and modernization sufficient to meet anticipated steel shipment requirements and to be able to operate at planned levels of utilization comes to $27.50 billion over the period 1975-83. Revenues required to comply with the BPCTCA effluent limitations in the present regulations come to $2.59 billion for the period 1975-83, while $338.61 billion will be needed for baseline [17] requirements associated with the production of iron and steel. TBS anticipates that $1.11 billion of the revenues required over the 1975-83 period to finance pollution control must come from external sources of funds, while $12.99 billion in external financing will be needed for baseline expenditures associated with iron and steel manufacturing.

The extent of the burden imposed upon the industry is underscored by TBS' statement that:

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

"(d)uring the last decade the steel industry has depended upon external sources for less than $1.0 billion . . . Thus, the steel industry must attract significant amounts of capital to finance expansion and modernization of steel operations after more than a decade of negligible financing activity. Environmental regulations will increase these financing requirements."

Moreover, TBS noted that the industry's ability to attract sufficient capital was diminished by the fact that:

. . . the industry's level of profitability has seriously lagged the average of all manufacturing with the exception of 1974 when the relaxation of price controls and worldwide shortages of both steel and basic raw materials enabled the steel industry to raise its prices and fully utilize its productive capacity. Overall steel industry rates of return in 1974 equalled the all-manufacturing average, with natural resources extraction and some non-steel activities (e.g., chemicals) far exceeding the returns on steel operations. Over the last decade, however, the steel industry's rate of return on common equity has averaged one-half of that for all manufacturing firms when profitability is adjusted to reflect inflationary trends.

**\*303** The Companies have made several challenges to the Agency's consideration of the financing problem. But we need consider only one: that the Agency relied on a February draft of the TBS report, which contains significant differences from the report dated as of March the month in which the interim final regulations were promulgated. The February draft states that:

(I)t is TBS's opinion that the steel industry would be unable to finance its expansion, modernization and pollution control requirements without earning an adequate return on common equity at least equal to that realized by steel firms overall. Difficulties in financing these needs would be eased further if steel firms could achieve a return equal to other manufacturing firms. (emphasis added)

On the other hand, the March report states that:
"(i)t is TBS's opinion that the steel industry will be unable to finance its expansion, modernization and pollution control requirements without earning a rate of return on common equity at least equal to those realized by other manufacturing firms." (emphasis added)

As EPA concedes before this Court, the "projected average nominal return on equity for the steel industry equals 72% Of the projected average nominal return on equity by the manufacturing sector as a whole." Thus, we cannot consider the difference between the February draft of the TBS study and the March report merely as a change in emphasis or of verbal shading. Nor can we consider the subject of the conditions under which the industry can meet all of its financing needs as peripheral to TBS' basic conclusions. Thus, unless the differences between the drafts of the TBS report are irrelevant because EPA made a sufficient independent assessment of the financing problem, or unless we can infer that the EPA was aware of and considered the March report, we must remand the matter to the Agency for reconsideration of the financing problems raised by the interim final regulations. If the Agency based its assessment of the financing problem in substantial part on the assumption that it had the benefit of TBS' expertise in evaluating the problem, and it did not in fact have the benefit of TBS' ultimate conclusions, the regulations must be viewed as having been promulgated under a misimpression going to the heart of the Agency's exercise of discretion.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

10 ERC 1689, 7 Envtl. L. Rep. 20,738

As to whether the EPA did make a sufficient independent assessment of the financing problem, it is important to note the following disclaimer in the March TBS report:

> This report is being released and circulated at approximately the same time as publication in the Federal Register of a notice of proposed and interim final rule making under sections 304(b) and 306 of the Act for the subject point source category. The study is not an official EPA publication. It will be considered along with the information contained in the Development Document and any comments received by EPA on either document before or during rule making proceedings necessary to establish final regulations. Prior to final promulgation of regulations, the accompanying study shall have standing in any EPA proceeding or court proceeding only to the extent that it represents the views of the contractor who studied the subject industry. It cannot be cited, referenced, or represented in any respect in any such proceeding as a statement of EPA's views regarding the subject industry.

Moreover, the Agency has argued before us that it "not only reviewed the TBS text but also analyzed the underlying data which remained unchanged." However, several factors lead us to conclude that EPA did rely in substantial part on TBS' expertise in evaluating the industry's financing problem, and not simply on the data contained in the report.

In the first place, EPA itself belittles the "standard" disclaimer contained in the March TBS report. Moreover, after completing a survey of the conclusions (rather than merely the data) contained in the **\*304** March report, EPA's brief states that "(t)he soundness of the TBS report and the Administrator's reliance thereupon are clearly supported in the record." We also note that the "Summary Economic Analysis of Effluent Guidelines for the Integrated Iron and Steel Industry" dated February 6, 1976, which was the last full discussion of the financing problem actually prepared by the Agency,[18] states that: "(t)he summary of economic effects that follows is prepared from preliminary results (of the TBS study) . . . This report summarizes the study in terms of the effects of the effluent guidelines on internal and external costs." The "Summary Economic Analysis" states that its "baseline assumption" is that the industry will be able to earn "approximately a 9% Return on stockholder equity." As the Agency itself notes, the 9% Figure is the projected rate of return on equity for the steel industry, (the rate stressed in the February TBS draft) rather than the manufacturing sector as a whole. In sum, we conclude that the EPA did rely on TBS' expertise in evaluating the extent of the financing burden imposed by the interim final regulations.

But we cannot infer that EPA ever received or considered the contents of the March draft of the TBS report. The Agency's own "Summary Economic Analysis," as we have noted, is dated February 6, 1976. Moreover, the interim final regulations state that: Studies of the economic impact of these regulations are under way and will be reported in the near future as separate reports entitled "Economic Analysis of Effluent Guidelines, Iron and Steel Industry" and "Economic Analysis of Effluent Guidelines, Specialty Steel Industry". 41 Fed.Reg. 13001.

The March TBS report is entitled "Economic Analysis of Proposed and Interim Final Effluent Guidelines, Integrated Iron and Steel Industry."

 **[20]**    The matter is remanded to the Agency for reconsideration of the financing problems raised by the interim final regulations.

 **[21]**    6. The Companies argue that the EPA did not adequately consider the evidence that combined treatment of waste streams ("central treatment") should be adopted as BPCTCA. The interim final regulations state that:

The comment has been made that these limitations require individual waste treatment facilities at each operating unit and prohibit the use of central waste treatment facilities which are more economical to construct and to operate.

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)
Case 3:20-cv-07721-SL   Document 58-4   Filed 11/10/20   Page 139 of 1384
10 ERC 1689, 7 Envtl. L. Rep. 20,738

Central treatment facilities typically provide for equalization, neutralization, solid removal, and sludge dewatering. Other pollutants requiring removal are usually more efficiently and economically controlled or recovered by a pretreatment step applied to the segregated stream. These regulations have been constructed so as to permit a discharger to apply either approach.

In the event that waste streams from various sources are combined for treatment or discharge, the quantity of each pollutant or pollutant property attributable to each controlled waste source (subcategories M through V) shall not exceed the specified limitation for that particular waste source. For example, if a plant's production allows it to discharge 5 lbs. a day of tin from its terne plating operation, it would not be allowed to discharge 10 lbs. a day of tin because the terne line wastes were combined with cold rolling wastes for treatment.

However, in the instance of the use of pickling wastes to assist in the breaking of emulsified oils from cold rolling wastes, some added waste load discharges are permitted by the regulation. The cost savings that could be achieved by the **\*305** use of one waste stream to treat another waste stream was considered sufficient to justify permitting additional loads to be discharged. 41 Fed.Reg. 13002.

The nature of EPA's decision with respect to central treatment can fairly be inferred from this passage. EPA recognized that the use of central treatment facilities could result in significant savings, but was concerned that combining different waste streams would sometimes increase the total load of pollutants discharged because some pollutants would be diluted and thus made more difficult to treat. The Agency consequently provided that when waste streams are combined, no more pollutant load can be discharged than if the streams had been segregated. However, the Agency recognized that in one instance combined treatment of cold rolling and pickling wastes some added waste load discharge should be allowed. The Agency also concluded that, in some cases, some of the benefits of central treatment could be attained by incorporating a pretreatment step to remove such wastes as would be unduly diluted before combining waste streams for central treatment. While we believe that the Agency could have set forth its reasoning on the cost-benefit question with greater clarity, we conclude that the record shows that it did give adequate consideration to the use of central treatment.

The Companies argue that many steel facilities are so crowded and have such limited land available that it is simply impracticable to employ separate treatment. They cite one of the plants studied by EPA's contractor as an example of a plant where central treatment could be impracticable. There may be some individual plants with extraordinary space limitations or other problems; these plants may petition the permit granters for a variance from the nationwide standards under the variance clause of EPA's regulations. But the companies have failed to show that the EPA's conclusions as to central treatment are unreasonable with respect to the industry as a whole. They have not argued that EPA's cost estimates assume central treatment, and thus make insufficient allowances for the measures which would have to be taken to institute separate treatment. Moreover, with respect to land availability, the interim final regulations state that: "(i)t is recognized that at older mills, the mill buildings may be crowded together, so the technologies suggested for . . . BPCTCA minimize land requirements." 41 Fed.Reg. 12993.

7. The Companies also claim that the EPA based its regulations on effluent flow rates which are too restrictive and unrealistic. Again, we must note that the interim final regulations do not require a particular flow rate: industry may employ any combination of concentrations and flow rates which achieves the prescribed effluent loads. Nevertheless, it is true that the EPA's assumption about the effluent flow rates was relevant to its choice of BPCTCA, and thus to the ultimate s 301 effluent limitations as well, since the flow rate is relevant to the type of technology to be employed, and thus to the costs.

 **[22]**   The Companies' first challenge to the EPA's treatment of flow rates is that the Agency ignored comments to the contractor's report and to the ANPR which indicated that the data base was unduly narrow and that the data from some of the sampled plants was incorrect. However, we are not directed to any evidence in the record which would substantiate these charges. Moreover, we note that a report of the EPA's Iron and Steel Task Force, which was established after the ANPR, states that the group reexamined the data base on the basis of further information "from the plants." As to the Hot-Forming-Primary subcategory, the report states specifically that "(t)he data base was examined and revised to include company data (particularly as regards flows) . . . "

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 140 of 1384

[23]   The Companies next challenge the flow rates on which the regulations are based because EPA employed a "circular" procedure in determining them. According to the Companies, the flows were calculated by multiplying flow by concentration to achieve the "calculated" loading, and then   *306   dividing by concentration to give the flow on which the regulations were based. This, however, is a misleading portrayal of the actual procedure. EPA set the hypothesized flow on which its choice of BPCTCA was based by first calculating the average discharge load at the best plants in each subcategory, and then dividing by what it considered to be the lowest concentration of pollutant materials which facilities could be relied on to attain. This is hardly a circular procedure even though the "calculated" loading of the best plants might be arrived at by multiplying the flow rate at each plant by the discharge rate at this plant.

The Companies argue that the flow rates required by the BPCTCA are unrealistically low. We note, however, that plants in each of the subcategories mentioned by them now have flow rates lower than those hypothesized by EPA as a basis for the interim final regulations.

[24]   We also reject the Companies' assertion that recycle of effluent cannot be BPCTCA because it requires facilities to make extensive internal alterations. The legislative history of the 1972 amendments to the Water Pollution Control Act shows that Congress expected the EPA to base BPCTCA standards chiefly upon end-of-manufacturing treatment of wastewater, though courts which have considered the problem have concluded that Congress did not intend to preclude the EPA from basing its BPCTCA standards on in-process control measures, at least when these measures are "considered normal practice within the industry." FMC Corp. v. Train, 539 F.2d 973, 981 (4th Cir. 1976); see also American Petroleum Institute v. E.P.A., 540 F.2d 1023, 1033 (10th Cir. 1976); American Paper Institute v. Train, 177 U.S.App.D.C. 181, 194, 543 F.2d 328, 341 (1976); Hooker Chemicals & Plastics Corp. v. Train, 537 F.2d 620, 637 (2d Cir. 1976). The Report of the House Committee is instructive as to Congress' intent that BPCTCA consist, for the most part, of secondary treatment: "(b)y the term 'control technology' the Committee means the treatment facilities at the end of a manufacturing . . . or other process rather than control technology within the manufacturing process itself."[19]

[25]   We agree with EPA that recycling of effluent does not constitute a change "within the manufacturing process itself." Rather, it is one form of secondary treatment, since it consists of gathering effluent from existing manufacturing processes, treating it, and returning the treated liquid to the process.

[26]   Some elucidation of the distinction between secondary treatment and in-process controls may be gathered from the legislative history of s 306 of the Act, which concerns national standards of performance for new sources of pollution. The Conference Committee Report states that under s 306 "that the Administrator is required to establish standards of performance which reflect the levels of control achievable through improved production processes, and of process technique, etc."[20] The House Committee's Report states that in setting standards for new sources, the EPA must look both "to control technology and procedures and operating methods inside the production plant."[21] With respect to recycling of effluent, the fact that some plants in the industry may have to substantially alter their piping and sewer systems does not mean that recycle is an in-process control. The dislocation of manufacturing processes which these alterations may cause is not the same thing as a change in "operating methods."

IV.

We next take up an issue posed by the Sierra Club and Pennsylvania's Department of Environmental Resources, petitioners[22]   *307   in Nos. 76-1749 and 76-1751: whether the EPA's decision to exempt plants in the Mahoning River Valley from effluent limitations requiring the application of BPCTCA was proper under the FWPCA.

[27]   Several arguments have been advanced to support the contention that the exemption is invalid. However, we need address only one: that the EPA is not permitted to exempt polluters from point source limitations established under the Act.

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

Section 301(e) of the FWPCA states that: "Effluent limitations established pursuant to this section or section 302 of this Act shall be applied to all point sources of discharge of pollutants in accordance with the provisions of this Act." Section 301 effluent limitations, as we have noted, require facilities to discharge no more than a specified quantity of pollutant. See E. I. duPont de Nemours and Company v. Train, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). Section 302 is not relevant here. [23] So in this case s 301(e) requires the EPA to establish specific effluent limitations under s 301 for all point sources of discharge.

EPA, however, has exempted point sources located in the Mahoning Valley region "from the effluent limitations based on best practicable control technology currently available." EPA claims that its decision:

. . . does not exempt those plants from coverage by the National Pollutant Discharge Elimination System (NPDES) permits issued pursuant to FWPCA Section 402. [24] Neither does it exempt those facilities from the application of State laws and regulations, including water quality standards for the Mahoning River. The decision does not define current discharge as "best practicable control technology currently available" for those plants, and it does not mean that discharges from those plants will remain at their current level. The Administrator's decision means solely that "best practicable control technology currently available" for those facilities must be defined and effluent limitations must be established and applied on a case-by-case basis by the State of Ohio. (footnote omitted)

This argument fails to address the specific command of s 301(e), namely, that effluent limitations established under s 301 be applied to all point sources. [25]

EPA also argues that the legislative history of the Water Pollution Control Act Amendments of 1972 shows that while Congress was concerned with national uniformity of effluent standards, it recognized the need to allow flexibility in the federal pollution control system in order to accommodate the diverse conditions found across the country. We do not dispute this contention because we hold solely that, under s 301(e), an exemption by regulation from effluent limitations is not a permissible means of accommodating diversity. [26]

**\*308** **[28]** We conclude that the decision to exempt plants in the Mahoning Valley from the s 301 effluent limitations is invalid, and remand to the EPA for reconsideration of the problems underlying its initial decision to grant plants in the Mahoning Valley special treatment. In remanding the case for this purpose, we wish to emphasize that we do not decide whether the FWPCA allows the Agency to afford special treatment on the basis of location, rather than explicitly and directly on the basis of identified factors which could conceivably be exhibited by plants located anywhere in the country.

V.

Petitioner in No. 76-2232, CF&I Steel Corporation ("CF&I"), contends that the EPA did not adequately consider a "non-water quality environmental impact" which it alleges must be considered under the FWPCA namely, the scarcity of water resources in the arid and semi-arid regions of the country. 33 U.S.C. s 1314(b)(1)(B). The water scarcity problem allegedly arises because the recycle technologies specified as BPCTCA for some subcategories require companies to use a system for cooling effluent before it can feasibly be reused in the process. The majority of cooling systems allegedly cause a greater water loss through evaporation than would occur in a system where effluent is disposed of directly into navigable waters.

**[29]** We agree with CF&I's contention that water scarcity is a non-water quality environmental factor which the EPA must consider. See Appalachian Power Co. v. Train, 545 F.2d 1351, 1368-71 (4th Cir. 1976). CF&I's first argument [27] that the EPA did not adequately consider this factor is based on the claim that the Agency, in promulgating the present phase of the regulations, failed to consider the aggregate impact on water resources of phase I of the regulations, which we reviewed in AISI I, and regulations on thermal discharges which might be set forth by the Agency in the future, in addition to the water loss due to phase II itself. CF&I relies on this Court's Statement in AISI I, with respect to the actual economic costs of meeting the prescribed limitations, that:

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

Case 3:20-cv-07721-SL    Document 58-4    Filed 11/10/20    Page 142 of 1384

10 ERC 1689, 7 Envtl. L. Rep. 20,738

. . . we are concerned that the Administrator be required at some point to assess the overall impact of his regulations in both phases. Otherwise, it is possible that the Administrator might consider the costs reasonable for each phase separately, without ever considering whether the aggregate costs on a particular industry warrant such strict standards. We thus believe that the competing interests can best be served by requiring the Administrator, when he promulgates the phase II regulations, to evaluate the total costs involved for those regulations as well as for phase I regulations. 📙 526 F.2d at 1054.

 [30]    EPA argues that it did in fact consider the aggregate impact of phase I and II. We find this contention devoid of support in the record. But we are persuaded by EPA's alternative contention that our earlier decision does not require it to consider the aggregate impact of phase I, phase II, and possible regulations on thermal pollution when promulgating phase II itself. Our earlier decision was addressed to the cumulative burdens the different phases of the regulations would impose on a "particular industry." Here, on the other hand, we are asked to require EPA to scrutinize the cumulative burdens its regulations would place on the water resources of entire areas of the country. We decline to extend the statement in our earlier decision to cover factors other than those which pertain to the aggregate burden placed on a "particular industry." We cannot conclude that it is arbitrary or capricious of EPA to consider the water scarcity problem by comparing  *309  the benefits in pollution reduction attributable to each phase of its regulations with the loss in water resources attributable to that phase.

CF&I also contends that EPA did not adequately consider the water loss problem posed by phase II alone. The discussion of the water loss problem in the interim final regulations is as follows:
One commenter stated that no consideration was given to the destructive use of water and that excessive recycle, particularly at the BATEA level, results in the unnecessary destruction of water.

A means to dissipate heat is frequently a necessity if a recycle system is to be employed. The evaporation of water in cooling towers or from ponds is the most commonly employed means to accomplish this. However, fin-tube heat exchangers or dry type cooling towers can be used to achieve cooling without evaporation of water. Such systems are used in the petroleum processing and electric utilities industries (see page 543, . . . Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Steam Electric Power Generating Point Source Category.)

The Agency also feels that recognition of the evaporation of water in recycle systems (and hence loss of availability to potential downstream users) should be balanced with recognition that evaporation also occur (sic) in once through systems, when the heated discharge causes evaporation in the stream. This is not an obvious phenomenon, since it occurs downstream of the discharge point, but to the downstream user it is as real as with consumptive in-plant usage, because assuming that the stream eventually gets back to temperature equilibrium with its environment, it will get there primarily by evaporation, i. e., with just as certain a loss of water. Additionally, the use of a recycle system permits lessening the intake flow requirements. 41 Fed.Reg. 13003.

CF&I focuses on the Agency's statement that "fin-tube heat exchangers or dry type cooling towers can be used to achieve cooling without evaporation of water." It argues that the Agency did not give adequate consideration to the possibility that severe scaling and fouling problems would develop if such closed cooling systems were used in the iron and steel industry. CF&I also challenges the Agency's reliance on its Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Steam Electric Power Generating Point Source Category, claiming that the EPA failed to adequately explore differences between the iron and steel industry and the steam electric power generating industry.

The EPA first responds that "the Agency was and is of the view that no cooling devices of any kind will be employed to meet Phase II BPT." (emphasis added) We must reject this response because it is not sufficiently reconcilable with the EPA's statement in the interim final regulations that: "(a) means to dissipate heat is frequently a necessity if a recycle system is to be employed." EPA also argues that fin-tube heat exchangers or dry type cooling towers are applicable to waters which do not contact steel as it is being formed and finished, even if these cooling systems are not applicable to contact cooling water. But the regulations

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 143 of 1384
American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

state that "fin-tube heat exchangers or dry type cooling towers can be used to achieve cooling without evaporation of water." They do not distinguish between contact and non-contact cooling waters. Moreover, EPA has conceded that: "(s)ince iron and steel industry process (contact) waters may be more prone to fouling and scaling than steam electric cooling water, the Steam Electric Development Document does not directly support EPA's belief that dry type cooling towers could be utilized on steel industry process waters without fouling and scaling problems."

[31]   In sum, even inferring that EPA considered the fouling and scaling problem, we must conclude that there is insufficient evidence to support the statement in the  **\*310**  interim final regulations that "fin-tube heat exchangers or dry type cooling towers can be used to achieve cooling without evaporation of water." Since EPA may have proceeded under a mistaken assumption of fact as to the water loss attributable to the interim final regulations, the matter will be remanded to the Agency for further consideration of whether fin-tube heat exchangers or dry type cooling towers may be employed despite any fouling or scaling problems assuming that cooling systems of some kind will be employed in order to meet the effluent limitations prescribed in the regulations. Since fouling and scaling problems may also extend to other types of cooling systems mentioned in the Development Document for the steam electric power generating industry, the Agency will consider any fouling and scaling problems associated with the use of these systems.

In addition, the Court notes that the various cooling systems mentioned in the Development Document for the steam electric power generating industry including basin cooling, basin cooling with sprays, wet cooling towers, and wet/dry cooling towers as well as dry cooling towers result in widely divergent evaporation rates. Thus, the cost in terms of water loss of achieving the specified effluent limitations may vary greatly depending on which cooling system is employed, assuming that a cooling system is required to achieve the effluent limitations based on BPCTCA. However, the record does not show that the EPA, in concluding that the specified effluent limitations were not too costly in terms of water consumption, was of any particular view as to how often each of the different cooling systems would be used.

[32]   We conclude that the Agency may not decline to estimate the water loss due to the interim final regulations as accurately as possible on the grounds that, whatever the cost in water consumption, the specified effluent limitations are justified. In order to insure that the Agency completes a sufficiently specific and definite study of the water consumption problem on remand, the Agency must address the question of how often the various cooling systems will be employed, or present reasons why it cannot make such an assessment. [28]

VI.

The petitions to review the interim final regulations are denied, except as follows:

1. The regulations are invalid for want of proper notice insofar as they apply to the specialty steel industry.

2. The interim final regulations are remanded to the Agency for a finding as to the bearing of "age" on the cost or feasibility of retrofitting plants with pollution control technology.

3. To the extent applicable, the regulations are remanded to the Agency to enable it to make a record showing that it has made adequate allowance for certain cost factors which were originally not directly included.

4. The regulations are remanded to the Agency for reconsideration of the industry's financing problems.

5. The Agency decision to exempt plants in the Mahoning River Valley from the  s 301  effluent limitations is invalid and the matter is remanded to the Agency for appropriate reconsideration.

6. To the extent applicable, the regulations are remanded to the Agency for further consideration of whether fin-tube heat exchangers or dry type cooling towers may be employed despite any fouling or scaling problems assuming that cooling systems of some kind will be employed. Similar consideration should be given to these problems as they may be associated with the use of other cooling systems which might be employed.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 144 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)
10 ERC 1689, 7 Envtl. L. Rep. 20,738

The Agency on remand shall also consider the question of the extent the various cooling systems will be employed or present **\*311** reasons why such an assessment is not feasible.

In closing this opinion, we must note that we have been troubled by the Agency's apparent failure to objectively identify the entire record of its action at the time of its original decision. We strongly suggest that the Agency adopt measures to correct this situation, so that the reviewing court is not faced with the problem of determining what materials were indeed before the Agency at the time of its decision.

**All Citations**

568 F.2d 284, 10 ERC 1689, 7 Envtl. L. Rep. 20,738

## Footnotes

*       H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

1       We reject as meritless petitioners' claim that the EPA violated the APA by failing to consider comments they made during the formulation of these regulations.

2       Basic Oxygen Furnace-Wet Air Pollution Control Methods Subcategory (Subpart G); Vacuum Degassing Subcategory (Subpart K); and Continuous Casting and Pressure Slab Molding Subcategory (Subpart L).

3       We need not, and do not, discuss possible circumstances under which the pendency of a court order to promulgate regulations might constitute "good cause" for dispensing with notice and an opportunity for comment. See National

        Resources Defense Council, Inc. v. Train, 166 U.S.App.D.C. 312, 331, 510 F.2d 692, 711 n.103 (1975).

4       We may not hold that the regulations are valid because they are in interim final form, with provision that the Agency will "consider petitions for reconsideration of any permits" issued under the regulations if the "final regulation differs substantially" from the interim finals. 41 Fed.Reg. 13004. The regulations are to take effect immediately, and we have no assurance that the possibility of petitioning the Agency for reconsideration of permits is sufficient to alleviate the likelihood of prejudice.

5       The EPA also revised the regulations as to other subcategories. We have examined the notice with respect to all subcategories and find it sufficient.

6       The BPCTCA specified for Subpart P (Pipe and Tubes Subcategory) calls for recycling of clarifier effluent, rather than the effluent which has only passed through the scale pit as with Subparts M, N and O.

7       Environmental Policy Division of the Library of Congress, A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess. (Comm. Print 1973), at 1468 (hereinafter, "Leg.Hist.").

8       40 Fed.Reg. 36712.

9       40 Fed.Reg. 36711-13.

10      We cannot accept the Companies' claim that the ANPR could not serve to fulfill the notice of requirement because it was, in terms, "advance notice of intent to propose and promulgate" regulations. The ANPR served the function of inviting comments on the issues before the Agency because it stated that:

        This advance notice of proposed rulemaking is being issued pursuant to EPA's policy for early rulemaking proceedings to provide the interested public a greater opportunity for review and comment . . . The purpose, therefore, in giving this advance notice is to apprise interested persons of EPA's expected course of action, and to provide such interested persons with an opportunity to submit comments thereon.

        In addition, this advance notice is given so as to obtain the aforesaid comments in sufficient time to enable EPA to promulgate effluent limitations guidelines and pretreatment standards by December 1, 1975, in accordance with the order of the United States District Court for the District of Columbia in Natural Resources Defense Council, Inc. v. Russell E. Train . . . 40 Fed.Reg. 36708.

AR.03985

10 ERC 1689, 7 Envtl. L. Rep. 20,738

11    We find no merit to Pennsylvania's claims that: a) the ANPR did not sufficiently specify that the Agency might consider granting special treatment to facilities in the Mahoning Valley b) the Agency had a duty to defer notice and comment until after it had completed its investigation and proposed a modification to the regulatory scheme c) that it was denied effective participation in the rulemaking process.

12    See ▯ AISI I, 526 F.2d at 1047.

13    Leg.Hist. at 170.

14    Leg.Hist. at 1466.

15    Development Document for Interim Final Effluent Limitations Guidelines and Proposed New Source Performance Standards for the Forming, Finishing and Specialty Steel Segments of the Iron and Steel Manufacturing Point Source Category, at 145.

16    Senator Muskie's statement in support of the 1972 amendments to the FWPCA as approved by the House-Senate Conference Committee says that: "(i)n those industrial categories where present practices are uniformly inadequate, the Administrator should interpret 'best practicable' to require higher levels of control than any currently in place if he determines that the technology to achieve those higher levels can be practicably applied." Leg.Hist. at 169-70.

17    The March TBS report indicates that "baseline" conditions represent "anticipated future operating conditions . . . (excluding) the impact of all pending environmental regulations . . . (but including) the impact of pollution control equipment placed into service prior to 1975."

18    A February 17, 1976 "Briefing Outline" on economic effects by EPA's staff does not mention what rate of return on equity the industry must earn. But this fact does not persuade us that the statement of the required rate of return in the fuller "Summary Economic Analysis" was peripheral to its conclusions, that EPA did not rely substantially on TBS' expertise in evaluating the extent of the financing problem, or that EPA considered the March TBS report.

19    Leg.Hist. at 788.

20    Leg.Hist. at 311.

21    Leg.Hist. at 798.

22    Sierra Club has standing because its members in Ohio and Pennsylvania will allegedly be adversely affected "in their aesthetic, recreational and conservational interests, and in their personal health and well-being, by the water pollution which the subject regulations unlawfully permit to continue." See ▯ United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

    Pennsylvania's Department of Environmental Resources has standing because some of its citizens, in the Beaver Falls area, utilize the Mahoning River as a public water supply.

23    Section 302 allows the Agency to establish "effluent limitations" (including alternative effluent control strategies) when, in its judgment, s 301 limitations would not adequately assure the "attainment or maintenance of (adequate) water quality in a specific portion of the navigable waters." 33 U.S.C. s 1312.

24    For a description of the states' role in developing and carrying out permit programs under s 402, see the Supreme Court's decision in E. I. duPont de Nemours and Company v. Train, supra.

25    The Report of the House Committee on Public Works states, with reference to s 301(b), that it "requires that all point sources of discharge of pollutants . . . achieve . . . effluent limitations requiring the use of the best practicable control technology currently available." Leg.Hist. at 787 (emphasis added).

26    We do not accept EPA's suggestion that our decision is contrary to National ▯ Resources Defense Council v. Train, 166 U.S.App.D.C. 312, 331, 510 F.2d 692, 711 n.102 (1975), where the Court said that: "(w)e do not believe that the statute requires guidelines covering all point sources." The same footnote states that: "the statute does not prohibit the promulgation of effluent limitations for point sources in the absence of guidelines."

27    Portions of CF&I's brief call into question the reasonableness of the Agency's determination that the regulations do not result in undue water loss. In view of our disposition of the case, we need not consider this question.

    We reject CF&I's contention that the regulations are invalid because the Agency did not sufficiently consider the water law and policy of the western United States. See ▯ AISI I, 526 F.2d 1027, 1050 n.49.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 146 of 1384

American Iron and Steel Institute v. E.P.A., 568 F.2d 284 (1977)

10 ERC 1689, 7 Envtl. L. Rep. 20,738

28    In view of the fact that we have remanded the interim final regulations in other respects, we do not consider EPA's suggestion that we limit our remand on the water loss problem only "to point sources not located in arid or semi-arid regions."

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

10 Cal. Daily Op. Serv. 968, 2010 Daily Journal D.A.R. 1241

KeyCite Yellow Flag - Negative Treatment

Distinguished by Phan v. Holder, 9th Cir., November 1, 2012

594 F.3d 673
United States Court of Appeals,
Ninth Circuit.

Virgilio ANAYA–ORTIZ, Petitioner,

v.

Eric H. HOLDER, Jr.,
Attorney General, Respondent.

No. 03–74666.
|
Argued and Submitted Aug. 6, 2007.
|
Decided Jan. 25, 2010.

**Synopsis**

**Background:** Alien, a native and citizen of Mexico, petitioned for review of an order of the Board of Immigration Appeals (BIA) dismissing his appeal and ordering him removed to Mexico.

**Holdings:** The Court of Appeals, Ikuta, Circuit Judge, held that:

[1] BIA properly relied on alien's testimony in determining whether state court drunk-driving conviction made him ineligible for withholding of removal, and

[2] BIA applied correct legal standard in making particularly serious crime determination.

Petition denied.

Opinion, 553 F.3d 1266, withdrawn and superseded.

West Headnotes (8)

[1] **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Although Court of Appeals lacked jurisdiction over the BIA's ultimate determination that alien committed a "particularly serious crime," and thus was ineligible for withholding of removal when he drunkenly drove his car into an elderly victim's house and caused part of the wall to collapse on her, Court of Appeals retained jurisdiction to review whether the Board of Immigration Appeals (BIA) used the correct legal analysis in reaching this conclusion. Immigration and Nationality Act, § 241(b)(3)(B)(ii), 8 U.S.C.A. § 1231(b)(3)(B)(ii).

15 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** 🔑 Fact Questions

**Aliens, Immigration, and Citizenship** 🔑 Law questions

Although Court of Appeals could not reweigh evidence to determine if alien's crime of conviction was particularly serious, such that alien was ineligible for withholding of removal, Court could determine whether the Board of Immigration Appeals (BIA) applied the correct legal standard in making its eligibility determination. Immigration and Nationality Act, § 242(a)(2)(B)(ii), (a)(2)(D), 8 U.S.C.A. § 1252(a)(2)(B)(ii), (a)(2)(D).

24 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Determination of whether Board of Immigration Appeals (BIA) and Immigration Judge (IJ) failed to consider appropriate factors or relied on improper evidence in determining that alien's crime of conviction was particularly serious, such that alien was ineligible for withholding of removal, was question of law that Court of Appeals had jurisdiction to review. Immigration and Nationality Act, §§ 241(b)(3)(B), 242(a)(2)(B)(ii), (a)(2)(D), 8 U.S.C.A. §§ 1231(b)(3)(B), 1252(a)(2)(B)(ii), (a)(2)(D).

47 Cases that cite this headnote

**[4]**    **Administrative Law and Procedure** ⚷ Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** ⚷ Erroneous or unreasonable construction; conflict with statute

A circuit court must apply *Chevron* deference to an agency's interpretation of a statute regardless of the circuit court's contrary precedent, provided that the court's earlier precedent was an interpretation of a statutory ambiguity; only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.

1 Cases that cite this headnote

**[5]**    **Aliens, Immigration, and Citizenship** ⚷ Admissibility

In determining that alien's crime of conviction was particularly serious, such that alien was ineligible for withholding of removal, Board of Immigration Appeals (BIA) may consider all reliable information, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction. Immigration and Nationality Act, § 241(b)(3)(B)(ii), 🔑 8 U.S.C.A. § 1231(b)(3)(B)(ii).

16 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship** ⚷ Weight and Sufficiency

Board of Immigration Appeals (BIA) properly relied on alien's own testimony at his removal hearing in determining whether his state court drunk driving conviction was a "particularly serious crime" making him ineligible for withholding of removal; alien's testimony was reliable information outside the confines of a record of conviction, given that alien testified under oath on his own behalf in order to obtain relief from removal while risking ineligibility for asylum and withholding of

removal. Immigration and Nationality Act, § 241(b)(3)(B)(ii), 🔑 8 U.S.C.A. § 1231(b)(3)(B)(ii); 8 C.F.R. § 1240.7(b).

12 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship** ⚷ Crimes and Related Grounds

In determining that alien's state court drunk-driving conviction was for a particularly serious crime, such that alien was ineligible for withholding of removal, Board of Immigration Appeals (BIA) properly considered the nature of the conviction, the circumstances and underlying facts of the conviction, and the type of sentence imposed; BIA determined that alien's removal hearing testimony established that, after drinking alcohol to the point where he was intoxicated, alien began driving a motor vehicle in reckless disregard for persons or property whereupon he drove his car into the home of his victim causing property damage and bodily injury, and that alien was confined for his criminal actions. Immigration and Nationality Act, § 241(b)(3)(B)(ii), 🔑 8 U.S.C.A. § 1231(b)(3)(B)(ii); 🔑 8 C.F.R. § 1208.16(d)(2).

8 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship** ⚷ Crimes and Related Grounds

Categorical and modified categorical approaches for determining whether alien was removable as an aggravated felon, under which court compared the elements of the statute of conviction with a federal definition of the crime and reviewed record of conviction to determine whether alien was necessarily convicted of the elements of the federal generic crime, did not apply to determination of whether alien was convicted of particularly serious crime making him ineligible for withholding of removal. Immigration and Nationality Act, §§ 101(a)(43)(E)(ii), 237(a)(2)(A)(iii), 241(b)(3)(B)(ii), 🚩 8 U.S.C.A. §§ 1101(a)(43)(E)(ii), 🔑 1227(a)(2)(A)(iii), 🔑 1231(b)(3)(B)(ii).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*675** Gary Finn, Indio, CA, for the petitioner.

Jennifer J. Keeney and Melissa Neiman–Kelting, Washington, D.C., for the respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX2–367.

Before: MARSHA S. BERZON and SANDRA S. IKUTA, Circuit Judges, and JAMES K. SINGLETON,[*] Senior District Judge.

ORDER AND OPINION

## ORDER

The opinion filed on January 27, 2009, and appearing at 553 F.3d 1266 (9th Cir.2009) is withdrawn. The superseding opinion and memorandum disposition will be filed concurrently with this order.

Further petitions for rehearing or rehearing en banc may not be filed.

## OPINION

IKUTA, Circuit Judge:

Virgilio Anaya–Ortiz (Anaya), a native and citizen of Mexico, petitions for review of a decision by the Board of Immigration Appeals (BIA) dismissing his appeal and ordering him removed to Mexico. We deny the petition.

### I

On August 29, 2002, the former Immigration and Naturalization Service (INS) placed Anaya in removal proceedings. The INS charged that Anaya was removable due to his conviction for the crime of possession of a firearm by a felon, a violation of California Penal Code § 12021(a)(1). At Anaya's initial removal hearing, the immigration judge (IJ) agreed with the INS's position and found Anaya removable as charged.

Anaya then sought two forms of relief from removal: cancellation of removal under 8 U.S.C. § 1229b and withholding of removal under 8 U.S.C. § 1231(b)(3)(A).[1] The IJ determined that Anaya was ineligible for cancellation of removal because he had been convicted of an aggravated felony, but granted Anaya a continuance to allow him to apply for withholding of removal.

After receiving Anaya's application for withholding of removal, the IJ reconvened a hearing on March 10, 2003 to determine Anaya's eligibility. An alien is ineligible for withholding of removal if "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii). At the hearing, Anaya admitted that he had pleaded guilty to being a felon in possession of a firearm on March 21, 2001. The predicate offense to his felon-in-possession conviction was a prior conviction for driving under the influence in violation of section 23153(b) of the California Vehicle Code, for which he was sentenced to one year in jail. According to his testimony before the IJ, Anaya drove into a house while driving drunk. The collision caused part of the house's sheetrock wall to collapse on an elderly woman who lived inside, causing injuries to her shoulder and leg.

**\*676** On the basis of Anaya's testimony regarding his drunk driving conviction under California Vehicle Code § 23153(b), the IJ held that Anaya had been convicted of a "particularly serious crime" and was therefore ineligible for withholding of removal under 8 U.S.C. § 1231(b)(3)(B)(ii). The IJ also held that Anaya was ineligible for relief under the Convention Against Torture (CAT), 8 C.F.R. § 1208.16–18, and ordered him removed from the United States. Anaya appealed this decision to the BIA. On November 21, 2003, the BIA affirmed the IJ's decision and dismissed Anaya's appeal. Anaya timely filed a petition for review.

10 Cal. Daily Op. Serv. 968, 2010 Daily Journal D.A.R. 1241

On appeal, Anaya argues that he is eligible for withholding of removal on the ground that his drunk-driving conviction does not constitute a conviction of a "particularly serious crime" under 8 U.S.C. § 1231(b)(3)(B)(ii). [2] He asserts that the BIA made a legal error in determining Anaya's drunk-driving conviction was a "particularly serious crime" because it (1) relied on the testimony Anaya gave at his removal hearing, and (2) failed to consider the appropriate factors giving rise to his drunk-driving conviction. We consider each of these alleged errors in turn.

## II

[1]    [2]    [3]    Before considering whether the BIA erred in relying on Anaya's testimony at the removal hearing, we must first determine whether we have jurisdiction to review the BIA's alleged error. We do not have jurisdiction to evaluate discretionary decisions by the Attorney General, *see* 8 U.S.C. § 1252(a)(2)(B)(ii), and therefore lack jurisdiction over the BIA's ultimate determination that Anaya committed a "particularly serious crime" when he drunkenly drove his car into an elderly victim's house and caused part of the wall to collapse on her. *See Unuakhaulu v. Gonzales, 416 F.3d 931, 935 (9th Cir.2005)* (holding that "when the Attorney General decides that the alien's offense was a 'particularly serious crime,' we lack jurisdiction to review such a decision because it is discretionary") (citation omitted). Nevertheless, we retain jurisdiction to review "questions of law raised upon a petition for review." *§ 1252(a)(2) (D).* While "we cannot reweigh evidence to determine if the crime was indeed particularly serious, we can determine whether the BIA applied the correct legal standard in making its determination." *Afridi v. Gonzales, 442 F.3d 1212, 1218 (9th Cir.2006), overruled in part on other grounds by Estrada–Espinoza v. Mukasey, 546 F.3d 1147, 1160 n. 15 (9th Cir.2008)* (en banc). Therefore, we have jurisdiction to review whether the BIA and IJ failed to consider the appropriate factors, *Afridi, 442 F.3d at 1220,* or relied on improper evidence, *see Morales v. Gonzales, 478 F.3d 972, 981 (9th Cir.2007),* in making the "particularly serious crime" determination.

## A

[4]    Accordingly, we turn to Anaya's argument that *§ 1231(b)(3)(B)(ii)* precluded the IJ and BIA from relying on Anaya's testimony at the removal hearing in making the determination that Anaya had been convicted of a "particularly serious crime." Because this raises a question of statutory interpretation, we "appl[y] the principles of deference described in **\*677** *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)*." *INS v. Aguirre–Aguirre, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).* Under *Chevron,* we first ask "whether the statute is silent or ambiguous with respect to the specific issue before it." *Id.* (internal quotation marks omitted). If it is, then we determine whether there is "binding agency precedent on-point (either in the form of a regulation or a published BIA case)." *Park v. Holder, 572 F.3d 619, 623–24 (9th Cir.2009).* We will defer to that precedent so long as it is "reasonable." *See Morales, 478 F.3d at 982; see also Simeonov v. Ashcroft, 371 F.3d 532, 535 (9th Cir.2004)* (noting that we give deference "to the BIA's interpretation [of the INA] unless that interpretation is contrary to the plain and sensible meaning of the statute"). A "circuit court must apply *Chevron* deference to an agency's interpretation of a statute regardless of the circuit court's contrary precedent, provided that the court's earlier precedent was an interpretation of a statutory ambiguity." *Gonzales v. DHS, 508 F.3d 1227, 1235–36* (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980–82, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005)*). As *Brand X* explained, "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Id. at 982–83, 125 S.Ct. 2688.*

We have previously held that the INA is "silent regarding the basis for determining whether a conviction is for a particularly serious crime" under *§ 1231(b)(3)(B)(ii)* and therefore the BIA's interpretation of "what an IJ may refer to in deciding whether a prior offense is a particularly serious crime" is entitled to deference under *Chevron* and *Aguirre–Aguirre. Morales, 478 F.3d at 980, 982.* In *Morales,* we considered the BIA's precedential interpretation

of § 1231(b)(3)(B)(ii) in *Matter of L–S–,* 22 I. & N. Dec. 645, 651 (BIA 1999). *Id.* at 981–82. We read *Matter of L–S–* as holding "that the particularly serious crime determination ... may be made by looking only to the record of conviction and sentencing information," and held that the BIA's interpretation was "based on a reasonable—and therefore permissible—construction of the statute." *Id.* at 982. Therefore, we deferred to the BIA's interpretation, and further held that the record of conviction "consists of a narrow, specified set of documents that includes the state charging document, a signed plea agreement, jury instructions, guilty pleas, transcripts of a plea proceeding and the judgment," and that it "may also include any explicit factual finding by the trial judge to which the defendant assented." *Id.* (internal quotation marks and citations omitted).

But after our decision in *Morales,* the BIA clarified its interpretation of what evidence "an IJ may refer to in deciding whether a prior offense is a particularly serious crime." *Id.* at 980. In its more recent precedential decision, *Matter of N–A–M–,* the BIA discussed the "particularly serious crime" determination under § 1231(b)(3)(B)(ii) and explained that

> once the elements of the offense are examined and found to potentially bring the offense within the ambit of a particularly serious crime, all reliable information may be considered in making a particularly serious crime determination, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction.

24 I. & N. Dec. 336, 342 (BIA 2007). The BIA explained that *Morales* had misconstrued its decision in *Matter of L–S–. Id.* at 344. According to the BIA, *Matter of L–S–* allowed consideration of the record *678 of conviction and sentencing information, but "did not prohibit the examination

of other evidence or indicate that only conviction records and sentencing information could be used." *Id.* In the BIA's view, the limited inquiry that *Morales* erroneously held was required by *Matter of L–S–* would be inappropriate given the discretionary nature of the "particularly serious crime" determination:

> It has been our practice to allow both parties to explain and introduce evidence as to why a crime is particularly serious or not. We see no reason to exclude otherwise reliable information from consideration in an analysis of a particularly serious crime once the nature of the crime, as measured by its elements, brings it within the range of a "particularly serious" offense.

*Id.* The BIA therefore upheld an IJ's "particularly serious crime" determination based on the facts alleged in a "Statement in Support of Warrantless Arrest," as well as a judgment of conviction for "felony menacing" under Colorado law. *Id.* at 337 ("Under section 18–3–206(1) of the Colorado Revised Statutes, a person 'commits the crime of menacing if, by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury.' ").

As noted in *Morales,* we must defer to the BIA's statutory interpretation regarding what evidence may be considered in deciding whether a prior offense is a particularly serious crime, 478 F.3d at 982, so long as the BIA's interpretation "is based on a reasonable—and therefore permissible—construction of the statute." *Id.* Under *Brand X,* we must apply *Chevron* deference to the BIA's most recent interpretation of § 1231(b)(3)(B)(ii) in *Matter of N–A–M–* if it is reasonable, regardless of our prior decision in *Morales. See Gonzales,* 508 F.3d at 1239.

[5]    We now hold that the BIA's interpretation of the evidence that may be considered in a "particularly serious crime" determination, as set forth in *Matter of N–A–*

10 Cal. Daily Op. Serv. 968, 2010 Daily Journal D.A.R. 1241

*M–*, is reasonable. An IJ ordinarily considers any relevant evidence adduced at a removal hearing, 8 C.F.R. § 1240.1(c), and nothing in the language of the "particularly serious crime" provisions in the INA limits the scope of permissible evidence. *See* 8 U.S.C. §§ 1158(b)(2)(A)(ii) & 1231(b)(3)(B)(ii). In undertaking a case-specific consideration of whether the circumstances of an alien's prior crime made it "particularly serious," *see Afridi,* 442 F.3d at 1220, it is reasonable for the BIA to maintain its practice of "allow[ing] both parties to explain and introduce evidence as to why a crime is particularly serious or not." *Matter of N–A–M–,* 24 I. & N. Dec. at 344. Because we are bound by *Brand X* to apply the BIA's interpretation in *Matter of N–A–M–,* rather than our prior interpretation of *Matter of L–S–, see Gonzales,* 508 F.3d at 1236 n. 7, we therefore defer to the BIA's reasonable conclusion that "all reliable information may be considered in making a particularly serious crime determination, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction," *Matter of N–A–M–,* 24 I. & N. Dec. at 342.

## B

**[6]** We now turn to Anaya's argument that the IJ and BIA erred in relying solely on his removal hearing testimony in holding that he had been convicted of a "particularly serious crime." We hold that such testimony is just the sort of "reliable information ... outside the confines of a record of conviction" referred to in *Matter of N–A–M–,* 24 I. & N. Dec. at 342. We see no reason to question the reliability of testimony giving rise to a "particularly serious **\*679** crime" determination where the alien is testifying under oath, *see* 8 C.F.R. § 1240.7(b), on his own behalf in order to obtain relief from removal, and risking ineligibility for asylum and withholding of removal should the IJ determine that he has been convicted of a "particularly serious crime" under 8 U.S.C. § 1231(b)(3)(B)(ii). "Where the BIA does not make an explicit adverse credibility finding, we must assume that [the petitioner's] factual contentions are true." *Navas v. INS,* 217 F.3d 646, 652 n. 3 (9th Cir.2000); *see also Kalubi v. Ashcroft,* 364 F.3d 1134, 1137 (9th Cir.2004) ("Testimony must be accepted as true in the absence of an explicit

adverse credibility finding."). Accordingly, we reject Anaya's argument that the BIA's reliance on his own testimony was improper.

## III

We next consider Anaya's only other argument, that the BIA erred by failing to consider the appropriate factors in determining his drunk-driving conviction constituted a particularly serious crime. The BIA has previously held that determining whether a crime is particularly serious requires a case-by-case analysis, using "such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *In re Frentescu,* 18 I. & N. Dec. 244, 247 (BIA 1982), *superseded by statute in part,* 8 U.S.C. § 1253(h)(1991), *as recognized in Miguel–Miguel v. Gonzales,* 500 F.3d 941, 946 (9th Cir.2007). Deferring to this interpretation of § 1231(b)(3)(B)(ii), we have held that these *Frentescu* factors constitute the applicable legal standard for determining whether a particularly serious crime has been committed. *See Afridi,* 442 F.3d at 1219. However, the BIA's "approach to determining whether a crime is particularly serious has evolved" since *Matter of Frentescu. Matter of N–A–M–,* 24 I. & N. Dec. at 342. The applicable legal standard for determining whether the alien has committed a particularly serious crime no longer requires the BIA to engage "in a separate determination to address whether the alien is a danger to the community." *Id.; see also Kankamalage v. INS,* 335 F.3d 858, 861 n. 2 (9th Cir.2003) ("Once the INS makes a finding that an offense constitutes a particularly serious crime, a separate determination of danger to the community is not required."). The BIA has promulgated this interpretation in a regulation, which provides that "an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community." 8 C.F.R. § 1208.16(d)(2). Therefore, in considering whether the BIA has applied the correct legal standard for determining whether a particularly serious crime has been committed, we must refer to the *Frentescu* factors as subsequently modified by the BIA.

[7]   Contrary to Anaya's argument, the IJ here analyzed the nature of Anaya's drunk-driving offense with sufficient reference to the 🚩 *Frentescu* factors as modified. The IJ noted the applicable standard, stating that "[t]o determine whether an alien has been convicted of a particularly serious crime, the Court weighs the facts and circumstances underlying the conviction, as well as the sentence imposed on the respondent." The IJ stated that Anaya's first felony conviction was for "driving under the influence of alcohol and personally inflicting great bodily injury." Finally, the IJ explained his view of the dangerousness of the crime:

> **\*680**  Drunk driving results in untold loss of human potential, not to mention the thousands of deaths each year. [Anaya] was driving drunk and ran into a stranger's home. He hit the home with such force that the interior walls collapsed and injured a woman .... It strikes me that this woman, who was no doubt in some repose in her own home, had an expectation that she need not fear drunk drivers. [Anaya] shattered this belief by basically barging into her home with his car. He inflicted what the California statutes refer to as great bodily injury on her.

The BIA determined that Anaya's testimony "establishes that the respondent, after drinking alcohol to the point where he was intoxicated, began driving a motor vehicle in reckless disregard for persons or property whereupon he drove his car into the home of his victim causing property damage and bodily injury," and also noted that Anaya "was confined for his criminal actions." We therefore conclude that the IJ and BIA did consider "the nature of the conviction, the circumstances and underlying facts of the conviction, [and] the type of sentence imposed" when reaching the conclusion that Anaya's conviction constituted a "particularly serious crime." *Afridi,* 442 F.3d at 1219; *accord* *Matter of N–A–M–,* 24 I. & N. Dec. at 342 (reciting the same factors). We reiterate that we are not reviewing or approving the ultimate conclusion that the drunk-driving conviction under 📄 California Vehicle Code § 23153(b) was for a particularly serious crime, because we lack the jurisdiction to do so in this

context. *See* 🚩 *Delgado v. Holder,* 563 F.3d 863, 871 (9th Cir.2009).

[8]   Anaya also argues that because "reckless disregard" is not an element of 📄 California Vehicle Code § 23153(b), his drunk-driving conviction cannot constitute a conviction for a "particularly serious crime." Although Anaya's argument is not entirely clear, he cites 🚩 *Leocal v. Ashcroft,* 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), which held that state DUI offenses "which either do not have a *mens rea* component or require only a showing of negligence in the operation of a vehicle" are not categorically "crime[s] of violence" under 🚩 18 U.S.C. § 16. 📄 *Id.* at 6, 125 S.Ct. 377. But the categorical and modified categorical approaches articulated in 📄 *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), are not applicable to evaluating whether a crime is "particularly serious." *See* 🚩 *Matter of N–A–M–,* 24 I. & N. Dec. at 344 (noting that no "decision of which we are aware[ ] has ever suggested that the categorical approach, used primarily in determining removability, is applicable to the inherently discretionary determination of whether a conviction is for a particularly serious crime").

We therefore conclude that the BIA applied the correct legal standard in determining that Anaya was convicted "of a particularly serious crime and is a danger to the community of the United States," making him ineligible for withholding of removal under 📄 8 U.S.C. § 1231(b)(3)(B)(ii).

IV

Accordingly, we reject Anaya's argument that the IJ and BIA improperly determined that he had been convicted of a "particularly serious crime." The IJ and BIA did not err in relying on Anaya's testimony at the removal hearing nor did they apply an erroneous legal standard. Because we also reject Anaya's argument that the IJ and BIA erred in holding that he was removable in a separate memorandum disposition, *see* **\*681** *Anaya–Ortiz v. Holder,* No. 0374666, 594 F.3d 673, 2010 WL 252519 (9th Cir. Jan. 25, 2010), Anaya's petition for review is **DENIED.**

10 Cal. Daily Op. Serv. 968, 2010 Daily Journal D.A.R. 1241

**All Citations**

594 F.3d 673, 10 Cal. Daily Op. Serv. 968, 2010 Daily Journal
D.A.R. 1241

## Footnotes

\*    The Honorable James K. Singleton, United States District Judge for the District of Alaska, sitting by
     designation.

1        Section 1231(b)(3)(A) provides that "the Attorney General may not remove an alien to a country if the
     Attorney General decides that the alien's life or freedom would be threatened in that country because of the
     alien's race, religion, nationality, membership in a particular social group, or political opinion."

2    In a separate memorandum disposition issued today, we address Anaya's argument that the IJ and BIA also

     erred in holding that Anaya was removable as an aggravated felon under ‖ § 1101(a)(43)(E)(ii). *See Anaya–
     Ortiz v. Holder,* No. 03–74666, 594 F.3d 673, 2010 WL 252519 (9th Cir. Jan. 25, 2010).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by F.L.B. v. Lynch, W.D.Wash., April 15, 2016

788 F.3d 893
United States Court of Appeals,
Ninth Circuit.

Nikolay Ivanov ANGOV, Petitioner,

v.

Loretta E. LYNCH, Attorney General, Respondent.

No. 07–74963.
|
Argued and Submitted June 5, 2012.
|
Filed Dec. 4, 2013.
|
Amended June 8, 2015.

**Synopsis**

**Background:** Alien, a citizen of Bulgaria, petitioned for review of order of Board of Immigration Appeals (BIA) affirming decision of immigration judge (IJ) denying application for asylum, withholding of removal, and relief under Convention Against Torture.

**Holdings:** On denial of petitions for panel rehearing and rehearing en banc, the Court of Appeals, Kozinski, Chief Judge, held that:

[1] BIA did not abuse its discretion in denying alien's motion to remand;

[2] alien did not enter United States, and thus had no procedural due process rights;

[3] record did not support alien's claim that he was denied his statutory right to examine evidence against him;

[4] alien's statutory right to cross-examine witnesses against him was not violated; and

[5] IJ did not abuse his discretion when he admitted into evidence a State Department official's letter describing results of consulate investigation.

Petition denied.

Thomas, Circuit Judge, filed a dissenting opinion.

Opinion, 736 F.3d 1263, amended and superseded.

West Headnotes (14)

**[1]** **Aliens, Immigration, and Citizenship** ⚷ New evidence, facts or circumstances

Board of Immigration Appeals (BIA) did not abuse its discretion in denying alien's motion to remand his asylum case for consideration of a court of appeals opinion from another Circuit; although alien claimed that court of appeals' opinion documented a pattern and practice of unlawful activity by the United States consulate in Sofia during overseas investigations, including divulging identity of asylum applicants to authorities in Bulgaria in violation of regulation prohibiting disclosure of information pertaining to an asylum application without applicant's written consent, alien did not provide any evidence supporting his motion, and he did not explain why he believed that regulation had been violated by consulate official who investigated his asylum claim. 8 C.F.R. §§ 208.6(a), 1003.2(c)(1).

5 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⚷ Reopening, Reconsideration, or Remand

Since a motion to remand removal proceedings from the Board of Immigration Appeals (BIA) to the immigration judge (IJ) is so similar to a motion to reopen, the motion to remand should be drafted in conformity with the regulations pertinent to motions to reopen. 8 C.F.R. § 1003.2(c)(1).

7 Cases that cite this headnote

**[3]    Administrative Law and
Procedure**  ⚷  Aliens, Immigration, and
Citizenship

**Aliens, Immigration, and
Citizenship**  ⚷  Law questions

While the Court of Appeals reviews legal
questions de novo, the interpretation and
application of the immigration laws by the Board
of Immigration Appeals (BIA) are generally
entitled to deference.

1 Cases that cite this headnote

**[4]    Aliens, Immigration, and
Citizenship**  ⚷  Conduct of hearing; fairness
in general

**Constitutional Law**  ⚷  Asylum, refugees, and
withholding of removal

Alien did not enter United States, and thus
had no procedural due process rights, where he
presented himself at port of entry without valid
entry documents and sought asylum. U.S.C.A.
Const.Amend. 5.

6 Cases that cite this headnote

**[5]    Aliens, Immigration, and
Citizenship**  ⚷  Mode and effect of entry or
reentry

**Constitutional Law**  ⚷  Admission and
exclusion; deportation

An alien seeking admission has not entered the
United States, so as to be entitled to procedural
due process, even if he is in fact physically
present. U.S.C.A. Const.Amend. 5.

4 Cases that cite this headnote

**[6]    Aliens, Immigration, and
Citizenship**  ⚷  Distinction between
admissibility and removal proceedings

Aliens who have once passed through the gates
of the United States, even illegally, are afforded
the full panoply of procedural due process
protections, and may be expelled only after

proceedings conforming to traditional standards
of fairness. U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**[7]    Aliens, Immigration, and
Citizenship**  ⚷  Conduct of hearing; fairness
in general

Record did not support alien's claim that he
was denied his statutory right to examine
evidence against him when immigration judge
(IJ) at his asylum hearing admitted letter from
a State Department official describing results
of investigation of alien's asylum claim by
United States consulate in Sofia, Bulgaria; record
showed that alien was allowed to examine
the letter, and given ample time to produce
substantial evidence to rebut it. REAL ID Act of
2005, § 101(d), 🔑 8 U.S.C.A. § 1229a(b)(4)(B).

3 Cases that cite this headnote

**[8]    Aliens, Immigration, and
Citizenship**  ⚷  Conduct of hearing; fairness
in general

With respect to admission at alien's asylum
hearing of letter from State Department
official describing results of investigation
of alien's asylum claim by United States
consulate in Sofia, Bulgaria, government made
reasonable effort to afford alien a reasonable
opportunity to confront witnesses against him,
and thus, alien's statutory right to cross-examine
witnesses against him was not violated by
admission of the letter; government made
reasonable effort to obtain witness from
State Department, but was prevented from
doing so by State's policy of not releasing
follow-up information regarding its overseas
investigations, and immigration authorities'
decision not to present witness in person
was made pursuant to coordinate department's
reasonable policy governing secrecy and safety
of its officers. REAL ID Act of 2005, § 101(d),

🔑 8 U.S.C.A. § 1229a(b)(4)(B).

1 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship** ⟜ Credibility

The strict standard for determining whether an immigration judge's (IJ) adverse credibility finding was supported by substantial evidence bars a reviewing court from independently weighing the evidence in an asylum proceeding, and requires it to deny the petition unless the petitioner has presented evidence so compelling that no reasonable factfinder could find that the petitioner was not credible.

1 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** ⟜ Credibility

Substantial evidence review of an immigration judge's (IJ) adverse credibility finding is generally flexible and highly deferential.

3 Cases that cite this headnote

**[11]    Aliens, Immigration, and Citizenship** ⟜ Conduct of hearing; fairness in general

**Aliens, Immigration, and Citizenship** ⟜ Assistance of counsel

Congress and the Attorney General have accorded aliens in asylum proceedings a variety of procedural rights, including the right to be present at the hearing, to be represented by counsel, to examine the evidence against him and present counter-evidence, to cross-examine witnesses, and to have a written record kept of the proceedings, but neither the statute nor the regulations give the asylum applicant a right to a particular quality of the evidence presented against him; instead, he is given the right to have an impartial adjudicator assess the evidence.

REAL ID Act of 2005, § 101(d), 🔖 8 U.S.C.A. § 1229a(b)(4).

**[12]    Constitutional Law** ⟜ Asylum, refugees, and withholding of removal

When exercising grace towards individuals entitled no procedural rights under the Constitution, Congress can set the precise limits of what it grants and what it withholds; that then defines the process an asylum seeker is due.

U.S.C.A. Const.Amend. 5.

1 Cases that cite this headnote

**[13]    Administrative Law and Procedure** ⟜ Rules of evidence

The rules of evidence, and the hearsay rules in particular, do not apply to administrative proceedings.

1 Cases that cite this headnote

**[14]    Aliens, Immigration, and Citizenship** ⟜ Admissibility

**Aliens, Immigration, and Citizenship** ⟜ Weight and Sufficiency

Immigration judge (IJ) did not abuse his discretion in asylum proceedings when he admitted into evidence State Department official's letter, which indicated that an investigation of alien's claim by United States consulate in Bulgaria found a number of errors in subpoenas, or when IJ relied on such letter to find that subpoenas were fraudulent.

**Attorneys and Law Firms**

**\*896** Nicolette Glazer (argued), Law Offices of Larry R. Glazer, Century City, CA, for Petitioner.

Gregory G. Katsas, Assistant Attorney General, Barry J. Pettinato, Assistant Director, Jesse Lloyd Busen (argued) and Charles E. Canter, Attorneys, United States Department of Justice, Civil Division, Washington, D.C., for Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX7–355.

Before: SIDNEY R. THOMAS, Chief Judge, ALEX KOZINSKI and STEPHEN S. TROTT, Circuit Judges.

Opinion by Judge KOZINSKI; Dissent by Chief Judge THOMAS.

## ORDER

🚩 The opinion and dissent filed on December 4, 2013, and published at 736 F.3d 1263, are hereby withdrawn and replaced by the amended opinion and dissent filed concurrently with this order. With these amendments, Judges Kozinski and Trott have voted to deny the petition for panel rehearing, Judge Kozinski has voted to deny the petition for rehearing en banc and Judge Trott has so recommended. Chief Judge Thomas has voted to grant the petition for panel rehearing and the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35. The petitions for panel rehearing and rehearing en banc are denied. No further petitions for panel rehearing or rehearing en banc will be entertained.

## OPINION

KOZINSKI, Circuit Judge:

Does an immigration judge err by relying on a State Department investigation of an asylum petitioner's claim?

## I. BACKGROUND

Nikolay Angov, a Bulgarian citizen, claims he was persecuted by the Bulgarian government because he is Roma.[1] He alleges repeated abuse at the hands of the Bulgarian police, including beatings, false accusations of crimes and illegitimate arrests. After three years of this treatment, he fled Bulgaria and sought asylum in the United States.

An IJ conducted asylum hearings in early 2004, during which Angov presented several documents, including two Bulgarian subpoenas that ordered him to appear at a Sofia police station. The immigration judge ("IJ") allowed the government to obtain a State Department investigation of Angov's allegations. See 8 C.F.R. § 208.11. The investigation was conducted by our consulate in Sofia, and the results were summarized in a letter signed by Cynthia Bunton, Director of Department of State's Office of Country Reports and Asylum Affairs.

The IJ admitted the Bunton Letter, which stated that the Embassy had contacted "an official in the Archive Department at the 5th Police District in Sofia." The official found a number of errors in the subpoenas, suggesting that they were forgeries: (1) Three officers named in the subpoena —Captain Donkov, Lieutenant Slavkov and Investigator Vutov—never worked for the police department; (2) the case and telephone numbers were wrong; and (3) although the subpoenas mentioned room 4 on the second floor of the department and room 5 on the first floor, there are no rooms by those numbers. The **\*897** official also explained (4) that the seal on the subpoena was too small.

Bunton also stated that the embassy investigator (5) was unable to locate Angov's claimed past residences; and (6) that the neighborhood where Angov lived was only twenty to thirty percent Roma, though Angov claimed that he lived in a "gypsy neighborhood." Attached to the letter were five photographs of the places the investigator had visited while trying to verify the addresses.

Angov's industrious lawyer submitted a plethora of rebuttal evidence, including photos, maps, an article about Angov's neighborhood and a letter apparently signed by someone named Daniela Mihaylova, who identified herself as the legal programs director of a Roma human rights organization in Bulgaria. Angov also argued that, without the opportunity to cross-examine the investigator, the admission of the Bunton Letter would violate his statutory and constitutional rights.

In response to Angov's objection, the government attorney asked the State Department to produce an employee to testify about the investigation. State responded with a letter authored by Nadia Tongour, Bunton's successor. The Tongour Letter provided some general background information on State's investigation procedures, but explained that it's State's policy to refrain from providing further specific information about an overseas investigation.

Based on the Bunton Letter, the IJ made an adverse credibility finding and denied Angov's applications for asylum, withholding of removal and relief under the Convention Against Torture. The Board of Immigration Appeals ("BIA") adopted and affirmed the IJ's ruling denying relief, and his determination that the subpoenas are fraudulent. The BIA also denied Angov's motion to supplement the record with a recent Sixth Circuit opinion that Angov claimed constituted new evidence of a "pattern and practice" of law-breaking

by officials in the Sofia consulate. *See* *Alexandrov v. Gonzales,* 442 F.3d 395 (6th Cir.2006).

## II. ANALYSIS

### A. Motion to Remand

**[1]**    Angov claims the BIA abused its discretion by denying his motion. *See* *Movsisian v. Ashcroft,* 395 F.3d 1095, 1098 (9th Cir.2005). His brief before the BIA spent just two sentences explaining this argument:

> Respondent respectfully submits a copy of *Alexandrov v. Gonzales* to supplement the record in this case. The document is submitted to document a pattern and practice of procedural and substantive violations of the law and applicable regulations by the consulate in Sofia during overseas investigations and in divulging the identity of asylum applicants to the authorities in Bulgaria in violation of C.F.R. 208.6 [sic].

**[2]**    "Since a motion to remand is so similar to a motion to reopen, the motion to remand should be drafted in conformity with the regulations pertinent to motions to reopen...." *Rodriguez v. INS,* 841 F.2d 865, 867 (9th Cir.1988) (internal quotation marks omitted). The applicable regulation provides that a motion to reopen shall state "the new facts that will be proven at a hearing to be held if the motion is granted" and be supported by affidavits or other "evidentiary material." 8 C.F.R. § 1003.2(c)(1). But Angov didn't provide any evidence supporting his motion nor did he even explain why he believed that section 208.6 had been violated.[2] The BIA did not abuse its discretion in denying Angov's motion to remand.

### *898 B. Admission of the Bunton Letter

Angov claims that the admission of, and the IJ's and BIA's reliance on, the Bunton Letter violated his statutory and constitutional rights. *See* 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. § 1240.10(a)(4); *Cinapian v. Holder,* 567 F.3d 1067, 1074–75 (9th Cir.2009). In considering Angov's argument, we review the IJ's decision, except for the portion that the BIA didn't clearly adopt—here, the IJ's conclusion that the Department of State's inability to verify Angov's addresses supported an adverse credibility finding. *See* *Joseph v. Holder,* 600 F.3d 1235, 1239–40 (9th Cir.2010). On that issue, we review the BIA's decision.

**[3]**    While we review legal questions de novo, "[t]he BIA's interpretation and application of the immigration laws are generally entitled to deference." *Hernandez–Mancilla v. Holder,* 633 F.3d 1182, 1184 (9th Cir.2011); *Zetino v. Holder,* 622 F.3d 1007, 1011–12 (9th Cir.2010). The agency's factual findings—such as its adverse credibility determination—are reviewed for substantial evidence and can be reversed only if the evidence "compels" a contrary conclusion. *See* *Rizk v. Holder,* 629 F.3d 1083, 1087–88 (9th Cir.2011) (emphasis omitted).

### (i) Due Process

**[4]**    **[5]**    **[6]**    Angov claims that the IJ's reliance on the Bunton Letter violated his constitutional right to procedural due process. But Angov has no such right. He is an alien who has never formally entered the United States. He presented himself at the San Ysidro port of entry without valid entry documents and sought asylum. "[A]n alien seeking admission has not 'entered' the United States, even if [he] is in fact physically present." *Kwai Fun Wong v. United States,* 373 F.3d 952, 971 (9th Cir.2004). "[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry." *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). Aliens "who have once passed through our gates, even illegally," are afforded the full panoply of procedural due process protections, and "may be expelled only after proceedings conforming to traditional standards of fairness." *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953). But those, like Angov, who have never technically "entered" the United States have no such rights. *Id.* For Angov, procedural due process is simply "[w]hatever the procedure authorized by Congress" happens to be. *Id.* (internal quotation marks omitted); *see also* *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ("[A]n alien seeking

initial admission to the United States requests a privilege and has no constitutional rights regarding his application....").

Angov's claim of a procedural due process violation simply can't be squared with the Supreme Court's teachings in *Mezei* and *Landon*, nor with our circuit's settled precedent. *See* Barrera–Echavarria v. Rison, 44 F.3d 1441, 1449 (9th Cir.1995) ("[E]xcludable aliens have no procedural due process rights in the admission process...."). [3]

**\*899  (ii) Statutory Rights**

[7]   Angov's challenge to the admission of the Bunton Letter is therefore purely statutory. In assessing such a challenge, we must first ask whether the IJ made legal error by denying Angov any of his statutory rights. Angov claims that he was denied his right to examine evidence against him. *See* 8 U.S.C. § 1229a(b)(4)(B). But the record tells a different story. He was allowed to examine the Bunton Letter, and given ample time to produce substantial evidence to rebut it. *See* p. 896 *supra; cf.* Cinapian, 567 F.3d at 1076 (had the government given petitioners a chance to examine forensic reports before hearing, they may have been able to produce rebuttal evidence).

[8]   Angov also argues that he was denied his statutory right to cross-examine the witnesses against him. We've held that, before hearsay statements made by an absent witness can be admitted into an immigration hearing, " 'the government must make a reasonable effort ... to afford the alien a reasonable opportunity to confront the witnesses against him or her.' " Hernandez–Guadarrama v. Ashcroft, 394 F.3d 674, 681 (9th Cir.2005) (quoting Saidane v. INS, 129 F.3d 1063, 1065 (9th Cir.1997)); *see also* § 1229a(b)(4)(B); Baliza v. INS, 709 F.2d 1231, 1234 (9th Cir.1983).

The government is, of course, not required to produce Bulgarian police officials at an immigration hearing in the United States. Such a requirement would make it virtually impossible for the government to introduce evidence rebutting an alien's claims relating to conduct abroad. Instead Angov, and the dissent, claim that the immigration authorities should have obtained a witness from the Department of State to verify the letter's contents. But hauling State Department officials into court wouldn't ameliorate the dissent's concerns, because the letters they author inescapably rely on foreign officials who aren't amenable to cross-examination.

In any event, the government here *did* make a reasonable effort to obtain a State Department witness, but was prevented from doing so by State's policy of not releasing follow-up information regarding its overseas investigations. The dissent claims that "allowing one executive branch agency to rely on another executive branch agency's blanket policy of refusing to provide certain information is tantamount to granting the government the kind of unfettered discretion we repudiated in *Baliza*." But *Baliza* offers no support to the dissent's position. There the government relied on the affidavit of an alien's ex-wife as the basis for a fraudulent marriage charge while barely even *trying* to investigate her whereabouts. The declarant was not a government official and the government **\*900** gave no justification for failing to find her. By contrast, the declarant here is a government official speaking in her official capacity. And the immigration authorities' decision not to present her in person was made pursuant to a coordinate department's reasonable policy governing the secrecy and safety of its officers. Because neither the immigration authorities nor the State Department acted unreasonably in failing to compel Bunton to testify, Angov's statutory rights were not violated.

**(iii) Substantial Evidence**

[9]   Because the IJ did not erroneously deny Angov a statutory right, our review is limited to whether the IJ's adverse credibility finding was supported by substantial evidence. "This strict standard bars a reviewing court from independently weighing the evidence," and requires us to "deny the Petition unless Petitioner [has] presented evidence so compelling that no reasonable factfinder could find that Petitioner" was not credible. Singh v. INS, 134 F.3d 962, 966 (9th Cir.1998) (internal quotation marks omitted).

[10]   Despite the generally flexible—and highly deferential—nature of substantial evidence review, Angov appears to argue for a per se rule under which immigration judges must blind themselves to the findings of a State Department letter, unless it provides particular information regarding how an investigation was conducted. Surprisingly, Angov's radical proposal accords with the view of the Second Circuit, which has held that a document akin to the Bunton Letter was "inherently unreliable" because it didn't reveal the qualifications of the investigator, the extent of the investigation or the methods used to verify the information. Lin v. U.S. Dep't of Justice, 459 F.3d 255, 271–72 (2d Cir.2006). Under Second Circuit law, therefore, documents like the Bunton Letter categorically "cannot

15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

support [an] adverse credibility finding." *Id.* at 272. We reject this approach. Substantial evidence review requires an appellate court to consider the reasonableness of an agency's conclusions; it does not empower us to craft quasi-statutory criteria governing the admissibility of evidence in agency proceedings. In light of our departure from the holding of a sister circuit—one with the second-largest immigration docket in the country—we offer a thorough explanation for our rationale.

**[11]  [12]  1.** Congress and the Attorney General have accorded aliens like Angov a variety of procedural rights, including the right to be present at the hearing; to be represented by counsel; to examine the evidence against him and present counter-evidence; to cross-examine witnesses; and to have a written record kept of the proceedings. 8 U.S.C. § 1229a(b)(4). But neither the statute nor the regulations give the asylum applicant a right to a particular *quality* of the evidence presented against him. Instead, he is given the right to have an impartial adjudicator assess the evidence. When exercising grace towards individuals entitled *no* procedural rights under the constitution, Congress can set the precise limits of what it grants and what it withholds. That then defines the process an asylum seeker like Angov is due.

With that in mind, let's put Angov's claims into some context. The IJ found that Angov presented forged documents. This is a serious matter that, if true, should not merely result in the immediate termination of Angov's asylum petition, but also in criminal prosecution for immigration fraud. But the IJ wasn't fazed by discovery of the fraud; he went on to decide whether Angov's asylum claim could be sustained despite the forgeries. No other adjudicator in the United States would react with such equanimity to finding that a party had tried to bamboozle it.

**\*901** This points to an unfortunate reality that makes immigration cases so different from all other American adjudications: Fraud, forgery and fabrication are so common —and so difficult to prove—that they are routinely tolerated. Our circuit is no exception. *See Abovian v. INS,* 257 F.3d 971 (9th Cir.2001) (Kozinski, J., dissental).

The reason for this deplorable state of affairs is not difficult to figure out. The schizophrenic way we administer our immigration laws creates an environment where lying and forgery are difficult to disprove, richly rewarded if successful and rarely punished if unsuccessful. This toxic combination

creates a moral hazard to which many asylum applicants fall prey.

First, the reward: the opportunity to be lawfully admitted into the United States. Those born with U.S. citizenship cannot imagine what this is worth to the world's poor and oppressed billions, most of whom would come here tomorrow if they could. Gaining a lawful foothold in America is an incalculable benefit. It sets an immigrant on the path to a peaceful life in a free society, economic prosperity, citizenship and the opportunity to bring family members in due course. A prize like this is worth a great deal of expense and risk. Telling an elaborate lie, and coming up with forged documents and mendacious witnesses to back it up, is nothing at all when the stakes are so high.

And the risk of getting caught is low. As eight members of this court pointed out in *Abovian:*

> The specific facts supporting a petitioner's asylum claim —when, where, why and by whom he was allegedly persecuted—are peculiarly within the petitioner's grasp. By definition, they will have happened at some time in the past—often many years ago—in a foreign country. In order for the INS to present evidence "refuting or in any way contradicting" petitioner's testimony, it would have to conduct a costly and often fruitless investigation abroad, trying to prove a negative—that the incidents petitioner alleges did not happen.

257 F.3d at 976. There's very little the United States can do to investigate obscure incidents that allegedly occurred in countries on the other side of the globe. Even if it were economically feasible, we can't send the FBI into a foreign country to conduct a full field investigation. The best we can do is to have consular personnel check basic facts, in addition to the many other functions they perform. And we have very few U.S. consular personnel on the ground in most countries; in all of Bulgaria, there are fewer than two dozen. *See* U.S. Sec'y of State, 1 *Congressional Budget Justification, Department of State Operations, Fiscal Year 2013,* at 306 (2012). All told, there are fewer than 6000 consular officials in embassies and consulates spread out across more than 170 countries. *Id.* at 227–311.

Finally, if an alien does get caught lying or committing fraud, nothing very bad happens to him. Sure, he may be ordered removed, but most aliens who aren't in custody remain here long after their removal orders become final. *See, e.g.,* Office of the Inspector Gen., U.S. Dep't of Justice, *The Immigration*

15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

and Naturalization Service's *Removal of Aliens Issued Final Orders* iii (2003) (reporting that "the INS removed only 3 percent of nondetained asylum seekers with final removal orders"); *see also* Mark Hamblett, *Circuit Sets Policy for Removal Cases Deemed Low Priority by U.S.,* N.Y. L.J., Oct. 18, 2012 (discussing policy that calls for "the exercise of prosecutorial discretion to focus removal efforts on the most high-priority cases"). And if they do get sent back —at our expense—what's lost? They wind up where they started. Would-be immigrants almost never get prosecuted for presenting forged documents in support of asylum **\*902** petitions, unless they commit some additional misconduct.

*See, e.g.,* United States v. Jawara, 474 F.3d 565, 570 (9th Cir.2007) (defendant charged with document fraud *and* conspiracy to commit marriage fraud). Consequently, immigration fraud is rampant.

Take, for instance, Angov's compatriot, Pavel Pavlov. Pavlov sought asylum as a persecuted gypsy, just like Angov. They even have the same lawyer. But Pavlov's story took a different turn when his wife gained U.S. citizenship and he sought adjustment of status. In the process, he had to disclose that his asylum application was a tissue of lies. Specifically, Pavlov admitted that he wasn't persecuted in Bulgaria. In fact, he's not even a gypsy.

Americans galore wind up in federal prison every year for far less significant lies on government forms or bank loan applications. *See, e.g.,* United States v. Prince, 647 F.3d 1257, 1260–61, 1265 (10th Cir.2011); *United States v. Sandlin,* 589 F.3d 749, 751–53 (5th Cir.2009); *United States v. Jack,* 216 Fed.Appx. 840, 841–43 (11th Cir.2007). So was Pavlov appealing his criminal conviction? Certainly not. The BIA barred Pavlov from obtaining any relief under our immigration laws because he had filed a frivolous (read: fraudulent) asylum petition—a decision he had the chutzpah to appeal. *See* Pavlov v. Holder, 697 F.3d 616 (7th Cir.2012).

Cases involving fraudulent asylum claims are distressingly common. *See, e.g.,* Cheema v. Holder, 693 F.3d 1045, 1046–47 (9th Cir.2012); *Dol v. Holder,* 492 Fed.Appx. 774, 775 (9th Cir.2012); *Zheng v. Holder,* 672 F.3d 178, 180–81 (2d Cir.2012); *Fernandes v. Holder,* 619 F.3d 1069, 1074–76 (9th Cir.2010); *Ghazali v. Holder,* 585 F.3d 289, 290–91 (6th Cir.2009); *Ribas v. Mukasey,* 545 F.3d 922, 925–26 (10th Cir.2008); *Siddique v. Mukasey,* 547 F.3d 814, 815–16 (7th Cir.2008); *Rafiyev v. Mukasey,* 536 F.3d 853, 855–57 (8th Cir.2008); *Dhital v. Mukasey,* 532 F.3d 1044, 1047–48 (9th Cir.2008) (per curiam); *Chen v. Mukasey,* 527 F.3d 935, 938–39 (9th Cir.2008); *Ahir v. Mukasey,* 527 F.3d 912, 914–16 (9th Cir.2008). And for every case where the fraud is discovered or admitted, there are doubtless scores of others where the petitioner gets away with it because our government didn't have the resources to expose the lie.

The Second Circuit has given this already shaky system a swift kick in the gut. As we explain further below, its ruling makes it pretty much impossible for the immigration authorities to carry out even the little bit of fact checking they now manage to do. Its decision smothers the State Department's informal process of checking up on asylum petitions in layers of procedural complexity that will prove impossible to administer in practice. Perhaps the Supreme Court or Congress will intervene and decide who's right.

**2.** The basic question that confronts us is this: In a system where there are pervasive, structural incentives for fraud, are we to disable our triers of fact from considering certain evidence—which may be essential to weeding out fraudulent claims—when that evidence lacks particular details that may bear on its reliability? Remember, the Second Circuit regards documents like the Bunton Letter as *inherently* unreliable. We need not—and do not—conclude that such letters will always lead to adverse credibility findings; we simply disclaim the conclusion that they must be excluded from an immigration judge's consideration when they fail to provide sufficient identifying detail.

We acknowledge the Bunton Letter lacks certain indicia of reliability, but we cannot say, under our "extremely deferential" review, that its use alone constitutes grounds to reverse the IJ's adverse credibility determination. **\*903** *Wang v. INS.,* 352 F.3d 1250, 1257 (9th Cir.2003). First of all, Angov has the burden of proving his eligibility for asylum.

*See* 8 C.F.R. § 1208.13(a). The government has no burden; it can present evidence solely to rebut or impeach petitioner's case. The IJ and the BIA could reasonably conclude that the Bunton Letter is at least sufficient to cast doubt on Angov's evidence and force him to come up with more solid proof to support his claim.

Angov finds fault with the Bunton Letter because it "provides no information as to who conducted the investigation; who obtained, stored and verified the information underlying the

15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

conclusion expressed in the document [or] when and under what authority the investigation was conducted." He notes that the Bunton Letter offers no explanation for many of its conclusions—for example, that both the case numbers and the telephone numbers listed on the fraudulent subpoenas were incorrect. These are all interesting points to raise at the hearing, and the absence of a satisfactory response from the government might well convince the trier of fact to disregard the letter. But in this instance, the IJ, in his discretion, chose to credit the letter. That was his prerogative, and our review is limited to whether that decision is *permissible* in light of the evidence.

 [13]    The doubts as to the letter's reliability flow from the fact that the rules of evidence, and the hearsay rules in particular, don't apply to administrative proceedings. *See Richardson v. Perales,* 402 U.S. 389, 400–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Hernandez–Guadarrama v. Ashcroft,* 394 F.3d 674, 681 (9th Cir.2005). This inevitably leaves some uncertainty that would be eliminated if this were a formal trial subject to the rules of evidence. But it doesn't deprive the opposing party of any and all means of rebutting the hearsay declarant's assertions.

The Bunton Letter does come to certain factual conclusions: that the addresses identified by Angov in his asylum petition don't exist; that the officers—Captain Donkov, Lieutenant Slavkov and Investigator Vutov—and room numbers specified in the subpoenas presented by Angov don't exist; that the seals on the subpoenas are the wrong size; and that the part of the city where Angov claimed to live was only twenty to thirty percent Roma. Each of these assertions describes facts in the real world, so it's possible to rebut Bunton by presenting proof that those facts are not as the Bunton Letter describes them.

In fact, Angov did precisely that with respect to the two addresses. He presented a letter from someone in Bulgaria, who explained that the Bunton Letter's conclusions about the addresses are wrong. *See* p. 896 *supra*; Appendix. And the BIA seems to have been swayed, as it noted that the "record is unclear" about whether Angov was telling the truth about the addresses.

Angov was free to present similar evidence to undermine the Bunton Letter's statements about the subpoenas. He could have had Ms. Mihaylova from the human rights organization or some other friend in Sofia visit the police station and try to find out whether the rooms referenced in the Bunton Letter do or don't exist. He might also have been able to obtain a roster of the names of police officials in Sofia and shown that it contains the names of the officers referenced in the subpoenas.

The Bunton Letter also asserts that the phone numbers in the subpoenas aren't correct. Angov or one of his friends could have called the numbers and asked whether he'd reached the police station—and then submitted an affidavit to that effect. The same is true about the seals: Angov or his friends might have tried to obtain an **\*904** official copy of the police seal from the Bulgarian government and introduced it into evidence. He did none of these things, perhaps because he knew that the subpoenas were forged.

Where the petitioner has the burden of proof, there's nothing unfair about having a U.S. government agent check out some of his basic facts and inform the IJ of possible discrepancies. This forces the petitioner to obtain further evidence supporting the challenged claims. There might be situations where obtaining further evidence is impossible, such as where the petitioner has fled from a closed society and can find no one willing or able to obtain the evidence he needs. In such cases, we don't hold the petitioner's failure to present evidence against him. *See Singh v. Holder,* 638 F.3d 1264, 1270–71 (9th Cir.2011). But Angov has never claimed that he couldn't get more evidence; indeed he has resources in Bulgaria with which to do so. Based on the almost complete absence of rebuttal evidence on Angov's part, the IJ was not unreasonable to credit the allegations in the Bunton Letter.

**3.** There's nothing particularly exotic about assessing an asylum applicant's credibility by comparison with an extrinsic source. For example, the Bunton Letter's estimate that Angov comes from a community that is only twenty to thirty percent Roma is similar to the kind of demographic estimates made by the State Department in its country reports, on which we and the BIA rely all the time. *See, e.g., Dhillon v. Holder,* 485 Fed.Appx. 252, 253 (9th Cir.2012); *Patel v. Holder,* 474 Fed.Appx. 584, 585 (9th Cir.2012); *Sesay v. Holder,* 469 Fed.Appx. 617, 617 (9th Cir.2012); *see also Sowe v. Mukasey,* 538 F.3d 1281, 1285 (9th Cir.2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (internal quotation marks omitted)); *cf.* 8 U.S.C. § 1158(b)(1)(B)(iii).

Were we to hold that we can't rely on this estimate in the Bunton Letter, we'd be casting doubt on a multitude of country reports that have no better support for their demographic estimates than the Bunton Letter. The country reports are, after all, prepared by the very same consular officials, using some of the same methods, as the Bunton Letter. *See* Bureau of Democracy, Human Rights & Labor, U.S. Dep't of State, *Country Reports on Human Rights Practices for 2012: Appendix A: Notes on Preparation of Reports,* at 1 (2012). Indeed, Cynthia Bunton's title when she wrote her letter was director of the Department of State's "Office of *Country Reports* and Asylum Affairs." (emphasis added). Nadia Tongour is her successor. Adopting Angov's objection to the findings in the Bunton Letter could render country reports inadmissible in immigration proceedings.

Angov complains that the Bunton Letter might have relied on reports from foreign service nationals (FSNs). *See Ezeagwuna,* 325 F.3d at 406. What if it did? Our embassy in Sofia, as elsewhere, employs roughly the same number of FSNs and Americans. U.S. Sec'y of State, 1 *Congressional Budget Justification, Department of State Operations, Fiscal Year 2013,* at 306 (2012). Our short-staffed consular offices no doubt use FSNs, who are fluent in the local language and familiar with local conditions, to do some of the legwork. We see nothing wrong with that. Whether the investigation was conducted by U.S. citizens, FSNs or Hercule Poirot, it resulted in certain factual conclusions that can be refuted.

Submissions such as the Bunton Letter and the various country reports on which we routinely rely aren't just a collection of statements by disconnected individuals. **\*905** Rather, they are the unified work product of a U.S. government agency carrying out governmental responsibilities. As such, the report itself, and the acts of the various individuals who helped prepare it, are clothed with a presumption of regularity. *See Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 174, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004); *see also Kohli v. Gonzales,* 473 F.3d 1061, 1068 (9th Cir.2007). "[I]n the absence of clear evidence to the contrary, courts presume that [these individuals] have properly discharged their official duties." *Favish,* 541 U.S. at 174, 124 S.Ct. 1570 (quoting *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)).

The presumption of regularity has been applied far and wide to many functions performed by government officials. *See, e.g., U.S. Postal Serv. v. Gregory,* 534 U.S. 1, 10, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001) (Post Office disciplinary procedures); *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (prosecutorial decision making); *FCC v. Schreiber,* 381 U.S. 279, 296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965) (FCC's decision making process); *cf. INS v. Miranda,* 459 U.S. 14, 16–18, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam) (processing of visa application).

The Bunton Letter is entitled to the presumption that those who participated in its preparation, be they FSNs, consular officers or officials at the State Department in Washington, did their jobs fairly, conscientiously and thoroughly; that each officer in the chain relied on the work of someone down the chain in whom he had confidence; that no one had a personal stake in the substance of the report; and that no one lied or fabricated evidence. Without this presumption, country reports would be no more useful than the Farmers' Almanac or Perezhilton.com.

The dissent argues that the presumption of regularity doesn't apply here because "[t]he key hearsay statement in the Bunton Letter comes from a Bulgarian police employee, not a U.S. government official." But that would remain true, even with the procedural protections the Second Circuit advocates. Those protections don't prevent Bulgarian police officers from lying, they simply make it easier for an IJ to assess the quality of investigation conducted by *our* consular officials —the very officials we presume reliable. As with a country report, the information in a consular letter may be based, in part, on hard-to-verify statements made by local officials. That's a reason to take the information contained in such letters with a grain of salt—as an IJ is entitled to do—not a reason to deem them inadmissible in their entirety.

The similarities between the Bunton Letter and the litany of documents used, and accepted, in everyday asylum adjudications speaks to a fundamental misapprehension on the part of the Second Circuit and the dissent. Immigration adjudication necessarily requires consideration of all manner of imperfect sources. But we do neither immigrants nor the immigration authorities a service by cabining the range of permissible documents on which a trier of fact can rely in making his decision. In assessing whether an incident occurred years ago in a faraway country with an unfamiliar

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

culture and political system, an immigration judge must be able to read, assess and weigh as much information as possible. True, dismissing a petition in reliance on an unsworn letter might seem harsh; but so is dismissing a petition based on relatively minor testimonial inconsistencies in the convoluted story of an immigrant who may have only a weak command of English and a hazy memory of his flight from terror. Harshness is endemic to any asylum system. Here, the **\*906** IJ came to the conclusion that the unrefuted contents of the Bunton Letter cast doubt on the subpoenas Angov presented as evidence. Do we really better serve justice, or the immigration process more generally, by compelling the IJ to either accept the dubious subpoenas as genuine, or base his review solely on his instincts as to what a Bulgarian subpoena "should" look like?

An implicit assumption of the Second Circuit's approach is that the exclusion of documents such as the Bunton Letter will lead, not to reliance on capricious information, but to the proliferation of more comprehensive and reliable State Department investigations. There's no reason to believe that will happen. The asylum unit of the Department of State's Office of Country Reports and Asylum Affairs "has suffered from long standing resource problems." Office of the Inspector Gen., U.S. Dep't of State, *Report of Inspection: Bureau of Democracy, Human Rights and Labor* 23 (2003). Many of its staffers are interns, and even its regular employees are often "pressed into service to work" on the Office's other main responsibility: country reports. *Id.* at 23–24. And the consular officers tasked with verifying asylum applicants' claims are also overworked and understaffed. The Tongour Letter expresses the government's position on providing additional information about the results of an overseas investigation: "Such additional demands are further burdens on Consular Officers in the performance of their regular responsibilities and are particularly onerous for FSNs who may be subject to local reprisal." The State Department tells us it's doing the best it can with the scant resources allocated to it and our consular corps abroad.

Demanding that the reports contain a multitude of additional details, such as "the identity and qualifications of the investigator(s)," "the objective and extent of the investigation" and "the methods used to verify the information discovered," *see* Lin, *459 F.3d at 271,* transforms a process that is swift, efficient and informal into one that's ponderous, time-consuming and expensive.

Insisting on these procedures would paralyze the process, making it impossible for our consular officers to do many of these investigations because they're too busy filling in all the jots and tittles our sister circuit enshrines as pre-requisites for a document's admission. Complying with such requirements considerably lengthens the time it takes to write most reports, and may make it impossible to write others for fear of disclosing sensitive information that could compromise sources or impair relations with local officials.

Nor is it realistic for the government to produce such information in camera. These reports are prepared by Department of State officials stationed in foreign countries, and are then turned over to another agency in another department, which then releases them to an adverse party. These disclosures are made in the context of immigration court proceedings, not in district court, and the immigration court, despite its name, is an executive branch agency. It has no contempt powers and can't have anyone arrested for violating its orders, including confidentiality orders. *See* Stephen H. Legomsky, *Restructuring Immigration Adjudication,* 59 Duke L.J. 1635, 1674, 1714 (2010); Dana Leigh Marks, *Still a Legal "Cinderella"? Why the Immigration Courts Remain an Ill–Treated Stepchild Today,* 59 Fed. Law., Mar. 2012, 25, at 30. There's a good chance the information will fall into the hands of people who have little regard for U.S. law and find themselves repatriated with a motive for revenge. Consular officials forced to disclose sensitive information in these circumstances would probably **\*907** leave the information out of the report rather than risk burning their sources, offending local officials or losing their lives.

If we make the job of compiling these reports substantially more risky and onerous, the State Department may stop writing them. The United States gets close to 74,000 asylum cases a year, far more than any other industrialized nation. *See* United Nations High Comm'r for Refugees, *Asylum Levels and Trends in Industrialized Countries* 3, 8 & n. 14 (2011). (That's more than three times the number of Social Security cases the Supreme Court considered massive in *Perales* ). The use of reports from consular officials gives the government the ability to check facts and puts at least *some* constraint on how far from the truth asylum applicants will stray. Knocking out even this most basic check on fraud and fabrication would subvert the asylum process, giving charlatans a free pass into the United States.

**4.** In any event, even if the Second Circuit's approach were to encourage more detailed State Department letters, such "faith in procedural choreography" as a truth-seeking device is "fundamentally flawed." *United States v. Balough, 820 F.2d 1485, 1491 (9th Cir.1987)* (Kozinski, J., concurring). Requiring the Department of State to disclose more details will neither materially enhance the reliability of the resulting report nor do very much to help asylum applicants.

We test this proposition by modifying a portion of the Bunton Letter to comply with the requirements that would (presumably) satisfy the Second Circuit; new or modified language is italicized:

*Agent Michael Smith, a foreign service agent with seventeen years of field experience who is fluent in Bulgarian, ordered Vladimir Popov, a foreign service national in the Embassy's employ, to visit the* 5th Police District station in Sofia *in order to seek* authentication of the two subpoenas. *FSN Popov is a lifelong resident of Sofia and has worked for the Embassy for two years. He is fluent in Bulgarian and speaks conversational English.*

*FSN Popov traveled to the station and, once there, spoke to Ludmilla Bogdanovich, who is the supervisor of personnel records at the station. FSN Popov considers Ms. Bogdanovich a trustworthy source. After she consulted the relevant records, Ms. Bogdanovich told FSN Popov that* Captain Donkov, Lieutenant Slavkov and Investigator Vutov have never worked for the 5th Police District. *Ms. Bogdanovich* also told *FSN Popov* that the case numbers on the subpoenas were not correct, there was no room 4 on the second floor and no room 5 on the first floor and that the telephone numbers on the subpoenas were incorrect. *While at the station, FSN Popov asked Ms. Bogdanovich for* an imprint of the police station seal, *which he brought back to the consulate. Agent Smith compared it to the seal on the two subpoenas and found the official seal to be* much larger.

*After hearing FSN Popov's oral report of his meeting with Ms. Bogdanovich, Agent Smith transmitted the information to the author of this letter by encrypted email.*

Best we can tell, this revised letter would comply with the requirements imposed by the Second Circuit, but would it be much more valuable than what we already have? We'd know a bit more about Agent Smith, and we'd know the identity of the person who did the legwork, but how would that help us? We'd also have a name of someone who purportedly provided the information from the Bulgarians, but how would *that* be

of any use? Angov **\*908** could still complain that the IJ was unable to assess the Bulgarian official's credibility, or even the credibility of any of the later links in the chain. We'd also know that it was Agent Smith who visually compared the seal on the subpoenas with the station's official seal, but how does that bring us closer to the truth?

At this point, we would be faced with a whole new set of questions: How do we know Popov really went to the police station instead of stopping off in a bar to chug rakia? How did Popov know whether Bogdanovich was really the supervisor of personnel records at the police station? Did he check her identification papers? How did Popov assess Bogdanovich to be trustworthy, and how can we be sure he's right? Did Popov look at the personnel records himself, or did he take Bogdanovich's word that the three officers never worked there? Can we be sure that Bogdanovich checked all the relevant records? Can we be sure the purported personnel records were accurate and complete? How do we know Popov didn't falsify important details because he was afraid of reprisal or because he hates gypsies? And how can we be sure Smith is telling the truth if we can't cross-examine him? Did Smith have a full-sized copy of the subpoena when he compared the seals or a shrunken photocopy?

These difficulties are inherent in trying to prove up facts related to events that occurred years past and thousands of miles away from where the IJ is holding his hearing. Short of transporting all the declarants and their underlying records to the United States for a hearing before an IJ, there will inevitably be gaps that can be bridged only by multiple levels of hearsay.

This is not a problem that plagues only the government. Almost every piece of evidence asylum petitioners present in support of their cases would be inadmissible if subjected to the rules of evidence, especially those pertaining to hearsay: threats they claim to have been subjected to; racist comments by the police; reports of strange people looking for them; letters from family members and others. A brief scan of our caselaw shows it's pretty much impossible to build an asylum case without relying on evidence that would be laughed out of court if presented in a domestic trial. *See, e.g., Meza–Vallejos v. Holder,* 669 F.3d 920, 922 (9th Cir.2012); *Haile v. Holder,* 658 F.3d 1122, 1124–25 (9th Cir.2011); *Singh v. Holder,* 656 F.3d 1047, 1049–50 (9th Cir.2011); *Hu v. Holder,* 652 F.3d 1011, 1013–15 (9th Cir.2011); *Kumar v. Gonzales,* 444 F.3d 1043, 1047–48 (9th Cir.2006).

Take, as a small example, the letter from Daniela Mihaylova that Angov presented to rebut some of the information in the Bunton Letter. This is a two-page, typed document, with a small emblem and a typed address by way of letterhead. (We reproduce it in the Appendix.) It is addressed "To: Whom it may concern" and references Angov's case. The letter represents that the "Romani Baht Foundation is a leading Bulgarian non-profit organization for protection of Roma/ Gypsies human rights, founded in 1996 and legally registered with Bulgarian court." Mihaylova purports to be the legal programs' director of the Foundation.

The BIA took this letter seriously and modified some of the IJ's findings based on it and other evidence presented by Angov. But there is absolutely no evidence in the record that there *is* any such person as Daniela Mihaylova and, if there is, how she went about obtaining the information detailed in her letter. For all we know, Angov could have printed the letter using his computer and standard word processing software.

**\*909**  Compared to this letter—and the remaining evidence presented by Angov—the Bunton Letter seems a paragon of reliability. It was prepared by government officials trained to perform this kind of investigation; who have nothing to gain by giving false information; and whose conduct is clothed with the presumption of regularity that attaches to all government actors. *Cf. Perales,* 402 U.S. at 402–06, 91 S.Ct. 1420. The Bunton Letter encloses five photographs depicting locations mentioned in Angov's asylum petition, which confirms that someone from our consulate traveled to those locations and made a personal inspection.

The Bunton Letter also gives specific reasons for doubting the authenticity of the addresses and points to several problems with the subpoenas. It is not an unsupported assertion that Angov is a liar; it is a rational, apparently objective recital of observed facts. At the very least, we can be sure that there *is* a Bunton and a Tongour, and that they can be disciplined or prosecuted if they negligently or deliberately falsified their reports. And we can reasonably presume that, in preparing their reports, Bunton and Tongour relied on trained State Department officers and agents who are themselves subject to discipline or prosecution for incompetence or corruption.

Compare this to the letter from Mihaylova (assuming there even *is* a Mihaylova): It comes from someone who cannot be disciplined or prosecuted in case of a lie, and who has not been screened for competence, honesty or reliability. It

encloses no pictures or other documentary evidence. It doesn't explain how the facts asserted were gathered or by whom. It doesn't even claim to be based on first-hand knowledge, rather than hearsay or rumor. The letter simply makes a series of bald factual assertions without any support. Even assuming the letter is genuine (in the sense that it was actually written by its purported signatory in Bulgaria), the IJ and the BIA have absolutely no way to evaluate how accurate or objective it is.

In an environment where it's pretty much impossible to obtain first-hand accounts of most of the relevant facts, should we require the government to fight an uphill battle on a slippery slope with one leg and both arms tied behind its back, while its adversary gets to use cleats and brass knuckles? Of course not. It would be the height of cognitive dissonance to hold the United States to standards of proof derived from domestic litigation while allowing petitioners to present anything and everything that doesn't bear the watermark "Forgery Purchased on the Black Market."

Furthermore, contrary to what the dissent and the Second Circuit might believe, the consequence of a rule excluding the consideration of documents such as the Bunton Letter will not be to allow more of the world's oppressed into the land of the free. Rather, it favors the canny, the dishonest, the brazen and those who have the means and connections to purchase or create fraudulent documents, such as Angov's compatriot, Pavlov. *See* pp. 900–01 *supra.* Nor does such a rule ultimately help asylum seekers, as it's hard to believe that Congress will long allow the program to continue when it rewards people who lie their way into the United States. Eventually, Congress and the public will catch on that asylum has become a fast-track vehicle for immigration fraud, and the asylum statute will be repealed or amended so as to make it even more difficult for honest asylum seekers to obtain relief. The ultimate victims will be the tired, poor, huddled masses who will find the golden door slammed in their faces.

\* \* \*

**\*910**  **[14]**  We conclude on this record that the IJ acted within his discretion when he admitted the Bunton Letter into evidence and relied on it to find that the subpoenas Angov submitted were fraudulent. The adverse credibility finding based on the fraudulent subpoenas was supported by substantial evidence. Because Angov's claim is based on his mistreatment by the Bulgarian police, the fact that the subpoenas were fraudulent "goes to the heart of [Angov's] claim of persecution." *See Rizk,* 629 F.3d at 1087–88.

15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

Furthermore, Angov's testimony is not credible, he doesn't present other evidence that meets his burden to show that it's " 'more likely than not' " that he would be tortured if sent back to Bulgaria. *See*  *Shrestha v. Holder,* 590 F.3d 1034, 1048 (9th Cir.2010). Consequently, the IJ and BIA decisions denying Angov asylum, withholding of removal and protection under the Convention Against Torture must stand.

**PETITION DENIED.**

**Appendix: Mihaylova Letter**



THOMAS, Chief Judge, dissenting:

I would join the Second Circuit in resolving the issue before us. Unsworn, unauthenticated, hearsay letters—prepared for litigation by the government and not subject to any form of cross-examination—cannot form the sole basis for denying asylum to an otherwise qualified applicant. Therefore, I must respectfully dissent.

I

A

Five of our sister circuits have held that the government may not deny asylum solely on the basis of conclusory letters prepared for litigation in reliance on multiple layers of unauthenticated hearsay, without affording the petitioner some right of confronting the charges. Four of those circuits reached this result on constitutional grounds, holding that the admission of unauthenticated consular letters against an asylum applicant violates that applicant's procedural due process rights.  *Banat v. Holder,* 557 F.3d 886, 892–93 (8th Cir.2009); *Anim v. Mukasey,* 535 F.3d 243, 256–58 (4th Cir.2008); *Alexandrov v. Gonzales,* 442 F.3d 395, 407 (6th Cir.2006); *Ezeagwuna v. Ashcroft,* 325 F.3d 396, 405–08 (3d Cir.2003). The Second Circuit declined to reach the constitutional issue but held that such letters, standing alone, could not provide a basis for denying asylum under the substantial evidence standard because they lacked sufficient indicia of reliability and trustworthiness. *Lin v. U.S. Dep't of Justice,* 459 F.3d 255, 268–72 (2d Cir.2006); *see also Balachova v. Mukasey,* 547 F.3d 374, 382–83 (2d Cir.2008) (applying *Lin* ). Although I would resolve the present case purely on statutory grounds, as the Second Circuit did, the cases decided by our other sister circuits also provide useful guidance here.

In *Banat,* for instance, the Eighth Circuit rejected an IJ's reliance on a consular letter that cited an unidentified investigator from the U.S. embassy in Beirut because the letter contained "multiple levels of hearsay" and omitted any mention of the investigator's qualifications, experience, or "contact." 557 F.3d at 891–92. The court acknowledged that "overseas investigations by State Department officials concerning the authenticity of documents purportedly originating in foreign countries are often necessary for the adjudication of an asylum claim," *id.* at 890; however, it concluded that "the IJ's reliance on the State Department letter, which provided no details about the investigation that would allow the IJ to assess the investigation's reliability or trustworthiness and which contained multiple levels of hearsay, violated Banat's right to a fundamentally fair hearing." *Id.* at 893. The court reasoned:

15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

**\*912** Reliance on reports of investigations that do not provide sufficient information about how the investigation was conducted are fundamentally unfair because, without that information, it is nearly impossible for the immigration court to assess the report's probative value and the asylum applicant is not allowed a meaningful opportunity to rebut the investigation's allegations.

*Id.* at 891.

The Fourth Circuit relied on similar logic in *Anim* when it rejected a State Department letter authored by the same official involved in our case. The court noted that the official's letter was "comprised entirely of multiple hearsay statements." 535 F.3d at 257. It also pointed out that "letter does not explain how Bunton received the information she relates, nor does the letter disclose the identities of some of the individuals involved in the chain of communication." *Id.; see also id.* ("Without the details of the investigation, it is impossible for an immigration judge, the BIA, or a court to evaluate the reliability of the letter's conclusions." (citations omitted)). Based on these deficiencies, the *Anim* court concluded that "the Bunton letter contains insufficient indicia of reliability and, as a result, its use was fundamentally unfair." *Id.* at 256.

The courts in both *Anim* and *Banat* relied heavily on the Second Circuit's reasoning in *Lin,* 459 F.3d at 268–72. In *Lin,* the Second Circuit rejected a consular report almost identical to the letter at issue here. The consular report was based on the opinions of Chinese government officials who, as the *Lin* court noted, "appear to have powerful incentives to be less than candid on the subject of their government's persecution of political dissidents." *Id.* at 269–70. The court also observed that the report lacked other traditional markers of reliability, namely: "(i) the identity and qualifications of the investigator(s); (ii) the objective and extent of the investigation; and (iii) the methods used to verify the information discovered." *Id.* at 271. The *Lin*

court distilled these factors from the Department of Justice's own guidelines for evaluating the reliability of documents produced overseas.[1] Noting that the consular letter failed to satisfy these basic criteria, the court held that the report was "insufficiently detailed to permit a reviewing court to assess its reliability" and, as such, could not support a finding that the petitioner had forged documents submitted with his asylum application. *Id.* at 270.

Critically, the Second Circuit reached this conclusion as a statutory matter, holding **\*913** that the consular report was "highly unreliable and therefore insufficient to satisfy the substantial evidence requirement." *Id.* at 269. The court noted that the Third and Sixth Circuits had recently rejected similar reports as procedural due process violations[2] but, ultimately, the *Lin* court held that it was unnecessary to reach the constitutional issue. *Id.* ("Although we find the logic of these cases [concerning procedural due process] persuasive, we do not reach the constitutional issue presented because the *statutory* standard of review requires vacatur." (emphasis in original)). The court later took the same approach in *Balachova.* 547 F.3d at 383 (concluding that a consular report that "contain[ed] no information concerning the qualifications of the investigators, the identity of the Russian officials who prepared the response to the consular inquiry, or the methods, if any, used to verify the information supplied by the foreign official" was "unreliable and cannot contribute to a finding of substantial evidence").

Our case cannot be distinguished from *Lin* or *Balachova.* The IJ relied on a short, unsworn letter from a State Department official to support his finding that Angov forged parts of his asylum application. The letter was devoid of any information concerning the methodology employed in the investigation or the qualifications of the investigators. Instead, it was based on the unauthenticated, hearsay statements of an unidentified Bulgarian police official who worked at the police station where Angov claims to have been severely beaten. Like the government officials in *Lin,* that police official—whose department had been accused of ethnically motivated brutality —had a strong incentive to be "less than candid." 459 F.3d at 269.

In sum, the Bunton Letter was comprised of conclusory statements of fact, none of which were supported by the basic information required under *Lin* and *Balachova.* We are left, as was the Second Circuit, with a document that is

"insufficiently detailed to permit a reviewing court to assess its reliability." *Lin, 459 F.3d at 270.* Indeed, in many ways, there is less information in the Bunton Letter than in the letters rejected as unreliable by our sister circuits. Accordingly, because the Bunton Letter lacks the indicia of reliability set forth in *Lin,* the agency could not have relied on it under the substantial evidence standard.

B

Neither *Lin* nor *Balachova* discussed the specific procedural protections guaranteed to aliens in removal proceedings under 8 U.S.C. § 1229a(b)(4)(B). That provision, however, offers independent grounds for barring the government from relying on unsworn, unauthenticated hearsay letters as the sole basis for denying an alien relief from removal.

Section 1229a(b)(4)(B) expressly provides that every alien "shall have a reasonable opportunity to examine the evidence against [him or her], to present evidence on [his or her] own behalf, and to cross-examine witnesses presented by the Government" during removal proceedings. *See also* 8 C.F.R. § 1240.10(a)(4) (requiring the IJ to "[a]dvise the respondent that he or she will have a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in *\*914* his or her own behalf and to cross-examine witnesses presented by the government"). We have recognized the "importance of the right to confront evidence and cross-examine witnesses" under this statute.[3] *Cinapian v. Holder, 567 F.3d 1067, 1074 (9th Cir.2009)* (listing "several cases" highlighting the importance of this right). As we explained in those cases, the "purpose of this statutory guarantee cannot be fulfilled ... if the government's choice whether to produce a witness or to use a hearsay statement is wholly unfettered." *Baliza v. INS, 709 F.2d 1231, 1234 (9th Cir.1983).* Rather, to comply with this provision, the government must "make a reasonable effort to present the witness" for cross-examination. *Cinapian, 567 F.3d at 1074.*

The majority asserts that the "government here *did* make a reasonable effort to obtain a witness" for cross-examination but, ultimately, was stymied by the State Department's policy of not releasing follow-up information about overseas investigations. *See supra,* Op. at p. 899. This "effort" cannot

be sufficient to satisfy the government's burden under the statute. Indeed, allowing one executive branch agency to rely on another executive branch agency's blanket policy of refusing to provide certain information is tantamount to granting the government the kind of unfettered discretion we repudiated in *Baliza.* As for the policy itself, whatever logistical obstacles might have once justified the State Department's blanket refusal to produce overseas government witnesses for removal proceedings, those obstacles can surely be overcome in an age of video conferencing.[4] Indeed, federal law specifically allows IJs to conduct entire hearings via telephone or video conference. 8 U.S.C. § 1229a(b)(2)(A); *see also* 8 C.F.R. § 1003.25(c) ("An Immigration Judge may conduct hearings through video conference to the same extent as he or she may conduct hearings in person.").

Because the government did not make a reasonable effort to produce Bunton for cross-examination, I would hold that its reliance on the Bunton Letter violated Angov's rights under § 1229a(b)(4)(B).[5]

C

The government argues that the Bunton Letter should be credited as trustworthy *\*915* by employing the presumption of regularity—that is, that government officials accurately perform their reporting duties without bias. *See Espinoza v. INS, 45 F.3d 308, 310 (9th Cir.1995)* (holding that "information on an authenticated immigration form is presumed to be reliable in the absence of evidence to the contrary presented by the alien").

However, the presumption of regularity does not apply when the source of information "was neither a government official nor the subject of the report." *Hernandez–Guadarrama v. Ashcroft, 394 F.3d 674, 681 n. 9 (9th Cir.2005)* (citing *Espinoza, 45 F.3d at 310*). The key hearsay statement in the Bunton Letter comes from a Bulgarian police employee, not a U.S. government official or Angov. Statements made by third persons under no business duty to report are not entitled to the presumption of reliability and cannot be considered subject to the presumption, even if included in a document that enjoys such a presumption. *United States v. Pazsint, 703 F.2d 420, 424–25 (9th Cir.1983); see also Pouhova v. Holder, 726 F.3d 1007, 1014–15 (7th Cir.2013)* (rejecting application

of presumption of reliability to hearsay statements of third parties recorded in official documents); *Jordan v. Binns,* 712 F.3d 1123, 1133 (7th Cir.2013) ("[T]he presumption of reliability that serves as the premise for the public-records exception does not attach to third parties who themselves have no public duty to report.").

Second, the presumption of reliability, similar to the traditional hearsay exception for public records, applies to documents "prepared in accordance with normal recordkeeping requirements." *Espinoza,* 45 F.3d at 310; *see also Lopez–Chavez v. INS,* 259 F.3d 1176, 1181 (9th Cir.2001) ("It must be shown that the document has been certified by the INS District Director as a true an [d] accurate reflection of INS records."). The Bunton Letter, summarizing the results of an investigation involving multiple individuals and carried out at the behest of a party involved in litigation, is not comparable to an authenticated immigration form routinely filled out by border agents. *Espinoza,* 45 F.3d at 309. It is not a "business record" which is prepared in the usual and ordinary course of business. It was not authenticated or certified. It did not even conform with the agency's own reporting procedures, as described and set forth in the Cooper Memo. Thus, the ad hoc Bunton Letter does not qualify as a government document produced in accordance with regular agency procedure.

For these reasons, I find the government's arguments unpersuasive.

## II

Adjudicating asylum claims is necessarily an imperfect endeavor. Witnesses to alleged foreign persecution are rarely available; documents are often impossible to locate. The immigration judge is often left with assessing witness credibility as the only means of resolving the request for relief. We are often limited to seeing through a glass, darkly.

As to post-REAL ID Act asylum seekers, the IJ may require corroboration, even when presented with credible testimony. *See Aden v. Holder,* 589 F.3d 1040, 1044 (9th Cir.2009) ("Where the trier of fact determines that

the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." (quoting 8 U.S.C. § 1158(b)(1)(B)(ii))). We have sustained the BIA's denial of relief founded on the inability of an asylum seeker to obtain corroboration. *Shrestha v. Holder,* 590 F.3d 1034, 1047–48 (9th Cir.2010).

**\*916** In the post-REAL ID Act world, when corroborating evidence has assumed more importance, it is not unfair or unduly burdensome to require the government to identify basic, rudimentary information about its sources when it challenges corroborating evidence so that the IJ can properly weigh it. The information our sister circuits have demanded is modest. They do not require that every detail be uncovered or every riddle solved, they merely ask that very basic foundational questions—already in the hands of the Executive Branch—be answered. The Executive Branch invests significant resources in forensic document analysts, who provide detailed declarations in immigration cases. It is not much to ask that in the case of routine foreign fact-checking, the government simply tell us how it acquired the facts upon which it asks us to deny asylum.

The alternative is a decision founded solely on anonymous hearsay, often—as in this case—produced by the very foreign government actors the asylum-seeker accuses of persecution. We should be wary of relying on "secret informers, whisperers and talebearers" to decide legal rights in this context, especially when their word is used as the sole basis to deny relief to an otherwise qualified applicant. *See Parker v. Lester,* 227 F.2d 708, 719 (9th Cir.1955) (cautioning against relying on untrustworthy sources in awarding security clearances to Coast Guard employees). The immigration system is fraught with enough risk of error. When it is reasonably possible, we need to minimize that risk.

I respectfully dissent.

## All Citations

788 F.3d 893, 15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

AR.04012

15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

## Footnotes

1    Angov's brief refers to him as "Roma" or "gypsy" interchangeably. So do we.

2    8 C.F.R. § 208.6(a) provides that "[i]nformation contained in or pertaining to any asylum application ... shall not be disclosed without the written consent of the applicant." Angov argues that *Alexandrov* "exposed the improprieties that have riddled overseas investigations in the Sofia consulate," including that investigations were often conducted by foreign service nationals, that someone other than a consular officer could have authored embassy reports and that consular officials often signed reports written by others. None of these arguments were presented to the BIA.

3    We note that four circuits have held that reliance on documents like the Bunton Letter in asylum proceedings violates due process. *See* *Banat v. Holder,* 557 F.3d 886, 892–93 (8th Cir.2009); *Anim v. Mukasey,* 535 F.3d 243, 256–58 (4th Cir.2008); *Alexandrov,* 442 F.3d at 407; *Ezeagwuna v. Ashcroft,* 325 F.3d 396, 405–08 (3d Cir.2003). Because Angov does not have a constitutional right to procedural due process, that question is not before us. We also note that two other circuits have held that asylum applicants like Angov are entitled to certain "minimum due process" rights in the application of their statutory rights. *See* *Marincas v. Lewis,* 92 F.3d 195, 203–04 (3d Cir.1996); *Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984); *see also* *Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Whether asylum applicants are owed such "minimum due process" is an open question in our circuit, but it is not one we need to resolve here. Angov was clearly given fair *access* to all his statutory rights. What he asks for instead are due process protections that go beyond those which Congress has provided him. But, as an alien who has never entered the United States, those protections are unavailable to him.

1    The Justice Department's guidelines stated that, in the case of a fraudulent document, the "report must contain, at a minimum: (i) the name and title of the investigator; (ii) a statement that the investigator is fluent in the relevant language(s) or that he or she used a translator who is fluent in the relevant language(s); (iii) any other statements of the competency of the investigator and the translator deemed appropriate under the circumstances (such as education, years of experience in the field, familiarity with the geographic terrain, etc.); (iv) the specific objective of the investigation; (v) the location(s) of any conversations or other searches conducted; (vi) the name(s) and title(s) of the people spoken to in the course of the investigation; (vii) the method used to verify the information; (viii) the circumstances, content, and results of each relevant conversation or search[ ]; and (ix) a statement that the Service investigator is aware of the confidentiality provisions found in 8 C.F.R. § 208.6." Memorandum from Bo Cooper ("Cooper Memo"), Gen. Counsel, Immigration & Naturalization Serv., to Jeffrey Weiss, Dir., Immigration & Naturalization Serv. Office of Int'l Affairs, Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information (June 21, 2001), *available at* http://judiciary. house.gov/legacy/82238.pdf at 39–45.

2    *See* *Alexandrov,* 442 F.3d at 407 (holding that memoranda prepared by a U.S. embassy official in Sofia did "not meet our standards of trustworthiness and reliability and were therefore improperly relied upon by the immigration court"); *Ezeagwuna,* 325 F.3d at 406–08 (holding that a letter prepared by a U.S. embassy official in Yaounde contained "multiple hearsay of the most troubling kind" and, therefore, was "neither reliable nor trustworthy").

3    The majority suggests that, because foreign officials are not themselves "amenable to cross-examination," allowing State Department officials to be cross-examined when they "inescapably rely" on information from foreign officials would not significantly enhance the credibility of that information. Op. at p. 899. This view overlooks the fact that State Department officials would be less likely to accept unreliable information as true if they knew that they might later be subject to cross-examination. Furthermore, if State Department officials

15 Cal. Daily Op. Serv. 5755, 2015 Daily Journal D.A.R. 6182

did rely on information obtained from foreign officials, they would be prepared to explain why that information was trustworthy.

4    At the very least, the State Department should be required to produce some specific hardship or reason why it cannot produce the witness for cross-examination, rather than relying on a general policy.

5    The four of our sister circuits to resolve this issue on constitutional grounds did not discuss the procedural rights guaranteed under § 1229a(b)(4)(B). However, the reasoning they used in concluding (unanimously) that the admission of unauthenticated, hearsay letters during removal proceedings violates an alien's procedural due process rights counsels toward holding that such letters also violate the alien's statutory rights under § 1229a(b)(4)(B). We have recognized that the due process right is closely related to the statutory right in this context. *See Bondarenko v. Holder,* 733 F.3d 899, 907 (9th Cir.2013) ( "The due process right, *incorporated into 8 U.S.C. § 1229a(b)(4)(B),* includes, among other things, 'a reasonable opportunity to examine the evidence against the alien.' " (emphasis added; citations omitted)).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

950 F.3d 15
United States Court of Appeals, First Circuit.

Selvin Ovidio AREVALO, Petitioner,

v.

William P. BARR, United States Attorney General, Respondent.

Nos. 18-1834
|
19-1250
|
February 14, 2020

**Synopsis**

**Background:** After his immigration proceeding was administratively closed, Guatemalan national filed petition for review of Board of Immigration Appeals (BIA) orders reinstating prior order of removal and denying his motion for reconsideration.

**Holdings:** The Court of Appeals, Selya, Senior Circuit Judge, held that:

[1] BIA had no obligation to explore interim developments before reinstating its earlier decision, and

[2] BIA's rejection of alien's attorney's attempt to apprise it of change in his office address did not violate alien's due process rights.

Petitions denied.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (4)

**[1]**   **Aliens, Immigration, and Citizenship**  Determination

   **Aliens, Immigration, and Citizenship** Determination

   Administrative closure is procedural convenience that may be granted if both parties to removal proceedings agree, but it does not constitute final order.

   1 Cases that cite this headnote

**[2]**   **Aliens, Immigration, and Citizenship** Determination

   **Constitutional Law** Asylum, refugees, and withholding of removal

   After administratively closing removal proceeding after alien filed petition for review of Board of Immigration Appeals (BIA) order upholding immigration judge's (IJ) denial of his application for asylum, withholding of removal, or protection under Convention Against Torture (CAT), BIA had no obligation to explore interim developments before reinstating its earlier decision, despite alien's contention that due process required new hearing to explore effects of passage of time on his claims for relief, where government's motion for administrative closure provided that either

party could place matter back on active calendar by filing motion to recalendar, and alien had not sought to reopen case. U.S. Const. Amend. 5.

[3]    **Aliens, Immigration, and Citizenship** 🔑 Determination

Word "recalendar," as used in Board of Immigration Appeals (BIA) order granting government's motion to administratively close alien's removal proceeding, but allowing either party to file motion to recalendar, meant to reinstate case to active docket in same posture as it occupied when it was paused for administrative closure.

[4]    **Aliens, Immigration, and Citizenship** 🔑 Administrative Review

**Constitutional Law** 🔑 Admission and exclusion;  deportation

Board of Immigration Appeals' (BIA) rejection of alien's attorney's attempt to apprise it of change in his office address did not violate alien's due process rights, even though BIA served copy of government's motion to reinstate removal proceeding to counsel's old address, and counsel did not receive notice until after 13-day window for responding to motions had expired, where counsel entered his appearance with his updated address shortly after motion to reinstate was filed and before BIA acted on it, alien did not ask for extension of 13-day limit, and alien did not advance any

arguments that he might successfully have raised in opposition to government's motion. U.S. Const. Amend. 5; 🚩 8 C.F.R. § 1003.2(g)(3).

**\*16** PETITIONS FOR REVIEW OF ORDERS OF THE BOARD OF IMMIGRATION APPEALS

**Attorneys and Law Firms**

David C. Bennion, with whom Free Migration Project was on brief, for petitioner.

Lindsay Corliss, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom Joseph H. Hunt, Assistant Attorney General, John S. Hogan, Assistant Director, Office of Immigration Litigation, Daniel E. Goldman, Senior Litigation Counsel, Office of Immigration Litigation, and Andrea N. Gevas, Trial Attorney, Office of Immigration Litigation, were on brief, for respondent.

Before Kayatta, Selya, and Stahl, Circuit Judges.

**Opinion**

SELYA, Circuit Judge.

In its present posture, this case turns largely on the meaning of the word "recalendar," as that word is used in the immigration context. Here, the parties supplied no particularized meaning for the word when they used it in the pertinent pleadings. Because the word is not specifically defined either in any applicable statutory provision or in any relevant regulation, we give "recalendar" its plain and natural meaning. The Board of Immigration Appeals (BIA) interpreted the word correctly and applied it faithfully. Accordingly, we uphold the challenged orders and deny the two petitions for judicial review.

The petitioner, Selvin Ovidio Arevalo, is a Guatemalan national. He entered the United States in 2000 at age fourteen without documentation. The government initiated removal proceedings against the petitioner in 2010, charging him with removability under 📒 8 U.S.C. § 1182(a)(6)(A)(i), 📒 (a)(7)(A)(i)(I).

The petitioner conceded removability but cross-applied for asylum and withholding of removal, claiming persecution on account of both political opinion and membership in a particular social group. See 8 U.S.C. §§ 1158(b)(1), 1231(b)(3)(A). At the same time, he sought protection under the United Nations Convention Against Torture (CAT). All of his claims were based on his concerns about violent gang recruitment of young, apparently wealthy adults in Guatemala.

After a hearing, an immigration judge (IJ) denied the petitioner's claim for asylum as untimely, see id. § 1158(a)(2)(B), noting that, had the claim been timely filed, she would have denied it on the merits. And although the IJ credited the petitioner's testimony, she concluded that **17** the petitioner's generalized fear of dangerous and violent conditions did "not give rise to a basis for a claim for ... withholding of removal." Finally, the IJ found no evidence that the petitioner would be subject to torture "by or at the instigation of or with the consent or acquiescence of a public official," 8 C.F.R. § 1208.18(a)(1), should he be repatriated. Accordingly, she denied the petitioner's CAT claim.

The petitioner appealed to the BIA. On November 18, 2010, the BIA upheld the IJ's decision, finding that the petitioner was not entitled to asylum, withholding of removal, or CAT protection. The petitioner filed a timely petition for judicial review.

After the petition for review was docketed and fully briefed, we entered an order, with the parties' consent, remanding the case to the BIA. Our remand order was premised on the government's representation that it intended to exercise prosecutorial discretion with respect to the petitioner, at least temporarily, by administratively closing the case. When remanding, though, we retained jurisdiction over the petition for review.

Once the case had been remitted to the BIA, the government filed an unopposed motion to close the proceedings administratively. The government's motion explained that if "either party" desired for any reason "to place this matter back on the active calendar or docket, that party w[ould] file a motion to recalendar with this Board." The BIA granted the unopposed motion and administratively closed the case in April of 2013.

Shortly thereafter, the parties filed a stipulation of dismissal in this court. Although the order closing the case did not expressly address the status of the November 18 decision, the parties filed a stipulation making pellucid that the administrative closure removed the entry of that decision from the docket. In the parties' words: "there is no longer a final order of removal." This construction provided two benefits to the petitioner: it clarified that he was not subject to a live order of removal; and it effectively preserved his ability to reactivate his petition for review of the November 18 decision should the administrative closure be revoked.

Consistent with the parties' agreement, we dismissed the pending petition for judicial review and entered a judgment of voluntary dismissal. Thereafter, the case laid dormant for approximately five years. But after the 2016 presidential election and the ensuing change in administration, the government rethought its earlier decision to exercise prosecutorial discretion favorably to the petitioner and moved before the BIA to "reinstate" the case. The petitioner offered no objection, and the BIA granted the motion: it decreed that its "original decision of November 18, 2010, now takes effect."

Displeased with the BIA's reinstatement of its earlier decision, the petitioner filed a new petition for judicial review on August 29, 2018. The same day, the petitioner asked the BIA to reconsider its order reinstating its earlier decision. Eschewing the merits of his claims for asylum, withholding of removal, and CAT protection, the petitioner's motion to reconsider focused exclusively on the BIA's order reinstating its earlier decision. On February 7, 2019, the BIA issued a written rescript denying the petitioner's motion to reconsider. The petitioner responded by filing yet another petition for judicial review. Once briefs were filed, we scheduled both petitions for oral argument on January 7, 2020; heard argument on both petitions as a unit; and took the matter under advisement.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The petitions for review, taken collectively, raise a common issue: whether the BIA acted appropriately in placing the **\*18** case back on its docket and proceeding from where it left off before the case was administratively closed. This issue turns on the meaning of "recalendar," as that word was used by the parties in the government's unopposed motion, which led to the administrative closure.

 **[1]**   "Administrative closure is a procedural convenience that may be granted if both parties to the removal proceedings agree, but it does not constitute a final order." Lopez-Reyes v. Gonzales, 496 F.3d 20, 21 (1st Cir. 2007). Instead, administrative closure "temporarily removes a case from ... the Board's docket." Id. Such a temporary displacement of a case from the BIA's active docket effectively pauses the case. Following an administrative closure, either party may seek to undo the pause — as the government did here — by filing a motion to reinstate.

 **[2]**   In this instance, the government's motion to reinstate was unopposed. When the BIA granted the unopposed motion, it recalendared the case, that is, it put the petitioner right back where he was before the parties agreed to the closure: subject to an operative order of removal, yet still able to secure appellate review. The petitioner takes umbrage: he points out that several years had passed since the case was administratively closed and argues that the BIA, either directly or by recourse to the IJ, had an obligation to explore interim developments before reinstating its earlier decision. We do not agree.

The propriety of the BIA's action hinges on the meaning of the word "recalendar" — the key word in the government's unopposed motion for administrative closure. The parties concede that no applicable statute or regulation supplies a definition of the word "recalendar" as used in this context. We therefore interpret the word according to its plain and natural meaning. Cf. Correia v. Fitzgerald, 354 F.3d 47, 55 (1st Cir. 2003) (explaining that "[c]ourts should construe stipulations in accordance with accepted principles of general contract law"); Smart v. Gillette Co. Long-Term Disab. Plan, 70 F.3d 173, 178 (1st Cir. 1995) (stating that canon of contract interpretation "teaches that contracts containing unambiguous language must be construed according to their plain and natural meaning").

 **[3]**   We conclude that "recalendar" means simply to reinstate the case to the active docket in the same posture as it occupied when it was paused for administrative closure. The dictionary defines the prefix "re-" as "again" and notes that it is to be "joined" to a "second element." Webster's Third New International Dictionary of the English Language Unabridged 1888 (Philip Babcock Gove ed., 2002). Here, the second element is the verb "calendar," which means "to enter (as a name or event) in a calendar or list." Id. at 316. Thus — in the present context — "recalendar" means to enter on the calendar again. That is exactly what the BIA did. Its 2018 order, like the government's motion, used the word "reinstate," and the accepted meaning of reinstate is "to ... place again (as in ... a former position)" or "to replace in an original or equivalent state." Id. at 1915. In other words, the BIA recalendared the petitioner's case by reinstating it, that is, by placing it back on the active docket in essentially the same posture that it occupied immediately before the administrative closure occurred. It again became a fully briefed administrative appeal from the IJ's order of removal, awaiting only the entry of a final decision by the BIA.

In an effort to draw the sting from this reasoning, the petitioner argues that the five-year hiatus between the administrative **\*19** closure and the case's reinstatement resulted in a final resolution based on an "old and stale record." He argues that due process required a new hearing to explore the effects of the passage of time on his claims for relief. This argument is woven out of whole cloth, devoid of any citation to relevant authority.

We add, moreover, that — as the petitioner's counsel acknowledged at oral argument — the petitioner could have asked the BIA either to reopen the case, see 8 C.F.R. § 1003.2(a), or to vacate the judgment and remand to the immigration court, see Falae v. Gonzáles, 411 F.3d 11, 14 (1st Cir. 2005) (noting that relevant statutes and regulations do not "recognize motions to remand as such," but motions to remand may be treated as motions to reopen).  [1]  He did neither — and he cannot ask this court for relief that he did not seek before the agency. See García v. Lynch, 821 F.3d 178, 181-82 (1st Cir. 2016) (explaining that failure to raise

argument before BIA precludes judicial review); cf. Meng Hua Wan v. Holder, 776 F.3d 52, 58 (1st Cir. 2015) ("Courts and agencies, like the Deity, tend to help those who help themselves.").

To be sure, the petitioner did file a motion to reconsider before the BIA. The filing of this motion, though, did not gain him any traction. Rather than asserting some substantive reason for reopening his case, his motion to reconsider merely asserted that the BIA had erred in its conception of what "recalendaring" meant and asked the BIA to reverse its earlier order. Put another way, the motion to reconsider was limited to the issue already addressed above: did the BIA act appropriately in recalendaring the case and giving effect to its earlier 2010 decision? As we already have explained, the petitioner cannot prevail on this issue.

 **[4]**   Struggling to salvage his due process argument, the petitioner suggests that he was denied due process because he "was not properly notified" of the government's motion to reinstate. This argument draws its essence from a curious sequence of events. In 2013 — while the case was administratively closed — the petitioner's counsel attempted to apprise the BIA of a change in his office address (he apparently had moved up the street). The BIA rejected this submission because the case was closed. Thus, when the government filed its motion to reinstate in 2018, it served a copy to counsel's old address. This is the disparity on which the petitioner bases his lack-of-notice claim.

When put in perspective, this claim lacks force. Shortly after the motion to reinstate was filed and before the BIA acted on it, the petitioner's counsel again entered his appearance (with his updated address). The BIA then mailed a copy of the motion to reinstate to counsel at the updated address. Counsel abjured any responsive filing, and the BIA granted the government's unopposed motion and reinstated its earlier 2010 decision over a month later.

Although it is apparent that the petitioner's counsel had actual notice of the motion to reinstate and ample time to reply to it, he nonetheless asserts that he could not have filed such a reply because he received notice only after the thirteen-day window for responding to motions, see 8 C.F.R § 1003.2(g)(3), had shut. The BIA gave short shrift to this assertion when the petitioner included it in his motion to reconsider. So do we.

 **\*20**  We need not tarry. For one thing, the petitioner never asked the BIA for an extension of the thirteen-day limit, and we have no reason to think that such an extension would have been denied. See id. (memorializing BIA's discretionary authority to extend filing dates). And for another thing, the petitioner has not advanced any arguments that he might successfully have raised in an opposition to the government's motion. There was no prejudice and, in the absence of prejudice, the petitioner's claim founders. See Lattab v. Ashcroft, 384 F.3d 8, 20 (1st Cir. 2004).

In sum, the petitioner received all of the process that was due. See Jones v. Flowers, 547 U.S. 220, 226, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006) ("[D]ue process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950))). Stripped of his due process claim, the petitioner's case becomes unglued. His briefing in this court fails to develop any claim of error addressed to the underlying merits decision. In short, the petitioner offers us no developed argumentation in support of a contention that the IJ and the BIA erred in rejecting his claims for asylum, withholding of removal, and/or CAT protection. Thus, he has waived any argument regarding the merits of his underlying claims. See Ahmed v. Holder, 765 F.3d 96, 101 n.2 (1st Cir. 2014); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). And although his briefs mention the possibility that he might "renew[ ] ... his asylum claim" or "reappl[y]" for other relief, he has failed to develop these possibilities. See Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The petitioner has a fallback position. He suggests that his previous immigration proceedings are a nullity because the IJ (and, thus, the BIA) lacked jurisdiction over his case. This suggestion rests on the notion that the Notice to Appear (NTA) that initiated his removal proceedings did not include the time and place of his initial hearing before the immigration court. In support, he says that the inclusion of such data was required both by statute, see 8 U.S.C. § 1229(a)(1)(G)(i), and by the Supreme Court's decision in Pereira v. Sessions, —— U.S. ——, 138 S. Ct. 2105, 2109-10, 201 L.Ed.2d 433 (2018). This suggestion is foreclosed by the case law and, thus, is a dead letter.

In the wake of Pereira, we have squarely rejected the jurisdictional thesis that the petitioner advances. See Goncalves Pontes v. Barr, 938 F.3d 1, 7 (1st Cir. 2019). Our decision in Goncalves Pontes explicates that, in circumstances such as those that are at issue here, immigration court jurisdiction is governed by regulation, see 8 C.F.R. §§ 1003.13-1003.14(a), not by the statute on which the petitioner relies. See Goncalves Pontes, 938 F.3d at 3-5. These regulations do not mandate that the time or place of the initial hearing be included in an NTA that commences a removal proceeding. See id. at 4 (citing 8 C.F.R. § 1003.18(b)).

In this case, the petitioner's NTA complied with the regulations, and he appeared before the immigration court as ordered. Under the rule in Goncalves Pontes, "[i]t follows that because the petitioner's NTA complied with the regulations ..., it was effective to confer jurisdiction upon the immigration court." Id. at 7.

Goncalves Pontes controls our decision here. After all, the law of the circuit doctrine **\*21** requires us to adhere to prior panel decisions, closely on point, with but few exceptions. See, e.g., United States v. Gonzalez, 949 F.3d 30, 39–40, 2020 WL 502497 (1st Cir. 2020) [No. 18-1597, slip op. at 20]; United States v. Barbosa, 896 F.3d 60, 74 (1st Cir.), cert. denied, —— U.S. ——, 139 S. Ct. 579, 202 L.Ed.2d 412 (2018). The exceptions to this doctrine are both "narrowly circumscribed" and "hen's-teeth-rare." Barbosa, 896 F.3d at 74 (quoting San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010)). No such exception has any bearing in the circumstances at hand. It follows inexorably that the petitioner's jurisdictional attack fails.

We need go no further. For the reasons elucidated above, the petitions for judicial review are

**Denied.**

**All Citations**

950 F.3d 15

## Footnotes

1    Each of these motions offered the petitioner essentially the same potential remedy. See Falae, 411 F.3d at 14 (treating motion to remand as motion to reopen and reviewing for abuse of discretion).

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Superseded by Statute as Stated in Hamid v. Gonzales, 7th Cir., August 2, 2005

395 F.3d 123
United States Court of Appeals,
Third Circuit.

Napoleon Bonaparte AUGUSTE, Appellant

v.

Thomas RIDGE, Secretary, United States
Department of Homeland Security; John
Ashcroft, Attorney General of the United States;
Michael Garcia, Assistant Secretary, Bureau
of Immigration and Customs Enforcement
(BICE); Anthony S. Tangeman, Director of
Detention and Removal, BICE; John Carbone,
Detention and Removal Field Office Director—
New Jersey, BICE; Michael T. Abode, Warden,
Middlesex County Adult Corrections Center.

No. 04–1739.
|
Argued Nov. 1, 2004.
|
Jan. 20, 2005.

**Synopsis**

**Background:** Haitian national who was removable based
on his conviction of narcotics offense filed habeas petition
for relief under the United Nations Convention Against
Torture and Other Cruel, Inhuman or Degrading Treatment
or Punishment (CAT). The United States District Court for
the District of New Jersey, Joel A. Pisano, J., entered order
denying petition, and alien appealed.

**Holdings:** The Court of Appeals, Fuentes, Circuit Judge, held
that:

[1] regardless of whether term "torture," as used in the
CAT, was intended to include specific intent requirement,
and regardless of whether the shared understanding of
President and the United States Senate, as part of ratification
process, that term required a specific intent was consistent
with understanding of that term in international community,
this shared understanding, as codified in the Foreign

Affairs Reform and Restructuring Act (FARRA), governed
interpretation of term in domestic context;

[2] Board of Immigration Appeals' (BIA's) interpretation of
"specific intent" requirement, to impose same limitations as
are ordinarily imposed by "specific intent" requirement under
American criminal law, was not unreasonable;

[3] for alien to establish that there are "substantial grounds"
for believing that he will be subjected to torture if removed, as
required for grant of relief under the CAT, alien must establish
that it is more likely than not that he will be subjected to
torture if removed;

[4] fact that Haitian national, if removed to Haiti, would be
detained indefinitely in Haitian prison did not rise to level of
"torture," nor did deplorable conditions in Haitian prisons;
and

[5] while isolated reports of physical beatings of prisoners
by Haitian guards might constitute evidence of torture, alien
failed to establish that such beatings were so pervasive that it
was more likely than not that he would be subjected to such
beatings if removed.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (25)

**[1]** **International Law** ◆ Self-executing
agreements; implementing legislation

Treaties that are not self-executing do not create
judicially-enforceable rights, unless they are first
given effect by implementing legislation.

12 Cases that cite this headnote

**[2]** **International Law** ◆ Self-executing
agreements; implementing legislation

United Nations Convention Against Torture and
Other Cruel, Inhuman or Degrading Treatment
or Punishment (CAT) is not self-executing,
and does not create judicially-enforceable
rights, except as given effect by implementing
legislation.

16 Cases that cite this headnote

**[3]    Habeas Corpus** 🖝 Aliens

Although alien against whom removal order was entered based on his conviction of aggravated felony/drug trafficking crime was statutorily barred from filing petition for direct review in the Court of Appeals from decision of the Board of Immigration Appeals (BIA) that he was ineligible for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), he retained right to seek relief under habeas statute for alleged violations of the CAT, as implemented by the Foreign Affairs Reform and Restructuring Act (FARRA). Immigration and Nationality Act, § 242, 🚩 8 U.S.C.A. § 1252; Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242, 🚩 8 U.S.C.A. § 1231 note; 🚩 28 U.S.C.A. § 2241.

3 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🖝 Substantial evidence in general

On direct petition for review in immigration case, Court of Appeals reviews factual findings made by immigration judge, or by the Board of Immigration Appeals (BIA), under "substantial evidence" standard.

**[5]    Habeas Corpus** 🖝 Aliens

On habeas review in immigration case, Court of Appeals' review is limited to constitutional issues and errors of law, including both statutory interpretations and application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings or the exercise of discretion. 🚩 28 U.S.C.A. § 2241.

2 Cases that cite this headnote

**[6]    Habeas Corpus** 🖝 Aliens

Regulation-specific jurisdiction-stripping provision of the Foreign Affairs Reform and Restructuring Act (FARRA) did not deprive court of jurisdiction to review alien's habeas corpus petition, alleging that his removal would violate the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), where FARRA, which implemented the CAT, neither stated explicitly that court could not exercise jurisdiction over habeas corpus claims alleging violations of the CAT nor indicated, in unmistakably clear terms, Congress' intent to eliminate habeas jurisdiction over such claims. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(d), 🚩 8 U.S.C.A. § 1231 note; 🚩 28 U.S.C.A. § 2241; 🚩 8 C.F.R. § 208.16(c)(2).

2 Cases that cite this headnote

**[7]    International Law** 🖝 Legislative or executive construction

Interpretive views of government agencies that have been charged with negotiation and enforcement of treaty are entitled to great weight.

**[8]    International Law** 🖝 Punishment, torture, and genocide

Regardless of whether the term "torture," as used in the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), was intended to include specific intent requirement, and regardless of whether the shared understanding of President and the United States Senate, as part of ratification process, that term required a specific intent to inflict severe pain and suffering was consistent with understanding of that term in international community, this shared understanding, as codified in the Foreign Affairs Reform and Restructuring Act (FARRA), governed interpretation of term in domestic context. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, §

2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.18(a)(5).

5 Cases that cite this headnote

**[9]     International Law** 👈 **Purpose and intent**

Generally, courts should interpret treaties so as to give a meaning consistent with shared expectations of contracting parties.

1 Cases that cite this headnote

**[10]     International Law** 👈 **Purpose and intent**

Though treaties should generally be interpreted in manner consistent with shared expectations of contracting parties, where President and the United States Senate express a shared consensus on meaning of treaty as part of the ratification process, that meaning is to govern in domestic context.

3 Cases that cite this headnote

**[11]     Aliens, Immigration, and Citizenship** 👈 **Acts constituting torture**

Board of Immigration Appeals' (BIA's) interpretation of "specific intent" requirement incorporated in definition of "torture," as used in the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), to impose same limitations as are ordinarily imposed by "specific intent" requirement under American criminal law, was not unreasonable, though the CAT is not concerned with criminal prosecution; "specific intent" standard is term of art well-known in American jurisprudence, and the BIA could rely on this jurisprudence to conclude that, in order for act to constitute "torture" under the CAT as implemented by the FARRA, there must be showing that actor had both intent to commit the act and intent to achieve the consequences of that act, i.e., infliction of severe pain and suffering. Omnibus Consolidated and Emergency Supplemental Appropriations Act,

1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.18(a)(5).

15 Cases that cite this headnote

**[12]     Aliens, Immigration, and Citizenship** 👈 **Law questions**

Board of Immigration Appeals' (BIA's) interpretation and application of immigration law are subject to *Chevron* deference.

1 Cases that cite this headnote

**[13]     Aliens, Immigration, and Citizenship** 👈 **Law questions**

Court of Appeals must defer to the Board of Immigration Appeals' (BIA's) interpretation of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), to extent that the CAT involves issues of immigration law which may implicate questions of foreign relations.

1 Cases that cite this headnote

**[14]     Aliens, Immigration, and Citizenship** 👈 **Standard for relief**

For alien to establish that there are "substantial grounds" for believing that he will be subjected to torture if removed to proposed country of removal, as required for grant of relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), alien must establish that it is more likely than not that he will be subjected to torture if removed. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.16(c)(2).

5 Cases that cite this headnote

**[15]     Habeas Corpus** 👈 **Review de novo**

Court of Appeals would review de novo district court's denial of alien's petition for habeas relief on theory that his removal to Haiti would violate rights that he possessed under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA). Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note.

**[16]** **Aliens, Immigration, and Citizenship** 🔑 **Law questions**

Board of Immigration Appeals' (BIA's) interpretation and application of its own regulations is entitled to great deference.

3 Cases that cite this headnote

**[17]** **Aliens, Immigration, and Citizenship** 🔑 **Standard and Scope of Review**

Deference to the Executive Branch is especially appropriate in immigration context, where officials exercise especially sensitive political functions that implicate questions of foreign relations.

**[18]** **Aliens, Immigration, and Citizenship** 🔑 **Standard for relief**

**Aliens, Immigration, and Citizenship** 🔑 **Presumptions and Burden of Proof**

Alien applying for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), bears burden of establishing that it is more likely than not that he will be tortured if removed to proposed country of removal. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.16(c)(2).

14 Cases that cite this headnote

**[19]** **Aliens, Immigration, and Citizenship** 🔑 **Standard for relief**

Standard for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) has no subjective component, but instead requires alien to establish, by objective evidence, that he is entitled to relief.

1 Cases that cite this headnote

**[20]** **Aliens, Immigration, and Citizenship** 🔑 **Relief Under Treaties Against Torture**

For an act to constitute "torture" under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for some illicit or proscribed purpose; (4) by or at instigation of, or with consent or acquiescence of, public official who has custody or physical control of alien; and (5) not arising from lawful sanctions. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 8 U.S.C.A. § 1231 note; 8 C.F.R. § 208.18(a).

30 Cases that cite this headnote

**[21]** **Aliens, Immigration, and Citizenship** 🔑 **Weight and Sufficiency**

Alien's uncorroborated testimony, if credible, may be sufficient to sustain his burden of proof on claim for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).

6 Cases that cite this headnote

**[22]    Aliens, Immigration, and Citizenship** 🔑 Relief Under Treaties Against Torture

**International Law** 🔑 Private parties; privately enforceable rights

If alien satisfies burden of establishing right to relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), then withholding of removal is mandatory.

4 Cases that cite this headnote

**[23]    Aliens, Immigration, and Citizenship** 🔑 Acts constituting torture

Fact that Haitian national, if removed to Haiti, would be detained indefinitely in Haitian prison due to combined effect of Haitian government's policy of preventively detaining criminal deportees and of his own prior United States conviction of narcotics offense did not rise to level of "torture," such as would provide basis for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), given complete lack of evidence that Haitian authorities were detaining criminal deportees with specific intent to inflict severe physical or mental pain or suffering. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 🔖 8 U.S.C.A. § 1231 note; 🔖 8 C.F.R. § 208.18(a).

24 Cases that cite this headnote

**[24]    Aliens, Immigration, and Citizenship** 🔑 Acts constituting torture

Deplorable nature of conditions inside prison where Haitian national would be detained if he were removed to Haiti, which were so crowded that inmates allegedly had to sleep sitting or standing up, and in which lack of sanitation facilities allegedly meant that prison floors were covered with urine and feces, did not rise to level of "torture," such as would provide basis for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA), where prison conditions appeared to be result of budgetary and management problems, not of any specific intent to inflict severe physical or mental pain or suffering; mere fact that Haitian authorities had knowledge of severe pain and suffering that might result from incarcerating detainees in such conditions did not support finding that they intended to inflict severe pain and suffering. Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 🔖 8 U.S.C.A. § 1231 note; 🔖 8 C.F.R. § 208.18(a).

33 Cases that cite this headnote

**[25]    Aliens, Immigration, and Citizenship** 🔑 Standard for relief

While isolated reports of physical beatings of prisoners by Haitian guards might constitute evidence of torture, Haitian national failed to establish that such beatings were so pervasive within prisons in Haiti that it was more likely than not that he would be subjected to such beatings if returned to Haiti and imprisoned pursuant to Haiti's policy of detaining criminal deportees; alien did not claim that he had been tortured in past and failed to make requisite showing for grant of relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) as enacted into domestic law by the Foreign Affairs Reform and Restructuring Act (FARRA). Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, § 2242(b), 🔖 8 U.S.C.A. § 1231 note; 🔖 8 C.F.R. § 208.16(c)(2).

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*128**  Robert W. Brundige, Renee C. Redman (Argued), Sarah Loomis Cave, Laurence Burger, Hughes Hubbard & Reed LLP, New York, The Legal Aid Society, Janet Sabel, Supervising Attorney, Immigration Law Unit, Bryan Lonegan, New York, for Appellant, of counsel.

Christopher J. Christie, United States Attorney, District of New Jersey, Stuart A. Minkowitz (Argued), Assistant United States Attorney, District of New Jersey, Newark, Robert D. McCallum, Jr., Assistant Attorney General, Margaret Perry, Senior Litigation Counsel, Office of Immigration Litigation, U.S. Department of Justice, Civil Division, Washington, for Appellees.

Before ALITO, FUENTES, and BECKER, Circuit Judges.

OPINION OF THE COURT

FUENTES, Circuit Judge.

Napoleon Bonaparte Auguste appeals from the District Court's denial of his petition for writ of habeas corpus seeking relief under the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT" or "Convention"). Auguste, who is facing removal to Haiti, claims that he will be indefinitely detained upon his arrival in Haiti in prisons that are notorious for their brutal and deplorable conditions that have been compared to those existing on slave ships. There is no doubt that the prison conditions that Auguste and others like him may face upon their removal to Haiti are indeed miserable and inhuman. However, because we hold that in order to constitute torture, an act must be inflicted with the specific intent to cause severe physical or mental pain and suffering, the standard the President and Senate understood as applying when the United States ratified the CAT, we find that Auguste is not entitled to relief. Accordingly, we will affirm the decision of the District Court.

**I. Background**

Auguste, a twenty-seven year old male, is a native and citizen of Haiti who was admitted to the United States as a lawful permanent resident on December 8, 1987. His entire family lives in the United States. On April 4, 2003, Auguste was convicted of Attempted Criminal Sale of a Controlled

Substance (cocaine) in the third degree in Queens County, New York, and sentenced to ten months imprisonment.

On July 3, 2003, the Department of Homeland Security, Bureau of Immigration and Customs Enforcement, issued a notice to appear charging Auguste with removal on two grounds: (1) as an alien who has been convicted of a controlled substance violation pursuant to § 237(a)(2)(B)(i) of the Immigration and Nationality Act (the "INA" or "Act"), 8 U.S.C. § 1227(a)(2)(B)(i), and (2) as an alien who has been convicted of an aggravated felony/attempted drug trafficking crime pursuant to § 237(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1227(a)(2)(A)(iii).

**\*129**  Auguste did not contest his eligibility for deportation as charged and instead, as his defense, applied for deferral of removal under the CAT and its implementing regulations. With regards to his claim for relief under the CAT, Auguste argued that he was entitled to a deferral of removal on the grounds that he faces torture in Haiti because, as a deported drug offender, he will be detained by Haitian authorities for an indeterminate amount of time in harsh and intolerable prison conditions.

**A. Conditions in Haitian Prisons**

Since at least 2000, it has been the policy of the Haitian government to detain deported Haitians, who have incurred a criminal record while residing in the United States and who have already served their sentences, in preventive detention. The policy appears to have been motivated by the belief that criminal deportees pose a threat of recidivist criminal behavior after their return to Haiti. The length of the detention can vary, lasting in many instances upwards of several months. Auguste contends that release often depends on the family members of the deportees petitioning the Haitian Ministry of Interior for release and their ability to pay anywhere between $1,000 to $20,000.

Documentary evidence submitted by Auguste in support of his CAT claim describes the brutal and harsh conditions that exist in the Haitian prison system. We recount briefly some of these conditions. The prison population is held in cells that are so tiny and overcrowded that prisoners must sleep sitting or standing up, and in which temperatures can reach as high as 105 degrees Fahrenheit during the day. Many of the cells lack basic furniture, such as chairs, mattresses, washbasins or toilets, and are full of vermin, including roaches, rats, mice and lizards. Prisoners are occasionally permitted out of their

cells for a duration of about five minutes every two to three days. Because cells lack basic sanitation facilities, prisoners are provided with buckets or plastic bags in which to urinate and defecate; the bags are often not collected for days and spill onto the floor, leaving the floors covered with urine and feces. There are also indications that prison authorities provide little or no food or water, and malnutrition and starvation is a continuous problem. Nor is medical treatment provided to prisoners, who suffer from a host of diseases including tuberculosis, HIV/AIDS, and Beri–Beri, a life-threatening disease caused by malnutrition. At least one source provided by Auguste likened the conditions in Haiti's prisons to a "scene reminiscent of a slave ship."

There are also reports of beatings of prisoners by guards. State Department reports on conditions in Haiti in 2001 and 2002 discussed police mistreatment of prisoners and noted that there were isolated allegations of torture by electric shock, as well as instances in which inmates were burned with cigarettes, choked, or were severely boxed on the ears, causing ear damage. The authorities' record of disciplining police misconduct was, however, inconsistent.

The Department of State reported that Haiti remains a "very poor" country, and that the prison system operates at or near the same budget level as in 1995. Despite attempts at increasing the budgetary allocation for prisons, political instability in Haiti was expected to cause a continuation of budgetary freezes.

**B. The Convention Against Torture**
Auguste seeks protection under Article 3 of the Convention. *See* Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, **\*130** art. 3, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85 (entered into force June 26, 1987)(1988), 1465 U.N.T.S. 85 (entered into force June 26, 1987). Because the history of ratification of the Convention by the United States will prove relevant to resolving Auguste's habeas claim, we recount that history in some detail.

The CAT was adopted by the United Nations General Assembly on December 10, 1984, with the stated purpose to "make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." *See* Preamble to Convention, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85.1465 U.N.T.S. 85. The CAT represented a continuing process in the codification of an international legal norm condemning the practice

of torture by public officials, a norm first recognized in several prior multilateral agreements. [1] As the preamble to the CAT recognizes, it is the obligation of nations under the United Nations Charter to "promote universal respect for, and observance of, human rights and fundamental freedoms." *See* Preamble to Convention, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85.1465 U.N.T.S. 85. Since opening for signature in December 1984, over 130 countries have signed and/or become parties to the Convention. [2]

Article 1 of the CAT defines torture as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, whether such pain or suffering is inflicting by or at the instigation of or within the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incident to lawful sanctions.

Art. 1(1), S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85.1465 U.N.T.S. 85. In turn, Article 3 of the CAT states: "No State Party shall expel, return (*"refouler"* ) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Art. 3(1), S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 851465 U.N.T.S. 85.

President Reagan signed the Convention on April 18, 1988, with the following reservation: "The Government of the United States of America reserves the right to communicate, upon ratification, such reservations, interpretive understandings, or declarations as are

deemed necessary." *See* *Ogbudimkpa v. Ashcroft,* 342 F.3d 207, 211 (3d Cir.2003); *see also* Declarations **\*131** and Reservations (visited Nov. 24, 2004) (http:// untreaty.un.org/ENGLISH/bible/englishinternetbible/ partI/chapterIV/treaty14.asp). Approximately one month later, on May 20, 1988, the President transmitted the CAT to the Senate for its advice and consent with seventeen proposed conditions (four reservations, nine understandings, and four declarations). *See* Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101–30, at 2, 7 (1990).

In response to congressional and public concern regarding several of the proposed conditions, in January 1990 President George H.W. Bush submitted a revised and reduced list of proposed conditions. *See id.* at 2, 7–8; *see also* *Ogbudimkpa,* 342 F.3d at 212 n. 11. Of the proposed conditions, President Bush submitted several understandings, two of which are directly relevant to this case. First, with respect to Article 1 of the CAT, the President proposed the understanding that the "United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." *See* S. Exec. Rep. 101–30, at 9, 36.[3] This first understanding closely tracked a similar understanding initially submitted by President Reagan in 1988, which stated that the United States "understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering." *See* S. Exec. Rep. 101–30, at 15.[4] Second, with respect to Article 3 of the CAT, President Bush submitted an understanding, previously submitted by President Reagan, that the United States "understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " *See* S. Exec. Rep. 101–30, at 16, 36.[5]

**\*132** The Senate adopted a resolution of advice and consent to ratification of the CAT on October 27, 1990, subject to several reservations, understandings, and declarations. *See* 136 Cong. Rec. S17,486, S17491–92 (daily ed. 1990) ("Senate Resolution"). Importantly, the Senate adopted the two understandings proposed by President Bush with respect to Articles 1 and 3 of the Convention. Thus, the Senate explained that with reference to the definition of torture contained in Article 1 of the CAT, the "United States

understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." *See* Senate Resolution, *supra,* II.1(a). Moreover, the Senate explained that with reference to the standard of proof required in Article 3 of the CAT, the "United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " *See* Senate Resolution, *supra,* II.2.

Finally, pursuant to Article 26 of the Convention, President Clinton deposited the instrument of ratification with the United Nations on October 21, 1994.[6] *See* Regulations Concerning the Convention Against Torture, 64 Fed.Reg. 8478, 8478 (Feb. 19, 1999); *see also* Status of the [Convention] (visited Nov. 24, 2004) (http://www.un.org/ documents/ga/docs/53/plenary/a53–253.htm). Notably, the President included the Senate understandings in the instrument of ratification. *See* 1830 U.N.T.S. 320, 321, 322 (1994)1830 U.N.T.S. 320, 321, 322 (1994); Declarations and Reservations made upon Ratification, Accession, or Succession (visited Nov. 24, 2004) (http:// untreaty.un.org/ENGLISH/bible/englishinternetbible/ partI/chapterIV/treaty14.asp).

**[1]** **[2]** Because the resolution of advice and consent specified that the CAT was not self-executing, Congress proceeded to pass legislation in order to implement the United States' obligations under the Convention in 1998 with the Foreign Affairs Reform and Restructuring Act ("FARRA"). *See* Pub.L. No. 105–227, Div. G., Title XXII, § 2242, 112 Stat. 2681, 2681–822, codified as note to [7] 8 U.S.C. § 1231.[7] **\*133** The first section of FARRA, § 2242(a), contained a general statement of congressional policy, providing that: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." In turn, § 2242(b), which substantively implements the CAT, directed "the heads of the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." *See* 8 U.S.C. § 1231 note.

In accordance with § 2242(b) of FARRA, the Department of Justice, of which the Immigration and Naturalization Service ("INS") at that time was a division, promulgated regulations setting forth the procedures by which individuals could seek relief pursuant to the CAT. *See* 64 Fed.Reg. 8478 (Feb. 19, 1999), codified at 8 C.F.R. §§ 208.16(c), .17, & .18(a) (2004). Section 208.18(a) sets out the definitions to be used in applying the United States' obligations under the CAT and states: "The definitions in this subsection incorporate the definition of torture contained in Article 1 of the [Convention], subject to the reservations, understandings, declarations, and provisos contained in the [Senate] resolution of ratification of the Convention." 8 C.F.R. § 208.18(a). Section 208.18(a)(1) proceeds then to adopt a basic definition of torture, mirroring the definition of torture in Article 1 of the CAT, which is then clarified by six additional provisions, several of which are relevant in this matter:

> (a)(1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

> (a)(2) Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.

> (a)(3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions....

> (a)(5) In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

In addition to clarifying the definition of torture that is to apply in the domestic context, the Department of Justice also promulgated regulations specifying the elements and burden of proof for a CAT claim. Section 208.16(c)(2), which tracks the understanding proposed by the President and adopted by the Senate in its **\*134** resolution of ratification, states that "[t]he burden of proof is on the applicant for withholding of removal to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." [8] If an applicant establishes that he "more likely than not would be tortured" upon return to his home country, withholding of removal or deferral of removal is mandatory. *See* 8 C.F.R. §§ 208.16(c)(3) and (4). The objective evidence to be considered in evaluating a CAT claim includes "[e]vidence of past torture inflicted upon the applicant;" "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal;" and "[o]ther relevant information regarding conditions in the country of removal." *See* 8 C.F.R. § 208.16(c)(3); *see also* 8 C.F.R. § 208.17(a). [9]

## C. The Immigration Judge's Decision

On November 12, 2003, an immigration judge ("IJ") issued an oral decision finding Auguste ineligible for deferral of removal under the CAT. The IJ began by noting that Auguste had conceded that he had never been tortured in the past in Haiti, and that his application was based on the likelihood that he would be detained upon arrival and subject to harsh prison conditions. (J.A. 43.) In denying Auguste's claim for CAT relief, the IJ found that the matter was governed by the Board of Immigration Appeals' ("BIA") decision in *Matter of J–E–,* 23 I. & N. Dec. 291 (BIA 2002), a 13–5 decision interpreting the elements of a claim for relief under the CAT.

In *Matter of J–E–* the BIA considered the same issue raised by Auguste: whether Haiti's indefinite detention of criminal deportees, the deplorable prison conditions in Haiti, and the physical abuse of prisoners constitute "torture" as that term is defined under the Convention and the implementing regulations. *Id.* at 292. The BIA emphasized that the Convention itself expressly differentiates between "torture" and "other acts of cruel, inhuman or degrading treatment or punishment." **\*135** *Id.* at 295. [10] Only those acts that constitute torture under Article 1 trigger the requirement that an individual's return to the removal country be suspended. *Id.* In exploring the difference between "torture" and "other acts of cruel, inhuman or degrading treatment or punishment," the BIA noted that "the act [of torture] must cause severe pain or suffering, physical or mental. It must be an extreme form of cruel and inhuman treatment, not lesser forms of cruel, inhuman, or degrading treatment or punishment that do

not amount to torture." *Id.* at 297 (citing 8 C.F.R. §§ 208.18(a)(1),(2)).

With reference to the regulations implementing the CAT, the BIA summarized a five-part test for determining whether an act rises to the level of torture:

> For an act to constitute torture it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

*Matter of J–E–,* 23 I. & N. Dec. at 297. As to the second element, that of intent, the BIA explained that the "act must be specifically intended to inflict severe physical or mental pain or suffering. This specific intent requirement is taken directly from the understanding contained in the Senate ratification resolution.... Thus, an act that results in unanticipated or unintended severity of pain or suffering does not constitute torture." *Id.* at 298 (citation omitted). The BIA went on to define "specific intent" with reference to its common legal definition: "specific intent is defined as the intent to accomplish the precise criminal act that one is later charged with while general intent commonly takes the form of recklessness." *Id.* at 301 (quoting Black's Law Dictionary 813–14 (7th ed.1999)).

In light of the requirements of 8 C.F.R. § 208.18(a), the BIA in *Matter of J–E–* considered whether any of the alleged state actions by Haiti—indefinite detention, inhuman prison conditions, and police mistreatment—constituted torture. First, with regards to the policy of indefinite detention, the BIA concluded that it appeared to be a "lawful enforcement sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad." *Id.* at 300. Accordingly, the BIA concluded that the detention policy was a lawful sanction and, standing

alone, did not constitute torture by virtue of 8 C.F.R. § 208.18(a)(3). *See id.* In addition, the BIA noted that "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering" within the meaning of 8 C.F.R. § 208.18(a)(1). *See id.*

Second, with regards to the inhuman prison conditions in Haiti, even when coupled with the possibility of indefinite detention, the BIA again concluded that this did not constitute torture. In particular, the BIA noted that there was "no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." *Id.* at 301 (citing 8 C.F.R. §§ 208.18(a)(1), (5)). The BIA noted that this specific intent **\*136** requirement was drawn from the Senate's understanding, which accompanied the resolution of advice and consent, and was distinct from a general intent requirement. *See id.* To the contrary, the BIA concluded that the prison conditions were not the result of any specific intent to inflict severe physical or mental pain or suffering, but rather were the "result of budgetary and management problems as well as the country's severe economic difficulties." *Id.*

Finally, the BIA considered whether police mistreatment of prisoners constituted torture. The BIA noted that there had been reports of isolated instances of police mistreatment, some of which could rise to the level of torture. *See id.* at 302. In particular, the BIA noted that while certain "[i]nstances of police brutality do not necessarily rise to the level of torture ... deliberate vicious acts such as burning with cigarettes, choking, hooding, kalot marassa [severe boxing of the ears, which can result in eardrum damage], and electric shock may constitute acts of torture." *Id.* Although the alien in *Matter of J–E–* had shown that acts of torture have occurred in Haitian prisons, the BIA concluded that he had failed to satisfy the requisite burden of proof, *i.e.,* that it was more likely than not that he would be tortured if returned to Haiti. *See id.* at 304. [11] The alien had made no claim of past torture, and the basis of his CAT claim was premised on the possibility that he would be subject to police mistreatment when detained in a Haitian prison. Accordingly, the BIA concluded that the alien had failed to establish that the severe yet isolated instances of mistreatment were "so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture, as opposed to other acts of cruel, inhuman, or degrading punishment or treatment." *Id.* at 304. In other words, the alien's evidence had failed to show that he as an

individual in a Haitian prison was more likely than not to suffer "torture," as defined by the CAT, as opposed to "other acts of cruel, inhuman or degrading punishment or treatment." *Id.* [12]

Returning to the present matter, the IJ found Auguste's CAT claim to be virtually indistinguishable from the matter presented in *Matter of J–E–*, noting that counsel "for [Auguste] is not claiming here today that the situation in Haiti is somehow different from the situation that confronted the [alien] in [*Matter of J–E–*]." (J.A. 46.) Accordingly, the IJ denied Auguste's request for deferral of removal. Auguste appealed the IJ's decision to the BIA, which, on February 27, 2004, affirmed the IJ's decision without an opinion. Accordingly, the IJ's decision is the final agency determination for purposes of our review. *See Dia v. Ashcroft,* 353 F.3d 228 (3d Cir.2003) (*en banc* ).

**D. Auguste's Habeas Petition**

On March 9, 2004, in the District of New Jersey, Auguste filed a Verified Petition **\*137** for a Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief, as well as a request for a stay of removal, on the grounds that the decision of the IJ, as affirmed by the BIA, erroneously denied him relief under the Convention for deferral of removal to Haiti. Count One of Auguste's petition alleged that his CAT claim was denied improperly based on *Matter of J–E–'* s interpretation of the phrase "specifically intended" in 8 C.F.R. § 208.18(a)(5) to require a showing of "specific intent" as that term is used in U.S. criminal law. In addition, Auguste contended that the BIA in *Matter of J–E–* erroneously concluded that the detention of criminal deportees in harsh and deplorable prison conditions did not constitute torture. Count Two of Auguste's petition alleged that his CAT claim was improperly denied because the Department of Justice had adopted regulations at 8 C.F.R. § 208.16(c)(2) that set the burden of proof for CAT relief higher than what was required by Article 3 of the Convention and FARRA.

The District Court began by noting that the conditions which Auguste would be subjected to in Haiti "can objectively be described as horrifying prison conditions which are inflicted upon anyone unfortunate enough to find themselves in custody in Haiti." (J.A. 14.) Nonetheless, the District Court denied Auguste's habeas petition on the merits, finding that the BIA in *Matter of J–E–* properly interpreted the intent requirement of 8 C.F.R. § 208.18(a)(5). The District Court

noted that "we have circumstances here where we have simply the allegation of general prison conditions in Haiti. So it does not appear to me that [Auguste] has made any showing that his pain and suffering or physical or mental injury would be intentionally inflicted." (J.A. 15.) The District Court concluded that "there must be some sort of underlying intentional direction of pain and suffering against a particular petitioner, more so than simply complaining of the general state of affairs that constitute conditions of confinement in a place, even as unpleasant as Haiti." (J.A. 18.) The District Court, however, did not appear to reach the issue of whether the BIA's application of the burden of proof in 8 C.F.R. § 208.16(c)(2) was inconsistent with Article 3 of the CAT or FARRA.

This timely appeal followed.

**II. JURISDICTION AND SCOPE OF REVIEW**

**[3]** As an alien convicted of an aggravated felony/drug trafficking crime and removable on such grounds, Auguste is statutorily barred from filing a petition for direct review from the BIA's decision to a court of appeals challenging his ineligibility for relief under the CAT. *See* 8 U.S.C. § 1252; *see also Bakhtriger v. Elwood,* 360 F.3d 414, 420 (3d Cir.2004). Several of the circuits, including this one, however, have concluded that aliens convicted of crimes retain the right to seek relief under the traditional habeas statute for alleged violations of the Convention. *See Ogbudimkpa,* 342 F.3d at 215–22; *see also Cadet v. Bulger,* 377 F.3d 1173, 1182 (11th Cir.2004); *Saint Fort v. Ashcroft,* 329 F.3d 191, 200–02 (1st Cir.2003); *Wang v. Ashcroft,* 320 F.3d 130, 140–43 (2d Cir.2003); *Singh v. Ashcroft,* 351 F.3d 435, 441–42 (9th Cir.2003). We have jurisdiction over appeals involving habeas petitions filed in the District Court pursuant to 28 U.S.C. §§ 1291, 2241, and 2253.

**[4]** **[5]** **[6]** The scope of review of an alien's habeas petition is far narrower than that typically available to an alien who has filed a direct petition for review to a court of appeals. On direct petitions for review, we review factual findings made by an immigration judge or the BIA under the **\*138** familiar substantial evidence standard. *See Mulanga v. Ashcroft,* 349 F.3d 123, 131 (3d Cir.2003); *see also Dia,* 353 F.3d at 247–48. However, on a habeas petition, our review

does not extend so far. It is limited to constitutional issues and errors of law, including both statutory interpretations and application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings or the exercise of discretion. *See Bakhtriger,* 360 F.3d at 425 ("In the wake of [ *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ] we are not aware of any cases that have upheld habeas review of factual findings or discretionary determinations in criminal alien removal cases."); *Ogbudimkpa,* 342 F.3d at 222; *see also Cadet,* 377 F.3d at 1184; *Bravo v. Ashcroft,* 341 F.3d 590, 592 (5th Cir.2003); *Gutierrez–Chavez v. INS,* 298 F.3d 824, 829–30 (9th Cir.2002), *amended by* 337 F.3d 1023; *Carranza v. INS,* 277 F.3d 65, 71–73 (1st Cir.2002); *Sol v. INS,* 274 F.3d 648, 651 (2d Cir.2001); *Bowrin v. INS,* 194 F.3d 483, 489–90 (4th Cir.1999). [13]

Keeping in mind the narrow scope of our habeas review, we now turn to consider Auguste's appeal.

## III. ANALYSIS

In his appeal from the denial of his habeas petition, Auguste raises three arguments. First, Auguste contends that the BIA erred as a matter of law in *Matter of J–E–,* upon which the IJ relied in denying Auguste's application, in construing the definition of torture in 8 C.F.R. § 208.18(a)(1) and (a)(5) to require a showing of "specific intent" to inflict severe pain and suffering. Auguste contends that such a specific intent requirement is inconsistent with the Convention's commonly understood international interpretation as well as the Third Circuit's prior decision in *Zubeda v. Ashcroft,* 333 F.3d 463 (3d Cir.2003). Second, Auguste contends that the Department of Justice promulgated regulations at 8 C.F.R. § 208.16(c)(2), which require that an alien show "more likely than not that he or she would be tortured," that are inconsistent with Article 3 of the **139 Convention, which only requires that an alien show that there are "substantial grounds for believing the person would be in danger of being subjected to torture." Finally, Auguste contends that even if the specific intent standard is the correct standard in defining torture, and even if the correct burden of proof is the "more likely than not" standard, he is nonetheless entitled to relief under the Convention because Haitian authorities knowingly

and purposefully detain criminal deportees, such as him, in prison conditions that he contends are torturous.

We address each argument in turn.

### A. The Standard of Intent Required for CAT Relief

#### 1.

8 C.F.R. § 208.18(a)(5) states that in order for an act to constitute torture, "[it] must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture." In *Matter of J–E–,* the BIA stated that the "ratification [history of the CAT] make it clear that this is a 'specific intent' requirement not a 'general intent' requirement." 23 I. & N. Dec. at 300–01. Thereafter, the BIA defined the term "specific intent" by its ordinary usage in American law as the "intent to accomplish the precise criminal act that one is later charged with." *Id.* at 301 (internal quotations omitted). Auguste, however, contends that the specific intent standard is at odds with the prevailing and commonly understood meaning of Article 1 of the Convention. Auguste argues that the infliction of severe pain and suffering, so long as the pain and suffering is not unanticipated or unintended, would satisfy the definition of torture under Article 1 of the Convention, and that the BIA's specific intent standard is in conflict with the more liberal standard he proposes. Auguste in effect suggests that a general intent standard would satisfy the requirements of Article 1 of the Convention, arguing that torture exists where the "actor had knowledge that the action (or inaction) might cause severe pain and suffering." Appellant's Br. at 25. Because this involves a pure question of law, we have habeas jurisdiction over the issue. *See Bakhtriger,* 360 F.3d at 425. [14]

The issue that we must resolve then is what the controlling standard for relief under the Convention is in the domestic context. Is it, as Auguste contends, the standard of intent that he believes to be the prevailing requirement under international legal interpretations of the Convention? Or is it, as the Government contends, the specific intent standard which the Department of Justice adopted in the Convention's implementing regulations issued pursuant to FARRA, and interpreted by the BIA in *Matter of J–E–?* We approach this matter mindful of the sensitive considerations that are raised in Auguste's habeas petition. Auguste is asking this Court in

effect to declare the administrative regulations implementing the United States' obligations under the Convention, and implicitly the understandings which accompanied the United States' ratification, to be inconsistent with the Convention.

**\*140** **[7]** **[8]** In so doing, Auguste invites this Court to inquire into the meaning of Article 1 of the Convention, its drafting history, and the interpretation of Article 1 by various international tribunals. Should we do so, we would of course not be interpreting the treaty from scratch, and the Government's interpretation would be accorded some deference. "[A]lthough not conclusive," the interpretive views of the government agencies that have been charged with the negotiation and enforcement of a treaty are "entitled to great weight." *See* *United States v. Stuart,* 489 U.S. 353, 369, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (internal citations omitted); *see also* *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("Respect is ordinarily due to reasonable views of the Executive Branch concerning the meaning of an international treaty.") (internal citations omitted); *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961). We, however, see no reason to be drawn into a debate about the appropriate interpretation of Article 1 of the Convention, or what the prevailing international understanding of the intent standard required under Article 1 of the Convention is. As will be discussed below, we believe that we must apply the standard clearly stated in the ratification record of the United States.

### 2.

In FARRA, Congress directed the appropriate agencies to implement the United States' obligations under the CAT "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the [CAT]." § 2242(b), codified at 8 U.S.C. § 1231 note. Congress passed FARRA because the Senate had explicitly included a declaration in its resolution of ratification that the Convention was not self-executing. *See* *Ogbudimkpa,* 342 F.3d at 212 (citing 136 Cong. Rec. 36,198 (1990)). Because the CAT was not self-executing, FARRA, at least in the domestic context, represented a clear statement on the part of Congress to incorporate into domestic law the understandings submitted by the President and adopted by the Senate in its resolution of ratification,

including the understanding that "in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering." The Department of Justice, in promulgating the relevant regulations, adopted verbatim the understanding in defining the intent standard at 8 C.F.R. § 208.18(a)(5). Thus, in our opinion, FARRA codified the Senate's understandings into domestic law.

Auguste, however, contends that the United States' understanding regarding specific intent was without effect and could not be enacted into domestic law as part of FARRA. In particular, Auguste argues that because the understanding regarding specific intent was in conflict with the accepted international interpretation of the Convention as he believes it to be, it could not modify the United States' obligations under the Convention. Auguste appears to rely in part on Article 19 of the Vienna Convention on the Law of the Treaties, which states that reservations to a treaty ratification are prohibited where they are "incompatible with the object and purpose of the treaty." *See* Vienna Convention on the Law of Treaties, May 23, 1969, art. 19, 1155 U.N.T.S. 331.1155 U.N.T.S. 331.[15] Auguste **\*141** also contends more generally that an understanding "that conflicts with those of other signatory states [is] of little weight," suggesting at one point that the fact that the Netherlands objected to the United States' understanding as overly restrictive should weigh in this Court's analysis. Appellant's Reply Br. at 11, 14. Thus, according to Auguste, FARRA could not modify or abrogate the United States' understanding under the Convention merely by incorporating the understanding accompanying the United States' ratification of the Convention because that understanding was void under international norms governing treaty interpretation.[16]

The issue of whether and in what circumstances courts should give effect to reservations, declarations and understandings to treaties is a hotly contested area of academic debate. *See* Curtis A. Bradley & Jack L. Goldsmith, *Treaties, Human Rights, and Conditional Consent,* 149 U. Pa. L.Rev. 399, 401–02 (2000). To date, several courts have enforced reservations, understandings, or declarations, but we are not aware of any court that has considered their validity in any detail.[17] However, we believe that resolution of this issue in this case is fairly straightforward.

We begin by noting that the Constitution vests the President and the U.S. Senate with the responsibility of making treaties, stating that the President "shall have Power, by and with

the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *See* U.S. Const. art. II, sec. 2, cl. 2. [18] As part of its role in the advice and **\*142** consent process, the U.S. Senate has routinely attached conditions to ratification known as reservations, understandings, and declarations. [19]

As we recounted at some length above in Part I.B, the specific intent standard was the standard accepted by both the President and the Senate during the ratification process. Both Presidents Reagan and Bush submitted nearly identical understandings containing the language stating that for an act to constitute torture, it must be specifically intended to inflict severe pain and suffering. *See* S. Exec. Rep. 101–30, at 9, 15. The Senate adopted the language of President Bush's understanding in its resolution of ratification. *See* Senate Resolution, *supra,* II.1(a). Moreover, when the President deposited the instrument of ratification with the United Nations, he did so with the relevant understanding relating to the specific intent requirement. *See* 1830 U.N.T.S. 320, 321; 1830 U.N.T.S. 320, 321; Declarations and Reservations made upon Ratification, Accession, or Succession (visited Nov. 24, 2004) (http:// untreaty.un.org/ENGLISH/bible/ englishinternetbible/partI/chapterIV/treaty14.asp).

Thus, we are presented with a situation where both the President and the Senate, the two institutions of the federal government with constitutional roles in the treaty-making process, agreed during the ratification stage that their understanding of the definition of torture contained in Article 1 of the Convention included a specific intent requirement. In our view, this is enough to ensure that the understanding accompanying the United States' ratification of the Convention be given domestic legal effect, regardless of any contention that the understanding may be invalid under international norms governing the formation of treaties or the terms of the Convention itself. We think it so plain a proposition that the United States may attach an understanding interpreting the meaning of a treaty provision as part of the ratification process that, where as here there is clear consensus among the President and Senate on that meaning, a court is obliged to give that understanding effect.

We find support for this position in the Restatement (Third) of the Foreign Relations Law of the United States, a persuasive authority. Section 314(2) of the Restatement states: "When the Senate gives its advice and consent to a treaty on the basis of a particular understanding of its meaning, the President, if he makes the treaty, must do so on the basis of

the Senate's understanding." *See* Restatement (Third) of the Foreign Relations Law of the United States § 314 (2004). Comment d to § 314 further states: "A treaty that is ratified or acceded to by the United States with a statement of understanding becomes effective in domestic law subject to that understanding." *See* § 314 cmt. d. Thus, we hold that, for purposes of domestic law, the understanding proposed by the President and adopted by the Senate in its resolution of ratification are the binding standard to be applied in domestic law.

In so holding, we should be clear what this case is not about. We are not presented with a situation where the President and the Senate took contradictory positions on the meaning of a treaty provision during the ratification process. Nor **\*143** are we required to resolve the situation where the President is contending that a Senate conditionality of ratification is improper, infringes on executive authority, or is without domestic or international legal effect. Undoubtedly, these situations, and others like them, would present more difficult constitutional issues. Instead, we are presented with a situation where both the President and Senate shared an understanding as to the meaning of a treaty provision during the ratification process.

**[9]** **[10]** Thus, because we find that the governing standards to be applied in the domestic context are those in the understanding that accompanied the United States' ratification of the treaty, and which were later incorporated in FARRA's implementing legislation, we believe that Auguste's claim that a specific intent standard is in conflict with what he perceives to be the prevailing international consensus misses the point. Generally, it is true that courts should interpret treaties so as to give a "meaning consistent with the shared expectations of the contracting parties." *See Air France v. Saks,* 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985); *see also MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1143 (3d Cir.1988) (noting that "our role in treaty interpretation is limited to ascertaining and enforcing the intent of the treaty parties"). Moreover, it is well-established that when construing international agreements, courts will often look to the drafting history of the agreement, as well as the intent of the other signatory parties, as Auguste now proposes. *See Stuart,* 489 U.S. at 366–69, 109 S.Ct. 1183; *see also El Al Israel Airlines, Ltd.,* 525 U.S. at 167, 119 S.Ct. 662 ("Because a treaty ratified by the United States is not only the law of this land ... but also an agreement among sovereign powers, we have traditionally considered as aids to

its interpretation the negotiating and drafting history (*travaux preparatoires* ) and the postratification understanding of the contracting parties.") (citations omitted). However, we believe that where the President and the Senate express a shared consensus on the meaning of a treaty as part of the ratification process, that meaning is to govern in the domestic context. [20]

**3.**

 [11]   Based on the ratification record, there is no doubt that the applicable standard to be applied for CAT claims in the  **\*144**  domestic context is the specific intent standard, which was adopted verbatim by the Department of Justice in 8 C.F.R. § 208.18(a)(5) from the understanding accompanying ratification. We now consider whether the BIA's interpretation of the specific intent standard in *Matter of J–E–*, which defined the term by reference to its ordinary meaning in American law, was appropriate. [21]

 [12]   [13]   Our resolution of whether the BIA's interpretation of the specific intent standard in 8 C.F.R. § 208.18(a)(5) was appropriate implicates two well-known principles of deference. First, the BIA's interpretation and application of immigration law are subject to *Chevron* deference. *See* Tineo v. Ashcroft, 350 F.3d 382, 396 (3d Cir.2003) ("There is no longer any question that the BIA should be accorded *Chevron* deference for its interpretations of the immigration laws.") (citing INS v. Aguirre–Aguirre, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)). [22] Second, this Court owes deference to the  **\*145**  agency's interpretation to the extent that the CAT involves issues of immigration law which may implicate questions of foreign relations. *See* INS v. Aguirre–Aguirre, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (noting that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations") (citations omitted).

In light of these principles, we cannot say that the BIA erred in its interpretation of the "specific intent" requirement in *Matter of J–E–* by defining that term as it is ordinarily used in American criminal law. In other contexts, we have noted that "congressional intent is presumed to be expressed through the ordinary meaning of the statute's plain language."

United States v. Whited, 311 F.3d 259, 263 (3d Cir.2002). We think that the same principle applies when interpreting an understanding proposed by the President and adopted by the Senate in its resolution of ratification. Thus, in light of the use of the phrase "specifically intended" in the understanding to ratification, the BIA acted reasonably in interpreting that language as mandating the use of a specific intent requirement and defining that term in accord with its ordinary meaning in American law.  Matter of J–E–, 23 I. & N. Dec. at 301 ("specific intent is defined as the intent to accomplish the precise criminal act that one is later charged with while general intent commonly takes the form of recklessness") (internal quotations omitted).

Auguste's contention that the introduction of criminal law concepts into the standard for relief under the Convention was in error because the Convention is not about criminal prosecution, but rather about protecting the victims of torture, is besides the point. The specific intent standard is a term of art that is well-known in American jurisprudence. The Supreme Court has explained that in order for an individual to have acted with specific intent, he must expressly intend to achieve the forbidden act. *See* Carter v. United States, 530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). In contrast, the more relaxed general intent standard typically only requires that a defendant "possessed knowledge with respect to the *actus reus* of the crime."  Carter, 530 U.S at 268, 120 S.Ct. 2159. [23]

Thus, in the context of the Convention, for an act to constitute torture, there must be a showing that the actor had the intent  **\*146**  to commit the act as well as the intent to achieve the consequences of the act, namely the infliction of the severe pain and suffering. In contrast, if the actor intended the act but did not intend the consequences of the act, *i.e.,* the infliction of the severe pain and suffering, although such pain and suffering may have been a foreseeable consequence, the specific intent standard would not be satisfied. Auguste's suggestion that torture exists where the "actor had knowledge that the action (or inaction) might cause severe pain and suffering," Appellant's Br. at 25, is inconsistent with the meaning of specific intent.

Nonetheless, despite what we think is the clear import of the use of the phrase "specifically intended" in 8 C.F.R. § 208.18(a)(5) and the understanding attached to ratification,

the Government inserted a curious footnote in its Brief to this Court, stating that:

> There has been some confusion about the [BIA's] reading of the specific-intent requirement. At one point in [*Matter of J–E–*] the majority stated that, "[a]lthough Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard, there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." 23 I. & N. Dec. at 301. However, when read in light of the majority's other statements describing the intent requirement quoted above, it is clear that this was not a heightened strict-intent standard.
>
> Nonetheless, one of the dissenting Board members [in *Matter of J–E–*] accused the [BIA] of imposing a requirement that an alien "pro[ve] ... an intent to accomplish a precise criminal act" and "the torture's [sic] specific intent to torture [the victim]." *See Matter of J–E–* at 315 (Rosenberg, L., dissenting). This is not what the majority concluded, given a full reading of its decision and the excerpts quoted above.

Appellee's Br. at 40. Not surprisingly, Auguste seizes on this statement, and argues that it merits reversal in this matter, stating that he finds "it difficult to believe that the [BIA] did not require a heightened specific-intent requirement" in *Matter of J–E–*. Appellant's Reply Br. at 15.

We see the source of the Government's concern. Standing alone, the problematic statement in *Matter of J–E–*, which the Government now disavows, could be read to impose a "heightened strict intent" or a "specific intent plus" standard. The statement can be broken down as follows: the Haitian authorities (1) intend the act of detaining deportees ("Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard") but (2) lack an intent to inflict severe pain and suffering ("there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions") and (3) lack an intent to inflict torture ("in order to inflict torture"). As the Government suggests, we think this last element goes too far and is not required under the specific intent standard. Section 208.18(a)(5) only requires that the act be specifically intended to inflict severe pain and suffering, not that the actor intended to commit torture. The two are distinct and separate inquiries.

However, we disagree with Auguste that this single troubling statement in *Matter of J–E–* renders the entire decision of the BIA in error. The statement should not be read out of context, and the rest of the opinion clearly indicates that the BIA appropriately understood 8 C.F.R. § 208.18(a)(5) to require only specific intent **\*147** to inflict severe pain or suffering, not anything more. *See Matter of J–E–,* 23 I. & N. Dec. at 297 (stating that "for an act to constitute 'torture' ... the act must cause severe physical or mental pain or suffering [and] ... be intentionally inflicted"); *id.* at 298 (quoting 8 C.F.R. § 208.18(a)(5) as requiring that "the act must be specifically intended to inflict severe physical or mental pain or suffering"); *id.* (noting that "the specific intent requirement is taken directly from the understanding contained in the Senate's ratification resolution"); *id.* (stating that "an act that results in unanticipated or unintended severity of pain or suffering does not constitute torture"); *id.* at 300 (determining that no conduct constituting "torture" took place based in part on the lack of evidence that "Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering" (citing 8 C.F.R. § 208.18(a)(5)). Thus, we reject Auguste's contention that the BIA applied in *Matter of J–E–* a "heightened strict intent" or a "specific intent plus" standard.

### 4.

We must resolve one final issue before turning to the appropriate burden of proof. Auguste contends that this Court previously held in *Zubeda v. Ashcroft,* 333 F.3d 463 (3d Cir.2003), that a showing of specific intent is not required under the Convention or its implementing regulations. In *Zubeda,* an alien successfully obtained relief from an order of removal under the Convention on the grounds that she would likely be subject to rape upon her return to the Democratic Republic of Congo ("DRC"). Zubeda introduced evidence tending to show that her family had been persecuted in the DRC, that members of her family had been brutally murdered, and that she had been gang-raped by soldiers. However, the BIA reversed, finding that the record did not support the immigration judge's finding that Zubeda would likely be detained if returned to the DRC, or that she would be targeted for harm by the soldiers of the Congolese government. In addition, the BIA likened the case to *Matter of J–E–*, noting

that reported isolated instances of mistreatment that may rise to the level of torture do not establish that the alien herself was more likely than not to be tortured.

Zubeda filed a petition for review to this Court, and we reversed. In particular, we were troubled by the cursory nature of the BIA's opinion and noted that the BIA "completely ignore[d] the basis of the Immigration Judge's decision." 333 F.3d at 475. For instance, we took issue with the BIA's assertion that the record did not support a finding that Zubeda would be likely detained upon her return to the DRC when the record clearly supported a contrary conclusion, a fact which the IJ had taken administrative notice of. *Id.* In addition, we held that the BIA erred when it relied on the IJ's adverse credibility finding, made in the context of Zubeda's asylum and withholding of deportation claims, to discredit her application for relief under the Convention. *Id.* at 476. We noted that because Zubeda's CAT claim was analytically separate from her other claims for relief, the BIA was required to provide a further explanation before relying on the IJ's adverse credibility finding. *Id.* Finally, we found the BIA's application of *Matter of J–E–* to Zubeda's CAT claim to be wholly unconvincing, noting that "[r]educing Zubeda's claim to an attack on the kind of inhumane prison conditions that formed the basis of the [BIA's] decision in *Matter of J–E–*totally ignores the fact that the record is replete with reports ... that detail what appear to be systematic incidents of gang rape, mutilation, and mass murder." *Id.* at 477.

  ***148**  In addition to our criticisms of the BIA's opinion in *Zubeda,* we discussed at length whether "rape can constitute torture" when it is inflicted with the requisite intent, imposed for one of the purposes specified under the Convention, and inflicted with the knowledge or acquiescence of a public official with custody or control over the victim. *Id.* at 473. With regards to the intent element, we considered the applicable regulations and stated:

> Although the regulations [ 8 C.F.R. § 208.18] require that severe pain or suffering be 'intentionally inflicted, *we do not interpret this as a specific intent requirement* .... The intent requirement [under § 208.18(a)(5) ] therefore distinguishes between suffering that is the accidental result of an intended act, and suffering that is purposefully inflicted or the foreseeable consequence of deliberate conduct. However, *this is not the same as requiring a specific intent to inflict suffering.'*

*Id.* at 473 (emphasis added). We proceeded to note that "requiring an alien to establish the specific intent of his/ her persecutors could impose insurmountable obstacles to affording the very protections the community of nations sought to guarantee under the [Convention]." *Id.* at 474 (citation omitted).

We recognize that this portion of *Zubeda* is in tension with our holding in this case, that based on the ratification record of the CAT, the appropriate standard to be applied in the domestic context is the specific intent standard. However, we believe that the quoted passage of *Zubeda,* upon which Auguste relies, is dicta. The basis of our holding in *Zubeda* was limited to the defects in the BIA's reversal of the IJ's ruling that Zubeda was entitled to relief under the CAT. In fact, the INS argued that, in light of these defects, "the most appropriate resolution [was] to remand to the Immigration Judge for clarification and additional evidence." *Id.* at 465.

Our discussion of the specific intent standard in 8 C.F.R. § 208.18(a)(5) was not necessary to our finding of the defects in the BIA's opinion. Moreover, it does not appear that the meaning of the specific intent standard was challenged in that case, as there is no discussion of the United States' ratification history of the Convention, nor a discussion of the understandings submitted by the President and agreed to by the Senate. Thus, we decline to follow that portion of the *Zubeda* opinion that is dicta. *See Ponnapula v. Ashcroft,* 373 F.3d 480, 488 n. 5 (3d Cir.2004); *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392, 397 (3d Cir.2003).

## B. The Burden of Proof Required to Prove a Claim for Relief under the CAT

 **[14]**  Auguste argues that the BIA erroneously set the burden of proof in 8 C.F.R. § 208.16(c)(2) to require an alien seeking relief under the Convention to show that it is "more likely than not" that he would be tortured upon removal, rather than the standard Auguste contends is required under Article 3 of the Convention, which requires a showing of "substantial grounds for believing that he would be in danger of being subjected to torture." In particular, Auguste points to the drafting history of the Convention, which he argues shows that negotiators rejected a similar increased burden of proof on individuals seeking protection from torture. Moreover, Auguste points to several decisions of the Committee against Torture, an advisory body created by

the Convention to monitor compliance with the terms of the treaty, that have used the "substantial grounds" standard of Article 3 in rendering opinions under the Convention. Because this involves a pure question of law, **\*149** we have habeas jurisdiction over the issue. *See* Bakhtriger, 360 F.3d at 425.

We begin by noting that on several prior occasions, we have applied the "more likely than not" standard in evaluating claims for relief under the Convention. *See, e.g.,* Berishaj v. Ashcroft, 378 F.3d 314, 332 (3d Cir.2004); Wang v. Ashcroft, 368 F.3d 347, 348 (3d Cir.2004); Mulanga, 349 F.3d at 132 (quotations omitted). Our prior uses of the "more likely than not" standard constitute precedent in this matter, and we are bound to apply the standard contained in 8 C.F.R. § 208.16(c)(2) to resolve Auguste's claim. *See* Third Circuit Internal Operating Procedure 9.1 ("It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.").

Nor do we see any error in our prior decisions in this regard because it is plain that the "more likely than not" standard is the correct standard to be applied for CAT claims. The "more likely than not" standard has its origins in identical understandings submitted by Presidents Reagan and Bush with regards to Article 3 of the Convention, and adopted by the Senate in its resolution of ratification, stating that the "United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " *See* Senate Resolution, *supra,* II.2. This standard was then codified into domestic law through § 2242(b) of FARRA, which directed the relevant agencies to adopt regulations implementing the United States' obligations under the Convention "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." *See* 8 U.S.C. § 1231 note. Accordingly, in evaluating Auguste's claim that he is entitled to relief under the Convention, we must apply the "more likely than not" standard contained in 8 C.F.R. § 208.16(c)(2).[24]

## C. Whether Auguste is Entitled to Relief on his Habeas Petition

### 1.

Auguste argues that, even if the BIA adopted the correct intent and burden of proof standards in the implementing regulations, he is nonetheless entitled to relief under the CAT. Auguste contends that he will be subject to indefinite detention upon his return to Haiti, that the conditions in Haitian prisons are deplorable, and that the Haitian authorities are not only aware that their imprisonment policy causes severe pain and suffering, but purposely place deportees in the deplorable conditions in order to punish and intimidate them.

**[15]** **[16]** **[17]** We review de novo the District Court's denial of Auguste's habeas petition. *See* De Leon–Reynoso v. Ashcroft, 293 F.3d 633, 635 (3d Cir.2002). However, because our evaluation of the merits of Auguste's habeas claim involves a review of the IJ's decision, which in turn relied on **\*150** the BIA's decision in *Matter of J–E–,* our standard of review is far narrower because the BIA's interpretation and application of its own regulations is entitled to "great deference." *See* Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir.2001). This deference "to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." Tineo, 350 F.3d at 396 (quoting Aguirre–Aguirre, 526 U.S. at 424, 119 S.Ct. 1439).

### 2.

Before considering the merits of Auguste's habeas petition, we address an issue related to the scope of our habeas review. As we noted above, our review is limited to errors of law, such as the application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings. Thus, as an initial matter, we must identify what the undisputed facts are in this matter, and what administrative fact findings were made by the IJ.

The IJ found the factual situation presented by Auguste's application for deferral of removal to be indistinguishable from the matter presented in *Matter of J–E–.* The IJ's oral decision states:

Counsel for the respondent is not claiming here today that the situation in Haiti is somehow different from the situation that confronted the respondent in [*Matter of J–E–*] and that the Board had to consider in *Matter of J–E–*. So, we are dealing with essentially the same fact pattern, the respondent like the respondent in [*Matter of J–E–*] is a person from Haiti on the brink of deportation back to that country for criminal reasons, and the prison conditions are fundamentally the same today as they were just a year ago in Haiti, and so the claim is in this Court's view virtually the identical claim that was before the Board in *Matter of J–E–* both as a legal issue and in terms of the facts of the case.

(J.A. 46–47.) Thus, on habeas review, we are limited to the administrative factual findings of the IJ, which are essentially those that the BIA addressed in *Matter of J–E–*. In addition, the IJ found that, with regards to Auguste's predicament in particular, there was no evidence (nor was there any submitted) that Auguste's situation differed in any way from the alien in *Matter of J–E–*, or that he had faced torture in Haiti in the past. The District Court, in considering Auguste's habeas petition, does not appear to have made any independent findings of fact in this matter and instead relied on the facts presented in *Matter of J–E–*. Thus, at a minimum, the administrative facts in this matter are the same as those in the factual record the BIA considered in *Matter of J–E–*.[25]

The Government, however, contends that Auguste has introduced evidence in his habeas petition that conflicts with the factual findings made by the BIA in *Matter of J–E–*, and that this constitutes an attack on fact findings inappropriate on habeas review. The specific facts in dispute include a statement by a Haitian government official that acknowledges that **\*151** the conditions in the prisons are "tough," as well as a statement that the purpose of Haiti's imprisonment policy is to intimidate and punish deportees, and to teach them a lesson about the true conditions in Haiti's prisons.

Even assuming that we agree with the Government that these statements somehow are in conflict with the findings of the BIA in *Matter of J–E–*, we nonetheless see no reason to decide the question of whether the foregoing statements offered by Auguste may be considered on habeas review because they do not, in our opinion, strengthen Auguste's CAT claim or change our ultimate disposition of his petition. Accordingly, although we will discuss these facts below, nothing in this opinion should be construed as a holding that the disputed facts are properly before this Court.[26]

### 3.

[18]  [19]  "An applicant for relief on the merits under [Article 3] of the [Convention] bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.' " *See* *Sevoian v. Ashcroft,* 290 F.3d 166, 174–75 (3d Cir.2002) (quoting 8 C.F.R. § 208.16(c)(2)). The standard for relief under the Convention "has no subjective component, but instead requires the alien to establish, by objective evidence, that he is entitled to relief." *See id.* (internal citations and quotations omitted); *see also* *Elien v. Ashcroft,* 364 F.3d 392, 398 (1st Cir.2004); *Cadet,* 377 F.3d at 1180.

[20]  [21]  [22]  For an act to constitute torture under the Convention and the implementing regulations, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions. *See* *Matter of J–E–,* 23 I. & N. Dec. at 297 (citing 8 C.F.R. § 208.18(a)); *see also* *Cadet,* 377 F.3d at 1192 (outlining the same requirements); *Elien,* 364 F.3d at 398 (same). An "alien's testimony, if credible, may be sufficient to sustain the burden of proof without corroboration." *Zubeda,* 333 F.3d at 471–72 (citing *Mansour v. INS,* 230 F.3d 902, 907 (7th Cir.2000)). "If an alien meets his/her burden of proof, withholding of removal under the Convention is mandatory just as it is for withholding of deportation under § 243(h)." *Zubeda,* 333

F.3d at 472 (citing INA § 241(b)(3) and 8 C.F.R. §§ 208.16—208.18).

We can discern at least three separate circumstances which Auguste contends constitute torture within the meaning of the Convention. First, Auguste contends that the indefinite detention of criminal deportees constitutes torture. Second, Auguste contends that the detention, coupled with the harsh and deplorable prison conditions, constitutes torture. Finally, **\*152** Auguste contends that the fact that he may be subject to physical abuse and beatings by prison guards constitutes torture. We consider each in turn.

#### a. Indefinite Detention

**[23]**    As we discussed above in Part I.A, the government of Haiti uses a preventive detention policy for criminal deportees. The State Department's 2000 Country Report on Human Rights Practices in Haiti, which was submitted to the District Court as an exhibit to Auguste's habeas petition, states:

> In the past, when the authorities received Haitian citizens deported from other countries for having committed crimes, they were generally processed in 1 week and then released. Since March 2000, criminal deportees who already have served sentences outside the country are kept in "preventive detention," with no fixed timetable for their eventual release. According to police officials, the deportees are held in order to prevent an increase in insecurity and to convince them that they would not want to risk committing crime because of prison conditions. The average period of preventive detention for these persons has decreased to approximately 1 month, compared to several months in 2000.

2000 Country Report.

The BIA found in *Matter of J–E–* as a factual matter that the Haitian government uses the detention procedure "to prevent the bandits from increasing the level of insecurity and crime in the country" and as a "warning and deterrent not to commit crimes in Haiti." *Matter of J–E–*, 23 I. & N. Dec. at 300 (internal citations and quotations omitted). The BIA also found that the detention policy "in itself appears to be a lawful sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who

are forced to return to the country after having been convicted of crimes abroad." *Id.* Accordingly, the BIA concluded that the detention policy constituted a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3), and was not otherwise intended to defeat the purpose of the Convention, and thus was not torture. *Matter of J–E–*, 23 I. & N. Dec. at 300.

Auguste, however, contends that the detention policy, whatever its deterrent purposes, is unlawful under Haiti's Constitution and criminal code and violates the international human rights law prohibition against indefinite and arbitrary imprisonment. Auguste, in effect, contends that whether a state policy is a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3) hinges on the legality of that policy under the removal country's applicable law. This is undoubtedly an interesting but difficult issue. [27]

However, we note that in *Matter of J–E–*, the BIA made an alternative ruling why the policy of indefinite detention does not constitute torture, specifically that "there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering." 23 I. & N. Dec. at 300. As will be shown in the next section, we agree with that conclusion. Thus, even if we were to find that the detention policy was not a lawful sanction, we would conclude that the Haitian authorities lacked the requisite intent for a finding **\*153** of torture. Thus, we see no need to address the lawful sanction issue arising under 8 C.F.R. § 208.18(a)(3) or be drawn into an inquiry as to the particularities of Haitian or international law on this matter.

#### b. Prison Conditions

**[24]**    Auguste contends that his detention in harsh and brutal prison conditions constitutes torture. We briefly described these conditions above in Part I.A, and there is no doubt that these conditions are objectively deplorable. In *Matter of J–E–*, the BIA found from the record that the Haitian prison conditions were "the result of budgetary and management problems as well as the country's severe economic difficulties." *Matter of J–E–*, 23 I. & N. Dec. at 301. In addition, the BIA found that "although lacking in resources and effective management, the Haitian Government is attempting to improve its prison systems,"

and that the Haitian Government "freely permitted the ICRC [International Committee of the Red Cross], the Haitian Red Cross, MICAH [International Civilian Mission for Support in Haiti], and other human rights groups to enter prisons and police stations, monitor conditions, and assist prisoners with medical care, food, and legal aid." *Id.* (citations omitted). However, the BIA found that placing detainees in these prison conditions did not constitute torture because there was no evidence that the Haitian authorities had the specific intent to create or maintain these conditions so as to inflict severe pain or suffering on the detainees. *Id.* The District Court, relying on *Matter of J–E–*, agreed, concluding that "we have circumstances here where we have simply the allegation of general prison conditions in Haiti. So it does not appear to me that [Auguste] has made any showing that his pain and suffering or physical or mental injury would be intentionally inflicted." (J.A. 15.)

Auguste, however, challenges the conclusion of the District Court and the BIA in *Matter of J–E–* that the Haitian authorities do not have the requisite specific intent under 8 C.F.R. § 208.18(a)(5). He contends that the Haitian authorities are not only aware that their imprisonment policy causes severe pain and suffering, but purposely place deportees in the brutal prison conditions in order to punish and intimidate them. The BIA's finding that the prison conditions are the result of budgetary and management problems is a factual finding that falls outside the scope of our habeas review.

However, Auguste's contention that the BIA misapplied 8 C.F.R. § 208.18(a)(5) involves the application of law to facts and thus is appropriate on habeas review.

Keeping in mind the appropriate deference we must give to the BIA in the interpretation of its own regulations, we do not think the BIA acted outside of its authority or contrary to law in *Matter of J–E–* in concluding that the Haitian authorities lack the requisite specific intent to inflict severe pain and suffering on Auguste, or others like him, within the meaning of 8 C.F.R. § 208.18(a)(5). As we noted above, for an act to constitute torture, the actor must only intend to commit the act but also intend to achieve the consequences of the act. In this case, the latter is lacking. As the BIA found in *Matter of J–E–*, the prison conditions, which are the cause of the pain and suffering of the detainees, result from Haiti's economic and social ills, not from any intent to inflict severe pain and suffering on detainees by, for instance, creating or maintaining the deplorable prison conditions. The mere fact that the Haitian authorities have knowledge that

severe pain and suffering may result by placing detainees in these conditions does not support a finding that the Haitian authorities **\*154** intend to inflict severe pain and suffering. The difference goes to the heart of the distinction between general and specific intent.

In effect, Auguste is complaining about the general state of affairs that exists in Haitian prisons. The brutal conditions are faced by all prisoners and are not suffered in a unique way by any particular detainee or inmate. We think it goes without saying that detainees and other prisoners face a brutal existence, experiencing pain and suffering on a daily basis. The conditions that we have described are among the worst we have ever addressed. But, the pain and suffering that the prisoners experience in Haiti cannot be said to be inflicted with a specific intent by the Haitian government within the meaning of 8 C.F.R. § 208.18(a)(5). [28]

In so holding, we caution that we are not adopting a per se rule that brutal and deplorable prison conditions can never constitute torture. To the contrary, if there is evidence that authorities are placing an individual in such conditions with the intent to inflict severe pain and suffering on that individual, such an act may rise to the level of torture should the other requirements of the Convention be met. Perhaps, as evidence is further developed on conditions in Haiti, the BIA may arrive at a different conclusion in the future. But, the situation that we are presented with, and the evidence that we must consider, do not support a finding that Auguste will face torture under the only definition that is relevant for our purposes—the definition contained in the Convention and the implementing regulations.

### c. Physical Abuse

[25]    Finally, Auguste points to reports of physical beatings of prisoners by prison guards as evidence that he faces torture upon his removal to Haiti. In *Matter of J–E–*, the BIA noted that the reports of prisoner abuse have ranged from the beating with fists, sticks and belts to burning with cigarettes, choking, hooding, and kalot marassa. 23 I. & N. Dec. at 302. In *Matter of J–E–*, the BIA concluded that, although such acts may rise to the level of torture, the alien there had failed to meet his burden of proof that he would be more likely than not subject to torture. *Id.* at 302–03. In particular, the BIA noted that there were no claims by the alien of past

torture. *Id.* at 303. Moreover, although there were reported instances of beatings of prisoners, the alien had failed to show that the beatings were "so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture." *Id.* at 304. The situation here is no different. Auguste has not alleged any past torture, nor has he offered any evidence tending to show that he faces an increased likelihood of torture anymore than the alien in *Matter of J–E–*.

The conditions that Auguste will likely face in Haiti's prisons, like those awaiting many other criminal deportees, are harsh and deplorable. However, in ratifying the **\*155** Convention against Torture, the United States undertook its obligations subject to certain understandings on the proper intent and burden of proof standards. The Department of Justice thereafter adopted regulations that properly implemented those standards in the regulations governing CAT claims. Auguste has not satisfied those standards. Accordingly, we will affirm the order of the District Court.

### IV. CONCLUSION

**All Citations**

395 F.3d 123

## Footnotes

1    *See, e.g.,* U.N. Charter, chap. IX, art. 55, para. c (directing United Nations member countries to promote "universal respect for, and observance of, human rights and fundamental freedoms for all"); Universal Declaration of Human Rights, art. 5, G.A. Res. 217A (III), U.N. Doc. A/810 (1948) (stating that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment"); International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 7, 999 U.N.T.S. 171, 6 I.L.M. 368 6 I.L.M. 368 (stating that "[n]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment"). *See generally* J Herman Burgers & Hans Danelius, The United Nations Convention against Torture: A Handbook on the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment 5–30 (1988).

2    *See* Status of the Ratification of the Convention against Torture (visited Nov. 24, 2004) (http://www.ohchr.org/english/law/cat-ratify.htm).

3    In a cover letter from Janet G. Mullins, Assistant Secretary, Legislative Affairs, Department of State, to Senator Claiborne Pell, Chairman of the Senate Committee on Foreign Relations, transmitting President Bush's revised reservations, understandings, and declarations to the CAT, it was stated that the revised understanding "maintains our position that specific intent is required for torture." *See* S. Exec. Rep. 101–30, at 35 (App.A).

4    A summary and technical analysis of the Convention submitted by President Reagan to the Senate further stated: "[T]he requirement of intent to cause severe pain and suffering is of particular importance in the case of alleged mental pain and suffering, as well as in cases where unexpectedly severe physical suffering is caused. Because specific intent is required, an act that results in unanticipated and unintended severity of pain and suffering is not torture for purposes of this Convention." *See* S. Exec. Rep. 101–30, at 13–14.

5    The Senate Report explains why this understanding was added:

    Article 3 forbids a State Party from forcibly returning a person to a country where there are "substantial grounds for believing that he would be in danger of being subjected to torture."

    Under U.S. immigration law, the United States can not deport an individual if "it is more likely than not that the alien would be subject to persecution." *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). U.S. immigration law also provides that asylum may be granted to an alien who is unwilling to return to his home country "because of persecution or a well-founded fear of persecution." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

The administration's proposed understanding adopts the more stringent *Stevic* standard because the administration regards the *nonrefoulement* prohibition of article 3 as analogous to mandatory withholding of deportation. Therefore, article 3 would apply when it is "more likely than not" that the individual would be tortured upon return.

> *See* S. Exec. Rep. 101–30, at 10.

6    Article 26 of the Convention states in pertinent part: "Accession shall be effected by the deposit of an instrument of accession with the Secretary–General of the United Nations." *See* art. 26, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 851465 U.N.T.S. 85.

7    Treaties that are not self-executing do not create judicially-enforceable rights unless they are first given effect by implementing legislation. *See* Ogbudimkpa, 342 F.3d at 218 (citing Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1298 (3d Cir.1979)). Several circuits have already determined that the CAT is not self-executing. *See, e.g., Reyes–Sanchez v. United States Attorney Gen.,* 369 F.3d 1239, 1240 n. 1 (11th Cir.2004); Saint Fort v. Ashcroft, 329 F.3d 191, 202 (1st Cir.2003); Wang v. Ashcroft, 320 F.3d 130, 140 (2d Cir.2003); Castellano–Chacon v. INS, 341 F.3d 533, 551 (6th Cir.2003). This Court, however, has not previously addressed whether the CAT is self-executing. *See* Ogbudimkpa, 342 F.3d at 218 n. 22 (noting that because Congress passed FARRA to implement the United States' obligations under the CAT, "we need not consider whether CAT is self-executing"). As noted later, we decide that the Convention is not self-executing.

On a side note, in *Ogbudimkpa,* we briefly considered whether a claim seeking relief from removal on the grounds of alleged future torture should be called a "CAT claim" or a "FARRA claim." 342 F.3d at 221 n. 24. We noted that, if it were true that the Convention was not self-executing, then strictly speaking an alien would seek relief under FARRA, and not the Convention. *Id.* Ultimately, however, given that the language of FARRA is virtually identical to the language of Article 3 of the Convention, we concluded that the difference between the terminology of a "CAT claim" versus a "FARRA claim" was inconsequential. *Id.* Accordingly, we used there, and we continue to use here, the colloquial reference to a "CAT claim" rather than a "FARRA claim" in discussing Auguste's requested relief. *Id.*

8    Auguste seeks deferral of removal, not withholding of removal. Regulations for withholding of removal are set out at 8 C.F.R. § 208.16, while regulations for deferral of removal are set out at 8 C.F.R. § 208.17. However, the general standards of eligibility for each are identical, i.e., a requirement that an alien establish that future "torture" is "more likely than not." *See* 8 C.F.R. § 208.16(c), .17(a); *see also* 64 Fed.Reg. 8478, 8481 (noting that " § 208.17(a) is subject to the same standard of proof and definitional provisions as § 208.16(c)").

9    Applications for relief under the CAT are not the only instance in which courts address torture-related claims. For instance, pursuant to Articles 4 and 5 of the Convention, the United States enacted §§ 2340–2340A of the U.S. Criminal Code, which criminalize torture in the United States and defines torture as any "act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. §§ 2340–2340A.

In addition, the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note (2000), provides a civil tort remedy for victims of torture. Torture is defined under the TVPA as:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

10    "Torture" is prohibited by Article 1 of the CAT, while "other acts of cruel, inhuman or degrading treatment or punishment" are prohibited by Article 16 of the CAT. *Id.* at 295–96.

11    In considering whether an alien has satisfied his burden of proof, the BIA stated that:

> all evidence relevant to the possibility of future torture shall be considered, including, but not limited to: (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (3) evidence of gross, flagrant, or mass violations of human rights within the country of removal, where applicable; and (4) other relevant information regarding conditions in the country of removal.

*Matter of J–E–,* 23 I. & N. Dec. at 303 (citing 8 C.F.R. § 208.16(c)(3)).

12    It does not appear that the aggrieved alien in *Matter of J–E–* appealed the adverse decision of the BIA or otherwise filed a habeas petition.

13    We note that neither party has addressed whether the regulation-specific jurisdiction-stripping provision of § 2242(d) of FARRA affects our jurisdiction in this matter. *See* § 2242(d) ("[N]o court shall have jurisdiction to review the regulations adopted to implement this section."). In *Ogbudimkpa,* we held that a different aspect of § 2242(d), stating that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention ... except as part of a review of a final order of removal,"

does not affect habeas review. *See Ogbudimkpa,* 342 F.3d at 215–16 (noting that "Ogbudimkpa does not challenge the regulations themselves, but the IJ's application of the regulations to his case, and thus [the regulation-specific jurisdiction-stripping] provision is not implicated"). The regulation-specific jurisdiction-stripping provision may be relevant insofar as any of Auguste's arguments may be construed as challenging the regulations themselves, instead of their application to his case.

We believe the rationale behind *Ogbudimkpa* applies here with the same force. In *St. Cyr,* the Supreme Court held that "at the absolute minimum, the Suspension Clause protects the writ [of *habeas corpus* ] as it existed in 1789." 533 U.S. at 301, 121 S.Ct. 2271 (internal quotation omitted). The Court found that, at that time, "the issuance of the writ was not limited to challenges to the jurisdiction of the custodian, but encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes." *Id.* at 302, 121 S.Ct. 2271. Thus, just as the wholesale jurisdiction-stripping provision of FARRA cannot eliminate habeas jurisdiction without what has been termed a "superclear statement" or "magic words," *id.* at 327, 121 S.Ct. 2271 (Scalia, J., dissenting) (characterizing the requirement set forth by the majority), the regulation-specific jurisdiction-stripping provision may not restrict that jurisdiction beyond its 1789 form without such an unmistakably clear statement, which is lacking in either provision of § 2242(d).

14    This, of course, is not the first instance in which this Court has applied the standards for relief under the CAT and its regulations. *See, e.g., Sevoian v. Ashcroft,* 290 F.3d 166, 174–78 (3d Cir.2002) (denying alien facing deportation to Republic of Georgia relief under the CAT). However, we are not aware of a prior decision by this Court, or any other court, that has analyzed whether the Department of Justice or the BIA thereunder have faithfully implemented the United States' obligations under the Convention.

15    The United States has not ratified the Vienna Convention on the Law of Treaties. Nonetheless, several courts have stated that they look to it "as an authoritative guide to the customary international law of treaties." *See, e.g., Ehrlich v. Am. Airlines, Inc.,* 360 F.3d 366, 373 n. 5 (2d Cir.2004).

16    Auguste makes a related argument: because the understandings were without effect, and thus the interpretation of the Convention he advocates was in effect upon ratification in the United States, a clear statement was required by Congress to modify or abrogate the treaty in FARRA to enact the specific intent standard. Auguste relies on the well-known rule that a "treaty will not be deemed to be abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed." *See Trans World Airlines v. Franklin Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) (quotations omitted). In Auguste's view, Congress' statement in § 2242(b) of FARRA directing the appropriate agencies

to implement the United States' obligations under the CAT "subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the [CAT]," 8 U.S.C. § 1231 note, was not a clear enough statement to modify or abrogate the Convention as it was ratified by the United States. Because we ultimately conclude that the understandings must be given domestic legal effect, we need not address this argument.

17    *See, e.g.,* *Igartua De La Rosa v. United States,* 32 F.3d 8, 10 n. 1 (1st Cir.1994) (enforcing declaration that the International Covenant on Civil and Political Rights was not self-executing); *Ralk v. Lincoln County,* 81 F.Supp.2d 1372, 1380 (S.D.Ga.2000) (same); *Sandhu v. Burke,* No. 97 Civ. 4608(JGK), 2000 WL 191707 (S.D.N.Y. Feb.10, 2000) (enforcing declaration that the CAT was not self-executing); *Calderon v. Reno,* 39 F.Supp.2d 943, 956 (N.D.Ill.1998) (same); *White v. Paulsen,* 997 F.Supp. 1380, 1387 (E.D.Wash.1998) (same).

18    In practice, the treaty-making process operates as follows. After the executive branch negotiates the terms of a treaty with foreign nations, and a completed draft is signed, the President thereafter transmits the treaty to the Senate for its advice and consent. If the treaty receives the required two-thirds vote, the Senate sends a resolution to the President approving the treaty. The President has the discretion at this point to ratify or not ratify the treaty. Should the President decide to ratify the treaty, he will sign the instrument of ratification and deposit it in a place typically specified by the treaty. *See* Bradley & Goldsmith, *supra,* (citing Congressional Research Service, Treaties and Other International Agreements: The Role of the United States Senate, 103rd Congress, 1st Sess., at 75–120 (1993)).

19    Although we are aware of no cases construing the limits of the Senate's prerogative to attach reservations, understandings, and declarations as part of its advice and consent function to ratification, we note in passing that the Supreme Court has previously held that the Senate's ability to put forward its understanding of a treaty does not extend beyond the ratification process. *See* *Fourteen Diamond Rings v. United States,* 183 U.S. 176, 180, 22 S.Ct. 59, 46 L.Ed. 138 (1901) ("The meaning of the treaty cannot be controlled by subsequent explanations of some of those who may have voted to ratify it.").

20    In passing, we express some skepticism as to whether it is so obvious, as Auguste contends, that the United States' understanding of Article 1 of the Convention as requiring "specific intent" is inconsistent with the Convention, as he contends it is generally understood internationally.

Auguste relies on several sources in support of his contention that a specific intent standard would be inconsistent with the common understanding of Article 1 of the Convention. For instance, he notes that during the negotiations of the treaty, a U.S. proposal for Article 1 that read "the offence of torture includes any act by which extremely severe pain and suffering, whether physical or mental, is deliberately and maliciously inflicted" was rejected. *See* Burgers and Danelius, *supra,* at 41–42. However, in our view, it does not follow necessarily that the final language of Article 1 was a repudiation of a specific intent standard.

We also believe it to be telling that both Presidents Reagan and Bush submitted the condition interpreting Article 1 with the "specifically intended" language as an understanding, and not as a reservation or declaration. This suggests to us that the commonly understood meaning at the time of ratification was that, at least to the United States, the specific intent standard was consistent with a reasonable interpretation of the language in Article 1.

In any event, we need not resolve this issue. Whether specific intent is or is not commonly understood to be part of Article 1's definition of torture is not relevant to our holding. But, as the CAT gains increased attention in light of recent events abroad, we are confident that the debate on this question will continue.

21    We note that this issue was itself a source of division within the BIA. In *Matter of J–E–,* one Board member, in dissent, wrote:

Contrary to what the majority suggests, the regulatory requirement that the torture be "specifically intended" does not mean that proof of specific intent, as that term is used in American criminal prosecutions, is required.... The majority's reading of the regulations functionally converts the Senate

understanding that torture must be "specifically intended" into a "specific intent" requirement. I disagree. I can find no basis to conclude that the Senate understanding was intended to require proof of an intent to accomplish a precise criminal act, as the majority contends is required. Rather, the plain language of the text of 8 C.F.R. § 208.18(a)(5) reflects only that something more than an accidental consequence is necessary to establish the probability of torture.

Nowhere does the regulation state that the respondent must prove that the prospective torture he may face will result from the torturer's specific intent to torture him. Indeed, it would be difficult, if not impossible, to prove specific intent in a prospective context.

23 I. & N. Dec. at 315–16 (Rosenberg, Comm'r, dissenting).

Another Board member in dissent wrote: "We are in the early stages of the very difficult and thankless task of construing the Convention. Only time will tell whether the majority's narrow reading of the torture definition and its highly technical approach to the standard of proof will be the long-term benchmark for our country's implementation of this international treaty.... I do not believe the majority adequately carries out the language or the purposes of the Convention and the implementing regulations." *Id.* at 309 (Schmidt, Comm'r, dissenting).

22    Under the *Chevron* analysis, in determining whether an agency's interpretation of the statute which it administers is reasonable, the initial question is whether the statute is silent or ambiguous with respect to the specific issue. If the statutory language is clear, the court need not look any further, and the agency's interpretation fails if it is inconsistent with the plain language. If, however, the statute is silent or ambiguous, the question for the court is whether the agency's interpretation is based on a permissible construction of the statute. *See Chevron U.S.A. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Auguste contends that *Chevron* deference to the BIA's interpretation of the Convention is not appropriate because the BIA does not have any particular expertise in interpreting treaties. Whether agencies are to be given *Chevron* deference when interpreting and implementing treaties is an unsettled topic. *See generally* Curtis A. Bradley, *Chevron Deference and Foreign Affairs,* 86 Va. L.Rev. 649 (2000). We note that some courts have applied or suggested applying *Chevron* deference to agency interpretation and implementation of United States' treaty obligations. *See, e.g., Hill v. Norton,* 275 F.3d 98, 104 (D.C.Cir.2001) (applying *Chevron* framework to agency's interpretation of a treaty and an implementing statute); *see also Collins v. Nat'l Transp. Safety Bd.,* 351 F.3d 1246, 1251 (D.C.Cir.2003) (applying some standard of deference to an agency construction of a treaty). However, in this matter, because we view the issue as one of the BIA interpreting and applying FARRA and its implementing regulations, and not the Convention per se, we do not believe that resolution of the issue is necessary. This is particularly so because we believe there is no ambiguity in the Convention for which we would need to afford the BIA any deference in the first place. Accordingly, unless there be any misunderstanding, we afford *Chevron* deference to the BIA's interpretation of FARRA and the implementing regulations in *Matter of J–E–* and no more.

23    In explaining the difference between specific and general intent, the Supreme Court used the following example to distinguish the two mental states:

[A] person entered a bank and took money from a teller at gunpoint, but deliberately failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated for alcoholism. Though this defendant knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent").

*Carter,* 530 U.S. at 268, 120 S.Ct. 2159 (citing *United States v. Lewis,* 628 F.2d 1276, 1279 (10th Cir.1980)).

24    Because we find that the applicable burden of proof to be applied for CAT claims is the "more likely than not" standard, we do not reach Auguste's arguments that the Department of Justice improperly incorporated

the burden of proof used in claims arising under Article 33 of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6223, 189 U.N.T.S. 150, or whether we should resort to the rule of lenity as an aid in interpreting the Convention.

25    The Government explains that the record before this Court is incomplete and does not include a copy of Auguste's pleadings before the IJ or the BIA. This is because the complete administrative record of the removal proceedings was not yet in evidence at the time the District Court denied the habeas petition on the merits. The only record we have is contained in the Joint Appendix, which contains the petition for writ of habeas corpus and attached exhibits, as well as an affidavit executed by counsel for Auguste with attached exhibits.

26    As an additional matter, in his Brief to this Court, Auguste relies in part on the 2003 State Department Country Report on Human Rights Practices for Haiti ("2003 Report") which was released on February 25, 2004. Because the IJ decided this case on November 12, 2003, the 2003 Report was not part of the administrative record on which the IJ based his finding that Auguste was not eligible for CAT relief. In contrast, it appears that the 2001 and 2002 State Department Country Reports were before the IJ. The Government contends that the 2003 Report is not properly before this Court. However, after reviewing the 2003 Report submitted as part of Auguste's habeas petition, we believe that it contains no new evidence that strengthens Auguste's claim or which would change our ultimate disposition of his habeas petition. Accordingly, we need not decide whether the 2003 Report is properly before this Court.

27    The District Court in this matter, relying on the BIA's finding in *Matter of J–E–* that the detention policy constituted a lawful sanction within the meaning of 8 C.F.R. § 208.18(a)(3), apparently found no violation or challenge to Haitian law by the use of the detention policy.

28    Although we do not think that the following list, contained in the record of the ratification of the Convention by the Senate, was intended to be exhaustive, we think the illustrative list of the acts which could constitute torture supports our analysis of the specific intent requirement of 8 C.F.R. § 208.18(a)(5):

> The term 'torture,' in United States and international usage, is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.

> *See* S. Exec. Rep. 101–30, at 14 (citations omitted).

---

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Overruled by Citizens United v. Federal Election Com'n, U.S., January 21, 2010

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Janus v. American Federation of State, County, and Mun. Employees, Council 31, U.S., June 27, 2018

110 S.Ct. 1391
Supreme Court of the United States

Richard H. AUSTIN, Michigan Secretary of State and Frank J. Kelley, Michigan Attorney General, Appellants

v.

MICHIGAN CHAMBER OF COMMERCE.

No. 88–1569.
|
Argued Oct. 31, 1989.
|
Decided March 27, 1990.

**Synopsis**

Business organization brought action challenging Michigan statute prohibiting corporations from using corporate treasury funds for independent expenditures in support of or in opposition to candidates in elections for state office. The United States District Court for the Eastern District of Michigan, 643 F.Supp. 397, upheld the statute and organization appealed. The Court of Appeals for the Sixth Circuit, 856 F.2d 783, reversed. The Supreme Court, Justice Marshall, held that: (1) unique state-conferred corporate structure which facilitates the amassing of large treasuries warrants the limit on independent expenditures; (2) act is sufficiently narrowly tailored to achieve its goal; (3) act may be constitutionally applied to not-for-profit corporations; (4) there is no equal protection violation in fact that act does not apply to labor unions or unincorporated associations; and (5) there is no equal protection violation in fact that news media corporations are exempted from the prohibition.

Reversed.

Justice Brennan filed a concurring opinion.

Justice Stevens filed a concurring opinion.

Justice Scalia filed a dissenting opinion.

Justice Kennedy filed a dissenting opinion in which Justice Scalia and Justice O'Connor joined.

**Procedural Posture(s):** On Appeal.

West Headnotes (13)

**[1]    Constitutional Law    🔑    Contributions**

Use of funds to support a political candidate is speech. U.S.C.A. Const.Amend. 1.

7 Cases that cite this headnote

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

**[2]**   **Constitutional Law**  ↦  Entities protected

Mere fact that organization is a corporation does not remove its speech from the ambit of the First Amendment. U.S.C.A. Const.Amend. 1.

10 Cases that cite this headnote

**[3]**   **Constitutional Law**  ↦  Corporate expenditures

State statute prohibiting corporation from making independent expenditures in support of political candidate from its general treasury burdens expressive activity and must be justified by compelling state interest. U.S.C.A. Const.Amend. 1; M.C.L.A. § 169.254(1).

36 Cases that cite this headnote

**[4]**   **Constitutional Law**  ↦  Corporate expenditures

**Election Law**  ↦  Corporations

Unique state-conferred corporate structure which facilitates the amassing of large treasuries warrants statute prohibiting corporation from making independent expenditures on behalf of a candidate from its general treasury. U.S.C.A. Const.Amend. 1; M.C.L.A. § 169.254(1).

19 Cases that cite this headnote

**[5]**   **Constitutional Law**  ↦  Corporate expenditures

**Election Law**  ↦  Corporations

Michigan statute prohibiting corporation from making independent expenditures on behalf of political candidates from general treasury is sufficiently narrowly tailored to achieve its goal as it does not impose an absolute ban on all forms of corporate political spending and permits corporations to make independent political expenditures from separate segregated funds. U.S.C.A. Const.Amend. 1; M.C.L.A. § 169.254(1).

58 Cases that cite this headnote

**[6]**   **Constitutional Law**  ↦  Corporate expenditures

**Election Law**  ↦  Corporations

Michigan statute prohibiting corporation from making independent expenditures on behalf of political candidate from its general treasury may constitutionally be applied to nonprofit corporation. U.S.C.A. Const.Amend. 1; M.C.L.A. § 169.254(1).

15 Cases that cite this headnote

**[7]**   **Election Law**  ↦  Corporations

Fact that Michigan statute prohibiting expenditures from general treasury of corporations for political candidates does not preclude such expenditures by labor unions does not make the statute underinclusive. M.C.L.A. § 169.254(1).

10 Cases that cite this headnote

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

**[8]**   **Labor and Employment** 🔑 Use of Funds

Although union and employer may require that all bargaining unit employees become union members, union may not compel those employees to support union activities beyond those germane to collective bargaining, contract administration, and grievance administration.

4 Cases that cite this headnote

**[9]**   **Labor and Employment** 🔑 Political activities

Employee who objects to union's political activities can decline to contribute to those activities while continuing to enjoy the benefits derived from the union's performance of its duties as the exclusive representative of the bargaining unit on labor-management issues.

2 Cases that cite this headnote

**[10]**   **Constitutional Law** 🔑 Narrow tailoring

   **Constitutional Law** 🔑 Strict or exacting scrutiny;  compelling interest test

Statutory classifications impinging upon First Amendment rights must be narrowly tailored to serve a compelling governmental interest. U.S.C.A. Const.Amend. 1.

60 Cases that cite this headnote

**[11]**   **Constitutional Law** 🔑 Contributions and expenditures

   **Election Law** 🔑 Corporations

Michigan statute prohibiting corporations from making independent expenditures on behalf of political candidates from general treasury does not deny equal protection to corporations even though the same restrictions are not placed on unincorporated associations which have the ability to accumulate large treasuries. U.S.C.A. Const.Amend. 1; M.C.L.A. § 169.254(1).

56 Cases that cite this headnote

**[12]**   **Constitutional Law** 🔑 Contributions and expenditures

Exemption of media corporations from application of state statute prohibiting independent political expenditures on behalf of candidates by corporations required justification by compelling state purpose. U.S.C.A. Const.Amend. 14; M.C.L.A. §§ 169.206(3)(d), 169.254(1).

25 Cases that cite this headnote

**[13]**   **Constitutional Law** 🔑 Contributions and expenditures

   **Election Law** 🔑 Corporations

Exemption of media corporations from general prohibition of Michigan statute on use of corporate treasury funds for independent expenditures in support of political candidates did not violate equal protection guarantees, as media corporations differ significantly from other corporations in that their resources are devoted to the collection of information and its dissemination to the public. U.S.C.A. Const.Amend. 14; M.C.L.A. §§ 169.206(3)(d), 169.254(1).

Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990)

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

18 Cases that cite this headnote

**1393  *Syllabus* [*]

**652**  Appellee Michigan State Chamber of Commerce (Chamber) is a nonprofit corporation, whose bylaws set forth both political and nonpolitical purposes. Its general treasury is funded through annual dues required of all members, three-quarters of whom are for-profit corporations. Section 54(1) of the Michigan Campaign Finance Act prohibits corporations, excluding media corporations, from using general treasury funds for, *inter alia,* independent expenditures in connection with state candidate elections. However, they may make such expenditures from segregated funds used solely for political purposes. Because the Chamber wished to use general treasury funds to place a local newspaper advertisement in support of a specific candidate for state office, it brought suit in the Federal District Court for injunctive relief against § 54(1)'s enforcement, arguing that the expenditure restriction is unconstitutional under the First and Fourteenth Amendments. The court upheld the section, but the Court of Appeals reversed, reasoning that, as applied to the Chamber, § 54(1) violated the First Amendment.

*Held:*

1. Section 54(1) does not violate the First Amendment. Pp. 1396–1401.

(a) Although § 54(1)'s requirements burden the Chamber's exercise of political expression, see *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 252, 107 S.Ct. 616, 624, 93 L.Ed.2d 539 (*MCFL* ), they are justified by a compelling state interest: preventing corruption or the appearance of corruption in the political arena by reducing the threat that huge corporate treasuries, which are amassed with the aid of favorable state laws and have little or no correlation to the public's support for the corporation's political  **1394**  ideas, will be used to influence unfairly election outcomes. Pp. 1396–1398.

(b) Section 54(1) is sufficiently narrowly tailored to achieve its goal, because it is precisely targeted to eliminate the distortion caused by corporate spending while also allowing corporations to express their political views by making expenditures through separate segregated funds. Because persons who contribute to segregated funds understand that their money will be used solely for political purposes, the speech generated accurately reflects contributors' support for the corporation's political views. The fact that § 54(1) covers closely held corporations that  **653**  do not possess vast reservoirs of capital does not make it substantially overinclusive, because all corporations receive the special benefits conferred by the corporate form and thus present the potential for distorting the political process. Cf. *FEC v. National Right to Work Committee,* 459 U.S. 197, 209–210, 103 S.Ct. 552, 555–556, 74 L.Ed.2d 364. P. 1398.

(c) There is no merit to the Chamber's argument that even if § 54(1) is constitutional with respect to for-profit corporations, it cannot be applied to a nonprofit ideological corporation such as itself. The Chamber does not exhibit the crucial features identified in *MCFL, supra,* that would require the State to exempt it from independent spending burdens as a nonprofit corporation more akin to a voluntary political association than a business firm. MCFL's narrow focus on the promotion of political ideas ensured that its resources reflected political support, while the Chamber's more varied bylaws do not. Additionally, unlike MCFL members, the Chamber's members are similar to shareholders—who have an economic disincentive for disassociating with a corporation even if they disagree with its political activity—in that they may be reluctant to withdraw from the Chamber because they wish to benefit from its nonpolitical programs and to establish contacts with other members of the business community. Also in contrast to MCFL, which took no contributions from business corporations, more than three-quarters of the Chamber's members are business corporations, whose political contributions and expenditures can constitutionally be regulated by the State, and who thus could circumvent § 54(1)'s restriction by funneling money through the Chamber's general treasury. Pp. 1398–1400.

AR.04051

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

(d) Section 54(1) is not rendered underinclusive by its failure to regulate the independent expenditures of unincorporated labor unions that also have the capacity to accumulate wealth, because the exclusion does not undermine the State's compelling interest in regulating corporations whose unique form enhances such capacity. Moreover, because members who disagree with a union's political activities can decline to contribute to them without giving up other membership benefits, a union's political funds more accurately reflect members' support for the organization's political views than does a corporation's general treasury. Pp. 1400–1401.

2. Section 54(1) does not violate the Equal Protection Clause of the Fourteenth Amendment. Even under strict scrutiny, its classifications pass muster. The State's decision to regulate corporations and not unincorporated associations is precisely tailored to serve its compelling interest. Similarly, the exemption of media corporations does not render the section unconstitutional. Restrictions on the expenditures of corporations whose resources are devoted to the collection and dissemination of information to the public might discourage news broadcasters or  **654**  publishers from serving their crucial societal role of reporting on and publishing editorials about newsworthy events; thus, their exemption from the section's restriction is justified. Pp. 1401–1402.

🚩 856 F.2d 783 (CA6 1988), reversed.

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined. BRENNAN, J., *post*, p. 1402, and STEVENS, J., *post*, p.  **1395**  1407, filed concurring opinions. SCALIA, J., filed a dissenting opinion, *post*, p. 1408. KENNEDY, J., filed a dissenting opinion, in which O'CONNOR and SCALIA, JJ., joined, *post*, p. 1416.

### Attorneys and Law Firms

*Louis J. Caruso,* Solicitor General of Michigan, argued the cause for appellants. With him on the briefs were *Frank J. Kelley,* Attorney General, *pro se, Thomas L. Casey,* Assistant Solicitor General, and *Gary P. Gordon* and *Richard P. Gartner,* Assistant Attorneys General.

*Richard D. McLellan* argued the cause for appellee. With him on the brief were *Joel M. Boyden, William J. Perrone,* and *Cindy M. Wilder.**

* Briefs of *amici curiae* urging reversal were filed for the Federal Election Commission by *Lawrence M. Noble* and  *Richard B. Bader;* and for Common Cause by *Roger M. Witten,* Carol F. Lee, and *Archibald Cox.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union by *Arthur B. Spitzer, John A. Powell,* and *Joel M. Gora;* for the American Medical Association et al. by *Michael A. Nemeroff, Carter G. Phillips,* and *Mark D. Hopson;* for the Center for Public Interest Law by *Robert C. Fellmeth;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar.*

*Thomas J. Hart* filed a brief of *amici curiae* for the National Organization for Women et al.

### Opinion

Justice MARSHALL delivered the opinion of the Court.

In this appeal, we must determine whether § 54(1) of the Michigan Campaign Finance Act, 1976 Mich.Pub. Acts 388, violates either the First or the Fourteenth Amendment to the Constitution. Section 54(1) prohibits corporations from using corporate treasury funds for independent expenditures in support of, or in opposition to, any candidate in elections for state office. 📄 Mich.Comp. Laws § 169.254(1) (1979). Corporations  **655**  are allowed, however, to make such expenditures from segregated funds used solely for political purposes. § 169.255(1). In response to a challenge brought by the Michigan State

Chamber of Commerce (Chamber), the Sixth Circuit held that § 54(1) could not be applied to the Chamber, a Michigan nonprofit corporation, without violating the First Amendment. 856 F.2d 783 (1988). Although we agree that expressive rights are implicated in this case, we hold that application of § 54(1) to the Chamber is constitutional because the provision is narrowly tailored to serve a compelling state interest. Accordingly, we reverse the judgment of the Court of Appeals.

## I

Section 54(1) of the Michigan Campaign Finance Act prohibits corporations from making contributions and independent expenditures in connection with state candidate elections. [1] The issue before us is only the constitutionality of the State's ban on independent expenditures. The Act defines "expenditure" as "a payment, donation, loan, pledge, or promise of payment of money or anything of ascertainable monetary value for goods, materials, services, or facilities in assistance of, or in opposition to, the nomination or election of a candidate." § 169.206(1). An expenditure is considered independent if it is "not made at the direction of, or under the control of, another person and if the expenditure is not a contribution to a committee." § 169.209(1); see § 169.203(4) (defining "committee" as a group that "receives contributions or makes expenditures for the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate"). The Act exempts from this general prohibition against corporate political spending any expenditure made from a segregated fund. **\*656** § 169.255(1). A corporation may solicit contributions to its political fund only from an enumerated list of persons associated with the corporation. See §§ 169.255(2), (3).

The Chamber, a nonprofit Michigan corporation, challenges the constitutionality of this statutory scheme. The Chamber comprises more than 8,000 members, three-quarters of whom are for-profit corporations. The Chamber's general treasury is funded through annual dues required of all members. Its purposes, as set out in the bylaws, are to promote economic conditions favorable to private enterprise; to analyze, compile, and disseminate information about laws of interest to the business community and to publicize to the government the views of the business community on such matters; to train and educate its members; to foster ethical business practices; to collect data on, and investigate matters of, social, civic, and economic importance to the State; to receive contributions and to make expenditures for political purposes and to perform any other **\*\*1396** lawful political activity; and to coordinate activities with other similar organizations.

In June 1985 Michigan scheduled a special election to fill a vacancy in the Michigan House of Representatives. Although the Chamber had established and funded a separate political fund, it sought to use its general treasury funds to place in a local newspaper an advertisement supporting a specific candidate. As the Act made such an expenditure punishable as a felony, see § 169.254(5), the Chamber brought suit in District Court for injunctive relief against enforcement of the Act, arguing that the restriction on expenditures is unconstitutional under both the First and the Fourteenth Amendments.

The District Court upheld the statute. 643 F.Supp. 397 (WD Mich.1986). The Sixth Circuit reversed, reasoning that the expenditure restrictions as applied to the Chamber, violated the First Amendment. We noted probable jurisdiction, 490 U.S. 1045, 109 S.Ct. 1952, 104 L.Ed.2d 421 (1989), and now reverse.

## \*657 II

**[1]** **[2]** To determine whether Michigan's restriction on corporate political expenditures may constitutionally be applied to the Chamber, we must ascertain whether it burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest. Buckley v. Valeo, 424 U.S. 1, 44–45, 96 S.Ct. 612, 646–647, 46 L.Ed.2d 659 (1976) (per curiam). Certainly, the use of funds to support a political candidate is "speech"; independent campaign expenditures constitute "political expression 'at the core of our electoral process and of the First Amendment freedoms.' " Id., at 39, 96 S.Ct., at

644 (quoting *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968)). The mere fact that the Chamber is a corporation does not remove its speech from the ambit of the First Amendment. See, *e.g., First National Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978).

## A

This Court concluded in *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL* ), that a federal statute requiring corporations to make independent political expenditures only through special segregated funds, 2 U.S.C. § 441b, burdens corporate freedom of expression. *MCFL,* 479 U.S., at 252, 107 S.Ct., at 624 (plurality opinion); *id.,* at 266, 107 S.Ct., at 632 (O'CONNOR, J., concurring in part and concurring in judgment). The Court reasoned that the small nonprofit corporation in that case would face certain organizational and financial hurdles in establishing and administering a segregated political fund. For example, the statute required the corporation to appoint a treasurer for its segregated fund, keep records of all contributions, file a statement of organization containing information about the fund, and update that statement periodically. *Id.,* at 253, 107 S.Ct., at 625 (plurality opinion). In addition, the corporation was permitted to solicit contributions to its segregated fund only from "members," which did not include persons who merely contributed to or indicated support for the organization. *Id.,* at 254, 107 S.Ct., at 626 (plurality opinion). **\*658** These hurdles "impose[d] administrative costs that many small entities [might] be unable to bear" and "create[d] a disincentive for such organizations to engage in political speech." *Ibid*; see also *id.,* at 265–266, 107 S.Ct., at 631–632 (O'CONNOR, J.).

**[3]** Despite the Chamber's success in administering its separate political fund, see, *e.g.,* Tr. 443 (Chamber expected to have over \$140,000 in its segregated fund available for use in the 1986 elections), Michigan's segregated fund requirement still burdens the Chamber's exercise of expression because "the corporation is *not* free to use its general funds for campaign advocacy purposes." *MCFL,* 479 U.S., at 252, 107 S.Ct., at 624 **\*\*1397** (plurality opinion). The Act imposes requirements similar to those in the federal statute involved in *MCFL*: a segregated fund must have a treasurer, § 169.221; and its administrators must keep detailed accounts of contributions, § 169.224, and file with state officials a statement of organization, *ibid.* In addition, a nonprofit corporation like the Chamber may solicit contributions to its political fund only from members, stockholders of members, officers or directors of members, and the spouses of any of these persons. § 169.255. Although these requirements do not stifle corporate speech entirely, they do burden expressive activity. See *MCFL,* 479 U.S., at 252, 107 S.Ct., at 624 (plurality opinion); *id.,* at 266, 107 S.Ct., at 632 (O'CONNOR, J.). Thus, they must be justified by a compelling state interest.

## B

The State contends that the unique legal and economic characteristics of corporations necessitate some regulation of their political expenditures to avoid corruption or the appearance of corruption. See *FEC v. National Conservative Political Action Committee,* 470 U.S. 480, 496–497, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985) (*NCPAC* ) ("[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances"). State law grants corporations special advantages—such as limited liability, perpetual life, and favorable **\*659** treatment of the accumulation and distribution of assets—that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments. These state-created advantages not only allow corporations to play a dominant role in the Nation's economy, but also permit them to use "resources amassed in the economic

marketplace" to obtain "an unfair advantage in the political marketplace." *MCFL,* 479 U.S., at 257, 107 S.Ct., at 627. As the Court explained in *MCFL,* the political advantage of corporations is unfair because

> "[t]he resources in the treasury of a business corporation ... are not an indication of popular support for the corporation's political ideas. They reflect instead the economically motivated decisions of investors and customers. The availability of these resources may make a corporation a formidable political presence, even though the power of the corporation may be no reflection of the power of its ideas." *Id.,* at 258, 107 S.Ct., at 628.

We therefore have recognized that "the compelling governmental interest in preventing corruption support[s] the restriction of the influence of political war chests funneled through the corporate form." *NCPAC, supra,* 470 U.S., at 500–501, 105 S.Ct., at 1470; see also *MCFL, supra,* 479 U.S., at 257, 107 S.Ct., at 627.

 **[4]**    The Chamber argues that this concern about corporate domination of the political process is insufficient to justify a restriction on independent expenditures. Although this Court has distinguished these expenditures from direct contributions in the context of federal laws regulating individual donors, *Buckley,* 424 U.S., at 47, 96 S.Ct., at 648, it has also recognized that a legislature might demonstrate a danger of real or apparent corruption posed by such expenditures when made by corporations to influence candidate elections, *Bellotti, supra,* 435 U.S., at 788, n. 26, 98 S.Ct., at 1422, n. 26. Regardless of whether this danger of "financial *quid pro quo* " corruption, see *NCPAC, supra,* 470 U.S., at 497, 105 S.Ct., at 1468; *post,* at 1420–1421 (KENNEDY, J., dissenting), may be sufficient to justify a restriction on independent expenditures, Michigan's regulation **\*660** aims at a different type of corruption in the political arena: the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas. See *supra,* at 1397. The Act does not attempt "to equalize the relative influence of speakers on elections," **\*\*1398** *post,* at 1421 (KENNEDY, J., dissenting); see also *post,* at 1411 (SCALIA, J., dissenting); rather, it ensures that expenditures reflect actual public support for the political ideas espoused by corporations. We emphasize that the mere fact that corporations may accumulate large amounts of wealth is not the justification for § 54; rather, the unique state-conferred corporate structure that facilitates the amassing of large treasuries warrants the limit on independent expenditures. Corporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures, just as it can when it assumes the guise of political contributions. We therefore hold that the State has articulated a sufficiently compelling rationale to support its restriction on independent expenditures by corporations.

C

 **[5]**    We next turn to the question whether the Act is sufficiently narrowly tailored to achieve its goal. We find that the Act is precisely targeted to eliminate the distortion caused by corporate spending while also allowing corporations to express their political views. Contrary to the dissents' critical assumptions, see *post,* at 1418, 1419, 1422 (KENNEDY, J.); *post,* at 1408, 1409–1410 (SCALIA, J.), the Act does not impose an *absolute* ban on all forms of corporate political spending but permits corporations to make independent political expenditures through separate segregated funds. Because persons contributing to such funds understand that their money will be used solely for political purposes, the speech generated accurately reflects contributors' support **\*661** for the corporation's political views. See *MCFL, supra,* 479 U.S., at 258, 107 S.Ct., at 628.

The Chamber argues that § 54(1) is substantially overinclusive, because it includes within its scope closely held corporations that do not possess vast reservoirs of capital. We rejected a similar argument in *FEC v. National Right to Work Committee,* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (*NRWC* ), in the context of federal restrictions on the persons from whom corporations could solicit contributions to their segregated funds. The Court found that the federal campaign statute, 2 U.S.C.

§ 441b, "reflect[ed] a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation. While § 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress' judgment that it is the *potential* for such influence that demands regulation." 459 U.S., at 209–210, 103 S.Ct., at 555–556 (citation omitted; emphasis added). Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process. This potential for distortion justifies § 54(1)'s general applicability to all corporations. The section therefore is not substantially overbroad.

III

[6] The Chamber contends that even if the Campaign Finance Act is constitutional with respect to for-profit corporations, it nonetheless cannot be applied to a nonprofit ideological corporation like a chamber of commerce. In *MCFL*, we held that the nonprofit organization there had "features more akin to voluntary political associations than business firms, and therefore should not have to bear burdens on independent spending solely because of [its] incorporated status." 479 U.S., at 263, 107 S.Ct., at 630. In reaching that conclusion, we enumerated *662 three characteristics of the corporation that were "essential" to our holding. *Ibid.* Because the Chamber does not share these crucial features, the Constitution does not require that it be exempted from the generally applicable provisions of § 54(1).

**1399 The first characteristic of Massachusetts Citizens for Life, Inc., that distinguished it from ordinary business corporations was that the organization "was formed for the express purpose of promoting political ideas, and cannot engage in business activities." *Id., at 264, 107 S.Ct., at 631.* Its articles of incorporation indicated that its purpose was "[t]o foster respect for human life and to defend the right to life of all human beings, born and unborn, through educational, political and other forms of activities," *id., at 241–242, 107 S.Ct., at 619,* and all of the organization's activities were "designed to further its agenda," *id., at 242, 107 S.Ct., at 619.* MCFL's narrow political focus thus "ensure[d] that [its] political resources reflect[ed] political support." *Id., at 264, 107 S.Ct., at 631.*

In contrast, the Chamber's bylaws set forth more varied purposes, see *supra,* at 1395–1396, several of which are not inherently political. For instance, the Chamber compiles and disseminates information relating to social, civic, and economic conditions, trains and educates its members, and promotes ethical business practices. Unlike MCFL's, the Chamber's educational activities are not expressly tied to political goals; many of its seminars, conventions, and publications are politically neutral and focus on business and economic issues. The Chamber's president and chief executive officer stated that one of the corporation's main purposes is to provide "service to [its] membership that includes everything from group insurance to educational seminars, and ... litigation activities on behalf of the business community." Deposition of E. James Barrett, Nov. 12, 1985, p. 11. See also PR Newswire, July 21, 1989 (Chamber cosponsored the Automotive Management Briefing Seminar); PR Newswire, May 9, 1989 (Chamber cosponsored the Michigan New Product Awards *663 competition); PR Newswire, June 14, 1988 (Chamber sponsored seminar on product liability losses and lawsuits); PR Newswire, Feb. 4, 1988 (Chamber cosponsored outreach program to increase awareness of investment opportunities in the Caribbean Basin). The Chamber's nonpolitical activities therefore suffice to distinguish it from MCFL in the context of this characteristic.

We described the second feature of MCFL as the absence of "shareholders or other persons affiliated so as to have a claim on its assets or earnings. This ensures that persons connected with the organization will have no economic disincentive for disassociating with it if they disagree with its political activity." 479 U.S., at 264, 107 S.Ct., at 631. Although the Chamber also lacks shareholders, many of its members may be similarly reluctant to withdraw as members even if they disagree with the Chamber's political expression, because they wish to benefit from the Chamber's nonpolitical programs and to establish contacts

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

with other members of the business community. The Chamber's political agenda is sufficiently distinct from its educational and outreach programs that members who disagree with the former may continue to pay dues to participate in the latter. Justice KENNEDY ignores these disincentives for withdrawing as a member of the Chamber, stating only that "[o]ne need not become a member ... to earn a living." *Post,* at 1424 (KENNEDY, J., dissenting). Certainly, members would be disinclined to terminate their involvement with the organization on the basis of less extreme disincentives than the loss of employment. Thus, we are persuaded that the Chamber's members are more similar to shareholders of a business corporation than to the members of MCFL in this respect. [2]

**\*\*1400  \*664**  The final characteristic upon which we relied in *MCFL* was the organization's independence from the influence of business corporations. On this score, the Chamber differs most greatly from the Massachusetts organization. MCFL was not established by, and had a policy of not accepting contributions from, business corporations. Thus it could not "serv[e] as [a] condui[t] for the type of direct spending that creates a threat to the political marketplace." 479 U.S., at 264, 107 S.Ct., at 631. In striking contrast, more than three-quarters of the Chamber's members are business corporations, whose political contributions and expenditures can constitutionally be regulated by the State. See *Buckley v. Valeo,* 424 U.S., at 29, 96 S.Ct., at 639 (upholding restrictions on political contributions); *supra,* at 1397–1398 (regarding independent expenditures). As we read the Act, a corporation's payments into the Chamber's general treasury would not be considered payments to influence an election, so they would not be "contributions" or "expenditures," see §§ 169.204(1), 169.206, and would not be subject to the Act's limitations. Business corporations therefore could circumvent the Act's restriction by funneling money through the Chamber's general treasury. [3]  Because the Chamber accepts money from for-profit corporations, it could, absent application of § 54(1), serve as a conduit for corporate political spending. In sum, the Chamber does not possess the features  **\*665**  that would compel the State to exempt it from restriction on independent political expenditures.

IV

[7]  The Chamber also attacks § 54(1) as underinclusive because it does not regulate the independent expenditures of unincorporated labor unions. [4]  Whereas unincorporated unions, and indeed individuals, may be able to amass large treasuries, they do so without the significant state-conferred advantages of the corporate structure; corporations are "by far the most prominent example of entities that enjoy legal advantages enhancing their ability to accumulate wealth." *MCFL,* 479 U.S., at 258, n. 11, 107 S.Ct., at 628, n. 11. The desire to counterbalance those advantages unique to the corporate form is the State's compelling interest in this case; thus, excluding from the statute's coverage unincorporated entities that also have the capacity to accumulate wealth "does not undermine its justification for regulating corporations." *Ibid.*

[8]  [9]  Moreover, labor unions differ from corporations in that union members who disagree with a union's political activities need not give up full membership in the organization to avoid supporting its political activities. Although a union and an employer may require that all bargaining unit employees become union members, a union may not compel those employees to support financially "union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment." *Communications Workers v. Beck,* 487 U.S. 735, 745, 108 S.Ct. 2641, 2648, 101 L.Ed.2d 634 (1988). See also *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (holding that compelling nonmember employees to contribute to union's political activities infringes employees' First Amendment rights). An employee who objects to a union's political activities thus can decline to contribute to those activities, while continuing to enjoy the  **\*666**  benefits derived from the  **\*\*1401**  union's performance of its duties as the exclusive representative of the bargaining unit on labor-management issues. As a result, the funds available for a union's political activities more accurately reflects members' support for the organization's political views than does a corporation's general treasury. Michigan's decision to exclude unincorporated labor unions from the scope of § 54(1) is therefore justified by the crucial differences between unions and corporations.

**Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990)**
Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 217 of 1384

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

V

Because we hold that § 54(1) does not violate the First Amendment, we must address the Chamber's contention that the provision infringes its rights under the Fourteenth Amendment. The Chamber argues that the statute treats similarly situated entities unequally. Specifically, it contends that the State should also restrict the independent expenditures of unincorporated associations with the ability to accumulate large treasuries and of corporations engaged in the media business.

 **[10]**    **[11]**    Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest. *Police Department of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972). We find that, even under such strict scrutiny, the statute's classifications pass muster under the Equal Protection Clause. As we explained in the context of our discussions of whether the statute was overinclusive, *supra,* at 1397–1398, or underinclusive, *supra,* at 1400–1401, the State's decision to regulate only corporations is precisely tailored to serve the compelling state interest of eliminating from the political process the corrosive effect of political "war chests" amassed with the aid of the legal advantages given to corporations.

 **[12]**    Similarly, we find that the Act's exemption of media corporations from the expenditure restriction does not render the statute unconstitutional. The "media exception" excludes **\*667** from the definition of "expenditure" any "expenditure by a broadcasting station, newspaper, magazine, or other periodical or publication for any news story, commentary, or editorial in support of or opposition to a candidate for elective office ... in the regular course of publication or broadcasting," § 169.206(3) (d). [5]  The Court of Appeals did not address the Chamber's equal protection argument because it found that the application of § 54(1) to the Chamber violates the First Amendment. See 856 F.2d, at 790. The District Court, however, appeared to hold that the media exception does not implicate the Equal Protection Clause because "[a]ny corporation ... may avail itself of the exemption" by entering the news broadcasting or publishing business. 643 F.Supp., at 405. We are persuaded, however, that a Fourteenth Amendment analysis is necessary in this case. It is true that the exemption does not refer expressly to "media corporations." Nevertheless, the exception will undoubtedly result in the imposition of fewer restrictions on the expression of corporations that are in the media business. Thus, it cannot be regarded as neutral, and the distinction must be justified by a compelling state purpose.

 **[13]**    Although all corporations enjoy the same state-conferred benefits inherent in the corporate form, media corporations differ significantly from other corporations in that their resources are devoted to the collection of information and its dissemination to the **\*\*1402** public. We have consistently recognized the unique role that the press plays in "informing and educating the public, offering criticism, and providing a forum for discussion and debate." *Bellotti,* 435 U.S., at 781, 98 S.Ct., at 1418. See also *Mills v. Alabama,* 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966) **\*668** "[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve"). The Act's definition of "expenditure," § 169.206, conceivably could be interpreted to encompass election-related news stories and editorials. The Act's restriction on independent expenditures therefore might discourage incorporated news broadcasters or publishers from serving their crucial societal role. The media exception ensures that the Act does not hinder or prevent the institutional press from reporting on, and publishing editorials about, newsworthy events. Cf. H.R.Rep. No. 93–1239, p. 4 (1974)H.R.Rep. No. 93–1239, p. 4 (1974) (explaining a similar federal media exception, 2 U.S.C. § 431(9)(B)(i), as "assur[ing] the unfettered right of the newspapers, TV networks, and other media to cover and comment on political campaigns"); 15 U.S.C. §§ 1801–1804 (enacting a limited exemption from the antitrust laws for newspapers in part because of the recognition of the special role of the press). A valid distinction thus exists between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public. Although the press' unique societal role may not entitle the press to greater protection under the Constitution, *Bellotti, supra,* 435 U.S., at 782, and n. 18, 98 S.Ct., at 1418, and

n. 18, it does provide a compelling reason for the State to exempt media corporations from the scope of political expenditure limitations. We therefore hold that the Act does not violate the Equal Protection Clause.

VI

Michigan identified as a serious danger the significant possibility that corporate political expenditures will undermine the integrity of the political process, and it has implemented a narrowly tailored solution to that problem. By requiring corporations to make all independent political expenditures **\*669** through a separate fund made up of money solicited expressly for political purposes, the Michigan Campaign Finance Act reduces the threat that huge corporate treasuries amassed with the aid of favorable state laws will be used to influence unfairly the outcome of elections. The Michigan Chamber of Commerce does not exhibit the characteristics identified in *MCFL* that would require the State to exempt it from a generally applicable restriction on independent corporate expenditures. We therefore reverse the decision of the Court of Appeals.

*It is so ordered.*

Justice BRENNAN, concurring.

I join the Court's opinion. As one of the "Orwellian" "censor[s]" derided by the dissents, *post,* at 1408 (SCALIA, J.); *post,* at 1426 (KENNEDY, J.), and as the author of our recent decision in *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL* ), I write separately to explain my views in this case.

The Michigan law at issue is not an across-the-board prohibition on political participation by corporations or even a complete ban on corporate political expenditures. Rather, the statute merely requires those corporations wishing to make independent expenditures in support of candidates to do so through segregated funds or political action committees (PAC's) rather than directly from their corporate treasuries.[1] As the dissents observe, this restriction still must be **\*\*1403** analyzed with great solicitude and care, because independent expenditures constitute expression " 'at the core of our electoral process and of the First Amendment freedoms.' " *Buckley v. Valeo,* 424 U.S. 1, 39, 96 S.Ct. 612, 644, 46 L.Ed.2d 659 (1976) (*per curiam* ) (quoting **\*670** *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968)). I believe, however, that the dissents significantly overstate their case in several important respects and that the Court's decision today is faithful to our prior opinions in the campaign financing area, particularly *MCFL.*

In *MCFL,* we held that a provision of the Federal Election Campaign Act of 1971 (FECA), as added, 90 Stat. 490, and amended, 2 U.S.C. § 441b, similar to the Michigan law at issue here, could not be applied constitutionally to a small, antiabortion advocacy group. In evaluating the First Amendment challenge, however, we "acknowledge[d] the legitimacy of Congress' concern that organizations that amass great wealth in the economic marketplace not gain unfair advantage in the political marketplace." 479 U.S., at 263, 107 S.Ct., at 630. Specifically, we noted that "*[d]irect corporate spending* on political activity raises the prospect that resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace," because "[t]he resources in the treasury of a business corporation ... are not an indication of popular support for the corporation's political ideas." *Id.,* at 257–258, 107 S.Ct., at 627–28 (emphasis added). Instead, these resources reflect "the economically motivated decisions of investors and customers." *Id.,* at 258, 107 S.Ct., at 628. A stockholder might oppose the use of corporate funds drawn from the general treasury—which represents, after all, *his* money—in support of a particular political candidate. See *id.,* at 260, 107 S.Ct., at 629, citing *FEC v. National Right to Work Committee,* 459 U.S. 197, 208, 103 S.Ct. 552, 559, 74 L.Ed.2d 364 (1982), and *Pipefitters v. United States,* 407 U.S. 385, 414–415, 92 S.Ct. 2247, 2264, 33 L.Ed.2d 11 (1972). The requirement that corporate independent expenditures be financed through a segregated

fund or PAC expressly established to engage in campaign spending is designed to avert this danger. "The resources available to [a PAC], as opposed to the corporate treasury, in fact reflect popular support for the political positions of the committee."

*MCFL,* 479 U.S., at 258, 107 S.Ct., at 628. We thus adopted the " 'underlying theory' " of FECA " 'that substantial general purpose **\*671** treasuries should not be diverted to political purposes' " and that requiring funding by voluntary contributions guarantees that " 'the money collected is that intended by those who contribute to be used for political purposes and not money diverted from another source.' " *Ibid.* (quoting 117 Cong.Rec. 43381 (1971) (statement of Rep. Hansen)). [2]

**\*\*1404** The PAC requirement may be unconstitutional as applied to some corporations because they do not present the dangers at which expenditure limitations are aimed. Indeed, we determined that Massachusetts Citizens for Life—the antiabortion advocacy organization at issue in *MCFL*—fell into this category. [3] We nevertheless predicted that the **\*672** class of exempt organizations would be small, see 479 U.S., at 264, 107 S.Ct., at 631, and we set out three features of MCFL that were "essential" to our holding that it could not be bound by the restriction on independent spending. *Id.,* at 263, 107 S.Ct., at 630. First, the group "was formed for the express purpose of promoting political ideas, and [could not] engage in business activities." *Id.,* at 264, 107 S.Ct., at 631. Second, it "ha[d] no shareholders or other persons affiliated so as to have a claim on its assets or earnings. This ensure[d] that persons connected with the organization [had] no economic disincentive for disassociating with it if they disagree[d] with its political activity." *Ibid.* (footnote omitted). Third, the group "was not established by a business corporation or a labor union, and it [was] its policy not to accept contributions from such entities. This prevent[ed it] from serving as [a] condui[t] for the type of direct spending that creates a threat to the political marketplace." *Ibid.*

The majority today persuasively demonstrates that the situation in this case is markedly different from that in *MCFL.* The Michigan State Chamber of Commerce (Chamber) is first and foremost a business association, not a political advocacy organization. See *ante,* at 1398–1400. The Michigan statute advances the interest identified in *MCFL* in two distinct ways, by preventing both the Chamber *and other business corporations* from using the funds of other persons for purposes that those persons may not support. First, the state law protects the small businessperson who does not wish his or her dues to be spent in support of political candidates, but who nevertheless wishes to maintain an association with the Chamber because of the myriad benefits it provides that are **\*673** unrelated to its political activities. See *ante,* at 1399–1400. The bylaws state that the Chamber's "objectives and purposes" shall be in part "[t]o analyze, compile and disseminate information on laws and regulations of interest to the members" and "[t]o further the training and education of the membership by means of educational materials, seminars, conventions, bulletins, newsletters, reports and technical materials." App. 43a. To attract new members, Chamber advertisements promise a wide variety of services, including "regular and special publications, legislative briefings, group insurance, a business hot-line, and seminars." *Id.,* at 42a. Its advertising practices indicate that even the Chamber understands that membership is not a function of support for its political causes alone. A member faces significant disincentives to withdraw, even if he disagrees with the Chamber's expenditures in support of a particular candidate.

**\*\*1405** In addition, the Michigan law protects dissenting shareholders of business corporations that are members of the Chamber to the extent that such shareholders oppose the use of their money, paid as dues to the Chamber out of general corporate treasury funds, for political campaigns. See *MCFL, supra,* at 260–261, 107 S.Ct., at 629; cf. *post,* at 1411–1412 (SCALIA, J., dissenting). The Michigan law prevents the Chamber from "serv[ing] as a conduit for corporate political spending." *Ante,* at 1400. Even Justice KENNEDY, by repeatedly using the qualifier "nonprofit" throughout his opinion, appears to concede that the Michigan law legitimately may be applied to for-profit business corporations, or at least that the Court's rationale might "suffice to justify restricting political speech by for-profit corporations." *Post,* at 1420–1421 (dissenting opinion). If that is so, Justice KENNEDY's failure to sustain the statute as applied in this case is perplexing, because the Chamber, unlike other nonprofits such as MCFL, is clearly a conduit for corporations barred from making independent expenditures **\*674** directly. [4] A corporation cannot under Michigan law make a contribution to a PAC out of its general treasury funds, see *ante,* at 1400, n. 3, and we have upheld similar rules restricting the groups from whom PAC's may solicit contributions. See *FEC v. National*

*Right to Work Committee,* 459 U.S., at 207–211, 103 S.Ct., at 559–561; *California Medical Assn. v. FEC,* 453 U.S. 182, 193–199, 101 S.Ct. 2712, 2720–2723, 69 L.Ed.2d 567 (1981) (plurality opinion). It is common ground that a segregated fund, even if it is a "nonprofit corporation," cannot be used as a conduit for independent expenditures by business corporations; I find it unremarkable that the Chamber and other nonprofits cannot perform such a function either.

Of course, a member could resign from the Chamber and a stockholder could divest from a business corporation that used the Chamber as a conduit, but these options would impose a financial sacrifice on those objecting to political expenditures.[5] See *MCFL,* 479 U.S., at 260, 107 S.Ct., at 629. It is therefore irrelevant that "[t]o the extent that members disagree with a nonprofit corporation's policies, they can seek change from within, withhold financial support, cease to associate with the group, or form a rival group of their own." *Post,* at 1424 (KENNEDY, J., dissenting). Moreover, none of the alternatives proposed by Justice KENNEDY would protect a captive **\*675** stockholder of a business corporation that used the Chamber as a conduit.[6] While the State may have no constitutional **\*\*1406** duty to protect the objecting Chamber member and corporate shareholder in the absence of state action, cf. *Abood v. Detroit Board of Education,* 431 U.S. 209, 232–237, 97 S.Ct. 1782, 1798–1800, 52 L.Ed.2d 261 (1977), the State surely has a compelling interest in preventing a corporation it has chartered from exploiting those who do not wish to contribute to the Chamber's political message. "A's right to receive information does not require the state to permit B to steal from C the funds that alone will enable B to make the communication." Brudney, Business Corporations and Stockholders' Rights Under the First Amendment, 91 Yale L.J. 235, 247 (1981). Cf. *Communications Workers v. Beck,* 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988); *Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). We have long recognized the importance of state corporate law in "protect[ing] the shareholders" of corporations chartered within the State. *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 91, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987).

The Michigan law is concededly "underinclusive" insofar as it does not ban other types of political expenditures to which **\*676** a dissenting Chamber member or corporate shareholder might object. See *post,* at 1411–1412 (SCALIA, J., dissenting). The particular provision at issue prohibits corporations from using treasury funds only for making independent expenditures in support of, or in opposition to, any candidate in state elections. See *ante,* at 1395. A corporation remains free, for example, to use general treasury funds to support an initiative proposal in a state referendum.[7] See *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

I do not find this underinclusiveness fatal, for several reasons.[8] First, as the dissents **\*\*1407** recognize, discussions on candidate elections **\*677** lie "at the heart of political debate." *Post,* at 1418 (KENNEDY, J.); see also *post,* at 1409, 1415 (SCALIA, J.). But just as speech interests are at their zenith in this area, so too are the interests of unwilling Chamber members and corporate shareholders forced to subsidize that speech. The State's decision to focus on this especially sensitive context is a justifiable one.[9] Cf. *MCFL,* 479 U.S., at 258, n. 11, 107 S.Ct., at 628, n. 11. Second, in light of our decisions in *Bellotti, supra,* *Consolidated Edison Co. of New York v. Public Service Comm'n of New York,* 447 U.S. 530, 533–535, 100 S.Ct. 2326, 2330–32, 65 L.Ed.2d 319 (1980), and related cases, a State cannot prohibit corporations from making many other types of political expenditures. One purpose of the underinclusiveness inquiry is to ensure that the proffered state interest actually underlies the law. See, *e.g.,* **\*678** *Florida Star v. B.J.F.,* 491 U.S. 524, 540, 109 S.Ct. 2603, 2613, 105 L.Ed.2d 443 (1989); *FCC v. League of Women Voters of California,* 468 U.S. 364, 396, 104 S.Ct. 3106, 3125, 82 L.Ed.2d 278 (1984). But to the extent that the Michigan statute is "underinclusive" only because it does not regulate corporate expenditures in referenda or other corporate expression (besides merely commercial speech), this reflects the requirements of our decisions rather than the lack of an important state interest on the part of Michigan in regulating expenditures in *candidate* elections. In this sense, the Michigan law is not "underinclusive" at all. Finally, the provision in Michigan corporate law authorizing shareholder actions

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 221 of 1384

against corporate waste might serve as a remedy for other types of political expenditures that have no legitimate connection to the corporation's business. See Mich.Comp. Laws § 600.3605(1)(b) (1979); [10] cf. Bellotti, supra, at 795, 98 S.Ct., at 1426.

For these reasons, I concur in the Court's opinion.

Justice STEVENS, concurring.

In my opinion the distinction between individual expenditures and individual contributions that the Court identified in Buckley v. Valeo, 424 U.S. 1, 45–47, 96 S.Ct. 612, 647–648, 46 L.Ed.2d 659 (1976), should have little, if any, weight in reviewing corporate participation in candidate elections. In that context, I believe the danger of either the fact, or the appearance, of *quid pro quo* relationships provides an adequate justification for state regulation of both expenditures and contributions. Moreover, as we recognized in First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), there is a vast difference between lobbying and debating public issues on the one hand, and political campaigns for election to public office on the other. [*] Accordingly, I join the Court's opinion and judgment.

**1408  *679  Justice SCALIA, dissenting.

"Attention all citizens. To assure the fairness of elections by preventing disproportionate expression of the views of any single powerful group, your Government has decided that the following associations of persons shall be prohibited from speaking or writing in support of any candidate: _____." In permitting Michigan to make private corporations the first object of this Orwellian announcement, the Court today endorses the principle that too much speech is an evil that the democratic majority can proscribe. I dissent because that *680  principle is contrary to our case law and incompatible with the absolutely central truth of the First Amendment: that government cannot be trusted to assure, through censorship, the "fairness" of political debate.

I

A

The Court's opinion says that political speech of corporations can be regulated because "[s]tate law grants [them] special advantages," *ante,* at 1397, and because this "unique state-conferred corporate structure ... facilitates the amassing of large treasuries," *ante,* at 1397–1398. This analysis seeks to create one good argument by combining two bad ones. Those individuals who form that type of voluntary association known as a corporation are, to be sure, given special advantages—notably, the immunization of their personal fortunes from liability for the actions of the association—that the State is under no obligation to confer. But so are other associations and private individuals given all sorts of special advantages that the State need not confer, ranging from tax breaks to contract awards to public employment to outright cash subsidies. It is rudimentary that the State cannot exact as the price of those special advantages the forfeiture of First Amendment rights. See Pickering v. Board of Education of Township High School Dist. No. 205, Will County, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). The categorical suspension of the right of any person, or of any association of persons, to speak out on political matters must be justified by a compelling state need. See **1409 Buckley v. Valeo, 424 U.S. 1, 44–45, 96 S.Ct. 612, 646–647, 46 L.Ed.2d 659 (1976) (*per curiam* ). That is why the Court puts forward its second bad argument, the fact that corporations "amas[s] large treasuries." But that alone is also not sufficient justification for the suppression of political speech, unless one thinks it would be lawful to prohibit men and women whose net worth is above a certain figure from endorsing political candidates. Neither of these two flawed arguments is *681  improved by combining

them and saying, as the Court in effect does, that "since the State gives special advantages to these voluntary associations, and since they thereby amass vast wealth, they may be required to abandon their right of political speech." *

The Court's extensive reliance upon the fact that the objects of this speech restriction, corporations, receive "special advantages" is in stark contrast to our opinion issued just six years ago in *FCC v. League of Women Voters of California,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). In that decision, striking down a congressionally imposed ban upon editorializing by noncommercial broadcasting stations that receive federal funds, the *only* respect in which we considered the receipt of that "special advantage" relevant was in determining whether the speech limitation could be justified under Congress' spending power, as a means of assuring that the subsidy was devoted only to the purposes Congress intended, which did not include political editorializing. We held it could not be justified on that basis, since "a noncommercial educational station that receives only 1% of its overall income from [federal] grants is barred absolutely from all editorializing.... The station has  **682** no way of limiting the use of its federal funds to all noneditorializing activities, and, more importantly, it is barred from using even wholly private funds to finance its editorial activity." *Id.,* at 400, 104 S.Ct., at 3127. Of course the same is true here, even assuming that tax exemptions and other benefits accorded to incorporated associations constitute an exercise of the spending power. It is not just that portion of the corporation's assets attributable to the gratuitously conferred "special advantages" that is prohibited from being used for political endorsements, but *all* of the corporation's assets. I am at a loss to explain the vast difference between the treatment of the present case and *League of Women Voters.* Commercial corporations may not have a public *persona* as sympathetic as that of public broadcasters, but they are no less entitled to this Court's concern.

As for the second part of the Court's argumentation, the fact that corporations (or at least some of them) possess "massive wealth": Certain uses of "massive wealth" in the electoral process—whether or not the wealth is the result of "special advantages" conferred by the State—pose a substantial risk of corruption which constitutes a compelling need for the regulation of speech. Such a risk plainly exists when the wealth is given directly to the political candidate, to be used under his direction and control. We held in *Buckley v. Valeo, supra,* however, that independent expenditures to express the political  **\*\*1410**  views of individuals and associations do not raise a sufficient threat of corruption to justify prohibition. *Id.,* at 45, 96 S.Ct., at 647. Neither the Court's opinion nor either of the concurrences makes any effort to distinguish that case—except, perhaps, by misdescribing the case as involving "federal laws regulating individual donors," *ante,* at 1397, or as involving "individual expenditures," *ante,* at 1407 (STEVENS, J., concurring). Section 608(e)(1) of the Federal Election Campaign Act of 1971, 18 U.S.C. § 608(e)(1) (1970 ed., Supp. V), which we found unconstitutional in *Buckley,* was directed, like the Michigan law before us here, to expenditures made for the purpose of advocating the election or defeat of  **\*683**  a particular candidate, see 424 U.S., at 42, 96 S.Ct., at 645. It limited to $1,000 (a *lesser* restriction than the absolute prohibition at issue here) such expenditures not merely by "individuals," but by "persons," specifically defined to include corporations. See *id.,* at 187, 96 S.Ct., at 712 (setting forth § 591(g) of the statute). The plaintiffs in the case included corporations, see *id.,* at 8, 96 S.Ct., at 629, and we specifically discussed § 608(e)(1) as a restriction addressed not just to individuals but to "individuals and groups," *id.,* at 39, 48, 96 S.Ct., at 648, "persons and groups," *id.,* at 45, 96 S.Ct., at 647, "persons and organizations," *ibid.,* "person[s] [and] association[s]," *id.,* at 50, 96 S.Ct., at 650. In support of our determination that the restriction was "wholly at odds with the guarantees of the First Amendment" we cited *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), which involved limitations upon a corporation. 424 U.S., at 50, 96 S.Ct., at 650. Of course, *if* § 608(e)(1) had been unconstitutional only as applied to individuals and not as applied to corporations, we might nonetheless have invalidated it *in toto* for substantial overbreadth, see *Broadrick v. Oklahoma,* 413 U.S. 601, 611–613, 93 S.Ct. 2908, 2915–2916, 37 L.Ed.2d 830 (1973), but there is not a hint of that doctrine in our opinion. Our First Amendment law is much less certain than I had thought it to be if we are free to recharacterize each clear holding as a disguised "overbreadth" determination.

*Buckley v. Valeo* should not be overruled, because it is entirely correct. The contention that prohibiting overt advocacy for or against a political candidate satisfies a "compelling need" to avoid "corruption" is easily dismissed. As we said in *Buckley,* "[i]t would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign." 424 U.S., at 45, 96 S.Ct., at 647. Independent advocacy, moreover, unlike contributions, "may well provide little assistance to the candidate's campaign and indeed may prove counterproductive," thus reducing the danger that it will be exchanged "as a *quid pro quo* for improper commitments **\*684** from the candidate." *Id.,* at 47, 96 S.Ct., at 648. The latter point seems even more plainly true with respect to corporate advocates than it is with respect to individuals. I expect I could count on the fingers of one hand the candidates who would generally welcome, much less negotiate for, a formal endorsement by AT & T or General Motors. The advocacy of such entities that have "amassed great wealth" will be effective only to the extent that it brings to the people's attention *ideas* which—despite the invariably self-interested and probably uncongenial source—strike them as true.

The Court does not try to defend the proposition that independent advocacy poses a substantial risk of political "corruption," as English speakers understand that term. Rather, it asserts that that concept (which it defines as " ' financial *quid pro quo* ' corruption," *ante,* at 1397) is really just a narrow subspecies of a hitherto unrecognized genus of political corruption. "Michigan's regulation," we are told, "aims at a different type of **\*\*1411** corruption in the political arena: the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporations's political ideas." *Ibid.* Under this mode of analysis, virtually anything the Court deems politically undesirable can be turned into political corruption—by simply describing its effects as politically "corrosive," which is close enough to "corruptive" to qualify. It is sad to think that the First Amendment will ultimately be brought down not by brute force but by poetic metaphor.

The Court's opinion ultimately rests upon that proposition whose violation constitutes the "New Corruption": Expenditures must "reflect actual public support for the political ideas espoused." *Ibid.* This illiberal free-speech principle of "one man, one minute" was proposed and soundly rejected in *Buckley:*

> "It is argued, however, that the ancillary governmental interest in equalizing the relative ability of individuals **\*685** and groups to influence the outcome of elections serves to justify the limitation on express advocacy of the election or defeat of candidates imposed by § 608(e)(1)'s expenditure ceiling. But the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed 'to secure "the widest possible dissemination of information from diverse and antagonistic sources," ' and ' "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." ' " 424 U.S., at 48–49, 96 S.Ct., at 648–649 (citations omitted).

But it can be said that I have not accurately quoted today's decision. It does not endorse the proposition that government may ensure that expenditures "reflect actual public support for the political ideas espoused," but only the more limited proposition that government may ensure that expenditures "reflect actual public support for the political ideas espoused *by corporations.* " *Ante,* at 1397 (emphasis added). The limitation is of course entirely irrational. Why is it perfectly all right if advocacy by an individual billionaire is out of proportion with "actual public support" for his positions? There is no explanation, except the effort I described at the outset of this discussion to make one valid proposition out of two invalid ones: When the vessel labeled "corruption" begins to founder under weight too great to be logically sustained, the argumentation jumps to the good ship "special privilege"; and when that in turn begins to go down, it returns to "corruption." Thus hopping back and forth between the two, the argumentation may survive but makes no headway towards port, where its conclusion waits in vain.

B

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

Justice BRENNAN's concurrence would have us believe that the prohibition adopted by Michigan and approved by the Court is a paternalistic measure to protect the corporate **\*686** shareholders of America. It is designed, we are told, "to avert [the] danger" that "corporate funds drawn from the general treasury—which represents, after all, [the shareholder's] money," might be used on behalf of a political candidate he opposes. *Ante,* at 1403 (BRENNAN, J., concurring). But such solicitude is a most implausible explanation for the Michigan statute, inasmuch as it permits corporations to take as many ideological and political positions as they please, so long as they are not "in assistance of, or in opposition to, the nomination or election of a candidate." Mich.Comp. Laws § 169.206(1) (1979). That is indeed the Court's sole basis for distinguishing 🔖 *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), which invalidated restriction of a corporation's general political speech. The Michigan law appears to be designed, in other words, **\*\*1412** neither to protect shareholders, nor even (impermissibly) to "balance" general political debate, but to protect political candidates. Given the degree of political sophistication that ought to attend the exercise of our constitutional responsibilities, it is regrettable that this should come as a surprise.

But even if the object of the prohibition could plausibly be portrayed as the protection of shareholders (which the Court's opinion, at least, does not even assert), that would not suffice as a "compelling need" to support this blatant restriction upon core political speech. A person becomes a member of that form of association known as a for-profit corporation in order to pursue economic objectives, *i.e.,* to make money. Some corporate charters may specify the line of commerce to which the company is limited, but even that can be amended by shareholder vote. Thus, in joining such an association, the shareholder knows that management may take any action that is ultimately in accord with what the majority (or a specified supermajority) of the shareholders wishes, so long as that action is designed to make a profit. That is the deal. The corporate actions to which the shareholder exposes himself, therefore, include many things that **\*687** he may find politically or ideologically uncongenial: investment in South Africa, operation of an abortion clinic, publication of a pornographic magazine, or even publication of a newspaper that adopts absurd political views and makes catastrophic political endorsements. His only protections against such assaults upon his ideological commitments are (1) his ability to persuade a majority (or the requisite minority) of his fellow shareholders that the action should not be taken, and ultimately (2) his ability to sell his stock. (The latter course, by the way, does not ordinarily involve the severe psychic trauma or economic disaster that Justice BRENNAN's opinion suggests.) It seems to me entirely fanciful, in other words, to suggest that the Michigan statute makes any significant contribution toward insulating the exclusively profit-motivated shareholder from the rude world of politics and ideology.

But even if that were not fanciful, it would be fanciful to think, as Justice BRENNAN's opinion assumes, that there is any difference between for-profit and not-for-profit corporations insofar as the need for protection of the individual member's ideological psyche is concerned. Would it be any more upsetting to a shareholder of General Motors that it endorsed the election of Henry Wallace (to stay comfortably in the past) than it would be to a member of the American Civil Liberties Union that it endorsed the election of George Wallace? I should think much less so. Yet in the one case as in the other, the only protection against association-induced trauma is the will of the majority and, in the last analysis, withdrawal from membership.

C

In Part V of its opinion, the Court accurately sets forth our longstanding First Amendment law as follows:

"Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly **\*688** tailored to serve a compelling governmental interest." *Ante,* at 1401.

The Court finds this requirement fully met for the following reason:

"As we explained in the context of our discussions of whether the statute was overinclusive, *supra,* at 1397–1398, or underinclusive, *supra,* at 1400–1401, the State's decision to regulate only corporations is precisely tailored to serve the compelling state interest of eliminating from the political process the corrosive effect of political 'war chests' amassed with the aid of the legal advantages given to corporations." *Ibid.*

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

That state interest (assuming it is compelling) does indeed explain why the State chose to silence "only corporations" rather than wealthy individuals as well. But it does not **\*\*1413** explain (what "narrow tailoring" pertains to) why the State chose to silence *all* corporations, rather than just those that possess great wealth. If narrow tailoring means anything, surely it must mean that action taken to counter the effect of amassed "war chests" must be targeted, if possible, at amassed "war chests." And surely such targeting is possible—either in the manner accomplished by the provision that we invalidated in *Buckley, i.e.,* by limiting the prohibition to independent expenditures above a certain amount, or in some other manner, *e.g.,* by limiting the expenditures of only those corporations with more than a certain amount of net worth or annual profit.

No more satisfactory explanation for the obvious lack of "narrow tailoring" is to be found in the Court's discussion of overinclusiveness, to which the above-quoted passage refers. That discussion asserts that we "rejected a similar argument" in *FEC v. National Right to Work Comm.,* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (*NRWC* ), where we said that " 'we accept Congress' judgment' " that " 'the special characteristics of the corporate structure' " create a " '*potential* for ... influence that demands *\*689* regulation.' " *Ante,* at 1398, quoting 459 U.S., at 209–210, 103 S.Ct., at 560 (emphasis added by the Court). Today's opinion then continues: "Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process. This potential for distortion justifies § 54(1)'s general applicability to all corporations." *Ante,* at 1398.

The Court thus holds, for the first time since Justice Holmes left the bench, that a direct restriction upon speech is narrowly enough tailored if it extends to speech that has the mere *potential* for producing social harm. *NRWC* (which in any event involved not a direct restriction upon corporate speech but a restriction upon corporate solicitation of funds for candidates) is no authority for that startling proposition, since it *did not purport* to be applying the First Amendment narrow-tailoring requirement. The principle the Court abandons today—that the mere potential for harm does not justify a restriction upon speech—had its origin in the "clear and present danger" test devised by Justice Holmes in 1919, see *Schenck v. United States,* 249 U.S. 47, 49–51, 39 S.Ct. 247, 248, 63 L.Ed. 470, and championed by him and Justice Brandeis over the next decade in a series of famous opinions opposing the affirmance of convictions for subversive speech, see *Abrams v. United States,* 250 U.S. 616, 624, 40 S.Ct. 17, 20, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *Gitlow v. New York,* 268 U.S. 652, 672, 45 S.Ct. 625, 632, 69 L.Ed. 1138 (1925) (Holmes, J., dissenting); *Whitney v. California,* 274 U.S. 357, 374, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). The Court finally adopted their view in 1937, see *Herndon v. Lowry,* 301 U.S. 242, 258, 57 S.Ct. 732, 739, 81 L.Ed. 1066; see also *Bridges v. California,* 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941); *Thornhill v. Alabama,* 310 U.S. 88, 105, 60 S.Ct. 736, 745, 84 L.Ed. 1093 (1940); *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943); *Terminiello v. Chicago,* 337 U.S. 1, 4–5, 69 S.Ct. 894, 895–896, 93 L.Ed. 1131 (1949). Today's reversal of field will require adjustment of a fairly large number of significant First Amendment holdings. Presumably the State *\*690* may now convict individuals for selling books found to have a potentially harmful influence on minors, *Butler v. Michigan,* 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957), ban indecent telephone communications that have the potential for reaching minors, *Sable Communications of California v. FCC,* 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), restrain the press from publishing information that has the potential for jeopardizing a criminal defendant's right to a fair trial, *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), or the potential for damaging the **\*\*1414** reputation of the subject of an investigation, *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), compel publication of the membership lists of organizations that have a potential for illegal activity, see *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 464, 78 S.Ct. 1163, 1172, 2

L.Ed.2d 1488 (1958), and compel an applicant for bar membership to reveal her political beliefs and affiliations to eliminate the potential for subversive activity, *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971).

It is perplexing, or perhaps revealing, to compare the Court's cavalier treatment of the narrow-tailoring requirement today with its elaborate discussion of that issue six years ago in *League of Women Voters.* See 468 U.S., at 392–395, 397–398, 104 S.Ct. 3106, 3126, 82 L.Ed.2d 278. As my earlier discussion makes clear, it would make no difference if the law *were* narrowly tailored to serve its goal, since that goal is not compelling. But the fact that, even having made that first error, the Court must make yet a second in order to reach today's judgment suggests what an impregnable fortress our First Amendment jurisprudence has been. The Court's explicit acceptance of "potential danger" as adequate to establish narrow tailoring, even more than its recognition of an insubstantial interests as "compelling," greatly weakens those defenses.

### D

Finally, a few words are in order concerning the Court's approval of the Michigan law's exception for "media corporations." This is all right, we are told, because of "the unique **\*691** role that the press plays in 'informing and educating the public, offering criticism, and providing a forum for discussion and debate.' " *Ante,* at 1402 (citation omitted). But if one believes in the Court's rationale of "compelling state need" to prevent amassed corporate wealth from skewing the political debate, surely that "unique role" of the press does not give Michigan justification for *excluding* media corporations from coverage, but provides especially strong reason to *include* them. Amassed corporate wealth that regularly sits astride the ordinary channels of information is much more likely to produce the New Corruption (too much of one point of view) than amassed corporate wealth that is generally busy making money elsewhere. Such media corporations not only have vastly greater power to perpetrate the evil of overinforming, they also have vastly greater opportunity. General Motors, after all, will risk a stockholder suit if it makes a political endorsement that is not plausibly tied to its ability to make money for its shareholders. But media corporations make money *by* making political commentary, including endorsements. For them, unlike any other corporations, the whole world of politics and ideology is fair game. Yet the Court tells us that it is reasonable to *exclude* media corporations, rather than target them specially.

Members of the institutional press, despite the Court's approval of their illogical exemption from the Michigan law, will find little reason for comfort in today's decision. The theory of New Corruption it espouses is a dagger at their throats. The Court today holds merely that media corporations *may* be excluded from the Michigan law, not that they *must* be. We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers. See *Bellotti,* 435 U.S., at 782, 98 S.Ct., at 1418, and cases cited. Thus, the Court's holding on this point must be put in the following unencouraging form: "Although the press' unique societal role may not entitle the press to greater protection under the Constitution, *Bellotti, supra,* at 782, 98 S.Ct., at 1418, and n. 18, it does provide a compelling reason for the State to exempt media corporations from the scope of political expenditure limitations." *Ante,* at 1402. One must hope, I suppose, that Michigan **\*\*1415** will continue to provide this generous and voluntary exemption.

### II

I would not do justice to the significance of today's decision to discuss only its lapses from case precedent and logic. Infinitely more important than that is its departure from long-accepted premises of our political system regarding the benevolence that can be expected of government in managing the arena of public debate, and the danger that is to be anticipated from powerful private institutions that compete with government, and with one another, within that arena.

Case 3:20-cv-07721-SI     Document 58-4     Filed 11/10/20     Page 227 of 1384

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

Perhaps the Michigan law before us here has an unqualifiedly noble objective—to "equalize" the political debate by preventing disproportionate expression of corporations' points of view. But governmental abridgment of liberty is always undertaken with the very best of announced objectives (dictators promise to bring order, not tyranny), and often with the very best of genuinely intended objectives (zealous policemen conduct unlawful searches in order to put dangerous felons behind bars). The premise of our Bill of Rights, however, is that there are some things—even some seemingly *desirable* things—that government cannot be trusted to do. The very first of these is establishing the restrictions upon speech that will assure "fair" political debate. The incumbent politician who says he welcomes full and fair debate is no more to be believed than the entrenched monopolist who says he welcomes full and fair competition. Perhaps the Michigan Legislature was genuinely trying to assure a "balanced" presentation of political views; on the other hand, perhaps it was trying to give unincorporated unions (a not insubstantial force in Michigan) political advantage over major employers. Or perhaps it was trying to assure a "balanced" presentation because it knows that with evenly balanced **\*693** speech incumbent officeholders generally win. The fundamental approach of the First Amendment, I had always thought, was to assume the worst, and to rule the regulation of political speech "for fairness' sake" simply out of bounds.

I doubt that those who framed and adopted the First Amendment would agree that avoiding the New Corruption, that is, calibrating political speech to the degree of public opinion that supports it, is even a *desirable* objective, much less one that is important enough to qualify as a compelling state interest. Those Founders designed, of course, a system in which popular ideas would ultimately prevail; but also, through the First Amendment, a system in which true ideas could readily become popular. For the latter purpose, the calibration that the Court today endorses is precisely backwards: To the extent a valid proposition has scant public support, it should have wider rather than narrower public circulation. I am confident, in other words, that Jefferson and Madison would not have sat at these controls; but if they did, they would have turned them in the opposite direction.

Ah, but then there is the special element of corporate wealth: What would the Founders have thought of that? They would have endorsed, I think, what Tocqueville wrote in 1835:

> "When the members of an aristocratic community adopt a new opinion or conceive a new sentiment, they give it a station, as it were, beside themselves, upon the lofty platform where they stand; and opinions or sentiments so conspicuous to the eyes of the multitude are easily introduced into the minds or hearts of all around. In democratic countries the governing power alone is naturally in a condition to act in this manner; but it is easy to see that its action is always inadequate, and often dangerous.... No sooner does a government attempt to go beyond its political sphere and to enter upon this new track than it exercises, even unintentionally, an insupportable tyranny.... Worse still will be the case if the **\*694** government really believes itself interested in preventing **\*\*1416** all circulation of ideas; it will then stand motionless and oppressed by the heaviness of voluntary torpor. Governments, therefore, should not be the only active powers; associations ought, in democratic nations, to stand in lieu of those powerful private individuals whom the equality of conditions has swept away." 2 A. de Tocqueville, Democracy in America 109 (P. Bradley ed. 1948).

While Tocqueville was discussing "circulation of ideas" in general, what he wrote is also true of candidate endorsements in particular. To eliminate voluntary associations—not only including powerful ones, but *especially* including powerful ones— from the public debate is either to augment the always dominant power of government or to impoverish the public debate. The case at hand is a good enough example. Why should the Michigan voters in the 93d House District be deprived of the information that private associations owning and operating a vast percentage of the industry of the State, and employing a large number of its citizens, believe that the election of a particular candidate is important to their prosperity? Contrary to the Court's suggestion, the same point cannot effectively be made through corporate PACs to which individuals may voluntarily contribute. It is important to the message that it represents the views of Michigan's leading corporations *as corporations,* occupying the "lofty platform" that they do within the economic life of the State—not just the views of some *other* voluntary associations to which some of the corporations' shareholders belong.

Despite all the talk about "corruption and the appearance of corruption"—evils that are not significantly implicated and that can be avoided in many other ways—it is entirely obvious that the object of the law we have approved today is not to prevent wrongdoing but to prevent speech. Since those **\*695** private associations known as corporations have so much money, they

Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990)
Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 228 of 1384
110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

will speak so much more, and their views will be given inordinate prominence in election campaigns. This is not an argument that our democratic traditions allow—neither with respect to individuals associated in corporations nor with respect to other categories of individuals whose speech may be "unduly" extensive (because they are rich) or "unduly" persuasive (because they are movie stars) or "unduly" respected (because they are clergymen). The premise of our system is that there is no such thing as too much speech—that the people are not foolish but intelligent, and will separate the wheat from the chaff. As conceded in Lincoln's aphorism about fooling "all of the people some of the time," that premise will not invariably accord with reality; but it will assuredly do so much more frequently than the premise the Court today embraces: that a healthy democratic system can survive the legislative power to prescribe how much political speech is too much, who may speak, and who may not.

* * *

Because today's decision is inconsistent with unrepudiated legal judgments of our Court, but even more because it is incompatible with the unrepealable political wisdom of our First Amendment, I dissent.

Justice KENNEDY, with whom Justice O'CONNOR and Justice SCALIA join, dissenting.

The majority opinion validates not one censorship of speech but two. One is Michigan's content-based law which decrees it a crime for a nonprofit corporate speaker to endorse or oppose candidates for Michigan public office. By permitting the statute to stand, the Court upholds a direct restriction on the independent expenditure of funds for political speech for the first time in its history.

The other censorship scheme, I most regret to say, is of our own creation. It is value-laden, content-based speech **\*696** suppression that permits some nonprofit corporate groups, but not others, to engage in political speech. After failing to disguise its animosity and distrust for the particular kind **\*\*1417** of political speech here at issue—the qualifications of a candidate to understand economic matters—the Court adopts a rule that allows Michigan to stifle the voices of some of the most respected groups in public life on subjects central to the integrity of our democratic system. Each of these schemes is repugnant to the First Amendment and contradicts its central guarantee, the freedom to speak in the electoral process. I dissent.

I

To understand the force of the Michigan statutory censorship scheme, one need not go beyond the facts of the case before us. The Michigan Chamber of Commerce (Chamber) is a nonprofit corporation with an interest in candidates and public policy issues throughout the State of Michigan. The Chamber sought, on its own initiative and without communication with the candidate, to place a newspaper advertisement in support of one Richard Bandstra, a candidate for the House of Representatives in Michigan. (The proposed advertisement is reproduced in the Appendix to this opinion.) The advertisement discussed the local economy and unemployment and explained why the candidate supported by the Chamber would understand and improve local economic conditions. This communication is banned by the law here in question, the Michigan Campaign Finance Act (Act), 1976 Mich.Pub. Acts 388, Mich.Comp. Laws § 169.201 et seq. (1979).

The Act prohibits "a corporation," including a non-profit corporation, from making any "expenditure" in connection with an election campaign for state office.[1] An expenditure **\*697** includes any payment or other contribution in "assistance of, or in opposition to, the nomination or election of a candidate...."[2] The Act by its terms forbids corporations to make "independent expenditures" undertaken without any coordination or even communication with a candidate's organization.[3] Under the Act, a corporate expenditure made for **\*698** purposes of communicating on issues of public policy is permissible only if it does not support or oppose a **\*\*1418** candidate by name or by "inference."[4] Violation of the Act is a felony.[5]

### A

The State has conceded that among those communications prohibited by its statute are the publication by a nonprofit corporation of its own assessment of a candidate's voting record. With the *imprimatur* of this Court, it is now a felony in Michigan for the Sierra Club, or the American Civil Liberties Union, or the Michigan Chamber of Commerce, to advise the public how a candidate voted on issues of urgent concern to its members. In both practice and theory, the prohibition aims at the heart of political debate.

As the majority must acknowledge, and as no party contests, the advertisement in this case is a paradigm of political speech. *Buckley v. Valeo,* 424 U.S. 1, 14–15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). The Michigan statute bans it, however, along with all other communications by nonprofit corporate speakers that carry an inference of support for, or opposition to, a candidate, on the sole ground that the speaker is organized in corporate form. The Act operates to prohibit information essential to the ability of voters to evaluate candidates. In my view, this speech cannot be restricted.

Far more than the interest of the Chamber is at stake. We confront here society's interest in free and informed discussion on political issues, a discourse vital to the capacity for self-government. "In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who **\*699** may address a public issue." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 784–785, 98 S.Ct. 1407, 1420, 55 L.Ed.2d 707 (1978). There is little doubt that by silencing advocacy groups that operate in the corporate form and forbidding them to speak on electoral politics, Michigan's law suffers from both of these constitutional defects.

First, the Act prohibits corporations from speaking on a particular subject, the subject of candidate elections. It is a basic precept that the State may not confine speech to certain subjects. Content-based restrictions are the essence of censorial power. *Ibid.* (invalidating statute that allowed corporations to speak on referenda issues that materially affected their business, but not on other subjects). See also *Consolidated Edison Co. of New York v. Public Service Comm'n of New York,* 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic").

Second, the Act discriminates on the basis of the speaker's identity. Under the Michigan law, any person or group other than a corporation may engage in political debate over candidate elections; but corporations, even nonprofit corporations that have unique views of vital importance to the electorate, must remain mute. Our precedents condemn this censorship. See *Bellotti, supra,* at 784–786, 98 S.Ct., at 1420–1421; *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (invalidating state statute that prohibited picketing near certain buildings but allowed certain labor picketers); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).

The protection afforded core political speech is not diminished because the speaker is a nonprofit corporation. Even in the case of a for-profit corporation, we have upheld **\*\*1419** the right to speak on ballot issues. The *Bellotti* Court stated:

"If the speakers here were not corporations, no one would suggest that the State could silence their proposed speech. It is the type of speech indispensable to decision **\*700** making in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." 435 U.S., at 777, 98 S.Ct., at 1416 (footnotes omitted).

By using distinctions based upon both the speech and the speaker, the Act engages in the rawest form of censorship: the State censors what a particular segment of the political community might say with regard to candidates who stand for election. The Court's holding cannot be reconciled with the principle that " 'legislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment.' " *Meyer v. Grant,* 486 U.S. 414, 428, 108 S.Ct. 1886, 1895, 100 L.Ed.2d 425 (1988), quoting *Buckley v. Valeo, supra,* 424 U.S., at 50, 96 S.Ct., at 650.

B

The second censorship scheme validated by today's holding is the one imposed by the Court. In *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL* ), a First Amendment right to use corporate treasury funds was recognized for the nonprofit corporation then before us. Those who thought that the First Amendment exists to protect all points of view in candidate elections will be disillusioned by the Court's opinion today; for that protection is given only to a preferred class of nonprofit corporate speakers: small, single issue nonprofit corporations that pass the Court's own vague test for determining who are the favored participants in the electoral process. There can be no doubt that if a State were to enact a statute empowering an administrative board to determine which corporations could place candidate advertisements in newspapers and which could not, with authority to enforce the guidelines the Court adopts today to distinguish between the Massachusetts Citizens for Life and the Michigan Chamber of Commerce, the statute would be   **\*701**  held unconstitutional. The First Amendment does not permit courts to exercise speech suppression authority denied to legislatures.

The Court draws support for its discrimination among nonprofit corporate speakers from portions of our opinion in *MCFL, supra.* It must be acknowledged that certain language in *MCFL,* in particular the discussion which pointed to the express purpose of the organization to promote political ideas, *id.* at 263–265, 107 S.Ct., at 630–631, lends support to the majority's test. That language, however, contravenes fundamental principles of neutrality for all political speech. It should not stand in the way of giving full force to the essential and vital holding of *MCFL,* which is that a nonprofit corporation engaged in political discussion of candidates and elections has the full protection of the First Amendment.

II

The Act does not meet our standards for laws that burden fundamental rights. The State cannot demonstrate that a compelling interest supports its speech restriction, nor can it show that its law is narrowly tailored to the purported statutory end. See *Bellotti, supra,* 435 U.S., at 786, 793–795, 98 S.Ct., at 1421, 1424–1426. Restrictions on independent expenditures are unconstitutional if they fail to meet both of these standards. *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *First National Bank of Boston v. Bellotti; supra; FEC v. National Conservative Political Action Committee,* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (*NCPAC* ); *MCFL, supra.* The majority opinion cannot establish either of these  **\*\*1420**  predicate conditions for the speech restriction imposed by the State.[6]

**\*702**  A

Our cases acknowledge the danger that corruption poses for the electoral process, but draw a line in permissible regulation between payments to candidates ("contributions") and payments or expenditures to express one's own views ("independent expenditures"). Today's decision abandons this distinction and threatens once-protected political speech. The Michigan statute prohibits independent expenditures by a nonprofit corporate speaker to express its own views about candidate qualifications.

Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990)
110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

Independent expenditures are entitled to greater protection than campaign contributions. *MCFL, supra,* 479 U.S., at 259–260, 107 S.Ct., at 628–629. See also *Buckley,* 424 U.S., at 20–21, 96 S.Ct., at 635. "[E]xpenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do ... limitations on financial contributions." *Id.,* at 23, 96 S.Ct., at 636. Candidate campaign contributions are subject to greater regulation because of the enhanced risk of corruption from the possibility that a large contribution would be given to secure political favors; independent expenditures pose no such risk:

> "Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.,* at 47, 96 S.Ct., at 648.

Appellants' reliance on cases involving contributions, such as *FEC v. National Right to Work Committee,* 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982), is misplaced.

The proper analysis must follow our cases on independent expenditures. We have established that limitations on independent **\*703** political expenditures are subject to exacting First Amendment scrutiny. In *Buckley,* we invalidated a federal limitation on independent expenditures because they had no tendency to corrupt. By like analysis, we invalidated a ban on independent corporate expenditures for referenda issues, *First National Bank of Boston v. Bellotti, supra,* and a federal limitation which prohibited political committees from spending more than $1,000 in support of any candidate who had accepted public funding, *NCPAC,* 470 U.S., at 491, 105 S.Ct., at 1465. In *NCPAC,* we found that the mere hypothetical possibility that candidates may take notice of and reward political action committee (PAC) expenditures by giving official favors was insufficient to demonstrate that the threat of corruption justified the spending regulation. *Id.,* at 497, 105 S.Ct., at 1468.

The majority almost admits that, in the case of independent expenditures, the danger of a political *quid pro quo* is insufficient to justify a restriction of this kind. Since the specter of corruption, which had been "the only legitimate and compelling government interest[s] thus far identified for restricting campaign finances," *NCPAC, supra,* at 496–497, 105 S.Ct., at 1468, is missing in this case, the majority invents a new interest: combating the "corrosive and distorting effects of immense aggregations of wealth," *ante* at 1397, accumulated in corporate form without shareholder or public support. The majority styles this novel interest as simply a different kind of corruption, but has no support for its assertion. While it is questionable whether such imprecision would suffice to justify restricting **\*\*1421** political speech by for-profit corporations, it is certain that it does not apply to nonprofit entities.

The evil of political corruption has been defined in more precise terms. We have said: "Corruption is a subversion of the political process" whereby "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain...." *NCPAC, supra,* at 497, 105 S.Ct., at 1468. In contrast, the interest touted by the majority is the impermissible **\*704** one of altering political debate by muting the impact of certain speakers.

The regulatory mechanism adopted by the Michigan statute is aimed at reducing the quantity of political speech, a rationale endorsed by today's majority. The First Amendment rests on quite the opposite theory. As we have already said in the context of political expenditures:

> "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley,* 424 U.S., at 19, 96 S.Ct., at 634 (footnote omitted); see also *id.,* at 39, 96 S.Ct., at 644.

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

In *Buckley* and *Bellotti,* acting on these precepts, we rejected the argument that the expenditure of money to increase the quantity of political speech somehow fosters corruption. The key to the majority's reasoning appears to be that because some corporate speakers are well supported and can buy press space or broadcast time to express their ideas, government may ban all corporate speech to ensure that it will not dominate political debate. The argument is flawed in at least two respects. First, the statute is overinclusive because it covers all groups which use the corporate form, including all nonprofit corporations. Second, it assumes that the government has a legitimate interest in equalizing the relative influence of speakers.

With regard to nonprofit corporations in particular, there is no reason to assume that the corporate form has an intrinsic flaw that makes it corrupt, or that all corporations possess great wealth, or that all corporations can buy more media coverage for their views than can individuals or other groups. There is no reason to conclude that independent speech **\*705** a corporation is any more likely to dominate the political arena than speech by the wealthy individual, protected in *Buckley v. Valeo, supra,* or by the well-funded PAC, protected in *NCPAC, supra* (protecting speech rights of PAC's against expenditure limitations). In *NCPAC,* we discredited the argument that because PAC's spend larger amounts than individuals, the potential for corruption is greater. *Id.,* at 497–498, 105 S.Ct., at 1468–1469. We distinguished between the campaign contribution at issue in *FEC v. National Right to Work Committee, supra,* and independent expenditures, by noting that while "the compelling governmental interest in preventing corruption supported the restriction of the influence of political war chests funneled through the corporate form" with regard to candidate campaign contributions, a similar finding could not be supported for independent expenditures. *NCPAC, supra,* at 500–501, 105 S.Ct., at 1470.

In addition, the notion that the government has a legitimate interest in restricting the quantity of speech to equalize the relative influence of speakers on elections is antithetical to the First Amendment:

> "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed 'to secure "the widest possible dissemination of information from diverse and antagonistic sources," '.... The First Amendment's protection against governmental abridgment of free expression cannot properly **\*\*1422** be made to depend on a person's financial ability to engage in public discussion."
>
> *Buckley, supra,* 424 U.S., at 48–49, 96 S.Ct., at 648–649 (citations omitted).

That those who can afford to publicize their views may succeed in the political arena as a result does not detract from the fact that they are exercising a First Amendment right. *Meyer v. Grant,* 486 U.S., at 426, n. 7, 108 S.Ct., at 1894, n. 7 (upholding First Amendment right to use paid petition circulators). As we **\*706** stated in *Bellotti,* paid advocacy "may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it." 435 U.S., at 790, 98 S.Ct., at 1423. The suggestion that the government has an interest in shaping the political debate by insulating the electorate from too much exposure to certain views is incompatible with the First Amendment. "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments." *Id.,* at 791, 98 S.Ct., at 1423; see also *Meyer; supra,* at 426, n. 7, 108 S.Ct., at 1894, n. 7; *Brown v. Hartlage,* 456 U.S. 45, 60, 102 S.Ct. 1523, 1532, 71 L.Ed.2d 732 (1982).

An argument similar to that made by the majority was rejected in *Bellotti.* There, we rejected the assumption that "corporations are wealthy and powerful and their views may drown out other points of view" or "exert an undue influence" on the electorate in the absence of a showing that the relative voice of corporations was significant. 435 U.S., at 789, 98 S.Ct., at 1422. And even were we to assume that some record support for this assertion would make a constitutional difference, it has not been established here. The majority provides only conjecture. All censorship is suspect; but censorship based on vague surmise is not permissible in any case.

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

The Act, as the State itself says, prevents a nonprofit corporate speaker from using its own funds to inform the voting public that a particular candidate has a good or bad voting record on issues of interest to the association's adherents. Though our era may not be alone in deploring the lack of mechanisms for holding candidates accountable for the votes they cast, that lack of accountability is one of the major concerns of our time. The speech suppressed in this case was directed to political qualifications. The fact that it was spoken by the Michigan Chamber of Commerce, and not a man or woman standing on a soapbox, detracts not a scintilla from its validity, its persuasiveness, or its contribution to the political dialogue.

 **\*707**  The Court purports to distinguish *MCFL* on the ground that the nonprofit corporation permitted to speak in that case received no funds from profit-making corporations. It is undisputed that the Michigan Chamber of Commerce is itself a nonprofit corporation. The crucial difference, it is said, is that the Chamber receives corporate contributions. But this distinction rests on the fallacy that the source of the speaker's funds is somehow relevant to the speaker's right of expression or society's interest in hearing what the speaker has to say. There is no reason that the free speech rights of an individual or of an association of individuals should turn on the circumstance that funds used to engage in the speech come from a corporation. Many persons can trace their funds to corporations, if not in the form of donations, then in the form of dividends, interest, or salary. That does not provide a basis to deprive such individuals or associations of their First Amendment freedoms. The more narrow alternative of recordkeeping and funding disclosure is available. See 📄 *MCFL,* 479 U.S., at 262, 107 S.Ct., at 630. A wooden rule prohibiting independent expenditures by nonprofit corporations that receive funds from business corporations invites discriminatory distinctions. The principled approach is to acknowledge that where political speech is concerned, freedom to speak extends to all nonprofit corporations, not the special favorites of a majority of this Court.


**\*\*1423  B**

The majority concludes that the Michigan Act is narrowly tailored. First, it seeks support in the availability of PAC's as an alternative to direct speech. Second, the majority advances the rationale that the restriction protects shareholders from the use of corporate funds to support speech with which they may not agree. Third, it asserts that independent expenditures funded by corporate wealth pose inherent dangers. None of these justifications can suffice to save the Act.

 **\*708**  That the censorship applies to the nonprofit corporate speaker itself and not to a PAC that it has organized, far from being a saving feature of the regulation, further condemns it. The argument that the availability of a PAC as an alternative means, see 📄 Mich.Comp. Laws § 169.255 (1979), can save a restriction on independent corporate expenditures was rejected by the Court in 📄 *MCFL,* 479 U.S., at 253–255, 107 S.Ct., at 625–626; 📄 *id.,* at 266, 107 S.Ct., at 632 (O'CONNOR, J., concurring), as a costly and burdensome disincentive to speech. The record in this case tended to show that between 25 and 50 percent of a PAC's funds are required to establish and administer the PAC. See App. 103a, 108a. While the corporation can direct the PAC to make expenditures on behalf of candidates, the PAC can be funded only by contributions from shareholders, directors, officers, and managerial employees, and cannot receive corporate treasury funds. See 📄 Mich.Comp. Laws § 169.255(3) (1979). That the avenue left open is more burdensome than the one foreclosed is "sufficient to characterize [a statute] as an infringement on First Amendment activities." 📄 479 U.S., at 255, 107 S.Ct., at 626. 📄 *Consolidated Edison Co.,* 447 U.S., at 541, n. 10, 100 S.Ct., at 2335, n. 10; see also 📄 *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 757, n. 15, 96 S.Ct. 1817, 1823, n. 15, 48 L.Ed.2d 346 (1976). As the Court reaffirmed just two Terms ago, "[t]he First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." 📄 *Meyer v. Grant,* 486 U.S., at 424, 108 S.Ct., at 1893.

The secondhand endorsement structure required by the Michigan state law debases the value of the voice of nonprofit corporate speakers. The public is not interested in what a PAC says; it does care what the group itself says, so that the group itself can be given credit or blame for the candidates it has endorsed or opposed. PAC's suffer from a poor public image. See App. 92a, 104a,

108a. An advertisement for which a nonprofit group takes direct responsibility, in all likelihood, will have more credibility and generate less distrust than one funded by a PAC. PAC's are interim, ad hoc organizations **\*709** with little continuity or responsibility. The respected organizations affected by this case have a continuity, a stability, and an influence that makes it critical for their members and the public at large to evaluate their official policies to determine whether the organizations have earned credibility over a period of time. If a particular organization supports a candidate who injures its cause or offends its ideals, the organization itself, not some intermediary committee, ought to take the blame. It is a sad irony that the group before us wishes to assume that responsibility but the action of the State, endorsed by this Court, does not allow it to do so.

The diffusion of the corporate message produced by the PAC requirement also ensures a lack of fit between the statute's ends and its means. If the concern is that nonprofit corporate speech distorts the political process, it would seem that injecting the confusion of a PAC as an intermediary, albeit one controlled and directed by the corporation, further diffuses responsibility. Even if there were any possibility of corruption by allowing the Michigan Chamber of Commerce to finance the proposed advertisement **\*\*1424** supporting a candidate, it makes no sense to argue that such a possibility would be eliminated by requiring the disclaimer at the bottom to read "Paid for by the Michigan Chamber of Commerce PAC" rather than "Paid for by the Michigan Chamber of Commerce."

The majority relies on the state interest in protecting members from the use of nonprofit corporate funds to support candidates whom they may oppose. We should reject this interest as insufficient to save the Act here, just as we rejected the argument in *Bellotti,* 435 U.S., at 792–793, 98 S.Ct., at 1424. See also *Consolidated Edison Co., supra,* at 543, 100 S.Ct., at 2336.

The Court takes refuge in the argument that some members or contributors to nonprofit corporations may find their own views distorted by the organization, and cites our holding in *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). *Abood* does not apply here, as the disincentives to dissociate are not comparable. *Bellotti, supra,* at 794, n. 34, 98 S.Ct., at 1425, n. 34 (noting "crucial distinction" between union members and **\*710** shareholders). One need not become a member of the Michigan Chamber of Commerce or the Sierra Club in order to earn a living. To the extent that members disagree with a nonprofit corporation's policies, they can seek change from within, withhold financial support, cease to associate with the group, or form a rival group of their own. Allowing government to use the excuse of protecting shareholder rights to stifle the speech of private, voluntary organizations undermines the First Amendment.

To create second-class speakers that can be stifled on the subject of candidate qualifications is to silence some of the most significant participants in the American public dialogue, as evidenced by the *amici* briefs filed on behalf of the Chamber of Commerce by the American Civil Liberties Union, the Center for Public Interest Law, the American Medical Association, the National Association of Realtors, the American Insurance Association, the National Organization for Women, Greenpeace Action, the National Abortion Rights Action League, the National Right to Work Committee, the Planned Parenthood Federation of America, the Fund for the Feminist Majority, the Washington Legal Foundation, and the Allied Educational Foundation. I reject any argument based on the idea that these groups and their views are not of importance and value to the self-fulfillment and self-expression of their members, and to the rich public dialogue that must be the mark of any free society. To suggest otherwise is contrary to the American political experience and our own judicial knowledge.

It is a distinctive part of the American character for individuals to join associations to enrich the public dialogue. See, *e.g.,* R. Horn, Groups and the Constitution 13–18 (1956). The theme of group identity is part of the history of American democracy. See, *e.g.,* The Federalist No. 10 (J. Madison). As Toqueville observed:

"Americans of all ages, all conditions, and all dispositions constantly form associations. They have not only commercial **\*711** and manufacturing companies, in which all take part, but associations of a thousand other kinds, religious, moral, serious, futile, general or restricted, enormous or diminutive.... If it is proposed to inculcate some truth or to foster some feeling by the encouragement of a great example, they form a society. Wherever at the head of some new undertaking you

see the government in France, or a man of rank in England, in the United States you will be sure to find an association." 2 A. de Toqueville, Democracy in America 106 (P. Bradley ed. 1948).

Finally, the majority's conclusion that the statute is not overinclusive because independent expenditures by nonprofit corporations may be assumed to have a pernicious, distorting effect on political processes does not withstand the rigorous scrutiny applicable to bans on speech. See *NCPAC,* 470 U.S., at 501, 105 S.Ct., at 1470. It even contradicts *MCFL,* where we said: "[A]ssociations do **\*\*1425** not suddenly present the specter of corruption merely by assuming the corporate form." 479 U.S., at 263, 107 S.Ct., at 630. The Court reasons that the Chamber of Commerce benefits from a "unique state-conferred corporate structure that facilitates the amassing of large treasuries." *Ante,* at 1398. This proposition is not self-evident and has little or no relation to the suppression of ideas. The reality, of course, is that some groups and organizations, particularly those with many members, may find that the nonprofit corporate form is the only feasible way of organizing so that they can transmit important views to the public as a whole. Because the unincorporated association structure carries with it a high risk of personal liability for members and operates in an uncertain legal climate, groups often prefer to organize in nonprofit corporate form. The corporate form provides clear rights and responsibilities and limits the liability of members. E. Hadden & B. French, Nonprofit Organizations 12 (1987); H. Oleck, Nonprofit Corporations, Organizations and Associations 30–31 (4th ed. 1982); M. Lane, Legal **\*712** Handbook for Nonprofit Organizations 4, 22–26, 43, 59–61, 124 (1980). For these reasons, in recent years the number of important unincorporated associations has dwindled while the number of incorporated associations has proliferated. Oleck, *supra,* at 31. By deciding to operate as a nonprofit corporation rather than an unincorporated association, a group does not forfeit its First Amendment protection to participate in political discourse.

## III

An independent ground for invalidating this statute is the blanket exemption for media corporations. It is beyond per-adventure that the media could not be prohibited from speaking about candidate qualifications. The First Amendment would not tolerate a law prohibiting a newspaper or television network from spending on political comment because it operates through a corporation. See *Mills v. Alabama,* 384 U.S. 214, 218–220, 86 S.Ct. 1434, 1436–1437, 16 L.Ed.2d 484 (1966). As Justice BRENNAN, supported by a majority of the Court in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), state: "[T]he rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities." *Id.,* at 784, 105 S.Ct., at 2958 (dissenting opinion, joined by MARSHALL, BLACKMUN, and STEVENS, JJ.); *id.,* at 773, 105 S.Ct., at 2952 (WHITE, J., concurring in judgment) ("[T]he First Amendment gives no more protection to the press ... than it does to others exercising their freedom of speech"). The argument relied on by the majority, that media corporations are in the business of communicating and other corporations are not, is unsatisfying. All corporations communicate with the public to some degree, whether it is their business or not; and communication is of particular importance for non-profit corporations.

The web of corporate ownership that links media and nonmedia corporations is difficult to untangle for the purpose **\*713** of any meaningful distinction. Newspapers, television networks, and other media may be owned by parent corporations with multiple business interests. Nothing in the statutory scheme prohibits a business corporate parent from directing its newspaper to support or oppose a particular candidate. The Act not only permits that discretion or control, but makes it a crime for a public-interest nonprofit corporation to bring to light such activity if to do so infers candidate support or opposition. I can find no permissible basis under the First Amendment for the States to make this unsupported distinction among corporate speakers.

## IV

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 236 of 1384

110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

The Court's hostility to the corporate form used by the speaker in this case and its assertion that corporate wealth is the evil to be regulated is far too imprecise to justify the most severe restriction on political **1426 speech ever sanctioned by this Court. In any event, this distinction is irrelevant to a non-profit corporation. "Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation." *MCFL,* 479 U.S., at 265, 107 S.Ct., at 631. The wholesale ban on corporate political speech enacted by the Michigan Legislature is "too blunt an instrument for such a delicate task." *Ibid.*

By constructing a rationale for the jurisprudence of this Court that prevents distinguished organizations in public affairs from announcing that a candidate is qualified or not qualified for public office, the Court imposes its own model of speech, one far removed from economic and political reality. It is an unhappy paradox that this Court, which has the role of protecting speech and of barring censorship from all aspects of political life, now becomes itself the censor. In the course of doing so, the Court reveals a lack of concern for speech rights that have the full protection of the First Amendment. I would affirm the judgment.


**1427 APPENDIX TO OPINION OF KENNEDY, J., DISSENTING

60a                                    *Plaintiff's Trial Exhibit 14*

# Michigan Needs Richard Bandstra To Help Us Be Job Competitive Again

The Michigan State Chamber of Commerce, an organization of over 8,000 member companies, associations and local chambers of commerce, is committed to making Michigan more competitive for business investment and job creation. With that goal in mind, we'd like to share some facts with the electors in the 93rd House District before they vote in tomorrow's special election.

To be job competitive, Michigan needs to have fair regulatory policies on business regarding such important issues as workers' compensation and we need to encourage greater efficiency in state government by lowering the state personal income tax.

Currently, workers' compensation costs are 20% higher in Michigan than those in neighboring states. Why? Our eligibility standards are not the same as most other states. Too many people are allowed to qualify for too long a period of a time.

Many Grand Rapids businesses

are competing with firms in other states having lower regulatory costs. Unless checked, this disadvantage may continue to cost Michigan jobs . . . jobs that are lost when businesses leave Michigan, expand out of state, or when out-state companies seeking to expand don't locate here in Michigan.

To ensure that Michigan is job competitive, we need legislators at the State Capitol who will show courage and stand up to special interests that advocate greater regulation and taxes.

The Michigan State Chamber of Commerce believes Richard Bandstra has the background and training to do the best job in Lansing for the people of the 93rd House District. We believe he will work to reduce workers' compensation costs and for an early rollback of the personal income tax rate.

The State Chamber is committed to job development in Michigan. We believe Richard Bandstra shares that commitment.

## On Monday June 10th, Elect Richard Bandstra State Representative 93rd House District Special Election



MICHIGAN STATE CHAMBER OF COMMERCE

Not authorized by the Candidate Committee of Richard Bandstra

Paid for by the Michigan State Chamber of Commerce • Suite 400, 200 N. Washington Square • Lansing, Michigan 48933

PLAINTIFF'S EXHIBIT 14

**All Citations**

494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990)
Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 238 of 1384
110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    Section 54(1) is modeled on a provision of the Federal Election Campaign Act of 1971, 86 Stat. 11, as amended, 2 U.S.C. §§ 431–455, that requires corporations and labor unions to use segregated funds to finance independent expenditures made in federal elections. § 441b.

2    A requirement that the Chamber disclose the nature and extent of its political activities, see *post,* at 1422 (KENNEDY, J., dissenting), would not eliminate the possible distortion of the political process inherent in independent expenditures from general corporate funds. Given the significant incentive for members to continue their financial support for the Chamber in spite of their disagreement with its political agenda, disclosure will not ensure that the funds in the Chamber's treasury correspond to members' support for its ideas.

3    A nonprofit corporation's segregated fund, on the other hand, apparently cannot receive contributions from corporations. See Mich.Comp. Laws § 169.255(3) (1979) (allowing contributions only from "(a) Members of the corporation who are individuals. (b) Stockholders of members of the corporation. (c) Officers or directors of members of the corporation"). In addition, a corporation's payment to a segregated fund would likely be considered a contribution or expenditure because the sole purpose of such segregated funds is to make political contributions and expenditures. § 169.255(1). The segregated fund, therefore, could not be used as a conduit for business corporations' political spending.

4    The Federal Election Campaign Act restricts the independent expenditures of labor organizations as well as those of corporations. 2 U.S.C. § 441b(a).

5    The Federal Election Campaign Act contains a similar exemption that excludes from the definition of expenditure "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate." 2 U.S.C. § 431(9)(B)(i).

1    In *MCFL,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), we observed that the requirement that expenditures be made through PACs "is of course distinguishable from the complete foreclosure of any opportunity for political speech that we invalidated in the state referendum context in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)." *Id.,* at 259, n. 12, 107 S.Ct., at 628, n. 12.

2    We cited with approval in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), a discussion of the constitutionality of restrictions on union contributions and independent expenditures in candidate elections:

"[T]he ban on union political contributions and expenditures is not total but applies only to general union funds. Contributions and expenditures made by a separate fund financed by voluntary contributions are specifically permitted, as are expenditures of general funds to solicit contributions to the separate fund. In order to engage in political discussion, a union need only convince its members that its views are sound enough to merit a contribution to a union political committee espousing the same political philosophy. The necessity of convincing union members of the value of such a contribution does not amount to a constitutionally invalid burden. After all, if union members are so unconvinced of the reasonableness of the union's position that they refuse to support it, the argument for prohibiting the union from spending dues money to support its political views is greatly strengthened.... In the case of unions, the statute strikes a legitimate and reasonable accommodation by distinguishing between the uses to which a separate, voluntary fund and the general

AR.04079

treasury fund may be put." Comment, The Regulation of Union Political Activity: Majority and Minority Rights and Remedies, 126 U.Pa.L.Rev. 386, 409 (1977) (cited in Bellotti, supra, at 788, n. 26, 98 S.Ct., at 1422, n. 26).

3    Justice KENNEDY is mistaken when he suggests that by upholding the as-applied challenge in *MCFL* and rejecting it here, we are embarking on "value-laden, content-based speech suppression that permits some nonprofit corporate groups but not others to engage in political speech." *Post,* at 1416 (KENNEDY, J., dissenting). The mere fact that some as-applied challenges succeed while others fail does not create a system of "speech suppression." Whether an organization presents the threat at which the campaign finance laws are aimed has to do with the particular characteristics of the organization at issue and not with the content of its speech. Of course, if a correlation between the two factors could be shown to exist, a group would be free to mount a First Amendment challenge on that basis. Cf. Buckley v. Valeo, 424 U.S. 1, 97, n. 131, 96 S.Ct. 612, 672, n. 131, 46 L.Ed.2d 659 (1976). Neither appellee nor Justice KENNEDY's dissent has provided any reason to believe that such a relationship exists here.

4    According to Justice KENNEDY's dissent, the majority holds that "it is now a felony in Michigan for the Sierra Club, or the American Civil Liberties Union" to make independent expenditures. *Post,* at 1418. This characterization is inaccurate. Not only are those groups not part of the proceeding before us, but the dissent has overlooked the central lesson of *MCFL* that the First Amendment may require exemptions, on an as-applied basis, from expenditure restrictions. If a nonprofit corporation is formed with the express purpose of promoting political ideas, is not composed of members who face an economic incentive for disassociating with it, and does not accept contributions from business corporations or labor unions, then it would be governed by our *MCFL* holding.

5    In addition, shareholders in a large business corporation may find it prohibitively expensive to monitor the activities of the corporation to determine whether it is making expenditures to which they object.

6    Justice KENNEDY's argument is also inconsistent with his focus on nonprofit corporations. The leading theory on nonprofit enterprises holds that the rationale for use of the nonprofit form lies chiefly in the so-called "nondistribution constraint"—*i.e.,* the fact that while ordinary business corporations have shareholders who are allowed to receive the residual earnings of the enterprise, the members of a nonprofit corporation are expressly prohibited from receiving any part of the assets or property of the corporation for themselves. See Hansmann, Reforming Nonprofit Corporation Law, 129 U.Pa.L.Rev. 497, 502–507, 557 (1981); Hansmann, The Role of Nonprofit Enterprise, 89 Yale L.J. 835, 843–845 (1980). The nondistribution constraint helps overcome contractual failure in situations where the activities of the corporation are difficult to monitor, by removing the "profit motive" and assuring those who contribute to, and contract with, the corporation that the nonprofit's managers will not exploit informational deficiencies to pursue their own private interests. Hence, Justice KENNEDY's proposed reliance on a nonprofit's donors to monitor and police the corporation's activities overlooks the *raison d'être* of the nonprofit form.

7    This very "underinclusiveness" belies the dissents' charge that the Michigan law is a broad restriction on corporate political expression; many avenues of communication are open to the Chamber. In addition, the segregated fund requirement in practice has not burdened the Chamber's speech with respect to candidate-oriented expenditures. The Chamber established a PAC in 1977 and has drawn from that fund in every election since then. The Chamber has an eligible class of about 50,000 individuals from whom it can solicit contributions to its PAC under the Michigan statute, and it has been quite successful in doing so. During the 1983–1984 election cycle, the Chamber PAC raised over $102,000, and its projected resources for the 1986 primary and general elections amounted to more than $140,000. See App. in No. 86–1867 (CA6), pp. 164, 184. The District Court found that "the record in this case amply demonstrates that the Chamber PAC frequently makes independent expenditures to influence political elections, and those efforts have been tremendously successful in electing Chamber PAC endorsed candidates." App. to Juris.Statement 66a–67a.

8    Justice SCALIA also maintains that protection of dissenting shareholders cannot qualify as a valid state interest because shareholders purchase their stock on the understanding that the corporation will use their money for any profitmaking purpose, including support for political candidates with whom the shareholders may not agree. See *post,* at 1411–1412.

We have already rejected this argument in the context of labor unions. See Abood v. Detroit Board of Education, 431 U.S. 209, 234–235, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977); Machinists v. Street, 367 U.S. 740, 764, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961). Rather than assuming that an employee accepts as "the deal," *post,* at 1412,

that the union will use his dues for any purpose that will advance the interests of the bargaining unit, including political contributions and expenditures, we have determined that "the authority to impose dues and fees [is] restricted at least to the 'extent of denying the unions the right, over the employee's objection, to use his money to support political causes which he opposes,' ... even though Congress was well aware that *unions had historically expended funds in the support of political candidates and issues.*" *Ellis v. Railway Clerks,* 466 U.S. 435, 447, 104 S.Ct. 1883, 1891, 80 L.Ed.2d 428 (1984) (quoting *Street, supra,* 367 U.S., at 768, 81 S.Ct., at 1796) (emphasis added).

Given the extensive state regulation of corporations, shareholder expectations are always a function of *state law.* It is circular to say, as does Justice SCALIA, that *if* a State did not protect shareholders, they would have no expectation of being protected, and therefore that the State has no legitimate interest in protecting them. Justice SCALIA concedes, as he must, that an expenditure "not plausibly tied to [a corporation's] ability to make money for its shareholders" can be prohibited. *Post,* at 1414. But States have always been permitted to define what qualifies as "plausibly tied" to the corporation's purpose of making money, *i.e.,* what qualifies as "corporate waste," see *Rogers v. Hill,* 289 U.S. 582, 591–592, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933), including wasteful speech, see *Bellotti,* 435 U.S., at 795, 98 S.Ct., at 1426; *Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975). I believe it entirely proper for a State to decide to promote the ability of investors to purchase stock in corporations without fear that their money will be used to support candidates with whom they do not agree.

9    As Justice STEVENS notes in his concurring opinion today, *post,* at 1407, n., our decision in *Bellotti* expressly distinguished "state and federal laws regulating corporate participation in partisan *candidate* elections." 435 U.S., at 788, n. 26, 98 S.Ct., at 1422, n. 26 (emphasis added).

10    I express no definitive view of the proper interpretation of this provision of state law inasmuch as it is not part of the case before us.

*    "In addition to prohibiting corporate contributions and expenditures for the purpose of influencing the vote on a ballot question submitted to the voters, § 8 also proscribes corporate contributions or expenditures 'for the purpose of aiding, promoting or preventing the nomination or election of any person to public office, or aiding, promoting, or antagonizing the interests of any political party.' ... In this respect, the statute is not unlike many other state and federal laws regulating corporate participation in partisan candidate elections. Appellants do not challenge the constitutionality of laws prohibiting or limiting corporate contributions to political candidates or committees, or other means of influencing candidate elections. Cf. *Pipefitters v. United States,* 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); *United States v. Automobile Workers,* 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); *United States v. CIO,* 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). About half of these laws, including the federal law, 2 U.S.C. § 441b (1976 ed.) (originally enacted as the Federal Corrupt Practices Act, 34 Stat. 864), by their terms do not apply to referendum votes. Several of the others proscribe or limit spending for 'political' purposes, which may or may not cover referenda. See *Schwartz v. Romnes,* 495 F.2d 844 (CA2 1974).

"The overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. See *United States v. Automobile Workers, supra,* at 570–575, 77 S.Ct., at 530–533; *Schwartz v. Romnes, supra,* at 849–851. The importance of the governmental interest in preventing this occurrence has never been doubted. The case before us presents no comparable problem, and our consideration of a corporation's right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office. Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections. Cf. *Buckley v. Valeo,* [424 U.S. 1, 46, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ]; Comment, The Regulation of Union Political Activity: Majority and Minority Rights and Remedies, 126 U.Pa.L.Rev. 386, 408–410 (1977)." *First National Bank of Boston v. Bellotti,* 435 U.S., at 788, n. 26, 98 S.Ct., at 1422, n. 26.

Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990)
Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 241 of 1384
110 S.Ct. 1391, 108 L.Ed.2d 652, 58 USLW 4371

\*    The Court's assertion that the Michigan law "does not impose an *absolute* ban on all forms of corporate political spending," *ante,* at 1398, is true only in a respect that is irrelevant for purposes of First Amendment analysis. A corporation is absolutely prohibited from spending its own funds on this form of political speech, and would be guilty of misrepresentation if it asserted that a particular candidate was supported or opposed by the corporation. This is to say that the corporation *as a corporation* is prohibited from speaking. What the Michigan law permits the corporation to do is to serve as the founder and treasurer of a different association of individuals that can endorse or oppose political candidates. The equivalent, where an individual rather than an association is concerned, would be to prohibit John D. Rockefeller from making political endorsements, but to permit him to form an association to which others (though not he himself) can contribute for the purpose of making political endorsements. Just as political speech by that association is not speech by John D. Rockefeller, so also speech by a corporate PAC that the Michigan law allows is not speech by the corporation itself.

1    Section 54 of the Act states:

"Sec. 54. (1) Except with respect to the exceptions and conditions in subsections (2) and (3) and section 55, and to loans made in the ordinary course of business, a corporation may not make a contribution or expenditure or provide volunteer personal services which services are excluded from the definition of a contribution pursuant to section 4(3)(a).

. . . . .

"(4) Nothing in this section shall preclude a corporation or joint stock company from making an independent expenditure in any amount for the qualification, passage, or defeat of a ballot question. A corporation making an independent expenditure under this subsection shall be considered a ballot question committee for the purposes of this act."

☐ Mich.Comp. Laws § 169.254 (1979).

2    Section 6 provides:

"Sec. 6. (1) 'Expenditure' means a payment, donation, loan, pledge, or promise of payment of money or anything of ascertainable monetary value for goods, materials, services, or facilities in assistance of, or in opposition to, the nomination or election of a candidate, or the qualification, passage, or defeat of a ballot question....

"(2) Expenditure includes a contribution or a transfer of anything of ascertainable monetary value for purposes of influencing the nomination or election of any candidate or the qualification, passage, or defeat of a ballot question.

"(3) Expenditure does not include:

. . . . .

"(c) An expenditure for communication on a subject or issue if the communication does not support or oppose a ballot issue or candidate by name or clear inference or an expenditure for the establishment, administration, or solicitation of contributions to a fund or independent committee.

"(d) An expenditure by a broadcasting station, newspaper, magazine, or other periodical or publication for any news story, commentary, or editorial in support of or opposition to a candidate for elective office, or a ballot question in the regular course of publication or broadcasting." Mich.Comp. Laws § 169.206 (1979).

3    Section 9(1) states:

"Sec. 9. (1) 'Independent expenditure' means an expenditure as defined in section 6 by a person if the expenditure is not made at the direction of, or under the control of, another person and if the expenditure is not a contribution to a committee." Mich.Comp. Laws § 169.209(1) (1979).

4    See n. 2, *supra.*

5    Section 54(5) states:

"(5) A person who knowingly violates this section is guilty of a felony and shall be punished by a fine of not more than $5,000.00 or imprisoned for not more than 3 years, or both, and if the person is other than an individual, the person shall be fined not more than $10,000.00." ☐ Mich.Comp. Laws § 169.254(5) (1979).

6    As the primary objective of the statute is itself prohibited by the First Amendment, there is no need to explain that the statute is invalid also because it is vague and imprecise. It should be noted, however, that the criminal prohibition of speech which by "inference" can be taken to support a candidate, see Mich.Comp. Laws § 169.206(3)(c) (1979), must in itself chill speech on public issues, which the Court has already found protected in *Bellotti.*

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

944 F.2d 638
United States Court of Appeals,
Ninth Circuit.

Jesus Jorge AYALA–CHAVEZ, Petitioner,

v.

U.S. IMMIGRATION AND
NATURALIZATION SERVICE, Respondent.

No. 90–70657.
|
Submitted Sept. 12, 1991. *
|
Decided Sept. 19, 1991.

**Synopsis**

Alien sought review of Board of Immigration Appeals' (BIA's) decision affirming immigration judge's denial of his application for waiver of deportation. The Court of Appeals, Eugene A. Wright, Circuit Judge, held that BIA did not abuse its discretion in finding that equities in favor of alien were not outstanding.

Affirmed.

West Headnotes (10)

**[1]** **Aliens, Immigration, and Citizenship** 🔑 Presentation and preservation of questions at administrative level

Issue of whether alien was required to show "outstanding equities" before waiver of deportation would be considered was adequately raised before Board of Immigration Appeals (BIA) and, thus, Court of Appeals had jurisdiction to consider issue; in brief to BIA, alien argued that nonviolent possessory drug offense and minor traffic infractions and problems should not by themselves require that alien show unusual or outstanding equities to merit relief. Immigration and Nationality Act, § 212(c), as amended, 🔑 8 U.S.C.A. § 1182(c).

41 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** 🔑 Law questions

Court of Appeals reviews de novo legal standard applied by Board of Immigration Appeals (BIA).

**[3]** **Administrative Law and Procedure** 🔑 Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** 🔑 Law questions

Court of Appeals shows considerable deference to Board of Immigration Appeals' (BIA's) interpretation of statutes it administers.

6 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** 🔑 Controlled substances offenses

Board of Immigration Appeals (BIA) permissibly interpreted Immigration and Nationality Act in applying higher waiver of deportation standard for drug offenders, requiring them to show outstanding equities. Immigration and Nationality Act, §§ 212(c), 241(b), as amended, 🔑 8 U.S.C.A. §§ 1182(c), 1251(b).

8 Cases that cite this headnote

**[5]** **Aliens, Immigration, and Citizenship** 🔑 Controlled substances offenses

Alien's criminal record was serious enough to justify application of higher standard for waiver of deportation, requiring alien to show outstanding equities; alien had been convicted of possession of cocaine and had been declared habitual traffic offender. Immigration and Nationality Act, §§ 212(c), 241(b), as amended, 🔑 8 U.S.C.A. §§ 1182(c), 1251(b).

10 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 👈 **Findings or statement of reasons**

Board of Immigration Appeals (BIA), in deportation proceeding, adequately evaluated gravity of alien's offenses by enumerating each and concluding that his convictions weighed heavily against him. Immigration and Nationality Act, §§ 212(c), 241(b), as amended, 8 U.S.C.A. §§ 1182(c), 1251(b).

1 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** 👈 **Crimes and immorality**

Board of Immigration Appeals' (BIA's) factual determination that record of alien seeking waiver of deportation showed pattern of criminal activity was amply supported by substantial evidence; alien had been convicted of cocaine possession and had been declared habitual traffic offender. Immigration and Nationality Act, § 212(c), as amended, 8 U.S.C.A. § 1182(c).

6 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship** 👈 **Review of discretion**

Court of Appeals reviews for abuse of discretion Board of Immigration Appeals' (BIA's) balancing of equities for waiver of deportation. Immigration and Nationality Act, § 212(c), as amended, 8 U.S.C.A. § 1182(c).

8 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship** 👈 **Fact Questions**

Court of Appeals may set aside Board of Immigration Appeals' (BIA's) denial of waiver of deportation only if BIA fails to support its conclusions with reasoned explanation based upon legitimate concerns. Immigration and Nationality Act, § 212(c), as amended, 8 U.S.C.A. § 1182(c).

32 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** 👈 **Controlled substances offenses**

Board of Immigration Appeals (BIA) did not abuse its discretion in finding that equities in favor of alien seeking waiver of deportation were not outstanding; alien had been convicted in state court for possession of cocaine and had been declared habitual traffic offender, and fact that he had legally resided in United States for 18 years, that most of his family legally resided there, and that he supported his minor daughter did not preclude deportation. Immigration and Nationality Act, § 212(c), as amended, 8 U.S.C.A. § 1182(c).

56 Cases that cite this headnote

**Attorneys and Law Firms**

**\*640** Jay Warren Stansell; Sarah B. Ignatius, Northwest Immigrant Legal Services, Seattle, Wash., for petitioner.

William J. Howard, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, D.C., for respondent.

Petition for Review of an Order of the Board of Immigration Appeals.

Before WRIGHT, FARRIS and TROTT, Circuit Judges.

**Opinion**

EUGENE A. WRIGHT, Circuit Judge:

Jesus Jorge Ayala–Chavez seeks review of a Board of Immigration Appeals (BIA) decision affirming the immigration judge's denial of his application for discretionary relief from deportation under section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c). We affirm.

I

Ayala is a 27 year old Mexican citizen who has lived in the United States as a lawful permanent resident for about 18 years. He, his parents and siblings have all lived in the same area of Eastern Washington since their arrival in this country. He is divorced from a United States citizen and he has a minor daughter, also a citizen, whom he visits regularly and to whom he pays child support. He attended state public schools through the eleventh grade, but was unable to finish high school due to a head injury. He has expressed an intention to obtain a G.E.D. and has maintained steady employment as a farm worker since leaving school.

In October 1987, Ayala was convicted in Washington state court of possession of cocaine. His prior record consisted of numerous traffic violations including two incidents of negligent driving, several speeding tickets and three arrests for driving without a license for which he served 42 days in jail. He also had been declared an habitual traffic offender.

Shortly after his conviction, the INS charged him with deportability under section 241(a)(11) of the Act, 8 U.S.C. § 1251(a)(11).[1] The immigration judge found him deportable and denied his application for a waiver of deportation under section 212(c) of the Act, 8 U.S.C. § 1182(c).[2] The BIA affirmed. We have jurisdiction under 8 U.S.C. § 1105a.

II

Ayala contends the BIA applied an erroneous legal standard by requiring him to show "outstanding equities" before a grant of section 212 relief would be considered.

**[1]** The INS responds that this court lacks jurisdiction over the issue because **\*641** Ayala did not raise it before the BIA. See Vargas v. INS, 831 F.2d 906, 907–08 (9th Cir.1987). We disagree. In his brief to the Board, Ayala argued, "A non-violent possessory drug offense, together with minor infractions and problems, should not by themselves require that an alien should show unusual or outstanding equities to merit relief under section 212(c)." We find this adequately raised the issue to the BIA.

**[2]    [3]** We review de novo the legal standard applied by the BIA. Arteaga v. INS, 836 F.2d 1227, 1228 (9th Cir.1988). Because section 212(c) is silent on the applicable legal standard, we must determine whether the administrative

agency's standard is based on a permissible reading of the statute. See Chevron v. Natural Res. Def. Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). "The court need not conclude that the agency construction was the only one it could permissibly have adopted ... or even the reading the court would have reached if the question had arisen in a judicial proceeding." Id. at 843 n. 11, 104 S.Ct. at 2782 n. 11. We show considerable deference to the BIA's interpretation of the statutes it administers. Mahini v. INS, 779 F.2d 1419, 1420 (9th Cir.1986).

**[4]** The BIA requires a showing of outstanding equities by applicants for discretionary relief who have been convicted of serious drug offenses, particularly trafficking. See Matter of Marin, 16 I. & N. Dec. 581, 586 n. 4 (1978). Outstanding equities must also be demonstrated where the applicant's record reflects a pattern of serious criminal activity. Matter of Buscemi, Interim Decision 3058 (BIA 1984).[3] Other circuits have recognized such a heightened standard but have not considered the precise argument made here. See, e.g., Blackwood v. INS, 803 F.2d 1165, 1168 (11th Cir.1988); Mantell v. INS, 798 F.2d 124, 126 (5th Cir.1986).

In determining whether the BIA's construction of the statute was permissible, we first note that courts have always interpreted broadly the discretionary authority of the Attorney General to grant or deny waiver of deportation. E.g., Jay v. Boyd, 351 U.S. 345, 353–54, 76 S.Ct. 919, 924, 100 L.Ed. 1242 (1956) (interpreting the then-current statute allowing suspension of deportation as giving the Attorney General "unfettered discretion"). Inherent in this discretion is the authority of the Attorney General and his subordinates to establish general standards that govern the exercise of such discretion, as long as these standards are rationally related to the statutory scheme. See C. Gordon, H. Rosenfield, S. Mailman, 3 Immigration Law and Procedure § 8.15a at 8–128 & n. 13.

The outstanding equities standard is rationally related to the statutory scheme. We agree with the Eleventh Circuit that "the immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." Blackwood v. INS, 803 F.2d 1165, 1167 (11th Cir.1988); cf. Mason v. Brooks, 862 F.2d 190, 194–95 (9th Cir.1988) ("Congress has forcefully expressed our national policy against persons who

possess controlled substances by enacting laws ... to exclude them from the United States if they are aliens.") The Act itself distinguishes between drug offenders and persons convicted of other crimes. *See, e.g.,* 8 U.S.C. § 1251(b) (judicial recommendations against deportation are not permitted in the case of aliens convicted of narcotics violations).

The BIA's application of a higher standard for drug offenders is rationally based upon the Act's manifest concern with drug activity by lawful permanent residents. The higher standard represents a permissible interpretation of the Act.

III

**[5]** Ayala contends that, even if the outstanding equities standard is generally val **\*642** id, the BIA erred by applying it to his case. He argues that the BIA did not state clearly its rationale for imposing the higher standard. This argument is meritless. The BIA clearly stated that "[Ayala's] drug conviction and the earlier lesser offenses are negative factors which ... compel a heightened showing of outstanding equities." Clearly there may be circumstances in which a petitioner's criminal activity is of such a slight nature that application of the higher standard would not be supported by substantial evidence. Ayala's criminal record is serious enough to justify application of the higher standard.

**[6]** **[7]** Ayala further argues that the BIA failed to evaluate the gravity of his criminal offenses and erred in its factual finding that his record showed a pattern of criminal activity. The Board adequately evaluated the gravity of his offenses by enumerating each and concluding that his convictions weighed heavily against him. The Board's factual determination that Ayala's record showed a pattern of criminal activity was amply supported by substantial evidence.

The BIA acknowledged that rehabilitation is an important factor for determining relief, but is not an absolute prerequisite for a waiver to issue. *Matter of Buscemi,*

*Interim Decision 3058 (BIA 1988).* It noted that Ayala's repeated convictions for driving offenses and his eventual drug conviction showed disregard for the laws of the United States. It concluded that he did not learn from the less serious convictions and that evidence he served his jail term and was paying off his fine was insufficient to show rehabilitation. This conclusion was reasonable.

IV

**[8]** **[9]** We review the BIA's balancing of the equities for section 212(c) relief for an abuse of discretion. *Vargas v. Dep't of Immigration and Naturalization,* 831 F.2d 906, 908 (9th Cir.1987). We may set aside the BIA's denial of section 212(c) relief "only if the Board failed to support its conclusions with a reasoned explanation based upon legitimate concerns." *Id.*

**[10]** In Ayala's favor, the BIA considered his 18–year residence in this country, commencing at age nine.[4] Also considered was the fact that most of his family resides legally in Eastern Washington and that many of them testified on his behalf at the hearing before the immigration judge. He has three sisters who are citizens, and one sister and brother who are legal permanent residents. Ayala's support of his minor daughter was also considered in the BIA proceedings.

The BIA weighed all of these factors and found the equities in Ayala's favor to be substantial, but not outstanding. Accordingly, the BIA dismissed his application for a waiver of deportation. In light of our narrow standard of review, we cannot say that the BIA abused its discretion.

AFFIRMED.

**All Citations**

944 F.2d 638

**Footnotes**

\*    The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

1    Section 241(a)(11) reads:

    Any alien in the United States ... shall, upon order of the Attorney General, be deported who—

    11) is, or hereafter at any time after entry has been a narcotic drug addict, or who at any time has been convicted of a violation of, or conspiracy to violate, any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substance Act).

    8 U.S.C. § 1251(a)(11). Ayala concedes that he is deportable under this provision.

2    Section 212(c) provides:

    Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under any order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted at the discretion of the Attorney General.

    8 U.S.C. § 1182(c). On its face, this provision seems to apply only to exclusion proceedings, but we have found it applicable to deportation proceedings as well. *See* *Tapia–Acuna v. INS,* 640 F.2d 223, 224 (9th Cir.1981). We have also held it applicable to deportation proceedings regardless of whether the resident ever left the United States. *Id.* at 225.

3    Ayala argues that *Buscemi's* outstanding equities standard was overruled by *Matter of Edwards,* Interim Decision 3134 (BIA 1990). Such a reading of *Edwards* is not justified. The *Edwards* decision merely explained *Buscemi* and made it clear that a full examination of an alien's equities could not be pretermitted. *Edwards,* Interim Decision 3134 at 7, n. 3. We find no such pretermission here.

4    Ayala contends that he actually arrived in the United States about 1967 at the age of four, but reentered the country legally in 1972 at age nine. The record is not clear on the actual date of entry. The discrepancy is not dispositive, however, because either date establishes long term residence that is a favorable factor for consideration.

---

**End of Document**  <span style="float:right">© 2020 Thomson Reuters. No claim to original U.S. Government Works.</span>

KeyCite Yellow Flag - Negative Treatment

Distinguished by Morehead v. Barr, 9th Cir., April 30, 2019

709 F.2d 1231
United States Court of Appeals,
Ninth Circuit.

Roman Agmata BALIZA, Appellant,

v.

IMMIGRATION AND
NATURALIZATION SERVICE, Appellee.

CA No. 82–7171.
|
Argued and Submitted Oct. 20, 1982.
|
Decided Jan. 18, 1983.
|
As Modified On Denial of Rehearing
June 28, 1983.

**Synopsis**

Petition was filed to review decision of the United States Immigration and Naturalization Service to deport alien. The Court of Appeals, Canby, Circuit Judge, held that government's introduction of affidavit of alien's ex-wife deprived alien of his right to confront and cross-examine witnesses against him necessitating reversal of order.

Petition to review granted and decision and order of Board of Immigration Appeals vacated and case remanded.

West Headnotes (3)

**[1]** **Aliens, Immigration, and Citizenship** 🔑 Reversal

**Aliens, Immigration, and Citizenship** 🔑 Admissibility

In a deportation hearing, the government's introduction of an affidavit of alien's ex-wife deprived alien of his right to cross-examine witnesses against him necessitating reversal of deportation order where affidavit, taken over a year before deportation hearing, was hearsay, no showing was made that affidavit fell within exception to hearsay rule, affidavit was probative and directly contradicted alien's testimony on

crucial issue of case, genuineness of affidavit had never been established, and no effort had been made by government to locate ex-wife immediately before hearing. Immigration and Nationality Act § 242(b)(3), 🚩 8 U.S.C.A. § 1252(b)(3).

26 Cases that cite this headnote

**[2]** **Administrative Law and Procedure** 🔑 Rules of evidence

Test of whether hearsay statement is admissible in administrative proceeding is whether statement was probative and whether its admission was fundamentally fair.

13 Cases that cite this headnote

**[3]** **Aliens, Immigration, and Citizenship** 🔑 Judicial Review or Intervention

Alien's hearsay challenge to ex-wife's affidavit admitted in deportation hearing was sufficient to require the Court of Appeals to review affidavit's probative value and fairness of its admission.

19 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1232** Peter A. Schey, Los Angeles, Cal., Peter A. Aduja, Honolulu, Hawaii, for appellant.

Alan J. Sobol, Lauri S. Filppu, Margaret Perry, Washington, D.C., for appellee.

Petition to Review a Decision of the United States Immigration & Naturalization Service.

Before CANBY, NORRIS and REINHARDT, Circuit Judges.

**Opinion**

CANBY, Circuit Judge:

On October 29, 1979, an order to show cause was issued, charging Roman Agmata Baliza with entering the United States with an immigration visa procured on the basis of a

fraudulent marriage, in violation of 8 U.S.C. §§ 1182(a)(19), 1251(a)(1) and (a)(2). The order to show cause also charged Baliza with entering the United States for the purpose of performing skilled or unskilled labor without a valid labor certification in violation of 8 U.S.C. §§ 1182(a)(14) and 1251(a)(1). The Immigration Judge found that Baliza was deportable as charged and granted him three months voluntary departure. Baliza appealed to the Board of Immigration Appeals which dismissed his appeal.

[1]    On petition for review, Baliza argues that the Immigration Judge's determination that his marriage was fraudulent was not supported by reasonable, substantial and probative evidence. In addition, he contends that the government's introduction of his ex-wife's affidavit deprived him of his statutory and constitutional right to confront and cross-examine the witnesses against him. We find it necessary to address only the latter contention. We hold that the government's introduction of the affidavit did deprive Baliza of his right to cross-examine witnesses against him. 8 U.S.C. § 1252(b)(3). We therefore reverse and remand for further proceedings.

Baliza is a thirty-four year old male alien. He is a native and citizen of the Philippines. He entered the United States at Honolulu, Hawaii on January 19, 1973. He was admitted as a nonquota immigrant by reason of his marriage on September 18, 1971, to Leonora Valera Borce, a United States citizen. The marriage, which was celebrated at Ilocos Norte, Philippines was terminated by divorce on February 22, 1974. Baliza **1233** admitted these facts, as alleged in the order to show cause, at his January 1980 deportation hearing.

Baliza testified that he and Leonora dated for three to five months prior to their marriage and that they married for love. He stated that they decided to get married before Leonora left for the United States, and that Leonora had promised she would bring him to this country. He testified that when he arrived in Honolulu Leonora met him at the airport. He claimed that they lived together at his aunt's home for three weeks until Leonora ran away with another man. He stated that he filed for the divorce, rather than Leonora, because Leonora was told she could not do so while she was pregnant.

In an affidavit dated December 15, 1978, Leonora stated that she was told to marry Baliza and that everything would be arranged for them. She denied ever living with him, before or after the marriage, and stated that she only found out that he had come to Honolulu when his aunt told her he was there. She also stated that she only went through with the marriage because she was very young and her mother and relatives said she should. Neither Leonora nor the investigator who took her statement testified at the deportation hearing. The Immigration Judge admitted the affidavit, which he recognized as hearsay, over the objection of Baliza's counsel.

The Immigration Judge held that the government met its burden of showing by clear, convincing and unequivocal evidence: (1) that Baliza's marriage took place less than two years prior to his entry; and (2) that the marriage was judicially terminated within two years after entry. He therefore concluded that Baliza had the burden, under section 1251(c) of coming forward with sufficient evidence to rebut the statutory presumption that his visa was procured on the basis of a fraudulent marriage.

The Immigration Judge noted several inconsistencies in Baliza's testimony and also considered the affidavit filed by Baliza's ex-wife. He concluded that Baliza had failed to show by a preponderance of the evidence that the marriage was not entered into in order to evade the immigration laws. He therefore found Baliza deportable under sections 1251(a)(2) and (c).

Baliza's ex-wife's affidavit, taken over a year before the deportation hearing, was hearsay. It was an out-of-court statement by a nonparty offered for the truth of the matter asserted. *See* Fed.R.Evid. 801. As such, it would not be admissible in court unless it could be shown to fall under one of the exceptions to the hearsay rule. Such a showing was not made in this case.

[2]    Administrative proceedings are not, however, bound by strict rules of evidence. *de Hernandez v. INS,* 498 F.2d 919 (9th Cir.1974). Thus the fact that the affidavit was hearsay is not dispositive. In the context of a deportation hearing this court has held that "the only limitation upon its procedure [is] that a hearing, though summary, must be fair." *Navarrette-Navarrette v. Landon,* 223 F.2d 234, 237 (9th Cir.1955) (*quoting, United States v. Brough,* 15 F.2d 377, 379 (2d Cir.1926), *cert. denied,* 351 U.S. 911, 76 S.Ct. 700, 100 L.Ed. 1446 (1956)). The test is whether the statement is probative and whether its admission was fundamentally fair. *Trias-Hernandez v. INS,* 528 F.2d 366, 369 (9th Cir.1975); *Martin-Mendoza v. INS,* 499 F.2d 918, 921 (9th Cir.1974),

cert. denied, 420 U.S. 984, 95 S.Ct. 1417, 43 L.Ed.2d 667 (1975).

[3] If credited, the affidavit was probative. It directly contradicted Baliza's testimony on the crucial issue of the case—the genuineness of his 1971 marriage to Leonora. Despite the affidavit's importance, the government made only a minimal effort at authentication. In his appeal to the Board of Immigration Appeals, Baliza challenged the admission of the affidavit but did not clearly direct his challenge to the lack of authentication. Ordinarily, such an omission might constitute a failure to exhaust administrative remedies that would foreclose further consideration of the affidavit's authenticity. Chung Young Chew v. Boyd, 309 F.2d 857, 861 (9th Cir.1962). Baliza's hearsay challenge to the affidavit is sufficient, *1234 however, to require us to review the affidavit's probative value and the fairness of its admission. That review necessarily encompasses some consideration of the affidavit's authenticity.

The government called no witnesses other than Baliza. The investigator who took the affidavit did not testify. Although the government argues that Baliza conceded that the statement was authentic, the record evidence does not support that claim. Baliza was asked, in reference to the affidavit, "[d]oes the name Roman Agmata Baliza relate to you?" He responded, "[t]hat's my name." The government's attempt to read that ambiguous response as a concession ignores the fact that his counsel objected to the affidavit's admission, in part because "it wasn't properly identified." Thus, although apparently credited by both the Immigration Judge and the Board of Immigration Appeals, the genuineness of the affidavit has never been established.

Even if the affidavit had been authenticated, on the facts of this case its admission raises substantial problems. Congress has required an alien in deportation proceedings to be afforded "a reasonable opportunity ... to cross-examine witnesses presented by the Government." 8 U.S.C. § 1252(b)(3). The purpose of this statutory guarantee cannot be fulfilled, however, if the government's choice whether to produce a witness or to use a hearsay statement is wholly unfettered. As noted, the basic issue is whether the affidavit's admission rendered the proceedings fundamentally unfair. Recognizing the Government's lack of control over potential witnesses, this court has upheld the admission of hearsay evidence in a number of cases in which the government was unable to produce the witness for cross-examination. See Trias-Hernandez v. INS, 528 F.2d at 370; Martin-Mendoza v. INS, 499 F.2d at 921–22; de Hernandez v. INS, 498 F.2d at 921; Navarrette-Navarrette v. Landon, 223 F.2d at 237. The troubling aspect of this case is the lack of effort the government expended to produce Leonora. No effort was made to locate her immediately before the deportation hearing. During the hearing, the Immigration Judge indicated on January 16, 1980, that the hearing would have to be continued for completion on Friday, January 18. Later on January 16, when he admitted the affidavit over Baliza's objection, the Immigration Judge stated that the government would make an effort to find Leonora and bring her in on Friday. At the close of testimony on Friday, the Immigration Judge questioned the government attorney regarding the efforts made to locate Leonora. The government responded that it had been unable to locate Leonora and offered into evidence an investigator's note. That note stated: "No such address as 2101 Wilson Place, occupant at 1124 Auld Lane says subject moved over six months ago. No idea of current whereabouts." The investigator was not produced to testify as to the extent of his investigation.

The government knew for over a year that Leonora's testimony would play a key role in its case, yet the record contains no evidence of any attempt to stay in contact with her or obtain her attendance at the hearing. Instead, the government was content to rely on an unauthenticated year old affidavit. An unsigned note, which indicates that in response to the Immigration Judge's order some effort was made to locate the witness during a twenty-four hour recess, is not enough to justify admission of such hearsay evidence. Admission of the affidavit under these circumstances was fundamentally unfair and consequently deprived Baliza of his right of cross-examination.

The petition for review is granted, the decision and order of the Board of Immigration Appeals is vacated, and the case is remanded to the Board for further proceedings not inconsistent with this opinion.

**All Citations**

709 F.2d 1231, 12 Fed. R. Evid. Serv. 759

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Med & Med GD (CCH) P 305,879

850 F.3d 257
United States Court of Appeals, Fifth Circuit.

BAYLOR COUNTY HOSPITAL DISTRICT, doing
business as Seymour Hospital, Plaintiff–Appellant
v.
Thomas PRICE, Secretary, U.S. Department of
Health and Human Services, Defendant–Appellee

No. 16-10310
|
FILED March 7, 2017

**Synopsis**
**Background:** Hospital brought action against Secretary
of Department of Health and Human Services (DHHS),
challenging DHHs's decision that it was not "critical access
hospital," based on finding that hospital was on a "primary
road," and thus that would not be entitled to favorable
Medicare reimbursement schedule. The United States District
Court for the Northern District of Texas, Reed Charles
O'Connor, J., 163 F.Supp.3d 372, granted Secretary's motion
for summary judgment. Hospital appealed.

**Holdings:** The Court of Appeals, Edith H. Jones, Circuit
Judge, held that:

[1] DHHS's decision was based on valid interpretation of
"secondary roads" provision of Medicare Rural Hospital
Flexibility Program;

[2] DHHS's consistent interpretation of "primary road"
supported granting *Skidmore* deference to DHHS's
determination; and

[3] DHHS's interpretation of "primary road" operated within
its expertise, weighing in favor of granting *Skidmore*
deference to DHHS's determination.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

**West Headnotes (7)**

**[1]    Federal Courts**    Summary judgment

The Court of Appeals reviews a grant of
summary judgment in an action challenging an
agency decision de novo, applying the same
standard to review the agency's decision that the
district court used.

6 Cases that cite this headnote

**[2]    Administrative Law and
Procedure**    Deference to Agency in
General

**Administrative Law and
Procedure**    Relationship of agency with
statute in general

The Court of Appeals accords *Skidmore*
deference to agency interpretations of statutes
they administer that do not carry the
force of law; the degree of deference
depends on the thoroughness evident in the
agency's consideration, the validity of its
reasoning, its consistency with earlier and later
pronouncements, and all those factors which give
it power to persuade, if lacking power to control.

4 Cases that cite this headnote

**[3]    Health**    Deference to agency in general

Decision of Department of Health and Human
Services (DHHS) that hospital was not "critical
access hospital," and thus that hospital would not
be entitled to favorable Medicare reimbursement
schedule for rural hospitals, was based on valid
interpretation of "secondary roads" provision of
Medicare Rural Hospital Flexibility Program,
weighing in favor of granting *Skidmore*
deference to DHHS's decision; DHHS opted
for bright-line rule that numbered federal
highway could not qualify as secondary road
after considering its lack of agency resources
to make case-by-case judgments about road
conditions, and it was reasonable for DHHS
to conclude that federal highways were likely

Med & Med GD (CCH) P 305,879

to be bigger and better-maintained than state highways. Social Security Act § 1820, 42 U.S.C.A. § 1395i-4(c)(2)(B)(i)(I).

1 Cases that cite this headnote

[4]  **Health**  Deference to agency in general

Department of Health and Human Services' (DHHS) consistent interpretation of "primary road," as used to determine that hospital did not qualify for critical access hospital status under Medicare Rural Hospital Flexibility Program, supported granting *Skidmore* deference to DHHS's determination; DHHS had never deviated from its bright-line rule that federally numbered highways were primary roads. Social Security Act § 1820, 42 U.S.C.A. § 1395i-4(c)(2)(B)(i)(I).

1 Cases that cite this headnote

[5]  **Health**  Deference to agency in general

Department of Health and Human Services' (DHHS) interpretation of "primary road," as used to determine that hospital did not qualify for critical access hospital status under Medicare Rural Hospital Flexibility Program, operated within DHHS's expertise, weighing in favor of granting *Skidmore* deference to DHHS's determination; DHHS bore burden of implementing Medicare's complex programs and regulatory scheme, DHHS was commissioned to facilitate rural health care, and DHHS's activity of classifying roadways was thereby intricately intertwined with broader Medicare policies. Social Security Act § 1820, 42 U.S.C.A. § 1395i-4(c)(2)(B)(i)(I).

1 Cases that cite this headnote

[6]  **Administrative Law and Procedure**  Review for arbitrary, capricious, unreasonable, or illegal actions in general

An agency's decision is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

3 Cases that cite this headnote

[7]  **Administrative Law and Procedure**  Review for arbitrary, capricious, unreasonable, or illegal actions in general

So long as the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld on arbitrary and capricious review.

2 Cases that cite this headnote

*258  Appeal from the United States District Court for the Northern District of Texas, Reed Charles O'Connor, U.S. District Judge.

**Attorneys and Law Firms**

Britton Dale McClung, Joshua L. Hedrick, Hedrick Kring, P.L.L.C., Dallas, TX, for Plaintiff–Appellant.

Brian Walters Stoltz, Dallas, TX, Ann Elizabeth Cruce–Haag, Assistant U.S. Attorney, Lubbock, TX, U.S. Attorney's Office, Northern District of Texas, for Defendants–Appellees.

Before JONES, BARKSDALE, and COSTA, Circuit Judges.

**Opinion**

*259  EDITH H. JONES, Circuit Judge:

In 1997, Congress created a favorable Medicare reimbursement schedule for rural facilities designated as "critical access hospitals." 42 U.S.C. §§ 1395i–4, 1395f. A critical access hospital is defined in part by the type of roads that connect the facility to the next nearest

hospital. Congress used the term "secondary roads" in the definition, but it neither defined that term nor contrasted it with "primary roads." To fill that gap, an agency within the Department of Health and Human Services (DHHS) issued a manual that defines "primary roads" as, *inter alia*, numbered federal highways and defines "secondary roads" as non-primary roads. Appellant Baylor County Hospital District d/b/a Seymour Hospital (Seymour), located in Seymour, Texas, challenges DHHS's decision, founded on the manual, that it is not a critical access hospital. The district court, in a thorough and thoughtful opinion, granted DHHS's motion for summary judgment. We accord 📄 *Skidmore* deference, find nothing arbitrary or capricious in the agency's decisionmaking, and **AFFIRM**.

## I. BACKGROUND

For 20 years, the Medicare Rural Hospital Flexibility Program has provided a special reimbursement scheme for certain rural facilities that serve Medicare beneficiaries. *See generally* 📄 42 U.S.C. §§ 1395i–4, 📄 1395f. These "critical access hospitals," 📄 *id.* § 1395f(l)(1), must meet several criteria, including geographical, staffing, and services requirements. *See* 📄 *id.* § 1395i–4(c)(2)(B). At issue in this case is the geographical requirement measured by a facility's distance from another hospital and the types of roads available to travel that distance:

> A State may designate a facility as a critical access hospital if the facility ... is a hospital that ... is located more than a 35–mile drive (or ... in areas with only secondary roads available, a 15–mile drive) from a hospital, or another facility described in this subsection[.]

📄 *Id.* § 1395i–4(c)(2)(B)(i)(I). Within that criterion, Congress created two standards—a 15–mile standard if "only secondary roads [are] available" between facilities, and a 35–mile default standard if roads other than secondary roads are available. Despite the reference to "secondary roads," Congress defined neither that term nor its comparator, "primary roads." The implementing regulations are similarly blank. *See* 42 C.F.R. § 485.610(c).

To remedy the lack of formally binding definitions, the Centers for Medicare and Medicaid Services (CMS), the agency within DHHS charged with administering Medicare, issued "guidance" in a State Operations Manual (the Manual). The Manual explains that a facility falls within the "secondary roads" provision when "there are more than 15 miles between the [facility] and any hospital or other [critical access hospital] where there are no primary roads." The Manual then articulates three types of "primary roads:"

1. A numbered federal highway, including interstates, intrastates, expressways or any other numbered federal highway;

2. A numbered state highway with 2 or more lanes each way; and

3. A road shown on a map prepared in accordance with the U.S. Geological Survey's Federal Geographic Data Committee (FGDC) Digital Cartographic Standard for Geologic Map Symbolization as a "primary highway, divided by median strip."

CMS, State Operations Manual, ch. 2, § 2256A. The end result is that to qualify under the "secondary roads" provision, a facility must be separated from the nearest **\*260** hospital by more than 15 miles in which there is no primary road—a numbered federal highway, a numbered state highway with two or more lanes each way, or a road shown on a particular map as a "primary highway, divided by median strip."

In 2013, Seymour applied to CMS for designation as a critical access hospital. The nearest hospital is located 31.8 miles away in Throckmorton, Texas. Approximately 28.4 miles of the road directly connecting the small towns of Seymour and Throckmorton are designated as U.S. Highway 183/283, rendering that 28.4–mile stretch a "primary road" under the "numbered federal highway" provision in the Manual. U.S. Highway 183/283 is designated a "Primary Highway," "Principal Highway," and "Major Road" by official sources such as the U.S. Geological Survey and the Texas Department of Transportation. Seymour does not satisfy the alternate 35–mile standard because Seymour lies less than 35 miles away from Throckmorton. But Seymour also fails to qualify under the "secondary roads" provision because for only approximately three miles (31.8 miles minus 28.4 miles) of the distance between Seymour and the Throckmorton hospital are "only secondary roads [ ] available"—well short of the 15–mile "secondary road" threshold. CMS rejected

Seymour's application based on the plain language of the "guidance."

Seymour then requested a hearing from an administrative law judge (ALJ), "disput[ing] the validity of CMS's determination and the rationale for it." Seymour asserted that U.S. Highway 183/283 is a secondary road because it "is a two lane rural road," has "no shoulders," and its "dimension and condition" are those "of a poor quality farm road." Seymour acknowledged that its characterization of U.S. Highway 183/283 as a secondary road conflicted with the "numbered federal highway" provision in the Manual, but Seymour dismissed the Manual as "only guidance," "not controlling," and "not law." Seymour additionally challenged the "numbered federal highway" provision as "unreasonable, arbitrary and capricious."

Applying the Manual, the ALJ rejected Seymour's position. The ALJ found that the Manual was entitled to "considerable deference" and "justified in this case by practical considerations," such as CMS's "lack [of] resources and capacity for making case-by-case judgments about the driving characteristics of every stretch of highway in the United States." Further, the ALJ stated that "making a policy determination that a numbered United States Highway is a 'primary road' not only makes sense, but it may be the only reasonably objective way, along with the other criteria listed in the [Manual], of determining what is 'primary' and what is 'secondary.' "

The DHHS Department of Appeals Board affirmed, holding

> CMS's interpretation provides a bright-line for what constitutes a primary road, based on objective criteria. CMS could reasonably assume that federal highways are likely to be bigger, better-maintained, and more well-traveled than state highways, and that state highways are more likely to have those characteristics than undesignated roads. Given those general expectations, CMS could reasonably require that state highways and undesignated roads be treated as equivalent to federal highways only when they demonstrated specific

characteristics typical of most federal highways. Thus, CMS's decision to categorize as primary roads all federal highways, but only state highways with two or more lanes in each direction, **\*261** and only "primary highways" divided by a median strip, is reasonable.

The Board emphasized that "CMS was not required to conduct case-by-case surveys of all the characteristics and traffic patterns of each stretch of road connecting two rural hospitals." According to the Board, "[a]dministrative efficiency justified developing a bright-line rule that would balance the goals [of the Program] without individual inquiry into each case."

Seymour sought judicial review of the Board's decision, and the district court, in turn, granted summary judgment for DHHS, "find[ing] that the 🔖 *Skidmore [v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ]* factors counsel the Court to grant deference to the Secretary's final decision, as it is supported by substantial evidence and lacks any clear error of law." Seymour appeals, arguing that 🔖 *Skidmore* deference is unwarranted and DHHS's final decision is arbitrary and capricious. (Seymour concedes that the decision is factually consistent with the Manual's definition of "primary roads.")

## II. ANALYSIS

### A. Standard of Review

**[1]** This court reviews a grant of summary judgment *de novo*, applying the same standard to review the agency's decision that the district court used. *E.g., Hayward v. U.S. Dep't of Labor,* 536 F.3d 376, 379 (5th Cir. 2008). But the parties dispute the nature of that standard of review. Seymour advocates arbitrary and capricious review under the Administrative Procedure Act (APA). *See* 🔖 5 U.S.C. § 706(2)(A) (requiring a reviewing court to hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Seymour also urges us to deny 🔖 *Skidmore* deference to the Manual's "numbered federal highway" provision.

For its part, DHHS relies on section 405(g) of the Social Security Act, which authorized judicial review in this case. *See* 42 U.S.C. § 1395cc(h) (citing 42 U.S.C. § 405(g)). Section 405(g) states in relevant part that "[t]he findings of [DHHS] as to any fact, if supported by substantial evidence, shall be conclusive[.]" *Id.* § 405(g). Quoting *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000), which ruled on the appeal of an individual Medicare claimant, DHHS contends that our review under section 405(g) "is limited to two issues: (1) whether [DHHS] applied the proper legal standards; and (2) whether [DHHS's] decision is supported by substantial evidence on the record as a whole." But DHHS also contends that it would prevail even under the arbitrary and capricious standard of review that Seymour prefers. Although it probably makes no difference, we assume only for the sake of argument that the APA's arbitrary and capricious standard applies.

**[2]** Beyond that baseline, this court accords *Skidmore* deference to "agency interpretations of statutes they administer that do not carry the force of law[.]" *Luminant Gen. Co., L.L.C. v. EPA*, 675 F.3d 917, 928 (5th Cir. 2012) (citing *Skidmore*, 323 U.S. 134, 65 S.Ct. 161, and *United States v. Mead Corp.*, 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). The degree of deference depends on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161.[1] Framed in *Skidmore* terms, the **\*262** issues before us are how persuasively CMS interpreted the statute in contrasting primary and secondary roads and whether the DHHS decision against Seymour properly reflects the dichotomy.[2]

We must also note the "distinct but potentially overlapping" relationship between the arbitrary and capricious standard of review and *Skidmore* deference. *Compare* *Fox v. Clinton*, 684 F.3d 67, 74–75, 80 (D.C. Cir. 2012) (referring to the standards as "distinct but potentially overlapping," then finding an agency's interpretation arbitrary and capricious because of "[t]he same flaws" that made *Skidmore*

deference inappropriate), *with* *Luminant*, 675 F.3d at 928–30 (affording "minimal" *Skidmore* deference to the Environmental Protection Agency's interpretation of the Clean Air Act, but holding the interpretation arbitrary and capricious). According some measure of *Skidmore* deference to an agency's informal action does not assure the action will survive arbitrary and capricious review. Following this court's decision in *Luminant,* we analyze the appeal under both standards.

**B. Discussion**

Whether a facility can be a critical access hospital turns in part on its location "in areas with only secondary roads available." 42 U.S.C. § 1395i–4(c)(2)(B)(i)(I). The term "secondary roads" is ambiguous. Congress did not define it or contrast "primary roads," and the implementing regulations likewise offer no guidance. Dictionary definitions offer little help. For example, one definition of "secondary" is "of less than first value or importance." Webster's Third New International Dictionary 2050 (1961). And a definition of "secondary road" is "a road not of primary importance whose classification and maintenance vary according to township, county, and state regulations." *Id.* at 2051. Thus, the "secondary roads" provision broadly refers to roads having less value or importance than other roads. But what does "lesser value or importance" mean and how does one distinguish between the two types of roads?

The CMS Manual attempted to answer those questions by defining a secondary road as a road that is *not* (1) a numbered federal highway, (2) a numbered state highway with two or more lanes each way, or (3) a road shown on a U.S.G.S. map as a "primary highway, divided by median strip."

**1.** *Skidmore* **Deference**

Seymour focuses on the Manual's statement that no "numbered federal highway" can be a "secondary road" and contends that DHHS's decision based on the Manual should not earn *Skidmore* deference "due to a lack of validity, consistency, and expertise." We consider separately each of these specific complaints.

**[3]** First, according to Seymour, the "numbered federal highway" provision is **\*263** invalid because it is "arbitrary and based on irrelevant criteria," and DHHS "has not

articulated a sufficient reason for categorizing identical roads differently."

Instead of relying on the arbitrary and irrelevant criteria of U.S. Highway designations, Seymour contends that DHHS should have considered "factors directly impacting a patient's ability to safely and efficiently travel on the roads leading to a hospital." DHHS's decision, however, is not as blinkered as Seymour suggests. To begin, CMS was interpreting the term used in the statutory text ("secondary roads"), whereas Seymour's "factors" approach, while relevant, imprecisely correlates with the statute. Further, DHHS opted for a bright-line rule after considering its lack of agency resources to make case-by-case judgments about the conditions of every stretch of rural highway in the United States. DHHS factored in the statutory goal of "increas[ing] [patients'] access to care" and sought to categorize roads to better serve "patients seeking medical care in rural areas." In sum, the statutory text had to be articulated properly and in an administratively efficient way. As DHHS put it, the Manual's "numbered federal highway" provision reasonably struck that balance because "federal highways are likely to be bigger, better-maintained, and more well-traveled than state highways[.]" Moreover, it was reasonable to "require that state highways and undesignated roads be treated as equivalent to federal highways only when they demonstrated specific characteristics typical of most federal highways." Therefore, DHHS concluded that it was reasonable to "categorize as primary roads all federal highways, but only state highways with two or more lanes in each direction, and only 'primary highways' divided by a median strip[.]"

Far from being arbitrary and irrelevant, DHHS considered more than a road's "alphanumeric designation," as it worked on the premise, supported by several official mapping sources, that numbered federal highways are generally likely to be more suitable for travel than state highways. DHHS's premise was that ordinarily, federal highways "are likely to be bigger, better-maintained, and more well-traveled than state highways." Seymour acknowledges that "[t]he intent of Congress was to ensure that areas where travel is generally harder and less efficient ... are judged by the more appropriate [secondary-road] 15–mile requirement." DHHS's approach was neither arbitrary nor unreasoned nor did it rely on irrelevant considerations in attempting to fulfill Congressional intent.

Seymour's second invalidity argument is that DHHS "has not articulated a sufficient reason for categorizing identical

roads differently." Seymour notes that U.S. Highway 183/283 would be considered a secondary road pursuant to the Manual if it were a state highway, because its characteristics—no median strip, no double lanes in each direction—do not fall within the Manual's description of non-federal-highway primary roads. This is a fact-specific quarrel with a general rule. DHHS's decision reflected the general conclusion that federal highways offer superior conditions than state highways. To be sure, as with all bright-line rules, there are undoubtedly cases where the Manual's definitions will treat similarly constructed state and federal highways differently. [3]

**\*264** DHHS's adoption of the Manual's criteria, however, reasonably concluded that differentiating between federal and state highways is valid in the vast majority of cases.

[4]  Seymour next argues that DHHS's application of the "numbered federal highway" provision lacks consistency. This assertion is puzzling in light of the two ALJ decisions from within DHHS that Seymour says illustrate arbitrary outcomes under the provision. [4]  Both decisions applied the "numbered federal highway" provision in precisely the same way DHHS applied the provision in this case. In addition, there is no evidence that the Manual's "numbered federal highway" provision has ever changed or that DHHS has deviated in its application. This evidence of consistency, and Seymour's lack of evidence showing inconsistency, weigh in favor of according *Skidmore* deference.

[5]  Finally, Seymour argues that DHHS "was not acting within its area of expertise when attempting to classify roads." Seymour contends that "expertise at identifying and classifying roadways is far afield from the agency's core expertise of administering a health care program." DHHS, however, aptly responds that DHHS bears the burden of implementing Medicare's complex programs and regulatory scheme. *See, e.g.*, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Within this framework, the activity of "classifying roadways" is intricately intertwined with broader Medicare policies. Congress commissioned DHHS to facilitate rural health care and designated rural facilities' locations (based in part on the use of "secondary roads") as the touchstone for that duty. *See* 42 U.S.C. § 1395i–4(c), (e). We decline to conclude, as Seymour implies, that DHHS's core expertise, as defined by Congress, is administering a rural health care program —except for the "rural" part. DHHS's duty to consider

Med & Med GD (CCH) P 305,879

roads connecting facilities in rural areas lies within DHHS's expertise in administering rural health care.

For these reasons, DHHS's interpretation of the "secondary roads" provision is persuasive and entitled to 🔖 *Skidmore* deference.

### 2. Arbitrary and Capricious Review

[6] [7] Seymour repeats the same arguments in challenging DHHS's decision as arbitrary and capricious, and we reject them for essentially the same reasons. Established law holds that an agency's decision is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

🔖 *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting 🔖 *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). So long as "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." 🔖 *Id.* at 934.

**\*265** Seymour argues that DHHS's final decision is arbitrary and capricious because DHHS relied on irrelevant factors, ignored relevant factors, and did not adequately explain its decision. The arguments have been addressed and rejected above; the same result obtains here. DHHS could have solved the problem created by Congress's silence in any number of ways, and its choice "conform[s] to minimal standards of rationality." 🔖 *Id.* at 934. Significantly, DHHS's interpretation of the statute more closely aligns with the text than the intent-based or purposive reading proffered by Seymour. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("First, the purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires."). DHHS's decision was not arbitrary and capricious.

\* \* \*

For these reasons, we **AFFIRM** the district court's judgment.

### All Citations

850 F.3d 257, Med & Med GD (CCH) P 305,879

## Footnotes

1    Reflecting widespread uncertainty over the standards of review for informal rulemaking activities of administrative agencies, DHHS argued in the trial court that both 🔖 *Skidmore* deference and 🔖 *Chevron* deference should apply to the Manual's informal but intended-to-be-decisive "guidance" interpreting "secondary" and "primary" roads. *See* 🔖 *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The trial court rejected DHHS's 🔖 *Chevron* argument but accorded deference anyway according to the 🔖 *Skidmore* sliding scale. In essence, DHHS has taken three positions, including those noted in text above, concerning the applicable standard.

2    Ironically, both the ALJ and the Department Appeals Board expressly viewed the Manual's guidance as non-binding but persuasive, yet the consequence of our according 🔖 *Skidmore* deference is that this court's decision will be binding on federal courts in the Fifth Circuit.

Med & Med GD (CCH) P 305,879

3    A similar point may be made about cases such as *Missouri Baptist Hospital—Sullivan v. CMS,* DAB No. CR2384, 2011 WL 2567291 (June 17, 2011), where state legislatures redesignate roads as something other than state highways to render those roads "secondary roads." That legislatures can find a way to perform an end run around DHHS's policy determination of what constitutes primary and secondary roads, however, does not make that policy determination irrational.

4    *See Mo. Baptist Hosp.—Sullivan v. CMS,* DAB No. CR1987, 2009 WL 3353357 (Aug. 11, 2009); *Mo. Baptist Hosp.—Sullivan v. CMS,* 2011 WL 2567291. Those are not the only ALJ decisions applying the "numbered federal highway" provision consistently. *See Shelby Mem'l Hosp. v. CMS,* DAB No. CR3647, 2015 WL 2452189 (Feb. 11, 2015).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Bedoya-Melendez v. U.S. Atty. Gen., 680 F.3d 1321 (2012)

23 Fla. L. Weekly Fed. C 1049

KeyCite Red Flag - Severe Negative Treatment

Overruled by Patel v. United States Attorney General, 11th Cir., August 19, 2020

680 F.3d 1321
United States Court of Appeals,
Eleventh Circuit.

Hamelt Rodolfo BEDOYA–MELENDEZ,
a.k.a. Hamelt Rodolfo Bedoya,
a.k.a. Hamelt Bedoya, Petitioner,

v.

U.S. ATTORNEY GENERAL, Respondent.

No. 11–10552.
|
May 17, 2012.

**Synopsis**

**Background:** Alien petitioned for review of decision of the Board of Immigration Appeals (BIA), finding that he had not been "battered or subjected to extreme cruelty," and that he was thus ineligible for special rule cancellation of removal.

**[Holding:]** The Court of Appeals, Cox, Circuit Judge, held that, as matter of first impression in the Eleventh Circuit, that whether alien was "battered or subjected to extreme cruelty," as required to be eligible for special rule cancellation of removal, was not question of law, such as the Court of Appeals had jurisdiction to consider, but unreviewable discretionary determination.

Petition dismissed.

West Headnotes (6)

**[1]** Aliens, Immigration, and Citizenship 🔑 Review of initial decision or administrative review

When the Board of Immigration Appeals (BIA) issues a decision on appeal from order of immigration judge, the Court of Appeals reviews only the BIA's decision on subsequent petition for review.

1 Cases that cite this headnote

**[2]** Aliens, Immigration, and Citizenship 🔑 Jurisdiction and venue

On petition for review in immigration case, the Court of Appeals lacks jurisdiction to review discretionary decisions of the Board of Immigration Appeals (BIA), but may review constitutional claims and questions of law. Immigration and Nationality Act, § 242(a)(2)(B, D), 8 U.S.C.A. § 1252(a)(2)(B, D).

5 Cases that cite this headnote

**[3]** Aliens, Immigration, and Citizenship 🔑 Jurisdiction and venue

Whether alien had been "battered or subjected to extreme cruelty," as required to be eligible for special rule cancellation of removal, was not question of law, such as the Court of Appeals had jurisdiction to consider on petition for review of the Board of Immigration Appeals' (BIA's) denial of alien's application for cancellation of removal, but was in nature of discretionary determination not guided by any objective statutory or regulatory standards, such as the Court of Appeals was without jurisdiction to review. Immigration and Nationality Act, §§ 240A(b)(2), 242(a)(2)(B, D), 8 U.S.C.A. §§ 1229b(b)(2), 1252(a)(2)(B, D).

5 Cases that cite this headnote

**[4]** Aliens, Immigration, and Citizenship 🔑 Jurisdiction and venue

Questions of law, such as the Court of Appeals has jurisdiction to consider on petition for review in immigration case, involve application of undisputed fact pattern to legal standard. Immigration and Nationality Act, § 242(a)(2)(B, D), 8 U.S.C.A. § 1252(a)(2)(B, D).

6 Cases that cite this headnote

Bedoya-Melendez v. U.S. Atty. Gen., 680 F.3d 1321 (2012)

23 Fla. L. Weekly Fed. C 1049

[5]     **Aliens, Immigration, and
        Citizenship** 👈 Jurisdiction and venue

Discretionary decisions of the Board of
Immigration Appeals (BIA), such as the Court
of Appeals is without jurisdiction to review, are
those that require the BIA to make judgment call.
Immigration and Nationality Act, § 242(a)(2)(B,
D), 🚩 8 U.S.C.A. § 1252(a)(2)(B, D).

6 Cases that cite this headnote

[6]     **Aliens, Immigration, and
        Citizenship** 👈 Cancellation of Removal or
        Suspension of Deportation in General

While regulation promulgated under sections
of the Immigration and Nationality Act (INA)
authorizing alien to petition the Attorney General
for adjustment in his immigration status to that of
lawful permanent resident without participation
of United States Citizen spouse if alien has been
battered or subjected to extreme cruelty might
provide useful guidance in interpreting almost
identical language in another section of the
INA, that rendered aliens who were "battered or
subjected to extreme cruelty" eligible for special
rule cancellation of removal, regulation did not
establish a binding legal standard for that later
determination. Immigration and Nationality Act,
§§ 204, 240A(b)(2), 245, 📑 8 U.S.C.A. §§ 1154,
📑 1229b(b)(2), 📑 1255; 🚩 8 C.F.R. § 204.2(c)
(1)(vi).

3 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*1322** Arturo Aponte–Pares, Aponte & Associates,
Orlando, FL, for Petitioner.

John J.W. Inkeles, U.S. Dept. of Justice, Civ. Div.—OIL,
Derek C. Julius, David V. Bernal, Krystal Samuels, U.S. Dept.
of Justice, OIL, Eric Holder, Jr., Washington, DC, Nicole
Guzman, DHS, Office of Chief Counsel, Orlando, FL, for
Respondent.

Petition for Review of a Decision of the Board of Immigration
Appeals.

Before MARCUS, COX and SILER, [*] Circuit Judges.

**Opinion**

COX, Circuit Judge:

Hamelt Rodolfo Bedoya–Melendez seeks review of the
decision of the Board of Immigration Appeals that he is
not eligible for special rule cancellation of removal under §
240A of the Immigration and Nationality Act (codified at 🏷️
 **\*1323** 8 U.S.C. § 1229b(b)(2)). The Board denied Bedoya–
Melendez's petition because he failed to show that he was
"battered or subjected to extreme cruelty" by his American
citizen spouse. We conclude that the Board has discretion to
make this determination, and therefore we lack jurisdiction to
review the Board's decision that Bedoya–Melendez is not a
battered spouse.

I. FACTS AND PROCEDURAL HISTORY

The underlying facts are largely irrelevant to this appeal.
We state them briefly to provide context for this opinion.
Bedoya–Melendez, a Peruvian citizen, entered the United
States in 2003 as a nonimmigrant visitor. In 2004, he married
an American citizen, Nancy Pinedo. A week later, she asked
the United States Citizenship and Immigration Service to
adjust Bedoya–Melendez's immigration status. But, when the
honeymoon ended, the marriage quickly soured. Bedoya–
Melendez alleges that Nancy began slapping him when
she became upset. And, he alleges she also falsely led
him to believe he had HIV. Less than six months after
they married, Bedoya–Melendez and Nancy separated, and
eventually divorced. Bedoya–Melendez alleges that Nancy
and her father then brought several frivolous lawsuits against
him.

Meanwhile, the Citizenship and Immigration Service
declined to adjust Bedoya–Melendez's immigration status,
and the Department of Homeland Security sought to remove
him. At a hearing in late 2004, Bedoya–Melendez admitted
that he was removable, but petitioned for asylum. He later
withdrew that petition.

[1]   In 2007, Bedoya–Melendez filed a petition for special
rule cancellation of removal, claiming that he was a battered

spouse under 🚩 8 U.S.C. § 1229b(b)(2). To establish his eligibility for this relief, Bedoya–Melendez had to show five things:

(i)(I) [he had] been battered or subjected to extreme cruelty by a spouse ... who is or was a United States citizen ...;

...

(ii) [he had] been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of [his] application, ...;

(iii) [he had] been a person of good moral character during such period ...;

(iv) [he] is not inadmissible [for certain reasons not applicable to this case]; and

(v) the removal would result in extreme hardship to [him] ....

🚩 8 U.S.C. § 1229b(b)(2)(A). This appeal concerns only the first element (hereafter the "battered-spouse determination"). Before the immigration judge, Bedoya–Melendez testified about Nancy's behavior. The immigration judge concluded that Nancy's actions did not make Bedoya–Melendez a battered spouse under 🚩 § 1229b(b)(2). His petition was denied for that reason. Bedoya–Melendez appealed to the Board, but it also denied his petition, issuing its own decision. Bedoya–Melendez then petitioned this court to review the Board's decision. [1]

**\*1324** II. ISSUES ON APPEAL

This appeal presents two issues: (1) does the Board have discretion to decide if an alien is a battered spouse under 🚩 § 1229b(b)(2); and (2) if the answer to the first issue is no, is Bedoya–Melendez a battered spouse under 🚩 § 1229b(b)(2)?

III. CONTENTIONS OF THE PARTIES

**[2]** It is undisputed that we lack jurisdiction to review the Board's discretionary decisions under 🚩 § 1229b. *See* 🚩 8 U.S.C. § 1252(a)(2)(B); *Martinez v. U.S. Att'y Gen.,* 446 F.3d 1219, 1222 (11th Cir.2006). But, it is also undisputed

that we have jurisdiction to review constitutional claims and questions of law arising under that provision. *See* 🚩 8 U.S.C. § 1252(a)(2)(D); 🚩 *Jean–Pierre v. U.S. Att'y Gen.,* 500 F.3d 1315, 1322 (11th Cir.2007). Because 🚩 § 1252(a)(2)(B) & (D) impose statutory conditions on our jurisdiction, we must first determine if those conditions are met. *See* 🚩 *Bahar v. Ashcroft,* 264 F.3d 1309, 1311 (11th Cir.2001).

This court has not yet considered whether the battered-spouse determination under 🚩 § 1229b(b)(2) is a question of law or a discretionary decision. Bedoya–Melendez contends that it is a question of law. He relies primarily on a Ninth Circuit case, 🚩 *Hernandez v. Ashcroft,* 345 F.3d 824 (9th Cir.2003), which held that the phrase "has been battered or subjected to extreme cruelty" establishes an objective legal standard to guide the battered-spouse determination under 🚩 § 1229b(b)(2).

The Attorney General counters that five other circuits have reached the opposite conclusion. These circuits reasoned that the phrase "has been battered or subjected to extreme cruelty" is not self-explanatory and that reasonable minds could differ as to its meaning. And, because Congress did not define this phrase, it intended to grant the Attorney General discretion to make this decision. These circuits also concluded that 🚩 8 C.F.R. § 204.2(c)(1)(vi), which interprets almost identical language in a different provision of the Immigration and Nationality Act, does not establish an objective legal standard for the battered-spouse determination. For the reasons stated below, we agree with the Attorney General and the majority of our sister circuits.

IV. DISCUSSION

**[3]** **[4]** Our jurisdiction over Bedoya–Melendez's petition turns on whether the battered-spouse determination is a question of law or a discretionary decision. A question of law involves "the application of an undisputed fact pattern to a legal standard." 🚩 *Jean–Pierre, 500 F.3d at 1322.* For example, under 🚩 § 1229b(b)(2), an alien must be continuously present in the United States for three years before he can file a petition for cancellation of removal. 🚩 8 U.S.C. § 1229b(b)(2)(A)(ii). Congress defined "continuous physical presence" in 🚩 § 1229b(b)(2)(B). A court need only

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 262 of 1384

Bedoya-Melendez v. U.S. Atty. Gen., 680 F.3d 1321 (2012)
23 Fla. L. Weekly Fed. C 1049

apply this definition to the undisputed facts to determine if this statutory requirement is met. *See* 🚩 *Najjar v. Ashcroft,* 257 F.3d 1262, 1298 (11th Cir.2001) ( "Either the petitioner has been continuously present in the United States for [three] years or the petitioner has not.") (quoting 🚩 *Kalaw v. INS,* 133 F.3d 1147, 1151 (9th Cir.1997)).

**[5]** A discretionary decision, on the other hand, requires an adjudicator to make a judgment call. For example, under 📄 § 1229b(b)(2), an alien must show that removal will "result in extreme hardship to [himself]." 📄 § 1229b(b)(2) (A)(v). In 🚩 *Najjar v. Ashcroft,* we examined a previous version of 📄 § 1229b, which also contained the phrase "extreme hardship." 📄 257 F.3d at 1298. We held that the Attorney General has discretion to determine when an alien will face an "extreme hardship" upon removal. **\*1325** *See* 📄 *id.* at 1297; *see also* 📄 *Gonzalez–Oropeza v. U.S. Att'y Gen.,* 321 F.3d 1331, 1332–33 (11th Cir.2003) (holding that the phrase "exceptional and extremely unusual hardship" in 📄 § 1229b(b)(1) grants the Attorney General discretion). We based our holding, in part, on the Supreme Court's decision in 📄 *INS v. Jong Ha Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981). In 📄 *Wang,* the Supreme Court explained that the phrase "extreme hardship" is "not self-explanatory and reasonable men could easily differ as [its] construction." 📄 *Id.* at 144, 101 S.Ct. at 1031. The Court concluded that Congress had vested the Attorney General with discretion to interpret the phrase "extreme hardship." *See* 📄 *id.* And, the Court refused to substitute its judgment for that of the Attorney General. *See* 📄 *id.; see also* 📄 *Wilmore v. Gonzales,* 455 F.3d 524, 527 (5th Cir.2006) (citing 📄 *Wang* for the proposition that a statutory term confers discretion on the Attorney General when it is "not self-explanatory, and reasonable men could easily differ as to [its] construction").

Other circuits have characterized a discretionary decision as lacking an "algorithm" or "formula" on which a court can base its review. *See* 📄 *Perales–Cumpean v. Gonzales,* 429 F.3d 977, 982 (10th Cir.2005) ( "Decisions that involve a 'judgment call' by the agency, or for which there is 'no algorithm' on which review may be based, are considered discretionary ...."); 📄 *Rosario v. Holder,* 627 F.3d 58, 62

(2d Cir.2010) ( "We ask whether the BIA is expressing legal doctrine or whether it is engaged in the factfinding and factor-balancing that are at the core of its discretion.")

📄 Section 1229b(b)(2)'s requirement that an alien be "battered or subjected to extreme cruelty" does not establish an objective legal standard on which a court can base its review. The word "battered" and the clause "subjected to extreme cruelty" are not self-explanatory and reasonable minds could differ as to their meaning in this provision. Thus, we hold that the battered-spouse determination under 📄 § 1229b(b)(2) is a discretionary decision reserved to the Attorney General. *See* 📄 *Wang,* 450 U.S. at 144, 101 S.Ct. at 1031. We consider the meaning of the word "battered" and the clause "subjected to extreme cruelty" in turn.

We first turn to the dictionary definition of the verb "batter." The Oxford English Dictionary defines "batter" as "to beat continuously and violently so as to bruise or shatter." Oxford English Dictionary 1005 (2d ed., 1989). Webster's Third New International Dictionary provides a similar definition: "to beat with successive blows: beat repeatedly and violently so as to bruise, shatter, or demolish." Webster's Third New International Dictionary 187 (2002). Finally, the American Heritage Dictionary defines "batter" as "to hit heavily and repeatedly with violent blows." American Heritage Dictionary 152 (5th ed., 2011). While these dictionaries suggest some boundaries for the word "battered" in 📄 § 1229b(b)(2), they do not establish an objective legal standard. The words "continuously," "successive," and "repeatedly" are ambiguous in this context. These words do not tell us how many blows an alien must endure before one becomes a battered spouse. Nor do these dictionary definitions clearly define the force these blows must exert. Thus, reasonable minds could differ as to what an alien must endure before he has been "battered."

Similarly, the clause "subjected to extreme cruelty" does not present an objective legal standard. Webster's Third New International Dictionary defines "cruelty" as "the quality or state of being cruel," which means "disposed to inflict pain ...." Webster's Third New International Dictionary 546 (2002). Webster's dictionary also **\*1326** includes a definition of cruelty specifically applicable to domestic relationships: "conduct of either party in a divorce action that endangers the life or health of the other." *Id.* These definitions draw no bright lines. Reasonable minds could easily differ as to what conduct shows a disposition "to inflict pain" and what

**Bedoya-Melendez v. U.S. Atty. Gen., 680 F.3d 1321 (2012)**

Case 3:20-cv-07721-SI Document 58-4 Filed 11/10/20 Page 263 of 1384

23 Fla. L. Weekly Fed. C 1049

conduct "endangers [a spouse's] life or health." Moreover, as other circuits have said, the adjective "extreme" requires the Attorney General to make a judgment call about "whether the cruel conduct alleged is sufficiently extreme to implicate the purposes of the statute." *Perales–Cumpean,* 429 F.3d at 982; *see Wilmore,* 455 F.3d at 528 (citing *Perales–Cumpean*).

The context in which Congress adopted the original version of § 1229b(b)(2) reinforces our conclusion that this provision does not establish an objective legal standard. Congress enacted the original version of § 1229b(b)(2) as part of the Violence Against Women Act of 1994. *See* Pub.L. No. 104–322 § 40703, 108 Stat. 1796, 1955 (1994). This Act sought to address gender-motivated violence, including domestic violence. Because Congress adopted § 1229b(b)(2) in this context, the word "battered" and the clause "subjected to extreme cruelty" arguably refer to domestic violence. But, that conclusion does not get us very far because domestic violence does not have a rigid definition.[2] Nor can we discern from the text of § 1229b(b)(2) in what manner and to what degree the word "battered" and the clause "subjected to extreme cruelty" relate to domestic violence.[3]

But we do not end our analysis with the text of § 1229b. Both the Secretary of Homeland Security and the Attorney General have authority to craft regulations interpreting the Immigration and Nationality Act. *See* 8 U.S.C. § 1103. These regulations could limit the Attorney General's discretion in ways that make the battered-spouse determination effectively nondiscretionary. *Cf. Cadet v. Bulger,* 377 F.3d 1173, 1180–81 (11th Cir.2004) (federal **\*1327** regulations defining torture created a legal standard which made the Board's decision subject to review). Bedoya–Melendez directs our attention to 8 C.F.R. § 204.2(c)(1)(vi), which provides:

> For the purpose of this chapter, the phrase "was battered by or was the subject of extreme cruelty" includes, but is not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. Psychological or sexual abuse or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution shall be considered acts of violence. Other

abusive actions may also be acts of violence under certain circumstances, including acts that, in and of themselves, may not initially appear violent but that are a part of an overall pattern of violence.

8 C.F.R. § 204.2(c)(1)(vi). Bedoya–Melendez contends that this regulation establishes an objective legal standard for the battered-spouse determination under § 1229b.

We reject this contention. Section 204.2(c)(1)(vi) was not promulgated under § 1229b and does not apply to that statutory provision. Instead, it was promulgated under 8 U.S.C. §§ 1154 & 1255. These sections authorize an alien to petition the Attorney General for an adjustment in his immigration status to that of a lawful permanent resident. An alien can file a petition under these sections whether or not he is facing removal. *See* § 1255 ("[T]he status of [an] alien having an approved petition for classification as [battered spouse] may be adjusted by the Attorney General [if he files a petition and meets certain other requirements]."). Conversely, § 1229b applies specifically to aliens whom the Attorney General has ordered removed. § 1229b(b)(2)(A) ("The Attorney General may cancel removal ....").

**[6]** Additionally, § 204.2(c)(1)(vi) is located in Title 8, Chapter I of the Code of Federal Regulations, and it specifically limits its applicability to that chapter. *See* § 204.2(c)(1)(vi) (stating "[f]or the purpose of this chapter ...."). Bedoya–Melendez has not identified (and our research has not found) any regulation in Title 8, Chapter I which applies to the battered-spouse determination under § 1229b(b)(2). The Board did not believe that § 204.2(c)(1)(vi) applied to the battered-spouse determination under § 1229b(b)(2). (R. at 4–5.) Instead, the Board said that § 204.2(c)(1)(vi) is "useful in ascertaining the parameters of the [phrase 'battered or subjected to extreme cruelty'] as applied in the context of cancellation of removal."[4] *Id.* We agree that § 204.2(c)(1)(vi), which interprets almost identical language, could be useful in making the battered-spouse determination. But, this regulation does not establish a binding legal standard for that determination.[5]

Bedoya-Melendez v. U.S. Atty. Gen., 680 F.3d 1321 (2012)

23 Fla. L. Weekly Fed. C 1049

And, even if we were to assume that 8 C.F.R. § 204.2(c)(1)(vi) applies to the battered-spouse **\*1328** determination under § 1229b(b)(2), that regulation does not create an objective legal standard. Instead, § 204.2(c)(1)(vi) merely suggests how the Attorney General should exercise his discretion. First, the regulation does not draw a bright line between facts which make one person a battered spouse and another person not a battered spouse. The regulation expressly states that "was battered by or was the subject of extreme cruelty" "includes, *but is not limited to* " certain conduct. 8 C.F.R. § 204.2(c)(1)(vi) (emphasis added). The "not limited to" language strongly suggests the Attorney General can exercise discretion in each case.

And though the regulation casts a wide net (capturing "any" act or threatened act of violence), we do not know what conduct that net will catch. The "act or threatened act of violence" must "result[ ] or threaten[ ] to result in physical or mental injury." *Id.* But the "physical or mental injury" requirement is not self-explanatory and reasonable minds could differ about what this clause means. Because this clause is imprecise, we do not know from the text of the regulation what conduct is included and what conduct is not.

Finally, § 204.2(c)(1)(vi) encompasses "[o]ther abusive actions ... [that] may not initially appear violent but that are a part of an overall pattern of violence." The regulation does not offer any guidance as to which acts fall in this category. This imprecision strongly suggests that the Attorney General also retains discretion to make this decision on a case-by-case basis. Because neither the statutory text nor an applicable regulation establish an objective legal standard on which to base our review, we hold that the battered-spouse determination under § 1229b(b)(2) is a discretionary decision reserved to the Attorney General.

Of the six other circuits that have considered this issue, five have concluded that the battered-spouse determination is a discretionary decision. *Rosario v. Holder,* 627 F.3d 58 (2d Cir.2010); *Johnson v. U.S. Att'y Gen.,* 602 F.3d 508 (3d Cir.2010); *Stepanovic v. Filip,* 554 F.3d 673 (7th Cir.2009); *Wilmore v. Gonzales,* 455 F.3d 524 (5th Cir.2006); *Perales–Cumpean v. Gonzales,* 429 F.3d 977 (10th Cir.2005). Only the Ninth Circuit has reached a contrary conclusion. In *Hernandez v. Ashcroft,* the court held that the phrase "battered or subjected to extreme cruelty" establishes an objective legal standard to determine if an alien is a victim of domestic violence. 345 F.3d 824, 834 (9th Cir.2003). Despite the court's pronouncement that domestic violence (and thus the phrase "battered or subjected to extreme cruelty") has a clinical definition, the court struggled to articulate that definition. *Id.* at 834, 836–39. Instead, the court relied on 8 C.F.R. § 204.2(c)(1)(vi). *Id.* at 839–40. But, as explained above, this regulation does not establish an objective legal standard for the battered-spouse determination. We find *Hernandez* unpersuasive.

V. CONCLUSION

Because the battered-spouse determination under § 1229b(b)(2) is a discretionary decision, we lack jurisdiction to review the Board's decision that Bedoya–Melendez is not a battered spouse. *See* 8 U.S.C. § 1252(a)(2)(B). For that reason, his petition is dismissed.

PETITION DISMISSED.

**All Citations**

680 F.3d 1321, 23 Fla. L. Weekly Fed. C 1049

---

**Footnotes**

\*   Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

1   The immigration judge also concluded that Bedoya–Melendez had failed to show that he would suffer extreme hardship if removed. But the Board did not consider this portion of the immigration judge's decision. It based

**Bedoya-Melendez v. U.S. Atty. Gen., 680 F.3d 1321 (2012)**

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 265 of 1384

23 Fla. L. Weekly Fed. C 1049

its denial solely on Bedoya–Melendez's failure to meet the battered-spouse requirement. "When the [Board] issues a decision, we review only that decision." *Lopez v. U.S. Att'y Gen.,* 504 F.3d 1341, 1344 (11th Cir.2007). Because the Board did not consider Bedoya–Melendez's failure to satisfy the extreme hardship requirement, that issue is not before us.

2    In 2006, Congress added § 40002 (codified at [?] 42 U.S.C. § 13925) to the Violence Against Women Act. Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub.L. No. 109–162, § 3, 119 Stat. 2960, 2965 (2006). This provision purported to define several terms used throughout the Violence Against Women Act. *Id.* at 2964. [?] Section 13925(a)(6) provides that:

> The term "domestic violence" includes felony or misdemeanor crimes of violence committed by a current or former spouse of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabited with the victim as a spouse, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.

[?] 42 U.S.C. § 13925(a)(6). This subsection does not define "domestic violence." It merely says that this term "includes" certain "crimes of violence." *Id.* This subsection does not limit the term "domestic violence" to such crimes. Instead, it leaves open the possibility that this term also includes other abusive acts which are not "felony or misdemeanor crimes of violence."

3    While we do not think the word "battered" in § 1229b(b)(2) has an objective definition, we can say what that word does not mean. "Battered" does not refer to common-law battery. *But see* *Hernandez v. Ashcroft,* 345 F.3d 824 (9th Cir.2003). At common law, an "unwelcome kiss or caress" was a battery. Bryan A. Garner, A Dictionary of Modern Legal Usage 100 (2d ed., 1995). If "battered" means an unwelcome kiss or caress, married aliens could easily allege their eligibility for relief under § 1229b(b)(2). But the text and the history of § 1229b(b)(2) suggest a different result. Section 1229b(b)(2) is, after all, a "special rule" applicable only to battered spouses. Aliens who are not battered spouses must seek cancellation of removal under § 1229b(b)(1), which has more stringent eligibility requirements.

4    The Board's opinion actually cites § 204.2(e)(1)(vi) (applicable to battered children) rather than § 204.2(c)(1)(vi) (applicable to battered spouses). However, these provisions are identical.

5    The six other circuits which have considered this issue have assumed, without discussion, that § 204.2(c)(1)(vi) applies to the battered-spouse determination. *See* *Rosario v. Holder,* 627 F.3d 58 (2d Cir.2010); *Johnson v. U.S. Att'y Gen.,* 602 F.3d 508 (3d Cir.2010); *Stepanovic v. Filip,* 554 F.3d 673 (7th Cir.2009); *Wilmore v. Gonzales,* 455 F.3d 524 (5th Cir.2006); *Perales–Cumpean v. Gonzales,* 429 F.3d 977 (10th Cir.2005); *Hernandez v. Ashcroft,* 345 F.3d 824 (9th Cir.2003). But, five of these six circuits (all but the Ninth Circuit) concluded that this regulation does not establish an objective legal standard for the battered-spouse determination.

---

**End of Document**                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

KeyCite Red Flag - Severe Negative Treatment

Abrogated by Johnson v. U.S., U.S., June 26, 2015

128 S.Ct. 1581
Supreme Court of the United States

Larry BEGAY, Petitioner,

v.

UNITED STATES.

No. 06−11543.
|
Argued Jan. 15, 2008.
|
Decided April 16, 2008.

**Synopsis**

**Background:** Defendant was convicted before the United States District Court for the District of New Mexico, 377 F.Supp.2d 1141, of being a felon in possession of a firearm, and he appealed. The Court of Appeals for the Tenth Circuit, 470 F.3d 964, affirmed in part, reversed in part, and remanded. Defendant petitioned for certiorari which was granted.

**[Holding:]** The Supreme Court, Justice Breyer, held that New Mexico felony offense of driving under the influence of alcohol (DUI) is not a "violent felony" within meaning of section of the Armed Career Criminal Act imposing special mandatory 15-year prison term upon felons who unlawfully possess a firearm and who have three or more convictions for violent felonies.

Reversed and remanded.

Justice Scalia filed opinion concurring in the judgment.

Justice Alito filed dissenting opinion in which Justices Souter and Thomas joined.

West Headnotes (2)

**[1]**    **Sentencing and Punishment** 🔑 Violent or Nonviolent Character of Offense

In determining whether a crime is a "violent felony," within meaning of the Armed Career Criminal Act, the offense is considered generically in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion. 18 U.S.C.A. § 924(e)(1), (e)(2)(B).

968 Cases that cite this headnote

**[2]**    **Sentencing and Punishment** 🔑 Particular offenses

New Mexico felony offense of driving under the influence of alcohol (DUI) is not a "violent felony" within meaning of section of the Armed Career Criminal Act imposing special mandatory 15-year prison term upon felons who unlawfully possess a firearm and who have three or more convictions for violent felonies; even assuming that DUI offense involves conduct that "presents a serious risk of physical injury another" under clause defining term "violent felony," the offense falls outside clause's scope because it is unlike clause's example crimes which involve purposeful, violent, and aggressive conduct. 18 U.S.C.A. § 924(e)(1), (e)(2)(B)(ii).

1372 Cases that cite this headnote

**\*\*1581** *Syllabus* [*]

The Armed Career Criminal Act (Act) imposes a special mandatory 15–year prison term upon a felon who unlawfully possesses a firearm and who has three or more prior convictions for committing certain drug crimes or "a violent felony." 18 U.S.C. § 924(e)(1). The Act defines "violent felony" as, *inter alia,* a crime punishable **\*\*1582** by more than one year's imprisonment that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii) (hereinafter clause (ii)). After petitioner Begay pleaded guilty to felony possession of a firearm, his presentence report revealed he had 12 New Mexico convictions for driving under the influence of alcohol

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

(DUI), which state law makes a felony (punishable by a prison term of more than one year) the fourth (or subsequent) time an individual commits it. Based on these convictions, the sentencing judge concluded that Begay had three or more "violent felony" convictions and, therefore, sentenced him to an enhanced 15–year sentence. The Tenth Circuit rejected Begay's claim that DUI is not a "violent felony" under the Act.

*Held:* New Mexico's felony DUI crime falls outside the scope of the Act's clause (ii) "violent felony" definition. Pp. 1584 – 1588.

(a) Whether a crime is a violent felony is determined by how the law defines it and not how an individual offender might have committed it on a particular occasion. Pp. 1584 – 1585.

(b) Even assuming that DUI involves conduct that "presents a serious potential risk of physical injury to another" under clause (ii), the crime falls outside the clause's scope because it is simply too unlike clause (ii)'s example crimes to indicate that Congress intended that provision to cover it. Pp. 1585 – 1588.

(i) Clause (ii)'s listed examples—burglary, arson, extortion, and crimes involving the use of explosives—should be read as limiting the crimes the clause covers to those that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves. Their presence in the statute indicates that Congress meant for the statute to cover only *similar c*rimes, rather than *every* crime that "presents a serious potential risk of physical injury to another," 🚩 § 924(e)(2)(B)(ii). If Congress meant the statute to be all encompassing, it would not have needed to include the examples at all. Moreover, if clause (ii) were meant to include *all* risky crimes, Congress likely would not have included clause (i), which includes crimes that have "as an element the use, attempted use, or threatened use of physical force against the person of another." And had Congress included the examples solely for quantitative purposes, demonstrating no more than the degree of risk of physical injury sufficient to bring a crime within the statute's scope, it would likely have chosen examples that better illustrated the degree of risk it had in mind rather than these that are far from clear in respect to the degree of risk each poses. The Government's argument that the word "otherwise" just after the examples is sufficient to demonstrate that they do not limit the clause's scope is rejected because "otherwise" can refer to a crime that is, *e.g.,* similar to the examples in respect to the degree of risk it

produces, but different in respect to the way or manner in which it produces that risk. Pp. 1585 – 1586.

(ii) DUI differs from the example crimes in at least one important respect: The examples typically involve purposeful, violent, and aggressive conduct, whereas DUI statutes typically do not. When viewed in terms of the Act's purposes, this distinction matters considerably. The Act looks to past crimes to determine which offenders create a special danger by possessing a gun. In this respect, a history of crimes involving purposeful, violent, and aggressive conduct, which shows an increased likelihood that the offender is the kind of person who might deliberately point a gun and pull the trigger, is different **1583 from a history of DUI, which does not involve the deliberate kind of behavior associated with violent criminal use of firearms. Pp. 1586 – 1588.

🚩⚠ 470 F.3d 964, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C.J., and STEVENS, KENNEDY, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, pp. 1588 – 1592. ALITO, J., filed a dissenting opinion, in which SOUTER and THOMAS, JJ., joined, *post*, pp. 1592 – 1597.

**Attorneys and Law Firms**

Margaret A. Katze, Albuquerque, NM, for petitioner.

Leondra R. Kruger, for respondent.

Stephen P. McCue, Federal Public Defender, Margaret A. Katze, Counsel of Record, Assistant Federal Public Defender, Charles McCormack, Research and Writing Specialist, Office of the Federal Public Defender, Albuquerque, NM, for petitioner.

Paul D. Clement, Solicitor General, Counsel of Record, Alice S. Fisher, Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, Leondra R. Kruger, Assistant to the Solicitor General, Richard A. Friedman, Attorney, Department of Justice, Washington, D.C., for respondent.

**Opinion**

Justice BREYER delivered the opinion of the Court.

 **\*139** The Armed Career Criminal Act imposes a special mandatory 15–year prison term upon felons who unlawfully

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

possess a firearm and who also have three or more previous convictions for committing certain drug crimes or "violent felon[ies]." 🚩 18 U.S.C. § 924(e)(1) (2000 ed., Supp. V). The question in this case is whether driving under the influence of alcohol is a "violent felony" as the Act defines it. We conclude that it is not.

### I

### A

Federal law prohibits a previously convicted felon from possessing a firearm. § 922(g)(1) (2000 ed.). A related provision provides for a prison term of up to 10 years for an ordinary offender. 🚩 § 924(a)(2). The Armed Career Criminal Act imposes a more stringent 15–year mandatory minimum sentence on an offender who has three prior convictions "for a violent felony or a serious drug offense." 🚩 § 924(e)(1) (2000 ed., Supp. V).

The Act defines a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that

¶ "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

**\*140** ¶ "(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 🚩 § 924(e)(2)(B) (2000 ed.).

We here consider whether driving under the influence of alcohol (DUI), as set forth in New Mexico's criminal statutes, falls within the scope of the second clause.

### B

The relevant background circumstances include the following: In September 2004, New Mexico police officers received a report that Larry Begay, the petitioner here, had threatened his sister and aunt with a rifle. The police arrested him. Begay subsequently conceded he was a felon and **\*\*1584** pleaded guilty to a federal charge of unlawful possession of a firearm in violation of § 922(g)(1). Begay's presentence report said that he had been convicted a dozen times for DUI, which under New Mexico's law becomes a

felony (punishable by a prison term of more than one year) the fourth (or subsequent) time an individual commits it. See 🚩 N.M. Stat. Ann. §§ 66–8–102(G) to (J) (Supp.2007). The sentencing judge consequently found that Begay had at least three prior convictions for a crime "punishable by imprisonment for a term exceeding one year." 377 F.Supp.2d 1141, 1143 (NM 2005). The judge also concluded that Begay's "three felony DUI convictions involve conduct that presents a serious potential risk of physical injury to another." 🚩 Id., at 1145. The judge consequently concluded that Begay had three or more prior convictions for a "violent felony" and should receive a sentence that reflected a mandatory minimum prison term of 15 years. 🚩 Ibid.

Begay, claiming that DUI is not a "violent felony" within the terms of the statute, appealed. The Court of Appeals panel by a vote of 2 to 1 rejected that claim. 🚩⚠️ 470 F.3d 964 (C.A.10 2006). Begay sought certiorari, and we agreed to decide the question.

### **\*141** II

### A

**[1]** New Mexico's DUI statute makes it a crime (and a felony after three earlier convictions) to "drive a vehicle within [the] state" if the driver "is under the influence of intoxicating liquor" (or has an alcohol concentration of .08 or more in his blood or breath within three hours of having driven the vehicle resulting from "alcohol consumed before or while driving the vehicle"). 🚩 §§ 66–8–102(A), (C). In determining whether this crime is a violent felony, we consider the offense generically, that is to say, we examine it in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion. See 🚩 Taylor v. United States, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (adopting this "categorical approach"); see also 🚩 James v. United States, 550 U.S. 192, 208 – 209, 127 S.Ct. 1586, 1597, 167 L.Ed.2d 532 (2007) (attempted burglary is a violent felony even if, on some occasions, it can be committed in a way that poses no serious risk of physical harm).

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

We also take as a given that DUI does not fall within the scope of the Act's *clause (i)* "violent felony" definition. DUI, as New Mexico defines it, nowhere "has as an element the use, attempted use, or threatened use of physical force against the person of another." ⚑ 18 U.S.C. § 924(e)(2)(B)(i).

Finally, we assume that the lower courts were right in concluding that DUI involves conduct that "presents a serious potential risk of physical injury to another." ⚑ § 924(e)(2)(B)(ii). Drunk driving is an extremely dangerous crime. In the United States in 2006, alcohol-related motor vehicle crashes claimed the lives of more than 17,000 individuals and harmed untold amounts of property. National Highway Traffic Safety Admin., Traffic Safety Facts, 2006 Traffic Safety Annual Assessment—Alcohol–Related Fatalities 1 (No. 810821, Aug. 2007), http://www-nrd.nhtsa.dot.gov/Pubs/810821.PDF (as visited Apr. 12, 2008, and available in **\*142** Clerk of Court's case file). Even so, we find that DUI falls outside the scope of clause (ii). It is simply too unlike the provision's listed examples for us to believe that Congress intended the provision to cover it.

### B

#### 1

**[2]**    In our view, the provision's listed examples—burglary, arson, extortion, or **\*\*1585** crimes involving the use of explosives—illustrate the kinds of crimes that fall within the statute's scope. Their presence indicates that the statute covers only *similar* crimes, rather than *every* crime that present a serious potential risk of physical injury to another." ⚑ § 924(e)(2)(B)(ii). If Congress meant the latter, *i.e.,* if it meant the statute to be all encompassing, it is hard to see why it would have needed to include the examples at all. Without them, clause (ii) would cover *all* crimes that present a "serious potential risk of physical injury." *Ibid.* Additionally, if Congress meant clause (ii) to include *all* risky crimes, why would it have included clause (i)? A crime which has as an element the "use, attempted use, or threatened use of physical force" against the person (as clause (i) specifies) is likely to create "a serious potential risk of physical injury" and would seem to fall within the scope of clause (ii).

Of course, Congress *might* have included the examples solely for quantitative purposes. Congress might have intended them

to demonstrate no more than the degree of risk sufficient to bring a crime within the statute's scope. But were that the case, Congress would have likely chosen examples that better illustrated the "degree of risk" it had in mind. Our recent case, *James v. United States*—where we considered only matters of degree, *i.e.,* whether the amount of risk posed by attempted burglary was comparable to the amount of risk posed by the example crime of burglary—illustrates the difficulty of interpreting the examples in this **\*143** respect. Compare ⚑ 550 U.S., at 203 – 207, 127 S.Ct., at 1594 – 1597, with ⚑ *id.,* at 215, 218 – 219, 229, 127 S.Ct., at 1601, 1603 – 1604, 1609 (SCALIA, J., dissenting). Indeed, the examples are so far from clear in respect to the degree of risk each poses that it is difficult to accept clarification in respect to degree of risk as Congress' only reason for including them. See ⚑ *id.,* at 1598–99 ("Congress provided examples [that] ... have little in common, most especially with respect to the level of risk of physical injury that they pose").

These considerations taken together convince us that, " 'to give effect ... to every clause and word' " of this statute, we should read the examples as limiting the crimes that clause (ii) covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves. ⚑ *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (quoting ⚑ *United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955); some internal quotation marks omitted); see also ⚑ *Leocal v. Ashcroft,* 543 U.S. 1, 12, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (describing the need to interpret a statute in a way that gives meaning to each word).

The concurrence complains that our interpretive approach is insufficiently specific. See *post,* at 1589 – 1590 (SCALIA, J., concurring in judgment). But the concurrence's own approach demands a crime-by-crime analysis, uses a standard of measurement (comparative degree of risk) that even the concurrence admits is often "unclear," *post,* at 1590, requires the concurrence to turn here to the still less clear "rule of lenity," *post,* at 1591, and, as we explain, is less likely to reflect Congress' intent. See, *e.g., post,* at 1590 – 1591 (recognizing inability to measure quantitative seriousness of risks associated with DUI).

The statute's history offers further support for our conclusion that the examples in clause (ii) limit the scope of the clause

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

to crimes that are similar to the examples themselves. Prior to the enactment of the current language, the Act applied its enhanced sentence to offenders with "three **\*\*1586** previous convictions for robbery or burglary." *Taylor, supra,* at 581, 110 S.Ct. 2143 (internal quotation marks omitted). Congress sought to **\*144** expand that definition to include both crimes against the person (clause (i)) and certain physically risky crimes against property (clause (ii)). See H.R.Rep. No. 99–849, p. 3 (1986)H.R.Rep. No. 99–849, p. 3 (1986) (hereinafter H.R. Rep.). When doing so, Congress rejected a broad proposal that would have covered *every* offense that involved a substantial risk of the use of " 'physical force against the person or property of another.' " *Taylor,* 495 U.S., at 583, 110 S.Ct. 2143 (quoting S. 2312, 99th Cong., 2d Sess. (1986); H.R. 4639, 99th Cong., 2d Sess. (1986)). Instead, it added the present examples. And in the relevant House Report, it described clause (ii) as including "State and Federal felonies against property such as burglary, arson, extortion, use of explosives and *similar* crimes as predicate offenses where the conduct involved presents a serious risk of injury to a person." H.R. Rep., at 5 (emphasis added).

Of course, the statute places the word "otherwise," just after the examples, so that the provision covers a felony that is one of the example crimes "or *otherwise* involves conduct that presents a serious potential risk of physical injury." § 924(e)(2)(B)(ii) (emphasis added). But we cannot agree with the Government that the word "otherwise" is *sufficient* to demonstrate that the examples do not limit the scope of the clause. That is because the word "otherwise" *can* (we do not say *must,* cf. *post,* at 1589 – 1590 (SCALIA, J., concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others—similar, say, in respect to the degree of risk it produces, but different in respect to the "way or manner" in which it produces that risk. Webster's Third New International Dictionary 1598 (1961) (defining "otherwise" to mean "in a different way or manner").

2

In our view, DUI differs from the example crimes—burglary, arson, extortion, and crimes involving the use of explosives —in at least one pertinent, and important, respect. The listed crimes all typically involve purposeful, "violent," **\*145** and "aggressive" conduct. 470 F.3d, at 980 (McConnell, J.,

dissenting in part); see, *e.g., Taylor, supra,* at 598, 110 S.Ct. 2143 ("burglary" is an unlawful or unprivileged entry into a building or other structure with "intent to commit a crime"); ALI Model Penal Code § 220.1(1) (1985) ("arson" is causing a fire or explosion with " 'the purpose of,' " *e.g.,* "destroying a building ... of another" or "damaging any property ... to collect insurance"); *id.,* § 223.4 (extortion is "purposely" obtaining property of another through threat of, *e.g.,* inflicting "bodily injury"); *Leocal, supra,* at 9, 125 S.Ct. 377 (the word " 'use' ... most naturally suggests a higher degree of intent than negligent or merely accidental conduct" which fact helps bring it outside the scope of the statutory term "crime of violence"). That conduct is such that it makes more likely that an offender, later possessing a gun, will use that gun deliberately to harm a victim. Crimes committed in such a purposeful, violent, and aggressive manner are "potentially more dangerous when firearms are involved." 470 F.3d, at 980 (McConnell, J., dissenting in part). And such crimes are "characteristic of the armed career criminal, the eponym of the statute." *Ibid.*

By way of contrast, statutes that forbid driving under the influence, such as the statute before us, typically do not insist on purposeful, violent, and aggressive conduct; rather, they are, or are most nearly comparable to, crimes that impose strict liability, criminalizing conduct in respect to which the offender need not have had any **\*\*1587** criminal intent at all. The Government argues that "the knowing nature of the conduct that produces intoxication combined with the inherent recklessness of the ensuing conduct more than suffices" to create an element of intent. Brief for United States 35. And we agree with the Government that a drunk driver may very well drink on purpose. But this Court has said that, unlike the example crimes, the conduct for which the drunk driver is convicted (driving under the influence) need not be purposeful or deliberate. See *Leocal, supra,* at 11, 125 S.Ct. 377 (a DUI offense involves "accidental or negligent conduct"); see also **\*146** 470 F.3d, at 980 (McConnell, J., dissenting in part) ("[D]runk driving is a crime of negligence or recklessness, rather than violence or aggression").

When viewed in terms of the Act's basic purposes, this distinction matters considerably. As suggested by its title, the Armed Career Criminal Act focuses upon the special danger created when a particular type of offender—a violent

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

criminal or drug trafficker—possesses a gun. See *Taylor, supra,* at 587–588, 110 S.Ct. 2143; 470 F.3d, at 981, n. 3 (McConnell, J., dissenting in part) ("[T]he title [of the Act] was not merely decorative"). In order to determine which offenders fall into this category, the Act looks to past crimes. This is because an offender's criminal history is relevant to the question whether he is a career criminal, or, more precisely, to the kind or degree of danger the offender would pose were he to possess a gun.

In this respect—namely, a prior crime's relevance to the possibility of future danger with a gun—crimes involving intentional or purposeful conduct (as in burglary and arson) are different from DUI, a strict-liability crime. In both instances, the offender's prior crimes reveal a degree of callousness toward risk, but in the former instance they also show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger. We have no reason to believe that Congress intended a 15–year mandatory prison term where that increased likelihood does not exist.

Were we to read the statute without this distinction, its 15–year mandatory minimum sentence would apply to a host of crimes which, though dangerous, are not typically committed by those whom one normally labels "armed career criminals." See, *e.g.,*Ark.Code Ann. § 8–4–103(a)(2) (A)(ii) (2007) (reckless polluters); 33 U.S.C. § 1319(c) (1) (individuals who negligently introduce pollutants into the sewer system); 18 U.S.C. § 1365(a) (individuals who recklessly tamper with consumer products); § 1115 (seamen whose inattention to **147** duty causes serious accidents). We have no reason to believe that Congress intended to bring within the statute's scope these kinds of crimes, far removed as they are from the deliberate kind of behavior associated with violent criminal use of firearms. The statute's use of examples (and the other considerations we have mentioned) indicate the contrary.

The dissent's approach, on the other hand, would likely include these crimes within the statutory definition of "violent felony," along with any other crime that can be said to present a " 'potential risk of physical injury.' " *Post,* at 1592 (opinion of ALITO, J.). And it would do so because it believes such a result is compelled by the statute's text. See *ibid.* But the dissent's explanation does not account for a key feature of that text—namely, the four example crimes intended to illustrate what kind of "violent felony" the statute

covers. The dissent at most believes that these examples are relevant only to define the requisite serious risk associated with a "crime of violence." *Post,* at 1595. But **1588** the dissent does not explain how to identify the requisite level of risk, nor does it describe how these various examples might help determine what other offenses in-involve conduct presenting the same level of risk. If they were in fact helpful on that score, we might expect more predictable results from a purely risk-based approach. Compare *post,* at 1588, 1591 – 1592 (SCALIA, J., concurring in judgment), with *post,* at 1592 – 1594 (dissenting opinion). Thus, the dissent's reliance on these examples for a function they appear incapable of performing reads them out of the statute and, in so doing, fails to effectuate Congress' purpose to punish only a particular subset of offender, namely, career criminals.

The distinction we make does not minimize the seriousness of the risks attached to driving under the influence. Nor does our argument deny that an individual with a criminal history of DUI might later pull the trigger of a gun. (Indeed, we may have such an instance before us. **148** 470 F.3d, at 965.) Rather, we hold only that, for purposes of the particular statutory provision before us, a prior record of DUI, a strict-liability crime, differs from a prior record of violent and aggressive crimes committed intentionally such as arson, burglary, extortion, or crimes involving the use of explosives. The latter are associated with a likelihood of future violent, aggressive, and purposeful "armed career criminal" behavior in a way that the former are not.

We consequently conclude that New Mexico's crime of "driving under the influence" falls outside the scope of the Armed Career Criminal Act's clause (ii) "violent felony" definition. And we reverse the judgment of the Court of Appeals in relevant part and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

Justice SCALIA, concurring in the judgment.
The statute in this case defines "violent felony" in part as "any crime punishable by imprisonment for a term exceeding one year ... that ... is burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). Contrary to the Court, I conclude that the residual clause unambiguously encompasses *all* crimes that present a serious risk of injury to another. But

AR.04112

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 272 of 1384

Begay v. U.S., 553 U.S. 137 (2008)
128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

because I cannot say that drunk driving clearly poses such a risk (within the meaning of the statute), the rule of lenity brings me to concur in the judgment of the Court.


I

Last Term, in *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586 (2007), the Court held that attempted burglary qualifies as a violent felony under § 924(e). It concluded that to determine whether a predicate crime falls under the residual clause, a court should first identify the enumerated crime to which the predicate crime is most closely analogous and then decide **\*149** whether the risk posed by the predicate crime is roughly equivalent to the risk posed by the enumerated crime. Because burglary was the enumerated crime most closely analogous to attempted burglary, and attempted burglary in the Court's judgment posed roughly the same risk of physical injury as burglary, attempted burglary qualified as a "violent felony" under § 924(e). See *id.,* at 209, 127 S.Ct., at 1597.

Unfortunately, the Court's approach in deciding that case provided no guidance for deciding future cases that involve predicate crimes other than attempted burglary, particularly those for which there are no clear analogs among the enumerated **\*\*1589** crimes. Pointing out that problem in dissent, I anticipated this very case: "Is, for example, driving under the influence of alcohol more analogous to burglary, arson, extortion, or a crime involving use of explosives?" *Id.,* at 215, 127 S.Ct., at 1601.

My dissent set out a different approach to the statute. In my view, the best way to interpret § 924(e) is first to determine which of the enumerated offenses poses the least serious risk of physical injury, and then to set that level of risk as the "serious potential risk" required by the statute. Crimes that pose at least that serious a risk of injury are encompassed by the residual clause; crimes that do not are excluded. In my judgment, burglary was the least risky crime among the enumerated offenses, and I therefore concluded that attempted burglary, which is less risky than burglary, is not covered by the residual clause.

The Court held otherwise in *James,* and since this is a statutory case that holding has a strong claim to *stare decisis.*

But the concomitant of the sad fact that the theory of *James* has very limited application is the happy fact that its *stare decisis* effect is very limited as well. It must be followed, I presume, for unenumerated crimes that are analogous to enumerated crimes (*e.g.,* attempted arson). It provides no answer, and suggests no approach to an answer, where, as here, the predicate crime has no analog among **\*150** the enumerated crimes. For such cases I would therefore adhere to the principles I set forth in my *James* dissent.


II

Today the Court devises a different way to give concrete meaning to the residual clause. Confronted with a predicate crime that has no obvious analog among the enumerated offenses, the Court engrafts a requirement onto the residual clause that a predicate crime involve "purposeful, 'violent,' and 'aggressive' conduct." *Ante,* at 1586. By doing so, it excludes a slew of crimes from the scope of the residual clause, including (not by happenstance) the crime at issue here, drunk driving. Like *James,* this latest made-for-the-case improvisation does not (as my resolution does) provide a complete framework that will embrace all future cases. There are still many crimes that are not analogous to the enumerated crimes (so that their status cannot be resolved by *James*) but do involve "purposeful, 'violent,' and 'aggressive' conduct" (so that their status cannot be resolved by today's *deus ex machina*). Presumably some third (and perhaps fourth and fifth) gimmick will be devised to resolve those cases as they arise, leaving our brethren on the district courts and courts of appeals much room for enjoyable speculation.

But quite apart from its regrettable continuation of a piecemeal, suspenseful, Scrabble-like approach to the interpretation of this statute, the problem with the Court's holding today is that it is not remotely faithful to the statute that Congress wrote. There is simply no basis (other than the necessity of resolving the present case) for holding that the enumerated and unenumerated crimes must be similar in respects *other than the degree of risk that they pose.*

The Court is correct that the clause "otherwise involves conduct that presents a serious potential risk of physical injury to another" signifies a similarity between the enumerated and unenumerated crimes. It is not, however, *any* old

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

**\*151** similarity, such as (to take a random example) "purposeful, 'violent,' and 'aggressive' conduct." Rather, it is the *particular* similarity specified after the "otherwise"—*i.e.,* that they all pose a serious potential risk of physical injury to another. They need not be similar **\*\*1590** in any other way. As the Court correctly notes, the word "otherwise" in this context means " 'in a different way or manner.' " 🚩*Ante,* at 218, 127 S.Ct. at 1587; see also 🚩*James,* 550 U.S., at 218, 127 S.Ct., at 1602 (SCALIA, J., dissenting); Webster's New International Dictionary 1729 (2d ed.1957) ("in another way, or in other ways"). Therefore, by using the word "otherwise" the writer draws a substantive connection between two sets only on one specific dimension—*i.e.,* whatever follows "otherwise." What that means here is that "committing one of the enumerated crimes ... is *one way* to commit a crime 'involv[ing] a serious potential risk of physical injury to another'; and that *other ways* of committing a crime of that character similarly constitute 'violent felon [ies].' " 🚩*James, supra,* at 218, 127 S.Ct., at 1603 (SCALIA, J., dissenting).

The Court rejects this seemingly straightforward statutory analysis, reading the residual clause to mean that the unenumerated offenses must be similar to the enumerated offenses not only in the degree of risk they pose, but also "in kind," despite the fact that "otherwise" means that the *common* element of risk must be presented " 'in a *different* way or manner.' " 🚩*Ante,* at 1585 – 1586 (emphasis added). The Court's explanation for this interpretation seems to be that the enumerated crimes are "so far from clear in respect to the degree of risk each poses that it is difficult to accept clarification in respect to degree of risk as Congress' only reason for including them." *Ante,* at 1585. While I certainly agree that the degree of risk associated with the enumerated crimes is unclear, I find it unthinkable that the solution to that problem is to write a different statute. The phrase "otherwise involves conduct that presents a serious potential risk of physical injury to another" limits inclusion in the statute only by a crime's degree of risk. See 🚩 **\*152** *James, supra,* at 218, 127 S.Ct., at 1603 (SCALIA, J., dissenting). The use of the adjective "serious" seems to me to signify a purely quantitative measure of risk. If both an intentional and a negligent crime pose a 50% risk of death, could one be characterized as involving a "serious risk" and the other not? Surely not.

The Court supports its argument with that ever-ready refuge from the hardships of statutory text, the (judicially) perceived

statutory purpose. According to the Court, because the Armed Career Criminal Act is concerned with "the special danger created when a particular type of offender—a violent criminal or drug trafficker—possesses a gun," the statutory purpose favors applying 🚩§ 924(e)'s enhanced penalty only to those criminals "who might deliberately point the gun and pull the trigger." 🚩*Ante,* at 1587. I cannot possibly infer that purpose from the statute. For all I know, the statute was meant to punish those who are indifferent to human life, or who are undeterred by the criminal penalties attached to the commission of other crimes (after all, the statute enhances penalties for drug traffickers, see 🚩§ 924(e)(2)(A)). While the Court's asserted purpose would surely be a reasonable one, it has no more grounding in the statutory text than do these other possibilities. And what is more, the Court's posited purpose is positively contradicted by the fact that one of the enumerated crimes—the unlawful use of explosives— may involve merely negligent or reckless conduct. See ALI, Model Penal Code § 220.2(2) (1985) ("A person is guilty of a misdemeanor if he recklessly creates a risk of catastrophe in the employment of fire, explosives or other dangerous means"); *id.,* § 220.3 ("A person is guilty of criminal mischief if he ... damages tangible property of another purposely, recklessly, or by negligence in the **\*\*1591** employment of fire, explosives, or other dangerous means").

The Court says that an interpretation of the residual clause that includes all crimes posing a serious risk of injury would render superfluous 🚩§ 924(e)(2)(B)(i), which provides **\*153** that a "violent felony" is any crime that "has as an element the use, attempted use, or threatened use of physical force against the person" of another. *Ante,* at 1584 (internal quotation marks omitted). But the canon against surplusage has substantially less force when it comes to interpreting a broad residual clause like the one at issue here. Though the second clause renders the first superfluous, it would raise no eyebrows to refer to "crimes that entail the use of force and crimes that, while not entailing the use of force, nonetheless present a serious risk of injury to another person." In any event, the canon against surplusage merely helps decide between competing permissible interpretations of an ambiguous statute; it does not sanction writing in a requirement that Congress neglected to think of. And finally, come to think of it, the Court's solution does nothing whatever to solve the supposed surplusage problem. Crimes that include as an element "the use ... of physical force against the person of another" are all embraced (and the reference to them thus rendered superfluous) by the requirement of

Begay v. U.S., 553 U.S. 137 (2008)

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 274 of 1384

"purposeful, 'violent,' and 'aggressive' conduct" that the Court invents.

### III

Under my interpretation of § 924(e), I must answer one question: Does drunk driving pose at least as serious a risk of physical injury to another as burglary? From the evidence presented by the Government, I cannot conclude so. Because of that, the rule of lenity requires that I resolve this case in favor of the defendant.

The Government cites the fact that in 2006, 17,062 persons died from alcohol-related car crashes, and that 15,121 of those deaths involved drivers with blood-alcohol concentrations of 0.08 or higher. See Brief for United States 17. Drunk driving is surely a national problem of great concern. But the fact that it kills many people each year tells us very little about whether a single act of drunk driving "involves conduct that presents a serious potential risk of physical injury **\*154** to another." It may well be that an even greater number of deaths occurs annually to pedestrians crossing the street; but that hardly means that crossing the street presents a serious potential risk of injury. Where the issue is "risk," the annual number of injuries from an activity must be compared with the annual incidents of the activity. Otherwise drunk driving could be said to pose a more serious risk of physical harm than murder. In addition, drunk driving is a combination of two activities: (1) drinking and (2) driving. If drinking alone results in injury in a certain percentage of cases, it could hardly be said that the entirety of the risk posed by drunk driving can be attributed to the combination. And finally, injuries to the drunk drivers themselves must be excluded from the calculus, because the statute counts only injuries to other persons.

Needless to say, we do not have these relevant statistics. And even if we did, we would still need to know similar statistics for burglary, which are probably even harder to come by. This does not mean that I will never be able to identify a crime that falls under the residual clause. For some crimes, the severity of the risk will be obvious. Crimes like negligent homicide, see ALI, Model Penal Code § 210.4 (1980), conspiracy to commit a violent crime, *id.,* § 5.03 (1985), inciting to riot, 18 U.S.C. § 2101, and the production of **\*\*1592** chemical weapons, § 229, certainly pose a more serious risk of physical injury to others than burglary. (By contrast, the Court's approach eliminates from the residual clause all negligent

crimes, even those that entail a 100% risk of physical injury such as negligent homicide.) But I can do no more than guess as to whether drunk driving poses a more serious risk than burglary, and I will not condemn a man to a minimum of 15 years in prison on the basis of such speculation. See *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958). Applying the rule of lenity to a statute that demands it, I would reverse the decision of the Court of Appeals.

**\*155**  Justice ALITO, with whom Justice SOUTER and Justice THOMAS join, dissenting.

The statutory provision at issue in this case—the so-called "residual clause" of 18 U.S.C. § 924(e)(2)(B)(ii)—calls out for legislative clarification, and I am sympathetic to the result produced by the Court's attempt to craft a narrowing construction of this provision. Unfortunately, the Court's interpretation simply cannot be reconciled with the statutory text, and I therefore respectfully dissent.

In September 2004, after a night of heavy drinking, petitioner pointed a rifle at his aunt and threatened to shoot if she did not give him money. When she replied that she did not have any money, petitioner repeatedly pulled the trigger, but the rifle was unloaded and did not fire. Petitioner then threatened his sister in a similar fashion.

At the time of this incident, petitioner was a convicted felon. He had 12 prior convictions in New Mexico for driving under the influence of alcohol (DUI). While DUI is generally a misdemeanor under New Mexico law, the offense of DUI after at least three prior DUI convictions is a felony requiring a sentence of 18 months' imprisonment. N.M. Stat. Ann. § 66–8–102(G) (Supp.2007).

Petitioner pleaded guilty to possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). A violation of that provision generally carries a maximum term of imprisonment of 10 years, see § 924(a)(2), but the District Court and the Court of Appeals held that petitioner was subject to a mandatory minimum sentence of 15 years because he had at least three prior convictions for the New Mexico felony of DUI after being convicted of DUI on at least three prior occasions. 377 F.Supp.2d 1141, 1143 – 1145 (NM 2005); 470 F.3d 964, 966–975, 977 (C.A.10

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 275 of 1384

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

2006). The lower courts concluded that these offenses were crimes "punishable by imprisonment for a term exceeding one year" and "involve[d] **156** conduct that present[ed] a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B).

The Court does not hold that the maximum term of imprisonment that petitioner faced on his felony DUI convictions was less than one year. [1] Nor does the Court dispute that petitioner's offenses involved a "potential risk of physical injury to another." *Ibid.* The only remaining question, therefore, is whether the risk presented by petitioner's qualifying DUI felony convictions was "serious," *i.e.,* "significant" or "important." See, *e.g.,* Webster's Third **1593** New International Dictionary 2073 (2002) (hereinafter Webster's); 15 Oxford English Dictionary 15 (def. 6(a)) (2d ed.1989) (hereinafter OED). In my view, it was.

Statistics dramatically show that driving under the influence of alcohol is very dangerous. Each year, approximately 15,000 fatal alcohol-related crashes occur, accounting for roughly 40% of all fatal crashes. [2] Approximately a quarter million people are injured annually in alcohol-related **157** crashes. [3] The number of people who are killed each year by drunk drivers is far greater than the number of murders committed during any of the crimes specifically set out in the statutory provision at issue here, § 924(e)(2)(B)(ii)—burglary, arson, extortion, and offenses involving the use of explosives. [4]

Petitioner's qualifying offenses, moreover, fell within the statute only because he had been convicted of DUI on at least three prior occasions. As noted, petitioner had *a dozen* prior DUI convictions. Persons who repeatedly drive drunk present a greatly enhanced danger that they and others will be injured as a result. [5] In **1594** addition, it has been **158** estimated that the ratio of DUI incidents to DUI arrests is between 250 to 1 and 2,000 to 1. [6] Accordingly, the risk presented by a 10th, 11th, and 12th DUI conviction may be viewed as the risk created by literally thousands of drunk-driving events. That risk was surely "serious," and therefore petitioner's offenses fell squarely within the language of the statute.

Moreover, taking the statutory language to mean what it says would not sweep in all DUI convictions. Most DUI convictions are not punishable by a term of imprisonment of more than one year and thus fall outside the scope of the statute. [7] Petitioner's convictions qualified only because of his extraordinary—and, I would say, extraordinarily dangerous—record of drunk driving.

The Court holds that an offense does not fall within the residual clause unless it is "roughly similar, in kind as well as in degree of risked posed," *ante,* at 1585, to the crimes specifically listed in 18 U.S.C. § 924(e)(2)(B), *i.e.,* burglary, extortion, arson, and crimes involving the use of explosives. These crimes, according to the Court, "all typically involve purposeful, 'violent,' and 'aggressive' conduct." *Ante,* at 1586 (quoting 470 F.3d, at 980 (McConnell, J., dissenting)).

This interpretation cannot be squared with the text of the statute, which simply does not provide that an offense must be "purposeful," "violent," or "aggressive" in order to fall within the residual clause. Rather, after listing burglary, **159** arson, extortion, and explosives offenses, the statute provides (in the residual clause) that an offense qualifies if it "otherwise involves conduct that presents a serious potential risk of physical injury to another." Therefore, offenses falling within the residual clause must be similar to the named offenses in one respect only: They must "otherwise"—which is to say, "in a different manner," 10 OED 984 (def. B(1)); see also Webster's 1598—"involv[e] conduct that presents a serious potential risk of physical injury to another." Requiring that an offense must also be "purposeful," "violent," or "aggressive" amounts to adding new elements to the statute, but we "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States,* 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997).

Each part of this additional, judicially added requirement presents other problems as well.

*Purposeful.* At least one State's DUI law requires proof of purposeful conduct. See *Tam v. State,* 232 Ga.App. 15, 15 – 16, 501 S.E.2d 51, 52 (1998) (requiring proof of the intent to drive). In addition, many States recognize involuntary intoxication as a defense. See 4 R. Essen & R. Erwin, Defense of Drunk Driving Cases: Criminal—Civil § 44.04 (2007). And even in States that do not require purposefulness, I have no doubt that the overwhelming majority of DUI defendants purposefully drank before getting behind the wheel and were purposefully operating their vehicles at the time of

apprehension. I suspect that many DUI statutes do not require **1595** proof of purposefulness because the element is almost always present, requiring proof of the element would introduce an unnecessary complication, and it would make no sense to preclude conviction of those defendants who were so drunk that they did not even realize that they were behind the wheel.

*Violent.* It is clear that 18 U.S.C. § 924(e)(2)(B) is not limited to "violent" crimes, for if it were, it would be redundant. **160** The prior subparagraph, § 924(e)(2)(A), includes offenses that have as an element the use or threatened use of violence.

*Aggressive.* The concept of "aggressive" crimes is vague, and in any event, it is hardly apparent why DUI—not to mention the species of felony DUI recidivism that resulted in petitioner's predicament—is not "aggressive." Driving can certainly involve "aggressive" conduct. Indeed, some States have created the offense of "aggressive driving." See M. Savage, M. Sundeen, & A. Teigen, Transportation Series, Traffic Safety and Public Health: State Legislative Action 2007,p. 17, and App. J, (NCSL, No. 32, Dec. 2007), online at http://www. ncsl.org/print/transportation/07trafficsafety.pdf. Most States have a toll-free telephone number to call to report "aggressive" driving. See Campaign Safe & Sober, Phone Numbers for Reporting Impaired, Aggressive, or Unsafe Driving, online at http://www.nhtsa.dot.gov/people/outreach/safesobr/16 qp/phone.html.

The Court defends its new statutory element on the ground that a defendant who merely engages in felony drunk driving is not likely to be "the kind of person who might deliberately point the gun and pull the trigger." *Ante,* at 1587. The Court cites no empirical support for this conclusion, and its accuracy is not self-evident. Petitioner's pattern of behavior may or may not be typical of those defendants who have enough DUI convictions to qualify under N.M. Stat. Ann. § 66–8–102(G) and 18 U.S.C. § 924(e)(2)(B), but the example of his behavior in this case—pointing a gun at his aunt's head and repeatedly pulling the trigger—should surely be enough to counsel against uncritical reliance on stereotypes about "the type" of people who commit felony DUI violations.

Defendants who qualify for an enhanced sentence under § 924(e) (2000 ed. and Supp. V) based (in whole or in part) on felony DUI convictions share at least three characteristics

that are relevant for present purposes. First, they are persons *161 who, in the judgment of Congress, cannot be trusted to use a firearm responsibly. In order to qualify for an enhanced sentence under § 924(e), a defendant must of course be convicted of violating the felon-in-possession statute, § 922(g)(2000 ed.). The felon-in-possession statute necessarily rests on the judgment that a person with a prior felony conviction cannot be trusted with a firearm. See *Caron v. United States,* 524 U.S. 308, 315, 118 S.Ct. 2007, 141 L.Ed.2d 303 (1998) ("Congress meant to keep guns away from all offenders who, the Federal Government feared, might cause harm ..."). And there is no dispute that a prior felony DUI conviction qualifies as a felony under the felon-in-possession law. If Congress thought that a person with a prior felony DUI conviction is not "the kind of person" who is likely to use a gun unlawfully, why would Congress have made it a crime for such a person to possess a gun?

Second, defendants with DUI convictions that are counted under 18 U.S.C. § 924(e)(2)(B) are likely to have serious alcohol abuse problems. As previously mentioned, ordinary DUI convictions are generally not counted under § 924(e) because they are not punishable by imprisonment **1596** for more than a year. Such penalties are reserved for persons, like petitioner, with a record of repeated DUI violations. See NCSL, *supra*. Such individuals are very likely to have serious alcohol abuse problems and a propensity to engage in irresponsible conduct while under the influence. Alcohol use often precedes violent crimes, see, *e.g.,* Roizen, Epidemiological Issues in Alcohol–Related Violence, in 13 Recent Developments in Alcoholism 7, 8–9 (M. Galanter ed.1997), and thus there is reason to worry about the misuse of firearms by defendants whose alcohol abuse problems are serious enough to result in felony DUI convictions.

Third, defendants with DUI convictions that are counted under § 924(e)(2)(B) have either (1) such serious alcohol abuse problems that they have at least three prior felony DUI convictions or (2) both one or two felony DUI convictions and *162 one or two offenses that fall under § 924(e)(2)(B)(i) (offenses that have "as an element the use, attempted use, or threatened use of physical force") or that are specifically set out in § 924(e)(2)(B)(ii) (burglary, arson, extortion, or an explosives offense). Defendants with three felony DUI convictions are likely to be super-DUI-recidivists like petitioner. Defendants with a combination of felony DUI and

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

other qualifying convictions—for example, convictions for assault or burglary—are persons who, even by the Court's lights, could be classified as "the kind of person who might deliberately point [a] gun and pull the trigger."

Unlike the Court, I cannot say that persons with these characteristics are less likely to use a gun illegally than are persons convicted of other qualifying felonies.

Justice SCALIA's concurrence takes a different approach, but his analysis is likewise flawed. Justice SCALIA would hold (1) that an offense does not fall within the residual clause unless it presents a risk that is at least as great as that presented by the least dangerous of the enumerated offenses; (2) that burglary is the least dangerous of the enumerated offenses; (3) that the relevant measure of risk is the risk that the typical burglary, DUI, etc., would result in injury; and (4) that the risk presented by an incident of DUI is less than the risk presented by a burglary.

Justice SCALIA, like the Court, does not follow the statutory language. The statute says that offenses falling within the residual clause must present "a serious potential risk of physical injury to another." The statute does not say that these offenses must present at least as much risk as the enumerated offenses.

The statute also does not say, as Justice SCALIA would hold, that the relevant risk is the risk that each incident of DUI will result in injury. I see no basis for concluding

that Congress was not also concerned with the risk faced by potential victims, particularly since the statute explicitly refers to "potential risk." Drunk driving is regarded as a severe **\*163** societal problem in large measure because of the very large number of victims it produces each year.

Finally, Justice SCALIA's conclusion that burglary is the least risky of the enumerated offenses is based on a procrustean reading of § 924(e)(2)(B)(ii). This provision refers, without qualification, to "extortion." In his dissent in *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586 (2007), Justice SCALIA concluded that many forms of extortion are "inherently *unlikely* to cause physical harm." *Id., at 223, 127 S.Ct., at 1594–95* (emphasis in original). Only by finding that the term **\*\*1597** "extortion" in § 924(e)(2)(B)(ii) really means only certain forms of extortion was Justice SCALIA able to come to the conclusion that burglary is the least risky of the enumerated offenses.

For all these reasons, I would affirm the decision of the Tenth Circuit.

### All Citations

553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462, 2008 Daily Journal D.A.R. 5389, 21 Fla. L. Weekly Fed. S 188

## Footnotes

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1   *United States v. Rodriquez,* now pending before the Court, presents the question "[w]hether a state drug-trafficking offense, for which state law authorized a ten-year sentence because the defendant was a recidivist, qualifies as a predicate offense under the Armed Career Criminal Act, 18 U.S.C. § 924(e)." Pet. for Cert., O.T.2007, No. 06–1646, p. I. [Reporter's Note: See *post,* p. 377.]

2   See National Highway Traffic Safety Administration (NHTSA), Traffic Safety Facts Annual Report, p. 56 (Table 34) (2006) (15,945 alcohol-related fatal crashes; 41%), (2005) (15,238; 39%), (2004) (14,968; 39%), (2003) (15,251; 40%), (2002) (15,626; 41%), (2001) (15,585; 41%), (2000) (14,847; 40%), (1999) (14,109; 38%), (1998) (14,278; 39%), (1997) (14,363; 38.5%), (1996) (15,249; 40.8%), online at http://www-nrd.nhtsa.dot.gov/CATS/listpublications.aspx? Id=E&ShowBy=DocType (Annual Reports 1994–2006 hyperlink) (all Internet materials as visited Apr. 11, 2008, and available in Clerk of Court's case file); see

128 S.Ct. 1581, 170 L.Ed.2d 490, 76 USLW 4228, 08 Cal. Daily Op. Serv. 4462...

also *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) ("No one can seriously dispute the magnitude of the drunken driving problem .... 'Drunk drivers cause an annual death toll of over 25,000 and in the same time span cause nearly one million personal injuries ...' " (footnote omitted); *South Dakota v. Neville,* 459 U.S. 553, 558, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) ("The carnage caused by drunk drivers is well documented.... This Court ... has repeatedly lamented the tragedy").

3      See NHTSA, *supra,* at 111 (Table 76) (2006) (278,000), (2005) (254,000), (2004) (248,000), (2003) (275,000), (2002) (258,000), (2001) (275,000), (2000) (310,000), (1999) (308,000), (1998) (305,000), (1997) (327,000), (1996) (321,000).

4      According to statistics compiled by the Federal Bureau of Investigation, between 1996 and 2006 total annual murders never exceeded 15,000 after 1997. During that same 11–year period, the highest number of murders committed in the course of burglary was 123, the number of murders committed in the course of arson peaked at 105, and the number of murders involving explosives topped out at 14—all in 1996. See Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports/Crime in the United States (Annual Reports 1996–2006), online at http://www.fbi.gov/ucr/ucr. htm # cius. While murders committed in the course of extortion were not separately reported, common sense and the fact that the total number of murders was similar to the number of fatal alcohol-related crashes at least after 1997 indicates that murders involving extortion would not rival deaths in alcohol-related auto accidents. Even if one were to expand beyond murders to all fatalities and even injuries, it is estimated that arson causes the relatively small number of 475 deaths and over 2,000 injuries annually. Dept. of Homeland Security, U.S. Fire Administration, Arson in the United States, Vol. 1 Topical Fire Research Series, No. 8 (Jan.2001, rev.Dec.2001), online at http://www.usfa.dhs. gov/downloads/pdf/tfrs/v1i8–508.pdf.

5      See *United States v. McCall,* 439 F.3d 967, 972 (C.A.8 2006) (en banc) (citing Brewer et al., The Risk of Dying in Alcohol–Related Automobile Crashes Among Habitual Drunk Drivers, 331 New Eng. J. Med. 513 (1994)); Dept. of Justice, Office of Community Oriented Policing Services, Drunk Driving, Problem–Oriented Guides for Police, Problem–Specific Guides Series No. 36, p. 4 (Feb.2006) ("By most estimates, although repeat drunk drivers comprise a relatively small proportion of the total population of drivers, they are disproportionately responsible for alcohol-related crashes and other problems associated with drunk driving").

6      Brewer, *supra,* text accompanying nn. 23–24; L. Taylor & S. Oberman, Drunk Driving Defense § 1.01 (2007).

7      See National Conference of State Legislatures (NCSL), Criminal Status of State Drunk Driving Laws, online at http://www.ncsl. org/print/transportation/drunkdrivecriminal.pdf (2008) (surveying 50 States, the District of Columbia, and U.S. Territories, most of which treat the first DUI offense as a misdemeanor).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  AR.04119    13

KeyCite Yellow Flag - Negative Treatment
Disagreed With by Carachuri-Rosendo v. Holder, 5th Cir., May 29, 2009

KeyCite Overruling Risk - Negative Treatment
Overruling Risk Lopez v. Gonzales, U.S., December 8, 2006

464 F.3d 74
United States Court of Appeals,
First Circuit.

Ambessa Hagos BERHE, Petitioner,

v.

Alberto R. GONZALES, United States
Attorney General, Respondent.

Herman Henry, Petitioner,

v.

Alberto R. Gonzales, United States
Attorney General, Respondent.

Nos. 05–1870, 05–2239.
|
Heard May 2, 2006.
|
Decided Sept. 26, 2006.

**Synopsis**
**Background:** Alien, a Jamaican national and a lawful
permanent resident of the United States, petitioned for review
of decision of the Board of Immigration Appeals (BIA) which
found him ineligible for cancellation of removal. Second
alien, a native of Eritrea and also a lawful permanent resident,
petitioned for review of BIA's decision finding him ineligible
for asylum or cancellation of removal, reversing grant of
withholding of removal, and refusing to consider his claim for
relief under the Convention Against Torture (CAT).

**Holdings:** In a single opinion the Court of Appeals, Howard,
Circuit Judge, held that:

[1] for purposes of determining whether a state drug
offense was an aggravated felony under the Immigration and
Nationality Act (INA), circuit precedent permitted an analysis
that considered whether the underlying offense would have
been punishable as a felony under federal law;

[2] first alien was an aggravated felon, for purposes of
removal proceedings, and thus was ineligible for cancellation
of removal; but

[3] second alien was not an aggravated felon.

Petitions denied in part and granted in part.

West Headnotes (9)

**[1]** **Federal Courts** ⚷ Statutes, regulations, and
ordinances, questions concerning in general

Court of Appeals reviews de novo issues
concerning the interpretation of statutory
provisions.

**[2]** **Aliens, Immigration, and
Citizenship** ⚷ Controlled substances offenses

For purposes of determining whether a state
drug offense was an aggravated felony under the
Immigration and Nationality Act (INA), circuit
precedent permitted an analysis that considered
whether the underlying offense would have
been punishable as a felony under federal law.
Immigration and Nationality Act, § 101(a)(43),

🚩 8 U.S.C.A. § 1101(a)(43).

7 Cases that cite this headnote

**[3]** **Aliens, Immigration, and
Citizenship** ⚷ Controlled substances offenses

Alien was an aggravated felon, for purposes of
removal proceedings, and thus was ineligible
for cancellation of removal, even though his
Massachusetts conviction for possession of
marijuana with intent to distribute was a
misdemeanor under state law; offense was
punishable under the Controlled Substances
Act (CSA) by a maximum of five years'
imprisonment. Immigration and Nationality Act,
§ 240A(a)(3), 🚩 8 U.S.C.A. § 1229b(a)(3);
Comprehensive Drug Abuse Prevention and
Control Act of 1970, § 401(a)(1), (b)(1)
(D), 🚩 21 U.S.C.A. § 841(a)(1), 🚩 (b)(1)(D);
🚩 M.G.L.A. c. 94C, § 32C(a).

3 Cases that cite this headnote

**[4]**  **Aliens, Immigration, and Citizenship**  Controlled substances offenses

Alien who was convicted of Massachusetts misdemeanor offense of simple possession of crack cocaine was not an aggravated felon, for purposes of removal proceedings, and thus was eligible for asylum and cancellation of removal, even though an enhancement based on a prior offense could have been charged, which would have resulted in a felony conviction; in light of fact that prior conviction was not a part of the record, offense of conviction was only a misdemeanor under federal law because it was punishable by no more than one year in prison. Immigration and Nationality Act, §§ 101(a)(43)(B), 208(b)(2)(A)(ii), 208(b)(2)(B)(i), 237(a)(2)(A)(iii), 240A(a)(3), 8 U.S.C.A. §§ 1101(a)(43)(B), 1158(b)(2)(A)(ii), 1158(b)(2)(B)(i), 1227(a)(2)(A)(iii), 1229b(a)(3); M.G.L.A. c. 94C, § 34.

6 Cases that cite this headnote

**[5]**  **Aliens, Immigration, and Citizenship**  Aggravated felonies in general

**Aliens, Immigration, and Citizenship**  Crimes and immorality

Under the modified categorical approach for determining whether an alien has been convicted of an aggravated felony, government bears burden of proving, by clear and convincing evidence derived solely from the record of the prior proceeding, that (1) the alien was convicted of a crime and (2) that crime involved every element of one of the enumerated offenses. Immigration and Nationality Act, § 101(a)(43), 8 U.S.C.A. § 1101(a)(43).

2 Cases that cite this headnote

**[6]**  **Aliens, Immigration, and Citizenship**  Jurisdiction and venue

Court of Appeals had jurisdiction to review claim for withholding of removal filed by alien who had been convicted of Massachusetts misdemeanor offense of simple possession of crack cocaine; issue of the adequacy of the Board of Immigration Appeals' (BIA) reasoning in reversing Immigration Judge's (IJ) grant of relief was a legal question. Immigration and Nationality Act, § 242(a)(2)(D), 8 U.S.C.A. § 1252(a)(2)(D); M.G.L.A. c. 94C, § 34.

1 Cases that cite this headnote

**[7]**  **Aliens, Immigration, and Citizenship**  Findings or statement of reasons

Board of Immigration Appeals (BIA) erred by reversing Immigration Judge's (IJ) grant of alien's request for withholding of removal without addressing IJ's findings that conditions in Eritrea were bad, that the ruling regime was brutal, and that people deemed sympathetic to critics of the government were detained and subjected to severe mistreatment.

**[8]**  **Aliens, Immigration, and Citizenship**  Findings or statement of reasons

Although Board of Immigration Appeals (BIA), in a removal proceeding, need not spell out every last detail of its reasoning where the logical underpinnings are clear from the record, there is a heightened obligation to offer more explanation when the record suggests strong arguments for the alien that the BIA has not considered.

1 Cases that cite this headnote

**[9]**  **Aliens, Immigration, and Citizenship**  Hearing or Interview

Board of Immigration Appeals (BIA) erred by finding that alien knowingly and intelligently waived his right to appeal the rejection of his claim for relief under the Convention Against Torture (CAT), particularly in light of fact that alien was not represented by counsel;

Immigration Judge (IJ) both failed to inform alien of his right to appeal and affirmatively suggested that alien had no reason to appeal, and no subsequent notice was sent to alien informing him of his right to appeal. Immigration and Nationality Act, § 240(c)(5), 8 U.S.C.A. § 1229a(c)(5).

**Attorneys and Law Firms**

**\*76** William W. Fick, with whom Foley Hoag LLP was on brief, for petitioner Berhe.

Jeremiah Friedman, with whom Ilana Greenstein, Harvey Kaplan, Maureen O'Sullivan and Kaplan, O'Sullivan & Friedman, LLP, were on brief, for petitioner Henry.

William E. Graves, Jr. and Graves & Doyle, on brief for Committee for Public Counsel Services, National Immigration Project of the National Lawyers Guild and Immigrant Defense Project of the New **\*77** York State Defenders Association, amici curiae in support of petitioner in No. 05–2239.

John J. Andre, Senior Litigation Counsel, United States Department of Justice, Office of Immigration Litigation, with whom Peter D. Keisler, Assistant Attorney General, Civil Division, Michael P. Lindeman, Assistant Director, and Ethan B. Kanter, Senior Litigation Counsel, Office of Immigration Litigation, were on brief in No. 05–1870, and with whom Peter D. Keisler, Assistant Attorney General, Civil Division, Linda S. Wernery, Assistant Director and William Minick, Attorney, Office of Immigration Litigation, were on brief in No. 05–2239, for respondent.

Before SELYA, LIPEZ, and HOWARD, Circuit Judges.

**Opinion**

HOWARD, Circuit Judge.

Herman Henry and Ambessa Hagos Berhe [1] each petition for review of Board of Immigration Appeals' decisions ordering their removal. We have written a single opinion dealing with those separate petitions because they both question whether a state misdemeanor drug offense can constitute an "aggravated felony" for the purposes of the Immigration

and Nationality Act (INA). *See* 8 U.S.C. § 1101(a)(43). Petitioners face removal from the United States on the basis of their respective state misdemeanor convictions for possession of a controlled substance. The Board denied their applications for discretionary relief from removal on account of their aggravated felony convictions. The petitioners argue, inter alia, that their respective state convictions should not be considered "aggravated felonies" because Massachusetts, the convicting authority in both cases, classified the crimes as misdemeanors.

We reject the petitioners' contentions that we may only look to state law in such cases and reaffirm that a state misdemeanor drug offense can amount to an "aggravated felony" if that offense would have been a felony had it been charged under the federal drug laws. Because Henry's offense —possession with intent to distribute—would have been a felony had it been charged under federal law, we deny his petition. The record of Berhe's state conviction, however, reveals that he was convicted merely for simple possession, a misdemeanor under federal law. For that reason, among others, we vacate the Board's order and remand Berhe's case for further proceedings.

We begin our discussion by outlining the relevant procedural and factual background of the respective petitions.

**I.**

*A. Henry's petition*

Henry is a Jamaican national who was admitted to the United States as a permanent resident in 1984. In 2001, he pleaded guilty in Massachusetts state court to possession of marijuana with intent to distribute in violation of Mass. Gen. Laws ch. 94C, § 32C(a), a misdemeanor under Massachusetts law. Two years later, Henry traveled abroad and was denied re-admission upon his return to the United States. The Department of Homeland Security (DHS)charged Henry with being removable because of his 2001 drug conviction. *See* INA § 212(a)(2)(A)(i)(II), 8 U.S.C. § 1182(a)(2)(A)(i)(II) (declaring inadmissible "any alien convicted of" violating a law "relating to a controlled substance"); INA **\*78** § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C)(i) (declaring inadmissible any alien "the Attorney General knows or has reason to believe ... is or has been an illicit trafficker in any controlled substance").

At a hearing before an immigration judge, Henry admitted the factual allegations charged by DHS and conceded removability on the ground that he had violated a law relating to controlled substances. He denied, however, that he was removable as an "illicit trafficker" in controlled substances. He also filed an application for cancellation of removal, arguing that his removal would result in exceptional hardship to his family living in the United States, who were all either citizens or lawful permanent residents. *See* INA § 240A(a), 8 U.S.C. § 1229b(a)(3). The immigration judge found Henry removable as charged. Although the judge deemed Henry eligible for cancellation of removal, she denied Henry's application as a matter of discretion. Both Henry and DHS appealed to the Board.

DHS challenged the immigration judge's legal conclusion that Henry was eligible for cancellation of removal. According to DHS, Henry was ineligible for such relief because he had been convicted of an "aggravated felony." *See id.* (providing the Attorney General with discretion to cancel the removal of any alien who "has not been convicted of any aggravated felony"); *id.* § 1101(a)(43)(B) (defining "aggravated felony").

The Board sustained DHS's appeal. It observed that, under this court's precedent, a state drug offense qualifies as an "aggravated felony" if it is punishable under one of the federal drug enforcement statutes, including the Controlled Substances Act (CSA), and is a felony. *See Amaral v. INS*, 977 F.2d 33, 35 (1st Cir.1992). The Board found that possession of marijuana with intent to distribute is punishable under the CSA by a maximum of five years' imprisonment, *see* 21 U.S.C. § 841(a)(1), (b)(1)(D), and would be classified as a felony under federal law, *see* 18 U.S.C. § 3559(a) (any offense punishable by more than one year in prison is a felony). Because Henry's Massachusetts offense would have been punishable as a felony under federal law, the Board concluded that it was an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(B). The Board therefore found Henry ineligible for cancellation of removal and ordered him removed to Jamaica.

### B. Berhe's petition

Berhe was born in 1978 in a city in Ethiopia, which is now a part of Eritrea. His birth mother gave him up for adoption during the Ethiopian civil war and his adoptive parents thereafter took him to Sudan. Four years later, in 1987, he and his adoptive parents were admitted to the United States as refugees. In 1988, Berhe's status was adjusted to lawful permanent resident. Since his admission to the United States, Berhe has never returned to Eritrea. Nor has he had any contact with any surviving family members there.

In 1996, Berhe was convicted in a Massachusetts municipal court for simple possession of crack cocaine under Mass. Gen. Laws ch. 94C, § 34, and for assault and battery of a police officer, and was sentenced to six months' probation. In 2003, he pleaded guilty to simple possession of crack cocaine in Massachusetts state district court, and received a six-month suspended sentence. In prosecuting the 2003 offense, the Commonwealth of Massachusetts did not charge Berhe with a prior conviction because it did not seek a recidivism-based sentence enhancement. *See* Mass. Gen. Laws ch. 278, § 11A (providing **\*79** that if the government seeks enhanced penalties because of a prior conviction, the defendant "shall be entitled to a trial by jury of the issue of conviction of a prior offense"). Both the 1996 conviction and the 2003 conviction were misdemeanors under Massachusetts law. *See* Mass. Gen. Laws ch. 274, § 1 ("A crime punishable by death or imprisonment in the state prison is a felony. All other crimes are misdemeanors.").

In 2004, DHS initiated removal proceedings against Berhe, charging that he was removable because of his 2003 conviction for simple possession of crack cocaine. *See* INA § 237(a)(2)(B)(i), 8 U.S.C. § 1227(a)(2)(B)(i) (providing that any alien convicted of violating a law "relating to a controlled substance ... is deportable"). Berhe conceded removability, but submitted applications seeking cancellation of removal, asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Berhe's asylum application asserted that he would be persecuted on account of his religion were he returned to Eritrea.

DHS subsequently filed a supplemental charge of removability contending that Berhe's 2003 conviction was for an "aggravated felony," *see id.* § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony ... is deportable."). DHS argued that because Berhe had a prior drug conviction, his 2003 misdemeanor simple possession conviction was an "aggravated felony" under the INA. *See id.* § 1101(a)(43)(B). As a result, DHS argued, Berhe was statutorily ineligible for the discretionary relief of asylum or cancellation of removal. *See id.* §§ 1158(b)(2)(A)(ii), 1158(b)

(2)(B)(i), 1229b(a)(3). DHS also argued that an aggravated felony is presumptively a "particularly serious crime," which rendered Berhe ineligible for withholding of removal. *See id.* § 1231(b)(3)(B)(ii).

Following a hearing, an immigration judge found Berhe removable on the basis of the original controlled substance charge, but not on the aggravated felony charge. The judge concluded that, because Berhe's 2003 conviction was classified by Massachusetts law as a misdemeanor, it could not be considered an aggravated felony. The judge therefore evaluated Berhe's claims for relief and granted him asylum, withholding of removal, and cancellation of removal, but denied relief under the CAT. DHS appealed to the Board and Berhe filed a cross-appeal from the denial of his CAT claim.

The Board sustained DHS's appeal. The Board stated that it would apply the First Circuit's approach for determining whether the state conviction is an aggravated felony. The Board found that Berhe's 2003 offense was punishable under federal law as a felony because his prior drug possession offense converted his subsequent possession conviction into a felony. Because Berhe had been convicted of an aggravated felony, the Board found him ineligible for asylum or cancellation of removal and therefore did not reach the merits of those claims. The Board also reversed the immigration judge's grant of withholding of removal on the ground that Berhe had not shown "a clear probability of persecution on account of any protected ground," and dismissed Berhe's cross-appeal as untimely. The Board ordered Berhe removed to Eritrea.

## II.

Henry and Berhe separately challenge the Board's interpretation of "aggravated felony." They contend that the Board erred by treating their state misdemeanor convictions as aggravated felonies under the INA. Berhe additionally challenges the **\*80** Board's merits-based determination overturning the immigration judge's decision granting him withholding of removal and contends that the Board's refusal to consider his CAT claim as untimely was erroneous as a matter of law. We begin with their common challenge to the definition of "aggravated felony."

### A. Aggravated Felony

**[1]** Because this issue concerns the interpretation of statutory provisions, *viz.,* 8 U.S.C. § 1101(a)(43) and 18 U.S.C. § 924(c)(2), our review is de novo. *Enwonwu v. Gonzales,* 438 F.3d 22, 34–35 & n. 12 (1st Cir.2006). Although we ordinarily accord deference to the Board's reasonable interpretation of a silent or ambiguous provision of the INA, and the Board's choice of methodology for resolving a given issue arising under the INA may be regarded as an interpretation, we do not accord such deference in an "aggravated felony" case because, as we describe below, *see infra* at 13, the BIA has taken a passive stance with regard to the interpretation of 8 U.S.C. § 1101(a)(43). *Conteh v. Gonzales,* 461 F.3d 45, 53 n. 3 (1st Cir.2006).

The INA establishes a comprehensive list of offenses that qualify as aggravated felonies. *See* 8 U.S.C. § 1101(a)(43) (providing 21 subcategories of aggravated felony offenses, many of which cross-reference to other U.S.Code provisions). Included in this list is "illicit trafficking in a controlled substance (as defined in section 802 of Title 21), *including a drug trafficking crime* (as defined in section 924(c) of Title 18) .... whether in violation of State or Federal law." *Id.* § 1101(a)(43)(B) (emphasis added). "Drug trafficking crime," in turn, means "*any felony* punishable under the Controlled Substances Act (21 U.S.C. § 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C.App.1901 et seq.)." 18 U.S.C. § 924(c)(2) (emphasis added).

The Board has interpreted § 1101(a)(43)(B) to provide two paths for arriving at an aggravated felony finding. The first route is based on the "illicit trafficking in a controlled substance" language, and is not relevant to these cases. *See Gerbier v. Holmes,* 280 F.3d 297, 313 (3d Cir.2002) (noting that under the "illicit trafficking route" the state offense "must be a felony under the law of the convicting sovereign" and "must contain a trafficking element"). The second route is premised on the language "drug trafficking crime" as defined in 18 U.S.C. § 924(c)(2). The Board concluded in *Matter of Davis,* 20 I & N Dec. 536, 1992 WL 443920 (BIA 1992), that in terms of the "drug trafficking crime" route, any state drug offense, whether classified as a felony or misdemeanor in that state, is an aggravated felony

if the same conduct would have been punishable as a felony if charged under one of the three federal statutes enumerated in § 924(c)(2). *Id.* at 543; *see also Gerbier,* 280 F.3d at 306. This methodology is sometimes referred to as the "hypothetical federal felony" approach. *See Gerbier,* 280 F.3d at 306.

The Board later clarified that the term "any felony" in § 924(c)(2) refers to the definition of felony in 18 U.S.C. § 3559(a), which provides catchall classifications for crimes codified in Title 18. *In re L–G–,* 21 I & N Dec. 89, 94 (BIA 1995); 18 U.S.C. § 3559(a) (classifying any offense that is not specifically classified in the substantive section defining the offense). Under that provision, a "felony" is any offense where the maximum term of imprisonment authorized is more than one year. 18 U.S.C. § 3559(a). Thus, the Board ruled that a **\*81** state drug offense could constitute an aggravated felony, in terms of the "drug trafficking crime" route, *only* if it is punishable by more than one year of imprisonment under one of the three federal drug statutes enumerated in § 924(c)(2). *In re L–G–,* 21 I & N Dec. at 96. In other words, under the Board's strict "hypothetical federal felony" approach, the phrase "drug trafficking crime" meant any conviction punishable by more than one year of imprisonment under one of the federal drug laws.

This approach has received mixed reviews from the circuit courts. In the civil immigration context, several circuits have adopted the Board's hypothetical federal felony approach. *E.g., Gonzales–Gomez v. Achim,* 441 F.3d 532, 534–36 (7th Cir.2006); *United States v. Palacios–Suarez,* 418 F.3d 692, 698–700 (6th Cir.2005); *Cazarez–Gutierrez v. Ashcroft,* 382 F.3d 905, 912–18 (9th Cir.2004); *Gerbier,* 280 F.3d at 308–12; *Aguirre v. INS,* 79 F.3d 315, 317–18 (2d Cir.1996). Under this approach, the underlying state classification of the offense is irrelevant. The circuits that have adopted this approach emphasize that focusing solely on federal law properly accounts for the need to apply the nation's immigration laws uniformly, and that an approach that allows the vagaries of state law to influence the determination would defeat this purpose. *See, e.g., Achim,* 441 F.3d at 535; *Gerbier,* 280 F.3d at 311–12.

At least two circuits have taken a more flexible approach. These circuits hold that a state conviction constitutes an "aggravated felony" if it (1) is punishable under one of the federal drug enforcement statutes, and (2) is a hypothetical federal felony *or* is a felony under the law of the convicting state. *E.g., Lopez v. Gonzales,* 417 F.3d 934, 936–37 (8th Cir.2005), *cert. granted,* 547 U.S. 1054, 126 S.Ct. 1651, 164 L.Ed.2d 395 (2006); *United States v. Hernandez–Avalos,* 251 F.3d 505, 507–08 (5th Cir.2001). This "dual approach" derives from circuit decisions interpreting the meaning of "aggravated felony" in the criminal sentencing context. [2]

In light of the split in circuit authority, the Board retreated from strictly applying the hypothetical federal felony approach in all cases, in favor of applying the approach of the circuit in which the case before it originated. *See In re Yanez–Garcia,* 23 I & N Dec. 390, 396–98, 2002 WL 993589 (BIA 2002). In those circuits that have not definitively ruled on the issue, the Board follows the position taken by the majority of the circuits in criminal sentencing cases—the dual approach. *Id.*

In the present cases, the Board interpreted our precedent as applying the dual approach. Accordingly, the Board found that the petitioners' state drug offenses **\*82** would constitute "drug trafficking crimes" if they were (1) punishable under one of the three statutes enumerated in § 924(c)(2), and (2) punishable as a felony under either federal *or* state law. *See Amaral v. INS,* 977 F.2d 33, 36–37 (1st Cir.1992) (finding that petitioner had been convicted of an aggravated felony because his state drug offense would be a felony under federal law); *United States v. Restrepo–Aguilar,* 74 F.3d 361, 364–67 (1st Cir.1996) (finding that the defendant was an aggravated felon because his state offense was a felony under state law and it violated the CSA). The Board found *Amaral* to control in both cases.

In *Amaral,* the Board found that the petitioner was an aggravated felon, and therefore deportable and ineligible for discretionary relief, because of three state court convictions for possession of cocaine. *See* 977 F.2d at 34. On review, we did not resolve the merits of the Board's decision because we lacked jurisdiction. *Id.* at 37. Our jurisdictional ruling, however, required us to consider whether the petitioner was an aggravated felon under the INA. *Id.* at 35 (noting that if the petitioner was an aggravated felon, his petition for review was

AR.04125

untimely).[3] In that case, as here, the question was whether any of the petitioner's state offenses was a "felony" under § 924(c)(2). Because of § 924(c)(2)'s cross-reference to the CSA, we consulted the CSA's definition of "felony" as "any Federal or State offense classified by applicable Federal or State Law as a felony." *Id.* at 36 (quoting 21 U.S.C. § 802(13)). Although we noted that the petitioner's offenses were felonies under state law, we undertook a federal analysis of the petitioner's crimes. *See id.* at 36 & n. 3. We concluded that, although a simple possession offense is ordinarily a misdemeanor under the CSA, *see* 21 U.S.C. § 844(a), "one prior conviction turns possession into a felony since the maximum penalty increases to over a year." *Amaral,* 977 F.2d at 34. Thus, we ruled that, "under [a] literal application of §§ 844(a) and 3559(a)," the subsequent possession conviction amounted to a felony under federal law. *Id.*

Applying *Amaral,* the Board found that Henry's Massachusetts conviction, possession of marijuana with intent to distribute, is punishable under the CSA by a maximum of five years' imprisonment, *see* 21 U.S.C. § 841(a)(1), (b)(1)(D), and is therefore a felony under federal law, *see* 18 U.S.C. § 3559(a). The Board found that Berhe's 2003 conviction for simple possession, although ordinarily punishable as a misdemeanor under federal law, would be converted to a felony because of his previous possession conviction. *See Amaral,* 977 F.2d at 36; 21 U.S.C. § 844(a). Thus, the Board concluded that both Henry and Berhe had been convicted for "drug trafficking crimes" as defined in § 924(c)(2).

Petitioners argue that, because their respective state drug offenses were not classified as *felonies* by the convicting authority, they should not be considered *aggravated felonies.*[4] They contend that **\*83** our holding in *Restrepo–Aguilar* mandates that the law of the prosecuting jurisdiction controls for purposes of determining whether an offense is a felony or misdemeanor. They point out that in *Restrepo–Aguilar,* we found that a state felony conviction was a "felony" for purposes of § 924(c)(2) notwithstanding that it would have been a misdemeanor under federal law. *See Restrepo–Aguilar,* 74 F.3d at 364–65. Thus, the petitioners argue, we discarded the approach

in *Amaral* (which they characterize as dicta) in favor of an approach that looks to the prosecuting jurisdiction to determine the classification of an offense. They contend that the word "applicable" in § 802(13)'s definition of "felony" requires us to consult the law *actually applied* by the convicting authority.

The petitioners misread our precedent. First, *Amaral's* ruling was not dicta. In *Amaral,* we were required to determine whether the petitioner had been convicted of an "aggravated felony" as defined in the INA, and in doing so, we employed a method that looked to the offense's hypothetical status under federal law. *See id.* at 36. Though we might have grounded our decision on the state's classification of the offense, we did not do so. *See id. Cf. United States v. Johnson,* 256 F.3d 895, 914 (9th Cir.2001) (en banc) (noting that when a federal appellate court "confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense").[5] Moreover, subsequent rulings of this court have followed the *Amaral* approach. Less than two years after *Amaral,* we applied precisely the same analysis in a sentencing case. *See United States v. Forbes,* 16 F.3d 1294, 1301 (1st Cir.1994). We found that the defendant's first state conviction for possession of a controlled substance would have converted his second state possession conviction into a felony under federal law. *See id.* (citing 21 U.S.C. § 844(a); 18 U.S.C. § 3559(a)). Although, as in *Amaral,* the underlying offenses were also felonies under state law, our application of the aggravated felony enhancement was predicated on our finding that the state offense was punishable as a felony under federal law. *See id. Forbes* also suggests that a felony classification under *either* federal *or* state law will suffice to meet § 924(c)(2)'s "any felony" requirement. *See id.; see also United States v. Cuevas,* 75 F.3d 778, 783 (1st Cir.1996) (holding that the defendant's state drug offense "undoubtedly qualifies as a felony" because it is punishable as a felony under federal law).

Second, *Restrepo–Aguilar* did not overrule or undermine *Amaral.* The defendant in *Restrepo–Aguilar* appealed the district court's application of the aggravated felon sentence

enhancement. *See* 74 F.3d at 363 (citing U.S.S.G. § 2L1.2(b)(2) (1994)). Although we recognized that the **\*84** definition of "aggravated felony" in U.S.S.G. § 2L1.2 was essentially the same as the definition in the INA, we declined to adopt the Board's precedent which, at the time, applied the strict hypothetical federal felony approach. *See id.* at 366–67. We noted that the Board's rationale was based significantly on "policy concerns relating to the consequences flowing from a deportation decision or a decision on an application for asylum, without regard to any of the policies that inform the meaning of 'aggravated felony' in the context of the statutory prior offense enhancement or its implementation in the Sentencing Guidelines." *Restrepo–Aguilar,* 74 F.3d at 366. Viewing *Amaral* as enduring precedent, we were also careful to distinguish it based on the differing contexts. *Id.* at 366 n. 6.

More importantly, however, we noted that our approach in *Restrepo–Aguilar* was entirely consistent with *Amaral* and *Forbes. See id.* We observed that our cases interpreted the phrase "drug trafficking crime" in § 924(c)(2) to encompass "two *separate* elements: (1) that the offense be punishable under the Controlled Substances Act (or one of the other two statutes identified); and (2) that the offense be a felony." *Id.* at 364 (citing *Forbes,* 16 F.3d at 1301; *Amaral* 977 F.2d at 36). We further observed that § 924(c)(2)'s definition of "drug trafficking crime," "by its terms includes *any* felony" that is criminalized under the CSA." *Id.* Thus, we found that the definition "does not *limit* its application to offenses that would be classified as felonies" under federal law. *Id.* (emphasis supplied). Moreover, we stressed that the CSA's definition of "felony" provided further support for the idea that a felony designation under *either* federal *or* state law would be sufficient. *See id.* ("[T]he CSA itself defines a felony as 'any Federal or State offense classified by applicable Federal or State law as a felony.' ") (quoting 21 U.S.C. § 802(13)). It is clear we read "applicable" to mean, not the law *actually applied,* but, consistent with the ordinary meaning of the word, the law "*capable of being applied.*" *Merriam–Webster's Collegiate Dictionary* 56 (10th ed.2001). Thus, we held that a state drug conviction may constitute an aggravated felony if it was classified as a felony under state law (even if it would have been a misdemeanor under federal law), but we did not suggest that a state offense could constitute an

aggravated felony *only if* it was classified as a felony under state law. *See Restrepo–Aguilar,* 74 F.3d at 364–66.

**[2]**    Accordingly, we conclude that the Board was correct to employ the hypothetical federal felony methodology outlined in *Amaral.* For the purposes of determining whether a state drug offense is an "aggravated felony" under the INA, our circuit precedent permits an analysis that considers whether the underlying offense would have been punishable as a felony under federal law. As discussed above, we are not alone. While there is disagreement concerning whether it is permissible to consult state law in making the aggravated felony determination, as far as we can tell, all the circuits to have considered the issue agree that a state drug offense that would be punishable as a felony under the CSA is a "drug trafficking crime" under § 924(c)(2). *See supra* at 11–12. To our knowledge, no circuit has endorsed the approach urged here—requiring that the underlying offense be a felony under state law.

### B. Henry's Case

**[3]**    Applying *Amaral's* hypothetical federal felony approach, the Board's determination that Henry is an aggravated felon is clearly correct. Henry's state conviction for possession of marijuana **\*85** with intent to distribute, which would be punishable under the CSA by a maximum of five years' imprisonment, *see* 21 U.S.C. § 841(a)(1), (b)(1)(D), is a felony under federal law, *see* 18 U.S.C. § 3559(a). The Board therefore properly determined that Henry is ineligible for cancellation of removal. *See* 8 U.S.C. § 1229b(a)(3). We next consider Berhe's alternative arguments.

### C. Berhe's Arguments

#### 1. Sufficiency of the evidence supporting the aggravated felony finding

Berhe argues that, even applying the hypothetical federal felony approach, his 2003 state drug possession conviction is not a felony under federal law because the 1996 conviction was neither charged nor proven during the 2003 proceeding. He notes that under federal and Massachusetts law, a defendant must be charged with a prior conviction before the government can seek a recidivism-based sentencing enhancement. *See* 21 U.S.C. § 851; Mass. Gen. Laws ch. 278, § 11A; *see also Prou v. United States,* 199 F.3d 37, 42, 44 (1st Cir.1999) (holding that federal courts "lack[ ] authority

to impose the statutory enhancement" where the government has not complied with the "strictly enforced" § 851 charging procedures). Berhe acknowledges that both the state and the federal government (had it brought charges against him) could have sought a recidivism-based sentence enhancement which, if successful, would have resulted in a felony conviction under federal law. But, because he was not so charged, and instead pleaded guilty only to simple possession of a controlled substance (which is only a misdemeanor under federal law because it is punishable by no more than one year in prison, *see* 21 U.S.C. § 844(a)), the government failed to establish that he was convicted of a hypothetical federal felony.

[4] [5] We agree. Because Berhe's 1996 conviction is not a part of the record of the 2003 conviction, the government did not establish that Berhe was convicted of a hypothetical federal felony. As recently articulated, this circuit applies a "modified categorical approach" for determining whether an alien has been convicted of an aggravated felony. *Conteh v. Gonzales*, 461 F.3d 45, 55–56 (1st Cir.2006). Under this approach, "the government bears the burden of proving, by clear and convincing evidence derived solely from the record of the prior proceeding, that (i) the alien was convicted of a crime and (ii) that crime involved every element" of one of the offenses enumerated in 8 U.S.C. § 1101(a)(43). *Id.* at 56. When the statute on which the underlying conviction rests necessarily involves all of the elements enumerated in one of the INA's definitions of aggravated felony, "proof of the fact of conviction suffices to discharge the government's burden." *Id.* Where, however, the underlying statute sweeps more broadly (i.e., encompasses crimes that are not necessarily aggravated felonies under the INA), "the government ... must demonstrate, by reference only to facts that can be mined from the record of conviction, that the putative predicate offense constitutes a crime designated as an aggravated felony in the INA." *Id.* (citing *Taylor v. United States*, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); *In re Pichardo–Sufren*, 21 I & N Dec. 330, 335–36, 1996 WL 230227 (BIA 1996)). [6]

**\*86** As noted above, the underlying state statute here encompasses crimes that ordinarily would not constitute felonies under either state or federal law. *Compare* Mass. Gen. Laws ch. 94C, § 34, *with* 21 U.S.C. § 844(a) (both setting a maximum term of imprisonment of one year

for "knowingly or intentionally ... possess[ing] a controlled substance"). Therefore, we must look to the record of conviction of the alleged aggravated felony to determine whether the government met its burden of proving that Berhe had a prior conviction for a drug offense. *See* 21 U.S.C. § 844(a) (noting that if an offense for simple possession is committed after a prior conviction for a drug offense has become final, the maximum penalty increases to two years' imprisonment). The record of Berhe's 2003 conviction in state district court—the criminal complaint alleging misdemeanor possession of crack cocaine and the official criminal docket indicating Berhe's plea of guilty to that charge—contains no reference to Berhe's 1996 conviction. Both the criminal complaint and the docket clearly indicate that Berhe was charged and convicted of the misdemeanor crime (under both Massachusetts and federal law) of simple possession of a controlled substance punishable by no more than one year in prison. [7]

Because the record of conviction here contains no reference to Berhe's prior conviction, or to any other factor that would hypothetically convert his 2003 state misdemeanor conviction into a felony under federal law, the Board erred by concluding that his 2003 conviction was an "aggravated felony" under 8 U.S.C. § 1101(a)(43). The Board therefore also erred in concluding that Berhe is ineligible for asylum and cancellation of removal. Hence, we must remand so that it may consider the merits of those claims. *See* *INS v. Ventura*, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (noting that a court of appeals should ordinarily "remand a case to an agency for decision of a matter that statutes place primarily in agency hands").

### 2. Withholding of removal

[6] Berhe also argues that the Board erred in reversing the immigration judge's decision granting him withholding of removal. He contends that the Board did not base its decision on substantial evidence and failed to explain sufficiently why it chose to disregard the immigration judge's conclusions. At oral argument, and in a supplemental post-argument filing, the government argues that the Real ID Act of 2005 strips us of jurisdiction to review Berhe's claim for withholding of removal. *See* 8 U.S.C. § 1252(a)(2)(C) (divesting jurisdiction to review "any final order of removal against an alien who is removable by reason of having committed a criminal offense" in violation of a law relating to controlled substances). Because Berhe was

found removable based on a controlled substance offense, the government argues, this court may review only "questions of law" and "constitutional **\*87** claims." *Id.* § 1252(a)(2)(D) (preserving our jurisdiction for such claims). The government contends that Berhe's withholding of removal claim does not present any legal or constitutional issues. Berhe counters that the adequacy of the Board's reasoning is a legal question that we may review. Berhe is correct. *See Enwonwu v. Gonzales,* 438 F.3d 22, 35 (1st Cir.2006)

During removal proceedings, Berhe, appearing pro se, asserted that he feared religious persecution on the basis of his status (or imputed status) as a member of the Jehovah's Witnesses. The immigration judge found "no evidence that this would be held against him" in Eritrea, but granted Berhe's application for withholding of removal on another ground. The judge found that documentary evidence (presumably the State Department country reports) established that conditions in Eritrea are "generally bad," that the ruling regime is "quite brutal," and that "people who are deemed sympathetic in any way to critics [of the government] are detained and subjected to severe mistreatment." Thus, crediting Berhe's testimony that he "came to the United States as a refugee and has continued to seek asylum even after becoming removable," the judge found that, upon return to Eritrea, he would likely be targeted for persecution "as a suspected critic of the Eritrean government."

On appeal, the Board found that "there is no basis to find that it is more likely than not that the respondent would be subjected to persecution based upon the religion of his adoptive parents." Nowhere, however, did the Board engage the immigration judge's rationale for granting Berhe's application for withholding of removal. [8]

**[7]** **[8]** We agree with Berhe, therefore, that this case is controlled by *Enwonwu. See* 438 F.3d at 35 (holding that, where the Board's reversal of an immigration judge's grant of relief under the CAT only addressed one of the two findings made by the judge in support of its decision, the Board's opinion was "insufficiently reasoned as a matter of law"). Although we have previously noted that the Board "need not spell out every last detail of its reasoning where the logical underpinnings are clear from the record," there is a heightened obligation "to offer more explanation when the record suggests strong arguments for the petitioner that the [Board] has not considered." *Id.* (quoting *Sulaiman*

*v. Gonzales,* 429 F.3d 347, 350 (1st Cir.2005)). We agree with Berhe that there was adequate support in the record for the immigration judge's finding, and that it was therefore an error of law for the Board to reverse without addressing that finding. The proper course, therefore, is to remand to the Board for further consideration of Berhe's claim for withholding of removal. *See id.; see also Ventura,* 537 U.S. at 16–17, 123 S.Ct. 353.

**\*88** *3. Convention Against Torture*

Finally, Berhe argues that the Board erred in refusing to consider his claim for relief under the CAT. The Board held that Berhe had waived his CAT claim by failing to inform the immigration judge of his intention to appeal. *See Matter of Shih,* 20 I & N Dec. 697, 698–99 (BIA 1993). The Board further noted that Berhe's Notice of Appeal, which was filed six months after the immigration judge's decision, was untimely. *See* 8 C.F.R. § 1003.38(b). In his petition, Berhe contends, and the government concedes, that the immigration judge failed to advise Berhe of his right to appeal the decision to deny him protection under the CAT. He argues, therefore, that he could not have knowingly and intelligently waived his right to appeal. We agree.

The regulations governing immigration proceedings require that "[a] party affected by a decision of an immigration judge which may be appealed to the Board ... shall be given notice of the opportunity for filing an appeal." *Id.* § 1003.3. *Cf.* 8 U.S.C. § 1229a(c)(5) (requiring the immigration judge to "inform the alien of the right to appeal" from an order of removal). The Board has previously recognized that any waiver of the right to appeal must be made "knowingly and intelligently." *In re Rodriguez–Diaz,* 22 I & N Dec. 1320, 1322 (BIA 2000); *see also Shih,* 20 I & N Dec. at 698–99 (finding waiver where the alien was specifically informed of the consequences of his waiver).

**[9]** In this case, the immigration judge both failed to inform Berhe of his right to appeal and affirmatively suggested that Berhe had no reason to appeal. At the close of proceedings, after having asked DHS's attorney whether she wished to appeal, the immigration judge told Berhe: "I've granted your applications for relief. Did you understand all of that?" Further assuring Berhe of the completeness of his victory, the judge stated: "If the Government does not actually file an appeal, you will be released." No reference was made to any right of cross-appeal or to the peril that Berhe's inaction could

result in his waiving the CAT claim. Nor was any subsequent notice sent to Berhe informing him of his right to appeal.

In these circumstances, the Board erred by ruling that Berhe "knowingly and intelligently" waived his right to appeal the rejection of his CAT claim. The equities weigh especially in Berhe's favor, given that he was not represented by counsel. *See Rodriguez–Diaz,* 22 I & N Dec. at 1323 (stressing that "in cases involving unrepresented aliens, more detailed explanations [of the alien's right to appeal] are often needed"). Nor should Berhe be faulted for the late filing of his Notice of Appeal. The Board's bar against hearing untimely appeals is inapplicable in these circumstances. *See Zhong Guang Sun v. United States Dep't of Justice,* 421 F.3d 105, 108–09 (2d Cir.2005) (collecting cases recognizing that the Board's bar has an exception for unique or extraordinary circumstances beyond the alien's control); *Vlaicu v. INS,* 998 F.2d 758, 760 (9th Cir.1993) (per curiam) (holding that the Board "may have jurisdiction to hear an otherwise untimely appeal" in "unique circumstances," such as when the appellant "was

misled by the words or conduct of the [immigration] court") (internal quotation marks omitted). And the government should not be allowed to benefit from the immigration court's failure to follow its own regulations. *Nelson v. INS,* 232 F.3d 258, 262 (1st Cir.2000) ("An agency has the duty to follow its own federal regulations," and failure to follow those regulations "can lead to reversal of an agency order and a new hearing"). We believe that such a remand is the proper course here.

**\*89  III.**

For the reasons stated, Henry's petition for review is ***denied,*** and Berhe's petition is ***granted.*** The Board's order of removal in Berhe's case is ***vacated,*** and the case is ***remanded*** to the Board for further proceedings consistent with this opinion.

**All Citations**

464 F.3d 74

---

**Footnotes**

1    Although we have indicated this petitioner's name consistent with the administrative record, his brief states that his proper name is "Ambessa Berhe Hagos." Whichever is correct, we shall refer to him in this opinion simply as "Berhe."

2    The United States Sentencing Guidelines provide a sentence enhancement for aliens who, after having been previously deported following a conviction for an "aggravated felony," unlawfully return to or remain in the United States. *See* U.S.S.G. § 2L1.2(b)(1)(C) (2005). The Guidelines in turn define an "aggravated felony" by reference to the definition in the INA. *See id.* § 2L1.2 cmt. n. 3 (2005). The majority of circuits that have confronted the "aggravated felony" question in this context have utilized the dual approach, finding that a felony drug conviction under state law can amount to a "drug trafficking crime" regardless of how the crime would be classified under analogous federal law. *See, e.g., United States v. Sanchez–Villalobos,* 412 F.3d 572, 574 (5th Cir.2005); *United States v. Ramirez,* 344 F.3d 247, 251, 253–54 (2d Cir.2003); *United States v. Wilson,* 316 F.3d 506, 512–13 (4th Cir.2003); *United States v. Ibarra–Galindo,* 206 F.3d 1337, 1339–40 (9th Cir.2000); *United States v. Briones–Mata,* 116 F.3d 308, 309 (8th Cir.1997). *But see Palacios–Suarez,* 418 F.3d at 697–700 (adopting the hypothetical federal felony approach for both immigration and sentencing cases).

3    Under the INA at that time, aggrieved aliens were generally allowed 90 days to file a petition to review a final order of deportation, but aggravated felons were given only 30 days. 8 U.S.C. § 1105a(a)(1) (repealed 1996). Under the current version of the INA, all aliens must file their petitions "not later than 30 days after the date of the final order of removal." 8 U.S.C. § 1252(b)(1).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

4    Henry also argues that his underlying state offense—possession of a controlled substance with intent to manufacture, distribute, dispense or cultivate, *see* Mass. Gen. Laws ch. 94C, § 32C(a)—is not sufficiently analogous to any federal offense to be deemed "punishable under" one of the federal drug enforcement statutes. He argues that the Massachusetts statute to which he pleaded guilty is broader in scope than the closest federal analogue. Henry's argument is a nonstarter. Assuming arguendo that the Massachusetts statute is broader, the particular conduct to which Henry pleaded guilty, possession of a controlled substance with intent to distribute, is clearly punishable under the CSA. *See* 21 U.S.C. § 841(a)(1).

5    It is of little import that we did not resolve the merits of the Board's aggravated felony determination in *Amaral.* To be sure, the "aggravated felony" question arose in a jurisdictional inquiry. *See* 977 F.2d at 35. But the question presented, and the statutory language at issue, were precisely the same as that considered here. Our holding that the petitioner had been convicted of an "aggravated felony" was expressly premised on a finding that the offense was *punishable as a felony* under the CSA. *See id.* at 36.

6    In *Conteh,* we outlined the contours of the "record of conviction." We held that the alien's testimony at his removal hearing, where he admitted to facts relevant to the aggravated felony determination, was not a part of the underlying record of conviction and therefore could not be considered in determining whether the conviction was for an aggravated felony. *Conteh,* 461 F.3d at 57–59; *see id.* at 58 ("[T]he record of conviction cannot encompass after-the-fact statements made in a separate and subsequent proceeding.").

7    *Amaral* does not control our consideration of this issue. Although it appears that the Board in *Amaral* found the existence of prior convictions based on the petitioner's admissions in removal proceedings, 977 F.2d at 34, it is not clear whether the petitioner simply testified to the fact of these prior convictions or stipulated to their existence and their validity. *See Conteh,* 2006 WL 2406942 at 58 n. 5. In any event, it does not appear that this issue was litigated in *Amaral.* Whatever the basis of our finding that the petitioner had prior convictions in that case, *Conteh* now limits our examination to the record of conviction.

8    In noting that there was no allegation of past persecution, the Board did call into question Berhe's refugee status on his admission to the United States, noting the lack of "information ... explain[ing] the basis for this admission." But regardless of the reason for Berhe's refugee status, the record is uncontradicted that Berhe was admitted as a refugee. In fact, at the removal hearing, the government proffered documents, relating to Berhe's approved application for adjustment to lawful permanent resident status, that establish that he was admitted as a refugee at New York City in 1987.

    We note that the Board also misstated Berhe's claim for relief. On our review of the record, we see no allegation that he feared persecution because his adoptive parents were Jehovah's Witnesses. Rather, he claims that it was his *birth mother* who was a Jehovah's Witness.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by    Hatfield v. Barr,    7th Cir.(Ill.),    June 6, 2019

836 F.3d 336
United States Court of Appeals, Third Circuit.

Daniel BINDERUP, Appellant (No. 14-4550),
v.
ATTORNEY GENERAL UNITED STATES OF
AMERICA; Director Bureau of Alcohol Tobacco
Firearms & Explosives, Appellants (No. 14-4549).
Julio Suarez, Appellant (No. 15-1976),
v.
Attorney General United States of America;
Director Bureau of Alcohol Tobacco Firearms
& Explosives, Appellants (No. 15-1975).

Nos. 14-4549 & 14-4550
|
Nos. 15-1975 & 15-1976
|
Argued June 1, 2016
|
(Opinion filed: September 7, 2016)

**Synopsis**
**Background:** Individuals convicted of state misdemeanors
punishable by more than two years' imprisonment brought
actions against United States Attorney General and director of
Bureau of Alcohol, Tobacco, Firearms & Explosives alleging
that federal statute prohibiting them from possessing firearms
violated their Second Amendment rights. The United States
District Court for the Eastern District of Pennsylvania, James
Knoll Gardner, J.,    2014 WL 4764424, and the United
States District Court for the Middle District of Pennsylvania,
William W. Caldwell, J.,    2015 WL 685889, ruled that
statute was unconstitutional as applied, and defendants
appealed. Appeals were consolidated for rehearing en banc.

**Holdings:** The Court of Appeals, en banc, Ambro, Circuit
Judge, held that:

[1] exception to statute did not cover any crime that could be
punished by more than two years in prison;

[2] statute was not a per se violation of Second Amendment;

[3] people who commit serious crimes do not automatically
retain or regain their Second Amendment rights if they
establish that they are not likely to commit violent crime,
*overruling* United States v. Barton, 663 F.3d 168; and

[4] challengers' convictions were not serious enough to strip
them of their Second Amendment rights.

Affirmed.

Hardiman, Circuit Judge, concurred in part and concurred
in judgments, and filed opinion in which Fisher, Chagares,
Jordan, and Nygaard, Circuit Judges, joined.

Fuentes, Circuit Judge, concurred in part, dissented in
part, and dissented from judgments, and filed opinion in
which McKee, Chief Judge, and Vanaskie, Shwartz, Krause,
Restrepo, and Roth, Circuit Judges, joined.

West Headnotes (10)

[1]    **Weapons** 🔑 Degree, scope, or nature of prior
offense in general

Exception to statute prohibiting individuals
convicted of a "crime punishable by
imprisonment for a term exceeding one year"
from possessing firearms for persons convicted
of state misdemeanors "punishable by at term of
imprisonment of two years or less" covered any
crime that could not be punished by more than
two years' imprisonment, but did not cover any
crime that could be punished by more than two
years in prison. 18 U.S.C.A. §§ 921(a)(20)
(B), 922(g)(1).

6 Cases that cite this headnote

[2]    **Weapons** 🔑 Violation of right to bear arms

Federal statute prohibiting persons convicted
of state misdemeanors punishable by more
than two years' imprisonment from possessing
firearms was not per se violation of Second
Amendment right to bear arms. (Per Ambro,

AR.04132

Circuit Judge, with six judges joining and five judges concurring in the judgment.) U.S. Const. Amend. 2; 18 U.S.C.A. §§ 921(a)(20)(B), 922(g)(1).

14 Cases that cite this headnote

**[3]    Weapons    Violation of right to bear arms**

Individual alleging that presumptively lawful regulation burdens his Second Amendment rights as applied must (1) identify traditional justifications for excluding from Second Amendment protections class of which he appears to be member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in historically barred class. (Per Ambro, Circuit Judge, with six judges joining and five judges concurring in the judgment.) U.S. Const. Amend. 2.

30 Cases that cite this headnote

**[4]    Weapons    Right to bear arms in general**

People who commit serious crimes do not automatically retain or regain their Second Amendment rights if they establish that they are not likely to commit violent crime; category of "unvirtuous citizens" whose Second Amendment rights may be abrogated is broader than violent criminals, *overruling* United States v. Barton, 663 F.3d 168. (Per Ambro, Circuit Judge, with six judges joining and five judges concurring in the judgment.) U.S. Const. Amend. 2.

10 Cases that cite this headnote

**[5]    Weapons    Right to bear arms in general**

Persons who have committed serious crimes forfeit Second Amendment right to possess firearms much way they forfeit other civil liberties, including fundamental constitutional rights. (Per Ambro, Circuit Judge, with six judges joining and five judges concurring in the judgment.) U.S. Const. Amend. 2.

12 Cases that cite this headnote

**[6]    Weapons    Right to bear arms in general**

Person who did not commit serious crime retains his Second Amendment rights. (Per Ambro, Circuit Judge, with six judges joining and five judges concurring in the judgment.) U.S. Const. Amend. 2.

6 Cases that cite this headnote

**[7]    Weapons    Right to bear arms in general**

Passage of time or evidence of rehabilitation will not necessarily restore Second Amendment rights of people who committed serious crimes. (Per Ambro, Circuit Judge, with six judges joining and five judges concurring in the judgment.) U.S. Const. Amend. 2.

18 Cases that cite this headnote

**[8]    Weapons    Degree, scope, or nature of prior offense in general**

Any crime subject to federal statute prohibiting persons convicted of felonies and serious misdemeanors from possessing firearms is presumptively disqualifying unless there is strong reason to do otherwise. (Per Ambro, Circuit Judge, with six judges joining and five judges concurring in the judgment.) 18 U.S.C.A. § 922(g)(1).

1 Cases that cite this headnote

**[9]    Weapons    Right to bear arms in general**
**Weapons    Particular Offenses**

One person's Pennsylvania misdemeanor conviction for corrupting minor and another's Maryland misdemeanor conviction for carrying handgun without license were not serious enough to strip them of their Second Amendment rights pursuant to federal statute prohibiting individuals convicted "crime punishable by imprisonment for a term exceeding one year," even though maximum punishment for both crimes exceeded two years imprisonment, where

neither offense involved violent conduct, each person received minor sentence with no jail time, corrupting minor offense, based on consensual sexual relationship between 41 and 17 year olds, would not have been criminal in most jurisdictions, more than half of states prescribed maximum sentence for unlicensed carry that did not meet threshold of traditional felony, and there was no evidence that ban promoted public safety as applied to challengers and persons like them. (Per Ambro, Circuit Judge, with six judges joining and five judges concurring in the judgment.) U.S. Const. Amend. 2; 18 U.S.C.A. §§ 921(a)(20)(B), 922(g)(1); Md. Code Ann., Crim. Law § 4-203; 18 Pa. Cons. Stat. Ann. §§ 1104, 6301(a)(1)(I).

11 Cases that cite this headnote

[10]     Weapons       Right to bear arms in general

When statute that restricts right to bear arms is challenged on Second Amendment grounds, government bears burden of proof on appropriateness of means it employs to further its interest. (Per Ambro, Circuit Judge, with six judges joining and five judges concurring in the judgment.) U.S. Const. Amend. 2.

14 Cases that cite this headnote

**West Codenotes**

**Unconstitutional as Applied**

18 U.S.C.A. § 922(g)(1)

**\*338** Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C. Civil Action No. 5-13-cv-06750), District Judge: Honorable James Knoll Gardner

Appeal from the United States District Court for the Middle District of Pennsylvania, (D.C. Civil Action No. 1-14-cv-00968), District Judge: Honorable William W. Caldwell

**Attorneys and Law Firms**

Benjamin C. Mizer, Esquire, Principal Deputy Assistant Attorney General, Zane D. Memeger, Esquire, United States Attorney, Mark B. Stern, Esquire, Michael S. Raab, Esquire, Patrick Nemeroff, Esquire (Argued), Abby C. Wright, Esquire, United States Department of Justice, Civil Division, 950 Pennsylvania Avenue, N.W., Washington, DC 20530, Counsel for Appellants/Cross-Appellees, Attorney General United States of America; Director Bureau of Alcohol Tobacco Firearms & Explosives.

Alan Gura, Esquire (Argued), Gura & Possessky, PLLC, 916 Prince Street, Suite 107, Alexandria, VA 22314, Douglas Gould, Esquire, 925 Glenbrook Avenue, Bryn Mawr, PA 19010, Counsel for Appellees/Cross-Appellants, Daniel Binderup, Julio Suarez.

Stefan B. Tahmassebi, Esquire, National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22309, Amicus Curiae Counsel, National Rifle Association of America.

Before: McKEE, Chief Judge, AMBRO, FUENTES [*], SMITH, FISHER, CHAGARES, JORDAN, HARDIMAN, GREENAWAY, Jr., VANASKIE, SHWARTZ, KRAUSE, RESTREPO, NYGAARD [*], and ROTH [*], Circuit Judges

FUENTES, Circuit Judge, filed an opinion concurring in part, dissenting in part, and dissenting from the judgments, in which McKEE, Chief Judge, VANASKIE, SHWARTZ, KRAUSE, RESTREPO, and ROTH, Circuit Judges, joined. HARDIMAN, Circuit Judge, filed an opinion concurring in part and concurring in the judgments, in which FISHER, CHAGARES, JORDAN, and NYGAARD, Circuit Judges, joined.

**\*339**  OPINION OF THE COURT

AMBRO, Circuit Judge, announced the judgments of the Court and delivered the opinion for a unanimous Court with respect to Parts I and II, an opinion with respect to Parts III.A, III.B, III.C.1, III.C.2, and III.C.3.a, in which FUENTES, SMITH, GREENAWAY, Jr., VANASKIE, KRAUSE, and ROTH, Circuit Judges, joined, and an opinion with respect to Parts III.C.3.b, III.D, and IV, in which SMITH and GREENAWAY, Jr., Circuit Judges, joined.

**TABLE OF CONTENTS**

I. Background...340

II. The Challengers' Statutory Argument...341

III. The Challengers' Constitutional Argument...343
A. The Second Amendment...343

B. The Framework for As-Applied Second Amendment Challenges...345

C. Step One of the *Marzzarella* Framework...347

1. The Challengers Presumptively Lack Second Amendment Rights...347

2. The Traditional Justification for Denying Felons the Right to Arms...348

3. The Challengers' Circumstances...349

a. Distinguishing the Historically Barred Class...349

b. Application to the Challengers...350
D. Step Two of the *Marzzarella* Framework...353

IV. Conclusion...356

Federal law generally prohibits the possession of firearms by any person convicted in any court of a "crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Excluded from the prohibition is "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." *Id.* § 921(a)(20)(B). And there is also an exemption for "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored," where the grant of relief does not expressly preserve the firearms bar. *Id.* § 921(a)(20).

In *United States v. Marzzarella* we adopted a framework for deciding facial and as-applied Second Amendment challenges. 614 F.3d 85 (3d Cir. 2010). Then in *United States v. Barton* we held that the prohibition of § 922(g)(1) does not violate the Second Amendment on its face, but

we stated that it remains subject to as-applied constitutional challenges. 633 F.3d 168 (3d Cir. 2011).

Before us are two such challenges. In deciding them, we determine how a criminal law offender may rebut the presumption that he lacks Second Amendment rights. In particular, a majority of the Court concludes that *Marzzarella*, whose two-step test we reaffirm today, drives the analysis. [1] Meanwhile, a separate majority holds that the two as-applied challenges before us succeed. Part IV of this opinion sets out how, for purposes of future cases, to make sense of our fractured vote.

**\*340  I. Background**

In 1996 Daniel Binderup began a consensual sexual relationship with a 17-year-old female employee at his bakery. Binderup was 41 years old at the time and was aware that his employee was a minor, though she was over the legal age of consent in Pennsylvania (16). Two years later, Binderup pled guilty in a Pennsylvania state court to corrupting a minor, a misdemeanor subject to possible imprisonment for up to five years. 18 Pa. Cons. Stat. §§ 6301(a)(1)(I), 1104. Despite this, Binderup's sentence was the colloquial slap on the wrist: probation (three years) and a $300 fine plus court costs and restitution. His criminal record shows no subsequent offenses.

In 1990 police stopped Julio Suarez on suspicion of driving while intoxicated. During the stop, police noticed that Suarez was carrying a .357 Magnum handgun, as well as two "speed loaders" (devices that allow one to load all chambers of a revolver mechanically rather than inserting bullets one-by-one). He had no permit for the gun. He later pled guilty in a Maryland state court to unlawfully carrying a handgun without a license, a misdemeanor subject to possible imprisonment for "not less than 30 days and not [more than] three years or a fine of not less than $250 and not [more than] $2,500 or both." Md. Code Ann. art. 27, § 36B(b) (1990) (now codified at Md. Code Ann. Crim. Law § 4–203). Suarez nonetheless received a suspended sentence of 180 days' imprisonment and a $500 fine, followed by a year of probation that he completed successfully. Eight years later, he was convicted again in a Maryland state court, this time for the state-law misdemeanor of driving under the influence of alcohol. Only the first of the convictions was subject to §

922(g)(1). Suarez now lives in Pennsylvania and since 1998 has led a life free of run-ins with the law. He holds a "Secret" federal government security clearance in connection with his job as a consultant for a government contractor.

Pennsylvania law disqualified Binderup and Suarez (collectively, the "Challengers") from possessing firearms due to their convictions, but in 2009 they successfully petitioned the Pennsylvania courts to remove that prohibition. Federal law, however, continues to bar them from possessing firearms because their convictions have not been expunged or set aside, they have not been pardoned, and their civil rights have not been restored. *See* 18 U.S.C. § 921(a)(20); Logan v. United States, 552 U.S. 23, 37, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007). Nor has the Attorney General granted them relief under 18 U.S.C. § 925(c), which allows her to remove the prohibition on a case-by-case basis "if it is established to [her] satisfaction" that a barred individual "will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."

Binderup and Suarez want to obtain guns to defend themselves and their families within their homes, but they have not attempted to do so for fear of violating § 922(g)(1). As a result, each filed a complaint in federal District Court (Binderup in the Eastern District of Pennsylvania, Suarez in the Middle District of Pennsylvania) seeking declaratory and injunctive relief. They claim as a matter of statutory construction that § 922(g)(1) does not apply to their convictions and, if it does, the statute is unconstitutional as applied. The Government opposed the lawsuits, and the parties in both cases filed cross-motions for summary judgment.

The District Courts rejected the Challengers' statutory argument but held that § 922(g)(1) is unconstitutional as applied. The United States District Court for the Eastern District of Pennsylvania ruled **341 that § 922(g)(1) is unconstitutional as applied to Binderup because he "distinguishe[d] himself from those individuals traditionally disarmed as the result of prior criminal conduct and demonstrate[d] that he poses no greater threat of future violent criminal activity than the average law-abiding citizen." Binderup v. Holder, No. 13–cv–6750, 2014 WL 4764424, at *1 (E.D. Pa. Sept. 25, 2014). The Court did not analyze the

constitutionality of § 922(g)(1) under any form of means-ends scrutiny, meaning it did not evaluate the law to assess whether its purpose—the end sought—matches appropriately the means chosen to achieve it. *Id.* at *20–21. Depending on the importance of the rights involved and the nature of the burden on them, a law's purpose may need to be only legitimate and the means to achieve it rational (called rational basis scrutiny); the purpose may need to be important and the means to achieve it substantially related (called intermediate scrutiny); or the purpose may need to be compelling and the means to achieve it narrowly tailored, that is, the least restrictive (called strict scrutiny). The latter two tests we refer to collectively as heightened scrutiny to distinguish them from the easily met rational basis test.

The United States District Court for the Middle District of Pennsylvania applied "a two[-]prong test for Second Amendment challenges" derived from our case law. *Suarez v. Holder*, —— F.Supp.3d ——, —— – ——, No. 1:14–CV–968, 2015 WL 685889, at *6–7 (M.D. Pa. Feb. 18, 2015). It found first that Suarez has Second Amendment rights notwithstanding his 1990 conviction because he demonstrated that "he is no more dangerous than a typical law-abiding citizen." *Id.* at ——, 2015 WL 685889 at *10. Then the Court applied means-ends scrutiny (in that case, strict scrutiny) and determined that § 922(g)(1) is unconstitutional as applied to him due to the severity of the burden it imposes. *Id.* at —— n.9, 2015 WL 685889 at *7 n.9.

The Government appealed the summary judgments, and the Challengers' cross-appealed the District Courts' interpretations of the dispossession statute. The District Courts had jurisdiction under 28 U.S.C. §§ 1331, 1343, 1346, 2201, and 2202. We have appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

Separate panels heard the appeals, and the Court *sua sponte* consolidated them for rehearing *en banc*. Our review is plenary. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158 (3d Cir. 2003).

## II. The Challengers' Statutory Argument

Section 922(g)(1), as noted, does not cover state misdemeanors "punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). The Challengers argue that the exception includes any state misdemeanor that, like theirs, could have been punished by less than two years' imprisonment.

**[1]** We disagree. The exception in § 921(a)(20)(B) covers any crime that *cannot* be punished by more than two years' imprisonment. It does not cover any crime that *can* be punished by more than two years in prison. In other words, § 921(a)(20)(B)'s use of "punishable by" means "subject to a maximum penalty of." Although we have never explicitly defined it this way, we have at least twice relied on that understanding in interpreting the relationship between § 921(a)(20)(B) and § 922(g)(1). See *United States v. Essig*, 10 F.3d 968, 969–71 (3d Cir. 1993) (relying on an understanding of "punishable" that refers to whether the maximum potential sentence for a state misdemeanor exceeds two years, not whether a lesser sentence might be imposed); *United States v. Schoolcraft*, 879 F.2d 64, 69–70 (3d Cir. 1989) **\*342** (explaining that a "misdemeanor punishable [by] up to seven years in prison" was "not a misdemeanor subject to a sentence of two years or less").

The D.C. Circuit's opinion in *Schrader v. Holder* supports our decision, as it distinguishes crimes carrying a maximum term of imprisonment of more than two years from those "punishable by a term of imprisonment of two years or less" under § 921(a)(20)(B). 704 F.3d 980, 986 (D.C. Cir. 2013). And the Supreme Court drew a similar distinction in *Logan. See* 552 U.S. at 34, 128 S.Ct. 475 ("[ Section] 921(a)(20)(B) ... places within [ § 922(g)(1)'s] reach state misdemeanor convictions *punishable by more than two years' imprisonment.*" (emphasis added)). Although this language is a *dictum*, "we should not idly ignore" its inclusion in the Supreme Court's thorough discussion of § 921(a)(20)(B). *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000).

Even if we were writing on a blank slate, we would reject the Challengers' interpretation. When considering a crime's potential punishment, we ordinarily refer only to the maximum punishment a court may impose. As the District Court in *Suarez* perceptively observed, when a crime has maximum and minimum possible punishments, we describe

it as being "punishable" by that specific range; and when a crime references only a maximum punishment, "we ordinarily identify only the upper boundary" of that range, as "[a]ll lower possible terms of imprisonment are included by implication." —— F.Supp.3d at ——, 2015 WL 685889, at \*3. That is why we would not describe a crime carrying a specified term of imprisonment of up to three years as one "punishable by a term of imprisonment of two years or less." By contrast, a misdemeanor carrying a ceiling of 18 months' imprisonment would properly be described in the criminal law context as a crime "punishable by a term of imprisonment of two years or less" and on its face would not trigger the bar on gun possession. Accordingly, "subject to a maximum possible penalty of" is the best reading of the phrase "punishable by" as used in § 921(a)(20)(B).

Our interpretation also makes sense in light of similar language in the United States Sentencing Guidelines. They provide three distinct grades of probation and supervised release violations—Grades A, B, and C—with Grade A violations treated most severely and Grade C least severely. *See* U.S.S.G. §§ 7B1.1(a), 7B1.4(a). The Challengers' interpretation of the phrase "punishable by" would erode those distinctions. Since Grade C applies only to offenses "punishable by a term of imprisonment of one year or less," U.S.S.G. § 7B1.1(a)(3), the Challengers' interpretation would render offenses punishable by more than a year (Grade B), as well as even more serious offenses described as Grade A, eligible for Grade C treatment. This would be an absurd result.

In a last-ditch effort, the Challengers argue that § 921(a)(20)(B)'s use of "punishable" merits application of the rule of lenity (that ambiguous criminal laws be construed in favor of defendants) or the constitutional avoidance doctrine (that ambiguous statutory language be construed to avoid serious constitutional doubts). Both of these principles require ambiguity in the statute. *See Voisine v. United States*, 579 U.S. ——, 136 S.Ct. 2272, 2282 n.6, 195 L.Ed.2d 736 (2016). As there isn't any here, they give no plausible defense.

In sum, the Challengers' argument that their convictions fall within § 921(a)(20)(B)'s exception to § 922(g)(1) has no traction. Their misdemeanor convictions were punishable by more than two years' imprisonment. Hence they cannot

seek refuge in § 921(a)(20)(B) and are subject to the bar of § 922(g)(1).

### *343 III. The Challengers' Constitutional Argument

A. The Second Amendment

The Challengers contend that, notwithstanding how we rule on their statutory argument, § 922(g)(1) is unconstitutional as applied to them. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court invalidated a law that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." 554 U.S. 570, 628, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In so doing, the Court held the Second Amendment protects an individual's right to possess a firearm "unconnected with militia service." *Id. at 582, 128 S.Ct. 2783*. At the "core" of the Second Amendment is the right of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id. at 634–35, 128 S.Ct. 2783; Barton, 633 F.3d at 170–71; Marzzarella, 614 F.3d at 89*. Two years after Heller, in *McDonald v. City of Chicago*, the Court held that the Fourteenth Amendment "incorporates the Second Amendment right recognized in Heller" because the right is "fundamental" to "our system of ordered liberty." 561 U.S. 742, 778, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

Although the Second Amendment guarantees an individual right, it is "not unlimited." *Heller, 554 U.S. at 626, 128 S.Ct. 2783; see United States v. Huitron-Guizar, 678 F.3d 1164, 1166 (10th Cir. 2012)*; Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1443 (2009).[2] Heller catalogued a non-exhaustive list of "presumptively lawful regulatory measures" that have historically constrained the scope of the right. 554 U.S. at 626–27 & n.26, 128 S.Ct. 2783; see

*Marzzarella, 614 F.3d at 91* (treating the "presumptively lawful regulatory measures" listed in Heller as "exceptions to the right to bear arms"). They include, but are not limited to, "longstanding prohibitions on the possession of firearms by felons and the mentally ill, [ ] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." *Heller, 554 U.S. at 626–27, 128 S.Ct. 2783; see McDonald, 561 U.S. at 786, 130 S.Ct. 3020*. These measures comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms. *See Heller, 554 U.S. at 631, 635, 128 S.Ct. 2783* (suggesting that one is "disqualified from the exercise of Second Amendment rights" if he is "a felon" or "insane"). For example, bans on "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," are permissible because those weapons fall outside the historical "scope of the right." *Id. at 625, 128 S.Ct. 2783; see United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804, 822 F.3d 136, 141–44 (3d Cir. 2016)*; *344 Marzzarella, 614 F.3d at 91–93*.

As to cases involving burdens on Second Amendment rights, Heller did not announce which level of scrutiny applies but cautioned that challenges based on those rights are not beaten back by the Government supplying a rational basis for limiting them. 554 U.S. at 628 n.27, 128 S.Ct. 2783 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

Some judges—including Judge Hardiman and those colleagues who join his opinion concurring in the judgments—and commentators have interpreted Heller to mean that any law barring persons with Second Amendment rights from possessing lawful firearms in the home even for self-defense is *per se* unconstitutional; that is, no scrutiny is needed. *See* Hardiman Op. Typescript at 13–19; *Heller v. District of Columbia, 670 F.3d 1244, 1272–73 (D.C. Cir. 2011)* (Kavanaugh, J., dissenting); Volokh, 56 UCLA L. Rev. at 1462; Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev.

375, 377, 380 (2009); see also United States v. McCane, 573 F.3d 1037, 1047–50 (10th Cir. 2009) (Tymkovich, J., concurring). But neither the Supreme Court nor any court of appeals has held that laws burdening Second Amendment rights evade constitutional scrutiny. Rather, when faced with an as-applied Second Amendment challenge, they agree that some form of heightened scrutiny is appropriate after it has been determined that the law in question burdens protected conduct. See, e.g., Marzzarella, 614 F.3d at 97–101 (applying intermediate scrutiny and, in the alternative, strict scrutiny to § 922(k)'s prohibition on possession of any firearm with a destroyed serial number); United States v. Williams, 616 F.3d 685, 692–93 (7th Cir. 2010) (applying intermediate scrutiny to § 922(g)(1)); United States v. Chovan, 735 F.3d 1127, 1141–42 (9th Cir. 2013) (same with respect to § 922(g)(9)'s disarmament of a domestic-violence misdemeanant); United States v. Chester, 628 F.3d 673, 682–83 (4th Cir. 2010) (same); United States v. Reese, 627 F.3d 792, 802–05 (10th Cir. 2010) (same with respect to § 922(g)(8)'s dispossession of certain persons subject to a domestic restraining order); Tyler v. Hillsdale Cty. Sheriff's Dep't, 775 F.3d 308, 326–29 (6th Cir. 2014) (applying strict scrutiny to § 922(g)(4)'s dispossession of any person "who has been committed to a mental institution"), reh'g en banc granted, opinion vacated (Apr. 21, 2015).

That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical. It is no different than saying that the Government may prevent an individual with First Amendment rights from engaging in First Amendment conduct—even conduct at the core of the First Amendment—if it makes the showing necessary to surmount heightened scrutiny. See, e.g., FEC v. Wis. Right to Life, 551 U.S. 449, 464–65, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (applying strict scrutiny to a statute prohibiting political speech at the core of the First Amendment); United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 102–03, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (upholding the constitutionality of prohibitions on certain political activities by federal employees notwithstanding the First Amendment). Thus burdens on Second Amendment rights are subject to scrutiny in much the way that burdens on First Amendment rights are. Drake v. Filko, 724 F.3d 426,

434–36 (3d Cir. 2013); see NRA **345** Amicus Br. at 13–15 (asserting that burdens on core Second Amendment rights should be subject to strict scrutiny). Far from subjecting the Second Amendment to an "entirely different body of rules than the other Bill of Rights guarantees," McDonald, 561 U.S. at 780, 130 S.Ct. 3020 (plurality opinion), this view uses "the structure of First Amendment doctrine [to] inform our analysis of the Second Amendment," Marzzarella, 614 F.3d at 89 n.4; see id. ("Heller itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment.").

[2] Even if a law that "completely eviscerates the Second Amendment right" would be per se unconstitutional under Heller, Hardiman Op. Typescript at 18, § 922(g)(1) is no such law. Notwithstanding that provision (and as already noted), persons convicted of disqualifying offenses may under some circumstances possess handguns if (1) their convictions are expunged or set aside, (2) they receive pardons, or (3) they have their civil rights restored. 18 U.S.C. § 921(a)(20). And were Congress to fund 18 U.S.C. § 925(c), they could ask the Attorney General to lift the ban in their particular cases. Though some of these statutory avenues for relief are closed to Binderup and Suarez, see infra Part III.D, the remaining opportunities for them to overcome the ban contrast starkly with the District of Columbia law in Heller that made it a crime to carry an unregistered firearm and prohibited entirely the registration of handguns by individuals; there was nothing Mr. Heller could do to possess a handgun lawfully while outside his job as a District of Columbia special police officer guarding the Federal Judicial Center (in other words, he guarded judges). See 554 U.S. at 574, 128 S.Ct. 2783 (citing D.C. Code §§ 7–2501.01(12), 7–2502.01(a), 7–2502.02(a)(4) (2001)); Parker v. District of Columbia, 478 F.3d 370, 373–74 (D.C. Cir. 2007); cf. United States v. Skoien, 614 F.3d 638, 645 (7th Cir. 2010) (en banc) (noting that disarmament under § 922(g)(9) is ordinarily not "perpetual" because of exceptions similar to those under § 922(g)(1)); Chovan, 735 F.3d at 1138 (same).

To say that § 922(g)(1) is per se unconstitutional as applied to anyone with Second Amendment rights notwithstanding

the statute's escape hatches is a bridge too far. For starters, that would condemn without exception all laws and regulations containing preconditions for the possession of firearms by individuals with Second Amendment rights. By that reasoning, any law prohibiting an individual from possessing a handgun unless he passes a physical examination (to show he is capable of handling a firearm safely) or completes firearm training (to show he knows how to handle a firearm safely) would similarly be *per se* unconstitutional, even if it is the least restrictive means of achieving a compelling government interest. There is no precedent for crippling the Government's ability to regulate gun ownership in this manner. And to guarantee absolutely the ability to keep and bear arms even in cases where disarmament would survive heightened scrutiny would be a radical departure from our post- *Heller* jurisprudence and risk undermining many commonplace constitutional gun regulations.

### B. The Framework for As-Applied Second Amendment Challenges

Unlike a facial challenge, an as-applied challenge "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) **\*346** ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." (internal quotation marks omitted)). Accordingly, our review of Binderup's and Suarez's as-applied challenges requires us to consider whether their particular circumstances remove them from the constitutional sweep of § 922(g)(1).

Two of our precedents— *Marzzarella* and *Barton*— have guided how we approach as-applied Second Amendment challenges. The former involved an as-applied challenge to 18 U.S.C. § 922(k), which bars the possession of any firearm with an obliterated serial number. It derived from *Heller* a "two-pronged approach to Second Amendment challenges" to firearm restrictions. 614 F.3d at 89. We first consider "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* If not, the challenged law

must stand. But if the law burdens protected conduct, the proper course is to "evaluate the law under some form of means-end scrutiny," *id.* that form in *Marzzarella* being intermediate scrutiny, *id.* at 97. "If the law passes muster under [the] standard [applied], it is constitutional. If it fails, it is invalid." *Id.* at 89. As to § 922(k), we held that the law withstood intermediate scrutiny "even if it burden[ed] protected conduct" by fitting reasonably with the important "law enforcement interest in enabling the tracing of weapons via their serial numbers." *Id.* at 95, 98. (We also noted in a *dictum* that the law would survive strict scrutiny, were that the test, because the provision serves a compelling interest through the least-restrictive means. *Id.* at 99–101.)

Nearly every court of appeals has cited *Marzzarella* favorably. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254 n.49 (2d Cir. 2015); *Chovan*, 735 F.3d at 1136–37; *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194–96 (5th Cir. 2012); *GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller*, 670 F.3d at 1252–53; *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *Chester*, 628 F.3d at 680–83; *Reese*, 627 F.3d at 800–05. Indeed, it has escaped disparagement by any circuit court.

A year after *Marzzarella* we decided *Barton*, which involved a felon convicted under the provision now before us — § 922(g)(1). Barton raised facial and as-applied Second Amendment challenges to the firearm ban. After dispensing with his facial challenge and confirming the availability of as-applied challenges under the Second Amendment, we ruled that "the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." 633 F.3d at 173. Because Barton's prior convictions for possession of cocaine with intent to distribute and for receipt of a stolen firearm (as well as his illegal post-conviction sale of a firearm with an obliterated serial number) were "closely related to violent crime," we concluded that he lacked Second Amendment rights. *Id.* at 174. Put another way, Barton did not present "facts about himself and his background

that distinguish[ed] his circumstances from those of persons historically barred from Second Amendment protections," *id.* so he was "disqualified from the exercise of Second Amendment rights," *id.* at 174 (quoting *Heller,* 554 U.S. at 635, 128 S.Ct. 2783), and his as-applied challenge could not succeed.

**[3]** Read together, *Marzzarella* and *Barton* lay out a framework for deciding as-applied challenges to gun regulations. At step one of the *Marzzarella* decision **\*347** tree, a challenger must prove, per *Barton,* that a presumptively lawful regulation burdens his Second Amendment rights. This requires a challenger to clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, *id.* at 173, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class, *id.* at 174.

No doubt a challenger cannot prevail merely on his say-so. Courts must find the facts to determine whether he has adequately distinguished his circumstances from those of persons historically excluded from Second Amendment protections. Not only is the burden on the challenger to rebut the presumptive lawfulness of the exclusion at *Marzzarella*'s step one, but the challenger's showing must also be strong. That's no small task. And in cases where a statute by its terms only burdens matters (*e.g.,* individuals, conduct, or weapons) outside the scope of the right to arms, it is an impossible one. But if the challenger succeeds at step one, the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny, discussed further below, at step two of the *Marzzarella* analysis.

The Challengers, the District Court in *Binderup,* and some of our colleagues claim that *Marzzarella* and *Barton* set standards for different types of as-applied Second Amendment challenges and that only *Barton* controls challenges to § 922(g)(1); *Marzzarella* has no role in the analysis. Our view is that, at least in pertinent part, each complements the other for an as-applied Second Amendment challenge to a presumptively lawful regulatory measure like

§ 922(g)(1). *Barton* identifies the two hurdles that an individual presumed to lack Second Amendment rights must overcome to rebut the presumption at step one of the *Marzzarella* framework. [3] Rebutting it permits testing the law or regulation under heightened scrutiny at step two. With this understanding, *Marzzarella* and *Barton* are neither wholly distinct nor incompatible.

## C. Step One of the *Marzzarella* Framework

### *1. The Challengers Presumptively Lack Second Amendment Rights*

*Heller* teaches that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful." 554 U.S. at 626 & 627 n.26, 128 S.Ct. 2783. Traditionally, "felons" are people who have been convicted of any crime "that is punishable by death or imprisonment for more than one year." 1 Wayne R. LaFave, *Substantive Criminal Law* § 1.6 (2d ed. 2015); *cf. Carachuri–Rosendo v. Holder,* 560 U.S. 563, 567, 130 S.Ct. 2577, 177 L.Ed.2d 68 (2010) (quoting 18 U.S.C. § 3559(a)).

Section 922(g)(1) bars the possession of firearms by anyone convicted of "a crime punishable by imprisonment for a term exceeding one year." This means that its prohibition extends to anyone convicted of a crime meeting the traditional definition of a felony, though Congress excluded anyone convicted of a "State offense classified by the laws of the State as a misdemeanor" unless it is punishable by more than **\*348** two years' imprisonment. 18 U.S.C. § 921(a)(20)(B).

Binderup and Suarez were each convicted of a misdemeanor subject to § 922(g)(1): Binderup's was punishable by up to five years' imprisonment; Suarez's by up to three years in prison. The Pennsylvania and Maryland legislatures classify their respective offenses as misdemeanors. However, based on their maximum possible punishments, they meet the traditional definition of a felony, and Congress treats them as felonies for purposes of § 922(g)(1). As a result, Binderup and Suarez are subject to a firearm ban that is, per *Heller,* "presumptively lawful."

### 2. The Traditional Justification for Denying Felons the Right to Arms

Turning to the first hurdle of step one, we look to the historical justification for stripping felons, including those convicted of offenses meeting the traditional definition of a felony, of their Second Amendment rights. "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.' " *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *see, e.g.*, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 491–92 (2004); Saul Cornell, *"Don't Know Much about History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002); David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588, 626–27 (2000); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, Law & Contemp. Probs., Winter 1986, at 143, 146; Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983). Several of our sister circuits endorse the "virtuous citizen" justification for excluding felons and felon-equivalents from the Second Amendment's ambit. *See, e.g.*, *United States v. Carpio–Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) ("[F]elons were excluded from the right to arms because they were deemed unvirtuous." (internal quotation marks omitted)); *Yancey*, 621 F.3d at 684–85; *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) ("[T]he right to bear arms does not preclude laws disarming ... unvirtuous citizens (*i.e.*, criminals)." (quoting Kates, Jr., 49 Law & Contemp Probs. at 146)); *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) ("In the parlance of the republican politics of the time, these limitations were sometimes expressed as efforts to disarm the 'unvirtuous.' ").

**[4]** People who have committed or are likely to commit "violent offenses"—crimes "in which violence (actual or attempted) is an element of the offense," *Skoien*, 614 F.3d at 642; *see Voisine*, 136 S.Ct. at 2280—undoubtedly qualify as "unvirtuous citizens" who lack Second Amendment rights. *Barton*, 633 F.3d at 173–74;

*see United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (recognizing "a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 727–28 (2009). But *Heller* recognized "longstanding prohibitions on the possession of firearms by felons," not just violent felons. 554 U.S. at 626, 128 S.Ct. 2783. The category of "unvirtuous citizens" is thus broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or nonviolent. *See Skoien*, 614 F.3d at 640–41; *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004); **\*349** Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations & Criminological Considerations*, 60 Hastings L.J. 1339, 1363–64 (2009); *see also Vongxay*, 594 F.3d at 1115 ("[F]elons are categorically different from the individuals who have a fundamental right to bear arms."). To the extent *Barton* suggests that people who commit serious crimes retain or regain their Second Amendment rights if they are not likely to commit a violent crime, 633 F.3d at 174, it is overruled. *See infra* Part III.C.3.a.

The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era. " *Heller* identified ... as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *Skoien*, 614 F.3d at 640 (quoting *Heller, 554 U.S. at 604, 128 S.Ct. 2783*). That report "asserted that citizens have a personal right to bear arms 'unless for *crimes committed*, or real danger of public injury.' " *Id.* (emphasis added) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). "[C]rimes committed—violent or not—were thus an independent ground for exclusion from the right to keep and bear arms. And there is reason to believe that felon disarmament has roots that are even more ancient. *See Kates, Jr., 82 Mich. L. Rev. at 266* ("Felons simply did not fall within the benefits of the common law right to possess arms.").

**[5]** The takeaway: persons who have committed serious crimes forfeit the right to possess firearms much the way they "forfeit other civil liberties, including fundamental constitutional rights." *Barton, 633 F.3d at 175.*

### 3. The Challengers' Circumstances

#### a. Distinguishing the Historically Barred Class

Having identified the traditional justification for denying some criminal offenders the right to arms—that they are "unvirtuous" because they committed serious crimes—we turn to how other criminal offenders may distinguish their circumstances from those of people who historically lacked the right to keep and bear arms. *Barton* suggests two ways to satisfy this second hurdle of step one: the first is that a challenger may show that he never lost his Second Amendment rights because he was not convicted of a serious crime; the second is that a challenger who once lost his Second Amendment rights by committing a serious crime may regain them if his "crime of conviction is decades-old" and a court finds that he "poses no continuing threat to society." 633 F.3d at 174.

**[6]** We agree with *Barton* only insofar as it stands for the unremarkable proposition that a person who did not commit a serious crime retains his Second Amendment rights. Setting aside what makes a crime "serious" in the Second Amendment context and whether § 922(g)(1) covers any non-serious crimes—issues we address in Part III.C.3.b and on which there is disagreement, *see Fuentes Op. Typescript at 19–20*—being convicted of a non-serious crime does not demonstrate a lack of "virtue" that disqualifies an offender from exercising those rights.

**[7]** But our agreement with *Barton* ends there. We reject its claim that the passage of time or evidence of rehabilitation will restore the Second Amendment rights of people who committed serious crimes. That view stems from *Barton*'s misplaced focus at *Marzzarella*'s step one on the probability of violent recidivism and is inconsistent with the true justification **\*350** for the disarmament of people who commit serious crimes: they are "unvirtuous." *See supra* Part III.C.2. A challenger's risk of violent recidivism tells us nothing about whether he was convicted of a serious crime, and the seriousness of the purportedly disqualifying offense is our sole focus throughout *Marzzarella*'s first step.

There is no historical support for the view that the passage of time or evidence of rehabilitation can restore Second Amendment rights that were forfeited. To the extent Congress affords such a remedy in 18 U.S.C. § 921(a)(20) or 18 U.S.C. § 925(c), that is a matter of legislative grace; the Second Amendment does not require that those who commit serious crimes be given an opportunity to regain their right to keep and bear arms in that fashion. Indeed, the Supreme Court and our Court have recognized in the Second Amendment context that the Judicial Branch is not "institutionally equipped" to conduct "a neutral, wide-ranging investigation" into post-conviction assertions of rehabilitation or to predict whether particular offenders are likely to commit violent crimes in the future. *United States v. Bean*, 537 U.S. 71, 77, 123 S.Ct. 584, 154 L.Ed.2d 483 (2002); *see Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 230–31 (3d Cir. 2002) (en banc); *cf.* S. Rep. 102-353, at 19 (1992) (doubting that even the Executive Branch could feasibly grant individualized exceptions to § 922(g)(1) based on an offender's supposed rehabilitation because doing so is "a very difficult and subjective task" that "could have devastating consequences for innocent citizens if the wrong decision is made").

In short, only the seriousness of the purportedly disqualifying offense determines the constitutional sweep of statutes like § 922(g)(1) at step one. To the extent *Barton* holds that people convicted of serious crimes may regain their lost Second Amendment rights after not posing a threat to society for a period of time, it is overruled.

#### b. Application to the Challengers

We now consider whether the Challengers have shown that their crimes are not serious. As a preliminary matter, we note that Judge Fuentes, those colleagues joining his opinion dissenting from the judgment, and the Government deny the possibility of successful as-applied Second Amendment challenges to § 922(g)(1). *See, e.g.*, Gov't *Binderup* Br. at 14; Gov't *Suarez* Br. at 15; Fuentes Op. Typescript at 18–40. In their view, § 922(g)(1), at least in its current form, is constitutional in all its applications because it does not burden the Second Amendment rights of felons or felon-equivalents who, because of their convictions, lack Second Amendment rights. Put another way, they believe that all crimes subject

to § 922(g)(1) are disqualifying because their maximum possible punishments are conclusive proof they are serious.

But that view puts the rabbit in the hat by concluding that all felons and misdemeanants with potential punishments past a certain threshold lack the right to keep and bear arms when, despite their maximum possible punishment, some offenses may be "so tame and technical as to be insufficient to justify the ban." *United States v. Torres–Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). *Heller* confirms such a showing is possible, as it describes prohibitions on the possession of firearms by felons as only "presumptively lawful." 554 U.S. at 626–27 & n.26, 128 S.Ct. 2783. Unless flagged as irrebutable, presumptions are rebuttable. *See* *Barton*, 633 F.3d at 173; *Williams*, 616 F.3d at 692. Indeed, under the approach of Judge Fuentes and those colleagues who join his opinion dissenting from the judgments, the Government could make an end-run around the **\*351** Second Amendment and undermine the right to keep and bear arms in contravention of *Heller*. A crime's maximum possible punishment is "purely a matter of legislative prerogative," *Rummel v. Estelle*, 445 U.S. 263, 274, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), subject only to "constitutional prohibitions on irrational laws," *Heller*, 554 U.S. at 628 n.27, 128 S.Ct. 2783; *see United States v. Walker*, 473 F.3d 71, 79 (3d Cir. 2007). Yet *Heller* teaches that the Government needs more than a rational basis "to overcome the right to keep and bear arms." 554 U.S. at 628 n.27, 128 S.Ct. 2783; *see* *Marzzarella*, 614 F.3d at 95–96. Therefore, to determine whether the Challengers are shorn of their Second Amendment rights, *Heller* requires us to consider the maximum possible punishment but not to defer blindly to it.

 [8]  At the same time, there are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights. Unlike the "historically unprotected categories of speech" that are First Amendment exceptions "long familiar to the bar," *United States v. Stevens*, 559 U.S. 460, 468, 470, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010), the category of serious crimes changes over time as legislative judgments regarding virtue evolve. For example, though only a few exceedingly serious crimes were "felonies" at early common law, by the time of our country's

founding "many new felonies were added by English statute." 1 *Wharton's Criminal Law* § 17 (15th ed. 2015); *see, e.g.*, 4 William Blackstone, *Commentaries* \*18 ("[N]o less than a[ ] hundred and sixty [actions] have been declared by act of parliament to be felonies without benefit of clergy; or, in other words, to be worthy of instant death."); Francis Bacon, *Preparation for the Union of Laws of England and Scotland, in* 2 *The Works of Francis Bacon, Lord Chancellor of England* 163–64 (1841) (listing dozens of felonies, including "[w]here a man stealeth certain kinds of hawks" or "invocates wicked spirits"). The upshot is that "exclusions need not mirror limits that were on the books in 1791" to comport with the Second Amendment. *Skoien*, 614 F.3d at 641. Rather, we will presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise.

 [9]  Here, upon close examination of the Challengers' apparently disqualifying convictions, we conclude that their offenses were not serious enough to strip them of their Second Amendment rights. For starters, though the Challengers' crimes meet the generic definition of a felony and Congress's definition of a felony for purposes of § 922(g)(1), the Pennsylvania and Maryland legislatures enacted them as misdemeanors. Misdemeanors are, and traditionally have been, considered less serious than felonies. *See* *Baldwin v. New York*, 399 U.S. 66, 70, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970); *misdemeanor*, Black's Law Dictionary (10th ed. 2014); 1 LaFave, *Substantive Criminal Law* § 1.6. Congress tried to ensure that only serious crimes would trigger disarmament under § 922(g)(1) by exempting from the ban any state-law misdemeanant whose crime was punishable by less than two years' imprisonment. 18 U.S.C. § 921(a)(20)(B). But we believe that accommodation still paints with too broad a brush, for a state legislature's classification of an offense as a misdemeanor is a powerful expression of its belief that the offense is not serious enough to be disqualifying.

This is not to say that state misdemeanors cannot be serious. No doubt "some misdemeanors are ... 'serious' offenses," *Baldwin*, 399 U.S. at 70, 90 S.Ct. 1886, and "numerous misdemeanors involve conduct more dangerous than many felonies," *Tennessee v. Garner*, 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). *See* *Johnson v. United States*, 559 U.S. 133, 149–50, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010)

**\*352** (Alito, J., dissenting) ("At common law ... many very serious crimes, such as kidnapping and assault with the intent to murder or rape, were categorized as misdemeanors."). And the maximum possible punishment is certainly probative of a misdemeanor's seriousness. But Congress may not overlook so generally the misdemeanor label, which, in the Second Amendment context, is also important.

Other considerations, however, confirm our belief that the Challengers' crimes were not serious. As explained above, violent criminal conduct—meaning a crime "in which violence (actual or attempted) is an element of the offense," *Skoien*, 614 F.3d at 642; *see* *Voisine*, 136 S.Ct. at 2280—is disqualifying. *See* Part III.C.2. But neither Challenger's offense had the use or attempted use of force as an element. [4] Though, as explained, it is possible for non-violent crimes to be serious, the lack of a violence element is a relevant consideration.

Also important is that each Challenger received a minor sentence by any measure: Binderup was sentenced to three years' probation (a condition of which was to avoid contact with his employee) and a $300 fine plus court costs and restitution, while Suarez received a suspended sentence of 180 days' imprisonment and a $500 fine. That is because severe punishments are typically reserved for serious crimes. Additionally, punishments are selected by judges who have firsthand knowledge of the facts and circumstances of the cases and who likely have the benefit of pre-sentence reports prepared by trained professionals. With not a single day of jail time, the punishments here reflect the sentencing judges' assessment of how minor the violations were.

Finally, there is no cross-jurisdictional consensus regarding the seriousness of the Challengers' crimes. Some states treat consensual sexual relationships between 41 and 17 year olds as serious crimes, *see* Gov't *Binderup* Br. at 17–19 & n.4, but the vast majority of states do not, *see* Asaph Glosser *et al.*, *Statutory Rape: A Guide to State Laws and Reporting Requirements* 6–7 (Dec. 15, 2004), *available at* https://aspe.hhs.gov/sites/default/files/pdf/75531/report.pdf (last visited Aug. 25, 2016). Binderup's conduct arguably would have been criminal in a few other states because his 17-year-old sexual partner was his employee, yet it still would have been legal in many states. Similarly, though some states punish the unlicensed carrying of a concealed weapon as a serious crime, *see* Gov't *Suarez* Br. at 16-17 n.5, more than half prescribe a maximum sentence that does not meet the threshold of a traditional felony (more than one year in prison) and others do not even require a specific credential to carry a concealed weapon, *see* Thomson Reuters, *50 State Survey: Right to Carry a Concealed Weapon (Statutes)* (October 2015); U.S. Gov't Accountability Off., *States' Laws and Requirements for Concealed Carry Permits Vary Across Nation* 73–74 (2012), *available at* http://www.gao.gov/assets/600/592552.pdf (last visited Aug. 25, 2016); Law Ctr. to Prevent Gun Violence, *Concealed Weapons Permitting*, http://smartgunlaws.org/gun-laws/policy-areas/firearms-in-public-places/concealed-weapons-permitting/

**\*353** (last visited Aug. 25, 2016). Were the Challengers unable to show that so many states consider their crimes to be non-serious, it would be difficult for them to carry their burden at step one. But because they have shown that there is no consensus regarding the seriousness of their crimes, their showing at step one is that much more compelling. [5]

In sum, the Challengers have carried their burden of showing that their misdemeanors were not serious offenses despite their maximum possible punishment. [6] This leads us to conclude that Binderup and Suarez have distinguished their circumstances from those of persons historically excluded from the right to arms. That, in turn, requires the Government to meet some form of heightened scrutiny at the second step of the *Marzzarella* framework.

### D. Step Two of the *Marzzarella* Framework

**[10]** Next, we consider whether § 922(g)(1) survives heightened scrutiny as applied. On this record, it does not. No doubt § 922(g)(1) is intended to further the government interest of promoting public safety by "preventing armed mayhem," *Skoien*, 614 F.3d at 642, an interest that is both important and compelling. But whether we apply intermediate scrutiny or strict scrutiny—and we continue to follow the lead of *Marzzarella* in choosing intermediate scrutiny, 614 F.3d at 97—the Government bears the burden of proof on the appropriateness of the means it employs to further its interest. *See, e.g.*, *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Johnson v. California*, 543 U.S. 499, 505, 506 n.1, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005).

Here the Government falls well short of satisfying its burden —even under intermediate scrutiny. The record before us

consists of evidence about the Challengers' backgrounds, including the time that has passed since they last broke the law. It contains no evidence explaining why banning **\*354** people like them (*i.e.*, people who decades ago committed similar misdemeanors) from possessing firearms promotes public safety. The Government claims that someone like Suarez is "particularly likely to misuse firearms" because he belongs to a category of "potentially irresponsible persons," Gov't *Suarez* Br. at 27–28, and that someone like Binderup is "particularly likely to commit additional crimes in the future," Gov't *Binderup* Br. at 35. But it must "present some meaningful evidence, not mere assertions, to justify its predictive [and here conclusory] judgments." *Heller, 670 F.3d at 1259.* In these cases neither the evidence in the record nor common sense supports those assertions.

The Government relies on a number of off-point statistical studies to argue that it is reasonable to disarm the Challengers because of their convictions. It notes that felons generally commit violent crimes more frequently than nonfelons, *see* Bureau of Justice Statistics, U.S. Dep't of Justice, *Recidivism of Prisoners Released in 1994*, at 6 (2002), and that the "denial of handgun purchases [to convicted felons] is associated with a reduction in risk for later criminal activity of approximately 20–30%," Mona A. Wright *et al.*, *Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence*, 89 Am. J. of Pub. Health 88, 89 (1999). But these studies estimate the likelihood that incarcerated felons will reoffend after their release from prison. The Challengers were not incarcerated and are not felons under state law; they are state-law misdemeanants who spent no time in jail. The Government cannot draw any reasonable conclusions about the risk posed by their possession of firearms from such obviously distinguishable studies. It claims that even criminals placed on probation rather than sent to prison have a heightened rate of recidivism, but the study it cites found that, "[g]enerally, the risk of recidivism was highest during the first year after admission to probation," and that "[a]s released prisoners and probationers age, they tend to exhibit lower rates of recidivism." Iowa Div. of Crim. & Juvenile Justice Planning, *Recidivism Among Iowa Probationers* 2 (July 2005), *available at* http://publications.iowa.gov/15032/ (last visited Aug. 25, 2016). Binderup's and Suarez's offenses are 20 and 26 years old, respectively, so that study tells us little, if anything, about the risk of recidivism in these cases. [7]

The Government also claims to have studies of particular relevance to each Challenger's situation, but this argument too misses the mark. As to Binderup, the Government cites studies from several states that it contends would classify him as a sex offender on account of his criminal conduct. *See* Gov't *Binderup* Br. at 33–34; *see also id.* at 28 n.8 (citing a Pennsylvania study showing that individuals convicted of **\*355** certain sexual offenses have a 50–60% chance of rearrest within three years of release from prison). Binderup unsurprisingly disputes that label. We need not delve into the weeds here, as, much like the more general studies discussed above, the sex-offender specific studies focus on people who were incarcerated. It is not helpful to draw inferences about the usefulness of disarming Binderup from those off-point studies.

As to Suarez, the Government emphasizes that persons arrested for "weapons offenses" are rearrested at high rates, Gov't *Suarez* Br. at 30 & nn.10–11 (citing studies), and relies on a study indicating that California handgun purchasers in 1977 "who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent offenses," were more likely than people with no criminal histories to be charged later with a violent crime, *see* Garen J. Wintemute *et al.*, *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 Am. Med. Ass'n 2083, 2086 (1998). Yet that study only addresses the risk of recidivism within 15 years of a conviction for an unspecified "nonviolent firearm-related offense[ ]." *Id.* at 2086. Common sense tells us that recidivism rates would change with the passage of an additional 11 years (Suarez was convicted 26 years ago) and vary based on the circumstances of the prior conviction.

This is not to say that empirical studies are irrelevant to as-applied Second Amendment challenges. Parties may use statistics to show that people who commit certain crimes have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament, even decades after a conviction. In these cases, empirical studies could have demonstrated an appropriate fit between the Challengers' total disarmament and the promotion of public safety if they contained reliable statistical evidence that people with the Challengers' backgrounds were more likely to misuse firearms or were otherwise irresponsible or dangerous. The Government simply presented no such evidence. [8]

Additionally, that federal law gives Binderup and Suarez opportunities to escape the effect of § 922(g)(1) does not save the statute from unconstitutionality under the

circumstances. For starters, several avenues are closed to them altogether: they may not apply for relief under § 925(c) because that provision has been unfunded for years, *see* Logan, 552 U.S. at 28 n.1, 128 S.Ct. 475; and Suarez is ineligible for expungement or the restoration of his civil rights, *see* Md. Code, Crim. P., § 10-105; Logan, 552 U.S. at 31–32, 128 S.Ct. 475. Those avenues that remain open to them do not satisfy even intermediate scrutiny. Binderup's record may be expunged only after he reaches age 70 (or is dead for three years), 18 Pa. Cons. Stat. § 9122(b), but as there is no evidence showing it is reasonable to ban Binderup from possessing a firearm today, there is certainly no evidence to show that it is reasonable to keep that ban in place until his 70th birthday. The only remaining option **\*356** is for Binderup and Suarez to receive pardons from the Governors of Pennsylvania and Maryland, respectively. (Pardons are, as already noted, an independent ground for relief from the firearm disability in § 922(g)(1), and Binderup must receive a pardon to restore his civil rights. *See* 42 Pa. Cons. Stat. § 4502(a)(3).) But the Government has presented no evidence or explanation as to why a Governor's decisions about pardons—"a classic example of unreviewable executive discretion," Bowens v. Quinn, 561 F.3d 671, 676 (7th Cir. 2009)—are reasonably related to the risk posed by the Challengers' possession of firearms. Though a pardon would reflect well on Binderup and Suarez, it is hardly reasonable to treat the absence of a pardon—rare by any measure—as adequate proof of a continuing need to disarm them indefinitely.

The Challengers' isolated, decades-old, non-violent misdemeanors do not permit the inference that disarming people like them will promote the responsible use of firearms. Nor is there any evidence in the record to show why people like them remain potentially irresponsible after many years of apparently responsible behavior. Without more, there is not a substantial fit between the continuing disarmament of the Challengers and an important government interest. Thus, § 922(g)(1) is unconstitutional as applied to them.

## IV. Conclusion

When sorting out a fractured decision of the Court, the goal is "to find a single legal standard" that "produce[s] results with which a majority of the [Court] in the case articulating the

standard would agree." United States v. Donovan, 661 F.3d 174, 182 (3d Cir. 2011) (quoting Planned Parenthood of Southeastern Pa. v. Casey, 947 F.2d 682, 693 (3d Cir. 1991), modified on other grounds, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). We have at times "looked to the votes of dissenting [judges] if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue." Id. And when no single rationale explaining the result enjoys the support of a majority of the Court, its holding "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion)).

Applying those interpretive tools here, the following is the law of our Circuit: (1) the two-step Marzzarella framework controls all Second Amendment challenges, including as-applied challenges to § 922(g)(1); (2) a challenger will satisfy the first step of that framework only if he proves that the law or regulation at issue burdens conduct protected by the Second Amendment; (3) to satisfy step one in the context of an as-applied challenge to § 922(g)(1), a challenger must prove that he was not previously convicted of a serious crime; (4) evidence of a challenger's rehabilitation or his likelihood of recidivism is not relevant to the step-one analysis; (5) as the narrowest ground supporting the Court's judgments for Binderup and Suarez, the considerations discussed above will determine whether crimes are serious (*i.e.*, disqualifying) at step one; and (6) if a challenger makes the necessary step-one showing, the burden shifts to the Government at step two to prove that the regulation at issue survives intermediate scrutiny.

In the cases before us, though Binderup and Suarez fail to show that their misdemeanor offenses are not subject to § 922(g)(1), they have rebutted the presumption that they lack Second Amendment rights by distinguishing their crimes of conviction from those that historically led to exclusion from Second Amendment **\*357** protections. This meets the first-step test of Marzzarella. At step two, the Government has failed to present sufficient evidence to demonstrate under even intermediate scrutiny that it may,

consistent with the Second Amendment, apply § 922(g)(1) to bar Binderup and Suarez from possessing a firearm in their homes. Accordingly, we affirm the judgments of the District Courts.

**HARDIMAN**, Circuit Judge, concurring in part and concurring in the judgments, joined by **FISHER**, **CHAGARES**, **JORDAN**, and **NYGAARD**, Circuit Judges.
The Second Amendment secures an individual "right of the people" to keep and bear arms unconnected to service in the militia. *District of Columbia v. Heller*, 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). This "pre-existing" right was included in the Bill of Rights in light of the troubles the colonists experienced under British rule and the Founders' appreciation of the considerable power that was transferred to the new federal government. Without a specific guarantee in our fundamental charter, it was feared that "the people" might one day be disarmed. *See id.* at 598–99, 128 S.Ct. 2783. At the same time, the Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among "the people" entitled to keep and bear arms.

The laws of the United States prohibit felons and certain misdemeanants from possessing firearms. 18 U.S.C. § 922(g)(1). Guided by the Supreme Court's characterization of felon dispossession as "presumptively lawful" in *Heller*, we held in *United States v. Barton* that this prohibition does not on its face violate the Second Amendment. 633 F.3d 168 (3d Cir. 2011). In doing so we stated that § 922(g)(1) remains subject to as-applied constitutional challenges. *Id.* at 172–75. These consolidated appeals present two such challenges. Daniel Binderup and Julio Suarez—each permanently barred from possessing firearms because of prior misdemeanor convictions—contend that § 922(g)(1) is unconstitutional as applied to them.

It is. The most cogent principle that can be drawn from traditional limitations on the right to keep and bear arms is that dangerous persons likely to use firearms for illicit purposes were not understood to be protected by the Second Amendment. And because Binderup and Suarez have demonstrated that their crimes of conviction were nonviolent and that their personal circumstances are distinguishable from those of persons who do not enjoy Second Amendment rights because of their demonstrated proclivity for violence, the judgments of the District Courts must be affirmed.

## I

We agree with all our colleagues that Binderup and Suarez are subject to disarmament under the plain terms of 18 U.S.C. § 922(g)(1).[1] We also agree with Judges Ambro, Smith, and Greenaway that the District Court correctly held that § 922(g)(1) is unconstitutional as applied to Binderup and Suarez. But we perceive flaws in Judge Ambro's opinion.[2]

***358** To begin with, our colleagues misapprehend the traditional justifications underlying felon dispossession, substituting a vague "virtue" requirement that is belied by the historical record. Then, under the guise of "reaffirm[ing]" the two-step test of *United States v. Marzzarella*, Ambro Op. 6, they actually expand that test—and along with it, the judicial power. For our colleagues hold that even with respect to persons entitled to Second Amendment rights, judges may pick and choose whom the government may permanently disarm if the judges approve of the legislature's interest balancing. Despite Binderup's and Suarez's success today, our colleagues have retained "the power to decide on a case-by-case basis whether the [Second Amendment] right is *really worth* insisting upon." *Heller*, 554 U.S. at 634, 128 S.Ct. 2783. This is demonstrated by the fact that all but three of our dissenting colleagues—who have concluded that *all* as-applied challenges to § 922(g)(1) must fail—join the bulk of Judge Ambro's constitutional analysis. By contrast, we would hold—consistent with *Heller*—that non-dangerous persons convicted of offenses unassociated with violence may rebut the presumed constitutionality of § 922(g)(1) on an as-applied basis, and that when a law eviscerates the core of the Second Amendment right to keep and bear arms (as § 922(g)(1) does by criminalizing exercise of the right entirely), it is categorically unconstitutional.

## A

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the

people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held the Second Amendment protects an individual right to possess a firearm unconnected to service in a militia, and to use that weapon for traditionally lawful purposes, such as self-defense within the home. 554 U.S. at 595, 128 S.Ct. 2783. The Second Amendment "elevates above *all* other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"—a right that is at the "core" of the Second Amendment. *Id.* at 635, 128 S.Ct. 2783 (emphasis added). Two years after *Heller*, in *McDonald v. City of Chicago*, the Court held the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*," explaining that the right is "fundamental" to "our system of ordered liberty." 561 U.S. 742, 778, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

Although the Second Amendment is an enumerated fundamental right, it is "not unlimited." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. "No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561 U.S. at 802, 130 S.Ct. 3020 (Scalia, J., concurring). A range of "who," "what," "where," "when," and "how" restrictions relating to firearms are permitted—many based on the scope of the Second Amendment and others based on their satisfaction of some level of heightened scrutiny. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1443 (2009) (distinguishing between " 'what' restrictions (such as bans on machine guns, so-called 'assault weapons,' or unpersonalized handguns), 'who' restrictions (such as bans on possession by felons, misdemeanants, noncitizens, or 18-to-20-year-olds), 'where' restrictions (such as bans on carrying in public, in places that **\*359** serve alcohol, or in parks, or bans on possessing [guns] in public housing projects), 'how' restrictions (such as storage regulations), [and] 'when' restrictions (such as waiting periods)"); *United States v. Huitron–Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012) (applying the same heuristic).

For instance, the right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. Likewise, the Supreme Court has acknowledged the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* (internal quotation marks omitted). In addition, *Heller* catalogued a non-exhaustive list of "presumptively lawful regulatory measures" that have historically constrained the parameters of the right. *Id.* at 627 n.26, 128 S.Ct. 2783. These include "longstanding prohibitions on the possession of firearms by felons and the mentally ill, ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." [3] *Id.* at 626–27, 128 S.Ct. 2783. Critically, such "traditional restrictions go to show the *scope* of the right, not its lack of fundamental character." *McDonald*, 561 U.S. at 802, 130 S.Ct. 3020 (Scalia, J., concurring) (emphasis added). The reason, for example, that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," is that they fall outside the historical "scope of the right"—not that the right yields to some important or compelling government interest. *Heller*, 554 U.S. at 625, 128 S.Ct. 2783; *see also United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010).

The Supreme Court has not yet heard an as-applied Second Amendment challenge to a presumptively lawful ban on firearms possession. But that fact makes *Heller* and *McDonald* no less binding on our inquiry here.

## B

### 1

Two of our decisions pertain to Binderup's and Suarez's as-applied challenges in these appeals. *United States v. Marzzarella* involved an as-applied challenge to a conviction under 18 U.S.C. § 922(k), which prohibits the possession of a handgun with an obliterated serial number—a "what" restriction limiting possession of a certain category of firearms. 614 F.3d at 87. Because this statute was not included in *Heller*'s list of presumptively lawful firearm regulations, we gleaned from *Heller* a "two-pronged approach to Second Amendment challenges." *Id.* at 89.

We first consider "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* If the conduct lies outside the Second Amendment's scope, the right does not apply and the challenged law must stand. But if the law burdens protected **\*360** conduct, we determined that the proper course is to "evaluate the law under some form of means-end scrutiny." *Id.* "If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id.*

Applying that test to § 922(k)'s ban on the possession of firearms with obliterated serial numbers, we held that the law "would pass constitutional muster even if it burdens protected conduct." *Id. at 95.* In other words, we skipped the first step and proceeded to apply means-ends scrutiny. We chose intermediate scrutiny [4] because "[t]he burden imposed by the law does not severely limit the possession of firearms" and does not bar possession of an entire class of firearms. *Id. at 97.* Under that standard, we concluded that the law is constitutional because it fits reasonably with the substantial or important "law enforcement interest in enabling the tracing of weapons via their serial numbers." *Id. at 98.* We also opined that the law would pass strict scrutiny [5] because it serves a compelling government interest through the "least-restrictive" means. *Id. at 100.*

A year after *Marzzarella* we decided *Barton*, which involved facial and as-applied challenges to the very law in question here: § 922(g)(1). Unlike the law at issue in *Marzzarella*—the "what" restriction codified in § 922(k)—the statute at issue in *Barton* (and in these appeals) was a presumptively lawful "who" restriction that prohibits certain people from possessing guns because of their membership in a criminal class. Barton was a felon who had been convicted of possessing firearms and ammunition in violation of § 922(g)(1). *Barton, 633 F.3d at 169.* We readily concluded that his facial challenge "must fail" in light of *Heller*'s list of presumptively lawful firearm regulations. *Id. at 172.* We reasoned that since a facial challenge requires a showing that the challenged law "is unconstitutional in all of its applications," *Heller* foreclosed a facial challenge to § 922(g)(1) because

it is "presumptively lawful," meaning that, "under most circumstances, [it] regulate[s] conduct which is unprotected by the Second Amendment." *Id.*

Most relevant to these appeals is our analysis of Barton's as-applied challenge to § 922(g)(1). In that regard, we first determined that "*Heller*'s statement regarding the presumptive validity of felon gun dispossession statutes does not foreclose" an as-applied challenge. *Id. at 173.* We reasoned that "[b]y describing the felon disarmament ban as presumptively lawful, the Supreme Court implied that the presumption may be rebutted." [6] *Id. at 173* (internal citation and quotation marks omitted).

**\*361** Next, we explained what was required to mount a successful as-applied Second Amendment challenge to § 922(g)(1). We looked to the "historical pedigree" of the statute to ascertain "whether the traditional justifications underlying the statute support a finding of permanent disability in this case." *Id.; see also id. at 175* (noting that the constitutionality of the felon dispossession statute under the Second Amendment right depends "upon *whom* the right was intended to protect") (emphasis in original). Our analysis revealed that although persons convicted of violent crimes have been barred from firearm possession since 1931, it wasn't until thirty years later that Congress dispossessed nonviolent felons. *Id. at 173.* The historical record demonstrated that "the common **\*362** law right to keep and bear arms did not extend to those who were likely to commit violent offenses." *Id.* Accordingly, we determined that the exclusion of felons and other criminals from the scope of the Second Amendment's protections was tethered to the time-honored practice of keeping firearms out of the hands of those likely to commit violent crimes. *Id.*

For the reasons discussed, we concluded that "[t]o raise a successful as-applied challenge, [one] must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." *Id. at 174.* We explained further:

> For instance, a felon convicted of a
> minor, nonviolent crime might show

that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society.

*Id.* (internal citation omitted).

We had no trouble concluding that Barton failed to make this showing because he could not demonstrate that he was "no more likely than the typical citizen to commit a crime of violence." *Id.* To begin with, his prior disqualifying convictions were for possession of cocaine with intent to distribute and for receipt of a stolen firearm. *Id.* As we explained, "[c]ourts have held in a number of contexts that offenses relating to drug trafficking and receiving stolen weapons are closely related to violent crime"—again, the relevant historical justification for excluding the class of which Barton was a member from the Second Amendment's protections. *Id.* The record also indicated that Barton had not been rehabilitated such that he was "no more dangerous than a typical law-abiding citizen." *Id.* Indeed, he had recently admitted to selling a firearm with an obliterated serial number to a police informant. *Id.* For those reasons, we rejected Barton's as-applied challenge because he had failed "to demonstrate that his circumstances place him outside the intended scope of § 922(g)(1)." *Id.*

2

Our decisions in *Marzzarella* and *Barton* show that the threshold question in a Second Amendment challenge is one of scope: whether the Second Amendment protects the person, the weapon, or the activity in the first place. This requires an inquiry into "text and history." *Heller,* 554 U.S. at 595, 128 S.Ct. 2783. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35, 128 S.Ct. 2783. The "critical tool of constitutional interpretation" in this area is "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification."

*Id.* at 605, 128 S.Ct. 2783 (emphasis in original); *see also Ezell v. City of Chicago,* 651 F.3d 684, 702 (7th Cir. 2011) ("*Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the scope of the right as publicly understood when the Bill of Rights was ratified; *McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."). Hence, the scope of the right is discerned with reference to the "historical justifications" underlying traditional limits on the right's coverage. *Heller,* 554 U.S. at 635, 128 S.Ct. 2783. The test we enunciated in *Barton* was directed at this very question. *See Barton,* 633 F.3d at 173 ("[T]o evaluate [an] as-applied challenge [to § 922(g)(1) ], we look to [its] historical pedigree **\*363** ... to determine whether the traditional justifications underlying the statute support a finding of permanent disability in this case.").

The fact that *Barton* speaks to scope does not mean, as our colleagues and the Government insist, that it requires application of means-end scrutiny once it is determined that a presumptively lawful regulation has dispossessed someone who falls within the protection of the Second Amendment. It is true that courts typically apply some form of means-end scrutiny to as-applied challenges once it has been determined that the law in question burdens protected conduct. But when, as in these appeals, it comes to an as-applied challenge to a presumptively lawful regulation that *entirely bars* the challenger from exercising the core Second Amendment right, any resort to means-end scrutiny is inappropriate once it has been determined that the challenger's circumstances distinguish him from the historical justifications supporting the regulation. This is because such laws are categorically invalid as applied to persons entitled to Second Amendment protection—a matter of scope.

This principle is based on *Heller* itself. That decision invalidated a municipal law that banned handgun possession in the home and required any lawful firearm to be kept disassembled and bound by a trigger lock at all times, rendering it inoperable. [7] *Heller,* 554 U.S. at 628, 128 S.Ct. 2783. Especially significant for these appeals, the Court eschewed means-end scrutiny in assessing the constitutionality of the ban. Because the law precluded

individuals from possessing an important class of firearms in the home even for self-defense (the right at the "core" of the Second Amendment) and required that all firearms within the home be rendered inoperable, it was unconstitutional without regard to governmental interests supporting the law or their overall "fit" with the regulation. *See* *Heller*, 554 U.S. at 629–30, 128 S.Ct. 2783.

*Heller*'s reasoning bears this out. Specifically, with respect to the District of Columbia's requirement that all firearms in the home be "kept inoperable at all times," the Court said: "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense and *is hence unconstitutional.*" *Id.* at 630, 128 S.Ct. 2783 (emphasis added). Conspicuously absent from the Court's analysis is any mention of means-end scrutiny. Instead, the Court reasoned categorically: (1) the regulation entirely deprives protected persons from exercising the core of the Second Amendment right; (2) it's therefore unconstitutional. The same went for the District of Columbia's handgun ban. After concluding that the Second Amendment includes handguns, the Court didn't mince words: "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is *invalid.*" *Id.* at 629, 128 S.Ct. 2783 (emphasis added). A nineteenth century authority quoted by the Supreme Court in the paragraph preceding this conclusion should eliminate any doubt regarding the Court's categorical approach: "A statute which, under the pretence of regulating, *amounts to a destruction of the right*, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be *clearly unconstitutional.*" *Id.* (quoting *State v. Reid*, 1 Ala. 612, 616–617 (1840)) (emphases added); *see also* *Bliss v. Com.*, 12 Ky. 90, 91 (1822) (suggesting **\*364** a regulation that "import[s] an entire destruction of the right of the citizens to bear arms in defense of themselves and the state" would be plainly unconstitutional). Hence, a law that burdens persons, arms, or conduct protected by the Second Amendment and that does so with the effect that the core of the right is eviscerated is unconstitutional. [8]

We are not the first to recognize this categorical rule. As the Seventh Circuit has explained, "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are *categorically* unconstitutional." *Ezell*, 651 F.3d at 703; *see also* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis,* 84 N.Y.U. L. Rev. 375, 380 (2009) ("Rather than adopting one of the First Amendment's many Frankfurter-inspired balancing approaches, the majority endorsed a categorical test under which some types of 'Arms' and arms-usage are protected absolutely from bans and some types of 'Arms' and people are excluded entirely from constitutional coverage."); *Heller v. D.C.*, 670 F.3d 1244, 1272–73 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("As to the ban on handguns[,] ... the Supreme Court in *Heller* never asked whether the law was narrowly tailored to serve a compelling government interest (strict scrutiny) or substantially related to an important government interest (intermediate scrutiny). If the Supreme Court had meant to adopt one of those tests, it could have said so in *Heller* and measured D.C.'s handgun ban against the relevant standard. But the Court did not do so; it instead determined that handguns had not traditionally been banned and were in common use—and thus that D.C.'s handgun ban was unconstitutional."); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1170 (9th Cir. 2014) ("[T]he rare law that 'destroys' the [core Second Amendment] right requires "*Heller*-style per se invalidation.") (O'Scannlain, J.), *rev'd on reh'g en banc*, 824 F.3d 919 (9th Cir.2016).

Although we suspect that most firearm regulations probably will not trigger this categorical rule, § 922(g)(1) certainly does. As applied to someone who falls within the protective scope of the Second Amendment, § 922(g)(1) goes even further than the "severe restriction" struck down in *Heller*: it completely eviscerates the Second Amendment right. [9] *Cf. United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (recognizing that "the broad scope of 18 U.S.C. § 922(g)(1)—which *permanently* disqualifies *all* felons from possessing firearms—would conflict with the 'core' self-defense right embodied in the Second Amendment" **\*365** to the extent that its presumptive validity does not attach) (emphasis in original). Indeed, the Government's contention that one can fall within the protective scope of the Second Amendment yet nevertheless be permanently deprived of the right transforms what it means to possess a "right." Boiled down to its essence, the

Government's position goes something like this: "You have the right to keep and bear arms, but you may never exercise that right because we have supplied good reasons." This understanding of the Second Amendment is too parsimonious a view of a constitutional right because a "right" that entitles its holder to nothing whatsoever "is no constitutional guarantee at all." *Heller*, 554 U.S. at 634, 128 S.Ct. 2783. When the Second Amendment applies, its core guarantee cannot be withdrawn by the legislature or balanced away by the courts. [10] Rather, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634, 128 S.Ct. 2783. [11]

3

For the reasons stated, *Barton* alone provides the standard for an as-applied Second Amendment challenge to a presumptively lawful regulatory measure (like *§ 922(g)(1)*) that denies a core Second **\*366** Amendment right to a certain class of persons. And our opinion in that case explains the two things an individual must do to mount a successful as-applied challenge. First, he must identify the traditional justifications for excluding from Second Amendment protections the class of which he is a member. *See Barton*, 633 F.3d at 172. Only justifications with "historical pedigree" are relevant for regulations imposing a permanent disability. *Id.* Second, he must present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class. *Id.* at 174. These facts must speak to the traditional justifications that legitimize the class's disability. In *Barton* we noted at least two ways of doing this: (1) "a felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen," or (2) "a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society." [12] *Id.*

This does not mean, of course, that a dispossessed individual can win an as-applied challenge by promising to behave well in the future. [13] Courts must diligently inquire into the facts to determine whether a challenger has adequately distinguished his own circumstances from those of persons historically

barred from Second Amendment protections. *Heller* and *Barton* place the burden on the challenger to rebut the presumptive lawfulness of *§ 922(g)(1)*. *See Barton*, 633 F.3d at 174. That's no easy task. Government evidence regarding one's criminal history will require the challenger to make a strong showing to distinguish himself from others with criminal records. But to deny one **\*367** even the opportunity to "develop [a] factual basis" in support of his constitutional claim would run afoul of both Supreme Court guidance regarding the scope of the Second Amendment and the concept of an as-applied challenge. *Id.* at 174.

II

A

We agree with the District Courts that *§ 922(g)(1)* is unconstitutional as applied to Binderup and Suarez. As far as the historical justification for felon dispossession goes, we explained it in *Barton*: the time-honored principle that the right to keep and bear arms does not extend to those likely to commit violent offenses. Because the Supreme Court declined to "expound upon the historical justifications" for the list of presumptively lawful firearm exclusions in *Heller*, 554 U.S. at 627 n.26, 635, 128 S.Ct. 2783—leaving that task to us—*Barton*'s rationale warrants further explication. As stated, *Heller* instructs that the public understanding of the scope of the right to keep and bear arms at the time of the Second Amendment's enactment dictates the scope of the right today. *Id.* at 605, 128 S.Ct. 2783. In undertaking this inquiry, we are reminded that "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *McDonald*, 561 U.S. at 803–04, 130 S.Ct. 3020 (Scalia, J., concurring).

The most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms. At the Pennsylvania ratifying convention, Constitutionalists and other opponents of the Federalists proposed language

stating that "no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals.*" The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971) (emphasis added). Likewise, at the Massachusetts ratifying convention just months later, Samuel Adams offered a proposal that the "Constitution be never construed to authorize Congress ... to prevent the people of the United States, *who are peaceable citizens,* from keeping their own arms." Journal of Convention: Wednesday February 6, 1788, *reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788,* at 86 (Boston, William White 1856) (emphasis added). And the New Hampshire convention proposed that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." Schwartz, 2 *The Bill of Rights: A Documentary History* at 761.

These proposals show that there was broad consensus between Federalists and their opponents on the existence and nature of the "natural right" to keep and bear arms for defensive purposes; what was controversial was whether the Constitution required a Bill of Rights to ensure the right to keep and bear arms (as so-called Anti-Federalists contended) or whether such an explicit guarantee was unnecessary in light of Congress's limited delegated powers and might in fact backfire by minimizing other, unenumerated liberties (as Federalists argued). *See* Stephen P. Halbrook, *The Founders' Second Amendment* 190–215 (surveying the debates at the ratifying conventions and highlighting the commonplace understanding that "dangerous persons could be disarmed"). Indeed, it is telling that in the crucibles of the ratifying conventions, such public declarations of the scope of the **\*368** right to keep and bear arms did not provoke any apparent disagreement. *See id.* As we summarized in 🚩 *Barton,* the "[d]ebates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered 'highly influential' by the Supreme Court in 🏳️ *Heller* ... confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." 🚩 633 F.3d at 174. Hence, the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public.

A number of firearms restrictions from the founding and pre-founding era support this conclusion. Aside from "complete bans on gun ownership by free blacks, slaves, Native Americans, and those of mixed race" (each of which today would be plainly unconstitutional), the founding generation also disarmed those who refused to pledge their loyalty to the Revolution, state, or nation. Adam Winkler, *Heller's Catch-22,* 56 UCLA L. Rev. 1551, 1562 (2009). As the Fifth Circuit has explained, "[a]lthough these Loyalists were neither criminals nor traitors, American legislators had determined that permitting these persons to keep and bear arms posed a potential danger." 🏷️ *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 200 (5th Cir. 2012); *see also* 🏷️ *United States v. Carpio–Leon,* 701 F.3d 974, 980 (4th Cir. 2012) (noting that Massachusetts required participants in Shays' Rebellion to obtain a pardon for taking up arms against the state, to swear allegiance to the state, and to give up their firearms for three years). This principle had some roots in the English arms tradition, wherein the Crown had the authority "to disarm not only papists, but dangerous and disaffected persons as well." Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 Clev. St. L. Rev. 351, 382 (2009); *cf.* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment,* 25 L. & Hist. Rev. 139, 164 (2007) (noting that although "English law supplied ample precedent" to disarm " 'dangerous' citizens," the power was rarely practiced by early American governments). In short, "from time immemorial, various jurisdictions recognizing a right to arms have ... taken the step of forbidding suspect groups from having arms," and "American legislators at the time of the Bill of Rights seem to have been aware of this tradition." Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations,* 60 Hastings L.J. 1339, 1360 (2009); *see also* Marshall, 32 Harv. J.L. & Pub. Pol'y at 711–12 (examining later laws (upheld in courts) barring possession of firearms while intoxicated and possession of firearms by "tramps" (roaming beggars) and construing them in terms of the "present danger" of misconduct presented by such persons were they to carry firearms).

Although the debates from the ratifying conventions point strongly toward a limit on Second Amendment rights centered on dangerousness, dispossessory regulations enacted to that

end were few and far between in the first century of our Republic. Consequently, some have reckoned that "[t]he historical evidence" regarding the scope of the Second Amendment "is inconclusive at best." *United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (en banc) (Sykes, J., dissenting). We disagree. Even though "[t]he Founding generation had no laws ... denying the right [to keep and bear arms] to people convicted of crimes," Winkler, 56 UCLA L. Rev. at 1563, novelty does not mean unconstitutionality. After **\*369** all, "[t]he paucity of eighteenth century gun control laws might have reflected a lack of political demand rather than constitutional limitations." Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1354 (2009).

Thus, a common thread running through the words and actions of the Founders gives us a distinct principle to inform our understanding of the original public meaning of the text of the Second Amendment. *See, e.g.*, Marshall, 32 Harv. J.L. & Pub. Pol'y at 698 ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that ... its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."); *id.* at 727–28 ("[T]o the extent that one can distill any guidance from the English disability and the Revolutionary disarmament, it would seem at most to be that persons who by their actions—not just their thoughts—betray a likelihood of violence against the state may be disarmed."); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to 'Bear Arms'*, 49 Law & Contemp. Probs. 151, 161 (1986) (concluding that "*violent criminals*, children, and those of unsound mind may be deprived of firearms" (emphasis added)). In sum, the historical record leads us to conclude that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed. [14]

**\*370** Section 922(g)(1) sweeps much more broadly than this traditional ground for disarmament. *See Barton*, 633 F.3d at 173 ("Although 18 U.S.C. § 922(g) was meant to keep firearms out of the hands of presumptively risky people, Congress did not bar non-violent felons from possessing guns until 1961.") (internal quotation marks and citation omitted); *United States v. Booker*, 644 F.3d 12,

24 & n.14 (1st Cir. 2011) ("[I]n covering only those with a record of violent crime, § 922(g)(9) [ (dispossession of domestic violence misdemeanants) ] is arguably more consistent with the historical regulation of firearms than § 922(g)(1)," which "applies to all individuals convicted of a federal felony, thus encompassing individuals convicted of crimes as disparate as tax evasion and bank robbery. This breadth, and particularly the inclusion of nonviolent offenses, constitutes a significant departure from earlier understandings of a 'felony.' At common law, for example, '[o]nly the most serious crimes' were considered to be felonies." (internal citations omitted)); *supra* n.14. The upshot of all this is that the as-applied constitutionality of § 922(g)(1) is tied to its historical justification: people who have demonstrated that they are likely to commit violent crimes have no constitutional right to keep and bear arms. [15]

### B

The Government's divergent reading of the historical scope of the Second Amendment—also adopted in different ways by Judges Ambro and Fuentes—is unconvincing. Relying on the republican notion of "civic virtue," the Government maintains that Binderup's and Suarez's misdemeanor convictions place them outside the class of "those members of the polity who were deemed capable of exercising [the right to keep and bear arms] in a virtuous manner." Gov't Suarez Br. 14 (quoting Saul Cornell, *"Don't Know Much about History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L Rev. 657, 679 (2002)). To be sure, "[s]ome scholarship suggests that at the time of the nation's founding, the right to bear arms was not understood to extend to those convicted of a felony, either because they were not believed to be among 'the people' whose right to bear arms was protected, or because they lacked the requisite 'virtue' necessary for firearm possession." Alexander C. Barrett, Note, *Taking Aim at Felony Possession*, 93 B.U. L. Rev. 163, 194–95 & n.197 (2013) (citing Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 L. & Contemp. Probs. 143, 146 (1986) (offering that the right to keep and bear arms was tied to the idea of the "virtuous citizen," such that "the right to arms does not preclude laws disarming the unvirtuous (*i.e.*, criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue")); *see also* Don B. Kates, Jr. & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009) **\*371** ("[T]here is every reason to believe that the

Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among 'the [virtuous] people' to whom they were guaranteeing the right to arms.") (alteration in original).

This "virtue" standard—especially in the pliable version articulated by the Government—is implausible because the "civic republican" view of the scope of the Second Amendment is wrong. Although courts, scholars, and litigants have cited this supposed limitation, [16] this virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre- 📖 *Heller* interpretations of the Second Amendment by proponents of the "sophisticated collective rights model" who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a "civic right.... exercised by citizens, not individuals ... who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 491–92 (2004). [17]

Moreover, this supposed limitation on the Second Amendment stems from a misreading of an academic debate about "ideological interpretation," Cornell & DeDino, 73 Fordham L. Rev. at 528 n.29, the gist of which concerns the extent to which the Founders were civic republicans or libertarians ***372** as well as what bearing these ideologies might have had on how they understood the right to keep and bear arms. *See* Robert E. Shalhope, *The Ideological Origins of the Second Amendment*, 69 J. Am. Hist. 599, 599–601 (1982) (the article that served as contemporary scholars' principal source for the "virtuousness" limitation). Unfortunately, this literature sheds no light on "who" was thought to enjoy the right to keep and bear arms (at least, none beyond the now-settled individual-versus-collective right interpretation). Rather, it relates to the *rationale* for having a right to keep and bear arms in the first place. *See id.* at 606–07 (characterizing the right to keep and bear arms as one with both individual- and collective-right elements and claiming that the Founders' unique blend of republicanism and libertarianism led them to "perceive[ ] a vital relationship between vigorous republican husbandmen and the possession of arms" and believe that a "man capable of defending himself with arms if necessary was prerequisite for maintaining the moral character to be a good republican"); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 L. & Contemp. Probs. 125, 132 (1986) (explaining that strains of civic republicanism in early-

American culture viewed arms possession as critical to the virtue of the citizenry and the spirit of the state, but never characterizing the *possession* of virtue as a prerequisite to arms rights).

This literature does not help us identify the types of people who were not entitled to exercise Second Amendment rights. [18] Contemporary advocates of a "virtuousness" limitation have projected that constraint onto the right to keep and bear arms based on the fact that the very *existence* of the right was informed by republican philosophical principles. [19] That is not enough. We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that "virtuousness" was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*.

Furthermore, it is hard to understand what the Government's proposed "virtuousness" limitation would even require. The Government has offered no guidance in this regard, except to urge that we defer to legislative judgments about what sorts of offenses or characteristics render one insufficiently "virtuous" to enjoy a fundamental right. The Dissent and to a lesser extent Judge Ambro have accepted this approach. The legislative judgments set forth in the margin are but a few illustrations of its deep flaws. [20] We doubt the ***373** Founders designed a fundamental constitutional right to turn on such vagaries. Although it "befits a diverse nation of fifty sovereign States and countless municipalities ... [that] gun regulation in the United States resembles a patchwork quilt that ***374** largely reflects local custom," 📖 *Drake v. Filko*, 724 F.3d 426, 440 (3d Cir. 2013) (Hardiman, J., dissenting), to make an individual's entitlement to the Second Amendment right itself turn on the predilections of the legislature governing his or her patch is defence the Constitution won't bear. *See* 📖 *McDonald*, 561 U.S. at 750, 130 S.Ct. 3020 (holding that "the Second Amendment right is *fully* applicable to the States" (emphasis added)).

Even if we were to attempt to apply the notion of civic virtue to felon dispossession, it is doubtful the Government would prevail. Although felons at common law "were essentially stripped of property and other rights," the term "felony" "applied only to a few very serious, very dangerous offenses such as murder, rape, arson, and robbery"—in other words, crimes closely associated with violence. Kates & Cramer, 60 Hastings L.J. at 1362. *But see* Marshall, 32 Harv. J.L. & Pub. Pol'y at 715–16 (casting doubt on the

claim that a felony conviction necessarily entailed permanent dispossession). Indeed, one of the scholars cited by the Government concludes that insofar as a statute "would seek to bar arms possession by" persons who have been convicted of a nonviolent "felony" in the modern sense, "those laws would seem to be invalid." Kates & Cramer, 60 Hastings L.J. at 1363. *See* Barrett, 93 B.U. L. Rev. at 196 ("[E]ven if some felons were historically understood to be barred from possessing firearms, the common law term 'felony' applied to only a few select categories of serious crimes at the time the Second Amendment was ratified, while in modern times, vast categories of 'non-dangerous' activities qualify as felonious."); Marshall, 32 Harv. J.L. & Pub. Pol'y at 729–30 (explaining that the first federal felony dispossession laws applied only to a core group of crimes including "murder, manslaughter, rape, mayhem, aggravated assault ... robbery, burglary, housebreaking, and attempt to commit any of these crimes"). And at least one of our sister courts faced with the virtuousness argument treated "virtue" as basically synonymous with "non-dangerous." *See* United States v. Rene E., 583 F.3d 8, 16 (1st Cir. 2009) ("To be sure, there is an ongoing debate among historians about the extent to which the right to bear arms in the founding period turned on concerns about the possessor's 'virtue,' *i.e.*, on a legislative judgment that possession of firearms by a certain class of individuals would pose a *serious danger to the public*." (emphasis added)). Accordingly, we reject the Government's suggestion that Second Amendment protections are limited "to those members of the polity who were deemed capable of exercising [the right to keep and bear arms] in a virtuous manner." Gov't Suarez Br. 14.

C

All this means that Binderup and Suarez must distinguish themselves and their circumstances from those of persons not entitled to keep and bear arms because of their propensity for violence. And as the District Courts found, both men did so. Specifically, each is a misdemeanant convicted of a non-violent crime who has shown "that he is no more dangerous than a typical law-abiding citizen." *See* Barton, 633 F.3d at 174. While we agree with the Government that the felony-misdemeanor distinction is "minor and often arbitrary," especially since "numerous misdemeanors involve conduct more dangerous than many felonies," Gov't Binderup Br. 19 and Gov't Suarez Br. 18 (quoting Tennessee v. Garner, 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1

(1985)), that is beside the point here. Our focus must remain on the legitimate (*i.e.*, traditional) concern that justifies the dispossession of certain offenders: we cannot trust them not to commit violent crimes with firearms. The Government concedes that "the Supreme Court might **\*375** find some felonies so tame and technical as to be insufficient to justify the ban,"[21] Gov't Binderup Br. 15 and Gov't Suarez Br. 15 (quoting United States v. Torres-Rosario, 658 F.3d 110, 113 (1st Cir. 2011)), but it insists that Binderup's and Suarez's misdemeanors do not qualify. We disagree.

For purposes of the traditional justifications animating § 922(g)(1), both Binderup's corruption of minors offense and Suarez's licensing violation were nonviolent misdemeanors. In Barton, we described the violent crimes of the sort that motivated felon dispossession since 1938 in the following way: "For nearly a quarter century, § 922(g)(1) had a narrower basis for a disability, limited to those convicted of a 'crime of violence.' 'Crimes of violence' were commonly understood to include only those offenses 'ordinarily committed with the aid of firearms.' " Barton, 633 F.3d at 173 (quoting Marshall, 32 Harv. J.L. & Pub. Pol'y at 698, 702 (2009)) (some internal quotation marks omitted); *see also* United States v. Chovan, 735 F.3d 1127, 1137 (9th Cir. 2013) (noting that the "Federal Firearms Act of 1938 only restricted firearm possession for those individuals convicted of a 'crime of violence,' defined as 'murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking, and certain forms of aggravated assault— assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year' "). Dispossession on the basis of a conviction for these sorts of crimes comports with the original public understanding of the scope of the right to keep and bear arms.

Neither Binderup's improper relationship with an employee capable of consent nor Suarez's possession of a handgun that he could have possessed lawfully had he acquired a license meets this description. Nor did their offenses involve any actual violent behavior. It is true that a small handful of States would classify Binderup's offense as statutory rape[22] or sexual abuse. And there are certainly circumstances in which an inappropriate and illegal relationship like Binderup's might involve implicit or genuine violence. Such facts would make his a much different case. But as the District Court explained:

There is simply nothing in the record here which would support a reasonable inference that [Binderup] used any violence, force, or threat of force to initiate or maintain the sexual relationship with his seventeen-year-old employee. Moreover, there is no record evidence present here which would support a reasonable inference that [he] was convicted of any crime of violence (or that he even engaged in any violent or threatening conduct) before or after his November 1997 conviction for [c]orruption of minors.

*Binderup*, 2014 WL 4764424, at *22. Nor is there any "record evidence [that] supports a reasonable inference that he has a propensity to commit violent acts, sexual or otherwise."

*Id.* at *23. In a real stretch, the Government likens Binderup's conduct to that which was felonized by a 1576 English statute that forbade "carnal[ ] **\*376** knowl[edge]" of "any woman child under the age of ten years." Gov't Binderup Br. 15–16 (quoting Mortimer Levine, *A More Than Ordinary Case of "Rape," 13 and 14 Elizabeth I*, 7 Am. J. Legal Hist. 159, 163 (1963)). Deplorable as it was, however, Binderup's conduct involved a seventeen-year-old capable of consent, [23] was not subject to criminal sanction at the time of the founding, and—most importantly—did not involve violence, force, or threat of force.

The nonviolent nature of Suarez's offense is evident as well. The Government's unremarkable observation that Maryland's licensing requirement relates to public safety does not make Suarez's offense a violent crime. It neither involved the actual use or threatened use of force, nor was it "closely related to violent crime" in the way that drug trafficking and receiving stolen weapons are. *See* *Barton*, 633 F.3d at 174. *Heller* characterized the Second Amendment as guaranteeing "the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home." 554 U.S. at 635, 128 S.Ct. 2783 (emphasis added). The Government relies on the Fourth Circuit's decision in *United States v. Pruess* to argue that Suarez's violation of a lawful, well-established

firearm regulation demonstrates that he is not a responsible, law-abiding citizen. That reliance is misplaced.

In *Pruess*, the Fourth Circuit rejected an as-applied challenge to § 922(g)(1) by a felon whose disqualifying convictions related to his prior sales of illegal arms, concluding that Pruess could not "rebut the presumption of lawfulness of the felon-in-possession prohibition as applied to him." 703 F.3d 242, 246 (4th Cir. 2012). Although Pruess, like Suarez, had committed regulatory violations, his circumstances were dissimilar from Suarez's in every other way. For example, Pruess had committed "repeated violations of the firearms laws, leading to at least twenty prior convictions," and admitted that although he "did not intend to use them for violence himself ... he believed that [certain] weapons and ammunition underlying his convictions were stolen." *Id.* His repeated dealings in stolen, illegal weapons—such as fully automatic AK-47's and grenades—appropriately led the court to conclude that Pruess had committed acts "closely related to violent crime" and "flunk[ed] the 'law-abiding responsible citizen' requirement." *Id.* at 244, 246. Suarez, by comparison, committed a nonviolent firearms licensing offense with respect to an otherwise lawful weapon decades ago, the circumstances of which were unassociated with violence. [24]

In addition to showing that neither their offenses nor the circumstances surrounding them involved any violence or threat of violence, Binderup and Suarez have also demonstrated that their subsequent behavior confirms their membership among the class of responsible, law-abiding citizens to whom Second Amendment protection extends. As the District Courts found, both **\*377** men presented compelling evidence that they are responsible citizens, each with a job, a family, and a clean record since 1997 and 1998. Their home State has seen fit to reinstate their right to keep and bear arms. And though it's by no means dispositive in Suarez's case, the fact that the United States deems him upright enough to entrust him with the Nation's secrets is further evidence that he is a "typical law-abiding citizen." *Barton*, 633 F.3d at 174.

The Government has presented no evidence that either Binderup or Suarez has been, or would be, dangerous, violent, or irresponsible with firearms. [25] For all these reasons, the

District Courts did not err when they found 🚩 § 922(g)(1) unconstitutional as applied to Binderup and Suarez.


D

The Government cites a number of recidivism studies as a final justification for permanently disarming Binderup and Suarez. It notes that felons commit violent crimes more frequently than nonfelons. *See* Bureau of Justice Statistics, U.S. Dep't of Justice, *Recidivism of Prisoners Released in 1994* at 6 (2002) (finding that, within a population of 234,358 federal inmates released in 1994, the rates of arrest for homicides were 53 times the national average). Relatedly, it highlights a 1994 study finding that approximately one in five offenders imprisoned for nonviolent crimes were rearrested for violent crimes within three years of their release. *See* Bureau of Justice Statistics Fact Sheet, *Profile of Nonviolent Offenders Exiting State Prisons*, tbl.11 (Oct. 2004), *available at* http://bjs.gov/content/pub/pdf/pnoesp.pdf. The Government's second piece of evidence is a study comparing denials of handgun purchases to convicted felons with successful purchases by persons arrested but not convicted of a felony. The study found that the "denial of handgun purchases is associated with a reduction in risk for later criminal activity of approximately 20% to 30%." Mona A. Wright et al., *Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence*, 89 Am. J. of Pub. Health 88, 89 (1999).

Finally, with respect to Binderup, it notes that "[s]ex offenders" (which Binderup is not) "present a high risk of recidivism." Gov't Binderup Br. 28 (citing Pennsylvania Dep't of Corrections, *Recidivism Report*, 21 tbl. 12 (Feb. 8, 2013), *available at* http://www.nationalcia.org/wp-content/uploads/2013-PA-DOC-Recidivism-Report.pdf) (finding that 50 percent of persons convicted of *statutory rape* and 60.2 percent of those convicted for "[o]ther [s]exual [o]ffenses" were rearrested or reincarcerated within three years of release from Pennsylvania prison) and U.S. Dep't of Justice, Office of Justice Programs, *Bureau of Justice Statistics Special Report: Recidivism of Prisoners Released in 1994*, 8 tbls.9, 15, *available at* http://www.bjs.gov/content/pub/pdf/rpr94.pdf (finding a 41.4 percent rearrest rate among persons convicted for "other sexual assault"). And with respect to Suarez, the Government emphasizes that persons arrested for "weapons offenses" are rearrested at high rates within a few years. Gov't Br. 30 & nn. 10–11 (citing studies). In addition, it relies upon a study indicating that California handgun

purchasers in 1977 "who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent **\*378** offenses," were over four times more likely to be charged with a later violent offense than a person with no criminal history. *See* Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 Am. Med. Ass'n 2083, 2086 (1998).

The Government presents this evidence in its argument that 🚩 § 922(g)(1) satisfies intermediate scrutiny as applied to Binderup and Suarez.[26] But as we have explained, that inquiry is inappropriate in this case. Applying some form of means-end scrutiny in an as-applied challenge against an absolute ban—after it has already been established that the individual has a right to keep and bear arms—eviscerates that right via judicial interest balancing in direct contravention of 📖 *Heller*. *See* 📖 *McDonald*, 561 U.S. at 785, 130 S.Ct. 3020 ("In 📖 *Heller* ... we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."). What matters, when it comes to a presumptively lawful regulation that eliminates the right to keep and bear arms, is whether Binderup and Suarez can distinguish themselves as responsible, law-abiding citizens in contrast to the class of persons historically understood to be excluded from Second Amendment protection.

Even if the Government's generalized studies are recast as addressing the issue of scope,[27] they still fall short. Perhaps the Government might use statistics to demonstrate that persons who commit certain nonviolent crimes have a high likelihood of violent recidivism, even decades later. But that conclusion would stretch the notion of "close association" and the historical roots of felon disarmament. Moreover, it would require untangling a number of complicating variables, such as the effects of incarceration. Recidivism studies of this type would be better suited to demonstrating a means-end fit for less restrictive firearm regulations on criminals otherwise protected by the Second Amendment (such as waiting periods or licensing requirements). Either way, the studies cited by the Government don't cut it.

**\*379** First, Binderup and Suarez were not convicted of felonies and have never been incarcerated, which renders irrelevant most of the Government's studies. The Government argues that even criminals placed on probation rather than

sent to prison have a heightened risk of recidivism. But the study it cites found that "[g]enerally, the risk of recidivism was highest during the first year after admission to probation," and that "[a]s released prisoners and probationers age, they tend to exhibit lower rates of recidivism." Iowa Div. of Crim. & Juvenile Justice Planning, *Recidivism Among Iowa Probationers*, at 2 (July 2005), available at http://publications.iowa.gov/15032/ (last visited Sept. 3, 2016). Given Binderup's and Suarez's ages, the study cited by the Government would predict that they pose a negligible chance of being arrested for a violent crime and a zero percent chance of being arrested for a violent felony. *Id.* at 39–40. Second, the denial-of-handgun survey was restricted to felons with extensive criminal records and conceded not only that the "modest benefit" it observed "may reflect the fact that the members of both study groups had extensive criminal records and therefore were at high risk for later criminal activity," but also that "this study was too small to determine whether the differences occurred by chance." Wright et al., 89 Am. J. of Pub. Health at 89.

Finally, the Government's sex-offender recidivism evidence paints with too broad a brush. Binderup's misdemeanor was not classified as a sexual offense and did not trigger a duty to register as a sex offender. *Compare* 18 Pa. Const. Stat. Ann. § 6301(a)(1)(I), *with* 18 Pa. Const. Stat. Ann. § 3103–3144. The report does not appear to cover corruption-of-minors recidivists and lumps Binderup together with an amalgam of persons guilty of a broad range of unspecified sexual offenses. *See* U.S. Dep't of Justice, Office of Justice Programs, *Bureau of Justice Statistics Special Report: Recidivism of Prisoners Released in 1994*, 8 tbls.9, 15. The same goes for the dated firearm-offense recidivism study the Government invokes against Suarez, which covers a wide, unspecified range of "nonviolent firearm-related offenses." Wintemute, 280 Am. J. Med. Ass'n at 2086. Common sense dictates that violent recidivism rates are different for drug dealers carrying unlicensed firearms to protect their turf and ordinary citizens carrying unlicensed firearms for self-defense (behavior that several states do not even criminalize). *See* GAO, *State's Laws and Requirements for Concealed Carry Permits Vary Across Nation* 8–9 (2012), available at http://www.gao.gov/assets/600/592552.pdf (last visited Sept. 3, 2016).

Without more, the Government's studies don't support the application of § 922(g)(1) to Binderup and Suarez. Given the uncontroverted evidence they have presented distinguishing themselves from persons who are not entitled to keep and bear arms, the Government needs to offer more

than regression analyses of recidivism (largely by felons who, unlike Binderup and Suarez, were incarcerated). An as-applied challenge ultimately rests on the question of whether "application [of a statute] to a *particular person* under *particular circumstances* deprive[s] that person of a constitutional right." Marcavage, 609 F.3d at 273 (emphases added). Binderup and Suarez have presented unrebutted evidence that their offenses were nonviolent and now decades old, and that they present no threat to society, which places them within the class persons who have a right to keep and bear arms. Accordingly, 18 U.S.C. § 922(g)(1) is unconstitutional as applied to them.

\* \* \*

In the years since the Supreme Court's decision in Heller, courts have had to **\*380** wrestle with difficult Second Amendment questions. Although these questions can be challenging and the stakes high—the guarantee is one to deadly weapons, after all—it is no answer to say that legislatures "have near total control" over the right. Dissent at 405. That is not how constitutional rights work. Because their personal circumstances are distinguishable from those of the class of persons historically excluded from Second Amendment protections due to their propensity for violence, Daniel Binderup and Julio Suarez fall outside the proper scope of the felon dispossession statute. And their Second Amendment rights cannot be withdrawn merely because § 922(g)(1) broadly serves the public good. Where the Second Amendment's guarantees apply, as they do for Binderup and Suarez, "certain policy choices" are "necessarily" taken "off the table." Heller, 554 U.S. at 636, 128 S.Ct. 2783. Forever prohibiting them from possessing any firearm is one of those policy choices.

FUENTES, Circuit Judge, concurring in part, dissenting in part, and dissenting from the judgments, with whom McKEE, Chief Judge, and VANASKIE, SHWARTZ, KRAUSE, RESTREPO, and ROTH, Circuit Judges, join.

The plaintiffs ask us to do something that no federal appellate court has done before: to hold that, even though they were both convicted of crimes punishable by multiple years in prison, Congress may not constitutionally prevent them from owning firearms. They ask us to do this notwithstanding a

long tradition in this country of preventing criminals from owning guns, and despite the fact that the felon-in-possession statute, 18 U.S.C. § 922(g)(1), has been in force for over half a century. [1] Most troubling of all, they ask us to saddle district court judges with a seemingly unending obligation to review as-applied challenges like theirs, even as they fail to provide us with any workable standards that would make such a regime administratively feasible or doctrinally coherent.

Judges Ambro and Hardiman believe that the Second Amendment requires us to sustain the plaintiffs' challenges, although they arrive at that conclusion along different routes and would shape our Second Amendment doctrine in divergent ways. By contrast, I would hold that the plaintiffs' as-applied challenges to § 922(g)(1) must fail. The Second Amendment, important as it may be, does not prevent Congress from deciding that convicted criminals should not have access to firearms. We as a society require persons convicted of crimes to forfeit any number of rights and privileges, including the right to sit on a jury, the right to hold elective office, and the right to vote. [2] However much the **\*381** plaintiffs may see unfairness in the fact that their law-abiding peers can legally own firearms and they cannot, that disparity is a consequence of their own unlawful conduct. Because I believe that the Second Amendment permits Congress to disarm persons who commit serious crimes, and because § 922(g)(1) reasonably circumscribes what counts as such a crime, I would reject the plaintiffs' as-applied challenges and reverse the judgments of the District Courts.

What's more, even if we were to apply intermediate scrutiny to test the validity of § 922(g)(1), I would conclude that the statute is reasonably tailored to promote the substantial government interest of suppressing armed violence. Congress itself previously created and then defunded an administrative regime for providing individualized exceptions to the felon-in-possession ban. [3] When it terminated that program, it stated that the review of such applications was "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made," [4] and warned that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms." [5] These congressional judgments stand in stark contrast to the plaintiffs' arguments. Congress has already experimented with a system of what

were, in effect, as-applied challenges and concluded that it was unworkable and dangerous.

I therefore concur with Judge Ambro's opinion in part, dissent from it in part, and dissent from the majority's decision to affirm the judgments of the District Courts.

## I. The Current State of the Law Regarding Challenges to § 922(g)(1)

No federal appellate court has yet upheld a challenge, facial or as-applied, to the felon-in-possession statute. It may therefore be helpful to begin by summarizing the Supreme Court's limited guidance on this issue and to explore how our sister circuits have applied that guidance in the context of § 922(g)(1).

### A. The Meaning of *Heller*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." [6] The touchstone in any Second Amendment case is *District of Columbia v. Heller*, [7] the Supreme Court decision holding that the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." [8] While *Heller* recognized an individual right to bear arms, it also explained that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." [9] The Court went on to provide us with important guidance about the Second Amendment's scope:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government **\*382** buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [10]

In a footnote, the Court described these laws collectively as "presumptively lawful regulatory measures," making clear that "[the] list does not purport to be exhaustive." [11] The Court also stated that people have the right to keep a loaded firearm in their homes for self-defense, provided that they are "not disqualified from the exercise of Second Amendment rights." [12]

Two interpretive questions about 📁 *Heller* therefore arise again and again. First, what does it mean to say that the felon-in-possession ban is "presumptively lawful"? Second, what does it mean to say that a person may only possess a firearm if he or she has not been "disqualified from the exercise of Second Amendment rights"? As we shall see, our sister circuits have already done yeoman's work exploring these questions and suggesting possible answers.

**B. Four Circuits Have Rejected As-Applied Challenges Altogether**

Four circuits—the Fifth, Ninth, Tenth, and Eleventh—have concluded that as-applied challenges to 🚩 *§ 922(g)(1)* are not permissible, at least with respect to felons.

We begin with the Fifth Circuit, which held years before 📁 *Heller* that the Second Amendment protects an individual right to bear arms. [13] In another pre- 📁 *Heller* case, *United States v. Everist*, [14] the Fifth Circuit held that the felon-in-possession ban was constitutional with respect to both violent and nonviolent offenders. [15] In the Fifth Circuit's view, "[i]rrespective of whether his offense was violent in nature, a felon has shown manifest disregard for the rights of others" and "[h]e may not justly complain of the limitation on his liberty when his possession of firearms would otherwise threaten the security of his fellow citizens." [16] The issue of the constitutionality of 🚩 *§ 922(g)(1)* arose again after 📁 *Heller* in 📁 *United States. v. Scroggins*. [17] The Fifth Circuit there said that nothing in 📁 *Heller* caused it to question its prior conclusion in *Everist* that 🚩 *§ 922(g)(1)* is constitutional even as applied to non-violent felons. [18]

The Ninth Circuit addressed the issue of as-applied challenges in 📁 *United States v. Vongxay*. [19] The defendant there raised both a facial and an as-applied challenge to **\*383** 🚩 *§ 922(g)(1)*. With respect to the defendant's facial challenge, the Ninth Circuit concluded that "[n]othing in 📁 *Heller* can be read legitimately to cast doubt on the constitutionality of 🚩 *§ 922(g)(1)*." [20] With respect to the defendant's as-applied challenge, 📁 *Vongxay* concluded that 🚩 *§ 922(g)(1)* is constitutional even as applied to non-violent felons. The Ninth Circuit articulated several rationales for this conclusion. First, it noted that the right to bear arms could be restricted at common law. Second, it observed "that to date no court that has examined 📁 *Heller* has found 🚩 *18 U.S.C. § 922(g)* constitutionally suspect." [21] Third, it stated that "[d]enying felons the right to bear arms is ... consistent with the explicit purpose of the Second Amendment to maintain 'the security of a free State.' " [22] To that end, "[f]elons are often, and historically have been, explicitly prohibited from militia duty." [23] Lastly, it stated that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably ... tied to' the concept of a 'virtuous citizen[ry]' " and that " 'the right to bear arms does not preclude laws disarming the unvirtuous citizens,' " including criminals. [24]

A recent Ninth Circuit decision, 📁 *United States v. Phillips*, [25] re-affirmed 📁 *Vongxay*, although with some skepticism. The defendant there argued that his prior criminal conviction could not support disarmament under 🚩 *§ 922(g)(1)* because his crime, which consisted of concealing an ongoing felony from federal officials, was "a non-violent, passive crime of inaction." [26] The Ninth Circuit said that "there may be some good reasons to be skeptical about the correctness of the current framework of analyzing the Second Amendment rights of felons," [27] but it nonetheless concluded that 📁 *Heller* and 📁 *Vongxay* foreclosed the defendant's argument. [28]

The Tenth Circuit rejected a constitutional challenge to 🚩 *§ 922(g)(1)* in 📁 *United States v. McCane*. [29] It focused on the fact that the Supreme Court "explicitly stated in 📁 *Heller* that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.' " [30] While Judge Tymkovich complained in concurrence that **\*384** "[t]he Court's summary treatment

of felon dispossession in dictum forecloses the possibility of a more sophisticated interpretation of § 922(g)(1)'s scope," [31] the Tenth Circuit has not revisited the issue. To the contrary, it said in a later case that it had "already rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)." [32]

Lastly, the Eleventh Circuit upheld the constitutionality of § 922(g)(1) in *United States v. Rozier*. [33] That opinion focused on the Supreme Court's language in *Heller* regarding "disqualifi[cation] from the exercise of Second Amendment rights." [34] Interpreting this language, the Eleventh Circuit concluded that one of *Heller*'s implied premises was that certain persons can be permissibly disqualified from exercising their Second Amendments rights altogether. The court went on to say that *Heller*'s list of "longstanding prohibitions" indicated that "statutes disqualifying felons from possessing a firearm *under any and all circumstances* do not offend the Second Amendment." [35] As a result, it concluded that "statutory restrictions of firearm possession, such as § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of certain classes of people," and that "Rozier, by virtue of his felony conviction, falls within such a class." [36]

## C. Three Circuits Are Wary of As-Applied Challenges

The First Circuit has expressed skepticism about as-applied challenges to the federal firearms laws, although it has not foreclosed such challenges. In *United States v. Torres-Rosario*, [37] the First Circuit considered a defendant's as-applied challenge to his conviction under § 922(g)(1). The defendant's prior convictions were for possession with intent to distribute and distribution of controlled substances, and the court concluded that the defendant's challenge failed because "drug dealing is notoriously linked to violence." [38] In reaching that conclusion, the First Circuit stated that the "Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban," and likewise "might even be open to highly fact-specific objections." [39] Even so, the court observed that permitting "such an approach, applied to countless variations in individual circumstances,

would obviously present serious problems of administration, consistency and fair warning." [40] The First Circuit thus suggested that defendants could bring as-applied challenges, even while recognizing the difficulties that considering such challenges would create.

The Second Circuit upheld the constitutionality of § 922(g)(1) in *United States v. Bogle*. [41] It did not analyze the issue in great depth. Instead, it pointed to *Heller*'s language about "longstanding prohibitions" and "join[ed] every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted **\*385** felons." [42] The court did not distinguish between facial and as-applied challenges. [43]

Meanwhile, the jurisprudence of the Sixth Circuit appears to be in flux. That court dealt with challenges to § 922(g)(1) in two non-precedential opinions. In one, *United States v. Frazier*, [44] the court rejected a challenge to § 922(g)(1) on the view that "congressional regulation of firearms [remained] constitutional" even post-*Heller*. [45] In another, *United States v. Khami*, [46] the court recognized the theoretical possibility of an as-applied challenge to § 922(g)(1) but said that, on the facts before it, "[e]ven an as applied challenge would be difficult ... to mount." [47] A later precedential opinion, *United States v. Carey*, [48] stated flatly that "prohibitions on felon possession of firearms do not violate the Second Amendment." [49] And most recently, the Sixth Circuit has considered the issue of whether the federal statute making it unlawful to possess a firearm after having been committed to a mental institution, 18 U.S.C. § 922(g)(4), permits as-applied challenges. That issue, which raises a doctrinal conundrum similar to the one we confront here, has also triggered *en banc* review. [50]

## D. Four Circuits Permit As-Applied Challenges

The Fourth, [51] Seventh, [52] Eighth, [53] and D.C. Circuits [54] have left the door open to a successful as-applied challenge. Even so, none of these courts has yet upheld one.

In many instances, these courts have also narrowed the universe of as-applied challenges that are permissible. The Fourth Circuit, which has repeatedly said that it might affirm an as-applied challenge in the right circumstances, has rejected the proposition that Congress may disarm only persons who commit violent **\*386** crimes. In *United States v. Pruess*, [55] the court considered a challenge to § 922(g)(1) brought by a firearms dealer and collector who also had over twenty prior convictions for failing to comply with various gun laws, although none of those convictions were for violent crime. *Pruess* held "that application of the felon-in-possession prohibition to allegedly non-violent felons ... does not violate the Second Amendment." [56]

There is also some ambiguity in the jurisprudence of the Eighth Circuit. That court upheld the facial constitutionality of § 922(g)(1) in *United States v. Seay*. [57] It also addressed as-applied challenges to § 922(g)(1) in *United States v. Woolsey*, [58] where it cited one of its prior non-precedential opinions, *United States v. Brown*, [59] that in turn relied on our decision in *United States v. Barton*. [60] Following *Barton*'s logic, *Woolsey* rejected a defendant's as-applied challenge to § 922(g)(1) because he had not "presented 'facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections.' " [61]

Even so, another Eighth Circuit decision, *United States v. Bena*, [62] suggests that as-applied challenges might rest on shaky ground. *Bena* involved a facial challenge to § 922(g)(8), which bars possession of firearms by those subject to a restraining order. In addressing that challenge, *Bena* stated that the *Heller*'s list of "longstanding prohibitions" suggested that the Supreme Court "viewed [those] regulatory measures ... as presumptively lawful because they do not infringe on the Second Amendment right." [63] In support of that conclusion, the court cited our own analysis in *United States v. Marzzarella*. [64] The Eighth Circuit also pointed to the fact that, as a historical matter, several states viewed the right to bear arms as limited to peaceable, responsible citizens. The court expressly declined to consider the question of "whether § 922(g)(8) would be constitutional as applied

to a person who is subject to an order that was entered without evidence of dangerousness." [65]

Meanwhile, the D.C. Circuit considered the issue of as-applied challenges in *Schrader v. Holder*. [66] In that case, the court concluded that the plaintiffs had brought, at most, a challenge to § 922(g)(1) "as applied to common-law misdemeanants as a class," not as applied to Schrader individually. [67] The court easily rejected that challenge. It stated that the "plaintiffs **\*387** [had] offered no evidence that individuals convicted of [common-law misdemeanors] pose an insignificant risk of future armed violence." [68] It also adopted the view that even if "*some* common-law misdemeanants ... may well present no such risk ... 'Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.' " [69]

\* \* \*

As this survey of cases demonstrates, federal judges face an almost complete absence of guidance from the Supreme Court about the scope of the Second Amendment right. Even so, only four of our sister courts have clearly stated that as-applied challenges to § 922(g)(1) are even permissible. In taking the further step of upholding such a challenge, we stand entirely alone.

With this background in mind, it is possible to explain where I agree—and disagree—with my colleagues. [70]

## II. *Marzzarella* Step-One and Exclusions from the Second Amendment Right

Our decision in *Marzzarella* establishes a two-step test for assessing challenges to the constitutionality of statutes under the Second Amendment:

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not,

our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid. [71]

I agree with Judge Ambro that ⚐ *Marzzarella* provides the correct framework for assessing challenges to the constitutionality of ⚑ § 922(g)(1). I also agree with him that, at ⚐ *Marzzarella* step-one, persons who commit serious crimes are disqualified from asserting their Second Amendment rights. [72]

Unfortunately, Judge Ambro and I disagree over how to decide whether any *particular* crime is serious enough to cause a loss of firearm rights. Judge Ambro **\*388** believes that the category of "serious crime" is amorphous. While some crimes may be serious by definition, including those in which the actual or attempted use of violence is an element of the offense, [73] other crimes may be serious—or not— depending on the circumstances. In Judge Ambro's view, the seriousness inquiry therefore requires district courts to engage in person-specific assessments based on the facts of any particular case. By contrast, I would hold that ⚐ *Heller* itself tells us that felons are disqualified from exercising their Second Amendment rights. Because there is no principled basis, at least in this context, for distinguishing felons from misdemeanants who commit crimes punishable by more than two years in prison, all crimes currently within ⚑ § 922(g) (1)'s scope are serious by definition. I would therefore hold that the plaintiffs' challenges fail at ⚐ *Marzzarella* step-one, full stop.

## A. Congress May Permissibly Disarm Felons at *Marzzarella* Step-One

In applying step-one of the ⚐ *Marzzarella* analysis, we ask whether ⚑ § 922(g)(1) burdens any Second Amendment right. At least as to the prohibition on felons possessing firearms, ⚐ *Heller* and ⚐ *Marzzarella* answer that question directly.

The ⚐ *Heller* Court was careful to tell us that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." [74] It also referred to the felon-in-possession ban as one of several "presumptively lawful regulatory measures." [75] In ⚐ *Marzzarella*, we concluded that the "better reading" of ⚐ *Heller* was that these measures were complete "*exceptions* to the right to bear arms." [76] On this view, felons do not simply have narrower Second Amendment rights than their law-abiding counterparts; they "are disqualified from exercising their Second Amendment rights" altogether. [77] While felons certainly have an interest in using firearms "for defense of hearth and home," ⚐ *Marzzarella* stated that "a felony conviction disqualifies an individual from asserting that interest." [78]

At the time ⚐ *Marzzarella* came down, this reading of ⚐ *Heller* was in accord with the views of several of our sister courts. [79] Other circuits have since adopted the same position, [80] and we ourselves have recommitted to it. [81]

**\*389** Apart from the text of ⚐ *Heller* itself, history and tradition also support ⚐ *Marzzarella*'s conclusion that the felon-in-possession ban is a permissible exclusion from the Second Amendment right. Without "engaging in a round of full-blown historical analysis," [82] it suffices for now to say that numerous courts have reviewed the historical record and concluded that Founding-era sources support the constitutionality of ⚑ § 922(g)(1) even as applied to non-violent felons. [83]

With respect to the Founding generation, the Eighth Circuit points us to Blackstone, who "explained that English subjects enjoyed a right to have arms for their defense, 'suitable to their condition and degree' and 'under due restrictions.' " [84] As to the Founders themselves, several judges— including Judge Hardiman—have recounted how "[s]hortly after the Pennsylvania ratifying convention for the original Constitution ... the Anti–Federalist minority recommended the following amendment: 'That the people have a right to bear arms for the defense of themselves and their own state, or the United States ... and no law shall be passed for disarming the people or any of them, unless for crimes committed, or

real danger of public injury from individuals.' "[85] *Heller* identified this proposal as a "precursor" that was "highly influential" to the ratification of the Second Amendment. [86]

The Seventh Circuit has also done helpful work mining the historical sources. Sitting *en banc*, the court highlighted the fact that, during the Founding era, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime."[87] In *United States v. Yancey*,[88] the court stated that "[w]hatever the pedigree of the rule against even nonviolent felons possessing weapons ... most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.' "[89] *Yancey* also noted that, "while felon-in-possession laws could be criticized as 'wildly overinclusive' for encompassing nonviolent offenders, every state court in the modern era to consider the propriety of disarming felons under **\*390** analogous state constitutional provisions has concluded that step to be permissible."[90]

The federal statutory ban on convicts possessing firearms itself has a lengthy pedigree. In 1932, Congress passed a law imposing restrictions on the possession of machine guns, sawed-off shotguns, and certain other weapons in the District of Columbia.[91] That law also made it illegal for any "person who has been convicted in the District of Columbia or elsewhere of a crime of violence [to] own or have in his possession a pistol, within the District of Columbia."[92] In 1938, Congress passed a broader statute—the Federal Firearms Act—that made it unlawful for those who had been convicted of a "crime of violence" to "receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."[93] Congress removed the "crime of violence" limitation in 1961[94] and "changed the 'receipt' element of the 1938 law to 'possession' [in 1968], giving § 922(g)(1) its current form."[95] The stated purpose of the 1968 revision was "to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.' "[96]

The development of § 922(g) also evinces Congress's desire to keep guns away from persons other than those whose past unlawful conduct indicates a likelihood

of future dangerousness. The current iteration of § 922(g) prohibits nine groups of persons from possessing guns, including fugitives, drug addicts, persons previously committed to mental institutions, persons under a court order for threatening a partner or child, and persons with misdemeanor convictions for crimes of domestic violence.

The other prohibitions of § 922(g), however, rest on a slightly different rationale. In 1968, Congress expanded what is now § 922(g) to cover undocumented or non-immigrant aliens, persons dishonorably discharged from the military, and persons who have renounced their U.S. citizenship. These additions, which were "enacted in response to the wave of political and civil rights assassinations during the 1960s,"[97] reflected Congress's judgment that persons within these categories "may not be trusted to possess a firearm without becoming a threat to society."[98] Rather than disarm persons based on a rigid link **\*391** between past violent acts and future dangerousness, these restrictions—consistent with the tradition at the Founding of tying gun rights to civic virtue—disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of citizenship.[99]

To be fair, one might quibble with this kind of historical explanation for § 922(g)(1)'s scope. With regard to the statute itself, one might ask if 50 years is a long enough period of time to entrench a constitutional tradition—although several courts have said as much when assessing Second Amendment challenges.[100] And with respect to Founding-era sources, some judges have expressed the view that the historical record is too infirm a platform on which to rest hard-and-fast decisions about the scope of the Second Amendment right.[101] Our Court's multiple opinions in this case illustrate just how contested Founding-era historiography can be.

Even so, my review of the relevant history leads me to conclude that § 922(g)(1)'s categorical ban on felons possessing firearms is rooted deeply enough in our tradition to operate as a *bona fide* disqualification from the Second Amendment right.

**B. Misdemeanors Within § 922(g)(1)'s Scope Are Functionally Felonies**

Having established that felons are categorically disqualified from asserting their Second Amendment rights, the next question is whether misdemeanants, like the plaintiffs, are situated differently. The plaintiffs insist that they are. In their view, "[w]hen *Heller* spoke of 'felons,' it spoke of a traditional common-law classification known to the Framers, not a late-twentieth century statute including some vast (if disputed) number of misdemeanor offenses." [102] Judge Ambro is sympathetic to that notion. [103] I am not.

As an initial matter, nothing in *Heller* suggests that the felony-misdemeanor distinction is a meaningful one. It is true, of course, that *Heller*'s list of "presumptively lawful regulatory measures" includes "longstanding prohibitions on the possession of firearms by felons." [104] One could **\*392** perhaps read those words and conclude that the Supreme Court was purposefully placing felons—and only felons—in the category of persons who may be permissibly disqualified from the exercise of their Second Amendment rights. Still, one could just as easily conclude that the Court was using shorthand to refer to § 922(g)(1) as a whole. After all, the Court was careful elsewhere in *Heller* to say that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." [105] Neither felons nor misdemeanants are the kinds of "law-abiding" citizens whose rights *Heller* vindicated. [106]

More fundamentally, the notion that there is a sharp distinction between felonies and misdemeanors, at least within the universe of crimes covered by § 922(g)(1), is not correct. Our own Court has long recognized that, in the modern world, a "felony" is any crime punishable by at least one year and one day in prison. [107] And the Supreme Court has explained that, in contemporary law, "the distinction [between felonies and misdemeanors] is minor and often arbitrary." [108] The kinds of misdemeanors within the scope of § 922(g)(1)—those punishable by more than two years in prison—are effectively felonies in all but name. [109]

Indeed, we have previously held that Congress has the power to define a "felony" for purposes of federal law in ways that depart even from the year-and-a-day rule. In *United States v. Graham*, [110] we considered how to apply Congress's definition of an "aggravated felony" to a provision of the Sentencing Guidelines that "increase[d] the penalty for the crime of reentering the country after deportation." [111] The issue in the case was two-fold. First, the federal statute defined the term "aggravated felony" as an offense punishable by at least one year in prison—not, as **\*393** is more typical, an offense punishable by *more than* one year in prison. [112] Second, the prior state offense that triggered the defendant's federal sentencing enhancement was technically a misdemeanor under New York law. [113]

*Graham* recognized that "[t]he line between felonies and misdemeanors is an ancient one," but it also noted that, "[w]ith the rise of the penitentiary and the disappearance of the death penalty for most felonies ... the felony-misdemeanor distinction solidified at the one-year line." [114] Even so, we concluded that Congress could ignore the year- and-a-day rule in its own statutory law. As a result, the label New York had affixed to Graham's offense was immaterial; what mattered was the fact that his misdemeanor fell within the technical federal definition of an "aggravated felony." [115]

Contrary to the statutory scheme we confronted in *Graham*, § 922(g)(1) *respects* the more modern, year-and-a-day distinction between felonies and misdemeanors. Indeed, it does more than respect it: it actually excludes from its scope misdemeanors that are punishable by two years of imprisonment or less. In this way, § 922(g)(1) incorporates certain state-law judgments about what crimes count as "serious" misdemeanors. In other contexts, the Supreme Court has affirmed the value of easily administrable statutory schemes by stating that Congress can adopt clear, uniform rules about what counts as a "felony" for purposes of federal law, even where state-level definitions are more nuanced. [116]

The bottom line is this: once a misdemeanor is punishable by more than two years in prison, treating it as though it were intrinsically different than a felony is unjustifiably formalistic. By choosing to punish such misdemeanors more severely than a traditional felony, a state has *already* indicated that such crimes are serious. In my view, Congress is entitled to rely on that judgment.

Accordingly, my resolution of this case would be simple. *Heller* tells us that "nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on

the possession of firearms by felons." [117] Our Court has since interpreted *Heller* to say that the ban on felons possessing firearms is a complete carve-out from the Second Amendment right. Since, for present purposes, there is no functional difference between felons and persons who commit misdemeanors punishable by more **\*394** than two years in prison, all persons with the scope of § 922(g)(1)—including the plaintiffs here—are *disqualified* from asserting their interest in using firearms "for defense of hearth and home." [118] At *Marzzarella* step-one, no further analysis is necessary.

## C. A Note on *Heller*'s Use of the Word "Presumptively"

A majority of my colleagues disagree with the proposition that the felon-in-possession ban is a constitutional carve-out from the Second Amendment right. In affirming the plaintiffs' challenges, they make it clear that district courts in our Circuit must now conduct person-by-person, individualized inquiries in order to determine whether the application of § 922(g)(1) is constitutional in any particular case.

In reaching that conclusion, my colleagues treat *Heller*'s use of the word "presumptively" as though it *requires* courts to consider as-applied challenges to the felon-in-possession ban. Judge Hardiman, for example, cites the Seventh Circuit's decision in *United States v. Williams*, which read *Heller*'s reference "to felon disarmament bans only as 'presumptively lawful' " to imply "the possibility that the ban could be unconstitutional in the face of an as-applied challenge." [119] Likewise, Judge Ambro insists that "[u]nless flagged as irrebutable, presumptions are rebuttable." [120] The shared assumption here is that, when the Supreme Court used the word "presumptively" in *Heller*, it meant to convey something like the definition of "presumption" that one might find in a legal dictionary—*i.e.*, "a rule of law, statutory or judicial, by which [a] finding of a basic fact gives rise to existence of presumed fact, until [the] presumption is rebutted." [121]

This reading of "presumptively" in *Heller* puts more weight on that word than it can fairly bear. It is important to keep in mind the context within which the word appears. The key text of *Heller* says:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [122]

Footnote 26 of *Heller*, which accompanies this passage, states: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." [123]

Judge Ambro and Judge Hardiman read the word "presumptively" as though the Supreme Court was communicating, through its use of a single adverb in a footnote, a *mandate* that the Second Amendment now *requires* courts to hear as-applied challenges to certain laws that limit gun rights. That interpretation strikes me as exactly backwards. The Supreme Court was not putting us on notice that "longstanding prohibitions" universally considered constitutional pre-*Heller* were, post-*Heller*, constitutionally suspect. The Court was instead trying to provide assurances that, whatever else *Heller* might portend, it did not provide a basis **\*395** for future litigants to upend any and all existing restrictions on the right to bear arms. In other words, *Heller*'s language about "longstanding prohibitions" was meant to *cabin* its holding, not to expand it.

It is also important to underscore that not all of the "longstanding prohibitions" on *Heller*'s list are the same. The ban on "the possession of firearms by felons" [124] is a black-and-white proscription that has deep roots in our shared constitutional tradition. There is also nothing unclear about when it applies. *Marzzarella* recognized as much, reasoning that *Heller* "suggests [that] felons ... are disqualified from exercising their Second Amendment

rights" because the "validity" of the felon-in-possession ban does not "turn on the presence or absence of certain circumstances."[125]

The latter two kinds of "longstanding prohibitions" are different. These categories—"laws forbidding the carrying of firearms in sensitive places" and "laws imposing conditions and qualifications on the commercial sale of arms"[126]—have much more ambiguous boundaries. One might well ask: other than a school and a government building, what kind of location counts as a "sensitive place"? What kinds of conditions on the sale of arms are truly "longstanding"? In a case involving such a regulation, a court will need to engage in a more probing inquiry to determine whether the challenged law is constitutionally valid.[127]

And here we come back to the word "presumptively." In a case involving "laws forbidding the carrying of firearms in sensitive places" or "laws imposing conditions and qualifications on the commercial sale of arms,"[128] the word "presumptively" is important. It signals to lower court judges that they must think carefully about whether the challenged regulation is truly analogous to "longstanding prohibitions" upon which *Heller* does not "cast doubt." In the parlance of our Court's jurisprudence, not all such regulations will be "presumptively lawful" enough to satisfy the inquiry at *Marzzarella* step-one.

**\*396** But with respect to the felon-in-possession ban, there is no work for the word "presumptively" to do. Section 922(g)(1) codifies the restriction on criminals possessing firearms in a manner that reflects longstanding history and tradition—and the Supreme Court has explicitly told us that *Heller* does not "cast doubt" on such a law.[129] This is not to say that Congress could never press its luck. If Congress were to *expand* § 922(g)(1) beyond its traditional scope by, for example, banning the possession of firearms by persons convicted of crimes punishable by *six months'* imprisonment, it might well run afoul of the Second Amendment's protections. But such a law would be outside of *Heller*'s safe harbor for "longstanding prohibitions," requiring courts—again, in the parlance of our Circuit—to proceed to *Marzzarella* step-two and assess such a law under some form of heightened constitutional scrutiny.[130]

Consequently, I disagree with Judge Ambro's view that courts must "determin[e] whether crimes are serious enough to destroy Second Amendment rights" on a case-by-case basis.[131] To my mind, the validity of the felon-in-possession ban is not so precarious. Congress has made a reasoned judgment that crimes currently covered by § 922(g)(1)—felonies and misdemeanors punishable by more than two years' imprisonment—*are* serious enough to support disarmament. That categorical rule is consonant with history and tradition, and *Heller* does not "cast doubt" on it at all.[132]

### III. *Marzzarella* Step-Two and the Proper Application of Constitutional Scrutiny

Even if, out of an abundance of caution, we were to move on to step two of the *Marzzarella* analysis and apply heightened scrutiny—a step I do not believe is necessary—Congress's interests in preventing gun violence are sufficiently important, and the felon-in-possession statute sufficiently tailored, that § 922(g)(1) would survive the plaintiffs' challenges.

My colleagues disagree. Judge Hardiman believes that § 922(g)(1) is so destructive of Second Amendment rights that, at least as applied to non-violent criminals, it is *per se* unconstitutional. Judge Ambro, meanwhile, insists that we must apply constitutional scrutiny at the level of people *like the plaintiffs*, and that if the government cannot show that "disarming people *like them*" will promote the responsible use of firearms," or that people "*like them* remain potentially irresponsible after many years of apparently responsible behavior,"[133] then application of § 922(g)(1) is unconstitutional. By contrast, I believe that conducting a tailoring analysis at Judge Ambro's level of specificity is problematic. Even in the First Amendment context, there are some laws whose structure and purpose are *incompatible* with person-specific constitutional challenges. For the reasons that follow, § 922(g)(1) is such a law.

### \*397  A. Intermediate Scrutiny Is the Appropriate Standard for These Cases

In 🚩 *Marzzarella*, we opted to apply intermediate rather than strict scrutiny to test the constitutionality of a federal statute. Looking to First Amendment jurisprudence for guidance, we asked whether (i) the challenged law involved a government interest that was either "significant," "substantial," or "important," and (ii) whether "the fit between the challenged regulation and the asserted objective [was] reasonable, not perfect." [134] The law challenged in 🚩 *Marzzarella*, 🚩 18 U.S.C. § 922(k), makes it unlawful to possess a firearm with an obliterated serial number. We concluded that the law survived intermediate scrutiny because the government had a substantial interest "in enabling the tracing of weapons via their serial numbers," and Marzzarella had failed to offer any "lawful purpose for which a person would prefer an unmarked firearm" to a marked one. [135]

In choosing to apply intermediate scrutiny, 🚩 *Marzzarella* discerned an important distinction in 🚩 *Heller*. While 🚩 *Heller* clearly rejected rational-basis review, [136] it did not select either intermediate or strict scrutiny as the appropriate standard for assessing the constitutionality of the District of Columbia's gun regulations. Instead, 🚩 *Heller* stated that those regulations were unconstitutional "[u]nder any of the standards of scrutiny ... applied to enumerated constitutional rights." [137] 🚩 *Marzzarella* interpreted 🚩 *Heller* as suggesting that firearm regulations fall along a continuum, with laws like the District of Columbia's handgun ban falling "at the far end of the spectrum of infringement." [138]

🚩 *Marzzarella* thus drew a distinction between laws that burden the "core ... right of law-abiding citizens to possess [certain] weapons for self-defense in the home," on the one hand, and laws that "do[ ] not severely limit the possession of firearms," [139] on the other. 🚩 *Marzzarella* concluded that courts should apply strict scrutiny to test the constitutional validity of the former kind of regulations, while they should apply intermediate scrutiny to test the validity of other, less burdensome regulations. [140]

We reaffirmed this framework in 🚩 *Drake v. Filko*, [141] where we considered the constitutionality of New Jersey's regulations governing the issuance of permits to carry guns

in public. 🚩 *Drake* reasoned that "the Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second Amendment restriction at issue." [142] It also **\*398** concluded that courts should apply intermediate scrutiny unless the challenged regulation burdens the "core" Second Amendment right. [143]

Just as intermediate scrutiny was the correct standard to apply in 🚩 *Marzzarella* and 🚩 *Drake*, it is also the correct standard to apply here. The felon-in-possession ban, to the extent it burdens Second Amendment rights at all, does not impinge on the rights of "law-abiding, responsible citizens." [144] Rather, it constrains the rights of persons who, by virtue of their prior criminal conduct, fall outside the core of the Second Amendment's protections.

Several of our sister circuits have assessed challenges to other provisions of 🚩 § 922(g) using this same approach. In 🚩 *United States v. Carter*, [145] for example, the Fourth Circuit considered a challenge to 🚩 18 U.S.C. § 922(g) (3), which prohibits firearm possession by "any person ... who is an unlawful user of or addicted to any controlled substance." Citing 🚩 *Marzzarella* with approval, *Carter* applied intermediate scrutiny to assess the validity of the statute. [146] It reasoned that a person within the scope of 🚩 § 922(g)(3)—that is, a user of controlled substances—could not fairly claim to be asserting the "core" Second Amendment right of "law-abiding, responsible citizens." [147] For the same reason, the Fourth Circuit has applied intermediate scrutiny to assess the validity of those provisions of 🚩 § 922(g) that limit the possession of firearms by persons subject to protective orders and by persons who have committed misdemeanor crimes of domestic violence. [148] The decisions of several other circuits are in accord. [149]

Thus, even assuming that Binderup and Suarez fall within the Second Amendment's protections, I would join our sister circuits in holding that their prior criminal convictions place them outside the core "right of law-abiding, responsible citizens to use arms in defense of hearth and home." [150] For this reason, intermediate scrutiny is the correct standard under which to assess their challenges.

**B. Judge Hardiman's Rejection of Heightened Scrutiny**

Before proceeding any further, I think it is important to pause in order to address a profound doctrinal disagreement between myself and Judge Hardiman. Like Judge Ambro and me, Judge Hardiman believes **\*399** that we determine the proper scope of the Second Amendment by looking to history and tradition. Reviewing the relevant historical sources, Judge Hardiman concludes that, as a matter of past practice, the only persons subject to disarmament were those who were dangerous. Judge Ambro and I obviously disagree with that assessment, but I am happy to acknowledge that reasonable minds could differ on this score. At that point, however, Judge Hardiman makes what I believe to be a serious doctrinal error.

Having concluded that Congress may permissibly disarm persons likely to commit violent acts, Judge Hardiman then defends the proposition that all other applications of § 922(g)(1) are *per se* unconstitutional. No recourse to heightened scrutiny or means-ends balancing is necessary. After all, *Heller* struck down a local ordinance that completely prevented citizens from possessing firearms in their homes for self-defense. Section 922(g)(1) has the same effect with respect to felons and certain misdemeanants. So, Judge Hardiman concludes, § 922(g)(1) must be unconstitutional in *every* application to non-violent criminals because it "eviscerates" their Second Amendment rights.[151] I agree with Judge Ambro that such an approach is inconsistent with the development of Second Amendment doctrine in this and other circuits.[152]

In addition, the rejection of heightened scrutiny in this context seems out-of-step with *Heller* itself. As discussed earlier, *Heller* says that the "core" Second Amendment right is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home."[153] Non-violent criminals are, by definition, not "law-abiding." Insofar as Judge Hardiman's opinion holds that non-violent criminals have an absolute, inviolable right to keep guns in their homes for self-defense, *Heller* seems to disagree.

The advantage of heightened scrutiny is that it allows us to think about how Congress (and, by corollary, we as a polity) can tackle real-world challenges within constitutional boundaries. Such an inquiry necessarily requires us to think about the connection between means and ends, and therefore to debate the seriousness of the problems we face—including gun violence—and the permissible means of addressing them. While history is of course important, and in many cases will be dispositive, the tiers of scrutiny provide us with a useful analytical framework for assessing the constitutionality of laws that burden Second Amendment rights—even those, like § 922(g)(1), that disarm certain persons altogether.

**C. The Felon-in-Possession Ban Survives Intermediate Scrutiny**

Applying intermediate scrutiny, we ask whether the challenged law involves a government interest that is "significant," "substantial," or "important," and then assess whether "the fit between the challenged regulation and the asserted objective [was] reasonable, not perfect."[154] Section 922(g)(1) easily clears those hurdles.

Courts have identified Congress's objective in passing § 922(g) as "keep[ing] guns out of the hands of presumptively risky people" and "suppressing armed violence."[155] As Congress explained when passing the 1968 modifications to the statute, "[T]he ease with which any person can acquire firearms other than a rifle or shotgun **\*400** (including criminals ...) is a significant factor in the prevalence of lawlessness and violent crime in the United States."[156]

Our Court has also said that governments "undoubtedly [have] a significant, substantial and important interest in protecting [their] citizens' safety."[157] As the Second Circuit stated shortly after the horrific shootings in Newtown, Connecticut, "[t]he regulation of firearms is a paramount issue of public safety, and recent events in this circuit are a sad reminder that firearms are dangerous in the wrong hands."[158]

Having established that the government's objective is a substantial one, we next ask if the challenged law is a "reasonable fit" to carry out the government's purposes. In making that assessment, the "State bears the burden of justifying its restrictions [and] it must affirmatively establish the reasonable fit we require."[159] Seeking to satisfy this burden, the government points to numerous studies that explore the link between past criminal conduct and future crime, including gun violence.[160] The plaintiffs challenge

the relevance of the government's cited studies, asserting that while they may show a connection between past criminal conduct and gun violence, they do not show such a link with respect to criminals who share their characteristics and who committed offenses similar to theirs. [161] Judges Ambro and Hardiman share this criticism.

Several courts have—correctly, in my view—refused to parse the government's evidence as finely as the plaintiffs ask us to. [162] The question is not whether someone *exactly like the plaintiffs* poses a threat to public safety. The question is whether "the fit between the challenged regulation and the asserted objective [is] reasonable, not perfect." [163] The plaintiffs seem to want something more.

**\*401** Assessing the strength of the government's evidence as assiduously as the plaintiffs demand would also raise separation of powers concerns, at least in the context of intermediate scrutiny. We generally say that "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." [164] Our Court has cautioned that "conflicting empirical evidence ... does not suggest, let alone compel, a conclusion that the 'fit' between [a challenged firearm regulation] and public safety is not 'reasonable.' " [165] Other courts have said that Congress may regulate firearms on the basis of "correlational evidence" that does not necessarily "prove a causal link" between the conduct at issue and a particular provision of § 922(g). [166] In the words of the D.C. Circuit, "the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." [167] Judge Wilkinson of the Fourth Circuit has been even more direct: "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." [168]

Against this backdrop, I conclude that the government's evidence adequately establishes a connection between past criminal conduct and future gun violence. I also conclude that Congress's decision to disarm felons and those who commit misdemeanors punishable by more than two years in prison is reasonably tailored to preventing such violence.

### D. Tailoring § 922(g)(1) Too Narrowly Is Problematic

The foregoing analysis, of course, speaks to the issue of tailoring with respect to the connection between the risk of gun violence and the universe of offenses that trigger § 922(g)(1) (*i.e.*, felonies and misdemeanors punishable by more than two years in prison). The plaintiffs believe that the statute must be tailored more narrowly still—indeed, so narrowly that it takes account of their individual characteristics.

And here we come to the difficult conceptual issue in this case: is this sort of as-applied challenge to § 922(g)(1) even permissible? This issue has divided the Courts of Appeals, caused endless trouble for the government at oral argument, and has at times perplexed me as well. But I ultimately conclude that the answer must be "no." [169]

**\*402** The notion of an as-applied challenge is familiar to us in the context of First Amendment law. In such cases, the government enacts some kind of law limiting speech for either logistical reasons (such as time, place, and manner restrictions) or to promote its own conception of the public good (such as regulations governing campaign financing). In such situations, it is entirely predictable that a certain number of citizens will raise the argument that the law makes little sense as applied to them. These arguments typically sound in overbreadth. The normal claim is that a person's inclusion within the scope of the law has no meaningful connection to the government's purported objective, leading to an impermissible infringement on that person's free speech rights.

But Second Amendment limitations like the felon-in-possession ban and the ban on mentally-ill persons possessing guns are different—and the *reason* they're different is because, in this context, the government's objective is neither logistical nor abstract. It is, quite simply, to prevent armed mayhem and death. [170] As a result, when we conduct a tailoring analysis in such a case, we must assess whether the challenged law is reasonably tailored to prevent future violence.

And *this* is why as-applied challenges to § 922(g)(1) are so problematic. Binderup and Suarez are, in effect, saying, "Trust us: we are not the kind of people who will cause future gun violence." The problem is that it is practically impossible to make this kind of individualized prediction with any degree of confidence. Mistakes—costly ones—are simply too likely.

That is not my judgment, but rather the judgment of Congress itself. A separate provision of the federal gun laws, 18 U.S.C. § 925(c), states that "[a] person who is prohibited from possessing, shipping, transporting, or receiving firearms or ammunition may make application to the Attorney General for relief from the disabilities imposed by Federal laws." The Attorney General may "grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." [171] If an application is denied, the applicant may petition a district court for relief. As it turns out, this "relief provision has been rendered inoperative" by virtue of the fact that "Congress has repeatedly barred the Attorney General from using appropriated funds 'to investigate or act upon [relief] applications.' " [172]

**\*403** Congress defunded this provision in 1992. In a Department of Justice appropriations statute, it provided that "none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c)." [173] That embargo on funds has remained in place ever since. And why did Congress effectively write § 925(c) out of the statute books? Because it concluded that the task of granting individual applications for relief from § 922(g)(1) was *too prone to error*. A 1992 Senate report stated that the Justice Department's review of applications was "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made," [174] and noted that the Bureau of Alcohol, Tobacco, and Firearms ("ATF") spent "approximately 40 man-years ... annually to investigate and act upon these investigations and applications." [175] Similarly, a later House report stated that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms," and concluded that "[t]here is no reason to spend the Government['s] time or taxpayer's money to restore a convicted felon's right to own a firearm." [176]

In other words, Congress reviewed the evidence from its prior regime of what were, in effect, as-applied challenges to § 922(g)(1) and concluded that such a system was unworkable. This should have a profound impact on our tailoring

analysis. Under intermediate scrutiny, we ask whether there is a "reasonable" fit between the challenged regulation and the government's objective. [177] Here, Congress tried the plaintiffs' way of doing things and concluded that it was too error-prone to support the government's objective of preventing armed violence. [178] There were too many mistakes—and, unlike in the First Amendment context, those mistakes were potentially fatal.

Notwithstanding Congress's experience with § 925(c), the plaintiffs seem to believe that by shoehorning their complaints about § 922(g)(1)'s scope into the rubric of "as-applied challenges," they necessarily force us to assess their individual characteristics rather than rely on Congress's categorical rule. I disagree. Even in the First Amendment context, where courts routinely assess as-applied challenges to speech-limiting laws, there are circumstances where such challenges must fail in the face of reasonable deference to legislative judgments.

The Supreme Court's decision in *United Public Workers of America (C.I.O.) v. Mitchell* [179] is a perfect example. The Supreme Court there confronted an as-applied challenge to the Hatch Act, which **\*404** bans government employees from engaging in certain kinds of partisan political activity, including some forms of political speech. Congress's goal in passing the Act was "to promote efficiency and integrity in the discharge of official duties." [180] The challenger, a "skilled mechanic" at the United States Mint, argued that he was simply not the type of government employee whose conduct was likely to raise integrity concerns. [181] Structurally, this argument is identical to the one the plaintiffs make here—*i.e.*, that they are too far removed from the core group of people who pose the risk of harm that Congress sought to address by passing § 922(g)(1) for that law to be constitutional as applied to them.

The Supreme Court rejected that argument. In its view, the Hatch Act survived constitutional scrutiny because the conduct it outlawed was "reasonably deemed by Congress to interfere with the efficiency of the public service." [182] The Court recognized that, given his role at the Mint, the challenger was situated somewhat differently than white-collar employees who might be more inclined to take on management roles in political campaigns. Even so, the

Court did not think these distinctions were constitutionally dispositive. [183] As the Court observed:

> Whatever differences there may be between administrative employees of the Government and industrial workers in its employ are differences in detail so far as the constitutional power under review is concerned. Whether there are such differences and what weight to attach to them, are all matters of detail for Congress....

> * * *

> When actions of civil servants in the judgment of Congress menace the integrity and the competency of the service, legislation to forestall such danger and adequate to maintain its usefulness is required. The Hatch Act is the answer of Congress to this need. [184]

The logic of *Mitchell* applies with equal force to the present case. Here, too, Congress has passed a law to respond to a public danger. Here, too, individualized predictions are impossible with any degree of accuracy. Here, too, a regime of person-by-person regulation would present grave problems of administrability. But here, unlike in *Mitchell*, the potential harm is not only serious and widespread, but also deadly.

*Mitchell* instructs us that Congress has the power in such circumstances to impose a complete ban on the exercise of a constitutional right by a category of persons who, in its reasonable estimation, pose a threat to the public. While courts must, of course, entertain constitutional challenges to statutes that infringe on constitutional rights, *Mitchell* makes it clear that there are some laws with respect to which as-applied challenges will categorically fail. I believe that § 922(g)(1) is such a law. [185]

Moreover, insofar as the plaintiffs' claims sound in overbreadth, it is worth **\*405** emphasizing that the federal regime for regulating firearm possession by convicts has numerous safety valves that make any complaint about unfairness far less persuasive.

*First*, we should remember that § 922(g)(1) is a statute predicated on principles of federalism. Rather than specifying a list of qualifying offenses, "[i]t looks to state law" and imposes "restrictions on certain convicts based on decisions made by state legislatures and courts." [186] In this

way, the federal statute leaves the judgment about which offenses should trigger disarmament to the discretion of state legislators who are, at least in theory, closer to the lived experience of their constituents. To put it another way, Congress did not decide that the plaintiffs' convictions would have the effect of preventing them from owning firearms; rather, their state legislatures did.

At this point, one might reasonably object that, by refusing to permit as-applied challenges to § 922(g)(1), we give legislatures far too much power to disarm citizens. After all, what prevents a state from passing a law saying that jaywalking is punishable by five years in prison? Or a speeding ticket? Or littering? "Surely," one might think, "Congress cannot disarm people who commit *those* offenses?"

I understand and appreciate these concerns. But institutional considerations lead me to conclude that Congress may permissibly use the existence of a prior criminal conviction as a trigger for collateral consequences under federal law. This necessarily means that states have near total control over what offenses will trigger those federal consequences. If the citizens of a particular state believe that a criminal offense is too minor to trigger disarmament, their remedy is to petition the state legislature to amend the law—not to seek redress in the federal courts. Indeed, there is evidence that state authorities are perfectly capable of assessing the consequences of § 922(g) and acting to counter them if they feel that doing so is appropriate. [187] The alternative, a regime of judges serving as a super-legislature to review the reasonableness of the criminal codes in all 50 states, is inconsistent with the way we have regulated gun ownership for more than half a century.

To put it another way, § 922(g) reflects a congressional policy judgment that states should have a role in determining what kinds of misdemeanor offenses will trigger disarmament. That is a question over which the states will predictably disagree. The Supreme Court itself recognized as much in *Logan v. United States*. [188] The petitioner there asserted that his conviction for violating § 922(g)(1) was unlawful because, properly construed, that statute did not apply to state offenses—like his—that did not trigger any loss of civil rights. [189] The Supreme Court found that **\*406** argument unpersuasive. In the course of its analysis,

it favorably cited 🔖 *McGrath v. United States*, [190] a Second Circuit opinion stating that "anomalies" in the application of the federal firearms laws are "inevitable" when those laws "depend on the differing laws and policies of the several states." [191] *Logan* also recognized that application of the federal firearm laws would be more uniform if "federal rather than state law define[d] a conviction for purposes of [§ 922]." [192] Even so, *Logan* treated the issue of how to balance uniformity and state-by-state variation in this context as a policy question properly reserved to the legislative branch. [193]

*Second*, federal law lifts the felon-in-possession ban whenever a conviction "has been expunged, or set aside," or is one "for which a person has been pardoned or has had civil rights restored." [194] This is a second way in which the statute devolves regulatory power to state authorities. As a consequence, 🚩 § 922(g) "in its normal application does not create a perpetual and unjustified disqualification" from the Second Amendment right. [195] As the Ninth Circuit has explained, any burden imposed by the provisions of 🚩 § 922(g) "is lightened by these exceptions" in ways that can factor into the relevant constitutional calculus. [196]

*Third*, there is the right to petition Congress itself. With respect to 🔖 § 925(c), some members of Congress have announced their support for appropriating the funds necessary for the Justice Department to once again consider applications for relief from the felon-in-possession ban. [197] Whether Congress will do so in light of its prior determination that such a regime is unworkable is an open question.

There is also the possibility of obtaining offense-specific carve-outs from 🚩 § 922(g)(1). For example, another provision of the federal gun laws says that the term "crime punishable by imprisonment for a term exceeding one year" in 🚩 § 922(g)(1) "does not include ... any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." [198] If the **407** plaintiffs believe that the crimes of corrupting a minor and carrying a firearm without a license belong on that list, their efforts may be more fruitfully directed towards the national legislature instead of the courts.

Accordingly, I believe that 🚩 § 922(g)(1) is a reasonable fit to carry out the government's purpose of reducing armed violence. Congress has made a reasoned judgment that persons who commit felonies and misdemeanors punishable by more than two years in prison are likelier to commit future gun violence than law-abiding citizens. That judgment is informed by Congress's experience with 🔖 § 925(c), which it concluded was unworkable and dangerous because, in its view, that law did not provide a way for the government to make accurate judgments about the safety of re-arming particular people.

I would therefore uphold 🚩 § 922(g)(1) under intermediate scrutiny, both as applied to these plaintiffs and as applied to future plaintiffs who might bring similar challenges.

## IV. The Problems with As-Applied Challenges to § 922(g)(1) Are Insurmountable

Finally, it is important to step back and take stock of what the plaintiffs are actually asking us to do, which is to create an entirely new judicial process for resolving as-applied challenges to 🚩 § 922(g)(1). Such an approach is both doctrinally unnecessary and administratively unworkable.

The current rule for determining whether 🚩 § 922(g)(1) applies is about as straightforward as it gets: "the fact of a felony conviction imposes a firearm disability until the conviction is vacated or the felon is relieved of his disability by some affirmative action." [199] The advantage of this scheme is its simplicity. The alternative, "a free floating prohibition," would be "very hard to administer." [200] Indeed, it would create a never-ending stream of "serious problems of administration, consistency and fair warning." [201]

This becomes apparent once we consider how a regime of as-applied challenges would function in the real world. We previously examined this issue in *Pontarelli v. United States Department of the Treasury*. [202] That case arose from Congress's previously discussed decision in 1992 to defund 🔖 § 925(c). In the early 2000s, plaintiffs began filing suits in federal court alleging that, by refusing to process their applications due to lack of funding, the Justice Department had effectively denied those applications. Because 🔖 §

925(c) provides for judicial review of such denials, these litigants asserted that they could ask federal district courts to "review" their applications in the first instance.

*Pontarelli* rejected that argument. Sitting *en banc*, we concluded that Congress's denial of funds to process § 925(c) applications stripped the federal district courts of jurisdiction to review the Justice Department's refusal to act on those applications. We also expressed skepticism that courts were capable of making individualized determinations about whether any particular felon should have his or her firearm rights restored. We stated that "[d]istrict courts' institutional limitations suggest that Congress could not have intended for the appropriations ban to transfer to them the primary responsibility for determining **\*408** whether to restore felons' firearm privileges." [203] Such a task required "interviewing a wide array of people, including the felon, his family, his friends, the persons whom he lists as character references, members of the community where he lives, his current and former employers, his coworkers, and his former parole officers," and, unlike a federal agency, "courts possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety." [204]

The Supreme Court later unanimously vindicated *Pontarelli* in *United States v. Bean*. [205] The Court there explained that "[i]naction by ATF does not amount to a 'denial' within the meaning of § 925(c)," and "an actual decision by ATF on an application is a prerequisite for judicial review." [206] It further noted that "[w]hether an applicant is 'likely to act in a manner dangerous to public safety' presupposes an inquiry into that applicant's background—a function best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation." [207] The Court summarized its view by stating that § 925(c) requires an "inherently policy-based decision best left in the hands of an agency." [208]

*Pontarelli* and *Bean* recognized the many pitfalls inherent in a regime of as-applied challenges. We should embrace the wisdom of those opinions now. [209]

Indeed, the great advantage of § 922(g)(1) is that its application turns on a *prior* adjudication. There is a real risk that by instead peering into the seriousness of a plaintiff's prior conviction, we are inviting what are, in effect, collateral attacks on long-closed proceedings. The Tenth Circuit recognized as much in *United States v. Reese*. [210] That case involved a challenge to 18 U.S.C. § 922(g)(8), which makes it unlawful to possess firearms while subject to a domestic protection order. The defendant argued that his prosecution for violating § 922(g)(8) was improper due to alleged infirmities in the underlying state court proceeding. The Tenth Circuit rejected this argument, stating that "the overwhelming weight of federal case law precludes a defendant in a § 922(g)(8) prosecution from mounting a collateral attack on the merits of the underlying state protective order." [211] As-applied challenges to § 922(g)(1) invite the same kinds of collateral attacks that *Reese* firmly rejected. [212]

**\*409** My colleagues' approaches are also vulnerable on another front. Their suggested criteria for assessing as-applied challenges *might* be feasible if every challenger, like the plaintiffs here, filed a declaratory judgment action. But at this point it is important to reiterate that § 922(g)(1) is a provision of *criminal law*. This raises its own set of constitutional difficulties.

First, our decision today places an extraordinary administrative burden on district courts handling criminal prosecutions under § 922(g)(1). Once as-applied challenges start to work their way through our courts, there will be an increasingly large body of "re-armament orders" that restore individuals' firearm rights. As a consequence, there will be more and more people who believe that they can rely on a particular judicial decision to claim that they, too, are entitled to possess a firearm. District court judges will find themselves in an ever-thickening morass of as-applied precedent, trying to make fine-grained distinctions about whether individual felon-in-possession prosecutions can proceed. Given that my colleagues leave the door open to as-applied challenges even with respect to persons who have committed felonies, we can expect these challenges to begin working their way through our Circuit almost immediately. [213]

Still worse, my colleagues' approaches appear to be on a collision course with the Due Process Clause of the Fifth Amendment, which prohibits the government from "taking

away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardlessly that it invites arbitrary enforcement."[214]  It seems to me that, under a regime of as-applied challenges to 🚩 § 922(g)(1), compliance with principles of due process will quickly prove impossible.

Keep in mind that both Judge Ambro and Judge Hardiman are open to the possibility that a person convicted of a crime might, over time, be able to present evidence of rehabilitation sufficient to mount a successful as-applied challenge to the felon-in-possession ban.[215]  But if time-from-conviction is really one of the relevant criteria, there is no clear reason why a person subject to 🚩 § 922(g)(1) could not bring *seriatim* challenges in the hope that, at some point, his or her conviction would be too far in the past to support the statute's application. Perhaps in future cases we could try to jerry-rig some kind of doctrinal framework to address this situation (*e.g.*, multiple challenges in a single year are disfavored; one challenge every five years is permissible), but we would be doing so on the basis of nothing more than our own judicial intuitions.

 **\*410**  Imagine, for example, that three people are prosecuted for committing a non-violent felony. One was convicted 1 year ago, one 15 years ago, and one 30 years ago. All three are caught by police officers at a shooting range with guns-in-hand, thereby violating 🚩 § 922(g)(1). Are the ensuing indictments constitutional, or are the convictions too far in the past? Under the approach adopted by my colleagues, I simply have no idea. Neither will future defendants, to whom the Fifth Amendment guarantees some clarity as to whether their conduct is, or is not, unlawful.

In response to this evident quagmire, one might propose a series of bright-line rules for determining when application of 🚩 § 922(g)(1) is constitutional. Unfortunately, my colleagues do not offer such rules. Under their more holistic standards, the constitutionality of the felon-in-possession statute in any particular case may depend on the judge's views about the offense and offender. As a result, defendants may not have fair notice of when and against whom the statute will be—or constitutionally can be—enforced.

The federal judiciary's recent experience with the Armed Career Criminal Act makes it plain that our new regime of as-applied challenges may be heading towards a doctrinal

dead-end. The Act increases the penalties on violations of 🚩 § 922(g) whenever a defendant has three or more earlier convictions for a "serious drug offense" or a "violent felony."[216]  The so-called "residual clause" of the Act defined a "violent felony," in part, as a crime that "involves conduct that presents a serious potential risk of physical injury to another."[217]  This clause bedeviled the Supreme Court for nearly a decade as it considered numerous cases raising the question of whether a particular offense presented a "serious potential risk of physical injury to another." Finally, in the recent case of 📙 *Johnson v. United States*,[218] the Supreme Court declared that the residual clause was void for vagueness. In the Court's view, the clause created "grave uncertainty about how to estimate the risk posed by a crime"[219] and generated too much "uncertainty about how much risk it takes for a crime to qualify as a violent felony."[220]

I take 📙 *Johnson* to stand for the proposition that the category of "violent felony" is simply too indefinite to use as a basis for determining who is and is not subject to criminal liability under 🚩 § 922(g)(1). Judge Hardiman, by contrast, would permit plaintiffs to bring as-applied challenges on the ground that their previous crimes were not sufficiently violent to support disarmament. This raises the question of *how violent*, exactly, a crime has to be for application of 🚩 § 922(g)(1) to be constitutional. Citing 📙 *Barton*, Judge Hardiman focuses on offenses "closely related to violent crime,"[221] but goes on to state that " '[c]rimes of violence' were commonly understood [in the early part of the 20th century] to include only those offenses 'ordinarily committed with the aid of firearms.' "[222]  We and future litigants can only guess whether this definition, unbounded as it is by reference to the elements of an offense, extends to drug possession with intent to distribute, human trafficking, extortion,  **\*411**  or RICO violations. We need not wonder, however, whether it provides fair notice and comports with due process: the Supreme Court made clear in 📙 *Johnson* it does not, and thus Judge Hardiman's approach would lead inexorably to courts having to strike down 🚩 § 922(g)(1) as void for vagueness.[223]

Unfortunately, Judge Ambro's approach raises its own set of problems. He would require district court judges to consider a variety of factors in order to assess a crime's "seriousness,"

including, among other things, (i) whether a crime is a misdemeanor or a felony,[224] (ii) the sentence imposed,[225] and (iii) whether there is a "cross-jurisdictional consensus regarding the seriousness" of the crime giving rise to the federal firearm disability.[226] Judge Ambro leaves it to future cases to explain more fully how to weigh and balance these various factors. Unfortunately, once district court judges start disagreeing about how to conduct this inquiry, it will only be a matter of time before void-for-vagueness challenges to § 922(g)(1) start to percolate throughout our courts.[227]

I see nothing in the Second Amendment that compels us to abandon the current system of administrable firearms regulation for such an uncertain future.

## V. Conclusion

It is easy to empathize with the plaintiffs in these cases. Having committed misdemeanors far in the past, they fail to see how they can fairly be denied a right guaranteed to them by the Constitution. Heller says that the "core" Second Amendment right is the "right of law-abiding, responsible citizens to use arms in defense of hearth and home."[228] The plaintiffs say that they are now "law-abiding, responsible citizens"—so why should they be unable to protect themselves and their families with a gun?

As understandable as that intuition may be, our emerging law of the Second Amendment does not permit this kind of as-applied challenge. First, Heller establishes a clear rule: statutes like § 922(g)(1) are "longstanding prohibitions" that are "presumptively lawful."[229] Interpreting that directive, our Court has said that Congress may permissibly disqualify certain people from asserting their Second Amendment rights on a categorical basis.[230] As a matter of tradition and history, persons who commit felonies and misdemeanors punishable by more than two years in prison (which are felonies in all but name) fall into that category. Second, even if we were to consider the plaintiffs' **\*412** challenges under the rubric of intermediate scrutiny, Congress has reasonably concluded that persons who commit crimes are also likelier to commit gun violence. Because § 922(g)(1) is appropriately tailored to address that problem, the plaintiffs' challenges must fail.

The plaintiffs' suggestion that we should get into the business of issuing individualized exceptions to the felon-in-possession ban is, in the final analysis, administratively unworkable and constitutionally suspect. By affirming the plaintiffs' challenges today, I fear my colleagues are sending our nascent law of the Second Amendment into a doctrinal Labyrinth from which it may not soon return.

I therefore respectfully dissent.

## All Citations

836 F.3d 336

## Footnotes

*     Judges Nygaard and Roth sat for the consolidated argument but participated as members of the *en banc* Court only in Nos. 14-4549 and 14-4550 pursuant to 3d Cir. I.O.P. 9.6.4. Judge Sloviter participated in the panel argument and conference in Nos. 15-1975 and 15-1976, but assumed inactive status on April 4, 2016, before rehearing *en banc* and the filing of this opinion. Judge Fuentes assumed senior status on July 18, 2016, after rehearing *en banc* but before the filing of this opinion.

1     Parts III.A–C.3.a preserve the *Marzzarella* framework for deciding Second Amendment challenges and overrule aspects of *Barton* that are inconsistent with it. Seven Judges join those Parts expressly. Chief Judge McKee and Judges Shwartz and Restrepo, who join Judge Fuentes's opinion, agree that *Marzzarella* controls the Second Amendment analysis, but do not join any of Part III because they reject the notion that the *Marzzarella* framework can be reconciled with any aspect of *Barton*'s as-applied Second Amendment analysis, which they would overrule entirely.

2    Professor Volokh's taxonomy of possible gun regulations divides them into
     [ (1) ] "what" restrictions (such as bans on machine guns, so-called "assault weapons," or unpersonalized
     handguns), [ (2) ] "who" restrictions (such as bans on possession by felons, misdemeanants, noncitizens,
     or [juveniles] ), [ (3) ] "where" restrictions (such as bans on carrying in public, in places that serve alcohol,
     or in parks, or bans on possessing [guns] in public housing projects), [ (4) ] "how" restrictions (such as
     storage regulations), [ (5) ] "when" restrictions (such as waiting periods), [ (6) ] "who knows" regulations
     (such as licensing or registration requirements), and [ (7) ] taxes and other expenses.
     Volokh, 56 UCLA L. Rev. at 1443.

3    Though *Barton* clarifies the types of showings that a challenger must make at step one of the
     *Marzzarella* framework, it defines too narrowly the traditional justification for why a criminal conviction may
     destroy the right to arms (*i.e.*, it limits felon disarmament to only those criminals likely to commit a violent
     crime in the future) and, by extension, defines too broadly the class of offenders who may bring successful
     as-applied Second Amendment challenges to § 922(g)(1) (*i.e.*, it allows people convicted of serious crimes
     to regain their right to arms). *See infra* Parts III.C.1–3.a.

4    Though we look only to a crime's elements rather than to the way it actually was committed, we note as
     an aside that the District Court in *Binderup* explained that "[t]here is simply nothing in the record here
     which would support a reasonable inference that [Binderup] used any violence, force, or threat of force to
     initiate or maintain the sexual relationship with his seventeen-year-old employee" or "that he even engaged
     in any violent or threatening conduct." 2014 WL 4764424, at *22. Similarly, the District Court in *Suarez*
     described Suarez's misdemeanor as "minor and non-violent." ——— F.Supp.3d at ———, 2015 WL 685889,
     at *9.

5    Judge Fuentes and those colleagues who join his opinion dissenting from the judgments caution that this
     approach is not "workable" and "places an extraordinary administrative burden on district courts," Fuentes Op.
     Typescript at 2, 71, but the criteria we use to assess the seriousness of a misdemeanor subject to § 922(g)
     (1)—the elements of the offense, the actual sentence, and the state of the law—are easily administrable.
     These objective indications of seriousness are well within the ambit of judgment exercised daily by judges.
     Courts are also well suited to the task of identifying serious crimes in the Second Amendment context, as
     in other constitutional contexts the Judicial Branch is charged with discerning "objective criteria reflecting
     the seriousness with which society regards [an] offense." *Baldwin*, 399 U.S. at 68, 90 S.Ct. 1886; *see,
     e.g.*, *Blanton v. City of North Las Vegas*, 489 U.S. 538, 543–44, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989)
     (Sixth Amendment); *Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1985)
     (Fourth Amendment); *Smith v. United States*, 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959) (Fifth
     Amendment).

6    Our decision is limited to the cases before us, which involve state-law misdemeanants bringing as-applied
     Second Amendment challenges to § 922(g)(1). This is important because when a legislature chooses to
     call a crime a misdemeanor, we have an indication of non-seriousness that is lacking when it opts instead to
     use the felony label. We are not confronted with whether an as-applied Second Amendment challenge can
     succeed where the purportedly disqualifying offense is considered a felony by the authority that created the
     crime. On the one hand, it is possible to read *Heller* to leave open the possibility, however remote, of a
     successful as-applied challenge by someone convicted of an offense. At the same time, even if that
     were so, the individual's burden would be extraordinarily high—and perhaps even insurmountable. In any
     event, given that neither Challenger fits that description, we need not decide the question.

7    As discussed, evidence of how individuals have lived their lives since committing crimes is irrelevant
     under *Marzzarella*'s first step, as there is no historical support for rehabilitation being a consideration in

determining whether someone has Second Amendment rights. However, at step two of the analysis the question is no longer whether the Challengers fall within the Second Amendment's protections. They do. Our task now is to decide whether the Government can disarm them despite these protections. Whereas our obligation at step one is to draw constitutional lines—separating those who have Second Amendment rights from those who do not—at step two we must ask whether the Government has made a strong enough case for disarming a person found after step one to be eligible to assert an as-applied challenge. This turns in part on the likelihood that the Challengers will commit crimes in the future. Thus, under the right circumstances the passage of time since a conviction can be a relevant consideration in assessing recidivism risks.

8    Judge Fuentes and those colleagues who join his opinion dissenting from the judgments suggest that our heightened scrutiny analysis boils down to the Challengers asking us to trust that they will not misuse firearms because we cannot make predictive judgments about the need to disarm the Challengers "with any degree of confidence." Fuentes Op. Typescript at 55. We disagree. Under either form of heightened scrutiny it is the Government's burden to prove that the restriction is appropriately tailored. The problem in our cases is that because the Government's evidence sweeps so broadly, it does not establish that the restriction serves an important interest even as applied to people *like* the Challengers, let alone to the Challengers themselves.

1    Given the Court's universal agreement that 🚩 § 922(g)(1) is *unambiguous* as to whom it covers and what it criminalizes, we have trouble comprehending the Dissent's fears that our approach for assessing the statute's as-applied constitutionality under the Second Amendment (set forth *infra*) puts it at risk of being declared unconstitutionally vague under the Due Process Clause. *See* Dissent at 71–74. Our view is simply that certain applications of this pellucid statute might be unconstitutional.

2    Although a majority of the Court joins two portions of Judge Ambro's opinion and a plurality joins others, the outcome-determinative sections are supported by only three judges. To minimize confusion, we will refer to the opinion as "Judge Ambro's opinion" and will indicate whether the relevant portion thereof was backed by a majority or not where necessary.

3    At least one of our sister courts has characterized 🏷️ *Heller*'s list of "presumptively lawful" regulations as dicta. *See* 🏷️ *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010). But "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings." *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (treating 🏷️ *Heller*'s "presumptively lawful" language as binding); *see also* 🏷️ *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) ("[T]o the extent that this portion of 🏷️ *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta."). 🏷️ Moreover, the Court doubled down on this language in *McDonald*. *See* 561 U.S. at 786, 130 S.Ct. 3020. Hence, we have concluded that 🏷️ *Heller*'s list constitutes a limitation on the scope of its holding and does not qualify as dicta. *See* 🏷️ *Barton*, 633 F.3d at 171; 🏷️ *United States v. Huet*, 665 F.3d 588, 600 (3d Cir. 2012).

4    Intermediate scrutiny "require[s] the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or 'important,' " and requires "the fit between the regulation and the asserted objective be reasonable, not perfect." 🏷️ *Marzzarella*, 614 F.3d at 98 (citations omitted).

5    "Strict scrutiny asks whether the law is narrowly tailored to serve a compelling government interest." 🏷️ *Marzzarella*, 614 F.3d at 96 n.14

6    At times, the Government seems to reject even the possibility of an as-applied Second Amendment challenge to a presumptively lawful regulation. *See, e.g.*, Gov't Suarez Br. 15 ("In recognizing 🚩 section 922(g)(1) as a 'presumptively lawful regulatory measure[ ],' the Supreme Court did not suggest that the statute nonetheless could be subject to a successful as-applied constitutional challenge." (internal citation omitted)); Gov't Binderup Br. 14 (same, verbatim). The Government retreated from that proposition somewhat at oral argument, reframing its position as an objection merely to as-applied challenges that rely on individualized

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

review of whether a law is unconstitutional in light of the challenger's particular circumstances. But some degree of individualized assessment is part and parcel of all as-applied challenges. *See, e.g., United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (explaining that an as-applied challenge "does not contend that a law is unconstitutional as written but that its application to a *particular person* under *particular circumstances* deprived that person of a constitutional right" (emphases added)).

And our determination in *Barton* that *§ 922(g)(1)* is subject to as-applied challenges is by no means an outlier. Several of our sister courts have either accepted or allowed the possibility of as-applied Second Amendment challenges to presumptively lawful regulations. *See, e.g., United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge."); *United States v. Carpio–Leon*, 701 F.3d 974, 981 (4th Cir. 2012) ("The *Heller* Court's holding that defines the core right to bear arms by law-abiding, responsible citizens does not preclude some future determination that persons who commit some offenses might nonetheless remain in the protected class of 'law-abiding, responsible' persons."); *Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013) (indicating willingness to consider an as-applied Second Amendment challenge to *§ 922(g)(1)* but concluding it had not been raised properly).

Although the Dissent rests its conclusion on its determination that all persons covered by *§ 922(g)(1)* fall outside the scope of the Second Amendment, it too expresses doubt as to the availability of as-applied constitutional challenges to this "presumptively lawful" statute. *See* Dissent at 388 (stating that *Marzzarella* "concluded that the 'better reading' of *Heller* was that [the list of presumptively lawful] measures were complete '*exceptions* to the right to bear arms' ") (quoting *Marzzarella*, 614 F.3d at 91 and adding emphasis). *Marzzarella* held no such thing (indeed, it did not even involve a challenge to one of the presumptively lawful longstanding regulations identified by *Heller*). Rather, its examination of *Heller*'s list was geared toward determining whether such regulations were "presumptively lawful" based on the step-one question (the scope of the Second Amendment) or the step-two question (means-end scrutiny). Its conclusion that the former is the correct understanding of *Heller* meant that "these longstanding limitations are exceptions to the right to bear arms." *Marzzarella*, 614 F.3d at 91. *Barton*'s characterization mirrored *Marzzarella*'s: it stated that a "lawful" longstanding regulation "regulates conduct 'fall[ing outside] the scope of the Second Amendment's guarantee.' " *Barton*, 633 F.3d at 172 (quoting *Marzzarella*, 614 F.3d at 91). But neither *Marzzarella* nor any other of our precedents has ever implied that *Heller*'s incomplete list of "presumptively lawful" firearm regulations " '*under any and all circumstances* do not offend the Second Amendment.' " Dissent at 384 (quoting *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) and adding emphasis). To so hold would ignore the meaning of the word "presumption." A presumption of constitutionality "is a presumption ... [about] the existence of factual conditions supporting the legislation. As such it is a *rebuttable* presumption." *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281 (1934) (emphasis added). We do not disagree that the *Heller* Court included this "presumptively lawful" language to provide some "assurance[ ]" that its decision "did not provide a basis for future litigants to upend any and all restrictions on the right to bear arms." Dissent at 394–95. Indeed, we have concluded that *§ 922(g)(1)* is *facially* valid for this very reason. *See Barton*, 633 F.3d at 172. But we doubt the Supreme Court couched its first definitive characterization of the nature of the Second Amendment

right so as to completely immunize this statute from any constitutional challenge whatsoever. Put simply, we take the Supreme Court at its word that felon dispossession is "*presumptively* lawful." *Heller,* 554 U.S. at 627 n.26, 128 S.Ct. 2783 (emphasis added).

7   *McDonald* involved a similar handgun ban, but the Court limited its analysis to the incorporation question and remanded the case. 561 U.S. at 791, 130 S.Ct. 3020. The City of Chicago subsequently lifted the ban and replaced it with a less restrictive ordinance. *See* *Ezell,* 651 F.3d at 689.

8   The *Heller* Court declined to detail which form of scrutiny might apply in cases involving less severe burdens on Second Amendment rights but cautioned that rational basis scrutiny would never apply. *Id.* at 629 n.27, 128 S.Ct. 2783. "If all that was required to overcome the right to keep and bear arms was a rational basis," the Court explained, "the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.*

9   The Government wrongly asserts that we have recognized that "even laws that actually burden Second Amendment rights must only have a 'reasonable, not perfect,' fit with an important government interest." Gov't Br. 26 (quoting *Marzzarella,* 614 F.3d at 98). The Dissent agrees that intermediate scrutiny is the appropriate standard here. *See* Dissent at 396–98. But *Marzzarella* applied intermediate scrutiny (before going on to apply strict scrutiny, just in case) because the law under attack did not even "come close" to a ban on the possession of firearms in the home. *Marzzarella,* 614 F.3d at 97.

10   *See Crawford v. Washington,* 541 U.S. 36, 67–68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design. Vague standards are manipulable....").

11   Judges Ambro and Fuentes deny that § 922(g)(1) eviscerates the right to keep and bear arms. In Judge Ambro's view, because "persons convicted of disqualifying offenses may possess handguns if (1) their convictions are expunged or set aside, (2) they receive pardons, or (3) they have their civil rights restored," the statute is akin to run-of-the-mill regulations imposing "preconditions" to firearm possession by individuals with Second Amendment rights, such as safety training requirements. Ambro Op. 17–18. Far from it. To begin with, the "only ... option" available to Binderup and Suarez to satisfy the so-called "precondition" imposed by § 922(g)(1) is to receive pardons. *Id.* at 39, 124 S.Ct. 1354. To frame this moonshot as a mere additional precondition to arms possession not unlike a training-course requirement strains credulity. Section 922(g)(1) is a *ban* on firearms possession subject to a few statutory exceptions, not a mere regulatory proviso that simply conditions exercise of the right on the completion of a background check or safety class.

Indeed, *Heller* itself shows the "precondition" characterization of § 922(g)(1) to be unavailing. The handgun ban and disassembly ordinance struck down in that case likewise had exceptions that could be abstractly framed as "conditions precedent" to exercise of the Second Amendment right: the handgun ban was subject to an exception that the Chief of Police could issue one-year handgun licenses at his discretion and the disassembly ordinance allowed residents to keep lawful firearms in the home so long as they were rendered inoperable. *See Heller,* 554 U.S. at 574–75, 128 S.Ct. 2783. But the Supreme Court did not understand the licensing exception as a condition precedent to handgun possession or the disassembly rule as a mere precondition on keeping firearms in the home; it viewed these carve-outs as "minor exceptions" and struck down both ordinances as unconstitutional destructions of the Second Amendment right. *Id.* at 575 n.1, 629–30, 128 S.Ct. 2783. The Dissent's retort that *Heller* is distinguishable because there the "core 'right of law-abiding, responsible citizens to use arms in defense of hearth and home' " was implicated and here it is not because Binderup and Suarez's misdemeanors place them outside of that class puts the

AR.04182

rabbit in the hat. Dissent at 397–98 (quoting 🚩 *Heller*, 554 U.S. at 635, 128 S.Ct. 2783). If Binderup's and Suarez's offenses *are not* of the type that were historically understood to remove them from the class of persons entitled to Second Amendment rights, 🚩 § 922(g)(1) effects the same type of untenable "conditions" that were deemed unconstitutional in 🚩 *Heller*.

12    Our colleagues reject 🚩 *Barton*'s mention of the possibility that "the passage of time or evidence of rehabilitation [might] restore the Second Amendment rights of people who committed serious crimes." Ambro Op. 26. We have not been presented with historical evidence one way or another whether this might be a route to restoration of the right to keep and bear arms in at least some cases, so we would leave for another day the determination whether that turns out to be the case.

13    The Government's and the Dissent's repeated citations on this point to *Pontarelli v. U.S. Department of Treasury* are inapposite. That case involved an appropriations ban that suspended the ability of the Bureau of Alcohol, Tobacco, and Firearms (ATF) to consider petitions from convicted felons for restoration of their firearms privileges under 🚩 18 U.S.C. § 925(c), a statute that also gives federal district courts jurisdiction to review applications denied by ATF. 285 F.3d 216, 217 (3d Cir. 2002). We concluded that "because the appropriations ban suspends ATF's ability to issue the 'denial' that 🚩 § 925(c) makes a prerequisite, it effectively suspends that statute's jurisdictional grant." *Id.* Given that "[e]valuating a 🚩 § 925(c) application requires a detailed investigation of the felon's background and recent conduct," which includes "interviewing a wide array of people, including the felon, his family, his friends, the persons whom he lists as character references, members of the community where he lives, his current and former employers, his coworkers, and his former parole officers," we noted as a "[p]olicy [c]onsideration[ ]" that without prior ATF involvement and an adversarial process, "courts are without the tools necessary to conduct a systematic inquiry into an applicant's background." *Id.* If courts "reviewed applications *de novo*," we reasoned, "they would be forced to rely primarily—if not exclusively—on information provided by the felon," which "would be dangerously one-sided." *Id.* (internal quotation marks and citation omitted). Contrary to the Government's and the Dissent's characterizations, a constitutional inquiry into a presumptively lawful statute is distinct from the one-sided, fact-intensive inquiry that would have been called for were courts required to assess 🚩 § 925(c) petitions in the first instance. Reviewing an as-applied constitutional challenge based on facts alleged by a challenger and weighing those facts against competing evidence proffered by the Government is not only something courts are equipped to do, it is our constitutional duty. *See* U.S. Const. arts. III and VI, cl. 2; 🚩 *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803).

14    In arguing generally that all persons with criminal records are not entitled to Second Amendment rights, the Government and the Dissent emphasize the fact that "[w]e as a society require persons convicted of crimes to forfeit any number of rights and privileges, including the right to sit on a jury, the right to hold elective office, and the right to vote." Dissent at 380. But these forfeitable rights have different histories and different constitutional dimensions. Consider the right to vote, which like the right to keep and bear arms has been declared fundamental by the Supreme Court. *See* 🚩 *Reynolds v. Sims*, 377 U.S. 533, 561–62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Although the Supreme Court has concluded that the Fourteenth Amendment's Equal Protection Clause does not require states to advance a compelling interest before denying citizens who have been convicted of crimes the right to vote, 🚩 *Richardson v. Ramirez*, 418 U.S. 24, 54, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), that result was demanded by the Constitution's text. Specifically, the Court relied on the "understanding of those who adopted the Fourteenth Amendment, as reflected in [ ] express language" of Section 2 of the Fourteenth Amendment that affirmatively contemplates criminal disenfranchisement, despite Section 1's guarantee of equal protection of the laws. 🚩 *Id.* Accordingly, felons fall outside the scope of the fundamental right to vote. *See* 🚩 *Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) ("[T]he right of

AR.04183

felons to vote is not fundamental."). Probably due to the breadth of this exclusion from the right to vote, the Supreme Court has not indicated that a disenfranchised criminal might succeed in demonstrating that such disenfranchisement is unconstitutional as applied to him in light of the historical understanding of the right. Rather, a challenger's only option is to show that a particular disenfranchisement provision is either irrational or discriminatory. *Richardson*, 418 U.S. at 56, 94 S.Ct. 2655; *Hunter v. Underwood*, 471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). Thus, the scope of the right to vote is historically and textually distinct from the Second Amendment right.

Nor do limits on jury service or eligibility for public office offer any insight into the scope of the Second Amendment, not least because they are not fundamental rights. *See Carter v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320, 332, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970) ("The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character."); James M. Binnall, *Sixteen Million Angry Men: Reviving A Dead Doctrine to Challenge the Constitutionality of Excluding Felons from Jury Service*, 17 Va. J. Soc. Pol'y & L. 1, 3 (2009) ("The Supreme Court does not recognize the right to sit on a jury as fundamental."); *Lindsay v. Bowen*, 750 F.3d 1061, 1064 (9th Cir. 2014) (noting that there is no "fundamental right to run for public office"); U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. X.

These defeasible civil rights cannot be invoked to justify disarming Binderup and Suarez. They are different rights, with different histories and scopes, subject to different constitutional analyses.

[15]  This rationale is consonant with the governmental interest usually offered today as justification for dispossession: public safety. But the traditional principle that constrained the class of persons not entitled to keep and bear arms still governs. *See Heller*, 554 U.S. at 634–35, 128 S.Ct. 2783 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.").

[16]  *See, e.g., United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) ("Whatever the pedigree of the rule against even nonviolent felons possessing weapons ... most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.' ") (cited in Govt. Binderup Br. 13 and Govt. Suarez Br. 13–14); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) ("[W]e observe that most scholars of the Second Amendment agree that the right to bear arms was 'inextricably ... tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals).' We recognize, however, that the historical question has not been definitively resolved." (internal citations omitted)) (cited in Govt. Binderup Br. 12–13 and Govt. Suarez Br. 13–14).

*Yancey* relies on a 19th century treatise by Thomas M. Cooley for the proposition that the Constitution "protect[s] rights for 'the People' excluding, among others, 'the idiot, the lunatic, and the felon.' " 621 F.3d at 685 (citing Cooley, *A Treatise on Constitutional Limitations* 29 (Boston, Little Brown & Co. 1868)). But this interpretation of Cooley's *Treatise* has been thoroughly debunked (and, indeed, already had been prior to *Yancey*'s publication). *See* Marshall, 32 Harv. J.L. & Pub. Pol'y at 709–10 ("The ... discussion in Cooley [cited for felon dispossession] ... concerns classes excluded from *voting*. These included women and the property-less—both being citizens and protected by arms rights. When Cooley does address the right to keep and bear arms, one finds this: '[H]ow far it may be in the power of the legislature to regulate the right we shall not undertake to say. Happily there neither has been, nor, we may hope, is likely to be, much occasion for the examination of that question by the courts.' " (quoting Cooley, *Treatise* at 499 (Victor H. Lane ed., 7th ed. 1903)).

17    *Cf.*  *Parker v. District of Columbia*, 478 F.3d 370, 378 (D.C. Cir. 2007), *aff'd sub nom.*  *Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (rejecting the view that "the Second Amendment protects private possession of weapons *only* in connection with performance of *civic duties* as part of a well-regulated citizens militia organized for the security of a free state" (second emphasis added, internal quotation marks omitted)); David T. Hardy, 15 Wm. & Mary Bill Rts. J. 1237, 1241–84 (2007) (reviewing Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origin of Gun Control in America* (2006)) (marshaling considerable historical evidence against Cornell's "civic only" approach).

18    Not least because it rests largely on a theoretical foundation that the Supreme Court has twice now rejected.

      *See*  *Heller*, 554 U.S. at 595, 128 S.Ct. 2783;  *McDonald*, 561 U.S. at 767–68, 130 S.Ct. 3020. And as at least one scholar has surmised: "[i]f the Second Amendment *does* provide a right to own guns for self-defense, republicanism cannot supply the intellectual foundation for it." Williams, 101 Yale L.J. at 559 (emphasis added).

19    One of the primary proponents of this school of thought has conceded that "[h]istorical scholarship has abandoned the notion that American political culture can be understood in terms of any single ideological tradition, and has embraced a more pluralistic conception of the intellectual world of the founders," though he remains a devotee of the civic-virtue limitation. Cornell & DeDino, 73 Fordham L. Rev. at 492.

20    Were we to adopt the Government's proposed standard, consider a few examples of offenses that would (and currently do) render one permanently disqualified from possessing firearms. In Arizona, simple possession

      of any amount of marijuana is a felony punishable by enough jail time that any conviction triggers  § 922(g)(1). *See* Ariz. Rev. Stat. Ann. § 13–3405. As the Government would have it, the last three Presidents of the United States would have been forever barred from possessing firearms had their youthful indiscretions been prosecuted in the Copper State. Or consider Michigan, which has a generous (10-cents-per-container) repayment policy for recyclable cans and bottles returned to the state—so long as the beverage containers were purchased *in state*. But one who returns out-of-state containers is subject to a felony count of beverage return of nonrefundable bottles punishable by up to five years' imprisonment (thus disabling the

      conniving interstate recycler under  § 922(g)(1)). *See* Mich. Comp. Laws Ann. § 445.574a(1)(d). This spells disqualification for Kramer, Newman, and at least one recent real-life offender. *See Seinfeld: The Bottle Deposit* (NBC television broadcast May 2, 1996); *Seinfeld-inspired 'Michigan bottle deposit scam' lands Kramer wannabe in hot water* (RT America Jun. 15, 2016), available at https://www.rt.com/viral/346835-seinfeld-michigan-bottle-deposit/. Finally, library theft in Pennsylvania constitutes a (federally disabling) misdemeanor of the first degree—punishable by up to five years' imprisonment—if the value of the material is

      $150 or more. 18 Pa. Stat. and Cons. Stat. Ann. § 3929.1. These examples illustrate the saliency of  *Heller*'s admonition that "[c]onstitutional rights are enshrined with the scope they were understood to have when the

      people adopted them, whether or not future legislatures ... think that scope too broad."  554 U.S. at 634–35, 128 S.Ct. 2783. We would contravene this instruction and set dangerous precedent for other constitutional rights were we to blithely accept that "[i]f the citizens of a particular state believe that a criminal offense is too minor to trigger disarmament, their remedy is to petition the state legislature to amend the law—not to seek redress in the federal courts." Dissent at 380.

      The Government's theory is all the more questionable when analogized to other constitutional rights, such as the First Amendment's free-speech guarantee. Like limitations on the scope of the Second Amendment, the

      unprotected status of obscenity, fighting words, and the like is rooted in our history. *See*  *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). These free-speech exceptions mean that while Congress can sharply restrict speech that amounts to obscenity or fighting words as traditionally understood, it may not substantially redefine what *counts as* obscenity or fighting words in order to reach

      otherwise protected expression. *See, e.g.,*  *Speiser v. Randall*, 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) ("[T]he line between speech unconditionally guaranteed and speech which may legitimately be

regulated, suppressed, or punished is finely drawn."); *Cantwell v. Connecticut*, 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) ("[T]he power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom."); *Gooding v. Wilson*, 405 U.S. 518, 521–25, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (statute that state claimed would only reach "fighting words" was unconstitutionally overbroad where its terms criminalized expression that a listener would find merely offensive or insulting). For instance, it would be plainly unconstitutional for a legislature to redefine "obscenity" in order to capture expression that would otherwise escape the traditional scope of obscenity as defined by the Supreme Court.

*See Janicki v. Pizza*, 722 F.2d 1274, 1276 (6th Cir. 1983); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 256, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). In other words, the historical scope of the First Amendment —not Congress—determines the parameters of the right.

The import of this analogy for the Second Amendment is straightforward: although certain types of criminals are excluded from the right to keep and bear arms, this traditional limitation on the scope of the right may not be expanded by legislative fiat. To hold otherwise would treat the Second Amendment "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780, 130 S.Ct. 3020 (plurality opinion). The historical record indicates that the right to keep and bear arms was publicly understood at the time of the Constitution's enactment to secure a broadly held natural right that did not extend to violent criminals. To redefine the type of "criminal" that would qualify for dispossession via a malleable "virtuousness" standard in order to capture former nonviolent misdemeanants who are in all other respects indistinguishable from normal, law-abiding citizens would be akin to redefining "fighting words" to encompass run-of-the-mill "trash talk." The Constitution takes each of these temptations "off the table." *Heller*, 554 U.S. at 636, 128 S.Ct. 2783.

21 The Dissent acknowledges this view, but expresses confidence that "institutional considerations" will prevent particularly absurd disarmaments. Dissent at 405. In our view, questionable disarmaments raise questions of constitutional law.

22 As the District Court pointed out, however, Black's Law Dictionary "defines 'statutory rape' as '[u]nlawful sexual intercourse with a person *under the age of consent* (as defined by statute), regardless of whether it is against that person's will.' " *Binderup v. Holder*, 2014 WL 4764424, at *24 (E.D. Pa. Sept. 25, 2014) (quoting Black's Law Dictionary 1374 (9th ed. 2009)) (emphasis added).

23 *Cf. Commonwealth v. Hughlett*, 249 Pa.Super. 341, 378 A.2d 326, 329 (1977) (noting that "[i]t is axiomatic that females under the age of 16 may not legally assent to sexual acts of ... any kind").

24 A number of other cases have applied *Barton* in rejecting as-applied challenges to § 922(g)(1). Like Pruess, the challengers in those cases have little in common with Suarez. *See United States v. Moore*, 666 F.3d 313, 319–20 (4th Cir. 2012) ("[T]hree prior felony convictions for common law robbery and two prior convictions for assault with a deadly weapon on a government official clearly demonstrate that [Moore] is far from a law-abiding, responsible citizen."); *United States v. Smoot*, 690 F.3d 215, 221–22, 221 & n.8 (4th Cir. 2012) (32 arrests and 16 convictions for offenses such as assault of a police officer, possession of cocaine with intent to distribute, and destruction of property); *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (three prior felony convictions for aggravated assault and resisting arrest).

25 To be sure, Suarez's 1998 DUI conviction was a dangerous act—but not in the sense of the traditional concerns motivating felon dispossession. *See, e.g., Begay v. United States*, 553 U.S. 137, 145, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008) (holding that drunk driving is not a "violent felony" under the Armed Career Criminal Act because it does not involve "purposeful, violent, and aggressive conduct").

26 Applying intermediate scrutiny, the Dissent agrees with the Government that—to the extent that Binderup and Suarez are protected by the Second Amendment—their permanent disarmament under § 922(g)(1) is a " 'reasonable fit' " to carry out the Government's purpose[s]." Dissent at 65. Should we be incorrect

that 🚩 § 922(g)(1) is categorically unconstitutional as applied to challengers who fall within the protective scope of the Second Amendment, we find Judge Ambro's analysis more persuasive. Of course, the gap between Judge Ambro's and the Dissent's applications of 🔖 *Marzzarella*'s "step two" assessment in this case highlights our concern that such interest-balancing exercises are too malleable when it comes to laws that eviscerate fundamental rights. Indeed, we fear that the winners and losers of "heightened" scrutiny contests are increasingly reflective of what rights—enumerated or not—"scrutinizing" judges favor or disfavor. As a Ninth Circuit judge presciently noted: "Judges know very well how to read the Constitution broadly when they are sympathetic to the right being asserted. ... When a particular right comports especially well with our notions of good social policy, we build magnificent legal edifices on elliptical constitutional phrases—or even the white spaces between lines of constitutional text. But ... when we're none too keen on a particular constitutional guarantee, we can be equally ingenious...." *Silveira v. Lockyer*, 328 F.3d 567, 568 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc of a panel decision adopting the "collective right" interpretation of the Second Amendment), *panel decision abrogated by* 🔖 *Heller*, 554 U.S. 570, 128 S.Ct. 2783.

27    Judge Gardner astutely observed that "the contentions [that the Government] contend[s] these studies support are ... pertinent to the analysis of [an] as-applied challenge under the 🚩 *Barton* framework." 🔖 *Binderup*, 2014 WL 4764424, at *26.

1    🚩 Section 922(g)(1) makes it "unlawful for any person ... who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Under 🔖 18 U.S.C. § 921(a)(20), "[t]he term 'crime punishable by imprisonment for a term exceeding one year' does not include ... any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." We therefore refer to 🚩 § 922(g)(1) as the "felon-in-possession" ban. Courts commonly use this shorthand even though the statute itself does not use the term "felon," and even though it includes within its scope certain individuals who committed offenses labeled as "misdemeanors." *See, e.g.,* 🔖 *Logan v. United States*, 552 U.S. 23, 27, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007).

2    Nothing herein should be interpreted as taking any position on the validity of statutes that deprive convicted felons of the right to vote. The issue of felon disenfranchisement is not presented here, and there may well be very different considerations that distinguish a felon's loss of the right to vote from the loss of the right to possess a gun.

3    *See* 🔖 18 U.S.C. § 925(c).

4    S. Rep. No. 102-353, at 19 (1992).

5    H.R. Rep. No. 104-183, at 15 (1995).

6    U.S. Const. amend. II.

7    🔖 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

8    🔖 *Id.* at 635, 128 S.Ct. 2783.

9    🔖 *Id.* at 626, 128 S.Ct. 2783.

10    🔖 *Id.* at 626–27, 128 S.Ct. 2783.

11    🔖 *Id.* at 627, 128 S.Ct. 2783 n.26. Elsewhere in the opinion, the Supreme Court described these regulations as "permissible" and as "exceptions" to the Second Amendment. 🔖 *Id.* at 635, 128 S.Ct. 2783. And two

years later, in *McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), without otherwise expounding on *Heller*'s delineation of the scope of the Second Amendment right, the Court recapitulated the list of "longstanding regulatory measures" in *Heller* and "repeat[ed] [*Heller*'s] assurances" that such laws were not "imperil[ed]" by the Second Amendment. *Id.* at 786, 130 S.Ct. 3020.

12  *Heller*, 554 U.S. at 635, 128 S.Ct. 2783.

13  *United States v. Emerson*, 270 F.3d 203, 229 (5th Cir. 2001).

14  368 F.3d 517 (5th Cir. 2004).

15  *See id.* at 519 ("It is not inconsistent with the Second Amendment to limit the ability of convicted felons to keep and possess firearms.").

16  *Id.*

17  599 F.3d 433 (5th Cir. 2010).

18  *Id.* at 451; *see also United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) (stating that "*Heller* provides no basis for reconsidering" whether § 922(g) is constitutional) (citing *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003) ("Section 922(g)(1) does not violate the Second Amendment.")).

19  594 F.3d 1111 (9th Cir. 2010).

20  *Id.* at 1114.

21  *Id.* at 1117 (internal quotation marks omitted).

22  *Id.* (quoting U.S. Const. amend. II).

23  *Id.*

24  *Id.* at 1118 (alteration in original) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)). As discussed *infra*, the strength of this historical interpretation has since been challenged by other scholars. *See, e.g.,* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1374–75 (2009) (analyzing sources cited by earlier scholars); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714 (2009).

25  827 F.3d 1171, 2016 WL 3675450 (9th Cir. July 6, 2016).

26  *Id.* at 1173, 2016 WL 3675450 at *2 (internal quotation marks omitted).

27  *Id.* at 1176, 2016 WL 3675450 at *5.

28  *Id.* at 1175, 2016 WL 3675450 at *4 ("[A]ssuming the propriety of felon firearm bans—as we must under Supreme Court precedent and our own—there is little question that Phillips's predicate conviction ... can constitutionally serve as the basis for a felon ban."); *see also Van Der Hule v. Holder*, 759 F.3d 1043, 1050–51 (9th Cir. 2014) ("We addressed whether § 922(g)(1) violates the Second Amendment in [*Vongxay*] and determined that it did not."). *But see United States v. Duckett*, 406 Fed.Appx. 185, 187 (9th Cir. 2010) (Ikuta, J., concurring) (stating that it might be constitutionally problematic to prevent non-violent felons from possessing firearms).

29  573 F.3d 1037 (10th Cir. 2009).

30  *Id.* at 1047 (quoting *Heller*, 554 U.S. at 626, 128 S.Ct. 2783).

31  *Id.* at 1049.

32  *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009).

33  598 F.3d 768 (11th Cir. 2010).

34  *Id.* at 770 (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783).

35  *Id.* at 771 (emphasis added).

36  *Id.*

37  658 F.3d 110 (1st Cir. 2011).

38  *Id.* at 113.

39  *Id.*

40  *Id.*

41  717 F.3d 281 (2d Cir. 2013).

42  *Id.* at 281–82.

43  Bogle did not raise an as-applied challenge to § 922(g)(1) on the basis of the Second Amendment. Even so, the Second Circuit's broad language and its citations to numerous courts that have considered such challenges suggest that it intended to broadly approve restrictions on the Second Amendment rights of individuals who are not law-abiding.

44  314 Fed.Appx. 801 (6th Cir. 2008).

45  *Id.* at 807.

46  362 Fed.Appx. 501 (6th Cir. 2010).

47  *Id.* at 508.

48  602 F.3d 738 (6th Cir. 2010).

49  *Id.* at 741.

50  *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014), *reh'g en banc granted*, *opinion vacated* (Apr. 21, 2015).

51  *United States v. Moore*, 666 F.3d 313, 320 (4th Cir. 2012) ("We do not foreclose the possibility that a case might exist in which an as-applied Second Amendment challenge to § 922(g)(1) could succeed.").

52  *Baer v. Lynch*, 636 Fed.Appx. 695, 698 (7th Cir. 2016) ("We have not decided if felons historically were outside the scope of the Second Amendment's protection and instead have focused on whether § 922(g)(1) survives intermediate scrutiny. As to violent felons, the statute does survive intermediate scrutiny, we have concluded, because the prohibition on gun possession is substantially related to the government's interest in keeping those most likely to misuse firearms from obtaining them." (internal citations omitted)); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("*Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge.").

53  *United States v. Woolsey*, 759 F.3d 905 (8th Cir. 2014).

54  *Schrader v. Holder*, 704 F.3d 980, 991–92 (D.C. Cir. 2013) (rejecting as-applied challenge to § 922(g)(1) brought by common-law misdemeanants as a class).

55  703 F.3d 242 (4th Cir. 2012).

56  *Id.* at 247.

57  620 F.3d 919 (8th Cir. 2010). *Seay* technically addressed § 922(g)(3), which prohibits gun possession by drug users. In reviewing the Eighth Circuit's precedents, *Seay* stated that a prior non-precedential opinion

upholding the constitutionality of § 922(g)(1) was correct. *See id.* at 924 (citing *United States v. Irish*, 285 Fed.Appx. 326 (8th Cir. 2008)). The Eighth Circuit rejected a facial challenge to § 922(g)(1) a second time in *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011).

58  759 F.3d 905.

59  *Id.* at 909 (citing *Brown*, 436 Fed.Appx. 725 (8th Cir. 2011)).

60  633 F.3d 168 (3d Cir. 2011).

61  *Woolsey*, 759 F.3d at 909 (quoting *Brown*, 436 Fed.Appx. at 726).

62  664 F.3d 1180 (8th Cir. 2011).

63  *Id.* at 1183.

64  614 F.3d 85, 91 (3d Cir. 2010).

65  *Bena*, 664 F.3d at 1185.

66  704 F.3d 980 (D. C. Cir. 2013).

67  *Id.* at 991.

68  *Id.* at 990.

69  *Id.* at 990–91 (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc)) (emphasis in original). *Schrader* suggested that, had the plaintiffs properly raised an as-applied challenge by arguing "that the statute is invalid as applied to Schrader specifically," then "*Heller* might well dictate a different outcome" than the decision the court reached with respect to the class-wide challenge. *Id.* at 991.

70  As an initial matter, I agree with both Judge Ambro and Judge Hardiman that the plaintiffs' statutory arguments are unavailing. The two statutory provisions here are straightforward: § 922(g)(1) makes it unlawful for anyone to possess a firearm after having been convicted of a crime punishable by more than one year in prison, and § 921(a)(20)(B) removes from that prohibition persons convicted of misdemeanors with a maximum punishment of two years or less.

In other words, the only persons subject to § 922(g)(1) are (i) felons and (ii) misdemeanants whose crimes are punishable by more than two years in prison. I therefore join Parts I and II of Judge Ambro's opinion.

71  *Marzzarella*, 614 F.3d at 89 (internal citation and footnote omitted).

72  Accordingly, I join Parts III.A, III.B, III.C.1, III.C.2, and III.C.3.a of Judge Ambro's opinion in their entirety. I would also vote to overrule *Barton*, at least insofar as it states that as-applied challenges to § 922(g)(1) are permissible as that statute is currently codified. In my view, they are not.
Chief Judge McKee, Judge Shwartz, and Judge Restrepo join only Parts I and II of Judge Ambro's opinion. (*See* Ambro Op. Typescript at 6–7 n.1.)

73  *See* Ambro Op. Typescript at 24, 31.

74  554 U.S. at 626, 128 S.Ct. 2783.

75  *Id.* at 627 n.26, 128 S.Ct. 2783.

76  614 F.3d at 91 (emphasis added).

77  *Id.* at 91–92; *see also* Jeff Golimowski, Note, *Pulling the Trigger: Evaluating Criminal Gun Laws in a Post-*Heller *World*, 49 Am. Crim. L. Rev. 1599, 1616 (2012) (contending that felons forfeit Second Amendment rights through affirmative decisions to violate the social contract).

78  614 F.3d at 92.

79    *See* *Rozier*, 598 F.3d at 770–71 ("Prior to taking into account Rozier's purpose for possessing the handgun, we must determine whether he is qualified to possess a handgun."); *Vongxay*, 594 F.3d at 1113 ("[F]elons are categorically different from the individuals who have a fundamental right to bear arms, and Vongxay's reliance on *Heller* is misplaced." (footnote omitted)).

80    *See, e.g.*, *Bena*, 664 F.3d at 1183 ("It seems most likely that the Supreme Court viewed the regulatory measures listed in *Heller* as presumptively lawful because they do not infringe on the Second Amendment right.").

81    *See* *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (reiterating that "certain longstanding regulations are 'exceptions' to the right to keep and bear arms, such that the conduct they regulate is not within the scope of the Second Amendment").

82    *Id.*

83    *See, e.g.*, *Bena*, 664 F.3d at 1183 ("Scholarship suggests historical support for a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible."); *Vongxay*, 594 F.3d at 1113 ("[M]ost scholars of the Second Amendment agree that the right to bear arms 'was ... inextricably tied to' the concept of 'virtuous citizen[ry]'...." (all alternations except first in original) (quoting Kates, *supra* note 24)); *Emerson*, 270 F.3d at 226 n.21 (citing sources for the proposition that "the Second Amendment does not prohibit legislation such as [the felon-in-possession ban]").

84    *Bena*, 664 F.3d at 1183 (quoting 1 William Blackstone, Commentaries 139).

85    *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 201 (5th Cir. 2012) (emphasis removed) (quoting Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 233 (1999)); *see also* Hardiman Op. Typescript at 24 (discussing the same proposal).

86    554 U.S. at 604, 128 S.Ct. 2783.

87    *Skoien*, 614 F.3d at 640 (citing Stephen P. Halbrook, The Founders' Second Amendment 273 (2008); Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y at 700–13).

88    621 F.3d 681 (7th Cir. 2010).

89    *Id.* at 684–85 (considering a challenge to 18 U.S.C. § 922(g)(3), which makes it unlawful to possess firearms as a person who is "an unlawful user of or addicted to any controlled substance").

90    *Id.* at 685 (quoting Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 721 (2007)).

91    Act of July 8, 1932, ch. 465, § 14, 47 Stat. 650, 654.

92    *Id.* § 3, 47 Stat. at 651. The 1932 Act defined a "crime of violence" as "[m]urder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary," or "an attempt to commit any of the same." *Id.* § 1, 47 Stat. at 650.

93    Act of June 30, 1938, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51.

94    Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757.

95    *Skoien*, 614 F.3d at 640 (statutory citation truncated).

96    *Huddleston v. United States*, 415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974) (quoting S. Rep. No. 90–1501, at 22S. Rep. No. 90–1501, at 22 (1968)).

97    *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984).

98    *Scarborough v. United States*, 431 U.S. 563, 572, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977) (quoting 114 Cong. Rec. 14,773 (1968)); *see also* *Stevens v. United States*, 440 F.2d 144, 146–49, 152–70 (6th Cir. 1971) (recounting the relevant legislative history).

99    I note that permitting plaintiffs to bring as-applied challenges to § 922(g)(1) opens the door to similar challenges under these other provisions. For example, once a plaintiff can challenge application of the felon-in-possession ban on the ground that his or her prior crime does not indicate a likelihood of future dangerousness, the next case might involve an as-applied challenge to § 922(g)(6), the provision concerning dishonorable discharge from the Armed Forces, for the same reason.

100    *See, e.g.*, *Preuss*, 703 F.3d at 245 n.1 (rejecting the argument that the ban on non-violent felons possessing firearms is not "longstanding," since it has been in place "for more than half a century").

101    *See, e.g.*, *United States v. Chester*, 628 F.3d 673, 680–81 (4th Cir. 2010) (stating that the relevant historical scholarship is, at best, "not conclusive" as to how the Founding generation treated felon dispossession);

*Skoien*, 614 F.3d at 650 (Sykes, J., dissenting) ("[S]cholars disagree about the extent to which *felons*— let alone misdemeanants—were considered excluded from the right to bear arms during the founding era.");

*McCane*, 573 F.3d at 1048 (Tymkovich, J., concurring) ("But more recent authorities have *not* found evidence of longstanding dispossession laws. On the contrary, a number have specifically argued such laws did not exist and have questioned the sources relied upon by the earlier authorities.").

102    Binderup Br. at 55–56.

103    *See, e.g.*, Ambro Op. Typescript at 30–31 ("Congress may not overlook entirely the misdemeanor label, which, in the Second Amendment context, is also important.").

104    554 U.S. at 626–27 & n.26, 128 S.Ct. 2783.

105    *Id.* at 635, 128 S.Ct. 2783.

106    *Heller* also underscored that its list of longstanding prohibitions "does not purport to be exhaustive," while emphasizing that the list flows from "historical justifications." *Id.* at 627 n.26, 635, 128 S.Ct. 2783. This guidance suggests a more practical approach than focusing on the word "felon" alone.

107    *See, e.g.*, *Thorm v. United States*, 59 F.2d 419, 419 (3d Cir. 1932) (noting that Congress has historically defined felonies as crimes punishable by a prison term exceeding one year).

108    *Tennessee v. Garner*, 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("[T]he assumption that a 'felon' is more dangerous than a misdemeanant [is] untenable. Indeed, numerous misdemeanors involve conduct more dangerous than many felonies.").

109    The Supreme Court's recent decision in *Voisine v. United States*, —— U.S. ——, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016), also addressed the distinction between misdemeanors and felonies. That case raised an issue of statutory interpretation regarding 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by persons convicted of a "misdemeanor crime of domestic violence."

Because *Voisine* did not involve a challenge to the constitutionality of § 922(g)(9), it bears on these cases only indirectly. Still, *Voisine* recognized that Congress passed § 922(g)(9) "to close [a] dangerous loophole in the gun control laws." *Id.* at 2276 (alteration in original) (internal quotation marks omitted). In particular, Congress enacted § 922(g)(9) to address the fact that "many perpetrators of domestic violence are charged with misdemeanors rather than felonies, notwithstanding the harmfulness of their conduct."

*Id.* Congress believed that closing this loophole was important because, in the Supreme Court's words,

"[f]irearms and domestic strife are a potentially deadly combination." *Id.* (alteration in original) (quoting *United States v. Hayes*, 555 U.S. 415, 427, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009)).

110    169 F.3d 787 (3d Cir. 1999).

111    *Id.* at 789 (discussing 8 U.S.C. § 1101(a)(43) and U.S.S.G. § 2L1.2(b)(1)(B)).

112    *Id.* at 791 ("8 U.S.C. § 1101(a)(43)(G) defines an aggravated felony as a theft offense with a sentence of at least one year.").

113    *Id.* at 789.

114    *Id.* at 792.

115    *Id.* ("Congress has the power to define the punishment for the crime of reentering the country after deportation, and we conclude that Congress was defining a term of art, 'aggravated felony,' which in this case includes certain misdemeanants who receive a sentence of one year.").

116    *See, e.g.,* *Burgess v. United States*, 553 U.S. 124, 134, 128 S.Ct. 1572, 170 L.Ed.2d 478 (2008) (recounting how Congress amended a statute's definition of "felony drug offense," which in its previous form "depended on the vagaries of state-law classifications of offenses as felonies or misdemeanors," to instead use a "uniform federal standard"); *Logan*, 552 U.S. at 35, 128 S.Ct. 475 (explaining that Congress could choose to "revise § 921(a)(20) to provide ... that federal rather than state law defines a conviction for purposes of [§ 922]"); *United States v. Turley*, 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957) ("[I]n the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law.").

117    554 U.S. at 626, 128 S.Ct. 2783.

118    *Marzzarella*, 614 F.3d at 92.

119    Hardiman Op. Typescript at 9–10 n.6 (citing *Williams*, 616 F.3d at 692).

120    Ambro Op. Typescript at 28.

121    *United States v. Chase*, 18 F.3d 1166, 1172 n.7 (4th Cir. 1994) (quoting Black's Law Dictionary 1185 (6th ed. 1990)).

122    554 U.S. at 626–27, 128 S.Ct. 2783.

123    *Id.* at 627 n.26, 128 S.Ct. 2783.

124    *Id.* at 626, 128 S.Ct. 2783.

125    614 F.3d at 91–92. Judge Ambro states that "the two-step *Marzzarella* framework controls all Second Amendment challenges," (Ambro Op. Typescript at 40), and I agree. Yet *Marzzarella* plainly stated that "the better reading" of *Heller* is that felons are *disqualified* from asserting their Second Amendment rights. *Marzzarella*, 614 F.3d at 91–92. Judge Ambro departs from this reading to leave open the possibility of "a successful as-applied challenge by a state-law felon" to § 922(g)(1), although he cautions that the "individual's burden would be extraordinarily high—and perhaps even insurmountable." (Ambro Op. Typescript at 33–34 n.6.) Nowhere does Judge Ambro explain how we can simultaneously proclaim our fidelity to *Marzzarella* while at the same time ignoring its reading of *Heller*'s key language.

126    *Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783.

127    *See, e.g., Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124–29 (10th Cir. 2015), *cert. denied*, —— U.S. ——, 136 S.Ct. 1486, 194 L.Ed.2d 550 (2016) (considering whether a federal regulation limiting the carrying

of firearms in post office *parking lots* was constitutionally permissible in view of *Heller*'s guidance about carrying of firearms in government *buildings*); *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 203 (considering the constitutionality of a federal law prohibiting the sale of firearms to 18-to-20-year-olds by federally licensed firearms dealers, and concluding that the law "is consistent with a longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment's protection").

128 *Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783.

129 *Id.* at 626, 128 S.Ct. 2783.

130 The same could be said of the ban on mentally-ill persons possessing firearms. As currently codified, § 922(g)(4) makes it unlawful for any person to possess a gun "who has been adjudicated as a mental defective or ... committed to a mental institution," and *Heller* does not "cast doubt" on that law. But if Congress were to expand the current restriction to, for example, all persons who have ever seen a mental health professional, *Heller*'s safe harbor for "longstanding prohibitions" would no longer apply.

131 Ambro Op. Typescript at 29.

132 554 U.S. at 626, 128 S.Ct. 2783.

133 Ambro Op. Typescript at 39 (emphasis added).

134 614 F.3d at 98.

135 *Id.* at 98–99. For good measure, we noted that we would uphold the constitutionality of § 922(k) even if we applied strict scrutiny because, in our view, the statute was narrowly tailored to serve a compelling government interest. *See id.* at 99–101.

136 *See Heller*, 554 U.S. at 628 n.27, 128 S.Ct. 2783 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

137 *Id.* at 628, 128 S.Ct. 2783.

138 614 F.3d at 97.

139 *Id.* at 92, 97.

140 *See id.* at 97 ("The distinction between limitations on the exercise of protected conduct and regulation of the form in which that conduct occurs also appears in the First Amendment context.... Accordingly, we think § 922(k) also should merit intermediate, rather than strict, scrutiny.").

141 724 F.3d 426.

142 *Id.* at 435 (quoting *United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010)).

143 *Id.* at 436; *see also id.* at 436 & n.14 (noting a few subtle differences between the standard for intermediate scrutiny articulated by the various circuits).

144 *Heller*, 554 U.S. at 635, 128 S.Ct. 2783.

145 669 F.3d 411 (4th Cir. 2012).

146 *Id.* at 417.

147 *Id.* at 416 (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783).

148 *See United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012) ("Chapman's claim is not within the core right identified in *Heller*—the right of a law-abiding, *responsible* citizen to possess and carry a weapon

for self-defense.") (considering a challenge to § 922(g)(8)); *Chester*, 628 F.3d at 682–83 ("Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* ... by virtue of Chester's criminal history as a domestic violence misdemeanant.") (considering a challenge to § 922(g)(9)).

149    *See United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) ("Section 922(g)(9) does not implicate [the] core Second Amendment right because it regulates firearm possession for individuals with criminal convictions."); *Schrader*, 704 F.3d at 989 (applying intermediate scrutiny "[b]ecause common-law misdemeanants as a class cannot be considered law-abiding and responsible"); *Reese*, 627 F.3d at 802 (applying intermediate scrutiny to § 922(g)(8)).

150    *Heller*, 554 U.S. at 635, 128 S.Ct. 2783.

151    Hardiman Op. Typescript at 18, 50.

152    Ambro Op. Typescript at 15–18.

153    554 U.S. at 635, 128 S.Ct. 2783.

154    *Marzzarella*, 614 F.3d at 98.

155    *Yancey*, 621 F.3d at 683–84 (citing S. Rep. No. 90–1501, at 22S. Rep. No. 90–1501, at 22 (1968)).

156    Pub. L. No. 90–351, § 901(a)(2), 82 Stat. 197, 225 (1968).

157    *Drake*, 724 F.3d at 437 (citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)) (punctuation modified).

158    *Osterweil v. Bartlett*, 706 F.3d 139, 143 (2d Cir.) (O'Connor, J.), *certifying question to the New York Court of Appeals*, *certified question answered*, 21 N.Y.3d 580, 977 N.Y.S.2d 153, 999 N.E.2d 516 (2013); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) ("It is beyond cavil that both states have substantial, indeed compelling, governmental interests in public safety and crime prevention." (internal quotation marks and citation omitted)).

159    *Drake*, 724 F.3d at 453 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)).

160    *See* Gov't Br. in *Binderup at 28,* (citing Bureau of Justice Statistics, Recidivism of Prisoners Released in 1994, at 6 (2002); Mona A. Wright et al., *Effectiveness of Denial of Handgun Purchase to Persons Believed To Be at High Risk for Firearm Violence*, 89 Am. J. of Pub. Health 88, 89 (1999)). The government also points out that the risk of recidivism is particularly high for sex offenders like Binderup irrespective of whether or not states categorize their crimes as felonies or as serious misdemeanors.

161    We might also consider the fact that, as we noted in *Drake*, legislatures generally crafted the regulatory schemes governing firearms before *Heller* concluded that the Second Amendment protected an individual right to bear arms. Consequently, the statistical evidence of "fit" may be lacking in certain instances because the drafters of the regulations did not realize they would need to compile it. *See Drake*, 724 F.3d at 437–38.

162    *See, e.g., Yancey*, 621 F.3d at 685 ("[M]ost felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." (citing *United States v. Lane*, 252 F.3d 905, 906 (7th Cir. 2001))).

163    *Marzzarella*, 614 F.3d at 98; *see also Drake*, 724 F.3d at 436 (same).

164    *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012).

165    *Drake*, 724 F.3d at 439.

AR.04195

166  *United States v. Carter*, 750 F.3d 462, 469 (4th Cir.), *cert. denied*, —— U.S. ——, 135 S.Ct. 273, 190 L.Ed.2d 201 (2014).

167  *Schrader*, 704 F.3d at 990 (quoting *Kachalsky*, 701 F.3d at 97).

168  *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011). I do not take Judge Wilkinson's admonition to imply that judges are incapable of making decisions about whether particular persons are dangerous. Every day judges decide whether to grant bail, impose prison time, or revoke a period of supervised release—and all of these determinations touch on dangerousness. The key point is that, in these contexts, there are mechanisms in place for informing judicial discretion. In sentencing, revocation, and bail hearings, for example, judges have the benefit of presentence and pretrial services reports, input from trained probation and pretrial services professionals, and recommendations from prosecutors.

By contrast, there are no tools readily at-hand for deciding whether an individual person should have access to a firearm despite a past criminal conviction. *See also infra* at pages 406–07 (discussing previous cases that have recognized the inherent difficulties in making such determinations).

169  I offer here an alternative assessment of the problem of as-applied challenges in the context of intermediate scrutiny (*i.e.*, at *Marzzarella* step-two). Because I believe that felons and serious misdemeanants can be disarmed at *Marzzarella* step-one, I would hold as an initial matter that the plaintiffs have been disqualified from the exercise of their Second Amendment rights altogether.

170  The Supreme Court's decision in *Vartelas v. Holder*, —— U.S. ——, 132 S.Ct. 1479, 182 L.Ed.2d 473 (2012), reiterated these congressional purposes. *Vartelas* addressed whether a provision of the immigration laws could be applied retroactively (that is, to conduct occurring before the law's enactment). The government tried to draw an analogy between the challenged statute and § 922(g). The Court, rejecting that comparison, stated that the law at issue in *Vartelas* targeted "past misconduct," *id.* at 1489, whereas " 'longstanding prohibitions on the possession of firearms by felons' ... target a present danger, *i.e.*, the danger posed by felons who bear arms." *Id.* (quoting *Heller*, 554 U.S. at 626, 128 S.Ct. 2783).

171  18 U.S.C. § 925(c).

172  *Logan*, 552 U.S. at 28 n.1, 128 S.Ct. 475 (alteration in original) (quoting *United States v. Bean*, 537 U.S. 71, 74–75, 123 S.Ct. 584, 154 L.Ed.2d 483 (2002)).

173  Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102–393, 106 Stat. 1729, 1732 (1992).

174  S. Rep. No. 102-353, at 19 (1992).

175  *Id.* at 20.

176  H.R. Rep. No. 104-183, at 15 (1995).

177  *Marzzarella*, 614 F.3d at 98.

178  As one of our colleagues in the D.C. Circuit has put it, "the reality of gun violence means our constitutional analysis should incorporate deference to the legislature." *Heller v. District of Columbia*, 801 F.3d 264, 283 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34–36, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010)). Deference in this context is even more appropriate when Congress has not simply made a policy judgment about preventing gun violence, but has actually experimented with a system of gun regulation and concluded—based on lived experience —that it was unworkable.

179  330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

180  *Id.* at 96–97, 67 S.Ct. 556 (quoting *Ex parte Curtis*, 106 U.S. 371, 373, 1 S.Ct. 381, 27 L.Ed. 232 (1882)).

181  *Id.* at 101, 67 S.Ct. 556.

182    *Id.*

183    *Id.* at 102, 67 S.Ct. 556.

184    *Id.* at 102–03, 67 S.Ct. 556.

185    The First Circuit, too, has recognized that categorical rules are sometimes constitutionally permissible in the Second Amendment context. *See* *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) ("[T]he Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." (internal citation omitted)).

186    *Chovan*, 735 F.3d at 1151 (Bea, J., concurring).

187    *See* Robert A. Mikos, *Enforcing State Law in Congress's Shadow*, 90 Cornell L. Rev. 1411, 1463–64 & nn.187, 188 (2005) (finding that expungement of domestic violence convictions increased following the enactment of § 922(g)(9)); *see also* *Logan*, 552 U.S. at 33, 128 S.Ct. 475 (recounting that "Wisconsin no longer punishes misdemeanors by more than two years of imprisonment").

188    552 U.S. 23, 34–36, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007).

189    *See* *id.* at 26, 128 S.Ct. 475. The petitioner's argument relied on 18 U.S.C. § 921(a)(20), which provides that "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms."

190    60 F.3d 1005 (2d Cir. 1995).

191    *Id.* at 1009; *see also* *Logan*, 552 U.S. at 33–34, 128 S.Ct. 475 (quoting the same passage).

192    552 U.S. at 35, 128 S.Ct. 475.

193    *See* *id.* ("We may assume, *arguendo*, that when Congress revised § 921(a)(20) in 1986 ... it labored under the misapprehension that all offenders—misdemeanants as well as felons—forfeit civil rights, at least temporarily. Even indulging the further assumption that courts may repair such a congressional oversight or mistake, we could hardly divine the revision the Legislature would favor." (footnote omitted)).

194    18 U.S.C. § 921(a)(20); *see also* *United States v. Leuschen*, 395 F.3d 155, 159–60 (3d Cir. 2005) (discussing the meaning of "civil rights" in our circuit).

195    *Skoien*, 614 F.3d at 645 (discussing expungement as a way to lift the ban imposed by § 922(g)(9)); *see also* *id.* ("Some of the largest states make expungement available as of right to misdemeanants who have a clean record for a specified time. California, for example, has such a program." (citing Cal. Penal Code § 1203.4a)).

196    *Chovan*, 735 F.3d at 1138.

197    *See* Press Release, Rep. Ken Buck, Buck Fights for Second Chance at Second Amendment Rights (June 2, 2015), https://buck.house.gov/media-center/press-releases/buck-fights-restore-second-amendment-rights (last visited Sept. 2, 2016).

198    18 U.S.C. § 921(a)(20)(A); *see also* *United States v. Schultz*, 586 F.3d 526, 529–31 (7th Cir. 2009) (considering the proper application of this statutory carve-out).

199    *Lewis v. United States*, 445 U.S. 55, 60–61, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) (considering a challenge to 18 U.S.C. § 1202, the predecessor to the current § 922).

200    *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012).

201    *Torres-Rosario*, 658 F.3d at 113.

202    285 F.3d 216 (3d Cir. 2002) (en banc).

203    *Id.* at 230–31.

204    *Id.* at 231.

205    537 U.S. 71, 123 S.Ct. 584, 154 L.Ed.2d 483 (2002).

206    *Id.* at 75–76, 123 S.Ct. 584.

207    *Id.* at 77, 123 S.Ct. 584.

208    *Id.*

209    I recognize, of course, that *Heller* changed the constitutional landscape. But again: *Heller* held that the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635, 128 S.Ct. 2783.

210    627 F.3d 792 (10th Cir. 2010).

211    *Id.* at 804; *see also* *id.* at 805 ("[A]ny such challenges could and should have been raised by Reese in the Hawaii Family Court.").

212    We ourselves recently reiterated that, as a general rule, collateral attacks on past state convictions are disfavored in our federal system. In *United States v. Napolian*, 830 F.3d 161, 2016 WL 3902164 (3d Cir. July 19, 2016), we concluded that a defendant could not challenge the reasonableness of his federal sentence on the ground that it was to run consecutively to a state sentence that the defendant claimed was unconstitutional. In our view, permitting such an attack "would be a cumbersome imposition on federal sentencing and a clear repudiation of the finality typically afforded to state court judgments." *Id.* at 167, 2016 WL 3902164 at *4. Asking district courts to litigate the seriousness of prior crimes giving rise to disarmament under § 922(g)(1) raises similar concerns.

213    *See, e.g.*, *Woolsey*, 759 F.3d at 907 (noting defendant moved to dismiss indictment on Second Amendment grounds); *Moore*, 666 F.3d at 315 (same); *Barton*, 633 F.3d at 169 (same); *Vongxay*, 594 F.3d at 1114 (same); *see also United States v. Hauck*, 532 Fed.Appx. 247, 249 (3d Cir. 2013) (not precedential) (same).

214    *Johnson v. United States*, ––– U.S. ––––, 135 S.Ct. 2551, 2556, 192 L.Ed.2d 569 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)).

215    *See* Hardiman Op. Transcript at 35 n.15 ("We have not been presented with historical evidence one way or another whether [the passage of time or evidence of rehabilitation] might be a route to restoration of the right to keep and bear arms in at least some cases, so we leave for another day the determination whether that turns out to be the case."); Ambro Op. Typescript at 36–37 n.7 ("[U]nder the right circumstances the passage of time since a conviction can be a relevant consideration in assessing recidivism risks.").

216    18 U.S.C. § 924(e)(1).

217    *Id.* § 924(e)(2)(B)(ii).

218    ––– U.S. ––––, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015).

219    *Id.* at 2257.

220    *Id.* at 2258.

221    Hardiman Op. Typescript at 13 (quoting *Barton*, 633 F.3d at 174).

222    *Id.* at 42 (material in second set of brackets added) (quoting *Barton*, 633 F.3d at 173).

223   This is to say nothing of Judge Hardiman's approach to assessing whether Binderup and Suarez are "responsible citizens." In answering that question, Judge Hardiman considers not only the plaintiffs' recent avoidance of criminal conduct, but also personal traits like the fact that they both have "a job [and] a family." *Id.* at 46. This approach seems to require an analysis so particularized as to be practically characterological, raising additional problems of fair warning and due process.

224   Ambro Op. Typescript at 30–31.

225   *Id.* at 31–32.

226   *Id.* at 32.

227   Not to put too fine a point on it, but I disagree with Judge Ambro's conclusions as to seriousness in this very case. While it may not have involved the threat of violence, Binderup's relationship with a teenager in his employ involved power dynamics that were, at the very least, troubling. And Suarez's offense—carrying an unlicensed firearm—indicates a cavalier attitude towards *gun safety regulations*. Neither offense strikes me as frivolous or "non-serious."

228   *Heller*, 554 U.S. at 635, 128 S.Ct. 2783.

229   *Id.* at 626–27 & n.26, 128 S.Ct. 2783.

230   *Marzzarella*, 614 F.3d at 92.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Panchevre v. U.S. Dept. of Justice-I.N.S., 5th Cir., February 7, 1991

803 F.2d 1165
United States Court of Appeals,
Eleventh Circuit.

Joel BLACKWOOD, Petitioner,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 86–5311
|
Non-Argument Calendar.
|
Nov. 10, 1986.

**Synopsis**

Immigration judge found alien who had been admitted for lawful permanent residence deportable as alien convicted of drug or marijuana-related offense, but granted him relief from deportation. The Board of Immigration Appeals reversed, and alien petitioned for review. The Court of Appeals held that evidence supported Board's denial of relief from deportation based on alien's conviction for possession of and trafficking in marijuana and Board's notation of Congress' particular concern with drug offenders.

Affirmed.

West Headnotes (6)

**[1]** **Aliens, Immigration, and Citizenship** ⚷ Continuous Physical Presence or Unrelinquished Domicile

Statute providing that aliens lawfully admitted for permanent residence who temporarily proceed abroad voluntarily and return to lawful unrelinquished domicile of seven consecutive years may be admitted in discretion of Attorney General without regard to specified grounds, including conviction of drug offense, does not provide indiscriminate waiver for all who demonstrate statutory eligibility for such relief, but rather, Attorney General or his delegate is

required to determine as matter of discretion whether applicant warrants the relief sought. Immigration and Nationality Act, § 212(c), as amended, 8 U.S.C.A. § 1182(c).

6 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⚷ Presumptions and burden of proof

Alien bears burden of demonstrating that his application for relief merits favorable consideration pursuant to statute providing that aliens lawfully admitted for permanent residence who temporarily proceed abroad voluntarily and return to lawful unrelinquished domicile in seven consecutive years may be admitted in discretion of Attorney General without regard to specified grounds for exclusion, including conviction of drug offense. Immigration and Nationality Act, § 212(c), as amended, 8 U.S.C.A. § 1182(c).

8 Cases that cite this headnote

**[3]** **Aliens, Immigration, and Citizenship** ⚷ Review of discretion

Judicial review of denials of discretionary relief incident to deportation proceedings is limited to determining whether there has been exercise of administrative discretion, and whether manner of exercise has been arbitrary or capricious.

3 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** ⚷ Review of discretion

**Aliens, Immigration, and Citizenship** ⚷ Substantial evidence in general

Standard for judicial review of denials of discretionary relief incident to deportation proceedings remains unchanged by disagreement between immigration judge and Board of Immigration Appeals; Court of Appeals could not choose freely between the two interpretations if the two interpreted the evidence differently, but rather, Court of Appeals had

to defer to Board's decision and affirm if it is supported by substantial evidence.

7 Cases that cite this headnote

[5]   **Administrative Law and Procedure**  Sufficiency

Where administrative discretion is exercised, findings are sufficient if written decision of administrative agency or record of administrative hearing sets out clearly ground which forms basis for denial of discretionary relief, so that reviewing court is able to ascertain whether decision is arbitrary or capricious.

2 Cases that cite this headnote

[6]   **Aliens, Immigration, and Citizenship**  Crimes and immorality

Evidence supported finding alien, who had been admitted for lawful permanent residence, deportable based on his conviction for possession of and trafficking in marijuana and Board of Immigration Appeals' notation of Congress' particular concern with drug offenders, notwithstanding fact that alien contributed approximately $25 per week as support for his child by his former wife who was United States citizen; Board properly balanced all relevant factors in deciding that equities presented by alien did not sufficiently outweigh drug crime and conviction. Immigration and Nationality Act, § 212(c), as amended, 8 U.S.C.A. § 1182(c).

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1166**  Cathy Davis, Florida Rural Legal Services, Inc., Ft. Pierce, Fla., for petitioner.

Donald A. Couvillon, Allen W. Hausman, Dept. of Justice, Washington, D.C., for respondent.

**\*1167**  Petition for Review of an Order of the Board of Immigration Appeals.

Before HILL, KRAVITCH and EDMONDSON, Circuit Judges.

**Opinion**

PER CURIAM:

In 1984, an immigration judge found the petitioner, Joel Blackwood, deportable as charged on the basis of his concessions at a hearing under section 241(a)(11) of the Immigration and Nationality Act (the Act), 8 U.S.C.A. § 1251(a)(11), as an alien convicted of a drug or marijuana related offense, but granted his request for relief from deportation under section 212(c) of the Act, 8 U.S.C.A. § 1182(c) ( section 1182(c)). The Board of Immigration Appeals (the Board) reversed in 1986, determining that Blackwood's drug crime was a very serious negative factor that had not been outweighed by a showing of unusual or outstanding equities. We affirm the Board's decision.

Blackwood is a 42–year–old native and citizen of Jamaica, who was admitted to the United States for lawful permanent residence on December 5, 1973, as the spouse of a United States citizen, his former wife. Blackwood has a 12–year–old daughter by that marriage who lives with her mother. He contributes approximately twenty-five dollars per week for her support. Blackwood and his present wife, a native of Jamaica who is in the United States unlawfully, are the parents of an 8–year–old son. Blackwood also has four illegitimate children living in Jamaica. While in the United States, Blackwood has been employed as an agricultural laborer and longshoreman.

Blackwood is involved in these deportation proceedings as a result of a 1981 conviction in Superior Court, Forsyth County, North Carolina, of two counts of possession and trafficking in marijuana. He was sentenced to two consecutive five-year terms of imprisonment. Blackwood was paroled in late 1983 and placed in these deportation proceedings.

At the deportation hearing, Blackwood applied for relief under section 1182(c). That section provides, in pertinent part, that aliens lawfully admitted for permanent residence who temporarily proceed abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to certain specified grounds for exclusion enumerated

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

in 8 U.S.C.A. § 1182(a). The grounds specified include an alien who has been convicted of a drug offense, as set forth in section 1182(a)(23).

[1]  [2]  Section 1182(c), however, does not provide an indiscriminate waiver for all who demonstrate statutory eligibility for such relief. Instead, the Attorney General or his delegate is required to determine as a matter of discretion whether an applicant warrants the relief sought. The alien bears the burden of demonstrating that his application merits favorable consideration.

In the instant case, the immigration judge, after considering evidence relating to Blackwood's drug crime, employment history, and family and community ties, concluded that "it is more socially desirable to let ... [Blackwood] remain in the United States since he is the sole support of his citizen children, than it is to have him deported to Jamaica." Blackwood was granted the waiver of deportation under section 1182(c).

The Board reversed, determining that Blackwood had not sustained his burden of establishing that he merits a grant of the relief sought under section 1182(c). Although the Board found the equities presented by Blackwood's family ties and relatively long residence in the United States substantial, it found them insufficient to overcome the serious drug crime he committed. The Board emphasized that the immigration laws clearly reflect the strong Congressional policy against lenient treatment of drug trafficking offenders. 8 U.S.C.A. §§ 1182(h), 1251(b), and 1251(f)(2). Further, they found that insufficient time had elapsed since Blackwood's release from custody to persuade them that Blackwood was genuinely rehabilitated. The Board **1168 ordered Blackwood to be deported to Jamaica, the place of deportation designated by him.

[3]  [4]  Judicial review of denials of discretionary relief incident to deportation proceedings is limited to determining whether there has been an exercise of administrative discretion, and whether the manner of exercise has been arbitrary or capricious. Crespo-Gomez v. Richard, 780 F.2d 932, 934 (11th Cir.1986); Garcia-Mir v. Smith, 766 F.2d 1478, 1490 (11th Cir.1985). The standard of review remains unchanged by the disagreement between the immigration judge and the Board. If these two interpret the

evidence differently, we cannot choose freely between the two interpretations. If the Board's decision is supported by substantial evidence, Congress has mandated that we defer to the Board and affirm. 8 U.S.C.A. § 1105a(a); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

[5]  [6]  Blackwood contends that he sustained his burden of establishing a grant of discretionary relief under section 1182(c) and the Board abused its discretion by not considering all the favorable factors presented on his behalf. When administrative discretion is exercised, as here, findings are sufficient if the written decision of the administrative agency or the record of the administrative hearing sets out clearly the ground which forms the basis for the denial of the discretionary relief, so that a reviewing court is able to ascertain whether the decision is arbitrary or capricious. Crespo-Gomez, 780 F.2d at 935; Jarecha v. INS, 417 F.2d 220, 225 (5th Cir.1969). The Board set forth the ground for denying relief, Blackwood's conviction for possession of and trafficking in marijuana, and noted Congress' particular concern with drug offenders. In deciding that the equities presented by Blackwood did not sufficiently outweigh the drug crime and conviction, the Board properly balanced all relevant factors in accordance with Matter of Marin, 16 I & N 581, 586 n. 4 (BIA 1978) (requiring a showing of unusual or outstanding countervailing equities by applicants for discretionary relief who have been convicted of serious drug offenses, particularly those involving the trafficking or sale of drugs). Indeed, the immigration judge, in his oral decision, noted that Blackwood's behavior over the last seven years in the United States, "is clearly less than angelic." The Board's decision is consistent with their precedent. Crespo-Gomez, 780 F.2d at 934–35; Cobourne v. I.N.S., 779 F.2d 1564 (11th Cir.1986); Matter of Duarte, 18 I & N 329 (BIA 1982).

In sum, there was sufficient evidence to support the Board's interpretation, and we cannot say that the Board acted arbitrarily or capriciously in deciding that Blackwood's crime was not outweighed by a showing of unusual or outstanding equities. Accordingly, we affirm the Board's decision denying relief under section 1182(c) and ordering the deportation of Blackwood to Jamaica.

AFFIRMED.

**All Citations**

803 F.2d 1165

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

712 F.3d 1338
United States Court of Appeals,
Ninth Circuit.

Roberto Javier BLANDINO–MEDINA, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General, Respondent.

No. 11–72081.
|
Argued and Submitted Oct. 17, 2012.
|
Filed April 10, 2013.

**Synopsis**

**Background:** Nicaraguan citizen petitioned for review of two decisions by the Board of Immigration Appeals (BIA) reversing an Immigration Judge's (IJ's) grant of withholding of removal pursuant to the Convention Against Torture (CAT), and affirming the IJ's finding that his California conviction for lewd and lascivious acts with a child under the age of 14 was a particularly serious crime, rendering him statutorily ineligible for withholding of removal.

**Holdings:** The Court of Appeals, Bea, Circuit Judge, held that:

[1] applicable section of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) unambiguously precluded Department of Homeland Security's (DHS) creation of additional categories of per se particularly serious crimes based solely on the elements of the offense, and

[2] alien failed to establish a clear probability that he would be tortured if he returned to Nicaragua, and thus was not entitled to withholding of removal under the Convention Against Torture (CAT).

Affirmed in part, vacated in part, and remanded.

West Headnotes (6)

**[1]** **Federal Courts** 🔑 Jurisdiction

Mootness is a jurisdictional issue which court reviews de novo.

1 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

An individual who has already been removed from country can satisfy the case-or-controversy requirement by raising a direct challenge to the removal order; a petitioner can also establish a live controversy by demonstrating concrete collateral consequences from the removal. U.S.C.A. Const. Art. 3, § 1 et seq.

4 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Although alien had already applied for a waiver of inadmissibility, which has been denied, his appeal from denial of withholding of removal presented a live case or controversy; alien was subject to concrete collateral consequences from the removal, and, given the highly discretionary nature of determination, it was possible that a future adjudicator would grant an application for waiver of inadmissibility. U.S.C.A. Const. Art. 3, § 1 et seq.; Immigration and Nationality Act, § 212(h), 🟡 8 U.S.C.A. § 1182(h).

2 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Whether Board of Immigration Appeals (BIA) applied the proper legal standard in determining whether alien's crime was "particularly serious" so as to render him statutorily ineligible for withholding of removal raised a question of law over which court had jurisdiction. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 305(a), 🟡 8 U.S.C.A. § 1231(b)(3)(A); Immigration and Nationality Act, § 242(a)(2)(D), 🚩 8 U.S.C.A. § 1252(a)(2)(D).

25 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 Sex offenses

Alien's California conviction for lewd and lascivious acts with a child under the age of 14 was not, per se, a particularly serious crime, rendering him statutorily ineligible for withholding of removal; applicable section of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) unambiguously precluded Department of Homeland Security's (DHS) creation of additional categories of per se particularly serious crimes based solely on the elements of the offense. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 305(a), 🟡 8 U.S.C.A. § 1231(b)(3)(A); West's Ann.Cal.Penal Code § 288(a).

18 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 🔑 Standard for relief
**Aliens, Immigration, and Citizenship** 🔑 Weight and Sufficiency

Alien failed to establish a clear probability that he would be tortured if he returned to Nicaragua, and thus was not entitled to withholding of removal under the Convention Against Torture (CAT); rather than presenting hard evidence of a probability that he would be tortured, alien merely presented a series of worst-case scenarios, and did not present evidence that similarly-situated individuals are being tortured by Nicaraguan officials. 🟡 8 C.F.R. § 208.18.

21 Cases that cite this headnote

## Attorneys and Law Firms

**\*1340**  Madeline Feldon (argued), Amy VyHanh Nguyen (argued), and Evangeline G. Abriel, Santa Clara University School of Law, Santa Clara, CA, for Petitioner.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Zoe J. Heller (argued), Office of Immigration Litigation, Washington, D.C., for Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX3–173.

Before: CARLOS T. BEA and ANDREW D. HURWITZ, Circuit Judges, and WILLIAM K. SESSIONS, District Judge. *

**OPINION**

BEA, Circuit Judge:

Roberto Xavier Blandino–Medina, a Nicaraguan citizen, seeks review of two decisions by the Board of Immigration Appeals ("BIA"): (1) a decision reversing an Immigration Judge's ("IJ's") grant of withholding of removal pursuant to the Convention Against Torture ("CAT"), and (2) a decision affirming the IJ's finding that Blandino's conviction for lewd and lascivious acts with a child under the age of 14, in violation of California Penal Code § 288(a), is a particularly serious crime, rendering him statutorily ineligible for withholding of removal.

We have jurisdiction under 8 U.S.C. § 1252(a)(1). We affirm the BIA's decision concerning withholding of removal pursuant to the CAT, but vacate its decision holding that Blandino's conviction under Section 288(a) is a particularly serious crime *per se,* and remand to the BIA to consider the circumstances of the offense.

## I. Facts and Procedural Background

Blandino is a Nicaraguan citizen, born in 1982. Several members of Blandino's family were affiliated with the Somoza regime, and after the Sandinistas took power, his family was persecuted. Blandino's father fled to the United States in 1986 and was later granted political asylum. In 1987, Blandino came to California to live with his father.

When Blandino was ten years old, his father sent him back to Nicaragua. Shortly after returning, Blandino encountered problems with the Sandinista National Liberation Front ("FSLN"). While Blandino was in school, the FSLN forced students to do manual labor. Blandino was forced to build barricades and beaten for not complying with the FSLN's instructions. When he was fifteen years old, Blandino was detained by the police for three days and questioned about his parents.

On December 19, 1998, Blandino entered the United States without permission and was apprehended by Border Patrol agents. The Immigration and Nationalization Service ("INS") sought to remove him for entering the country illegally. Blandino applied for Temporary Protected Status ("TPS"), and in 1999 the INS granted that application and closed removal proceedings.

Since 1999, Blandino has been convicted of three crimes. The third conviction is central to this appeal: a 2008 guilty plea to the felony of lewd and lascivious conduct with a child under the age of fourteen in **\*1341** violation of Section 288(a), [1] for which Blandino was sentenced to one year in county jail, five years of felony probation, and registration as a sex offender.

In 2009, the Department of Homeland Security ("DHS") re-instituted removal proceedings. Blandino appeared before an IJ, conceded the legal and factual bases for removal, but sought cancellation of removal and adjustment of status (along with a waiver of inadmissibility) pursuant to 8 U.S.C. § 1182(h), as a spouse or child of a person granted asylum. Claiming political persecution, Blandino also applied for asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and relief under the CAT.

The IJ denied Blandino's applications for cancellation of removal and for a waiver of inadmissibility in conjunction with his application for adjustment of status. The IJ also denied Blandino's asylum application. However, the IJ granted Blandino's application for withholding of removal under 8 U.S.C. § 1231(b)(3), and relief under the CAT.

The government appealed the IJ's grant of withholding of removal under 8 U.S.C. § 1231(b)(3) and the CAT to the BIA; Blandino did not seek review of the IJ's denial of cancellation of removal, waiver of inadmissibility, or asylum. The BIA remanded for the IJ to determine whether Blandino's conviction under Section 288(a) was a "particularly serious crime" rendering him ineligible for withholding of removal. [2] The BIA instructed the IJ "to examine the statutory elements of the alien's crime; if an offense qualifies as a particularly serious crime based solely on its elements, then no further inquiry is required and the application for withholding of removal must be pretermitted."

On remand, the IJ noted that he had previously found Blandino's Section 288(a) conviction not particularly serious because "respondent honestly believed based upon the victim's representation that she was 19 years old." After examining the elements of Section 288(a), but without reexamining the facts and circumstances of Blandino's conviction, the IJ concluded that Blandino had been convicted of a particularly serious crime.

The BIA dismissed Blandino's appeal, agreeing "with the Immigration Judge's determination that the respondent is ineligible for withholding of removal under the [INA] as his offense constitutes a 'particularly serious crime' *per se*." This petition for review followed.

## II. Mootness

DHS removed Blandino to Nicaragua after this court granted Blandino's request to lift a temporary stay of removal. The threshold issue is whether Blandino's appeal from the denial of withholding of removal presents a live case or controversy.

[1]  [2]  "Mootness is a jurisdictional issue which [this court] review[s] de novo." *1342 *In re Arnold & Baker Farms,* 85 F.3d 1415, 1419 (9th Cir.1996). An individual who has already been removed can satisfy the case-or-controversy requirement by raising a direct challenge to the removal order. *See, e.g.,* *Lopez v. Gonzales,* 549 U.S. 47, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006). A petitioner can also establish a live controversy by demonstrating concrete collateral consequences from the removal. *See, e.g.,* *Zegarra–Gomez v. INS,* 314 F.3d 1124, 1127 (9th Cir.2003) (holding that because petitioner's inability to return to the United States for twenty years as a result of his removal was "a concrete disadvantage imposed as a matter of law, the fact of his deportation did not render the pending habeas petition moot").

Blandino claims standing to challenge his removal because it renders him inadmissible to the United States for ten years pursuant to 8 U.S.C. § 1182(a)(9)(A)(ii). The government, relying on *Kaur v. Holder,* 561 F.3d 957 (9th Cir.2009), argues that there is an independent basis for Blandino's inability to reenter the United States, namely, the agency's independent determination that his conviction under Section 288(a) is a crime involving moral turpitude.

In *Kaur,* the petitioner sought review of a BIA decision denying him asylum and withholding of removal. *Id.* at 958. The BIA had found that Cheema was a danger to the security of the United States. *Id.* This court dismissed his petition as moot because he had "already been deported and he suffer[ed] no collateral consequences from the withholding decision." *Id.* at 959. He did not fall under the collateral consequences exception to mootness because his inadmissibility to the United States was "not a collateral consequence of the BIA's denial of withholding of deportation; rather it [was] a collateral consequence

of the Board's *unchallenged* determination under ▯ 8 U.S.C. § 1182(a)(3)(B)(i)(I) that Cheema is an alien who engaged in terrorist activities." ▯ *Id.*

**[3]**    However, there is a significant distinction between Cheema's situation and Blandino's: although there is no waiver of inadmissibility for aliens who, like Cheema, are found to have engaged in terrorist activities, *see* ▯ 8 U.S.C. § 1182(a)(3)(B) (i), a discretionary waiver is available for aliens who, like Blandino, have been convicted of crimes involving moral turpitude, *see* ▯ 8 U.S.C. § 1182(h).

The government correctly notes that Blandino has already applied for such a waiver, which has been denied. However, that denial does not preclude him from again seeking the same waiver in connection with a new visa petition. Rather, "USCIS does not place a restriction on the number of times [an alien] may file a Form I–601." *See* U.S. Citizenship and Immigration Services, Centralized Filing and Adjudication for Form I–601, Application for Waiver of Grounds of Inadmissibility. When evaluating a waiver of inadmissibility, the adjudicator "is required to balance the equities and adverse matters to determine whether discretion should be favorably exercised." ▯ *Matter of Mendez–Moralez,* 21 I. & N. Dec. 296, 301 (BIA 1996). Given the highly discretionary nature of this determination, it is possible that a future adjudicator will "balance the equities and adverse matters" in a manner different than did the original IJ. This is sufficient to give Blandino "a personal stake" in the litigation. ▯ *Swaby v. Ashcroft,* 357 F.3d 156, 161 (2d Cir.2004).

### III. The BIA's Authority to Determine that Certain Offenses Are "Particularly Serious Crimes" *Per Se*

**[4]**    Whether the BIA applied the proper legal standard in determining whether Blandino's crime was "particularly serious" **\*1343** raises a question of law. We have jurisdiction over questions of law raised in petitions for review. ▯ 8 U.S.C. § 1252(a) (2)(D); *see also* ▯ *Miguel–Miguel v. Gonzales,* 500 F.3d 941, 944 (9th Cir.2007). Although we "cannot reweigh evidence to determine if the crime was indeed particularly serious, [we] can determine whether the BIA applied the correct legal standard." ▯ *Afridi v. Gonzales,* 442 F.3d 1212, 1218 (9th Cir.2006). This Court reviews both the BIA's decision and those portions of the IJ's decision incorporated by the BIA. *See* ▯ *Kalubi v. Ashcroft,* 364 F.3d 1134, 1137 n. 3 (9th Cir.2004).

### A. Standard of Review and *Chevron* Deference

We ordinarily review questions of law *de novo*. However, the Court must afford deference under ▯ *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to the BIA's reasonable interpretations of ambiguous statutes it is charged with administering. *See* ▯ *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (citing ▯ 8 U.S.C. § 1101(a)(3)).

The first step of the *Chevron* analysis considers whether "the statute is silent or ambiguous with respect to the specific issue." ▯ *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." ▯ *Id.* at 842–43, 104 S.Ct. 2778. Courts "only defer ... to agency interpretations of statutes that, applying the normal 'tools of statutory construction,' are ambiguous." ▯ *INS v. St. Cyr,* 533 U.S. 289, 320 n. 45, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting ▯ *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778).

"[I]f the statute is silent or ambiguous with respect to the specific issue," the court moves to step two of the *Chevron* inquiry, and considers "whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. Deference "is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' " *Aguirre–Aguirre,* 526 U.S. at 425, 119 S.Ct. 1439 (quoting *INS v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)).

**B. Statutory Framework**

[5]   Applying the "traditional tools of statutory construction," we conclude that 8 U.S.C. § 1231(b)(3)(A) is not ambiguous.

We begin with the text and the history of the statute. Section 1231(b)(3)(A)(ii) provides that an alien may not be removed to a nation in which his life or freedom would be threatened on a protected ground unless "the Attorney General decides ... the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." Before 1990, the Immigration and Nationality Act did not define "particularly serious crime." *See Miguel–Miguel,* 500 F.3d at 945.

In *Matter of Frentescu,* 18 I. & N. Dec. 244 (BIA 1982), the BIA developed a multi-factor test for determining whether a crime was particularly serious. Frentescu had been convicted of burglary, sentenced to three months in jail, and placed on probation for one year. *Id.* at 245. To determine whether Frentescu had been convicted of a "particularly serious crime," the BIA described the required inquiry as follows:

> **\*1344**   While there are crimes which, on their face, are "particularly serious crimes," or clearly are not "particularly serious crimes,"[3] the record in most proceedings will have to be analyzed on a case-by-case basis. In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community.

*Id.* at 247.[4] After applying these "*Frentescu* factors" the BIA found that Frentescu's crime was not particularly serious, because it was a crime against property, he had not been armed, and had received a relatively short sentence. *Id.*

In 1990, we held that *Frentescu's* case-by-case analysis was mandatory and that the BIA could not create categories of *per se* particularly serious crimes. *Beltran–Zavala v. INS,* 912 F.2d 1027 (9th Cir.1990). We explained:

> If Congress wanted to erect per se classifications of crimes precluding immigration and nationality benefits, it knew how to do so ... In contrast, the language of [the particularly serious crime provision], as interpreted in *Frentescu,* commits the BIA to an analysis of the characteristics and circumstances of the alien's conviction.

 *Id.*

Since *Beltran–Zavala,* Congress has thrice amended the provision barring withholding of removal for those convicted of certain crimes. In 1990, Congress amended the INA to provide that all aggravated felonies were categorically particularly serious crimes.[5] Immigration Act of 1990, Pub.L. No. 101–649, § 515 (Nov. 29, 1990). This amendment effectively overruled *Matter of Frentescu* and *Beltran–Zavala* in part, by precluding case-by-case analysis of an aggravated felony. *See Afridi,* 442 F.3d at 1220 n. 4.

In 1996, Congress eliminated the categorical rule, replacing it with a rebuttable presumption that aggravated felonies were particularly serious crimes. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 413(f) (Apr. 24, 1996). A few months later, however, Congress again amended the statute. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, div. C, sec. 305, § 241 (Sept. 30, 1996) (codified at 8 U.S.C. § 1231(b)(3)(B)) ("IIRIRA"). This version, which applies to Blandino's case, and remains in effect today, provides in relevant part:

> **\*1345**  [A]n alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(B)(iv).

Thus, the current version of the statute establishes a two-tiered approach. Aggravated felonies[6] for which an alien receives a sentence of imprisonment of five years or more are particularly serious crimes *per se.* This *per se* class, however, "shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime." *Id.* The question at the first step of the *Chevron* inquiry is whether the statute is ambiguous as to whether the Attorney General has authority to create additional categories of *per se* particularly serious crimes.

We find that Congress has clearly expressed its intent: the overall structure of the INA compels the conclusion that Section 1231(b)(3)(B)(iv) establishes but one category of "per se" particularly serious crimes, and requires the agency to conduct a case-by-case analysis of convictions falling outside the category established by Congress. *See Illinois Pub. Telecommc'ns Ass'n v. Federal Commc'ns Comm.,* 117 F.3d 555, 568, *decision clarified on reh'g,* 123 F.3d 693 (D.C.Cir.1997) ("[U]nder step one of *Chevron,* we consider not only the language of the particular statutory provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part.").

We start by applying the basic statutory construction principle of *expressio unius est exclusio alterius.* Under that principle, the express creation of one category of *per se* particularly serious crimes should be understood as the exclusion of other categorically particularly serious crimes. *See Silvers v. Sony Pictures Entm't, Inc.,* 402 F.3d 881, 885 (9th Cir.2005) (en banc) ("The doctrine of *expressio unius est exclusio alterius* 'as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.' ") (quoting *Boudette v. Barnette,* 923 F.2d 754, 756–57 (9th Cir.1991)).

13 Cal. Daily Op. Serv. 3893, 2013 Daily Journal D.A.R. 4598

This reading is also the most consistent with the structure of the INA as a whole. Congress put considerable effort into delineating which crimes should be categorized as particularly serious *per se.* The extensive and detailed definition of the term "aggravated felony" in 🚩 8 U.S.C. § 1101(a)(43) demonstrates that Congress made specific decisions about what sorts of crimes should qualify as facially particularly serious. *Cf.* 🚩 *Alphonsus v. Holder,* 705 F.3d 1031, 1043 (9th Cir.2013) ("The aggravated felony definitions serve both to delineate the group of *per se* particularly serious crimes and to suggest the types of crimes most likely to be covered by the statute even when the aggregate sentence is less than five years.").

Our conclusion that 📑 Section 1231(b)(3)(B)(iv) precludes the agency's creation of additional categories of particularly serious crimes *per se* is supported by a comparison between 📑 Section 1231, which **\*1346** governs withholding of removal, and Section 1158, which governs asylum. Section 1158(b)(2)(A)(ii) prohibits the Attorney General from granting asylum to an alien "if the Attorney General determines that ... the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." This language is nearly identical to the provision at issue in this case, which provides that an alien shall not be eligible for withholding of removal "if the Attorney General decides that ... the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." 📑 8 U.S.C. § 1231(b)(3)(B)(ii).

There are, however, key differences between the two provisions. All aggravated felonies are categorically particularly serious crimes for the purposes of asylum, but only aggravated felonies for which the alien was sentenced to at least five years' imprisonment are categorically particularly serious for the purposes of withholding of removal. *Compare* 📑 8 U.S.C. § 1158(b)(2)(B)(i) (asylum) *with* 📑 8 U.S.C. § 1231(b)(3)(B)(iv) (withholding of removal). More importantly, the provisions differ in describing how the Attorney General may designate other crimes as "particularly serious." The withholding of removal provision allows the Attorney General to determine "that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime." 📑 8 U.S.C. § 1231(b)(3)(B)(iv). In contrast, the asylum statute allows the Attorney General to "designate by regulation offenses that will be considered to be a [particularly serious crime]." 📑 8 U.S.C. § 1158(b)(2)(B)(ii).

We noted in *Delgado v. Holder* that "[t]here is little question that [the asylum] provision permits the Attorney General, by *regulation,* to make particular crimes categorically particularly serious even though they are not aggravated felonies." 📑 648 F.3d 1095, 1106 (9th Cir.2011) (en banc) (emphasis in original). However, the withholding of removal statute is notably missing an analogue provision permitting the Attorney General to designate crimes as categorically particularly serious even if they are not aggravated felonies for which the defendant has received a sentence of at least five years.

The current language of both provisions was simultaneously enacted by Congress in 1996, when it passed the IIRIRA. [7] *See* Pub.L. No. 104–208, div. C, sec. 305, § 241, and sec. 604, § 208 (Sept. 30, 1996). "When 'Congress includes particular language in one section of a statute but omits it in another section of the same Act ... it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.' " 📑 *Clay v. United States,* 537 U.S. 522, 528–29, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (quoting 📑 *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)). This principle bolsters our conclusion that Congress's failure to include a provision explicitly granting the Attorney General the authority to designate offenses as categorically particularly serious crimes in the withholding of removal context precludes the agency's interpretation of the statute as granting it that authority.

For these reasons, we conclude that 📑 Section 1231(b)(3)(B)(iv) unambiguously provides one category of particularly serious crimes *per se,* precluding the agency's interpretation of the statute as allowing it to **\*1347** create additional categories of facially particularly serious crimes.

**WESTLAW**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

13 Cal. Daily Op. Serv. 3893, 2013 Daily Journal D.A.R. 4598

### C. BIA and Ninth Circuit Precedent

Although we base our conclusion on the text, history, and structure of the statute, our holding also comports with Ninth Circuit precedent and with the BIA's practice of applying the *Frentescu* case-by-case analysis in most cases involving convictions of offenses other than aggravated felonies. In two en banc decisions, the BIA held that the IIRIRA revived the *Frentescu* case-by-case analysis for aggravated felony convictions resulting in a sentence of less than 5 years. *See* *Matter of L–S–*, 22 I. & N. Dec. 645, 649 (BIA 1999) (en banc), *Matter of S–S–*, 22 I. & N. Dec. 458, 463–65 (BIA 1999) (en banc). [8] In 2006, this court accordingly reversed a decision by the BIA for failure to apply the *Frentescu* factors. *See* *Afridi*, 442 F.3d at 1218. Afridi was convicted under California Penal Code § 261.5(c) for unlawful intercourse with a minor who was more than three years younger than the perpetrator and was sentenced to three years' probation. *Id.* at 1214. The BIA found him statutorily ineligible for withholding of removal because he had been convicted of a particularly serious crime. *Id.* at 1217. This court granted the petition for review in part noting, "The BIA considered two of the *Frentescu* factors, the nature of the conviction and the sentence imposed ... [but] the BIA did not consider the circumstances and underlying facts of the conviction." *Id.* at 1219. We specifically noted that under the most recent statutory amendments, "aggravated felonies resulting in sentences fewer than five years are not per se particularly serious and still require a case-by-case analysis, as laid out in *Frentescu*." *Id.* at 1220 n. 4.

The government argues that we should defer to the BIA's construction of 8 U.S.C. § 1231 in *Matter of N–A–M–*, 24 I. & N. Dec. 336 (BIA 2007), that it may designate an offense as a particularly serious crime *per se*. But, because we have already resolved this case at the first step of the *Chevron* inquiry, we do not move to the second step of the inquiry, in which we ask whether the agency's interpretation is a "permissible construction" of the statute. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. We note briefly, however, that *Matter of N–A–M–* does not necessarily support the government's position. The respondent in that case was convicted of felony menacing and sentenced to four years' deferred judgment. 24 I. & N. Dec. at 337. The BIA stated that where "a conviction is not for an aggravated felony for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years, we examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction." *Id.* at 342. The agency noted in dictum that "[o]n some occasions, we have focused exclusively on the elements of the offense," [9] but "we have generally **\*1348** examined a variety of factors and found that the consideration of the individual facts and circumstances is appropriate." *Id.* (internal quotations omitted). And, although stating that "that the respondent's offense is a particularly serious crime based solely on its elements," the BIA nonetheless examined the individualized characteristics of the offense, including the fact that the offense was a crime against a person, that the respondent was required to register as a sex offender, and the statement in support of the warrantless arrest describing the nature of the respondent's crime. *Id.* at 343.

We acknowledge that two other circuits have assumed, without explicitly deciding, that the BIA can make the "particularly serious crime" determination based solely on the elements of the offense. [10] However, no Ninth Circuit decision so holds, and our considered analysis of the statute at issue compels a contrary conclusion.

### IV. Substantial Evidence Supported the BIA's Finding that Blandino Failed to Establish a Clear Probability of Torture

[6]    We affirm the BIA's denial of withholding of removal under the CAT because Blandino has not established a clear probability that he would be tortured if he returned to Nicaragua. This court reviews "for substantial evidence the factual findings

underlying the ... BIA's determination that [the applicant] was not eligible for deferral of removal under the CAT." *Arbid v. Holder,* 674 F.3d 1138, 1143 (9th Cir.2012). Under this standard, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

In its initial decision to grant Blandino relief under CAT, the IJ specifically identified the past persecution of Blandino's family as grounds for granting relief. On appeal, the BIA found that the record as a whole provided insufficient evidence to establish that it was "more likely than not" that Blandino would be tortured by the Nicaraguan government, and noted that rather than presenting hard evidence of a probability that he would be tortured, Blandino merely presented a series of worst-case scenarios. Furthermore, he had not presented evidence that similarly-situated individuals are being tortured by Nicaraguan officials. Given the deference this court must afford to the BIA's findings of fact, we affirm its decision to deny CAT relief to Blandino.

**Conclusion**

For the foregoing reasons, we GRANT Blandino's petition for review of the BIA's **\*1349** determination that he committed a particularly serious crime, and we REMAND with instructions that the agency engage in a case-specific analysis in accordance with *Matter of Frentescu* to determine whether Blandino's conviction under Section 288(a) is a particularly serious crime, rendering him statutorily ineligible for withholding of removal.

We DENY Blandino's petition for review of the BIA's denial of his claim for relief under the Convention Against Torture.

All pending motions in this case are DENIED.

**GRANTED IN PART, DENIED IN PART, AND REMANDED.**

**All Citations**

712 F.3d 1338, 13 Cal. Daily Op. Serv. 3893, 2013 Daily Journal D.A.R. 4598

**Footnotes**

\*       The Honorable William K. Sessions, III, District Judge for the U.S. District Court for the District of Vermont, sitting by designation.

1       California Penal Code § 288(a) states: "Any person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

2       8 U.S.C. § 1231(b)(3)(B)(ii) provides that an alien may not be removed to a nation in which his life or freedom would be threatened on a protected ground unless "the Attorney General decides ... the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States."

3       The BIA did not identify in *Matter of Frentescu* any crimes that were, on their face, "particularly serious crimes" or clearly not "particularly serious crimes."

4   The *Frentescu* factors have evolved slightly. The BIA no longer engages "in a separate determination to address whether the alien is a danger to the community." *Matter of N–A–M–,* 24 I. & N. Dec. 336, 342 (BIA 2007); *see also Kankamalage v. I.N.S.,* 335 F.3d 858, 861 n. 2 (9th Cir.2003) ("Once the INS makes a finding that an offense constitutes a particularly serious crime, a separate determination of danger to the community is not required.").

5   At that time, only a limited number of offenses had been designated "aggravated felonies." *See* Pub.L. No. 100–690, § 7342, 102 Stat. 4181, 4469–70 (1988 version of the INA) (defining "aggravated felony" as: "murder; any drug trafficking crime ... or any illicit trafficking in any firearms or destructive devices"). The Immigration Act of 1990 added money laundering and crimes of violence for which the term of imprisonment is at least five years to the list of aggravated felonies. *See* Pub.L. No. 101–649, § 501, 104 Stat. 4978, 5048.

6   "As used in immigration law, 'aggravated felony' is a term of art referring to the offenses enumerated in [ 8 U.S.C.] § 1101(a)(43)." *Delgado v. Holder,* 648 F.3d 1095, 1101 (9th Cir.2011) (en banc).

7   Prior to the enactment of the IIRIRA, the asylum statute did not have a "particularly serious crime" provision; rather, it simply stated that aliens convicted of aggravated felonies were ineligible for asylum. *See* 8 U.S.C. § 1158 (Apr. 24, 1996).

8   In *Matter of S–S–,* the BIA also noted that "Congress easily could have designated categories of aggravated felonies that it considered to be particularly serious crimes—either independently or in conjunction with a specific sentence— but it did not do so." 22 I. & N. Dec. at 464. After holding that an individualized consideration of the facts and circumstances of each conviction for aggravated felonies resulting in less than five years' imprisonment was necessary, the BIA went on to note, "We leave for another day the question of whether, and under what conditions, it might be appropriate, as a matter of discretion, for the Attorney General to designate certain offenses as being particularly serious crimes per se." *Id.* at 465 n. 7.

9   The BIA cited *Matter of Garcia–Garrocho,* 19 I. & N. Dec. 423, 425–26 (BIA 1986), in support of this proposition. The applicant in *Garcia–Garrocho* had been convicted of first-degree burglary in violation of New York Penal Law § 140.30. *Id.* at 425. The BIA stated that certain crimes are "inherently" or "per se" particularly serious, and require "no further inquiry into the nature and circumstances of the underlying conviction," *id.,* and held that "the applicant's conviction for burglary in the first degree is within the category of crimes that are per se 'particularly serious.' " *Id.* at 426. However, *Garcia–Garrocho* predates the 1996 passage of IIRIRA, which established the two-tier approach to determining which offenses are particularly serious crimes.

10   In *Hamama v. INS,* which was decided several months before the "particularly serious crimes" provision at issue in this case was enacted by the IIRIRA, the Sixth Circuit stated that the BIA "has the prerogative to declare a crime particularly serious without examining each and every *Frentescu* factor." 78 F.3d 233, 240 (6th Cir.1996). In *Lapaix v. U.S. Attorney General,* the Eleventh Circuit stated that in making the "particularly serious crime" determination, the IJ is "free to rely solely on the elements of the offense," but that "IJ's generally consider additional evidence" and apply the *Frentescu* factors. 605 F.3d 1138, 1143 (11th Cir.2010).

---

**End of Document**                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   AR.04214   11

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Akhtar v. Gonzales, 5th Cir., May 23, 2006

425 F.3d 663
United States Court of Appeals,
Ninth Circuit.

Delia Ramos BONA, Petitioner,

v.

Alberto R. GONZALES,
Attorney General, Respondent.
Delia Ramos Bona, Petitioner,

v.

Alberto R. Gonzales, Attorney General, Respondent.

Nos. 03–71596, 03–72488.
|
Argued and Submitted Feb. 8, 2005.
|
Filed Sept. 30, 2005.

**Synopsis**

**Background:** Alien, a native of the Philippines, petitioned for review of the final order of removal issued by the Board of Immigration Appeals (BIA), which affirmed the decision of the immigration judge (IJ).

**Holdings:** The Court of Appeals, Hug, Circuit Judge, held that:

[1] alien was an "arriving alien," and

[2] as a matter of first impression, Immigration and Naturalization Service (INS) regulation which rendered aliens who had been paroled into the United States but placed in removal proceedings ineligible for adjustment of status, was invalid.

Petition granted; remanded.

West Headnotes (7)

[1]    **Aliens, Immigration, and Citizenship** ⟵ Adjustment of status

Alien, a native of the Philippines, was an "arriving alien," for purpose of determining her eligibility to apply for adjustment of status, where she was paroled into the United States.

Immigration and Nationality Act, § 235(b), 8 U.S.C.A. § 1225(b); 8 C.F.R. § 1.1(q).

30 Cases that cite this headnote

[2]    **Administrative Law and Procedure** ⟵ Plain, literal, or clear meaning; ambiguity or silence

Under step one of the *Chevron* test, a court must first ask whether Congress has spoken to the precise question at issue.

[3]    **Administrative Law and Procedure** ⟵ Plain, literal, or clear meaning; ambiguity or silence

Under *Chevron*, if Congress has spoken on the precise question at issue, the inquiry is at an end; the court must give effect to the unambiguously expressed intent of Congress.

[4]    **Administrative Law and Procedure** ⟵ Plain, literal, or clear meaning; ambiguity or silence

If a court determines that Congress did not speak to the precise issue because the statute is either silent or ambiguous, the court must go to step two in the *Chevron* analysis and consider the agency's interpretation.

[5]    **Administrative Law and Procedure** ⟵ Permissible or reasonable construction

Under *Chevron*, if the administrative regulation enacted by the government agency is a permissible construction of the statute, the court must defer to the agency's interpretation.

1 Cases that cite this headnote

05 Cal. Daily Op. Serv. 8721, 2005 Daily Journal D.A.R. 11,857

**[6]    Administrative Law and
Procedure** 🔑 Permissible or reasonable
construction

Whether the administrative regulation enacted
by a government agency is a permissible
construction of the statute is a question of law
reviewed de novo.

1 Cases that cite this headnote

**[7]    Aliens, Immigration, and
Citizenship** 🔑 Validity

Immigration and Naturalization Service (INS)
regulation, which rendered aliens who had been
paroled into the United States but placed in
removal proceedings ineligible for adjustment
of status, was invalid; regulation was contrary
to provision of Immigration and Nationality
Act (INA) provision, allowing paroled aliens to
apply for adjustment of status. Immigration and
Nationality Act, § 235(a, b), 🚩 8 U.S.C.A. §
1225(a, b); 🚩 8 C.F.R. § 245.1(c)(8).

31 Cases that cite this headnote

**West Codenotes**

**Held Invalid**

🚩 8 C.F.R. § 245.1(c)(8).

**Attorneys and Law Firms**

**\*664**  Stuart I. Folinsky, Los Angeles, CA, for the petitioner.

Earle B. Wilson and Jennifer Paisner, Office of Immigration
Litigation, Washington, DC, for the respondent.

On Petition for Review of an Order of the Board of
Immigration Appeals.

Before HUG, FERGUSON, and HAWKINS, Circuit Judges.

**Opinion**

HUG, Circuit Judge.

This case involves a woman who is a Philippine citizen whose
husband has served for 19 years in the United States Navy and
is a naturalized United States citizen. They have three children
who are also now naturalized citizens. She arrived in the
United States in 1991 with her three children as endangered
family members of a serviceman when Mt. Pinatubo erupted
in the Philippines. She was placed in removal proceedings
eight years later and denied the ability to apply for adjustment
of status under an INS regulation because she was paroled
into the United States at the time of her arrival in 1991. We
hold in agreement with 📗 *Succar v. Ashcroft,* 394 F.3d 8 (1st
Cir.2005), that the regulation is in conflict with the governing
statute and is thus invalid. Under the statute she is **\*665**
entitled to apply for adjustment in the removal proceedings.

This case started with the best of intentions by our own
government, with the evacuation of military personnel and
their families from the Philippine islands under threat of an
impending volcanic eruption. But the case quickly digressed
into a series of unwise and misplaced discretionary decisions
which ultimately led to an immigration judge entering a
final order of removal against Delia Ramos Bona ("Delia").
Delia appeals the Board of Immigration Appeals's ("Board")
decision affirming the final order of removal and the Board's
refusal to remand the case. Most importantly, however, Delia
also argues that this court should follow the First Circuit's
decision in *Succar,* which held that 🚩 8 C.F.R. § 245.1(c)
(8), the regulation that precludes arriving aliens from seeking
adjustment of status in removal proceedings, is invalid. We
have jurisdiction pursuant to 🚩 8 U.S.C. § 1252(a)(1) to
consider this appeal. We agree with the *Succar* decision and
hold that 🚩 8 C.F.R. § 245.1(c)(8) is invalid. [1] Therefore,
Delia was improperly precluded from applying for adjustment
of status during her removal proceedings. Accordingly, we
grant the petition for review and remand the case to the Board
of Immigration Appeals for further proceedings.

I.

Delia is a native and citizen of the Philippines. She is
married to Rolando G. Bona ("Rolando"), a naturalized
United States citizen. The Bonas are the parents of three
children who are also naturalized citizens. At the time of oral
argument, Rolando had served in the United States Navy for
approximately nineteen years.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 376 of 1384

In 1989, while Delia and the children were living in the Philippines, Rolando filed an immediate relative visa petition on behalf of his wife and children. The petitions were granted the same year.

In August 1991, the United States military evacuated its personnel and their families from the Philippine Islands due to the eruption of Mount Pinatubo. It appears that these military families had no choice but to evacuate at the military's insistence and their transportation was paid for by the government. As a result, Delia and her children were evacuated from the Philippines and she and the children were paroled into the United States on August 21, 1991. In September of that same year, Rolando was naturalized.

Following her husband's naturalization, Delia applied for adjustment of status. However, her adjustment application was denied by the then Immigration and Naturalization Service ("the Service") in October 1991. It appears that the Service denied the adjustment application because it believed that Delia's *husband,* Rolando, had fraudulently obtained his immigrant visa and subsequent citizenship. According to the Service's hypothesis, Rolando received his immigrant visa (and subsequent citizenship) as the "unmarried son of a United States citizen." However, the Service believed that at the time Rolando applied for and received his visa, he was not "unmarried" because he was in fact married to Delia. Subsequently, the Service revoked Delia's parole authorization.

At the time of the denial, these allegations of fraud had never been adjudicated **\*666** or proven in any court of law. Nor does it appear that there was any evidence that Delia participated or otherwise was involved in the fraud, if in fact it did occur. At no time has the Service ever attempted to de-naturalize Rolando or revoke the approved visa petition granted to Delia in 1991. In fact, as of this time, the Service could not take steps to de-naturalize Rolando based upon his long service to the United States military. In spite of denying Delia adjustment, the Service did grant the Bona children permanent resident status based upon Rolando's citizenship. The children have since been naturalized.[2]

To compound matters, the Service waited more than eight years to initiate removal proceedings against Delia. Delia's August 1999 Notice to Appear alleged that Delia: 1) was an arriving alien, 2) was not a citizen or national of the United States, 3) had been admitted to the country as a parolee, and 4) had obtained admission into the United States by fraud.

Thus, the Service charged her as removable under 8 U.S.C. § 1227(a)(1)(A) as an inadmissible alien.

The following month, the Service amended the charging document. The amendment included an additional charge of inadmissibility under 8 U.S.C. § 1182(a)(7), alleging Delia was an immigrant not in possession of a valid entry document at the time of her application for admission.

The Immigration Judge ("IJ") conducted a hearing on both charges of inadmissibility and rendered his decision in February 2000. Initially, the IJ determined that the first charge failed as a matter of law because as a parolee Delia was not subject to the deportability provisions of section 1227.

Next, the IJ turned to the second charge of removability under section 1182. Delia admitted the basic elements of the charge, most notably that she was an arriving alien. Based upon her status as an arriving alien, the IJ made clear that he could not consider Delia's application for an adjustment of status.[3] Recognizing that there were no other "remedies" available to Delia, he gave the parties three options: 1) the parties could agree to an administrative closure of the case, which would require the government's consent, 2) Delia could withdraw her application for admission and agree to return to the Philippines in order to pursue her application for admission from her native country, or 3) the matter could proceed. Both the government and Delia agreed to proceed. As a result, the IJ found clear and convincing evidence that Delia was removable. Additionally, he refused to consider Delia's application for adjustment because she was ineligible for such relief as an arriving alien. 8 C.F.R. § 245.1(c)(8). Thus, Delia was ordered removed to the Philippines.

Delia appealed the decision to the Board of Immigration Appeals arguing that she was not an "arriving alien" and should have been allowed to adjust her status in her removal proceedings. The Board, in a *per curiam* decision, rejected this argument without comment and dismissed the appeal. On a motion to reconsider, the Board again rejected this argument because Delia admitted at her removal hearing that she was an "arriving alien."

**\*667** On appeal, she renews her argument that she was not an "arriving alien" within the meaning of the Immigration and Naturalization Act. Alternatively, she argues that even if she is "an arriving alien" she should not have been precluded

05 Cal. Daily Op. Serv. 8721, 2005 Daily Journal D.A.R. 11,857

from applying for adjustment of status in her removal proceedings. She urges this court to adopt the rationale of *Succar v. Ashcroft*, 394 F.3d 8 (1st Cir.2005), and hold that the regulation promulgated by the Attorney General, 8 C.F.R. § 245.1(c)(8), which precludes "arriving aliens" from applying for adjustment of status in removal proceedings, is invalid because it is in direct conflict with 8 U.S.C. § 1255(a).[4]

II.

The precise issue raised by this appeal is whether a paroled alien, who is also deemed an arriving alien under 8 C.F.R. § 1.1(q), is properly precluded from applying for adjustment of status in removal proceedings. This is a novel issue, not yet addressed by this circuit. To answer this question, we must first determine whether Delia is in fact an "arriving alien" within section 1.1(q). If she is, we must then turn to the question of whether 8 C.F.R. § 245.1(c)(8), which precludes arriving aliens (including paroled aliens by definition) from applying for adjustment of status, is invalid because it is clearly contrary to the statute defining the categories of aliens who are eligible to apply for adjustment of status without restriction. 8 U.S.C. § 1255(a).

First, Delia argues that she is not an "arriving alien" within the meaning of 8 C.F.R. § 1.1(q). She bases this argument on the fact that she was paroled into the United States before April 1, 1997, and thus she claims to be specifically exempted from the definition of "arriving alien" under section 1.1(q).

The section states, in relevant part:

> An arriving alien remains such even if paroled pursuant to section 212(d)(5) [ 8 U.S.C. § 1182(d)(5) ] of the Act, *except that an alien who was paroled before April 1, 1997,* or an alien who was granted advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, *shall not be considered an arriving alien for purposes of section*

*235(b)(1)(A)(i)* [ 8 U.S.C. § 1225(b)(1)(A)(i) ] *of the Act.*

8 C.F.R. § 1.1(q) (emphasis added).

**[1]** The regulation shows that an alien paroled under 8 U.S.C. § 1182(d) remains an "arriving alien" regardless of her parole status. The section also creates two exemptions from the definition of "arriving alien": 1) aliens paroled into the United States before April 1, 1997, and 2) aliens granted advance parole. However, a plain reading of the regulation clearly shows that both exceptions only exempt these aliens from the definition of "arriving alien" *for the purpose* of excluding them from expedited removal proceedings under 8 U.S.C. § 1225(b). Accordingly, Delia, as a parolee, was properly deemed an "arriving **\*668** alien" within the meaning of section 1.1(q).

As a parolee who is deemed an "arriving alien," Delia is specifically precluded by regulation from applying for adjustment of status. 8 C.F.R. § 245.1(c)(8). However, Delia argues that this regulation directly conflicts with 8 U.S.C. § 1255(a), which allows any alien who has been "inspected and admitted *or paroled*" into the country to apply for adjustment of status. (emphasis added). She specifically urges this court to follow *Succar,* which invalidated this regulation on this very basis.

We agree with the analysis and holding of *Succar.* Accordingly, we hold that because the "regulation redefines certain aliens as ineligible to apply for adjustment of status ... whom a statute, 8 U.S.C. § 1255(a), defines as eligible to apply[,]" the regulation is invalid. *Succar,* 394 F.3d at 9.[5] Therefore, we expressly adopt and follow the *Succar* decision and hold that 8 C.F.R. § 245.1(c)(8) is invalid.[6]

**[2]** **[3]** **[4]** **[5]** **[6]** In reviewing regulation section 245.8(c)(8) we apply the test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under step one of the *Chevron* test, we must first ask whether Congress has spoken to the precise question at issue. *Id.* at 842, 104 S.Ct. 2778; *Akhtar v. Burzynski,* 384 F.3d 1193, 1198 (9th

05 Cal. Daily Op. Serv. 8721, 2005 Daily Journal D.A.R. 11,857

Cir.2004). "If Congress has done so, the inquiry is at an end; [we] must give effect to the unambiguously expressed intent of Congress." *Morales–Izquierdo v. Ashcroft,* 388 F.3d 1299, 1303 (9th Cir.2004) (internal quotations and citations omitted). However, if we determine that Congress did not speak to the precise issue because the statute is either silent or ambiguous, we must go to step two in the *Chevron* analysis and consider the agency's interpretation. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *Akhtar,* 384 F.3d at 1198. Here, we ask whether the regulation enacted by the agency is a permissible construction of the statute. *Id.* If so, we must defer to the agency's interpretation. *Id.* This is a question of law reviewed de novo. *Id.*

In *Succar,* the First Circuit directly confronted the identical issue presented by this appeal. 394 F.3d at 9. Wissam Succar, a native and citizen of Lebanon, was taken into custody by immigration officials at Miami International Airport after approaching an official at the airport and indicating that he wished to apply for asylum. *Id.* at 11. After an initial interview with immigration authorities, it was determined that Succar had a credible fear of **\*669** future persecution and the facts provided by Succar were sufficient to establish his eligibility for asylum. *Id.* Succar was placed into removal proceedings and paroled into the United States. *Id.*

More than a year later at his removal hearing, Succar admitted the allegations in his Notice to Appear. He renewed his application for asylum, but the IJ denied it. Succar appealed to the Board of Immigration Appeals. *Id.*

While his appeal was pending, Succar married a United States citizen, who filed an immigrant visa petition on his behalf; the petition was approved. *Id.* Believing that he now met the statutory requirements for adjustment of status, Succar then filed a motion with the Board to remand his case to the IJ for consideration of his adjustment application. *Id.* His motion was granted. Before the IJ, the government took the position that 8 C.F.R. § 245.1(c)(8) prevented Succar from applying for adjustment of status. *Id.* The IJ denied the application for adjustment because of Succar's status as an arriving alien. *Id.* at 12. Succar's subsequent appeal to the Board was denied. *Id.*

Succar challenged the validity of section 245.1(c)(8) on appeal to the First Circuit. After explaining in great detail the immigration laws and regulations pertaining to adjustment of status, parolees, and the changes brought about by the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), the court turned to the validity of section 245.1(c)(8). The court first addressed step one of the *Chevron* test—whether Congress had spoken to the precise question at issue. *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. The court determined that Congress had spoken to the precise issue of which aliens were eligible to apply for adjustment of status, specifically all aliens who were "inspected and admitted or paroled" into the country. *Succar,* 394 F.3d at 24 (quoting 8 U.S.C. § 1255(a)). Therefore, the court found that Congress had "reserved for itself the determination of whether a non-citizen should be able to apply for this relief." *Id.*

The court noted that Congress specifically defined who was eligible to apply for adjustment and that these categories had remained the same in spite of numerous amendments made to the statute since its initial enactment in 1960. *Id.* at 24 n. 20. Additionally, aliens in these eligible categories are not restricted from seeking adjustment of status once placed in removal proceedings. *Id.* at 24.

Next, *Succar* clarified that when Congress intended to limit those categories of aliens who were eligible to apply for adjustment, it explicitly did so. *Id.* at 25 (citing 8 U.S.C. § 1255(c)). Under section 1255(c), Congress specifically excluded several categories of aliens otherwise eligible from applying for adjustment of status. Furthermore, Congress has even provided for exceptions to these exclusions in certain classes of cases. *See* 8 U.S.C. § 1255(i).

Next, the court engaged in a very thorough analysis of the larger statutory scheme. The court's analysis makes clear that Congress first determined that paroled aliens were to be considered "inadmissible" by statute. *Succar,* 394 F.3d at 26 (citing 8 U.S.C. § 1182(a)). However, in spite of their "inadmissible" status, Congress also made the clear policy choice that these aliens also should be eligible to apply for adjustment of status. 8 U.S.C. § 1255(a). The court went on to explain that based upon their "inadmissible"

AR.04219

status, paroled aliens also would be placed in removal proceedings. *Succar,* 394 F.3d at 27 (citing 8 U.S.C. § 1225(b)(2)(A)). The decision to place these aliens in removal proceedings is not left to the discretion of the Attorney General, but rather is mandated **\*670** by the statute. *See* 8 U.S.C. § 1225(b)(2)(A). Thus, the *Succar* opinion points out:

> This context shows that Congress purposefully classified paroled individuals as "inadmissible," and it also determined that they should generally be placed in removal proceedings. But Congress also explicitly allowed paroled individuals to adjust status if they meet the other statutory requirements.

*Succar,* 394 F.3d at 27. Thus, a regulation that specifically excludes paroled aliens from applying for adjustment of status in removal proceedings directly conflicts not only with the specific statute on point, 8 U.S.C. § 1255(a), but creates absurd results when viewed in light of the larger statutory scheme.

[7] We agree with the above analysis. But we must also point out the practical effect of the Attorney General's regulations with respect to adjustment of status applications made by parolees. Prior to the enactment of IIRIRA, a paroled alien was generally placed in exclusion proceedings as she was considered not to have "entered" the country. *See generally Landon v. Plasencia,* 459 U.S. 21, 25–26, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). Although exclusion proceedings limited the forms of relief available to individuals, paroled aliens were specifically allowed to apply to the district director having jurisdiction over their case while the exclusion proceedings were ongoing.[7] *In Re Castro–Padron,* 21 I. & N. Dec. 379, 379–380 (BIA 1996).

The enactment of IIRIRA changed this system. Gone were the days of "exclusion" proceedings and now paroled aliens were generally placed in "removal" proceedings. Based upon the Attorney General's regulation, a paroled alien may apply only to the district director for an adjustment. 8 C.F.R. § 245.2(a)(1). However, this is only true if the paroled alien is also not first placed in removal proceedings. *Id.* Based upon 8 C.F.R. § 245.1(c)(8), once the paroled alien (who is also classified as an "arriving alien") is placed in removal proceedings, the regulation precludes any application for adjustment of status, including a direct application to the district director. 8 C.F.R. § 245.2(a)(1); 8 C.F.R. § 245.1(c) (8); *Succar,* 394 F.3d at 18. This is a break from the prior procedure and it is this aspect of section 245.1(c)(8) which proves fatal. By entirely excluding a category of aliens from the ability to apply for adjustment, who by statute are eligible to apply for such relief, the regulation goes beyond simply regulating the manner in which such applications shall be made or the discretionary decision to grant such relief. Rather, the regulation strips statutory eligibility for such relief *in any form* from this entire category of aliens once they are placed in removal proceedings. The statute provides for no such restriction. Furthermore, the larger statutory context does not provide the Attorney General with the discretion to make such a choice.

Although Congress delegated to the Attorney General the discretionary authority to grant or deny an application for an adjustment of status, 8 U.S.C. § 1255(a), Congress did not delegate to the Attorney General the discretion to choose who was *eligible to apply* for such relief. Thus, we agree with the First Circuit that Congress has spoken to the precise issue of who is eligible to apply for adjustment of status and that 8 C.F.R. § 245.1(c)(8) is directly **\*671** contrary to this Congressional determination. *Succar,* 394 F.3d at 29. Therefore, the inquiry is at an end, *see Morales–Izquierdo v. Ashcroft,* 388 F.3d at 1303, and section 245.1(c)(8) is invalid. The petitioner is eligible for adjustment of status.[8]

Accordingly, we GRANT the petition for review and REMAND this case to the Board for further proceedings consistent with this opinion.

**All Citations**

425 F.3d 663, 05 Cal. Daily Op. Serv. 8721, 2005 Daily Journal D.A.R. 11,857

05 Cal. Daily Op. Serv. 8721, 2005 Daily Journal D.A.R. 11,857

## Footnotes

1   8 C.F.R. § 245.1(c)(8) is identical to 8 C.F.R. § 1245.1(c)(8). Section 245.1(c)(8) applies to the immigration agencies within the Department of Homeland Security, whereas section 1245.1(c)(8) applies to the immigration courts and the Board of Immigration of Appeals which remain within the Department of Justice. This opinion will refer to 8 C.F.R. § 245.1(c)(8), although both sections are challenged on appeal.

2   This is based upon representations made to the Court by Delia's attorney at oral argument.

3   It is important to note the Delia was not attempting to *renew* her previously denied application for adjustment. Rather, she was attempting to make a *new* application for adjustment in her removal proceedings.

4   The First Circuit decided the *Succar* case while this case was pending on appeal to this court. Delia initially raised the issue in a letter to the court pursuant to Fed. R.App. P. 28(j). The issue was addressed at oral argument and the parties were ordered to provide supplemental briefing on the issue. The court also accepted an *amicus* brief filed by the American Immigration Law Foundation. The Attorney General was also permitted to file a response to this brief. We find that a narrow exception allowing us to hear an issue raised for the first time on appeal applies in this case because this is a pure issue of law and the opposing party will not be prejudiced by its consideration. *See* United States v. Antonakeas, 255 F.3d 714, 721 (9th Cir.2001).

5   At oral argument, the Attorney General attempted to distinguish *Succar* from the facts of this case because Delia's parole status had been revoked. However, the Attorney General did not provide any legal authority or analysis for why this distinction is significant. Furthermore, the Attorney General did not raise this argument again in either of his supplemental briefs filed with the court following oral argument. Therefore, it appears the argument has been waived by the government. However, even if it has not been waived, it is not disputed that Delia was "paroled" into the United States. Therefore, under the plain terms of section 1255(a), she would be eligible for adjustment of status regardless of whether her parole status ended or was revoked at a later time. *Cf.* Tibke v. INS, 335 F.2d 42, 45 (2d Cir.1964) (noting that the adjustment of status statute as amended eliminated the requirement that the non-citizen's original status be maintained in order to be eligible for relief.)

6   In reaching this conclusion, we have reviewed and considered Mouelle v. Gonzales, 416 F.3d 923, 2005 WL 1790137 (8th Cir. July 29, 2005) (2–1 decision), which recently rejected the *Succar* holding in a case very similar to the case at bar. However, we find the reasoning of *Succar* more persuasive and therefore reject the approach taken by the *Mouelle* court.

7   Such a paroled alien also could apply directly for adjustment to the district director if not placed in exclusion proceedings.

8   This case is both factually and legally distinguishable from Jiang v. Gonzales, 2005 WL 2319668 (9th Cir. filed Sept. 23, 2005) and therefore, not controlled by its result. First, the circumstances of Jiang's arrival and initial stay in the United States are completely different. Jiang initially was allowed to travel through the country after receiving the "transit-without-visa" privilege. However, his inadvertence at an airport resulted in his staying in the United States after failing to board a flight back to China. After his initial arrival, Jiang *voluntarily* applied for and was granted advance parole. Upon his return from China, Jiang was paroled into the United States. Delia, on the other hand, was compelled to come to this country and evacuate the Philippines by the United States military. Upon her arrival, she was given parole. She was neither given a choice in the matter nor was she made aware of the consequences of her parole status.

Second, although Jiang and Delia were both "paroled" aliens, who were subsequently categorized as "arriving aliens" under 8 C.F.R. § 1.1(q), and were limited in obtaining adjustment of status in removal proceedings, the posture of their adjustment applications is completely different. Jiang was attempting to *renew* his previously denied adjustment application in removal proceedings, whereas Delia was attempting to make a completely new application. As a result, Jiang and Delia attack entirely different regulations on appeal.

05 Cal. Daily Op. Serv. 8721, 2005 Daily Journal D.A.R. 11,857

Delia challenges 🚩 8 C.F.R. § 245.1(c)(8), which precludes arriving aliens from making a new or initial application for adjustment of status in removal proceedings. In contrast, Jiang challenges 8 C.F.R. § 1245.2(a), which precludes an arriving alien from *renewing* a previously denied application for adjustment of status in removal proceedings. Unlike the regulation attacked in this case, 8 C.F.R. § 1245.2(a) does not entirely preclude paroled aliens (who are deemed arriving aliens) from their statutory eligibility to apply for adjustment. Rather, the regulation merely defines the manner in which a previously denied application can be *renewed*. This difference is significant.

🚩 Section 245.1(c)(8) entirely precludes a class of aliens, paroled aliens, who by statute are eligible to apply for adjustment of status, from making any such application once they are placed in removal proceedings. *See* 🚩 8 U.S.C. § 1255(a). This is different from precluding a paroled alien, who is also an arriving alien, from *renewing* a previously denied application. Unlike Delia, Jiang was eligible to apply for adjustment and did apply, but was denied relief. Thus, section 1245.2(a) does not strip the ability of an otherwise eligible class of aliens from applying for adjustment of status in any way. Therefore, the conclusion in *Jiang* that 8 C.F.R. § 1245.2(a) does not violate 🚩 8 U.S.C. § 1255(a) is correct. However, the determination of whether section 1245.2(a) is consistent with the statute is inapposite to the issue of whether 🚩 section 245.1(c)(8) is valid. As *Jiang* is distinguishable from the case at bar both factually and legally it is not controlling.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

898 F.2d 1053
United States Court of Appeals,
Fifth Circuit.

Pedro BUSTOS–TORRES, Petitioner,
v.
IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 89–4738
|
Summary Calendar.
|
April 26, 1990.

**Synopsis**

Alien sought judicial review of final deportation order of Board of Immigration Appeals. The Court of Appeals, Patrick E. Higginbotham, Circuit Judge, held that: (1) form prepared by Immigration and Naturalization Service (INS) investigator as result of his interview with allegedly deportable alien was admissible in deportation proceeding, notwithstanding government's failure to produce officer who prepared form to authenticate form in person; (2) form was admissible, notwithstanding lack of *Miranda*-type warning; and (3) form prepared by INS investigator was itself sufficient to make out prima facie case of deportability, requiring alien to produce evidence of legal presence in country.

Affirmed.

West Headnotes (11)

**[1] Aliens, Immigration, and Citizenship** ⚷ Evidence in Administrative or Judicial Proceedings

Rules of evidence applicable in court are not applicable in deportation proceedings.

2 Cases that cite this headnote

**[2] Aliens, Immigration, and Citizenship** ⚷ Conduct of hearing; fairness in general

**Constitutional Law** ⚷ Admission and exclusion; deportation

Due process standards of fundamental fairness extend to conduct of deportation proceedings. U.S.C.A. Const.Amend. 14.

10 Cases that cite this headnote

**[3] Aliens, Immigration, and Citizenship** ⚷ Admissibility

Test for admissibility of evidence in deportation proceeding is whether evidence is probative and whether its use is fundamentally fair so as not to deprive alien of due process. U.S.C.A. Const.Amend. 14.

33 Cases that cite this headnote

**[4] Administrative Law and Procedure** ⚷ Hearsay

**Constitutional Law** ⚷ Hearings and adjudications

Hearsay evidence is admissible in administrative proceedings, as long as admission of evidence meets tests of fundamental fairness and probity. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[5] Aliens, Immigration, and Citizenship** ⚷ Admissibility

Form prepared by Immigration and Naturalization Service (INS) investigator as result of his interview with allegedly deportable alien was admissible in deportation proceeding, notwithstanding government's failure to produce officer who prepared form to authenticate form in person, where officer's affidavit showed that information in form was based upon statements of allegedly deportable alien and alien did not contest its validity.

5 Cases that cite this headnote

**[6] Aliens, Immigration, and Citizenship** ⚷ Civil proceedings in general

Aliens, Immigration, and Citizenship ⚷ Informing alien of rights in general

*Miranda* warnings are not required in deportation context, as deportation proceedings are civil and not criminal in nature. U.S.C.A. Const.Amends. 5, 6.

7 Cases that cite this headnote

[7] Aliens, Immigration, and Citizenship ⚷ Admissibility

Constitutional Law ⚷ Admission and exclusion; deportation

Alien's involuntary statements cannot, as matter of due process, be used against him in deportation proceeding. U.S.C.A. Const.Amend. 14.

5 Cases that cite this headnote

[8] Aliens, Immigration, and Citizenship ⚷ Admissibility

Alien's statements to immigration officers are not considered involuntary and inadmissible in deportation proceeding, absent any showing of coercion, duress or improper action on part of officers. U.S.C.A. Const.Amend. 14.

5 Cases that cite this headnote

[9] Aliens, Immigration, and Citizenship ⚷ Admissibility

Allegedly deportable alien's statements to immigration officers were admissible, in deportation proceeding, despite officers' failure to give *Miranda*-type warnings regarding alien's right to remain silent. U.S.C.A. Const.Amends. 5, 6.

1 Cases that cite this headnote

[10] Aliens, Immigration, and Citizenship ⚷ Presumptions and burden of proof

Although government has ultimate burden of proving deportability of alien by clear and convincing evidence, burden shifts to alien to prove that he is legally in country, once government establishes alienage. Immigration and Nationality Act, §§ 241(a)(2), 291, 8 U.S.C.A. §§ 1251(a)(2), 1361.

[11] Aliens, Immigration, and Citizenship ⚷ Presumptions and burden of proof

Aliens, Immigration, and Citizenship ⚷ Weight and Sufficiency

Record of deportable alien completed by immigration officer was by itself sufficient to make out prima facie showing of deportability, requiring alien to produce evidence of legal presence in country. Immigration and Nationality Act, §§ 241(a)(2), 291, 8 U.S.C.A. §§ 1251(a)(2), 1361.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1054** Peter Williamson, Houston, Tex., for petitioner.

Donald A. Couvillon, Richard M. Evans, Alice M. Smith, Allen W. Hausman, Richard Thornburgh, Atty. Gen., U.S. Dept. of Justice, Robert L. Bombaugh, Washington, D.C., John B.Z. Caplinger, I.N.S., New Orleans, La., Ronald G. Parr, Houston, Tex., for respondent.

Petition for Review of an Order of the Board of Immigration & Naturalization Service.

Before WILLIAMS, HIGGINBOTHAM, and SMITH, Circuit Judges.

**Opinion**

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Pedro Bustos–Torres appeals from the Board of Immigration Appeals' final order of deportation. Because the immigration judge did not err in admitting the INS Form I–213 (Record of Deportable Alien), and because Bustos did not refute any of the statements in the form which were sufficient for a prima facie showing of deportability, we affirm.

**\*1055** I

On April 5, 1985, the immigration judge found Bustos deportable as charged for entering the United States without inspection in violation of 8 U.S.C. § 1251(a)(2). At the deportation hearing Bustos identified himself, but refused to plead to the Order to Show Cause and refused to answer the immigration judge's questions, pleading his Fifth Amendment privilege. The INS submitted a Form I–213 Record of Deportable Alien relating to a Pedro Bustos–Torres, which stated that he is a native and citizen of Mexico who entered the United States without inspection in 1981. Attached to the form is an attestation by the INS's trial attorney that it is authentic and a true and correct copy of the original document taken from the INS's files. The record also contains a letter from the district director, pursuant to 8 C.F.R. § 103.7(d)(2), authorizing any trial attorney, acting on behalf of the district director, to certify as to authenticity, originality, and custodial source of any record from any file presented as government evidence in any hearing. Bustos objected to the admission of the Form I–213, conceding that the trial attorney's authentication certified the custodial source of the document, but argued that the document was hearsay, and that the officer who made it should be present for cross-examination and to authenticate the document. The hearing was adjourned so that the officer could be produced. The officer was not available to testify at the continued hearing, as he was at the Dallas office and the hearing was in Houston. The INS produced an affidavit of the officer attesting that he filled out the form based upon an interview with the alien and this affidavit was admitted over Bustos's objections, including an objection that there was no indication that Bustos had executed a Form I–214, Warning as to Rights, or that he was told that he did not have to speak with the arresting officer. No further evidence was presented, and the judge found Bustos deportable.

Bustos appealed to the Board of Immigration Appeals, which affirmed the immigration judge's finding of deportability. Bustos appeals to this court.

II

In determining whether Bustos's deportation was proper, we must answer three questions. First, is a Form I–213 admissible

evidence in a deportation proceeding without the testimony of the officer who completed the form to authenticate it and to explain the source of the information? Second, is a Form I–213 admissible in a deportation proceeding when there is no evidence that the alien was informed of any right to remain silent? Third, if the form is admissible, is it by itself sufficient to make a prima facie showing of deportability, requiring the alien to produce evidence of legal presence in this country?

A. Admissibility Without Supporting Testimony

**[1]  [2]  [3]** Bustos alleges that the Form I–213 amounts to hearsay, and is not properly admissible without the testimony of the officer who filled out the form, so that he may be available for cross examination. First we note that the rules of evidence applicable in the courts are not applicable in deportation proceedings. *Soto–Hernandez v. INS,* 726 F.2d 1070 (5th Cir.1984). Nonetheless, due process standards of fundamental fairness extend to the conduct of deportation proceedings. *Bridges v. Wixon,* 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). The test for admissibility of evidence in a deportation proceeding is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law. *See, e.g., Calderon–Ontiveros v. INS,* 809 F.2d 1050 (5th Cir.1986); *Baliza v. INS,* 709 F.2d 1231 (9th Cir.1983); *Tashnizi v. INS,* 585 F.2d 781 (5th Cir.1978); *Trias–Hernandez v. INS,* 528 F.2d 366 (9th Cir.1975).

**[4]** In *Trias–Hernandez,* the Ninth Circuit considered the admissibility of a Form I–213, and determined that it was properly admitted, despite the alien's objections on the grounds that: "(1) he was not advised of his rights as required by *Miranda* "; "(2) the INS did not comply with its own **\*1056** regulation, 8 C.F.R. § 287.3"; "(3) it was inadmissible hearsay; and (4) no interpreter was present at the interrogation." 528 F.2d at 368. Bustos makes similar claims but none require reversal. Several courts have held that Form I–213 is admissible, despite its hearsay character. Hearsay is admissible in administrative proceedings, so long as the admission of evidence meets the tests of fundamental fairness and probity. *Calderon–Ontiveros,* 809 F.2d at 1053; *Trias–Hernandez,* 528 F.2d at 369; *Martin–Mendoza v. INS,* 499 F.2d 918, 921 (9th Cir.1974). The Form I–213 is essentially a recorded recollection of a conversation with the

alien, and there is no evidence that the statements were not those of the petitioner or that they were the result of coercion.

 **[5]**   The affidavit of the examining officer shows that the information in the Form I–213 is based upon statements of the petitioner, and the petitioner does not contest their validity. In *Tejeda–Mata v. INS,* 626 F.2d 721, 724 (9th Cir.1980), the court held that the authenticity of a Form I–213 was sufficiently established by the testimony of the examining officer, who identified it as the form prepared by him when he questioned the alien. Here there was no such testimony by the examining officer, but his affidavit to that effect was introduced into evidence. [1] Because the rules of evidence do not apply in deportation hearings, the admission of this affidavit was not error, for it is probative, and not fundamentally unfair.

Official INS documents have been admitted in deportation proceedings without being identified by the signer when the person to whom the document refers does not attempt to impeach the information in the document. *Vlisidis v. Holland,* 245 F.2d 812 (3d Cir.1957). *Cf. Baliza v. INS,* 709 F.2d 1231, 1234 (9th Cir.1983). [2] Bustos does not contest that the Form I–213 reflects the officer's examination, nor did he attempt to impeach the information on the form. A similar INS apprehension report was admitted in *Calderon–Ontiveros* for the purpose of showing that the alien had been out of the country and then returned, and there is no indication that the officer who had completed the form testified at the later hearing. 809 F.2d at 1053. The court did not find the report inadmissible because it was hearsay, holding that "[t]he Administrative Procedure Act, which governs such hearings, excludes only 'irrelevant, immaterial, or unduly repetitious evidence.' 5 U.S.C. § 556(d)." *Id.* The Form I–213 relating to Bustos is clearly relevant and material and is not repetitious, so it was properly admitted.

### B. Admissibility With No Evidence of Warnings

 **[6]   [7]   [8]   [9]**   *Miranda* warnings are not required in the deportation context, for deportation proceedings are civil, not criminal, in nature, and the Sixth Amendment safeguards are not applicable. *Trias–Hernandez,* 528 F.2d at 368. **\*1057** *Lavoie v. INS,* 418 F.2d 732, 734 (9th Cir.1969). Because deportation hearings must conform to due process standards, however, an alien's involuntary statements

cannot be used against him in a deportation hearing. *See United States v. Alderete–Deras,* 743 F.2d 645, 647 (9th Cir.1984); *Choy v. Barber,* 279 F.2d 642, 647 (9th Cir.1960). An alien's statements to immigration officers are not considered involuntary absent any showing of "coercion, duress, or improper action on the part of the immigration officer." *Cuevas–Ortega v. INS,* 588 F.2d 1274, 1278 (9th Cir.1979). Bustos has not alleged any coercion, duress, or improper actions by the immigration officer.

The INS has instituted its own regulations imposing a duty on its officers to give certain warnings. 8 C.F.R. § 287.3 provides:

> An alien arrested without a warrant ... shall be examined ... by an officer.... After the examining officer has determined that formal proceedings ... will be instituted, an alien arrested without warrant ... shall be advised of the reason for his/her arrest and the right to be represented by counsel of his/her choice, at no expense to the government. The alien shall also be provided with a list of the available free legal services programs ... It shall be noted on Form I–213 that such a list was provided to the alien. The alien shall also be advised that any statement made may be used against him/her in a subsequent proceeding....

The plain language of this regulation does not require warnings similar to *Miranda* warnings to be issued before the examination that provides the information to be noted on the Form I–213.

The Seventh and Ninth Circuits have held that an alien's statements were admissible despite the lack of *Miranda*-type warnings that he had the right to remain silent. *Alderete–Deras,* 743 F.2d at 648; *Trias–Hernandez,* 528 F.2d at 368; *Chavez–Raya v. INS,* 519 F.2d 397 (7th Cir.1975). In particular, the Seventh Circuit reasoned:

A principal purpose of the *Miranda* warnings is to permit the suspect to make an intelligent decision as to whether to answer the government agent's questions [citations omitted]. In deportation proceedings, however, —in light of the alien's burden of proof, the requirement that the alien answer non-incriminating questions, the potential adverse consequences to the alien of remaining silent, and the fact that an alien's statement is admissible in the deportation hearing despite his lack of counsel at the preliminary interrogation —*Miranda* warnings would be not only inappropriate but could also serve to mislead the alien.

*Chavez–Raya,* 519 F.2d at 402. The Form I–213 was not inadmissible in this case because of any lack of warnings.

### C. Prima Facie Case

**[10]    [11]**  Bustos argues that finding the Form I–213 to be sufficient for a prima facie case of deportability results in deportation by dossier, and that the form is not the clear and convincing evidence necessary for deportation. Although the government has the ultimate burden of proving deportability by clear and convincing evidence, in a § 1251(a)(2) case

charging deportability of an alien who entered the country without inspection, the government need only show alienage. Then 8 U.S.C. § 1361 [3] imposes a statutory presumption that the alien is in the country illegally, and that the burden shifts to the alien to prove that he is here legally.

The Ninth Circuit has held that

Once the forms have been properly admitted, the Service's *prima facie* case of **\*1058** deportability is made. (8 U.S.C. § 1361.) The burden of going forward to produce evidence of nondeportability then shifts to the petitioners. No abridgement of the petitioners' Fifth Amendment rights are involved in requiring them to go forward with the production of evidence.

*Cabral–Avila v. INS,* 589 F.2d 957, 959 (9th Cir.1978).

We adopt the position of the Ninth Circuit and hold that the Form I–213 presented uncontested evidence that Bustos was an alien, a citizen of Mexico, and, therefore, was sufficient for the government's prima facie case of deportability.

AFFIRM.

### All Citations

898 F.2d 1053

---

### Footnotes

1    The affidavit declared that Pablo Hernandez is an investigator with INS, that on November 9, 1984, he prepared a Form I–213 for "Pedro Bustos–Torres" under INS no. "A26 900 740," that the contents of the form were the result of his interview with that alien, that the information was given "freely and voluntarily," and that the investigator signed the form. The affidavit also stated that the alien admitted being a citizen of Mexico.

2    In *Baliza,* the trial court accepted the version of the facts set out in a witness's affidavit although it was directly contradicted by the alien and the government had made no effort to produce the witness. The Ninth Circuit reversed because this was problematic in light of Congress' requirement that an alien in

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

deportation proceedings be afforded "a reasonable opportunity ... to cross-examine witnesses presented by the Government." 🚩 8 U.S.C. § 1252(b)(3). The court stated:

> The purpose of this statutory guarantee cannot be fulfilled, however, if the government's choice whether to produce a witness or to use a hearsay statement is wholly unfettered * * * Recognizing the Government's lack of control over potential witnesses, this court has upheld the admission of hearsay evidence in a number of cases in which the government was unable to produce the witness for cross-examination.... The troubling aspect of this case is the lack of effort the government expended to produce [the witness].

*Baliza v. INS*, 709 F.2d at 1234. In this case there is no contradiction of the officer's affidavit, and the government has given a reason for the absence of the witness.

3    8 U.S.C. § 1361 provides in pertinent part:

> In any deportation proceeding under part V of this subchapter against any person, the burden of proof shall be upon such person to show the time, place, and manner of his entry into the United States, but in presenting such proof he shall be entitled to the production of his visa or other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry in the custody of the Service. If such burden of proof is not sustained, such person shall be presumed to be in the United States in violation of law.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by United States v. Sorensen, 8th Cir.(S.D.), June 26, 2018

130 S.Ct. 2577
Supreme Court of the United States

Jose Angel CARACHURI–ROSENDO, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General.

No. 09–60.
|
Argued March 31, 2010.
|
Decided June 14, 2010.

**Synopsis**
**Background:** Alien petitioned for review of en banc order of the Board of Immigration Appeals (BIA), 2007 WL 4624548, holding he was ineligible for cancellation of removal. The Fifth Circuit Court of Appeals, Edith H. Jones, Chief Judge, 570 F.3d 263, denied petition. Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Stevens, held that defendant's second Texas offense of simple drug possession was not "aggravated felony," so as to preclude cancellation of removal, where second conviction was not based on fact of prior conviction; abrogating Fernandez v. Mukasey, 544 F.3d 862.

Reversed.

Justice Scalia filed opinion concurring in judgment.

Justice Thomas filed opinion concurring in judgment.

West Headnotes (8)

**[1]**   **Aliens, Immigration, and Citizenship** 🔑 Controlled substances offenses

Second or subsequent simple drug possession offenses are not "aggravated felonies," so as

to preclude cancellation of removal, when the state conviction is not based on the fact of a prior conviction. Immigration and Nationality Act, §§ 101(a)(43), 240A(a)(3), 8 U.S.C.A. §§ 1101(a)(43), 1229b(a)(3).

139 Cases that cite this headnote

**[2]**   **Aliens, Immigration, and Citizenship** 🔑 Aggravated felonies in general

For a state conviction to qualify as an "aggravated felony," so as to preclude cancellation of removal, it is necessary for the underlying conduct to be punishable as a federal felony. Immigration and Nationality Act, § 240A(a)(3), 8 U.S.C.A. § 1229b(a)(3).

113 Cases that cite this headnote

**[3]**   **Aliens, Immigration, and Citizenship** 🔑 Cancellation of Removal or Suspension of Deportation in General

An alien may still seek cancellation of removal even after having been removed. Immigration and Nationality Act, § 240A(a), 8 U.S.C.A. § 1229b(a).

8 Cases that cite this headnote

**[4]**   **Statutes** 🔑 Particular Elements of Language

When interpreting statutory provisions, Supreme Court would begin by looking at terms of the provisions and the commonsense conception of those terms.

8 Cases that cite this headnote

**[5]**   **Statutes** 🔑 Defined terms; definitional provisions

For purposes of statutory interpretation, Congress has the power to give words unorthodox meanings.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 389 of 1384

Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010)

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

**[6]**    **Aliens, Immigration, and Citizenship** 🔑 Constitutional and Statutory Provisions

Ambiguities in criminal statutes referenced in immigration laws should be construed in the noncitizen's favor.

2 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship** 🔑 Aggravated felonies in general

For a state offense to qualify as an "aggravated felony," so as to preclude cancellation of removal, the defendant must have been actually convicted of a crime that is itself punishable as a felony under federal law; the mere possibility that the defendant's conduct, coupled with facts outside of the record of conviction, could have authorized a felony conviction under federal law is insufficient to satisfy the statutory command that a noncitizen be convicted of an aggravated felony before he loses the opportunity to seek cancellation of removal. Immigration and Nationality Act, § 240A(a)(3), 🚩 8 U.S.C.A. § 1229b(a)(3).

275 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship** 🔑 Controlled substances offenses

Defendant's second Texas offense of simple drug possession was not "aggravated felony," so as to preclude cancellation of removal, notwithstanding that had he been prosecuted in federal court instead of state court he could have been prosecuted as felon and received 2–year sentence based on his first simple possession offense, where prosecutor declined to charge him as recidivist in second case, such that second conviction was not based on fact of prior conviction; abrogating 🚩 *Fernandez v. Mukasey,* 544 F.3d 862. Immigration and Nationality Act, § 240A(a)(3), 🚩 8 U.S.C.A. § 1229b(a)(3); 🚩 18 U.S.C.A. § 924(c)(2).

176 Cases that cite this headnote

**\*\*2578**  *Syllabus* *

Petitioner, a lawful permanent resident of the United States, faced deportation after committing two misdemeanor drug offenses in Texas. For the first, possession of a small amount of marijuana, he received 20 days in jail. For the second, possession without a prescription of one antianxiety tablet, he received 10 days. Texas law, like federal law, authorized a sentencing enhancement if the State proved that petitioner had been previously convicted of a similar offense, but Texas did not seek such an enhancement here. After the second conviction, the Federal Government initiated removal proceedings. Petitioner conceded that he was removable, but claimed that he was eligible for discretionary cancellation of removal under the Immigration and Nationality Act (INA) because he had not been convicted of any "aggravated felony," 🚩 8 U.S.C. § 1229b(a)(3). 🚩 Section 1101(a)(43)(B) defines that term to include, *inter alia,* "illicit trafficking in a controlled substance ... including a drug trafficking crime" as defined in 🚩 18 U.S.C. § 924(c), which, in turn, defines a "drug trafficking crime" as a "felony punishable under," *inter alia,* "the Controlled Substances Act (21 U.S.C. 801 et seq.)." A felony is a crime for which the "maximum term of imprisonment authorized" is "more than one year." § 3559(a). Simple possession offenses are ordinarily misdemeanors punishable with shorter sentences, but a conviction "after a prior conviction under this subchapter [or] the law of any State ... has become final," 🚩 21 U.S.C. § 844(a)—a "recidivist" simple possession offense—is "punishable" as a "felony" under 🚩 § 924(c)(2) and subject to a 2–year sentence. Only this "recidivist" simple possession category might be an "aggravated felony" under 🚩 8 U.S.C. § 1101(a)(43). A prosecutor must charge the existence of the prior conviction. See 21 U.S.C. § 851(a)(1). Notice and an opportunity to challenge its validity, §§ 851(b)-(c), are mandatory prerequisites to obtaining a punishment based on the fact of the prior conviction and necessary prerequisites to "authorize" a felony punishment, 🚩 18 U.S.C. § 3559(a), for the simple possession offense at issue.

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

Here, the Immigration Judge held that petitioner's second simple possession conviction was an "aggravated felony" that made him ineligible for cancellation of removal. The Board of Immigration Appeals and Fifth Circuit affirmed. Relying on the holding in **2579 *Lopez v. Gonzales,* 549 U.S. 47, 56, 127 S.Ct. 625, 166 L.Ed.2d 462—that to be an "aggravated felony" for immigration law purposes, a state drug conviction must be punishable as a felony under federal law—the court used a "hypothetical approach," concluding that because petitioner's "conduct" could have been prosecuted as a recidivist simple possession under state law, it could have also been punished as a felony under federal law.

*Held:* Second or subsequent simple possession offenses are not aggravated felonies under § 1101(a)(43) when, as in this case, the state conviction is not based on the fact of a prior conviction. Pp. 2585 – 2590.

(a) Considering the disputed provisions' terms and their "commonsense conception," *Lopez,* 549 U.S. at 53, 127 S.Ct. 625, it would be counterintuitive and "unorthodox" to apply an "aggravated felony" or "illicit trafficking" label to petitioner's recidivist possession, see *id.,* at 54, 127 S.Ct. 625. The same is true for his penalty. One does not usually think of a 10-day sentence for unauthorized possession of one prescription pill as an "aggravated felony." This Court must be very wary in this case because the Government seeks a result that "the English language tells [the Court] not to expect." *Ibid.* P. 2585.

(b) The Government's position—that "conduct punishable as a felony" should be treated as the equivalent of a felony conviction when the underlying conduct could have been a felony under federal law—is unpersuasive. First, it ignores the INA's text, which limits the Attorney General's cancellation power only when, *inter alia,* a noncitizen "has ... been convicted of a[n] aggravated felony." 8 U.S.C. § 1229b(a)(3). Thus, the conviction itself is the starting place, not what might have or could have been charged. Under the Controlled Substances Act, simple possession offenses carry only a 1-year sentence unless a prosecutor elects to charge the defendant as a recidivist and the defendant receives notice and an opportunity to defend against that charge. Here, petitioner's record of conviction contains no finding of the fact of his prior drug offense. An immigration court cannot, *ex post,* enhance the state offense of record just because facts

known to it would have authorized a greater penalty. The Government contends that had petitioner been prosecuted in federal court under identical circumstances, he would have committed an "aggravated felony" for immigration law purposes. But his circumstances were not identical to the Government's hypothesis. And the Government's approach cannot be reconciled with § 1229b(a)(3), which requires an "aggravated felony" conviction—not that the noncitizen merely could have been convicted of a felony but was not. Second, the Government's position fails to effectuate 21 U.S.C. § 851's mandatory notice and process requirements, which have great practical significance with respect to the conviction itself and are integral to the structure and design of federal drug laws. They authorize prosecutors to exercise discretion when electing whether to pursue a recidivist enhancement. So do many state criminal codes, including Texas'. Permitting an immigration judge to apply his own recidivist enhancement after the fact would denigrate state prosecutors' independent judgment to execute such laws. Third, the Fifth Circuit misread *Lopez.* This Court never used a "hypothetical approach" in its analysis. By focusing on facts known to the immigration court that could have *but did not* serve as the basis for the state conviction and punishment, the Circuit's approach introduces a level of conjecture that has no basis in *Lopez.* Fourth, the Government's argument is inconsistent with common practice in the **2580 federal courts, for it is quite unlikely that petitioner's conduct would have been punished as a felony in federal court. Finally, as the Court noted in *Leocal v. Ashcroft,* 543 U.S. 1, 11, n. 8, 125 S.Ct. 377, 160 L.Ed.2d 271, ambiguities in criminal statutes referenced in immigration laws should be construed in the noncitizen's favor. Notably, here, the question whether petitioner has committed an "aggravated felony" is relevant to the type of relief he may obtain from a removal order, but not to whether he is in fact removable. Thus, any relief he may obtain still depends on the Attorney General's discretion. Pp. 2586 – 2589.

570 F.3d 263, reversed.

STEVENS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, ALITO, and SOTOMAYOR, JJ., joined. SCALIA, J., *post,* pp. 2590 – 2591, and THOMAS, J., *post,* p. 2591 filed opinions concurring in the judgment.

**Attorneys and Law Firms**

Sri Srinivasan, Washington, DC, for petitioner.

Nicole A. Saharsky, Washington, DC, for respondent.

Geoffrey A. Hoffman, University of Houston, Law Center, Houston, TX, Sri Srinivasan, Counsel of Record, Irving L. Gornstein, Loren L. Alikhan, O'Melveny & Myers LLP, Washington, DImmigration and Nationality Act, Washington, DC, for petitioner.

Elena Kagan, Solicitor General, Counsel of Record, Tony West, Assistant Attorney General, Edwin S. Kneedler, Michael R. Dreeben, Deputy Solicitors General, Nicole A. Saharsky, Assistant to the Solicitor General, Donald E. Keener, W. Manning Evans, Saul Greenstein, Andrew MacLachlan, Holly M. Smith, Washington, DC, for respondent.

**Opinion**

Justice STEVENS delivered the opinion of the Court.

**\*566** Petitioner Jose Angel Carachuri–Rosendo, a lawful permanent resident who has lived in the United States since he was five years old, faced deportation under federal law after he committed two misdemeanor drug possession offenses in Texas. For the first, possession of less than two ounces of marijuana, he received 20 days in jail. For the second, possession without a prescription of one tablet of a common antianxiety medication, he received 10 days in jail. After this second offense, the Federal Government initiated removal proceedings against him. He conceded that he was removable, but claimed he was eligible for discretionary relief from removal under 8 U.S.C. § 1229b(a).

**[1]** To decide whether Carachuri–Rosendo is eligible to seek cancellation of removal or waiver of inadmissibility under § 1229b(a), we must decide whether he has been convicted of an "aggravated felony," § 1229b(a)(3), a category of crimes singled out for the harshest deportation consequences. The Court of Appeals held that a simple drug possession offense, committed after the conviction for a first possession offense became final, is always an aggravated felony. We now reverse and hold that second or subsequent simple possession offenses are not aggravated felonies under § 1101(a)(43) when, as in this case, the state conviction is not based on the fact of a prior conviction.

I

Under the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, **\*\*2581** 8 U.S.C. § 1101 et seq., a lawful permanent **\*567** resident subject to removal from the United States may apply for discretionary cancellation of removal if, *inter alia,* he "has not been convicted of any aggravated felony," § 1229b(a)(3). The statutory definition of the term "aggravated felony" includes a list of numerous federal offenses, [1] one of which is "illicit trafficking in a controlled substance ... including a drug trafficking crime (as defined in section 924(c) of title 18)." § 1101(a)(43)(B). Section 924(c)(2), in turn, defines a "drug trafficking crime" to mean "any felony punishable under," *inter alia,* "the Controlled Substances Act (21 U.S.C. 801 et seq.)." A felony is a crime for which the "maximum term of imprisonment authorized" is "more than one year." 18 U.S.C. § 3559(a). [2]

The maze of statutory cross-references continues. Section 404 of the Controlled Substances Act criminalizes simple possession offenses, the type of offense at issue in this case. But it prescribes punishment for both misdemeanor and felony offenses. Except for simple possession of crack cocaine or flunitrazepam, a first-time simple possession offense is a federal misdemeanor; the maximum term authorized for such a conviction is less than one year. 21 U.S.C. § 844(a). However, a conviction for a simple possession offense "after a prior conviction under this subchapter [or] under the law of any State ... has become final"—what we will call recidivist simple possession [3]— may be punished as a felony, with **\*568** a prison sentence of up to two years. *Ibid.* [4] Thus, except for simple possession offenses involving isolated categories of drugs not presently at issue, only *recidivist* simple possession offenses are "punishable" as a federal "felony" under the Controlled Substances Act, 18 U.S.C. § 924(c)(2). And thus only a conviction within this particular category of simple possession offenses might, conceivably, be an "aggravated felony" under 8 U.S.C. § 1101(a)(43).

For a subsequent simple possession offense to be eligible for an enhanced punishment, *i.e.,* to be punishable as a

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 392 of 1384

Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010)
130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

felony, the Controlled Substances Act requires **2582 that a prosecutor charge the existence of the prior simple possession conviction before trial, or before a guilty plea. See 21 U.S.C. § 851(a)(1). [5] Notice, plus an opportunity to challenge the validity of the prior conviction used to enhance the current *569 conviction, §§ 851(b)-(c), are mandatory prerequisites to obtaining a punishment based on the fact of a prior conviction. [6] And they are also necessary prerequisites under federal law to "authorize" a felony punishment, 18 U.S.C. § 3559(a), for the type of simple possession offense at issue in this case.

Neither the definition of an "illicit trafficking" offense under 8 U.S.C. § 1101(a)(43)(B) nor that of a "drug trafficking crime" under 18 U.S.C. § 924(c)(2) describes or references any state offenses. The "aggravated felony" definition does explain that the term applies "to an offense described in this paragraph whether in violation of Federal or State law." § 1101(a)(43). But in *Lopez v. Gonzales, 549 U.S. 47, 56, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006),* we determined that, in order to be an "aggravated felony" for immigration law purposes, a state drug conviction must be punishable as a felony under *federal* law. We held that "a state offense constitutes a 'felony punishable under the Controlled Substances Act' only if it proscribes conduct punishable as a felony under that federal law." *Id.* at 60, 127 S.Ct. 625. Despite the fact that the *Lopez* petitioner had been punished as a felon under state law—and, indeed, received a 5-year sentence—the conduct of his offense was not punishable as a felony under federal law, and this prevented the state conviction from qualifying as an aggravated *570 felony for immigration law purposes. *Id.* at 55, 127 S.Ct. 625 ("Unless a state offense is punishable as a federal felony it does not count").

**[2]**   In the case before us, the Government argues that Carachuri-Rosendo, despite having received only a 10-day sentence for his Texas misdemeanor simple possession offense, nevertheless has been "convicted" of an "aggravated felony" within the meaning of the INA. This is so, the Government contends, because had Carachuri-Rosendo been prosecuted in federal court instead of state court, he *could have been* prosecuted as a felon and received a 2-year sentence based on the fact of his prior simple possession offense. Our holding in *Lopez* teaches that, for a state conviction to qualify as an "aggravated **2583 felony"

under the INA, it is necessary for the underlying conduct to be punishable as a federal felony. *Id.* at 60, 127 S.Ct. 625. We now must determine whether the mere possibility, no matter how remote, that a 2–year sentence might have been imposed in a federal trial is a sufficient basis for concluding that a state misdemeanant who was not charged as a recidivist has been "convicted" of an "aggravated felony" within the meaning of § 1229b(a)(3).

II

Carachuri-Rosendo was born in Mexico in 1978. He came to the United States with his parents in 1983 and has been a lawful permanent resident of Texas ever since. His common-law wife and four children are American citizens, as are his mother and two sisters.

Like so many in this country, Carachuri-Rosendo has gotten into some trouble with our drug laws. In 2004, he pleaded guilty to possessing less than two ounces of marijuana, a class B misdemeanor, and was sentenced to confinement for 20 days by a Texas court. See App. 19a–22a; Tex. Health & Safety Code Ann. §§ 481.121(a) and (b)(1) (West Supp.2009). In 2005, he pleaded *nolo contendere* to possessing less than 28 grams—one tablet—of alprazolam *571 known commercially as Xanax) without a prescription, a class A misdemeanor. See App. 31a–34a; Tex. Health & Safety Code Ann. §§ 481.117(a) and (b). Although Texas law, like federal law, authorized a sentencing enhancement if the prosecutor proved that Carachuri-Rosendo had been previously convicted of an offense of a similar class, the State did not elect to seek an enhancement based on his criminal history. App. 32a.

In 2006, on the basis of Carachuri-Rosendo's second possession offense, the Federal Government initiated removal proceedings against him. Appearing *pro se* before the Immigration Judge, Carachuri-Rosendo did not dispute that his conviction for possessing one tablet of Xanax without a prescription made him removable, [7] but he applied for a discretionary cancellation of removal pursuant to 8 U.S.C. § 1229b(a). Under that statutory provision, the Attorney General may cancel an order of removal or an order of inadmissibility so long as, *inter alia,* the noncitizen "has not been convicted of a[n] aggravated felony." § 1229b(a)(3). The Immigration Judge held that petitioner's second simple

Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010)

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

possession conviction was an "aggravated felony" that made him ineligible for cancellation of removal.

The Board of Immigration Appeals (BIA) followed Circuit precedent and affirmed that decision, but it disagreed with the Immigration Judge's legal analysis. In its en banc opinion, the BIA ruled that in cases arising in Circuits in which the question had not yet been decided, the BIA would not treat a second or successive misdemeanor conviction as an aggravated felony unless the conviction contained a finding that the offender was a recidivist. *In re Carachuri– Rosendo,* 24 I. & N. Dec. 382, 387, 391 (2007).

The BIA explained that the statutory question is complicated by the fact that " 'recidivist possession' " is not a **\*572** "discrete offense under Federal law." *Id.* at 388. While most federal offenses are defined by elements that must be proved to a jury beyond a reasonable doubt, recidivist possession is an "amalgam of elements, substantive sentencing factors, and procedural safeguards." *Id.* at 389. Section 844(a) defines simple possession **\*\*2584** by reference to statutory elements, but "facts leading to recidivist felony *punishment,* such as the existence of a prior conviction, do not qualify as 'elements' in the traditional sense." *Ibid.*

The BIA observed, however, that "21 U.S.C. § 851 precludes a Federal judge from enhancing a drug offender's sentence on the basis of recidivism absent compliance with a number of safeguards that, among other things, serve to protect the right of the accused to notice and an opportunity to be heard as to the propriety of an increased punishment based on prior convictions." *Ibid.* Therefore, these requirements "are part and parcel of what it means for a crime to be a 'recidivist' offense." *Id.* at 391. "[U]nless the State successfully sought to impose punishment for a recidivist drug conviction," the BIA concluded, a state simple possession "conviction cannot 'proscribe conduct punishable as' recidivist possession" under federal law. *Ibid.*

[3]  On review, the Court of Appeals affirmed the BIA's decision in Carachuri–Rosendo's case, reading our decision in *Lopez* as dictating its outcome. "[I]f the *conduct* proscribed by state offense could have been prosecuted as a felony" under the Controlled Substances Act, the court reasoned, then the defendant's conviction qualifies as an aggravated felony. *570 F.3d 263, 267 (5th Cir.2009)*

(citing *Lopez,* 549 U.S. at 60, 127 S.Ct. 625). The court deemed its analysis "[t]he hypothetical approach," a term it derived from its understanding of our method of analysis in *Lopez.* *570 F.3d at 266 n. 3; see also United States v. Pacheco–Diaz,* 513 F.3d 776, 779 (7th Cir.2008) *(per curiam)* (employing the "hypothetical-federal-felony approach"). Under this approach, as the Court of Appeals understood it, courts "g[o] beyond the state statute's **\*573** elements to look at the hypothetical conduct a state statute proscribes." *570 F.3d at 266, n. 3.* Accordingly, any "conduct" that "hypothetically" "could have been punished as a felony" "had [it] been prosecuted in federal court" is an "aggravated felony" for federal immigration law purposes. *Id.* at 265. In applying this hypothetical approach, the Court of Appeals did not discuss the § 851 procedural requirements. Instead, it concluded that because Carachuri– Rosendo's "conduct" could have been prosecuted as simple possession with a recidivist enhancement under state law— even though it was not—it could have also been punished as a felony under federal law. Thus, in the Court of Appeals' view, his conviction for simple possession under state law, without a recidivist enhancement, was an "aggravated felony" for immigration law purposes. [8]

We granted certiorari to resolve the conflict among the Courts of Appeals over whether subsequent simple possession offenses are aggravated felonies. [9] 558 U.S. 1091, 130 S.Ct. 1012, 175 L.Ed 617 (2009).

**\*\*2585**  III

[4]  When interpreting the statutory provisions under dispute, we begin by looking at the terms of the provisions and the "commonsense conception" of those terms. **\*574** *Lopez,* 549 U.S. at 53, 127 S.Ct. 625. Carachuri–Rosendo is ineligible for cancellation of removal only if he was "convicted of a[n] aggravated felony," 8 U.S.C. § 1229b(a) (3), which, in this case, could only be a conviction for "illicit trafficking in a controlled substance ... including a drug trafficking crime," § 1101(a)(43)(B).

A recidivist possession offense such as Carachuri–Rosendo's does not fit easily into the "everyday understanding" of those terms, *Lopez,* 549 U.S. at 53, 127 S.Ct. 625. This type

of petty simple possession offense is not typically thought of as an "aggravated felony" or as "illicit trafficking." We explained in *Lopez* that "ordinarily 'trafficking' means some sort of commercial dealing." *Id.* at 53–54, 127 S.Ct. 625 (citing Black's Law Dictionary 1534 (8th ed.2004)). And just as in *Lopez,* "[c]ommerce ... was no part of" Carachuri–Rosendo's possessing a single tablet of Xanax, "and certainly it is no element of simple possession." 549 U.S. at 54, 127 S.Ct. 625. As an initial matter, then, we observe that a reading of this statutory scheme that would apply an "aggravated" or "trafficking" label to *any* simple possession offense is, to say the least, counterintuitive and "unorthodox," *ibid*.

The same is true for the type of penalty at issue. We do not usually think of a 10–day sentence for the unauthorized possession of a trivial amount of a prescription drug as an "aggravated felony." A "felony," we have come to understand, is a "serious crime usu[ally] punishable by imprisonment for more than one year or by death." Black's Law Dictionary 694 (9th ed.2009) (hereinafter Black's). An "aggravated" offense is one "made worse or more serious by circumstances such as violence, the presence of a deadly weapon, or the intent to commit another crime." *Id.,* at 75, 127 S.Ct. 625. The term "aggravated felony" is unique to Title 8, which covers immigration matters; it is not a term used elsewhere within the United States Code. Our statutory criminal law classifies the most insignificant of federal felonies—"Class E" felonies—as carrying a sentence of "less than five years but **\*575** more than one year." 18 U.S.C. § 3559(a)(5). While it is true that a defendant's criminal history might be seen to make an offense "worse" by virtue thereof, Black's 75, it is nevertheless unorthodox to classify this type of petty simple possession recidivism as an "aggravated felony."

[5]    Of course, as Justice Souter observed in his opinion for the Court in *Lopez,* Congress, like "Humpty Dumpty," has the power to give words unorthodox meanings. 549 U.S. at 54, 127 S.Ct. 625. But in this case the Government argues for a result that "the English language tells us not to expect," so we must be "very wary of the Government's position." *Ibid.* Because the English language tells us that most aggravated felonies are punishable by sentences far longer than 10 days, and that mere possession of one tablet of Xanax does not constitute "trafficking,*" Lopez* instructs us to be doubly wary of the Government's position in this case. [10]

**\*\*2586** IV

The Government's position, like the Court of Appeals' "hypothetical approach," would treat all "conduct punishable as a felony" as the equivalent of a "conviction" of a felony whenever, **\*576** hypothetically speaking, the underlying conduct could have received felony treatment under federal law. We find this reasoning—and the "hypothetical approach" itself—unpersuasive for the following reasons.

First, and most fundamentally, the Government's position ignores the text of the INA, which limits the Attorney General's cancellation power only when, *inter alia,* a noncitizen "has ... been *convicted* of a[n] aggravated felony." 8 U.S.C. § 1229b(a)(3) (emphasis added). The text thus indicates that we are to look to the conviction itself as our starting place, not to what might have or could have been charged. And to be convicted of an aggravated felony punishable as such under the Controlled Substances Act, the "maximum term of imprisonment authorized" must be "more than one year," 18 U.S.C. § 3559(a)(5). Congress, recall, chose to authorize only a 1–year sentence for nearly all simple possession offenses, but it created a narrow exception for those cases in which a prosecutor elects to charge the defendant as a recidivist and the defendant receives notice and an opportunity to defend against that charge. See 21 U.S.C. § 851; Part I, *supra*.

Indisputably, Carachuri–Rosendo's record of conviction contains no finding of the fact of his prior drug offense. Carachuri–Rosendo argues that even such a finding would be insufficient, and that a prosecutorial charge of recidivism and an opportunity to defend against that charge also would be required before he could be deemed "convicted" of a felony punishable under the Controlled Substances Act. In the absence of any finding of recidivism, we need not, and do not, decide whether these additional procedures would be necessary. Although a federal immigration court may have the power to make a recidivist finding in the first instance, see, *e.g.,* *Almendarez–Torres v. United States,* 523 U.S. 224, 247, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), it cannot, *ex post,* enhance the state offense of record just because facts known to it would have authorized a greater penalty under either state or federal **\*577** law. [11] **\*\*2587** Carachuri–Rosendo was not actually "convicted," § 1229b(a)(3), of a drug possession offense committed

Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010)

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

"after a prior conviction ... has become final," § 844(a), and no subsequent development can undo that history. [12]

 **\*578**  The Government contends that if Carachuri–Rosendo had been prosecuted in federal court for simple possession under 21 U.S.C. § 844(a) under identical circumstances, he would have committed an "aggravated felony" for immigration law purposes. Tr. of Oral Arg. 36–37. This is so, the Government suggests, because the only statutory text that matters is the word "punishable" in 18 U.S.C. § 924(c) (2): Whatever conduct might be "punishable" as a felony, regardless of whether it actually is so punished or not, is a felony for immigration law purposes. But for the reasons just stated, the circumstances of Carachuri–Rosendo's prosecution were not identical to those hypothesized by the Government.

And the Government's abstracted approach to § 924(c)(2) cannot be reconciled with the more concrete guidance of 8 U.S.C. § 1229b(a)(3), which limits the Attorney General's cancellation authority only when the noncitizen has actually been "convicted of a[n] aggravated felony"—not when he merely could have been convicted of a felony but was not.

Second, and relatedly, the Government's position fails to give effect to the mandatory notice and process requirements contained in 21 U.S.C. § 851. For federal-law purposes, a simple possession offense is not "punishable" as a felony unless a federal prosecutor first elects to charge a defendant as a recidivist in the criminal information. The statute, as described in Part I, *supra*, at 3–4, speaks in mandatory terms, permitting "[n]o person" to be subject to a recidivist enhancement—and therefore, in this case, a felony sentence —"unless" he has been given notice of the Government's intent to prove the fact of a prior conviction. Federal law also gives the defendant an opportunity to challenge the fact of the prior conviction itself. §§ 851(b)-(c). The Government would dismiss  **\*\*2588**  these procedures as meaningless,  **\*579**  so long as they may be satisfied during the immigration proceeding.

But these procedural requirements have great practical significance with respect to the conviction itself and are integral to the structure and design of our drug laws. They authorize prosecutors to exercise discretion when electing whether to pursue a recidivist enhancement. See United States v. Dodson, 288 F.3d 153, 159 (5th Cir.2002) ("Whereas the prior version of [§ 851(a) ]

made enhancements for prior offenses mandatory, the new statutory scheme gave prosecutors discretion whether to seek enhancements based on prior convictions"). Because the procedures are prerequisites to an enhanced sentence, § 851 allows federal prosecutors to choose whether to seek a conviction that is "punishable" as a felony under § 844(a). Underscoring the significance of the § 851 procedures, the United States Attorney's Manual places decisions with respect to seeking recidivist enhancements on par with the filing of a criminal charge against a defendant. See Dept. of Justice, United States Attorneys' Manual § 9–27.300(B) (1997), online at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/27mcrm.htm#9–27.300 (as visited June 3, 2010, and available in Clerk of Court's case file) ("Every prosecutor should regard the filing of an information under 21 U.S.C. § 851 ... as equivalent to the filing of charges").

Many state criminal codes, like the federal scheme, afford similar deference to prosecutorial discretion when prescribing recidivist enhancements. Texas is one such State. See, *e.g.,* Tex. Penal Code Ann. §§ 12.42, 12.43 (West 2003 and Supp. 2009) (recidivist enhancement is available "[i]f it is shown on the trial" that defendant was previously convicted of identified categories of felonies and misdemeanors). And, in this case, the prosecutor specifically elected to "[a]bandon" a recidivist enhancement under state law. App. 32a (reproducing state judgment). Were we to permit a federal immigration judge to apply his own recidivist enhancement after  **\*580**  the fact so as to make the noncitizen's offense "punishable" as a felony for immigration law purposes, we would denigrate the independent judgment of state prosecutors to execute the laws of those sovereigns.

Third, the Court of Appeals' hypothetical felony approach is based on a misreading of our decision in *Lopez.* We never used the term "hypothetical" to describe our analysis in that case. We did look to the "proscribe[d] conduct" of a state offense to determine whether it is "punishable as a felony under that federal law." 549 U.S. at 60, 127 S.Ct. 625. But the "hypothetical approach" employed by the Court of Appeals introduces a level of conjecture at the outset of this inquiry that has no basis in *Lopez.* It ignores both the conviction (the relevant statutory hook) and the conduct actually punished by the state offense. Instead, it focuses on facts known to the immigration court that could have *but did not* serve as the basis for the state conviction and punishment. As the Sixth Circuit has explained, this approach is really a

Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010)

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

" 'hypothetical to a hypothetical.' " *Rashid v. Mukasey,* 531 F.3d 438, 445 (2008). Not only does the Government wish us to consider a fictional federal felony—whether the crime for which Carachuri–Rosendo was actually convicted would be a felony under the Controlled Substances Act— but the Government also wants us to consider facts not at issue in the crime of conviction (*i.e.,* the existence of a prior conviction) to determine whether Carachuri–Rosendo *could have* been charged with a federal felony. This methodology is far removed from the more focused, categorical inquiry employed in *Lopez.*

 **2589  Fourth, it seems clear that the Government's argument is inconsistent with common practice in the federal courts. It is quite unlikely that the "conduct" that gave rise to Carachuri–Rosendo's conviction would have been punished as a felony in federal court. Under the United States Sentencing Guidelines, Carachuri–Rosendo's recommended sentence, based on the type of controlled substance at issue, would not **581  have exceeded one year and very likely would have been less than six months. See *United States Sentencing Commission, Guidelines Manual* § 2D2.1(a)(3) (Nov.2009) (base offense level of 4). And as was true in *Lopez,* the Government has provided us with no empirical data suggesting that "even a single eager Assistant United States Attorney" has ever sought to prosecute a comparable federal defendant as a felon. *549 U.S. at 57–58, 127 S.Ct. 625.* The Government's "hypothetical" approach to this case is therefore misleading as well as speculative, in that Carachuri–Rosendo's federal-court counterpart would *not,* in actuality, have faced any felony charge.

 [6]  Finally, as we noted in *Leocal v. Ashcroft,* 543 U.S. 1, 11 n. 8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), ambiguities in criminal statutes referenced in immigration laws should be construed in the noncitizen's favor. And here the critical language appears in a criminal statute, *18 U.S.C. § 924(c)(2).*

We note that whether a noncitizen has committed an "aggravated felony" is relevant, *inter alia,* to the type of relief he may obtain from a removal order, but not to whether he is in fact removable. In other words, to the extent that our rejection of the Government's broad understanding of the scope of "aggravated felony" may have any practical effect on policing our Nation's borders, it is a limited one. Carachuri–Rosendo, and others in his position, may now seek cancellation of removal and thereby avoid the harsh consequence of mandatory removal. But he will not avoid the fact that his conviction makes him, in the first instance, removable. Any relief he may obtain depends upon the discretion of the Attorney General.

* * *

 [7]  In sum, the Government is correct that to qualify as an "aggravated felony" under the INA, the conduct prohibited by state law must be punishable as a felony under federal law. See *Lopez, 549 U.S. at 60, 127 S.Ct. 625.* But as the text and structure of the relevant statutory provisions demonstrate, the **582  defendant must *also* have been *actually convicted* of a crime that is itself punishable as a felony under federal law. The mere possibility that the defendant's conduct, coupled with facts outside of the record of conviction, could have authorized a felony conviction under federal law is insufficient to satisfy the statutory command that a noncitizen be "convicted of a[n] aggravated felony" before he loses the opportunity to seek cancellation of removal. *8 U.S.C. § 1229b(a)(3).* The Court of Appeals, as well as the Government, made the logical error of assuming that a necessary component of an aggravated felony is also sufficient to satisfy its statutory definition.

V

 [8]  We hold that when a defendant has been convicted of a simple possession offense that has not been enhanced based on the fact of a prior conviction, he has not been "convicted" under *§ 1229b(a)(3)* of a "felony punishable" as such "under the Controlled Substances Act," *18 U.S.C. § 924(c)(2).* The prosecutor in Carachuri–Rosendo's case declined to charge him as a recidivist. He has, therefore, not been **2590  convicted of a felony punishable under the Controlled Substances Act.

The judgment of the Court of Appeals is reversed.

It is so ordered.

JUSTICE SCALIA, concurring in the judgment.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 397 of 1384

Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010)
130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

I agree with the Court that Carachuri–Rosendo's 2005 conviction for simple possession of a tablet of Xanax in violation of Texas law is not a conviction for an "aggravated felony" under 🚩 8 U.S.C. § 1101(a)(43)(B). But my reasoning is more straightforward than the Court's, and so I concur only in the judgment.

Under the Immigration and Nationality Act, the Attorney General may cancel the removal of an alien from the United States provided the alien "has not been convicted of any aggravated felony." 🟨 § 1229b(a)(3). There is no statutory definition of "convicted," but a "conviction" is defined to **583 mean a "formal judgment of guilt of the alien entered by a court." 🚩 § 1101(a)(48)(A). The term "aggravated felony" includes, among many other offenses, "a drug trafficking crime (as defined in [ 🚩 18 U.S.C. § 924(c) ] )." 🚩 § 1101(a)(43)(B). A "drug trafficking crime" is in turn defined as "any felony punishable under the Controlled Substances Act." 🚩 18 U.S.C. § 924(c)(2).

It could be concluded from the provisions discussed above that only a *federal* conviction for a felony offense under the Controlled Substances Act would qualify under 🚩 8 U.S.C. § 1101(a)(43)(B). But the penultimate sentence in 🚩 § 1101(a)(43) provides that the statutory definition of "aggravated felony" "applies to an offense described in this paragraph whether in violation of Federal or State law." This language, we have said, confirms that "a state offense whose elements include the elements of a felony punishable under the [Controlled Substances Act] is an aggravated felony." *Lopez v. Gonzales,* 549 U.S. 47, 57, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006).

The conceptual problem in the present case is that the only crime defined by 🟨 21 U.S.C. § 844(a) of the Controlled Substances Act, simple possession of prohibited drugs, is a misdemeanor. That misdemeanor becomes a "felony punishable under the Controlled Substances Act" only because the sentencing factor of recidivism authorizes additional punishment beyond one year, the criterion for a felony. We held in 🟠 *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), that recidivism can constitutionally be made a sentencing factor rather than an element of the crime, despite the fact that it is used to increase the allowable sentence. And we said in *Lopez*

that a "state possession crim[e] that correspond[s] to" the "felony violatio[n]" of "recidivist possession" in 🟨 § 844(a) "clearly fall[s] within the definitions used by Congress in ... 🚩 § 1101(a)(43)(B) and ... 🚩 § 924(c)(2)." 549 U.S. at 55 n. 6, 127 S.Ct. 625.

But to say all that is not to say that an alien has been "convicted of" an aggravated felony (which is what 🟨 § 1229b(a)(3) requires) when he has been convicted of nothing **584 more than a second state misdemeanor violation, the punishment for which could, because of recidivism, be extended beyond one year. Just because, by reason of *Almendarez–Torres,* the federal misdemeanor offense has been raised to a felony offense without changing its elements, solely by increasing its penalty pursuant to a recidivist "sentencing factor"; it does not follow that when the question is asked whether someone has been "convicted of" a state offense that "corresponds" to the federal misdemeanor-become-felony, **2591 the answer can be sought in sentencing factors. A defendant is not "convicted" of sentencing factors, but only of the elements of the crime charged in the indictment. In other words, a misdemeanor offense with a sentencing factor that raises its punishment to the felony level qualifies for purposes of establishing the elements of a "felony punishable under the Controlled Substances Act"; but does *not* qualify for purposes of determining what elements the alien has been "convicted of."

Here, Carachuri–Rosendo was only "convicted of" the crime of knowing possession of a controlled substance without a valid prescription, a class A misdemeanor under Texas law. Tex. Health & Safety Code Ann. §§ 481.117(a) and (b) (West Supp.2009). Since the elements of that crime did not include recidivism, the crime of his conviction did not "correspond" to the Controlled Substances Act felony of possession-plus-recidivism under 🟨 21 U.S.C. § 844(a).

For these reasons, I concur in the judgment.

JUSTICE THOMAS, concurring in the judgment.

A plain reading of 🚩 18 U.S.C. § 924(c)(2) identifies two requirements that must be satisfied for Carachuri–Rosendo's state conviction to qualify as a " ' drug trafficking crime ' " that renders him ineligible for cancellation of removal: * *585 "First, the offense must be a felony; second, the offense must be capable of punishment under

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 398 of 1384

Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010)

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

the Controlled Substances Act (CSA)." *Lopez v. Gonzales, 549 U.S. 47, 61, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006)* (THOMAS, J., dissenting). Carachuri–Rosendo's offense of simple possession was "punishable under the [CSA]," *§ 924(c)(2)*, and thus satisfied the second requirement, but his crime of conviction in state court was only a misdemeanor. Accordingly, that offense does not bar him from obtaining cancellation of removal.

The Fifth Circuit understandably felt constrained by this Court's decision in *Lopez* to rule otherwise. In *Lopez*, this Court held that "a state offense constitutes a 'felony punishable under the [CSA]' only if it proscribes conduct punishable *as a felony* under that federal law." *Id. at 60, 127 S.Ct. 625* (emphasis added). Though *Lopez* addressed a felony conviction under state law that did not correlate to a felony under the CSA, the Court's rule preordained the result in this case:

"[T]he Court admits that its reading will subject an alien defendant convicted of a state misdemeanor to deportation

if his conduct was punishable as a felony under the CSA. Accordingly, even if never convicted of an actual felony, an alien defendant becomes eligible for deportation based on a hypothetical federal prosecution." *Id. at 67, 127 S.Ct. 625* (THOMAS, J., dissenting).

Today, the Court engages in jurisprudential gymnastics to avoid *Lopez*. I will not contort the law to fit the case. *Lopez* was wrongly decided. But because a proper reading of the statutory text, see *id. at 60–63, 127 S.Ct. 625*, supports the result the Court reaches today, I concur in the judgment.

### All Citations

560 U.S. 563, 130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382, 2010 Daily Journal D.A.R. 8882, 22 Fla. L. Weekly Fed. S 451

---

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499 (1906)*.

1       The term "aggravated felony" "applies to an offense ... whether in violation of Federal or State law" (or, in certain circumstances, "the law of a foreign country"). *8 U.S.C. § 1101(a)(43)*.

2       The Controlled Substances Act itself defines the term "felony" as "any Federal or State offense classified by applicable Federal or State law as a felony." *21 U.S.C. § 802(13)*. The Government concedes that the classification of felonies under *18 U.S.C. § 3559(a)* controls in this case. Brief for Respondent 4.

3       Although *§ 844(a)* does not expressly define a separate offense of "recidivist simple possession," the fact of a prior conviction must nonetheless be found before a defendant is subject to a felony sentence. True, the statutory scheme comports with *Almendarez–Torres v. United States, 523 U.S. 224, 247, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)*, in which we explained that the Constitution does not require treating recidivism as an element of the offense. In other words, Congress has permissibly set out a criminal offense for simple possession whereby a recidivist finding by the judge, by a preponderance of the evidence, authorizes a punishment that exceeds the statutory maximum penalty for a simple possession offense. But the fact of a prior conviction must still be found—if only by a judge and if only by a preponderance of the evidence—before a defendant is subject to felony punishment. For present purposes, we therefore view *§ 844(a)*'s felony simple possession provision as separate and distinct from the misdemeanor simple possession offense that section also prescribes.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

4    The statute provides in relevant part: "Any person who violates this subsection may be sentenced to a term of imprisonment of not more than 1 year ... except that if he commits such offense after a prior conviction ... he shall be sentenced to a term of imprisonment for not less than 15 days but not more than 2 years ...."

       21 U.S.C. § 844(a).

5    This subsection provides: "No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon." § 851(a)(1).

6    We have previously recognized the mandatory nature of these requirements, as have the Courts of Appeals.

       See *United States v. LaBonte,* 520 U.S. 751, 754, n. 1, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) ( "We note that imposition of an enhanced penalty [for recidivism] is not automatic.... If the Government does not file such notice [under 21 U.S.C. § 851(a)(1) ] ... the lower sentencing range will be applied even though the defendant may otherwise be eligible for the increased penalty"); see also, *e.g., United States v. Beasley,* 495 F.3d 142, 148 (4th Cir.2007); *United States v. Ceballos,* 302 F.3d 679, 690–692 (7th Cir.2002); *United States v. Dodson,* 288 F.3d 153, 159 (5th 2002); *United States v. Mooring,* 287 F.3d 725, 727–728 (8th 2002).

       Although § 851's procedural safeguards are not constitutionally compelled, see *Almendarez–Torres, 523 U.S. at 247, 118 S.Ct. 1219,* they are nevertheless a mandatory feature of the Controlled Substances Act and a prerequisite to securing a felony conviction under § 844(a) for a successive simple possession offense.

7    But for trivial marijuana possession offenses (such as Carachuri–Rosendo's 2004 state offense), virtually all drug offenses are grounds for removal under 8 U.S.C. § 1227(a)(2)(B)(i).

8    Since the Court of Appeals issued its decision in this case, Carachuri–Rosendo has been removed. Brief for Respondent 10–11. Neither party, however, has suggested that this case is now moot. If Carachuri–Rosendo was not convicted of an "aggravated felony," and if he continues to satisfy the requirements of 8 U.S.C. § 1229b(a), he may still seek cancellation of removal even after having been removed. See § 1229b(a) ("The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien" meets several criteria).

9    Compare 570 F.3d 263 (5th Cir.2009) (holding state conviction for simple possession after prior conviction for simple possession is a felony under the Controlled Substances Act and thus an aggravated felony) and *Fernandez v. Mukasey,* 544 F.3d 862 (7th Cir.2008) (same), with *Berhe v. Gonzales,* 464 F.3d 74 (1st Cir.2006) (taking contrary view), *Alsol v. Mukasey,* 548 F.3d 207 (2d Cir.2008) (same), *Gerbier v. Holmes,* 280 F.3d 297 (3rd Cir.2002) (same), and *Rashid v. Mukasey,* 531 F.3d 438 (6th Cir.2008) (same).

10   The Court stated in *Lopez* that "recidivist possession, see 21 U.S.C. § 844(a), clearly fall[s] within the definitions used by Congress in 8 U.S.C. § 1101(a)(43)(B) and 18 U.S.C. § 924(c)(2), regardless of whether these federal possession felonies or their state counterparts constitute 'illicit trafficking in a controlled substance' or 'drug trafficking' as those terms are used in ordinary speech." 549 U.S. at 55 n. 6, 127 S.Ct. 625. Our decision today is not in conflict with this footnote; it is still true that recidivist simple possession offenses charged and prosecuted as such "clearly fall" within the definition of an aggravated felony. What we had no occasion to decide in *Lopez,* and what we now address, is what it means to be *convicted* of an aggravated felony. *Lopez* teaches us that it is necessary that the conduct punished under state law correspond to a felony punishable under the Controlled Substances Act to be an aggravated felony under

130 S.Ct. 2577, 177 L.Ed.2d 68, 78 USLW 4535, 10 Cal. Daily Op. Serv. 7382...

§ 1101(a)(43)(B). But it does not instruct as to whether the mere possibility that conduct could be—but is not—charged as an offense punishable as a felony under federal law is sufficient.

11    Our decision last Term in *Nijhawan v. Holder,* 557 U.S. 29, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009), also relied upon by the Government, is not to the contrary. In that case, we rejected the so-called categorical approach employed in cases like *United States v. Rodriguez,* 553 U.S. 377, 128 S.Ct. 1783, 170 L.Ed.2d 719 (2008), when assessing whether, under 8 U.S.C. § 1101(a)(43)(M)(i), a noncitizen has committed "an offense that ... involves fraud or deceit in which the loss to the ... victims exceeds $10,000." Our analysis was tailored to the "circumstance-specific" language contained in that particular subsection of the aggravated felony definition. *Nijhawan,* 557 U.S. at 38, 129 S.Ct. at 2301. And we specifically distinguished the "generic" categories of aggravated felonies for which a categorical approach might be appropriate—including the "illicit trafficking" provision—from the "circumstance-specific" offense at hand. *Id.,* at 36 – 38, 38 – 39, 129 S.Ct. at 2300 – 2301. Moreover, unlike the instant case, there was no debate in *Nijhawan* over whether the petitioner actually had been "convicted" of fraud; we only considered how to calculate the amount of loss once a conviction for a particular category of aggravated felony has occurred.

12    Linking our inquiry to the record of conviction comports with how we have categorized convictions for state offenses within the definition of generic federal criminal sanctions under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). The United States urges that our decision in *Rodriguez,* 553 U.S. 377, 128 S.Ct. 1783, 170 L.Ed.2d 719, an ACCA case, supports its position in this case. Brief for Respondent 29–30. To the extent that *Rodriquez* is relevant to the issue at hand, we think the contrary is true. In that decision we considered whether a recidivist finding under state law that had the effect of increasing the "maximum term of imprisonment" to 10 years, irrespective of the actual sentence imposed, made the offense a "serious drug offense" within the meaning of 18 U.S.C. § 924(e)(1) and therefore an ACCA predicate offense. 553 U.S. at 382, 128 S.Ct. 1783. We held that a recidivist finding could set the "maximum term of imprisonment," but only when the finding is a part of the record of conviction. *Id.,* at 389, 128 S.Ct. 1783. Indeed, we specifically observed that "in those cases in which the records that may properly be consulted do not show that the defendant faced the possibility of a recidivist enhancement, it may well be that the Government will be precluded from establishing that a conviction was for a qualifying offense." *Ibid.* In other words, when the recidivist finding giving rise to a 10–year sentence is not apparent from the sentence itself, or appears neither as part of the "judgment of conviction" nor the "formal charging document," *ibid.,* the Government will not have established that the defendant had a prior conviction for which the maximum term of imprisonment was 10 years or more (assuming the recidivist finding is a necessary precursor to such a sentence).

\*    See 8 U.S.C. § 1229b(a) (permitting cancellation of removal); § 1229b(a)(3) (barring aliens convicted of an "aggravated felony" from cancellation of removal); § 1101(a)(43)(B) (defining "aggravated felony" as "illicit trafficking in a controlled substance ... including a drug trafficking crime (as defined in [18 U.S.C. § 924(c) ])"); 18 U.S C § 924(c)(2) (defining "drug trafficking crime" to mean "any felony punishable under the Controlled Substances Act").

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.                          AR.04241

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Bonilla v. Lynch, 9th Cir., October 20, 2016

781 F.3d 1155
United States Court of Appeals,
Ninth Circuit.

Jose Luis Marquez CARRILLO, Petitioner,

v.

Eric H. HOLDER, Jr.,
Attorney General, Respondent.

No. 12–70779.
|
Submitted March 3, 2015. *
|
Filed March 31, 2015.

**Synopsis**

**Background:** Native and citizen of Mexico filed petition for review of Board of Immigration Appeals' (BIA) order removing him due to his conviction for crime of domestic violence.

**Holding:** The Court of Appeals, Fernandez, Circuit Judge, held that alien's conviction under California statute criminalizing willful infliction of corporal injury upon spouse or cohabitant was categorically crime of domestic violence.

Petition denied.

West Headnotes (1)

[1]    **Aliens, Immigration, and Citizenship** ⚖ **Crimes of violence**

Alien's conviction under California statute criminalizing willful infliction of corporal injury upon spouse or cohabitant was categorically a "crime of domestic violence," warranting removal, despite alien's contention that statute could encompass non-domestic relationships; California case law made it plain that spouse-like relationship was implicit. Immigration and Nationality Act, § 237(a)(2)(E)(i), 8 U.S.C.A.

§ 1227(a)(2)(E)(i); West's Ann.Cal.Penal Code § 273.5(a).

21 Cases that cite this headnote

**Attorneys and Law Firms**

*1156 Jaime Jasso, Law Offices of Jaime Jasso, Westlake Village, CA, for Petitioner.

Stuart F. Delery, Principal Deputy Assistant Attorney General, Civil Division, Terri J. Scadron, Assistant Director, Office of Immigration Litigation, Kathryn L. DeAngelis, Attorney, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX5–059.

Before: HARRY PREGERSON, FERDINAND F. FERNANDEZ, and JACQUELINE H. NGUYEN, Circuit Judges.

**OPINION**

FERNANDEZ, Circuit Judge:

Jose Luis Marquez Carrillo, a citizen of Mexico, petitions for review of the Board of Immigration Appeals' (BIA) order removing him due to his conviction for a crime of domestic violence. *See* 8 U.S.C. § 1227(a)(2)(E)(i); [1] Cal.Penal Code § 273.5(a) (2002). [2] We deny the petition.

BACKGROUND

Marquez is a forty-nine-year-old native and citizen of Mexico, who entered the United States as a lawful permanent resident on or about July 20, 1971.

Marquez was arrested in January 2005 for domestic violence and turned over to the Department of Homeland Security (DHS). DHS served him with a Notice to Appear, which charged him with removability as an alien who had been convicted of a crime of domestic violence. The notice alleged that his 2002 conviction under § 273.5 rendered him

removable pursuant to § 1227(a)(2)(E)(i). On February 23, 2005, Marquez appeared before an Immigration Judge (IJ) who found him removable as charged due to the § 273.5 conviction. At that time, Marquez said his criminal record included a 1995 conviction of great bodily injury to a child, a 2002 conviction of corporal injury to his spouse, and a 2005 domestic violence conviction. [3]

At a continued hearing on April 5, 2005, the IJ sustained the charge of removability and found "that 273.5, by definition, falls within [ § 1227(a)(2)(E)(i) ]." Marquez then filed an application for cancellation of removal. *See* 8 U.S.C. § 1229b. After **\*1157** years of continued hearings, Marquez appeared before the IJ on May 20, 2010, and presented evidence to support his application. Among other things, he claimed that he had completed an Alcoholics Anonymous program and several domestic violence programs. He also submitted letters that had first been submitted, and accepted, at a bail bond hearing some five years earlier.

The IJ then issued a decision that affirmed Marquez's removability because of the domestic violence conviction from 2002, and denied his application for cancellation of removal. The IJ found that Marquez met the statutory elements for eligibility for cancellation of removal, but denied discretionary relief because the negative factors in his background outweighed the positive. The IJ accorded minimal weight to the letters submitted in Marquez's bond hearing five years earlier. Regarding his wife's letter, in particular, the IJ noted that Marquez's latest domestic violence charge occurred years after his wife wrote her letter of support. The IJ accepted Marquez's word that he had recently completed a domestic violence course. On balance, the IJ found that Marquez had not sustained his burden of establishing that he was deserving of cancellation of removal.

On appeal to the BIA, Marquez contested his removability in light of this court's then recent decision that § 273.5 is not categorically a crime involving moral turpitude (CIMT). He argued that by analogy the court should find that § 273.5 is not a crime of domestic violence. He also objected to the IJ's discretionary decision.

The BIA adopted and affirmed the IJ's decision. It agreed that § 273.5 is categorically a crime of domestic violence. Furthermore, it agreed that the negative factors outweighed

the positive equities in Marquez's application. The BIA refused to consider new evidence, including a certificate of completion of a domestic violence program, because it could not consider new evidence on appeal; it also noted that Marquez did not file a motion to remand and that the evidence was not material in any event. Marquez's timely petition for review followed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 8 U.S.C. § 1252. When, as here, the BIA adopts the IJ's decision and also adds its own reasons, we review both decisions. *Vasquez–Hernandez v. Holder,* 590 F.3d 1053, 1054 (9th Cir.2010). "The Ninth Circuit reviews *de novo* whether a conviction constitutes a removable offense under the Immigration and Nationality Act." *Szalai v. Holder,* 572 F.3d 975, 978 (9th Cir.2009) (per curiam). Purely legal questions, including the BIA's interpretation of the INA, are likewise reviewed *de novo. Id.* at 979.

## DISCUSSION

Marquez's primary argument is that § 273.5 is not a categorical crime of domestic violence within the meaning of § 1227(a)(2)(E)(i) because § 273.5 casts its protective mantel over too many categories of victims. He recognizes that we have previously held that § 273.5 "is categorically a crime of domestic violence." *Banuelos–Ayon v. Holder,* 611 F.3d 1080, 1081 (9th Cir.2010); *see also Vasquez–Hernandez,* 590 F.3d at 1054–56. However, Marquez argues, in that case we focused on the question of whether § 273.5 spelled out a crime of violence and did not expressly consider the limiting adjective—domestic. Thus, he says, *Banuelos–Ayon* does not bind us. *See Estate of Magnin v. Comm'r,* 184 F.3d 1074, 1077 (9th Cir.1999).

**\*1158** We believe that in context there was little reason for *Banuelos–Ayon* to be more explicit because it is apparent that § 273.5 is categorically [4] a crime that is both domestic and violent in nature, but we will now put any uncertainty to rest.

We start, as we must, with the language of the statutes. At the time of Marquez's conviction, his crime was defined as follows in 📄 § 273.5(a):

> Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine and imprisonment.

The domestic violence language in 📄 § 1227(a)(2)(E)(i) reads as follows:

> Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable. For purposes of this clause, the term "crime of domestic violence" means any crime of violence (as defined in section 16 of title 18) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State,

Indian tribal government, or unit of local government.

It is apparent that both statutes encompass crimes committed by a spouse or former spouse, by a person with whom the victim shares a child, and by a cohabitant or former cohabitant. The only slight variation is that as to cohabitants 📄 § 1227(a)(2)(E)(i) adds the qualifier "as a spouse" whereas 📄 § 273.5 does not have that qualifier.

But California case law has made it plain that a spouse-like relationship is implicit. As the California Court of Appeal has put it: "The term 'cohabitant' has been interpreted broadly to refer to those living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy." 📄 *People v. Taylor,* 118 Cal.App.4th 11, 18, 12 Cal.Rptr.3d 693, 696 (2004) (some internal quotation marks omitted); *see also* 📄 *People v. Moore,* 44 Cal.App.4th 1323, 1333–34, 52 Cal.Rptr.2d 256, 262–63 (1996). That alleviates any concern that the California law would cover merely being together in some sort of a "platonic, rooming-house arrangement." 📄 *People v. Holifield,* 205 Cal.App.3d 993, 999, 252 Cal.Rptr. 729, 733 (1988).

As we see it, that rational view of cohabiting is what the specific coverage language of 📄 § 1227(a)(2)(E)(i) is intended to reach. That is emphasized by the somewhat less specific language that Congress then used when it indicated that it intended to cover individuals "similarly situated **\*1159** to a spouse." *Id.* On that basis alone, the match is categorical.

But, to the extent that any doubt remains, it was removed when Congress adopted the ultimate inclusionary provision of 📄 § 1227(a)(2)(E)(i): a crime committed by "any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of ... any State." That language must be given effect—it should not be seen as merely redundant or superfluous. *See* 📄 *Negrete–Ramirez v. Holder,* 741 F.3d 1047, 1053 (9th Cir.2014); 🔶 *Spencer Enters., Inc. v. United States,* 345 F.3d 683, 691 (9th Cir.2003). As it is, the breadth of that language does decidedly encompass the victims listed in 📄 § 273.5, both in principle and in the reification of the principle.

As the California courts have explained, the Legislature's stated purpose has been to address the problem of domestic violence, the elimination of which "is a compelling state interest." *People v. Jungers,* 127 Cal.App.4th 698, 704, 25 Cal.Rptr.3d 873, 878 (2005). It recognized " 'the high incidence of violence in intimate relationships,' " and sought to reduce that. *Id.* (quoting Cal. Judges Benchbook: Domestic Violence Cases in Criminal Court (CJER 2000) § 1.7, p. 9). Thus, § 273.5 came into being. The whole purpose of domestic violence laws like § 273.5 "is to protect persons ... in a special relationship for which society demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable." *People v. Vega,* 33 Cal.App.4th 706, 710, 39 Cal.Rptr.2d 479, 483 (1995). No one doubts that § 273.5 was and is a domestic violence law. *See, e.g., United States v. Denton,* 611 F.3d 646, 651 (9th Cir.2010); *Galen v. Cnty. of L.A.,* 477 F.3d 652, 656 (9th Cir.2007); *People v. Hamlin,* 170 Cal.App.4th 1412, 1428–29, 89 Cal.Rptr.3d 402, 416–17 (2009). While the scope of the law has evolved, that "reflects a developing awareness of the human factors that lead to domestic violence"[5] and the need to protect those who have found themselves in those kinds of relationships.[6]

The language of § 1227(a)(2)(E)(i) shows beyond peradventure that Congress was aware of the need for fluidity as states sought to protect victims from violent injuries that grow out of personal, intimate relationships which are domestic in nature. That, perforce, explains Congress' casting a net wide enough to encompass "any other individual"[7] who has committed a crime of violence against a person protected from that individual "under the domestic or family violence laws of ... any State."[8]

Thus, § 273.5 is categorically a crime of domestic violence within the meaning of § 1227(a)(2)(E)(i). In so holding, we do not overlook *Morales–Garcia v. Holder,* 567 F.3d 1058, 1064–66 (9th Cir.2009), which decided that § 273.5 is not categorically a CIMT. That case is simply inapposite to the issue before us. It did not, and could not, decide whether § 273.5 was a crime of domestic violence; it simply decided whether it was a CIMT. Perhaps a conviction under § 273.5 will sometimes be a CIMT;[9] perhaps it will sometimes be an aggravated felony;[10] but it categorically *is* **\*1160** a crime of domestic violence.[11]

## CONCLUSION

We hold that when Marquez was convicted in 2002 for violation of § 273.5, he was convicted of a crime that is categorically a crime of domestic violence under § 1227(a)(2)(E)(i). The BIA did not err.

Petition **DENIED.**

**All Citations**

781 F.3d 1155, 15 Cal. Daily Op. Serv. 3131, 2015 Daily Journal D.A.R. 3607

## Footnotes

\*   The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a)(2).

1   Hereafter, we will refer to this law as § 1227(a)(2)(E)(i).

2   Hereafter, we will refer to this law as § 273.5.

3   Marquez's criminal record is extensive and includes multiple theft and burglary convictions, a battery conviction, a conviction for driving under the influence, and multiple domestic violence charges.

4   *See Descamps v. United States,* —— U.S.——, ——, 133 S.Ct. 2276, 2283–85, 186 L.Ed.2d 438 (2013).

5   *People v. Mora,* 51 Cal.App.4th 1349, 1355, 59 Cal.Rptr.2d 801, 805 (1996).

15 Cal. Daily Op. Serv. 3131, 2015 Daily Journal D.A.R. 3607

6    *See id.*

7    § 1227(a)(2)(E)(i).

8    *Id.*

9    *See* *Morales–Garcia,* 567 F.3d at 1066–67.

10   *See* 8 U.S.C. §§ 1101(a)(43)(F), 1227(a)(2)(A)(iii).

11   Marquez raises two other minor issues regarding the BIA's cancellation of removal decision, but we do not have jurisdiction over either of them. He argues that the IJ erred when she gave minimal weight to certain witness letters, but his failure to make that claim to the BIA deprives us of jurisdiction over it. *See* 8 U.S.C. § 1252(d)(1); *Sola v. Holder,* 720 F.3d 1134, 1135 (9th Cir.2013) (per curiam). We also lack jurisdiction over his claim that the BIA should have sua sponte reopened and remanded to the IJ. *See* *Mejia–Hernandez v. Holder,* 633 F.3d 818, 823–24 (9th Cir.2011); *Ekimian v. INS,* 303 F.3d 1153, 1159 (9th Cir.2002).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

469 F.3d 1376
United States Court of Appeals,
Federal Circuit.

Leonard E. CASSELLA, Plaintiff–Appellee,

v.

UNITED STATES, Defendant–Appellant.

No. 06–5035.
|
Dec. 1, 2006.

**Synopsis**

**Background:** Widower of "special school zone police officer" who had been killed by automobile while directing traffic in school zone appealed decision by Department of Justice's (DOJ) Bureau of Justice Assistance (BJA) denying claim for death benefit under Public Safety Officers' Benefit Act (PSOBA). The United States Court of Federal Claims, 68 Fed.Cl. 189, Futey, J., granted widower's motion for judgment on the administrative record. Government appealed.

**Holdings:** The Court of Appeals, Michel, Chief Judge, held that:

[1] "law enforcement officer" under PSOBA is one involved in criminal law enforcement;

[2] to extent that PSOBA definition of "law enforcement officer" was ambiguous, BJA regulation limiting definition to those involved in criminal law enforcement was reasonable; and

[3] substantial evidence supported BJA's determination that "special school zone police officer" was not "law enforcement officer."

Reversed in part and vacated in part.

**Procedural Posture(s):** On Appeal.

West Headnotes (5)

[1]     **Public Employment** 👈 Compensation, pensions, and benefits

**United States** 👈 Judicial review or intervention

In reviewing administrative denial of benefit under Public Safety Officers' Benefits Act (PSOBA), Court of Federal Claims is limited to deciding whether: (1) there has been substantial compliance with statutory requirements and provisions of implementing regulations; (2) there has been any arbitrary or capricious action by government officials involved; and (3) substantial evidence supports agency's decision. Public Safety Officers' Benefit Act, § 1201 et seq., 42 U.S.C.A. § 3796 et seq.

1 Cases that cite this headnote

**[2]**  **Public Employment** 🔑 Scope of further judicial review

**United States** 🔑 Judicial review or intervention

Court of Appeals reviewed de novo judgment of Court of Federal Claims, on appeal from Bureau of Justice Assistance's (BJA) denial of claim for death benefit under Public Safety Officers' Benefit Act (PSOBA), and applied same deferential standard applied by Court of Federal Claims. Public Safety Officers' Benefits Act, § 1201 et seq., 42 U.S.C.A. § 3796 et seq.

**[3]**  **Public Employment** 🔑 Death and survivors' benefits

**United States** 🔑 Death benefits

"Law enforcement officer," as used in Public Safety Officers' Benefits Act (PSOBA), providing death benefit if such officer dies in line of duty, is limited to persons in criminal law enforcement, rather than those involved in purely civil law enforcement. Public Safety Officers' Benefits Act, § 1204(5), 42 U.S.C.A. § 3796b(5).

2 Cases that cite this headnote

**[4]**  **Public Employment** 🔑 Administrative construction of statutes

**Public Employment** 🔑 Statutory and regulatory questions in general

**United States** 🔑 Judicial review or intervention

To extent that provision of Public Safety Officers' Benefits Act (PSOBA) defining "law enforcement officer" in part as one involved in "enforcement of the laws" was ambiguous as to whether eligible officer could be involved in purely civil law enforcement, Bureau of Justice Assistance (BJA) regulation clarifying that Act was limited to persons in criminal law enforcement was reasonable, and entitled to deference, given intent of Act to protect families of those officers involved in criminal law enforcement. Public Safety Officers' Benefits Act, § 1204(5), 42 U.S.C.A. § 3796b(5); 28 C.F.R. § 32.2(m).

1 Cases that cite this headnote

**[5]**  **Public Employment** 🔑 Substantial evidence

**United States** 🔑 Judicial review or intervention

Substantial evidence supported Bureau of Justice Assistance's (BJA) determination that "special school zone police officer" was not "law enforcement officer" within meaning of Public Safety Officers' Benefit Act (PSOBA), precluding death benefit to officer's widower after she was struck and killed by automobile while directing traffic in school zone; officer's responsibilities consisted of enforcing non-criminal, i.e. traffic, laws, and there was no showing that officer had been trained for or was authorized to fight crime or perform criminal law enforcement duties, including arrests. Public Safety Officers' Benefits Act, § 1204(5), 42 U.S.C.A. § 3796b(5); 28 C.F.R. § 32.2(m); West's Ann.W.Va.Code, 8-14-5, 30-29-1, 30-29-5.

2 Cases that cite this headnote

**West Codenotes**

**Negative Treatment Vacated**

🔖 28 C.F.R. § 32.2(m)

**Attorneys and Law Firms**

**\*1377** Gordon C. Lane, Lane & Young, of Charleston, WV, argued for plaintiff-appellee.

Dawn S. Conrad, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Donald E. Kinner, Assistant Director. Of counsel on the brief was Jason P. Cooley, Attorney Advisor, Office of General Counsel, Office of Justice Programs, United States Department of Justice, of Washington, DC.

Before MICHEL, Chief Judge, LOURIE, Circuit Judge, and ELLIS, [*] District Judge.

**Opinion**

MICHEL, Chief Judge.

The claim at issue in this case was brought under the Public Safety Officers' Benefits Act ("PSOBA" or "Act") of 1976, Pub.L. No. 94–430 (codified as amended at ⬜ 42 U.S.C. §§ 3796–96c (2000)). The United States appeals an October 19, 2005 order of the United States Court of Federal Claims holding that Mrs. Mildred W. Cassella, a part-time Special School Zone Police Officer ("SSZPO") employed by the **\*1378** City of Weirton (WV) Police Department ("WPD"), was a "public safety officer" who died as a direct and proximate result of a personal injury sustained in the "line of duty," and therefore met the Act's requirements for an award of a death benefit to her survivor, plaintiff. 🚩 *Cassella v. United States,* 68 Fed.Cl. 189 (Fed.Cl.2005). In the opinion accompanying the order, the Court of Federal Claims invalidated 🔖 28 C.F.R. § 32.2(m), a portion of the regulation in which the Bureau of Justice Assistance ("BJA"), a unit of the Department of Justice charged with implementing the Act, further defined terms of the Act, particularly "law enforcement officer," a species of the statutory term "public safety officer." We reverse the court's judgment of entitlement and vacate the court's invalidation of 🔖 28 C.F.R. § 32.2(m).

## I. BACKGROUND

### A.

The PSOBA provides a one-time cash payment to survivors of public safety officers who die in the line of duty. In relevant part, ⬜ § 3796(a) provides that "[i]n any case in which the Bureau of Justice Assistance determines ... that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit...." ⬜ 42 U.S.C. § 3796(a). For a survivor or survivors to be entitled to payment, the public safety officer must have suffered a personal injury within the meaning of the Act, the injury must have been suffered in the line of duty, and the death must have been the direct and proximate result of the personal injury. *Id.; see also Yanco v. United States,* 258 F.3d 1356, 1359 (Fed.Cir.2001).

A "public safety officer" was statutorily defined in the 2000 version of the Act, applicable here, as "an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a firefighter, or as a member of a rescue squad or ambulance crew[.]" ⬜ 42 U.S.C. § 3796b(7)(A). A "law enforcement officer," in turn, was defined as "an individual involved in crime and juvenile delinquency control or reduction, or *enforcement of the laws,* including, but not

limited to, police, corrections, probation, parole, and judicial officers[.]" 42 U.S.C. § 3796b(5) (emphasis added). The Act, however, does not define "line of duty."

The BJA is authorized under § 3796c(a) to "establish such rules, regulations, and procedures as may be necessary to carry out the purposes of" the PSOBA. 42 U.S.C. § 3796c(a). Pursuant to this authority, the BJA promulgated the regulations set forth in Part 32 of Title 28 of the Code of Federal Regulations (28 C.F.R. §§ 32.1 et. seq.). Section 32.2(c)(1) defined "line of duty" as:

> Any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or suppression of fires is obligated or authorized by rule, regulation, condition of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which the officer is assigned, or for which he is compensated, by the public agency he serves. *For other officers,* "line of duty" means any action the officer is so obligated or authorized to perform in the course of *controlling or reducing crime,* enforcing the criminal law, or suppressing fires....

28 C.F.R. § 32.2(c)(1) (emphases added). In § 32.2(m), the statutory definition of "law enforcement officer" was clarified to mean an "individual involved in crime and juvenile delinquency control or reduction, **\*1379** or *enforcement of the criminal law* ...." 28 C.F.R. § 32.2(m) (emphasis added).

## B.

Plaintiff is the surviving husband of the late Mrs. Mildred W. Cassella. Mrs. Cassella was employed by the WPD for seven years as a part-time SSZPO. Mrs. Cassella held her position as a SSZPO pursuant to West Virginia Statute § 8–14–5, which provides:

> Every municipality shall have plenary power and authority to provide by ordinance for the appointment of special school zone police officers, who shall have the duty of controlling and directing traffic upon designated parts of the streets, avenues, roads, alleys or ways at or near schools, and who, *in the performance of such duty, shall be vested with all the powers of local police officers.* Such special school zone police officers shall be in uniform, shall display a badge or other sign of authority, shall serve at the will and pleasure of the appointing authority, and shall not come within the civil service provisions of this article or the policemen's pension and relief fund provisions....

W. Va.Code § 8–14–5 (emphasis added).

At approximately 2:25 p.m. on April 12, 2002, Mrs. Cassella was on duty at the intersection of West Virginia 105 (Pennsylvania Avenue) and California Avenue in Weirton. Mrs. Cassella entered the eastbound lane of Pennsylvania Avenue from California Avenue to stop traffic so that a school bus could pull away from the curb. She was wearing her police-issued orange vest and carrying a whistle and stop sign. While standing in the eastbound traffic lane, Mrs. Cassella was fatally struck from the side by a sport utility vehicle traveling eastward. Mrs. Cassella was taken by ambulance to a local hospital where she was pronounced dead by reason of blunt force traumatic injury at 2:50 p.m. The individual who was driving the vehicle that struck and killed Mrs. Cassella was charged and convicted of two traffic violations.

**C.**

Following Mrs. Cassella's death, plaintiff filed a PSOBA death benefit claim with the BJA on July 30, 2002. The BJA reviewed the claim and issued a decision in May 2003 that plaintiff was not entitled to receive the death benefit authorized to be paid under the Act. The BJA concluded that Mrs. Cassella was not a "public safety officer" within the meaning of the Act, because as a SSZPO, Mrs. Cassella did not meet the definition of "law enforcement officer," the only type of "public safety officer" applicable here, because she did not have the duty to control or reduce crime and juvenile delinquency or to enforce criminal law.

Plaintiff appealed the decision within the Department of Justice, and in accordance with BJA regulations, an appeal hearing was held on February 26, 2004 before an independent Hearing Officer. Mr. Michael D. Gordon, Weirton's Chief of Police at the time of Mrs. Cassella's death, provided detailed testimony as to Mrs. Cassella's duties and responsibilities as a SSZPO for the WPD.

Chief Gordon testified at the hearing that Mrs. Cassella was responsible for directing and controlling traffic at a particular street intersection in Weirton during the times of the day when school buses and children were entering and leaving school. Chief Gordon testified that Mrs. Cassella also had "an implied responsibility" to be watchful for the welfare of children at her crossing and could intervene and report to the police any problems such as suspected child abuse and bullying between children.

**\*1380** Chief Gordon further testified that Mrs. Cassella was neither a "sworn" officer nor a state-certified law enforcement officer and that she did not attend a police academy or undergo any formal police training. Rather, Chief Gordon stated, Mrs. Cassella was trained for her position as a SSZPO by going through an "informal on-the-job break-in-period" with another SSZPO. As a SSZPO, Mrs. Cassella was outfitted with an orange vest, whistle, and stop sign, but did not carry a communications device or a firearm or other type of weapon.

Chief Gordon testified that Mrs. Cassella was the "face of the police" and a "figure of authority" during the specific time that she was instructed to be on duty, but, unlike other officers who had attended the police academy, she did not have the power to make an arrest or stop a crime in progress. Rather, Chief Gordon asserted, Mrs. Cassella had "indirect arrest power" in that "she could gather information regarding an offense" and then report it to "other police officers within the department [who] would proceed against the violators." Although Chief Gordon testified that Mrs. Cassella was a "law enforcement officer in that she was responsible for the enforcement of traffic laws," she would actually report any traffic violations she observed to regular officers of the WPD. Further, when asked if she was vested with all the powers of local police, Chief Gordon stated, "For her job description as a special school zone officer, yes."

The Hearing Officer issued a Determination on April 12, 2004, affirming the BJA's prior denial of benefits. The Hearing Officer first concluded that Mrs. Cassella was not a "law enforcement officer" because she did not possess the requisite law enforcement authority, nor was her primary function that of crime control or reduction. The Hearing Officer noted that, under West Virginia law, a "law enforcement officer" is defined as a "duly authorized member of a law-enforcement agency who is authorized to maintain public peace and order, prevent and detect crime, make arrests and enforce the laws of the state or any county or municipality thereof," W. Va.Code § 30–29–1, and that, with a few exceptions not relevant here, "no person may be employed as a law-enforcement officer ... unless the person is certified." W. Va.Code § 30–29–5. The Hearing Officer concluded that Mrs. Cassella's position did not meet this definition, since she was neither certified by the state nor authorized to make arrests.

The Hearing Officer also found that Mrs. Cassella did not die in the "line of duty" as defined in the PSOBA because for "a public safety officer whose primary function is not crime control ... death in the 'line of duty' must have resulted from activities directly related to reducing crime or enforcing the criminal law." The Hearing Officer concluded that Mrs. Cassella was directing traffic at the time of her death, rather than reducing crime or enforcing the criminal law, and therefore did not die in the "line of duty."

On October 6, 2004, plaintiff filed a complaint with the United States Court of Federal Claims seeking review of the Hearing Officer's determination. The court stayed proceedings so that plaintiff could first submit his claim to the BJA Director for a final agency determination. Plaintiff appealed the Hearing Officer's determination to the BJA Director pursuant to 28 C.F.R. § 32.24 on February 18, 2005. On April 28, 2005, the BJA Director issued the agency's final determination upholding the determinations of the Hearing Officer. The Director agreed with the BJA and the Hearing Officer that Mrs. Cassella was not a "public safety officer" because she "lacked requisite legal and actual authority as a law enforcement officer to control or **\*1381** reduce crime or enforce the criminal law." The Director also determined that even if Mrs. Cassella actually had law-enforcement authority and duties, she did not sustain a fatal injury in the "line of duty" as required by the PSOBA. In this regard, the Director stated that plaintiff failed to show that Mrs. Cassella was in fact enforcing criminal laws at the time of her death, such as pulling over and detaining a drunk driver. The evidence showed that Mrs. Cassella was simply controlling traffic in an intersection at the time of her death.

The Court of Federal Claims reinstated its proceedings on May 17, 2005. The United States filed a motion for judgment on the administrative record on June 23, 2005, and plaintiff filed a cross-motion for judgment on the administrative record on July 28, 2005. The court issued a decision on October 19, 2005 denying the United States' motion for judgment, granting plaintiff's cross-motion for judgment, and entering a final judgment in favor of the plaintiff in the statutory amount of $250,000.00. *Cassella, 68 Fed.Cl. at 195.*

Both plaintiff and the government briefed arguments before the trial court with regard to whether Mrs. Cassella's duties involved the enforcement of criminal law. The trial judge, however, relying heavily on an earlier decision by another judge of the Court of Federal Claims in *Hawkins v. United States, 68 Fed.Cl. 74 (2005),* concluded that these arguments were ultimately irrelevant. Rather, following the earlier decision that a "law enforcement officer" encompasses an individual who solely enforces civil law, the court determined that the issue on appeal was whether Mrs. Cassella's responsibilities as a SSZPO included enforcement of the laws, criminal or otherwise. *Cassella, 68 Fed.Cl. at 194.* The court proceeded to find that Mrs. Cassella's responsibilities included enforcement of "non-criminal" laws, i.e., traffic laws and the welfare of children in her crossing zone. *Id.* Thus, the court concluded that Mrs. Cassella was a "law enforcement officer" for purposes of the PSOBA. *Id.*

The Court of Federal Claims further invalidated 28 C.F.R. § 32.2(m), the regulation in which the BJA defined a "law enforcement officer" as an "individual involved in crime and juvenile delinquency control or reduction, or enforcement of the criminal law," as an "invalid restriction of the statute," 42 U.S.C. § 3796b(5). *Id.* at 193. The court stated that § 3796b(5) does not limit a "law enforcement officer" to those who enforce the *criminal law,* but rather encompasses an individual involved in "enforcement of the laws," whether criminal or otherwise. *Cassella, 68 Fed.Cl. at 193–94.*

Finally, the trial court held that Mrs. Cassella died in the "line of duty" as defined by the PSOBA. *Id.* at 195. The court found that since Mrs. Cassella was enforcing the traffic laws at the time of her death, she was killed in the "line of duty." *Id.* For these reasons, the court held that plaintiff was entitled to the death benefit under the Act. *Id.*

This appeal followed. This court has subject matter jurisdiction under 28 U.S.C. § 1295(a)(3) because the appeal is from a final judgment of the Court of Federal Claims.

## II. DISCUSSION

### A.

**[1]** **[2]**  In reviewing an administrative denial of a benefit under the PSOBA, the Court of Federal Claims is limited to deciding: (1) whether there has been substantial compliance with statutory requirements and provisions of implementing regulations; (2) whether there has been **\*1382** any arbitrary or capricious action by the government officials involved; and (3) whether substantial evidence supports the agency's decision. *Chacon v. United States,* 48 F.3d 508, 511 (Fed.Cir.1995). On appeal, we review the judgment of the Court of Federal Claims *de novo,* applying the same deferential standards anew. *Greeley v. United States,* 50 F.3d 1009, 1010–11 (Fed.Cir.1995) (in PSOBA case, finding that BJA's factual finding that traumatic injury was not a substantial factor in fire chief's death was supported by substantial evidence, and reversing Court of Federal Claims' judgment to the contrary).

### B.

**[3]**  The government argues on appeal that the BJA's regulatory interpretation of the term "law enforcement officer" is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). According to the government, the Court of Federal Claims erred in concluding that "law enforcement officer" in § 3796b(5) constitutes the "unambiguously expressed intent of Congress" to cover not only individuals who enforce criminal law, but also individuals who enforce only civil law. The government asserts that the cited statutory phrase "enforcement of the laws" in § 3796b(5) is actually ambiguous, since the term "laws" may encompass many different types of law or only criminal law. Given this ambiguity, the government asserts that the BJA's interpretation of the PSOBA as requiring that "law enforcement officer[s]" be involved in the enforcement of criminal rather than purely civil law warrants *Chevron* deference because it is consistent with the intent of Congress to benefit those involved in crime control and reduction. The government asserts that Congress's intent is demonstrated here in the plain meaning of the phrase's contextual language, the Act's legislative history, and clarification in a recent statutory amendment. In contrast, plaintiff argues that the Court of Federal Claims correctly determined that the death benefit under the PSOBA is available to survivors of "law enforcement officers" who enforce criminal and/or civil laws.

This court recently resolved this very issue on appeal in *Hawkins v. United States,* No. 06–5013, 2006 WL 3334483, 469 F.3d 993 (Fed.Cir. Nov. 17, 2006). In *Hawkins,* we confronted the question of whether a "law enforcement officer" involved in "enforcement of the laws" as defined in the PSOBA includes officers who are involved in only civil law enforcement or is limited to officers who are involved in criminal law enforcement. *Id.* at 1000. Taking into consideration the literal text of the statute defining "law enforcement officer" and the Act's legislative history, we concluded that Congress intended "law enforcement officer" to cover individuals who enforce criminal law rather than merely civil law. *Id.* at 1000. Since we found the definition of "law enforcement officer" unambiguous after employing these traditional tools of statutory construction, we declined to reach the government's argument that deference to its regulatory interpretation of "law enforcement officer" was due under *Chevron. Id.* at 1002.

**[4]**  Nevertheless, we observed that to the extent the phrase "enforcement of the laws" could be viewed as ambiguous as to the type of "laws" Congress intended to encompass in the statute, the BJA's interpretation thereof to exclude an officer who only enforces civil law was reasonable. *Id.* **\*1383**  As noted above, "law enforcement officer" was defined by statute in 42 U.S.C. § 3796b(5) as "an individual involved in ... *enforcement of the laws[,]"* 42 U.S.C. § 3796b(5) (emphasis added), but defined by regulation in 28 C.F.R. § 32.2(m) as an "individual involved in ... *enforcement of the criminal law."* 28 C.F.R. § 32.2(m) (emphasis added). Thus, the BJA, by regulation, excluded individuals who only enforce the civil law from the

definition of "law enforcement officer" such that survivors of these individuals would not qualify for a death benefit under the Act. Given that the definition of "law enforcement officer" unambiguously refers to individuals who are involved in criminal law enforcement rather than only civil law enforcement, however, we find that the BJA's definition of "law enforcement officer" as set forth in 28 C.F.R. § 32.2(m) is consistent with, and gives proper effect to, the intent of Congress to protect the families of those officers involved in criminal law enforcement. As such, the BJA regulation interpreting "law enforcement officer," 28 C.F.R. § 32.2(m), contrary to the holding of the trial court, is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. We therefore vacate its invalidation by the Court of Federal Claims.

The BJA has consistently ruled that an individual is a "law enforcement officer" if he or she is an officer of a public agency, and in that capacity, has authority and responsibility to fight crime or enforce the criminal law. Common hallmarks considered by the BJA include an individual's power to arrest, apprehend, prosecute, adjudicate, correct, detain (in a prison or other detention or confinement facility), or supervise (as a parole or probation officer) persons who are alleged or found to have violated the criminal law. In this regard, the BJA has extended coverage under the PSOBA to auxiliary police, conservation officers who enforce criminal law, constables with arrest power, security officers in a psychiatric hospital for the criminally insane, and an animal control officer with peace-officer power and responsibility. *See Legal Interpretations of the Public Safety Officers' Benefits Act,* Office of General Counsel, Dep't of Justice, November 1981 (cited in *Chacon v. United States,* 48 F.3d 508, 512 (Fed.Cir.1995)). We conclude that the BJA's interpretation of "law enforcement officer" to limit applicability of the PSOBA to individuals who have the authority and responsibility to fight crime or enforce the criminal law is "reasonable," and therefore is entitled to deference. *Chevron,* 467 U.S. at 845, 104 S.Ct. 2778.

[5]   Turning to the facts of this case, we find that the BJA's determination that Mrs. Cassella was not a "law enforcement officer" under 42 U.S.C. § 3796b(5) is supported by substantial evidence. Plaintiff argues that even if this court overrules the standard articulated by the Court of Federal Claims in *Hawkins v. United States,* 68 Fed.Cl. at 83, substantial evidence in the record supports a finding that Mrs. Cassella was in fact involved in the control or reduction of crime and juvenile delinquency as well as criminal law enforcement and therefore, meets the definition of "law enforcement officer." In support of this argument, Plaintiff points to W. Va.Code § 8–14–5 as evidence that SSZPOs have full police power. Plaintiff asserts that, as a full police officer, Mrs. Cassella had the authority and duty to control, reduce, and enforce many non-traffic criminal laws, such as juvenile delinquency and child abuse, as well as make arrests. Plaintiff also cites to numerous other West Virginia statutes that indicate that many traffic violations are punishable by jail time.

**\*1384**   In *Hawkins,* we held that the PSOBA was enacted to provide benefits to the families of individuals who were "exposed to the 'constant risk of death' by acts of criminals or related events inherent in the activities of crime and juvenile delinquency control or reduction, or enforcement of the criminal law." 469 F.3d at 1002–03. Thus, to be a law enforcement officer, "the officer must be actually appointed for and authorized or obligated to fight crime or perform *criminal law* enforcement duties on behalf of the police agency that he or she serves." *Id.* at 1003 (emphases added). Here, no lower court or agency decision actually held that Mrs. Cassella was appointed for, trained for, authorized, assigned, or obligated to fight crime or perform criminal law enforcement duties. Indeed, the Court of Federal Claims found that Mrs. Cassella's responsibilities included "enforcing non-criminal laws, namely traffic laws." *Cassella,* 68 Fed.Cl. at 194. We conclude therefore that substantial evidence supports the BJA's decision that Mrs. Cassella was not involved in the enforcement of criminal law and as such, was not a "law enforcement officer" under the Act.

While Mrs. Cassella held her position as SSZPO under W. Va.Code § 8–14–5, we agree with the BJA that this statute invests SSZPOs with "all the powers of local police officers" *only* in connection with their duty of controlling and directing traffic. This finding is supported by the testimony of Chief Gordon, who when questioned if Mrs. Cassella was vested with all the powers of local police, stated, "For her job description as a special school zone officer, yes." Indeed, to hold otherwise would

be directly contradictory to other West Virginia statutes which clearly evidence that an individual must be trained and certified in order to be considered a "law enforcement officer." *See* W. Va.Code § 30–29–1 (defining "law enforcement officer" as a "duly authorized member of a law-enforcement agency who is authorized to maintain public peace and order, prevent and detect crime, make arrests and enforce the laws of the state or any county or municipality thereof"); W. Va.Code § 30–29–5 ("[N]o person may be employed as a law-enforcement officer by any West Virginia law enforcement agency ... unless the person is certified ... by the governor's committee as having met the minimum entry level law enforcement qualification and training program requirements."). Thus, we find that, contrary to plaintiff's assertions, Mrs. Cassella did not have the authority and obligation to control or reduce crime and juvenile delinquency or enforce criminal law under the West Virginia statutes.

Consequently, the fact that many traffic violations are criminal offenses under West Virginia law is not dispositive in this case. As Chief Gordon testified, Mrs. Cassella did not have the power to arrest the violator of a traffic crime or to stop a traffic crime in progress. Rather, Mrs. Cassella would have to actually report any traffic violations she observed to the police who would then proceed against the violators. As we held in *Hawkins*, "an officer's *actual* responsibilities or obligations as appointed, rather than some theoretical authorizations, are controlling under the PSOBA." *Id.* at 1003. Here, Chief Gordon's uncontroverted testimony confirms that Mrs. Cassella did not actually have the authority or responsibility to stop traffic crimes in progress (such as pull over and apprehend a drunk driver).

We further are not persuaded by plaintiff's assertions that Mrs. Cassella was involved in the control or reduction of juvenile delinquency. As testified to by Chief Gordon, Mrs. Cassella merely had "an implied **\*1385** responsibility" to be watchful for the welfare of children at her crossing. Such an implied responsibility does not equate to the responsibilities and obligations of trained and certified juvenile delinquency police officers. [2]

Plaintiff also asserts that the legislative history of the PSOBA, wherein Senator Moss testified that a police officer killed while directing traffic should be covered by the Act, *see* 122 Cong. Rec. 22644 (1976), confirms that Mrs. Cassella was a "law enforcement officer" under the Act. We disagree. The debate to which plaintiff refers actually centers around the application of "line of duty," rather than the definition of "law enforcement officer." The Senate bill that was favorably reported by the Judiciary Committee provided a death benefit to survivors only if an officer died in the line of duty from "injuries directly and proximately caused by a *criminal act* or an *apparent criminal* act." S.Rep. No. 94–816, at 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2504 (emphases added). However, an amendment was introduced on the Senate floor substituting "as the direct and proximate result of a personal injury sustained in the *line of duty* " for the more limiting "criminal act" language. Speaking in support of the amendment, Senator Moss stated,

> [B]y requiring that the benefit be limited to death resulting from an injury directly or proximately caused by a criminal act, the committee has failed to provide for the stated purpose and need of this legislation. This specific language leaves a loophole in the bill whereby those who should be benefited and are deserving may be excluded. There can arise a situation which may give cause to question whether a death was actually the result of a criminal act. An excellent example is the police officer who is directing traffic.

122 Cong. Rec. 22644 (1976) (statement of Sen. Moss). Thus, the purpose of the amendment was to enlarge the set of scenarios in which death of a law enforcement officer would be covered by the PSOBA but not enlarge the definition of "law enforcement officer" *per se*. The BJA has given effect to Congress's intent here by including within the "line of duty" any social, ceremonial, or athletic functions to which a *criminal law enforcement officer* is assigned or for which he or she is compensated. *See* 28 C.F.R. § 32.2(c)(1). This regulation simply cannot apply to Mrs. Cassella because she was not a criminal law enforcement officer in the first place.

Finally, plaintiff avers that it is incomprehensible that the BJA would consider a FEMA worker, a chaplain, an auxiliary police officer, and a conservation officer eligible for benefits under the PSOBA, while excluding a SSZPO who risked her life daily to protect the public. In the 2000 version of the Act, applicable here, Congress chose to statutorily protect only certain types of "public safety officer[s]," including law enforcement officers, firefighters, rescue squad members, ambulance crew members, certain FEMA employees, and certain State, local or tribal employees performing official duties in cooperation with FEMA.

**\*1386** 42 U.S.C. § 3796b(7). [3] The only species of "public safety officer" of relevance here is "law enforcement officer," which as explained above, is limited to an individual involved in crime and juvenile delinquency control or reduction, or enforcement of the criminal law. Plaintiff does not contend, and no evidence of record suggests, that Mrs. Cassella meets the definition of any of the other species of "public safety officer." As Mrs. Cassella was not involved in crime and juvenile delinquency control or reduction, or enforcement of the criminal law, she simply does not meet the definition of "law enforcement officer" as required under the PSOBA. The proper forum to address the omission of individuals such as Mrs. Cassella from the PSOBA is before Congress, not a court charged with interpreting the Act. *See Boyer v. West,* 210 F.3d 1351, 1356 (Fed.Cir.2000) ("This court can only interpret the statutes that are enacted by the Congress. Any changes that parties may seek in order to eliminate a statutory incongruity should be brought to the attention of Congress. We are simply powerless to amend any statutory provision *sua sponte.*").

Since a "law enforcement officer" must be appointed for and given the authorization or obligation to perform duties involving crime and juvenile delinquency control or reduction or the enforcement of criminal law and Mrs. Cassella was not, the BJA's determination that Mrs. Cassella was not a "law enforcement officer" under 42 U.S.C. § 3796b(5) (2000) is supported by substantial evidence and legally correct.

## C.

Contrary to the ruling of the trial court, Mrs. Cassella could not be a law enforcement officer who died in the "line of duty" because she was simply not a "law enforcement officer" as defined in the PSOBA. Therefore, we need not and do not review whether she otherwise met the definition of "line of duty" at her death, i.e., whether she was performing actions that she was "obligated or authorized to perform in the course of controlling or reducing crime, [or] enforcing of the criminal law" at the scene of her death. 28 C.F.R. § 32.2(c)(1).

## III. CONCLUSION

For the foregoing reasons, the order of the Court of Federal Claims denying the government's motion for judgment on the administrative record, and entering a final judgment for plaintiff is

*REVERSED–IN–PART and VACATED–IN–PART.*

**All Citations**

469 F.3d 1376

## Footnotes

\*      Honorable T.S. Ellis, III, United States District Court for the Eastern District of Virginia, sitting by designation.

2      The BJA has interpreted juvenile delinquency laws to be a species of criminal law and included within the definition of criminal law. We see no reason to disturb this interpretation. Cf. Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub.L. No. 109–162, § 1164(a)(4), 119 Stat. 2960 (Jan. 5, 2006) (amending 42 U.S.C. § 3796b(6) by replacing the phrase "enforcement of the laws" with "enforcement of the criminal laws (including juvenile delinquency)").

3      The definition of "public safety officer" was expanded in 2003 to include "an individual serving a public agency ... as a chaplain." 42 U.S.C. § 3796b(8) (Supp. III 2003).

---

**End of Document**           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Mejia v. Sessions, 4th Cir., August 9, 2017

856 F.3d 249
United States Court of Appeals, Third Circuit.

Yoselin Linet Martinez CAZUN, Petitioner

v.

ATTORNEY GENERAL UNITED
STATES of America, Respondent

No. 15-3374
|
Argued on September 22, 2016
|
(Opinion filed: May 2, 2017)

**Synopsis**

**Background:** Alien, a previously-removed citizen of Guatemala who had subsequently been granted withholding of removal and protection under the Convention Against Torture (CAT), petitioned for review of decision of the Board of Immigration Appeals (BIA) which found her ineligible for asylum.

**Holdings:** The Court of Appeals, Rendell, Circuit Judge, held that:

[1] plain text of Immigration and Nationality Act (INA) did not indicate clear and unambiguous Congressional intent as to whether aliens in reinstated removal proceedings were eligible to apply for asylum; and

[2] Attorney General's interpretation of INA was entitled to Chevron deference.

Affirmed.

Hardiman, Circuit Judge, filed opinion concurring in the judgment.

**West Headnotes (6)**

[1]     **Administrative Law and Procedure** ⚖ Plain, literal, or clear meaning; ambiguity or silence

        **Administrative Law and Procedure** ⚖ Permissible or reasonable construction

        In deciding whether an agency's interpretation of a statute it administers is entitled to Chevron deference, court must first determine whether Congress has directly spoken to the precise question at issue; if intent of Congress is clear, then court's inquiry ends, and it must give effect to Congress's intent, but if statute remains ambiguous, court will defer to the agency's reasonable interpretation of the statutory scheme, even if that interpretation is not what the court would otherwise choose.

        4 Cases that cite this headnote

[2]     **Aliens, Immigration, and Citizenship** ⚖ Eligibility;  Refugee Status

        Plain text of Immigration and Nationality Act (INA) did not indicate clear and unambiguous Congressional intent as to whether aliens in reinstated removal proceedings were eligible to apply for asylum: although statute authorized "any alien" to apply for asylum regardless of his or her status, it listed specific groups of aliens who could not in fact apply for that relief, and it also instructed that an alien subject to a reinstated removal order was not eligible and could not apply for asylum, and Congress had not directly spoken to issue of which provision should control. Immigration and Nationality Act §§ 208, 241, 8 U.S.C.A. §§ 1158, 1231(a)(5); 8 C.F.R. § 1208.31(e).

        14 Cases that cite this headnote

[3]     **Statutes** ⚖ Plain Language;  Plain, Ordinary, or Common Meaning

In discerning congressional intent in passing a statute, Court looks first to plain text of the statute.

4 Cases that cite this headnote

**[4]     Statutes** 🔑 **Words of number or amount**

Read naturally, word "any," when used in statute, has an expansive meaning.

**[5]     Administrative Law and Procedure** 🔑 **Aliens, Immigration, and Citizenship**

**Aliens, Immigration, and Citizenship** 🔑 **Law questions**

Deference to agency interpretations of a statute is especially applicable in the immigration context, in which officials must make complex policy judgments.

**[6]     Administrative Law and Procedure** 🔑 **Asylum, refugees, and withholding of removal**

**Aliens, Immigration, and Citizenship** 🔑 **Ineligible Aliens**

**Aliens, Immigration, and Citizenship** 🔑 **Law questions**

Attorney General's interpretation of Immigration and Nationality Act (INA), that aliens subject to reinstated removal proceedings were ineligible to apply for asylum, was reasonable interpretation of the statutory scheme, despite existence of apparently conflicting INA provisions, and was thus entitled to 🏳 *Chevron* deference; it was reasonable to conclude that the statutory reinstatement bar meant what it said, that no asylum relief was available to those subject to reinstated removal orders, the reinstatement bar was more specific than the asylum provision, Congress had previously indicated an intent to strengthen effect of the reinstatement bar, interpretation was consistent with Attorney General's discretion to deny asylum even to alien's meeting the criteria for such relief, and agency had expertise making

complex policy judgments related to asylum, withholding of removal, or protection under the Convention Against Torture (CAT). Immigration and Nationality Act §§ 208(a)(1), 241(a)(5), 🏳 8 U.S.C.A. §§ 1158(a)(1), 🏳 1231(a)(5); 🏳 8 C.F.R. § 1208.31(e).

19 Cases that cite this headnote

**\*250** On Petition for Review of an Order of the Board of Immigration Appeals, (Agency No.: AXXX-XX8-210), Immigration Judge: Honorable Walter A. Durling

**Attorneys and Law Firms**

**\*251** Matthew J. Archambeault, Corpuz & Archambeault, 1420 Walnut Street, Suite 1188, Philadelphia, PA 19102, Charles Roth, Keren Zwick (ARGUED), National Immigrant Justice Center, 208 South LaSalle Street, Suite 1300, Chicago, IL 60604, Counsel for Petitioner.

Jefferson B. Sessions III, United States Attorney General, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Shelley R. Goad, Assistant Director, Laura Halliday Hickein, Thomas W. Hussey, Carmel A. Morgan (ARGUED), Civil Division, United States Department of Justice, Office of Immigration Litigation, P.O. Box 878, Ben Franklin Station, Washington, DC 20044, Counsel for Respondent.

Rebecca A. Sharpless, Caroline McGee, Law Student, Immigration Clinic, University of Miami School Law, 1311 Miller Drive, Suite E257, Coral Gables, FL 33146, Dree K. Collopy, Benach Collopy, LLP, 1333 H Street, NW, Suite 900 West, Washington, DC 20005, Counsel Amicus for Petitioner.

Before: MCKEE, Chief Judge [*], HARDIMAN and RENDELL, Circuit Judges

OPINION

RENDELL, Circuit Judge:

Yoselin Linet Martinez Cazun, a native and citizen of Guatemala, entered the United States illegally in 2014. She was detained and removed under an expedited removal order. Later that year, she attempted to re-enter the United States, was detained again, and her previous removal order was

reinstated. When she attempted to apply for asylum, the Board of Immigration Appeals ("BIA") held that she was statutorily ineligible to apply because her previous order of removal had been reinstated. Cazun appeals that ruling.

This case thus presents a question that many of our sister circuits have already answered in the negative: may an alien subject to a reinstated removal order apply for asylum? Because we find that Congress has not spoken clearly on the issue in the relevant statute, we will give *Chevron* deference to the agency's reasonable statutory interpretation that aliens subject to reinstated removal orders are ineligible to apply for asylum.

### I. Background

#### A. Factual Background

In March 2014, Cazun fled her native Guatemala following threats against her life by unknown persons. Upon arrival in the United States, Cazun was detained by immigration authorities. Because Cazun expressed a fear of returning to Guatemala, an asylum officer interviewed her. The asylum officer made a negative credible fear determination, and an Immigration Judge ("IJ") affirmed that decision. Thus, an expedited order of removal was issued to Cazun, and she returned to Guatemala.

Upon Cazun's return to Guatemala, her circumstances grew more dire. The head of a drug trafficking gang threatened, tortured, and sexually assaulted her.[1] To escape, Cazun fled again to the United States, this time with her two-year-old son. On her attempted re-entry, Cazun was detained by Border Patrol.

After determining that Cazun had already been removed from the United **\*252** States once before, the Department of Homeland Security ("DHS") notified Cazun that it intended to reinstate her previously entered removal order. Through this reinstatement process, the DHS would simply re-execute her previous removal order and deport her rather than initiating an entirely new removal process. But before deportation, Cazun expressed fear of returning to Guatemala, so she was interviewed by an asylum officer.[2] The asylum officer made a negative reasonable fear determination, and an IJ affirmed that decision.

Subsequently, but still before deportation, Cazun consulted counsel and urged that she had been unable to reveal the full details of her suffering in her previous interview due to the psychological trauma she had endured in Guatemala. Consequently, she obtained a new interview with an asylum officer. At this interview, Cazun described being sexually assaulted, tortured, and facing threats against her life and the life of her son. The asylum officer concluded that Cazun's testimony was credible and that it established a reasonable fear of persecution. But because Cazun's previous removal order had been reinstated, she was placed in hearings before an IJ to determine her eligibility for withholding of removal and Convention Against Torture (CAT) protection only.

The IJ granted Cazun withholding of removal and protection under the regulations implementing obligations under the CAT, but would not consider Cazun's asylum request.[3] He stated that under current statutes and regulations, Cazun was ineligible to apply for asylum due to her reinstated removal order.[4]

Cazun appealed to the BIA, which agreed with the IJ that Cazun was ineligible for asylum. The BIA based its decision on 8 U.S.C. § 1231(a)(5), which states that aliens like Cazun who are subject to a reinstated removal order are "not eligible and may not apply for any relief under [8 U.S.C. Ch. 12]." A.R. 3. The BIA further cited applicable regulations of the Attorney General that allow "an alien fearing persecution to apply for *withholding of removal only*." A.R. 3. (emphasis added) (citing 8 C.F.R. §§ 1208.31(e), 1208.31(g)(2); 1241.8(e)). Cazun timely appealed the BIA's ruling to this Court, urging **\*253** that she is eligible for asylum pursuant to the asylum provision, and it should apply notwithstanding her reinstated removal order.

#### B. Statutory Background

The issue presented by Cazun's appeal arises from two separate but related statutes: 8 U.S.C. § 1158, the asylum statute, and 8 U.S.C. § 1231(a)(5), the reinstatement bar.[5]

##### i. Asylum Statute

The initial version of § 1158 was enacted by the Refugee Act of 1980, affording "an alien" the right to apply for asylum "irrespective of immigration status." *See* Refugee Act of 1980, Pub. L. No. 96-212, § 208 (codified as amended at

§ 1158). "The purpose of the [Act] ... was 'to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States.' " *Marincas v. Lewis,* 92 F.3d 195, 198 (3d Cir. 1996) (quoting Pub. L. No. 96-212, tit. I, § 101(b), 94 Stat. 102 (1980)).

In 1996, Congress altered the statutory scheme, [6] enacting the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Div. C, 110 Stat. 3009. IIRIRA preserved and in many ways replicated the initial version of § 1158. In its updated form, § 1158(a)(1) instructed that "[a]ny alien who is physically present in the United States ... irrespective of such alien's status, may apply for asylum in accordance with this section."

Despite this seemingly broad guarantee, Congress carved out exceptions for several classes of aliens making them statutorily ineligible to apply for asylum: those who could be safely resettled into another country, *see* § 1158(a)(2) (A), those who failed to timely apply, *see* § 1158(a)(2) (B), and those previously denied asylum, *see* § 1158(a) (2)(C). However, even in the face of these exceptions, § 1158(a)(2)(D) created an exception to the exceptions: despite a previous denial of asylum or tardy asylum application, an alien could apply if she could demonstrate "changed circumstances which materially affect [her] eligibility for asylum or extraordinary circumstances relating to the delay in filing an application."

### ii. Reinstatement

IIRIRA also altered the effect of a previously entered removal order. Before IIRIRA, previous removal orders were not reinstated against aliens who re-entered the country. Instead, these aliens were placed in the same removal proceedings as other aliens who had not previously been removed. Reinstatement of a previous removal order was reserved for only a subset of individuals. *See Fernandez-Vargas v. Gonzales,* 548 U.S. 30, 33–35, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006).

But in IIRIRA, Congress hardened the effect of a reinstated removal order. As the Supreme Court noted, in enacting

this provision Congress "toed a harder line" with respect to reinstatement. *Id.* at 34, 126 S.Ct. 2422. The Act broadened the applicability of reinstatement, and it "explicitly insulate[d] the removal orders from review, and generally foreclose[d] discretionary **\*254** relief from the terms of the reinstated order." *Id.* at 34–35, 126 S.Ct. 2422.

The new reinstatement provision reads:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, *the alien is not eligible and may not apply for any relief under this chapter*, and the alien shall be removed under the prior order at any time after reentry.

§ 1231(a)(5) (emphasis added). "[T]his chapter" refers to Chapter 12 of Title 8 of the U.S. Code, which contains both the asylum statute and the reinstatement bar.

### iii. Attorney General's Interpretation of the Statutory Scheme

Three years after Congress enacted IIRIRA, the Attorney General promulgated 8 C.F.R. § 1208.31(e), [7] instructing that "[i]f an asylum officer determines that an alien [subject to a reinstated removal order] has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a ... [r]eferral to [an] Immigration Judge, *for full consideration of the request for withholding of removal only*." (emphasis added).

The Attorney General clarified that under the regulations aliens subject to reinstated removal orders were "ineligible for asylum" but "may ... be entitled to withholding of removal" or CAT protection. Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999). This distinction between withholding of removal and asylum

for those subject to reinstated removal orders "allow[ed] for the fair and expeditious resolution of ... claims without unduly disrupting the streamlined removal process applicable to ... aliens [subject to reinstated removal orders]." *Id.* at 8479. [8] In brief, the Attorney General determined that the statutory scheme forbade aliens subject to reinstated removal orders from applying for asylum, but allowed such aliens withholding of removal. The BIA relied on this interpretation in deciding Cazun's case.

## II. Discussion [9]

The issue before us is whether an alien whose removal order is reinstated is statutorily ineligible to apply for asylum. We must reconcile two apparently conflicting provisions of the INA, both enacted on the same day. On the one hand, § 1158(a)(1) allows "any alien" "irrespective of such alien's status" to apply for asylum. On the other hand, § 1231(a)(5) instructs that an alien subject to a reinstated removal order "is not eligible and may not apply for any relief under this chapter."

We are not the first court to consider the effect of a reinstated removal order. To date, four Courts of Appeals have addressed this question. Each has concluded that individuals subject to reinstated removal orders may not apply for asylum, though the courts have parted ways in **\*255** their rationales. [10] Three of these courts have found the reinstatement bar clear on its face. [11] But these courts "mention[ ] [the asylum provision] only in passing, or not at all." [12] Only the Ninth Circuit explicitly considered the interplay between the asylum provision and the reinstatement bar. Following the analytic path set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), that Court determined that the statutory scheme was ambiguous, and that the Attorney General's interpretation forbidding aliens subject to reinstated removal orders from applying for asylum to be reasonable. *Perez-Guzman v. Lynch,* 835 F.3d 1066, 1077, 1082 (9th Cir. 2016), *reh'g and reh'g en banc denied* (9th Cir. 2017). We agree.

[1] Using the same *Chevron* framework that the Ninth Circuit employed, we first assess whether "Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. If we can discern congressional intent using the plain text and traditional tools

of statutory construction, our inquiry ends: we give effect to Congress's intent. *See id.* at 843, 104 S.Ct. 2778. If, however, the statute remains ambiguous, we defer to the agency's reasonable interpretation of the statutory scheme, even if the interpretation is not what we would otherwise choose. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).

### A. *Chevron Step One*

[2] [3] [4] In discerning congressional intent, we look first to the plain text of the statute. *CSX Transp., Inc. v. Ala. Dep't of Revenue,* 562 U.S. 277, 283, 131 S.Ct. 1101, 179 L.Ed.2d 37 (2011). In this case, the text does not indicate clear and unambiguous congressional intent. Both provisions at play use broad language to characterize their mandates: that "any" alien can apply for asylum, § 1158(a)(1), but that aliens subject to reinstated removal orders are barred from "any relief," § 1231(a)(5). "Read naturally, the word 'any' has an expansive meaning...." *United States v. Gonzales,* 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). It means "one or some indiscriminately of whatever kind." *Id.* (quoting Webster's Third New International Dictionary 97 (1976)).

But despite use of the word "any," neither section is as broad as it first seems. As to § 1158(a)(1), despite claiming that "any" alien may apply for asylum, the section then lists specific groups of aliens who may not in fact apply. § 1158(a)(2)(A)–(C). So, it is not "any" alien who can apply, but only certain classes of aliens. As to § 1231(a)(5), although **\*256** the section bars "any relief" under the chapter, precedent and the Attorney General's own interpretation clarify that withholding from removal and CAT protection—both forms of relief [13]—are actually still available to individuals in reinstatement proceedings. *See Fernandez-Vargas,* 548 U.S. at 35 n.4, 126 S.Ct. 2422; 8 C.F.R. §§ 1208.31(e), 1208.16(c)(4). Here, the plain language of the statute offers no insight into Congress's intent as to how we should interpret the interplay between the two sections at issue.

Nor can we discern Congress's clear intent using "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9, 104 S.Ct. 2778. To start, both sides rely on the canon *generalibus specialibus non derogant*, that the specific governs the general in interpreting a statutory scheme. See *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 133 S.Ct. 500, 504, 184 L.Ed.2d 328 (2012). The logic behind this canon is quite simple: when there are two conflicting provisions, we can assume that "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Radlax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (Thomas, J., dissenting)). Thus, the more specific section targets the specific question at issue and that section should control our interpretation.

**[5]** Here, however, the canon does not help us resolve the question definitively, because each subsection is more specific in certain respects and more general in others. Section 1158(a)(1) speaks with specificity as to a type of relief Cazun seeks: asylum. But § 1231(a)(5) speaks with specificity as to a subset of aliens: those, like Cazun, subject to reinstated removal orders. While Judge Hardiman makes several persuasive arguments as to why he finds the reinstatement bar the more specific provision, Concurrence Typescript at 6–9, we are not convinced that this canon renders the statutory scheme clear at *Chevron* 's first step, especially given the asylum bar's explicit applicability to aliens "irrespective of [their] status." [14]

**\*257** Nor does legislative history clarify Congress's intent on the matter. "IIRIRA's amendments to the INA show Congress intended to add more detail to the existing asylum scheme while simultaneously expanding the scope and consequences of the reinstatement of an earlier removal order." *Perez-Guzman*, 835 F.3d at 1076. Because Congress enacted the two conflicting provisions on the same day, cherry picking statements from legislative history tends to ignore congressional intent on the opposing provision. Legislative history is of little use in helping us resolve this question.

Cazun offers a number of other arguments to support her position that the statute is clear on its face. None are convincing. First, she emphasizes a minor textual change Congress made when it recrafted the INA in 1996. The original text of the asylum provision had stated that "an" alien could apply for asylum irrespective of status; the updated text provided that "any" alien could do so. *Compare* § 1158(a) (1980), *with id.* § 1158(a)(1) (1996). We think this change is of little interpretive significance, because on the same day that Congress made the change it forbade those subject to reinstated removal orders from obtaining "any" relief. Certainly this minor alteration does not clearly express Congress's intent on the matter.

Second, Cazun suggests that making aliens subject to reinstated removal orders ineligible for asylum risks running afoul of treaty obligations under the United Nations Protocol Relating to the Status of Refugees ("Protocol"), [15] or that treaty obligations should at least inform our reading of the statute. But, given the availability of withholding of removal and CAT protection, there is no treaty obligation in conflict with the Government's reading. *See Ramirez-Mejia v. Lynch*, 813 F.3d 240, 241 (5th Cir. 2016) (denying rehearing en banc). [16]

**\*258** Finally, Cazun argues that our reasoning in *Marincas v. Lewis*, 92 F.3d 195 (3d Cir. 1996), counsels that we find the INA to be clear and unambiguous here. In that case, we considered whether the Refugee Act of 1980 required that stowaways receive the same asylum proceedings as non-stowaway aliens. One provision of the INA commanded that the Attorney General establish "a procedure"—singular—for aliens to apply for asylum "irrespective of [the] alien's status." § 1158(a) (1980). But an earlier-enacted provision instructed that stowaways, a specific class of aliens, were not entitled to an exclusion hearing, where the asylum determination took place. *Marincas*, 92 F.3d at 198. Thus, the BIA reasoned such stowaway applicants for asylum were not entitled to the same adversarial adjudication before an IJ that other aliens received at an exclusion hearing. *See id.* at 199–200. Instead, the BIA concluded that stowaways applying for asylum should receive only a non-adversarial interview before an INS employee. *See id.* at 199–200.

We rejected the BIA's distinction between stowaways and other aliens with respect to asylum proceedings. We found that, regarding the question we faced there, "the plain

meaning of the Refugee Act is clear and unambiguous" at the first step of *Chevron*. *Id.* at 200. Because the statute required "a uniform" procedure for an alien to apply for asylum "irrespective of such alien's status," we found that Congress did not intend to allow one procedure for stowaways and another for other aliens. *See id.* at 201. However, we noted that stowaways' hearings could be limited to the issue of asylum, and that their hearings need not reach any other exclusion issue.

Cazun likens her case to *Marincas*: one provision of the INA singles out her group—those subject to reinstated removal orders—for less favorable immigration procedures than other aliens, while another provision envisions equal asylum procedures for all aliens.

Cazun's analogy fails, however, for several reasons. First, as Cazun herself agreed at oral argument, in *Marincas* we considered a different statute altogether than the one we analyze today. There, we interpreted the Refugee Act of 1980, not IIRIRA. Although the language of the asylum provision remained largely unchanged by IIRIRA, the statutory scheme as a whole shifted dramatically. Therefore, *Marincas 's* interpretation of the asylum provision enacted in 1980 does little to clarify what Congress intended when it enacted IIRIRA, which included the broad reinstatement bar, sixteen years later.

Second, even setting this difference aside, common principles of statutory interpretation distinguish Cazun's case from *Marincas*. When interpreting statutes, we work to "fit, if possible, all parts [of a statute] into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959)). In *Marincas*, we were able to so harmonize the statutory scheme without doing serious damage to either of the provisions at issue. For although we held that stowaways were entitled to the same adversarial hearing as other aliens, we nonetheless reasoned that **\*259** the stowaway's hearing could be limited to the issue of asylum eligibility: consistent with the stowaway provision's dictates, the asylum hearing need not reach any other issue of exclusion. *Marincas*, 92 F.3d at 201. Thus, our ruling harmonized the seemingly contradictory

provisions, and we were able to preserve the "basic thrust" of the stowaway provision. *Id.* Here, Cazun offers no similar way for us to preserve both § 1158(a) and § 1231(a)(5).

Finally, at the core of our reasoning in *Marincas* was a commitment to discerning congressional intent. We found strong support for the idea that "Congress clearly intended a single, uniform procedure be established" with respect to asylum proceedings. *Id.* So when we interpreted the weighty asylum provision alongside a somewhat cursory, technical provision regarding stowaways, it was not difficult to conclude that Congress intended that the asylum provision should control. But here, we must square the asylum provision that affords relief with the reinstatement bar that takes such relief away. We know that Congress intended the reinstatement bar to be taken seriously, *see Fernandez-Vargas*, 548 U.S. at 33–35, 126 S.Ct. 2422, and that the provision should be given considerable weight in interpreting the provisions. Thus we cannot say, as we did in *Marincas*, that Congress clearly intended that one provision or the other should control. Because of these differences, we cannot reconcile the provisions so as to find the INA "clear and unambiguous" here. [17]

The Attorney General's arguments that the text is clear and unambiguous fare no better than Cazun's. For while the Government focuses on language barring aliens from "any relief," it ignores the affirmative asylum provision, which applies on its face to "any alien ..., irrespective of such alien's status." Accordingly, because the statute does not clearly indicate congressional intent, we proceed to the second step of *Chevron*.

### B. Chevron *Step Two*

[6] At the second step of *Chevron*, we defer to the agency's interpretation of the statute as long as that reading is reasonable. *Brand X Internet Servs.*, 545 U.S. at 980, 125 S.Ct. 2688. Deference to the executive branch is "especially appropriate in the immigration context" where officials must make complex policy judgments. *See Aguirre-Aguirre*, 526 U.S. at 425, 119 S.Ct. 1439; *Yusupov*, 518 F.3d at 197. We must therefore decide whether 8 C.F.R. § 1208.31(e)—which prevents individuals subject to reinstated

removal orders from applying for asylum—is a reasonable interpretation of the statutory scheme. [18]

 **\*260**  It was reasonable for the agency to conclude that the statutory reinstatement bar foreclosing "any relief under this chapter" means just what it says: no asylum relief is available to those subject to reinstated removal orders. Certainly this interpretation was not unreasonable: two Courts of Appeals have explicitly adopted the same interpretation without even finding the statutory scheme ambiguous. *Jimenez-Morales, 821 F.3d at 1310*; *Ramirez-Mejia, 794 F.3d at 489–91.* [19]

Even independent of these courts' conclusions, at least four factors lend support to the agency's interpretation. First, as discussed at length in Judge Hardiman's concurrence, the reinstatement bar is, at least in some respects, more specific than the asylum provision. It applies to a far narrower group of aliens—those subject to reinstated removal orders—than the asylum provision, which applies to all aliens. From a purely textual standpoint, this in and of itself might compel us to agree with the Attorney General were we forced to decide the issue without resorting to *Chevron.*

Second, the Supreme Court has already emphasized congressional intent as to IIRIRA in *Fernandez-Vargas, 548 U.S. at 33, 126 S.Ct. 2422*: Congress meant to strengthen the effect of the reinstatement bar. *See also* H. R. Rep. No. 104–469(I), at 155 (1996) ("[T]he ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border."). The agency's interpretation is faithful to that intent. For aliens who re-enter our shores illegally despite previous removal and instructions not to return, the Attorney General's interpretation takes asylum off the table while allowing other forms of relief that fulfill humanitarian commitments.

Third, the Supreme Court has emphasized that the Attorney General can deny asylum in the agency's discretion even when an alien meets the criteria for asylum. *Cardoza-Fonseca, 480 U.S. at 423–24, 107 S.Ct. 1207*; *see also* § 1158(d) (5)(B). It would be strange to find that granting asylum is discretionary, but that the Attorney General *must* allow Cazun to apply, even in the face of contradictory statutory text.

Finally, the agency has expertise making complex policy judgments related to asylum, withholding of removal, and CAT protection. Deference regarding questions of immigration policy is especially appropriate. *See Aguirre-Aguirre, 526 U.S. at 425, 119 S.Ct. 1439.*

All this is not to say that the agency's position is flawless. To start, the Attorney General's interpretation bars from asylum those like Cazun whose compelling claims arose after their first removal order was issued. This is at least in tension with the text of § 1158(a)(2)(D), which allows aliens who can demonstrate changed circumstances to apply for asylum even when a previous application was rejected.

Further, the Attorney General's reading seems counterintuitive as applied to someone in Cazun's situation. An alien like Cazun who complies with a removal order is **\*261** barred from asserting an asylum claim on illegal reentry. But aliens ordered to be removed who evade deportation are not similarly barred: those aliens never left the country, so their first removal order remains in effect and is not subject to reinstatement. Thus, such non-compliant aliens avoid the reinstatement bar and may apply for asylum in the face of changed circumstances, while those who comply with the removal order but reenter illegally cannot.

However, these points are not fatal to the Government's case. For while the Government's reading leaves vulnerable those like Cazun whose claims for asylum arose after they were previously removed, as the Government urged in briefing and oral argument, reinstatement of a removal order is not automatic. *See* § 1231(a)(5); *Perez-Guzman, 835 F.3d at 1081* ("[T]he government has discretion to forgo reinstatement and instead place an individual in ordinary removal proceedings." (citing *Villa-Anguiano v. Holder, 727 F.3d 873, 878 (9th Cir. 2013)*)). The agency may rely on this flexibility when deciding whether to reinstate a previous removal order. Exercising this discretion in cases like Cazun's speaks to the "wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress." *Chevron, 467 U.S. at 866, 104 S.Ct. 2778.* [20] As a result, we will defer to the agency's expertise on complex matters of immigration policy such as the one before us today.

*See Aguirre-Aguirre, 526 U.S. at 425, 119 S.Ct. 1439.*

### III. Conclusion

In summary, the agency's interpretation of the ambiguous statute is reasonable. When Congress enacted IIRIRA, it set the agency adrift between an interpretive Scylla and Charybdis. No reading—including Cazun's—could harmonize the statutory scheme perfectly. But because the Attorney General's reading, bolstered by its own expertise, is reasonable, we will defer to it and uphold the decision of the BIA.

HARDIMAN, Circuit Judge, concurring in the judgment.

Under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we do not defer to an agency's construction of a statute when "Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. At issue in this appeal is whether Yoselin Cazun may apply for asylum even though she is the subject of a reinstated removal order. To answer that question we must analyze two provisions of the Immigration and Naturalization Act: 8 U.S.C. § 1158 (the "asylum provision") and § 1231(a)(5) (the "reinstatement bar"). The asylum provision permits "[a]ny alien" to apply for asylum, while the reinstatement bar precludes aliens subject to reinstated removal orders from applying for "any relief." Based on the text, history, and structure of the statute, I would hold that the reinstatement bar precludes Cazun from applying for asylum. This interpretation fulfills our duty to "fit, if possible, all parts [of this statute] into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citation omitted).

Three of our sister courts agree that the INA precludes aliens like Cazun from applying for asylum. *See* **\*262** *Jimenez-Morales v. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016) (holding an alien with a reinstated removal order "is not eligible for and cannot seek asylum"); *Ramirez-Mejia v. Lynch*, 794 F.3d 485, 490 (5th Cir. 2015) (holding the reinstatement bar, "read plainly, broadly denies all forms of redress from removal, including asylum"), *pet'n for reh'g en banc denied*, 813 F.3d 240 (5th Cir. 2016); *Herrera-Molina v. Holder*, 597 F.3d 128, 138–39 (2d Cir. 2010) (accepting regulations applying restrictions to aliens subject to reinstatement removal orders as correct statutory interpretations); *see id.* at 137 (discussing "the availability of suspension of deportation or asylum" and noting "the

terms of [the reinstatement bar] preclude such relief"). *But see Perez-Guzman v. Lynch*, 835 F.3d 1066, 1076–77 (9th Cir. 2016) (finding the statute ambiguous and deferring to the Agency). And while I agree with the Ninth Circuit in *Perez-Guzman* and with the Majority that the Agency's interpretation here is reasonable, I would join the Eleventh, Fifth, and Second Circuits in finding that it is compelled by the statute.

I

The provisions at issue in this appeal were codified in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009 (1996). IIRIRA recodified the asylum provision at § 1158 and enacted for the first time the reinstatement bar codified at § 1231(a)(5), which prohibits illegal reentrants from applying for "any relief" under the statute.

The asylum provision as recodified in IIRIRA retained its original scope and was reformatted in two sections. One section provides that "[a]ny alien ..., irrespective of such alien's status, may apply for asylum" if present in the country, and the other section lists some exceptions to the general provision. § 1158(a)(1)–(2).

IIRIRA also implemented a more efficient process for the reinstatement of removal orders. Before 1996, those who entered the United States illegally after having been deported typically were placed in a new round of regular deportation proceedings. *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 33–34, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). IIRIRA streamlined the system by reinstating prior orders of removal as of their original start date, thus hastening the removal process. [1] As such, aliens with reinstated orders may be removed "at any time after the reentry," without new administrative hearings or any opportunity for review. § 1231(a)(5). Most important for purposes of this appeal, reinstated orders disqualify those who reenter after prior removal from obtaining "any relief under this chapter." *Id.*

As the Supreme Court noted, the reinstatement bar "toed a harder line" by "appl[ying] to *all* illegal reentrants."

*Fernandez-Vargas*, 548 U.S. at 34–35, 126 S.Ct. 2422 (emphasis added). This "harder line," *id.* at 34, 126 S.Ct. 2422, punishes and deters the criminal act of reentering the country illegally, *see* 8 U.S.C. § 1326. *See generally In re Briones*, 24 I. & N. Dec. 355, 370–71 (B.I.A. 2007) ("[O]ne of the chief purposes of the IIRIRA ... was to overcome the problem of recidivist immigration violations by [*inter alia*] escalating the punitive consequences ... of illegal reentry." (citing IIRIRA §§ 105(a)(2), 301(b)(1), 303(a), 305(a)(3), (b)(3), 324(a), 326, 332, 353(b), which "expedite the detection, **\*263** deterrence, and punishment of recidivist immigration violators")).

The Immigration and Naturalization Service implemented the reinstatement bar by promulgating regulations that established expedited removal proceedings for illegal reentrants subject to a prior removal order, 8 C.F.R. § 241.8(a), (c), and precluded those aliens from filing asylum applications, *id.* § 208.31(e) (allowing reasonable fear proceedings "for full consideration of the request for *withholding of removal only*" (emphasis added)).

## II

At *Chevron* Step One, we use "traditional tools of statutory construction" to ascertain whether "Congress had an intention on the precise question." *Hanif v. Att'y Gen.*, 694 F.3d 479, 483 (3d Cir. 2012) (citation omitted). In doing so, we "consider the text and structure of the statute in question." *United States v. Geiser*, 527 F.3d 288, 292 (3d Cir. 2008).

Cazun and the Government agree that the statute is clear, but they disagree about whose position it supports. Cazun claims she should prevail because the asylum provision states that "[a]ny alien" may apply for asylum, "irrespective of such alien's status." 8 U.S.C. § 1158(a)(1). For its part, the Government argues that Cazun is ineligible for asylum because she is subject to a reinstated removal order and the reinstatement bar says she is "not eligible and may not apply for any relief" under Chapter 12 of Title 8 of the United States Code, which includes the asylum provision. 8 U.S.C. § 1231(a)(5).

We previously found both sections at issue to be clear when read independently. We held in *Marincas v. Lewis* that "under the plain meaning of [the asylum provision], Congress clearly and unambiguously intended that the Attorney General establish a uniform asylum procedure that is to be applied irrespective of an alien's status." 92 F.3d 195, 201 (3d Cir. 1996) (disallowing unequal procedures for alien stowaways). *Marincas* does not control this appeal, however. As my colleagues note, Maj. Op. at 258–59, *Marincas* did not analyze the reinstatement bar because it had not yet taken effect. After our decision in *Marincas*, a case dealing with the reinstatement bar, we assumed in dicta that "asylum is not available to aliens who face reinstatement of a prior order of removal [under] 8 U.S.C. § 1231(a)(5)." *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 680 (3d Cir. 2015). Because neither *Marincas* nor *Gonzalez-Posadas* analyzed the interplay between the asylum provision and the reinstatement bar, this appeal requires us for the first time to "attempt to harmonize" two statutory provisions that seem, at first blush, to conflict with one another. *N.J. Air Nat'l Guard v. Fed. Labor Relations Auth.*, 677 F.2d 276, 282 (3d Cir. 1982); *see also Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and ... it is the duty of courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

### A

Our effort to harmonize these provisions begins with the text of the statute. *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 283, 131 S.Ct. 1101, 179 L.Ed.2d 37 (2011). As the Majority notes, both provisions use the word "any," which typically has an "expansive meaning." Maj. Op. at 255 (citing *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997)). Yet "neither section is as broad as it first seems." *Id.*

**\*264** After stating that *any* alien, irrespective of status, may apply for asylum, the asylum provision then lists several exceptions preventing certain aliens from doing so in specific circumstances. *See* § 1158(a)(2). It is thus clear that *some*

aliens may *not* apply for asylum. In a similar way, after the reinstatement bar states that aliens with reinstated removal orders may not apply for *any* relief, the statute goes on to allow them to seek withholding of removal to certain countries. *See* § 1231(b)(3)(A). Thus, that section does not bar *all* types of relief. So neither provision is absolute, and both may be limited by other provisions. Therefore, we must turn to canons of construction and the statute's structure to see whether the two provisions can be harmonized.

B

Cazun and the Government both invoke the "specificity" canon of statutory construction. Maj. Op. at 256. Simply put, this means that a "narrow, precise, and specific" statutory provision is not overridden by another provision "covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012) (explaining that because the more specific text "comes closer to addressing the very problem posed by the case at hand[, it] is thus more deserving of credence").

Instead of challenging this canon of construction, the parties each claim that their favored provision is more specific than the other one. Although both parties provide reasonable arguments,[2] I am convinced that the reinstatement bar is more specific than the asylum provision. While the asylum provision establishes general rules for asylum applications, the reinstatement bar deals specifically with a particular subset of illegal aliens: those who are subject to reinstated removal orders. As such, it is most naturally read as an exception to the "general permission," Scalia & Garner, *supra*, at 183, to apply for asylum. By making relief unavailable to certain aliens, the reinstatement bar nullifies every relief provision to which it applies with respect to certain persons no longer eligible for that relief.

Cazun argues that the reinstatement bar is a "blunt instrument" that is less detailed, and thus less specific, than the asylum provision. Cazun Br. 17–18. I disagree. The reinstatement bar's application to all of Chapter 12 does not defeat its specificity. When Congress raised the age at which Americans could receive full Social Security benefits, *see* Social Security Amendments of 1983, Pub. L. No. 98-21, § 201, 97 Stat. 65 (1983) (codified at 42 U.S.C. § 416(l)(1)),

the law affected millions of people. But its broad applicability did nothing to dilute its specificity. In a similar way, the reinstatement bar applies to a large but specific group of people (aliens with reinstated removal orders) and deprives them of relief for which they would otherwise qualify—in this case, asylum.

As the Majority suggests, the asylum provision can also be seen as specific insofar as it deals with just one of many types of relief. Maj. Op. at 256; *see also* *Perez-Guzman, 835 F.3d at 1075–76*. But focusing the specificity inquiry on the type of relief available as opposed to the type of **\*265** person affected creates tensions in the statute that my interpretation does not.

First, the reinstatement bar creates an exception from the general availability of multiple forms of relief (of which asylum is one), whereas the asylum provision simply establishes rules for asylum applications and makes them generally available to "[a]ny alien," subject to exceptions. If asylum (and every other form of relief) were deemed more specific than the reinstatement bar, all forms of relief found in Chapter 12 would be unaffected by the reinstatement bar, essentially nullifying that section in violation of another canon of construction: "the cardinal principle that we do not cripple statutes by rendering words therein superfluous." *Rojas v. Att'y Gen.*, 728 F.3d 203, 209 (3d Cir. 2013); *see also* *id.* at 210 ("It is our duty to give effect, if possible, to every clause and word of a statute." (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001))).

Second, creating a requirement that all forms of relief in Chapter 12 must cross-reference the reinstatement bar in order for it to apply, as Cazun recommends, would run afoul of the statutory scheme. Cazun claims that because the asylum provision enumerates some exceptions, *see* § 1158(a)(2), (b)(2)(A), but does not reference the reinstatement bar among them, Congress did not intend to make illegal reentrants ineligible for asylum. But if the reinstatement bar applied only to types of relief that cross-referenced it, it would never apply. *See* Gov't Br. 29 (noting that none of the forms of relief under the INA specifically refers to reinstatement of removal). Such an interpretation not only would render the reinstatement bar superfluous, it would also contravene the Supreme Court's observation that the reinstatement bar "generally forecloses discretionary relief from the terms of the

AR.04268
11

reinstated [removal] order," *Fernandez-Vargas,* 548 U.S. at 35, 126 S.Ct. 2422.

Indeed, the Supreme Court already recognized that Congress limited at least some types of relief via the reinstatement bar when it "held that aliens subject to reinstatement orders are ineligible for adjustments of status[ ] ... [even though] the adjustment-of-status provision[ did] not mention reinstatement orders." *Ramirez-Mejia,* 794 F.3d at 490 (describing *Fernandez-Vargas,* 548 U.S. at 46–47, 126 S.Ct. 2422, and 8 U.S.C. § 1255 (adjustment-of-status provision)). It so held despite the fact that the adjustment-of-status provision—like the asylum provision—does not reference the reinstatement bar among its other enumerated exceptions. Provisions like the reinstatement bar, which by their terms create exceptions from many other sections, need not list every section to which they apply, nor must they be explicitly cross-referenced in the excepted provisions. Congress may choose to limit one section of a statute via another section without an explicit cross-reference to or amendment of the section to be limited. *See id.* ("The judiciary's role is not to question the method of an amendment but only to interpret its effect.").

## C

Cazun's remaining counterarguments are also unavailing.

The reinstatement bar speaks to the more specific problem Congress meant to address even if Cazun is correct that in some years those who are subject to reinstatement removal orders outnumber those who apply for asylum. As with the Social Security example mentioned previously, the numerosity of the class sheds no light on the specificity of the statute. Moreover, not every alien who submits an asylum application is subject to a reinstated removal order, which is reflected by **\*266** every successful asylum applicant since 1996. Thus, there are necessarily fewer asylum applications from aliens with reinstated orders than the total number of asylum applications. The class of aliens who seek asylum despite reinstated removal orders, then, is still narrower than the class of aliens who seek asylum generally.

The policy concerns created by Cazun's changed circumstances should not sway our opinion either. Congress decided to "toe[ ] a harder line" with respect to "illegal

reentrants," *Fernandez-Vargas,* 548 U.S. at 34–35, 126 S.Ct. 2422, and to discourage initial illegal entry by removing some options upon illegal reentry. And the fact that withholding of removal is available to Cazun and those like her mitigates somewhat the concerns about "dire humanitarian consequences," *Perez-Guzman,* 835 F.3d at 1081. And as my colleagues note, asylum seekers may declare themselves at the border without illegally reentering the country after they have been removed. *See* Maj. Op. at 261 n.20.

Congress's focus on illegal *re*entry would also explain the disparate treatment of aliens successfully removed previously (even if changed circumstances result) from those who have not yet been removed. *See* Maj. Op. at 260–61. It is only the former group that commits the action which triggers reinstated removal orders: "reenter[ing] the United States illegally after having been removed or having departed voluntarily." *§ 1231(a)(5).*

## III

Because the statute is not "silent or ambiguous" as to whether aliens with reinstatement orders of removal may apply for asylum, I would enforce the statute as written rather than defer to the Agency's interpretation. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. *Section 1231(a)(5)*—the reinstatement bar—specifically prevents the subclass of aliens of which Cazun is a member from applying for any relief under Chapter 12 of Title 8, which includes asylum. Nothing about this section is ambiguous, nor is there an implication that Congress intended a "legislative delegation to [the Agency] on [the] particular question" of the effect of reinstated removal orders. *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. Unlike the "definitional issue" in *Chevron, id.* at 858, 104 S.Ct. 2778, in which the lack of definition of "stationary source" meant that "Congress did not actually have an intent regarding the applicability of [the relevant environmental] concept to the permit program," *id.* at 845, 104 S.Ct. 2778, Congress here has expressed its intent to disqualify illegal reentrants from applying for asylum, among other forms of relief.

The Majority opinion eloquently describes the facts, the question of statutory interpretation presented, and the various legal arguments made by both sides. I agree with my

colleagues that the Agency's interpretation of IIRIRA is reasonable, and would join them in full if I believed this question should be decided under Step Two of *Chevron*. I concur only in the judgment, however, because I think we should end our analysis at Step One.

It is true that the apparent conflict in this case presents a difficult question of statutory interpretation, but our traditional tools of statutory construction answer it. Unless we find silence or ambiguity after employing these tools, we must answer even difficult interpretative questions. *See Scialabba v. Cuellar de Osorio*, ––– U.S. ––––, 134 S.Ct. 2191, 2214, 189 L.Ed.2d 98 (2014) (Roberts, C.J., concurring

in judgment) ("[D]eference is [not] warranted because of a direct conflict between [two] clauses.... [Statutory] conflict is not ambiguity...."). The reinstatement **\*267** bar singles out a subclass of aliens—illegal reentrants subject to reinstated removal orders—and deprives them of various forms of relief available under Chapter 12, including asylum.

More than merely reasonable, the Agency's view that Cazun is ineligible for asylum is compelled by the statute. For that reason, I concur in the judgment.

**All Citations**

856 F.3d 249

---

## Footnotes

\*    Judge McKee was Chief Judge at the time this appeal was argued. Judge McKee completed his term as Chief Judge on September 30, 2016.

1    The drug trafficker apparently targeted Cazun because of a debt owed him by the father of Cazun's child. Cazun was not married to the father of her child, but she lived with him.

2    Although an asylum officer conducted the interview, the only purpose of the interview was to determine Cazun's eligibility for withholding of removal and protection under the Convention Against Torture, not her eligibility for asylum.

3    Aliens may prefer to seek asylum rather than withholding of removal or CAT protection for several reasons. First, unlike other forms of relief, asylum provides a pathway to lawful permanent resident status and, ultimately, citizenship. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Second, withholding of removal and CAT protection only prevent removal of an alien to the specific country from which she fled; asylum prevents removal from the United States altogether. *See id.* Third, withholding of removal status comes with several restrictions, including potential limitations on the ability to work and travel internationally. 8 C.F.R. § 274a.12(a)(10); 8 C.F.R. § 241.7. Finally, the standard for asserting a successful asylum claim is less demanding than the standard for withholding of removal or CAT protection. *Compare Cardoza-Fonseca*, 480 U.S. at 430–32, 107 S.Ct. 1207 ("well-founded fear" standard applies to asylum applications), *with* 8. C.F.R. § 1208.16(b)(1)(iii) (applicant for withholding of removal must prove she "more likely than not" will suffer harm if returned to native country), *and* 8 C.F.R. § 1208.16(c)(2) (applicant for CAT protection must establish she "more likely than not" would be tortured if returned to native country).

4    Cazun's young son, who was not subject to a reinstated removal order, was granted asylum.

5    For ease of reference, unless otherwise noted, statutory sections referenced in the remainder of this opinion come from Title 8 of the United States Code.

6    Congress had previously amended the statute in 1990 to forbid individuals convicted of aggravated felonies from being granted asylum. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 515.

7    Though the regulation was originally promulgated as 8 C.F.R. § 208.31(e), it was recodified in 2003 as 8 C.F.R. § 1208.31(e). Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003). We use this updated numbering throughout the opinion for consistency.

8    The Attorney General identified § 1158 as one of the statutes giving the agency authority to promulgate regulations to govern asylum and withholding procedures. *Id.* at 8487.

9    We have jurisdiction pursuant to § 1252. The Board's jurisdiction arose under 8 C.F.R. §§ 1003.1(b)(3) & 208.31(e) (2014).

10   *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1082 (9th Cir. 2016) (statutory scheme was ambiguous and *Chevron* deference was warranted because the Attorney General's interpretation was reasonable); *Jimenez-Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016) (plain text of § 1231(a)(5) supported conclusion that aliens subject to reinstated removal orders cannot apply for asylum); *Ramirez-Mejia v. Lynch*, 794 F.3d 485, 491 (5th Cir. 2015), *reh'g en banc denied*, 813 F.3d 240 (5th Cir. 2016) ("*Section 1231(a)(5)*'s plain language, relevant regulations, and analogous case law all compel the conclusion that aliens whose removal orders are reinstated may not apply for asylum."); *Herrera-Molina v. Holder*, 597 F.3d 128, 138–39 (2d Cir. 2010) (plain text, Attorney General's regulations, and precedent all supported conclusion that aliens subject to reinstated removal orders could not apply for asylum).

11   *Jimenez-Morales*, 821 F.3d at 1310; *Ramirez-Mejia*, 794 F.3d at 491; *Herrera-Molina*, 597 F.3d at 138–39 (2d Cir. 2010).

12   *Perez-Guzman*, 835 F.3d at 1074 (citations omitted).

13   Despite both sides' arguments to the contrary, neither statute nor caselaw supports any argument that either asylum or withholding of removal is not in fact "relief" in this case. *See, e.g., Yusupov v. Att'y Gen. of United States*, 518 F.3d 185, 188 n.1 (3d Cir. 2008) (referring to withholding of removal as "relief"); *Ghebrehiwot v. Att'y Gen. of United States*, 467 F.3d 344, 351 (3d Cir. 2006) (same); *Johnson v. Gonzales*, 416 F.3d 205, 211 (3d Cir. 2005) (referring to asylum as relief); *see also* § 1229(a)(c)(7)(C)(ii) (referring to asylum as relief); *United States v. Denedo*, 556 U.S. 904, 909, 129 S.Ct. 2213, 173 L.Ed.2d 1235 (defining the "familiar meaning" of "relief" as "any 'redress or benefit' provided by a court" (quoting Black's Law Dictionary 1317 (8th ed. 2004)))

14   Cazun briefly argues that the rule of lenity, or its immigration corollary, supports her favored interpretation. *See Cardoza-Fonseca*, 480 U.S. at 449, 107 S.Ct. 1207. But we have never found that such a rule of construction clarifies an ambiguous statute, especially one with two conflicting provisions, such that it does away with the need to proceed to *Chevron* 's second step. *Cf. Babbitt v. Sweet Home Chapters of Cmtys. for Great Ore.*, 515 U.S. 687, 704 n.18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). Indeed, we use the immigration rule of lenity "as a canon of last resort" when interpreting statutory ambiguities. *Valansi v. Ashcroft*, 278 F.3d 203, 214 n.9 (3d Cir. 2002). "It cannot be the case ... that the doctrine of lenity must be applied whenever there is an ambiguity in an immigration statute because, if that were true, it would supplant the application of *Chevron* in the immigration context." *Ruiz-Almanzar v. Ridge*, 485 F.3d 193, 198 (2d Cir. 2007). To the contrary, deference is especially applicable in the immigration context. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). We also note that the policy concerns animating the rule of lenity—executive encroachment on legislative powers and notice to defendants accused

AR.04271

of crimes, see 🚩 *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1023 (6th Cir. 2016)—are not implicated in this case.

15    The United States agreed to comply with the substantive provisions of Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees ("Convention") in 1968. *Cardoza-Fonseca, 480 U.S. at 429, 107 S.Ct. 1207* (citing 19 U.S.T. 6223, 6259–6276, T.I.A.S. No. 6577 (1968)). The Protocol incorporated the Convention. *Marincas*, 92 F.3d at 197.

16    Cazun points to three specific Articles from the Protocol to support her proposed interpretation. None convince us as to Congress's clear intent. First, she highlights Article 34, which urges nations to assimilate refugees. But this Article is merely "precatory." *Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207.*

Second, she turns to Article 28, which requires signatories to afford refugees travel documents. She contends that the travel restrictions placed on recipients of withholding violate this Article, so she must be granted the right to apply for asylum. But we have noted that the Protocol is "not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation." *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005). And even assuming that this Article should influence our interpretation, it does not provide the support Cazun contends. Her reasoning that withholding of removal "effectively trap[s her] within the United States," *Pet. Br.* at 33, misstates the relief's effect. As a recipient of withholding of removal and CAT protection, Cazun remains free to leave the United States: she simply cannot return to the United States without approval from immigration authorities.

Third, Cazun points to Article 31(1), which forbids countries from imposing "penalties" "on account of [an applicant's] illegal entry or presence." She argues that the reinstatement bar constitutes such a penalty. Again, even assuming this Article should influence our interpretation, neither the text of the Article nor its history clearly indicates that the reinstatement bar, which does not imprison or fine aliens, is the sort of criminal "penalty" forbidden. *See* James C. Hathaway, The Rights of Refugees Under International Law, 405, 408, 411 (2005). In short, this non-self-executing treaty provides no basis for finding that Congress spoke clearly on the issue at hand.

17    In addition, two other factors supported our analysis in *Marincas* that are not at issue today: a concern for basic due process rights once an applicant was entitled to an asylum proceeding, 92 F.3d at 203–04, and the Board's seemingly inconsistent statutory interpretations, *id.* at 201–02.

18    As a threshold matter, we reject Cazun's argument that the interpretation does not merit *Chevron* deference because the agency did not appreciate the statutory ambiguity at issue. She cites out-of-circuit cases for the proposition that an agency failing to appreciate statutory ambiguity deserves no deference. *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350 (D.C. Cir. 2006); *Cajun Elec. Power Coop., Inc. v. F.E.R.C.*, 924 F.2d 1132 (D.C. Cir. 1991).

But even those non-binding cases do not support her position. Despite some language in *Cajun Electric Power Coop., Inc.* supporting Cazun's argument, that case involved interpretation of a contract, not a statute. 924 F.2d at 1135. And in *Peter Pan Bus Lines, Inc.*, the agency mistakenly felt *compelled* to reach the conclusion it did. 471 F.3d at 1354; *see also* *Negusie v. Holder*, 555 U.S. 511, 521, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) (refusing to apply *Chevron* deference where agency mistakenly deemed its interpretation "mandated" by precedent). Here, Cazun seems to infer from the Attorney General's lack of discussion about the asylum statute that the agency felt similarly compelled to arrive at the conclusion it did. But this inference is unsubstantiated. On the contrary, the agency's explanation demonstrated that it relied on its own expertise to balance Congress's goals of efficiency and fairness in the screening process. *See* 64 Fed. Reg. at 8485.

AR.04272

19    While the Second Circuit concluded in 🔖 *Herrera-Molina* that aliens subject to reinstatement removal orders could not apply for asylum, that case did not explicitly interpret the reinstatement bar. 🔖 597 F.3d at 138–39.

20    To the extent that prosecutorial discretion is denied to aliens such as Cazun, we note that the reinstatement bar applies only to "an alien who has reentered the United States *illegally*." 🔖 § 1231(a)(5) (emphasis added). Thus, aliens subject to removal orders may continue to apply for asylum by *lawfully* approaching a port of entry without illegally crossing the border.

1    IIRIRA also consolidated deportation and exclusion proceedings into one "removal" proceeding. *See* 🔖 8 U.S.C. § 1227. The reinstatement provision further streamlines this removal process for aliens with reinstated removal orders.

2    Justice Scalia and Mr. Garner recognize that in some cases, "it is difficult to determine whether a provision is a general or specific one." Scalia & Garner, *supra*, at 187. Sometimes two provisions may be seen as more specific each in their own way. *See id.* at 187–88 (citing 🔖 *Radzanower*, 426 U.S. at 159, 96 S.Ct. 1989 (Stevens, J., dissenting)).

---

**End of Document**                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

138 S.Ct. 2648
Supreme Court of the United States

Yoselin Linet Martinez CAZUN, petitioner,
v.
Jefferson B. SESSIONS, III, Attorney General.

No. 17–931.
|
June 18, 2018.

**Synopsis**

Case below, 856 F.3d 249.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Third Circuit denied.

**All Citations**

138 S.Ct. 2648 (Mem), 201 L.Ed.2d 1049, 86 USLW 3628, 86 USLW 3629

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by U.S. v. Reynolds, 3rd Cir.(Pa.), March 14, 2013

443 F.3d 890
United States Court of Appeals,
District of Columbia Circuit.

CHAMBER OF COMMERCE OF THE UNITED STATES of America, Petitioner

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 05–1240.
|
Argued Jan. 6, 2006.
|
Decided April 7, 2006.

**Synopsis**

**Background:** Organization petitioned for review of Securities and Exchange Commission (SEC) rule which required that, to engage in certain transactions otherwise prohibited by the Investment Company Act (ICA), an investment company, commonly referred to as a mutual fund, must have a board with no less than 75% independent directors and an independent chairman. The Court of Appeals, Ginsburg, Chief Judge, 412 F.3d 133, granted petition in part and remanded. On remand, the SEC decided not to modify the conditions. Organization petitioned for review.

**Holdings:** The Court of Appeals, Rogers, Circuit Judge, held that:

[1] organization had standing;

[2] the SEC had authority to consider modifying rule prior to issuance of Court of Appeals' mandate in prior case;

[3] the SEC was required to afford opportunity for public comment on publicly available materials not in record;

[4] its preference to proceed with the same five members was not the type of exigent circumstance coming within the narrow "good cause" exception excusing notice and comment in emergency situations; and

[5] vacating the rule and a withheld mandate for ninety days was appropriate remedy.

Petition granted, and conditions vacated, but mandate withheld.

West Headnotes (18)

[1]     **Securities Regulation**      Administrative proceedings and review

Organization with a desire to invest in management-chaired funds and in funds with fewer than 75% independent directors had standing to challenge Securities and Exchange Commission (SEC) rule which required independent

370 U.S.App.D.C. 249, Fed. Sec. L. Rep. P 93,740

mutual fund chair and board with no less than 75% independent directors; sworn declaration by organization's chief financial officer (CFO) substantiated its claim of continued injury in light of historical data of marginally better performance by management-chaired funds and in light of costs of implementing the conditions. U.S.C.A. Const. Art. 3, § 2, cl. 1; Investment Company Act of 1940, § 1 et seq., 15 U.S.C.A. § 80a-1 et seq.

[2]     **Securities Regulation**   ⚷   Administrative proceedings and review

Securities and Exchange Commission (SEC) had authority to consider modifying rule prior to issuance of Court of Appeals' mandate in case on previous petition for review; even if SEC's remedial power was limited prior to the issuance of the mandate, the SEC was not disabled from sua sponte considering whether to modify its rule. Investment Company Act of 1940, §§ 6(c), 43(a), 15 U.S.C.A. §§ 80a–6(c), 80a–42(a).

3 Cases that cite this headnote

[3]     **Administrative Law and Procedure**   ⚷   Decision of reviewing court as law of the case

**Constitutional Law**   ⚷   Rule making

Congress may vest broad rulemaking authority in an agency and even charge the agency with swiftly and effectively implementing a national policy, but on remand the agency remains bound by the Administrative Procedure Act's (APA) notice and comment requirements. 5 U.S.C.A. § 553(c).

2 Cases that cite this headnote

[4]     **Administrative Law and Procedure**   ⚷   Rulemaking and Procedure

**Administrative Law and Procedure**   ⚷   Rules, regulations, and other policymaking

**Administrative Law and Procedure**   ⚷   Failure to obey mandate or follow decision of reviewing court

Although judicial review of informal rulemaking is generally limited in scope and is deferential when rulemaking implicates the agency's expertise, more exacting review may be required when the presumption of regularity is rebutted, as may occur when the agency arrives at an identical result on remand under circumstances that throw into question the regularity of its proceedings.

[5]     **Administrative Law and Procedure**   ⚷   Course and conduct of further administrative proceedings

Where a court does not require additional fact gathering on remand, the agency is typically authorized to determine, in its discretion, whether such fact gathering is needed and how it should be accomplished.

2 Cases that cite this headnote

[6]     **Administrative Law and Procedure**   ⚷   Course and conduct of further administrative proceedings

If the agency determines on remand that additional fact gathering is necessary, then notice and comment are typically required. 5 U.S.C.A. § 553(c).

3 Cases that cite this headnote

[7]     **Administrative Law and Procedure**   ⚷   Effect of decision of reviewing court

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

370 U.S.App.D.C. 249, Fed. Sec. L. Rep. P 93,740

Further notice and comment are not required on remand from court when additional fact gathering merely supplements information in the rulemaking record by checking or confirming prior assessments without changing methodology, by confirming or corroborating data in the rulemaking record, or by internally generating information using a methodology disclosed in the rulemaking record.

3 Cases that cite this headnote

**[8]**   **Administrative Law and Procedure** 🗝 Decision of reviewing court as law of the case

When the agency relies on supplementary evidence without a showing of prejudice by an interested party on remand from court, the procedural requirements of the Administrative Procedure Act (APA) are satisfied without further opportunity for comment, provided the agency's response constitutes a logical outgrowth of the rule initially proposed.

5 U.S.C.A. § 553(c).

4 Cases that cite this headnote

**[9]**   **Securities Regulation** 🗝 Administrative proceedings and review

Securities and Exchange Commission (SEC) was required to afford opportunity for public comment on publicly available materials not in record for proposed rule which required mutual fund board to have an independent chairman and no less than 75% independent directors; to prejudice of organization challenging the rule, the SEC extensively relied on extra-record materials in arriving at its cost estimates and thus in determining not to modify the two conditions, and SEC's bare request for information on costs and its expectation of minimal costs did not place interested parties on notice that, in the absence of receiving reliable cost data during the comment period, the SEC would base its cost estimates on an extra-record summary of extra-record survey data that was not the sort relied upon by SEC during the normal course of its official business. 5 U.S.C.A. § 553(c).

2 Cases that cite this headnote

**[10]**   **Administrative Law and Procedure** 🗝 Exceptions to Rulemaking Procedures

For extra-record data to be supplementary and relied on by agency without affording comment, the data must clarify, expand, or amend other data that has been offered for comment. 5 U.S.C.A. § 553(c).

7 Cases that cite this headnote

**[11]**   **Administrative Law and Procedure** 🗝 Requirements of notice and comment in general

To show prejudice, those protesting agency's use of supplementary information without providing opportunity for comment might point to inaccuracies in the supplemental data, show that the agency hid or disguised the information it used or otherwise conducted the rulemaking in bad faith, id., or indicate with reasonable specificity what portions of the data it objects to and how it might have responded if given the opportunity. 5 U.S.C.A. § 553(c).

12 Cases that cite this headnote

**[12]**   **Administrative Law and Procedure** 🗝 Requirements of notice and comment in general

The requirement that an agency may rely on supplemental materials to fill gaps in the rulemaking record only when there is no prejudice to the interested parties does not mean parties can withhold relevant data and blindside the agency on appeal. 5 U.S.C.A. §§ 553(c), 706.

370 U.S.App.D.C. 249, Fed. Sec. L. Rep. P 93,740

**[13]**    **Administrative Law and Procedure**    ☞    Findings; reason or explanation

After an agency explains the basis for its preliminary conclusions by reference to the information on which it has relied, requests data regarding its conclusions, and concludes no such data (or no data the agency concludes is reliable) has been produced during the comment period, the agency may develop data along the lines it has proposed to fulfill its statutory obligations without further public comment; in light of the notice provided, there is no fair-comment prejudice to interested parties even if the extra-record materials serve as the crucial confirmation of the agency's preliminary conclusions or even as the compelling reason for the agency's modification of its preliminary conclusion.

🔖 5 U.S.C.A. § 553(c).

6 Cases that cite this headnote

**[14]**    **Securities Regulation**    ☞    Administrative proceedings and review

Test for prejudice from Securities and Exchange Commission (SEC) reliance on materials not in rulemaking record did not require organization challenging the rule to prove that its comments would have persuaded the SEC to reach a different outcome or that the materials were materially inaccurate; the organization's demonstration that it had something useful to say about this critical data was sufficient to establish prejudice. 🔖 5 U.S.C.A. § 553(c).

**[15]**    **Securities Regulation**    ☞    Administrative proceedings and review

Securities and Exchange Commission's (SEC) preference to proceed with the same five members who were familiar with the rulemaking in considering the cost estimates described in prior Court of Appeals' opinion was not the type of exigent circumstance coming within the narrow "good cause" exception excusing notice and comment in emergency situations. 🔖 5 U.S.C.A. § 553(b)(3)(B).

**[16]**    **Administrative Law and Procedure**    ☞    Public interest; harm

The narrow "good cause" exception excuses notice and comment in emergency situations, where delay could result in serious harm or the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare. 🔖 5 U.S.C.A. § 553(b)(B).

**[17]**    **Securities Regulation**    ☞    Administrative proceedings and review

Vacating requirements of independent mutual fund chair and independent directors was remedy for Securities and Exchange Commission's (SEC) reliance on extra-record material critical to its cost estimates without affording an opportunity for comment, but issuance of mandate would be withheld for ninety days to afford the SEC an opportunity to reopen the record for comment on the costs of implementing the two conditions. 🔖 5 U.S.C.A. §§ 553(b)(B), 706(2)(D); F.R.A.P.Rule 41(b), 28 U.S.C.A.

1 Cases that cite this headnote

**[18]**    **Administrative Law and Procedure**    ☞    Annulment, Vacatur, or Setting Aside of Administrative Decision

*Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890 (2006)

370 U.S.App.D.C. 249, Fed. Sec. L. Rep. P 93,740

**Administrative Law and Procedure**  ⚖️  Particular Errors and Defects Warranting Remand

The decision to remand to agency or vacate its decision hinges upon court's assessment of the seriousness of the deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed. 📄 5 U.S.C.A. § 706(2)(D).

8 Cases that cite this headnote

**\*893** On Petition for Review of an Order of the Securities and Exchange Commission.

**Attorneys and Law Firms**

Eugene Scalia argued the cause for petitioner. With him on the briefs were John F. Olson, Douglas R. Cox, Cory J. Skolnick, Stephen A. Bokat, Robin S. Conrad, and Amar D. Sarwal.

Giovanni P. Prezioso, General Counsel, Securities & Exchange Commission, argued the cause for respondent. With him on the brief were Jacob H. Stillman, Solicitor, John W. Avery, Special Counsel, and Michael L. Post, Senior Counsel.

Mercer Bullard was on the brief for amici curiae Fund Democracy, Inc. and Consumer Federal of America in support of respondent.

Before: HENDERSON, ROGERS and BROWN, Circuit Judges.

**Opinion**

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge.

**\*\*252** This appeal concerns the continuing challenge by the Chamber of Commerce of the United States to the rule promulgated on July 27, 2004 ("the Rule") by the Securities and Exchange Commission amending the Exemptive Rules under the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a–1 *et seq.* (2000). The Rule requires that mutual funds relying on the Exemptive Rules adopt certain governance practices, including those set forth in two conditions: a fund must have (1) a board with no less than 75% independent directors and (2) an independent chair. *See* Investment Company Governance, Release No. 26,520, 69 Fed.Reg. 46,378, 46,381 (Aug. 2, 2004) ("Adopting Release"). In **\*\*253 \*894** *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C.Cir.2005) ("*Chamber I*"), the court held that the Chamber had standing to challenge the Rule, the Commission had authority to promulgate the Rule, and the Commission had not violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.,* except when it failed, as required by the ICA, to determine the costs of the two conditions and when it failed to address a proposed alternative to the independent chair condition. The court remanded the case to the Commission.

The Chamber now challenges the Commission's decision not to modify the two conditions in response to *Chamber I. See* Investment Company Governance, Release No. 26,985, 70 Fed.Reg. 39,390, 39,398 (July 7, 2005) ("Response Release"). We again hold that the Chamber has standing, and we hold that the Commission had authority to consider whether to modify the Rule prior to issuance of the mandate in *Chamber I.* We further hold that, although the Commission was not constrained by *Chamber I* in how to estimate the costs of the conditions, the Commission failed to comply with section 553(c) of the APA, 5 U.S.C. § 553(c), by relying on materials not in the rulemaking record without affording an opportunity for public comment, to the prejudice of the Chamber. On August 10, 2005, the court stayed the two conditions.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## I.

Section 2(c) of the ICA requires that when the Commission "engage[s] in rulemaking and is required to consider or determine whether an action is consistent with the public interest, [it] shall ... consider ... whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 80a–2(c). In *Chamber I,* the court held:

> With respect to the 75% independent director condition, the Commission, although describing three methods by which a fund might comply with the condition, claimed it was without a "reliable basis for determining how funds would choose to satisfy the [condition] and therefore it [was] difficult to determine the costs associated with electing independent directors." 69 Fed.Reg. at 46,387. That particular difficulty may mean the Commission can determine only the range within which a fund's cost of compliance will fall, depending upon how it responds to the conditions but, as the Chamber contends, it does not excuse the Commission from its statutory obligation to determine as best it can the economic implications of the rule it has proposed.

412 F.3d at 143 (citing *Pub. Citizen v. Fed. Motor Carrier Safety Admin.,* 374 F.3d 1209, 1221 (D.C.Cir.2004)). With respect to the independent chair condition, the court noted that the Commission had stated that an independent chair may decide to hire more staff, but that it had no "reliable basis for estimating ... th[ose] costs." *Id.* at 144 (citing Adopting Release, 69 Fed.Reg. at 46,387 n. 81) The court held that "[a]lthough the Commission may not have been able to estimate the aggregate cost to the mutual fund industry of additional staff ... it readily could have estimated the cost to an individual fund, which estimate would be pertinent to its assessment of the effect the condition would have upon efficiency and competition, if not upon capital formation." *Id.* The court also held that the Commission could not ignore a "facially reasonable" alternative suggested by the two dissenting Members of the Commission. *See* id. at 145 (citing standard set forth in *Laclede Gas Co. v. FERC,* 873 F.2d 1494, 1498 (D.C.Cir.1989)).

The Commission responded within a matter of days to the release of *Chamber I.* The Commission explained that prompt action was required to avoid postponing **\*\*254  \*895** the January 15, 2006 date for compliance with the Rule in order to ensure protection of fund investors "in the wake of the discovery of serious wrongdoing at many of the nation's largest fund complexes and by officials at the highest levels of those complexes." Response Release, 70 Fed.Reg. at 39,391. This occurred, the Commission explained, because "[f]und managers acted in their own interests rather than in the interests of fund investors (which they are required to do), resulting in substantial investor losses that were well documented at the time [the Commission] adopted the [Rule]," and left investor confidence severely shaken, *id.; see* Adopting Release, 69 Fed.Reg. at 43,378. In the Commission's view, prompt action could best be accomplished by having the same five Commissioners who had been considering mutual fund governance issues for more than a year and a half " bring the[ir] collective judgment and learning" to the issues identified by the court. *See* Response Release, 70 Fed.Reg. at 39,391. Because the Chairman was scheduled to resign on June 30, 2005, the Commission decided to respond to *Chamber I* at its previously scheduled public meeting on June 29, 2005. *See id.* at 39,391; *see also id.* at 39,403 (Glassman, Comm'r, dissenting); *id.* at 39,408 (Atkins, Comm'r, dissenting).

The Commission decided it was unnecessary to reopen the rulemaking record for further comment. Observing that it had previously given notice and called for comment on the costs of complying with the two conditions, the Commission concluded that "the information in the existing record, *together with publicly available information on which we may rely,* is a sufficient base on which to rest the Commission's consideration of the deficiencies identified by the Court." *Id.* at 39,390–91 (emphasis added). Based on materials not in the rulemaking record, including what the Commission described as a "widely used industry survey" of mutual fund directors' compensation, the Commission determined a range of costs for each of the options that a fund might use to meet the 75% independent director condition. *See id.* at 39,392 n. 28, 39,391–94. The Commission viewed the costs to an individual fund of the independent chair condition to derive principally from the increased compensation for the independent chair and the costs of additional staff, the latter cost estimated based on extra-record salary surveys by the

Securities Industry Association, a source on which the Commission stated it "commonly rel [ies] in its rulemakings." *Id.* at 39,394. The Commission stated that it did not expect small funds would hire additional staff. *See id.*

The Commission concluded, based on these cost estimates, that the costs of complying with the two conditions "are extremely small relative to the fund assets for which fund boards are responsible, and are also small relative to the expected benefits of the two conditions." *Id.* at 39,395. "Whether the two conditions are viewed separately or together," the Commission stated, "even at the high end of the ranges, the costs of compliance are minimal." *Id.* This was true as well for small funds. *See id.* at 39,396 n. 77. Accordingly, regarding section 2(c) of the ICA, the Commission concluded: "[W]e do not expect the amendments to the Exemptive Rules to have a significant adverse effect on efficiency, competition or capital formation because the costs associated with the amendments are minimal and many funds have already adopted the required practices." *Id.* at 39,396. The Commission noted that as of the time it proposed the Rule, it estimated that "nearly sixty percent of all funds currently me[t] [the 75% independent director] requirement." Adopting Release, 69 Fed.Reg. at 46,387 n. 78; *see* Response Release, 70 Fed.Reg. at 39,391 & n. 18.

**\*896  \*\*255**  The Commission also set forth its reasons for rejecting the alternative proposal to the independent chair condition: "[I]n light of the nature of investment companies and the purposes of the statutory prohibitions to which the Exemptive Rules apply," the Commission concluded that the condition requiring an independent chair was superior to an expansion of disclosure requirements. *See* Response Release, 70 Fed.Reg. at 39,396–97. The Commission explained that mutual funds are "unique" because they are managed "by people whose primary loyalty and pecuniary interests lie outside the enterprise," which presents "inherent conflicts of interest and potential for abuses." *Id.* at 39,396. The Commission reasoned that disclosure alone would not prevent self-dealing by managers. *See id.* at 39,397. Further, the Commission observed, the independent chair was part of a package of regulatory reforms designed to change the "boardroom culture," *id.,* that would result in benefits that could not be accomplished by disclosure alone, which to become meaningful faced several obstacles given the information that would need to be imparted to an investor, *see id.*

## II.

The Chamber petitions for review, challenging the Commission's decision not to modify the Rule's two conditions on procedural and substantive grounds. Before reaching the merits of the Chamber's challenge, we address the Chamber's standing and the Commission's authority to consider whether to modify the two conditions before issuance of the mandate in *Chamber I.*

## A.

**[1]**  The Commission maintains that the court lacks jurisdiction to consider the Chamber's petition because the Chamber lacks standing under Article III of the Constitution. Specifically, the Commission maintains that the Chamber has failed to show a continuing injury-in-fact and to address the implications of *DH2, Inc. v. SEC,* 422 F.3d 591 (7th Cir.2005), which the Commission presents as being in conflict with our holding in *Chamber I* that the Chamber has standing. *See* 🔖 *Chamber I,* 412 F.3d at 138. Whatever may be said of the injury-in-fact analysis in *DH2,* the holding in *Chamber I* is the law of this circuit. *See* 🔖 *LaShawn A. v. Barry,* 87 F.3d 1389, 1395 (D.C.Cir.1996) (en banc).

In *Chamber I,* the court held that the Chamber had standing in light of sworn declarations regarding its investment in, and continuing desire to invest in, mutual funds that are not governed in accordance with the Rule's two conditions. *See* 🔖 *Chamber I,* 412 F.3d at 138. The court concluded these concrete actions and intentions were sufficient because the "inability of consumers to buy a desired product constituted injury-in-fact even if they could ameliorate the injury by purchasing some alternative

370 U.S.App.D.C. 249, Fed. Sec. L. Rep. P 93,740

product." *Id.* (quoting 📄 *Consumer Fed'n of Am. v. FCC,* 348 F.3d 1009, 1012 (D.C.Cir.2003)) (alterations and internal quotations omitted).

The Chamber seeks in its current petition for review to challenge the same two conditions it challenged in *Chamber I.* It has substantiated its claim of continued injury through the September 19, 2005 sworn declaration of Stan M. Harrell, Senior Vice President, Chief Financial Officer and Chief Information Officer of the Chamber. *See* 📄 *Sierra Club v. EPA,* 292 F.3d 895, 899–900 (D.C.Cir.2002). Mr. Harrell avers that the Chamber continues to hold investments in mutual funds, four of which he identifies by name, and currently intends to continue making such investments and wishes to invest in management-chaired funds and in funds with fewer than 75% independent directors. In light of the historical data in the rulemaking **\*\*256 \*897** record indicating that management-chaired funds may have performed marginally better then independently chaired funds, *see* Adopting Release, 69 Fed.Reg. at 46,383 n. 52, and the Chamber's concern that the costs of implementing the two conditions will present barriers to entry, especially for small funds, there is no basis to conclude that the circumstances underlying *Chamber I* 's holding that the Chamber had standing have changed.

## B.

 [2]    The Chamber, in turn, challenges the Commission's authority to consider modifying the Rule prior to issuance of the court's mandate in *Chamber I.* It advances this challenge based on an analogy to Federal Rule of Appellate Procedure 41, which effects a limit on the jurisdiction of a district court while a case is pending on appeal, and like Article III standing, might be viewed as a threshold jurisdictional issue. However, the Chamber's challenge is, in effect, a merits challenge based on 📄 section 706(2)(C) of the APA.

Essentially, the Chamber makes a policy argument by analogy. It points to Rule 41, which addresses when the mandate of a court of appeals issues, and to authorities holding that the pendency of an appeal " 'divests the district court of control over those aspects of the case involved in the appeal,' " 📄 *United States v. DeFries,* 129 F.3d 1293, 1302 (D.C.Cir.1997) (quoting 📄 *Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (per curiam)); *see also* FED. R. APP. P. 3, to argue that the district court does not regain jurisdiction over those issues until the court of appeals issues its mandate, *cf.* 📄 *In re Thorp,* 655 F.2d 997, 998 (9th Cir.1981). To extend this principle to agencies, the Chamber points to an isolated and irrelevant reference in the 1998 Advisory Committee Notes addressing when a court of appeals determination becomes a "fixed" legal obligation for an agency. *See* FED. R. APP. P. 41 Advisory Committee's Notes (1998 amends., subdiv. (c)). The Chamber then contends that treating district courts and administrative agencies as "divested" of jurisdiction prior to issuance of the court's mandate "is sensible in light of the[ir] comparable role[s] ... in developing a factual record and narrowing the issues for review." Petitioner's Br. at 32. Such an approach, the Chamber contends, also is consistent with the rule that a court will not entertain a petition for review while a petition for reconsideration is before an agency. *Id.* (citing 📄 *United Transp. Union v. ICC,* 871 F.2d 1114, 1117 (D.C.Cir.1989)).

The Chamber's contention is unpersuasive. Admittedly, some of the reasons underlying the general principle, expressed in 📄 *Griggs v. Provident Consumer Discount Co.,* 459 U.S. at 58, 103 S.Ct. 400, that the jurisdictional authority of district courts and courts of appeal are mutually exclusive regarding issues raised in the appeal, *see generally* CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, 16A FEDERAL PRACTICE & PROCEDURE JURISDICTION §§ 3949.1, 3987 (3d ed.1999 and 2005 Pocket Part), such as avoiding confusion or a waste of time by having the same matter considered in more than one forum at the same time, *see* 📄 *DeFries,* 129 F.3d at 1303; 📄 *United States v. Salerno,* 868 F.2d 524, 540 (2d Cir.1989), apply to administrative proceedings, *cf.* 📄 *United Transp. Union,* 871 F.2d at 1117. However, the Chamber overlooks the fact that administrative agencies, unlike federal courts, are not jurisdictionally constrained by the case-and-controversy

limitation in Article III. *See* U.S. CONST. art. III; *Envirocare of Utah, Inc. v. NRC,* 194 F.3d 72, 74 (D.C.Cir.1999); *see also* *Fund Democracy, LLC v. SEC,* 278 F.3d 21, 27 (D.C.Cir.2002). Thus, the Chamber must recognize that its analogy based on Rule 41 is not informed by the concerns underlying Article III. It observes that in *DeFries* this court stated **\*\*257   \*898** that the principle that a district court lacks jurisdiction to act until the court of appeals' mandate issues is "grounded in solid considerations of efficient judicial administration," 129 F.3d at 1303. Even assuming that Article III concerns do not inform *DeFries* ' holding, the Chamber's contention fails.

The court has previously recognized that agencies possess authority to address issues identified by the court prior to the issuance of its mandate. *See, e.g., Hazardous Waste Treatment Council v. EPA,* 886 F.2d 355, 371 (D.C.Cir.1989); *Nat'l Coal. Against Misuse of Pesticides v. Thomas,* 809 F.2d 875, 884–85 (D.C.Cir.1987); *Indep. U.S. Tanker Owners Comm. v. Dole,* 809 F.2d 847, 855 (D.C.Cir.1987); *see also* *Northern States Power Co. v. U S. Dep't of Energy,* 128 F.3d 754, 761 (D.C.Cir.1997). The Chamber would distinguish those cases on the ground that in those instances the court instructed the agency to proceed, and thus "wielded its mandate to determine when its action attains controlling force so as to marshal litigation in an orderly manner through the legal system." Petitioner's Br. at 33. Even if that distinction were persuasive, no such distinction applies to *Alabama Power Co. v. FPC,* 511 F.2d 383 (D.C.Cir.1974).

In *Alabama Power,* the court observed that although "[l]imitations on the [agency's] power to modify an order during the pendency of an appeal may be inferred from Section 313 of the Federal Power Act, 16 U.S.C. § 825*l* [ (1970) ] .... [t]he precise scope of these limitations has not been fully defined." 511 F.2d at 388. Section 313 authorized the agency, upon application for rehearing, to set aside or modify an order until the record in the proceeding had been filed in the court of appeals and stated that, upon the filing of a petition for review, the appellate court has exclusive jurisdiction to affirm, modify, or set aside the order. Concluding that it was unnecessary "to define the precise contours of Section 313," the court held that

> [a]ssuming the [agency's] remedial powers [are] limited during the pendency of appeal, it nevertheless retains power to consider a petition for amendment and to defer until disposition of the appeal any modification found appropriate or, in a case of urgency, to apply to the reviewing court for a remand order so as to permit amendment.

*Id.* The court cited *Smith v. Pollin,* 194 F.2d 349 (D.C.Cir.1952), which established an exception under Rule 41 for district courts to reconsider an order or judgment pending on appeal and to seek remand of the case if it decided to grant relief, *id.* at 350. By parity of reasoning, the court in *Alabama Power* held that the Federal Power Commission retained jurisdiction to consider whether it would revise the Rule prior to the issuance of the court's mandate. 511 F.2d at 388.

*Alabama Power* is dispositive here because the jurisdictional provisions of section 43(a) of the ICA, 15 U.S.C. § 80a–42(a), [1] are substantially the same as section **\*\*258   \*899** 313 of the Federal Power Act, 16 U.S.C. § 825*l*, as construed in *Alabama Power.* Assuming, as in *Alabama Power,* that the statute limited the Commission's remedial power prior to the issuance of the mandate in *Chamber I,* the Commission was not disabled from *sua sponte* considering whether to modify the Rule's two conditions. *See* ICA § 6(c), 15 U.S.C. § 80a–6(c). Because the Commission decided not to modify the Rule, there is no need to consider whether, prior to issuance of the mandate, the Commission retained authority to adopt amendments to the Rule without first seeking a remand of the proceeding. While there was a small risk that the Commission's response would have become wasted effort had the court granted the Chamber's petition for rehearing in *Chamber I,* this risk is balanced against the benefits

of allowing an agency broad scope to carry out its mission, *cf. Alabama Power,* 511 F.2d at 388–89, particularly as the goal of conserving judicial resources is served under the *Smith v. Pollin* approach adopted in *Alabama Power.*

Accordingly, we hold that the Chamber has standing under Article III to bring its petition challenging the Rule's two conditions and that the Commission had authority to consider whether to alter the conditions in response to *Chamber I* prior to the issuance of the mandate.

### III.

Section 553 of the APA requires that an agency give notice of a proposed rule setting forth "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," *id.* § 553(c). Among the information that must be revealed for public evaluation are the "technical studies and data" upon which the agency relies. *See Solite Corp. v. EPA,* 952 F.2d 473, 484 (D.C.Cir.1991).

[3]  [4]  Congress may vest broad rulemaking authority in an agency, and even charge the agency with "swiftly and effectively implementing [a] national policy," *Natural Res. Def. Council, Inc. v. SEC,* 606 F.2d 1031, 1050 (D.C.Cir.1979) ("*NRDC*"), but on remand the agency remains bound by the APA's notice and comment requirements, *see Simmons v. ICC,* 757 F.2d 296, 300 (D.C.Cir.1985); *cf. West Virginia v. EPA,* 362 F.3d 861, 869 (D.C.Cir.2004). Although judicial review of informal rulemaking is generally limited in scope, *see NRDC,* 606 F.2d at 1050, and is deferential when rulemaking implicates the agency's expertise, *see Fresno Mobile Radio, Inc. v. FCC,* 165 F.3d 965, 971 (D.C.Cir.1999), more exacting review may be required when the presumption of regularity is rebutted, as may occur when the agency arrives at an identical result on remand under circumstances that throw into question the regularity of its proceedings, *see NRDC,* 606 F.2d at 1049 n. 23; *Food Mktg. Inst. v. ICC,* 587 F.2d 1285, 1289–90 (D.C.Cir.1978); *see also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Reviewing the procedures through which agencies develop legislative rules falls within the court's "special area[s] of competence" and generally "contributes to the rationality and fairness of agency decisionmaking **259  *900  without detracting unduly from its effectiveness." *NRDC,* 606 F.2d at 1049; *see Envtl. Def. Fund, Inc. v. Ruckelshaus,* 439 F.2d 584, 598 (D.C.Cir.1971).

[5]  [6]  Where the court does not require additional fact gathering on remand, as in *Chamber I,* 412 F.3d at 145, the agency is typically authorized to determine, in its discretion, whether such fact gathering is needed, *see Sierra Club v. EPA,* 325 F.3d 374, 382 (D.C.Cir.2003) (citing *Nat'l Grain & Feed Ass'n v. OSHA,* 903 F.2d 308, 310–11 (5th Cir.1990)), and how it should be accomplished, *see NRDC,* 606 F.2d at 1055. If the agency determines that additional fact gathering is necessary, then notice and comment are typically required. *See Action on Smoking and Health v. Civil Aeronautics Bd.,* 713 F.2d 795, 799–800 (D.C.Cir.1983); *cf. Air Transp. Ass'n of Am. v. FAA,* 169 F.3d 1, 7 (D.C.Cir.1999); *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.,* 745 F.2d 677, 684–85 (D.C.Cir.1984).

[7]  [8]  However, further notice and comment are not required when additional fact gathering merely supplements information in the rulemaking record by checking or confirming prior assessments without changing methodology, *see Solite,* 952 F.2d at 485, by confirming or corroborating data in the rulemaking record, *see Community Nutrition Inst. v. Block,* 749 F.2d 50, 57–

58 (D.C.Cir.1984); *cf. Building Indus. Ass'n of Superior Cal. v. Norton,* 247 F.3d 1241, 1246 (D.C.Cir.2001), or by internally generating information using a methodology disclosed in the rulemaking record, *Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.,* 732 F.2d 219, 224 (D.C.Cir.1984); *cf. Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 393 (D.C.Cir.1973). For example, in *Solite,* the agency's explanation of a rule rested on a survey, which was not part of the rulemaking record, that the agency substituted for an older report in the rulemaking record. *Solite,* 952 F.2d at 481. The court stated that "consistent with the APA, an agency may use 'supplementary' data, unavailable during the notice and comment period, that 'expands on and confirms' information contained in the proposed rulemaking and addresses 'alleged deficiencies' in the pre-existing data, so long as no prejudice is shown." *Id.* at 484 (quoting *Community Nutrition,* 749 F.2d at 57–58) (alterations omitted). Such "supplementary" information, the court explained in *Community Nutrition,* is distinct from "provid[ing] entirely new information critical to the [agency]'s determination." *Community Nutrition,* 749 F.2d at 57–58 (citations omitted). When the agency relies on supplementary evidence without a showing of prejudice by an interested party, *see Solite,* 952 F.2d at 484; *Community Nutrition,* 749 F.2d at 58, the procedural requirements of the APA are satisfied without further opportunity for comment, provided that the agency's response constitutes a "logical outgrowth" of the rule initially proposed, *see Envtl. Integrity Project v. EPA,* 425 F.3d 992, 996 (D.C.Cir.2005); *Ne. Md. Waste Disposal Auth. v. EPA,* 358 F.3d 936, 952 (D.C.Cir.2004).

In essence, the question is whether "at least the most critical factual material that is used to support the agency's position on review ... [has] been made public in the proceeding and exposed to refutation." *Ass'n of Data Processing,* 745 F.2d at 684; *see Air Transp. Ass'n,* 169 F.3d at 7. By requiring the "most critical factual material" used by the agency be subjected to informed comment, the APA provides a procedural device to ensure that agency regulations are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to support their positions, and thereby to enhance the quality of judicial review. *See Int'l Union, United Mine* **\*\*260** **\*901** *Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C.Cir.2005). These considerations are no less relevant when an agency on remand considers whether to modify a rule pending on appeal. *See Simmons,* 757 F.2d at 300.

**[9]** The Commission maintains that section 553 did not require further notice and comment in response to *Chamber I* for two reasons: First, the Rule's two conditions were set out in materially the same terms in the notice of proposed rulemaking, *see* Investment Company Governance, Release No. 26,323, 69 Fed.Reg. 3472, 3473 (Jan. 23, 2004) ("NOPR"), thus providing all interested parties the opportunity to comment on the proposed amendments and specifically on their costs, *see id.* at 3481. Second, although the Commission relied on materials not made subject to public comment under section 553(c), the materials were "publicly available" and merely supplemented data in the rulemaking record that had been subject to public comment. *See* Response Release, 70 Fed.Reg. at 39,391. We agree with the Commission's first point, because the NOPR provided adequate notice, but not the second, because the extra-record materials did not merely supplement the rulemaking record without prejudice to the Chamber, and the public availability of those materials, in this instance, does not merit an exception to the comment requirement of section 553(c). We therefore do not reach the Chamber's contention that the Commission's decision to forgo further notice and comment and rely on extra-record materials was arbitrary and capricious under the APA. *Cf. Air Transp. Ass'n,* 169 F.3d at 8.

In *Chamber I,* the court held that the Commission, in order to satisfy "its statutory obligation" under ICA § 2(c), 15 U.S.C. § 80a–2(c), would need "to do what it can to apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation before it decides whether to adopt the measure." *Chamber I,* 412 F.3d at 144. Given

this general instruction, the Commission was not required under ▯ section 553(b) to give further notice of the two conditions. The NOPR identified the amendments to the Exemptive Rules, proposed the 75% independent director and independent chair conditions, *id.,* and solicited comments and empirical data on costs. *See* NOPR, 69 Fed.Reg. at 3473. In relevant part, the NOPR stated:

> We do not anticipate that these proposals will have a significant effect on efficiency, competition and capital formation with regard to funds because the costs associated with the proposals are minimal and many funds have already adopted some of the proposed practices.... We request comments on whether the proposed rule amendments, if adopted, would promote efficiency, competition, and capital formation. Will the proposed amendments or their resulting costs materially affect the efficiency, competition, and capital formation of funds? Comments will be considered by the Commission in satisfying its responsibilities under section 2(c) of the Investment Company Act. Commenters are requested to provide empirical data and other factual support for their views to the extent possible.

*Id.* The NOPR thus fully informed interested parties of the two conditions and expressly requested comments on costs so that the Commission would be in a position to comply with ICA section 2(c). *See* ▯ *Envtl. Integrity Project,* 425 F.3d at 996.

The Commission's extensive reliance upon extra-record materials in arriving at its cost estimates, and thus in determining not to modify the two conditions, however, required further opportunity for comment under ▯ section 553(c). The Commission **\*\*261   \*902** justified its decision not to reopen the comment period on the ground that "the information in the existing record, *together with publicly available information upon which we may rely,* is a sufficient base on which to rest the Commission's consideration of the deficiencies identified by the Court." Response Release, 70 Fed.Reg. at 39,391 (emphasis added); *see also id.* at 39,392 n. 24. To the extent the Commission suggests that the "publicly available" extra-record materials merely supplemented the rulemaking record, which alone would have been sufficient to allow the Commission to estimate the costs of the two conditions, it ignores what is obvious from the Response Release.

To develop cost estimates for the Rule's two conditions, the Commission relied on privately produced "Management Practice Inc. Bulletin[s]," *id.* at 39,392 nn. 24, 28, 30; *id.* at 39,393 nn. 33, 43; *id.* at 39,394 n. 48; *id.* at 39,395 n. 73, and a nonpublic survey of compensation and governance practices in the mutual fund industry that is summarized in one of these bulletins, *id.* at 39,392 n. 28. Neither the bulletins nor the survey were part of the rulemaking record. Nor did the Commission identify the bulletins as materials on which it typically relies in rulemakings. *Compare id.* at 39,394. Yet these extra-record materials supply the basic assumptions used by the Commission to establish the range of costs that mutual funds are likely to bear in complying with the two conditions. *See id.* at 39,392. The bulletins constitute the only source of information on the number of directors serving on the boards of most mutual funds, *id.* n. 24, the median annual salaries for directors, *id.* n. 28 (summarizing the "widely used" survey), and the rough breakdown between boards overseeing a large number of individual funds and boards overseeing a small number of funds, *id.* n. 30. With these three assumptions—average number of board members, average salary, and average number of funds overseen by an individual director—the Commission was able to "estimate the annual compensation cost *per fund* " of the 75% independent director requirement from $4,779 for large fund complexes to $37,500 for boards overseeing only one fund. *Id.* at 39,392–93.

When the Commission does refer to information in the rulemaking record with regard to the per fund cost calculation for the 75% independent director condition, *see id.* at 39,393 n. 31, the Commission uses this data to bolster estimates based upon the extra-record materials, and not the other way around. Specifically, the Commission, in referring to two letters in the rulemaking record, "note[s] that commentators' estimated costs of paying new independent directors ranged from $4000 to $20,000, which are roughly comparable with and do not exceed our estimated ranges." *Id.* (citing letters of New Alternatives Fund, Inc. (Feb. 9, 2004) and Independent Directors of Flaherty & Crumrine Preferred Income Opportunity Fund Inc. (Feb. 23, 2004)). But

comparing the range derived from the record data with the range derived from the extra-record data implies that the two ranges are comparable. The ranges are not comparable because the two letters, which are cited as the source of the $4,000 and $20,000 figures, refer only to boards overseeing "small" and "small to mid-sized funds."

Hence, the $4,000 to $20,000 range derived from the rulemaking record is comparable only to the $37,500 figure that the Commission estimated as the per fund cost for boards overseeing a single fund. This comparison of the $37,500 estimate and the $4,000 to $20,000 range suggests that the Commission, acting conservatively, may have overestimated the per fund cost for boards overseeing only a few funds. *See* Response Release, 70 Fed.Reg. at 39,392. However, the Commission points to no **262  *903  data in the rulemaking record to support its per fund cost estimate for compensation of independent directors overseeing a large number of funds. At best, the rulemaking record supports only one end of the Commission's estimated range; the cost estimate for boards overseeing a large number of funds appears entirely derived from the extra-record materials. *See id.* 39,392 n. 28. The rulemaking record, then, serves to supplement the extra-record data by providing a cross-check for only the Commission's estimate for small fund families.

Other aspects of the Commission's decision illustrate that it treated extra-record data as primary, rather than supplementary, evidence. Extra-record sources are essential to the Commission's cost estimate for the independent chair condition, which is based on estimates of the cost of compensation for independent directors. *See id.* at 39,395. With respect to the ancillary, non-compensation costs of the conditions, while the nature of the Commission's estimates is somewhat different—because they are largely based upon such things as the prevailing rates for legal, financial, and other services, matters with which Commission Members are likely to be familiar and which are less susceptible to reasonable disagreement—extra-record data is similarly essential to these estimations to the extent they are affected by the Commission's predictions about how funds would come into compliance and how independent directors will behave. *See, e.g., id.* at 39,394. Thus, even with respect to ancillary costs, section 553(c) required that interested parties have the opportunity to comment prior to the agency's final decision.

On appeal, the Commission maintains, relying on *Solite,* 952 F.2d at 484, and *Building Industry,* 247 F.3d at 1246, that the extra-record materials simply filled gaps in the rulemaking record and "only confirmed the findings delineated in the [NOPR]." Respondent's Br. at 46. By this, the Commission suggests that the extra-record materials were "supplementary"—not in the sense of being unnecessary support for the Commission's cost estimates—but in the sense of filling the gap left in the rulemaking record after the Commission had solicited public comment on the costs of the proposed amendments. The NOPR requested such cost data and stated that the Commission expected "the costs associated with the proposals to be minimal." 69 Fed.Reg. at 3473. However, neither *Solite,* 952 F.2d at 484, nor *Building Industry,* 247 F.3d at 1246, suggest that an agency generally may rely, without affording comment, on data critical to support a rule solely because the existing record contains a deficiency that extra-record data might cure.

[10]  Rather, for extra-record data to be "supplementary," it must clarify, expand, or amend other data that has been offered for comment. *See Air Transp. Ass'n,* 169 F.3d at 8. In *Solite,* the agency relied upon an updated and expanded extra-record study that was based upon a "methodology ... that did not change significantly from the proposed notices," giving the petitioners "ample opportunity to criticize the [agency's] approach." *See ... 952 F.2d at 485.* In *Building Industry,* the agency relied upon a comprehensive empirical study that "confirmed the findings delineated in the proposal," was supported by data in the record, and "provided *additional* support for that hypothesis." *See 247 F.3d at 1246* (emphasis added). Similarly, the Commission's reliance on the statement in *Association of Data Processing* "that the 'administrative record' might well include crucial material that was neither shown to nor known by the private parties in the proceeding," 745 F.2d at 684, is misplaced, for the court was addressing **263  *904  judicial review of all informal agency actions, including adjudications under the arbitrary and capricious standard, 5 U.S.C. § 706, not addressing an agency's independent requirement to provide notice and comment under section 553(c). *See Ass'n of Data Processing,* 745 F.2d at 683–84.

**[11]**    The Commission also maintains that it was free to use extra-record data in its response because the Chamber has not, as we have required, shown that it was prejudiced by its lack of opportunity to comment. *See* *Solite,* 952 F.2d at 484 (citing *Community Nutrition,* 749 F.2d at 57–58, and *Air Transp. Ass'n,* 732 F.2d at 224); *see also* *Air Canada v. Dep't of Transp.,* 148 F.3d 1142, 1156–57 (D.C.Cir.1998) (citing 5 U.S.C. § 706). To show prejudice, those protesting the use of supplementary information might "point to inaccuracies in the [supplemental] data," *Solite,* 952 F.2d at 484, show that the agency "hid or disguised the information it used, or otherwise conducted the rulemaking in bad faith," *id.,* or "indicate with 'reasonable specificity' what portions of the [data] it objects to and how it might have responded if given the opportunity," *Air Transp. Ass'n,* 169 F.3d at 8. The court has not required a particularly robust showing of prejudice in notice-and-comment cases, holding that "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Co-op. of Fla. v. Veneman,* 289 F.3d 89, 96 (D.C.Cir.2002) (explaining the standard of *McLouth Steel Prods. Corp. v. Thomas,* 838 F.2d 1317, 1324 (D.C.Cir.1988)); *see also* *Sprint Corp. v. FCC,* 315 F.3d 369, 376–77 (D.C.Cir.2003). Although the instant case does not involve the outright dodge of APA procedures that led the court to permit a limited showing of prejudice, *see* *McLouth Steel Prods. Corp.,* 838 F.2d at 1323–24, the Chamber has offered objections and studies creating enough "[un]certainty whether petitioner's comments would have had some effect if they had been considered," *id.* at 1324, to show prejudice.

**[12]**    **[13]**    To be clear, the requirement, deriving from sections 553(c) and 706 that an agency may rely on supplemental materials to fill gaps in the rulemaking record only when there is no prejudice to the interested parties does not mean parties can withhold relevant data and blindside the agency on appeal. When, after an agency explains the basis for its preliminary conclusions by reference to the information on which it has relied and requests data regarding its conclusions, and the agency concludes no such data (or no data the agency concludes is reliable) has been produced during the comment period, the agency may develop data along the lines it has proposed to fulfill its statutory obligations without further public comment. *See* *Solite,* 952 F.2d at 484–85. In light of the notice provided, there is no fair-comment prejudice to interested parties under section 553(c) even if the extra-record materials serve as the crucial confirmation of the agency's preliminary conclusions, *see* *Building Indus.,* 247 F.3d at 1246, or even as the compelling reason for the agency's modification of its preliminary conclusion, *see* *Solite* 952 F.2d at 484–85. A contrary rule would provide a perverse incentive for parties opposing a rule to withhold data in order to seek vacation of the rule on appeal.

This is not the situation here. The Commission's bare request for information on costs and its expectation that these costs would be "minimal" did not place interested parties on notice that, in the absence of receiving reliable cost data during the comment period, the Commission would base its cost estimates on an extra-record summary of extra-record survey data that, although characterized as "a **\*\*264   \*905** widely used survey," was not the sort, apparently, relied upon by the Commission during the normal course of its official business. For purposes of section 553(c), it is one thing to suggest that members of the mutual fund industry are familiar with an extra-record survey and quite another thing to give notice that the Commission would rely on a summary of that survey as set forth in the bulletins. The Chamber's failure to critique the extra-record bulletins and summarized survey until this appeal indicates that it had no reason to anticipate the Commission's ultimate reliance on those materials.

Moreover, the rulemaking record closed almost a year before the Commission returned to the cost issue in July 2005, and during that period more funds had adopted the Rule's conditions. *See* Response Release, 70 Fed.Reg. at 39,391, 39,398; *see id.* at 39,407 & n. 23 (Atkins, Comm'r, dissenting). When the Commission decided not to reopen the rulemaking record, individual mutual funds had offered to provide information on their actual implementation costs and the Investment Company Institute had offered to gather such data from its membership. *See id.* The Chamber alerted the Commission that the actual implementation

data would identify how funds had adopted the 75% independent director condition and could indicate whether independent director's fees had increased and whether additional staff had been hired in light of the added costs for the fund.

**[14]**   The Commission would rebut the Chamber's assertions of prejudice by pointing out that the Chamber has not suggested the implementation cost data would show that the Commission's cost estimates are materially inaccurate. This is not the relevant test of prejudice under our precedent, which does not require a showing that the Commission would have reached a different result. *See, e.g., Sprint,* 315 F.3d at 376–77. While the Chamber's section 553(c) challenge focuses on the procedural faults of the Commission's action, with respect to which the Chamber maintains it had no burden to show such prejudice because it had no knowledge of the specific extra-record information until the Commission relied upon such information in its final decision, *see Air Transp. Ass'n,* 169 F.3d at 8, the Chamber proffered specific and credible objections to the soundness of the Commission's estimates and hence to its decision not to modify the two conditions. *See id.; Sprint,* 315 F.3d at 377. Specifically, the Chamber maintains that the Commission's cost estimates were predicated upon an assumption that the extra-record survey summarized in an extra-record bulletin provides information on the salaries solely of *independent* directors, *see* Response Release, 70 Fed.Reg. at 39,392 n. 28, which if incorrect "would have depressed the overall salary data and potentially seriously undermined this important point of the rule," Petitioner's Br. at 46. *Cf. Cent. & S. Motor Freight Tariff Ass'n v. ICC,* 777 F.2d 722, 737 (D.C.Cir.1985). Although the Chamber also identifies data regarding small funds that it would have presented had it been afforded an opportunity to comment, only data that was unavailable during the comment period is relevant here as the NOPR specifically requested cost data; the actual implementation data, however, would either lend support or not to the Chamber's position that the Commission understated the potential ill effects of the two conditions on smaller mutual funds. *Cf. Air Transp. Ass'n,* 169 F.3d at 8. Under our precedents, the Chamber need not prove that its comments would have persuaded the Commission to reach a different outcome. The Chamber's demonstration that it had something useful to say about this critical data is sufficient to establish prejudice.

**\*906   \*\*265**   In sum, the combination of circumstances—inadequate notice that the Commission would base its cost estimates for the two conditions on " publicly available" extra-record materials on which it did not typically rely in rulemakings; the Commission's acknowledgment that the rulemaking record contained gaps and did not include reliable cost data; the availability of additional implementation data for the period between the close of the rulemaking record and the Commission's response to *Chamber I* as more funds adopted the conditions; the Chamber's colorable claim that the Commission's failure to consider such implementation data harms its investment choices—suffices to show that the Chamber has been prejudiced by the Commission's reliance on materials not in, nor merely "supplementary" to, the rulemaking record. *See Solite,* 952 F.2d at 484; *Community Nutrition,* 749 F.2d at 57–58.

The Commission seeks to mitigate its procedural burdens in two ways. First, the Commission suggests that public comment was not necessary because the extra-record materials on which it relied were "publicly available." *See* Response Release, 70 Fed.Reg. at 39,391. In some instances, "publicly available" information, such as "published literature in the fields relevant to the [agency's] proposal," may be so obviously relevant that requiring it be specifically noticed and included in the rulemaking record would advance none of the goals of the APA, *see* RICHARD J. PIERCE, ADMINISTRATIVE LAW TREATISE § 7.3, at 436–38 (2004), such as improving the quality of the information used by the agency, ensuring fairness to affected parties, or enhancing the quality of judicial review, *cf. Sprint,* 315 F.3d at 373. The public availability of such information might fall into an implied exception to the general requirement that extra-record data critical to support a legislative rule be subject to public comment, *see Community Nutrition,* 749 F.2d at 57–58, or, alternatively, go towards negating the petitioner's claims of prejudice when such extra-record information is used to cure deficiencies in the rulemaking record. Neither circumstance is present here.

On appeal, the Commission characterizes the extra-record survey as a "widely used industry survey," Response Release, 70 Fed.Reg. at 39,392 n. 28; Respondent's Br. at 52, noting that an earlier version had been cited by the dissenting commissioners,

370 U.S.App.D.C. 249, Fed. Sec. L. Rep. P 93,740

*id.,* and pointing to the Management Practice Inc. website as one public source for the bulletins summarizing the results of this survey. However, the mere availability of the extra-record bulletins on the internet is insufficient to demonstrate that these bulletins are generally considered reliable sources of information that should be treated as the inevitable background source of information on the mutual fund industry, as might be true, in other contexts, of a relevant study in a broadly cited scientific journal. *See* PIERCE, ADMINISTRATIVE LAW TREATISE § 7.3, at 436–38. Although the Commission points out that opponents of the two conditions, including the Investment Company Institute, have cited a broad array of publications as the principal sources on fund director compensation during the last decade, this does not explain why these particular privately produced bulletins are trustworthy or confirm that the survey is so reliable or ubiquitous that the procedural requirements for comment should be relaxed when these materials serve as the critical data on which the Commission relies to assess the costs

of implementing the two conditions. *See* 📄 *Building Indus.,* 247 F.3d at 1245–46; *Ass'n of Data Processing,* 745 F.2d at 684–

85; *see also* 📄 *Int'l Union, UAW v. OSHA,* 938 F.2d 1310, 1324 (D.C.Cir.1991) (citing 📄 *Sierra Club v. Costle,* 657 F.2d 298,

398 (D.C.Cir.1981)). Unlike the salary surveys conducted by the Securities Industry Association, which **266 *907** the Commission identified as "a source on which we commonly rely in our rulemakings," Response Release, 70 Fed.Reg. at 39,394, and the Mutual Fund Fact Book, which is a generally cited source of statistical information relied upon by the Commission in

other rulemakings, *see, e.g.,* 📄 Regulation NMS, Exchange Act Release No. 34–51808, 70 Fed.Reg. 37,496, 37,532 n. 300

(2005), the bulletins received no such commendation by the Commission in the Response Release.

Nor are the Chamber's claims of prejudice materially diminished because the bulletins are "publicly available." The NOPR did not indicate that the Commission intended to rely on these bulletins if reliable cost data was not produced during the comment period, much less indicate that the Commission considered the bulletins to be a source of reliable data for estimating the costs of the two conditions. The fact that the dissenting Commissioners cited a news article that summarized an extra-record survey conducted by the publisher of the bulletins, *see* Adopting Release, 69 Fed.Reg. at 46,391 n. 24 (Glassman & Atkins, Comm'rs, dissenting), likewise does not indicate that interested parties would have treated a summary of the "widely used survey" as background information or focused their comments on the survey. At best, notice was given that surveys of the type typically relied upon by the Commission in rulemakings should be addressed. In fact, one of the bulletins was not in existence until after the rulemaking record had closed and thus was not "publicly available" for comment. *See id.* at 39,393 n. 43.

Nor does public access to the bulletins alter the fact that the Commission had acknowledged the inadequacies of the rulemaking record with respect to estimating costs. The Commission's recourse to extra-record materials indicates that even for the more

refined task of estimating direct costs described in 📄 *Chamber I,* 412 F.3d at 144, the Commission continued to view the rulemaking record as lacking reliable cost information. Nor, finally, does the availability of the "widely used survey" alleviate the prejudice to the Chamber when the Commission, in light of its prior acknowledgment of the inadequacies of the rulemaking record and the period during which more funds had adopted the conditions, declines to reopen the record to allow the Chamber to submit actual implementation cost data. Although the Commission's judgment in relying on these extra-record sources may be well-founded, the bulletins themselves acknowledge "wide divergence" among the funds represented in the summarized extra-record survey "in the methodologies used to calculate director compensation." Management Practice Inc. Bulletin: More Meetings Means More Pay for Fund Directors at 1 (April 2004) (cited at 70 Fed.Reg. at 39,392 n. 28). In the absence of an explanation by the Commission, this caveat suggests that other, possibly more reliable estimates may exist that could have influenced the Commission's assumptions about director compensation, which supports the Chamber's claim of prejudice.

[15]  [16]  Second, the Commission justifies its choice to act without re-opening the record by invoking the need to act swiftly:

> We find that any further delay or ambiguity surrounding implementation of the rules would disadvantage not only investors but also fund boards and management companies, most of which have already begun the process of coming into compliance with the rules. By acting swiftly and deliberately to respond to

the Court's remand order, the Commission will reduce uncertainty, facilitate better decision-making by funds, and ultimately serve the interests of fund shareholders.

**\*908  \*\*267** *Id.* at 39,398. The Commission's preference to proceed with the same five Commission Members who were familiar with the rulemaking in considering the cost estimates described in *Chamber I, see id.* at 39,391, is not the type of exigent circumstance that comes within the narrow "good cause" exception of section 553(b)(B). *See Tennessee Gas Pipeline Co. v. FERC,* 969 F.2d 1141, 1144 (D.C.Cir.1992);  *Util. Solid Waste Activities Group v. EPA,* 236 F.3d 749, 754 (D.C.Cir.2001). The exception excuses notice and comment in emergency situations,  *Am. Fed'n of Gov't Employees v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981), where delay could result in serious harm, *see  Jifry v. FAA,* 370 F.3d 1174, 1179 (D.C.Cir.2004) (citing  *Hawaii Helicopter Operators Ass'n v. FAA,* 51 F.3d 212, 214 (9th Cir.1995)), or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare, *see  Mobil Oil Corp. v. Dep't of Energy,* 728 F.2d 1477, 1492 (Temp.Emer.Ct.App.1983). These exigent circumstances are of a far different nature than the not uncommon circumstance facing commissions when their membership changes during the course of a rulemaking, which may involve appeals and remands and thus extend for a period of years. Although the Commission's membership would change after June 30, 2005, and the even division among the remaining Commissioners could delay further action on the Rule, which the Commission considered necessary to redress "a serious breakdown in management controls," Adopting Release, 69 Fed.Reg. at 43,379, the risk of such delay is hardly atypical and does not satisfy the narrow exception.

Therefore, because the Commission relied on extra-record material critical to its costs estimates without affording an opportunity for comment to the prejudice of the Chamber, we hold that the Commission violated the comment requirement of  section 553(c).

## IV.

**[17]  [18]**  The question remains what is the appropriate remedy for the Commission's procedural violation under  section 553(c). The APA provides that the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law,"  5 U.S.C. § 706(2)(D), with "due account ... taken of the rule of prejudicial error,"  *id.* § 706. Under circuit precedent, the decision to remand or vacate hinges upon court's assessment of "the seriousness of the ... deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150–51 (D.C.Cir.1993) (citations omitted).

When the Rule was proposed, the Commission estimated that nearly 60% of mutual funds already complied with the 75% independent director condition. *See* Response Release, 70 Fed.Reg. at 39,391 & n. 18. The court stayed the effectiveness of the Rule's two conditions on August 10, 2005; the other amendments to the Exemptive Rules, *see* Adopting Release, 69 Fed.Reg. at 46,381, were scheduled to take effect on January 15, 2006. *See* 17 C.F.R. § 270.0–1(a)(7)(v), (vi), & (vii) (2005). In the meantime, more mutual funds have voluntarily adopted the challenged conditions. *See* Response Release, 70 Fed.Reg. at 39,407 (Atkins, Comm'r, dissenting). In other words, the two conditions, which were part of a larger program of regulatory reforms adopted by the Commission to address serious conflicts of interest in the mutual fund industry by changing the "boardroom culture," Response Release, 70 Fed.Reg. at 39,397, have become partially operational.

**\*909  \*\*268**  The Commission's reliance on extra-record materials to fulfill its statutory obligation under ICA § 2(c), 15 U.S.C. § 80a–2(c), effectively acknowledges gaps in the rulemaking record that could not be properly supplemented without further opportunity for comment under section 553(c). Given the circumstances described in Part III of this opinion, a further remand to the Commission without the opportunity for comment would be unproductive. This suggests that vacation of the 75% independent director and independent chair conditions would be appropriate.

However, although vacating the two conditions would be less disruptive than if they had taken effect on January 15, 2006, *see Allied Signal,* 988 F.2d at 150–51, a significant portion of the mutual fund industry appears to have come into substantial compliance with the Rule. This compliance tends to suggest that immediate vacation of the two conditions risks substantial disruption to the mutual fund industry because of the resultant inconsistent governance practices that would arise within the industry, which also might sow confusion in the investing public. Also, the Commission's decision to rely upon extra-record data without reopening the rulemaking record for comment does not, of itself, indicate that the Commission's cost estimates are incorrect, much less that its conclusion, under ICA § 2(c), that the costs of implementing the two conditions do not outweigh the benefits of adopting the two conditions. *See id.*

The Commission is in a better position than the court to assess the disruptive effect of vacating the Rule's two conditions. Therefore, the court will vacate the 75% independent director and independent chair conditions of the Rule but, given the court's expectation in *Chamber I* that the Commission could "readily" address costs, 412 F.3d at 144, withhold the issuance of its mandate pursuant to Rule 41(b) for ninety days. Such an approach is not unprecedented. *See Hazardous Waste Treatment Council,* 886 F.2d at 371; *Nat'l Coal. Against Misuse of Pesticides,* 809 F.2d at 884–85; *Indep. U.S. Tanker Owners Comm.,* 809 F.2d at 855; *Simmons,* 757 F.2d at 300; *see also Rodway v. U.S. Dep't of Agric.,* 514 F.2d at 817–18. This approach will afford the Commission an opportunity to reopen the record for comment on the costs of implementing the two conditions. Within ninety days the Commission shall file a status report with the court, unless the Commission shall have prevailed on a motion to modify, accelerate, or postpone the mandate, and upon further order the mandate will issue.

Accordingly, we grant the Chamber's petition, without reaching its other challenges to the Remand Release, vacate the two conditions, but withhold the issuance of the mandate for ninety days as set forth in this opinion.

### All Citations

443 F.3d 890, 370 U.S.App.D.C. 249, Fed. Sec. L. Rep. P 93,740

### Footnotes

1    Section 43(a) of ICA provides:
Any person or party aggrieved by an order issued by the Commission ... may obtain a review of such order in the United States court of appeals within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia .... Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record shall be exclusive, to affirm, modify, or set aside such order, in whole or in part.
15 U.S.C. § 80a–42(a). It further provides for a modified remand procedure for further findings of fact:
If application is made to the court for leave to adduce additional evidence, and it is shown to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before

370 U.S.App.D.C. 249, Fed. Sec. L. Rep. P 93,740

the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Chavez-Reyes v. Holder, 741 F.3d 1 (2014)

14 Cal. Daily Op. Serv. 862, 2014 Daily Journal D.A.R. 1071

741 F.3d 1
United States Court of Appeals,
Ninth Circuit.

Manuel CHAVEZ–REYES, Petitioner,

v.

Eric H. HOLDER Jr., Attorney General, Respondent.

No. 10–70776.

|

Submitted Jan. 17, 2014. *

|

Filed Jan. 27, 2014.

**Synopsis**

**Background:** Alien petitioned for review of Board of Immigration Appeals' (BIA) dismissal of his appeal from an immigration judge's (IJ) entry of a final order of removal.

**Holdings:** The Court of Appeals, Graber, Circuit Judge, held that:

[1] BIA did not violate alien's due process rights by considering alien's vacated guilty plea, and

[2] substantial evidence supported BIA's determination.

Petition denied.

West Headnotes (4)

[1] **Aliens, Immigration, and Citizenship** 👈 Effect of expungement or vacation

**Constitutional Law** 👈 Admission and exclusion; deportation

Board of Immigration Appeals (BIA) did not violate alien's due process rights by considering alien's guilty plea to possession of cocaine with intent to distribute when it determined that alien was removable because there was reason to believe that he had engaged or assisted in illicit drug trafficking, despite the fact that Court

of Appeals had overturned alien's conviction on appeal, where Court of Appeals overturned conviction solely because the police officers lacked reasonable suspicion to conduct the traffic stop that led to discovery of almost 900 pounds of cocaine, a reason unrelated to the voluntariness of the guilty plea. U.S.C.A. Const.Amends. 4, 5; Immigration and Nationality Act, § 212(a)(2)(C)(i), 8 U.S.C.A. § 1182(a)(2)(C)(i).

4 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** 👈 Constitutional questions

Court of Appeals reviews de novo whether the Board of Immigration Appeals (BIA) violated an alien's due process. U.S.C.A. Const.Amend. 5.

6 Cases that cite this headnote

[3] **Criminal Law** 👈 Effect in General

As a general rule, a voluntary guilty plea to criminal charges is probative evidence that the petitioner did, in fact, engage in the charged activity, even if the conviction is later overturned for a reason unrelated to voluntariness.

[4] **Aliens, Immigration, and Citizenship** 👈 Controlled substances offenses

Substantial evidence supported Board of Immigration Appeals' (BIA) determination that alien was removable because there was reason to believe that he had engaged or assisted in illicit drug trafficking, where police discovered almost 900 pounds of cocaine in a vehicle over which alien had sole control, and he entered guilty plea to possession of cocaine with intent to distribute. Immigration and Nationality Act, § 212(a)(2)(C)(i), 8 U.S.C.A. § 1182(a)(2)(C)(i).

10 Cases that cite this headnote

Chavez-Reyes v. Holder, 741 F.3d 1 (2014)

14 Cal. Daily Op. Serv. 862, 2014 Daily Journal D.A.R. 1071

**Attorneys and Law Firms**

**\*1**  Jose A. Bracamonte, Law Office of Jose A. Bracamonte, Phoenix, AZ, for Petitioner.

**\*2**  Tony West, Assistant Attorney General, Thomas B. Fatouros, Senior Litigation Counsel, and Julie M. Iversen, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX8–458.

Before:  DIARMUID F. O'SCANNLAIN, SUSAN P. GRABER, and JACQUELINE H. NGUYEN, Circuit Judges.

## OPINION

GRABER, Circuit Judge:

Petitioner Manuel Chavez–Reyes petitions for review of the Board of Immigration Appeals' ("BIA") dismissal of his appeal from an immigration judge's ("IJ") entry of a final order of removal. The BIA held that Petitioner was removable pursuant to 8 U.S.C. § 1182(a)(2)(C)(i)[1] because there was "reason to believe" that he "is or has been an illicit trafficker" in a controlled substance or knowingly has assisted others in trafficking. Because the BIA did not violate due process or otherwise err, we deny the petition.

In 1989, Petitioner was the driver and sole occupant of a truck containing almost 900 pounds of cocaine valued at $28.7 million, in a hidden compartment. Police officers pulled the truck over, found the drugs, and arrested Petitioner. He pleaded guilty to possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1). But we overturned that conviction on appeal on the ground that the officers lacked sufficient suspicion to make a traffic stop. United States v. Chavez–Reyes, 921 F.2d 281 (9th Cir.1990) (unpublished decision).

In the immigration proceedings on review, the government charged Petitioner with removability under 8 U.S.C. § 1182(a)(2)(C)(i).[2] Unlike many immigration statutes, which require a criminal conviction before imposing immigration consequences,[3] § 1182(a)(2)(C)(i) requires only a "reason

to believe" that Petitioner engaged or assisted in illicit trafficking of drugs. Lopez–Molina v. Ashcroft, 368 F.3d 1206, 1208–09 (9th Cir.2004).

Here, the BIA held that there was "reason to believe" that Petitioner had engaged or assisted in illicit trafficking for two primary reasons. First, the BIA held that the circumstantial evidence strongly suggested that Petitioner knew that the drugs were in the truck. The BIA reasoned that the amount of cocaine was "too large for personal use, and the quantity and high value of the cocaine suggests that [Petitioner] was either a drug trafficker himself, or was trusted by the drug traffickers and that he knew that the drugs **\*3** were in the vehicle." Second, the BIA held that Petitioner's guilty plea also supported its conclusion. The BIA reasoned that, although Petitioner's conviction "was subsequently overturned due to a finding that the agents lacked legal reasonable cause to stop the truck [Petitioner] was driving, this does not change the fact that [Petitioner] pled guilty to engaging in drug trafficking."

**[1]**  **[2]**  Petitioner argues that the BIA violated his due process rights by considering his guilty plea, because the resulting conviction was overturned on appeal. We have jurisdiction over this constitutional claim. Rojas v. Holder, 704 F.3d 792, 794 (9th Cir.2012). We review de novo whether the BIA violated due process. Ramirez–Alejandre v. Ashcroft, 319 F.3d 365, 377 (9th Cir.2003) (en banc). We must determine whether "the proceeding was so fundamentally unfair that [Petitioner] was prevented from reasonably presenting his case." Sanchez–Cruz v. INS, 255 F.3d 775, 779 (9th Cir.2001) (internal quotation marks omitted). We find no fundamental unfairness here.

**[3]**  As a general rule, a voluntary guilty plea to criminal charges is probative evidence that the petitioner did, in fact, engage in the charged activity, even if the conviction is later overturned for a reason unrelated to voluntariness.[4] Indeed, as the Eleventh Circuit held in a case in which the conviction was expunged, "[b]ecause petitioner has pleaded guilty to cocaine trafficking, it logically follows that immigration officials do not merely have reason to believe he has trafficked in narcotics, they have reason to *know* he has done so." Castano v. INS, 956 F.2d 236, 238 (11th Cir.1992).

We recognize that there may be instances in which an overturned conviction may require the BIA to give little or no weight to a guilty plea. For example, the Eleventh Circuit has held that a guilty plea may "carry little or no

14 Cal. Daily Op. Serv. 862, 2014 Daily Journal D.A.R. 1071

probative weight," *Garces v. U.S. Attorney Gen.,* 611 F.3d 1337, 1347 (11th Cir.2010), if, among other things, the guilty plea was involuntary and the state court later vacated the conviction on that ground, *id.* at 1340–41, 1347–48. Here, however, we overturned Petitioner's conviction solely because the police officers lacked reasonable suspicion to conduct the traffic stop—a reason unrelated to the voluntariness of the guilty plea. Nor has Petitioner suggested any other particularized reason why his guilty plea is so unreliable that the BIA's reliance on it rendered his proceeding "fundamentally unfair." *Sanchez–Cruz,* 255 F.3d at 779. Accordingly, we conclude that the BIA did not violate Petitioner's due process rights.

[4] Petitioner also argues that substantial evidence does not support the BIA's "reason to believe" finding. *See Lopez–Molina,* 368 F.3d at 1211 (holding that we review the BIA's "reason to believe" finding for substantial evidence). We disagree. The large amount of drugs in a vehicle over which Petitioner had sole control, coupled with his guilty plea,

strongly suggests that Petitioner indeed knew that his truck contained drugs. "While a generous fact-finder might have believed [Petitioner's] version of the facts, both the BIA and IJ were clearly within reason on these facts and circumstances to conclude otherwise." *Alarcon–Serrano v. INS,* 220 F.3d 1116, 1120 (9th Cir.2000); *see also* **\*4** *Cuevas v. Holder,* 737 F.3d 972, 975–76 (5th Cir.2013) (holding, in similar circumstances, that substantial evidence supported the BIA's "reason to believe" finding). Petitioner's reliance on our decision in *Pichardo v. INS,* 188 F.3d 1079 (9th Cir.1999), is in error, because that opinion was withdrawn and superseded on rehearing, 216 F.3d 1198 (9th Cir.2000). In short, the BIA's decision rests on substantial evidence.

**Petition DENIED.**

**All Citations**

741 F.3d 1, 14 Cal. Daily Op. Serv. 862, 2014 Daily Journal D.A.R. 1071

---

## Footnotes

\*  The panel unanimously concludes that this case is suitable for decision without oral argument. Fed. R.App. P. 34(a)(2).

1  Title 8 U.S.C. § 1182(a)(2)(C)(i) defines the following class of inadmissible aliens:
   Any alien who the consular officer or the Attorney General knows or has reason to believe—
   (i) is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of Title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so[.]

2  This case has a long procedural history, but we recount only the historical facts relevant to the issues on appeal.

3  *See, e.g.,* 8 U.S.C. § 1182(a)(2)(A) ("Conviction of certain crimes"); *id.* § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); *id.* § 1227(a)(2)(C) ("Any alien who at any time after admission is convicted [of specified firearm offenses] is deportable.").

4  Because the BIA considered Petitioner's guilty plea in combination with other evidence, we need not and do not address whether a guilty plea would be sufficient—by itself—to satisfy the "reason to believe" standard. We decide only that the BIA properly *considered* the guilty plea at issue.

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds Count My Vote, Inc. v. Cox, Utah, October 10, 2019

104 S.Ct. 2778
Supreme Court of the United States

CHEVRON, U.S.A., INC., Petitioner,

v.

NATURAL RESOURCES
DEFENSE COUNCIL, INC., et al.
AMERICAN IRON AND STEEL
INSTITUTE, et al., Petitioners,

v.

NATURAL RESOURCES
DEFENSE COUNCIL, INC., et al.
William D. RUCKELSHAUS, Administrator,
Environmental Protection Agency, Petitioner,

v.

NATURAL RESOURCES
DEFENSE COUNCIL, INC., et al. *

Nos. 82-1005, 82-1247 and 82-1591.
|
Argued Feb. 29, 1984.
|
Decided June 25, 1984.

**Synopsis**
Rehearing Denied Aug. 16, 1984.

See 468 U.S. 1227, 105 S.Ct. 28, 29.

Petition was filed for review of order of the Environmental Protection Agency. The Court of Appeals, 685 F.2d 718, vacated regulations, and certiorari was granted. The Supreme Court, Justice Stevens, held that Environmental Protection Agency regulation allowing states to treat all pollution-emitting devices within same industrial grouping as though they were encased within single "bubble" was based on permissible construction of term "stationary source" in Clean Air Act Amendments.

Reversed.

West Headnotes (7)

**[1]**   **Federal Courts** ⬤ Decisions Reviewable

Supreme Court reviews judgments, not opinions.

112 Cases that cite this headnote

**[2]**   **Administrative Law and Procedure** ⬤ Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** ⬤ Permissible or reasonable construction

When court reviews agency's construction of statute which it administers, court is confronted with two questions: whether Congress has directly spoken on precise question at issue; if statute is silent or ambiguous with respect to specific issue, question for court is whether agency's answer is based on permissible construction of statute.

7111 Cases that cite this headnote

**[3]**   **Administrative Law and Procedure** ⬤ Erroneous or unreasonable construction; conflict with statute

Judiciary is final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.

1802 Cases that cite this headnote

**[4]**   **Administrative Law and Procedure** ⬤ Permissible or reasonable construction

Court need not conclude that agency's construction of statute which it administered was only one it permissibly could have adopted to uphold construction, or even reading the court would have reached if question initially had arisen in judicial proceeding.

2694 Cases that cite this headnote

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 457 of 1384

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

**[5]**    **Administrative Law and**
       **Procedure**  👉  **Permissible or reasonable**
       **construction**

Where legislative delegation to agency on particular question is implicit rather than explicit, court may not substitute its own construction of statutory provision for reasonable interpretation made by administrator of agency.

6209 Cases that cite this headnote

**[6]**    **Administrative Law and**
       **Procedure**  👉  **Relationship of agency with**
       **statute in general**

Considerable weight should be accorded to executive department's construction of statutory scheme it is entrusted to administer.

632 Cases that cite this headnote

**[7]**    **Environmental Law**  👉  **Stationary sources in**
       **general**

Environmental Protection Agency regulation allowing states to treat all pollution-emitting devices within same industrial grouping as though they were encased within single "bubble" was based on permissible construction of term "stationary source" in Clean Air Act Amendments. Clean Air Act, §§ 111(a)(3), 172(b)(6), 302(j), as amended, 📗 42 U.S.C.A. §§ 7411(a)(3), 7502(b)(6), 7602(j).

297 Cases that cite this headnote

*Syllabus* [a1]

The Clean Air Act Amendments of 1977 impose certain requirements on States **2779** that have not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation, including the requirement that such "nonattainment" States establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for such sources unless

stringent conditions are met. EPA regulations promulgated in 1981 to implement the permit requirement allow a State to adopt a plantwide definition of the term "stationary source," under which an existing plant that contains several pollution-emitting devices may install or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the total emissions from the plant, thus allowing a State to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble." Respondents filed a petition for review in the Court of Appeals, which set aside the regulations embodying the "bubble concept" as contrary to law. Although recognizing that the amended Clean Air Act does not explicitly define what Congress envisioned as a "stationary source" to which the permit program should apply, and that the issue was not squarely addressed in the legislative history, the court concluded that, in view of the purpose of the nonattainment program to improve rather than merely maintain air quality, a plantwide definition was "inappropriate," while stating it was mandatory in programs designed to maintain existing air quality.

Held: The EPA's plantwide definition is a permissible construction of the statutory term "stationary source." Pp. 2781–2793.

(a) With regard to judicial review of an agency's construction of the statute which it administers, if Congress has not directly spoken to the precise question at issue, the question for the court is whether the **838** agency's answer is based on a permissible construction of the statute. Pp. 2781–2783.

(b) Examination of the legislation and its history supports the Court of Appeals' conclusion that Congress did not have a specific intention as to the applicability of the "bubble concept" in these cases. Pp. 2783–2786.

(c) The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas plainly discloses that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Pp. 2786–2787.

(d) Prior to the 1977 Amendments, the EPA had used a plantwide definition of the term "source," but in 1980 the EPA ultimately adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals here,

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 458 of 1384

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

precluding use of the "bubble concept" in nonattainment States' programs designed to enhance air quality. However, when a new administration took office 1981, the EPA, in promulgating the regulations involved here, reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be given the plantwide definition in nonattainment areas. Pp. 2787–2790.

(e) Parsing the general terms in the text of the amended Clean Air Act—particularly the provisions of §§ 302(j) and 111(a)(3) pertaining to the definition of "source"—does not reveal any actual intent of Congress as to the issue in these cases. To the extent any congressional "intent" can be discerned from the statutory language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the EPA's power to regulate particular sources in order to effectuate the policies of the Clean Air Act. Similarly, the legislative history is consistent with the **2780 view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments. The plantwide definition is fully consistent with the policy of allowing reasonable economic growth, and the EPA has advanced a reasonable explanation for its conclusion that the regulations serve environmental objectives as well. The fact that the EPA has from time to time changed its interpretation of the term "source" does not lead to the conclusion that no deference should be accorded the EPA's interpretation of the statute. An agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis. Policy arguments concerning the "bubble concept" should be addressed to legislators or administrators, not to judges. The EPA's interpretation of the statute here represents a reasonable accommodation of manifestly competing interests and is entitled to deference. Pp. 2790–2793.

222 U.S.App.D.C. 268, 685 F.2d 718 (1982), reversed.

**Attorneys and Law Firms**

*Deputy Solicitor General Bator* argued the cause for petitioners in all cases. With him on the briefs for petitioner in No. 82-1591 were *Solicitor General Lee, Acting Assistant Attorney General Habicht, Deputy Assistant Attorney General Walker, Mark I. Levy, Anne S. Almy, William F. Pedersen,* and *Charles S. Carter. Michael H. Salinsky* and *Kevin M. Fong* filed briefs for petitioner in No. 82-1005.

*Robert A. Emmett, David Ferber, Stark Ritchie, Theodore L. Garrett, Patricia A. Barald, Louis E. Tosi, William L. Patberg, Charles F. Lettow,* and *Barton C. Green* filed briefs for petitioners in No. 82-1247.

**\*839** *David D. Doniger* argued the cause and filed a brief for respondents.†>>>

† Briefs of *amici curiae* urging reversal were filed for the American Gas Association by *John A. Myler;* for the Mid-America Legal Foundation by *John M. Cannon, Susan W. Wanat,* and *Ann P. Sheldon;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robin L. Rivett.*

A brief of *amici curiae* urging affirmance was filed for the Commonwealth of Pennsylvania et al. by *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Thomas Y. Au, Duane Woodard,* Attorney General of Colorado, *Richard L. Griffith,* Assistant Attorney General, *Joseph I. Lieberman,* Attorney General of Connecticut, *Robert A. Whitehead, Jr.,* Assistant Attorney General, *James S. Tierney,* Attorney General of Maine, *Robert Abrams,* Attorney General of New York, *Marcia J. Cleveland* and *Mary L. Lyndon,* Assistant Attorneys General, *Irwin I. Kimmelman,* Attorney General of New Jersey, *John J. Easton, Jr.,* Attorney General of Vermont, *Merideth Wright,* Assistant Attorney General, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Maryann Sumi,* Assistant Attorney General.

*James D. English, Mary-Win O'Brien,* and *Bernard Kleiman* filed a brief for the United Steelworkers of America, AFL-CIO-CLC, as *amicus curiae.*

**Opinion**

Justice STEVENS delivered the opinion of the Court.

In the Clean Air Act Amendments of 1977, Pub.L. 95–95, 91 Stat. 685, Congress enacted certain requirements applicable **\*840** to States that had not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation. The amended Clean Air Act required these "nonattainment" States to establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for a new or modified major stationary source unless several stringent conditions are met.[1] The EPA regulation promulgated to implement this permit requirement allows a State to adopt a plantwide definition of the term "stationary source."[2] Under this definition, an existing plant that contains several pollution-emitting devices may install

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 459 of 1384

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the total emissions from the plant. The question presented by these cases is whether EPA's decision to allow States to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble" is based on a reasonable construction of the statutory term "stationary source."

I

The EPA regulations containing the plantwide definition of the term stationary source were promulgated on October **\*841** 14, 1981. 46 Fed.Reg. 50766. Respondents [3] filed a timely petition for review in the United States Court of Appeals for the District of Columbia Circuit pursuant to 42 U.S.C. § 7607(b)(1). [4] The Court of Appeals **\*\*2781** set aside the regulations. 🚩 Natural Resources Defense Council, Inc. v. Gorsuch, 222 U.S.App.D.C. 268, 685 F.2d 718 (1982).

The court observed that the relevant part of the amended Clean Air Act "does not explicitly define what Congress envisioned as a 'stationary source, to which the permit program ... should apply," and further stated that the precise issue was not "squarely addressed in the legislative history." 🚩 Id., at 273, 685 F.2d, at 723. In light of its conclusion that the legislative history bearing on the question was "at best contradictory," it reasoned that "the purposes of the nonattainment program should guide our decision here." 🚩 Id., at 276, n. 39, 685 F.2d, at 726, n. 39. [5] Based on two of its precedents concerning the applicability of the bubble concept to certain Clean Air Act programs, [6] the court stated that the bubble concept was "mandatory" in programs designed merely to maintain existing air quality, but held that it was "inappropriate" in programs enacted to improve air quality. 🚩 Id., at 276, 685 F.2d, at 726. Since the purpose of the permit **\*842** program—its "raison d'être," in the court's view—was to improve air quality, the court held that the bubble concept was inapplicable in these cases under its prior precedents. Ibid. It therefore set aside the regulations embodying the bubble concept as contrary to law. We granted certiorari to review that judgment, 461 U.S. 956, 103 S.Ct. 2427, 77 L.Ed.2d 1314 (1983), and we now reverse.

[1]   The basic legal error of the Court of Appeals was to adopt a static judicial definition of the term "stationary source" when it had decided that Congress itself had not commanded that definition. Respondents do not defend the

legal reasoning of the Court of Appeals. [7] Nevertheless, since this Court reviews judgments, not opinions, [8] we must determine whether the Court of Appeals' legal error resulted in an erroneous judgment on the validity of the regulations.

II

[2]   [3]   [4]   When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, **\*843** as well as the agency, must give effect to the unambiguously expressed intent of Congress. [9] If, however, **\*\*2782** the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, [10] as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. [11]

[5]   "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." 🏳️ Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation **\*844** of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. [12] Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. [13]

[6]   We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, [14] and the principle of deference to administrative interpretations.

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

"has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full **\*2783** understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See, e.g., National Broadcasting Co. v. United States, 319 U.S. 190 [63 S.Ct. 997, 87 L.Ed. 1344]; Labor Board v. Hearst Publications, Inc., 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170]; **\*845** Republic Aviation Corp. v. Labor Board, 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372]; Securities & Exchange Comm'n v. Chenery Corp., [332] 322 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995]; Labor Board v. Seven–Up Bottling Co., 344 U.S. 344 [73 S.Ct. 287, 97 L.Ed. 377].

"... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." United States v. Shimer, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961).

Accord Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699–700, 104 S.Ct. 2694, 2700–2701, 81 L.Ed.2d 580 (1984).

In light of these well-settled principles it is clear that the Court of Appeals misconceived the nature of its role in reviewing the regulations at issue. Once it determined, after its own examination of the legislation, that Congress did not actually have an intent regarding the applicability of the bubble concept to the permit program, the question before it was not whether in its view the concept is "inappropriate" in the general context of a program designed to improve air quality, but whether the Administrator's view that it is appropriate in the context of this particular program is a reasonable one. Based on the examination of the legislation and its history which follows, we agree with the Court of Appeals that Congress did not have a specific intention on the applicability of the bubble concept in these cases, and conclude that the EPA's use of that concept here is a reasonable policy choice for the agency to make.

III

In the 1950's and the 1960's Congress enacted a series of statutes designed to encourage and to assist the States in curtailing air pollution. See generally Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 63–64, 95 S.Ct. 1470, 1474–1475, 43 L.Ed.2d 731 (1975). The Clean Air Amendments of 1970, Pub.L. 91–604, 84 Stat. 1676, "sharply increased federal authority and responsibility **\*846** in the continuing effort to combat air pollution," 421 U.S., at 64, 95 S.Ct., at 1474, but continued to assign "primary responsibility for assuring air quality" to the several States, 84 Stat. 1678. Section 109 of the 1970 Amendments directed the EPA to promulgate National Ambient Air Quality Standards (NAAQS's) [15] and § 110 directed the States to develop plans (SIP's) to implement the standards within specified deadlines. In addition, § 111 provided that major new sources of pollution would be required to conform to technology-based performance standards; the EPA was directed to publish a list of categories of sources of pollution and to establish new source performance standards (NSPS) for each. Section 111(e) prohibited the operation of any new source in violation of a performance standard.

Section 111(a) defined the terms that are to be used in setting and enforcing standards of performance for new stationary sources. It provided:

"For purposes of this section:

.....

"(3) The term 'stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant." 84 Stat. 1683.

**\*\*2784** In the 1970 Amendments that definition was not only applicable to the NSPS program required by § 111, but also was made applicable to a requirement of § 110 that each state implementation plan contain a procedure for reviewing the location of any proposed new source and preventing its construction if it would preclude the attainment or maintenance of national air quality standards. [16]

In due course, the EPA promulgated NAAQS's, approved SIP's, and adopted detailed regulations governing NSPS's **\*847** for various categories of equipment. In one of its programs, the EPA used a plantwide definition of the term "stationary source." In 1974, it issued NSPS's for the nonferrous smelting industry that provided that the standards

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 461 of 1384

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

would not apply to the modification of major smelting units if their increased emissions were offset by reductions in other portions of the same plant. [17]

### Nonattainment

The 1970 legislation provided for the attainment of primary NAAQS's by 1975. In many areas of the country, particularly the most industrialized States, the statutory goals were not attained. [18] In 1976, the 94th Congress was confronted with this fundamental problem, as well as many others respecting pollution control. As always in this area, the legislative struggle was basically between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes would retard industrial development with attendant social costs. The 94th Congress, confronting these competing interests, was unable to agree on what response was in the public interest: legislative proposals to deal with nonattainment failed to command the necessary consensus. [19]

In light of this situation, the EPA published an Emissions Offset Interpretative Ruling in December 1976, see 41 Fed.Reg. 55524, to "fill the gap," as respondents put it, until Congress acted. The Ruling stated that it was intended to **\*848** address "the issue of whether and to what extent national air quality standards established under the Clean Air Act may restrict or prohibit growth of major new or expanded stationary air pollution sources." Id., at 55524–55525. In general, the Ruling provided that "a major new source may locate in an area with air quality worse than a national standard only if stringent conditions can be met." Id., at 55525. The Ruling gave primary emphasis to the rapid attainment of the statute's environmental goals. [20] Consistent with that emphasis, the construction of every new source in nonattainment areas had to meet the "lowest achievable emission rate" under the current state of the art for that type of facility. See Ibid. The 1976 Ruling did not, however, explicitly adopt or reject the "bubble concept." [21]

### **\*2785** IV

The Clean Air Act Amendments of 1977 are a lengthy, detailed, technical, complex, and comprehensive response to a major social issue. A small portion of the statute—91 Stat.

**\*849** 745–751 (Part D of Title I of the amended Act, 42 U.S.C. §§ 7501–7508)—expressly deals with nonattainment

areas. The focal point of this controversy is one phrase in that portion of the Amendments. [22]

Basically, the statute required each State in a nonattainment area to prepare and obtain approval of a new SIP by July 1, 1979. In the interim those States were required to comply with the EPA's interpretative Ruling of December 21, 1976. 91 Stat. 745. The deadline for attainment of the primary NAAQS's was extended until December 31, 1982, and in some cases until December 31, 1987, but the SIP's were required to contain a number of provisions designed to achieve the goals as expeditiously as possible. [23]

**\*850** Most significantly for our purposes, the statute provided that each plan shall

"(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173...." Id., 747.

Before issuing a permit, § 173 requires (1) the state agency to determine that there will be sufficient emissions reductions in the region to offset the emissions from the new source and also to allow for reasonable further progress toward attainment, or that the increased emissions will not exceed an allowance for growth established pursuant to § 172(b)(5); (2) the applicant to certify that his other sources in the State are in compliance with the SIP, (3) the agency to determine that the applicable SIP is otherwise being implemented, and (4) the proposed source to comply with the lowest achievable emission rate (LAER). [24]

**\*\*2786** **\*851** The 1977 Amendments contain no specific reference to the "bubble concept." Nor do they contain a specific definition of the term "stationary source," though they did not disturb the definition of "stationary source" contained in § 111(a)(3), applicable by the terms of the Act to the NSPS program. Section 302(j), however, defines the term "major stationary source" as follows:

"(j) Except as otherwise expressly provided, the terms 'major stationary source' and 'major emitting facility' mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)." 91 Stat. 770.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 462 of 1384

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

V

The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas does not contain any specific comment on the "bubble concept" or the question whether a plantwide definition of a stationary source is permissible under the permit program. It does, however, plainly disclose that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Indeed, the House Committee Report identified the economic interest as one of the "two main purposes" of this section of the bill. It stated:

"Section 117 of the bill, adopted during full committee markup establishes a new section 127 of the Clean Air Act. The section has two main purposes: (1) to allow reasonable economic growth to continue in an area while making reasonable further progress to assure attainment of the standards by a fixed date; and (2) to allow  **\*852**  States greater flexibility for the former purpose than EPA's present interpretative regulations afford.

"The new provision allows States with nonattainment areas to pursue one of two options. First, the State may proceed under EPA's present 'tradeoff' or 'offset' ruling. The Administrator is authorized, moreover, to modify or amend that ruling in accordance with the intent and purposes of this section.

"The State's second option would be to revise its implementation plan in accordance with this new provision." H.R.Rep. No. 95–294, p. 211 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1290. [25]

The portion of the Senate Committee Report dealing with nonattainment areas states generally that it was intended to "supersede the EPA administrative approach," and that expansion should be permitted if a State could "demonstrate that these facilities can be accommodated within its overall plan to provide for attainment of air quality standards." S.Rep. No. 95–127,  **\*\*2787**  p. 55  **\*\*2787**  S.Rep. No. 95–127, p. 55 (1977). The Senate Report notes the value of "case-by-case review of each new or modified major source of pollution that seeks to locate in a region exceeding an ambient standard," explaining that such a review "requires matching reductions from existing sources against  **\*853**  emissions expected from the new source in order to assure that introduction of the new

source will not prevent attainment of the applicable standard by the statutory deadline." Ibid. This description of a case-by-case approach to plant additions, which emphasizes the net consequences of the construction or modification of a new source, as well as its impact on the overall achievement of the national standards, was not, however, addressed to the precise issue raised by these cases.

Senator Muskie made the following remarks:

"I should note that the test for determining whether a new or modified source is subject to the EPA interpretative regulation [the Offset Ruling]—and to the permit requirements of the revised implementation plans under the conference bill—is whether the source will emit a pollutant into an area which is exceeding a national ambient air quality standard for that pollutant—or precursor. Thus, a new source is still subject to such requirements as 'lowest achievable emission rate' even if it is constructed as a replacement for an older facility resulting in a net reduction from previous emission levels.

"A source—including an existing facility ordered to convert to coal—is subject to all the nonattainment requirements as a modified source if it makes any physical change which increases the amount of any air pollutant for which the standards in the area are exceeded." 123 Cong.Rec. 26847 (1977).

VI

As previously noted, prior to the 1977 Amendments, the EPA had adhered to a plantwide definition of the term "source" under a NSPS program. After adoption of the 1977 Amendments, proposals for a plantwide definition were considered in at least three formal proceedings.

In January 1979, the EPA considered the question whether the same restriction on new construction in nonattainment areas that had been included in its December 1976 Ruling  **\*854**  should be required in the revised SIP's that were scheduled to go into effect in July 1979. After noting that the 1976 Ruling was ambiguous on the question "whether a plant with a number of different processes and emission points would be considered a single source," 44 Fed.Reg. 3276 (1979), the EPA, in effect, provided a bifurcated answer to that question. In those areas that did not have a revised SIP in effect by July 1979, the EPA rejected the plantwide definition; on the other hand, it expressly concluded that the plantwide approach would be permissible in certain circumstances if authorized by an approved SIP. It stated:

"Where a state implementation plan is revised and implemented to satisfy the requirements of Part D, including the reasonable further progress requirement, the plan requirements for major modifications may exempt modifications of existing facilities that are accompanied by intrasource offsets so that there is no net increase in emissions. The agency endorses such exemptions, which would provide greater flexibility to sources to effectively manage their air emissions at least cost." Ibid. [26]

**2788 *855 In April, and again in September 1979, the EPA published additional comments in which it indicated that revised SIP's could adopt the plantwide definition of source in nonattainment areas in certain circumstances. See id., at 20372, 20379, 51924, 51951, 51958. On the latter occasion, the EPA made a formal rulemaking proposal that would have permitted the use of the "bubble concept" for new installations within a plant as well as for modifications of existing units. It explained:

" 'Bubble' Exemption: The use of offsets inside the same source is called the 'bubble.' EPA proposes use of the definition of 'source' (see above) to limit the use of the bubble under nonattainment requirements in the following respects:

"i. Part D SIPs that include all requirements needed to assure reasonable further progress and attainment by the deadline under section 172 and that are being carried out need not restrict the use of a plantwide bubble, the same as under the PSD proposal.

"ii. Part D SIPs that do not meet the requirements specified must limit use of the bubble by including a definition of 'installation' as an identifiable piece of process equipment." [27]

*856 Significantly, the EPA expressly noted that the word "source" might be given a plantwide definition for some purposes and a narrower definition for other purposes. It wrote:

"Source means any building structure, facility, or installation which emits or may emit any regulated pollutant. 'Building, structure, facility or installation' means plant in PSD areas and in nonattainment areas except where the growth prohibitions would apply or where no adequate SIP exists or is being carried out." Id., at 51925. [28]

The EPA's summary of its proposed Ruling discloses a flexible rather than rigid definition of the term "source" to implement various policies and programs:

"In summary, EPA is proposing two different ways to define source for different kinds of NSR programs:

"(1) For PSD and complete Part D SIPs, review would apply only to plants, with an unrestricted plant-wide bubble.

"(2) For the offset ruling, restrictions on construction, and incomplete Part D SIPs, review would apply to both plants and individual pieces of process equipment, causing the plant-wide bubble not to apply for new and modified major pieces of equipment.

"In addition, for the restrictions on construction, EPA is proposing to define 'major modification' so as to prohibit the bubble entirely. Finally, an alternative discussed but not favored is to have only pieces of process equipment reviewed, resulting in no plant-wide bubble and allowing minor pieces of equipment to escape **2789 NSR *857 regardless of whether they are within a major plant." Id., at 51934.

In August 1980, however, the EPA adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals in these cases. The EPA took particular note of the two then-recent Court of Appeals decisions, which had created the bright-line rule that the "bubble concept" should be employed in a program designed to maintain air quality but not in one designed to enhance air quality. Relying heavily on those cases, [29] EPA adopted a dual definition of "source" for nonattainment areas that required a permit whenever a change in either the entire plant, or one of its components, would result in a significant increase in emissions even if the increase was completely offset by reductions elsewhere in the plant. The EPA expressed the opinion that this interpretation was "more consistent with congressional intent" than the plantwide definition because it "would bring in more sources or modifications for review," 45 Fed.Reg. 52697 (1980), but its primary legal analysis was predicated on the two Court of Appeals decisions.

In 1981 a new administration took office and initiated a "Government-wide reexamination of regulatory burdens and complexities." 46 Fed.Reg. 16281. In the context of *858 review, the EPA reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

given the same definition in both nonattainment areas and PSD areas.

In explaining its conclusion, the EPA first noted that the definitional issue was not squarely addressed in either the statute or its legislative history and therefore that the issue involved an agency "judgment as how to best carry out the Act." Ibid. It then set forth several reasons for concluding that the plantwide definition was more appropriate. It pointed out that the dual definition "can act as a disincentive to new investment and modernization by discouraging modifications to existing facilities" and "can actually retard progress in air pollution control by discouraging replacement of older, dirtier processes or pieces of equipment with new, cleaner ones." Ibid. Moreover, the new definition "would simplify EPA's rules by using the same definition of 'source' for PSD, nonattainment new source review and the construction moratorium. This reduces confusion and inconsistency." Ibid. Finally, the agency explained that additional requirements that remained in place would accomplish the fundamental purposes of achieving attainment with NAAQS's as expeditiously as possible. [30] These conclusions were **2790 expressed *859 in a proposed rulemaking in August 1981 that was formally promulgated in October. See id., at 50766.

### VII

[7]    In this Court respondents expressly reject the basic rationale of the Court of Appeals' decision. That court viewed the statutory definition of the term "source" as sufficiently flexible to cover either a plantwide definition, a narrower definition covering each unit within a plant, or a dual definition that could apply to both the entire "bubble" and its components. It interpreted the policies of the statute, however, to mandate the plantwide definition in programs designed to maintain clean air and to forbid it in programs designed to improve air quality. Respondents place a fundamentally different construction on the statute. They contend that the text of the Act requires the EPA to use a dual definition—if either a component of a plant, or the plant as a whole, emits over 100 tons of pollutant, it is a major stationary source. They thus contend that the EPA rules adopted in 1980, insofar as they apply to the maintenance of the quality of clean air, as well as the 1981 rules which apply to nonattainment areas, violate the statute. [31]

*Statutory Language*

The definition of the term "stationary source" in § 111(a)(3) refers to "any building, structure, facility, or installation" which emits air pollution. See supra, at 2784. This definition is applicable only to the NSPS program by the express terms of the statute; the text of the statute does not make this definition *860 applicable to the permit program. Petitioners therefore maintain that there is no statutory language even relevant to ascertaining the meaning of stationary source in the permit program aside from § 302(j), which defines the term "major stationary source." See supra, at 2786. We disagree with petitioners on this point.

The definition in § 302(j) tells us what the word "major" means—a source must emit at least 100 tons of pollution to qualify—but it sheds virtually no light on the meaning of the term "stationary source." It does equate a source with a facility—a "major emitting facility" and a "major stationary source" are synonymous under § 302(j). The ordinary meaning of the term "facility" is some collection of integrated elements which has been designed and constructed to achieve some purpose. Moreover, it is certainly no affront to common English usage to take a reference to a major facility or a major source to connote an entire plant as opposed to its constituent parts. Basically, however, the language of § 302(j) simply does not compel any given interpretation of the term "source."

Respondents recognize that, and hence point to § 111(a)(3). Although the definition in that section is not literally applicable to the permit program, it sheds as much light on the meaning of the word "source" as anything in the statute. [32] As respondents point out, use of the words "building, structure, facility, or installation," as the definition of source, could be read to impose the permit conditions on an individual building that is a part of a plant. [33] A "word may have a character of its own not to be submerged by its association." 🔖 *861 *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519, 43 S.Ct. 428, 429, 67 L.Ed. 778 (1923). On the other hand, the meaning of a word must be ascertained in the context of achieving particular objectives, and the words associated with it may **2791 indicate that the true meaning of the series is to convey a common idea. The language may reasonably be interpreted to impose the requirement on any discrete, but integrated, operation which pollutes. This gives meaning to all of the terms—a single building, not part of a larger operation, would be covered if it emits more than 100 tons

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

of pollution, as would any facility, structure, or installation. Indeed, the language itself implies a "bubble concept" of sorts: each enumerated item would seem to be treated as if it were encased in a bubble. While respondents insist that each of these terms must be given a discrete meaning, they also argue that § 111(a)(3) defines "source" as that term is used in § 302(j). The latter section, however, equates a source with a facility, whereas the former defines "source" as a facility, among other items.

We are not persuaded that parsing of general terms in the text of the statute will reveal an actual intent of Congress.[34] **\*862** We know full well that this language is not dispositive; the terms are overlapping and the language is not precisely directed to the question of the applicability of a given term in the context of a larger operation. To the extent any congressional "intent" can be discerned from this language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the agency's power to regulate particular sources in order to effectuate the policies of the Act.

### Legislative History

In addition, respondents argue that the legislative history and policies of the Act foreclose the plantwide definition, and that the EPA's interpretation is not entitled to deference because it represents a sharp break with prior interpretations of the Act.

Based on our examination of the legislative history, we agree with the Court of Appeals that it is unilluminating. The general remarks pointed to by respondents "were obviously not made with this narrow issue in mind and they cannot be said to demonstrate a Congressional desire...." Jewell Ridge Coal Corp. v. Mine Workers, 325 U.S. 161, 168–169, 65 S.Ct. 1063, 1067–1068, 89 L.Ed. 1534 (1945). Respondents' argument based on the legislative history relies heavily on Senator Muskie's observation that a new source is subject to the LAER requirement.[35] But the full statement is ambiguous and like the text of § 173 itself, this comment does not tell us what a new source is, much less that it is to have an inflexible definition. We find that the legislative history as a whole is silent on the precise issue before us. It is, however, consistent with the view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments.

**\*863** More importantly, that history plainly identifies the policy concerns that motivated the enactment; the plantwide

definition is fully consistent with one of those concerns **\*\*2792** —the allowance of reasonable economic growth— and, whether or not we believe it most effectively implements the other, we must recognize that the EPA has advanced a reasonable explanation for its conclusion that the regulations serve the environmental objectives as well. See supra, at 2789–2790, and n. 29; see also supra, at 2788, n. 27. Indeed, its reasoning is supported by the public record developed in the rulemaking process,[36] as well as by certain private studies.[37]

Our review of the EPA's varying interpretations of the word "source"—both before and after the 1977 Amendments —convinces us that the agency primarily responsible for administering this important legislation has consistently interpreted it flexibly—not in a sterile textual vacuum, but in the context of implementing policy decisions in a technical and complex arena. The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations **\*864** and the wisdom of its policy on a continuing basis. Moreover, the fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute.

Significantly, it was not the agency in 1980, but rather the Court of Appeals that read the statute inflexibly to command a plantwide definition for programs designed to maintain clean air and to forbid such a definition for programs designed to improve air quality. The distinction the court drew may well be a sensible one, but our labored review of the problem has surely disclosed that it is not a distinction that Congress ever articulated itself, or one that the EPA found in the statute before the courts began to review the legislative work product. We conclude that it was the Court of Appeals, rather than Congress or any of the decisionmakers who are authorized by Congress to administer this legislation, that was primarily responsible for the 1980 position taken by the agency.

### Policy

The arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 466 of 1384

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

in a judicial forum a specific policy battle which they ultimately lost in the agency and in the 32 jurisdictions opting for the "bubble concept," but one which was never waged in the Congress. Such policy arguments are more properly addressed to legislators or administrators, not to judges. [38]

**\*865** In these cases, the Administrator's interpretation represents a reasonable accommodation of manifestly competing in **\*\*2793** terests and is entitled to deference: the regulatory scheme is technical and complex, [39] the agency considered the matter in a detailed and reasoned fashion, [40] and the decision involves reconciling conflicting policies. [41] Congress intended to accommodate both interests, but did not do so itself on the level of specificity presented by these cases. Perhaps that body consciously desired the Administrator to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question, and those on each side decided to take their chances with the scheme devised by the agency. For judicial purposes, it matters not which of these things occurred.

Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the

**\*866** agency charged with the administration of the statute in light of everyday realities.

When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency —have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." TVA v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

We hold that the EPA's definition of the term "source" is a permissible construction of the statute which seeks to accommodate progress in reducing air pollution with economic growth. "The Regulations which the Administrator has adopted provide what the agency could allowably view as ... [an] effective reconciliation of these twofold ends...." United States v. Shimer, 367 U.S., at 383, 81 S.Ct., at 1560.

The judgment of the Court of Appeals is reversed.

It is so ordered.

Justice MARSHALL and Justice REHNQUIST took no part in the consideration or decision of these cases.

Justice O'CONNOR took no part in the decision of these cases.

**All Citations**

467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, 21 ERC 1049, 14 Envtl. L. Rep. 20,507

---

# Footnotes

\*    US Reports Title: Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.

a1    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    Section 172(b)(6), 42 U.S.C. § 7502(b)(6), provides:
     "The plan provisions required by subsection (a) shall—

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 467 of 1384

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)
104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

.....

"(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173 (relating to permit requirements)." 91 Stat. 747.

2    "(i) 'Stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Act.

"(ii) 'Building, structure, facility, or installation' means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel." 40 CFR §§ 51.18(j)(1)(i) and (ii) (1983).

3    National Resources Defense Council, Inc., Citizens for a Better Environment, Inc., and North Western Ohio Lung Association, Inc.

4    Petitioners, Chevron U.S.A. Inc., American Iron and Steel Institute, American Petroleum Institute, Chemical Manufacturers Association, Inc., General Motors Corp., and Rubber Manufacturers Association were granted leave to intervene and argue in support of the regulation.

5    The court remarked in this regard:

"We regret, of course, that Congress did not advert specifically to the bubble concept's application to various Clean Air Act programs, and note that a further clarifying statutory directive would facilitate the work of the agency and of the court in their endeavors to serve the legislators' will." 222 U.S.App.D.C., at 276, n. 39, 685 F.2d, at 726, n. 39.

6    Alabama Power Co. v. Costle, 204 U.S.App.D.C. 51, 636 F.2d 323 (1979); ASARCO Inc. v. EPA, 188 U.S.App.D.C. 77, 578 F.2d 319 (1978).

7    Respondents argued below that EPA's plantwide definition of "stationary source" is contrary to the terms, legislative history, and purposes of the amended Clean Air Act. The court below rejected respondents' arguments based on the language and legislative history of the Act. It did agree with respondents contention that the regulations were inconsistent with the purposes of the Act, but did not adopt the construction of the statute advanced by respondents here. Respondents rely on the arguments rejected by the Court of Appeals in support of the judgment, and may rely on any ground that finds support in the record. See Ryerson v. United States, 312 U.S. 405, 408, 61 S.Ct. 656, 658, 85 L.Ed. 917 (1941); LeTulle v. Scofield, 308 U.S. 415, 421, 60 S.Ct. 313, 316, 84 L.Ed. 355 (1940); Langnes v. Green, 282 U.S. 531, 533–539, 51 S.Ct. 243, 244–246, 75 L.Ed. 520 (1931).

8    E.g., Black v. Cutter Laboratories, 351 U.S. 292, 297, 76 S.Ct. 824, 827, 100 L.Ed. 1188 (1956); J.E. Riley Investment Co. v. Commissioner, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940); Williams v. Norris, 12 Wheat. 117, 120, 6 L.Ed. 571 (1827); McClung v. Silliman, 6 Wheat. 598, 603, 5 L.Ed. 340 (1821).

9    The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. See, e.g., FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); SEC v. Sloan, 436 U.S. 103, 117–118, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978); FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745–746, 93 S.Ct. 1773, 1784–1785, 36 L.Ed.2d 620 (1973); Volkswagenwerk v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); FTC v. Colgate–Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965); Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587 (1932); Webster v. Luther, 163 U.S. 331, 342, 16 S.Ct. 963, 967, 41 L.Ed. 179 (1896). If a court, employing traditional tools

AR.04308

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

10    See generally, R. Pound, The Spirit of the Common Law 174–175 (1921).

11    The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. FEC v. Democratic Senatorial Campaign Committee, 454 U.S., at 39, 102 S.Ct., at 46; Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946); McLaren v. Fleischer, 256 U.S. 477, 480–481, 41 S.Ct. 577, 577–578, 65 L.Ed. 1052 (1921).

12    See, e.g., United States v. Morton, 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984) Schweiker v. Gray Panthers, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); Batterton v. Francis, 432 U.S. 416, 424–426, 97 S.Ct. 2399, 2404–2406, 53 L.Ed.2d 448 (1977); American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 235–237, 57 S.Ct. 170, 172–173, 81 L.Ed. 142 (1936).

13    E.g., INS v. Jong Ha Wang, 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981); Train v. Natural Resources Defense Council, Inc., 421 U.S., at 87, 95 S.Ct., at 1485.

14    Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389, 104 S.Ct. 2472, 2479–2480, 81 L.Ed.2d 301 (1984); Blum v. Bacon, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); Union Electric Co. v. EPA, 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976); Investment Company Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971); Unemployment Compensation Comm'n v. Aragon, 329 U.S., at 153–154, 67 S.Ct., at 250–251; NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944); McLaren v. Fleischer, 256 U.S., at 480–481, 41 S.Ct., at 577–578; Webster v. Luther, 163 U.S., at 342, 16 S.Ct., at 967; Brown v. United States, 113 U.S. 568, 570–571, 5 S.Ct. 648, 649–650, 28 L.Ed. 1079 (1885); United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588 (1878); Edwards' Lessee v. Darby, 12 Wheat. 206, 210, 6 L.Ed. 603 (1827).

15    Primary standards were defined as those whose attainment and maintenance were necessary to protect the public health, and secondary standards were intended to specify a level of air quality that would protect the public welfare.

16    See §§ 110(a)(2)(D) and 110(a)(4).

17    The Court of Appeals ultimately held that this plantwide approach was prohibited by the 1970 Act, see ASARCO Inc., 188 U.S.App.D.C., at 83–84, 578 F.2d, at 325–327. This decision was rendered after enactment of the 1977 Amendments, and hence the standard was in effect when Congress enacted the 1977 Amendments.

18    See Report of the National Commission on Air Quality, To Breathe Clean Air, 3.3–20 through 3.3–33 (1981).

19    Comprehensive bills did pass both Chambers of Congress; the Conference Report was rejected in the Senate. 122 Cong.Rec. 34375–34403, 34405–34418 (1976).

20    For example, it stated:
"Particularly with regard to the primary NAAQS's, Congress and the Courts have made clear that economic considerations must be subordinated to NAAQS achievement and maintenance. While the ruling allows for some growth in areas violating a NAAQS if the net effect is to insure further progress toward NAAQS

AR.04309

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

achievement, the Act does not allow economic growth to be accommodated at the expense of the public health." 41 Fed.Reg. 55527 (1976).

21 In January 1979, the EPA noted that the 1976 Ruling was ambiguous concerning this issue:

"A number of commenters indicated the need for a more explicit definition of 'source.' Some readers found that it was unclear under the 1976 Ruling whether a plant with a number of different processes and emission points would be considered a single source. The changes set forth below define a source as 'any structure, building, facility, equipment, installation, or operation (or combination thereof) which is located on one or more contiguous or adjacent properties and which is owned or operated by the same person (or by persons under common control.' This definition precludes a large plant from being separated into individual production lines for purposes of determining applicability of the offset requirements." 44 Fed.Reg. 3276.

22 Specifically, the controversy in these cases involves the meaning of the term "major stationary sources" in § 172(b)(6) of the Act, 42 U.S.C. § 7502(b)(6). The meaning of the term "proposed source" in § 173(2) of the Act, 42 U.S.C. § 7503(2), is not at issue.

23 Thus, among other requirements, § 172(b) provided that the SIP's shall—

"(3) require, in the interim, reasonable further progress (as defined in section 171(1)) including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology;

"(4) include a comprehensive, accurate, current inventory of actual emissions from all sources (as provided by rule of the Administrator) of each such pollutant for each such area which is revised and resubmitted as frequently as may be necessary to assure that the requirements of paragraph (3) are met and to assess the need for additional reductions to assure attainment of each standard by the date required under paragraph (1);

"(5) expressly identify and quantify the emissions, if any, of any such pollutant which will be allowed to result from the construction and operation of major new or modified stationary sources for each such area; ...

.....

"(8) contain emission limitations, schedules of compliance and such other measures as may be necessary to meet the requirements of this section." 91 Stat. 747.

Section 171(1) provided:

"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 110(a)(2)(I) and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 172(a)." Id., at 746.

24 Section 171(3) provides:

"(3) The term 'lowest achievable emission rate' means for any source, that rate of emissions which reflects—

"(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or

"(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent. "In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance."

The LAER requirement is defined in terms that make it even more stringent than the applicable new source performance standard developed under § 111 of the Act, as amended by the 1970 statute.

25 During the floor debates Congressman Waxman remarked that the legislation struck

"a proper balance between environmental controls and economic growth in the dirty air areas of America.... There is no other single issue which more clearly poses the conflict between pollution control and new jobs. We have determined that neither need be compromised....

"This is a fair and balanced approach, which will not undermine our economic vitality, or impede achievement of our ultimate environmental objectives." 123 Cong.Rec. 27076 (1977).

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

The second "main purpose" of the provision—allowing the States "greater flexibility" than the EPA's interpretative Ruling—as well as the reference to the EPA's authority to amend its Ruling in accordance with the intent of the section, is entirely consistent with the view that Congress did not intend to freeze the definition of "source" contained in the existing regulation into a rigid statutory requirement.

26    In the same Ruling, the EPA added:

"The above exemption is permitted under the SIP because, to be approved under Part D, plan revisions due by January 1979 must contain adopted measures assuring that reasonable further progress will be made. Furthermore, in most circumstances, the measures adopted by January 1979 must be sufficient to actually provide for attainment of the standards by the dates required under the Act, and in all circumstances measures adopted by 1982 must provide for attainment. See Section 172 of the Act and 43 FR 21673–21677 (May 19, 1978). Also, Congress intended under Section 173 of the Act that States would have some latitude to depart from the strict requirements of this Ruling when the State plan is revised and is being carried out in accordance with Part D. Under a Part D plan, therefore, there is less need to subject a modification of an existing facility to LAER and other stringent requirements if the modification is accompanied by sufficient intrasource offsets so that there is no net increase in emissions." 44 Fed.Reg. 3277 (1979).

27    Id., at 51926. Later in that Ruling, the EPA added:

"However, EPA believes that complete Part D SIPs, which contain adopted and enforceable requirements sufficient to assure attainment, may apply the approach proposed above for PSD, with plant-wide review but no review of individual pieces of equipment. Use of only a plant-wide definition of source will permit plant-wide offsets for avoiding NSR of new or modified pieces of equipment. However, this is only appropriate once a SIP is adopted that will assure the reductions in existing emissions necessary for attainment. See 44 FR 3276 col. 3 (January 16, 1979). If the level of emissions allowed in the SIP is low enough to assure reasonable further progress and attainment, new construction or modifications with enough offset credit to prevent an emission increase should not jeopardize attainment." Id., at 51933.

28    In its explanation of why the use of the "bubble concept" was especially appropriate in preventing significant deterioration (PSD) in clean air areas, the EPA stated: "In addition, application of the bubble on a plant-wide basis encourages voluntary upgrading of equipment, and growth in productive capacity." Id., at 51932.

29    "The dual definition also is consistent with Alabama Power and ASARCO. Alabama Power held that EPA had broad discretion to define the constituent terms of 'source' so as best to effectuate the purposes of the statute. Different definitions of 'source' can therefore be used for different sections of the statute....

"Moreover, Alabama Power and ASARCO taken together suggest that there is a distinction between Clean Air Act programs designed to enhance air quality and those designed only to maintain air quality....

.....

"Promulgation of the dual definition follows the mandate of Alabama Power, which held that, while EPA could not define 'source' as a combination of sources, EPA had broad discretion to define 'building,' 'structure,' 'facility,' and 'installation' so as to best accomplish the purposes of the Act." 45 Fed.Reg. 52697 (1980).

30    It stated:

"5. States will remain subject to the requirement that for all nonattainment areas they demonstrate attainment of NAAQS as expeditiously as practicable and show reasonable further progress toward such attainment. Thus, the proposed change in the mandatory scope of nonattainment new source review should not interfere with the fundamental purpose of Part D of the Act.

"6. New Source Performance Standards (NSPS) will continue to apply to many new or modified facilities and will assure use of the most up-to-date pollution control techniques regardless of the applicability of nonattainment area new source review.

"7. In order to avoid nonattainment area new source review, a major plant undergoing modification must show that it will not experience a significant net increase in emissions. Where overall emissions increase significantly, review will continue to be required." 46 Fed.Reg. 16281 (1981).

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 471 of 1384

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

31  "What EPA may not do, however, is define all four terms to mean only plants. In the 1980 PSD rules, EPA did just that. EPA compounded the mistake in the 1981 rules here under review, in which it abandoned the dual definition." Brief for Respondents 29, n. 56.

32  We note that the EPA in fact adopted the language of that definition in its regulations under the permit program. 40 CFR §§ 51.18(j)(1)(i), (ii) (1983).

33  Since the regulations give the States the option to define an individual unit as a source, see 40 CFR § 51.18(j)(1) (1983), petitioners do not dispute that the terms can be read as respondents suggest.

34  The argument based on the text of § 173, which defines the permit requirements for nonattainment areas, is a classic example of circular reasoning. One of the permit requirements is that "the proposed source is required to comply with the lowest achievable emission rate" (LAER). Although a State may submit a revised SIP that provides for the waiver of another requirement—the "offset condition"—the SIP may not provide for a waiver of the LAER condition for any proposed source. Respondents argue that the plantwide definition of the term "source" makes it unnecessary for newly constructed units within the plant to satisfy the LAER requirement if their emissions are offset by the reductions achieved by the retirement of older equipment. Thus, according to respondents, the plantwide definition allows what the statute explicitly prohibits—the waiver of the LAER requirement for the newly constructed units. But this argument proves nothing because the statute does not prohibit the waiver unless the proposed new unit is indeed subject to the permit program. If it is not, the statute does not impose the LAER requirement at all and there is no need to reach any waiver question. In other words, § 173 of the statute merely deals with the consequences of the definition of the term "source" and does not define the term.

35  See supra, at 2787. We note that Senator Muskie was not critical of the EPA's use of the "bubble concept" in one NSPS program prior to the 1977 amendments. See ibid.

36  See, for example, the statement of the New York State Department of Environmental Conservation, pointing out that denying a source owner flexibility in selecting options made it "simpler and cheaper to operate old, more polluting sources than to trade up...." App. 128–129.

37  "Economists have proposed that economic incentives be substituted for the cumbersome administrative-legal framework. The objective is to make the profit and cost incentives that work so well in the marketplace work for pollution control.... [The 'bubble' or 'netting' concept] is a first attempt in this direction. By giving a plant manager flexibility to find the places and processes within a plant that control emissions most cheaply, pollution control can be achieved more quickly and cheaply." L. Lave & G. Omenn, Cleaning Air: Reforming the Clean Air Act 28 (1981) (footnote omitted).

38  Respondents point out if a brand new factory that will emit over 100 tons of pollutants is constructed in a nonattainment area, that plant must obtain a permit pursuant to § 172(b)(6) and in order to do so, it must satisfy the § 173 conditions, including the LAER requirement. Respondents argue if an old plant containing several large emitting units is to be modernized by the replacement of one or more units emitting over 100 tons of pollutant with a new unit emitting less—but still more than 100 tons—the result should be no different simply because "it happens to be built not at a new site, but within a pre-existing plant." Brief for Respondents 4.

39  See e.g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S., at 390, 104 S.Ct., at 2480 (1984).

40  See SEC v. Sloan, 436 U.S., at 117, 98 S.Ct., at 1711; Adamo Wrecking Co. v. United States, 434 U.S. 275, 287, n. 5, 98 S.Ct. 566, 574, n. 5, 54 L.Ed.2d 538 (1978); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

41  See Capital Cities Cable, Inc. v. Crisp, 467 U.S. at 699–700, 104 S.Ct. at 2700–2701; United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Manufactured Housing Institute v. U.S. Environmental Protection Agency, 4th Cir., October 25, 2006

755 F.2d 1098
United States Court of Appeals,
Fourth Circuit.

CHOCOLATE MANUFACTURERS ASSOCIATION OF the UNITED STATES, Appellant,

v.

John R. BLOCK, Sec. U.S. Dept. of Agriculture; Samuel J. Cornelius, Administrator,
Food and Nutrition Service and U.S. Department of Agriculture, Appellees.

No. 83–2053.
|
Argued Oct. 4, 1984.
|
Decided Feb. 27, 1985.

**Synopsis**

Manufacturers of chocolate sought review of rule promulgated by Food and Nutrition Services of Department of Agriculture that prohibited use of chocolate flavored milk in federally funded special supplemental food program for women, infants and children. The United States District Court for the Eastern District of Virginia, Alexandria, James C. Cacheris, J., denied relief, and appeal was taken. The Court of Appeals, Sprouse, Circuit Judge, held that Department's proposed rule making did not provide adequate notice that elimination of flavored milk would be considered in rule-making procedure.

Reversed and remanded.

West Headnotes (10)

**[1]**  **Administrative Law and Procedure** 👉 Notice

**Administrative Law and Procedure** 👉 Comment and Hearing

Requirement of notice and fair opportunity to be heard is basic to administrative law.

**[2]**  **Administrative Law and Procedure** 👉 Notice and comment in general

Purpose of notice and comment procedure in administrative rule making is both to allow agency to benefit from experience and input of parties who file comments and to see to it that agency maintains flexible and open-minded attitude towards its own rules. 5 U.S.C.A. § 553(b)(3).

7 Cases that cite this headnote

**[3]**  **Administrative Law and Procedure** 👉 Notice and comment in general

Notice and comment procedure of rule making encourages public participation in administrative process and educates agency, thereby helping to ensure informed agency decision making. 5 U.S.C.A. § 553(b)(3).

AR.04313

6 Cases that cite this headnote

[4]    **Administrative Law and Procedure**  👈  Change of Position or Course;  Stare Decisis

Agency may promulgate final rule that differs in some particulars from its proposal.

[5]    **Administrative Law and Procedure**  👈  Contents and sufficiency

**Administrative Law and Procedure**  👈  Change of Position or Course;  Stare Decisis

Agency does not have carte blanche to establish rule contrary to its original proposal simply because it receives suggestions to alter it during comment period, but rather, interested party must have been alerted by notice to possibility of changes eventually adopted from comments.

7 Cases that cite this headnote

[6]    **Administrative Law and Procedure**  👈  Contents and sufficiency

Although agency, in its notice of proposed rule making, need not identify precisely every potential regulatory change, notice must be sufficiently descriptive to provide interested parties with fair opportunity to comment and to participate in rule making.

12 Cases that cite this headnote

[7]    **Administrative Law and Procedure**  👈  Notice and comment;  response

Appellate review of changes in proposed rule after comments is more specifically controlled in circumstances by each case than most administrative appeals.

[8]    **Administrative Law and Procedure**  👈  Rule differing from published notice

**Administrative Law and Procedure**  👈  Explanation or reasons for change

Proposed rule must fairly apprise interested parties of potential scope and substance of substantially revised final rule and substantial change must relate in part to comments received.

5 Cases that cite this headnote

[9]    **Administrative Law and Procedure**  👈  Rule differing from published notice

If final rule materially alters issues involved in rule making or if final rule substantially departs from terms or substance of proposed rule, notice is inadequate.

6 Cases that cite this headnote

[10]    **Public Assistance**  👈  Administrative proceedings

Department of Agriculture's rule making did not provide adequate notice that elimination of flavored milk would be considered in rule-making procedure where discussion in preamble to proposed rule was very detailed and identified specific foods which agency was examining for excess sugar; this specificity, together with total silence concerning any suggestion of eliminating flavored milk, strongly indicated flavored milk was not at issue, proposed

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 474 of 1384

**Chocolate Mfrs. Ass'n of U.S. v. Block, 755 F.2d 1098 (1985)**

rule positively and unqualifiedly approved continued use of flavored milk, and flavored milk had been approved, in special supplemental food program for women, infants, and children since its conception.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1099** Peter Barton Hutt, Washington, D.C. (Richard A. Friedman, Laird Hart, Covington & Burling, Washington, D.C., Chris Beatley, Alexandria, Va., on brief), for appellant.

Gregory S. Walden, Dept. of Justice, Washington, D.C. (John B. Koch, Dept. of Agriculture; Richard K. Willard, Acting Asst. Atty. Gen., Carolyn B. Kuhl, Deputy Asst. Atty. Gen., Washington, D.C.; Elsie L. Munsell, U.S. Atty., Alexandria, Va.; Anthony J. Steinmeyer, Dept. of Justice, Washington, D.C., on brief), for appellees.

Before RUSSELL and SPROUSE, Circuit Judges, and HARGROVE, United States District Judge for the District of Maryland, sitting by designation.

**Opinion**

SPROUSE, Circuit Judge:

Chocolate Manufacturers Association (CMA) appeals from the decision of the district court denying it relief from a rule promulgated by the Food and Nutrition Service (FNS) of the United States Department **\*1100** of Agriculture (USDA or Department). CMA protests that part of the rule that prohibits the use of chocolate flavored milk [1] in the federally funded Special Supplemental Food Program for Women, Infants and Children (WIC Program) [2]. Holding that the Department's proposed rulemaking did not provide adequate notice that the elimination of flavored milk would be considered in the rulemaking procedure, we reverse.

I

Since 1946 USDA has administered a variety of child nutrition programs under the National School Lunch Act [3] and the Child Nutrition Act of 1966. [4] Besides the WIC Program, these programs are the National School Lunch Program [5], the Special Milk Program for Children [6], the School Breakfast Program [7], the Summer Food Service Program [8], and the Child Care Food Program. [9]

The WIC Program was established by Congress in 1972 to assist pregnant, postpartum, and breastfeeding women, infants and young children from families with inadequate income whose physical and mental health is in danger because of inadequate nutrition or health care. [10] Under the program, the Department designs food packages reflecting the different nutritional needs of women, infants, and children and provides cash grants to state or local agencies, which distribute cash or vouchers to qualifying individuals in accordance with Departmental regulations as to the type and quantity of food.

In 1975 Congress revised and extended the WIC Program through fiscal year 1978 [11] and, for the first time, defined the "supplemental foods" which the program was established to provide. The term

Chocolate Mfrs. Ass'n of U.S. v. Block, 755 F.2d 1098 (1985)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 475 of 1384

shall mean those foods containing nutrients known to be lacking in the diets of populations at nutritional risk and, in particular, those foods and food products containing high-quality protein, iron, calcium, vitamin A, and vitamin C.... The contents of the food package shall be made available in such a manner as to provide flexibility, taking into account medical and nutritional objectives and cultural eating patterns.

Pub.L. No. 94–105, § 17(g)(3), 89 Stat. 511, 520 (1975) (codified at 42 U.S.C. § 1786(g)(3) (1976)) (replaced by 42 U.S.C. § 1786(b)(14) (1982)).

Pursuant to this statutory definition, the Department promulgated new regulations specifying the contents of WIC Program food packages. These regulations specified that flavored milk was an acceptable substitute for fluid whole milk in the food packages for women and children, but not infants. [12] This regulation formalized the Department's practice of permitting the substitution of flavored milk, a practice observed in the WIC Program since its inception in 1973 as well as in several of the other food programs administered by the Department.

In 1978 Congress, in extending the WIC Program through fiscal year 1982, redefined the term "supplemental foods" to mean:

> those foods containing nutrients determined by nutritional research to be lacking **\*1101** in the diets of pregnant, breastfeeding, and postpartum women, infants, and children, as prescribed by the Secretary. State agencies may, with the approval of the Secretary, substitute different foods providing the nutritional equivalent of foods prescribed by the Secretary, to allow for different cultural eating patterns.

Pub.L. No. 95–627, § 17(b)(14), 92 Stat. 3603, 3613 (1978) (codified at 42 U.S.C. § 1786(b)(14) (1982)). Congress stated further:

> The Secretary shall prescribe by regulation supplemental foods to be made available in the program under this section. To the degree possible, the Secretary shall assure that the fat, sugar, and salt content of the prescribed foods is appropriate.

Id. at § 17(f)(12), 92 Stat. at 3616 (codified at 42 U.S.C. § 1786(f)(12) (1982)). To comply with this statutory redefinition, the Department moved to redraft its regulations specifying the WIC Program food packages. In doing so it relied upon information collected during an extensive investigative effort which had begun in 1977. In June 1977 the Department held public hearings in seven cities and elicited testimony on the structure and administration of the WIC Program. The Department invited many interested and informed parties to attend these hearings—the governor and chief health officer of every state, the House Education and Labor Committee, the Senate Select Committee on Nutrition Evaluation, state WIC coordinators, industry representatives, and professional and advocacy groups. In addition to information gathered at the public hearings, the Department received periodic reports from the National Advisory Council on Maternal, Infant, and Fetal Nutrition, as well as recommendations from a Food Package Advisory Panel convened in October 1978.

Using this information as well as its own research as a basis, the Department in November 1979 published for comment the proposed rule at issue in this case. 44 Fed.Reg. 69254 (1979). Along with the proposed rule, the Department published a preamble discussing the general purpose of the rule and acknowledging the congressional directive that the Department design food packages containing the requisite nutritional value and appropriate levels of fat, sugar, and salt. Id. at 69254. Discussing the issue of sugar at length, it noted, for example, that continued inclusion of high sugar cereals may be "contrary to nutrition education principles and may lead to unsound eating practices." Id. at 69263. It also noted that high sugar foods are

more expensive than foods with lower sugar content, and that allowing them would be "inconsistent with the goal of teaching participants economical food buying patterns." *Id.*

The rule proposed a maximum sugar content specifically for authorized cereals. The preamble also contained a discussion of the sugar content in juice, but the Department did not propose to reduce the allowable amount of sugar in juice because of technical problems involved in any reduction. Neither the rule nor the preamble discussed sugar in relation to flavoring in milk. Under the proposed rule, the food packages for women and children without special dietary needs included milk that could be "flavored or unflavored." *Id.*

The notice allowed sixty days for comment and specifically invited comment on the entire scope of the proposed rules: "The public is invited to submit written comments in favor of or in objection to the proposed regulations or to make recommendations for alternatives not considered in the proposed regulations." *Id.* at 69255. Over 1,000 comments were received from state and local agencies, congressional offices, interest groups, and WIC Program participants and others. Seventy-eight commenters, mostly local WIC administrators, recommended that the agency delete flavored milk from the list of approved supplemental foods.

In promulgating the final rule, the Department, responding to these public comments, deleted flavored milk from the list, explaining:

> **\*1102**  In the previous regulations, women and children were allowed to receive flavored or unflavored milk. No change in this provision was proposed by the Department. However, 78 commenters requested the deletion of flavored milk from the food packages since flavored milk has a higher sugar content than unflavored milk. They indicated that providing flavored milk contradicts nutrition education and the Department's proposal to limit sugar in the food packages. Furthermore, flavored milk is more expensive than unflavored milk. The Department agrees with these concerns. There are significant differences in the sugar content of fluid whole milk and low fat chocolate milk. Fluid whole milk supplies 12.0 grams of carbohydrate per cup compared to 27.3 grams of carbohydrate per cup provided by low fat chocolate milk. If we assume that the major portion of carbohydrate in milk is in the form of simple sugar, fluid whole milk contains 4.9% sugar contrasted with 10.9% sugar in low fat chocolate milk. Therefore, to reinforce nutrition education, for consistency with the Department's philosophy about sugar in the food packages, and to maintain food package costs at economic levels, the Department is deleting flavored milk from the food packages for women and children. Although the deletion of flavored milk was not proposed, the comments and the Department's policy on sugar validate this change.

45 Fed.Reg. 74854, 74865–66 (1980).

After the final rule was issued, CMA petitioned the Department to reopen the rulemaking to allow it to comment, maintaining that it had been misled into believing that the deletion of flavored milk would not be considered. In a letter to CMA dated November 18, 1981, the Department indicated that it would reopen the issue of flavored milk for "further public comments" and would request "rationale both supporting and opposing the disallowance of flavored milk in the WIC Program." It subsequently reversed this position, however, and declined to reopen the rulemaking procedure.

On this appeal, CMA contends first that the Department did not provide notice that the disallowance of flavored milk would be considered, and second that the Department gave no reasoned justification for changing its position about the nutritional value of chocolate in the food distributed under its authority. The Department responds to the first contention by arguing that its notice advised the public of its general concern about high sugar content in the proposed food packages and that this should have alerted potentially interested commenters that it would consider eliminating any food with high sugar content. It also argues in

**Chocolate Mfrs. Ass'n of U.S. v. Block, 755 F.2d 1098 (1985)**

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 477 of 1384

effect that the inclusion of flavored milk in the proposed rule carried with it the implication that both inclusion and exclusion would be considered in the rulemaking process. Because we agree with CMA that the Department provided inadequate notice and, therefore, that it must reopen the comment period on the rule, we do not reach the issue of the reasonable justification for its change of position.

<center>II</center>

**[1]**    The requirement of notice and a fair opportunity to be heard is basic to administrative law. *See* 1 K. Davis, *Administrative Law Treatise* § 6.1 at 450 (2d ed. 1978). Our single chore is to determine if the Department's notice provided interested persons, including CMA, with that opportunity. We must decide whether inclusion of flavored milk in the allowable food packages under the proposed rule should have alerted interested persons that the Department might reverse its position and exclude flavored milk if adverse comments recommended its deletion from the program.

**[2]    [3]**    Section 4 of the Administrative Procedure Act (APA) requires that the notice in the Federal Register of a proposed rulemaking contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved." **\*1103** 5 U.S.C. § 553(b)(3) (1982). The purpose of the notice-and-comment procedure is both "to allow the agency to benefit from the experience and input of the parties who file comments ... and to see to it that the agency maintains a flexible and open-minded attitude towards its own rules." *National Tour Brokers Ass'n v. United States,* 591 F.2d 896, 902 (D.C.Cir.1978). The notice-and-comment procedure encourages public participation in the administrative process and educates the agency, thereby helping to ensure informed agency decisionmaking. *Spartan Radiocasting Co. v. FCC,* 619 F.2d 314, 321 (4th Cir.1980); *BASF Wyandotte Corp. v. Castle,* 598 F.2d 637, 642 (1st Cir.1979), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980).

The Department's published notice here consisted of the proposed rule and a preamble discussing the negative effect of high sugar content in general and specifically in relation to some foods such as cereals and juices, but it did not mention high sugar content in flavored milk. The proposed rule eliminated certain foods with high sugar content but specifically authorized flavored milk as part of the permissible diet. In a discussion characterized by pointed identification of foods with high sugar content, flavored milk was conspicuous by its exclusion. If after comments the agency had adopted without change the proposed rule as its final rule, there could have been no possible objection to the adequacy of notice. The public was fully notified as to what the Department considered to be a healthy and adequate diet for its target group. The final rule, however, dramatically altered the proposed rule, changing for the first time the milk content of the diet by deleting flavored milk. The agency concedes that the elimination of flavored milk by the final rule is a complete reversal from its treatment in the proposed rule, but it explains that the reversal was caused by the comments received from 78 interested parties—primarily professional administrators of the WIC Program.

This presents then not the simple question of whether the notice of a proposed rule adequately informs the public of its intent, but rather the question of how to judge the adequacy of the notice when the proposal it describes is replaced by a final rule which reaches a conclusion exactly opposite to that proposed, on the basis of comments received from parties representing only a single view of a controversy. [13]    In reviewing the propriety of such agency action, we are not constrained by the same degree of deference we afford most agency determinations. "Though our review of an agency's final decision is relatively narrow, we must be strict in reviewing an agency's compliance with procedural rules." *BASF Wyandotte Corp. v. Castle,* 598 F.2d at 641; *see also* *Weyerhauser Co. v. Castle,* 590 F.2d 1011, 1025–28 (D.C.Cir.1978) (whereas a court defers to an agency's technical judgments, it is less hesitant to reject the agency's interpretation of statutes, and in reviewing an agency's procedural integrity, the court relies on its own independent judgment). "The question of adequacy of notice where a proposed rule is changed after comment ... requires careful consideration on a case-by-case basis." *BASF,* 598 F.2d at 642.

**[4]**  **[5]**  **[6]**  There is no question that an agency may promulgate a final rule that differs  ***1104*  in some particulars from its proposal. Otherwise the agency "can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 n. 51 (D.C.Cir.1973). An agency, however, does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period. An interested party must have been alerted by the notice to the possibility of the changes eventually adopted from the comments. *Wagner Electric Corporation v. Volpe,* 466 F.2d 1013, 1019 (3rd Cir.1972). Although an agency, in its notice of proposed rulemaking, need not identify precisely every potential regulatory change, *Spartan Radiocasting Co.,* 619 F.2d at 321–22 (quoting *Consolidation Coal Co. v. Costle,* 604 F.2d 239, 248 (4th Cir.1979), *rev'd on other grounds sub nom. EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980), the notice must be sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rulemaking. *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 758, 92 S.Ct. 1941, 1951, 32 L.Ed.2d 453 (1972); *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 392–94 (D.C.Cir.1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

**[7]**  As we have indicated, appellate review of changes in a proposed rule after comments is more specifically controlled by the circumstances of each case than most administrative appeals. Nevertheless, a review of decisions of our sister circuits performing similar tasks is helpful. In *BASF Wyandotte Corp. v. Costle,* 598 F.2d 637 (1st Cir.1979), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980), the court considered an EPA regulation controlling the discharge of pollutants into navigable waters by the pesticide industry. The EPA originally proposed dividing the organic pesticide industry into three subcategories, setting different pollutant standards for each one. The industry, arguing for expansion of the number of subcategories and, therefore, pollutant standards, submitted comments demonstrating that the proposed three subcategories were indistinguishable. The EPA, while agreeing with the comments, chose a different solution: it altered its initial rule by eliminating the subcategories and applying uniform standards throughout the entire organic pesticide industry. The industry complained that the EPA's decision to contract rather than expand the number of subcategories took them entirely by surprise. "The essential inquiry," the court said, "is whether the commentators have had a fair opportunity to present their views on the contents of the final plan." *Id.* at 642. The First Circuit reasoned that even if the initial rule had proposed uniform standards, the content of petitioner's comments would not have been different for they still would have argued, albeit more voluminously and vociferously, for more subcategories. *Id.* at 644. The petitioners, therefore, "had a fair opportunity to present their views." *Id.*

In *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615 (D.C.Cir.1973), the court considered an EPA decision to deny applications by vehicle manufacturers for a one-year suspension of the emission standards for light-duty vehicles. The court upheld the agency's denial even though the petitioners were precluded from commenting on the methodology that the EPA had used to determine that compliance with the emission standards was technologically possible. The court based this holding on the fact that the methodology in question was developed in part on the basis of the petitioners' submissions at prior hearings. The court stated that "[t]he requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions." *Id.* at 632 (footnote omitted).

**[8]**  In *South Terminal Corp. v. EPA,* 504 F.2d 646 (1st Cir.1974), the court considered  ***1105*  an air quality transportation control plan for Boston, Massachusetts, which varied substantially from the proposal described in the notice. The petitioners contended that they had no meaningful notice of the substance of the plan. The *South Terminal* court identified two factors of primary importance in determining whether a substantially revised final rule is promulgated in accordance with the APA: the changes in the original rule must be "in character with the original scheme" and "a logical outgrowth" of the notice and comment already given. *Id.* at 658, 659; *see also BASF Wyandotte Corp. v. Costle,* 598 F.2d at 642. In rejecting the petitioners' claim, the court stated: "Although the changes were substantial, they were in character with the original scheme and were additionally

foreshadowed in proposals and comments advanced during the rulemaking. [In addition, the parties] had been warned that strategies might be modified in light of their suggestions." 504 F.2d at 658. A proposed rule, therefore, must fairly apprise interested parties of the potential scope and substance of a substantially revised final rule and, under this approach, a substantial change must relate in part to the comments received.

While considering factors similar to those applied in the above cases, the Third Circuit, in *Wagner Electric Corporation v. Volpe,* 466 F.2d 1013 (3rd Cir.1972), found notice inadequate where a final rule had been substantially altered from the one described in the initial notice. The National Highway Traffic Safety Administration had published a proposed rule governing hazard warning flashers. The proposed rule would have eliminated the permissible failure rate for flashers, but it said nothing about changing the pertinent performance criteria. The final rule substantially downgraded the performance criteria for flashers. Despite the fact that several comments by manufacturers suggested downgrading the performance criteria, the court concluded that the agency's proposed rule provided inadequate notice of its final rule because it failed to apprise all interested parties of the issue of performance criteria. *Id.* at 1019–20. In support of this conclusion, the court noted the absence of comments from groups which could be expected to oppose downgrading the performance criteria, for example, consumer groups and state highway agencies. *Id.*

 **[9]**    The test devised by the First Circuit for determining adequacy of notice of a change in a proposed rule occurring after comments appears to us to be sound: notice is adequate if the changes in the original plan "are in character with the original scheme," and the final rule is a "logical outgrowth" of the notice and comments already given. *See, e.g., BASF Wyandotte Corp. v. Costle,* 598 F.2d 637, 642 (1st Cir.1979), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980); *South Terminal Corp. v. EPA,* 504 F.2d 646, 659 (1st Cir.1974). Other circuits also have adopted some form of the "logical outgrowth" test. *See, e.g., Sierra Club v. Costle,* 657 F.2d 298, 352 (D.C.Cir.1981) (logical outgrowth of the notice and comments); *Taylor Diving & Salvage Co. v. Dept. of Labor,* 599 F.2d 622, 626 (5th Cir.1979) (logical outgrowth of the standard originally proposed). Stated differently, if the final rule materially alters the issues involved in the rulemaking or, as stated in *Rowell v. Andrus,* 631 F.2d 699, 702 n. 2 (10th Cir.1980), if the final rule "substantially departs from the terms or substance of the proposed rule," the notice is inadequate.

There can be no doubt that the final rule in the instant case was the "outgrowth" of the original rule proposed by the agency, but the question of whether the change in it was in character with the original scheme and whether it was a "*logical* outgrowth" is not easy to answer. In resolving this difficult issue, we recognize that, although helpful, verbal formulations are not omnipotent talismans, and we agree that in the final analysis each case "must turn on how well the notice that the agency gave serves the policies underlying the notice requirement." *Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983). Under either view, we do  **\*1106**  not feel that CMA was fairly treated or that the administrative rulemaking process was well served by the drastic alteration of the rule without an opportunity for CMA to be heard.

It is apparent that for many years the Department of Agriculture has permitted the use of chocolate in some form in the food distribution programs that it administers. The only time the Department has proposed to remove chocolate in any form from its programs was in April 1978 when it sought to characterize chocolate as a candy and remove it from the School Lunch Program. That proposal was withdrawn after CMA commented, supporting chocolate as a part of the diet. Chocolate flavored milk has been a permissible part of the WIC Program diet since its inception and there have been no proposals for its removal until the present controversy.

The Department sponsored commendable information-gathering proceedings prior to publishing its proposed rule. Together with its own research, the information gathered in the pre-publication information solicitations formed the basis for the proposed rule. Most of the same information was presented to Congress prior to enactment of the 1978 statute that precipitated the 1979 rulemaking here in controversy. The National Advisory Council on Maternal, Infant, and Fetal Nutrition provided

information and advice. Regional council meetings were open to the public and held in diverse areas of the country. Department of Agriculture personnel attended a number of regional, state, and local meetings and gathered opinions concerning possible changes in the food packages. The agency also gathered a food package advisory panel of experts seeking their recommendations. Food packages were designed based on the information and advice gleaned from these sources. In all of these activities setting out and discussing food packages, including the proposed rule and its preamble, the Department never suggested that flavored milk be removed from the WIC Program.

The published preamble to the proposed rule consisted of twelve pages in the Federal Register discussing in detail factors that would be considered in making the final rule. Two pages were devoted to a general discussion of nutrients, including protein, iron, calcium, vitamin A, vitamin C, folic acid, zinc, and fiber, and the dangers of overconsumption of sugar, fat, and salt. The preamble discussed some foods containing these ingredients and foods posing specific problems. It did not discuss flavored milk.

In the next eight pages of the preamble, the nutrition content of food packages was discussed—under the general headings of "cereal" and "juice" for infants; and "eggs," "milk," "cheese," "peanut butter and mature dried beans and peas," "juice," "additional foods," "cereals," "iron," "sugar," "whole grain cereals," "highly fortified cereals," and "artificial flavors and colors" for women and children. The only reference to milk concerned the correct quantity to be provided to children, *i.e.,* 24 quarts per month instead of 28 quarts. Although there was considerable discussion of the sugar content of juice and cereal, there was none concerning flavored milk. Likewise, there was considerable discussion of artificial flavor and color in cereal but none concerning flavored milk. The only reference to flavored milk was in the two-page discussion of the individual food packages, which noted that the proposed rule would permit the milk to be flavored or unflavored. The proposed rule which followed the preamble expressly noted that flavored or unflavored milk was permitted in the individual food packages for women and children without special dietary needs.

 [10]    At the time the proposed rulemaking was published, neither CMA nor the public in general could have had any indication from the history of either the WIC Program or any other food distribution programs that flavored milk was not part of the acceptable diet for women and children without special dietary needs. The discussion  **\*1107**  in the preamble to the proposed rule was very detailed and identified specific foods which the agency was examining for excess sugar. This specificity, together with total silence concerning any suggestion of eliminating flavored milk, strongly indicated that flavored milk was not at issue. The proposed rule positively and unqualifiedly approved the continued use of flavored milk. Under the specific circumstances of this case, it cannot be said that the ultimate changes in the proposed rule were in character with the original scheme or a logical outgrowth of the notice. We can well accept that, in general, an approval of a practice in a proposed rule may properly alert interested parties that the practice may be disapproved in the final rule in the event of adverse comments. The total effect of the history of the use of flavored milk, the preamble discussion, and the proposed rule, however, could have led interested persons only to conclude that a change in flavored milk would not be considered. Although ultimately their comments may well have been futile, CMA and other interested persons at least should have had the opportunity to make them. We believe that there was insufficient notice that the deletion of flavored milk from the WIC Program would be considered if adverse comments were received, and, therefore, that affected parties did not receive a fair opportunity to contribute to the administrative rulemaking process. That process was ill-served by the misleading or inadequate notice concerning the permissibility of chocolate flavored milk in the WIC Program and "does not serve the policy underlying the notice requirement."

The judgment of the district court is therefore reversed, and the case is remanded to the administrative agency with instructions to reopen the comment period and thereby afford interested parties a fair opportunity to comment on the proposed changes in the rule.

REVERSED AND REMANDED WITH INSTRUCTIONS.


**All Citations**

755 F.2d 1098

Chocolate Mfrs. Ass'n of U.S. v. Block, 755 F.2d 1098 (1985)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 481 of 1384

## Footnotes

1    Referred to hereafter as "flavored milk."

2    7 C.F.R. § 246.8 (1984).

3    42 U.S.C. §§ 1751–1769c (1982).

4    42 U.S.C. §§ 1771–1789 (1982).

5    7 C.F.R. § 210 (1984).

6    7 C.F.R. § 215 (1984).

7    7 C.F.R. § 220 (1984).

8    7 C.F.R. § 225 (1984).

9    7 C.F.R. § 226 (1984). Regulations promulgated by USDA affecting the conduct of these programs also appear at 7 C.F.R. §§ 245.1, 245.2(f–1) (1984).

10   42 U.S.C. § 1786(a) (1982).

11   Pub.L. No. 94–105, 89 Stat. 511 (1975) (codified as amended at 42 U.S.C. § 1786 (1982)).

12   41 Fed.Reg. 1743, 1744 (1976) (codified at 7 C.F.R. § 246 and since amended).

13   In dissenting from the Supreme Court's denial of certiorari in *Eli Lilly & Co. v. Costle,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980), Justice Rehnquist noted that the case presented

an issue of great importance, which cannot help but become greater as time goes on and more and more administrative proceedings are conducted either directly under the Administrative Procedure Act ... or similar provisions in new Acts of Congress for review of agency action. That question is the degree to which an agency, which publishes a rule for notice and comment under § 4 of the Administrative Procedure Act and very substantially changes the rule in response to the comments it receives, is obliged to publish the revised rule to allow another opportunity for notice and comment....

... [W]hen we consider the very significant effects that a "rulemaking" procedure may have upon the parties involved ... I think this Court should grant certiorari to examine the question.

444 U.S. at 1096–97, 100 S.Ct. at 1063–64.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by New York v. United States Department of Homeland Security, 2nd Cir.(N.Y.), August 4, 2020

944 F.3d 773
United States Court of Appeals, Ninth Circuit.

CITY AND COUNTY OF SAN FRANCISCO;
County of Santa Clara, Plaintiffs-Appellees,

v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, a federal agency;
U.S. Department of Homeland Security, a
federal agency; Chad F. Wolf, in his official
capacity as Acting Secretary of the United States
Department of Homeland Security; Kenneth
T. Cuccinelli, in his official capacity as Acting
Director of United States Citizenship and
Immigration Services, Defendants-Appellants.
State of California; District of Columbia; State
of Maine; Commonwealth of Pennsylvania;
State of Oregon, Plaintiffs-Appellees,

v.

U.S. Department of Homeland Security, a federal
agency; United States Citizenship and Immigration
Services, a federal agency; Chad F. Wolf, in
his official capacity as Acting Secretary of the
United States Department of Homeland Security;
Kenneth T. Cuccinelli, in his official capacity as
Acting Director of United States Citizenship and
Immigration Services, Defendants-Appellants.
State of Washington; Commonwealth of Virginia;
State of Colorado; State of Delaware; State of
Illinois; State of Maryland; Commonwealth of
Massachusetts; Dana Nessel, Attorney General
on behalf of the People of Michigan; State
of Minnesota; State of Nevada; State of New
Jersey; State of New Mexico; State of Rhode
Island; State of Hawai'i, Plaintiffs-Appellees,

v.

U.S. Department of Homeland Security, a federal
agency; Chad F. Wolf, in his official capacity as
Acting Secretary of the United States Department
of Homeland Security; United States Citizenship
and Immigration Services, a federal agency;
Kenneth T. Cuccinelli, in his official capacity as

Acting Director of United States Citizenship and
Immigration Services, Defendants-Appellants.

No. 19-17213, No. 19-17214, No. 19-35914
|
Filed December 5, 2019

**Synopsis**

**Background:** Counties, states, and organizations brought actions challenging Department of Homeland Security's (DHS) final rule requiring consideration of non-cash public benefits in determining whether alien was "public charge" under Immigration and Nationality Act (INA). The United States District Court for the Eastern District of Washington, Rosanna Malouf Peterson, J., 2019 WL 5100717, granted states' motions for stay and for preliminary injunction in one action, and the United States District Court for the Northern District of California, Phyllis J. Hamilton, Chief Judge, 2019 WL 5100718, granted plaintiffs' motion for preliminary injunction in other actions. DHS filed interlocutory appeals, and appeals were consolidated. DHS filed emergency motion to stay injunctions.

**Holdings:** The Court of Appeals, Bybee, Circuit Judge, held that:

[1] states had standing to challenge DHS's final rule;

[2] motion fell within mootness exception for cases capable of repetition, yet evading review;

[3] phrase "public charge," as used in INA, was ambiguous

[4] final rule was entitled to Chevron deference;

[5] DHS established strong likelihood that final rule did not violate Rehabilitation Act; and

[6] DHS established likelihood that final rule was not arbitrary and capricious.

Motions granted.

Bybee, Circuit Judge, concurred and filed opinion.

Owens, Circuit Judge, concurred in part, dissented in part, and filed opinion.

**Procedural Posture(s):** Interlocutory Appeal; Motion for Stay; Motion for Preliminary Injunction.

West Headnotes (29)

**[1]**   **Federal Courts**   Necessity of Objection; Power and Duty of Court

Federal court has obligation to ensure that jurisdiction exists before proceeding to merits.

**[2]**   **Constitutional Law**   Nature and scope in general

**Federal Civil Procedure**   In general; injury or interest

Built on separation-of-powers principles, standing ensures that litigants have personal stake in controversy's outcome as to justify exercise of court's remedial powers on their behalf. U.S. Const. art. 3, § 2, cl. 1.

**[3]**   **Federal Civil Procedure**   In general; injury or interest

**Federal Civil Procedure**   Causation; redressability

To demonstrate Article III standing, plaintiff must show concrete and particularized injury that is fairly traceable to defendant's conduct and that is likely to be redressed by favorable judicial decision. U.S. Const. art. 3, § 2, cl. 1.

**[4]**   **Federal Civil Procedure**   In general; injury or interest

At least one plaintiff must have standing to seek each form of relief requested. U.S. Const. art. 3, § 2, cl. 1.

**[5]**   **Federal Civil Procedure**   In general; injury or interest

Plaintiff bears burden of establishing elements of standing with manner and degree of evidence required at successive stages of litigation. U.S. Const. art. 3, § 2, cl. 1.

**[6]**   **Injunction**   Persons entitled to apply; standing

To establish standing to seek preliminary injunction, plaintiffs may rely on allegations in their complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden, and need only establish risk or threat of injury to satisfy actual injury requirement.

1 Cases that cite this headnote

**[7]**   **Aliens, Immigration, and Citizenship**   Right of review or intervention; standing

States had standing to challenge Department of Homeland Security's (DHS) final rule requiring consideration of non-cash public benefits in determining whether alien was "public charge" under Immigration and Nationality Act (INA), where anticipated disenrollment from public benefits would result in reduction in Medicaid reimbursement payments to states, final rule was expected to increase administrative costs, and predicted results had already begun. U.S. Const. art. 3, § 2, cl. 1; Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(4)(A).

3 Cases that cite this headnote

**[8]**   **Federal Civil Procedure**   In general; injury or interest

Predictable effect of government action on decisions of third parties is sufficient to establish injury in fact required to establish standing to challenge that action.

2 Cases that cite this headnote

**[9]**   **Federal Courts**   Injunction and temporary restraining order cases

Department of Homeland Security's (DHS) emergency motion to stay, pending resolution of appeal, preliminary injunctions barring

2019 Daily Journal D.A.R. 11,375

enforcement of its final rule requiring consideration of non-cash public benefits in determining whether alien was "public charge" under Immigration and Nationality Act (INA) fell within mootness exception for cases capable of repetition, yet evading review, even though district courts in other circuits had also entered nationwide injunctions. Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(4) (A).

4 Cases that cite this headnote

[10]    **Federal Courts** 🗝 Injunction and temporary restraining order cases

All Writs Act provided Court of Appeals with authority to stay district courts' preliminary injunctions barring enforcement of Department of Homeland Security's (DHS) final rule requiring consideration of non-cash public benefits in determining whether alien was "public charge" under Immigration and Nationality Act (INA) pending resolution of DHS's appeal. Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(4)(A); 28 U.S.C.A. § 1651.

4 Cases that cite this headnote

[11]    **Injunction** 🗝 Grounds in general; multiple factors

Plaintiff seeking preliminary injunction must establish that (1) he is likely to succeed on merits, (2) he is likely to suffer irreparable harm in absence of preliminary relief, (3) balance of equities tips in his favor, and (4) injunction is in public interest.

5 Cases that cite this headnote

[12]    **Injunction** 🗝 Grounds in general; multiple factors

Serious questions going to merits and balance of hardships that tips sharply towards plaintiff can support issuance of preliminary injunction, so long as plaintiff also shows that there is likelihood of irreparable injury and that injunction is in public interest.

1 Cases that cite this headnote

[13]    **Injunction** 🗝 Preservation of status quo

Generally, purpose of preliminary injunction is to preserve status quo and parties' rights until final judgment issues in cause.

1 Cases that cite this headnote

[14]    **Injunction** 🗝 Extraordinary or unusual nature of remedy

**Injunction** 🗝 Entitlement to Relief

**Injunction** 🗝 Clear showing or proof

Injunction is extraordinary remedy that may only be awarded upon clear showing that plaintiff is entitled to such relief.

1 Cases that cite this headnote

[15]    **Injunction** 🗝 Clear showing or proof

Injunction should not be granted unless movant, by clear showing, carries burden of persuasion.

1 Cases that cite this headnote

[16]    **Federal Courts** 🗝 Supersedeas or Stay of Proceedings

Party requesting stay pending resolution of appeal bears burden of showing that circumstances justify exercise of that discretion.

1 Cases that cite this headnote

[17]    **Federal Courts** 🗝 Supersedeas or Stay of Proceedings

In deciding whether to issue stay pending resolution of appeal, Court of Appeals should consider (1) whether stay applicant has made strong showing that he is likely to succeed on merits; (2) whether applicant will be irreparably injured absent stay; (3) whether issuance of stay will substantially injure other parties interested in proceeding; and (4) where public interest lies.

7 Cases that cite this headnote

**[18]** **Administrative Law and Procedure** 🔑 **Plain, literal, or clear meaning; ambiguity or silence**

**Administrative Law and Procedure** 🔑 **Permissible or reasonable construction**

When confronted with argument that agency's interpretation of statute that it administers is wrong, court must first ask whether Congress has directly spoken to precise question at issue, and if it has, court must give effect to unambiguously expressed intent of Congress, but if Congress has not spoken directly to issue at hand, court must ask whether agency's answer is based on permissible construction of statute.

1 Cases that cite this headnote

**[19]** **Aliens, Immigration, and Citizenship** 🔑 **Judicial review and intervention**

Under rule of consular nonreviewability, when statute entrusts determination to consular or immigration officer's opinion, only most egregious abuses of discretion may be reviewed.

**[20]** **Aliens, Immigration, and Citizenship** 🔑 **Liable to become public charge**

Phrase "public charge," as used in Immigration and Nationality Act (INA) provision permitting immigration official to deem alien inadmissible if alien is likely to become public charge, was ambiguous under *Chevron*; term was not term of art or self-defining, and history of term confirmed that its definition had changed over time. Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(4)(A); 8 U.S.C.A. § 1182(a)(4)(B)(i).

2 Cases that cite this headnote

**[21]** **Aliens, Immigration, and Citizenship** 🔑 **Powers and duties in general**

By granting regulatory authority to Department of Homeland Security (DHS), Congress intended

that DHS would resolve any ambiguities in Immigration and Nationality Act (INA). Immigration and Nationality Act § 103, 8 U.S.C.A. § 1103(a)(1) & (3).

**[22]** **Administrative Law and Procedure** 🔑 **Reenactment of construed statute; incorporation of construction**

**Statutes** 🔑 **Reenactment or incorporation of prior statute**

Congress is presumed to be aware of administrative or judicial interpretation of statute and to adopt that interpretation when it re-enacts statute without change.

**[23]** **Statutes** 🔑 **Failed, rejected, and other unenacted provisions**

In interpreting statute, it is sometimes appropriate to consider language Congress has rejected, primarily when Congress rejected language in favor of statute adopted and under review.

**[24]** **Aliens, Immigration, and Citizenship** 🔑 **Liable to become public charge**

Department of Homeland Security's (DHS) final rule requiring consideration of non-cash public benefits in determining whether alien was likely to become "public charge" under Immigration and Nationality Act (INA) was reasonable interpretation of statute, and thus was entitled to *Chevron* deference, even though rule permitted consideration of in-kind benefits for first time; self-sufficiency had been basic principle of United States immigration law since earliest immigration statutes, and receipt of non-cash public assistance was relevant to self-sufficiency and whether immigrants were depending on public resources to meet their needs. Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(4)(A).

3 Cases that cite this headnote

**[25]    Federal Courts** 🔑 **Injunction and temporary restraining order cases**

Department of Homeland Security (DHS) established strong likelihood that its final rule permitting consideration of immigrant's receipt of in-kind government assistance as part of its totality-of-the-circumstances test in determining whether immigrant was likely to become "public charge" under Immigration and Nationality Act (INA) did not violate Rehabilitation Act, for purposes of determining its entitlement to stay of preliminary injunction barring enforcement of its final rule pending resolution of its appeals; INA required immigration officers to consider immigrant's "health" when making public-charge determination, and final rule did not change DHS's practice with respect to considering alien's health or suggest that any alien would be denied admission or adjustment of status solely by reason of her or his disability. Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(4)(B)(i)(II); Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

2 Cases that cite this headnote

**[26]    Administrative Law and Procedure** 🔑 **Arbitrariness and capriciousness; reasonableness**

Normally, agency rule would be arbitrary and capricious if agency has relied on factors that Congress has not intended it to consider, entirely failed to consider important aspect of problem, offered explanation for its decision that runs counter to evidence before agency, or is so implausible that could not be ascribed to difference in view of product of agency expertise. 5 U.S.C.A. § 706(2).

**[27]    Administrative Law and Procedure** 🔑 **Response to comment**

Agency's failure to respond to any particular comment or point put forward by rule's opponents is not ground for finding per se arbitrary-and-capricious action. 5 U.S.C.A. § 706(2).

**[28]    Administrative Law and Procedure** 🔑 **Change of policy; reason or explanation**

Agency must show that there are good reasons for new policy, but it need not demonstrate to court's satisfaction that reasons for new policy are better than reasons for old one; it suffices that new policy is permissible under statute, that there are good reasons for it, and that agency believes it to be better, which conscious change of course adequately indicates. 5 U.S.C.A. § 706(2).

**[29]    Federal Courts** 🔑 **Injunction and temporary restraining order cases**

Department of Homeland Security (DHS) established likelihood that its final rule permitting consideration of immigrant's receipt of in-kind government assistance in determining whether immigration was likely to become "public charge" under Immigration and Nationality Act (INA) was not arbitrary and capricious under Administrative Procedure Act (APA), for purposes of determining its entitlement to stay of preliminary injunction barring enforcement of final rule pending resolution of its appeals, despite contentions that it failed to properly weigh costs to state and local governments and healthcare providers resulting from disenrollment from public benefits programs, or adequately consider final rule's impact on public health; nothing in final rule imposed costs on governments or providers, and DHS addressed at length costs and benefits associated with final rule, responded to comments claiming that final rule would cause aliens to disenroll from or forego enrollment in public benefit programs, and changed final rule in response to comments expressing public-health concerns. 5 U.S.C.A. § 706(2); Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(4)(A).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*777** Joseph H. Hunt, Assistant Attorney General; David L. Anderson, United States Attorney; Daniel Tenny, Gerard Sinzdak, and Joshua Dos Santos, Appellate Staff; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Dennis J. Herrera, City Attorney; Jesse C. Smith, Chief Assistant City Attorney; Ronald P. Flynn, Chief Deputy City Attorney; Yvonne R. Mere, Chief, Complex & Affirmative Litigation; Sara J. Eisenberg, Chief of Strategic Advocacy; Matthew D. Goldberg, Deputy City Attorney; City Attorney's Office, City and County of San Francisco, San Francisco, California; James R. Williams, County Counsel; Greta S. Hansen, Chief Assistant County Counsel; Laura S. Trice, Lead Deputy County Counsel; Raphael N. Rajendra, Julia B. Spiegel, and H. Luke Edwards, Deputy County Counsel; Office of the County Counsel, County of Santa Clara, San Jose, California; for Plaintiffs-Appellees City and County of San Francisco, and County of Santa Clara.

Xavier Becerra, Attorney General; Matthew Rodriguez, Chief Assistant Attorney General; Michael L. Newman, Senior Assistant Attorney General; Cherokee DM Melton, Supervising Deputy Attorney General; Jennifer C. Bonilla, Lisa Cisneros, Rebekah Fretz, Katherine Lehe, Julia Harumi Mass, Anita Garcia Velasco, Brenda Ayon Verduzco, and Anna Rich, Deputy Attorneys General; Office of the Attorney General, Oakland, California; for Plaintiff-Appellee State of California.

Karl A. Racine, Attorney General; Kathleen Konopka, Deputy Attorney General, Public Advocacy Division; Alacoque Hinga Nevitt, Assistant Attorney General; Office of the Attorney General, Washington, D.C.; for Plaintiff-Appellee District of Columbia.

Aaron M. Frey, Attorney General; Susan P. Herman, Chief Deputy Attorney General; Office of the Attorney General, Augusta, Maine; for Plaintiff-Appellee State of Maine..

Ellen Rosenblum, Attorney General; Benjamin Gutman, Solicitor General; Nicole DeFever and Patricia Garcia Rincon, Assistant Attorneys General; Oregon Department of Justice, Salem, Oregon; for Plaintiff-Appellee State of Oregon.

Josh Shapiro, Attorney General; Michael J. Fischer, Chief Deputy Attorney General; Aimee D. Thomson,

Deputy Attorney General; Office of the Attorney General, Philadelphia, Pennsylvania; for Plaintiff-Appellee Commonwealth of Pennsylvania.

Robert W. Ferguson, Attorney General; Jeffrey T. Sprung, Assistant Attorney General; Rene D. Tomisser, Senior Counsel; Zachary P. Jones, Joshua Weissman, Paul M. Crisalli, Nathan K. Bays, and Bryan M.S. Ovens, Assistant Attorneys General; Office of the Attorney General, Kennewick, Washington; for Plaintiff-Appellee State of Washington.

Mark R. Herring, Attorney General; Michelle S. Kallen, Deputy Solicitor General; Ryan Spreague Hardy, Alice Anne Lloyd, and Mamoona H. Siddiqui, Assistant Attorneys General; Office of the Attorney General, Richmond, Virginia; for Plaintiff-Appellee Commonwealth of Virginia.

Phil Weiser, Attorney General; Eric R. Olson, Solicitor General; Office of the Attorney General, Denver, Colorado; for Plaintiff-Appellee State of Colorado.

Kathleen Jennings, Attorney General; Aaron R. Goldstein, State Solicitor; Ilona Kirshon, Deputy State Solicitor; Monica A. Horton, Deputy Attorney General; Office of the Attorney General, Wilmington, Delaware; for Plaintiff-Appellee State of Delaware.

Kwame Raoul, Attorney General; Liza Roberson-Young, Public Interest Counsel; Office of the Attorney General, Chicago, Illinois; for Plaintiff-Appellee State of Illinois.

Clare E. Connors, Attorney General; Lili A. Young, Deputy Attorney General; Department of the Attorney General, Honolulu, Hawaiʻi; for Plaintiff-Appellee State of Hawaiʻi.

Brian E. Frosh, Attorney General; Jeffrey P. Dunlap, Assistant Attorney General; Office of the Attorney General, Baltimore, Maryland; for Plaintiff-Appellee State of Maryland.

Maura Healey, Attorney General; Abigail B. Taylor, Chief, Civil Rights Division; David Urena, Special Assistant Attorney General; Angela Brooks, Assistant Attorney General; Office of the Attorney General, Boston, Massachusetts; for Plaintiff-Appellee Commonwealth of Massachusetts.

Dana Nessel, Attorney General; Fadwa A. Hammoud, Solicitor General; Toni L. Harris, First Assistant Attorney General; Michigan Department of Attorney General, Lansing, Michigan; for Plaintiff-Appellee Dana Nessel on behalf of the People of Michigan.

City and County of San Francisco v. United States Citizenship..., 944 F.3d 773 (2019)

2019 Daily Journal D.A.R. 11,375

Keith Ellison, Attorney General; R.J. Detrick, Assistant Attorney General; Attorney General's Office, St. Paul, Minnesota; for Plaintiff-Appellee State of Minnesota.

Aaron D. Ford, Attorney General; Heidi Parry Stern, Solicitor General; Office of the Attorney General, Las Vegas, Nevada; for Plaintiff-Appellee State of Nevada.

Gurbir Singh Grewal, Attorney General; Glenn J. Moramarco, Assistant Attorney General; Office of the Attorney General, Trenton, New Jersey; for Plaintiff-Appellee State of New Jersey.

Hector Balderas, Attorney General; Tania Maestas, Chief Deputy Attorney General; Office of the Attorney General, Santa Fe, New Mexico; for Plaintiff-Appellee State of New Mexico.

Peter F. Neronha, Attorney General; Lauren E. Hill, Special Assistant Attorney General; Office of the Attorney General, Providence, Rhode Island; for Plaintiff-Appellee State of Rhode Island.

Edward T. Waters, Phillip A. Escoriaza, and Amanda N. Pervine, Feldesman Tucker Leifer Fidell LLP, Washington, D.C., for Amici Curiae Public Health, Health Policy, Medicine, and Nursing Deans, Chairs, and Scholars; The American Public Health Association; and The American Academy of Nursing.

R. Adam Lauridsen, Chessie Thacher, Victor H. Yu, and Nicholas R. Green, Keker Van Nest & Peters LLP, San Francisco, California, for Amici Curiae National Housing Law Project, Food Research & Action Center, and Center for Law & Social Policy.

D.C. No. 4:19-cv-04717-PJH

D.C. No. 4:19-cv-04975-PJH

D.C. No. 4:19-cv-05210-RMP

Before: Jay S. Bybee, Sandra S. Ikuta, and John B. Owens, Circuit Judges.

Concurrence by Judge Bybee; Partial Concurrence and Partial Dissent by Judge Owens

**ORDER**

BYBEE, Circuit Judge:

**\*779** Since 1882, when the Congress enacted the first comprehensive immigration statute, U.S. law has prohibited the admission to the United States of "any person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214 (1882). Although the precise formulation of this provision has been amended regularly in the succeeding century and a quarter, the basic prohibition and the phrase "public charge" remains. Most recently, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Congress amended the Immigration and Nationality Act (INA) to provide that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A). In making this determination, "the consular officer or the Attorney General shall at a minimum" take five factors into account: age; health; family status; assets, resources, and financial status; and education and skills. *Id.* § 1182(a)(4)(B)(i). Under long-standing practice, consular officers and the Attorney General consider these factors under a "totality of the circumstances" test.

In 1999, the Immigration and Naturalization Service (INS), providing guidance to the public and INS field officers, defined "public charge" as an "alien ... who is likely to become ... primarily dependent on the government for subsistence" as demonstrated by either "institutionalization for long-term care at government expense" or "receipt of public cash assistance for income maintenance." **\*780** Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, 28,689 (May 26, 1999) (*1999 Field Guidance*) (internal quotation marks omitted). Although INS determined that the receipt of *cash* benefits received under a public program would be considered a factor in determining whether an alien was likely to become a public charge, it stated that *non-cash* benefits would not be taken into account for public-charge purposes. *Id.*

In August 2019, following notice and comment, the Department of Homeland Security adopted a new rule, redefining the term "public charge" to require a consideration of not only *cash* benefits, but also *non-cash* benefits. Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292, 41,292 (Aug. 14, 2019) (Final Rule). Under DHS's Final Rule a public charge is "an alien who receives one

or more public benefits ... for more than 12 months in the aggregate within any 36-month period." *Id.* at 41,501. In turn, DHS defined "public benefits." Consistent with the *1999 Field Guidance*, DHS still considers receipt of cash assistance from Supplemental Security Income (SSI); Temporary Assistance for Needy Families (TANF); and federal, state, or local general assistance programs to be public benefits. To that list, DHS added non-cash assistance received through the Supplemental Nutrition Assistance Program (SNAP), Section 8 housing assistance, Section 8 project-based rental assistance, Medicaid (with certain exceptions), and Section 9 public housing. *Id.* DHS's rule exempts public benefits received for emergency medical conditions, benefits received under the Individuals with Disabilities Education Act, and school-based services or benefits. *Id.* It also exempts those benefits received by aliens under 21 years of age, women during pregnancy, and members of the armed forces and their families. *Id.* DHS repeated that "[t]he determination of an alien's likelihood of becoming a public charge at any time in the future must be based on the totality of the alien's circumstances." *Id.* at 41,502.

Prior to the Final Rule taking effect in October 2019, various states, municipalities, and organizations brought suits in California and Washington seeking a preliminary injunction against the implementation of the rule. In Nos. 19-17213 and 19-17214, California, Maine, Oregon, Pennsylvania, and the District of Columbia; the City and County of San Francisco and the County of Santa Clara; and various organizations brought suit in the Northern District of California against the United States under the Due Process Clause of the Fifth Amendment; the Administrative Procedure Act (APA), 5 U.S.C. § 706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. The district court granted a preliminary injunction on the basis of the APA, effective against implementation of the rule in the plaintiff states. *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, 408 F.Supp.3d 1057, 2019 WL 5100718 (N.D. Cal. Oct. 11, 2019). In No. 19-35914, thirteen states—Washington, Virginia, Colorado, Delaware, Hawaiʻi, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, and Rhode Island—filed suit in the Eastern District of Washington against DHS under the Due Process Clause of the Fifth Amendment and the APA. The district court granted a preliminary injunction on the basis of the APA claims and issued a nationwide injunction. *Washington v. U.S. Dep't of Homeland Sec.*, 408 F.Supp.3d 1191, 2019 WL 5100717 (E.D. Wash. Oct. 11, 2019).

DHS seeks a stay of both preliminary injunctions.[1] Our authority to issue a stay **\*781** of a preliminary injunction is circumscribed. Nevertheless, for the reasons explained below, we will grant the stay. DHS has shown a strong likelihood of success on the merits, that it will suffer irreparable harm, and that the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

## I. BACKGROUND AND PROCEDURE

We begin with the governing statutory framework, the proposed change to this framework, and the proceedings below.

### A. *Statutory Framework*

The INA requires all aliens who seek lawful admission to the United States, or those already present but seeking to become lawful permanent residents (LPRs), to prove that they are "not inadmissible." 8 U.S.C. § 1361; *see also id.* §§ 1225(a), 1255(a). Section 212 of the INA lists the grounds on which an alien may be adjudged inadmissible. *Id.* § 1182(a)(1)–(10). One of the grounds for inadmissibility is a determination that the alien is likely to become a "public charge." *Id.* § 1182(a)(4). Section 212(a)(4) of the INA reads as follows:

(4) PUBLIC CHARGE. —

(A) IN GENERAL.—Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.

(B) FACTORS TO BE TAKEN INTO ACCOUNT.—

(i) In determining whether an alien is inadmissible under this paragraph, the consular officer or the Attorney General[2] shall at a minimum consider the alien's—

(I) age;

(II) health;

(III) family status;

(IV) assets, resources, and financial status; and

(V) education and skills.

(ii) In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support [ 3 ] under section 1183a of this title for purposes of exclusion under this paragraph.

*Id.*

This provision is applied at different times by different government agencies. When an alien seeks a visa to travel to the United States, a Department of State (DOS) consular officer must make an admissibility determination. *See* 84 Fed. Reg. at 41,294 n.3. When an alien arrives at a port of entry without a visa, DHS makes that determination. *Id.* An alien may also be deemed "inadmissible" even when the alien is already in the country. For example, when an alien seeks an adjustment ***782** of status from non-immigrant to LPR, DHS must determine that the alien is not inadmissible. *See id.* And when an alien is processed in immigration court, the Department of Justice (DOJ) through immigration judges and the Board of Immigration Appeals (BIA) must determine whether that alien is inadmissible. *Id.*

Though § 212 of the INA lays out the factors an immigration official must consider "at a minimum" when making a public-charge determination, the INA does not define the term "public charge," or restrict how officials are to consider age, health, family status, financial resources, and education. Indeed, as explained in more detail below, in the context of immigration law, the term "public charge" has had several meanings. Since 1999, however, the term has been defined according to guidelines issued by the INS Field Guidance on the matter. *See 1999 Field Guidance,* 64 Fed. Reg. at 28,689. The *1999 Field Guidance* defined a public charge as an alien who "is likely to become (for admission/adjustment purposes) primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." *Id.* (internal quotation marks omitted). The *1999 Field Guidance* did not permit immigration officers to "place any weight on the receipt of non-cash public benefits," *id.*, and allowed consideration of only cash-benefit programs like SSI, TANF, and "[s]tate and local cash assistance programs that provide benefits for income maintenance," *id.* at 28,692.

B. *The Proposed Rule*

On October 10, 2018, DHS published a Notice of Proposed Rulemaking (NPRM) indicating its intent to abandon the *1999 Field Guidance* and redefine the term "public charge." *See* Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (proposed Oct. 10, 2018). [4] It did so acting under the authority vested in the Secretary of Homeland Security to establish immigration regulations and enforce immigration law. *See* 8 U.S.C. § 1103(a)(3) ("[The Secretary of Homeland Security] shall establish such regulations ... as he deems necessary for carrying out his authority under the provisions of this chapter."). The proposed rule redefined the term "public charge" in two ways.

First, the proposed rule for the first time established a required length of time for which the alien would have to rely on public benefits before being labeled a public charge. Under the *1999 Field Guidance,* a public charge was defined as an individual "primarily dependent" on government benefits, but the *1999 Field Guidance* prescribed no specific time period for which this determination should be made. *See* 64 Fed. Reg. at 28,689, 28,692. Under the new rule, an alien would be considered a public charge if he or she "receives one or more [designated] public benefits ... for more than 12 months in the aggregate within a 36-month period." 83 Fed. Reg. at 51,157–58. Moreover, the proposed rule counts each public benefit received, so that "receipt of two different non-monetizable benefits in one month counts as two months." *Id.* at 51,166.

Second, the proposed rule expanded which benefits contributed to a public-charge ***783** determination. The proposed rule still included those cash-benefit programs that were listed in the *1999 Field Guidance,* but now also included various in-kind programs, such as:

(A) Supplemental Nutrition Assistance Program (SNAP, formerly called "Food Stamps"), 7 U.S.C. 2011 to 2036c;

(B) Section 8 Housing Assistance under the Housing Choice Voucher Program, as administered by HUD under 24 CFR part 984; 42 U.S.C. 1437f and 1437u;

(C) Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation) under 24 CFR parts 5, 402, 880 through 884 and 886; and

...

(i) Medicaid, 42 U.S.C. 1396 *et seq.*, [with several exceptions, discussed below]

...

(iv) Subsidized Housing under the Housing Act of 1937, 42 U.S.C. 1437 *et seq.*

*Id.* at 51,290 (to be codified at 8 C.F.R. § 212.21). [5]

Additionally, the proposed rule added other factors for immigration officers to consider when making a public-charge determination. The rule still required consideration of the alien's age, health, family status, financial status, education, and skills, as well as any affidavits of support the alien presents. *See* 83 Fed. Reg. 51,178 (to be codified at 8 C.F.R. § 212.22). But the proposed rule also laid out new factors to be afforded extra weight. Four factors weigh heavily against the alien in a public-charge determination: (1) a finding that the alien "is not a full-time student and is authorized to work," but cannot demonstrate "current employment, employment history, or [a] reasonable prospect of future employment"; (2) a previous finding of inadmissibility on public-charge grounds; (3) a medical diagnosis that would likely require extensive medical treatment or interfere with the alien's ability to be self-sufficient; and (4) receipt of benefits for more than twelve months within a thirty-six month period. *Id.* at 51,198–201 (to be codified at 8 C.F.R. § 212.22). Conversely, two factors would weigh heavily in favor of the alien in a public-charge determination: (1) assets or household income over 250 percent of the Federal poverty line, and (2) individual income over 250 percent of the Federal poverty line. [6] *Id.* at 51,292 (to be codified at 8 C.F.R. § 212.22(c)(2)).

During the sixty-day public comment period that followed the NPRM, DHS collected 266,077 comments, "the vast majority of which opposed the rule." 84 Fed. Reg. at 41,297. On August 14, 2019, DHS published the Final Rule in the Federal Register. *Id.* at 41,292. In its 216-page Final Rule, DHS made some changes to the proposed rule (which are not relevant here) and addressed the comments it received. The Final Rule was scheduled to **\*784** take effect on October 15, 2019, and would apply to anyone applying for admission or adjustment of status after that date. *Id.*

### C. *The Proceedings*

#### 1. *The Northern District of California Case*

On August 13, 2019, the City and County of San Francisco and the County of Santa Clara sued several government agencies and officials, including U.S. Citizenship and Immigration Services (USCIS), the Acting Director of USCIS

Kenneth T. Cuccinelli, DHS, and the then Acting Director of DHS Kevin McAleenan. They brought suit in the United States District Court for the Northern District of California, claiming that the proposed rule violated the APA on two grounds: (1) the rule was not made in accordance with the law, and (2) the rule was arbitrary, capricious, and an abuse of discretion. *See* 5 U.S.C. § 706(2). Three days later, on August 16, 2019, California, Maine, Oregon, Pennsylvania, and the District of Columbia, sued the same defendants in the same court. They claimed that (1) the proposed rule violated § 706 of the APA because (a) it was not made in accordance with the INA, the IIRIRA, the Rehabilitation Act, or state healthcare discretion, (b) it was arbitrary, capricious, and an abuse of discretion, and (2) the proposed rule violated the Fifth Amendment's Due Process Clause because it denied equal protection based on race and unconstitutional animus.

Each set of plaintiffs filed a motion to preliminarily enjoin enforcement of the proposed rule. On August 27, 2019, the district court ordered the two cases consolidated. [7]

The district court heard oral argument on October 2, 2019, and on October 11, granted the preliminary injunction. *See City & Cty. of San Francisco,* —— F.Supp.3d ——, ——, 2019 WL 5100718 at \*1, \*53. The court first held that both the Counties and the States had standing to sue because they showed imminent financial injury. *Id.* at ——, at 2019 WL 5100718 \*46–47. It held that they were in the statute's zone of interests because, in enacting the public-charge provision of the INA, "Congress intended to protect states and their political subdivisions' coffers." *Id.* at ——, 2019 WL 5100718 at \*41. On the merits, the district court found that the States satisfied the four-factor test for a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The court held that the States had a likelihood of success on the merits for at least some of their claims. It found the States were likely to successfully show that the proposed rule was contrary to law because it unreasonably defined the term "public charge," and thus failed the second step of the *Chevron* analysis. *City & Cty. of San Francisco,* —— F.Supp.3d ——, ——, 2019 WL 5100718, at \*28. Alternatively, the court found that the States had shown a serious question as to whether the INA unambiguously foreclosed the proposed change to the definition of public charge, thus causing the Final Rule to fail at *Chevron* step one. *Id.* The court also concluded that the States had demonstrated a likelihood of success on the arbitrary-and-capricious claim because DHS failed to adequately consider the adverse economic and public health-

related costs of the proposed rule. *Id.* at ——, ——, 2019 WL 5100718 at *34, *37.

Further, the court found that the rule's implementation would irreparably harm **\*785** the Counties and States by causing them to lose millions of dollars in federal reimbursements and face increased operational costs. *Id.* at —— – ——, 2019 WL 5100718 at *46–49. Focusing on the public's interest in the continued provision of medical services and the prevention of communicable diseases, the district court found both the balance of the equities and the public interest weighed in favor of granting an injunction. *Id.* at —— – ——, 2019 WL 5100718 at *50–51. However, because the court found that the States had failed to show why a nationwide injunction would be necessary, the court granted an injunction that applied only to those persons living in plaintiff states or counties. *Id.* at ——, 2019 WL 5100718 at *53.

On October 25, 2019, DHS sought a stay of the preliminary injunction. DHS informed the court that it would seek appellate relief if the court did not act by November 14.

## 2. *The Eastern District of Washington Case*

On August 14, 2019, Washington, Virginia, Colorado, Delaware, Hawai'i, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, Rhode Island, and the state attorney general on behalf of Michigan sued USCIS, Cuccinelli, DHS, and McAleenan in the United States District Court for the Eastern District of Washington. They alleged claims similar to those presented in the California cases: (1) the proposed rule violated the APA because (a) it was not in accordance with immigration law or the Rehabilitation Act, (b) it exceeded DHS's statutory jurisdiction or authority, and (c) it was arbitrary, capricious, and an abuse of discretion, and (2) the proposed rule violated the Fifth Amendment's Due Process Clause because it denied equal protection based on race and unconstitutional animus.

The district court heard oral argument on October 3, 2019, and on October 11, granted the preliminary injunction. *See Washington*, —— F.Supp.3d ——, ——, 2019 WL 5100717, at *23. The court's conclusions largely mirrored those of the Northern District of California, though there were some differences. Citing the States' anticipated economic, administrative, and public-health costs, the court held that the States had standing and that the matter was ripe. *Id.* at ——, 2019 WL 5100717 at *11. Finding that the INA was enacted "to protect states from having to spend state money to provide for immigrants who could not provide for themselves," the

court concluded that the States were within the INA's zone of interests. *Id.*

On the merits, the court held that the States had shown a likelihood of success on the arbitrary-and-capriciousness claim and the *Chevron* claim, though the Washington court was less clear than the California court had been about at which step of the *Chevron* analysis the proposed rule would fail. *Id.* at —— – ——, 2019 WL 5100717 at *13–17. Unlike the California court, the Washington court also found that the States were likely to succeed in proving that DHS had violated the Rehabilitation Act, and that DHS acted beyond its congressionally delegated authority in defining self-sufficiency. *Id.* at —— – ——, 2019 WL 5100717 at *17–18. Noting that "the Plaintiff States provide a strong basis for finding that disenrollment from non-cash benefits programs is predictable, not speculative," and that such disenrollment would financially harm the States, the court found that the States would suffer irreparable harm if the injunction were not issued. *Id.* at —— – ——, 2019 WL 5100717 at *20–21. On these same grounds, the court found that the balance of the equities and public interest both "tip[ped] in favor" of granting a preliminary injunction. *Id.* at ——, 2019 WL 5100717 at *21. However, unlike the California court, the Washington court found a geographically limited injunction untenable, in part because a limited injunction might give immigrants an incentive to move from unprotected **\*786** states to protected states. Accordingly, the Washington court granted the States a nationwide injunction. *Id.* at —— – ——, 2019 WL 5100717 at *22–23.

On October 25, 2019, DHS sought a stay of the preliminary injunction. DHS informed the court that it would seek appellate relief if the court did not act by November 14.

\* \* \*

By November 14, neither district court responded to the respective motions to stay. On November 15, 2019, DHS filed a motion in this court for an emergency stay of the injunction.

## II. JURISDICTION

**[1]** DHS contends that the plaintiffs do not have Article III standing to sue and that their claims do not fall within the zone of interests protected by the INA. We have an obligation to ensure that jurisdiction exists before proceeding to the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–

95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). [8] Additionally, although no party has raised the issue, we must address whether DHS's request for a stay pending appeal is moot in light of the fact that two courts outside our circuit have also issued nationwide injunctions, and any decision we issue here would not directly affect those orders. We conclude that, at this preliminary stage of the proceedings, the States have sufficiently alleged grounds for Article III standing and that DHS's petition for a stay is not moot.

### A. Article III Standing

[2] Article III of the Constitution limits the federal judicial power to the adjudication of "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. This fundamental limitation "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). "One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue." *Trump v. Hawai'i*, — U.S. ——, 138 S. Ct. 2392, 2416, 201 L.Ed.2d 775 (2018). "[B]uilt on separation-of-powers principles," standing ensures that litigants have "a personal stake in the outcome of the controversy as to justify the exercise of the court's remedial powers on their behalf." *Town of Chester v. Laroe Estates, Inc.*, — U.S. ——, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) (internal citations and alterations omitted).

[3] [4] [5] [6] To demonstrate Article III standing, a plaintiff must show a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, — U.S. ——, 136 S. Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "At least one plaintiff must have standing to seek each form of relief requested," *Town of Chester*, 137 S. Ct. at 1651, and that party "bears the burden of establishing" the elements of standing "with the **787** manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. "At this very preliminary stage," plaintiffs "may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden." *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (per curiam). And they "need only establish a *risk* or *threat* of injury to satisfy

the actual injury requirement." *Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004); *see Spokeo*, 136 S. Ct. at 1548 (noting that the injury must be "actual or imminent, not conjectural or hypothetical" (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130)).

[7] The district courts concluded that the States had standing based on their alleged loss of federal funds and increase in operational costs related to individuals disenrolling from the non-cash public benefits at issue. DHS challenges this finding, arguing that predictions of future financial harm are based on an " 'attenuated chain of possibilities' that does not show 'certainly impending' injury." [9] DHS's argument is unavailing for several reasons.

[8] First, the injuries alleged are not entirely speculative —at least for standing purposes. DHS acknowledges that one result of the Final Rule will be to encourage aliens to disenroll from public benefits. It predicted a 2.5 percent disenrollment rate when proposing the rule. 84 Fed. Reg. at 41,463. This disenrollment, DHS predicted, would result in a reduction in Medicaid reimbursement payments to the States of about $1.01 billion. *Id.* at 41,301. DHS also acknowledged increased administrative costs that would result from the Final Rule. *Id.* at 41,389. To be sure, the predicted result is premised on the actions of third parties, but this type of "predictable effect of Government action on the decisions of third parties" is sufficient to establish injury in fact. *Dep't of Commerce v. New York*, — U.S. ——, 139 S. Ct. 2551, 2566, 204 L.Ed.2d 978 (2019).

Moreover, according to evidence supplied by the States, the predicted results have already started. As more individuals disenroll from Medicaid, the States will no longer receive reimbursements from the federal government for treating them. Similarly, the States have sufficiently alleged that they are facing new and ongoing operational costs resulting from the Final Rule. *See City & Cty. of San Francisco*, — F.Supp.3d ——, ——, 2019 WL 5100718, at *48. These costs are predictable, likely, and imminent. It is disingenuous for DHS to claim that they are too attenuated at this point when it acknowledged these costs in its own rulemaking process.

Finally, DHS's reliance on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013), is unfounded. There, the Court found that various human rights, labor, legal, and media organizations did not have standing to challenge the constitutionality of a law authorizing governmental electronic surveillance of communications for

foreign intelligence purposes. *Id.* at 414, 133 S.Ct. 1138. The alleged injury was that the threat of surveillance would compel them to travel abroad to have in-person conversations with sources and witnesses, in addition to other costs related to protecting the confidentiality of sensitive communications. *Id.* at 406–07, 133 S.Ct. 1138. The Court found that the injury was not "certainly impending" because it was highly speculative whether the government would imminently target communications between the plaintiffs and foreign individuals. **788** *Id.* at 410–11, 133 S.Ct. 1138. The assumption that their communications would be targeted was not enough to demonstrate injury in fact. *Id.* at 411–14, 133 S.Ct. 1138. Here, the States are not making assumptions about their claimed injuries. Unlike in *Clapper*, the States present evidence that the predicted disenrollment and rising administrative costs are currently happening.

Thus, based on the available evidence at this early stage of the proceedings, we conclude that the States have shown that they have suffered and will suffer direct injuries traceable to the Final Rule and thus have standing to challenge its validity.

### B. *Mootness*

Finally, we raise on our own the question of whether we can consider DHS's request for a stay of the district court's preliminary injunctions. *See Demery v. Arpaio*, 378 F.3d 1020, 1025 (9th Cir. 2004) ("[W]e have an independent duty to consider *sua sponte* whether a case is moot."). The stay would, presumably, allow the Final Rule to go into effect pending further proceedings in the district court and this court. The question of mootness arises because, contemporaneous with the district courts' orders here, district courts in Maryland and New York also issued nationwide injunctions. *Casa de Md., Inc. v. Trump*, 2019 WL 5190689 (D. Md. Oct. 14, 2019); *New York v. U.S. Dep't of Homeland Sec.*, 408 F.Supp.3d 334, 2019 WL 5100372 (S.D.N.Y. Oct. 11, 2019). [10] Thus, unless a stay also issues in those cases, any stay we might issue would not allow the Final Rule to go into effect; the Final Rule would still be barred by those injunctions.

[9] We recently addressed this precise question in *California v. U.S. Department of Health & Human Services*, 941 F.3d 410, 423 (9th Cir. 2019), and we concluded that even if an injunction from another court "has a fully nationwide scope, we nevertheless retain jurisdiction under the exception to mootness for cases capable of repetition, yet evading review."

Similarly, we conclude that DHS's petition is not moot, and we proceed to the merits of its petition.

### III. STANDARD OF REVIEW

[10] DHS requests that we stay the district courts' preliminary injunctions pending resolution of the consideration of the merits of DHS's appeals. We have authority to do so under the All Writs Act, 28 U.S.C. § 1651, which provides that the courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *See Scripps-Howard Radio, Inc. v. F.C.C.*, 316 U.S. 4, 9–10, 62 S.Ct. 875, 86 L.Ed. 1229 (1942) (finding that a federal court may stay judgments pending appeal "as part of its traditional equipment for the administration of justice"); *In re McKenzie*, 180 U.S. 536, 551, 21 S.Ct. 468, 45 L.Ed. 657 (1901) (noting the "inherent power of the appellate court to stay ... proceedings on appeal"); *see also* Fed. R. Civ. P. 62(g).

[11] Two standards affect our determination, the standard applicable to district courts for preliminary injunctions, and the standard for appellate courts for stays pending appeal. The district court must apply a four-factor standard:

> A plaintiff seeking a preliminary injunction must establish [1] that he is likely to **789** succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.

*Winter*, 555 U.S. at 20, 129 S.Ct. 365.

[12] Alternatively, " 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

[13]  [14]  [15]  Generally, the purpose of a preliminary injunction is to "preserve the status quo and the rights of the

parties until a final judgment issues in the cause." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)). An injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 129 S.Ct. 365. It "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam) (citation omitted).

[16]  [17]  The standard we apply to DHS's request for a stay is similar, although the burden of proof is reversed. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion," and our analysis is guided by four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 433–34, 129 S.Ct. 1749 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)). "The first two factors ... are the most critical," and the "mere possibility" of success or irreparable injury is insufficient to satisfy them. *Id.* at 434, 129 S.Ct. 1749 (internal quotation marks omitted). At this stage of the proceedings, it is now DHS's burden to make "a strong showing that [it] is likely to" prevail against the States' claims. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken*, 556 U.S. at 426, 129 S.Ct. 1749). We consider the final two factors "[o]nce an applicant satisfies the first two." *Nken*, 556 U.S. at 435, 129 S.Ct. 1749.

"A stay is an 'intrusion into the ordinary process of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.' " *Id.* at 427, 129 S.Ct. 1749 (citations omitted). "It is instead 'an exercise of judicial discretion,' and

'the propriety of its issue is dependent upon the circumstances of the particular case.' " *Id.* at 433, 129 S.Ct. 1749 (alteration omitted) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73, 47 S.Ct. 222, 71 L.Ed. 463 (1926)).

There is significant overlap in these standards. The first prong in both tests—likelihood of success on the merits—is the same. And the Supreme Court has made clear that satisfaction of this factor is the irreducible minimum requirement to granting any equitable and extraordinary relief. **\*790** *Trump v. Hawai'i*, 138 S. Ct. at 2423. The analysis ends if the moving party fails to show a likelihood of success on the merits of its claims. *Id.*

## IV. LIKELIHOOD OF SUCCESS ON THE MERITS

Any "person suffering legal wrong ... or adversely affected or aggrieved" by an agency's final action may seek judicial review. 5 U.S.C. § 702. The scope of our review is determined by the APA. As a reviewing court, we must "set aside" a final rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2) (A). In making this determination, we may "decide all relevant questions of law, interpret ... statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706.

DHS argues that it is likely to succeed on the merits of its appeal because, contrary to the conclusions of the district courts, the Final Rule is neither contrary to law nor arbitrary and capricious. We agree. The Final Rule's definition of "public charge" is consistent with the relevant statutes, and DHS's action was not arbitrary or capricious.

### A. *Contrary to Law*

The States argue that the Final Rule is invalid under the APA because the Final Rule's definition of "public charge" is contrary to (1) the INA and (2) the Rehabilitation Act. We disagree and find that DHS is likely to succeed in its argument that the Final Rule is not contrary to law. [11]

#### 1. The INA and "Public Charge"

[18]  When confronted with an argument that an agency's interpretation of a statute that it administers is wrong, we employ the familiar *Chevron* two-step test. First, we ask "whether Congress has directly spoken to the precise question

at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. But if Congress has not spoken directly to the issue at hand, we proceed to the second step and ask "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

We must keep in mind why *Chevron* is an important rule of construction:

> *Chevron* is rooted in a background presumption of congressional intent: namely, that Congress, when it left ambiguity in a statute administered by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows. *Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency. Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.

**\*791** *Arlington v. F.C.C.,* 569 U.S. 290, 296, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (quotation marks and citations omitted).

The district courts found that the Final Rule failed the *Chevron* test at one or both steps because the Final Rule's definition of "public charge" was an impermissible reading of that phrase in the INA. We will consider each step in turn.

### a. *Chevron* Step 1

At *Chevron*'s first step, we determine whether Congress has directly spoken to the issue at hand by "employing traditional tools of statutory construction." *Chevron,* 467 U.S. at 843 n.9, 104 S.Ct. 2778. That means we start with the text. *Afewerki v. Anaya Law Grp.,* 868 F.3d 771, 778 (9th Cir. 2017). We will then examine the history of interpretation to see if there has been a judicial construction of the term "public charge" that "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 982, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). Finally, we will consider other factors raised by the district courts and the States.

(1) *Text.* Under § 212 of the INA, an alien is inadmissible if, "in the opinion of" the immigration official, the alien "is likely at any time to become a public charge." In making that determination, the immigration official must consider "at a minimum" the alien's age, health, family status, financial resources, education, and skills. 8 U.S.C. § 1182(a)(4)(A). Congress did not define these terms and placed no further restrictions on what these officers may consider in the public-charge assessment. Nor did Congress prescribe how the officers are to regard the five enumerated factors.

 **[19]** We have four quick observations. First, the determination is entrusted to the "opinion" of the consular or immigration officer.[12] That is the language of discretion, and the officials are given broad leeway. Depending on the context in which the "opinion" is given, the decision may be nonreviewable. Under the rule of consular nonreviewability, only the most egregious abuses of discretion may be reviewed. *See Kerry v. Din,* 575 U.S. 86, 135 S. Ct. 2128, 2140–41, 192 L.Ed.2d 183 (2015) (Kennedy, J., concurring); *see also Cardenas v. United States,* 826 F.3d 1164, 1171–72 (9th Cir. 2016) (holding that Justice Kennedy's concurring opinion in *Din* is the controlling opinion and summarizing the consular nonreviewability rule). Indeed, we have previously held that the phrase "in the opinion of the Attorney General" in a now-repealed immigration statute conferred "unreviewable" discretion to the Executive Branch. *See Kalaw v. I.N.S.,* 133 F.3d 1147, 1151–52 (9th Cir. 1997), *superseded by statute on other grounds.* And to the extent the federal courts may review such determinations, our review is narrow. *See Montero-Martinez v. Ashcroft,* 277 F.3d 1137, 1144 (9th Cir. 2002) (holding that judicial review of discretionary acts by the BIA is limited to "the purely legal and hence non-discretionary" aspects of the BIA's action); *see also Allen v. Milas,* 896 F.3d 1094, 1106–07 (9th Cir. 2018)

(noting that judicial review of visa denials is "limited ... to constitutional challenges" and does not extend to APA-based challenges (emphasis omitted)).

**\*792**  **[20]**  Second, the critical term "public charge" is not a term of art. It is not self-defining. That does not mean that officials may pour any meaning into the term, but it does mean that there is room for discretion as to what, precisely, being a "public charge" encompasses. In a word, the phrase is "ambiguous" under *Chevron*; it is capable of a range of meanings. So long as the agency has defined the term within that range of meanings, we have no grounds for second-guessing the agency, "even if the agency's reading differs from what [we] believe[ ] is the best statutory interpretation." *Brand X*, 545 U.S. at 980, 125 S.Ct. 2688 (citing *Chevron*, 467 U.S. at 843–44 & n.11, 104 S.Ct. 2778). It also means that an agency "must consider varying interpretations and the wisdom of its policy on a continuing basis," including "in response to changed factual circumstances, or a change in administrations." *Id.* at 981, 125 S.Ct. 2688 (quotations marks and citations omitted).

Third, Congress set out five factors to be taken into account by immigration officials, but expressly did not limit the discretion of officials to those factors. Rather the factors are to be considered "at a minimum." Other factors may be considered as well, giving officials considerable discretion in their decisions.

**[21]**  Fourth, Congress granted DHS the power to adopt regulations to enforce the provisions of the INA. When Congress created DHS, Congress vested the Secretary of Homeland Security "with the administration and enforcement of ... all [ ] laws relating to the immigration and naturalization of aliens" and authorized the Secretary to "establish such regulations ... as he deems necessary." 8 U.S.C. § 1103(a)(1) & (3); *see also* 6 U.S.C. § 112(b)(1) (authorizing the Secretary to "delegate any of the Secretary's functions to any [DHS] officer, employee, or organizational unit"); *Matter of D-J-*, 23 I. & N. Dec. at 573–74. By granting regulatory authority to DHS, Congress intended that DHS would resolve any ambiguities in the INA. *See Encino Motorcars, LLC v. Navarro*, —— U.S. ——, 136 S. Ct. 2117, 2125, 195 L.Ed.2d 382 (2016) ("A premise of *Chevron* is that when Congress grants an agency the authority to administer a statute by issuing regulations with the force of law, it presumes the agency will use that authority to resolve ambiguities in the statutory scheme."). As we have already noted, the INA's text is ambiguous. DHS has attempted to elucidate that ambiguity

in the Final Rule. In short, we do not read the text of the INA to unambiguously foreclose DHS's action.

**[22]**  (2) *Historical Understanding.* Although the foregoing would ordinarily be sufficient to end our inquiry, the current provision, which was most recently rewritten in 1996 in IIRIRA, is merely the most recent iteration of federal immigration law to deem an alien inadmissible if he or she is likely to become a "public charge." There is a long history of judicial and administrative interpretations of this phrase in the immigration context that predates the enactment of the INA. Because "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), we must examine this history to determine if "public charge" has a well-defined and congressionally understood meaning that limits DHS's discretion.

The history of the term "public charge" confirms that its definition has changed over time to adapt to the way in which federal, state, and local governments have cared for our most vulnerable populations. "Public charge" first appeared in this **\*793** country's immigration law in 1882. That statute excluded a would-be immigrant from the United States if the person was a "convict, lunatic, idiot, or a[ ] person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882 ch. 376, § 2, 22 Stat. 214.

Congress did not define "public charge" in the 1882 act. We thus ascribe to that phrase its commonly understood meaning at the time, as evidenced by contemporary sources. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 633–34 & n.6–8, 132 S.Ct. 2034, 182 L.Ed.2d 955 (2012) (citing contemporary dictionary definitions to interpret statutory phrases). An 1828 dictionary defined "charge" as "[t]hat which is enjoined, committed, entrusted or delivered to another, implying care, custody, oversight, or duty to be performed by the person entrusted," or a "person or thing committed to anothers [sic] custody, care or management." Charge, WEBSTER'S DICTIONARY (1828 Online Edition), http://webstersdictionary1828.com/Dictionary/charge; *see also* Stewart Rapaljb & Robert L. Lawrence, DICTIONARY OF AMERICAN AND ENGLISH LAW, WITH DEFINITIONS OF THE TECHNICAL TERMS OF THE CANON AND CIVIL LAWS 196 (Frederick D. Linn & Co. 1888) (defining "charge" as "an obligation or liability. Thus we speak ... of a pauper being

chargeable to the parish or town"). That is a broad, common-sense definition, which is reflected in Nineteenth-Century judicial opinions using the phrase. *See, e.g.*, *In re Day*, 27 F. 678, 681 (C.C.S.D.N.Y. 1886) (defining a "public charge" as a person who "can neither take care of themselves, nor are under the charge or protection of any other person"); *State v. The S.S. "Constitution"*, 42 Cal. 578, 584–85 (1872) (noting that those who are "liable to become a public charge" are "paupers, vagabonds, and criminals, or sick, diseased, infirm, and disabled persons"); *City of Alton v. Madison Cty.*, 21 Ill. 115, 117 (1859) (noting that a person is not a "public charge" if the person has "ample means" of support).

The 1882 act did not consider an alien a "public charge" if the alien received merely some form of public assistance. The act itself established an "immigrant fund" that was designed to provide "for the care of immigrants arriving in the United States." Act of Mar. 26, 1910 ch. 376, § 1, 22 Stat. 214. Congress thus accepted that providing some assistance to recent immigrants would not make those immigrants public charges. But Congress did not draw that line with any precision. Instead, we read "public charge" in the 1882 act to refer generally to those who were unwilling or unable to care for themselves. In context that often meant that they were housed in a government or charitable institution, such as an almshouse, asylum, or penitentiary.

The term "public charge" endured through subsequent amendments to the 1882 act. In 1910, Congress enacted a statute that deemed "paupers; persons likely to become a public charge; professional beggars;" and similar people inadmissible. ch. 128, § 2, 36 Stat. 263 (1910). Relying on the placement of "public charge" between "paupers" and "professional beggars," the Supreme Court held that a person is likely to become a public charge if that person has "permanent personal objections" to finding employment. *Gegiow v. Uhl*, 239 U.S. 3, 10, 36 S.Ct. 2, 60 L.Ed. 114 (1915). In that case, the petitioners, Russian emigrees, arrived in the United States with little cash and the intention of going to Portland, Oregon. The immigration officials considered them likely to become public charges because Portland had a high unemployment rate. In a spare, three-page opinion by Justice Holmes, the Court noted that the "single question" before the Court was "whether an alien can be declared likely to become a public **\*794** charge on the ground that the labor market in the city of his immediate destination is overstocked." *Id.* at 9–10, 36 S.Ct. 2. The Court answered in the negative. In making the public-charge determination, immigration officers must consider an alien's "personal" characteristics, not a localized

job shortage. *Id.* at 10, 36 S.Ct. 2. The Court observed that "public charge" should be "read as generically similar to the other[ ] [statutory terms] mentioned before and after" that phrase. *Id.* Five years later, we followed the Supreme Court's lead, holding that "the words 'likely to become a public charge' are meant to exclude only those persons who are likely to become occupants of almshouses for want of means with which to support themselves in the future." *Ng Fung Ho v. White*, 266 F. 765, 769 (9th Cir. 1920) (citing *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917)), *aff'd in part and rev'd in part on other grounds*, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938 (1922).[13] Thus, as of 1920, we considered the likelihood of being housed in a state institution to be the primary factor in the public-charge analysis.

By the mid-Twentieth Century, the United States had largely abandoned the poorhouse in favor of direct payments through social welfare legislation. At the federal level, the government had created Social Security and Aid to Families With Dependent Children (AFDC). At the state level, governments supplemented family income through programs such as unemployment insurance and worker's compensation. Similar changes were being made in other programs such as mental health care, where we moved from institutionalizing the mentally ill to a program of treatment with the end of releasing them. As Chief Justice Burger observed:

> Historically, and for a considerable period of time, subsidized custodial care in private foster homes or boarding houses was the most benign form of care provided incompetent or mentally ill persons for whom the States assumed responsibility. Until well into the 19th century the vast majority of such persons were simply restrained in poorhouses, almshouses, or jails.

*O'Connor v. Donaldson*, 422 U.S. 563, 582, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring). "[T]he idea that States may not confine the mentally ill except for the purpose of providing them with treatment [was] of very recent origin." *Id.* (footnote omitted). The way in which we regarded the poor and the mentally infirm not only brought changes in the way we treated them, but major changes in their legal rights as well. *See, e.g.*, *McNeil v. Director,*

*Patuxent Inst.*, 407 U.S. 245, 248–50, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972) (requiring a hearing before a person who has completed his criminal sentence can be committed to indefinite confinement in a mental institution); *cf. Goldberg v. Kelly*, 397 U.S. 254, 260–61, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (holding that a recipient of public assistance payments is constitutionally entitled **\*795** to an evidentiary hearing before those payments are terminated).

The movement towards social welfare was soon reflected in the definition of "public charge." In *Matter of B-*, 3 I. & N. Dec. 323 (BIA 1948), the recently created BIA articulated a new definition of "public charge." Permanent institutionalization would not be the sole measure of whether an alien was a public charge. The BIA said it would also consider whether an alien received temporary services from the government. At the same time, the BIA recognized that mere "acceptance by an alien of services provided by" the government "does not in and of itself make the alien a public charge." *Id.* at 324. Instead, the BIA stated that an alien becomes a public charge if three elements are met: "(1) The State or other governing body must, by appropriate law, impose a charge for the services rendered to the alien.... (2) The authorities must make demand for payment of the charges .... And (3) there must be a failure to pay for the charges." *Id.* at 326. In other words, the government benefit received by the alien must be monetized, a bill must be presented to the alien, and the alien must refuse to pay. Ultimately, in *Matter of B-*, the BIA held that the petitioner had not become a public charge, even though she had been involuntarily committed to a mental institution, because the state of Illinois had not charged her or demanded payment. *Id.* at 327. The BIA's order was subsequently affirmed by the Attorney General. *Id.* at 337.

Four years later, Congress substantially revised the immigration laws in the Immigration and Nationality Act of 1952. The amended statute retained the term "public charge," but, for the first time, made clear that the decision was committed to the opinion of a consular officer or the Attorney General. The INA deemed inadmissible "[a]liens who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges." Title 2, ch. 2, § 212, 66 Stat. 163, 183 (1952). Although *Matter of B-* was not mentioned in the legislative history accompanying the 1952 act, it is notable that Congress chose to insert this "opinion" language following the BIA's articulation of a new definition of "public

charge" that departed from prior judicial interpretations of the term.

In 1974, the BIA altered course again. The BIA limited *Matter of B-*'s three-part test to determining whether a person had become a public charge after having been admitted to the United States. *See Matter of Harutunian*, 14 I. & N. Dec. 583, 585 (BIA 1974). After noting that the phrase "public charge" had been interpreted differently by various courts, the BIA held:

> [A]ny alien who is incapable of earning a livelihood, who does not have sufficient funds in the United States for his support, and has no person in the United States willing and able to assure that he will not need public support is excludable as likely to become a public charge whether or not the public support which will be available to him is reimbursable to the state.

*Id.* at 589–90. The BIA thus pegged the public-charge determination to whether the alien was likely to "need public support," irrespective of whether the alien was likely to be institutionalized for any length of time and billed for the cost by the state. *Id.* at 589.

That definition of "public charge" was subsequently amended by the INS. In 1987, the INS issued a final rule that deemed an applicant for adjustment of status to be a "public charge" if the applicant had "received public cash assistance." **\*796** Adjustment of Status for Certain Aliens, 52 Fed. Reg. 16,205, 16,211 (May 1, 1987). INS did not state how much "public cash assistance" an alien had to receive, but left the decision to officers who would judge the totality of the circumstances. *See id.* at 16,211 (noting that "all [the] evidence produced by the applicant will be judged"), 16,212 ("The weight given in considering applicability of the public charge provisions will depend on many factors ...."). INS did make clear that "public cash assistance" would not include the value of "assistance in kind, such as food stamps, public housing, or other non-cash benefits," including Medicare and Medicaid. *Id.* at 16,209.

In 1996, through IIRIRA, Congress enacted the current language appearing in § 212 of the INA. Omnibus

Consolidated Appropriations Act, Title 5 § 531, 110 Stat. 3009 (1996). As detailed above, Congress added a requirement that an immigration officer consider an alien's "age;" "health;" "family status;" "assets, resources and financial status;" and "education and skills" when determining if a person is likely to become a public charge. 8 U.S.C. § 1182(a)(4)(B).

Responding to the 1996 act, INS published the *1999 Field Guidance* to "establish clear standards governing a determination that an alien is inadmissible or ineligible to adjust status ... on public charge grounds." 64 Fed. Reg. at 28,689. In the *1999 Field Guidance*, INS defined "public charge" as "an alien ... who is likely to become (for admission/adjustment purposes) primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." *Id.* (internal quotation marks omitted). The *1999 Field Guidance* made clear that the public-charge determination remained a "totality of the circumstances test." *Id.* at 28,690. Within this totality-of-the-circumstances assessment, only the receipt of "cash public assistance for income maintenance" should be considered; "receipt of non-cash benefits or the receipt of special-purpose cash benefits not for income maintenance should not be taken into account." *Id.* The *1999 Field Guidance* thus largely reaffirmed INS's 1987 rule. For the past twenty years, the *1999 Field Guidance* has governed, until it was replaced by the Final Rule.

So what to make of this history? Unlike the district courts, we are unable to discern one fixed understanding of "public charge" that has endured since 1882. If anything has been consistent, it is the idea that a totality-of-the-circumstances test governs public-charge determinations. But different factors have been weighted more or less heavily at different times, reflecting changes in the way in which we provide assistance to the needy. Initially, the likelihood of being housed in a government or charitable institution was most important. Then, the focus shifted in 1948 to whether public benefits received by an immigrant could be monetized, and the immigrant refused to pay for them. In 1974, it shifted again to whether the immigrant was employable and self-sufficient. That was subsequently narrowed in 1987 to whether the immigrant had received public cash assistance, which excluded in-kind benefits. Congress then codified particular factors immigration officers must consider, which was followed by the *1999 Field Guidance*'s definition of

"public charge." In short, we find that the history of the use of "public charge" in federal immigration law demonstrates that "public charge" does not have a fixed, unambiguous meaning. Rather, the phrase is subject to multiple interpretations, it in fact has been interpreted differently, **\*797** and the Executive Branch has been afforded the discretion to interpret it.

Congress simply has not spoken to how "public charge" should be defined. We must presume that when Congress enacted the current version of the INA in 1996, it was aware of the varying historical interpretations of "public charge." *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009). Yet Congress chose not to define "public charge" and, instead, described various factors to be considered "at a minimum," without even defining those factors. It is apparent that Congress left DHS and other agencies enforcing our immigration laws the flexibility to adapt the definition of "public charge" as necessary.

(3) *Other Factors.* Both district courts found it significant that Congress twice considered, but failed to enact, a definition of "public charge" that is similar to the definition adopted in the Final Rule. *City & Cty. of San Francisco*, —— F.Supp.3d ——, ——, 2019 WL 5100718 at \*27; *Washington*, —— F.Supp.3d ——, ——, 2019 WL 5100717, at \*17. During the debates over IIRIRA in 1996, Congress considered whether to enact the following definition of "public charge": "the term 'public charge' includes any alien who receives [certain means-tested] benefits ... for an aggregate period of at least 12 months or 36 months" in some cases. 142 Cong. Rec. 24,313, at 24,425 (1996). Senator Leahy argued that this was "too quick to label people as public charges for utilizing the same public assistance that many Americans need to get on their feet," and that the phrase "means tested" was "unnecessarily uncertain." S. Rep. No. 104-249, at 63–64 (1996). Nevertheless, the Senate passed the bill containing the definition of "public charge." Before the House considered the bill, however, President Clinton implicitly threatened to veto it because it went "too far in denying legal immigrants access to vital safety net programs which could jeopardize public health and safety." Statement on Senate Action on the "Immigration Control and Financial Responsibility Act of 1996," 32 Weekly Comp. Pres. Doc. 783 (May 6, 1996). Ultimately, Congress chose not to enact this "public charge" definition. In 2013, the Senate rejected an amendment to the INA that "would have expanded the definition of 'public charge' such that people who received non-cash health benefits could not become legal permanent residents. This

amendment would also have denied entry to individuals whom the Department of Homeland Security determines are likely to receive these types of benefits in the future." S. Rep. No. 113-40, at 63 (2013).

**[23]** The district courts viewed these failed legislative efforts as evidence that Congress specifically rejected the interpretation of "public charge" DHS articulated in the Final Rule, and that the Final Rule is thus an impermissible reading of the INA. *City & Cty. of San Francisco,* —— F.Supp.3d ——, ——, 2019 WL 5100718, at *27; *Washington,* —— F.Supp.3d ——, ——, 2019 WL 5100717, at *17. We disagree. If this legislative history is probative of anything, it is probative only of the fact that Congress chose *not* to codify a particular interpretation of "public charge." [14] *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 184, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." **\*798** (quotation marks and citation omitted)). But the failure of Congress to *compel* DHS to adopt a particular rule is not the logical equivalent of *forbidding* DHS from adopting that rule. The failure to adopt a new rule is just that: no new rule. [15] And no change to § 212 means that consular officers, the Attorney General, and DHS retain all the discretion granted them in the INA.

A second argument made by the States and relied upon by the Eastern District of Washington is that DHS exceeded its authority by determining what makes a person "self-sufficient." *Washington,* —— F.Supp.3d ——, —— – ——, 2019 WL 5100717, at *17–18. This argument is refuted by the statute itself. As we have discussed, the INA requires immigration officers to consider an alien's "health," "family status," "assets, resources, [ ] financial status," "education and skills." 8 U.S.C. § 1182(a)(4)(B)(i)(II)–(V). The concept of self-sufficiency is subsumed within each of these factors. And even if it were not, the statutory factors are not exhaustive; DHS may add to them. *See id.* § 1182(a)(4)(B)(i). Because DHS has been "charged with the administration and enforcement" of all "laws relating to the immigration and naturalization of aliens," *Id.* § 1103(a)(1); *see also* 6 U.S.C. § 112(b)(1), determining what constitutes self-sufficiency for purposes of the public-charge assessment is well within DHS's authority. [16]

\* \* \*

In short, Congress has not spoken directly to the interpretation of "public charge" in the INA. Nor did it unambiguously foreclose the interpretation articulated in the Final Rule. Instead, the phrase "public charge" is ambiguous under *Chevron.* DHS has the authority to interpret it and "must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron,* 467 U.S. at 863–64, 104 S.Ct. 2778. Indeed, "the fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute." *Id.* at 864, 104 S.Ct. 2778. **\*799** We thus proceed to the second step of the *Chevron* analysis.

#### b. *Chevron* Step 2

At *Chevron*'s second step, we ask whether the agency's interpretation is "reasonable—or 'rational and consistent with the statute.' " *Diaz-Quirazco v. Barr,* 931 F.3d 830, 840 (9th Cir. 2019) (quoting *Sullivan v. Everhart,* 494 U.S. 83, 89, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990)). If it is, we must defer to it, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Perez-Guzman v. Lynch,* 835 F.3d 1066, 1073–74 (9th Cir. 2016) (quoting *Brand X,* 545 U.S. at 980, 125 S.Ct. 2688).

**[24]** The Final Rule easily satisfies this test. As we have explained, the INA grants DHS considerable discretion to determine if an alien is likely to become a public charge. To be sure, under the Final Rule, in-kind benefits (other than institutionalization) will for the first time be relevant to the public-charge determination. We see no statutory basis from which a court could conclude that the addition of certain categories of in-kind benefits makes DHS's interpretation untenable. [17] And whether the change in policy results from changing circumstances or a change in administrations, the wisdom of the policy is not a question we can review. *See Brand X,* 545 U.S. at 981, 125 S.Ct. 2688.

Our conclusion is reinforced by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), which Congress enacted contemporaneously with IIRIRA. PRWORA set forth our "national policy with respect to welfare and immigration." 8 U.S.C. § 1601. In relevant part, PRWORA provides, "Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." *Id.* § 1601(1).

As a result, "[i]t continues to be the immigration policy of the United States that ... aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id.* § 1601(2). Receipt of non-cash public assistance is surely relevant to "self-sufficiency" and whether immigrants are "depend[ing] on public resources to meet their needs." *See id.* § 1601(1)–(2); *see also Korab v. Fink*, 797 F.3d 572, 580 (9th Cir. 2014). PRWORA thus lends support to DHS's interpretation of the INA.

We conclude that DHS's interpretation of "public charge" is a permissible construction of the INA.

### 2. The Rehabilitation Act

The States argue, and the Eastern District of Washington found, that the Final Rule is inconsistent with the Rehabilitation Act. *Washington*, ––– F.Supp.3d ––––, ––––, 2019 WL 5100717, at *18. The Northern District of California rejected that argument. *City & Cty. of San Francisco*, ––– F.Supp.3d ––––, –––– – ––––, 2019 WL 5100718, at *29–30. The Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity ... conducted **\*800** by any Executive agency." 29 U.S.C. § 794(a). "Program or activity" is defined as "all of the operations of ... [an] agency." *Id.* § 794(b).

[25] This argument need not detain us long. First, under the INA, immigration officers are obligated to consider an immigrant's "health" when making the public-charge determination. 8 U.S.C. § 1182(a)(4)(B)(i)(II). To the extent that inquiry may consider an alien's disability, the officers have been specifically directed by Congress to do so. Indeed, Congress's express direction that immigration officers consider an alien's "health" came twenty-three years *after* the Rehabilitation Act. We cannot see how a general provision in one statute constrains an agency given a specific charge in a subsequent law. The INA does not violate the Rehabilitation Act. Second, nothing in the Final Rule changes DHS's practice with respect to considering an alien's health. Nothing in the Final Rule suggests that aliens will be denied admission or adjustment of status "solely by reason of her or his disability." Throughout the Final Rule, DHS confirms that the public-charge determination is a totality-of-the-circumstances test. *See* 84 Fed. Reg. at 41,295, 41,368.

And DHS specifically addressed this argument in the Final Rule: "it is not the intent, nor is it the effect of this rule to find a person a public charge solely based on his or her disability." *Id.* at 41,368. DHS has shown a strong likelihood that the Final Rule does not violate the Rehabilitation Act.

\* \* \*

In sum, DHS is likely to succeed in its argument that the Final Rule should not be set aside as contrary to law. We will not minimize the practical impact of the Final Rule, but we will observe that it is a short leap in logic for DHS to go from considering in-cash public assistance to considering both in-cash and in-kind public assistance. DHS has shown that there is a strong likelihood that its decision to consider the receipt of in-kind government assistance as part of its totality-of-the-circumstances test is a reasonable interpretation of the INA and does not violate the Rehabilitation Act.

### B. Arbitrary and Capricious

[26] [27] Arbitrary and capricious review under the APA addresses the reasonableness of the agency's decision. The classic statement of our scope of review is *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automotive Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983):

> [T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that could not be ascribed

to a difference in view of the product of agency expertise.

*Id.* at 43 (quotation marks and citations omitted); *see Org. Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956, 966–67 (9th Cir. 2015). An agency's failure to respond to any particular comment or point put forward by a rule's opponents is not a ground for finding per se arbitrary-and-capricious action. *See Safari Aviation Inc. v. Garvey*, 300 F.3d 1144, 1150–52 (9th Cir. 2002) **\*801** (explaining that there is no per se violation of the APA when an agency fails to address comments); *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) ("[The APA] has never been interpreted to require the agency to respond to every comment, or to analyse [sic] every issue or alternative raised by the comments, no matter how insubstantial.").

[28] The fact that DHS has changed policy does not substantially alter the burden in the challengers' favor. DHS must, of course, "show that there are good reasons for the new policy," but, it

> need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009).

[29] The district courts raised two objections to DHS's consideration that the district courts found made the Final Rule arbitrary and capricious: (1) DHS's failure to properly weigh the costs to state and local governments and healthcare providers, such as hospitals, resulting from disenrollment from public benefits programs; and (2) DHS's inadequate consideration of the Final Rule's impact on public health. *City & Cty. of San Francisco*, —— F.Supp.3d ——, ——, 2019 WL 5100718, at \*31–35; *Washington*, —— F.Supp.3d ——, ——, 2019 WL 5100717, at \*19. We will consider each in turn.

**1. Costs of Disenrollment**

The Northern District of California's principal concern was the higher costs that state and local governments will face as a result of "disenrollment [from] public benefits." *City & Cty. of San Francisco*, —— F.Supp.3d ——, ——, 2019 WL 5100718 at \*31. Specifically, the district court concluded that "DHS appears to have wholly failed to engage with [comments on the costs of the change]. DHS failed to grapple with the [Final] Rule's predictable effects on local governments, and instead concluded that the harms—whatever they may be—are an acceptable price to pay." *Id.* at ——, 2019 WL 5100718 at \*32. The court further faulted DHS for "refus[ing] to consider the costs associated with predicted, likely disenrollment of those not subject to the public charge determination." *Id.*

We begin with the observation that DHS addressed at length the costs and benefits associated with the Final Rule. *See* 84 Fed. Reg. at 41,300–03 (summarizing costs and benefits); *id.* at 41,312–14 (estimating costs to health care providers, states, and localities); *id.* at 41,463–81 (responding to various comments on costs and benefits); *id.* at 41,485–41,489 (responding to Executive Orders requiring an assessment of the costs and benefits of regulatory alternatives). [18] In addition, DHS prepared an "Economic Analysis Supplemental Information for Analysis of Public Benefits Programs," www.regulations.gov/document?D=USCIS-2010-0012-63742.

DHS's analysis began by stating, "This rule will impose new costs on this population applying to adjust status ... that are subject to the public charge ground of inadmissibility." 84 Fed. Reg. at 41,300. It estimated the direct costs to the federal **\*802** government of the rule to be \$35,202,698 annually. Some of these direct costs to the federal government would be offset by "individuals who may choose to disenroll from or forego enrollment in a public benefits program." *Id.* DHS estimated the reduction in federal transfer payments would be about \$2.47 billion annually. *Id.* at 41,301. It further estimated that there would be a reduction in state transfer payments of about \$1.01 billion annually. *Id.* DHS also acknowledged that the Final Rule would impose direct and indirect costs on individuals and entities. The first of these, it suggested, were "familiarization costs," which was "a direct cost of the rule." *Id.* Organizations that work with immigrant communities would similarly experience indirect costs of familiarization. *Id.*

Elsewhere, DHS responded to comments claiming that the Final Rule would cause aliens to disenroll from or forego enrollment in public benefit programs and that this "would be detrimental to the financial stability and economy of communities, States, local organizations, hospitals, safety net providers, foundations, and healthcare centers." *Id.* at 41,312; *see also id.* (suggesting that the Final Rule would increase the use of hospital emergency rooms). DHS identified three categories of aliens who might be affected by the Final Rule. First, there are aliens who are entitled to public benefits and seek to immigrate or adjust status. Their receipt of some public benefits are simply not covered by the rule. DHS noted, for example, that "emergency response, immunization, education, or [certain] social services" are not included in its revised definition of "public benefits." *Id.* On the other hand, there are public benefits to which such an alien is entitled but which will be considered by DHS in its determination whether such alien is a "public charge." DHS "acknowledge[d] that individuals subject to this rule may decline to enroll in, or may choose to disenroll from, public benefits for which they may be eligible under PRWORA, in order to avoid negative consequences as a result of this final rule." *Id.* DHS could not estimate how many aliens in this category would be affected by the Final Rule "because data limitations provide neither a precise count nor reasonable estimate of the number of aliens who are both subject to the public charge ground of inadmissibility and are eligible for public benefits in the United States." *Id.* at 41,313.

The second category of aliens are those who are unlawfully in the United States. These are "generally barred from receiving federal public benefits other than emergency assistance." *Id.* (footnote omitted). Nevertheless, DHS announced that it will *not* consider "for purposes of a public charge inadmissibility determination whether applicants for admission or adjustment of status are receiving food assistance through other programs, such as exclusively state-funded programs, food banks, and emergency services, nor will DHS discourage individuals from seeking such assistance." *Id.*

Third are those aliens and U.S. citizens who are *not* subject to the Final Rule, but erroneously think they are and disenroll from public benefits out of an abundance of caution. *Id.* Disenrollment by this category of persons should not be influenced by the Final Rule because their receipt of public benefits will "not be counted against or made attributable to immigrant family members who are subject to this rule." *Id.* DHS understood "the potential effects of confusion" over the scope of the Final Rule that might lead to over-disenrollment.

DHS stated that it would "issue clear guidance that identifies the groups of individuals who are not subject to the rule." *Id.*

**\*803** The Northern District of California pointed out that DHS's response "fails to discuss costs being borne by the states, hospitals, or others, other than to say DHS will issue guidance in an effort to mitigate confusion." *City & Cty. of San Francisco,* —— F.Supp.3d ——, ——, 2019 WL 5100718, at \*34. The court further criticized DHS for "flatly refus[ing] to consider the costs associated with predicted, likely disenrollment of those not subject to the public charge determination." *Id.* at ——, 2019 WL 5100718 at \*35.

We think several points must be considered here. First, the costs that the states, localities, and various entities (such as healthcare providers) may suffer are indirect. Nothing in the Final Rule imposes costs on those governments or entities; the Final Rule does not regulate states, localities, and private entities. Disenrollment will be the consequence of either (1) the free choice of aliens who wish to avoid any negative repercussions for their immigration status that would result from accepting public benefits, or (2) the mistaken disenrollment of aliens or U.S. citizens who can receive public benefits without any consequences for their residency status. DHS addressed both groups. DHS said it did not have data to calculate the size of the first group (and, presumably, the value of the benefits from which they will disenroll), and it had no way to estimate the second. 84 Fed. Reg. at 41,313. DHS stated that it would try to compensate for the latter group's error by publishing clear guidance, and it also noted that other organizations, public and private, would have an incentive to provide accurate information to persons who might mistakenly disenroll. *Id.* at 41,486.

Second, DHS did acknowledge the indirect costs the Final Rule might impose

> downstream ... on state and local economics, large and small businesses, and individuals. For example, the rule might result in reduced revenues for healthcare providers participating in Medicaid, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or

landlords participating in federally funded housing programs.

*Id.* It did not attempt to quantify those costs, but it recognized the overall effect of the Final Rule, and that is sufficient. *See Irvine Med. Ctr. v. Thompson,* 275 F.3d 823, 835 (9th Cir. 2002) ("[T]he Secretary acknowledged that some Medicare beneficiaries would possibly have to shoulder an additional financial burden as a result of the repeal of the carry-forward provision. This acknowledgment did not render the Secretary's rulemaking statement or reliance upon it arbitrary, however." (internal citation omitted)).

Third, DHS is not a regulatory agency like EPA, FCC, or OSHA. Those agencies have broad mandates to regulate directly entire industries or practices, sometimes on no more instruction from Congress than to do so in the "public convenience, interest or necessity," 47 U.S.C. § 303 (FCC), or as "appropriate and necessary," 42 U.S.C. § 7412(n)(1) (A) (EPA). When Congress has vested such broad regulatory authority in agencies, the Supreme Court has sometimes insisted that the agencies perform some kind of a cost-benefit analysis. *See, e.g., Michigan v. E.P.A.,* ––– U.S. ––––, 135 S. Ct. 2699, 2707, 192 L.Ed.2d 674 (2015) (EPA cannot "ignore cost when deciding whether to regulate power plants"); *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,* 448 U.S. 607, 644, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality opinion) (OSHA must "undertake some cost-benefit analysis before [it] promulgates any [safety and health] standard"). *But see* **\*804** *Am. Textile Mfs. Inst. Inc. v. Donovan,* 452 U.S. 490, 510–11, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) ("Congress uses specific language when intending that an agency engage in cost-benefit analysis."). By contrast, DHS is defining a simple statutory term—"public charge"—to determine whether an alien is admissible. Its only mandate is to regulate immigration and naturalization, not to secure transfer payments to state governments or ensure the stability of the health care industry. Any effects on those entities are indirect and well beyond DHS's charge and expertise. Even if it could estimate the costs to the states, localities, and healthcare providers, DHS has a mandate from Congress with respect to admitting aliens to the United States. As DHS explained,

DHS does not believe that it is sound policy to ignore the longstanding self-sufficiency goals set forth by Congress or to admit or grant adjustment of status applications of aliens who are likely to receive public benefits designated in this rule to meet their basic living needs in ... hope that doing so might alleviate food and housing insecurity, improve public health, decrease costs to states and localities, or better guarantee health care provider reimbursements. DHS does not believe that Congress intended for DHS to administer [§ 212] in a manner that fails to account for aliens' receipt of food, medical, and housing benefits so as to help aliens *become* self-sufficient.

84 Fed. Reg. at 41,314. Even had DHS been able to calculate the indirect costs that states, localities, and healthcare providers might bear as a result of the Final Rule, it is not clear what DHS was supposed to balance. Rather, it was sufficient —and not arbitrary and capricious—for DHS to consider whether, in the long term, the overall benefits of its policy change will outweigh the costs of retaining the current policy.

### 2. Public-Health Concerns

The Northern District of California also found that DHS did not sufficiently respond to certain public-health concerns. *City & Cty. of San Francisco,* ––– F.Supp.3d ––––, ––––, 2019 WL 5100718, at *35–37. Specifically, the court worried that by disenrolling from public-health benefits like Medicaid, people may forgo vaccinations, which could have serious health consequences. *Id.* The district court also pointed out that the *1999 Field Guidance* declined to define "public charge" to include receipt of "health and nutrition benefits" out of fear of possible public-health ramifications. *Id.* at ––––, 2019 WL 5100718 at *37 (citing 64 Fed. Reg. at 28,692).

DHS not only addressed these concerns directly, it changed its Final Rule in response to the comments. 84 Fed. Reg. at 41,297. With respect to vaccines, DHS stated that it "does not intend to restrict the access of vaccines for children or adults or intend to discourage individuals from obtaining the necessary vaccines to prevent vaccine-preventable diseases." *Id.* at 41,384. The Final Rule "does not consider receipt of Medicaid by a child under age 21, or during a person's

pregnancy, to constitute receipt of public benefits." DHS said that would address "a substantial portion, though not all, of the vaccinations issue." *Id.* Accordingly, DHS "believes that vaccines would still be available for children and adults even if they disenroll from Medicaid." *Id.* at 41,385.

Both the Northern District of California and the Eastern District of Washington expressed concern that the Final Rule was a departure from the *1999 Field Guidance*, which raised the vaccine issue, and that the *1999 Field Guidance* had "engendered reliance." *City & Cty. of San Francisco,* —— F.Supp.3d ——, ——, 2019 WL 5100718, at *37; *see also Washington,* —— F.Supp.3d ——, ——, 2019 WL 5100717, at *19. The question is not whether an agency can **\*805** change a policy that people have come to rely on; clearly, it can. The real question is whether the agency has acknowledged the change and explained the reasons for it. DHS knew well that it was adopting a change in policy; that was the whole purpose of this rulemaking exercise. *See Encino Motorcars,* 136 S. Ct. at 2126 (holding that a Department of Labor regulation was "issued without ... reasoned explanation" where there was "decades of industry reliance on the Department's prior policy" and the new rule was "offered [with] barely any explanation"); *I.N.S. v. Yueh-Shaio Yang,* 519 U.S. 26, 32, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) (distinguishing "an irrational departure from [established] policy" from "an avowed alteration of it"). "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television Stations,* 556 U.S. at 515, 129 S.Ct. 1800. Because DHS has adequately explained the reasons for the Final Rule, it has demonstrated a strong likelihood of success on the merits.

## V. OTHER FACTORS

We have concluded that DHS is likely to succeed on the merits. Were we reviewing the preliminary injunctions on direct review, this would be sufficient to reverse the district courts' orders. *See Trump v. Hawai'i,* 138 S. Ct. at 2423. But because we are here on DHS's motion for a stay, DHS bears the burden of satisfying three additional factors: that DHS will suffer some irreparable harm, that the balance of the hardships favors a stay, and that the stay is in the public interest. *Nken,* 556 U.S. at 434, 129 S.Ct. 1749.

A. *Irreparable Harm*

We first consider whether DHS has shown that it "will be irreparably injured absent a stay." *Nken,* 556 U.S. at 434, 129 S.Ct. 1749 (quoting *Hilton,* 481 U.S. at 776, 107 S.Ct. 2113). The claimed irreparable injury must be *likely* to occur; "simply showing some 'possibility of irreparable injury' " is insufficient. *Id.* (citation omitted). DHS has carried its burden on this factor.

DHS contends that as long as the Final Rule is enjoined,

> DHS will grant lawful-permanent-resident status to aliens whom the Secretary would otherwise deem likely to become public charges in the exercise of his discretion. DHS currently has no practical means of revisiting public-charge determinations once made, so the injunctions will inevitably result in the grant of LPR status to aliens who, under the Secretary's interpretation of the statute, are likely to become public charges.

The States do not deny that LPR status might be irrevocably granted to some aliens, but they claim that DHS has "exaggerate[d] the effect of the injunction" because the public-charge exclusion has "never played a significant role in immigration. In contrast, in just 8 of the 14 Plaintiff States [in the *Washington* case] over 1.8 million lawfully present residents may be driven from federal and state assistance programs if the injunction is lifted." They argue that preserving the status quo will not harm DHS pending adjudication on the merits, especially considering that the Final Rule replaces a policy that had been in place for decades.

Several points emerge from the parties' claims. First, the States appear to concede that decisions to grant adjustment of status to aliens who could otherwise not be eligible are not reversible. Second, although the States argue that "public charge" exclusions have not been an important component of our immigration **\*806** scheme in the past, the whole point of DHS's Final Rule is that "public charge" inadmissibility has been underenforced.

Moreover, to the extent the States are contesting the magnitude of the harm to DHS, the claim is irrelevant here. We have said that this "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.' " *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). But even if we look at the magnitude, the States' own evidence is double-edged. The States claim that they will suffer harm because millions of persons will disenroll to avoid potential immigration consequences. This seems to prove DHS's point. If millions of "lawfully present residents" are currently receiving public benefits and may choose to disenroll rather than be found to be a "public charge" and inadmissible, the harm cited by DHS is not only irreparable, but significant.

Finally, we think the tenability of DHS's past practice is of no import here. Congress has granted DHS the authority to enact and alter immigration regulations and DHS has done that, and it has done so in a way that comports with its legal authority. Thus, as of October 15, 2019, DHS had an obligation to deny admission to those likely to become public charge, as defined by the Final Rule. This is true regardless of DHS's prior policy. As a consequence, the preliminary injunctions will force DHS to grant status to those not legally entitled to it. DHS has satisfied its burden to show irreparable harm to the government absent a stay of the injunctions.

### B. *Balance of Hardships and Public Interest*

Since DHS has satisfied the first two factors, we proceed to the final two: balance of equities and the public interest. *Nken*, 556 U.S. at 435, 129 S.Ct. 1749. "Because the government is a party, we consider [these two factors] together." *California v. Azar*, 911 F.3d at 581.

To balance the equities, we consider the hardships each party is likely to suffer if the other prevails. *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843–44 (9th Cir. 2007) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). We have discussed above the irreparable, non-monetary harm to the government. On the other hand, the States contend that they face financial, public-health, and administrative harms if the Final Rule takes effect and otherwise eligible individuals disenroll from public benefits. These effects are indirect effects of the Final Rule and they are largely short-term, since they will only result during the pendency of the proceedings in the district courts and any appeals to this court and the Supreme

Court. [19] Those proceedings are likely to be conducted on an expedited basis, limiting further any potential harm to be considered by this court. DHS does not dispute that the States will incur some financial harm if the Final Rule is not stayed. It cannot, because DHS repeatedly addressed the potential costs to the States in its Final Rule. *See, e.g.*, 84 Fed. Reb. at 41,300, 41,312–14, 41,385–85, 41,469–70, 41,474. And while ordinarily, we do not consider purely economic harm irreparable, we have concluded that "such harm is irreparable" when "the states will not be able to recover monetary damages." **\*807** *California v. Azar*, 911 F.3d at 581. Yet the States' financial concerns will be mitigated to some extent. As DHS explained in the Final Rule, disenrollment from public benefits means a reduction in federal and state transfer payments, so the States will realize some savings in expenditures. 84 Fed. Reg. at 41,485–86. Nevertheless, we consider the harms to the States, even if not readily quantifiable, significant.

Balancing these harms is particularly difficult in this case. First, the harms are not comparable. DHS's harm is not monetary, but programmatic. The policy behind Congress's decision not to admit those who are likely to become a public charge may have a fiscal component, but it is not the reason for DHS's Final Rule, nor has DHS argued financial harm as a reason for seeking a stay. By contrast, the States' proffered harms are largely financial. Second, both parties' proffered harms are, to a degree, speculative. We cannot say for certain how many residents of the plaintiff states and counties will disenroll from public benefits programs, nor how much any over-disenrollment will cost the States. Nor can we say for certain how many aliens might be found admissible during the pendency of the preliminary injunction, and would have been found inadmissible under the Final Rule. Given the largely predictive nature of both parties' alleged harms, we cannot state with any confidence which is greater.

For the same reasons, the public interest in this case is likewise difficult to calculate with precision. DHS contends it is in the public's interest not to grant immigration status to persons likely to become public charges. The States contend that it is in the public's interest to avoid increased administrative and public-health costs. Both of these contentions are likely true. But on balance, we have few standards for announcing which interest is greater.

We recently observed that "balancing the equities is not an exact science." *Azar*, 911 F.3d at 582. Indeed, Justice Frankfurter once remarked that the balancing of the

equities was merely "lawyers' jargon for choosing between conflicting public interests." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). Whether the stay is granted or denied, one party's costs will be incurred and the other avoided. In the end, the "critical" factors are that DHS has mustered a strong showing of likelihood of success on the merits and some irreparable harm. *Nken*, 556 U.S. at 434, 129 S.Ct. 1749. Those factors weigh in favor of granting a stay, despite the potential harms to the States. And for that reason, the stay is in the public interest.

## VI. CONCLUSION

The motion for a stay of the preliminary injunction in Nos. 19-17213 and 19-17214 is **GRANTED**. The motion for stay of the preliminary injunction in No. 19-35914 is **GRANTED**. The cases may proceed consistent with this opinion.

BYBEE, Circuit Judge, concurring, perplexed and perturbed: I join the majority opinion in full. I write separately to emphasize two points—points that I feel must be made, but are better said in a separate opinion.

We as a nation are engaged in titanic struggles over the future of immigration in the United States. These are difficult conversations. As a court, the Ninth Circuit in particular has felt the effects of the recent surge in immigration. As we observed last year with respect to the asylum problem:

> We have experienced a staggering increase in asylum applications. Ten years ago we received about 5,000 applications **\*808** for asylum. In fiscal year 2018 we received about 97,000—nearly a twenty-fold increase. Our obligation to process these applications in a timely manner, consistent with our statutes and regulations, is overburdened. The current backlog of asylum cases exceeds 200,000—about 26% of the immigration courts' total backlog of nearly 800,000 removal cases. In the meantime, while applications are processed, thousands of applicants

who had been detained by immigration authorities have been released into the United States.

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 754 (9th Cir. 2018) (citations omitted). Because of our proximity to Mexico, Central America, and East Asia, the brunt of these cases will find their way into our court. And we are well aware that we are only seeing the matters that find their way into federal court, and that the burdens of the increase in immigration are borne not only by our judges, but by the men and women in the executive branch charged with enforcing the immigration laws.

Our court has faced an unprecedented increase in emergency petitions arising out of the administration's efforts to administer the immigration laws and secure our borders. These controversial efforts have met with mixed success in our court and the Supreme Court. *See, e.g., Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) (construction of wall on the border with Mexico), *stay issued*, ––– U.S. ––––, 140 S. Ct. 1, 204 L.Ed.2d 1170 (2019) (mem.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) (aliens entering outside a port of entry are ineligible for asylum); *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018) (DACA), *cert. granted*, ––– U.S. ––––, 139 S. Ct. 2779, 204 L.Ed.2d 1156 (2019) (mem.); *Trump v. Hawai'i*, 878 F.3d 662 (9th Cir. 2017) (per curiam) (entry restrictions), *rev'd*, ––– U.S. ––––, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018); *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) (treatment of detained alien minors under *Flores* agreement); *Hawai'i v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam) (travel ban), *vacated as moot*, ––– U.S. ––––, 138 S. Ct. 377, 199 L.Ed.2d 275 (2017) (mem.); *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam) (travel ban), *cert. denied sub nom. Golden v. Washington*, ––– U.S. ––––, 138 S. Ct. 448, 199 L.Ed.2d 331 (2017) (mem.).

My first point is that even as we are embroiled in these controversies, no one should mistake our judgments for our policy preferences. Whether "the iron fist [or an extended velvet glove] would be the preferable policy.... our thoughts on the efficacy of the one approach versus the other are beside the point, since our business is not to judge the wisdom of the National Government's policy." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003); *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 165, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) ("The wisdom of the

policy choices made by Presidents Reagan, Bush, and Clinton is not a matter for our consideration."); *Lochner v. New York*, 198 U.S. 45, 69, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Harlan, J., dissenting) ("Whether or not this be wise legislation it is not the province of the court to inquire. Under our systems of government the courts are not concerned with the wisdom or policy of legislation.").

Oh, I am not so naive as to think that a simple declaration of judicial neutrality will quell inquiry into judges' backgrounds, prior writings, and opinions. The battles over judicial nominations provide ample proof that our generation of lawyers bear a diverse set of assumptions about the nature **\*809** of law, proper modes of constitutional interpretation, and the role of the judiciary. These are fair debates and they are likely to continue for some time. We can only hope that over time our differences can be resolved by reason and persuasion rather than by politics by other means. But I don't know of any judge—at least not this judge—who can say that every opinion and judgment she issued was in accord with her preferred policy outcomes. "[I]n our private opinions, [we] need not concur in Congress' policies to hold its enactments constitutional. Judicially we must tolerate what personally we may regard as a legislative mistake." *Harisiades v. Shaughnessy*, 342 U.S. 580, 590, 72 S.Ct. 512, 96 L.Ed. 586 (1952).

My second point is less politic. In this case, we are called upon to review the merits of DHS's Final Rule through the lens of the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 706. Our review is quite circumscribed. We can set aside agency action if it is contrary to law, if it exceeds the agency's jurisdiction or authority, or if the agency failed to follow proper procedure. *Id.* § 706(2)(B)–(D). Those are largely *legal* judgments, which we can address through the traditional tools judges have long used. With respect to the *policy* behind the agency's action, we are largely relegated to reviewing the action for arbitrariness and caprice. *Id.* § 706(2)(A). That is not a very rigorous standard and, as a result, an agency has broad discretion to administer the programs entrusted to it by Congress. *Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) ("[F]undamental policy questions appropriately resolved in Congress ... are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action.").

In the immigration context, whatever dialogue we have been having with the administration over its policies, we are a poor conversant. We are limited in what we can say and in our ability—even if anyone thought we were qualified to do so—to shape our immigration policies. We lack the tools of inquiry, investigation, and fact-finding that a responsible policymaker should have at its disposal. In sum, the APA is the meagerest of checks on the executive. We are not the proper foil to this or any other administration as it crafts our immigration policies.

By constitutional design, the branch that is qualified to establish immigration policy and check any excesses in the implementation of that policy is Congress. *See* U.S. CONST. Art. I, § 8, cl. 4. And, so far as we can tell from our modest perch in the Ninth Circuit, Congress is no place to be found in these debates. We have seen case after case come through our courts, serious and earnest efforts, even as they are controversial, to address the nation's immigration challenges. Yet we have seen little engagement and no actual legislation from Congress. It matters not to me as a judge whether Congress embraces or disapproves of the administration's actions, but it is time for a feckless Congress to come to the table and grapple with these issues. Don't leave the table and expect us to clean up.

OWENS, Circuit Judge, concurring in part and dissenting in part:

While I concur with the majority's jurisdiction analysis, I otherwise respectfully dissent. In light of the: (1) government's heavy burden due to the standard of review, (2) opaqueness of the legal questions before us, (3) lack of irreparable harm to the government at this early stage, (4) likelihood of substantial injury to the plaintiffs, and (5) equities involved, I would **\*810** deny the government's motions to stay and let these cases proceed in the ordinary course. *See Nken v. Holder*, 556 U.S. 418, 427, 433–34, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (holding that a "stay is an 'intrusion into the ordinary processes of administration and judicial review,' " and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of [judicial] discretion" (citation omitted)).

**All Citations**

944 F.3d 773, 2019 Daily Journal D.A.R. 11,375

## Footnotes

1   For clarity, we will refer to the plaintiffs below as "the States" and the defendants as "DHS."

2   The Homeland Security Act of 2002 transferred much of the Attorney General's immigration authority to the newly created office of the Secretary of Homeland Security. *See In re D-J-, 23 I. & N. Dec. 572, 573–74 & n.2 (Op. Att'y Gen. 2003)* (citing Homeland Security Act of 2002, Pub. L. No. 108-7, 117 Stat. 531 (2003)). Though the Attorney General retains authority over the Executive Office for Immigration Review, *id.* n.3, the Secretary of Homeland Security is now responsible with the general administration and enforcement of immigration law, *id.* n.2.

3   An affidavit of support is a binding pledge, often made by an employer or family member of the alien, to financially support the alien at 125 percent of the Federal poverty line. 8 U.S.C. § 1183.

4   The proposed rule would not change the definition of public charge for removability determinations, only for determinations of inadmissibility. 83 Fed. Reg. at 51,134. And though the rule only applies to DHS, DHS is currently working with DOS and DOJ to ensure that all three agencies apply a consistent definition of the term in their admissibility inquiries. 84 Fed. Reg. at 41,294 n.3.

5   DHS altered the Final Rule to make clear that certain benefits were exempt from consideration, including "Medicaid [collected] by aliens under the age of 21[, Medicaid collected by] pregnant women during pregnancy and during the 60-day period after pregnancy," school-based services, Individuals with Disabilities Education Act (IDEA) services, Medicare Part D Low-Income Subsidies, and emergency medical care. 84 Fed. Reg. at 41,296–97 (codified at 8 C.F.R. § 212.21). Further, in certain circumstances, the proposed rule excuses receipt of covered public benefits. *See id.* (codified at 8 C.F.R. § 212.21) (exempting public benefits from consideration when the recipient has received certain humanitarian relief, the recipient or his spouse was in the Armed Forces, or the recipient received a waiver).

6   The Final Rule added a third factor: private health insurance not subsidized under the Affordable Care Act. 84 Fed. Reg. at 41,504.

7   Several legal and health-care organizations were also parties to the motion for a preliminary injunction below. The district court found that they failed to establish that they were within the zone of interests. *City & Cty. of San Francisco*, —— F.Supp.3d ——, ——, 2019 WL 5100718, at *53. They are not parties to this appeal.

8   Both district courts also held that the States' claims fall within the States' "zone of interests." *See City & Cty. of San Francisco*, —— F.Supp.3d ——, ——, 2019 WL 5100718, at *41; *Washington*, —— F.Supp.3d ——, ——, 2019 WL 5100717, at *11. For present purposes, because the issue is close and raises a prudential rather than jurisdictional concern, *see Bank of Am. Corp. v. City of Miami*, —— U.S. ——, 137 S. Ct. 1296, 1302, 197 L.Ed.2d 678 (2017), we will assume that the States' claims satisfy the requirement.

9   DHS raises no argument about the second and third elements of the standing analysis.

10   In a third case out of the Northern District of Illinois, the district court issued an order enjoining enforcement of the Final Rule in Illinois only. *Cook Cty. v. McAleenan*, 2019 WL 5110267 (N.D. Ill. Oct. 14, 2019).

11   The States also brought claims in both courts under the equal protection component of the Due Process Clause. U.S. CONST. art. V. Neither district court reached this issue. We also decline to reach this issue. We will consider the likelihood of success on the merits only as to those issues that formed the bases for the district courts' injunctions. In any further proceedings, the district courts are free to consider any issues fairly before them.

12   The text of the INA does not mention immigration officers. Rather, it commits the public-charge determination to the "opinion of the Attorney General." 8 U.S.C. § 1182(a)(4)(A). As we explained above, Congress has since transferred the authority granted by the INA to DHS's immigration officers.

13   In *Ng Fung Ho*, the petitioner had been admitted to the United States, based partly on his holding a "certificate" that allowed him to be a "merchant." *Id.* at 768. Several years after his admission, he pleaded guilty to gambling. *Id.* at 769. It was then determined that the petitioner was no longer a merchant. The government argued that the petitioner was deportable because he had been likely to become a public charge at the time of his admission. Because there was no evidence that the certificate he had produced prior to admission had

AR.04351

been fraudulent, we held that merely pleading guilty to gambling and paying a $25 fine three years after being admitted did not "prove that the alien ... was likely to become a public charge" at the time of admission. *Id.* We thus rejected the government's assertion that the petitioner should be deported on that basis. *Id.* at 770.

14   Sometimes it is appropriate to consider language Congress has rejected, primarily when Congress rejected language in favor of the statute adopted and under review. *See, e.g., I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421, 441–42, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (contrasting Congress's decision to adopt the House proposal over the Senate version).

15   We can speculate as to the reasons that members of Congress declined to adopt these legislative proposals, but the speculation will not help us. "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers,* 531 U.S. 159, 170, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001). Although some members may have thought the rule too harsh, others may have thought it too lenient, while a third group may have thought the rule should be left flexible and in the hands of the immigration agencies. If anything, this legislative history proves only that Congress decided not to constrain the discretion of agencies in determining who is a public charge. That discretion had long been vested in the agencies, and these failed legislative efforts did not alter that discretion.

16   The Eastern District of Washington also held that, because the states have a "central role in formulation and administration of health care policy," DHS "acted beyond its Congressionally delegated authority" when it adopted the Final Rule. *Washington,* ⸺ F.Supp.3d ⸺, ⸺, 2019 WL 5100717, at *18; *see also id.* ("Congress cannot delegate authority that the Constitution does not allocate to the federal government in the first place ...."). Congress, of course, has plenary authority to regulate immigration and naturalization. U.S. CONST. art. I, § 8, cl. 4. Pursuant to that authority, Congress adopted the "public charge" rule, which no one has challenged on constitutional grounds. Further, Congress has authorized DHS to adopt regulations. 8 U.S.C. § 1103(a)(3). DHS thus did not overstep its authority by promulgating the Final Rule. Indeed, under the district court's analysis, even the *1999 Field Guidance* might be unconstitutional. But neither the district court nor the States question the lawfulness of the *1999 Field Guidance.* We see no meaningful difference between INS's authority to promulgate the *1999 Field Guidance* and DHS's authority to adopt the Final Rule.

17   Cash benefits and in-kind benefits are often treated under the single rubric of a "direct subsidy." *Witters v. Wash. Dep't of the Servs. for the Blind,* 474 U.S. 481, 487, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). In certain contexts, such as settlement, "compensation in kind is worth less than cash of the same nominal value," *In re Mex. Transfer Litig.,* 267 F.3d 743, 748 (9th Cir. 2001), but the Final Rule does not deal with the valuation of such services. It deals only with whether in-kind benefits have been received under certain specified programs.

18   Indeed, DHS's notice is quite comprehensive. In no fewer than 216 pages (which DHS estimated would take sixteen to twenty hours to read), DHS explained the changes proposed, estimated costs and savings, and addressed scores of comments on topics ranging from potential public-health concerns to whether DHS should consider immigrants' credit scores. *See generally* 84 Fed. Reg. at 41,292–508.

19   This is not to say that the States will not continue to incur harms after the litigation terminates, but these potential harms are not relevant to the question of a preliminary injunction or a stay.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Candelas-Garcia v. Barr, 9th Cir., July 15, 2020

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Maldonado v. Lynch, 9th Cir., May 18, 2015

659 F.3d 762
United States Court of Appeals,
Ninth Circuit.

Hubert George COLE, Petitioner,

v.

Eric H. HOLDER Jr., Attorney General, Respondent.

No. 09–73625.
|
Argued and Submitted Dec. 7, 2010.
|
Filed Sept. 22, 2011.

**Synopsis**

**Background:** Citizen and national of Honduras filed petition for review of Board of Immigration Appeals' (BIA) order denying his application for deferral of removal under Convention Against Torture (CAT).

**Holdings:** The Court of Appeals, Berzon, Circuit Judge, held that:

[1] BIA failed to adequately consider expert testimony presented by alien, and

[2] BIA was required to consider alien's claim that medical care would be intentionally withheld because of his gang tattoos.

Petition granted, BIA decision vacated, and matter remanded.

Noonan, Circuit Judge, concurred and filed opinion.

Callahan, Circuit Judge, dissented and filed opinion.

West Headnotes (16)

**[1]      Aliens, Immigration, and Citizenship      Law questions**

In reviewing denial of relief under Convention Against Torture (CAT), Court of Appeals reviews issues of law de novo.

1 Cases that cite this headnote

**[2]      Aliens, Immigration, and Citizenship      Review of initial decision or administrative review**

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

Where Board of Immigration Appeals (BIA) conducts its own review of evidence and law, Court of Appeals only reviews BIA's decision, except to extent it expressly adopts immigration judge's (IJ) decision.

31 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship** 👉 Substantial evidence in general

Board of Immigration Appeals' (BIA) findings underlying its determination that applicant is not eligible for relief under Convention Against Torture (CAT) are reviewed for substantial evidence.

25 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 👉 Substantial evidence in general

Under substantial evidence standard, Court of Appeals upholds Board of Immigration Appeals' (BIA) determination unless evidence in record compels contrary conclusion.

20 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 👉 Credibility

If neither Board of Immigration Appeals (BIA) nor immigration judge (IJ) made adverse credibility finding in proceeding seeking relief under Convention Against Torture (CAT), Court of Appeals must assume that applicant's factual contentions are true.

18 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 👉 Relief Under Treaties Against Torture

Application for relief under Convention Against Torture (CAT) need not show that applicant will be tortured on account of any particular ground.

17 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** 👉 Standard for relief

Where torture is sufficiently likely, Convention Against Torture (CAT) does not permit any discretion or provide for any exceptions.

8 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship** 👉 Relief Under Treaties Against Torture

Provision for deferral of removal under Convention Against Torture (CAT) applies to all applicants, even those who are former gang members convicted of aggravated felony. 8 C.F.R. § 208.17(a).

5 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship** 👉 Government action or acquiescence

In ruling on application for relief under Convention Against Torture (CAT), acquiescence by government officials requires only that they were aware of torture but remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

13 Cases that cite this headnote

**[10]**    **Aliens, Immigration, and Citizenship**  👉  Acts constituting torture

To establish entitlement to relief under Convention Against Torture (CAT), applicant must show that torturer, whether public official or private party acting with government's consent or acquiescence, has specific intent to inflict severe harm. 🔖 8 C.F.R. § 1208.18(a)(1).

14 Cases that cite this headnote

**[11]**    **Aliens, Immigration, and Citizenship**  👉  Findings or statement of reasons

Where, in ruling on application for relief under Convention Against Torture (CAT), there is any indication, such as misstating record and failing to mention highly probative or potentially dispositive evidence, that Board of Immigration Appeals (BIA) did not consider all evidence before it, catchall phrase does not suffice, and decision cannot stand. 🔖 8 C.F.R. § 1208.16(c)(3).

90 Cases that cite this headnote

**[12]**    **Aliens, Immigration, and Citizenship**  👉  Admissibility

Where potentially dispositive testimony and documentary evidence is submitted in support of application for relief under Convention Against Torture (CAT), Board of Immigration Appeals (BIA) must give reasoned consideration to that evidence. 🔖 8 C.F.R. § 1208.16(c)(3).

83 Cases that cite this headnote

**[13]**    **Aliens, Immigration, and Citizenship**  👉  Findings or statement of reasons
      **Aliens, Immigration, and Citizenship**  👉  Country conditions;  official reports

Board of Immigration Appeals (BIA) failed to adequately consider expert testimony presented by Honduran citizen in support of his application for relief under Convention Against Torture (CAT), where alien presented two expert witnesses to support his claim that he would be subjected to torture if returned to Honduras because of his gang tattoos, BIA stated only that one expert's testimony was unpersuasive in light of State Department's country report and because he failed to provide specific examples to corroborate his opinion, but did not address other expert's testimony at all, State Department report in fact corroborated rather than contradicted many aspects of both experts' testimony, and experts did testify about specific incidents of police torturing or killing suspected gang members. 🔖 8 C.F.R. § 1208.16(c)(3).

9 Cases that cite this headnote

**[14]**    **Aliens, Immigration, and Citizenship**  👉  Acts constituting torture

To establish specific intent to inflict severe harm, applicant for relief under Convention Against Torture (CAT) must show not just that acts have foreseeable result of inflicting harm, but rather must establish that actor intends actual consequences of his conduct. 🔖 8 C.F.R. § 1208.18(a)(5).

2 Cases that cite this headnote

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

[15]  **Aliens, Immigration, and Citizenship**  ☞  Acts constituting torture

Claim of inadequate health care, without more, is insufficient to warrant relief under Convention Against Torture (CAT). 8 C.F.R. § 1208.18(a)(5).

2 Cases that cite this headnote

[16]  **Aliens, Immigration, and Citizenship**  ☞  Admissibility

In ruling on Honduran citizen's application for relief under Convention Against Torture (CAT), Board of Immigration Appeals (BIA) was required to consider alien's claim that medical care would be intentionally withheld because of his gang tattoos, and that he, specifically, was likely to need medical care due to his brain injury, where expert had testified that he had personally witnessed staff at public hospitals let victim bleed to death because he had tattoos, and that, in his opinion, alien would similarly be denied emergency medical care in Honduras and would have only contingent, restricted access to other medical care. 8 C.F.R. §§ 1208.16(c)(3), 1208.18(a)(5).

2 Cases that cite this headnote

**Attorneys and Law Firms**

*764  Fatma E. Marouf, Marouf Law Group, Los Angeles, CA, for the petitioner.

Tony West, Assistant Attorney General, Civil Division, Thomas B. Fatouros, Senior Litigation Counsel, and Pegah Vakili and Yedidya Cohen, Trial Attorneys, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX7–988.

Before: JOHN T. NOONAN, MARSHA S. BERZON, and CONSUELO M. CALLAHAN, Circuit Judges.

Opinion by Judge BERZON; Concurrence by Judge NOONAN; Dissent by Judge CALLAHAN.

## OPINION

BERZON, Circuit Judge:

We consider the application of Hubert George Cole (Cole), a citizen and national of Honduras, for deferral of removal under the Convention Against Torture (CAT). The Board of Immigration Appeals (BIA) denied the application, concluding that Cole had not established he would more likely than not be tortured if removed to Honduras. Because the BIA failed to give reasoned consideration to potentially dispositive testimony by Cole's expert witnesses and did not address all of Cole's claims, we grant the petition and remand to the BIA.

## I.

Cole, a 40–year–old, black, former gang member, was born in Honduras and entered the United States at age eleven with his mother and two sisters. Cole has a lengthy criminal history in the United States, beginning when he was a juvenile. While in

prison, he joined the Crips, an African American gang, as a way to protect himself from Hispanic gangs. While a member of the Crips, he was tattooed with gang-related symbols and letters on his face and body. In August 2007, Cole was the victim of a drive-by shooting; he was seriously injured and needs ongoing medical care.

The Department of Homeland Security commenced removal proceedings against Cole on July 11, 2008. The Notice to Appear charged that Cole was removable because he entered without being admitted or paroled and was convicted, on June 18, 1999, for possession of cocaine for sale. Cole conceded removability and applied for asylum, withholding of removal, and relief under CAT. After the immigration judge (IJ) denied all his claims for relief, Cole appealed only the CAT claim to the BIA, **\*765** which dismissed the appeal. Whether the BIA properly denied CAT relief is the only issue before us.

## A. Factual Background

Cole testified that while incarcerated as a young man, he felt threatened by Hispanic gang members, joined the Crips for protection, and acquired several Crips tattoos, including a teardrop under his eye, a G behind his ear, and tattoos on his calves, arms and back. Once released from prison Cole stopped associating with the Crips and worked at a homeless services agency. Nevertheless, rival gangs could still identify him as a Crips gang member because of his tattoos. According to Cole, Hispanic gangs hate the Crips and kill Crips gang members. Cole has not had the tattoos removed because tattoo removal is a painful and long process.

Despite disassociating himself from the Crips, Cole continued to feel threatened by Hispanic gang members. In August 2007, Cole was the victim of a drive-by shooting by Hispanic gang members. [1] He was outside a store with a friend when a car with four or five Hispanic people drove by; the car's occupants were pointing at him and yelling out their gang affiliation—Santa Monica 13. Cole and his friend quickly got back into their car. But, before his friend could get his car started, the other car pulled up on the passenger side, where Cole was sitting, and a Hispanic man started shooting at Cole.

Cole was shot in the head and abdomen. Half his liver and part of his skull had to be removed because of the shooting. Hospitalized for five or six months, Cole was still experiencing problems related to his brain injury at the time of his testimony. In his declaration, Cole stated that he now has a defective, fragile skull and that he can easily injure his brain if he is not careful. A letter from his doctor confirmed that he has a "sizable skull defect with no protection of his brain" and asserted that, for this reason, incarceration could put him at a high risk of serious injury. Cole's doctor told him he will be in pain for a long time and will likely have seizures in the future, necessitating ongoing medical care.

Cole maintains that if returned to Honduras, he will be tortured and possibly killed by gangs, police, or death squads, because of his race and his gang-related tattoos. [2] He testified that his race, [3] his **\*766** tattoos, his general appearance, and even his accent will mark him as an outsider in Honduras, and that he believes that, even if the police do not harm him themselves, they will think he is a gang member and so not protect him. Cole also fears that the police will detain him and that he will be intentionally exposed to torturous prison conditions because of his tattoos. Finally, Cole contends that he will be intentionally denied necessary medical care by public health officials in Honduras because of his tattoos, and that the intentional denial of medical care also qualifies as torture.

Cole's sister and mother testified that they are also afraid Cole will be tortured or killed if returned to Honduras and will not be able to receive the medical care that he needs.

### 1. Expert Testimony

Cole supported his CAT claim with testimony from two experts. Luis Javier Rodriguez (Rodriguez) testified as an expert on the "structure and dynamics of U.S. and Central American gangs, including the racial rivalries among those gangs." He discussed the origins of two large Hispanic gangs, Mara Salvatrucha (MS–13) and 18th Street, and how those gangs spread to Central America, primarily through gang members deported from the U.S. Rodriguez explained that the Crips gang is viewed as an

enemy by Hispanic gangs, including MS–13 and 18th Street, whose members attack members of African American gangs. According to Rodriguez, the Hispanic gangs can easily spot Crips tattoos. He also testified that the Hispanic gang members brought their "anti-black culture" down to Central America when they were deported and that someone with Crips tattoos would likely be threatened, beaten, or killed in Central America by either MS–13 or 18th Street gang members.

Cole's second expert, Elmer Javier Canales Mesa (Canales), had about nine years experience working with gang members and former gang members in Honduras. Canales testified that the two biggest gangs in Honduras are MS–13 and 18th Street and that members of these gangs kill people with tattoos from rival gangs such as the Crips. In Canales' experience, the Honduran police do not investigate the murders of gang members or suspected gang members.

Canales also testified that it is illegal to be a member of a gang in Honduras and that having a gang-related tattoo can lead to a prison sentence of six to twelve years. According to Canales, suspected gang members in the area where he works are each detained by police two or three times per week and sometimes jailed. Honduran police also physically abuse suspected gang members by throwing them on the ground and beating them with their weapons. [4] In one case he knew of, a police officer tortured two gang members to death. That officer, a former police chief, is in jail as a result of an investigation by the organization for which Canales works. Generally, however, police are not held accountable for harming gang members.

Canales also testified about specific incidents in which police or prison guards killed suspected gang members in prison. In an incident that occurred three or four years before the hearing, 68 suspected gang members died after being shot by prison guards. The year he testified, more than 20 suspected gang members had been killed in jail on the first day they **\*767** arrived there; Canales attributed the slaughter to "police negligence." He also testified about an incident in which 104 gang members died in a fire in their cell block. The guards blocked their escape by not opening the gate, and it was later determined that the fire was set by the police.

In Canales' opinion, based on statistics, studies, and his experiences over the years, Cole has a 90% chance of being detained by the Honduran police and a greater than 75% chance of being killed by gang members in Honduras because of his Crips tattoos. Canales also testified about the risk Cole would face in Honduras from death squads and social cleansing aimed at eliminating gang members. According to Canales, groups of police and other powerful citizens torture and kill those they find undesirable, including suspected gang members. Canales reported that such groups act with complete impunity in Honduras.

Finally, Canales spoke about the inability of suspected gang members to get medical care in public hospitals in Honduras. He had personally accompanied gang members and former gang members to hospitals and had seen doctors refuse to care for them. One young man, wounded and bleeding, died in the waiting room because doctors refused to treat him. Most doctors in Honduras, Canales stated, would refuse to treat an individual with tattoos because they would suspect him of being a gang member. Also, he reported, the government does nothing to hold healthcare workers accountable in such situations, despite demands from his organization. According to Canales, Cole would be denied emergency medical care if he needed it and, in a non-emergency situation, would get treatment only if accompanied by the Commissioner for Human Rights.

Given the high risk of harm former gang members in Honduras face from rival gangs, police, and vigilante groups, most of the former gang members with whom he works attempt to remove their tattoos to make themselves less identifiable. There are some programs in Honduras to help former gang members remove tattoos, but, Canales reported, they cannot meet the demand, [5] and the process is long, extremely painful, and often results in visible scarring. In his written declaration, Canales explained that because such "scars are often visible ... these individuals remain a target for gang members, death squads, and the police."

### 2. Documentary Evidence

Both Cole and the government submitted extensive documentary evidence, including reports by the U.S. government and by United Nations agencies. Many of the reports corroborated aspects of Cole's experts' testimony.

AR.04358

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 518 of 1384

For example, the 2008 U.S. State Department report recognized several human rights problems in Honduras, such as "unlawful killings by members of the police and government agents; arbitrary and summary killings committed by vigilantes and former members of the security forces; violence against detainees by security forces; harsh prison conditions; [and] corruption and impunity within the security forces." The report confirmed that gang membership, without more, was illegal in Honduras and punishable by up to 12 years in prison, and that police arrested **\*768** people based on factors such as their tattoos. The report also noted that private security companies and vigilante groups acted, with the complicity of police, as death squads to kill "supposed habitual criminals."

Moreover, although the Honduran constitution prohibits torture, there were instances in which government officials employed such practices, including beatings and other abuse of detainees. The 2008 State Department report stated that the Committee for the Defense of Human Rights in Honduras had reported that police arbitrarily detained and sometimes tortured more than two dozen individuals during a government program called Operation National. The 2007 State Department report placed the number of individuals arbitrarily arrested and, sometimes, tortured under Operation National at more than 34,000 and noted that a number of prisoner deaths had been attributed to members of the security forces.

On the other hand, the 2008 State Department report acknowledged that the government had undertaken some investigations of illegal activities by security forces. For example, on June 6, 2008, a court found guilty and sentenced 21 of the 43 government officials implicated in a 2003 jail massacre.

Other documentary evidence confirmed and expanded on the information in the State Department reports. A 2007 Congressional Research Service report noted that increased violence by gangs has led to corresponding vigilantism, with increasing extrajudicial killings. It also acknowledged the July 2003 legislation in Honduras making membership in a gang punishable by up to 12 years in prison and confirmed that a prison fire in 2004 killed 107 inmates, mostly gang members. Similarly, a 2006 U.S. Agency for International Development (USAID) report on gangs in Honduras noted that the Honduran government's strict approach includes rounding up tattooed individuals and putting them in prison for gang membership. The report also noted that when gang members were killed or died in prisons, often no one was punished.

An August 2008 report by the UN High Commissioner for Refugees (UNHCR) counted "lack of accountability and professionalism within the police," "the frequent abuse of detainees," and "a culture of impunity for violations of human rights including extrajudicial executions" as among Honduras' biggest human rights problems. The report also discussed a 2006 anti-gang initiative that called for recruiting 30,000 to 60,000 private security personnel to join the efforts of the 10,000 armed services personnel and 8,000 police officers, and granting the private security personnel "the right to use any means necessary to deter assailants from committing criminal acts." The report noted that the policy had led to mass arrests, and that there were reports of excessive and even lethal force being used by these private security forces. The UNHCR report also discussed evidence that death squads were executing gang members, noting "the widespread conviction that [the unlawful killings] are being committed by members of the existing or former security forces."

Finally, numerous newspaper articles also discussed the problems of government-linked death squads, extrajudicial killings, and the high level of violence in Honduran prisons. Particularly disturbing were reports regarding fires in prison, some reportedly deliberately set by security forces, which have killed around 200 prisoners, mostly gang members. One article noted that an independent report commissioned by the President of Honduras found that in one prison fire, 51 of the 68 people who were killed had been "executed **\*769** —shot, stabbed, beaten or burned to death by a force of the state police, soldiers, prison guards and prisoners working with the guards."

**B. IJ and BIA Decisions**

The IJ denied Cole's application for deferral of removal under CAT, finding that Cole's evidence "str[ung] together a series of suppositions," but did not show that each step in the hypothetical chain of events was more likely than not to occur.[6] In particular, the IJ (1) faulted the expert testimony about the likelihood that Cole would be tortured as lacking evidence that

AR.04359

individuals similarly situated to Cole had been incarcerated and tortured; (2) noted that, according to the State Department report, torture is against the law in Honduras, and the state has prosecuted police officers for torture and other abuses, including for one of the jail massacres; and (3) characterizing Cole as arguing that lack of medical care and poor prison conditions in Honduras

amount to torture, held that Cole had failed to meet the standard of specific intent to cause harm established in *Villegas v. Mukasey,* 523 F.3d 984 (9th Cir.2008). Although Cole argued that he would be *intentionally* denied medical care and that prison officials have *intentionally* created dangerous prison conditions, the IJ did not address these arguments.

Like the IJ, the BIA discounted Cole's expert witness testimony about the likelihood that Cole would be tortured on the ground that the expert failed to give specific examples corroborating his opinion. The Board also held, as did the IJ, that Cole had not established by sufficient evidence each link in the chain of events that could result in his torture by police, death squads, or other gang members. The BIA did recognize that evidence in the record suggested that "the presence of a tattoo can cause an automatic association with gangs, and that a tattoo or suspected gang affiliation can equate to harsh treatment." But the BIA found nothing in the record explaining why Cole could not have his tattoos removed to avoid being perceived as a gang member. Finally, the BIA determined that lack of medical treatment is not tantamount to torture. The BIA did not make any finding regarding government acquiescence in torture by death squads or gang members.

Cole timely filed this petition for review.[7]

## II.

**[1] [2] [3] [4]** We review issues of law regarding CAT claims de novo. *Edu v. Holder,* 624 F.3d 1137, 1142 (9th Cir.2010). "Where the BIA conducts its own review of the evidence and the law, this panel only reviews the BIA's decision, except to the extent it expressly adopts the IJ's decision." **\*770** *Eneh v. Holder,* 601 F.3d 943, 946 (9th Cir.2010). "The BIA's findings underlying its determination that an applicant is not eligible for relief under the CAT are reviewed for substantial evidence." *Arteaga v. Mukasey,* 511 F.3d 940, 944 (9th Cir.2007). "Under the substantial evidence standard, the court upholds the BIA's determination unless the evidence in the record compels a contrary conclusion." *Id.*

**[5]** "Because neither the BIA nor the IJ made an adverse credibility finding, 'we must assume that [Cole's] factual contentions are true.' " *Aguilar–Ramos,* 594 F.3d at 704 (quoting *Navas v. INS,* 217 F.3d 646, 652 n. 3 (9th Cir.2000)). "As a result, the facts to which [he] testified are 'deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief.' " *Edu,* 624 F.3d at 1143 (quoting *Nuru v. Gonzales,* 404 F.3d 1207, 1216 (9th Cir.2005)).

## III.

### A. General CAT Principles

To qualify for CAT relief, a petitioner must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). In other words, Cole must "show only a chance greater than fifty percent that he will be tortured if removed to" Honduras. *Hamoui v. Ashcroft,* 389 F.3d 821, 827 (9th Cir.2004). In determining whether an individual will more likely than not be tortured, "all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 1208.16(c)(3).

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

[6]  [7]  [8]  Importantly, an application for CAT relief need not show that he will be tortured "on account of" any particular ground. *See* *Kamalthas v. INS,* 251 F.3d 1279, 1283 (9th Cir.2001). Moreover, where torture is sufficiently likely, "CAT 'does not permit any discretion or provide for any exceptions.' " *Edu,* 624 F.3d at 1145 (quoting 64 Fed.Reg. 8478, 8481 (Feb. 19, 1999)). Instead, the provision for deferral of removal under CAT applies to all applicants, even those who, like Cole, are former gang members convicted of an aggravated felony. *See* 8 C.F.R. § 208.17(a); *Lemus–Galvan v. Mukasey,* 518 F.3d 1081, 1083 (9th Cir.2008) (holding that "even if an alien has been convicted of a 'particularly serious crime,' and is ineligible for withholding of removal under the CAT, an IJ is required to grant deferral of removal if the alien can establish the likelihood of torture upon return"). As we explained in *Edu,* "the words of CAT ... reach out to protect even the most vile of actors against state vileness." 624 F.3d at 1146. Indeed, "in adopting the [CAT] regulations, the agencies themselves recognized that even those who assisted in Nazi persecutions, or engaged in genocide, or pose a danger to our own security are not excluded from the protections of CAT." *Id.* at 1145. Further, "[a foreign] government cannot exempt torturous acts from CAT's prohibition merely by authorizing them as permissible forms of punishment," *Nuru,* 404 F.3d at 1221, nor do other circumstances provide a justification for denying deferral of removal where torture is sufficiently likely.

In other words, the policy against providing "sanctuary for universal outlaws" that led this court to conclude that gang members or former gang members are not a social group for the purposes of asylum and withholding of removal, *see* *Arteaga,* 511 F.3d at 946, does not preclude deferral of removal under CAT. Both the governing regulations and the case law of this circuit dictate that even gang members, both current and former, cannot be returned to a country in which they will more likely than **\*771** not be tortured. *See* 8 C.F.R. § 208.17(a); *Arteaga,* 511 F.3d at 949.

[9]  [10]  "Acts constituting torture" under CAT "are varied, and include beatings and killings." *Bromfield v. Mukasey,* 543 F.3d 1071, 1079 (9th Cir.2008). The implementing regulations define torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). Acquiescence by government officials "requires only that [they] were aware of the torture but 'remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.' " *Bromfield,* 543 F.3d at 1079 (quoting *Ornelas–Chavez v. Gonzales,* 458 F.3d 1052, 1060 (9th Cir.2006)). The torturer, whether a public official or a private party acting with the government's consent or acquiescence, must have the specific intent to inflict severe harm. *See* *Villegas v. Mukasey,* 523 F.3d 984, 989 (9th Cir.2008).

## B. Expert Testimony

Cole's CAT claim depends heavily on the testimony of two experts, Rodriguez and Canales, as well as on documentary evidence corroborating their testimony. In determining whether Cole had established that he would more likely than not be tortured if returned to Honduras, the BIA was required to evaluate the expert testimony, as well as the documentary evidence in the record.

AR.04361

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 521 of 1384

CAT's implementing regulations so require: In making a CAT decision, the regulations state, "*all* evidence relevant to the possibility of future torture *shall be* considered, including ... [e]vidence of gross, flagrant or mass violations of human rights within the country of removal ... and ... [o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3) (emphasis added). We therefore grant petitions for review in CAT cases where the BIA did not consider country conditions evidence in the record. *See Aguilar–Ramos,* 594 F.3d at 705 (remanding for the BIA to determine in the first instance whether the Country Report demonstrates a likelihood of torture); *see also Bromfield,* 543 F.3d at 1077, 1079; *Al–Saher v. INS,* 268 F.3d 1143, 1147 (9th Cir.2001). Indeed, "country conditions alone can play a decisive role in granting relief under the Convention." *Kamalthas,* 251 F.3d at 1280.

In *Aguilar–Ramos,* for example, the government argued that "the Board is not required to cite and refute explicitly every piece of evidence offered on appeal"; this court responded that "[t]he regulations implementing CAT explicitly require the IJ to consider 'all evidence relevant to the possibility of future torture,' " and also noted that country reports are accorded special weight in removal proceedings. 594 F.3d at 705 n. 6 (citations omitted).

 [11]    That is not to say that the BIA must discuss each piece of evidence submitted. When nothing in the record or the BIA's decision indicates a failure to consider all the evidence, a "general statement that [the agency] considered all the evidence before [it]" may be sufficient. *See Almaghzar v. Gonzales,* 457 F.3d 915, 922 (9th Cir.2006). But, where there is any indication that the BIA did not consider all  **772**  of the evidence before it, a catchall phrase does not suffice, and the decision cannot stand. Such indications include misstating the record and failing to mention highly probative or potentially dispositive evidence. *See Aguilar–Ramos,* 594 F.3d at 705 & n. 6; *Eneh,* 601 F.3d at 948–49; *Bromfield,* 543 F.3d at 1076–77; *Kamalthas,* 251 F.3d at 1283–84.

 [12]    In particular, where potentially dispositive testimony and documentary evidence is submitted, the BIA must give reasoned consideration to that evidence. *See Eneh,* 601 F.3d at 948–49. We granted the petition for review in *Kamalthas,* for example, because the BIA did not "consider probative evidence in the record of country conditions which confirm[ed]" torture of individuals with characteristics similar to the petitioner. 251 F.3d at 1284.

Here, the BIA neither asserted that it had considered all of the evidence nor evidenced in its opinion reasoned consideration of the potentially dispositive testimony of Cole's two experts. Instead, the BIA stated only that the testimony of *one* of Cole's experts "was unpersuasive in light of the other evidence, including the State Department report, ... because [he] failed to give specific examples to corroborate his opinion." In so stating, the BIA did not clarify to which of Cole's experts it was referring; nor did it address the other expert's testimony at all. In other words, the Board did not evidence reasoned consideration of the testimony of Cole's *two* experts.

Further, as to whichever expert the BIA opinion did reference, the Board was obliged to "state[ ] reasons in the record why the testimony was insufficient to establish the probability of torture necessary to grant CAT relief." *Aguilar–Ramos,* 594 F.3d at 706 n. 7. It did not do that.

 [13]    The BIA's sole stated rationale for rejecting the one expert's opinion is entirely unsupported by the record for two reasons. First, although the Board opined that the expert's testimony was "unpersuasive in light of the other evidence," specifically the State Department report, in fact that report corroborates rather than contradicts many aspects of both experts' testimony. For example, although the 2008 report noted that torture was illegal in Honduras,[8] it also stated that human rights problems in Honduras included "unlawful killings by members of the police and government agents; arbitrary and summary killings committed by vigilantes and former members of the security forces; violence against detainees by security forces; harsh prison

conditions; [and] corruption and impunity within the security forces." The State Department report also noted that there are instances in which government officials beat and abuse detainees, and that human rights groups had reported over two dozen instances of torture due to one government initiative. [9] Additionally, the 2008 report acknowledged that police arrest individuals for having certain types of tattoos. Thus, while the report indicated that some officials are being investigated and convicted for abusing their authority, it also noted ongoing serious problems and so corroborated the experts' testimony. Further, as **773** noted above, other documentary evidence corroborated their testimony as well.

Moreover, contrary to the Board's assertion, the experts, in particular Canales, did testify about specific incidents of police torturing or killing suspected gang members. For example, Canales discussed an incident in which 68 suspected gang members were shot in jail by "members of the police guard"; an incident in which police set fire to a jail and killed 104 gang members; and an incident involving a police officer who tortured two gang members to death. Canales also testified that he had personally experienced police brutality, and personally witnessed tattooed individuals being denied medical care at public hospitals. Finally, Canales attempted to quantify the risk Cole faced if returned to Honduras, placing his risk of detention by the police at 90% and his risk of being killed by other gang members at 75%. The Board did not acknowledge these examples and estimates.

The government argues that Canales' testimony should be discounted because he did not work with former members of the Crips gang and had very little first-hand knowledge regarding how former members of that particular gang are treated in Honduras. Canales' lack of knowledge about the Crips gang does not mean, however, that his testimony is inapplicable to Cole. As the BIA recognized, evidence in the record demonstrates that tattoos "can cause an automatic association with gangs," which can "equate to harsh treatment." There is no record evidence suggesting that Cole would experience different treatment because his tattoos are affiliated with the Crips rather than with the gangs with which Canales primarily works. Moreover, Canales' testimony about violence perpetrated by gang members on those they suspect of being rivals should have been evaluated alongside Rodriguez's testimony, which focused on the rivalries between the Crips and the two dominant gangs in Honduras, MS–13 and 18th Street. Because the BIA acknowledged the testimony of only one of Cole's experts, it appears that it never considered Cole's CAT claim in light of the evidence presented by *both* experts.

Because the BIA mischaracterized the record with regard to one of the expert's consistency with the State Department reports, criticized that expert's testimony on a basis belied by the record, and failed even to acknowledge Cole's other expert witness, it failed to give reasoned consideration to the potentially dispositive testimony of Cole's two experts. We must therefore remand for the agency to reconsider Cole's CAT claim in light of the expert testimony and the corroborating documentary evidence.

*See* *INS v. Ventura,* 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam); *see also* *Aguilar–Ramos,* 594 F.3d at 705; *Eneh,* 601 F.3d at 948–49.

## C. Intentional Denial of Medical Care

In addition to its errors regarding the testimony of Cole's expert witnesses, the BIA also failed to consider Cole's claim that he would face torture in Honduras as a result of *intentional* denial of medical care.

[14]  [15]  The applicable CAT regulations require that the torturer have the specific intent to inflict severe harm. 8 C.F.R. § 1208.18(a)(5). Acts that merely have the foreseeable result of inflicting harm are not sufficient; "the actor[must] intend the actual consequences of his conduct." *Villegas,* 523 F.3d at 989. Thus, inhumane conditions and lack of access to appropriate medical care do not, in and of themselves, constitute torture. *Id.;* *Eneh,* 601 F.3d at 948. The IJ and BIA were therefore correct that a claim of inadequate **774** health care in Honduras, without more, is insufficient to warrant CAT relief.

[16]  This court has recognized, however, that the *intentional* denial of medical care as a form of punishment could suffice to establish a CAT claim. *Eneh,* 601 F.3d at 948. Here, the BIA did not consider at all Cole's claim that medical care would be *intentionally* withheld because of his gang tattoos, and that he, specifically, was likely to need medical care due to his brain

injury. [10] There is at least some evidence supporting Cole's contentions: Canales testified that he had personally witnessed staff at public hospitals let a victim bleed to death because he had tattoos. His opinion was that Cole, also tattooed, would similarly be denied emergency medical care in Honduras and would have only contingent, restricted access to other medical care. The BIA should have considered whether that was so, particularly given evidence in the record that Cole will need medical care in Honduras to deal with complications from his brain injury.

### D. Tattoo Removal

Additionally, the BIA's conclusion that Cole did not meet his burden under CAT rested in part on its assertion that Cole could "have his tattoos removed so that he would not be perceived as a gang member upon return to Honduras." Given that statement, we cannot tell whether the BIA would have reached the same result had it not assumed that the tattoos could feasibly be removed in a timely manner. [11] But that assumption falters if the record evidence on the issue is credited: There is evidence that the tattoo removal process is quite long and extremely painful. Moreover, the process can leave permanent scarring. Canales also testified that there is a far greater demand for tattoo removal in Honduras than there are places that can provide such services, leading many tattooed individuals to resort to dangerous home remedies such as burning themselves with cigarette butts or battery acid. Added to likely lengthy delay in beginning tattoo removal is the length of time it takes to remove tattoos once the process begins. As a result of these circumstances, Cole would likely be unable to remove his tattoos until well after his arrival in Honduras, and thus would face being perceived as a gang member for as long as it took—likely quite a while—to get them removed. And even after getting his tattoos removed, the record indicates, visible scarring could mean that he would still be a targeted by rival gangs, police, and death squads.

The BIA's statement concerning tattoo removal does not discuss any of this evidence or explain why it is not dispositive. Thus, once again, the BIA did not give reasoned consideration to potentially dispositive testimony with regard to the probability **\*775** of torture, and we must remand for further consideration and explanation.

### E. Aggregation of Risk

Finally, the BIA did not consider the *aggregate* risk that Cole would face from police, death squads, and gangs if returned to Honduras. Cole need not prove that each group, treated individually, would more likely than not torture him. Rather, he must establish that, taking into account all possible sources of torture, he is more likely than not to be tortured, by or with the consent or acquiescence of the government, if returned to Honduras. The BIA erred by treating each potential source of torture individually, never assessing Cole's overall risk of being tortured.

### IV.

The BIA did not give reasoned consideration to potentially dispositive testimony by Cole's expert witnesses, corroborating documentary evidence, or evidence concerning removal of tattoos. Nor did it address Cole's argument regarding the intentional denial of medical care or assess Cole's risk of torture in the aggregate. We therefore **GRANT** Cole's petition, **VACATE** the BIA's decision, and **REMAND** for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

NOONAN, Circuit Judge, concurring:

Cole's peril comes from his possession of tattoos. Before exposing him to that peril, he should be given the chance to remove the tattoos. The Board of Immigration Appeals has the discretion, in these extraordinary circumstances, to defer his deportation until the tattoos are removed. *See Barapind v. Reno,* 225 F.3d 1100, 1113 (9th Cir.2000). Accordingly, I vote to remand to the BIA to exercise this discretion.

If the BIA does exercise this discretion and the tattoos are removed, or if Cole declines to seek removal of the tattoos, I vote to deny Cole any further delay in his deportation. If the BIA does not exercise its discretion or if the tattoos are not removed, I concur in Judge Berzon's opinion.

CALLAHAN, Circuit Judge, dissenting:

I dissent because the majority, in reviewing Cole's assertion that he will be tortured if returned to Honduras because of his gang tattoos, improperly substitutes its judgment for that of the BIA. Specifically, the majority: (1) manufactures a procedural basis for remand by deciding that the BIA failed to give "reasoned consideration" to Cole's evidence; (2) fails to follow the standard for granting relief under the Convention Against Torture ("CAT"), see Arteaga v. Mukasey, 511 F.3d 940, 944 (9th Cir.2007), by reweighing the evidence and stringing together a series of hypothetical events to justify its conclusion that Cole may be tortured if returned to Honduras because he would be misidentified as being a gang member based on his tattoos; (3) fails to appreciate the lack of evidence that Cole would be intentionally deprived medical care if he were returned to Honduras; and (4) accepts Cole's problematic argument that he may be entitled to CAT relief on the basis of his gang-related tattoos. I would deny Cole's petition on the basis that substantial evidence supported the BIA's decision and nothing Cole presented in his petition compels a contrary result.

I

Neither the IJ nor the BIA made an adverse credibility finding, therefore we take Cole's factual allegations as true. *776 Aguilar–Ramos v. Holder, 594 F.3d 701, 704 (9th Cir.2010). Because of his criminal background, the IJ and BIA concluded that Cole is not entitled to either asylum or withholding of removal. Cole does not challenge these decisions. Rather, the only issue before this court is his assertion that he is entitled to protection under CAT.

A

**1. Cole's Background and Testimony**

Cole is a native and citizen of Honduras who entered the United States with his family when he was eleven years old and has since acquired a lengthy criminal record. He has no extended family in Honduras. Cole is African–American and has numerous gang tattoos on his arms, legs and face that he acquired while in prison after he joined the Crips, an African–American gang. After his release from prison, Cole apparently left the gang and worked for a homeless services agency. He states he did not get the gang tattoos removed because tattoo removal is a long and painful process.

In 2007, Cole was shot in a drive-by shooting.[1] As a result of the shooting, he suffers from certain ongoing medical problems and has a defective, fragile skull.

In 2008, because of a 1999 conviction for possession of cocaine for sale, Cole was placed in removal proceedings where he sought asylum, withholding of removal, and CAT relief. The IJ determined that Cole was removable as an aggravated felon and therefore ineligible for asylum and withholding of removal. Cole did not contest those decisions before the BIA.

At his immigration hearing, Cole testified that he feared he would be tortured or killed if he were returned to Honduras. He asserted that gangs, police, death squads, or even his neighbors may torture or kill him because of his race, gang tattoos, former gang membership, demeanor or accent, and that the torture and killing would be done with the acquiescence of the government.[2]

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

Cole's sister and mother also testified that they feared he would be tortured or killed if returned to Honduras on the basis of his race and tattoos. In addition, Cole claimed that he would be intentionally denied medical care by public health officials and that this denial of health care would constitute torture.

## 2. Cole's Experts

Cole supported his claim with testimony from two purported experts: Luis Javier Rodriguez ("Rodriguez") and Javier Canales Mesa ("Canales"). Rodriguez was offered as an expert on Central American gangs. Rodriguez testified that he was a self-employed author who had not written **\*777** about Honduras and had no specific education, background, or expertise on the subject of Honduras or gangs in Honduras. The IJ was not convinced that Rodriguez was an expert on Central American gangs or had any specialized knowledge on the interaction between Honduran former gang members and the Honduran authorities, but permitted Rodriguez to testify as an expert on gangs and on the narrow issue of racial dynamics between Los Angeles and Central American gangs.

Rodriguez testified that the major gangs in Honduras are the Hispanic gangs, Mara Salvatrucha, also known as MS–13, and the Mara 18, also known as the 18th Street, which are American gangs that have spread to Central America. He stated that the Crips are an African–American gang from Los Angeles. He testified that, in Los Angeles, the Crips are viewed as rivals to the Hispanic gangs. Rodriguez asserted that, in the United States, gang members may recognize rival gang members' tattoos, which can lead to violence. He speculated that the rivalry between the Hispanic gangs and the Crips would exist in Honduras and that someone with Crips tattoos might be "threatened, beaten, or killed" by the Hispanic gangs there if rival gangs were to see the Crips tattoos. Rodriguez also testified that there is a "very strong anti-black culture" in Honduras.

Rodriguez testified that gang members obtain tattoos as a means of identifying their affiliation with a particular gang. He stated that removing tattoos is an expensive and painful process that could take several sessions and could leave scarring. He testified that tattoo removal was possible in Honduras, but that he knew of only two facilities and they lacked adequate personnel and equipment, so there was a backlog of people wanting to get their tattoos removed.

The IJ accepted Cole's second expert, Canales, as an expert on the issue of the treatment of suspected gang members by Honduran police and rival gang members. Canales had worked with former gang members in Honduras. He testified that because Cole's gang tattoos indicate his membership in the Crips, Cole may be seen as a threat to some Honduran Hispanic gang members and accordingly there was a "big possibility" that Cole could be killed. However, on cross-examination, Canales admitted that he had not worked with any Crips. Canales testified that former Honduran gang members often try to remove their tattoos because of the risk of violence from rival gangs, police, and "civil groups." He stated that some individuals try to remove the tattoos themselves, although there are three tattoo removal places in Honduras that will professionally remove tattoos. [3] He claims that it takes four to six sessions to remove a tattoo and that it is a painful process which may result in scarring.

Canales stated that it is illegal in Honduras to be a gang member or to have a gang-related tattoo. He asserted that the government does not investigate the murders of gang members and that the police will direct violence at suspected gang members, or may even kill them. In addition, Canales testified about incidents in which Honduran police or prison guards killed suspected gang members in prison. He also testified that government-sanctioned death squads torture and kill undesirables, including suspected gang members. Canales opined that because of his tattoos, Cole has a greater than 75% chance he will be killed by Hispanic gang **\*778** members and a 90% probability that he would be detained by police.

Finally, Canales testified that most health care professionals in Honduras would refuse to treat an individual with tattoos because they would suspect he is a gang member. Canales provided one example in which he stated that he accompanied a bleeding tattooed gang member to a hospital and that this individual died in the waiting room because the staff would not treat the man on account of his tattoos. Canales asserted that the government is "negligent" because it does not hold doctors accountable and "these events occur very often."

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

## B

### 1. The IJ's Decision

The IJ denied Cole's application for relief under CAT. The IJ considered both the documentary evidence and witness testimony and discussed the arguments raised by both Cole and the government.

The IJ recognized that torture is an extreme form of punishment and that "an alien cannot establish eligibility for [CAT relief] by stringing together a series of suppositions to show that it is more likely than not that torture will result where the evidence does not establish each step in the hypothetical chain of events is more likely than not to happen." The IJ found that Cole was attempting to do just that, by asserting:

> that it is more likely than not that he will be arrested in Honduras and that once he is arrested, he will be detained for a substantial amount of time and if so detained, he will then be killed or tortured by the security forces or he will receive no medical care or the gangs will kill or torture him with the government's acquiescence.

The IJ concluded that although there was "evidence that arrests, abuse, and killings occur, the evidence does not show that it is more likely than not to happen to the respondent." The IJ noted that, according to the Country Report, torture is illegal in Honduras. Further, "neither the witnesses [n]or the documentary evidence presented in the case establishes that a majority of deported gang members are in fact arrested by the police, held in custody, and tortured or killed."

The IJ rejected Cole's assertion that "the lack of medical care and poor prison conditions are specifically intended to inflict severe physical or mental pain and suffering," or that the government intended those consequences. The IJ, citing *Villegas v. Mukasey,* 523 F.3d 984 (9th Cir.2008), found that Cole was "unable to show that Honduras has a specific intent to inflict suffering on prisoners or patients or suspected gang members by creating the conditions in their jails or medical facilities."

Finally, the IJ concluded that:

> The respondent also has not shown that the government of Honduras will acquiesce in his torture at the hands of other gang members or the death squads nor has he established that it is more likely than not to occur to him. It is not enough to show that gang members have killed other gang members or that death squads have tortured and killed gang members.
>
> ... The evidence does not establish that the government acquiesces in such conduct and in fact, reflects the opposite. The government is trying to handle the huge gang problem they face and are attempting to receive specialized training. They are taking steps to prosecute police officers for abuse of power. Accordingly, the Court finds that the respondent is unable to establish a likelihood **\*779** of torture in Honduras by either the government or with the government's acquiescence....

### 2. The BIA's Decision

In October 2009, the BIA, in a single judge decision, affirmed the IJ. The BIA agreed with the IJ that Cole:

> failed to meet his burden of proving that it is more likely than not that he will be tortured based on his race and gang related tattoos and former gang member status upon return to Honduras. *See* 8

C.F.R. §§ 1208.16–.18; *Arteaga v. Mukasey,* 511 F.3d 940 (9th Cir.2007). The Immigration Judge properly concluded that the expert witness's claim that the respondent will be tortured was unpersuasive in light of the other evidence, including the State Department report, contained in the record because the respondent's expert failed to give specific examples to corroborate his opinion; the record does not compel a contrary conclusion. *See Dukuly v. Filip,* 553 F.3d 1147 (9th [8th] Cir.2009); *Shehu v. Gonzales,* 443 F.3d 435 (5th Cir.2006). He further properly determined that the evidence does not establish that each event in the chain of events proposed by the respondent is more likely than not to occur. *Matter of J–F–F–,* 23 I. & N. Dec. 912 (A.G.2006); 8 C.F.R. §§ 1208.16–.18. For example, the evidence does not establish that, as a black, tattooed, ex-gang member, it is more likely than not that the police would become aware of the respondent's return to Honduras, that upon becoming aware of him, it is more likely than not that the police would detain him, and that it is more likely than not that, once the respondent was detained, they would use physical force against the respondent that would rise to the level of torture. *Id.* Likewise, the respondent failed to meet his burden of proving that it is more likely than not that a death squad, rival gang members, or any other entity would become aware of his return to Honduras and that it is more likely than not that any of these groups would then torture him. Additionally, the respondent submitted numerous articles which detail that the presence of a tattoo can cause an automatic association with gangs, and that a tattoo or suspected gang affiliation can equate to harsh treatment. However, there is no indication that the respondent could not have his tattoos removed so that he would not be perceived as a gang member upon return to Honduras. Finally, we cannot conclude that the lack of medical treatment to the respondent is tantamount to torture. Although the respondent has shown that he faces some risks of harm when returned to Honduras, the Immigration Judge properly determined that the testimony and evidence does not establish that he will "more likely than not" be tortured.

Cole timely petitioned this court for review. In his petition, Cole alleged that the BIA erred by (a) failing to give proper weight to his experts' testimony; (b) finding that he had failed to establish a clear probability of future torture by the police, rival gang members, or death squads; (c) failing to consider Cole's prison conditions and denial of medical care claims; and (d) failing to give proper weight to Cole's evidence he will be tortured because the BIA found Cole could remove his tattoos.

## II

Our review focuses on the BIA's single-member decision but we look to the IJ's decision "as a guide to what lay behind the BIA's conclusion." *Delgado v. Holder,* 563 F.3d 863, 866 (9th Cir.2009) (quoting *Avetova–Elisseva* **\*780** *v. INS,* 213 F.3d 1192, 1197 (9th Cir.2000)).

We review factual determinations supporting the denial of CAT relief under a deferential substantial evidence standard. *See Arteaga,* 511 F.3d at 944 ("[t]he BIA's findings underlying its determination that an applicant is not eligible for relief under the CAT are reviewed for substantial evidence"). Under this standard, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphasis added); *see also INS v. Elias–Zacarias,* 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) ("To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it."). This court "must uphold the IJ's determination if it is supported by reasonable, substantial, and probative evidence in the record." *Halim v. Holder,* 590 F.3d 971, 975 (9th Cir.2009) (quoting *Zehatye v. Gonzales,* 453 F.3d 1182, 1185 (9th Cir.2006)).

AR.04368

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

We have held that "[t]his strict standard bars the reviewing court from independently weighing the evidence and holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown." *Kotasz v. I.N.S.,* 31 F.3d 847, 851 (9th Cir.1994). "We are not free to look anew at the testimony and then measure the soundness of the agency's decision by what we would have found. Nor does evidence compel the opposite conclusion just because it would also support a different result." *Donchev v. Mukasey,* 553 F.3d 1206, 1213 (9th Cir.2009).

To be eligible for deferral of removal under the CAT, the applicant must establish that he would more likely than not be tortured at the instigation of, or with the consent or acquiescence of, a public official. *See* 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *Kamalthas v. INS,* 251 F.3d 1279, 1282 (9th Cir.2001). The "consent or acquiescence" requirement means that the government must be aware of the allegedly tortuous conduct, or at least willfully blind to it. *Zheng v. Ashcroft,* 332 F.3d 1186, 1188–89 (9th Cir.2003) (citation omitted).

The applicable regulation, 8 C.F.R. § 1208.18(a)(1) states:

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person ..., when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*See also* *Kamalthas,* 251 F.3d at 1282; *Sinha v. Holder,* 564 F.3d 1015, 1026 (9th Cir.2009). In addition, "[t]orture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). Furthermore, "[t]orture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." 8 C.F.R. § 1208.18(a)(2); *Al–Saher v. I.N.S.,* 268 F.3d 1143, 1147 (9th Cir.2001).

### III

Applying the applicable standard of review, the majority commits four errors in granting Cole's petition. First, the majority manufactures a procedural basis for remand by concluding that the BIA failed to give "reasoned consideration" to Cole's experts' testimony and evidence related to Cole's ability to get his tattoos removed. Second, the majority impermissibly (a) reweighs the evidence, *see, e.g.,* *Kotasz,* 31 F.3d at 851; and (b) strings together a series of hypothetical events, related to Cole's claim that he will be misidentified as **\*781** being a gang member and then tortured by rival gangs, police, or death squads, none of which is more likely than not to occur. *See Matter of J–F–F–,* 23 I. & N. Dec. 912 (A.G.2006). Third, the majority misreads the record in concluding that the BIA did not adequately consider whether Cole would be *intentionally* deprived of medical care if he were returned to Honduras. Fourth, the majority decision allows a petitioner to obtain CAT relief on the basis of having voluntarily obtained a gang-related tattoo. This is problematic for a number of reasons, not the least of which is that it appears to undermine our holding in *Arteaga,* 511 F.3d 940, that being a tattooed ex-gang member does not constitute belonging to a particular social group.

### A

The majority manufactures a procedural basis for remand by deciding that the BIA failed to give "reasoned consideration" to "the potentially dispositive testimony" of both of Cole's experts. Maj. Op. at 772, 774–75. Contrary to the majority's perspective, the BIA and IJ considered all of Cole's evidence.

### 1. The BIA Considered Both Experts' Testimony

The majority finds the BIA erred because "the BIA stated only that the testimony of *one* of Cole's experts 'was unpersuasive in light of the other evidence, including the State Department report, ... because [he] failed to give specific examples to corroborate his opinion.' " The majority claims that the BIA failed to address Cole's other expert at all. Maj. Op. at 772–73. The majority professes not to know which expert the BIA was referring to, but concludes that whichever expert it was, the BIA was obligated to state the reasons " 'why the testimony was insufficient to establish the probability of torture necessary to grant CAT relief.' " *Id.* (quoting *Aguilar–Ramos,* 594 F.3d at 706 n. 7). This is not a fair reading of the record.

The BIA stated that "[t]he Immigration Judge properly concluded that the expert witness's claim that the respondent will be tortured was unpersuasive in light of the other evidence, including the State Department report, contained in the record because the respondent's expert failed to give specific examples to corroborate his opinion...." Only two experts testified—Rodriguez, who primarily testified about the racial dynamics of Los Angeles gangs spreading to Central America, rather than about Cole being tortured in Honduras, and Canales, who testified extensively about the various ways that Cole might be tortured. In context, it is clear that the BIA was specifically referring to Canales's testimony.[4]

Furthermore, we do not review the BIA's decision in a vacuum, but rather look to the IJ's decision "as a guide to what lay behind the BIA's conclusion." *Delgado,* 563 F.3d at 866 (quoting *Avetova–Elisseva,* 213 F.3d at 1197). The BIA's decision generally affirmed the IJ's decision and the IJ explicitly discussed both Canales's and Rodriguez's testimony, before concluding that "neither the *witnesses* [n]or the documentary evidence presented in the case establishes that a majority of deported gang members are in fact arrested by the police, held in custody, and tortured or killed." It is clear that the IJ considered both of Cole's experts' testimony, **\*782** but found other evidence more compelling, and it is equally clear that the BIA considered the IJ's decision and affirmed on the same basis.

The majority asserts that the BIA's "rationale for rejecting one expert's opinion is entirely unsupported by the record for two reasons": (1) the State Department report "corroborates rather than contradicts many aspects of both experts' testimony"; and (2) the experts "did testify about specific incidents of police torturing or killing suspected gang members." Maj. Op. at 773. The majority cites examples from the report and from Canales's testimony in support of these contentions. *Id.* at 772–73.

The majority, however, overlooks the documentary evidence and testimony supporting the opposite conclusion.[5] The BIA stated:

the evidence does not establish that, as a black, tattooed, ex-gang member, it is more likely than not that the police would become aware of the respondent's return to Honduras, that upon becoming aware of him, it is more likely than not that the police would detain him, and that it is more likely than not that, once the respondent was detained, they would use physical force against the respondent that would rise to the level of torture. *Id.*

The IJ found that "[n]either the witnesses[n]or the documentary evidence presented in this case establishes that a majority of deported gang members are in fact arrested by the police, held in custody, and tortured or killed." The IJ noted that, "[h]ere, the Department of State report for Honduras reflects that torture is against the law," and observed that:

The report reflects that the public ministry has filed charges against police officers for torture and illegal detention and that an office of internal affairs has been created. There is a special prosecutor

for human rights and charges against the police have been found to have merit. Members of the government, including the chief of police of Lasaba and the police commissioner have been prosecuted and sentenced for the Porvener Jail massacre and authorities prosecuted 268 police officers for offenses ranging from abuse of authority to drug trafficking, rape, and homicide. Furthermore, the evidence reflects that Honduras is one of the poorest countries in the hemisphere and therefore, a lack of resources remains a problem.

A review of the 2008 Country Report (the most current at the time of Cole's hearing) supports the IJ's and BIA's conclusions. That report noted that the Honduran constitution and law prohibit torture. In addition, arbitrary arrest and detention are prohibited by the Honduran constitution and other laws. Regarding arrests, the State Department Human Rights report states that:

> The law states that police may arrest a person only with a court order, unless the arrest is by order of a prosecutor, made during the commission of a crime, made when there is strong suspicion that a person has committed a crime and may try to evade criminal prosecution, or made when the person is caught with evidence related to a crime. Police must **\*783** clearly inform the person of the grounds for the arrest. Police must bring a detainee before a competent authority within 24 hours. The prosecutor has 24 hours to decide if there is probable cause for an indictment, and a judge then has 24 hours to decide whether to issue a temporary detention order that can last up to six days, by which time the judge must hold a pretrial hearing to examine probable cause and make a decision on whether pretrial detention should continue.

Further, while the reports document instances of abuses committed by police and prison authorities, they also document the government's efforts to investigate prison officials who allegedly abused their authority, and note that twenty-one members of the government, including a chief of police and a police commissioner, had been convicted for their part in a jail "massacre" in 2003. The State Department's Human Rights report noted that "[t]he Office of Internal Affairs investigates allegations of illegal activities committed by members of the police force. The Preventive Police and the DGIC each have an office of professional responsibility that conducts internal reviews of police." Other evidence also supports the conclusion that the Honduran government investigates and prosecutes police officers accused of wrongdoing. And Honduras has sought assistance in training its law enforcement and military: "Foreign donors and international organizations provided human rights training to police and military officials." There was also evidence that the government actively investigated and prosecuted gang members. The 2007 Congressional Research Service report documented the government's efforts to crack down on gang members and noted that Honduras had received assistance in its efforts from several U.S. agencies.

In sum, it appears that the BIA's rationale for rejecting Cole's evidence is supported by the record. When presented with a record containing conflicting evidence, we are restrained to determine only whether the agency's decision is supported by substantial evidence. *See, e.g.,* 8 U.S.C. § 1252(b)(4)(B); *see also Elias–Zacarias,* 502 U.S. at 481 & n. 1, 112 S.Ct. 812; *Halim,* 590 F.3d at 975.

## B

The above discussion of the majority's alleged procedural errors implicates a more fundamental issue: there is no compelling evidence that Cole will be tortured by rival gangs, death squads, or the police on the basis of being misidentified as a gang member because of his tattoos.

The majority suggests that Cole may be identified by rival gangs because of his tattoos, and that if he were identified as a rival gang member, he would be in peril of being tortured or killed by them. *See* Maj. Op. at 766, 766, 772–75, 775. This assumes that

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

a Honduran gang would recognize Cole's tattoos and consider him a rival. [6] But there is no evidence that the Crips operate in Honduras. The majority also assumes that Honduran gangs will direct violence against Cole even though he is a former member of a gang that does not operate in Honduras. Furthermore, even if all of these possibilities were considered probabilities, it is only "torture" for the purposes of CAT relief if the Honduran **\*784** government condones or acquiesces in such gang activity.

There is evidence in the record that the Honduran government does not condone gang activity. For example, Canales testified that being a member of a gang is a crime in Honduras and that the police will detain and arrest gang members. There is also documentary evidence that the police investigated and prosecuted suspected gang members.

This, however, is not evidence that Cole will be tortured by the police or prison officials because he is misidentified as being a gang member based on his Crips tattoos. Although there was evidence that having gang-related tattoos can lead to imprisonment in Honduras, *see* Maj. Op. at 766, 767, Cole is a *former* member of a gang—a gang that does not operate in Honduras—and there is no evidence that the police or prison authorities would continue to detain a person who they mistakenly identified as a gang member. [7] Even if the police and prison officials did detain or imprison Cole, neither of these acts by themselves constitute torture. *See,* e.g., *8 C.F.R. § 1208.18(a)(3)* ( "Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."); *Prasad v. INS,* 47 F.3d 336, 339–40 (9th Cir.1995) (no past persecution where the petitioner was arrested once, detained for four to six hours and beaten).

The majority cites Canales's testimony and documentary evidence that Honduran police physically abuse suspected gang members. *See* Maj. Op. 766. Similarly, the majority discusses evidence of violent acts directed at prisoners, including gang members. *Id.* at 766, 767–69, 772. However, there was also evidence in the record that tended to show that the Honduran government neither instigates nor acquiesces in such behavior by police officers and that it prosecutes police officers who violate the law. Moreover, evidence that the Honduran government opposes gangs is not evidence that it would condone violence against a person misidentified as a gang member or would torture such a person.

Cole's argument that he will be tortured by death squads, with the government's acquiescence, also lacks compelling evidence. Cole must show that the government "is unwilling or unable to control those elements of its society responsible for targeting a particular class of individuals." *See* *Avetova–Elisseva v. INS,* 213 F.3d 1192, 1196 (9th Cir.2000) (citation and internal quotation marks omitted). The majority notes Canales's testimony that death squads, comprised of "police and other powerful citizens," kill suspected gang members with "complete impunity," as well as documentary evidence of killings committed by "vigilantes." Maj. Op. at 766, 767. But other than the possibility of someone recognizing Cole's tattoos as gang tattoos, the majority does not explain how Cole might come to the attention of these groups. Furthermore, because Cole is not a member of a Honduran gang, there is no evidence that such groups—with or without the government's acquiescence—would torture Cole once the misidentification **\*785** became known. [8] Also, there is evidence that the government prosecuted government officials who violated its laws.

In sum, the majority does not point to any compelling evidence that individuals such as Cole—who are tattooed ex-gang member deportees to Honduras—have come, or are more likely than not to come, to the attention of rival gangs, police, or death squads and are then tortured at the instigation of, or with the acquiescence of, the government. It is only by taking a number of hypothetical events and then assuming that each one of them inexorably leads to the next hypothetical event in the sequence, that one can reach the conclusion that it is more likely than not that Cole will be tortured if he is returned to Honduras.

The majority does just that. It strings together a series of hypothetical events to reach a thoroughly speculative conclusion. *Matter of J–F–F–,* 23 I. & N. Dec. at 917–18 ("The evidence does not establish that any step in this hypothetical chain of events is more likely than not to happen, let alone that the entire chain will come together to result in the probability of torture of respondent."); *see also* *Savchuck v. Mukasey,* 518 F.3d 119, 123–24 (2d Cir.2008) (holding that a series of hypothetical events related to the petitioner's economic hardship if returned to the Ukraine were too speculative to establish that he would be tortured

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

under CAT). The majority cannot, and does not, point to any compelling evidence that Cole will be misidentified as a gang member on the basis of his tattoos or that this misidentification is likely to lead to his being tortured at the instigation of, or with the acquiescence of, the government.

## C

The majority concedes that for Cole's claim that he may be denied medical care to rise to the level of torture for CAT purposes, he must show that the denial is *intentional.* [9] Maj. Op. at 773–74 (citing, inter alia, 8 C.F.R. § 1208.18(a)(5); *Villegas,* 523 F.3d at 989). The majority then concludes that the BIA failed to consider Cole's claims that he would be tortured as a result of the *intentional* denial of medical care. Maj. Op. at 773–74. Again, the majority misconstrues the record.

Although the majority does not specifically identify the relevant language in the BIA's decision related to Cole's denial of medical care claim, it appears to be referencing the BIA's statement that it "cannot conclude that the lack of medical treatment to the respondent is tantamount to torture." The majority interprets this as the BIA failing to specifically consider whether Cole would be *intentionally* denied health care. Maj. Op at 774.

**\*786** However, the majority overlooks the IJ's decision. *See Delgado,* 563 F.3d at 866. The BIA affirmed the IJ's determination that Cole was "unable to show that Honduras has a *specific intent* to inflict suffering on prisoners or patients or suspected gang members by creating the conditions in their jails or medical facilities." A review of the IJ's decision confirms that the IJ specifically rejected Cole's contention that he would be tortured as a result of intentional denial of medical care.

Furthermore, there appears to be but a single anecdote provided by Canales to support the contention that Cole may be intentionally denied medical care. Canales described an incident in which he witnessed staff at a hospital let a tattooed gang member that he had brought to the hospital bleed to death, allegedly on account of his gang tattoos. Maj. Op. at 774. Even assuming that the events occurred as Canales described them, this is too slender a reed to compel the conclusion that Cole will more likely than not be intentionally denied medical care because of his gang tattoos. It is more than offset by the evidence in the 2008 Country Report of the efforts undertaken by the Honduran government to combat gangs and gang violence.

In sum, the BIA, in affirming the IJ's decision, agreed that Cole was "unable to show that Honduras has a *specific intent* to inflict suffering on prisoners or patients or suspected gang members by creating the conditions in their jails or medical facilities," and the evidence does not compel a contrary result.

## D

While the majority is careful not to explicitly hold that being a tattooed gang member or tattooed ex-gang member is a particular social group for the purposes of obtaining CAT relief, all of the harm that Cole will allegedly be exposed to is based on his being misidentified as belonging to a gang. The majority appears to assume that because Cole has gang tattoos, he is in effect like every tattooed gang suspect, gang member, or former gang member.

The majority's apparent acceptance of an undifferentiated class of tattooed gang members and tattooed former gang members as being eligible for CAT relief on account of their tattoos, appears to be contrary to our decision in *Arteaga,* 511 F.3d at 944. In *Arteaga,* in the context of a withholding of removal claim, we rejected the petitioner's contention that he was part of a particular social group based on his status as a tattooed gang member, gang member, or tattooed former gang member. *Id.* at 945–46. We stated:

> We cannot conclude that Congress, in offering refugee protection for individuals facing potential persecution through social group status, intended to include violent street gangs who assault people and who traffic in drugs and commit theft. Following in the analytical footsteps of President Lincoln, calling a street gang a "social group" as meant by our humane and accommodating law does not make it so. In fact, the outlaw group to which the petitioner belongs is best described as an "antisocial group[.]"

*Id.* at 945–46. Further,

> To do as Arteaga requests would be to pervert the manifest humanitarian purpose of the statute in question and to create a sanctuary for universal outlaws. Accordingly, we hold that participation in such activity is not fundamental to gang members' individual identities or consciences, and they are therefore ineligible for protection as members of a social group under 8 U.S.C. § 1231(b)(3).

*Id.* at 946. We also rejected Arteaga's claim that he belonged to a particular social **\*787** group comprised of tattooed former gang members. *Id.* We stated, "Arteaga's attempt to present himself as a former member of a social group fares no better. Disassociating oneself from a group does not automatically put one in another group as group is meant in the law." *Id.*

Of course, relief under CAT is not dependant upon an individual being a part of a protected group, *see, e.g., Kamalthas,* 251 F.3d at 1283–84. Nonetheless, I cannot square the majority's concern for the harm Cole will allegedly be exposed to on being misidentified as belonging to a gang with our decision in *Arteaga.*

Moreover, I have grave doubts as to whether a tattoo, or at least Cole's tattoos, should form a basis for relief under CAT. A tattoo is not something that is innate to an individual or beyond his or her control. We have held that "tattooing is purely expressive activity, fully protected by the First Amendment." *Anderson v. City of Hermosa Beach,* 621 F.3d 1051, 1055 (9th Cir.2010). Nonetheless, there are limits to speech under the First Amendment and even consequences to speech that is constitutionally protected. Furthermore, there seems to be no disagreement that tattoos are removable, even if this process may entail some pain.

Basing CAT relief on a tattoo would appear to encourage an individual who does not want to be deported to his home country to get a tattoo that is offensive in his home country (even if it is not necessarily offensive in the United States) and refuse to have it removed. [10] Would this lead an individual who did not want to return to China to obtain a Falun Gong tattoo? Would a prominent swastika tattoo compel CAT relief against repatriation to Israel?

Fortunately, this case does not present such extreme situations. Still, I would not grant CAT relief to an individual because of tattoos that allegedly may cause the individual to be misidentified as a member of a violent street gang which is disapproved of by the government.

**CONCLUSION**

I disagree with the majority on several counts. First, the majority manufactures reasons to remand the case by mischaracterizing the BIA's decision and reweighing the evidence. Second, the majority concludes that remand is necessary because the BIA failed to give "reasoned consideration" to evidence that Cole may be tortured in Honduras by rival gangs, police or death squads, on account of his gang tattoos, when there is no compelling evidence of a likelihood of torture, and there is evidence that the government neither instigates nor acquiesces in torture by any of these groups. Third, the majority incorrectly asserts that remand is necessary because the BIA failed to consider whether Cole would be *intentionally* denied medical care rising to a level of torture. But the record shows that the BIA affirmed the IJ's factual determination that Cole would not be intentionally denied medical care, and that determination is **\*788** adequately supported by the evidence. Finally, the majority's reliance on

Cole's tattoos as a basis for relief under CAT is problematic and appears to be inconsistent with our decision in ▢ *Arteaga,* 511 F.3d 940, that gangs do not constitute particular social groups for immigration purposes. Because I believe the majority erred as to each of these matters, and because I find that the BIA's decision is supported by substantial evidence, I dissent.

## All Citations

659 F.3d 762, 11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

## Footnotes

1   Cole also testified about one other specific instance in which he encountered Hispanic gang members after he was released from prison: Once, while he and his friends were watching fireworks at the Santa Monica pier, 18th Street gang members approached and asked them if they were Crips. Cole testified that there was a lot of tension until the police appeared and took some of the 18th Street gang members to jail. He testified that he believes "something terrible," such as someone being stabbed, would have happened if the police had not arrived.

2   The dissent emphasizes that there is no evidence in the record to suggest that the Crips operate in Honduras. It argues that there is, therefore, no reason to think that Cole will suffer harm because of his Crips tattoos. But Cole's claim does not rely on the presence of Crips in Honduras. Rather, he claims—and presented evidence—that (1) Hispanic gang members removed from the United States and returned to Honduras are likely to bring their rivalries with them to and to recognize Cole's tattoos as those of a rival gang; (2) Honduran gangs are likely to see Cole as a threat because of his tattoos regardless of whether they can identify the gang with which he was affiliated; and (3) the Honduran government, police, and medical personnel associate tattoos with gang membership, regardless of the nature of the tattoo, and are not likely to inquire further as to the meaning of the tattoo or whether a tattooed person maintains gang membership.

3   The record includes documentation of racial inequality and discrimination in Honduras against Afro–Hondurans.

4   Canales also testified that he had been punched in the back and chest by police for defending the youth with whom he worked.

5   Out of desperation, some former gang members attempt to remove their tattoos using methods such as cigarette burns, mosquito repellent, car battery acid, acid creams, and metal cleaners. Former gang members go to such extreme lengths to remove their tattoos because young people with tattoos run a great risk of being killed.

6   Cole's applications for asylum and withholding of removal were also denied.

7   We note that Cole has been detained throughout these proceedings, which have lasted for more than three years, seemingly without a bond hearing. If so, then, as did the court in ▢ *Aguilar–Ramos v. Holder,* 594 F.3d 701 (9th Cir.2010), "we express grave concerns over [Cole's three]-year detention," ▢ *id.* at 704 n. 3, particularly given Cole's testimony that while in detention, he was not permitted the medications he needed to control the pain from his brain injury. Prolonged detention of aliens absent a bond hearing is not authorized by ▢ 8 U.S.C. § 1226(a). *See* ▢ *Casas– Castrillon v. Dep't of Homeland Sec.,* 535 F.3d 942, 950–51 (9th Cir.2008); *see also* ▢ *Prieto–Romero v. Clark,* 534 F.3d

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

1053, 1062 (9th Cir.2008) (holding that a three-year detention "qualifies as prolonged by any measure"). "We encourage [Cole] to challenge his detention by filing a habeas petition pursuant to 28 U.S.C. § 2241 or by requesting a bond hearing." *Aguilar–Ramos*, 594 F.3d at 704 n. 3.

8        That a country's constitution prohibits torture does not establish that the country does not torture people. *See* *Al–Saher*, 268 F.3d at 1147 (stating that the country report noted that the Iraqi Constitution prohibited torture but reported that security forces routinely tortured detainees).

9        The 2007 State Department report, also in the record, placed the number of individuals arbitrarily arrested and sometimes tortured at more than 34,000.

10       Cole also argues that the BIA inadequately considered his claim that prison officials would intentionally allow him to be tortured and killed in prison by rival gang members. The agency found that Cole had failed to establish that he would more likely than not come to the attention of police and be detained in prison, and so did not consider what would happen were he detained. If, after reasoned consideration of potentially dispositive testimony and documentary evidence, the BIA reconsiders its conclusion regarding the likelihood that Cole will come to the attention of the police and be detained, it should address his claim that prison officials will *intentionally* subject him to dangerous conditions amounting to torture.

11       It is also unclear whether, if it were feasible for Cole to remove his tattoos sufficiently to reduce his risk of torture, the BIA could deny CAT relief on that basis. The issue is not squarely before us, so we need not, and do not, address it.

1        Although the majority asserts that "rival gangs could still identify him as a Crips gang member because of his tattoos," Cole never testified that any rival gang ever identified him as a gang member, whether because of his tattoos or not. Cole testified about a confrontation with rival gang members at the Santa Monica Pier while he was with friends, but he did not assert that any of the rival gang members recognized him as a Crip or that anyone noticed his tattoos. Similarly, when Cole was shot, he was with a friend in his car and although he claimed that the people who shot him identified themselves as members of a Hispanic gang, Cole does not state that any mention was made of his race or his gang tattoos.

2        Although Cole's race is a factor, there is little discussion of race in the proceedings, and neither Cole nor the majority contend that he would be tortured based on his race alone. Rather, Cole's race is raised as an additional way that Hispanic gang members, death squads, the police, or medical authorities may recognize Cole as a Crip. It is only the combination of Cole being an African–American with Crips tattoos that would make him identifiable as a (former) Crip.

3        It appears that the third program is run by doctors who come to Honduras every couple of months from the United States. They typically remove 90% of a tattoo in four sessions.

4        Another possibility, not considered by the majority, is that the BIA's statement is a typographical error: the BIA failed to pluralize "witness", writing "witness's" when it actually meant "witnesses' " which would render the majority's argument moot.

5        In addition to Cole's testimony, over 700 pages of documents were submitted by the parties, including newspaper articles regarding gang violence in the United States and Honduras, general research articles related to gang issues in the United States and Honduras, Department of State Human Rights Reports and Country Reports for 2007 and 2008, a summary of criminal proceedings against Cole, as well as Cole's medical history related to his gunshot wound.

6        Neither of Cole's experts testified that Honduran gangs would assault Cole because of his tattoos. Rodriguez testified that rival gangs in the United States "may recognize rival gang members' tattoos," and admitted that he had no specific knowledge about gangs in Honduras. Canales, who worked with former gang members in Honduras, testified that Cole, because of his tattoos, may be seen as a threat by a Honduran gang.

7        It seems questionable that having a gang-related tattoo that was obtained in another country and has no relationship to gangs that are active in Honduras would be considered to be illegal and would lead to Cole's detention and torture. The State Department Human Rights report sets forth the procedures for arresting a suspect, which include the prosecutor determining whether there is probable cause for an indictment and a requirement that the suspect be brought before a judge for a probable cause determination. Accordingly, it is unlikely that Cole would be arrested, detained, processed by a prosecutor and a judge, and then tortured by police on the basis of his American gang tattoos.

11 Cal. Daily Op. Serv. 12,108, 2011 Daily Journal D.A.R. 14,427

8    Indeed, the facts that Cole is an African–American and that his tattoos do not indicate membership in a Honduran gang —which appear to be primarily of Hispanic ethnicity—suggest that he is not likely to be a target of death squads or vigilantes.

9    The majority also appears to have concluded that because the BIA did not specifically refer to whether prison officials will *intentionally* subject Cole to dangerous conditions amounting to torture, the BIA failed to give adequate consideration to this contention. Maj. Op. at 774, 774 n. 10. However, the BIA affirmed the IJ's decision and the IJ specifically found that Cole was "unable to show that Honduras has a *specific intent* to inflict suffering on prisoners or patients or suspected gang members by creating the conditions in their jails or medical facilities." In addition, there is evidence that the authorities are doing their best with limited resources to enforce the laws, even against police officers and prison officials.

10   Judge Noonan's concurrence appears to misconceive Cole's desires. Cole does not want to return to Honduras. Accordingly, he has no incentive to remove his tattoos—which appear to be the thing delaying his removal to Honduras.

     Furthermore, it is doubtful that the BIA could force Cole to remove his tattoos. *See* *Anderson,* 621 F.3d at 1055. Rather, on remand, the BIA might ascertain whether Cole has made any effort to remove his tattoos. If Cole has not removed his tattoos and declines to do so—and Cole is otherwise determined to be removable—the BIA should be free to remove him immediately, or possibly after a short period of time in which he could have the tattoos removed in the United States.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

482 Mass. 454
Supreme Judicial Court of Massachusetts,
Suffolk..

COMMONWEALTH
v.
Demetrius WARDSWORTH.

SJC-11125
|
Argued February 8, 2019
|
Decided June 19, 2019

**Synopsis**
**Background:** Defendant was convicted in the Superior Court Department, Frank M. Gaziano, Stephen E. Neel, and Linda E. Giles, JJ., of murder in the first degree, armed assault with intent to murder, and firearm offenses. Defendant appealed.

**Holdings:** The Supreme Judicial Court, Lenk, J., held that:

[1] statements made to police by coventurer were inadmissible against defendant under the joint venture exception to the hearsay rule;

[2] a statement made in response to police questioning is testimonial, and thus subject to the Confrontation Clause, where the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution, abrogating *Commonwealth v. Celester*, 473 Mass. 553, 45 N.E.3d 539, *Commonwealth v. Cole*, 473 Mass. 317, 41 N.E.3d 1073, *Commonwealth v. Cheremond*, 461 Mass. 397, 961 N.E.2d 97;

[3] trial court's error in allowing the admission of coventurer's statements to police inculpating the defendant was not harmless beyond a reasonable doubt, and sufficiently prejudiced defendant so as to constitute grounds for a new trial;

[4] insufficient foundation existed to support gang expert's opinion that defendant was a member of a gang;

[5] improper identification evidence given by police officers in murder prosecution was substantially more prejudicial than it was probative;

[6] prosecutor's argument that she was aware of up to 84 witnesses who would have been helpful in proving defendant's guilt, but whom she was unable to call, impermissibly asked the jury to speculate or imaging what evidence was not before them; and

[7] police had probable cause to arrest defendant.

Vacated and remanded for a new trial.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion; Trial or Guilt Phase Motion or Objection.

West Headnotes (61)

**[1]**  **Criminal Law**  ⚷  Necessity of Objections in General

**Criminal Law**  ⚷  Prejudice to rights of party as ground of review

Where the defendant objected, the Supreme Judicial Court will review to determine whether there was error and, if so, whether there is a reasonable possibility that the error might have contributed to the jury's verdict, or whether it can be assured that the evidence did not influence the jury, or had but very slight effect.

**[2]**  **Criminal Law**  ⚷  Evidence wrongfully obtained

Where the preserved error is constitutional, the Supreme Judicial Court will evaluate the admission of constitutionally proscribed evidence to determine whether it was harmless beyond a reasonable doubt.

**[3]**  **Criminal Law**  ⚷  Necessity of Objections in General

Where the defendant did not object, the Supreme Judicial Court will review for a substantial likelihood of a miscarriage of justice.

**[4]**    Criminal Law    Prejudice to rights of party
as ground of review

In analyzing a claim under the substantial
likelihood standard, the Supreme Judicial Court
will review the evidence and case as a whole and
consider whether any error made in the course of
the trial was likely to have influenced the jury's
conclusion.

**[5]**    Criminal Law    Grounds of Admissibility
in General

Criminal Law    Furtherance or Execution
of Common Purpose

Just as a defendant's statements are admissible
against the defendant, so too are certain
statements made by a defendant's coventurers;
the exemption applies only where a defendant's
coventurer makes a statement both during the
pendency of the cooperative effort and in
furtherance of its goal. Mass. Guide to Evid. §
801(d)(2)(E).

1 Cases that cite this headnote

**[6]**    Criminal Law    Proof and effect of acts or
declarations

Statements admitted under the joint venture
exemption to the hearsay rule are entered for
their truth. Mass. Guide to Evid. § 801(d)(2)(E).

**[7]**    Criminal Law    Grounds of Admissibility
in General

The rationale for the joint venture exemption
to the hearsay rule is twofold: first, while
acting "in furtherance of" a "common object,"
coventurers are considered agents for one
another, and accordingly, where their interests
are sufficiently aligned, a statement by a
coventurer is deemed equivalent to a statement
by the defendant; second, the exemption derives
from the policy considerations underpinning the
prohibition against hearsay, and whereas courts
generally are wary of the reliability of out-of-

court statements, the community of activities
and interests which exists among the coventurers
during the enterprise tends in some degree to
assure that their statements about one another
will be minimally reliable. Mass. Guide to Evid.
§ 801(d)(2)(E).

**[8]**    Criminal Law    Grounds of Admissibility
in General

Criminal Law    Weight and sufficiency

To introduce out-of-court statements as a
statement of a joint venturer, the Commonwealth
must show, by a preponderance of the evidence,
that a joint venture existed between the declarant
and the defendant, and that the statement was
made in furtherance of the joint venture, while
the joint venture was ongoing. Mass. Guide to
Evid. § 801(d)(2)(E).

1 Cases that cite this headnote

**[9]**    Criminal Law    After Accomplishment of
Object

Statements made after a joint venture has ended
are not admissible under the joint venture
exception to the hearsay rule. Mass. Guide to
Evid. § 801(d)(2)(E).

**[10]**    Criminal Law    After Accomplishment of
Object

For purposes of the joint venture exception to the
hearsay rule, to determine whether a joint venture
has ended, the inquiry focuses not on whether
the crime has been completed, but on whether
the coventurers' interests are still closely bound
together, tending to ensure the reliability of their
statements. Mass. Guide to Evid. § 801(d)(2)(E).

**[11]**    Criminal Law    Self-serving acts or
declarations

Statements made to police by coventurer
were inadmissible against defendant under the
joint venture exception to the hearsay rule;
coventurer's description to police inculpated the

defendant and another man in the shooting, while attempting to exculpate himself, and thus, coventurer's interests at the time he made the statements were no longer closely bound together with those of the defendant's. Mass. Guide to Evid. § 801(d)(2)(E).

**[12]    Criminal Law** 🔑 Acts and declarations after commission of crime but before complete fulfillment of purpose

For purposes of the joint venture exemption to the hearsay rule, where coventurers attempt to silence witnesses after a crime, it will generally be considered to be a continuation of the joint venture.

**[13]    Criminal Law** 🔑 Confessions

**Criminal Law** 🔑 Self-serving acts or declarations

Declarations of the usual sort by a coventurer after he has been apprehended or arrested, admitting the crime or implicating another, while they may be admissible against himself, do not fall within the joint venture hearsay exception and cannot be offered against another coventurer to prove the matters asserted. Mass. Guide to Evid. § 801(d)(2)(E).

**[14]    Criminal Law** 🔑 Self-serving acts or declarations

Joint venturer's statements to police were inadmissible for the nontruth purpose of showing joint venturer and defendant conspired together or shared consciousness of guilt with regard to shooting; even though the two men gave conflicting statements to police, suggesting that one or both of them were lying, it did not suggest which declarant lied. Mass. Guide to Evid. § 801(d)(2)(E).

**[15]    Criminal Law** 🔑 Evidence as to fact of making declarations and not as to subject-matter

Statements offered for a nontruth purpose are not hearsay. Mass. Guide to Evid. § 801(d).

**[16]    Criminal Law** 🔑 Furtherance or Execution of Common Purpose

Acts of a joint venturer amounting to consciousness of guilt may be attributed to another joint venturer if the acts occurred during the course of a joint venture and in furtherance of it.

**[17]    Criminal Law** 🔑 Coconspirators' statements

Statements made to police by coventurer in response to questions regarding his whereabouts, and those of the defendant, in relation to a shooting that officers were investigating, were not made to resolve an ongoing emergency or to procure medical aid, and thus, were testimonial and barred by the Sixth Amendment; the shooting had taken place more than one hour earlier, and police were investigating the alibis of potential suspects. U.S. Const. Amend. 6.

**[18]    Criminal Law** 🔑 Availability of declarant

Where an individual does not appear at trial, that individual's "testimonial" out-of-court statements are not admissible against a criminal defendant absent unavailability and a prior opportunity for cross-examination. U.S. Const. Amend. 6.

1 Cases that cite this headnote

**[19]    Criminal Law** 🔑 Out-of-court statements and hearsay in general

A statement made in response to police questioning is testimonial, and thus subject to the Confrontation Clause, where the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution, abrogating

🚩 *Commonwealth v. Celester*, 473 Mass. 553, 45 N.E.3d 539, 🚩 *Commonwealth v. Cole*, 473

Mass. 317, 41 N.E.3d 1073, 🚩 *Commonwealth v. Cheremond*, 461 Mass. 397, 961 N.E.2d 97. U.S. Const. Amend. 6.

**[20]    Criminal Law** 👐 Out-of-court statements and hearsay in general

"Testimonial statements," as would be subject to confrontation clause, are those made with the primary purpose of creating an out-of-court substitute for trial testimony. U.S. Const. Amend. 6.

5 Cases that cite this headnote

**[21]    Criminal Law** 👐 Out-of-court statements and hearsay in general

The test for whether a statement is testimonial, and thus, subject to the Confrontation Clause, is an objective one; the court will examine the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances. U.S. Const. Amend. 6.

3 Cases that cite this headnote

**[22]    Criminal Law** 👐 Out-of-court statements and hearsay in general

Statements made in response to police interrogation are not testimonial per se for purposes of the Confrontation Clause, although they will qualify as testimonial in many cases. U.S. Const. Amend. 6.

2 Cases that cite this headnote

**[23]    Criminal Law** 👐 Out-of-court statements and hearsay in general

The Sixth Amendment does not bar testimonial statements offered for a nontruth purpose. U.S. Const. Amend. 6.

**[24]    Criminal Law** 👐 Acts, declarations, and admissions of accomplices and codefendants

Trial court's error in allowing the admission of coventurer's statements to police inculpating the defendant was not harmless beyond a reasonable doubt, and sufficiently prejudiced defendant so as to constitute grounds for a new trial; throughout her closing argument, the prosecutor repeatedly emphasized the importance of the coventurer's statements, leaving the jury to choose between believing either that the coventurer told the truth and the defendant had committed the charged crimes with another individual, or that the coventurer was covering up his own participation in the crimes and his consciousness of guilt could be imputed to the defendant.

**[25]    Criminal Law** 👐 Hearsay

With respect to a hearsay objection, the Supreme Judicial Court will review for prejudicial error.

**[26]    Criminal Law** 👐 Prejudice to rights of party as ground of review

With respect to preserved constitutional error, the Supreme Judicial Court must vacate the conviction unless it is satisfied that the error was harmless beyond a reasonable doubt.

1 Cases that cite this headnote

**[27]    Criminal Law** 👐 Sources of data

Insufficient foundation existed to support gang expert's opinion that defendant was a member of a gang, in murder prosecution premised on shooting death of victim; that defendant was observed in the presence of a suspected or actual gang member, even on more than one occasion, was insufficient to support the conclusion that defendant, himself, was a member of a gang. Mass. Guide to Evid. § 702(a).

1 Cases that cite this headnote

**[28]    Criminal Law** 👐 Necessity and sufficiency

Expert opinion testimony must rest on a proper basis, else inadmissible evidence might enter in

the guise of expert opinion. Mass. Guide to Evid. § 702.

1 Cases that cite this headnote

**[29]    Criminal Law    ☞ Gang membership**

Courts are wary of the vagaries, circularity, and dangers of trying to prove some kind of guilt by association.

**[30]    Criminal Law    ☞ Gang membership**

Although not all gangs are the same and not all gang affiliations are the same, community attitudes towards gang violence are likely to color the evidence, and thus, caution is urged in admitting gang-related evidence because evidence of a defendant's gang membership risks prejudice to the defendant in that it may suggest a propensity to criminality or violence.

**[31]    Criminal Law    ☞ Limiting effect of evidence of other offenses**

Where there is sufficient foundation to allow introduction of an opinion on gang affiliation, it is appropriate to instruct the jury regarding the admission of such evidence for the limited purpose of showing motive and joint venture; in such cases, the jury is permitted to consider the gang affiliations of two or more codefendants for the proposition that the defendants therefore shared a common motive, as may be the case where codefendants are members of one gang and the victim is a member of a rival gang.

**[32]    Criminal Law    ☞ Opinion evidence**

Erroneous admission of gang expert's opinion that defendant was a member of a gang was itself sufficient to warrant a new trial on charges of murder in the first degree, armed assault with intent to murder, and attendant firearms offenses; the Commonwealth's case depended upon the jury believing that the defendant was a member of a gang, and since his coventurer was not a gang member, the gang rivalry motive could not

be established absent evidence of the defendant's gang affiliation. Mass. Guide to Evid. § 702(a).

1 Cases that cite this headnote

**[33]    Criminal Law    ☞ Purposes for Admitting Evidence of Other Misconduct**

**Criminal Law    ☞ Showing bad character or criminal propensity in general**

**Criminal Law    ☞ Other Misconduct Showing Motive**

While, ordinarily, evidence of prior bad acts is inadmissible to show a defendant's propensity to commit the crime charged, such evidence may be admitted for another purpose, such as to establish motive. Mass. Guide to Evid. § 404(b).

**[34]    Criminal Law    ☞ Prejudicial effect and probative value**

Where evidence is offered for a nonpropensity purpose, it is admissible if the prejudicial effect does not outweigh the probative value. Mass. Guide to Evid. § 404(b).

**[35]    Criminal Law    ☞ Homicide, mayhem, and assault with intent to kill**

**Criminal Law    ☞ Gang membership**

**Criminal Law    ☞ Limiting effect of evidence of other offenses**

While evidence of animosity between gangs was admissible in murder prosecution to establish defendant's motive for committing the crimes, and there was no clear error of judgment in the trial court's determination that the risk of unfair prejudice did not outweigh the probative value of the evidence, the court was required to instruct the jury carefully on the limited use of such evidence. Mass. Guide to Evid. § 404(b).

**[36]    Criminal Law    ☞ Practices or modus operandi of offenders**

Gang expert's gang-related testimony went well beyond that which was probative of the facts at issue, namely the rivalry between two gangs,

which might have given the defendant a motive to kill, and thus, was inadmissible in murder prosecution; the expert's testimony on direct examination strayed into other criminal activity in which gangs purportedly were involved when he testified gangs were responsible for drug transactions "in schoolyards" and "playgrounds," and he attributed to the rival gangs a range of criminal activity, including shootings, drugs, and some prostitution. Mass. Guide to Evid. § 702(b).

**[37]    Criminal Law** ⚷ Identity of persons and things

Making a determination of the identity of a person from a photograph or video image is an expression of an opinion, and when offered by a lay witness, such an opinion is admissible only where the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time.

1 Cases that cite this headnote

**[38]    Criminal Law** ⚷ Identity of persons and things

The purpose of a lay witness identification is to assist the jurors in making their own independent identification, and thus, lay witness identifications are admissible when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess; if the witness lacks such familiarity, it is the province of the jury to draw their own conclusions regarding the identity of the person depicted without the witness's assistance. Mass. Guide to Evid. § 701.

1 Cases that cite this headnote

**[39]    Criminal Law** ⚷ Identity of persons and things

Even where a lay witness is familiar with a defendant, his or her testimony regarding the identity of the defendant from a photograph or video image is not admissible where the witness

is no better-suited than the jury to make the identification. Mass. Guide to Evid. § 701.

1 Cases that cite this headnote

**[40]    Criminal Law** ⚷ Identity of persons and things

Testimony of four police officers describing what was depicted in surveillance footage, and identifying the defendant as one of the shooters, was inadmissible in murder prosecution, where the jury was capable of viewing the videotape and drawing their own conclusion about whether one of the men in the videotape was the defendant without the assistance of the police officers' testimony. Mass. Guide to Evid. § 701.

1 Cases that cite this headnote

**[41]    Criminal Law** ⚷ Evidence calculated to create prejudice against or sympathy for accused

Improper identification evidence given by police officers in murder prosecution was substantially more prejudicial than it was probative; the prosecutor elicited that the officers had viewed the footage four or five times, over and over, and repeatedly suggested that their opinions concerning its contents merited greater weight than that of the jurors, which risked the creation of a cognitive bias before the jurors saw the footage for the first time, particularly where the recording was of poor quality. Mass. Guide to Evid. § 403.

**[42]    Criminal Law** ⚷ Identity of persons and things

Identification testimony from a police officer risks bringing with it a greater imprint of authority.

**[43]    Criminal Law** ⚷ Conclusions and Matters of Opinion or Facts

The usurpation problem that arises when a witness testifies to opinions based on evidence that was also available to the jurors is

compounded when the witness is a government agent whose testimony is effectively a judgment on the question of guilt or innocence.

**[44]**    **Criminal Law** 🔑 Scope of Evidence in Rebuttal

Testimony of four police officers, purporting to identify defendant as one of the shooters visible in surveillance video, was inadmissible for the purpose of rebutting a defense based on allegedly inadequate police investigation, in the absence of any showing that such a defense was meaningfully raised.

1 Cases that cite this headnote

**[45]**    **Criminal Law** 🔑 Scope of Evidence in Rebuttal

Where a defendant raises a defense based on allegedly inadequate police investigation, the Commonwealth may offer testimony about why the investigators chose the particular investigative path they did, in order to rebut that defense.

1 Cases that cite this headnote

**[46]**    **Criminal Law** 🔑 Scope of Evidence in Rebuttal

That a defendant has called into question the thoroughness of a police investigation does not provide carte blanche to introduce all conceivable rebuttal evidence; rather, the scope of permissible rebuttal evidence must be proportionate to the defense raised, and the more wide-ranging the defendant's attack on the police investigation, the broader the Commonwealth's response may be.

**[47]**    **Criminal Law** 🔑 Matters Not Sustained by Evidence

Prosecutor's argument that she was aware of up to 84 witnesses who would have been helpful in proving defendant's guilt, but whom she was unable to call, impermissibly asked the jury to

speculate or imagine what evidence was not before them. Mass. Guide to Evid. § 1113(b).

**[48]**    **Criminal Law** 🔑 Evidence excluded

Counsel may not invite an inference from the exercise of a party's right to have evidence excluded.

**[49]**    **Criminal Law** 🔑 Matters Not Sustained by Evidence

Attorneys are explicitly barred from arguing that they would have been able to parade witness after witness into court, but for evidentiary limitations.

**[50]**    **Criminal Law** 🔑 Illegally obtained evidence
         **Criminal Law** 🔑 Evidence wrongfully obtained

When reviewing the denial of a motion to suppress, the Supreme Judicial Court will accept the judge's findings of fact absent clear error and make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found.

1 Cases that cite this headnote

**[51]**    **Criminal Law** 🔑 Custodial interrogation in general

*Miranda* warnings are required before police conduct a custodial interrogation.

**[52]**    **Criminal Law** 🔑 Custodial interrogation in general

For purposes of requirement of *Miranda* warnings for custodial interrogation, a "custodial interrogation" is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

**[53]    Criminal Law** 🔑 **Custody**

For purposes of requirement of 📑 *Miranda* warnings for custodial interrogation, the defendant bears the burden of showing that the interrogation was custodial.

**[54]    Criminal Law** 🔑 **Warnings**

For purposes of requirement of 📑 *Miranda* warnings for custodial interrogation, to determine whether an interrogation was custodial, courts will ask whether a reasonable person in the defendant's shoes would have perceived the environment as coercive.

1 Cases that cite this headnote

**[55]    Criminal Law** 🔑 **Warnings**
**Criminal Law** 🔑 **Warnings**

In assessing the circumstances of an encounter with police for 📑 *Miranda* purposes, courts consider four factors: (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest; and no single factor is dispositive.

1 Cases that cite this headnote

**[56]    Criminal Law** 🔑 **Warnings**

An arrest after an incriminating statement has been obtained, by itself, does not label as custodial the interrogation that precedes the incriminating statement, for purposes of 📑 *Miranda*.

**[57]    Criminal Law** 🔑 **Particular cases or issues**

At the point at which defendant made preliminary statements to officers regarding his prior whereabouts, the interrogation was not yet custodial, for purposes of 📑 *Miranda*; on the whole, the officer's questioning was generally of a fact-finding nature, intended to verify or dispel a reasonable suspicion of criminal activity, for which 📑 *Miranda* warnings were not required. U.S. Const. Amend. 4.

**[58]    Arrest** 🔑 **Identification or description of offender or vehicle**
**Arrest** 🔑 **Appearance, acts, and statements of persons arrested**

Police had probable cause to arrest defendant; police officers investigating fatal shooting found the defendant and another individual together about one-half mile from the scene of the shooting, less than one hour after the shooting, the clothing of both men matched the descriptions given by witnesses and confirmed by surveillance video footage, the men were similar in relative height and relative weight to the individuals depicted on the surveillance footage, and the defendant provided an account of where he had been that not only contradicted the other man's statements, but police attempts to verify the defendant's statements were unsuccessful. U.S. Const. Amend. 4.

**[59]    Arrest** 🔑 **What constitutes such cause in general**

Probable cause to arrest exists when, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[60]    Arrest** 🔑 **Suspicion or rumor**

Probable cause to arrest requires more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt. U.S. Const. Amend. 4.

[61]   **Criminal Law**   Prejudice to Defendant in General

Where there has been an error in a trial resulting in a conviction of murder in the first degree, a new trial is called for unless the Supreme Judicial Court is substantially confident that, if the error had not been made, the jury verdict would have been the same.

**669 Homicide. Armed Assault with Intent to Murder. Firearms. Evidence, Statement of codefendant, Joint venturer, Relevancy and materiality, Hearsay, Inflammatory evidence, Expert opinion, Prior misconduct, Identification, Voluntariness of statement. Joint Enterprise. Witness, Expert. Identification. Constitutional Law, Confrontation of witnesses, Voluntariness of statement, Probable cause. Probable Cause. Search and Seizure, Probable cause. Practice, Criminal, Capital case, Confrontation of witnesses, Argument by prosecutor, Motion to suppress, Voluntariness of statement.

INDICTMENTS found and returned in the Superior Court Department on April 18, 2008.

A pretrial motion to suppress evidence was heard by Frank M. Gaziano, J.; the cases were tried before Stephen E. Neel, J.; and a motion for a new trial, filed on November 3, 2014, was considered by Linda E. Giles, J.

**Attorneys and Law Firms**

Robert F. Shaw, Jr., Cambridge, for the defendant.

Cailin M. Campbell, Assistant District Attorney, for the Commonwealth.

Present: Gants, C.J., Lenk, Lowy, & Kafker, JJ.

**Opinion**

LENK, J.

*455   On the evening of September 20, 2007, two men opened fire at the Academy Homes residential complex, killing Urel Duncan and injuring Kevon Grant. The defendant and Shawn Daughtry subsequently were indicted on charges of murder in the first degree, G. L. c. 265, § 1; armed assault with intent to murder, G. L. c. 265, § 18(b); and firearm offenses pursuant to G. L. c. 265, § 10(a), (h), and (n), in conjunction with the shooting.

The Commonwealth's theory at trial was that the defendant was a member of the Walnut Park gang, and that both he and Daughtry previously had been shot at by members of the rival Academy Homes gang. The men went together to the Academy Homes complex for the purpose of retaliating; they intended to shoot the first people they saw. A Superior Court jury found the  *456  defendant guilty of all charges. [1]

Of the claims raised by the defendant on appeal, we determine that four constitute error: (1) Daughtry's statements should not have been admitted against the defendant; (2) the Commonwealth's gang expert gave improper testimony; (3) police witnesses should not have given their opinions as to the identity of individuals depicted in surveillance footage; and (4) the prosecutor engaged in impermissible argument during closing. In light of at least the first three trial errors, we conclude that the defendant's convictions must be vacated and set aside, and the matter remanded to the Superior Court for a new trial. We determine, however, that there was no error in the motion judge's denial of the defendant's motion to suppress.

Facts.  We recite the facts the jury could have found, in the light most favorable to the Commonwealth, reserving additional facts for later discussion. See Commonwealth v. Platt, 440 Mass. 396, 397, 798 N.E.2d 1005 (2003). Around 9:20 P.M. on September 20, 2007, two men walked up a street in the Academy Homes housing complex in the Roxbury section of Boston. One wore a gray hooded sweatshirt; the other wore a black hooded sweatshirt.  **670  Upon seeing four individuals sitting on a porch, the two men each pulled out a gun. Three to four shots were fired. [2] Duncan was shot in the head and died the next day; Grant was shot in the ankle and survived. The perpetrators fled on foot.

Police officers arrived within minutes of the shooting. After speaking with witnesses, police began to search for two men wearing gray and black hooded sweatshirts. Police knew that the Academy Homes housing complex was the territory of the Academy Homes gang, and that there were rival gangs in the area. Accordingly, officers canvassed the territory of several rival gangs, including the Walnut Park area, which was associated with a gang known as the Walnut Park Dogs.

Approximately fifty minutes after the shooting, police stopped the defendant and Daughtry [3] coming out of a building in Walnut Park. The defendant was wearing a gray hooded sweatshirt with **457** a large zipper running down the middle, a white T-shirt, jeans, and light-colored sneakers. Daughtry was wearing a black hooded sweatshirt, black pants, and black shoes.

Police pat frisked the two men, [4] separated them, and questioned them. While each denied involvement in the shooting, they gave conflicting statements about where they had been at that time. Daughtry claimed to have met with the defendant and a third individual, "Dee," fifteen minutes earlier. The defendant said that he had spent the afternoon with Daughtry, and that the two had just come from visiting the defendant's "Uncle Mike."

Police learned that the shooting had been captured on surveillance footage by an Academy Homes security camera. The men depicted on the security footage wore clothing similar to that which the defendant and Daughtry were wearing when they were stopped by police, and were of approximately the same height and weight. [5]

The defendant and Daughtry were transported to Boston police headquarters, where their hands and clothing were tested for gunshot residue. Daughtry's left hand tested positive; the defendant's hands and clothing tested negative. Both men were charged with murder in the first degree, armed assault with intent to murder, and firearms offenses. They were tried separately.

The Commonwealth's theory at the defendant's trial in November and December of 2009 was that the defendant and Daughtry went to the Academy Homes complex to retaliate for prior shootings in which they had been the targets. In February 2007, the defendant was shot and injured near his home. Seven months later, on September 10, 2007, Daughtry was shot at in the "general area" of Walnut Park.

Detective Sixto Merced of the Boston police department testified as a gang expert. He explained that, at the time of the shooting, the Walnut Park and Academy Homes gangs had an ongoing rivalry. Police believed that the defendant was a **671** member of the Walnut Park gang, but they did not believe that Daughtry was a gang member. Although the victims were not members of any gang, they lived next door to members of the Academy Homes gang.

Prior proceedings. The defendant was convicted of all charges. **458** In November 2014, he filed a motion for a new trial. The defendant's appeal from the denial of that motion was consolidated with his direct appeal.

On appeal, the defendant points to numerous asserted errors. He argues that (1) Daughtry's statements to police were erroneously admitted as evidence against him; (2) the Commonwealth's gang expert impermissibly concluded that the defendant was a member of a gang, and his descriptions of general gang activities were unfairly prejudicial; (3) multiple police witnesses improperly opined that the individual depicted in security footage was the defendant; (4) the prosecutor engaged in impermissible argument in closing; (5) the defendant's motion to suppress should have been allowed; (6) trial counsel was ineffective because he did not challenge certain testimony relating to gunshot residue testing; (7) trial counsel did not properly challenge misleading evidence; (8) trial counsel should have called a particular witness; and (9) the denial of the defendant's postconviction motions for funds and an evidentiary hearing was error. With respect to the first four categories of error, we agree.

[1]  [2]  [3]  [4]  Standard of review. Where the defendant objected, we review to determine whether there was error and, if so, whether "there is a reasonable possibility that the error might have contributed to the jury's verdict," or whether we can be assured that the evidence "did not influence the jury, or had but very slight effect" (citations omitted). See Commonwealth v. Sullivan, 478 Mass. 369, 376, 85 N.E.3d 934 (2017); Commonwealth v. Carriere, 470 Mass. 1, 7, 18 N.E.3d 326 (2014). Where the preserved error is constitutional, "we evaluate the admission of constitutionally proscribed evidence to determine whether it was harmless beyond a reasonable doubt." See Commonwealth v. Nardi, 452 Mass. 379, 394, 893 N.E.2d 1221 (2008). Where the defendant did not object, we review for a substantial likelihood of a miscarriage of justice. Carriere, supra at 8,

18 N.E.3d 326, citing Commonwealth v. Wright, 411 Mass. 678, 682, 584 N.E.2d 621 (1992), S.C., 469 Mass. 447, 14 N.E.3d 294 (2014). "In analyzing a claim under the substantial likelihood standard, we review the evidence and case as a whole and consider whether any error made in the course of the trial was likely to have influenced the jury's conclusion." Commonwealth v. Berry, 457 Mass. 602, 618, 931 N.E.2d 972 (2010), S.C., 466 Mass. 763, 2 N.E.3d 177 (2014).

Discussion. 1. Coventurer statements. At trial, a number of police officers testified to statements made by Daughtry after the **459** shooting. [6] They pointed out inconsistencies between Daughtry's statements about his activities near the time of the shooting and the defendant's statements. From this, the prosecutor argued that the statements proved the two men were lying.

The first statement was made within approximately one hour of the shooting, when Daughtry told Sergeant Thomas Teahan of the Boston police department that he had been in the area "a short time," and had met with the defendant only fifteen minutes earlier. Daughtry said that he and the defendant briefly had been at the home of someone named "Dee," and **672** he provided an address. The second statement was given several hours later, at Boston police headquarters; at that time, Daughtry told Detective Dennis Harris that he had been "smoking a blunt," alone, at the time of the shooting. He heard four or five gunshots, walked "out front," and encountered the defendant walking down the street with Dee. According to Daughtry, the two men were wearing gray and black hooded sweatshirts, respectively. [7]

The defendant asserts that Daughtry's statements should have been excluded as hearsay, and also that their admission violated his rights to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. [8]

[5]    [6]  a.  Hearsay.  i.  Joint venturer statements. Massachusetts recognizes a joint venture exemption to the hearsay rule. See Commonwealth v. Wood, 469 Mass. 266, 280, 14 N.E.3d 140 (2014); Mass. G. Evid. § 801(d)(2)(E) (2019). [9] Just as a defendant's statements are admissible against the defendant, so too are certain statements made by a defendant's coventurers. The exemption applies only where a defendant's coventurer makes a statement both "during the

pendency of the cooperative effort" and "in furtherance of its **460** goal" (citation omitted). See Commonwealth v. Raposa, 440 Mass. 684, 659, 801 N.E.2d 789 (2004).

[7]  The rationale for the exemption is twofold. See Commonwealth v. Rakes, 478 Mass. 22, 36, 82 N.E.3d 403 (2017). First, while acting "in furtherance of" a "common object," coventurers are considered agents for one another. See Commonwealth v. Bright, 463 Mass. 421, 426, 974 N.E.2d 1092 (2012), quoting Commonwealth v. Tivnon, 8 Gray 375, 381, 74 Mass. 375 (1857). Accordingly, where their interests are sufficiently aligned, a statement by a coventurer is "deemed equivalent to a statement by the defendant" (quotation and citation omitted). Carriere, 470 Mass. at 8, 18 N.E.3d 326. Second, the exemption derives from the policy considerations underpinning the prohibition against hearsay. Whereas courts generally are wary of the reliability of out-of-court statements, "[t]he community of activities and interests which exists among the coventurers during the enterprise tends in some degree to assure that their statements about one another will be minimally reliable." Commonwealth v. White, 370 Mass. 703, 712, 352 N.E.2d 904 (1976). See Rakes, supra at 37, 41, 82 N.E.3d 403.

[8]  To introduce out-of-court statements as a statement of a joint venturer, the Commonwealth must show, by a preponderance of the evidence, that a joint venture existed between the declarant and the defendant, and that the statement was made in furtherance of the joint venture, while the joint venture was ongoing. [10] See Rakes, 478 Mass. at 37, 82 N.E.3d 403.

**673**  [9]    [10]  It is well established that statements made after a joint venture has ended are not admissible under the hearsay exemption. See Commonwealth v. Winquist, 474 Mass. 517, 522, 52 N.E.3d 105 (2016); Commonwealth v. Andrews, 403 Mass. 441, 452, 530 N.E.2d 1222 (1988). To determine whether a joint venture has ended, our inquiry "focuses not on whether the crime has been completed," Carriere, 470 Mass. at 10, 18 N.E.3d 326, but on whether the coventurers' interests are still "closely bound together, tending to ensure the reliability of their statements" (citation omitted). See Commonwealth v. Mavredakis, 430 Mass. 848, 863, 725 N.E.2d 169 (2000). When a joint venture ends, "there is a dispersion of interests, and motives of self-preservation, not to speak of malice or spite, may take over." Commonwealth v. Santos, 463 Mass. 273, 291, 974 N.E.2d

1 (2012), quoting White, 370 Mass. at 712, 352 N.E.2d 904.

In some cases, statements made after the commission of a **\*461** crime nonetheless may continue to advance the goals of the joint venture. See Carriere, 470 Mass. at 11, 18 N.E.3d 326. For example, where coventurers meet to align their alibis or plan to evade capture, the statements they make to one another may be part of an ongoing joint venture. See, e.g., Commonwealth v. Burton, 450 Mass. 55, 63, 876 N.E.2d 411 (2007) (meeting to discuss what had happened and where murder weapon was hidden). See also White, 370 Mass. at 709 n.8, 352 N.E.2d 904. Such was not the case here.

**[11]    [12]**  Daughtry's first statements were made to police officers approximately one hour after the shooting. While Daughtry placed himself elsewhere at the time of the shooting, he produced no such alibi for the defendant. [11]  In his second statement, Daughtry claimed that, after he heard gunshots, he walked around a building and encountered the defendant and a man named "Dee" on the street. At the time of the interview, Daughtry already had been informed that police sought two suspects for the shooting, one wearing a "gray hoodie," the other wearing a "black hoodie." Daughtry described the defendant and Dee as having been dressed in gray and black hooded sweatshirts. In both statements, he insisted that he had not been with the men earlier in the evening.

**[13]**  Daughtry's statements reveal that his interests at that point were no longer "closely bound together" with those of the defendant (citation omitted). [12]  Mavredakis, 430 Mass. at 863, 725 N.E.2d 169. Daughtry's description inculpated the defendant and Dee in the shooting, while attempting to exculpate himself. As the prosecutor **\*\*674** urged in closing, "Clearly, ... Daughtry wanted to distance himself from the defendant." "[N]either the 'pendency' nor the 'furtherance' requirement" is met" where a coventurer shifts the **\*462** blame to another defendant. See White, 370 Mass. at 711, 352 N.E.2d 904 (coventurer explicitly accused defendant of crime). See also Santos, 463 Mass. at 291, 974 N.E.2d 1 (error in admitting statements that were intended to exculpate declarant by inculpating defendant). Even if the statements could be said to evince an ongoing effort to cover up the crime, the effort "was not a 'common' one." See White, supra. Contrast Raposa, 440 Mass.

at 690-691, 801 N.E.2d 789 (defendant and coventurer "continued to cooperate" where they contacted police together and shared mutual goal of silencing witnesses, and coventurer made statements "in an attempt to divert [police] attention from himself and the defendant"); Mavredakis, supra at 863 n.17, 725 N.E.2d 169 (coventurers told police defendant was not at scene of crime). [13]

As Daughtry's statements were not made during and in furtherance of a joint venture, the judge erred in allowing them to be introduced under the joint venture exemption to the hearsay rule. [14]

**[14]    [15]**  ii. Truth of the matter asserted. In the alternative, the Commonwealth argues that Daughtry's statements were not offered for their truth, but, rather, to demonstrate that Daughtry and the defendant were lying. Where no exception applies, the rule against hearsay prohibits the admission of out-of-court statements offered to prove the truth of the matter asserted. See Mass. G. Evid. § 801(c)(2) (2019). Statements offered for a nontruth purpose are not hearsay. See Commonwealth v. Keown, 478 Mass. 232, 245, 84 N.E.3d 820 (2017), cert. denied, ––– U.S. ––––, 138 S. Ct. 1038, 200 L.Ed.2d 292 (2018).

**[16]**  That Daughtry and the defendant gave conflicting statements suggests that one or both men were lying, although it does not **\*463** suggest which. [15]  If the Commonwealth could have established that Daughtry's statements were false, and that they were made in coordination with the defendant, the statements might have been admissible for the nontruth purpose of showing that the two men conspired together, or shared consciousness of guilt. [16]  Cf. **\*\*675** Commonwealth v. Pytou Heang, 458 Mass. 827, 854, 942 N.E.2d 927 (2011) (statement of codefendant admitted for "falsity and for its similarity to the defendant's statements"); Commonwealth v. Brum, 438 Mass. 103, 116-117, 777 N.E.2d 1238 (2002) (coventurer's statement admissible to show he had coordinated with defendant to give "identically false accounts of the same precise details").

The statements, however, were not admitted for a nontruth purpose, and the judge did not instruct the jury that Daughtry's statements could not be considered for their truth. [17]  See Commonwealth v. Purdy, 459 Mass. 442, 453, 945 N.E.2d 372 (2011) (defendant entitled to limiting instruction where

Commonwealth offered out-of-court statement for nontruth purpose). See also Commonwealth v. Caillot, 454 Mass. 245, 255-256, 909 N.E.2d 1 (2009), cert. denied, 559 U.S. 948, 130 S.Ct. 1525, 176 L.Ed.2d 127 (2010) (admission of statements without limiting instruction was error where statements reasonably might be considered for their truth). To the contrary, the judge instructed that the statements could be used against the defendant if the Commonwealth established evidence of a joint venture. Accordingly, the jury improperly could have considered the statements for their truth.

[17]  [18]  b. Confrontation clause. The defendant maintains that the admission of Daughtry's statements also violated the defendant's right to confront the witnesses against him. Where an individual does not appear at trial, that individual's "testimonial" out-of-court **464** statements are not admissible against a criminal defendant absent unavailability and a prior opportunity for cross-examination.

See Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

[19]  [20]  [21]  [22]  Testimonial statements are those made with the primary purpose of "creating an out-of-court substitute for trial testimony." See Commonwealth v. Imbert, 479 Mass. 575, 580, 97 N.E.3d 335 (2018), quoting Michigan v. Bryant, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). A statement made in response to police questioning is testimonial where "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." See Commonwealth v. Middlemiss, 465 Mass. 627, 633, 989 N.E.2d 871 (2013), quoting Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Compare Commonwealth v. Smith, 460 Mass. 385, 395, 951 N.E.2d 674 (2011) (statements were not testimonial where primary purpose was to aid officers in terminating ongoing emergency). The test is an objective one; we examine "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." [18] Imbert, supra, quoting **676** Williams v. Illinois, 567 U.S. 50, 84, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012).

[23]  Here, Daughtry made statements to police in response to questions regarding his whereabouts, and those of the defendant, in relation to a shooting that the officers were investigating. The statements were not made to resolve an ongoing emergency or to procure medical aid. Contrast Middlemiss, 465 Mass. at 635-636, 989 N.E.2d 871 **465** (purpose of 911 call was to intercept armed fugitive and procure medical treatment for shooting victim). The shooting had taken place more than one hour earlier, and police were investigating the alibis of potential suspects. In the circumstances presented here, the statements were testimonial. [19] As Daughtry did not testify at the defendant's trial, admission of his statements was barred by the Sixth Amendment. [20]

[24]  [25]  [26]  c. Prejudicial effect. The defendant objected to the admission of Daughtry's statements as both hearsay and as a violation of his right to confrontation. With respect to hearsay, we review for prejudicial error. See Sullivan, 478 Mass. at 375-376, 85 N.E.3d 934. With respect to preserved constitutional error, we must vacate the conviction unless we are satisfied that the error was harmless beyond a reasonable doubt. See Nardi, 452 Mass. at 394, 893 N.E.2d 1221.

Throughout her closing argument, the prosecutor repeatedly emphasized the importance of Daughtry's statements. She claimed that the jury could make an "identification" of the perpetrators through "Daughtry's own statements." She also urged the jury to think about the two men's "completely contradictory" statements, and argued that the contradictions proved the defendant's guilt:

> "So, ladies and gentlemen, what are they lying about? What are they covering up? Why did they give two completely false statements? Why did they give two completely **677** contradictory statements? Ladies and gentlemen, that's not a coincidence, that's a cover-up."

The jury thus were left to choose between believing either that Daughtry told the truth [21] and the defendant likely had committed the crimes with Dee, or that Daughtry was covering up his own **466** participation in the crimes and his consciousness of guilt could be imputed to the defendant. In either case, Daughtry's statements risked influencing the jury's verdicts. Under both our constitutional and nonconstitutional standards of review, the error sufficiently prejudiced the defendant so as to constitute grounds for a new trial.

2. Gang expert. Merced testified as a gang expert. The defendant does not challenge the detective's testimony with respect to whether the Walnut Park and Academy Home gangs operated in the area, or whether they were rivals. Rather, the defendant claims that the detective's testimony was improper in two ways: (1) his opinion that the defendant was a member of the Walnut Park gang lacked proper foundation, and (2) his testimony as to a variety of illicit activities conducted by gangs was unduly prejudicial.

[27] a. Gang affiliation. The detective was permitted to testify, over the defendant's objections, that the defendant was a member of the "Walnut Park Dogs." The defendant contends that the detective's conclusion lacked sufficient foundation. We review for prejudicial error. See Sullivan, 478 Mass. at 375-376, 85 N.E.3d 934.

[28] We note first that Merced was properly qualified as an expert. See Mass. G. Evid. § 702(a) (2019) (requiring "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue"). Second, where the Commonwealth maintained that the motive for the killing was a gang rivalry, the detective's specialized information could help the jury understand pertinent facts. "Expert opinion testimony must rest on a proper basis, else inadmissible evidence might enter in the guise of expert opinion" (quotation and citation omitted). Commonwealth v. Barbosa, 477 Mass. 658, 667, 81 N.E.3d 293 (2017). Proper bases include "facts within the witness's direct personal knowledge," facts already introduced in evidence, or "unadmitted but independently admissible evidence." Id., citing Mass. G. Evid. § 703 (2017).[22] See Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531, 499 N.E.2d 812 (1986). See also *467 Commonwealth v. Piantedosi, 478 Mass. 536, 543, 87 N.E.3d 549 (2017) (in addition to personal knowledge, expert witnesses are permitted to rely upon unadmitted but independently admissible evidence, that is, evidence that "would be admissible with the proper witness or foundation"). In Barbosa, supra at 668, 81 N.E.3d 293, for example, a police officer was permitted to opine as to a defendant's gang affiliation where he had known the defendant for **678 many years, had repeatedly seen the defendant with gang associates "and at the address of the gang's headquarters," and had personally "observed [him] wearing ... gang colors and in the presence of ... gang leaders on multiple occasions."

A voir dire hearing was conducted, outside the jury's hearing, in order to determine the basis for Merced's conclusions regarding the defendant. Although Merced had known the defendant from the time the defendant was eight years old, Merced had accumulated relatively little personal knowledge connecting the defendant to any gang. The defendant had never self-identified as a member of any gang.[23] He did not frequent a gang's headquarters, speak with identified gang leaders, or wear gang colors. Merced was aware of graffiti that listed members of the Walnut Park gang, but the defendant's name was not among those listed. Nor was Merced able to link the defendant to any gang by signs, symbols, street names, or tattoos. Rather, during voir dire, Merced explained that he believed the defendant belonged to a gang, in part, because the defendant was listed in the Boston regional intelligence center "gang database":

> Q.: "And can you tell us why he would be considered a gang member?"
>
> A.: "I believe in 2005 he was entered into the database as a Holworthy associate, and then later on in '07 as Walnut Park. The reason being is that those individuals who entered him into the database felt that he fit the criteria under the orders."

That other officers had formed the opinion that the defendant fit the criteria does not constitute proper foundation for Merced's opinion; the gang database entry did not provide Merced with underlying facts or data to which he could apply his own expertise. *468 [24] Cf. Commonwealth v. Avila, 454 Mass. 744, 761-763, 912 N.E.2d 1014 (2009) (substitute medical expert may rely on autopsy report, not to repeat its conclusions, but to apply expertise to "underlying 'facts or data' contained [therein]" [citation omitted]). Ultimately, Merced was unsure as to who had entered the defendant's name in the database, or what that officer's reasons had been for doing so. There was no testimony regarding how the database is created or maintained, or what criteria police use to determine whose names are entered in it.[25] Cf. **679 Sullivan, 478 Mass. at 377-378, 85 N.E.3d 934 (admission of testimony regarding deoxyribonucleic acid [DNA] match in Combined DNA Index System database "inadmissible without testimony from those responsible for creating and maintaining the database" under Sixth Amendment and art. 12).

Merced did make several personal observations of the defendant. On one occasion, he suspected that he had

observed the defendant participate in a hand-to-hand drug transaction. Police, however, were unable to recover evidence of any drugs, and no charges were brought. Merced was unsure whether the individual seen with the defendant was a member of any gang at the time. On another occasion, Merced had seen the defendant "in the company of ... [a named] known gang member" from Walnut Park. The two were neither stopped nor charged with any unlawful **\*469** activity. [26] Indeed, to the best of Merced's knowledge, the defendant had never been stopped by police while with a member of the Walnut Park gang:

Q.: "Can you identify, sir, one time, just one time, not simply where he was merely observed with someone, but he was actually stopped by a member of the Boston Police Department, gang or otherwise, that [the defendant] was stopped with another gang member from Walnut Park?"

...

A.: "None that I can recall at this time, no."

 **[29]**  That the defendant was observed in the presence of a suspected or actual gang member, even on more than one occasion, does not suffice to support the conclusion that the defendant was, himself, a member of a gang. Contrast Barbosa, 477 Mass. at 668, 81 N.E.3d 293 (witness observed defendant speaking with gang leaders, visiting gang headquarters, and wearing gang colors); Commonwealth v. Cintron, 435 Mass. 509, 521, 759 N.E.2d 700 (2001). We are wary of the "vagaries, circularity, and dangers of trying to prove some kind of guilt by association." [27] See Commonwealth v. Wolcott, 28 Mass. App. Ct. 200, 208, 548 N.E.2d 1271 (1990) (opinion that defendant was member of gang constituted "unacceptable conjecture" where membership "was supported by little more than [the defendant's] use of a street name and his association with [a member of the gang]"). [28] Without more, Merced lacked a basis in personal knowledge for concluding that the defendant was a member of the Walnut Park **\*470** gang. Nonetheless, at the conclusion of the voir dire **\*\*680** hearing, he was permitted to testify to that effect.

As the prosecutor noted, the Commonwealth's case depended upon the jury believing that the defendant was a member of the Walnut Park gang. Since Daughtry was not a gang member, the gang rivalry motive could not be established absent evidence of the defendant's gang affiliation. Here,

Merced's testimony provided the linchpin. During closing argument, the prosecutor repeatedly drew the jury's attention to the defendant's "gang ties," arguing that the defendant's "association with a gang" implicated him in the crimes, and stating that the "fact" that "the defendant is a Walnut Park gang member" is no "coincidence."

"You heard that the defendant is a member of the Walnut Park gang. That the Boston police have classified him as such. That's uncontroverted fact. What's also uncontroverted fact is that this was a particularly violent rivalry they had with Academy Homes.... Gang members are going to take this personally when there is a shooting on their home turf.... There's your motive. There's your alleged association with a gang."

 **[30]**  **[31]**  We have recognized the dangers of liberally attributing gang membership, even in cases where membership in a gang is not central to the Commonwealth's case. See Commonwealth v. Akara, 465 Mass. 245, 267-268, 988 N.E.2d 430 (2013). [29] "Although 'not all gangs are the same and not all gang affiliations are the same,' community attitudes towards gang violence are likely to color [the] evidence." Id., citing Hagedorn & MacLean, Breaking the Frame: Responding to Gang Stereotyping in Capital Cases, 42 U. Mem. L. Rev. 1027, 1029 (2012). Accordingly, "[w]e have urged caution in admitting gang-related evidence," because "evidence of a defendant's gang membership risks prejudice to the defendant in that it may suggest a propensity to criminality or violence." See Akara, supra at 267, 988 N.E.2d 430, quoting **\*471** Commonwealth v. Phim, 462 Mass. 470, 477, 969 N.E.2d 663 (2012). [30]

 **[32]**  In this case, we cannot say that the erroneous admission of the gang expert's opinion had but a slight effect on the jury. Accordingly, the error is itself sufficient to warrant a new trial.

 **\*\*681**  b. Gang activities. Even if Merced's opinion regarding the defendant's gang affiliation were not error, the defendant separately argues that Merced's trial testimony regarding the gangs' prior criminal activities was unduly prejudicial. As this objection was not raised at trial, we review for a substantial likelihood of a miscarriage of justice. See Carriere, 470 Mass. at 8, 18 N.E.3d 326.

 **[33]**  **[34]**  i. Prior shootings. Merced testified regarding prior shootings that had taken place between the Academy

Homes and Walnut Park gangs. While, ordinarily, evidence of prior bad acts is inadmissible to show a defendant's propensity to commit the crime charged, such evidence may be admitted for another purpose, such as to establish motive. See Commonwealth v. Veiovis, 477 Mass. 472, 481-482, 78 N.E.3d 757 (2017). Where evidence is offered for a nonpropensity purpose, as here, it is admissible if the prejudicial effect does not outweigh the probative value. See Akara, 465 Mass. at 269, 988 N.E.2d 430; Commonwealth v. Anestal, 463 Mass. 655, 665, 978 N.E.2d 37 (2012). See also Mass. G. Evid. § 404(b) (2019).

[35] Merced testified that there was a rivalry between the Academy Homes and Walnut Park gangs, and that specific members of the two gangs had been shot, or shot at, in the months leading up to the killing. Evidence of animosity between the gangs was admissible for a nonpropensity purpose; namely, to establish the defendant's motive for committing the crimes. See Phim, 462 Mass. at 477, 969 N.E.2d 663 (evidence of antagonism between gangs relevant). See also Veiovis, 477 Mass. at 481-482, 78 N.E.3d 757. "[W]ithout this evidence, the homicide would have made no sense to the jury." See *472 Commonwealth v. Leng, 463 Mass. 779, 783, 979 N.E.2d 199 (2012). See also Commonwealth v. Smith, 459 Mass. 538, 547, 946 N.E.2d 95 (2011) (no evidence of individual antagonism). There was no clear error of judgment in the judge's determination that the risk of unfair prejudice did not outweigh the probative value of the evidence. See Commonwealth v. Rutherford, 476 Mass. 639, 649, 71 N.E.3d 481 (2017); Commonwealth v. Maldonado, 429 Mass. 502, 504, 709 N.E.2d 809 (1999) ("within the discretion of the judge" to admit gang evidence "essential to understanding the motivation behind the crimes").

The judge was required to instruct the jury, however, lest the jury "consider [the] evidence without limitation." See Veiovis, 477 Mass. at 487, 78 N.E.3d 757. In Barbosa, 477 Mass. at 669, 81 N.E.3d 293, we noted with approval that, "[e]ach time the [gang-related] evidence was introduced, it was accompanied by a thorough limiting instruction, which was repeated in the final charge." There, the judge "carefully cabined properly admitted testimony with limiting instructions, voir dire, and exclusion of any references to prior acts of gang-related violence." Id.

Here, by contrast, the judge instructed:

> "Evidence that the defendant may have been a member of a gang you may not consider such evidence as evidence that this defendant is of bad character or has or had a propensity to commit the crimes with which he is charged. And such evidence, if you believe it, you may consider only on the limited issues of the defendant's state of mind, motive, and whether he engaged in aiding and abetting another in the commission of the crimes with which he is charged."

In permitting the jury to consider gang affiliation for the broad purpose of determining "whether [the defendant] engaged in aiding and abetting [Daughtry] in the commission of the crimes with which he is **682 charged," the judge placed virtually no limitation on the use of the evidence. Indeed, this "limiting" instruction appears to permit the jury to use the evidence for any purpose relevant to their determination of guilt or innocence. [31] Contrast Akara, 465 Mass. at 266, 268, 988 N.E.2d 430 (limiting gang evidence to "the limited purpose of showing motive and joint venture," that is, "that the defendants therefore shared a common motive").

*473 ii. Other illicit activity. Merced's testimony on direct examination also strayed into other criminal activity in which gangs purportedly were involved. He testified that gangs, generally, were responsible for drug transactions "in schoolyards" and "playgrounds." He attributed to the Walnut Park and Academy Homes gangs a range of criminal activity, including "shootings, drugs, [and] some prostitution." Merced also stated that the rivalry between Walnut Park and Academy Homes was responsible for "unsolved shootings." [32] He said that "gang members oftentimes have access to guns," sometimes giving them to a "non-gang member," "[c]ommonly referred to as a crash dummy" or "human holster." Other times, gang members hide a "community gun," which is a "gun where all the gang members in that particular jurisdiction will know where that gun may be hidden." [33]

[36] In totality, the gang-related testimony went well beyond that which was probative of the facts at issue: the rivalry between the Walnut Park and Academy Homes gangs, which might have given the defendant a motive to kill. Contrast Akara, 465 Mass. at 267-269, 988 N.E.2d 430 ("The prosecutor did not suggest that the gang or its members had a history of violence" and "did not discuss any criminal

activity"; "rather, the emphasis was on common identifying symbols, reflected in graffiti and clothing"); Commonwealth v. John, 442 Mass. 329, 338 n.14, 812 N.E.2d 1218 (2004) (gang testimony sanitized so that "[t]he only evidence of [defendant's] violence presented at trial was the murder of [victim]"). The judge gave no curative instructions with respect to the testimony concerning drug activity, sex trafficking, or community guns. Accordingly, the jury could have taken Merced's testimony to mean that the defendant was engaged in the drug trade, the sex trade, and numerous "unsolved" shootings.

We need not reach what effect, if any, this additional gang-related evidence might have had on the jury in the absence of Merced's opinion that the defendant was a member of a gang. It suffices that, in light of the other prejudicial errors, a new trial is required, at which the aforementioned testimony will not be admitted.

**\*474** 3. Video identification. The defendant argues that the testimony of four Boston police officers, who identified him as the individual depicted in the surveillance videotape (video), was improper and unduly prejudicial. Where, as here, the issue was not preserved, we review for a substantial **\*\*683** likelihood of a miscarriage of justice. See Carriere, 470 Mass. at 8, 18 N.E.3d 326.

a. Police testimony. The jury viewed surveillance footage from the night of the shooting that showed two individuals walking down the middle of the street, apparently shooting in the direction of a house, and then running back the way they had come. The black and white footage is grainy, and both individuals have their hoods up. The Commonwealth elicited testimony from four Boston police officers describing what was depicted in the surveillance footage, and portions of the footage were played multiple times during that testimony.

Before the jury were shown the surveillance video recording, Teahan opined that the people shown were dressed "similar to the way the two individuals [he] had stopped, [the defendant] and ... Daughtry." He also described the articles of clothing the individuals depicted in the video footage were wearing. [34] The prosecutor emphasized that the officer had watched the recording "four or five times" while looking for "similarities in clothing." The officer testified that it was "readily apparent that the clothing descriptions of the individuals [he] had stopped and the clothing descriptions within the video were almost -- looked exact to [him]." He then described the differences in height and stature of the two men, and the color

of the shoes one was wearing, which the officer said matched the shoes the defendant had been wearing when stopped. The prosecutor also introduced photographs of the defendant, with arrows pointing to the "points of comparison [Teahan] used when looking at the video." Teahan testified that he was "struck by the fact that you could see that same similarity."

Detective John Callahan also described the clothing, height, and handedness of the individuals depicted in the surveillance video footage. He opined that, upon seeing the defendant and Daughtry, "I observed that their attire matched, was a definitive match to that of what I saw in the video earlier in the evening." Sergeant John Fitzgerald then testified that he watched the video "over and over"; "repeated[ly]." Fitzgerald went to see the defendant **\*475** and Daughtry, to "see if they resemble the two people in the video"; he concluded that, with respect to the defendant, he "appeared to be the same person from the video," and that the clothing worn by Daughtry "appeared to match the person on the video" as well. Lastly, Detective Dennis Harris was asked to make comparisons between the appearance of the defendant and Daughtry and the individuals depicted in the video footage. He opined that "they had identical clothing on." He then reviewed side-by-side comparisons of a still image from the surveillance video recording and a photograph taken at the police station, and noted the similarities between the two.

[37] [38] [39] b. Improper lay opinion. "Making a determination of the identity of a person from a photograph or video image is an expression of an opinion." Commonwealth v. Pina, 481 Mass. 413, 429, 116 N.E.3d 575 (2019). When offered by a lay witness, such an opinion is admissible only where "the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time" (citation omitted).

See ⚲ Commonwealth v. Austin, 421 Mass. 357, 366, 657 N.E.2d 458 (1995). The purpose of a lay witness identification is to "assist the jurors in making their own independent identification." **\*\*684** Pina, supra. See Mass. G. Evid. § 701 (2019). Lay witness identifications are admissible, therefore, "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess." See Commonwealth v. Vacher, 469 Mass. 425, 441, 14 N.E.3d 264 (2014), quoting ⚲ Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326-327, 729 N.E.2d 642 (2000). "If the witness lacks such familiarity, it is the province of the jury to draw their own conclusions regarding the identity of the person depicted without the witness's assistance." Vacher, supra.

Even where a witness is familiar with a defendant, his or her testimony is not admissible where "the witness is no better-suited than the jury to make the identification." See United States v. Jackman, 48 F.3d 1, 4–5 (1st Cir. 1995). See also Austin, supra.

[40]  Here, the jury were able to view the same surveillance footage that the officers watched. So, too, the jury were able to examine the appearance of the defendant on the night of the shooting, including the clothing he was wearing. Photographs of the defendant taken that night, as well as the clothing itself, were introduced in evidence. There was no evidence that the defendant's appearance had changed substantially between the time the video recording was made and the time the photographs were taken, on *476 the same evening. Nor were any of the four officers who offered opinions regarding the surveillance footage specifically familiar with the defendant, such that they could provide special insight into his appearance. [35] See Vacher, 469 Mass. at 442, 14 N.E.3d 264. Contrast Commonwealth v. Vitello, 376 Mass. 426, 460, 381 N.E.2d 582 (1978) (defendant had lost twenty-five pounds since photograph was taken, and officer had known defendant for long time and seen him often).

In short, "[t]he jury were capable of viewing the videotape and drawing their own conclusions regarding whether the man in the videotape was the defendant without the assistance of [the witness's] testimony." See Austin, 421 Mass. at 366, 657 N.E.2d 458. See also United States v. Vázquez-Rivera, 665 F.3d 351, 361 (1st Cir. 2011) ("Crucially, because the determination of whether [defendant] was the man in the [Internet camera] video could have been properly reached only by considering evidence available to the jury, [officer's] testimony also usurped the jury's role instead of being helpful to it"). It was also the province of the jury, and not the officers, to determine whether the defendant "appeared to be the same person from the video," or whether "their attire matched, was a definitive match."

[41]  We have recognized the "increase[d] potential for inappropriate prejudice to the defendant stemming from identification testimony from a police officer who is so designated" (quotations omitted). See Vacher, 469 Mass. at 442, 14 N.E.3d 264, quoting Commonwealth v. Carr, 464 Mass. 855, 879, 986 N.E.2d 380 (2013). Nonetheless, we also have determined that there was no prejudice in

the admission of improper lay witness identifications where the improper testimony was "brief and fleeting" and the defendant otherwise admitted having been present at the scene. See, e.g., Vacher, supra. See also Pina, 481 Mass. at 430, 116 N.E.3d 575 (four witnesses identified defendant at scene).

The improper identification evidence here was extensive. It was elicited not once, but from four individual officers, and it was supplemented with side-by-side photographs detailing points of comparison relied upon by the officers. Crucially, the **685 evidence was not collateral; identification was at the heart of the Commonwealth's case. Indeed, the prosecutor spent much of his closing arguing that there was sufficient evidence to identify the man in the video footage as the defendant. Faced with the opinions of *477 four officers imbued with the imprimatur of authority and privy to repeated viewings of the surveillance footage, a juror well might have substituted the officers' opinions for his or her own.

c.  Substantially more prejudicial than probative.  Even had the officers' testimony constituted proper lay opinions, it nonetheless was substantially more prejudicial than it was probative. See Pleas, 49 Mass. App. Ct. at 327, 729 N.E.2d 642 (applying balancing test even where lay witness identification otherwise is admissible); Mass. G. Evid. § 403 (2019). Having established that the officers had viewed the surveillance footage, there was minimal probative value in their testimony as to what they saw depicted therein, which the jury could see for themselves.

[42]  [43]  The risk of prejudice, by contrast, was great. As this court has recognized, identification testimony from a police officer risks bringing with it a "greater imprint of authority." Pina, 481 Mass. at 430, 116 N.E.3d 575. "The usurpation problem that arises when a witness testifies to opinions based on evidence that was also available to the jurors is compounded when the witness is a government agent whose testimony -- as here -- is effectively a judgment on the question of guilt or innocence." United States v. Meises, 645 F.3d 5, 17 (1st Cir. 2011). In addition, here the prosecutor elicited that the officers had viewed the video footage "four or five times," "over and over," and "repeated[ly]," suggesting that their opinions concerning its contents merited greater weight than that of the jurors. Moreover, immediately before the jury were shown the footage for the first time, Teahan testified that the figures the jurors were about to see in the video recording were dressed similarly to the way the

defendant and Daughtry had been dressed. Such priming risked creating a cognitive bias before the jurors saw the footage for the first time, particularly where the recording was of poor quality. [36]

Because we determine that the introduction of the improper and unduly prejudicial identifications was "likely to have influenced the jury's conclusion," a new trial is required. See Berry, 457 Mass. at 618, 931 N.E.2d 972.

**[44] [45] [46]** d. Bowden defense. On appeal, the Commonwealth argues that the foregoing identification by the four police officers was offered **\*478** to rebut a Bowden defense. See Commonwealth v. Bowden, 379 Mass. 472, 486, 399 N.E.2d 482 (1980). Where a defendant raises a Bowden defense, the Commonwealth may offer "testimony about why the investigators chose the particular investigative path they did," in order to rebut that defense. See Avila, 454 Mass. at 755, 912 N.E.2d 1014. That a defendant has called into question the thoroughness of a police investigation, however, does not provide carte blanche to introduce all conceivable rebuttal evidence. Rather, the scope of permissible rebuttal evidence must be proportionate to the defense raised; "the more wide-ranging the defendant's attack on the police investigation, the broader the Commonwealth's response **\*\*686** may be." Id. at 754–755, 912 N.E.2d 1014. See Commonwealth v. Bizanowicz, 459 Mass. 400, 414, 945 N.E.2d 356 (2011) (before allowing admission of Bowden evidence, judge must balance probative value against risk of prejudice). "[D]etermining precisely what evidence may be admitted to rebut a Bowden defense is a delicate and difficult task." Avila, supra at 753, 912 N.E.2d 1014.

It is not clear from the record that a Bowden defense was meaningfully raised. In any event, the judge did not instruct the jury that the officers' identification testimony was admissible only for the limited purpose of rebutting a Bowden argument. [37] Contrast Avila, 454 Mass. at 755-756, 912 N.E.2d 1014 ("judge repeatedly instructed the jury that the investigators' testimony ... was presented to enable the jury to evaluate the police"). The jurors had access to the video recording and could determine for themselves whether an officer, having reviewed it, acted appropriately in pursuing the defendant as the target of the investigation. The officers' opinions that the individual in the recording was a "definitive match" to the defendant were neither pertinent nor necessary to rebut a Bowden defense.

**[47]** 4. <u>Closing argument</u>. The defendant contends that the prosecutor engaged in improper argument and vouching during her closing. The prosecutor argued,

"And so, too, when I present this evidence to you, there is two years' worth of investigation; that [eighty-four] witnesses, **\*479** the list of names you heard when you were still in the jury pool, those [eighty-four] witnesses, I need to make judgment calls. I need to exercise my discretion. I need to decide to present to you what is admissible and what is relevant. And from that you heard from [twenty-seven] witnesses over eight days and [eighty-nine] exhibits. That's what I'm asking you to focus on, ladies and gentlemen."

Among several limitations on closing argument, see 30A E.B. Cypher, Criminal Practice and Procedure §§ 36:16-36:41 (4th ed. 2014), it is improper for an attorney to "imply that [he or she] knew more about the case than he [or she] had presented in court." [38] See Commonwealth v. Dinkins, 415 Mass. 715, 725, 615 N.E.2d 570 (1993). See also Mass. G. Evid. § 1113(b) (2019). The prosecutor's argument here, that she was aware of up to "[eighty-four] witnesses" who would have been useful to proving the defendant's guilt, but whom she was unable to call, was a clear violation of this principle. Such argument impermissibly asks the jury to "speculate" or "imagine" additional evidence not before them. See Commonwealth v. Corriveau, 396 Mass. 319, 339, 486 N.E.2d 29 (1985).

**[48] [49]** Additionally, the prosecutor in effect attributed her inability to call missing witnesses to constraints regarding "what is admissible and what is relevant." Counsel may not "invite an inference from the exercise of a party's right to have **\*\*687** evidence excluded." See Commonwealth v. Burke, 373 Mass. 569, 575, 369 N.E.2d 451 (1977). See also Berger v. United States, 295 U.S. 78, 87, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (attorney impermissibly argued he had to "play within" "rules of the game"). Attorneys are explicitly barred from arguing that they would have been able to "parade witness after witness" into court, but for evidentiary limitations. [39] See Commonwealth v. Dirgo, 474 Mass. 1012, 1016, 52 N.E.3d 160 (2016). See also United States

124 N.E.3d 662

v. Walker-Couvertier, 860 F.3d 1, 10 (1st Cir. 2017), cert. denied, —— U.S. ——, 138 S. Ct. 1303, 200 L.Ed.2d 487 and —— U.S. ——, 138 S. Ct. 1339, 200 L.Ed.2d 523 (2018) (government argued it could **\*480** have put on "two months" of evidence and "boatloads" of evidence); State v. Ranicke, 3 Wash. App. 892, 897, 479 P.2d 135 (1970) (government argued it "could have called 200 witnesses").

In some cases, violation of these principles constitutes grounds for reversal. See Dirgo, 474 Mass. at 1016-1017, 52 N.E.3d 160 (new trial ordered, notwithstanding lack of objection at trial, where judge did not give "strong curative instructions" and evidence was not "overwhelming"). See also Burke, 373 Mass. at 575, 369 N.E.2d 451 (multiple errors in closing argument). Here, however, the improper argument played a relatively minor role in the prosecutor's remarks. We need not determine whether this unpreserved error, alone, gave rise to a substantial likelihood of a miscarriage of justice, as we conclude that, in combination with the aforementioned errors, a new trial is required. In any event, the prosecutor's argument went beyond that which is acceptable, a practice that should not be repeated at any new trial. [40]

**[50]** 5. Motion to suppress. Prior to trial, the defendant moved to suppress several statements he made to police. He argued that, as to his earlier statements, he was not given Miranda warnings and, as to his later statements, the Commonwealth lacked probable cause for his arrest. When reviewing the denial of a motion to suppress, we accept the judge's findings of fact absent clear error and "make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Pridgett, 481 Mass. 437, 439, 116 N.E.3d 549 (2019), quoting Commonwealth v. Tremblay, 460 Mass. 199, 205, 950 N.E.2d 421 (2011).

a. Miranda warnings. Police first questioned the defendant on the street, fifty minutes after the shooting. They did not read Miranda warnings prior to speaking with the defendant.

**[51]** **[52]** **[53]** **[54]** Miranda warnings are required before police conduct a custodial interrogation. See **\*\*688** Commonwealth v. Morse, 427 Mass. 117, 122-123, 691 N.E.2d 566 (1998). A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken **\*481** into custody or otherwise deprived of his

freedom of action in any significant way." Commonwealth v. Jung, 420 Mass. 675, 688, 651 N.E.2d 1211 (1995), quoting Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant bears the burden of showing that the interrogation was custodial. Commonwealth v. Larkin, 429 Mass. 426, 432, 708 N.E.2d 674 (1999). To determine whether an interrogation was custodial, we ask whether a reasonable person in the defendant's shoes would have perceived the environment as coercive. See Commonwealth v. Kirwan, 448 Mass. 304, 309, 860 N.E.2d 931 (2007).

**[55]** In making this determination, we consider four factors: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." Commonwealth v. Groome, 435 Mass. 201, 211–212, 755 N.E.2d 1224 (2001). No single factor is dispositive. See Kirwan, 448 Mass. at 309, 860 N.E.2d 931.

The motion judge found that the interrogation took place on a public street. The defendant was not handcuffed, although he had been separated from Daughtry. See Commonwealth v. Cawthron, 479 Mass. 612, 618-619, 97 N.E.3d 671 (2018) (police separately questioned two suspects in public parking lot without physical restraints; we determined that atmosphere was not "inherently coercive"). The officer conducting the questioning did not accuse the defendant of shooting the victim or otherwise suggest that the defendant was a suspect. Compare id. at 620, 97 N.E.3d 671 (officers did not tell defendants they were suspects). See Groome, 435 Mass. at 212 n.13, 755 N.E.2d 1224. officer's "unarticulated suspicion[ ] contribute[d] nothing to the objective circumstances of the encounter"). The officer's tone was "conversational" and he "did not raise his voice" when asking the defendant about the defendant's whereabouts. "[N]othing in the record suggests that [the officers] were 'aggressive,' 'persistent,' or 'harsh,' which

would support a conclusion that the defendant[ ] had been subject to a custodial interrogation." Cawthron, supra at 621, 97 N.E.3d 671, quoting *482 Commonwealth v. Coleman, 49 Mass. App. Ct. 150, 155, 727 N.E.2d 103 (2000). [41]

[56] As to the final Groome factor, however, the defendant was questioned for at least twenty minutes, while officers attempted to verify his statement and reviewed security footage. The interrogation ended with the defendant being handcuffed and transported to police headquarters. "An arrest after an incriminating statement has been obtained, by itself, [does not] label[ ] as custodial the interrogation that precedes the incriminating statement" (quotation and citation omitted). Cawthron, 479 Mass. at 622, 97 N.E.3d 671. Rather, we must weigh the **689 factors in their totality. See id. at 622-623, 97 N.E.3d 671.

[57] This case is similar to Cawthron, 479 Mass. at 624, 97 N.E.3d 671, in which defendants were "subject to a minimal detention when officers asked them to move a few yards; the detectives conducted a very preliminary investigation." On the whole, the officer's questioning "was generally of a fact-finding nature, intended to verify or dispel a reasonable suspicion of criminal activity, for which Miranda warnings are not required." Compare Kirwan, 448 Mass. at 311, 860 N.E.2d 931. At the point at which the defendant here made preliminary statements to the officers regarding his prior whereabouts, the interrogation was not yet custodial. [42]

[58] [59] [60] b. Probable cause. The defendant also maintains that police lacked probable cause to arrest him. "Probable cause to arrest exists when, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense" (quotation and citation omitted). Pridgett, 481 Mass. at 439, 116 N.E.3d 549. Probable cause requires "more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt" (citation omitted). Commonwealth v. Santaliz, 413 Mass. 238, 241, 596 N.E.2d 337 (1992).

The defendant argues, essentially, that he was arrested for wearing a hooded sweatshirt, as an African-American male, and *483 for becoming startled in the presence of a police officer. See Commonwealth v. Warren, 475 Mass. 530, 535, 58 N.E.3d 333 (2016) (description of African-American man wearing "red hoodie" "contribute[d] nothing to the officers' ability to distinguish the defendant from any other black male wearing dark clothes and a hoodie" [quotations and citation omitted] ). Cf. id. at 540, 58 N.E.3d 333 ("the finding that black males in Boston are disproportionately and repeatedly targeted for [field interrogation observation] encounters suggests a reason for flight totally unrelated to consciousness of guilt"). We do not agree with the defendant, however, that these facts were the bases of his arrest.

Officers found the defendant and Daughtry together. The two men were about one-half mile from the scene of the shooting, less than one hour after the shooting. The clothing of both men matched the descriptions given by witnesses and confirmed by surveillance video footage. The men were similar in relative height and relative weight to the individuals depicted on the surveillance footage. Moreover, the shooting had occurred in one gang's territory, and police found the defendant and Daughtry in the territory of a rival gang. One officer had reason to believe that the defendant was a member of that rival gang. Perhaps most importantly, the defendant provided an account of where he had been in the afternoon and late evening. His account not only contradicted Daughtry's statements, but police attempts to verify the defendant's statements were unsuccessful. When police knocked on the door of the apartment from which the defendant claimed to have come, the occupant replied that he had not had any visitors and was not the man the defendant claimed him to be.

**690 Taken together, the information known to the police at the time was sufficient to establish probable cause to arrest the defendant. Accordingly, there was no error in the denial of the defendant's motion to suppress.

[61] Conclusion. "Where there has been an error in a trial resulting in a conviction of murder in the first degree, a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same" (quotation and citation omitted). Commonwealth v. Tavares, 471 Mass. 430, 441, 30 N.E.3d 91 (2015). Because we are not "substantially confident" that the jury verdicts would have been the same absent these

**\*484** errors, the verdicts are vacated and set aside, and the matter is remanded to the Superior Court for a new trial.

So ordered.

**All Citations**

482 Mass. 454, 124 N.E.3d 662

## Footnotes

1   In a separate trial, Daughtry was acquitted of all charges.

2   The accounts differed as to which guns were fired. Whereas two witnesses reported that flashes came from both guns, the Commonwealth's theory at trial was that only Daughtry's gun fired, while the defendant's jammed. This explained the presence of a dislodged round of live ammunition on the street and the absence of gunshot residue on the defendant's hands.

3   The defendant was then eighteen years old, and Daughtry was twenty-seven.

4   No guns were found.

5   The defendant is five feet, eleven inches tall and weighed approximately 150 pounds at the time; Daughtry is six feet tall and weighed approximately 180 pounds.

6   Daughtry's statements were admitted, over objection, as statements of a joint venturer.

7   To the extent that the defendant argues that the judge also erred in permitting the jury to learn that Daughtry made additional statements to police, the argument is without merit. The jury were not privy to the contents of Daughtry's further statements, only to the fact that statements had been made.

8   We previously have determined that art. 12 of the Massachusetts Declaration of Rights is coextensive with the Sixth Amendment to the United States Constitution with respect to questions of hearsay. See Commonwealth v. DeOliveira, 447 Mass. 56, 57 n.1, 849 N.E.2d 218 (2006).

9   Statements admitted under this exemption are entered for their truth. See Commonwealth v. Holley, 478 Mass. 508, 534, 87 N.E.3d 77 (2017); Commonwealth v. Veiovis, 477 Mass. 472, 480 n.8, 78 N.E.3d 757 (2017).

10  We assume, without deciding, that the Commonwealth presented sufficient evidence to demonstrate that the defendant and Daughtry were engaged in a joint venture.

11  We have "expressed skepticism that disclosing the circumstances of a crime to a third party can be considered to be in furtherance of the crime disclosed." See Commonwealth v. Rakes, 478 Mass. 22, 40, 82 N.E.3d 403 (2017), and cases cited. One exception would be cases in which a coventurer sought a third party's assistance in covering up the crime or evading capture. See, e.g., Commonwealth v. Colon-Cruz, 408 Mass. 533, 544, 562 N.E.2d 797 (1990). Likewise, where coventurers attempt to silence witnesses after a crime, we generally consider those attempts to be a continuation of the joint venture. See, e.g., Rakes, supra at 39, 82 N.E.3d 403; Commonwealth v. Wood, 469 Mass. 266, 281, 14 N.E.3d 140 (2014); Commonwealth v. Bright, 463 Mass. 421, 436, 974 N.E.2d 1092 (2012).

12  The Commonwealth makes much of the fact that the defendant and Daughtry spoke about their conversations with police after Daughtry's first statement and before his second. If anything, Daughtry's interests became less aligned with the defendant after this encounter; in his second statement, Daughtry further implicated the defendant, describing the defendant and "Dee" as wearing clothing that matched that of the perpetrators.

13  We note that Daughtry had been handcuffed and transported to police headquarters prior to making his second statement. "[D]eclarations of the usual sort by a coventurer after he has been apprehended or arrested, admitting the crime or implicating another, while they may be admissible against himself, do not fall

within the [joint venture] hearsay exception and cannot be offered against another coventurer to prove the

matters asserted." 🔖 Commonwealth v. White, 370 Mass. 703, 710, 352 N.E.2d 904 (1976).

14    At Daughtry's trial, a Superior Court judge denied the Commonwealth's motion to introduce the defendant's statements against Daughtry, under a joint venture theory. That judge concluded that the Commonwealth had "not shown that the statements were made during the pendency of the joint venture nor that the statements were made in an effort to conceal the crime." He also found that "the statements of [the defendant] [were] not properly attributable to Daughtry as consciousness of guilt evidence."

15    This situation differs from that in which two contradictory statements come from a single declarant. In such a case, the declarant must have lied -- either in making the earlier statement, or in making the latter. Where, as here, the declarants are two different people, the fact of contradiction does not suggest which declarant lied.

16    " 'Acts of a joint venturer amounting to consciousness of guilt may be attributed to another joint venturer if the

acts occurred during the course of a joint venture and in furtherance of it.' 🔖 Commonwealth v. Mahoney,

405 Mass. 326, 330–331, 540 N.E.2d 179 (1989). Cf. 🔖 Commonwealth v. Andrews, 403 Mass. 441, 452,

530 N.E.2d 1222 (1988) (if joint venture has ended, subsequent actions of joint venturer cannot be admitted

against another)." 🔖 Commonwealth v. Braley, 449 Mass. 316, 322, 867 N.E.2d 743 (2007).

17    By comparison, where other evidence was admitted "not for the truth," the judge instructed the jury to that effect, and offered further guidance when the jury required clarification.

18    Before the United State Supreme Court's decision in 🔖 Michigan v. Bryant, 562 U.S. 344, 358, 131 S.Ct.

1143, 179 L.Ed.2d 93 (2011), we applied a two-part test to determine whether a statement was testimonial. We examined, first, whether a statement was "per se testimonial," and, if not, whether "a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and

prosecuting a crime." See 🚩 Commonwealth v. Gonsalves, 445 Mass. 1, 3, 833 N.E.2d 549 (2005), cert.

denied, 548 U.S. 926, 126 S.Ct. 2980, 165 L.Ed.2d 990 (2006).

Following that decision, however, we recognized that the "touchstone of the confrontation clause analysis"

is the "primary purpose" of the statement. See 🔖 Commonwealth v. Middlemiss, 465 Mass. 627, 634,

989 N.E.2d 871 (2013). See also Commonwealth v. Imbert, 479 Mass. 575, 580, 97 N.E.3d 335 (2018);

🔖 Commonwealth v. Beatrice, 460 Mass. 255, 259-264, 951 N.E.2d 26 (2011). While, on occasion, we

continued to apply the two-step analysis from 🚩 Gonsalves, 445 Mass. at 3, 833 N.E.2d 549, see, e.g.,

🚩 Commonwealth v. Celester, 473 Mass. 553, 562-563, 45 N.E.3d 539 (2016); 🚩 Commonwealth v. Cole,

473 Mass. 317, 329–330, 41 N.E.3d 1073 (2015); 🚩 Commonwealth v. Cheremond, 461 Mass. 397, 411,

961 N.E.2d 97 (2012), we take this opportunity to clarify that the appropriate method of analysis is the "primary purpose" test. Accordingly, statements made in response to police interrogation are not "testimonial per se,"

although they will qualify as testimonial in many cases, as they do here. See 🔖 Ohio v. Clark, —— U.S. ——,

135 S. Ct. 2173, 2181, 192 L.Ed.2d 306 (2015) (statements to police are more likely to be testimonial than statements to other individuals).

19    Nor do the statements avoid scrutiny under the Sixth Amendment by virtue of having been made by a coventurer. See Commonwealth v. Carriere, 470 Mass. 1, 9, 18 N.E.3d 326 (2014) (statements of joint venturer made in furtherance of joint venture generally are not testimonial). As discussed, Daughtry's statements were not made in furtherance of a joint venture.

20    The Sixth Amendment does not bar testimonial statements offered for a nontruth purpose. See 🔖 Crawford v.

Washington, 541 U.S. 36, 59 n.9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Even had Daughtry's statements been so admitted, however, the inculpatory nature of the statements might have posed a risk of unfair

prejudice to the defendant. Cf. 🔖 Bruton v. United States, 391 U.S. 123, 125-126, 88 S.Ct. 1620, 20 L.Ed.2d

476 (1968) (codefendant's inculpation of defendant creates substantial risk of prejudice, which cannot be overcome by jury instructions).

21    Where, as here, the judge gave no limiting instruction to the contrary, we cannot assume that the jury did not consider the statement for its truth. See Commonwealth v. Caillot, 454 Mass. 245, 255-256, 909 N.E.2d 1 (2009), cert. denied, 559 U.S. 948, 130 S.Ct. 1527, 176 L.Ed.2d 128 (2010). Cf. Commonwealth v. Crayton, 470 Mass. 228, 251, 21 N.E.3d 157 (2014) ("We generally presume that a jury understand and follow limiting instructions ..." [quotation and citation omitted] ).

22    The judge grappled with Detective Sixto Merced's lack of personal knowledge; he noted that "there has to be some amount of evidence that is based on personal observation of the testifying witness with regard to the defendant, and it's that quantum of information that I'm struggling with."

23    Although "other gang members" had identified themselves to Merced as being affiliated with a particular gang, he was not personally familiar with anyone who self-identified as a member of the Walnut Park gang.

24    To the extent that the gang database contained factual observations reported by other officers, Merced was not familiar with them. To the extent that the database contained opinions, these were not independently admissible. See Julian v. Randazzo, 380 Mass. 391, 393, 403 N.E.2d 931 (1980) (police reports containing officer's conclusions or recommendations inadmissible as hearsay). See also Mass. G. Evid. § 803(6)(A) note (2019) (business record hearsay exception for police reports "applies only to factual observations and does not permit the admission of opinions contained in the report").

25    The judge excluded any mention of a gang "database" from testimony. To the extent that Merced's opinion regarding the defendant's gang membership was a reiteration of the gang database entry, however, it implicated the defendant's right to confront the officers who formed that opinion. See United States v. Ramos-González, 664 F.3d 1, 5 (1st Cir. 2011), quoting United States v. Ayala, 601 F.3d 256, 275 (4th Cir.), cert. denied, 562 U.S. 910, 131 S.Ct. 262, 178 L.Ed.2d 173 (2010) (inquiry is whether "expert is, in essence, [giving an independent judgment or] merely acting as a transmitter for testimonial hearsay"). See also United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008) (expert may not simply "repeat[ ] hearsay evidence without applying any expertise whatsoever" [citation omitted] ); Seaman, Triangulating Testimonial Hearsay: The Constitutional Boundaries of Expert Opinion Testimony, 96 Geo. L.J. 827, 880 (2008).

26    Merced also was aware of reports, written by other officers, stating that the defendant had twice been seen with a man believed to be an associate of the Walnut Park gang. In one instance, the men were observed together. In the other instance, the two were seen in the proximity of an area from which a gun was recovered. Neither man was charged in connection with the firearm, nor was the defendant stopped or questioned by police in connection with any crime.

27    Similarly, the Commonwealth's contention that Merced could surmise the defendant's gang membership because shootings had occurred in the defendant's neighborhood is unavailing. One need not be a gang member to be present for, or the victim of, a shooting. As the Commonwealth argued at trial, individuals may be present during a shooting, "not because of anything they did but only because of where they lived."

28    Nor is it sufficient that, on one occasion, another officer found cocaine in the proximity of the defendant. The presence of "some crack cocaine" in a discarded pair of pants does not itself indicate gang membership. Merced's suggestion that possession is "consistent" with gang membership because "the distribution of narcotics ... [could] further the income of the gang" is speculative at best.

29    See also See Eisen, Dotson, & Dohi, Probative or Prejudicial: Can Gang Evidence Trump Reasonable Doubt?, 62 UCLA L. Rev. Discourse 2, 13-14 (2014) (jurors in study attributed assessment of defendant's guilt to "gang affiliation" or "criminal background," even where only evidence of criminal activity was fact of gang membership); Eisen, Gomes, Wandry, Drachman, Clemente, & Groskopf, Examining the Prejudicial Effects of Gang Evidence on Jurors, 13 J. Forensic Psychol. Prac. 1, 11-12 (Jan. 2013) (fact that defendant spent time with gang members or had gang tattoo significantly increased rate at which jurors in study voted to convict).

30    To this end, where there is sufficient foundation to allow introduction of an opinion on gang affiliation, it is appropriate to instruct the jury regarding the admission of such evidence for "the limited purpose of showing motive and joint venture." See, e.g., Commonwealth v. Akara, 465 Mass. 245, 266, 988 N.E.2d 430 (2013). In such cases, we permit the jury to consider the gang affiliations of two or more codefendants for the proposition "that the defendants therefore shared a common motive," as may be the case where codefendants are members of one gang and the victim is a member of a rival gang. See id. at 268, 988 N.E.2d 430. See also Commonwealth v. Smith, 450 Mass. 395, 399, 879 N.E.2d 87, cert. denied, 555 U.S. 893, 129 S.Ct. 202, 172 L.Ed.2d 161 (2008); Commonwealth v. Swafford, 441 Mass. 329, 332, 805 N.E.2d 931 (2004); Commonwealth v. Smiley, 431 Mass. 477, 484, 727 N.E.2d 1182 (2000). As discussed infra, the instruction in this case was overbroad, permitting the jury to consider the evidence for virtually any purpose.

31    Should the judge at retrial again determine that the risk of unfair prejudice from the testimony regarding prior shootings that had taken place between the two gangs does not outweigh the probative value of that evidence, and that it is admissible, the judge must instruct the jury carefully and at the appropriate times (including in the final charge) on the limited use of such evidence.

32    Merced's basis for this opinion is unclear, as an "unsolved" shooting, by definition, cannot be attributed to a particular perpetrator. See Mass. G. Evid. §§ 702(b), 703 (2019) (requiring sufficient facts and data for expert opinions).

33    An objection to this definition of a "community gun" was sustained, although the testimony was not explicitly struck, nor were the jury explicitly instructed to disregard it.

34    At this point, the jury were first shown the surveillance footage, which they saw again multiple times during the other officers' testimony.

35    While Merced testified that he had known defendant for several years, he was not one of the officers who opined as to the identity of the individual in the video footage.

36    See Yakren, Removing the Malice from Federal "Malicious Prosecution": What Cognitive Science Can Teach Lawyers About Reform, 50 Harv. C.R.-C.L. L. Rev. 359, 382 (Summer 2015). See also Dror & Charlton, Why Experts Make Errors, 56 J. Forensic Identification, no. 4, 2006, at 600-616 (discussing effects of cognitive bias on forensic analysis).

37    During the testimony, the judge gave a limiting instruction regarding the use of one of Detective John Callahan's answers: "[Y]ou may consider it ... only as you find it goes to this individual officer's decision to take or not to take certain action." That instruction, however, was in response to an earlier portion of Callahan's testimony, and the judge ultimately reversed his decision and struck the related answer. The judge did not give a limiting instruction on the subsequent testimony regarding video identification.

38    Although the judge mentioned eighty-four names of potential witnesses to the venire during empanelment, a judge's questions during voir dire are not evidence. "Closing argument must be based on the evidence and the fair inferences from the evidence." Mass. G. Evid. § 1113(b) (2019).

39    "A prosecutor must not suggest that additional inculpatory evidence exists that was not presented at trial because of legal rules, trial tactics, administrative convenience, or defense objections. Such insinuations invite the jury to speculate about such phantom proof, and may be even more prejudicial than erroneously admitted specific proof." B.L. Gershman, Prosecutorial Misconduct § 11:29 (2d ed. Aug. 2018 update).

40    Because of the result we reach, we do not address the remainder of the defendant's arguments, except to note that several concern asserted ineffective assistance of counsel. As with the defendant's arguments as to the denial of his motion for expert funds and motion for an evidentiary hearing, as it relates to his motion for a new trial, such claims are now moot. Cf. Commonwealth v. Clary, 388 Mass. 583, 595, 447 N.E.2d 1217 (1983) ("We do not anticipate that [these issues] ... will arise at a new trial of this case, and for that reason there is no necessity to discuss [them] here").

41    Although they displayed their badges, the officers wore plain clothes and approached in an unmarked vehicle. No evidence was presented that the officers displayed their weapons.

42    When the officers discovered additional evidence implicating the defendant (i.e., the surveillance video recording), they properly ceased questioning. At that point, they placed the defendant in custody and transported him to the police station. There, they read him the Miranda warnings before proceeding with a formal interrogation.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 563 of 1384

106 S.Ct. 2286
Supreme Court of the United States

Roger H. CORLEY, petitioner,

v.

UNITED STATES.

No. 85-6792
|
June 2, 1986

**Synopsis**

Case below, 416 A.2d 713.

**Opinion**

Petition for writ of certiorari to the District of Columbia Court of Appeals.

Denied.

**All Citations**

476 U.S. 1162, 106 S.Ct. 2286 (Mem), 90 L.Ed.2d 727

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

KeyCite Yellow Flag - Negative Treatment
Not Followed on State Law Grounds United States v. Fredericks, 3rd Cir.
(Virgin Islands), April 7, 2017

129 S.Ct. 1558
Supreme Court of the United States

Johnnie CORLEY, Petitioner,

v.

UNITED STATES.

No. 07–10441.
|
Argued Jan. 21, 2009.
|
Decided April 6, 2009.

**Synopsis**
**Background:** Defendant was convicted in the United States
District Court for the Eastern District of Pennsylvania, Berle
M. Schiller, J., of armed robbery and conspiracy. Defendant
appealed conviction and sentence. The United States Court
of Appeals for the Third Circuit, Thomas L. Ambro, Circuit
Judge, 500 F.3d 210, affirmed in part, vacated in part, and
remanded. Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Souter, held that
Congress meant to limit *McNabb-Mallory* presentment
exclusionary rule, not eliminate it, when it enacted statute
providing that confession shall not be inadmissible solely
because of delay in presentment if confession is found by
trial judge to have been made voluntarily and within six hours
of arrest; abrogating *Government of the Virgin Islands v.
Gereau,* 502 F.2d 914, *United States v. Glover,* 104 F.3d
1570, *United States v. Christopher,* 956 F.2d 536.

Vacated and remanded.

Justice Alito filed dissenting opinion in which Chief Justice
Roberts and Justices Scalia and Thomas joined.

West Headnotes (2)

**[1]** **Statutes** Superfluousness

Statute should be construed so that effect is given
to all its provisions, so that no part will be
inoperative or superfluous, void or insignificant.

324 Cases that cite this headnote

**[2]** **Criminal Law** Delay in Arraignment or
Initial Appearance

In enacting statute providing that confession
shall not be inadmissible solely because of delay
in presentment if confession is found by trial
judge to have been made voluntarily and within
six hours of arrest, Congress modified rather
than supplanted *McNabb-Mallory* rule rendering
inadmissible confessions made during periods
of detention that violated prompt presentment
requirement of federal criminal rule; abrogating
*Government of the Virgin Islands v. Gereau,*
502 F.2d 914, *United States v. Glover,* 104
F.3d 1570, *United States v. Christopher,* 956
F.2d 536. 18 U.S.C.A. § 3501(c); Fed.Rules
Cr.Proc.Rule 5(a), 18 U.S.C.A.

210 Cases that cite this headnote

**\*\*1559** *Syllabus* [*]

*McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87
L.Ed. 819, and *Mallory v. United States,* 354 U.S. 449, 77
S.Ct. 1356, 1 L.Ed.2d 1479, "generally rende[r] inadmissible
confessions made during periods of detention that violat[e]
the prompt presentment requirement of [Federal Rule of
Criminal Procedure] 5(a)." *United States v. Alvarez–
Sanchez,* 511 U.S. 350, 354, 114 S.Ct. 1599, 128 L.Ed.2d
319. Rule 5(a), in turn, provides that a "person making an
arrest ... must take the defendant without unnecessary delay
before a magistrate judge ...." Congress enacted 18 U.S.C.

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

§ 3501 in response to 🔖 *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and some applications of the *McNabb–Mallory* rule. In an attempt to eliminate *Miranda,* 🔖 § 3501(a) provides that "a confession ... shall be admissible in evidence if it is voluntarily given," and 🔖 § 3501(b) lists several considerations for courts to address in assessing voluntariness. Subsection (c), which focuses on *McNabb–Mallory,* provides that "a confession made ... by ... a defendant ..., while ... under arrest ..., shall not be inadmissible solely because of delay in bringing such person before a magistrate judge ... if such confession is found by the trial judge to have been made voluntarily and ... within six hours [of arrest]"; it extends that time limit when further delay is "reasonable considering the means of transportation and the distance to ... the nearest available [magistrate judge]."

Petitioner Corley was arrested for assaulting a federal officer at about 8 a.m. **1560 Around 11:45 Federal Bureau of Investigation (FBI) agents took him to a Philadelphia hospital to treat a minor injury. At 3:30 p.m. he was taken from the hospital to the local FBI office and told that he was a suspect in a bank robbery. Though the office was in the same building as the nearest magistrate judges, the agents did not bring him before a magistrate judge, but questioned him, hoping for a confession. At 5:27 p.m., some 9.5 hours after his arrest, Corley began an oral confession that he robbed the bank. He asked for a break at 6:30 and was held overnight. The interrogation resumed the next morning, ending with his signed written confession. He was finally presented to a Magistrate Judge at 1:30 p.m., 29.5 hours after his arrest, and charged with armed bank robbery and related charges. The District Court denied his motion to suppress his confessions under Rule 5(a) and *McNabb–Mallory.* It reasoned that the oral confession occurred within 🔖 § 3501(c)'s 6-hour window because the time of Corley's medical treatment should be excluded from the delay. It also found the written confession admissible, explaining there was no unreasonable delay under Rule 5(a) because Corley had requested the break. He was convicted of conspiracy and bank robbery. The Third Circuit affirmed. Relying on Circuit precedent to the effect that 🔖 § 3501 abrogated *McNabb–Mallory* and replaced it with a pure voluntariness test, it concluded that if a district court found a confession voluntary after considering the points listed in 🔖 § 3501(b), it would be admissible, even if the presentment delay was unreasonable.

*Held:* 🔖 Section 3501 modified *McNabb–Mallory* but did not supplant it. Pp. 1565 – 1571.

(a) The Government claims that because 🔖 § 3501(a) makes a confession "admissible" "if it is voluntarily given," it entirely eliminates *McNabb–Mallory* with its bar to admitting even a voluntary confession if given during an unreasonable presentment delay. Corley argues that 🔖 § 3501(a) was only meant to overrule *Miranda,* and notes that only 🔖 § 3501(c) touches on *McNabb–Mallory,* making the rule inapplicable to confessions given within six hours of an arrest. He has the better argument. Pp. 1565 – 1570.

(1) The Government's reading renders 🔖 § 3501(c) nonsensical and superfluous. If subsection (a) really meant that any voluntary confession was admissible, then subsection (c) would add nothing; if a confession was "made voluntarily" it would be admissible, period, and never "inadmissible solely because of delay," even a delay beyond six hours. The Government's reading is thus at odds with the basic interpretive canon that " '[a] statute should be construed [to give effect] to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.' " 🔖 *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172. The Government claims that in providing that a confession "shall not be admissible," Congress meant that a confession "shall not be [involuntary]." Thus read, (c) would specify a bright-line rule applying (a) to cases of delay: it would tell courts that delay alone does not make a confession involuntary unless the delay exceeds six hours. But " 'Congress did not write the statute that way.' " 🔖 *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17. The terms "inadmissible" and "involuntary" are not synonymous. Congress used both in (c), and this Court "would not presume to ascribe this difference to a simple mistake in draftsmanship." *Ibid.* There is also every reason to believe that Congress used the distinct terms deliberately, specifying two criteria that must be satisfied to prevent a confession from being "inadmissible solely because of delay": the confession must be "[1] made voluntarily **1561 and ... [2] within six hours [of arrest]." Moreover, under the *McNabb–Mallory* rule, "inadmissible" and "involuntary" mean different things. Corley's position, in contrast, gives effect to both (c) and (a), by reading (a) as overruling *Miranda* and (c) as qualifying *McNabb–Mallory.* The Government's counterargument—that Corley's reading

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

would also create a conflict, since (a) makes all voluntary confessions admissible while (c) would leave some voluntary confessions inadmissible—falls short. First, (a) is a broad directive while (c) aims only at *McNabb–Mallory*, and "a more specific statute [is] given precedence over a more general one." 🚩 *Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 64 L.Ed.2d 381. Second, reading (a) to create a conflict with (c) not only would make (c) superfluous, but would also create conflicts with so many other Rules of Evidence that the subsection cannot possibly be given its literal scope. Pp. 1565 – 1568.

(2) The legislative history strongly favors Corley's reading. The Government points to nothing in this history supporting its contrary view. Pp. 1568 – 1570.

(3) The Government's position would leave the Rule 5 presentment requirement without teeth, for if there is no *McNabb–Mallory* there is no apparent remedy for a presentment delay. The prompt presentment requirement is not just an administrative nicety. It dates back to the common law. Under Rule 5, presentment is the point at which the judge must take several key steps to foreclose Government overreaching: *e.g.,* informing the defendant of the charges against him and giving the defendant a chance to consult with counsel. Without *McNabb–Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, even though "custodial police interrogation, by its very nature, isolates and pressures the individual," 🚩 *Dickerson v. United States,* 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405, inducing people to confess to crimes they never committed. Pp. 1569 – 1570.

(b) There is no merit to the Government's fallback claim that even if 🚩 § 3501 preserved a limited version of *McNabb–Mallory*, Congress cut it out by enacting Federal Rule of Evidence 402, which provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court ...." The Advisory Committee's Notes expressly identified *McNabb–Mallory* as a statutorily authorized rule that would survive Rule 402, and the Government has previously conceded before this Court that Rule 402 preserved *McNabb–Mallory*. Pp. 1570 – 1571.

🚩 500 F.3d 210, vacated and remanded.

SOUTER, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, GINSBURG, and BREYER, JJ., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and THOMAS, JJ., joined, *post*, pp. 1571 – 1576.

**Attorneys and Law Firms**

David L. McColgin, for petitioner.

Michael R. Dreeben, for respondent.

Leigh M. Skipper, Chief Federal Defender, Maureen K. Rowley, Chief Federal Defender, Joseph M. Miller, First Assistant Federal Defender, David L. McColgin, Counsel of Record, Supervising Appellate Attorney, Brett G. Sweitzer, Assistant Federal Defender, Federal Community Defender, Philadelphia, PA, for petitioner.

Gregory G. Garre, Solicitor General, Counsel of Record, Matthew W. Friedrich, Acting Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, Toby J. Heytens, Assistant to the Solicitor **1562 General, Thomas E. Booth, Attorney, Department of Justice, Washington, D.C., for United States.

**Opinion**

Justice SOUTER delivered the opinion of the Court.

**306** The question here is whether Congress intended 🚩 18 U.S.C. § 3501 to discard, or merely to narrow, the rule in 🚩 *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and 🚩 *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), under which an arrested person's confession is inadmissible if given after an unreasonable delay in bringing him before a judge. We hold that Congress meant to limit, not eliminate, *McNabb–Mallory*.

I

A

The common law obliged an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could. See 🏛️ *County of Riverside v. McLaughlin,* 500 U.S. 44,

61–62, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (SCALIA, J., dissenting). This "presentment" requirement tended to prevent secret detention and served to inform a suspect of the charges against him, and it was the law in nearly every American State and the National Government. See *id., at 60–61, 111 S.Ct. 1661; McNabb, supra,* at 342, and n. 7, 63 S.Ct. 608.

*McNabb v. United States* raised the question of how to enforce a number of federal statutes codifying the presentment **\*307** rule. 318 U.S., at 342, 63 S.Ct. 608 (citing, among others, 18 U.S.C. § 595 (1940 ed.), which provided that " '[i]t shall be the duty of the marshal ... who may arrest a person ... to take the defendant before the nearest ... judicial officer ... for a hearing' "). There, federal agents flouted the requirement by interrogating several murder suspects for days before bringing them before a magistrate, and then only after they had given the confessions that convicted them. 318 U.S., at 334–338, 344–345, 63 S.Ct. 608.

On the defendants' motions to exclude the confessions from evidence, we saw no need to reach any constitutional issue. Instead we invoked the supervisory power to establish and maintain "civilized standards of procedure and evidence" in federal courts, *id., at 340, 63 S.Ct. 608,* which we exercised for the sake of making good on the traditional obligation embodied in the federal presentment legislation. We saw both the statutes and the traditional rule as aimed not only at checking the likelihood of resort to the third degree but meant generally to "avoid all the evil implications of secret interrogation of persons accused of crime." *Id., at 344, 63 S.Ct. 608.* We acknowledged that "Congress ha[d] not explicitly forbidden the use of evidence ... procured" in derogation of the presentment obligation, *id., at 345, 63 S.Ct. 608,* but we realized that "permit[ting] such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress ha[d] enacted into law," *ibid.,* and in the exercise of supervisory authority we held confessions inadmissible when obtained during unreasonable presentment delay.

Shortly after *McNabb,* the combined action of the Judicial Conference of the United States and Congress produced Federal Rule of Criminal Procedure 5(a), which pulled the several statutory presentment provisions together in one place. See *Mallory, supra,* at 452, 77 S.Ct.

1356 (describing **\*\*1563** Rule 5(a) as "a compendious restatement, without substantive change, of several prior specific federal statutory provisions"). As first enacted, the rule told "[a]n officer making an arrest under a **\*308** warrant issued upon a complaint or any person making an arrest without a warrant [to] take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States." Fed. Rule Crim. Proc. 5(a) (1946). The rule remains much the same today: "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge ...." Fed. Rule Crim. Proc. 5(a)(1)(A) (2007).

A case for applying *McNabb* and Rule 5(a) together soon arose in *Upshaw v. United States,* 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948). Despite the Government's confession of error, the D.C. Circuit had thought *McNabb* 's exclusionary rule applied only to involuntary confessions obtained by coercion during the period of delay, 335 U.S., at 411–412, 69 S.Ct. 170, and so held the defendant's voluntary confession admissible into evidence. This was error, and we reiterated the reasoning of a few years earlier. "In the *McNabb* case we held that the plain purpose of the requirement that prisoners should promptly be taken before committing magistrates was to check resort by officers to 'secret interrogation of persons accused of crime.' " *Id., at 412, 69 S.Ct. 170* (quoting *McNabb, supra,* at 344, 63 S.Ct. 608). *Upshaw* consequently emphasized that even voluntary confessions are inadmissible if given after an unreasonable delay in presentment. 335 U.S., at 413, 69 S.Ct. 170.

We applied Rule 5(a) again in *Mallory v. United States,* holding a confession given seven hours after arrest inadmissible for "unnecessary delay" in presenting the suspect to a magistrate, where the police questioned the suspect for hours "within the vicinity of numerous committing magistrates." 354 U.S., at 455, 77 S.Ct. 1356. Again, we repeated the reasons for the rule and explained, as we had before and have since, that delay for the purpose of interrogation is the epitome of "unnecessary delay." *Id., at 455–456, 77 S.Ct. 1356;* see also *McLaughlin, supra, at 61, 111 S.Ct. 1661* (SCALIA, J., dissenting) ("It was clear" at common **\*309** law "that the only element bearing upon the reasonableness of delay was not such circumstances

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

as the pressing need to conduct further investigation, but the arresting officer's ability, once the prisoner had been secured, to reach a magistrate"); *Upshaw, supra,* at 414, 69 S.Ct. 170. Thus, the rule known simply as *McNabb–Mallory* "generally render[s] inadmissible confessions made during periods of detention that violat[e] the prompt presentment requirement of Rule 5(a)." *United States v. Alvarez–Sanchez,* 511 U.S. 350, 354, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994).

There the law remained until 1968, when Congress enacted 18 U.S.C. § 3501 in response to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and to the application of *McNabb–Mallory* in some federal courts. Subsections (a) and (b) of § 3501 were meant to eliminate *Miranda*.[1] See *Dickerson v. United States,* 530 U.S. 428, 435–437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *infra,* at 1568 – 1569. Subsection (a) provides that "[i]n any criminal prosecution brought by the United States ..., a confession ... **1564** shall be admissible in evidence if it is voluntarily given," while subsection (b) lists several considerations for courts to address in assessing voluntariness.[2] Subsection (c), which focused *310 on McNabb–Mallory,* see *infra,* at 1568 – 1569, provides that in any federal prosecution, "a confession made ... by ... a defendant therein, while such person was under arrest ..., shall not be inadmissible solely because of delay in bringing such person before a magistrate judge ... if such confession is found by the trial judge to have been made voluntarily ... and if such confession was made ... within six hours [of arrest]"; the 6-hour time limit is extended where further delay is "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]."[3]

*311 The issue in this case is whether Congress intended § 3501(a) to sweep *McNabb–Mallory* 's exclusionary rule aside entirely, or merely meant § 3501(c) to provide immunization to voluntary confessions given within six hours of a suspect's arrest.

B

Petitioner Johnnie Corley was suspected of robbing a bank in Norristown, Pennsylvania. After federal agents learned that Corley was subject to arrest on an unrelated **1565**

local matter, some federal and state officers went together to execute the state warrant on September 17, 2003, and found him just as he was pulling out of a driveway in his car. Corley nearly ran over one officer, then jumped out of the car, pushed the officer down, and ran. The agents gave chase and caught and arrested him for assaulting a federal officer. The arrest occurred about 8 a.m. 500 F.3d 210, 212 (C.A.3 2007).

Federal Bureau of Investigation (FBI) agents first kept Corley at a local police station while they questioned residents near the place he was captured. Around 11:45 a.m. they took him to a Philadelphia hospital to treat a minor cut on his hand that he got during the chase. At 3:30 p.m. the agents took him from the hospital to the Philadelphia FBI office and told him that he was a suspect in the Norristown bank robbery. Though the office was in the same building as the chambers of the nearest magistrate judge, the agents did not bring Corley before a magistrate judge, but questioned him instead, in hopes of getting a confession. App. 68–69, 83, 138–139.

The agents' repeated arguments sold Corley on the benefits of cooperating with the Government, and he signed a form waiving his *Miranda* rights. At 5:27 p.m., some 9.5 hours after his arrest, Corley began an oral confession that he robbed the bank, App. 62, and spoke on in this vein until about 6:30, when agents asked him to put it all in writing. Corley said he was tired and wanted a break, so the agents *312 decided to hold him overnight and take the written statement the next morning. At 10:30 a.m. on September 18 they began the interrogation again, which ended when Corley signed a written confession. He was finally presented to a Magistrate Judge at 1:30 p.m. that day, 29.5 hours after his arrest. 500 F.3d, at 212.

Corley was charged with armed bank robbery, 18 U.S.C. §§ 2113(a), (d), conspiracy to commit armed bank robbery, § 371, and using a firearm in furtherance of a crime of violence, § 924(c). When he moved to suppress his oral and written confessions under Rule 5(a) and *McNabb–Mallory,* the District Court denied the motion, with the explanation that the time Corley was receiving medical treatment should be excluded from the delay, and that the oral confession was thus given within the 6-hour window of § 3501(c). Crim. No. 03–775 (ED Pa., May 10, 2004), App. 97. The District Court also held Corley's written confession admissible, reasoning that "a break from interrogation requested by an arrestee who has already begun his confession does not constitute

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 569 of 1384

Corley v. U.S., 556 U.S. 303 (2009)
129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

unreasonable delay under Rule 5(a)." *Id.,* at 97–98. Corley was convicted of conspiracy and armed robbery but acquitted of using a firearm during a crime of violence. 500 F.3d, at 212–213.

A divided panel of the Court of Appeals for the Third Circuit affirmed the conviction, though its rationale for rejecting Corley's Rule 5(a) argument was different from the District Court's. The panel majority considered itself bound by Circuit precedent to the effect that § 3501 entirely abrogated the *McNabb–Mallory* rule and replaced it with a pure voluntariness test. See 500 F.3d, at 212 (citing *Government of Virgin Islands v. Gereau,* 502 F.2d 914 (C.A.3 1974)). As the majority saw it, if a district court found a confession voluntary after considering the points listed in § 3501(b), it would be admissible, regardless of whether delay in presentment was unnecessary or unreasonable. 500 F.3d, at 217. Judge **\*313** Sloviter read *Gereau* differently and dissented with an opinion that " '§ 3501 does not displace Rule 5(a)" or abrogate *McNabb–Mallory* for presentment delays beyond six hours.' 500 F.3d, at 236.

**\*\*1566** We granted certiorari to resolve a division in the Courts of Appeals on the reach of § 3501. 554 U.S. 945, 129 S.Ct. 29, 171 L.Ed.2d 932 (2008). Compare *United States v. Glover,* 104 F.3d 1570, 1583 (C.A.10 1997) ( § 3501 entirely supplanted *McNabb–Mallory* ); *United States v. Christopher,* 956 F.2d 536, 538–539 (C.A.6 1991) (*per curiam*) (same), with *United States v. Mansoori,* 304 F.3d 635, 660 (C.A.7 2002) ( § 3501 limited the *McNabb–Mallory* rule to periods more than six hours after arrest); *United States v. Perez,* 733 F.2d 1026, 1031–1032 (C.A.2 1984) (same). [4] We now vacate and remand.

## II

The Government's argument focuses on § 3501(a), which provides that any confession "shall be admissible in evidence" in federal court "if it is voluntarily given." To the Government, subsection (a) means that once a district court looks to the considerations in § 3501(b)

and finds a confession voluntary, in it comes; (a) entirely eliminates *McNabb–Mallory* with its bar to admitting even a voluntary confession if given during an unreasonable delay in presentment.

Corley argues that § 3501(a) was meant to overrule *Miranda* and nothing more, with no effect on *McNabb–Mallory,* which § 3501 touches only in subsection (c). By providing that a confession "shall not be inadmissible solely because of delay" in presentment if "made voluntarily and ... within six hours [of arrest]," subsection (c) leaves *McNabb–Mallory* inapplicable to confessions given within the six hours, but when a confession comes even later, the exclusionary rule **\*314** applies and courts have to see whether the delay was unnecessary or unreasonable.

Corley has the better argument.

### A

The fundamental problem with the Government's reading of § 3501 is that it renders § 3501(c) nonsensical and superfluous. Subsection (c) provides that a confession "shall not be inadmissible solely because of delay" in presentment if the confession is "made voluntarily and ... within six hours [of arrest]." If (a) really meant that any voluntary confession was admissible, as the Government contends, then (c) would add nothing; if a confession was "made voluntarily" it would be admissible, period, and never "inadmissible solely because of delay," no matter whether the delay went beyond six hours. There is no way out of this, and the Government concedes it. Tr. of Oral Arg. 33 ("Congress never needed (c); (c) in the [G]overnment's view was always superfluous").

[1] The Government's reading is thus at odds with one of the most basic interpretive canons, that " '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant ....' " *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, pp.181–186 (rev. 6th ed.2000)). [5] **\*315** The Government attempts to **\*\*1567** mitigate its problem by rewriting (c) into a clarifying, if not strictly necessary, provision: although Congress wrote that a confession "shall not be inadmissible solely because of delay" if the confession is "made voluntarily and ... within six hours

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 570 of 1384

Corley v. U.S., 556 S.Ct. 303 (2009)
129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

[of arrest],” the Government tells us that Congress actually meant that a confession "shall not be [involuntary] solely because of delay” if the confession is "[otherwise voluntary] and ... [made] within six hours [of arrest].” Thus rewritten, (c) would coexist peacefully (albeit inelegantly) with (a), with (c) simply specifying a bright-line rule applying (a) to cases of delay: it would tell courts that delay alone does not make a confession involuntary unless the delay exceeds six hours.

To this proposal, " '[t]he short answer is that Congress did not write the statute that way.' " *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979)). The Government may say that we can sensibly read "inadmissible” as "involuntary” because the words are "virtually synonymous ... in this statutory context,” Brief for United States 23, but this is simply not so. To begin with, Congress used both terms in (c) itself, and "[w]e would not presume to ascribe this difference to a simple mistake in draftsmanship." *Russello, supra,* at 23, 104 S.Ct. 296. And there is, in fact, every reason to believe that Congress used the distinct terms very deliberately. Subsection (c) specifies two criteria that must be satisfied to prevent a confession from being "inadmissible solely because of delay": the confession must be "[1] made voluntarily and ... [2] within six hours [of arrest].” Because voluntariness is thus only one of several criteria for admissibility under (c), "involuntary” and "inadmissible” plainly cannot be synonymous. **\*316** What is more, the Government's argument ignores the fact that under the *McNabb–Mallory* rule, which we presume Congress was aware of, *Cannon v. University of Chicago,* 441 U.S. 677, 699, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), "inadmissible” and "involuntary” mean different things. As we explained before and as the Government concedes, *McNabb–Mallory* makes even voluntary confessions inadmissible if given after an unreasonable delay in presentment, *Upshaw,* 335 U.S., at 413, 69 S.Ct. 170; Tr. of Oral Arg. 33 ("[I]t was well understood that *McNabb–Mallory* ... excluded totally voluntary confessions”). So we cannot accept the Government's attempt to confuse the critically distinct terms "involuntary” and "inadmissible” by rewriting (c) into a bright-line rule doing nothing more than applying (a).

Corley's position, in contrast, gives effect to both (c) and (a), by reading (a) as overruling *Miranda* and (c) as qualifying *McNabb–Mallory.* The Government answers, however, that accepting Corley's argument would result in a different problem: it would create a conflict between (c) **\*\*1568** and (a), since (a) provides that all voluntary confessions are admissible while Corley's reading of (c) leaves some voluntary confessions inadmissible. But the Government's counterargument falls short for two reasons. First, even if (a) is read to be at odds with (c), the conflict is resolved by recognizing that (a) is a broad directive while (c) aims only at *McNabb–Mallory,* and "a more specific statute will be given precedence over a more general one ... .” *Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). Second, and more fundamentally, (a) cannot prudently be read to create a conflict with (c), not only because it would make (c) superfluous, as explained, but simply because reading (a) that way would create conflicts with so many other rules that the subsection cannot possibly be given its literal scope. Subsection (a) provides that "[i]n any criminal prosecution brought by the United States ..., a confession ... shall be admissible in evidence if it is voluntarily given,” and § 3501(e) defines "confession” as "any confession **\*317** of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.” Thus, if the Government seriously urged a literal reading, (a) would mean that "[i]n any criminal prosecution brought by the United States ..., ['any self-incriminating statement' with respect to 'any criminal offense'] ... shall be admissible in evidence if it is voluntarily given.” Thus would many a Rule of Evidence be overridden in case after case: a defendant's self-incriminating statement to his lawyer would be admissible despite his insistence on attorney-client privilege; a fourth-hand hearsay statement the defendant allegedly made would come in; and a defendant's confession to an entirely unrelated crime committed years earlier would be admissible without more. These are some of the absurdities of literalism that show that Congress could not have been writing in a literalistic frame of mind.[6]

### B

As it turns out, there is more than *reductio ad absurdum* and the antisuperfluousness canon to confirm that subsection (a) leaves *McNabb–Mallory* alone, for that is what legislative history says. In fact, the Government concedes that subsections (a) and (b) were aimed at *Miranda,* while subsection (c) was meant to modify the presentment exclusionary rule. **\*318** Tr. of Oral Arg. 38 ("I will concede to you ... that section (a) was considered to overrule *Miranda*[,] and subsection (c) was addressed to *McNabb–*

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

*Mallory* "). The concession is unavoidable. The Senate, where 🚩 § 3501 originated, split the provision into two parts: division 1 contained subsections (a) and (b), and division 2 contained subsection (c). 114 Cong. Rec. 14171 (1968). In the debate on the Senate floor immediately before voting on these proposals, several Senators, including the section's prime sponsor, Senator McClellan, explained that division 1 "has to do with the *Miranda* decision," while division 2 related to *Mallory*. 114 Cong. Rec. 14171–14172. This **\*\*1569** distinct intent was confirmed by the separate Senate votes adopting the two measures, division 1 by 55 to 29 and division 2 by 58 to 26, *id.,* at 14171–14172, 14174–14175; if (a) did abrogate *McNabb–Mallory*, as the Government claims, then voting for division 2 would have been entirely superfluous, for the division 1 vote would already have done the job. That aside, a sponsor's statement to the full Senate carries considerable weight, and Senator McClellan's explanation that division 1 was specifically addressed to *Miranda* confirms that (a) and (b) were never meant to reach far enough to abrogate other background evidentiary rules including *McNabb–Mallory*.

Further legislative history not only drives that point home, but conclusively shows an intent that subsection (c) limit *McNabb–Mallory*, not replace it. In its original draft, subsection (c) would indeed have done away with *McNabb–Mallory* completely, for the bill as first written would have provided that "[i]n any criminal prosecution by the United States ..., a confession made or given by a person who is a defendant therein ... shall not be inadmissible solely because of delay in bringing such person before a [magistrate judge] if such confession is ... made voluntarily." S. 917, 90th Cong., 2d Sess., 44–45 (1968) (as reported by Senate Committee on the Judiciary); 114 Cong. Rec. 14172. The provision so conceived was resisted, however, by a number **\*319** of Senators worried about allowing indefinite presentment delays. See, *e.g., id.,* at 11740, 13990 (Sen.Tydings) (the provision would "permit Federal criminal suspects to be questioned indefinitely before they are presented to a committing magistrate"); *id.,* at 12290 (Sen.Fong) (the provision "would open the doors to such practices as holding suspects incommunicado for an indefinite period"). After Senator Tydings proposed striking (c) from the bill altogether, *id.,* at 13651 (Amendment No. 788), Senator Scott introduced the compromise of qualifying (c) with the words: " 'and if such confession was made or given by such person within six hours following his arrest or other detention,' " *id.,* at 14184–14185 (Amendment No. 805). [7] The amendment was intended to confine *McNabb–Mallory* to excluding only

confessions given after more than six hours of delay, see 114 Cong. Rec. 14184 (remarks of Sen. Scott) ("My amendment provides that the period during which confessions may be received ... shall in no case exceed 6 hours"), and it was explicitly modeled on the provision Congress had passed just months earlier to govern presentment practice in the District of Columbia, Title III of An Act Relating to Crime and Criminal Procedure in the District of Columbia (D.C. Crime Act), § 301(b), 81 Stat. 735–736, see, *e.g.,* 114 Cong. Rec. 14184 (remarks of Sen. Scott) ("My amendment is an attempt to conform, as nearly as practicable, to title III of [the D.C. Crime Act]"). By the terms of that Act, "[a]ny statement, admission, or confession made by an arrested person within three hours immediately following his arrest shall not be excluded from evidence in the courts of the District of Columbia solely because of delay in presentment." § 301(b), 81 Stat. 735–736. Given the clear intent that Title III modify but not eliminate *McNabb–Mallory* in the District of Columbia, see, *e.g.,* S.Rep. No. 912, 90th Cong., 1st Sess., 17–18 **\*320** 1967), using it as a model plainly shows how Congress **\*\*1570** meant as much but no more in 🚩 § 3501(c).

In sum, the legislative history strongly favors Corley's reading. The Government points to nothing in this history supporting its view that (c) created a bright-line rule for applying (a) in cases with a presentment issue.

### C

It also counts heavily against the position of the United States that it would leave the Rule 5 presentment requirement without any teeth, for as the Government again is forced to admit, if there is no *McNabb–Mallory* there is no apparent remedy for delay in presentment. Tr. of Oral Arg. 25. One might not care if the prompt presentment requirement were just some administrative nicety, but in fact the rule has always mattered in very practical ways and still does. As we said, it stretches back to the common law, when it was "one of the most important" protections "against unlawful arrest." *McLaughlin,* 500 U.S., at 60–61, 111 S.Ct. 1661 (SCALIA, J., dissenting). Today presentment is the point at which the judge is required to take several key steps to foreclose Government overreaching: informing the defendant of the charges against him, his right to remain silent, his right to counsel, the availability of bail, and any right to a preliminary hearing; giving the defendant a chance to consult

AR.04412

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 572 of 1384

Corley v. U.S., 556 U.S. 303 (2009)

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

with counsel; and deciding between detention or release. Fed. Rule Crim. Proc. 5(d); see also Rule 58(b)(2).

In a world without *McNabb–Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to. See *McNabb,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. No one with any smattering of the history of 20th-century dictatorships needs a lecture on the subject, and we understand the need even within our own system to take care against going too far. "[C]ustodial police interrogation, by its very nature, isolates and pressures the individual," **\*321** *Dickerson,* 530 U.S., at 435, 120 S.Ct. 2326, and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed, see, *e.g.,* Drizin & Leo, The Problem of False Confessions in the Post– DNA World, 82 N.C.L.Rev. 891, 906–907 (2004).

Justice Frankfurter's point in *McNabb* is as fresh as ever: "The history of liberty has largely been the history of observance of procedural safeguards." 318 U.S., at 347, 63 S.Ct. 608. *McNabb–Mallory* is one of them, and neither the text nor the history of § 3501 makes out a case that Congress meant to do away with it.

### III

The Government's fallback claim is that even if § 3501 preserved a limited version of *McNabb–Mallory*, Congress cut out the rule altogether by enacting Federal Rule of Evidence 402 in 1975. Act of Jan. 2, Pub.L. 93–595, 88 Stat.1926. So far as it might matter here, that rule provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." *Id.,* at 1931. The Government says that *McNabb–Mallory* excludes relevant evidence in a way not "otherwise provided by" any of these four authorities, and so has fallen to the scythe.

The Government never raised this argument in the Third Circuit or the District Court, which would justify refusing to consider it here, but in any event it has no merit. The Advisory Committee's Notes on Rule 402, which were before Congress when it enacted the Rules of Evidence and **\*\*1571**

which we have relied on in the past to interpret the rules, *Tome v. United States,* 513 U.S. 150, 160, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (plurality opinion), expressly identified *McNabb–Mallory* as a statutorily authorized rule that would survive Rule 402: "The Rules of Civil and Criminal Procedure in some instances require the **\*322** exclusion of relevant evidence. For example, ... the effective enforcement of ... Rule 5(a) ... is held to require the exclusion of statements elicited during detention in violation thereof." 28 U.S.C.App., pp. 325–326 (citing *Mallory,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, and 18 U.S.C. § 3501(c)); see also *Mallory, supra,* at 451, 77 S.Ct. 1356 ("Th[is] case calls for the proper application of Rule 5(a) of the Federal Rules of Criminal Procedure ..."). Indeed, ... the Government has previously conceded before this Court that Rule 402 preserved *McNabb–Mallory*. Brief for United States in *United States v. Payner,* O.T.1979, No. 78–1729, p. 32, and n. 13 (saying that Rule 402 "left to the courts ... questions concerning the propriety of excluding relevant evidence as a method of implementing the Constitution, a federal statute, or a statutorily authorized rule," and citing *McNabb–Mallory* as an example). The Government was right the first time, and it would be bizarre to hold that Congress adopted Rule 402 with a purpose exactly opposite to what the Advisory Committee Notes said the rule would do.

### IV

**[2]** We hold that § 3501 modified *McNabb–Mallory* without supplanting it. Under the rule as revised by § 3501(c), a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]"). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and ... the weight to be given [it] is left to the jury." *Ibid.* If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed.

**\*323** In this case, the Third Circuit did not apply this rule and in consequence never conclusively determined whether Corley's oral confession "should be treated as having been

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

made within six hours of arrest," as the District Court held. 🚩 500 F.3d, at 220, n. 7. Nor did the Circuit consider the justifiability of any delay beyond six hours if the oral confession should be treated as given outside the 6-hour window; and it did not make this enquiry with respect to Corley's written confession. We therefore vacate the judgment of the Court of Appeals and remand the case for consideration of those issues in the first instance, consistent with this opinion.

*It is so ordered.*

Justice ALITO, with whom THE CHIEF JUSTICE, Justice SCALIA, and Justice THOMAS join, dissenting.

🚩 Section 3501(a) of Title 18, United States Code, directly and unequivocally answers the question presented in this case. After petitioner was arrested by federal agents, he twice waived his *Miranda*[1] rights and voluntarily confessed, first orally and later in writing, that he had participated in an armed bank robbery. He was then taken before a Magistrate Judge for an initial appearance. The question that we must **\*\*1572** decide is whether this voluntary confession may be suppressed on the ground that there was unnecessary delay in bringing petitioner before the Magistrate Judge. Unless the unambiguous language of 🚩 § 3501(a) is ignored, petitioner's confession may not be suppressed.

I

🚩 Section 3501(a) states: "In any criminal prosecution brought by the United States ..., a confession ... shall be admissible in evidence if it is voluntarily given."

Applying "settled principles of statutory construction," "we must first determine whether the statutory text is plain **\*324** and unambiguous," and "[i]f it is, we must apply the statute according to its terms." *Carcieri v. Salazar,* 555 U.S. 379, 387, 129 S.Ct. 1058, 1063–1064, 172 L.Ed.2d 791 (2009). Here, there is nothing ambiguous about the language of 🚩 § 3501(a), and the Court does not claim otherwise. Although we normally presume that Congress "means in a statute what it says there," 🟨 *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117

L.Ed.2d 391 (1992), the Court today concludes that 🚩 § 3501(a) *does not* mean what it says and that a voluntary confession may be suppressed under the *McNabb–Mallory* rule.[2] This supervisory rule, which requires the suppression of a confession where there was unnecessary delay in bringing a federal criminal defendant before a judicial officer after arrest, was announced long before 🟨 18 U.S.C. § 3501(a) was adopted. According to the Court, this rule survived the enactment of 🟨 § 3501(a) because Congress adopted that provision for the sole purpose of abrogating *Miranda* and apparently never realized that the provision's broad language would also do away with the *McNabb–Mallory* rule. I disagree with the Court's analysis and therefore respectfully dissent.

II

A

The Court's first and most substantial argument invokes "the antisuperfluousness canon," *ante,* at 1568, under which a statute should be read, if possible, so that all of its provisions are given effect and none is superfluous. *Ante,* at 1566 – 1568. 🟨 Section 3501(c) provides that a voluntary confession "shall not be inadmissible solely because of [the] delay" in bringing the defendant before a **\*325** judicial officer if the defendant is brought before a judicial officer within six hours of arrest. If 🟨 § 3501(a) means that a voluntary confession may never be excluded due to delay in bringing the defendant before a judicial officer, the Court reasons, then 🚩 § 3501(c), which provides a safe harbor for a subset of voluntary confessions (those made in cases in which the initial appearance occurs within six hours of arrest), is superfluous.

Canons of interpretation "are quite often useful in close cases, or when statutory language is ambiguous. But we have observed before that such 'interpretative canon[s are] not a license for the judiciary to rewrite language enacted by the legislature.' " 🟨 *United States v. Monsanto,* 491 U.S. 600, 611, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (quoting 🟨 *United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). Like other canons, the antisuperfluousness canon is merely an interpretive aid, not an absolute rule. See 🟨 *Connecticut Nat. Bank,* 503 U.S.,

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

at 254, 112 S.Ct. 1146 ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete' "). There are times when Congress **1573 enacts provisions that are superfluous, and this may be such an instance. Cf. id., at 253, 112 S.Ct. 1146 (noting that "[r]edundancies across statutes are not unusual events in drafting"); Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 445–446, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995) (SOUTER, J., dissenting) (noting that, although Congress "indulged in a little redundancy," the "inelegance may be forgiven" because "Congress could sensibly have seen some practical value in the redundancy").

Moreover, any superfluity created by giving subsection (a) its plain meaning may be minimized by interpreting subsection (c) to apply to confessions that are otherwise voluntary. The Government contends that § 3501(c), though inartfully drafted, is not superfluous because what the provision means is that a confession is admissible if it is given within six hours of arrest and it is *otherwise* voluntary—that is, if there is no basis other than prepresentment delay for concluding that the confession was coerced. Read in this way, § 3501(c) is not superfluous.

The Court rejects this argument on the ground that " 'Congress did not write the statute that way,' " *ante,* at 1567, and thus, in order to adhere to a narrow reading of § 3501(c), *326 the Court entirely disregards the unambiguous language of § 3501(a). Although § 3501(a) says that a confession is admissible if it is "voluntarily given," the Court reads that provision to mean that a voluntary confession may not be excluded on the ground that the confession was obtained in violation of *Miranda*. To this reading, the short answer is that Congress *really* did not write the statute that way.

As is true with most of the statutory interpretation questions that come before this Court, the question in this case is not like a jigsaw puzzle. There is simply no perfect solution to the problem before us.

Instead, we must choose between two imperfect solutions. The first (the one adopted by the Court) entirely disregards the clear and simple language of § 3501(a), rests on the proposition that Congress did not understand the plain import of the language it used in subsection (a), but adheres to

a strictly literal interpretation of § 3501(c). The second option respects the clear language of subsection (a), but either accepts some statutory surplusage or interprets § 3501(c)'s reference to a voluntary confession to mean an otherwise voluntary confession. To my mind, the latter choice is far preferable.

B

In addition to the antisuperfluousness canon, the Court relies on the canon that favors a specific statutory provision over a conflicting provision cast in more general terms, *ante,* at 1567 – 1568, but that canon is inapplicable here. For one thing, § 3501(a) is quite specific; it specifically provides that if a confession is voluntary, it is admissible. More importantly, there is no other provision, specific or general, that conflicts with § 3501(a). See National Cable & Telecommunications Assn., Inc. v. Gulf Power Co., 534 U.S. 327, 335–336, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002) ("It is true that specific statutory language should control more general language *when there is a conflict between the two*. Here, however, there is no conflict" (emphasis added)). Subsection (c) is not conflicting because it does not authorize *327 the suppression of any voluntary confession. What the Court identifies is not a conflict between two statutory provisions but a conflict between the express language of one provision (§ 3501(a)) and the "negative implication" that the Court draws from another (§ 3501(c)). United States v. Alvarez–Sanchez, 511 U.S. 350, 355, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). Because **1574 § 3501(c) precludes the suppression of a voluntary confession based solely on a delay of less than six hours, the Court infers that Congress must have contemplated that a voluntary confession could be suppressed based solely on a delay of more than six hours. The Court cites no authority for a canon of interpretation that favors a "negative implication" of this sort over clear and express statutory language.

C

The Court contends that a literal interpretation of § 3501(a) would leave the prompt presentment requirement set out in Federal Rule of Criminal Procedure 5(a)(1) "without

Corley v. U.S., 556 U.S. 303 (2009)

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

any teeth, for ... if there is no *McNabb–Mallory* there is no apparent remedy for delay in presentment." *Ante,* at 1570. There is nothing strange, however, about a prompt presentment requirement that is not enforced by a rule excluding voluntary confessions made during a period of excessive prepresentment delay. As the Court notes, "[t]he common law obliged an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could," *ante,* at 1562, but the *McNabb–Mallory* supervisory rule was not adopted until the middle of the 20th century. To this day, while the States are required by the Fourth Amendment to bring an arrestee promptly before a judicial officer, see, *e.g.,* County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), we have never held that this constitutional requirement is backed by an automatic exclusionary sanction, see, *e.g.,* Hudson v. Michigan, 547 U.S. 586, 592, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). And although the prompt presentment requirement serves interests in addition to the prevention of coerced confessions, the *McNabb–Mallory* rule provides **\*328** no sanction for excessive prepresentment delay in those instances in which no confession is sought or obtained.

Moreover, the need for the *McNabb–Mallory* exclusionary rule is no longer clear. That rule, which was adopted long before *Miranda,* originally served a purpose that is now addressed by the giving of *Miranda* warnings upon arrest. As *Miranda* recognized, *McNabb* and *Mallory* were "responsive to the same considerations of Fifth Amendment policy" that the *Miranda* rule was devised to address. Miranda v. Arizona, 384 U.S. 436, 463, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In the pre-*Miranda* era, the requirement of prompt presentment ensured that persons taken into custody would, within a relatively short period, receive advice about their rights. See McNabb v. United States, 318 U.S. 332, 344, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Now, however, *Miranda* ensures that arrestees receive such advice at an even earlier point, within moments of being taken into custody. Of course, arrestees, after receiving *Miranda* warnings, may waive their rights and submit to questioning by law enforcement officers, see, *e.g.,* Davis v. United States, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), and arrestees may likewise waive the prompt presentment requirement, see, *e.g.,* New York v. Hill, 528 U.S. 110, 114, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000) ("We have ... 'in the context

of a broad array of constitutional and statutory provisions,' articulated a general rule that presumes the availability of waiver, ... and we have recognized that 'the most basic rights of criminal defendants are ... subject to waiver' "). It seems unlikely that many arrestees who are willing to waive the right to remain silent and the right to the assistance of counsel during questioning would balk at waiving the right to prompt presentment. More than a few Courts of Appeals have gone as far as to hold that a waiver of *Miranda* rights also constitutes a waiver under *McNabb–* **\*\*1575** *Mallory.* See, *e.g.,* United States v. Salamanca, 990 F.2d 629, 634 (C.A.D.C.), cert. denied, 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993); United States v. Barlow, 693 F.2d 954, 959 (C.A.6 1982), cert. denied, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); United States **\*329** v. Indian Boy X, 565 F.2d 585, 591 (C.A.9 1977), cert. denied, 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978); United States v. Duvall, 537 U.S. 15, 23–24, n. 9(CA2), cert. denied, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); United States v. Howell, 470 F.2d 1064, 1067, n. 1 (C.A.9 1972); Pettyjohn v. United States, 419 F.2d 651, 656 (C.A.D.C.1969), cert. denied, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970); O'Neal v. United States, 411 F.2d 131, 136–137(CA5), cert. denied, 396 U.S. 827, 90 S.Ct. 72, 24 L.Ed.2d 77 (1969). Whether or not those decisions are correct, it is certainly not clear that the *McNabb–Mallory* rule adds much protection beyond that provided by *Miranda.*

D

The Court contends that the legislative history of § 3501 supports its interpretation, but the legislative history proves nothing that is not evident from the terms of the statute. With respect to § 3501(a), the legislative history certainly shows that the provision's chief backers meant to do away with *Miranda,* [3] but the Court cites no evidence that this was all that § 3501(a) was intended to accomplish.

To the contrary, the Senate Report clearly says that § 3501(a) was meant to reinstate the traditional rule that a confession should be excluded only if involuntary, see S.Rep. No. 1097, 90th Cong., 2d Sess., 38 (1968) (Senate Report), a step that obviously has consequences beyond the elimination of *Miranda.* And the Senate Report repeatedly cited Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12

L.Ed.2d 977 (1964), as an example of an unsound limitation on the admission of voluntary confessions, see Senate Report 41–51Senate Report 41–51, thus illustrating that 🚩 § 3501(a) was not understood as simply an anti-*Miranda* provision. Whether a **\*330** majority of the Members of the House and Senate had the *McNabb–Mallory* rule specifically in mind when they voted for 🚩 § 3501(a) is immaterial. Statutory provisions may often have a reach that is broader than the specific targets that the lawmakers might have had in mind at the time of enactment.

The legislative history relating to 🚩 § 3501(c) suggests nothing more than that *some Members* of Congress may mistakenly have thought that the version of 🚩 § 3501 that was finally adopted would not displace the *McNabb–Mallory* rule. As the Court relates, the version of 🚩 § 3501(c) that emerged from the Senate Judiciary Committee would have completely eliminated that rule. See *ante,* at 1568 – 1569. Some Senators opposed this, and the version of this provision that was eventually passed simply trimmed the rule. It is possible to identify a few Senators who spoke out in opposition to the earlier version of subsection (c) and then voted in favor of the version that eventually passed, and it is fair to infer that these Senators likely thought that the amendment of subsection (c) had saved the rule. See 114 Cong. Rec. 14172–14175, 14798 (1968). But there is no evidence that a majority of the House **\*\*1576** and Senate shared that view, and any Member who took a few moments to read subsections (a) and (c) must readily have understood that subsection (a) would wipe away all nonconstitutionally based rules barring the admission of voluntary confessions, not just *Miranda,* and that subsection (c) did not authorize the suppression of any voluntary confessions. The Court unjustifiably attributes to a majority of the House and Senate a mistake that, the legislative history suggests, may have been made by only a few.

E

Finally, the Court argues that under a literal reading of 🚩 § 3501(a), "many a Rule of Evidence [would] be overridden in case after case." *Ante,* at 1568. In order to avoid this absurd result, the Court says, it is necessary to read 🚩 § 3501(a) **\*331** as merely abrogating *Miranda* and not the *McNabb–Mallory* rule. There is no merit to this argument. [4]

The language that Congress used in 🚩 § 3501(a)—a confession is "admissible" if "voluntarily given"—is virtually a verbatim quotation of the language used by this Court in describing the traditional rule regarding the admission of confessions. See, *e.g.,* 🚩 *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (" 'In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort' " (quoting 🚩 *Wilson v. United States,* 162 U.S. 613, 623, 16 S.Ct. 895, 40 L.Ed. 1090 (1896))); 🔶 *Lyons v. Oklahoma,* 322 U.S. 596, 602, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944); 🚩 *Ziang Sung Wan v. United States,* 266 U.S. 1, 15, 45 S.Ct. 1, 69 L.Ed. 131 (1924); 🚩 *Bram v. United States,* 168 U.S. 532, 545, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In making these statements, this Court certainly did not mean to suggest that a voluntary confession must be admitted in those instances in which a standard rule of evidence would preclude admission, and there is no reason to suppose that Congress meant any such thing either. In any event, the Federal Rules of Evidence now make it clear that 🚩 § 3501(a) does not supersede ordinary evidence Rules, including Rules regarding privilege (Rule 501), hearsay (Rule 802), and restrictions on the use of character evidence (Rule 404). Thus, it is not necessary to disregard the plain language of 🚩 § 3501(a), as the Court does, in order to avoid the sort of absurd results to which the Court refers.

For all these reasons, I would affirm the decision of the Court of Appeals, and I therefore respectfully dissent.

## All Citations

556 U.S. 303, 129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230, 2009 Daily Journal D.A.R. 5023, 21 Fla. L. Weekly Fed. S 757

---

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

# Footnotes

\*        The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions
for the convenience of the reader. See 📄 *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337,
26 S.Ct. 282, 50 L.Ed. 499.

1        We rejected this attempt to overrule *Miranda* in 📄 *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326,
147 L.Ed.2d 405 (2000).

2        In full, subsections (a) and (b) provide:

"(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession,
as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such
confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any
issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall
be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of
voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves
under all the circumstances.

"(b) The trial judge in determining the issue of voluntariness shall take into consideration all the
circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and
arraignment of the defendant making the confession, if it was made after arrest and before arraignment,
(2) whether such defendant knew the nature of the offense with which he was charged or of which he was
suspected at the time of making the confession, (3) whether or not such defendant was advised or knew
that he was not required to make any statement and that any such statement could be used against him,
(4) whether or not such defendant had been advised prior to questioning of his right to the assistance of
counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned
and when giving such confession.

"The presence or absence of any of the above-mentioned factors to be taken into consideration by the
judge need not be conclusive on the issue of voluntariness of the confession."

3        In full, subsection (c) provides:

"In any criminal prosecution by the United States or by the District of Columbia, a
confession made or given by a person who is a defendant therein, while such person
was under arrest or other detention in the custody of any law-enforcement officer or
law-enforcement agency, shall not be inadmissible solely because of delay in bringing
such person before a magistrate judge or other officer empowered to commit persons
charged with offenses against the laws of the United States or of the District of Columbia
if such confession is found by the trial judge to have been made voluntarily and if the
weight to be given the confession is left to the jury and if such confession was made or
given by such person within six hours immediately following his arrest or other detention:
*Provided,* That the time limitation contained in this subsection shall not apply in any case
in which the delay in bringing such person before such magistrate judge or other officer
beyond such six-hour period is found by the trial judge to be reasonable considering the
means of transportation and the distance to be traveled to the nearest available such
magistrate judge or other officer."

4        We granted certiorari to resolve this question once before, in 📄 *United States v. Alvarez–Sanchez,* 511 U.S.
350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994), but ultimately resolved that case on a different ground, 📄 *id.,*
at 355–360, 114 S.Ct. 1599.

Corley v. U.S., 556 U.S. 303 (2009)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 578 of 1384

129 S.Ct. 1558, 173 L.Ed.2d 443, 77 USLW 4276, 09 Cal. Daily Op. Serv. 4230...

5    The dissent says that the antisuperfluousness canon has no place here because "there is nothing ambiguous about the language of § 3501(a)." *Post*, at 1572 (opinion of ALITO, J.). But this response violates "the cardinal rule that a statute is to be read as a whole," *King v. St. Vincent's Hospital,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991). Section 3501(a) seems clear only if one ignores the absurd results of a literal reading, *infra,* at 1567 – 1568, and only until one reads § 3501(c) and recognizes that if (a) means what it literally says, (c) serves no purpose. Even the dissent concedes that when (a) and (c) are read together, "[t]here is simply no perfect solution to the problem before us." *Post,* at 1573. Thus, the dissent's point that subsection (a) seems clear when read in isolation proves nothing, for "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). When subsection (a) is read in context, there is no avoiding the question, "What could Congress have been getting at with both (a) and (c)?" The better answer is that Congress meant to do just what Members explicitly said in the legislative record. See *infra,* at 1568 – 1570.

6    The dissent seeks to avoid these absurd results by claiming that "§ 3501(a) does not supersede ordinary evidence Rules," *post,* at 1576, but its only argument for this conclusion is that "there is no reason to suppose that Congress meant any such thing," *ibid.* The dissent is certainly correct that there is no reason to suppose that Congress meant any such thing; that is what our *reductio ad absurdum* shows. But that leaves the dissent saying, "§ 3501(a) must be read literally" (rendering § 3501(c) superfluous), "but not too literally" (so that it would override other Rules of Evidence). The dissent cannot have it both ways. If it means to profess literalism it will have to take the absurdity that literalism brings with it; "*credo quia absurdum*" (as Tertullian may have said). If it will not take the absurd, then its literalism is no alternative to our reading of the statute.

7    The proviso at the end of (c) relating to reasonable delays caused by the means of transportation and distance to be traveled came later by separate amendment. 114 Cong. Rec. 14787.

1    See *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2    See *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

3    At argument, the Government conceded "that section (a) was considered to overrule *Miranda* and subsection (c) was addressed to *McNabb–Mallory*." See Tr. of Oral Arg. 38. It is apparent that the attorney for the Government chose his words carefully and did not concede, as the Court seems to suggest, that subsection (a) was intended to do no more than to overrule *Miranda* or that subsection (c) was the only part of § 3501 that affected the *McNabb–Mallory* rule.

4    Contrary to the Court's suggestion, cases in which one of the standard Rules of Evidence might block the admission of a voluntary confession would seem quite rare, and the Court cites no real-world examples. The Court thus justifies its reading of § 3501, which totally disregards the clear language of subsection (a), based on a few essentially fanciful hypothetical cases that, in any event, have been covered since 1975 by the Federal Rules of Evidence.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Mohammad v. Slattery, S.D.N.Y., February 2, 1994

901 F.2d 1166
United States Court of Appeals,
Second Circuit.

Alba Nubia CORREA, Petitioner–Appellant,

v.

Richard THORNBURGH, as de jure head of the Immigration & Naturalization Service;
Immigration Court; The Board of Immigration Appeals, Respondents–Appellees.

No. 736, Docket 89–6199.
|
Argued Jan. 26, 1990.
|
Decided April 20, 1990.

**Synopsis**
Resident alien, who had left United States, petitioned for writ of habeas corpus seeking review of final order of Board of Immigration Appeals excluding her from admission into the United States. The United States District Court for the Eastern District of New York, Mark A. Costantino, J., denied petition. Alien appealed. The Court of Appeals, Walker, Circuit Judge, held that: (1) alien was subject to exclusion rather than deportation, and (2) alien was excludable on basis that she was found in possession of cocaine upon her attempt to reenter United States.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (13)

---

**[1]    Aliens, Immigration, and Citizenship**  🔑  Distinction between admissibility and removal proceedings

Rights available in deportation but not exclusion include advance notice of charges, burden of proof placed on government, direct appeal to Court of Appeals, right to seek suspension of order, and right to designate country of destination.

5 Cases that cite this headnote

---

**[2]    Aliens, Immigration, and Citizenship**  🔑  Presentation and preservation of questions at administrative level

Alien's claim that when she cleared primary inspection station at Houston airport she effected an "entry" into United States and, thus, while deportation proceedings may have been appropriate, she could not have been subjected to exclusion proceedings should have been dismissed for failure to exhaust administrative remedies where claim was never raised by alien before immigration judge or on appeal to Board of Immigration Appeals.

14 Cases that cite this headnote

---

**[3]    Aliens, Immigration, and Citizenship**  🔑  Mode and effect of entry or reentry

Colombian national, who had been granted resident alien status, did not make an "entry" into United States when detained by customs officials who believed her to be cocaine trafficker and, thus, she was subject to exclusion instead of deportation where alien had not passed through customs area of airport before her arrest. Immigration and Nationality Act, § 101(a)(13), as amended, 🚩 8 U.S.C.A. § 1101(a)(13).

6 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 👉 Mode and effect of entry or reentry

"Freedom from official restraint" which is required for finding of entry into United States for immigration purposes means that alien who is attempting entry is no longer under constraint emanating from government that would otherwise prevent her from physically passing on. Immigration and Nationality Act, § 101(a)(13), as amended, 🚩 8 U.S.C.A. § 1101(a)(13).

14 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 👉 Mode and effect of entry or reentry

Although physical movement may evidence that freedom from official restraint has been acquired by alien, for purposes of determining whether alien has entered into the United States, it is not a necessary component as long as alien is free physically to enter the United States openly or surreptitiously. Immigration and Nationality Act, § 101(a)(13), as amended, 🚩 8 U.S.C.A. § 1101(a)(13).

13 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 👉 Mode and effect of entry or reentry

Official restraint which prevents alien from "entering" United States need not be by immigration officers. Immigration and Nationality Act, § 101(a)(13), as amended, 🚩 8 U.S.C.A. § 1101(a)(13).

7 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** 👉 Controlled substances offenses

Alien's undisputed possession of one kilogram of cocaine, which was an amount too large for personal use and too valuable to have been entrusted to a person unaware of its existence, constituted "trafficking" which rendered alien, who had previously been granted resident alien status, excludable. Immigration and Nationality Act, §§ 106(a)(4), 212(a), as amended, 🏳 8 U.S.C.A. §§ 1105a(a)(4), 🏳 1182(a).

**[8]    Aliens, Immigration, and Citizenship** 👉 Validity

**Constitutional Law** 👉 Discrimination Between Classes of Aliens

Statute, permitting exclusion of alien who has been convicted of violation of, or conspiracy to violate, any statute or regulation of state, United States, or foreign country relating to controlled substance did not unconstitutionally deprive alien, who had previously been granted resident alien status, of right to equal protection, although it subjected her as a resident alien, normally entitled to deportation proceedings, to exclusion proceedings based merely upon her having temporarily traveled abroad; statute was a rational and necessary step to stem flow of drugs into United States, to prevent drug traffickers from entering United States and to ensure effective administration of immigration

laws at border. Immigration and Nationality Act, § 212(a)(23), as amended, 🚩 8 U.S.C.A. § 1182(a)(23); U.S.C.A. Const.Amend. 14.

6 Cases that cite this headnote

**[9]**　　**Aliens, Immigration, and Citizenship** 🔑 Power to deny admission or remove in general

　　　　**Aliens, Immigration, and Citizenship** 🔑 Judicial Review or Intervention

　　　　**Constitutional Law** 🔑 Political Questions

Power to expel or exclude aliens is a fundamental sovereign attribute exercised by government's political departments largely immune from judicial control.

4 Cases that cite this headnote

**[10]**　　**Aliens, Immigration, and Citizenship** 🔑 Invalid reentry of permanent residents

With limited exception, resident alien who leaves country and attempts to enter United States on his return is subject to all current exclusionary laws.

2 Cases that cite this headnote

**[11]**　　**Aliens, Immigration, and Citizenship** 🔑 Invalid reentry of permanent residents

Lawful permanent resident alien who makes departure from United States which is brief, casual and innocent, is not considered to be making entry on return to United States and, therefore, is not subject to exclusion.

2 Cases that cite this headnote

**[12]**　　**Habeas Corpus** 🔑 Presentation and reservation in lower habeas court of grounds of review

Claim that Board of Immigration Appeals' denial of resident alien's application for remand to immigration judge for consideration of waiver of excludability was error was not reviewable on appeal where issue was not presented to district court in habeas corpus petition. Immigration and Nationality Act, § 212(c), as amended, 🚩 8 U.S.C.A. § 1182(c).

5 Cases that cite this headnote

**[13]**　　**Aliens, Immigration, and Citizenship** 🔑 Grounds and Factors Considered

Board of Immigration Appeals acted within its discretion in denying resident alien's application to remand excludability proceeding and reopen; Board found that equities offered by resident alien, who had been found in possession of drugs on her attempted reentry into United States, were typical of those accrued by someone who had lived in the United States for seven years and that she had not shown any specific evidence of rehabilitation and the kind of equities which would be described as outstanding to offset serious nature of her crime.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1168** Irving Edelman, New York City (Leo E. Ypsilanti, New York City, of counsel), for petitioner-appellant.

Scott Dunn, Sp. Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., Eastern District of New York, Robert L. Begleiter, Asst. U.S. Atty., of counsel), for respondents-appellees.

Before VAN GRAAFEILAND, MINER and WALKER, Circuit Judges.

**Opinion**

WALKER, Circuit Judge:

This appeal comes to us from a denial by the United States District Court for the Eastern District of New York (Costantino, *Judge*) of a petition for a writ of habeas corpus, pursuant to 8 U.S.C. § 1105a(b), seeking a review of a final order of the Board of Immigration Appeals (BIA) excluding the petitioner-appellant, Alba Nubia Correa, from admission into the United States.

BACKGROUND

On August 21, 1982, Correa, a citizen of Colombia, and an "alien" who had been "lawfully admitted for permanent residence" in the United States since February 14, 1981, sought to re-enter the United States at the Houston Intercontinental Airport following an international flight from Colombia via Guatemala. [1]

At the Houston airport, all processing at that time of arriving international passengers for customs, agriculture and immigration purposes was conducted in a restricted area closed to the general public commonly referred to as the "Customs Enclosure." Access to or exit from the area was controlled by exit control officers and the other inspecting officers of the United States Customs Service (Customs), Immigration and Naturalization Service (INS or Immigration) and Department of Agriculture (USDA).

Each incoming passenger was initially processed at a primary inspection station by a single Customs or INS inspector, who was cross-designated in order to act for both agencies. After preliminary questioning, the primary inspector would refer the passenger to a "red area" within the "Customs Enclosure" for a more intensive inspection, or to a "green area" still within the "Customs Enclosure." "Green area" referrals were permitted to proceed to the exit control station but were still subject to random selection for the more intensive "red area" inspection. The final stage in the inspection process occurred at the point of exit when the passenger presented the Customs declaration to the exit control officer. The exit control officer could either accept the declaration and permit the passenger to depart the "Customs Enclosure," or direct the passenger to the "red area" for further inspection. [2]

Events leading to Correa's arrest began on August 21, 1982, when another passenger, Maria Teresa Uribe, presented herself to Customs Inspector Kenneth W. Brown at the primary inspection station. Inspector Brown, cross-designated as an Immigration inspector, noticed that Uribe's passport revealed numerous trips to Colombia, which he knew to be a source country for drugs, with this most recent return to the United States taken via a circuitous route. He also observed that Uribe's style of dress, her manner, and her frequent trips abroad were peculiar for a person who **\*1169** claimed to be a maid. Inspector Brown decided to refer Uribe to the "red area" for a more intensive inspection.

As he was inspecting Uribe, Brown noticed Correa, waiting in another primary inspection line. Correa had arrived on the same flight as Uribe, appeared to be about her age and was similarly dressed. Inspector Brown knew that drug couriers frequently travelled in pairs and decided then to question Correa to determine if she was traveling with Uribe.

Inspector Brown escorted Uribe to the baggage carousel area, where she claimed her luggage and then to the "red area" inspection station. When they arrived there, Correa was already in the "red area". After going through the primary inspection area, Correa had been stopped by USDA agents before passing through the exit control station and had been sent to the "red area" for a more intensive agriculture inspection. After telling the USDA officers that he also wished to inspect Correa, Brown began a search of Uribe and discovered approximately one kilogram of cocaine hidden in her luggage. Uribe was arrested by Customs officers and turned over to the Houston Police Department.

Inspector Brown then turned his attention to Correa, whose agriculture inspection was completed and who was being detained by Inspector George Holt. Assisted by Inspectors Holt and Gail Osborne–Tanner, Brown searched Correa's luggage and found one kilogram of cocaine that he estimated to be worth one-million dollars. Like Uribe, Correa was arrested and turned over to the Houston Police Department. At that time Correa was also formally "paroled" into the United States for purposes of prosecution pursuant to 8 U.S.C. § 1182(d)(5)(A). [3]

From her arrival in the United States to the moment of her arrest, Correa was never free to leave the "Customs Enclosure". If she had attempted to leave, she would have been prevented from doing so by Inspector Brown, other Customs, Immigration or USDA officers, or the exit control officer.

On December 8, 1982, Correa was convicted in a Texas state court, after a jury trial, of possession with intent to distribute cocaine weighing at least 400 grams. The state court jury imposed a sentence of twenty-five years. On April 17, 1985, a Texas appeals court reversed Correa's conviction and remanded because of an improper jury instruction as to the applicable penalty range. On October 7, 1985, Correa pleaded no contest to the same charge and was given a term of five years probation with the adjudication of guilt to be deferred.

On May 28, 1986, the INS issued to Correa a Form I–122 charging her with being excludable from the United States pursuant to 8 U.S.C. § 1182(a)(23) (1982), as an alien "who an immigration officer knows or has reason to believe is or has been an illicit trafficker in narcotic drugs or marijuana." [4]

**\*1170**  On January 15, 1987, an exclusion hearing was held before an Immigration Judge. Correa was represented by counsel. At the hearing, Inspector Brown testified that based on the events at the airport, he believed that Correa was a trafficker in cocaine. Inspector Osborne–Tanner, who participated in the search of Correa, testified that based on Correa's demeanor during the search and the cocaine found in Correa's luggage, she also believed that Correa was a trafficker in cocaine. In an opinion dated January 27, 1987, the Immigration Judge, crediting the testimony of the officers, ordered Correa excluded from the United States pursuant to 8 U.S.C. § 1182(a)(23).

Correa appealed the finding of excludability to the BIA and, alternatively, requested remand to the Immigration Judge to enable her to apply for a waiver of excludability pursuant to 8 U.S.C. § 1182(c). Such a waiver is available at the discretion of the Attorney General to lawful permanent resident aliens who have kept a lawful unrelinquished domicile in the United States for seven consecutive years and can demonstrate that they are deserving of a waiver. Drug offenders must present a showing of unusual or outstanding countervailing equities to obtain a waiver, particularly if the grounds for exclusion involved trafficking in drugs. *Matter of Marin,* 16 I & N Dec. 581, 586 & n. 4 (BIA 1978).

On January 18, 1989, the BIA affirmed the Immigration Judge's excludability findings and denied Correa's request for a remand. The BIA noted that Correa's counsel conceded excludability at oral argument, a finding that Correa now challenges, but went on to uphold the Immigration Judge's findings on the merits. In denying Correa's request for a remand for consideration of a § 1182(c) waiver, the BIA concluded that such a waiver would be denied by the Immigration Judge in the exercise of

her discretion, since Correa "does not have the kind of equities which could be described as outstanding to offset the serious nature of her crime."

On March 8, 1989, the INS instructed Correa to report to the Immigration authorities for her return to Colombia. She thereupon filed her petition for habeas corpus relief in the United States District Court for the Eastern District of New York, as she had taken up residence in Queens County, New York. Her departure has been postponed pending final disposition of her habeas petition.

DISCUSSION

On appeal, Correa argues that the District Court erred in several respects in dismissing her petition: 1) that she had effected an "entry" into the United States and thus was entitled to deportation proceedings instead of exclusion proceedings; 2) that the Immigration Judge's finding of excludability, affirmed by the BIA, was based on the erroneous application of 8 U.S.C. § 1182(a)(23) to her case; 3) that, in being subjected to exclusion rather than deportation proceedings as a returning resident alien, she was deprived of her constitutional right to equal protection of the laws; and 4) that the BIA abused its discretion in denying her a waiver of excludability.

Some of these claims were not raised in the administrative proceedings and thus can be rejected on that basis. In any event, as is explained below, all are without merit.

**\*1171** **[1]** **[2]** Correa claims that on August 21, 1982, when she cleared the primary inspection station at the Houston airport, she effected an "entry" into the United States, and thus while deportation proceedings may have been appropriate, she could not have been subjected to exclusion proceedings. [5]

This claim was never raised by Correa either before the Immigration Judge or on appeal to the BIA. [6] The District Court in this habeas corpus proceeding apparently considered the issue *de novo,* thereby according Correa a benefit to which she was not entitled. *See Kessler v. Strecker,* 307 U.S. 22, 34–35, 59 S.Ct. 694, 700, 83 L.Ed. 1082 (1939); *United States ex rel. Tom We Shung v. Murff,* 176 F.Supp. 253, 256–57 (S.D.N.Y.1959) (Weinfeld, J.), *aff'd per curiam,* 274 F.2d 667 (2d Cir.1960). This claim should have been dismissed for failure to exhaust administrative remedies.

**[3]** Moreover, we note that the District Court's conclusion that Correa had not effected an "entry" and thus was subject to exclusion instead of deportation was clearly correct.

Title 8, United States Code, Section 1101(a)(13) defines "entry" as:

> any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise ...

BIA case law, synthesized in *Matter of Pierre,* 14 I & N Dec. 467 (BIA 1973), has led to the formulation of a more precise test of whether an entry into the United States for immigration purposes has occurred:

An entry involves: (1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

*Matter of Ching and Chen,* Interim Decision 2984, at 3 (BIA 1984); *see also Matter of Lin,* 18 I & N Dec. 219, 220 (BIA 1982); *Matter of Yam,* 16 I & N Dec. 535, 536–37 (BIA 1978); *Matter of Pierre,* 14 I & N Dec. 467, 468–69 (BIA 1973). Applying this test to the events of August 21, 1982, it is evident that Correa never effected an entry. She satisfied the first prong, "physical presence," when she disembarked her Avianca flight from Guatemala to Houston. Regarding the second prong, "inspection and admission by an immigration officer," since she was allowed to pass the primary inspection station and was referred to the "red area" solely for an agriculture inspection, she was arguably **\*1172** "inspect[ed]" and "admit[ted]" by an immigration officer. On the other hand, the more compelling view is that Correa was subject to inspection at any time before passing through the "Customs Enclosure" exit control and her immigration inspection and admission were never completed. We need not resolve this point since it is clear that Correa never satisfied the third prong of the test—"freedom from official restraint."

[4] [5] [6] "Freedom from official restraint" means that the alien who is attempting entry is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on. *See United States v. Vasilatos,* 209 F.2d 195, 197 (3d Cir.1954); *Lazarescu v. United States,* 199 F.2d 898, 900 (4th Cir.1952). Although physical movement may evidence that such freedom has been acquired, *Matter of V–Q–,* 9 I & N Dec. 78, 79–80 (BIA 1960), it is not a necessary component as long as the alien is *free* physically to enter the United States openly or surreptitiously. *Vasilatos,* 209 F.2d at 197; *Lazarescu,* 199 F.2d at 900–01; *In Re Dubbiosi,* 191 F.Supp. 65, 66 (E.D.Va.1961). Such restraint need not be by immigration officers. *Edmond v. Nelson,* 575 F.Supp. 532, 535 (E.D.La.1983) (aliens seeking entry by sea "restrained" by master of rescuing ship, acting pursuant to government regulations); *Matter of Yam,* 16 I & N Dec. 535, 536–37 (BIA 1978) (alien found at border and taken under guard by local police to a medical facility).

In the instant case, Correa was never free from official restraint prior to her arrest on August 21, 1982 and thus never entered the United States. As Inspector Brown's uncontroverted affidavit makes clear, at all times during Correa's processing, she remained in a restricted area, known as the "Customs Enclosure," where access and egress were controlled by exit control officers, and by Customs, Immigration, and USDA officers assigned to the area. [7] Had she attempted to leave the enclosure, she would have been prevented from doing so by Inspector Brown, other Immigration, Customs or USDA officers, or the exit control officer. Petitioner was thus never free to physically enter the United States or to go at large and mix with the general population. *See Ex parte Chow Chok,* 161 F. 627, 629, 632 (C.C.N.D.N.Y.), *aff'd,* 163 F. 1021 (2d Cir.1908); *Lazarescu,* 199 F.2d at 900; *Vasilatos,* 209 F.2d at 197.

Petitioner's reliance on *Matter of V–Q–,* 9 I & N Dec. 78 (BIA 1960), in support of her claim that she "entered" the United States is misplaced. *Matter of V–Q–* involved an alien whom an inspector, after completing an inspection, had told to "go ahead" and who had proceeded 75 to 100 feet beyond the inspection point. The BIA concluded that since the inspector had lost custody over the alien, an entry had occurred thus necessitating deportation proceedings. *Id.* at 81. In Correa's case, custody was never lost.

[7]    Correa next contends that she was not excludable pursuant to 8 U.S.C. § 1182(a) since "the conduct in which [she] was believed to have engaged did not and does not constitute trafficking within the **\*1173**  meaning of the controlling statute." This argument is patently frivolous.

The Immigration Judge accepted the unrebutted testimony of Customs Officers Brown and Osborne–Tanner that they believed Correa to be a trafficker in cocaine and found their belief to be reasonable, based upon Correa's attempted entry into the country in undisputed possession of a kilogram of cocaine—an "amount too large for one's personal use" and too valuable to have been entrusted to a person unaware of its existence—and based further upon the officers' personal observations of Correa on August 21, 1982. These findings were supported by substantial evidence and are binding in this habeas corpus proceeding. 8 U.S.C. § 1105a(a)(4).

Correa further argues that Congress' 1987 amendment of 8 U.S.C. § 1182(a)(23), adding language that permits exclusion of an alien who the immigration officers know or have reason to believe "is or has been a knowing assistor, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance", establishes that Correa must not have been covered by the earlier version, which speaks only of traffickers *per se* and not of aiders or abettors.[8]  This argument is equally frivolous. It is premised upon Correa's *post hoc* claim that she was merely an "assister, abettor, conspirator or colluder with others" and thus not a trafficker. However, the finding of the Immigration Judge, based on ample evidence and affirmed by the BIA, was to the contrary.

[8]    Correa next argues that 8 U.S.C. § 1182(a)(23) works an unconstitutional deprivation of her right to equal protection because it subjects the resident alien, normally entitled to deportation proceedings, to exclusion proceedings based merely upon the alien's having temporarily travelled abroad. We reject this argument as well.

[9]    Over no subject is the power of Congress more complete than it is over the admission of aliens. *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). The power to expel or exclude aliens is a fundamental sovereign attribute exercised by the government's political departments largely immune from judicial control. *Fiallo v. Bell,* 430 U.S. 787, 794–96, 97 S.Ct. 1473, 1479–80, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972); *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953); *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952). Indeed, it may well be that Congress can bar aliens from entering the United States for discriminatory and arbitrary reasons, and that the usual constraints of rationality imposed by the equal protection clause do not limit the federal government's power to regulate immigration. *Matter of Longstaff,* 716 F.2d 1439, 1442–43 (5th Cir.1983), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984).

Thus while there can be little doubt that our scope of review as to Correa's equal protection claim is exceedingly narrow, its precise outer boundaries are unclear. In any event, even under a traditional "rational basis" analysis, 8 U.S.C. § 1182(a)(23) easily satisfies constitutional requirements.

Congress has expressed particular concern about the tide of drugs entering the country and about drug offenders, *see* *Blackwood v. INS,* 803 F.2d 1165, 1168 (11th Cir.1986); *Guan Chow Tok v. INS,* 538 F.2d 36, 38–39 (2d Cir.1976), and has promulgated strong antidrug provisions, such as 8 U.S.C. § 1182(a)(23), in order to **\*1174**  exclude aliens that immigration officers have a reason to believe are involved in drug trafficking. This section is both a rational and necessary step to stem the flow of drugs into the United States, to prevent drug traffickers from entering the United States and to ensure the effective administration of immigration laws at the border.

**[10]  [11]**  To hold otherwise would amount to granting a blanket exemption from the alien admission process to aliens previously granted permanent residency status who subsequently depart the United States voluntarily and thereafter seek to return. No authority is cited for this proposition. Rather, it is a basic principle of immigration law, with a limited exception not relevant here,[9] that a resident alien who leaves this country and attempts to enter the United States on his or her return, is subject to *all* current exclusionary laws. *Bonetti v. Rogers,* 356 U.S. 691, 698, 78 S.Ct. 976, 980, 2 L.Ed.2d 1087 (1958); *see also Landon v. Plasencia,* 459 U.S. 21, 25–28, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982). As petitioner was making an attempted entry on her return to the United States, she is subject to all of the exclusionary laws, including 8 U.S.C. § 1182(a)(23).[10]

**[12]**  Finally, Correa argues that the BIA's denial of her application for a remand to the Immigration Judge, for consideration of a waiver of excludability under 8 U.S.C. § 1182(c), was error. This issue was not presented to the District Court in the habeas corpus petition and thus is not reviewable here. *Sales v. Harris,* 675 F.2d 532, 540 (2d Cir.), *cert. denied,* 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982); *Alexander v. Smith,* 582 F.2d 212, 217–18 (2d Cir.), *cert. denied,* 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978).

**[13]**  In any event, the BIA acted well within its discretion in denying Correa's application to remand and reopen. *See INS v. Abudu,* 485 U.S. 94, 104–11, 108 S.Ct. 904, 911–15, 99 L.Ed.2d 90 (1988); *INS v. Bagamasbad,* 429 U.S. 24, 25–26, 97 S.Ct. 200, 201, 50 L.Ed.2d 190 (1976) (per curiam). In exercising its discretion, the BIA balanced the relevant factors as required by its own decisions. *See Matter of Buscemi,* Interim Decision 3058, at 7–8 (BIA 1988); *Matter of Marin,* 16 I & N Dec. 581, 585–86 (BIA 1978). The BIA found that the equities offered by Correa were "typical of those accrued by someone who has lived in the United States for seven years" and that "she has not shown any specific evidence of rehabilitation" and concluded that "she does not have the kind of equities which could be described as outstanding to offset the serious nature of her crime." The BIA also noted that Correa had "accrued her [requisite] seven years lawful permanent residence during the pendency of a meritless appeal." Thus, even if the remand denial had been properly raised in the District Court, it would have been error for that court to disturb it.

Judgment affirmed.

**All Citations**

901 F.2d 1166

## Footnotes

[1]  An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). "Lawfully admitted for permanent residence" is defined as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20).

2    The facts relating to the operation of the "Customs Enclosure" were not part of the administrative record. Correa's claim that she had "entered" the United States and thus could not be subject to an order of exclusion, to which these facts relate, was raised for the first time in the District Court.

3    That section provides in pertinent part that:

The Attorney General may ... in his discretion parole into the United States temporarily ... any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien ... shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

An alien paroled into the United States has not "entered" the United States for immigration purposes. *Siu Fung Luk v. Rosenberg,* 409 F.2d 555, 558 (9th Cir.), *cert. dismissed,* 396 U.S. 801, 89 S.Ct. 2151, 24 L.Ed.2d 38 (1969). *See also United States ex rel. Lam Hai Cheung v. Esperdy,* 345 F.2d 989, 990 (2d Cir.1965); *Wong Hing Fun v. Esperdy,* 335 F.2d 656, 657 (2d Cir.1964), *cert. denied,* 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965).

4    At the time the Form I–122 was issued, 8 U.S.C. § 1182(a)(23) provided for the exclusion of:

Any alien who has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana, or who has been convicted of a violation of, or a conspiracy to violate, any law or regulation governing or controlling the taxing, manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, exportation ... of opium, coca leaves, heroin, marihuana, or any salt derivative or preparation of opium or coca leaves, or isonipecaine or any addiction-forming or addiction-sustaining opiate; *or any alien who the consular officer or immigration officers know or have reason to believe is or has been an illicit trafficker in any of the aforementioned drugs;*

(Emphasis added).

On October 27, 1986, 8 U.S.C. § 1182(a)(23) was amended by the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207, 3207–47, expanding the list of drugs for which an alien trafficker can be excluded. The amendment was effective as to aliens seeking entry after its enactment. On December 22, 1987, the statute was further broadened by amendment to make excludable aliens who knowingly assist, abet, conspire or collude with others in illicit drug trafficking. Sect. 806, Foreign Relations Authorization Act, Pub.L. No. 100–204, 101 Stat. 1331, 1399.

5    Deportation proceedings are generally more favorable to the alien than exclusion proceedings. Rights available in deportation but not exclusion include advance notice of the charges, a burden of proof placed on the government, direct appeal to the Court of Appeals, the right to seek suspension of the order, and the right to designate the country of destination. *See Landon v. Plasencia,* 459 U.S. 21, 26–27, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982); *Maldonado–Sandoval v. INS,* 518 F.2d 278, 280 n. 3 (9th Cir.1975) (per curiam); 2 Gordon & Mailman, *Immigration Law and Procedure,* § 3.18.

Other than protection against gross physical abuse, the alien seeking initial entry appears to have little or no constitutional due process protection. *See Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212–16, 73 S.Ct. 625, 629–31, 97 L.Ed. 956 (1953); *Landon,* 459 U.S. at 32, 103 S.Ct. at 329; *Lynch v. Cannatella, Jr.,* 810 F.2d 1363, 1374 (5th Cir.1987). Rights in such circumstances appear to be largely statutorily derived, *see Jean v. Nelson,* 727 F.2d 957, 968 (11th Cir.1984), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); 2 Gordon & Mailman, *supra,* §§ 3.18–3.19, although some constitutional due process protection may be available to the resident alien seeking re-entry depending on the length of her absence. *See Landon,* 459 U.S. at 33–34, 103 S.Ct. at 329–30 (citing *Shaughnessy*); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596–600, 73 S.Ct. 472, 477–79, 97 L.Ed. 576 (1953).

6    Indeed, the BIA opinion states that counsel for Correa at oral argument "conceded the applicant is excludable." The BIA, nonetheless, went on to affirm the Immigration Judge's finding of excludability on the merits. While normally such a concession would bind Correa, we cannot exclude the possibility, as Correa argues here, that in view of the BIA's extensive discussion of the issue, the "concession", which contradicted the brief, was in the nature of an assumption

predicating Correa's second argument that the case should be remanded to the Immigration Judge for consideration of a waiver of excludability pursuant to 8 U.S.C. § 1182(c).

7    Relying on a section of the INS Operations Instructions manual entitled "One–Stop Inspection System," Correa asserts for the first time on appeal that she was free to leave the Customs Enclosure after passing through primary inspection without specific referral for further inspections. The manual states that "one-stop" is a system where a complete inspection of incoming passenger and baggage is conducted by one inspector at the primary area. If the applicant is determined by the primary inspector to be admissible, he is "free to exit the facility immediately"; if a determination is made that further inspection is necessary, the applicant is referred to Customs, INS, or both.

Correa is precluded from raising this issue for the first time on appeal. Even so, the argument is without merit. Correa has made no factual showing that the "one-stop" procedure was the one in operation at the Houston airport on the day she arrived. The evidence was wholly to the contrary. The Inspectors' uncontradicted testimony was that Correa was not "free to leave" after passing the primary inspector, and that each passenger was subject to further questioning and inspection up until the time that she passed through the exit control station.

8    Public Law 100–204 amended 8 U.S.C. § 1182(a)(23) to read in pertinent part:

"(A) has been convicted of a violation of, or a conspiracy to violate, any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substance Act (21 U.S.C. 802)); or

(B) the consular officers or immigration officers know or have reason to believe is or has been an illicit trafficker in any such controlled substance or is or has been a knowing assistor, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance...."

9    The only exception to this rule is the *Fleuti* doctrine, wherein a lawful permanent resident who makes a departure from the United States which is brief, casual and innocent, is not considered to be making an entry on return to the United States and therefore is not subject to the exclusionary provisions. *See Rosenberg v. Fleuti,* 374 U.S. 449, 452–62, 83 S.Ct. 1804, 1806–12, 10 L.Ed.2d 1000 (1963); *Landon v. Plasencia,* 459 U.S. 21, 28–29, 103 S.Ct. 321, 327, 74 L.Ed.2d 21 (1982); *see also Git Foo Wong v. INS,* 358 F.2d 151, 153 (9th Cir.1966). Since Correa's departure was not innocent, the *Fleuti* doctrine is inapplicable to this case. *See Palatian v. INS,* 502 F.2d 1091, 1093 (9th Cir.1974) (alien attempting to import 55 lbs. of marijuana); *Matter of Alvarez–Verduzco,* 11 I & N Dec. 625, 626–27 (BIA 1966) (alien attempting to import heroin).

10   Correa also argues that 8 U.S.C. § 1182(a)(23) should not be applied to her because if she had not left the United States, she could not have been deported for similar conduct, as there are no grounds for deportation comparable to the "reason to believe" standard for exclusion contained in 8 U.S.C. § 1182(a)(23). However, there is no requirement that exclusion and deportation grounds be analogous. *See Cabasug v. INS,* 847 F.2d 1321, 1326–27 (9th Cir.1988).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

737 F.3d 972
United States Court of Appeals,
Fifth Circuit.

Florencio CUEVAS, Petitioner
v.
Eric H. HOLDER, Jr., U.S.
Attorney General, Respondent.

No. 13–60150
|
Summary Calendar.
|
Dec. 10, 2013.

**Synopsis**
**Background:** Native and citizen of Mexico filed petition for review of Board of Immigration Appeals' (BIA) ruling that he was inadmissible.

**[Holding:]** The Court of Appeals, E. Grady Jolly, Circuit Judge, held that Department of Homeland Security (DHS) presented sufficient evidence to support its belief that alien was engaged in illicit drug trafficking.

Petition dismissed.

West Headnotes (2)

**[1]**     **Aliens, Immigration, and
     Citizenship**  ⚷ Controlled substances offenses

It is not necessary that alien be convicted of drug trafficking offense in order for Department of Homeland Security (DHS) to conclude that there is reason to believe that he is drug trafficker, thus rendering him removable. Immigration and Nationality Act, § 212(a)(2)(C), 8 U.S.C.A. § 1182(a)(2)(C).

4 Cases that cite this headnote

**[2]**     **Aliens, Immigration, and
     Citizenship**  ⚷ Jurisdiction and venue

**Aliens, Immigration, and
Citizenship**  ⚷ Crimes and immorality

Department of Homeland Security (DHS) presented sufficient evidence to support its belief that alien was engaged in illicit drug trafficking, and thus Court of Appeals lacked jurisdiction over alien's petition for review of Board of Immigration Appeals' (BIA) ruling that he was inadmissible, even though alien was not convicted of drug trafficking offense, in light of evidence that alien attempted to enter United States with nearly 24 kilograms of cocaine, which was amount consistent with trafficking, that cocaine was found in vehicle that alien owned, and that, aside from period of ninety minutes, alien exercised complete control over vehicle from time he purchased it. Immigration and Nationality Act, § 212(a)(2)(C), 8 U.S.C.A. § 1182(a)(2)(C).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*973** Anthony Matulewicz, Esq., Matulewicz & Associates, McAllen, TX, for Petitioner.

Jacob Alexander Bashyrov, Tangerlia Cox, Imran Raza Zaidi, Trial Attorney, U.S. Department of Justice, Washington, DC, for Respondent.

Petition for Review of an Order of the Board of Immigration Appeals.

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

**Opinion**

E. GRADY JOLLY, Circuit Judge:

Florencio Cuevas seeks review of the decision of the Board of Immigration Appeals (BIA) concluding that Cuevas was inadmissible because there was reason to believe he was a drug trafficker. Because the Department of Homeland Security (DHS) presented sufficient evidence to demonstrate that it had reason to believe Cuevas was an illegal trafficker, the petition for review is DISMISSED.

I.

Florencio Cuevas is a native and citizen of Mexico who was a legal permanent resident of the United States. While reentering the United States from Mexico in 2005, Cuevas's car was searched, and nearly 24 kilograms of cocaine were found concealed in the car's rear panel. Based on this finding, the Department of Homeland Security (DHS) charged Cuevas with removability under 8 U.S.C. § 1182(a)(2)(C) on the basis that there was reason to believe that Cuevas was a drug trafficker. Cuevas does not contest that the cocaine was found in his vehicle. Instead, Cuevas argues that there is not sufficient evidence to show that he was a drug trafficker because the DHS did not provide additional direct or circumstantial evidence that Cuevas knew the drugs were in his vehicle.

II.

Cuevas appeared in immigration court before an immigration judge (IJ). Cuevas's main contention was that he was unaware that the cocaine was in his vehicle. Cuevas testified that he bought the vehicle approximately two weeks before he left for Mexico from a man on the street in Chicago, paying $2,300 for it. Cuevas testified that, during the two weeks he spent in Mexico, he had exclusive control over the vehicle except for a period of between sixty and ninety minutes while his headlight was fixed at a mechanic's shop in Mexico. Cuevas testified that the shop was located in a town near where he grew up, but that he knew neither the name of the shop nor the name of the proprietor.

Based on this evidence, the IJ concluded that Cuevas was inadmissible, and therefore removable, under § 1182(a)(2)(C). **\*974** Cuevas appealed the decision of the IJ to the BIA, and the BIA remanded the case, instructing the IJ to determine whether the DHS had proven by clear, unequivocal, and convincing evidence that there exists reason to believe that Cuevas was a drug trafficker.

On remand, the IJ concluded that the DHS had shown sufficiently that there was reason to believe Cuevas was engaged in illicit drug trafficking. The IJ relied on several items of evidence: Cuevas was driving his own car that he had purchased just prior to his trip to Mexico; Cuevas had maintained exclusive control over the vehicle with the

exception of a single ninety minute period; Cuevas had mechanical work done on the vehicle two or three days before his arrest; there were fresh weld marks on the rear quarter panel of Cuevas's vehicle; and the quantity of cocaine was an amount indicating illegal trafficking.

The IJ rejected Cuevas's testimony—giving it very little weight—finding it implausible that either (1) someone had sold Cuevas a car containing 24 kilograms of cocaine for $2,300 or (2) Cuevas had failed to notice modifications made to his car for the purposes of hiding the cocaine.

On appeal, the BIA agreed that, through the evidence cited by the IJ, the DHS had met its burden of proving a reason to believe that Cuevas was a drug trafficker and dismissed the appeal.[1] Cuevas filed this timely petition for review.

III.

Cuevas challenges only the BIA's determination that he is inadmissible, and therefore removable, under § 1182(a)(2)(C). On appeal, we review the BIA's decision except to the extent the BIA has adopted conclusions or findings of the IJ. *Chun v. I.N.S.,* 40 F.3d 76, 78 (5th Cir.1994).

An alien is inadmissible if a consular officer or the Attorney General knows or has reason to believe that the alien is or has been an illicit trafficker in any controlled substance or has knowingly aided or abetted such trafficking. 8 U.S.C. § 1182(a)(2)(C). Our review of such a determination is limited in the immigration context. We lack jurisdiction to review any final order of removal against an alien who is removable for having committed a criminal offense under § 1182(a)(2), but retain jurisdiction over questions of law. 8 U.S.C. § 1252(a)(2)(C)-(D). Additionally, we retain jurisdiction to review jurisdictional questions, such as whether an alien is inadmissible pursuant to [ § 1182(a)(2) ]. *Balogun v. Ashcroft,* 270 F.3d 274, 278 (5th Cir.2001). Specific to this case, the Government concedes that we have jurisdiction to decide whether the DHS had reason to believe that Cuevas participated in illegal drug trafficking. If we find that the DHS had reason to believe that Cuevas was engaged in illegal trafficking, we lack jurisdiction to review the BIA's order and must dismiss the petition.

IV.

In deciding this jurisdictional question, we face two related issues on which our court has not spoken. First, whether a criminal conviction is required for an alien to be removable under § 1182(a)(2)(C). Second, what amount of evidence the DHS must provide in order to establish a reason **\*975** to believe that an alien is engaged in illegal trafficking.

A.

**[1]** Our court has not yet decided whether there can be reason to believe that an alien is a drug trafficker if the alien were not convicted of a drug trafficking offense. We have no difficulty, however, in joining other circuits that have held that a conviction is not required to meet this standard.

*See Lopez–Umanzor v. Gonzales,* 405 F.3d 1049, 1053 (9th Cir.2005) ( Section 1182(a)(2)(C) does not require a conviction....); *Garces v. United States Atty. Gen.,* 611 F.3d 1337, 1345 (11th Cir.2010) (A 'reason to believe' determination can be made even if the alien was never convicted of any offense.); *see also In re Rico,* 16 I. & N. Dec. 181, 185–86 (BIA 1977) (alien excluded after being caught with truckload of marijuana, even though never convicted).

Moreover, the plain language of the statute does not indicate that a prior conviction is necessary. Indeed, reason to believe necessarily evokes a lower standard than the beyond a reasonable doubt required to obtain a criminal conviction. *Compare* 8 U.S.C. § 1182(a)(2)(C), *with In re Winship,* 397 U.S. 358, 361, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (reaffirming requirement of proving guilt beyond a reasonable doubt for criminal convictions). Based on this language, and the precedents mentioned above, we hold that an alien can be inadmissible pursuant to § 1182(a)(2)(C) even when not convicted of a crime.

B.

Although not requiring a prior conviction, § 1182(a)(2)(C) does require some measure of evidence to support the DHS's belief that an alien is an illegal drug trafficker. Again, however, our circuit precedent has not established the amount of evidence that the DHS must present to satisfy the reason to believe standard. The First Circuit and the BIA have intimated that this standard is equivalent to the probable cause standard. *See Westover v. Reno,* 202 F.3d 475, 480 n. 6 (1st Cir.2000) (speculating in dicta that probable cause to believe that an alien was growing marijuana could have rendered the alien removable under § 1182(a)(2)(C)); *In re U–H–,* 23 I. & N. Dec. 355, 356 (BIA 2002) (describing the reasonable ground to believe standard as akin to the probable cause standard). Conversely, the Ninth Circuit requires a showing greater than mere probable cause. *See Alarcon–Serrano v. I.N.S.,* 220 F.3d 1116, 1119 (9th Cir.2000) (holding that a reason to believe must be based on reasonable, substantial, and probative evidence).

**[2]** Under either of these standards, the DHS presented sufficient evidence to support its belief that Cuevas was engaged in illicit trafficking. To recap: Cuevas was attempting to enter the United States with nearly 24 kilograms of cocaine, an amount consistent with trafficking; the cocaine was found in a vehicle that Cuevas owned; and, aside from a period of ninety minutes, Cuevas exercised complete control over the vehicle since he purchased it.

Although this evidence does not establish with certainty that Cuevas knew about the cocaine being in the vehicle— it is possible, but hardly plausible, that the cocaine was in the car when he purchased it or was placed in the vehicle without his knowledge—such certainty is not required under § 1182(a)(2)(C). The facts presented by the DHS provide reasonable, substantial, and probative evidence that Cuevas was a drug trafficker. Because the evidence satisfies this standard—the more stringent of the two potential standards —it is unnecessary **\*976** to decide whether a probable cause standard would support the DHS's reason to believe an alien is a drug trafficker. Under either standard, Cuevas was removable under § 1182(a)(2)(C).

V.

Because a prior conviction is not required for an alien to be removable under § 1182(a)(2)(C), and because the DHS has shown through reasonable, substantial, and probative evidence that Cuevas was engaged in illicit trafficking,

we lack jurisdiction to consider the petition for review. Accordingly, Cuevas's petition is

DISMISSED.

**All Citations**

737 F.3d 972

## Footnotes

1    The BIA declined to consider the fresh weld marks as evidence against Cuevas. Before the BIA, Cuevas raised several arguments against relying on the weld marks as evidence of Cuevas's drug trafficking. The BIA determined that it need not reach Cuevas's arguments because the other evidence was sufficient.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

449 F.3d 45
United States Court of Appeals,
First Circuit.

Sandra H. DACOSTA, Petitioner,

v.

Alberto GONZALES, Attorney General
of the United States, Respondent.

No. 05–1438.
|
Submitted March 7, 2006.
|
Decided May 24, 2006.

**Synopsis**
**Background:** Alien petitioned for review of removal order of
Board of Immigration Appeals (BIA).

**Holdings:** The Court of Appeals, Howard, Circuit Judge, held
that:

[1] alien did not have a protected due process interest in
adjustment of status, and

[2] BIA's order granting alien's motion to reopen immigration
proceedings did not retroactively nullify alien's violation of
terms of BIA's previous order setting deadline for voluntary
departure.

Petition denied.

West Headnotes (4)

[1]    **Aliens, Immigration, and
Citizenship** 🗝 Presentation and preservation
of questions at administrative level

Alien's claim that the running of her voluntary
departure period should have been equitably
tolled until date on which her husband's
alien relative petition was approved was not
reviewable by Court of Appeals, since alien
failed to exhaust her administrative remedies
by raising claim in her appellate brief to

Board of Immigration Appeals. Immigration and
Nationality Act, § 242(d)(1), 🚩 8 U.S.C.A. §
1252(d)(1).

3 Cases that cite this headnote

[2]    **Aliens, Immigration, and
Citizenship** 🗝 Application or Petition

**Constitutional Law** 🗝 Admission and
exclusion; deportation

Because adjustment of status was a discretionary
form of relief, alien did not have a protected
liberty or property interest in adjustment
of status, as required to sustain claim that
mishandling of her application for adjustment
by Immigration and Naturalization Service
(INS) violated her due process rights. U.S.C.A.
Const.Amend. 5.

15 Cases that cite this headnote

[3]    **Aliens, Immigration, and
Citizenship** 🗝 Reopening, Reconsideration,
or Remand

By declining to oppose alien's motion to reopen
immigration proceedings to allow alien to apply
for adjustment of status to lawful permanent
resident, Immigration and Naturalization Service
did not waive its right to present argument as to
alien's eligibility for adjustment of status.

2 Cases that cite this headnote

[4]    **Aliens, Immigration, and
Citizenship** 🗝 Findings, statement of reasons,
and determination

Order of Board of Immigration Appeals (BIA)
granting alien's motion to reopen immigration
proceedings to allow alien to apply for
adjustment of status to lawful permanent resident
did not retroactively nullify alien's violation of
terms of BIA's previous order setting deadline for
alien's voluntary departure.

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*46** Jose A. Vazquez on brief for petitioner.

Peter D. Keisler, Assistant Attorney General, Anthony W. Norwood, Senior Litigation Counsel, and Terri J. Scadron, Assistant Director, Office of Immigration Litigation, Civil Division, on brief for respondent.

Before LIPEZ, Circuit Judge, CYR, Senior Circuit Judge, and HOWARD, Circuit Judge.

**Opinion**

HOWARD, Circuit Judge.

Sandra DaCosta, a native and citizen of Brazil, petitions for review of a decision of the Board of Immigration Appeals (BIA). The BIA found DaCosta statutorily ineligible for adjustment of status and ordered her removed from the United States. We deny the petition.

DaCosta failed to depart the United States when her six-month tourist visa expired in May 1994. Over two years later, she filed an application for political asylum and withholding of removal with the Immigration and Naturalization Service (INS)[1] **\*47** claiming that she had been threatened by Brazilian drug traffickers. In July 1997, the INS commenced removal proceedings against DaCosta by charging her with overstaying her visa. Conceding removability, DaCosta renewed her request for asylum. Following a hearing, an immigration judge found DaCosta removable and denied her applications for asylum and withholding of removal. The immigration judge granted her voluntary departure in lieu of removal but informed her that if she failed to depart by October 13, 1998, she would be subject to removal without further notice.

The BIA affirmed without opinion on June 6, 2002 and granted DaCosta an additional 30 days to voluntarily depart the United States "subject to any extension beyond that time that may be granted by the district director." Citing section 240B(d) of the Immigration and Nationality Act (INA), the BIA warned that if DaCosta failed "to depart the United States within the time specified, or any extensions granted by the district director, [DaCosta] ... shall be ineligible for a period of 10 years for any further relief including adjustment of status."

*See* 8 U.S.C. § 1229c(d). DaCosta did not petition for review of that order, and, despite the BIA's warning, failed to

depart or to request an extension of the voluntary departure period.

On September 3, 2002, DaCosta moved the BIA to reopen her case to allow her to apply for an adjustment of status to lawful permanent resident. DaCosta claimed that she had married a United States citizen and that, in August 2000, during the pendency of her BIA appeal, her spouse had filed an I–130 "alien relative" petition in support of her I–485 application for adjustment. According to DaCosta's motion, the INS had accepted her application, her husband's petition and the accompanying processing fees, and had subsequently notified DaCosta to appear for an interview at the INS office in Hartford, Connecticut. DaCosta claimed that the INS agent who conducted the interview informed her that her application would be transferred to the Providence, Rhode Island, INS office.

DaCosta further claimed that, on July 16, 2002, she received a letter from the Providence office informing her that it lacked jurisdiction to process her application because she was in removal proceedings. *See* 8 C.F.R. § 245.2(a)(1) ("After an alien ... is in deportation or removal proceedings, his or her application for adjustment of status ... shall be made and considered only in those proceedings."). According to DaCosta's motion, for nearly two years she had been led to believe that her application was being processed by the INS when in fact it was not. DaCosta therefore asserted that her case should be reopened because the INS had "misled" her during the time period when she could have asked the BIA to remand her case for consideration of her adjustment application. The INS did not file an opposition to DaCosta's motion to reopen.

On October 24, 2002, the BIA, noting only the lack of opposition from the INS, granted DaCosta's motion to reopen and remanded the case for further proceedings.[2] On remand, the INS argued that **\*48** DaCosta was ineligible for adjustment of status because she had failed to comply with the BIA's voluntary departure order of June 6, 2002. The INS argued that INA § 240B(d) mandates that an alien who fails to voluntarily depart within the time period specified in a voluntary departure order is ineligible for adjustment of status for a period of ten years. *See* 8 U.S.C. § 1229c(d). The immigration judge disagreed, finding that the BIA's order reopening the case extinguished the legal consequences of her failure to timely depart. The immigration judge therefore considered the merits of DaCosta's adjustment application. During cross-examination at the hearing, DaCosta confirmed

her receipt of the BIA's June 6, 2002 order denying her appeal. She testified that she understood that the order required her to leave the United States within 30 days and that if she failed to depart within that time, she could be fined and would be ineligible for certain forms of relief. Nevertheless, on October 23, 2003, the immigration judge granted DaCosta's application for adjustment of status. *See* 8 U.S.C. § 1255.

The INS appealed to the BIA, again arguing that DaCosta was statutorily ineligible for relief. DaCosta, citing to a provision in the INA that was repealed in 1996 with passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), responded that "exceptional circumstances" beyond her control—the INS's two-year delay in notifying her that it did not have jurisdiction to adjudicate her application —excused her failure to depart. *See* INA § 242B (codified at 8 U.S.C. § 1252b(e)(2)(A) (1995) (repealed 1996)). DaCosta also argued that the INS had waived its opportunity to appeal the immigration judge's decision to grant adjustment of status by failing to oppose her motion to reopen. On February 24, 2005, the BIA sustained the INS's appeal and vacated the order granting adjustment. Acknowledging that it had made a good-faith error in reopening the case, the BIA agreed with the INS that DaCosta was statutorily ineligible for adjustment of status because she had violated an order to depart. Citing *Matter of Shaar,* the BIA held that DaCosta had failed to establish "exceptional circumstances" sufficient to excuse her failure to depart. *See* 21 I. & N. Dec. 541, 544–46 (BIA 1996) (holding that, during the pendency of a voluntary departure period, neither the filing of a motion to reopen to apply for a new form of discretionary relief nor an immigration judge's failure to adjudicate such a motion qualify as "exceptional circumstances" sufficient to excuse a failure to depart within the confines of the departure order). The BIA ordered DaCosta removed to Brazil. She thereafter filed the present petition for review.[3]

**\*49** DaCosta's petition to this court does not contest that INA § 240B(d) bars an alien from receiving an adjustment of status where the alien has previously failed to depart the United States within the deadline of a voluntary departure order. *See Jupiter v. Ashcroft,* 396 F.3d 487, 491 (1st Cir.2005) (holding that the plain language of INA § 240B(d) renders an alien ineligible for adjustment of status where the alien has previously failed to adhere to a voluntary departure order). She also abandons her argument that "exceptional circumstances" excuse her failure to timely depart. Rather, she asserts that, by failing to oppose her motion to reopen

for consideration of her application for adjustment of status, the INS waived its right to contest the immigration judge's subsequent order granting her adjustment. She further contends that the BIA's order reopening her case had the effect of reopening and tolling her voluntary departure period and gave the immigration judge the authority to consider afresh her application for adjustment of status.

DaCosta also presents three new legal theories based on the same set of operative facts previously cited in support of her "exceptional circumstances" argument. First, she argues that the government should be equitably estopped from asserting her ineligibility for adjustment in light of her detrimental reliance on the INS's implicit and explicit representations that it was processing her application. For similar reasons, she contends that the running of her voluntary departure period should be regarded as having been equitably tolled until October 21, 2002, the date in which her husband's I–130 petition was approved. Finally, she asserts that the INS's conduct in mishandling her application violated her due process rights.

We begin by outlining the limits of our jurisdiction to adjudicate DaCosta's claims. The INA strips the courts of jurisdiction to review BIA decisions granting or denying discretionary relief such as adjustment of status. *See* 8 U.S.C. § 1252(a)(2)(B). Because a BIA decision on the merits of an application for adjustment of status is committed to the discretion of the Attorney General, "arguably, this court would not have jurisdiction to review that discretionary determination." *Succar v. Ashcroft,* 394 F.3d 8, 19 n. 15 (1st Cir.2005). In this case, however, the BIA did not reach the merits of DaCosta's adjustment claim, finding, as a threshold matter, that she is statutorily ineligible for such relief. The arguments presented in DaCosta's petition are legal in nature, "and as such [are] not within the jurisdictional bar of 8 U.S.C. § 1252(a)(2)(B)." *Id.* at 19; *see also Cho v. Gonzales,* 404 F.3d 96, 100 (1st Cir.2005). We review such legal questions de novo, subject to established principles of agency deference. *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *Herrera–Inirio v. INS,* 208 F.3d 299, 304 (1st Cir.2000).

[1]    There is another jurisdiction-stripping provision, however, that is applicable here: 8 U.S.C. § 1252(d)(1), which permits judicial review of a final order of removal only where "the alien has exhausted all administrative remedies

available to the alien as of right." In her brief to the BIA preceding its February 2005 order (the decision from which DaCosta petitioned for review), DaCosta did not argue that the doctrines of equitable estoppel or equitable tolling were applicable. Because the **\*50** BIA was not given the opportunity to adjudicate these claims, we may not consider them now. *See Olujoke v. Gonzales,* 411 F.3d 16, 23 (1st Cir.2005) (noting that we lack authority "to consider points not squarely raised before the BIA"). [4]

**[2]** DaCosta's due process argument, which was also not presented to the BIA, is subject to a different analysis. We have noted that "an asserted denial of due process may, in certain limited circumstances, be exempt from the ordinary exhaustion requirement." *Jupiter,* 396 F.3d at 492 (noting that such circumstances "are rare and are restricted to claims that are beyond the authority of the agency to adjudicate"). Without deciding whether DaCosta's due process claim falls within this exemption, we conclude that it cannot succeed. *See id.* (assuming jurisdiction *arguendo* where petitioner's due process claim was not colorable). A due process claim requires that a cognizable liberty or property interest be at stake. *See id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Because adjustment of status is a discretionary form of relief, it does not rise to the level of such a protected interest. *See id.* (citing *Henry v. INS,* 74 F.3d 1, 7 (1st Cir.1996)).

**[3]** DaCosta's waiver argument also fails. DaCosta contends that the INS is barred from presenting an argument as to her eligibility for adjustment where it previously declined an opportunity to "try" the issue by not opposing her motion to reopen. But the cases she cites, *Matter of Kasinga,* 21 I. & N. Dec. 357, 363 (BIA 1996) (denying remand where the INS already had an opportunity to explore a particular issue before the immigration judge) and *Matter of Guevara,* 20 I. & N. Dec. 238, 249 (BIA 1991) (denying a motion to reconsider where the INS already had ample opportunity to introduce additional evidence of deportability), are inapposite. The filing of a motion to reopen with the BIA is not a vehicle for trying an issue, but is merely a request for the opportunity to try it. Although the INS did not oppose the motion to reopen, the INS did not waive its right to present an argument against DaCosta's request for adjustment of status or to appeal the immigration judge's decision granting such relief. DaCosta's entitlement to adjustment of status was not before the BIA at the motion to reopen stage.

**[4]** DaCosta's remaining argument is that she actually did *not* violate the BIA's voluntary departure order. She contends that, by reopening her case, the BIA effectively expunged its June 6, 2002 voluntary departure order. Consequently, she argues, since the BIA's final decision ordering voluntary departure was erased, the requirement to leave the United States within 30 days of the final decision was never triggered.

DaCosta places too much significance on the BIA's order reopening her case. It is undisputed that DaCosta's voluntary departure period had already expired *before* she filed her motion to reopen with the BIA. Although the BIA's reopening of the case had the legal effect of vacating the BIA's June 6, 2002 order, it could not **\*51** "retroactively nullify" DaCosta's previous violation of the terms of that order. *Cf. Khalil v. Ashcroft,* 370 F.3d 176, 180 (1st Cir.2004) (holding that reinstatement of a new voluntary departure period did not apply retroactively to eradicate the legal consequences of failing to comply with the agency's original grant of voluntary departure so as to render the alien eligible for adjustment of status); *see also Bocova v. Gonzales,* 412 F.3d 257, 268, 270 (1st Cir.2005) (holding that "[o]nce the voluntary departure period has run its course, a court of appeals lacks the authority to fashion a new one or to reinstate or extend the old one[,]" and that, in order to suspend a voluntary departure period, an alien must "explicitly request that relief *before* the expiration of the voluntary departure period") (emphasis added).

Voluntary departure is a discretionary form of relief that allows an alien subject to removal time in which to leave the country of her own volition. *See id.* at 264–65. The privilege of voluntary departure provides benefits to both the government and the alien, but with the benefits come "attendant responsibilities." *Id.* at 265. A failure to honor those responsibilities results in mandatory sanctions. The BIA's order reopening DaCosta's case cannot expunge her previous violation of an order to depart. Therefore, the BIA properly found DaCosta statutorily ineligible for adjustment of status for failure to comply with an order to voluntarily depart.

***The petition for review is denied.***

**All Citations**

449 F.3d 45

# Footnotes

1    In March 2003, during the pendency of proceedings in this case, the functions of the INS were reorganized
     and transferred from the Department of Justice to the newly formed Department of Homeland Security (DHS).
     *See* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002). Title 8 of the Code
     of Federal Regulations was thereafter reorganized and amended to reflect the resulting division of jurisdiction
     between the DHS and the Executive Office for Immigration Review, which includes the immigration courts and the
     BIA and remains under the direction of the Attorney General. *See* 68 Fed.Reg. 10349 (Mar. 5, 2003). To
     avoid confusion, we shall employ the shorthand "INS" whether referring to the former INS or the present DHS.

2    Three days before the BIA order reopening proceedings, the INS Service Center in Vermont granted the I–
     130 petition filed by DaCosta's husband and instructed DaCosta to file a I–485 application for adjustment.

3    Contemporaneous with her petition for review, DaCosta moved the BIA to reconsider its February 2005
     decision. Although the BIA's subsequent denial of that motion is not the subject of the present petition for
     review, we note that the BIA offered a point of clarification regarding an error in its previous order of February
     2005. Because removal proceedings were commenced against DaCosta in July 1997, after the passage of
     the IIRIRA, the new section 240B(d), as opposed to the former section 242B, provides the applicable
     voluntary departure provision. *Compare* 8 U.S.C. § 1252b(e)(2)(A) (1995) (repealed 1996), *with* 8
     U.S.C. § 1229c(d) (2005). The BIA noted that, among other things, the new provision removes the opportunity
     for an alien to demonstrate "exceptional circumstances" excusing a failure timely to depart. *See* 8 U.S.C.
     § 1229c(d) ("If an alien ... fails voluntarily to depart the United States within the time period specified [in
     a voluntary departure order], the alien *shall be* ... ineligible for a period of 10 years for any further relief,"
     including adjustment of status under 8 U.S.C. § 1255) (emphasis added). The BIA therefore recognized
     that it had erred in previously considering DaCosta's "exceptional circumstances" argument. But because
     that error did not alter the result, the BIA concluded that it was harmless.

4    DaCosta did ultimately raise these issues with the BIA in the motion to reconsider she filed
     contemporaneously with this petition for review. But although the BIA subsequently denied that motion,
     DaCosta never petitioned for review of that decision. We therefore lack jurisdiction to review that decision and
     consequently cannot consider the arguments DaCosta raised for the first time in her motion to reconsider.
     *Cf.* *Asemota v. Gonzales*, 420 F.3d 32, 33 (1st Cir.2005) (considering only the denial of petitioner's motion
     to reconsider where petitioner failed to timely petition for review of the underlying order).

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Indrawati v. U.S. Atty. Gen., 11th Cir., March 2, 2015

765 F.2d 581
United States Court of Appeals,
Sixth Circuit.

Paul Ziah DALLO, Petitioner, Petitioner-Appellant,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent, Respondent-Appellee.

Nos. 84–3393, 85–1033 and 85–3092.
|
Argued May 9, 1985.
|
Decided June 20, 1985.

**Synopsis**

Alien brought appeals from decisions of Board of Immigration Appeals refusing to reopen deportation proceedings and from decision of United States District Court for the Eastern District of Michigan, Ralph B. Guy, Jr., J., denying petition for habeas corpus. The Court of Appeals, Boyce F. Martin, Jr., Circuit Judge, held that: (1) affidavit of alien's wife testifying that marriage was fraudulent was admissible; (2) Board did not abuse its discretion in refusing to reopen deportation proceeding to consider application for discretionary waiver of deportation for fraudulently admitted aliens who are closely related to citizens or permanent residents; and (3) habeas corpus petition was mooted by release of opinion on appeal.

Petitions for review denied and appeal dismissed.

West Headnotes (5)

**[1]** **Aliens, Immigration, and Citizenship** ⚖ Grounds and Factors Considered

Board of Immigration Appeals did not abuse its discretion in refusing to reopen deportation proceedings on ground that affidavit of alien's wife had been admitted to prove that marriage was fraudulent where government made reasonable effort to subpoena alien's wife for cross-examination and where, because

marriage occurred less than two years prior to alien's entry and was terminated less than two years after his entry, it fit within statutory presumption of fraud. Immigration and Nationality Act, § 241(f), as amended, ⚖ 8 U.S.C.A. § 1251(f).

17 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⚖ New evidence, facts, or circumstances

Board of Immigration Appeals did not abuse its discretion in refusing to reopen proceedings to consider application for discretionary waiver of deportation for fraudulently admitted aliens who are closely related to citizens or permanent residents where alien's marriage was fraudulent and took place only after final order of deportation had taken effect and thus alien's application lacked equity. Immigration and Nationality Act, § 241(f)(1), as amended, ⚖ 8 U.S.C.A. § 1251(f)(1).

11 Cases that cite this headnote

**[3]** **Habeas Corpus** ⚖ Mootness

Alien's appeal from denial of petition for writ of habeas corpus seeking release on bond pending exhaustion of judicial remedies was mooted by release of decision by Court of Appeals and, in any event, was meritless where alien failed to show special circumstances to support the writ.

9 Cases that cite this headnote

**[4]** **Federal Courts** ⚖ Proceedings frivolous or for delay

Appeal is frivolous if it is obviously without merit and is prosecuted for delay, harassment, or other improper purposes.

26 Cases that cite this headnote

**[5]** **Federal Civil Procedure** ⚖ Frivolousness; particular cases

Penalties would be assessed against alien and his counsel for bringing frivolous appeals from orders refusing to reopen deportation proceedings.

23 Cases that cite this headnote

**Attorneys and Law Firms**

**\*582** Fakhri W. Yono, argued, Yono & Sarafa, P.C., Southfield, Mich., William M. Hatchett, argued, Pontiac, Mich., for P. Dallo.

Robert Kendall, Jr. (LC), argued, Office of Immigration Litigation, Crim. Div., Washington, D.C., Thomas W. Hussey, Christopher Barnes, U.S. Atty., Nicholas J. Pantel, Cincinnati, Ohio, L. Michael Wicks, argued, Asst. U.S. Atty., Detroit, Mich., for I.N.S.

Before ENGEL and MARTIN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

**Opinion**

BOYCE F. MARTIN, Jr., Circuit Judge.

These three consolidated matters all relate to Paul Ziah Dallo's continuing efforts to resist deportation. Nos. 84–3393 and 85–3092 challenge the Board of Immigration Appeals' refusals to reopen deportation proceedings, and No. 85–1033 is an appeal from a district court's denial of his petition for habeas corpus. We affirm in all three cases.

**Facts**

Dallo is a native and citizen of Iraq who entered the United States on November 9, 1977, as an immigrant. His immigrant visa was approved on September 19, 1977, based on his marriage to United States citizen Judy Henry on September 8, 1977, at Windsor, Canada. That marriage was terminated by divorce on July 13, 1978.

On November 14, 1979, an investigator for the Immigration and Naturalization Service contacted Judy Henry, and she told the investigator that the marriage was a fraudulent one arranged for immigration purposes. After notice of her rights and in the presence of the investigator, she wrote out and signed the affidavit set out in the footnote. [1] Parallel

investigations of the **\*583** marriages of Dallo's brothers, Vadi Zia Jajou and Khalid Zia Jajo, produced affidavits from United States citizens Patricia Ann Crombez and Esther Diaz (*neé* Jaime) saying that the marriages were also fraudulent ones. Patricia Crombez stated in a sworn affidavit, dated November 14, 1979, that Dallo persuaded her to travel to Cairo, Egypt, and marry Vadi Zia Jajou on August 20, 1979. She stated that Dallo paid her a total of $400 to enter an unconsummated marriage to a man she had never met. Esther Diaz stated in a sworn affidavit dated November 20, 1979, that Dallo paid her $300 to marry Khalid Zia Jajo in Cairo on August 20, 1979, although her marriage was initially arranged by a man she knew only as Billy. The United States Attorney declined prosecution of Dallo in favor of administrative action to deport him.

The INS then issued an Order to Show Cause and Notice of Hearing to Dallo on January 24, 1980. The notice alleged four bases for deportability, all essentially flowing from his fraud. [2] The deportation hearing commenced on February 21, 1980, but was not completed until July 20, 1981. The INS trial attorney moved the admittance into evidence of various documents, including Judy Henry's affidavit; Dallo's counsel stipulated to the admission of the affidavit, but reserved his right to cross-examine the witness.

After learning of petitioner's desire to cross-examine Judy Henry and before the ultimate completion of the hearing, the INS attempted to subpoena Judy Henry for testimony. A subpoena dated March 19, 1980, was returned by the Postal Service stamped "return to sender, moved not forwardable." An investigator then visited Judy Henry's parents' home, and they told him that they did not know her location, as she traveled throughout the United States in her work, but they were in occasional telephonic contact with her. They accepted a subpoena for her and promised to tell her about it when she next called. At the hearing on April 17, 1980, however, the immigration judge telephoned the Henrys and they said they had not been in touch with their daughter since the investigator's visit. A third subpoena was served on June 11, 1981, to no avail. At the June 17, 1981, hearing, Dallo's trial counsel had no suggestions as to how Judy Henry could be located. Dallo himself, when asked by an investigator prior to the hearing where his **\*584** ex-wife could be located, refused to answer on advice of counsel. At no time did Dallo introduce any evidence to rebut Judy Henry's affidavit.

The immigration judge on November 20, 1981, issued a written decision ordering Dallo to voluntarily depart within

thirty days, or alternatively to be deported to Iraq. The judge held that every effort possible had been made to locate the ex-wife for cross-examination and admitted her affidavit on the authority of 8 C.F.R. § 242.14(c). He found the marriage fraudulent, a finding based in part on the INS investigation, including Judy Henry's affidavit, and in part on the statutory presumption of fraud in section 241(c) of the Immigration and Nationality Act, 8 U.S.C. § 1251(c). He also denied a request for asylum, finding that Dallo had failed to establish the likelihood of persecution if he were returned to Iraq. [3] Dallo timely appealed to the Board of Immigration Appeals, which on May 9, 1983, sustained the order that Dallo depart the United States voluntarily within thirty days in lieu of enforced deportation.

Dallo did not seek judicial review of the Board's order within the six months provided by section 106(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a) (1), nor did he voluntarily depart the United States. The INS issued a Warrant of Deportation for Dallo on August 29, 1983. Petitioner applied for a stay of deportation on October 3, 1983; the application was denied on March 8, 1984, and he was ordered to report for deportation on March 15, 1984. When he failed to appear as ordered, a second notice to report was sent to him and his counsel, ordering him to report for deportation on March 29, 1984. He again failed to report as ordered, and on April 3, 1984, INS officers took him into custody, where he remains.

Dallo's counsel on April 4, 1984, telephonically requested the Board of Immigration Appeals to reconsider its decision. The Board denied this request without opinion on May 10, 1984.

On April 6, 1984, Dallo's counsel mailed a petition to review the Board's May 9, 1983, order to this Court with a motion to file the petition out of time. The petition and motion were received by the Clerk of Court on April 9, 1984, and the motion was denied and the case dismissed by a per curiam order on September 26, 1984. *Dallo v. INS,* No. 84–3280 (6th Cir. Sept. 26, 1984). This and the subsequent petitions to this Court have stayed the deportation until the present date, pursuant to section 106(a)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a)(3).

On April 20, 1984, Dallo's counsel filed a petition for a writ of habeas corpus, attacking the deportation, in the United States District Court for the Eastern District of Michigan. After a two-hour hearing on May 7, 1984, Judge Guy denied

the writ in a bench opinion. *Dallo v. INS,* No. 84–CV1928–DT (E.D.Mich. filed May 11, 1984). Although the court did grant Dallo a four-day temporary restraining order to give him time to appeal, no appeal was ever taken, perhaps because jurisdiction was improperly **\*585** premised on Immigration and Nationality Act § 106(b), 8 U.S.C. § 1105a(b).

On April 30, 1984, Dallo's counsel moved the Board of Immigration Appeals to reopen and reconsider the deportation proceedings pursuant to 8 C.F.R. §§ 103.5, 242.22. The Board denied the motion to reopen in a written opinion on May 16, 1984, which also included a more formal denial of the April 4 telephonic motion to reopen. Dallo on May 17, 1984, petitioned for review of this order to this Court, and it is No. 84–3393.

On May 21, 1984, Dallo's counsel filed a second petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. This petition sought his release on bond pending this court's disposition of No. 84–3393. Judge Joiner held in open count on May 25, 1984, that the District Director of the INS was within his discretion in denying bond, and a formal judgment and order denying the writ was entered on June 14, 1984. *Dallo v. INS, Detroit, Mich.,* No. 84–CV–7253–AA (E.D.Mich. filed June 14, 1984). No appeal was taken.

On May 31, 1984, six days after Judge Joiner's bench opinion and two weeks before it was filed, Dallo's local counsel filed a third petition for a writ of habeas corpus, this time in the United States District Court for the Western District of Texas. Dallo chose this district because he was then being held at the Alien Detention Facility in El Paso, Texas, to await deportation. He again attacked the legality of the deportation order and sought release on bond pending that court's disposition of his habeas petition. Judge Hudspeth denied the writ in a written opinion on July 20, 1984. *Dallo v. Giugni,* No. EP–84–CA–198 (W.D.Tex. July 20, 1984). No appeal was taken.

On August 21, 1984, Dallo's counsel for the third time moved the Board of Immigration Appeals to reopen and reconsider the deportation proceedings. He now alleged that he had married a lawful permanent resident of the United States on December 11, 1983, and thus was eligible for relief under section 241(f) of the Immigration and Nationality Act, 8 U.S.C. § 1251(f). Dallo did not explain why this ground was not combined with the April 30 request to reopen. The Board

denied the motion on January 4, 1985. Dallo on January 28, 1985, petitioned for review in this Court, and it is No. 85–3092.

On September 5, 1984, Dallo's counsel filed a fourth petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. This petition again sought Dallo's release on bond pending this court's disposition of his petitions for review. The case was referred to United States Magistrate Komives for a report and recommendation. Magistrate Komives on October 23, 1984, recommended that the petition be dismissed for want of jurisdiction, petitioner not being in the district but in the Western District of Texas, and alternatively that the writ be denied because the possibility of favorable action on Dallo's pending judicial proceedings "must be considered remote at best." In a written opinion, Judge Guy on December 12, 1984, agreed with the petitioner that he had jurisdiction, but declared that the likelihood of Dallo's success on the merits was too remote to justify a writ of habeas corpus. *Dallo v. INS,* No. 84–CV–4130–DT (E.D.Mich. Dec. 12, 1984). Dallo on January 4, 1985, appealed the denial to this court, No. 85–1033, and made an emergency motion for release pending appeal. That motion was denied by a motions panel of this Court on March 6, 1985, and the appeal was consolidated with the two remaining petitions for review of orders of the Board of Immigration Appeals.

Petitioner has also made a fourth application to the Board to reopen deportation proceedings, this one to apply for suspension of deportation pursuant to section 244(a)(1) of the Immigration and Nationality Act, 🚩 8 U.S.C. § 1254(a)(1). Ironically, that provision allows a suspension of deportation, in the discretion of the Attorney General, for aliens who, inter alia, have been physically present in the United States for at least seven years—a condition **\*586** Dallo can meet only because of his continued petitions to this court. The Board had not yet acted on this motion on the date of oral argument.

### Admission of the Henry Affidavit

**[1]** In No. 84–3393, the petition to review the Board's May 16, 1984, refusal to reopen deportation proceedings, the only issue on review is whether the Board abused its discretion in denying the motion to reopen in the light of 🚩 *Baliza v. INS,* 709 F.2d 1231 (9th Cir.1983). As the motion to reopen was made after it was too late to appeal the final

order of deportation, we can review only whether the Board abused its discretion in failing to reopen and reconsider the appeal. *Perwolf v. INS,* 741 F.2d 1109, 1110 (8th Cir.1984); 🚩 *LeBlanc v. INS,* 715 F.2d 685, 688–93 (1st Cir.1983); *Bae v. INS,* 706 F.2d 866, 869 (8th Cir.1983).

The Federal Rules of Evidence do not apply in immigration hearings. Instead, the regulations provide that "[t]he special inquiry officer may receive in evidence any oral or written statement which is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial." 8 C.F.R. § 242.14(c). *Baliza* held that an out-of-court (hearsay) statement such as an affidavit must at least be shown to be authentic. 🚩 709 F.2d at 1234. It held in the alternative that the government cannot simply choose to use a hearsay statement without making a reasonable effort to locate the potential witness for cross-examination. *Id.; see* Immigration and Nationality Act § 242(b)(3), 🚩 8 U.S.C. § 1252(b)(3), *Baliza* recognized, however, that hearsay evidence is admissible whenever the government cannot locate the witness. 🚩 709 F.2d at 1234; *see de Hernandez v. INS,* 498 F.2d 919, 921 (9th Cir.1974) (per curiam); *Solis-Davila v. INS,* 456 F.2d 424, 426 (5th Cir.1972).

The Board held that this case is distinguishable from *Baliza* in that the government did make a reasonable effort to subpoena the witness for cross-examination. We agree with that conclusion, and it cannot by any stretch of the imagination be called an abuse of discretion. However, the refusal to reopen is correct for an additional reason. Dallo's marriage would have been found fraudulent even without his ex-wife's affidavit. He married Henry less than two years prior to his entry into the United States and the marriage was terminated less than two years after his entry. He was well within the statutory presumption of fraud in section 241(c) of the Immigration and Nationality Act. 🚩 8 U.S.C. § 1251(c), and he offered no evidence to rebut the presumption. The petition for review, therefore, is obviously without merit.

### The Section 241(f) Exception

**[2]** In No. 85–3092, Dallo's petition for review of the Board's January 4, 1985, refusal to reopen proceedings, the only question is whether the Board abused its discretion in refusing to reconsider the deportation order in the light of section

241(f) of the Immigration and Nationality Act, 8 U.S.C. § 1251(f). Section 241(f) formerly provided a nondiscretionary waiver for fraudulently admitted aliens who were closely related to United States citizens or permanent residents. [4] In 1981, section 241(f) was amended to read in relevant part as follows:

#### (f) Discretion of Attorney General to waive deportation for fraudulent entry in specified cases

(1)(A) The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure or have procured visas or other documentation, **\*587** or entry into the United States, by fraud or misrepresentation, whether willful or innocent, may, in the discretion of the Attorney General, be waived for any alien ... who—

(i) is the spouse, parent, or child of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence; and

(ii) was in possession of an immigrant visa or equivalent document and was otherwise admissible to the United States at the time of such entry except for those grounds of inadmissibility specified under paragraphs (14), (20), and (21) of section 1182(a) of this title which were a direct result of that fraud or misrepresentation.

(B) A waiver of deportation for fraud or misrepresentation granted under subparagraph (A) shall also operate to waive deportation based on the grounds of inadmissibility at entry described under subparagraph (A)(ii) directly resulting from such fraud or misrepresentation.

Immigration and Nationality Act Amendments of 1981, Pub.L. No. 97–116, § 8, 95 Stat. 1611, 1616 (codified as 8 U.S.C. § 1251(f)(1)). The legislative history shows that a primary purpose of the amendment was to minimize litigation over the provision by placing a high level of discretionary authority in the Attorney General and his delegates. [5] Dallo was married to Bushra Elais Schounia, a native of Iraq but presumably a permanent legal resident of the United States, on December 11, 1983. [6] The Board concedes that

he made out a sufficient prima facie showing of eligibility for relief under section 241(f). However, as a matter of administrative discretion, the Board declined to reopen. [7]

**\*588** This Court in *Balani* established the rule that "[i]n determining whether the Board abused its discretion, this Court must decide whether the denial of Petitioner's motion to reopen deportation proceedings was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Balani v. INS,* 669 F.2d 1157, 1161 (6th Cir.1982) (per curiam). Petitioner makes no claim that the Board's order rested on an impermissible basis such as invidious discrimination. Although he claims that *Da Lomba,* 16 I. & N. Dec. 616 (Bd. Immigration App.1978), represents an established policy from which the Board has inexplicably departed, it is obvious that the nondiscretionary provisions of prior law offer no guidance to the Board's current discretion.

We can only take petitioner's argument to be that the Board's explanation of its decision was not rational. That cannot be said to be the case. Dallo did not merely marry to evade the immigration laws, he did so in the most blatant fraudulent manner. Furthermore, he has conspired with others to create equally fraudulent marriages. His current marriage took place only after a final order of deportation took effect against him, an indication that this marriage too may have been contracted to evade the immigration laws. It appears to be one in a long series of overt acts to evade and abuse the immigration laws. It is clear that if the unfavorable use of discretion were not appropriate in this case, there is virtually no case in which it would be appropriate. Dallo's claim has all the equity of one who has murdered his parents and asks for mercy because he is an orphan.

Dallo and his counsel must have been aware at all times that the Board's decision not to reopen the deportation proceedings in order to consider the effect of section 241(f) has the protection of not one but two "abuse of discretion" standards of review: The Board's decision whether to reopen is discretionary, and the Board's application of section 241(f) is discretionary. These two protections are in addition to the unusual degree of discretion given to the Board in immigration matters. *See* *INS v. Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981); *Balani,* 669 F.2d at 1162. It is clear in the face of that discretion and Dallo's lack

of equity that this petition for review is obviously without merit. [8]

### *589 The Habeas Corpus Petition

[3] Dallo's petition for a writ of habeas corpus, No. 85–1033 on appeal, asks for his release on bond pending the exhaustion of his judicial remedies. Those remedies are, of course, exhausted with the release of this opinion and accompanying order, and this appeal is therefore moot. We note, however, that this petition essentially realleged the facts relied on in the three previous petitions for the writ, except for the procedural status of Dallo's motions that the Board reopen his deportation proceedings. In addition, it is well-established that Dallo must show some sort of special circumstances, including a substantial likelihood of success, to obtain the predisposition relief he sought. *See, e.g., Aronson v. May, —— U.S. ——, 85 S.Ct. 3, 13 L.Ed.2d 6 (1964)* (Douglas, J., in chambers); *Ostrer v. United States, 584 F.2d 594 (2d Cir.1978); Calley v. Callaway, 496 F.2d 701 (5th Cir.1974)* (per curiam); *Baker v. Sard, 420 F.2d 1342, 1343–44 (D.C.Cir.1969).* As Dallo plainly could not make such a showing, this appeal was obviously without merit.

### Conclusion

The INS first became aware on November 14, 1979, that Dallo's presence in the United States was based on fraud. Dallo was able to delay administrative enforcement of deportation until March 15, 1984, when he was ordered to report for deportation and failed to do so. This apparently created the impression in his mind that the immigration laws can safely be evaded by obfuscation and delay.

[4] [5] We are not responsible for inefficiency and delay in the INS, but we are responsible for it here. Dallo and his counsel have consumed an incredible amount of judicial and administrative resources with this series of proceedings, few of which have raised substantial questions at any point and none of which raise substantial questions in this Court. The primary purpose of the proceedings here has been to obtain the automatic stay provided in section 106(a)(3) of the Immigration and Nationality Act, *8 U.S.C. § 1105a(a)(3).* [9] Indeed, it is apparent that counsel's purpose

in separately moving the Board to reconsider each ground, rather than making a consolidated motion, was to increase the possible number of appeals to this Court. An appeal is frivolous if it is obviously without merit and is prosecuted for delay, harassment, or other improper purposes. *See Ruderer v. Fines, 614 F.2d 1128, 1132 (7th Cir.1980).* Every proceeding here being obviously without merit and the petitioner's purpose being delay, all three petitions on review are frivolous. The courts of appeals have not hesitated to assess penalties against such frivolous petitioners. *See Martin v. Commissioner, 756 F.2d 38, 40–41 (6th Cir.1985); Jaloy Manufacturing Co. v. United States Fidelity & Guaranty Co., 736 F.2d 1131, 1134 (6th Cir.1984); Beer v. Commissioner, 733 F.2d 435, 437 (6th Cir.)* (per curiam), *cert. denied, 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984); TIF Instruments v. Colette, 713 F.2d 197, 201 (6th Cir.1983); Muigai v. INS, 682 F.2d 334, 337 (2d Cir.1982); Acevedo v. INS, 538 F.2d 918, 920–21 (2d Cir.1976)* (per curiam); *28 U.S.C. § 1912; Fed.R.App.P. 20, 38.*

It is especially appropriate here to assess a penalty against Dallo's counsel, pursuant to *28 U.S.C. § 1927.* An immigrant who is truly determined not to return to his native country may be undeterred by such penalties, but it should be possible to control the flood of frivolous petitions by penalizing counsel. Furthermore, the actual petitioner may be unaware that his legal position is utterly without merit, whereas counsel can be expected to know the merits of the positions they take. A lawyer should "represent a client zealously," Model Code of Professional Responsibility Canon 7, but it *590 is well-recognized that the obligation does not justify the assertion of frivolous positions in litigation. Model Rules of Professional Conduct Rule 3.1; Model Code of Professional Responsibility EC 7–4, DR 7–102(A); *see Acevedo, 538 F.2d at 921.* We note that repeated frivolous petitions for review of immigration decisions caused the First Circuit to take disciplinary action against counsel, resulting in a fine and suspension. *In re Bithoney, 486 F.2d 319 (1st Cir.1973).*

The petitions for review are denied, the appeal is dismissed, and the petitioner is ordered immediately deported. Double costs are assessed against petitioner and his counsel.

### All Citations

765 F.2d 581

## Footnotes

1    My full true and correct name is Judy Lucille Henry. I am a citizen of the United States by my birth in Hamtramck, Michigan on September 25, 1956. I was first introduced to Mr. Dallo by a mutual friend who told me that Dallo was in Canada and wanted to get married so he could come to the United States. After about 2–3 months I finally married Paul Dallo in Windsor Ontario Canada on September 8, 1977. On the day of our marriage Paul gave me $250.00. He returned to his residence and I returned to the home of my parents on 28458 Park Court in Madison Heights, Michigan. There was another man, about 30 plus years old, about 160, short, and thin hair, who was at the marriage who brought me back home. This same man took me to the immigration office when I made the papers for Paul. I put on that paper that I lived at an address on Joseph Street in Utica and I also said that Paul would be living there when he came to the United States. I never lived on Joseph Street; I have never lived as man and wife with Paul H. Dallo and there was never any intent that I should. I did not see the man I married after our marriage until about a month after he arrived in the United States, and that was only for a few hours. Paul later came to me and told me that I could now get the divorce, and that it had all been arranged if I went to this particular attorney in Southfield. At the time of the divorce Paul gave me another $250.00. He had given me about $50.00 over a period of time between our marriage and the divorce. I will present to the immigration service those copies of divorce papers to testify as to the date of divorce and to name the attorney who handled the case —I cannot remember either fact. I have never lived with Paul H. Dallo and he has never lived with me. There was never any intent on the part of either of us to have a normal working marriage. Our marriage was to help Paul to get into the United States. If it becomes necessary for me to appear in any proceedings I shall do so voluntarily. I understand now that this marriage has caused some problems and that by doing it I may have violated some law, but I did not understand that at the time.

2    [I]t is charged that you are subject to deportation pursuant to the following provision(s) of law:

Sections 241(a)(2) and 241(c) of the Immigration and Nationality Act [ 8 U.S.C. § 1251(a)(2), (c) ], in that you are in the United States in violation thereof because you are an alien who entered in violation of Section 212(a)(19) [ 8 U.S.C. § 1182(a)(19) ] with an immigrant visa or other documentation which was procured by fraud on the basis of a marriage entered into less than 2 years prior to such entry, which marriage was judicially annulled or terminated within 2 years subsequent to any entry.

Sections 241(a)(2) and 241(c) of the Immigration and Nationality Act, in that you are in the United States in violation thereof because you are an alien who entered in violation of Section 212(a)(19) with an immigrant visa or other documentation which was procured by fraud, it appearing to the satisfaction of the Attorney General that you have failed or refused to fulfill your marital agreement which in the opinion of the Attorney General was made for the purpose of procuring your entry as an immigrant.

Section 241(a)(1) of the Immigration and Nationality Act [ 8 U.S.C. § 1251(a)(1) ] in that, at time of entry you were within one or more of the classes of aliens excludable by the law existing at the time of such entry, to wit, aliens who are immigrants not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document and not exempted from the possession thereof by said act or regulations made thereunder, under Section 212(a)(20) of the Act [ 8 U.S.C. § 1182(a)(20) ].

Section 241(a)(1) of the Immigration and Nationality Act, in that, at time of entry you were within one or more of the classes of aliens excludable by the law existing at the time of such entry, to wit, aliens who are seeking to enter for the purpose of performing skilled or unskilled labor and in whose cases the Secretary of Labor has not made the certification as provided by Section 212(a)(14) of the Act [ 8 U.S.C. § 1182(a)(14) ], as amended.

3    The claim to asylum and for withholding of deportation was for the most part based on self-serving generalized statements. While it is true that in most instances the respondents are unable to present evidence other

than these statements, it is to be noted that this respondent's claim rests primarily upon the premise that because he is a Chaldean Christian in a predominately Moslem country, dire consequences are certain to befall him. Yet, it is true that the respondent served and was honorably discharged from the Iraqi army. It is also a fact that all of the members of his family including his mother, father, and a sister reside in Iraq, with the exception of two brothers in Cairo, Egypt. It is also an established fact that he was out of Iraq to marry in Windsor, Canada on September 8, 1977, and made no claim to asylum while in that country. He also was in Cairo, Egypt prior to coming to the United States as an immigrant and the record establishes that he did not make a claim to asylum while in Cairo, Egypt.

Paul Ziah Dallo, No. A–30 848 215, slip op. at 6 (Angelilli, Immigration J. Nov. 20, 1981). The immigration judge therefore held that Dallo had not met his burden of proof. *Id.* at 7; *see* Dally v. INS, 744 F.2d 1191 (6th Cir.1984). The asylum claim is not before this court.

4    **Relationship to United States citizen or lawfully admitted alien as affecting deportation for fraudulent entry**

> (f) The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent, or a child of a United States citizen or of an alien lawfully admitted for permanent residence.

5    The present law has been a major source of controversy and litigation for many years. Although the original intent of the section was simply to waive relatively minor grounds for deportation—those arising out of misrepresentations in arranging entry—for aliens with a close family relative who was a United States citizen or lawful permanent resident, the scope of the waiver and the meaning of "otherwise admissible" have become increasingly unclear. As early as 1973, in an Executive Communication enclosing a legislative proposal to clarify the section, the Department of Justice stated that "litigants have sought to expand section 241(f) into a charter of amnesty, waiving all restrictions for those who have entered the United States through fraud." Twice litigation involving the proper interpretation of that section has reached the Supreme Court with no clear resolution. Compare INS v. Errico, 385 U.S. 214, 87 S.Ct. 473, 17 L.Ed.2d 318 (1966), with Reid v. INS, 420 U.S. 619, 95 S.Ct. 1164, 43 L.Ed.2d 501 (1975). In testimony before the Committee in 1979, Acting INS Commissioner Crosland concluded that "differing administrative and judicial interpretations have left the law in a state of confusion which makes it virtually impossible for the INS to uniformly administer section 241(f)."

> The Committee amendment reconciles the confusing and conflicting judicial and administrative interpretations of the scope of this provision, and clarifies that the waiver is only intended to apply to immigrants and that it is available for innocent (as well as fraudulent) misrepresentations. By doing this and making the waiver discretionary, it should obviate the need for further litigation, and promote the uniform administration of this section.

H.R.Rep. No. 264, 97th Cong., 1st Sess. 25 (footnote omitted), *reprinted in* 1981 U.S.Code Cong. & Ad.News 2577, 2594.

6    Because this was a denial of a motion to reopen and no evidence was taken, the Board seems to have assumed the set of facts most favorable to petitioner, as upon motions for summary judgment. However, the Board was aware that Dallo's 1983 federal income tax return claimed single filing status.

7    [W]e find that the respondent's motion to reopen for 241(f) relief warrants denial as a matter of discretion. In this regard, neither the courts nor this Board have been lenient toward aliens who have flouted our immigration laws by engaging in fraudulent marriages to United States citizens or lawful permanent residents. Congress has emphatically expressed its disapproval of such conduct by the enactment of section 204(c) of the Act, 8 U.S.C. § 1154(c), which precludes from immediate relative or preference status any alien who has previously been accorded a nonquota or preference status on the basis of a marriage which has been determined to have been entered into for the purpose of evading the immigration

laws. The purpose of section 241(f) is to aid in the unification of families, a goal which Congress has promoted through a number of provisions of the Act. However, it does not appear that Congress intended to extend the benefits to this humanitarian purpose to aliens who have attempted to evade the immigration laws through fraudulent marriages. In light of the provisions of section 204(c) denying immediate relative status to such persons, it would appear to be inconsistent with the Congressional purpose to grant 241(f) relief to any alien who has engaged in marriage fraud in order to gain immigration benefits. We note that the Board is not precluded from granting relief in such a case. However, in view of the egregious nature of the violation and the fact that Congress has denied preference status to aliens in similar circumstances who are outside the United States, it is reasonable to require that an alien who has entered the United States on the basis of a sham marriage must demonstrate substantial equities to warrant reopening of his deportation proceedings. Mere statutory qualification should not suffice. In the present case, we note that the Board entered a final administrative order of deportation on May 9, 1983. Respondent's second marriage in December 1983 occurred long after our final order. Respondent has repeatedly disregarded United States immigration laws to suit his own needs. He has overstayed a grant of voluntary departure and failed to appear for two orders of deportation. At the midnight hour, respondent filed his third motion for relief from deportation. The equity of a marriage is accorded less weight where the marriage did not occur until long after the respondent has been found deportable. Finally, we note that the filing of respondent's motion on August 21, 1984, occurred long after the marriage and respondent's orders to report for deportation. Consequently, we find that the motion to reopen should be denied as a matter of discretion. Accordingly, the following order will be entered.

ORDER: The motion is denied.

Paul Ziah Dallo, No. A30 848 215, slip op. at 3–4 (Bd. Immigration App. Jan. 4, 1985).

8    Subsequent to oral argument, the Supreme Court decided *INS v. Rios-Pineda,* 471 U.S. 444, 105 S.Ct. 2098, 85 L.Ed.2d 452 (1985), which emphasizes the Board's discretion and the impropriety of frivolous appeals. Although we are guided by many of the same concerns that guided the Supreme Court, we do not rely on its holdings in finding this petition without merit.

9    We note that this stay, automatic unless the court otherwise directs, provides aliens subject to deportation with procedural protection even stronger than that given to prisoners under sentence of death appealing a denial of habeas corpus, who must obtain a certificate of probable cause to appeal. *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); 28 U.S.C. § 2253.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by United States v. Gaspar-Miguel, D.N.M., January 25, 2019

761 F.3d 336
United States Court of Appeals,
Fourth Circuit.

Oscar Angel DE LEON, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General, Respondent.

No. 13–1651.
|
Argued: May 14, 2014.
|
Decided: July 30, 2014.

**Synopsis**

**Background:** Alien, a Guatemalan national, petitioned for review of the Board of Immigration Appeals (BIA) order denying his application for special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act (NACARA).

**[Holding:]** The Court of Appeals, Diana Gribbon Motz, Circuit Judge, held that the alien entered the United States free from official restraint.

Ordered accordingly.

Duncan, J., filed an opinion in which he dissented.

West Headnotes (11)

**[1]    Aliens, Immigration, and Citizenship**   ⌐  Necessity of Entry;  Mode

For purposes of immigration, "entry" into the United States requires: (1) a crossing into the territorial limits of the United States; (2) inspection and admission by an immigration officer or actual and intentional evasion of inspection; and (3) freedom from official restraint.   8 U.S.C.A. § 1229b.

3 Cases that cite this headnote

**[2]    Aliens, Immigration, and Citizenship**   ⌐  Necessity of Entry;  Mode

An alien enters the United States free from official restraint only if he experiences some degree of liberty in the United States before the government apprehends him; thus, freedom from official restraint means that the alien who is attempting entry is not under constraint emanating from the government that would otherwise prevent him from physically passing on.

AR.04449

1

**[3]**   **Aliens, Immigration, and Citizenship**   Necessity of Entry;  Mode

For purposes of entry into the United States, surveillance constitutes official restraint because an alien who is under surveillance by a government official lacks the freedom to go at large and mix with the population.

2 Cases that cite this headnote

**[4]**   **Aliens, Immigration, and Citizenship**   Necessity of Entry;  Mode

An alien kept under surveillance by the government is not free from official restraint even if officials permit him to proceed some distance beyond the border before physically intercepting him.

3 Cases that cite this headnote

**[5]**   **Aliens, Immigration, and Citizenship**   Cancellation of Removal or Suspension of Deportation in General
**Aliens, Immigration, and Citizenship**   Presumptions and burden of proof

Applicant for cancellation of removal under Nicaraguan Adjustment and Central American Relief Act (NACARA) must proceed through a two-step process: first, applicant bears burden of establishing his eligibility for relief, including that he entered the United States free from official restraint; second, if applicant satisfies statutory requirements, Attorney General in his discretion decides whether to grant or deny relief. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 8 U.S.C.A. §§ 1229a(c)(4), 1229b(a).

4 Cases that cite this headnote

**[6]**   **Aliens, Immigration, and Citizenship**   Jurisdiction and venue

Court of Appeals retains its jurisdiction to review constitutional and legal questions regarding special rule cancellation of removal under Nicaraguan Adjustment and Central American Relief Act (NACARA), recognizing that ultimate granting of relief is not a matter of right under any circumstances but rather is in all cases a matter of grace to be determined by the Attorney General. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), 8 U.S.C.A. §§ 1229a(c)(4), 1229b(b); Immigration and Nationality Act, § 242(a)(2)(B, D), 8 U.S.C.A. § 1252(a)(2)(B, D).

2 Cases that cite this headnote

**[7]**   **Aliens, Immigration, and Citizenship**   Review of initial decision or administrative review
**Aliens, Immigration, and Citizenship**   Law questions

The Court of Appeals reviews de novo legal questions raised in petitions for review of Board of Immigration Appeals (BIA) determinations; where the BIA issues its own opinion without adopting the Immigration Judge's opinion, the Court of Appeals reviews only the decision of the BIA.

1 Cases that cite this headnote

**[8]**   **Aliens, Immigration, and Citizenship**   Cancellation of Removal or Suspension of Deportation in General

Alien, a Guatemalan national, entered the United States free from official restraint, as required for special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act (NACARA), even though alien was not credible as to when or how he entered the United States, where the first report of alien's presence in

the United States was by a border patrol agent who apprehended him 17 miles from the border. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 304(a), ⬜ 8 U.S.C.A. § 1229a(c)(4).

4 Cases that cite this headnote

[9]    **Evidence** ⚷ Evidence introduced by adverse party

A party may satisfy his burden of proof by pointing to evidence supplied by his adversary.

[10]   **Administrative Law and Procedure** ⚷ Change of policy; reason or explanation

If an agency follows, by settled course of adjudication, a general policy by which its exercise of discretion will be governed, an irrational departure from that policy constitutes grounds for reversal.

[11]   **Administrative Law and Procedure** ⚷ Explanation or reasons for change

An agency may depart from its own precedent only if it offers a reasoned explanation for doing so.

**Attorneys and Law Firms**

**\*337  ARGUED:** Cherylle C. Corpuz, Cherylle C. Corpuz, Esq. PC, Philadelphia, Pennsylvania, for Petitioner. Jeffery R. Leist, United States Department of Justice, Washington, D.C., for Respondent. **ON BRIEF:** Stuart F. Delery, Assistant Attorney General, Ernesto H. Molina, Jr., Assistant Director, Andrew N. O'Malley, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

Before MOTZ, KING, and DUNCAN, Circuit Judges.

**Opinion**

Petition granted and case remanded by published opinion. Judge MOTZ wrote the majority opinion, in which Judge KING joined. Judge DUNCAN wrote a dissenting opinion.

DIANA GRIBBON MOTZ, Circuit Judge:

Oscar Angel De Leon, a Guatemalan national residing in the United States, petitions **\*338** for review of the decision of the Board of Immigration Appeals (BIA) denying his application for "special rule" cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act (NACARA). For the reasons that follow, we grant the petition for review and remand the case to the BIA for further proceedings.

I.

In 1997, Congress enacted NACARA to amend the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). *See* ⬜ *Appiah v. INS,* 202 F.3d 704, 707 (4th Cir.2000). NACARA authorizes individuals from certain countries—including Guatemala—to seek discretionary relief from removal under the more lenient standards that predated IIRIRA. *See Gonzalez v. Holder,* 673 F.3d 35, 37 (1st Cir.2012). Congress passed NACARA to correct a provision of IIRIRA "that would

have had the effect of changing the rules in the middle of the game for thousands of Central Americans and others who came to the United States because their lives and families had been torn apart by war and oppression." *Appiah,* 202 F.3d at 710 (quotation marks omitted).

Section 203 of NACARA allows aliens from Guatemala to apply for what is known as "special rule" cancellation of removal. 8 U.S.C. § 1229b. An applicant for special rule cancellation of removal must satisfy a number of requirements, only one of which is at issue here: the applicant must prove that he was not "apprehended at the time of entry" if he entered the United States on any occasion after December 31, 1990. 8 C.F.R. § 1240.61(a)(1).

**[1]** "Entry" into the United States for immigration purposes requires more than setting foot on American soil. As defined by the BIA, "entry" requires (1) a crossing into the territorial limits of the United States; (2) inspection and admission by an immigration officer or actual and intentional evasion of inspection; and (3) freedom from official restraint.[1] *In re Pierre,* 14 I. & N. Dec. 467, 468 (BIA 1973). This case concerns the meaning of the phrase "freedom from official restraint."

**[2]** An alien enters free from official restraint only if he experiences some degree of liberty in the United States before the government apprehends him. Thus, freedom from official restraint "means that the alien who is attempting entry is no[t] under constraint emanating from the government that would otherwise prevent [him] from physically passing on." *Correa v. Thornburgh,* 901 F.2d 1166, 1172 (2d Cir.1990). An alien detained at a border crossing or customs enclosure, for example, cannot claim an "entry" merely because he has technically crossed into United States territory. *See, e.g., id.* at 1169; *Sidhu v. Ashcroft,* 368 F.3d 1160, 1165 (9th Cir.2004).

**[3]** **[4]** The BIA has explained that official restraint "may take the form of surveillance, unbeknownst to the alien." *Pierre,* 14 I. & N. Dec. at 469. Such surveillance constitutes official restraint because an alien who is under surveillance by a government official "lacks the freedom to go at large and mix with the population." *Id.* An alien kept under surveillance **\*339** by the government is not free from official restraint even if officials permit him to proceed some distance beyond the border before physically intercepting him. *See, e.g., United States v. Gonzalez–Torres,* 309 F.3d 594, 599 (9th Cir.2002). But the critical question is whether the alien is in fact free from official restraint, not whether or how the alien has exercised such freedom. *In re Patel,* 20 I. & N. Dec. 368, 374 (BIA 1991).

**[5]** An applicant for cancellation of removal under NACARA must proceed through a "two-step process." *Rodriguez v. Gonzales,* 451 F.3d 60, 62 (2d Cir.2006) (per curiam). First, the applicant bears the burden of establishing his eligibility for relief. That is, he must prove by a preponderance of the evidence that he meets all requirements for special rule cancellation of removal—including that he entered the United States "free from official restraint." 8 U.S.C. § 1229a(c)(4); *In Re G–,* 20 I. & N. Dec. 764, 770–71 (BIA 1993). Second, if the alien "satisfies the statutory requirements, the Attorney General in his discretion decides whether to grant or deny relief." *Rodriguez,* 451 F.3d at 62; *see also* 8 U.S.C. § 1229b (a).

**[6]** Congress has strictly limited our jurisdiction to review the Attorney General's resolution of NACARA applications. The denial of special rule cancellation of removal is final and "not subject to judicial review," except for "constitutional claims or questions of law" arising from the denial. 8 U.S.C. § 1252(a)(2)(B), (D); *see also Barahona v. Holder,* 691 F.3d 349, 353 (4th Cir.2012). Such "constitutional claims or questions of law" typically arise from rulings made at the first step of the application process—whether the alien proved eligibility for relief. We retain our jurisdiction to review these constitutional and legal questions recognizing that the ultimate granting of relief is "not a matter of right under any circumstances but rather is in all cases a matter of grace" to be determined by the Attorney General. *Rodriguez,* 451 F.3d at 62 (quoting *INS v. St. Cyr,* 533 U.S. 289, 307–08, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)).

[7]   We review de novo legal questions raised in petitions for review. 📖 *Higuit v. Gonzales,* 433 F.3d 417, 420 (4th Cir.2006). Where, as here, the BIA "issue[s] its own opinion without adopting the IJ's opinion," we review only the decision of the BIA. 📖 *Martinez v. Holder,* 740 F.3d 902, 908 (4th Cir.2014).

With this understanding of NACARA in mind, we turn to the underlying facts and procedural history of this case.

## II.

Born in Guatemala, De Leon first entered the United States illegally with his uncle in 1988. During his early years in the United States he travelled among various east coast states performing agricultural work, ultimately settling in Delaware.

In July 2003, a border patrol agent, Galen Huffman, apprehended De Leon north of the Arizona–Mexico border as he returned to the United States from an unauthorized trip to Latin America. According to Agent Huffman's written report, on July 30, he observed a pickup truck at "milepost nine" of Arivaca Road near Sasabe, Arizona, approximately seventeen miles north of the border. There, he saw a number of persons attempting to conceal themselves in the truck bed. Agent Huffman followed the truck eight more miles before stopping it at milepost seventeen and apprehending its passengers, including De Leon.

Shortly after De Leon's apprehension by Agent Huffman, immigration officials released him on bond. He currently resides **\*340** in Delaware with his wife and his three United States-citizen children.

In 2005, De Leon submitted an application for special rule cancellation of removal under NACARA, as well as applications for other forms of immigration relief. An immigration judge (IJ) denied these applications and ordered De Leon removed to Guatemala. The BIA affirmed the IJ's denial of De Leon's other applications, but concluded that the IJ provided an improper basis for denying NACARA relief. [2] Accordingly, the BIA remanded the case for the IJ to reconsider whether De Leon qualified for special rule cancellation of removal under NACARA.

In May 2010, the IJ held a hearing to reevaluate this issue. The judge determined that De Leon's eligibility for NACARA relief now depended on whether he was apprehended at his "time of entry" when he crossed into the United States in July 2003. Counsel for the government stated that she "th[ought] [De Leon] met all of the other requirements" for NACARA eligibility.

At the hearing, the parties primarily disputed the circumstances surrounding De Leon's return to the United States in July 2003. De Leon contended that he crossed the border on foot several days before July 30, walked for six or seven hours within the United States, stopped to rest at a smugglers' "ranch," boarded a pickup truck, and drove for three more hours before being apprehended near Tucson, Arizona. But the government, relying on Agent Huffman's report, maintained that De Leon boarded a pickup truck in Mexico on July 30 and that he was apprehended later that day when Agent Huffman first observed the truck at milepost nine, seventeen miles north of the border. The government acknowledged that Agent Huffman may have apprehended De Leon "a slight distance away from the border." But, comparing this issue to "extended border search [es]," which officers may conduct without violating the Fourth Amendment if they apprehend an alien within twenty-five miles of the border, the government argued that De Leon was effectively apprehended at the border at his "time of entry" for purposes of NACARA.

The IJ agreed with the government. In an oral ruling, the IJ pointed to numerous inconsistencies in De Leon's testimony and found him not credible as to "the issue of the date and location of his entry and the circumstances surrounding his entry." The IJ found that Agent Huffman provided the most credible evidence regarding De Leon's return to the United States. That evidence showed that De Leon was apprehended "within 25 miles of the border." Borrowing from the border-search context, the IJ held that this qualified as an apprehension "at the border or at the functional equivalent of the border." On this basis, the IJ concluded that De Leon's arrest constituted apprehension "at the time of his entry" into the United States, precluding NACARA relief.

She therefore again denied De Leon's application for special rule cancellation of removal under NACARA and ordered him removed to Guatemala.

The BIA affirmed. Perhaps recognizing that different standards govern whether border officials may search aliens near the border without violating the Fourth Amendment and whether such aliens have affected an "entry" for purposes of NACARA, the BIA did not adopt the IJ's **\*341** rationale. But the BIA did agree with the IJ's "ultimate conclusion" that De Leon failed to meet his burden of proof that he was not apprehended at his "time of entry." The BIA found that Agent Huffman provided "the only credible and reliable evidence" regarding De Leon's entry. In light of this evidence, the BIA recognized that it appeared that De Leon "crossed into the territorial limits of the United States and was intentionally evading inspection." But the BIA held that De Leon failed to present "clear evidence that he was ever 'free from official restraint.' "

De Leon then filed this petition for review.

## III.

**[8]**    Given our limited jurisdiction over this petition, De Leon accepts, as he must, the facts as found in the proceedings below. Thus, on appeal, he concedes that he entered this country on July 30, 2003, and that on that day Agent Huffman observed him at milepost nine of Arivaca Road—seventeen miles north of the border—and took him into custody eight miles later. De Leon similarly accepts that, in order to prove that he was not apprehended at his "time of entry," he must prove (1) a crossing into United States territory, (2) admission by or evasion from an immigration officer, and (3) freedom from official restraint. De Leon Reply Br. 1–2. Further, he recognizes that official restraint may take the form of government surveillance.[3]

De Leon contends that, accepting these facts and applying these principles, the only credible evidence establishes that he entered the United States free from official restraint. He claims the BIA erred as a matter of law in concluding otherwise.

Because the BIA issued its own opinion without adopting the IJ's rationale, we review only the BIA's opinion. *See Martinez,* 740 F.3d at 908. The BIA dismissed De Leon's appeal on the ground that De Leon failed to "present [ ] clear evidence that he was ever 'free from official restraint.' " Noting that official restraint "may take the form of surveillance, unbeknownst to the alien," the BIA reasoned that it remained unclear "at what point [De Leon] actually entered the United States, how much time had passed before he was spotted by Agent Huffman, and how far from the border he had travelled before being detained."

The Attorney General defends the BIA's ruling primarily by emphasizing the applicable burden of proof.[4] The Attorney General contends that, in failing to provide credible evidence regarding the circumstances of his entry, De Leon did not satisfy his burden of proving an entry free from official restraint.

**[9]**    We disagree. De Leon did indeed bear the burden of proving that he entered the United States free from official restraint. **\*342** *See Pastora v. Holder,* 737 F.3d 902, 905 (4th Cir.2013). But he met that burden by relying on Agent Huffman's written report, which, the BIA expressly found, constituted the "*only* credible and reliable evidence" in the record and showed that Agent Huffman "*first* saw" De Leon at milepost nine, seventeen miles beyond the border. That the government, rather than De Leon, offered this evidence makes no difference. As Judge Friendly noted long ago, a party may satisfy his burden of proof by pointing to evidence supplied by his adversary. *See United States v. Riley,* 363 F.2d 955, 958 (2d Cir.1966) (explaining that a defendant may meet his burden of proving an affirmative defense by pointing to evidence supplied "by the Government itself"). Of course, a party will rarely introduce evidence that proves his adversary's case. But if he does, nothing prevents the adversary from using that evidence to his benefit.

We applied this principle in *United States v. Hicks,* 748 F.2d 854, 857 (4th Cir.1984), where "evidence adduced by the government"—but never once mentioned by the defendant—nevertheless provided a basis for the defendant to assert an alibi defense. Numerous other cases confirm that a party may rely on its opponent's evidence to make its own case. *See, e.g., United States v. Hairston,* 64 F.3d 491, 495 (9th Cir.1995) (defendant could assert alibi defense even though evidence supporting it was introduced by government); *United States v. Ortiz–Rengifo,* 832 F.2d 722, 725 (2d Cir.1987) (government could rely on evidence supplied by the defendant to carry its burden of proof); *United States v. Webster,* 769 F.2d 487, 490 (8th Cir.1985) (defendant could rely on " 'any' evidence, whether 'defense' evidence or 'government' evidence," to make his case); *In re Brogna,* 589 F.2d 24, 27 (1st Cir.1978) (the "government's own evidence ... without more" satisfied a witness's burden of establishing Fifth Amendment privilege).

The Attorney General offers no reason why this principle does not apply in the immigration context, and we see none. Indeed, recent case law suggests that it does indeed apply in that context. The Third Circuit, for example, has held that State Department country reports "are probative evidence and can, by themselves, provide sufficient proof to sustain an alien's burden"—without so much as hinting that the alien must supply this evidence himself. *Zubeda v. Ashcroft,* 333 F.3d 463, 477 (3d Cir.2003). A number of other courts have relied on documents submitted by the government as evidence helping to demonstrate an alien's eligibility for relief. *See, e.g., Gomes v. Gonzales,* 473 F.3d 746, 756 (7th Cir.2007) (granting asylum applicant's petition for review in part because "the State Department Reports themselves" helped establish a well-founded fear of persecution); *Chanchavac v. INS,* 207 F.3d 584, 592 (9th Cir.2000) (noting that evidence introduced by the INS "gives us further reason to believe [the alien's] fears are warranted").

Given that government surveillance can amount to official restraint, De Leon came under restraint as soon as Agent Huffman spotted him at milepost nine—where the BIA found that Agent Huffman "first saw" him and began following him. The BIA did not suggest, let alone find, that before arriving at milepost nine De Leon was under any "constraint emanating from the government that would otherwise prevent [him] from physically passing on." *Correa,* 901 F.2d at 1172. Before any government official first observed him, De Leon necessarily enjoyed the "freedom to go at large and mix with the population" unconstrained by government surveillance. *343 *Pierre,* 14 I. & N. Dec. at 469. He therefore entered free from official restraint. [5]

The BIA remarked that neither Agent Huffman's report nor De Leon's testimony established where De Leon crossed the border or the distance he travelled before ultimately being apprehended at milepost nine. Although it is not clear, the BIA may have relied on the absence of evidence on these points to hold that De Leon did not enter the country free from official restraint. The dissent similarly finds importance in the asserted lack of evidence as to the "circumstances of De Leon's entry"—i.e., "when and how he entered the United States." [6]

But, as the BIA's own published precedent establishes, the "circumstances" that the BIA and the dissent find critical simply do not bear on the issue of official restraint. In the case of *In re Z–,* 20 I. & N. Dec. 707 (BIA 1993), for example, the BIA concluded that an alien who disembarked illegally in San Francisco and was apprehended some time later "somewhere in the vicinity" of the harbor entered free from official restraint. *Id.* at 707, 713. As in this case, the alien bore the burden of proving freedom from official restraint. *Id.* at 710. And as in this case, the record did not reflect the distance the alien travelled, the precise amount of time he spent in the country before being apprehended, or how he occupied this time. But the BIA found it sufficient that he "*could have* exercised" his freedom to move about the city. *Id.* at 714 (emphasis added). Whether he chose to exercise this freedom was "of no consequence." *Id.* [7]

*344 [10]  [11]  The BIA has adhered to this approach in a number of unpublished decisions affirmed by courts of appeals. *See, e.g., Nyirenda v. INS,* 279 F.3d 620, 624–25 (8th Cir.2002); *Cheng v. INS,* 534 F.2d 1018, 1019 (2d Cir.1976) (per

curiam). Some of these cases arose under a different statutory provision whereby a finding that the alien entered free from official restraint rendered the alien deportable—the outcome the government sought in those cases. Here, by contrast, a finding that De Leon entered free from official restraint would qualify him for cancellation of removal—an outcome the government opposes. The BIA cannot apply its official-restraint standard broadly when broadness favors the government's position and narrowly when it does not. If an agency follows "by settled course of adjudication[ ] a general policy by which its exercise of discretion will be governed, an irrational departure from that policy" constitutes grounds for reversal. *INS v. Yueh–Shaio Yang,* 519 U.S. 26, 32, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996). Indeed, an agency may depart from its own precedent only if it offers a "reasoned explanation" for doing so. *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 516, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). The BIA failed to provide such a "reasoned explanation" here.

We finally note that every circuit to consider the issue has concluded that an alien first observed by a government agent miles (or less) beyond the United States border has entered free from official restraint—regardless of whether the party bearing the burden of proof has offered evidence of the "circumstances" of the alien's entry. *See United States v. Cruz–Escoto,* 476 F.3d 1081, 1085–86 (9th Cir.2007) (alien first observed 150 yards beyond the border entered free from official restraint even where officer "did not see [the alien] cross the border and could not say how or where [the alien] entered the United States"); *Nyirenda,* 279 F.3d at 624 (alien stopped after driving "out of sight" for two miles in the United States entered free from official restraint); *Castellanos–Garcia,* 270 F.3d at 774–76 (alien first seen walking "at least 100 yards from the border" entered free from official restraint even though neither party submitted evidence "about [the alien's] exact point of entry"); *Cheng,* 534 F.2d at 1019 (alien first discovered driving less than a mile beyond the border entered free from official restraint); *United States v. Martin–Plascencia,* 532 F.2d 1316, 1317 (9th Cir.1976) (alien apprehended fifty yards beyond the border entered free from official restraint). [8] We decline to disregard this overwhelming body of precedent by holding to the contrary.

IV.

For all of these reasons, we grant the petition for review and remand the case to **\*345** the BIA to consider De Leon's application for NACARA relief in light of the proper legal standard. We express no opinion as to whether De Leon meets all of the criteria for NACARA eligibility. If he is eligible for NACARA relief, such eligibility "in no way limits the considerations that may guide the Attorney General in exercising [his] discretion to determine" whether to accord De Leon relief. *Yueh–Shaio Yang,* 519 U.S. at 31, 117 S.Ct. 350. The Attorney General retains his authority to determine whether De Leon should be granted special rule cancellation of removal.

*PETITION GRANTED AND CASE REMANDED*

DUNCAN, Circuit Judge, dissenting:

It is undisputed that De Leon presents no credible evidence to carry his burden of proving freedom from official restraint upon entry into the United States as required by NACARA. 8 U.S.C. § 1229a(c)(4); *In re G–,* 20 I. & N. Dec. 764, 770–71 (BIA 1993). Although the majority recites that fact, it fails to recognize its analytical significance. To be clear, I am not, as the majority mistakenly appears to believe, requiring De Leon to prove a negative—i.e. that he was not under official restraint prior to being observed by Agent Huffman. I simply seek to hold him to his statutory burden of presenting some credible evidence regarding the circumstances of his entry into the United States. Because he presents none, not even as to the passage of time, I respectfully dissent.

To establish freedom from official restraint, an applicant must prove that he was "free[ ] to go at large and mix with the population" between the time he entered the United States and the time he was apprehended. *In re Pierre,* 14 I. & N. Dec. 467, 469 (BIA 1973). The government acknowledged at oral argument, that had De Leon been found credible by the Immigration Judge, his testimony would have established the circumstances of his entry, and I agree. *See Matter of G–,* 20 I. & N. Dec. 764, 777 (BIA 1993).

Indeed, as the BIA explained below, the law requires only that De Leon establish the circumstances of his entry into the United States by providing some credible evidence regarding when and how he entered the United States. Joint Appendix 4–5. Here, because De Leon is not credible, we have evidence only of his apprehension by Agent Huffman. We know nothing of the circumstances of De Leon's entry, including whether he was observed by a government official. [*] The absence of evidence is not evidence of absence. Yet, **\*346** the majority finds Agent Huffman's report sufficient to establish that De Leon "necessarily enjoyed" freedom from official restraint before being observed by Agent Huffman at "milepost nine." Maj. Op. 342. There is no basis whatsoever in the record for this assumption, particularly when it is drawn in favor of the party bearing the statutory burden of proof.

Where "there is no clear evidence of the facts determinative of the entry issue, th[e] case[ ] ultimately must be resolved on where the burden of proof lies." *Matter of G–,* 20 I. & N. Dec. at 777. Here, the adverse credibility ruling means that we have *no* evidence regarding De Leon's entry. By holding that De Leon nonetheless prevails, the majority necessarily and without explanation shifts to the government the burden of proving what happened before De Leon was apprehended. This is contrary to law.

Because the majority ignores the significance of the adverse credibility ruling and, as a result, misallocates the burden of proof, I respectfully dissent.

**All Citations**

761 F.3d 336

**Footnotes**

1    Although we have never formally adopted the BIA's definition of "entry," our published cases addressing the entry question comport with the BIA's standard. *See Chen Zhou Chai v. Carroll,* 48 F.3d 1331, 1343 (4th Cir.1995); *Lazarescu v. United States,* 199 F.2d 898, 900 (4th Cir.1952). Because De Leon does not challenge this standard, we assume, without deciding, that it applies here.

2    The IJ had ruled that De Leon failed to document that he registered prior to December 31, 1991—a prerequisite for obtaining NACARA relief as a Guatemalan national. But the BIA held that De Leon's credible testimony, in addition to a letter from his attorney verifying that he had registered, satisfied this criterion.

3    Hence, De Leon does not challenge the IJ's adverse credibility ruling or contend that the government bears the burden of proof. And neither do we. Rather, we accept the IJ's adverse credibility ruling and evaluate whether De Leon satisfied his burden of proof in light of the facts found below.

4    The Attorney General also briefly contends that we must deny this petition because De Leon assertedly challenges (1) the agency's findings of fact, which we lack jurisdiction to review, and (2) the BIA's three-part "entry" standard, which deserves *Chevron* deference. Both arguments are meritless. First, this case presents a pure question of law, as

the many appellate opinions assessing freedom from official restraint confirm. *See* *Sidhu,* 368 F.3d at 1164 (citing cases). Second, we need not determine whether the BIA's "entry" standard warrants *Chevron* deference because, even if it does, De Leon does not challenge this standard. Indeed, he embraces it and asks us to apply it.

5    The BIA's citation to *Pierre,* 14 I. & N. Dec. at 469—which parenthetically noted that official restraint "may take the form of surveillance, unbeknownst to the alien"—could be construed as holding that an alien must also prove that no government official observed him *without his knowledge.* De Leon argues that this would impose an insurmountable burden, and that no alien could hope to qualify for NACARA relief under this approach. The Attorney General does not disagree. Indeed, the Attorney General expressly rejects as "incorrect" any contention that the BIA imposes this "additional burden." Att'y Gen. Br. 29. The Attorney General suggests that the language from *Pierre* merely affirms the undisputed proposition that government surveillance alone—as opposed to physical apprehension—can constitute official restraint. We agree with the Attorney General that *Pierre* does not require an alien to meet the impossible burden of proving that no government official observed him "unbeknownst to [himself]." The only other appellate court to address the question, albeit in a case where the government bore the burden of proof, came to the same conclusion. *See*

*United States v. Castellanos–García,* 270 F.3d 773, 776 (9th Cir.2001).

6    The dissent suggests that De Leon cannot prevail for one additional reason: his asserted failure to offer credible evidence as to "whether he was observed by a government official" at the time of his entry. The BIA, however, did not deny relief on this ground. Rather, the BIA's sole rationale for denying De Leon's claim was that discussed in text above—that De Leon had failed to present "clear evidence that he was ever 'free from official restraint' as it is unclear at what point [he] actually entered the United States, how much time had passed before he was spotted by Agent Huffman, and how far from the border he had travelled before being detained." Of course, we cannot uphold the BIA's ruling on a ground never relied on by the agency. *See* *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

7    The dissent contends that our reliance on *In re Z–* is misplaced. But we rely on *In re Z–* only to show that the BIA itself has previously recognized the irrelevance of the specific factors on which it relied here in denying De Leon relief; i.e. the absence of evidence of "the point [at which De Leon] actually entered the United States, how much time had passed before he was spotted by Agent Huffman, and how far from the border he had travelled before being detained." The dissent apparently believes the BIA should have denied De Leon's claim on the ground that he failed to establish "a lapse in time between his unwitnessed entry and his apprehension." But the BIA did not deny relief on this ground and so we cannot affirm the BIA on this basis. *See supra* n. 6.

8    A narrow circuit division has emerged regarding aliens who cross the border unseen but are detected mere yards away. *Compare* *United States v. Cruz–Escoto,* 476 F.3d 1081, 1085–86 (9th Cir.2007) (aliens "who evade government observation while crossing the border are deemed to be free from official restraint, regardless of the distance they travel between entry and arrest") *with* *Yang v. Maugans,* 68 F.3d 1540, 1550 (3d Cir.1995) ("the mere fact that [an alien] may have eluded the gaze of law enforcement for a brief period of time" after entry "is insufficient, in and of itself, to establish freedom from official restraint"). We need not pick a side in this debate, however, because neither line of precedent undermines the conclusion that an alien who rode in a car, undetected, for at least seventeen miles into the United States entered the country "free from official restraint."

*    In *In re Z–,* 20 I. & N. Dec. 707 (1993), the BIA found both the circumstances of the applicant's entry into the United States and the fact that the record established a lapse in time between his unwitnessed entry and his apprehension relevant in holding that the applicant carried his burden of proving freedom from official restraint. *Id.* at 708, 713–14. Contrary to the majority's contention, therefore, the BIA quite properly applied its precedent in holding that De Leon failed to establish freedom from official restraint because he failed to present any comparable evidence, or, in fact, any evidence at all to carry his burden of proof. I would equally properly affirm for that reason.

I also feel compelled to once point out yet again that the *only* thing I would do is hold De Leon to his statutory burden of presenting some credible evidence regarding the circumstances of his entry into the United States. Had De Leon himself been credible, this would have been enough. The majority strains to give the impression that the dissent would create some untethered obligation out of whole cloth, as opposed to recognizing—as it does not—the burden of proof imposed

by law. Were the majority to point to some legally cognizable evidence of the circumstances of entry, I would gladly yield. It proffers none—not the proverbial scintilla. And mischaracterizing the dissent will not fill that analytical void.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.04459    11

11 Cal. Daily Op. Serv. 10,573, 2011 Daily Journal D.A.R. 12,595

KeyCite Yellow Flag - Negative Treatment

Distinguished by Avendano-Hernandez v. Lynch, 9th Cir.(Cal.), September 3, 2015

648 F.3d 1095
United States Court of Appeals,
Ninth Circuit.

Hernan Ismael DELGADO, Petitioner,

v.

Eric H. HOLDER Jr., Attorney General, Respondent.

No. 03–74442.
|
Argued and Submitted Dec. 16, 2010.
|
Filed Aug. 19, 2011.

**Synopsis**

**Background:** Alien petitioned for review of a decision of the Board of Immigration Appeals (BIA), 563 F.3d 863, affirming an immigration judge's (IJ) ruling that he was ineligible for asylum, withholding of removal and withholding under the Convention Against Torture (CAT), and ordering him removed to his native El Salvador.

**Holdings:** On rehearing en banc, the Court of Appeals, Fisher, Circuit Judge, held that:

[1] court had jurisdiction to review BIA's determination that alien had been convicted of a "particularly serious crime;" overruling Matsuk v. INS, 247 F.3d 999;

[2] for purposes of withholding of removal, "particularly serious crimes" were not limited to statutorily defined aggravated felonies; and

[3] ambiguity as to basis for BIA's ruling that alien had committed a "particularly serious crime," and was thus barred from eligibility for asylum, and withholding of removal precluded meaningful review of Board's decision.

Petition granted in part and denied in part and case remanded.

Reinhardt, Circuit Judge, filed opinion concurring in part and concurring in the judgment.

**West Headnotes (9)**

[1] **Aliens, Immigration, and Citizenship** ⬤ Jurisdiction and venue

Court of Appeals has jurisdiction to review the Board of Immigration Appeals' (BIA) determination that an alien has been convicted of a "particularly serious crime" and is therefore ineligible for withholding of removal; overruling Matsuk v. INS, 247 F.3d 999. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 305(a), 8 U.S.C.A. § 1231; Immigration and Nationality Act, § 242(a)(2)(B)(ii), 8 U.S.C.A. § 1252(a)(2)(B)(ii).

32 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** ⬤ Discretionary or mandatory

Withholding of removal is not discretionary. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 305(a), 8 U.S.C.A. § 1231(b)(3)(A).

2 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship** ⬤ Discretionary or mandatory
**Aliens, Immigration, and Citizenship** ⬤ Eligibility; Refugee Status

Attorney General has discretion to grant asylum to any applicant who qualifies as a "refugee." Immigration and Nationality Act, § 208(b)(1), 8 U.S.C.A. § 1158(b)(1).

2 Cases that cite this headnote

[4] **Aliens, Immigration, and Citizenship** ⬤ Crimes and Related Grounds

For purposes of withholding of removal, "particularly serious crimes" are not limited

11 Cal. Daily Op. Serv. 10,573, 2011 Daily Journal D.A.R. 12,595

to statutorily defined aggravated felonies. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 305(a), 8 U.S.C.A. § 1231(b)(3)(B).

6 Cases that cite this headnote

[5]    **Administrative Law and Procedure** ⚷ Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** ⚷ Law questions

Board of Immigration Appeals' (BIA) precedential decisions interpreting the Immigration and Nationality Act are entitled to *Chevron* deference. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

12 Cases that cite this headnote

[6]    **Aliens, Immigration, and Citizenship** ⚷ Crimes and Related Grounds

For purposes of asylum, "particularly serious crimes" are not limited to offenses designated by the Attorney General by regulation; rather, Attorney General has the authority to designate offenses as particularly serious crimes through case-by-case adjudication of individual asylum applications. Immigration and Nationality Act, § 208(b)(2)(A)(ii), 8 U.S.C.A. § 1158(b)(2)(A)(ii).

13 Cases that cite this headnote

[7]    **Aliens, Immigration, and Citizenship** ⚷ Crimes and Related Grounds

A crime is a "particularly serious crime," and thus barred from eligibility for asylum, and withholding of removal, if the nature of the conviction, the underlying facts and circumstances and the sentence imposed justify the presumption that the convicted immigrant is a danger to the community. Immigration and Nationality Act, § 208(b)(2)(A)(ii), 8 U.S.C.A. § 1158(b)(2)(A)(ii); Illegal Immigration Reform and Immigrant

Responsibility Act of 1996, § 305(a), 8 U.S.C.A. § 1231(b)(3)(B)(ii).

21 Cases that cite this headnote

[8]    **Aliens, Immigration, and Citizenship** ⚷ Decision or Order

**Aliens, Immigration, and Citizenship** ⚷ Remand

Ambiguity as to basis for Board of Immigration Appeals' (BIA) ruling that alien had committed a "particularly serious crime," and was thus barred from eligibility for asylum, and withholding of removal precluded meaningful judicial review of Board's decision, thus warranting remand to BIA for clear explanation; Board's analysis did not disclose which of alien's crimes it considered particularly serious or what led the it to find his crime particularly serious, given that BIA may have determined that one or more of alien's three DUI convictions individually rose to the level of a particularly serious crime, that alien's three convictions, when viewed cumulatively, rose to the level of a particularly serious crime, or that one of the convictions, presumably the third, rose to the level of a particularly serious crime in light of alien's two earlier convictions. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 208(b)(2)(A)(ii), 8 U.S.C.A. § 1158(b)(2)(A)(ii); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 305(a), 8 U.S.C.A. § 1231(b)(3)(B)(ii).

48 Cases that cite this headnote

[9]    **Aliens, Immigration, and Citizenship** ⚷ Weight and Sufficiency

**Aliens, Immigration, and Citizenship** ⚷ Country conditions; official reports

Substantial evidence supported Board of Immigration Appeals' (BIA) determination that alien was not entitled to relief under Convention Against Torture (CAT); record reflected that conditions in El Salvador had improved, that it was not more likely than not, that he would be tortured at the instigation of, or with the

acquiescence of the Salvadoran government, and that the political violence that led to the murder of his parents has ended. 8 C.F.R. §§ 1208.17(a), 1208.18(a)(1).

16 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1096** Niels W. Frenzen (argued), University of Southern California Gould School of Law, Los Angeles, CA, and J. Thomas Logan, Los Angeles, CA, for the petitioner.

Tony West, Assistant Attorney General, Civil Division, Linda S. Wernery, Assistant Director, and Erica B. Miles (argued), Attorney, U.S. Department of Justice, Washington, D.C., for the respondent.

Stephen W. Manning, Jennifer M. Rotman and Jessica M. Boell, Immigrant Law Group PC, Portland, OR, for amicus curiae American Immigration Lawyers Association.

**\*1097** H. Elizabeth Dallam, Office of the United Nations High Commissioner for Refugees, Washington, D.C., for amicus curiae Office of the United Nations High Commissioner for Refugees.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXXX–XX1–226.

Before: ALEX KOZINSKI, Chief Judge, WILLIAM C. CANBY, STEPHEN REINHARDT, DIARMUID F. O'SCANNLAIN, M. MARGARET McKEOWN, RAYMOND C. FISHER, JAY S. BYBEE, CONSUELO M. CALLAHAN, CARLOS T. BEA, MILAN D. SMITH, JR. and N. RANDY SMITH, Circuit Judges.

Opinion by Judge FISHER; Partial Concurrence and Partial Dissent by Judge REINHARDT.

## OPINION

FISHER, Circuit Judge:

Hernan Ismael Delgado petitions for review of a decision of the Board of Immigration Appeals (BIA) ordering him removed to his native El Salvador. The BIA affirmed the immigration judge's (IJ) ruling that Delgado was ineligible for asylum, withholding of removal and withholding under the Convention Against Torture (CAT) because he had been "convicted of a particularly serious crime"—driving under the influence (DUI). 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(b)(3)(B)(ii). The BIA also ruled that Delgado was ineligible for deferral of removal under CAT because he failed to prove a likelihood of future torture. We grant the petition in part, deny it in part and remand to the BIA.[1] We hold as follows:

First, we hold that we have jurisdiction to review the BIA's determination that an alien has been convicted of a "particularly serious crime" and is therefore ineligible for withholding of removal. We held otherwise in Matsuk v. INS, 247 F.3d 999 (9th Cir.2001), relying on 8 U.S.C. § 1252(a)(2)(B)(ii), which strips us of jurisdiction to review "any ... decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified ... to be in the discretion of the Attorney General or the Secretary of Homeland Security."[2] We now overrule Matsuk in light of the Supreme Court's decision that § 1252(a)(2)(B)(ii) bars judicial review "only when Congress itself set out the Attorney General's discretionary authority in the statute." Kucana v. Holder, 558 U.S. 233, 130 S.Ct. 827, 837, 175 L.Ed.2d 694 (2010).

Second, we hold that, for purposes of withholding of removal, an offense need not be an aggravated felony to be a particularly serious crime. The BIA has so held in a precedential decision, In re N–A–M– (N–A–M– I), 24 I. & N. Dec. 336, 337 (B.I.A.2007). That decision is entitled to deference under Chevron U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, that driving under the influence is not statutorily defined as an aggravated felony **\*1098** does not preclude the BIA from determining that DUI can be a particularly serious crime.

Third, we hold that, for asylum purposes, the Attorney General has the authority to designate offenses as particularly serious crimes through case-by-case adjudication as well as regulation. The BIA—as the Attorney General's delegate —was thus permitted in this case to determine whether

Delgado's DUI offenses were particularly serious for purposes of asylum eligibility. [3]

The remaining question is whether the BIA properly concluded that Delgado was convicted of a particularly serious crime and thus barred from eligibility for withholding of removal and asylum. The BIA's explanation for its decision is so ambiguous that we cannot conduct meaningful judicial review. We therefore remand to the BIA for a clear explanation. *See Su Hwa She v. Holder,* 629 F.3d 958, 963–64 (9th Cir.2010); *Eneh v. Holder,* 601 F.3d 943, 947 (9th Cir.2010).

## I. BACKGROUND

Delgado, a native and citizen of El Salvador, entered the United States on a nonimmigrant visitor visa in 1980. He fled El Salvador at age 10 after his mother and father were tortured and murdered for their political opinions. Delgado overstayed his visa and has remained in the United States since his entry in 1980. During his time in the United States, he has been convicted of DUI three times.

Delgado's first DUI conviction was in 1992. That conviction arose from an accident occurring when the vehicle he was driving collided with another vehicle. Both Delgado and his passenger suffered broken legs; it is not clear whether anyone in the other vehicle was injured. He received a one-year jail sentence.

His second DUI conviction occurred in 2000. Delgado was stopped for driving 85 miles an hour and weaving on a highway. He failed a field sobriety test, pled guilty to DUI and received a 16–month prison sentence. Upon his release on parole in July 2001, the Immigration and Naturalization Service (INS) took him into custody and initiated removal proceedings against him. [4] The INS charged that Delgado was removable for overstaying his 1980 visa and because his latest DUI was an aggravated felony. [5] An immigration judge released Delgado on bond.

Delgado's third DUI conviction followed. In December 2001, while Delgado was still on parole and had a suspended license, he was stopped for unsafe driving after being observed weaving between lanes on an interstate highway.

His blood alcohol level was 0.12. He was convicted of DUI and sentenced to two years' imprisonment.

At his subsequent immigration hearing, Delgado, proceeding pro se, conceded removability but sought asylum, withholding of removal, CAT withholding and CAT deferral, claiming that he would be persecuted if returned to El Salvador. [6]

**\*1099** The IJ denied Delgado's applications for withholding of removal, asylum and CAT withholding. In each case, the IJ concluded that Delgado was ineligible for relief because he had been convicted of a particularly serious crime. The IJ "conduct[ed] an individualized hearing to determine whether [Delgado's] convictions individually or cumulatively constitute[d] particularly serious crimes," and determined that *each* of Delgado's three DUI convictions was a particularly serious crime that barred him from eligibility for asylum under § 1158(b)(2)(A)(ii), withholding of removal under § 1231(b)(3)(B)(ii) and CAT withholding under 8 C.F.R. § 1208.16(d)(2). In the alternative, the IJ concluded that Delgado's DUI offenses were "particularly serious crimes" when considered *cumulatively.*

The IJ also denied Delgado's request for CAT deferral under 8 C.F.R. § 1208.17. [7] The IJ accepted that Delgado's parents were killed in 1980 on account of their political activities, but found that, as a result of improved country conditions, Delgado did not show that it was more likely than not that he would be tortured were he returned to El Salvador.

The BIA affirmed in an unpublished, per curiam decision signed by one member of the Board. The decision stated that Delgado "presented no arguments on appeal that would cause us to reverse the Immigration Judge's decision." On the particularly serious crime question, the Board said only: "Based on the record before us, we agree with the Immigration Judge that the respondent is subject to removal from the United States based on ... his record of convictions which rise to the level of being a particular[ly] serious crime...."

## II. DISCUSSION

Delgado raises three principal arguments in his petition for review. First, he contends that the BIA lacked the authority

11 Cal. Daily Op. Serv. 10,573, 2011 Daily Journal D.A.R. 12,595

to treat his DUI offenses as particularly serious crimes for purposes of withholding of removal because only statutorily defined aggravated felonies can be treated as particularly serious crimes under 🚩 § 1231. Second, he contends that the BIA lacked the authority to treat his DUI offenses as particularly serious crimes for purposes of asylum because only aggravated felonies and offenses designated by the Attorney General *by regulation*—as opposed to case-by-case adjudication—can constitute particularly serious crimes under 📄 § 1158. Finally, Delgado argues that, even if the BIA had authority to treat his DUI offenses as particularly serious crimes for purposes of withholding of removal, asylum or both, the BIA erroneously concluded that his DUI offenses were in fact particularly serious. We address Delgado's arguments in turn. Before doing so, however, we consider our jurisdiction.

## A. Jurisdiction

**[1]** There is no question that we have jurisdiction over this case to the extent it involves questions of statutory interpretation. *See* 🚩 8 U.S.C. § 1252(a)(2)(D); 📄 *Ramadan v. Gonzales,* 479 F.3d 646, 648 (9th Cir.2007) (per curiam). Nevertheless, we previously held that we lacked jurisdiction to review the determination that a crime was particularly serious for purposes of withholding of removal. *See* 🚩 *Matsuk v.* **\*1100** *INS,* 247 F.3d 999, 1002 (9th Cir.2001). We decided that we lacked jurisdiction over the question because 📄 § 1231 directs the Attorney General to "decide" whether there was a conviction for a particularly serious crime and 📄 § 1252(a)(2)(B)(ii) provides that "no court shall have jurisdiction to review ... any ... decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under [§§ 1151–1381] to be in the discretion of the Attorney General or the Secretary of Homeland Security." [8] We concluded that the Attorney General's decision was discretionary within the meaning of 🚩 § 1252(a)(2)(B)(ii). Under *Matsuk,* we would be precluded from reaching Delgado's contention that the BIA improperly treated his DUI convictions as particularly serious crimes for purposes of his application for withholding of removal, but *Matsuk* is no longer good law. [9]

The government concedes *Matsuk* must be overruled in light of the Supreme Court's recent decision in 📄 *Kucana v. Holder,* 558 U.S. 233, 130 S.Ct. 827, 175 L.Ed.2d 694

(2010). *Kucana* explains that 🚩 § 1252(a)(2)(B)(ii) "bar[s] court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." 📄 *Id.* at 837. Under *Kucana,* a provision is not "specified ... to be in the discretion of the Attorney General" unless the statute explicitly refers to the discretion of the Attorney General. *See* 📄 *id.* at 836–37. The statute at issue here, 📄 § 1231(b)(3)(B)(ii), states that withholding of removal "does not apply ... if the Attorney General decides that ... the alien, having been convicted by a final judgment of a particularly serious crime[,] is a danger to the community of the United States." This provision does not explicitly vest discretion in the Attorney General. Accordingly, as the government concedes, we have jurisdiction to review such determinations. [10] Because *Matsuk* held otherwise, we overrule it.

## B. Statutory Framework

We begin with a brief overview of the statutory framework. Congress established the statutory right of aliens to request asylum and withholding of removal to bring the United States refugee law into conformity with the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 (the Protocol), to which the United States acceded in 1968. *See* 📄 *Barapind v. Reno,* 225 F.3d 1100, 1106 (9th Cir.2000). The Protocol incorporates the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees (the Convention), July 5, 1951, 189 U.N.T.S. 150. *See* 📄 *id.* (citing the Protocol, 19 U.S.T. at 6259, which reprints the Convention). Article 33 of the Convention, entitled "Prohibition of Expulsion or Return ('Refoulement')," provides that:

> 1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom **\*1101** would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.
>
> 2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final

judgment of a particularly serious crime, constitutes a danger to the community of that country.

19 U.S.C. at 6276.

Our immigration laws reflect these principles by providing for two different forms of relief from removal—withholding of removal and asylum. See In re S–M–J–, 21 I. & N. Dec. 722, 723 (B.I.A.1997) (en banc) ("Congress incorporated the international obligation into domestic United States law when it enacted the withholding of deportation provision of the Refugee Act of 1980, prohibiting the refoulement of refugees. Going beyond the nonrefoulement provision, Congress also established asylum as a discretionary form of relief for those who could meet a lesser standard of proof." (citation omitted)), disapproved of on other grounds by Ladha v. INS, 215 F.3d 889 (9th Cir.2000); see also INS v. Cardoza–Fonseca, 480 U.S. 421, 427–29, 436, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

*1. Withholding of Removal*

[2]    To qualify for withholding of removal, an applicant must show that his "life or freedom would be threatened" if he is returned to his homeland. See 8 U.S.C. § 1231(b)(3)(A) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."). The alien must demonstrate "that it is more likely than not that he would be subject to persecution on one of the specified grounds." Al–Harbi v. INS, 242 F.3d 882, 888 (9th Cir.2001) (internal quotation marks omitted). Withholding of removal is not discretionary: "[t]he Attorney General is not permitted to deport an alien to a country where his life or freedom would be threatened on account of one of the [ ] protected grounds." Id. (internal quotation marks omitted).

Withholding, however, "does not apply to an alien ... if the Attorney General decides that ... the alien, having been convicted by a final judgment of a particularly serious crime[,] is a danger to the community of the United States." 8 U.S.C. § 1231(b)(3)(B)(ii). The statute does not define "particularly serious crime," but does provide that certain aggravated felony convictions automatically fall within this category:

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

Id. § 1231(b)(3)(B). As used in immigration law, "aggravated felony" is a term of art referring to the offenses enumerated under § 1101(a)(43).

*2. Asylum*

[3]    The Attorney General has discretion to grant asylum to any applicant who qualifies as a "refugee." Id. § 1158(b)(1). A refugee is "any person ... who is unable or unwilling to return to" his country of origin "because of persecution or a well-founded fear of persecution on account of **1102 race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42).

As in the case of withholding of removal, asylum relief does "not apply to an alien if the Attorney General determines that ... the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." Id. § 1158(b)(2)(A)(ii). As with withholding, the statute does not define "particularly serious crime." But the statute provides that all aggravated felonies are particularly serious crimes and authorizes the Attorney General to designate additional crimes as particularly serious crimes by regulation:

(i) Conviction of aggravated felony

For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

(ii) Offenses

The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

*Id.* § 1158(b)(2)(B).

Having provided this brief overview of the statutory framework, we turn to Delgado's specific arguments.

**C. For Purposes of Withholding of Removal, Particularly Serious Crimes Are Not Limited to Statutorily Defined Aggravated Felonies** [11]

[4] Delgado argues that the BIA was barred from treating his DUI convictions as particularly serious crimes for purposes of withholding of removal. Drawing inferences from § 1231(b)(3)(B), he contends that only aggravated felonies, statutorily defined by § 1101(a)(43), may be treated as particularly serious crimes. We reject this argument because it is contrary to the BIA's reasonable interpretation of § 1231 that "a particularly serious crime need not be an aggravated felony." *N–A–M–I*, 24 I. & N. Dec. at 337. Under *Chevron*, we owe deference to the BIA's interpretation.

[5] The BIA's precedential decisions interpreting the Immigration and Nationality Act are entitled to *Chevron* deference. *See Marmolejo–Campos v. Holder*, 558 F.3d 903, 909 (9th Cir.2009) (en banc). Under *Chevron*,

we determine whether "the intent of Congress is clear." If it is, both the court and the agency "must give effect to the unambiguously expressed intent of Congress." If the statute is "silent or ambiguous," however, we may not supply the interpretation of the statute we think best ..., but must limit ourselves to asking "whether the agency's answer is based on a permissible construction of the statute."

*Id.* at 908 (internal citations omitted) (quoting *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). We therefore address whether § 1231 is ambiguous and, if so, whether the BIA's resolution of that ambiguity is reasonable.

*1. Section 1231(b)(3)(B) Is Ambiguous*

We have little trouble concluding that § 1231 is ambiguous. As noted, the last paragraph in § 1231(b)(3)(B) provides:

> For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence ***1103** shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(B). This provision, and the second sentence in particular, could be understood to mean that only aggravated felonies can be particularly serious crimes. *See Alaka v. Attorney Gen.*, 456 F.3d 88, 105 (3d Cir.2006) (holding that "an offense must be an aggravated felony in order to be classified as a 'particularly serious crime'" because the second sentence is "clearly tied to the first"). But an alternative construction is at least as reasonable—the second sentence may mean that any crime potentially can be particularly serious regardless of the sentence imposed. *See N–A–M–I*, 24 I. & N. Dec. at 338 (adopting the reasoning of *Ali v. Achim*, 468 F.3d 462, 470 (7th Cir.2006), which held that § 1231(b)(3)(B) "does not imply that only aggravated felonies can qualify as 'particularly serious' crimes"). Other circuits have found the statute ambiguous, *see Gao v. Holder*, 595 F.3d 549, 554 (4th Cir.2010); *N–A–M v. Holder (N–A–M– II )*, 587 F.3d 1052, 1056 (10th Cir.2009); *Nethagani v. Mukasey*, 532 F.3d 150, 156–57 (2d Cir.2008), and we agree. We must therefore decide whether the BIA's interpretation is based on a permissible construction of the statute.

*2. The BIA's Interpretation Is Permissible*

The BIA agreed with the Seventh Circuit that the "designation of aggravated felonies producing sentences of at least five years' imprisonment as per se 'particularly serious' creates no presumption that the Attorney General may not exercise discretion on a case-by-case basis to decide that other nonaggravated-felony crimes are also 'particularly serious.'" *N–A–M– I,* 24 I. & N. Dec. at 338 (quoting *Ali,* 468 F.3d at 470) (internal quotation marks omitted). The BIA rejected the Third Circuit's conclusion that the second sentence in the last paragraph in § 1231(b)(3)(B) implies that particularly serious crimes are limited to the universe of aggravated felonies. *See id. at 341.* According to the BIA, "[t]hat sentence means only that aggravated felonies for which sentences of less than 5 years' imprisonment were imposed may be found to be 'particularly serious crimes,' not that *only* aggravated felonies may be found to be such crimes." *Id.* The BIA noted that its "consistent practice in numerous decisions over the course of the years has reflected an understanding that the classification of an offense as a 'particularly serious crime' is not limited to offenses that are aggravated felonies." *Id. at 338–39.* The BIA also emphasized that its interpretation is "supported by the history and background of the particularly serious crime provision." *Id. at 339.*

We agree with those courts to have considered the question that the BIA's construction of the statute is a permissible one under *Chevron. See Gao,* 595 F.3d at 554–55; *N–A–M– II,* 587 F.3d at 1055–56; *Nethagani,* 532 F.3d at 156–57.[12] The **\*1104** BIA's interpretation of the statutory language is reasonable. The statute includes no express requirement that the Attorney General consider particularly serious crimes as a subset of aggravated felonies. Furthermore, as the BIA emphasized, its interpretation is supported by the statutory history of the particularly serious crime bar.

Congress first adopted a "particularly serious crime" bar to withholding of removal in 1980. *See* Refugee Act of 1980, Pub.L. No. 96–212, § 203(e), 94 Stat. 102, 107 (formerly codified at § 1253(h)(2)(B)). Under this provision, the BIA applied the case-by-case balancing test of *In re Frentescu,* 18 I. & N. Dec. 244 (B.I.A.1982), to define particularly serious crimes. *Frentescu's* test did not take into account whether the crime at issue had been statutorily defined as an aggravated felony. But over time, the BIA

denominated some crimes as inherently particularly serious, so that individual determinations with regard to those crimes were not necessary. *See, e.g., In re Garcia–Garrocho,* 19 I. & N. Dec. 423, 425–26 (B.I.A.1986) (defining first-degree burglary as per se particularly serious).

Congress then amended three times the "particularly serious crime" bar applicable to withholding of removal. Congress created and modified a category of per se particularly serious crimes, in part ratifying the BIA's newer approach of specifying per se particularly serious crimes. *See Miguel– Miguel v. Gonzales,* 500 F.3d 941, 945–46 (9th Cir.2007). The Immigration Act of 1990 (the 1990 Act) made all crimes defined as aggravated felonies also particularly serious crimes. *See* Pub.L. No. 101–649, § 515(a)(2), 104 Stat. 4978, 5053 (1990) (formerly codified at § 1253(h)(2)(B)). Nothing in the text or history of the 1990 Act suggests that Congress intended, by making aggravated felonies per se particularly serious crimes, to divest the Attorney General of authority to determine on a case-by-case basis that other crimes are particularly serious. *See N–A–M– II,* 587 F.3d at 1056. Notwithstanding the 1990 Act, the agency continued to adjudicate particularly serious crimes on a case-by-case basis. *See In re B-,* 20 I. & N. Dec. 427, 430–31 (B.I.A.1991).

Congress relaxed the 1990 Act's categorical approach in 1996 by passing § 413(f) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, § 413(f), 110 Stat. 1214, 1269 (formerly codified at § 1253(h)(3)(B)). AEDPA amended the "particularly serious crime" bar to allow the Attorney General to override the per se rule for aggravated felonies when "necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." *Id.* Congress again relaxed the categorical bar when it passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, div. C, § 305(a) (3), 110 Stat. 3009–546, 3009–602 (codified at § 1231(b) (3)(B)). IIRIRA enacted the provision at issue here, which categorically bars aggravated felons sentenced to five years or more imprisonment. *See* 8 U.S.C. § 1231(b)(3)(B).

The sparse legislative history of IIRIRA suggests one purpose of this enactment was to prevent violations of the Protocol. As noted earlier, the Protocol includes a non-refoulement provision prohibiting the expulsion or return of certain aliens. *See* 19 U.S.T. at 6276. As the list of aggravated felonies expanded during the 1990s, the per se rule for particularly serious crimes created tension with

the Protocol by **\*1105** sweeping in some "fairly minor offenses." *In re Q–T–M–T–,* 21 I. & N. Dec. 639, 648 & n. 4 (B.I.A.1996) (quoting Immigration Control and Financial Responsibility Act of 1996: Mark-up on S. 1664 before the S. Comm. on the Judiciary, 104th Cong., 2d sess. 60–61 (1996) (remarks of Sen. Kennedy)) (internal quotation marks omitted); *see also Choeum v. INS,* 129 F.3d 29, 42–44 (1st Cir.1997) (accepting the INS's argument that the 1996 IIRIRA amendments were motivated by expansion of the list of aggravated felonies). But nothing in the legislative history indicates that Congress intended, by creating a categorical bar and by later relaxing that categorical bar, to eliminate the Attorney General's pre-existing authority to determine that, under the circumstances presented by an individual case, a crime was "particularly serious," whether or not the crime was an aggravated felony. [13]

We therefore hold that, for purposes of withholding of removal, an offense need not be an aggravated felony to be a particularly serious crime. The BIA thus had authority to determine whether Delgado's DUI convictions were particularly serious crimes, barring him from withholding of removal under § 1231(b)(3)(B). [14]

## D. For Purposes of Asylum, Particularly Serious Crimes Are Not Limited to Offenses Designated by the Attorney General by Regulation

[6] Delgado next argues that the BIA lacked authority to designate his DUI convictions as particularly serious crimes for purpose of his asylum application. He contends that, for purposes of asylum, particularly serious crimes include only aggravated felonies and such additional offenses as are designated particularly serious crimes by the Attorney General through regulation. DUI is not an aggravated felony and has not been designated by regulation as a particularly serious crime. Delgado thus disputes the BIA's authority to determine through adjudication that his DUI convictions were particularly serious crimes. We reject his contention and hold that the Attorney General—or the BIA, the Attorney General's delegate—can designate a specific offense as a particularly serious crime through case-by-case adjudication.

As we have said, asylum relief does "not apply to an alien if the Attorney General determines that ... the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii). The

statute does not define "particularly serious crime," but provides that aggravated felonies are particularly serious crimes and authorizes the Attorney General to designate additional crimes as particularly serious crimes by regulation:

(i) Conviction of aggravated felony

For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

(ii) Offenses

The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) or (iii) of subparagraph (A).

**\*1106** *Id.* § 1158(b)(2)(B). There is little question that this latter provision permits the Attorney General, by *regulation,* to make particular crimes categorically particularly serious even though they are not aggravated felonies. *See Gao,* 595 F.3d at 556. The question here is whether the Attorney General may also determine by *adjudication* that an individual immigrant's crime was particularly serious. [15]

Because the history of the withholding and asylum statutes are similar, our conclusion as to the withholding statute is instructive. Although Congress has amended the asylum statute's particularly serious crime bar over time, none of its actions have called into question the BIA's authority to designate offenses as particularly serious crimes through case-by-case adjudication. The BIA historically made the determination whether an alien's crime was particularly serious for purposes of asylum strictly by adjudication, applying the *Frentescu* standard. *See In re Frentescu,* 18 I. & N. Dec. at 247. Congress made aggravated felonies categorically particularly serious crimes in 1990. *See* 1990 Act, Pub.L. No. 101–649, § 515(a)(1), 104 Stat. at 5053 (formerly codified at § 1158(d)). In 1996, Congress added § 1158(b)(2)(B)(ii), which authorizes the Attorney General to "designate by regulation offenses that will be considered to be [particularly serious crimes]" for purposes of asylum. IIRIRA, Pub.L. No. 104–208, div. C, § 604(a), 110 Stat. at 3009–692.

Section 1158(b)(2)(B)(ii) authorizes the *categorical* designation of additional crimes as particularly serious through regulation, and is silent on case-by-case adjudication. *See Gao*, 595 F.3d at 556–57. Indeed, it would be difficult to designate by regulation crimes that will be "considered" to be particularly serious unless the designation is categorical for those crimes. The provision simply does not speak to the ability of the Attorney General to determine in an individual case that the circumstances of an alien's crime made that crime particularly serious. The statute does not require the Attorney General to anticipate every adjudication by promulgating a regulation covering each particular crime.

We therefore hold, consistent with other circuits to have addressed the question, that the Attorney General has the authority to designate offenses as particularly serious crimes through case-by-case adjudication of individual asylum applications. *See id.* at 557; *Ali*, 468 F.3d at 469.[16] The BIA thus was permitted to determine **\*1107** whether Delgado's DUI offenses were particularly serious through adjudication.

### E. The BIA's Determination that Delgado Was Convicted of a Particularly Serious Crime

Having settled questions of jurisdiction and the scope of the BIA's authority, the remaining question is whether the BIA properly determined that Delgado was convicted of a particularly serious crime, and thus barred from eligibility for asylum, *see* 8 U.S.C. § 1158(b)(2)(A)(ii), and withholding of removal, *see id.* § 1231(b)(3)(B)(ii).

 [7] The BIA articulated "[t]he applicable legal standard for determining whether the alien has committed a particularly serious crime" in *Frentescu*, 18 I. & N. Dec. at 247. *Anaya–Ortiz v. Holder*, 594 F.3d 673, 679 (9th Cir.2010). *Frentescu* requires consideration of certain factors: "the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community." *In re Frentescu*, 18 I. & N. Dec. at 247. In short, a crime is particularly serious if the nature of the conviction, the underlying facts and circumstances and the sentence imposed justify the presumption that the convicted immigrant is a danger to the community. *See In re Carballe*, 19 I. & N. Dec. at 360 ("It must be determined that

an applicant for relief constitutes a danger to the community of the United States to come within the purview of the particularly serious crime bar."); *see also N–A–M– I*, 24 I. & N. Dec. at 342 (describing the BIA's method of applying the *Frentescu* factors).[17]

The BIA's decisionmaking is governed by minimum procedural requirements. As relevant here, the BIA must provide "a reasoned explanation for its actions." *Movsisian v. Ashcroft*, 395 F.3d 1095, 1098 (9th Cir.2005). "Due process and this court's precedent require a minimum degree of clarity in dispositive reasoning and in the treatment of a properly raised argument." *Su Hwa She v. Holder*, 629 F.3d 958, 963 (9th Cir.2010). The BIA must be clear enough that we need not "speculate based on an incomplete analysis." *Id.* at 964; *see also Eneh v. Holder*, 601 F.3d 943, 947 (9th Cir.2010).

 [8] In Delgado's case, the BIA explained only that:

> Based on the record before us, we agree with the Immigration Judge that the respondent is subject to removal from the United States based on ... his record of convictions which rise to the level of being a particular[ly] serious crime (Exh. 2).

We cannot tell from this scant analysis which of Delgado's crimes the BIA considered **\*1108** particularly serious or what led the Board to find his crime particularly serious. The BIA may have determined that one or more of Delgado's three DUI convictions *individually* rises to the level of a particularly serious crime. Alternatively, the BIA may have determined that Delgado's three convictions, when viewed *cumulatively,* rise to the level of a particularly serious crime. Or the BIA may have determined that one of the convictions—presumably the third—rises to the level of a particularly serious crime *in light of* Delgado's two earlier convictions. Moreover, the ambiguity that precludes us from understanding the BIA's reasoning also prevents us from discerning the extent to which the BIA agreed with and is supported by the IJ's analysis, assuming the BIA intended to adopt the IJ's reasoning.[18] Without knowing the basis of the

Board's decision, we cannot conduct a meaningful review. We therefore remand to the BIA for a clear explanation. *See Su Hwa She,* 629 F.3d at 963–64; *Eneh,* 601 F.3d at 947.

### F. Delgado's CAT Deferral Claim

We have jurisdiction pursuant to § 1252(a) to review the BIA's denial of Delgado's claim for CAT deferral. *See Morales v. Gonzales,* 478 F.3d 972, 976 (9th Cir.2007). We review for substantial evidence. *See Zheng v. Ashcroft,* 332 F.3d 1186, 1193 (9th Cir.2003). To obtain relief, Delgado was required to prove that "more likely than not, [ ] he will be tortured at the instigation of, or with the acquiescence of the [Salvadoran] government." *Silaya v. Mukasey,* 524 F.3d 1066, 1073 (9th Cir.2008); *see also* 8 C.F.R. § 1208.17(a).

**[9]** The agency's conclusion that Delgado failed to meet his burden is supported by substantial evidence. The evidence does not compel the conclusion that Delgado will be tortured by the Salvadoran government. *See Sinha v. Holder,* 564 F.3d 1015, 1026 (9th Cir.2009) (defining "torture," citing 8 C.F.R. § 1208.18(a)(1)). The record reflects that conditions in El Salvador have improved, and the political violence that led to the murder of Delgado's parents has ended. Although we believe Delgado when he says that it will be like torture for him to return to the country where his parents were murdered, that is not a harm inflicted "at the instigation of or with the consent or acquiescence of" the current Salvadoran government. 8 C.F.R. § 1208.18(a)(1). CAT relief is therefore unavailable.

**PETITION GRANTED IN PART AND DENIED IN PART AND CASE REMANDED.** Each party shall bear its own costs.

REINHARDT, Circuit Judge, concurring in part and concurring in the judgment:

I join parts I, II.A, II.B, II.E, and II.F of the majority opinion. I also agree with **\*1109** most of parts II.C and II.D.[1] I write separately in order to explain why I believe that the BIA should hold on remand that Delgado's DUI convictions were *not* particularly serious crimes.

It may help to put matters in perspective if I first explain the consequences of determining that a given offense constitutes a particularly serious crime. Not only does such a determination override the universal rule concerning refugees—that an alien who faces persecution or even death will not be returned to the land controlled by his persecutors—but it strips the Attorney General of all discretion to determine whether, considering all the circumstances, the individual who has committed an offense should be permitted to remain in this country. If an alien's offense is deemed particularly serious, the Attorney General loses his ability to consider a host of relevant discretionary factors: whether the alien has served in our Armed Forces, whether he has been gainfully employed and for how long, whether he has paid his taxes, whether he is the sole support of his American wife and children, and whether any members of his American family are ill or in need of medical care that they would be unable to obtain if he is removed to a foreign land. The "particularly serious crime" determination is thus a total bar to asylum and withholding of removal, regardless of how overwhelming the equities that favor an alien's remaining with his citizen family in this country. The INA reserves such severe consequences for those criminal offenses that make an alien so "danger[ous] to the community of the United States" that we are not willing to keep him here, notwithstanding the persecution he may face at home. In my opinion, these consequences should not be imposed on the basis of a DUI conviction.

### I

As the BIA itself held in *Matter of Frentescu,* "a 'particularly serious crime' is more serious than a serious nonpolitical crime.' " 18 I. & N. Dec. 244, 245 (BIA 1982), *superseded on other grounds by statute,* 8 U.S.C. § 1253(h) (1991), *as recognized in Miguel–Miguel v. Gonzales,* 500 F.3d 941, 946 (9th Cir.2007). To state what would be obvious even apart from the BIA's having said so, a particularly serious crime must be one that is *more* than serious—one that stands clearly apart from the broader category of "serious" crimes.[2] A list of those crimes that the statutes **\*1110** make *per se* "particularly serious" (by virtue of their status as aggravated felonies) gives some indication of the types of offenses that stand apart in their seriousness: "murder, rape, or sexual abuse of a minor," child pornography offenses, treason, the disclosure of national defense information, or RICO offenses.[3] *See* 8 U.S.C. § 1101(a)(43) (enumerating aggravated felonies).[4]

The agency's past precedential decisions also help to illuminate the definition of a "particularly serious crime." Crimes that the Attorney General has determined to be "particularly serious" as a categorical matter, regardless of the circumstances of an individual conviction, include felony menacing (by threatening with a deadly weapon), [5] armed robbery, [6] and burglary of a dwelling (during which the offender is armed with a deadly weapon or causes injury to another). [7] Common to these crimes is the intentional use or threatened use of force, the implication being that the perpetrator is a violent person.

Driving under the influence has little in common with these sorts of crimes. It has not been specially targeted through federal legislation, nor is it mentioned elsewhere in the immigration laws, nor does it involve violence. *See Leocal v. Ashcroft,* 543 U.S. 1, 11, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) ("The ordinary meaning of ['crime of violence'] ... suggests a category of violent, active crimes that cannot be said naturally to include DUI offenses."). A DUI, while deemed worthy of punishment, is more a run-of-the-mill offense than a particularly serious one. American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record. If the BIA is to hold that a DUI conviction qualifies as a particularly serious crime, then it must clearly explain this anomaly.

The BIA should also explain how it can consider a DUI conviction to qualify as a particularly serious crime, when it does not consider even a recidivist DUI offense to be a "crime involving moral turpitude." *Matter of Torres–Varela,* 23 I. & N. Dec. 78 (BIA 2001). [8] The BIA's determination **\*1111** that this offense is "not necessarily a conviction for a crime involving moral turpitude should lead [it] to exercise great caution in designating such an offense as a particularly serious crime." *Matter of L–S–,* 22 I. & N. Dec. 645, 655 (BIA 1999). It is difficult to understand how the BIA could hold that a DUI conviction is a particularly serious crime, sufficient to send an alien home to face persecution and possible death, when it is not even a serious enough offense to render him removable in the first place—when it is neither an aggravated felony, nor a crime involving moral turpitude, nor any other kind of offense for which an alien may be deported. [9]

All the relevant indications—the statute's text, the purpose of the "particularly serious crime" bar, the BIA's own past applications of that bar, and common sense—should lead the BIA to hold on remand that a DUI conviction is not a particularly serious crime. I cannot imagine that when Congress added the "particularly serious crime" exception to our immigration law in the Refugee Act of 1980, "to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees," it envisioned that everyday offenses of this sort could be included within that term. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 436, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). I hope that when the BIA considers this question in a fully reasoned manner, it will agree.

**II**

As the majority notes, one of the three possible readings of the BIA's cryptic order is that "the BIA may have determined that Delgado's three convictions, when viewed *cumulatively,* rise to the level of a particularly serious crime." Maj. Op. at 1108. Another is that "the BIA may have determined that one of the convictions—presumably the third—rises to the level of a particularly serious crime *in light of* Delgado's two earlier convictions." *Id.* at 1108. In my view, neither of these interpretations is legally available to the agency. [10]

The statutes provide no conceivable basis for the agency to consider the convictions' *cumulative* effect. The bar to relief applies if the Attorney General determines that "the alien, having been convicted by *a* final judgment of *a* particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii) (emphasis added); *see id.* § 1231(b)(3)(B)(ii) (virtually identical **\*1112** for withholding of removal). The statutes do not mention "a particularly long rap sheet," "a particularly egregious repeat offender," or "a particularly serious series of offenses." The singular article "a" could not make any clearer the singular nature of "a particularly serious crime": the agency must identify *one* offense of conviction that constitutes "a particularly serious crime" in order to relieve the Attorney General of the opportunity to exercise his discretion and to bar the alien's application for relief.

Indeed, the BIA has recognized as much in the closely related context of crimes involving moral turpitude. In *Matter of Torres–Varela,* it held "that multiple convictions for the same

DUI offense, which individually is not a crime involving moral turpitude, do not, by themselves, aggregate into a conviction for a crime involving moral turpitude." 23 I. & N. Dec. at 86. "[N]onturpitudinous conduct," the BIA explained, "is not rendered turpitudinous through multiple convictions for the same offense." *Id.* Precisely the same is true here: if one conviction of a given offense does not constitute a particularly serious crime, then the offense does not become particularly serious through the aggregation of several convictions.

The fallacy in a holding that multiple convictions cumulatively amount to "a particularly serious crime" may be readily shown by an analogy. Suppose the chairman of a political party comments that one of its candidates, "having made a particularly offensive remark, constitutes a danger to the electoral fortunes of the party," and accordingly urges that the candidate be replaced with a different nominee. Anyone fluent in the English language would understand the chairman to have said that (1) among the set of all offensive remarks, there is a sub-class that may be defined as "particularly offensive"; (2) the candidate had made one such remark; and (3) this single act by the candidate threatened the party's chances of victory in the next election. No one would understand the chairman to have meant that the candidate had made an inappropriate remark on several occasions and that these remarks, taken together, had "risen to the level of being" *a* particularly offensive remark. It would not matter, under the rule announced by the chairman, whether the candidate had made an offensive remark one, four, or ten times. Unless the remark that caused the chairman to seek the candidate's replacement were in fact *particularly* offensive, rather than only offensive, it would not fall under the chairman's rule.

It would be no less improper for the agency to determine that Delgado's third DUI conviction was particularly serious only in light of his two *prior* DUI convictions. Indeed, such a rationale would amount to the same as treating the three convictions cumulatively as particularly serious. Because the cumulative approach contravenes the statutory text, if the agency were to reason in a manner substantively identical to that approach, its interpretation of the statute would not qualify for deference under the *Chevron* framework. Although "[t]he BIA's interpretation of immigration laws is entitled to deference ..., we are not obligated to accept an interpretation clearly contrary to the plain and sensible meaning of the statute." *Kankamalage v. INS,* 335 F.3d 858, 862 (9th Cir.2003); *see* *Chevron, U.S.A., Inc. v.*

*Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The BIA's set of criteria for determining whether a given conviction is of a particularly serious crime makes clear that the relevant inquiry is limited to the events relating to that single conviction, not to the broader subject of an immigrant's history **\*1113** of criminality in general. "In judging the seriousness of a crime," the agency "look[s] to such factors as the nature *of the conviction,* the circumstances and underlying facts *of the conviction,* the type of sentence imposed, and, most importantly, whether the type and circumstances *of the crime* indicate that the alien will be a danger to the community." *Frentescu,* 18 I. & N. Dec. at 247 (emphasis added). Each of these factors relates solely to the *one conviction* that the agency is asked to classify as either a particularly serious crime or one that may be serious but not particularly serious. The agency can consider the "circumstances" of that conviction, but the phrase imposes its own limit: the relevant circumstances are those relating to *the conviction,* not to the alien's life history, his moral character, or his criminal record. *See* *Matter of Carballe,* 19 I. & N. Dec. 357, 360 (BIA 1986) ("The focus [in applying the *Frentescu* factors] is on the crime that was committed.").

The circumstances of a DUI conviction might include such factors as the driver's blood alcohol level, the speed at which he was traveling when arrested, the road conditions at the time, or whether passengers were in the car. [11] But they do not include the driver's list of past convictions, regardless of what offenses it may include. Whether the driver has a prior DUI conviction is no more relevant than whether he has a prior conviction for murder or rape: none of those prior convictions relates to the seriousness of the particular crime that the agency is required to classify. As the Attorney General has explicitly held, "the fact that an alien has no prior convictions is irrelevant to the 'particularly serious crime' calculus." *Matter of Y–L–, A–G–, & R–S–R–,* 23 I. & N. Dec. 270, 277 (AG 2002), *overruled on other grounds by Zheng v. Ashcroft,* 332 F.3d 1186 (9th Cir.2003); *see also* *Matter of N–A–M–,* 24 I. & N. Dec. 336, 343 (BIA 2007) ("[O]ffender characteristics ... do not diminish the gravity of a crime."). If an alien's *lack* of prior convictions is irrelevant to the "particularly serious crime" determination, then as a logical matter, it must equally be irrelevant that an alien *does* have prior convictions. As the BIA has emphasized, "the proper focus for determining whether a crime is particularly

serious is on the nature of the crime and not the likelihood of future serious misconduct." *Id.* [12]

In short, two of the three grounds on which the majority suggests that the agency's conclusion may have been based would violate the statute's dictates. The third basis is that a single act of drunk driving may have constituted a particularly serious crime. As to this possibility, as I have indicated in part I, I strongly doubt that the "particularly serious crime" provision was intended to encompass a single conviction for drunk driving.

### *1114  III

"Drunk driving is a nationwide problem, as evidenced by the efforts of legislatures to prohibit such conduct and impose appropriate penalties. But this fact does not warrant our shoe-horning it into statutory sections where it does not fit." *Leocal,* 543 U.S. at 13, 125 S.Ct. 377. Simple drunk driving has no place in a statutory exception limited to crimes so serious that they require the government to deport refugees to face likely persecution without consideration of the merits of their claims. No single conviction for such an offense can constitute a particularly serious crime, and the statute permits neither the aggregation of multiple convictions into a single particularly serious crime nor the determination that a single conviction is particularly serious in light of an alien's prior convictions.

To hold that Delgado has not committed a particularly serious crime would not necessarily allow him to remain in the country. It would mean only that the agency could *hear* his claim of persecution; he would still have to prove that he reasonably fears persecution on account of a protected ground upon his return to El Salvador. Even if he were found eligible for asylum, the Attorney General would have the discretion to deny him that relief. *Cardoza–Fonseca,* 480 U.S. at 428 n. 5, 107 S.Ct. 1207. [13]  At that point, the Attorney General could consider Delgado's criminal record, along with the equities in his favor and his likelihood of future persecution, in determining whether to grant him asylum. *See, e.g.,* *Kazlauskas v. INS,* 46 F.3d 902, 907 (9th Cir.1995).

In my view, Delgado should have the opportunity to demonstrate his eligibility for relief and for the Attorney General's exercise of his discretion. I strongly doubt that the agency should pretermit that process by holding that a DUI conviction can condemn an alien to deportation into the hands of his potential persecutors.

### All Citations

648 F.3d 1095, 11 Cal. Daily Op. Serv. 10,573, 2011 Daily Journal D.A.R. 12,595

### Footnotes

1  A three-judge panel, Judge Canby writing for the majority, initially dismissed in part and denied in part Delgado's petition, but later amended the opinion to grant a partial remand. *See* Delgado v. Mukasey (*Delgado I*), 546 F.3d 1017 (9th Cir.2008), *withdrawn and superseded by* Delgado v. Holder (*Delgado II* ), 563 F.3d 863 (9th Cir.2009). Judge Berzon concurred in part and dissented in part in both opinions. We granted rehearing en banc, *see Delgado v. Holder,* 621 F.3d 957 (9th Cir.2010) (order), and stayed the case pending the Supreme Court's decision in *Kucana v. Holder,* 558 U.S. 233, 130 S.Ct. 827, 175 L.Ed.2d 694 (2010).

2  Hereinafter, all statutory references are to 8 U.S.C. unless otherwise indicated.

3  "As adjudicator in immigration cases, the Board exercises authority delegated by the Attorney General." *Kucana,* 130 S.Ct. at 832.

4  On March 1, 2003, the detention and removal duties of the INS were transferred to the newly formed Bureau of Immigration and Customs Enforcement, a subdivision of the Department of Homeland Security. *See*

    *Resendiz v. Kovensky,* 416 F.3d 952, 954 n. 1 (9th Cir.2005) (citing the Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135).

5    The INS later dropped the aggravated felony charge.

6    Delgado also sought cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act and suspension of deportation, but he has not sought review of the denial of those forms of relief.

7    Deferral of removal and withholding of removal are different forms of CAT protection. Both prohibit returning an alien to a specific country where he or she would likely face torture. An alien who is ineligible for CAT withholding may nonetheless be eligible for deferral of removal. *See* 8 C.F.R. § 1208.16(c)(4); *see also Abufayad v. Holder,* 632 F.3d 623, 631 (9th Cir.2011); *Lemus–Galvan v. Mukasey,* 518 F.3d 1081, 1083 (9th Cir.2008).

8    In a later case, we held that the jurisdiction-stripping provision did not apply to the determination that a crime was particularly serious for purposes of asylum. *See Morales v. Gonzales,* 478 F.3d 972, 979–80 (9th Cir.2007).

9    The three-judge panel questioned *Matsuk* but felt constrained to follow it. *See Delgado II,* 563 F.3d at 871 n. 12 (recognizing the dissent's "persuasive" criticism of *Matsuk* ); *id.* at 874–75, 888–89 (Berzon, J., concurring in part and dissenting in part) (criticizing *Matsuk* and suggesting rehearing en banc to overrule it).

10    This conclusion is in accord with the decisions of other circuits. *See Nethagani v. Mukasey,* 532 F.3d 150, 154–55 (2d Cir.2008); *Alaka v. Attorney Gen.,* 456 F.3d 88, 97–98, 101–02 (3d Cir.2006).

11    Parts II.C and II.D of this opinion borrow substantially from Judge Canby's opinion. *See Delgado II,* 563 F.3d 863.

12    Delgado and amici argue that we need not defer to the BIA because it relied on a "plain text" reading of § 1231, a statute we have just found ambiguous. But the BIA did not rely on plain text alone: As we explained above, the BIA acknowledged the ambiguity and exercised its discretion to interpret the statute. *Chevron* requires us to defer to the BIA so long as *N–A–M– I* is "a permissible construction of the statute." *Marmolejo–Campos,* 558 F.3d at 908 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778) (internal quotation marks omitted). Even if the BIA had relied solely on the text of § 1231, we would not be able to adopt Delgado's preferred interpretation. "[I]f an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see." *Negusie v. Holder,* 555 U.S. 511, 129 S.Ct. 1159, 1167, 173 L.Ed.2d 20 (2009) (quoting *Cajun Elec. Power Coop., Inc. v. FERC,* 924 F.2d 1132, 1136 (D.C.Cir.1991)) (internal quotation marks omitted).

13    Just as the 1996 amendments appear to recognize that some aggravated felonies are not particularly serious crimes, so too does it appear that some particularly serious crimes are not statutorily defined as aggravated felonies. Possession of a biological weapon, for example, is a very serious offense, but is not enumerated as an aggravated felony under § 1101(a)(43). *See Gao,* 595 F.3d at 555.

14    If Delgado is ineligible for withholding of removal because he has been convicted of a particularly serious crime under § 1231(b)(3)(B), he is also ineligible for CAT withholding. *See* 8 C.F.R. § 1208.16(d)(2).

15    Unlike in the withholding context, where we deferred to *N–A–M– I,* in the asylum context there is no precedential BIA decision addressing whether the Attorney General can designate particularly serious crimes by adjudication. The BIA's decision in the present case was itself not precedential, so we would owe it only *Skidmore* deference. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). But the BIA did not explicitly *interpret* its authority under the asylum statute so there is no reasoning to

which we could defer. *See* *Vasquez v. Holder,* 602 F.3d 1003, 1012 n. 8 (9th Cir.2010) (holding that *Skidmore* requires only "minimal deference" to a thinly reasoned decision); *Miranda Alvarado v. Gonzales,* 449 F.3d 915, 924 n. 6 (9th Cir.2006) (holding that *Skidmore* deference did not apply to a "brief and conclusory decision"). Under *Skidmore,* "the measure of deference afforded to the agency varies 'depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *Marmolejo–Campos,* 558 F.3d at 909 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161). Our review of this question is therefore effectively de novo.

16    It is true that our reading makes § 1158(b)(2)(B)(ii) a "belt and suspenders" approach to denying asylum, but that outcome is inevitable. Under our reading, the statute confirms that the Attorney General can deny relief on a case-by-case basis because of criminal history or through an exercise of discretion under § 1158(b)(1)(A), which provides that "the Attorney General *may* grant asylum" (emphasis added). But were the statute read to mean that the Attorney General could rely on regulation alone to designate classes of aliens as ineligible, that too would be redundant because § 1103(g)(2) already directs the Attorney General to "establish such regulations ... as the Attorney General determines to be necessary for carrying out this section."

17    We have upheld the BIA's interpretation of this statute to require only the factual finding of conviction of a particularly serious crime to support the determination of danger to the community. *See* *Ramirez–Ramos v. INS,* 814 F.2d 1394, 1397 (9th Cir.1987). The United Nations High Commissioner for Refugees (UNHRC) argued in an amicus brief submitted before rehearing en banc that the BIA's precedent violates the 1967 Protocol Relating to the Status of Refugees and the 1951 Convention Relating to the Status of Refugees. Delgado did not adopt the UNHRC's argument or brief his own argument for overturning *Ramirez–Ramos.* We therefore do not address that issue.

18    We cannot ascertain which of the IJ's rationales the BIA intended to adopt, if any. Thus, the ambiguity in the BIA's decision cannot be resolved by consulting the IJ's decision. As a threshold matter, we may look to an IJ's decision only if the BIA reviewed the decision for an abuse of discretion, *see de Leon–Barrios v. INS,* 116 F.3d 391, 393 (9th Cir.1997), the BIA incorporated portions of the IJ's decision into its analysis, *see* *Molina–Estrada v. INS,* 293 F.3d 1089, 1093 (9th Cir.2002), or the circumstances indicate that the IJ's decision serves as "a guide to what lay behind the BIA's conclusion," *Avetova–Elisseva v. INS,* 213 F.3d 1192, 1197 (9th Cir.2000). None of those preconditions is satisfied here. Although the BIA indicated that it "agree[d] with the Immigration Judge," the IJ relied on two independent bases for its ruling: (1) each of the three DUI convictions "individually rises to the level of being a particularly serious crime" and (2) the three DUIs "are particularly serious crimes when looked at cumulatively." The BIA's decision is unclear about which of the IJ's alternative rationales it intended to adopt.

1    I agree with the holding of each section. With respect to part II.C, I agree "that, for purposes of withholding of removal, an offense need not be an aggravated felony to be a particularly serious crime." Op. at 1105. I do so even though the statutes provide that certain aggravated felonies *per se* fall in that category of offenses. With respect to part II.D, I recognize "that the Attorney General has the authority to designate offenses as particularly serious crimes through case-by-case adjudication of individual asylum applications," Op. at 1106, but believe that this authority applies principally to the *categorical* classification of offenses as particularly serious, rather than to the classification of *individual* criminal acts as particularly serious.

2    Were I interpreting this statute in the first instance, in light of the provision's international provenance I would hold that a conviction of a particularly serious crime is necessary but not sufficient to trigger the bar to relief. I would read the statute to say that the Attorney General must separately determine that "the alien ... constitutes a danger to the community of the United States" in order to send him home to face persecution. This interpretation of the statute's plain text, which appears to me to be the most natural one, is most consistent with the intent of the 1951 Refugee Convention and has been adopted by other countries in

interpreting identical provisions of their refugee laws, as the amicus brief of the U.N. High Commissioner for Refugees explains. *See, e.g., In re Tamayo and Department of Immigration,* (1994) 37 A.L.D. 786 (Austl.); *Pushpanathan v. Canada* (*Minister of Citizenship and Immigration* ), [1998] 1 S.C.R. 982, 999 (Can.); *see also* Paul Weis, *The Refugee Convention, 1951: The Travaux Préparatoires Analyzed with a Commentary* 342 (1995). Our court, the BIA, and every other circuit to consider the issue have rejected that interpretation, however. *See Ramirez–Ramos v. INS,* 814 F.2d 1394, 1397 (9th Cir.1987); *Matter of Carballe,* 19 I. & N. Dec. 357 (BIA 1986); *see also, e.g., Kofa v. INS,* 60 F.3d 1084, 1088 (4th Cir.1995) (en banc).

3    For withholding of removal, such offenses are only *per se* "particularly serious crimes" if the alien was sentenced to at least five years of imprisonment. 8 U.S.C. § 1231(b)(3)(B) (hanging paragraph).

4    As I have said, I agree with the majority's holding that the Attorney General may determine through case-by-case adjudication that crimes other than aggravated felonies are particularly serious. The list nevertheless illustrates the *types* of crimes that are serious enough to order an individual removed to his homeland to face persecution or death.

5    *Matter of N–A–M–,* 24 I. & N. Dec. 336, 343 (BIA 2007).

6    *Matter of Carballe,* 19 I. & N. Dec. 357, 360–61 (BIA 1986).

7    *Matter of Garcia–Garrocho,* 19 I. & N. Dec. 423, 425–26 (BIA 1986).

8    In *Matter of Lopez–Meza,* 22 I. & N. Dec. 1188 (BIA 1999), the BIA held that a conviction under Arizona's aggravated DUI statute is a crime involving moral turpitude. That statute makes it a crime to drive under the influence while knowingly driving with a suspended license. *See* Ariz.Rev.Stat. § 28–1381(A)(1); *Marmolejo–Campos v. Holder,* 558 F.3d 903, 917 (9th Cir.2009) (en banc). California separately criminalizes DUI and driving with a suspended license, and Delgado has admitted to one conviction of each offense in 2002. But the BIA's precedents make clear that the two convictions do not merge to become "a" crime involving moral turpitude, akin to a conviction under the Arizona statute. As the BIA has held, "[m]oral turpitude cannot be viewed to arise from some undefined synergism by which two offenses are combined to create a crime involving moral turpitude." *Matter of Short,* 20 I. & N. Dec. 136, 139 (BIA 1989); *see Marmolejo–Campos,* 558 F.3d at 918 (Bybee, J., concurring in part and dissenting in part).

9    The Immigration and Nationality Act assumes only a limited set of other types of criminal offenses grounds for an immigrant's removal. They include high-speed flight from an immigration checkpoint, INA § 237(a)(2)(A)(iv); failure to register as a sex offender, *id.* § 237(a)(2)(A)(v); controlled substance offenses, *id.* § 237(a)(2)(B); fire-arms offenses, *id.* § 237(a)(2)(C); national security offenses, *id.* § 237(a)(2)(D)(i-iii); misuse of travel documentation, *id.* § 237(a)(2)(D)(iv); importation of an alien for an immoral purpose, *id.;* domestic violence offenses, *id.* § 237(a)(2)(E); and trafficking, *id.* § 237(a)(2)(F). A DUI conviction falls into none of these categories.

10   Were I deciding the issue in the first instance, I would hold that the agency may define what crimes are particularly serious only on a categorical offense-by-offense basis, rather than treating individual convictions differently on the basis of their specific facts. Under current law, however, the agency does sometimes look to the individual conviction and its particular characteristics rather than merely to the type of crime. My view is that it should do so only sparingly.

11   They might also include whether the driver caused serious harm to any other person, but a DUI that caused such harm would ordinarily be charged not under a simple DUI statute, *e.g.,* Cal. Veh.Code § 23152, but as a more serious crime. *See, e.g.,* Cal.Penal Code § 191.5(b) (defining "[v]ehicular manslaughter while intoxicated"). Indeed, fatal DUIs may be and often are charged as second-degree murder. *Cf. People v. Watson,* 30 Cal.3d 290, 179 Cal.Rptr. 43, 637 P.2d 279 (1981). Delgado's first DUI conviction was under a separate statute for DUI causing bodily injury, Cal. Veh.Code § 23153(a).

12    To the extent that the agency's "particularly serious crime" determinations may sometimes have taken into account an alien's prior criminal history, or lack thereof, its actions can only be regarded as inconsistent with or overruled by the precedents cited above. *Compare* ▢ *Matter of L–S–,* 22 I. & N. Dec. 645, 656 (BIA 1999) ("The record demonstrates that this was his first offense.") *with* ▢ *Matter of Y–L–, A–G–, & R–S–R–,* 23 I. & N. Dec. at 277 ("[T]hat an alien has no prior convictions is irrelevant to the 'particularly serious crime' calculus.").

13    Only if Delgado could demonstrate a clear probability of persecution upon his return would the government be *obligated* not to deport him. *See INS v. Stevic,* 467 U.S. 407, 424, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

795 F.Supp.2d 246
United States District Court,
E.D. New York.

William DUFFY, Gene Panessa and James Mascarella, Plaintiffs,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 14–14 B, George Stamboulodis,
Edwin L. Christian, Walter J. McKenna, Christopher T. Confrey, John R. Powers, Daniel
Noesges, Robert LiMandri, and the New York City Department of Buildings, Defendants.

No. 10 CV 3111(SJ).
|
June 29, 2011.

**Synopsis**

**Background:** Members of local union representing heavy construction equipment operators throughout New York City who were indicted on criminal charges pursuant to Racketeer Influenced and Corrupt Organizations Act (RICO) filed action alleging § 1983 claims against city defendants for deprivation of due process rights and against Ethical Practices Attorney (EPA) and union defendants for acting outside scope of consent decree, and claims pursuant to New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL) against all defendants. Plaintiffs moved for temporary restraining order (TRO) and preliminary injunction staying Department of Buildings and Commissioner from taking any action that would affect their hoisting machine operator licenses. The District Court, Sterling Johnson, Jr., Senior District Judge, 2010 WL 4340542, denied motion. Plaintiffs subsequently moved for preliminary injunction staying local union, any members or agents, and EPA from suspending or revoking their membership in union, commencing disciplinary proceedings against them, or taking any other actions that could affect their membership in union. Defendants moved to dismiss complaint.

**Holdings:** The District Court, Johnson, J., held that:

[1] there was no likelihood of irreparable injury in absence of preliminary injunction as to possible disciplinary actions by EPA and union;

[2] plaintiffs could not state plausible § 1983 claim for relief against EPA and union defendants, absent any state action;

[3] as for plaintiffs' § 1983 claims for violation of Fourteenth Amendment, city defendants did not rely on unconstitutionally vague terms as basis for initiating New York City Office of Administrative Trials and Hearings (OATH) proceedings against them and did not fail to provide them with procedural due process; and

[4] having dismissed all federal claims over which it had original jurisdiction, district court would decline to exercise supplemental jurisdiction over remaining state law claims.

Plaintiffs' motion denied in part; defendants' motions granted.

**Procedural Posture(s):** Motion to Dismiss; Motion for Preliminary Injunction; Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Subject Matter Jurisdiction.

## West Headnotes (16)

**[1]    Injunction    Grounds in general;  multiple factors**

To succeed on motion for preliminary injunction, moving party must demonstrate (1) likelihood of irreparable injury in absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

**[2]    Labor and Employment    Internal affairs of labor organizations**

Union members failed to demonstrate likelihood of irreparable injury in absence of preliminary injunction as to possible disciplinary actions by Ethical Practices Attorney (EPA) and union, despite their argument that EPA's Advisory Notices regarding possible disciplinary hearings against them and union defendants' amendment of by-laws to permit same would inflict irreparable harm in form of lost wages, loss of reputation, and potential removal from union; loss of wages by identifiable group of employees did not qualify as irreparable harm in the Second Circuit, plaintiffs were convicted felons, and therefore potential suspensions would cause little further damage to their reputations, and even if disciplinary proceedings were instituted, plaintiffs had recourse to appeal to federal district court pursuant to consent decree.

**[3]    Federal Courts    Necessity of Objection;  Power and Duty of Court**

Claim is properly dismissed for lack of subject matter jurisdiction when district court lacks statutory or constitutional power to adjudicate it. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[4]    Federal Civil Procedure    Insufficiency in general**

**Federal Civil Procedure    Matters deemed admitted;  acceptance as true of allegations in complaint**

On motion to dismiss for failure to state a claim, plaintiffs' well-pleaded allegations, assumed to be true, must plead enough facts to state a claim to relief that is plausible on its face; claim has facial plausibility when plaintiff pleads factual content that allows court to draw reasonable inference that defendant is liable for misconduct alleged. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5]    Federal Civil Procedure    Insufficiency in general**

**Federal Civil Procedure    Matters deemed admitted;  acceptance as true of allegations in complaint**

In determining whether complaint survives motion to dismiss for failure to state a claim, legal conclusions or threadbare recitals of elements of cause of action, supported by conclusory statements, should not be credited; plaintiff's obligation to provide grounds of his entitlement to relief requires more than labels and conclusions, and formulaic recitation of elements of cause of action will not do. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[6]    Civil Rights    Nature and elements of civil actions**

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 639 of 1384

Duffy v. International Union of Operating Engineers Local..., 795 F.Supp.2d 246...

To assert § 1983 claim, plaintiff must prove that (1) challenged conduct was attributable at least in part to person who was acting under color of state law and (2) conduct deprived plaintiff of right guaranteed under Constitution of the United States. 42 U.S.C.A. § 1983.

**[7]    Civil Rights  ⚷  Employment practices**

Actions of officer appointed by federal district court to oversee implementation of union consent decree do not constitute "state action" for constitutional purposes. 42 U.S.C.A. § 1983.

**[8]    Civil Rights  ⚷  Employment practices**

Union or its officials generally are not amenable to suit under § 1983 because they are not state actors. 42 U.S.C.A. § 1983.

**[9]    Constitutional Law  ⚷  Certainty and definiteness; vagueness**

Due Process Clause requires that laws be crafted with sufficient clarity to give person of ordinary intelligence reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them. U.S.C.A. Const.Amend. 14.

**[10]    Constitutional Law  ⚷  Certainty and definiteness; vagueness**

First way that law may be unconstitutionally vague as applied to conduct of certain individuals so as to violate Due Process clause is if it fails to provide people of ordinary intelligence reasonable opportunity to understand what conduct it prohibits, and even if person of ordinary intelligence has notice of what statute prohibits, statute nonetheless may be unconstitutionally vague if it authorizes or even encourages arbitrary and discriminatory enforcement. U.S.C.A. Const.Amend. 14.

**[11]    Constitutional Law  ⚷  Certainty and definiteness; vagueness**

Regulations satisfy due process as long as reasonably prudent person, familiar with conditions regulations are meant to address and objectives regulations are meant to achieve, has fair warning of what regulations require. U.S.C.A. Const.Amend. 14.

**[12]    Constitutional Law  ⚷  Contractors, plumbers, and electricians**
**Licenses  ⚷  Constitutionality and Validity of Acts and Ordinances**

Requirement in New York City Construction Code that carriers of licenses be "of good moral character," relied on as basis for initiating Office of Administrative Trials and Hearings (OATH) proceedings against union members who held hoisting machine operator licenses and were indicted on criminal charges pursuant to Racketeer Influenced and Corrupt Organizations Act (RICO) was not unconstitutionally vague so as to deprive them of Fourteenth Amendment due process; charges against members, who were longtime license holders, specifically stated that their criminal conduct, i.e., conspiracy to commit extortion and mail fraud, "constitutes poor moral character" and they thus had fair warning that Code precluded that type of criminal conduct, and even if phrases "bad moral character" or "good moral character" were not clear, conduct involving extortion and mail fraud was consistent with former and antithetical

Duffy v. International Union of Operating Engineers Local..., 795 F.Supp.2d 246...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 640 of 1384

to latter and as such clearly fell within Code's prohibitions, i.e., no reasonable enforcing officer could doubt law's application in the circumstances. U.S.C.A. Const.Amend. 14; 🚩 18 U.S.C.A. § 1961 et seq.; 📄 42 U.S.C.A. § 1983; New York City Administrative Code, § 28–401.19(13).

**[13]    Constitutional Law** 🔑 Certainty and definiteness; vagueness

Court may determine that statute challenged as impermissibly vague on due process grounds provides adequate guidance if either (1) statute as general matter provides sufficiently clear standards to eliminate risk of arbitrary enforcement, or (2) even in absence of such standards, conduct at issue falls within core of statute's prohibition. U.S.C.A. Const.Amend. 14.

**[14]    Constitutional Law** 🔑 Duration and timing of deprivation; pre- or post-deprivation remedies

Although particular requirements of due process are situation-specific, generally, due process requires that state afford persons some kind of hearing prior to depriving them of liberty or property interest. U.S.C.A. Const.Amend. 14.

**[15]    Constitutional Law** 🔑 Contractors, plumbers, and electricians

**Licenses** 🔑 Revocation, suspension, or forfeiture; discipline in general

Union members who were indicted for criminal charges under Racketeer Influenced and Corrupt Organizations Act (RICO) and whose hoisting machine operator licenses were thus subject to revocation in New York City Office of Administrative Trials and Hearings (OATH) proceedings failed to allege they were deprived of procedural due process, as complaint failed to identify constitutionally protected interest or deprivation thereof; they did not assert that their licenses were revoked or that they were deprived of a hearing prior to the revocation. U.S.C.A. Const.Amend. 14; 🚩 18 U.S.C.A. § 1961 et seq.; 📄 42 U.S.C.A. § 1983.

**[16]    Federal Courts** 🔑 Effect of dismissal or other elimination of federal claims

Having dismissed all federal claims over which it had original jurisdiction, district court would decline to exercise supplemental jurisdiction over remaining state law claims. 📄 28 U.S.C.A. § 1367(c)(3).

**Attorneys and Law Firms**

**\*249**  Law Offices Of Frederick K. Brewington, by: Frederick K. Brewington, Hempstead, NY, for Plaintiffs.

La Reddola, Lester & Associates, LLP, by: Robert James La Reddola, Garden City, NY, for Plaintiffs.

Brady McGuire & Steinberg, LLP, by: James Michael Steinberg, Hastings–on–Hudson, NY, for Defendants International Union of Operating Engineers Local 14–14B, Edwin L. Christian, Walter J. McKenna, Christopher T. Confrey, John R. Powers, and Daniel Noesges.

Baker & Hostetler LLP, by: Lauren J. Resnick, New York, NY, for Defendant George A. Stamboulidis.

The City of New York Law Department, Office of Corporation Counsel, by: Diana M. Murray, New York, NY, for Defendants The New York City Department of Buildings and Robert LiMandri.

Duffy v. International Union of Operating Engineers Local..., 795 F.Supp.2d 246...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 641 of 1384

### MEMORANDUM & ORDER

JOHNSON, Senior District Judge.

Presently before the Court are the following motions:

(1) Plaintiffs' William Duffy, Gene Panessa, and James Mascarella (collectively, **\*250** "Plaintiffs") motion for a preliminary injunction staying Defendant International Union of Operating Engineers Local 14–14B ("the Union" or "Local 14"); Defendants Edwin L. Christian, Walter J. McKenna, Christopher T. Confrey, John R. Powers, and Daniel Noesges (collectively, with the Union, "Union Defendants"); any members or agents of the Union; and Defendant George Stamboulidis, Ethical Practices Attorney ("the EPA"), from suspending or revoking Plaintiffs' membership in the Union, commencing disciplinary proceedings against the Plaintiffs, or taking any other actions that could affect the Plaintiffs' membership in the Union (Docket No. 2);

(2) motions to dismiss the Complaint by the EPA (Docket No. 35); the Union Defendants (Docket No. 21); and Defendants the New York City Department of Buildings and Robert LiMandri (collectively, "the City Defendants") (Docket No. 28).

In March 2011, the Court issued an oral order denying Plaintiffs' motion for injunctive relief against the EPA and Union Defendants and granting the EPA and Union Defendants' motions to dismiss, but reserving decision on the City Defendants' motion to dismiss. The Court now reaffirms these rulings and further GRANTS the City Defendants' motion to dismiss.

### BACKGROUND

#### I. Factual Background

Local 14, a labor organization, represents heavy construction equipment operators throughout the five boroughs of New York City. Plaintiffs are members of Local 14 who hold Hoisting Machine Operator licenses. Defendants Christian, McKenna, Confrey, Powers, and Noesges are elected officials of Local 14.

Between 2003 and 2005, Plaintiffs and several other members and officers of Local 14 were indicted on criminal charges pursuant to the Racketeer Influenced and Corrupt Organizations Act, 🚩 18 U.S.C. § 1961 *et seq.* ("RICO") in the Eastern and Southern Districts of New York. In total, twenty-nine officers and members of Local 14 each pleaded guilty to various crimes including labor racketeering, extortion, mail fraud, embezzlement, and conspiracy. Following the indictments, Local 14 took steps internally to combat corruption, including the introduction of amendments to the Union's by-laws and a new Ethical Practices Code.

In July 2008, the Government commenced a civil RICO action, pursuant to 🚩 18 U.S.C. § 1964 to further combat corruption and organized crime influence in the Union's operations. *United States v. Local 14–14B of the International Union of Operating Engineers,* 08–CV–3046 (SJ)(JMA) (E.D.N.Y.) (*"United States v. Local 14"*). To settle the action, the Union and the Government entered into a Consent Decree, which was entered as Order and Judgment on August 11, 2008. (*See* Consent Decree and Judgment ("Consent Decree"), Compl. Ex. 1.)

The Consent Decree states that its purpose is to "eradicate corruption ... and any organized crime influence within Local 14 while preserving the Local's strength and autonomy ...." (*See* Consent Decree at 2.) Accordingly, relevant to the pending motions, the Consent Decree enjoins Local 14 and all of its current and future officers, agents, representatives, employees, and members from engaging in acts of corruption. (*See* Consent Decree § III.) The Consent Decree ordered the appointment of an Ethical Practices Attorney (the "EPA") to, *inter alia,* investigate corruption concerning Local 14 and institute disciplinary proceedings against

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 642 of 1384

Duffy v. International Union of Operating Engineers Local..., 795 F.Supp.2d 246...

union leaders and/or members who engaged in corrupt practices. (*See* Consent Decree §§ II.D, IV.B.) The Consent Decree also authorized a Hearing Officer to preside over any disciplinary hearings and to suspend from **\*251** Union membership any officer or member who the Hearing Officer has determined engaged in corruption concerning Local 14. (*See* Consent Decree § V.) The Decree further provides for notice and appeal procedures for any determinations made by the EPA or the Hearing Officer. (*See* Consent Decree § VII.). Defendant Stamboulidis was appointed as the EPA and Steven C. Bennett was appointed as the Hearing Officer. (*See* Compl. ¶ 33.)

In February 2010, the EPA mailed notices ("Advisory Notices") to Plaintiffs advising them of potential disciplinary charges based on the acts which formed the basis for their convictions. (*See* Compl. ¶ 37.) In the Advisory Notices, the EPA invited the members to advocate as to why charges should not be filed against them. (*See id.*) Meanwhile, in May 2010, the City Defendants filed petitions against each Plaintiff at the New York City Office of Administrative Trials and Hearings ("OATH"), an independent agency that conducts administrative hearings for other City agencies, alleging that Plaintiffs violated the section 28–401.19 of the New York City Construction Code ("the Code") requiring carriers of the licenses to be "of good moral character." (*See* Compl. ¶¶ 69, 78, 85.) The bases of the charges were Plaintiffs' guilty pleas to federal criminal charges involving the construction industry. (*See id.*)

## II. Procedural Background

In July 2010, the EPA filed a Motion to Enforce Judgment ("the Petition") in *United States v. Local 14;* Plaintiffs entered an appearance in that action to oppose. Plaintiffs then filed this action [1] alleging: (1) claims pursuant to 42 U.S.C. § 1983 against the City Defendants for deprivation of due process rights and against the EPA and the Union Defendants for acting outside the scope of the Consent Decree; and (2) claims pursuant to New York State and New York City anti-discrimination law against all defendants. Plaintiffs also moved for a temporary restraining order ("TRO") and for preliminary and permanent injunctive relief against Defendants. This Court denied the motion for a TRO and preliminary relief. (*See* Docket Entry 7/13/2010.) Defendants then moved to dismiss the Complaint.

After oral argument, the Court denied Plaintiffs' motion for permanent injunctive relief against the City Defendants to enjoin the OATH hearings. (*See* Docket No. 45 ("October 22 Order").) [2] In January 2011, the Court entered an Order granting the EPA's Petition in the civil RICO action. (*See United States v. Local 14–14B,* Docket 62 (the "*Local 14* Order").) [3] As noted, this Court denied Plaintiffs' motion for preliminary injunction as to the EPA **\*252** and Union Defendants, granted the EPA's and Union Defendants' motions to dismiss, and reserved decision on the City Defendants' motion to dismiss.

## *DISCUSSION*

## I. Plaintiffs' Motion for Injunctive Relief

 **[1]**    To succeed on a motion for a preliminary injunction, the moving party "must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Fed. Express Corp. v. Fed. Espresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000) (citations omitted).

 **[2]**    Here, the Court need not consider the second prong because Plaintiffs cannot bear their burden on the first. Plaintiffs argue that the EPA's Advisory Notices regarding possible disciplinary hearings against them and the Union Defendants' amendment of the by-laws to permit the same will inflict irreparable harm in the form of lost wages, loss of reputation, and potential removal from the Union. But, "loss of wages by an identifiable group of employees does not qualify as irreparable harm in the Second Circuit." *United States v. International Brotherhood of Teamsters* 725 F.Supp. 162, 169 (S.D.N.Y.1989), *aff'd,* 905 F.2d 610 (2d Cir.1990). Like the union members in *Teamsters,* Plaintiffs are convicted felons, and therefore "potential suspensions should

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 643 of 1384

Duffy v. International Union of Operating Engineers Local..., 795 F.Supp.2d 246...

cause little further damage to their reputations." *Id.* Even if disciplinary proceedings are instituted, Plaintiffs have recourse to appeal to this Court pursuant to the Consent Decree and therefore suffer no irreparable harm. *See id.* (describing appellate procedures pursuant to consent decree); *see also* Consent Decree § VII (describing analogous appellate procedures applicable to *United States v. Local 14* ). Accordingly, Plaintiffs' request for a preliminary injunction as to possible disciplinary actions by the EPA and the Union is denied.

## II. Defendants' Motions to Dismiss

### A. *Legal Standard*

**[3]**   "[A] claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008) (citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) (citation omitted). "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (citation omitted). A district court may consider evidence outside the pleadings when resolving a motion to dismiss for lack of subject matter jurisdiction. *Id.* (citing *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)).

**[4]**   **[5]**   In a Rule 12(b)(6) motion to dismiss for failure to state a claim, Plaintiffs' well-pleaded allegations, assumed to be true, must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Legal conclusions **\*253**  or threadbare recitals of the elements of a cause of action, supported by conclusory statements, should not be credited. *Id.* at 1950. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (internal quotation marks omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 129 S.Ct. at 1950. In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint. *Subaru Distribs. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 122 (2d Cir.2005) (citation omitted).

### B. *Section 1983 Claim*

**[6]**   To assert a § 1983 claim, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted); *Sybalski v. Independent Group Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008).

### 1. Claim against the EPA and the Union Defendants

AR.04484

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 644 of 1384

Duffy v. International Union of Operating Engineers Local..., 795 F.Supp.2d 246...

**[7]** **[8]** Plaintiffs assert § 1983 claims against the EPA and the Union Defendants for acting outside the scope of the Consent Decree and for impermissibly amending the Union's by-laws, respectively. (*See* Compl. ¶ 37–62.) However, "[i]t is well settled that the actions of an officer appointed by a federal district court to oversee the implementation of a union consent decree do not constitute 'state action' for constitutional purposes." *United States v. Mason Tenders District Council,* No. 94–6487, 1997 WL 340993, at *6 (S.D.N.Y. June 20, 1997). The EPA's powers to bring disciplinary proceedings stem from amendments to the Union's Constitution, a private agreement. *See United States v. International Brotherhood of Teamsters,* 941 F.2d 1292, 1296 (2d Cir.1991). As to the Union, "[a] Union or its officials ... generally are not amenable to suit under § 1983 because they are not state actors." *Jourdain v. Service Employees International Union Local 1199,* No. 09–1942, 2010 WL 3069965, at *6 (S.D.N.Y. July 28, 2010). Plaintiffs therefore cannot state a plausible § 1983 claim for relief against the EPA and the Union Defendants; those claims are hereby dismissed.

### 2. Claim against the City Defendants

Plaintiffs also allege that, pursuant to § 1983, the City Defendants violated their Fourteenth Amendment right to due process by relying on unconstitutionally vague terms as the basis for initiating OATH proceedings against them, and by failing to provide them with procedural due process. (*See* Compl. ¶¶ 63–90.) These claims also must be dismissed.

### (a) *Void-for Vagueness As–Applied*[4]

**[9]** **[10]** "The Due Process Clause requires 'that laws be crafted with sufficient **\*254** clarity to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply them.' " *Perez v. Hoblock,* 368 F.3d 166, 174–75 (2d Cir.2004) (citations omitted). "The first way that a law may be unconstitutionally vague as applied to the conduct of certain individuals is 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.' " *VIP of Berlin LLC v. Town of Berlin,* 593 F.3d 179, 186–87 (2d Cir.2010) (citing *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)). Even if a person of ordinary intelligence has notice of what a statute prohibits, the statute nonetheless may be unconstitutionally vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Dickerson v. Napolitano,* 604 F.3d 732, 747 (2d Cir.2010) (citations omitted).

Plaintiffs allege the following: (1) in 2009, they appeared before the New York City Department of Investigation to answer questions about their convictions and their licenses were renewed (Compl.¶¶ 67–68, 76–77, 83–84); (2) in May 2010, the City Defendants filed charges against them pursuant to section 28–401.19(13) of the Code, which gives the Commissioner the power to suspend or revoke a license for several reasons, including "[p]oor moral character that adversely reflects on [the license holder's] fitness to conduct work regulated by this code ...." (*see* Compl. ¶¶ 69, 78, 85, 86); (3) no evidence for "poor moral character" in May 2010, when the charges were filed, is presented, other than past criminal arrest history (Compl. ¶ 87); and (4) the grounds asserted for poor moral character relate back to events in 2003 and 2004 and are not relevant because Plaintiffs' licenses were renewed annually from 2003 to 2009 (*see* Compl. ¶ 88).

**[11]** **[12]** Even assuming their truthfulness, none of these allegations can "plausibly give rise to an entitlement to relief." *Iqbal,* 129 S.Ct. at 1950. "[R]egulations satisfy due process as long as a reasonably prudent person, familiar with conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require." *Lyn v. Incorporated Village of Hempstead,* No. 03–CV–5041, 2007 WL 1876502, at *10 (E.D.N.Y. June 28, 2007) (Hurley, J.) (citations omitted), *aff'd,* 308 Fed.Appx. 461 (2d Cir.2009) (unpublished opinion). Here, the charges against Plaintiffs specifically state that the criminal conduct—i.e., conspiracy to commit extortion **\*255** and mail fraud

Duffy v. International Union of Operating Engineers Local..., 795 F.Supp.2d 246...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 645 of 1384

—"constitutes poor moral character." (*See* Murray Decl. Exs. B–D, at 2.) Plaintiffs, long-time hoist machine operators and license holders, had fair warning that the Code precluded this type of criminal conduct. Moreover, the Code need not "achieve 'meticulous specificity,' which would come at the cost of 'flexibility and reasonable breadth.' " *Dickerson,* 604 F.3d at 747 (citations omitted).

[13]    As to arbitrary enforcement, "a court may determine that a statute provides adequate guidance if either: (1) the statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement; or (2) even in the absence of such standards the conduct at issue falls within the core of the statute's prohibition[.]" *VIP of Berlin,* 593 F.3d at 191 (citing *Farrell v. Burke,* 449 F.3d 470, 494 (2d Cir.2006)). Here, even if the terms "bad moral character" or "good moral character" are not clear, conduct involving extortion and mail fraud is consistent with the former and antithetical to the latter; as such, such conduct clearly falls within the Code's prohibitions. In other words, "no reasonable enforcing officer ... could doubt the law's application in the circumstances." *Farrell,* 449 F.3d at 494. Plaintiffs' as-applied vagueness claim must be dismissed.

### (b) *Procedural Due Process*

[14]    [15]    Finally, Plaintiffs allege that the City Defendants "are not following any procedure which would satisfy due process under the 14th Amendment" because licenses are revoked even when the OATH Hearing Officer recommends otherwise. (Compl. ¶ 90.) "To establish a violation of due process, a plaintiff must (1) identify a constitutionally protected interest of which she was deprived by state action; and (2) show that she did not receive the process that was constitutionally due." *Behrend v. Klein,* Nos. 04–CV–5413 & 04–CV–5414, 2010 WL 627696, at *5 (E.D.N.Y. Feb. 22, 2010) (Garaufis, J.) (citing *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). Plaintiffs cannot meet this burden because the Complaint fails to identify a constitutionally protected interest or deprivation thereof; a single paragraph in their opposition to the City Defendants' motion to dismiss is not sufficient. *See Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") Even if Plaintiffs had properly alleged their constitutionally protected interest in their licenses or deprivation thereof, Plaintiffs fail to allege that they were not provided sufficient process. "Although the particular requirements of due process are situation-specific, generally, due process requires that a state afford persons some kind of hearing prior to depriving them of a liberty or property interest." *See Behrend,* 2010 WL 627696, at *7 (citing *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003)) (internal quotation marks omitted). In the Complaint, Plaintiffs do not assert that their licenses were revoked, or that they were deprived of a hearing prior to the revocation. The Court is aware that at this point Plaintiffs' licenses have been revoked, but Plaintiffs were not denied due process because they afforded a hearing before the decision was issued. Accordingly, this claim is dismissed.

### B. *State Law Claims*

[16]    "It is well-settled that if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Bernstein v. Misk,* 948 F.Supp. 228, 243 (E.D.N.Y.1997) (Glasser, J.) (citations and internal quotation marks omitted); *see also* 28 U.S.C. § 1367(c)(3). **\*256** Having dismissed Plaintiffs' § 1983 claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

### *CONCLUSION*

For the foregoing reasons, the portion of Plaintiffs' motion for preliminary injunction staying the Union, Union Officials, and the EPA from taking any actions that could affect the Plaintiffs' membership in the Union is DENIED. All Defendants' motions to dismiss are GRANTED. [5] The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**All Citations**

795 F.Supp.2d 246

## Footnotes

[1]    Plaintiffs purport to file this action on behalf of themselves and of "a class of persons similarly situated who have been discriminated against in violation of the 14th Amendment of the Constitution, Due Process Clauses and other sections of the Constitution, [42 U.S.C.] § 1981, the Consent Decree, [and state and city anti-discrimination laws.]" (Compl. ¶ 22.) No other plaintiffs have joined this action.

[2]    In December 2010, the OATH hearings for each Plaintiff proceeded, with the Administrative Law Judges ("ALJs") recommending suspension of each Plaintiff's license for one year. (*See* Letter from Robert LaReddola dated Dec. 23, 2010, Exs. A–C (Docket No. 52).) The Commissioner, in his discretion, rejected the ALJs' recommendations and ordered the licenses revoked. (*See* Letter from Robert LaReddola dated January 14, 2011, Exs. A–C (Docket No. 54).)

[3]    Plaintiffs have appealed the *Local 14* Order to the Second Circuit. Further, Plaintiffs have instituted state court proceedings to challenge the Commissioner's decision to revoke the licenses. (*See* Exhibits to Letter from Diana Murray dated Feb. 22, 2011) (Docket No. 56).

[4]    Plaintiffs, in their opposition brief, argue that the Complaint raises facial *and* as-applied vagueness challenges. (Pl. Opp. Mem. at 11–12.) The Second Circuit has stated that "[w]hether a facial void-for-vagueness challenged can be maintained when, as here, a challenge is not properly based on the First Amendment is unsettled." *Dickerson, 604 F.3d at 743* (citing *Farrell, 449 F.3d at 495 n. 12* and *United States v. Rybicki, 354 F.3d 124, 131–32 (2d Cir.2003)* (en banc) for the proposition that *City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999),* cast doubt on previous cases that had limited facial challenges for vagueness, but noting that *Farrell* and *Rybicki* both declined to resolve the conflict). Under one standard, "such challenges are permitted only when 'no set of circumstances exists under which the law would be valid.' " *Dickerson, 604 F.3d at 743* (citing *United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)*). Under another standard, such challenges may be permitted "only after concluding that the law is 'permeated' with vagueness, and, perhaps, that it infringes on a constitutional right and has no mens rea requirement." *Id.* at 744 (citing *Rybicki, 354 F.3d at 131* and *Arriaga v. Mukasey, 521 F.3d 219 (2d Cir.2008)*) (internal quotations omitted). To the extent that Plaintiffs allege a facial challenge, the claims are dismissed because they fail to plead these elements under either standard in the Complaint. The Court's conclusion is consistent with this Circuit's philosophy that "laws with civil consequences[,]" like the Code, receive "less exacting vagueness scrutiny." *Lyn v. Incorporated Village of Hempstead,* 308 Fed.Appx. 461, 464 (2d Cir.2009) (unpublished opinion) (citing *Arriaga, 521 F.3d at 223*).

[5]    The EPA's counter motion for a preliminary injunction in opposition to Plaintiffs' motion for preliminary injunction (Docket No. 27) is denied as moot.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Patel v. Barr, E.D.Pa., July 27, 2020

950 F.3d 1242
United States Court of Appeals, Ninth Circuit.

EAST BAY SANCTUARY COVENANT; Al Otro Lado; Innovation Law Lab; Central American Resource Center, Plaintiffs-Appellees,

v.

Donald J. TRUMP, President of the United States; William P. Barr, Attorney General; James McHenry, Director, Executive Office for Immigration Review (EOIR); Chad Wolf, Acting Secretary, U.S. Department of Homeland Security; Kenneth T. Cuccinelli, Acting Director, U.S. Citizenship and Immigration Services; Mark A. Morgan, Acting Commissioner, U.S. Customs and Border Protection; Matthew T. Albence, Acting Director, U.S. Immigration and Customs Enforcement, Defendants-Appellants.

Nos. 18-17274, 18-17436
|
Argued and Submitted October 1, 2019 San Francisco, California
|
Filed February 28, 2020

**Synopsis**

**Background:** Legal services organizations that assisted migrants seeking asylum sued United States President and Executive Branch agencies and officials, challenging new rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, in combination with presidential proclamation, stripped asylum eligibility from every migrant who crossed into United States at place other than at port of entry, which organizations claimed was unlawful under Administrative Procedure Act (APA) and conflicted with Immigration and Nationality Act (INA). United States District Court for the Northern District of California, Jon S. Tigar, J., 349 F.Supp.3d 838, granted temporary restraining order (TRO) enjoining enforcement of rule and ordering government to return to pre-rule practices for processing asylum applications, and 354 F.Supp.3d 1085, denied stay pending appeal. Government appealed and filed emergency motion for stay pending appeal. The Court of Appeals, Bybee, Circuit Judge, 932 F.3d 742, denied

stay. Government then applied for stay from United States Supreme Court, 139 S. Ct. 782, which also denied stay. While stay application was pending, organizations moved for preliminary injunction. The District Court, Tigar, J., 354 F.Supp.3d 1094, issued nationwide injunction barring enforcement of rule. Government appealed again, and appeal from TRO was consolidated with appeal from preliminary injunction.

**Holdings:** The Court of Appeals, Paez, Circuit Judge, held that:

[1] prior decision by motions panel denying stay was not law of the case;

[2] organizational standing requirements were satisfied;

[3] judicial review was authorized as to whether rule overstepped government's delegated authority under INA;

[4] jurisdiction was not divested by Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA);

[5] organizations fell within zone of interests protected by INA;

[6] rule substantively invalid under APA as conflicting with INA;

[7] rule's interpretation of INA was arbitrary and capricious under APA;

[8] rule unreasonably interpreted INA in light of treaty obligations;

[9] good cause exception to APA's procedural requirements did not apply;

[10] foreign affairs exception to APA's procedural requirements did not apply;

[11] organizations would suffer irreparable harm absent preliminary injunction;

[12] public interest favored grant of preliminary injunction; and

20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

[13] nationwide scope of injunction was not abuse of discretion.

Affirmed.

Fernandez, Senior Circuit Judge, filed opinion concurring in result.

**Procedural Posture(s):** On Appeal; Motion for Temporary Restraining Order (TRO); Motion for Preliminary Injunction; Motion to Stay Enforcement of Judgment.

West Headnotes (133)

**[1]** **Courts** 🔑 Conclusiveness of decisions of Court of Appeals within its circuit

Law of the circuit is "stare decisis," by another name.

**[2]** **Courts** 🔑 Conclusiveness of decisions of Court of Appeals within its circuit

The "law of the circuit doctrine" requires that the Court of Appeals stand by yesterday's decisions, even when doing so means sticking to some wrong decisions.

**[3]** **Courts** 🔑 Conclusiveness of decisions of Court of Appeals within its circuit

Published decisions of the Court of Appeals become law of the circuit, which is binding authority that the Court of Appeals and district courts must follow until overruled.

1 Cases that cite this headnote

**[4]** **Courts** 🔑 Number of judges concurring in opinion, and opinion by divided court

Controlling, overruling authority includes only intervening statutes or United States Supreme Court opinions that create clearly irreconcilable conflicts with Court of Appeals' caselaw.

**[5]** **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

**Federal Courts** 🔑 Law of the case in general

Under the "law of the case doctrine," courts at their own discretion will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case.

**[6]** **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

**Federal Courts** 🔑 Law of the case in general

The law of the case doctrine encourages the conservation of limited judicial resources and promotes consistency by allowing court decisions to govern the same issues in subsequent stages of the same case.

1 Cases that cite this headnote

**[7]** **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

**Federal Courts** 🔑 Law of the case in general

The Court of Appeals does sometimes exercise its discretion to reconsider issues within the same case as exceptions to law of the case.

**[8]** **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

**Federal Courts** 🔑 Law of the case in general

Most often, the Court of Appeals recognizes exceptions to the law of the case doctrine where the prior decision is clearly erroneous and enforcing it would create manifest injustice, intervening controlling authority encourages reconsideration, or substantially different evidence is produced at a later merits trial; this list is narrow but nonexhaustive.

1 Cases that cite this headnote

**[9]** **Courts** 🔑 Previous Decisions in Same Case as Law of the Case

The legal context of the prior decision affects whether and to what extent it may be treated as law of the case.

[10]    **Federal Courts** ⚷ Law of the case

Generally, the Court of Appeals does not apply the law of the case doctrine to administrative proceedings because agencies are sometimes vested with explicit authority to reconsider their own decisions.

[11]    **Federal Courts** ⚷ Former decision as law of the case

Court of Appeals' review of district court orders denying or granting preliminary injunction requests does not typically become law of the case; the record before a later panel may materially differ from the record before the first panel, such that the first panel's decision eventually provides little guidance as to the appropriate disposition on the merits.

1 Cases that cite this headnote

[12]    **Federal Courts** ⚷ Former decision as law of the case

In the Court of Appeals, merits panels tend not to extend the law of the case doctrine to a prior motions panel's decision in the same case.

[13]    **Federal Courts** ⚷ Former decision as law of the case

In the Court of Appeals, a later merits panel should not lightly overturn a decision made by a prior motions panel, but the court does not apply the law of the case doctrine as strictly in that instance as when a second merits panel is asked to reconsider a decision reached by the first merits panel on an earlier appeal.

3 Cases that cite this headnote

[14]    **Federal Courts** ⚷ Rehearing and reargument

Court of Appeals motions panels' orders are generally issued without oral argument, on limited timelines, and in reliance on limited briefing. Fed. R. App. P. 27(a)(3)-(4), 27(e); Ninth Circuit Rules 3-3, 32-1.

1 Cases that cite this headnote

[15]    **Federal Courts** ⚷ Hearing

The record before a Court of Appeals motions panel, much like the record before a district court deciding a preliminary injunction, is often incomplete.

[16]    **Federal Courts** ⚷ Hearing

Constrained by timing demands, Court of Appeals motions panels' decisions are often issued without opinions and explanations.

[17]    **Federal Courts** ⚷ Rehearing and reargument

A Court of Appeals merits panel operating with the benefit of a complete record and additional time to consider the merits of the case may conclude that the prior motions panel's decision was improvident and should be reconsidered.

[18]    **Federal Courts** ⚷ Rehearing and reargument

Reconsideration of a Court of Appeals motions panel's decision by a merits panel differs in a significant way from reconsideration of a merits panel's decision; a party that receives an unfavorable decision by a merits panel will have the opportunity to file a petition for panel rehearing, rehearing en banc, or petition for certiorari.

5 Cases that cite this headnote

[19]    **Federal Courts** ⚷ Rehearing and reargument

Court of Appeals motions panel decisions are rarely subjected to a thorough reconsideration process; full review of a motions panel decision will more likely occur only after the merits panel has acted. Ninth Circuit Rule 27-1.

**East Bay Sanctuary Covenant v. Trump, 950 F.3d 1242 (2020)**
Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 650 of 1384

20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

**[20]** **Federal Courts** ← Former decision as law of the case

Unilaterally binding later Court of Appeals merits panels to the preliminary decisions made by motions panels prevents litigants from fully vindicating their appellate rights.

**[21]** **Courts** ← Number of judges concurring in opinion, and opinion by divided court

**Federal Courts** ← Former decision as law of the case

The first panel in the Court of Appeals to consider an issue sets the law for all the inferior courts in the circuit and future panels of the Court of Appeals, but motions panels' conclusions do not set the law for later merits panels in the same case.

1 Cases that cite this headnote

**[22]** **Courts** ← Number of judges concurring in opinion, and opinion by divided court

**Federal Courts** ← Former decision as law of the case

Tentative conclusions that are not law of the case do not bind later Court of Appeals panels in the same case as law of the circuit; any other rule would paradoxically require that a merits panel treat a motions panel's published decision that does not constitute law of the case as binding.

**[23]** **Courts** ← Number of judges concurring in opinion, and opinion by divided court

**Federal Courts** ← Former decision as law of the case

A Court of Appeals merits panel cannot be simultaneously bound by the prior motions panel's opinion--because it is law of the circuit--and not bound by the opinion--because it is not law of the case.

**[24]** **Federal Courts** ← Supersedeas or Stay of Proceedings

The decision whether to grant a stay pending appeal, much like the decision whether to grant a preliminary injunction, is a probabilistic endeavor; Court of Appeals discusses the merits of a stay request in likelihood terms and exercises a restrained approach to assessing the merits.

**[25]** **Federal Courts** ← Supersedeas or Stay of Proceedings

A predictive analysis in deciding whether to grant a stay pending appeal should not, and does not, forever bind the merits of the parties' claims; this sort of pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing court the time to act responsibly, rather than doling out justice "on the fly."

**[26]** **Federal Courts** ← Former decision as law of the case

Prior decision by Court of Appeals motions panel, denying government's motion to stay preliminary injunction issued by district court to bar enforcement of rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry, and issuing panel's stated reservations that case was still at very preliminary stage and that further development of record could alter panel's conclusions, was not law of the case precluding Court of Appeals merits panel from treating motions panel's decision as persuasive but not binding.

2 Cases that cite this headnote

**[27]** **Federal Courts** ← Supersedeas or Stay of Proceedings

**Injunction** ← Nature of remedy in general

A stay does have some functional overlap with an injunction, particularly a preliminary one; both

can have the practical effect of preventing some action before the legality of that action has been conclusively determined.

**[28]    Federal Courts** 🔑 Supersedeas or Stay of Proceedings

**Injunction** 🔑 Nature of remedy in general

There are important differences between a preliminary injunction and a stay pending review.

**[29]    Federal Courts** 🔑 Supersedeas or Stay of Proceedings

**Injunction** 🔑 Nature of remedy in general

A stay pending review operates upon the judicial proceeding itself, while a preliminary injunction directs an actor's conduct.

**[30]    Federal Courts** 🔑 Injunction and temporary restraining order cases

Court of Appeals exercises restraint in assessing the merits of either the question of whether serious questions were raised relating to the propriety of a district court's preliminary injunction and whether a party would prevail on appeal, but particularly so when considering the extraordinary request to stay a preliminary injunction granted by a district court.

1 Cases that cite this headnote

**[31]    Federal Civil Procedure** 🔑 In general; injury or interest

The Article III standing inquiry serves a single purpose of maintaining the limited role of courts by ensuring they protect against only concrete, non-speculative injuries. U.S. Const. art. 3, § 2, cl. 1.

**[32]    Federal Civil Procedure** 🔑 In general; injury or interest

To satisfy the requirements of Article III standing, parties must have a personal stake in

the outcome sufficient to ensure the court that, absent judicial review, they will suffer or have suffered some direct injury. U.S. Const. art. 3, § 2, cl. 1.

**[33]    Associations** 🔑 Suits on organization's own behalf; organizational standing in general

**Associations** 🔑 Suits on Behalf of Members; Associational or Representational Standing

Organizations can assert standing on behalf of their own members or in their own right.

3 Cases that cite this headnote

**[34]    Associations** 🔑 Injury or interest in general

To determine whether organizational standing requirements have been satisfied, Court of Appeals conducts the same inquiry as in the case of an individual, by inquiring whether the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction.

**[35]    Associations** 🔑 Injury or interest in general

To satisfy the requirements of organizational standing, the organization has the burden of demonstrating that (1) the organization has suffered an "injury-in-fact," meaning an injury that is concrete and particularized and actual and imminent, (2) the alleged injury is fairly traceable to the defendants' conduct, and (3) it is more than speculative that the injury is judicially redressable.

1 Cases that cite this headnote

**[36]    Associations** 🔑 Injury or interest in general

An organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose.

3 Cases that cite this headnote

**[37]    Associations**  ⚷  **Causation and redressability in general**

Organizations cannot manufacture their injury required for organizational standing, by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all; but rather, organizations can show they would have suffered some other injury had they not diverted resources to counteracting the problem.

**[38]    Associations**  ⚷  **Aliens, immigration, and citizenship**

Legal services organizations established that rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) which, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry perceptibly impaired organizations' ability to perform their mission of assisting migrants seeking asylum, thus satisfying organizational standing requirements to challenge rule, where rule significantly discouraged large number of migrants from seeking asylum, caused organizations to divert their limited resources in response to collateral obstacles that rule introduced for asylum-seekers, and jeopardized organizations' critical funding.

3 Cases that cite this headnote

**[39]    Federal Civil Procedure**  ⚷  **In general; injury or interest**

The comparative magnitude of the harms alleged by the parties is not relevant for standing purposes; a loss of even a small amount of money is ordinarily an injury.

**[40]    Associations**  ⚷  **Injury or interest in general**

In analyzing organizational standing, plaintiffs who suffer concrete, redressable harms that amount to pennies are still entitled to relief.

3 Cases that cite this headnote

**[41]    Federal Civil Procedure**  ⚷  **In general; injury or interest**

An injury-in-fact required for Article III standing is an invasion of a legally protected interest, but this means an interest that is only concrete and particularized and actual or imminent, not an interest protected by statute. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[42]    Federal Civil Procedure**  ⚷  **In general; injury or interest**

The distinction between an injury-in-fact as an invasion of a legally protected interest rather than an interest protected by statute prevents Article III standing requirements from collapsing into the merits of a plaintiff's claim; a plaintiff's legally protected interest need not be a statutorily created interest, and the plaintiff can have standing despite losing on the merits. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[43]    Federal Civil Procedure**  ⚷  **In general; injury or interest**

Injury-in-fact required for Article III standing is a judicially cognizable interest; such an interest can support standing even if it is not protected by law so long as it is the sort of interest that courts think to be of sufficient moment to justify judicial intervention. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[44]    Constitutional Law**  ⚷  **Encroachment on Executive**

Court of Appeals does not conduct independent policy analyses of executive decisions; but the court does police the separation of powers in litigation involving the executive. U.S. Const. art. 3, § 1 et seq.

**[45]    Administrative Law and Procedure** 🔑 **Presumptions as to Reviewability**

There is a strong presumption favoring judicial review of administrative action; non-reviewability is an exception that must be clearly evidenced in the statute.

**[46]    Administrative Law and Procedure** 🔑 **Purpose or necessity of review**

Without judicial review of administrative action, statutes would in effect be blank checks drawn to the credit of some administrative officer or board.

**[47]    Administrative Law and Procedure** 🔑 **Powers in General**

Efficient agency administration always requires some authority and responsibility to resolve questions left unanswered by Congress; it does not include the power to revise clear statutory terms.

**[48]    Aliens, Immigration, and Citizenship** 🔑 **Decisions reviewable**

Although power to expel or exclude aliens was fundamental sovereign attribute exercised by government's political departments largely immune from judicial control, Court of Appeals was authorized to review whether government overstepped its delegated authority, under Immigration and Nationality Act (INA), and encroached upon Congress's legislative prerogative by new rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry. 📒 5 U.S.C.A. § 706(2) (A); Immigration and Nationality Act § 208, 📒 8 U.S.C.A. § 1158.

**[49]    Aliens, Immigration, and Citizenship** 🔑 **Expedited removal**

Migrants can be placed in expedited removal proceedings when they arrive at ports of entry without documents, misrepresent their identities, or present fraudulent documents.

**[50]    Aliens, Immigration, and Citizenship** 🔑 **Eligibility; Refugee Status**

Under the INA, undocumented migrants who receive removal orders but indicate an intention to apply for asylum or a fear of persecution may still be considered for asylum. Immigration and Nationality Act § 235, 📒 8 U.S.C.A. § 1225(b) (1)(A)(i).

**[51]    Aliens, Immigration, and Citizenship** 🔑 **Jurisdiction and venue**

In the context of an Administrative Procedure Act (APA) challenge, the provisions of the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA), limiting jurisdiction over challenges to removal orders, prohibit a claim by an alien, however it is framed, that challenges the procedure and substance of an agency determination that is inextricably linked to the order of removal. 📒 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 242, 📕 8 U.S.C.A. §§ 1252(a) (5), 📕 1252(b)(9), 📕 1252(e)(3).

**[52]    Aliens, Immigration, and Citizenship** 🔑 **Jurisdiction and venue**

Claims that are independent of or collateral to the removal process are not actions taken to "remove an alien from the United States," within the meaning of the Immigration Reform and Immigration Responsibility Act (IIRIRA), limiting jurisdiction over challenges to removal orders. Immigration and Nationality Act § 242, 📕 8 U.S.C.A. § 1252(b)(9).

2 Cases that cite this headnote

**[53]    Aliens, Immigration, and Citizenship**  ⚷ Jurisdiction and venue

The purpose of the claim-channeling provisions, under the Immigration Reform and Immigration Responsibility Act (IIRIRA), limiting jurisdiction over challenges to removal orders, is to limit all aliens to "one bite of the apple" with regard to challenging an order of removal. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. §§ 1252(a)(5), 🚩 1252(b)(9), 🚩 1252(e)(3).

1 Cases that cite this headnote

**[54]    Aliens, Immigration, and Citizenship**  ⚷ Jurisdiction and venue

Rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry was not "regulation issued to implement" expedited removal orders or otherwise entirely linked with removal orders, within meaning of Illegal Immigration Reform and Immigration Responsibility Act's (IIRIRA) jurisdiction-stripping provisions authorizing only limited judicial review of removal orders or expedited removal orders, since rule barred eligibility for asylum that was, at best, collateral to process of removal. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. §§ 1252(a)(5), 🚩 1252(b)(9), 🚩 1252(e)(3).

3 Cases that cite this headnote

**[55]    Aliens, Immigration, and Citizenship**  ⚷ Asylum, Refugees, and Withholding of Removal

The law governing asylum is collateral to the process of removal.

2 Cases that cite this headnote

**[56]    Aliens, Immigration, and Citizenship**  ⚷ Eligibility; Refugee Status

Migrants in the United States who file affirmatively for asylum, or who are otherwise lawfully in the country such as those who have a valid visa, maintain Temporary Protected Status, or are given parole, can apply and be eligible for asylum and never encounter any of the statutory provisions governing removal. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. §§ 1252(a)(5), 🚩 1252(b)(9), 🚩 1252(e)(3); 8 C.F.R. § 208.4(a)(5)(iv).

**[57]    Federal Civil Procedure**  ⚷ In general; injury or interest

Plaintiffs are required to fall within the zone of interests protected by the statute in question to bring their claims in federal court.

**[58]    Federal Civil Procedure**  ⚷ In general; injury or interest

The breadth of the zone of interests test for bringing suit in federal court varies, depending on the provisions of law at issue.

**[59]    Administrative Law and Procedure**  ⚷ Interest in general

Under the Administrative Procedure Act (APA), the zone of interests test for bringing claims in federal court is not especially demanding. 5 U.S.C.A. § 702.

1 Cases that cite this headnote

**[60]    Federal Civil Procedure**  ⚷ In general; injury or interest

The zone of interests analysis forecloses suit in federal court only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue.

20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

1 Cases that cite this headnote

[61]  **Federal Courts**  Jurisdiction

In a zone of interests review, Court of Appeals is not limited to considering the specific statute under which plaintiffs sued, but may consider any provision that helps the court to understand Congress' overall purposes in enacting the statute.

1 Cases that cite this headnote

[62]  **Action**  Statutory rights of action

**Federal Courts**  Causes of action created by federal law

The inquiry in the zone of interests test for bringing claims in federal court is intended only to help clarify the statute's scope, not determine whether Congress intended a cause of action to arise for the plaintiff in question.

2 Cases that cite this headnote

[63]  **Aliens, Immigration, and Citizenship**  Right of review or intervention;  standing

**Federal Courts**  Aliens, Immigration, and Citizenship

Legal services organizations' claims that rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) which, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry violated Administrative Procedure Act (APA) and INA fell within zone of interests of INA and of regulatory amendments implemented by rule, since rule shaped asylum eligibility for migrants similar to scope of INA, and organizations' interests in assisting migrants with asylum, providing low-cost immigration services, and conducting related community education programs were at least marginally related to and arguably within scope of INA. 5 U.S.C.A. § 702; Immigration and Nationality Act § 208, 8 U.S.C.A. § 1158.

[64]  **Injunction**  Grounds in general;  multiple factors

A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.

3 Cases that cite this headnote

[65]  **Injunction**  Injunctions Sought by Government in General

**Injunction**  Injunctions against government entities in general

When the government is a party, the last two factors for preliminary injunctive relief, namely, equities and public interest, merge.

2 Cases that cite this headnote

[66]  **Injunction**  Balancing or weighing factors;  sliding scale

The factors for granting a preliminary injunction are evaluated on a sliding scale.

[67]  **Federal Courts**  Preliminary injunction;  temporary restraining order

Court of Appeals reviews for abuse of discretion the district court's grant of a preliminary injunction.

[68]  **Federal Courts**  Abuse of discretion in general

District courts abuse their discretion when they rely on an erroneous legal standard or clearly erroneous finding of fact.

1 Cases that cite this headnote

[69]  **United States**  Review of presidential actions

Presidential action is not ordinarily "agency action" and is typically unreviewable under the Administrative Procedure Act (APA). 5 U.S.C.A. § 706(2)(A).

**[70]    Aliens, Immigration, and Citizenship** 🔖 Decisions reviewable

Rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry was reviewable "agency action," within meaning of Administrative Procedure Act (APA), although presidential action was not ordinarily reviewable agency action under APA, since proclamation and rule together created operative rule of decision for asylum eligibility. 5 U.S.C.A. § 706(2)(A).

**[71]    Administrative Law and Procedure** 🔖 Plain, literal, or clear meaning; ambiguity or silence

Under 🔖 *Chevron*, the Court of Appeals first considers whether Congress has directly spoken to the precise question at issue; if the intent of Congress is clear, that is the end of the matter.

**[72]    Administrative Law and Procedure** 🔖 Erroneous or unreasonable construction; conflict with statute

Federal courts are the final authority on issues of statutory construction and must reject administrative constructions that are contrary to clear congressional intent.

**[73]    Aliens, Immigration, and Citizenship** 🔖 Validity

**Aliens, Immigration, and Citizenship** 🔖 Aliens not within United States

Rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry was substantively invalid as directly conflicting with INA, providing that undocumented migrant could apply for asylum when "physically present in the United States" or "arrives in the United States (whether or not at a designated port of arrival)," and thus, rule was not in accordance with law under Administrative Procedure Act (APA). 5 U.S.C.A. § 706(2) (A); Immigration and Nationality Act § 208, 8 U.S.C.A. § 1158(a).

**[74]    Statutes** 🔖 Unintended or unreasonable results; absurdity

Court of Appeals avoids absurd results when interpreting statutes.

1 Cases that cite this headnote

**[75]    Administrative Law and Procedure** 🔖 Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** 🔖 Permissible or reasonable construction

Under 🔖 *Chevron*, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

**[76]    Administrative Law and Procedure** 🔖 Permissible or reasonable construction

**Administrative Law and Procedure** 🔖 Erroneous or unreasonable construction; conflict with statute

Under 🔖 *Chevron*, Court of Appeals must give effect to an agency's reasonable interpretation of

**East Bay Sanctuary Covenant v. Trump, 950 F.3d 1242 (2020)**

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 657 of 1384
20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

a statute unless the interpretation is inconsistent with clearly expressed congressional intent.

**[77]** **Aliens, Immigration, and Citizenship** 🔑 Humanitarian grant

A refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief.

**[78]** **Aliens, Immigration, and Citizenship** 🔑 Humanitarian grant

Especially where a migrant may be eligible only for asylum and cannot establish the more stringent criteria for withholding of removal, the discretionary factors, including method of entry, to determine whether the migrant should be granted humanitarian relief should be carefully evaluated in light of the unusually harsh consequences which may befall an alien.

**[79]** **Aliens, Immigration, and Citizenship** 🔑 Standards for Persecution

In determining whether a migrant is eligible for asylum, the danger of persecution should generally outweigh all but the most egregious of adverse factors.

**[80]** **Aliens, Immigration, and Citizenship** 🔑 Aliens not within United States

Rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry INA arbitrarily and capriciously, under Administrative Procedure Act (APA), even if INA provisions were ambiguous as to whether migrant could apply for asylum when physically present or arrived in United States whether or not at designated port of arrival, since rule flouted Court of Appeals' and Board of Immigration Appeals' (BIA) discretionary individualized

treatment of refugees' methods of entry as factor long understood to be worth little if any weight.

Immigration and Nationality Act § 208, 🔑 8 U.S.C.A. § 1158(a).

**[81]** **Aliens, Immigration, and Citizenship** 🔑 Aliens not within United States

**International Law** 🔑 Refugees

Rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry was arbitrary and capricious interpretation of INA by infringing on treaty obligations under United Nations Convention Relating to Status of Refugees and United Nations Protocol Relating to Status of Refugees that United States stood by for over 50 years, including right to seek asylum, prohibition against penalties for irregular entry, and principle of nonrefoulement of refugees to countries where their lives were threatened.

Immigration and Nationality Act § 208, 🔑 8 U.S.C.A. § 1158(a).

**[82]** **International Law** 🔑 United Nations

Arguments presented by United Nations in amicus brief as to how United Nations Convention Relating to Status of Refugees and United Nations Protocol Relating to Status of Refugees should be construed were not binding on Court of Appeals, on review of nationwide preliminary injunction barring enforcement of rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry; however, arguments provided significant guidance in construing Protocol, to which Congress sought to conform, and were useful in giving content to obligations that Protocol established.

**[83]** **International Law** 🔑 **Refugees**

Neither the United Nations Protocol Relating to Status of Refugees nor the United Nations Convention Relating to Status of Refugees require countries to accept refugees, but they do ensure that refugees at each signatory's borders have legal and political rights and protections.

**[84]** **Aliens, Immigration, and Citizenship** 🔑 **Eligibility; Refugee Status**

**International Law** 🔑 **Refugees**

The definition of refugee used in the United Nations Convention Relating to Status of Refugees is virtually identical to the one adopted by Congress in the INA. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(42).

**[85]** **Aliens, Immigration, and Citizenship** 🔑 **Eligibility; Refugee Status**

**International Law** 🔑 **Refugees**

Under both the INA and the United Nations Convention Relating to Status of Refugees, "refugees" are all individuals who, because of a well-founded fear of being persecuted for reasons of race, religion, nationality, membership in a particular social group or political opinion, are unable, or, because of such fear, unwilling to return to their home countries. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(42).

**[86]** **Aliens, Immigration, and Citizenship** 🔑 **Eligibility; Refugee Status**

Once individuals meet the statutory definition of a refugee, they may be granted asylum under the INA. Immigration and Nationality Act §§ 101, 208, 🚩 8 U.S.C.A. §§ 1101(a)(42), 🏳 1158(b)(1)(A).

**[87]** **Aliens, Immigration, and Citizenship** 🔑 **Eligibility; Refugee Status**

**International Law** 🔑 **Refugees**

Both the INA and the United Nations Convention Relating to Status of Refugees acknowledge that individuals may be stripped of their refugee status even when they meet the other eligibility criteria for asylum. Immigration and Nationality Act § 208, 🏳 8 U.S.C.A. § 1158(b)(2)(A)(i)-(vi).

**[88]** **International Law** 🔑 **Refugees**

The exceptions to eligibility criteria for asylum listed in the United Nations Convention Relating to Status of Refugees require individualized assessments and must be interpreted restrictively.

**[89]** **Aliens, Immigration, and Citizenship** 🔑 **Ineligible Aliens**

The categorical bars on asylum eligibility in the INA are interpreted with lenience toward migrants to avoid infringing on the commitments set forth in the United Nations Convention Relating to Status of Refugees and United Nations Protocol Relating to Status of Refugees. Immigration and Nationality Act § 208, 🏳 8 U.S.C.A. § 1158(b)(2)(A)(i)-(vi).

**[90]** **Aliens, Immigration, and Citizenship** 🔑 **Unlawful entry or presence**

Illegal entry into the United States by a migrant is not ordinarily considered a serious crime.

**[91]** **Aliens, Immigration, and Citizenship** 🔑 **Ineligible Aliens**

A migrant's method of entry does not per se create a danger to the United States, serve as a useful proxy for terrorist activity, or suggest the persecution of another for purposes of eligibility for asylum.

**[92]    Aliens, Immigration, and Citizenship** 🔑 Aliens not within United States

Many migrants enter between ports of entry out of necessity: they cannot satisfy regular exit and entry requirements and have no choice but to cross into a safe country irregularly prior to making an asylum claim under the INA.

Immigration and Nationality Act § 208, 🔖 8 U.S.C.A. § 1158(b)(1)(A).

**[93]    Aliens, Immigration, and Citizenship** 🔑 Ineligible Aliens

**Aliens, Immigration, and Citizenship** 🔑 Crimes and Related Grounds

Under the INA, deportation is an integral part, indeed, sometimes the most important part, of the penalty that may be imposed on migrants who are found guilty of specified crimes or for other reasons are barred from seeking asylum.

Immigration and Nationality Act § 208, 🔖 8 U.S.C.A. § 1158(b)(2)(A)(i)-(vi).

**[94]    Aliens, Immigration, and Citizenship** 🔑 Asylum Distinguished from Withholding of Removal or Deportation

**Aliens, Immigration, and Citizenship** 🔑 Relief Under Treaties Against Torture

The INA's withholding of removal and Convention Against Torture (CAT) protections are not as great as those conferred by the INA's asylum provisions. Immigration and Nationality Act §§ 208, 241, 🔖 8 U.S.C.A. §§ 1158(b)(1)(A), 🔖 1231(b)(1); 🔖 8 C.F.R. § 1208.16 et seq.

**[95]    Aliens, Immigration, and Citizenship** 🔑 Reasonable fear of persecution or clear probability standard

**Aliens, Immigration, and Citizenship** 🔑 Standard for relief

The evidentiary standard that applicants must meet for either withholding of removal or Convention Against Torture (CAT) relief is higher than the evidentiary standard for asylum. Immigration and Nationality Act §§ 208, 241, 🔖 8 U.S.C.A. §§ 1158(b)(1)(A), 🔖 1231(b)(1); 🔖 8 C.F.R. § 1208.16 et seq.

**[96]    Aliens, Immigration, and Citizenship** 🔑 Clear Probability Standard for Withholding of Removal

**Aliens, Immigration, and Citizenship** 🔑 Standard for relief

Applicants for withholding of removal and Convention Against Torture (CAT) relief must establish a clear probability that they would be persecuted or tortured, respectively, if they were removed to their home countries. Immigration and Nationality Act § 241, 🔖 8 U.S.C.A. § 1231(b)(1); 🔖 8 C.F.R. § 1208.16 et seq.

**[97]    Aliens, Immigration, and Citizenship** 🔑 Clear Probability Standard for Withholding of Removal

**Aliens, Immigration, and Citizenship** 🔑 Standard for relief

A clear probability of persecution or torture, as required for withholding of removal and Convention Against Torture (CAT) relief, means that it is more likely than not that applicants will be persecuted upon their removal. Immigration and Nationality Act § 241, 🔖 8 U.S.C.A. § 1231(b)(1); 🔖 8 C.F.R. § 1208.16 et seq.

**[98]    Aliens, Immigration, and Citizenship** 🔑 Well Founded Fear of Future Persecution

One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place; it would only be too apparent, for example, for a refugee to have a well-founded fear of being

persecuted, as required for eligibility for asylum, where every tenth adult male person is either put to death or sent to some remote labor camp in the applicant's home country. Immigration and Nationality Act § 101, 🚩 8 U.S.C.A. § 1101(a)(42)(A).

**[99]**    **Administrative Law and Procedure** 🔑 Good Cause in General

**Administrative Law and Procedure** 🔑 Effective Date; Prospective or Retroactive Effect

Under the Administrative Procedure Act (APA), different policies underlie the good cause exception for the 30-day grace period before a proposed rule takes effect and the good cause exception for the notice-and-comment requirement, and the exceptions can be invoked for different reasons. 🔖 5 U.S.C.A. § 553(b) et seq.

**[100]**    **Administrative Law and Procedure** 🔑 Notice and comment in general

**Administrative Law and Procedure** 🔑 Effective Date; Prospective or Retroactive Effect

Under the Administrative Procedure Act (APA), notice-and-comment requirements are intended to ensure public participation in rulemaking, and the 30-day waiting period before a proposed rule takes effect is intended to give affected parties time to adjust their behavior before the final rule takes effect. 🔖 5 U.S.C.A. § 553(b) et seq.

1 Cases that cite this headnote

**[101]**    **Administrative Law and Procedure** 🔑 Good Cause in General

**Administrative Law and Procedure** 🔑 Effective Date; Prospective or Retroactive Effect

Proper invocation of the good cause exception to the Administrative Procedure Act's (APA) notice-and-comment requirement and 30-day

waiting period before a proposed rule takes effect is sensitive to the totality of the factors at play.

🔖 5 U.S.C.A. §§ 553(b)(B), 🔖 553(d)(3).

2 Cases that cite this headnote

**[102]**    **Administrative Law and Procedure** 🔑 Good Cause in General

**Administrative Law and Procedure** 🔑 Effective Date; Prospective or Retroactive Effect

The good cause exception to the Administrative Procedure Act's (APA) notice-and-comment requirement and 30-day waiting period before a proposed rule takes effect is a high bar because it is essentially an emergency procedure. 🔖 5 U.S.C.A. §§ 553(b)(B), 🔖 553(d)(3).

1 Cases that cite this headnote

**[103]**    **Administrative Law and Procedure** 🔑 Good Cause in General

**Administrative Law and Procedure** 🔑 Public interest; harm

**Administrative Law and Procedure** 🔑 Effective Date; Prospective or Retroactive Effect

To qualify for the good cause exception to the Administrative Procedure Act's (APA) notice-and-comment requirement and 30-day waiting period before a proposed rule takes effect, the government must make a sufficient showing that delay would do real harm to life, property, or public safety or that some exigency interferes with its ability to carry out its mission. 🔖 5 U.S.C.A. §§ 553(b)(B), 🔖 553(d)(3).

**[104]**    **Aliens, Immigration, and Citizenship** 🔑 Proceedings for adoption and review

Rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant

20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

crossing into United States between ports of entry did not fall within good cause exception to Administrative Procedure Act's (APA) requirements of notice and comment and 30-day grace period before proposed rule took effect; government failed to establish existence of exigency justifying good cause, as single newspaper article was insufficient to demonstrate that delay caused by notice and comment or grace period could do harm to life, property, or public safety. 📖 5 U.S.C.A. §§ 553(b)(B), 📖 553(d)(3).

**[105]    Administrative Law and Procedure** 🔗 **Effective Date; Prospective or Retroactive Effect**

**Statutes** 🔗 **Delay or postponement; future date**

Lag period before any regulation under the Administrative Procedure Act (APA), statute, or proposed piece of legislation allows parties to change their behavior in response. 📖 5 U.S.C.A. § 553(b) et seq.

**[106]    Administrative Law and Procedure** 🔗 **Exceptions to Rulemaking Procedures**

For the foreign affairs exception to apply to the Administrative Procedure Act's (APA) notice-and-comment requirements, the public rulemaking provisions should provoke definitely undesirable international consequences. 📖 5 U.S.C.A. § 553(a).

**[107]    Administrative Law and Procedure** 🔗 **Exceptions to Rulemaking Procedures**

Use of the foreign affairs exception to the Administrative Procedure Act's (APA) notice-and-comment requirements is generally permissible where the international consequences of the rule-making requirements are obvious or thoroughly explained. 📖 5 U.S.C.A. § 553(a).

**[108]    Aliens, Immigration, and Citizenship** 🔗 **Proceedings for adoption and review**

Rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry did not fall within foreign affairs exception to Administrative Procedure Act's (APA) notice-and-comment requirement; government proffered four documents appearing to demonstrate that rule and proclamation were related to ongoing changes in national immigration landscape, but those documents did not establish that adhering to ADA's procedural requirements would provoke definitely undesirable international consequences. 📖 5 U.S.C.A. § 553(a).

**[109]    Injunction** 🔗 **Irreparable injury**

**Injunction** 🔗 **Adequacy of remedy at law**

**Injunction** 🔗 **Recovery of damages**

In evaluating a motion for a preliminary injunction, "irreparable harm" is harm for which there is no adequate legal remedy, such as an award for damages.

7 Cases that cite this headnote

**[110]    Injunction** 🔗 **Irreparable injury**

In evaluating a motion for a preliminary injunction, economic harm is not generally considered irreparable.

7 Cases that cite this headnote

**[111]    Injunction** 🔗 **Irreparable injury**

**Injunction** 🔗 **Recovery of damages**

**Injunction** 🔗 **Administrative Agencies and Proceedings in General**

Where parties cannot typically recover monetary damages flowing from their injury, as is often the case in Administrative Procedure Act (APA) cases, economic harm can be considered irreparable, in support of granting a preliminary injunction. 5 U.S.C.A. § 706(2)(A).

6 Cases that cite this headnote

**[112]    Injunction    Irreparable injury**

In evaluating a motion for a preliminary injunction, intangible injuries may qualify as "irreparable harm," because such injuries generally lack an adequate legal remedy.

1 Cases that cite this headnote

**[113]    Aliens, Immigration, and Citizenship    Injunction**

Legal services organizations that assisted migrants seeking asylum would suffer irreparable harm in absence of preliminary injunction preventing enforcement of rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry, which was substantively invalid as directly conflicting with INA, where organizations would suffer significant change in their programs that was intangible injury as well as concomitant loss of funding for which they had no vehicle for recovery. Immigration and Nationality Act § 208, 8 U.S.C.A. § 1158(a).

**[114]    Aliens, Immigration, and Citizenship    Injunction**

Public interest supported grant of preliminary injunction preventing enforcement of rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from every migrant crossing into United States between ports of entry, which directly conflicted with INA

and, thus, was unlawful under Administrative Procedure Act (APA); public interest was served in value of complying with APA, preventing deaths and wrongful removal of asylum-seekers, preserving congressional intent under INA and United Nations Convention Relating to Status of Refugees, and promoting efficient administration of immigration laws at border. 5 U.S.C.A. § 706(2)(A); Immigration and Nationality Act § 208, 8 U.S.C.A. § 1158(a).

1 Cases that cite this headnote

**[115]    Injunction    Administrative Agencies and Proceedings in General**

In evaluating a motion for a preliminary injunction, the public interest is served by compliance with the Administrative Procedure Act (APA). 5 U.S.C.A. § 706(2)(A).

1 Cases that cite this headnote

**[116]    Injunction    Rules and regulations**

In evaluating a motion for a preliminary injunction, it does not matter that notice and comment required under the Administrative Procedure Act (APA) could have changed the substantive result; the public interest is served from the proper process itself. 5 U.S.C.A. § 553(b) et seq.

1 Cases that cite this headnote

**[117]    Injunction    Rules and regulations**

In evaluating a motion for a preliminary injunction, the requirements of the Administrative Procedure Act (APA) reflect a judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations. 5 U.S.C.A. § 706(2)(A).

**[118]    Aliens, Immigration, and Citizenship    Injunction**

In evaluating a motion for a preliminary injunction, the public has an interest in ensuring that courts do not deliver aliens into the hands of their persecutors and preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.

1 Cases that cite this headnote

**[119]    Injunction** 🔑 Injunctions against government entities in general

In evaluating a motion for a preliminary injunction, the public has an interest in ensuring that the statutes enacted by their representatives are not imperiled by executive fiat.

2 Cases that cite this headnote

**[120]    Injunction** 🔑 Aliens, immigration, and citizenship

In evaluating a motion for a preliminary injunction, the government and the public have an interest in the efficient administration of the immigration laws at the border; this interest is weighty.

**[121]    Injunction** 🔑 Aliens, immigration, and citizenship

In evaluating a motion for a preliminary injunction, control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature; the government has a compelling interest in ensuring that injunctions do not undermine separation of powers by blocking the Executive's lawful ability to regulate immigration and rely on its rulemaking to aid diplomacy. U.S. Const. art. 3, § 1 et seq.

1 Cases that cite this headnote

**[122]    Aliens, Immigration, and Citizenship** 🔑 Standard and Scope of Review

The role of the judiciary in reviewing Executive Branch policies regarding immigration is narrow; it is merely to ensure that executive procedures do not violate principles of due process or displace congressional choices of policy. U.S. Const. art. 3, § 1 et seq.; U.S. Const. Amend. 5.

**[123]    Injunction** 🔑 Specificity, vagueness, overbreadth, and narrowly-tailored relief

Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.

4 Cases that cite this headnote

**[124]    Injunction** 🔑 Specificity, vagueness, overbreadth, and narrowly-tailored relief

Where injunctive relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown, but there is no general requirement that an injunction affect only the parties in the suit.

1 Cases that cite this headnote

**[125]    Equity** 🔑 Grounds of jurisdiction in general

Equitable relief granted by the district court is acceptable where it is necessary to give prevailing parties the relief to which they are entitled.

**[126]    Equity** 🔑 Grounds of jurisdiction in general

**Federal Courts** 🔑 Equity and equitable relief in general

District courts have considerable discretion in crafting suitable equitable relief; correspondingly, appellate review is narrow.

**[127]    Aliens, Immigration, and Citizenship** 🔑 Injunction

Preliminary injunction preventing federal government from taking any action nationwide to implement rule adopted by Department of Justice (DOJ) and Department of Homeland Security (DHS) that, combined with presidential proclamation, stripped asylum eligibility from

every migrant crossing into United States between ports of entry, which directly conflicted with INA, was not abuse of discretion; government failed to propose workable alternative injunctive relief applicable within Ninth Circuit borders, scope of injunction was warranted to remedy irreparable harm to legal services organizations from loss of funding and disruption of their mission to assist asylum-seekers, and there was important need for uniformity in immigration policy. Immigration and Nationality Act § 208,  8 U.S.C.A. § 1158(a).

**[128]**    **Administrative Law and Procedure**  Determination and Disposition

**Administrative Law and Procedure**  Rules and regulations

When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated, not that their application to the individual petitioners is proscribed.

1 Cases that cite this headnote

**[129]**    **Administrative Law and Procedure**  Determination and Disposition

Singular equitable relief is commonplace in Administrative Procedure Act (APA) cases and is often necessary to provide the plaintiffs with complete redress.  5 U.S.C.A. § 706(2)(A).

2 Cases that cite this headnote

**[130]**    **Administrative Law and Procedure**  Scope and Extent of Review of Regulations, Rules, and Other Policies

**Administrative Law and Procedure**  Rules and regulations

**Administrative Law and Procedure**  Rules, regulations, and other policymaking

Court of Appeals' typical response is to vacate the unlawful rule and remand to the agency; the court ordinarily does not attempt, even with the

assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule.

**[131]**    **Administrative Law and Procedure**  Determination and Disposition

Because of the broad equitable relief available in Administrative Procedure Act (APA) challenges, a successful APA claim by a single individual can affect an entire regulatory program.

1 Cases that cite this headnote

**[132]**    **Aliens, Immigration, and Citizenship**  Constitutional and statutory provisions

The INA itself was designed to implement a uniform federal policy, and the meaning of concepts important to its application are not to be determined according to the law of the forum, but rather require a uniform federal definition. Immigration and Nationality Act, § 101 et seq.,  8 U.S.C.A. § 1101 et seq.

1 Cases that cite this headnote

**[133]**    **Injunction**  Aliens, immigration, and citizenship

Different interpretations of executive policy across circuit or state lines will needlessly complicate agency and individual action in response to the United States' changing immigration requirements; for these reasons, in immigration cases, Court of Appeals consistently recognizes the authority of district courts to enjoin unlawful policies on a universal basis.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1257**  Scott Grant Stewart (argued), Deputy Assistant Attorney General; Francesca Genova and T. Benton York, Trial Attorneys; Erez Reuveni, Assistant Director; William C. Peachey, Director; August E. Flentje, Special Counsel; Joseph H. Hunt, Assistant Attorney General; Office of

Immigration Litigation, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Lee P. Gelernt (argued), Judy Rabinovitz, Omar C. Jadwat, Anand Balakrishnan, Daniel Galindo, and Celso Perez, American Civil Liberties Union Foundation, Immigrants' Rights Project, New York, New York; Jennifer Chang Newell, Cody Wofsy, Spencer Amdur, and Julie Veroff, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, California; Melissa Crow, Southern Poverty Law Center, Washington, D.C.; Mary Bauer, Southern Poverty Law Center, Charlottesville, Virginia; Gracie Willis, Southern Poverty Law Center, Decatur, Georgia; Baher Azmy, Angelo Guisado, and Ghita Schwarz, Center for Constitutional Rights, New York, New York; Christine P. Sun and Vasudha Talla, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; for Plaintiffs-Appellees.

Lawrence J. Joseph, Washington, D.C.; Christopher J. Hajec, Director of Litigation, Immigration Reform Law Institute, Washington, D.C.; for Amicus Curiae Immigration Reform Law Institute.

Patrick W. Pearsall, Karthik P. Reddy, and Vaishalee V. Yeldandi, Jenner & Block LLP, Washington, D.C.; Alice Farmer, Office of the United Nations High Commissioner for Refugees, Washington, D.C.; for Amicus Curiae Office of the United Nations High Commissioner for Refugees.

Richard D. Bernstein, Washington, D.C.; Richard Mancino, Willkie Farr & Gallagher LLP, New York, New York; for Amici Curiae Peter Keisler, Stuart Gerson, Carter Phillips, John Bellinger III, Samuel Witten, Ray Lahood, Brackett Denniston, Stanley Twardy, and Richard Bernstein.

Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Alex Gazikas, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Peter S. Margulies, Bristol, Rhode Island; Shoba Sivaprasad Wadhia, University Park, Pennsylvania; for Amici Curiae Professors of Immigration Law.

Margaret L. Carter, Dmitri D. Portnoi, and Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, California; Barbara J. Parker, City Attorney; Maria Bee, Erin Bernstein, Malia McPherson, Zarah Rahman, and Suzanne Deschanner; Office of the City Attorney Oakland, California; Edward N. Siskel, Corporation Counsel, City of Chicago Department of Law, Chicago, Illinois; Zachary W. Carter, Corporation Counsel,

New York City Law Department, New York, New York; for Amici Curiae 21 Counties, Cities, and Local Officials.

Xavier Becerra, Attorney General; Michael L. Newman, Senior Assistant Attorney General; Christine Chuang, Supervising Deputy Attorney General; Shubhra Jeswani and James F. Zahradka II, Deputy Attorneys General; Office of the Attorney General, Oakland, California; Philip J. Weiser, Attorney General, Denver, Colorado; William Tong, Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General, Wilmington, Delaware; Karl A. Racine, Attorney General, Washington, D.C.; Clare E. Connors, Attorney General, Honolulu, Hawaii; Kwame Raoul, Attorney General, Chicago, Illinois; Tom Miller, Attorney General, Des Moines, Iowa; Brian E. Frosh, Attorney General, Baltimore, Maryland; Maura Healey, Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General, Lansing, Michigan; Keith Ellison, Attorney General, St. Paul, Minnesota; Aaron D. Ford, Attorney General, Carson City, Nevada; Gurbir S. Grewal, Attorney General, Trenton, New Jersey; Hector Balderas, Attorney General, Santa Fe, New Mexico; Letitia James, Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Josh Shapiro, Attorney General, Harrisburg, Pennsylvania; Peter F. Neronha, Attorney General, Providence, Rhode Island; Thomas J. Donovan, Jr., Attorney General, Montpelier, Vermont; Mark R. Herring, Attorney General, Richmond, Virginia; Robert W. Ferguson, Attorney General, Olympia, Washington; for Amici Curiae California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Iowa, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington.

Appeal from the United States District Court for the Northern District of California, Jon S. Tigar, District Judge, Presiding, D.C. No. 4:18-cv-06810-JST

Before: Ferdinand F. Fernandez, William A. Fletcher, and Richard A. Paez, Circuit Judges.

Concurrence by Judge Fernandez

**OPINION**

PAEZ, Circuit Judge:

20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

**\*1259** Forty years ago, Congress recognized that refugees fleeing imminent persecution do not have the luxury of choosing their escape route into the United States. It mandated equity in its treatment of all refugees, however they arrived. [1]

This principle is embedded in the Refugee Act of 1980, which established an asylum procedure available to any migrant, "irrespective of such alien's status," and irrespective of whether the migrant arrived "at a land border or port of entry." Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Today's Immigration and Nationality Act ("INA") preserves that principle. It states that a migrant who arrives in the United States—"whether or not at a designated port of arrival"—may apply for asylum. *See* 8 U.S.C. § 1158(a).

In November 2018, the Departments of Justice and Homeland Security jointly adopted an interim final rule ("the Rule") which, coupled with a presidential proclamation issued the same day ("the Proclamation"), strips asylum eligibility from every migrant who crosses into the United States between designated ports of entry. In this appeal, we consider whether, among other matters, the Rule unlawfully conflicts with the text and congressional purpose of the INA. We conclude that it does.

## I.

The Rule announces a new bar to asylum eligibility. It makes migrants who enter the United States in violation of "a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico" categorically ineligible for asylum. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,952 (Nov. 9, 2018) (codified at 8 C.F.R. §§ 208.13, 208.30). Migrants who are ineligible for asylum under the Rule will also automatically receive negative credible-fear determinations in expedited-removal proceedings. *See id.* at 55,935, 55,952. Typically, a migrant in expedited-removal proceedings who demonstrates a "credible fear" of persecution must be allowed to present her asylum claim before an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(v). A migrant who enters the United States in contravention of a proclamation will instead need to demonstrate a "reasonable fear" of persecution or torture—which is more difficult than establishing a credible fear of

persecution—to obtain other forms of relief. *See* 83 Fed. Reg. at 55,936, 55,952; *see also* 8 C.F.R. § 208.31(c); 8 U.S.C. § 1225(b)(1)(B)(v).

The same day the Departments of Justice ("DHS") and Homeland Security ("DHS") adopted the Rule, President Trump issued the Proclamation. The Proclamation suspends the entry of all migrants along the southern border of the United States for ninety days, except for **\*1260** any migrant who "enters the United States at a port of entry and properly presents for inspection." *See* Presidential Proclamation No. 9,822, Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661, 57,663 (Nov. 9, 2018).

Individually, the Rule and Proclamation have little effect. The Proclamation does not have the force of law, and the Rule only effectuates proclamations. But together, the Rule and Proclamation make asylum entirely unavailable to migrants who enter the country between ports of entry. The magnitude of the Rule's effect is staggering: its most direct consequence falls on "the more than approximately 70,000 aliens a year (as of FY 2018) estimated to enter between the ports of entry [who] then assert a credible fear in expedited-removal proceedings." 83 Fed. Reg. at 55,948. These migrants would typically proceed to an asylum hearing before an immigration judge but will now be unable to do so because they have entered the country at a place other than a port of entry.

The day the Proclamation and Rule issued, four legal services organizations that represent current and future asylum-seekers sued to prevent enforcement of the Rule. East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center of Los Angeles (collectively, "the Organizations") argued that the Rule was likely unlawful because it was issued without public notice and comment or complying with the thirty-day grace period required by the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 553(b)–(d). The Organizations also argued that the Rule conflicts with the plain text of the INA and is arbitrary and capricious because it constitutes a severe departure from the Board of Immigration Appeals's and the Ninth Circuit's interpretation of asylum practices in the United States.

The district court agreed that the Rule "irreconcilably conflicts with the INA and the expressed intent of Congress" and entered a temporary restraining order enjoining the Rule's

enforcement and ordering the government "to return to the pre-Rule practices for processing asylum applications." *See* *E. Bay Sanctuary Covenant v. Trump (EBSC I)*, 349 F. Supp. 3d 838, 844, 868–69 (N.D. Cal. 2018). Eight days after the court's order, the government filed an appeal and an emergency motion in the district court to stay the temporary restraining order pending appeal. The court denied the stay motion three days later.

The following day, the government sought an immediate stay in our court of the district court's order pending appeal. In a lengthy published order, a motions panel of this court denied the government's request to stay enforcement of the court's order. *See* *E. Bay Sanctuary Covenant v. Trump (EBSC II)*, 932 F.3d 742, 755, 762 (9th Cir. 2018). Although temporary restraining orders are typically not appealable, the panel concluded that appellate jurisdiction existed under 28 U.S.C. § 1292(a)(1) because the temporary restraining order was effective for thirty days, well beyond the fourteen-day limit imposed by Federal Rule of Civil Procedure 65(b). *Id.* at 762–63. The government's application for a stay from the Supreme Court was also denied. *See* *Trump v. E. Bay Sanctuary Covenant*, ––– U.S. ––––, 139 S. Ct. 782, 202 L.Ed.2d 510 (2018).

While the government's stay application was pending before the Supreme Court, the Organizations filed a motion for a preliminary injunction in the district court. The arguments presented during the second round of litigation were "nearly identical" to those made during the first. *See* **\*1261** *E. Bay Sanctuary Covenant v. Trump (EBSC III)*, 354 F. Supp. 3d 1094, 1102 (N.D. Cal. 2018). Relying heavily on the motions panel's published order, the district court again issued an injunction barring enforcement of the Rule. *See* *id.* at 1121.

The government again appeals, arguing that the district court erred when it entered the injunction or that the injunction should at least be narrowed. We consolidated the government's appeal from the temporary restraining order with the appeal from the preliminary injunction.[2] For the reasons explained below, we agree with the district court that the Rule is inconsistent with the INA, and we affirm the district court's orders granting preliminary injunctive relief.

## II.

We first consider the effect of the motions panel's order on the present panel's decision. How strictly the order binds this court depends on whether it is law of the case, law of the circuit, or both.

[1] [2] [3] [4] Law of the circuit is stare decisis, by another name. The doctrine requires that we "stand by yesterday's decisions"—even when doing so "means sticking to some wrong decisions." *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 135 S. Ct. 2401, 2409, 192 L.Ed.2d 463 (2015). Published decisions of this court become law of the circuit, which is binding authority that we and district courts must follow until overruled. *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc). Controlling, overruling authority includes only intervening statutes or Supreme Court opinions that create "clearly irreconcilable" conflicts with our caselaw. *Miller v. Gammie*, 335 F.3d 889, 893, 900 (9th Cir. 2003) (en banc).

[5] [6] Under the law-of-the-case doctrine, instead, courts—at their own discretion—"will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez*, 677 F.3d at 389 n.4; *see also* *United States v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986). The doctrine encourages the conservation of limited judicial resources and promotes consistency by allowing court decisions to govern the same issues in subsequent stages of the same case. *See* *Am. Civil Liberties Union v. F.C.C.*, 523 F.2d 1344, 1346 (9th Cir. 1975).

[7] [8] [9] [10] [11] We do sometimes exercise our discretion to reconsider issues within the same case. Most often, we recognize exceptions to the law-of-the-case doctrine where the prior decision is "clearly erroneous" and enforcing it would create "manifest injustice"; intervening, controlling authority encourages reconsideration; or substantially different evidence is produced at a later merits trial. *See* *In Re Rainbow Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir. 1996). This list is narrow but nonexhaustive. The legal context of the prior decision also affects whether and to what extent it may be treated as law of the case. We generally do not, for example, apply the doctrine to administrative proceedings because agencies are sometimes vested with explicit authority to reconsider their own **\*1262** decisions. *See, e.g.,* *Silva-Pereira v. Lynch*, 827 F.3d 1176, 1190 (9th Cir. 2016). Our review of district court orders denying

or granting preliminary-injunction requests also does not typically become law of the case; the record before a later panel may materially differ from the record before the first panel, such that the first panel's decision eventually provides "little guidance as to the appropriate disposition on the merits." *Sports Form, Inc. v. United Press Intern., Inc.*, 686 F.2d 750, 753 (9th Cir. 1982).

**[12]    [13]**   Merits panels also tend not to extend the doctrine to a prior motions panel's decision in the same case. *See, e.g., United States v. Lopez-Armenta*, 400 F.3d 1173, 1175 (9th Cir. 2005) (explaining that a prior motions panel's denial of a motion to dismiss did not "preclude [the panel] from reaching a contrary decision"); *In re Castro*, 919 F.2d 107, 108 (9th Cir. 1990) (per curiam) (holding that a motions panel's denial of a dispositive motion without an opinion was not binding on a later merits panel); *Stifel, Nicolaus & Co., Inc. v. Woolsey & Co., Inc.*, 81 F.3d 1540, 1543–44 (10th Cir. 1996) (concluding that the law-of-the-case doctrine did not prevent the panel from reconsidering a motions panel's application of res judicata to a relevant state-court decision). A later merits panel should not "lightly overturn a decision made by a motions panel," but "we do not apply the law of the case doctrine as strictly in that instance as we do when a second merits panel is asked to reconsider a decision reached by the first merits panel on an earlier appeal." *Houser*, 804 F.2d at 568.

Our caselaw interpreting the relationship between motions and merits panels' opinions has not always been clear. Citing to *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003), we recently stated that "a motions panel's published opinion binds future panels the same as does a merits panel's published opinion." *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015). But this observation was not germane to the eventual resolution of *Lair*; the panel noted that the effect of the motions panel's decision was not necessary to its holding, *see id.*, and it was not reached after "reasoned consideration," so its law-of-the-case discussion is dicta and not binding on subsequent cases. *See United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019).

*Gammie* encouraged a "pragmatic" approach to "an evolving body of common law." *335 F.3d at 899–900.* Our own practice has frequently indicated that we have not, and do not, follow the summary language in *Lair*: merits panels of this court frequently depart from published decisions issued by motions panels in the same case. *See, e.g., Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886–87 (9th Cir. 2007) (vacating a stay of a preliminary injunction issued in an opinion by a motions panel); *Golden Gate Rest. Ass'n v. City and Cty. of San Francisco*, 546 F.3d 639, 643–61 (9th Cir. 2008) (reaching the merits of an appeal without reliance on a previous motions panel's order entering a stay of a district court judgment pending appeal); *see also Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 873 (9th Cir. 2008), *rev'd on other grounds by* 562 U.S. 134, 131 S.Ct. 746, 178 L.Ed.2d 667 (re-reviewing the merits of the case and generally treating a motions panel's opinion as nonbinding); *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 518 (9th Cir. 2019) (Fletcher, J., concurring in the judgment) (stating that a later merits panel may, "with the benefit of full briefing and regularly scheduled oral argument," depart from the legal conclusions reached by the motions panel). At least four other circuits have agreed that later panels may review the merits of a case "uninhibited" by a motions panel's earlier decision in the same case. *Stifel, Nicolaus & Co., Inc.*, 81 F.3d at 1544 (10th Cir. 1996); *see also* **\*1263** *Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 311 n.26 (5th Cir. 1998); *Vann v. Citicorp Sav. of Illinois*, 891 F.2d 1507, 1509 n.2 (11th Cir. 1990). Two others have held that jurisdictional determinations by motions panels do not bind later merits panels. *See Council Tree Commc'ns, Inc. v. F.C.C.*, 503 F.3d 284, 291–92 (3d Cir. 2007); *United States v. Henderson*, 536 F.3d 776, 778 (7th Cir. 2008).

**[14]    [15]    [16]    [17]**   There are good policy and practical reasons for departing from *Lair*'s dicta. Motions panels' orders are generally issued without oral argument, on limited timelines, and in reliance on limited briefing. *See Fed. R. App. P. 27(e)* (motions are decided without oral argument unless the court orders otherwise); *compare also Rule 27(a)(3)–(4)* (responses to motions and replies to responses must be filed within ten days of service of the motion) *and* 27(d)(2) (motions or responses to motions are limited to 5,200 words; replies are limited to 2,600 words) *with* Ninth Circuit Rule 3-3 (in preliminary injunction appeal, opening brief must be filed within 28 days of notice of appeal; response must be filed 28 days thereafter; reply may be filed 21 days thereafter) *and* Ninth Circuit Rule 32-1 (opening and response briefs limited to 14,000 words). The record before a motions

panel, much like the record before a district court deciding a preliminary injunction, is often incomplete. *Cf. Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."). Constrained by timing demands, motions panels' decisions are often issued without opinions and explanations. *See, e.g., Haggard v. Curry*, 631 F.3d 931, 933 n.1 (9th Cir. 2010) (per curiam). A panel operating with the benefit of a complete record and additional time to consider the merits of the case may "conclude that the motions decision was improvident and should be reconsidered." *Houser*, 804 F.2d at 568 (citing *E.E.O.C. v. Neches Butane Prod. Co.*, 704 F.2d 144, 147 (5th Cir. 1983)).

**[18]  [19]  [20]  [21]  [22]  [23]** Reconsideration of a motions panel's decision by a merits panel also "differs in a significant way" from reconsideration of a merits panel's decision. *Id.* A party that receives an unfavorable decision by a merits panel will have the opportunity to file a petition for panel rehearing, rehearing en banc, or petition for certiorari. Motions for reconsideration or modification of a motions panel's order are "discouraged," "disfavored by the court[,] and rarely granted." Ninth Circuit Rule 27-1 advisory committee note. For this reason, motions panel decisions are "rarely subjected" to a thorough reconsideration process; "[f]ull review of a motions panel decision will more likely occur only after the merits panel has acted." *Houser*, 804 F.2d at 568. Unilaterally binding later merits panels to the preliminary decisions made by motions panels prevents litigants from fully vindicating their appellate rights.[3]

*\*1264* **[24]  [25]** These concerns are particularly heightened here, where the motions panel considered whether to grant the government's request for a stay of the district court's preliminary injunction. The decision whether to grant a stay—much like the decision whether to grant a preliminary injunction—is a "probabilistic" endeavor. *Sierra Club v. Trump*, 929 F.3d 670, 688 (9th Cir. 2019). We discuss the merits of a stay request in "likelihood terms," and exercise a "restrained approach to assessing the merits." *Id.* (quotations omitted). Such a predictive analysis should not, and does not, forever bind the merits of the parties' claims. This sort of "pre-adjudication adjudication would defeat the purpose of a stay, which is to give the reviewing

court the time to 'act responsibly,' rather than doling out 'justice on the fly.'" *Leiva-Perez v. Holder*, 640 F.3d 962, 967 (9th Cir. 2011) (quoting *Nken v. Holder*, 556 U.S. 418, 427, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)).

**[26]** Notably, when acting on the government's stay motion in this case, the motions panel acknowledged the preliminary nature of the stay proceedings. The panel issued a lengthy opinion with detailed analysis, but repeatedly "stress[ed]" that the case was still "at a very preliminary stage of the proceedings," and expected that "[f]urther development of the record as the case progresses may alter [their] conclusions." *EBSC II*, 932 F.3d at 780. The panel also left open various mixed questions of law and fact for a later court—pointing out, for example, that if "facts develop in the district court that cast doubt on the Organizations' standing, the district court is, of course, free to revisit this question," *id.* at 763 n.6, and reiterating that its conclusions were reached "at [the current] stage of the proceedings," *see id.* at 763, 767, 778, 779.

**[27]  [28]  [29]  [30]** The question before us now is also doctrinally distinct from the question considered by the motions panel. A stay does have "some functional overlap with an injunction, particularly a preliminary one"; both "can have the practical effect of preventing some action before the legality of that action has been conclusively determined." *Nken*, 556 U.S. at 428, 129 S.Ct. 1749. But, as we have noted, "there are important differences between a preliminary injunction and a stay pending review." *Leiva-Perez*, 640 F.3d at 966 (citing *Nken*, 556 U.S. at 425–30, 129 S.Ct. 1749). A stay "operates upon the judicial proceeding itself," while a preliminary injunction "direct[s] an actor's conduct." *Nken*, 556 U.S. at 428, 429, 129 S.Ct. 1749. In the government's appeal, we are charged with determining whether the district court abused its discretion in granting the preliminary injunction, *see All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); the motions panel, instead, considered whether the government raised serious questions relating to the propriety of the district court's preliminary injunction and whether the government would likely prevail on appeal, *see Leiva-Perez*, 640 F.3d at 965–66. The question presented to the motions panel is an additional step removed from the underlying merits of the district court's preliminary injunction. We exercise restraint in assessing the merits of either question, *see Sierra*

*Club*, 929 F.3d at 688, but particularly so when considering the "extraordinary request" to stay a preliminary injunction granted by a district court. *Barr v. E. Bay Sanctuary Covenant*, No. 19A230, —— U.S. ——, ——, 140 S.Ct. 3, 204 L.Ed.2d 1189 ( 2019) (Sotomayor, J., dissenting from grant of a stay).

Given the preliminary stage of the appellate process at which the motions panel **\*1265** issued the order denying the government's stay motion and the panel's stated reservations, we treat the motions panel's decision as persuasive, but not binding.

### III.

We next re-evaluate the government's challenge to our jurisdiction. The government argues, as it did previously before the district court and before the motions panel, that the Organizations lack Article III standing because they have not suffered a cognizable injury and are outside the zone of interests protected by the INA. The government also renews three arguments before this court: (1) the Organizations lack a "legally protected interest in maintaining their current organizational structure or in the [R]ule's application to third parties," Op. Br. of Gov't at 29,[4] (2) the "immigration context" of the Rule counsels against judicial intrusion, and (3) various portions of the INA divest this court of jurisdiction to entertain this appeal. We address each argument in turn.

### A.

**[31]** **[32]** The Article III standing inquiry serves a single purpose: to maintain the limited role of courts by ensuring they protect against only concrete, non-speculative injuries.

*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 583, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Parties must have a "personal stake in the outcome" sufficient to ensure the court that, absent judicial review, they will suffer or have suffered some direct injury. *See id.*

**[33]** **[34]** **[35]** Organizations can assert standing on behalf of their own members, *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), or in their own right, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79,

102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). To determine whether organizational standing requirements have been satisfied, we "conduct the same inquiry as in the case of an individual: Has the plaintiff 'alleged such a personal stake in the outcome of the controversy so as to warrant his invocation of federal-court jurisdiction?' " *Havens*, 455 U.S. at 378–79, 102 S.Ct. 1114. The Organizations therefore have the burden of demonstrating that (1) they have suffered an injury-in-fact, meaning an injury that is "concrete and particularized" and "actual and imminent," (2) the alleged injury is "fairly traceable" to the defendants' conduct, and (3) it is "more than speculative" that the injury is judicially redressable. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130.

In *Havens*, the Supreme Court held that a fair housing organization had standing under the Fair Housing Act where the defendants' allegedly racial steering practices had frustrated the organization's ability to assist equal access to housing, and it had to devote "significant resources" to identify and counteract those practices. 455 U.S. at 379, 102 S.Ct. 1114. Because the defendants' practices had "perceptibly impaired" the organization's ability to provide its services, the Court explained, "there can be no question that the organization has suffered injury in fact." *Id.*

**[36]** **[37]** We have read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). Of course, organizations cannot "manufacture the injury by incurring litigation costs or simply choosing **\*1266** to spend money fixing a problem that otherwise would not affect the organization at all," but they can show they "would have suffered some other injury" had they "not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010); *see also, e.g., El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 745, 748 (9th Cir. 1991).

**[38]** We agree with the motions panel and the district court that the Organizations have established that the Rule has "perceptibly impaired" their ability to perform the services they were formed to provide. *EBSC II*, 932 F.3d at 765. This

is sufficient for organizational standing. *See* Combs, 285 F.3d at 904–05.

The Organizations share the same mission of assisting migrants seeking asylum. "[B]ecause the Rule significantly discourages a large number of [asylum-seekers] from seeking asylum given their ineligibility," the Rule frustrates their mission. *EBSC II*, 932 F.3d at 766. The Rule has also caused the Organizations to divert their already limited resources in response to the collateral obstacles it introduces for asylum-seekers. East Bay Sanctuary Covenant ("EBSC") and Innovation Law Lab ("ILL"), for example, are located near Berkeley, California, and in Oregon, respectively, and because most asylum-seekers who enter at a designated port of entry will "remain detained in detention facilities near the border hundreds of miles away," EBSC III, 354 F. Supp. 3d at 1109 (internal quotation marks omitted), those organizations "cannot represent asylum seekers." Decl. of Michael Smith at ¶ 6. Unaccompanied minors are now often unable to seek asylum alone, and "[s]ince the new rule was announced, Al Otro Lado [ ("AOL") ] has been overwhelmed with children who traveled to the southern border of the United States to apply for asylum but now cannot do so." Supp. Decl. of Erika Pineiro at ¶¶ 4, 15. Caring for the often nonlegal needs of these unaccompanied children is not part of AOL's core mission and is "causing a near complete diversion of [AOL's] resources." *Id.* ¶ 16. It has "expended significant resources to send staff to the border as it attempts to shift its programs." *EBSC III*, 354 F. Supp. 3d at 1109.

The funding on which the Organizations critically depend is also jeopardized by the Rule. EBSC only "rarely" represents people in removal proceedings. Decl. of Michael Smith at ¶ 8. Because 80 percent of its clients have entered without stopping at a port of entry in the past, EBSC stands to "lose a significant amount of business and suffer a concomitant loss of funding" if these individuals are deemed categorically ineligible for asylum. *EBSC III*, 354 F. Supp. 3d at 1109 (citing *EBSC II*, 932 F.3d at 767). AOL and CARECEN explain that the Rule decreases the funding they stand to receive from the California Department of Social Services. AOL often represents detained immigrants in their bond proceedings, and "[s]ince the [R]ule went into effect," AOL has "not received a single referral for a bond case, as persons who enter without inspection are ostensibly being put into 'Withholding-only' proceedings and no longer initially eligible for bond." Supp. Decl. of Erika Pineiro at ¶ 22. CARECEN receives from the Department a flat amount of

funding per client it assists, and because more of its clients are being put into more time- and resource-intensive withholding proceedings, it will assist less clients and receive less funding. Decl. of Daniel Sharp at ¶ 7.

**[39]** **[40]** Each organization would have lost clients seeking refuge in the United States had it not diverted resources toward counteracting the effect of the Rule. La Asociacion de Trabajadores de Lake Forest, 624 F.3d at 1088. The Organizations **\*1267** are not required to demonstrate some threshold magnitude of their injuries; [5] one less client that they may have had but-for the Rule's issuance is enough. In other words, plaintiffs who suffer concrete, redressable harms that amount to pennies are still entitled to relief.

**[41]** **[42]** The government advances three additional justiciability arguments. First, the government argues that the Organizations have "no legally protected interest in maintaining their current organizational structure or in the Rule's application to third parties, which the motions panel did not consider in its analysis." Op. Br. of Gov't at 28. This position misunderstands the injury-in-fact inquiry and conflates organizational standing with third-party standing, which the Organizations have conceded is not at issue. [6] An injury-in-fact is "an invasion of a legally protected interest," *see* Lujan, 504 U.S. at 560, 112 S.Ct. 2130, but this means an interest that is only concrete and particularized and actual or imminent—*not* an interest protected by statute. This distinction prevents Article III standing requirements from collapsing into the merits of a plaintiff's claim; "a petitioner's 'legally protected interest' need not be a statutorily created interest," Ass'n of Pub. Agency Customers v. Bonneville Power Admin., 733 F.3d 939, 950 (9th Cir. 2013), and a plaintiff can have standing despite losing on the merits. *See also* In re Special Grand Jury 89-2, 450 F.3d 1159, 1172 (10th Cir. 2006) (citing Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal ....")).

**[43]** More recent Supreme Court opinions have described injury-in-fact as "a judicially cognizable interest"—implying that "an interest can support standing even if it is not protected by law ... so long as it is the sort of interest that courts think to be of sufficient moment to justify judicial intervention." In re Special Grand Jury 89-2, 450 F.3d at 1172 (citing

Bennett v. Spear, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)); *see also, e.g.,* Hollingsworth v. Perry, 570 U.S. 693, 707, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013). Whether the Organizations have a sufficient **\*1268** statutory or otherwise legal basis for their claims is irrelevant at this threshold stage.

The government next argues that we should avoid interfering with DOJ's and DHS's decision to adopt the Rule because "[t]he Supreme Court has 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.' " *See* Op. Br. of Gov't at 30 (quoting Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977)).

**[44]  [45]  [46]  [47]** We do not conduct independent policy analyses of executive decisions. But we do "police the separation of powers in litigation involving the executive[.]" In re Cheney, 334 F.3d 1096, 1106 (D.C. Cir. 2003), *vacated and remanded on other grounds*, 542 U.S. 367, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004). For this reason, there is a strong presumption favoring judicial review of administrative action, *see* Bowen v. Mich. Acad. of Family Phys., 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986); non-reviewability is an exception that must be clearly evidenced in the statute, *see* Barlow v. Collins, 397 U.S. 159, 166–67, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Without such review, "statutes would in effect be blank checks drawn to the credit of some administrative officer or board." Bowen, 476 U.S. at 671, 106 S.Ct. 2133 (citing S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). Efficient agency administration always requires some authority and responsibility to resolve questions left unanswered by Congress. It does not include the "power to revise clear statutory terms." [7] Utility Air Reg. Grp. v. E.P.A., 573 U.S. 302, 327, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014).

**[48]** We are therefore responsible for reviewing whether the government has overstepped its delegated authority under the INA and encroached upon Congress's legislative prerogative.

*See* 5 U.S.C. § 706(2)(A).

Finally, the government argues that three provisions of the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), 8 U.S.C. §§ 1252(e)(3), 1252(a)(5), and 1252(b)(9), divest this court of jurisdiction to entertain this appeal. These statutes, in the government's view, require the Organizations to bring their claims in individual-removal proceedings or in the District Court for the District of Columbia.

**[49]  [50]** Section 1252(e)(3) authorizes a limited court review of expedited-removal proceedings. The statute requires that judicial review of such administrative decisions be initiated in the District Court for the District of Columbia, and limits review to "determinations of (i) whether such section, or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation ... is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." [8] Section 1252(e) (3), in short, limits **\*1269** jurisdiction over challenges to regulations implementing expedited-removal orders. *See* Barajas-Alvarado, 655 F.3d at 1086 n.10.

Section 1252(a)(5) operates in conjunction with section 1252(e). It limits review of expedited-removal orders to habeas review under 1252(e) and further restricts any appellate habeas review to considering only whether the migrant is lawfully in the country. *See* id. at 1082; 8 U.S.C. § 1252(e)(2). Section 1252(b)(9) also applies only to removal orders, but instead channels "[j]udicial review of all questions of law and fact ... arising from any action taken or proceeding brought to remove an alien from the United States[,]" to the courts of appeals. 8 U.S.C. § 1252(b)(9); *see also* I.N.S. v. St. Cyr, 533 U.S. 289, 313, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

**[51]  [52]  [53]** In the APA context, these provisions prohibit "a claim by an alien, however it is framed, [that] challenges the procedure and substance of an agency determination that is 'inextricably linked' to the order of removal[.]" Martinez v. Napolitano, 704 F.3d 620, 623 (9th Cir. 2012). "[C]laims that are independent of or collateral to the removal process" are not actions taken to "remove an alien from the United States." J.E.F.M. v. Lynch, 837 F.3d 1026, 1032 (9th Cir. 2016); 8 U.S.C. § 1252(b)(9). The

purpose of these claim-channeling provisions is to "limit all aliens to one bite of the apple with regard to challenging an order of removal." *Martinez*, 704 F.3d at 622.

**[54]** None of these provisions have any bearing on the Rule. Sections 1252(a)(5), (b)(9), and (e)(3) govern judicial review of removal orders or challenges inextricably linked with actions taken to remove migrants from the country. The Rule "governs *eligibility* for asylum and *screening procedures* for aliens subject to a presidential proclamation or order restricting entry[.]" 83 Fed. Reg. at 55,934 (emphasis added). Bars to asylum eligibility may eventually be relevant to removal proceedings, but they are not "regulation[s] ... to implement [removal orders]" or otherwise entirely linked with removal orders. [9] 8 U.S.C. § 1252(e)(3); *see also Martinez*, 704 F.3d at 623; *O.A. v. Trump*, 404 F. Supp. 3d 109, 141 (D.D.C. 2019) ("§ 1252(e)(3) is about challenges to expedited removal orders and the implementation of the expedited removal provisions that Congress enacted in IIRIRA."). This is consistent with the purposes of these jurisdictional limitations: allowing collateral APA challenges to an asylum-eligibility rule does not undermine Congress's desire to "limit all aliens to one bite of the apple with regard to challenging" their removal orders.

*See Martinez*, 704 F.3d at 622.

**[55] [56]** At best, the law governing asylum is collateral to the process of removal. Migrants in the country who file affirmatively **\*1270** for asylum, or who are otherwise lawfully in the country—such as those who have a valid visa, maintain Temporary Protected Status, or are given parole, for example—can apply and be eligible for asylum and never encounter any of the statutory provisions governing removal. *See* 8 C.F.R. § 208.4(a)(5)(iv). Other subsections of the INA explicitly *grant* this court jurisdiction to review denials of individual asylum applications, further reinforcing that the jurisdiction-stripping provisions cited by the government were not intended to apply at all to challenges to asylum eligibility rules. *See* 8 U.S.C. §§ 1252(a)(2)(B)(ii), (a)(2)(D); *see also Morales v. Gonzales*, 478 F.3d 972, 978–79 (9th Cir. 2007).

We again hold that the Organizations' claims are justiciable and they have otherwise satisfied the Article III standing requirements.

**B.**

**[57] [58] [59] [60]** We generally also require that plaintiffs fall within the "zone of interests" protected by the statute in question to bring their claims in federal court. *Lexmark Int'l, Inc., v. Static Control Components, Inc.*, 572 U.S. 118, 129, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). The breadth of the zone-of-interests test varies, depending on the provisions of law at issue. *Id.* Under the APA, the test is not "especially demanding." *Id.* at 130, 134 S.Ct. 1377 (quotations and citations omitted). The zone-of-interests analysis forecloses suit "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* (quotations and citations omitted).

The Organizations bring their claims under the APA, but because the APA provides a cause of action only to those "suffering legal wrong because of agency action ... within the meaning of a relevant statute," 5 U.S.C. § 702, the relevant zone of interest is that of the INA. *EBSC II*, 932 F.3d at 767–68. And the relevant purpose is not that of the entire INA; it is "by reference to the particular provision of law upon on which the plaintiff relies." *Bennett*, 520 U.S. at 175–76, 117 S.Ct. 1154.

**[61] [62]** In our review, we are "not limited to considering the [specific] statute under which [plaintiffs] sued, but may consider any provision that helps us to understand Congress' overall purposes" in enacting the statute. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *see also EBSC II*, 932 F.3d at 768. This inquiry is intended only to help clarify the act's *scope*—not determine whether Congress *intended* a cause of action to arise for the plaintiff in question. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012) ("We do not require any indication of congressional purpose to benefit the would-be plaintiff.") (internal quotation marks omitted).

**[63]** The Organizations' claims continue to fall within the zone of interests of the INA and of the regulatory amendments implemented by the Rule. The Rule, much like the scope of section 1158(b) of the INA, shapes asylum eligibility

requirements for migrants. The Organizations' purpose is to help individuals apply for and obtain asylum, provide low-cost immigration services, and carry out community education programs with respect to those services. *EBSC III*, 354 F. Supp. 3d at 1108–10. This is sufficient for the Court's lenient APA test: at the very least, the Organizations' interests are "marginally related to" and "arguably within" the scope of the statute. *See* Patchak, 567 U.S. at 224, 225, 132 S.Ct. 2199.

#### *1271 IV.

[64]  [65]  [66]  We turn to the merits of the preliminary injunction [10] entered by the district court. A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *All for the Wild Rockies, 632 F.3d at 1131* (citing *Winter v. National Res. Def. Council, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)*). When the government is a party, the last two factors (equities and public interest) merge. *Nken, 556 U.S. at 435, 129 S.Ct. 1749*. These factors are evaluated on a sliding scale. *All. for the Wild Rockies, 632 F.3d at 1131–34*.

[67]  [68]  We review for abuse of discretion the district court's grant of a preliminary injunction. *Arc of Cal. v. Douglas, 757 F.3d 975, 983 (9th Cir. 2014)*. District courts abuse their discretion when they rely on an erroneous legal standard or clearly erroneous finding of fact. *Id.* (internal quotations omitted).

#### A.

The likelihood of the Organizations' success on the merits depends on the substantive and procedural validity of the Rule. *See EBSC III, 354 F. Supp. 3d at 1111–12*. They must establish a likelihood that the Rule is either substantively or procedurally invalid. *See EBSC II, 932 F.3d at 770*. Because the record on appeal is now "fully developed," and the substantive validity of the Rule "rest[s] primarily on interpretations of law, not the resolution of factual issues, we may consider the merits of the case and enter a final judgment

to the extent appropriate." *Beno v. Shalala, 30 F.3d 1057, 1063 (9th Cir. 1994)* (internal quotation marks omitted).

#### 1.

[69]  [70]  The APA requires that we "hold unlawful and set aside agency action, findings, and conclusions found to be ... an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Presidential action is not ordinarily "agency action," and is typically unreviewable under the APA. *Franklin v. Massachusetts, 505 U.S. 788, 796, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992)*. But the Proclamation and Rule together create an "operative rule of decision" for asylum eligibility that is reviewable by this court. *EBSC II, 932 F.3d at 770; see also City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1166 (9th Cir. 1997)* (holding that executive orders with "specific statutory foundation[s]" that do not expressly preclude judicial review are treated as agency action and reviewed under the APA); *Public Citizen v. U.S. Trade Rep., 5 F.3d 549, 552 (D.C. Cir. 1993)* ("*Franklin* is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties.").

[71]  [72]  To determine whether the Rule is "not in accordance with law," we apply the framework established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)*. Under *Chevron*, we first consider "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." **\*1272** *Campos-Hernandez v. Sessions, 889 F.3d 564, 568 (9th Cir. 2018)* (quoting *Chevron, 467 U.S. at 842, 104 S.Ct. 2778*). Federal courts are "the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron, 467 U.S. at 843 n.9, 104 S.Ct. 2778*.

#### a.

We consider, then, whether the Rule conflicts with Congress's intent. The only section of the INA implicated by the Rule is

section 1158 ("Asylum"). That section begins by stating that an undocumented migrant may apply for asylum when she is "physically present in the United States" or "arrives in the United States (whether or not at a designated port of arrival ... )[.]" 8 U.S.C. § 1158(a)(1). DOJ and DHS adopted the Rule under section 1158(b)(2)(C)'s grant of authority to the Attorney General to "establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum[.]" [11]

[73]  We agree with the district court that the Rule is "not in accordance with law." 5 U.S.C. § 706(2)(A). Section 1158(a) provides that migrants arriving anywhere along the United States's borders may apply for asylum. The Rule requires migrants to enter the United States at ports of entry to preserve their eligibility for asylum. It is effectively a categorical ban on migrants who use a method of entry explicitly authorized by Congress in section 1158(a). As the district court stated, "[i]t would be hard to imagine a more direct conflict" than the one presented here. *EBSC III*, 354 F. Supp. 3d at 1112.

The government argues that the structure of section 1158 mandates a different result. Critical to the government's argument is that section 1158 splits asylum applications (§ 1158(a)) and eligibility (§ 1158(b)) into two different subsections; therefore, the government explains, Congress intended to allow DOJ to promulgate limitations on asylum eligibility without regard to the procedures and authorizations governing asylum applications. The text in section 1158(a) requires only that migrants arriving between ports of entry be permitted to "apply for *asylum*," and the Rule does not prevent migrants from submitting futile asylum applications. (emphasis added).

[74]  This argument is unconvincing. We avoid absurd results when interpreting statutes. *Rowland v. Cal. Men's Colony, Unit II Men's Adv. Council*, 506 U.S. 194, 200–01, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). Explicitly authorizing a refugee to file an asylum application *because* he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity. The consequences of denial at the application or eligibility stage are, to a refugee, the same. *See EBSC II*, 932 F.3d at 771. Had Congress intended to allow DOJ and DHS to override this provision,

it could have said so in its delegation of authority to the Attorney General or in the statutory provisions governing asylum applications. And Congress signaled its desire that any eligibility limitations be consistent with application requirements; limitations promulgated under the eligibility subsection of the statute must be "consistent with this **\*1273** *section*"—meaning the entirety of section 1158—not just consistent with this *subsection*.

The other categorical bars to asylum in section 1158(b) of the INA do not meaningfully inform our reading of the statute and the Rule. *See EBSC II*, 932 F.3d at 771 n.12. The INA contains various provisions making ineligible asylum applicants who committed a serious, nonpolitical crime outside the United States prior to arrival ( 8 U.S.C. § 1158(b)(2)(A)(iii)), assisted or otherwise participated in the persecution of another person ( 8 U.S.C. § 1158(b)(2)(A)(i), or were firmly resettled in another country prior to arriving in the United States ( 8 U.S.C. § 1158(b)(2)(A)(vi)), among other things. The government again suggests that the existence of these eligibility bars in the INA demonstrates that Congress intended certain categories of migrants to be permitted to apply for asylum even though they are categorically ineligible. A migrant who was firmly resettled in another country, for example, is still free to complete an asylum application, even though she will be barred from seeking asylum under section 1158(b)(2)(A)(vi).

But—unlike the eligibility bar effected by the Rule—the statutory asylum bars in the INA do not separately conflict with explicit text in section 1158(a). There is no provision in section 1158(a), for example, that affirmatively requires that migrants who were firmly resettled in another country be permitted to apply for asylum. The Rule creates the only bar to eligibility under section 1158(b) that directly conflicts with language in section 1158(a). The statutory eligibility bars noted above do not suggest Congress intended that migrants who are subject to them be permitted to apply for asylum. *See also EBSC II*, 932 F.3d at 772 (" '[t]o say that one may *apply* for something that one has no right to *receive* is to render the right to apply a dead letter.' ") (quoting *EBSC I*, 349 F. Supp. 3d at 857). The district court correctly concluded that the Rule is substantively invalid because it conflicts with the plain congressional intent instilled in 8

U.S.C. § 1158(a), and is therefore "not in accordance with law," 5 U.S.C. § 706(2)(A).

### b.

**[75]** **[76]** But even if the text of section 1158(a) were ambiguous, the Rule fails at the second step of *Chevron* because it is an arbitrary and capricious interpretation of that statutory provision. If the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Campos-Hernandez*, 889 F.3d at 568 (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). Under this standard, we must give effect to an agency's reasonable interpretation of a statute, unless the interpretation is inconsistent with clearly expressed congressional intent. *See United States v. Fulton*, 475 U.S. 657, 666–67, 106 S.Ct. 1422, 89 L.Ed.2d 661 (1986).

**[77]** The Board of Immigration Appeals ("BIA") and this court have long recognized that a refugee's method of entering the country is a discretionary factor in determining whether the migrant should be granted humanitarian relief. *EBSC II*, 932 F.3d at 772. More than thirty years ago, the BIA stated that "an alien's manner of entry or attempted entry is a proper and relevant discretionary factor" to adjudicating asylum applications under section 1158(a), but "it should not be considered in such a way that the practical effect is to deny relief in virtually all cases." [12] *Matter of Pula*, 19 I. & N. Dec. 467, 473 (B.I.A. 1987), *superseded in part by statute on* **\*1274** *other grounds as stated in Andriasian v. I.N.S.*, 180 F.3d 1033, 1043–44 (9th Cir. 1999); *see also EBSC II*, 932 F.3d at 772. The court explained that it would instead evaluate "the totality of the circumstances and actions of an alien in his flight from the country where he fears persecution," rather than deny asylum outright because of a single procedural flaw in the migrant's application. *Matter of Pula*, 19 I. & N. Dec. at 473–74.

**[78]** **[79]** Especially where a migrant may be eligible only for asylum and cannot establish the more stringent criteria for withholding-of-removal, the discretionary factors—including method of entry—should be "carefully evaluated in light of the unusually harsh consequences which may befall an alien[.]" *Id.* at 474. Indeed, "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Id.*

**[80]** We have supported the BIA's understanding of section 1158(a). The most vulnerable refugees are perhaps those fleeing across the border through the point physically closest to them. That a refugee crosses a land border instead of a port-of-entry says little about the ultimate merits of her asylum application; "if illegal manner of flight and entry were enough independently to support a denial of asylum, ... virtually no persecuted refugee would obtain asylum." *EBSC II*, 932 F.3d at 773 (quoting *Huang v. I.N.S.*, 436 F.3d 89, 100 (2d Cir. 2006)). Given the Rule's effect of conditioning asylum eligibility on a factor that has long been understood as "worth little if any weight," *see Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004), in adjudicating whether a migrant should be granted asylum, it is an arbitrary and capricious interpretation of section 1158(a).

**[81]** The Attorney General's interpretation of section 1158(a) is also unreasonable, as the motions panel and district court discussed, in light of the United States's treaty obligations. *See EBSC II*, 932 F.3d at 772–73; *EBSC III*, 354 F. Supp. 3d at 1112–13. The United States agreed to comply with Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees ("1951 Convention") and the 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol") in 1968. H.R. Rep. 96-781H.R. Rep. 96-781 (Conf. Rep.), at 19–20 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 160, 160–62; *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 429, 436–37, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). To streamline the United States's refugee procedures and implement the country's new treaty commitments, Congress passed the Refugee Act of 1980, which amended the INA and created the country's first codified rules governing asylum. S. Rep. No. 96-256, at 1 (1979), *as reprinted in* 1980 U.S.C.C.A.N. 141, 141–42, 144; H.R. Doc. No. 96-608, at 17–18 (1979); *see also Negusie v. Holder*, 555 U.S. 511, 535–36, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009).

**[82]** **[83]** As the United Nations High Commissioner of Refugees ("UNHCR") explains, [13] the Rule runs afoul of three of **\*1275** these codified rules: the right to seek asylum, the prohibition against penalties for irregular entry, and the

principle of non-refoulement embodied in Article 31(1) of the 1951 Convention. Neither the 1967 Protocol nor the 1951 Convention require countries to accept refugees, but they do ensure that refugees at each signatory's borders have legal and political rights and protections. *See* Cong. Research Serv. S522-10, Review of U.S. Refugee Resettlement Programs and Policies 15–16 (1980).

**[84]    [85]    [86]**  The definition of "refugee" used in the 1951 Convention is "virtually identical" to the one adopted by Congress in the INA. *Cardoza-Fonseca*, 480 U.S. at 437, 107 S.Ct. 1207. Under both the INA and the 1951 Convention, refugees are all individuals who—because of a "well-founded fear of being persecuted for reasons of race, religion, nationality, membership in a particular social group or political opinion"—are "unable," or, because of such fear, "unwilling to return" to their home countries. *See* 8 U.S.C. § 1101(a)(42); 1951 Convention, Art. 1(A)(2). Once individuals meet the statutory definition of a "refugee," they may be granted asylum under the INA. *See* 8 U.S.C. § 1158(b)(1)(A).

**[87]**  Both the INA and the 1951 Convention acknowledge that individuals may be stripped of their refugee status even when they meet the other eligibility criteria for asylum. The refugee provisions of the 1951 Convention "shall not apply" to "any person with respect to whom there are serious reasons for considering" that such a person has committed a crime against peace, a war crime, a crime against humanity, a non-political crime outside of the country of refuge, prior to their admission as a refugee, or has been "guilty of acts contrary to the purposes and principles of the United Nations." 1951 Convention, Art. 1(F)(a)–(c). The statutory bars for eligibility in the INA are similarly severe. Individuals who are otherwise refugees may not apply for asylum if the Attorney General determines that they "ordered, incited, assisted, or otherwise participated" in the persecution of another, based on a trait protected by the INA; "constitute[ ] a danger to the community of the United States"; committed a "serious nonpolitical crime" outside the country; are a "danger to the security" of the country; have engaged in terrorist activities; or were "firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(i)–(vi).

**[88]    [89]**  The exceptions listed in the 1951 Convention "require individualized assessments and 'must be [interpreted] restrictive[ly]." Br. for UNHCR as Amicus

Curiae at 14 n.6 (quoting Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 149 (Geneva, 1979)). So too the categorical bars on eligibility in the INA are interpreted with lenience toward migrants to avoid infringing on the commitments set forth in the 1951 Convention and 1967 Protocol. *See, e.g.,* *Ali v. Ashcroft*, 394 F.3d 780, 790 (9th Cir. 2005) (A "narrow interpretation of the firm resettlement bar would limit asylum to refugees from nations contiguous to the United States or to those wealthy enough to afford to fly here in search of refuge. The international obligation our nation agreed to share when we enacted the Refugee Convention into law knows no such limits."); *Cardoza-Fonseca*, 480 U.S. at 449, 107 S.Ct. 1207.

**[90]    [91]**  The asylum bars in the INA and in the 1951 Convention appear to serve either the safety of those already in the United States or, in the case of the firm-resettlement bar, the safety of refugees.  **\*1276**  The Rule ensures neither. Even a broad interpretation of these eligibility bars does not naturally encompass a refugee's method of entry. Illegal entry is not ordinarily considered a "serious crime." *See* *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968) (stating that the statute criminalizing entry into the United States "is not based on any common law crime, but is a regulatory statute enacted to assist in the control of unlawful immigration by aliens" and "is a typical mala prohibita offense"). Nor does a migrant's method of entry per se create a danger to the United States, serve as a useful proxy for terrorist activity, or suggest the persecution of another.

**[92]**  And the Rule surely does not suggest that the migrant has received protection in a third country. Many migrants enter between ports of entry out of necessity: they "cannot satisfy regular exit and entry requirements and have no choice but to cross into a safe country irregularly prior to making an asylum claim." Br. for UNHCR as Amicus Curiae at 15 (citing *Memorandum by the Secretary-General*, Ad Hoc Comm. on Statelessness, Status of Refugees & Stateless Persons, at Annex Art. 24, cmt. ¶ 2, U.N. Doc. E/AC.32/2 (Jan. 3, 1950); UNHCR Executive Committee Conclusion No. 58 (XL) ¶ (i) (Oct. 13, 1989)). This was well recognized when the Refugee Act of 1980 was drafted. *See* Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Prior to the passage of the Act, migrants who arrived at a port of entry were "given an opportunity to have their [asylum] applications heard in a hearing before an immigration judge," but refugees arriving "at a land border of the United States [we]re not given this right." *Refugee*

AR.04518

*Act of 1979: Hearing on H.R. 2816 before the Subcom. on Immigration, Refugees, and Int'l Law of the Comm. on the Judiciary*, 96th Cong. 190 (1979) (testimony of David Carliner, American Civil Liberties Union). In its attempt to streamline the country's refugee and asylum laws, Congress was urged to consider that "persons who seek any benefits under [the INA] should be entitled to a uniform procedure." *Id.* Congress heeded this consideration during the drafting of the Refugee Act, eventually describing it as "establish[ing] a more uniform basis for the provision of assistance to refugees, and [ ] other purposes." Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980). The Rule defies this desire for uniformity and denies refuge to those crossing a land border. The effects of the Rule contravene the United States's commitments in the 1951 Convention.

 **[93]**  Article 31(1) of the 1951 Convention also explains that signatories "shall not impose penalties" on account of refugees' "illegal entry or presence," 1951 Convention Art 31(1). Notwithstanding the government's interpretations otherwise, "deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed" on migrants who are found guilty of specified crimes, or for other reasons are barred from seeking asylum. [14] *See* Padilla v. Kentucky, 559 U.S. 356, 364, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) (footnote omitted). The Rule imposes an additional penalty on refugees because of their "illegal entry" by risking the deportation of migrants who enter the country at a land border. 1951 Convention Art. 31(1).

 **[94]**    **[95]**    **[96]**    **[97]**  And by categorically denying refugees an opportunity to seek asylum only because of their method of entry, the Rule is also in tension with the United States's commitment to avoid refouling individuals to countries where their lives **\*1277** are threatened. Article 31(1) of the 1951 Convention prohibits signatories from "expel[ling] or return[ing] ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened[.]" The INA's withholding-of-removal, 8 U.S.C. § 1231(b)(1), and Convention Against Torture ("CAT") protections, 8 C.F.R. § 1208.16–18, are not as great as those conferred by the INA's asylum provisions. The evidentiary standard that applicants must meet for either withholding-of-removal or CAT relief is higher than the evidentiary standard for asylum. *See, e.g.,* Ling Huang v. Holder, 744 F.3d 1149, 1152

(9th Cir. 2014). Applicants for withholding-of-removal and CAT relief must establish a "clear probability" that they would be persecuted or tortured, respectively, if they were removed to their home countries. *See* Korablina v. I.N.S., 158 F.3d 1038, 1045–46 (9th Cir. 1998); Wakkary v. Holder, 558 F.3d 1049, 1053 (9th Cir. 2009). A "clear probability" of persecution or torture means that it is "more likely than not" that applicants will be persecuted upon their removal. *I.N.S. v. Stevic*, 467 U.S. 407, 424, 429–30, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984).

 **[98]**  Applicants for asylum instead must demonstrate only that they are "unable or unwilling" to return to their home countries "because of persecution or a well-founded fear of persecution[.]" 8 U.S.C. § 1101(a)(42)(A). "One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place"; it would only be "too apparent," for example, for a refugee to have a "well-founded fear of being persecuted" where "every tenth adult male person is either put to death or sent to some remote labor camp" in the applicant's home country. Cardoza-Fonseca, 480 U.S. at 431, 107 S.Ct. 1207 (citing 1 A. Grahl-Madsen, The Status of Refugees in International Law 180 (1966)). The Rule, then, risks the removal of individuals with meritorious asylum claims who cannot petition for withholding of removal or CAT relief. By doing so, it is inconsistent with our treaty commitment to non-refoulement.

The Rule is "arbitrary, capricious, or manifestly contrary to the statute," Chevron, 467 U.S. at 844, 104 S.Ct. 2778, both because it is contrary to plain congressional intent, and because it is an arbitrary and capricious interpretation of section 1158(a). Even if we agreed that the text of section 1158(a) is ambiguous, the Rule flouts this court's and the BIA's discretionary, individualized treatment of refugees' methods of entry, and infringes upon treaty commitments we have stood by for over fifty years.

### 2.

 **[99]**    **[100]**  Because we conclude that the Rule is substantively invalid, we only briefly address the procedural arguments raised by the parties. The APA requires public notice and comment and a thirty-day grace period before a

20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

proposed rule takes effect. 5 U.S.C. § 553(b)– (d). The notice-and-comment requirements are exempted when "there is involved a military or foreign affairs function of the United States[,]" id. § 553(a), or when "the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest." Id. § 553(b)(B). The thirty-day lag in publication can be waived where "good cause [is] found." [15] Id. § 553(d)(3).

**\*1278** The Rule was issued without notice and comment or the grace period. The government argues that the Rule was properly issued because it falls under either the good-cause or the foreign-affairs exceptions to these procedural requirements.

### a.

**[101]** **[102]** **[103]** Proper invocation of the good-cause exception is "sensitive to the totality of factors at play." United States v. Valverde, 628 F.3d 1159, 1164 (9th Cir. 2010). The exception is a "high bar" because it is "essentially an emergency procedure." Id. at 1164, 1165. The government must make a sufficient showing that " 'delay would do real harm' to life, property, or public safety," EBSC II, 932 F.3d at 777 (quoting Valverde, 628 F.3d at 1164–65), or that "some exigency" interferes with its ability to carry out its mission. Nat. Res. Def. Council, Inc. v. Evans, 316 F.3d 904, 911 (9th Cir. 2003).

**[104]** In support of its reliance on the exception, the government now cites a *Washington Post* article indicating that when the United States stopped its policy of separating migrant parents from their children, smugglers told asylum-seekers that "the Americans do not jail parents who bring children—and to hurry up before they might start doing so again." *See* Nick Miroff and Carolyn Van Houten, The Border is Tougher to Cross Than Ever. But There's Still One Way into America, Wash. Post (Oct. 24, 2018). The district court concluded that the article "at least supports the inference" that the Rule might result in similar changes in immigration policy, and held that the government had "identified a 'rational connection between the facts found and the choice made' to promulgate the interim Rule on an

emergency basis." *EBSC III*, 354 F. Supp. 3d at 1115 (quoting Valverde, 628 F.3d at 1168).

A citation to this single article is not sufficient to demonstrate that the delay caused by notice-and-comment or the grace period might do harm to life, property, or public safety. *See EBSC II*, 932 F.3d at 777. The government's reasoning continues to be largely speculative, *see* id. at 778; no evidence has been offered to suggest that any of its predictions are rationally likely to be true. The article does not directly relate to the Rule, the consequences of the Rule, or anything related to asylum eligibility.

**[105]** Even if it did, that "the very announcement of [the] proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare," Reply Br. of Gov't at 21, is likely often, or even always true. The lag period before any regulation, statute, or proposed piece of legislation allows parties to change their behavior in response. If we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm the Rule is intended to regulate, these procedures would often cede to the good-cause exception. Because the government has failed to demonstrate the existence of an exigency justifying good cause, we hold that the Rule likely does not properly fall under the good cause exception.

### b.

**[106]** **[107]** For the foreign affairs exception to apply, "the public rulemaking provisions should provoke definitely undesirable international consequences." Yassini v. Crosland, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). Otherwise, the exception "would become distended if applied to INS **\*1279** actions generally, even though immigration matters typically implicate foreign affairs." Id. Use of the exception is generally permissible where the international consequences of the rule-making requirements are obvious or thoroughly explained. We have rejected its use where the government has failed to substantiate its reliance on the exception or explain the detrimental effects of compliance with the APA's requirements. *See EBSC II*, 932 F.3d at 776–77.

**[108]** The government cites to four documents in support of its renewed argument that the foreign-affairs

20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

exception is justified: a Memorandum of Understanding ("MOU") between DHS and the Mexican government, the *Washington Post* article, credible-fear origin data published by the Executive Office of Immigration Review ("EOIR"), and a speech by President Trump. The four documents appear to demonstrate that the Rule and Proclamation are related to ongoing changes in the national immigration landscape, but still fail to establish that adhering to notice and comment and a thirty-day grace period will "provoke definitely undesirable international consequences." *Yassini*, 618 F.3d at 1360 n.4.

We agree with the government that the cited MOU does broadly "show[ ] that [immigration] negotiations have happened in the past," Op. Br. of Gov't at 49, but this is insufficient to demonstrate that notice and comment will provoke undesirable international consequences. Indeed, the MOU's substance seems to undermine the "broader diplomatic program involving sensitive and ongoing negotiations with Mexico." Op. Br. of Gov't at 47 (internal quotations omitted). Article 3 of the MOU states that "[l]ocal repatriation agreements should conform to mutually established criteria and principles for the repatriation of Mexican nationals being repatriated from the United States to Mexico." The unilateral repatriation of Mexican nationals set forth by the Rule—without requesting public participation—undermines these terms.

The cited *Washington Post* page discusses an increase in the proportion of families that seek asylum and the EOIR data lists the country of origin of credible-fear cases and summarizes the number of people that attempt to enter the United States with an asylum application, the number of cases completed in 2018, and the outcome of credible fear cases. It is unclear how these data "reflect[ ] motivations for crossing the border illegally," Op. Br. of Gov't at 49, and even less clear how they demonstrate the consequences of requesting public notice-and-comment on foreign policy. And the speech by President Trump, as the district court noted, discusses the *domestic* consequences of foreign immigration, not the foreign policy consequences of immigration into the United States. *See EBSC III*, 354 F. Supp. 3d at 1114. The speech —like the MOU, the article, and the EOIR data—does not suggest that the APA's rulemaking provisions might trigger or even shape immediate consequences in foreign affairs.

The evidence relied on by the government here is largely the same as the evidence previously before the motions panel and

the district court. While we remain "sensitive to the fact that the President has access to information not available to the public, and ... [are] cautious about demanding confidential information," the connection between negotiations with Mexico and the immediate implementation of the Rule is still "not apparent." *EBSC II*, 932 F.3d at 776. Broadly citing to the Rule's immigration context is insufficient to invoke the foreign-affairs exception. *See Yassini*, 618 F.2d at 1360 n.4. The government has not made a "sufficient showing" that "the public rulemaking provisions should provoke definitely undesirable international **\*1280** consequences." *Id.*; *see also Evans*, 316 F.3d at 912.

In sum, we agree with the motions panel that the government has not established that DOJ and DHS properly invoked the foreign-affairs exception to the notice-and-comment requirement and thirty-day grace period.

**B.**

**[109]  [110]  [111]  [112]**  We next consider whether the Organizations have established that, in the absence of a preliminary injunction, they are likely to suffer irreparable harm. *See Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages." *Id.* For this reason, economic harm is not generally considered irreparable. But where parties cannot typically recover monetary damages flowing from their injury —as is often the case in APA cases—economic harm can be considered irreparable. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Intangible injuries may also qualify as irreparable harm, because such injuries "generally lack an adequate legal remedy." *Brewer*, 757 F.3d at 1068.

**[113]**  We agree with the district court that the Organizations have established that they will suffer a significant change in their programs and a concomitant loss of funding absent a preliminary injunction enjoining enforcement of the Rule. *EBSC II*, 932 F.3d at 767. Both constitute irreparable injuries: the first is an intangible injury, and the second is economic harm for which the Organizations have no vehicle for recovery.

The Rule has already prompted the Organizations to change their core missions. Since the Rule issued, ILL has placed programmatic expansions on hold and has "had to lessen its caseload[.]" Supp. Decl. of Stephen W. Manning at ¶ 14. CARECEN notes that it will "divert significant resources," including "staff time and organizational resources" to respond to the Rule. Decl. of Daniel Sharp at ¶¶ 11–13. EBSC has had to "divert resources away from its core programs to address the new policy." Decl. of Michael Smith at ¶ 15. And, as discussed in Part III, *supra*, the Organizations each stand to lose funding because of their core changes in mission.

Importantly, the Organizations also filed suit the same day that the Rule and the first proclamation issued; while not dispositive, this suggests urgency and impending irreparable harm. *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985). We agree with the district court that the Organizations have demonstrated a sufficient likelihood of irreparable injury to warrant injunctive relief. *EBSC III*, 354 F. Supp. 3d at 1116.

### C.

[114] The government next argues that the harms it will suffer because of the preliminary injunction—namely, the harm caused by the injunction "undermin[ing] the Executive Branch's constitutional and statutory authority to secure the Nation's borders," and the "entry of illegal aliens"—outweigh the benefit to the public and the Organizations conferred by the injunction. Op. Br. of Gov't at 51–52. Relevant equitable factors include the value of complying with the APA, the public interest in preventing the deaths and wrongful removal of asylum-seekers, preserving congressional intent, and promoting the efficient administration of our immigration laws at the border.

[115] [116] [117] First, "[t]he public interest is served by compliance with the APA." *Azar*, 911 F.3d at 581. Indeed, it "does not matter that notice and comment could have changed the substantive result; the public interest is served from the proper **\*1281** process itself." *Id.* at 581–82. The Organizations and various Amici informed the district court that they would have submitted comments explaining why the Rule disrupts their organizational missions and fails to meet its intended purpose, had they had the opportunity. The APA's requirements reflect "a judgment by Congress that the public interest is served by a careful and open review of proposed

administrative rules and regulations." *Alcaraz v. Block*, 746 F.2d 593, 610 (9th Cir. 1984) (citing *Phil. Citizens in Action v. Schweiker*, 669 F.2d 877, 881 (3d Cir. 1982)). The government's failure to comply with the APA—particularly given the strength of the Organizations' procedural attack on the Rule—weighs in favor of granting injunctive relief.

[118] Second, the public has an interest in "ensuring that we do not deliver aliens into the hands of their persecutors," *Leiva-Perez*, 640 F.3d at 971, and "preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," *Nken*, 556 U.S. at 436, 129 S.Ct. 1749. The Rule will likely result in some migrants being wrongfully denied refugee status in this country. For migrants affected by the Rule, withholding of removal and CAT protection are the only forms of relief available. As discussed, these forms of relief demand a higher burden of proof than an asylum claim. At the initial screening interview with an asylum officer, an applicant seeking asylum need only present a "credible fear" of persecution, while an applicant seeking withholding of removal or CAT protection must demonstrate the higher "reasonable fear" of persecution or torture.

The government's opening brief notes that 17 percent of the 34,158 migrants whose cases were completed in 2018 received asylum. *See* Op. Br. of Gov't at 52. Assuming the number of migrants remains constant, if even just 25 percent of asylum-seekers with meritorious claims are denied asylum because of their method of entry, over 1,000 people will either be returned to home countries where they face "persecution based on 'race, religion, nationality, membership in a political social group, or political opinion,' " *EBSC III*, 354 F. Supp. 3d at 1117 n.15 (quoting 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)), or forced to proceed on limited-relief claims that demand more stringent showings. If the rate of migration and the rate of migrants claiming fear during the expedited removal process continues to increase, *see* 84 Fed. Reg. at 21,229, the scale of this wrongful removal will only worsen.

[119] Third, the public has an interest in ensuring that the "statutes enacted by [their] representatives are not imperiled by executive fiat." *EBSC II*, 932 F.3d at 779 (internal quotation marks omitted). The INA, and the United States's signatory status to the 1951 Convention, "reflect the balance Congress struck between the public interests in rendering

aliens who enter illegally inadmissible and subject to criminal and civil penalties, and ... preserving their ability to seek asylum." *EBSC III*, 354 F. Supp. 3d at 1117–18 (citations omitted). The Rule and Proclamation disrupt that balance by overriding plain congressional intent.

**[120]** **[121]** Finally, the government and the public have an interest in the "efficient administration of the immigration laws at the border." *EBSC II*, 932 F.3d at 779 (internal quotation marks omitted). This interest is "weighty."

*Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). "[C]ontrol over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Id.* The government has a compelling interest in ensuring that injunctions—such as the one granted here—do **\*1282** not undermine separation of powers by blocking the Executive's lawful ability to regulate immigration and rely on its rulemaking to aid diplomacy.

**[122]** The role of the judiciary in reviewing such policies is narrow. It is merely to ensure that executive procedures do not violate principles of due process or "displace congressional choices of policy." *Id.* at 35, 103 S.Ct. 321. This executive deference, then, is closely linked with our determination on the substantive validity of the Rule. Essentially, the weight we ascribe to this factor depends on the extent to which we agree that the Rule overrides plain congressional intent. Because the Organizations have established that the Rule is invalid, we do not place much weight on this factor. As the motions panel noted: "[t]here surely are enforcement measures that the President and the Attorney General can take to ameliorate the [immigration] crisis, but continued inaction by Congress is not a sufficient basis under our Constitution for the Executive to rewrite our immigration laws." *EBSC II*, 932 F.3d at 774.

In sum, we agree with the district court that there is a significant basis for concluding that the public interest weighs "sharply" in the Organizations' favor. *See EBSC III*, 354 F. Supp. 3d at 1111.

## V.

Finally, we turn to the remedy entered by the district court: an injunction preventing enforcement of the Rule. The injunction enjoins the part of the Rule that removes asylum eligibility from migrants who fail to follow a presidential proclamation. *EBSC III*, 354 F. Supp. 3d at 1121. It does not enjoin the

credible-fear amendments, but "they have no independent effect," so they are effectively enjoined as well. *Id.* at 1121 n.22. We conclude that the district court did not abuse its discretion in enjoining enforcement of the Rule.

**[123]** **[124]** **[125]** **[126]** Injunctive relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (internal quotations omitted). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown," but there is "no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169–1170 (9th Cir. 1987). The equitable relief granted by the district court is acceptable where it is "necessary to give prevailing parties the relief to which they are entitled." *Id.* at 1170–71. District courts have "considerable discretion" in crafting suitable equitable relief; correspondingly, appellate review is "narrow." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

**[127]** As discussed, the harms caused to the Organizations as a result of the Rule include a (1) loss of funding and (2) disruption of organizational purpose. Adequate equitable relief must remedy both harms. *Bresgal*, 843 F.2d at 1170–71. Both harms are due, in part, to the Rule's likely consequence of preventing asylum-seekers with meritorious claims from entering the country along our southern border and successfully obtaining asylum. The stymied flow of refugees will result in less funding for the Organizations, and a shift (sometimes wholesale) in their organizational missions.

The Organizations do not limit their potential clients to refugees that enter the United States only at the California-Mexico or Arizona-Mexico border; they represent "asylum seekers" broadly. Unlike the plaintiffs in *California v. Azar*—individual states seeking affirmance of an injunction that applied past their borders—the Organizations here "do not operate in a fashion **\*1283** that permits neat geographic boundaries." *EBSC III*, 354 F. Supp. 3d at 1120–21; *see also Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) (The "scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."). An

injunction that, for example, limits the application of the Rule to California, would not address the harm that one of the Organizations suffers from losing clients entering through the Texas-Mexico border. One fewer asylum client, regardless of where the client entered the United States, results in a frustration of purpose (by preventing the organization from continuing to aid asylum applicants who seek relief), and a loss of funding (by decreasing the money it receives for completed cases).

The government suggests that plaintiffs "identify actual aliens in the United States who would otherwise be subject to the Rule," Op. Br. of Gov't at 57, but this suggestion fails to redress the scope of the Organizations' harms. Part of the harm the Organizations have alleged is the difficulty posed by the Rule in helping them reach migrants who will cross the border; their missions are not limited to helping individuals currently present in the United States. Even if their missions were so limited, asking the Organizations to seek and list every person in the country they might help in the coming months is infeasible and impracticable. The "Government has not proposed a workable alternative form of the [injunction] that accounts" for the harm at issue but "nevertheless appl[ies] only within the [ ] borders" of the Ninth Circuit. *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017); *see also EBSC II*, 932 F.3d at 779; *EBSC III*, 354 F. Supp. 3d at 1121.

[128]  [129]  [130]  [131] Two other factors support the district court's decision to enjoin Defendants from taking any action to implement the Rule. First, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Univ. of Cal.*, 908 F.3d at 511 (internal quotation marks omitted). Singular equitable relief is "commonplace" in APA cases, and is often "necessary to provide the plaintiffs' with 'complete redress.'" *Id.* at 512. Our "typical response is to vacate the rule and remand to the agency"; we "ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule." *Harmon v. Thornburg*, 878 F.2d 484, 494 (D.C. Cir. 1989). Because of the broad equitable relief available in APA challenges, a successful APA claim by a single individual can affect an "entire" regulatory program. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

[132]  [133] Second, as the district court noted, there is an important "need for uniformity in immigration policy." *Id.* at 511, 129 S.Ct. 1159; *see also EBSC III*, 354 F. Supp. 3d at 1120–21. We previously have recognized that the "Constitution requires a *uniform* Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly*; and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Univ. of Cal.*, 908 F.3d at 511 (quoting *United States v. Texas*, 809 F.3d 134, 187–88 (5th Cir. 2014) (emphases in original)). The INA itself "was designed to implement a uniform federal policy, and the meaning of concepts important to its application are not to be determined according to the law of the forum, but rather require[ ] a uniform federal definition." *Kahn v. I.N.S.*, 36 F.3d 1412, 1414 (9th Cir. 1994) (internal quotation marks omitted).  **\*1284** Different interpretations of executive policy across circuit or state lines will needlessly complicate agency and individual action in response to the United States's changing immigration requirements. For these reasons, in immigration cases, we "consistently recognize[ ] the authority of district courts to enjoin unlawful policies on a universal basis." *EBSC II*, 932 F.3d at 779 (citing *Univ. of Cal.*, 908 F.3d at 511).

The government again "raises no grounds on which to distinguish this case from our uncontroverted line of precedent." *Id.* Given the context of this case and the harm the district court sought to address, we find no error or abuse of discretion in the terms or scope of the preliminary injunction.

## VI.

For the reasons discussed, the district court's orders granting preliminary injunctions are **AFFIRMED.**

FERNANDEZ, Circuit Judge, concurring in the result:

I concur in the majority opinion because, and for the most part only because, I believe that we are bound by the published decision in *East Bay Sanctuary Covenant v. Trump* (*East Bay I*), 932 F.3d 742 (9th Cir. 2018).

More specifically, we are bound by both the law of the circuit and the law of the case. Of course, the rules that animate the former doctrine are not the same as those that animate the latter. *See* *Gonzalez v. Arizona,* 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc).

As we have said: "Circuit law ... binds all courts within a particular circuit, including the court of appeals itself. Thus, the first panel to consider an issue sets the law not only for all the inferior courts in the circuit, but also future panels of the court of appeals." *Hart v. Massanari,* 266 F.3d 1155, 1171 (9th Cir. 2001). Moreover: "Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court." *Id.* (footnote omitted). Published opinions are precedential. *See* *id.* at 1177; *see also* *Gonzalez,* 677 F.3d at 389 n.4. That remains true, even if some later panel is satisfied that "arguments have been characterized differently or more persuasively by a new litigant,"[1] or even if a later panel is convinced that the earlier decision was "incorrectly decided" and "needs reexamination."[2] And those rules are not mere formalities to be nodded to and avoided. Rather, "[i]nsofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis." *Hart,* 266 F.3d at 1172. In this case, there are no material differences—in fact, the situation before this panel is in every material way the same as that before the motions panel. Furthermore, there is no doubt that motions panels can publish their opinions,[3] even though they do not generally do so.[4] Once published, there is no difference between motions panel opinions and other opinions; all are entitled to be considered with the same principles of deference by ensuing panels. Thus, any hesitation about whether they should be precedential must necessarily come before the panel decides to publish, not after. As we held in *Lair v. Bullock,* 798 F.3d 736 (9th Cir. 2015):

> **\*1285**  Lair contended at oral argument that a motions panel's decision cannot bind a merits panel, and as a result we are not bound by the motions panel's analysis in this case. Not so. We have held that motions panels can issue published decisions. ... [W]e are bound by a prior three-judge panel's published opinions, and a motions panel's published opinion binds future panels the same as does a merits panel's published opinion.

*Id.* at 747 (citations omitted).[5] Therefore, the legal determinations in *East Bay I* are the law of the circuit.

We have explained the law of the case doctrine as "a jurisprudential doctrine under which an appellate court does not reconsider matters resolved on a prior appeal." *Jeffries v. Wood,* 114 F.3d 1484, 1488–89 (9th Cir. 1997) (en banc), *overruled on other grounds by* *Gonzalez,* 677 F.3d at 389 n.4. While we do have discretion to decline application of the doctrine, "[t]he prior decision should be followed unless: (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Id.* at 1489 (internal quotation marks and footnote omitted).[6] We have also indicated that, in general, "our decisions at the preliminary injunction phase do not constitute the law of the case,"[7] but that is principally because the matter is at the preliminary injunction stage and a further development of the factual record as the case progresses to its conclusion may well require a change in the result.[8] Even so, decisions "on pure issues of law ... are binding." *Ranchers Cattlemen,* 499 F.3d at 1114. Of course, the case at hand has not progressed beyond the preliminary injunction stage. It is still at that stage, and the factual record has not significantly changed between the record at the time of the decision regarding the stay motion and the current record. Therefore, as I see it, absent one of the listed exceptions, which I do not perceive to be involved here, the law of the case doctrine would also direct that we are bound by much of the motions panel's decision in *East Bay I.*

Applying those doctrines:

(1) The Organizations have standing. *East Bay II,* 932 F.3d at 765–69.

(2) The Organizations are likely to succeed on the substantive merits. *See* **\*1286** *id.* at 770–74. As to procedural validity regarding adoption of the regulation, the motions panel decision that the foreign affairs exception to the notice and comment procedures does not apply is binding. *Id.* at 775–77. In addition, while the motions panel decision regarding the good cause exceptions is not fully binding, what it did determine was that the information then brought to the attention of the panel and the district court did not suffice. *Id.* at 777–78. In light of that, I agree with the majority that merely adding the twenty-five-word sentence from a Washington Post article was insufficient to justify changing the motions panel result.

(3) The decisions made by the motions panel regarding harm to the Organizations and balance of hardships are also binding decisions regarding the propriety of the preliminary injunction. *Id.* at 767, 778–79.

(4) The scope of the injunction is not overly broad. *Id.* at 779–80.

Thus, I respectfully concur in the result of the majority opinion.

### All Citations

950 F.3d 1242, 20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

---

## Footnotes

1    *See* 125 Cong. Rec. 35,813–14 (1979) (statement of Rep. Holtzman).

2    Although the Proclamation expired by its terms in February 2019, the President issued a new Proclamation, which did not substantially change the terms of the original Proclamation and extended its effect for an additional ninety days. When that Proclamation expired in May, the President again re-issued it and extended the effect of the initial Proclamation "for an additional 90 days beyond the date when the United States obtains relief from the preliminary injunction of the interim final rule[.]" *See* Presidential Proclamation No. 9,880, Addressing Mass Migration Through the Southern Border of the United States, 84 Fed. Reg. 21,229, 21,229 (May 8, 2019).

3    Our holding is consistent with our general rules governing law of the circuit. "[T]he first panel to consider an issue sets the law ... for all the inferior courts in the circuit" and "future panels of the court of appeals," Hart v. Massanari, 266 F.3d 1155, 1171 (9th Cir. 2001), but motions panels' conclusions do not "set the law" for later merits panels *in the same case, see, e.g.,* Askins v. U.S. Dep't of Homeland Sec., 899 F.3d 1035, 1042 (9th Cir. 2018) ("The law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case."). Tentative conclusions that are not law of the case do not bind later panels in the same case as law of the circuit. Any other rule would paradoxically require that a merits panel treat a motions panel's published decision that does not constitute law of the case as binding. A merits panel cannot be simultaneously bound by the motions panel's opinion—because it is law of the circuit—and not bound by the opinion—because it is not law of the case.

4    We refer to the government's opening brief as "Op. Br. of Gov't," and to the government's reply brief as "Reply Br. of Gov't."

5    The government notes that "East Bay Sanctuary Covenant has only 'around 35 clients who have entered without inspection and [who] expect to file for affirmative asylum in the upcoming months,' " while, "[b]y comparison, the 'current backlog of asylum cases exceeds 200,000' and more than 200,000 inadmissible aliens present themselves for inspection at ports of entry annually (even without the additional incentive to do so that the Rule will create)." Op. Br. of Gov't at 27 n.4.

The comparative magnitude of the harms alleged by the parties, however, is not relevant for standing purposes; "a loss of even a small amount of money is ordinarily an 'injury.' " *Czyzewski v. Jevic Holding Corp.*, ––– U.S. ––––, 137 S. Ct. 973, 983, 197 L.Ed.2d 398 (2017); *see also Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("The consumers' alleged economic harm—even if only a few pennies each—is a concrete, non-speculative injury."); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes.").

6    Many of the cases cited by the government in support of this proposition do not concern organizational standing under Article III. In *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), the Court addressed whether nursing home residents have a right to an administrative hearing before a state or federal agency hearing before the agency revokes the home's authority to provide them with nursing care at government expense. *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006), *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), and *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) all describe limitations on third-party, not organizational, standing.

7    The irony of the government's position is that section 1158(b)(2)(C)—the INA rule-making delegation upon which it relies—is based on a congressional mandate that was intended, at least in part, to curtail "unfettered executive discretion" and assure *Congress's* "proper and substantial role in refugee admissions, given [its] plenary power over immigration." 125 Cong. Rec. 35,814–15 (1979) (statement of Rep. Holtzman) (emphasis added). "[I]f there is a separation-of-powers concern here, it is between the President and Congress." *EBSC II*, 932 F.3d at 774.

8    Migrants can be placed in expedited removal proceedings when they arrive at ports of entry without documents, misrepresent their identities, or present fraudulent documents. *See United States v. Barajas-Alvarado*, 655 F.3d 1077, 1081 (9th Cir. 2011). Undocumented migrants who receive removal orders but indicate an intention to apply for asylum or a fear of persecution may still be considered for asylum. *See id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i)).

9    In another, strikingly similar context, the government appears to agree with this interpretation of section 1252(e)(3). Before the District Court for the District of Columbia, the government argued that section 1252(e)(3) divested the court of jurisdiction to hear an APA challenge to an immigration decision issued by the Attorney General. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 105 (D.D.C. 2018). The Attorney General's decision, and a policy memorandum that adopted the standards in the decision, invoked the expedited-removal statute and required that "claims based on membership in a putative particular social group defined by the members' vulnerability to harm ... will not establish the basis for asylum, refugee status, or a credible or reasonable fear of persecution." *Id.* at 110. The government there argued that the policy memorandum and the Attorney General's decision did not "implement" section 1225(b) because it "was a decision about *petitions for asylum* under section 1158." *Id.* at 115–16 (emphasis added).

10   The terms of the temporary restraining order entered by the district court in *EBSC I* technically differ from the terms of the preliminary injunction entered by the court in *EBSC III*, but the difference has no practical effect: both injunctions prevent enforcement of the Rule and are identical in scope. Therefore, we review them together.

11   A separate subsection of section 1158, 1158(d)(5)(B), grants the Attorney General authority to impose "conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter." As the motions panel observed, had the Rule explicitly conditioned *applications* for asylum (instead of

East Bay Sanctuary Covenant v. Trump, 950 F.3d 1242 (2020) | Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 687 of 1384

20 Cal. Daily Op. Serv. 1618, 2020 Daily Journal D.A.R. 1684

eligibility for asylum) on arriving at a designated point of entry, the Rule would be "quite obviously, 'not in accordance with law,' " *EBSC II*, 932 F.3d at 770 (quoting 5 U.S.C. § 706(2)(A)), because 1158(a) directs migrants to "apply for asylum" in accordance with section 1158.

12 The BIA in *Pula* interpreted section 1158(a) before it was amended to include the particular phrase at issue ("whether or not at a designated port of arrival"). At the time, the relevant sentence stated "The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum[.]" 8 U.S.C. § 1158(a) (1980).

13 The arguments presented by the United Nations in its amicus brief on how the 1951 Convention and 1967 Protocol should be construed are not binding on this court. *See Cardoza-Fonseca*, 480 U.S. at 439 n.22, 107 S.Ct. 1207. But they do "provide[ ] significant guidance in construing the [1967] Protocol, to which Congress sought to conform[,]" and are "useful in giving content to the obligations that the Protocol establishes." *Id; see also Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007) ("We view the UNHCR Handbook as persuasive authority in interpreting the scope of refugee status under domestic asylum law.") (internal quotation marks and citation omitted).

14 The UNHCR's view is that "penalties" in Article 31(1) "encompasses civil or administrative penalties as well as criminal ones." Br. for UNHCR as Amicus Curiae at 20.

15 "Different policies" underlie the good-cause exception for the thirty-day grace period and the good-cause exception for the notice-and-comment requirement, and "they can be invoked for different reasons." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992). Notice-and-comment requirements are intended to ensure public participation in rulemaking, and the thirty-day waiting period is "intended to give affected parties time to adjust their behavior before the final rule takes effect." *Id.*

1 🔺 *United States v. Ramos-Medina*, 706 F.3d 932, 939 (9th Cir. 2013).

2 *Naruto v. Slater*, 888 F.3d 418, 425 n.7 (9th Cir. 2018).

3 *See* 9th Cir. Gen. Order 6.3(g)(3)(ii); *see also id.* at 6.4(b).

4 *See Haggard v. Curry*, 631 F.3d 931, 933 n.1 (9th Cir. 2010) (per curiam).

5 The majority opines that in this respect *Lair*'s holding is dicta. Not so. The court's first basis for rejecting Lair's contention was the basis just quoted. Its second basis was then set forth. *Id.* It gave both of those alternatives weight and attention. *See Woods v. Interstate Realty Co.*, 337 U.S. 535, 537, 69 S. Ct. 1235, 1237, 93 L. Ed. 1524 (1949) (holding "where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*."); *see also* 🔺 *United States v. Vidal-Mendoza,* 705 F.3d 1012, 1016 n.5 (9th Cir. 2013); *Guadalupe-Cruz v. INS*, 240 F.3d 1209, 1211 & n.5 (9th Cir.), *corrected*, 250 F.3d 1271 (9th Cir. 2001).

6 The majority seems to add a fourth exception, that is, motions panel decisions never constitute the law of the case. That would be strange if those decisions can constitute the law of the circuit, which they can. Moreover, the case primarily cited for that proposition did not indicate it was dealing with a published motions panel decision or one that set forth its reasoning. *See United States v. Lopez-Armenta*, 400 F.3d 1173, 1175 (9th Cir. 2005). It also dealt with the unique area of jurisdiction. *See id.*

7 *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007); *see also Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1074, 1076 n.5 (9th Cir. 2015); *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013).

8 *See Ctr. for Biological Diversity*, 706 F.3d at 1090.

AR.04528

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 689 of 1384
Elhaj-Chehade v. Office of the Chief Administrative Hearing Officer, 532 U.S. 1055 (2001)

121 S.Ct. 2200, 149 L.Ed.2d 1030, 69 USLW 3749

121 S.Ct. 2200
Supreme Court of the United States

Jamal Y. ELHAJ-CHEHADE, petitioner,

v.

OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER, et al.

No. 00-9148.
|
May 29, 2001.

**Synopsis**

Case below, *Elhaj-Chehade v. OCAHO*, 235 F.3d 1339; *Elhaj-Chehade v. UT Southwestern*, 235 F.3d 1339.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

**All Citations**

532 U.S. 1055, 121 S.Ct. 2200 (Mem), 149 L.Ed.2d 1030, 69 USLW 3749

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

8 OCAHO 1018 (O.C.A.H.O.), 1998 WL 1085951

United States Department of Justice

Executive Office for Immigration Review

Office of the Chief Administrative Hearing Officer (O.C.A.H.O.)

JAMAL Y. ELHAJ-CHEHADE, COMPLAINANT

v.

UNIVERSITY OF TEXAS, SOUTHWESTERN MEDICAL CENTER AT DALLAS, RESPONDENT

**8 U.S.C. § 1324b Proceeding**

OCAHO Case No. 98B00068
December 14, 1998

**ORDER**

 *1  During the third telephonic prehearing conference on December 3, 1998, as confirmed in the Third Prehearing Conference Report and Order (Dec. 9, 1998), Complainant acknowledged that his prior references to Parkland Memorial Hospital in Dallas, Texas (Parkland), were for background and explanation of his claim against the University of Texas, Southwestern Medical Center at Dallas (UTSW), and not an effort to make Parkland a party to this case. In contrast, by facsimile transmission, Complainant has today filed a request to amend the Complaint "to include Parkland and other parties involved as defendants."

The broad ranging comments contained in Complainant's pleading provide no justification for amending the Complaint to make Parkland and/or any other entities respondents in this case.[1] Because UTSW was Complainant's employer, UTSW is the only real party in interest regarding Complainant's claim of failure to be rehired based on citizenship status discrimination. Nothing in the prehearing filings or colloquy at the three prehearing conferences warrants the inference that Complainant's application to be rehired by UTSW as a Clinical Research Fellow implicates his separate applications to Parkland for internship positions or that "Parkland, et al.," are necessary parties to the dispute before me concerning the Clinical Research Fellowship. As I understand Complainant's hypothesis, the omnibus claim "et al." embraces any individual who had a relationship to Complainant's UTSW employment, including duties at Parkland, or to his applications for employment. The fact that individuals may occupy positions of responsibility at both UTSW and Parkland is an insufficient basis for amending the Complaint to include them as parties. The individuals referred to, however, could be called upon as potential witnesses if further proceeding are necessary in this action.

Complainant's concern that UTSW is attempting "to evade justice" by identifying itself in its correspondence to Complainant as the "University of Texas Southwestern Medical School at Dallas" is misplaced. Regardless of the name referenced, there is no doubt as to the identity of Respondent; either UTSW is amenable to 8 U.S.C. § 1324b administrative law judge jurisdiction (ALJ) or it is not. If it is so amenable, the inquiry as to whether UTSW unlawfully discriminated against Complainant in violation of 8 U.S.C. § 1324b will go forward, and Complainant's allegations of an inadequate investigation by the Office of Special Counsel for Immigration-Related Unfair Employment Practice will be mooted by an ALJ trial *de novo.*

Notwithstanding that Complainant is *pro se*, he must understand that in the administration of the justice system, as in the practice of medicine, there is a need for procedural discipline. The current Rules of Practice and Procedure of this Office, 28 C.F.R. pt. 68 (Rules), do not refer to filing by facsimile. As a matter of convention and for the convenience of the parties and the forum, however, ALJs have accepted such filings when accompanied by a declaration of concurrent mailing of an original document.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**\*2** Complainant's request to amend filed today is the last pleading by him that I will accept in facsimile form unless: (1) it complies with the limited situations provided for in the amended rule quoted below; and (2) it is accompanied by a true declaration that he has concurrently mailed, postage prepaid, a signed original of the same document. By a pending amendment to the Rules at 28 C.F.R. § 68.6(c), to be published later this month in the Federal Register, legally effective facsimile filings (as distinct from *facsimile copies* for information purposes) of pleadings and briefs will be accepted "**only to toll the running of a time limit.**" Moreover, in such instances, the party filing by facsimile "must include in the certification of service a certification that service on the opposing party has also been made by facsimile or by same-day hand delivery, or, if service by facsimile or same-day hand delivery cannot be made, a certification that the document has been served instead by overnight delivery service."

For the reasons stated above, Complainant's request to amend his Complaint to include Parkland and other individuals as party respondents and to include a new discrimination claim related to his internship applications submitted to Parkland is denied.

SO ORDERED.

Dated and entered this 14th day of December, 1998.

Marvin H. Morse
Administrative Law Judge

## Footnotes

1    *See* 8 C.F.R. §§ 68.1, 68.9(e); FED.R.CIV.P. 15(c)(3) (delineating relation back amendments and addition of party respondents). *See, e.g.,* FED.R.CIV.P. 13 (permitting additional claims against parties to the action in certain situations); FED.R.CIV.P. 15(a) (permitting amendment of pleadings "by leave of court or by written consent of the adverse party"); FED.R.CIV.P. 18(a) (permitting joinder of claims against opposing party); FED.R.CIV.P. 20(a) (permitting joinder of parties related to claims "arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.").

8 OCAHO 1018 (O.C.A.H.O.), 1998 WL 1085951

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

8 OCAHO 1022 (O.C.A.H.O.), 1999 WL 545741

United States Department of Justice

Executive Office for Immigration Review

Office of the Chief Administrative Hearing Officer (O.C.A.H.O.)

JAMAL Y. ELHAJ-CHEHADE, COMPLAINANT

v.

UNIVERSITY OF TEXAS, SOUTHWESTERN MEDICAL CENTER AT DALLAS, RESPONDENT

**8 U.S.C. § 1324b Proceeding**

OCAHO Case No. 98B00068

January 28, 1999

**ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY DECISION**

## I. Procedural and Factual History

**\*1**  Jamal Elhaj-Chehade (Complainant or Chehade) filed a Charge dated October 9, 1997, with the Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC). Chehade alleged that the University of Texas, Southwestern Medical Center at Dallas [1] (Respondent or UTSW) and Parkland Memorial Hospital discriminated against Complainant by not rehiring him as a Clinical Research Fellow because of his national origin and citizenship status and in retaliation for asserting rights protected under 8 U.S.C. § 1324b.

By letter dated February 13, 1998, OSC informed Chehade that its investigation had not been completed within the statutory time period and that, accordingly, he may file his own complaint with the Office of the Chief Administrative Hearing Officer (OCAHO). OSC's letter to Complainant made no reference to Parkland Memorial Hospital.

On May 4, 1998, Chehade filed his OCAHO Complaint, alleging that in violation of 8 U.S.C. § 1324b UTSW knowingly and intentionally did not rehire him as a Clinical Research Fellow because of his citizenship status and national origin. The Complaint specified that UTSW discriminated against him as a lawful permanent resident (LPR) by virtue of an alleged UTSW hiring policy whereby J-1 visa holders are favored over LPRs and United States citizens. At Paragraph 10 of the OCAHO Complaint which obliges complainants to list those individuals or entities against whom a complaint is filed, Chehade listed only UTSW, omitting Parkland Memorial Hospital. Chehade attached to his Complaint a three-page handwritten statement outlining his personal beliefs and selected encounters with UTSW personnel.

Respondent filed its Answer to the Complaint on June 10, 1998. "Respondent contends that Complainant was never an employee, but instead has engaged in a research study as a research fellow—training designation." Denying that it discriminated against Complainant, Respondent stated that his "research fellow position ended on October 2, 1997, when the study exhausted its funds" and that "Respondent was no longer looking for clinical research fellows for this study, regardless of their qualifications." [2]

At the first telephonic prehearing conference on August 5, 1998, Complainant specified three discriminatory actions for which he seeks relief:
(1) He endured intimidation, threat, coercion, or retaliation in September 1997, after informing UTSW personnel that he would file a charge of discrimination;

(2) He was discharged as a research fellow on October 2, 1997, because of his citizenship status as a LPR of the United States; and

(3) He made subsequent updates in the appropriate personnel office to his continuous application for research positions but was not rehired because of UTSW's pattern and practice to fill such positions with individuals holding J-1 visas in preference to LPRs and U.S. citizens with similar qualifications.

**\*2**  First Prehearing Conference Report and Order (August 6, 1998).

At the second telephonic prehearing conference on September 24, 1998, Respondent advised that it had taken Complainant's deposition, that it would be filing dispositive motions relying on *Hensel v. Office of the Chief Administrative Hearing Officer*, 38 F.3d 505 (10 th Cir.1994), and that Complainant had filed a national origin lawsuit in the United States District Court for the Northern District of Texas.

Respondent filed its Motion for Summary Decision on October 19, 1998, contending that this tribunal is without jurisdiction to entertain Complainant's action because: "A. The Eleventh Amendment to the United States Constitution Bars Unconsented Suits Against UT Southwestern Before Federal Tribunals[;]" "B. Congress Did Not Waive the Eleventh Amendment Immunity of the States in the Provisions of 8 U.S.C. § 1324b of the Immigration Reform and Control Act[;]" and "C. The State of Texas Has Not Waived Its Eleventh Amendment Immunity by the Enactment of the Texas Commission on Human Rights Act."

In response, Complainant filed a "Motion to leave to answer out of time" on November 9, 1998, which I granted on November 16, 1998. He filed "Plaintiff's response to the respondent's motion for summary decision" (Complainant's Response) on November 17, 1998. Complainant offered a two part, nine-page, handwritten document in support of the assertion that "this tribunal and other federal tribunals do have the jurisdiction to entertain this Complaint."

Complainant's Response contends for the first time that the "initial complaint was filed and still considered as against UTSWMS et all. [sic.] / parkland hospital," that "none of the entities listed as defendant qualifies for the Eleven [sic] Amendment immunity[,]" and that jurisdiction over the action exists under the Fourteenth Amendment, "Federal Statutes question," the First Amendment, the "Equal Protection Act of 1964," the Thirteenth Amendment, the Supremacy Clause, and the "Equal Education Act."

Complainant's Response argues that
this case is not against a state, nor against an arm/alter ego of the state—it is against some institutions and individuals who acted outside of their authorities.... Furthermore, it is not [the] Texas Code of [E]ducation ... that determine[s] which is an arm of state (alter ego) or not—This matter and issue are of federal law....

Complainant referenced cases in support of his contention that Eleventh Amendment immunity does not apply to this action, while distinguishing *Hensel*. Complainant concluded by extending an offer of settlement to Respondent.

The third telephonic prehearing conference was held on December 3, 1998. On December 7, 1998, Complainant filed his "Request to submit the following information as a part of a prehearing clarification December 03-1998" (Complainant's Request). Complainant's Request seeks to clarify discussions during the conference about the J-1 visa program, to highlight his claim that UTSW has an "open" and "deliberate" discrimination policy, to restate Complainant's references to Parkland Hospital, and to address issues raised during Complainant's deposition (which were not otherwise submitted to the bench).

**\*3**  The Third Prehearing Conference Report and Order issued on December 9, 1998, subsequent to receipt of Complainant's Request, and summarized the December 3, 1998, conference to the effect that:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(1) I understood "Complainant to have declared that he does not claim he was employed by Parkland [Hospital] and to have conceded that his cause of action for failure to be rehired as a Clinical Research Fellow is limited to UTSW which employed him[;]" and

(2) Complainant explicitly acknowledged that his rejected applications for internship positions submitted to Parkland Hospital in July of 1997 and 1998 are not at issue in this proceeding.

On December 14, 1998, Complainant filed his "Request permission to submit to amend the complaint to include parkland and other parties involved as defendants" (Request to Amend). This Request to Amend attempted to add additional party respondents and additional discrimination claims. Complainant argued that this action as originally filed in the OSC Charge included all of the entities, individuals and claims that he currently seeks to add by this Request to Amend. Complainant contended that OSC failed to properly investigate the original Charge which included all of the referenced entities and individuals as respondents and the rejection of internship applications as discrimination claims.

On December 14, 1998, an Order issued in which I denied Complainant's Request to Amend, stating,
The broad ranging comments contained in Complainant's [Request to Amend] provide no justification for amending the Complaint to make Parkland and/or any other entities respondents in this case.... Nothing in the prehearing filings or colloquy at the three prehearing conferences warrants the inference that Complainant's application to be rehired by UTSW as a Clinical Research Fellow implicates his separate applications to Parkland for internship positions or that "Parkland, et al.," are necessary parties to the dispute before me concerning the Clinical Research Fellowship.

The Order also addressed Complainant's concerns that UTSW is attempting "to evade justice" by identifying itself in its correspondence to Complainant as the "University of Texas Southwestern Medical School at Dallas." As stated, "Regardless of the name referenced, there is no doubt as to the identity of Respondent; either UTSW is amenable to 8 U.S.C. § 1324b administrative law judge (ALJ) jurisdiction or it is not."

## II. Discussion and Findings

I do not reach the merits underlying this case as I lack subject matter jurisdiction over Complainant's claims. UTSW, as an arm of the state, is shielded from federal court jurisdiction by sovereign immunity under the Eleventh Amendment to the United States Constitution. Therefore, as more fully discussed below, Respondent's Motion for Summary Decision is granted, and the Complaint is dismissed.

### A. Eleventh Amendment Sovereign Immunity

Generally, the Eleventh Amendment to the United States Constitution divests federal courts of jurisdiction in suits against states. *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990); *Green v. State Bar of Tex.*, 27 F.3d 1083, 1087 (5th Cir.1994); *Hockaday v. Texas Dep't of Criminal Justice, Pardons and Paroles Division*, 914 F.Supp. 1439, 1444 (S.D.Tex.1996). **\*4**  The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. While the Eleventh Amendment only refers to suits against a state by citizens of another state, the Supreme Court has extended this prohibition to suits by *all persons* against a state in federal court. *Port Auth. Trans-Hudson Corp.*, 495 U.S. at 304; *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100 (1984); *Employees v. Missouri Dep't of Public Health and Welfare*, 411 U.S. 279, 280 (1973).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

There are two judicially recognized exceptions to this jurisdictional bar. First, Congress may abrogate state sovereign immunity by "unequivocally express [[ing] its intent to abrogate the immunity" in the language of the enacting statute, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)), and by acting "pursuant to a valid exercise of power." *Id.*. Second, states may consent to suit in federal court. *Port Auth. Trans-Hudson Corp.*, 495 U.S. at 304; *Atascadero State Hospital v. Scanlon* 473 U.S. 234, 241 (1985); *Clark v. Barnard*, 108 U.S. 436, 447 (1883).

Chehade's Complaint arises under the appellate jurisdiction of the United States Court of Appeals for the Fifth Circuit. The Fifth Circuit's treatment of the Eleventh Amendment jurisdictional bar mirrors Supreme Court precedent.

Absent waiver, neither a state nor agencies acting under its control are subject to suit in federal court.... "In deciding whether a state has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' "

*Sherwinski v. Peterson*, 98 F.3d 849, 851-52 (5th Cir.1996) (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909) *cited in Edelman v. Jordan*, 415 U.S. 651, 673 (1974)) (footnotes omitted). *See also James v. Texas Dep't of Human Servs.*, 818 F.Supp. 987, 989 (N.D.Tex.1993) (barring claim in federal court brought under Texas Human Rights Act which generally waived state immunity but did not explicitly waive Eleventh Amendment protection of state immunity from suit in federal court. To waive immunity from federal suit, a state "must specify [its] intention to subject itself to suit in federal court.").

## 1. Congress Did Not Expressly Abrogate State Sovereign Immunity under 8 U.S.C. § 1324b

Chehade's claims before the ALJ arise exclusively under 8 U.S.C. § 1324b. Title 8 U.S.C. § 1324b is silent on the subject of sovereign immunity. For that reason, the United States Court of Appeals for the Tenth Circuit in *Hensel v. Office of the Chief Administrative Hearing Officer*, 38 F.3d 505, 507 (10th Cir.1994),[3] held unambiguously that § 1324b does not reach state entities.

  **5**  [T]here is no textual support by definition or even reference [in the language of the Immigration Reform and Control Act (IRCA), enacting 8 U.S.C. § 1324b,] that a "person" or "entity" includes the state. Absent explicit language in the IRCA itself, we do not find that these terms were intended to subject the state to suit in federal court.... Absent textual support, we cannot conclude that Congress intended to abrogate Eleventh Amendment immunity in the IRCA.

*Hensel*, 38 F.3d at 508 (barring federal jurisdiction over 8 U.S.C. § 1324b claims against the University of Oklahoma Health Sciences Center due to Eleventh Amendment immunity).

Since 1324b does not manifest an intention to make the state amenable to such a suit and [when] the state has not consented to such a suit, a state may invoke Eleventh Amendment sovereign immunity with respect to a law suit brought pursuant to 8 U.S.C. § 1324b. Furthermore, state agencies and entities may be understood to act as the state's alter-ego, in which case the entity may invoke state sovereign immunity.

*D'Amico v. Erie Community College*, 7 OCAHO 948, at 436 (1997), *available in* 1997 WL 562107, at *4 (O.C.A.H.O.) (distinguishing suit against the state from suit against a local entity) (citing *Smiley v. City of Philadelphia Dep't of Licences and Inspections*, 7 OCAHO 925, at 23 (1997), *available in* 1997 WL 1048384, at *8 (O.C.A.H.O.)).

## 2. Texas Did Not Consent To Suit in Federal Court

The State of Texas and UTSW have not consented to federal court jurisdiction in this 8 U.S.C. § 1324b action nor waived their right to seek protection under the Eleventh Amendment.

A waiver of the state's constitutional immunity must be clear and is not to be lightly inferred. *Edelman v. Jordan*, 415 U.S. at 678.... Waiver may only be found where the waiver is express or the inference of waiver overwhelming. *Id.* Further, waiver for

purposes of suit in state courts does not necessarily waive immunity for actions in federal courts. *Murray v. Wilson Distilling Co.,* 213 U.S. 151 ... (1909).

*United Carolina Bank v. Board of Regents of Stephen F. Austin State Univ.,* 665 F.2d 553, 559 (5th Cir.1982).

"The Eleventh Amendment was fashioned to protect against federal judgments requiring payment of money that would interfere with the state's fiscal autonomy and thus its political sovereignty." *United Carolina Bank,* 665 F.2d at 560. UTSW claims that it qualifies for Eleventh Amendment immunity from federal court jurisdiction afforded to the State of Texas because: (1) 8 U.S.C. § 1324b does not abrogate the State's immunity; and (2) UTSW is the alter-ego of the State of Texas. Because *Hensel* and *D'Amico* establish that the language of 8 U.S.C. § 1324b does not abrogate state sovereign immunity, UTSW's ability to invoke immunity depends on whether it is an arm of the state under Texas law.

**B. State Law Determines Which Entities Qualify for State Sovereign Immunity**

**\*6**  Complainant's assertion that "it is not [the] Texas Code of [E]ducation ... that determine[s] which [sic] is an arm of the state (alter ego) or not—This matter and issue are of <u>federal law</u> ...." is only partly correct. The suggestion that state law does not inform as to Respondent's amenability to § 1324b claims overlooks the critical role of state law in determining the character of public entities for purposes of jurisdictional analysis.

[T]he question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore "one of the United States" within the meaning of the Eleventh Amendment, is a question of federal law. But that federal question can be answered only after considering the provisions of state law that define the agency's character.

*Regents of the Univ. of Cal. v. Doe,* 117 S.Ct. 900, 904 n. 5 (1997).

"In determining whether an action is really against the state, federal courts examine the power, characteristics, and relationships created by state law which concern the entity undergoing Eleventh Amendment analysis...." *Hart v. University of Texas at Houston,* 474 F.Supp. 465, 466-67 (S.D.Tex.1979) (citations omitted). "Whether an entity is an arm of the state partaking of the state's eleventh amendment immunity turns on its function and characteristics as determined by state law. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280 (1977)." *Sessions v. Rusk State Hospital,* 648 F.2d 1066, 1069 (5th Cir.1981) (barring former employees civil rights action against state hospital because Eleventh Amendment Immunity) (citations omitted).

Public universities may qualify for immunity or not depending on their status under state law and their relationship to state government. In *United Carolina Bank v. Board of Regents,* 665 F.2d 553 (5th Cir.1982), we formulated a detailed analysis for resolving the status of public universities. That analysis focused on the status of the university under state law, the degree of state control over the university, and whether a money judgment against the university would, because of the status of the university's funds, interfere with the fiscal autonomy of the state. *Id.* at 557-61.

*Lewis v. Midwestern State Univ.,* 837 F.2d 197, 198 (5th Cir.1988). Because state law sets forth which entities are considered alter-egos of the state, the treatment of UTSW by Texas law must be examined.

**C. UTSW Is An Arm of the State**

"The University of Texas Southwestern Medical Center at Dallas is a component of the University of Texas System." Tex.Educ.Code Ann. § 65.02(a)(7) (West 1998). Therefore, a determination that the University of Texas is an arm of the state confers such status on UTSW.

The majority of decisions concerning the eleventh amendment status of state universities have concluded the institutions involved were arms of the state. Yet, each situation must be addressed individually because the states have adopted different schemes, both intra and interstate, in constituting their institutions of higher learning.

**\*7**  *United Carolina Bank, 665 F.2d at 557* (citations omitted).

*United Carolina Bank*[4] sets forth the following factors which are instructive in determining whether the University of Texas is an arm of the state for Eleventh Amendment immunity purposes:

(1) <u>Status of the University of Texas under Texas law</u>

The University of Texas was created by the Texas Constitution:
The Legislature shall as soon as practicable establish, organize and provide for the maintenance, support and direction of a University of the first class, to be located by a vote of the people of this State, and styled, "The University of Texas", for the promotion of literature, and the arts and sciences, including an Agricultural, and Mechanical department.

*Tex. Const. art. VII, § 10*. Texas law provides that a " 'state agency' means a university system or an institution of higher education as defined in section 61.003 Texas Education Code, other than a public junior college." *United Carolina Bank, 665 F.2d at 557* (citing "Tex. Rev.Civ.Stat.Ann. art. 6252-9b(8)(B) (Vernon)").

(2) <u>Degree of Control the State Has over the University of Texas</u>

In addition to being created by Texas law, the University of Texas is supervised and managed by the Board of Regents who are appointed by the Governor with the advice and consent of the state senate. Tex.Educ.Code Ann. § 65.11 (West 1998). Specifically related to UTSW, "[t]he board of regents may prescribe courses leading to customary degrees and may make rules and regulations for the operation, control, and management of the medical school as may be necessary for its conduct as a medical school of the first class." Tex.Educ.Code Ann. § 74.102 (West 1998) ("Chapter 74, Subchapter C. The University of Texas Southwestern Medical Center at Dallas"). Therefore, the state, through its appointments to the board of regents, maintains significant control over the University of Texas and its component UTSW.

(3) <u>The Fiscal Autonomy of the University of Texas</u>[5]

The University of Texas, through its Board of Regents, has limited fiscal autonomy. The Texas Legislature set apart land, other property, grants, donations, and appropriations made by the State of Texas "heretofore made or hereafter to be made" into a "Permanent University Fund" for the establishment and maintenance of the University of Texas. Tex. Const. art. VII, § 11. "All interest, dividends, and other income accruing and earned from the investments of the permanent university fund shall be deposited in the State Treasury ... at least once a month by the board of regents of the University of Texas System." Tex.Educ.Code Ann. § 66.02 (West 1998). "The University of Texas System shall provide the information necessary for the comptroller to accurately account for income from the permanent university fund and to protect state revenues." Tex.Educ.Code Ann. § 66.02 (West 1998). "The composition, investment, purposes, and use of the permanent university fund are governed by Article VII, Sections 10, 11, 11a, 15, and 18, of the Texas Constitution." Tex.Educ.Code Ann. § 66.01 (West 1998). The board of regents of the University of Texas System prepares a financial report containing a statement of assets and a summary of gains, losses, and income from investments and securities to be distributed to the governor, state comptroller of public accounts, state auditor, attorney general, commissioner of higher education, and to the members of the legislature by the 1st day of January each year. Tex.Educ.Code Ann. § 66.05 (West 1998).

#### (4) Ability of the University of Texas To Hold Property

**\*8**  Property owned by the University of Texas is state public property. State law is the source of UT's authority to purchase, sell or lease real and personal property:

> Property conveyed to the board of regents by fiduciaries for the use and benefit of the University of Texas is the property of the university, *a department of the state*, and is public property used for public purposes and is therefore exempt from all taxation under the Constitution and laws or the state.

Op. Att'y Gen. No. 0-1577 (1939) (emphasis added)

The board of regents of the University of Texas System has the sole and exclusive management and control of the lands set aside and appropriated to, or acquired by, the permanent university fund. The board may sell, lease, and otherwise manage, control, and use the lands in any manner and at prices and under terms and conditions the board deems best for the interest of the permanent university fund, not in conflict with the constitution.

Tex.Educ.Code Ann. § 66.41 (West 1998).

#### (5) Court Treatment of the University of Texas as an Arm of the State

"Texas courts have held repeatedly that suits against Universities ... are suits against the state for sovereign immunity purposes." *United Carolina Bank*, 665 F.2d at 558. *See Texas v. Walker*, 142 F.3d 813, 829 n. 10 (5th Cir.1998), *cert. denied*, 67 U.S.L.W. 3156, 3189 (U.S. Jan. 19, 1999) (Nos. 98-348, 98-350) (citations omitted) ("The parties in this case do not dispute that [the University of Texas Health Science Center at Houston] and the Regents of the University of Texas, sued in their official capacity, may invoke the State's Eleventh Amendment immunity; they are 'arms' of the state for purposes of the Eleventh Amendment.");

*Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996) ("Texas Tech, as a state institution, clearly enjoys Eleventh Amendment immunity."); *Hart v. University of Texas at Houston*, 474 F.Supp. 465, 466-67 (S.D.Tex.1979) ( "[The University of Texas at Houston's] M.D. Anderson Hospital [and Tumor Institute] is an instrumentality of the State of Texas for Eleventh Amendment ... purposes."); *Guaranty Petroleum Corp. v. Armstrong*, 609 S.W.2d 529, 531 (Tex.1980) (holding the University of Texas System and its components agencies of the state, shielded from suit in federal court by sovereign immunity, because: (i) the University of Texas "exercises its jurisdiction throughout the State" by maintaining component institutions and entities throughout the State. *See* Tex.Educ.Code Ann. §§ 65.02, 74.101 (West 1998); (ii) the University of Texas is governed by the board of regents who "are appointed by State officials [,]" the Governor with the advice and consent of the senate. Tex.Educ.Code Ann. § 65.11 (West 1997); and (iii) the University of Texas is not authorized to assess or collect taxes. *See* Tex.Educ.Code Ann. §§ 65.11, 65.31-65.46, 74.102 (West 1998)); *Whitehead v. University of Texas Health Science Center at San Antonio*, 854 S.W.2d 175, 180 (Tex.App.1993) (categorizing the University of Texas Health Science Center at San Antonio a part of the University of Texas System and, thus, finding it protected by sovereign immunity). *See also Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex.1976) ("A state agency, as an arm of the state, is shielded by the sovereign immunity available to the state government.").

**\*9**  The State of Texas intends the University of Texas to be an arm of the state. This intent is demonstrated by the above-referenced state laws which establish that the University is under the control of officials selected by the Governor and senate, the University lacks fiscal autonomy, and the University possesses state property used for public purposes. In addition, the

conclusion that the University of Texas is an arm of the state is supported by the above-cited judicial decisions to that effect. As an arm of the state, the University of Texas, including its component UTSW, necessarily qualifies for state sovereign immunity and successfully invokes the sovereign immunity defense of the Eleventh Amendment. Accordingly, I am divested of jurisdiction over Complainant's national origin and citizenship status discrimination claims. Respondent's Motion for Summary Decision in which UTSW claims sovereign immunity from federal court jurisdiction under the Eleventh Amendment is granted.

### III. *Grand Prairie* State Sovereign Immunity Issue

Respondent's Answer asks the court to revisit "the issue of whether the State of Texas had waived it [sic] Eleventh Amendment immunity from suit in federal court by waiving its sovereign immunity to allow civil actions to be filed under the Texas Commission on Human Rights Act, Tex. Labor Code Ann. §§ 21.001, *et seq.* (Vernon 1996 and Supp.1998)" addressed in *Iwuchukwu v. City of Grand Prairie*, 6 OCAHO 915, at 1109-10 (1997), *available in* 1997 WL 176857, at *8-9 (O.C.A.H.O.). However, the *Grand Prairie* "Order Finding Jurisdiction" (Order) determined that the City of Grand Prairie, Texas, did not qualify for Eleventh Amendment immunity from federal court jurisdiction **because it is a municipality, not an arm of the state.** Therefore, the City was subject to federal jurisdiction under 8 U.S.C. § 1324b. *City of Grand Prairie*, 6 OCAHO 915, at 1102, 1107-08, *available in* 1997 WL 17857, at *3-4, *7.

*Grand Prairie* did mention the necessity to determine "whether, on finding that Grand Prairie is an arm of the state under state law, the state has waived its immunity to suit in federal court." *City of Grand Prairie*, 6 OCAHO 915, at 1101, *available in* 1997 WL 176857, at *3. The issue as to whether Texas waived its state immunity to suit in federal court was not resolved, however, because it was determined that the City of Grand Prairie was a home-rule municipality, not an arm of the state. Rather, the Eleventh Amendment immunity analysis focused on the applicability to the municipality of the sovereign immunity defense.

*Grand Prairie* did *not* conclude that the State of Texas waived immunity for state entities from federal court jurisdiction by enactment of the Texas Commission on Human Rights Act or its successor, the Texas Labor Code. "A 'municipality ... regardless of the number of individuals employed' is among the specific governmental employers Texas renders statutorily amenable to suit for employment discrimination. Tex.Lab.Code Ann. § 21.002(8)(D)." *City of Grand Prairie*, 6 OCAHO 915, at 1102, *available in* 1997 WL 176857, at *3. Additionally, the statement in the Order that "Texas consents to suit when federal laws governing employment discrimination are invoked" relates solely to "Texas Statutory Authority" and the State's consent to suit in its own State courts. State sovereign immunity from federal court jurisdiction is *not* abrogated when state law contains a waiver of sovereign immunity in its own state courts and/or encompasses federal employment discrimination laws within its own state statutes. *See Sherwinski v. Peterson*, 98 F.3d 849, 851-52 (5th Cir.1996) ("A state does not waive Eleventh Amendment immunity in federal courts merely by waiving sovereign immunity in its own courts ....") (footnotes omitted); *James v. Texas Dep't of Human Servs.*, 818 F.Supp. 987, 989 (N.D.Tex.1993) ("A state does not ... necessarily waive its Eleventh Amendment immunity to suit in federal court by consenting generally to suit in its own courts. *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306 ... (1990)"). In short, the reach of *Grand Prairie* is to municipalities only, and not to arms of the state.

### IV. Ultimate Findings, Conclusion and Order

**\*10** I find that UTSW, a component of the University of Texas System, is an arm of the State of Texas. UTSW, therefore, is immune from 8 U.S.C. § 1324b jurisdiction by virtue of the Eleventh Amendment. Accordingly, I lack subject matter jurisdiction over Complainant's 8 U.S.C. § 1324b claims. This result concurs with OCAHO precedent examining the Eleventh Amendment's bar to § 1324b jurisdiction. *See D'Amico v. Erie Community College*, 7 OCAHO 948, at 439 (1997) *available in* 1997 WL 562107, at *4 (O.C.A.H.O.) (finding Eleventh Amendment immunity not available to local entity); *Smiley v. City of Philadelphia Dep't of Licenses and Inspections*, 7 OCAHO 925, at 23-30 (1997), *available in* 1997 WL 1048384, at *5-10 (O.C.A.H.O.) (finding Eleventh Amendment immunity defense not available to Philadelphia); *Iwuchukwu v. City of Grand Prairie*, 6 OCAHO 915, at 1111-12 (1997), *available in* 1997 WL 176857, at *10 (O.C.A.H.O.) ("City of Grand Prairie not entitled to defense of sovereign immunity."); *United States v. New Mexico State Fair*, 6 OCAHO 898, at 876-77 (1996) *available in* 1996 WL 776504, at *1-2 (O.C.A.H.O.) (relying on the Tenth Circuit ruling in *Hensel*, action dismissed on Eleventh Amendment grounds for

lack of subject matter jurisdiction); *Kupferberg v. University of Oklahoma Health Sciences Center*, 4 OCAHO 709, at 1059-61 (1994), *available in* 1994 WL 761187, at * 2-3 (O.C.A.H.O.) (dismissing, finding the University of Oklahoma Health Sciences Center immune from liability under IRCA because of Eleventh Amendment sovereign immunity). Because the Complaint is dismissed, I do not reach either the merits or other claims by either party.

I have considered the filings by both parties. All motions and requests not specifically ruled upon are denied. In summary, I make the following determinations, findings of fact, and conclusions of law:

1. UTSW is an arm of the State of Texas;

2. UTSW can invoke the defense of sovereign immunity under the Eleventh Amendment to the United States Constitution;

3. Congress did not explicitly express its intent to abrogate state sovereign immunity under the Eleventh Amendment in Title 8 U.S.C. § 1324b;

4. Respondent's Motion for Summary Decision is granted; and

5. Because I lack subject matter jurisdiction over Complainant's 8 U.S.C. § 1324b claims, this case is dismissed.

Pursuant to 8 U.S.C. § 1324b(g)(1), this Order Granting Respondent's Motion for Summary Decision is the final administrative adjudication in this proceeding and "shall be final unless appealed" within 60 days to the United States Court of Appeals for the Fifth Circuit in accordance with 8 U.S.C. § 1324b(i).

SO ORDERED

Dated and entered this 28th day of January, 1999.

Marvin H. Morse
Administrative Law Judge

## Footnotes

1    Identification of Respondent in the case caption was corrected from "University of Texas, Southwestern Medical School" to "University of Texas, Southwestern Medical Center at Dallas" during the first telephonic prehearing conference as confirmed by the First Prehearing Conference Report and Order (August 6, 1998).

2    By Order issued June 16, 1998, I rejected Complainant's attempt to file a document captioned "Complainant's Comments" in response to Respondent's Answer because it lacked a certificate or other indication of service upon Respondent in breach of the prohibition against ex parte communications. 28 C.F.R. §§ 68.6 and 68.36.

3    Finding no waiver of state sovereign immunity, the Court in *Hensel* stated,
that under Oklahoma Law, the Board of Regents of the University is an arm of the state and that a suit against the University is a suit against the Board of Regents.... Therefore, [the University of Oklahoma Health Sciences Center], as part of the University, is an arm of the state for Eleventh Amendment purposes. Oklahoma has not waived its immunity.... Consequently, [ [The University of Oklahoma] is immune unless Congress has specifically eliminated Oklahoma's privilege.
*Hensel*, 38 F.3d at 508.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

4    *See also Delahoussaye v. City of New Iberia*, 937 F.2d 144, 147 (5 [th] Cir.1991) (examining factors akin to those used in *United Carolina Bank* to determine whether an entity is considered an arm of the state: (1) whether the state statutes and case law characterize the agency as an arm of the state; (2) the source of funds for the entity; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide problems; (5) whether the entity has authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.) (citations omitted).

5    "[B]ecause an important goal of the Eleventh Amendment is the protection of state treasuries, the most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds." *McDonald v. Board of Miss. Levee Comm'rs*, 832 F.2d 901, 907 (5 [th] Cir.1987), *cited in Delahoussaye v. City of New Iberia*, 937 F.2d 144, 147-48 (5 [th] Cir.1991).

8 OCAHO 1022 (O.C.A.H.O.), 1999 WL 545741

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

🟨 KeyCite Yellow Flag - Negative Treatment

Disagreed With by Assa'ad v. U.S. Atty. Gen., 11th Cir., June 5, 2003

94 F.3d 1270
United States Court of Appeals,
Ninth Circuit.

Gabriel ESPINOZA–GUTIERREZ, Petitioner–Appellant,

v.

Richard C. SMITH, District Director, Immigration and Naturalization Service, Respondent–Appellee.

No. 95–35409.
|
Argued and Submitted April 11, 1996.
|
Decided Sept. 3, 1996.

**Synopsis**

Applicant for legalization brought petition for writ of habeas corpus challenging his exclusion while attempting to return from four-day trip to Mexico without advance parole from Immigration and Naturalization Service (INS). The United States District Court for the Western District of Washington, William L. Dwyer, J., denied petition, and applicant appealed. The Court of Appeals, Tashima, Circuit Judge, held that: (1) applicant's failure to raise argument before immigration judge or Board of Immigration Appeals (BIA) that INS regulation requiring advance parole conflicted with legalization statute providing exception to continuous physical presence requirement did not deprive district court of jurisdiction to consider question; (2) exception to continuous physical presence requirement for "brief, casual, and innocent" absence applied to legalization applicant stopped at border; (3) regulations requiring legalization applicants to receive advance parole before leaving country were invalid, since they conflicted with statute; (4) district court lacked jurisdiction to review merits of Legalization Appeals Unit's (LAU) denial of alien's legalization application appeal; and (5) applicant failed to establish, as required to support his request for attorney fees, that government acted in "bad faith, vexatiously, wantonly, or for oppressive reasons."

Reversed in part, affirmed in part and remanded.

**Procedural Posture(s):** On Appeal.

West Headnotes (7)

**[1]** **Aliens, Immigration, and Citizenship** 🔑 Judicial Review or Intervention

Alien's failure to raise argument before immigration judge or Board of Immigration Appeals (BIA) that Immigration and Naturalization Service (INS) regulation requiring advance parole conflicted with legalization statute providing exception to continuous physical presence requirement did not deprive district court of jurisdiction to consider question; BIA lacked authority to invalidate regulation it was bound to follow. Immigration and Nationality Act, §§ 106(c), 245A(a)(3)(B), as amended, 🟨 8 U.S.C.A. §§ 1105a(c), 🟨 1255a(a)(3)(B).

9 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** 🔑 Exhaustion of remedies in general

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

Exhaustion of administrative remedies doctrine does not bar review of question concerning validity of Immigration and Naturalization Service (INS) regulation because of conflict with statute.

8 Cases that cite this headnote

**[3]**    **Aliens, Immigration, and Citizenship** 🔑 Legalization and amnesty

Exception to continuous physical presence requirement for "brief, casual, and innocent" absence applied to legalization applicant stopped at border, rather than just in context of legalization decisions. Immigration and Nationality Act, § 245A(a)(3)(B), as amended, 🔖 8 U.S.C.A. § 1255a(a)(3)(B).

8 Cases that cite this headnote

**[4]**    **Statutes** 🔑 Common or civil law

When Congress adopts language from case law into statutes, there is strong presumption that Congress intended language to have same purpose in statute, as it did in common law.

1 Cases that cite this headnote

**[5]**    **Aliens, Immigration, and Citizenship** 🔑 Validity
       **Aliens, Immigration, and Citizenship** 🔑 Invalid reentry of permanent residents
       **Aliens, Immigration, and Citizenship** 🔑 Legalization and amnesty

Regulations requiring legalization applicants to receive advance parole before leaving country were invalid, since they conflicted with Immigration and Naturalization Service's (INS) own construction of statutory exception to continuous physical presence requirement for "brief, casual, and innocent" absences as border control mechanism; they barred alien who left without advance parole from reentering country even if alien's departure was not intended to disrupt United States residency. Immigration and Nationality Act, § 245A(a)(3)(B), as amended, 🔖 § 1255a(a)(3)(B); 🔖 8 C.F.R. § 245a.2(*l*) (2), 🔖 (m)(1), 🔖 (n)(2).

10 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

District court lacked jurisdiction to review merits of Legalization Appeals Unit's (LAU) denial of alien's legalization application appeal; judicial review of legalization denials was not available in exclusion proceedings. Immigration and Nationality Act, § 245A(f)(1), as amended, 🔖 8 U.S.C.A. § 1255a(f)(1).

2 Cases that cite this headnote

**[7]**    **United States** 🔑 Particular cases and contexts

Alien failed to establish, as required to support his request for attorney fees on appeal under Equal Access to Justice Act, that government acted in "bad faith, vexatiously, wantonly, or for oppressive reasons" in challenging whether alien's return without advance parole was "entry" into United States within meaning of Immigration and Nationality Act. Immigration and Nationality Act, § 245A(a)(3)(B), as amended, 🔖 8 U.S.C.A. § 1255a(a)(3)(B); 🔖 28 U.S.C.A. § 2412(b).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1271** Eric Bakken, Dan P. Danilov, and Mark B. Nerheim, on the brief, Seattle, Washington, for petitioner-appellant.

Donald E. Keener, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for respondent-appellee.

Appeal from the United States District Court for the Western District of Washington, William L. Dwyer, District Judge, Presiding. D.C. No. CV–94–01681–WLD.

Before: WRIGHT, PREGERSON and TASHIMA, Circuit Judges.

**Opinion**

TASHIMA, Circuit Judge:

Petitioner Gabriel Espinoza–Gutierrez ("Espinoza"), an applicant for legalization under 8 U.S.C. § 1255a, appeals the denial of his petition for a writ of habeas corpus. Espinoza was put into exclusion proceedings while attempting to return from a four-day trip to Mexico because he had not received advance parole from the Immigration and Naturalization Service ("INS") prior to his departure. The district court had jurisdiction under 8 U.S.C. § 1105a(b). We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we reverse and remand. Petitioner also appeals the district court's determination that it had no jurisdiction to review the denial of his legalization application. We affirm that ruling.

The first issue on appeal is whether Espinoza's return without advance parole constituted an "entry" into this country within the meaning of the Immigration and Nationality Act ("INA"), 8 U.S.C § 1101(a)(13). To decide this question, we must determine whether the "brief, casual, and innocent" language of 8 U.S.C. § 1255a(a)(3)(B) applies to legalization applicants stopped at the border. We conclude that under the INS's permissible construction of the statute, § 1255a(a)(3)(B) does operate as a border-control mechanism. We further conclude that INS regulations requiring advance parole conflict with the historical meaning and application of the "brief, casual, and innocent departure" doctrine and are, therefore, invalid. *See* 8 C.F.R. §§ 245a.2(*l*) (2) & (m)(1).

## FACTS

Espinoza is a 32–year old native and citizen of Mexico, who entered the United States illegally in 1973. Since that time, he has resided continuously in Yakima Valley, Washington. In 1988, Espinoza applied for legalization under 8 U.S.C. § 1255a. Espinoza's legalization application was initially denied, and he filed appeals with the proper administrative authorities.

His application was on appeal to the Legalization Appeals Unit ("LAU"), in May, 1993, when he flew to Guadalajara, Mexico, to check on some property for his parents. He did not inform or request permission from the INS prior to his departure. Upon his return from Mexico four days after his departure, an immigration inspector at Houston **\*1272** International Airport determined that Espinoza did not possess documents that would allow his entry into the United States, and placed him into exclusion

proceedings. Both the Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") rejected Espinoza's argument that he could not be placed into exclusion proceedings while his legalization application was pending.

Espinoza thereafter filed a petition for a writ of habeas corpus. In seeking the writ, Espinoza abandoned the arguments pursued in front of the IJ and BIA. For the first time, Espinoza argued that the INS had erroneously instituted exclusion proceedings against him because he did not "enter" the country, as his absence from the United States was "brief, casual, and innocent." After filing his opening brief in the district court, the LAU denied Espinoza's legalization appeal. In his reply brief, Espinoza also asked the district court to review the merits of the LAU decision.

The district court concluded that the "brief, casual, and innocent" exception to the entry doctrine does not apply to legalization applicants stopped at the border and, therefore, denied the writ. The district court also determined that it did not have jurisdiction to review the LAU decision.

## DISCUSSION

### I. Statutory Overview

Because this case involves various immigration statutes, INS regulations interpreting and applying those statutes and case law, a brief overview of the law is necessary before analyzing the parties' arguments.

#### A. IRCA and the Regulations

In 1986, Congress passed the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99–603, *reprinted in* 1986 U.S.C.C.A.N. 5649 (100 Stat. 3359). IRCA established a statutory scheme allowing unlawful aliens who had been residing continuously in the United States since January 1, 1982, to apply for legalization. 8 U.S.C. § 1255a. To qualify, an applicant must satisfy four requirements: (1) timely application; (2) continuous unlawful residence since 1982; (3) continuous physical presence since November 6, 1986; and (4) admissibility as an immigrant. 8 U.S.C. § 1255a(a). Applicants meeting these requirements are granted temporary lawful status and, eventually, permanent lawful status. 8 U.S.C. § 1255a(a) & (b).

The continuous physical presence requirement of § 1255a(a)(3) is qualified by subsection (B), which provides: "An alien shall not be considered to have failed to maintain continuous physical presence in the United States ... by virtue of brief, casual, and innocent absences from the United States." 8 U.S.C. § 1255a(a)(3)(B). The INS defines a "brief, casual, and innocent" absence as "a departure authorized by the Service (advance parole) ... of not more than thirty (30) days for legitimate emergency or humanitarian purposes ... or a departure ... beyond the alien's control." 8 C.F.R. § 245.2(*l*)(2). According to the regulations, legalization applicants must have received advance parole from the INS to be readmitted to the country. 8 C.F.R. § 245a.2(m)(1). [1]

#### B. The *Fleuti* Doctrine

The "brief, casual, and innocent" language of § 1255a(a)(3)(B) is a direct descendant of the Supreme Court's decision in *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). *Fleuti* held that a permanent lawful alien resident did not "enter" the country after a "brief, casual, and innocent" absence from the United States. *Id.* at 462, 83 S.Ct. at 1812. In practice, courts balance the length of the trip, its purpose, and the presence of travel documents to determine whether an absence was "brief, casual, and innocent." *Jubilado v. United States,* 819 F.2d 210, 212 (9th Cir.1987).

**\*1273**  Aside from the *Fleuti* doctrine exception, every alien who comes into the United States is deemed to be "entering," and is subject to inspection and must meet admission requirements. 8 U.S.C. §§ 1101(a)(13) & 1181(a). Entering aliens who do not meet admission requirements must be excluded from admission to the United States. 8 U.S.C. § 1182(a). [2]

Exclusion proceedings can only be instituted against aliens who are "entering" the country. *Landon v. Plasencia,* 459 U.S. 21, 28, 103 S.Ct. 321, 326–27, 74 L.Ed.2d 21 (1982). Thus, aliens who do not "enter" the country within the meaning of the INA cannot be excluded from the country.

## II. Exhaustion of Remedies

 **[1]**    Although Espinoza's entire argument on this petition is that he did not "enter" the country, and thus cannot be excluded, he did not raise this argument before the IJ or BIA. Ordinarily, we cannot review an order of exclusion "if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws...." 8 U.S.C. § 1105a(c). Typically, a failure to raise an issue below "constitutes a failure to exhaust remedies with respect to that question and deprives this court of jurisdiction to hear the matter." *Vargas v. United States Dept. of Immigration and Naturalization,* 831 F.2d 906, 907–08 (9th Cir.1987) (citing *Tejeda–Mata v. INS,* 626 F.2d 721, 726 (9th Cir.1980), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982)). Thus, we must first consider whether we have jurisdiction to consider the merits of Espinoza's appeal. We review questions of subject matter jurisdiction *de novo. Xiao v. Barr,* 979 F.2d 151, 153 (9th Cir.1992).

In *Landon,* the Supreme Court held that the determination of whether a petitioner is entering the country is an issue that should be decided in an exclusion hearing by an IJ. 459 U.S. at 31, 103 S.Ct. at 328. This circuit has interpreted *Landon* to mean that IJs have the authority to determine their own jurisdiction. *Castillo–Magallon v. INS,* 729 F.2d 1227, 1228–29 (9th Cir.1984). "Since habeas corpus review of an order of exclusion is permitted under section 1105a(c) only following exhaustion of administrative remedies, it follows from section 1105a and *Castillo–Magallon,* that the question of jurisdiction must first be litigated in the exclusion proceedings themselves." *Xiao, 979 F.2d at 155.* As claimants are required to raise the entry doctrine to an IJ, Espinoza's failure to do so is fatal, unless an exception to the exhaustion doctrine applies.

 **[2]**    We have long held the exhaustion doctrine does not bar review of questions involving the constitutionality of INA statutes and regulations because the BIA has no jurisdiction over those issues. *See, e.g., Liu v. Waters,* 55 F.3d 421, 425 (9th Cir.1995); *Hernandez–Rivera v. INS,* 630 F.2d 1352, 1355 (9th Cir.1980). Applying this same reasoning, we hold today that the exhaustion doctrine does not bar review of a question concerning the validity of an INS regulation because of conflict with a statute.

The INS must follow its own regulations. *Bui v. INS,* 76 F.3d 268, 269 (9th Cir.1996). Accordingly, had Espinoza argued below that the regulations requiring advance parole conflict with § 1255a(a)(3)(B), the argument would necessarily have fallen on deaf ears. The BIA simply has no authority to invalidate a regulation that it is bound to follow. As Espinoza could not have received meaningful review of this issue from the IJ or BIA, he has not failed to avail himself of an administrative remedy, as required by **\*1274** § 1105a(c). We therefore have jurisdiction to consider whether a regulation violates a federal statutory right. *Cf. Campos v. Nail,* 43 F.3d 1285, 1290 (9th Cir.1994) (stating in the context of an immigration class action suit, "jurisdiction exists even if [a] policy violated only federal statutory rights").

## III. Scope and Construction of Section 1255a(a)(3)(B)

**[3]**    Turning to the merits, we must first determine whether § 1255a(a)(3)(B)'s "brief, casual, and innocent" language applies to legalization applicants stopped at the border. By use of the phrase "brief, casual, and innocent," it is uncontested that Congress intended to extend the *Fleuti* doctrine to the legalization application process. *See Mendoza v. INS,* 16 F.3d 335, 337 (9th Cir.1994) ("Barring a congressional mandate, such as 8 U.S.C. §§ 1254(b)(2) and *1255a(a)(3)(B),* the *Fleuti* doctrine applies only to lawful permanent resident aliens.") (emphasis added); *Catholic Social Serv., Inc. v. Meese,* 685 F.Supp. 1149, 1153–54 (E.D.Cal.1988) ("*CSS I* ") (*Fleuti* doctrine applies to legalization applicants), *aff'd,* 956 F.2d 914 (9th Cir.1992), *vacated and remanded on jurisdictional grounds,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). What is less clear, however, is the function Congress intended the *Fleuti* doctrine to serve in the legalization application process.

Espinoza argues that the *Fleuti* doctrine applies to legalization applicants stopped at the border. Thus, according to Espinoza, he should have been entitled to be readmitted to the United States, provided his trip was "brief, casual, and innocent." The INS, on the other hand, argues that § 1255a(a)(3)(B) applies not at the border, but in legalization offices. That is, subsection (B)'s only purpose is to preclude a denial of temporary lawful status based on short absences from the country. Because the LAU did not deny Espinoza temporary lawful status because of his trip to Guadalajara, the INS contends that § 1255a(a)(3)(B) is irrelevant to a discussion of Espinoza's legal rights. The district court agreed with the INS's interpretation of the statute and, therefore, denied the writ. We review the decision to grant or deny a petition for habeas corpus *de novo. Singh v. Ilchert,* 63 F.3d 1501, 1506 (9th Cir.1995).

In deciding the scope of § 1255a(a)(3)(B), we must consider two questions. First, we must decide whether Congress has directly addressed the precise issue at hand. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If we conclude that Congress expressed an intention, then we must give effect to congressional intent without deferring to agency interpretation. *Id.* If, on the other hand, we conclude that Congress has not directly addressed the issue at hand, we must first look to the INS's own construction of the statute. *Id.* at 843, 104 S.Ct. at 2782. If the INS's answer is based on a permissible construction of the statute, we must defer to the agency, as it is charged with the administration and implementation of immigration laws. *Id.; accord Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1444–45 (9th Cir.) (en banc), *cert. denied,* 516 U.S. 976, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995).

**A. Did Congress Address the Precise Issue At Hand?**

First, we consider whether Congress clearly and unambiguously defined the scope of § 1255a(a)(3)(B). We conclude that it did not.

On its face, subsection (B) qualifies the continuous physical presence requirement of 8 U.S.C. § 1255a(a)(3)(A). It does not, either expressly or implicitly, indicate whether or not it is to be applied as a border-crossing mechanism.

The INS argues, however, that by reference to other statutes, it becomes clear that Congress did not intend subsection (B) to extend to the border. First, the INS relies on § 1255a(a)(3)(C), which provides:

> Nothing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for adjustment of status under this subsection.

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

8 U.S.C. § 1255a(a)(3)(C). According to the INS, this subsection clarifies that subsection  **\*1275**  (B) cannot be used as an admission ticket to the United States. The INS reads this subsection far too broadly.

Subsection (C) only precludes admission into the United States "*in order to apply for adjustment of status.*" 8 U.S.C. § 1255a(a)(3)(C) (emphasis added). Espinoza, however, had already applied for legalization, and thus was not seeking to enter the country *to apply* for legalization. Accordingly, by its plain terms, subsection (C) is inapplicable to Espinoza.

The INS also makes much of the fact that once a legalization applicant is granted temporary lawful status, Congress expressly authorized travel abroad.

> The Attorney General shall, in accordance with regulations, permit the alien to return to the United States after such brief and casual trips abroad as reflect an intention on the part of the alien to adjust to lawful permanent resident status ... and after brief temporary trips abroad occasioned by a family obligation involving an occurrence such as the illness or death of a close relative or other family need.

8 U.S.C. § 1255a(b)(3)(A). This section expressly applies to border-crossings. It also applies only to those aliens who have already received temporary lawful status. According to the INS, this section evinces Congress's ability to carve out special entry procedures for aliens subject to IRCA. Congress's failure to provide a similar section for legalization applicants suggests to the INS that Congress intended to deny legalization applicants border-crossing privileges. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

[4]    A countervailing principle of statutory construction, however, undermines the INS's position. Section 1255a(a)(3)(B) does include the "brief, casual, and innocent" language of *Fleuti.* Historically, this language has been viewed as a border-crossing mechanism. *See Mendoza,* 16 F.3d at 337 (indicating the *Fleuti* doctrine is a mechanism to avoid the entry doctrine). When Congress adopts language from case law into statutes, there is a strong presumption that Congress intended the language to have the same purpose in the statute, as it did in the common law. *CSS I,* 685 F.Supp. at 1154 (citing *Lorillard v. Pons,* 434 U.S. 575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978)). Accordingly, in this instance, the more explicit language of § 1255a(b) does not evince Congress's intent to limit the scope of § 1255a(a)(3)(B). As § 1255a(a)(3)(B) expressly includes the language of the *Fleuti* doctrine, we cannot, merely by reference to § 1255a(b), conclude that Congress did not intend § 1255a(a)(3)(B) to operate as a border-crossing mechanism.

Finally, the INS argues by analogy to 8 U.S.C. § 1160, a separate legalization framework for seasonal agricultural workers ("SAW"). Under § 1160(d)(2), SAW applicants cannot be excluded or deported during the pendency of their applications. By contrast, IRCA legalization applicants are only protected against deportation, not exclusion. *See* 8 U.S.C. § 1255a(e)(2) (providing that legalization applicant presenting prima facie application for lawful status "may not be deported"). The INS argues that the difference in the statutory schemes reflects Congress's intention to deny admission to IRCA legalization applicants stopped at the border.

We disagree. SAW has no bearing on whether Espinoza can reenter the United States after his trip to Guadalajara. SAW does not have a continuous physical presence requirement. Because SAW applicants are not required to prove continuous physical presence, there was no need for Congress to carve out a "brief, casual, and innocent" exception under SAW. Thus, SAW does not help us to determine the scope of § 1255a(a)(3)(B).

In sum, none of the arguments presented by the INS convinces us that Congress intended § 1255a(a)(3)(B) to apply only in the context of legalization decisions. By the same token, nothing in § 1255a expressly indicates that subsection (B) was intended to apply at the border. Accordingly, we conclude that Congress has not clearly and unambiguously **1276** defined the scope of § 1255a(a)(3)(B).

### B. The INS's Interpretation of the Statute

As the statute itself does not define the scope of the *Fleuti* doctrine as applied to legalization applicants, we must look beyond the statute to find the answer. In so doing, we first turn to the INS's own construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

#### 1. What is the INS's Construction?

The INS argues that § 1255a(a)(3)(B) is not intended to act as a border-crossing mechanism. In practice, however, the INS developed the advance parole regulations to monitor legalization applicants' departure from and readmission into this country. *See* 8 C.F.R. §§ 245a.2(m)(1) & (n)(2). From what source does the INS derive its authority to permit legalization applicants to cross and re-cross the border? It is, of course, § 1255a(a)(3)(B)'s "brief, casual, and innocent" language.

8 C.F.R. § 245a.2(*l*) provides guidance on § 1255a(a)(3)'s continuous physical presence requirement. Subsection (2) of that regulation provides in pertinent part: "A brief, casual and innocent absence *means a departure authorized by the Service (advance parole).*" 8 C.F.R. § 245a.2(*l*) (2) (emphasis added). This regulation unambiguously and clearly reveals that the INS interprets the "brief, casual, and innocent" language of § 1255a(a)(3)(B) as a border-crossing mechanism. The very existence of the contested regulation belies the INS's argument. Through the authority derived from subsection (B), the INS created admission procedures entitling legalization applicants to be readmitted to the country. Thus, contrary to its argument, the INS has construed subsection (B) as a border-crossing mechanism.

#### 2. Is it Permissible?

We next must decide whether the INS's construction of the statute is permissible. That is, is it permissible to construe subsection (B) as a border-crossing mechanism? We conclude that it is.

The *Fleuti* doctrine itself is a border-crossing mechanism, whereby lawful resident aliens are not deemed to have entered the country if an absence was not intended meaningfully to disrupt permanent residency in the United States. 374 U.S. at 462, 83 S.Ct. at 1812. Given the historical function of the *Fleuti* doctrine, the INS was perfectly justified in concluding that Congress intended § 1255a(a)(3)(B) to extend to the border. *See Lorillard,* 434 U.S. at 583, 98 S.Ct. at 871–72 (presumption that Congress intends statutory phrases adopted from common law to have the same well-known meaning of common law).

Moreover, the legislative history confirms that Congress was well aware of the historical meaning of the *Fleuti* doctrine when it enacted § 1255a(a)(3)(B). *De Oliveira v. United States INS,* 873 F.Supp. 338, 343 (C.D.Cal.1994) (citing H.R.Rep. No.

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

682(I), 99th Cong., 2d Sess. 116 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5720).[3] Accordingly, because the agency's construction of the statute conforms with congressional intent, we hold that the INS's construction of § 1255a(a)(3)(B) as a border-control mechanism is a permissible construction of the statute.

### IV. Do the Advance Parole Regulations Conflict with the Statute?

[5]    We must next determine whether the INS's regulations requiring legalization applicants to receive advance parole conflict with its own construction of § 1255a(a)(3)(B) as a border control mechanism. We conclude that the regulations requiring advance parole are invalid. *See CSS I,* 685 F.Supp. at 1159 (invalidating the regulations); *De Oliveira,* 873 F.Supp. at 343 (same); **\*1277** *Fernandes v. McElroy,* 920 F.Supp. 428 (S.D.N.Y.1996) (same).

Since the Supreme Court decided *Fleuti* in 1963, courts have found that a trip was "brief, casual, and innocent" if it was not intended to disrupt meaningfully an alien's permanent residency in the United States. *CSS I,* 685 F.Supp. at 1158 (citing *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812). The focal point of the *Fleuti* doctrine is the alien's intentions. *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812. "[W]e declare today simply that an innocent, casual, and brief excursion by a resident alien ... may not have been 'intended' as a departure disruptive of his resident alien status and therefore may not subject him to the consequences of an 'entry' into the country on his return." *Id.*

The INS's advance parole regulations totally lose sight of the *Fleuti* doctrine's purpose to circumvent entry procedures when aliens have not intended to disrupt their United States residency. Instead, the advance parole regulations require aliens to jump through several administrative hoops in order to receive advance parole. *See* 8 C.F.R. §§ 245a.2(*l*)(2), (m)(1) & (n)(2). Aliens who fail to jump through the requisite administrative hoops are thereafter barred from reentering the country, regardless of the fact that a departure may not have been intended to disrupt United States residency. *See* 8 C.F.R. § 245a.2(m)(1).

For example, in *De Oliveira,* the legalization applicant flew to Brazil after learning her mother was ill and needed surgery. 873 F.Supp. at 339–40. The petitioner waited in line for two days to obtain advance parole prior to her departure, but did not get in to see an INS agent. *Id.* The petitioner had to leave to be with her mother, and so left without permission from the INS. *Id.* The INS thereafter put her into exclusion proceedings upon her return. *Id.* In these circumstances, it is irrefutable that the petitioner did not intend to disrupt meaningfully her United States residency. Nonetheless, the INS sought to exclude the petitioner by application of its advance parole regulations. Such a result cannot be reconciled with the intent and spirit of the *Fleuti* doctrine.

By construing the "brief, casual, and innocent" language of subsection (B) so narrowly, not only has the INS eviscerated the historical meaning and purpose of the words; it has also contravened Congress's intent that IRCA be liberally construed.

> The Committee intends that the legalization program should be implemented in a liberal and generous fashion, as has been the historical pattern with other forms of administrative relief granted by Congress.

H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 72 (1986), *reprinted in,* 1986 U.S.C.C.A.N. 5649, 5676. The advance parole regulations subjecting legalization applicants to administrative requirements not contemplated by the *Fleuti* doctrine are a far cry from a liberal and generous application of IRCA as intended by Congress.

Given the historical meaning of the phrase "brief, casual, and innocent," and given Congress's desire for IRCA to be liberally and generously construed, we conclude that subsection (B) is not limited to those absences authorized in advance by the INS. To the contrary, the language of the statute, as confirmed by the INS's own interpretation, mandates the application of the *Fleuti*

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

doctrine as it has been historically understood and applied. We therefore hold those regulations requiring advance parole for legalization applicants to be invalid: 8 C.F.R. § 245a.2(*l*)(2), providing that a brief, casual, and innocent absence means a departure authorized by the INS; and 8 C.F.R. § 245a.2(m)(1) providing that readmission is authorized only if the alien received advance parole. [4] We therefore remand to the INS for a determination under *Fleuti* whether Espinoza's absence was "brief, casual, and innocent." *See Castrejon–Garcia v. INS,* 60 F.3d 1359, 1362–63 (9th Cir.1995) (construing "brief, casual, and innocent").

**\*1278  V. Jurisdiction to Review Denial of Legalization Appeal**

[6]    Espinoza appeals the district court's determination that it lacked jurisdiction to review the merits of the LAU's denial of his legalization application appeal. Review of IRCA and its legislative history shows that Congress did not intend judicial review of legalization denials in exclusion proceedings.

8 U.S.C. § 1255a(f)(1) provides there "shall be no administrative or judicial review" of an IRCA application, except as expressly accorded by the statute. Section 1255a(f)(4) provides for judicial review of a denial of a legalization application "only" in "an order of deportation under section 1105a of this title." *Id.* (emphasis added); *see also Reno v. Catholic Social Serv., Inc.,* 509 U.S. 43, 53–54, 113 S.Ct. 2485, 2493–94, 125 L.Ed.2d 38 (1993); *Noriega–Sandoval v. INS,* 911 F.2d 258, 260–61 (9th Cir.1990). Thus, the plain meaning of the statute precludes review of a legalization application in an exclusion proceeding, such as the one at bench.

The plain meaning of a statute is controlling, "absent a clearly expressed congressional intention to the contrary." *Id.* at 260 (quoting *United States v. Hoffman,* 794 F.2d 1429, 1432 (9th Cir.1986)). The legislative history of § 1255a(f) indicates that Congress's failure to provide for judicial review of a legalization application in an exclusion hearing was intentional.

> When the administrative review is exhausted and also yields a negative decision, and when the applicant is in a deportation proceeding (but not an exclusion proceeding), the applicant can appeal a negative decision within the context of judicial review of a deportation order.

H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 74 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5678 (emphasis added).

Moreover, in SAW, passed simultaneously with IRCA, Congress did provide for judicial review of LAU denials in exclusion proceedings. 8 U.S.C. § 1160(e)(3)(A). Section 1160(e)(3)(A), providing the exclusive means of judicial review of SAW legalization denials, is identical to § 1255a(f)(3)(A), with one major exception. Section 1160(e) expressly provides that orders of deportation and exclusion can be judicially reviewed, while § 1255a(f) provides for judicial review only of deportation orders.

The fact that Congress did not include judicial review in § 1255a(f) indicates that Congress did not want to give IRCA applicants this benefit. *See Russello,* 464 U.S. at 23, 104 S.Ct. at 300–01; *see also Navarro–Aispura v. INS,* 53 F.3d 233, 235 (9th Cir.1995) (recognizing in the context of another amnesty statute, 8 U.S.C. § 1259, that there is no administrative review in exclusion proceedings).

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

In summary, the plain meaning of the statute, its legislative history, and its construction, all suggest that Congress purposely foreclosed the possibility of judicial review of an LAU denial in an exclusion proceeding.

Espinoza also argues that the district court had jurisdiction to review the LAU denial because the IJ ordered that Espinoza be "excluded and deported" from the United States. Section 1255a(f)(4)(A) provides: "There shall be judicial review of such a denial only in the judicial review of an order of deportation under section 1105a of this title." Thus, because he has been ordered to be deported, Espinoza claims that the plain language of § 1255a(f)(4)(A) gives the district court jurisdiction to review the denial. Espinoza's argument is without merit.

Although Espinoza relies on use of the word "deport" in the IJ's order, he was not subject to a deportation hearing, nor is he subject to an order of deportation. He was the subject of an exclusion proceeding. Consequently, he is subject to an order of exclusion, which can only be effectuated by deporting him. See Leng May Ma v. Barber, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073–74, 2 L.Ed.2d 1246 (1958) (use of the word deportation in an exclusion proceeding is merely the method of removing the alien from this country, and is not intended as a word of art). Accordingly, we reject Espinoza's attempt to recharacterize his exclusion hearing as a deportation hearing within the meaning of § 1255a(f) and affirm the district court's holding that it lacked jurisdiction to review the LAU's denial of his legalization appeal.


*1279 VI. Attorney's Fees

Espinoza requests attorney's fees on appeal under subsection (b) of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(b). This subsection makes the United States liable to the prevailing party [5] for attorney's fees "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b).

Espinoza identifies no statute providing for an award of fees. Under the common law, attorney's fees may be assessed against a losing party that has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons [.]" Chambers v. NASCO, Inc., 501 U.S. 32, 45–46, 111 S.Ct. 2123, 2133–34, 115 L.Ed.2d 27 (1991) (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975)). The bad faith doctrine is an exception to the "American rule" that litigants bear their own expenses. Barry v. Bowen, 825 F.2d 1324, 1334 (9th Cir.1987). As the bad faith exception predates the EAJA, it is applicable in suits against the United States. Id. (citing H.R.Rep. No. 1418, 96th Cong., 2d Sess. 9, reprinted in 1980 U.S.C.C.A.N. 4953, 4984, 4987).

Awarding attorney's fees under this common law doctrine is punitive, and should be imposed "only in exceptional cases and for dominating reasons of justice." Brown v. Sullivan, 916 F.2d 492, 495 (9th Cir.1990) (internal quotations omitted). To be liable, the government's conduct must have been more than merely unreasonable. Barry, 825 F.2d at 1334. The burden of showing the government's bad faith is on the prevailing party. Id. at 1333. (citing United States v. Ford, 737 F.2d 1506, 1509–10 (9th Cir.1984)).

 [7]    In sum, Espinoza has not offered any argument whatsoever to support his request for fees under § 2412(b). Thus, he has failed to meet his burden of showing the government's bad faith. Moreover, we have held that the government does not act in bad faith where it seeks judicial resolution of an important, doubtful question of law that is "not subject to resolution by clear, controlling precedent." Minor v. United States, 797 F.2d 738, 739 (9th Cir.1986) (internal quotation omitted). As the preceding analysis indicates, the issues presented in this appeal were difficult and the law unsettled. Accordingly, we conclude that the

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Espinoza-Gutierrez v. Smith, 94 F.3d 1270 (1996)**
Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 713 of 1384

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

government did not act in "bad faith, vexatiously, wantonly, or for oppressive reasons[.]" *Chambers,* 501 U.S. at 45–46, 111 S.Ct. at 2133–34 (quoting *Alyeska,* 421 U.S. at 258–59, 95 S.Ct. at 1622). The request for attorney's fees is therefore denied. [6]

## CONCLUSION

Because we conclude that INS regulations requiring advance parole are invalid, we reverse the district court's holding denying the petition for writ of habeas corpus and remand for determination by the INS whether Espinoza's absence was "brief, casual, and innocent," under *Fleuti.* We affirm the district court's holding that it lacked jurisdiction to review the merits of the LAU's denial of his legalization appeal.

**REVERSED IN PART, AFFIRMED IN PART AND REMANDED.** Espinoza shall recover his costs on appeal.

**All Citations**

94 F.3d 1270, 65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

## Footnotes

1    Section 245a.2(m)(1) provides:

During the time period from the date that an alien's application establishing prima facie eligibility for temporary resident status is reviewed at a Service Legalization Office and the date status as a temporary resident is granted, the alien applicant can only be readmitted to the United States provided his or her departure was authorized under the Service's advance parole provisions contained in § 212.5(e) of this chapter.

8 C.F.R. § 245a.2(m)(1).

2    Although aliens who do not "enter" the country by virtue of "brief, casual, and innocent" absences cannot be excluded, they may, nonetheless, be subject to a deportation hearing. 8 U.S.C. § 1251(a)(1)(B) ("Any alien who entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this chapter or any other law of the United States is deportable"). *See also Correa v. Thornburgh,* 901 F.2d 1166, 1171 (2d Cir.1990) ("An entry involves: (1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.") (citation omitted); *Garcia–Mir v. Smith,* 766 F.2d 1478, 1484 (11th Cir.1985) ("Deportable aliens ... have succeeded in either legally or illegally entering this country.") (per curiam)

3    In a letter to the Chairman of the House Judiciary Committee, then Assistant Attorney General, John Bolton, discussed the *Fleuti* doctrine in his comments regarding use of the phrase "brief, casual, and innocent" in § 1255a(a)(3)(B). (H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 116 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5649, 5720).

4    We do not invalidate 8 C.F.R. § 245a.2(n)(2)(i), which provides that the INS may grant advance parole to legalization applicants. Many legalization applicants may prefer to have advance permission from the INS knowing that there will not be any immigration concerns upon their return. We only invalidate those statutes that *require* advance parole, but we do not foreclose the *option* of advance parole.

65 USLW 2161, 96 Cal. Daily Op. Serv. 6547, 96 Daily Journal D.A.R. 10,779

5    Espinoza has prevailed on this appeal, at least in substantial part. We assume for purposes of analyzing his claim that he is the "prevailing party" under the EAJA. *See, e.g., Animal Lovers Volunteer Ass'n v. Carlucci,* 867 F.2d 1224, 1225 (9th Cir.1989) (to qualify as a prevailing party, the plaintiff must succeed on any significant issue).

6    Espinoza does not seek fees under the EAJA's more generous standard of subsection (d)(1)(B), which permits an award of fees if the position of the United States was "not substantially justified." 28 U.S.C. § 2412(d)(1)(B). *See Barry,* 825 F.2d at 1334 (more difficult to establish "bad faith" under § 2412(b), than to establish "not substantially justified" under § 2412(d)). Because Espinoza did not seek fees under § 2412(d) in his initial brief, we cannot consider an award of fees under that subsection. Ninth Cir. R. 39–1.6; *see United States v. City and County of San Francisco,* 990 F.2d 1160, 1161 (9th Cir.1993).

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Angov v. Holder, 9th Cir., December 4, 2013

325 F.3d 396
United States Court of Appeals,
Third Circuit.

Glory Obianuju EZEAGWUNA, Petitioner

v.

John ASHCROFT, Attorney General
of the United States, Respondent.

No. 01-3294.
|
Argued April 25, 2002.
|
Panel Rehearing Granted on April 14, 2003.
|
Submitted After Grant of Panel
Rehearing on April 14, 2003.
|
Filed April 14, 2003.

Synopsis

Alien petitioned for review of order of the Board of Immigration Appeals (BIA), denying her application for asylum. Vacating prior opinion, 🚩 301 F.3d 116, the Court of Appeals, Rendell, Circuit Judge, held that the BIA violated alien's due process rights when it rejected her claims of past persecution based almost entirely upon hearsay statements of State Department official in letter that alien received only days prior to final hearing on her asylum application.

Petition granted; case remanded.

West Headnotes (12)

[1]     **Aliens, Immigration, and
        Citizenship** 🔑 Review of Initial Decision or
        Administrative Review

        Where the Board of Immigration Appeals (BIA)
        had conducted independent analysis of record
        in asylum proceedings, Court of Appeals would
        limit its review to the BIA's final order.
        Immigration and Nationality Act, § 208(b)(1), as
        amended, 🚩 8 U.S.C.A. § 1158(b)(1).

9 Cases that cite this headnote

[2]     **Aliens, Immigration, and
        Citizenship** 🔑 Constitutional Questions

        On appeal from order entered by the Board
        of Immigration Appeals (BIA) in asylum
        proceedings, Court of Appeals would review de
        novo whether alien's due process rights were
        violated. U.S.C.A. Const.Amend. 5.

15 Cases that cite this headnote

[3]     **Aliens, Immigration, and
        Citizenship** 🔑 Review of Discretion

        On appeal from order entered by the Board
        of Immigration Appeals (BIA) in asylum
        proceedings, Court of Appeals would review,
        for abuse of discretion, the BIA's decision
        not to reopen the record and to remand
        to immigration judge for consideration of
        supplemental evidence.

85 Cases that cite this headnote

[4]     **Aliens, Immigration, and
        Citizenship** 🔑 Admissibility

        **Constitutional Law** 🔑 Asylum, Refugees,
        and Withholding of Removal

        Board of Immigration Appeals (BIA) violated
        due process rights of alien seeking political
        asylum when it rejected her claims of past
        persecution based almost entirely upon hearsay
        statements of State Department official in letter
        that alien received only days prior to final
        hearing on her asylum application, where this
        letter, which concerned results of "investigation"
        allegedly conducted by unknown individual into
        documents that alien had submitted in support of
        her application, was in nature of multiple hearsay
        authored by government official with no personal
        knowledge of matters reported, of alleged
        investigator, or of how alleged investigation was
        conducted. U.S.C.A. Const.Amend. 5.

33 Cases that cite this headnote

**[5]**    **Constitutional Law** ⬅ Non-Citizens; Aliens

Due process protections are afforded to aliens facing removal. U.S.C.A. Const.Amend. 5.

3 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship** ⬅ Admissibility

Because the Federal Rules of Evidence do not apply in asylum proceedings, test for admissibility of evidence is whether evidence is probative and whether its use is fundamentally fair, so as not to deprive alien of due process. U.S.C.A. Const.Amend. 5; Fed.Rules Evid.Rule 101 et seq., 28 U.S.C.A.

25 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship** ⬅ Weight and Sufficiency

**Constitutional Law** ⬅ Asylum, Refugees, and Withholding of Removal

Whether the Board of Immigration Appeals (BIA) violated alien's due process rights when it rejected her claims of past persecution based almost entirely upon hearsay statements of State Department official as to "investigation" allegedly conducted by unknown individual of alien's documents turned on whether letter written by State Department official regarding results of investigation was reliable and trustworthy. U.S.C.A. Const.Amend. 5.

25 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship** ⬅ Admissibility

Hearsay can be admitted in asylum cases under certain circumstances. Immigration and Nationality Act, § 208(b)(1), as amended, 8 U.S.C.A. § 1158(b)(1).

**[9]**    **Evidence** ⬅ Nature and Admissibility

Hearsay is generally inadmissible because hearsay statements are inherently untrustworthy:

declarant may not have been under oath at time of statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined.

3 Cases that cite this headnote

**[10]**    **Aliens, Immigration, and Citizenship** ⬅ Findings or Statement of Reasons

Decisions of the Board of Immigration Appeals (BIA) in asylum cases cannot be sustained simply by invoking the State Department's authority. Immigration and Nationality Act, § 208(b)(1), as amended, 8 U.S.C.A. § 1158(b)(1).

3 Cases that cite this headnote

**[11]**    **Aliens, Immigration, and Citizenship** ⬅ New Evidence, Facts or Circumstances

Decision of the Board of Immigration Appeals (BIA) not to reopen record in asylum proceedings in order to allow alien to introduce undated affidavit of nun who had visited alien's country of origin prior to hearing on her application for asylum, on ground that alien had failed to show that nun's affidavit could not have been presented earlier, was not abuse of discretion. 8 C.F.R. § 3.2(c)(1).

24 Cases that cite this headnote

**[12]**    **Aliens, Immigration, and Citizenship** ⬅ New Evidence, Facts or Circumstances

Psychological evaluation by clinical psychologist, concluding that asylum applicant possessed psychiatric profile consistent with and strongly corroborative of her claim that she was a victim of persecution and continued to suffer effects of those experiences, was material to question of whether alien had in fact been persecuted, and was not duplicative of affidavit that alien had previously introduced from family doctor, so that where this psychological evaluation admittedly could not have been

introduced prior to close of hearing on alien's application for asylum, the Board of Immigration Appeals (BIA) should have reopened record in asylum proceedings in order to allow alien to introduce this evaluation.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*398** Sidney S. Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison, New York, for Petitioner Glory Obianuju Ezeagwuna.

Michael T. Dougherty, United States Department of Justice, Office of Immigration Litigation, Washington, Richard M. Evans, Terri J. Scadron, John M. McAdams, Jr., Donald E. Keener, Francis W. Fraser, United States Department of Justice, Office of Immigration Litigation, Washington, Brian G. Slocum, United States Department of Justice, Washington, for Respondent John Ashcroft, Attorney General of the United States.

James C. La Forge, Chadbourne & Parke, Upper Montclair, for Amicus-Appellant Lawyers Committee for Human Rights.

Before BECKER, Chief Judge, SCIRICA, and RENDELL, Circuit Judges.

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Glory Obianuju Ezeagwuna ("Ms. Obianuju"), a citizen of Cameroon, seeks political asylum and withholding of deportation. She claims to have been persecuted because of her membership in two political organizations in Cameroon that represent the interests of the English-speaking minority population. The Immigration Judge ("IJ") denied her application, and the Board of Immigration Appeals ("BIA" or "Board") dismissed her appeal. The BIA also denied Ms. Obianuju's motion to supplement the record with four additional pieces of evidence.

The BIA's dismissal was based on a finding that Ms. Obianuju had submitted fraudulent documents and therefore was not credible. The BIA relied almost entirely on a letter from the Department of State that contained the conclusions of an investigation in Cameroon. In an original opinion on appeal, we concluded that reliance on this letter denied Ms. Obianuju her due process rights and undermined the fundamental fairness of the administrative process. *See* 🚩 *Ezeagwuna v. Ashcroft,* 301 F.3d 116 (3d Cir.2002). We also concluded that a reasonable factfinder would be compelled to conclude that Ms. Obianuju was persecuted because of her political opinions and faces a clear probability of persecution if returned to Cameroon. We then found Ms. Obianuju eligible for asylum and ordered withholding of deportation, subject to the Attorney General's discretion. Because we viewed the record as sufficient, we declined to consider whether the BIA abused its discretion in refusing to reopen the record and remand to the IJ for it to consider additional evidence proffered by Ms. Obianuju.

The Attorney General sought panel rehearing in light of the Supreme Court's opinion in 📄 *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002), urging that the BIA, and not this Court, should make the determination as to whether, based on the record absent the documents we found unreliable, asylum and withholding of deportation should be granted. We agreed with this view and vacated our prior opinion and judgment. In so doing, while the analysis in our amended opinion remains unchanged regarding the documents that we found untrustworthy, we will now also address whether the BIA should have permitted Ms. Obianuju to supplement the record with the proffered additional evidence. Because the IJ has not had the opportunity to determine Ms. Obianuju's eligibility for asylum based on the appropriate evidence, we will grant the petition for review, and remand to the BIA for further proceedings consistent with this opinion.

**\*399** I.

A. *Background*

Glory Obianuju Ezeagwuna, a citizen of Cameroon, seeks asylum in the United States. Prior to her alleged persecution she lived in Bamenda, a city in the Northwest Province of Cameroon. She is a member of the English-speaking minority population, French being the language of the majority. She claims to have been persecuted because of her political opinion, and she points to mistreatment resulting from her membership in two political groups representing the interests of this Anglophone population - the Social Democratic Front

("SDF") and the Southern Cameroons National Council ("SCNC").

Ms. Obianuju provided a detailed account of her abuse in affidavits, testimony, and corroborating documents. Following is a summary of the account presented by Ms. Obianuju in her affidavit in support of her application for asylum.

Ms. Obianuju's parents and other family members were very active members of SDF. In 1994, Ms. Obianuju began participating in SDF activities, and in 1996, at the age of eighteen, she became an official member of SDF. Ms. Obianuju tells of three times that she was jailed and physically abused because of her political activism. The first incident took place in 1996 when she joined other SDF members in protesting the appointment of Francis Faie Yengo as the leader of the Bamenda Urban Council. Government police sprayed tear gas on the protestors and arrested them. Ms. Obianuju claims that she was then dragged through the gravel on her knees and taken by force to Bamenda Central Prison where she was beaten on the soles of her feet and on her knees with police sticks. Ms. Obianuju's parents retained an attorney, Robert Nsoh Fon, to obtain her release from prison and on the fourth day she was released on bail. Upon her release she visited a doctor, Dr. Nji, who applied ointment to her hands and knees, and provided her with painkillers.

Next, in January 1997, Ms. Obianuju and other students marched to protest a substantial fee increase for taking a university entrance exam only imposed in the English-speaking areas of Cameroon. Ms. Obianuju marched at the front of the group. The government police began beating the students with their belts and spraying tear gas in an effort to disperse the students. She was kicked in the stomach and then dragged by an officer through the gravel. In prison, she was further hit and kicked by the officers. Her attorney was able to negotiate her release from prison. After her release, Ms. Obianuju left the SDF and became a member of the SCNC. Although the SCNC did not hold demonstrations, its goals were otherwise similar to the SDF.

In March and April 1997 there were a series of attacks on police and civilian establishments in Bamenda. According to Ms. Obianuju, the government blamed the SCNC for the attacks, but she denies any involvement. Ms. Obianuju claims that a few weeks after the attacks the police entered her home at 10 p.m. while she was asleep and physically removed her from her home without providing any explanation. During the

course of the family's struggle to protect her, a police officer cut her mother's hand with a knife. Ms. Obianuju was taken to prison and placed in a cell with other SCNC members where she remained for six days. During the first day she and the others were beaten with police sticks on the soles of their feet and on their knees. During the second day an officer removed her from her cell and attempted to rape her, but was stopped by another officer. He bit her on the chest and scratched her back with his nails, leaving **400** scars. She was repeatedly kicked in the stomach and hit across her face during the remainder of her detention. When her lawyer sought her release, he was told that she was being imprisoned for the March and April attacks mentioned above. On April 30, she was released upon payment of 1,500,000 francs.

Upon release she was taken to a doctor, because she was discharging blood. She subsequently became more ill and underwent an emergency appendectomy because her appendix "had been destroyed" by the abuse she suffered. She remained in the hospital for thirty days thereafter.

On July 31, 1997, Ms. Obianuju's attorney informed her that the police had a warrant for her arrest claiming that she had been improperly released in April. She therefore traveled to Bafut, a city in the Northwest province, to stay with a family friend, George Moma. She remained in hiding there indoors until December 1998. She then obtained a fake passport in the name of George Moma's sister, Francisca Biwie Moma. She used this passport to fly to Jamaica in February 1999. She stayed with a series of new acquaintances in Jamaica for three weeks. At that time her return trip was scheduled, and she requested asylum from the Jamaican immigration office, but they denied her application and attempted to take her into custody. She again went into hiding. A Jamaican provided her with a fake English passport in the name of Rebecca Channon, and she left on a flight to Newark, New Jersey on August 13, 1999. Upon her arrival at Newark International Airport, United States immigration officers determined that the passport was false, and upon questioning by the INS, Ms. Obianuju sought political asylum. Ms. Obianuju was deemed inadmissible by the INS under sections 212(a)(6)(C)(i) [1] and 212(a)(7)(A)(i)(I) [2] of the INA ("Immigration and Nationality Act") because she entered the country with invalid documents, and she was detained and has remained in detention ever since. She seeks political asylum and withholding of deportation, and, in the alternative, relief under the Convention Against Torture ("CAT"). [3] She claims that Cameroonian authorities continue to look for her and

AR.04559

believes that her well-being and even her life would be in jeopardy if she returned to Cameroon.

B. *Proceedings Before the INS*

Ms. Obianuju first appeared before the Immigration Judge ("IJ") on September 2, 1999 pro se. She subsequently obtained counsel, and a hearing on the merits was held first on March 3, 2000 and continued on May 9, 2000. Ms. Obianuju testified at great length and was cross-examined by INS counsel, Irene Feldman. Ms. Obianuju submitted a large number of corroborating documents, including affidavits and declarations of family, friends, and SDF members, SDF membership cards, and U.S. State Department Country Reports. At the time of the hearing, the IJ had before her 37 exhibits provided by Ms. **\*401** Obianuju and the INS. Dr. David S. Kang, a family medicine practitioner who conducted a physical examination of Ms. Obianuju on November 9, 1999, testified on her behalf. He concluded that she was credible, in part because she did not claim that every scar on her body resulted from torture. Furthermore, the scars she claimed were caused by torture were consistent with the acts she claimed caused them, specifically, scars on her knees from being dragged through the gravel, a scar on her chest from being bitten, and a surgical scar on her abdomen resulting from her appendectomy. Ms. Obianuju also moved to admit Dr. Kang's affidavit. At the close of this hearing the IJ said:

> I have spoken with, to both counsels. I need to, this matter has to be continued, of course, for the issuance of the oral decision. And of course Ms. Feldman is waiting response of the [forensic document laboratory] report regard, as to one document just recently submitted. Therefore, this hearing is adjourned for the 26th of May, at 1 p.m. in the afternoon. [4]

On June 7, 2000, during a continuance of the May 26 hearing, the INS provided a two-page letter from John Larrea, Vice Consul of the Embassy of the United States in Yaounde, Cameroon (the "Larrea letter"). The Larrea letter sets forth in a summary fashion the results of an investigation conducted into five documents submitted by Ms. Obianuju: a medical certificate from her doctor in Cameroon; the arrest warrant;

an application for bail; an affidavit by Ms. Obianuju's father; and, an affidavit by her attorney in Cameroon, Robert Nsoh Fon. The letter concludes that each of these documents is fraudulent. A copy of each document is attached to the Larrea letter with notations allegedly made by government officials setting forth why the document is believed to be fraudulent. No investigative report is provided, nor is there any information about the investigation or the investigator.

In order to respond to the letter, on June 16, 2000, Ms. Obianuju's counsel requested a 30-day continuance. She explained: "An additional 30 days would enable us to address the allegations in the June 7, 2000 letter from the United States Embassy concerning Ms. Obianuju's asylum application, and make any necessary motions with regard to the findings in that letter." The continuance was granted.

On July 27, 2000, Ms. Obianuju filed a motion in limine setting forth five reasons why the Larrea letter should be excluded: 1) no foundation was laid for Larrea's opinions, 2) the letter's admission would violate the due process requirement of fundamental fairness; 3) its admission would violate INS regulations prohibiting the disclosure of asylum applications to third parties; 4) the admission of evidence based on this type of investigation would frustrate future asylum proceedings; and, 5) the letter was not authenticated in accordance with INS regulations. As support for the motion, Ms. Obianuju included a July 26, 2000 affidavit from Milton Krieger, a scholar of politics in Cameroon ["first Krieger affidavit"]. [5] Dr. Krieger shared **\*402** his detailed knowledge of Cameroon, particularly regarding the government's persecution of SDF and SCNC members, the U.S. Embassy's limited knowledge of the political situation in Bamenda, and the difficulty of authenticating documents in Cameroon. Finally, he explained that Ms. Obianuju's account of what occurred was credible and shared his opinion that if she returned there was "a significant probability that Ms. Obianuju would be severely harassed, beaten, tortured or possibly even killed."

On August 7, 2000, the INS moved for a continuance of the hearing set for August 9 in order to obtain an original of the Larrea Letter. On that very same day, August 7, counsel for the INS obtained a letter from Marc J. Susser, Director, Office of Country Reports and Asylum Affairs, United States Department of State (the "Susser letter"). The entire text of the Susser letter is set forth in the appendix to this opinion. Susser explained in his opening paragraph: "I am writing to forward the results of an investigation, by a Foreign Service post, of

documents presented in support of the asylum application of [Glory Obianuju]. These documents were forwarded to us by your office." The Susser letter is simply a restructured version of the Larrea letter, utilizing almost the exact same language. Significantly, however, the referenced documents are *not* attached to the Susser letter.

Although the Susser Letter is dated August 7, 2000, it was not provided to the IJ or Ms. Obianuju's counsel until September 18, 2000, three days before the hearing date. [6] On September 18, the INS sent a letter to the IJ as a response to Ms. Obianuju's motion in limine. In addition to rebutting the arguments made in the motion in limine, the INS provided the Susser letter "since [Ms. Obianuju] has objected to the admissions of the letter from John Larrea." The INS contended:

> In an effort to provide Your Honor with an original letter, the Service respectfully submits the more recent Department of State letter in lieu of the prior submission. To date, the Service has not received the original copy of the Larrea Letter. Although the respondent has questioned the integrity of the Embassy staff, it would be beyond the realm for the respondent to question the recent letter submitted by Marc J. Susser, Director of the Office of Country Reports and Asylum Affairs.

> The INS, therefore, no longer sought to admit the Larrea letter nor did it submit copies of the allegedly fraudulent documents for consideration as part of the record. It only moved for admission of the two-page Susser letter.

On September 21, 2000, the day of the hearing, counsel for Ms. Obianuju presented the IJ with a letter expressing her objections to the Susser letter, primarily reiterating the concerns set forth in the motion in limine. On September 21, the IJ heard from both counsel regarding the admissibility of the Susser letter and other documents. As the INS no longer sought admission of the Larrea letter, it was marked for identification purposes only. Without any explanation, the IJ admitted the Susser letter over Ms. Obianuju's objections. The IJ closed the record at this hearing. [7]

**\*403** On October 30, 2000, the IJ issued a written opinion. The IJ found that Ms. Obianuju had not established that she suffered past persecution or a well-founded fear of persecution, and therefore denied her applications for asylum, withholding of removal, and relief under the Convention Against Torture. The IJ's decision was based almost entirely on its finding that Ms. Obianuju was not credible. First, the

IJ said that Ms. Obianuju's testimony seemed exaggerated and rehearsed. Second, the IJ believed that details of her testimony "simply did not add up." She pointed specifically to the implausibility of Ms. Obianuju's explanation for discrepancies with her membership cards, that she was repeatedly mistreated by officers in exactly the same manner, and that the government would search so actively for a girl who was only moderately involved in political activity. Third, the IJ found that several reports provided by the INS questioned the authenticity of documents submitted by Ms. Obianuju, as well as the veracity of her testimony. Specifically, the IJ pointed to the Susser letter, the INS Forensic Document Laboratory ("FDL") report questioning the authenticity of one SDF card, and a document entitled "Abuse of Membership of the Social Democratic Front by Asylum Seekers" prepared by the SDF in Cameroon. Finally, the IJ explained that it was unbelievable that a person in her position would be the subject of the persecution she claimed.

Ms. Obianuju filed an appeal with the Board of Immigration Appeals on November 27, 2000. On July 10, 2001, Ms. Obianuju filed a motion to supplement the record for her asylum application. She asked the BIA to consider three additional documents that were not part of the record before the IJ: an affidavit of Sister Jane Mankaa, a Cameroonian nun living in New Jersey who visited Ms. Obianuju's parents in August 2000; a second affidavit of Dr. Milton Henry Krieger commenting in part on Sister Mankaa's affidavit; and, an affidavit of Dr. Frances Geteles, a certified clinical psychologist who examined Ms. Obianuju in July 2001. All three affidavits provide support for Ms. Obianuju's version of events and bolster her credibility. Ms. Obianuju also asked the BIA to consider a June 21, 2001 memorandum from Bo Cooper, General Counsel to the INS. Cooper set forth the proper procedure to follow when conducting overseas investigations in order to ensure the confidentiality of the asylum applicant. Ms. Obianuju offered the letter as support for her argument on appeal that the confidentiality of her application was breached by the investigation reflected in the Susser letter.

Without oral argument, the BIA issued its decision on August 17, 2001. The BIA first denied Ms. Obianuju's motion to supplement the record. It explained: "[T]he Board is an appellate body whose function is to review, not create a record. Thus it would be inappropriate for us to accept the evidence proffered by the respondent." (citation omitted). The BIA also refused to remand to the IJ for it to consider the additional evidence, because, with the exception of Dr.

Geteles's affidavit, it was "not shown that the affidavits could not have been presented on or before close of the hearing on the merits which was concluded on September 21, 2000." The BIA further found that Dr. Geteles's affidavit would not change the outcome in the case and therefore did not merit reopening the record.

The BIA then conducted a de novo review of the record, found that the IJ's decision was correct, and dismissed the appeal. In the course of its analysis, however, **\*404** the BIA disagreed with much of the IJ's reasoning, specifically two of the primary grounds on which the IJ relied when concluding that Ms. Obianuju was not credible. The BIA explained: "We disagree with the Immigration Judge that it is implausible that the respondent may have been abused on different occasions in similar ways or that as a rank and file member of the SDF she would not have been subject to custodial abuse." The BIA also found that the IJ's description of Ms. Obianuju's testimony did not reflect whether her demeanor was a result of rehearsal, as the IJ concluded, or instead "related to the respondent's repetition of stressful events in different venues with resulting emotional numbness." The BIA concluded: "Consequently, to the extent that the Immigration Judge's decision is based upon finding these accounts of the respondent incredible solely based upon their implausibility and/or the manner in which the testimony was provided, we disagree with the Immigration Judge."

The remainder of the BIA's decision focused on the allegedly fraudulent corroborating documents submitted by Ms. Obianuju based on the "investigation" results set forth in the Susser letter. The BIA concluded that the Susser letter was properly admitted and considered by the IJ. The BIA essentially adopted the conclusions of the Susser letter and concluded that the five pieces of evidence discussed therein were fraudulent: the medical certificate from her doctor in Cameroon; the arrest warrant; the bail application; the affidavit of Ms. Obianuju's father; and the affidavit by her attorney in Cameroon, Robert Nsoh Fon. The BIA also concluded that one of the SDF membership cards she submitted was fraudulent because of the discrepancy between the dates of contribution, beginning in 1991, and the date she claims to have joined, in 1996. The BIA specifically rejected Ms. Obianuju's explanation, supported by affidavits of SDF members, regarding the practice of backdating membership cards when a member paid dues for previous years.

The BIA's finding that the evidence described in the Susser letter was fraudulent was the linchpin of its decision:

> In essence, there is a pattern in the evidence consistent with the repeated fabrication of identities for individuals signing documents presented by the respondent and this pattern is reinforced by stamps on affidavits which appear to be fake and the failure to register documents in the High Court of Bamenda as required. We find this pattern consistent with the production of counterfeit evidence as opposed to the administrative lapses and corruption described by the respondent or intentional efforts to discredit her persecution claim.

The BIA focused on Ms. Obianuju's submission of fraudulent documents, and not the substance of the evidence supporting Ms. Obianuju's claims:

> We find that the respondent's failure to meet the burden of proving eligibility for relief is directly related to the adverse credibility determination and the presence of counterfeit evidence presented in an attempt to corroborate the respondent's account. It is the presentation of counterfeit documents to bolster her claim, rather than the failure to present any specific supporting evidence, which has resulted in the failure of proof.

Notwithstanding its concerns regarding the IJ's analysis, the BIA ultimately reached the same conclusion and rejected Ms. Obianuju's application due to her lack of credibility, although based on the submission of falsified documents. The BIA concluded:

> Despite the fact that we do not agree with all aspects of the Immigration **\*405** Judge's decision, we see

no reason to disturb the adverse credibility determination. We find that the respondent's efforts to explain and/or rebut the findings of United States officials are inadequate and that such counterfeit corroborative evidence discredits not only the specific evidence itself, but indicates an overall lack of credibility regarding the entire claim. As the adverse credibility determination is dispositive for purposes of eligibility, the respondent's appeal from the denial of her applications for asylum, withholding of removal, and relief under the CAT is dismissed.

(citations omitted).

Ms. Obianuju then filed this petition for review.

II.

**[1]    [2]    [3]**  We have jurisdiction to review the BIA's final order pursuant to 8 U.S.C. § 1252(a)(1). The BIA had jurisdiction under 8 C.F.R. § 3.1(b)(9). As it conducted an independent analysis of the record, we limit our review to the BIA's final order. *Abdulai v. Ashcroft,* 239 F.3d 542, 549 (3d Cir.2001). Our analysis of the order will proceed in two parts. First, we will review de novo whether Ms. Obianuju's due process rights were violated. *Chong v. INS,* 264 F.3d 378, 386 (3d Cir.2001). Next, we will consider whether the BIA abused its discretion in refusing to reopen the record and remand to the IJ for it to consider supplemental evidence. *Lu v. Ashcroft,* 259 F.3d 127, 131 (3d Cir.2001).

A. *Reliance on Susser Letter Violated Ms. Obianuju's Due Process Rights*

**[4]**  We must first consider Ms. Obianuju's challenge to the BIA's consideration of the Susser letter. This is a crucial, threshold consideration, because, as we noted, the BIA's decision was based almost entirely on the Susser letter, and it is clearly the underpinning for the BIA's conclusion that Ms. Obianuju's testimony was not credible and that her

corroborative evidence was fraudulent. Without the Susser letter, the majority of the BIA's reasoning actually supports Ms. Obianuju's case. Because we believe that the BIA's reliance on the letter violated her Fifth Amendment right to due process, we need not address Ms. Obianuju's other challenges to the letter.

**[5]    [6]    [7]**  Due process protections are afforded to aliens facing removal. *See, e.g., Abdulai v. Ashcroft,* 239 F.3d 542, 549 (3d Cir.2001) ( "Despite the fact that there is no constitutional right to asylum, aliens facing removal are entitled to due process."); *Chong v. INS,* 264 F.3d 378, 386 (3d Cir.2001) ("Aliens facing removal are entitled to due process."). Because the Federal Rules of Evidence do not apply in asylum proceedings, "[t]he test for admissibility of evidence ... is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Bustos-Torres v. INS,* 898 F.2d 1053, 1055 (5th Cir.1990); *see Lopez-Chavez v. INS,* 259 F.3d 1176, 1184 (9th Cir.2001) ("The sole test governing the admission of evidence in deportation proceedings is whether the evidence is probative and its admission is fundamentally fair.") (quotation omitted). As the Court of Appeals for the Second Circuit has explained: "In the evidentiary context, fairness is closely related to the reliability and trustworthiness of the evidence." *Felzcerek v. INS,* 75 F.3d 112, 115 (2d Cir.1996). Therefore, our analysis as to whether an individual's constitutional rights are violated turns on whether the evidence considered by the BIA is reliable and trustworthy. For the reasons discussed below, we find that the admission of **\*406** the Susser letter violated Ms. Obianuju's due process rights.

Succinctly stated, the Susser Letter does not satisfy our standards of reliability and trustworthiness. Initially, we are troubled by the dates of the INS's procurement of the Susser Letter and the timing of its being provided to Ms. Obianuju's counsel and the IJ a few days before the final hearing. As we noted above, the date that INS counsel requested an extension in order to obtain the original of the Larrea letter - August 7, 2000 - is the very same date that appears on the Susser letter. However, the INS only provided the Susser letter to the IJ and Ms. Obianuju's counsel nearly six weeks later, on September 18, 2000, when it sought to introduce it into evidence as a replacement for the Larrea letter which was ultimately marked for identification purposes only. Furthermore, Susser noted in his August 7 letter: "These documents were forwarded to us by your office."

**[8]    [9]**   Second, although hearsay can be admitted in asylum cases under certain circumstances, *see, e.g.,* *Kiareldeen v. Ashcroft,* 273 F.3d 542, 549 (3d Cir.2001), reliance on such evidence here raises the precise concerns that are fundamental to its general inadmissibility in civil proceedings, and raises concerns that it is not fundamentally fair. As we have previously explained: "Hearsay is generally inadmissible because the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined." *U.S. v. Reilly,* 33 F.3d 1396, 1409 (3d Cir.1994) (quotation omitted). Although the Federal Rules do not apply in this case, exceptions set forth in the Rules focus on trustworthiness, further indicating why we regard hearsay with a level of suspicion. *See, e.g.,* Fed.R.Evid. 803(6)-(8) ("Hearsay Exceptions; Availability of Declarant Immaterial"); Fed.R.Evid. 804(b)(3) ("Hearsay Exceptions; Declarant Unavailable"); Fed.R.Evid. 807 ("Residual Exception").

The Susser letter is multiple hearsay of the most troubling kind. It seeks to report statements and conduct of three declarants who are far removed from the evidence sought to be introduced. They are purportedly individuals who told the investigator that certain aspects of the documents appeared to be fraudulent. Not only does Susser have no direct knowledge of the investigation, he did not even directly communicate with John Larrea, the declarant whose hearsay statements he is repeating. Therefore, the current speaker - Susser - was unable to even evaluate the credibility of the immediate preceding declarant - Larrea - who of course was himself only a proponent of hearsay. Further, we do not know whether Larrea had any interaction with "the investigator," only referred to as "she," who reports to Larrea what others have purportedly told her. Given that the consul is in Yaounde and the investigation necessarily took place in Bamenda, it seems entirely possible that Larrea's sole source for the hearsay statements was the notations written on the document. Therefore, Larrea would also have been unable to judge the credibility of the investigator, also a proponent of hearsay. Therefore, Susser was three steps away from the actual declarants; all we know about the two individuals who have forwarded these written statements is that one is a Cameroonian Foreign Service National who conducted "an investigation" for the U.S. Embassy in Cameroon and the other is John Larrea, who worked as Vice Consul for the U.S.

Embassy in Cameroon but now, according to the INS, cannot be located by the **\*407** Government. [8]

A comparison of the letters shows that Susser simply repeated Larrea's representations with slight variations in sentence construction, bolstering the conclusion that Susser's knowledge of the investigation was limited solely to the Larrea letter itself. [9] Consideration of the first representations, regarding the medical certificate, is illustrative. Larrea explained:

> The Director of Administrative Affairs in the Provincial Hospital of Bamenda told us that no doctor named Chefor James N. has ever worked at the hospital. He added that there is no medical record at the hospital for Glory Obianuju and the round stamp and the form used for the Medico-Legal Certificate are fake. It is our conclusion that this document is fraudulent.

Susser similarly stated:

> > Regarding the Medico Legal Certificate, the Director of Administrative Affairs in the Provincial Hospital of Bamenda stated that the round form and the stamper used for the Certificate are fake, and that there is no medical record at the hospital for Glory Obianuju. He also noted that no doctor by the name of James N. Chefor has ever worked at the hospital. The investigator in the U.S. Embassy in Yaounde, Cameroon, concluded that this document is fraudulent.

Susser provided no information in his letter which was not already stated in almost the precise same words in the Larrea letter. The INS has not contended before us or the BIA that Susser has any personal or even second-hand knowledge of the investigation. His knowledge is limited to the Larrea letter which was not even sought to be admitted in this case because of the INS's inability to obtain the original.

 **[10]**    Third, we are concerned that the INS is attempting to use the prestige of the State Department letterhead to make its

case and give credibility to the letter's contents. As we have previously noted,

> the Board's decisions cannot be sustained simply by invoking the State Department's authority. We are expected to conduct review of the Board's decisions, and that procedural safeguard would be destroyed if the Board could justify its decisions simply by invoking assertions by the State Department that themselves provide no means for evaluating their validity. *See* *Galina v. INS,* 213 F.3d 955, 958-59 (7th Cir.2000). The Board cannot hide behind the State Department's letterhead.

*Li Wu Lin v. INS,* 238 F.3d 239, 246 (3d Cir.2001). This seems to be precisely what the INS intended to do in this case, as it explained: "Although the respondent has questioned the integrity of the Embassy staff, it would be beyond the realm for the respondent to question the recent letter submitted by Marc J. Susser, Director of Office of Country Reports and Asylum Affairs."

**\*408** Fourth, partially due to the multiple levels of hearsay involved here, we have absolutely no information about what the "investigation" consisted of, or how the investigation was conducted in this case. [10] In combination with the concerns we note above, we believe that the complete dearth of information about the investigator or the investigation undermines the Susser letter as not only untrustworthy, but also unhelpful. Further adding to our concern, Dr. Milton Krieger, a scholar of politics in Cameroon, expressed his belief "that it is very difficult to prove and/or disprove the authenticity of documents created in Cameroon since political tensions and administrative lapses and corruption intensified in the early 1990s." We also agree with Ms. Obianuju's contention that the persons contacted provided only indirect attacks as to the genuineness of the documents. For instance, rather than locate the individual who supposedly signed the warrant, or confirm through authorities that such person existed, the investigator presented the warrant to a different magistrate who states: "After a thorough search in my chambers, I have not been able to get any trace of evidence

that a warrant of arrest was ever issued." JA41. There is no reason to expect that the warrant would be in this magistrate's chambers.

We have previously expressed concern about the BIA's attributing significance to activities such as interviews at airports when it lacked key information regarding the manner in which interviews were conducted. *Balasubramanrim v. INS,* 143 F.3d 157, 164 (3d Cir.1998); *Senathirajah v. INS,* 157 F.3d 210, 216 (3d Cir.1998). Although we did not consider whether there was a due process violation in those cases, we did conclude that the BIA's adverse credibility determination was faulty because the airport interviews were not "valid grounds upon which to base a finding that the applicant [was] not credible." *Balasubramanrim,* 143 F.3d at 164 (quotation omitted); *see* *Senathirajah,* 157 F.3d at 216. In *Balasubramanrim,* we noted that we did "not know how the interview was conducted or how the document was prepared." 143 F.3d at 162. In *Senathirajah,* relying in large part on our reasoning in *Balasubramanrim,* we likewise were troubled by the interview because "[t]he government offered no testimony as to the circumstances under which that affidavit was obtained." 157 F.3d at 218. The manner of eliciting such information is crucial to their probative value. Similarly, here, the nature of the purported "investigation" is a matter of pure conjecture and can provide no basis for a finding of falsification on the part of Ms. Obianuju.

We find that the BIA violated Ms. Obianuju's due process rights by basing its credibility finding almost entirely on the Susser letter, because it appears neither reliable nor trustworthy. As in *Lin, Balasubramanrim,* and *Senathirajah,* "[t]he Board's performance in this case was less than it should have been." *Lin,* 238 F.3d at 248. Accordingly, on remand, the BIA must consider the record before it absent the Susser letter.

### B. *Additional Evidence*

We next consider whether the BIA abused its discretion in denying Ms. Obianuju's motion to reopen the record and remand to the IJ for it to consider four **\*409** additional pieces of evidence: an affidavit of Sister Jane Mankaa, a nun who visited Ms. Obianuju's parents in Cameroon in August 2000; an affidavit of Dr. Milton Henry Krieger discussing the reliability of Sister Mankaa's affidavit; a psychological evaluation of Ms. Obianuju by Dr. Frances Geteles; and a

June 2001 memorandum from Bo Cooper, General Counsel to the INS, setting forth the proper procedure to follow in overseas investigations to ensure the confidentiality of the asylum applicant. We find that the BIA did not err in finding that the affidavits of Sister Mankaa and Dr. Krieger could have been presented on or before the close of the record, and thus not permitting their consideration, but that it did abuse its discretion in determining that Dr. Geteles's psychological evaluation was not material and should not have been considered by the IJ. We will therefore remand to the BIA for it to reopen the record and remand to the IJ for consideration of the psychological evaluation. Finally, we conclude that the Cooper memo, which related to the investigation referenced in the Susser letter, is no longer material, and accordingly we will not require the BIA to allow its submission.

"A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 3.2(c)(1). We review the BIA's denial of the motion to reopen for abuse of discretion, "mindful of the 'broad' deference that the Supreme Court would have us afford." *Lu v. Ashcroft,* 259 F.3d 127, 131 (3d Cir.2001) (citing *INS v. Abudu,* 485 U.S. 94, 108, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)).

The BIA denied Ms. Obianuju's motion to reopen to present additional evidence on the grounds that she had not proven that Sister Mankaa's affidavit, Dr. Krieger's affidavit, and the Cooper memo "could not have been presented on or before the close of the hearing on the merits which was concluded on September 21, 2000." The BIA found that the psychological evaluation could not have been presented prior to the close of the record, but that "there is other evidence of record of the respondent's medical examination in the United States," and that "in view of the basis of [its] disposition of this case, it does not appear that evidence of psychological evaluation subsequent to the immigration hearing would change the outcome."

**[11]**   First, we find that the BIA did not abuse its discretion in finding that Sister Mankaa's and Dr. Krieger's affidavits could have been presented prior to the close of the record. Because Dr. Krieger's affidavit is an evaluation of Sister Mankaa's affidavit, the time frame for the Sister's affidavit governs both pieces of evidence. That is, if her affidavit could have been

presented prior to the close of the evidence, then so could his. We will therefore address these two affidavits together.

Sister Mankaa's affidavit was taken in support of Ms. Obianuju's parole application of May 17, 2001. The affidavit itself is not dated. In her affidavit, Sister Mankaa states that she learned of Ms. Obianuju's detention from a friend and visited Ms. Obianuju at her detention center in New Jersey before Ms. Obianuju was transferred to a detention center in New York. After that, she and Ms. Obianuju were in "regular contact by mail." She then states that she went home to Cameroon in August 2000 and visited Ms. Obianuju's family there. She details what Ms. Obianuju's parents told her about the persecution Ms. Obianuju would face if she returned home. Nowhere in the affidavit does Sister Mankaa state when she returned from Cameroon.

**\*410**   Ms. Obianuju contends that she could not have presented this evidence before September 21, 2000 because she and her counsel did not learn of that trip until several months later. The government argues that the affidavit does not meet the threshold requirement of establishing its unavailability at the hearing because it does not contain any information as to when the affidavit was taken or when the Sister returned to the United States.

We agree with the government's position and find that the BIA did not abuse its discretion in finding that these affidavits could have been presented prior to the close of the record. The BIA was provided with a document that did not contain any dates except to state that the trip occurred in August 2000, prior to the close of the record. Since Sister Mankaa states that she and Ms. Obianuju were in "regular contact," it was within the realm of discretion for the BIA to conclude that Ms. Obianuju could have found out about the trip and presented the information. Although it is true that this affidavit, and Dr. Krieger's, were presented in response to the Susser letter, which Ms. Obianuju did not have until three days prior to the final hearing, Ms. Obianuju had been in possession of the Larrea letter since June 2000, which contained almost exactly the same contentions. Ms. Obianuju therefore was on notice that her credibility and the legitimacy of her claim were being challenged. [11]

**[12]**   However, we find that BIA did abuse its discretion in denying the motion as to the psychological evaluation. The BIA found that the report could not have been presented earlier, but that it was duplicative of a previous medical report and would not change the outcome. *See Matter of Coelho,*

20 I. & N. Dec. 464 (BIA 1992) ("if we conclude that our decision on the appeal would be the same even if the proffered evidence were already part of the record on appeal, we will deny the motion to remand").

We find that the psychological evaluation is material and not simply repetitive of the other medical evidence. The "other evidence" that was in the record consists of a four page medical report by Dr. Kang, a family doctor who has received specialized training in documenting and treating victims of torture. The psychological components of the report include two statements about Ms. Obianuju's psychiatric state and a conclusion that her explanation of events was consistent and that she was most likely telling the truth. The report also concludes that a physical exam was consistent with her story.

The psychological evaluation Ms. Obianuju seeks to submit was conducted by Dr. Geteles, a clinical psychologist who has also received special training in the detection and documentation of torture. Her seven page report contains two pages of "Psychological Assessment," including a diagnosis of Post Traumatic Stress Disorder and Major Depressive Disorder, and the doctor's conclusion that Ms. Obianuju "possesses a psychiatric profile consistent with and strongly corroborative of her claim that she was the victim of persecution and continues to suffer the effect of those experiences." This report adds new, material information beyond what was contained in Dr. Kang's report.

**\*411** Because we see no need to question the BIA's finding that the information could not have been presented prior to the close of evidence, but find that the evaluation is material, we will remand to the BIA with instructions to reopen the record and remand to the IJ for consideration of the evaluation.

Finally, both parties agree that the BIA erred when it found that the Cooper memo could have been presented prior to the close of evidence. The BIA erroneously stated that the memo was dated June *2000,* however, a closer look reveals that the memo is dated "June *2001.*" The memo was therefore clearly not available prior to the close of evidence. However, this memo was intended to cast doubt on the investigation outlined in the Susser memo and is therefore no longer material because we have already held the Susser letter to be untrustworthy and its use a violation of Ms. Obianuju's due process rights. As the memo is no longer material, we will not require the IJ to consider it.

## III.

The BIA violated Ms. Obianuju's due process rights by resting its credibility determination almost entirely on the unreliable and untrustworthy Susser letter. In addition, the BIA abused its discretion by refusing to reopen the record and remand to the IJ for it to consider a material psychological report. We will not assess Ms. Obianuju's entitlement to relief based on the record as we have required it to be modified by this opinion because the agency should have the opportunity to do so. *See* INS v. Ventura, 537 U.S. 12, ----, 123 S.Ct. 353, 356, 154 L.Ed.2d 272 (2002). We will therefore remand to the BIA for further proceedings regarding Ms. Obianuju's petition without reliance on the Susser letter and aided by the additional psychological evaluation. Accordingly, we will GRANT the petition for review, and REMAND this case to the BIA for further proceedings consistent with this opinion.

**Appendix**

**Susser Letter**

Bureau of Democracy,

Human Rights and Labor

August 7, 2000

NAME: Obianuju, Glory

A # : 76 142 746

COUNTRY: Cameroon

Irene Feldman

Assistant District Counsel

U.S. Department of Justice

Immigration and Naturalization Service

Elizabeth, NJ 07201

Dear Ms. Feldman:
I am writing to forward the results of an investigation, by a Foreign Service post, of documents presented in support of the asylum application of the above-named individual. These documents were forwarded to us by your office.

Regarding the Medico Legal Certificate, the Director of Administrative affairs in the Provincial Hospital of Bamenda stated that the round form and the stamp used for the Certificate are fake, and that there is no medical record at the hospital for Glory Obianuju. He also noted that no doctor by the name of James N. Chefor has ever worked at the hospital. The investigator in the U.S. Embassy in Yaounde, Cameroon, concluded that this document is fraudulent.

Regarding the affidavits dated October 22 and November 15, 1999, the president of the High Court of Bamenda stated that the round stamp and the Commissioner for Oaths stamps are fake. He further stated that neither affidavit had been registered **\*412** or sworn in the High Court of Bamenda. It is the Embassy investigator's conclusion that this document is fraudulent.

It is the Embassy investigator's conclusion that arrest warrant and application for bail documents are also fraudulent. The arrest warrant lacks key information such as the charge number and dates of appearance and time. The application for bail was allegedly signed by an individual who has never served as president of the court.

We hope that this information is helpful. If we can be of any further assistance. Please do not hesitate to contact us.

> Sincerely,
>
> Marc J. Susser
>
> Director
>
> Office of Country Reports and Asylum Affairs

**All Citations**

325 F.3d 396

---

### Footnotes

1    "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 🔖 8 U.S.C. § 1182(a)(6)(C)(i).

2    A person is inadmissible if she "is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter...." 🔖 8 U.S.C. § 1182(a)(7)(A)(i)(I).

3    As the relief provided by the CAT is subsumed by the relief provided by the grants of asylum and withholding of deportation, we will not address whether she qualifies for relief under the CAT.

4    In support of her motion to reopen, Ms. Obianuju claims that this statement by the IJ closed the record. We must disagree and find that the record did not close until the IJ explicitly said so on September 21, 2000. This is further evidenced by the fact that both parties submitted new evidence in support of motions after the May hearing.

5    Milton Krieger has spent many months in Cameroon studying its political system. Since 1989 he has been to Cameroon four times and stayed there each time for between four and ten months. He is the author of *African State and Society in the 1990s: Cameroon's Political Crossroads* (Joseph Takougang co-author, 1998).

6    Ms. Obianuju's counsel claims not to have received the letter until September 19, 2000.

7    "The record is closed, but for the decision of the Court. Understood, counsels? I will accept no further documents unless there's a showing that this document was unavailable, and is germane to the case, and it was unavailable at the, and it was clearly unavailable, and this clearly this document is extraordinary, and would clearly substantiate the respondent's claim. So the record is closed but for the submission, the issuance of the decision."

8    While counsel for Ms. Obianuju suggested that Embassy personnel often had pressures on them which could lead to less than accurate reports, and the INS contends that these individuals would not risk their

jobs to undermine an asylum application, we make no judgment regarding the veracity or motives of these individuals. Our analysis is based not on these aspects, but on the information the BIA had before it when it based its decision on the Susser letter.

9    The Susser letter does not recite Larrea's statement that he "does not believe that any claims for asylum in recent years based upon political beliefs or SDF membership have any merit." Larrea's statement is in direct conflict with the State Department Country Reports on Cameroon.

10    The Lawyers Committee for Human Rights filed an amicus curiae brief arguing that we should rule the Susser letter inadmissible because the confidentiality of Ms. Obianuju's asylum application was violated by the investigation. We agree that the guarantee of confidentiality is significant, but the issue in this case is resolved by the violation of Ms. Obianuju's due process rights and therefore we do not reach this argument.

11    While we do not find that the BIA was required to reopen the record to allow the IJ to consider Sister Mankaa's and Dr. Krieger's affidavits, we note that, on remand, the IJ may wish to consider these affidavits so that he has a fully developed record on which to rest his ruling. *See*  *Jacinto v. INS,* 208 F.3d 725, 733 (9th Cir.2000) (immigration judge, like administrative law judge in social security cases, has a duty to fully develop the record).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Holding Limited by Lising v. I.N.S., 9th Cir., May 23, 1997

79 F.3d 955
United States Court of Appeals,
Ninth Circuit.

Saideh FISHER, aka Saideh Hassib–
Tehrani; Kian Hosseini Lavasani, Petitioners,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 91–70676.
|
Argued and Submitted April 13, 1993.
|
Filed Oct. 5, 1994.
|
Amended July 31, 1995.
|
Order Granting Rehearing
En Banc Filed Sept. 29, 1995.
|
Argued and Submitted Nov. 30, 1995.
|
Decided April 2, 1996.

**Synopsis**

Iranian citizen petitioned for review of Board of Immigration Appeals' (BIA) denial of her requests for asylum and withholding of deportation. The Court of Appeals, 61 F.3d 1366, vacated and remanded. On rehearing en banc, the Court of Appeals, Wallace, Circuit Judge, held that: (1) petitioner's claim that Iranian government will prosecute her for violating dress and conduct rules did not amount to persecution on account of religious or political beliefs; (2) State Department report would not be considered part of administrative record despite immigration judge's reliance on portion of it; and (3) finding that petitioner lacked good moral character required for voluntary departure because of sham marriage, making her statutorily ineligible for withholding of deportation, was not arbitrary or capricious.

Petition denied.

Canby, Circuit Judge, filed concurring opinion, in which David R. Thompson, Circuit Judge, joined.

Noonan, Circuit Judge, filed dissenting opinion, in which Fletcher, Circuit Judge, joined.

West Headnotes (22)

**[1]    Aliens, Immigration, and Citizenship**    Eligibility; Refugee Status

Attorney General has discretion to allow political asylum to any alien determined to be "refugee," which is defined as alien unwilling to return to his or her country of origin because of persecution or well-founded fear of persecution on account of race, religion, nationality, membership in particular social group, or political opinion. Immigration and Nationality Act, §§ 101(42)(A), 208(a), as amended, 8 U.S.C.A §§ 1101(a)(42)(A), 1158(a).

42 Cases that cite this headnote

**[2]    Aliens, Immigration, and Citizenship**    Subjective and Objective Tests

To establish eligibility for asylum based on well-founded fear of persecution, applicant's fear of persecution must be both subjectively genuine and objectively reasonable. Immigration and Nationality Act, § 208(a), as amended, 8 U.S.C.A. § 1158(a).

89 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship**    Subjective and Objective Tests

**Aliens, Immigration, and Citizenship**    Weight and Sufficiency

Subjective component of asylum claim may be satisfied by credible testimony that applicant genuinely fears persecution. Immigration and Nationality Act, § 208(a), as amended, 8 U.S.C.A. § 1158(a).

39 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 Subjective and Objective Tests

Objective component of asylum claim requires showing, by credible, direct, and specific evidence in record, of facts supporting reasonable fear of persecution on relevant ground. Immigration and Nationality Act, § 208(a), as amended, 📙 8 U.S.C.A. § 1158(a).

17 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 Presumptions and Burden of Proof

Asylum applicant has burden of proving objective component of asylum claim. Immigration and Nationality Act, § 208(a), as amended, 📙 8 U.S.C.A. § 1158(a).

1 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 🔑 Clear Probability Standard for Withholding of Removal

Alien is statutorily eligible for withholding of deportation relief if he or she demonstrates clear probability of persecution. Immigration and Nationality Act, § 243(h), as amended, 8 U.S.C.A. § 1253(h).

4 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship** 🔑 Reasonable fear of persecution or clear probability standard

Standard for withholding of deportation is more stringent than well-founded fear standard for asylum; it can be met only by showing that it is more likely than not that alien will be persecuted if deported. Immigration and Nationality Act, §§ 208(a), 243(h), as amended, 📙 8 U.S.C.A. §§ 1158(a), 1253(h).

148 Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship** 🔑 Effect of failure to meet standard for asylum

Failure to satisfy lesser standard of proof required to establish eligibility for asylum necessarily results in failure to demonstrate eligibility for withholding of deportation as well. Immigration and Nationality Act, §§ 208(a), 243(h), as amended, 📙 8 U.S.C.A. §§ 1158(a), 1253(h).

165 Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship** 🔑 Substantial evidence in general

Court of Appeals reviews Board of Immigration Appeals' (BIA) determination that alien failed to demonstrate well-founded fear of persecution, including its factual findings, for substantial evidence. Immigration and Nationality Act, § 106(a)(4), as amended, 📙 8 U.S.C.A. § 1105a(a)(4).

40 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** 🔑 Fact Questions

To obtain reversal of Board of Immigration Appeals' (BIA) denial of her request for asylum, alien must establish that evidence not only supports conclusion that she suffered persecution or has well-founded fear of persecution, but also compels it. Immigration and Nationality Act, § 208(a), as amended, 📙 8 U.S.C.A. § 1158(a).

71 Cases that cite this headnote

**[11]    Administrative Law and Procedure** 🔑 Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** 🔑 Law questions

Court of Appeals reviews Board of Immigration Appeals' (BIA) legal interpretations of Immigration and Nationality Act (INA) de novo,

96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

but such interpretations generally are entitled to deference. Immigration and Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. § 1101 et seq.

15 Cases that cite this headnote

**[12]** **Aliens, Immigration, and Citizenship** 👉 **Persecution**

**Aliens, Immigration, and Citizenship** 👉 **Acts Constituting Persecution**

In interpreting Immigration and Nationality Act (INA), Board of Immigration Appeals (BIA) is bound by earlier circuit court decisions, which define "persecution" generally for purposes of asylum as infliction of suffering or harm upon those who differ in race, religion or political opinion in way regarded as offensive. Immigration and Nationality Act, § 208(a), as amended, 🔖 8 U.S.C.A. § 1158(a).

26 Cases that cite this headnote

**[13]** **Aliens, Immigration, and Citizenship** 👉 **Acts Constituting Persecution**

Persecution for asylum purposes is extreme concept, which ordinarily does not include discrimination based on race or religion, as morally reprehensible as it may be. Immigration and Nationality Act, § 208(a), as amended, 🔖 8 U.S.C.A. § 1158(a).

34 Cases that cite this headnote

**[14]** **Aliens, Immigration, and Citizenship** 👉 **Religion**

**Aliens, Immigration, and Citizenship** 👉 **Political opinion in general**

Iranian citizen's claim that government will prosecute her for violating dress and conduct rules did not amount to persecution on account of religious or political beliefs, as required to support her request for asylum, where she merely established that she faced possibility of prosecution for act deemed criminal in Iranian society that applied to all women there, and she did not establish that Iran selectively

enforced its regulations, that she received disproportionately severe punishment, or that regulations as applied to her were especially unconscionable. Immigration and Nationality Act, § 208(a), as amended, 🔖 8 U.S.C.A. § 1158(a).

26 Cases that cite this headnote

**[15]** **Aliens, Immigration, and Citizenship** 👉 **Religion**

**Aliens, Immigration, and Citizenship** 👉 **Political opinion in general**

Iranian citizen claiming asylum demonstrated only discrimination on account of her sex from enforcement of Iran's dress restrictions, not persecution on account of her religious or political beliefs, though she stated that she was against Khomeini regime and disagreed with its theory of Islam, where she introduced no evidence suggesting that her arrests for being at party where host was wearing bathing suit and for "mistakenly" leaving several strands of hair outside her veil were connected to her religious or political beliefs. Immigration and Nationality Act, § 208(a), as amended, 🔖 8 U.S.C.A. § 1158(a).

12 Cases that cite this headnote

**[16]** **Aliens, Immigration, and Citizenship** 👉 **Acts Constituting Persecution**

"Persecution" for asylum purposes requires government actor to inflict suffering *on account of* individual's religious or political beliefs, race, nationality, or membership in particular social group; it does not include mere discrimination, as offensive as it may be. Immigration and Nationality Act, § 208(a), as amended, 🔖 8 U.S.C.A. § 1158(a).

39 Cases that cite this headnote

**[17]** **Aliens, Immigration, and Citizenship** 👉 **Record**

Court of Appeals' review is limited to administrative record upon which deportation

96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

order is based and Attorney General's findings of fact; overruling *Ubau–Marenco v. INS,* 67 F.3d 750; *Nasseri v. Moschorak,* 34 F.3d 723; *Shirazi–Parsa v. INS,* 14 F.3d 1424; *Lazo–Majano v. INS,* 813 F.2d 1432. Immigration and Nationality Act, § 106(a)(4), as amended, 8 U.S.C.A. § 1105a(a)(4).

14 Cases that cite this headnote

**[18]    Aliens, Immigration, and Citizenship**    Administrative Review

State Department's *Country Reports on Human Rights Practices for 1986* would not be considered part of administrative record in deportation proceeding, though immigration judge (IJ) relied on portion of it in rendering his decision, where report contained generally applicable information, and IJ did not request State Department comments. 8 C.F.R. § 208.11(c).

45 Cases that cite this headnote

**[19]    Aliens, Immigration, and Citizenship**    Review of discretion

**Aliens, Immigration, and Citizenship**    Fact Questions

On review of deportation order, Court of Appeals may consider out-of-record evidence only where Board of Immigration Appeals (BIA) considers evidence, or BIA abuses its discretion by failing to consider such evidence upon motion of applicant. Immigration and Nationality Act, § 106(a)(4), as amended, 8 U.S.C.A. § 1105a(a)(4).

78 Cases that cite this headnote

**[20]    Aliens, Immigration, and Citizenship**    Good moral character requirement

Immigration judge's (IJ) finding that alien lacked good-moral character required for voluntary departure because she entered into sham marriage, making her statutorily ineligible for voluntary departure, was not arbitrary or capricious; it was supported by reasoned explanation based on legitimate concerns. Immigration and Nationality Act, § 244(e), as amended, 8 U.S.C.A. § 1254(e).

8 Cases that cite this headnote

**[21]    Aliens, Immigration, and Citizenship**    Admissibility

In deportation proceedings, test for admissibility is whether hearsay statement is probative and whether its admission is fundamentally fair.

1 Cases that cite this headnote

**[22]    Aliens, Immigration, and Citizenship**    Admissibility

It was not fundamentally unfair for immigration judge to rely on hearsay statement of alien's former husband to establish that marriage was fraudulent, where government made reasonable efforts to find him, and, instead of objecting, alien's counsel proceeded to elicit testimony from alien about her role in marriage.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*958** Walter Rafael Pineda, Charles E. Nichol, San Francisco, California; Carolyn Patty Blum, Central American Refugee Defense Fund, Berkeley, California, for petitioners.

Karen Fletcher Torstenson, Thomas W. Hussey, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for respondent.

Petition for Review of a Decision of the Board of Immigration Appeals; INS Nos. AXX-XXX-713, AXX-XXX-319.

Before: WALLACE, FLETCHER, CANBY, HALL, BRUNETTI, JOHN T. NOONAN, Jr., THOMPSON, O'SCANNLAIN, TROTT, FERNANDEZ, and RYMER, Circuit Judges.

**Opinion**

Opinion by Judge WALLACE; Concurrence by Judge CANBY; Dissent by Judge NOONAN.

WALLACE, Circuit Judge:

Saideh Fisher and her son Kian Hosseini Lavasani are natives and citizens of Iran. On her behalf, as well as for her son, Fisher petitions for review of the Board of Immigration Appeals' (Board) decision denying her application for asylum and withholding of deportation. The Board also denied Fisher's application for voluntary departure pursuant to section 244(e) of the Immigration and Nationality Act (Act). 8 U.S.C. § 1254(e). We have jurisdiction over this timely appeal pursuant to 8 U.S.C. § 1105a(a). The petition is denied.

I

Fisher and her son entered the United States on April 30, 1984. Because her son's immigration status derives from her own, our discussion will focus on the status of Fisher. 8 C.F.R. § 208.21 (1995). Although Fisher was admitted as the fiancee of a United States citizen, she did not marry her then-fiancee within the 90–day period allowed by her visa. Instead, on August 4, 1984, she married Charles Fisher (Charles), a United States citizen. They were divorced in 1987.

Prior to their divorce, Charles filed a petition in support of Fisher's application for permanent resident status. On February 3, 1986, he withdrew the petition and filed an affidavit which stated, "I was given $500.00 to marry my wife Saideh." According to the affidavit, a co-worker apparently told Charles that Fisher's step-cousin, to whom she was originally engaged to be married, would pay him the $500. Charles also denied living with Fisher on a continuous basis since their marriage.

Accordingly, on February 3, 1986, the Immigration and Naturalization Service (INS) denied Fisher's application for permanent **\*959** resident status and began deportation proceedings. Fisher conceded deportability and filed for asylum and withholding of deportation pursuant to 8 U.S.C. §§ 1158(a), 1253(h).

An immigration judge (IJ) held two hearings, one on May 15, 1987, concerning Fisher's application for voluntary departure, and another on September 25, 1987, concerning Fisher's asylum application. At the May hearing, Fisher testified that she originally came to the United States to marry Robert Lavasani, her step-cousin. When she arrived, she learned that he was living with and had impregnated another woman. Upset and lonely, she testified that she then married Charles, but she denied offering him money to marry her. She suspected that Charles withdrew his petition in support of her application for permanent resident status because he "never kept his promises" and he took advantage of her.

Fisher testified that she lived with Charles as husband and wife for approximately one year. Yet in preparation for an interview conducted by INS officials to determine the validity of her marriage, Fisher testified that she reviewed potential questions and answers with Charles. She also referred to handwritten notes during the interview, which contained information including: what time she and her husband went to sleep at night, how often she saw his two daughters, what kind of food he likes, what time he comes home from work, how much money he gives her, how long they have lived in their new house, what kind of car they own, what kind of television programs he watches, his parents' names, what clothing items he owns, and what brand of cigarettes he smokes. The notes also contained information such as her parents' names, her own birth date, and her place of work. Fisher testified that she needed these notes because she had difficulties remembering many things, in part because of her traumatic experiences in Iran.

Charles was not available to testify at the May hearing. The INS issued a subpoena, to which he did not respond; its investigations unit attempted to locate him, but without success. An INS officer who interviewed Fisher in depth also was unavailable to testify because he had been reassigned to Alaska. Another INS officer, who interviewed Fisher briefly, testified that she told him she had a bona fide marriage with Charles. The IJ decided that "the case will just have to stand on the evidence" presented as well as Fisher's own testimony. Fisher's counsel did not object.

At the September hearing on Fisher's asylum application, she testified that she left Iran in February 1984 following three events. First, Fisher testified that she was detained and questioned by Khomeini government officials because she attended a party at a male friend's home where she observed her host in a bathing suit. When this occurred is unclear,

but she alleges to us that it was approximately six months prior to leaving Iran. Along with several other female guests, Fisher was held at the "Comite"—probably a police station—for several hours. The authorities recorded Fisher's name and address, and they told her that being present with a man in a bathing suit was "incorrect." She was then released.

The next incident occurred approximately one month prior to her departure from Iran. Fisher testified that four government officials stopped her on the street and ordered her into their car at gunpoint. She said she was stopped because she "had a few pieces of hair hanging out [of her chador or veil] by mistake." The officials told her that she was not dressed properly, returned her to her home, and admonished her not to appear on the street like that again.

The third incident occurred shortly after the "veil incident." Fisher testified that government officials came to her father's home, where Fisher lived, to search for political dissidents. She said that the search was a "normal" occurrence, and that she assumed the officials were looking for persons associated with her brother-in-law, who was in prison at the time. In her brief to this court, Fisher suggests that her brother-in-law was arrested for political activities, but there was no record testimony concerning the reasons for his imprisonment. Government officials did not question or detain Fisher as a result of the search. They merely asked her to inform them if she learned of any persons who were "against the regime," and they left.

 **\*960** Fisher testified that these three events so traumatized her that she became ill, missed several months of work, and eventually left Iran. She argues that these events amount to persecution on account of her religious and political beliefs. With respect to these beliefs, Fisher testified that she did not believe in "the way [the Khomeini government] treat[s] people, the covering of the face, and the way of life" dictated by the government. When asked what might happen to her if she returned to Iran, Fisher responded that she "presumes" she would be "in a worse situation" than before she left. Significantly, Fisher did not state whether she would comply with the governmental requirements if she returned to Iran.

The IJ found Fisher's testimony concerning her application for asylum credible, but nevertheless denied her request for asylum and withholding of deportation because she did not have a well-founded fear of persecution and did not face a clear probability of persecution. The IJ also denied Fisher's request for voluntary departure, finding that she married

Charles solely for immigration purposes. The IJ based his decision on Charles's affidavit and Fisher's behavior during her interview with the INS interviewing officer. He found Fisher's testimony concerning her marriage not credible.

Fisher appealed from the IJ's decisions to the Board, which independently reviewed the record and affirmed the IJ's findings concerning Fisher's application for asylum and withholding of deportation. The Board first held that general enforcement of Iran's rules concerning the interaction between men and women and clothing restrictions, which require all women to wear "ultraconservative dress," do not "rise to the level of persecution." It also held that although Fisher stated she feared persecution upon return to Iran, she failed to present sufficient evidence showing how the government's actions related specifically to her and to her beliefs. For example, the Board found that Fisher provided no evidence of how the search of the family home related to her. The Board also adopted the IJ's findings and decision concerning Fisher's request for voluntary departure.

A three-judge panel of this court vacated the Board's decision and remanded, holding that (1) the Board failed to consider whether Fisher would suffer future persecution if she returned to Iran; (2) the Board improperly defined "persecution"; (3) Fisher may suffer persecution on account of her religious beliefs as a result of Iran's enforcement of its conduct and dress rules; and (4) Fisher may face persecution on account of her political beliefs based on a "totality of the circumstances."

🚩 *Fisher v. INS,* 61 F.3d 1366 (9th Cir.1995). Because the three-judge panel remanded for the Board to reconsider Fisher's application for asylum, it did not reach the issue of voluntary departure. We decided to rehear this case en banc and withdrew our panel opinion.

## II

 **[1]**  **[2]**  **[3]**  **[4]**  **[5]**  Section 208(a) of the Act, 🔖 8 U.S.C. § 1158(a), gives the Attorney General discretion to allow political asylum to any alien the Attorney General determines to be a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 🚩 8 U.S.C. § 1101(a)(42)(A). A refugee is defined as an alien unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

8 U.S.C. § 1101(a)(42)(A). To establish eligibility on the basis of a "well-founded fear of persecution," Fisher's fear of persecution must be both subjectively genuine and objectively reasonable. *Ghaly v. INS,* 58 F.3d 1425, 1428 (9th Cir.1995) (*Ghaly* ). "The subjective component may be satisfied by credible testimony that the applicant genuinely fears persecution." *Prasad v. INS,* 47 F.3d 336, 338 (9th Cir.1995) (*Prasad* ). The objective component requires a showing by credible, direct, and specific evidence in the record, of facts supporting a reasonable fear of persecution on the relevant ground. *Id.* Fisher has the burden of making this showing. *Ghaly,* 58 F.3d at 1428; 8 C.F.R. § 208.13(a) (1995).

 **[6]** **[7]** **[8]**  Section 243(h) of the Act, 8 U.S.C. § 1253(h), requires the Attorney General, subject to certain exceptions not relevant **\*961** here, to withhold deportation "if the Attorney General determines that such alien's life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion." An alien is statutorily eligible for such relief if he or she demonstrates a "clear probability of persecution." *Ghaly,* 58 F.3d at 1429 (internal quotation omitted). This standard is more stringent than the "well-founded fear" standard applicable to requests for asylum, and it can be met only by showing that it is more likely than not that the alien will be persecuted if deported. *Id.* "Therefore, failure to satisfy the lesser standard of proof required to establish eligibility for asylum necessarily results in a failure to demonstrate eligibility for withholding of deportation as well." *Id.* Thus, we first focus on whether Fisher proved she was eligible for asylum.

 **[9]** **[10]** **[11]**  We review the Board's determination that Fisher failed to demonstrate a "well-founded fear of persecution," including its factual findings, for substantial evidence. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) (*Elias–Zacarias* ); 8 U.S.C. § 1105a(a)(4). The burden on Fisher is a heavy one. To obtain reversal, Fisher must establish that the evidence not only supports the conclusion that she suffered persecution or has a well-founded fear of persecution, but compels it. *Ghaly,* 58 F.3d at 1431. Fisher must demonstrate that "the evidence [she] presented was so compelling that no reasonable factfinder could fail to find the requisite fear of

persecution." *Elias–Zacarias,* 502 U.S. at 483–84, 112 S.Ct. at 817. "Phrased differently, [Fisher] must demonstrate that any reasonable factfinder would have to conclude that [she] has a well-founded fear of persecution." *Ghaly,* 58 F.3d at 1431 (internal quotation omitted). We review the Board's legal interpretations of the Act de novo, but such interpretations generally are entitled to deference under *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (*Chevron* ). *Ghaly,* 58 F.3d at 1429.

### III

We begin by reviewing the Board's application of section 101(a)(42)(A) of the Act, which defines "refugee" as a person who has suffered persecution or has a well-founded fear of persecution. 8 U.S.C. § 1101(a)(42)(A). The Act does not define "persecution"; therefore, we must defer to the Board's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Romero v. INS,* 39 F.3d 977, 980 (9th Cir.1994), *quoting* *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782; *see also* *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1444 (9th Cir.) (en banc) (court may not substitute its own construction of the Act for the Board's reasonable interpretation), *cert. denied,* 516 U.S. 976, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995).

 **[12]** **[13]**  In interpreting the Act, the Board is bound by our earlier decisions, which define "persecution" generally as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *See, e.g.,* *Ghaly,* 58 F.3d at 1431, *quoting* *Prasad,* 47 F.3d at 339. Persecution is an extreme concept, which ordinarily does not include "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be." *Ghaly,* 58 F.3d at 1431.

The Board's analysis of "persecution" here is consistent with the Act and our prior decisions. The Board found that Fisher did not suffer persecution or have a well-founded fear of persecution based on the Iranian government's enforcement of its regulations against her. The Board stated that although enforcement of Iran's dress and conduct rules may seem harsh by Western standards, it does not "rise to the level of

96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

persecution." This conclusion is consistent with our cases that distinguish prosecution for general crimes from persecution, as well as those that construe persecution to include mental suffering. *See* Abedini v. INS, 971 F.2d 188 (9th Cir.1992) (*Abedini* ); Kovac v. INS, 407 F.2d 102 (9th Cir.1969) (*Kovac* ).

 **[14]**  Fisher's assertion that the government will prosecute her for violating the dress and conduct rules does not alone  **\*962**  amount to persecution on account of religious or political beliefs. She "merely has established that [she] faces a possibility of prosecution for an act deemed criminal in Iranian society, which is made applicable to all [women] in that country." *Abedini,* 971 F.2d at 191. The two exceptions to the general rule that prosecution does not amount to persecution—disproportionately severe punishment and pretextual prosecution—do not apply here. *See id.* First, Fisher failed to show that Iran selectively enforced its regulations against her or that she received disproportionately severe punishment on account of one of the five grounds enumerated in the Act. *See id.* Second, she failed to establish that the regulations as applied to her were "especially unconscionable or were merely a pretext to persecute [her] for [her] beliefs or characteristics." *Id., citing* Alonzo v. INS, 915 F.2d 546, 548 (9th Cir.1990) (holding that applicant must demonstrate government knew of his religious or political beliefs and attempted to conscript him in spite of those beliefs). Fisher testified that as a result of the "swimsuit incident," she and several other females present were detained by government officials. She also testified that the "veil incident" came about only because she had mistakenly left several strands of hair outside her chador. Neither of these occurrences indicates that government officials knew of her political or religious beliefs or punished her on account of them. Nor do they indicate that she was punished as a pretext to persecute her for her beliefs.

The Board's interpretation of persecution also is consistent with our decisions defining persecution to encompass both physical and mental suffering. *See* Kovac, 407 F.2d at 106–07 (Congress's deletion of "physical persecution" from the Act indicates persecution may include mental suffering). Based on the record Fisher established, the Board held that she failed to show any past or potential persecution, mental or physical. It found that Fisher failed to provide evidence showing that the enforcement of the dress and conduct regulations against her constituted persecution or created

a well-founded fear of future persecution. *See* Safaie v. INS, 25 F.3d 636, 640–41 (8th Cir.1994) (general assertion that Iran's policies are repressive or that applicant disagrees with them does not "demonstrate that [the applicant] fears particularized persecution directed at her personally on the basis of her political opinion").

 **[15]**     **[16]**  Fisher contends that although enforcement of laws such as those enforced against her could be viewed merely as harassment not reaching the level of persecution, Iran's human rights record somehow transforms common harassment into persecution. This argument is unacceptable. The mere existence of a law permitting the detention, arrest, or even imprisonment of a woman who does not wear the chador in Iran does not constitute persecution any more than it would if the same law existed in the United States. Persecution requires the government actor to inflict suffering *on account of* an individual's religious or political beliefs, race, nationality, or membership in a particular social group.

*See* Ghaly, 58 F.3d at 1431 (defining persecution as infliction of suffering upon those who differ because of their religious or political beliefs); *cf.* 8 U.S.C. § 1101(a)(42) (A) (defining refugee as person who suffers persecution "on account of" one of the five enumerated grounds). It does not include mere discrimination, as offensive as it may be. Ghaly, 58 F.3d at 1431.

Fisher has the burden of showing the requisite connection between the Iranian government's acts and her religious or political beliefs. She must show that "the Iranian government's potential act of persecution stemmed from its desire to single [her] out for unique punishment because of [her] actually-held or perceived-to-be-held political or religious beliefs." *Abedini,* 971 F.2d at 192 n. 1; *see also* Elias–Zacarias, 502 U.S. at 482, 112 S.Ct. at 816 (" 'persecution on account of ... political opinion' in § 101(a) (42) is persecution on account of the *victim's* political opinion, not the persecutor's").

Fisher failed to show that Iran punished her because of her religious or political beliefs, or that, if she returned to Iran, she would violate the regulations because of her beliefs, thereby triggering government action. Abedini, 971 F.2d at 192 (applicant must show that the government was aware of his alleged beliefs). No evidence suggests  **\*963**  that Fisher ever "spoke out against the government's political or religious

practices or even publicly articulated any political or religious opinions." *Id.* Although she stated that she is against the Khomeini regime and disagrees with its theory of Islam, she introduced no evidence suggesting that the three incidents she described were related to these beliefs.

There also is no evidence suggesting that if she returned to Iran, Fisher would not conform with the regulations. Indeed, she testified that the "veil incident" occurred because she *mistakenly* left several strands of hair outside her veil, not because she intended to make a political or religious statement. She also testified that the search of her father's home was "a normal thing that [the government does]," which suggests no connection to her religious or political beliefs whatsoever.

Because Fisher has demonstrated only discrimination on account of her sex, not persecution on account of her religious or political beliefs, she has failed to carry her burden under *Ghaly.* Persecution on account of sex is not included as a category allowing relief under section 101(a)(42)(A) of the Act.

[17]    Fisher argues she did establish that enforcement of the regulations in Iran constitutes more than mere harassment. She bases her argument on information contained in the State Department's *Country Reports on Human Rights Practices for 1990,* which is not part of the administrative record. The Act limits our review to the "administrative record upon which the deportation order is based and the Attorney General's findings of fact." 8 U.S.C. § 1105a(a)(4). *See also Gomez–Vigil v. INS,* 990 F.2d 1111, 1113 (9th Cir.1993) (*Gomez–Vigil* ) (reviewing court is "not permitted to consider evidence that is not part of the administrative record"); *Tejeda–Mata v. INS,* 626 F.2d 721, 726 (9th Cir.1980) (reviewing court does not conduct factfinding in the first instance), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982); *Rybachek v. United States Environmental Protection Agency,* 904 F.2d 1276, 1296 n. 25 (9th Cir.1990) ("Judicial review of agency actions should generally be confined to the original record upon which the actions were based."). To the extent our prior decisions may be interpreted as authorizing us to take judicial notice of information not part of the administrative record or not previously submitted to the Board, they are overruled as inconsistent with the Act and prior precedent. These decisions include *Ubau–Marenco v. INS,* 67 F.3d 750, 759 (9th Cir.1995) (taking judicial notice of State Department Country Reports where

INS did not object); *Nasseri v. Moschorak,* 34 F.3d 723, 727 (9th Cir.1994) (taking judicial notice of "background evidence" offered by petitioner); *Shirazi–Parsa v. INS,* 14 F.3d 1424, 1428 (9th Cir.1994) (*Shirazi–Parsa* ) (suggesting that this court may take judicial notice even if Board did not abuse its discretion in declining to do so); *Lazo–Majano v. INS,* 813 F.2d 1432, 1435 (9th Cir.1987) (taking judicial notice of reports supporting petitioner's asylum claim).

Fisher could have requested the Board to take administrative notice of the Country Report, but she did not. If she had, and the Board refused, we would review the Board's action for an abuse of discretion. *Shirazi–Parsa,* 14 F.3d at 1428. Here, there is no such abuse because Fisher never offered the 1990 Country Report or the facts contained in it to the Board.

*See Liu v. Waters,* 55 F.3d 421, 427 (9th Cir.1995) (Board is "not required independently to take administrative notice of [country] conditions" where petitioner "provided no such information"). Because we are limited to reviewing the facts considered by the Board, we are statutorily prevented from taking judicial notice of the Country Report. *See id.* (taking judicial notice only of materials applicant presented to the Board for administrative notice). If Fisher believes the 1990 Country Report or other documents are material to her asylum application, her only course is to file a motion to reopen her deportation proceedings pursuant to 8 C.F.R. §§ 3.2, 208.19 (1995).

[18]    Fisher also argued that the State Department's *Country Reports on Human Rights Practices for 1986* should be considered part of the administrative record because the IJ relied on a portion of it in rendering his decision. In rejecting Fisher's argument that she was fired from her teaching position in Iran solely because she is a **\*964** woman, the IJ stated that the 1986 Country Report provides no evidence that the government routinely fires women from teaching jobs. At oral argument before the en banc court, Fisher suggested that because the IJ relied on a portion of the 1986 Country Report, the entirety of the Report should be made part of the administrative record.

INS regulations provide that Department of State comments requested by the IJ in particular cases become part of the administrative record. 8 C.F.R. § 208.11(c) (1995). Here, the IJ did not request any such comments from the Department of State, and the IJ's reliance on the 1986 Country Report, which contains generally applicable information, cannot be

96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

construed as State Department comments within the meaning of the regulations.

 **[19]**  We may review out-of-record evidence only where (1) the Board considers the evidence; or (2) the Board abuses its discretion by failing to consider such evidence upon the motion of an applicant. *See* *Shirazi–Parsa,* 14 F.3d at 1428. Allowing the Board to consider out-of-record evidence only on motion of the applicant is consistent with the Act's placement of the burden of proof on the applicant's shoulders and with an analogous federal evidentiary rule. Federal Rule of Evidence 106 expresses the "rule of completeness," which states: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." *See* Charles A. Wright & Kenneth W. Graham, Jr., 21 Federal Practice and Procedure §§ 5071–79 (1977 & Supp.1995). Where an applicant requests the Board to take administrative notice of evidence on which the IJ relied, we will review a refusal to do so for an abuse of discretion. *Shirazi–Parsa,* 14 F.3d at 1428; *see also Elnager v. INS,* 930 F.2d 784, 787 (9th Cir.1991) (Board "has the power to conduct a de novo review of the record ... and independently to determine the legal sufficiency of the evidence").

Fisher could have requested either the IJ or the Board to supplement the administrative record with the 1986 Country Report; she did neither. Her appeal brief to the Board contested neither the IJ's finding that she was not dismissed from her teaching position solely because of her status as a woman, nor the IJ's reliance on parts of the 1986 Country Report which she now claims support her asylum application. There is no evidence that the Board took into account the 1986 Country Report, and its decision is "sufficient for us to conduct our review and to be assured that the petitioner's case received individualized attention." *Ghaly,* 58 F.3d at 1430; *see also id.* (Board is not required to indicate with specificity the weight it accorded certain exhibits). We will not create a new administrative record on appeal by reviewing evidence that the Board did not consider. *See Gomez–Vigil,* 990 F.2d at 1113.

This is not a case such as *Gomez–Vigil,* where the Board took administrative notice of certain facts without providing the petitioner an opportunity to rebut the noticed facts. *Id.* at 1114. In this case, Fisher did not request the IJ to include the entirety

of the Country Report. In addition, she had ample opportunity to request consideration of the Country Report and to rebut the IJ's findings in her appeal to the Board, but she failed to do so. We will not remand this case to the Board for it to consider evidence Fisher failed to present. *Roque–Carranza v. INS,* 778 F.2d 1373, 1373–74 (9th Cir.1985); *cf. Rivera–Cruz v. INS,* 948 F.2d 962, 967 (5th Cir.1991) (asylum applicant cannot raise new evidence on appeal from Board's decision to contest officially noticed facts).

In sum, the Board's decision concluding that Fisher failed to show she suffered persecution or had a well-founded fear of persecution on account of her political or religious beliefs is supported by substantial evidence. Fisher failed to allege acts constituting persecution, and she failed to show that the Iranian government took action against her because of her political or religious beliefs. Indeed, the record indicates that Fisher received routine punishment for violating generally applicable laws. Thus, she failed to carry her burden by not presenting evidence "such that a reasonable factfinder would have to conclude that the requisite fear of persecution **\*965** existed." *Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. at 815. Because Fisher failed to satisfy the lesser standard of proof required to establish eligibility for asylum, she necessarily failed to demonstrate eligibility for withholding of deportation. *Ghaly,* 58 F.3d at 1429.

## IV

 **[20]**  The Board also adopted the findings and decision of the IJ denying Fisher voluntary departure pursuant to 8 U.S.C. § 1254(e). We therefore review the IJ's decision. *Kazlauskas v. INS,* 46 F.3d 902, 905 (9th Cir.1995). We examine whether the IJ actually exercised his discretion and whether he did so in an arbitrary and capricious manner. *Abedini,* 971 F.2d at 193. The IJ need only support his conclusion with a "reasoned explanation based on legitimate concerns." *See id.*

Section 101(f)(6) of the Act states that "one who has given false testimony for the purpose of obtaining any benefits under [the Act]" cannot be regarded as possessing "good moral character" and thus is statutorily ineligible for voluntary departure. 8 U.S.C. § 1101(f). The IJ found that Fisher lacked "good moral character" because she entered into

96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

a sham marriage with Charles. He supported this finding with a "reasoned explanation" by considering Charles's affidavit and Fisher's preparation for her interview with the INS. Fisher asserted that she did not know that someone paid Charles $500 to marry her, and that she had legitimate reasons for having notes containing the answers to questions the INS would ask her at her interview. The IJ, however, found Fisher's testimony concerning her marriage not credible, and we must afford this finding "substantial deference." *De Valle v. INS,* 901 F.2d 787, 792 (9th Cir.1990) (internal quotations omitted). Based on the record, we cannot say that the IJ's denial of voluntary departure is not supported by a "reasoned explanation based on legitimate concerns."

 **[21]**    Fisher argues that the IJ's decision is "arbitrary and capricious" because the IJ relied on hearsay evidence— Charles's affidavit. She cites *Cunanan v. INS,* 856 F.2d 1373 (9th Cir.1988), for the proposition that the IJ abuses his discretion when he relies on hearsay evidence, because such out-of-court statements preclude the petitioner from confronting her witnesses. *Cunanan,* however, recognizes that "[i]n deportation proceedings, the test for admissibility is whether the hearsay statement is 'probative' and whether its admission is 'fundamentally fair.' " *Id.* at 1374, *quoting Baliza v. INS,* 709 F.2d 1231, 1233 (9th Cir.1983) (*Baliza* ).

 **[22]**    The affidavit was clearly probative of an issue in the case; the question is whether it was fundamentally unfair for the IJ to rely on it. In *Baliza,* we held that admission of a hearsay affidavit was fundamentally unfair because the government made no reasonable effort to produce the declarant. *Baliza,* 709 F.2d at 1234. Here, the INS made reasonable efforts to find Charles before the hearing. In addition, Fisher's counsel could have objected to the IJ's reliance on the available evidence. The IJ stated that "the case will just have to stand on the evidence." He then said that "if either party wishes to question [Fisher] about her role in [the marriage], that's fine.... I'll consider that [testimony] as well." In response, Fisher's counsel stated, "That's what I'd like to do, Your Honor," and he proceeded to elicit testimony from Fisher. The IJ's reliance on Charles's affidavit was not "fundamentally unfair" under these circumstances.

PETITION DENIED.

CANBY, Circuit Judge, joined by THOMPSON, Circuit Judge, concurring in the judgment:

I agree with the result reached by the majority, but write separately to emphasize a crucial aspect of this case. At oral argument, Fisher's counsel *expressly disavowed any claim that Fisher was persecuted or feared persecution on account of her gender, or that persecution of women could constitute persecution "on account of ... membership in a particular social group* " within the meaning of  8 U.S.C. § 1101(a)(42)(A).

This essential fact must be taken into consideration in assessing Judge Wallace's majority opinion. There is no issue of gender  **\*966** discrimination before our en banc court. The majority opinion should not be read as establishing that enforcement of criminal laws against women, or the infliction of suffering upon women, *because they are women* cannot constitute persecution under the Act. All that properly can be said is that the enforcement of criminal laws against Fisher because she is a woman does not, on this record, constitute persecution on grounds of *religion* or *political belief*—the only two grounds urged by Fisher.

Judge Wallace's opinion convincingly demonstrates that substantial evidence supports the Board's finding that Fisher was not persecuted, and did not have a well-founded fear of persecution, *on account of* her two asserted grounds of religion or political belief. I do not join the opinion, however, because it may too easily be misinterpreted as deciding, without briefing or argument, the important claim that it concedes Fisher did not raise: whether persecution of women because they are women is a ground for asylum under the Act.

There are several statements in Judge Wallace's majority opinion that could be misinterpreted as foreclosing the possibility that persecution of women on account of their gender presents a ground of asylum under the Act. Two of the clearest follow:

> Because Fisher has demonstrated only discrimination on account of her sex, not persecution on account of her religious or political beliefs, she has failed to carry her burden under *Ghaly.* Persecution on account of sex is not included as a category allowing relief under section 101(a)(42)(A) of the Act.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

79 F.3d at 963. Again, in a similar vein, the opinion states:

> A law permitting the mere detention, arrest, or even imprisonment of a woman who does not wear the chador in Iran does not constitute persecution any more than it would if the same law existed in the United States. Persecution requires the government actor to inflict suffering *on account of* an individual's religious or political beliefs, race, nationality, or membership in a particular social group.

79 F.3d at 962.

These passages may be read as ruling on an issue of law that is not before us. Whether persecution directed at women constitutes persecution "on account of ... membership in a particular social group" within the meaning of section 1101(a)(42)(A) is an arguable point,[1] but it has not been argued or briefed in this case. The issue is not before us. Presumably these gratuitous statements on the merits of the question are dicta, but they should be left unsaid.

Nor can I embrace the majority opinion's treatment of a quotation from *Abedini v. INS,* 971 F.2d 188 (9th Cir.1992). *Abedini* ruled that persecution was not established by showing a possibility of "prosecution for an act deemed criminal in Iranian society, which is made applicable to all people in the country." *Id.* at 191. The majority opinion substitutes "all [women]" for "all people," 79 F.3d at 966, implying that there is no material difference between the two classes. Again, any implication that laws targeting women are no different from laws equally applicable to everyone must be dictum, but we should not express a view on the subject until it is briefed and argued to us in a case that turns on the point.

The case before us is a simple one when we restrict ourselves to the arguments properly before us. Fisher contends that Iranian authorities persecuted her, and she fears future persecution, on account of her religion or her political beliefs. She did not establish persecution, or a well-founded fear of persecution, on either of those grounds. No more need be said regarding the merits of her asylum claim. I agree that the immigration judge's denial of voluntary departure was not arbitrary or capricious. I therefore concur in the denial of Fisher's petition for review.

**\*967** NOONAN, Circuit Judge, joined by FLETCHER, Circuit Judge, dissenting:

To begin with, the petitioner identified herself at the immigration hearing as Saideh Hassib–Tehrani. Despite the fact that the INS and this court have continued to identify her as "Fisher," that appellation seems cruelly ironic when the majority denies that she was ever validly married to Fisher. It is always appropriate to refer to people by the names they give themselves. Consequently, in this dissent Saideh Hassib–Tehrani will be identified by the name she calls herself.

On October 5, 1994 a panel of this court unanimously remanded to the Board of Immigration Appeals (the Board) for further consideration of two claims: one, that Saideh Hassib–Tehrani feared persecution on account of her religious beliefs, and two, that she feared persecution on account of imputed political opinion. 37 F.3d 1371, 1383 and 1384. The panel did not decide that she was entitled to asylum on these grounds. It only decided that the Board had failed to analyze the evidence that supported asylum on these grounds. Today the majority opinion denies her petition on the ground that substantial evidence supports the Board's decision. However, the Board determined only that the petitioner's encounters with the regime did not amount to persecution without considering whether she had established a well-founded *fear* of persecution were she returned to Iran. I agree with the original panel that the case should be remanded to the Board for further consideration. The majority opinion now leaves open the possibility that she could move to reopen the proceedings before the Board pursuant to 8 C.F.R. §§ 3.2, 208.19 (1995). For a reason now to be stated, it is evident that reopening of the deportation proceedings should be acceptable to the government and granted by the Board. The principal division in this court is as to whether we should remand requiring reconsideration or whether the reopening should be left to the discretion of the government and the Board.

*The Sea–Change In Government Policy.* A compelling reason that either remand or reopening should occur is that this case occurs in a kind of time warp in which governmental

policies, now abandoned by the government, operate to decide the case. The decision of the Immigration Judge was given in 1987. The decision of the Board was given in 1990. The decision of the panel was given in 1994. On May 26, 1995 a new approach to the basic problems present in this case was announced by the INS Field Operations Office of International Affairs in the Department of Justice. Addressed to "All INS Asylum Office/rs" and entitled "Considerations for Asylum Officers Adjudicating Asylum Claims From Women," *reprinted at* 72 *Interpreter Releases* 781 (June 5, 1995) (hereinafter "Considerations"), the policy is set out in a public document and given a large and appropriate amount of attention in the media. *See, e.g.* Michael Sniffen, *U.S. Stresses That Sexual Persecution Can be Basis for Asylum,* The Associated Press, May 26, 1995, AM Cycle; Ashley Dunn, *U.S. to Accept Asylum Pleas for Sex Abuse,* N.Y. Times, May 27, 1995, at 1. The Considerations are put forward as "*required reading* for all interviewing and supervising Asylum Officers." Considerations at 18 (emphasis in original). Training in these guidelines is required in order to enhance the ability of Asylum Officers "to make informed, consistent and fair decisions." *Id.* at 19. Supervisors of Asylum Officers are to be held accountable "for assuring that Asylum Officers fully implement this guidance." *Id.*

Under the heading "Background and International Guidance" the Asylum Officers are told: "The evaluation of gender-based claims *must* be viewed within the framework provided by existing international human rights instruments and the interpretation of these instruments by international organizations." *Id.* at 2 (emphasis supplied). Among the international documents then cited are the 1979 Convention on the Elimination of All Forms of Discrimination Against Women and the 1993 Declaration on the Elimination of Violence Against Women, adopted by the General Assembly of the United Nations. According to the guidelines, the Declaration recognizes violence against women "as both a per se violation of human rights and as an impediment to the enjoyment by women of other human rights." *Id.* at 2. A third **\*968** document cited by the Considerations was adopted by the Executive Committee of the United Nations High Commissioner for Refugees in 1985 and, as summarized by the Considerations For Asylum Officers, declares that states were free to adopt the interpretation "that women asylum-seekers who face harsh or inhuman treatment due to their having transgressed the social mores of the society in which they live may be considered a 'particular social group'" for asylum purposes. *Id.* at 3. In other words, this whole class of women is eligible for asylum consideration

as persons persecuted on account of their membership in the social group of nonconforming and therefore harshly treated women. This conclusion is reinforced by reference to the Guidelines adopted in 1993 by the Canadian Immigration and Refugee Board which formally recognize that "women fleeing persecution because of their gender can be found to be refugees." *Id.*

Against this background of international guidance, Asylum Officers of the United States are instructed that the laws and customs of some countries

> "contain gender-discriminatory provisions. Breaching social mores (e.g., marrying outside of an arranged marriage, wearing lipstick or failing to comply with other cultural or religious norms) may result in harm, abuse or harsh treatment that is distinguishable from the treatment given the general population, frequently without meaningful recourse to state protection. As a result, the civil, political, social and economic rights of women are often diminished in these countries."

*Id.* at 4. The Asylum Officers are instructed that claims must be analyzed under the laws of the United States "but gender-related claims can raise issues of particular complexity, and it is important that United States asylum adjudicators understand those complexities and give proper consideration to gender-related claims." *Id.* at 8. In particular, it is stated that persecution occurs when oppression is inflicted "because of a difference [that] the persecutor will not tolerate," citing 🔖 *Hernandez–Ortiz v. INS,* 777 F.2d 509, 516 (9th Cir.1985), and that discriminatory practices and experiences "can accumulate over time or increase in intensity so that they may rise to the level of persecution." Considerations at 9 (quoting U.S. Department of Justice, Immigration and Naturalization Service, *Basic Law Manual* at [28], *reprinted in* Charles Gordon and Stanley Mailman, 8 *Immigration Law and Procedure* (rev. ed.1995)). The contrary-to-fact hypothetical indulged in by the majority (a law in the United States not constituting persecution of a social group although permitting detention, arrest "or even imprisonment"

96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

of a woman for not wearing a chador) suggests that these guidelines have not been assimilated by this court.

The guidelines go on to cite in particular the panel opinion in this very case at a time when rehearing en banc was pending. *Id.* at 10. Without the slightest criticism of the analysis and conclusions reached by the panel, the guidelines quote the panel at 🚩 37 F.3d at 1379 emphasizing that persecution should not be evaluated "solely on the basis of the physical sanction" and that requiring a person with religious views different from those espoused by a religious regime to conform to the regime's laws when the laws are fundamentally abhorrent to that person's religious convictions could result in anguish amounting to persecution. The Considerations further note that a woman could have imputed to her a political opinion about laws based on gender—a political opinion which would be the basis of persecution by those enforcing the regime's views. The Considerations quote with approval the Board's statement in 🚩 *Matter of Acosta,* 19 I & N Dec. 211, 233 (March 1, 1985), that persecution on account of membership in a particular social group had to be based on those who "share a common, immutable characteristic. The shared characteristic might be an innate one such as sex...." Considerations at 12. The Considerations leave open whether, under existing precedent, "gender might be one characteristic that combines with others to define the particular social group." Considerations at 13. The guidelines are an invitation to develop asylum law with special attention to the problems of women oppressed on account of their nonconformity with the moral codes of a rigorist regime.

**\*969**  As Judge Canby's concurrence observes, the case as governed by the guidelines has not been presented to us and so cannot now be decided by us. The majority of the en banc panel reaching out to decide what it has no power to decide speaks of course for those making up this majority. Its dicta do not constitute Ninth Circuit law. It is this particular majority which has the view that if in the United States a law imposed a religiously-inspired dress code on all women under penalty of imprisonment the law would not be evidence of persecution of a particular social group. If only there is a law, if only the law is general enough, half of the population may be subjected to discrimination and subject to incarceration for disobedience to the discriminatory regulation. We are not very far from *The Handmaid's Tale* when seven judges of this court are capable of expressing such a view.

In oral argument the court inquired of counsel representing the government whether he was in agreement with the guidelines of May 1995. After a pause, counsel said that he was sure his client was in agreement with them. This answer cannot be faulted for its honesty, but it suggests that there are elements in the INS who have not assimilated the spirit of the new guidelines. It would be tragic if government policy towards a woman claiming persecution or fear of persecution today should be decided on the basis of a policy that has become obsolete. There is no unfairness to the petitioner in letting the new guidelines apply to her case. There is no unfairness to the government in suggesting that it follow its new rules. This case was presented, argued and decided without any attention whatsoever to the guidelines that Asylum Officers today are supposed to "fully implement" and that are important to "informed, consistent and fair decisions." What advantage accrues to the government in avoiding the Considerations? This case needs to be heard again with the Board free to follow the guidelines of May 1995. If the majority agreed that this case should be remanded because the Board erred, that would be possible; because the majority does not, reopening is the path to achieving this objective. The Board has the discretion to reopen, and the present policy of the government indicates that it would be a proper exercise of the Board's discretion to do so.

We turn to the case as it has been presented to us.

*Saideh Hassib–Tehrani's Fear.* The statute itself establishes that what must be shown by a person seeking asylum is something less than what is required by the standard for withholding of deportation. The higher standard for withholding requires showing something that is more probable than not. The standard for showing fear is less. 🔖 *INS v. Cardoza–Fonseca,* 480 U.S. 421, 427–32, 107 S.Ct. 1207, 1211–14, 94 L.Ed.2d 434 (1987), 🔖 *Singh v. Ilchert,* 69 F.3d 375, 381 (9th Cir.1995). There is a grave temptation for judges, used as they are to determinations of probability, to invoke unconsciously the higher standard in assessing fear. The Supreme Court reminds us that a chance of one-in-ten of serious harm befalling one is enough to establish fear that qualifies for asylum. 🔖 *Cardoza–Fonseca,* 480 U.S. at 440, 107 S.Ct. at 1217.

The common teaching of this circuit is that fear has a subjective component and an objective component. The dichotomy is easy to state but not so easy to grasp. Fear is an emotion. As an emotion it must be subjective. Our

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 743 of 1384

requirement of an "objective" component reflects the judicial desire to have some way of checking on whether a fear is imaginary or fantastic. We have spoken in terms of evidence showing a credible, direct and specific basis for the fear. *Prasad v. INS,* 47 F.3d 336, 338 (9th Cir.1995). We still must integrate that credible, direct and specific basis with the subjective reaction of the person who says that she is scared.

In this case, the claim is not that Saideh Hassib–Tehrani has suffered persecution but that she fears that if she is returned to Iran she will suffer persecution. No one doubts the genuineness of her emotion. Does she have a credible, direct and specific basis for this fear? She cites three bad things that happened to her before she left her native country. Found in mixed company where the host wore his swimsuit she was arrested, handcuffed, taken to a government center, and held for four hours; her name and address were taken. The experience was traumatic **\*970** ("they hurt me"), and she became depressed, ill and unable to continue with her valued job as a teacher. Subsequently, caught with strands of hair outside her chador, she was seized upon the street by government agents or government-approved vigilantes, put into a car at gunpoint, lectured on her clothing, and driven to her home. Later in time her home was actually invaded by government agents searching for suspected enemies of the government. None of the incidents in themselves are of such gravity that they constitute persecution. As credible, direct, specific facts which make her fear persecution if she returns to Iran, the incidents have a different significance. They indicate to her that the authorities know about her, know that she has been a nonconformist on points of great importance to the authorities and foretell that she will suffer more serious harm if she is returned to the country.

The Board stopped its analysis with its finding that she had not suffered persecution in the three incidents. The Board did not address her fear of persecution in the future. The Board focused on her opinions as they had been expressed in Iran. But this focus was as inappropriate as was the Board's stopping at past persecution.

The structure of the statute authorizing asylum is modelled on the Fifteenth Amendment to the Constitution prohibiting the denial of rights "on account of" race, color or previous condition of servitude. Persecution must be "on account of" a characteristic belonging to the victim. *INS v. Elias–Zacarias,* 502 U.S. 478, 482, 112 S.Ct. 812, 815–16, 117 L.Ed.2d 38 (1992). That elementary proposition does not eliminate from consideration the view that the alleged persecutors take of the victim. *See Mendoza Perez v. INS,* 902 F.2d 760, 762 (9th Cir.1990).

For example, it is the conjunction of the victim's political opinion and religious belief, as perceived by the persecutors, with the persecutors' reaction to that opinion or belief, which produces persecution. So, as the Supreme Court tells us, Jews in Nazi Germany were not persecuted on account of their political opinion. *Elias–Zacarias,* 502 U.S. at 482, 112 S.Ct. at 815–16. Rather, they were persecuted as members of a particular group variously viewed as religious, ethnic, or social by the Nazis. The Jews did not need to raise a finger against their persecutors, or whisper a criticism, in order to be the maligned objects of hatred. Similarly, what befell Saideh Hassib–Tehrani was not because she had demonstrated a sympathy for feminism or voiced a more tolerant interpretation of Islam than the Ayatollah's or expressed in Iran any dissent from the rigorist regime. The arrests and search occurred because the regime perceived her as a religious nonconformist. The way in which she led her daily life was enough to invite repression. It was on account of her religious opinion, as perceived by the regime viewing her unconventional routine behaviors, that she was arrested and that she foreseeably will face more serious repression if she returns. *See Abedini v. INS,* 971 F.2d 188, 192 n. 1 (9th Cir.1992). As Iran is a theocracy, the religious beliefs imputed to her by the regime were also political opinions, and the persecution she fears from the regime would also be "on account of" those imputed political opinions.

In this case Saideh Hassib–Tehrani has testified that she is a Muslim but that she does not believe that the government is a truly Muslim regime. She reaches that belief from "the way they treat people, the covering of the face, the way of life." She is opposed to the regime's fundamentalist beliefs and so invites persecution. Her views, which have been made public in the course of these proceedings are not concealed from the Iranian authorities. *See Bastanipour v. INS,* 980 F.2d 1129, 1133 (7th Cir.1992). If we wished to discount expression of opinion offered by a petitioner during a hearing, we should seal the record and disguise the petitioner's identity in our published reports. If the testimony in an asylum proceeding is not shielded from the government of the country to which a person may be returned, it is only fair to take that testimony into account in determining whether a petitioner has a basis for believing that the government will persecute her if she is returned. According to her testimony in this case

96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

Hassib–Tehrani has a political opinion and religious beliefs on account **\*971** of which she can reasonably fear persecution.

What kind of trouble is she likely to receive at the hands of the government if she goes back? What is she scared of? We begin with the information in the administrative record by virtue of its incorporation of the detailed information on Iran provided by the United States Department of State to the Committee On Foreign Relations, U.S. Senate, and the Committee on Foreign Affairs, U.S. House of Representatives, in the State Department's *Country Reports on Human Rights Practices for 1986* (1987) (hereafter "the 1986 Country Report"). According to this official information, Iran was not a country without laws and procedures. It was a country in the grip of righteous religious revolutionaries, intolerant of even the slightest departure from the norms that they believed required by the Koran. It was a country in which vigilantes, with government approval, enforced the dress code and other matters of gender decorum. It was a country where, once in the hands of police or prison officials, there was no effective restraint on arbitrary infliction of suffering. According to the 1986 Country Report, a person in Saideh Hassib–Tehrani's position faced arrest by revolutionary guards, prolonged detention, interrogation under torture, imprisonment, and arbitrary beatings on the soles of her feet. The government has produced no evidence that these conditions have changed.

The majority in this case says that we cannot use the 1986 Country Report because it did not form part of the administrative record. That is not entirely accurate. The immigration judge did use a portion of this report in making his decision, as the majority concedes. 79 F.3d at 964. This use of the report makes it part of the record. *Cf.* 8 C.F.R. § 208.9(f) ("The application, all supporting provided by the applicant, any comments submitted by the Department of State, or by the Service, *and any other information considered by the Asylum Officer* shall comprise the record.") (emphasis added). In addition, by using the report, the immigration judge brought into play the following regulation that governs immigration hearings:

### Comments from the Department of State

(a) At its option, the Department of State may provide detailed country conditions information addressing the specific conditions relevant to eligibility for refugee status according to the grounds specified in section 101(a)(42) of the Act, 8 U.S.C. 1101(a)(42). Any such information relied upon by an immigration judge in deciding a claim for asylum or withholding of deportation shall be made part of the record and the parties shall be provided an opportunity to review and respond to such information prior to the issuance of a decision.

8 C.F.R. § 208.11 (1995). It is apparent that the State Department's Country Reports are "detailed country conditions information" within the terms of this regulation. The term "information" in the second sentence cannot be isolated from the whole phrase qualifying "information". That being so, it is not the specific detail relied on by the immigration judge but the "detailed country conditions information," or "Country Report" that is made part of the record. Consequently, the 1986 Country Report is properly before us.

In summary, we are asked in this en banc court to decide whether the Board had substantial evidence for concluding that Saideh Hassib–Tehrani had fear, and reason to fear, persecution on account of her religious beliefs and political opinion if she were now deported to Iran. In the end, in deciding that question we are required to integrate the objective evidence with her subjective emotions and to ask whether a person with her experiences, who fell ill after being handcuffed and detained for four hours, would be scared of suffering on account of her now openly expressed opposition to the regime if she were sent back. In *Bastanipour*, Judge Posner asked the government's lawyer "whether *he* would fear persecution by Iran if he were in Bastanipour's religious and political shoes and he conceded that he would."

*Bastanipour, 980 F.2d at 1133.* We did not ask the government lawyer a similar **\*972** question but we should ask ourselves: If we had the beliefs and the experience and the gender of Saideh Hassib–Tehrani, would we reasonably fear that we had a one-in-ten chance of suffering seriously on account of our beliefs if we returned to Iran? The answer, it may be suggested, is obvious. If it is obvious, the Board necessarily erred in its contrary finding.

*On Remand or Reopening.* There is more that should be before the Board on remand or reopening. Under the governing statute the immigration judge conducting the deportation proceedings "shall determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine and cross-examine the alien or witnesses." 8 U.S.C. § 1252(b). In this role, the immigration judge has duties imposed by statute that are different from the functions of an Article III judge. He has

the specific duties of interrogating, examining and cross-examining, and he also has the duty of presenting evidence. In short, the immigration judge has the duty of developing the record on which his or her decision must be based. *Id.* For that reason the immigration judge for these purposes is also described as a "special inquiry officer." *Id.*; *see also* 8 C.F.R. § 1.1(*l* ).

These statutory obligations put the immigration judge in a position analogous to that of an administrative law judge hearing a Social Security claim. The immigration judge has, analogously, the "special duty to fully and fairly develop the record." *See* Brown v. Heckler, 713 F.2d 441, 443 (9th Cir.1983). Like the administrative law judge the immigration judge has the obligation to be informed about the facts relevant to the decision being made. Heckler v. Campbell, 461 U.S. 458, 471, n. 1, 103 S.Ct. 1952, 1959 n. 1, 76 L.Ed.2d 66 (Brennan, J., concurring) (1983).

In a case such as the one at bar the information available from the State Department on the country conditions is obviously relevant; and the relevant information stands in need of updating with the passage of each year. As the majority opinion notes, it should be open to Saideh Hassib–Tehrani to reopen the proceeding before the Board to present the most relevant up-to-date information from the State Department on conditions in Iran. Why should the Board adjudicate about conditions in a far-away land without getting the most reliable kind of information, information all the more acceptable because it comes from an agency of the United States? The government has no reason to resist such a reopening. The government is not the enemy of the alien. Its interest is that the asylum-seeker should obtain asylum if she is entitled to it. The Country Reports bear on this entitlement.

Unlike most questions litigated in federal court, the most relevant questions in an asylum proceeding depend on knowledge of conditions in some foreign land. The Board should not stultify itself by denying itself the benefit of responsible reports on the country in question. When a judge decides about issues within the United States the judge necessarily puts to use a vast fund of knowledge gained through experience of living in this country; and that experience does not form part of any administrative record. Lacking such experience of tyrannical regimes abroad, the Board is free to consult not only the Country Reports issued by the State Department but also responsible information from other sources. The special inquiry officer is specifically

authorized to do so. 8 C.F.R. § 208.12(a). When the special inquiry officer has not, and when the information in the administrative record is eight years old, the Board should welcome the submission of up-to-date Country Reports.

*Involuntary Departure.* Although it might be hoped that the issue will never need to be finally resolved, the possibility exists that Saideh Hassib–Tehrani will be returned to Iran because the Immigration Judge found that she gave false testimony at the immigration hearing. On this point the Board made no findings of its own but simply adopted the Immigration Judge's findings. Consequently it is our task to look at them.

The Immigration Judge found Saideh Hassib–Tehrani to be "lying" when she testified that she had been married to Charles Fisher. A.R. at 44. The evidence given weight by the Immigration Judge consisted of two things: an affidavit of Charles Fisher and **\*973** notes that Saideh Hassib–Tehrani had prepared for her hearing. The notes were amazingly non-probative of deceit. As the majority observes, the notes contained information such as her parents' home town, birth date and her place of work. She was certainly not going to lie about these matters. The fact that she had notes about her life with Fisher seems to fall within her own explanation for all the notes, *viz.* that she had a poor memory and was nervous and wanted to have all the facts at her fingertips when she testified.

Fisher's affidavit read as follows: "I was given $500.00 to marry my wife Saideh from a friend Rick Ronquillo, Amalco Metals employee. That if I married Saideh from Iran, that I would receive $500.00 cash. From her cousin Bob. I have not resided with Saideh on continuios [sic] basis sense [sic] our marriage." The background of this affidavit is provided by Saideh Hassib–Tehrani herself. She came to the United States expecting to marry Bob. She found him living with another woman. Bob had every reason to try to find someone to take his place, and he did. Bob's solution of a sad situation does not reflect on the credibility or the moral character of Saideh Hassib–Tehrani.

What does Fisher's affidavit prove? It proves that Fisher believes that he had married Saideh Hassib–Tehrani. It implies that he had resided with her. It is not probative of a fake marriage. It reveals nothing about whether Saideh Hassib–Tehrani knew of Fisher's motive and whether therefore her testimony that the marriage was not one entered into for immigration purposes was false; indeed, nothing in

the record suggests that she even knew about the payment, much less caused Bob to make it. The affidavit invites interrogation. Saideh Hassib–Tehrani's testimony explains why cousin Bob had offered Fisher $500.00. The monetary motivation for the marriage does not establish that it was invalid or fictitious. No doubt all should marry for love; but many marriages in the history of the world have been entered for mercenary motives. Without substantial evidence in the record supporting the Immigration Judge's determination, there should be a grant of voluntary departure.

**All Citations**

79 F.3d 955, 96 Cal. Daily Op. Serv. 2252, 96 Daily Journal D.A.R. 3751

## Footnotes

1    *See, e.g.,* 🚩 *Matter of Acosta,* 19 I & N Dec. 211 (BIA 1985), defining the term "particular social group" as "a group of persons all of whom share a common, immutable characteristic" and opining that "[t]he shared characteristic might be an innate one such as *sex,* color, or kinship ties...." 🚩 *Id.* at 233 (emphasis added). *See also* 🏳 *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir.1993) (petitioner who establishes fear of persecution in Iran because she is a woman has identified a requisite "particular social group" for purposes of asylum).

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Not Followed on State Law Grounds People v. Rodriguez, N.Y.City Ct., November 7, 2019

13 S.Ct. 1016
Supreme Court of the United States

FONG YUE TING

v.

UNITED STATES et al.

WONG QUAN

v.

SAME.

LEE JOE

v.

SAME.

Nos. 1,345, 1,346, 1,347.
|
May 15, 1893.

**Synopsis**
Appeals from the circuit court of the United States in and for the southern district of New York. Affirmed.

West Headnotes (7)

**[1]**   **Aliens, Immigration, and Citizenship**   ⚷   Power to deny admission or remove in general

The right of a nation to expel or deport foreigners who have not been naturalized or taken any steps towards becoming citizens of the country rests upon the same grounds, and is an absolute and unqualified as the right to prohibit and prevent their entrance into the country.

52 Cases that cite this headnote

**[2]**   **Aliens, Immigration, and Citizenship**   ⚷   Power to deny admission or remove in general

The political department of the federal government, through the constitutional grant to it of control over international relations, has authority to expel aliens who have taken no steps to become citizens, even though they are subjects of a friendly power, and have acquired a domicile in this country.

69 Cases that cite this headnote

**[3]**   **Aliens, Immigration, and Citizenship**   ⚷   Rights of Aliens in General

**Aliens, Immigration, and Citizenship**   ⚷   Power to deny admission or remove in general

Chinese laborers residing in the United States are entitled, like all other aliens, so long as they are permitted by the government to remain in the country, to all the safeguards of the Constitution, and to the protection of the laws in regard to their rights of person and of property, and to their civil and criminal responsibility; but, as they have taken no steps to become citizens, and are incapable of becoming such under the naturalization laws, they remain subject to

the power of congress to order their expulsion or deportation whenever, in its judgment, such a measure is necessary or expedient for the public interest.

225 Cases that cite this headnote

[4]    **Aliens, Immigration, and Citizenship** 🔑 Power to deny admission or remove in general

It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.

49 Cases that cite this headnote

[5]    **International Law** 🔑 Legislation; statutes, regulations, and ordinances

When an act of congress conflicts with a prior treaty, the act controls.

16 Cases that cite this headnote

[6]    **International Law** 🔑 Constitutional law

**International Law** 🔑 Legislation; statutes, regulations, and ordinances

The provisions of an act of congress passed in the exercise of its constitutional authority must prevail even if they contravene the express stipulations of an earlier treaty.

15 Cases that cite this headnote

[7]    **Aliens, Immigration, and Citizenship** 🔑 Validity

**Constitutional Law** 🔑 Evidence

The provision of the Chinese Deportation Act of May 6, 1892, 27 Stat. 25, c. 60, which puts the burden of proof upon a Chinese laborer arrested for having no certificate, as well as the requirement of proof by one credible white witness that he was a resident of the United States at the time of the passage of the act, is within the acknowledged power of every legislature to prescribe the evidence which shall be received, and the effect of that evidence in the courts of its own government.

90 Cases that cite this headnote

**\*\*1016**  Statement by Mr. Justice GRAY:

These were three writs of habeas corpus, granted by the circuit court of the United States for the southern district of New York, upon petitions of Chinese laborers arrested and held by the marshal of the district for not having certificates of residence, under section 6 of the act of May 5, 1892, c. 60, which is copied in the margin. [1]

**\*\*1017**  The rules and regulations made and promulgated by the secretary of the treasury under section 7 of that act prescribe forms for applications for certificates of residence, for affidavits in support thereof, and for the certificates themselves; contain the provisions copied in the margin; [2] and also provide for recording duplicates of the certificates in the office of the collector of internal revenue.

13 S.Ct. 1016, 37 L.Ed. 905

The first petition alleged that the petitioner was a person of the Chinese race, born in China, and not a naturalized citizen of the United States; that in or before 1879 he came to the United States, with the intention of remaining and taking up his residence therein, and with no definite intention of returning to China, and had ever since been a permanent resident of the United States, and for more than a year last past had resided in the city, county, and state of New York, and within the second district for the collection of internal revenue in that state; that he had not, since the passage of the act of 1892, applied to the collector of internal revenue of that district for a **1018 certificate of residence, as required by section 6, and was, and always had been, without such certificate of residence; and that he was arrested by the marshal, claiming authority to do so under that section, without any writ or warrant. The return of the marshal stated that the petitioner was found by him within the jurisdiction of the United States and in the southern district of New York, without the certificate of residence required by that section; that he had, therefore, arrested him, with the purpose and intention of taking him before a United States judge within that district; and that the petitioner admitted to the marshal, in reply to questions put through an interpreter, that he was a Chinese laborer, and was without the required certificate of residence.

The second petition contained similar allegations, and further alleged that the petitioner was taken by the marshal before the district judge for the southern district of New York, and that 'the said United States judge, without any hearing of any kind, thereupon ordered that your petitioner be remanded to the custody of the marshal in and for the southern district of New York, and deported forthwith from the United States, as is provided in said act of May 5, 1892, all of which more fully appears by said order, a copy of which is hereto annexed and made a part hereof,' and which is copied in the margin;[3] and that he was detained by virtue of the marshal's claim of authority and the judge's order. The marshal returned that he held the petitioner under that order.

In the third case the petition alleged, and the judge's order showed, the following state of facts: On April 11, 1893, the petitioner applied to the collector of internal revenue for a certificate of residence. The collector refused to give him a certificate, on the ground that the witnesses whom he produced to prove that he was entitled to the certificate were persons of the Chinese race, and not credible witnesses, and required of him to produce a witness other than a Chinaman to prove that he was entitled to the certificate, which he was unable to do, because there was no person other than one of the Chinese race who knew and could truthfully swear that he was lawfully within the United States on May 5, 1892, and then entitled to remain therein; and because of such unavoidable cause he was unable to produce a certificate of residence, and was now without one. The petitioner was arrested by the marshal, and taken before the judge, and clearly established to the satisfaction of the judge that he was unable to procure a certificate of residence by reason of the unavoidable cause aforesaid; and also established to the judge's satisfaction, by the testimony of a Chinese resident of New York, that the petitioner was a resident of the United States at the time of the passage of the act; but, having failed to establish this fact clearly to the satisfaction of the court by at least one credible white witness, as required by the statute, the judge ordered the petitioner to be remanded to the custody of the marshal, and to be deported from the United States, as provided in the act.

Each petition alleged that the petitioner was arrested and detained without due process of law, and that section 6 of the act of May 5, 1892, was unconstitutional and void.

In each case the circuit court, after a hearing upon the writ of habeas corpus and the return of the marshal, dismissed the writ of habeas corpus, and allowed an appeal of the petitioner to this court, and admitted him to bail pending the appeal. All the proceedings, from the arrest to the appeal, took place on May 6th.

**Attorneys and Law Firms**

*704 Jos. H. Choate, J. Hubley Ashton, and Maxwell Evarts, for appellants.

Sol. Gen. Aldrich, for appellees.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Opinion**

Mr. Justice GRAY, after stating the facts, delivered the opinion of the court.

The general principles of public law which lie at the foundation of these cases are clearly established by previous judgments **\*705** of this court, and by the authorities therein referred to.

In the recent case of Nishimura Ekiu v. U. S., 142 U. S. 651, 659, 12 Sup. Ct. Rep. 336, the court, in sustaining the action of the executive department, putting in force an act of congress for the exclusion of aliens, said: 'It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, **\*\*1019** and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe. In the United States this power is vested in the national government, to which the constitution has committed the entire control of international relations, in peace as well as in war. It belongs to the political department of the government, and may be exercised either through treaties made by the president and senate or through statutes enacted by congress.'

The same views were more fully expounded in the earlier case of Ping v. U. S., 130 U. S. 581, 9 Sup. Ct. Rep. 623, in which the validity of a former act of congress, excluding Chinese laborers from the United States, under the circumstances therein stated, was affirmed.

In the elaborate opinion delivered by Mr. Justice Field in behalf of the court it was said: 'Those laborers are not citizens of the United States; they are aliens. That the government of the United States, through the action of the legislative department, can exclude aliens from its territory, is a proposition which we do not think open to controversy. Jurisdiction over its own territory to that extent is an incident of every independent nation. It is a part of its independence. If it could not exclude aliens, it would be to that extent subject to the control of another power.' 'The United States, in their relation to foreign countries and their subjects or citizens, are one nation, invested with powers which belong to independent nations, the exercise of which can be invoked for the maintenance of its absolute independence and security throughout its entire territory.' 130 U. S. 603, 604, 9 Sup. Ct. Rep. 629.

It was also said, repeating the language of Mr. Justice **\*706** Bradley in Knox v. Lee, 12 Wall. 457, 555: 'The United States is not only a government, but it is a national government, and the only government in this country that has the character of nationality. It is invested with power over all the foreign relations of the country, war, peace, and negotiations and intercourse with other nations; all of which are forbidden to the state governments.' 130 U. S. 605, 9 Sup. Ct. Rep. 629. And it was added: 'For local interests, the several states of the Union exist; but for international purposes, embracing our relations with foreign nations, we are but one people, one nation, one power.' 130 U. S. 606, 9 Sup. Ct. Rep. 630.

The court then went on to say: 'To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation; and to attain these ends nearly all other considerations are to be subordinated. It matters not in what form such aggression and encroachment come, whether from the foreign nation acting in its national character, or from vast hordes of its people crowding in upon us. The government, possessing the powers which are to be exercised for protection and security, is clothed with authority to determine the occasion on which the powers shall be called forth; and its determination, so far as the subjects affected are concerned, is necessarily conclusive upon all its departments and officers. If, therefore, the government of the United states, through its legislative department, considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security, their exclusion is not to be stayed because at the time there are no actual hostilities with the nation of which the foreigners are subjects. The existence of war would render the necessity of the proceeding only more obvious and pressing. The same necessity, in a less pressing degree, may arise when war does not exist, and the same authority which adjudges the necessity in one case must also determine it in the

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 751 of 1384

13 S.Ct. 1016, 37 L.Ed. 905

other. In both cases its determination is conclusive upon the judiciary. If the government of the country of which the foreigners excluded are subjects is dissatisfied with this action, it can make complaint to the **\*707** executive head of our government, or resort to any other measure which, in its judgment, its interests or dignity may demand; and there lies its only remedy. The power of the government to exclude foreigners from the country, whenever, in its judgment, the public interests require such exclusion, has been asserted in repeated instances, and never denied by the executive or legislative departments.' 130 U. S. 606, 607, 9 Sup. Ct. Rep. 631. This statement was supported by many citations from the diplomatic correspondence of successive secretaries of state, collected in Whart. Int. Law Dig. § 206.

The right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country.

This is clearly affirmed in dispatches referred to by the court in Ping's Case. In 1856, Mr. Marcy wrote: 'Every society possesses the undoubted right to determine who shall compose its members, and it is exercised by all nations, both in peace and war. A memorable example of the exercise of this power in time of peace was the passage of the alien law of the United States in the year 1798.' In 1869, Mr. Fish wrote: 'The control of the people within its limits, and the right to expel from its territory persons who are dangerous to the peace of the state, are too clearly within the essential attributes of sovereignty to be seriously contested.' Whart. Int. Law Dig. § 206; 130 U. S. 607, 9 Sup. Ct. Rep. 630.

**\*\*1020** The statements of leading commentators on the law of nations are to the same effect.

Vattel says: 'Every nation has the right to refuse to admit a foreigner into the country, when he cannot enter without putting the nation in evident danger, or doing it a manifest injury. What it owes to itself, the care of its own safety, gives it this right; and, in virtue of its natural liberty, it belongs to the nation to judge whether its circumstances will or will not justify the admission of the foreigner.' 'Thus, also, it has a right to send them elsewhere, if it has just cause to **\*708** fear that they will corrupt the manners of the citizens; that they will create religious disturbances, or occasion any other disorder, contrary to the public safety. In a word, it has a right, and is even obliged, in this respect, to follow the rules which prudence dictates.' Vatt. Law Nat. lib. 1, c. 19, §§ 230, 231.

Ortolan says: 'The government of each state has always the right to compel foreigners who are found within its territory to go away, by having them taken to the frontier. This right is based on the fact that, the foreigner not making part of the nation, his individual reception into the territory is matter of pure permission, of simple tolerance, and creates no obligation. The exercise of this right may be subjected, doubtless, to certain forms by the domestic laws of each country; but the right exists none the less, universally recognized and put in force. In France no special form is now prescribed in this matter; the exercise of this right of expulsion is wholly left to the executive power.' Ortolan, Diplomatie de la Mer, (4th Ed.) lib. 2, c. 14, p. 297.

Phillimore says: 'It is a received maxim of international law that the government of a state may prohibit the entrance of strangers into the country, and may, therefore, regulate the conditions under which they shall be allowed to remain in it, or may require and compel their departure from it.' 1 Phillim. Int. Law, (3d Ed.) c. 10, § 220.

Bar ways: 'Banishment and extradition must not be confounded. The former is simply a question of expediency and humanity, since no state is bound to receive all foreigners, although, perhaps, to exclude all would be to say good-bye to the international union of all civilized states; and although in some states, such as England, strangers can only be expelled by means of special acts of the legislative power, no state has renounced its right to expel them, as is shown by the alien bills which the government of England has at times used to invest itself with the right of expulsion.' 'Banishment is regulated by rules of expediency and humanity, and is a matter for the police of the state. No doubt the police can apprehend any foreigner who refuses to quit the country in **\*709** spite of authoritative orders to do so, and convey him to the frontier.' Bar, Int. Law, (Gillespie's Ed. 1883,) 708, note, 711.

In the passages just quoted from Gillespie's translation of Bar, 'banishment' is evidently used in the sense of expulsion or deportation by the political authority on the ground of expediency, and not in the sense of transportation or exile by way of punishment for crime. Strictly speaking, 'transportation,' 'extradition,' and 'deportation,' although each has the effect of removing a person from the country, are different things, and have different purposes. 'Transportation' is by way of punishment of one convicted of an offense against the laws of the country. 'Extradition' is the surrender to another country of one accused of an offense against its laws, there to be tried, and, if found guilty, punished. 'Deportation' is the removal of an alien out of the country simply because his presence is deemed inconsistent with the public welfare, and without any punishment being imposed or contemplated, either under the laws of the country out of which he is sent or under those of the country to which he is taken.

In England, the only question that has ever been made in regard to the power to expel aliens has been whether it could be exercised by the king without the consent of parliament. It was formerly exercised by the king, but in later times by parliament, which passed several acts on the subject between 1793 and 1848. 2 Inst. 57; 1 Chalm. Op. 26; 1 Bl. Comm. 260; Chit. Prerog. 49; 1 Phillim. Int. Law, c. 10, § 220, and note; 30 Parl. Hist. 157, 167, 188, 217, 229; 34 Hans. Deb. (1st Series) 441, 445, 471, 1065–1071; 6 Law Rev. Quar. 27.

Eminent English judges, sitting in the judicial committee of the privy council, have gone very far in supporting the exclusion or expulsion, by the executive authority of a colony, of aliens having no absolute right to enter its territory or to remain therein.

In 1837, in a case arising in the island of Mauritius, which had been conquered by Great Britain from France in 1810, and in which the law of France continued in force, Lord  **\*710** Lyndhurst, Lord Brougham, and Justices Bosanquet and Erskine, although considering it a case of great hardship, sustained the validity of an order of the English governor, deporting a friendly alien, who had long resided and carried on business in the island, and had enjoyed the privileges and exercised the rights of a person duly domiciled, but who had not, as required by the French law, obtained from the colonial government formal and express authority to establish a domicile there. In re Adam, 1 Moore, P. C. (N. S.) 460.

In a recent appeal from a judgment of the supreme court of the colony of Victoria, a collector of customs, sued by a Chinese immigrant for preventing him from landing in the colony, had pleaded a justification under the  **\*\*1021** order of a colonial minister claiming to exercise an alleged prerogative of the crown to exclude alien friends, and denied the right of a court of law to examine his action, on the ground that what he had done was an act of state; and the plaintiff had demurred to the plea. Lord Chancellor Halsbury, speaking for himself, for Lord Herschell, (now lord chancellor,) and for other lords, after deciding against the plaintiff on a question of statutory construction, took occasion to observe: 'The facts appearing on the record raise, quite apart from the statutes referred to, a grave question as to the plaintiff's right to maintain the action. He can only do so if he can establish that an alien has a legal right, enforceable by action, to enter British territory. No authority exists for the proposition that an alien has any such right. Circumstances may occur in which the refusal to permit an alien to land might be such an interference with international comity as would properly give rise to diplomatic remonstrance from the country of which he was a native; but it is quite another thing to assert that an alien, excluded from any part of her majesty's dominions by the executive government there, can maintain and action in a British court, and raise such question as were argued before their lordships on the present appeal,—whether the proper officer for giving or refusing access to the country has been duly authorized by his own colonial government, whether the colonial government has received sufficient delegated authority  **\*711** from the crown to exercise the authority which the crown had a right to exercise through the colonial government if properly communicated to it, and whether the crown has the right, without parliamentary authority, to exclude an alien. Their lordships cannot assent to the proposition that an alien refused permission to enter British territory can, in an action in a British court, compel the decision of such matters as these, involving delicate and difficult constitutional questions affecting the respective rights of the crown and parliament, and the relations of this country to her self governing colonies. When once it is admitted that there is no absolute and unqualified right of action on behalf of an alien refused admission to British territory, their lordships are of opinion that it would be impossible, upon the facts which the demurrer admits, for an alien to maintain an action.' Musgrove v. Chun Teeong Toy, [1891] App. Cas. 272, 282, 283.

The right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its

welfare, the question now before the court is whether the manner in which congress has exercised this right in sections 6 and 7 of the act of 1892 is consistent with the constitution.

The United States are a sovereign and independent nation, and are vested by the constitution with the entire control of international relations, and with all the powers of government necessary to maintain that control, and to make it effective. The only government of this country which other nations recognize or treat with is the government of the Union, and the only American flag known throughout the world is the flag of the United States.

The constitution of the United States speaks with no uncertain sound upon this subject. That instrument, established by the people of the United States as the fundamental law of the land, has conferred upon the president the executive power; has made him the commander in chief of the army and navy; has authorized him, by and with the consent of the  *712  senate, to make treaties, and to appoint ambassadors, public ministers, and consuls; and has made it his duty to take care that the laws be faithfully executed. The constitution has granted to congress the power to regulate commerce with foreign nations, including the entrance of ships, the importation of goods, and the bringing of persons into the ports of the United States; to establish a uniform rule of naturalization; to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations; to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water; to raise and support armies, to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces; and to make all laws necessary and proper for carrying into execution these powers, and all other powers vested by the constitution in the government of the United States, or in any department or officer thereof. And the several states are expressly forbidden to enter into any treaty, alliance, or confederation; to grant letters of marque and reprisal; to enter into any agreement or compact with another state, or with a foreign power; or to engage in war, unless actually invaded, or in such imminent danger as will not admit of delay.

In exercising the great power which the people of the United States, by establishing a written constitution as the supreme and paramount law, have vested in this court, of determining, whenever the question is properly brought before it, whether the acts of the legislature or of the executive are consistent with the constitution, it behooves the court to be careful that it does not undertake to pass upon political questions, the final decision of which has been committed by the constitution to the other departments of the government.

As long ago said by Chief Justice Marshall, and since constantly maintained by this court: 'The sound construction of the constitution must allow to the national legislature  **1022  that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the  *713  manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution; and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional.' 'Where the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretensions to such a power.' McCulloch v. Maryland, 4 Wheat. 316, 421, 423; Juilliard v. Greenman, 110 U. S. 421, 440, 450, 4 Sup. Ct. Rep. 122; Ex parte Yarbrough, 110 U. S. 651, 658, 4 Sup. Ct. Rep. 152; In re Rapier, 143 U. S. 110, 134, 12 Sup. Ct. Rep. 374; Logan v. U. S., 144 U. S. 263, 283, 12 Sup. Ct. Rep. 617.

The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of congress, and to be executed by the executive authority according to the regulations so established, except so far the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the constitution, to intervene.

In Nishimura Ekiu's Case, it was adjudged that, although congress might, if it saw fit, authorize the courts to investigate and ascertain the facts upon which the alien's right to land was made by the statutes to depend, yet congress might intrust the final determination of those facts to an executive officer; and that, if it did so, his order was due process of law, and no other tribunal,

AR.04594

unless expressly authorized by law to do so, was at liberty to re-examine the evidence on which he acted, or to controvert its sufficiency. 142 U. S. 660, 12 Sup. Ct. Rep. 336.

The power to exclude aliens, and the power to expel them, rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but parts of one and the same power.

The power of congress, therefore, to expel, like the power to exclude, aliens, or any specified class of aliens, from the **\*714** country, may be exercised entirely through executive officers; or congress may call in the aid of the judiciary to ascertain any contested facts on which an alien's right to be in the country has been made by congress to depend.

Congress, having the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain, has undoubtedly the right to provide a system of registration and identification of the members of that class within the country, and to take all proper means to carry out the system which it provides.

It is no new thing for the lawmaking power, acting either through treaties made by the president and senate, or by the more common method of acts of congress, to submit the decision of questions, not necessarily of judicial cognizance, either to the final determination of executive officers, or to the decision of such officers in the first instance, with such opportunity for judicial review of their action as congress may see fit to authorize or permit.

For instance, the surrender, pursuant to treaty stipulations, of persons residing or found in this country, and charged with crime in another, may be made by the executive authority of the president alone, when no provision has been made by treaty or by statute for an examination of the case by a judge or magistrate. Such was the case of Jonathan Robbins, under article 27 of the treaty with Great Britain of 1794, in which the president's power in this regard was demonstrated in the masterly and conclusive argument of John Marshall in the house of representatives. 8 Stat. 129; Whart. State Tr. 392; U. S. v. Nash, Bee, 286, 5 Wheat. append. 3. But provision may be made, as it has been by later acts of congress, for a preliminary examination before a judge or commissioner; and in such case the sufficiency of the evidence on which he acts cannot be reviewed by any other tribunal, except as permitted by statute. Act Aug. 12, 1848, c. 167, (9 Stat. 302:) Rev. St. §§ 5270–5274; Ex parte Metzger, 5 How. 176; Benson v. McMahon, 127 U. S. 457, 8 Sup. Ct. Rep. 1240; In re Luis Oteiza y Cortes, 136 U. S. 330, 10 Sup. Ct. Rep. 1031.

So claims to recover back duties illegally exacted on imports may, if congress so provides, be finally determined by the **\*715** secretary of the treasury. Cary v. Curtis, 3 How. 236; Curtis v. Fiedler, 2 Black, 461, 478, 479; Arnson v. Murphy, 109 U. S. 238, 240, 3 Sup. Ct. Rep. 184. But congress may, as it did for long periods, permit them to be tried by suit against the collector of customs; or it may, as by the existing statutes, provide for their determination by a board of general appraisers, and allow the decisions of that board to be reviewed by the courts in such particulars only as may be prescribed by law. Act June 10, 1890, c. 407, §§ 14, 15, 25, (26 Stat. 137, 138, 141;) In re Fassett, 142 U. S. 479, 486, 487, 12 Sup. Ct. Rep. 295; Passavant v. U. S., 148 U. S. 214, 13 Sup. Ct. Rep. 572.

To repeat the careful and weighty words uttered by Mr. Justice Curtis in delivering a unanimous judgment of this court upon the question what is due process of law: **\*\*1023** 'To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law or in equity or admiralty, nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters involving public rights, which may be presendt in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.' Murray v. Hoboken, etc., Co., 18 How. 272, 284.

Before examining in daitail the provisions of the act of 1892, now in question, it will be convenient to refer to the previous statutes, treaties, and decisions upon the subject.

The act of congress of July 27, 1868, c. 249, (re-enacted in sections 1999–2001, Rev. St.,) began with these recitals: 'Whereas, the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas, in the recognition of this principle this government has freely received emigrants from all nations, and invested them with the rights of citizenship.' It then declared that **\*716** any order or decision of any officer of the United States to the contrary was inconsistent with the fundamental principles of this government; enacted that 'all naturalized citizens of the United States, while in foreign states, shall be entitled to and shall receive from this government the same protection of persons and property that is accorded to native-born citizens in like situations and circumstances;' and made it the duty of the president to take measures to protect the rights in that respect of 'any citizen of the United States.' 15 Stat. 223, 224.

That act, like any other, is subject to alteration by congress whenever the public welfare requires it. The right of protection which it confers is limited to citizens of the United States. Chinese persons, not born in this country, have never been recognized as citizens of the United States, nor authorized to become such under the naturalization laws. Rev. St. (2d Ed.) §§ 2165, 2169; Acts April 14, 1802, c. 28, (2 Stat. 153;) May 26, 1824, c. 186, (4 Stat. 69;) July 14, 1870, c. 254, § 7, (16 Stat. 256;) Feb. 18, 1875, c. 80, (18 Stat. 318;) In re Ah Yup, 5 Sawy. 155; Act of May 6, 1882, c. 126, § 14, (22 Stat. 61.)

The treaty made between the United States and China on July 28, 1868, contained the following stipulations:

'Art. 5. The United States of America and the emperor of China cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from one country to the other, for purposes of curiosity, of trade, or as permanent residents.

'Art. 6. Citizens of the United States visiting or residing in China, * * * and, reciprocally, Chinese subjects visiting or residing in the United States, shall enjoy the same privileges, immunities, and exemptions, in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation. But nothing herein contained shall be held to confer naturalization upon citizens of the United States in China, nor upon the subjects of China in the United States.' 16 Stat. 740.

**\*717** After some years' experience under that treaty, the government of the United States was brought to the opinion that the presence within our territory of large numbers of Chinese laborers, of a distinct race and religion, remaining strangers in the land, residing apart by themselves, tenaciously adhering to the customs and usages of their own country, unfamiliar with our institutions, and apparently incapable of assimilating with our people, might endanger good order, and be injurious to the public interests, and therefore requested and obtained from China a modification of the treaty. Chew Heong v. U. S., 112 U. S. 536, 542, 543, 5 Sup. Ct. Rep. 255; Ping v. U. S., 130 U. S. 581, 595, 596, 9 Sup. Ct. Rep. 623.

On November 17, 1880, a supplemental treaty was accordingly concluded between the two countries, which contained the following preamble and stipulations:

'Whereas, the government of the United States, because of the constantly increasing immigration of Chinese laborers to the territory of the United States, and the embarrassments consequent upon such immigration, now desires to negotiate a modification of the existing treaties which shall not be in direct contravention of their spirit:

'Article 1. Whenever, in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country, or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit, or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable, and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such a **\*\*1024** character only as is

necessary to enforce the regulation, limitation, or suspension of immigration, and immigrants shall not be subject to personal maltreatment or abuse.

'Art. 2. Chinese subjects, whether proceeding to the  **\*718**  United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemption which are accorded to the citizens and subjects of the most favored nation.

'Art. 3. If Chinese laborers, or Chinese of any other class, now either permanently or temporarily residing in the territory of the United States, meet with ill treatment at the hands of any other persons, the government of the United States will exert all its power to devise measures for their protection, and to secure to them the same rights, privileges, immunities, and exemptions as may be enjoyed by the citizens or subjects of the most favored nation, and to which they are entitled by treaty.' 22 Stat. 826, 827.

The act of May 6, 1882, c. 126, entitled 'An act to execute certain treaty stipulations relating to Chinese,' and amended by the act of July 5, 1884, c. 220, began with the recital that, 'in the opinion of the government of the United States, the coming of Chinese laborers to this country endangers the good order of certain localities within the territories thereof;' and, in section 1, suspended their coming for 10 years, and enacted that it should 'not be lawful for any Chinese laborer to come from any foreign port or place, or, having so come, to remain within the United States;' in section 3, that this provision should not apply to Chinese laborers who were in the United States on November 17, 1880, or who came here within 90 days after the passage of the act of 1882, and who should produce evidence of that fact, as afterwards required by the act, to the master of the vessel and to the collector of the port; and, in section 4, that 'for the purpose of properly identifying Chinese laborers who were in the United States' at such time, 'and in order to furnish them with the proper evidence of their right to go from and come to the United States,' as provided by that act and by the treaty of November 17, 1880, the collector of customs of the district from which any Chinese laborers should depart from  **\*719**  the United States by sea should go on board the vessel, and make and register a list of them, with all facts necessary for their identification, and should give to each a corresponding certificate, which should entitle him 'to return to and re-enter the United States, upon producing and delivering the same to the collector of customs' to be canceled. The form of certificate prescribed by the act of 1884 differed in some particulars from that prescribed by the act of 1882, and the act of 1884 added that 'said certificate shall be the only evidence to establish his right of re-entry.' Each act further enacted, in section 5, that any such Chinese laborer, being in the United States, and desiring to depart by land, should be entitled to a like certificate of identity; and, in section 12, that no Chinese person should be permitted to enter the United States by land without producing such a certificate, and that 'any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came, and at the cost of the United States, after being brought before some justice, judge, or commissioner of a court of the United States, and found to be one not lawfully entitled to be or remain in the United States.' The act of 1884 further enacted, in section 16, that a violation of any of the provisions of the act, the punishment of which was not therein otherwise provided for, should be deemed a misdemeanor, and be punishable by fine not exceeding $1,000, or by imprisonment for not more than one year, or by both such fine and imprisonment. 22 Stat. 58–60; 23 Stat. 115–118.

Under those acts this court held, in  Chew Heong v. U. S., 112 U. S. 536,  5 Sup. Ct. Rep. 255, that the clause of section 4 of the act of 1884, making the certificate of identity the only evidence to establish a right to re-enter the United States, was not applicable to a Chinese laborer who resided in the United States at the date of the treaty of 1880, departed by sea before the passage of the act of 1882, remained out of the United States until after the passage of the act of 1884, and then returned by sea;

and in  U. S. v. Jung Ah Lung, 124 U. S. 621,  8 Sup. Ct. Rep. 663, that a Chinese laborer, who resided in the United  **\*720**  States at the date of the treaty of 1880, and until 1883, when he left San Francisco for China, taking with him a certificate of identity from the collector of the port in the form provided by the act of 1882, which was stolen from him in China, was entitled to land again in the United States in 1885, on proving by other evidence these facts, and his identity with the person described in the register kept by the collector of customs as the one to whom that certificate was issued.

Both those decisions proceeded upon a consideration of the various provisions of the acts of 1882 and 1884, giving weight to the presumption that they should not, unless unavoidably, be construed as operating retrospectively, or as contravening the

stipulations of the treaty. In the first of those cases Justices Field and Bradley, and in the second case Justices Field, Harlan, and Lamar, dissented from the judgment, being of opinion that the necessary construction of those acts was against the Chinese inborer, and in none of the opinions in either case was it suggested that the acts in questions, if **1025 construed as contended by the United States, and so as to contravene the treaty, would be unconstitutional or inoperative.

In our jurisprudence it is well settled that the provisions of an act of congress, passed in the exercise of its constitutional authority, on this, as on any other, subject, if clear and explicit, must be upheld by the courts, even in contravention of express stipulations in an earlier treaty. As was said by this court in Ping's Case, following previous decisions: 'The treaties were of no greater legal obligation than the act of congress. By the constitution, laws made in pursuance thereof, and treaties made under authority of the United States, are both declared to be the supreme law of the land, and no paramount authority is given to one over the other. A treaty, it is true, is in its nature a contract between nations, and is often merely promissory in its character, requiring legislation to carry its stipulations into effect. Such legislation will be open to future repeal or amendment. If the treaty operates by its own force, and relates to a subject within the power of congress, it can be deemed in that particular only the equivalent of a legislative act, to be repealed or modified *721 at the pleasure of congress. In either case the last expression of the sovereign will must control.' 'So far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country it is subject to such acts as congress may pass for its enforcement, modification, or repeal.' 130 U. S. 600, 9 Sup. Ct. Rep. 623. See, also, Foster v. Neilson, 2 Pet. 253, 314; Edye v. Robertson, 112 U. S. 580, 597–599, 5 Sup. Ct. Rep. 247; Whitney v. Robertson, 124 U. S. 190, 8 Sup. Ct. Rep. 456.

By the supplementary act of October 1, 1888, c. 1064, it was enacted, in section 1, that 'from and after the passage of this act it shall be unlawful for any Chinese laborer, who shall at any time heretofore have been, or who may now or hereafter be, a resident within the United States, and who shall have departed or shall depart therefrom, and shall not have returned before the passage of this act, to return to, or remain in, the United States;' and, in section 2, that 'no certificates of identity, provided for in the fourth and fifth sections of the act to which this is a supplement, shall hereafter be issued; and every certificate heretofore issued in pursuance thereof is hereby declared void and of no effect, and the Chinese laborer claiming admission by virtue thereof shall not be permitted to enter the United States.' 25 Stat. 504.

In the case of Ping, already often referred to, a Chinese laborer, who had resided in San Francisco from 1875 until June 2, 1887, when he left that port for China, having in his possession a certificate issued to him on that day by the collector of customs, according to the act of 1884, and in terms entitling him to return to the United States, returned to the same port on October 8, 188, and was refused by the collector permission to land, because of the provisions of the act of October 1, 1888, above cited. It was strongly contended in his behalf that by his residence in the United States for 12 years preceding June 2, 1887, in accordance with the fifth article of the treaty of 1868, he had now a lawful right to be in the United States, and had a vested right to return to the United States, which could not be taken from him by any exercise of mere legislative power by congress; *722 that he had acquired such a right by contract between him and the United States, by virtue of his acceptance of the offer contained in the acts of 1882 and 1884, to every Chinese person then here, if he should leave the country, complying with specified conditions, to permit him to return; that, as applied to him, the act of 1888 was unconstitutional, as being a bill of attainder and an ex post facto law; and that the depriving him of his right to return was punishment, which could not be inflicted except by judicial sentence. The contention was thus summed up at the beginning of the opinion: 'The validity of the act is assailed as being in effect an expulsion from the country of Chinese laborers, in violation of existing treaties between the United States and the government of China, and of rights vested in them under the laws of congress.' 130 U. S. 584–589, 9 Sup. Ct. Rep. 624.

Yet the court unanimously held that the statute of 1888 was constitutional, and that the action of the collector in refusing him permission to land was lawful; and, after the passages already quoted, said: 'The power of exclusion of foreigners being an incident of sovereignty belonging to the government of the United States, as a part of those sovereign powers delegated by the constitution, the right to its exercise at any time when, in the judgment of the government, the interests of the county require it, cannot be granted away or restrained on behalf of any one. The powers of government are delegated in trust to the United States, and are incapable of transfer to any other parties. They cannot be abandoned or surrendered. Nor can their exercise be hampered, when needed for the public good, by any considerations of private interest. The exercise of these public trusts is not the subject

of barter or contract. Whatever license, therefore, Chinese laborers may have obtained, previous to the act of October 1, 1888, to return to the United States after their departure, is held at the will of the government, revocable at any time, at its pleasure.' 'The rights and interests created by a treaty, which have become so vested that its expiration or abrogation will not destroy or impair them, are such as are connected with and lie in property, capable **1026 of sale and transfer or other *723 disposition; not such as are personal and untransferable in their character.' 'But far different is this case, where a continued suspension of the exercise of a governmental power is insisted upon as a right, because, by the favor and consent of the government, it has not heretofore been exerted with respect to the appellant, or to the class to which he belongs. Between property rights not affected by the termination or abrogation of a treaty, and expectations of benefits from the continuance of existing legislation, there is as wide a difference as between realization and hopes.' 130 U. S. 609, 610, 9 Sup. Ct. Rep. 631.

It thus appears that in that case it was directly adjudged, upon full argument and consideration, that a Chinese laborer, who had been admitted into the United States while the treaty of 1868 was in force, by which the United States and China 'cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from one country to the other,' not only for the purpose of curiosity or of trade, but 'as permanent residents,' and who had continued to reside here for 12 years, and who had then gone back to China, after receiving a certificate, in the form provided by act of congress, entitling him to return to the United States, might be refused readmission into the United States, without judicial trial or hearing, and simply by reason of another act of congress, passed during his absence, and declaring all such certificates to be void, and prohibiting all Chinese laborers who had at any time been residents in the United States, and had departed therefrom and not returned before the passage of this act, from coming into the United States.

In view of that decision, which, as before observed, was a unanimous judgment of the court, and which had the concurrence of all the justices who had delivered opinions in the cases arising under the acts of 1882 and 1884, it appears to be impossible to hold that a Chinese laborer acquired, under any of the treaties or acts of congress, any right, as a denizen, or otherwise, to be and remain in this country, except by the license, permission, and sufferance of congress, to be withdrawn, *724 whenever, in its opinion, the public welfare might require ti.

By the law of nations, doubtless, aliens residing in a country, with the intention of making it a permanent place of abode, acquire, in one sense, a domicile there; and, while they are permitted by the nation to retain such a residence and domicile, are subject to its laws, and may invoke its protection against other nations. This is recognized by those publicists who, as has been seen, maintain in the strongest terms the right of the nation to expel any or all aliens at its pleasure. Vatt. Law Nat. lib. 1, c. 19, § 213; 1 Phillim. Int. Law, c. 18, § 321; Mr Marcy, in Koszta's Case, 2 Whart. Int. Law Dig. § 198. See, also, Law Ow Bew v. U. S., 144 U. S. 47, 62, 12 Sup. Ct. Rep. 517; Merl. Repert. 'Domicile,' § 13, quoted in the case above cited, of In re Adam, 1 Moore, P. C. (N. S.) 460, 472, 473.

Chinese laborers, therefore, like all other aliens residing in the United States for a shorter or longer time, are entitled, so long as they are permitted by the government of the United States to remain in the country, to the safeguards of the constitution, and to the protection of the laws, in regard to their rights of person and of property, and to their civil and criminal responsibility. But they continue to be aliens, having taken no steps towards becoming citizens, and incapable of becoming such under the naturalization laws; and therefore remain subject to the power of congress to expel them, or to order them to be removed and deported from the country, whenever, in its judgment, their removal is necessary or expedient for the public interest.

Nothing inconsistent with these views was decided or suggested by the court in Chy Lung v. Freeman, 92 U. S. 275, or in Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. Rep. 1064, cited for the appellants.

In Chy Lung v. Freeman, a statute of the state of California, restricting the immigration of Chinese persons, was held to be unconstitutional and void, because it contravened the grant in the constitutional congress of the power to regulate commerce with foreign nations.

**\*725** In Yick Wo v. Hopkins the point decided was that the fourteenth amendment of the constitution of the United States, forbidding any state to deprive any person of life, liberty, or property without due process of law, or to deny to any person within its jurisdiction the equal protection of the laws, was violated by a municipal ordinance of San Francisco, which conferred upon the board of supervisors arbitrary power, without regard to competency of persons or to fitness of places, to grant or refuse licenses to carry on public laundries, and which was executed by the supervisors by refusing licenses to all Chinese residents, and granting them to other persons under like circumstances. The question there was of the power of a state over aliens continuing to reside within its jurisdiction, not of the power of the United States to put an end to their residence in the country.

The act of May 5, 1892, c. 60, is entitled 'An act to prohibit the coming of Chinese persons into the United States;' and provides, in section 1, that 'all laws now in force, prohibiting and regulating the coming into this country of Chinese persons and persons of Chinese descent, are hereby continued in force for a period of ten years from the passage of this act.'

**\*\*1027** The rest of the act (laying aside, as immaterial, section 5, relating to an application for a writ of habeas corpus 'by a Chinese person seeking to land in the United States, to whom that privilege has been denied') deals with two classes of Chinese persons: First, those 'not entitled to be or remain in the United States;' and, second, those 'entitled to remain in the United States.' These words of description neither confer nor take away any right, but simply designate the Chinese persons who were not, or who were, authorized or permitted to remain in the United States under the laws and treaties existing at the time of the passage of this act, but subject, nevertheless, to the power of the United States, absolutely or conditionally, to withdraw the permission, and to terminate the authority to remain.

Sections 2–4 concern Chinese 'not lawfully entitled to be or remain in the United States,' and provide that, after trial **\*726** before a justice, judge, or commissioner, a 'Chinese person, or person of Chinese descent, convicted and adjudged to be not lawfully entitled to be or remain in the United States,' shall be imprisoned at hard labor for not more than a year, and be after wards removed to China, or other country of which he appears to be a citizen or subject.

The subsequent sections relate to Chinese laborers 'entitled to remain in the United States' under previous laws. Sections 6 and 7 are the only sections which have any bearing on the cases before us, and the only ones, therefore, the construction or effect of which need now be considered.

The manifest objects of these sections are to provide a system of registration and identification of such Chinese laborers, to require them to obtain certificates of residence, and, if they do not do so within a year, to have them deported from the United States.

Section 6, in the first place, provides that 'it shall be the duty of all Chinese laborers, within the limits of the United States at the time of the passage of this act, and who are entitled to remain in the United States, to apply to the collector of internal revenue of their respective districts, within one year after the passage of this act, for a certificate of residence.' This provision, by making it the duty of the Chinese laborer to apply to the collector of internal revenue of the district for a certificate, necessarily implies a correlative duty of the collector to grant him a certificate, upon due proof of the requisite facts. What this proof shall be is not defined in the statute, but is committed to the supervision of the secretary of the treasury by section 7, which directs him to make such rules and regulations as may be necessary for the efficient execution of the act, to prescribe the necessary forms, and to make such provisions that certificates may be procured in localities convenient to the applicants, and without charge to them; and the secretary of the treasury has, by such rules and regulations, provided that the fact of residence shall be proved by 'at least one credible witness of good character,' or, in case of necessity, by other proof. The statute and the regulations, in order to make sure that every such Chinese **\*727** laborer may have a certificate, in the nature of a passport, with which he may go into any part of the United States, and that the United States may preserve a record of all such certificates issued, direct that a duplicate of each certificate shall be recorded in the office of the collector who granted it, and may be issued to the laborer upon proof of loss or destruction of his original certificate. There can be no doubt of the validity of these provisions and regulations, unless they are invalidated by the other provisions of section 6.

13 S.Ct. 1016, 37 L.Ed. 905

This section proceeds to enact that any Chinese laborer within the limits of the United States, who shall neglect, fail, or refuse to apply for a certificate of residence within the year, or who shall afterwards be found within the jurisdiction of the United States without such a certificate, 'shall be deemed and adjudged to be unlawfully within the United States.' The meaning of this clause, as shown by those which follow, is not that this fact shall thereupon be held to be conclusively established against him, but only that the want of a certificate shall be prima facie evidence that he is not entitled to remain in the United States; for the section goes on to direct that he 'may be arrested by any customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge;' and that it shall thereupon be the duty of the judge to order that the laborer 'be deported from the United States' to China, (or to any other country which he is a citizen or subject of, and which does not demand any tax as a condition of his removal to it,) 'unless he shall establish clearly, to the satisfaction of said judge, that by reason of accident, sickness, or other unavoidable cause he has been unable to procure his certificate, and to the satisfaction of the court, and by at least one credible white witness, that he was a resident of the United States at the time of the passage of this act; and if, upon the hearing, if shall appear that he is so entitled to a certificate, it shall be granted upon his paying the cost. Should it appear that said Chinaman had procured a certificate which has been lost or destroyed, he shall be detained, and judgment suspended a reasonable time, to enable him to procure a duplicate from the  **728**  officer granting it; and in such cases the cost of said arrest and trial shall be in the discretion of the court.'

For the reasons stated in the earlier part of this opinion, congress, under the power to exclude or expel aliens, might have directed any Chinese laborer found in the United States without a certificate of residence  **\*\*1028**  to be removed out of the country be executive officers, without judicial trial or examination, just as it might have authorized such officers absolutely to prevent his entrance into the country. But congress has not undertaken to do this.

The effect of the provisions of section 6 of the act of 1892 is that, if a Chinese laborer, after the opportunity afforded him to obtain a certificate of residence within a year, at a convenient place, and without cost, is found without a certificate, he shall be so far presumed to be not entitled to remain within the United States that an officer of the customs, or a collector of internal revenue, or a marshal, or a deputy of either, may arrest him, not with a view to imprisonment or punishment, or to his immediate deportation without further inquiry, but in order to take him before a judge, for the purpose of a judicial hearing and determination of the only facts which, under the act of congress, can have a material bearing upon the question whether he shall be sent out of the country, or be permitted to remain.

The powers and duties of the executive officers named being ordinarily limited to their own districts, the reasonable inference is that they must take him before a judge within the same judicial district; and such was the course pursued in the cases before us.

The designation of the judge, in general terms, as 'a United States judge,' is an apt and sufficient description of a judge of a court of the United States, and is equivalent to or synonymous with the designation, in other statutes, of the judges authorized to issue writs of habeas corpus, or warrants to arrest persons accused of crime. Rev. St. §§ 752, 1014.

When, in the form prescribed by law, the executive officer, acting in behalf of the United States, brings the Chinese laborer before the judge, in order that he may be heard, and  **\*729**  the facts upon which depends his right to remain in the country be decided, a case is duly submitted to the judicial power; for here are all the elements of a civil case,—a complainant, a defendant, and a judge,—actor, reus, et judex. 3 Bl. Comm. 25;  Osborn v. Bank, 9 Wheat. 738, 819. No formal complaint or pleadings are required, and the want of them does not affect the authority of the judge or the validity of the statute.

If no evidence is offered by the Chinaman, the judge makes the order of deportation as upon a default. If he produces competent evidence to explain the fact of his not having a certificate, it must be considered by the judge; and if he thereupon appears to be entitled to a certificate, it is to be granted to him. If he proves that the collector of internal revenue has unlawfully refused to give him a certificate, he proves an 'unavoidable cause,' within the meaning of the act, for not procuring one. If he proves that he had procured a certificate, which has been lost or destroyed, he is to be allowed a reasonable time to procure a duplicate thereof.

The provision which puts the burden of proof upon him of rebutting the presumption arising from his having no certificate, as well as the requirement of proof 'by at least one credible white witness that he was a resident of the United States at the

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

time of the passage of this act,' is within the acknowledged power of every legislature to prescribe the evidence which shall be received, and the effect of that evidence, in the courts of its own government. Ogden v. Saunders, 12 Wheat. 213, 262, 349; Pillow v. Roberts, 13 How. 472, 476; Cliquot's Champagne, 3 Wall. 114, 143; Ex parte Fisk, 113 U. S. 713, 721, 5 Sup. Ct. Rep. 724; Holmes v. Hunt, 122 Mass. 505, 516–519. The competency of all witnesses, without regard to their color, to testify in the courts of the United States, rests on acts of congress, which congress may, at its discretion, modify or repeal. Rev. St. §§ 858, 1977. The reason for requiring a Chinese alien, claiming the privilege of remaining in the United States, to prove the fact of his residence here at the time of the passage of the act 'by at least one credible white witness,' may have been the experience of congress, as **730** mentioned by Mr. Justice Field in Ping's Case, that the enforcement of former acts, under which the testimony of Chinese persons was admitted to prove similar facts, 'was attended with great embarrassment, from the suspicious nature, in many instances, of the testimony offered to establish the residence of the parties, arising from the loose notions entertained by the witnesses of the obligation of an oath.' 130 U. S. 598, 9 Sup. Ct. Rep. 627. And this requirement, not allowing such a fact to be proved solely by the testimony of aliens in a like situation, or of the same race, is quite analogous to the provision, which has existed for 77 years in the naturalization laws, by which aliens applying for naturalization must prove their residence within the limits and under the jurisdiction of the United States, for five years next preceding, 'by the oath or affirmation of citizens of the United States.' Acts March 22, 1816, c. 32, § 2, (3 Stat. 259;) May 24, 1828, c. 116, § 2, (4 Stat. 311;) Rev. St. § 2165, cl. 6; 2 Kent, Comm. 65.

The proceeding before a United States judge, as provided for in section 6 of the act of 1892, is in no proper sense a trial and sentence for a crime or offense. It is simply the ascertainment, by appropriate and lawful means, of the fact whether the conditions exist upon which congress has enacted that an alien of this class may remain within the country. The order of deportation is not a punishment for crime. It is not a **1029** banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment. It is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority, and through the proper departments, has determined that his continuing to reside here shall depend. He has not, therefore, been deprived of life, liberty, or property without due process of law; and the provisions of the constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures and cruel and unusual punishments, have no application.

 **731** The question whether, and upon what conditions, these aliens shall be permitted to remain within the United States being one to be determined by the political departments of the government, the judicial department cannot properly express an opinion upon the wisdom, the policy, or the justice of the measures enacted by congress in the exercise of the powers confided to it by the constitution over this subject.

The three cases now before us do not differ from one another in any material particular.

In the first case the petitioner had wholly neglected, failed, and refused to apply to the collector of internal revenue for a certificate of residence, and, being found without such a certificate after a year from the passage of the act of 1892, was arrested by the United States marshal, with the purpose, as the return states, of taking him before a United States judge within the district; and thereupon, before any further proceeding, sued out a writ of habeas corpus.

In the second case the petitioner had likewise neglected, failed, and refused to apply to the collector of internal revenue for a certificate of residence, and, being found without one, was arrested by the marshal, and taken before the district judge of the United States, who ordered him to be remanded to the custody of the marshal, and to be deported from the United States, in accordance with the provisions of the act. The allegation in the petition that the judge's order was made 'without any hearing of any kind' is shown to be untrue by the recital in the order itself (a copy of which is annexed to and made part of the petition) that he had failed to clearly establish to the judge's satisfaction that by reason of accident, sickness, or other unavoidable cause he had been unable to procure a certificate, or that he had procured one, and it had been lost or destroyed.

In the third case the petitioner had, within the year, applied to a collector of internal revenue for a certificate of residence, and had been refused it, because he produced, and could produce, none but Chinese witnesses, to prove the residence necessary to entitle him to a certificate. Being found without a certificate of residence, he was arrested by the **\*732** marshal, and taken before the United States district judge, and established to the satisfaction of the judge that, because of the collector's refusal to give him a certificate of residence, he was without one by an unavoidable cause; and also proved, by a Chinese witness only, that he was a resident of the United States at the time of the passage of the act of 1892. Thereupon the judge ordered him to be remanded to the custody of the marshal, and to be deported from the United States, as provided in that act.

It would seem that the collector of internal revenue, when applied to for a certificate, might properly decline to find the requisite fact of residence upon testimony which, by an express provision of the act, would be insufficient to prove that fact at a hearing before the judge. But if the collector might have received and acted upon such testimony, and did, upon any ground, unjustifiably refuse a certificate of residence, the only remedy of the applicant was to prove by competent and sufficient evidence at the hearing before the judge the facts requisite to entitle him to a certificate. To one of those facts—that of residence—the statute, which, for the reasons already stated, appears to us to be within the constitutional authority of congress to enact, peremptorily requires at that hearing the testimony of a credible white witness; and it was because no such testimony was produced that the order of deportation was made.

Upon careful consideration of the subject, the only conclusion which appears to us to be consistent with the principles of international law, with the constitution and laws of the United States, and with the previous decisions of this court, is that in each of these cases the judgment of the circuit court dismissing the writ of habeas corpus is right, and must be affirmed.

Mr. Justice BREWER, dissenting.

I dissent from the opinion and judgment of the court in these cases, and, the questions being of importance, I deem it not improper to briefly state my reasons therefor.

**\*733** I rest my dissent on three propositions: First, that the persons against whom the penalties of section 6 of the act of 1892 are directed are persons lawfully residing within the United States; secondly, that as such they are within the protection of the constitution, and secured by its guaranties against oppression and wrong; and, third, that section 6 deprives them of liberty, and imposes punishment, without due process of law, and in disregard of constitutional guaranties, especially those found in the 4th, 5th, 6th, and 8th articles of the amendments.

**\*\*1030** And, first, these persons are lawfully residing within the limits of the United States. By the treaty of July 28, 1868, (16 Stat. 740,) commonly known as the 'Burlingame Treaty,' it was provided, (article 5:) 'The United States of America and the emperor of China cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from the one country to the other, for purposes of curiosity, of trade, or as permanent residents.' And, (article 6:) 'Citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities, or exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation; and, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation.' At that time we sought Chinese emigration. The subsequent treaty of November 17, 1880, (22 Stat. 826,) which looked to a restriction of Chinese emigration, nevertheless contained, in article 2, this provision:

'Art. 2. Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, **\*734** and exemptions which are accorded to the citizens and subjects of the most favored nation.'

While, subsequently to this treaty, congress passed several acts—May 6, 1882, (22 Stat. 58;) July 5, 1884, (23 Stat. 115;) October 1, 1888, (25 Stat. 504)—to restrict the entrance into this country of Chinese laborers, and while the validity of this restriction was sustained in the Chinese Exclusion Case, 130 U. S. 581, 9 Sup. Ct. Rep. 623, yet no act has been passed, denying the right of those laborers who had once lawfully entered the country to remain, and they are here not as travelers, or only temporarily. We must take judicial notice of that which is disclosed by the census, and which is also a matter of common knowledge. There are 100,000 and more of these persons living in this country, making their homes here, and striving by their labor to earn a livelihood. They are not travelers, but resident aliens.

But, further, this section 6 recognizes the fact of a lawful residence, and only applies to those who have such; for the parties named in the section, and to be reached by its provisions, are 'Chinese laborers within the limits of the United States at the time of the passage of this act, and who are entitled to remain in the United States.' These appellants, therefore, are lawfully within the United States, and are here as residents, and not as travelers. They have lived in this country, respectively, since 1879, 1877, and 1874,—almost as long a time as some of those who were members of the congress that passed this act of punishment and expulsion.

That those who have become domiciled in a country are entitled to a more distinct and larger measure of protection than those who are simply passing through, or temporarily in, it, has long been recognized by the law of nations. It was said by this court in the case of The Venus, 8 Cranch, 253, 278: 'The writers upon the law of nations distinguish between a temporary residence in a foreign country, for a special purpose, and a residence accompanied with an intention to make it a permanent place of abode. The latter is styled by Vattel 'domicile,' which he defines to be 'a habitation fixed in any place, with an intention of always staying there.' Such **735** a person, says this author, becomes a member of the new society, at least as a permanent inhabitant, and is a kind of citizen of the inferior order from the native citizens; but is, nevertheless, united and subject to the society, without participating in all its advantages. This right of domicile, he continues, is not established unless the person makes sufficiently known his intention of fixing there, either tacitly or by an express declaration. Vatt. Law Nat. pp. 92, 93. Grotius nowhere uses the word 'domicile,' but he also distinguishes between those who stay in a foreign country by the necessity of their affairs, or from any other temporary cause, and those who reside there from a permanent cause. The former he denominates 'strangers,' and the latter, 'subjects.'' The rule is thus laid down by Sir Robert Phillimore: 'There is a class of persons which cannot be, strictly speaking, included in either of these denominations of naturalized or native citizens, namely, the class of those who have ceased to reside in their native country, and have taken up a permanent abode in another. These are domiciled inhabitants. They have not put on a new citizenship through some formal mode enjoined by the law or the new country. They are de facto, though not de jure, citizens of the country of their domicile.' 1 Phillim. Int. Law, c. 18, p. 347.

In the Koszta Case it was said by Secretary Marcy: 'This right to protect persons having a domicile, though not nativeborn or naturalized citizens, rests on the firm foundation of justice, and the claim to be protected is earned by considerations which the protecting power is not at liberty to disregard. Such domiciled citizen pays the same price for his protection as nativeborn or naturalized citizens pay for theirs. He is under the bonds of allegiance to the **1031** country of his residence, and, if he breaks them, incurs the same penalties. He owes the same obedience to the civil laws. His property is in the same way, and to the same extent, as theirs, liable to contribute to the support of the government. In nearly all respects his and their condition as to the duties and burdens of government are undistinguishable.' 2 Whart. Int. Law Dig. § 198.

**736** And in Lau Ow Bew v. U. S., 144 U. S. 47, 61, 12 Sup. Ct. Rep. 521, this court declared that, 'by general international law, foreigners who have become domiciled in a country other than their own acquire rights, and must discharge duties, in many respects the same as possessed by and imposed upon the citizens of the country, and no restriction on the footing upon which such persons stand, by reason of their domicile, is to be presumed.'

Indeed, there is force in the contention of counsel for appellants that these persons are 'denizens,' within the true meaning and spirit of that word as used in the common law. The old definition was this:

'A denizen of England by letters patent for life, entayl or in fee, whereby he becomes a subject in regard of his person.' Craw v. Ramsey, Vaughan, 278.

And again:

'A denizen is an alien born, but who has obtained ex donatione regis letters patent to make him an English subject. * * * A denizen is in a kind of middle state between an alien and a natural-born subject, and partakes of both of them.' 1 Bl. Comm. 374.

In respect to this, after quoting from some of the early constitutions of the states, in which the word 'denizen' is found, counsel say: 'It is claimed that the appellants in this case come completely within the definition quoted above. They are alien born, but they have otained the same thing as letters patent from this country. They occupy a middle state between an alien and a native. They partake of both of them. They cannot vote, or, as it is stated in Bacon's Abridgment, they have no 'power of making laws,' as a native-born subject has, nor are they here as ordinary aliens. An ordinary alien within this country has come here under no prohibition and no invitation, but the appellants have come under the direct request and invitation, and under the 'patent,' of the federal government. They have been guarantied 'the same privileges, immunities, and exemptions in respect to * * * residence' (Burlingame Treaty, concluded July 28, 1868) as that enjoyed in the United States by the citizens and **\*737** subjects of the most favored nation. They have been told that if they would come here they would be treated just the same as we treat an Englishman, an Irishman, or a Frenchman. They have been invited here, and their position is much stronger than that of an alien, in regard to whom there is no guaranty from the government, and who has come not in response to any invitation, but has simply drifted here because there is no prohibition to keep him out. They certainly come within the meaning of 'denizen,' as used in the constitutions of the states.'

But, whatever rights a resident alien might have in any other nation, here he is within the express plotection of the constitution, especially in respect to those guaranties which are declared in the original amendments. It has been repeated so often as to become axiomatic that this government is one of enumerated and delegated powers; and, as deciared in article 10 or the amendments, 'the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states, respectively, or to the people.'

It is said that the power here asserted is inherent in sovereignty. This doctrine of powers inherent in sovereignty is one both indefinite and dangerous. Where are the limits to such powers to be found, and by whom are they to be pronounced? Is it within legislative capacity to declare the limits? If so, then the mere assertion of an inherent power creates it, and despotism exists. May the courts establish the boundaries? Whence do they obtain the authority for this? Shall they took to the practices of other nations to ascertain the limits? The governments of other nations have elastic powers. Ours are fixed and bounded by a written constitution. The expulsion of a race may be within the inherent powers of a despotism. History, before the adoption of this constitution, was not destitute of examples of the exercise of such a power; and its framers were familiar with history, and wisely, and it seems to me, they gave to this government no general power to banish. Banishment may be resorted to as punishment for crime; but **\*738** among the powers reserved to the people, and not delegated to the government, is that of determining whether whole classes in our midst shall, for no crime but that of their race and birthplace, be driven from our territory.

Whatever may be true as to exclusion,—and as to that see Chinese Exclusion Case, 130 U. S. 581, 9 Sup. Ct. Rep. 623, and Nishimura Ekiu v. United States, 142 U. S. 651, 12 Sup. Ct. Rep. 336,—I deny that there is any arbitrary and unrestrained power to banish residents, even resident aliens. What, it may be asked, is the reason for any difference? The answer is obvious. The constitution has no extraterritorial effect, and those who have not come lawfully within our territory cannot claim any protection from its provisions; and it may be that the national government, having full **\*\*1032** control of all matters relating to other nations, has the power to build, as it were, a Chinese wall around our borders, and absolutely forbid alidens to enter. But the constitution has potency everywhere within the limits of our territory, and the powers which the national government may exercise within such limits are those, and only those, given to it by that instrument. Now, the power to remove resident aliens is, confessedly, not expressed. Even if it be among the powers implied, yet still it can be exercised only in subordination to the limitations and restrictions imposed by the constitution. In the case of Monongahela Navigation Company v. United States,

AR.04605

148 U. S. 312, 336, 13 Sup. Ct. Rep. 630, it was said: 'But, like the other powers granted to congress by the constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the fifth amendment we have heretofore quoted. Congress has supreme control over the regulation of commerce; but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by this fifth amendment, and can take only on payment of just compensation.' And, if that be true of the powers expressly granted, it must a certainly be true of those that are only granted by implication.

When the first 10 amendments were presented for adoption, **\*739** they were preceded by a preamble stating that the conventions of many states had at the time of their adopting the constitution expressed a desire, 'in order to prevent misconception or abuse of its powers, that further declaratory and restrictive clauses should be added.' It is worthy of notice that in them the word 'citizen' is not found. In some of them the descriptive word is 'people,' but in the fifth it is broader, and the word is 'person,' and in the sixth it is the 'accused,' while in the third, seventh, and eighth there is no limitation as to the beneficiaries suggested by any descriptive word.

In the case of Yick Wo v. Hopkins, 118 U. S. 356, 369, 6 Sup. Ct. Rep. 1070, it was said: 'The fourteenth amendment of the constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.' The matter considered in that case was of a local nature, a municipal ordinance for regulating the carrying on of public laundries, something fairly within the police power of a state; and yet, because its previous conflicted with the guaranties of the fourteenth amendment, the ordinance was declared void.

If the use of the word 'person' in the fourteenth amendment protects all individuals lawfully within the state, the use of the same word, 'person,' in the fifth must be equally comprehensive, and secures to all persons lawfully within the territory of the United States the protection named therein; and a like conclusion must follow as to the sixth.

I pass, therefore, to the consideration of my third proposition: Section 6 deprives of 'life, liberty, and property without due process of law.' It imposes punishment without a trial, and punishment cruel and severe. It places the liberty of one individual subject to the unrestrained control of **\*740** another. Notice its provisions: It first commands all to register. He who does not register violates that law, and may be punished; and so the section goes on to say that one who has not complied with its requirements, and has no certificate of residence, 'shall be deemed and adjudged to be unlawfully within the United States,' and then it imposes as a penalty his deportation from the country. Deportation is punishment. It involves—First, an arrest, a deprival of liberty; and, second, a removal from home, from family, from business, from property. In 1 Rap. & L. Law Dict. p. 109, 'banishment' is thus defined: 'A punishment by forced exile, either for years or for life, inflicted principally upon political offenders; 'transportation' being the word used to express a similar punishment of ordinary criminals.' In 4 Bl Comm. 377, it is said: 'Some punishments consist in exile or banishment, by abjuration of the realm, or transportation.' In Vattel we find that 'banishment is only applied to condemnation in due course of law.' Note to section 228 in 1 Vattel.

But it needs no citation of authorities to support the proposition that deportation is punishment. Every one knows that to be forcibly taken away from home and family and friends and business and property, and sent across the ocean to a distant land, is punishment, and that oftentimes most severe and cruel. Apt and just are the words of one of the framers of this constitution,— President Madison,—when he says, (4 Elliot Deb. 555:) 'If the banishment of an alien from a country into which he has been invited as the asylum most auspicious to his happiness,—a country where he may have formed the most tender connections; where he may have invested his entire property, and acquired property of the real and permanent, as well as the movable and temporary, kind; where he enjoys, under the laws, a greater share of the blessings of personal security and personal liberty than he **\*\*1033** can elsewhere hope for; \* \* \* if, moreover, in the execution of the sentence against him, he is to be exposed, not only to the ordinary dangers of the sea, but to the peculiar casualties incident to a crisis of war and of unusual licentiousness on **\*741** that element, and possibly to vindictive purposes, which his immigration itself may have provoked,—if a banishment

13 S.Ct. 1016, 37 L.Ed. 905

of this sort be not a punishment, and among the severest of punishments, it will be difficult to imagine a doom to which the name can be applied.'

But punishment implies a trial: 'No person shall be deprived of life, liberty, or property without due process of law.' Due process requires that a man be heard before he is condemned, and both heard and condemned in the due and orderly procedure of a trial, as recognized by the common law from time immemorial. It was said by this court in Hagar v. Reclamation Dist. No. 108, 111 U. S. 701, 708, 4 Sup. Ct. Rep. 667: 'Undoubtedly, where life and liberty are involved, due process requires that there be a regular course of judicial proceedings, which imply that the party to be affected shall have notice, and an opportunity to be heard.' And by Mr. Justice Bradley, in defining 'due process of law' in Davidson v. New Orleans, 96 U. S. 97, 107: 'If found to be suitable or admissible in the special case, it will be adjudged to be 'due process of law;' but if found to be arbitrary, oppressive, and unjust, it may be declared to be not 'due process of law.'' And no person who has once come within the protection of the constitution can be punished without a trial. It may be summary, as for petty offenses and in cases of contempt, but still a trial, as known to the common law. It is said that a person may be extradited without a previous trial, but extradition is simply one step in the process of arresting and securing for trial. He may be removed by extradition from California to New York, or from this country to another, but such proceeding is not oppressive or unjust, but suitable and necessary, and therefore due process of law. But here the Chinese are not arrested and extradited for trial, but arrested, and, without a trial, punished by banishment.

Again, it is absolutely within the discretion of the collector to give or refuse a certificate to one who applies therefor. Nowhere is it provided what evidence shall be furnished to the collector, and nowhere is it made mandatory upon him to grant a certificate on the production of such evidence. It cannot   *742   be due process of law to impose punishment on any person for failing to have that in his possession, the possession of which he can obtain only at the arbitrary and unregulated discretion of any official. It will not do to say that the presumption is that the official will act reasonably, and not arbitrarily. When the right to liberty and residence is involved, some other protection than the mere discretion of any official is required. Well was it said by Mr. Justice Matthews in the case of Yick Wo v. Hopkins, 118 U. S., on page 369, 6 Sup. Ct. Rep., on page 1071: 'When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.'

Again, a person found without such certificate may be taken before a United States judge. What judge? A judge in the district in which the party resides or is found? There is no limitation in this respect. A Chinese laborer in San Francisco may be arrested by a deputy United States marshal, and taken before a judge in Oregon; and, when so taken before that judge, it is made his duty to deport such laborer, unless he proves his innocence of any violation of the law, and that, too, by at least one credible white witness. And how shall he obtain that witness? No provision is made in the statute therefor. Will it be said that article 6 of the amendments gives to the accused a right to have a compulsory process for obtaining witnesses in his favor? The reply is that if he is entitled to one part of that article he is entitled to all, and among them is the right to a speedy and public trial by an impartial jury of the state and district. The only theory upon which this proceeding can be sustained is that he has no right to any benefits of this article 6; and if he has no right thereto, and the statute has made no provision for securing his witnesses, or limiting the proceeding to a judge of the district where he resides, the results follow inevitably, as stated, that he may be arrested by any one of the numerous officials named in the statute, and carried before any judge in   *743   the United States that such official may select, and then, unless he proves that which he is given no means of proving, be punished by removal from home, friends, family, property, business, to another country.

It is said that these Chinese are entitled while they remain to the safeguards of the constitution, and to the protection of the laws in regard to their rights of person and of property, but that they continue to be aliens, subject to the absolute power of congress to forcibly remove them. In other words, the guaranties of 'life, liberty, and property,' named in the constitution, are theirs by sufferance, and not of right. Of what avail are such guaranties?

Once more: Supposing a Chinaman from San Francisco, having obtained a certificate, should go to New York or other place in pursuit of work, and on the way his certificate be lost or destroyed. He is subject to arrest and detention, the cost of which is in

the discretion of the court, and judgment of **1034 deportation will be suspended a reasonable time to enable him to obtain a duplicate from the officer granting it. In other words, he cannot move about in safety without carrying with him this certificate. The situation was well described by Senator Sherman in the debate in the senate: 'They are here ticket-of-leave men. Precisely as, under the Australian law, a convict is allowed to go at large, upon a ticket-of-leave, these people are to be allowed to go at large, and earn their livelihood, but they must have their tickets-of-leave in their possession.' And he added: 'This inaugurates in our system of government a new departure; one, I believe, never before practiced, although it was suggested in conference that some such rules had been adopted in slavery times to secure the peace of society.'

It is true this statute is directed only against the obnoxious Chinese, but, if the power exists, who shall say it will not be exercised to-morrow against other classes and other people? If the guaranties of these amendments can be thus ignored in order to get rid of this distasteful class, what security have others that a like disregard of its provisions may not be resorted to? Profound and wise were the *744 observations of Mr. Justice Bradley, speaking for the court in Boyd v. U. S., 116 U. S. 616, 635, 6 Sup. Ct. Rep. 535: 'Illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches, and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be, 'obsta principiis."

In the Yick Wo Case, in which was presented a municipal ordinance fair on its face, but contrived to work oppression to a few engaged in a single occupation, this court saw no difficulty in finding a constitutional barrier to such injustice. But this greater wrong, by which a hundred thousand people are subject to arrest and forcible deportation from the country, is beyond the reach of the protecting power of the constitution. Its grievous wrong suggests this declaration of wisdom coming from the dawn of English history: 'Verily, he who dooms a worse doom to the friendless and the comer from afar than to his fellow, injures himself.' The Laws of King Cnut, 1 Thorp, Anc. Laws Eng. p. 397.

In view of this enactment of the highest legislative body of the foremost Christian nation, may not the thoughtful Chinese disciple of Confucius fairly ask, 'Why do they send missionaries here?'

Mr. Justice FIELD, dissenting.

I also wish to say a few words upon these cases, and upon the extraordinary doctrines announced in support of the orders of the court below.

*745 With the treaties between the United States and China, and the subsequent legislation adopted by congress to prevent the immigration of Chinese laborers into this country, resulting in the exclusion act of October 1, 1888, the court is familiar. They have often been before us, and have been considered in almost every phase. The act of 1888 declared that after its passage it should be unlawful for any Chinese laborer—who might then or thereafter be a resident of the United States, who should depart therefrom, and not return before the passage of the act—to return or remain in the United States. The validity of this act was sustained by this court. Chinese Exclusion Case, 130 U. S. 581, 9 Sup. Ct. Rep. 623. In the opinion announcing the decision we considered the treaties with China, and also the legislation of congress, and the causes which led to its enactment. The court cited numerous instances in which statesmen and jurists of eminence had held that it was the undoubted right of every independent nation to exclude foreigners from its limits whenever, in its judgment, the public interests demanded such exclusion.

'The power of exclusion of foreigners,' said the court, 'being an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the constitution, the right to its exercise at any time when, in the judgment of the government, the interests of the country require it, cannot be granted away or restrained on behalf of any one. The powers of government are delegated in trust to the United States, and are incapable of transfer to any other parties. They cannot be abandoned or surrendered. Nor can their exercise be hampered, when needed for the public good, by any considerations of private interest. The exercise of these public trusts is not the subject of barter or contract. Whatever license,

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

therefore, Chinese laborers may have obtained previous to the act of October 1, 1888, to return to the United States after their departure, is held at the will of the government, revocable at any time at its pleasure. Whether a proper consideration by our government of its previous laws, or a proper respect for the nation whose subjects are affected by its action, ought to have qualified its inhibition, and made it applicable only to **\*746** persons departing from the country after the passage of the act, are not questions for judicial determination. If there be any just ground of complaint on the part of China, it must be **\*\*1035** made to the political department of our government, which is alone competent act upon the subject.'

I had the honor to be the organ of the court in announcing this opinion and judgment. I still adhere to the views there expressed, in all particulars; but between legislation for the exclusion of Chinese persons,—that is, to prevent them from entering the country, —and legislation for the deportation of those who have acquired a residence in the country under a treaty with China, there is a wide and essential difference. The power of the government to exclude foreigners from this country,—that is, to prevent them from entering it,—whenever the public interests, in its judgment, require such exclusion, has been repeatedly asserted by the legislative and executive departments of our government, and never denied; but its power to deport from the country persons lawfully domiciled therein by its consent, and engaged in the ordinary pursuits of life, has never been asserted by the legislative or executive departments, except for crime, or as an act of war, in view of existing or anticipated hostilities, unless the alien act of 1798 can be considered as recognizing that doctrine. 1 Stat. p. 570, c. 58. That act vested in the president power to order all such aliens as he should adjudge dangerous to the peace and safety of the United States, or should have reasonable grounds to suspect were concerned in any treasonable or secret machinations against the government, to depart out of the territory of the United States within such time as should be expressed in his order; and in case any alien when thus ordered to depart should be found at large within the United States after the term limited in the order, not having obtained a license from the president to reside therein, or, having obtained such license, should not have conformed thereto, he should, on conviction thereof, be imprisoned for a term not exceeding three years, and should never afterwards be admitted to become a citizen of the United States, with a proviso that if the alien thus ordered to depart should prove to the satisfaction **\*747** of the president, by evidence to be taken before such person or persons as he should direct, that no injury or danger to the United States would arise from suffering him to reside therein, the president might grant a license to him to remain within the United States for such time as he should judge proper, and at such place as he should designate. The act also provided that the president might require such alien to enter into a bond to the United States, in such penal sum as he might direct, with one or more sureties, to the satisfaction of the person authorized by the president to take the same, conditioned for his good behavior during his residence in the United States, and not to violate his license, which the president might revoke whenever he should think proper. The act also provided that it should be lawful for the president, whenever he deemed it necessary for the public safety, to order to be removed out of the territory of the United States any alien in prison in pursuance of the act, and to cause to be arrested, and sent out of the United States, such aliens as may have been ordered to depart, and had not obtained a license, in all cases where, in the opinion of the president, the public safety required a speedy removal, and that if any alien thus removed or sent out of the United States should voluntarily return, unless by permission of the president, such alien, being convicted thereof, should be imprisoned so long as, in the opinion of the president, the public safety might require.

The passage of this act produced great excitement throughout the country, and was severely denounced by many of its ablest statesmen and jurists as unconstitutional and barbarous, and among them may be mentioned the great names of Jefferson and Madison, who are throughout our country honored and revered for their lifelong devotion to principles of constitutional liberty. It was defended by its advocates as a war measure. John Adams, the president of the United States at the time, who approved the bill, and against whom the responsibility for its passage was charged, states in his correspondence that the bill was intended as a measure of that character. Volume 9 of his works, p. 291. The state of Virginia denounced it in severe terms. Its general assembly **\*748** passed resolutions upon the act, and another act of the same session of congress, known as the 'Sedition Act.' Upon the first—the alien act—one of the resolutions declared that it exercised a power nowhere delegated to the federal government, and which, by uniting legislative and judicial powers to those of executive, subverted the general principles of free government, as well as the particular organization and positive provisions of the federal constitution. 4 Elliot, Deb. 529. The resolutions upon both acts were transmitted to the legislatures of different states, and their communications in answer to them were referred to a committee of the general assembly of Virginia, of which Mr. Madison was a member, and upon them his celebrated report was made. With reference to the alien act, after observing that it was incumbent in this, as in every other exercise of power by the federal government, to prove from the constitution that it granted the particular power exercised, and also that much confusion

13 S.Ct. 1016, 37 L.Ed. 905

and fallacy had been thrown into the question to be considered by blending the two cases of aliens, members of a hostile nation, and aliens, members of friendly nations, he said: 'With respect to alien enemies, no doubt has been intimated as to the federal authority over them; the constitution having expressly delegated to congress **1036 the power to declare war against any nation, and, of course, to treat it and all its members as enemies. With respect to aliens who are not enemies, but members of nations in peace and amity with the United States, the power assumed by the act of congress is denied to be constitutional, and it is accordingly against this act that the protest of the general assembly is expressly and exclusively directed.' Id. 554.

'Were it admitted, as is contended, that the 'act concerning aliens' has for its object, not a penal, but a preventive, justice, it would still remain to be proved that it comes within the constitutional power of the federal legislature, and, if within its power, that the legislature has exercised it in a constitutional manner. * * * But it can never be admitted that the removal of aliens, authorized by the act, is to be considered, not as punishment for an offense, but as a measure of *749 precaution and prevention. If the banishment of an alien from a country into which he has been invited as the asylum most auspicious to his happiness,—a country where he may have formed the most tender connections; where he may have invested his entire property, and acquired property of the real and permanent as well as the movable and temporary kind; where he enjoys, under the laws, a greater share of the blessings of personal security and personal liberty than he can elsewhere hope for; * * * if a banishment of this sort be not a punishment, and among the severest of punishments, it would be difficult to imagine a doom to which the name can be applied. And, if it be a punishment, it will remain to be inquired whether it can be constitutionally inflicted, on mere suspicion, by the single will of the executive magistrate, on persons convicted of no personal offense against the laws of the land, nor involved in any offense against the law of nations, charged on the foreign state of which they are members.' 4 Elliot, Deb. 555. 'It does not follow because aliens are not parties to the constitution, as citizens are parties to it, that, whilst they actually conform to it, they have no right to its protection. Aliens are not more parties to the laws than they are parties to the constitution, yet it will not be disputed that, as they owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage. If aliens had no rights under the constitution, they might not only be banished, but even capitally punished, without a jury, or the other incidents to a fair trial. But, so far has a contrary principle been carried, in every part of the United States, that, except on charges of treason, an alien has, besides all the common privileges, the special one of being tried by a jury, of which one-half may be also aliens.

'It is said, further, that, by the law and practice of nations, aliens may be removed, at discretion, for offenses against the law of nations; that congress are authorized to define and punish such offenses; and that to be dangerous to the peace of society is, in alien, one of those offenses.

'The distinction between alien enemies and alien friends is *750 a clear and conclusive answer to this argument. Alien enemies are under the law of nations, and liable to be punished for offenses against it. Alien friends, except in the single case of public ministers, are under the municipal law, and must be tried and punished according to the law only.' 4 Elliot, Deb. 556.

Massachusetts, evidently considering the alien act as a war measure, adopted in anticipation of probable hostilities, said, in answer to the resolutions of Virginia, among other things, that 'the removal of aliens is the usual preliminary of hostility, and is justified by the invariable usages of nations. Actual hostility had, unhappily, been long experienced, and a formal declaration of it the government had reason daily to expect.' Id. 535.

The duration of the act was limited to two years, and it has ever since been the subject of universal condemnation. In no other instance, until the law before us was passed, has any public man had the bordness to advocate the deportation of friendly aliens in time of peace. I repeat the statement that in no other instance has the deportation of friendly aliens been advocated as a lawful measure by any department of our government. And it will surprise most people to learn that any such dangerous and despotic power lies in our government,—a power which will authorize it to expel at pleasure, in time of peace, the whole body of friendly foreigners of any country domiciled herein by its permission; a power which can be brought into exercise whenever it may suit the pleasure of congress, and be enforced without regard to the guaranties of the constitution intended for the protection of the rights of all persons in their liberty and property. Is it possible that congress can, at its pleasure, in disregard of the guaranties of the constitution, expel at any time the Irish, German, French, and English who may have taken up their residence here on the invitation of the government, while we are at peace with the countries from which they came, simply on the ground that they have not been naturalized?

Notwithstanding the activity of the public authorities in enforcing the exclusion act of 1888, it was constantly evaded.  **\*751** Chinese laborers came into the country by water and by land; they came through the open ports, and by rivers reaching the seas, and they came by the way of the Canadas and Mexico. New means of ingress were discovered, and, in spite of the vigilance of the police and customs officers, great numbers clandestinely found their way into the country. Their resemblance to each other rendered  **\*\*1037**  it difficult, and often impossible, to prevent this evasion of the laws. It was under these circumstances that the act of May 5, 1892, was passed. It had two objects in view. There were two classes of Chinese persons in the country, —those who had evaded the laws excluding them and entered clandestinely, and those who had entered lawfully, and resided therein under the treaty with China.

The act of 1892 extended, for the period of 10 years from its passage, all laws then in force, prohibiting and regulating the coming into the country of Chinese persons, or persons of Chinese descent; and it provided that any person, when convicted or adjudged under any of those laws of not legally being or remaining in the United States, should be removed therefrom to China, or to such other country as it might appear he was a subject of, unless such other country should demand a tax as a condition of his removal thereto, in which case he should be removed to China. The act also provided that a Chinese person arrested under its provisions, or the provisions of the acts extended, should be adjudged to be unlawfully within the United States, unless he should establish by affirmative proof his lawful right to remain within the United States, and that any Chinese person, or persons of Chinese descent, 'convicted and adjudged not lawfully entitled to be or remain in the United States, should be imprisoned at hard labor for a period not exceeding one year, and thereafter removed from the United States.' With this class of Chinese, and with the provisions of law applicable to them, we have no concern in the present case. We have only to consider the provisions of the act applicable to the second class of Chinese persons,—those who had a lawful right to remain in the United States. By the additional articles to the  **\*752**  treaty of 1858, adopted in 1868, generally called the 'Burlingame Treaty,' the governments of the two countries recognized 'the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of free migration and emigration of their citizens and subjects, respecively, from the one country to the other, for purposes of curiosity, of trade, or as permanent residents;' and accordingly the treaty, in the additional articles, provided that citizens of the United States visiting or residing in China, and Chinese subjects visiting or residing in the United States, should reciprocally enjoy the same privileges, immunities, and exemptions in respect to travel or residence as should be enjoyed by citizens or subjects of the most favored nation, in the country in which they should, respectively, be visiting or residing. 16 Stat. 739, 740. The supplemental treaty of November 17, 1880, providing for the limitation or suspension of the emigration of Chinese laborers, declared that 'the limitation or suspension shall be reasonable, and apply only to Chinese who may go to the United States as laborers,—other classes not being included in the limitation,'—and that 'Chinese subjects, whether residing in the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who were then in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation.'

There are many thousands of Chinese laborers who came to the country, and resided in it, under the additional articles of the treaty adopted in 1868, and were in the country at the time of the adoption of the supplemental treaty of November, 1880. To these laborers, thus lawfully within the limits of the United States, section 6 of the act of May 5, 1892, relates. That section, so far as applicable to the present cases, is as follows:

'Sec. 6. And it shall be the duty of all Chinese laborers within the limits of the United States at the time of the passage of this act, and who are entitled to remain in the  **\*753**  United States, to apply to the collector of internal revenue of their respective districts, within one year after the passage of this act, for a certificate of residence, and any Chinese laborer within the United States, who shall neglect, fail, or refuse to comply with the provisions of this act, or who, after one year from the passage hereof, shall be found within the jurisdiction of the United States without such certificate of residence, shall be deemed and adjudged to be unlawfully within the United States, and may be arrested by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge, whose duty it shall be to order that he be deported from the United States, as hereinbefore provided, unless he shall establish clearly, to the satisfaction of the said judge, that by reason of accident, sickness, or other unavoidable cause, he has been unable to procure his certificate, and

13 S.Ct. 1016, 37 L.Ed. 905

to the satisfaction of the court, and by at least one credible white witness, that he was a resident of the United States at the time of the passage of this act; and if, upon the hearing, it shall appear that he is so entitled to a certificate, it shall be granted, upon his paying the cost. Should it appear that said Chinaman had procured a certificate which had been lost or destroyed, he shall be detained, and judgment suspended, a reasonable time, to enable him to procure a duplicate from the officer granting it, and in such cases the cost of said arrest and trial shall be in the discretion of the court.'

The purpose of this section was to secure **1038 the means of readily identifying the Chinese laborers present in the country, and entitled to remain, from those who may have clandestinely entered the country in violation of its laws. Those entitled to remain, by having a certificate of their identification, would enable the officers of the government to readily discover, and bring to punishment, those not entitled to enter, but who are excluded. To procure such a certificate was not a hardship to the laborers, but a means to secure full protection to them, and at the same time prevent an evasion of the law.

This object being constitutional, the only question for our *754 consideration is the lawfulness of the procedure provided for its accomplishment; and this must be tested by the provisions of the constitution and laws intended for the protection of all persons against encroachment upon their rights. Aliens from countries at peace with us, domiciled within our country by its consent, are entitled to all the guaranties for the protection of their persons and property which are secured to native-born citizens. The moment any human being from a country at peace with us comes within the jurisdiction of the United States, with their consent, —and such consent will always be implied when not expressly withheld, and, in the case of the Chinese laborers before us, was, in terms, given by the treaty referred to,—he becomes subject to all their laws, is amenable to their punishment, and entitled to their protection. Arbitrary and despotic power can no more be exercised over them, with reference to their persons and property, than over the persons and property of native-born citizens. They differ only from citizens in that they cannot vote, or hold any public office. As men having our common humanity, they are protected by all the guaranties of the constitution. To hold that they are subject to any different law, or are less protected in any particular, than other persons, is, in my judgment, to ignore the teachings of our history, the practice of our government, and the language of our constitution. Let us test this doctrine by an illustration: If a foreigner who resides in the country by its consent commits a public offense, is he subject to be cut down, maltreated, imprisoned, or put to death by violence, without accusation made, trial had, and judgment of an established tribunal, following the regular forms of judicial procedure? If any rule in the administration of justice is to be omitted or discarded in his case, what rule is it to be? If one rule may lawfully be laid aside in his case, another rule may also be laid aside, and all rules may be discarded. In such instances a rule of evidence may be set aside in one case, a rule of pleading in another; the testimony of eye-witnesses may be rejected, and hearsay adopted; or no evidence at all may be received, but simply an inspection of the accused, as is often *755 the case in tribunals of Asiatic countries, where personal caprice and not settled rules prevail. That would be to establish a pure, simple, undisguised despotism and tyranny, with respect to foreigners resident in the country by its consent, and such an exercise of power is not permissible, under our constitution. Arbitrary and tyrannical power has no place

in our system. As said by this court, speaking by Mr. Justice Matthews, in Yick Wo v. Hopkins, 118 U. S. 366, 369, 6 Sup. Ct. Rep. 1064: 'When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude they do not mean to leave room for the play and action of purely personal and arbitrary power. * * * The fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to man the blessings of civilization under the reign of just and equal laws.' What once I had occasion to say of the protection afforded by our government, I repeat: 'It is certainly something in which a citizen of the United States may feel a generous pride that the government of his country extends protection to all persons within its jurisdiction, and that every blow aimed at any of them, however humble, come from what quarter it may, 'is caught upon the broad shield of our blessed constitution and our equal laws.'' Ah Kow v. Nunan, 5 Sawy. 552–563.

I utterly dissent from, and reject, the doctrine expressed in the opinion of the majority, that 'congress, under the power to exclude or expel aliens, might have directed any Chinese laborer found in the United States without a certificate of residence to be removed out of the country by executive officers, without judicial trial or examination, just as it might have authorized such officers absolutely to prevent his entrance into the country.'[4] An arrest in that way, for that purpose, would not be a reasonable seizure of the person, within the meaning of the fourth article of the amendments of the constitution. It would be brutal and

oppressive. The **\*756** existence of the power thus stated is only consistent with the admission that the government is one of unlimited and despotic power, so far as aliens domiciled in the country are concerned. According to this theory, congress might have ordered executive officers to take the Chinese laborers to the ocean, and put them into a boat, and set them adrift, or to take them to the borders of Mexico, and turn them loose there, and in both cases without any means of support. Indeed, it might have sanctioned towards these laborers the most **\*\*1039** shocking brutality conceivable. I utterly repudiate all such notions, and reply that brutality, inhumanity, and cruelty cannot be made elements in any procedure for the enforcement of the laws of the United States.

The majority of the court have, in their opinion, made numerous citations from the courts and the utterances of individuals upon the power of the government of an independent nation to exclude foreigners from entering its limits, but none, beyond a few loose observations, as to its power to expel and deport from the country those who are domiciled therein by its consent. The citation from the opinion in the recent case of Nishimura Ekiu v. U. S., (the Japanese Case,) 142 U. S. 651, 12 Sup. Ct. Rep. 336; the citation from the opinion in Ping v. U. S., (the Chinese Exclusion Case,) 130 U. S. 603, 604, 606, 9 Sup. Ct. Rep. 623; the citation in the case before the judiciary committee of the privy council,—all have reference to the exclusion of foreigners from entering the country. They do not touch upon the question of deporting them from the country after they have been domiciled within it by the consent of its government, which is the real question in the case. The citation from Vattel is only as to the power of exclusion; that is, from coming into the country. The citation from Phillimore is to the same effect. As there stated, the government allowing the introduction of aliens may prescribe the conditions on which they shall be allowed to remain, the conditions being imposed whenever they enter the country. There is no dispute about the power of congress to prevent the landing of aliens in the country. The question is as to the power of congress to deport them, without **\*757** regard to the guaranties of the constitution. The statement that in England the power to expel aliens has always been recognized, and often exercised, and the only question that has ever been as to this power is whether it could be exercised by the king without the consent of parliament, is, I think, not strictly accurate. The citations given by Mr. Choate in his brief show conclusively, it seems to me, that deportation from the realm has not been exercised in England since Magna Charta, except in punishment for crime, or as a measure in view of existing or anticipated hostilities. But, even if that power were exercised by every government of Europe, it would have no bearing in these cases. It may be admitted that the power has been exercised by the various governments of Europe. Spain expelled the Moors; England, in the reign of Edward I., banished 15,000 Jews; [5] and Louis XIV., in 1685, by revoking the edict of Nantes, which gave religious liberty to Protestants in France, drove out the Huguenots. Nor does such severity of European governments belong only to the distant post. Within three years, Russia has banished many thousands of Jews, and apparently intends the expulsion of the whole race,—an act of barbarity which has aroused the indignation of all Christendom. Such was the feeling in this country that, friendly as our relations with Russia had always been, President Harrison felt compelled to call the attention of congress to it in his message in 1891, as a fit subject for national remonstrance. Indeed, all the instances mentioned have been condemned for their barbarity and cruelty, and no power to perpetrate such barbarity is to be implied from the nature of our government, and certainly is not found in any delegated powers under the constitution.

The government of the United States is one of limited and delegated powers. It takes nothing from the usages or the former action of European governments, nor does it take any power by any supposed inherent sovereignty. There is a great deal of confusion in the use of the word 'soveignty' **\*758** by law writers. Sovereignty or supreme power is in this country vested in the people, and only in the people. By them certain sovereign powers have been delegated to the government of the United States, and other sovereign powers reserved to the states or to themselves. This is not a matter of inference and argument, but is the express declaration of the tenth amendment to the constitution, passed to avoid any misinterpretation of the powers of the general government. That amendment declares that 'that powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states, respectively, or to the people.' When, therefore, power is exercised by congress, authority for it must be found in express terms in the constitution, or in the means necessary or proper for the execution of the power expressed. If it cannot be thus found, it does not exist.

It will be seen by its provisions that the sixth section recognizes the right of certain Chinese laborers to remain in the United States, but to render null that right it declares that if, within one year after the passage of the act, any Chinese laborer shall have neglected, failed, or refused to comply with the provisions of the act to obtain a certificate of residence, or shall be found

13 S.Ct. 1016, 37 L.Ed. 905

within the jurisdiction of the United States without a certificate of residence, he shall be deemed and adjudged to be unlawfully within the United States, and may be arrested by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge, whose duty it shall be to order that he be deported from the United States, unless he **\*\*1040** shall establish clearly, to the satisfaction of the judge, that by reason of accident, sickness, or other unavoidable cause, he has been unable to secure his certificate, and to the satisfaction of the judge, by at least one credible white witness, that he was a resident of the United States at the time of the passage of the act. His deportation is thus imposed for neglect to obtain a certificate of residence, from which he can only escape by showing his inability to secure it from one of the causes named. That is the punishment **\*759** for his neglect, and that, being of an infamous character, can only be imposed after indictment, trial, and conviction. If applied to a citizen, none of the justices of this court would hesitate a moment to pronounce it illegal. Had the punishment been a fine, or anything else than of an infamous character, it might have been imposed without indictment; but not so now, unless we hold that a foreigner from a country at peace with us, though domiciled by the consent of our government, is withdrawn from all the guaranties of due process of law prescribed by the constitution, when charged with an offense to which the grave punishment designated is affixed.

The punishment is beyond all reason in its severity. It is out of all proportion to the alleged offense. It is cruel and unusual. As to its cruelty, nothing can exceed a forcible deportation from a country of one's residence, and the breaking up of all the relations of friendship, family, and business there contracted. The laborer may be seized at a distance from his home, his family, and his business, and taken before the judge for his condemnation, without permission to visit his home, see his family, or complete any unfinished business. Mr. Madison well pictures its character in his powerful denunciation of the alien law of 1798, in his celebrated report upon the resolutions, from which we have cited, and concludes, as we have seen, that if a banishment of the sort described be not a punishment, and among the severest of punishments, it will be difficult to imagine a doom to which the name can be applied.

Again, when taken before a United States judge, he is required, in order to avoid the doom declared, to establish clearly, to the satisfaction of the judge, that by reason of accident, sickness, or other unavoidable cause he was unable to secure his certificate, and that he was a resident of the United States at the time, by at least one credible white witness. Here the government undertakes to exact of the party arrested the testimony of a witness of a particular color, though conclusive and incontestable testimony from others may be adduced. The law might as well have said that unless the laborer **\*760** SHOULD ALSO PRESENT A PARTICULAR PERSON As a witness, who could not be produced, from sickness, absence, or other cause, such as the archbishop of the state, to establish the fact of residence, he should be held to be unlawfully within the United States.

There are numerous other objections to the provisions of the act under consideration. Every step in the procedure provided, as truly said by counsel, tramples upon some constitutional right. Grossly it violates the fourth amendment, which declares that 'the right of the people to be secure in their persons * * * against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the * * * persons * * * to be seized.'

The act provides for the seizure of the person without oath or affirmation or warrant, and without showing any probable cause by the officials mentioned. The arrest, as observed by counsel, involves a search of his person for the certificate which he is required to have always with him. Who will have the hardihood and effrontery to say that this is not an 'unreasonable search and seizure of the person?' Until now it has never been asserted by any court or judge of high authority that foreigners domiciled in this country by the consent of our government could be deprived of the securities of this amendment; that their persons could be subjected to unreasonable searches and seizures, and that they could be arrested without warrant upon probable cause, supported by oath or affirmation.

I will not pursue the subject further. The decision of the court, and the sanction it would give to legislation depriving resident aliens of the guaranties of the constitution, fill me with apprehensions. Those guaranties are of priceless value to every one resident in the country, whether citizen or alien. I cannot but regard the decision as a blow against constitutional liberty, when it declares that congress has the right to disregard the guaranties of the constitution intended for the protection of all men domiciled in the country with the consent of the government, in their rights of person and property. **\*761** How far will its legislation go? The unnaturalized resident feels it to-day, but if congress can disregard the guaranties with respect to any one domiciled in the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.04614

country with its consent, it may disregard the guaranties with respect to naturalized citizens. What assurance have we that it may not declare that naturalized citizens of a particular country cannot remain in the United States after a certain day, unless they have in their possession a certificate that they are of good moral character, and attached to the principles of our constitution, which certificate they must obtain from a collector of internal revenue upon the testimony of at least one competent witness of a class or nationality to be designated by the government?

**\*\*1041** What answer could the naturalized citizen in that case make to his arrest for deportation, which cannot be urged in behalf of the Chinese laborers of to-day?

I am of the opinion that the orders of the court below should be reversed, and the petitioners should be discharged.

Mr. Chief Justice FULLER, dissenting.

I also dissent from the opinion and judgment of the court in these cases.

If the protection of the constitution extends to Chinese laborers who are lawfully within, and entitled to remain in, the United States, under previous treaties and laws, then the question whether this act of congress, so far as it relates to them, is in conflict with that instrument, is a judicial question, and its determination belongs to the judicial department.

However reluctant courts may be to pass upon the constitutionality of legislative acts, it is of the very essence of judicial duty to do so, when the discharge of that duty is properly invoked.

I entertain no doubt that the provisions of the fifth and fourteenth amendments, which forbid that any person shall be deprived of life, liberty, or property without due process of law, are, in the language of Mr. Justice Matthews, already quoted by my Brother Brewer, 'universal in their application to all persons within the territorial jurisdiction, without **\*762** regard to any differences of race, of color, or of nationality;' and although in Yick Wo's Case, 118 U. S. 356, 6 Sup. Ct. Rep. 1064, only the validity of a municipal ordinance was involved, the rule laid down as much applies to congress, under the fifth amendment, as to the states, under the fourteenth. The right to remain in the United States, in the enjoyment of all the rights, privileges, immunities, and exemptions accorded to the citizens and subjects of the most favored nation, is a valuable right, and certainly a right which annot be taken away without taking away the liberty of its possessor. This cannot be done by mere legislation.

The argument is that friendly aliens, who have lawfully acquired a domicile in this country, are entitled to avail themselves of the safeguards of the constitution only while permitted to remain, and that the power to expel them, and the manner of its exercise, are unaffected by that instrument. It is difficult to see how this can be so, in view of the operation of the power upon the exising rights of individuals; and to say that the residence of the alien, when invited and secured by traties and laws, is held in subordination to the exertion against him, as an alien, of the absolute and unqualified power asserted, is to import a condition not recognized by the fundamental law. Conceding that the exercise of the power to exclude is committed to the political department, and that the denial of entrance is not necessarily the subject of judicial cognizance, the exercise of the power to expel, the manner in which the right to remain may be terminated, rests on different ground, since limitations exist or are imposed upon the deprivation of that which has been lawfully acquired. And while the general government is invested, in respect of foreign countries and their subjects or citizens, with the powers necessary to the maintenance of its absolute independence and security throughout its entire territory, it cannot, in virtue of any delegated power, or power implied therefrom, of of a supposed inherent sovereignty, arbitrarily deal with persons lawfully within the peace of its dominion. But the act before us is not an act to abrogate or repeal treaties or laws in respect of Chinese laborers entitled to remain in the United States, or **\*763** to expel them from the country, and no such intent can be imputed to congress. As to them, registration for the purpose of identification is required, and the deportation denounced for failure to do so is by way of punishment to coerce compliance with that requisition. No euphuism can disguise the character of the act in this regard. It directs the performance of a judicial function in a particular way, and inflicts punishment without a judicial trial. It is, in effect, a legislative sentence of banishment, and, as such, absolutely void. Moreover, it contains within it the germs of the assertion of an unlimited and arbitrary power, in general, incompatible with the immutable principles of justice, inconsistent with the nature of our government, and in conflict with the written constitution by which that government was created, and those principles secured.

**All Citations**

149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905

# Footnotes

1    An act to prohibit the coming of Chinese persons into the United States.

Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that all laws now in force prohibiting and regulating the coming into this country of Chinese persons and persons of Chinese descent are hereby continued in force for a period of ten years from the passage of this act.

Sec. 2. That any Chinese person or person of Chinese descent, when convicted and adjudged under any of said laws to be not lawfully entitled to be or remain in the United States, shall be removed from the United States to China, unless he or they shall make it appear to the justice, judge, or commissioner before whom he or they are tried that he or they are subjects or citizens of some other country, in which case he or they shall be removed from the United States to such country: provided, that in any case where such other country, of which such Chinese person shall claim to be a citizen or subject, shall demand any tax as a condition of the removal of such person to that country, he or she shall be removed to China.

Sec. 3. That any Chinese person or person of Chinese descent arrested under the provisions of this act or the acts hereby extended shall be adjudged to be unlawfully within the United States, unless such person shall establish, by affirmative proof, to the satisfaction of such justice, judge, or commissioner, his lawful right to remain in the United States.

Sec. 4. That any such Chinese person or person of Chinese descent convicted and adjudged to be not lawfully entitled to be or remain in the United States shall be imprisoned at hard labor for a period of not exceeding one year, and thereafter removed from the United States, as hereinbefore provided.

Sec. 5. That after the passage of this act, on an application to any judge or court of the United States in the first instance for a writ of habeas corpus, by a Chinese person seeking to land in the United States, to whom that privilege has been denied, no bail shall be allowed, and such application shall be heard and determined promptly, without unnecessary delay.

Sec. 6. And it shall be the duty of all Chinese laborers within the limits of the United States at the time of the passage of this act, and who are entitled to remain in the United States, to apply to the collector of internal revenue of their respective districts, within one year after the passage of this act, for a certificate of residence; and any Chinese laborer within the limits of the United States, who shall neglect, fail, or refuse to comply with the provisions of this act, or who, after one year from the passage hereof, shall be found within the jurisdiction of the United States without such certificate of residence, shall be deemed and adjudged to be unlawfully within the United States, and may be arrested by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge, whose duty it shall be to order that he be deported from the United States, as hereinbefore provided, unless he shall establish clearly, to the satisfaction of said judge, that by reason of accident, sickness, or other unavoidable cause he has been unable to procure his certificate, and to the satisfaction of the court, and by at least one credible white witness, that he was a resident of the United States at the time of the passage of this act; and if upon the hearing it shall appear that he is so entitled to a certificate, it shall be granted, upon his paying the cost. Should it appear that said Chinaman had procured a certificate which has been lost or destroyed, he shall be detained, and judgment suspended a reasonable time to enable him to procure a duplicate from the officer granting it; and in such cases the cost of said arrest and trial shall be in the discretion of the court. And any Chinese person other than a Chinese laborer, having a right to be and remain in the United States, desiring such certificate as evidence of such right, may apply for and receive the same without charge.

Sec. 7. That immediately after the passage of this act the secretary of the treasury shall make such rules and regulations as may be necessary for the efficient execution of this act, and shall prescribe the necessary forms and furnish the necessary blanks to enable collectors of internal revenue to issue the certificates required hereby, and make such provisions that

certificates may be procured in localities convenient to the applicants. Such certificates shall be issued without charge to the applicant, and shall contain the name, age, local residence, and occupation of the applicant, and such other description of the applicant as shall be prescribed by the secretary of the treasury; and a duplicate thereof shall be filed in the office of the collector of internal revenue for the district within which such Chinaman makes application.

Sec. 8. That any person who shall knowingly and falsely alter or substitute any name for the name written in such certificate, or forge such certificate, or knowingly utter any forged or fraudulent certificate, or falsely personate any person named in such certificate, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not exceeding one thousand dollars, or imprisoned in the penitentiary for a term of not more than five years.

Sec. 9. The secretary of the treasury may authorize the payment of such compensation in the nature of fees to the collectors of internal revenue, for services performed under the provisions of this act, in addition to salaries now allowed by law, as he shall deem necessary, not exceeding the sum of one dollar for each certificate issued.

2    Collectors of internal revenue will receive applications on the following form, at their own offices, from such Chinese as are conveniently located thereto, and will cause their deputies to proceed to the towns or cities in their respective divisions where any considerable number of Chinese are residing, for the purpose of receiving applications. No application will be received later than May 5, 1893.

Collectors and deputies will give such notice, through leading Chinese, or by notices posted in the Chinese quarter of the various localities, as will be sufficient to apprise all Chinese residing in their districts of their readiness to receive applications, and the time and place where they may be made. All applications received by deputies must be forwarded to the collector's office, from whose office all certificates of residence will be issued, and sent to the deputy for delivery. The affidavit of at least one credible witness of good character to the fact of residence and lawful status within the United States must be furnished with every application. If the applicant is unable to furnish such witness satisfactory to the collector or his deputy, his application will be rejected, unless he shall furnish other proof of his right to remain in the United States, in which case the application, with the proofs presented, shall be forwarded to the commissioner of internal revenue for his decision. The witness must appear before the collector or his deputy, and be fully questioned in regard to his testimony before being sworn.

In all cases of loss or destruction of original certificates of residence, where it can be established to the satisfaction of the collector of the district in which the certificate was issued that such loss or destruction was accidental. and without fault or negligence on the part of the applicant, a duplicate of the original may be issued under the same conditions that governed the original issue.

3    In the matter of the arrest and deportation of Wong Quan, a Chinese laborer.

Wong Quan, a Chinese laborer, having been arrested in the city of New York on the 6th day of May, 1893, and brought before me, a United States judge, by John W. Jacobus, the marshal of the United States in and for the southern district of New York, as being a Chinese laborer found within the jurisdiction of the United States after the expiration of one year from the passage of the act of congress approved on the 5th day of May, 1892, and entitled 'An act to prohibit the coming of Chinese persons into the United States,' without having the certificate of residence required by said act; and the said Wong Quan having failed to clearly establish to my satisfaction that by reason of accident, sickness, or other unavoidable cause he had been unable to procure the said certificate, or that he had procured such certificate, and that the same had been lost or destroyed: Now, on motion of Edward Mitchell, the United States attorney in and for the southern district of New York, it is ordered that the said Wong Quan be, and he hereby is, remanded to the custody of the said John W. Jacobus, the United States marshal in and for the southern district of New York; and it is further ordered, that the said Wong Quan be deported from the United States of America in accordance with the provisions of said act of congress approved on the 5th day of May, 1892.

Dated New York, May 6, 1893.

Addison Brown,

United States District Judge for the Southern District of New York.

4    These words were originally printed in the opinion of the court, to which the dissent was directed. In the revision of the opinion the phraseology is charged.

5    The Jews during his reign were cruelly despoiled, and in 1290 ordered, under penalty of death, to quit England forever, before a certain day. 6 Amer. & Eng. Enc. Law, p. 434.

13 S.Ct. 1016, 37 L.Ed. 905

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

435 F.2d 728
United States Court of Appeals, Second Circuit.

FOOK HONG MAK, Petitioner,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 163, Docket 34237.
|
Argued Oct. 29, 1970.
|
Decided Nov. 24, 1970.

**Synopsis**

Petition to review an order for the deportation of an alien who had been admitted to the United States in transit without a visa. The Court of Appeals, Friendly, Circuit Judge, held that Attorney General's determination that aliens who have obtained admission without a visa as being in immediate and continuous transit through the United States should not be eligible to apply for adjustment of status to that of an alien lawfully admitted for permanent residence under 245 of Immigration and Nationality Act of 1952 is not unlawful, since it is reasonably related to statutory scheme and enforcement of regulations with respect to such aliens who are accorded the privilege of admission on so fleeting a basis for the purpose of facilitating international travel.

Petition denied.

West Headnotes (3)

**[1]** **Administrative Law and Procedure** 🔑 Power and Authority to Make

An administrator vested with discretionary power may determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis, if his determination is founded on considerations rationally related to the statute he is administering.

12 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** 🔑 Adjustment of status

Attorney General's determination that aliens who have obtained admission without a visa as being in immediate and continuous transit through the United States should not be eligible to apply for adjustment of status to that of an alien lawfully admitted for permanent residence under § 245 of Immigration and Nationality Act of 1952 is reasonably related to statutory scheme and enforcement of regulations with respect to such aliens who are accorded the privilege of admission on so fleeting a basis for the purpose of facilitating international travel. Immigration and Nationality Act, §§ 101(a) (15) (C), 214, 244(e), 245; 🚩 8 U.S.C.A. §§ 1101(a) (15) (C), 1184, 🚩 1254(e), 1255.

6 Cases that cite this headnote

**[3]** **Aliens, Immigration, and Citizenship** 🔑 Adjustment of status

In precluding Attorney General from exercising discretion in favor of specified classes of aliens with respect to adjustment of status under § 245 of Immigration and Nationality Act of 1952, Congress did not thereby require him to exercise it in favor of everyone else on a case-by-case basis even if experience should convince him of the existence of another group with similar potentialities or actualities of abuse. Immigration and Nationality Act, §§ 101(a) (15) (C), 214, 244(e), 245; 🚩 8 U.S.C.A. §§ 1101(a) (15) (C), 1184, 🚩 1254(e), 1255.

8 Cases that cite this headnote

**Attorneys and Law Firms**

*728 Stanley H. Wallenstein, Asst. U.S. Atty. (Whitney North Seymour, Jr., U.S. Atty., S.D.N.Y., of counsel), for respondent.

Martin H. Leonard, New York City (John L. Murff, New York City, of counsel), for petitioner.

Before MOORE, FRIENDLY and ADAMS, * Circuit Judges.

## Opinion

FRIENDLY, Circuit Judge:

Petitioner Fook Hong Mak, a fifty year old, married male alien, is a citizen of the Republic of China. In April 1968 he was admitted to the United States without a visa, pursuant to § 101(a)(15)(C) and § 214 of the Immigration and Nationality Act of 1952 and the Regulations thereunder, 8 C.F.R. § 214.2(c)(1), as a nonimmigrant alien 'in immediate and continuous transit **\*729** through the United States.' He was on a journey from Hong Kong to South America, in the course of which an eight day lay-over in this country had been authorized. When the INS discovered that he was still here six months later, it began a deportation proceeding. Conceding deportability, Fook Hong Mak sought two forms of discretionary relief— adjustment of status to that of an alien lawfully admitted for permanent residence under § 245 or, failing that, voluntary departure under § 244(e).

Section 245, so far as here material, reads as follows:

(a) The status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is available to him at the time his application is approved.

(c) the provisions of this section shall not be applicable to any alien who is a native of any country of the Western Hemisphere or of any adjacent island named in Section 101(b)(5).

Acting under the authority specifically delegated to him by the Immigration and Nationality Act, the Attorney General adopted a regulation, 8 C.F.R. § 214.2(c), which in its present form [1] provides:

§ 214.2 Special requirements for admission, extension, and maintenance of status.

The general requirements in § 214.1 are modified for the following nonimmigrant classes:

(c) Transits— (1) Without visas. An applicant for admission under the transit without visa privilege must establish that he is admissible under the immigration laws; that he has confirmed and onward reservations to at least the next country beyond the United States, and that his departure from the United States will be accomplished within ten calendar days after his arrival * * *. The privilege of transit without a visa may be authorized only under the conditions that the carrier, without the prior consent of the Service, will not refund the ticket which was presented to the Service as evidence of the alien's confirmed and onward reservation, that the alien will not apply for extension of temporary stay or for adjustment of status under Section 245 of the Act, and that at all times he is not aboard an aircraft which is in flight through the United States he shall be in the custody directed by the district director. [2]

Conceding that Fook Hong Mak met the three numbered requirements of § 245(a) and that the presence in the United States of his wife and children, at least one of whom is a citizen, made even temporary departure somewhat of a **\*730** hardship, the Board of Immigration Appeals, affirming the Special Inquiry Officer, found that the italicized condition of the Regulation precluded consideration of his application for such relief. It granted the alternative request for voluntary departure, which will enable the petitioner to apply from abroad for entry as an immigrant. Fook Hong Mak says that whether or not the Board would have been justified in denying his application for adjustment of status on the merits, the Attorney General's self-imposed restriction on the consideration of it is unlawful. [3]

 **[1]**   We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis, if his determination is founded on considerations rationally related to the statute he is administering. The legislature's grant of discretion to accord a privilege does not imply a mandate that this must inevitably be done by examining each case rather than by identifying groups. The administrator also exercises the discretion accorded him when, after appropriate deliberation, he determines certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration, regardless of other factors that otherwise might tend in their favor. He has then decided that one element is of such determinative negative force that no possible combination of others could justify an

affirmative result. By the same token he could select one characteristic as entitling a group to favorable treatment despite minor variables. Nothing in this offends the basic concept that like cases should be treated similarly and unlike ones differently. The administrator has simply determined that the one paramount element creates such 'likeness' that other elements cannot be so legally significant as to warrant a difference in treatment. This may be an even 'juster justice' than to accord different treatment because of trivial differences of fact; at least it is competent for the administrator to think so. The leading student of the problem has recently so counseled:

When legislative bodies delegate discretionary power without meaningful standards, administrators should develop standards at the earliest feasible time, and then, as circumstances permit, should further confine their own discretion through principles and rules.

Davis, Discretionary Justice: A Preliminary Inquiry 55 (1969).

The authorities cited to us would not lead to any contrary view. 🚩 United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), rested on the basis that the Attorney General by regulation had delegated discretion to the Board of Immigration Appeals but then had precluded the Board from exercising it in certain instances. Here the Special Inquiry Officer and the Board are empowered to exercise only such discretion as the Attorney General himself could do within the Regulations he has prescribed. In 🚩 Mastrapasqua v. Shaughnessy, 180 F.2d 999, 1002 (2 Cir.1950), all the judges agreed that the Attorney General could set up a class of cases as to which he would refuse to exercise discretion, provided the class was 'rationally differentiated from other cases, not within that class, where he uses his discretion case by case.' The difference of opinion was whether the classification there was capricious, as the majority held, or rational, **\*731** as the dissenting judge thought. We have stated more recently, in 🚩 United States ex rel. Stellas v. Esperdy, 366 F.2d 266, 269-270 (2 Cir.1966), vacated and remanded at the INS' suggestion, on a point not here material, 388 U.S. 462, 87 S.Ct. 2121, 18 L.Ed.2d 1322 (1967):

* * * the Attorney General may govern the exercise of his discretion by written or unwritten rules; indeed it would be remarkable if he did not. Any such decision is an application

of facts to principles. All this regulation does is provide a substitute for the exercise of discretion on a case by case basis. But there has been an exercise of discretion; * * * We know of no rule which requires a case by case approach; the Attorney General certainly may proceed by regulation.

[2]  The Attorney General's determination that aliens who had obtained admission without a visa as being 'in immediate and continuous transit through the United States,' § 101(a) (15)(C), should not be eligible to apply for adjustment of status under § 245 was reasonably related to the statutory scheme. Both the definition and other provisions of the Immigration and Nationality Act, notably § 238(d) which authorizes the Attorney General to enter into contracts with transportation lines guaranteeing that such passage will occur, show that Congress authorized the Attorney General to accord the unusual benefit of admission as a nonimmigrant and without a visa only because quick departure was assured. It was reasonable for the Attorney General to conclude that aliens admitted on so fleeting a basis were not within the spirit of § 245 and thus could not deserve favorable exercise of his discretion, even if they came within the letter. He could properly have thought also that to entertain such applications in any case would encourage aliens to obtain admission under the pretense that they were in 'immediate and continuous transit' and then stay on for years, as Fook Hong Mak has managed to do, [4] thereby upsetting the balance of benefit and burden that Congress had envisioned. He could have thought further that affording such encouragement might create such burdens for transportation lines that had contracted to assure the departure of such aliens as to make them reluctant to do so and in the long run thus impede the facility of international travel which the privilege of transit without visa was intended to enhance.

[3]  Petitioner argues that however the matter might otherwise stand, the Attorney General's blanket exclusion of transits without visas from consideration for status adjustment under § 245 was unauthorized because that section itself states two exceptions— alien crewmen and aliens who are natives of any country of the Western Hemisphere or any adjacent island named in § 101(b)(5). But it is fallacious to reason that because Congress prevented the Attorney General from exercising any discretion in favor of those groups, which Congress had found to have abused the privileges accorded them, [5] it meant to require him to exercise it in favor of everyone else on a case-by-case basis even if experience should convince him of the existence of another group with similar potentialities or actualities of abuse. [6] Cf. Pfizer, Inc. v. Richardson, 434 F.2d 536, 537, 545 (2 Cir.1970).

Having expressed its judgment that two categories **\*732** should be ineligible for the exercise of discretion, Congress left it open to the Attorney General to determine whether the applications of all other aliens seeking status adjustment under § 245 should be evaluated on the merits of each case or whether some categories were susceptible to handling on a less individualized basis. See Davis, supra, at 56.

The petition to review is denied.

**All Citations**

435 F.2d 728

## Footnotes

\*    Of the Third Circuit, sitting by designation.

1    The applicable provision of the Regulation was first promulgated in 1963. 28 F.R. 3078. The Regulation has since been amended several times with respect to matters not material here.

2    While the Regulation in question was codified under § 214 in the Code of Federal Regulations, the authority under which it was issued derives not only from § 214 of the Act, whereby 'the admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe,' but also from § 103, charging the Attorney General with 'the administration and enforcement of this chapter and all other laws relating to this chapter' including the establishment of 'such regulations * * * as he deems necessary for carrying out his authority,' and § 245, providing for the adjustment of status of aliens 'in his discretion and under such regulations as he may prescribe.'

3    After the submission of briefs in this case, another panel of this court sustained the validity of the Regulation in a per curiam opinion, La Franca v. INS, 433 F.2d 992, 993 (2 Cir. 1970). In apparent recognition that the brief of counsel for La Franca did not challenge the validity of the Regulation with anything like the force of petitioner's brief here, the INS does not seriously object to our considering the issue on its merits. If we were to disagree with our brothers, which we do not, in banc consideration would be required.

4    The time involved in appeals from discretionary denials on the part of the Special Inquiry Officer to the Board of Immigration Appeals, and from the Board's affirmance to a court of appeals, is also relevant.

5    See House Report No. 2088, 86th Cong.2d 2d Sess., p. 2 (1960); Sen.Rep.No.748, 89th Cong. 1st Sess., p. 24 (1965).

6    This also disposes of appellant's contention that the last sentence in § 238(d), 'notwithstanding any other provision of this chapter, such aliens may not have their classification changed under section 248 * * *,' is indicative of a congressional intent to require case-by-case disposition of all applications for status adjustment under § 245.

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by United States v. De Souza, 11th Cir.(Fla.), April 28, 2020

611 F.3d 1337
United States Court of Appeals,
Eleventh Circuit.

Roberto GARCES, Petitioner,

v.

U.S. ATTORNEY GENERAL, Respondent.

No. 09–11520.

|

July 27, 2010.

**Synopsis**

**Background:** Alien, a native and citizen of Cuba, petitioned for review of a decision of the Board of Immigration Appeals (BIA), No. AXXX-XX1-016, 2009 WL 773211, dismissing his appeal from the removal order issued by the immigration judge (IJ).

**Holdings:** The Court of Appeals, Carnes, Circuit Judge, held that:

[1] Court of Appeals had jurisdiction to review underlying facts that established its jurisdiction or lack thereof, and

[2] alien's vacated guilty plea along with police reports did not amount to reason to believe that alien trafficked in controlled substances.

Petition granted; reversed and remanded.

West Headnotes (11)

[1] **Aliens, Immigration, and Citizenship** ⚷ Jurisdiction and venue

Although the Court of Appeals lacked jurisdiction on petition for review to review final order of removal against Cuban alien who was removable by reason of having committed a criminal drug trafficking offense, it did have

jurisdiction to determine the underlying facts that established its jurisdiction or lack thereof, as to whether the alien in fact committed the drug trafficking offense and was therefore removable. Immigration and Nationality Act, §§ 212(a)(2), 242(a)(2)(C), 8 U.S.C.A. §§ 1182(a)(2), 1252(a)(2)(C).

6 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** ⚷ Effect of expungement or vacation

A vacatur or expungement of a conviction obtained under a rehabilitative statute, or granted simply in order to help the alien avoid immigration hardships, has no effect for immigration law purposes.

1 Cases that cite this headnote

[3] **Aliens, Immigration, and Citizenship** ⚷ Effect of expungement or vacation

The vacatur of a conviction because of a constitutional, statutory, or procedural defect in the underlying criminal proceedings means that there is no longer a conviction for immigration law purposes. Immigration and Nationality Act, § 212(a)(2), 8 U.S.C.A. § 1182(a)(2).

4 Cases that cite this headnote

[4] **Aliens, Immigration, and Citizenship** ⚷ Effect of expungement or vacation

A vacated state conviction remains effective for immigration purposes if it is not clear from the record that the vacatur was based on a defect in the underlying proceedings.

3 Cases that cite this headnote

[5] **Aliens, Immigration, and Citizenship** ⚷ Controlled substances offenses

22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed. 2d 651

**Aliens, Immigration, and Citizenship** ← Effect of expungement or vacation

Cuban alien's guilty plea for cocaine trafficking in violation of Florida law, which was later vacated by Florida state court, combined with hearsay statements in police reports did not constitute "reason to believe" that alien trafficked in controlled substances, and thus, alien was not removable under statute permitting removal if Attorney General had reason to believe that alien was or had been an illicit drug trafficker; there was no showing that defendant made factual admission of guilt during plea proceedings, since Florida's rules at time of plea allowed defendant to plead guilty while maintaining his innocence, transcript of plea hearing was not available, and same state court later determined that plea was not voluntary, and police reports were not reliable to show alien's guilt, since they contained officers' conclusions, rather than their observations of facts, and reports were not corroborated. Immigration and Nationality Act, § 212(a)(2)(C), 8 U.S.C.A. § 1182(a)(2)(C); West's F.S.A. § 893.135.

11 Cases that cite this headnote

[6] **Aliens, Immigration, and Citizenship** ← Controlled substances offenses

A reason to believe determination, under statute permitting removal if Attorney General had reason to believe that alien was or had been an illicit trafficker in any controlled substance, can be made even if the alien was never convicted of any offense. Immigration and Nationality Act, § 212(a)(2)(C), 8 U.S.C.A. § 1182(a)(2)(C).

5 Cases that cite this headnote

[7] **Aliens, Immigration, and Citizenship** ← Effect of expungement or vacation

Fact that alien's drug conviction is subsequently vacated, for whatever reason, does not bar immigration authorities from using the facts that led to the conviction as the basis for a "reason to believe" determination, under statute permitting removal if Attorney General had reason to believe that alien was or had been an illicit trafficker in any controlled substance. Immigration and Nationality Act, § 212(a)(2)(C), 8 U.S.C.A. § 1182(a)(2)(C).

8 Cases that cite this headnote

[8] **Aliens, Immigration, and Citizenship** ← Substantial evidence in general

The task of the Court of Appeals on a petition for review is to determine whether the decision of the Board of Immigration Appeals (BIA) is supported by reasonable, substantial, and probative evidence.

7 Cases that cite this headnote

[9] **Aliens, Immigration, and Citizenship** ← Substantial evidence in general

The Court of Appeals will affirm the decision of the Board of Immigration Appeals (BIA) if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.

4 Cases that cite this headnote

[10] **Aliens, Immigration, and Citizenship** ← Civil proceedings in general

**Aliens, Immigration, and Citizenship** ← Weight and Sufficiency

Immigration proceedings are not criminal trials, and the reasonable, substantial, and probative evidence needed to support a determination of removability is considerably less than the proof beyond a reasonable doubt that would be required for a criminal conviction.

3 Cases that cite this headnote

[11] **Aliens, Immigration, and Citizenship** ← Evidence in Administrative or Judicial Proceedings

Garces v. U.S. Atty. Gen., 611 F.3d 1337 (2010)

22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed. 2d 651

The federal rules of evidence do not apply in administrative immigration proceedings.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1338** Tammy Fox–Isicoff, Rifkin & Fox–Isicoff, P.A., Miami, FL, for Petitioner.

David V. Bernal, Stuart S. Nickum, Dept. of Justice, Office Immigration Lit., Washington, DC, for Respondent.

Petition for Review of a Decision of the Board of Immigration Appeals.

Before CARNES, ANDERSON and STAHL,\* Circuit Judges.

**Opinion**

CARNES, Circuit Judge:

Roberto Garces has petitioned us for review of the Board of Immigration Appeals' **\*1339** order dismissing his appeal from an immigration judge's order finding him removable under section 212(a)(2)(C) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(2)(C), as an alien whom the Attorney General "knows or has reason to believe is or has been an illicit trafficker in any controlled substance." Unlike other grounds for inadmissibility that are triggered by criminal convictions, the "reason to believe" provision allows removal based on criminal conduct even if there was no conviction. At issue in this case is whether the combination of a guilty plea leading to a conviction that was later vacated and some hearsay statements in police reports provides enough reason to believe that Garces trafficked in a controlled substance. Our conclusion is that it does not, at least not in the circumstances of this case.

## I.

Garces, a native and citizen of Cuba, was paroled into the United States in 1980. *See generally* INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). Three years later, on April 6, 1983, he was caught up in a drug bust at a Miami Beach hotel. That would eventually lead to a removal notice being filed against Garces in 2006, an immigration hearing in 2007, a BIA decision in 2009, and this review of that decision.

Two different accounts of what happened that April night in 1983 emerge from the record, one from arrest reports and the other from Garces' testimony at his 2007 immigration hearing.

The record contains four sworn "complaints/arrest affidavits," which we will call arrest reports, prepared by the Miami Beach police officers who arrested Garces and five other men as a result of an attempted drug transaction that night. According to those four arrest reports, undercover officers had arranged a cocaine buy at a hotel. Around 9:45 p.m. George Canevaro "arrived w [ith]" Kevin Sayers and Juan Castillo, and Garces then arrived and "made contact with" Canevaro at the hotel. After Castillo made a phone call, Canevaro came up to the room where the undercover "buyer" was waiting. Canevaro walked out on the balcony, signaled to someone downstairs, turned around, and handed the undercover officer baggies containing about four ounces of cocaine. He was arrested a few minutes later.

Meanwhile, other officers saw Garces and a man named "Joseph" (last name unknown) get into a late-model Isuzu and begin to leave the parking lot. When the officers identified themselves and ordered Garces to stop, he swerved the car "towards" one of the officers and "attempted to run him down." After the officer jumped out of the way, the car hit a light pole and a tree and came to a stop. Joseph jumped out of the passenger side and was subdued after a struggle. He and Garces were placed under arrest and advised of their rights. None of the arrest reports mention any shots being fired.

Garces, testifying at his immigration hearing twenty-four years after the fact, told a different story. He was at home around 9:00 p.m. when Canevaro, his neighbor from down the block, stopped by and invited him to a birthday party. Garces had been acquainted with Canevaro for about a year, and the two men would chat when they washed their cars on Saturdays. He insisted that he had no idea that Canevaro, who had a job and a family, was involved in anything illegal. Garces did not know the person whose birthday was being celebrated, but he drove Canevaro to the party at a hotel in Miami Beach. When they arrived there at around 9:45 p.m., Garces pulled up in front of the lobby and Canevaro got out of the car to meet someone at the door. Garces then got out and asked Canevaro where he **\*1340** should park. Canevaro told a man named Joseph, whom Garces had not previously met, to show him where to take the car.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 785 of 1384

Garces v. U.S. Atty. Gen., 611 F.3d 1337 (2010)
22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed. 2d 651

As Garces, with Joseph in the car, was driving slowly through the dark parking lot looking for a space, several men approached, brandishing guns. When one of those men jumped in front of the car, Garces swerved to avoid hitting him, causing the car to crash. Joseph then jumped out of the car and began struggling with the men. Garces thought it was a robbery. He heard gunshots. [1] When he got out of the car, someone grabbed him from behind, put a gun to his head, and threw him to the ground. Only after they put him in handcuffs did he realize that the men were plainclothes police officers. Before that, Garces had not heard the men identify themselves as police. He testified he did not have any drugs on his person or in his car, and he had no idea that Canevaro had drugs and was planning to sell them.

Garces was initially charged with trafficking in cocaine, in violation of Fla. Stat. § 893.135; aggravated assault, in violation of Fla. Stat. § 784.021; and willfully fleeing, in violation of Fla. Stat. § 316.1935. On April 16, 1984, one year after his arrest, Garces pleaded guilty in Dade County Circuit Court to the trafficking [2] and aggravated assault charges. On May 30, 1984, he was sentenced to three years' probation on the drug charge; he received deferred adjudication and a suspended sentence on the assault charge.

Because the record in this case does not contain any transcript or minutes of the long-ago plea proceedings, we do not know what statements Garces made during those proceedings, or whether he was under oath at the time; we do not know what the judge said to him; and we do not know what evidence the prosecution had against him or whether the prosecutor recited it. When asked at the immigration hearing nearly a quarter of a century later why he had pleaded guilty if, as he now insists, he did not commit any crime, Garces testified that his attorney advised him to do so. He was told that if he took the plea deal he would get probation, which the lawyer called "nothing," but if he went to trial and lost, he could have faced up to 15 years in prison. Garces added that he also did not have the money to pay that lawyer to represent him through trial. The lawyer misadvised him that a guilty plea would not affect his immigration status.

## II.

Garces eventually found out that, as far as federal immigration law is concerned, a felony drug conviction is very far from

"nothing." *See, e.g.,* 8 U.S.C. § 1182(a)(2)(A)(i)(II) (alien convicted of, or who admits having committed, a controlled substance offense is inadmissible to this country). He learned that lesson when he first applied for permanent resident status and saw his application denied. [3] That prompted Garces to return in August of 2000 to the same state court that had convicted him sixteen years earlier and file a motion under Fla. R.Crim. P. 3.850 to vacate and set aside his guilty plea. His **\*1341** motion asserted that the plea was involuntary because the court had failed to advise him of potential immigration consequences as required by the Florida Rules of Criminal Procedure. *See* Fla. R.Crim. P. 3.172(c)(8) ("[T]he trial judge ... shall determine that [the defendant] understands ... that if he or she pleads guilty or nolo contendere, if he or she is not a United States citizen, the plea may subject him or her to deportation...."). The Florida court apparently agreed, because on August 11, 2000, it vacated Garces' guilty plea and resulting convictions. The same court order also noted that the state had decided to *nol pros* the original charges, not a surprising decision in light of the length of time that had elapsed.

At some point after his convictions were vacated, though the record does not indicate exactly when, Garces submitted a second application to the United States Citizenship and Immigration Services seeking adjustment to permanent resident status under the Cuban Adjustment Act, Pub.L. No. 89–732, 80 Stat. 1161 (Nov. 2, 1966) (reproduced as a historical note to 8 U.S.C. § 1255). The USCIS denied Garces' second application on August 11, 2006, informing him that he was still inadmissible to the United States because there was reason to believe he had engaged in drug trafficking. *See* 8 U.S.C. § 1182(a)(2)(C).

On September 28, 2006, the Department of Homeland Security revoked Garces' parole into this country and initiated removal proceedings. The Notice to Appear charged two grounds for removal: (1) that he was an immigrant not in possession of a valid visa or other entry document, INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I); and (2) that there was reason to believe he had engaged in drug trafficking, INA § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C)(i). Specifically, it alleged that he "sold 4 ½ ounces, more or less, of Cocaine to an undercover Police Officer" in 1983.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 786 of 1384

Garces v. U.S. Atty. Gen., 611 F.3d 1337 (2010)
22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed. 2d 651

On December 6, 2006, Garces filed a motion in the Immigration Court to renew his application under the Cuban Adjustment Act. He denied any involvement in the cocaine sale, telling the court he had only pleaded guilty because he could not afford to pay his lawyer through a trial and he believed that the probationary sentence would not affect his immigration status. Garces argued that there was insufficient evidence to establish that he "knowingly and consciously participated" in the cocaine transaction.

At the initial hearing before the immigration judge on December 12, 2006, Garces conceded removability on the documents charge but denied that he was removable on the drug trafficking charge. Pointing out that his trafficking conviction had been vacated, he insisted he had nothing to do with the 1983 drug transaction that had led to that conviction. The government acknowledged that the conviction itself could no longer be considered, but indicated that it would rely on the underlying facts of the arrest as reason to believe Garces had engaged in drug trafficking. The IJ did not rule on Garces' motion to renew his Cuban Adjustment Act application. The IJ did say, however, that if convinced there was no reason to believe that Garces had trafficked drugs, he would find him to be not inadmissible and terminate the removal proceedings, which would enable Garces to reapply for an adjustment of status.

On April 3, 2007, the IJ held an evidentiary hearing on whether there was reason to believe that Garces had trafficked drugs. The 1983 arrest reports that referred to Garces were admitted without objection.[4] Garces testified to his version **\*1342** of what had happened on the evening of April 6, 1983. *See supra* 1339–40. On cross-examination, the government questioned him about discrepancies between his testimony and what was reported in the officers' affidavits. *See supra* 1339–40.

Six days later, on April 9, the IJ issued a written order sustaining Garces' removability on the "reason to believe" charge. He found that Garces was "not a particularly credible witness," and to support that finding gave three reasons. First, Garces testified that he had driven Canevaro to the hotel, while the arrest report said that he had "made contact with" Canevaro there. When asked about that discrepancy, Garces had no explanation. Second, the IJ found that a last minute invitation to a birthday party for someone Garces did not even know was "not a plausible or reasonable explanation" for his presence at the hotel. Third, the IJ thought Garces' story that the plainclothes officers had approached his car

without identifying themselves and at some point fired their weapons "hardly seems credible or within standard police operating procedure," especially since the police reports did not mention any gunfire. Garces did not offer "any meaningful or credible testimony" to dispute the account of his conduct in the arrest reports. The IJ concluded by finding that Garces "was a conscious participant in a drug transaction" and was therefore removable as a drug trafficker.

Garces moved for reconsideration, arguing that the IJ erred by giving too much weight to the arrest affidavits, which have limited probative value under BIA precedent and which would be inadmissible as hearsay in a Florida court. *See* In re Arreguin De Rodriguez, 21 I. & N. Dec. 38, 42 (BIA 1995); Fla. Stat. § 90.803(8). In any case, he argued, the affidavits did not allege he was caught with any drugs, and any differences between the reports and his own version of events were insignificant. The IJ denied Garces' motion for reconsideration and later entered a final order finding him removable on both the documents charge and the drug trafficking charge. Although the documents charge would not have prevented Garces from obtaining lawful residency under the Cuban Adjustment Act, the finding of reason to believe that he had trafficked in drugs would and did.

Garces filed a timely appeal with the BIA, repeating the same arguments he had made to the IJ in his motion for reconsideration. On September 18, 2008, the BIA issued a final order affirming the IJ's finding of inadmissibility on the documents charge. The BIA concluded that it did not need to address Garces' challenge to the trafficking charge because he had conceded removability on the documents charge, and he had not identified any form of relief from removal for which he would be eligible.

Garces promptly filed a motion for reconsideration, arguing that the BIA erred as a matter of law in not addressing the trafficking charge. He pointed out that he had requested relief from removal when he moved in the Immigration Court to reopen his application for adjustment of status under the Cuban Adjustment Act. While the drug trafficking charge would prevent him from obtaining lawful residency under the CAA, the documents charge alone would not. On October 20, 2008, with his motion for reconsideration still pending before the BIA, Garces filed a petition in this Court for review of the BIA's order. *Garces v. U.S. Att'y Gen.,* No. 08–15926.

**\*1343** The BIA granted Garces' motion for reconsideration, but dismissed his appeal. In its March 9, 2009 order the BIA found no reversible error in the IJ's conclusion that Garces was removable on the "reason to believe" charge. It explained:

> The record evidence, including the police report and the "Motion to Vacate and Set Aside Guilty Plea" in which the respondent confirms that he pled guilty to possession with intent to sell cocaine, is admissible for the purpose of establishing his inadmissibility, and is reasonable, substantial, and probative evidence supporting the Immigration Judge's finding of inadmissibility under section 212(a)(2)(C) of the Act.

Garces filed with us a timely petition for review of the BIA's March 9 order, along with a motion to consolidate it with his earlier petition. *Garces v. U.S. Att'y Gen.,* No. 09–11520. We granted the motion to consolidate. The government moved to dismiss both of the petitions for review for lack of jurisdiction. We dismissed the petition for review of the BIA's initial September 18, 2008 order as moot in light of the March 9, 2009 order. However, we denied the government's motion to dismiss the petition for review of the March 9, 2009 order, explaining that Garces "raises a colorable legal argument as to whether the [BIA] erred in considering his vacated conviction in holding that there was reason to believe that Garces had engaged in trafficking a controlled substance." After oral argument on March 19, 2010, we directed the parties to submit supplemental briefing on two issues: (1) the significance, if any, of the Supreme Court's decision in *Kercheval v. United States,* 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927), which held that a withdrawn guilty plea is inadmissible in subsequent criminal proceedings; and (2) whether Florida procedural rules in effect in 1984 would have required Garces to make a sworn factual admission of guilt when he entered his plea.

### III.

**[1]** Before reaching the merits, we must first determine whether we have jurisdiction. We lack jurisdiction to review a final order of removal against an alien who "is removable by reason of having committed a criminal offense covered in [8 U.S.C.] section 1182(a)(2)," such as drug trafficking. INA § 242(a)(2)(C), 8 U.S.C. § 1252(a)(2)(C). We do, however, have jurisdiction to determine underlying facts that establish our jurisdiction or lack of it—in this case, to determine whether Garces in fact "committed a criminal offense" and therefore "is removable." The upshot of all this is that the jurisdictional question merges into our consideration of the merits.[5] *See Resendiz–Alcaraz v. U.S. Att'y Gen.,* 383 F.3d 1262, 1266–67 (11th Cir.2004); *Fernandez–Bernal v. U.S. Att'y Gen.,* 257 F.3d 1304, 1309–10 (11th Cir.2001).

### IV.

If Garces' state conviction still stood, there is no question that he would have been subject to removal. Under INA § 212(a)(2)(A)(i)(II), 8 U.S.C. § 1182(a)(2)(A)(i)(II), he would have been **\*1344** inadmissible as an alien convicted of violating a state law "relating to a controlled substance" for which the maximum possible penalty exceeded one year's imprisonment. *Id.* § 1182(a)(2)(A)(ii)(II); *see* Fla. Stat. §§ 893.135(1)(b)(1) and 775.082(3)(b) (first degree felony punishable by up to thirty years in prison). Whether Garces actually committed the crime would not have mattered, because the BIA "will not go behind a record of conviction to determine the guilt or innocence of an alien." *In re Arreguin De Rodriguez,* 21 I. & N. Dec. at 42.

**[2]** **[3]** Whether Garces committed that crime or, more specifically, whether there is reason to believe that he did, does matter because his conviction was vacated. In the eyes of the State of Florida that conviction is a legal nullity. Whether it is a nullity for purposes of 8 U.S.C. § 1182(a)(2) and other provisions of federal immigration law that refer to criminal convictions, depends on the reason it was vacated. A vacatur or expungement obtained under a rehabilitative statute, or granted simply in order to help the alien avoid "immigration hardships," has no effect for immigration law purposes. *See In re Adamiak,* 23 I. & N. Dec. 878, 879–80 (BIA 2006). By contrast, the vacatur of a conviction because of a constitutional, statutory, or procedural defect in the underlying criminal proceedings does have effect—there is no longer a "conviction" for immigration purposes. *Id.* We held in *Alim v. Gonzales,* 446 F.3d 1239 (11th Cir.2006), that the BIA's approach as outlined in *Adamiak* was a reasonable interpretation of the Immigration and Nationality Act and was therefore entitled to *Chevron* deference. *Id.* at

Garces v. U.S. Atty. Gen., 611 F.3d 1337 (2010)

22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed. 2d 651

1249–50; *cf.* *Resendiz–Alcaraz v. U.S. Att'y Gen.,* 383 F.3d 1262, 1267–69 (11th Cir.2004) (a state conviction expunged because defendant successfully completed probation was still a "conviction" under INA).

[4] The petitioner in *Alim* faced removal under the "crime of moral turpitude" provision of 8 U.S.C. § 1227(a)(2)(A)(ii) because of a Florida conviction for domestic battery. *Alim,* 446 F.3d at 1242–43. He obtained a vacatur of his guilty plea and conviction on the same ground as Garces: his plea was involuntary because the court failed to advise him of possible immigration consequences. *Id.* at 1243; *see* Fla. R.Crim. P. 3.172(c)(8). Because the state court vacated the conviction due to a defect in the underlying proceedings, Alim was no longer "convicted" for immigration purposes, and the same is true of Garces. [6] *See* *Alim,* 446 F.3d at 1250–51. It is not necessary that the defect be one that implicates a federal right, although this one probably does. [7] **\*1345** We give full faith and credit to the Florida court's determination that the judgment of conviction was flawed because Garces was deprived of a right he did have under Florida law. *See* *Adamiak,* 23 I. & N. Dec. at 881 (accepting vacatur based on violation of Ohio rule similar to Florida's); *cf.* *In re Rodriguez–Ruiz,* 22 I. & N. Dec. 1378, 1379–80 (BIA 2000) (giving full faith and credit to New York court's judgment vacating a conviction that had been entered by the courts of that state, and declining to analyze whether that court had correctly applied the law in doing so).

[5] Unfortunately for Garces, the vacatur of his conviction did not end the matter. The matter lingers on because the charge on which he was found removable does not depend on a criminal conviction. Instead, it requires simply that there be "reason to believe" Garces engaged in drug trafficking. The relevant provision of the INA reads as follows:

(C) CONTROLLED SUBSTANCE TRAFFICKERS— Any alien who the consular officer or the Attorney General knows or has reason to believe—

(i) is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in [ 21 U.S.C. § 802]), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so ... is inadmissible.

INA § 212(a)(2)(C), 8 U.S.C. § 1182(a)(2)(C).

[6] [7] A "reason to believe" determination can be made even if the alien was never convicted of any offense. *See* *In re Favela,* 16 I. & N. Dec. 753, 754–56 (BIA 1979) (alien excluded based on his admission that he attempted to smuggle marijuana, even though he was not convicted of a controlled substance offense); *In re Rico,* 16 I. & N. Dec. 181, 185–86 (BIA 1977) (alien excluded after being caught with truckload of marijuana, even though criminal charges were dropped); *In re R–H–,* 7 I. & N. Dec. 675, 678 (BIA 1958) (alien excluded based on his admission that he helped dealer deliver marijuana, even though he was never convicted of it). And the fact that a drug conviction is subsequently vacated, for whatever reason, does not bar immigration authorities from using the facts that led to the conviction as the basis for a "reason to believe" charge. *See* *Castano v. INS,* 956 F.2d 236, 238–39 (11th Cir.1992) (upholding BIA's determination of removability based on facts underlying conviction for distributing cocaine, even though conviction was expunged under federal youthful-offender rehabilitation statute). To hold otherwise would lead to the absurd result that an alien who was convicted, and then obtained a vacatur, would be in a better position than one who was never convicted in the first place. *Id.* at 239. Given that the conviction is out of the picture, the question is whether the evidence in the record shows that there is "reason to believe" that Garces was engaged in drug trafficking on that April night in Miami when he was arrested and charged with the crime.

[8] Although Garces was paroled into the United States in 1980, he was never admitted as a legal resident. *See* INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A) ("parole ... shall not be regarded as an admission of the alien"). For that reason, in the removal proceeding the burden was on him to establish that he was "clearly **\*1346** and beyond doubt" entitled to admission, and that he was not inadmissible under any of the grounds enumerated in 8 U.S.C. § 1182(a). *See* 8 U.S.C. § 1229a(c)(2)(A). [8] According to the government, that means Garces had to prove clearly and beyond doubt that it would be "unreasonable" to believe he had engaged in drug trafficking. However, the burden of proof in the immigration hearing and the standard of review on appeal are not the same thing. *See* *Adefemi v. Ashcroft,* 386 F.3d 1022, 1027

& n. 9 (11th Cir.2004) (en banc) explaining how burden of proof differs from standard of review in the context of immigration proceedings). Our task is to determine whether the BIA's decision is supported by reasonable, substantial, and probative evidence. *See Diallo v. U.S. Att'y Gen., 596 F.3d 1329, 1332 (11th Cir.2010)* (per curiam). The fact that Garces had the burden before the IJ does not change our review of the BIA's decision. *See Adefemi, 386 F.3d at 1027; see also Blanco v. Mukasey, 518 F.3d 714, 720 (9th Cir.2008)* (reviewing BIA's decision under substantial-evidence standard while noting that alien had burden of proof below); *Singh v. Gonzales, 413 F.3d 156, 160–61 (1st Cir.2005)* (same).

Burdens of proof notwithstanding, a finding of inadmissibility must be based on something more than the alien's failure to prove a negative. We do not require every alien seeking admission to the United States to produce evidence proving clearly and beyond a doubt that he is not a drug trafficker, unless there is already some other evidence—some "reason to believe"—that he is one. The State Department's *Foreign Affairs Manual* explains what is needed to make such a determination:

> "Reason to believe" might be established by a conviction, an admission, a long record of arrests with an unexplained failure to prosecute by the local government, or several reliable and corroborative reports. The essence of the standard is that the consular officer must have *more than a mere suspicion—there must exist a probability, supported by evidence,* that the alien is or has been engaged in trafficking....

U.S. Dep't of State, 9 *Foreign Affairs Manual* 40.23 Notes n. 2(b) (emphasis added).

 **[9]**    The *Foreign Affairs Manual* rule, which is addressed to the officers who make initial determinations on an alien's admissibility, is consistent with the standard of review that applies at later stages of appeal. The BIA itself requires that a finding of inadmissibility under the "reason to believe" provision be based on "reasonable, substantial, and probative evidence." *Rico, 16 I. & N. Dec. at 185.* [9] Likewise, we will affirm the BIA's decision if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Diallo, 596 F.3d at 1332. See also Alarcon–Serrano v. INS, 220 F.3d 1116, 1119 (9th Cir.2000)* ("The appropriate way of measuring whether the IJ and the BIA had 'reason to **\*1347** believe' that [petitioner] knew he was participating in drug trafficking is to determine whether substantial evidence supports such a conclusion. In this regard, the conclusion of the immigration judge must be affirmed if based on reasonable, substantial, and probative evidence.").

In this case, the BIA determined that "[t]he record evidence, including the police report and the 'Motion to Vacate and Set Aside Guilty Plea' in which the respondent confirms that he pled guilty to possession with intent to sell cocaine," constituted reasonable, substantial, and probative evidence supporting the IJ's finding that Garces was inadmissible because there was reason to believe he had engaged in drug trafficking. We consider the guilty plea and the arrest reports in turn.

## A.

 **[10]**    **[11]**    Even though Garces' 1984 conviction itself no longer exists for immigration purposes, *see Alim, 446 F.3d at 1250–51,* the facts that led to it can still support a "reason to believe" determination if they are established by reasonable, substantial, and probative evidence. *See Castano, 956 F.2d at 238–39.* Of course, in any civil or criminal proceeding in federal court, evidence of a withdrawn guilty plea, or of any statements made in the course of plea proceedings or negotiations, would not be admissible. *Fed.R.Evid. 410.* Rule 410 codifies and expands the Supreme Court's holding in *Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927),* that a withdrawn guilty plea is not admissible in a later criminal trial for the same offense. *Id. at 223–24, 47 S.Ct. at 583* ("When the plea was annulled it ceased to be evidence."); *see Fed.R.Evid. 410* advisory committee's note. Though its language is sweeping, *Kercheval*'s actual holding is limited to the context of a later criminal trial on the same offense. *See id.* For that reason, it has no direct application to immigration proceedings which, although their result may be dictated by the outcome of an

22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed. 2d 651

earlier criminal case, are not a continuation of that case. Immigration proceedings are not criminal trials, and the "reasonable, substantial, and probative evidence" needed to support a determination of removability is considerably less than the proof beyond a reasonable doubt that would be required for a criminal conviction. *See Rico,* 16 I. & N. Dec. at 185. Furthermore, it is a "well-settled principle[ ]" that the Federal Rules of Evidence do not apply in administrative proceedings. *Dir. of Office of Thrift Supervision, U.S. Dep't of Treasury v. Lopez,* 960 F.2d 958, 964 n. 11 (11th Cir.1992); *see also Myers v. Sec'y of Health & Human Servs.,* 893 F.2d 840, 843 (6th Cir.1990) (specifically holding that Rule 410 does not apply in administrative proceedings). Neither *Kercheval* nor Rule 410 categorically bars the BIA from considering Garces' withdrawn plea for any purpose. *See Castano,* 956 F.2d at 238 (BIA could consider as part of "reason to believe" determination a guilty plea to a cocaine trafficking charge even though the resulting conviction was later expunged for rehabilitation purposes). The question is how much evidentiary weight, under these circumstances, the BIA reasonably could give the fact that Garces pleaded guilty to the drug trafficking charge in 1984.

Given the state of the record, the simple fact that Garces entered a guilty plea can carry little or no probative weight. The record does not show that Garces made any factual admission of guilt, sworn or otherwise, in the plea proceedings. Florida's rules at the time recommended that the trial judge "should" place a defendant under oath before questioning him to ascertain the voluntariness of the plea, but they did not require it. *See* Fla. R.Crim. P. 3.172(c). Regardless, the plea itself cannot be taken as an admission of guilt because Florida law in 1984, as it does **\*1348** today, expressly allowed a defendant to plead guilty while maintaining his innocence. *See* Fla. R.Crim. P. 3.172(d) (1977) (current version at id. 3.172(e)) ("Before the trial judge accepts a guilty or nolo contendere plea, he must determine that the defendant either 1) acknowledges his guilt, or 2) acknowledges that he feels the plea to be in his best interest, while maintaining his innocence."). This rule is adopted to permit so-called *Alford* "plea of convenience."

*Id.* 3.172 committee note; *see North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (no constitutional error in accepting a guilty plea from a defendant who maintains his innocence, as long as the plea has a factual basis).

The record does not tell us whether Garces admitted his guilt and entered the plea on that basis or maintained his innocence and entered a "plea of convenience" because he was convinced it was in his best interest to do so. In fact, the record tells us nothing at all about what happened at the plea proceeding or in whatever negotiations led up to it. We do not know what the court asked Garces, whether he was put under oath, or whether he admitted any facts indicating his guilt. The government argues it is Garces' burden to convince us that he did enter a "plea of convenience" or "best interests" plea while maintaining his innocence. As we have already explained, however, *supra* at 1345–47, our concern is not with who has the burden of proof but with whether substantial evidence supports the BIA's determination. Florida's rule put the burden on the trial judge to determine that the defendant was making a knowing and voluntary plea either because he was actually guilty or because it was in his best interests to do so, *see* Fla. R.Crim. P. 3.172(d) (1977), but that tells us nothing about which basis the judge accepted the plea found to exist. We can only speculate. [10] Regardless of what happened at the plea colloquy, the same state court that accepted the plea in the first place has since determined that it was not voluntarily entered. *See id.* 3.172(c)(8).

If the record established that Garces had indeed stood up in court and admitted the facts of the offense under oath, or that Florida procedural rules would necessarily have required him to do so, this would be a different case and the result might well be different. We need not decide whether a plea given under those circumstances would necessarily be sufficient in and of itself to establish "reason to believe." [11] Of **\*1349** course, such an admission by a defendant—especially if made under oath—would be strong evidence that he did in fact commit the crime. [12] As the Supreme Court has noted in another context, "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977). An alien who had admitted under oath that he was guilty of the crime would have enormous difficulty convincing immigration authorities that there was no reason to believe that he had committed it. Given the fact that Florida allows pleas of convenience without any admission of guilt, and given the state of the record, however, there is no substantial evidence that Garces admitted anything when he pleaded guilty a quarter of a century ago. For that reason, the fact that

AR.04631

he pleaded guilty does not corroborate the allegations in the arrest reports.

## B.

We are left with only the arrest reports. Both federal and Florida courts would exclude those documents as hearsay in a criminal case, *see* Fed.R.Evid. 803(8) (police reports not admissible under public records hearsay exception); Fla. Stat. § 90.803(8) (same), but that does not bar them from being considered in an administrative immigration proceeding. *See* Lopez, 960 F.2d at 964 n. 11. Even so, the BIA implicitly acknowledged the reliability concerns [13] behind Rule 803(8) when it decided to give "little weight" to arrest reports that are not corroborated by other evidence.

*See* Arreguin De Rodriguez, 21 I. & N. Dec. at 42 ("[W]e are hesitant to give substantial weight to an arrest report, absent a conviction or corroborating evidence of the allegations contained therein. Here, the applicant conceded that the arrest took place but admitted to no wrongdoing. Considering that prosecution was declined and that there is no corroboration, from the applicant or otherwise, we give the apprehension report little weight."). The arrest reports state the police officers' conclusions (saying Garces "was involved in a cocaine deal") rather than recording their observations of facts sufficient to show guilt. And the *Foreign Affairs Manual* instructs immigration officers not to base a finding of inadmissibility solely on "conclusions of other evaluators ... no matter how trustworthy." 9 *FAM* 40.23 Notes n. 2(c).

Even if we assume the accuracy of the facts stated in the reports, they do not say much. They say that Garces "made contact with" Canevaro, but do not tell how. They also say that after Canevaro was caught with cocaine Garces tried to drive off when the undercover officers approached his car. But no drugs or drug paraphernalia were found on Garces or in his car, and he was not in the room when Canevaro handed the drugs to the undercover officer. Of course, the "reason to believe" charge does not require evidence that Garces himself actually handled the drugs; it is enough if he knowingly aided, abetted, or conspired with someone else **\*1350** who did. *See* 8 U.S.C. § 1182(a)(2)(C)(i). But there must be some reasonable, substantial, and probative evidence that he was a "knowing and conscious participant" in Canevaro's cocaine transaction. *See* Rico, 16 I. & N. Dec. at 186; R–H–, 7 I. & N. Dec. at 678. Although the circumstances might give rise

to some suspicion that Garces knew what Canevaro was up to, "mere suspicion" is not enough. *See* 9 FAM 40.23 Notes n. 2(b).

Decisions of this Court and the BIA upholding "reason to believe" determinations have done so on considerably more substantial evidence. In those cases, the alien either admitted that he had trafficked in drugs, or he was caught with a significant quantity of them. *See* Castano, 956 F.2d at 238 & n. 6 (INS "in effect 'retried' " the criminal case, introducing "lengthy evidence, both documentary and testimonial," and alien did not contest facts); Favela, 16 I. & N. Dec. at 754 (alien "admitted his conscious participation" in attempt to smuggle marijuana); Rico, 16 I. & N. Dec. at 182–83 (several DEA, Border Patrol, and Customs agents testified that alien was caught at the border with 162 pounds of marijuana in his pickup truck; he told agents he knew "something" was in the truck and offered to give them information on other drug traffickers; his later story that he had only borrowed the truck for the day was contradicted by agents' testimony that they had seen him crossing the border several times before in the same vehicle); R–H–, 7 I. & N. Dec. at 678 (alien admitted he helped dealer deliver marijuana cigarettes to customers). We cite these cases not to suggest that they set a bar to be cleared, but simply to illuminate the weakness of the evidence against Garces. We do not have to define the minimum showing necessary to establish "reason to believe" in order to conclude that it was not made in this case.

## V.

The BIA's decision, terse as it is, appears to take the fact of Garces' guilty plea as an admission by him that corroborates the allegations in the arrest reports. For the reasons we have stated, it does not. Absent corroboration, the arrest reports by themselves do not offer reasonable, substantial, and probative evidence that there is reason to believe Garces engaged in drug trafficking. Accordingly, the BIA's order is reversed, and the case is remanded for further proceedings consistent with this opinion. [14]

REVERSED AND REMANDED.

Garces v. U.S. Atty. Gen., 611 F.3d 1337 (2010)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 792 of 1384

22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed. 2d 651

**All Citations**

611 F.3d 1337, 22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed.
2d 651

# Footnotes

* Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

1 Garces' counsel does not contend that any shots were actually fired that night but instead suggests that his client was "confused" after wrecking the car and might have mistaken some other noise for gunfire.

2 The few state court documents that are in the record are inconsistent as to whether the charge to which Garces ultimately pleaded was trafficking in cocaine, Fla. Stat. § 893.135, or sale of an opium derivative, Fla. Stat. § 893.13. For purposes of federal immigration law and this appeal, it makes no difference.

3 The record does not contain any details about this first application.

4 Garces is mentioned by name in only two of the reports, his own and that for "Joseph." Neither side attempted to track down the arresting officers. Even if they could have been found, it is unlikely that after so many years they would have remembered any independent detail about what seems to have been a fairly routine drug bust.

5 As part of the threshold jurisdictional inquiry, the government urges us to review the entire record *de novo* and make our own independent determination as to whether Garces engaged in drug trafficking before we decide whether the BIA had reason to believe that he did. Apparently, it makes this suggestion so that we will take into account the IJ's finding that Garces did not testify credibly, which we would not otherwise consider because the BIA did not expressly adopt it. *See* Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir.2001). It would make no difference if we did that, because the inconsistencies identified by the IJ in Garces' testimony are not significant enough to change our conclusion that the record fails to support a "reason to believe" determination.

6 By contrast, a vacated state conviction remains effective for immigration purposes if it is not clear from the record that the vacatur was based on a defect in the underlying proceedings. *See* Ali v. U.S. Att'y Gen., 443 F.3d 804, 810–11 & n. 7 (11th Cir.2006) (alien was removable based on vacated Georgia conviction for child molestation, where state court said only that it granted vacatur "for good cause shown and by consent of the parties" and did not explain further; alien claimed it was because he had not been warned of immigration consequences, but Georgia law at the time did not require such a warning).

7 In *Padilla v. Kentucky,* 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), the Court held that an attorney's failure to warn a non-citizen defendant of possible immigration consequences of his plea can, assuming prejudice is shown, constitute ineffective assistance of counsel in violation of the Sixth Amendment. *Id.* at 1482–84. Padilla, who like Garces faced a state drug trafficking charge, received the same type of erroneous advice when his attorney told him he would "not have to worry" about his immigration status if he took a plea deal. *Id.* at 1478. Still, neither the Supreme Court nor this Court has specifically held that a defendant's ignorance of immigration consequences renders his guilty plea involuntary. *See* United States v. Campbell, 778 F.2d 764, 768 (11th Cir.1985) (holding that because deportation is merely a collateral consequence of criminal conviction, there is no federal constitutional right to be warned of it); *cf.* Padilla, 130 S.Ct. at 1481–82 (recognizing disagreement among courts as to whether deportation is a direct or a collateral consequence of conviction, and declining to decide the question).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 793 of 1384

**Garces v. U.S. Atty. Gen., 611 F.3d 1337 (2010)**

22 Fla. L. Weekly Fed. C 1218, 76 A.L.R. Fed. 2d 651

8       By contrast, if Garces had already obtained legal resident status, then the government would bear the burden of proving the trafficking charge in a removal proceeding by clear and convincing evidence. 8 U.S.C. § 1229a(c)(3)(A); *see Woodby v. INS,* 385 U.S. 276, 286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966) (facts alleged as grounds for deportation of resident alien must be found by "clear, unequivocal, and convincing evidence").

9       The BIA has also suggested that where the ground asserted for exclusion is one that would permanently bar the alien from admission to the United States, "close scrutiny" of the factual basis for the charge is warranted. *In re Healy and Goodchild,* 17 I. & N. Dec. 22, 29 & n. 7 (BIA 1979) (alien charged with willfully making false statement to obtain visa).

10      We have no idea what the case against Garces looked like by the time he took the plea offer, a year after his arrest. We do not know whether any of the co-defendants implicated him, or even whether the powder seized from Canevaro was tested to determine if it actually was cocaine. As an argument of last resort, the government urges us to consider Garces' willingness to enter the plea as an acknowledgment by him that the state's evidence was strong enough to convict him. Though that might have been the case, it just as well might not have been so. The reason Garces pleaded guilty could have been that the prosecutor offered him such a sweet deal, with no actual jail time, that it was too tempting for Garces to pass up and risk even a small chance of being convicted after a trial and sentenced to imprisonment. It might even be argued that the fact that the prosecutor offered Garces such leniency indicates a lack of confidence in the case against him. The point is that speculation concerning the beliefs of Garces and the prosecutor about what might have happened at trial is not "reasonable, substantial, and probative evidence."

11      We also need not decide whether an alien who in the course of pleading guilty admitted having committed the criminal conduct in question would be removable under 8 U.S.C. § 1182(a)(2)(A) (removability where the alien "admits having committed, or ... admits committing acts which constitute the essential elements of" a covered offense). The government has not argued that under the facts of this case that provision is applicable.

12      In *Castano* we stated that because the "petitioner has pleaded guilty to cocaine trafficking, it logically follows that immigration officials do not merely have reason to believe he has trafficked in narcotics, they have reason to know he has done so." 956 F.2d at 238. But Castano, unlike Garces, never denied that he had committed the offense and did not dispute any of the factual allegations against him.

13      *See* Fed.R.Evid. 803(8) advisory committee's note (1974 enactment) (citing as one reason for excluding police reports that "observations by police officers at the scene of the crime or the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases").

14      Garces' argument that the BIA violated his due process rights by failing to adequately explain the reasoning behind its decision is therefore moot, and we do not address it.

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Mejia v. Sessions, 4th Cir., August 9, 2017

856 F.3d 27
United States Court of Appeals, First Circuit.

Victor Garcia GARCIA, Petitioner,

v.

Jefferson B. SESSIONS, III, Attorney

General of the United States, [*] Respondent.

Nos. 15-2571; 16-1964
|
May 3, 2017

**Synopsis**

**Background:** Alien petitioned for review of order of the Board of Immigration Appeals (BIA) upholding Immigration Judge's grant of withholding of removal, but determining that, as alien who was subject to reinstated order of removal, he was not eligible for asylum.

**Holdings:** The Court of Appeals, Barron, Circuit Judge, held that:

[1] Department of Homeland Security (DHS) regulations which, in specifying that aliens who are subject to reinstated orders of removal are eligible to apply only for mandatory relief in nature of withholding of removal and are ineligible to apply for discretionary grant of asylum, sought to implement apparently conflicting provisions of the Immigration and Nationality Act (INA), represented reasonable attempts at reconciling this statutory tension;

[2] rule of lenity, as applied in immigration context to require resolution of statutory ambiguity in alien's favor to protect alien from drastic consequence of removal, could not apply to contravene the Board of Immigration Appeals' (BIA's) reasonable interpretation of immigration statute; and

[3] *Charming Betsy* canon of statutory construction did not compel different result.

Petitions denied.

Stahl, Circuit Judge, filed dissenting opinion.

West Headnotes (8)

**[1]** **Administrative Law and Procedure** ⟳ Asylum, refugees, and withholding of removal

**Aliens, Immigration, and Citizenship** ⟳ Law questions

Whether alien, being subject to a reinstated order of removal, was eligible to apply for asylum, or only for withholding of removal, turned on questions implicating agency's construction of statute which it administered, so that agency's construction was entitled to *Chevron* deference. Immigration and Nationality Act §§ 208(a)(1), 241(a)(5), 8 U.S.C.A. §§ 1158(a)(1), 1231(a)(5).

5 Cases that cite this headnote

**[2]** **Administrative Law and Procedure** ⟳ Plain, literal, or clear meaning; ambiguity or silence

Under *Chevron* analysis, court first asks whether Congress has directly spoken to the precise question at issue; if it has, then courts, as well as administrative agency, must give effect to unambiguously expressed intent of Congress.

**[3]** **Administrative Law and Procedure** ⟳ Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** ⟳ Permissible or reasonable construction

If court determines that Congress has not directly addressed the precise question at issue, it must move on to second step of *Chevron* analysis and ask whether implementing agency's construction of statute is reasonable; if so, then *Chevron* requires federal court to accept the agency's construction of the statute.

[4]  **Aliens, Immigration, and
Citizenship** ⚷ Ineligible Aliens

Congress, by amending provision of the
Immigration and Nationality Act (INA) to
replace the indefinite article "an" with "any," in
specifying that "any alien" was entitled to apply
for asylum, did not clearly and unambiguously
grant alien who was subject to reinstated order
of removal the right to apply for asylum,
given that another provision of the INA, which
was enacted on same date, expressly purported
to foreclose such relief; even assuming that
the word "any" was more sweeping than the
word "an," court was reluctant to conclude that
Congress used subtle stratagem of replacing one
indefinite article with a different one to signal
its unambiguous intent to make an exception
to otherwise categorical bar that Congress set
forth the very same day in different provision
of the INA. Immigration and Nationality Act §§
208(a)(1), 241(a)(5), 📄 8 U.S.C.A. §§ 1158(a)
(1), 📄 1231(a)(5).

1 Cases that cite this headnote

[5]  **Administrative Law and
Procedure** ⚷ Asylum, refugees, and
withholding of removal

**Aliens, Immigration, and
Citizenship** ⚷ Eligibility; Refugee Status

**Aliens, Immigration, and
Citizenship** ⚷ Law questions

Department of Homeland Security (DHS)
regulations which, in specifying that aliens who
are subject to reinstated orders of removal are
eligible to apply only for mandatory relief
in nature of withholding of removal and
are ineligible to apply for discretionary grant
of asylum, sought to implement apparently
conflicting provisions of the Immigration and
Nationality Act (INA), one of which permitted
"any alien" to apply for asylum "irrespective
of [the alien's] status," and the other of which
categorically barred aliens subject to reinstated
removal orders from applying for "any relief"
available under chapter 12 of title 8, a chapter
that contained provisions of the INA dealing

with both asylum and withholding of removal,
represented a reasonable attempt by DHS
to resolve this statutory tension, which was
entitled to 📄 *Chevron* deference. Immigration
and Nationality Act §§ 208(a)(1), 241(a)(5), (b)
(3)(A), 📄 8 U.S.C.A. §§ 1158(a)(1), 📄 1231(a)
(5), 📄 (b)(3)(A); 📄 8 C.F.R. §§ 208.31(e),
241.8(e).

5 Cases that cite this headnote

[6]  **Aliens, Immigration, and
Citizenship** ⚷ Law questions

Rule of lenity, as applied in immigration
context to require resolution of statutory
ambiguity in alien's favor to protect alien
from drastic consequence of removal, cannot
apply to contravene the Board of Immigration
Appeals' (BIA's) reasonable interpretation of
immigration statute, where the BIA makes use of
ordinary principles of statutory interpretation.

2 Cases that cite this headnote

[7]  **Aliens, Immigration, and
Citizenship** ⚷ Constitutional and Statutory
Provisions

**International Law** ⚷ Self-executing
agreements; implementing legislation

Mere fact that Protocol Relating to the Status
of Refugees was not self-executing did not
mean that *Charming Betsy* canon of statutory
construction did not apply to require a particular
construction of provisions of the Immigration
and Nationality Act (INA) in order to avoid
conflict with the Protocol. Immigration and
Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. §
1101 et seq.; 19 U.S.T. 6223 (Nov. 6, 1968).

[8]  **Aliens, Immigration, and
Citizenship** ⚷ Eligibility; Refugee Status

**International Law** ⚷ Refugees

Department of Homeland Security (DHS)
regulations which implemented apparently

conflicting provisions of the Immigration and Nationality Act (INA), by specifying that aliens who are subject to reinstated orders of removal are eligible to apply only for mandatory relief in nature of withholding of removal and are ineligible to apply for discretionary grant of asylum, did not create kind of conflict with international law, and specifically with the Protocol Relating to the Status of Refugees, which the *Charming Betsy* canon of statutory construction directed court to avoid; while the Protocol instructed contracting states to facilitate assimilation and naturalization of refugees, it did so only "as far as possible," and required other relief with which denial of asylum would interfere "unless compelling reasons of national security or public order otherwise require[d]." Immigration and Nationality Act §§ 208(a)(1), 241(a)(5), (b)(3)(A), 8 U.S.C.A. §§ 1158(a)(1), 1231(a)(5), (b)(3)(A); 19 U.S.T. 6223 (Nov. 6, 1968); 8 C.F.R. §§ 208.31(e), 241.8(e).

3 Cases that cite this headnote

**\*29** PETITIONS FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS

### Attorneys and Law Firms

Nancy J. Kelly, with whom John Willshire Carrera, the Harvard Immigration & Refugee Clinic, and Greater Boston Legal Services, Boston, MA, were on brief, for petitioner.

Kevin J. Conway, Attorney, Office of Immigration and Litigation, Civil Division, United States Department of Justice, with whom Andrew Oliveira, Trial Attorney, Office of Immigration and Litigation, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, and Justin Markel, Senior Litigation Counsel, were on brief, for respondent.

Before Barron, Selya, and Stahl, Circuit Judges.

### Opinion

BARRON, Circuit Judge.

In this dispute, we must decide whether aliens who are subject to reinstated orders of removal may apply for asylum. Below, the immigration judge ("IJ") and the Board of Immigration Appeals ("BIA") each concluded that such aliens may not apply for asylum, even though they may be entitled to withholding of removal. The IJ and the BIA based their conclusions on certain provisions of the Illegal Immigration **\*30** Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-546 ("IIRIRA"), as well as Department of Homeland Security ("DHS") regulations that implement those provisions. And, on that basis, the IJ and the BIA ruled that Victor Garcia Garcia ("Garcia"), a citizen of Guatemala who is subject to a reinstated order of removal, could not apply for asylum, notwithstanding that the IJ determined (and the government does not dispute) that he is entitled to withholding of removal due to the persecution he would face in his home country.

Garcia now brings these consolidated petitions for review, in which he challenges the IJ's and the BIA's denial of his asylum application on the ground that a key provision of IIRIRA plainly entitles him to seek asylum. He also contends that, in any event, the DHS regulations are unreasonable, insofar as they permit aliens subject to reinstated orders of removal to obtain withholding of removal but not to apply for asylum, because he contends that IIRIRA does not provide any basis for drawing such a distinction between withholding of removal and asylum. For the reasons that follow, we uphold the agency decisions below.

### I.

Immigration law is distinguished by its complexity more than by its clarity. We thus need to provide some background before we turn to the merits of the legal issue that we must resolve. To do so, we first describe the distinction between withholding of removal and asylum. We then describe the relevant parts of IIRIRA—some of which might appear on first glance to be in tension with one another—and the implementing regulations. Finally, we recount how Garcia came to be subject to the reinstated order of removal that the IJ and the BIA ruled stands in the way of his asylum request.

### A.

The distinction between withholding of removal and asylum is subtle but important. We start by describing withholding of removal.

Congress codified the right to withholding of removal in 8 U.S.C. § 1231(b)(3)(A). IIRIRA § 305; see also INS v. Aguirre-Aguirre, 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). This statute directs, in categorical fashion, that, if the Attorney General decides that an alien's "life or freedom would be threatened" in the country to which he would be removed "because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," then "the Attorney General may not remove an alien to [that] country." 8 U.S.C. § 1231(b)(3)(A).[1]

The roots of this statutory provision may be traced to the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951) (the "Refugee Convention"). See INS v. Cardoza-Fonseca, 480 U.S. 421, 429, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The United States acceded to the Refugee Convention by ratifying the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (Nov. 6, 1968) (the "Refugee Protocol"). By doing so, the United States "agree[d] to comply with the substantive provisions of Articles 2 through 34" of the Refugee Convention. Cardoza-Fonseca, 480 U.S. at 429, 107 S.Ct. 1207. Article 33.1 of the Refugee Convention provides: "No Contracting State shall expel or return ('refouler') a *31 refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion." 19 U.S.T at 6276.[2] Thus, 8 U.S.C. § 1231(b)(3)(A) implements the "mandatory duty" of the United States as a "contracting State[ ]" to the Refugee Protocol. Cardoza-Fonseca, 480 U.S. at 429, 107 S.Ct. 1207.

We now turn to asylum. Congress codified the right to apply for asylum in 8 U.S.C. § 1158(a)(1), which provides: "Any alien who is physically present in the United States or who arrives in the United States ... irrespective of such alien's status, may apply for asylum in accordance with this section ...." IIRIRA § 604; see also Aguirre-Aguirre, 526 U.S. at 420, 119 S.Ct. 1439. Thus, 8 U.S.C. § 1158 lays

out a "discretionary mechanism which gives the Attorney General the authority to grant the broader relief of asylum to refugees," Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207 (emphasis in original)—that is, pursuant to 8 U.S.C. § 1101(a)(42)(A), aliens who can show a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." See also 8 C.F.R. §§ 208.13(b), 1208.13(b).

The roots of this statutory grant of the right to apply for asylum may also be traced to the Refugee Protocol, in which the United States acceded to the Refugee Convention. In particular, Article 34 of the Convention provides: "The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees." 19 U.S.T. at 6276. And, as the Supreme Court has explained, Congress's statutory mechanism for applying for asylum implements Article 34's "precatory" language. Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207.

The upshot of the domestic statutory provisions that implement these two articles of the Refugee Convention is this: aliens who can show a "clear probability" of persecution—that is, that "it is more likely than not that the alien would be subject to persecution," INS v. Stevic, 467 U.S. 407, 424, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984)—are "entitled to mandatory suspension of deportation," or, as it is now known, withholding of removal, Cardoza-Fonseca, 480 U.S. at 444, 107 S.Ct. 1207 (emphasis in original). 8 U.S.C. § 1231(b)(3)(A). In contrast, aliens "who can ... show [only] a well-founded fear of persecution"—that is, refugees per the definition laid out in 8 U.S.C. § 1101(a)(42)(A)—"are not entitled to anything." Cardoza-Fonseca, 480 U.S. at 444, 107 S.Ct. 1207 (emphasis in original). Instead, pursuant to 8 U.S.C. § 1158, such aliens merely "are eligible for the discretionary relief of asylum." Id. (emphasis in original); see also Aguirre-Aguirre, 526 U.S. at 420, 119 S.Ct. 1439 ("[W]hereas withholding is mandatory unless the Attorney General determines one of the exceptions applies, the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion.").

In Cardoza-Fonseca, the Court made clear that—given the differences between withholding of removal and asylum—the

standards governing the two were necessarily different. **32** 480 U.S. at 449-50, 107 S.Ct. 1207. Specifically, the clear-probability test for triggering the United States' mandatory duty to withhold removal is more demanding than the "well-founded fear" test that must be satisfied to trigger the Attorney General's exercise of his discretion as to whether to grant asylum. Id.

Withholding of removal and asylum also differ in another key respect: they afford aliens distinct types of benefits. In particular, asylum, though obtainable upon a less-demanding showing, "affords broader benefits" to the recipient than does withholding of removal. Cardoza-Fonseca, 480 U.S. at 428 n.6, 107 S.Ct. 1207. As the Ninth Circuit summarizes:

> Unlike an application for asylum ...
> a grant of an alien's application
> for withholding is not a basis for
> adjustment to legal permanent resident
> status, family members are not granted
> derivative status, and [the relief] only
> prohibits removal of the petitioner
> to the country of risk, but does not
> prohibit removal to a non-risk country.

Lanza v. Ashcroft, 389 F.3d 917, 933 (9th Cir. 2004) (quoting Castellano-Chacon v. INS, 341 F.3d 533, 545 (6th Cir. 2003) (second alteration in the original)). In addition, aliens granted asylum may be issued a refugee travel document, enabling them to travel outside of the United States and subsequently return. By contrast, aliens who are merely entitled to withholding of removal receive no such benefit. 8 C.F.R. §§ 223.1, 223.2. They are simply protected from being sent back to their home country. Thus, an alien who is entitled to withholding of removal may still have an interest in seeking asylum, given the greater benefits it affords an alien. See 8 U.S.C. § 1158(c)(1). [3]

Having described the distinction between withholding of removal and asylum, and the statutes that enable aliens to obtain each, we need to discuss one final statutory provision that is of direct relevance to the issue we confront here. 8 U.S.C. § 1231(a)(5)—part of section 305 of IIRIRA—states

that an alien subject to a reinstated order of removal "is not eligible and may not apply for any relief under ... [chapter 12 of Title 8 of the U.S. Code], and the alien shall be removed under the prior order at any time after the entry." 8 U.S.C. § 1231(a)(5). This provision matters here because, as the parties to this dispute agree, asylum is a form of "relief" under chapter 12.

Thus, the question arises as to how this seemingly sweeping statutory bar to relief relates both to the seemingly categorical grant of the right to seek asylum provided to aliens in § 1158(a)(1) and to the directive to the Attorney General to withhold removal in certain enumerated circumstances that is set forth in § 1231(b)(3)(A). After all, that latter provision also appears in chapter 12.

DHS, which is now charged with administering IIRIRA, has offered its answer to that question. It has done so in regulations that attempt to harmonize the three statutory provisions—8 U.S.C. §§ 1258(a)(1), 1231(a)(5) and 1231(b)(3)(A)—along with the United States' obligations under the Convention Against Torture ("CAT"). See United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 95 (entered into force June 26, 1987); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999); see also **33** Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824 (Feb. 28, 2003) (transferring the functions of the Immigration and Naturalization Service to the Department of Homeland Security and recodifying the regulations). [4]

The regulations do so as follows. First, 8 C.F.R. § 241.8(a) requires that an alien "who illegally reenters the United States after having been removed ... shall be removed from the United States by reinstating the prior order." That subsection further provides that such an alien "has no right to a hearing before an immigration judge in such circumstances." Id.; see also 8 C.F.R. § 1241.8(a).

Subsection (e) of that regulation, however, then creates an "[e]xception." It provides that an alien who "expresses a fear of returning to the country designated in" his reinstated removal order "shall be immediately referred to an asylum officer for an interview to determine whether the alien has a

reasonable fear of persecution or torture pursuant to § 208.31 of this chapter." 8 C.F.R. § 241.8(e); see also 8 C.F.R. § 1241.8(e). The regulation referenced at the end of this exception, 8 C.F.R. § 208.31(e), in turn provides that:

> If an asylum officer determines that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for full consideration of the request for <u>withholding of removal only</u>.

(emphasis added); see also 8 C.F.R. § 1208.31(e). [5]

Thus, under the regulations, an alien subject to a reinstated order of removal may not apply for asylum. However, after such an alien has expressed a fear of persecution and after an asylum officer has determined that fear to be reasonable, the alien is entitled to withholding of removal to home country if the Attorney General then decides that the alien's life or freedom would be threatened in his home country because of a protected ground.

**B.**

With that legal background in place, we now turn to Garcia's current plight. Garcia—who speaks no English and only minimal Spanish—first entered the United States unlawfully in 2004. Three years later, in 2007, immigration authorities in the United States apprehended Garcia, detained him, and then ordered him removed from this country. From all that the record reveals, it appears that Garcia would have been successful in obtaining asylum had he sought it at that time. And, it appears, too, he may have been entitled to withholding of removal. But, he did not request either asylum or withholding of removal, apparently because of the language barriers he faced and because he was uncounseled. Accordingly, Garcia was removed to Guatemala in 2007.

After returning to Guatemala, Garcia then entered the United States unlawfully for a second time in February 2015. Once Garcia had crossed the border into the United

States, immigration authorities detained him. Released on his own recognizance, Garcia was permitted to travel to Massachusetts to stay with family members. Garcia was informed about two months later that his 2007 removal order would be reinstated. As the IJ noted, after **\*34** retaining counsel, Garcia "expressed a fear of return to Guatemala on account of his ethnicity, family membership, and religious beliefs," and was referred to an asylum officer pursuant to 8 C.F.R. §§ 241.8(e) and 1241.8(e). See also 8 C.F.R. §§ 208.16, 1208.16 (laying out procedures for consideration of withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and under the CAT). The asylum officer conducted the required interview and concluded that Garcia had met his burden of showing a "reasonable fear of persecution." 8 C.F.R. §§ 241.8(e), 1241.8(e).

Thereafter, Garcia's case was referred to an IJ. In an oral decision issued on August 4, 2015, the IJ first concluded that Garcia, whom the IJ found "credible," had met his burden, pursuant to 8 U.S.C. § 1231(b)(3)(A), of showing that "future persecution is 'more likely than not' to occur" in Guatemala and therefore granted Garcia's application for withholding of removal. Specifically, the IJ found that Garcia had experienced past persecution "on account of [his] family membership as well as his ethnicity inasmuch as [ ] Ladino [that is, mixed-race] soldiers," as well as government-affiliated paramilitary forces and gangs, "had targeted his village, which was comprised almost exclusively of Mayan indigenous individuals, for retaliation for the belief that these individuals were aiding or assisting in any way the guerilla movement during the civil war." And, the IJ found, "based upon the evidence ... that the predominant Ladino element will not assist the Mayan community in fighting off the Ladino outlaw elements," and thus that Garcia had shown "a reasonable likelihood of persecution or harm in the future by these same elements."

But, in addition to seeking withholding of removal, Garcia had also argued to the IJ that he was eligible to apply for asylum and thus to receive the additional benefits that such relief would afford him. Garcia based this argument on the text of 8 U.S.C. § 1158(a)(1), which, he argued, entitled even an alien subject to a reinstated removal order to seek asylum.

In his oral decision, the IJ rejected Garcia's argument that he was eligible to seek asylum. The IJ held that asylum

is a form of "relief" provided by chapter 12 of Title 8 of the U.S. Code and thus that 8 U.S.C. § 1231(a)(5) barred Garcia from applying for it. The IJ also held that the DHS implementing regulations supported this conclusion. Thus, the IJ concluded that, by virtue of Garcia's reinstated removal order, and notwithstanding § 1158(a)(1), Garcia was barred from seeking asylum, regardless of whether he was entitled to withholding of removal.

Garcia then appealed the IJ's oral ruling to the BIA. On December 1, 2015, the BIA affirmed the IJ's decision in all respects and remanded the case so that the IJ could conduct certain background checks before ordering the withholding of Garcia's removal. While awaiting the results of the background checks, Garcia petitioned for review in this court of the BIA's decision denying his request to apply for asylum.

On July 6, 2016, while Garcia's petition was pending in this court, the background checks were completed. At that point, the IJ granted Garcia withholding of removal. In doing so, the IJ also stated that the IJ's August 4, 2015 oral decision, which had also denied Garcia's request to seek asylum, would become the "official opinion in this case."

Following the IJ's July 6, 2016 order, Garcia petitioned this court for review. Garcia also moved to consolidate that newly filed petition for review with his pending petition for review of the BIA's December 2015 ruling that also barred him from seeking asylum. On August 18, 2016, we **\*35** granted Garcia's unopposed motion to consolidate his two petitions for review.

At oral argument before this court concerning these consolidated petitions, the government agreed with Garcia that the IJ's July 2016 order, which had been issued after the completion of the background checks, and which granted Garcia withholding of removal but barred him from applying for asylum, constituted a final order over which we have jurisdiction. We also agree with Garcia on that point, and so, our jurisdiction secure, see Cano-Saldarriaga v. Holder, 729 F.3d 25, 27 (1st Cir. 2013), we proceed to the merits. [6]

## II.

**[1]** Garcia's right to apply for asylum under § 1158(a)(1) turns on "questions implicating 'an agency's construction of the statute which it administers.' " Vásquez v. Holder,

635 F.3d 563, 567 (1st Cir. 2011) (quoting Aguirre-Aguirre, 526 U.S. at 424, 119 S.Ct. 1439). We thus "apply the principles of deference described in Chevron, USA, Inc. v. Natural Resources Defense Coucil, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." Id. (quoting Aguirre-Aguirre, 526 U.S. at 424, 119 S.Ct. 1439) (brackets omitted).

**[2]** **[3]** "We first ask whether 'Congress has directly spoken to the precise question at issue.' " Succar v. Ashcroft, 394 F.3d 8, 22 (1st Cir. 2005) (quoting Chevron, 467 U.S. at 842, 104 S.Ct. 2778). "If so, courts, as well as the agency, 'must give effect to the unambiguously expressed intent of Congress.' " Id. (quoting Chevron, 467 U.S. at 842–43, 104 S.Ct. 2778). But if we "determine[ ] Congress has not directly addressed the precise question at issue," then we must move on to the second step of the analysis. Chevron, 467 U.S. at 843, 104 S.Ct. 2778. At this second step, "[we] do[ ] not simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation." Id. Rather, "if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005); see also Succar, 394 F.3d at 23 ("If the statutory terms are ambiguous, then the principle of Chevron deference to the Attorney General's choice must apply.")

### A.

**[4]** Garcia contends that § 1158(a)(1) unambiguously grants him the right to seek asylum. He thus argues that he wins at Chevron's first step.

In pressing this argument, Garcia acknowledges that there is another provision of IIRIRA that could be read to take away what § 1158(a)(1) otherwise appears to give: § 1231(a)(5). That provision expressly bars aliens subject to reinstated orders of removal from seeking "any relief" available under chapter 12 of Title 8 of the U.S. **\*36** Code, and Garcia does not dispute that asylum is a type of relief that is available

under that chapter. 8 U.S.C. § 1231(a)(5). Nevertheless, Garcia argues that § 1158(a)(1) unambiguously creates an exception to the bar that § 1231(a)(5) otherwise appears to impose. [7]

In making this argument, Garcia cannot—and does not—contend that § 1158(a)(1) actually repealed the bar that § 1231(a)(5) appears to establish. Both provisions were enacted on the same day as part of the same statute: IIRIRA. Garcia instead argues that, in enacting IIRIRA, Congress changed what had been the relevant text of § 1158(a)(1). And Garcia argues that Congress did so in a manner that clearly reflected an intention to carve out an exception to § 1231(a)(5) for aliens seeking asylum.

Garcia points out that, pre-IIRIRA, § 1158(a)(1) referred only to "an" alien being entitled to seek asylum "irrespective of [the alien's] status." Refugee Act of 1980, Pub. L. 96-212, § 208, 94 Stat. 102, 105 (emphasis added). But, Garcia notes, IIRIRA changed the wording of the text. Section 1158(a)(1) now refers to "any alien," while keeping the sweeping phrase "irrespective of [the alien's] status." IIRIRA § 604 (emphasis added). Garcia contends that this change from "an" to "any" clearly shows that Congress intended the broad grant of the right to seek asylum set forth in § 1158(a)(1) to take precedence over § 1231(a)(5)'s seemingly contradictory bar. [8]

We do not agree. As a matter of grammar, the word "any" is not clearly more sweeping than is the word "an." Thus, the change in wording need not be understood to reflect Congress's intention that § 1158(a)(1) trumps the bar that § 1231(a)(5) otherwise imposes. We are also reluctant to conclude that, insofar as "any" might be thought to be somewhat more sweeping than "an," Congress used the subtle stratagem of replacing one indefinite article with a different one to signal its unambiguous intent to make an exception to an otherwise categorical bar that Congress set forth the very same day in a different provision of the very same statute. See Barraford v. T & N Ltd., 778 F.3d 258, 266 (1st Cir. 2015) ("It has been said that statutes that one does not normally hide elephants in mouseholes." (citing *37 Whitman v. Am.

Trucking Ass'ns, Inc., 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001))).

In addition, Garcia's reading of § 1158(a)(1) is not necessary to ensure that one of its words—"any"—means what it says. Even on Garcia's favored reading, the word "any" in § 1158(a)(1) would not mean literally "any." Section 1158(a)(2) itself makes clear that certain types of aliens are not eligible to apply for asylum, even though § 1158(a)(1) states that "any" alien may do so. See 8 U.S.C. § 1158(a)(2). [9]

Garcia does argue that § 1158(a)(1) should be read to override all exceptions to its grant of the right to seek asylum except for the ones that are expressly set forth in § 1158 itself. But, even if Garcia's suggested reading is a possible one, we do not see why it is compelled. As the Fifth Circuit observed in considering and rejecting this very same argument, Congress has "many options in revising statutory schemes," and "[a]dopting a clear limitation in one section [i.e., § 1231(a)(5)] without amending another section specifically dealing with the same subject [i.e., § 1158] is one such option." Ramirez-Mejia v. Lynch, 794 F.3d 485, 490 (5th Cir. 2015), reh'g en banc denied, 813 F.3d 240 (5th Cir. 2016); see also Perez-Guzman v. Lynch, 835 F.3d 1066, 1076 (9th Cir. 2016), reh'g en banc denied (No. 13-70579, Apr. 26, 2017) ("In adopting both changes simultaneously, Congress effectively adopted 'a clear limitation in one section'—§ 1231(a)(5)—'without amending another section' dealing with the same subject matter." (quoting Ramirez-Mejia, 794 F.3d at 490)).

Moreover, reading § 1231(a)(5) to set forth an additional "statutory limit," Ramirez-Mejia, 794 F.3d at 490, does not render superfluous § 1158(a)(2), which conditions asylum eligibility on compliance with certain requirements, see 8 U.S.C. § 1158(a)(2). In addition, the limits on asylum eligibility that § 1158(a)(2) expressly sets forth do not render § 1231(a)(5) redundant if it, too, limits an alien's right to seek asylum. Those express limits in § 1158(a)(2)

do not concern the eligibility to seek relief of aliens subject to reinstated removal orders, while 🔖 § 1231(a)(5) does.

Shifting course, Garcia contends that 🔖 § 1158(a)(1) must be read unambiguously to trump 🔖 § 1231(a)(5), because the former provision is the more specific provision of the two. But, as the Ninth Circuit has noted, the "difficulty" is that both 🔖 § 1158(a)(1) and 🔖 § 1231(a)(5) are "specific in certain respects and general in others." 🔖 Perez-Guzman, 835 F.3d at 1075. It is thus just as possible, as a matter of text alone, to say that 🔖 § 1231(a)(5) imposes a specific check on 🔖 § 1158(a)(1)'s general grant of eligibility to apply for asylum as it is to say that 🔖 § 1158(a)(1) carves out a specific exception to the general bar to relief that applies to aliens subject to reinstated removal orders. See 🔖 id. at 1075-76 (noting that 🔖 § 1158(a)(1) is "more specific in that it speaks narrowly to the rules governing asylum applications," while 🔖 § 1231(a)(5) "is more specific in that it speaks directly to the particular subset of individuals ... who are subject to reinstated removal orders").

Garcia's final textual argument relies on 🔖 § 1158(a)(2)(D). That provision permits individuals who have been previously denied asylum to file a second asylum application if they can demonstrate "either the existence of changed circumstances which materially **38** affect ... eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." 🔖 8 U.S.C. § 1158(a)(2)(D). Garcia argues that reading 🔖 § 1231(a)(5) to bar aliens subject to reinstated removal orders from applying for asylum would nullify 🔖 § 1158(a)(2)(D).

But Garcia is mistaken on this point. Many aliens who are not subject to reinstated orders of removal may benefit from 🔖 § 1158(a)(2)(D). As a result, 🔖 § 1231(a)(5), insofar as it limits 🔖 § 1158(a)(2)(D), does not thereby render that provision a nullity. See 🔖 Perez-Guzman, 835 F.3d at 1082 (noting that it is not "necessarily" the case that "any individual to whom 🔖 § 1158(a)(2)(D) applies will ... be subject to a reinstated removal order").

In light of this complex statutory scheme, we cannot say that 🔖 § 1158(a)(1) unambiguously grants Garcia the right to seek asylum, and we reject his contention that he wins at 🔖 Chevron's first step.

### B.

Because the relevant statutory provisions do not clearly compel Garcia's reading, we ordinarily would move on from 🔖 Chevron's first step to see whether Garcia could win at step two of the 🔖 Chevron analysis. The government argues, however, that we may not do so because the relevant provisions in IIRIRA, properly read, clearly bar aliens subject to reinstated orders of removal from seeking asylum. The government thus argues not only that Garcia loses at step one of 🔖 Chevron but also that the government prevails at that same step.

In so arguing, the government contends that "asylum" is plainly a form of "relief" to which 🔖 § 1231(a)(5)'s bar applies. The government further contends there is no conflict between 🔖 §§ 1231(a)(5) and 🔖 1158(a)(1), because the former is more specific than the latter and thus the former must take precedence. And, finally, the government argues that its reading of "relief" to encompass asylum comports with its conclusion that 🔖 § 1231(a)(5) does not bar aliens subject to reinstated orders of removal from having their removal withheld pursuant to 🔖 § 1231(b)(3)(A). And that is because, the government contends, withholding of removal differs from asylum because withholding of removal provides "protection" rather than "relief." Accordingly, the government contends that the statutes clearly compel the interpretation reflected in the regulations, in which aliens subject to reinstated orders of removal may not apply for asylum but may be entitled to withholding of removal.

A number of circuits have agreed with the government. They have held that 🔖 § 1231(a)(5) does clearly bar aliens subject to reinstated orders of removal from seeking asylum, notwithstanding 🔖 § 1158(a)(1). See 🔖 Jimenez-Morales v. U.S. Att'y Gen., 821 F.3d 1307, 1310 (11th Cir. 2016); 🔖 Ramirez-Mejia, 794 F.3d at 489-90. But, there is at the least a surface tension between the two provisions—with

§ 1231(a)(5) seemingly barring aliens subject to reinstated orders of removal from seeking asylum and § 1158(a)(1) seemingly conferring upon any alien (save for those expressly mentioned in that provision) the right to seek asylum. And, as the Ninth Circuit has noted, insofar as these provisions conflict with one another, it is by no means clear which is the more specific of the two. See Perez-Guzman, 835 F.3d at 1075-76.

[5] Thus, rather than deciding the case for the government at step one of Chevron—an issue on which we take no view—we proceed to Chevron's second step. [10] At **39 step two, we must accept the agency's regulatory choice as to how to resolve an ambiguity in a statute that the agency administers—such as the putative ambiguity presented by the tension we have identified—if the choice it makes is a reasonable one.

See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 661, 666-67, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (applying Chevron deference to "mediate a clash of seemingly categorical—and, at first glance, irreconcilable—legislative commands"). And we conclude that the agency's choice in this case is one that we must accept, because the agency's regulations reasonably balance the various statutory provisions by "establish[ing] a new screening process to rapidly identify and assess both claims for withholding of removal under [ § 1231(b)(3)] and for protection under the [CAT] ... without unduly disrupting the streamlined removal processes applicable to" aliens subject to reinstated removal orders. Regulations Concerning the Convention Against Torture, 64 Fed. Reg. at 8479.

In reaching this conclusion, we recognize, as Garcia correctly points out, that courts, the BIA, and DHS have at times used the word "relief"—which is the key word in § 1231(a)(5)—to refer to both asylum and withholding of removal. [11] We thus understand the basis for Garcia's contention that the agency's regulatory choice is arbitrary because it permits aliens to obtain one type of "relief" under chapter 12—withholding of removal—but not another—asylum—even though the relevant statutory provision, § 1231(a)(5), bars aliens subject to reinstated orders of removal from seeking the "relief" chapter 12 affords. Garcia therefore argues that the only coherent interpretation is one in which the agency affords withholding of removal the same treatment as asylum. And since the agency permits aliens subject to reinstated orders

of removal to be eligible for the former, Garcia contends that such aliens must be permitted to apply for latter, too.

The problem with Garcia's argument is that the relevant question at Chevron's second step is not whether it is possible to characterize both asylum and withholding of removal as forms of "relief," such that each then would be subject to § 1231(a)(5)'s statutory bar or neither would be. The relevant question instead is whether it is unreasonable to distinguish between asylum and withholding of removal **40 for purposes of applying that bar. And, in our view, it is not. See Perez-Guzman, 835 F.3d at 1081 (holding that "it is not unreasonable to conclude Congress intended to bar ... persons in reinstated removal proceedings [from applying for asylum] while preserving relief [that is, withholding of removal] for individuals able to meet the higher standards for withholding of removal and CAT relief").

For one thing, the distinction that the government posits in defending the regulations, such that asylum is a form of "relief" that § 1231(a)(5) bars while withholding of removal is a form of "protection" that § 1231(a)(5) does not by its terms reach, reasonably tracks the distinct ways in which the Supreme Court has described asylum and withholding of removal in construing the United States' obligations under the Refugee Protocol. As we noted at the outset, the Court has explained that, under the Refugee Protocol, "those who can show a clear probability of persecution are entitled to mandatory suspension of deportation ... while those who can only show a well-founded fear of persecution are not entitled to anything, but are eligible for the discretionary relief of asylum." Cardoza-Fonseca, 480 U.S. at 444, 107 S.Ct. 1207 (emphases in original). Thus, withholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood.

The text of the relevant provisions of IIRIRA provides further support for distinguishing between asylum and withholding of removal in construing the scope of the bar that § 1231(a)(5) imposes. For example, § 1231(b)(3)(A), unlike § 1158(a)(1), does not by its terms expressly purport to permit an alien to do what § 1231(a)(5) appears expressly to forbid: "apply for ... relief" under chapter 12. Rather, § 1231(b)(3)(A) is styled as a limitation on the Attorney

General's removal authority. That provision, unlike § 1158, thus appears simply to guarantee that an alien facing persecution or torture will receive protection from being returned to the alien's home country. [12]

The agency's choice to treat asylum, but not withholding of removal, as subject to the bar to applying for "relief" set forth in § 1231(a)(5) also comports with the relevant legislative history, even if it is not compelled by it. By reading "relief" to encompass asylum, the agency's regulations give effect to Congress's clear intention, in enacting § 1231(a)(5), to "strengthen the reinstatement provision and to make it operate more efficiently." Lattab v. Ashcroft, 384 F.3d 8, 19 (1st Cir. 2004). IIRIRA did so by "enlarg[ing] the class of illegal reentrants whose orders may be reinstated and limit[ing] the possible relief from a removal order available to them." Fernandez-Vargas v. Gonzales, 548 U.S. 30, 33, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). But, the legislative history does not show that Congress intended for § 1231(a)(5) to be an all-encompassing bar on the ability of aliens subject to reinstated removal orders to remain in the United States. See S. Rep. 104-249, at 7 (1996) (emphasizing that, although "[a]liens who violate U.S. immigration law should be removed from this country as soon as possible," that broad aim was subject to "[e]xceptions ... specified in the statute and approved by the Attorney General"); **41** H.R. Rep. 104-469, pt. 1, at 107-08 (1996) (noting that although "[r]emoval of aliens who enter the United States illegally ... is an all-too-rare event," and therefore that "[r]elief from deportation will be more strictly limited," aliens subject to the new "streamlined appeal and removal process" now laid out in § 1231(a)(5) could nevertheless "establish ... that they are entitled to be admitted or to remain in the United States"). Thus, we cannot say that the agency acted unreasonably in choosing to ensure that the same aliens who could not seek asylum still would be protected through withholding of removal from suffering persecution or torture in their home country, in accord with § 1231(b)(3)(A)'s clear directive to the Attorney General to afford that vital and long-understood-to-be mandatory protection.

### III.

Garcia makes two additional arguments as to why he should win, each of which relies on a longstanding canon of construction. But, in our view, neither argument is persuasive.

First, Garcia argues that the rule of lenity that has been applied in the immigration context requires us to resolve any statutory ambiguity in his favor, notwithstanding that the agency's choice might otherwise be considered to be a reasonable one. It is not at all clear, however, that the rule of lenity, which "favors construction of immigration laws in the light most favorable to the alien" only insofar as that alien risks the "drastic consequences of deportation," Lumataw v. Holder, 582 F.3d 78, 90 (1st Cir. 2009), bears on the precise interpretive question that we face. After all, that question concerns the type of "relief" that an alien whose removal may be withheld may obtain.

See also Cardoza-Fonseca, 480 U.S. at 449, 107 S.Ct. 1207 (identifying a "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien"); INS v. St. Cyr, 533 U.S. 289, 320, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (same) (quoting Cardoza-Fonseca, 480 U.S. at 421, 107 S.Ct. 1207); Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948) (applying the rule of lenity "because deportation is a drastic measure and at times the equivalent of banishment o[r] exile").

[6] But, even if the rule of lenity might be relevant to this case, we have stated that it "cannot apply to contravene the BIA's reasonable interpretation" of an immigration statute where the agency makes use of "ordinary principles of statutory interpretation." Soto-Hernandez v. Holder, 729 F.3d 1, 6 (1st Cir. 2013). And Garcia does not explain why, notwithstanding our ruling in Soto-Hernandez and the seeming reasonableness of the agency's choice under traditional tools of statutory construction, the rule of lenity should control here.

Second, Garcia argues that, for over two hundred years, it has been a canon of statutory construction—known as the Charming Betsy canon—that a statute "ought never to be construed to violate the law of nations if any other possible construction remains." Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). Yet, Garcia contends, the agency's interpretation of the statutory scheme—by denying aliens subject to reinstated orders of

removal the right to seek asylum—would violate certain of the United States' obligations under the Refugee Convention, to which the United States acceded via the Refugee Protocol.

In particular, Garcia contends that the agency's reading conflicts with Article 34 and Article 28 of the Refugee Convention. Accordingly, Garcia argues that, insofar as there is an ambiguity as to whether § 1158(a)(1) does carve out an exception to **\*42** § 1231(a)(5), that ambiguity must be resolved in a manner that avoids the conflicts with the Refugee Protocol that he alleges would result if § 1158(a)(1) were not construed to create such an exception.

 **[7]** In response, the government contends only that the Refugee Protocol is not self-executing and thus that the Charming Betsy canon does not apply. But we do not find that argument persuasive. Garcia does not seek to enforce rights arising under the Refugee Protocol and, by extension, the Refugee Convention. Rather, he contends that, under the Charming Betsy canon, the existence of these rights must be used as a guide to construing the statutory provisions at issue so as to give effect to Congress's intent to honor the United States' obligations under international law. As a result, we do not see why the non-self-executing status of the Refugee Protocol bears on the Charming Betsy canon's potential application. Cf. Stevic, 467 U.S. at 425-26, 104 S.Ct. 2489 (looking to the Refugee Protocol to interpret the statutory definition of the term "refugee" and noting that Congress "intended that the definition would be construed consistently with the Protocol"); Cardoza-Fonseca, 480 U.S. at 432-33, 107 S.Ct. 1207 (same).

 **[8]** Nevertheless, Garcia fails to show that the regulations create the kind of conflict with international law that the canon instructs us to avoid if possible. Accordingly, we do not see how the Charming Betsy canon helps him.

We start with Garcia's reliance on the conflict that he contends would arise in consequence of Article 34, which, as we have seen, provides that "[t]he Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees." 19 U.S.T. at 6276 (emphasis added). Garcia makes no argument, however, to support his contention that this "precatory" language, Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207, precludes a contracting State from imposing

a limitation on the eligibility of an alien to seek asylum such as the limited one that the agency has concluded § 1231(a)(5) imposes. Thus, Garcia fails to show how Article 34 requires that we apply the Charming Betsy canon to read the relevant provisions to exclude "asylum" from § 1231(a)(5)'s bar.

We now turn to Article 28, which provides that "[t]he Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require." 19 U.S.T. at 6274 (emphasis added). Garcia points out that aliens granted asylum may obtain a travel document permitting them to travel internationally. By contrast, aliens granted withholding of removal may not. Garcia thus contends that, so long as § 1231(a)(5) is read to bar aliens subject to reinstated orders of removal from seeking asylum, a conflict with the Refugee Protocol arises. And, accordingly, he contends that the Charming Betsy canon must be deployed to avoid that conflict.

But, even though there is no dispute in this case that Garcia qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42)(A), and correspondingly, under the Refugee Convention, see Cardoza-Fonseca, 480 U.S. at 436-37, 107 S.Ct. 1207, the fact is that Article 28 recognizes that exceptions may be made from its requirements for "compelling reasons of national security or public order." The governmental interest advanced by the government's reading of § 1231(a)(5)—deterring repeated unlawful entry into this country—would appear to constitute such a "compelling reason[ ] of ... public order." And, Garcia makes no argument to the contrary. Thus, we have no basis for concluding that Article 28 **\*43** necessitates the use of the Charming Betsy canon. [13]

## IV.

For the foregoing reasons, the petitions are **denied.**

STAHL, Circuit Judge, dissenting.

In 2007, Victor Garcia Garcia, a member of Guatemala's indigenous Maya community, was scooped up in a large

raid on a factory in New Bedford, Massachusetts, whisked away to a border detention center in Texas several days later, and, following a group hearing before an Immigration Judge, ordered removed from the United States. During these proceedings, Garcia did not have access to an attorney, nor was an interpreter made available to him (an interpreter would have certainly come in handy because the group hearing was conducted in Spanish, a language that Garcia does not understand). Returned to the same life of persecution in Guatemala that had led him to seek refuge here in the first place, Garcia reentered the United States and sought asylum.

Today, the majority holds that Garcia cannot apply for asylum, despite having made the higher threshold showing of likely harm that is required for an alien to acquire a temporary grant of withholding of removal. This is so, the majority postulates, because the Attorney General has ordained it as such through his own preferred statutory interpretation under Chevron, construing the reinstatement statute of the INA, 8 U.S.C. § 1231(a)(5), which states that an alien subject to a reinstated order of removal "is not eligible and may not apply for any relief," as trumping the broad grant of asylum in 8 U.S.C. § 1158(a)(1), which provides that "[a]ny alien who is physically present in the United States or who arrives in the United States ... irrespective of such alien's status, may apply for asylum in accordance with this section." Because administrative law, like baseball, has its own default rule in cases like this—tie goes to the agency—in my view the majority mechanically applies that default rule, ignoring the fact that Garcia was denied due process in his initial removal proceedings and failing to address the degree to which the agency's interpretation violates the spirit, if not the letter, of various U.S. treaty obligations.

Because the majority's interpretation would put the United States in violation of international law, and countenance the flagrant due process violations that occurred below, I would find this interpretation of the relevant ambiguous provisions of the INA unreasonable under the Charming Betsy doctrine, which counsels that "an Act of Congress ought never to be construed to violate the law of nations if any **44** other possible construction remains." Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). Since it is beyond doubt that courts play a crucial role in ensuring that the United States complies with its treaty obligations, barring some clear indicia of Congressional intent to violate a treaty via statute, and because the majority's

approach contravenes our obligations under international law and the due process protections that litigants like Garcia should rightly expect from our court system, I respectfully dissent.

## I. Facts & Background

Because the majority glosses over (or ignores completely) significant portions of the factual record, including facts that bear directly on Garcia's Charming Betsy argument, I set forth below the salient facts before explaining why I believe the legal result that the majority reaches is incorrect.

### A. Garcia's Background in Guatemala

Garcia is a member of Guatemala's indigenous Mayan community, and grew up speaking an indigenous language, K'iche. The Maya have often suffered at the hands of the ruling elite, made up primarily of the mixed-race Ladino community. During the Guatemalan Civil War, the national army and local Ladino citizen-patrols, paramilitary organizations which operated with impunity, conducted a systematic military campaign against the Maya. The Historical Clarification Commission, established by the 1996 Peace Accords, found that racial and ethnic animus constituted the reason for these attacks and atrocities, and that the Guatemalan State had "committed acts of genocide against groups of Mayan people" in four regions, including Garcia's home region of Zacualpa, Quiche. See Historical Clarification Report, Conclusions ¶¶ 110, 122.

Against that historical backdrop, Garcia put forth the following factual allegations. As a child, Garcia and his family were frequently forced to flee into the mountains when the army conducted sweeps of his village—sweeps that often resulted in summary executions and beatings for those unable to escape. Garcia resisted the Ladinos' efforts to draft him into their patrols, and endured at least one beating at the hands of the militia, who insulted him with racial epithets.

Far from being simply caught up in the widespread violence and unrest plaguing the country at the time, the record indicates that Garcia's family was the subject of particular ill-treatment because they were leaders in the indigenous community and in the local Catholic Church, and because following the conclusion of the Civil War, they began a long campaign to seek justice for Garcia's father and other

indigenous civilians that were disappeared or were executed during the war. Ladino armed groups retaliated against Garcia, on one occasion beating him and attacking him with a knife. After this incident, Garcia was unable to walk for 15 days.

As the threats against him worsened, Garcia, fearing for his life, fled Guatemala in early 2004, hoping to join one of his brothers who was then living in New Bedford. There, Garcia lived in an underground community of other Mayans who had fled Guatemala, joined a prayer group at a local Catholic church, and became active in a local indigenous organization. He never applied for asylum in the United States during that period of time, and counsel for Garcia suggests that this was because he remained traumatized from the events in Guatemala and spoke only minimal Spanish and no English. [14]

**\*45** B. Initial Removal Proceedings

Immigration authorities detained Garcia in March 2007 during a raid on the factory in New Bedford, Massachusetts, at which Garcia had been clandestinely employed. After two days at a temporary holding facility, and without the opportunity to consult with an attorney, Garcia was transferred to a detention facility in southern Texas. On March 21, 2007, in a group hearing before a Texas Immigration Court with proceedings conducted in Spanish, Garcia accepted a removal order entered against him and did not reserve his right to appeal. Although the record is less than clear on this point, it appears that Garcia neither had access to an attorney during this proceeding, nor was there a K'iche interpreter available.

However, shortly after this hearing in 2007, a group of attorneys traveled to Texas with the assistance of a K'iche-speaking interpreter and met with Garcia and other detainees. Following this meeting, the attorneys, on Garcia's behalf, sought to reopen the appeal, arguing that his waiver of his right to apply for asylum and his right of appeal were coercive because he was denied his due process rights during the course of the initial proceedings, including the right to an attorney. In an opinion dated August 10, 2007, the BIA rejected Garcia's argument, finding that "[t]he Immigration Judge explained to the respondent, along with others at the group hearing, his rights in Spanish, including the right to appeal any adverse decision. The Immigration Judge also explained that the respondent had a right to counsel at that hearing." Garcia filed a motion to reconsider the BIA's

decision, which was denied. At no point during these various appeals did the BIA address the fact that Garcia did not speak Spanish. Garcia was then removed to Guatemala.

C. The Majority's Approach

The majority opinion alludes to these procedural defects in the underlying removal proceedings, but gives them short shrift:

> Three years later, in 2007, immigration authorities in the United States apprehended Garcia, detained him, and then ordered him removed from this country. From all that the record reveals, it appears that Garcia would have been successful in obtaining asylum had he sought it at that time. And, it appears, too, he may have been entitled to withholding of removal. But, he did not request either asylum or withholding of removal, apparently because of the language barriers he faced and because he was uncounseled. See ante at 33.

The majority in this passage concedes that Garcia would have likely been "successful in obtaining asylum" at the time of his initial removal proceedings, but did not have an opportunity to do so because he did not have access to a lawyer and because he did not speak the language in **\*46** which the proceedings were conducted. We can surmise, as his counsel argued before the Immigration Judge in the 2015 proceedings, that Garcia had no idea what was going on at this en masse hearing at the border detention center. [15] By the time the attorneys arrived in Texas to meet with Garcia and other similarly situated indigenous persons, it was too late, because he had already been ordered removed and waived his right to appeal.

Garcia would later contend that he never had a meaningful opportunity to apply for asylum during these proceedings, but to no avail. The BIA ruling in 2015 disposed of this argument in a single sentence, concluding that "[t]hough the applicant asserts he was not accorded due process in the course of his prior removal proceedings, the Immigration Judge and this Board do not have authority to review those proceedings." The majority opinion of this panel, despite,

in my view, having such authority to review the underlying removal order—a topic to which I will turn shortly—devotes only the aforementioned four sentences to the obvious due process defects in Garcia's underlying removal order.

### D. Return to Guatemala and Subsequent Reentry

Things did not improve for Garcia after he returned to Guatemala. Ladino gangs frequently harassed Garcia, on at least one occasion shooting at him while he rode his bicycle, forcing him to flee into the woods. Once again, his efforts to organize the indigenous community through leadership in his local church were not met with enthusiasm on the part of the Ladino gang leaders, many of whom directly retaliated against Garcia's family. The frequency of harassment by the militia groups increased until, on February 10, 2015, Garcia and his son decided to flee Guatemala and join family members who had previously been granted asylum and resided in New Bedford. Garcia's wife and seven children remain in Guatemala, and have informed Garcia that it is not safe to return.

### E. Administrative Proceedings Below

DHS apprehended Garcia at the border, and subsequently allowed him to travel to Massachusetts. After receiving notice that his previous removal order would be reinstated, Garcia was given a reasonable fear interview by an asylum officer on May 19, 2015, which was conducted with the assistance of a K'iche-speaking interpreter. The asylum officer found that Garcia had a reasonable fear of persecution if he were returned to Guatemala, and allowed him to apply for withholding of removal. At his hearing before the Boston Immigration Court, again with the assistance of an interpreter, Garcia argued that in addition to applying for withholding of removal, he should be permitted to apply for asylum, and that the automatic reinstatement of his prior removal order would violate U.S. obligations under the 1967 Refugee Protocol. [16]

**\*47** The IJ found Garcia to be a credible witness and ruled that he had established past persecution as well as a likelihood of future persecution. He therefore granted Garcia's application for withholding of removal. However, the IJ did not consider Garcia's asylum claim, concluding (as the majority does) that he was ineligible to apply for asylum under the INA because of the previous removal order. Additionally, the IJ rejected (with no accompanying analysis) Garcia's argument that a reading of the statutory

language to bar asylum claims would be in tension with the Refugee Protocol. In that same opinion, the IJ rejected Garcia's argument that he had not previously been afforded a meaningful opportunity to apply for asylum, citing the 2007 BIA decision which had found that the Garcia had his "rights [explained in] Spanish."

Garcia appealed to the BIA. In a two-page order, the BIA denied Garcia's appeal, and concluded that "[n]either section 241(a)(5) of the Act nor its implementing regulations authorize the applicant to be considered for asylum." Although Garcia renewed his argument to the BIA that he had not previously had the opportunity to apply for asylum because of the procedural defects of his 2007 removal proceedings, the BIA concluded that it lacked "authority to review those proceedings."

### F. Garcia's Current Status

Thus began Garcia's sojourn through the legal limbo that the majority, today, suggests is the very position where Congress would want him. Having been granted withholding of removal, Garcia's only security is that he cannot be sent back to Guatemala. His actual position, however, is more precarious. A grant of withholding of removal does not prevent his transfer to a third country. See 8 C.F.R. § 1208.16(f). He therefore lives under a cloud of possible relocation, and should the government decide to effect such a transfer, he would have no say in the matter. Additionally, while aliens granted withholding of removal are eligible to apply for work permits, these employment authorization documents are granted at the discretion of USCIS and are granted in increments. See 8 C.F.R. § 274a.12(a)(10). Such aliens must reapply for this document before it expires, often encountering long processing delays, and cannot work legally unless and until the authorization document is renewed. [17] Id. Furthermore, individuals in withholding of removal status are not eligible for travel documents necessary for reentry into the United States after foreign travel, while aliens who have been granted asylum or refugee status may obtain such documents. [18]

**\*48** Adding insult to injury, withholding of removal carries with it no options for bringing family members to the United States, while an alien granted asylum can apply for derivative asylum status for his spouse and minor children. See Burbiene v. Holder, 568 F.3d 251, 256 n.5 (1st Cir.

2009) (noting that "there can be no derivative beneficiaries of a grant of withholding of removal"). Indeed, DHS regulations require that an alien who has been denied asylum status, but granted withholding of removal, must have his or her asylum application reconsidered. See 8 C.F.R. § 1208.16(e) ("In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered.")

Just consider that if Garcia had access to an attorney, the benefit of legal proceedings in a language he understood, or even just an interpreter, during his initial detention and removal, he could have then applied for asylum and withholding of removal concurrently. If the government had denied his application for asylum, but later granted withholding of removal, the government would be compelled to reconsider his asylum application by virtue of the fact that withholding of removal alone "preclude[s] admission of the applicant's spouse or minor children." Id. The government apparently recognizes the absurdity of denying to the alien the right to try to bring his family to the United States because he has met the higher threshold required for withholding of removal, as opposed to the lesser showing that is required for the discretionary grant of asylum. [19] Hence the requirement that the government reopen the asylum claim in that situation.

Garcia is essentially overqualified for the relief that he seeks: he falls into the "narrower class of aliens who are given a statutory right not to be deported to the country where they are in danger," but misses out on membership in the "broad class of refugees who are eligible for a discretionary grant of asylum," all because he was initially removed from the country without due process. Cardoza-Fonseca, 480 U.S. at 424, 107 S.Ct. 1207. Yet had he been afforded a modicum of process and then had his asylum application denied, the government would be obligated to reopen that asylum application if he was subsequently granted withholding of removal.

Today we are told by the majority that the Attorney General's interpretation of the INA, which produces the absurd and counterintuitive result that I have just outlined, is reasonable because it is a permissible construction of a statutory ambiguity. This is so even though a separate provision of the INA provides that "any alien who is physically

present in the United States or who arrives in the United States ... irrespective *49 of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). Even under Mark Twain's more pessimistic assessments of Congressional sagacity, [20] I cannot agree that the result the majority reaches today is one that Congress would desire.

## II. Due Process Considerations

Before proceeding to what I believe is the main flaw in the majority's reasoning, the failure to adequately consider the Charming Betsy question and the tension between the agency's interpretation in this case and U.S. treaty commitments, I want to briefly explain why a contrary holding is not necessarily inconsistent with other circuits that have held in favor of the reinstatement statute in similar cases, and why I believe that we have jurisdiction to look behind the underlying removal order and to examine whether Garcia's due process rights were violated.

### A. Other Cases Interpreting This Statutory Interplay

While the majority is quite correct that other circuits that have encountered this statutory tension have sided in favor of the reinstatement bar, none of these cases, as far as I can discern, involved petitioners whose initial removal proceedings were infected with the procedural irregularities which occurred here. Furthermore, some of these courts noted the due process tensions when applying the reinstatement statute mechanically, but found them inapplicable to the cases at hand.

For instance, in Herrera-Molina v. Holder, the Second Circuit rejected the petitioner's argument that Section 241(a)(5) "deprives him of due process," while noting that "Herrera-Molina does not allege any impropriety" in the underlying removal proceedings and "does not argue that those earlier proceedings deprived him of due process." 597 F.3d 128, 139-40 (2d Cir. 2010). Because the petitioner did not raise that argument, the court did "not consider whether [it] would have jurisdiction to review legal or constitutional challenges to the validity of that underlying deportation order." Id. at 140 n.9.

In Perez-Guzman v. Lynch, the Ninth Circuit noted that the petitioner had "testified before the IJ that the Border Patrol agents never asked him whether he feared returning to Guatemala," but also concluded that "[r]ecords of a brief interview conducted during the expedited removal process, however, note Perez answered in the negative when asked whether he feared returning to Guatemala." 835 F.3d 1066, 1070-71 (9th Cir. 2016), reh'g and reh'g en banc denied (No. 13-70579, Apr. 26, 2017). There is nothing in Perez-Guzman that suggests the petitioner did not speak the language in which the proceedings were conducted. By contrast, Garcia has testified that he was never asked whether he feared returning to Guatemala. [21] Of course, he may have been asked in Spanish, but I struggle to see how this is much better than not being asked at all.

**\*50** Furthermore, in that same case, the Ninth Circuit noted that "[t]he Attorney General's interpretation of § 1231(a)(5) may have dire humanitarian consequences for individuals in reinstatement who seek relief from removal ... because they were improperly denied an opportunity to seek asylum during their earlier removal from the United States." Perez–Guzman, 835 F.3d at 1081. The Ninth Circuit's rejoinder to this point, that "the government has discretion to forgo reinstatement and instead place an individual in ordinary removal proceedings," id., would seem to be cold comfort to aliens who, like Garcia, are not so fortunate as to be showered with the government's magnanimity. [22]

In short, none of our sister circuits, as far as I can gather, have encountered a comparable set of facts to those undergirding Garcia's appeal at the time that they answered this same statutory riddle. Nor did any of them address the tension between the agency's interpretation of the INA and international law, an issue of first impression in our circuit. [23] For these reasons, I do not find these opinions persuasive.

### B. The Court's Jurisdiction to Examine Underlying Removal Orders

The procedural defects in the 2007 removal proceedings are, admittedly, not front and center in the petitioner's presentation of his case. [24] He focuses, like the majority does, on the statutory interplay between the asylum and reinstatement of **\*51** removal provisions. However, Garcia did argue below,

and renews the point on appeal in his brief, that he "was never provided a real opportunity to apply for asylum" when he was initially removed in 2007. Because these statements in his brief and the descriptions of his initial confinement and removal are both sufficiently detailed to put this court on notice and sufficiently shocking that such notice should be heeded, I would conclude that the issue is properly before us. [25]

To be sure, the removal statute itself provides that "[t]he prior order of removal ... is not subject to being reopened or reviewed," 8 U.S.C. § 1231(a)(5), and some courts have interpreted this as erecting a strict bar to judicial review of such orders, see Ramirez-Mejia, 794 F.3d at 489 ("This court has jurisdiction to review the lawfulness of a reinstatement order but not the underlying removal order."); Garcia v. Mukasey, 531 F.3d 141, 150 (2d Cir. 2008) (concluding that "the reinstatement of removal statute expressly prohibits us from giving petitioner a second bite at the apple").

However, as other courts have recognized, there is more to this story. The Supreme Court has held that reading the IIRIRA to "entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions" under the Suspension Clause. [26] I.N.S. v. St. Cyr, 533 U.S. 289, 300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). In light of the "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," the Supreme Court interpreted three separate provisions of the IIRIRA and concluded that they had not clearly repealed the general grant of habeas jurisdiction to federal courts. St. Cyr, 533 U.S. at 298, 121 S.Ct. 2271. Other courts have recognized similar constitutional problems with a literal reading of § 1231(a)(5) that precludes all judicial review of the underlying removal action. See, e.g., Ramirez-Molina v. Ziglar, 436 F.3d 508, 513 (5th Cir. 2006) ("[I]f there were no judicial review available to an alien in the initial removal proceedings, then § 1231(a)(5)'s foreclosure of judicial review of constitutional and legal claims regarding that order after reinstatement arguably would implicate the Suspension Clause concerns articulated in St. Cyr.").

Additionally, while a separate provision of the INA precludes judicial review over some cases, § 1252(a)(2)(D) exempts constitutional issues from this restriction:

> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional **\*52** claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." 8 U.S.C. § 1252(d); see also id. § 1252 (b)(ii) (stating that no court shall have jurisdiction over discretionary actions taken by the Attorney General and Secretary of Homeland Security "other than the granting of relief under Section 1158(a)," which governs asylum).

In Debeato v. Att'y Gen. of U.S., the Third Circuit concluded that "there is no principled reason for reading § 1252(a)(2)(D) as permitting jurisdiction to review a final removal order, yet denying jurisdiction to review a reinstatement of that very same order." 505 F.3d 231, 234-35 (3d Cir. 2007); see also Ramirez-Molina, 436 F.3d at 513–14 ("Because § 1231(a)(5) limits judicial review, § 1252(a)(2)(D) prevents its operation in cases, such as this one, in which the validity of an underlying order is questioned on constitutional or legal grounds.").

This court has previously suggested that the automatic reinstatement of a prior removal order could present serious constitutional problems. In Lattab, the petitioner had not made the required showing of prejudice arising from his underlying removal proceedings, and thus the court was without authority to reach the question of the due process-related issues associated with the summary reinstatement process. Nevertheless, with one of my colleagues on this panel writing for the court, we noted:

> Although this case does not provide a vehicle for testing the merits of the constitutional claim, we do not mean to imply that the claim is insubstantial.... While judicial review of reinstatement orders is available in the courts of appeals, that review may not be adequate when the alien has not

been given a meaningful opportunity to develop an administrative record.

Lattab, 384 F.3d at 21 n.6 (internal citations omitted).

In my view, Garcia has satisfied the requirement of showing that he was prejudiced by the due process deficiencies in his underlying removal order. Therefore, I would find that just as the reinstatement of removal statute's bar of "any relief" does not literally mean "any relief,"[27] § 1231(a) (5)'s command that the prior order of removal "is not subject to being reopened or reviewed" does not actually mean "no reopening" and "no review" because such a reading, taken to its logical destination, would violate both the Suspension Clause and 8 U.S.C. § 1252.

To conclude, I would hold that the court is permitted to review the underlying removal order for serious due process defects when properly called upon to do so. I would further hold that a mechanical and categorical application of the reinstatement of removal statute (allowing it to trump the asylum statute, as the agency suggests and as the majority holds today), would render judicial vindication of such due process rights impossible. The majority's ruling thus contravenes the court's duty in cases where "a serious doubt of constitutionality is raised" to "first ascertain whether a construction of the statute is fairly possible by which [a constitutional] question may be avoided." Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)).

### *53  III. The Reinstatement of Removal and International Law

The due process concerns alone might be sufficient to justify a more nuanced and case-by-case inquiry into whether the reinstatement statute should trump the right to apply for asylum in a particular petitioner's case. However, these concerns, highlighted so vividly in Garcia's case, also reinforce the most jarring problem with the majority's conclusion that the reinstatement provision wins outright: such a reading would cause the United States to run afoul of international treaty commitments in an ordinary case, and

even more so in cases where the alien was not afforded due process in the initial removal proceedings.

## A. The *Charming Betsy* Canon

The interpretive principle that ambiguous federal statutes are to be interpreted in conformity with international law where feasible can be traced to a pair of Supreme Court cases, both arising out of the quasi-war with France: Talbot v. Seeman, 5 U.S. (1 Cranch) 1, 2 L.Ed. 15 (1801), and Charming Betsy, 6 U.S. at 64. In *Talbot*, Chief Justice Marshall's opinion for the Court observed that "the laws of the United States ought not, if it be avoidable, so to be construed as to infract the common principles and usages of nations," and thus, by the Court's construction of the statute in question, "the act of congress will never violate those principles which we believe, and which it is our duty to believe, the legislature of the United States will always hold sacred." Talbot, 5 U.S. at 43-44. The *Charming Betsy* case followed three years later, in which Chief Justice Marshall announced the more familiar maxim that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." Charming Betsy, 6 U.S. (2 Cranch) at 118.

This interpretive principle is now firmly established in U.S. law and has been employed by the Supreme Court and this court on a regular basis when interpreting federal statutes. See, e.g., Weinberger v. Rossi, 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) (noting that construing federal statutes to avoid violating international law has "been a maxim of statutory construction since the decision" in Charming Betsy); United States v. Lachman, 387 F.3d 42, 55 (1st Cir. 2004) ("We recognize that statutory and regulatory language should be construed in consonance with international obligations when possible."); United States v. Hensel, 699 F.2d 18, 27 (1st Cir. 1983) (Breyer, J., for the court) (describing the *Charming Betsy* principle as "well established"); see also Restatement (Third) of Foreign Relations Law § 114 (Am. Law. Inst. 1987) ("Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States.")[28]

**\*54** It is entirely appropriate in cases of statutory ambiguity[29] to adopt a reading of the statute that does not conflict with U.S. commitments under a non-self-executing treaty, precisely because the canon is concerned with the international obligations of the country, rather than the domestic enforceability of international law. See, e.g., Ma v. Ashcroft, 257 F.3d 1095, 1114 (9th Cir. 2001) (applying the Charming Betsy canon to avoid a violation of the International Covenant on Civil and Political Rights, which had been ratified by the United States but declared by the Senate to be non-self-executing). At least one circuit has applied the Charming Betsy canon in the context of a possible conflict between the INA and the Refugee Protocol. See Khan v. Holder, 584 F.3d 773, 783 (9th Cir. 2009) ("Under Charming Betsy, we should interpret the INA in such a way as to avoid any conflict with the [Refugee] Protocol, if possible.")[30]

A treaty, ultimately, "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it," Medellín, 552 U.S. at 505, 128 S.Ct. 1346 (quoting Head Money Cases, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884)), and there is no reason why the judiciary, as a co-equal branch of government, should interpret a statute in such a way that would violate a treaty, absent a clear showing by Congress that it desires this result. Applying the Charming Betsy doctrine is therefore consistent with the judiciary's role to "say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803), a role that extends to international law. See The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) ("International law is part of our law, and must be ascertained and administered by the courts ... of appropriate jurisdiction.").

## B. The Refugee Convention

The Refugee Convention "was enacted largely in response to the experience of Jewish refugees in Europe during the period of World War II," and the "tragic consequences of the world's indifference at that time are well known." Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 207, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (Blackmun, J., dissenting). Although the United States did not join the Convention, it acceded to the

1967 Protocol, and in so doing, the United States "agree[d] to comply with the substantive provisions of Articles 2 through 34" of the Refugee Convention. Congress soon followed with the Refugee Act of 1980, which amended the INA specifically to "bring United States refugee law into conformance with the 1967 Protocol." Cardoza-Fonseca, 480 U.S. at 436, 107 S.Ct. 1207. Central to State obligations **55 under the 1967 Protocol (and the 1951 Convention) is the requirement that States provide "fair and efficient procedures for the determination of refugee status." UNHCR Exec. Comm., General Conclusions on International Protection, No. 71 (XLIV), U.N. Doc. A/48/12/Add.1 (Oct. 8, 1993).[31]

The majority correctly notes, *ante* at 42, that Garcia is a refugee under both statutory and international law. The Convention defines a "refugee" as one who, "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country." 19 U.S.T. at 6261. The INA more or less adopts this same definition, with exceptions not relevant here.[32] The Immigration Judge found that Garcia, who is clearly "outside the country of his nationality," had a well-founded fear of persecution on account of both his membership in a particular social group and because of his religious activities, and there is no way that one could read the voluminous record in this case and not agree with that conclusion.[33] None of the exceptions under Article 1 of the Convention apply to Garcia.

As explained below, in light of that status, Garcia qualifies for certain rights and protections under international law, protections which the majority's holding today denies to him. While the materials accompanying Garcia's petition rely primarily on Article 28 (the right to have a travel document) and Article 34 (the requirement that states facilitate the naturalization of refugees), for completeness' sake, I note aspects of this case and aspects of the majority opinion that seem to be in tension with other portions of the Convention as well.[34]

**56 *i. Article 17*

Article 17 of the Convention requires that states "shall accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment." 19 U.S.T. at 6269. The travaux préparatoires to the Convention notes that, as used in Article 17, "most favourable treatment" is defined as "the best treatment which is accorded to nationals of another country by treaty or usage." See UN High Commissioner for Human Rights, The Refugee Convention, 1951: The Travaux Préparatoires Analyzed with a Commentary by Paul Weis 94 (hereinafter "Weis, Travaux"). An early draft of Article 17, provided by the Secretariat, noted that "[b]ecause of their limited resources and their status, wage-earning employment is the only type of employment to which most refugees can aspire," and the commentary to Article 17 concludes it is "one of the most important of the Convention." Id. at 97.

The article is essentially a requirement that member states grant refugees the unrestricted right to work, on par with the rights that would be extended to other aliens. Yet, as noted above, withholding of removal status requires the periodic refiling of work applications to USCIS, which has discretion to reject or delay the applications, and the expiration of a permit results in the inability for the alien to work legally, in contrast with asylum status, where the expiration of the permit does not deprive the asylee of the right to work. See 8 C.F.R. § 274a.12(a)(5). Additionally, asylees are exempted from the class of aliens who "must apply" to USCIS "for a document evidencing such employment authorization," while aliens in withholding of removal are not. Id. § 274a.12(a). Because state parties are obliged to extend the most favorable treatment to refugees (comparable, at minimum, to the treatment they extend to non-refugee aliens from the same country), the imposition of a more cumbersome work permit program for aliens in withholding of removal status who are seeking employment likely violates the spirit, if not the letter, of Article 17.

*ii. Article 28*

Article 28 of the Convention requires that "[t]he Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require." 19 U.S.T. at 6274. This requirement arose from a recognition that "[r]efugees who do not enjoy the protection of the authorities of their country of origin do not have national passports" and "would therefore be unable to leave the initial reception country if a document

replacing the passport had not been established for their benefit." Weis, Travaux, at 157.

While considering several proposed drafts of Article 28, the U.K. representative noted that were a refugee not issued a travel document by the state in question, "the refugee would probably not be allowed to enter other countries, for they would hesitate to admit him for fear that they might be obliged to keep him permanently on their territory without this provision." Weis, Travaux, at 161. The U.S. representative said that while "the US had not adhered to any convention or agreement relating to travel documents for refugees" prior to these discussions, he could "assure the Committee that refugees resident in the US would ordinarily be able to leave the country and to return to it." Id. at 162 (emphasis added).

**\*57** Article 28 is a categorical requirement, "a mandatory obligation on Contracting States to issue the document," see Weis, Travaux, at 194, yet an alien who has been granted withholding of removal (as opposed to asylum) is not eligible for such a travel document, which essentially renders him trapped in the United States (at least unless the government finds a third country that is willing to take him). Because these documents are unavailable for people afforded withholding of removal status, the grant of withholding of removal to an individual that otherwise qualifies as a refugee (like Garcia) is a per se violation of the Convention.

The majority's rejoinder to this point is that the clause allowing for exceptions to this requirement when "compelling reasons of national security or public order otherwise require" allows the government to skirt this requirement because "deterring repeated unlawful entry into this country" is a "compelling reason[ ] of ... public order." See ante at 42. This is a temporal non-sequitur, because the government has already made a decision that Garcia meets the "reasonable fear" requirement for withholding of removal. If concerns of "public order" dictated that Garcia be kept out of the United States, then the United States would have various grounds to refuse to grant him withholding of removal. But after deciding that Garcia poses no such threat, on what possible basis could the government argue that "public order" considerations required that he not be permitted to leave the United States for some other country?

Nor is the majority correct in its suggestion that Garcia needs to make "an argument to the contrary" for why the United States does not have a "compelling reason of ... public order" for denying travel documents to individuals

in withholding of removal. Id. That suggestion places the burden on the wrong party, because "the issue of the travel document is an obligation" imposed on the state, and applies "unless compelling reasons of public security or public order justify a refusal." Weis, Travaux, at 194 (emphasis in original). Examples given for such "compelling" grounds in the commentaries include "cases where a refugee seeks to escape prosecution or punishment for a criminal offence or where the refugee is suspected of travelling in order to engage in criminal or espionage activities." Id. It would not, it seems to me, apply to the issuance of a travel document to an alien, like Garcia, who had already been determined to have qualified for protected status and already had a full security screening as part of the withholding of removal process.

### iii. Article 31

Article 31 of the Convention provides that "[t]he Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened ... enter or are present in their territory without authorization," 19 U.S.T. at 6275. This treaty commitment is implemented in the INA by the provision, at issue in this case, which allows individuals to apply for asylum "irrespective of such alien's status," 🔖 8 U.S.C. § 1158(a)(1), because to deny asylum relief to a refugee that has flouted a country's border control or immigration laws because of the urgency with which he was required to leave his home country would be to penalize him for the very fact of being a refugee, see 🚩 8 U.S.C. § 1101(a)(42) (recognizing that refugees, by definition, are fleeing persecution); UN Ad Hoc Committee on Refugees and Stateless Persons, Memorandum by the Secretary-General, UN Doc. E/AC.32/2, Ch. XI, Art. 24. Para. 2 (Jan. 3, 1950) ("A refugee **\*58** whose departure from his country of origin is usually a flight, is rarely in a position to comply with the requirements for legal entry (possession of national passport and visa) into the country of refuge.") For this reason, the principle of non-penalization is described in UNHCR's Introductory Note to the Convention as one of the most notable "fundamental principles" which "underpin[s]" the Convention's commitment to rights protection, along with non-discrimination and non-refoulement. See Introductory Note (UNHCR) (2010), UN Convention Relating to the Status of Refugees ("This recognizes that the seeking of asylum can require refugees to breach immigration rules.").

Because of the importance of this provision, "penalties" cannot be interpreted as merely the assessment of a fine or imprisonment, but must be applied flexibly to assess whether a state party is denying the full scope of refugee protection to a particular individual on account of his or her illegal entry into the state's territory. [35] *See* Refugee Convention, Introductory Note ("Prohibited penalties might include being charged with immigration or criminal offences relating to the seeking of asylum, or being arbitrarily detained purely on the basis of seeking asylum"); *see also* James C. Hathaway, The Rights of Refugees Under International Law 405 (2005) (stating that penalties may include "sanctions that might ordinarily be imposed for breach of the asylum state's general migration control laws"). Though not defined in the Convention, the commentary notes that "[i]t is clear from the travaux préparatoires that ['penalties'] refers to administrative or judicial convictions on account of illegal entry or presence, not to expulsion." Weis, Travaux, at 219.

Here, although the penalty imposed on Garcia is not in the form of a criminal conviction, it is, in essence, an administrative sanction on account of his earlier illegal entry —one automatically imposed by [🔒] 8 U.S.C. § 1231(a)(5) without regard to the underlying circumstances in a petitioner's case. *See Penalty*, Black's Law Dictionary (10th ed. 2014) (defining a "statutory penalty" as one that is "imposed for a statutory violation; esp., a penalty imposing automatic liability on a wrongdoer for violation of a statute's terms."). It is also worth noting that an Amendment was introduced by the Austrian delegate during the Convention negotiations which would have provided that the non-penalization provision "shall not apply, however, to a refugee against whom an expulsion or residence order has been issued under a judicial or administrative decision of the State in which he seeks asylum." Weis, Travaux, at 214. This amendment, which describes Garcia's situation in spades, was voted down overwhelmingly, *see id.* at 216, and the final non-penalization provision of Article 31 did not distinguish a state's obligation to a refugee based on the existence of a prior deportation or removal order against the same refugee. [36]

**\*59** Case law from other signatory states and from international courts also supports a flexible interpretation of "penalties." [37] For instance, in R v. Uxbridge Magistrates Court and Another, ex parte Adimi, the U.K. High Court (Divisional Court) noted that Article 31's protections "extend[ed] not merely to those ultimately accorded refugee status but also to those claiming asylum in good faith,"

and that the non-penalization obligation had as its broad purpose "to provide immunity for genuine refugees whose quest for asylum reasonably involved them in breaching the law." [1999] EWHC (Admin) 765, [15-16] (Eng.); *see also* UK Soc. Sec. Comm. Dec. No. CIS/4439/98, ¶ 16 (Nov. 25, 1999) (noting that interpreting "penalties" narrowly would "put[ ] form above substance and would enable contracting states to evade Article 31"). In interpreting the word "penalty" as used in the International Covenant on Civil and Political Rights (ICCPR), the UN Human Rights Committee has embraced a similarly flexible approach. *See* Van Duzen v. Canada, UNHRC Comm. No. 50/1979, ¶ 10.2 (Apr. 7, 1982) (stating that Article 15 of the ICCPR, which prohibits the imposition of "a heavier penalty ... than the one that was applicable at the time when the criminal offence was committed," should be interpreted according to the "object and purpose" of the treaty as a whole).

In short, because the majority's approach categorically prevents an alien in Garcia's situation from applying for relief that would be available to other aliens, I would consider this administrative roadblock to constitute an impermissible "penalty" that is imposed on Garcia, likely triggering a violation of Article 31 because the penalty is imposed before Garcia's status as a refugee can be determined. *See* Hathaway at 407 (noting that it is "lawful for a government to charge an asylum-seeker with an immigration offense, and even to commence a prosecution, so long as no conviction is entered until and unless a determination is made that the individual is not in fact a Convention refugee.") Viewing this administrative ruling as a penalty makes particular sense in a case like Garcia's, where the Attorney General's practices in the first instance of illegal entry have "deprive[d] the asylum seeker of the right to gain effective access to the procedure for determining refugee status." Amuur v. France, Eur. Ct. H.R., App. No. 19776/92, ¶ 43 (1996) (emphasis added).

### iv. Article 34

Taken together, the above violations lend credence to Garcia's argument that the government's position likely violates Article 34 of the Convention. That provision, as noted in the majority opinion, provides that "[t]he Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees." 19 U.S.T. at 6276 (emphasis added). While "precatory," [🔒] Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207, and non-self-executing, Stevic, 467 U.S. at 428, 104 S.Ct. 2489, I have serious doubts as to whether the bifurcated

system of withholding of removal and asylum comports with the basic spirit of Article 34, particularly when an alien's initial removal order was bereft of basic fairness and process.

**\*60** There is one final way in which a reading of the statute that only allows for withholding of removal to a petitioner like Garcia is in serious tension with Article 34's commitment to facilitate the assimilation and naturalization of eligible refugees, and also with Article 31's prohibition on "penalizing" refugees. As both the majority opinion and Section I.F of this dissent point out, an alien must meet a much higher evidentiary showing to qualify for withholding of removal.

Aliens with previous removal orders, therefore, have to meet a higher burden to get less relief, even when they never had a meaningful opportunity to meet the lesser burden and receive the right to apply for more relief. I question how this could possibly be consistent with the object and purpose of Articles 31, 34, and the Convention as a whole. Ultimately, even though Article 34 "is in the form of a recommendation," Weis, Travaux, at 251, it seems very doubtful to me whether this is a recommendation that we as a country are following in good faith.

### C. The ICCPR

Although the petitioner does not raise this issue, I want to note one final Charming Betsy problem: the approach adopted by the majority today leaves in place a structure, evidenced by Garcia's situation, which deprives aliens on U.S. soil of the fair trial guarantees enshrined in the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171. The ICCPR was signed by the United States in 1976 and ratified thereafter by the Senate in 1992. Similar to the Refugee Protocol, the ICCPR was ratified "on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." Sosa v. Alvarez-Machain, 542 U.S. 692, 735, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

Notwithstanding its non-self-executing status, the Supreme Court and lower federal courts have frequently consulted the ICCPR as an interpretive tool to determine important issues in the area of human rights law. See, e.g., Roper v. Simmons, 543 U.S. 551, 576, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (referring to the ICCPR to support the prohibition on the juvenile death penalty); Ma, 257 F.3d at 1114

(relying on Article 9 of the ICCPR, which prohibits arbitrary arrest or detention, when interpreting a provision of the INA); Igartúa-De La Rosa v. United States, 386 F.3d 313, 319 (1st Cir. 2004) (Torruella, J., dissenting), reh'g granted, judgment vacated, 404 F.3d 1 (1st Cir. 2005) (stating that, despite its non-self-executing status, "I am nonetheless compelled to recognize that the United States is in violation of its obligation under Article 25 to afford universal suffrage to its citizens" with respect to voting rights of residents of Puerto Rico).

The ICCPR applies to "all individuals within [a State's] territory and subject to its jurisdiction," ICCPR art. 2, ¶ 1, a category which includes aliens. Most pertinent to this case, Article 14 of the ICCPR lays out the basic protections for the right to a fair trial. [38] Among these basic rights are: "[t]o be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him," Art. 14(3)(a); "[t]o have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing," Art. 14(3)(b); "to **\*61** be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require," Art. 14(3)(d); and "[t]o have the free assistance of an interpreter if he cannot understand or speak the language used in court," Art. 14(3)(f).

As I have emphasized throughout this dissent, none of these rights, which are also protected under U.S. law and broadly apply to aliens in removal proceedings, were extended to Garcia during his initial removal proceedings. True, the government has apparently remedied these violations in the instant case: Garcia is counseled and had access to an interpreter during the 2015 proceedings. However, the government's interpretation of the INA is essentially a "one strike and you're out" policy, so it does no good for Garcia to have access to these basic due process protections now, when he has already been hoodwinked by the Potemkin process that infected his initial encounter with our justice system. It would presumably come as no surprise to Garcia to learn that a Government Accountability Office Report conducted the year after his initial removal concluded that "having [legal] representation was associated with more than a three-fold increase in the asylum grant rate compared to those without representation." See U.S. Gov't Accountability Office, GAO-08-940, U.S. Asylum System: Significant Variation Existed in Asylum Outcomes Across Immigration Courts and Judges 30 (2008). It would also do no good for him to learn this after the fact.

Because none of the basic elements of due process were met in Garcia's initial removal proceedings, and because the approach taken by the majority today leaves in place a deferential legal scaffolding that allows such tainted procedures to go unchecked, I would also find that deference to the agency on this statutory question causes the United States to be in violation of its commitments under the ICCPR's fair trial provisions.

### IV. Conclusion

There is much to be said for the majority's observation that "[i]mmigration law is distinguished by its complexity more than by its clarity." Ante at 30. In the face of such complexity, it can be tempting to throw up our hands and say that while these immigration cases are sad (and they often are), we will simply defer to the immigration authorities' reasoned judgment as to its statutory mandate, never mind the consequences and never mind the volume of due process and international law principles that are trampled along the way.

This sort of judicial muscle memory may be the easy answer, but it is not always the correct one. Because the petitioner in this case was not afforded due process in his underlying removal proceedings, and because we are obliged to interpret statutes in consonance with international treaty obligations where fairly possible, we need not defer to an agency interpretation which violates these obligations.

I therefore dissent.

### All Citations

856 F.3d 27

## Footnotes

\*   Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Jefferson B. Sessions, III has been substituted for former Attorney General Loretta E. Lynch as the respondent.

1   8 U.S.C. § 1231(b)(3)(B) then describes certain specific categories of aliens—not including those subject to reinstated removal orders—who may not benefit from withholding of removal. See 8 U.S.C. § 1231(b)(3)(B).

2   A refugee is defined in Article 1(2) of the Refugee Convention as someone who, "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country." 19 U.S.T. at 6226.

3   Aliens whose removal has been withheld are, however, like aliens granted asylum, authorized to accept employment in the United States. 8 C.F.R. § 274a.12(a)(5), (10).

4   Despite the transfer to DHS, the statutory responsibilities assigned to the Attorney General that are "indigenous to the functions of the Attorney General" were retained in the Department of Justice. 68 Fed. Reg. at 9824.

5   8 C.F.R. § 208.16 governs the agency's consideration of the alien's application for withholding of removal, whether made under 8 U.S.C. § 1231(b)(3)(A) or under the CAT. See 8 C.F.R. § 208.16(b), (c); § 1208.16(b), (c).

6   The dissent spends a great deal of time developing arguments about a potential due process violation concerning Garcia's initial removal and its bearing on the propriety of his reinstated order of removal. But Garcia is arguing to us only that aliens who are subject to reinstated orders of removal may seek asylum, even though they may be barred from seeking other forms of relief. Thus, the dissent's extended discussion of case law concerning whether flaws in an underlying removal order may provide a basis for challenging a reinstated order of removal has no bearing on this appeal. That is no doubt why the due process issue

on which the dissent focuses is not only not "front and center" in Garcia's briefing, post at 50, but also not set forth as a developed argument at all about the only statutory issue that Garcia raises—namely, how to construe § 1231(a)(5) in light of § 1158(a)(1).

7    Garcia's argument regarding § 1158(a)(1), if accepted, would not render § 1231(a)(5) a nullity. Chapter 12 provides for other forms of relief, besides asylum: cancellation of removal, pursuant to 8 U.S.C. § 1229b; voluntary departure as an alternative to removal, pursuant to 8 U.S.C. § 1229c; and adjustment of status, pursuant to 8 U.S.C. § 1255. See, e.g., Fernandez-Vargas v. Gonzales, 548 U.S. 30, 42 n.9, 44 n.10, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006) (characterizing these procedural avenues as forms of "relief"); Rodriguez v. Gonzales, 451 F.3d 60, 61 (2d Cir. 2006) (characterizing cancellation of removal and adjustment of status as "relief"); see also Zambrano-Reyes v. Holder, 725 F.3d 744, 752 (7th Cir. 2013) (characterizing a motion to reopen removal proceedings as a form of relief).

8    Adding force to Garcia's argument, these other forms of relief are styled as grants of discretion to the Attorney General to provide relief, rather than as a categorical grant of an entitlement to any alien to seek it, as § 1158(a)(1) is styled. Section 1229b(a), for instance, provides: "The Attorney General may cancel removal" under certain circumstances. (emphasis added). Likewise, § 1229c provides: "The Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense...." (emphasis added). Finally, § 1255 provides: "The status of an alien who was inspected and admitted or paroled into the United States ... may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence...." (emphasis added).

9    Garcia does not argue that the phrase "irrespective of such alien's status"—which, unlike the change from "an" to "any," dates back to section 208 of the Refugee Act, Cardoza-Fonseca, 480 U.S. at 427, 107 S.Ct. 1207, and thus pre-dates IIRIRA—in and of itself trumps § 1231(a)(5).

10    Garcia contends that, in this case, the agency cannot benefit from deference at Chevron's second step because the agency did not interpret the statutory scheme, but instead "believe[d] that [its] interpretation is compelled by Congress." Garcia offers no support for this proposition, and we find none in the agency's own statements. See Perez-Guzman, 835 F.3d at 1079 n.8 ("The administrative history does not ... suggest the agency saw § 1231(a)(5) as compelling the regulation's particular approach to asylum, withholding of removal or CAT protection. On the contrary, the agency's explanation shows it applied its expertise by crafting an expedited screening process and balancing the fair resolution of claims for relief from removal against Congress' desire to provide for streamlined removal of certain classes of individuals, including those subject to reinstated removal orders.").

11    See, e.g., Aguirre-Aguirre, 526 U.S. at 419, 119 S.Ct. 1439 ("Under the immigration laws, withholding is distinct from asylum, although the two forms of relief serve similar purposes."); Hinds v. Lynch, 790 F.3d 259, 261 (1st Cir. 2015) (commenting that the petitioner sought no "asylum, withholding, or other relief from the Immigration Judge"); López-Castro v. Holder, 577 F.3d 49, 52 (1st Cir. 2009) ("This brings us to the particular relief sought in the instant case: withholding of removal."); Matter of L-A-C-, 26 I. & N. Dec. 516, 519 (BIA 2015) ("[A]n applicant who seeks asylum or withholding of removal has the burden of demonstrating eligibility for such relief....").

12    In this respect, moreover, § 1231(b)(3)(A) differs significantly from each of the grants of relief other than asylum that Congress provided for in chapter 12. While Section 1231(b)(3)(A) prohibits the Attorney

General from removing an alien if that alien satisfies the statutory criteria, as we noted above, §§ 1229b, 1229c, and 1255 permit the Attorney General to undertake certain actions as a matter of discretion.

13    The dissent relies on a number of provisions of the Refugee Convention that Garcia never mentions. As for the two provisions of the Convention that Garcia does address, the dissent does not address the fact that Garcia makes no developed argument regarding the exceptions they contain. Thus, the dissent does not address the fact that Garcia offers no argument as to why the government's evident interest in deterring unlawful entry must be understood to conflict with Article 28, notwithstanding its "public order" exception, or Article 34, notwithstanding its "as far as possible" limitation. Moreover, in following our usual rules of waiver and, accordingly, holding Garcia to the arguments that he actually does develop, see Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010) ("[A]ppellate arguments advanced in a perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived."), we do not impermissibly relieve the government of any burden of explanation that the Charming Betsy canon may impose. We simply ensure that we do not decide the case based on arguments about the meaning of international law that were never subjected to adversary testing.

14    The record is replete with evidence that Garcia could not comprehend legal proceedings in Spanish. On his application for asylum in 2015, on the section of the form which asked what languages the applicant speaks, Garcia wrote "Spanish (not fluently)." At his hearing before an asylum officer in May 2015, a proceeding designed to determine whether he had a reasonable fear of being removed to Guatemala, officials instructed Garcia to give his answers in K'iche and provided him with an interpreter. The government also provided Garcia with a K'iche interpreter during the proceedings before the Boston Immigration Judge for withholding of removal. One wonders what the Government learned between 2007 and 2015 which led it to conclude, in the latter instance, that Garcia required a K'iche interpreter so as to have the benefit of due process.

15    Garcia himself confirmed as much at his 2015 reasonable fear hearing before an asylum officer (this time with the benefit of a K'iche interpreter):

Q: Have you ever been denied anything or any rights because you are Mayan?

A: Yes a lot of things have been denied for me since I don't speak Spanish and I didn't go to school.

Q: What have you been denied since you don't speak Spanish?

A: I don't understand when people talk to me so I just remain quiet because I don't understand.

16    Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (Nov. 6, 1968). Because accession to the Protocol required that the United States comply with all substantive aspects of the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), I will refer to the "Refugee Convention" or the "Convention" when describing U.S. international law obligations under this treaty regime.

17    By contrast, for aliens granted asylum, the regulations stipulate that "[a]n expiration date on the employment authorization document issued by USCIS reflects only that the document must be renewed, and not that the bearer's work authorization has expired." See 8 C.F.R. § 274a.12(a)(5). Additionally, asylees are exempt from the classes of aliens who "must apply" to USCIS for a work permit, id. § 274a.12(a), with the regulations obliquely noting that asylees may be employed by virtue of "an employment authorization document, issued by USCIS to the alien," with no requirement that they apply for this document, id. § 274a.12(a)(5). While it is not clear whether the issuance of the work permit to asylees is therefore obligatory on the part of USCIS, at minimum it seems obvious that aliens in withholding of removal encounter additional procedural hurdles in order to work legally.

18    See generally USCIS Form I-131, Application for Travel Document Instructions 1 (rev. Dec. 13, 2016), available at http://www.uscis.gov/files/form/i-131instr.pdf (noting that a "Reentry Permit allows a lawful permanent resident or conditional permanent resident to apply for admission to the United States upon returning from abroad" and that "[a] Refugee Travel Document is issued to an individual in valid refugee or asylee status, or to a lawful permanent resident who obtained such status as a refugee or asylee in the United

States."). Because aliens granted withholding of removal status technically still have a removal order entered against them, they do not have either Refugee or Asylee status and thus may not apply for the reentry permit.

19    As the majority notes, the clear-probability test for withholding of removal "is more demanding than the 'well-founded fear' test" that applies in asylum cases. Ante at 32 (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 449-50, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

20    See Mark Twain, Foster's Case, N.Y. Tribune, Mar. 10, 1873, at 5 ("To my mind Judas was nothing but a low, mean, premature Congressman.")

21    Immigration Judge: When you were in front of the Immigration Judge in 2007, why didn't you tell him of your fear of these Ladino gangs?
Garcia (through an interpreter): I did not tell them anything because they did not ask me any questions whether I was afraid. That's why I didn't tell them anything.
Counsel for Garcia: Your honor, for the record, they didn't understand what was going on. We went down to Texas. The Federal Judge sent us down. We talked to everybody. They didn't understand what was going on.

22    The recent Fifth and Eleventh Circuit cases interpreting this issue included cursory treatments of the underlying removal proceedings, which makes it difficult to discern whether the proceedings in those cases violated the basic due process protections of the petitioners in a similar fashion to Garcia. See Ramirez-Mejia v. Lynch, 794 F.3d 485, 487 (5th Cir. 2015) ("Ramirez-Mejia I")(noting only that the petitioner "was apprehended while illegally entering the United States" and "was subsequently removed from the country"); Jimenez-Morales v. U.S. Atty. Gen., 821 F.3d 1307, 1307-08 (11th Cir. 2016) (explaining that, "after having been removed to Colombia," petitioner again tried to enter the United States without authorization).

23    In a short denial for rehearing en banc, the Fifth Circuit in Ramirez-Mejia noted in passing that "we find no treaty obligation in conflict with our holding" because Article 34 of the Refugee Convention is a "precatory" provision (citing Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207) and Congress left intact the right to apply for withholding of removal and protection under the Convention Against Torture (CAT) in the IIRIRA. See Ramirez-Mejia v. Lynch, 813 F.3d 240, 241 (5th Cir. 2016) ("Ramirez-Mejia II"). However, the Court did not address other pertinent sections of the Refugee Protocol, nor did it address whether the availability of CAT protection and the possibility of withholding of removal are sufficient to satisfy U.S. obligations under the Protocol.

24    I disagree with the majority's contention that because the due process issue was "not set forth as a developed argument," these concerns have "no bearing on this appeal." Ante, at 35 n.6. While Federal Rule of Appellate Procedure 28(a) generally requires that parties develop arguments in some detail in their briefs or risk having them be deemed waived, see Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010), this principle is a "prudential construct that requires the exercise of discretion," U.S. v. Miranda, 248 F.3d 434, 443 (5th Cir. 2001), and some courts have determined that they "have discretion to consider issues not raised in the briefs, 'particularly where substantial public interests are involved.' " Hatley v. Lockhart, 990 F.2d 1070, 1073 (8th Cir. 1993) (quoting Continental Ins. Cos. v. Ne. Pharm. & Chem. Co., Inc., 842 F.2d 977, 984 (8th Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988)). Here, Garcia's brief raises the lack of due process afforded to him in his initial removal proceedings, and even if his brief does not develop these facts into an express argument for why his preferred statutory construction is correct, I would consider that the "substantial public interests," id. at 1073, at stake in this dispute counsel against applying the usual waiver rule.

25    While aliens in removal proceedings do not enjoy the protections of the Sixth Amendment's right to counsel, the INA itself provides this guarantee (along with other due process protections). See 8 U.S.C. § 1229 (a)(1)(E) ("The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel ... and (ii) a current list of counsel" provided by the Attorney General); see also Lattab v. Ashcroft, 384 F.3d 8, 18 (1st Cir. 2004) ("In general, section 240 entitles aliens to be represented by counsel,

to be heard by an immigration judge, to adduce evidence, and to cross-examine adverse witnesses."). Fifth Amendment due process protections also apply in removal proceedings. See Demore v. Kim, 538 U.S. 510, 523, 123 S.Ct. 1708, 155 L.Ed.2d 724, (2003) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." (quoting Reno v. Flores, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993))).

26    See U.S. Const. art. 1, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.")

27    As the majority notes, aliens with previous removal orders can apply for cancellation of removal, departure as an alternative to removal, and adjustment of status, all forms of "relief" under the INA. See ante at 36 n.7.

28    As an initial matter, I agree with the majority that there should be no objection to the application of the Charming Betsy canon to this case. The government's cursory argument, that the Refugee Protocol is not a self-executing treaty and thus it is inappropriate to apply the Charming Betsy canon, is a clear misfire. Even assuming arguendo that the relevant portions of the Refugee Protocol are not self-executing, application of the Charming Betsy canon would remain unaffected. The question of whether a treaty is self-executing speaks to whether the international agreement in question can be enforced as domestic law in the courts of the United States without implementing legislation, not whether the treaty is an international obligation on the part of the country as a whole. In Medellín v. Texas, the Supreme Court recognized that even treaty provisions that do not constitute binding federal law enforceable in United States courts may still "constitute[ ] an international law obligation on the part of the United States." 552 U.S. 491, 504, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); accord Restatement (Third) § 321 ("Every international agreement in force is binding upon the parties to it and must be performed by them in good faith.").

29    Like other interpretive canons, "[t]he Charming Betsy canon comes into play only where Congress's intent is ambiguous." United States v. Yousef, 327 F.3d 56, 92 (2d Cir. 2003).

30    Although one of our sister circuits has interpreted the canon as only applying "where conformity with the law of nations is relevant to considerations of international comity," see Serra v. Lappin, 600 F.3d 1191, 1198 (9th Cir. 2010), I would note that even if we were to apply this minority rule (which we have not previously done), there are certainly significant "foreign policy implications," Weinberger, 456 U.S. at 32, 102 S.Ct. 1510, to whether (and to what extent) the United States abides by its treaty commitments to provide protection to individuals fleeing religious and political persecution. One need only open a newspaper to see why this is so.

31    Although not binding, the views of the Office of the United Nations High Commissioner for Refugees (UNHCR) have been cited by the Supreme Court for interpretive guidance given that office's expertise and responsibilities for monitoring refugee issues. See, e.g., Negusie v. Holder, 555 U.S. 511, 536-37, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) (consulting the UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status, "to which the Court has looked for guidance in the past"); Cardoza-Fonseca, 480 U.S. at 439, 107 S.Ct. 1207 (seeking guidance in interpreting the "well founded fear" test under the Refugee Convention and Protocol from the position of UNHCR).

32    See 8 U.S.C. § 1101(a)(42)(A).

33    In the spirit of this case, I suppose if one could not read Spanish or English and did not have the opportunity to have the record explained to them in their native tongue, they might not be able to form an opinion one way or another on this conclusion.

34    To be clear, Garcia's actual Charming Betsy claim is that "[t]he Agency's interpretation of INA § 241(a)(5) in a way which deprives Mr. Garcia of the opportunity to have his asylum case heard, violates its obligations under the Convention and Protocol" and that the accompanying DHS regulations "are premised on an

interpretation which does not comport with U.S. obligations under the Protocol and Convention and which is in violation of international law." Articles 34 and 28 are cited as examples, but I interpret his claim to be based on U.S. commitments under these treaty regimes more generally, and he makes several arguments about the relative paucity of benefits available under withholding of removal that would otherwise be available for aliens granted asylum, all of which collectively implicate a variety of provisions under the Refugee Convention aside from Articles 28 and 34. Given that the focus of the 🔖 Charming Betsy canon is on the international law obligations of the United States as a whole, rather than the domestic enforceability of those rights, and given what I consider to be a clear incongruity between U.S. treaty obligations and the automatic reinstatement of removal process, I find these additional provisions of the Refugee Convention to be of sufficient importance that they warrant exploration notwithstanding Garcia's failure to explicitly raise them in his brief, for the same reasons identified at <u>supra</u>, note 24.

35    We have previously held that detention of an alien does not violate Article 31 because that provision "was not intended to prevent a government from detaining one who attempted to enter illegally, pending a final decision as to whether to admit or exclude the person." 🔖 Amanullah v. Nelson, 811 F.2d 1, 16 n.10 (1st Cir. 1987). Here, however, the Article 31 problem is not detention but the denial of certain forms of relief that would otherwise be available to aliens (the right, in this case, merely to apply for asylum), and in Garcia's case, unlike in 🔖 Amanullah, the government has already made a decision <u>not</u> to exclude Garcia from the country.

36    Indeed, the Commentary and travaux préparatoires suggest that "[i]n the case of asylum-seekers, proceedings on account of illegal entry or presence should be suspended pending examination of their request," <u>see</u> Weis, <u>Travaux</u>, at 219. In other words, states are obliged to hear the asylum claim first before forging ahead with ordinary removal or deportation "proceedings on account of illegal entry or presence." <u>Id.</u>

37    When "interpreting any treaty, [t]he 'opinions of our sister signatories' ... are 'entitled to considerable weight.' " 🔖 Abbott v. Abbott, 560 U.S. 1, 16, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010) (quoting 🔖 El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 176, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999)(alterations in original)).

38    The Refugee Convention, too, provides that all refugees "shall have free access to the courts of law on the territory of all contracting states," Refugee Convention, Art. 16, a right that "applies to all refugees wherever resident and whether the residence is lawful or not." Weis, <u>Travaux</u>, at 97.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.04663    29

873 F.3d 553
United States Court of Appeals, Seventh Circuit.

Cirilo G. GARCIA, Petitioner,

v.

Jefferson B. SESSIONS III, Attorney
General of the United States, Respondent.

No. 16-3234
|
Argued April 20, 2017
|
Decided October 11, 2017

**Synopsis**

**Background:** Native citizen of Honduras filed petition for review of Board of Immigration Appeals (BIA) order dismissing his appeal of immigration judge's (IJ) decision denying his request to reconsider reinstatement of his removal order. After the Court of Appeals dismissed petition, 859 F.3d 406, alien moved for rehearing.

**Holdings:** The Court of Appeals, Manion, Circuit Judge, held that:

[1] alien had standing to challenge statute preventing him from applying for asylum, overruling Delgado–Arteaga v. Sessions, 856 F.3d 1109, and

[2] alien subject to reinstated order for removal was statutorily prohibited from applying for asylum.

Petition denied.

West Headnotes (3)

**[1]**   **Aliens, Immigration, and Citizenship**   Right of review or intervention; standing

Alien suffered injury in fact when he was denied opportunity to apply for asylum on basis that he was subject to reinstated order for his removal, and thus had standing to challenge statute preventing him from applying for asylum on that basis, even though asylum was form of discretionary relief, overruling Delgado–Arteaga v. Sessions, 856 F.3d 1109. Immigration and Nationality Act §§ 208, 241, 8 U.S.C.A. §§ 1158(a), 1231(a)(5); 8 C.F.R. § 208.31(e).

2 Cases that cite this headnote

**[2]**   **Aliens, Immigration, and Citizenship**   Ineligible Aliens

Alien subject to reinstated order for removal was statutorily prohibited from applying for asylum. Immigration and Nationality Act §§ 208, 241, 8 U.S.C.A. §§ 1158(a)(1), 1231(a)(5).

2 Cases that cite this headnote

**[3]**   **Statutes**   General and specific statutes

**Statutes**   Construction in View of Effects, Consequences, or Results

Canons of statutory construction discourage interpretation that would render statute meaningless, and usually require that specific statute prevail over general one.

1 Cases that cite this headnote

**\*554** Petition for Review of an Order of the Board of Immigration Appeals. No. AXXX-XX0-280

**Attorneys and Law Firms**

Edward F. Malone, William S. Porterfield, Attorneys, BARACK, FERRAZZANO, KIRSCHBAUM & NAGELBERG LLP, Chicago, IL, Keren Zwick, Attorney, NATIONAL IMMIGRANT JUSTICE CENTER, Chicago, IL, for petitioner.

Lisa Marie Arnold, OIL, Attorneys, DEPARTMENT OF JUSTICE, Civil Division, Immigration Litigation, Washington, DC, for respondent.

Rebecca Ann Sharpless, Attorney, UNIVERSITY OF MIAMI SCHOOL OF LAW, Coral Gables, FL, for

Amicus Curiae AMERICAN IMMIGRATION LAWYERS ASSOCIATION.

Before Manion and Rovner, Circuit Judges, and Coleman, District Judge. *

**Opinion**

Manion, Circuit Judge.

Petitioner Cirilo Garcia is a native citizen of Honduras currently subject to a reinstated order of removal. Federal regulations say that aliens in his position have no right to apply for asylum. Garcia argues that these regulations are inconsistent with the general asylum statute, 8 U.S.C. § 1158(a)(1). Following circuit precedent, we initially held that Garcia lacked standing to challenge the regulations because of the discretionary nature of asylum. However, we now grant Garcia's petition for rehearing to address the standing question. The government now agrees that Garcia has standing.

 **\*555** We agree with the parties that Garcia has standing to file this petition, and as we discuss below, anything to the contrary in this court's precedent will be overruled. However, on the merits we conclude that 8 U.S.C. § 1231(a)(5) plainly prohibits aliens in Garcia's position from applying for asylum. Therefore, we deny his petition for review.

**I. Background**

Garcia is a Honduran national who first came to the United States in 2003. He was ordered removed *in absentia* on October 24, 2003, and eventually departed in 2005. However, Garcia claims that he encountered persecution upon his return to Honduras because of his unpopular political views—specifically, his opposition to deforestation. Eventually, he was kidnapped and beaten. He chose to return to the United States in 2014 and, after being apprehended by Border Patrol, sought asylum.

Garcia expressed a fear of persecution and torture because of his activism if he returned to Honduras. On June 9, 2014, the Chicago Asylum Office issued a positive reasonable fear determination, finding that Garcia was generally credible and had a reasonable fear of torture. The Office referred his case to an Immigration Judge for withholding-only proceedings. See 8 C.F.R. § 208.31(e) ("If an asylum officer determines

that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for *full consideration of the request for withholding of removal only*." (emphasis added)). Garcia then filed an asylum application in Immigration Court on September 8, 2014.

On October 29, 2014, the Immigration Judge granted Garcia statutory withholding of removal after finding that he had been persecuted in the past and it was more likely than not that he would be again if he returned to Honduras. The IJ explained that she lacked the authority to reconsider the reinstatement of Garcia's removal order. Garcia then appealed to the Board of Immigration Appeals, arguing that he has a statutory right to seek asylum under 8 U.S.C. § 1158(a). On July 25, 2016, the Board dismissed his appeal. It explained that it lacked authority to declare the controlling regulations in violation of the statute, but also noted that "several federal courts have held a person in reinstatement proceedings is not eligible for and cannot seek asylum." This petition followed.

**II. Discussion**

The parties have presented a straightforward question: may an alien subject to reinstatement of a removal order apply for asylum? The general asylum statute, 8 U.S.C. § 1158(a), says "[a]ny alien who is physically present in the United States or who arrives in the United States ... irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." Garcia contends that this language grants him the right to apply for asylum. The Attorney General counters with the specific language of 8 U.S.C. § 1231(a)(5), providing that aliens subject to a reinstated order of removal are "not eligible and may not apply for any relief under this chapter." Since asylum is a form of relief, the Attorney General argues that Section 1231(a)(5) categorically prohibits Garcia's application.

Initially, the Attorney General also argued that Garcia lacked standing to file this petition in light of our decision in *Delgado–Arteaga v. Sessions*, 856 F.3d 1109, 1115 (7th Cir. 2017). In that case, we held that because "[a]sylum is a form of discretionary relief in which 'there is no liberty interest at stake[,]' " the petitioner  **\*556**  had not suffered an

Article III injury-in-fact when he was denied the opportunity to apply. *Id.* (quoting *Delgado v. Holder,* 674 F.3d 759, 765 (7th Cir. 2012)). Relying on *Delgado–Arteaga,* the panel initially reached the same conclusion in this case. *Garcia v. Sessions,* 859 F.3d 406, 408 (7th Cir. 2017).

**[1]** In response to Garcia's petition for rehearing, the government repudiated its standing argument. Moreover, we recognize that we are the only circuit to hold that a petitioner lacks standing to assert a statutory right to apply for asylum. See *Mejia v. Sessions,* 866 F.3d 573, 583–84 (4th Cir. 2017) (collecting cases). In light of these considerations, we hereby grant Garcia's motion for panel rehearing. Subsequently, a majority of the active judges of this court indicated a desire to overrule the cited portion of *Delgado–Arteaga* in accordance with our procedures under Circuit Rule 40(e).

We now conclude that *Delgado–Arteaga's* holding was inconsistent with Article III standing doctrine. A litigant has standing to sue if he has suffered an injury-in-fact, the injury is fairly redressable to the defendant's conduct, and it is redressable by a favorable judicial decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Garcia has been denied the right to apply for asylum. While asylum is indeed entirely discretionary, an alien must be allowed to apply for asylum before he can receive it. In other words, the denial of a statutory right to apply for asylum extinguishes any chance an alien might have had to receive asylum. Therefore, it is a sufficient injury-in-fact under Article III even though there is no due process right to asylum. That injury is caused by the Attorney General's interpretation of *Section 1231(a)(5)* and could be cured by a favorable decision of this court. That is, even though this court could never guarantee that Garcia *receive* asylum, it could order the Attorney General to allow him to *apply.* Therefore, Garcia has standing to challenge the denial of his alleged statutory right to apply for asylum. Insofar as *Delgado–Arteaga* held otherwise, it is overruled.[1]

**[2]** Because we have decided that Garcia has standing to petition, we must reach the merits of his claim. The question he presents—whether an alien subject to a reinstated order of removal may apply for asylum—has recently confronted

several of our sister circuits. All of them have answered in the negative, although there is a significant split in the reasoning of those decisions. The Second, Fourth, Fifth, and Eleventh Circuits each found the text of *8 U.S.C. § 1231(a)(5)* dispositive,[2] while the First, Third, and Ninth Circuits deferred to the government's position under **\*557** *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[3] We agree with the result in all these cases. Further, we follow the first group of courts and hold that the plain text of *8 U.S.C. § 1231(a)(5)* prohibits Garcia from applying for asylum.

*Section 1231(a)(5)* prohibits aliens subject to reinstated orders of removal from applying for "any relief under this chapter." "[A]sylum is a form of relief from removal," *Jimenez–Morales,* 821 F.3d at 1310, "because, if granted, it prevents the removal from going forward[,]" *Ramirez–Mejia,* 794 F.3d at 489. That is why "[c]ourts routinely refer to asylum as a form of relief from removal and frequently employ the phrase 'asylum relief.' " *Id.* Because the word "any" typically "has an expansive meaning," *United States v. Gonzales,* 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997), it should be read to encompass all forms of relief, including asylum. Therefore, Congress has unambiguously declared that aliens in Garcia's position are ineligible to apply for asylum.[4]

**[3]** The general asylum statute, *8 U.S.C. § 1158(a),* doesn't change that result. While it says that "[a]ny alien ... irrespective of such alien's status, may apply for asylum," that general statement is followed by numerous exceptions. *Section 1231(a)(5)* should be read as another limitation on the right to apply for asylum. "Canons of statutory construction discourage an interpretation that would render a statute meaningless and usually require that a 'specific' statute prevail over a 'general' one." *In re Baker,* 430 F.3d 858, 860 (7th Cir. 2005). Garcia's proffered interpretation of *Section 1158(a)* attempts to use that subsection to trump the specific prohibition in *Section 1231(a)(5),* rendering that prohibition meaningless. Therefore, we join the Second, Fourth, Fifth, and Eleventh Circuits in rejecting it.

### III. Conclusion

We hold, contrary to *Delgado–Arteaga v. Sessions*, that an alien has standing to contest a denial of the right to apply for asylum in this court. That portion of *Delgado–Arteaga* is therefore overruled. However, we join our sister circuits in holding that an alien subject to a reinstated order of removal is not eligible to apply for asylum. Therefore, we deny Garcia's petition for review.

DENIED

**All Citations**

873 F.3d 553

## Footnotes

\*    The Honorable Sharon Johnson Coleman, of the United States District Court for the Northern District of Illinois, sitting by designation.

1    This opinion has thus been circulated to all judges in active service on this court and no judge voted to rehear this case en banc.

2    *Herrera–Molina v. Holder*, 597 F.3d 128, 139 (2d Cir. 2010) ("According to the relevant statutory and regulatory provisions, relief other than withholding of removal, e.g., asylum or cancellation of removal, is not available to this petitioner."); *Mejia*, 866 F.3d at 584 ("[W]e discern no ambiguity in the interplay between § 1231(a)(5) and § 1158(a)(1). We think it clear that, by enacting the reinstatement bar, Congress intended to preclude individuals subject to reinstated removal orders from applying for asylum."); *Ramirez–Mejia v. Lynch*, 794 F.3d 485, 490 (5th Cir. 2015) ("Section 1231(a)(5), read plainly, broadly denies all forms of redress from removal, including asylum."); *Jimenez–Morales v. U.S. Att'y Gen.*, 821 F.3d 1307, 1310 (11th Cir. 2016) ("As asylum is a form of relief from removal, we join the Second and Fifth Circuits in holding that a person like Mr. Jimenez–Morales is not eligible for and cannot seek asylum." (citation omitted)).

3    *Garcia v. Sessions*, 856 F.3d 27, 41 (1st Cir. 2017) ("[W]e cannot say that the agency acted unreasonably in choosing to ensure that the same aliens who could not seek asylum still would be protected through withholding of removal from suffering persecution or torture in their home country, in accord with § 1231(b)(3)(A)'s clear directive to the Attorney General to afford that vital and long-understood-to-be mandatory protection."); *Cazun v. Att'y Gen.*, 856 F.3d 249, 260 (3d Cir. 2017) ("It was reasonable for the agency to conclude that the statutory reinstatement bar foreclosing 'any relief under this chapter' means just what it says: no asylum relief is available to those subject to reinstated removal orders."); *Perez–Guzman v. Lynch*, 835 F.3d 1066, 1082 (9th Cir. 2016) ("[W]e hold that 8 C.F.R. § 1208.31(e) is a reasonable interpretation of the interplay between § 1158 and § 1231, and we must therefore defer to it under *Chevron*. In keeping with that regulation, Perez is not eligible to apply for asylum under § 1158 as long as he is subject to a reinstated removal order."). But see *Cazun*, 856 F.3d at 262 (Hardiman, J., concurring in the judgment) (noting that he would find the agency's interpretation compelled by the statutory text).

4    We don't address whether withholding of removal might also be a form of "relief" under Section 1231(a)(5) even though Garcia received it. Neither party takes issue with the grant of withholding in this case so it is not properly before the court.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

138 S.Ct. 2648
Supreme Court of the United States

Cirilo Garcia GARCIA, petitioner,

v.

Jefferson B. SESSIONS, III Attorney General.

No. 17–984.
|
June 18, 2018.

**Synopsis**

Case below, 873 F.3d 553.

**Opinion**

**\*2649**  Petition for writ of certiorari to the United States Court of Appeals for the Seventh Circuit denied.

**All Citations**

138 S.Ct. 2648 (Mem), 201 L.Ed.2d 1050, 86 USLW 3628, 86 USLW 3629

---

**End of Document**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

965 F.3d 883
United States Court of Appeals,
District of Columbia Circuit.

GRACE, et al., Appellees

v.

William P. BARR, Attorney General of the United States, In His Official Capacity, et al., Appellants

No. 19-5013
|
Argued December 9, 2019
|
Decided July 17, 2020

**Synopsis**

**Background:** Asylum applicants, who asserted believable accounts of domestic or gang violence in expedited removal process, brought action against Attorney General, alleging new credible fear policies for asylum applications based on domestic or gang violence adopted in immigration decision violated the Administrative Procedure Act (APA) and Immigration and Nationality Act (INA). The United States District Court for the District of Columbia, Emmet G. Sullivan, J., 344 F.Supp.3d 96, granted summary judgment in favor of applicants, in part, and enjoined enforcement of policies. Attorney General appealed.

**Holdings:** The Court of Appeals, Tatel, Circuit Judge, held that:

[1] District Court had jurisdiction over action;

[2] policy requiring asylum applicants to demonstrate that native country governments condoned persecution or were completely helpless to protect victims was arbitrary and capricious; abrogating *Matter of A-B-, 27 I. & N. Dec. 316*;

[3] United States Citizenship and Immigration Service (USCIS) policy, requiring asylum officers to apply law of the Circuit where alien was physically located during credible fear interview, was arbitrary and capricious;

[4] aliens seeking asylum based on membership in a particular social group were required to demonstrate that their proposed social group existed independently of the claimed persecution; and

[5] Attorney General's guidance, explaining that asylum claims pertaining to domestic violence or gang violence perpetrated by non-governmental actors generally would not meet credible fear standard, was not arbitrary and capricious.

Affirmed in part, vacated in part, and remanded.

Henderson, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal; Review of Administrative Decision; Motion for Summary Judgment.

West Headnotes (26)

**[1]** **Aliens, Immigration, and Citizenship** ⚖ Right to hearing

An alien found to have a credible fear of persecution by an asylum officer receives a full-blown asylum hearing before an immigration judge. Immigration and Nationality Act § 235, 8 U.S.C.A. §§ 1225(b)(1)(B)(ii), 1225(b)(1)(E); 8 C.F.R. § 208.30(f).

1 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⚖ Hearing or Interview

At the screening stage of a credible fear interview by an asylum officer, an alien seeking asylum need not show that he or she is in fact eligible for asylum. Immigration and Nationality Act §§ 208, 235, 8 U.S.C.A. §§ 1158, 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

**[3]** **Aliens, Immigration, and Citizenship** ⚖ Grounds for Persecution; Protected Groups

To gain asylum, the alien must prove that the alleged persecution has a nexus to one of the

enumerated statutory grounds. 8 U.S.C.A. § 1158(b)(1)(B)(i).

**[4]    Aliens, Immigration, and Citizenship**    Membership in social group

A "particular social group," as may support an asylum claim, is a group of persons all of whom share a common, immutable characteristic, one they either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. 8 U.S.C.A. § 1158(b)(1)(B)(i).

1 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship**    Membership in social group

If the members have no common characteristics they cannot constitute a "particular social group," for purpose of an asylum claim, and if they can change their common characteristics, that is, cease to belong to the group, without significant hardship, they should be required to do so rather than be allowed to resettle in the United States if they do not meet the ordinary criteria for immigration to this country. 8 U.S.C.A. § 1158(b)(1)(B)(i).

**[6]    Aliens, Immigration, and Citizenship**    Membership in social group

A particular social group, for purpose of an asylum claim, must exist independently of the harm suffered by the asylum applicant, that is, the alleged persecution cannot be what defines the contours of the group. 8 U.S.C.A. § 1158(b)(1)(B)(i).

1 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship**    Acts Constituting Persecution

"Persecution," for purpose of an asylum claim, encompasses harm inflicted by non-state actors.

Immigration and Nationality Act § 208, 8 U.S.C.A. § 1158.

**[8]    Aliens, Immigration, and Citizenship**    Government action or acquiescence

In order to obtain asylum based on persecution by non-state actors, aliens must show that their governments were unable or unwilling to control the persecutors. Immigration and Nationality Act § 208, 8 U.S.C.A. § 1158.

**[9]    Aliens, Immigration, and Citizenship**    Jurisdiction and venue

District Court had jurisdiction over action by asylum applicants, who asserted believable accounts of domestic or gang violence in expedited removal process, alleging new credible fear policies and standard governing asylum officers' role in expedited removal process adopted in immigration decision and guidance issued by the Attorney General violated the INA; INA explicitly allowed for challenges to validity of system, which included the policies articulating new standard for credible fear determinations and standards for asylum officers. Immigration and Nationality Act §§ 208, 242, 8 U.S.C.A. §§ 1158, 1225(b), 1252, 1252(e)(3).

2 Cases that cite this headnote

**[10]    Declaratory Judgment**    Power to render

The district court has authority to declare any reviewable government action unlawful and set it aside.

1 Cases that cite this headnote

**[11]    Administrative Law and Procedure**    Rulemaking, adjudication, or other mechanism

Administrative agencies can and do announce new policies in adjudications.

**[12]    Administrative Law and**
**Procedure** 🔑 Reviewability

Administrative determinations generally are subject to judicial review.

**[13]    Administrative Law and**
**Procedure** 🔑 Aliens, Immigration, and Citizenship

**Aliens, Immigration, and**
**Citizenship** 🔑 Law questions

Principles of 📄 *Chevron* deference are applicable to the Attorney General's interpretation of the INA. Immigration and Nationality Act § 242, 🚩 8 U.S.C.A. § 1252.

**[14]    Administrative Law and**
**Procedure** 🔑 Plain, literal, or clear meaning; ambiguity or silence

Under the 📄 *Chevron* framework, a court asks first whether Congress has directly spoken to the precise question at issue; if the intent of Congress is clear, that is the end of the matter.

**[15]    Statutes** 🔑 Purpose and intent; unambiguously expressed intent

A court interpreting a statute must give effect to the unambiguously expressed intent of Congress.

**[16]    Administrative Law and**
**Procedure** 🔑 Standard of review in general

Under the Administrative Procedure Act (APA), a court is not to substitute its judgment for that of an administrative agency, but instead assesses only whether the administrative decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. 📄 5 U.S.C.A. § 551 et seq.

**[17]    Administrative Law and**
**Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

Judicial review of an administrative agency decision under the arbitrary and capricious standard of the Administrative Procedure Act (APA) involves examining the reasons for the agency decisions or the absence of such reasons. 📄 5 U.S.C.A. § 551 et seq.

**[18]    Aliens, Immigration, and**
**Citizenship** 🔑 Government action or acquiescence

Immigration decision and Attorney General's policy memorandum requiring asylum applicants, who alleged persecution based on domestic or gang violence during expedited removal proceedings, to show that governments in native countries condoned private actions or demonstrated complete helplessness to protect victims was arbitrary and capricious, in violation of the Administrative Procedure Act (APA), as inconsistent with well-established standard requiring showing by asylum seekers that government was unable or unwilling to control persecutors; abrogating *Matter of A-B-, 27 I. & N. Dec. 316*. Immigration and Nationality Act § 208, 📄 8 U.S.C.A. § 1158.

1 Cases that cite this headnote

**[19]    Aliens, Immigration, and**
**Citizenship** 🔑 Hearing or Interview

Policy memorandum issued by the United States Citizenship and Immigration Service (USCIS), requiring its asylum officers to faithfully apply precedents of the Board of Immigration Appeals (BIA) and, if necessary, the law of the Circuit where the alien was physically located during the credible fear interview, was arbitrary and capricious in violation of the Administrative Procedure Act (APA); USCIS failed to acknowledge and explain its departure from past well-established practice of asylum officers applying Circuit law most favorable to

asylum applicants. 🔖 5 U.S.C.A. § 551 et seq.;
Immigration and Nationality Act §§ 208, 235,
🔖 8 U.S.C.A. §§ 1158, 🚩 1225(b)(1)(A)(i)-(ii),
🚩 1225(b)(1)(B)(v); 🔖 8 C.F.R. § 208.30(d).

**[20]    Administrative Law and
Procedure** 🔑 Explanation or reasons for
change

Reasoned decision-making under the
Administrative Procedure Act (APA) requires
that when departing from precedents or practices,
an administrative agency must offer a reason to
distinguish them or explain its apparent rejection
of their approach. 🔖 5 U.S.C.A. § 551 et seq.

**[21]    Administrative Law and
Procedure** 🔑 Change of policy; reason or
explanation

**Administrative Law and
Procedure** 🔑 Explanation or reasons for
change

Although not every administrative agency action
representing a policy change must be justified
by reasons more substantial than those required
to adopt a policy in the first instance, to comply
with the Administrative Procedure Act (APA),
however the agency justifies its new position,
what it may not do is gloss over or swerve
from prior precedents without discussion. 🔖 5
U.S.C.A. § 551 et seq.

**[22]    Aliens, Immigration, and
Citizenship** 🔑 Purpose

One purpose of asylum provision of the INA is to
ensure that individuals with valid asylum claims
are not returned to countries where they could
face persecution. Immigration and Nationality
Act § 208, 🔖 8 U.S.C.A. § 1158.

**[23]    Administrative Law and
Procedure** 🔑 Timing of theory and grounds
asserted

When assessing the reasonableness of an
administrative agency's action, under the
Administrative Procedure Act (APA), the court
looks only to what the agency said at the
time of the action, not to its lawyers' post-hoc
rationalizations. 🔖 5 U.S.C.A. § 551 et seq.

**[24]    Aliens, Immigration, and
Citizenship** 🔑 Membership in social group

Aliens seeking asylum based on membership
in a particular social group were required
to demonstrate that their proposed social
group existed independently of the claimed
persecution. Immigration and Nationality Act §
208, 🔖 8 U.S.C.A. § 1158.

2 Cases that cite this headnote

**[25]    Aliens, Immigration, and
Citizenship** 🔑 Particular cases

Attorney General's guidance, explaining that
asylum claims pertaining to domestic violence or
gang violence perpetrated by non-governmental
actors generally would not meet the credible
fear standard for persecution, was not arbitrary
and capricious in violation of the Administrative
Procedure Act (APA) and did not violate INA's
asylum requirements; guidance did not establish
categorical bar to aliens seeking asylum based on
domestic or gang violence, and made clear that
asylum officers were required to analyze each
case on its own merits based on the facts of each
claim. 🔖 5 U.S.C.A. § 551 et seq.; Immigration
and Nationality Act §§ 208, 235, 🔖 8 U.S.C.A.
§§ 1158, 🚩 1225(b)(1)(A)(i)-(ii), 🚩 1225(b)(1)
(E).

**[26]    Statutes** 🔑 Similarity or difference

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In interpreting a statute, identical words and phrases within the same statute should normally be given the same meaning.

**\*886**  Appeal from the United States District Court for the District of Columbia (No. 1:18-cv-01853)

**Attorneys and Law Firms**

Erez Reuveni, Assistant Director, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were Susan Bennett Green, Senior Litigation Counsel, and Christina P. Greer, Trial Attorney.

Michael M. Hethmon was on the brief for amicus curiae Immigration Reform Law Institute in support of defendants-appellants.

Cody Wofsy, San Francisco, CA, argued the cause for appellees. With him on the brief were Jennifer Chang Newell, Katrina Eiland, Julie Veroff, Judy Rabinovitz, Omar C. Jadwat, New York, NY, Celso J. Perez, Eunice Lee, Washington, DC, Karen Musalo, Anne Dutton, Blaine Bookey, Sandra S. Park, Scott Michelman, Arthur B. Spitzer, Washington, DC, and Thomas Buser-Clancy.

Karl A. Racine, Attorney General, Office of the Attorney General for the District of Columbia, Loren L. AliKhan, Solicitor General, Caroline S. Van Zile, Deputy Solicitor General, and Lewis T. Preston, Assistant Attorney General, were on the brief for amici curiae The District of Columbia, et al. in support of appellees.

Elizabeth B. Wydra, San Francisco, CA, Brianne J. Gorod, and Brian R. Frazelle were on the brief for amici curiae Current Members of Congress and Bipartisan Former Members of Congress in support of plaintiffs-appellees.

Paul M. Thompson, Julie Carpenter, and Richard Caldarone were on the brief for amici curiae The Tahirih Justice Center, et al. in support of appellees and affirmance.

Derek T. Ho, Washington, DC, was on the brief for amici curiae Administrative Law Professors in support of plaintiffs-appellees.

Thomas K. Ragland, Washington, DC, was on the brief for amici curiae Immigration Law Professors in support of plaintiffs-appellees.

Alexander J. Kasner, Washington, DC, was on the brief for amicus curiae United Nations High Commissioner for Refugees in support of plaintiffs-appellees.

Before: Henderson, Tatel, and Griffith, Circuit Judges.

**Opinion**

Dissenting opinion filed by Circuit Judge Henderson.

Tatel, Circuit Judge:

**\*887**  Twelve asylum seekers challenge a host of executive-branch policies adopted to implement the expedited-removal provisions of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-546 (codified as amended in scattered sections of 8 U.S.C.). Broadly speaking, the challenged policies concern how asylum officers determine whether an alien has demonstrated a "credible fear" of persecution, a threshold showing that permits an alien who would otherwise be immediately deported to seek asylum in the United States. The asylum seekers principally argue that the policies raise the bar for demonstrating a credible fear of persecution far above what Congress intended and that the Attorney General and various agencies violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq., by failing to adequately address important factors bearing on the policies' adoption. Largely on these grounds, the district court found the policies inconsistent with IIRIRA, the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 et seq., and the APA, and enjoined their enforcement. For the reasons set forth in this opinion, we affirm in part and reverse in part.

## I.

In IIRIRA, Congress established a comprehensive scheme for distinguishing between aliens with potentially valid asylum claims and those " 'who indisputably have no authorization to be admitted [to the United States].' " *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1355 (D.C. Cir. 2000) (quoting H.R. Rep. 104-828, 209H.R. Rep. 104-828, 209 (1996) (Conf. Rep.)). Under IIRIRA, which amended the INA, newly-arrived aliens who lack valid authorization to enter the United States but express an "intention to apply for asylum," or indicate to immigration officers that they "fear persecution" if returned

to their home countries, must be interviewed by trained asylum officers. 8 U.S.C. § 1225(b)(1)(A)(i)–(ii), (b)(1)(E). Such officers are employees of the United States Citizenship and Immigration Service (USCIS), an agency of the Department of Homeland Security (DHS). Asylum officers determine, in a "nonadversarial" interview, whether an alien's "fear of persecution" is "credible." 8 C.F.R. § 208.30(d)–(e).

**[1]** The stakes are high. An alien found to have a credible fear of persecution receives a full-blown asylum hearing before an immigration judge, an employee of the Department of Justice (DOJ), and has a **\*888** right to review by the Board of Immigration Appeals—also housed within DOJ—and then the appropriate circuit court of appeals. See *DHS v. Thuraissigiam*, —— U.S. ——, 140 S. Ct. 1959, 1965, 207 L.Ed.2d 427 (2020) ("If the asylum officer finds an applicant's asserted fear to be credible, the applicant will receive 'full consideration' of his asylum claim in a standard removal hearing." (quoting 8 C.F.R. § 208.30(f))); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii). An alien who receives a negative credible-fear determination may also seek review by an immigration judge, but if that judge affirms the negative finding, then "the asylum officer shall order the alien removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III); *see also* 8 C.F.R. § 1208.30(g). Aliens removed through this "highly expedited" process, which "is meant to conclude within 24 hours," *Make the Road New York v. Wolf*, 962 F.3d 612, 619 (2020), are ineligible for admission to the United States for a period of five years, 8 U.S.C. § 1182(a)(9)(A)(i).

**[2]** **[3]** This case concerns the credible-fear interview. At this "screening" stage, "[t]he applicant need not show that he or she is *in fact eligible* for asylum." *Thuraissigiam*, 140 S. Ct. at 1965. Instead, IIRIRA defines "[c]redible fear of persecution" as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [ 8 U.S.C.] section 1158." 8 U.S.C. § 1225(b)(1)(B)(v). Under section 1158, an alien must demonstrate two things: first, "refugee" status, *id.* § 1158(b)(1)(B)(i), that

is, either past persecution, or a "well-founded fear" of future persecution, "on account of" one or more of five statutorily-provided grounds—"race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A); and second, that the ground "was or will be at least one central reason" for the persecution, *id.* § 1158(b)(1)(B)(i). Put differently, to gain asylum, the alien must prove that the alleged harm has a nexus to one of the enumerated grounds—in this case, "membership in a particular social group."

**[4]** **[5]** **[6]** The INA nowhere defines "particular social group." But in a line of decisions beginning with *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), the Board has long defined the term to mean "a group of persons all of whom share a common, immutable characteristic," one they "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.* at 233; *see also Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 230–31 (BIA 2014) (same); *In re Kasinga*, 21 I. & N. Dec. 357, 366 (BIA 1996) (same). This basic definition is well-recognized by the courts. *See, e.g.*, *S.E.R.L. v. Attorney General*, 894 F.3d 535, 545–49 (3d Cir. 2018) (describing the Board's efforts to refine *Acosta*'s core framework); *Reyes v. Lynch*, 842 F.3d 1125, 1134 (9th Cir. 2016) (same). As the Seventh Circuit has explained, "if the 'members' have no common characteristics they can't constitute a group, and if they can change [their common] characteristics—that is, cease to belong to the group—without significant hardship, they should be required to do so rather than be allowed to resettle in [the United States] if they do not meet the ordinary criteria for immigration to this country." *Gatimi v. Holder*, 578 F.3d 611, 614 (7th Cir. 2009). Significantly for this case, moreover, a social group must exist independently of the harm suffered by the asylum applicant, i.e., "the persecution cannot be what defines the contours of the group." **\*889** *Escobar v. Gonzales*, 417 F.3d 363, 367 (3d Cir. 2005). For this reason, the Board has "resist[ed] efforts to classify people who are targets of persecution as members of a particular social group when they have little or nothing in common beyond being targets." *Gatimi*, 578 F.3d at 616. The parties refer to this principle as the circularity rule.

**[7]** **[8]** Narrowing our focus even further, the agency action at issue in this case addresses persecution by non-governmental actors, like gangs and spouses. Under longstanding administrative and judicial precedent, the term

"persecution," undefined in the INA, encompasses harm inflicted by non-state actors. *See* *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017) (en banc) (explaining that "[t]he concept of persecution by non-state actors is 'inherent' in ... the Refugee Act," which amended the INA); Deborah Anker, Law of Asylum in the United States § 4:10 (2019 ed.) ("In U.S. law, recognition of the non-state actor doctrine is long-standing, pre-dating the 1980 incorporation of the international refugee definition into the [INA]."). In order to obtain asylum based on persecution by non-state actors, applicants must show that their governments were "unable or unwilling to control" the persecutors. *See, e.g.,* *Bringas-Rodriguez*, 850 F.3d at 1062–68 (collecting cases applying the "unable or unwilling" standard).

This case traces its roots to the asylum petition of an El Salvadoran mother, A.B., who entered the United States unlawfully and claimed that she suffered persecution on account of her membership in the "purported particular social group of El Salvadoran women who are unable to leave their domestic relationships where they have children in common with their partners." *Matter of A-B-*, 27 I. & N. Dec. 316, 321 (2018) (internal quotation marks omitted). In support, A.B. produced evidence that "her ex-husband, with whom she share[d] three children, repeatedly abused her physically, emotionally, and sexually during and after their marriage." *Id.* An immigration judge denied A.B.'s asylum application, but the Board reversed, finding that A.B.'s social group was "substantially similar" to the group "married women in Guatemala who are unable to leave their relationship"—a group it had approved in an earlier case, *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014). *A-B-*, 27 I. & N. Dec. at 321. (internal quotation marks omitted). The Board also found "that the El Salvadoran government was unwilling or unable to protect [A.B.]" from abuse and thus concluded that she satisfied the requirements for asylum. *Id.*

Pursuant to DOJ regulations, the Attorney General, then Jefferson Sessions, "direct[ed] the Board to refer" A.B.'s case to him for review, 8 C.F.R. § 1003.1(h)(1)(i), and sought briefing on the question "whether, and under what circumstances, being a victim of private criminal activity constitutes a cognizable 'particular social group' for purposes of an application for asylum or withholding of removal," *A-B-*, 27 I. & N. Dec. at 317. He then vacated the Board's decision finding that A.B. had met the statutory definition of

"refugee" and overruled *A-R-C-G-*, 26 I. & N. Dec. 388, the decision on which the Board had relied in granting A.B.'s asylum application. *See* *A-B-*, 27 I. & N. Dec. at 317.

In his opinion, the Attorney General first reviewed the Board's social-group caselaw, explaining that applicants seeking asylum based on particular social group membership must establish "that [the group] exists independently of the alleged ... harm[ ] [and] demonstrate that their persecutors harmed them on account of their membership in that group rather **\*890** than for personal reasons." *Id.* He then cautioned:

> Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum. While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address.

*Id.* at 320 (footnote omitted). "Accordingly," he added, "few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution," citing the IIRIRA provision that governs credible-fear interviews. *Id.* at 320 n.1 (citing 8 U.S.C. § 1225(b)(1)(B)(v)). The Attorney General also reiterated that asylum seekers alleging non-state-actor persecution must show that their governments are "unable or unwilling to prevent" the persecution. *Id.* at 338. He added, however, that such applicants "must show that the government condoned the private actions or at least demonstrated a complete helplessness to protect the victims." *Id.* at 337 (internal quotation marks omitted).

USCIS then issued a policy memorandum to provide guidance to asylum officers "for determining whether a petitioner is eligible for asylum ... status in light of the Attorney General's decision in *Matter of A-B-*." USCIS, Guidance for Processing Reasonable Fear, Credible Fear,

Asylum, and Refugee Claims in Accordance with *Matter of A-B-* 1, PM-602-0162 (July 11, 2018), Joint Appendix (J.A.) 353 ("Guidance"). In addition to summarizing and restating *A-B-*, especially its discussion of asylum claims based on persecution by non-state actors on account of an applicant's membership in a particular social group, the Guidance announced that, in making credible-fear determinations, officers should apply the law of "the circuit where the alien is physically located during the credible fear interview." *Id.* at 9, J.A. 361. Until then, USCIS had generally applied the circuit law most favorable to applicants. We shall have much more to say about this later.

With this background in mind, we turn to the facts of this particular case. Twelve asylum seekers challenged both *A-B-* and the Guidance in the district court, alleging that several of the policies announced by the Attorney General and USCIS violate the INA, the APA, and the U.S. Constitution. Compl. ¶¶ 6–11. The asylum seekers, most from Central America, all testified to asylum officers that they suffered, or faced threats of, sexual abuse or physical violence at the hands of romantic partners or gangs. *Id.* ¶¶ 15–23. Cindy Ardon Mejia, for example, testified that she "fled her home in Central America with her young daughter ... after suffering ... rape, physical beatings, and shootings carried out by her daughter's father and members of his gang" and that she "repeatedly sought police protection" in her home country but never received it. *Id.* ¶ 23. An asylum officer nonetheless found that Ardon Mejia had failed to demonstrate a significant possibility that she would qualify for asylum—that is, that she lacked a "credible fear of persecution"—and after an immigration judge agreed, she was removed to her home country. *Id.* The other asylum seekers alleged similar experiences. Although asylum officers found each asylum seeker credible, all were nonetheless ordered removed from the United States.

In their lawsuit, the asylum seekers challenged four specific policies: (1) the **\*891** condoned-or-completely helpless standard for non-state persecution claims; (2) the requirement that officers apply the law of the circuit where the credible-fear interview occurs; (3) the standard for analyzing claims of persecution "on account of ... membership in a particular social group," 8 U.S.C. § 1101(a)(42)(A); and (4) the Attorney General's statement, repeated by USCIS in the Guidance, that "generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum," *A-B-*, 27 I. & N. Dec. at 320.

The district court began by finding that it had jurisdiction to review both *A-B-* and the Guidance. It then ruled that three of the policies—the non-state actor standard, the choice-of-law policy, and the "categorical ban" on domestic- and gang-violence claims—are contrary to law and arbitrary and capricious. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 126, 146 (D.D.C. 2018). It also found the Guidance's directive regarding how asylum officers should analyze claims of persecution "on account of ... membership in a particular social group" arbitrary and capricious on the ground that it departed from agency policy without explanation. *Id.* at 132–33. The court granted summary judgment in the asylum seekers' favor, declared the four policies unlawful, vacated them, and permanently enjoined defendants—the Attorney General, the DHS Secretary, the USCIS Director, and the Director of the Executive Office for Immigration Appeals—and their agents from applying them in credible-fear proceedings. *See* Order, *Grace v. Whitaker*, No. 18-cv-1853 (D.D.C. June 3, 2019). The court never reached the asylum seekers' constitutional claims, *Grace*, 344 F. Supp. 3d at 141 n.27, and they do not press them here. The government now appeals. Our review is de novo. *See Aamer v. Obama*, 742 F.3d 1023, 1028 (D.C. Cir. 2014) (reviewing the district court's subject-matter jurisdiction ruling de novo); *Purepac Pharmaceutical Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004) ("Because the district court entered a summary judgment, we review its decision de novo and therefore, in effect, review directly the decision of the agency." (alteration omitted)).

## II.

[9]  We start with the government's argument that 8 U.S.C. § 1252, titled "[j]udicial review of orders of removal," barred the district court from considering the asylum seekers' challenges to *A-B-* and the Guidance.

As our court recently explained, although much of section 1252 "limits and channels judicial relief directly into the federal appellate courts or habeas corpus proceedings," subsection (e)(3) expressly "provide[s] in the expedited removal context for more traditional judicial review of 'challenges on validity of the system,' " *Make the Road,*

962 F.3d at 625 (quoting 🚩 8 U.S.C. § 1252(e)(3)), including agency policies governing credible-fear interviews. As relevant here, that provision states:

> Judicial review of determinations under 🚩 section 1225(b) [governing expedited removal] of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of ... whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

🚩 8 U.S.C. § 1252(e)(3)(A)(ii). Any such action "must be filed no later than 60 days after the date the challenged ... regulation, **\*892** directive, guideline, or procedure ... is first implemented." 🚩 Id. § 1252(e)(3)(B).

The parties agree that the reference to the Attorney General includes the DHS Secretary. And because the asylum seekers challenged 🚩 A-B- and the Guidance within the sixty-day period, the only question before us is whether the Guidance and 🚩 A-B- qualify as "regulation[s], ... written policy directive[s], written policy guideline[s], or written procedure[s] issued ... to implement ... section [1225(b) ]." 🚩 Id. § 1252(e)(3)(A)(ii). They do.

### A. The Guidance

Using language mirroring 🚩 section 1252(e)(3), the Guidance describes itself as a "*policy* memorandum" that "provides *guidance*" to USCIS officers. Guidance 1, J.A. 353 (emphasis added). And citing 🚩 section 1225, the provision governing expedited removal, the Guidance instructs "all

USCIS employees" on how to apply 🚩 A-B- "consistent[ly]" throughout several types of proceedings, including "credible fear ... adjudications." *Id.* In its brief, moreover, the government explains that the Guidance "alerts USCIS officers to new binding precedent and tells them how to operationalize that precedent in various contexts, including expedited removal." Appellants' Br. 31. As described by both USCIS in the Guidance and the government in its brief, then, the Guidance qualifies as a "written policy directive" or "guideline" that "implement[s]" 🚩 section 1225(b). 🚩 8 U.S.C. § 1252(e)(3)(A)(ii).

The government nonetheless insists that the Guidance falls outside 🚩 section 1252(e)(3)'s scope because it "implement[s] 🚩 A-B-, which in turn[ ] implements [🚩 section 1158]" and "thus does not implement 🚩 section 1225(b)(1)." Appellants' Br. 31 (internal quotation marks omitted); *see also* Dissenting Op. at 916. As the government sees it, 🚩 section 1158 addresses the "substantive content of asylum law," whereas 🚩 section 1225(b) establishes procedures for implementing the expedited-removal system. Appellants' Br. 25 (emphasis omitted). So according to the government, the Guidance "implements" 🚩 section 1158's substantive asylum standards, not 🚩 section 1225(b)'s expedited-removal system.

This substance-procedure distinction finds no support in the statute's text. 🚩 Section 1225(b) expressly links the credible-fear standard to the statutory requirements for asylum by defining "credible fear" as "a significant possibility ... that the alien could establish eligibility for asylum *under* 🚩 *section 1158*." 🚩 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added). To be sure, 🚩 section 1225(b) requires immigration officials to follow several procedural steps, but the credible-fear definition itself encompasses the *substantive* requirement that an alien demonstrate a "significant possibility" of asylum eligibility. *Id.*

The government also argues that the asylum seekers' suit is barred by 🚩 section 1252(a)(2)(A)(iii), which withdraws district-court jurisdiction over " 'the application of' 🚩 section 1225(b)(1) 'to individual aliens, including

the determination made under 🚩 section 1225(b)(1)(B).' " Appellants' Br. 30 (quoting 🚩 8 U.S.C. § 1252(a)(2)(A)(iii)); *see also* Dissenting Op. at 914–17. That provision, however, forbids review of individual aliens' credible-fear determinations, not suits like this that challenge credible-fear policies on their face. *See* 🚩 Make the Road, 962 F.3d at 626 n.7 ("Romanette (iii) applies specifically to a challenge to the 'application' of the expedited removal process to an 'individual[,]' ... who must funnel [a] challenge[ ] to [a] final order[ ] of removal into habeas corpus review rather than through 🚩 Section 1252(e)." (quoting 🚩 8 U.S.C. § 1252(a)(2)(A)(iii))). Nothing in the asylum seekers' complaint required the district **\*893** court to examine how USCIS officers "appl[ied]" the challenged policies "to individual aliens." 🚩 8 U.S.C. § 1252(a)(2)(A)(iii).

The Supreme Court reached a similar conclusion in 🚩 *McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), which involved a virtually identical INA provision that prohibited " 'judicial review of a determination respecting an application for adjustment of status.' " 🚩 *Id.* at 491, 111 S.Ct. 888 (quoting 🚩 8 U.S.C. § 1160(e)(1)). Observing that "[t]he critical words ... describe the provision as referring only to review 'of *a determination* respecting *an application*,' " the Court explained that " 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." 🚩 *Id.* at 491–92, 111 S.Ct. 888 (emphasis in original) (quoting 🚩 8 U.S.C. § 1160(e)(1)). Such language, the Court continued, "describ[es] the process of direct review of individual denials ..., rather than ... referring to general collateral challenges to ... practices and policies used by the agency." 🚩 *Id.* at 492, 111 S.Ct. 888. So too here. 🚩 Section 1252(a)(2)(A)(iii)'s "critical words"—"the application" of 🚩 section 1225(b)(1) and "the" credible-fear "determination"—describe[ ] a single act rather than a group of decisions or a ... procedure employed in making decisions," 🚩 *id.* They thus refer to direct review of individual aliens' negative credible-fear determinations, not to facial challenges to the written policies that govern those determinations.

As the asylum seekers point out, the government's view of 🚩 section 1252(a)(2)(A)(iii) could leave no one able to challenge the policies at issue in this suit. Although the dissent thinks this is irrelevant, *see* Dissenting Op. at 916–17, we view it as further evidence that our interpretation best "comports with our obligation to interpret the statute's provisions"—here, 🚩 section 1252(a)(2)(A)(iii) and 🚩 section 1252(e)(3)—"in harmony with each other," 🚩 *James Madison Limited by Hecht v. Ludwig,* 82 F.3d 1085, 1093 (D.C. Cir. 1996). Our reading gives full effect to the two provisions, which are best understood to address different matters: 🚩 section 1252(a)(2)(A)(iii) restricts judicial authority to review how immigration officials apply credible-fear policies in individual cases, while 🚩 section 1252(e)(3) preserves judicial authority over challenges to the underlying policies themselves. By contrast, the dissent's reading would "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." 🚩 *Clark v. Uebersee Finanz-Korporation,* 332 U.S. 480, 489, 68 S.Ct. 174, 92 L.Ed. 88 (1947).

The dissent insists that "the standard petition for review procedure" offers "an alternative avenue for judicial review of *Matter of A-B-* and the Guidance." Dissenting Op. at 916 n.7 (referring to Hobbs Act review of a removal order issued after full consideration of an asylum claim in a standard removal hearing). Not quite. Two of the policies the asylum seekers challenge appear only in the Guidance, and, as best we can tell, are unreviewable through the standard petition-for-review procedure. The first, the choice-of-law policy, applies only at the credible-fear stage, so any aliens eligible to file petitions for review will have suffered no injury from it; they either received positive credible-fear determinations or were not subject to the policy at all. The second, the circularity rule, also applies in interviews conducted by USCIS asylum officers in connection with affirmative asylum applications. *See* 🚩 8 C.F.R. § 208.9(a) (stating that USCIS "shall adjudicate" affirmative asylum applications; Guidance 1, J.A. 353 ("[The Guidance] applies to and shall be used to guide determinations by all USCIS employees."). **\*894** Like aliens found to lack credible fear, however, aliens denied asylum by USCIS officers after affirmative-application interviews generally cannot obtain judicial review of that decision. *See* Anker, *supra,* app. A § A2:39 ("No appeal beyond USCIS is available to applicants whose affirmative asylum applications have been denied ...."); 🚩 *Dhakal v. Sessions,* 895 F.3d 532,

540 (7th Cir. 2018) (describing the affirmative asylum process and concluding that denial by an asylum officer is non-final). Given this, we are unconvinced that the petition-for-review procedure provides an "alternative avenue" for review of the Guidance.

The dissent also contends that courts interpreting 🚩 section 1252 have "adopted" a "consistent understanding of 'review'" that "necessarily means that the plaintiffs ask for 'review' of their credible fear determinations." Dissenting Op. at 915 n.6. But the cases the dissent cites in support of this claim mention neither credible-fear interviews nor expedited removal, so those courts had no need to harmonize the provisions at issue with 🚩 section 1252(e)(3). For example, in 🚩 *Zhu v. Gonzales*, 411 F.3d 292 (D.C. Cir. 2005), we found judicial review barred by 🚩 section 1252(a)(2)(B)(ii), which withdraws jurisdiction over challenges to "any ... decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in [their] discretion," 🚩 8 U.S.C. § 1252(a)(2)(B)(ii). We have since held, however, that even where a decision is committed to the Secretary's discretion by law—in which case 🚩 section 1252(a)(2)(B)(ii), read in isolation, would appear to prohibit judicial review—🚩 section 1252(e)(3) operates to preserve district-court jurisdiction so long as the challenged decision implements 🚩 section 1225(b). *See* *Make the Road*, 962 F.3d at 630 ("[W]hatever [🚩 section 1252(a)(2)(B)]'s jurisdictional bar covers, it is not the type of challenges to the Secretary's ... policies[ ] and directives specifically implementing the expedited removal scheme for which 🚩 Section 1252(e) expressly grants jurisdiction."). The same logic requires that we read 🚩 section 1252(a)(2)(A)(iii)'s jurisdictional bar in tandem with 🚩 section 1252(e)(3). That is, even if, as the dissent argues, 🚩 section 1252(a)(2)(A)(iii), read in isolation, could reasonably be understood to withdraw jurisdiction over the asylum seekers' claims—and, to be clear, we do not think it can, *see supra* at 892–93 (citing *Make the Road*, 962 F.3d at 626 n.7, and 🚩 *McNary*, 498 U.S. at 491–92, 111 S.Ct. 888)—🚩 section 1252(e)(3) decisively refutes that understanding.

 **[10]**  Changing tack, the government argues that the district court's "sweeping nationwide injunction ... underscores the serious error in [its] exercise of jurisdiction to begin with." Appellants' Br. 32. But the government concedes that the district court has authority to "[declare] any reviewable action unlawful and set it aside." Reply Br. 9. Given this, whether the district court had authority to enter an injunction has no bearing on its jurisdiction to review the Guidance since, as the government acknowledges, the court had authority to order other relief. *See* 🚩 *Nielsen v. Preap*, ––– U.S. –––, 139 S. Ct. 954, 962, 203 L.Ed.2d 333 (2019) (plurality opinion) (explaining that "[w]hether the [district] court had jurisdiction to enter ... a[ ] [classwide] injunction is irrelevant because [it] had jurisdiction to entertain the plaintiffs' request for declaratory relief"); *Make the Road*, 962 F.3d at 635 (same).

We thus see no jurisdictional obstacle to the district court's review of the choice-of-law policy and the circularity rule, as they appear only in the Guidance. But the other two challenged policies—the condoned-or-completely-helpless standard and the Attorney **\*895** General's statement regarding domestic and gang violence claims—are contained in both the Guidance and 🚩 *A-B-*, meaning that we must address the district court's jurisdiction to review the latter.

### B. *A-B-*

Recall that 🚩 section 1252(e)(3) authorizes review of "a ... written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [🚩 section 1225(b)]." 🚩 8 U.S.C. § 1252(e)(3)(A)(ii). In our view, 🚩 *A-B-* falls within this section's scope.

To begin with, the decision expressly references the credible-fear standard and asylum officers' role in implementing the expedited-removal system. It declares that "[w]hen confronted with asylum cases based on purported membership in a particular social group ... *asylum officers* must analyze the requirements as set forth in this opinion, which restates and where appropriate, elaborates upon, the requirements [for asylum]." 🚩 *A-B-*, 27 I. & N. Dec. at 319 (emphasis added). It also states that "few [domestic violence and gang violence] claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution," citing the statutory provision governing credible-fear interviews. 🚩 *Id.* at 320 n.1 (citing 🚩 8

U.S.C. § 1225(b)(1)(B)(v)). The decision's overarching purpose, moreover, is to interpret section 1158's phrase "membership in a particular social group," which Congress incorporated into section 1225(b) by defining "credible fear of persecution" as "a significant possibility ... that the alien could establish eligibility for asylum under section 1158." 8 U.S.C. § 1225(b)(1)(B)(v). In short, like the Guidance, A-B- qualifies as a "written policy directive" or "written policy guideline" "issued by ... the Attorney General to implement [ section 1225(b)]." Id. § 1252(e)(3)(A)(ii).

**[11]** Arguing to the contrary, the government points out that A-B- "was an *adjudication* in full removal proceedings under 8 U.S.C. § 1229a." Appellants' Br. 24; *see also* Dissenting Op. at 917–18. True enough, but we have often recognized that agencies can and do announce new policies in adjudications. *See, e.g.,* POM Wonderful, LLC v. FTC, 777 F.3d 478, 497 (D.C. Cir. 2015) (noting that agencies may "announce[e] new principles in an adjudicative proceeding" (internal quotation marks omitted)). Were this sufficient to remove the decision from section 1252(e)(3)'s scope, moreover, then the Attorney General could immunize credible-fear policies from judicial review by simply announcing them in section 1229a adjudications. Such a result would conflict with section 1252(e)(3)'s purpose: to authorize, as its title makes clear, "[c]hallenges on [the] validity of the [expedited-removal] system." 8 U.S.C. § 1252(e)(3); *see also* Make the Road, 962 F.3d at 625 ("[A]t every turn, [ section 1252] expressly preserve[s] jurisdiction over ... claims of legal or constitutional error in ... rules implementing expedited removal.").

The dissent offers an additional argument based on section 1252's structure. According to the dissent, "if section [1252(e)(3) ] grants our district court jurisdiction to review [ A-B-] ..., it follows from the parallel language of sections 1252(e)(3)(A)(ii) and 1252(a)(2)(A)(iv) that the latter provision bars a court of appeals from reviewing any adjudicatory decision by the Attorney General or the BIA that touches on asylum." Dissenting Op. at 918. We respectfully disagree. Section 1252(a)(2)(A)(iv), which

provides that "except as provided in subsection (e)," "no court shall have jurisdiction to review ... procedures and policies adopted by the ***896** Attorney General to implement the provisions of section 1225(b)(1)," channels facial challenges to expedited-removal policies to the district court for the District of Columbia. 8 U.S.C. § 1252(a)(2)(A)(iv); *see also* id. § 1252(e)(3). Contrary to the dissent, however, that provision leaves open the possibility that some such "procedures and policies" might be "adopted by the Attorney General" to "implement ... section 1225(b)(1)" and also for other purposes, meaning that the policies could simultaneously be challenged in the district court for the District of Columbia pursuant to section 1252(e)(3) and also through a petition for review of a BIA decision. Indeed, review of A-B- has proceeded on precisely such parallel tracks, with the Fifth Circuit noting that "[t]he Grace [district] court's order does not prevent us from reviewing A-B- in order to rule on [a] petition for review" because "the court vacated A-B- and the [Guidance] as they pertain to credible-fear claims in expedited removal proceedings only." Gonzales-Veliz v. Barr, 938 F.3d 219, 228 (5th Cir. 2019); *see also* De Pena-Paniagua v. Barr, 957 F.3d 88, 93 (1st Cir. 2020) (considering challenge to A-B- on petition for review from a final order of removal).

Another point bears mention. We do not hold today that a plaintiff may seek review of every BIA or Attorney General decision regarding asylum. Far from it, we hold only that the district court had jurisdiction to review *this* Guidance and that such jurisdiction extended to A-B- to the extent the Guidance incorporates A-B-.

**[12]** Finally, even were section 1252 "reasonably susceptible to divergent interpretation," circuit precedent requires that we "adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." Make the Road, 962 F.3d at 624 (internal quotation marks omitted); *see also* id. at 623 (expressly rejecting the argument that this "strong presumption" is inapplicable to section 1252 (internal quotation marks omitted)). Applying that presumption here would "dispel[ ]" "[a]ny lingering doubt about the proper interpretation of" section 1252. Kucana v. Holder, 558 U.S. 233, 251, 130 S.Ct. 827, 175 L.Ed.2d 694 (2010). Having assured ourselves of

the district court's jurisdiction, and accordingly our own, we turn to the merits. *See Make the Road, 962 F.3d at 623* (noting appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) where 8 U.S.C. § 1252(e)(3) preserved district court's federal-question jurisdiction over APA challenge to Secretary's memorandum).

## III.

**[13]    [14]    [15]** As both sides acknowledge, it is "well settled that principles of *Chevron* deference are applicable" to the Attorney General's interpretation of the INA. *Negusie v. Holder, 555 U.S. 511, 516, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009)* (internal quotation marks omitted). Accordingly, to the extent the challenged policies represent the Attorney General's interpretations of that statute, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).* "If the intent of Congress is clear, that is the end of the matter; for [we], as well as the [Attorney General], must give effect to the unambiguously expressed intent of Congress." *Id. at 842–43, 104 S.Ct. 2778.*

**[16]    [17]** For those policies that are "not ... interpretation[s] of any statutory language," however, "the more apt analytic framework ... is standard 'arbitrary [or] capricious' review under the APA." **\*897** *Judulang v. Holder, 565 U.S. 42, 52 n.7, 132 S.Ct. 476, 181 L.Ed.2d 449 (2011)* (alterations in original). "Under this narrow standard of review, a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *DHS v. Regents of the University of California, 140 S. Ct. 1891, 1905 (2020)* (internal quotation marks omitted) (citation omitted). "That task involves examining the reasons for agency decisions —or, as the case may be, the absence of such reasons." *Judulang, 565 U.S. at 53, 132 S.Ct. 476.*

## A. Condoned or Completely Helpless

**[18]** Citing *A-B-*, the Guidance instructs officers that "[i]n cases where the persecutor is a non-government actor, the applicant must show the harm or suffering was inflicted by persons or an organization that his or her home government is unwilling or unable to control, such that the government either 'condoned the behavior or demonstrated a complete helplessness to protect the victim.' " Guidance 2, J.A. 354 (quoting *A-B-, 27 I. & N. Dec. at 337*). The asylum seekers argue that the term "persecution," 8 U.S.C. § 1101(a)(42)(A), incorporates the unwilling-or-unable standard for asylum claims involving non-governmental persecutors and thus precludes use of the more demanding condoned-or-completely-helpless standard adopted by *A-B-* and the Guidance. To prevail on this claim, the asylum seekers must show that the unwilling-or-unable standard is so "unambiguously expressed" in the statute that "we must impose it upon the agency initially responsible for interpreting the statute, despite the deference otherwise accorded under *Chevron*." *Fort Stewart Schools v. FLRA, 495 U.S. 641, 647, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990).* This they have failed to do.

The INA nowhere defines the term "persecution," let alone addresses the standards for government conduct, and nothing in the statute otherwise speaks directly "to the precise question at issue," *Chevron, 467 U.S. at 842, 104 S.Ct. 2778*—the level of government culpability required to qualify for asylum. The asylum seekers insist that the statute's silence makes no difference because "[the unwilling-or-unable] standard has been a settled construction of the term 'persecution' since before Congress established the modern asylum system in 1980," i.e., the year it enacted the Refugee Act, the source of section 1101(a)(42)(A). Appellees' Br. 40. In support, they make two arguments, neither of which is persuasive.

They first rely on a handbook issued by the United Nations High Commissioner for Refugees, which states that "persecution" includes harm by non-governmental actors "if ... knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection." U.N. High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 65 (1979) ("Handbook"). Urging us to import the Handbook's standard into the statute, the asylum seekers cite *INS v. Cardoza-Fonseca, 480 U.S. 421, 107*

S.Ct. 1207, 94 L.Ed.2d 434 (1987), in which the Supreme Court relied on the Handbook as evidence of the meaning of the phrase "well-founded fear of persecution." *See id. at 438–39, 107 S.Ct. 1207* ("In interpreting ... 'refugee' [in the United Nations Protocol Relating to the Status of Refugees] we are further guided by the analysis set forth in the [Handbook]."). There, however, the Court used the Handbook to "confirm[ ]" "the message conveyed by the *plain language* of the Act." *Id. at 432, 107 S.Ct. 1207* (emphasis added). In this case, the asylum seekers ask us to do the opposite— use the Handbook to divine clarity from ambiguous **\*898** statutory language, something we cannot do. *See I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 427, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)* ("The U.N. Handbook may be a useful interpretative aid, but it is not binding on the Attorney General, the [Board], or United States courts."); *Cardoza-Fonseca, 480 U.S. at 439 n.22, 107 S.Ct. 1207* ("We do not suggest, of course, that the explanation in the U.N. Handbook has the force of law or in any way binds the [Immigration and Naturalization Service] with reference to the asylum provisions of [ 8 U.S.C. § 1158(a)].").

The asylum seekers next argue that "domestic law at the time of the Refugee Act" had settled the meaning of the term "persecution" and that "Congress intended to adopt this judicial and administrative construction." Appellees' Br. 43 (internal quotation marks omitted); *see also Grace, 344 F. Supp. 3d at 128* (finding it "clear at the time the Act was passed" that Congress intended to adopt the "unable or unwilling" standard). But the "domestic law" they cite—a single circuit court decision and two Board decisions—is far too sparse for us to conclude that when Congress enacted the Refugee Act, it "would have surveyed the jurisprudential landscape and necessarily concluded that the courts had already settled the question." *Lightfoot v. Cendant Mortgage Corp., —— U.S. ——, 137 S. Ct. 553, 564, 196 L.Ed.2d 493 (2017)*; *cf. Banister v. Davis, —— U.S. ——, 140 S. Ct. 1698, 1706–07, 207 L.Ed.2d 58 (2020)* (finding that one Supreme Court decision and multiple court of appeals decisions established a "legal backdrop"); *Bragdon v. Abbott, 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)* (finding statute's meaning "settled" where Office of Legal Counsel opinion, twelve judicial decisions, and multiple federal agencies interpreted term consistently and "[a]ll indications [we]re that Congress was well aware of th[at] position" when it incorporated that term into the statute). In any event, the decisions the asylum seekers cite are themselves ambiguous regarding the non-government persecutor standard. *See Rosa v. INS, 440 F.2d 100, 102 (1st Cir. 1971)* (not discussing the precise standard for determining when non-governmental persecutors "[have] sufficient ... power to carry out [their] purposes without effective hindrance"); *Matter of Eusaph, 10 I. & N. Dec. 453, 454–55 (BIA 1964)* (using the terms "unable," "sponsored," "tolerated," and "condone" without distinguishing among them); *Matter of Stojkovic, 10 I. & N. Dec. 281, 287 (BIA 1963)* ("not consider[ing]" "whether intentional physical harm ... by a riotous mob, acting without the sanction of the Dominican Government, would amount to physical persecution").

Alternatively, the asylum seekers argue that the condoned-or-completely-helpless standard is arbitrary and capricious. Specifically, they contend that the Board has historically required applicants to demonstrate only that their governments are "unwilling or unable" to protect them, and that the Attorney General and USCIS adopted the new, more demanding standard "without acknowledging and explaining the change[,] violat[ing] the rule that '[an] agenc[y] may not ... depart from a prior policy *sub silentio*.'" Appellees' Br. 48 (emphasis omitted) (quoting *American Wild Horse Preservation Campaign v. Perdue, 873 F.3d 914, 923 (D.C. Cir. 2017)*). The government insists that no change occurred, that is, that the two standards are identical. The asylum seekers have the better of the argument.

To begin with, as a matter of plain language, the two formulations are hardly interchangeable. A government that "condones" or is "completely helpless" in the face of persecution is obviously more culpable, or more incompetent, than one that **\*899** is simply "unwilling or unable" to protect its citizens. Take, for example, the facts of a recent First Circuit decision, where a Mexican man sought asylum after his son was murdered by individuals he believed to be organized criminals. Evidence at the applicant's removal hearing demonstrated that after the murder, federal police visited "the scene where [his son's] body was recovered" and "took statements from [him] and his wife" and that "an autopsy was performed." *Rosales Justo v. Sessions, 895 F.3d 154, 159 (1st Cir. 2018)*. Although this was sufficient to establish that some "police took an immediate and active interest in [the applicant's] son's murder," other evidence— corruption among state and local police, local residents' "'lack

[of] faith" in police, and high homicide rates—showed that organized criminals generally operated with impunity within the applicant's home state. *Id.* at 159–60. Under the unwilling-or-unable standard, the applicant would qualify for asylum because, though the police investigation demonstrated his home government's willingness to intervene, the evidence of criminal impunity demonstrated its inability to offer him effective protection. *See id.* at 167 (concluding that "country condition reports ... combined with [the applicant's] testimony about the particular circumstances of his case[ ] were sufficient to support the ... finding that the police in [the applicant's home state] would be unable to protect Rosales from persecution by organized crime"). By contrast, under the condoned-or-completely-helpless standard, the applicant's asylum claim would fail because his home government, far from condoning the violence or being completely helpless in response to the murder, responded to the crime scene, took statements from the asylum seeker and his wife, and autopsied the body.

The government emphasizes that several courts of appeals, despite reciting the condoned-or-completely-helpless standard, never actually required asylum applicants to meet that higher standard. *See, e.g.,* *Hor v. Gonzales,* 421 F.3d 497, 502 (7th Cir. 2005) (finding military's inability to protect petitioner and court's inability to offer relief "strong evidence" that Algerian government was "incapable" of protecting petitioner); *Galina v. INS,* 213 F.3d 955, 958 (7th Cir. 2000) (finding that petitioner suffered persecution despite some police action in response to threatening phone calls). The Guidance, however, instructs asylum officers to follow *the Guidance,* emphasizing that it "applies to and shall be used to guide determinations by all USCIS employees." Guidance 1, J.A. 353. And the Guidance requires asylum officers to apply the more demanding standard:

> In a case where the alleged persecutor is not affiliated with the government, the applicant must show the government is unable or unwilling to protect him or her. When the harm is at the hands of a private actor, the applicant must show more than the government's difficulty controlling the private behavior. The applicant must show the government condoned the private actions or at least demonstrated

a complete helplessness to protect the victim.

*Id.* at 6, J.A. 358 (internal citations omitted); *see also id.* at 10, J.A. 362 ("Again, the home government must either condone the behavior or demonstrate a complete helplessness to protect victims of such alleged persecution."). To be sure, as the government points out, the Guidance also includes the unwilling-or-unable language. *See id.* at 2, J.A. 354 (explaining that applicants must show that their home governments were "unwilling or unable to control [the persecutors], such that the government either 'condoned the behavior or demonstrated a complete helplessness to protect [them]' " (quoting **\*900** *A-B-,* 27 I. & N. Dec. at 337)). But if the government is suggesting that asylum officers can choose between the two standards, then "[a]n alien appearing before one official may suffer deportation; an identically situated alien appearing before another may gain the right to stay in this country." *Judulang,* 565 U.S. at 58, 132 S.Ct. 476. This, the Supreme Court has warned, is precisely "what the APA's 'arbitrary and capricious' standard is designed to thwart." *Id.* at 59, 132 S.Ct. 476.

In short, contrary to the government's arguments, the two standards differ. And putting all of its eggs in the "no change" basket, the government does not, in the alternative, defend the condoned-or-completely-helpless standard on the merits. That is, nowhere does it argue that even if the policy changed, the Attorney General or USCIS "provide[d] a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro,* — U.S. ——, 136 S. Ct. 2117, 2125, 195 L.Ed.2d 382 (2016). Accordingly, we have no choice but to find the standard arbitrary and capricious. Because this, by itself, requires setting aside the new standard, we need not reach the asylum seekers' alternative argument that the new standard conflicts with the Refugee Act's "well-founded fear" standard and IIRIRA's "significant possibility" standard.

**B. Choice of Law**

[19] This policy, which USCIS adopted on its own—i.e., not in response to *A-B-*—requires asylum officers conducting credible-fear interviews to "faithfully apply precedents of the Board and, if necessary, the circuit where the alien is *physically located* during the credible

fear interview." Guidance 9, J.A. 361 (emphasis added). By contrast, under USCIS's prior policy, officers generally applied "the interpretation most favorable to the applicant." USCIS, Lesson Plan: Credible Fear of Persecution and Torture Determinations 17 (Feb. 13, 2017), J.A. 379 ("Lesson Plan"). According to the asylum seekers, the new policy is arbitrary and capricious because "it represents a dramatic, unacknowledged, and unexplained departure from years of prior agency practice." Appellees' Br. 30.

 [20]   [21]   As our court recently explained, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.' " *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (quoting *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). Although "[not] every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009), "however the agency justifies its new position, what it may not do is 'gloss[ ] over or swerve[ ] from prior precedents without discussion,' " *Southwest Airlines*, 926 F.3d at 856 (alterations in original) (quoting *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

According to the government, "the extent of any divergence" between its prior policy and the new policy is "debatable," Reply Br. 15, thus making it "far from clear" that there was "any need" to acknowledge any change, Appellants' Br. 39. We disagree.

The old policy appears in a USCIS Lesson Plan, which provides that:

> Questions as to how the [credible-fear] standard is applied should be considered in light of the nature of the standard as a screening standard .... [W]here there is:

> **\*901**  a. disagreement among the United States Circuit Courts of Appeal as to the proper interpretation of a legal issue; or,

> b. the claim otherwise raises an unresolved issue of law; and,

> c. there is no DHS or Asylum Division policy or guidance on the issue, then

> generally the interpretation *most favorable* to the applicant is used when determining whether the applicant meets the credible fear standard.

Lesson Plan 17, J.A. 379 (original emphasis omitted and emphasis added). As the government emphasizes, the Lesson Plan contained an exception to the most-favorable-law rule: if there is "DHS or Asylum Division policy or guidance on the issue," then officers should apply such guidance. *Id.* (emphasis omitted). But this makes no difference for our purposes because the new policy requires asylum officers to apply local circuit law in *every* circumstance, thus "eliminat[ing] the most-favorable-interpretation rule on *every* issue," not just on "specific issue[s]" for which the agency has issued guidance. Appellees' Br. 36. In other words, even under the government's own telling, USCIS's new policy differs significantly from the old one.

Nothing in the Guidance acknowledges this change. In full, here is what the Guidance says about the choice-of-law policy:

> [R]emoval proceedings can take place in any forum selected by DHS, and not necessarily the forum where the intending asylum applicant is located during the credible fear or reasonable fear interview. Because an asylum officer cannot predict with certainty where DHS will file a Notice to Appear or Notice of Referral to Immigration Judge, and because there may not be removal proceedings if the officer concludes the alien does not have a credible fear or reasonable fear and the alien does not seek review from an immigration judge, the asylum officer should faithfully apply precedents of the Board and, if necessary, the circuit where the alien is physically located during the credible fear interview.

Guidance 9, J.A. 361. From this, readers would have no idea that prior to issuing the Guidance, USCIS generally applied the law most favorable to applicants. Put in terms of our caselaw, the Guidance has "gloss[ed] over or swerve[d] from prior precedents without discussion," "cross[ing] the line from the tolerably terse to the intolerably mute." *Greater Boston Television*, 444 F.2d at 852.

USCIS's failure to acknowledge the change in policy is especially egregious given its potential consequences for asylum seekers. Under the previous policy, applicants either got the benefit of the doubt—because officers applied the most favorable circuit law—or were at least treated equally across circuits because officers applied nationally uniform guidance. But under the new policy, "a noncitizen who would be eligible for asylum in the circuit where [removal] proceedings would ultimately take place can be issued a negative credible-fear determination and summarily removed, simply because the circuit in which the screening interview takes place happens to have unfavorable law." Appellees' Br. 32. USCIS has thus "fail[ed] to grapple with how [the new] policy affected its statutory ... mandate[ ]," *Physicians*, 956 F.3d at 647—to ensure that aliens who demonstrate "a significant possibility ... [of] eligibility for asylum under section 1158" are not summarily removed, 8 U.S.C. § 1225(b)(1)(B)(v). Such silence, the Supreme Court has made clear, fails the APA's requirement of reasoned decisionmaking because it ignores "an important aspect of the problem." **\*902** *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

The government argues that it had no obligation to acknowledge the change because the old policy appeared only in the USCIS Lesson Plan. In support, it cites our decision in *Vietnam Veterans of America v. Secretary of the Navy*, 843 F.2d 528 (D.C. Cir. 1988), in which we ruled that a servicemember could not challenge his military discharge on the ground that failed to comply with a Navy policy memorandum. *See id.* at 537–38 ("[T]he ... [m]emorandum cannot reasonably be classified as a binding statement."). But the policy involved in that case was quite different from the one at issue here. As explained in *Vietnam Veterans*' very first paragraph, the policy at issue there was "not specific or prescriptive enough ... to bind agency discretion," *id.* at 530, and there "[was] no evidence

in the record that the Secretary," who authored the policy, "ha[d] ever applied [it] in an inflexible fashion or used it to limit significantly the [military] review boards' discretion," *id.* at 539. Here, by contrast, the government nowhere claims that immigration officials were free to depart from USCIS's previous choice-of-law policy. Quite to the contrary, the Lesson Plan reminded asylum officers that they were expected to "*correctly* make ... credible fear determination[s] *consistent with* the ... policies[ ] and procedures that govern ... credible fear." Lesson Plan 14, J.A. 363 (emphasis added).

Nor does it make any difference that the Lesson Plan was informal, as the government argues. Although the formality of a policy may be relevant in cases where the policy's existence or content is disputed, this is not such a case. The government acknowledges that the Lesson Plan reflected USCIS's "consistent practice," which under our caselaw "sets the baseline from which future departures must be explained." *Southwest Airlines*, 926 F.3d at 858; *see also American Wild Horse*, 873 F.3d at 925 (finding that an agency could not deny the existence of a policy that was "well documented in the administrative record, and ... reconfirmed repeatedly by two decades of agency practice and official pronouncements").

**[22]** Alternatively, the government argues that the reasons USCIS offered for the rule—venue uncertainty and the Board's (not USCIS's) practice of applying the law of the circuit in which proceedings occur—"[were] sufficient to fulfill any obligation to explain." Reply Br. 15. That might well be so if the statute's only goal were to ensure efficient removal of aliens with no lawful authorization to remain in the United States. But the statute has a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution. Both purposes are evident in the system's design and are confirmed throughout the legislative history on which the government relies. *See* 142 Cong. Rec. 25,347 (1996) ("The [significant-possibility] standard ... is intended to be a low screening standard for admission into the usual full asylum process.") (statement of Sen. Hatch); H.R. Rep. No. 104-469, pt. 1, at 158 (1995) ("Under this system, there should be no danger that an alien with a genuine asylum claim will be returned to persecution."). Appearing to recognize this, the Lesson Plan instructs officers to apply the credible-fear standard "in light of the nature of the standard as a *screening standard* to identify persons who could qualify for asylum ..., including when there is reasonable doubt regarding

the outcome of a credible fear determination." Lesson Plan 17, J.A. 379. And as explained above, the Guidance's choice-of-law policy could undermine this purpose were it to result in the expedited removal **\*903** of applicants who would have been eligible for asylum had their credible-fear interviews taken place in a different circuit.

[23] In its brief, the government offers two additional justifications for the local-circuit-law policy: that "apply[ing] the law where the action takes place" "is consistent with the most basic and firmly established choice of law rule" and that requiring officers to apply the most favorable law would "result in significant operational burdens." Appellants' Br. 39–40, 41. These rationales, however, appear nowhere in the Guidance, and when "assessing the reasonableness of [an agency's action], we look only to what the agency said at the time of the [action]—not to its lawyers' post-hoc rationalizations." *Good Fortune Shipping SA v. Commissioner of Internal Revenue Service*, 897 F.3d 256, 263 (D.C. Cir. 2018) (internal quotation marks omitted).

Given our conclusion that the new choice-of-law policy is arbitrary and capricious due to USCIS's failure to acknowledge and explain its departure from past practice, we may affirm the district court's order on that basis alone, thus leaving us with no need to consider the asylum seekers' alternative argument that the policy is contrary to law.

## C. Circularity

[24] As noted above, the circularity rule governs how immigration officials analyze asylum claims premised on an applicant's "membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). As explained in *A-B-*, under Board precedent social groups must "exist independently" of the harm claimed by the applicant, that is, the applicant must be able to establish the group's existence "without defining [it] by the fact of persecution." *A-B-*, 27 I. & N. Dec. at 334.

To understand the precise issue before us, we think it helpful to begin with a few examples that are not circular. One paradigmatic case involves persecution on account of sexual orientation—for example, a gay man fleeing a country where the police are known to assault homosexual men. *See Kadri v. Mukasey*, 543 F.3d 16, 21 (1st Cir. 2008) (collecting cases). Because the social group (gay men) exists independently of

the harm alleged (assault), the group is not circular. Another example involves persecution on account of disability—for example, an individual who suffers from bipolar disorder fleeing a country whose government institutionalizes and tortures mentally-ill individuals. *See Temu v. Holder*, 740 F.3d 887, 892 (4th Cir. 2014) (discussing such a claim). Again, because the social group (mentally-ill individuals) exists independently of the harm alleged (torture), the group is not circular.

But whether a group exists independently of the harm alleged is not always so apparent. Consider, for example, the group "women who fear being forced into prostitution." Stated that way, the group is defined by the harm alleged (forced prostitution). But if the women are targeted for forced prostitution because they share a common protected characteristic, such as their political views, then the group exists independently of the harm alleged and thus is not circular. *Cf. Lushaj v. Holder*, 380 F. App'x 41, 43 (2d Cir. 2010) (discussing the group "women whom members of the Haklaj gang wished to kidnap and force into prostitution ... to punish their family members for their political activities in Albania" (alterations omitted) (internal quotation marks omitted)). Consider another example, Somali women who have suffered female genital mutilation. *See Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007) (describing such a group). At one level, the group is circular because it is defined in part by the harm alleged (female genital mutilation). But it could also **\*904** be defined independently of the harm by describing the group as Somali women or, depending on the facts, even more narrowly as "young girls in the Benadiri clan," *Mohammed v. Gonzales*, 400 F.3d 785, 797 (9th Cir. 2005). As these examples demonstrate, "it is not fair to conclude that the group is defined by the harm or potential harm inflicted merely by the language used rather than determining what underlying characteristics account for the fear and vulnerability." *Cece v. Holder*, 733 F.3d 662, 672 (7th Cir. 2013) (en banc).

*A-B-* itself illustrates the difficulty in determining whether an applicant's proposed group is circular. The asylum seeker there alleged that she had been abused by her husband on account of her membership in the group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common with their partners." *A-B-*, 27 I. & N. Dec. at 321 (internal quotation marks omitted). This group, like the group "women who fear forced

prostitution," appears to be defined in part by the alleged harm (being unable to leave a relationship). On closer examination, however, this is not necessarily so. If A.B.'s inability to leave her relationship stems from circumstances independent of the alleged harm—for example, legal constraints on divorce—then the group would not be circular because the "inability to leave" does not refer to harm at all. *See De Pena-Paniagua, 957 F.3d at 93–94* (explaining that the "inability to leave a relationship may be the product of forces other than physical abuse," such as "cultural, societal, religious, economic, or other factors"). In short, whether a given group is circular depends on the facts of the particular case.

With these examples in mind, we turn to the asylum seekers' argument that the Guidance incorrectly describes the circularity rule as set forth in 🚩 *A-B-*. There, the Attorney General explained:

> [t]o be cognizable, a particular social group *must* exist independently of the harm asserted in an application for asylum .... If a group is defined by the persecution of its members, then the definition of the group moots the need to establish actual persecution. For this reason, the individuals in the group must share a narrowing characteristic other than their risk of being persecuted.

🚩 *A-B-, 27 I. & N. Dec. at 334–35* (citations omitted) (internal quotation marks omitted). Referring to an earlier case, the Attorney General also noted that the group " 'married women in Guatemala who are unable to leave their relationship' [is] effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability 'to leave' was created by harm or threatened harm." *Id. at 335*.

The asylum seekers do not challenge 🚩 *A-B-*'s description of the circularity rule, arguing instead that "the Guidance departs from th[at] settled standard." Appellees' Br. 53. We disagree.

The Guidance explains that in 🚩 *A-B-*, "[t]he Attorney General observed" that the group " 'married women in

Guatemala who are unable to leave their relationship' " " 'was effectively defined to consist of women in Guatemala who are victims of domestic abuse because the inability to leave was created by [the] harm or threatened harm.' " Guidance 5, J.A. 357 (quoting 🚩 *A-B-, 27 I. & N. Dec. at 335–36*). Focusing on the circularity rule's application to asylum claims founded on domestic violence, the Guidance explains:

> [🚩 *A-B-*'s] analysis casts doubt on whether a particular social group defined solely by the ability to leave a relationship can be sufficiently particular. Even if "unable to leave" were particular, the applicant **\*905** must show something more than the danger of harm from an abuser if the applicant tried to leave, because that would amount to circularly defining the particular social group by the harm on which the asylum claim was based. Officers should carefully examine any proposed particular social group to ascertain whether it contains any attributes that "exist independently of the harm asserted."

*Id.*

Unlike the asylum seekers, we detect no meaningful difference between 🚩 *A-B-* and the Guidance regarding the circularity rule. Fairly read, the Guidance simply quotes or paraphrases 🚩 *A-B-* and betrays no intent to depart from the Attorney General's decision. Nor, contrary to the asylum seekers' claim, does anything in the Guidance categorically bar groups based in part on applicants' inability to leave a relationship. Instead, read as a whole, the document directs officers to "analyze each case on its own merits in the context of the society where the claim arises," and warns that "analysis of a proposed social group is incomplete whenever the defining terms of the proposed group are analyzed in isolation, rather than collectively." *Id.* at 3, J.A. 355. This is exactly what 🚩 *A-B-* requires and, as our hypotheticals demonstrate, exactly the analysis required to determine whether a particular claim is or is not circular.

So far, so good. But in its brief, the government asserts that "the group must be 'separate' from the harm, not consisting of the harm, even in part." Reply Br. 23. As the asylum seekers point out, this statement of the rule is flatly inconsistent with both 🚩 *A-B-* and the Guidance. Indeed, government counsel conceded as much at oral argument. Asked about the inaccurate statement in its brief, counsel agreed that asylum officers must not apply the social-group requirements

formulaically and instead must go case-by-case. *See* Oral Arg. Rec. 24:00–03, 25:10–12 (describing how an "asylum officer would elicit further testimony" and "go through the steps" set forth in 🚩 *A-B* and the Guidance). And when asked specifically about the group "Guatemalan women unable to leave their relationships," counsel acknowledged that it is "not categorically barred," *id.* at 19:55–58, 21:34–35, and that its validity would turn on the specific factual circumstances of an applicant's claim, *id.* at 21:50–21:53 ("You could, in theory, have that group, if you checked the boxes."). In sum, then, when viewed as a whole, the Guidance accurately restates the circularity rule as described in 🚩 *A-B-*.

### D. Domestic and Gang Violence

[25]  In bold font, the Guidance states that:

> [i]n general, ... claims based on membership in a putative particular social group defined by the members' vulnerability to harm of domestic violence or gang violence committed by non-government actors will not establish the basis for asylum, refugee status, or a credible or reasonable fear of persecution.

Guidance 6, J.A. 358. 🚩 *A-B-* likewise states that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum," and "[a]ccordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution." 🚩 27 I. & N. Dec. at 320, n.1. Challenging these statements, the asylum seekers argue that they "establish[ ] a rule generally rejecting credible fear claims pertaining to domestic and gang violence" and thus violate the INA. Appellees' Br. 14. The government responds that the asylum seekers misread 🚩 *A-B-*, which, according to the government, **\*906** simply "remarked" "that asylum claims based on gang and domestic violence [have] historically foundered on the requirements for particular social group, nexus, and persecution." Appellants' Br. 17, 56.

The problem with the government's argument is that both 🚩 *A-B-* and the Guidance use the phrase "will not," rather than "have not," thus suggesting that the statements represent a new rule. That said, both statements also use the phrase "in general," thus suggesting that asylum claims based on domestic and/or gang violence might, depending on the circumstances of the case, qualify for asylum. Indeed, at oral argument, government counsel assured us that there is no general rule against such claims, calling it "crystal clear" that "none of these groups are categorically barred." Oral Arg. Rec. 24:03–07. "[T]he only general rule that 🚩 *Matter of A-B-* articulates," counsel explained, is that "[asylum officers] have to go through the steps" for analyzing particular-social-group claims. *Id.* at 25:20–25. This explanation is perfectly consistent with the Guidance's instruction to asylum officers, explained above, that claims be analyzed on a case-by-case basis.

The asylum seekers argue that "an allowance for limited exceptions does not mean no rule exists." Appellees' Br. 55. In support, they cite 🟡 *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988), in which we found that an EPA model used to determine contamination levels constituted a "rule" within the meaning of APA section 553. 🟡 *Id.* at 1319. As the asylum seekers point out, in that case we rejected EPA's argument that its "discretion to deviate" from the model transformed it into a nonbinding policy statement. 🟡 *Id.* at 1320. Critical to our ruling, however, the language EPA used to announce the model "strongly suggested" that the agency intended to treat it as a "binding norm" and EPA's "later conduct"—namely, treating the model as "conclusively disposing of certain issues"—"confirm[ed] [the model's] binding character." 🟡 *Id.* at 1320, 1321. Here, by contrast, the challenged statements are qualified by the words "general" and "generally." And, as explained above, other parts of both *A-B* and the Guidance make clear that asylum officers must "analyze each case on its own merits in the context of the society where the claim arises," Guidance 3, J.A. 355. In other words, the record in this case does not support the asylum seekers' argument that USCIS and the Attorney General have erected a rule against asylum claims involving allegations of domestic and/or gang violence.

### IV.

This brings us, finally, to the government's challenge to the district court's remedy. The district court declared all four policies unlawful, vacated them, and permanently enjoined application of the policies in credible-fear proceedings. It also ordered the government to (1) "provide written guidance or instructions to all asylum officers and immigration judges ... communicating that the [vacated policies] shall not be applied to any ... credible fear proceedings," and (2) provide new credible-fear interviews to the twelve asylum seekers who brought this case. Order at 3, *Grace*, No. 18-cv-1853 (D.D.C. June 3, 2019). The government does not challenge the latter requirement—indeed, the credible-fear interviews have already occurred. Instead, the government objects to the portions of the district court's order enjoining the challenged credible-fear policies. According to the government, the injunction runs afoul of 8 U.S.C. § 1252, which the government believes withdraws district-court authority to issue a "prospective injunction mandating or barring particular **\*907** interpretations of section 1158 in future individual credible-fear determinations." Appellants' Br. 34.

In support, the government first points to section 1252(f) (1), which provides:

> [N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221– 31], ... other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). This section, however, refers only to "the operation of the provisions"—i.e., the statutory provisions themselves, and thus places no restriction on the district court's authority to enjoin *agency action* found to be unlawful. Indeed, the Supreme Court has twice noted that section 1252(f) "prohibits federal courts from granting classwide injunctive relief against the operation *of §§ 1221–1231*"; in neither case did it even hint that the "operation of the provisions" refers to anything other than the

statute itself. *Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 481–482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (emphasis added); *see also Jennings v. Rodriguez*, ─── U.S. ───, 138 S. Ct. 830, 851, 200 L.Ed.2d 122 (2018) (quoting *Reno*, 525 U.S. at 481, 119 S.Ct. 936, and noting, without questioning, the Ninth Circuit's conclusion that section 1252(f) had no effect on its authority to enjoin violations or misapplications of the immigration-detention statutes).

The government also relies on section 1252(e)(1)(A), which provides that "no court may ... enter declaratory, injunctive, or other equitable relief in an action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection." 8 U.S.C. § 1252(e)(1)(A). As the plain language of this provision makes clear, it applies to "action[s] pertaining to an order to exclude an alien in accordance with section 1225(b) (1)," not to the kind of challenge we face here, namely, a "[c]hallenge[ ] on [the] validity of the [expedited-removal] system," *id.* § 1252(e)(3). As explained above, although the asylum seekers were issued expedited-removal orders, nothing about adjudicating their APA claims required the district court to examine those orders or the underlying credible-fear determinations.

This reading of section 1252(e)(1)(A) is confirmed by section 1252(e)(3). The latter provision does not, in the words of section 1252(e)(1)(A), "specifically authorize[ ]" any relief. Accordingly, were the government correct that section 1252(e)(1)(A) applies to this case, then Congress would have expressly authorized the district court to review expedited-removal policies yet simultaneously prohibited it from issuing any remedies. The government insists that section 1252(e)(3) does "specifically authorize[ ]" relief, citing in support the portion of that section stating that "[j]udicial review is available ... but shall be limited to *determinations*," *id.* § 1252(e)(3)(A) (emphasis added). According to the government, that word means "declaratory" or "set aside" relief that "prevent[s] implementation of the challenged policies as to [these] Plaintiffs," but not "system-wide injunction[s]." Reply Br. 9–10 (internal quotation marks

omitted). "Determination," however, denotes a decision, not a remedy. *See* Webster's Third New International Dictionary, Unabridged (online ed. 2020) (defining "determination" as "the settling and ending of a controversy especially by judicial decision"); Black's Law Dictionary (11th ed. 2019) (defining "determination" as "[t]he act of deciding something officially"). Indeed, throughout **\*908** section 1252, Congress used "determination" in connection with decisions, referring, for example, to "the determination made under section 1225(b)(1)(B)," 8 U.S.C. § 1252(a)(2) (A)(iii), and "a determination made by a trier of fact," *id.* § 1252(b)(4).

[26] Further confirming that the government is mistaken about the meaning of "determination," subsection (e)(2), mirroring subsection (e)(3), provides that "[j]udicial review" of expedited-removal orders "is available in habeas corpus proceedings, but shall be *limited to determinations of ...* whether the petitioner is an alien," "whether the petitioner was ordered removed under [ section 1225(b)(1)]," and "whether the petitioner can prove" lawful permanent residence or refugee or asylee status." *Id.* § 1252(e) (2) (emphasis added). Subsection (e)(4), in turn, specifies the relief available in such cases, namely, "a hearing in accordance with section 1229a." *Id.* § 1252(e)(4) (B). The contrast between subsections (e)(2) and (e)(4) makes clear that Congress used the phrase "limited to determinations" in the former to refer to the scope of judicial review, not the relief available. Applying the "standard principle of statutory construction ... that identical words and phrases within the same statute should normally be given the same meaning," *Powerex Corp. v. Reliant Energy Services, Inc.,* 551 U.S. 224, 232, 127 S.Ct. 2411, 168 L.Ed.2d 112 (2007), we conclude that the phrase "limited to determinations" in subsection (e)(3) likewise refers to the scope of judicial review.

In sum, neither section 1252(f)(1) nor section 1252(e) (1) prohibited the district court from issuing an injunction. That said, unlike the district court, which in addition to finding the condoned-or-completely-helpless standard and choice-of-law policy arbitrary and capricious, enjoined them as contrary to law, we have not reached the latter issue. Instead, our decision rests on the agency's failure to satisfy the APA's "requirement of reasoned decisionmaking." *Fogo*

*De Chao (Holdings) Inc. v. DHS,* 769 F.3d 1127, 1141 (D.C. Cir. 2014). Accordingly, nothing in this opinion necessarily precludes USCIS or the Attorney General from attempting to "remedy[ ] deficiencies in [their] explanation[s]" for these challenged policies and reissuing them. *Shays v. Federal Election Commission,* 414 F.3d 76, 112 (D.C. Cir. 2005). Should that occur, and should the new policies be challenged, the "contrary to law" question will be squarely before the court.

## V.

During the course of this appeal, it has come to our attention —though, regrettably, not through any effort of the parties —that the Departments of Justice and Homeland Security, acting pursuant to a Centers for Disease Control order, have severely circumscribed newly-arrived aliens' ability to seek asylum. *See* Notice of Order Under Sections 362 and 365 of the Public Health Services Act Suspending Introduction of Certain Persons From Countries Where A Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,061 (Mar. 26, 2020) (suspending, with limited exceptions, the admission of noncitizens traveling from Mexico and Canada). We have also learned that the two Departments, citing *A-B-*, have jointly proposed new regulations that would, among other things, "provide clear parameters for evaluating cognizable 'particular social groups.' " Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264, 36,278, 36,279 (proposed June 15, 2020). Our obligation, however, is to resolve the issues before us on the record the parties have presented. Having done just that, we reverse the district court's grant of summary judgment **\*909** with respect to the circularity rule and the statements regarding domestic- and gang-violence claims, vacate the injunction insofar as it pertains to those issues, and remand to the district court for further proceedings consistent with this opinion. In all other respects, we affirm.

*So ordered.*

Karen LeCraft Henderson, Circuit Judge, dissenting:
The Congress created the expedited removal system to ensure the swift removal of aliens unquestionably inadmissible into the United States. *See Am. Immigration Lawyers Ass'n v. Reno,* 199 F.3d 1352, 1354 (D.C. Cir. 2000); *see also*

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

*DHS v. Thuraissigiam*, —— U.S. ——, 140 S.Ct. 1959, 1963, 207 L.Ed.2d 427 (2020) ("[W]hen Congress enacted the [expedited removal] system, it crafted a system for weeding out patently meritless claims and expeditiously removing the aliens making such claims from the country."). Accordingly, it sharply circumscribed the availability of judicial review related to expedited removal, *see generally* 8 U.S.C. § 1252(a)(2)(A), providing only a narrow path for challenges to the expedited removal system in the United States District Court for the District of Columbia, *see id.* § 1252(e)(3), and for limited habeas review in all federal district courts, *see id.* § 1252(e)(2). Moreover, the Congress expressly forbade any court from reviewing "credible fear determinations" or providing equitable relief not specifically authorized in the same subsection. *See id.* §§ 1252(a)(2)(A)(iii), (e)(1)(A).

Despite these constraints, the district court used section 1252(e)(3) to abrogate individual credible fear determinations and issue a sweeping universal injunction purporting to prevent the immigration authorities from applying the United States Attorney General's interpretation of the law. We now reverse the district court's interpretation of the expedited removal statute in all respects and vacate much of its order. In the meantime, however, asylum officers have been forced to make tens of thousands of credible fear determinations without the benefit of the United States Attorney General's legal views or the guidance of the United States Department of Homeland Security (DHS). The consequence is that thousands of aliens have been detained for full removal proceedings and released into the United States, despite there being little doubt that they are not entitled to asylum.

In short, the district court's actions represent precisely the type of judicial meddling in removal decisions the Congress sought to prevent when it created the expedited removal system. Rather than halt the district court's overreach, my colleagues sanction it and embark on a new experiment in judicial interference with the immigration system—vacating the Attorney General's interpretation of the immigration statutes pursuant to section 1252(e)(3). Accordingly, I respectfully dissent.

## I.

Setting out the relevant statutory and procedural background.

## A.

An alien who is "physically present" or "arrives" in the United States may seek asylum. 8 U.S.C. § 1158(a)(1). To qualify, an alien must be a "refugee." *Id.* § 1158(b)(1)(A). With certain exceptions inapplicable here, a "refugee" is an individual "who is outside any country of such person's nationality ... who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution **\*910** or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1101(a)(42)(A).

Typically, an alien may pursue two paths in seeking asylum. Using the first path, he must submit an application under 8 U.S.C. § 1158. An application must be made within one year of the alien's arrival in the United States (unless certain exemptions apply). *See id.* § 1158(a)(1), (a)(2)(B). Once an alien applies for asylum, he is interviewed by an asylum officer. *See* 8 C.F.R. 208.9. If the asylum officer decides not to grant an application and the applicant otherwise has a valid status, the officer simply denies the application. *See id.* § 208.14(c)(2). There is no avenue for appeal from such a denial. On the other hand, if the asylum officer denies the application and it appears that the applicant is removable, the asylum officer must place the applicant in removal proceedings in immigration court. *See id.* § 208.14(c)(1). Using the second path, after the applicant is placed in removal proceedings (either following referral by the asylum officer or after DHS initiates removal proceedings on its own), he may raise his asylum request as a defense to removal. *See id.* § 1208.14(a), (c). The immigration court then adjudicates the alien's claim in an adversarial proceeding, *see generally* 8 U.S.C. § 1229a, from which both the government and the alien may appeal to the Board of Immigration Appeals (BIA), *see* 8 C.F.R. § 1003.1(b). The Attorney General, in his discretion, may also certify a decision for his review. *See id.* § 1003.1(h). After an alien exhausts the administrative process, including any review by the Attorney General, a final order of removal issues. The alien may then petition for

review in the appropriate court of appeals. *See* 8 U.S.C. § 1252(a)(1), (a)(5), (b), (d).

The Attorney General and the DHS Secretary retain ultimate authority to grant or deny asylum. *See id.* §§ 1103, 1158. Moreover, the Attorney General may adopt policies and issue precedential decisions that are binding on immigration judges and asylum officers. *See id.* § 1103(a)(1) ("[D]etermination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling."). The Attorney General has delegated authority to the BIA to issue precedential asylum decisions. 8 C.F.R. § 1003.1(d)(1), (h).

**B.**

There is also a third, irregular, path by which an alien can seek asylum. In response to a surge in the level of illegal immigration and asylum applications during the mid-1990s, the Congress enacted the provisions now codified at 8 U.S.C. § 1225(b)(1) in order to "expedite the removal from the United States of aliens who indisputably have no authorization to be admitted ...." H.R. Rep. No. 104-828, at 209H.R. Rep. No. 104-828, at 209 (1996) (Conf. Rep.); *see also* Thuraissigiam, 140 S.Ct. at 1963 ("It was Congress's judgment that detaining all asylum seekers until the full-blown removal process is completed would place an unacceptable burden on our immigration system and that releasing them would present an undue risk that they would fail to appear for removal proceedings."). The Congress mandated that "[i]f an immigration officer determines that an alien" who is "arriving in the United States" or otherwise designated by the Attorney General is inadmissible because he lacks immigration papers or misrepresents facts related to his eligibility for admission, the alien is "order[ed] ... removed from the United States without further hearing." [1] *See* **\*911** 8 U.S.C. § 1225(b)(1)(A)(i). The Congress included a procedure for an alien with a non-frivolous asylum claim to pursue it. *See id.* § 1225(b)(1)(B). If an alien who is otherwise immediately removable expresses an intent to apply for asylum based on, *inter alia*, a "fear of persecution," he is interviewed by an asylum officer. *Id.* § 1225(b)(1)(A)(ii). The asylum officer must determine whether the

alien has a "credible fear of persecution," defined as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [section § 1158]." *Id.* § 1225(b)(1)(B)(v). If the asylum officer finds that the alien has a "credible fear of persecution," the alien follows the standard removal process before an immigration judge. *Id.* § 1225(b)(1)(B)(ii); *see also id.* § 1229a (setting out procedures for standard removal proceedings). If, on the other hand, the asylum officer finds that an alien does not have a credible fear of persecution, the alien may seek review by an immigration judge. *Id.* § 1225(b)(1)(B)(iii). If the immigration judge affirms the asylum officer's determination, the alien must be immediately removed. [2] *Id.* The Congress has expressly precluded further administrative or judicial review of a negative credible fear determination. *See id.* §§ 1225(b)(1)(B)(iii)(I); 1252(a)(2)(A)(iii).

Critical to this case, the Congress also set out in 8 U.S.C. § 1252(a)(2) specific "[m]atters *not* subject to judicial review" (emphasis added). It gave special attention to expedited removal in section 1252(a)(2)(A) as follows:

> Notwithstanding any other provision of law ... no court shall have jurisdiction to review—
>
> (i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,
>
> (ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,
>
> (iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or
>
> (iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

*Id.* § 1252(a)(2)(A). In another provision, however, the Congress allowed for swift resolution of any legal challenge to the **\*912** new system. Section 1252(e)(3) authorizes the United States District Court for the District of Columbia to review "determinations under 1225(b) ... and its implementation," *id.* § 1252(e)(3)(A)(i), but limits judicial review to "whether [ section 1225(b)], or any regulation issued to implement such section, is constitutional" and "whether such a regulation, or written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law," *id.* § 1252(e)(3)(A)(ii). The Congress required any action brought under section 1252(e)(3) to "be filed no later than 60 days after the challenged section, regulation, directive, guideline, or procedure ... is first implemented," *id.* § 1252(e)(3)(B), and specified "the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph,"[3] *id.* § 1252(e)(3)(D). The Congress also limited the remedies available to the district court in section 1252(e) proceedings. *See id.* § 1252(e)(1)(A) (providing that "declaratory, injunctive, or other equitable relief" must be specifically authorized therein).

## C.

In Matter of A-B-, issued two months before this case began, the Attorney General exercised his authority to issue a precedential decision. *See* 27 I. & N. Dec. 316 (2018). The decision began with a DHS formal proceeding to remove an alien under section 1229a. The alien claimed asylum as a defense to removal, arguing that she was a "refugee" because she was abused by her husband based on her being one of a group of "El Salvadoran women who are unable to leave their domestic relationships where they have children in common." *Id.* at 321. On appeal, the BIA held that she qualified for asylum.[4] *Id.* The Attorney General referred the BIA's decision to himself and reversed in a precedential decision rendered under 8 U.S.C. § 1103.

Construing the definition of "refugee" in 8 U.S.C. § 1101(a)(42)(A), the Attorney General determined that the BIA erred in finding that the alien was persecuted based on her membership in a particular social group. *Id.* at 320. He reasoned that "El Salvadoran women who are unable to leave their domestic relationships where they have children in common" is not a cognizable "particular social group" because, among other reasons, "[t]o be cognizable, a particular social group must 'exist independently' of the harm asserted in an application for asylum or statutory withholding of removal." *Id.* at 334. He further held that A-B- was not "persecuted" because she had not shown that the El Salvadoran government was "unwilling or unable" to protect her. *Id.* at 344. The Attorney General noted that:

> Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum. While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such **\*913** claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address.

*Id.* at 320. In a footnote, he also noted that "[a]ccordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution." *Id.* at 320, n.1.

Subsequently, the United States Customs and Immigration Service[5] (USCIS) issued a "Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B-" (Guidance). The Guidance explained the implications of Matter of A-B- for asylum decisions made by USCIS personnel and instructed asylum officers to apply the law of the federal circuit in which an asylum interview takes place in processing an asylum claim. *See* USCIS, Guidance for Processing Reasonable Fear,

Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-* 8–9, PM-602-0162 (July 11, 2018).

**D.**

The plaintiffs are twelve nationals of various Central American countries who were apprehended after illegally crossing the United States border with Mexico. USCIS placed each alien in an expedited removal proceeding pursuant to section 1225(b)(1). Because all of the plaintiffs expressed a "fear of persecution," each had a credible fear interview pursuant to section 1225(b)(1)(A). Asylum officers determined that none of the twelve had a credible fear of persecution and an immigration judge agreed. All were ordered removed.

The plaintiffs then filed suit in district court against DHS, the Attorney General, USCIS and the Executive Office of Immigration Review, using section 1252(e)(3) as their jurisdictional hook. They challenged the validity of both *Matter of A-B-* and the Guidance, alleging that they would have received positive credible fear determinations had *Matter of A-B-* and the Guidance not been applied to them. The plaintiffs asked the district court to vacate *Matter of A-B-* and the Guidance, enjoin the defendants from applying *Matter of A-B* and the Guidance, vacate their removal orders and order DHS to grant each plaintiff a new credible fear determination. They also asked the district court to allow those plaintiffs who had been removed to be paroled into the United States instead.

The district court granted the plaintiffs' summary judgment motion. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (D.D.C. 2018). It held that *Matter of A-B-* and the Guidance were policies "issued by or under the authority of the Attorney General to implement" section 1225(b) and therefore it had jurisdiction to consider whether *Matter of A-B-* and the Guidance contravened the Immigration and Nationality Act (INA) and the Administrative Procedure Act (APA) pursuant to 8 U.S.C. § 1252(e)(3). *Id.* at 117. It declared that both *Matter of A-B-* and the Guidance violated both the APA and "the immigration laws insofar as those policies are applied in credible fear

proceedings," vacated *Matter of A-B-* and the Guidance and permanently enjoined "defendants and their agents from apply[ing *Matter of A-B-* and the Guidance] with respect to credible fear determinations, credible fear interviews, or credible fear review hearings." *Order* at 2–3, ECF No. 105. It also vacated each individual plaintiff's credible fear determination and removal order and ordered the defendants —if they sought to remove any of the plaintiffs without a full removal hearing—to "provid[e] each of them a new **\*914** credible fear process consistent with the Court's Memorandum Opinion and free from" the policies contained in *Matter of A-B-* and the Guidance. *Id.* at 3. As for those plaintiffs who had been removed, it ordered the defendants to return them to the United States. *Id.* The district court denied the defendants' requested stay pending appeal. *See Grace v. Whitaker*, No. 18-1853, 2019 WL 329572, at \*5 (D.D.C. Jan. 25, 2019). The defendants timely appealed, *see* FED. R. APP. P. 4(A)(1)(B), and our jurisdiction arises from 28 U.S.C. § 1291.

**II.**

I believe the district court was without jurisdiction to review the plaintiffs' claims, as is made plain by three separate statutory provisions. *See* 8 U.S.C. §§ 1252(a)(2)(A)(i) (barring district court from "entertain[ing] any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)"); 1252(a)(2)(A)(iii) (barring judicial review of "the determination made under section 1225(b)(1)(B)"); 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals ... shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in [section 1252(e)]"). Nevertheless, my colleagues conclude that 8 U.S.C. § 1252(e)(3) authorizes the plaintiffs to challenge their credible fear determinations, *Matter of A-B-* and the Guidance. I disagree—section 1252(e)(3) does not vest jurisdiction in the district court and, even assuming it does, section 1252(a)(2)(A)(iii) constitutes an independent bar to its review of the plaintiffs' claims.

**A.**

First, I believe the plaintiffs' suit is barred by section 1252(a)(2)(A)(iii). That provision commands that "no court shall have jurisdiction to review ... the application of [ section 1225(b)(1)] to individual aliens, including the determination made under section 1225(b)(1)(B) of this title." Unlike the other jurisdictional bars contained in section 1252(a)(2)(A), section 1252(a)(2)(A)(iii) conspicuously does *not* include an exception for litigation brought pursuant to section 1252(e). If the plaintiffs' suit requires "review [of] ... the determination made under section 1225(b)(1)(B)," that is, the credible fear determination, the district court is without jurisdiction to entertain it. See *Thuraissigiam*, 140 S.Ct. at 1966 (quoting 8 U.S.C. § 1252(a)(2)(A)(iii)) ("[C]ourts may not review 'the determination' that an alien lacks a credible fear of persecution.").

I have no doubt that their suit does require such review. The plaintiffs contend that they do not seek "review" of any credible fear determination because they mount instead a "systemic challenge" to *Matter of A-B-* and the Guidance. Appellee's Br. 23. But the plaintiffs asked the district court to accept that "as a result of [ *Matter of A-B-* and the Guidance], the immigration authorities summarily rejected [their] asylum claims and ordered them removed," to declare *Matter of A-B* and the Guidance "contrary to law," "order that [their] expedited removal orders be vacated and that they be provided with a new credible fear process." *Complaint* at 3, 5, ECF No. 3. In other words, the plaintiffs assert standard APA arguments and ask for standard APA remedies regarding their individual credible fear determinations. See 5 U.S.C. § 706 ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."). Their allegations **\*915** and requested relief require "review" of a determination as "review" is ordinarily used. See BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "review" as "[c]onsideration, inspection, or reexamination of a subject or thing."). Moreover, we have held that an

APA challenge to the DHS Secretary's discretionary decision constitutes "review" of that decision within the meaning of section 1252(a)(2)(B)(ii)'s jurisdictional bar. See *Zhu v. Gonzales*, 411 F.3d 292, 294–95 (D.C. Cir. 2005); *see also Poursina v. USCIS*, 936 F.3d 868 (9th Cir. 2019) (same); *Bernardo ex rel. M & K Eng's, Inc. v. Johnson*, 814 F.3d 481, 484–85 (1st Cir. 2016) (same); *cf. INS v. St. Cyr*, 533 U.S. 289, 121 S. Ct. 2271, 2285–86, 150 L.Ed.2d 347 (2001) (statutes that "preclude[ ] judicial review" historically construed to bar APA suits). [6] And, interpreting the same provision, several sister circuits have held that a suit purporting to challenge policies that guide DHS in making its ultimate decision seeks "review" of that decision. See *Bakran v. DHS*, 894 F.3d 557 (3d Cir. 2018); *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018); *Privett v. DHS*, 865 F.3d 375, 380–81 (6th Cir. 2017); *Bremer v. Johnson*, 834 F.3d 925, 929–32 (8th Cir. 2016); *Lee v. USCIS*, 592 F.3d 612, 620 (4th Cir. 2010); *Walid El-Baz Abdelwahab v. Frazier*, 578 F.3d 817, 821 (8th Cir. 2009); *but cf. Musunuru v. Lynch*, 831 F.3d 880, 887–88 (7th Cir. 2016) ( section 1252(a)(2)(B)(ii) does not prevent court from considering whether immigration authorities complied with procedure in making discretionary decision); *Mantena v. Johnson*, 809 F.3d 721, 728 (2d Cir. 2015) (same); *Kurapati v. U.S. Bureau of Citizenship and Immigration Servs.*, 775 F.3d 1255, 1262 (11th Cir. 2014) (same). That the plaintiffs characterize their suit as a challenge to *Matter of A-B-* and the Guidance should not prevent us from recognizing what, in reality, it is—an APA challenge to their respective credible fear determinations. It follows that they seek judicial review of "the determination made under section 1225(b)(1)(B)," review that the Congress has expressly barred.

The language of section 1225(b)(1)(B) itself, enacted simultaneously with section 1252, confirms my understanding of section 1252(a)(2)(A)(iii), that is, that it bars any attempt to seek judicial review of a negative credible fear determination. Section 1225(b)(1)(B) provides that "[s]ubject to [review by an immigration judge], if the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from

the United States *without further hearing or review.*" 8 U.S.C. § 1225(b)(1)(B)(iii)(I) (emphasis added). In other words, the Congress made clear in section 1225(b)(1)(B) that there is to be no judicial review of negative credible fear determinations, whether framed as "systemic" challenges or otherwise.

Nevertheless, the plaintiffs argue that the first clause of section 1252(a)(2)(A)(iii) **\*916** ("no court shall have jurisdiction to review ... the application of such section to individual aliens") requires that we read the second clause of section 1252(a)(2)(A)(iii) ("including the determination made under section 1225(b)(1)(B) of this title") to bar review of credible fear determinations only to the extent that it prohibits a claimant to seek judicial review of whether an asylum officer correctly applied the law to the facts of the particular claimant's case. The plaintiffs mangle the plain text of the statute. The Congress made a point of specifically withholding jurisdiction to review "the determination made under section 1225(b)(1)(B)." *Id.* § 1252(a)(2)(A)(iii). Whatever the Congress intended by barring review of "the application of [ section 1225(b)(1)] to individual aliens," it left no doubt that review of "the determination made under section 1225(b)(1)(B)" is beyond judicial review. *Id.* And although the use of "including" may suggest that the Congress viewed "review ... [of] the determination made under section 1225(b)(1)(B)" as one instance of the more generally forbidden "review ... [of] the application of [ section 1225(b)(1)] to individual aliens," *id.*, the obvious reading is that the Congress regarded credible fear determinations as inherently individualized. The Congress did not carve out an exception for a so-called "systemic" challenge as the plaintiffs contend.

The plaintiffs also argue that the most natural reading of section 1252(a)(2)(A)(iii) should be rejected because it would effectively prevent any individual from mounting a challenge pursuant to section 1252(e)(3). Appellee's Br. 23.[7] That claim is doubly flawed. First, section 1252(a)(2)(A)(iii) bars review of "the application of [ section 1225(b)(1)] to individual aliens" and credible fear determinations only. Under our precedent, *see Am. Immigration Lawyers Ass'n,* 199 F.3d at 1356–57 (upholding standing of two non-

asylum seeking aliens subjected to expedited removal to challenge policies implementing section 1225(b)(1)),[8] an alien determined inadmissible and ordered removed pursuant to section 1225(b)(1)(A) can challenge a policy "issued by ... the Attorney General to implement" section 1225(b)(1), 8 U.S.C. § 1252(e)(3)(A)(ii). Moreover, even if the plaintiffs are correct that reading section 1252(a)(2)(A)(iii) as its text demands would leave no plaintiff able to challenge a policy via section 1252(e)(3), that result can make no difference to our decision. We must apply the statute as the Congress enacted it. *See Baker Botts L.L.P. v. ASARCO LLC,* 576 U.S. 121, 135 S. Ct. 2158, 2169, 192 L.Ed.2d 208 (2015) ("Our job is to follow the text even if doing so will supposedly undercut a basic objective of the statute.") (internal quotation marks omitted).

**B.**

In addition, I do not believe that section 1252(e)(3) vested jurisdiction in the district **\*917** court. Section 1252(e)(3)(A) authorizes the district court to review "determinations under [ section 1225(b)] and its implementation" but restricts that jurisdiction to "determination[s] of ... whether [any regulation issued to implement section 1225(b)] or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." Neither *Matter of A-B-* nor the Guidance construes section 1225(b). Instead, *Matter of A-B-* construes the definition of "refugee" contained in 8 U.S.C. § 1101(a)(42)(a). 27 I. & N. Dec. at 325–26. That definition is connected to section 1225(b) circuitously— the definition of "refugee" contained in section 1101 is used to define eligibility for asylum in 8 U.S.C. § 1158. Section 1225(b)(1)(B)(v) in turn defines a "credible fear of persecution" as "a significant possibility ... that the alien could establish eligibility for asylum under *section 1158 of this title*" (emphasis added). That *Matter of A-B-* construes

only sections 1101 and 1158, not section 1225(b), means, in my reading, that the district court lacks jurisdiction to review both *Matter of A-B-* and the Guidance.

Section 1252(e)(3)(A)(ii) does not authorize judicial review of the Attorney General's interpretation of provisions other than section 1225(b), at least if his interpretation is included in an adjudicatory decision like *Matter of A-B-*. That becomes clear once the admittedly complex structure of section 1252 is understood. *See Negusie v. Holder*, 555 U.S. 511, 519, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) ("[W]e look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.") (internal quotation marks and citations omitted). Judicial review of issues of law in immigration proceedings, including those related to asylum, is ordinarily through a petition for review of a final removal order. *See generally* 8 U.S.C. § 1252(b); *see also id.* § 1252(a)(2)(D), (a)(5). But the Congress sought to bar judicial review in expedited removal proceedings and thus section 1252(a)(2)(A) expressly bars "judicial review" of various actions related to expedited removal, including removal orders. *See id.* § 1252(a)(2)(A)(i). Section 1252(a)(2)(A)(iv) contains one of four statutory barriers to judicial review. It provides that "[n]otwithstanding any other provision of law ... no court shall have jurisdiction to review ... (iv) except as provided in [ section 1252(e)], procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title." The district court acknowledged that section 1252(a)(2)(A)(iv) would bar the plaintiffs' challenge to *Matter of A-B-* and the Guidance *unless* section 1252(e)(3) provides otherwise. *See Grace*, 344 F. Supp. 3d at 115. At the same time, however, it disregarded the language of section 1252(a)(2)(A)(iv), which closely resembles the jurisdiction-granting language of section 1252(e)(3)(A)(ii). *Compare id.* § 1252(a)(2)(A)(iv) ("Notwithstanding any other provision of law ... no court shall have jurisdiction to review ... (iv) except as provided in [ section 1252(e)], procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)") *with id.* § 1252(e)(3)(A)(ii)

("Judicial review of determinations under section 1225(b) ... is available ... but shall be limited to determinations of ... whether ... a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.").

**\*918** These two provisions differ in some respects — section 1252(a)(2)(A)(iv) bars judicial review of "procedures and policies" and section 1252(e)(3)(A)(ii) applies to "written policy directive[s], written policy guideline[s], [and] written procedure[s]." A policy must be "adopted by the Attorney General" to be covered by section 1252(a)(2)(A)(iv) but may be "issued by or under the authority of the Attorney General" to come within section 1252(e)(3)(A)(ii). A policy must implement " section 1225(b)(1)" to oust judicial review per section 1252(a)(2)(A)(iv) but may implement section 1225(b) more broadly and nonetheless be covered by section 1252(e)(3)(A)(ii)'s grant. The overall effect, however, is that the two provisions mirror one another. What limited authority section 1252(e)(3)(A)(ii) grants to the United States District Court for the District of Columbia, section 1252(a)(2)(A)(iv) withdraws from all other courts.

That structural feature of section 1252 means that section 1252(e)(3)(A)(ii) cannot grant the district court jurisdiction to consider the plaintiffs' claims. The majority reasons that *Matter of A-B-* constitutes a written policy "issued by or under the authority of the Attorney General to implement" section 1225(b) because it construes the asylum eligibility provisions of section 1158. Maj. Op. at 891 (quoting 8 U.S.C. § 1252(e)(3)(A)(ii)) (*Matter of A-B-* is a policy "issued ... to implement" section 1225(b) because "[t]he decision's overarching purpose ... is to interpret section 1158[ ] ... which Congress incorporated into section 1225(b) by defining 'credible fear of persecution' as 'a significant possibility ... that the alien could establish eligibility for asylum under section

1158.' "). But if section 1252(e)(3)(A)(ii) grants our district court jurisdiction to review the Attorney General's precedential adjudication interpreting the asylum statutes, as the district court (and my colleagues) believe, it follows from the parallel language of sections 1252(e)(3)(A)(ii) and 1252(a)(2)(A)(iv) that the latter provision bars a court of appeals from reviewing any adjudicatory decision by the Attorney General or the BIA that touches on asylum, notwithstanding their authority to "review all questions of law and fact" included in a petition for review from such decision. See id. § 1252(b)(9). That reading of the judicial review provisions—limited as they are—cannot be correct. Plainly, the Congress did not intend the jurisdiction-stripping provisions of section 1252(a)(2)(A) to bar judicial review of every adjudicatory decision by the Attorney General applying the asylum statutes. Reading 1252(a)(2)(A)(iv) to do so is inconsistent with Supreme Court precedent and decisions of our sister circuits. See Negusie, 555 U.S. at 513–14, 129 S.Ct. 1159 (review of BIA decision construing "refugee"); Gonzales-Veliz v. Barr, 938 F.3d 219, 233–36 (5th Cir. 2019) (review of Attorney General's interpretation of "refugee" in Matter of A-B-). The majority's interpretation of section 1252(e)(3) suggests that every court that has assessed whether the Attorney General or the BIA correctly construed section 1158 or the section 1101 definition of "refugee" applied in section 1158 (not to mention the other statutes cross-referenced in section 1158) did so in contravention of the jurisdiction-stripping provisions of section 1252(a)(2)(A). In view of Supreme Court precedent and in line with other circuits, I have to conclude that Matter of A-B- is not a written policy "issued ... to implement" section 1225(b) and, accordingly, section 1252(e)(3) does not clothe the district court with authority to review it.

In holding otherwise, the district court emphasized that Matter of A-B- cited section 1225(b)(1)(B) in a short footnote, presumably indicating to that court that **\*919** Matter of A-B- construed section 1225(b). Grace, 344 F. Supp. 3d at 116. The footnote is attached to the Attorney General's statement that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence

perpetrated by non-governmental actors will not qualify for asylum," Matter of A-B-, 27 I. & N. Dec. at 320, and notes simply that "[a]ccordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution," id. at 320 n.1. At oral argument, the government counsel argued that the footnote "doesn't matter," Oral Arg. at 7:25, and the plaintiffs' counsel did not demur.

And for good reason. The footnote simply makes an unremarkable observation about non-governmental violence's limited basis to support a credible fear determination. It does not construe section 1225(b) and the determinations made in Matter of A-B- would have been the same without regard to section 1225(b). In other words, the footnote does not transform Matter of A-B- into a written policy "issued ... to implement" section 1225(b).

The majority responds that section 1252(a)(2)(A)(iv) "leaves open the possibility that some such 'procedures and policies' might be 'adopted by the Attorney General' to 'implement ... section 1225(b)(1)' and also for other purposes" so that the "policies could simultaneously be challenged in the district court for the District of Columbia pursuant to section 1252(e)(3) and also through a petition for review of a BIA decision." Maj. Op. at 896(quoting 8 U.S.C. § 1252(a)(2)(A)(iv)). The plain language of the statute refutes that suggestion. The Congress was absolutely clear that if a "procedure[ ] [or] [polic[y]" is "adopted by the Attorney General" to "implement ... section 1225(b)(1)," it is not subject to judicial review outside a section 1252(e) proceeding, regardless of any other purpose that policy might have. See 8 U.S.C. § 1252(a)(2)(A)(iv). The dual-track review procedure the majority envisions is a mirage.

My colleagues also suggest that a sister circuit agrees with their understanding of the interplay between sections 1252(a)(2)(A)(iv) and (e)(3). See Maj. Op. at 896–97(citing Gonzales-Veliz, 938 F.3d at 228). They are again mistaken. The Gonzales-Veliz panel did not discuss section 1252(a)(2)(A)(iv) at all. The comment quoted by the majority comes from the Fifth Circuit's consideration of the effect of our district court's remedy on its review of a different

plaintiff's final removal order. That court came to the sensible conclusion that its review of 🚩 *Matter of A-B-* and the Guidance was not affected by our district court's order because the order was, by its own terms, limited to credible fear proceedings. *See Gonzales-Veliz, 938 F.3d at 228* (D.C. district court order did not affect its review because district court "vacated 🚩 *[Matter of] A-B-* and the guidance memorandum as they pertain to credible-fear claims in expedited removal proceedings only"). At no point did the Fifth Circuit consider the merits of our district court's reading of 🚩 *section 1252(e)(3)* or its implication, if any, for the Fifth Circuit. The fact that the Fifth Circuit did *not* agree with our district court's interpretation of the 🚩 *section 1252(e)(3)* cannot be wheeled out as support for that interpretation. The Fifth Circuit decision, together with that of the First Circuit also cited by the majority, *see* Maj. Op. at 896–97 (citing *De Pena-Paniagua v. Barr, 957 F.3d 88, 93 (1st Cir. 2020))*, simply serve to underline the fact that the majority's interpretation of 🚩 *section 1252(e)(3)* is irreconcilable with the decisions of sister circuits.

I believe that the district court also lacked jurisdiction to review the Guidance, at least to the extent that it addresses the substantive asylum standard. The Guidance **\*920** largely restates 🚩 *Matter of A-B-*. It has no independent legal effect apart from 🚩 *Matter of A-B-* and, like 🚩 *Matter of A-B-*, the Guidance mentions credible fear determinations only in passing. [9] Because the Guidance adds nothing substantive to 🚩 *Matter of A-B-* and 🚩 *Matter of A-B-* is not a policy "issued ... to implement" 🚩 *section 1225(b)*, it follows that neither is the Guidance.

In my view, 🚩 *section 1252(e)(3)* does not permit judicial review of the plaintiffs' challenge to 🚩 *Matter of A-B-* or to the Guidance and I would dismiss their complaint under Rule 12(b)(1).

Accordingly, I respectfully dissent.

**All Citations**

965 F.3d 883

---

## Footnotes

1    Originally the Attorney General (now the DHS Secretary) was authorized in his "sole and unreviewable discretion" to so designate "any or all aliens" so long as they "have not been admitted or paroled into the United States" and cannot show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *See* 🚩 *id. § 1225(b)(1)(A)(iii)*. The DHS Secretary exercised his discretion to require the expedited removal of all aliens whose removal is statutorily required. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409, 35,409–14 (July 23, 2019).

2    The DHS Secretary must provide for review of a removal order issued to "an alien who claims under oath, or as permitted under penalty of perjury under section 1746 of title 28, after having been warned of the penalties for falsely making such claim under such conditions, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section 1157 of this title, or to have been granted asylum under 🏳 *section 1158* of this title." *See* 🚩 *8 U.S.C. § 1225(b)(1)(C)*.

3    The Congress also provided for habeas review in all federal district courts. *See* 🚩 *§ 1252(e)(3), (4), (5)*; *see also* 🏳 *Thuraissigiam, 140 S.Ct. at 1967–71*; 🏳 *Castro v. DHS, 835 F.3d 422, 427 (3d Cir. 2016)*.

4    The alien appealed to the BIA after having been ordered removed by an immigration judge. *See* 🚩 *8 C.F.R. § 1003.1(b)*.

5    As part of DHS, *see* 🏳 *6 U.S.C. § 271*, USCIS administers much of the removal system.

6    The majority discounts this precedent because it "mention[s] neither credible-fear interviews nor expedited removal." Maj. Op. at 894. My colleagues miss the point of my discussion. I express no view about the relationship between section 1252(a)(2)(B) and section 1252(a)(2)(A). In discussing section 1252(a)(2)(B), my point is that the consistent understanding of "review" adopted by courts in interpreting section 1252 necessarily means that the plaintiffs ask for "review" of their credible fear determinations. The fact that neither *Zhu* nor section 1252(a)(2)(B) involves expedited removal does not rebut that point. Moreover, "read[ing] section 1252(a)(2)(A)(iii)'s jurisdictional bar in tandem with section 1252(e)(3)," Maj. Op. at 894, which we must do of course, *see Negusie v. Holder*, 555 U.S. 511, 519, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) ("[W]e look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.") (internal quotation marks and citations omitted), does not mean ignoring section 1252(a)(2)(A)(iii)'s plain text.

7    The majority claims that "the government's view of section 1252(a)(2)(A)(iii) could leave no one able to challenge the policies at issue in this suit." Maj. Op. at 893. That is incorrect. Section 1252(a)(2)(A)(iii) prevents only the plaintiff who has received a negative credible fear determination from challenging *Matter of A-B-* and the Guidance. As several sister circuits have recognized, however, an alternative avenue for judicial review of *Matter of A-B-* and the Guidance exists—the standard petition for review procedure. *See Gonzales-Veliz v. Barr*, 938 F.3d 219, 233–36 (5th Cir. 2019). Moreover, although this issue is not before us, my reading of section 1252(a)(2)(A)(iii) does not rule out the possibility of a plaintiff's challenge to a policy before receiving a negative credible fear determination.

8    Critically, the plaintiffs in *Am. Immigration Lawyers Ass'n* did not challenge a credible fear determination —they were individual non-asylum seekers and organizations seeking to vindicate aliens' rights in general. *See* 199 F.3d at 1356–57.

9    Because section 1252(a)(2)(A)(iii) independently bars the plaintiffs' suit, I leave aside the more difficult question whether the Guidance's instruction to asylum officers on the law they are to apply in credible fear interviews—the only part of the Guidance other than its reading of *Matter of A-B-* the plaintiffs challenge —itself qualifies as a "written policy ... issued ... to implement" section 1225(b).

---

**End of Document**            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Reversed in Part and Remanded by Grace v. Barr, D.C.Cir.,
July 17, 2020

344 F.Supp.3d 96
United States District Court, District of Columbia.

GRACE, et al., Plaintiffs,

v.

Matthew G. WHITAKER, [1] Acting Attorney
General of the United States, et al., Defendants.

No. 18-cv-01853 (EGS)
|
Signed December 17, 2018
|
Filed 12/19/2018

**Synopsis**

**Background:** Asylum applicants, who asserted believable accounts of domestic or gang violence in expedited removal process, brought action against Attorney General, alleging new credible fear policies for asylum applications based on domestic or gang violence adopted in immigration decision violated the Administrative Procedure Act (APA) and Immigration and Nationality Act (INA). Parties cross-moved for summary judgment and applicants moved for preliminary injunction and to consider evidence outside administrative record.

**Holdings:** The District Court, Emmet G. Sullivan, J., held that:

[1] it would consider evidence outside administrative record;

[2] it had jurisdiction;

[3] applicants had standing;

[4] immigration decision precluding credible fear determinations in expedited removal proceedings based on claims of domestic violence and gang-related violence was arbitrary and capricious, abrogating Matter of A-B-, 27 I. & N. Dec. 316;

[5] new policies requiring showing government condoned private actions or demonstrated complete helplessness to protect victims was inconsistent with unambiguous term "persecution";

[6] new policies did not create new standard for INA nexus requirement; and

[7] permanent injunction was warranted.

Motions granted in part and denied in part.

See also 2018 WL 3812445.

**Procedural Posture(s):** Motion for Summary Judgment; Motion for Preliminary Injunction; Motion to Strike; Review of Administrative Decision.

West Headnotes (48)

**[1]** **Administrative Law and Procedure** ⟳ Scope and contents; matters to be shown

In an Administrative Procedure Act (APA) case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision. 5 U.S.C.A. § 706.

**[2]** **Administrative Law and Procedure** ⟳ Scope and contents; matters to be shown

**Administrative Law and Procedure** ⟳ Review limited to administrative record in general

Under the Administrative Procedure Act (APA), a reviewing court is confined to reviewing the whole record or those parts of it cited by a party, and the administrative record only includes the materials compiled by the agency that were before the agency at the time the decision was made. 5 U.S.C.A. § 706.

**[3]** **Administrative Law and Procedure** ⟳ Grounds, factors, and considerations

When plaintiffs seek to place before a court additional materials that an agency did not review in making its decision, a court in Administrative Procedure Act (APA) proceedings must exclude such material unless plaintiffs can demonstrate unusual circumstances justifying departure from the general rule. 5 U.S.C.A. § 706.

**[4]    Administrative Law and Procedure** 🖝 Consideration of new or additional evidence

A court in Administrative Procedure Act (APA) proceedings may appropriately consider extra-record materials: (1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information is needed to determine whether the agency considered all of the relevant factors, or (3) if the agency failed to explain the administrative action so as to frustrate judicial review. 5 U.S.C.A. § 706.

**[5]    Aliens, Immigration, and Citizenship** 🖝 Record

District court would consider evidence outside administrative record of government's prior policies, but not declarations explaining them, in action by asylum applicants, who asserted believable accounts of domestic or gang violence in expedited removal process, alleging new credible fear policies adopted in immigration decision violated Administrative Procedure Act (APA) and Immigration and Nationality Act (INA); applicants asserted new policies deviated from prior policies without explanation, which government disputed, and court could not analyze the argument without reviewing prior policies. 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

1 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** 🖝 Record

In action by asylum applicants, who asserted believable accounts of domestic or gang violence in expedited removal process, alleging new credible fear policies adopted in immigration decision violated Administrative Procedure Act (APA) and Immigration and Nationality Act (INA), district court would consider evidence outside administrative record that applicants submitted in support of their request for preliminary injunction, which included, among other things, applicants' declarations and reports describing conditions of native countries; even though court had consolidated injunction motion with parties' cross-motions for summary judgment, court had to determine whether to issue permanent injunction if applicants succeeded. 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

**[7]    Federal Courts** 🖝 Limited jurisdiction; jurisdiction as dependent on constitution or statutes

Federal district courts are courts of limited jurisdiction.

**[8]    Federal Courts** 🖝 Necessity of Objection; Power and Duty of Court

A court must resolve any challenge to its jurisdiction before it may proceed to the merits of a claim.

**[9]    Aliens, Immigration, and Citizenship** 🖝 Jurisdiction and venue

District court had jurisdiction over action by asylum applicants, who asserted believable accounts of domestic or gang violence in expedited removal process, alleging new credible fear policies adopted in immigration decision violated Administrative Procedure Act (APA) and Immigration and Nationality Act

(INA); INA explicitly allowed for systemic challenges, the decision implemented the INA by articulating new standard for credible fear determinations, agencies could make legal-policy through adjudication and their dicta could represent articulation of policy, decision gave directive to asylum officers regarding domestic and gang violence claims, and immigration judges who reviewed credible fear determinations were required to apply the decision. 🚩 5 U.S.C.A. § 551 et seq.; 🚩 8 U.S.C.A. § 1252(e)(3).

2 Cases that cite this headnote

**[10]    Administrative Law and Procedure** 🔑 Rulemaking, adjudication, or other mechanism

An administrative agency can make legal-policy through rulemaking or by adjudication.

**[11]    Administrative Law and Procedure** 🔑 Construction, operation, and effect in general

When an agency does make policy by adjudication, because it is a policymaking institution unlike a court, its dicta can represent an articulation of its policy, to which it must adhere or adequately explain deviations.

**[12]    Administrative Law and Procedure** 🔑 Mode and sufficiency of presentation

Only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.

**[13]    Administrative Law and Procedure** 🔑 Presumptions as to Reviewability

There is a strong presumption in favor of judicial review of administrative action.

**[14]    Aliens, Immigration, and Citizenship** 🔑 Constitutional and statutory provisions

Statutory ambiguities in immigration laws are resolved in favor of the alien.

1 Cases that cite this headnote

**[15]    Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

District court had jurisdiction to review policy memorandum issued by Department of Homeland Security (DHS) regarding credible fear policies in expedited removal process challenged by asylum applicants, who asserted believable accounts of domestic or gang violence, in action alleging new credible fear policies adopted in immigration decision and memorandum violated Administrative Procedure Act (APA) and Immigration and Nationality Act (INA); memorandum expressly applied to credible fear interviews and provided guidance to adjudicators, and INA did not limit jurisdiction over review of written policy directives or guidelines. 🚩 5 U.S.C.A. § 551 et seq.; 🚩 8 U.S.C.A. § 1252(e)(3).

4 Cases that cite this headnote

**[16]    Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Civil Procedure** 🔑 Causation; redressability

To establish standing, a plaintiff must, generally speaking, demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.

**[17]    Federal Civil Procedure** 🔑 In general; injury or interest

Standing is assessed upon the facts as they exist at the time the complaint is filed.

**[18]    Aliens, Immigration, and
Citizenship** 🔑 **Right of review or
intervention; standing**

Asylum applicants, who asserted believable
accounts of domestic or gang violence in
expedited removal process, had standing to
challenge policy memorandum issued by
Department of Homeland Security (DHS)
regarding credible fear policies in expedited
removal process in action alleging new credible
fear policies adopted in immigration decision
and memorandum violated Administrative
Procedure Act (APA) and Immigration and
Nationality Act (INA); applicants asserted new
policies impermissibly raised burden and denied
them fair opportunity to seek asylum in violation
of the APA and INA, and order declaring policies
unlawful and enjoying their use would redress
those injuries. 🏷 5 U.S.C.A. § 551 et seq.;
Immigration and Nationality Act, § 101 et seq.,
🚩 8 U.S.C.A. § 1101 et seq.

1 Cases that cite this headnote

**[19]    Administrative Law and
Procedure** 🔑 **Character and amount of
evidence in general**

The function of a district court in reviewing an
administrative decision under the Administrative
Procedure Act (APA) is to determine whether
or not as a matter of law the evidence in the
administrative record permitted the agency to
make the decision it did. 🏷 5 U.S.C.A. § 706.

**[20]    Administrative Law and
Procedure** 🔑 **Review for arbitrary,
capricious, unreasonable, or illegal actions in
general**

To survive an arbitrary and capricious challenge
under the Administrative Procedure Act (APA),
an agency action must be the product of reasoned
decisionmaking. 🏷 5 U.S.C.A. § 706(2)(a).

**[21]    Administrative Law and
Procedure** 🔑 **Review for arbitrary,
capricious, unreasonable, or illegal actions in
general**

The reasoned decisionmaking requirement of the
Administrative Procedure Act (APA) applies to
judicial review of agency adjudicatory actions.
🏷 5 U.S.C.A. § 706(2)(a).

**[22]    Administrative Law and
Procedure** 🔑 **Review for arbitrary,
capricious, unreasonable, or illegal actions in
general**

Under the Administrative Procedure Act (APA),
a court must not uphold an adjudicatory
action when the agency's judgment was neither
adequately explained in its decision nor
supported by agency precedent. 🏷 5 U.S.C.A. §
706(2)(a).

**[23]    Administrative Law and
Procedure** 🔑 **Review for arbitrary,
capricious, unreasonable, or illegal actions in
general**

**Administrative Law and
Procedure** 🔑 **Deference to Agency in
General**

The scope of review under both the arbitrary
and capricious standard of the Administrative
Procedure Act (APA) and 🏷 *Chevron* are
concededly narrow. 🏷 5 U.S.C.A. § 706(2)(a).

**[24]    Administrative Law and
Procedure** 🔑 **Asylum, refugees, and
withholding of removal**

**Aliens, Immigration, and
Citizenship** 🔑 **Law questions**

Immigration decision by Attorney General
addressing whether asylum applications
based on domestic violence could establish
membership in particular social group in
expedited removal process was entitled to

*Chevron* deference; decision interpreted provisions of the Immigration and Nationality Act (INA), which charged Attorney General with enforcing the statutory scheme. 8 U.S.C.A. § 1103(a)(1).

2 Cases that cite this headnote

**[25]    Administrative Law and Procedure** Deference to Agency in General

Not every agency interpretation of a statute is appropriately analyzed under *Chevron*.

**[26]    Administrative Law and Procedure** Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** Law questions

Principles of *Chevron* deference are applicable to the Immigration and Nationality Act (INA) because that statute charges the Attorney General with administering and enforcing the statutory scheme. Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

**[27]    Administrative Law and Procedure** Construction, interpretation, or application of law in general

In addition to *Chevron* deference, a court must also afford deference to an agency when it is interpreting its own precedent.

**[28]    Administrative Law and Procedure** Denial of admission; removal

**Aliens, Immigration, and Citizenship** Law questions

Policy memorandum issued by Department of Homeland Security (DHS) regarding credible fear policies in expedited removal process was

not subject to *Chevron* deference; such a policy statement lacked force of law.

1 Cases that cite this headnote

**[29]    Aliens, Immigration, and Citizenship** Membership in social group

Phrase "particular social group" in Immigration and Nationality Act (INA) asylum provisions was ambiguous, for purposes of determining whether Attorney General violated Administrative Procedure Act (APA) by issuing immigration decision addressing whether asylum applications based on domestic or gang violence could establish membership in particular social group in expedited removal process; INA provided that asylum could be granted to refugee who had well-founded fear of persecution on account of, among other things, membership in particular social group, and legislative intent indicated attempt to comply with interpretation of word "refugee" by the United Nations, but Congress did not address question of whether victims of domestic or gang persecution fell into a particular social group. 5 U.S.C.A. § 706(2)(a); 8 U.S.C.A. § 1101(a)(42)(A).

10 Cases that cite this headnote

**[30]    Aliens, Immigration, and Citizenship** Grounds for Persecution; Protected Groups

Attorney General's immigration decision precluding credible fear determinations in expedited removal proceedings based on asylum applicants' claims of domestic violence and gang-related violence was arbitrary and capricious in violation of the Administrative Procedure Act (APA) and Immigration and Nationality Act (INA); decision created general rule, such a rule was inconsistent with Congressional intent in INA to bring United States refugee law into compliance with policy of the United Nations, INA additionally required an individualized analysis, and decision heightened standard for applicants at the credible fear stage; abrogating *Matter of A-B-*, 27 I. & N. Dec.

316. 5 U.S.C.A. § 706(2)(a); 8 U.S.C.A. § 1103(a)(1).

2 Cases that cite this headnote

**[31]    Aliens, Immigration, and Citizenship**  Government action or acquiescence

When a private actor, rather than the government itself, is alleged to be a persecutor, an alien must demonstrate some connection between the actions of the private actor and governmental action or inaction; to establish this connection, a petitioner must show that the government was either unwilling or unable to protect him or her from persecution. 8 U.S.C.A. § 1101(a)(42)(A).

2 Cases that cite this headnote

**[32]    Aliens, Immigration, and Citizenship**  Government action or acquiescence

Term "persecution" in Immigration and Nationality Act (INA) provisions regarding applications for asylum was not ambiguous, for purposes of determining whether immigration decision and policy memorandum violated Administrative Procedure Act (APA) by requiring asylum applicants, who alleged persecution based on domestic or gang violence, show governments in native countries condoned private actions or demonstrated complete helplessness to protect victim; Congress carried forward term's established meaning of harm or suffering inflicted either by government or by persons or an organization that the government was unable or unwilling to control. 5 U.S.C.A. § 706(2)(a); 8 U.S.C.A. § 1101(a)(42)(A).

2 Cases that cite this headnote

**[33]    Aliens, Immigration, and Citizenship**  Government action or acquiescence

Immigration decision and policy memorandum requiring asylum applicants, who alleged persecution based on domestic or gang violence during expedited removal proceedings, show governments in native countries condoned private actions or demonstrated complete helplessness to protect victims violated Administrative Procedure Act (APA) by being inconsistent with unambiguous term "persecution" in Immigration and Nationality Act (INA) provisions regarding applications for asylum; persecution had well established meaning of harm or suffering inflicted either by government or by persons or an organization that the government was unable or unwilling to control, that standard did not require showing that government "condoned" persecution or was "completely helpless," and new standard would mean no applicant who received government assistance, regardless of how ineffective the assistance was, could meet persecution standard. 5 U.S.C.A. § 706(2)(a); 8 U.S.C.A. § 1103(a)(1).

2 Cases that cite this headnote

**[34]    Administrative Law and Procedure**  Plain, literal, or clear meaning; ambiguity or silence

When Congress uses a term with a settled meaning, its intent is clear for purposes of *Chevron*.

**[35]    Administrative Law and Procedure**  Explanation or reasons for change

Unexplained inconsistency is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act (APA). 5 U.S.C.A. § 706(2)(a).

**[36]    Aliens, Immigration, and Citizenship**  Membership in social group

Immigration decision and policy memorandum, which addressed whether asylum applications based on domestic or gang violence could establish membership in particular social group in expedited removal process, stating that when private actors inflict violence based on personal relationship with victim, victim's membership in larger group might not be "one central reason" for abuse did not create new standard for Immigration and Nationality Act's (INA) nexus requirement that persecution be "on account of" a protected ground, and therefore, did not violate the Administrative Procedure Act (APA) or INA; INA expressly provided for mixed motives for persecution. 5 U.S.C.A. § 706(2)(a); 8 U.S.C.A. § 1158(b)(1)(B)(i).

[37]    **Aliens, Immigration, and Citizenship** 👉 Membership in social group

Policy memorandum, which addressed asylum applications in expedited removal process, stating that "particular social group" definitions based on claims of domestic violence were impermissibly circular and could not establish persecution was arbitrary and capricious in violation of the Administrative Procedure Act (APA) and Immigration and Nationality Act (INA); such a rule precluded taking into account independent characteristics presented in each case, and memorandum did not provide reasoned explanation for change to circularity rule. 5 U.S.C.A. § 706(2)(a); 8 U.S.C.A. § 1103(a)(1).

[38]    **Aliens, Immigration, and Citizenship** 👉 Membership in social group

Immigration decision and policy memorandum, which addressed whether asylum applications based on domestic or gang violence could establish membership in particular social group in expedited removal process, did not require asylum adjudicators to take into account discretionary factors at credible fear stage, as would violate Immigration and Nationality Act (INA); decision and memorandum discussed

discretion only in context of when applicant established eligibility for asylum, which was not determined at credible fear stage. 🚩 8 U.S.C.A. § 1225(b)(1)(B)(v).

3 Cases that cite this headnote

[39]    **Aliens, Immigration, and Citizenship** 👉 Membership in social group

Policy memorandum, which addressed whether asylum applications based on domestic or gang violence could establish membership in particular social group in expedited removal process, requiring applicants to clearly indicate exact delineation of any proposed particular social group during credible fear determinations was arbitrary and capricious, and therefore, violated Administrative Procedure Act (APA) and Immigration and Nationality Act (INA); such a requirement was contrary to INA. 5 U.S.C.A. § 706(2)(a); 🚩 8 U.S.C.A. § 1225(b)(1)(B)(v).

5 Cases that cite this headnote

[40]    **Aliens, Immigration, and Citizenship** 👉 Hearing or Interview

Directive in policy memorandum, which addressed whether asylum applications based on domestic or gang violence could establish membership in particular social group in expedited removal process, that asylum officers processing credible fear interviews were to ignore circuit law contrary to a specific immigration decision was contrary to United States Supreme Court decision in *Nat'l Cable & Telecomm's Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, which held that agency's interpretation of statutory provision could override a prior court's interpretation if agency was entitled to *Chevron* deference and the agency's interpretation was reasonable; memorandum directed officers to ignore any contrary decision, while Supreme Court's decision limited an agency's ability to override judicial decisions. 8 U.S.C.A. § 1103(a)(1).

AR.04708

**[41]**  **Administrative Law and Procedure** 🔑 Deference to Agency in General

**Administrative Law and Procedure** 🔑 Permissible or reasonable construction

An agency's interpretation of a statutory provision may override a prior court's interpretation if the agency is entitled to 📖 *Chevron* deference and the agency's interpretation is reasonable; if the agency is not entitled to deference or if the agency's interpretation is unreasonable, a court's prior decision interpreting the same statutory provision controls.

1 Cases that cite this headnote

**[42]**  **Aliens, Immigration, and Citizenship** 🔑 Hearing or Interview

Directive in policy memorandum, which addressed whether asylum applications based on domestic or gang violence could establish membership in particular social group in expedited removal process, for asylum officers to apply law of circuit where applicant was physically located during credible fear interview was arbitrary and capricious, and therefore, violated the Administrative Procedure Act (APA) and Immigration and Nationality Act (INA); INA did not speak to what law should apply during screening, but Congress deliberately established a low screening standard for admission into full asylum process, and memorandum could allow an applicant to be deported following negative credible fear determination, even though applicant could have possibility of establishing asylum during removal proceeding. 📖 5 U.S.C.A. § 706(2)(a); 🚩 8 U.S.C.A. § 1225(b)(1)(B)(v).

1 Cases that cite this headnote

**[43]**  **Aliens, Immigration, and Citizenship** 🔑 Determination

Immigration and Nationality Act (INA) did not preclude equitable relief in action by asylum applicants, who asserted believable accounts of domestic or gang violence in expedited removal process, alleging new credible fear policies adopted in immigration decision and policy memorandum violated Administrative Procedure Act (APA) and INA; INA authorized systemic challenges to written expedited removal policies, which was outside INA provision limiting relief, and applicants did not seek to enjoin operation of expedited removal provisions or to declare provisions unlawful. 🚩 8 U.S.C.A. §§ 1252(e)(1), 🚩 (f).

4 Cases that cite this headnote

**[44]**  **Constitutional Law** 🔑 Nature and scope in general

It is the province of a court to declare what the law is.

**[45]**  **Aliens, Immigration, and Citizenship** 🔑 Determination

In finding immigration decision and policy memorandum, which addressed whether asylum applications based on domestic or gang violence could establish membership in particular social group in expedited removal process, violated Administrative Procedure Act (APA) and Immigration and Nationality Act (INA), district court had authority to return applicants unlawfully removed pursuant to policies announced in decision and memorandum; applicants had availed themselves of framework for aliens to enter the United States. 📖 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act, § 101 et seq., 🚩 8 U.S.C.A. § 1101 et seq.

**[46]**  **Injunction** 🔑 Grounds in general; multiple factors

A plaintiff seeking a permanent injunction must demonstrate they have: (1) suffered an irreparable injury; (2) that traditional legal

remedies, such as monetary relief, are inadequate to compensate for that injury; (3) the balance of hardships between the parties warrants equitable relief; and (4) the injunction is not contrary to the public interest.

1 Cases that cite this headnote

[47]    **Aliens, Immigration, and Citizenship** 🔑 Injunction

After finding immigration decision and policy memorandum, which addressed whether asylum applications based on domestic or gang violence could establish membership in particular social group in expedited removal process, violated Administrative Procedure Act (APA) and Immigration and Nationality Act (INA), permanent injunction was warranted prohibiting enforcement of policies announced in decision and memorandum; unlawful policies were applied in applicants' credible fear determinations, causing denial of their applications, no other relief could provide adequate remedy, they did not seek monetary compensation, and injunction was not contrary to public interest. 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act, § 101 et seq., 8 U.S.C.A. § 1101 et seq.

[48]    **Injunction** 🔑 Unclear, unlikely, doubtful or speculative injury

The government cannot suffer harm from an injunction that merely ends an unlawful practice.

**Attorneys and Law Firms**

*104 Anne Kathleen Scholten Dutton, Pro Hac Vice, Hastings College of the Law, Eunice Lee, UC Hastings Center for Gender and Refugee Studies, Cody H. Wofsy, Pro Hac Vice, Jennifer Chang Newell, Katrina Eiland, Pro Hac Vice, American Civil Liberties Union Foundation, San Francisco, CA, Celso Perez, Lenora M. Lapidus, ACLU Immigrants' Rights Project, Emma Jane Roth, Judy Rabinovitz, Pro Hac Vice, Omar C. Jadwat, Pro Hac Vice, Sandra Shin-

Young Park, Pro Hac Vice, American Civil Liberties Union Foundation, New York, NY, Scott Michelman, Arthur B. Spitzer, American Civil Liberties Union of the District of Columbia, Washington, DC, Andre Ivan Segura, Pro Hac Vice, Thomas Paul Buser-Clancy, Pro Hac Vice, American Civil Liberties Union Foundation of Texas, Houston, TX, for Plaintiffs.

Erez Reuveni, Joseph Anton Darrow, Joshua Samuel Press, United States Department of Justice, Christina Greer, U.S. Department of Justice, Civil Division Office of Immigration Litigation, Washington, DC, for Defendants.

## MEMORANDUM OPINION

Emmet G. Sullivan, United States District Judge

When Congress passed the Refugee Act in 1980, it made its intentions clear: the purpose was to enforce the "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, § 101(a), Pub. L. No. 96–212, 94 Stat. 102 (1980). Years later, Congress amended the immigration laws to provide for expedited removal of those seeking admission to the United States. Under the expedited removal process, an alien could be summarily removed after a preliminary inspection by an immigration officer, so long as the alien did not have a credible fear of persecution by his or her country of origin. In creating this framework, Congress struck a balance between an efficient immigration system and ensuring that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution." H.R. REP. NO. 104-469, pt. 1, at 158 (1996).

Seeking an opportunity for asylum, plaintiffs, twelve adults and children, alleged accounts of sexual abuse, kidnappings, and beatings in their home countries during interviews with asylum officers. [2]   *105 These interviews were designed to evaluate whether plaintiffs had a credible fear of persecution by their respective home countries. A credible fear of persecution is defined as a "significant possibility" that the alien "could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Although the asylum officers found that plaintiffs' accounts were sincere, the officers denied their claims after applying the standards set forth in a recent precedential immigration decision issued by then-Attorney General, Jefferson B. Sessions, *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018).

Plaintiffs bring this action against the Attorney General alleging violations of, *inter alia*, the Administrative Procedure Act ("APA") and the Immigration and Nationality Act ("INA"), arguing that the standards articulated in *Matter of A-B-*, and a subsequent Policy Memorandum issued by the Department of Homeland Security ("DHS") (collectively "credible fear policies"), unlawfully and arbitrarily imposed a heightened standard to their credible fear determinations.

Pending before the Court are: (1) plaintiffs' combined motions for a preliminary injunction and cross-motion for summary judgment; (2) plaintiffs' motion to consider evidence outside the administrative record; (3) the government's motion to strike exhibits supporting plaintiffs' motion for summary judgment; and (4) the government's motion for summary judgment. Upon consideration of the parties' memoranda, the parties' arguments at the motions hearings, the arguments of *amici*,[3] the administrative record, the applicable law, and for the reasons discussed below, the Court finds that several of the new credible fear policies, as articulated in *Matter of A-B-* and the Policy Memorandum, violate both the APA and INA. As explained in this Memorandum Opinion, many of these policies are inconsistent with the intent of Congress as articulated in the INA. And because it is the will of Congress—not the whims of the Executive—that determines the standard for expedited removal, the Court finds that those policies are unlawful.

Part I of this Opinion sets forth background information necessary to resolve plaintiffs' claims. In Part II, the Court considers plaintiffs' motion to consider evidence outside the administrative record and denies the motion in part. In Part III, the Court considers the parties' cross-motions for summary judgment. In Part III.A, the Court considers the government's arguments that this case is not justiciable and holds that this Court has jurisdiction to hear plaintiffs' challenges to the credible fear policies. In Part III.B, the Court addresses the legal standards that govern plaintiffs' claims. In Part III.C, the Court turns to the merits of plaintiffs' claims and holds that, with the exception of two policies, the new credible fear policies are arbitrary, capricious, and in violation of the immigration laws. In Part III.D, the Court considers the appropriate form of relief and vacates the unlawful credible fear policies. The Court further permanently enjoins the government from continuing to apply those policies and from removing plaintiffs who are currently in the United States

without first providing credible fear determinations consistent with the immigration laws. Finally, the Court orders the government to return to the United States the plaintiffs who were unlawfully deported and to provide them with new credible fear determinations consistent with the immigration laws.

**\*106  I. Background**

Because the claims in this action center on the expedited removal procedures, the Court discusses those procedures, and the related asylum laws, in detail.

### A. Statutory and Regulatory Background

#### 1. The Refugee Act

In 1980, Congress passed the Refugee Act, Pub. L. No. 96-212, 94 Stat. 102, which amended the INA, Pub. L. No. 82-414, 66 Stat. 163 (1952)(codified as amended in sections of 8 U.S.C.). The "motivation for the enactment of the Refugee Act" was the "United Nations Protocol Relating to the Status of Refugees ["Protocol"]," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 424, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), "to which the United States had been bound since 1968," *id. at 432–33, 107 S.Ct. 1207*. Congress was clear that its intent in promulgating the Refugee Act was to bring the United States' domestic laws in line with the Protocol. *See id. at 437, 107 S.Ct. 1207* (stating it is "clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act ... that one of Congress' primary purposes was to bring United States refugee law into conformance with the [Protocol]."). The Board of Immigration Appeals ("BIA"), has also recognized that Congress' intent in enacting the Refugee Act was to align domestic refugee law with the United States' obligations under the Protocol, to give statutory meaning to "our national commitment to human rights and humanitarian concerns," and "to afford a generous standard for protection in cases of doubt." *In Re S-P-*, 21 I. & N. Dec. 486, 492 (B.I.A. 1998) (quoting S. REP. NO. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144).

The Refugee Act created a statutory procedure for refugees seeking asylum and established the standards for granting such requests; the INA currently governs that procedure. The INA gives the Attorney General discretion to grant asylum

to removable aliens. 8 U.S.C. § 1158(b)(1)(A). However, that relief can only be granted if the alien is a "refugee." *Id.* The term "refugee" is defined as:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). "Thus, the 'persecution or well-founded fear of persecution' standard governs the Attorney General's determination [of] whether an alien is eligible for asylum." *Cardoza-Fonseca,* 480 U.S. at 428, 107 S.Ct. 1207. To establish refugee status, the alien must show he or she is someone who: (1) has suffered persecution (or has a well-founded fear of persecution) (2) on account of (3) one of five specific protected grounds: race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42)(A). An alien fearing harm by non-governmental actors is eligible for asylum if the other criteria are met, and the government is "unable or unwilling to control" the persecutor. *Matter of Acosta,* 19 I. & N. Dec. 211, 222 (BIA 1985) *overruled on other grounds* by *Matter of Mogharrabi,* 19 I. & N. Dec. 439 (BIA 1987).

### 2. Expedited Removal Process

Before seeking asylum through the procedures outlined above, however, many **\*107** aliens are subject to a streamlined removal process called "expedited removal." 8 U.S.C. § 1225. Prior to 1996, every person who sought admission into the United States was entitled to a full hearing before an immigration judge, and had a right to administrative and judicial review. *See Am. Immigration Lawyers Ass'n v. Reno,* 18 F.Supp.2d 38, 41 (D.D.C. 1998)(describing prior system for removal). The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") amended the INA to provide for a summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation. As described in the IIRIRA Conference Report, the purpose of the expedited removal procedure

> is to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted ..., while providing an opportunity for such an alien who claims asylum to have the merits of his or her claim promptly assessed by officers with full professional training in adjudicating asylum claims.

H.R. REP. NO. 104–828H.R. REP. NO. 104–828, at 209–10 (1996)("Conf. Rep.").

Consistent with that purpose, Congress carved out an exception to the expedited removal process for individuals with a "credible fear of persecution." *See* 8 U.S.C. § 1225(b)(1)(B)(ii). If an alien "indicates either an intention to apply for asylum ... or a fear of persecution," the alien must be referred for an interview with a U.S. Citizenship and Immigration Services ("USCIS") asylum officer. *Id.* § 1225(b)(1)(A)(ii). During this interview, the asylum officer is required to "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture[.]" 8 C.F.R. § 208.30(d). The asylum officer must "conduct the interview in a nonadversarial manner." *Id.*

Expediting the removal process, however, risks sending individuals who are potentially eligible for asylum to their respective home countries where they face a real threat, or have a credible fear of persecution. Understanding this risk, Congress intended the credible fear determinations to be governed by a low screening standard. *See* 142 CONG. REC. S11491-02 ("The credible fear standard ... is intended to be a low screening standard for admission into the usual full asylum process"); *see also* H.R. REP. NO. 104-469, pt. 1, at

158 (1996)(stating "there should be no danger that an alien with a genuine asylum claim will be returned to persecution"). A credible fear is defined as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v).

If, after a credible fear interview, the asylum officer finds that the alien does have a "credible fear of persecution" the alien is taken out of the expedited removal process and referred to a standard removal hearing before an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(B)(ii), (v). At that hearing, the alien has the opportunity to develop a full record with respect to his or her asylum claim, and may appeal an adverse decision to the BIA, 8 C.F.R. § 208.30(f), and then, if necessary, to a federal court of appeals, *see* 8 U.S.C. § 1252(a)- (b).

If the asylum officer renders a negative credible fear determination, the alien may request a review of that determination by an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III). The immigration judge's decision is "final and may not be appealed" 8 C.F.R. § 1208.30(g)(2)(iv)(A), **\*108** except in limited circumstances. *See* 8 U.S.C. § 1252(e).

### 3. Judicial Review

Section 1252 delineates the scope of judicial review of expedited removal orders and limits judicial review of orders issued pursuant to negative credible fear determinations to a few enumerated circumstances. *See* 8 U.S.C. § 1252(a). The section provides that "no court shall have jurisdiction to review ... the application of [ section 1225(b)(1) ] to individual aliens, including the [credible fear] determination made under section 1225(b)(1)(B)." 8 U.S.C. § 1252(a)(2)(A)(iii). Moreover, except as provided in section 1252(e), the statute prohibits courts from reviewing: (1) "any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an [expedited removal] order;" (2) "a decision by the Attorney General to invoke" the expedited removal regime; and (3) the "procedures and policies adopted by the

Attorney General to implement the provisions of section 1225(b)(1)." *Id.* § 1252(a)(2)(A)(i), (ii) & (iv).

Section 1252(e) provides for judicial review of two types of challenges to removal orders pursuant to credible fear determinations. The first is a habeas corpus proceeding limited to reviewing whether the petitioner was erroneously removed because he or she was, among other things, lawfully admitted for permanent residence, or had previously been granted asylum. 8 U.S.C. § 1252(e)(2)(C). As relevant here, the second proceeding available for judicial review is a systemic challenge to the legality of a "written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement" the expedited removal process. *Id.* § 1252(e)(3)(A)(ii). Jurisdiction to review such a systemic challenge is vested solely in the United States District Court for the District of Columbia. *Id.* § 1252(e)(3)(A).

### B. Executive Guidance on Asylum Claims

#### 1. Precedential Decision

The Attorney General has the statutory and regulatory authority to make determinations and rulings with respect to immigration law. *See, e.g.,* 8 U.S.C. § 1103(a)(1). This authority includes the ability to certify cases for his or her review and to issue binding decisions. *See* 8 C.F.R. §§ 1003.1(g)- (h)(1)(ii).

On June 11, 2018, then-Attorney General Sessions did exactly that when he issued a precedential decision in an asylum case, *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018). In *Matter of A-B-*, the Attorney General reversed a grant of asylum to a Salvadoran woman who allegedly fled several years of domestic violence at the hands of her then-husband. *Id.* at 321, 346.

The decision began by overruling another case, *Matter of A-R-C-G-*, 27 I. & N. Dec. 388 (BIA 2014). *Id.* at 319. In *A-R-C-G-*, the BIA recognized "married women in Guatemala who are unable to leave their relationship" as a "particular social group" within the meaning of the asylum statute. 27 I. & N.

Dec. at 392. The Attorney General's rationale for overruling *A-R-C-G-* was that it incorrectly applied BIA precedent, "assumed its conclusion and did not perform the necessary legal and factual analysis" because, among other things, the BIA accepted stipulations by DHS that the alien was a member of a qualifying particular social group.  *Matter of A-B-,* 27 I. & N. Dec. at 319. In so doing, the Attorney General made clear that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not **\*109** qualify for asylum,"  *id.* at 320,[4] and "[a]ccordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution."  *Id.* at 320 n.1 (citing  8 U.S.C. § 1225(b)(1)(B)(v) ).

The Attorney General next reviewed the history of BIA precedent interpreting the "particular social group" standard and again explained, at length, why *A-R-C-G-* was wrongly decided. In so ruling, the Attorney General articulated legal standards for determining asylum cases based on persecution from non-governmental actors on account of membership in a particular social group, focusing principally on claims by victims of domestic abuse and gang violence. He specifically stated that few claims pertaining to domestic or gang violence by non-governmental actors could qualify for asylum or satisfy the credible fear standard. *See*  *id.* at 320 n.1.

The Attorney General next focused on the specific elements of an asylum claim beginning with the standard for membership in a "particular social group." The Attorney General declared that "[s]ocial groups defined by their vulnerability to private criminal activity likely lack the particularity required" under asylum laws since "broad swaths of society may be susceptible to victimization."  *Id.* at 335.

The Attorney General next examined the persecution requirement, which he described as having three elements: (1) an intent to target a belief or characteristic; (2) severe harm; and (3) suffering inflicted by the government or by persons the government was unable or unwilling to control.  *Id.* at 337. With respect to the last element, the Attorney General stated that an alien seeking to establish persecution based on the violent conduct of a private actor may not solely rely on the government's difficulty in controlling the violent behavior.  *Id.* Rather, the alien must show "the government

condoned the private actions or at least demonstrated a complete helplessness to protect the victims."  *Id.* (citations and internal quotation marks omitted).

The Attorney General concluded with a discussion of the requirement that an asylum applicant demonstrate that the persecution he or she suffered was on account of a membership in a "particular social group."  *Id.* at 338–39. He explained that "[i]f the ill-treatment [claimed by an alien] was motivated by something other than" one of the five statutory grounds for asylum, then the alien "cannot be considered a refugee for purpose of asylum."  *Id.* at 338 (citations omitted). He continued to explain that when private actors inflict violence based on personal relationships with a victim, the victim's membership in a particular social group "may well not be 'one central reason' for the abuse."  *Id.* Using *Matter of A-R-C-G-* as an example, the Attorney General stated that there was no evidence that the alien was attacked because her husband was aware of, and hostile to, her particular social group: women who were unable to leave their relationship.  *Id.* at 338-39. The Attorney General remanded the matter back to the immigration judge for further proceedings consistent with his decision.  *Id.* at 346.

### 2. Policy Memorandum

Two days after the Attorney General issued  *Matter of A-B-,* USCIS issued Interim Guidance instructing asylum officers to apply  *Matter of A-B-* to credible fear determinations. Asylum Division Interim Guidance -- **\*110** *Matter of A-B-,* 27 I. & N. Dec. 316 (A.G. 2018) ("Interim Guidance"), ECF No. 100 at 15–18.[5] On July 11, 2018, USCIS issued final guidance to asylum officers for use in assessing asylum claims and credible fear determinations in light of  *Matter of A-B-.* USCIS Policy Mem., Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with  *Matter of A-B-,* July 11, 2018 (PM-602-0162) ("Policy Memorandum"), ECF No. 100 at 4–13.

The Policy Memorandum adopts the standards set forth in  *Matter of A-B-* and adds new directives for

asylum officers. First, like *Matter of A-B-*, the Policy Memorandum invokes the expedited removal statute. *Id.* at 4 (citing section 8 U.S.C. § 1225 as one source of the Policy Memorandum's authority). The Policy Memorandum further acknowledges that "[a]lthough the alien in *Matter of A-B-* claimed asylum and withholding of removal, the Attorney General's decision and this [Policy Memorandum] apply also to refugee status adjudications and reasonable fear and credible fear determinations." *Id.* n.1 (citations omitted).

The Policy Memorandum also adopts the standard for "persecution" set by *Matter of A-B-*: In cases of alleged persecution by private actors, aliens must demonstrate the "government is unwilling or unable to control" the harm "such that the government either 'condoned the behavior or demonstrated a complete helplessness to protect the victim.' " *Id.* at 5 (citing *Matter of A-B-*, 27 I. & N. Dec. at 337). After explaining the "condoned or complete helplessness" standard, the Policy Memorandum explains that:

> In general, in light of the [standards governing persecution by a non-government actor], claims based on membership in a putative particular social group defined by the members' vulnerability to harm of domestic violence or gang violence committed by nongovernment actors will not establish the basis for asylum, refugee status, or a credible or reasonable fear of persecution.

*Id.* at 9 (emphasis in original).

Furthermore, the Policy Memorandum made clear that because *Matter of A-B-* "explained the standards for eligibility for asylum ... based on a particular social group ... if an applicant claims asylum based on membership in a particular social group, then officers must factor [the standards explained in *Matter of A-B-* ] into their determination of whether an applicant has a credible fear ... of persecution." *Id.* at 12 (citations and internal quotation marks omitted).

The Policy Memorandum includes two additional directives not found in *Matter of A-B-*. First, it instructs asylum officers to apply the "case law of the relevant federal circuit court, to the extent that those cases are not inconsistent with *Matter of A-B-*." *Id.* at 11. Second, although acknowledging that the "relevant federal circuit is the circuit where the removal proceedings *will take place* if the officer makes a positive credible fear or reasonable fear determination," the Policy Memorandum instructs asylum officers to "apply precedents of the Board, and, if necessary, the circuit where the alien is *physically located* during the credible fear interview." *Id.* at 11–12. (emphasis added).

The Policy Memorandum concludes with the directive that "[asylum officers] should be alert that under the standards clarified in *Matter of A-B-*, few gang-based or domestic-violence claims involving particular social groups defined by the members' vulnerability **\*111** to harm may ... pass the 'significant probability' test in credible-fear screenings." *Id.* at 13.

## C. Factual and Procedural Background

Each of the plaintiffs, twelve adults and children, came to the United States fleeing violence from Central America and seeking refuge through asylum. Plaintiff Grace fled Guatemala after having been raped, beaten, and threatened for over twenty years by her partner who disparaged her because of her indigenous heritage. Grace Decl., ECF No. 12-1 ¶ 2.[6] Her persecutor also beat, sexually assaulted, and threatened to kill several of her children. *Id.* Grace sought help from the local authorities who, with the help of her persecutor, evicted her from her home. *Id.*

Plaintiff Carmen escaped from her country with her young daughter, J.A.C.F., fleeing several years of sexual abuse by her husband, who sexually assaulted, stalked, and threatened her, even after they no longer resided together. Carmen Decl., ECF No. 12-2 ¶ 2. In addition to Carmen's husband's abuse, Carmen and her daughter were targeted by a local gang because they knew she lived alone and did not have the protection of a family. *Id.* ¶ 24. She fled her country of origin out of fear the gang would kill her. *Id.* ¶ 28.

Plaintiff Mina escaped from her country after a gang murdered her father-in-law for helping a family friend escape from the gang. Mina Decl., ECF No. 12-3 ¶ 2. Her husband

went to the police, but they did nothing. *Id.* at ¶ 10. While her husband was away in a neighboring town to seek assistance from another police force, members of the gang broke down her door and beat Mina until she could no longer walk. *Id.* ¶ 15. She sought asylum in this country after finding out she was on a "hit list" compiled by the gang. *Id.* ¶¶ 17–18.

The remaining plaintiffs have similar accounts of abuse either by domestic partners or gang members. Plaintiff Gina fled violence from a politically-connected family who killed her brother, maimed her son, and threatened her with death. Gina Decl., ECF No. 12-4 ¶ 2. Mona fled her country after a gang brutally murdered her long-term partner—a member of a special military force dedicated to combating gangs—and threatened to kill her next. Mona Decl., ECF No. 12-5 ¶ 2. Gio escaped from two rival gangs, one of which broke his arm and threatened to kill him, and the other threatened to murder him after he refused to deal drugs because of his religious convictions. Gio Decl., ECF No. 12-6 ¶ 2. Maria, an orphaned teenage girl, escaped a forced sexual relationship with a gang member who targeted her after her Christian faith led her to stand up to the gang. Maria Decl., ECF No. 12-7 ¶ 2. Nora, a single mother, together with her son, A.B.A., fled an abusive partner and members of his gang who threatened to rape her and kill her and her son if she did not submit to the gang's sexual advances. Nora Decl., ECF No. 12-8 ¶ 2. Cindy, together with her young child, A.P.A., fled rapes, beatings, and shootings [redacted]. Cindy Decl., ECF No. 12-9 ¶ 2. [7]

Each plaintiff was given a credible fear determination pursuant to the expedited removal process. Despite finding that the accounts they provided were credible, the asylum officers determined that, in light of *Matter of A-B-,* their claims lacked merit, **\*112** resulting in a negative credible fear determination. Plaintiffs sought review of the negative credible fear determinations by an immigration judge, but the judge affirmed the asylum officers' findings. Plaintiffs are now subject to final orders of removal or were removed pursuant to such orders prior to commencing this suit. [8]

Facing imminent deportation, plaintiffs filed a motion for preliminary injunction, ECF No. 10, and an emergency motion for stay of removal, ECF No. 11, on August 7, 2018. In their motion for stay of removal, plaintiffs sought emergency relief because two of the plaintiffs, Carmen and her daughter J.A.C.F., were "subject to imminent removal." ECF No. 11 at 1.

The Court granted the motion for emergency relief as to the plaintiffs not yet deported. The parties have since filed cross-motions for summary judgment related to the Attorney General's precedential decision and the Policy Memorandum issued by DHS. Further, plaintiffs have filed an opposed motion to consider evidence outside the administrative record.

## II. Motion to Consider Extra Record Evidence

Plaintiffs attach several exhibits to their combined application for a preliminary injunction and cross-motion for summary judgment, *see* ECF Nos. 10–2 to 10–7, 12-1 to 12-9, 64-3 to 64-8, which were not before the agency at the time it made its decision. These exhibits include: (1) declarations from plaintiffs; (2) declarations from experts pertaining to whether the credible fear policies are new; (3) government training manuals, memoranda, and a government brief; (4) third-party country reports or declarations; (5) various newspaper articles; and (6) public statements from government officials. Pls.' Evid. Mot., ECF No. 66-1 at 7–16. The government moves to strike these exhibits, arguing that judicial review under the APA is limited to the administrative record, which consists of the "materials that were before the agency at the time its decision was made." Defs.' Mot. to Strike, ECF No. 88-1 at 20.

### A. Legal Standard

**[1]** **[2]** "[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.' " *Hill Dermaceuticals, Inc. v. Food & Drug Admin.,* 709 F.3d 44, 47 (D.C. Cir. 2013)(quoting *Walter O. Boswell Mem'l Hosp. v. Heckler,* 749 F.2d 788, 792 (D.C. Cir. 1984) ). This is because, under the APA, the court is confined to reviewing "the whole record or those parts of it cited by a party," 5 U.S.C. § 706, and the administrative record only includes the "materials 'compiled' by the agency that were 'before the agency at the time the decision was made,' " *James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085, 1095 (D.C. Cir. 1996)(citations omitted).

**[3]** **[4]** Accordingly, when, as here, plaintiffs seek to place before the court additional materials that the agency did not review in making its decision, a court must exclude such material unless plaintiffs "can demonstrate

unusual circumstances justifying departure from th[e] general rule." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)(citation omitted). Aa court may appropriately consider extra-record materials: (1) if the agency "deliberately or negligently excluded documents that may have been adverse to its decision," (2) if background **\*113** information is needed to "determine whether the agency considered all of the relevant factors," or (3) if the agency "failed to explain [the] administrative action so as to frustrate judicial review." *Id.*

Plaintiffs make three arguments as to why the Court should consider their proffered extra-record materials: (1) to evaluate whether the government's challenged policies are an impermissible departure from prior policies; (2) to consider plaintiffs' due process cause of action;[9] and (3) to evaluate plaintiffs' request for permanent injunctive relief. Pls.' Evid. Mot., ECF No. 66-1 at 2–12. The Court considers each argument in turn.

## B. Analysis

### 1. Evidence of Prior Policies

 **[5]**  Plaintiffs first argue that the Court should consider evidence of the government's prior policies as relevant to determining whether the policies in *Matter of A-B-* and the subsequent guidance deviated from prior policies without explanation. *Id.* at 8–11. The extra-record materials at issue include government training manuals, memoranda, and a government brief, *see* Decl. of Sarah Mujahid ("Mujahid Decl."), ECF No. 10-3 Exs. E–J; Second Decl. of Sarah Mujahid ("Second Mujahid Decl."), ECF No. 64-4, Exs. 1–3, and declarations from third parties explaining the policies are new, Decl. of Rebecca Jamil and Ethan Nasr, ECF No. 65-5.

The Court will consider the government training manuals, memoranda, and government brief, but not the declarations explaining them. Plaintiffs argue that the credible fear policies are departures from prior government policies, which the government changed without explanation. Pls.' Evid. Mot., ECF No. 66-1 at 7–11. The government's response is the credible fear policies are not a departure because they do not articulate any new rules. *See* Defs.' Mot., ECF No. 57-1 at 17. Whether the credible fear policies are new is clearly an "unresolved factual issue" that the "administrative record, on

its own, ... is not sufficient to resolve." *See United Student Aid Funds, Inc. v. Devos*, 237 F.Supp.3d 1, 6 (D.D.C. 2017). The Court cannot analyze this argument without reviewing the prior policies, which are not included in the administrative record. Under these circumstances, it is "appropriate to resort to extra-record information to enable judicial review to become effective." *Id.* at 3 (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) ).

The government agrees that "any claim that *A-B-* or the [Policy Memorandum] breaks with past policies ... is readily ascertainable by simply reviewing the very 'past policies.' " Defs.' Mot. to Strike, ECF No. 88-1 at 24. However, the government disagrees with the types of documents that are considered past policies. *Id.* According to the government, the only "past policies" at issue are legal decisions issued by the Attorney General, BIA, or courts of appeals. *Id.* The Court is not persuaded by such a narrow interpretation of the evidence that can be considered as past policies. *See Leadership Conference on Civil Rights v. Gonzales*, 404 F.Supp.2d 246, 255 (D.D.C. 2005)(finding training manual distributed as informal guidance "at a minimum" reflected the policy of the "Elections Crimes Branch if not the Department of Justice").

Admitting third party-declarations from a retired immigration officer and former immigration judge, on the other hand, are **\*114** not necessary for the Court in its review. Declarations submitted by third-parties regarding putative policy changes would stretch the limited extra-record exception too far. Accordingly, the Court will not consider these declarations when determining whether the credible fear policies constitute an unexplained change of position.

### 2. Evidence Supporting Injunctive Relief

 **[6]**  The second category of information plaintiffs ask the Court to consider is extra-record evidence in support of their claim that injunctive relief is appropriate. Pls.' Evid. Mot., ECF No. 66-1 at 13–16. The evidence plaintiffs present includes plaintiffs' declarations, ECF Nos. 12-1 to 12-9 (filed under seal); several reports describing the conditions of plaintiffs' native countries, Mujahid Decl., ECF No. 10-3, Exs. K-T; and four United Nations High Commissioner for Refugees ("UNHCR") reports, Second Mujahid Decl., ECF No. 64-4 Exs. 10–13. The materials also include three

declarations regarding humanitarian conditions in the three home countries. Joint Decl. of Shannon Drysdale Walsh, Cecilia Menjívar, and Harry Vanden ("Honduras Decl."), ECF No. 64-6; Joint Decl. of Cecilia Menjívar, Gabriela Torres, and Harry Vanden ("Guatemala Decl."), ECF No. 64-7; Joint Decl. of Cecilia Menjívar and Harry Vanden ("El Salvador Decl."), ECF No. 64-8.

The government argues that the Court need not concern itself with the preliminary injunction analysis because the Court's decision to consolidate the preliminary injunction and summary judgment motions under Rule 65 renders the preliminary injunction moot. Defs.' Mot. to Strike, ECF No. 88-1 at 12 n.1. The Court concurs, but nevertheless must determine if plaintiffs are entitled to a permanent injunction, assuming they prevail on their APA and INA claims. Because plaintiffs request specific injunctive relief with respect to their expedited removal orders and credible fear proceedings, the Court must determine whether plaintiffs are entitled to the injunctive relief sought. *See Eco Tour Adventures, Inc. v. Zinke,* 249 F.Supp.3d 360, 370, n.7 (D.D.C. 2017)("it will often be necessary for a court to take new evidence to fully evaluate" claims "of irreparable harm ... and [claims] that the issuance of the injunction is in the public interest.") (citation omitted). Thus, the Court will consider plaintiffs' declarations, the UNHCR reports, and the country reports only to the extent they are relevant to plaintiffs' request for injunctive relief. [10]

In sum, the Court will consider extra-record evidence only to the extent it is relevant to plaintiffs' contentions that the government deviated from prior policies without explanation or to their request for injunctive relief. The Court will not consider any evidence related to plaintiffs' due process claim. Accordingly, the Court will not consider the following documents: (1) evidence related to the opinions of immigration judges and attorneys, Second Mujahid Decl., ECF No. 64-4, Exs. 8–9, 14–17 and ECF No. 64-5; (2) statements of various public officials, Second Mujahid Decl., ECF No. 64-4, Exs. 4–7; and (3) various newspaper articles, Mujahid Decl., ECF No. 10-3, Exs. R-T, and Second Mujahid Decl., ECF No. 64-4, Exs. 14–17.

## III. Motion for Summary Judgment

### A. Justiciability

[7]    [8] The Court next turns to the government's jurisdictional arguments that: **\*115** (1) the Court lacks jurisdiction to review plaintiffs' challenge to *Matter of A-B-*; and (2) because the Court lacks jurisdiction to review *Matter of A-B-,* the government action purportedly causing plaintiffs' alleged harm, the plaintiffs lack standing to challenge the Policy Memorandum. Federal district courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d (1994). A court must therefore resolve any challenge to its jurisdiction before it may proceed to the merits of a claim. *See Galvan v. Fed. Prison Indus.,* 199 F.3d 461, 463 (D.C. Cir. 1999). The Court addresses each argument in turn.

### 1. The Court has Jurisdiction under Section 1252(e)(3)

#### a. *Matter of A-B*

[9] The government contends that section 1252 forecloses judicial review of plaintiffs' claims with respect to *Matter of A-B-*. Defs.' Mot., ECF No. 57-1 at 30–34. Plaintiffs argue that the statute plainly provides jurisdiction for this Court to review their claims. Pls.' Mot., ECF No. 64-1 at 26–30. The parties agree that to the extent jurisdiction exists to review a challenge to a policy implementing the expedited removal system, it exists pursuant to subsection (e) of the statute.

Under section 1252(a)(2)(A), no court shall have jurisdiction over "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)" except "as provided in subsection [1252](e)." Section 1252(e)(3) vests exclusive jurisdiction in the United States District Court for the District of Columbia to review "[c]hallenges [to the] validity of the [expedited removal]" system." *Id.* § 1252(e)(3)(A). Such systemic challenges include challenges to the constitutionality of any provision of the expedited removal statute or to its implementing regulations. *See id.* § 1252(e)(3)(A)(i). They also include challenges claiming that a given regulation or written policy directive, guideline, or procedure is inconsistent with law. *Id.* § 1252(e)(3)(A)(ii). Systemic challenges must be brought within sixty days of the challenged statute or regulation's implementation. *Id.* § 1252(e)(3)(B); *see also Am. Immigration Lawyers Ass'n,*

18 F.Supp.2d at 47 (holding that "the 60–day requirement is jurisdictional rather than a traditional limitations period").

Both parties agree that the plain language of section 1252(e)(3) is dispositive. It reads as follows:

(3) Challenges on validity of the system

(A) In general

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of--

(i) whether such section, or any regulation issued to implement such section, is constitutional; or

(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

8 U.S.C. § 1252(e)(3).

The government first argues that Matter of A-B- does not implement section 1225(b), as required by section 1252(e)(3). Defs.' Mot., ECF No. 57-1 at 30–32. Instead, the government contends Matter of A-B- was a decision about petitions for asylum under section 1158. Id. The government also argues that Matter of A-B- is **116 not a written policy directive under the Act, but rather an adjudication that determined the rights and duties of the parties to a dispute. Id. at 32.

The government's argument that Matter of A-B- does not "implement" section 1225(b) is belied by Matter of A-B- itself. Although A-B- sought asylum, the Attorney General's decision went beyond her claims explicitly addressing "the legal standard to determine whether an alien has a credible fear of persecution" under 8 U.S.C. section 1225(b). Matter of A-B-, 27 I. & N. Dec. at 320 n.1 (citing standard for credible fear determinations). In the decision, the Attorney General articulated the general rule that claims by aliens pertaining to either domestic violence,

like the claim in Matter of A-B-, or gang violence, a hypothetical scenario not at issue in Matter of A-B-, would likely not satisfy the credible fear determination standard. Id. (citing 8 U.S.C. § 1225(b) ). Because the Attorney General cited section 1225(b) and the standard for credible fear determinations when articulating the new general legal standard, the Court finds that Matter of A-B- implements section 1225(b) within the meaning of section 1252(e)(3).

[10]  [11]  The government also argues that, despite Matter of A-B-'s explicit invocation of section 1225 and articulation of the credible fear determination standard, Matter of A-B- is an "adjudication" not a "policy," and therefore section 1252(e)(3) does not apply. Defs.' Mot., ECF No. 57-1 at 32–34. However, it is well-settled that an "administrative agency can, of course, make legal-policy through rulemaking or by adjudication." Kidd Commc'ns v. F.C.C., 427 F.3d 1, 5 (D.C. Cir. 2005)(citing SEC v. Chenery Corp., 332 U.S. 194, 202–03, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) ). Moreover, "[w]hen an agency does [make policy] by adjudication, because it is a policymaking institution unlike a court, its dicta can represent an articulation of its policy, to which it must adhere or adequately explain deviations." Id. at 5. Matter of A-B- is a sweeping opinion in which the Attorney General made clear that asylum officers must apply the standards set forth to subsequent credible fear determinations. See NRLB v. Wyman–Gordon Co., 394 U.S. 759, 765, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)("Adjudicated cases may and do, of course, serve as vehicles for the formulation of agency policies, which are applied and announced therein.").

Indeed, it is difficult to reconcile the government's argument with the language in Matter of A-B-: "When confronted with asylum cases based on purported membership in a particular social group, the Board, immigration judges, and asylum officers must analyze the requirements as set forth in this opinion, which restates and where appropriate, elaborates upon, the requirements [for asylum]." 27 I. & N. Dec. at 319 (emphasis added). This proclamation, coupled with the directive to asylum officers that claims based on domestic or gang-related violence generally would not "satisfy the

standard to determine whether an alien has a credible fear of persecution," *id.* at 320 n.1, is clearly a "written policy directive" or "written policy guidance" sufficient to bring *Matter of A-B-* under the ambit of section 1252(e)(3). *See Kidd,* 427 F.3d at 5 (stating agency can "make legal-policy through rulemaking or by adjudication"). Indeed, one court has regarded *Matter of A-B-* as such. *See Moncada v. Sessions,* —— Fed.Appx. ——, ——, 2018 WL 4847073 *2 (2d Cir. Oct. 5, 2018)*(characterizing *Matter of A-B-* as providing "**substantial new guidance** on the viability of asylum 'claims by aliens pertaining to ... gang violence' ") (emphasis added)(citation omitted).

**\*117** The government also argues that because the DHS Secretary, rather than the Attorney General, is responsible for implementing most of the provisions in section 1225, the Attorney General lacks the requisite authority to implement section 1225. Defs.' Reply, ECF No. 85 at 25. Therefore, the government argues, *Matter of A-B-* cannot be "issued by or under the authority of the Attorney General to implement [ section 1225(b) ]" as required by the statute. *See* 8 U.S.C. § 1252(e)(3)(A)(ii). The government fails to acknowledge, however, that the immigration judges who review negative credible fear determinations are also required to apply *Matter of A-B-*. 8 C.F.R. § 1208.30(g)(2); 8 C.F.R. § 103.10(b)(stating decisions of the Attorney General shall be binding on immigration judges). And it is the Attorney General who is responsible for the conduct of immigration judges. *See, e.g.,* 8 U.S.C. § 1101(b)(4)("An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe."). Therefore, the Attorney General clearly plays a significant role in the credible fear determination process and has the authority to "implement" section 1225.

**[12]** Finally, the Court recognizes that even if the jurisdictional issue was a close call, which it is not, several principles persuade the Court that jurisdiction exists to hear plaintiffs' claims. First, there is the "familiar proposition that only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.,* 502 U.S. 32, 44, 112 S.Ct. 459, 116

L.Ed.2d 358 (1991)(citations and internal quotation marks omitted). Here, there is no clear and convincing evidence of legislative intent in section 1252 that Congress intended to limit judicial review of the plaintiffs' claims. To the contrary, Congress has explicitly provided this Court with jurisdiction to review systemic challenges to section 1225(b). *See* 8 U.S.C. § 1252(e)(3).

**[13]** Second, there is also a "strong presumption in favor of judicial review of administrative action." *INS v. St. Cyr,* 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). As the Supreme Court has recently explained, "legal lapses and violations occur, and especially so when they have no consequence. That is why [courts have for] so long applied a strong presumption favoring judicial review of administrative action." *Weyerhaeuser Co. v. United States Fish and Wildlife Servs.,* 586 U.S. ——, ——, 139 S.Ct. 361, 370, —— L.Ed.2d —— (2018). Plaintiffs challenge the credible fear policies under the APA and therefore this "strong presumption" applies in this case.

**[14]** Third, statutory ambiguities in immigration laws are resolved in favor of the alien. *See Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. 1207. Here, any doubt as to whether 1252(e)(3) applies to plaintiffs' claims should be resolved in favor of plaintiffs. *See INS v. Errico,* 385 U.S. 214, 225, 87 S.Ct. 473, 17 L.Ed.2d 318 (1966)("Even if there were some doubt as to the correct construction of the statute, the doubt should be resolved in favor of the alien.").

In view of these three principles, and the foregoing analysis, the Court concludes that section 1252(a)(2)(A) does not eliminate this Court's jurisdiction over plaintiffs' claims, and that section 1252(e)(3) affirmatively grants jurisdiction.

### b. Policy Memorandum

**[15]** The government also argues that the Court lacks jurisdiction to review the Policy Memorandum under section 1252(e) for three reasons. First, according to the government, the Policy Memorandum "primarily **\*118** addresses the asylum standard" and therefore does not implement section 1225(b) as required by the statute. Defs.' Reply, ECF No. 85 at 30. Second, since the Policy

Memorandum "merely explains" *Matter of A-B-*, the government argues, it is not reviewable for the same reasons *Matter of A-B-* is not reviewable. *Id.* Finally, the government argues that sections 1225 and 1252(e)(3) "indicate" that Congress only provided judicial review of agency guidelines, directives, or procedures which create substantive rights as opposed to interpretive documents, like the Policy Memorandum, which merely explain the law to government officials. *Id.* at 31–33.

The Court need not spend much time on the government's first two arguments. First, the Policy Memorandum, entitled "Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-*" expressly applies to credible fear interviews and provides guidance to credible fear adjudicators. Policy Memorandum, ECF No. 100 at 4 n.1 ("[T]he Attorney General's decision and this [Policy Memorandum] apply also to ... credible fear determinations."). Furthermore, it expressly invokes section 1225 as the authority for its issuance. *Id.* at 4. The government's second argument that the Policy Memorandum is not reviewable for the same reasons *Matter of A-B-* is not, is easily dismissed because the Court has already found that *Matter of A-B-* falls within section 1252(e)(3)'s jurisdictional grant. *See supra,* at 114–19.

The government's third argument is that section 1252(e)(3) only applies when an agency promulgates legislative rules and not interpretive rules. Defs.' Reply, ECF No. 85 at 30–33. Although not entirely clear, the argument is as follows: (1) the INA provides DHS with significant authority to create legislative rules; (2) Congress barred judicial review of such substantive rules in section 1252(a); (3) therefore Congress must have created a mechanism to review these types of legislative rules, and only legislative rules, in section 1252(e)(3) ). *Id.* at 30–31. Folded into this reasoning is also a free-standing argument that because the Policy Memorandum is not a final agency action, it is not reviewable under the APA. *Id.* at 32.

Contrary to the government's assertions, section 1252(e)(3) does not limit its grant of jurisdiction over a "written policy directive, written policy guideline, or

written procedure" to only legislative rules or final agency action. Nowhere in the statute did Congress exclude interpretive rules. *Cf.* 5 U.S.C. § 553(b)(3)(A)(stating subsection of statute does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."). Rather, Congress used broader terms such as policy "guidelines," "directives," or "procedures" which do not require notice and comment rulemaking or other strict procedural prerequisites. *See* 8 U.S.C. § 1252(e)(3). There is no suggestion that Congress limited the application of section 1252(e)(3) to only claims involving legislative rules or final agency action, and this Court will not read requirements into the statute that do not exist. *See Keene Corp. v. U.S.*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993)(stating courts have a "duty to refrain from reading a phrase into the statute when Congress has left it out").

In sum, section 1252(a)(2)(A) is not a bar to this Court's jurisdiction because plaintiffs' claims fall well within section 1252(e)(3)'s grant of jurisdiction. Both *Matter of A-B-* and the Policy Memorandum expressly reference credible fear determinations in applying the standards articulated by the Attorney General. Because **\*119** *Matter of A-B-* and the Policy Memorandum are written policy directives and guidelines issued by or under the authority of the Attorney General, section 1252(e)(3) applies, and this Court has jurisdiction to hear plaintiffs' challenges to the credible fear policies.

### 2. Plaintiffs have Standing to Challenge the Policy Memorandum

[16]  [17]  The government next challenges plaintiffs' standing to bring this suit with respect to their claims against the Policy Memorandum only. Defs.' Mot., ECF No. 57-1 at 35–39. To establish standing, a plaintiff "must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)(citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d

351 (1992); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–72, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ). Standing is assessed "upon the facts as they exist at the time the complaint is filed." *Natural Law Party of U.S. v. Fed. Elec. Comm'n,* 111 F.Supp.2d 33, 41 (D.D.C. 2000).

 **[18]**  As a preliminary matter, the government argues that plaintiffs lack standing to challenge any of the policies in the Policy Memorandum that rest on *Matter of A-B-* because the Court does not have jurisdiction to review *Matter of A-B-*. *See* Defs.' Mot., ECF No. 57-1 at 35, 37–39. Therefore, the government argues, plaintiffs' injuries would not be redressable or traceable to the Policy Memorandum since they stem from *Matter of A-B-*. This argument fails because the Court has found that it has jurisdiction to review plaintiffs' claims related to *Matter of A-B-* under 1252(e)(3). *See supra,* at 114–19.

The government also argues that because plaintiffs do not have a legally protected interest in the Policy Memorandum—an interpretive document that creates no rights or obligations—plaintiffs do not have an injury in fact. Defs.' Reply, ECF No. 85 at 33. The government's argument misses the point. Plaintiffs do not seek to enforce a right under a prior policy or interpretive guidance. *See* Pls.' Reply, ECF No. 92 at 17–18. Rather, they challenge the validity of their credible fear determinations pursuant to the credible fear policies set forth in *Matter of A-B-* and the Policy Memorandum. Because the credible fear policies impermissibly raise their burden and deny plaintiffs a fair opportunity to seek asylum and escape the persecution they have suffered, plaintiffs argue, the policies violate the APA and immigration laws. *See id.*

The government also argues that even if the Court has jurisdiction, all the claims, with the exception of one, are time-barred and therefore not redressable. Defs.' Mot., ECF No. 57-1 at 39–41. The government argues that none of the policies are in fact new and each pre-date the sixty days in which plaintiffs are statutorily required to bring their claims. *Id.* at 39–41. The government lists each challenged policy and relies on existing precedent purporting to apply the same standard espoused in the Policy Memorandum prior to its issuance. *See id.* at 39–41. The challenge in accepting this theory of standing is that it would require the Court to also accept the government's theory of the case: that the

credible fear policies are not "new." In other words, the government's argument "assumes that its view on the merits of the case will prevail." *Defs. of Wildlife v. Gutierrez,* 532 F.3d 913, 924 (D.C. Cir. 2008).  **\*120**  This is problematic because "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA,* 320 F.3d 228, 235 (D.C. Cir. 2003) (citations omitted).

Whether the credible fear policies differ from the standards articulated in the pre-policy cases cited by the government, and are therefore new, is a contested issue in this case. And when assessing standing, this Court must "be careful not to decide the questions on the merits" either "for or against" plaintiffs, "and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Id.* Instead, the Court must determine whether an order can redress plaintiffs' injuries in whole or part. *Gutierrez,* 532 F.3d at 925. There is no question that the challenged policies impacted plaintiffs. *See* Defs.' Mot., ECF No. 57-1 at 28 (stating an "asylum officer reviewed each of [plaintiffs] credible fear claims and found them wanting in light of *Matter of A-B-*"). There is also no question that an order from this Court declaring the policies unlawful and enjoining their use would redress those injuries. *See* *Carpenters Indus. Council v. Zinke,* 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (stating when government actions cause an injury, enjoining that action will usually redress the injury).

Because plaintiffs have demonstrated that they have: (1) suffered an injury; (2) the injury is fairly traceable to the credible fear policies; and (3) action by the Court can redress their injuries, plaintiffs have standing to challenge the Policy Memorandum. Therefore, the Court may proceed to the merits of plaintiffs' claims.

### B. Legal Standard for Plaintiffs' Claims

 **[19]**  Although both parties have moved for summary judgment, the parties seek review of an administrative decision under the APA. *See* 5 U.S.C. § 706. Therefore, the standard articulated in Federal Rule of Civil Procedure 56 is inapplicable because the Court has a more limited

AR.04722

role in reviewing the administrative record. *Wilhelmus v. Geren*, 796 F.Supp.2d 157, 160 (D.D.C. 2011)(internal citation omitted). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *See Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006)(internal quotation marks and citations omitted). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Wilhelmus*, 796 F.Supp.2d at 160 (internal citation omitted).

[20]  [21]  [22]  Plaintiffs bring this challenge to the alleged new credible fear policies arguing they violate the APA and INA. Two separate, but overlapping, standards of APA review govern the resolution of plaintiffs' claims. First, under 5 U.S.C. § 706(2)(a), agency action must not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To survive an arbitrary and capricious challenge, an agency action must be "the product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012). The reasoned decisionmaking requirement applies to judicial review of agency adjudicatory actions. *Id.* at 75. A court must not uphold an adjudicatory action when the agency's judgment "was neither adequately explained in its decision nor supported by agency precedent." *Id.* **\*121** (citing *Siegel v. SEC*, 592 F.3d 147, 164 (D.C. Cir. 2010) ). Thus, review of *Matter of A-B-* requires this Court to determine whether the decision was the product of reasoned decisionmaking. *See id.* at 75.

Second, plaintiffs' claims also require this Court to consider the degree to which the government's interpretation of the various relevant statutory provisions in *Matter of A-B-* is afforded deference. The parties disagree over whether this Court is required to defer to the agency's interpretations of the statutory provisions in this case. "Although balancing the necessary respect for an agency's knowledge, expertise, and constitutional office with the courts' role as interpreter of laws can be a delicate matter," the familiar *Chevron* framework offers guidance. *Id.* at 75 (citing *Gonzales v. Oregon*, 546 U.S. 243, 255, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) ).

In reviewing an agency's interpretation of a statute it is charged with administering, a court must apply the framework of *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Halverson v. Slater*, 129 F.3d 180, 184 (D.C. Cir. 1997). Under the familiar *Chevron* two-step test, the first step is to ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. In making that determination, the reviewing court "must first exhaust the 'traditional tools of statutory construction' to determine whether Congress has spoken to the precise question at issue." *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 572 (2000)(citation omitted). The traditional tools of statutory construction include "examination of the statute's text, legislative history, and structure ... as well as its purpose." *Id.* (internal citations omitted). If these tools lead to a clear result, "then Congress has expressed its intention as to the question, and deference is not appropriate." *Id.*

If a court finds that the statute is silent or ambiguous with respect to a particular issue, then Congress has not spoken clearly on the subject and a court is required to proceed to the second step of the *Chevron* framework. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Under *Chevron* step two, a court's task is to determine if the agency's approach is "based on a permissible construction of the statute." *Id.* To make that determination, a court again employs the traditional tools of statutory interpretation, including reviewing the text, structure, and purpose of the statute. *See Troy Corp. v. Browder*, 120 F.3d 277, 285 (D.C. Cir. 1997)(noting that an agency's interpretation must "be reasonable and consistent with the statutory purpose"). Ultimately, "[n]o matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." *District of Columbia v. Dep't of Labor*, 819 F.3d 444, 459 (D.C. Cir. 2016)(citation omitted).

[23]  The scope of review under both the APA's arbitrary and capricious standard and *Chevron* step two are concededly

narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)(stating "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency");

*see also Judulang v. Holder*, 565 U.S. 42, 52 n.7, 132 S.Ct. 476, 181 L.Ed.2d 449 (2011)(stating the *Chevron* step two analysis overlaps with arbitrary and capricious review under the APA because under **\*122** *Chevron* step two a court asks "whether an agency interpretation is 'arbitrary or capricious in substance' "). Although this review is deferential, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decision making." *Judulang*, 565 U.S. at 53, 132 S.Ct. 476; *see also Daley*, 209 F.3d at 755 (stating that although a court owes deference to agency decisions, courts do not hear cases "merely to rubber stamp agency actions").

With these principles in mind, the Court now turns to plaintiffs' claims that various credible fear policies based on *Matter of A-B-*, the Policy Memorandum, or both, are arbitrary and capricious and in violation of the immigration laws.

### C. APA and Statutory Claims

Plaintiffs challenge the following alleged new credible fear policies: (1) a general rule against credible fear claims related to domestic or gang-related violence; (2) a heightened standard for persecution involving non-governmental actors; (3) a new rule for the nexus requirement in asylum; (4) a new rule that "particular social group" definitions based on claims of domestic violence are impermissibly circular; (5) the requirements that an alien articulate an exact delineation of the specific "particular social group" at the credible fear determination stage and that asylum officers apply discretionary factors at that stage; and (6) the Policy Memorandum's requirement that adjudicators ignore circuit court precedent that is inconsistent with *Matter of A-B-*, and apply the law of the circuit where the credible fear interview takes place. The Court addresses each challenged policy in turn.

### 1. The General Rule Foreclosing Domestic Violence and Gang-Related Claims Violates the APA and Immigration Laws

**[24]** Plaintiffs argue that the credible fear policies establish an unlawful general rule against asylum petitions by aliens with credible fear claims relating to domestic and gang violence. Pls.' Mot., ECF No. 64-1 at 28.

**[25]** A threshold issue is whether the *Chevron* framework applies to this issue at all. "Not every agency interpretation of a statute is appropriately analyzed under *Chevron*." *Alabama Educ. Ass'n v. Chao*, 455 U.S. 386, 392 (D.C. Cir. 2006). The government acknowledges that the alleged new credible fear policies are not "entitled to blanket *Chevron* deference." Defs.' Reply, ECF No. 85 at 39 (emphasis in original). Rather, according to the government, the Attorney General is entitled to *Chevron* deference when he "interprets any *ambiguous* statutory terms in the INA." *Id.* (emphasis in original). The government also argues that the Attorney General is entitled to *Chevron* deference to the extent *Matter of A-B-* states "long-standing precedent or interpret[s] prior agency cases or regulations through case-by-case adjudication." *Id.* at 40.

**[26]** **[27]** To the extent *Matter of A-B-* was interpreting the "particular social group" requirement in the INA, the *Chevron* framework clearly applies. The Supreme Court has explained that "[i]t is clear that principles of *Chevron* deference are applicable" to the INA because that statute charges the Attorney General with administering and enforcing the statutory scheme. *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting 8 U.S.C. §§ 1103(a)(1), 1253(h)). In addition to *Chevron* deference, a court must also afford deference to an agency when it is interpreting its own precedent. *U.S. Telecom Ass'n v. F.C.C.*, 295 F.3d 1326, 1332 (D.C. Cir. 2002)("We [ ] defer to an agency's **\*123** reasonable interpretation of its own rules and precedents.").

**[28]** In this case, the Attorney General interpreted a provision of the INA, a statute that Congress charged the

Attorney General with administering. *See* 8 U.S.C. § 1103(a)(1). *Matter of A-B-* addressed the issue of whether an alien applying for asylum based on domestic violence could establish membership in a "particular social group." Because the decision interpreted a provision of the INA, the *Chevron* framework applies to *Matter of A-B-*.[11] *See Negusie v. Holder*, 555 U.S. 511, 516, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009)(stating it "is well settled" that principles of *Chevron* deference apply to the Attorney General's interpretation of the INA).

### a. *Chevron* Step One: The Phrase "Particular Social Group" is Ambiguous

[29] The first question within the *Chevron* framework is whether, using the traditional tools of statutory interpretation including evaluating the text, structure, and the overall statutory scheme, as well as employing common sense, Congress has "supplied a clear and unambiguous answer to the interpretive question at hand." *Pereira v. Sessions*, ——— U.S. ———, 138 S.Ct. 2105, 2113, 201 L.Ed.2d 433 (2018)(citation omitted). The interpretive question at hand in this case is the meaning of the term "particular social group."

Under the applicable asylum provision, an "alien who is physically present in the United States or who arrives in the United States ... irrespective of such alien's status" may be granted asylum at the discretion of the Attorney General if the "Attorney General determines that such alien is a refugee within the meaning of" section 1101(a)(42)(A)." 8 U.S.C. § 1158. The term "refugee" is defined in section 1101(a)(42)(A) as, among other things, an alien who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). At the credible fear stage, an alien needs to show that there is a "significant possibility ... that the alien could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v).

The INA itself does not shed much light on the meaning of the term "particular social group." The phrase "particular social group" was first included in the INA when Congress

enacted the Refugee Act of 1980. Pub. L. No. 96-212, 94 Stat. 102 (1980). The purpose of the Refugee Act was to protect refugees, i.e., individuals who are unable to protect themselves from persecution in their native country. *See id.* § 101(a)("The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including ... humanitarian assistance for their care and maintenance in asylum areas."). While the legislative history of the Act does not reveal the specific meaning the members of Congress attached to the phrase "particular social group," the legislative history does make clear that Congress intended "to bring United States **\*124** refugee law into conformance with the [Protocol], 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States acceded in 1968." *Cardoza-Fonseca*, 480 U.S. at 436-37, 107 S.Ct. 1207. Indeed, when Congress accepted the definition of "refugee" it did so "with the understanding that it is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol." *Id.* at 437, 107 S.Ct. 1207 (citations omitted). It is therefore appropriate to consider what the phrase "particular social group" means under the Protocol. *See id.*

In interpreting the Refugee Act in accordance with the meaning intended by the Protocol, the language in the Act should be read consistently with the United Nations' interpretation of the refugee standards. *See id.* at 438–39, 107 S.Ct. 1207 (relying on UNHCR's interpretation in interpreting the Protocol's definition of "well-founded fear"). The UNHCR defined the provisions of the Convention and Protocol in its Handbook on Procedures and Criteria for Determining Refugee Status ("UNHCR Handbook").[12] *Id.* As the Supreme Court has noted, the UNHCR Handbook provides "significant guidance in construing the Protocol, to which Congress sought to conform ... [and] has been widely considered useful in giving content to the obligations that the protocol establishes." *Id.* at 439 n.22, 107 S.Ct. 1207 (citations omitted). The UNHCR Handbook codified the United Nations' interpretation of the term "particular social group" at that time, construing the term expansively. The UNHCR Handbook states that "a 'particular social group' normally comprises persons of similar background, habits, or social status." UNHCR Handbook at Ch. II B(3)(e) ¶ 77.

The clear legislative intent to comply with the Protocol and Congress' election to not change or add qualifications to the U.N.'s definition of "refugee" demonstrates that Congress intended to adopt the U.N.'s interpretation of the word "refugee." Moreover, the UNHCR's classification of "social group" in broad terms such as "similar background, habits, or social status" suggests that Congress intended an equally expansive construction of the same term in the Refugee Act. Furthermore, the Refugee Act was enacted to further the "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands .... [and] it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible." *Maharaj v. Gonzales,* 450 F.3d 961, 983 (9th Cir. 2006)(O'Scannlain, J. concurring in part)(citing Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102).

Although the congressional intent was clear that the meaning of "particular social group" should not be read too narrowly, the Court concludes that Congress has not "spoken directly" on the precise question of whether victims of domestic or gang-related persecution fall into the particular social group category. Therefore, the Court proceeds to *Chevron* step two to determine whether the Attorney General's interpretation, which generally precludes domestic violence and gang-related claims at the credible fear stage, is a permissible interpretation of the statute.

**\*125 b.** *Chevron* **Step Two: Precluding Domestic and Gang-Related Claims at the Credible Fear Stage is an Impermissible Reading of the Statute and is Arbitrary and Capricious**

**[30]**  As explained above, the second step of the *Chevron* analysis overlaps with the arbitrary and capricious standard of review under the APA. *See* *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC,* 41 F.3d 721, 726 (D.C. Cir. 1994)("[T]he inquiry at the second step of *Chevron* overlaps analytically with a court's task under the [APA]."). "To survive arbitrary and capricious review, an agency action must be the product of reasoned decisionmaking." *Fox v. Clinton,* 684 F.3d 67, 74–75 (D.C. Cir. 2012). "Thus, even though arbitrary and capricious review is fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise—no deference is owed to an agency action that is based on an agency's purported expertise where the agency's explanation for its action lacks any coherence." *Id.* at 75 (internal citations and alterations omitted).

Plaintiffs argue that the Attorney General's near-blanket rule against positive credible fear determinations based on domestic violence and gang-related claims is arbitrary and capricious for several reasons. First, they contend that the rule has no basis in immigration law. Pls.' Mot., ECF No. 64-1 at 39–40. Plaintiffs point to several cases in which immigration judges and circuit courts have recognized asylum petitions based on gang-related or gender-based claims. *See id.* at 38–39 (citing cases). Second, plaintiffs argue that the general prohibition is arbitrary and capricious and contrary to the INA because it constitutes an unexplained change to the long-standing recognition that credible fear determinations must be individualized based on the facts of each case. *Id.* at 40–41.

The government's principal response is straightforward: no such general rule against domestic violence or gang-related claims exists. Defs.' Reply, ECF No. 85 at 44–47. The government emphasizes that the only change to the law in *Matter of A-B-* is that *Matter of A-R-C-G-* was overruled. *Id.* at 43. The government also argues that *Matter of A-B-* only required the BIA to assess each element of an asylum claim and not rely on a party's concession that an element is satisfied. *Id.* at 45. Thus, according to the government, the Attorney General simply "eliminated a loophole created by *A-R-C-G-*." *Id.* at 45. The government dismisses the rest of *Matter of A-B-* as mere "comment[ary] on problems typical of gang and domestic violence related claims." *Id.* at 46.

And even if a general rule does exist, the government contends that asylum claims based on "private crime[s]" such as domestic and gang violence have been the center of controversy for decades. Defs.' Reply, ECF No. 85 at 44.

Therefore, the government concludes, that *Matter of A-B-* is a lawful interpretation and restatement of the asylum laws, and is entitled to deference. *Id.* Finally, the government argues that Congress designed the asylum statute as a form of limited relief, not to "provide redress for all misfortune." *Id.*

The Court is not persuaded that *Matter of A-B-* and the Policy Memorandum do not create a general rule against positive credible fear determinations in cases in which aliens claim a fear of persecution based on domestic or

gang-related violence. 🚩 *Matter of A-B-* mandates that "[w]hen confronted with asylum cases based on purported membership in a particular social group ... immigration judges, and asylum officers must analyze the requirements as set forth" in the decision. 🚩 27 I. & N. Dec. at 319. The precedential **\*126** decision further explained that "[g]enerally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum." 🚩 *Id.* at 320. 🚩 *Matter of A-B-* also requires asylum officers to "analyze the requirements as set forth in" 🚩 *Matter of A-B-* when reviewing asylum related claims including whether such claims "would satisfy the legal standard to determine whether an alien has a credible fear of persecution." 🚩 *Id.* at 320 n.1 (citing 🚩 8 U.S.C. § 1225(b) ). Furthermore, the Policy Memorandum also makes clear that the sweeping statements in 🚩 *Matter of A-B-* must be applied to credible fear determinations: "if an applicant claims asylum based on membership in a particular social group, then officers must factor the [standards explained in 🚩 *Matter of A-B-* ] *into their determination of whether an applicant has a credible fear or reasonable fear of persecution*." Policy Memorandum, ECF No. 100 at 12 (emphasis added).

Not only does 🚩 *Matter of A-B-* create a general rule against such claims at the credible fear stage, but the general rule is also not a permissible interpretation of the statute. First, the general rule is arbitrary and capricious because there is no legal basis for an effective categorical ban on domestic violence and gang-related claims. Second, such a general rule runs contrary to the individualized analysis required by the INA. Under the current immigration laws, the credible fear interviewer must prepare a case-specific factually intensive analysis for each alien. *See* 8 C.F.R. § 208.30(e)(requiring individual analysis including material facts stated by the applicant, and additional facts relied upon by officer). Credible fear determinations, like requests for asylum in general, must be resolved based on the particular facts and circumstances of each case. *Id.*

A general rule that effectively bars the claims based on certain categories of persecutors (i.e. domestic abusers or gang members) or claims related to certain kinds of violence is inconsistent with Congress' intent to bring "United States refugee law into conformance with the [Protocol]." 📙 *Cardoza-Fonseca*, 480 U.S. at 436-37, 107 S.Ct. 1207.

The new general rule is thus contrary to the Refugee Act and the INA. [13] In interpreting "particular social group" in a way that results in a general rule, in violation of the requirements of the statute, the Attorney General has failed to "stay[ ] within the bounds" of his statutory authority. [14] *District of Columbia v. Dep't of Labor*, 819 F.3d at 449.

The general rule is also arbitrary and capricious because it impermissibly heightens the standard at the credible fear stage. The Attorney General's direction to deny most domestic violence or gang violence claims at the credible fear determination **\*127** stage is fundamentally inconsistent with the threshold screening standard that Congress established: an alien's removal may not be expedited if there is a "significant possibility" that the alien could establish eligibility for asylum. 🚩 8 U.S.C. § 1225(b)(1)(B)(v). The relevant provisions require that the asylum officer "conduct the interview in a nonadversarial manner" and "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 🚩 8 C.F.R. § 208.30(d). As plaintiffs point out, to prevail at a credible fear interview, the alien need only show a "significant possibility" of a one in ten chance of persecution, i.e., a fraction of ten percent. *See* 🚩 8 U.S.C. § 1225(b)(1)(B)(v); 📙 *Cardoza-Fonseca*, 480 U.S. at 439–40, 107 S.Ct. 1207 (describing a well-founded fear of persecution at asylum stage to be satisfied even when there is a ten percent chance of persecution). The legislative history of the IIRIRA confirms that Congress intended this standard to be a low one. *See* 142 CONG. REC. S11491-02 ("[t]he credible fear standard ... is intended to be a low screening standard for admission into the usual full asylum process"). The Attorney General's directive to broadly exclude groups of aliens based on a sweeping policy applied indiscriminately at the credible fear stage, was neither adequately explained nor supported by agency precedent. Accordingly, the general rule against domestic violence and gang-related claims during a credible fear determination is arbitrary and capricious and violates the immigration laws.

### 2. Persecution: The "Condoned or Complete Helplessness" Standard Violates the APA and Immigration Laws

Plaintiffs next argue that the government's credible fear policies have heightened the legal requirement for all credible

fear claims involving non-governmental persecutors. Pls.' Mot., ECF No. 64-1 at 48.

[31] To be eligible for asylum, an alien must demonstrate either past "persecution or a well-founded fear of persecution." 8 U.S.C. § 1101(a)(42)(A). When a private actor, rather than the government itself, is alleged to be the persecutor, the alien must demonstrate "some connection" between the actions of the private actor and "governmental action or inaction." *See* Rosales Justo v. Sessions, 895 F.3d 154, 162 (1st Cir. 2018). To establish this connection, a petitioner must show that the government was either "unwilling or unable" to protect him or her from persecution. *See* Burbiene v. Holder, 568 F.3d 251, 255 (1st Cir. 2009).

Plaintiffs argue that Matter of A-B- and the Policy Memorandum set forth a new, heightened standard for government involvement by requiring an alien to "show the government condoned the private actions or at least demonstrated a complete helplessness to protect the victim." Matter of A-B-, 27 I. & N. Dec. at 337; Policy Memorandum, ECF No. 100 at 9. The government argues that the "condone" or "complete helplessness" standard is not a new definition of persecution; and, in any event, such language does not change the standard. Defs.' Reply, ECF No. 85 at 55.

### a. *Chevron* Step One: The Term "Persecution" is Not Ambiguous [15]

[32] [33] Again, the first question under the *Chevron* framework is whether Congress has "supplied a clear and unambiguous answer to the interpretive question at **\*128** hand." Pereira, 138 S.Ct. at 2113. Here, the interpretive question at hand is whether the word "persecution" in the INA requires a government to condone the persecution or demonstrate a complete helplessness to protect the victim.

The Court concludes that the term "persecution" is not ambiguous and the government's new interpretation is inconsistent with the INA. The Court is guided by the longstanding principle that Congress is presumed to have incorporated prior administrative and judicial interpretations of language in a statute when it uses the same language

in a subsequent enactment. *See* Sekhar v. United States, 570 U.S. 729, 733, 133 S.Ct. 2720, 186 L.Ed.2d 794 (2013)(explaining that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it"); Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978)(stating Congress is aware of interpretations of a statute and is presumed to adopt them when it re-enacts them without change).

The seminal case on the interpretation of the term "persecution," *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), is dispositive. In *Matter of Acosta*, the BIA recognized that harms could constitute persecution if they were inflicted "either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Id.* at 222 (citations omitted). The BIA noted that Congress carried forward the term "persecution" from pre-1980 statutes, in which it had a well-settled judicial and administrative meaning: "harm or suffering ... inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control." *Id.* Applying the basic rule of statutory construction that Congress carries forward established meanings of terms, the BIA adopted the same definition. *Id.* at 223.

[34] The Court agrees with this approach. When Congress uses a term with a settled meaning, its intent is clear for purposes of *Chevron* step one. *cf.* B & H Med., LLC v. United States, 116 Fed. Cl. 671, 685 (2014)(a term with a "judicially settled meaning" is "not ambiguous" for purposes of deference under Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ). As explained in *Matter of Acosta*, Congress adopted the "unable or unwilling" standard when it used the word "persecution" in the Refugee Act. 19 I. & N. Dec. at 222, *see also* Shapiro v. United States, 335 U.S. 1, 16, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948)(Congress presumed to have incorporated "settled judicial construction" of statutory language through re-enactment). Indeed, the UNHCR Handbook stated that persecution included "serious discriminatory or other offensive acts ... committed by the local populace ... if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer *effective* protection." *See* UNHCR Handbook ¶ 65 (emphasis added). It was clear at the time that the Act was passed by Congress that the "unwilling or unable" standard did not require a showing that the government

"condoned" persecution or was "completely helpless" to prevent it. Therefore, the government's interpretation of the term "persecution" to mean the government must condone or demonstrate complete helplessness to help victims of persecution fails at 📑 *Chevron* step one.

The government relies on circuit precedent that has used the "condoned" or "complete helplessness" language to support **\*129** its argument that the standard is not new. Defs.' Reply, ECF No. 85 at 55. There are several problems with the government's argument. First, upon review of the cited cases it is apparent that, although the word "condone" was used, in actuality, the courts were applying the "unwilling or unable" standard. For example, in 📑 *Galina v. INS*, 213 F.3d 955 (7th Cir. 2000), an asylum applicant was abducted and received threatening phone calls in her native country. 📑 *Id.* at 957. The applicant's husband called the police to report the threatening phone calls, and after the police located one of the callers, the calls stopped. 📑 *Id.* The Court recognized that a finding of persecution ordinarily requires a determination that the government condones the violence or demonstrated a complete helplessness to protect the victims. 📑 *Id.* at 958. However, relying on the BIA findings, the Court found that notwithstanding the fact "police might take some action against telephone threats" the applicant would still face persecution if she was sent back to her country of origin because she could have been killed. 📑 *Id.* Therefore, the Court ultimately concluded that an applicant can still meet the persecution threshold when the police are unable to provide effective help, but fall short of condoning the persecution. 📑 *Id.* at 958. Despite the language it used to describe the standard, the court did not apply the heightened "condoned or complete helplessness" persecution standard pronounced in the credible fear policies here.

**[35]** Second, and more importantly, under the government's formulation of the persecution standard, no asylum applicant who received assistance from the government, regardless of how ineffective that assistance was, could meet the persecution requirement when the persecutor is a non-government actor. [16] *See* Policy Memorandum, ECF No. 100 at 17 (stating that in the context of credible fear interviews, "[a]gain, the home government must either condone the behavior or demonstrate a complete helplessness to protect victims of such alleged persecution"). That is simply not the law. For example, in *Rosales Justo v. Sessions*, the United

States Court of Appeals for the First Circuit held that a petitioner satisfied the "unable or unwilling" standard, even though there was a significant police response to the claimed persecution. 895 F.3d 154, 159 (1st Cir. 2018). The petitioner in *Rosales Justo* fled Mexico after organized crime members murdered his son. *Id.* at 157–58. Critically, the "police took an immediate and active interest in the [petitioner's] son's murder." *Id.* The Court noted that the petitioner "observed seven officers and a forensic team at the scene where [the] body was recovered, the police took statements from [petitioner] and his wife, and an autopsy was performed." *Id.* The Court held that, despite the extensive actions taken by the police, the "unwilling or unable" standard was satisfied because although the government was willing to protect the petitioner, the evidence did not show that the government was able to make the petitioner and his family any safer. *Id.* at 164 (reversing BIA's conclusion that the immigration judge clearly erred in finding that the police were willing but unable to protect family). As *Rosales Justo* illustrates, a requirement that police condone or demonstrate complete helplessness is inconsistent with the current **\*130** standards under immigration law. [17]

Furthermore, the Court need not defer to the government's interpretation to the extent it is based on an interpretation of court precedent. Indeed, in "case after case, courts have affirmed this fairly intuitive principle, that courts need not, and should not, defer to agency interpretations of opinions written by courts." *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 209 F.Supp.3d 77, 87 (D.D.C. 2016)(listing cases). "There is therefore no reason for courts—the supposed experts in analyzing judicial decisions —to defer to agency interpretations of the Court's opinions." 📑 *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002); *see also* 📑 *Judulang*, 565 U.S. at 52 n.7, 132 S.Ct. 476 (declining to apply 📑 *Chevron* framework because the challenged agency policy was not "an interpretation of any statutory language").

To the extent the credible fear policies established a new standard for persecution, it did so in purported reliance on circuit opinions. The Court gives no deference to the government's interpretation of judicial opinions regarding the proper standard for determining the degree to which government action, or inaction, constitutes persecution. 📑 *Univ. of Great Falls*, 278 F.3d at 1341. The "unwilling or unable" persecution standard was settled at the time

AR.04729

the Refugee Act was codified, and therefore the Attorney General's "condoned" or "complete helplessness" standard is not a permissible construction of the persecution requirement.

### 3. Nexus: The Credible Fear Policies Do Not Pose a New Standard for the Nexus Requirement

[36] Plaintiffs next argue that the formulation of the nexus requirement articulated in 🚩 *Matter of A-B-* that when a private actor inflicts violence based on a personal relationship with the victim, the victim's membership in a larger group may well not be "one central reason" for the abuse—violates the INA, Refugee Act, and APA. The nexus requirement in the INA is that a putative refugee establish that he or she was persecuted "on account of" a protected ground such as a particular social group.[18] *See* 8 U.S.C. § 1158(b)(1)(B)(i).

The parties agree that the precise interpretive issue is not ambiguous. The parties also endorse the "one central reason" standard and the need to conduct a "mixed-motive" analysis when there is more than one reason for persecution. *See* Defs.' Mot., 57-1 at 47; Pls.' Mot., ECF No. 64-1 at 53–54. The INA expressly contemplates mixed motives for persecution when it specifies that a protected ground must be "one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i). Where the parties disagree is whether the credible fear policies deviate from this standard.

With respect to the nexus requirement, the government's reading of 🚩 **\*131** *Matter of A-B-* on this issue is reasonable. In 🚩 *Matter of A-B-*, the Attorney General relies on the "one central reason" standard and provides examples of a criminal gang targeting people because they have money or property or "simply because the gang inflicts violence on those who are nearby." 🚩 27 I. & N. Dec. at 338–39. The decision states that "purely personal" disputes will not meet the nexus requirement. 🚩 *Id.* at 339 n.10. The Court discerns no distinction between this statement and the statutory "one central reason" standard.

Similarly, the Policy Memorandum states that "when a private actor inflicts violence based on a personal relationship with the victim, the victim's membership in a larger group often will not be 'one central reason' for the abuse." Policy Memorandum, ECF No. 100 at 9 (citing 🚩 *Matter of A-B-*, 27

I. & N. Dec. at 338–39). Critically, the Policy Memorandum explains that in "a particular case, the evidence may establish that a victim of domestic violence was attacked ***based solely*** on her preexisting personal relationship with her abuser." *Id.* (emphasis added). This statement is no different than the statement of the law in 🚩 *Matter of A-B-*. Because the government's interpretation is not inconsistent with the statute, the Court finds the government's interpretation to be reasonable.

The Court reiterates that, although the nexus standard forecloses cases in which ***purely*** personal disputes are the impetus for the persecution, it does not preclude a positive credible fear determination simply because there is a personal relationship between the persecutor and the victim, so long as the one central reason for the persecution is a protected ground. *See* 🚩 *Aldana-Ramos v. Holder,* 757 F.3d 9, 18–19 (1st Cir. 2014)(recognizing that "multiple motivations [for persecution] can exist, and that the presence of a non-protected motivation does not render an applicant ineligible for refugee status"); 🚩 *Qu v. Holder,* 618 F.3d 602, 608 (6th Cir. 2010)("[I]f there is a nexus between the persecution and the membership in a particular social group, the simultaneous existence of a personal dispute does not eliminate that nexus."). Indeed, courts have routinely found the nexus requirement satisfied when a personal relationship exists—including cases in which persecutors had a close relationship with the victim. *See, e.g.,* 🚩 *Bringas-Rodriguez v. Sessions,* 850 F.3d 1051, 1056 (9th Cir. 2017) (persecution by family members and neighbor on account of applicant's perceived homosexuality); 🚩 *Nabulwala v. Gonzales,* 481 F.3d 1115, 1117–18 (8th Cir. 2007)(applicant's family sought to violently "change" her sexual orientation).

🚩 *Matter of A-B-* and the Policy Memorandum do not deviate from the "one central reason" standard articulated in the statute or in BIA decisions. *See* 🚩 8 U.S.C. § 1158(b)(1)(B)(i). Therefore, the government did not violate the APA or INA with regards to its interpretation of the nexus requirement.

### 4. Circularity: The Policy Memorandum's Interpretation of the Circularity Requirement Violates the APA and Immigration Laws

[37] Plaintiffs argue that the Policy Memorandum establishes a new rule that "particular social group"

definitions based on claims of domestic violence are impermissibly circular and therefore not cognizable as a basis for persecution in a credible fear determination. Pls.' Mot., ECF No. 64-1 at 56–59. Plaintiffs argue that this new circularity rule is inconsistent with the current legal standard and therefore violates the Refugee Act, INA, and is arbitrary **\*132** and capricious. [19] *Id.* at 57. The parties agree that the formulation of the anti-circularity rule set forth in *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 242 (BIA 2014)—"that a particular social group cannot be defined exclusively by the claimed persecution"—is correct. *See* Defs.' Reply, ECF No. 85 at 62; Pls.' Reply., ECF No. 92 at 30–31. Accordingly, the Court begins with an explanation of that opinion.

The question before the BIA in *Matter of M-E-V-G-*, was whether the respondent had established membership in a "particular social group," namely "Honduran youth who have been actively recruited by gangs but who have refused to join because they oppose the gangs." 26 I. & N. Dec. at 228. The BIA clarified that a person seeking asylum on the ground of membership in a particular social group must show that the group is: (1) composed of members who share an immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question. *Id.* at 237. In explaining the third element for membership, the BIA confirmed the rule that "a social group cannot be defined exclusively by the fact that its members have been subjected to harm." *Id.* at 242. The BIA explained that for a particular social group to be distinct, "persecutory conduct alone cannot define the group." *Id.*

The BIA provided the instructive example of former employees of an attorney general. *Id.* The BIA noted that such a group may not be valid for asylum purposes because they may not consider themselves a group, or because society may not consider the employees to be meaningfully distinct in society in general. *Id.* The BIA made clear, however, that "such a social group determination must be made on a case-by-case basis, because it is possible that under certain circumstances, the society would make such a distinction and consider the shared past experience to be a basis for distinction within that society." *Id.* "Upon their maltreatment," the BIA explained "it is possible these people would experience a sense of 'group' and society would discern that this group of individuals, who share a common immutable characteristic, is distinct in some significant way." *Id.* at 243 (recognizing that "[a] social group cannot be defined *merely* by the fact of persecution or *solely* by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors ... but that the

shared trait of persecution does not disqualify an otherwise valid social group")(citations and internal quotation marks omitted). The BIA further clarified that the "act of persecution by the government may be the catalyst that causes the society to distinguish [a group] in a meaningful way and consider them a distinct group, but the immutable characteristic of their shared past experience exists independent of the persecution." *Id.* at 243. Thus, such a group would not be circular because the persecution they faced was not **\*133** the sole basis for their membership in a particular social group. *Id.*

With this analysis in mind, the Court now focuses on the dispute at issue. Here, plaintiffs do not challenge 🚩 *Matter of A-B-'s* statements with regard to the rule against circularity, but rather challenge the Policy Memorandum's articulation of the rule. Pls.' Mot., ECF No, 64-1 at 57–58. Specifically, they challenge the Policy Memorandum's mandate that domestic violence-based social groups that include "inability to leave" are not cognizable. *Id.* at 58 (citations and internal quotation marks omitted). The Policy Memorandum states that "married women ... who are unable to leave their relationship" are a group that would not be sufficiently particular. Policy Memorandum, ECF No. 100 at 6. The Policy Memorandum explained that "even if 'unable to leave' were particular, the applicant must show something more than the danger of harm from an abuser if the applicant tried to leave because that would amount to circularly defining the particular social group by the harm on which the asylum claim is based." *Id.*

The Policy Memorandum's interpretation of the rule against circularity ensures that women unable to leave their relationship will always be circular. This conclusion appears to be based on a misinterpretation of the circularity standard and faulty assumptions about the analysis in 🚩 *Matter of A-B-*. First, as *Matter of M-E-V-G-* made clear, there cannot be a general rule when it comes to determining whether a group is distinct because "it is possible that under certain circumstances, the society would make such a distinction and consider the shared past experience to be a basis for distinction within that society." 26 I. & N. Dec. at 242. Thus, to the extent the Policy Memorandum imposes a general circularity rule foreclosing such claims without taking into account the independent characteristics presented in each case, the rule is arbitrary, capricious, and contrary to immigration law.

Second, the Policy Memorandum changes the circularity rule as articulated in settled caselaw, which recognizes that if

the proposed social group definition contains characteristics independent from the feared persecution, the group is valid under asylum law. *Matter of M-E-V-G-,* 26 I. & N. Dec. at 242 (Particular social group may be cognizable if "immutable characteristic of their shared past experience exists independent of the persecution."). Critically, the Policy Memorandum does not provide a reasoned explanation for, let alone acknowledge, the change. *See* 🚩 *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 514, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009)*(*"[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing [its] position."). 🚩 *Matter of A-B-* criticized the BIA for failing to consider the question of circularity in *Matter of A-R-C-G-* and overruled the decision based on the BIA's reliance on DHS's concession on the issue. 🚩 27 I. & N. Dec. at 334-35, 335. Moreover, 🚩 *Matter of A-B-* suggested only that the social group at issue in *Matter of A-R-C-G-* might be "effectively" circular. 🚩 *Id.* at 335. The Policy Memorandum's formulation of the circularity standard goes well beyond the Attorney General's explanation in 🚩 *Matter of A-B-.* As such, it is unmoored from the analysis in *Matter of M-E-V-G-* and has no basis in 🚩 *Matter of A-B-.* It is therefore, arbitrary, capricious, and contrary to immigration law.

### 5. Discretion and Delineation: The Credible Fear Policies Do Not Contain a Discretion Requirement, but the Policy Memorandum's Delineation Requirement is Unlawful

 **[38]**  Plaintiffs next argue that the credible fear policies "unlawfully import ***134** two aspects of the ordinary removal context into credible fear proceedings." Pls.' Reply, ECF No. 92 at 32. The first alleged requirement is for aliens to delineate the "particular social group" on which they rely at the credible fear stage. *Id.* The second alleged requirement is that asylum adjudicators at the credible fear stage take into account certain discretionary factors when making a fair credibility determination and exercise discretion to deny relief. [20] *Id.* at 32–33.

The government agrees that a policy which imposes a duty to delineate a particular social group at the credible fear stage would be a violation of existing law. Defs.' Reply, ECF No. 85 at 67. The government also agrees that requiring asylum officers to consider the exercise of discretion at the credible fear stage "would be inconsistent with 🚩 section 1225(b)(1) (B)(v)." *Id.* at 68. The government, however, argues that no such directives exist. *Id.* at 67–69.

The Court agrees with the government. There is nothing in the credible fear policies that support plaintiffs' arguments that asylum officers are to exercise discretion at the credible fear stage. The Policy Memorandum discusses discretion only in the context of when an alien has established that he or she is eligible for asylum. Policy Memorandum, ECF No. 100 at 5 ("[I]f eligibility is established, the USCIS officer must then consider whether or not to exercise discretion to grant the application."). 🚩 *Matter of A-B-* also discusses the discretionary factors in the context of granting asylum. 🚩 27 I. & N. Dec. at 345 n.12 (stating exercising discretion should not be glossed over "solely because an applicant *otherwise meets the burden of proof* for asylum eligibility under the INA")(emphasis added). Eligibility for asylum is not established, nor is an asylum application granted, at the credible fear stage. *See* 🚩 8 U.S.C. § 1225(b)(1) (B)(ii)(stating if an alien receives a positive credibility determination, he or she shall be detained for "further consideration of the application of asylum"). Since the credible fear policies only direct officers to use discretion once an officer has determined that an applicant is eligible for asylum, they do not direct officers to consider discretionary factors at the credible fear stage. *See* Policy Memorandum, ECF No. 100 at 10.

The Court also agrees that, with respect to 🚩 *Matter of A-B-*, the decision does not impose a delineation requirement during a credible fear determination. The decision only requires an applicant seeking asylum to clearly indicate "an exact delineation of any proposed particular social group" when the alien is "on the record and before the immigration judge." 🚩 27 I. & N. Dec. at 344. Any delineation requirement therefore would not apply to the credible fear determination which is not on the record before an immigration judge.

 **[39]**  The Policy Memorandum, however, goes further than the decision itself and incorporates the delineation requirement into credible fear determinations. Unlike the mandate to use discretion, the Policy Memorandum does not contain a limitation that officers are to apply the delineation requirement to asylum interviews only, as opposed to credible fear interviews. In fact, it does the opposite and explicitly

**\*135** requires asylum officers to apply that requirement to credible fear determinations. Policy Memorandum, ECF No. 100 at 12. The Policy Memorandum makes clear that "if an applicant claims asylum based on membership in a particular social group, then officers must factor the [standards explained in 🚩 *Matter of A-B-* ] *into their determination of whether an applicant has a credible fear or reasonable fear of persecution.*" *Id.* at 12. In directing asylum officers to apply 🚩 *Matter of A-B-* to credible fear determinations, the Policy Memorandum refers back to all the requirements explained by 🚩 *Matter of A-B-* including the delineation requirement. *See id.* (referring back to section explaining delineation requirement). In light of this clear directive to "factor" in the standards set forth in 🚩 *Matter of A-B-*, into the "determination of whether an applicant has a credible fear" and its reference to the delineation requirement, it is clear that the Policy Memorandum incorporates that requirement into credible fear determinations. *See id.* [21]

The government argues, that to the extent the Policy Memorandum is ambiguous, the Court should defer to its interpretation as long as it is reasonable. The government cites no authority to support its claim that deference is owed to an agency's interpretations of its policy documents like the Policy Memorandum. However, the Court acknowledges the government's interpretation is "entitled to respect ... only to the extent that those interpretations have the 'power to persuade.' " 📄 *Christensen v. Harris Cnty.,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)(citation omitted). For the reasons stated above, however, such a narrow reading of the Policy Memorandum is not persuasive. Because the Policy Memorandum requires an alien—at the credible fear stage—to present facts that clearly identify the alien's proposed particular social group, contrary to the INA, that policy is arbitrary and capricious.

### 6. The Policy Memorandum's Requirements Related to Asylum Officer's Application of Circuit Law are Unlawful

Plaintiffs' final argument is that the Policy Memorandum's directives instructing asylum officers to ignore applicable circuit court of appeals decisions is unlawful. Pls.' Mot., ECF No. 64-1 at 63.

The relevant section of the Policy Memorandum reads as follows:

> When conducting a credible fear or reasonable fear interview, an asylum officer must determine what law applies to the applicant's claim. The asylum officer should apply all applicable precedents of the Attorney General and the BIA, *Matter of E-L-H-*, 23 I & N Dec. 814, 819 (BIA 2005), which are binding on all immigration judges and asylum officers nationwide. The asylum officer should also apply the case law of the relevant federal circuit court, to the extent that those cases are not inconsistent with 🚩 *Matter of A-B-*. *See, e.g., Matter of Fajardo Espinoza,* 26 I & N Dec. 603, 606 (BIA 2015). The relevant federal circuit court is the circuit where the removal proceedings will take place if the officer makes a positive credible fear determination. *See Matter of Gonzalez,* 16 I & N Dec. 134, 135–36 (BIA 1977); **\*136** *Matter of Waldei,* 19 I & N Dec. 189 (BIA 1984). But removal proceedings can take place in any forum selected by DHS, and not necessarily the forum where the intending asylum applicant is located during the credible fear or reasonable fear interview. Because an asylum officer cannot predict with certainty where DHS will file a Notice to appear ... the asylum officer should faithfully apply precedents of the Board and, if necessary, the circuit where the alien is physically located during the credible fear interview.

Policy Memorandum, ECF No. 100 at 11–12. Plaintiffs make two independent arguments regarding this policy. First, they argue that the Policy Memorandum's directive to disregard circuit law contrary to 🚩 *Matter of A-B-*, violates the APA, INA, and the separation of powers. Pls.' Mot., ECF No.

64-1 at 64–68. Second, plaintiffs argue that the Policy Memorandum's directive requiring asylum officers to apply the law of the circuit where the alien is physically located during the credible fear interview violates the APA and INA. *Id.* 68–71.

### a. The Policy Memorandum's Directive to Disregard Contrary Circuit Law Violates *Brand X*

**[40]** Plaintiffs' first argument is that the Policy Memorandum's directive that asylum officers who process credible fear interviews ignore circuit law contrary to *Matter of A-B–* is unlawful. Pls.' Mot., ECF No. 64-1 at 63–68. Because the policy requires officers to disregard all circuit law regardless of whether the provision at issue is entitled to deference, plaintiffs maintain that the policy exceeds an agency's limited ability to displace circuit precedent on a specific question of law to which an agency decision is entitled to deference. *Id.*

An agency's ability to disregard a court's interpretation of an ambiguous statutory provision in favor of the agency's interpretation stems from the Supreme Court's decision in *Nat'l Cable & Telecomm's Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). At issue in *Brand X* was the proper classification of broadband cable services under Title II of the Communications Act of 1934, as amended by the Telecommunications Act of 1996. *Id.* at 975, 125 S.Ct. 2688. The Federal Communications Commission ("Commission") had issued a Declaratory Rule providing that broadband internet service was an "information service" but not a "telecommunication service" under the Act, such that certain regulations would not apply to cable companies that provided broadband service. *Id.* at 989, 125 S.Ct. 2688. The circuit court vacated the Declaratory Rule because a prior circuit court opinion held that a cable modem service was in fact a telecommunications service. *Id.* (citing *AT & T Corp. v. Portland,* 216 F.3d 871 (9th Cir. 2000). The Supreme Court concluded that the circuit court erred in relying on a prior court's interpretation of the statute without first determining if the Commission's contrary interpretation was reasonable. *Id.* at 982, 125 S.Ct. 2688.

**[41]** The Supreme Court's holding relied on the same principles underlying the *Chevron* deference cases. *Id.* at 982, 125 S.Ct. 2688 (stating that the holding in *Brand X* "follows from *Chevron* itself"). The Court reasoned that Congress had delegated to the Commission the authority to enforce the Communications Act, and under the principles espoused in *Chevron,* a reasonable interpretation of an ambiguous provision of the Act is entitled to deference. *Id.* at 981, 125 S.Ct. 2688. Therefore, regardless of a circuit court's prior interpretation of a provision, the **\*137** agency's interpretation is entitled to deference as long as the court's prior construction of the provision does not "follow[ ] from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982, 125 S.Ct. 2688. In other words, an agency's interpretation of a provision may override a prior court's interpretation if the agency is entitled to *Chevron* deference and the agency's interpretation is reasonable. If the agency is not entitled to deference or if the agency's interpretation is unreasonable, a court's prior decision interpreting the same statutory provision controls. *See Petit v. U.S. Dep't of Educ.,* 675 F.3d 769, 789 (D.C. Cir. 2012)(citation omitted)(finding that a court decision interpreting a statute overrides the agency's interpretation only if it holds "that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion").

The government argues that the Policy Memorandum's mandate to ignore circuit law contrary to *Matter of A-B-* is rooted in statute and sanctioned by *Brand X.* Defs.' Reply, ECF No. 85 at 70. Moreover, the government contends that the requirement "simply states the truism that the INA requires all line officers to follow binding decisions of the Attorney General." *Id.* (citing 8 U.S.C. § 1103(a) ) ("determination and ruling by the Attorney General with respect to all questions of law shall be controlling"). The government also argues that plaintiffs have failed to point to any decisions that are inconsistent with *Matter of A-B-,* and therefore any instruction for an officer to apply *Matter of A-B-* notwithstanding prior circuit precedent to the contrary is permissible. The Policy Memorandum, according to the government, "simply require[s] line officers to follow [ *Matter of A-B-* ] unless and until a circuit court

of appeals declares some aspect of it contrary to the plain text of the INA." Defs.' Reply, ECF No. 85 at 72.

The government, again, minimizes the effect of the Policy Memorandum. As an initial matter, *Brand X* would only allow an agency's interpretation to override a prior judicial interpretation if the agency's interpretation is entitled to deference. *Brand X*, 545 U.S. at 982, 125 S.Ct. 2688 (stating "agency construction *otherwise entitled to Chevron deference*" may override judicial construction under certain circumstances)(emphasis added). In this case, the government contends that *Matter of A-B-* only interprets one statutory provision: "particular social group." *See* Defs.' Mot., ECF No. 57-1 at 56 (stating "[t]he language that the Attorney General interpreted in [ *Matter of* ] *A-B-*, [is] the meaning of the phrase 'particular social group' as part of the asylum standard"). The Policy Memorandum, however, directs officers to ignore federal circuit law to the extent that the law is inconsistent with *Matter of A-B-* in *any* respect, including *Matter of A-B-*'s persecution standard. The directive requires officers performing credible fear determinations to use *Brand X* as a shield against any prior or future federal circuit court decisions inconsistent with the sweeping proclamations made in *Matter of A-B-* regardless of whether *Brand X* has any application under the circumstances of that case.

There are several problems with such a broad interpretation of *Brand X* to cover guidance from an agency when it is far from clear that such guidance is entitled to deference. First, a directive to ignore circuit precedent when doing so would violate the principles of *Brand X* itself is clearly unlawful. For example, when a court determines a provision is unambiguous, as courts have done upon evaluating the "unwilling and unable" definition, a court's interpretation controls when faced with a contrary agency interpretation. *Brand X*, 545 U.S. at 982, 125 S.Ct. 2688. The Policy **\*138** Memorandum directs officers as a rule not to apply circuit law if it is inconsistent with *Matter of A-B-*, without regard to whether a specific provision in *Matter of A-B-* is entitled to deference in the first place. Such a rule runs contrary to *Brand X*.

Second, the government's argument only squares with the *Brand X* framework if every aspect of *Matter of A-B-* is both entitled to deference and is a reasonable interpretation of a relevant provision of the INA. Indeed, *Brand X* does not disturb any prior judicial opinion that a statute is unambiguous because Congress has spoken to the interpretive question at issue. *Brand X*, 545 U.S. at 982, 125 S.Ct. 2688 ("[A] judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."). If a Court does make such a determination, the agency is not free to supplant the Court's interpretation for its own under *Brand X*. *Id*.[22] Unless an agency's interpretation of a statute is afforded deference, a judicial construction of that provision binds the agency, regardless of whether it is contrary to the agency's view. The Policy Memorandum does not recognize this principle and therefore, the government's reliance on *Brand X* is misplaced. *Cf., e.g., Matter of Marquez Conde*, 27 I. & N. Dec. 251, 255 (BIA 2018)(examining whether the particular statutory question fell within *Brand X* ).[23]

The government's statutory justification fares no better. It is true that pursuant to 8 U.S.C. § 1103(a), the Attorney General's rulings with respect to questions of law are controlling; and they are binding on all service employees, 8 C.F.R. § 103.3(c). But plaintiffs do not dispute the fact that asylum officers must follow the Attorney General's decisions. The issue is that the Policy Memorandum goes much further than that. Indeed, the government's characterization of the Policy Memorandum's directive to ignore federal law only highlights the flaws in its argument. According to the government, the directive at issue merely instructs officers to listen to the Attorney General. Defs.' Reply, ECF No. 85 at 70. Such a mandate would be consistent with section 1103 and its accompanying regulations. In reality, however, the Policy Memorandum requires officers conducting credible fear interviews to follow the precedent of the relevant circuit only "to the extent that those cases are not inconsistent with *Matter of A-B-*." Policy Memorandum, ECF No. 100 at 11. The statutory and regulatory provisions cited by the government do not justify a blanket mandate to ignore circuit law.

#### b. The Policy Memorandum's Relevant Circuit Law Policy Violates the APA and INA

 **[42]**  Plaintiffs next argue that the Policy Memorandum's directive to apply the law of the **\*139** to apply the law of the "circuit where the alien is physically located during the credible fear interview" violates the immigration laws. Pls.' Mot., ECF No. 64-1, 68–71; Policy Memorandum, ECF No. 100 at 12. Specifically, Plaintiffs argue that this policy conflicts with the low screening standard for credible fear determinations established by Congress, and therefore violates the APA and INA. Pls.' Reply, ECF No. 92 at 35–36. The credible fear standard, plaintiffs argue, requires an alien to be afforded the benefit of the circuit law most favorable to his or her claim because there is a possibility that the eventual asylum hearing could take place in that circuit. *Id.*

The government responds by arguing that it is hornbook law that the law of the jurisdiction in which the parties are located governs the proceedings. Defs.' Reply, ECF No. 85 at 73. The government cites the standard for credible fear determinations and argues that it contains no requirement that an alien be given the benefit of the most favorable circuit law. *Id.* The government also argues that, to the extent there is any ambiguity, the government's interpretation is entitled to some deference, even if not *Chevron* deference. *Id.* at 74.

This issue turns on an interpretation of 8 U.S.C. § 1225(b)(1)(B)(v), which provides the standard for credible fear determinations. That section explicitly defines a "credible fear of persecution" as follows:

> For purposes of this subparagraph, the term "credible fear of persecution" means that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title.

8 U.S.C. § 1225(b)(1)(B)(v). Applicable regulations further explain the manner in which the interviews are to be conducted. Interviews are to be conducted in an "nonadversarial manner" and "separate and apart from the general public." 8 C.F.R. § 208.30(d). The purpose of the interview is to "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture[.]" *Id.*

The statute does not speak to which law should be applied during credible fear interviews. *See generally* 8 U.S.C. § 1225(b)(1)(B)(v). However, the Court is not without guidance regarding which law should be applied because Congress explained its legislative purpose in enacting the expedited removal provisions. 142 CONG. REC. S11491-02. When Congress established expedited removal proceedings in 1996, it deliberately established a low screening standard so that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution." H.R. REP. No. 104-469, pt. 1, at 158. That standard "is a low screening standard for admission into the usual full asylum process" and when Congress adopted the standard it "reject[ed] the higher standard of credibility included in the House bill." 142 CONG. REC. S11491-02.

In light of the legislative history, the Court finds plaintiffs' position to be more consistent with the low screening standard that governs credible fear determinations. The statute does not speak to which law should be applied during the screening, but rather focuses on eligibility at the time of the removal proceedings. 8 U.S.C. § 1225(b)(1)(B)(v). And as the government concedes, these removal proceedings could occur anywhere in the United States. Policy Memorandum, ECF No. 100 at 12. Thus, if there is a disagreement among the circuits on an issue, the alien should get **\*140** the benefit of that disagreement since, if the removal proceedings are heard in the circuit favorable to the aliens' claim, there would be a significant possibility the alien would prevail on that claim. The government's reading would allow for an alien's deportation, following a negative credible fear determination, even if the alien would have a significant possibility of establishing asylum under section 1158 during his or her removal proceeding. Thus, the government's reading leads to the exact opposite result intended by Congress. [24]

The government does not contest that an alien with a possibility of prevailing on his or her asylum claim could be denied during the less stringent credible fear determination, but rather claims that this Court should defer to the government's interpretation that this policy is consistent with the statute. Defs.' Reply, ECF No. 85 at 74–75. Under *Skidmore v. Swift & Co.*, the Court will defer to the government's interpretation to the extent it has the power to persuade.[25] *See* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). However, the government's arguments bolster plaintiffs' interpretation more than its own. As the government acknowledges, and the Policy Memorandum explicitly states, "removal proceedings can take place in any forum selected by DHS, and not necessarily the forum where the intending asylum applicant is located during the credible fear or reasonable fear interview." Policy Memorandum, ECF No. 100 at 12. Since the Policy Memorandum directive would lead to denial of a potentially successful asylum applicant at the credible fear determination, the Court concludes that the directive is therefore inconsistent with the statute. H.R. REP. NO. 104-469 at 158 (explaining that there should be no fear that an alien with a genuine asylum claim would be returned to persecution).[26]

Because the government's reading could lead to the exact harm that Congress sought to avoid, it is arbitrary capricious and contrary to law.

* * * * *

In sum, plaintiffs prevail on their APA and statutory claims with respect to the following credible fear policies, which this Court finds are arbitrary and capricious and contrary to law: (1) the general rule against credible fear claims relating to gang-related and domestic violence victims' membership in a "particular social group," as reflected in *Matter of A-B-* and the Policy Memorandum; (2) the heightened "condoned" or "complete helplessness" standard for persecution, as reflected in *Matter of A-B-* and the Policy Memorandum; (3) the circularity standard as reflected in the Policy Memorandum; (4) the delineation requirement at the credible fear stage, as reflected in the Policy Memorandum; and (5) the requirement that adjudicators disregard contrary circuit law and apply only the law of the **\*141** circuit where the credible fear interview occurs, as reflected in the Policy Memorandum. The Court also finds that neither the Policy

Memorandum nor *Matter of A-B-* state an unlawful nexus requirement or require asylum officers to apply discretionary factors at the credible fear stage. The Court now turns to the appropriate remedy.[27]

### D. Relief Sought

Plaintiffs seek an Order enjoining and preventing the government and its officials from applying the new credible fear policies, or any other guidance implementing *Matter of A-B-* in credible fear proceedings. Pls.' Mot., ECF No. 64-1 at 71–72. Plaintiffs also request that the Court vacate any credible fear determinations and removal orders issued to plaintiffs who have not been removed. *Id.* As for plaintiffs that have been removed, plaintiffs request a Court Order directing the government to return the removed plaintiffs to the United States. *Id.* Plaintiffs also seek an Order requiring the government to provide new credible fear proceedings in which asylum adjudicators must apply the correct legal standards for all plaintiffs. *Id.*

**[43]** The government argues that because section 1252 prevents all equitable relief the Court does not have the authority to order the removed plaintiffs to be returned to the United States. Defs.' Reply, ECF No. 85 at 75–76. The Court addresses each issue in turn.

#### 1. Section 1252 Does Not Bar Equitable Relief

##### a. Section 1252(e)(1)

The government acknowledges that section 1252(e)(3) provides for review of "systemic challenges to the expedited removal system." Defs.' Mot., ECF No. 57-1 at 11. However, the government argues 1252(e)(1) limits the scope of the relief that may be granted in such cases. Defs.' Reply, ECF No. 85 at 75–76. That provision provides that "no court may ... enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection." 8 U.S.C. § 1252(e)(1)(a). The government argues that

since no other subsequent paragraph of section 1252(e) specifically authorizes equitable relief, this Court cannot issue an injunction in this case. Defs.' Reply, ECF No. 85 at 75–76.

Plaintiffs counter that section 1252(e)(1) has an exception for "any action ... specifically authorized in a subsequent paragraph." Since section 1252(e)(3) clearly authorizes "an action" for systemic challenges, their claims fall within an exception to the proscription of equitable relief. Pls.' Reply, ECF No. 92 at 38.

This issue turns on what must be "specifically authorized in a subsequent paragraph" of section 1252(e). Plaintiffs argue the "action" needs to be specifically authorized, and the government argues that it is the "relief." Section 1252(e)(1) states as follows:

(e) Judicial review of orders under section 1225(b)(1)

(1) Limitations on relief Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may--

**\*142** (A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection, or

(B) certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

The government contends that this provision requires that any "*declaratory, injunctive, or other equitable relief*" must be "*specifically authorized in a subsequent paragraph*" of subsection 1252(e) for that relief to be available. Defs.' Reply, ECF No. 85 at 75 (emphasis in original). The more natural reading of the provision, however, is that these forms of relief are prohibited except when a plaintiff brings "any action ... specifically authorized in a subsequent paragraph." *Id.* § 1252(e)(1)(a). The structure of the statute supports this view. For example, the very next subsection, 1252(e)(1)(b), uses the same language when referring to an *action*: "[A court may not certify a class] in *any action for which judicial review is authorized under a subsequent paragraph of this subsection*." *Id.* § 1252(e)(1)(b)(emphasis added).

A later subsection lends further textual support for the view that the term "authorized" modifies the type of action, and not the type of relief. Subsection 1252(e)(4) limits the remedy a court may order when making a determination in habeas corpus proceedings challenging a credible fear determination. [28] Under section 1252(e)(2), a petitioner may challenge his or her removal under section 1225, if he or she can prove by a preponderance of the evidence that he or she is in fact in this country legally. [29] *See* 8 U.S.C. § 1252(e)(2)(c). Critically, section 1252(e)(4) limits the type of relief a court may grant if the petitioner is successful: "the court may order no remedy or relief other than to require that the petitioner be provided a hearing." *Id.* § 1252(e)(4)(B). If section 1252(e)(1)(a) precluded all injunctive and equitable relief, there would be no need for § 1252(e)(4) to specify that the court could order no other form of relief. Furthermore, if the government's reading was correct, there should be a parallel provision in section 1252(e)(3) limiting the relief a prevailing party of a systemic challenge could obtain to only relief specifically authorized by that paragraph.

Indeed, under the government's reading of the statute there could be no remedy for a successful claim under paragraph 1252(e)(3) because that paragraph does not specifically authorize any remedy. However, it does not follow that Congress would have explicitly authorized a plaintiff to bring a suit in the United States District Court for the District of Columbia and provided this Court with exclusive jurisdiction to determine the legality of the challenged agency action, but deprived the Court of any authority to provide *any remedy* (because none are specifically authorized), effectively allowing the unlawful agency action to continue. This Court "should not assume that Congress left such a gap in its scheme." **\*143** *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005)(holding Title IX protected against retaliation in part because "all manner of Title IX violations might go unremedied" if schools could retaliate freely).

An action brought pursuant to section 1252(e)(3) is an action that is "specifically authorized in a subsequent paragraph" of 1252(e). *See* 8 U.S.C. § 1252(e)(1). And 1252(e)(3) clearly authorizes "an action" for systemic

challenges to written expedited removal policies, including claims concerning whether the challenged policy "is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3). Because this case was brought under that systemic challenge provision, the limit imposed on the relief available to a court under 1252(e)(1)(a) does not apply. [30]

### b. Section 1252(f)

The government's argument that section 1252(f) bars injunctive relief fares no better. That provision states in relevant part: "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [sections 1221–1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). The Supreme Court has explained that " 'Section 1252(f)(1) thus 'prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–123[2].' " *Jennings v. Rodriguez,* ––– U.S. ––––, 138 S.Ct. 830, 851, 200 L.Ed.2d 122 (2018)(citing *Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 481, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) ). The Supreme Court has also noted that circuit courts have "held that this provision did not affect its jurisdiction over ... statutory claims because those claims did not 'seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct ... not authorized by the statutes." *Id.* (citing *Rodriguez v. Hayes,* 591 F.3d 1105, 1120 (9th Cir. 2010) ).

In this case, plaintiffs do not challenge any provisions found in section 1225(b). They do not seek to enjoin the operation of the expedited removal provisions or any relief declaring the statutes unlawful. Rather, they seek to enjoin the government's violation of those provisions by the implementation of the unlawful credible fear policies. An injunction in this case does not obstruct the operation of section 1225. Rather, it enjoins conduct that violates that provision. Therefore, section 1252(f) poses no bar. *See* R.I.L-R v. Johnson, 80 F.Supp.3d 164, 184 (D.D.C.

2015)(holding section 1252(f) does not limit a court's ability to provide injunctive relief when the injunctive relief "enjoins conduct that allegedly violates [the immigration statute]"); *see also* Reid v. Donelan, 22 F.Supp.3d 84, 90 (D. Mass. 2014)("[A]n injunction 'will not prevent the law from operating in any way, but instead would simply force the government to *comply* with the statute.")(emphasis in original) ).

**[44]** Finally, during oral argument, the government argued that even if the Court has the authority to issue an injunction in **\*144** this case, it can only enjoin the policies as applied in plaintiffs' cases under section 1252(f). *See* Oral Arg. Hr'g Tr., ECF No. 102 at 63. In other words, according to the government, the Court may declare the new credible fear policies unlawful, but DHS may continue to enforce the policies in all other credible fear interviews. To state this proposition is to refute it. It is the province of the Court to declare what the law is, *see* Marbury v. Madison, 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803), and the government cites no authority to support the proposition that a Court may declare an action unlawful but have no power to prevent that action from violating the rights of the very people it affects. [31] To the contrary, such relief is supported by the APA itself. *See* Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998)("We have made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed.' "). Moreover section 1252(f) only applies when a plaintiff challenges the legality of immigration laws and not, as here, when a plaintiff seeks to enjoin conduct that violates the immigration laws. In these circumstances, section 1252(f) does not limit the Court's power.

### 2. The Court Has the Authority to Order the Return of Plaintiffs Unlawfully Removed

**[45]** Despite the government's suggestion during the emergency stay hearing that the government would return removed plaintiffs should they prevail on the merits, TRO Hr'g Tr., Aug. 9, 2018, ECF No. 23 at 13-14 (explaining that the Department of Justice had previously represented to the Supreme Court that should a Court find a policy that led to a

plaintiffs' deportation unlawful the government "would return [plaintiffs] to the United states at no expense to [plaintiffs]"), the government now argues that the Court may not do so, *see* Defs.' Reply, ECF No. 85 at 78–79.

In support of its argument, the government relies principally on *Kiyemba v. Obama,* 555 F.3d 1022 (D.C. Cir 2009) vacated, 559 U.S. 131, 130 S.Ct. 1235, 175 L.Ed.2d 1070, reinstated in amended form, 605 F.3d 1046 (D.C. Cir. 2010). In *Kiyemba,* seventeen Chinese citizens, determined to be enemy combatants, sought habeas petitions in connection with their detention in Guantanamo Bay, Cuba. 555 F.3d at 1024. The petitioners sought release in the United States because they feared persecution if they were returned to China, but had not sought to comply with the immigration laws governing a migrant's entry into the United States. *Id.* After failed attempts to find an appropriate country in which to resettle, the petitioners moved for an order compelling their release into the United States. *Id.* The district court, citing exceptional circumstances, granted the motion. *Id.*

The United States Court of Appeals for the District of Columbia Circuit reversed. The Court began by recognizing that the power to exclude aliens remained in the **\*145** exclusive power of the political branches. *Id.* at 1025 (citations omitted). As a result, the Court noted, "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *Id.* at 1026 (citation and internal quotation marks omitted). The critical question was "what law expressly authorized the district court to set aside the decision of the Executive Branch and to order these aliens brought into the United States." *Id.* at 1026 (internal quotation marks omitted).

In this case, the answer to that question is the immigration laws. In fact, *Kiyemba* distinguished Supreme Court cases which "rested on the Supreme Court's interpretation not of the Constitution, but of a provision in the immigration laws." *Id.* at 1028. The Court further elaborated on this point with the following explanation:

> it would ... be wrong to assert that, by ordering aliens paroled into the country ... the Court somehow undermined the plenary authority of the political branches over the entry and admission of aliens. The point is that Congress has set up the framework under which aliens may enter the United States. The Judiciary only possesses the power Congress gives it to review Executive action taken within that framework. Since petitioners have not applied for admission, they are not entitled to invoke that judicial power.

*Id.* at 1028 n.12.

The critical difference here is that plaintiffs have availed themselves of the "framework under which aliens may enter the United States." *Id.* Because plaintiffs have done so, this Court "possesses the power Congress gives it to review Executive action taken within that framework." *Id.* Because the Court finds *Kiyemba* inapposite, the government's argument that this Court lacks authority to order plaintiffs returned to the United States is unavailing.

It is also clear that injunctive relief is necessary for the Court to fashion an effective remedy in this case. The credible fear interviews of plaintiffs administered pursuant to the policies in *Matter of A-B-* and the Policy Memorandum were fundamentally flawed. A Court Order solely enjoining these policies is meaningless for the removed plaintiffs who are unable to attend the subsequent interviews to which they are entitled. *See, e.g., Walters v. Reno,* 145 F.3d 1032, 1050–51 (9th Cir. 1998)("[A]llowing class members to reopen their proceedings is basically meaningless if they are unable to attend the hearings that they were earlier denied.").

### 3. Permanent Injunction Factors Require Permanent Injunctive Relief

**[46]**  A plaintiff seeking a permanent injunction must satisfy a four-factor test. *eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).* Plaintiffs must demonstrate they have: (1) suffered an irreparable injury; (2) that traditional legal remedies, such as monetary relief, are inadequate to compensate for that injury; (3) the balance of hardships between the parties warrants equitable relief; and (4) the injunction is not contrary to the public interest. *See Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau, 785 F.3d 684, 695 (D.C. Cir. 2015).*

**[47]**  Plaintiffs seek a permanent injunction, arguing that they have been irreparably harmed and that the equities are in their favor. Pls.' Mot., ECF No. 64-1 at 73–74. The government has not responded to these arguments on the merits, and rests on its contention that the Court does not have the authority to order such relief. Defs.' Reply, ECF No. 85 at 75–78. Having found that the Court does have the authority **\*146** to order injunctive relief, *supra,* at 141–45, the Court will explain why that relief is appropriate.

Plaintiffs claim that the credible fear policies this Court has found to be unlawful have caused them irreparable harm. It is undisputed that the unlawful policies were applied to plaintiffs' credible fear determinations and thus caused plaintiffs' applications to be denied. *See* Defs.' Mot., ECF No. 57-1 at 28 (stating an "asylum officer reviewed each of [plaintiffs] credible fear claims and found them wanting in light of Matter of A-B-"). Indeed, plaintiffs credibly alleged at their credible fear determinations that they feared rape, pervasive domestic violence, beatings, shootings, and death in their countries of origin. Based on plaintiffs' declarations attesting to such harms, they have demonstrated that they have suffered irreparable injuries. [32]

The Court need spend little time on the second factor: whether other legal remedies are inadequate. No relief short of enjoining the unlawful credible fear policies in this case could provide an adequate remedy. Plaintiffs do not seek monetary compensation. The harm they suffer will continue unless and until they receive a credible fear determination pursuant to the existing immigration laws. Moreover, without an injunction, the plaintiffs previously removed will continue to live in fear every day, and the remaining plaintiffs are at risk of removal.

**[48]**  The last two factors are also straightforward. The balance of the hardships weighs in favor of plaintiffs since the "[g]overnment 'cannot suffer harm from an injunction that merely ends an unlawful practice.' " *R.I.L-R, 80 F.Supp.3d at 191* (citing *Rodriguez, 715 F.3d at 1145*). And the injunction is not contrary to the public interest because, of course, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Id.* (citations omitted). Moreover, as the Supreme Court has stated, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder, 556 U.S. 418, 436, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).* No one seriously questions that plaintiffs face substantial harm if returned to their countries of origin. Under these circumstances, plaintiffs have demonstrated they are entitled to a permanent injunction in this case.

### IV. Conclusion

For the foregoing reasons, the Court holds that it has jurisdiction to hear plaintiffs' challenges to the credible fear policies, that it has the authority to order the injunctive relief, and that, with the exception of two policies, the new credible fear policies are arbitrary, capricious, and in violation of the immigration laws.

Accordingly, the Court **GRANTS in PART and DENIES in PART** plaintiffs' cross-motion for summary judgment and motion to consider evidence outside the administrative record. The Court also **GRANTS** plaintiffs' motion for a permanent injunction. The Court further **GRANTS in PART and DENIES in PART** the government's motion for summary judgment and motion to strike.

The Court will issue an appropriate Order consistent with this Memorandum Opinion.

### SO ORDERED.

### All Citations

344 F.Supp.3d 96

# Footnotes

1    Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes the current Acting Attorney General as the defendant in this case. "Plaintiffs take no position at this time regarding the identity of the current Acting Attorney General of the United States." Civil Statement, ECF No. 101.

2    Plaintiffs Grace, Carmen, Gio, Gina, Maria, Mina, Nora, and Mona § are proceeding under pseudonyms.

3    The Court appreciates the illuminating analysis provided by the *amici*.

4    Although *Matter of A-B-* discusses gang-related violence at length, the applicant in *Matter of A-B-* never claimed gang members had any involvement in her case. *Id.* at 321 (describing persecution related to domestic violence).

5    When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF header page number, not the original page number of the filed docket.

6    The plaintiffs' declarations have been filed under seal.

7    Each plaintiffs' harrowing accounts were found to be believable during the plaintiffs' credible fear interviews. Oral Arg. Hr'g Tr., ECF No. 102 at 37.

8    Since the Court's Order staying plaintiffs' removal, two plaintiffs have moved for the Court to lift the stay and have accordingly been removed. *See* Mot. to Lift Stay, ECF Nos. 28 (plaintiff Mona), 60 (plaintiff Gio).

9    The Court does not reach plaintiffs' due process claims, and therefore will not consider the extra-record evidence related to that claim. *See* Second Mujahid Decl., ECF No. 64-4, Exs. 4–7; Second Mujahid Decl., ECF No. 64-4, Exs. 8-9; ECF No. 64-5.

10   The Court will not consider three newspaper articles, Mujahid Decl., ECF No. 10-3, Exs. R–T, however, since they are not competent evidence to be considered at summary judgment. *See* Fed. R. Civ. P. 56(c).

11   The Policy Memorandum is not subject to *Chevron* deference. The Supreme Court has warned that agency "[i]nterpretations such as those in opinion letters—like interpretations contained in *policy statements*, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Rather, interpretations contained in such formats "are entitled to respect ... only to the extent that those interpretations have the power to persuade." *Id.* (citations omitted).

12   Handbook of Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and 1967 Protocol Relating to the Status of Refugees, OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES, *available at* http://www.unhcr.org/4d93528a9.pdf.

13   The new rule is also a departure from previous DHS policy. *See* Mujahid Decl., Ex. F ("2017 Credible Fear Training") ("Asylum officers should evaluate the entire scope of harm experienced by the applicant to determine if he or she was persecuted, taking into account the individual circumstances of each case."). It is arbitrary and capricious for that reason as well. *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013)("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, *not casually ignored.*")(emphasis added).

14   The Court also notes that domestic law may supersede international obligations only by express abrogation, *Chew Heong v. United States*, 112 U.S. 536, 538, 5 S.Ct. 255, 28 L.Ed. 770 (1884), or by subsequent legislation that irrevocably conflicts with international obligations, *Reid v. Covert*, 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Congress has not expressed any intention to rescind its international obligations assumed through accession to the 1967 Protocol via the Refugee Act of 1980.

15   Because the government is interpreting a provision of the INA, the *Chevron* framework applies.

16   The Court notes that this persecution requirement applies to all asylum claims not just claims based on membership in a "particular social group" or claims related to domestic or gang-related violence. *See*

🔖 *Matter of A-B-*, 27 I. & N. Dec. at 337 (describing elements of persecution). Therefore, such a formulation heightens the standard for every asylum applicant who goes through the credibility determination process.

17    This departure is also wholly unexplained. As the Supreme Court has held, "[u]nexplained inconsistency is ... a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the [APA]." *See* 🔖 *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The credible fear policies do not acknowledge a change in the persecution standard and are also arbitrary and capricious for that reason. *See* 🔖 *Fox Television Stations, Inc.*, 556 U.S. at 514, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009)("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing [its] position.").

18    Similar to the Attorney General's directives related to the "unwilling or unable" standard, this directive applies to all asylum claims, not just claims related to domestic or gang-related violence.

19    The government contends that plaintiffs' argument on this issue has evolved from the filing of the complaint to the filing of plaintiffs' cross-motion for summary judgment. Defs.' Reply, ECF No. 85 at 61. In plaintiffs' complaint, they objected to the circularity issue by stating the new credible fear policies erroneously conclude "that groups defined in part by the applicant's inability to leave the relationship are impermissibly circular." ECF No. 54 at 24. In their cross-motion for summary judgment, plaintiffs argue that the government's rule is inconsistent with well-settled law that the circularity standard only applies when the group is defined exclusively by the feared harm. Pls.' Mot., ECF No. 64-1 at 57. The Court finds that plaintiffs' complaint was sufficient to meet the notice pleading standard. *See* 🔖 *3E Mobile, LLC v. Glob. Cellular, Inc.*, 121 F.Supp.3d 106, 108 (D.D.C. 2015)(explaining that the notice-pleading standard does not require a plaintiff to "plead facts or law that match every element of a legal theory").

20    These discretionary factors include but are not limited to: "the circumvention of orderly refugee procedures; whether the alien passed through any other countries or arrived in the United States directly from her country; whether orderly refugee procedures were in fact available to help her in any country she passed through; whether he or she made any attempts to seek asylum before coming to the United States; the length of time the alien remained in a third country; and his or her living conditions, safety, and potential for long-term residency there." Policy Memorandum, ECF No. 100 at 10.

21    The Policy Memorandum also reiterates that "few gang-based or domestic-violence claims involving particular social groups defined by the members' vulnerability to harm may ... pass the 'significant possibility' test in credible-fear screenings." Policy Memorandum, ECF No. 100 at 10. For this proposition, the Policy Memorandum refers to the "standards clarified in 🔖 *Matter of A-B-*." *Id.* This requirement for an alien to explain how they fit into a particular social group independent of the harm they allege, further supports the fact that there is a delineation requirement at the credible fear stage.

22    Any assumption that the entirety of 🔖 *Matter of A-B-* is entitled to deference also falters in light of the government's characterization of most of the decision as dicta. Defs.' Reply, ECF No. 85 at 44–47. (characterizing 🔖 *Matter of A-B-* "comment[ary] on problems typical of gang and domestic violence related claims.") According to the government, the only legal effect of 🔖 *Matter of A-B-* is to overrule *Matter of A-R-C-G-*. Any other self-described dicta would not be entitled to deference under 🔖 *Chevron* and therefore 🔖 *Brand X* could not apply. 🔖 *Brand X*, 545 U.S. at 982, 125 S.Ct. 2688 (agency interpretation must at minimum be "otherwise entitled to deference" for it to supersede judicial construction). Simply put, 🔖 *Brand X* is not a license for agencies to rely on dicta to ignore otherwise binding circuit precedent.

23    🔖 *Matter of A-B-* invokes 🔖 *Brand X* only as to its interpretation of particular social group. 🔖 27 I. & N. Dec. at 327. As the Court has explained above, that interpretation is not entitled to deference.

24    The government relies on BIA cases to support its argument that the law of the jurisdiction where the interview takes place controls. *See* Defs.' Mot., ECF No. 57-1 at 49. These cases address the law that governs the removal proceedings, an irrelevant and undisputed issue.

25    The government cannot claim the more deferential *Auer* deference because *Auer* applies to an agency's interpretation of its own regulations, not to interpretations of policy documents like the Policy Memorandum.

      *See Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)(holding agencies may resolve ambiguities in regulations).

26    The policy is also a departure from prior DHS policy without a rational explanation for doing so. *See* Mujahid Decl., Ex. F (DHS training policy explaining that law most favorable to the applicant applies when there is a circuit split).

27    Because the Court finds that the government has violated the INA and APA, it need not determine whether there was a constitutional violation in this case. *See Am. Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161, 109 S.Ct. 1693, 104 L.Ed.2d 139 (1989)(per curiam)(stating courts should be wary of issuing "unnecessary constitutional rulings").

28    Habeas corpus proceedings, like challenges to the validity of the system under 1252(e)(3), are "specifically authorized in a subsequent paragraph of [1252(e) ]." 8 U.S.C. § 1252(e)(1)(a).

29    To prevail on this type of claim a petitioner must establish that he or she is an "alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158." 8 U.S.C. § 1252(e)(2).

30    Plaintiffs also argue that section 1252(e)(1) does not apply to actions brought under section 1252(e)(3). Section 1252(e)(1), by its terms, only applies to an "action pertaining to an order to exclude an alien in accordance with section 1225(b)(1)." Plaintiffs argue that the plain reading of section 1252(e)(3) shows that an action under that provision does not pertain to an individual order of exclusion, but rather "challenges the validity of the system." Pls.' Reply, ECF No. 92 at 12 (citing 8 U.S.C. § 1252(e)(3) ). Having found that section 1252(e)(3) is an exception to section 1252(e)(1)'s limitation on remedies, the Court need not reach this argument.

31    During oral argument, the government argued for the first time that an injunction in this case was tantamount to class-wide relief, which the parties agree is prohibited under the statute. *See* Oral Arg. Hr'g Tr., ECF No. 102 at 63; 8 U.S.C. § 1252(e)(1)(b)(prohibiting class certification in actions brought under section 1252(e)(3) ). The Court finds this argument unpersuasive. Class-wide relief would entail an Order requiring new credible fear interviews for all similarly situated individuals, and for the government to return to the United States all deported individuals who were affected by the policies at issue in this case. Plaintiffs do not request, and the Court will not order, such relief.

32    The country reports support the accounts of the Plaintiffs. *See* Mujahid Decl., ECF No. 10-3, Exs. K-T; Second Mujahid Decl., ECF No. 64-4 Exs. 10–13; Honduras Decl., ECF No. 64-6; Guatemala Decl., ECF No. 64-7; El Salvador Decl., ECF No. 64-8.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by California v. Azar, 9th Cir.(Cal.), December 13, 2018

51 F.3d 212

United States Court of Appeals,

Ninth Circuit.

HAWAII HELICOPTER OPERATORS

ASSOCIATION, Petitioner,

v.

FEDERAL AVIATION

ADMINISTRATION, Respondent.

No. 94–70703.

|

Argued and Submitted Jan. 10, 1995.

|

Decided March 29, 1995.

**Synopsis**

Association of Hawaiʻi helicopter tour operators filed petition to review Federal Aviation Administration's (FAA) issuance of regulation establishing special operating rules, procedures and limitations for airplane and helicopter air tour operators in Hawaiʻi. The Court of Appeals, Schroeder, Circuit Judge, held that: (1) Federal Aviation Administration (FAA) properly invoked good cause exception to notice and comment requirements of the Administrative Procedure Act's (APA) rule-making provision; (2) regulation prohibiting air tour aircraft in Hawaiʻi from flying below minimum altitude of 1,500 feet was not arbitrary and capricious; (3) regulation requiring air tour operators in Hawaiʻi to equip helicopters with emergency flotation gear or require each person to wear flotation gear was supported by rational basis.

Review denied.

West Headnotes (5)

**[1]** **Administrative Law and Procedure** ⬩ Public interest; harm

Notice and comment procedures under Administrative Procedure Act (APA) should be waived only when delay would do real harm.

5 U.S.C.A. § 553(b)(B).

12 Cases that cite this headnote

**[2]** **Aviation** ⬩ Notice and comment

Federal Aviation Administration (FAA) properly invoked good cause exception to notice and comment requirements of the Administrative Procedure Act's (APA) rule-making provision when it established special operating rules for airplane and helicopter tour operators in Hawaiʻi, where FAA waived notice and comment because of its concern about threat to public safety reflected in increasing number of helicopter air tour accidents. 5 U.S.C.A. § 553(b)(B).

14 Cases that cite this headnote

**[3]** **Aviation** ⬩ Determination and disposition

Emergency Federal Aviation Administration (FAA) regulation prohibiting air tour aircraft in Hawaiʻi from flying below minimum altitude of 1,500 feet was not arbitrary and capricious; regulation bore rational relationship to legitimate FAA concern that tour aircraft be at sufficient altitude to have access to emergency landing areas. 5 U.S.C.A. § 706(2)(A).

1 Cases that cite this headnote

**[4]** **Aviation** ⬩ Determination and disposition

Emergency Federal Aviation Administration (FAA) regulation requiring air tour operators in Hawaiʻi to equip helicopters with emergency flotation gear or require each passenger to wear flotation gear was supported by rational basis; requirements were imposed after study of recent helicopter accidents in Hawaiʻi showed that crash victims of accidents where flotation equipment was available were much less likely to drown than victims of helicopter accidents where no such equipment was available. 5 U.S.C.A. § 706(2)(A).

2 Cases that cite this headnote

**[5]** **Aviation** ⬩ Notice and comment

**Constitutional Law** 🔗 Aviation and airspace

**Constitutional Law** 🔗 Aviation

Due process did not require Federal Aviation Administration (FAA) to provide notice and comment before promulgating regulation limiting airplane and helicopter air tours in Hawai'i, where FAA satisfied good cause exception to notice and comment requirements of Administrative Procedure Act's (APA) rule-making provisions, and did not bar all input from interested parties. U.S.C.A. Const.Amend. 5; 5 U.S.C.A. § 553.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*213** Patricia Barlow, Carole Morrell, Elliott Myles, Law Offices of Patricia Barlow, San Francisco, CA, for petitioner.

Timothy P. Melcher, F.A.A., Washington, DC, for respondent.

Petition for Review of a Federal Aviation Administrative Order.

Before: GOODWIN and SCHROEDER, Circuit Judges, and TASHIMA,* District Judge.

**Opinion**

SCHROEDER, Circuit Judge:

The Hawaii Helicopter Operators Association ("HHOA") petitions, pursuant to 49 U.S.C. § 46110(a), for review of the Federal Aviation Administration's issuance of Special Federal Aviation Regulation ("SFAR") No. 71 establishing special operating rules, procedures and limitations for airplane and helicopter air tour operators in Hawaii. The regulation was promulgated on an emergency **\*214** basis pursuant to the exception contained in 5 U.S.C. § 553, which exempts an agency from complying with the notice and comment requirements of the Administrative Procedure Act ("APA") where good cause exists. HHOA's principal grievance is with SFAR No. 71's prohibition against air traffic aircraft flying below a minimum altitude of 1,500 feet. HHOA also objects to the requirements that helicopters be amphibious and equipped with emergency flotation gear, or that each person on board wear approved flotation gear.

The FAA promulgated SFAR No. 71 after a series of seven helicopter accidents involving four fatalities, which occurred in the first nine months of 1994. The regulation was promulgated September 26, 1994. It became effective on October 26, 1994.

HHOA initially contends that the FAA improperly invoked 5 U.S.C. § 553(b)(B), the good cause exception to the notice and comment requirements of the APA's rule-making provision. The APA provides that notice and comment may be waived by an agency when it "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

**[1]** This court has said that our "inquiry into whether the Secretary properly invoked 'good cause' proceeds case-by-case, sensitive to the totality of the factors at play." Alcaraz v. Block, 746 F.2d 593, 612 (9th Cir.1984). We have observed that notice and comment procedures should be waived only when "delay would do real harm." Buschmann v. Schweiker, 676 F.2d 352, 357 (9th Cir.1982) (quoting U.S. Steel Corp. v. EPA, 595 F.2d 207, 214 (5th Cir.1979)), reh'g granted, 598 F.2d 915 (1979); see also Washington State Farm Bureau v. Marshall, 625 F.2d 296, 306–07 (9th Cir.1980).

**[2]** In this case the FAA based its invocation of the "good cause" exception on Hawaii's "recent escalation of fatal air tour accidents." The FAA further explained that the problem was urgent:

> Despite voluntary measures, the cooperation of the Hawaii air tour operators, and the FAA's inspections, the accident data show that voluntary measures and existing regulations are insufficient to ensure safe air tour operations in Hawaii. The recent accidents ... indicate an urgent safety problem that cannot be adequately

addressed solely by enforcement of existing regulations.

Air Tour Operators in the State of Hawaii, 59 Fed.Reg. 49138, 49145 (Sept. 26, 1994) (to be codified at 14 C.F.R. §§ 91 and 135). The FAA listed specific facts supporting its reasons for issuing SFAR No. 71. These facts included: (1) there had been 20 air tour accidents between 1991 and 1994, including 24 fatalities; (2) among the 20 accidents, seven had occurred in 1994; (3) the most recent fatal accident had occurred on July 14, 1994; (4) the most recent non-fatal accident had occurred on September 4, 1994, only three weeks before SFAR No. 71 was promulgated. [1]

We perceive no indication in this record that the FAA waived notice and comment for any reasons other than its concern about the threat to public safety reflected in an increasing number of helicopter accidents. The FAA adequately explained the basis for taking emergency action without waiting for public participation. *Compare San Diego Air Sports Center, Inc. v. FAA,* 887 F.2d 966, 970 (9th Cir.1989) (FAA did not comply with provisions of § 553 when it issued letter disallowing parachuting without any explanation of why it felt emergency action was needed and where only known accident had occurred two years earlier.).

[3]    HHOA also contends that SFAR No. 71 is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious within the meaning of the APA when the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the **\*215** problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Beno v. Shalala,* 30 F.3d 1057, 1073 (9th Cir.1994) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). The reviewing court "may not substitute its judgment for the agency's; rather, it is limited to an inquiry whether the agency's decision was based on a consideration of relevant factors and whether there was a clear error of judgment." *Marshall,* 625 F.2d at 302. An agency's factual findings must be upheld "if those findings are supported by substantial evidence on the record as a whole." *Arkansas v. Oklahoma,* 503 U.S. 91, 113, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992).

HHOA's principal objection is to the 1,500 foot minimum flying altitude requirement. The FAA summarized its rationale as follows:

> Hawaii's unique topography often complicates access to suitable emergency landing areas. The air tour accidents in Hawaii have been characterized by insufficient time for pilots to locate suitable landing areas after engine power loss or other problems leading to accidents. The requirement to maintain an altitude of 1,500 feet above the surface is necessary for safety because it allows the pilot sufficient time to react in an emergency, to notify and instruct passengers, and to prepare for a forced landing. An aircraft operating at least 1,500 feet above the surface allows the pilot a greater opportunity to select a suitable landing site than would be the case at lower altitudes.

Air Tour Operators in the State of Hawaii, 59 Fed.Reg. 49138, 49143. On the basis of the record before this court, the regulation bears a rational relationship to legitimate FAA safety concerns and is neither arbitrary nor capricious.

[4]    HHOA also objects to the SFAR 71's flotation requirements, contending that no rational basis supports singling out helicopters flown in Hawaii for such regulation.

The regulation itself adequately explains that flotation requirements were imposed after a study of recent helicopter accidents in Hawaii showed that crash victims of accidents where flotation equipment was available were much less likely to drown than victims of helicopter accidents where no such equipment was available. *Air Tour Operators in the State of Hawaii,* 59 Fed.Reg. 49138, 49142. We conclude that a reasonable basis supported the flotation requirement.

 **[5]** HHOA also contends that due process requires the FAA to provide some notice and comment before promulgating the regulation. Where the requirements of § 553 have been satisfied, however, the Constitution imposes no higher procedural requirements. *Cf. Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978) ( "[ Section 553 establishes] the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures.").

Moreover, the FAA has not barred all input from interested parties such as HHOA. Under SFAR No. 71,

> interested persons are invited to submit such comments as they desire regarding this SFAR.... All communications received on or before the close of the comment period will be considered by the Administrator, and this SFAR may be changed in light of the comments received. All comments

will be available, both before and after the closing dates for comments, in the Rules Docket for examination by interested parties.

*Air Tour Operators in the State of Hawaii,* 59 Fed.Reg. 49138, 49145.

In this manner, the FAA left the record open for a comment period that has recently expired. The FAA has indicated that it may modify SFAR No. 71 in response to comments. The record reflects that a number of comments, including comments from the National Transportation Safety Board, have directed criticism at SFAR No. 71. These comments may well merit response by the FAA.

 **\*216** When the FAA does respond to the comments, its action, including any modifications of the regulation, will constitute final agency action reviewable by this court. *See, e.g.,* 14 C.F.R. §§ 11.61–11.69.

This panel will retain jurisdiction of any further petitions for review of SFAR No. 71 or any successor regulation emerging from the comment period. *See, e.g., Klein v. Sullivan,* 978 F.2d 520, 521 (9th Cir.1992).

REVIEW DENIED.

**All Citations**

51 F.3d 212

## Footnotes

\*      Honorable A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation.

1      In the FAA's letter to HHOA denying HHOA's petition for stay of SFAR No. 71, the FAA noted that another non-fatal accident occurred on October 24, 1994, two days before SFAR No. 71 was to become effective.

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

03 Cal. Daily Op. Serv. 8967, 2003 Daily Journal D.A.R. 11,291

KeyCite Yellow Flag - Negative Treatment

Superseded by Statute as Stated in Johnson v. Attorney General of U.S., 3rd Cir., April 16, 2010

345 F.3d 824
United States Court of Appeals,
Ninth Circuit.

Laura Luis HERNANDEZ, Petitioner,

v.

John ASHCROFT, Attorney General, Respondent.

No. 02–70988.
|
Argued and Submitted July 10, 2003.
|
Filed Oct. 7, 2003.

## Synopsis

Alien petitioned for judicial review of decision of the Board of Immigration Appeals (BIA) denying her application for suspension of deportation under the Violence Against Women Act (VAWA) or, in alternative, for adjustment in status. The Court of Appeals, Paez, Circuit Judge, held that: (1) Attorney General's decision as to whether alien satisfied one of the statutory requirements for suspension of deportation under the VAWA by demonstrating that she had been subjected to "extreme cruelty in the United States" was nondiscretionary decision, which Court of Appeals had jurisdiction to review; (2) conduct on part of alien's physically abusive spouse, after alien had fled to home of her sister in the United States, in repeatedly calling sister's home and, through his false promises and short-lived contrition, in luring alien from safety of the United States back to his home in Mexico, qualified as acts of "extreme cruelty in the United States," such as might provide basis for suspension of deportation; (3) possession of allocated visa number is not requirement for eligibility for adjustment of status; and (4) nonviability of alien's marriage at time of adjustment was impermissible basis for denying application for adjustment of status.

Petition granted; case remanded.

West Headnotes (24)

**[1]**  **Aliens, Immigration, and Citizenship**  🔑  Review of initial decision or administrative review

Where the Board of Immigration Appeals (BIA) has conducted a de novo review of immigration judge's decision, Court of Appeals reviews only the BIA's decision.

9 Cases that cite this headnote

**[2]**  **Aliens, Immigration, and Citizenship**  🔑  Law questions

Board of Immigration Appeals' (BIA's) resolution of questions of law is reviewed de novo, except to extent that it involves interpretation of ambiguous statutory provisions intended by Congress to be left to the BIA's discretion; in such circumstances, Court of Appeals must affirm the BIA's interpretation as long as it involves a permissible construction of statute.

3 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship** ☛ Substantial evidence in general

Board of Immigration Appeals' (BIA's) determinations of fact, including determinations as to alien's eligibility for adjustment of status, are reviewed for substantial evidence.

7 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** ☛ Presumptions and burden of proof

Burden was on alien petitioning for suspension of deportation based on her alleged status as battered or abused spouse to establish each of statutory factors needed for her to qualify for suspension of deportation on that basis. Immigration and Nationality Act, § 244(a)(3), 🚩 8 U.S.C.(1994 Ed.) § 1254(a)(3).

1 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** ☛ Cancellation of Removal or Suspension of Deportation in General
**Aliens, Immigration, and Citizenship** ☛ Jurisdiction and venue

Attorney General's decision as to whether alien petitioning for suspension of deportation based upon her alleged status as battered or abused spouse satisfied one of the statutory requirements for such relief by demonstrating that she had been subjected to "extreme cruelty in the United States" was nondiscretionary decision, which involved a determination of question of fact through application of legal standards, and which Court of Appeals had jurisdiction to review. Immigration and Nationality Act, § 244(a)(3), 🚩 8 U.S.C.(1994 Ed.) § 1254(a)(3); Omnibus Consolidated Appropriations Act, 1997, § 309(c)(4)(E), 🚩 8 U.S.C.A § 1101 note.

27 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship** ☛ Jurisdiction and venue

On judicial review in immigration case, Court of Appeals always has jurisdiction to consider whether it has jurisdiction.

**[7]    Aliens, Immigration, and Citizenship** ☛ Jurisdiction and venue

Although Court of Appeals has no jurisdiction to review an exercise of discretion by the Board of Immigration Appeals (BIA) in deciding whether to grant application for suspension of deportation, BIA's decision as to those elements of statutory eligibility for such relief that do not involve exercise of discretion remain subject to direct judicial review. Immigration and Nationality Act, § 244, 🚩 8 U.S.C.(1994 Ed.) § 1254.

**[8]    Statutes** ☛ Express mention and implied exclusion;  expressio unius est exclusio alterius

When Congress includes particular language in one section of statute but omits it in another section of same act, court may infer that Congress acted intentionally and purposely in the disparate inclusion or exclusion.

**[9]    Aliens, Immigration, and Citizenship** ☛ Hardship as basis for relief

In deciding whether alien had been subjected to "extreme cruelty in the United States," as one of factors bearing on whether she was entitled to suspension of deportation under provision of the Violence Against Women Act (VAWA),

03 Cal. Daily Op. Serv. 8967, 2003 Daily Journal D.A.R. 11,291

court was concerned with location of alien at time of this alleged cruelty and not with location of her alleged abusive spouse; thus, where this alleged cruelty consisted in part of repeated phone calls from spouse to alien, spouse's presence outside the United States at time he initiated these calls was irrelevant to whether alien met statutory eligibility requirement. Immigration and Nationality Act, § 244(a)(3), 🚩 8 U.S.C.(1994 Ed.) § 1254(a)(3).

5 Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship** 🔑 Hardship as basis for relief

Conduct on part of alien's physically abusive spouse, after alien had fled to home of her sister in the United States to escape his abuse, in repeatedly calling sister's home and, through his false promises and short-lived contrition and by playing on alien's emotional dependence and her fears, as abused spouse, that failure to accede to spouse's demands would result in renewed violence, in luring her from safety of the United States back to his home in Mexico, qualified as acts of "extreme cruelty in the United States," such as might provide basis, under the Violence Against Women Act (VAWA), for suspension of deportation when, following attack by her spouse with knife, alien returned to United States. Immigration and Nationality Act, § 244(a)(3), as amended, 🚩 8 U.S.C.A. § 1254(a)(3).

6 Cases that cite this headnote

**[11]    Statutes** 🔑 Intent

**Statutes** 🔑 Will of legislature

Court of Appeals interprets federal statute by ascertaining intent of Congress and by giving effect to its legislative will.

1 Cases that cite this headnote

**[12]    Aliens, Immigration, and Citizenship** 🔑 Cancellation of Removal or Suspension of Deportation in General

In providing, in the Violence Against Women Act (VAWA), that Attorney General may grant suspension of deportation to alien who, inter alia, has been battered or subjected to extreme cruelty in the United States, Congress meant to distinguish between "battery" and "extreme cruelty," reserving the term "extreme cruelty" for something other than physical assault, presumably for actions in some way involving mental or psychological cruelty. Immigration and Nationality Act, § 244(a)(3), as amended, 🚩 8 U.S.C.A. § 1254(a)(3).

22 Cases that cite this headnote

**[13]    Administrative Law and Procedure** 🔑 Plain, literal, or clear meaning; ambiguity or silence

When traditional tools of statutory interpretation are unable to unearth Congress' intent with regard to precise question at issue, courts must respect interpretation of agency to which Congress has delegated responsibility for administering statutory program.

**[14]    Statutes** 🔑 Remedial Statutes

When legislature enacts an ameliorative rule designed to forestall harsh results, rule will be interpreted and applied in ameliorative fashion.

5 Cases that cite this headnote

**[15]**    **Aliens, Immigration, and Citizenship**  ⬤➤  Constitutional and statutory provisions

In immigration context, doubts as to meaning of statute are to be resolved in favor of alien.

4 Cases that cite this headnote

**[16]**    **Aliens, Immigration, and Citizenship**  ⬤➤  Adjustment of status

Even assuming that alien, as prerequisite for adjustment of status based on application for permanent residency filed by her citizen-spouse, had to show an approved visa petition, alien made this showing by demonstrating, inter alia, that she had been provided with priority date, and that priority date is not assigned until visa petition is approved.

Immigration and Nationality Act, § 245, as amended, 8 U.S.C.A. § 1255.

9 Cases that cite this headnote

**[17]**    **Aliens, Immigration, and Citizenship**  ⬤➤  Adjustment of status

Possession of allocated visa number is not requirement for eligibility for adjustment of status. Immigration and Nationality Act, § 245, as amended, 8 U.S.C.A. § 1255.

6 Cases that cite this headnote

**[18]**    **Aliens, Immigration, and Citizenship**  ⬤➤  Adjustment of status
**Aliens, Immigration, and Citizenship**  ⬤➤  Jurisdiction and venue

Board of Immigration Appeals (BIA) did not exercise its discretion in denying alien's application for adjustment in status based on fact that her marriage to United States citizen had completely deteriorated and was not longer viable, so that its decision was not insulated from judicial review, where BIA's decision was contrary to its own precedent that nonviability of marriage at time of adjustment is impermissible basis for denying application for adjustment of status. Immigration and Nationality Act, § 245, as amended, 8 U.S.C.A. § 1255.

18 Cases that cite this headnote

**[19]**    **Aliens, Immigration, and Citizenship**  ⬤➤  Adjustment of status
**Aliens, Immigration, and Citizenship**  ⬤➤  Jurisdiction and venue

First step in adjudicating petition for adjustment of status is nondiscretionary determination of alien's statutory eligibility for such an adjustment, a determination that is subject to judicial review, followed by a discretionary determination as to whether eligible applicant is actually permitted to adjust status. Immigration and Nationality Act, § 245, as amended, 8 U.S.C.A. § 1255.

12 Cases that cite this headnote

**[20]**    **Aliens, Immigration, and Citizenship**  ⬤➤  Determination
**Aliens, Immigration, and Citizenship**  ⬤➤  Jurisdiction and venue

Board of Immigration Appeals (BIA) may not insulate a decision that is contrary to law from judicial review by merely labeling such a decision discretionary; BIA has no discretion to make a decision that is contrary to law.

03 Cal. Daily Op. Serv. 8967, 2003 Daily Journal D.A.R. 11,291

14 Cases that cite this headnote

[21]   **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Nonprecedential decision by the Board of Immigration Appeals (BIA) in defiance of its precedential case law cannot be classified as "discretionary," and thus not subject to judicial review.

6 Cases that cite this headnote

[22]   **Aliens, Immigration, and Citizenship** 🔑 Administrative Review

Board of Immigration Appeals (BIA) must exercise its discretion within constraints of law.

9 Cases that cite this headnote

[23]   **Aliens, Immigration, and Citizenship** 🔑 Administrative Review
       **Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

When the Board of Immigration Appeals (BIA) acts where it has no legal authority to do so, it does not make "discretionary" decision, and its determination is not protected from judicial review.

2 Cases that cite this headnote

[24]   **Aliens, Immigration, and Citizenship** 🔑 Adjustment of status

Nonviability of alien's marriage at time of adjustment was impermissible basis for denying application for adjustment of status. Immigration and Nationality Act, § 245, as amended, 📄 8 U.S.C.A. § 1255.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*827** Katrin E. Frank, MacDonald Hoague & Bayless, Seattle, WA; Angela M. Niemann and Rima J. Alaily, Heller Ehrman White & McAuliffe, Seattle, WA, on behalf of Northwest Women's Law Center, for the petitioner-appellant.

John C. Cunningham, Office of Immigration Litigation, Washington, DC, for the respondent-appellee.

Thomas C. Means, Crowell & Moring, Washington, DC, for the amici.

On Petition for Review of an Order of the Board of Immigration Appeals. Agency No. AXX–XXX–485.

Before REAVLEY, [*] TASHIMA, and PAEZ, Circuit Judges.

## OPINION

PAEZ, Circuit Judge:

While living in Mexico, Laura Luis Hernandez ("Hernandez") experienced life-threatening violence at the hands of her husband, a legal permanent resident of the United States. She fled to the United States, but her husband tracked her down, promised

not to hurt her again, and begged her to return to Mexico with him. After Hernandez submitted to his demand and returned to Mexico, the physical abuse began again.

Having escaped her husband permanently, and now living without legal status in the United States, Hernandez applied for suspension of deportation under a provision of the Violence Against Women Act of 1994 ("VAWA") intended to protect immigrants who have suffered domestic violence. [1] With the passage of VAWA, Congress provided a mechanism for women who have been battered or subjected to extreme cruelty to achieve lawful immigration status independent of an abusive spouse. However, the Board of Immigration Appeals ("BIA") affirmed the immigration **\*828** judge's ("IJ's") denial of Hernandez's application because it determined that Hernandez had not "been battered or subjected to extreme cruelty *in the United States,*" as the statute then required. Hernandez also applied for adjustment of status on the basis of a petition for permanent residency that her husband had filed for her while they were still together. The BIA affirmed the IJ's denial of this application as well, first stating that she failed to adequately show that she had an approved visa petition or that an immigrant visa was immediately available to her, and secondly affirming the IJ's "discretionary determination to deny the respondent's application for adjustment of status for the reason that the marriage is no longer in existence." We reverse the BIA's denial of both the suspension of deportation and adjustment of status.

As a preliminary matter, we hold that we have jurisdiction to consider the BIA's determination that Hernandez was not subjected to extreme cruelty in the United States. We next turn to the merits of Hernandez's claim of eligibility for suspension of deportation. We interpret the phrase "extreme cruelty" as a matter of first impression. In so doing, we give deference to a regulation promulgated by the Immigration and Naturalization Service ("INS"), [2] and conduct our inquiry in a manner mindful of Congress's intent that domestic violence be evaluated in the context of professional and clinical understandings of violence within intimate relationships. Although Hernandez was not battered in the United States, the interaction that took place in the United States presents a well-recognized stage within the cycle of violence, one which is both psychologically and practically crucial to maintaining the batterer's control. We conclude that an abuser's behavior during the "contrite" phase of domestic violence may, and in circumstances such as those present here does, constitute "extreme cruelty." Thus, we conclude that Hernandez suffered extreme cruelty in the United States, and we determine that the BIA erred by denying her application for suspension of deportation under VAWA.

We also hold that the BIA erred in denying Hernandez's petition for adjustment of status. Although the INS cites a regulation that appears to require that Hernandez show that a visa number has been allocated to her, the visa scheme and other regulations establish that Hernandez must only show that a visa number was immediately available to her at the time she filed her application. By demonstrating that she was assigned a priority date that was current at the time of filing, Hernandez met this burden. Moreover, because a priority date is not assigned until a petition is approved, the possession of a priority date, as well as other indicia, establishes that Hernandez had an approved petition.

Additionally, we conclude that we have jurisdiction to consider the BIA's determination that the nonviability of Hernandez's marriage constituted a proper discretionary ground for denial of her application for **\*829** adjustment of status. Although the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009–546 (1996), removes our jurisdiction over discretionary decisions regarding adjustment of status, the BIA has no discretion to act in a manner contrary to law. Because the BIA's own precedent states that nonviability of a marriage is an improper basis for denial of an adjustment of status application, we retain jurisdiction over this determination.

As this conclusion presages, we hold that the BIA erred in concluding that the nonviability of Hernandez's marriage was a proper basis for denying her application for adjustment of status. In expressly overriding the viability test, the BIA itself had previously proclaimed that "the denial of an adjustment of status application ... cannot be based solely on the nonviability of the marriage at the time of the adjustment application." Thus, the BIA acted in a manner contrary to law in denying Hernandez's application for adjustment of status because of the nonviability of her marriage.

Accordingly, we grant the petition for review and remand for further proceedings.

03 Cal. Daily Op. Serv. 8967, 2003 Daily Journal D.A.R. 11,291

# I.

## BACKGROUND

Hernandez was thirty years old when she met her future husband, Refugio Acosta Gonzalez ("Refugio"), early in 1990. [3] Refugio frequently ate at a restaurant where Hernandez worked in Mexicali, and after a short while they began dating. Initially, the relationship seemed idyllic. Hernandez believed that Refugio "was a marvelous person, a good person .... he used to give me flowers .... everything was marvelous." After dating for a few months, the two decided to move in together. Several months later, "we were already in love and he asked me to get married." They were married in October 1990, in a small civil ceremony with a few friends present. After the wedding, they continued living in the same apartment in Mexicali.

Following the marriage, however, Refugio's behavior changed drastically. He began drinking heavily and verbally abusing Hernandez, and ultimately began physically abusing her as well. Although the verbal and physical abuse appear to have been constant throughout the marriage, Hernandez described several specific instances of particularly serious physical assault.

On the first occasion, a few months after their marriage, Refugio and Hernandez had gone to the movies. They became separated, and Hernandez was unable to find Refugio. After searching for him without success, she returned home and went to sleep. She was awakened some time later by the shattering of the bedroom window above her head. Refugio entered the darkened room through the broken window, landing on Hernandez. Seeing her, Refugio lifted her by her hair and threw her forcefully against the wall. Hernandez lay where she fell, stunned. Refugio stumbled drunkenly into the kitchen, seized a chair, and broke it across Hernandez's back. He continued hitting and kicking her while uttering insults and other verbal abuse.

Hernandez's head was wounded by the assault, and it was noted during the hearing that she still bears a visible scar from **\*830** the injury. However, Refugio refused to allow her to leave the house or seek medical treatment. While testifying about this assault Hernandez became upset and began crying. She stated:

> I merely cleaned my head and for two days he wouldn't let me go out. He didn't let me go to the hospital to get treatment. I was bleeding alone. He was afraid that I will denounce him to the police, that's why he wouldn't let me go out.

Following this incident Refugio became "the same man that I knew. He was very good and he will behave very well."

In December of 1992 another violent assault occurred. Intoxicated, Refugio broke through the mosquito netting of the kitchen window while Hernandez was sleeping, and again attacked her. He smashed a pedestal fan over her head, breaking it on her forehead.

Hernandez was convinced that Refugio intended to kill her. She was afraid to return to her family in Mexico, because Refugio knew where they lived, and she feared he would follow her and kill her. With the help of a neighbor, Hernandez fled to the United States, to the home of her sister who lived in Los Angeles. However, after two weeks Refugio convinced the neighbor to give him the telephone number of Hernandez's sister. Refugio began calling every day. Ultimately, Hernandez agreed to talk to him. Refugio told Hernandez that he needed her. Hernandez testified, "He was crying. He asked me forgiveness and he said that he wouldn't do it again. And he asked why I had come here.... [I responded,] if I hadn't gone, fled, he would have killed me."

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Refugio came to Los Angeles. He told Hernandez that "if I would go back with him he would look for a marriage counselor so that we could save our marriage, because he didn't want to lose me and I also didn't want to leave him." Hernandez believed him, particularly because he had never previously raised the possibility of seeking professional help. Still loving him, and believing his remorse and his promises to change, she returned to Mexico with him.

Upon their return, Hernandez found a marriage counselor. However, despite his earlier promise, Refugio refused to see the counselor. After a brief period, Refugio's violence returned.

The violence culminated several months later when Refugio came home drunk one evening. He beat Hernandez savagely, broke the windows in the house, and destroyed all of the furniture. After the beating, Hernandez "stayed in the corner sitting there in the corner, because I was very hurt." The next morning, Hernandez arose and began cooking breakfast.[4] Behaving as though nothing had occurred, Refugio got up and began helping her. Then, suddenly, Refugio lunged at her with the knife he was using to chop vegetables. Sensing the attack, Hernandez blocked the knife thrust with her arm as Refugio attempted to stab her in the back. The knife gouged Hernandez's hand, slicing through to the bone.

Despite the severity of the wound, Hernandez was unable to go to the hospital to treat the injury. Instead, Refugio kept her trapped inside the house for two days. During these two days, Refugio stayed home with her, no longer beating her. On the third day Refugio returned to work, but he placed a padlock on the front door in order to keep Hernandez locked in the house while he was gone. However, Hernandez had an extra key to the padlock, **831** and she was able to attract the attention of a passing neighbor. She slid the key under the door, and the neighbor unlocked the padlock and released her.

Hernandez went straight to the hospital to get treatment for her hand, but the delay in treatment had resulted in permanent damage to the nerves. The hand continues to give Hernandez great pain, and her use of it is restricted. At the hearing, Hernandez showed the IJ a scar approximately an inch and a half long on her right hand between her index finger and thumb.

In fear for her life, Hernandez again fled to the United States. She did not return to her sister's house, because Refugio knew its location. She explained, "I didn't go there anymore, because he has the address of my sister. He knew where I lived and I didn't want him to—and I didn't want him to find me again. I was very afraid. In fact, I am very afraid that he will find me again and he will kill me." She stayed with a friend in the town of Huron, California, for a few months, and then moved to Salinas.

A year later, in Salinas, she met Paulino Garcia, now her domestic partner, who "has helped me economically and morally with all the problems that I have suffered from my—from the abuse of my—the constant abuse that I suffer from my husband." In 1995, she and Paulino attempted to go to Alaska to work on a fishing boat, but Hernandez was intercepted by the INS at the airport and deportation proceedings were initiated against her.

Hernandez is still married to Refugio, but she has not had any contact with him and does not want him to find her. She believes that if she were required to return to Mexico, Refugio would find her and kill her.

Hernandez testified regarding the circumstances surrounding the I–130 petition for residency that Refugio had filed for her. Refugio was a legal permanent resident of the United States, and a year after their marriage he petitioned for her to become a permanent resident as well. On August 11, 1992, she received a letter indicating that she had a priority date for her visa. After leaving Refugio, she was unaware of any further communication by the INS.

*Procedural Background*

Hernandez was served with an Order to Show Cause on June 8, 1995. She appeared before an IJ, represented by an attorney from the Northwest Immigrant Rights Project, and conceded deportability. Her attorney informed the court that she wished to seek two forms of relief: suspension of deportation under VAWA, and adjustment of status based upon an I–130 petition filed by her husband.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

03 Cal. Daily Op. Serv. 8967, 2003 Daily Journal D.A.R. 11,291

Following a hearing, the IJ issued a written opinion, finding Hernandez's testimony to lack credibility due to inconsistencies and the absence of corroborating testimony. The IJ denied her application for suspension of deportation because she had failed to prove she was a victim of domestic violence, and denied her application for adjustment of status because there was no evidence showing that the I–130 application had been approved.

On appeal, the BIA reversed the negative credibility determination, which it determined was unfounded. Nonetheless, the BIA affirmed the IJ's denial of both suspension of deportation and adjustment of status. With regard to the application for suspension of deportation under VAWA, the BIA determined that Hernandez met the three-year continuous physical presence requirement and the good moral character requirement. However, the BIA concluded that because the acts of physical **\*832** violence occurred in Mexico, Hernandez was unable to show that she was "battered or subjected to extreme cruelty in the United States," as required by the 1994 version of the statute. Due to this conclusion, the BIA did not consider whether Hernandez had demonstrated extreme hardship.

The BIA provided two grounds for denying the application for adjustment of status. First, the BIA found that Hernandez had not established that a visa was immediately available to her or that her visa petition had been approved. Secondly, the BIA stated that the deterioration of the marriage provided an independent, discretionary basis for denying the adjustment of status. The BIA did, however, grant Hernandez's request for voluntary departure.

Hernandez filed a timely petition for review.

## II.

### STANDARD OF REVIEW

[1] [2] [3] Where as here, the BIA has conducted a *de novo* review of the IJ's decision, we review only the decision of the BIA. *Dillingham v. INS,* 267 F.3d 996, 1004 (9th Cir.2001). The BIA's resolution of questions of law are reviewed *de novo,* "except to the extent they involve interpretations of ambiguous statutory provisions intended by Congress to be left to the agency's discretion." *Id.* In such cases, we must affirm the agency's interpretation so long as that interpretation involves a permissible construction of the statute. *Chevron v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The BIA's determinations of fact, including determinations regarding eligibility for adjustment of status, are reviewed for substantial evidence. *Lee v. INS,* 541 F.2d 1383, 1385 (9th Cir.1976).

## III.

### SUSPENSION OF DEPORTATION UNDER VAWA

[4] Hernandez applied for suspension of deportation under section 244(a)(3) of the Immigration and Naturalization Act (INA), 8 U.S.C. § 1254(a)(3) (1996) (now amended and recodified). The former section 244 of the INA provided a method for certain aliens to establish eligibility for a discretionary suspension of deportation and obtain a grant of lawful status. Section 244(a)(3) was added to the INA as part of the passage of the Violence Against Women Act of 1994, in order to assist certain immigrants suffering from domestic violence. This provision provided that the Attorney General had the discretion to suspend deportation proceedings against an individual who:

1) has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application;

AR.04757

2) has been battered or subjected to extreme cruelty in the United States by a spouse or parent who is a United States citizen or lawful permanent resident;

3) proves that during all of such time in the United States the alien was and is a person of good moral character;

4) and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or the alien's parent or child.

*Id.* Hernandez bears the burden of establishing each of these four factors in order to qualify for suspension of deportation under section 244(a)(3). The BIA concluded that Hernandez had established both continuous physical presence and good moral character, the first and third prongs. Hernandez asks us to reverse the BIA's **\*833** determination that she did not "suffer[ ] extreme cruelty in the United States."

## A. Jurisdiction

**[5]  [6]**    The INS raises an initial challenge to our jurisdiction to review the BIA's determination that Hernandez did not suffer extreme cruelty in the United States. [5] Certain prongs of the determination regarding eligibility for suspension of deportation involve nondiscretionary determinations and others involve discretionary determinations. *Kalaw v. INS,* 133 F.3d 1147, 1150–52 (9th Cir.1997). As explained in more detail below, our jurisdiction turns upon whether the determination that an applicant was not subjected to extreme cruelty is deemed to be discretionary or nondiscretionary.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") "dramatically altered this court's jurisdiction to review final deportation and exclusion orders." *Kalaw,* 133 F.3d at 1149. Under IIRIRA's transitional rules, [6] "there shall be no appeal of any discretionary decision under section ... 244 ... of the Immigration and Nationality Act." IIRIRA § 309(c)(4)(E), 8 U.S.C. § 1101, Note; *see also Larita–Martinez v. INS,* 220 F.3d 1092, 1095 (9th Cir.2000).

**[7]**    Although there is no jurisdiction to review the exercise of discretion under section 244, "[a]s to those elements of statutory eligibility which do not involve the exercise of discretion, direct judicial review remains." *Kalaw,* 133 F.3d at 1150. "Exactly what constitutes a discretionary decision is not defined in the IIRIRA or the INA." *Id.* However, in *Kalaw* we "walked through the statutory requirements for suspension of deportation [under INA § 244(a)(1)], sorting discretionary from nondiscretionary aspects." *Romero–Torres v. Ashcroft,* 327 F.3d 887, 890 (9th Cir.2003). We concluded that determinations regarding both continuous physical presence and whether a petitioner falls into a per se category of bad moral character are nondiscretionary inquiries. *Kalaw,* 133 F.3d at 1151. As a result, we retain jurisdiction to consider the propriety of the BIA's action with regard to either of these questions. In contrast, we determined that aside from the per se categories, the general inquiry regarding whether an alien has good moral character is a discretionary one. *Id.; but see Ikenokwalu–White v. INS,* 316 F.3d 798, 802–03 (8th Cir.2003) (noting that *Kalaw* statement was dicta, and concluding that moral character determination is nondiscretionary and reviewable). We also concluded that "extreme hardship" was a discretionary, nonreviewable determination. *Kalaw,* 133 F.3d at 1152.

No court has yet considered whether the inquiry into whether a VAWA petitioner suffered "extreme cruelty" is discretionary or nondiscretionary. The INS urges us to conclude that "extreme cruelty" is a determination similar to "extreme hardship," and therefore of necessity discretionary. Looking beyond the linguistic parallel between the phrases, and evaluating instead the actual nature of each factor, we reject this interpretation.

In assessing whether a particular element is discretionary or nondiscretionary, we consider a number of factors. We have noted that determinations that "require[ ] **\*834** application of law to factual determinations" are nondiscretionary. *Id.* at 1150. We

concluded, for example, that continuous physical presence fell into this category, because it "must be determined from the facts, not through an exercise of discretion." *Id.* at 1151; *see also* Montero–Martinez v. Ashcroft, 277 F.3d 1137, 1141 (9th Cir.2002) (holding that the element of the "exceptional and extremely unusual hardship" determination that involves the factual determination of whether an adult daughter is a child is nondiscretionary because it only "require[s] us to review the BIA's construction of the INA, which is a pure question of law. This question would not require us to review a discretionary determination by the BIA.").

Similarly, extreme cruelty involves a question of fact, determined through the application of legal standards. [7] Section 244(a)(3) introduces battery and extreme cruelty as parallel methods by which an individual may establish that she has experienced domestic violence. *See* INA § 244(a)(3) (requiring that applicant "has been battered or subjected to extreme cruelty"). The existence or nonexistence of battery is clearly a factual determination, readily resolved by the application of a legal standard defining battery to the facts in question. Extreme cruelty provides an inquiry into an individual's experience of mental or psychological cruelty, an alternative measure of domestic violence that can also be assessed on the basis of objective standards. Ultimately, the question of whether an individual has experienced domestic violence in either its physical or psychological manifestation is a clinical one, akin to the issue of whether an alien is a "habitual drunkard," which *Kalaw* established was clearly nondiscretionary. 133 F.3d at 1151.

**[8]** The text of the statute, which in some provisions "itself commits the determination to 'the opinion of the Attorney General,'" also supports our conclusion that extreme cruelty is a nondiscretionary decision. *Id.* at 1152. Unlike the inquiry into "extreme hardship," which is specifically committed to "the opinion of the Attorney General," [8] nothing in the text of the statute indicates that the phrase at issue is discretionary. It is a basic principle of statutory construction that "where Congress includes particular language in one section of the statute but omits it in another section of the same Act, ... Congress acts intentionally and purposely in the disparate inclusion or exclusion." Andreiu v. Ashcroft, 253 F.3d 477, 480 (9th Cir.2001) (en banc) (quoting INS v. Cardoza–Fonseca, 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (alteration omitted)). We disregarded this fundamental rule of statutory interpretation in construing the "exceptional and extremely unusual hardship" determination in *Romero–Torres,* because despite the absence of statutory text regarding discretion, "exceptional and extremely unusual hardship" was intended as a more demanding version **\*835** of the "extreme hardship" determination, which our previous decisions had recognized as quintessentially discretionary. 327 F.3d at 891. No such unusual circumstance applies here.

In *Romero–Torres,* we emphasized the "essential, discretionary nature of the hardship decision." *Id.* However, it is not the adjective "extreme" that establishes hardship as discretionary. This adjective serves only to limit and emphasize the basic requirement under consideration. Rather, it is the basic nature and purpose of hardship, unmodified, which is discretionary, *see id.;* discretionary determinations such as hardship and good moral character guide the INS in its limitation of a scarce and coveted status to those applicants deemed particularly worthy. In contrast, extreme cruelty simply provides a way to evaluate whether an individual has suffered psychological abuse that constitutes domestic violence. Like duration of physical presence, status as a survivor of domestic violence functions as a basic threshold inquiry into whether an individual possesses the minimum attributes necessary to qualify for certain types of relief. Thus, the basic nature and purpose of extreme cruelty reveal it at core to be nondiscretionary.

The wisdom of treating the determination of whether an applicant has suffered extreme cruelty as nondiscretionary is further illuminated through consideration of congressional intent. Bedroc Ltd. v. United States, 314 F.3d 1080, 1083 (9th Cir.2002). In light of Congress's desire to remedy the past insensitivity of the INS and other governmental entities to the dangers and dynamics of domestic violence, it appears quite unlikely that Congress would have intended to commit the determination of what constitutes domestic violence to the sole discretion of immigration judges. *See* H.R. REP. NO. 103–395, at 25–27, 37–38 (1993); *see also* Fornalik v. Perryman, 223 F.3d 523, 533 (7th Cir.2000) (questioning, without resolving, whether IIRIRA eliminated jurisdiction under circumstances of case, and noting particularly, "[w]e are skeptical that Congress, in attempting

AR.04759

to 'pursu[e] justice for the thousands of Poles who were victims of this bureaucratic bungle,' meant to leave all oversight of this provision in the hands of the very same bungling bureaucrats" (citation omitted)); Leslye E. Orloff & Janice V. Kaguyutan, *Offering a Helping Hand: Legal Protections for Battered Immigrant Women: A History of Legislative Responses,* 10 AM. U.J. GENDER SOC. POL'Y & L. 95 (2001).

In sum, a variety of factors supports our determination that the question of whether an individual has suffered extreme cruelty is a nondiscretionary one. As a result, we conclude that we have jurisdiction to review the BIA's consideration of this issue.

## B. Extreme Cruelty

 **[9]**    There is no dispute that the egregious abuse that Hernandez suffered in Mexico would qualify as battery or extreme cruelty. However, it is also clear that none of the acts of battery that occurred took place in the United States. Although Congress has since removed the requirement that an alien must have suffered from domestic abuse within the United States, [9] Hernandez's case is subject to an older version of VAWA, which did include this requirement. 8 U.S.C. § 1254(a)(3) (1996). Thus, the question  **\*836**  presented is whether the actions taken by Refugio in seeking to convince Hernandez to leave her safe haven in the United States in which she had taken refuge can be deemed to constitute extreme cruelty. [10]

## 1) Refugio's Behavior in the Context of Domestic Violence

 **[10]**    Hernandez and amici [11] argue that the interaction between Hernandez and Refugio in Los Angeles made up an integral stage in the cycle of domestic violence, and thus the actions taken by Refugio in order to lure Hernandez back to the violent relationship constitute extreme cruelty. Although according to common understanding, Refugio's actions might not be perceived as cruel, in enacting VAWA, Congress recognized that lay understandings of domestic violence are frequently comprised of "myths, misconceptions, and victim blaming attitudes," and that background information regarding domestic violence may be crucial in order to understand its essential characteristics and manifestations. H.R. REP. NO. 103–395, at 24. Thus, in order to evaluate Hernandez's argument, we must first consider the nature and effects of violence in intimate relationships.

The field of domestic violence and our own case law reflect the fact that Refugio's actions represent a specific phase that commonly recurs in abusive relationships. Abuse within intimate relationships often follows a pattern known as the cycle of violence, "which consists of a tension building phase, followed by acute battering of the victim, and finally by a contrite phase where the batterer's use of promises and gifts increases the battered woman's hope that violence has occurred for the last time." Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome,* 21 HOFSTRA L. REV. 1191, 1208 (1993); Evan Stark, *Re–Presenting Women Battering: From Battered Woman Syndrome to Coercive Control,* 58 ALB. L. REV.. 973, 985–86 (1995); *see also* *Dillard v. Roe,* 244 F.3d 758, 763–64 (9th Cir.2001) (describing domestic violence expert's testimony that "[a]fter the violent episode, ... the man is scared that the woman will tell the police or decide to leave him. He tells the woman he loves her and minimizes the seriousness of his violent outburst...."). Indeed, Hernandez's relationship with Refugio reflected just such a cycle: as described in Hernandez's testimony, following each violent episode, Refugio would for a time again become the man she had loved.

The literature also emphasizes that, although a relationship may appear to be predominantly tranquil and punctuated  **\*837**  only infrequently by episodes of violence, "abusive behavior does not occur as a series of discrete events," but rather pervades the entire relationship. Dutton, *supra,* at 1208. The effects of psychological abuse, coercive behavior, and the ensuing dynamics of power and control mean that "the pattern of violence and abuse can be viewed as a single and continuing entity." *Id.; see also* Stark, *supra,* at 985–86. Thus, "the battered woman's fear, vigilance, or perception that she has few options may persist, ... even when the abusive partner appears to be peaceful and calm." Dutton, *supra,* at 1208–09. The psychological role of kindness is also significant in understanding the impact of Refugio's actions on Hernandez, since in combination with the batterer's physical dominance, such kindness often creates an intense emotional dependence by the battered woman on the batterer. *Id.* at 1206,

1225. Significantly, research also shows that women are often at the highest risk of severe abuse or death when they attempt to leave their abusers. *Id.* at 1212; *see also* H.R. REP. 103–395, at 24.

Although the INS implies otherwise, the record before the IJ and BIA contained substantial evidence regarding the cycle of violence and clinical and psychological understandings of domestic violence, evidence that was entirely unrebutted. For example, Leslye Orloff's *Manual on Intrafamily Cases for the D.C. Superior Court Judges* (1993) explained:

> Either immediately following the battering incident or shortly thereafter, the batterer will become contrite, apologetic and will beg the battered woman for forgiveness. He tells her that the violence will never happen again and promises to reform. During this phase, batterers will court their spouse and become again the man that she fell in love with. Many batterers honestly believe that they will reform their behavior. Battered women want to believe them.... [Batterers] will be apologetic or very convincing that the violence will cease. However, without outside intervention in most cases the cycle will gradually repeat itself[,] moving from this hearts and flowers phase back into the tension building phase.

*Id.* at 15. Information in the record also explained that "[d]omestic violence is not an isolated, individual event, but rather a pattern of perpetrator behaviors used against the victim." Anne L. Ganley, *Understanding Domestic Violence, in* IMPROVING THE HEALTH CARE RESPONSE TO DOMESTIC VIOLENCE 18 (Carole Warshaw & Anne L. Ganley eds., 1996). Explaining the connection between violence and other tactics of control, this work stated:

> Sometimes physical abuse, threats of harm, and isolation tactics are interwoven with seemingly loving gestures (e.g., expensive gifts, intense displays of devotion, sending flowers after an assault, making romantic promises, tearfully promising it will never happen again). Amnesty International (1973) describes such "occasional indulgences" as a method of coercion used in torture. With such tactics, the perpetrator provides positive motivation for victim compliance.... The message is always there that if the victim does not respond to this "loving" gesture or verbal abuse, then the perpetrator will escalate and use whichever tactic, including force, is necessary to get what he wants.

*Id.* at 22; *see also id.* at 33 ("Perpetrators do not just let victims leave relationships. They will use violence and all other tactics of control to maintain the relationship."). This excerpt also discussed how a battered woman's responses to the batterer may reflect her experience of violent retribution:

> **\*838**  Victims use many different strategies to cope with and resist the abuse. Such strategies include ... accepting the perpetrator's promises that it will never happen again, saying that she "still loves him," being unwilling to leave the perpetrator or terminate the relationship, and doing what he asks. These strategies may appear to be the result of passiveness or submission on the part of the victim, when in reality she has learned that these are sometimes successful approaches for temporarily avoiding or stopping the violence.

*Id.* at 34. The INS presented no evidence contradicting or undermining any of Hernandez's evidence.

Understood in light of the familiar dynamics of violent relationships, Refugio's seemingly reasonable actions take on a sinister cast. Following Refugio's brutal and potentially deadly beating, Hernandez fled her job, home, country, and family. Hernandez

believed that if she had not fled, Refugio would have killed her. Unwilling to lose control over Hernandez, Refugio stalked her, convincing the very neighbor who helped Hernandez to escape to give him her phone number and calling her sister repeatedly until Hernandez finally agreed to speak with him. Once Refugio was able to speak with Hernandez, he emanated remorse, crying and telling Hernandez that he needed her. Refugio promised not to hurt Hernandez again, and told her that if she would go back to him he would seek counseling. Wounded both emotionally and physically by someone she trusted and loved, Hernandez was vulnerable to such promises. Moreover, Hernandez was well aware of Refugio's potential for violence. Behind Refugio's show of remorse, there also existed the lurking possibility that if Hernandez adamantly refused, Refugio might resort to the extreme violence or murder that commonly results when a woman attempts to flee her batterer. Refugio successfully manipulated Hernandez into leaving the safety that she had found and returning to a deadly relationship in which her physical and mental well-being were in danger.

## 2) Statutory Analysis of "Extreme Cruelty"

 **[11]**    **[12]**    No court has yet interpreted the meaning of  8 U.S.C. § 1254(a)(3)'s reference to extreme cruelty. "We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will."  *Bedroc,* 314 F.3d at 1083 (quoting  *Ariz. Appetito's Stores, Inc. v. Paradise Vill.,* 893 F.2d 216, 219 (9th Cir.1990)). The text of the statute reveals that Congress distinguished between "battery" and "extreme cruelty," reserving the term extreme cruelty for something other than physical assault, presumably actions in some way involving mental or psychological cruelty. A contrary interpretation would render section 244's reference to "extreme cruelty" redundant, violating elementary principles of statutory construction. *See, e.g.,*  *id.* at 1088 ("[I]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).

However, because the text of the statute provides no further elucidation regarding Congress's intent, we must "look to the congressional intent revealed in the history and purposes of the statutory scheme." *Id.* (quoting  *United States v. Buckland,* 289 F.3d 558, 565 (9th Cir.2002) (en banc)). The legislative history reflects Congress's conviction that "[c]urrent [immigration] law fosters domestic violence," H.R. REP. NO. 103–395, at 26, and its intent that VAWA be so interpreted as to remedy the widespread gender bias and ignorance that  **\*839**  have resulted in governmental harm, rather than help, for survivors of domestic violence, *see* H.R. REP. NO. 103–395. However, the legislative history does not contain any explicit consideration of the phrase in question, and thus is of limited aid in interpreting Congress's intent with regard to the breadth of extreme cruelty.

 **[13]**    When traditional tools of statutory interpretation are unable to unearth Congress's intent with regard to the precise question at issue, "the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program."  *Cardoza–Fonseca,* 480 U.S. at 448, 107 S.Ct. 1207 (quoting  *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778); *see also*  *INS v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982). The INS has promulgated a regulation defining battery and extreme cruelty in the context of VAWA self petitions, a regulation that lends support to Hernandez's contention that she was subjected to extreme cruelty by Refugio's "contrite" actions. Because the statutory text at issue is subject to a number of possible interpretations, [12] the regulation promulgated by the INS interpreting this language is accorded *Chevron* deference.  *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 ("If ... the court determines Congress has not directly addressed the precise question at issue ... the question for the court is whether the agency's answer is based on a permissible construction of the statute."). [13]

The regulation states in relevant part:

> For the purpose of this chapter, the phrase "was battered by or was the subject of extreme cruelty" includes, but is not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens

to result in physical or mental injury. Psychological or sexual abuse ... shall be considered acts of violence. *Other abusive actions may also be acts of violence under certain circumstances, including acts that, in and of themselves, may not initially appear violent but that are a part of an overall pattern of violence.*

8 C.F.R. § 204.2(c)(1)(vi) (emphasis added). As we have mentioned, Congress clearly intended extreme cruelty to indicate nonphysical aspects of domestic violence. Defining extreme cruelty in the context of domestic violence to include acts that "may not initially appear violent but that are part of an overall pattern of violence" is a reasonable construction of the statutory text at hand. This interpretation is congruent with Congress's goal of **\*840** protecting battered immigrant women and recognition of past governmental insensitivity regarding domestic violence, *see* H.R. REP. NO. 103–395, and consistent with the clinical understanding of domestic violence, *see, e.g.,* Dutton, *supra,* at 1204.

[14] [15] Moreover, the INS conceded at oral argument that section 244(a)(3) was a generous enactment, intended to ameliorate the impact of harsh provisions of immigration law on abused women. Thus, this interpretation also adheres to "the general rule of construction that when the legislature enacts an ameliorative rule designed to forestall harsh results, the rule will be interpreted and applied in an ameliorative fashion.... This is particularly so in the immigration context where doubts are to be resolved in favor of the alien." *United States v. Sanchez–Guzman,* 744 F.Supp. 997, 1002 (E.D.Wash.1990); *see also Matter of Vizcaino,* 19 I. & N. Dec. 644, 648 (BIA 1988) (noting that expansion of relief "clearly was intended as a generous provision, and it should therefore be generously interpreted"); *cf.* Cardoza–Fonseca, 480 U.S. at 449, 107 S.Ct. 1207 (emphasizing the importance of maintaining flexibility in immigration law "when the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country").

Congress's intent in allowing a showing of either battery or extreme cruelty was to protect survivors of domestic violence. H.R. REP. NO. 103–395, at 37–38. Under the INS's regulation, any act of physical abuse is deemed to constitute domestic violence without further inquiry, while "extreme cruelty" describes all other manifestations of domestic violence. Non-physical actions rise to the level of domestic violence when "tactics of control are intertwined with the threat of harm in order to maintain the perpetrator's dominance through fear." Ganley, *supra,* at 20. By defining extreme cruelty to encompass "abusive actions" that "may not initially appear violent but that are part of an overall pattern of violence," 8 C.F.R. § 204.2(c)(1)(vi), section 244(a)(3) protects women against manipulative tactics aimed at ensuring the batterer's dominance and control. Because every insult or unhealthy interaction in a relationship does not rise to the level of domestic violence, *see, e.g.,* Ganley, *supra,* at 20 ("Emotional abuse in domestic violence cases is not merely a matter of someone getting angry and calling his partner a few names or cursing. Not all verbal insults between partners are acts of violence."), Congress required a showing of extreme cruelty in order to ensure that section 244(a)(3) protected against the extreme concept of domestic violence, rather than mere unkindness.

Here, there is no question that the relationship between Hernandez and Refugio was a violent one. Hernandez's interaction with Refugio in the United States clearly occurred within this context, an observation reaffirmed by the fact that domestic violence is not a phenomenon that appears only at brief isolated times, but instead pervades an entire relationship. *See* Dutton, *supra,* at 1208. Refugio's success in this "contrite" or "hearts and flowers" phase occurred because of Hernandez's emotional vulnerability, the strong emotional bond to Refugio necessitated by his violence, and the underlying threat that the failure to accede to his demands would bring renewed violence. Against this violent backdrop, Refugio's actions in tracking Hernandez down and luring her from the safety of the United States through false promises and short-lived contrition are precisely the type of acts of extreme cruelty that "may not initially appear violent but that are part of an overall pattern of violence." 8 C.F.R. § 204.2(c)(1)(vi). As a result, we hold that **\*841** Hernandez has established that she was subjected to extreme cruelty in the United States.

The INS argues that Hernandez was appropriately denied relief because she is not the type of battered immigrant woman with whom Congress was concerned in enacting VAWA. The INS contends that because Hernandez and Refugio never lived

together in the United States, and because Hernandez had already left Refugio, the agency was entitled to find her ineligible for suspension of deportation. We are unpersuaded.

Congress required that battered immigrant women show two sources of connection to the United States in order to be eligible for relief under section 244(a)(3): three years of residency and a spouse who was a legal permanent resident or citizen of the United States. We reject the notion that the INS is at liberty to also add a third requirement. *Vincent v. Apfel,* 191 F.3d 1143, 1148 (9th Cir.1999) ("There is no justification for adding limiting language to a clear and unambiguous statute and regulation."). This conclusion is strengthened by the fact that Congress chose to add the very factor proposed by the INS elsewhere, [14] but not here. *See* *Andreiu v. Ashcroft,* 253 F.3d at 480; *Gorbach v. Reno,* 219 F.3d 1087, 1093–94 (9th Cir.2000) (en banc).

Moreover, Congress's goal in enacting VAWA was to eliminate barriers to women leaving abusive relationships. H.R. REP. NO. 103–395, at 25 (stating that the goal of the bill is to "permit[ ] battered immigrant women to leave their batterers without fearing deportation"); *see also* Orloff & Kaguyutan, *supra,* at 108–15. The notion that Congress would require women to remain with their batterers in order to be eligible for the forms of relief established in VAWA is flatly contrary to Congress's articulated purpose in enacting section 244(a)(3).

Thus, we reverse the BIA's determination that Hernandez did not suffer extreme cruelty in the United States, and remand to the BIA to determine whether Hernandez can establish the extreme hardship prong and for the exercise of discretion regarding suspension of deportation.

## IV.

## ADJUSTMENT OF STATUS

Hernandez also appeals the BIA's denial of her petition for adjustment of status under section 245 of the INA, 8 U.S.C. § 1255. The BIA deemed Hernandez statutorily ineligible for relief, and alternatively denied her relief as a discretionary manner. As an initial matter, we note that the INS's treatment of Hernandez's application for adjustment of status provides belated support for Congress's assessment that the INS's hostility to battered women results in unnecessary barriers to relief to which they appear entitled. Both grounds relied upon by the BIA to justify its denial of Hernandez's application—her inability to provide a copy of the approved visa petition and the deterioration of her marriage—relate directly to her status as a battered woman.

### A. Statutory Eligibility For Adjustment of Status

Section 245(i) requires that in order for an applicant to be eligible for an adjustment of status, the applicant must show that: "(A) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence; and (B) an immigrant visa is immediately **\*842** available to the alien at the time the application is filed." 8 U.S.C. § 1255(i). During the time that Hernandez lived with her husband, who was a legal permanent resident of the United States, he filed an I–130 petition for her to become a legal permanent resident pursuant to 8 U.S.C. § 1154(a)(1)(B). As the spouse of a legal permanent resident, Hernandez was eligible for an immigrant visa under the second family preference category upon approval of the petition. *See* 8 U.S.C. § 1153(a)(2)(A).

However, the IJ, affirmed by the BIA, found that Hernandez was statutorily ineligible for adjustment of status because she could not show that she had an approved visa petition and because she had not been allocated an immigrant visa number. We address these issues in turn.

## 1) Approved Visa Petition

[16]   The INS claims that Hernandez must show that a visa petition has been approved on her behalf. Neither the BIA nor the INS clearly traced the provenance of the requirement that Hernandez show an approved visa petition. As noted above, section 245 requires eligibility for a visa and immediate availability of the visa at the time of filing. 8 U.S.C. § 1255(i)(2). It is silent as to possession of an approved visa petition. Of course, an immigrant visa cannot be immediately available to a petitioner unless a petition on her behalf has been approved. [15]   See 8 U.S.C. § 1255(i)(1)(B)(i); Jacobe v. INS, 578 F.2d 42, 44–45 (3d Cir.1978).

[15] Even assuming the existence of some authority to require an applicant for adjustment of status to show an approved visa petition, Hernandez has made this showing. First, Hernandez provided a letter that she had received from the Transitional Immigrant Visa Processing Center, dated August 11, 1992. This letter explained that at the time it was issued, there was no visa number available to Hernandez, but her application had been archived. The letter stated that Hernandez's priority date was April 3, 1992, and her preference category was "LB."

Once Hernandez obtained representation, her attorneys submitted a request that the INS provide a copy of the I–130 approval notice and the I–130 petition itself. In response, the INS refused to provide any information, stating, "The information requested by you is unavailable because regulations do not permit providing information directly to the beneficiary of the petition. Please direct your inquiry to your petitioner." [16] Hernandez and her attorneys also sought to obtain information from the consulate in Juarez. The cover letter received in response stated that Hernandez's preference category was "F2A—Mex" and her priority date was April 3, 1992. It listed the traveling applicants as Hernandez and her two children. The letter closed with an enclosure line indicating that it was accompanied by  *843  "Packet 3." The INS also apparently made inquiries of the consulate, to no avail.

The only interpretation to which this evidence was susceptible is that Hernandez was the beneficiary of an approved petition. Two independent letters indicate that Hernandez had been assigned a priority date. Procedures established by the Department of State and the INS provide that a priority date is not assigned until a visa petition is approved. See 8 C.F.R. § 245.1(g)(2); 22 C.F.R. § 42.53(a); 9 U.S. DEP'T OF STATE, FOREIGN AFFAIRS MANUAL § 42.53 N5.1(a); see also GORDON, supra, at § 55.03(2). Additionally, Hernandez had received communications regarding her application from the Transitional Immigrant Visa Processing Center. [17]   A petition is not forwarded to a Visa Center unless it has been approved. See 8 U.S.C. § 1154(b); GORDON, supra, at §§ 55.06(1), (2); IRA J. KURZBAN, IMMIGRATION LAW SOURCEBOOK 583 (8th ed.2002). Finally, Hernandez received a letter from the consulate indicating that a "Packet 3" was enclosed. Consulates sent Packet 3 only when the priority date of an approved petition was current or almost current. [18]

In short, Hernandez's petition could not have reached the stage it did unless it had been approved. The INS has not suggested that the documents produced by Hernandez are fraudulent, and has provided no alternative explanation regarding their subject matter. [19]   At oral argument, the INS suggested that we disallow any effort to prove an approved visa petition except by production of a copy of the approved petition or notice of approval. The INS proposed that because errors are frequent in the agency, we should assume the documents produced by Hernandez were sent erroneously. We reject this rather remarkable proposition. The BIA's determination that Hernandez failed to show that she possessed an approved visa is not supported by substantial evidence.

## 2) Availability of Immigrant Visa Versus Allocation of Immigrant Visa

[17]   As noted above, in order for an applicant to be eligible for adjustment of status, an immigrant visa must be immediately available at the time of filing. 8 U.S.C. §§ 1255(a), 1255(i). Hernandez's April 3, 1992 priority date was current for the second family preference category, Mexico, as of the time that Hernandez filed the application for adjustment of status. Visa Bulletin for March 1997, 74 Inter. Rel. 312 (Feb. 24, 1997). The text of the statute requires nothing else.

However, the INS argues that Hernandez must show that she actually has been **\*844** allocated a visa number, pointing to a regulation that states: "An application for adjustment of status as a preference alien shall not be approved until an immigrant visa number has been allocated by the Department of State." 8 C.F.R. § 245.2(a)(5)(ii). In response, Hernandez cites 🚩 8 C.F.R. § 245.1(g)(1), which states in relevant part:

> An alien is ineligible for the benefits of section 245 of the Act unless an immigrant visa is immediately available to him or her *at the time the application is filed.* If the applicant is a preference alien, the current Department of State Bureau of Consular Affairs *Visa Bulletin will be consulted to determine whether an immigrant visa is immediately available.*

*Id.* (emphasis added).

[17] We do not read the regulation cited by the INS as requiring that a visa number be allocated to the individual seeking to adjust status. The regulation itself does not indicate that an individual must possess an allocated number, and no treatise or regulation promulgated by the Department of State [20] or INS suggests otherwise. *See* GORDON, *supra,* at § 51.02(2)(b)(iii); NATIONAL LAWYERS GUILD, *supra,* at §§ 4:149, 8:10; KURZBAN, *supra,* at 587, 590. In fact, the regulation cited by the INS itself refers back to the regulation cited by Hernandez for a description of what is meant by "immediately available." 8 C.F.R. § 245.2(a)(2)(i)(A) ("An immigrant visa must be immediately available in order for an alien to properly file an adjustment application under section 245 of the Act. See 🚩 § 245.1(g)(1) to determine whether an immigrant visa is immediately available."). Additionally, the allocation of a visa number for an adjustment of status appears to be triggered by INS officials. 22 C.F.R. § 42.51(b) ("[T]he Department shall allocate immigrant visa numbers for use in connection with the issuance of immigrant visas and adjustments based on ... the priority dates of ... applicants for adjustment of status *as reported by officers of the INS.*" (emphasis added)). Thus, there is no indication that possession of an allocated visa number is an eligibility requirement for adjusting status. [21]

 **\*845** [18] In light of this conclusion, it appears that the evidence produced by Hernandez is more than sufficient to establish that her priority date was April 3, 1992, that this priority date was current at the time she filed the application for adjustment of status, and that an immigration visa was immediately available to her. The INS points to the mysterious preference category "LB" on the letter Hernandez received from the Transitional Immigrant Visa Processing Center, and also notes that Hernandez is unable to explain why her children would be listed as traveling applicants on the letter she received from the consulate. Although these clerical errors are puzzling, the INS does not suggest that these documents are fraudulent or that these inconsistencies demonstrate that they relate to some other matter. We do not believe that the INS intends to advocate for a rule whereby an applicant may rely upon government documents only if he or she is able to explain every notation upon them. In sum, Hernandez has met her burden of showing her eligibility for adjustment of status.


## B. Discretionary Denial Due to Nonviability of Marriage

The BIA provided an alternative basis for denying Hernandez's application, affirming the IJ's determination that, because Hernandez's marriage to Refugio had completely deteriorated, the application for adjustment of status was appropriately denied as a matter of discretion. Hernandez contests this determination pointing to case law establishing that the nonviability of a marriage at the time of adjustment is an impermissible basis for denying an application for adjustment of status.


### 1) Jurisdiction

 [18]    [19]    The INS challenges our jurisdiction over this question. It argues that because the BIA's determination was discretionary, we have no authority to review it. The first step in adjudicating a petition for adjustment of status is the

nondiscretionary determination of statutory eligibility, followed by a discretionary determination regarding whether an eligible applicant is actually permitted to adjust status. *Dillingham,* 267 F.3d at 1003; *Vasquez v. INS,* 767 F.2d 598, 601 (9th Cir.1985). Although the eligibility determination is clearly reviewable, IIRIRA stripped us of jurisdiction to review the discretionary aspect of a decision to deny an application for adjustment of status. IIRIRA § 309(c)(4)(E), 8 U.S.C. § 1101, Note (providing that "there shall be no appeal of any discretionary decision under section ... 245 ... of the Immigration and Nationality Act"); *see also Dillingham,* 267 F.3d at 1003. The INS urges us to end our analysis here.

However, in interpreting IIRIRA's jurisdictional limitations, the Supreme Court has cautioned that restrictions on jurisdiction should be construed narrowly. *Reno v. Am.-Arab Anti–Discrimination Comm.,* 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (criticizing widely-adopted broad reading of seemingly sweeping provision and requiring "much narrower" interpretation); *see also* **\*846** *INS v. St. Cyr,* 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). We have distilled two fundamental principles from the Court's admonitions, which we apply in evaluating jurisdiction in the immigration context:

First, there is a "strong presumption in favor of judicial review of administrative action." *St. Cyr,* 533 U.S. at 298, 121 S.Ct. 2271. Second, there is a "long-standing principal construing any [lingering] ambiguities in deportation statutes in favor of the alien." *Id.* at 320, 121 S.Ct. 2271 (quoting *Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. 1207).

*Montero–Martinez,* 277 F.3d at 1141 (citations reformed); *see also Mart v. Beebe,* 94 F.Supp.2d 1120, 1123 (D.Or.2000) ("Restrictions on jurisdiction are construed narrowly, and the court will not assume that its jurisdiction has been repealed unless the statute says so explicitly.").

 **[20]**     In this case, the BIA and IJ affixed the adjective "discretionary" to the determination that the nonviability of Hernandez's marriage was a proper basis for denying her adjustment of status. The INS asserts that the use of this adjective places the BIA's decision beyond review. However, it has long been established that the nonviability of a marriage at the time of adjustment is not a permissible basis for denying a petition. *See Matter of Boromand,* 17 I. & N. Dec. 450, 454 (BIA 1980) ("[T]he denial of an adjustment of status application or the subsequent rescission of such a grant cannot be based solely on the nonviability of the marriage at the time of the adjustment application."); *United States v. Qaisi,* 779 F.2d 346, 348 (6th Cir.1985) ( "Decisions from the Immigration and Naturalization Service and the district courts have universally held that the viability of a marriage is not a material factor in deciding to confer or deny an immigration benefit."); 3A AM. JUR.2d *Aliens & Citizens* § 475, *Viability of Marriage* (2003) ("If a marriage is not a sham or fraudulent from its inception, it is valid for immigration purposes...."). Thus, the jurisdictional question at issue can be stated as follows: May the BIA insulate a decision that is contrary to law from review by labeling such a decision discretionary?

 **[21]**     **[22]**     The BIA has no discretion to make a decision that is contrary to law. *See Mejia v. Ashcroft,* 298 F.3d 873, 878 (9th Cir.2002) ("The BIA does not have the discretion to misapply the law ...."); *see also Iturribarria v. INS,* 321 F.3d 889, 895 (9th Cir.2003) (same). Regulations defining the power of the BIA provide that it "shall resolve the questions before it in a manner ... consistent with the Act and regulations," and "shall be governed by the provisions and limitations prescribed by applicable law, regulations, and procedures, and by decisions of the Attorney General." 8 C.F.R. § 1003.1(d)(1) (2003); *see also* 8 C.F.R. § 1003.1(g) ("Except as Board decisions may be modified or overruled by the Board or the Attorney General, decisions of the Board ... shall be binding on all ... immigration judges in the administration of the immigration laws of the United States."). The regulations provide that "*[s]ubject to these governing standards,* Board members shall exercise their independent judgment and discretion." 8 C.F.R. § 1003.1(d)(1)(ii) (emphasis added). Thus, the regulations themselves limit the BIA's discretion to operating within the law. A nonprecedential decision by the BIA in defiance of its own precedential case

03 Cal. Daily Op. Serv. 8967, 2003 Daily Journal D.A.R. 11,291

law simply cannot be classified as discretionary. [22] *Cf.* *Spencer* **\*847** *Enters., Inc. v. United States,* 345 F.3d 683, 2003 WL 22137016 (9th Cir.2003) ("Even if a statute gives the Attorney General discretion ... the courts retain jurisdiction to review whether a particular decision is *ultra vires* the statute in question."); *Estep v. United States,* 327 U.S. 114, 121–22, 66 S.Ct. 423, 90 L.Ed. 567 (1946) (contrasting *erroneous* decisions of selective service boards with decisions *not in conformity with the regulations,* and deeming the latter to exceed the granted authority of the boards); *Frazar v. Gilbert,* 300 F.3d 530, 551 n. 109 (5th Cir.2002) (noting in the context of *Ex Parte Young* injunctive relief that government officials "have no 'discretion' to violate federal law"). As we have explained before, "[t]he BIA must exercise its discretion 'within the constraints of law.' " *Andriasian v. INS,* 180 F.3d 1033, 1040 (9th Cir.1999) (quoting *Singh v. INS,* 94 F.3d 1353, 1358 (9th Cir.1996)).

[23]    The INS implicitly posits a world in which there is a small box labeled reviewable decisions. This box contains only the elements of statutory eligibility. Under this view, a decision is not reviewable as long as the BIA bases its decision upon a factor not in the box, even if it must remove the factor from the box to do so. If the BIA were truly at liberty to disregard the law merely by labeling its conclusions discretionary, serious constitutional problems would arise. [23] *See, e.g., Ramirez–Alejandre v. Ashcroft,* 319 F.3d 365, 380 (9th Cir.2003) (en banc). However, such is not the case. When the BIA acts where it has no legal authority to do so, it does not make a discretionary decision, *see* *Mejia,* 298 F.3d at 878; *Andriasian,* 180 F.3d at 1040, and such a determination is not protected from judicial review, *see, e.g.,* *Bernal–Vallejo v. INS,* 195 F.3d 56, 60 (1st Cir.1999) ("§ 309(c)(4)(E) precludes the exercise of jurisdiction only where ... the agency decision rests on a ground that is committed to agency discretion."). Because the decision made by the BIA was contrary to law, it was not discretionary and jurisdiction exists to review the determination.

## 2) Merits

[24]    Because the basis of our jurisdiction is the fact that the BIA acted beyond the bounds of its discretion by relying upon the nonviability of the marriage in contradiction to its own case law, the merits of the question require little additional scrutiny.

As noted above, the INS had no authority to consider the present nonviability of Hernandez's marriage in considering her petition for adjustment of status. In a series of decisions in the early eighties, the BIA overturned its previous holdings that the nonviability of a marriage formed a valid basis for rejecting a petition. *See* *Matter of Mowrer,* 17 I. & N. Dec. 613, 615 (BIA 1981) ("In recent decisions, this Board has ruled that the viability of an alien's marriage can no longer be determinative of his entitlement to immigration benefits."); *Matter of Pierce,* 17 I. & N. Dec. 456, 456 (BIA 1980) ("[T]he Board has altered its position in regard to the question of viable marriages."). [24]

**\*848**    The prior line of cases had held that an individual could be barred from obtaining immigration benefits where, although valid at its inception, the marriage was no longer viable. *See, e.g.,* *Matter of Sosa,* 15 I. & N. Dec. 572, 574 (BIA 1976). The logic behind this position, the same logic applied by the IJ in the case before us, was that conferring immigration benefits on the basis of a nonviable marriage would defeat the purpose behind adjustment of status: "to prevent the separation of families and to preserve the family unit." *Id.; see also* *Menezes v. INS,* 601 F.2d 1028, 1034–35 (9th Cir.1979). However, rulings by the federal courts rejected this position, noting that the inquiry into viability "represents an intrusion into the most sensitive and private areas of life and has extremely dangerous implications." *Chan v. Bell,* 464 F.Supp. 125, 130 (D.D.C.1978) (citations omitted); *see also* *Dabaghian v. Civiletti,* 607 F.2d 868, 869–70 (9th Cir.1979); *Bark v. INS,* 511 F.2d 1200, 1201–02 (9th Cir.1975) ("Aliens cannot be required to have more conventional or more successful marriages than citizens. Conduct of the parties after marriage is relevant only to the extent that it bears upon their subjective state of mind at the time they were married."); *Whetstone v. INS,* 561 F.2d 1303, 1309 (9th Cir.1977) (Sneed, J., concurring) ("The desire of the Service to engraft

on 8 U.S.C. § 1184 a requirement of 'satisfactoriness,' or 'continuing viability,' of the marriage is understandable but without statutory authority.").

In response to these rulings, the BIA "expressly overrode the viability test," *Matter of Lenning,* 17 I. & N. Dec. 476, 477 (BIA 1980), concluding that "the denial of an adjustment of status application ... cannot be based solely on the nonviability of the marriage at the time of the adjustment application," *Matter of Boromand,* 17 I. & N. Dec. at 454. Moreover, in the Immigration Marriage Fraud Amendments of 1986, Pub.L. No. 99–639, 120 Stat. 3537 (1986), Congress denied the INS's request that it insert a viability requirement, *see* H.R. REP. NO. 99–906, at 10 (1986), thus legislatively endorsing the judicial prohibition on the use of viability. *See Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *see also* Vonnell C. Tingle, *Immigration Marriage Fraud Amendments of 1986: Locking In by Locking Out?,* 27 J. FAM. L. 733 (1989).

The INS accuses Hernandez of mistaking factors that may be considered in the context of eligibility with factors that may be considered in the context of discretion. Although this argument is not implausible, the sweeping statements made by the BIA do not recognize such a distinction. *See, e.g., Matter of McKee,* 17 I. & N. Dec. 332, 334 (BIA 1980) ("[A] separation in and of itself is no longer a valid basis for denial of a visa petition...."). [25] Moreover, in *Matter of Adalatkhah,* the BIA discussed our *849 decision in *Menezes,* which had distinguished between discretionary and eligibility determinations, but reiterated the new policy that "separation of the parties to a marriage ... [is] no longer a valid basis for denial of a visa petition." 17 I. & N. Dec. at 405–06. Additionally, the policy reasons for forbidding the inquiry into marriage viability do not permit a distinction between eligibility determinations and discretionary determinations. *See, e.g., Chan,* 464 F.Supp. at 130 ("INS has no expertise in the field of predicting the stability and growth potential of marriages ... and it surely has no business operating in that field."); *see also* 3A AM. JUR.2d *Aliens & Citizens* § 475, *Viability of Marriage* (2003) ("The INS has no authority to establish the elusive concept of marriage viability and enforce that concept by intruding on the privacy of the marital relationship."). [26] Thus, in reaching back to rely upon the *Menezes* dictum, which deferred to the BIA's now disavowed position, the BIA improperly resurrected the doctrine of nonviability in contradiction to both circuit court and BIA precedent.

In conclusion, the BIA erred both in finding Hernandez ineligible for adjustment of status and in relying upon an impermissible factor while purporting to exercise its discretion regarding her application. We reverse the denial of adjustment of status.

## V.

## CONCLUSION

We hold that the BIA erred both in denying the application for suspension of deportation and in denying the application for adjustment of status. Although the question of whether Hernandez suffered extreme cruelty in the United States is challenging, the INS's regulation defining extreme cruelty to include acts that "may not initially appear violent but that are a part of an overall pattern of violence" makes it clear that extreme cruelty must be evaluated in the context of domestic violence. In this context, Refugio's actions subjected Hernandez to extreme cruelty, and we grant the petition and remand the case for further consideration of Hernandez's eligibility for suspension of deportation under section 244(a)(3).

The BIA also erred in denying Hernandez's application for adjustment of status. By demonstrating that she had an approved petition and that an immigrant visa was immediately available to her at the time the application was filed, Hernandez established her statutory eligibility for adjustment of status. Although jurisdiction to review a discretionary denial of an application for adjustment of status is generally unavailable, it is clear that the BIA does not exercise its discretion when it acts in a matter

contrary to law. Because the BIA did so here, we review its determination, reverse its decision, and remand for further proceedings consistent with this opinion.

Petition **GRANTED** and **REMANDED** for further proceedings.

**All Citations**

345 F.3d 824, 03 Cal. Daily Op. Serv. 8967, 2003 Daily Journal D.A.R. 11,291

## Footnotes

\*   The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1   VAWA was passed as Title IV of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (1994). The provision in question is section 40703.

2   The Homeland Security Act of 2002 abolished the INS. Pub.L. No. 107–296 § 471, 116 Stat. 2135 (2002). It initiated a mammoth governmental reorganization, transferring the majority of the INS's functions from the Department of Justice ("DOJ") to the Department of Homeland Security ("DHS"), but leaving the Executive Office of Immigration Review (including the immigration judges and BIA) under the auspices of the DOJ. Although the prosecutorial component of the INS has now been transferred to the Bureau of Immigration and Customs Enforcement ("BICE") within DHS, we follow the recent practice of this circuit and continue to refer to respondent as the INS for convenience until new roles under the reorganization are more clearly established.

3   Because Hernandez was found credible by the BIA, her testimony is accepted as undisputed. *Singh v. INS,* 94 F.3d 1353, 1356 (9th Cir.1996). Thus, the facts recounted here are derived from her testimony. Hernandez testified in Spanish, with the aid of an interpreter.

4   The timing is somewhat unclear from the testimony.

5   We always have jurisdiction to consider whether we have jurisdiction. *See, e.g., Murillo–Salmeron v. INS,* 327 F.3d 898, 901 (9th Cir.2003).

6   IIRIRA's transitional rules apply because Hernandez's case was pending before April 1, 1997, and the final removal order was filed after October 30, 1996. *Kalaw,* 133 F.3d at 1150.

7   We note that the existence of legal standards, as well as certain other factors emphasized by *Kalaw* and subsequent cases, are of limited aid in considering new provisions of our immigration laws. Courts develop legal standards through the process of interpreting statutes; the relative absence of legal standards in the immigration context for extreme cruelty is a consequence not of its essentially discretionary nature, but of its novelty. Although we address the legal standards for assessing extreme cruelty as a matter of first impression, extreme cruelty is the type of inquiry for which legal standards are natural and appropriate.

8   *See* 8 U.S.C. §§ 1254(a)(1), 1254(a)(3) (1996) (requiring that applicant be "a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship").

9   *See* Pub.L. No. 106–386 § 1504(a)(2)(A)(II), 114 Stat. 1464 (2000), *codified at* 8 U.S.C. § 1229b(b)(2)(A)(i) (allowing cancellation of removal for an alien who "has been battered or subjected to extreme cruelty by a spouse or parent" without regard to where the abuse occurred).

10  The INS contends that neither Refugio's actions in incessantly calling Hernandez's sister's home from Mexico nor his representations in the course of his telephone conversation with Hernandez are relevant to the question of whether extreme cruelty occurred in the United States, because Refugio was in Mexico when these actions took place. However, the statutory text demonstrates that it is Hernandez's location, not Refugio's, which is significant: the question is whether *Hernandez* was "*subjected to* extreme cruelty in the United States." INA § 244(a)(3) (emphasis added). Clearly, actions

03 Cal. Daily Op. Serv. 8967, 2003 Daily Journal D.A.R. 11,291

taken by a person in one location may subject a person in another location to extreme cruelty. *Cf.* *United States v. Haggard,* 41 F.3d 1320, 1323–24, 1328 (9th Cir.1994) (holding that family of kidnaped child in California was subjected to extreme cruelty by false claim of natural individual in Indiana to know location of child's dead body). Thus, we consider actions taken by Refugio in Mexico in determining whether Hernandez experienced extreme cruelty in the United States.

11    We granted the National Immigration Project, NOW Legal Defense and Education Fund, and Family Violence Prevention Fund ("amici") leave to file an amici curiae brief.

12    For example, amici note that "Congress legislated against an extensive common law backdrop of family law cases defining extreme cruelty," and claim that we should look to the expansive interpretation of extreme cruelty applied in these cases in interpreting the phrase. Although this argument is creative, we need not rely upon it in reaching our conclusion.

13    The INS maintains that we should accord *Chevron* deference to the interpretation of extreme cruelty contained in the BIA's adjudication of Hernandez's claim. Although the Supreme Court has held that case-by-case adjudications under the INA may be subject to *Chevron* deference, *see* *INS v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999), there is no indication that the BIA intended to issue an interpretation of extreme cruelty in this case. The decision was not designated as precedential. Moreover, the BIA did not focus on the term or even reference its own regulation, and the opinion contains no definition or explicit consideration of the term. In essence, the BIA appeared to treat "extreme cruelty" as a mere extension of "battery," an interpretation that would not present a permissible construction of the regulation, even if the BIA had so intended it. *See, e.g.,* *Lal v. INS,* 255 F.3d 998, 1004 (9th Cir.2001).

14    *See* 8 U.S.C. § 1154(a)(1)(A)(iii) (allowing battered alien to *self petition* only if she has "resided in the United States *with the alien's spouse* " (emphasis added)).

15    The first act in obtaining a visa is filing a petition with the INS. GORDON ET AL., IMMIGRATION LAW & PROCEDURE, § 41.01(1)(c) (2003). The INS determines whether a petition will be approved or denied. Certain categories of beneficiaries, for example spouses of United States citizens, are eligible to receive immigrant visas immediately upon approval of their petitions. *Id.* at § 51.01(2)(b)(iii). Otherwise, once a petition is approved, a visa issuance priority date is assigned. For petitions based on a family preference category, the priority date is the date that the approved petition was filed. *See* 22 C.F.R. § 42.53; GORDON, *supra,* § 51.01(2)(b)(iii).

16    In most cases, a family petition may not be filed by the individual desiring to acquire status (the beneficiary), but must be filed by the relative who is the United States citizen or legal permanent resident (the petitioner).

17    Approved petitions are now forwarded to the National Visa Center, which is a division of the State Department. Between 1991 and 1994 (the period during which Hernandez's petition was filed and processed), petitions went to the Transitional Immigrant Visa Processing Center.

18    When a priority date becomes current, the beneficiary may follow one of two methods to obtain legal permanent resident status: 1) initiate adjustment of status within the United States under section 245 of the INA; or 2) interview at a United States consulate abroad and obtain an immigrant visa. Prior to 2001, a system of standardized mailings known as the "packet system" had been in operation for decades. GORDON, *supra,* at § 55.06(1). The Visa Center or consulate would send out "Packet 3," the application to begin consular processing (now known as "the Instruction Package"), when an applicant's priority date was current or almost current. *See id.;* NATIONAL LAWYERS GUILD, IMMIGRATION LAW AND DEFENSE § 4:157 (3d ed.2003).

19    It is not clear why the INS has been unable to produce the I–130, which clearly was filed, and should be in its possession. One authority notes that the INS and consulates periodically lose applications and other documents. NATIONAL LAWYERS GUILD, *supra,* at § 4:165.

20    The State Department maintains centralized control of the allocation of visa numbers, allocating visa numbers to consulates (for individuals applying through consulates) and immigration offices in the United States (for individuals applying for adjustment of status). 22 C.F.R. § 42.51; GORDON, *supra,* at § 55.03(3).

21    These two regulations may be best harmonized as follows: Section 245.1(g)(1) refers to *eligibility* for adjustment of status, the question of whether an applicant can demonstrate that she is entitled to adjustment of status. In contrast,

section 245.2(a)(5)(ii), the regulation emphasized by the INS, describes a *mechanical requirement* necessary to actually adjust status, one that does not defeat eligibility but which may affect processing of an approved petition.

This interpretation receives support from an INS operations instruction that explains, "When a properly filed application cannot be completed solely because visa numbers became unavailable subsequent to the filing, the application will be held in abeyance until a visa number is allocated." INS Operations Instruction 245.4(a)(6) (2003), http:// www.immigration.gov/lpBin/lpext.dll/inserts/slb/ slb1/slb–44806/slb–51356? f=templates & fn=document–frame.htm# slb–oi2454. BIA cases relying upon a substantially similar version of this operations instruction explain that possession of a visa number is necessary *only* for actual adjustment, not for eligibility for adjustment of status. *See, e.g., Matter of Ho,* 15 I. & N. Dec. 692 (BIA 1976); *Matter of the Amornvootiskul,* 19 I. & N. Dec. 366, 369 (BIA 1986); *Matter of Torres,* 19 I. & N. Dec. 371, 376 (BIA 1986). As one treatise explains:

> Whether a number is available for that priority date is established by the monthly Visa Bulletin issued by the Department of State. *... Although the visa need only be available at the time of filing, adjustment cannot actually be granted unless a number is also available at the time of adjustment.* Should the numbers meanwhile fall behind and become unavailable for the applicant's priority date, adjustment is postponed ... until the number does become available.

GORDON, *supra,* at § 51.02(2)(b)(iii) (emphasis added). We note, however, that Hernandez's visa number remains current. *See* Visa Bulletin for October 2003, http://travel.state.gov/visa_bulletin.html.

22 Under the abuse of discretion standard previously applied by this court to review of the BIA's exercise of discretion, abuse of discretion was found "when the denial [was] arbitrary, irrational or contrary to law." *Jen Hung Ng v. INS,* 804 F.2d 534, 538 (9th Cir.1986). We emphasize that we are not applying an abuse of discretion standard; if a decision is not within the power of the BIA, it cannot be construed as discretionary.

23 We note that "we maintain jurisdiction to review whether the [BIA] violated an alien's due process rights." *Larita– Martinez,* 220 F.3d at 1095.

24 *See also* Austin T. Fragomen, et al., *Continued Validity of the Marriage: the Viability Issue,* 1 IMMIGR. LAW & BUSS. § 3:20 (2003); Judith Patterson et al., *IRCA, IMFA, and SDCEA: What Does This Immigration Alphabet Soup Spell?,* 39 BAYLOR L. REV. 413, 456 (1987); 3 IMMIGRATION LAW SERVICE § 36:13, *Viability of Marriage* ("The Attorney General may inquire into whether a marriage is fraudulent and was entered into for the purpose of securing an alien's admission or continued residence in the United States, but immigration officials may not inquire into whether a valid, undissolved marriage is viable at the time the visa petition is filed. If a marriage is not a sham or fraudulent from its inception, it is valid for immigration purposes, despite an INS contention that the marriage is 'factually dead,' or 'nonviable.' ").

25 The DOJ indicated its understanding that nonviability was an impermissible discretionary factor in its unsuccessful request that Congress override the judicial and BIA interpretation, stating, "the interpretation applied by the Board of Immigration Appeals is that no examination of the 'viability' of a marriage may occur. Under the Board's holding in *Matter of Boromand,* 17 I & N Dec. 450 (BIA 1980), estrangement, or even separation in anticipation of divorce, are not sufficient grounds to deny a visa petition or adjustment of status." H.R. REP. NO. 99–906, at 10 (reproducing DOJ report on H.R. 3737).

26 We also agree with Hernandez that denying an application on this basis is particularly inappropriate in the case of a survivor of domestic violence, and all the more so in a case such as this one, where Hernandez has credibly testified that she fears she would be killed by her abusive spouse if forced to return to Mexico.

---

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    AR.04772    24

884 F.3d 107
United States Court of Appeals, Second Circuit.

Marleny HERNANDEZ, Petitioner,

v.

Jefferson B. SESSIONS III, United
States Attorney General, Respondent.

No. 16-2323-ag
|
August Term 2017
|
Argued: November 30, 2017
|
Decided: February 28, 2018

**Synopsis**
**Background:** Alien, a native and citizen of Colombia, filed petition for review of the decision of the Board of Immigration Appeals (BIA) affirming the determination of the immigration judge (IJ), which found her ineligible for asylum based on her material support of terrorist organization.

The Court of Appeals for the Second Circuit, 579 Fed.Appx. 12, granted the petition, in part, and remanded. On remand, the BIA found her ineligible for asylum on ground that she provided material support to terrorist organization, notwithstanding that she acted under duress. Alien again filed petition for review.

**Holdings:** The Court of Appeals, Dennis Jacobs, Circuit Judge, held that:

[1] bar to asylum relief for providing material support to terrorists organization did not contain duress exception, and

[2] alien did not have due process right to other means of obtaining exemption from material support bar.

Petition denied.

Droney, Circuit Judge, filed concurring opinion.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (7)

**[1]** **Administrative Law and Procedure** 🔑 Aliens, Immigration, and Citizenship

**Aliens, Immigration, and Citizenship** 🔑 Law questions

When the Board of Immigration Appeals (BIA) construes a statute which it administers, a court interpreting that statute applies the principles of deference outlined originally in *Chevron*.

**[2]** **Administrative Law and Procedure** 🔑 Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** 🔑 Permissible or reasonable construction

At the first step of the two-step *Chevron* framework, a court determines whether Congress has directly spoken to the precise question at issue, and if it has, the court gives effect to Congress's unambiguously expressed intent; if the statute is ambiguous, the court proceeds to the second step of the *Chevron* analysis to determine whether an administrative agency's interpretation of the statute is reasonable, and if it is, the court must defer to it.

**[3]** **Aliens, Immigration, and Citizenship** 🔑 Terrorist activity

Bar to asylum relief for providing material support to terrorist organization did not contain implied exception for aliens who did so under duress; INA section providing for material support bar was silent as to conduct taken under duress, and interpretation by Board of Immigration Appeals (BIA) that no such exception existed was reasonable, in light of the lack of any explicit duress exception when other explicit exceptions were set forth in the statute.

Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(3)(B)(iv)(VI).

2 Cases that cite this headnote

**[4]    Statutes**  ⚖  **Prior or existing law in general**

A court interpreting a statute assumes that Congress is aware of existing law when it passes legislation.

**[5]    Aliens, Immigration, and Citizenship**  ⚖  **Civil proceedings in general**

A deportation proceeding is not a criminal proceeding and the full trappings of legal protections that are accorded to criminal defendants are not constitutionally required in deportation proceedings.

**[6]    Aliens, Immigration, and Citizenship**  ⚖  **Terrorist activity**

**Constitutional Law**  ⚖  **Asylum, refugees, and withholding of removal**

Aliens found to be ineligible for asylum under statutory bar for providing material support to a terrorist organization did not have any due process right to some means of obtaining an exemption from the bar based on duress, other than the available procedure for obtaining a discretionary waiver upon a showing of involuntariness from the Department of State or the Department of Homeland Security. U.S. Const. Amend. 5; Immigration and Nationality Act § 212, 8 U.S.C.A. § 1182(a)(3)(B)(iv)(VI), (d)(3)(B)(i).

1 Cases that cite this headnote

**[7]    Constitutional Law**  ⚖  **Admission and exclusion; deportation**

Aliens have no due process liberty or property interest in any discretionary grant of relief from removal for which they are otherwise statutorily ineligible. U.S. Const. Amend. 5.

**Attorneys and Law Firms**

**\*108**  Gregory Silbert (with Kevin Meade and Melanie Conroy on the brief ), Weil, Gotshal & Manges LLP, New York, NY and Boston, MA; Anne Pilsbury and Heather Yvonne Axford, Central American Legal Assistance, Brooklyn, NY, for Petitioner.

Jeffrey L. Menkin, Senior Counsel for National Security, Office of Immigration Litigation (with Chad A. Readler, Acting Assistant Attorney General, and Ethan B. Kanter, Deputy Chief, on the brief ), United States Department of Justice, Washington, D.C., for Respondent.

Before: Jacobs, Raggi, and Droney, Circuit Judges.

**Opinion**

Judge Droney concurs in the opinion of the Court and files a concurring opinion.

Dennis Jacobs, Circuit Judge:

**\*109**  Petitioner Marleny Hernandez, a native and citizen of Colombia, seeks review of a June 9, 2016 published decision of the Board of Immigration Appeals ("BIA") finding her ineligible for asylum on the ground that she provided "material support" to a terrorist organization, notwithstanding that she acted under duress. See Matter of M–H–Z–, 26 I. & N. Dec. 757 (B.I.A. 2016).

The Immigration and Nationality Act ("INA") deems ineligible for asylum any alien who has "engaged in a terrorist activity." 8 U.S.C. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I). In a provision known as the "material support bar," the INA defines "[e]ngag[ing] in [a] terrorist activity" to include committing an act that "the actor knows, or reasonably should know, affords material support" to a terrorist organization. Id. § 1182(a)(3)(B)(iv)(VI). A 2014 Summary Order of this court identified no error in the BIA's conclusion that Hernandez provided material support to a terrorist organization by providing the Revolutionary Armed Forces of Colombia $100 packages of foodstuffs every three months for more than two years. See Hernandez v. Holder, 579 Fed.Appx. 12, 15 (2d Cir. 2014). But the Order remanded the matter for the BIA to determine in the first instance whether

the material support bar, which makes no explicit mention of duress, nevertheless has an *implied* duress exception that might exempt Hernandez. See id. (citing Ay v. Holder, 743 F.3d 317, 320 (2d Cir. 2014) (explaining that the material support bar is "silent on the question" of whether "a duress exception is implicit in its terms") ). The agency decision resulting from that remand is the subject of the petition before us.

The principal question presented by the petition is whether the agency's determination that the material support bar contains no implied duress exception is entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We conclude that Chevron deference is warranted and join several other circuits in holding that the material support bar does not except aliens, like Hernandez, who acted under duress.[1] We also reject Hernandez's argument that aliens who are rendered ineligible for relief from removal by the material support bar have a due process right to some means of obtaining an exemption based on duress, other than the currently available procedure for obtaining a discretionary waiver from the Department of State or the Department of Homeland Security—a waiver that Hernandez sought but did not receive. See 8 U.S.C. § 1182(d)(3)(B)(i). Accordingly, we deny the petition.

The facts and procedural course of this case are set out in the BIA's published decision and in our 2014 Summary Order. We review only the BIA's decision issued **110** on remand. See Belortaja v. Gonzales, 484 F.3d 619, 623 (2d Cir. 2007).

## I

[1] [2] The INA's material support bar, 8 U.S.C. § 1182(a)(3)(B)(iv)(VI), is construed by the BIA to have no implied exception for duress. When, as here, the BIA construes "the statute which it administers," we apply the familiar principles of deference outlined originally in Chevron. I.N.S. v. Aguirre–Aguirre, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). "At the first step" of the two-step Chevron framework, we "determine where Congress has directly spoken to the precise question at issue," and if it has, we "give effect to [Congress's] unambiguously

expressed intent .... If, however, the statute [is] ambiguous ..., we proceed to a second step of analysis to [determine] whether the agency's interpretation is reasonable, and if it is, "we must defer to it." Adams v. Holder, 692 F.3d 91, 95 (2d Cir. 2012) (internal quotation marks and citations omitted).

The inquiry here begins at Chevron step two, because we have already concluded that the material support bar is ambiguous as to whether duress is an exception.[2] See Hernandez, 579 Fed.Appx. at 15 (citing Ay, 743 F.3d at 320). At Chevron step two, we conclude that the BIA's construction of the material support bar is reasonable and therefore entitled to Chevron deference. In doing so, we join several of our sister circuits in holding that the material support bar does not contain an implied duress exception. See Sesay v. Att'y Gen., 787 F.3d 215, 217–18 (3d Cir. 2015); Barahona v. Holder, 691 F.3d 349, 355–56 (4th Cir. 2012); Annachamy v. Holder, 733 F.3d 254, 260, 267 (9th Cir. 2013), overruled on other grounds by Abdisalan v. Holder, 774 F.3d 517 (9th Cir. 2014) (en banc); Alturo v. U.S. Att'y Gen., 716 F.3d 1310, 1314 (11th Cir. 2013).

Hernandez argues that the BIA's construction is not reasonable in view of **(1)** the context, purpose, and legislative history of the INA; **(2)** United States treaty obligations; and **(3)** the availability of a duress defense in criminal proceedings. For the reasons that follow, we reject these arguments.

[3] [4] **1.** The BIA reasonably determined that the nonexistence of a duress exception can be inferred from the language and design of the INA as a whole. See Adams, 692 F.3d at 95. The text of the material support bar itself is "silent" as to conduct taken under duress.[3] See Ay, 743 F.3d at 320. Elsewhere in the INA, the bar to relief from removal for members or affiliates of communist or totalitarian political parties contains an explicit exception for individuals who can establish that their "membership or affiliation is or was involuntary." 8 U.S.C. § 1182(a)(3)(D)(i)-(ii). The omission of such an express exception in the material support bar supports the inference drawn by the BIA that no exception was intended. See INS v. Cardoza–Fonseca, 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("[W]here Congress **111** includes particular language in one section

AR.04775

of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and citation omitted) ). Other circuits agree. See ⚑ Alturo, 716 F.3d at 1314 (observing that the lack of an explicit duress exception in the material support bar "stands in marked contrast to a neighboring provision in the INA that includes an explicit involuntariness exception for aliens who have been affiliated with a totalitarian party"); ⚑ Annachamy, 733 F.3d at 261 (same); Sesay, 787 F.3d at 222–23 (same). [4]

The BIA likewise relied on the separate INA provision under which an alien who "has not '*voluntarily and knowingly*' supported terrorist activities" may apply for a discretionary "waive[r] [ ] of the material support bar" from "the Secretary of State or [ ] the Secretary of Homeland Security"—a waiver that requires inter-agency consultation. [5] ⚑ Ay, 743 F.3d at 321 (emphasis added) (quoting 8 U.S.C. § 1182(d)(3)(B)(i) ). In enacting that provision—"well after [enacting] the material support bar"—"Congress demonstrated its ability to distinguish between voluntary and involuntary" conduct in the INA. ⚑ Matter of M–H–Z–, 26 I. & N. Dec. at 761 n.4; see also Sesay, 787 F.3d at 223–24 ("Given that the 2007 Amendments discussed duress waivers and voluntariness, and required reporting on persons removed for having provided material support under duress, Congress clearly legislated on the premise that the material support bar otherwise applied to support given under duress."); ⚑ Annachamy, 733 F.3d at 262 n.8 ("Although the waiver provision was not enacted until 15 years after the creation of the material support bar, the waiver provision is still relevant in determining the earlier congressional intent.").

**2.** Hernandez argues that a material support bar without an implied duress exception is incompatible with the non-refoulement obligation of the 1976 United Nations Protocol Relating to the Status of Refugees (the "Protocol"), to which the United States is a signatory. That argument appears to suggest that the Protocol is self-executing: it is not. See Yuen Jin v. Mukasey, 538 F.3d 143, 159 (2d Cir. 2008). In any event, the BIA recognized that the absence of an implied duress exception to the material support bar is consistent with the United States's obligations under the Protocol.

"The Protocol incorporates by reference Articles 2 through 34 of the [1951] United Nations Convention Relating to the Status of Refugees [ (the 'Convention') ]," Aguirre–Aguirre, 526 U.S. at 427, 119 S.Ct. 1439, and Article 33.2 of the Convention provides that non-refoulement may not "be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is," Convention, art. 33.2, reprinted in 19 U.S.T. 6223. Moreover, "the determination **\*112** of refugee status under the 1951 Convention and the 1967 Protocol ... is incumbent upon the Contracting State in whose territory the refugee finds himself." Cardoza–Fonseca, 480 U.S. at 439 n.22, 107 S.Ct. 1207 (quoting Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status 1 (ii) (Geneva, 1979) ). Therefore, "[u]nder the Protocol and Convention, Congress is free to decide that an alien who provided material support to a terrorist organization, even if under duress, is a danger to the security of the United States." ⚑ Annachamy, 733 F.3d at 266.

[5] **3.** Hernandez argues that an implied duress exception to the material support bar is compelled by the pervasive availability of duress as a defense in the criminal law. However, a deportation proceeding "is not a criminal proceeding ... [,] and the full trappings of legal protections that are accorded to criminal defendants are not [ ] constitutionally required in deportation proceedings." Dor v. Dist. Dir., INS, 891 F.2d 997, 1003 (2d Cir. 1989) (citation omitted). It was reasonable for the BIA to deem the criminal defense of duress inapposite because ineligibility for relief from removal under the material support bar is not premised on criminal liability. See ⚑ Annachamy, 733 F.3d at 260 n.6 ("[An] alien's ... [acts in] support [of a] ... terrorist organization need not [give rise to] criminal[ ] liab[ility] for the material support bar to apply."); see also Negusie v. Holder, 555 U.S. 511, 526, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) (Scalia, J., concurring) (observing that the existence of the duress defense in criminal cases is irrelevant to the interpretation of a bar to relief from removal under the INA because an "order of deportation is not a punishment for a crime" (quoting Fong Yue Ting v. United States, 149 U.S. 698, 730, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) ) ).

## II

[6]  Hernandez argues in the alternative that, given the BIA ruling, the discretionary waiver system authorized under 8 U.S.C. § 1182(d)(3)(B)(i) is the sole means by which an alien may obtain a duress exception to the material support bar, and that the government thus violates due process because that system does not afford aliens sufficient procedural safeguards. See Burger v. Gonzales, 498 F.3d 131, 134 (2d Cir. 2007).

[7]  Aliens for whom the waiver system may later become necessary still have a full and fair opportunity to have their claims for asylum or withholding of removal first heard and adjudicated by an immigration judge and the BIA, see id., and it is through that adequate process that aliens may be deemed ineligible for relief if they are found to have provided material support to terrorists, see 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). The system that Hernandez challenges "afford[s] [these aliens] *additional* process," Yuen Jin, 538 F.3d at 157 (emphasis added), by allowing them to make a showing of involuntariness, which the Executive may, in its "sole [and] unreviewable discretion," deem deserving of a waiver, see 8 U.S.C. § 1182(d)(3)(B)(i). However, aliens have no constitutionally-protected "liberty or property interest" in such a discretionary grant of relief for which they are otherwise statutorily ineligible. See Yuen Jin, 538 F.3d at 156–57 (collecting cases); cf. Town of Castle Rock v. Gonzales, 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion."). There is therefore no merit to Hernandez's due process challenge to either the denial of her waiver *113 application or to the waiver system in general.

For the foregoing reasons, the petition for review is DENIED. Any stay of removal that the Court previously granted in this petition is VACATED, and any pending motion for a stay of removal in this petition is DISMISSED as moot.

Droney, Circuit Judge, concurring:

I agree that the material support for terrorism bar to asylum and withholding of removal does not contain a duress exception. I write separately to address whether the discretionary waiver to the material support bar complies with the obligations of the United States under international law, both in this case and more broadly. In my view, it is not clear that the waiver system meets these obligations without additional information from the Department of Homeland Security (DHS); indeed, I have serious concerns that it does not.

The United States is a signatory to the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577 (1968) ("the Protocol"), which re-incorporated the main provisions of the U.N. Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150. Under the Protocol, signatory states may not deport an otherwise-eligible refugee or asylee unless the state has "reasonable grounds for regarding [the refugee] as a danger to security of the country in which he is." Protocol art. 33.2. This "national security exception" places limits on expelling individuals who can otherwise establish their eligibility for asylum by showing that their "life or freedom would be threatened on account of ... race, religion, nationality, membership [in] a particular social group or political opinion" if returned to their country of origin. *Id.* art. 33.1. The government contends that the material support bar does not violate this restriction because the Protocol "did not define what constitutes a 'danger to the security of the country,' [and thus] it was left to Congress to set the parameters of that exclusion." Resp't Br. at 35. However, the treaty's language, as well as the statute and its legislative history, make clear that Congress did not intend to allow DHS to remove otherwise-eligible asylees who do not present genuine security threats to the United States—a description that seems very likely to apply to Hernandez, and perhaps, others like her.

First, the plain language and structure of the Protocol demonstrate that a state may expel only asylees who present true security threats to the United States. *See* Swarna v. Al–Awadi, 622 F.3d 123, 132 (2d Cir. 2010) ("In interpreting a treaty, it is well established that we begin with the text of the treaty and the context in which the written words are used." (alteration and internal quotation marks omitted) ). Specifically, the Protocol requires *reasonable* grounds to deem an individual a security threat. Protocol art. 33.2. The United Nations Handbook on Procedures and Criteria for Determining Refugee Status, which federal courts have often used to interpret the Protocol,[1] supports interpreting this clause to place significant restrictions on a signatory state's ability to deport otherwise-eligible asylees. *See* United Nations High Commissioner for Refugees *114 (UNHCR),

Handbook on Procedures and Criteria for Determining Refugee Status ¶¶ 140–63 (Geneva 1979) ("the Handbook"). The Court's opinion here cites the Handbook to support its conclusion that the determination of refugee status is left to signatories to the Protocol, slip op. at 7, but elsewhere the Handbook also specifies the limited conditions under which states may deny refugee status or expel a refugee, *see* UNHCR Handbook ¶¶ 140–63. In specifying these conditions, the Handbook indicates that a signatory state may expel an otherwise-eligible asylee only where that individual presents a serious threat to the country's security. *See also* UNHCR, Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees 5 (Geneva 2003) ("Article 33(2) has always been considered as a measure of last resort, ... justified by the exceptional threat posed by the individual—a threat such that it can only be countered by removing the person from the country of asylum."). The fact that the Protocol is not self-executing, *see Yuen Jin v. Mukasey*, 538 F.3d 143, 159 (2d Cir. 2008), does not mean that we may disregard the Protocol's language. [2]

Second, domestic case law and Congress's actions support this interpretation of the Protocol. As the Supreme Court has noted, the United States codified its obligations under the Protocol when Congress passed the 1980 Refugee Act. *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177–78, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). Part of the Act incorporated Article 33.2's protection into U.S. law, using language virtually identical to that used in the Protocol. *See* 8 U.S.C. § 1231(b)(3)(B)(iv) (preventing a grant of withholding of removal where "there are reasonable grounds to believe that the alien is a danger to the security of the United States"). The Third Circuit has interpreted this "national security exception" to prevent removal unless there is probable cause to believe that an otherwise-eligible asylee poses an "actual" and "non-trivial" threat to national security. *Yusupov v. Att'y Gen.*, 518 F.3d 185, 201–04 (3d Cir. 2008); *see also id.* at 204 (noting that the language of " 'danger to the security of the United States' includes an inherent seriousness requirement"). [3]

The question is whether the discretionary waiver system, as currently implemented, satisfies this standard. On the one hand, there is some basis to conclude that the waiver approach meets the Protocol's requirements and that Congress exercises meaningful oversight over the system to **\*115** ensure

compliance with its purpose and U.S. treaty obligations. In 2005, Congress amended the bar for "engaging in terrorist activities" to allow the Secretary of DHS to waive the bar in his or her sole discretion. *See* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, § 104, 119 Stat. 231, 309 (codified at 8 U.S.C. § 1182(d)(3)(B) ). As part of that law, Congress mandated that the Secretary report to certain congressional committees regarding how frequently DHS invoked the discretionary authority. 8 U.S.C. § 1182(d)(3)(B)(ii). Using this authority, the Secretary created a waiver system for certain individuals who provided material support under duress. *See, e.g.*, Exercise of Auth. under Sec. 212(d)(3)(B)(i) of the Immigration and Nationality Act, 72 Fed. Reg. 26138-02 (May 8, 2007). In December 2007, Congress enacted additional reporting requirements regarding discretionary waivers for duress cases. *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, § 691(e), 121 Stat. 1844, 2365. Congress acted in 2007 after many refugee and asylee advocates (as well as members of Congress) voiced concern about the implementation of the 2005 waiver authority and the material support bar's unfortunate consequences in many cases. *See The "Material Support" Bar: Denying Refuge to the Persecuted?": Hearing before the Subcomm. on Human Rights & the Law, Senate Comm. on the Judiciary*, 110th Cong. 1–186 (Sept. 19, 2007).

However, the facts of this case, the nature of the discretionary waiver process, and the limited public information available regarding the waiver prevent me from concluding that the waiver system necessarily complies with the Protocol; indeed, these issues leave me with serious concerns that at least in some cases, the waiver system does not comply with our treaty obligations and Congress's intent to create an effective waiver system. First, the record in Hernandez's case does not suggest that the United States faces an actual threat from this asylum applicant. There is no dispute that Hernandez was a "successful businesswoman" in Colombia who provided food to members of FARC [4] every three months for a period of two years following a series of FARC threats against her. *Matter of M–H–Z*, 26 I. & N. Dec. 757, 758 (2016). However, in early 1999, Hernandez stopped providing assistance to FARC, and instead housed Colombian police officers in her hotel. Appellate Record 96. FARC once again began threatening Hernandez, and in March 2000, they attacked her hometown, burning down Hernandez's store and hotel. *Id.* Hernandez was later taken to see a FARC commander, who pointed a gun at her head,

threatened her family, and ordered her to stop assisting "the police and politicians in her town." *Id.* at 97. After continuing to receive threats, Hernandez fled Colombia for the United States in 2001. *Id.* The U.S. government placed her in removal proceedings, and eventually, the immigration judge —following a full, contested hearing—determined "that, but for the material support bar, [Hernandez] would be eligible for asylum based on her past persecution by the FARC." 26 I. & N. Dec. at 759; Appellate Record 203.

Nothing about this undisputed history suggests that Hernandez is a security **\*116** threat to this country. Indeed, DHS did *not* deny Hernandez a waiver on security grounds or express doubt that she had acted under duress. Rather, DHS denied her a waiver only because she failed to "fully disclose, in all relevant applications and interviews with U.S. Government representatives and agents, the nature and circumstances of each provision of material support." Pet'r Br. at 50, No. 11–31 (2d Cir.), ECF No. 90. This failure to disclose violated the DHS-created "threshold requirement" that a waiver applicant disclose certain information about the material support she provided in order to be eligible for a waiver. *See* 72 Fed. Reg. at 26138. Yet as I detailed above, under the Protocol, the United States may only deport an asylee based upon the security threat she presents to this country.[5]

This leads me to my second concern. In my view, the fact of Hernandez's denial—after the immigration judge determined that she was likely to face persecution if returned to Colombia—raises serious concerns that the discretionary waiver process is not effective given the few protections that the waiver process provides. *See* Islam v. Gonzales, 469 F.3d 53, 55 (2d Cir. 2006) (detailing procedural protections in formal removal proceedings). It may well be that a discretionary waiver system and its lack of administrative or judicial review best balances the need for our Executive Branch to safeguard national security while ensuring that some applicants who do not present a genuine security risk may obtain asylum and withholding of removal. For example, some cases might involve sensitive information about terrorist organizations such as ISIS that pose (or have posed) serious threats to U.S. national security. These cases may require secrecy of the waiver interviews and reasons for the waiver denials to protect sources or methods of overseas intelligence gathering. However, the need for such secrecy does not seem so clear in this case involving FARC, which has not presented a security threat to the United States

for quite some time, if ever.[6] As Hernandez's experience seems to suggest, in practice this discretionary waiver system also allows DHS to make its own credibility determinations, without the protections afforded in removal proceedings before the immigration court. *See* 72 Fed. Reg. at 26138; *see also* Burger v. Gonzales, 498 F.3d 131, 134–35 (2d Cir. 2007) (noting procedural protections in asylum and withholding of removal).

DHS's regulations and the limited information available on the waiver process underscore these procedural concerns. As mentioned above, to obtain the waiver, an applicant must "[p]ose[ ] no danger to the safety and security of the United States." 72 Fed. Reg. at 26138. This requirement essentially concedes that many individuals to whom the material support bar applies are not an "actual" and "non-trivial" threat **\*117** to U.S. national security. Yusupov, 518 F.3d at 201–04. Absent a grant of a discretionary waiver, denying these non-dangerous applicants asylum or withholding would violate the terms of the Protocol (so long as there are no other grounds for denial). *See* id.; Protocol Art. 33.2. Furthermore, the current waiver process does not appear to provide a "full and fair opportunity [for an applicant] to present her claims" or to respond to the government's reasons for denying the waiver. Burger, 498 F.3d at 134. An agency memorandum providing internal guidance to the agency provides some structure to this process, but also suggests that the applicant's only participation in the waiver process takes place in an interview focused on the details of the applicant's material support. *See* Memorandum of Jonathan Scharfen, Deputy Director, to DHS Officials (May 24, 2007), https://hsdl.hsdl.org/?view&did=21273.

Finally, the limited public statistics available to evaluate the waiver system further underscore my concerns and those of the panel in Ay v. Holder, 743 F.3d 317, 321 (2d Cir. 2014). For example, in fiscal year 2014—the only year with publicly available data—DHS processed only nineteen waivers for asylum applicants in the United States.[7] U.S. Citizenship & Immig. Servs., Report on the Secretary's Application of the Discretionary Authority Contained in Sec. 212(d)(3)(B)(i) of the INA 2 (2015).[8] Of these, DHS provided only four waivers for material support provided under duress to Tier I or Tier II terrorist organizations—the category into which FARC falls. Without more information (e.g., how many individuals in asylum proceedings DHS considers each year for a waiver),

these results are difficult to assess. Nevertheless, the fact that DHS awards few waivers for asylum cases raises concerns that the process may be inadequate to comply with the Protocol. In light of each of these concerns, I join the other members of this Court who have observed that "the relief that [the discretionary] waiver offers appears to be limited," *Ay*, 743 F.3d at 321; indeed, it is possible that the relief may be so limited that it does not comply with the Protocol in certain cases.

Nothing in this case suggests that Hernandez represents a genuine threat to U.S. national security. Perhaps DHS has information demonstrating otherwise, and perhaps the waiver system ensures compliance with international law in every case. Courts would need additional information to reach the conclusion that the material support bar complies with the Protocol's requirements. Here, all the administrative record reflects is a Colombian businesswoman who acted under extreme fear and duress to protect her life and her family's life by providing foodstuffs to a guerilla organization located only in the highlands of Colombia. This same woman also assisted the Colombian police, the very people FARC often targeted. Indeed, DHS's denial of Hernandez's waiver did not even suggest she is an actual security threat. If she is in fact not a threat, then I would urge the government to reconsider Hernandez's denial—to ensure that this case and others comply with the Protocol.

**All Citations**

884 F.3d 107

## Footnotes

1   While this opinion discusses the material support bar in the context of Hernandez's claim for *asylum*, the bar—and the interpretation of it discussed in this opinion—applies equally to claims for withholding of removal. See 8 U.S.C. §§ 1231(b)(3)(B)(iv), 1227(a)(4)(B), 1182(a)(3)(B)(i)(I), II82(a)(3)(B)(iv)(VI).

2   Hernandez argues that the statutory language favors her reading unambiguously. That argument is defeated by stare decisis and law of the case.

3   Hernandez argues that the bar's text, which states that it applies to aliens who "commit [ ] act[s]" that provide material support to terrorists, presumes deliberate conduct. The point does not support her petition, however, because deliberate conduct may be taken under duress. See Dixon v. United States, 548 U.S. 1, 6, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006) (observing, in the criminal context, that the duress defense may excuse conduct that would otherwise be punishable for satisfying all elements of the offense).

4   In urging otherwise, Hernandez observes that the so-called "totalitarian bar" was enacted years before the material support bar by a different Congress. However, we "assume that Congress is aware of existing law when it passes legislation." Miles v. Apex Marine Corp., 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) (citation omitted). Indeed, presuming congressional awareness is "particularly appropriate here," because Congress updated the totalitarian bar "in the same legislation in which it created the material support bar." Annachamy, 733 F.3d at 261 n.7.

5   The Secretary of State may exempt an applicant after consulting with the Attorney General and the Secretary of Homeland Security, and the Secretary of Homeland Security may do so after consulting with the Attorney General and the Secretary of State. See 8 U.S.C. § 1182(d)(3)(B)(i).

1   See INS v. Cardoza–Fonseca, 480 U.S. 421, 438–39, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("In interpreting the Protocol's definition of 'refugee' we are further guided by the analysis set forth in the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva 1979).); I.N.S. v. Aguirre–Aguirre, 526 U.S. 415, 427, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (consulting Handbook to interpret Protocol).

2      While the Protocol may permit states to determine how to implement its terms, the Protocol's text establishes a baseline for what constitutes a security risk serious enough to justify denying asylum to an otherwise-eligible applicant. Thus, this Court should look to these words in resolving the issues raised by this case. *See* *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains ...."). Indeed, the Supreme Court has consulted the Protocol's text on various occasions to help interpret the meaning of the U.S.'s asylum and withholding of removal law. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 179–87, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); *Cardoza–Fonseca*, 480 U.S. at 438–39, 107 S.Ct. 1207.

3      *Yusupov* involved review of a case from the Attorney General that interpreted 8 U.S.C. § 1231(b)(3)(B)(iv). *Matter of A–H–*, 23 I. & N. Dec. 774 (2005). In that case, the Attorney General had similarly concluded that this section requires probable cause to believe that an individual *may* pose a non-trivial threat to national security. *Id.* at 788–89. Applying *Chevron* deference, the Third Circuit differed from the Attorney General only in that the Court determined an asylee must "*actually* pose a danger to the United States." *Yusupov*, 518 F.3d at 201 (emphasis added).

4      FARC is the Spanish acronym for the Revolutionary Armed Forces of Colombia, a guerilla organization at the center of Colombia's internal conflict for decades. *See* June S. Beittel, Cong. Research Serv., RL 43813, *Colombia: Background and U.S. Relations*, 2–8 (2017). FARC and the Colombian government signed a peace accord in 2016, under which FARC has disarmed. *Id.* at 11, 13–15. However, these very recent developments occurred after the administrative record in this case was developed. *See* 8 U.S.C. § 1252(b)(4).

5      Significantly, Hernandez is not alone, which increases my concerns. In the Third Circuit case addressing this issue, DHS denied a waiver to an individual who provided material support under duress to a rebel group in Sierra Leone by moving the group's equipment and goods. *Sesay v. Att'y Gen.*, 787 F.3d 215, 217–18 (3d Cir. 2015); *id.* at 223 n.7. The individual provided this support after repeatedly refusing to join the group as a rebel and after imprisonment and repeated beatings. *Id.* at 218. Similarly, in the Fourth Circuit's case addressing this issue, an asylum applicant permitted FMLN guerillas in El Salvador to use his house for cooking after the FMLN previously killed the applicant's father and cousin. *Barahona v. Holder*, 691 F.3d 349, 351–52 (4th Cir. 2012). DHS also denied a waiver in that case. *Id.* at 355 n.8.

6      *See* Beittel, *Colombia: Background and U.S. Relations* at 2–8, 11, 13–15 (summarizing the history of Colombia's internal conflicts and recent developments).

7      Many more waivers were processed for refugees outside the United States.

8      At oral argument, the government indicated that this report—which only contains information on the number of waivers granted—was not originally intended to be publicly available. According to the government, an outside organization obtained and released a copy of the report. The report is now available on the Internet.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Perez-Guzman v. Lynch, 9th Cir., August 31, 2016

597 F.3d 128
United States Court of Appeals,
Second Circuit.

William HERRERA–MOLINA,
a.k.a. Eduardo Salazar, Petitioner,
v.
Eric H. HOLDER, Jr., Attorney General
of the United States, Respondent. [1]

No. 07–0985–ag.
|
Argued Nov. 16, 2009.
|
Decided March 3, 2010.

**Synopsis**
**Background:** Alien, a native and citizen of Colombia, sought review of a decision of the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), reinstating a prior order of deportation under the Immigration and Nationality Act (INA).

**Holdings:** The Court of Appeals, Straub, Circuit Judge, held that:

[1] INA provision for reinstatement of removal orders against aliens illegally reentering the United States was not impermissibly retroactive;

[2] alien who illegally reentered United States was ineligible for any relief other than withholding of removal; and

[3] alien was not prejudiced by administrative process adopted by agency for reinstatement of removal orders, and could not successfully challenge that procedure on due process grounds.

Petition denied.

**West Headnotes (8)**

**[1]** **Aliens, Immigration, and Citizenship** ⚷ Decisions reviewable

A premature petition for review of a not-yet-final order of removal can become a reviewable final order upon the adjudication of remaining applications for relief and protection, provided that the Attorney General has not shown prejudice.

12 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⚷ Reinstatement of order

**Aliens, Immigration, and Citizenship** ⚷ Decisions reviewable

Statutory provision providing for reinstatement of removal orders against aliens illegally reentering the United States applies to all illegal reentrants, explicitly insulates the removal orders from review, and generally forecloses discretionary relief from the terms of the reinstated order. Immigration and Nationality Act, § 241(a)(5), 8 U.S.C.A. § 1231(a)(5).

10 Cases that cite this headnote

**[3]** **Statutes** ⚷ Prospective or Retroactive Construction

**Statutes** ⚷ Language and Intent; Express Provisions

Under the two-step test for determining whether a statute may be applied retroactively, the court must first ascertain, using the ordinary tools of statutory construction, whether Congress has expressly prescribed the statute's proper reach, and if it has not, the court must determine whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the basis of conduct arising before its enactment.

1 Cases that cite this headnote

**[4]**    **Statutes**    Effect on vested rights

**Statutes**    Imposition of liabilities, penalties, duties, obligations, or disabilities

A statute is impermissibly retroactive when it (1) takes away or impairs vested rights acquired under existing laws or (2) creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.

1 Cases that cite this headnote

**[5]**    **Statutes**    Nature and definition of retroactive statute

**Statutes**    Prospective or Retroactive Construction

When determining whether a statute is impermissibly retroactive, courts must exercise commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment; this analysis is further informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations.

1 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship**    Retroactive operation

**Statutes**    Aliens, immigration, and citizenship

Immigration and Nationality Act provision for reinstatement of removal orders against aliens illegally reentering the United States was not impermissibly retroactive as applied to alien who reentered United States and married United States citizen before provision's effective date, where alien did not apply for adjustment of status until after provision became effective. Immigration and Nationality Act, § 241(a)(5),

8 U.S.C.A. § 1231(a)(5).

5 Cases that cite this headnote

**[7]**    **Aliens, Immigration, and Citizenship**    Relief from Denial of Admission or Removal in General

**Aliens, Immigration, and Citizenship**    Reinstatement of order

Alien who reentered the United States illegally after having previously been deported, and against whom proceeding was brought for reinstatement of original removal order, was ineligible for any relief other than withholding of removal. Immigration and Nationality Act,

§ 241(a)(5),    8 U.S.C.A. § 1231(a)(5);    8 C.F.R. § 241.8.

16 Cases that cite this headnote

**[8]**    **Aliens, Immigration, and Citizenship**    Reinstatement of order

**Constitutional Law**    Admission and exclusion; deportation

Alien who admitted all facts necessary to warrant reinstatement of prior removal, that he was deported, illegally reentered the United States thereafter, and was apprehended while present in the United States, was not prejudiced by administrative process adopted by agency for reinstatement of removal orders, and could not successfully challenge that procedure on due process grounds, particularly where alien did not allege any impropriety in the underlying deportation proceedings and did not argue that those earlier proceedings deprived him of due process. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 241(a)(5),    8 U.S.C.A. § 1231(a)(5).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*130**  Haroutyun Asatrian, Strasser Asatrian, LLC, Newark, NJ, for Petitioner.

Anna E. Nelson, Trial Attorney for the United States Department of Justice, Office of Immigration Litigation

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

(Kelly J. Walls, Trial Attorney for the United States Department of Justice, Office of Immigration Litigation; Jeffrey S. Bucholtz, Acting Assistant Attorney General for the United States Department of Justice, Civil Division; and Linda S. Wernery, Assistant Director for the United States Department of Justice, Office of Immigration Litigation, on the brief), Washington, DC, for Respondent.

Before: MINER, CABRANES, and STRAUB, Circuit Judges.

**Opinion**

STRAUB, Circuit Judge:

Petitioner William Herrera–Molina seeks review of a February 23, 2007 decision of the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), reinstating a prior order of deportation for illegal entry, entered in July 1985 against Herrera–Molina. The first issue before us is whether the reinstatement of removal statute, section 241(a)(5) of the Immigration and Naturalization Act ("INA"), as added by section 305(a)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), 📑 8 U.S.C. § 1231(a)(5), is impermissibly retroactive as applied to Herrera–Molina, an alien who illegally reentered the United States and married a United States citizen prior to the statute's enactment. For the reasons set forth below, we hold that section 241(a)(5) is not impermissibly retroactive as applied to Herrera–Molina. We further hold, as discussed below, that section 241(a)(5) forecloses Herrera–Molina from applying for certain additional types of relief and that section 241(a)(5) does not deprive him of due process.

**BACKGROUND**

**I. Herrera–Molina's Initial Illegal Entry, Deportation, and Subsequent Illegal Reentry**

Herrera–Molina, a native and citizen of Colombia, illegally entered the United States in 1972 at the age of twenty-two. In 1985, he pled guilty to two crimes: (1) simple possession of a controlled substance (cocaine) in Nebraska and (2) fraudulent practices in the third degree in Iowa. On June 6, 1985, Herrera–Molina was served with an Order to Show Cause charging that he had entered the United States without inspection. On July 26, 1985, an Immigration Judge ordered him deported from the United States to Colombia based on the charges contained in the Order to Show Cause. Herrera–

Molina waived appeal of that decision, and on October 21, 1985, he was deported from the United States to Colombia.

In 1986, shortly after being deported to Colombia, Herrera–Molina reentered the United States without inspection. He asserts that he then married Rosa Haydee Garofalo in 1986 in a Mormon church in **\*131** Texas but that the record of their marriage was misplaced by the church. Subsequently, on July 4, 1988, Herrera–Molina and his wife had a child, William Herrera, Jr., who is a United States citizen. Garofalo became a naturalized United States citizen in March 1995, and on May 27, 1995, Herrera–Molina remarried Garofalo and obtained an official marriage license from the state of New York.

**II. Proceedings Below: Herrera–Molina's Applications for Relief and Reinstatement of Herrera–Molina's Prior Order of Deportation**

In late 1997, Garofalo filed on behalf of Herrera–Molina a Petition for Alien Relative ("Form I–130") and an Application to Adjust Status ("Form I–485"). In connection with these applications, Herrera–Molina paid a fee for having entered the United States without inspection. In addition, in 2003, Herrera–Molina filed an Application for Permission to Reapply for Admission into the United States after Deportation or Removal ("Form I–212"), which was denied on March 17, 2004.

On February 23, 2007, ICE reinstated Herrera–Molina's prior order of deportation from its original date, July 26, 1985, pursuant to INA § 241(a)(5), 📑 8 U.S.C. § 1231(a)(5), and placed him in custody. On the same date, an ICE officer interviewed Herrera–Molina, at which time he indicated that he feared for his life if forced to return to Colombia. On April 25, 2007, an asylum officer issued a Reasonable Fear Determination finding that Herrera–Molina was credible and that he had a reasonable fear of returning to Colombia on account of his Mormon faith; in conclusion, the asylum officer opined that Herrera–Molina should be allowed to pursue his withholding of removal claim before an immigration judge. Based on the asylum officer's findings, Herrera–Molina was placed in withholding of removal proceedings before an immigration judge ("IJ"), and on November 8, 2007, the IJ denied his application for withholding of removal. Herrera–Molina appealed the IJ's decision to the Board of Immigration Appeals ("BIA") on December 4, 2007.[2] On July 31, 2009, the BIA dismissed Herrera–Molina's appeal, concluding that the IJ was not clearly erroneous in his determination that Herrera–Molina

failed to provide credible testimony and evidence in support of his assertion that his family has been targeted for persecution. [3]

On October 5, 2009, we granted Herrera–Molina's motion for a stay of removal pending disposition of Herrera–Molina's present petition for review of the reinstatement of his prior deportation order.

## DISCUSSION

Herrera–Molina argues that section 241(a)(5)—the provision pursuant to which his prior order of deportation was reinstated —is impermissibly retroactive as applied to him. Herrera–Molina further argues that, even if section 241(a)(5) is not impermissibly retroactive, the statute nevertheless deprives him of due process and we should interpret section 241(a)(5) to allow him to apply for additional types of relief. For the reasons set forth below, we hold that section 241(a)(5) is not impermissibly retroactive as applied Herrera–Molina,  **\*132** does not deprive him of due process, and forecloses him from applying for certain additional types of relief.

### I. Jurisdiction

Before reaching the merits of Herrera–Molina's arguments, we first address whether we have jurisdiction over this matter. The parties initially disputed our jurisdiction because, at the time that the parties filed their briefs, Herrera–Molina's appeal of the IJ's denial of withholding of removal was still pending before the BIA. Due to the pendency of the appeal, the Attorney General argued that the reinstated order of deportation was not a "final" order of removal over which we could exercise jurisdiction. *See Chupina v. Holder,* 570 F.3d 99, 103–04 (2d Cir.2009) (noting that our jurisdiction is limited to review of "final" orders of removal and that, when a petitioner's "pending applications [for relief] directly affect whether he may be removed ..., [the] order of removal is not final until those applications have been resolved by the agency"). After the Attorney General filed his brief, however, the BIA subsequently dismissed Herrera–Molina's appeal of the denial of withholding of removal. As a result, the Attorney General has withdrawn his argument that we lack jurisdiction to review the reinstatement of Herrera–Molina's prior deportation order. *See* Resp't Supp. Letter Br. of Oct. 28, 2009 at 2 ("With the Board's dismissal of Mr. Herrera–Molina's appeal of the denial of withholding of removal, the instant petition for review has ripened from

a premature petition into a petition for review of a final order of removal."). Likewise, by supplemental letter brief dated October 29, 2009, Herrera–Molina concurred with the Attorney General's position and represented that he "has elected not to seek review of" the BIA's July 31, 2009 decision dismissing his appeal from the IJ's denial of withholding of removal.

 **[1]**    A premature petition for review of a not-yet-final order of removal can become a reviewable final order upon the adjudication of remaining applications for relief and protection, provided that the Attorney General has not shown prejudice. *See  Lewis v. Gonzales,* 481 F.3d 125, 128–29 (2d Cir.2007);  *Foster v. INS,* 376 F.3d 75, 77 (2d Cir.2004) ("Despite his premature petition to us, we exercised jurisdiction noting that the BIA has since affirmed petitioner's removal order and the respondent has not shown prejudice." (internal quotation marks omitted)). In the present case, the BIA has now rendered a decision resolving Herrera–Molina's appeal of the denial of withholding of removal, and the Attorney General does not claim that he was prejudiced by Herrera–Molina filing a petition for review prior to the BIA's decision—nor do we see how he could have been prejudiced. Accordingly, even if Herrera–Molina's initial petition were premature, we conclude that the reinstatement of his prior deportation order is now a reviewable final order and proceed to the merits of his arguments.

### II. The Reinstatement Provisions of Section 241(a)(5)

Before analyzing Herrera–Molina's specific arguments regarding section 241(a)(5), it is necessary to summarize briefly how section 241(a)(5) changed the law regarding reinstatement of removal orders, formerly known as deportation orders. [4]  Section 241(a)(5) provides that:

   **\*133**  If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

 8 U.S.C. § 1231(a)(5). The statute became effective on April 1, 1997, "the first day of the first month beginning more than 180 days after" it was enacted on September

30, 1996. *Fernandez–Vargas,* 548 U.S. at 35, 126 S.Ct. 2422 (internal quotation marks omitted).

**[2]**  Prior to April 1, 1997, only aliens who had previously been deported on certain specified grounds, such as a conviction for an aggravated felony, were subject to having their original deportation orders reinstated, and even those aliens subject to reinstatement could seek certain kinds of discretionary relief. *Id.* at 33–34, 126 S.Ct. 2422; *see* 8 U.S.C. §§ 1252(e)– (f), 1254(a) (1994). By contrast, section 241(a)(5) "applies to *all* illegal reentrants, explicitly insulates the removal orders from review, and *generally forecloses discretionary relief* from the terms of the reinstated order." *Fernandez–Vargas,* 548 U.S. at 35, 126 S.Ct. 2422 (emphases added).

## III. Retroactivity Analysis

As noted earlier, although Herrera–Molina applied for adjustment of status *after* section 241(a)(5) became effective, he illegally reentered the United States and married a United States citizen *before* section 241(a)(5) became effective. On this basis, Herrera–Molina contends that section 241(a)(5) is impermissibly retroactive as applied to him because "long standing INS practice created a reasonable expectation that Petitioner could defend against later deportation by seeking a discretionary adjustment of status to lawful permanent resident." Opening Br. for Pet'r at 26. For the reasons discussed below, Herrera–Molina's argument is unavailing.

In one of its seminal retroactivity cases, the Supreme Court noted that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In the same case, however, the Supreme Court observed that Congress may, within constitutional limits, enact laws that operate retroactively. *Id.* at 267–68, 114 S.Ct. 1483. The Court further acknowledged that "[r]etroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary." *Id.*

**[3]**  In light of these principles, the Supreme Court developed a two-step test for determining whether a statute may be applied retroactively. At step one, a "court must ascertain, using the ordinary tools of statutory construction, 'whether Congress has expressly prescribed the statute's proper reach.' " *Martinez v. INS,* 523 F.3d 365, 370 (2d Cir.2008) (quoting *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483). "If the answer is yes, the inquiry is over...." *Id.* Applying ordinary tools of statutory **\*134** construction, the Supreme Court in *Fernandez–Vargas* found that Congress did *not* expressly prescribe whether section 241(a)(5) should apply to individuals who illegally reentered the United States before section 241(a)(5) went into effect on April 1, 1997. 548 U.S. at 38–42, 126 S.Ct. 2422.

**[4]**  **[5]**  Because the statute contains no express command, we therefore proceed to step two of the analysis, which "ask[s] whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.' " *Id.* at 37, 126 S.Ct. 2422 (alterations in original) (quoting *Landgraf,* 511 U.S. at 278, 114 S.Ct. 1483). Under step two of the relevant inquiry, "a statute is impermissibly retroactive" when it (1) " 'takes away or impairs vested rights acquired under existing laws' " or (2) " 'creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.' "[5] *Martinez,* 523 F.3d at 373 (quoting *Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483). When determining whether a statute is impermissibly retroactive, courts must exercise "commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment." *INS v. St. Cyr,* 533 U.S. 289, 321, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (internal quotation marks omitted). This analysis is further "informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* (internal quotation marks omitted).

Applying these principles at step two, the Supreme Court held that section 241(a)(5) is not impermissibly retroactive as applied to aliens who reentered the United States prior to its enactment. *Fernandez–Vargas,* 548 U.S. at 42–47, 126 S.Ct. 2422. The Court noted that, "[w]hile the law looks

back to a past act in its application to 'an alien [who] has reentered ... illegally,' ... it is the conduct of *remaining* in the country after entry that is the predicate action." *Id.* at 44, 126 S.Ct. 2422 (emphasis added). Thus, "[i]t is ... the alien's choice to continue his illegal presence, after illegal reentry and after the effective date of the new law, that subjects him to the new and less generous legal regime, not a past act that he is helpless to undo up to the moment the Government finds him out." *Id.* The Court further noted that, although section 241(a)(5) "became law on September 30, 1996," it did not become "effective and enforceable" until April 1, 1997. *Id.* at 45, 126 S.Ct. 2422. "Unlawful alien reentrants ... thus had the advantage of a grace period between the unequivocal warning that a tougher removal regime lay ahead and actual imposition of the less opportune terms of the new law." *Id.* The Court observed that, "[i]n that stretch of six months, Fernandez–Vargas could have ended his illegal presence and potential exposure to the coming law by crossing back into Mexico." *Id.* at 45, 126 S.Ct. 2422. Furthermore, and most pertinent to the present case, the Court noted that Fernandez–Vargas "could have married the mother of his son *and applied for adjustment of status during that period,* in which case he would at least have had a claim (about which we express no opinion)   **\*135**  that proven reliance on the old law should be honored by applying the presumption against retroactivity." *Id.* at 46, 126 S.Ct. 2422 (emphasis added).

 [6]   In the present case, Herrera–Molina married a United States citizen before section 241(a)(5) went into effect, but he did not apply for adjustment of status until after section 241(a)(5) became effective. Accordingly, Herrera–Molina's reliance on the Supreme Court's dicta—that petitioner might have had a claim had he married *and* applied for adjustment of status before section 241(a)(5) became effective—is unavailing. It is true that several Courts of Appeals have found section 241(a)(5) impermissibly retroactive as applied to individuals who submitted applications for adjustment of status before section 241(a)(5) became effective. *See Valdez–Sanchez v. Gonzales,* 485 F.3d 1084, 1086, 1090–91 (10th Cir.2007) (finding section 241(a)(5) impermissibly retroactive as applied to a petitioner who had both applied for and obtained adjustment of status prior to section 241(a)(5)'s effective date); *Faiz–Mohammad v. Ashcroft,* 395 F.3d 799, 809 & n. 10, 810 (7th Cir.2005) (finding section 241(a) (5) impermissibly retroactive as applied to a petitioner who had applied for adjustment of status prior to section 241(a)

(5)'s effective date); *Sarmiento Cisneros v. U.S. Attorney Gen.,* 381 F.3d 1277, 1284–85 (11th Cir.2004) (same); *Arevalo v. Ashcroft,* 344 F.3d 1, 4, 15 (1st Cir.2003) (same). However, unlike the petitioners in those cases, Herrera–Molina, as we just noted, did not apply for adjustment of status before section 241(a)(5)'s effective date.

In addition, the only Court of Appeals decision that found section 241(a)(5) impermissibly retroactive as applied to a petitioner who married, but did not apply for adjustment of status, before section 241(a)(5)'s effective date was an Eighth Circuit decision issued before *Fernandez–Vargas* was decided. *See generally Alvarez–Portillo v. Ashcroft,* 280 F.3d 858 (8th Cir.2002). After the Supreme Court issued *Fernandez–Vargas,* however, the Eighth Circuit acknowledged that *Alvarez–Portillo* was overruled to the extent that it conflicted with *Fernandez–Vargas. See Gonzalez v. Chertoff,* 454 F.3d 813, 816–18 (8th Cir.2006) (holding that a different immigration provision enacted at the same time as section 241(a)(5) was not impermissibly retroactive as applied to a petitioner who married before the statute became effective and who could have pursued adjustment of status as a defense to removal prior to the statute's effective date); *id.* at 818 n. 4 ("To the extent our decision in *Alvarez–Portillo* ... suggests a different result, it is overruled by *Fernandez–Vargas.*").

Herrera–Molina argues here that *Fernandez–Vargas* did not address whether section 241(a)(5) is impermissibly retroactive as applied to a petitioner who married, but did not apply for adjustment of status, before section 241(a)(5)'s effective date. Accordingly, Herrera–Molina concludes that *Fernandez–Vargas* does not conflict with *Alvarez–Portillo* and, therefore, *Alvarez–Portillo* has not been overruled. Careful analysis of *Alvarez–Portillo,* however, illustrates that its reasoning conflicts with *Fernandez–Vargas* and, therefore, *Alvarez–Portillo* has been overruled. The *Alvarez–Portillo* decision analogized the retroactive effect at issue there, *i.e.,* section 241(a)(5)'s effect on aliens who had reentered before section 241(a)(5)'s enactment, to the retroactivity issue in *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 117 S.Ct.

1871, 138 L.Ed.2d 135 (1997). *See* *Alvarez–Portillo,* 280 F.3d at 866. After *Fernandez–Vargas,* it became clear that this analogy was misplaced. *Hughes Aircraft* dealt with the **\*136** retroactive application of a statutory amendment to "conduct completed before [the amendment's] enactment." 520 U.S. at 952, 117 S.Ct. 1871. By contrast, as discussed earlier, *Fernandez–Vargas* made clear that the conduct which section 241(a)(5) regulates is ongoing and is "not a past act that [petitioner] is helpless to undo up to the moment the Government finds him out." *Fernandez–Vargas,* 548 U.S. at 44, 126 S.Ct. 2422. Accordingly, the reasoning of *Alvarez–Portillo* conflicts with *Fernandez–Varga's,* and, therefore, as the Eighth Circuit itself has recognized, *Alvarez–Portillo* was overruled.

Unlike the Eighth Circuit's *Alvarez–Portillo* decision, the Fourth and Fifth Circuits' decisions on this question—which hold that section 241(a)(5) is *not* impermissibly retroactive as applied to petitioners who married, but did not apply for adjustment of status, before section 241(a)(5)'s effective date —are fully in line with *Fernandez–Vargas. Silva Rosa v. Gonzales,* 490 F.3d 403, 407–08 (5th Cir.2007) (holding that section 241(a)(5) was not impermissibly retroactive because, although the petitioner married and applied for a visa prior to section 241(a)(5)'s effective date, he did not apply for adjustment of status before section 241(a)(5) went into effect); *Velasquez–Gabriel v. Crocetti,* 263 F.3d 102, 109–10 (4th Cir.2001) (reaching the same result prior to *Fernandez–Vargas).* Implicitly recognizing that *Fernandez–Vargas* foreclosed any argument that section 241(a)(5) applied to "completed" conduct, the Fifth Circuit in *Silva Rosa* instead analyzed whether section 241(a) (5) impaired the "vested rights" of petitioners who had married, but not applied for adjustment of status, before its effective date. As the Fifth Circuit noted, "any expected relief from removal under a 'reasonable expectation' or 'vested rights' theory [of retroactivity] must be 'something more substantial than inchoate expectations and unrealized opportunities.' " *See Silva Rosa,* 490 F.3d at 407 (quoting *Fernandez–Vargas,* 548 U.S. at 44 n. 10, 126 S.Ct. 2422). In *Fernandez–Vargas,* the petitioner's claims to relief such as cancellation of removal and adjustment of status were "not vested rights," but instead were "contingent" because

petitioner "never availed himself of them or took action that enhanced their significance to him in particular." 548 U.S. at 44 n. 10, 126 S.Ct. 2422 (internal quotation marks omitted). Likewise, the Fifth Circuit reasoned that, even if a petitioner took preliminary steps to become eligible to apply for adjustment of status because of his marriage, his claim for such discretionary relief is contingent and not a "vested right" if he never actually applied for such relief before section 241(a)(5) went into effect. *Silva Rosa,* 490 F.3d at 407–08. Or, as the Fourth Circuit concluded, the petitioner "posit[ed] no way in which his marriage in 'reliance' on preexisting law weakened his immigration status under the new law or hurt his chances of remaining in this country." *Velasquez–Gabriel,* 263 F.3d at 109 (emphasis omitted); *id. at 110* (concluding further that the petitioner's "failure to apply to adjust his resident status before the new law took effect fatally undermines his contention that § 241(a)(5)'s application to him attaches new legal consequences to events *completed* before its enactment" (internal quotation marks omitted)).

Further weakening Herrera–Molina's retroactivity argument is the Attorney General's contention, which Herrera–Molina fails to rebut, that Herrera–Molina would not have been entitled to adjustment of status even prior to section 241(a) (5)'s enactment. *See* Br. for Resp't at 25–27. The Attorney General argues that, because of his 1985 conviction for possession of cocaine, Herrera–Molina would have been ineligible to adjust his status based upon **\*137** his marriage to a United States citizen, even before section 241(a)(5)'s enactment. *See* 8 U.S.C. § 1182(a)(2)(A)(i)(II) (1994) (providing that aliens convicted of any controlled substance violation are an excludable class of aliens who are ineligible to receive a visa and who shall be excluded from admission into the United States); *id. § 1182(h) (1994)* (providing that only a single offense of simple possession of thirty grams or less of marijuana may be waived and, even then, only in certain circumstances). [6] Herrera–Molina fails to address this argument—that he would have been ineligible for adjustment of status even under the old law—and instead argues that, notwithstanding his convictions, he would have been eligible to apply for suspension of deportation or asylum under the old law.

Herrera–Molina's claim that he reasonably relied on the availability of suspension of deportation or asylum fails for two reasons. First, the terms of section 241(a)(5) preclude such relief, *see* Discussion *infra* Part IV, and Herrera–Molina

chose to remain in this country despite Congress's warning that a new statutory framework that eliminated such relief was imminent and despite a six month grace period in which to alter his conduct. Second, with respect to suspension of deportation specifically, such relief has been completely repealed (not just in the context of section 241(a)(5)), and we have previously found that the repeal of this relief is not impermissibly retroactive. *See* *Karageorgious v. Ashcroft,* 374 F.3d 152, 156 (2d Cir.2004) ("The repeal of suspension of deportation does not ... attach any new legal consequences to petitioners' pre-IIRIRA conduct.... Petitioners had no right to remain living illegally and undetected in the United States. Therefore, they relinquished no rights and acquired no new obligations when they turned themselves in to the INS." (internal citation and quotation marks omitted)).

In sum, section 241(a)(5) does not create new consequences for prior, completed conduct. It is Herrera–Molina's continued presence in the United States that serves as the predicate act to which section 241(a)(5) applies, not some prior, completed conduct that Herrera–Molina is helpless to correct. Nor does section 241(a)(5) impair Herrera–Molina's vested rights. That Herrera–Molina married a United States citizen prior to section 241(a)(5)'s enactment does not alter these conclusions. Even if Herrera–Molina would have been eligible to apply for certain discretionary relief before section 241(a)(5) became effective, he did not make any such application **\*138** prior to the law's effective date and, therefore, did not have any "vested" right to such relief. For the reasons discussed above, section 241(a)(5) is not impermissibly retroactive as applied to Herrera–Molina.

## IV. The Scope of Relief Provided By Section 241(a)(5) and Petitioner's Due Process Rights

In addition to arguing that section 241(a)(5) is impermissibly retroactive, Herrera–Molina argues that section 241(a)(5)'s elimination of certain discretionary relief and the denial of a formal hearing in connection with the reinstatement of his prior deportation order deprived him of his due process rights.

We squarely addressed these issues in *Garcia–Villeda v. Mukasey,* 531 F.3d 141 (2d Cir.2008). In *Garcia–Villeda,* we applied the two-prong test enunciated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to determine "whether elimination of the requirement of a hearing before an immigration judge, pursuant to 8

C.F.R. § 241.8 (2001), is consistent with the reinstatement of removal statute." *Garcia–Villeda,* 531 F.3d at 144, 146. We further considered "whether the reinstatement of removal procedure set forth in 8 C.F.R. § 241.8, both as applied in this case and on its face, comports with the Due Process Clause of the Fifth Amendment; ... and whether the ICE properly reinstated the underlying deportation order without first adjudicating petitioner's pending applications for [relief]." *Id.* at 144. We rejected the petitioner's arguments with regard to all of the above issues.

First, we noted that, pursuant to section 241(a)(5)'s terms, "[t]he inquiry in a reinstatement proceeding is limited to whether the 'alien has reentered the United States illegally after having been removed.' " *Id.* at 148 (quoting 8 U.S.C. § 1231(a)(5)). We further noted that, according to section 241(a)(5), "illegal reentrants are now categorically declared ineligible for any relief from removal."[7] *Id.* Accordingly, we had "little difficulty" granting *Chevron* deference to the government's interpretation of section 241(a)(5), as set forth in 8 C.F.R. § 241.8. *Id.* at 148–49. We found the summary procedure set forth in 8 C.F.R. § 241.8, which eliminated the requirement of a hearing before an immigration judge, "quite appropriate [because] the only issues to be determined are ... the alien's identity, the existence of a prior removal order, and whether the alien has unlawfully reentered." *Id.* at 148 (internal quotation marks omitted). Furthermore, we rejected the petitioner's due process challenges to the reinstatement order because he "admitted before the ICE and before us all of the facts necessary to warrant reinstatement under INA § 241(a)(5), i.e., that he is an alien who reentered the U.S. illegally after being previously deported." *Id.* at 149 (internal quotation marks omitted); *id.* ("None of the additional procedural protections he demands ... would have changed this."). Finally, we rejected the petitioner's claim that, "before the reinstatement order could be issued, he was entitled to adjudication on the merits of his applications for [relief] filed with the DHS ... before the reinstatement order was issued." *Id.* at 150. We concluded that "we cannot disregard **\*139** the statutory text" which provides that "[a]n illegal reentrant 'is not eligible and may not apply for any relief' " under the INA." *Id.* at 151 (emphasis omitted) (quoting 8 U.S.C. § 1231(a)(5)). *But see supra* at 138 n. 7.

**[7]**   In light of *Garcia–Villeda,* we reject Herrera–Molina's argument that he is entitled to apply for additional relief. Herrera–Molina has already applied for withholding of removal, the only relevant relief apparently available to him, based on his fear of returning to Columbia, and that application has been denied. According to the relevant statutory and regulatory provisions, relief other than withholding of removal, *e.g.,* asylum or cancellation of removal, is not available to this petitioner. As we noted in *Garcia–Villeda,* 8 C.F.R. § 241.8 allows "an alien subject to reinstatement to (1) 'express[ ] a fear of returning to the country designated in [the reinstatement] order'; or (2) apply for adjustment of status under either the Haitian Refugee Immigrant Fairness Act of 1998 or the Nicaraguan Adjustment and Central American Relief Act." 531 F.3d at 151 n. 8 (alterations in original) (quoting 8 C.F.R. § 241.8(e)). Herrera–Molina does not argue that he is entitled to apply for adjustment of status under the Haitian Refugee Immigrant Fairness Act or the Nicaraguan Adjustment and Central American Relief Act. Moreover, with regard to those aliens who express a fear of returning to the country designated in the reinstatement order, the provisions of 8 C.F.R. § 241.8 state *only* that there is an "[e]xception for withholding of removal" and do not state that there is any exception for asylum. *See* 8 C.F.R. § 241.8(e). In this context, "[i]f an asylum officer determines that an alien [subject to a reinstatement order] has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for full consideration of the request for withholding of removal *only.*" 8 C.F.R. § 208.31(e) (emphasis added). With regard to this screening process, the Department of Justice has made clear that "aliens subject to reinstatement of a previous removal order under section 241(a)(5)" are "*ineligible for asylum.*" 64 Fed.Reg. 8478, 8485 (Feb. 19, 1999) (emphasis added). Accordingly, we reject Herrera–Molina's claim that he is entitled to apply for asylum or additional types of relief other than withholding of removal. [8]

**[8]**   Furthermore, we reject Herrera–Molina's argument that section 241(a)(5) deprives him of due process. Like the petitioner in *Garcia–Villeda,* Herrera–Molina admits all of the facts necessary to warrant reinstatement under section 241(a)(5): he was deported in 1985, illegally reentered the United States thereafter, and was apprehended while present in the United States. In addition, Herrera–Molina **\*140** does not allege any impropriety in the underlying 1985 deportation proceedings and does not argue that those earlier proceedings deprived him of due process. [9] As in *Garcia–Villeda,* no "additional procedural protections ... would have changed" the determination that Herrera–Molina was subject to reinstatement of the prior deportation order. 531 F.3d at 149. Accordingly, because Herrera–Molina has failed to "allege some cognizable prejudice fairly attributable to the challenged process," *id.* (internal quotation marks omitted), we conclude that he was not deprived of due process with regard to the reinstatement of his prior deportation order.

### CONCLUSION

For the reasons set forth above, Herrera–Molina's petition for review of the ICE order reinstating his prior order of deportation is DENIED. Having completed our review, the stay of removal that this Court previously granted in connection with this petition is VACATED.

### All Citations

597 F.3d 128

### Footnotes

1   The Clerk of Court is respectfully directed to amend the caption pursuant to Federal Rule of Appellate Procedure 43(c)(2) to reflect that Attorney General Eric H. Holder, Jr., has been substituted automatically for former Attorney General Michael B. Mukasey.

2    On December 11, 2007, ICE paroled Herrera–Molina out of detention and placed him under supervision because he established that he was likely to appear at all hearings or other immigration matters and that he posed no danger to the community.

3    Herrera–Molina has presented no arguments here that challenge the BIA's July 31, 2009 decision, and his counsel indicated at oral argument on November 16, 2009, that Herrera–Molina does not intend to seek review of that decision.

4    As we have previously noted, the terms "order of deportation" and "order of removal" are synonymous. *See* *Chupina,* 570 F.3d at 104. "What was formerly known as 'deportation' is now called 'removal' in IIRIRA." *Fernandez–Vargas v. Gonzales,* 548 U.S. 30, 33 n. 1, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006).

5    Although the above quoted language is frequently cited when analyzing retroactivity, the Supreme Court has made clear that this language does not provide "the exclusive definition of presumptively impermissible retroactive legislation" and "does not purport to define the outer limit of impermissible retroactivity." *Hughes Aircraft Co. v. U.S. ex rel. Schumer,* 520 U.S. 939, 947, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997).

6    On April 30, 2007, Herrera–Molina filed a motion to withdraw his previously entered guilty plea with the District Court of Douglas County, Nebraska, which was denied on the merits on June 14, 2007. Herrera–Molina represents that he appealed this decision to the Court of Appeals for the State of Nebraska, which appeal was pending at the time that he submitted his brief to this court on January 7, 2008. On May 14, 2008, subsequent to the submission of his opening brief to this court, the Court of Appeals for the State of Nebraska remanded the matter to the district court with instructions to dismiss Herrera–Molina's motion to withdraw his guilty plea for lack of jurisdiction. *State of Nebraska v. William Herrera,* No. A–07–772, slip op. (Neb.Ct.App. May 14, 2008). In light of this discussion about Herrera–Molina's prior guilty plea, it is worth noting that this case is completely distinguishable from *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). In *St. Cyr,* the Supreme Court found that a law that eliminated discretionary relief was impermissibly retroactive as applied to a petitioner who relied on the old law when deciding whether to plead guilty to a crime. Unlike the prior, completed predicate act in *St. Cyr* (the guilty plea), the predicate act here is Herrera–Molina's continued presence in the United States after section 241(a)(5) went into effect, which as discussed earlier, is not a prior, completed act.

7    We did note, however, that 8 C.F.R. § 241.8 allows "an alien subject to reinstatement to (1) 'express[ ] a fear of returning to the country designated in [the reinstatement] order'; or (2) apply for adjustment of status under either the Haitian Refugee Immigrant Fairness Act of 1998 or the Nicaraguan Adjustment and Central American Relief Act." *Garcia–Villeda,* 531 F.3d at 151 n. 8 (alterations in original) (quoting 8 C.F.R. § 241.8(e)).

8    The Supreme Court in *Fernandez–Vargas* suggests in dicta that the above statutory and regulatory provisions "rais[e] the possibility of asylum." *See* *Fernandez–Vargas,* 548 U.S. at 35, 126 S.Ct. 2422 n.4. It is true that an alien who "expresses a fear of returning to the country" designated in the reinstatement order "shall be referred to an asylum officer for a reasonable fear determination." 8 C.F.R. § 208.31(a), (b). Furthermore, if that asylum officer determines that the alien has established "a reasonable fear of persecution or torture"—a showing relevant to establishing eligibility for asylum—the alien is referred to an Immigration Judge. 8 C.F.R. § 208.31(e). However, the regulations are clear that this referral to an Immigration Judge is for the purpose of considering the alien's "request for *withholding of removal only*." *Id.* (emphasis added). Accordingly, Herrera–Molina's counsel properly conceded at oral argument that, if we find that section 241(a)(5) is not impermissibly retroactive as applied to Herrera–Molina, he would be ineligible to apply for asylum under the relevant statutory and regulatory provisions.

9    Because Herrera–Molina does not challenge the process afforded him in connection with his underlying deportation order, we need not consider the issue of whether we would have jurisdiction to review legal or constitutional challenges to the validity of that underlying deportation order. *See* *Debeato v. Attorney Gen.,* 505 F.3d 231, 234–35 (3d Cir.2007); *Ramirez–Molina v. Ziglar,* 436 F.3d 508, 513–14 (5th Cir.2006).

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Norris v. Whitaker, M.D.Pa., July 31, 2020

948 F.3d 164
United States Court of Appeals, Third Circuit.

Raymond HOLLOWAY, Jr.

v.

ATTORNEY GENERAL UNITED STATES
of America; Deputy Director Bureau of
Alcohol Tobacco Firearms & Explosives;
Director Federal Bureau of Investigation;
United States of America, Appellants

No. 18-3595
|
Argued October 2, 2019
|
Filed: January 17, 2020

**Synopsis**

**Background:** Putative gun purchaser brought civil rights action against federal officials seeking declaratory judgment that federal statute prohibiting him from purchasing firearms because of his prior conviction for driving under influence of alcohol violated Second Amendment as applied, and seeking permanent injunction to bar enforcement of the statute against him. The United States District Court for the Middle District of Pennsylvania, Christopher C. Conner, Chief Judge, 349 F.Supp.3d 451, granted summary judgment in favor of putative purchaser. Officials appealed.

**[Holding:]** The Court of Appeals, Shwartz, Circuit Judge, held that federal prohibition did not violate Second Amendment as applied to putative gun purchaser.

Reversed and remanded.

Fisher, Senior Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**West Headnotes (18)**

**[1]** **Federal Courts** 🔑 Summary judgment
   **Federal Courts** 🔑 Summary judgment

   Appellate review of a district court's order granting summary judgment is plenary, and the Court of Appeals views the facts and makes all reasonable inferences in the non-movant's favor. Fed. R. Civ. P. 56(a).

**[2]** **Federal Civil Procedure** 🔑 Lack of cause of action or defense

   The moving party is entitled to summary judgment when the non-moving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. Fed. R. Civ. P. 56(a).

**[3]** **Weapons** 🔑 Right to bear arms in general

   The Second Amendment protects the right of law-abiding, responsible citizens to use arms in defense of hearth and home. U.S. Const. Amend. 2.

**[4]** **Weapons** 🔑 Right to bear arms in general

   The Second Amendment right to bear arms is not unlimited. U.S. Const. Amend. 2.

**[5]** **Weapons** 🔑 Violation of right to bear arms

   In evaluating whether a law regulating the possession of firearms violates the Second Amendment right to bear arms, a court first asks whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. U.S. Const. Amend. 2.

**[6]** **Weapons** 🔑 Violation of right to bear arms

   If a law regulating the possession of firearms does not impose a burden on conduct falling within the scope of the Second Amendment's

guarantee, the inquiry of a court evaluating whether the law violates the Second Amendment right to bear arms is complete; if it does, the court next evaluates the law under some form of heightened scrutiny. U.S. Const. Amend. 2.

**[7]    Weapons** 🗝 Violation of right to bear arms

A litigant raising a Second Amendment challenge to a law regulating the possession of firearms must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class; if the challenger passes these two hurdles, the burden shifts to the government to demonstrate that the regulation satisfies some form of heightened scrutiny. U.S. Const. Amend. 2.

2 Cases that cite this headnote

**[8]    Courts** 🗝 Number of judges concurring in opinion, and opinion by divided court

When no single rationale explaining the result enjoys the assent of five justices, the holding of the United States Supreme Court may be viewed as that position taken by those justices who concurred in the judgment on the narrowest grounds.

**[9]    Courts** 🗝 Number of judges concurring in opinion, and opinion by divided court

The goal in analyzing a fractured opinion of the United States Supreme Court is to find a single legal standard that when properly applied, produces results with which a majority of justices in the case articulating the standard would agree.

**[10]    Weapons** 🗝 Violation of right to bear arms

In evaluating an as-applied Second Amendment challenge to the federal statute prohibiting convicted felons from possessing firearms, a court determines whether the individual has

committed a serious offense, and thus was an unvirtuous citizen who was historically barred from possessing firearms and fell out of the Second Amendment's scope. U.S. Const. Amend. 2; 🚩 18 U.S.C.A. § 922(g)(1).

1 Cases that cite this headnote

**[11]    Weapons** 🗝 Violation of right to bear arms

A crime is found to be serious, so that the offender is determined to be historically barred from Second Amendment guarantees, in an as-applied Second Amendment challenge to the federal statute prohibiting convicted felons from possessing firearms, based on circumstances related to the offense, and so evidence of a challenger's rehabilitation or his likelihood of recidivism is not relevant. U.S. Const. Amend. 2; 🚩 18 U.S.C.A. § 922(g)(1).

1 Cases that cite this headnote

**[12]    Weapons** 🗝 Violation of right to bear arms

There are no fixed rules for determining whether an offense is serious, so that the offender is determined to be historically barred from Second Amendment guarantees, in an as-applied Second Amendment challenge to the federal statute prohibiting convicted felons from possessing firearms, but various factors may be informative including, but not limited to, whether the crime poses a danger or risk of harm to self or others, whether the crime involves violence or threatened violence, the classification of the offense, the maximum penalty, the penalty imposed, and how other jurisdictions view the crime. U.S. Const. Amend. 2; 🚩 18 U.S.C.A. § 922(g)(1).

2 Cases that cite this headnote

**[13]    Weapons** 🗝 Violation of right to bear arms

If a litigant raising an as-applied Second Amendment challenge to the federal statute prohibiting convicted felons from possessing firearms makes a strong showing that the statute burdens his Second Amendment rights and

that he has not committed a serious crime, and thus is different from those historically barred from possessing firearms, then the burden shifts to the government to demonstrate that the statute satisfies intermediate scrutiny. U.S. Const. Amend. 2; 18 U.S.C.A. § 922(g)(1).

**[14]**  Weapons  ⚷  Violation of right to bear arms

Weapons  ⚷  Possession After Conviction of Crime

Federal statute prohibiting persons convicted of crimes punishable by more than one year of imprisonment from purchasing firearms did not violate Second Amendment right to bear arms as applied to putative gun purchaser convicted of Pennsylvania offense of driving under influence at the highest blood alcohol content; although the offense was labeled as a misdemeanor, under Pennsylvania law, it carried a maximum penalty of five years' imprisonment, driving under the influence of alcohol was a dangerous and potentially deadly crime, and purchaser was sentenced to three months in prison, so that the offense was serious enough to justify federal disarmament, and purchaser failed to present evidence that he did not commit serious crime.

U.S. Const. Amend. 2; 18 U.S.C.A. § 922(g)(1); 75 Pa. Cons. Stat. Ann. § 3802(c).

**[15]**  Weapons  ⚷  Right to bear arms in general

A person who did not commit a serious crime retains his Second Amendment right to bear arms because a non-serious crime does not demonstrate a lack of virtue that disqualifies an offender from exercising those rights. U.S. Const. Amend. 2.

**[16]**  Weapons  ⚷  Violation of right to bear arms

While generally the misdemeanor label for a state offense is important, and is a powerful expression of the state legislature's view, it is not dispositive of whether the crime qualifies as serious, for purpose of determining whether federal statute prohibiting persons convicted of

crimes punishable by more than one year of imprisonment from purchasing firearms violates the Second Amendment as applied. U.S. Const. Amend. 2; 18 U.S.C.A. § 922(g)(1).

**[17]**  Weapons  ⚷  Violation of right to bear arms

The maximum penalty that may be imposed often reveals how the state legislature views an offense, and is probative of the seriousness of the offense, for purpose of determining whether the federal prohibition on the purchase of firearms by persons convicted of crimes punishable by more than one year of imprisonment may be applied without violating the offender's Second Amendment rights. U.S. Const. Amend. 2; 18 U.S.C.A. § 922(g)(1).

**[18]**  Weapons  ⚷  Violation of right to bear arms

The actual penalty imposed on the offender does not necessarily show that the crime was not serious, for purpose of determining whether the federal prohibition on the purchase of firearms by persons convicted of crimes punishable by more than one year of imprisonment may be applied without violating the offender's Second Amendment rights. U.S. Const. Amend. 2; 18 U.S.C.A. § 922(g)(1).

***167**  Appeal from the United States District Court for the Middle District of Pennsylvania (D.C. No. 1-17-cv-00081), District Judge: Hon. Christopher C. Conner

**Attorneys and Law Firms**

Joseph H. Hunt, Assistant Attorney General, David J. Freed, United States Attorney, Mark B. Stern, Thais-Lyn Trayer [ARGUED], Tyce R. Walters, United States Department of Justice, 950 Pennsylvania Avenue, N.W., Civil Division, Room 7712, Washington, D.C. 20530, Counsel for Appellants United States of America, Attorney General United States of America, Deputy Director Bureau of Alcohol Tobacco Firearms & Explosives, and Director Federal Bureau of Investigation

Adam J. Kraut, Joshua Prince [ARGUED], Prince Law Offices, 646 Lenape Road, Bechtelsville, PA 19505, Counsel for Appellee Raymond Holloway, Jr.

Joseph G. S. Greenlee, Firearms Policy Coalition, 1215 J Street, 17th Floor, Sacramento, CA 95814, Counsel for Amici Curiae Firearms Policy Coalition Inc, Firearms Policy Foundation, Madison Society Foundation Inc, and Second Amendment Foundation Inc

Before: SHWARTZ, FUENTES, and FISHER, Circuit Judges.

OPINION

SHWARTZ, Circuit Judge.

Drunk driving is a dangerous and often deadly crime. "Approximately a quarter million people are injured annually in alcohol-related crashes," Begay v. United States, 553 U.S. 137, 156-57, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008) (Alito, J., dissenting), and the number "who are killed ... by drunk drivers is far greater than the number of murders committed" during many other violent crimes, id. at 157 & n.4, 128 S.Ct. 1581. "[F]rom 1982 to 2016, alcohol-related accidents took roughly 10,000 to 20,000 lives in this Nation **\*168** every single year. In the best years, that would add up to more than one fatality per hour." Mitchell v. Wisconsin, —— U.S. ——, 139 S. Ct. 2525, 2536, 204 L.Ed.2d 1040 (2019) (emphasis omitted) (citations omitted).

Today, we consider whether Pennsylvania's driving under the influence ("DUI") law, which makes a DUI at the highest blood alcohol content ("BAC") a first-degree misdemeanor that carries a maximum penalty of five years' imprisonment, see 18 Pa. Cons. Stat. Ann. § 1104; 75 Pa. Cons. Stat. Ann. §§ 3802(c), 3803(b)(4), constitutes a serious crime that requires disarmament. Plaintiff Raymond Holloway, Jr., was convicted under this statute, and by the terms of 18 U.S.C. § 922(g)(1), he is prohibited from possessing a firearm. Holloway claims this prohibition violates his Second Amendment rights. The District Court agreed and enjoined applying § 922(g)(1) to him. Because Holloway was convicted of a serious crime as contemplated by Binderup v. Attorney General United States of America, 836 F.3d 336 (3d Cir. 2016) (en banc), applying § 922(g)(1) to him does not offend the Second Amendment. Therefore, we will reverse the District Court's order and remand for the entry of judgment in favor of the Government.

I

In 2002, Holloway was convicted of a DUI at the highest BAC, but the charge was dismissed upon his completion of an accelerated rehabilitation program. In 2005, Holloway was again arrested for driving under the influence and registered a BAC of 0.192%. Holloway pled guilty to violating 75 Pa. Cons. Stat. Ann. § 3802(c) for driving under the influence at the highest BAC (greater than 0.16%). He received a sentence of 60 months' "Intermediate Punishment," including 90-days' imprisonment that allowed him work release, a $1,500 fine, and mandatory drug and alcohol evaluation.

In 2016, Holloway sought to purchase a firearm but was unable to do so because of his disqualifying DUI conviction. Holloway sued the Attorney General of the United States and other federal officials (the "Government") in the United States District Court for the Middle District of Pennsylvania, claiming that § 922(g)(1) is unconstitutional as applied to him and seeking declaratory and permanent injunctive relief. The parties filed cross-motions for summary judgment.

[1] [2] The District Court granted Holloway's motion for summary judgment, awarded him a declaratory judgment, and entered a permanent injunction barring the Government from enforcing § 922(g)(1) against him. Holloway v. Sessions, 349 F. Supp. 3d 451, 463 (M.D. Pa. 2018). Applying Binderup, the Court held that § 922(g)(1) is unconstitutional as applied to Holloway because (1) Holloway's DUI offense was a non-serious crime that has not historically been a basis for the denial of Second Amendment rights, id. at 459-60, and (2) the Government failed to demonstrate that disarmament of individuals like Holloway would promote the public safety, particularly given his decade of crime-free behavior, id. at 460-62. The Government appeals.

II[1]

A

The sole issue on appeal is whether applying **\*169** 18 U.S.C. § 922(g)(1)[2] to Holloway, which makes it unlawful for him to possess a firearm due to his prior conviction, violates his Second Amendment rights.

[3] [4] In District of Columbia v. Heller, the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). This right, however, "is not unlimited." Id. at 626, 128 S.Ct. 2783. Indeed, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." Id. The Court described the felon ban as just one "example[ ]" of "presumptively lawful regulatory measures." Id. at 627 n.26, 128 S.Ct. 2783.

[5] [6] Since Heller, we have been called upon to determine whether various laws unlawfully infringe the Second Amendment. Some of these laws regulate who can possess firearms, see, e.g., Beers v. Att'y Gen. U.S., 927 F.3d 150, 155-56 (3d Cir. 2019) (ban on possession by those adjudicated mentally defective or committed to mental institution); Binderup, 836 F.3d 336 (ban on possession by certain convicts). Other laws regulate the type of firearms that may be possessed. See, e.g., Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J. (N.J. Rifle), 910 F.3d 106 (3d Cir. 2018) (large capacity magazines). In each instance, we examined the challenged law by applying the two-part test first articulated in United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010). Under that test, we first "ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Id. at 89. "If it does not, our inquiry is complete." Id. If it does, we move to the second step: we evaluate the law under some form of heightened scrutiny. See id. at 96-97.

After Marzzarella, we addressed a constitutional challenge to § 922(g)(1) in United States v. Barton, 633 F.3d 168 (3d Cir. 2011). Barton recognized that § 922(g)(1) was one of the "presumptively lawful" measures referenced in Heller, id. at 172, 128 S.Ct. 2783, but that individuals could challenge § 922(g)(1) on an as-applied basis, id. at 173. Barton, however, did not expressly apply Marzzarella's two-step framework. Id. Rather, Barton held that a challenger could rebut the presumption that § 922(g)(1) constitutionally applied to him by "present[ing] facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." Id. at 174. The "historically barred" class, Barton concluded, was individuals "likely to commit violent offenses." Id. at 173-74. Thus, Barton held that if an individual could show that he posed no threat of future violence, then § 922(g)(1) could not constitutionally apply to him. Id. at 174.

**\*170** We revisited Barton and as-applied challenges to § 922(g)(1) as an en banc Court in Binderup. Binderup resulted in several opinions from fifteen judges: (1) an opinion by Judge Ambro, joined in full by two judges and joined additionally in part by four other judges; (2) an opinion by Judge Hardiman, joined in full by four judges, and which concurred in part with Judge Ambro and concurred in the judgment; and (3) an opinion by Judge Fuentes, joined by six judges (some of whom joined parts of Judge Ambro's opinion), which concurred in part, dissented in part, and dissented from the judgment.

[7] [8] [9] There are no specific rules for how to identify the holdings and legal standards from split circuit opinions. We can, however, look to the rules we use to identify such standards in fractured Supreme Court opinions, as set forth in Marks v. United States, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), and its progeny.[3] We need not conduct an explicit Marks analysis of the Binderup opinions here because we already recited its holdings, as expressed by Judge Ambro's controlling opinion, in Beers, 927 F.3d at 155-56;[4] see also N.J. Rifle, 910 F.3d at 130 (Bibas, J., dissenting) (describing Judge Ambro's Binderup opinion

as the "controlling opinion"), and it binds us.[5]  ***171**
Mateo v. Att'y Gen. U.S., 870 F.3d 228, 231 n.6 (3d Cir. 2017)
(prior panel's precedential opinion "binding on subsequent
panels"); see also Jackson v. Danberg, 656 F.3d 157, 165
n.10 (3d Cir. 2011) (applying a legal standard derived from a
previous panel opinion's Marks analysis as the law of our
Circuit).

Nevertheless, both Beers and *Marks* reveal the following
relevant Binderup holdings agreed to by a majority of
judges:

(1) Marzzarella's two-step test—and not the test
articulated in Barton—governs Second Amendment
challenges, 836 F.3d at 346-47 (Ambro, J.); id. at 387
(Fuentes, J.);[6]

**[10]**  (2) At Marzzarella step one for challenges to §
922(g)(1), we determine whether an individual has committed
a "serious" offense, and thus was an "unvirtuous citizen[ ]"
who was historically barred from possessing firearms and
fell out of the Second Amendment's scope, id. at 348-49
(Ambro, J.); id. at 387 (Fuentes, J.);[7]

(3) Barton's focus on whether the challenger's crime was
violent or whether the challenger poses a threat of violence
is overruled, id. at 348-49 (Ambro, J.); id. at 387 n.72
(Fuentes, J.);

(4) a challenger, otherwise barred from possession by §
922(g)(1), can make a factual showing that he falls outside of
the historically barred class, id. at 347 & n.3, 349 (Ambro,
J.); id. at 365-67 (Hardiman, J.);[8]

(5) intermediate scrutiny applies at Marzzarella step two,
id. at 353 (Ambro, J.); id. at 396-97 (Fuentes, J.).[9]

***172** **[11]**  **[12]**  **[13]** Thus, as we said in Beers,
927 F.3d at 155, Binderup held that "the two-step
Marzzarella framework controls all Second Amendment

challenges, including as-applied challenges to § 922(g)
(1)," 836 F.3d at 356 (Ambro, J.). At step one, the
challenger must "identify the traditional justifications for
excluding from Second Amendment protections the class
of which he appears to be a member[.]" Id. at 347.
When the class at issue is historically excluded convicts, as
here and in Binderup, the challenger must show that he
was not previously convicted of a serious crime. Id. at
350. A crime is "serious" based on circumstances related
to the offense, id. at 350-53, and so evidence of a
challenger's rehabilitation or his likelihood of recidivism
is not relevant, id. at 349-50. There are no fixed rules
for determining whether an offense is serious but various
factors may be informative including, but not limited to,
whether the crime poses a danger or risk of harm to self
or others, whether the crime involves violence or threatened
violence, the classification of the offense, the maximum
penalty, the penalty imposed, and how other jurisdictions
view the crimes. See id. at 351-52.[10] If a challenger
makes a "strong" showing that the regulation burdens his
Second Amendment rights and that he has not committed a
"serious" crime, and thus is different from those historically
barred from possessing firearms, then "the burden shifts to
the Government to demonstrate that the regulation satisfies"
intermediate scrutiny. Id. at 347.

We apply this framework to determine whether § 922(g)
(1) as applied to Holloway violates his Second Amendment
rights.

B

**[14]** At the first step of the analysis, we must determine
whether the application of § 922(g)(1) burdens
Holloway's Second Amendment rights by considering the
traditional justifications for denying certain criminals Second
Amendment rights and then examining whether Holloway's
offense is disqualifying. We "presume the judgment of the
legislature is correct and treat any crime subject to § 922(g)
(1) as disqualifying unless there is a strong reason to do
otherwise." Id. at 351.

1

As previously stated, Heller embraced the "longstanding prohibitions on the possession of firearms by felons." **\*173** 554 U.S. at 626, 128 S.Ct. 2783. Because Holloway's DUI misdemeanor conviction carries a maximum penalty of five years' imprisonment, it is deemed a disqualifying felony under § 922(g)(1). Thus, the application of § 922(g)(1) is presumptively lawful. See Binderup, 836 F.3d at 348 (Ambro, J.).

2

**[15]** We next examine whether Holloway's crime was nonetheless "not serious enough to strip [him] of [his] Second Amendment rights." Id. at 351. Under Binderup, "a person who did not commit a serious crime retains his Second Amendment rights," because "a non-serious crime does not demonstrate a lack of 'virtue' that disqualifies an offender from exercising those rights." Id. at 349.

A crime that presents a potential for danger and risk of harm to self and others is "serious."[11] See "Serious," Black's Law **\*174** Dictionary (11th ed. 2019) (defining "serious" as, among other things, "dangerous; potentially resulting in death or other severe consequences"). "There is no question that drunk driving is a serious and potentially deadly crime .... The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases." Virginia v. Harris, 558 U.S. 978, 979-80, 130 S.Ct. 10, 175 L.Ed.2d 322 (2009) (Mem.) (Roberts, C.J., dissenting from denial of writ of certiorari); see Mitchell, 139 S. Ct. at 2541 (Sotomayor, J., dissenting) ("[D]runk driving poses significant dangers that [states] must be able to curb."); Begay, 553 U.S. at 141, 128 S.Ct. 1581 ("Drunk driving is an extremely dangerous crime.").

All three branches of the federal government have recognized as much. The Supreme Court has described individuals "who drive with a BAC significantly above the ... limit of 0.08% and recidivists" as "the most dangerous offenders." Birchfield v. North Dakota, —— U.S. ——, 136 S. Ct. 2160, 2179, 195 L.Ed.2d 560 (2016). Congress and the Executive Branch have also recognized the dangers posed

by drunk driving. Congress requires states to implement highway safety programs "to reduce injuries and deaths resulting from persons driving motor vehicles while impaired by alcohol." 23 U.S.C. § 402(a)(2)(A)(iii). The Secretary of Transportation conditions the receipt of certain highway-related funds on states' implementation of programs with impaired driving countermeasures that will "effective[ly]" "reduce driving under the influence of alcohol." § 405(a)(3), (d). Thus, all branches of the federal government agree that DUIs are dangerous, and those who present a danger may be disarmed.

While use or the threatened use of violence is not an element of a DUI offense, see 75 Pa. Cons. Stat. Ann. § 3802(c) (providing "[a]n individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is 0.16% or higher"), a showing of violence is not necessary for a crime to be deemed serious, see, e.g., Binderup, 836 F.3d at 348 (Ambro, J.); id. at 390-91 (Fuentes, J.); Medina v. Whitaker, 913 F.3d 152, 160 (D.C. Cir. 2019) (holding that fraud, by lying on mortgage documents, is "a serious crime"). Thus, the fact that an offense does not include the use or threatened use of violence does not mean it is not serious.

**[16]** Moreover, though labeled as a first-degree misdemeanor, Holloway's DUI crime carries a three-month mandatory minimum prison term and a five-year maximum prison term. See 18 Pa. Cons. Stat. Ann. § 1104; 75 Pa. Cons. Stat. Ann. § 3803(b)(4); 75 Pa. Cons. Stat. Ann. § 3804(c)(2). While "generally the misdemeanor label ... in the Second Amendment context, is ... important" and is a "powerful expression" of the state legislature's view, it is not dispositive. Binderup, 836 F.3d at 352. First, not only is the distinction "minor and often arbitrary," Tennessee v. Garner, 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); see also Burgess v. United States, 553 U.S. 124, 132, 128 S.Ct. 1572, 170 L.Ed.2d 478 (2008), some states do not use the distinction at all, see, e.g., N.J. Stat. Ann. § 2C:1-4 (dividing offenses into "crimes," "disorderly **\*175** persons offenses," and "petty disorderly persons offenses"); § 2C:43-1a (dividing "crimes" further into four degrees); State v. Doyle, 42 N.J. 334, 200 A.2d 606, 613 (1964) ("Criminal codes in New Jersey have not utilized the felony-

misdemeanor nomenclature or classification of the English common law."). Second, "numerous misdemeanors involve conduct more dangerous than many felonies." Garner, 471 U.S. at 14, 105 S.Ct. 1694. Indeed, giving dispositive weight to the felony/misdemeanor nomenclature for determining whether an offense is serious would mean that the following offenses, labeled under Pennsylvania law as misdemeanors and carrying a five-year maximum penalty (the maximum Holloway faced), 18 Pa. Cons. Stat. Ann. § 1104(1), would not qualify as serious crimes: involuntary manslaughter, § 2504(b), terrorism, § 2717(b)(1), assaulting a child, § 2701(b)(2), abusing a care-dependent person, § 2713.1(b)(1), making terroristic threats, § 2706(d), threatening to use weapons of mass destruction, § 2715(b)(1), shooting a fire bomb into public transportation, § 2707(a), indecent assault by forcible compulsion, § 3126(a)(2), concealing the murder of a child, § 4303(a), luring a child into a motor vehicle or structure, § 2910(a), restraining a person "in circumstances exposing him to risk of serious bodily injury," § 2902(a)(1), and stalking, § 2709.1(c)(1). At bottom, Heller emphasized that the Second Amendment right belongs to "law-abiding, responsible citizens," 554 U.S. at 635, 128 S.Ct. 2783, and whether labeled a felon or misdemeanant, those who commit serious crimes are not "the kinds of 'law-abiding' citizens whose rights Heller vindicated," Binderup, 836 F.3d at 392 (Fuentes, J.).

**[17]** **[18]** Furthermore, the maximum penalty that may be imposed often reveals how the legislature views an offense.[12] Put succinctly, "the maximum possible punishment is certainly probative of a misdemeanor's seriousness." Id. at 352 (Ambro, J.).[13] "[T]he category of serious crimes **\*176** changes over time as legislative judgments regarding virtue evolve," id. at 351, and here, the Pennsylvania legislature has demonstrated an evolution in judgment. Pennsylvania's DUI laws were amended in 2003 when state legislators observed that "[t]oo many people have been injured and killed on our highways," H.R. Legis. Journal, 187th Gen. Assemb., Reg. Sess. 1443 (Pa. 2003) (statement of Rep. Turzai), and unlike in other states, which saw an eleven percent decrease in deaths caused by drunk drivers, such deaths "continue to rise" in Pennsylvania with a five percent increase, H.R. Legis. Journal, 187th Gen. Assemb., Reg. Sess. 1444 (Pa. 2003) (statement of Rep. Harper); S. Legis. Journal, 187th Gen. Assemb., Reg. Sess. 981 (Pa. 2003) (statement of Sen. Williams). At the time of the

amendment, thirteen individuals were killed every two weeks in Pennsylvania from alcohol-related accidents. H.R. Legis. Journal, 187th Gen. Assemb., Reg. Sess. 1445 (Pa. 2003) (statement of Rep. Harper). "[M]ore than half of all fatal alcohol-related accidents [were] caused by hardcore drunken drivers, those people whose BACs are .16 or above," H.R. Legis. Journal, 187th Gen. Assemb., Reg. Sess. 1444 (Pa. 2003) (statement of Rep. Harper), and "one-third of drunk driving arrests involve[d] repeat offenders," S. Legis. Journal, 187th Gen. Assemb., Reg. Sess. 981 (Pa. 2003) (statement of Sen. Williams). To address this "very serious matter," H.R. Legis. Journal, 187th Gen. Assemb., Reg. Sess.1445 (Pa. 2003) (statement of Rep. Harper), the legislature "provid[ed] for tough civil and criminal penalties together with mandatory treatment," H.R. Legis. Journal, 187th Gen. Assemb., Reg. Sess. 1443 (Pa. 2003) (statement of Rep. Turzai), to "mak[e] it clear that if you are under the influence of alcohol or drugs and behind the wheel in Pennsylvania, you will be punished," H.R. Legis. Journal, 187th Gen. Assemb., Reg. Sess. 1445 (Pa. 2003) (statement of Rep. Harper). Therefore, despite the misdemeanor label, Pennsylvania's decision to impose a mandatory minimum jail term and a maximum penalty of up to five years' imprisonment for a second DUI at the highest BAC reflects the seriousness of the offense.[14]

Holloway received the statutory minimum sentence of 90 days' imprisonment, 75 Pa. Cons. Stat. Ann. § 3804(c)(2), and although he was permitted to work, he received a custodial sentence unlike either of the challengers in Binderup. 836 F.3d at 352 ("With not a single day of jail time, the punishments here reflect the sentencing judges' assessment of how minor the violations were."). The legislature's mandate that repeat DUI offenders receive at least three months in jail reflects its judgment that such offenses are serious.

Pennsylvania is not alone in its decision to severely punish repeat DUI offenders. Mitchell, 139 S. Ct. at 2536 ("[M]any States ... have passed laws imposing increased penalties for recidivists or for drivers with a BAC level that exceeds a **\*177** higher threshold." (citations omitted)). Although most states do not impose penalties for second DUI offenses that subject an offender to disarmament under § 922(g)(1), three states impose penalties that subject misdemeanants who commit a second DUI at a higher BAC to § 922(g)(1) disarmament. Moreover, several states grade a second DUI offense as a felony, thus triggering disarmament.

The absence of a cross-jurisdictional consensus regarding the punishment for such conduct does not mean the conduct is not serious. Indeed, states unanimously agree that DUIs are crimes subject to punishment.

Holloway suggests that his crimes cannot be so serious to justify federal disarmament and that to apply § 922(g)(1) to him would be overinclusive because Pennsylvania law only disarms DUI offenders at their third offense and permits them to apply for relief after ten years. This argument ignores the gradations in Pennsylvania's DUI laws. In fact, Pennsylvania's prohibition may be broader than § 922(g)(1) because it applies to all DUIs under 75 Pa. Cons. Stat. Ann. § 3802, regardless of punishment. For example, an individual who commits a third DUI, none at the high or highest BAC, within a five-year period, is convicted of a second-degree misdemeanor under 75 Pa. Cons. Stat. Ann. § 3803(a)(2) and subject to up to two years' imprisonment under 18 Pa. Cons. Stat. Ann. § 1104(2). This individual's third DUI triggers Pennsylvania's disarmament statute under 18 Pa. Cons. Stat. Ann. § 6105(c), but does not trigger § 922(g)(1) because it falls within § 921(a)(20)(B)'s exception for state misdemeanors subject to a term of imprisonment of two years or less. Holloway's second DUI, however, subjects him to the federal provision but not the state provision because his offense was at the highest BAC, which enhanced the grading of his offense to a first-degree misdemeanor and exposed him to five years' imprisonment. Thus, Pennsylvania's disarmament statute captures offenders who may not face § 922(g)(1)'s bar and shows that Pennsylvania meant to disarm a broader swath of offenders than § 922(g)(1).

Together, these considerations demonstrate that Holloway's DUI conviction constitutes a serious crime, placing him within the class of "persons historically excluded from Second Amendment protections." Binderup, 836 F.3d at 347. Because Holloway has not met his burden at the first step of the analysis to overcome the presumptive application of § 922(g)(1), [15] § 922(g)(1) is constitutional as applied to him, and he is not entitled to relief. [16]

**\*178** III

For the foregoing reasons, we will reverse the order granting Holloway summary judgment, a declaratory judgment, and an injunction and remand for the entry of judgment in favor of the Government.

FISHER, Circuit Judge, dissenting.

Driving under the influence of alcohol is undoubtedly a significant offense deserving of punishment. Yet the principal question in this case is not whether that offense is "serious" in the abstract or even as a matter of ordinary understanding. "Seriousness" here has a discrete legal meaning—that a conviction of the crime deprives in perpetuity an individual of an enumerated constitutional right. Under our precedent, these two categories are distinct, and they must be treated as such. Just because this question arises under the Second Amendment does not make our decision any less weighty. If the circumstances were different, we would assuredly consider very carefully the legal standard for depriving an individual of his right to free speech. The majority incorrectly, in my view, holds that Holloway has not carried his burden at Step One of the two-step framework established in United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010). Further, because I conclude that at Step Two, 18 U.S.C. § 922(g)(1) as applied here does not survive intermediate scrutiny, I must respectfully dissent.

I

Under the Marzzarella framework, we first determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." 614 F.3d at 89. In particular, our precedent requires the challenger to satisfy the two elements articulated in United States v. Barton, 633 F.3d 168 (3d Cir. 2011). He must "identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member," and then "present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." Binderup v. Attorney Gen. United States of America, 836 F.3d 336, 347 (3d Cir. 2016) (en banc) (plurality opinion) (citing Barton, 633 F.3d at 173-74); see id. at 366 (Hardiman, J., concurring in part and concurring in the judgments); see

*also* *Beers v. Attorney Gen. United States of America*, 927 F.3d 150, 157 (3d Cir. 2019) (adopting this test for an as-applied challenge to 18 U.S.C. § 922(g)(4)).

In *Binderup*, ten judges on the fifteen-member en banc court agreed that, in the context of as-applied challenges to 18 U.S.C. § 922(g)(1), the "historically barred class" is those who are "unvirtuous" because they have "committed a serious criminal offense, violent or nonviolent." 836 F.3d at 348 (plurality opinion); *see* *id.* at 387 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments); *see also* *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011) (noting that when this Circuit confronts a fractured decision, we "look[ ] to the votes of dissenting [judges] if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue"). "Seriousness"—and by extension "unvirtuousness"—therefore has no independent legal significance. It is a gloss on the first part of the *Barton* test—a way of describing the offenses committed by those historically barred from possessing a firearm. [1]

**\*179** The principal question before us today concerns the application of *Barton*'s second prong in the § 922(g)(1) context—that is, how to evaluate whether a challenger's crime is sufficiently similar to crimes of the historically barred class such that he is not entitled to Second Amendment protection. The *Binderup* Court divided on this issue, and, for the reasons detailed below, it remains an open question whether the multifactor test used in *Binderup* is binding precedent in our Circuit—despite the lower courts' application of it as such. *See, e.g.*, *Williams v. Barr*, 379 F. Supp. 3d 360, 370-74 (E.D. Pa. 2019); *Holloway v. Sessions*, 349 F. Supp. 3d 451, 457-60 (M.D. Pa. 2018). Nevertheless, for reasons I also state, the test is an appropriate means under our precedent of determining whether a challenger's crime is "serious" for purposes of *Marzzarella* Step One.

It is on this latter point—the application of the multifactor test—that I break with my colleagues in the majority. They interpret the test's list of factors to be non-exhaustive, Majority Op. at II.A, and so they supplement their analysis of the factors with additional considerations. The majority

appears to concede that at least three of the four *Binderup* factors are in Holloway's favor, but still concludes that Holloway is not entitled to Second Amendment protection. Although I agree that we are not bound to consider the four factors exclusively, I disagree with my colleagues in how they have applied and supplemented those factors. Simply because our precedent does not require us to apply the four factors alone does not mean the determination of "seriousness" is open to any legal content. Our precedent *does* require us to follow the doctrinal structure established in *Barton* and adopted in *Binderup*. The "seriousness" inquiry is a comparison of the challenger's circumstances with those of the historically barred class. The majority's analysis, in my view, diverges too far from this requirement.

### A

As it was applied in *Binderup*, the multifactor test contains four factors for determining whether an individual's crime is sufficiently "serious" to deprive him of his Second Amendment right. First, the court considers whether the state classifies the challenger's disqualifying crime under § 922(g)(1) as a felony or a misdemeanor. 836 F.3d at 351 (opinion of Ambro, J.). Second, it determines whether the challenger's crime "had the use or attempted use of force as an element." *Id.* at 352. Third, also relevant is the sentence the challenger in fact received. Although the maximum possible sentence determines whether the crime triggers the § 922(g)(1) bar, the crime's "seriousness" for purposes of Second Amendment analysis turns, in part, on the challenger's actual punishment. Finally, the court considers whether there exists a "cross-jurisdictional consensus regarding the seriousness of the [challenger's] crimes." *Id.* Although this multifactor test garnered the support of only three judges, it was declared "the law of our Circuit" under the Supreme Court's *Marks* rule. *Id.* at 356.

**\*180** My review of our case law leads me to question this conclusion. Courts and legal scholars disagree as to the nature of the *Marks* rule and how it is to be applied. [2] In particular, there are multiple possible versions of the rule, and the Supreme Court's most recent statement on the matter acknowledged but declined to resolve this debate.

*See* Hughes v. United States, —— U.S. ——, 138 S. Ct. 1765, 1771-72, 201 L.Ed.2d 72 (2018). On my assessment, the multifactor test should be Circuit precedent under only one of these versions, [3] and our Court has not adopted this interpretation of the Marks rule above the others. [4] As a result, despite the declaration in Binderup to the contrary, I do not think Marks requires us to treat the multifactor test as controlling authority. [5]

**B**

Nevertheless, like the District Court, I believe that the multifactor test should guide the Step One analysis in this case. On my reading, the four factors reflect an underlying logic that is consistent with our precedent in Barton and Binderup. Those cases require us to assess the relation between the challenger's "circumstances [and] those of persons historically barred from Second Amendment protections." Barton, 633 F.3d at 174; *see also* Binderup, 836 F.3d at 346-47 (plurality opinion); *id.* at 366 (Hardiman, J., concurring in part and concurring in the judgments). This comparative exercise demands certain measures of "seriousness," and those measures should naturally be the features—the classification, elements, and punishments—common to the crimes that traditionally have qualified the individuals convicted of them for firearm dispossession. These crimes include felonies, crimes of violence, and (as Binderup held)[6] some nonviolent misdemeanors. Further, because **\*181** neither courts nor scholars have agreed on the precise contours of this category —and in particular how "longstanding" a regulation must be for its violators to be considered part of the historically barred class, *see, e.g.,* United States v. Skoien, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 HARV. J.L. & PUB. POL'Y 695 (2009)—the multifactor test has the virtue of permitting a number of different measures of "seriousness" without making any one factor dispositive.

A methodical evaluation of each factor, consistent with this logic, compels the conclusion reached by the District Court: that Holloway's conduct has not removed him from the scope of Second Amendment protection. In conducting

this analysis, I shall also address the majority's additional considerations—the "potential for danger and risk of harm" posed by the challenger's crime, Majority Op. at II.B.2, and the maximum level of punishment Pennsylvania imposes for Holloway's second DUI offense, *id.* While, as noted, I do not dispute that the majority may supplement the four factors, any such additions must be—as the four factors are—consistent with the comparative exercise required by Barton and Binderup. [7]

**1**

The first factor asks whether the challenger's crime is a felony or a misdemeanor. The majority acknowledges that Pennsylvania classifies Holloway's second DUI offense as a misdemeanor, but it points out that the offense "carries ... a five-year maximum prison term." Majority Op. at II.B.2. Yet, under our precedent, the potential prison term cannot nullify the relevance of the felony/misdemeanor distinction for determining whether a crime is "serious" enough to deprive an individual of his Second Amendment right. A common feature of the crimes that traditionally have barred an individual from owning a firearm is that they are classified as felonies.

For example, in Heller, the Supreme Court warned specifically that its opinion should not be read to question "longstanding prohibitions on the possession of firearms by *felons.*" District of Columbia v. Heller, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (emphasis added); *see also* McDonald v. City of Chicago, 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion). Congress itself recognized the relevance of the distinction when it excluded from § 922(g)(1)'s reach *misdemeanors* punishable by imprisonment of two years or less. *See* 18 U.S.C. § 921(a)(20)(B). If, as the majority suggests, the maximum length of the sentence rather than the classification of the crime is what really matters, then Congress would never have made an exception for **\*182** misdemeanors alone. It would either have amended § 922(g)(1) to cover all crimes punishable by more than two years' incarceration or never added § 921(a)(20)(B) in the first place. [8]

Further, the classification of a crime as a felony has profound implications for whether a person may possess a firearm under state law. On my assessment, thirty-two out of fifty-one jurisdictions (the fifty states and the District of Columbia) disarm individuals because of a felony conviction.[9] That is, they bar for at least some time the possession of a firearm precisely because the person was convicted of a crime labeled a felony. The distinction therefore matters for defining the historically barred class, regardless of jurisdictional diversity in the sentence ranges for various crimes.

As noted, in evaluating the relevance of the felony/ misdemeanor distinction, the majority lends great weight to the maximum punishment that Pennsylvania imposes for Holloway's offense. *See* Majority Op. at II.B.2. However, a majority of the en banc Court in 📄 *Binderup* rejected the significance of that consideration. As Judge Ambro noted there, prohibitions on the possession of firearms by criminals are only "*presumptively* lawful." 📄 *Binderup*, 836 F.3d at 350 (opinion of Ambro, J.) (emphasis added) (citing 📄 *Heller*, 554 U.S. at 626-27 & n.26, 128 S.Ct. 2783), and in the absence of an explicit declaration to the contrary, all presumptions are rebuttable. To hold otherwise would constitute "an **\*183** end-run around the Second Amendment," in effect subjecting such prohibitions to rational-basis review rather than the heightened scrutiny demanded when a constitutional right is at stake. 📄 *Id.* at 351-52. As a result, the maximum possible sentence for Holloway's crime, although a valid consideration, cannot detract from the relevance of a factor that is consistent with our precedent in 🚩 *Barton* and 📄 *Binderup*.[10]

In saying this, I do not question the Pennsylvania legislature's judgment that an offense such as Holloway's should be punishable by a lengthy prison term. But for the purposes of answering the question before us today—whether that offense is "serious" enough to deprive Holloway of his Second Amendment right—we must look to how his offense compares with those of the historically barred class. That involves giving weight to the felony/misdemeanor distinction. In addition to the sentence it permitted, the Pennsylvania legislature also chose to punish Holloway's crime as a misdemeanor. Indeed, the sentence and the classification are inseparable—*all* such misdemeanors in Pennsylvania carry Holloway's maximum possible prison term. *See* 18 PA. CONS. STAT. § 1104(1) (2019). Even

as a simple matter of statutory interpretation, then, the classification of the crime matters. This factor therefore weighs in Holloway's favor.

2

The second factor asks whether the "[c]hallenger's offense had the use or attempted use of force as an element." 📄 *Binderup*, 836 F.3d at 352 (opinion of Ambro, J.). The majority concedes that Holloway's DUI offense does not fulfill this criterion, *see* Majority Op. at II.B.2, but it supplements its analysis by considering the crime's "potential for danger and risk of harm to self and others," *id.* Although the 📄 *Marks* rule does not foreclose additions to the multifactor test by a panel majority, our precedent demands that the "seriousness" inquiry be a comparative exercise involving the challenger's offense and the characteristic features of those crimes that traditionally have disqualified persons from owning firearms. The virtue of the second 📄 *Binderup* factor is that it crystallizes in a clear legal standard the evident historical concern with force and violence. By contrast, the relevant historical and contemporary authorities do not support a standard focusing on all conduct that poses a "potential for danger and risk of harm to self and others." *Id.*

The most prominent late eighteenth-century sources supporting legislative power **\*184** to bar certain individuals from owning firearms are the proposals made in the ratifying conventions of Pennsylvania, New Hampshire, and Massachusetts. The first of these provides that "no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." THE ADDRESS AND REASONS OF DISSENT OF THE MINORITY OF THE CONVENTION, OF THE STATE OF PENNSYLVANIA, TO THEIR CONSTITUENTS 1 (Phila., E. Oswald 1787), https:// www.loc.gov/item/90898134. It is important to note that the two categories are interlocking—the provision captures both convicted criminals and those non-criminals who pose a "real danger of public injury." *Id.* The inclusion of the latter phrase in turn suggests that the drafters did not necessarily have in mind all crimes, but rather those that manifest a real danger to the public. To this extent, I agree with the majority's reading of the text. *See* Majority Op. at II.B.2 n.11.

Yet the provision alone does not tell us what "real danger of public injury" means. Perhaps the best way of interpreting this historical term is to look to the dispossessory provisions proposed at the other two conventions. In voting to ratify the Federal Constitution, New Hampshire's delegates also recommended certain amendments to it. Among these was a provision that "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." 1 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed. 1836). Although the Pennsylvania minority's "real danger of public injury" was likely meant to sweep more broadly than New Hampshire's "in actual rebellion," insofar as we are attempting to discover the limitations the ratifying public would have *implicitly* placed on the Second Amendment, the New Hampshire provision suggests a concern with armed conflict or violence against the government, rather than with all dangerous acts. In this context, it is noteworthy that the Pennsylvania minority speaks of the danger of public, rather than private, injury— a distinction it explicitly makes elsewhere in the document. *See, e.g.*, ADDRESS AND REASONS OF DISSENT, at 3 ("The absolute unqualified command that congress have over the militia may be made instrumental to the destruction of all liberty, both public and private ...."). From this perspective, it appears the Pennsylvania antifederalists had in mind something narrower than the majority's standard of "risk of harm to self and others." [11]

 **\*185** This understanding is also found in Samuel Adams's proposal to the Massachusetts ratifying convention. The Constitution, he suggested, should never be "construed to authorize Congress ... to prevent the people of the United States who are peaceable citizens from keeping their own arms." 3 WILLIAM V. WELLS, THE LIFE AND PUBLIC SERVICES OF SAMUEL ADAMS 267 (Bos., Little, Brown & Co. 1865). What Adams meant by "peaceable" can be determined from the rest of his proposal. He also thought the Constitution should not be construed "to prevent the people from petitioning, in a peaceable and orderly manner, the Federal Legislature for a redress of grievances." *Id.* The right to keep arms was linked to the assembly and petitioning right not only in Adams's proposal but also in the Bill of Rights itself. To many late-eighteenth-century Americans, the arms right in the Second Amendment helped to ensure that the liberties guaranteed in the First Amendment would not be eroded by a tyrannical central government. *See* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 47-48 (1998). Thus, in both Adams's

proposal and the Bill of Rights, it is "the people" who are given the right to petition their government and to possess arms. That entity, of course, is the one that (as the Preamble declares) alone has the power to form the government, and concomitantly to alter or abolish it. In this context, "peaceable" refers to those individuals who remain a part of "the people," and do not independently disturb or take up arms against its legitimate government. Only "the people" itself has that ability.

In sum, the principal historical evidence from the Founding period suggests that the majority's "risk of harm" standard is too broad to serve as a basis for comparison under our precedent. The correct standard appears to be something closer to the one used in *Binderup*, focusing on the presence of force or violence in the challenger's conduct. Notably, in a part of *Barton* that remains good law, our Court summarized the ratifying convention proposals as "confirm[ing] that the common law right to keep and bear arms did not extend to those who were likely to commit *violent* offenses." *633 F.3d at 173* (emphasis added); *see also Kanter v. Barr*, *919 F.3d 437, 456 (7th Cir. 2019)* (Barrett, J., dissenting) (concluding that "[t]he concern common to all three" proposals is "threatened violence and the risk of public injury"). [12]

Further, although the majority cites contemporary authorities to support its standard, these seem to me inapt for conducting the comparison required by **\*186** *Barton* and *Binderup*. On my reading, the majority principally relies on an inference from a colloquial understanding of drunk driving's "seriousness" to that offense's "seriousness" for purposes of depriving a person of Second Amendment protection. *See* Majority Op. at II.B.2. This is a category mistake. If we conducted a poll of a representative sample of Americans, asking them whether drunk driving is a serious crime, it is likely that most would answer affirmatively. Such an appeal to ordinary meaning has legal purchase in the context of statutory interpretation because a court there confronts words as adopted by a procedurally established majority of the people's elected representatives. But "serious" for present purposes is not a statutory, let alone a constitutional, term. It is how a majority of this Circuit's judges in *Binderup* summarized the crimes that historically have deprived persons convicted of them of the right to own a firearm. "Serious," therefore, has a discrete

legal meaning, and the "seriousness" inquiry must be given content consistent with that meaning. It is a determination of whether a challenger's offense is sufficiently similar to those committed by the historically barred class. Evaluation of the second factor should be grounded in this legal framework.

Given the indeterminate nature of the historically barred class, I do not dispute that current authorities may assist us in measuring the "seriousness" of a challenger's offense. But any such measurement must be consistent with our precedent. To me, the most relevant contemporary authorities for measuring "seriousness" are in fact included in the third and fourth factors: the actors within the criminal-justice system who confronted the challenger's offense and imposed a punishment, and the jurisdictions that penalize the challenger's conduct as a crime. As a result, I must conclude that the second factor weighs in Holloway's favor.

3

Although the preceding factors support Holloway, they are insufficient in themselves to establish whether he is entitled to Second Amendment protection. Because a majority of the judges in *Binderup* held that a nonviolent misdemeanor may be "serious," the preceding factors, while probative measures of "seriousness," are not dispositive. Yet in the absence of common features of "serious" nonviolent misdemeanors—and *Binderup* did not specify any—we must compare the punishment for the challenger's crime with the punishments for the crimes of the historically barred class. *See* 836 F.3d at 352 (opinion of Ambro, J.). The third and fourth *Binderup* factors both accomplish this end. [13]

The third factor looks to the sentence the challenger received. It directs our attention to the unique circumstances of the challenger's offense and conviction. Holloway was arrested in January 2005 after a police officer witnessed him driving the wrong way down a one-way street. *Holloway*, 349 F. Supp. 3d at 454. He registered a blood alcohol concentration (BAC) at the "highest rate" under Pennsylvania law, and because this was his second DUI offense, **\*187** he was convicted of a first-degree misdemeanor, punishable by up to five years in prison. *Id.* However, he received the mandatory minimum sentence, which included three months of confinement on a work-release program. *Id.* 454-55.

The majority finds this factor against Holloway, emphasizing that, unlike the challengers in *Binderup*, he received a punishment that deprived him of his liberty. *See* Majority Op. at II.B.2. While this fact is certainly evidence that Pennsylvania considers Holloway's offense more significant than that of Binderup (which was also committed in Pennsylvania), it does not measure Holloway's offense against those of the historically barred class. A factor that considers the punishment received suggests some deference to the decisions of those within the criminal-justice system.

*See* *Binderup*, 836 F.3d at 352 (opinion of Ambro, J.) ("[P]unishments are selected by judges who have firsthand knowledge of the facts and circumstances of the cases and who likely have the benefit of pre-sentence reports prepared by trained professionals."). Here, the actors on the ground did not deem Holloway's offense "serious" enough to warrant the maximum penalty that Pennsylvania law permitted. Rather, the sentencing judge imposed the lightest punishment that the law allowed—a term of imprisonment, with work release, considerably shorter than the qualifying sentences under either § 922(g)(1) or § 921(a)(20)(B). As the District Court noted, Holloway's assignment to a work-release program "undergirds the relatively minor nature of his sentence and suggests that the sentencing judge did not find Holloway to pose a significant risk to public safety." *Holloway*, 349 F. Supp. 3d at 457.

For the purposes of the *Barton* and *Binderup* comparison, then, I conclude that those who administered Pennsylvania's law did not deem Holloway's offense "serious" enough to merit imposition of a sentence on a par with those of the historically barred class. The argument that Holloway's punishment was greater than anything received by the *Binderup* challengers bears more on the final factor than on the present one. The latter supports Holloway's claim to Second Amendment protection.

4

The fourth factor asks whether there is a "cross-jurisdictional consensus regarding the seriousness of the [challenger's] crime[ ]." *Id.* Like the sentence actually received, the challenger's maximum possible punishment similarly provides a point of comparison with the historically barred

class, but it cannot be assessed by looking to the challenger's jurisdiction alone. The fact that the challenger's crime is punishable by more than one or two years is the very reason he is in court; it demonstrates only that one jurisdiction has chosen to punish his conduct on terms comparable to the punishments of the historically barred class. More significant is how jurisdictions generally punish the challenger's conduct because such a measure permits a comparison of current appraisal of the significance of the challenger's crime with the punishments imposed on the historical class.

My review of the DUI laws in all fifty states and the District of Columbia reveals a notable consensus in how these jurisdictions punish Holloway's conduct. Most importantly, only twelve of these jurisdictions punish such conduct with a maximum term of imprisonment exceeding one year. [14] Of **\*188** these twelve jurisdictions, seven provide for a maximum punishment exceeding two years, [15] and only four of these seven classify such a crime as a misdemeanor. [16] The other three jurisdictions, as well as the remaining five that punish the crime by more than one year of imprisonment, classify it as a felony. Given these statistics, there is no cross-jurisdictional consensus that a second DUI offense with a BAC at 0.192% is "serious" for purposes of Second Amendment analysis. In fact, the consensus lies in the other direction: a significant majority of jurisdictions—thirty-nine out of fifty-one—do not consider Holloway's second DUI offense to be a crime worthy of punishment in accord with that of a traditional felony.

The majority finds it sufficient that "states unanimously agree that DUIs are crimes subject to punishment." Majority Op. at II.B.2. Yet as I have emphasized, our precedent dictates that the relevant measures of "seriousness" are those indicating how the challenger's circumstances compare with the circumstances of the historically barred class. The fact of punishment alone should not render a crime "serious" enough to deprive an individual of a constitutional right. In the light of the evidence presented above, I must conclude that under the fourth factor, Holloway is not removed from the scope of Second Amendment protection.

\*\*\*

Drunk driving is a dangerous crime. Declaring it not "serious" for purposes of the Second Amendment in no way detracts from its "seriousness" in the ordinary understanding of that word. But that is my point—the two categories are distinct, and our analysis should reflect that fact. Although

*Binderup* did not create controlling precedent on the nature of the "seriousness" inquiry, the legal content of that inquiry must fulfill the requirements established in *Barton* and *Binderup*. Properly understood and applied, the multifactor test meets these demands. And in the context of the present case, it leads me to agree with the District Court that § 922(g)(1) burdens Holloway's constitutional right to own a firearm. In this way, I part with the majority in this case.

II

If a court determines, as I do here, that the challenged law burdens protected conduct, then *Marzzarella*'s second step requires the court to "evaluate the law under some form of means-ends scrutiny." *614 F.3d at 89*. In *Binderup*, the same ten judges who agreed to adopt *Marzzarella*'s two-step framework and the "seriousness" standard also accepted the application of intermediate scrutiny in as-applied challenges to § 922(g)(1). *See Binderup, 836 F.3d at 353* (opinion of Ambro, J.); *id. at 398* (Fuentes, J., concurring in part, dissenting **\*189** in part, and dissenting from the judgments). Therefore, our precedent requires the application of intermediate scrutiny in the present case. *See Donovan, 661 F.3d at 182.*

Following a long line of Supreme Court case law, *Marzzarella* enumerated two elements of intermediate-scrutiny review. First, the government interest in the enforcement of the challenged regulation must be "significant, substantial, or important." *614 F.3d at 98* (internal quotation marks omitted). Second, there must be a "reasonable" fit between the asserted government interest and the regulation as written or applied. *Id.; see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey, 910 F.3d 106, 119 (3d Cir. 2018)* (adopting this two-part test); *Drake v. Filko, 724 F.3d 426, 436 (3d Cir. 2013)* (same). I will consider each in turn.

A

The parties do not contest that the government has a substantial interest in "protecting the public from people who cannot be trusted to use firearms responsibly." Appellants' Br. at 29. Neither Holloway's brief nor the District Court's opinion even mention this element. Thus, there is no reason to question whether the government has a substantial interest in enforcing § 922(g)(1).

## B

Our primary difficulty lies in determining how to apply the second element of intermediate-scrutiny review to § 922(g)(1). *Binderup* established no precedent for how to decide whether there is a "[reasonable] fit between [ § 922(g)(1)] and the asserted governmental end." *Marzzarella*, 614 F.3d at 98. Moreover, the standards applied by the judges in that case are not the same as the standard applied by the Court in *Marzzarella*. Yet as I detail in Section II.B.1, these standards are in fact doctrinally consistent with each other. If the government presents sufficient evidence to support its enforcement of the regulation at issue, we are then to evaluate how closely the regulation has been drawn to advance that interest. This is the standard I apply in Section II.B.2, concluding that § 922(g)(1) as applied in the present case fails intermediate scrutiny.

## 1

There is no binding precedent in our Circuit for the proper application of intermediate scrutiny to § 922(g)(1). In *Binderup*, the opinion announcing the Court's judgment said the government "must 'present some meaningful evidence, not mere assertions, to justify its predictive ... judgments' " regarding the danger presented by the challengers and others like them. 836 F.3d at 354 (opinion of Ambro, J.) (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011)). By contrast, in *Marzzarella*, the court held that 18 U.S.C. § 922(k) "fits reasonably with [the government's asserted] interest in that it reaches only conduct creating a substantial risk of rendering a firearm untraceable." 614 F.3d at 98. Whereas

in *Binderup*, then, the judges were concerned with the evidence the government put forward, in *Marzzarella* the Court focused on the relation between the government's asserted interest and the statute's actual operation. [17]

Despite this ostensible difference, these standards are in fact consistent with each other as a doctrinal matter. *Marzzarella* **\*190** followed *Heller* in looking to the Supreme Court's First Amendment case law for guidance, calling that doctrine "the natural choice" for "evaluating Second Amendment challenges." 614 F.3d at 89 n.4. In particular, for the second prong of intermediate-scrutiny review—that "the fit between the challenged regulation and the asserted objective be reasonable, not perfect"— *Marzzarella* referred to two of the Supreme Court's commercial-speech cases. *See id.* at 98 (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); and *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). A brief consideration of commercial-speech doctrine allows us to see how our Circuit's Second Amendment precedent in fact dictates a single standard for subjecting § 922(g)(1) to intermediate scrutiny. [18]

The Supreme Court applies a four-step test for determining whether a regulation of commercial speech violates the First Amendment. A court must first "determine whether the expression is protected by the First Amendment," and then "ask whether the asserted governmental interest is substantial." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *see also Fox*, 492 U.S. at 475, 109 S.Ct. 3028. If the answer to both inquires is affirmative, the government must then show "that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011) (citing *Fox*, 492 U.S. at 480-81, 109 S.Ct. 3028; and *Cent. Hudson*, 447 U.S. at 566, 100 S.Ct. 2343).

This test bears notable resemblance to our Circuit's developing Second Amendment doctrine. For our purposes

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

here, the third and fourth steps are especially remarkable: they resemble the standards applied in *Binderup* and *Marzzarella*, respectively. Both are essential means of measuring the fit between the interest and the regulation. Indeed, the Supreme Court has said that these steps are not necessarily distinct inquiries. In as-applied challenges, the question posed at step three "cannot be answered by limiting the inquiry to whether the governmental interest is directly advanced as applied to a single person or entity." *United States v. Edge Broad. Co.*, 509 U.S. 418, 427, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). The court must also consider "the regulation's general application to others" with the same relevant characteristics as the challenger. *Id.* As a result, the validity of the regulation's application to the challenger "properly should be dealt with under the fourth factor of the *Central Hudson* test." *Id.* This means that, regardless of the nature of the challenge, the third and fourth steps "basically involve a consideration of the fit between the legislature's ends and the means chosen to accomplish those ends." *Id.* at 427-28, 113 S.Ct. 2696 (internal quotation marks omitted).

This background clarifies the standard to apply in the present case. In effect, *Binderup* concerned the correct application of the third step—whether the regulation "directly advances a substantial governmental interest." *Sorrell*, 564 U.S. at 572, 131 S.Ct. 2653. The three-judge opinion announcing the judgment of the Court did not need to advance its inquiry any **\*191** further, because it concluded that § 922(g)(1) already failed as applied. In *Marzzarella*, however, there was no question whether the government had presented sufficient evidence to justify its enforcement action, and so the Court looked to how closely § 922(k) was drawn to achieve the government's stated interest, holding that the statute is not impermissibly overinclusive because "it reaches only conduct creating a substantial risk of rendering a firearm untraceable." 614 F.3d at 98. As a result, to my mind *Binderup* and *Marzzarella* are doctrinally consistent, or at least reconcilable, in the light of how the Supreme Court has elaborated the final two steps of the commercial-speech test. At *Marzzarella* Step Two, if we are satisfied with the evidence supporting the statute's application, we must then consider how closely the statute has been drawn to advance the government's substantial interest.

2

Applying that standard in the present case, I conclude that § 922(g)(1) does not survive intermediate scrutiny. I disagree with the District Court, however, that the government has failed to produce evidence demonstrating that its enforcement of the statute directly advances its stated substantial interest. Rather, the flaw with the government's case is that the statute as applied here is "wildly underinclusive." *Nat'l Inst. Fam. & Life Advocs. v. Becerra*, ––– U.S. ––––, 138 S. Ct. 2361, 2375, 201 L.Ed.2d 835 (2018) (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011)).

a

In finding that § 922(g)(1)'s enforcement in this case does not directly advance the government's substantial interest, the District Court demanded an excessively particularized connection between the purpose proffered and Holloway's circumstances. Yet, as explained above, we should not limit our "inquiry to whether the governmental interest is directly advanced as applied to a single person or entity," but also consider "the regulation's general application to others." *Edge Broad. Co.*, 509 U.S. at 427, 113 S.Ct. 2696. The government's studies in *Binderup* were "obviously distinguishable." 836 F.3d at 354 (opinion of Ambro, J.). They concerned the likelihood of incarcerated felons to reoffend, though the *Binderup* challengers were neither incarcerated nor felons under state law. And the studies cited recidivism rates not applicable to individuals in the challengers' situation. More compelling studies would have presented evidence relating to individuals "with the Challengers' backgrounds." *Id.* at 355.

The government's expert report in the present case does exactly that. It offers evidence relating to the features of Holloway's biography that are at issue in this case. It refers to the likelihood of drug and alcohol abuse among repeat DUI offenders. D. Ct. Docket No. 61-4, at 4. It refers to

firearm purchasers with prior alcohol-related convictions. *Id.* at 9. These are the features of Holloway's biography at issue here. For the purposes of government policy, barring individuals with those characteristics from possessing a firearm is reasonable.

b

As explained above, our inquiry into "reasonable fit" does not end here. The question is not merely whether it is reasonable to disarm the challenger because of his conviction, but whether "the *fit* between the challenged regulation and the asserted objective [is] reasonable." *Marzzarella,* 614 F.3d at 98 (emphasis added). **\*192** As a result, we must consider, in the context of this as-applied challenge, how closely 🚩 § 922(g)(1) has been drawn to achieve the government's substantial interest.

Under this standard, the law appears to be significantly underinclusive. Holloway's crimes—a first DUI offense at a BAC of 0.131%, and a second DUI offense less than three years later with a BAC of 0.192%—implicate 🚩 § 922(g)(1) in only eight of fifty-one jurisdictions (the fifty states and the District of Columbia). [19] These eight jurisdictions account for approximately 21% of the United States population. [20] On average, then, only about one in five individuals behaving *exactly as Holloway did* would be barred from possessing a firearm under 🚩 § 922(g)(1). The statute's dependence on state criminal classifications and punishments results in an underinclusive application that raises constitutional concerns, regardless of the reasonableness of disarming recidivist DUI offenders.

c

The next question is whether this underinclusivity renders 🚩 § 922(g)(1) as applied here unconstitutional under intermediate scrutiny. To my mind, there are two principal counterarguments to answering this question affirmatively. Both of them fail.

First, it might be argued that our precedent remains unsettled regarding whether underinclusivity is a valid consideration in the Second Amendment context. Although 🟡 *Marzzarella*

allowed that a regulation's "underinclusiveness can be evidence that the interest is not significant enough to justify the regulation," 🟡 614 F.3d at 99, the Court was there referring to underinclusivity in the context of strict, rather than intermediate, scrutiny. As a result, a future panel majority may reject a consideration of underinclusivity in intermediate-scrutiny review. *See, e.g.,* 🟡 *Ass'n of N.J. Rifle & Pistol Clubs,* 910 F.3d at 122 n.28 ("While our Court has consulted First Amendment jurisprudence concerning the appropriate level of scrutiny to apply to a gun regulation, we have not wholesale incorporated it into the Second Amendment." (citations omitted)).

Yet, in constitutional law, underinclusivity follows necessarily from the evaluation of a fit between means and ends. And in 🟡 *Marzzarella* we explicitly adopted a test that considers "the fit between the challenged regulation and the asserted objective." 🟡 614 F.3d at 98; *see also* 🟡 *Reilly,* 533 U.S. at 556, 121 S.Ct. 2404; 🟡 *Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 632, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995); 🟡 *Fox,* 492 U.S. at 480, 109 S.Ct. 3028. The assessment of fit looks to the relation between the class of persons who come within the scope of the regulation's stated **\*193** objective, and the class of persons actually affected by the regulation. *See, e.g.,* Joseph Tussman & Jacobus tenBroek, *The Equal Protection of the Laws,* 37 CALIF. L. REV. 341, 344-53 (1949). [21] Under this standard, what matters is not whether a regulation is specifically overinclusive, but rather by how much it is either over- or underinclusive. *See, e.g.,* 🟡 *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 428, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (holding a city ordinance intended to advance safety and aesthetic interests unconstitutional because it unjustifiably affected only a small fraction of operating newsracks, thus constituting an unreasonable fit between ends and means).

This generalized inquiry encompasses both intermediate and strict scrutiny. The difference between those standards is the *degree*, rather than the *type*, of fit—whether the fit is either "reasonable" or "perfect." 🟡 *Marzzarella,* 614 F.3d at 98; *see* 🟡 *McCutcheon v. Fed. Election Comm'n,* 572 U.S. 185, 218, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion) ("Even when the Court is not applying strict scrutiny, we still require 'a fit that is not necessarily perfect, but reasonable; ... that employs not necessarily the least restrictive means but ...

a means narrowly tailored to achieve the desired objective.' " (alterations in original) (quoting *Fox,* 492 U.S. at 480, 109 S.Ct. 3028)). Intermediate scrutiny simply requires less of a fit between the governmental interest and the challenged regulation than strict scrutiny does.

It would be contrary to the logic of this analysis to hold that under intermediate scrutiny alone a court may not consider a regulation's underinclusivity. To be sure, there may be a compelling reason why the Second Amendment context precludes such a consideration, but, to my mind, even that determination must now be left either to this Court sitting en banc or to the Supreme Court. Because our Court in *Marzzarella* adopted a means-ends fit analysis, we have already decided that underinclusivity is at least a valid consideration.

Second, it might be argued that § 922(g)(1) as applied here falls into one of the contexts in which the Supreme Court has upheld a regulation despite claims of underinclusivity. In particular, the Court has acknowledged two principal defenses—that a distinction drawn by a lawmaking body is in itself legitimate, and that a legislature is permitted to address a problem incrementally. *See Williams-Yulee v. Fla. Bar,* 575 U.S. 433, 135 S. Ct. 1656, 1668-69, 191 L.Ed.2d 570 (2015) (highlighting these two defenses); *see also McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 207-08, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." (quoting *Buckley v. Valeo,* 424 U.S. 1, 105, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976))); *Burson v. Freeman,* 504 U.S. 191, 207, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) ("States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist.").

**\*194** These defenses do not support § 922(g)(1) as applied in the present case. Congress has drawn no distinction between different types of conduct—the same behavior may activate § 922(g)(1) or not based merely on where that behavior occurred. *See City of Cincinnati,* 507 U.S. at 428, 113 S.Ct. 1505 (declaring a city ordinance unconstitutionally underinclusive under intermediate scrutiny "[b]ecause the distinction [the city] has drawn has absolutely no bearing

on the interests it has asserted"). For this same reason, it is hard to see how the statute represents Congress addressing problems as they arise. Section 922(g)(1) sweeps so broadly, covering any person convicted under state law of a felony or a misdemeanor carrying a sentence that exceeds two years, that in particular applications it is underinclusive, curtailing the constitutional rights of some and not others for the exact same conduct. Far from regulating for problems that do not exist, Congress is here not even regulating the vast majority of conduct it apparently deems problematic.

\*\*\*

Ultimately at stake in this case is whether the government may arbitrarily burden the constitutional right of some citizens and not others. This equality concern goes to the heart of constitutional adjudication, regardless of the nature of the right at issue. As Justice Jackson put it in a different context:

> The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.

*Ry. Express Agency v. New York,* 336 U.S. 106, 112-13, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (Jackson, J., concurring). When a law, for reasons unrelated to enforcement discretion, on average punishes the same conduct only one in five times, such that those chosen individuals are deprived in perpetuity of a constitutional right, there is not a reasonable fit between the legislature's asserted interest and the challenged

regulation.[22] If Congress wants to bar all individuals convicted of a second DUI offense with a BAC above 0.16% of owning a firearm, then it must do so through the ordinary channels of democratic lawmaking. At least then all persons' constitutional right will be treated equally.

For these reasons, I respectfully dissent.

**All Citations**

948 F.3d 164

---

# Footnotes

1    The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. Our review of a district court's order granting summary judgment is plenary, Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013), and we view the facts and make all reasonable inferences in the non-movant's favor, Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

2    Section 922(g)(1) makes it unlawful for any person convicted of "a crime punishable by imprisonment for a term over one year" to possess a firearm. Excluded from this definition is any crime "classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B).

3    Marks is often applied by judges who did not participate in the opinion being reviewed. In this case, fourteen of the fifteen judges who participated in Binderup remain on our Court and know what it held and did not hold.

4    In Beers, we explained that at step one of Binderup, "a challenger 'must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class.' " 927 F.3d at 155 (quoting Binderup, 836 F.3d at 346-47). "If a challenger passes these two hurdles, 'the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny[.]' " Id. (quoting Binderup, 836 F.3d at 347). Beers further explained that Binderup overruled Barton in large part and "[w]here the historical justification for disarming felons was because they had committed serious crimes, risk of violent recidivism was irrelevant, 'and the seriousness of the purportedly disqualifying offense is our sole focus throughout Marzzarella's first step.' " Id. at 156 (quoting Binderup, 836 F.3d at 350) (emphasis omitted).

5    Although Beers did not explicitly conduct a Marks analysis, Beers set forth the Binderup majority holdings. In Marks, the Supreme Court held that when "no single rationale explaining the result enjoys the assent of five justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." 430 U.S. at 193, 97 S.Ct. 990 (internal quotation marks and citation omitted). Marks expresses one way to identify a holding from among separate opinions.

The Supreme Court has adopted other approaches for examining fractured opinions to identify the rule or rules a majority endorsed. See, e.g., United States v. Jacobsen, 466 U.S. 109, 117 n.12, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ("[T]he disagreement between the majority and the dissenters in [a previous] case with respect to the [application of law to fact] is less significant than the agreement on the standard to be applied ...."); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 17, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[T]he Court of Appeals correctly recognized that the four dissenting Justices and Justice Blackmun formed a majority to require application of the Colorado River test."). Whatever the test, "our goal in analyzing a fractured [opinion] is to find 'a single legal standard ... [that] when properly applied, produce[s] results with which a majority of justices in the case articulating the standard would agree.' ... To that end, we have looked to the votes of dissenting justices if they, combined with the votes from plurality or concurring opinions, establish a majority view on the relevant issue." United States v. Donovan, 661 F.3d 174, 182 (3d Cir. 2011) (quoting Planned Parenthood of Se. Pa. v. Casey, 947 F.2d 682, 693 (3d Cir. 1991), modified on other grounds, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)) (first alteration added); see also Jacobsen, 466 U.S. at 115-17, 104 S.Ct. 1652 (deriving the rule established in a particular case by combining one opinion that garnered two votes with the opinion of the four dissenters); B.H. ex rel Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 310 (3d Cir. 2013) (stating that we have "count[ed] even dissenting justices' votes that, by definition," did not concur in the judgment to identify a majority's holding).

6   Chief Judge Smith and Judge Greenaway, Jr., joined Judge Ambro's opinion in its entirety, for a total of three judges. Then-Chief Judge McKee and Judges Vanaskie, Shwartz, Krause, Restrepo, and Roth joined Judge Fuentes for a total of seven judges. Thus, any agreement between Judge Ambro's and Judge Fuentes' opinions represents agreement by ten judges.

Judges Fuentes, Vanaskie, Krause, and Roth also "expressly" joined the portions of Judge Ambro's opinion laying out the framework for as-applied challenges, for a total of seven judges. Binderup, 836 F.3d at 339 n.1 (Ambro, J.); id. at 387 n.72 (Fuentes, J.). Judges McKee, Shwartz, and Restrepo did not "expressly" join Judge Ambro's opinion "because they reject[ed] the notion that the Marzzarella framework can be reconciled with any aspect of Barton's as-applied Second Amendment analysis, which they would overrule entirely." Id. at 339 n.1 (Ambro, J.). Thus, ten Binderup judges rejected Barton and held that Marzzarella's framework governs as-applied challenges.

7   Although Judge Ambro, joined by two judges, disagreed with Judge Fuentes, joined by six judges, over "how to decide whether any particular crime is serious enough" to warrant disarmament, 836 F.3d at 388 (Fuentes, J.) (emphasis omitted), a total of ten judges agreed that the correct test at step one for challenges to § 922(g)(1) is whether the offense is "serious," not whether the offense is violent, and thus overruled Barton's focus on violence for this inquiry.

8   Judges Fisher, Chagares, Jordan, and Nygaard joined Judge Hardiman's opinion for a total of five judges.

9   Our dissenting colleague agrees that a majority in Binderup: (1) rejected the idea that the Second Amendment excludes only those who commit violent offenses and that, because that majority adopted the "virtuous citizenry" theory of serious offenses, the Second Amendment excludes "any person who has committed a serious criminal offense, violent or nonviolent," Dissenting Op. at 178; Binderup, 836 F.3d at 348 (Ambro, J.); id. at 388-91 (Fuentes, J.); (2) held that we evaluate § 922(g)(1) under intermediate scrutiny, not strict scrutiny, Dissenting Op. at 188–89; Binderup, 836 F.3d at 353 (Ambro, J.); id. at 398 (Fuentes, J.); and (3) held that Barton was overruled to the extent it suggested that (a) the Second

Amendment excludes only those who commit violent offenses, id. at 348-49 (Ambro, J.); id. at 388-91 (Fuentes, J.), (b) "the passage of time or evidence of rehabilitation will restore the Second Amendment rights of people who committed serious crimes," id. at 349 (Ambro, J.); id. at 339 n.1, or (c) that strict scrutiny rather than intermediate scrutiny applies at step two of the Marzzarella framework, id. at 353, id. at 398 (Fuentes, J.); Dissenting Op. at 178, 180, 188–89.

10    In Binderup, Judge Ambro considered: (1) whether the crime of conviction was classified as a misdemeanor or felony, (2) whether the criminal offense involves violence or attempted violence as an element, (3) the sentence imposed, and (4) whether there is a cross-jurisdictional consensus as to the seriousness of the crime. See 836 F.3d at 351-52.

No majority of judges in Binderup agreed on how to determine whether a particular offense is serious. That said, we have viewed, albeit in a non-precedential opinion, Judge Ambro's factors as providing data points for determining whether a challenger's prior conviction was serious, King v. Att'y Gen. U.S., 783 F. App'x 111, 113-14 (3d Cir. 2019), and we agree with the dissent that a multifactor test should be used to identify whether an offense is serious, at least as to misdemeanor offenses, Dissenting Op. at 180.

11    The dissent asserts that our consideration of an offense's dangerousness steps too far from Barton. Dissenting Op. at 185–86. Barton, however, has been overruled in nearly all respects. Among other things, seven Binderup judges agreed that Barton "defines too narrowly the traditional justification for why a criminal conviction may destroy the right to arms (i.e., it limits felon disarmament to only those criminals likely to commit a violent crime in the future) and, by extension, defines too broadly the class of offenders who may bring successful as-applied Second Amendment challenges to § 922(g)(1) (i.e., it allows people convicted of serious crimes to regain their right to arms)." 836 F.3d at 347 n.3 (Ambro, J.). Three other judges would have overruled Barton entirely. Id. at 339 n.1. Thus, ten judges rejected the dissent's argument that our considerations of who falls within the historically barred class must be tied to Barton, and in particular, "the presence of force or violence in the challenger's conduct." Dissenting Op. at 185.

Instead of Barton's exclusive focus on violence, Binderup instructs that the Founders sought to permit only the virtuous citizen to possess a firearm. The historical record tells us that those who present a risk of danger lack virtue and the Founders considered danger in evaluating who had the right to bear arms. See Binderup, 836 F.3d at 348-49 (Ambro, J.); id. at 389-91 (Fuentes, J.).

First, The Address and Reasons of Dissent of the Minority of the Convention of the States of Pennsylvania to Their Constituents (the "Address"), "a 'highly influential' 'precursor' to the Second Amendment," Binderup, 836 F.3d at 349 (Ambro, J.) (quoting United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) and Heller, 554 U.S. at 604, 128 S.Ct. 2783), stated "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals," United States v. Bena, 664 F.3d 1180, 1184 (8th Cir. 2011) (emphasis omitted) (quoting the Address, reprinted in Bernard Schwartz, 2 The Bill of Rights: A Documentary History 662, 665 (1971)); see also Binderup, 836 F.3d at 349 (quoting same passage). While the dissent proposes a narrow reading of the broad language "real danger of public injury," Dissenting Op. at 183–84, we precedentially interpreted the Address to indicate that the legislature could historically disarm those "considered dangerous to themselves and/or to the public at large," Beers, 927 F.3d at 158. The dissent's read is thus foreclosed by our precedent.

Second, Samuel Adams' proposed language for the Second Amendment would have expressly limited the right to "peaceable citizens." Binderup, 836 F.3d at 367 (Hardiman, J.) (quoting Journal of Convention: Wednesday February 6, 1788, reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788, at 86 (Boston, William White 1856)) (emphasis omitted). In Adams' time, "peaceable" meant "free from tumult;" "quiet; undisturbed;" "[n]ot violent; not bloody;" "[n]ot quarrelsome; not turbulent." 1 Samuel Johnson, A Dictionary of the English Language (5th ed. 1773). Relatedly, "[b]reaches of the peace comprise[d] not only cases of actual violence to the person of another, but any unlawful acts, tending to produce an actual breach of the peace; whether the peace of the public, or an individual, be in fact disturbed or not." Pearce v. Atwood, 13 Mass. 324, 332 (1816). From these sources, judges have concluded that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." Kanter v. Barr, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). Thus, the Pennsylvania and Massachusetts proposals show that any right to bear arms did not extend to those who posed a danger to the public. These historical sources therefore support considering risk of danger in determining whether an offense constitutes a serious crime that deprives an offender of Second Amendment protection.

12    In addition to ascribing high value to the offense's felony/misdemeanor label, the dissent favors focusing on the actual penalty imposed. While the penalty imposed may provide some insight into how a sentencing judge may have viewed an offender, it does not necessarily reflect how the offense itself is viewed. Binderup step one focuses on the offense and not the offender. See 836 F.3d at 349-50 (Ambro, J.); id. at 388 (Fuentes, J.). Because the actual sentence imposed can be influenced by many factors, such as cooperation, U.S.S.G. § 5K1.1, acceptance of responsibility, U.S.S.G. § 3E1.1, and offender-related variances, 18 U.S.C. § 3553, the actual penalty imposed does not necessarily show that the crime was not "serious." Instead, the maximum punishment is a more appropriate data point because it provides insight into how a state legislature views a crime—not how a sentencing judge views an individual. See Lewis v. United States, 518 U.S. 322, 325-26, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996) (noting that an offense's penalty "reveals the legislature's judgment about the offense's severity"); id. at 328, 116 S.Ct. 2163 (noting that the maximum punishment is an "objective indication of the seriousness with which society regards the offense"); Binderup, 836 F.3d at 351-52. For these reasons, it is proper to consider the maximum penalty an offender faces, and not simply the actual punishment imposed or whether the offense is designated as a misdemeanor or felony, to determine whether an offense is properly viewed as "serious."

13    The dissent is mistaken to say that a majority in Binderup rejected consideration of a maximum penalty in favor of the felony/misdemeanor label. Judge Ambro's opinion for three judges reasoned that "the maximum possible punishment is certainly probative of a misdemeanor's seriousness" under the first factor. 836 F.3d at 352 (Ambro, J.). Seven judges stated that any crime which qualifies for § 922(g)(1) is serious. Id. at 388 (Fuentes, J.). That means that those seven judges would conclude that the penalty Holloway faced shows his offense is serious regardless of its misdemeanor classification. Combining the views of Judge Ambro's and Judge Fuentes' opinions, a majority of the Binderup court rejected the dissent's view.

14    As one district court analyzing an as-applied challenge under Binderup aptly observed,
       juxtaposing the Pennsylvania legislature's use of the misdemeanor label with the legislature's simultaneous imposition of a substantial imprisonment term creates an inherent contradiction: a five-year maximum prison term suggests that [the plaintiff's] predicate offense is serious, while the misdemeanor label simultaneously undercuts the apparent severity by labeling the offense a non-serious.

Laudenslager v. Sessions, 4:17-CV-00330, 2019 WL 587298, at *4 (M.D. Pa. Feb. 13, 2019) (discussing the classification and maximum sentence for receiving stolen property under Pennsylvania law). We agree, and for the reasons described above, conclude that the legislative history elucidates this contradiction.

AR.04815

15    At the first step of our framework, we do not consider Holloway's arguments that he has not committed any offenses since 2005 or the letters he offered in support of his character because "[t]here is no historical support for the view that the passage of time or evidence of rehabilitation can restore Second Amendment rights that were forfeited." Binderup, 836 F.3d at 350, 354 n.7.

16    Because Holloway has not carried his burden at step one to show he was not convicted of a serious offense, we need not move on to step two to determine whether the statute as applied to him survives intermediate scrutiny. We do note, however, that our precedent is cautious in applying the intermediate scrutiny test used in First Amendment cases. Compare N.J. Rifle, 910 F.3d at 122 n.28 (stating that we do not incorporate "wholesale" First Amendment jurisprudence when evaluating Second Amendment challenges), with Dissenting Op. at 190 (advocating that we import the Supreme Court's test for commercial speech cases for Second Amendment challenges to § 922(g)(1)). In addition, the dissent's application of intermediate scrutiny seemingly asks for a near-perfect fit between the challenged regulation and the objective, rather than a "reasonable" fit. Marzzarella, 614 F.3d at 98 (stating that the "fit between the challenged regulation and the asserted objective be reasonable, not perfect").

1    The majority suggests that any discussion of Barton is misplaced because that decision "has been overruled in nearly all respects." Majority Op. at II.B.2 n.11. Yet, even if that is true, my emphasis throughout this opinion is on a key respect in which it has not been overruled: that a challenger to the application of § 922(g)(1) must distinguish his circumstances from those of the historically barred class. The majority acknowledges that we must still conduct such an analysis. See id. at II.A & n.4; see also Binderup, 836 F.3d at 346-47 (plurality opinion) ("At step one of the Marzzarella decision tree, a challenger must prove, per Barton, that a presumptively lawful regulation burdens his Second Amendment rights.").

2    See Richard M. Re, Beyond the Marks Rule, 132 HARV. L. REV. 1942, 1947-65 (2019) (providing a helpful survey of the Marks debate).

3    This version holds that the concurring opinion representing the views of the median judge constitutes binding precedent. See Re, supra, at 1977 (citing MAXWELL L. STEARNS, CONSTITUTIONAL PROCESS: A SOCIAL CHOICE ANALYSIS OF SUPREME COURT DECISION MAKING (2000)).

4    In fact, we have occasionally endorsed a different version of the rule, which construes it to apply only to those views in an opinion concurring in the judgment that constitute a logical subset of broader views expressed in another concurrence in the judgment. See, e.g., B.H. ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 310-13 (3d Cir. 2013) (en banc); Jackson v. Danberg, 594 F.3d 210, 222 (3d Cir. 2010) ("[T]he Marks framework applies where one opinion is clearly 'narrower' than another, that is, where one opinion would always lead to the same result that a broader opinion would reach."); Planned Parenthood of Se. Pa. v. Casey, 947 F.2d 682, 693-94 (3d Cir. 1991), aff'd in part and rev'd in part on other grounds, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); see also Re, supra, at 1980-84 (explaining this version of the Marks rule). Under this version of the rule, the multifactor test would have to constitute a logical subset of the views expressed in Judge Hardiman's opinion, which was the other concurring opinion in Binderup. It is difficult to see how this is the case.

5    Nor has any subsequent precedential opinion of this Court resolved this difficulty by adopting that test. Only three of this Court's precedential opinions cite Binderup. None concerns an as-applied challenge to § 922(g)(1). See Beers, 927 F.3d 150; United States v. Greenspan, 923 F.3d 138 (3d Cir. 2019); Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen. New Jersey, 910 F.3d 106 (3d Cir. 2018). However, one recent non-precedential opinion confronting an as-applied challenge to § 922(g)(1) has declared the multifactor

test controlling authority. *See King v. Attorney Gen. of the United States*, 783 Fed.Appx. 111, 113 & n.2 (3d Cir. 2019).

6      *See* 836 F.3d at 348–49 (plurality opinion); *id.* at 387–88 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments)

7      According to the majority, I argue that "our considerations of who falls within the historically barred class must be tied to *Barton*, and in particular 'the presence of force or violence in the challenger's conduct,' " Majority Op. at II.B.2 n.11. Yet that is not my argument. At multiple points in this opinion I note that because of the indefinite nature of the historically barred class, no one factor can be dispositive. I assert, rather, that the relevant factors may not be any ones we choose—they must aid the determination of whether the challenger's crime is sufficiently similar to those of the persons historically barred from firearm possession. This certainly involves historical analysis (which the majority also engages in), but, as I mentioned above and restate below, it additionally includes looking to other measures relevant to making the comparison. My point, as I go on to detail, is that the majority has given too much weight to considerations that, however compelling in other contexts, are irrelevant to the comparative analysis that the majority itself acknowledges we must conduct. *See id.* at II.A & n.4.

8      To the extent one gives it validity, the legislative history confirms this interpretation. In 1961, Congress amended the precursor of § 922(g)(1) to prevent the transportation or receipt of a firearm by all persons convicted of any "crime punishable by imprisonment for a term exceeding one year"—not just persons convicted of a "crime of violence," as had previously been the case. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, 75 Stat. 757, 757 (1961). In the Gun Control Act of 1968, however, Congress amended §§ 921 and 922 to their present form. *See* Pub. L. No. 90-618, 82 Stat. 1213 (1968). The House bill would have maintained the existing broad language covering all crimes—both felonies and misdemeanors—punishable by more than one year of imprisonment. *See* H.R. 17735, 90th Cong. § 2 (1968). By contrast, the Senate bill would have made it "unlawful for any person ... convicted in any court of a crime punishable as a felony" to transport or receive any firearm. S. 3633, 90th Cong. § 102 (1968). The Conference Report noted this discrepancy, declaring the compromise to be the maintenance of the House language in § 922(g)(1), but adding what became § 921(a)(20)(B). *See* H.R. REP. NO. 90-1956, at 28-29H.R. REP. NO. 90-1956, at 28-29 (1968) (Conf. Rep.). Thus, in creating our current regime, Congress not only wanted to include misdemeanors as well as felonies in the reach of the law, but also drew a distinction between the two types of crimes.

9      *See* ALASKA STAT. § 11.61.200(a)(1) (2019); ARIZ. REV. STAT. ANN. § 13-904(A)(5) (2019); ARK. CODE ANN. § 5-73-103(a)(1) (2019); CAL. PENAL CODE § 29800(a)(1) (West 2019); COLO. REV. STAT. § 18-12-108(1) (2019); CONN. GEN. STAT. § 53a-217(a)(1) (2019); DEL. CODE ANN. tit. 11, § 1448(a)(1) (2019); D.C. CODE § 7-2502.03(a)(2) (2019); FLA. STAT. § 790.23(1) (2019); HAW. REV. STAT. § 134-7(b) (2019); 720 ILL. COMP. STAT. 5/24-1.1(a) (2019); IND. CODE § 35-47-2-3(h) (2019); IOWA CODE § 724.26(1) (2019); KAN. STAT. ANN. § 21-6304(a) (2019); KY. REV. STAT. ANN. § 527.040(1) (West 2019); MD. CODE ANN., CRIM. LAW § 5-622(b) (West 2019); MASS. GEN. LAWS ch. 140, § 131(d)(i)(A) (2019); MICH. COMP. LAWS § 750.224f(1) (2019); MISS. CODE ANN. § 97-37-5(1) (2019); MO. REV. STAT. § 571.070.1(1) (2019); NEB. REV. STAT. § 28-1206(1)(a)(i), (2) (2019); NEV. REV. STAT. § 202.360(1)(b) (2019); N.H. REV. STAT. ANN. § 159:3 (2019); N.M. STAT. ANN. § 30-7-16(A)(1) (2019); N.Y. PENAL LAW § 400.00(1)(c) (McKinney 2019); N.C. GEN. STAT. § 14-415.1(a) (2019); OKLA. STAT. tit. 21, § 1283(A) (2019); OR. REV. STAT. § 166.270 (2019);

TEX. PENAL CODE ANN. § 46.04(a) (West 2019); VA. CODE ANN. § 18.2-308.2(A) (2019); WASH. REV. CODE § 9.41.040(2)(a)(i) (2019); WIS. STAT. § 941.29(1m) (2019).

10    I do not, as the majority suggests, read *Binderup* as "reject[ing] consideration of a maximum penalty in favor of the felony/misdemeanor label." Majority Op. at II.B.2 n.13. Rather, my point is that the majority cannot invoke the maximum penalty to discount the relevance of a factor consistent with the comparative exercise *Barton* and *Binderup* require us to conduct. The dissent in *Binderup* would have held the challengers' crimes "serious" simply because they carry maximum prison terms exceeding those provided in §§ 921(a)(20)(B) and 922(g)(1). *See* 836 F.3d at 388 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments). A majority of the judges rejected such a categorical approach—and that is a key reason why *Binderup* came out as it did. The maximum penalty and the felony/misdemeanor distinction cannot, therefore, be treated as mutually exclusive. For this same reason, I agree with the majority that the maximum punishment is probative of the offense's "seriousness." *See* Majority Op. at II.B.2. But I think that fact should be considered under the fourth factor—how United States jurisdictions generally punish the offense. It is important, for purposes of the *Barton* and *Binderup* comparison, whether the challenger's maximum punishment reflects a jurisdictional consensus or is an outlier.

11    The majority does not discuss the New Hampshire proposal. Nevertheless, it declares this reading of the Pennsylvania minority's *Address* "foreclosed by our precedent" in *Beers*. Majority Op. at II.B.2 n.11. It is unclear, though, how *Beers*'s interpretation constitutes binding precedent. *Beers* used the phrase "real danger of public injury" to hold in part "that the traditional justification for disarming mentally ill individuals was that they were considered dangerous to themselves and/or to the public at large." 927 F.3d at 158. By its very terms, this holding applies to the mentally ill, and/or to those convicted of crimes. To the extent *Beers* found the phrase to apply to all persons who present a danger to themselves or the public at large, that finding is dicta. Alternatively, if an interpretation of "real danger of public injury" can apply precedentially beyond the context in which it is invoked, then *Beers* was in fact bound by *Barton*'s interpretation, which found the phrase to cover "those who were likely to commit violent offenses." *See* 633 F.3d at 173. It cannot plausibly be argued that *Binderup* overruled this aspect of *Barton*, since the *Binderup* plurality opinion emphasized the phrase "crimes committed," which precedes "real danger of public injury" in the *Address*, and suggested that it was the operative language covering nonviolent offenses. *See* 836 F.3d at 349 (plurality opinion). Further, the plurality opinion explicitly stated that it was overruling *Barton* "[t]o the extent" that *Barton* "holds that people convicted of serious crimes may regain their lost Second Amendment rights after not posing a threat to society for a period of time." *Id.* at 350. On any reading, then, the majority is incorrect to suggest that *Beers* requires us to interpret "real danger of public injury" as it does.

12    Additional historical evidence from after the Founding further undercuts the majority's position. For one, scholars have found little evidence of categorical bans on firearm possession in the nineteenth century. The principal means of gun control in this period appear to have been public-carry laws. *See* Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11, 33-43 (2017); Marshall, *supra*, at 710-12. In addition, although firearm dispossession laws became increasingly prevalent in the early twentieth century, even these foundational statutes cannot support the majority's standard. For example, the original version of § 922(g)(1) made it unlawful for any person "convicted of a crime of violence" to transport or receive a firearm. Federal Firearms

Act, Pub. L. No. 75-785, § 2, 52 Stat. 1250, 1251 (1938) (codified at 15 U.S.C. § 902 (1940)). On the background to the Federal Firearms Act's "crime of violence" provision, see Marshall, *supra*, at 700-07.

13    The majority says that "in addition to ascribing high value to the offense's felony/misdemeanor label," I "favor[ ]" a focus "on the actual penalty imposed." Majority Op. at II.B.2 n.12. It contrasts this view with its own, declaring it "proper to consider the maximum penalty an offender faces, and not simply" these other factors. *Id.* As I have noted, however, I do not value any one factor above another, and in fact agree with the majority that the maximum penalty is relevant, though (for the reasons I state below) I think that such a penalty is most appropriately, for purposes of the *Barton* and *Binderup* comparison, considered under the fourth factor.

14    *See* CONN. GEN. STAT. §§ 14-227a, 53a-25, 53a-26 (2019); DEL. CODE ANN. tit. 21, § 4177; tit. 11, § 233 (2019); IND. CODE §§ 9-30-5-1, 9-30-5-3 (2019); IOWA CODE § 321J.2 (2019); MD. CODE ANN., TRANSP. §§ 21-902, 27-101 to -102 (West 2019); MASS. GEN. LAWS ch. 90, § 24; ch. 274, § 1 (2019); N.Y. VEH. & TRAF. LAW §§ 1192- 1193 (McKinney 2019); N.C. GEN. STAT. §§ 20-138.1, 20-138.5, 20-179 (2019); OKLA. STAT. tit. 47, § 11-902 (2019); 75 PA. CONS. STAT. §§ 3803(b) (4), 3804 (2019); 18 PA. CONS. STAT. § 1104 (2019); S.C. CODE ANN. §§ 56-5-2930, 56-5-2933, 16-1-20, 16-1-100 (2019); VT. STAT. ANN. tit. 23, §§ 1201, 1210; tit. 13, § 1 (2019).

15    *See* IND. CODE §§ 9-30-5-1, 9-30-5-3 (2019); MASS. GEN. LAWS ch. 90, § 24; ch. 274, § 1 (2019); N.Y. VEH. & TRAF. LAW §§ 1192- 1193 (McKinney 2019); N.C. GEN. STAT. §§ 20-138.1, 20-138.5, 20-179 (2019); OKLA. STAT. tit. 47, § 11-902 (2019); 75 PA. CONS. STAT. §§ 3803(b)(4), 3804 (2019); 18 PA. CONS. STAT. § 1104 (2019); S.C. CODE ANN. §§ 56-5-2930, 56-5-2933, 16-1-20, 16-1-100 (2019).

16    *See* MASS. GEN. LAWS ch. 90, § 24; ch. 274, § 1 (2019); N.C. GEN. STAT. §§ 20-138.1, 20-138.5, 20-179 (2019); 75 PA. CONS. STAT. §§ 3803(b)(4), 3804 (2019); 18 PA. CONS. STAT. § 1104 (2019); S.C. CODE ANN. §§ 56-5-2930, 56-5-2933, 16-1-20, 16-1-100 (2019).

17    For the same reasons given above with regard to the multifactor test, I do not think the application of intermediate scrutiny in *Binderup* is binding precedent under the *Marks* rule.

18    The majority suggests that I am "advocating that we import" the commercial-speech standard into the § 922(g)(1) context. Majority Op. at II.B.2 n.16. To the contrary, I am simply applying our precedent, mindful that *Marzzarella* has "guided how we approach as-applied Second Amendment challenges." *Binderup*, 836 F.3d at 346 (plurality opinion).

19    *See* CONN. GEN. STAT. §§ 14-227a, 53a-25, 53a-26 (2019); IND. CODE §§ 9-30-5-1, 9-30-5-3 (2019); MASS. GEN. LAWS ch. 90, § 24; ch. 274, § 1 (2019); N.Y. VEH. & TRAF. LAW §§ 1192- 1193 (McKinney 2019); N.C. GEN. STAT. §§ 20-138.1, 20-138.5, 20-179 (2019); OKLA. STAT. tit. 47, § 11-902 (2019); 75 PA. CONS. STAT. § 3804 (2019); S.C. CODE ANN. §§ 56-5-2930, 56-5-2933, 16-1-20, 16-1-100 (2019).

20    I base this number on the U.S. Census Bureau's estimated 2019 national and state populations. The estimated population of the fifty states and the District of Columbia on July 1, 2019 was 328,239,523 persons. *See* U.S. Census Bureau, *National Population Totals and Components of Change: 2010-2019*, U.S. DEP'T COM. (Dec. 23, 2019), https://www.census.gov/data/tables/timeseries/demo/popest/2010s-national-total.html. On that same date, the total estimated population of the eight states where Holloway's crimes would implicate § 922(g)(1) was 69,039,328 persons. *See* U.S. Census Bureau, *State Population Totals*

*and Components of Change: 2010-2019*, U.S. DEP'T COM. (Dec. 30, 2019), https://www.census.gov/data/tables/timeseries/demo/popest/2010s-state-total.html.

21    The Court first developed this test in the equal-protection context, and subsequently imported it into First Amendment doctrine in the early 1970s. *See, e.g.*, Police Dep't of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Kenneth L. Karst, *Equality as a Central Principle in the First Amendment*, 43 U. CHI. L. REV. 20 (1975). It therefore makes sense that when our Court in Marzzarella began to formulate Second Amendment doctrine, it called for an evaluation of the challenged law "under some form of means-end scrutiny," 614 F.3d at 89, and described that evaluation as an assessment of "the fit between the challenged regulation and the asserted objective," *id.* at 98.

22    Although the majority does not reach Step Two, it observes that I "seemingly ask[ ] for a near-perfect fit." Majority Op. at II.B.2 n.16. Reasonable minds may differ as to whether demanding a fit of greater than 21% is to demand near-perfection.

---

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Gappy v. Sessions, 6th Cir., September 26, 2017

436 F.3d 89
United States Court of Appeals,
Second Circuit.

Wu Zheng HUANG, Petitioner,

v.

IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.

No. 02-4602-AG.
|
Argued: Sept. 1, 2005.
|
Decided: Jan. 25, 2006.

**Synopsis**
**Background:** Chinese national brought Petition for Review from final order of Board of Immigration Appeals (BIA), granting withholding of removal with respect to China but denying his application for asylum.

**Holdings:** The Court of Appeals, Calabresi, Circuit Judge, held that:

[1] national met all relevant exhaustion requirements, and

[2] immigration judge improperly relied on adverse credibility finding and national's use of smuggler as basis for denying asylum.

Affirmed in part, vacated in part, and remanded.

West Headnotes (7)

[1]    **Aliens, Immigration, and Citizenship**  🔑  Exhaustion of remedies in general

Chinese national who brought Petition for Review from final order of Board of Immigration Appeals (BIA), granting withholding of removal with respect to China but denying his application for asylum, met all relevant exhaustion

requirements for pursuing petition; pertinent regulation did not place duty solely on national to move for reconsideration, as opposed to requiring BIA or immigration judge to reconsider any denial of asylum sua sponte. 8 C.F.R. § 1208.16(e).

11 Cases that cite this headnote

[2]    **Aliens, Immigration, and Citizenship**  🔑  Well Founded Fear of Future Persecution

**Aliens, Immigration, and Citizenship**  🔑  Past persecution

If applicant establishes past persecution, he triggers rebuttable presumption of well-founded fear of persecution and thus of eligibility for asylum; if he establishes well-founded fear of future persecution, he is automatically eligible for asylum. Immigration and Nationality Act, § 101, 8 U.S.C.A. § 1101.

13 Cases that cite this headnote

[3]    **Aliens, Immigration, and Citizenship**  🔑  Discretionary or mandatory

Once applicant demonstrates eligibility for asylum, decision whether to grant particular application is within discretion of Attorney General. Immigration and Nationality Act, § 101, 8 U.S.C.A. § 1101.

10 Cases that cite this headnote

[4]    **Aliens, Immigration, and Citizenship**  🔑  Discretionary or mandatory

Applicant who proves that he is eligible for asylum, but is denied asylum in exercise of discretion by Board of Immigration Appeals (BIA), remains eligible for withholding of deportation. Immigration and Nationality Act, § 241(b), 8 U.S.C.A. § 1231(b).

11 Cases that cite this headnote

[5]    **Aliens, Immigration, and Citizenship** 🔑 Substantial evidence in general

**Aliens, Immigration, and Citizenship** 🔑 Credibility

Factual findings underlying discretionary decision by immigration judge (IJ) are entitled to deference if they are supported by substantial evidence, and IJ's credibility determinations are entitled to particular deference.

1 Cases that cite this headnote

[6]    **Aliens, Immigration, and Citizenship** 🔑 Adverse credibility determinations in general

Immigration judge (IJ) improperly relied on adverse credibility finding and Chinese national's use of smuggler as basis for discretionary denial of asylum; IJ failed to take into account significant equities favoring grant of asylum, i.e., national was victim of forced sterilization, denial of asylum would have barred national's wife and children from joining him in United States, and no third country could have provided alternative relocation. Immigration and Nationality Act, § 242(b)(4)(D), 🚩 8 U.S.C.A. § 1252(b)(4)(D).

21 Cases that cite this headnote

[7]    **Aliens, Immigration, and Citizenship** 🔑 Presumptions and Burden of Proof

Procedurally, applicant for asylum bears burden of establishing that favorable exercise of discretion is warranted, but either party may proffer evidence relevant to any discretionary aspects of case.

**Attorneys and Law Firms**

\***90** Steven A. Mundie, Baron & Mundie, P.C., New York, N.Y., for Petitioner.

Robert David Rees, Assistant United States Attorney, for Kevin V. Ryan, United States Attorney for the Northern District of California (Hannah Horsley, Assistant United States Attorney, on the brief), San Francisco, Cal. for Respondent.

Before: NEWMAN, CALABRESI and STRAUB, Circuit Judges.

**Opinion**

CALABRESI, Circuit Judge.

In this unusual case involving a denial of asylum as a matter of discretion, Wu Zheng Huang ("Wu" or "Petitioner") petitions for review of a September 19, 2002 Board of Immigration Appeals ("BIA") decision summarily affirming the April 6, 1999 oral decision of an Immigration Judge ("IJ"). Wu argues on appeal that certain of the IJ's factual findings were not supported by substantial evidence, and that in any event the IJ abused his discretion in denying asylum on the basis of those findings. Respondent defends the IJ's denial of asylum on the merits, but also challenges this court's jurisdiction to hear Wu's appeal, arguing that Wu failed to exhaust an automatic right to BIA reconsideration of an IJ's discretionary denial of asylum, *see* 📄 8 C.F.R. § 1208.16(e) [1]. We hold that Wu has exhausted his administrative remedies, grant the petition for review, and affirm in part and vacate and remand in part the BIA's decision.

**BACKGROUND**

Petitioner Wu, a native and citizen of the People's Republic of China, entered the United States illegally and was immediately detained by immigration authorities at Brownsville, Texas. He conceded removability, but sought asylum and withholding of removal pursuant to the Immigration and Nationality Act (INA), §§ 208(b)(1), 241(b)(3)(A), as amended, 📄 8 U.S.C. §§ 1158(b)(1), 1231(b)(3)(A).

In his application for asylum and at his hearing before the IJ, Wu offered credible testimony corroborated by medical and documentary evidence to show that in 1990, after the birth of his second child, he was forcibly subjected to a vasectomy by \***91** Chinese family planning authorities. [2] Wu also testified that after his sterilization, he became politicized about family

planning policies in China, and that he came into conflict with the head of his village on the subject and spoke openly about his views. The first incident of confrontation over the policies, according to his testimony and I-589 application, occurred when Wu's son, then nine years old, vocally objected to a film he was shown in school regarding the patriotism of Chinese family planning policy. Wu attested that the head of his village summoned Wu, informed him that anti-governmental views and parental teachings would not be tolerated, and threatened to arrest him if he continued to speak out. Wu objected, saying that the government lacked respect for human rights by forcing sterilizations. Wu also testified that one year later he had a second, similar confrontation with the village head, and he began to oppose publicly the family planning policy. Wu's written application, however, did not mention this second confrontation or his public opposition.

"[O]n the whole," the IJ found Wu to be credible "up to a point." The IJ believed, based on medical evidence from an American physician and a Chinese sterilization certificate, that Wu had been forcibly sterilized pursuant to Chinese family planning policy. The IJ stated: "He has testified that he was forced to be sterilized and I believe him." He found that Wu "established that he has a well-founded fear of persecution within the meaning of our laws," and was therefore eligible for asylum. *See* 8 U.S.C. § 1101(a)(42) (as amended by Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, § 601(a)(1), 110 Stat. 3009-689) (granting per se eligibility for asylum based on forced sterilization). The IJ also found that Wu had met his burden with respect to withholding of removal to China.

The IJ refused, however, to exercise his discretion to grant Wu asylum. He found that Wu had attempted to "deceive the Court" by embellishing his claims. Specifically, the IJ stated (1) that Wu mentioned two clashes with the village head in his testimony, while his I-589 application for asylum had implied that there had been only one such encounter; (2) that Wu embellished or fabricated testimony regarding his public opposition to family planning (this finding was based on the fact that Wu had not mentioned this activity in his written asylum application); and (3) that Wu made up testimony regarding a one-month hiding period within China prior to leaving the country. In addition to this credibility-related concern, the IJ noted as a second "adverse factor" that Wu had used a professional smuggler to leave China. [3] The IJ repeatedly emphasized that his decision on the asylum claim was made "as a matter of discretion."

**\*92**  Petitioner appealed, and on September 19, 2002, the Board of Immigration Appeals affirmed the IJ's decision without opinion. Wu filed a timely petition for review. He did not seek reconsideration of either the IJ's or the BIA's orders.

### DISCUSSION

This case presents two primary issues. First, we consider whether a failure to exhaust what, arguably, is an automatic right to BIA reconsideration of an IJ's discretionary denial of asylum, *see* 8 C.F.R. § 1208.16(e), denies this court jurisdiction over a petition for review. Second, we address (a) whether, on the facts, the IJ's partial adverse credibility finding was supported by substantial evidence, and (b) whether the IJ properly relied on that finding and on Wu's use of a smuggler as a basis for denying asylum as a matter of discretion. Discretionary denials of asylum are exceedingly rare. Neither side has presented (nor have we found) a case involving a jurisdictional challenge under 8 C.F.R. § 1208.16(e), or an exercise of agency discretion to deny asylum based on factual findings like those in the case before us. [4]

The government does not now challenge, and we accordingly affirm, the agency's conclusion that Wu made a sufficient showing of a well-founded fear of persecution to warrant withholding of removal to China and to establish *eligibility* for asylum.

### 1. Exhaustion Requirements in Light of 8 C.F.R. § 1208.16(e)

Federal regulations provide special and unusual rights to an alien who has been denied asylum, on a discretionary basis, where that denial will preclude the alien from admitting his/her spouse or minor children:

> Reconsideration of discretionary denial of asylum. In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal

under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

8 C.F.R. § 1208.16(e). Respondent argues that this language is mandatory, obliging an alien covered by the regulation to move for reconsideration by the BIA. Thus, the government argues, since Petitioner failed to bring a motion to reconsider within thirty days of the agency decision, he did not exhaust his obligation to seek "all possible relief" within the administrative agency before seeking federal judicial review. *See* 8 U.S.C. § 1252(d) ("A court may review a final order of removal only if ... the alien has exhausted all administrative remedies available to the alien as of right").

Respondent's contention ignores the significance of some key language in the regulation. That language mandates reconsideration when an applicant is granted withholding "subsequently" to a discretionary denial of asylum. As such, the language would most reasonably be read to apply to situations (unlike the one before us) in which the BIA had affirmed a discretionary denial of asylum, and *subsequently* (for whatever reasons, perhaps **\*93** new facts or circumstances), the alien was granted withholding of removal.[5] In such situations, the regulation would appear to require the BIA to revisit its discretionary decision as to asylum, in order to facilitate family reunification.

 **[1]**  In the case before us, the IJ denied asylum and granted withholding of removal in the same decision. As a result, reconsideration in the light of that grant would arguably not be mandated, and Petitioner would not have failed to take advantage of an available immigration remedy. But, even apart from this plausible reading of the regulation, and assuming away, arguendo, the significance of the word "subsequently" in the text, we conclude that Petitioner has met all relevant exhaustion requirements.

Respondent's argument hinges on an interpretation of 8 C.F.R. § 1208.16(e) that would place a duty solely on

the petitioner to move for reconsideration, as opposed to requiring the BIA (or the IJ for that matter) to reconsider any denial of asylum *sua sponte.* Compare 8 C.F.R. § 1003.2(b) (describing the requirements of filing a motion to reconsider, including a thirty-day filing window following the contested agency decision) *with* 8 C.F.R. § 1003.2(a) ( "The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision.").

*See also* *Li Yong Zheng v. U.S. Dep't of Justice,* 416 F.3d 129, 130 (2d Cir.2005) (per curiam) ("[T]he BIA has the authority to reopen any case at any time sua sponte.").

But Respondent's reading of 8 C.F.R. § 1208.16(e) would convert what is manifestly a law designed to further the reunification of families into an additional burden on a petitioner (to move formally for a reconsideration pursuant to 8 C.F.R. § 1003.2(a)). In effect, rather than allowing a normal BIA appeal from a legally erroneous discretionary denial of asylum, it would set a procedural trap in the way of such an appeal in those very cases that the regulation is most concerned with-situations in which a discretionary denial of asylum resulted in family separation.[6]

We disagree with this overly restrictive reading of the regulation. On its face, the language of § 1208.16(e) instructs the BIA, not a petitioner, of its duties. It states that "the denial of asylum *shall be reconsidered* " (emphasis added), and does so in the passive voice. Read normally, the passive voice in such a phrase mandates action by the party which previously had acted, *i.e.,* the BIA. But even apart from that ordinary reading, the rule does not specify the mechanism that initiates review-*i.e.,* by motion, through direct appeal, or as a result of the BIA's own initiative. It follows that Respondent's reading-that § 1208.16(e) requires a timely motion made by the alien pursuant to 8 C.F.R. § 1003.2(b)-finds no support whatsoever in the text of the regulation.

Not only does ordinary *textual* analysis run counter to Respondent's reading of the **\*94** regulation, so do *contextual* considerations. For, as mentioned above, reading 8 C.F.R. § 1208.16(e) as a jurisdictional bar if a petitioner fails to move for reconsideration would have the perverse effect of creating a special procedural barrier for the very group to whom Congress sought to give added protection. The regulation expressly acknowledges a particular concern raised by some discretionary denials of asylum when withholding of removal

is granted. The concern focuses on the fact that in such cases, an applicant's spouse or minor children will be precluded from joining the applicant. It would contort this special concern to hold that 8 C.F.R. § 1208.16(e) imposes on covered persons the duty to make a mandatory motion, even where the BIA has the authority, in the absence of such a motion, *sua sponte* to satisfy its statutory obligation to reconsider, and where-in the ordinary course of things-a reviewing court would have the capacity, on appeal by the applicant, to require the BIA to reconsider.

Our reading of the regulation by no means relieves petitioners in Wu's position of ordinary exhaustion requirements. Such exhaustion is, of course, still mandatory. *See* 8 U.S.C. § 1252(d); *Foster v. INS,* 376 F.3d 75, 77 (2d Cir.2004) (per curiam). We simply hold that a petitioner's duty to exhaust administrative relief under 8 U.S.C. § 1252(d) is unchanged, rather than amplified, by the terms of 8 C.F.R. § 1208.16(e). Thus, a petitioner fulfills the duty to exhaust administrative relief under 8 U.S.C. § 1252(d) by appealing the IJ's exercise of discretion to the BIA. Wu did just that: he argued to the BIA that "the IJ abused his discretion in not granting asylum to the Respondent after he found that the Respondent credibly testified about his forced sterilization." Therefore, his contention was clearly presented to the BIA. *See Foster,* 376 F.3d at 78 ("[W]e require petitioner to raise *issues* to the BIA in order to preserve them for judicial review.") (internal quotation mark and alternation omitted).

Petitioner sought administrative review of a discretionary denial of asylum using one of the appeal mechanisms available to him when he appealed the IJ's decision to the BIA. By doing so, he allowed the agency to fulfill its duty under 8 C.F.R. § 1208.16(e) to reconsider the denial with attention to "the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country." By affirming the IJ's discretionary denial, the BIA exercised its own discretion and "independent judgment," making the decision of the IJ its own. *See In re Burbano,* 20 I. & N. Dec. 872, 873 (BIA 1994) (holding that when considering the discretionary decision of an immigration judge, the BIA "issue[s] a discretionary decision independent from that of the immigration judge," rather than employing an abuse of

discretion standard). Petitioner now seeks review of the BIA's refusal to reverse the IJ's discretionary denial of asylum. We hold that no exhaustion issues deprive us of jurisdiction to hear his petition.

### 2. The IJ's Discretionary Denial of Asylum

**[2]** **[3]** To establish eligibility for asylum, a petitioner must show that he satisfies the statutory definition of a "refugee," *i.e.,* that he has suffered past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or that he has a well-founded fear of future persecution on one of these grounds. 8 U.S.C. § 1101(a)(42); *Jin Shui Qiu v. Ashcroft,* 329 F.3d 140, 148 (2d Cir.2003). If an applicant establishes past persecution, he triggers a rebuttable presumption of a well-founded **\*95** fear of persecution and thus of eligibility for asylum; or, if he establishes a well-founded fear of future persecution, he is automatically eligible for asylum. *See Li Yong Cao v. U.S. Dep't of Justice,* 421 F.3d 149, 155 (2d Cir.2005). In cases involving persecution through forcible sterilization or abortion, the BIA has held that because these acts are "permanent and continuous," they trigger an irrebuttable presumption of a well-founded fear of future persecution and thus conclusively establish eligibility for asylum. *See id.; In re Y-T-L-,* 23 I. & N. Dec. 601, 605-08 (BIA 2003). "Once an applicant demonstrates eligibility for asylum, however, the decision whether to grant a particular application is ... within the discretion of the Attorney General." *Diallo v. INS,* 232 F.3d 279, 284 (2d Cir.2000) (internal quotation mark omitted); *see also* 8 U.S.C. § 1158(b)(1).

**[4]** Entitlement to withholding of removal, a mandatory form of relief, requires an applicant to satisfy a higher burden. The applicant must show that it is more likely than not that, if deported, his life or freedom would be threatened on account of one of the five bases for asylum. *See* 8 U.S.C. § 1231(b)(3); *Diallo,* 232 F.3d at 284-85. In conformity with United States obligations under international human rights law, *see INS v. Cardoza-Fonseca,* 480 U.S. 421, 440, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), the BIA *must* withhold deportation if the applicant meets the higher standard of eligibility for withholding of deportation. [7] *See Osorio v.*

AR.04825

*INS,* 18 F.3d 1017, 1032 (2d Cir.1994); *see also* 8 U.S.C. § 1231(b)(3)(A). "An applicant who proves that he or she is eligible for asylum, but is denied asylum in the BIA's exercise of discretion, remains eligible for withholding of deportation." *Osorio,* 18 F.3d at 1033.

A petitioner who proves persecution to the degree warranting withholding of removal, but who has been denied asylum in the IJ's exercise of discretion, is placed in an unusual legal status. One practical effect of this status is that the refugee is not eligible to become a lawful permanent resident, pursuant to 8 U.S.C. § 1159(a), as an asylee; and hence, his spouse or children cannot enter the United States, pursuant to 8 U.S.C. § 1158(b)(3)(A), as derivative asylees. Furthermore, withholding of removal is a "country-specific" form of relief, *i.e.,* it bars removal to the nation of persecution, but it does not prevent exclusion and deportation to a hospitable third country. *See Cardoza-Fonseca,* 480 U.S. at 428, n. 6, 107 S.Ct. 1207.

In this appeal, Wu challenges the IJ's exercise of discretion on two grounds. First, Wu argues that the IJ's partial adverse credibility finding, which provided one foundation for the IJ's denial of asylum, was not supported by substantial evidence. Second, and regardless of our disposition of the first question, Wu contends that the IJ erred as a matter of law both in relying on the stated grounds for exercising discretion and in failing to balance the equities as required for the exercise of discretion.

### a. The Adverse Credibility Finding

[5] Factual findings underlying the IJ's discretionary decision are entitled to deference if they are supported by substantial evidence, *see, e.g., Zhou Yun Zhang v. INS,* 386 F.3d 66, 73 (2d Cir.2004), and an IJ's credibility determinations are entitled to "particular deference," **\*96** *see, e.g., Wu Biao Chen v. INS,* 344 F.3d 272, 275 (2d Cir.2003) (per curiam).

The IJ found Wu credible with respect to the entire content of his I-589 application-*i.e.,* his forced vasectomy by Chinese authorities, his son's anti-governmental speech in school, and his confrontation with the village head on one occasion as a result of Wu's opposition to family planning policy. On that basis, the IJ found Wu to be the victim of government

sterilization, and hence statutorily eligible for asylum. *See* 8 U.S.C. § 1101(a)(42). He also found, however, that in Wu's oral testimony at his asylum hearing, Wu had embellished the story of his persecution. Specifically, the IJ concluded that Wu had falsely increased the number of times that he was confronted by the village head, had overstated the degree of his opposition to family planning policies, and had made up the account of disappearing into hiding for one month prior to leaving China. Wu argues that these latter findings of adverse credibility were not in fact inconsistent with his I-589 application (which was simply more general in nature) and that, in any case, they amounted to collateral or ancillary inconsistencies within the meaning of *Secaida-Rosales v. INS,* 331 F.3d 297, 308 (2d Cir.2003).

We have serious doubts about whether the IJ's partially adverse credibility finding was supported by substantial evidence of inconsistencies, and whether the alleged testimonial inconsistencies that the IJ identified could justify a finding of lack of credibility, under *Secaida-Rosales.* Moreover, we might reasonably question the propriety of parsing the legal significance of Wu's testimony as this IJ did, rendering the same nexus of facts credible for purposes of eligibility for asylum, but significantly not credible for purposes of a discretionary denial of asylum. *Cf. Kalubi v. Ashcroft,* 364 F.3d 1134, 1138-39 (9th Cir.2004) (holding that the agency abused its discretion in denying asylum to an eligible alien because "if an applicant's testimony on a particular issue is not found incredible for purposes of determining whether he is eligible for asylum, it must be taken as true-and cannot be found incredible-on the same issue for purposes of determining whether he is entitled to asylum"). Nevertheless, we decline to reach these questions, and we will, instead, assume, arguendo, that the IJ's credibility determination is supported by the record. But, as discussed *infra,* we conclude that the IJ relied improperly on this narrow adverse credibility determination in making his discretionary decision on asylum.

### b. The IJ's Exercise of Discretion

Judicial review of discretionary decisions to grant or deny asylum is governed by 8 U.S.C. § 1252(b)(4)(D), which provides that: "the Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and

an abuse of discretion." [8] *See, e.g.,* *Li Yong Cao v. U.S. Dep't of Justice,* 421 F.3d 149, 155 (2d Cir.2005); *Gilaj v. Gonzales,* 408 F.3d 275, 288 (6th Cir.2005); *Etchu-Njang v. Gonzales,* 403 F.3d 577, 580 (8th Cir.2005); *Sepulveda v. U.S. Attorney Gen.,* 401 F.3d 1226, 1231 (11th Cir.2005); *Kalubi v. Ashcroft,* 364 F.3d 1134, 1137 (9th Cir.2004). Congress added 8 U.S.C. § 1252(b)(4)(D) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), **\*97** Pub.L. 104-208, 110 Stat. 3009-608 (1996). [9]

[6]    The IJ based his discretionary denial of asylum on two findings. First, he found that Wu had embellished or fabricated aspects of his testimony, and second, that Wu had used a professional smuggler to leave China. Petitioner argues that these adverse factors were insufficient as a matter of law to warrant a discretionary denial of asylum, and that the IJ failed to take into account significant equities favoring a grant of asylum in his case. We agree.

Recognizing the special nature of asylum cases, the BIA has established-and federal courts have enforced-extensive limitations on an IJ's exercise of discretion in the context of asylum-eligible refugees. *See, e.g.,* *Kalubi,* 364 F.3d at 1138-39; *Andriasian,* 180 F.3d at 1044-47; *Castro-O'Ryan v. INS,* 847 F.2d 1307, 1314 (9th Cir.1988); *Shahandeh-Pey v. INS,* 831 F.2d 1384, 1387-89 (7th Cir.1987); *In re Fauziya Kasinga,* 21 I. & N. Dec. 357, 367 (BIA 1996); *In re H-,* 21 I. & N. Dec. 337, 348 (BIA 1996); *In re Chen,* 20 I. & N. 16, 19 (BIA 1989). [10]

[7]    Procedurally, an applicant for asylum bears the burden of establishing that the favorable exercise of discretion is warranted, but either party may proffer evidence relevant to any discretionary aspects of the case. *See* **\*98** *In re H-,* 21 I. & N. Dec. at 348. Thus, after an IJ determines that past persecution has been established, "the regulations envision that he or she ordinarily will proceed to accept further evidence" concerning discretionary relief. *Id.* In the case before us, after finding that Wu would be eligible for asylum, the IJ invoked his discretion to deny asylum without taking any further evidence. Nothing in the federal regulations specifically mandates a bifurcated proceeding, however. Therefore-at least on the record before this IJ, which already

included the applicant's positive equities-the IJ's failure to invite new evidence was not, in and of itself, improper.

It was the substantive bases of the IJ's decision, rather than its procedural aspects, that were contrary to law in Wu's case. In making the substantive determination of whether an alien qualifies for a discretionary grant of asylum, the immigration agency must examine the totality of the circumstances. *See* *In re H-,* 21 I. & N. Dec. at 347; *see also* *In re A-H-,* 23 I. & N. Dec. 774, 782-83 (Att'y Gen.2005) (evaluating all the circumstances, including equities favoring the petitioner, informing a discretionary decision on asylum); *In re Chen,* 20 I. & N. Dec. at 19 (stating that "as with any case involving the exercise of discretion, all other factors, both favorable and adverse, should also be considered, with recognition of the special considerations present in asylum cases").

In discussing the balancing of favorable and adverse factors, the BIA has stated that "[t]he *danger of persecution* will outweigh all but the most egregious adverse factors." *Id.* (emphasis added); *see also* *In re Kasinga,* 21 I. & N. Dec. at 367 (citing *In re Pula,* 19 I. & N. Dec. 467, 474 (BIA 1987) (superseded by regulation on other grounds)). The *actual experience* of past persecution should also weigh in favor of a grant of asylum. [11] *See* *In re Chen,* 20 I. & N. Dec. at 19. Other favorable considerations include "general humanitarian reasons, independent of the circumstances that led to the applicant's refugee status, such as his or her age, health, or family ties." *In re H-,* 21 I. & N. Dec. at 347-48. Adverse factors include criminal convictions, as well as significant violations of national immigration laws and the manner of entry into this country. *See* *In re Pula,* 19 I. & N. Dec. at 473; *Jian v. INS,* 28 F.3d 256, 259 (2d Cir.1994).

**\*99**    The IJ in Wu's case entirely failed to undertake the examination of the totality of the circumstances as mandated by the case law. He focused solely on Wu's alleged "embellishments" and on Wu's use of a snakehead. The failure to weigh the relevant factors was thus manifestly contrary to law and would, together with the abuse of discretion it reflected, give us jurisdiction to review the IJ's discretionary denial of asylum. *See* 8 U.S.C. § 1252(b)(4)(D). Moreover, when such a review is undertaken, the failure to balance, by itself, justifies a vacatur of the IJ's denial and a remand for a proper balancing of the equities. *See* *Kalubi,* 364

F.3d at 1140-41 (remanding a discretionary denial of asylum where an IJ failed to consider the alien's past persecution, fear of future persecution, and separation from his spouse, as well as his membership in a secret police organization); Castro-O'Ryan, 847 F.2d at 1314 (remanding an agency denial of asylum to a criminal alien where the agency failed to take into account counterveiling equities); Shahandeh-Pey, 831 F.2d at 1387-89 (vacating and remanding where the BIA failed to consider possible evidence of the petitioner's family ties, employment history, good character, property, and duration of residence in the United States, which might have outweighed his several prior criminal convictions).

While a remand is therefore appropriate, and while, on remand, the requisite balancing must be made by the BIA, we would be remiss if we did not note the weight on Wu's side of the balance, at least on the record currently before us. The IJ identified two adverse factors, and the IJ's handling of each is problematic. First, the IJ found that Wu had exaggerated certain peripheral aspects of his testimony. But as we have said-speaking of inconsistencies and omissions, such as the ones here found by the IJ-in the context of eligibility for asylum, "the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding," and thus, "holding applicants to such a standard is not only unrealistic but also unfair." Secaida-Rosales, 331 F.3d at 308. And, it need hardly be observed that if testimonial embellishment at the margins, by a proven refugee, were sufficient to justify a denial of asylum, there would be few asylees indeed.

Secondly, the IJ stated that he "[took] note of the fact" that Wu had paid a smuggler $30,000 to leave China and come to the United States. The manner of entry into the United States, or the circumvention of orderly refugee procedures abroad, is indeed one of the factors that can be weighed adversely in the exercise of agency discretion. See In re H-, 21 I. & N. Dec. at 348; In re Kasinga, 21 I. & N. Dec. at 368; see also In re Pula, 19 I. & N. Dec. at 473. Such consideration, however, should be made in light of the full circumstances of an alien's flight. See In re Pula, 19 I. & N. Dec. at 473-74. The record in this case, as currently before us, is unclear as to whether Wu's entry into the United States was fraudulent, and it does not suggest that Wu was eligible for orderly refugee procedures in China or elsewhere. All that the record shows, is (a) that Wu paid a snakehead $30,000 to exit China and to travel to the United States, (b) that he came in "somewhere near Brownsville, Texas," and (c) that Wu was taken into custody immediately upon entry at the southern border and that he conceded removability forthwith.

The BIA has explicitly cautioned that manner of entry cannot, as a matter of law, suffice as a basis for a discretionary denial of asylum in the absence of other adverse factors. See **\*100** In re Pula, 19 I. & N. Dec. at 473-74 (holding that fraud should be considered only as one of a number of factors and reversing the prior position of the BIA that fraudulent entry was nearly a *per se* grounds for a discretionary denial of asylum). Moreover, the BIA has also held that quick admission of removability (such as that made by Wu) mitigates the negative impact of the manner of entry, even where the use of fraudulent documents during transit is at issue. See In re Kasinga, 21 I. & N. Dec. at 368 (reversing an IJ's discretionary denial of asylum where the applicant had purchased a fraudulent passport to enter the United States, but admitted its falsity to an immigration inspector at the border).

As with peripheral embellishments, if illegal manner of flight and entry were enough independently to support a denial of asylum, we can readily take notice, from the facts in numerous asylum cases that come before us, that virtually no persecuted refugee would obtain asylum. It follows that Wu's manner of entry, on the facts in this record, could not bear the weight given to it by the IJ.

In considering the factors influencing the IJ's exercise of discretion, we emphasize that unlike applicants as to whom discretionary denials of asylum have been upheld by courts of appeals, Wu was not a criminal alien nor aligned in any way with terrorism. [12] Even in those circumstances, however, a balancing of the equities for and against a petitioner is required. [13]

Conversely, the factors in Wu's favor on the discretionary scale are weighty indeed. First, as the IJ found, Wu was a victim of forced sterilization, a form of past persecution that amounts to on-going persecution. As the BIA has said, past persecution or the danger of future persecution can overcome all but the strongest adverse factors. See In re H-, 21 I. & N. Dec. at 348 (internal citations and quotations omitted); In re Chen, 20 I. & N. at 19.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

AR.04828

Second, denial of asylum, paired with the reasons that underlay the granting of withholding of removal, would likely have the practical effect of separating Wu from his wife and children. [14] Denial of asylum **101 bars Wu's wife and children from joining him in the United States as derivative asylees pursuant to 8 U.S.C. § 1158(b)(3)(A). And the circumstances justifying withholding of removal would, for obvious reasons, preclude Wu's return to China to reunite with his family. Family reunification has been expressly recognized as a crucial factor in weighing asylum as a discretionary matter. *See In re H-, 21 I. & N. Dec. at 347-48* (recognizing that family ties are among the general humanitarian concerns that must be taken into account). Indeed, the federal regulation mandating reconsideration of discretionary denials of asylum explicitly recognizes the undesirability of family divisions attendant to a discretionary denial of asylum, and provides an added tier of protection in such circumstances. *See 8 C.F.R. § 1208.16(e)* (reconsideration of discretionary denials of asylum is required because such decisions "thereby effectively preclud[e] admission of the applicant's spouse or minor children following to join him or her.")

Finally, the record does not show that any third country is available that would provide an alternative relocation for Wu or his family. There is no indication in the record of any place where Wu had resettled, any place where he had family ties, or any place where he could reunite with his spouse and children. Again, 8 C.F.R. § 1208.16(e) recognizes this concern, providing that upon reconsideration of discretionary denials of asylum, the BIA must consider whether "reasonable alternatives [are] available to the applicant such as reunification with his or her spouse or minor children in a third country."

We hold that the factors the IJ invoked to weigh against a grant of asylum in Wu's case were of dubious legitimacy. We find no other factors weighing against asylum in the record. We also hold that on this record, the adverse factors found by the IJ were of little weight in comparison to the factors favoring asylum, as the latter have been shaped by Congress, the courts, and the BIA itself. If the adverse factors relied upon in Wu's case could outweigh (a) a finding of a form of persecution that was expressly denominated as such by Congress, and (b) the humanitarian importance of family reunification, also explicitly recognized in applicable statutes and regulations, then the Attorney General's discretion under 8 U.S.C. § 1158(b)(1) would eclipse the substance of Congressional policies designed to make Wu and others similarly situated qualified for asylum. We therefore find that the IJ's decision was an abuse of discretion. [15] We remand to the BIA for a proper balancing of the factors governing discretionary judgments to grant or deny asylum. [16] Should the BIA find it appropriate to remand further, we strongly urge that this case be assigned to a different IJ than the one who **102 previously handled Wu's application. *See, e.g., Wang v. Attorney Gen. of the United States,* 423 F.3d 260, 271 (3d Cir.2005); *Yi-Tu Lian v. Ashcroft,* 379 F.3d 457, 462 (7th Cir.2004); *Arulampalam v. Ashcroft,* 353 F.3d 679, 688-89 (9th Cir.2003).

The petition for review is therefore GRANTED. We AFFIRM the decision of the BIA with respect to Wu's eligibility for asylum, but VACATE the decision of the BIA with respect to the discretionary denial of asylum and REMAND the case to that agency for further proceedings consistent with this opinion.

All Citations

436 F.3d 89

---

## Footnotes

1      As applied to the BIA, 8 C.F.R. § 208.16(e), upon which Respondent rested its arguments, is actually designated at 8 C.F.R. § 1208.16(e), as a result of the enactment of the Homeland Security Act of 2002, Pub.L. 107-296, tit. IV, subtits. D,E, F, 116 Stat. 2135, 2192 (Nov. 25, 2002) (as amended) and the promulgation of final rule 68 Fed.Reg. 9824-01, effective February 28, 2003.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2    Wu testified that after the birth of his first child, his wife was subjected to involuntary insertion of an intrauterine device ("IUD"). Wu's wife became pregnant again in 1989 in spite of the IUD, and she went into hiding to protect her pregnancy. Wu registered this second child after its birth, and the authorities informed Wu that his wife was required to report for sterilization within five days. She returned to hiding. When she did not report for the procedure, government officials came to the couple's home. Unable to locate Wu's wife, they instead arrested Wu and took him to a hospital for a forced vasectomy. Wu testified that he could not work for three months after the procedure, which had "scarred [him] mentally." The IJ did not contest the credibility of this testimony.

3    The record does not indicate if the smuggler, who was in China, aided Wu's entry into the United States or just coordinated his exit from China and his transit to the border.

4    We have, however, found one case that comes close in several respects, *see* Kalubi v. Ashcroft, 364 F.3d 1134 (9th Cir.2004), discussed *infra*.

5    *See, e.g.,* Andriasian v. INS, 180 F.3d 1033 (9th Cir.1999) (reviewing a grant of withholding of removal *by the BIA* after *an IJ* had denied asylum as a matter of discretion).

6    Normally, a petitioner can choose whether to file a motion to reconsider in addition to or in lieu of a direct agency appeal, and the federal courts of appeal may consider the initial agency decision and any subsequent denial of reconsideration separately or in a consolidated petition for review. *See* Khouzam v. Ashcroft, 361 F.3d 161, 167 (2d Cir.2004) (holding that, in light of Stone v. INS, 514 U.S. 386, 394, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995), a petitioner may file a motion to reconsider an agency decision with the BIA after filing a petition for judicial review of the same agency decision, and need not petition the court to consolidate review of the motion to reconsider and of the underlying agency action).

7    There are certain statutory exceptions to this rule, none of which are relevant here. *See* 8 U.S.C. § 1231(b) (3)(B) (enumerating exceptions to withholding of removal where the Attorney General determines that the alien has persecuted others, committed certain crimes, or poses a danger to national security).

8    It is not clear whether "manifestly contrary to law and an abuse of discretion" represent parallel statements of the same standard or constitute separate standards. For reasons that follow, we do not find it necessary to decide this question.

9    The provision in 8 U.S.C. § 1252(b)(4)(D) refers to 8 U.S.C. § 1158(a), which governs the circumstances under which aliens may apply for asylum. Section 1158(a) says nothing about the authority of the Attorney General to grant asylum, or the "discretionary judgment whether to grant relief" to which 8 U.S.C. § 1252(b) (4)(D) refers. This anomaly is likely explained by the fact that prior to the enactment of IIRIRA in 1996, § 1158(a) did include a reference to the Attorney's General's discretionary authority to grant asylum. *See* 8 U.S.C. § 1158(a) (1994) (providing that "the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien in a refuge ...."). In 1996, Congress amended section 1158(a) by, *inter alia,* splitting its text into sections 1158(a) and 1158(b). *See* IIRIRA, 110 Stat. at 3009-691-692. Section 1158(b) now contains the language concerning the Attorney General's discretion to grant asylum:

> The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a) (42)(A) of this title.

8 U.S.C. § 1158(b)(1)(A).

One can only conclude, as we and other circuits have implicitly done, that the drafters of 8 U.S.C. § 1252(b)(4)(D) intended to refer to section 1158(b) when they promulgated the standard of review governing the Attorney General's discretionary judgment whether to grant asylum. Applying the standard of review in 8 U.S.C. § 1252(b)(4)(D), therefore, the discretionary denial of asylum in Wu's case is "conclusive unless manifestly contrary to the law and an abuse of discretion." *See* 8 U.S.C. § 1252(b)(4)(D). While this circuit has yet to define precisely what "manifestly contrary to law" means, we have held that "[a]n abuse of discretion may be found in those circumstances where the Board's decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements; that is to say, where the Board has acted in an arbitrary and capricious manner." *Ke Zhen Zhao v. U.S. Dep't of Justice,* 265 F.3d 83, 93 (2d Cir.2001) (internal citations omitted).

10    Aspects of the BIA case law on this issue-specifically, instructions that IJs should take into account persecution of others, certain types of criminal conduct, dangers to national security, and firm resettlement in third countries-have now been made mandatory bars to asylum, by statute. *See* 8 U.S.C. § 1158(b)(2). The remaining aspects of the case law guiding an IJ's exercise of discretion, however, remain unaffected by these legislative changes.

11    The BIA emphasized the importance of the danger and actual experience of persecution in cases in which the government had attempted to rebut, based on changed country conditions, the presumption of a well-founded fear of persecution that had arisen as a result of a petitioner's showing of past persecution. In the instant case, instead, Wu was entitled-by federal legislation and by BIA holdings-to an *irrebuttable* presumption of a well-founded fear of future persecution on account of his forcible sterilization. *See* *Li Yong Cao,* 421 F.3d at 155. But this distinction in no way changes the applicability of the rule that makes past persecution a major factor favoring asylum. Indeed, the BIA has explicitly stated that weighing this factor in the discretionary equation is based on a "general humanitarian principle" favoring asylum for "a person who-or whose family-has suffered under atrocious forms of persecution." *See* *In re Chen,* 20 I. & N. Dec. at 19. Thus, Wu's showing of persecution as a result of his forced sterilization constituted an important factor favoring asylum. The government might seek to counter this reasoning by arguing that the danger of future persecution or the experience of past persecution become irrelevant where the agency has granted withholding of removal. But the government's position would yield a bizarre result (and one which is in conflict with *In re Chen* ). For, if one accepted this position, those very asylum-seekers who met the higher standard of proof of persecution required for withholding of removal (and thus those persons most in need of this nation's asylum relief) would be the ones who received less protection.

12    In the only discretionary denial of asylum to have come before this court-in which we evaluated an IJ's exercise of discretion in order to determine whether an improper change of venue resulted in prejudice-we stated that an IJ would have been within his discretion to deny asylum where the "seriousness of [petitioner's] criminal conduct," *i.e.,* a felony conviction for a heroin distribution conspiracy, was not counterbalanced by any mitigating circumstances or witnesses. *Jian,* 28 F.3d at 258; *see also* *Sheikh v. Gonzales,* 427 F.3d 1077, 1078-80 (8th Cir.2005) (denying a petition for review of an IJ's discretionary denial of asylum where the IJ had based his decision on the petitioner's conviction for a crime of moral turpitude in the United States); *Kazlauskas v. INS,* 46 F.3d 902, 907 (9th Cir.1995) (upholding a discretionary denial of asylum in a case involving two prior convictions in the United States).

13    *See* *Jian,* 28 F.3d at 259 (stating that "testimony about mitigating circumstances surrounding [the] criminal conduct would have been relevant to the BIA's discretionary decision"); *Kazlauskas,* 46 F.3d at 907 (finding that in addition to considering the petitioner's criminal record in the United States, the IJ had properly considered a wide range of both favorable and unfavorable factors in the petitioner's circumstances.)

14   It is possible that in the particular circumstances of Wu's case, his wife would be eligible, on fleeing China, to apply for asylum herself, as the spouse of a person who had been forcibly sterilized. *See* ▪ *In re C-Y-Z-,* 21 I. & N. Dec. 915, 918 (BIA 1997). But such flight is not always easy, and if we were to uphold the IJ today, another IJ might, on grounds similar to those applied to Wu, deny his wife asylum. Moreover, Wu's children are not, under the law of this circuit, eligible for asylum, "*per se,*" as the children of a person forcibly sterilized. *See* ▫ *Shao Yan Chen v. U.S. Dep't of Justice,* 417 F.3d 303, 305 (2d Cir.2005) (per curiam).

15   It is reasonable to expect that the BIA, having been given the opportunity, will act consistently with the way it has exercised discretion in the overwhelming majority of its cases. Accordingly, we do not deem it appropriate to decide at this time whether we would have the authority to order the granting of asylum directly, as was done in ▫ *Andriasian v. INS,* 180 F.3d 1033, 1047 (9th Cir.1999).

16   An added reason for a remand and reconsideration by the BIA in this case is the entirely inadequate representation that Wu received on his appeal of the IJ's decision to the BIA. The "brief," submitted by Karen Jaffe, Esq., contains a one-paragraph argument, consisting of 14 lines. There is no citation to any authority. The relevant BIA precedents, which we have recounted, are ignored. Fortunately, Wu is represented in this Court by new counsel, who can be expected to provide competent representation on the renewed administrative appeal.

---

**End of Document**                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

897 F.3d 707
United States Court of Appeals, Sixth Circuit.

HUSSAM F., Petitioner,
v.
Jefferson B. SESSIONS, III,
Attorney General, Respondent.

No. 17-3641
|
Argued: March 8, 2018
|
Decided and Filed: July 27, 2018
|
Rehearing En Banc Denied November 26, 2018 *

**Synopsis**
**Background:** Alien, a Syrian citizen who had married a citizen of the United States following his admission on fiance visa, petitioned for review of decision of the Board of Immigration Appeals (BIA) reversing Immigration Judge's grant of his application for asylum and waiver of removal.

**Holdings:** The Court of Appeals held that:

[1] the BIA abused its discretion in denying admittedly eligible alien's application for asylum based solely on alien's willful blindness in not investigating the nontraditional procedures his father had employed to obtain passport for him to travel to the United States, and based on his failure to disclose nontraditional nature of his passport to immigration officials;

[2] in exercising its discretion to deny waiver of removal to Syrian citizen who had entered the United States on fiance visa and married United States citizen, the BIA improperly engaged in independent fact-finding;

[3] fiance visa that alien possessed at time of his initial admission to the United States was not "equivalent to an immigrant visa"; but

[4] any waiver of removal based on alien's adjustment of status, when he was again admitted to the United States and was at that time in possession of visa or equivalent document, as required to be eligible for waiver of removal, would also waive his removal based on earlier misrepresentations made at time of his initial admission.

Petition granted; case remanded.

Rogers, Circuit Judge, filed opinion concurring in part and dissenting in part.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (21)

**[1]** **Aliens, Immigration, and Citizenship** ⟜ Decisions reviewable

"Final order of removal," such as the Court of Appeals has jurisdiction to review, is one that has become final and that either orders alien's removal or concludes that alien is removable. Immigration and Nationality Act § 242(a)(1), 🚩 8 U.S.C.A. § 1252(a)(1).

**[2]** **Aliens, Immigration, and Citizenship** ⟜ Findings or statement of reasons

If immigration judge makes a finding of removability, that finding qualifies as "order of deportation." Immigration and Nationality Act § 101(a)(47), 🚩 8 U.S.C.A. § 1101(a)(47).

**[3]** **Aliens, Immigration, and Citizenship** ⟜ Determination

**Aliens, Immigration, and Citizenship** ⟜ Decisions reviewable

Determination by immigration judge (IJ) that alien was removable qualified as "order of removal," though the IJ also granted alien asylum and waiver of removal, and this order became final and reviewable, as "final order of removal," when the Board of Immigration Appeals (BIA) affirmed the IJ's finding of removability and reversed the IJ's grants of asylum and waiver of removal. Immigration and Nationality Act §§

AR.04833

101(a)(47), 242(a)(1), 🚩 8 U.S.C.A. §§ 1101(a)
(47), 🚩 1252(a)(1).

1 Cases that cite this headnote

**[4]    Aliens, Immigration, and
Citizenship** 🔑 Discretionary or mandatory

Asylum is discretionary form of relief.
Immigration and Nationality Act § 208(b)(1)(A),
🏳 8 U.S.C.A. § 1158(b)(1)(A).

**[5]    Aliens, Immigration, and
Citizenship** 🔑 Discretionary or mandatory

Even if alien is otherwise eligible for asylum,
the Attorney General still has discretion to grant
or deny such relief. Immigration and Nationality
Act § 208(b)(1)(A), 🏳 8 U.S.C.A. § 1158(b)(1)
(A).

**[6]    Aliens, Immigration, and
Citizenship** 🔑 Review of discretion

When the Board of Immigration Appeals (BIA)
has exercised its discretion to deny asylum, the
Court of Appeals may reverse only if the denial
was manifestly contrary to the law and an abuse
of discretion. Immigration and Nationality Act
§ 242(a)(2)(B)(ii), (b)(4)(D), 🚩 8 U.S.C.A. §
1252(a)(2)(B)(ii), 🚩 (b)(4)(D).

**[7]    Aliens, Immigration, and
Citizenship** 🔑 Findings or statement of
reasons

Board of Immigration Appeals (BIA) abused
its discretion in denying admittedly eligible
alien's application for asylum based solely on
alien's willful blindness in not investigating
the nontraditional procedures his father had
employed to obtain passport for him to travel
to the United States, and based on his failure
to disclose nontraditional nature of passport to
immigration officials, where alien had married
United States citizen while in the U.S. on

fiance visa, had close relationship with other
U.S. citizens, had no criminal history, was
highly educated and performed skilled labor in
technology field, and would face likelihood of
religious persecution if removed to his home
country of Syria; in emphasizing nontraditional
nature of alien's passport and his failure to
disclose this fact to exclusion of all other
factors, the BIA ignored its own precedent.
Immigration and Nationality Act § 208(b)(1)(A),
🏳 8 U.S.C.A. § 1158(b)(1)(A).

2 Cases that cite this headnote

**[8]    Aliens, Immigration, and
Citizenship** 🔑 Findings or statement of
reasons

While the Board of Immigration Appeals (BIA),
in deciding whether to exercise its discretion to
grant an eligible alien's application for asylum,
may consider alien's failure to comply with
established immigration procedures as a serious
adverse factor, it may not do so to the practical
exclusion of all other factors, but merely as
one factor in the totality of the circumstances.
Immigration and Nationality Act § 208, 🏳 8
U.S.C.A. § 1158(b)(1)(A).

2 Cases that cite this headnote

**[9]    Aliens, Immigration, and
Citizenship** 🔑 Substantial evidence in
general

Finding that alien is ineligible for asylum based
on his 'firm resettlement' in another country
is factual determination, which the Court of
Appeals reviews under a deferential "substantial
evidence" standard. Immigration and Nationality
Act § 208(b)(2)(A)(vi), 🏳 8 U.S.C.A. § 1158(b)
(2)(A)(vi); 🏳 8 C.F.R. § 1208.15.

**[10]    Aliens, Immigration, and
Citizenship** 🔑 Jurisdiction and venue

As general rule, the Court of Appeals
lacks jurisdiction to review the discretionary

component of the Board of Immigration Appeals' (BIA's) denial of waiver of removal. Immigration and Nationality Act §§ 237(a)(1)(H), 242(a)(2)(B)(ii), 8 U.S.C.A. §§ 1227(a)(1)(H), 1252(a)(2)(B)(ii).

**[11]    Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

While the Court of Appeals, on petition for review of the Board of Immigration Appeals' (BIA's) denial of alien's application for waiver of removal, did not have jurisdiction to review discretionary component of the BIA's decision, it could review whether the BIA, in reversing immigration judge's grant of waiver, had accepted immigration judge's factual determinations unless clearly erroneous or engaged in improper de novo review of immigration judge's findings of fact. Immigration and Nationality Act §§ 237(a)(1)(H), 242(a)(2)(B)(ii), (a)(2)(D), 8 U.S.C.A. §§ 1227(a)(1)(H), 1252(a)(2)(B)(ii), (a)(2)(D); 8 C.F.R. § 1003.1(d)(3)(i).

**[12]    Aliens, Immigration, and Citizenship** 🔑 Administrative Review

In exercising its discretion to deny waiver of removal to Syrian citizen who had entered the United States on fiance visa and married United States citizen, the Board of Immigration Appeals (BIA) improperly engaged in independent fact-finding in ignoring immigration judge's finding that alien had not engaged in any fraud in not advising immigration officials of unofficial channels that his father had used to obtain passport to travel to the United States, without finding that immigration judge had clearly erred, and based on its own views of evidence, in discounting critical factor that should have weighed in favor of granting alien a waiver. Immigration and Nationality Act §§ 237(a)(1)(H), 242(a)(2)(B)(ii), (a)(2)(D), 8 U.S.C.A.

§§ 1227(a)(1)(H), 1252(a)(2)(B)(ii), (a)(2)(D); 8 C.F.R. § 1003.1(d)(3)(i).

**[13]    Aliens, Immigration, and Citizenship** 🔑 Unlawful Entry or Reentry and Unlawful Presence

"Fraud" in obtaining admission to the United States, such as will render an alien removable, requires proof of an intent to deceive. Immigration and Nationality Act § 212(a)(6)(C)(i), 8 U.S.C.A. § 1182(a)(6)(C)(i).

**[14]    Aliens, Immigration, and Citizenship** 🔑 Unlawful Entry or Reentry and Unlawful Presence

"Willful misrepresentation of a material fact," of kind which, if occurring during admission to the United States, will render an alien removable, requires proof only that: (1) alien had knowledge of falsity of facts presented to immigration officer, and (2) the fact was material. Immigration and Nationality Act § 212(a)(6)(C)(i), 8 U.S.C.A. § 1182(a)(6)(C)(i).

**[15]    Aliens, Immigration, and Citizenship** 🔑 Waiver of inadmissibility or removal in general

Alien's family ties in the United States should weigh in favor of grant of waiver of removal. Immigration and Nationality Act § 237(a)(1)(H), 8 U.S.C.A. § 1227(a)(1)(H).

**[16]    Aliens, Immigration, and Citizenship** 🔑 Jurisdiction and venue

Court of Appeals has jurisdiction to review whether alien is statutorily eligible for a waiver removal, though the Court does not have jurisdiction to review the discretionary component of the Board of Immigration Appeals' (BIA's) denial of waiver of removal. Immigration and Nationality Act §§ 237(a)(1)

(H), 242(a)(2)(B)(ii), (a)(2)(D), 8 U.S.C.A. §§ 1227(a)(1)(H), 1252(a)(2)(B)(ii), (a)(2)(D).

**[17]     Aliens, Immigration, and Citizenship** ⚷ Jurisdiction and venue

Jurisdiction-stripping provision of the Immigration and Nationality Act (INA) for decisions left to the discretion of the Attorney General does not extend to the non-discretionary decisions upon which such discretionary decisions are predicated. Immigration and Nationality Act § 242(a)(2)(B)(ii), (a)(2)(D), 8 U.S.C.A. § 1252(a)(2)(B)(ii), (a)(2)(D).

**[18]     Aliens, Immigration, and Citizenship** ⚷ Waiver of inadmissibility or removal in general

"Admission to the United States," for purpose of statute providing that alien is eligible for waiver of removal only if, among other things, he was "in possession of an immigrant visa or equivalent document" at the time of his admission into the United States, took place both when alien was initially admitted to the country on a fiance visa and when he adjusted his status to that of a lawful permanent resident based on his marriage to a United States citizen. Immigration and Nationality Act § 237(a)(1)(H), 8 U.S.C.A. § 1227(a)(1)(H).

**[19]     Aliens, Immigration, and Citizenship** ⚷ Immigrant Visas

**Aliens, Immigration, and Citizenship** ⚷ Waiver of inadmissibility or removal in general

Fiance visa that alien possessed at time of his initial admission to the United States was not "equivalent to an immigrant visa," as placing additional hurdles on its holder to clear in order to become a lawful permanent resident, and thus alien's possession of fiance visa at time of his initial entry did not satisfy statutory

requirement for eligibility for waiver of removal. Immigration and Nationality Act § 237(a)(1)(H), 8 U.S.C.A. § 1227(a)(1)(H).

**[20]     Administrative Law and Procedure** ⚷ Denial of admission; removal

**Aliens, Immigration, and Citizenship** ⚷ Law questions

Even if it were fairly debatable whether the fiance visa that alien possessed at time of his initial admission to the United States was "equivalent to an immigrant visa," as required for alien's possession of this visa at time of his initial entry to satisfy statutory requirement for eligibility for waiver of removal, the Court of Appeals would grant *Chevron* deference to the Board of Immigration Appeals (BIA's) reasonable determination regarding the lack of such equivalence. Immigration and Nationality Act § 237(a)(1)(H), 8 U.S.C.A. § 1227(a)(1)(H).

**[21]     Aliens, Immigration, and Citizenship** ⚷ Adjustment of status

Any waiver of removal based on alien's adjustment of status, when he was again admitted to the United States and was at that time in possession of visa or equivalent document, as required to be eligible for waiver of removal, would also waive his removal based on earlier misrepresentations made at time of his initial admission to the United States on fiance visa in failing to disclose to immigration authorities the nontraditional nature of passport obtained by his father to allow alien to travel to the United States. Immigration and Nationality Act § 237(a)(1)(H)(i)(II), 8 U.S.C.A. § 1227(a)(1)(H)(i)(II).

**\*711** On Petition for Review from the Board of Immigration Appeals; No. A XXX XX1 758.

**Attorneys and Law Firms**

ARGUED: Sehla Ashai, CONSTITUTIONAL LAW
CENTER FOR MUSLIMS IN AMERICA, Richardson,
Texas, for Petitioner. Jessica D. Strokus, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for
Respondent. ON BRIEF: Sehla Ashai, Kristine Cruz, Pei
Yu, CONSTITUTIONAL LAW CENTER FOR MUSLIMS
IN AMERICA, Richardson, Texas, for Petitioner. Jessica
D. Strokus, Anthony C. Payne, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for
Respondent.

Before: GILMAN, ROGERS, and STRANCH, Circuit
Judges.

The court delivered a PER CURIAM opinion in which
ROGERS, J., joined in Parts I, II.A, and II.B. ROGERS, J.
(pp. 726–29), delivered a separate opinion dissenting from
Parts II.C and II.D. of the majority opinion.

## OPINION

PER CURIAM.

Four years ago, Petitioner came to the United States on a
K-1 fiancé visa, using a Syrian passport. Although he was a
Syrian citizen, his family had fled Syria decades ago to escape
persecution. Petitioner therefore had difficulty obtaining a
passport from a Syrian consulate in the usual manner, and
he instead relied on his father to get a passport for him
through unknown contacts in Syria. As it would turn out,
however, this was a mistake. The passport was not legitimate;
it had been stolen from the Syrian government while blank,
and Petitioner's biographical information was later inscribed
without official approval.

When U.S. immigration officials learned of this, they initiated
removal proceedings. An immigration judge ("IJ") concluded
that Petitioner was removable, but granted withholding of
removal and asylum based on the risk of religious persecution
that Petitioner would face if removed to Syria. The IJ also
granted him a waiver of removal under 8 U.S.C. §
1227(a)(1)(H), a statute that, if certain eligibility requirements
are met, permits waiver of an alien's inadmissibility due
to fraud or misrepresentation. The Government appealed,
however, and the Board of Immigration Appeals ("BIA" or
"Board") reversed in part. The Board affirmed the grant of

withholding, but concluded that Petitioner was *not* entitled
to asylum or to the § 1227(a)(1)(H) waiver. The Board
reasoned that he was statutorily ineligible for asylum, and
that he did not deserve that form of relief as a matter of the
Board's **\*712** discretion because he intentionally failed to
tell immigration officials about the non-traditional manner
in which his passport had been obtained. The Board also
concluded that, with respect to the waiver, Petitioner neither
met the statutory eligibility requirements nor merited the
waiver as a matter of the Board's discretion.

Petitioner now seeks review of the BIA's decision. As
explained below, the Board's discretionary denial of asylum
amounted to an abuse of discretion because the Board
unreasonably applied its own binding precedent. That
precedent dictates that asylum may not be denied solely
due to violations of proper immigration procedures, and
also that the danger of persecution—which all agree exists
in this case—should outweigh all but the most egregious
countervailing factors. As for the waiver, by statute courts
are generally deprived of jurisdiction to review discretionary
determinations such as the denial of a waiver under §
1227(a)(1)(H). This jurisdictional limitation does not apply
here, however, because the BIA engaged in de novo review
of the IJ's factual findings, in violation of its regulatory
obligation to review those findings only for clear error.

## I.

Petitioner is a citizen of Syria, but he has never set foot in
that country. His parents, Sunni Muslims, fled Syria before he
was born to escape violence and persecution by the regime of
Hafez al-Assad. Petitioner was born in Iraq, but grew up in
Yemen, where the family had moved to avoid the First Iraq
War. In Yemen, Petitioner's father found work as a doctor.
The family was able to obtain temporary residency status,
but this was derivative of the father's work residency and
had to be renewed with increasing frequency. While living in
Yemen, Petitioner obtained a bachelor's degree in computer
engineering from a university in Sana'a. In 2011, however,
the political situation in Yemen deteriorated. With the country
headed toward revolution, Petitioner left for Turkey. He
entered Turkey using a Syrian passport, obtained for him by
his father, which was the predecessor of the passport at issue
in this case. Petitioner testified that he had "no idea" where his
father went to get this passport, but he believed it to be valid.

When Petitioner decided to pursue marriage, he sought his mother's advice on a suitable match. She suggested his cousin, Asma Alhaider, who is a United States citizen. Alhaider was born in the U.S. and has lived her whole life here; she graduated from an American university and works as an elementary school teacher in the Detroit area. Alhaider and Petitioner communicated electronically for about three years and then, in 2012, Alhaider traveled to Turkey to get to know Petitioner in person. They soon became formally engaged.

Alhaider and Petitioner then began the process of applying for a fiancé visa that would allow him to travel to the United States so they could be married. [1] *See* 8 U.S.C. § 1184(d). Because Petitioner's Syrian passport was due to expire soon, he set about acquiring a new one to ensure passage to the U.S. He obtained this second passport just as he had the first one: through his father. According to Petitioner, his father would not divulge how he obtained the passport, but instead told Petitioner **\*713** only that it was common for Syrian expatriates to seek the help of family in Syria for such matters. Petitioner testified that, although he understood he could not get a passport from the Syrian consulate because he had not completed his mandatory military service, he believed that his father could still get him a valid passport through his father's connections in Syria. Unfortunately, as it would turn out, this passport was a "stolen blank"—that is, a legitimate Syrian passport that had been stolen from the Syrian government and to which Petitioner's biographical information was later added without official approval. Evidence would later suggest that the passport might have been stolen by the terrorist organization known as the Islamic State of Iraq and the Levant ("ISIL"), although there is no indication that Petitioner himself has ever had anything to do with that group.

Using his new Syrian passport, Petitioner obtained a fiancé visa from the U.S. consulate in Ankara, Turkey. He then traveled to the United States, arriving on January 26, 2014. Upon arrival, he presented his new Syrian passport to immigration officials and was allowed to enter the country. Thereafter, he and Alhaider were married. In July of that year, Petitioner applied for and received an adjustment of status to that of a conditional permanent resident. *See* 8 U.S.C. § 1255(a), (d); *id.* § 1186a. In connection with the adjustment of status, he affirmed under oath that he had not obtained his visa by fraud or misrepresentation.

On December 12, 2015, the Department of Homeland Security ("DHS") learned that Petitioner might have entered the U.S. using a stolen blank passport. Petitioner was interviewed by federal agents twice at his home in January 2016, and he voluntarily turned over the passport for examination. Petitioner then left the U.S. on a planned trip to see family in Turkey, returning several weeks later on February 6, 2016. During this trip, he asked his father (now living in Turkey) about the passport, but his father refused to reveal from whom he had obtained it for fear of endangering that person. When Petitioner arrived back in the U.S., he was interviewed about the passport again. He explained that he had not completed his mandatory military service in Syria, and so he knew that the Syrian consulate would not issue him a passport. With the benefit of the information recently obtained from his father, he told agents that his father had gotten the passport from an unknown, well-connected person in Syria who could bypass official channels.

The Government initiated removal proceedings on February 24, 2016, filing a Notice to Appear that contained three charges of removability under 8 U.S.C. § 1227(a)(1) (A). Under that provision, an alien is removable if he was inadmissible at the time of a prior entry or adjustment of status. The Government alleged that Petitioner was removable because, at the time of a prior entry or adjustment of status, he had been inadmissible: (1) as a nonimmigrant not in possession of a valid passport, *see* 8 U.S.C. § 1182(a)(7) (B)(i)(I); (2) as an immigrant not in possession of a valid passport, *see* *id.* § 1182(a)(7)(A)(i)(I); and (3) because he had obtained a visa and admission to the U.S. "by fraud or willfully misrepresenting a material fact," *see* *id.* § 1182(a) (6)(C)(i). [2]

**\*714** At a hearing before the IJ on March 14, 2016, Petitioner denied the three charges of removability and designated Syria as the country of removal based on his Syrian citizenship. On April 12, 2016, Petitioner submitted applications for: (1) a waiver of inadmissibility under 8 U.S.C. § 1227(a)(1)(H); (2) asylum; (3) withholding of removal; and (4) protection under the U.N. Convention Against Torture ("CAT").

Petitioner appeared with counsel for three hearings in June and July of 2016. At these hearings, the IJ heard testimony from Petitioner, Alhaider, Petitioner's aunt (who is also Alhaider's mother and thus Petitioner's mother-in-

law), a DHS forensic document examiner who had examined Petitioner's passport and determined it to be a stolen blank, and the U.S. Citizenship and Immigration Services officer who had processed Petitioner's application for adjustment of status. The relevant substance of this testimony has been related above. Additionally, Petitioner offered expert testimony from Professor Keith David Watenpaugh of the University of California, Davis, who explained that Syrians living in exile often have difficulty getting passports, and that they might view Syrian consulates as "enemy territory" and therefore avoid consulates for fear of placing themselves and their families at risk. He further testified that the practice of purchasing forged passports or bribing government officials to obtain passports is widely accepted among Syrians living in exile.

The IJ issued his decision on September 12, 2016. The IJ sustained all three charges of removability and denied CAT protection. But he granted Petitioner a waiver of removal under 8 U.S.C. § 1227(a)(1)(H), asylum, and withholding of removal. The IJ first made a credibility determination, finding Petitioner's explanation regarding the passport to be credible insofar as he purported to have "blindly trusted his father to obtain his passport from Syria under a 'don't ask, don't tell' policy." However, despite Petitioner's "attempt to remain willfully blind to the passport application process," the IJ concluded that Petitioner "knew that the document was obtained in a non-traditional (if not improper) manner." "That knowledge was enough to put him on notice that the passport, purportedly issued by the Syrian government, might have been acquired improperly." Still, the IJ also found that Petitioner had "little if any reason ... to suspect that [the passport] was a 'stolen blank' document," and that Petitioner believed the passport had been "acquired in the usual manner for a Syrian citizen opposed to the government and a member of a family living in exile."

The IJ granted Petitioner a waiver of removal under 8 U.S.C. § 1227(a)(1)(H). That provision gives the Attorney General discretion to waive an alien's removability on the grounds specified in 8 U.S.C. § 1182(a)(6)(C)(i), i.e., that the alien obtained admission by fraud or willful misrepresentation. However, the Attorney General may exercise this discretion only if certain requirements are met. First, the alien must be "the spouse, parent, son, or daughter of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence." *Id.* § 1227(a)(1)(H)(i)(I). Second, the alien must have been "in

possession of an immigrant visa or equivalent document and [have been] otherwise admissible to the United States at the time of such admission except for those grounds of inadmissibility specified under paragraphs (5)(A) and (7)(A) of section 1182(a) of this title which were a direct result of that fraud or misrepresentation." *Id.* § 1227(a)(1)(H)(i)(II). If those requirements are met, the Attorney General may exercise his discretion to grant the waiver, **\*715** which the statute further explains "shall also operate to waive removal based on the grounds of inadmissibility directly resulting from such fraud or misrepresentation." *Id.* § 1227(a)(1)(H).

Application of the waiver is thus a two-step process. First, the alien must meet the above requirements simply to be eligible for the waiver. Second, the Attorney General must determine that, in his discretion, the waiver should be granted. *See Singh v. Gonzales*, 451 F.3d 400, 410–11 (6th Cir. 2006).

Here, the IJ concluded that, when Petitioner initially entered the U.S., he was not in possession of an immigrant visa as required by the waiver statute, because at that time he had only a *nonimmigrant* fiancé visa, which, the IJ determined, was not an "immigrant visa or equivalent document." However, the IJ held that Petitioner did qualify for the waiver at the time he adjusted his status (which counts as an "admission" for purposes of the statute). *See Matter of Agour*, 26 I. & N. Dec. 566, 570 (BIA 2015). The IJ then concluded that, under our decision in *Avila-Anguiano v. Holder*, 689 F.3d 566, 570 (6th Cir. 2012), even though Petitioner qualified for the waiver only with respect to his later adjustment of status and not his initial entry into the country, he could still use it to waive his earlier misrepresentation made when he first entered the U.S.

The IJ next held that Petitioner deserved the waiver as a matter of discretion. Petitioner's misrepresentation was "not ... particularly egregious," because the passport appeared valid even to trained immigration officials, and Petitioner had no reason to suspect that it had been stolen from the Syrian government. There was "no other evidence that [Petitioner] is an individual of bad character," and the IJ found that any suggestion of a connection between Petitioner and ISIL was merely "unsubstantiated suspicion." Additionally, the IJ reasoned that Petitioner was deserving of the waiver because it would help him stay with Alhaider, who is a U.S. citizen, it

would remove him from his former life of statelessness, and it would prevent Petitioner from being sent to a country he had never lived in that was enduring a violent civil war.

The IJ also granted Petitioner asylum. *See* 8 U.S.C. § 1158. To obtain asylum, Petitioner first had to show that he was a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A), meaning that he was unable or unwilling to reside in Syria "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Second, he had to show that he merited a favorable exercise of discretion. *See id.* § 1158(b)(1)(A); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The IJ held that Petitioner demonstrated a well-founded fear of persecution in Syria based on his Sunni Muslim religion, and that he merited a favorable exercise of discretion for the same reasons he merited the § 1227(a)(1)(H) waiver.

Finally, the IJ granted withholding of removal because Petitioner had demonstrated a "clear probability" that he would face harm in Syria on account of his religion. *See INS v. Stevic*, 467 U.S. 407, 413, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *see also* 8 U.S.C. § 1231(b)(3)(A). CAT protection, however, was denied.

The Government appealed, and the BIA affirmed the grant of withholding but reversed the IJ's grants of the § 1227(a)(1)(H) waiver and asylum.[3] The **\*716** Board first denied the waiver, concluding that Petitioner was neither statutorily eligible nor merited a favorable exercise of discretion. Contrary to the IJ, the Board did not read our decision in *Avila-Anguiano* to permit Petitioner's eligibility for the waiver based on his adjustment of status to also waive his removability based on misrepresentations made at the time of his initial entry. The Board also held that one of Petitioner's grounds of inadmissibility—his entry as a nonimmigrant without a valid passport, *see* 8 U.S.C. § 1182(a)(7)(B)(i)(I)—cannot be waived by § 1227(a)(1)(H). The BIA further concluded that Petitioner did not merit the waiver as a matter of discretion. To reach this determination, the Board balanced "the evidence of [Petitioner's] undesirability as a permanent resident" against "the social and humane considerations present" to determine "whether a grant of relief is in the best interests of this country." *See Matter of*

*Tijam*, 22 I. & N. Dec. 408, 412 (BIA 1998). The Board concluded that a waiver was not in the country's best interests because Petitioner "kn[e]w that [his passport] was obtained in a non-traditional manner, he remained willfully blind as to its origins, and he intentionally withheld that information in order to gain entry into the United States." The Board also emphasized as a negative factor that Petitioner failed to get clarification from his father about the passport's origins, even though there is evidence that it might have been stolen by a terrorist organization. In the Board's view, these negative factors outweighed the positive factors that Petitioner was married to a U.S. citizen, he enjoyed a close relationship with his U.S. citizen in-laws, he had no criminal history, he volunteered, was highly educated, and performed skilled labor in the technology field. The Board also reasoned that concerns about breaking up Petitioner's family unit were lessened because Alhaider testified that she would go with Petitioner if he were deported to Syria, and that the humanitarian concerns about sending Petitioner to live in Syria were lessened because the Board affirmed the IJ's grant of withholding, so Petitioner was not in imminent danger of removal to that country.

The BIA also denied asylum, first because Petitioner was not eligible for asylum due to his being "firmly resettled" in Yemen, *see* 8 U.S.C. § 1158(b)(2)(A)(vi); 8 C.F.R. § 1208.15, and second because, regardless of whether Petitioner was firmly resettled, the Board would deny asylum as a matter of its discretion for the same reasons that it denied the § 1227(a)(1)(H) waiver.

The BIA's decision was issued on May 17, 2017. The case was remanded to the IJ. On June 12, 2017, the IJ entered an order of removal, ordering Petitioner to be removed to Syria but also granting withholding of removal. On June 15, 2017, Petitioner petitioned this court to review the BIA's denials of his applications for the waiver and asylum.

## II.

### A.

As a preliminary matter, the Government contends that we lack jurisdiction over Petitioner's entire petition for review because he failed to attach a copy of the IJ's June 12, 2017, final order of removal to the petition. This argument has two components. First, the Government notes that we

have jurisdiction to review only "a final order of removal." 8 U.S.C. § 1252(a)(1). According to the Government, the IJ's June 12 order of removal was the only "final order of removal" in this case, and therefore our jurisdiction is limited to a review of that order, and not the BIA's decision itself. Second, the Government contends that we lack jurisdiction even to review the IJ's June 12 order **717 because the immigration statute provides that a petition for review of an order of removal "shall attach a copy of such order," *id.* § 1252(c)(1), and, because Petitioner did not attach the IJ's June 12 order to his petition, he has "failed to petition for review of" that order.

[1] [2] [3] We need not reach the Government's second argument—that we lack jurisdiction to review the IJ's June 12 order because it was not attached to the petition for review—because that was not the only final order of removal in this case. The immigration statute defines "order of deportation," which is interchangeable with "order of removal,"[4] as "the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, *concluding that the alien is deportable* or ordering deportation." 8 U.S.C. § 1101(a)(47)(A) (emphasis added). Thus, "the statutory requirement of an order of removal is satisfied when ... the IJ *either* orders removal or concludes that an alien is removable." *Giraldo v. Holder,* 654 F.3d 609, 613 (6th Cir. 2011) (alterations in original) (quoting *Lazo v. Gonzales,* 462 F.3d 53, 54 (2d Cir. 2006) (per curiam) ). "[I]f the IJ makes a finding of removability, that finding satisfies *§ 1101(a) (47)*'s definition of an order of deportation." *Id.* (quoting *Sosa-Valenzuela v. Gonzales,* 483 F.3d 1140, 1146 (10th Cir. 2007) ). Accordingly, when the IJ in this case concluded in his original decision that Petitioner was removable, that qualified as an order of removal, even though the IJ also granted asylum and a waiver. Moreover, an order of removal "becomes 'final' upon 'a determination by the Board of Immigration Appeals affirming such order,' or upon 'the expiration of the period in which the alien is permitted to seek review of such order' by the BIA." *Id.* (quoting 8 U.S.C. § 1101(a)(47)(B)(i) & (ii) ). Therefore, when the BIA affirmed the IJ's finding of removability and reversed the IJ's grants of asylum and the waiver, that amounted to a final order of removal because it "left in place" the IJ's order that Petitioner was removable, and Petitioner's opportunity to seek review of that order had

passed. *See id.* at 614; *see also Perkovic v. INS,* 33 F.3d 615, 619 (6th Cir. 1994) ("We are aware of no authority for the proposition that a Board order rejecting an asylum application is not a final order unless a formal order of deportation has already been issued."). Because Petitioner has clearly petitioned for review of that final order of removal, our jurisdiction is not affected by Petitioner's failure to attach the IJ's June 12 order to his petition.

## B.

[4] [5] [6] Petitioner challenges the BIA's denial of his claim for asylum. Asylum is a discretionary form of relief: the asylum statute provides that "the Attorney General *may* grant asylum to an alien" who meets certain eligibility requirements. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). Thus, even if an alien is otherwise eligible, the Attorney General still has discretion to grant or deny asylum. *See Cardoza-Fonseca,* 480 U.S. at 428 n.5, 107 S.Ct. 1207. When the BIA has exercised this discretion to deny asylum, our review is statutorily circumscribed: we may reverse only if **718 the denial was "manifestly contrary to the law and an abuse of discretion."[5] *See* 8 U.S.C. § 1252(b)(4)(D); *see also id.* § 1252(a)(2)(B)(ii); *Marouf v. Lynch,* 811 F.3d 174, 181 (6th Cir. 2016).

[7] Here, the BIA abused its discretion because it unreasonably applied its own precedential legal decisions that govern how the Board may exercise that discretion. The Board's analysis identified only one factor counting against Petitioner: his intentional failure to disclose that his passport was obtained in a non-traditional manner. On the opposite side of the balance, the Board identified several positive factors: Petitioner's wife is a U.S. citizen and he has a close relationship with his in-laws, also U.S. citizens; he has no criminal history; he volunteers; he is highly educated; and he performs skilled labor in the technology field. The Board's analysis thus boils down to the conclusion that Petitioner's failure to disclose the uncertain origins of his passport on its own outweighed the litany of factors cutting in his favor.

[8] This runs afoul of the BIA's precedential decision in *Matter of Pula,* 19 I. & N. Dec. 467 (BIA 1987). There, the BIA concluded that "the totality of the circumstances ... should be examined in determining whether a favorable exercise of discretion is warranted," and in particular that

an alien's circumvention of proper immigration procedures could not be a sole dispositive factor against the alien's claim, and "should not be considered in such a way that the practical effect is to deny relief in virtually all cases." 🚩 *Id.* at 473; *see also* 📘 *Kouljinski v. Keisler*, 505 F.3d 534, 542 (6th Cir. 2007). Although such circumvention may be taken into account as a "serious adverse factor," it must be considered as just one factor in the "totality of the circumstances." 🚩 *Pula*, 19 I. & N. Dec. at 473. In other words, although the BIA may consider an alien's failure to comply with established immigration procedures, it may not do so to the practical exclusion of all other factors. Here, Petitioner certainly should have been more forthcoming with immigration officials. But under *Pula*, the Board's analysis may not begin and end with his failure to follow proper immigration procedures. *See* 📘 *Zuh v. Mukasey*, 547 F.3d 504, 511 n.4 (4th Cir. 2008) (citing *Pula* and noting that "the presence of immigration law violations" is a relevant factor, but "the BIA has cautioned against affording it too much weight"). [6]

BIA precedent also holds that "[t]he danger of persecution will outweigh all but the most egregious adverse factors." 📘 *Matter of Kasinga*, 21 I. & N. Dec. 357, 367 (BIA 1996); *see also* 📘 *Kouljinski*, 505 F.3d at 542. In affirming the IJ's grant of withholding in this case, the BIA upheld the IJ's conclusion that Petitioner had shown "a clear probability that his life or freedom will be threatened on account of his Sunni religion if returned to Syria." Because the "clear probability" standard requires a showing that harm is "more likely than not" to result from removal, *Kamar v. Sessions*, 875 F.3d 811, 817 (6th Cir. 2017) (quoting *Stevic*, 467 U.S. at 429–30, 104 S.Ct. 2489), the BIA acknowledged that it is more likely than not that Petitioner would face harm due to his religion if **\*719** returned to Syria. According to its own precedent, this should "outweigh all but the most egregious adverse factors." *See* 📘 *Kasinga*, 21 I. & N. Dec. at 367. To the contrary, however, the Board determined that the "clear probability" that Petitioner would suffer persecution was outweighed simply by his failure to disclose that his passport was not obtained in the usual manner. This cannot be reasonably termed the "most egregious" of adverse factors. In this respect, too, the BIA unreasonably applied its own binding precedent.

In a similar vein, BIA precedent dictates that, because Petitioner made misrepresentations to circumvent

orderly refugee procedures, "the seriousness of the [misrepresentations] should be considered." 🚩 *Pula*, 19 I. & N. Dec. at 474. The BIA's opinion does not show that it evaluated Petitioner's misrepresentations on a sliding scale of seriousness. The Board noted only that Petitioner remained "willfully blind" to the passport's origins and that he intentionally failed to disclose this fact to immigration officials. This does not appear to be an overly serious misrepresentation. Indeed, the IJ found that Petitioner's misrepresentations were not "particularly egregious," given that the passport appeared valid and there was "little if any" reason for him to believe it was stolen. If the BIA disagreed and believed this was in fact a serious kind of fraud, it should have said so and explained why. The BIA's apparent failure to consider the relative seriousness of Petitioner's fraud is another way in which the Board unreasonably applied its precedent to this case.

The BIA's unreasonable application of these precedential legal decisions was an abuse of discretion. By regulation, the BIA must follow its own precedents unless they are modified or overruled. 🚩 8 C.F.R. § 1003.1(g). Although the BIA is entitled to some leeway in interpreting the meaning of its own precedents, the BIA here did not reasonably apply its precedents in considering whether to grant or deny asylum.

Moreover, this is not the type of case where asylum is typically denied. Although not a hard-and-fast rule, we have previously observed that "[t]he grounds upon which asylum can be discretionarily denied to an otherwise-eligible applicant appear in practice to be limited to cases of 'egregious conduct by the applicant,' such as criminal convictions or fraud." 📘 *Marouf*, 811 F.3d at 180 (quoting 📘 *Zuh*, 547 F.3d at 507). For instance, in 📘 *Kouljinski*, we held that the IJ "did not abuse his discretion ... by basing his discretionary denial of asylum on Kouljinski's three drunk-driving convictions." 📘 505 F.3d at 543. But here, Petitioner has no criminal convictions, and although he certainly made misrepresentations by failing to disclose his passport's murky origins, the IJ did not find that these misrepresentations amounted to fraud. Furthermore, as the Fourth Circuit has noted in a similar case, it is quite uncommon to deny asylum as a matter of discretion when withholding of removal has been granted. 📘 *Zuh*, 547 F.3d at 507–08.

## C.

**[9]** Apart from the BIA's discretionary denial, the BIA determined that Petitioner was not eligible for asylum because he was firmly resettled in Yemen. *See* 8 U.S.C. § 1158(b) (2)(A)(vi); 8 C.F.R. § 1208.15. "A finding of 'firm resettlement' is a factual determination that we review under the deferential substantial evidence standard." *Hanna v. Holder*, 740 F.3d 379, 386 (6th Cir. 2014) (quoting *Maharaj v. Gonzales*, 450 F.3d 961, 967 (9th Cir. 2006) (en banc) ). On appeal, the Government does not defend the Board's conclusion. Rather, in the event that we find that the Board abused its discretion in discretionarily denying **\*720** Petitioner asylum, the Government urges us to remand the case to allow the Board to "clarify the standard it used in making its firm resettlement determination."

The Board appears to have applied the proper framework for evaluating the firm-resettlement question, and the Government does not explain how the Board's statement of the governing law was improper or "unclear." We deem the Government's failure to respond to Petitioner's argument that the Board erred in finding him firmly resettled in Yemen to be a concession that the Board's decision was not supported by "substantial evidence." *See id.*; *Puckett v. Lexington-Fayette Urban County Gov't*, 833 F.3d 590, 611 (6th Cir. 2016) ("The failure to present an argument in an appellate brief waives appellate review." (quoting *Middlebrook v. City of Bartlett*, 103 F. App'x 560, 562 (6th Cir. 2004) ) ). Accordingly, with respect to Petitioner's asylum claim, the BIA's sole task on remand is to exercise its discretion in accordance with its governing precedent.

## D.

Petitioner also challenges the BIA's denial of a waiver under 8 U.S.C. § 1227(a)(1)(H). The BIA denied him a waiver for two independent reasons. First, the Board concluded that he did not meet the statutory eligibility requirements. Second, the Board determined that Petitioner did not merit a favorable exercise of discretion. In order to prevail, Petitioner must show that both of these conclusions were incorrect. We will address both issues in turn.

## 1.

**[10]** We will initially consider whether there is a basis for the BIA to revisit its discretionary denial of a § 1227(a) (1)(H) waiver. That analysis requires us to determine first whether we have jurisdiction to review the Board's decision. Congress has stripped our jurisdiction to review the Attorney General's decision to deny a waiver under § 1227(a)(1) (H) in a statutory provision that precludes judicial review of decisions explicitly within the Attorney General's discretion. This provision states that "no court shall have jurisdiction to review any ... decision or action of the Attorney General ... the authority for which is specified under this subchapter to be in the discretion of the Attorney General." 8 U.S.C. § 1252(a)(2)(B)(ii). Petitioner does not argue that § 1227(a) (1)(H) is a form of nondiscretionary relief, nor could he: § 1227(a)(1)(H) says that, if various eligibility conditions are met, an alien's inadmissibility "may, in the discretion of the Attorney General be waived." Therefore, as a general rule, we lack jurisdiction to review the discretionary component of the BIA's denial of a § 1227(a)(1)(H) waiver. *Singh*, 451 F.3d at 410-11.

But Petitioner argues that an exception applies in this case that provides jurisdiction. He bases his argument on 8 U.S.C. § 1252(a)(2)(D), which preserves review for "constitutional claims and questions of law" that arise during the BIA's exercise of its discretionary authority. *See* *Ghazali v. Holder*, 585 F.3d 289, 291 (6th Cir. 2009) (holding that a petition that raised a question of law came within § 1252(a)(2)(D), which this court characterized as "a statutory exception to the jurisdiction-stripping provision"). Petitioner casts his petition as presenting a question of law, noting that, by regulation, the BIA may not engage in de novo review of an IJ's findings of fact, but instead may set aside those findings only if clearly erroneous. 8 C.F.R. § 1003.1(d)(3)(i).

The BIA accurately stated in Petitioner's case that its review of the IJ's factual findings was governed by the clear-error standard. But Petitioner contends that the BIA actually based its decision on different **\*721** facts than those found by the IJ without holding that any of the IJ's factual findings were clearly erroneous. He therefore argues that we have

jurisdiction under 🚩 § 1252(a)(2)(D) to review whether the Board violated 8 C.F.R. § 1003(d)(3)(i) by improperly engaging in de novo factfinding.

[11] Although some circuits have interpreted 🚩 § 1252(a)(2)(D) to allow for review of "mixed questions of fact and law," *see* 🚩 *Ramadan v. Gonzales*, 479 F.3d 646, 648 (9th Cir. 2007) (per curiam); *see also* 🚩 *Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 329–30 & n.7 (2d Cir. 2006), this court has rejected those broad interpretations of the provision, 🚩 *Khozhaynova v. Holder*, 641 F.3d 187, 192 (6th Cir. 2011). This court has nevertheless found that 🚩 § 1252(a)(2)(D) provides jurisdiction to review whether the BIA has complied with 🚩 8 C.F.R. § 1003.1(d)(3)(i). 🚩 *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006).

Noting that "BIA review under an incorrect standard of review implicates [petitioners'] due process rights," this court held in 🚩 *Tran* that it had jurisdiction under 🚩 § 1252(a) (2)(D) to review whether the Board violated 🚩 8 C.F.R. § 1003.1(d)(3)(i) by applying the wrong standard of review in denying relief under the Convention Against Torture (CAT). 🚩 *Id.* at 943–44. In that case, the Board never stated the standard of review that it was applying. 🚩 *Id.* at 943. The court therefore examined the Board's presentation of the facts, but was also unable to ascertain the standard of review that the Board implicitly applied. 🚩 *Id.* at 944. Accordingly, the court remanded the case to the Board for reconsideration of the CAT claim under the proper standard of review. 🚩 *Id.*

🚩 *Tran* demonstrates that whether the BIA employed the correct standard of review is among the "constitutional claims and questions of law" that 🚩 § 1252(a)(2)(D) excludes from the INA's jurisdiction-stripping provision. Although the Board here, unlike in 🚩 *Tran*, stated the proper standard of review that it purportedly applied, that is a distinction without difference. The invocation of the correct standard of review does not diminish the due-process injury caused when the Board in fact applies an improper standard of review. *See* 🚩 *id.* This court has thus cited 🚩 *Tran* for the proposition that "[q]uestions of law include ... whether the BIA employed the correct standard of review and burden of proof," without

indicating that such review is limited to confirming that the Board stated the proper standard. 🚩 *Mendoza-Rodriguez v. Holder*, 564 F. App'x 222, 224 (6th Cir. 2014). Accordingly, based on 🚩 *Tran* and *Mendoza-Rodriguez*, we conclude that 🚩 § 1252(a)(2)(D) provides jurisdiction for this court to confirm that the Board actually applied the standard of review that it announced in its decision.

This holding is in accord with comparable decisions from our sister courts. *See, e.g.*, 🚩 *Kaplun v. Att'y Gen. of U.S.*, 602 F.3d 260, 272–73 (3d Cir. 2010) (remanding a BIA decision denying CAT relief because, "even though the BIA purported 'not [to] find facts [itself,]' ... it appears that the BIA reexamined the record and conducted *de novo* factfinding" (alterations in original) (quoting 🚩 *Matter of V-K-*, 24 I. & N. Dec. 500, 502 (BIA 2008) ) ); 🚩 *Kabba v. Mukasey*, 530 F.3d 1239, 1246, 1249 (10th Cir. 2008) (remanding a BIA decision denying withholding of removal and other relief because, "[a]lthough the BIA's opinion set forth the correct standard of review ..., it instead engaged in its own fact finding in violation of 🚩 § 1003.1(d)(3)(i)").

[12] Having concluded that we possess jurisdiction to determine whether the BIA applied the proper standard of review, we will next examine whether the Board in fact applied the clear-error standard to the IJ's factfinding in Petitioner's case. Petitioner **\*722** identifies four categories of facts in the BIA's decision that he contends contradict the IJ's factfinding despite no clear-error analysis. We will consider each in turn.

First, Petitioner argues that the BIA engaged in de novo factfinding by stating that Petitioner "intentionally withheld" from authorities that he had "obtained [his passport] in a non-traditional manner" and "remained willfully blind as to its origins." The IJ did find that Petitioner "attempt[ed] to remain willfully blind to the passport application process" and "knew that the document was obtained in a non-traditional (if not improper) manner." But the IJ also found that Petitioner "believed [that the passport] was being acquired in the usual manner for a Syrian citizen opposed to the government and a member of a family living in exile," and that he had "little if any reason ... to suspect that [the passport] was a 'stolen blank' document." Without engaging in clear-error analysis, the Board failed to mention these critical facts that greatly temper the IJ's findings about Petitioner's willful blindness to the passport's origins.

[13] [14] Moreover, the IJ never found that Petitioner had "intentionally withheld" his knowledge of the non-traditional manner in which his passport was acquired. Aliens are removable under 🔖 8 U.S.C. § 1182(a)(6)(C)(i) for either (1) fraud, or (2) a willful misrepresentation of a material fact committed during admission into the United States. Fraud requires proof of an intent to deceive. *Parlak v. Holder,* 578 F.3d 457, 463 (6th Cir. 2009). But a willful misrepresentation of a material fact requires proof only that (1) the alien had " 'knowledge of the falsity' of facts presented to an immigration officer," and (2) the "fact was material." *Bazzi v. Holder,* 746 F.3d 640, 645 (6th Cir. 2013) (quoting 🔖 *Parlak,* 578 F.3d at 463–64). The IJ held that Petitioner committed a willful misrepresentation of a material fact because he knew and failed to disclose that his passport had been acquired by non-traditional means, which was a material omission because its disclosure would have prompted more careful scrutiny of his passport. But because Petitioner had "little if any reason ... to suspect that [the passport] was a 'stolen blank' document" and believed that it had been "acquired in the usual manner for a Syrian citizen opposed to the government and a member of a family living in exile," the IJ did not find that Petitioner's actions constituted fraud.

Second, Petitioner contends that the BIA conducted its own factfinding by faulting Petitioner for failing, along with his father, to "explain[ ] how the passport was actually obtained," despite the supposed possibility that the "passport may have been trafficked by terrorists." The IJ was highly critical of the Government's invocation of ISIL during the proceedings before him. Although Petitioner's passport contained a serial number that falls within a range of passports that the International Police Organization (INTERPOL) reports were stolen by ISIL and another terrorist organization, the IJ dismissed "the Government's allusions that [Petitioner] may have some connection to [ISIL]" as an "unsubstantiated suspicion of national security implications."

The BIA's resuscitation of fears concerning Petitioner's connections to ISIL runs contrary to the IJ's findings. Although the Board cabined its discussion of ISIL to a suggestion of a nexus between the passport and the terrorist organization (rather than Petitioner himself and ISIL), it held this fact against Petitioner when exercising its discretion to deny him a § 1227(a)(1)(H) waiver. There was no reason for the Board to hold the passport's potential connection to terrorist activity against Petitioner if it was not also implying

*723 that Petitioner himself posed a national-security risk to the United States, a conclusion that the IJ pointedly rejected.

Third, Petitioner faults the BIA for finding that he "does not know whether his father obtained the passport through bribery or other improper means" and that he never "got clarification from his father[,] ... remain[ing] willfully blind in this regard." To the contrary, the IJ did not find that Petitioner remained willfully blind to the passport's origins after he became aware that he possessed a fraudulent passport. Petitioner indeed confronted his father about the passport during a return trip to Turkey after his second interview with immigration authorities. The IJ found, however, that Petitioner's father "did not and would not reveal ... how the passport had actually been obtained" for fear that "doing so would endanger the individual in Syria who helped him obtain" the document. Based on the IJ's findings, Petitioner cannot be said to have remained willfully blind to the passport's origins because he attempted to secure more information once immigration authorities determined that the passport was fraudulent.

[15] Finally, Petitioner argues that the BIA, based on its own factfinding, discounted a critical factor that should have weighed in favor of granting him a 🔖 § 1227(a)(1)(H) waiver —his wife's status as a U.S. citizen. Although an alien's "family ties in the United States" should weigh in favor of granting a waiver, *Tijam,* 22 I. &. N. Dec. at 412, the Board failed to credit Petitioner's marriage as a factor in his favor because Alhaider "indicated that she would accompany [Petitioner] if he were removed from the United States." This treatment of the issue omits key contextual details from the IJ's decision. The IJ emphasized that Alhaider, who he deemed credible, was willing to accompany Petitioner *despite* fearing "that she would also be targeted [in Syria] due to [her] shared family history [with Petitioner], her and her father's political activism, and her status as a United States citizen." Surely the United States does not demand that its citizens risk death in order to preserve the family unit. By neglecting to mention this important detail, the Board exercised its discretion based on a highly distorted recasting of the IJ's findings.

Judging from the multiple instances in which the BIA's decision finds facts contrary to the IJ, omits key facts that temper other findings, or discusses facts in a misleading light, the Board violated 🔖 8 C.F.R. § 1003.1(d)(3)(i) by engaging in de novo factfinding. We must therefore determine whether Petitioner is statutorily eligible for a 🔖 § 1227(a)(1)

(H) waiver. If he is, then we must remand the case to the BIA to exercise its discretion once again, but based on all of the facts as found by the IJ, unless those facts are found by the BIA to be clearly erroneous.

**2.**

**[16]  [17]**  Having concluded that the BIA must exercise its discretionary authority once again if Petitioner is statutorily eligible for a § 1227(a)(1)(H) waiver, we will now address Petitioner's statutory eligibility. First, we note that we have jurisdiction to review whether an individual is statutorily eligible for a waiver under § 1227(a)(1)(H), pursuant to 8 U.S.C. § 1252(a)(2)(D). *See Singh*, 451 F.3d at 410 (holding that the court had jurisdiction to review the statutory eligibility elements of § 1227(a)(1)(H) ). Although waivers under this section are ultimately left to the discretion of the Attorney General, "we may review the non-discretionary decisions that underlie determinations that are ultimately discretionary." *Billeke-Tolosa v. Ashcroft*, 385 F.3d 708, 711 (6th Cir. 2004). The jurisdiction-stripping provision in 8 U.S.C. § 1252(a)(2)(B)(ii) does "not extend to non-discretionary decisions upon which the discretionary decision is predicated." *Id.*

**\*724**  Section 1227(a)(1)(H) provides, in relevant part, as follows:

The provisions of this paragraph relating to the removal of aliens within the United States on the ground that they were inadmissible at the time of admission as aliens described in section 1182(a)(6)(C)(i) of this title [which renders inadmissible aliens who procure a visa or admission by "fraud or willfully misrepresenting a material fact"], whether willful or innocent, may, in the discretion of the Attorney General, be waived for any alien ... who—

(i)(I) is the spouse, parent, son, or daughter, of a citizen of the United States or of an alien lawfully admitted to the United States for permanent residence; and

(II) was in possession of an immigrant visa or equivalent document and was otherwise admissible to the United States at the time of such admission except for those grounds of inadmissibility specified under

paragraphs (5)(A) and (7)(A) of section 1182(a) of this title which were a direct result of that fraud or misrepresentation.

....

A waiver of removal for fraud or misrepresentation granted under this subparagraph shall also operate to waive removal based on the grounds of inadmissibility directly resulting from such fraud or misrepresentation.

**[18]**  Thus, to be eligible for the waiver, Petitioner must (among other things) have been "in possession of an immigrant visa or equivalent document" at the time of his admission into the U.S. Here, there are two separate "admissions" that are relevant. First, Petitioner was admitted to the U.S. when he initially came to the country in January 2014. Second, another admission occurred when he adjusted his status to that of a lawful permanent resident. *See Matter of Agour*, 26 I. & N. Dec. 566, 570 (BIA 2015).

**[19]**  The BIA concluded that Petitioner's inadmissibility at the time of his first admission could not be waived because, at the time of that admission, he was not in possession of an immigrant visa or equivalent document. The BIA reasoned that, when he was first admitted, Petitioner did not have an "immigrant visa" because he had only a fiancé visa, and aliens seeking to enter the country on fiancé visas are classified as nonimmigrants. *See* 8 U.S.C. § 1101(a)(15)(K). Nor, in the BIA's view, was Petitioner's fiancé visa an "equivalent document" to an immigrant visa because an alien who enters on a fiancé visa is not automatically entitled to adjust his status, but rather may apply to do so only after taking the additional step of marrying the U.S. citizen petitioner within ninety days of his entry. *See generally Choin v. Mukasey*, 537 F.3d 1116, 1118 (9th Cir. 2008).

**[20]**  Petitioner concedes that fiancé visas are not immigrant visas, but argues that they are an equivalent because the BIA treats fiancé visa holders like immigrant visa holders in some ways. The BIA is correct, however, that the additional hurdles a fiancé visa holder must clear in order to become a lawful permanent resident distinguish fiancé visas from immigrant visas. Thus, as the Ninth Circuit has held, *see Caddali v. INS*, 975 F.2d 1428, 1431 (9th Cir. 1992), a fiancé visa is not "equivalent" to an immigrant visa. Moreover, even if this question of statutory interpretation were fairly debatable, we would still give *Chevron* deference to the BIA's reasonable answer. *See Reyes v. Lynch*, 835 F.3d 556, 559 (6th Cir. 2016).

Petitioner (and the IJ) advance a more complicated alternative argument: they say that, even if Petitioner did not actually have an immigrant visa or equivalent document upon his *first* admission into the country, he nonetheless met all the requirements **\*725** for the waiver at the time of his *second* admission (i.e., his adjustment of status). It is true that he is deemed to have had an immigrant visa at the time of the second admission under the rule of *Agour,* 26 I. & N. Dec. at 570. Petitioner argues that, having qualified for the waiver at the time of his second admission, he can use the waiver to cure his inadmissibility at the time of his first admission as well.

To make this argument, Petitioner relies on our decision in *Avila-Anguiano v. Holder,* 689 F.3d 566 (6th Cir. 2012). But that case is different, as the BIA explicitly reasoned. Avila-Anguiano, a Mexican national, attempted to enter the United States on two separate occasions. When he first arrived at the border in 1991, he falsely claimed to be a U.S. citizen. Border inspectors, however, did not fall for the ruse, and he was not only refused entry, but also convicted of making a false claim of citizenship. *Id.* at 567. When he entered the United States again in 1993, he was granted a visa after failing to disclose his earlier conviction. *Id.* at 567–68. The Government later sought to remove him, contending that he was inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i) because he had procured a visa "by fraud or willfully misrepresenting a material fact." The Government pointed to two different misrepresentations that it claimed rendered Avila-Anguiano removable: (1) his 1991 false claim of citizenship, and (2) his 1993 failure to disclose his conviction for the prior fraud. *Id.* at 568. Avila-Anguiano sought a waiver of removability under § 1227(a)(1)(H). The Government conceded that he met the statutory requirements for the waiver with respect to the 1993 misrepresentation, but argued that the earlier 1991 misrepresentation could not be waived because § 1227(a)(1)(H) permitted waiver of misrepresentations made only at the time of the alien's admission to the United States, and he had not been admitted in 1991. *Id.*

We held that the waiver could cure all the misrepresentations that rendered Avila-Anguiano inadmissible at the time of his sole admission in 1993, including his earlier 1991 misrepresentation. *Id.* at 569. Crucially, however, we

focused only on whether he met the eligibility requirements for the waiver with respect to his single admission in 1993, not whether he also met those requirements at the time he made his first misrepresentation in 1991. *See id.* at 568. The situation in *Avila-Anguiano* is distinguishable from the facts of this case because here Petitioner was admitted to the United States twice. Thus, although we held in *Avila-Anguiano* that two misrepresentations may be waived when they each render an alien inadmissible for purposes of the *same admission,* that case did not answer the question posed here: whether a waiver of inadmissibility with respect to one admission may be used to cure inadmissibility at the time of *another admission.*

The BIA answered this question in the negative, concluding that "the same fraud or misrepresentation may be waived for two separate 'admissions' only if 'the other requirements of [ § 1227(a)(1)(H) ] are met' " (quoting *Avila-Anguiano,* 689 F.3d at 569). So far as it goes, we find the Board's analysis sound. Whereas the Government contended in *Avila-Anguiano* that the petitioner was ineligible for a waiver based on a single admission and two connected misrepresentations, here, the Government argues that two separate admissions (Petitioner's initial entry into the country and his adjustment of status) preclude him from obtaining a waiver because of misrepresentations that he made during each admission. Although Petitioner is eligible for a waiver of removal based on his adjustment of status, argues the Government, he is ineligible for a second standalone waiver of removal based on his **\*726** initial entry into the United States because he lacked "an immigrant visa or equivalent document" at that time. *See* 8 U.S.C. § 1227(a)(1)(H)(i)(II).

The BIA's analysis, however, omits any discussion of the final paragraph of § 1227(a)(1)(H), which we conclude is the dispositive component of the provision in this case. Petitioner persuasively argues that the final paragraph prevents his misrepresentation about his passport's origins during his initial entry from rendering him ineligible for a waiver. That is because a petitioner who is eligible for a waiver of removal is "*also*" eligible for a "waive[r] [of] removal based on the grounds of inadmissibility directly resulting from [the relevant] fraud or misrepresentation." *Id.* (emphasis added). By its express terms, § 1227(a)(1)(H) waives the grounds of inadmissibility contained in 8 U.S.C. § 1182(a)

(6)(C)(i), which specifies that an alien who "has procured" admission through misrepresentation is inadmissible. The provision thus contemplates circumstances where an already admitted alien seeks to cure a prior misrepresentation.

 [21]  Assuming that the BIA were to grant Petitioner a waiver of removal based on his adjustment of status, the sole remaining basis for his removal would be his misrepresentation about the origins of his passport during his initial entry. In other words, he would continue to be removable only because of the legal consequences that "directly result[ ]" from the sole misrepresentation at issue in this case—Petitioner's failure to notify the authorities that his passport had been acquired in a non-traditional manner. *See id.* A waiver of removal based on Petitioner's adjustment of status could therefore, on a derivative basis, also waive his removal based on the earlier misrepresentation.

*See Vasquez v. Holder*, 602 F.3d 1003, 1015 (9th Cir. 2010) (holding that an alien's commission of marriage fraud in order to gain entry to the United States "result[ed] directly" in the termination of her conditional permanent residency and that her removal based on the termination of her conditional permanent residency was therefore also eligible for a waiver). Accordingly, we hold that Petitioner is statutorily eligible for a § 1227(a)(1)(H) waiver, and we will remand the case to the BIA to once again consider whether Petitioner is entitled to such a waiver as a matter of its discretion.

In doing so, we acknowledge that this is a somewhat paradoxical outcome. Had the Government initiated removal proceedings against Petitioner after he had entered the United States, but before he had adjusted his status, he would not have been eligible for a § 1227(a)(1)(H) waiver because he lacked an "immigrant visa or equivalent document" during the only admission that would have been at issue under those circumstances. *See* 8 U.S.C. § 1227(a)(1)(H)(i) (II). But because the Government did not initiate removal proceedings until after Petitioner had adjusted his status, his misrepresentation during his initial entry is not a nonwaivable barrier to the relief that he seeks. *See id.* § 1227(a)(1) (H). This paradox, however, is a product of the statute's plain text, which binds both the BIA and this court and drives the outcome of this case.

### III.

The petition for review is granted and the case is remanded to the BIA for further proceedings consistent with this opinion.

### DISSENT

ROGERS, Circuit Judge, concurring in part and dissenting in part.

I join parts I, II.A, and II.B of the court's opinion, but I respectfully dissent with respect to Parts II.C and II.D.

We have no business exercising jurisdiction to review the discretionary aspect of **\*727** the BIA's denial of the § 1227(a)(1)(H) waiver, where Congress has clearly denied us such jurisdiction. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). In particular, Congress has flatly denied us jurisdiction to review the BIA's denial, in its discretion, of a waiver under § 1227(a)(1)(H), except for constitutional claims and questions of law. *See id.* § 1252(a)(2)(D). Calling the BIA's fact-bound exercise of statutory discretion a legal issue makes the question-of-law exception swallow the rule and amounts to an unwarranted grab of decisional authority. The legal question in this case, according to Petitioner, is whether the Board complied with its regulatory obligation to review the IJ's fact-finding for clear error. Only in the most technical sense can this be called a question of law. The same technical sense would make a legal issue of virtually any issue on judicial review of agency action, and thereby effectively nullify in its entirety the preclusion of judicial review that Congress enacted.

Instead, the exception in § 1252(a)(2)(D) "only permits judicial review of purely legal questions, such as constitutional and statutory construction questions." *Khozhaynova v. Holder*, 641 F.3d 187, 192 (6th Cir. 2011) (citing, and rejecting, Ninth and Second Circuit precedents). Since we first reached this interpretation of § 1252(a)(2) (D) in 2006 in *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006), we have reaffirmed it on many occasions. We explained this history in *Rais v. Holder*:

Relying on the Second Circuit's opinion in *Chen v. U.S. Dep't of Justice*, 434 F.3d 144 (2d Cir. 2006), this

court defined 🚩 § 1252(a)(2)(D) to include "constitutional and statutory-construction questions, not discretionary or factual questions" in 📑 *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 ( [6th Cir.] 2006). Thus, a petitioner cannot create jurisdiction by alleging "nothing more than a challenge to the [BIA's] discretionary and fact-finding exercises cloaked as a question of law[.]" *Abdul v. Holder*, 326 F. App'x 344, 347 (6th Cir. 2009).... After this court decided 📑 *Almuhtaseb*, the Second Circuit revised 📑 *Chen* to expand its definition of "question of law." 📑 *Chen v. U.S. Dep't of Justice* (*Chen II*), 471 F.3d 315, 326–27, 329 (2d Cir. 2006).... Since 📑 *Chen II*, a circuit split has emerged over whether that term includes only issues of statutory construction and interpretation or also includes mixed questions of law and fact.... *This court, however, expressly has declined to expand its definition of "question of law" to include mixed questions of law and fact.* 📑 *Khozhaynova v. Holder*, 641 F.3d 187, 192 (6th Cir. 2011) ("We continue to maintain a more narrow interpretation of our jurisdiction ... and limit review to constitutional or statutory interpretation claims.").

📑 768 F.3d 453, 462 n.17 (6th Cir. 2014) (emphasis added, brackets in original). As 📑 *Rais* indicates, in 📑 *Khozhaynova*, 641 F.3d at 192, we rejected a request to apply Ninth and Second Circuit precedents that were inconsistent with 📑 *Almuhtaseb*, and instead reaffirmed 📑 *Almuhtaseb*'s narrower interpretation of 🚩 § 1252(a)(2) (D). *See also Vincent v. Holder*, 632 F.3d 351, 353 (6th Cir. 2011); *Pepaj v. Mukasey*, 509 F.3d 725, 728 (6th Cir. 2007). Petitioner's attempt to characterize his challenge to the BIA's recitation of the facts as a question of law thus runs headlong into a solid wall of circuit precedent. [1] His claim—that the **\*728** Board reviewed the IJ's factual findings de novo rather than for clear error—does not ask this court to construe a statute, or even the relevant regulation. Rather, it asks us to review the Board's *application* of 📑 8 C.F.R. § 1003.1(d) (3)(i) and determine whether the BIA's factual statements differed from those made by the IJ. This we cannot do, for it presents precisely the kind of mixed question of law and fact that we have repeatedly said falls outside of 📑 § 1252(a)(2) (D)'s definition of "questions of law."

In an analogous case, we held that the exception allowing review for legal issues does not apply when the purported "legal issue" is whether one set of facts is similar to or different from the facts in agency precedent. 📑 *Etienne v. Holder*, 659 F.3d 513, 518 (6th Cir. 2011). As we said in 📑 *Etienne*, "this court lacks jurisdiction over claims that can be evaluated only by engaging in head-to-head comparisons between the facts of the petitioner's case and those of precedential decisions." 📑 *Id.* In 📑 *Etienne*, the petitioner argued that the BIA had a legal obligation to comply with its own precedent requiring it to consider certain hardship factors in their totality, and that we had jurisdiction to consider whether the BIA had done so. 📑 *Id.* at 517. We held that we lacked jurisdiction, however, because Etienne's challenge amounted to a request to second-guess the BIA's weighing of the factors in her particular case. 📑 *Id.* at 518. This, we concluded, was beyond the limited scope of the exception for legal questions because if the exception were so expanded, it would effectively negate Congress's command that such factual and discretionary decisions—as opposed to constitutional or legal decisions—may not be judicially reviewed.

Permitting judicial review here would open virtually all BIA factual determinations to judicial review, contrary to the clear intent of Congress. As we explained in 📑 *Almuhtaseb*, "the purpose of [ 🚩 § 1252(a)(2)(D) ] is to permit judicial review over those issues that were historically reviewable on habeas—constitutional and statutory-construction questions, not discretionary or factual questions." 📑 453 F.3d at 748 (emphasis deleted) (quoting 📑 *Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 153 (2d Cir. 2006) ). While any question of whether an agency determination is supported by substantial evidence or constitutes an abuse of discretion may be in some sense "legal," Congress obviously intended a narrower meaning to the term. Letting every BIA discretionary decision be reviewed as "legal" under the guise of reviewing the BIA's application of its scope of review to an IJ's factual or discretionary determinations would gut Congress's attempt in 🚩 § 1252(a)(2)(D) to limit judicial review over claims that Congress has placed within the Attorney General's discretion.

Moreover, this is not a case in which the BIA has purported to apply an incorrect legal standard. In 📑 *Etienne* we distinguished cases in which there was jurisdiction to review

AR.04849

whether the BIA had identified the correct legal rule at all. *See* 659 F.3d at 517–18 (discussing 🔺*Figueroa v. Mukasey*, 543 F.3d 487, 496 (9th Cir. 2008), and *Perez-Roblero v. Holder*, 431 F. App'x 461, 466–68 (6th Cir. 2011)). In particular, Petitioner's case is not like *Tran v. Gonzales*, 447 F.3d 937, 943–44 (6th Cir. 2006), in which we concluded that a reviewable question of law was presented when "[t]he BIA's decision never stated the standard of review that it employed ... and its treatment of Tran's claims d[id] not make it evident to th[e] Court what standard of review the BIA employed." Here, as in *Etienne* (and in contrast to *Tran*), there is no doubt that the BIA identified the right legal standard. The BIA plainly stated the correct legal rule when it said in its decision that it would "review findings of fact determined **\*729** by the Immigration Judge, including credibility findings, under a 'clearly erroneous' standard. 8 C.F.R. § 1001.1(d)(3)(i)." Petitioner is therefore left to argue that the Board erred in its application of this rule to the facts found by the IJ. But just as there was not jurisdiction in *Etienne* to review the Board's weighing of the factors in Etienne's case, so too here there is not jurisdiction to examine

how the Board applied the correctly identified legal rule to the facts found by the IJ.

For these reasons, we lack jurisdiction to review the discretionary component of the BIA's denial of the waiver. I need not reach the question of Petitioner's statutory eligibility for the waiver.

Finally, with respect to Part II.C, we should not play "Gotcha!" when the Government has agreed to a remand to an agency to reconsider a decision using the correct standard. The Government's brief before this court contends that a remand is necessary to "clarify the standard [the Board] used in making its firm resettlement determination," and we may accept such a government concession to permit further consideration by the agency below. *See Citizens Against the Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 416–17 (6th Cir. 2004). The Board on remand should be permitted to consider the firm-resettlement issue using the proper standard, and nothing precludes us from allowing the Board to do so.

**All Citations**

897 F.3d 707

---

### Footnotes

\*    Judge Rogers would grant rehearing for the reasons stated in his dissent.

1    A fiancé visa, also known as a K-1 visa, is a nonimmigrant visa "granted to an alien solely 'to conclude a valid marriage with [the alien's U.S. citizen fiancé(e) ] within ninety days after admission.' " *Birdsong v. Holder*, 641 F.3d 957, 957 (8th Cir. 2011) (alteration in original) (quoting 8 U.S.C. § 1101(a)(15)(K)(i) ). An alien admitted on a fiancé visa must marry his U.S. citizen fiancée within 90 days or else be subject to removal. 8 U.S.C. § 1184(d)(1).

2    Although the Notice to Appear does not spell this out, presumably Petitioner was charged with being inadmissible as a nonimmigrant under § 1182(a)(7)(B) based on his initial entry into the United States (at which time he had only a fiancé visa, which is classified as a nonimmigrant visa), and he was charged with being inadmissible as an immigrant under § 1182(a)(7)(A) based on his later adjustment of status (at which time he became an immigrant).

3    Board Member Michael J. Creppy dissented, but only as to the Board's conclusion that Petitioner was not statutorily eligible for the § 1227(a)(1)(H) waiver.

4    The term "order of removal" is an updated version of the older term "order of deportation." *See Calcano-Martinez v. INS*, 533 U.S. 348, 350 n.1, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001); *Warner v. Ashcroft*, 381 F.3d 534, 537 (6th Cir. 2004) (per curiam) (noting that, under the Illegal Immigration Reform and Immigrant

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Responsibility Act of 1996, "an order of removal includes 'an order of exclusion and deportation or an order of deportation' " (quoting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 309(d)(2), 110 Stat. 3009–627) ).

5    This is an explicit exception to the general rule that matters within the Attorney General's discretion are unreviewable. *See* ⚑ 8 U.S.C. § 1252(a)(2)(B)(ii).

6    It is true that the Board also noted that "there is evidence in the record indicating that the respondent's passport may have been trafficked by terrorists," and that, in light of this possibility, it was "significant" that "the respondent and his father never explained how the passport was actually obtained." But the Board did not explain how this is significant. The sins of the father are not normally attributed to the son.

1    Because of this binding circuit precedent, it is beside the point that some other circuits have held that the issue of the BIA's compliance with ⚑ 8 C.F.R. § 1003.1(d)(3)(i) is a question of law. *See, e.g., Zumel v. Lynch*, 803 F.3d 463, 476 (9th Cir. 2015); *Kabba v. Mukasey*, 530 F.3d 1239, 1245–46 (10th Cir. 2008).

---

**End of Document**                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Overruled by Matter of Thomas, U.S.Atty.Gen., October 25, 2019

23 I. & N. Dec. 849 (BIA), Interim Decision 3522, 2005 WL 3105750

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

IN RE OSCAR COTA-VARGAS, RESPONDENT

File A37 803 631 - San Diego

Decided November 18, 2005

**1  \*849  A trial court's decision to modify or reduce an alien's criminal sentence nunc pro tunc is entitled to full faith and credit by the Immigration Judges and the Board of Immigration Appeals, and such a modified or reduced sentence is recognized as valid for purposes of the immigration law without regard to the trial court's reasons for effecting the modification or reduction.

*Matter of Song*, 23 I&N Dec. 173 (BIA 2001), clarified; *Matter of Pickering*, 23 I&N Dec. 621 (BIA 2003), distinguished.

FOR RESPONDENT:
James R. Patterson, Esquire,
San Diego, California

FOR THE DEPARTMENT OF HOMELAND SECURITY:
Michael P. Rummel,
Assistant Chief Counsel

BEFORE: Board Panel: COLE and FILPPU, Board Members. Dissenting Opinion: PAULEY, Board Member.

COLE, Board Member:

The respondent appeals from an Immigration Judge's March 19, 2004, decision denying his motion to terminate the removal proceedings and ordering him removed from the United States as an alien convicted of an aggravated felony. The appeal will be sustained and the removal proceedings will be terminated.

I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Mexico and a lawful permanent resident of the United States. On August 8, 2001, he was convicted in the Superior Court of San Diego County, California, of the offense of receiving stolen property in violation of section 496(a) of the California Penal Code. In an order dated December 20, 2001, he was sentenced to 3 years of formal  *850  probation and a 365-day term of probationary detention in county jail. [1]  On the basis of this conviction, the Department of Homeland Security (the "DHS," formerly the Immigration and Naturalization Service), initiated removal proceedings, charging the respondent with deportability under section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii) (2000), as an alien convicted of an aggravated felony, to wit, a "theft offense (including receipt of stolen property) … for which the term of imprisonment [was] at least one year." Section 101(a)(43)(G) of the Act, 8 U.S.C. § 1101(a)(43)(G) (2000).

In May 2003, the respondent filed a motion with the San Diego Superior Court requesting reduction or elimination of the 365-day jail sentence that had been imposed as a condition of his probation. In making this request, the respondent made the following declaration through counsel:

This relief is sought so that Mr. Cota can seek a waiver of deportation from the Immigration and Naturalization Service. Cota is a long-time lawful resident alien.… [Mr. Cota's immigration attorney] has advised defense counsel that Cota may be eligible for a waiver of deportation if the stayed custody in this case is reduced to 364 days or less. For I.N.S. purposes, it apparently is irrelevant whether the imposed custody is stayed or actually served. What *is* important is whether the term imposed is *less than* 365 days.

 **2  The respondent did not, and does not now, allege that the original 365-day sentence was substantively unlawful or procedurally defective.

On June 3, 2003, the Superior Court accommodated the respondent's request and, without comment, reduced his period of probationary detention from 365 days to 240 days, nunc pro tunc to December 20, 2001, the date of his original sentencing. Based on this modification of his sentence, the respondent filed a motion to terminate the removal proceedings, in which he argued, by reference to our decision in *Matter of Song*, 23 I&N Dec. 173 (BIA 2001), that he was not deportable as an alien convicted of an aggravated felony, because his receipt of stolen property offense was no longer one "for which the term of imprisonment [was] at least one year" within the meaning of section 101(a)(43)(G) of the Act.

The Immigration Judge denied the motion, concluding that our subsequent precedent in *Matter of Pickering*, 23 I&N Dec. 621 (BIA 2003), had materially modified *Matter of Song* as it related to sentence modifications undertaken solely to affect the immigration consequences of the underlying conviction. *851  The respondent appeals, arguing that *Matter of Pickering* is inapposite in the sentence modification context and that a modified criminal sentence must be given effect in immigration proceedings, regardless of the reasons for the modification.

## II. ISSUE

The respondent's appeal presents the question whether the California trial court's order reducing his sentence from 365 days to 240 days, nunc pro tunc, precludes the underlying conviction for receipt of stolen property from qualifying as an aggravated felony conviction, where the evidence reflects that the sentence was reduced solely for the purpose of affecting the immigration consequences of the conviction, and not to correct any substantive or procedural defect in the original judgment.

## III. ANALYSIS

In *Matter of Pickering, supra*, we held that a criminal conviction that was vacated for reasons solely related to rehabilitation or immigration hardships would continue to operate as a "conviction" within the meaning of section 101(a)(48)(A) of the Act, 8 U.S.C. § 1101(a)(48)(A) (2000). Section 101(a)(48)(A) provides as follows:

The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where —

(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

 **3  Although we acknowledged in *Matter of Pickering, supra*, at 622, that the language of section 101(a)(48)(A) did not "directly address 'quashing' of convictions," that language did at least reflect a clear desire on the part of Congress to extend the meaning of the term "conviction" to encompass many judgments that would not otherwise be considered valid convictions under the law of the rendering jurisdiction because of rehabilitative or other policy considerations. In light of the language and legislative purpose of the "conviction" definition and a series of decisions of the Federal courts of appeals applying that definition in analogous circumstances, we concluded in *Pickering* that "there is a significant distinction between convictions

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

vacated on the basis of a procedural or substantive defect in the underlying proceedings and those vacated because of post-conviction events, such as rehabilitation or immigration hardships." *Id.* at 624.

**\*852** While the language and purpose of section 101(a)(48)(A) of the Act provided support for the interpretive approach we adopted in *Pickering* as it related to the existence of a "conviction," the Immigration Judge's application of the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act. Section 101(a)(48)(B) of the Act provides as follows:

Any reference to a term of imprisonment of a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

This language plainly instructs us to disregard the term of imprisonment that was actually imposed upon an alien in favor of the term of imprisonment that was ordered, but not necessarily imposed, by the trial court. *Matter of Batista-Hernandez*, 21 I&N Dec. 955 (BIA 1997); *Matter of S-S-*, 21 I&N Dec. 900 (BIA 1997). However, we see nothing in the language or stated purpose of section 101(a)(48)(B) that would authorize us to equate a sentence that has been modified or vacated by a court ab initio with one that has merely been suspended. Indeed, the importance of this distinction was implicitly acknowledged by our precedent decision in *Matter of Song, supra*, which was issued well after the promulgation of section 101(a)(48)(B) and which gave effect to a sentence modification under circumstances similar to those presented here. *See also Garcia-Lopez v. Ashcroft*, 334 F.3d 840, 846 (9th Cir. 2003) (citing *Matter of Song* with approval).

**\*\*4** The dissent advances a number of cogent *policy* reasons for refusing to countenance certain sentencing modifications in the immigration context, but we cannot advance policy goals that are not moored to the language of the Act. If it is the will of Congress that modified sentences should be given no effect for immigration purposes, Congress can amend the statute to so provide. But we should not force section 101(a)(48)(B) of the Act to serve a purpose that cannot be fairly reconciled with its language.

Accordingly, in the absence of a congressional directive to the contrary, we will follow *Matter of Song, supra*, and give full and faith and credit to the decision of California Superior Court modifying the respondent's sentence, nunc pro tunc, from 365 days to 240 days. Because the respondent does not presently stand convicted of an offense for which the term of imprisonment was at least 1 year, his offense is not an aggravated felony.[2] *Cf. Matter of Batista-Hernandez, supra*, at 963. No other charges of deportability are **\*853** currently pending against the respondent. Therefore, the respondent's appeal will be sustained, and the removal proceedings will be terminated.

**ORDER:** The appeal is sustained.

**FURTHER ORDER:** The removal proceedings are terminated.

*DISSENTING OPINION*: Roger A. Pauley, Board Member

I respectfully dissent.

# I. BACKGROUND

The respondent in this matter was lawfully convicted in California of the offense of receipt of stolen property and was duly sentenced to a 365-day jail term by the trial court. Less than 2 months after the initiation of these removal proceedings, however, the respondent requested that the trial court modify his sentence, nunc pro tunc, solely for the purpose of allowing him to escape the immigration consequences of his conviction. The trial court granted the respondent's request without comment, and the Immigration Judge concluded, with ample justification, that such State action, undertaken solely for the purpose of undermining

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

enforcement of the Federal immigration laws, cannot be given effect in removal proceedings without compromising the integrity of the Immigration and Nationality Act.

The majority has arrived at a different conclusion based on its seriously misguided belief that the Immigration Judge's decision was based on "policy goals that are not moored to the language of the Act." *Matter of Cota*, 23 I&N Dec. 849, 852 (BIA 2005). On the contrary, I conclude that the Immigration Judge's decision was bottomed on—and compelled by—the Attorney General's responsibility, delegated to the Immigration Judges and the Board of Immigration Appeals, to implement the Immigration and Nationality Act as Congress intends.

## II. ANALYSIS

**\*\*5** In *Matter of Pickering*, 23 I&N Dec. 621 (BIA 2003), we dealt with a situation in which a court vacated an alien's controlled substances conviction pursuant to a motion in which the alien requested the vacatur for reasons solely related to the conviction's adverse effect on his eligibility for relief from removal. Citing several decisions of the Federal courts of appeals reaching like conclusions, we held that a conviction vacated, not on the merits but solely to achieve an immigration result, remained a "conviction" under section 101(a)(48)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(48)(A) (2000), despite its vacatur. Underlying the *Pickering* **\*854** decision is the recognition that immigration enforcement is an area of Federal responsibility, in which Congress has sought to achieve consistency through the enactment of uniform criteria for removal (and relief from removal) that often necessitate an inquiry as to whether an alien has been convicted of a particular type of offense. To permit the courts, whether State or Federal, to affect the immigration consequences of a conviction by vacating it, where such action is done purely and entirely for the purpose of avoiding those consequences, would undermine the intent of Congress.

The Immigration Judge concluded that the rationale of *Matter of Pickering* should apply to sentence modifications, as well as to vacated convictions. I agree. Had the respondent's motion sought the vacatur of his conviction rather than a reduction of his sentence, and had the motion been granted, the case would clearly be governed by *Matter of Pickering*, because the motion was predicated only on immigration consequences. I see no justification for a different result simply because the motion involved a request for sentence reduction.

The majority makes much of the fact that *Pickering* related to the existence of a "conviction," as defined by section 101(a)(48)(A) of the Act, while the present case relates to the term of a sentence under section 101(a)(48)(B), thereby implying that our rationale in *Pickering* somehow flowed from language that is present in the "conviction" definition but absent from the "term of sentence" definition. That is an untenable interpretation of *Matter of Pickering*. Nothing in the language of section 101(a)(48)(A) addresses convictions that have been vacated solely for immigration purposes, nor does the validity of *Pickering* depend on the existence of the conviction definition, as the majority here implies. [3]

**\*\*6** *Matter of Pickering*, like the Immigration Judge's decision in this case, was grounded in the Attorney General's duty to maintain the integrity of the Federal immigration system against flagrant attempts by judges to undercut Congress's purpose by erasing or modifying an alien's conviction solely to achieve an immigration result. Indeed, I note that for like reasons, in the Federal system and perhaps some State systems, it appears to be *illegal* to reduce a sentence for the purpose of affecting immigration consequences. *See United States v. Maung*, 320 F.3d 1305, 1309 (11th Cir. 2003) (citing **\*855** *United States v. Aleskerova*, 300 F.3d 286 (2d Cir. 2002)); *see also United States v. Hernandez*, 325 F.3d 811 (7th Cir. 2003).

Of course, *Pickering* does not depend for its validity on a finding that the vacatur was unlawful. On the contrary, in *Pickering* itself, we assumed that the alien's conviction had been vacated properly for purposes of the law of the rendering jurisdiction (and I would assume here, as well, that the respondent's sentence reduction was valid under California law), but we declined to recognize the purported elimination of the conviction for immigration purposes, because we found that Congress did not contemplate that courts should be able to manipulate immigration consequences through the device of erasing a conviction where the "erasure" was not done for a legal reason, but only to affect the immigration results.

AR.04855

These same considerations logically apply to sentence modifications.[4] In this regard, the following observations in *United States v. Maung, supra,* are pertinent:

Congress has made a deliberate policy judgment about the consequences a criminal conviction should have upon an alien's ability to remain in this country, and it has set the scale accordingly. In setting the scale, Congress has used as measurements the type of crime and the length of sentence imposed. Courts cannot reset the scale. They cannot fudge the result of the measurement Congress has mandated through the use of departures designed to reduce (or enlarge) a sentence for the sole purpose of affecting its immigration consequences....

The Second Circuit viewed things the same way we do, explaining in the *Aleskerova* case that when a district court departs downward for the purpose of taking a case out of the aggravated felony category, it "disrupt [s] the balance struck by the legislative branch ...."

*Id.* at 1309 (quoting *United States v. Aleskerova, supra,* at 301) (citations omitted).

 **\*\*7 \*856** For these reasons, I conclude that where a sentence is shown to have been reduced solely for immigration purposes, such reduction should not be recognized and the original sentence should remain in effect for immigration purposes. While no individual provision of the Act instructs how we should treat sentence modifications designed *solely,* as in this case, to ameliorate immigration-law consequences upon an alien, the text, structure, and history of the Act suggest that we should treat such modifications as unavailing.[5]

I believe there is implicit or inherent authority in an adjudicative agency created to interpret a statute to disregard efforts intended solely to undermine the legislative intent and thereby interfere with its very reason for being. Moreover, if a specific delegation of authority to the Board is thought necessary to effect this commonsense result, it is found in the regulations. Thus, 8 C.F.R. § 1003.1(d)(1) (2005) directs in no uncertain terms that the "Board shall resolve the questions before it in a manner that is timely, impartial, and *consistent with the Act.*" (Emphasis added.) It should go without saying that construing the Act to give effect to a court's order meant only to avoid an immigration result otherwise dictated by the Act is not a resolution "consistent" with the Act.

In concluding that sentence modifications should be treated differently from outright vacaturs of convictions, the majority relies on *Matter of Song,* 23 I&N Dec. 173 (BIA 2001), declaring that in that case we gave effect to a sentence modification under circumstances similar to those presented here. In *Matter of Song,* the alien was originally sentenced to 1 year in prison for a theft offense but succeeded in getting his sentence reduced to 360 days while the Immigration Judge's decision was pending on appeal. We granted the respondent's motion to terminate proceedings, finding that he was no longer convicted of an aggravated felony under section 101(a)(43)(G) of the Act (categorizing theft offenses as aggravated felonies only if the sentence imposed is at least 1 year).

 **\*857** The Board's brief opinion stated only (insofar as pertinent here) that it found our prior decision in *Matter of Roldan,* 22 I&N Dec. 512 (BIA 1999), inapplicable because that case dealt with the definition of a "conviction" in section 101(a)(48)(A) of the Act, and not, as in the case at hand, with the definition of the phrase "term of imprisonment" in section 101(a)(48)(B). We did not otherwise purport to deal with a claim that the sentence had been reduced solely for immigration purposes. Nor does the cryptic reference to *Matter of Roldan, supra,* imply otherwise, as that decision addressed the quite different issue whether a conviction vacated under a state *rehabilitative* statute remained a "conviction" for immigration purposes.[6] In short, nothing in *Matter of Song, supra,* indicates that the Board was confronted with (or resolved) the issue presented here: whether a sentence reduction found to have been made solely to alleviate the immigration consequences of the underlying conviction should be recognized for immigration purposes.

 **\*\*8** Thus, in refusing to give effect to sentence modifications undertaken solely to ameliorate the immigration consequences of a conviction, we would not undermine the general rule in *Matter of Song, supra,* that sentence reductions are ordinarily valid for immigration (as for other) purposes.[7] As we emphasized in *Matter of Pickering, supra,* the same is true for court actions

vacating convictions, which are generally effective for immigration purposes under *Matter of Rodriguez-Ruiz*, 22 I&N Dec. 1378 (BIA 2000). *See Matter of Pickering, supra*, at 624 (noting that "there is a significant distinction between convictions vacated on the basis of a procedural or substantive defect in the underlying proceedings and those vacated because of post-conviction events, such as rehabilitation or immigration hardships"). I would hold only that the limited exception provided in *Pickering* for court actions vacating convictions undertaken for the *sole purpose* of affecting immigration results applies also in the sphere of sentence modifications.

## *858  III. CONCLUSION

It is unfortunate that the majority regard the Board as impotent to preserve the immigration consequences that flow from an alien's conviction and sentence against the subsequent efforts of State judges when they manipulate a previously imposed sentence at the behest of an alien *solely* to ameliorate or eliminate such adverse immigration consequences. While such judges undoubtedly act with benign intentions and in the belief that they are doing justice, in fact, by substituting their judgment for the judgment of Congress as to whether an alien should be deported or rendered ineligible for certain relief from deportation, their actions detract from the evenhanded application of the law and thereby arguably create injustice. As the Attorney General's "delegates," *see* 8 C.F.R. § 1003.1(a)(1), enjoined to decide cases consistent with the Act, we fail to fulfill our responsibility by honoring such judicial orders that thwart the clear intention of Congress.

The respondent does not dispute that the offense of receipt of stolen property in violation of section 496(a) of the California Penal Code constitutes a "receipt of stolen property" offense within the meaning of section 101(a)(43)(G) of the Act. *Matter of Bahta*, 22 I&N Dec. 1381, 1391 (BIA 2000). Thus, because I conclude that the respondent's conviction for that offense resulted in a sentence to a term of imprisonment of at least 1 year, I agree with the Immigration Judge that he is deportable (and ineligible for relief) as an alien convicted of an aggravated felony.

## Footnotes

1    This period of probationary detention was stayed, subject to the respondent's completion of 20 days of work in a Public Service Program.

2    In view of our finding that the respondent's sentence was for less than a year, it is unnecessary for us to reach the question whether the record meets the tests set out in *Penuliar v. Ashcroft*, 395 F.3d 1037 (9th Cir. 2005), for determining whether this California conviction has been shown to be for a "theft" offense.

3    *Pickering* quoted the definition of a "conviction" but rightly observed that it did not "directly address" the quashing of convictions. *Matter of Pickering, supra*, at 622. Our opinion went on to rely on decisions of courts of appeals that likewise did not peg the result to a particular provision of the Act but rather noted that giving effect to convictions vacated solely to achieve an immigration result would thwart the intent of Congress. *See, e.g., Renteria-Gonzalez v. INS*, 322 F.3d 804, 812 (5th Cir. 2002) ("When a court vacates an otherwise final and valid conviction on equitable grounds merely to avoid the immigration-law consequences of the conviction, it usurps Congress's plenary power….").

4    I realize that, in imposing sentence initially, a court might rely only on immigration consequences to refrain from imposing a particular term of imprisonment, and if the relevant immigration threshold was not reached, we could not say that the alien had been sentenced to the requisite term. But the same could be said of a court that acquitted or refused to convict an alien solely due to the perception that the potential immigration consequences were too severe. Thus, this potential ability of judges intentionally and irreversibly to affect immigration consequences is not a reason for not applying the teachings of *Pickering* in the sentencing milieu. We cannot prevent such untoward *original* outcomes; but the bare possibility of their occurrence (which I do not identify as having been or as likely to become a significant problem) is not a ground for discarding the teachings of *Matter of Pickering* and for failing to recognize an original

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

conviction or sentence that has a disqualifying or adverse effect on an alien, when such has been vacated or amended solely to bar or ameliorate the application of the immigration laws.

5    As for history, it is worth noting that Congress experimented for many years with the so-called judicial recommendation against deportation ("JRAD") of former section 241(b) of the Act, 8 U.S.C. § 1251(b) (1988), which allowed Federal and State courts, in imposing sentence or within 30 days thereafter, to determine that an alien convicted of a crime or crimes that rendered the alien deportable should nevertheless not be deported. Although couched in the phraseology of a "recommendation," the statutory "recommendation" was binding. *See Renteria-Gonzalez v. Ashcroft, supra*, at 808 n.2. The JRAD statute was abolished in 1990. *See* Immigration Act of 1990, Pub. L. No. 101-649, §§ 505, 602(b)(1), 104 Stat. 4978, 5050, 5081. Having determined 15 years ago to divest judges of their power, at sentencing, to second-guess and overrule the provisions of the Act relating to the removability of aliens convicted of crimes, it is logical to conclude that Congress would likewise not deem it consistent with later and current versions of the Act to give effect to individual judges' tampering with previously imposed sentences solely to render an alien immune from removal.

6    Indeed, it is not apparent how *Matter of Roldan* was even relevant to the issue before the Board in *Matter of Song*, since reducing a sentence by a few days, even if done for other than penologically sound reasons or to affect an immigration result, is not effected pursuant to a rehabilitative program or statute and is not properly characterized as serving rehabilitative ends.

7    There are, of course, many valid nonimmigration-related reasons for reducing a sentence, such as to correct an illegal sentence, to recognize a defendant's post-sentence assistance to law enforcement or other meritorious behavior, or to harmonize a sentence with that imposed on other similarly situated offenders, and nothing in this opinion is to be taken as indicating my view that such sentencing actions would be without effect for immigration purposes.

23 I. & N. Dec. 849 (BIA), Interim Decision 3522, 2005 WL 3105750

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Ortiz-Preciado v. Mukasey, 9th Cir., September 23, 2008

22 I. & N. Dec. 7 (BIA), Interim Decision 3342, 1998 WL 151434

United States Department of Justice

Board of Immigration Appeals

IN RE C-V-T-, Respondent

Not provided

Decided February 12, 1998

**\*\*1  \*7** (1) To be statutorily eligible for cancellation of removal under section 240A(a) of the Immigration and Nationality Act (to be codified at 8 U.S.C. § 1229b(a)), an alien must demonstrate that he or she has been lawfully admitted for permanent residence for not less than 5 years, has resided in the United States continuously for 7 years after having been admitted in any status, and has not been convicted of an aggravated felony.

(2) In addition to satisfying the three statutory eligibility requirements, an applicant for relief under section 240A(a) of the Act must establish that he or she warrants such relief as a matter of discretion.

(3) The general standards developed in Matter of Marin, 16 I&N Dec. 581, 584-85 (BIA 1978), for the exercise of discretion under section 212(c) of the Act, 8 U.S.C. § 1182(c)(1994), which was the predecessor provision to section 240A(a), are applicable to the exercise of discretion under section 240A(a).

Pro se

for the Immigration and Naturalization Service
Robert F. Peck
Assistant District Counsel

Before: Board Panel: HOLMES, FILPPU, and GUENDELSBERGER, Board Members.

HOLMES, Board Member:

In a decision dated July 25, 1997, an Immigration Judge found the respondent removable as charged under section 237(a)(2)(B)(i) of the Immigration and Nationality Act (to be codified at 8 U.S.C. § 1227(a)(2)(B)(i)), denied his applications for cancellation of removal, asylum, and withholding of deportation, [1] and ordered him removed from **\*8** the United States to Vietnam. The respondent has appealed. The appeal will be sustained and the respondent will be granted cancellation of removal under section 240A(a) of the Act (to be codified at 8 U.S.C. § 1229b(a)) [2]

The respondent is a 42-year-old native and citizen of Vietnam who entered the United States as a refugee on March 1, 1983. He became a lawful permanent resident of this country in 1991. On June 11, 1997, he was convicted in a superior court for the State of Alaska of the offense of misconduct involving a controlled substance, fourth degree, in violation of section 11.71.040 of the Alaska Statutes. He was sentenced to 90 days in jail. Although the record of conviction does not reflect the pertinent subsection of the Alaska Statutes under which he was convicted, an Immigration and Naturalization Service document refers to the offense as "Misconduct involving a Controlled Substance in the Fourth Degree (possession of cocaine)," and the Service attorney advised the Immigration Judge that the respondent had pled guilty to "simple possession of drugs."

Removal proceedings were instituted in June 1997. The respondent has not contested that he is removable under section 237(a)(2)(B)(i) of the Act, as an alien convicted of a controlled substance violation. Instead, he applied for cancellation of removal under section 240A(a) of the Act. The Immigration Judge found the respondent statutorily eligible for such relief. Then, noting the absence of pertinent decisions since the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), regarding this new section of law, the Immigration Judge stated that she would look for guidance regarding the exercise of discretion to the existing case law concerning applications for suspension of deportation under section 244(a) of the Act, 8 U.S.C. § 1254(a)(1994), and for relief under section 212(c) of the Act, 8 U.S.C. § 1182(c)(1994), which were the predecessors to sections 240A(a) and (b) prior to the enactment of the IIRIRA. The Immigration Judge ultimately concluded that the respondent had not adequately demonstrated that he warranted a favorable exercise of discretion and denied his application for cancellation of removal. The respondent appeals from the Immigration Judge's decision in this regard.

## I. ISSUES

This case presents two principal issues arising from the respondent's application for cancellation of removal under section 240A(a) of the Act. The first is what standards for the exercise of discretion should be used in **\*9** considering an application for cancellation of removal under section 240A(a) of the Act. Secondly, under the appropriate standards, has this respondent adequately demonstrated that he warrants, as a matter of discretion, cancellation of removal under this section of law?

## II. FACTS

**\*\*2** The respondent, the sole witness in this case, was found by the Immigration Judge to have testified credibly. He related that he was born in Saigon, Vietnam, in 1956. His elderly parents and some of his brothers still reside in that country; however, he has not been able to contact his parents by mail for over 10 years and his many attempts to have friends look for them have been unsuccessful. The respondent was in the Vietnamese Marine Corps from 1973 until 1975, when it was disbanded after "the Viet Cong took over." He testified that he returned to Saigon in 1975, was imprisoned from 1975 to 1976 because of his military service, and was forced to do heavy labor for the Communists with insufficient food. From 1976 to 1981, he was allowed to work as a mechanic on the condition that he voluntarily work for the Communists for 1 month a year. He testified that the Communists did not like those who had previously been in the Vietnamese Marine Corps. In 1981, he got into a disagreement with the police who claimed he had violated a curfew even though he had reached home 15 minutes ahead of time. He fought with the police and was charged with assaulting a police officer. He was detained for a week, held separately from others, fed once a day, yelled at because of his prior military service, and told that he had been a mercenary for the United States forces. After his parents posted a bond, he and a younger brother fled Vietnam.

The respondent was admitted to the United States as a refugee in March 1983, and became a lawful permanent resident of this country in 1991. He worked in Los Angeles until 1991, when he moved to Anchorage. His brother remained in California and he has not been in touch with him for many years. The respondent studied English and speaks and reads well enough to keep a job, read papers, and watch English-language television. He works as a mechanic and drives a taxi during the summer in Alaska, and he fishes or fixes boat engines in the winter. While in Alaska, he has volunteered to pick up trash and help clean the streets in the city for several days each summer when asked to help.

The respondent also testified regarding the circumstances of his conviction. He related that on his way home from work one day, a close friend told him that someone wanted to buy cocaine. The respondent did not have any, but knew someone who previously told him that he had cocaine available. The respondent called this person to come over and, acting as the middleman, he took the money from his friend and then gave him the drugs. He testified that he had not been paid and that he had only helped his friend **\*10** once. After being arrested, the respondent disclosed the drug supplier's name to the police and assisted with his arrest.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The Service introduced into evidence a June 6, 1997, letter written to them by the Alaska assistant district attorney who had prosecuted the respondent and the other Vietnamese individual involved in the drug offense. The prosecutor wrote that he was "taking the unusual step of recommending that the INS allow both men to remain in the United States." He noted in part that "(w)hile these men certainly deserved their convictions, their conduct can only be described as purely amateur, perhaps the most amateur drug delivery case I have encountered."

### III. CRITERIA FOR RELIEF UNDER SECTION 240A(a) OF THE ACT

**\*\*3** Section 240A(a) of the Act provides that the Attorney General may cancel the removal of an alien who is inadmissible or deportable if the alien:

(1) has been an alien lawfully admitted for permanent residence for not less than 5 years,

(2) has resided in the United States continuously for 7 years after having been admitted in any status, and

(3) has not been convicted of any aggravated felony.

Section 240A(a) of the Act.

Thus, section 240A(a) sets forth three eligibility requirements, but does not provide for the indiscriminate cancellation of removal for those who demonstrate statutory eligibility for this relief. Rather, the Attorney General, or her delegate, is vested with the discretion to determine whether or not such cancellation is warranted. Section 240A(a) does not provide express direction as to how this discretion is to be exercised. Thus, the initial question before us is what standards should be applied in exercising this discretionary authority.

The Immigration Judge concluded, in part, that she should look to the case law that had been developed regarding the exercise of discretion under section 212(c) of the Act, the predecessor provision to section 240A(a) of the Act. The Service agreed with the Immigration Judge's conclusion in this regard. We also find that the application of the general standards developed in the context of relief under the former section 212(c) of the Act are appropriate standards for the exercise of discretion under section 240A(a) of the Act. [3]

**\*11** The Board has long noted both the undesirability and "the difficulty, if not impossibility, of defining any standard in discretionary matters . . . which may be applied in a stereotyped manner." Matter of L-, 3 I&N Dec. 767, 770 (BIA, A.G. 1949). Accordingly, there is no inflexible standard for determining who should be granted discretionary relief, and each case must be judged on its own merits. Id. Within this context, the Board ruled in Matter of Marin, 16 I&N Dec. 581, 584-85 (BIA 1978), that in exercising discretion under section 212(c) of the Act, an Immigration Judge, upon review of the record as a whole, "must balance the adverse factors evidencing the alien's undesirability as a permanent resident with the social and humane considerations presented in his (or her) behalf to determine whether the granting of . . . relief appears in the best interest of this country." We find this general standard equally appropriate in considering requests for cancellation of removal under section 240A(a) of the Act.

We also find that the factors we have enunciated as pertinent to the exercise of discretion under section 212(c) are equally relevant to the exercise of discretion under section 240A(a) of the Act. For example, favorable considerations include such factors as family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred at a young age), evidence of hardship to the respondent and his family if deportation occurs, service in this country's armed forces, a history of employment, the existence of property or business ties, evidence of value and service to the community, proof of genuine rehabilitation if a criminal record exists, and other evidence attesting to a respondent's good character. Matter of Marin, supra. Among the factors deemed adverse to an alien are the nature and underlying circumstances of the grounds of exclusion or deportation (now removal) that are at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency, and seriousness, and the presence of other evidence indicative of a respondent's bad character or undesirability as a permanent resident of this country. Id.

AR.04861

**\*\*4** In some cases, the minimum equities required to establish eligibility for relief under section 240A(a) (i.e., residence of at least 7 years and status as a lawful permanent resident for not less than 5 years) may be sufficient in and of themselves to warrant favorable discretionary action. See Matter of Marin, supra, at 585. However, as the negative factors grow more serious, it becomes incumbent upon the alien to introduce additional offsetting **\*12** favorable evidence, which in some cases may have to involve unusual or outstanding equities. Matter of Edwards, 20 I&N Dec. 191, 195-96 (BIA 1990); see also Matter of Arreguin, Interim Decision 3247 (BIA 1995); Matter of Burbano, 20 I&N Dec. 872 (BIA 1994); Matter of Roberts, 20 I&N Dec. 294 (BIA 1991); Matter of Buscemi, 19 I&N Dec. 628 (BIA 1988); Matter of Marin, supra. [4]

With respect to the issue of rehabilitation, a respondent who has a criminal record will ordinarily be required to present evidence of rehabilitation before relief is granted as a matter of discretion. See Matter of Marin, supra, at 588; see also Matter of Buscemi, supra. However, applications involving convicted aliens must be evaluated on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion. Matter of Edwards, supra. We have held that a showing of rehabilitation is not an absolute prerequisite in every case involving an alien with a criminal record. See Matter of Buscemi, supra, at 196.

As was the case in the context of adjudicating waivers of inadmissibility under section 212(c) of the Act, it remains incumbent on the Immigration Judge to clearly enunciate the basis for granting or denying a request for cancellation of removal under section 240A(a). Furthermore, it is still the alien who bears the burden of demonstrating that his or her application for relief merits favorable consideration. See Blackwood v. INS, 803 F.2d 1165 (11th Cir. 1986); Matter of Marin, supra.

Finally, we note in this regard that the Immigration Judge deemed it appropriate to cite to prior case law that was "applicable as to discretion under section 244(a)(1) of the Act," the predecessor provision to section 240A(b)(1) of the Act, enacted by the IIRIRA. However, we have found "it prudent to avoid cross-application, as between different types of relief from deportation, of particular principles or standards for the exercise of discretion." Matter of Marin, supra, at 586. Thus, as a general rule, we find it best not to apply case law regarding applications for suspension of deportation under section 244(a) of the Act when considering a request for cancellation of removal under section 240A(a) of the Act.

**\*13** IV. RESPONDENT'S APPLICATION FOR SECTION 240A(a) RELIEF

It is uncontested that the respondent in this case is statutorily eligible for cancellation of removal under section 240A(a) of the Act. The determinative issue is whether he has demonstrated that he warrants such relief in the exercise of discretion. In this regard, the Immigration Judge stated that the main issues were whether "the respondent's lengthy status in this country and having a brother in California outweighs his criminal record" and whether the respondent's "ties to the community and his work record merits a discretionary grant of cancellation of removal." The Immigration Judge found the respondent had been a credible witness, that he had been in the United States for many years, and that he had worked hard in this country. She recognized that he did not want to return to Vietnam, but noted that he still spoke Vietnamese fluently, that the majority of his family remained there, that there was no showing that he could not return to his prior work in that country, that he had fled from his homeland for personal reasons "as a fugitive from justice," and that there was "no evidence" that he had been persecuted in any way in Vietnam. The Immigration Judge ultimately concluded that the "equities presented by the respondent do not represent the kind of equities required to outweigh the considerable evidence of his undesirability as a permanent resident."

**\*\*5** We initially note that the respondent's conviction for drug possession, albeit a serious matter, apparently is the entirety of his criminal record in this country. He was sentenced to 90 days in jail. The conviction was not for an aggravated felony, or the respondent would be statutorily ineligible for relief. And, in the context of the respondent's application for asylum, the Service advised the Immigration Judge that the respondent's conviction was not for a "particularly serious crime." See section 208(b) (2)(A)(ii) of the Act (to be codified at 8 U.S.C. § 1158(b)(2)(A)(ii)). The respondent, who was found to be a credible witness, related that this had been his only involvement with drugs, that it was not something that he had done for money, and that he had assisted the police in the arrest of the individual who had supplied the cocaine. The rather unusual recommendation on the respondent's behalf by the assistant district attorney who prosecuted him indicates that he was cooperative with the police and

AR.04862

that he was an "amateur" rather than an experienced criminal. While any drug offense that can result in an alien's removal is a serious adverse matter, the facts of this case mitigate the seriousness of this respondent's conviction record. [5]

**\*14** Moreover, the respondent has presented significant equities. He is a lawful permanent resident of this country and has resided here for some 15 years, having entered lawfully as a refugee. He has learned English and has evidently been entirely self-supporting. The Immigration Judge commented favorably on his work history, noting that she had little doubt that he had worked hard in this country. And, although it is not of particular significance, the respondent has engaged in some volunteer work in Alaska.

We note that to be eligible for relief under section 240A(a) of the Act, the respondent need not demonstrate that his removal to Vietnam would result in any hardship, nor is such a showing a prerequisite to a favorable exercise of discretion. However, we do consider relevant the facts that he was admitted to the United States as a refugee from Vietnam, that he has been unable to even locate his parents for many years, that he was found to have testified credibly that the problems he had in his native country were due, in part, to his service in the Vietnamese Marine Corps, and that he had been accused of having been a "mercenary" of the United States.

Rehabilitation can be a relevant consideration in the exercise of discretion. See Matter of Arreguin, supra. The respondent served 90 days for his crime and apparently has since been in Immigration and Naturalization Service detention. Confinement can make it difficult to assess rehabilitation, and we do not find sufficient evidence of rehabilitation in this case for it to be weighed as a favorable factor on his behalf. However, the respondent has only been convicted of this one crime, there is no evidence that he has engaged in any other criminal activity in this country, the assistant district attorney who prosecuted him has written on his behalf, he apparently has had no negative history while detained, and on appeal he has expressed remorse for his crime, promising to never again break the law if forgiven. Although the future always involves some uncertainty, the totality of these facts would indicate that the respondent does not pose a serious ongoing threat to our society.

**\*\*6** Considering the totality of the evidence before us, we find that the respondent has adequately demonstrated that he warrants a favorable exercise of discretion and a grant of cancellation of removal under section 240A(a) of the Act. However, we advise the respondent that having once been granted cancellation of removal, he is statutorily ineligible for such relief in the future. See section 240A(c)(6) of the Act. Thus, any further criminal misconduct on his part would likely result in his removal from this country.

**\*15** ORDER: The appeal is sustained and the respondent is granted cancellation of removal pursuant to section 240A(a) of the Immigration and Nationality Act.

### Footnotes

1  The Immigration Judge inadvertently referenced section 243(h) of the Act, 8 U.S.C. § 1253(h)(1994), in her decision. The prior law regarding withholding of deportation under section 243(h) has now been replaced with a restriction on removal in section 241(b)(3) of the Act (to be codified at 8 U.S.C. § 1231(b)(3)). See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208,§ 305(a), 110 Stat. 3009-546, 3009-597 (enacted Sept. 30, 1996) ("IIRIRA").

2  Due to our decision in this case, we need not address the respondent's contentions concerning his request for asylum and restriction on removal.

3  We note that section 212(c) of the Act replaced the seventh proviso to section 3 of the Immigration Act of 1917, ch. 29, 39 Stat. 874 (repealed 1952). See generally Matter of S-, 5 I&N Dec. 116 (BIA 1953). In setting out the standards for

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

the exercise of discretion under section 212(c), the Board looked in turn to case law that had developed regarding the exercise of discretion under the "seventh proviso." See Matter of Marin, 16 I&N Dec. 581, 584-85 (BIA 1978).

4    In the context of the exercise of discretion under section 212(c), we have held that a showing of counterbalancing unusual and outstanding equities may be required because of a single serious criminal offense or a succession of criminal acts. This now may be largely a moot point in view of the expanded "aggravated felony" definition and the ineligibility of anyone convicted of such an offense for relief under section 240A(a). For example, each of the aliens whose cases were before us in Matter of Arreguin, Matter of Burbano, Matter of Roberts, Matter of Buscemi, Matter of Edwards, and Matter of Marin, would be statutorily ineligible for relief under section 240A(a) of the Act, without regard to the issue of discretion. However, we need not resolve this question today.

5    During the course of the proceedings, the Immigration Judge stated to the respondent that she considered as an adverse matter the fact that he had "committed a crime in Vietnam." However, she did not mention this in the decision itself, other than to indicate that the respondent's case presented adverse "factors." Given the respondent's testimony regarding the events in Vietnam and his subsequent admission to this country as a refugee, we do not find the circumstances surrounding his involvement with the police in that country to be clear enough to be weighed as a meaningful adverse consideration in this case.

22 I. & N. Dec. 7 (BIA), Interim Decision 3342, 1998 WL 151434

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Cisneros v. Lynch, 7th Cir., August 25, 2016

23 I. & N. Dec. 373 (U.S.Atty.Gen.), Interim Decision 3472, 2002 WL 968631

U.S. Department of Justice

Office of the Attorney General

IN RE MELANIE BEAUCEJOUR JEAN, RESPONDENT [1]

File A25 452 154

Decided May 2, 2002

**\*\*1  \*373**  (1) The 30-day period set forth in 8 C.F.R. § 3.38(b) (2002) for filing an appeal to the Board of Immigration Appeals is mandatory and jurisdictional, and it begins to run upon the issuance of a final disposition in the case.

(2) The Board of Immigration Appeals' authority under 8 C.F.R. § 3.1(c) (2002) to certify cases to itself in its discretion is limited to exceptional circumstances, and is not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations, where enforcing them might result in hardship.

(3) In evaluating the propriety of granting an otherwise inadmissible alien a discretionary waiver to permit adjustment of status from refugee to lawful permanent resident pursuant to section 209(c) of the Immigration and Nationality Act, 8 U.S.C. § 1159(c) (2000), any humanitarian, family unity preservation, or public interest considerations must be balanced against the seriousness of the criminal offense that rendered the alien inadmissible.

(4) Aliens who have committed violent or dangerous crimes will not be granted a discretionary waiver to permit adjustment of status from refugee to lawful permanent resident pursuant to section 209(c) of the Act except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship. Depending on the gravity of the alien's underlying criminal offense, such a showing of exceptional and extremely unusual hardship might still be insufficient.

(5) Aliens who have committed violent or dangerous crimes will not be granted asylum, even if they are technically eligible for such relief, except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship. Depending on the gravity of the alien's underlying criminal offense, such a showing of exceptional and extremely unusual hardship might still be insufficient.

IN REMOVAL PROCEEDINGS

By previous Order, I directed the Board of Immigration Appeals ("BIA" or "Board") to refer this case to me for review pursuant to  **\*374**  8 C.F.R. § 3.1(h)(1)(i) (2002). [2]  Overruling the decision of an immigration judge, a BIA panel declared that the respondent's conviction for second-degree manslaughter did not render her ineligible for asylum or withholding of removal, and that the likely hardship her family would endure if she were returned to Haiti merited adjusting her status from refugee to lawful permanent resident. For the reasons set forth below, I now reverse the BIA's decision and hold that the interests of the respondent's family and the general public would be ill-served by granting her lawful permanent residency in the United States. I further conclude that the respondent is not entitled to any alternative relief from removal. [3]

I.

**\*\*2** Respondent Melanie Beaucejour Jean is a forty-five-year-old foreign national from Plaisance, Haiti. Accompanied by her husband and five children, she was conditionally admitted into the United States as a refugee in November 1994 pursuant to section 207 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1157 (1994).[4]

In August 1995, the respondent pled guilty in the County Court for Monroe County, New York, to one count of second-degree manslaughter in connection with the March 30, 1995 death of nineteen-month-old R-J-. According to the respondent's signed confession, R-J- had been left in her care that day by the boy's mother - who was also the sister-in-law of the respondent's husband - in an apartment the two families shared in Rochester, New York. Early in the afternoon, the young child fell off a couch in the apartment and began to cry. The respondent reacted by striking the toddler's buttocks two or three times with her open hand in an attempt to quiet him. When this effort proved unsuccessful, she picked the boy up by the armpits and shook him. She then **\*375** hit him two or three times on the top of his head with her fist. Finally, she picked him up again and shook him until he lost consciousness. Upon observing that the child was no longer breathing and that his eyes, although open, had stopped blinking, the respondent placed him on a bed just off the living room. She neither called 911 nor sought any other emergency assistance. When her husband returned to the apartment with the child's mother approximately one hour later, the respondent told them that R-J- had passed out in their absence.

The medical examiner's report described bruises to R-J-'s head, chest, and back; internal hemorrhages of the lungs, pancreas, and diaphragm; and acute subdural and spinal epidural hemorrhages. The report determined that R-J- died from bleeding and swelling inside his skull caused by blunt trauma, and that the death was a homicide.

During her plea colloquy with the Monroe County Court judge, the respondent maintained that she did not attempt to contact emergency personnel after shaking the child into an unconscious state because, in the interim, she was preoccupied with a long-distance telephone conversation and thought the boy was in bed sleeping. She added that phoning emergency officials would have been difficult inasmuch as she does not speak English well and thus may not have been understood.[5] A month after the plea hearing, the court sentenced her to two-to-six years' incarceration.

Following the completion of her state sentence, the respondent requested an adjustment of her status from "refugee" to "lawful permanent resident" pursuant to INA § 209(a), 8 U.S.C. § 1159(a) (1994 & Supp. V 1999). The Immigration and Naturalization Service ("INS") denied this application in July 1999 and commenced formal removal proceedings against her as an inadmissible alien convicted of a crime of moral turpitude.[6] See INA §§ 212(a)(2)(A)(i)(I), 240(a), 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1229a(a) (1994 & Supp. V 1999). Although the respondent did not contest the fact that she **\*376** was inadmissible in light of her manslaughter conviction - indisputably, a crime of moral turpitude - she sought a waiver of inadmissibility under INA § 209(c), citing her fear of persecution upon return to Haiti as well as her desire to keep her family together in the United States. In addition, she requested asylum pursuant to INA § 208, 8 U.S.C. § 1158 (Supp. V 1999), and withholding or deferral of removal pursuant to both INA § 241(b)(3), 8 U.S.C. § 1231(b)(3) (Supp. V 1999), and Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture"), see 8 C.F.R. §§ 208.16-208.18 (2002) (regulations implementing Convention).

**\*\*3** An immigration judge ruled that the respondent's second-degree manslaughter conviction constituted an "aggravated felony" within the meaning of the INA and, on this basis, declared her ineligible for all relief from removal.[7] IJ Oral Decision (Aug. 18, 1999) at 1-2. The respondent appealed to the BIA, which reversed the immigration judge's decision. Relying on its opinion in *Matter of Sweetser*, Interim Decision 3390 (BIA 1999), the Board concluded that the respondent's criminal conviction did not amount to a "crime of violence" - the necessary predicate for classifying the offense as an "aggravated felony" under the facts of this case - "because there was no substantial risk that physical force would be used in the commission of the crime." BIA Decision (Dec. 16, 1999) at 2. The Board then remanded the case back to the immigration judge for the purpose of giving the respondent "an opportunity to apply for any relief from removal for which she may be eligible." *Id.*

**\*377** On remand, the immigration judge conducted several evidentiary hearings and issued two decisions which, in combination, denied all relief requested by the respondent. Addressing the adjustment of status issue, the judge found that a determination regarding the propriety of such a discretionary grant of relief required a balancing of "the adverse factors evidencing [the respondent's] undesirability as a permanent resident [against] the social and humane considerations presented on her behalf." IJ Decision (May 4, 2000) at 3. After weighing these considerations, the judge concluded that there was no sound basis for a grant of lawful permanent residency to the respondent. *Id*. at 3-5.

The immigration judge next held that the respondent had no right to asylum. He noted that not only did the respondent fail to demonstrate an objectively reasonable fear of persecution in Haiti, but the nature of her criminal conviction rendered her ineligible for such relief. *Id*. at 5-10. On the latter point, the judge reasoned that, unlike the Colorado criminally negligent child abuse statute that the BIA examined in *Sweetser*, second-degree manslaughter in New York required an affirmative act on the part of the offender. *Id*. at 8-10. As a result, the offense satisfied the criteria for a "crime of violence," and thus qualified as an "aggravated felony" under the INA. *Id*.

The immigration judge's finding regarding the risk of persecution to the respondent also supported the rejection of her application for withholding of removal under INA § 241. Having determined that the respondent failed to demonstrate the "well-founded fear of persecution" necessary to qualify for asylum, the judge held that the respondent necessarily fell short in her effort to meet the far more demanding "clear probability of persecution" standard required to obtain relief under section 241. *Id*. at 10 (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984)).

**\*\*4** In a separate opinion issued weeks later, the judge denied the respondent's claims for withholding or deferral of removal under the Convention Against Torture as well. He found that the record failed to support the respondent's allegation that those individuals or entities in Haiti who had purportedly attacked her husband and burned her family's home years earlier continued to persecute opponents of the former military regime. *See* IJ Decision (May 25, 2000) at 3. He further noted that there was no credible evidence that such individuals or entities, to the extent they are still engaged in political violence, would find the respondent if she took up residence somewhere other than the village where she had previously lived. *Id*.

**\*378** Following the issuance of these adverse decisions, the respondent pursued a second administrative appeal to the BIA, which once again reversed the immigration judge. In a cursory opinion, the Board chastised the immigration judge for not adhering to its earlier ruling that the respondent's second-degree manslaughter conviction did not represent a "crime of violence." BIA Decision (Mar. 1, 2001) at 1-2. The Board then held that, under its own view of the evidence, the respondent had established her eligibility for a waiver of inadmissibility and an adjustment of status from refugee to lawful permanent resident. *Id*. at 2. Finally, the Board concluded in a single sentence that "the equities," when weighed against the respondent's criminal conviction, warranted the grant of such discretionary relief.[8] *Id*.

II.

Before turning to the merits, I must first examine the INS's contention that the BIA lacked jurisdiction to hear the respondent's post-remand appeal because it was untimely. INS regulations dictate that appeals from the rulings of immigration judges must "be filed directly with the [BIA] within 30 calendar days after the stating of an Immigration Judge's oral decision or the mailing of an Immigration Judge's written decision." 8 C.F.R. § 3.38(b) (2002). The effective date of any such appeal is the day the notice of appeal is received by the Board. *Id*. § 3.38(c). This deadline is mandatory and jurisdictional. *Da Cruz v. INS*, 4 F.3d 721, 722 (9th Cir. 1993).

Counsel for the respondent filed two post-remand notices of appeal with the BIA in this case, responding separately to the immigration judge's two post-remand decisions. The immigration judge's initial decision on remand, which denied the respondent's applications for adjustment of status, asylum, and withholding of removal under the INA, was dated May 4, 2000. It was mailed to the respondent that same day, *see Karimian-Kaklaki v. INS*, 997 F.2d 108, 111 (5th Cir. 1993) (date of INS

transmittal letter accepted as dispositive evidence of the mailing date, absent specific evidence to the contrary), accompanied by a notification form warning that the decision would become final unless an appeal was filed with the BIA "within 30 calendar days of the date of the mailing of this written decision." The immigration judge later issued a second post-remand decision, denying the respondent's remaining claims under the Convention Against Torture, on May 25, 2000. This latter decision was also mailed on the date of its issuance, and contained **\*379** an identical warning that it would become final unless appealed within thirty days.

**\*\*5** The respondent's first notice of appeal, which was filed on June 6, 2000, indicated explicitly that she was appealing from the immigration judge's May 4 ruling. Her second notice of appeal, which was filed on June 28, 2000, stated specifically that she was challenging the immigration judge's May 25 ruling. The INS maintains that both appeals were untimely inasmuch as the first was filed thirty-three days after the first decision, while the second was filed thirty-four days after the second decision. Although I agree with the INS that the respondent failed to preserve her challenge to the immigration judge's adverse decision on the Convention Against Torture claim, I reach this conclusion for different reasons than those advanced by the INS. As for the respondent's appeal of the denial of her other requested relief, I find that her notice was timely.

At the time of the immigration judge's initial post-remand ruling, there was no final disposition in the case. Any appeal at that moment, therefore, would have been interlocutory in nature. Yet interlocutory appeals are discouraged in immigration proceedings, and the BIA properly declines to review non-final decisions of immigration judges except in highly unusual circumstances. *See Matter of Morales*, 21 I&N Dec. 130, 131-32 (BIA 1996) (BIA ordinarily does not consider interlocutory appeals, but makes occasional exceptions "to address important jurisdictional questions regarding the administration of the immigration laws or to correct recurring problems in the handling of cases before" immigration judges). In light of this practice, I believe it would be unreasonable to construe 8 C.F.R. § 3.38(b) to require litigants to file notices of appeal with the BIA from non-final decisions in order to preserve their objections to such rulings. Accordingly, the notice of appeal filed by the respondent on June 6 - twelve days after the issuance of the May 25 final decision in the case - was timely.

The June 6 notice of appeal did not, however, preserve the respondent's objections to the substance of the immigration judge's May 25 decision, *i.e.*, the rejection of her application for relief under the Convention Against Torture. To perfect an appeal to the BIA, a litigant must file a timely notice on a Form EOIR-26. *See* 8 C.F.R. § 3.38(b). The instructions therein state unequivocally that the appellant must "specify the reasons for appeal" on that form, even if a separate brief or statement will be filed. *See* Form EOIR-26, Notice of Appeal to the BIA of Decision of Immigration Judge (General Instructions VII-VIII). The failure to adhere to this directive may result in the dismissal of the appeal. *See* **\*380** *Soriano v. INS*, 45 F.3d 287, 287 (8th Cir. 1995) (per curiam); *Nazakat v. INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *Matter of Lodge*, 19 I&N Dec. 500, 501 (BIA 1987); 8 C.F.R. § 3.1(d)(2)(i)(D).

**\*\*6** The respondent's June 6 notice of appeal refers exclusively to the immigration judge's May 4 decision denying her application for relief under the INA, and contains no reference whatsoever to the May 25 decision denying her Convention Against Torture claim. Although this latter claim is identified in the respondent's subsequent June 28 notice of appeal, that notice was rendered nugatory because it was filed more than thirty days after the immigration judge's final disposition in the case. [9] While there may be rare cases where special circumstances would support a decision to consider issues not properly presented to the BIA in a timely-filed Form EOIR-26, this is not such a case. The Board here, as it often does, ordered simultaneous briefing on the merits, an approach that allows a more expeditious resolution of cases on the docket, and one that would not be feasible if the Board failed to enforce the requirement that appellants clearly specify the reasons for their appeals. Because the record in this case provides no indication of the kind of special circumstances that might justify an exception to this procedural requirement, the respondent's appeal of the adverse ruling on her Convention Against Torture claim shall be dismissed. [10]

**\*381** III.

The BIA addressed only one of the proposed forms of relief in this case. Its determination that the respondent was entitled to a waiver of inadmissibility and a discretionary adjustment of status from refugee to lawful permanent resident effectively mooted

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1028 of 1384

her requests for asylum and withholding of removal. Because I find the Board's resolution of the adjustment of status issue to be in error, I must examine the respondent's eligibility for these alternative remedies.

*A. Adjustment of Refugee Status*

Aliens, like the respondent, who have been admitted (or conditionally admitted) into the United States as refugees can seek an adjustment of status only under INA § 209. *See* 8 C.F.R. § 209.1 (2002) ("The provisions of this section [implementing section 209 of the INA] shall provide the sole and exclusive procedure for adjustment of status by a refugee admitted under section 207 of the [INA] whose application is based on his or her refugee status."). Section 209(a) provides that a refugee who has been physically present in the United States for at least one year and whose conditional admission status has not been previously terminated must return (or be returned) to INS custody for inspection and examination to determine eligibility for lawful permanent residency. If, after conducting this examination, an immigration officer concludes that the alien seeking permanent residency "is not clearly and beyond a doubt entitled to be admitted," he or she must be detained for a removal proceeding. *See* INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A) (2000). The INS is free to charge the alien in the ensuing proceeding, which is overseen by an immigration judge, with any applicable ground of inadmissibility or deportability. *See* INA § 240(a).

**\*\*7** In the case at bar, the INS charged the respondent with being inadmissible by virtue of her conviction for a crime involving moral turpitude. *See id.* § 212(a)(2)(A)(i)(I). She did not contest this charge and, indeed, conceded her statutory inadmissibility. Nevertheless, she sought a waiver pursuant to INA § 209(c), a provision empowering the Attorney General to waive most disqualifying barriers to an alien refugee's admissibility under INA § 212(a) "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." [11]

**\*382** Although INA § 209(c) was enacted into law more than twenty years ago as part of the Refugee Act of 1980, Pub. L. No. 96-212, § 201(b), 94 Stat. 102, 106, there appears to be only one published decision discussing the merits of a requested discretionary waiver of inadmissibility under this provision. Specifically, in *Matter of H-N-*, Interim Decision 3414 (BIA 1999), the BIA upheld an immigration judge's grant of lawful permanent residency under INA § 209(c) to an otherwise inadmissible refugee who had been convicted of second-degree robbery. I find the majority opinion in *H-N-* to be wholly unconvincing. The majority there treated the applicant's crime - participation in a burglary in which one of the applicant's co-conspirators shot a woman to death in front of her children - as a virtual afterthought. Citing nothing more than the American citizenship of the applicant's children, the legal residency of her husband, and a number of letters from family and friends, the majority found "strong equities" in the applicant's favor and thus affirmed the immigration judge's discretionary grant of relief. The seriousness of the underlying offense was all but lost on the Board. Part II of the opinion of Board Member Filppu, who dissented from the decision to confer lawful permanent residency on the applicant, combines a far more thorough review of the record with a much greater appreciation of the harmfulness of the criminal conduct at issue, and reflects the result I would reach if that case were before me today. [12]

As deeply troubling as the ruling in *H-N-* is, I find the Board's decision in this case even more difficult to accept. The Board here cited testimony and "lengthy letters" provided by members of the respondent's family, as well as the fact that the respondent's husband and children are permanent legal residents, as evidence that her removal would cause the family "severe emotional hardship." BIA Decision (Mar. 1, 2001) at 2. On the strength of this scant summary, the Board found that she "met the standard for granting" a waiver of inadmissibility and an adjustment of status. *Id.*

**\*383** The Board's analysis, which makes no attempt to balance claims of hardship to the respondent's family against the gravity of her criminal offense, is grossly deficient. The opinion marginalizes the depravity of her crime, stating simply that the panel had "weighed the equities in this case against the respondent's criminal conviction" and concluded that discretionary relief was warranted. *Id.* Little or no significance appears to have been attached to the fact that the respondent confessed to beating and shaking a nineteen-month-old child to death, or that her confession was corroborated by a coroner's report documenting a wide-ranging collection of extraordinarily severe injuries.

AR.04869

**\*\*8**  To be sure, the respondent's removal will undoubtedly impose a strain on her family. Her husband and children testified as to the difficulties they experienced during her nearly six years of incarceration in the custody of the State of New York and the INS. Although the record makes clear that the respondent's family exhibited admirable strength and resiliency during that period, I do not doubt that her removal to Haiti will be a source of additional hardship for them. Administrative evaluations of requests for waivers of inadmissibility under INA § 209(c) cannot, however, focus solely on family hardships, but must consider the nature of the criminal offense that rendered an alien inadmissible in the first place.

In my judgment, that balance will nearly always require the denial of a request for discretionary relief from removal where an alien's criminal conduct is as serious as that of the respondent. Congress has *authorized* the Attorney General under section 209(c) to waive an alien's inadmissibility, notwithstanding certain otherwise disqualifying convictions, "for humanitarian reasons, to assure family unity, or when it is otherwise in the public interest." Congress did not *compel* the Attorney General to do so. [13]  It would not be a prudent exercise of the discretion afforded to me by this provision to grant favorable adjustments of status to violent or dangerous individuals except in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of status adjustment would result in exceptional and extremely unusual hardship. Moreover, depending on the gravity of the alien's underlying criminal offense, such a showing might still be insufficient. From  **\*384**  its inception, the United States has always been a nation of immigrants; it is one of our greatest strengths. But aliens arriving at our shores must understand that residency in the United States is a *privilege*, not a *right*. For those aliens, like the respondent, who engage in violent criminal acts during their stay here, this country will not offer its embrace. The BIA's grant of lawful permanent residency is reversed.

### B. Asylum

The respondent also sought asylum pursuant to INA § 208. Eligibility for such relief is restricted to aliens who may be classified as a "refugees" under the INA, *i.e.*, persons who are "unable or unwilling to return to [their native country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (2000); *see also* INA § 208(b)(1) ("The Attorney General may grant asylum to an alien . . . if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A)."). The applicant bears the burden of proving his or her "refugee" status. *See* 8 C.F.R. § 208.13(a) (2002).

**\*\*9**  Establishing "refugee" status is not the only hurdle an alien seeking asylum must clear in order to be considered eligible for such relief. Indeed, there are a series of exceptions outlined in INA § 208(b)(2) under which all aliens - including "refugees" - are statutorily barred from asylum. As relevant here, an alien convicted of a "particularly serious crime," defined for these purposes as any "aggravated felony," may not be granted asylum under any circumstances. *See* INA § 208(b)(2)(A)(ii), (B)(i). Furthermore, even if asylum eligibility is established, the decision whether to grant an application is committed to the Attorney General's discretion. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).

The immigration judge declared the respondent ineligible for asylum for two independently sufficient reasons. First, he found that the respondent failed to demonstrate "a continuing[,] genuine and credible fear of persecution" if removed to Haiti or, alternatively, a history of persecution so severe as to justify an unwillingness to return there irrespective of current conditions in the country. IJ Decision (May 4, 2000) at 7. This finding is well-supported in the record.

The judge also found that the respondent had been convicted of an aggravated felony. Although Congress has delineated multiple categories of  **\*385**  offenses that constitute "aggravated felonies" - a term of art defined in INA § 101(a)(43), 8 U.S.C. § 1101(a)(43) (2000) - the only category pertinent here is "crimes of violence." *See* INA § 101(a)(43)(F) (an aggravated felony includes "a crime of violence (as defined in [18 U.S.C. § 16]) . . . for which the term of imprisonment [is] at least one year"). After examining the elements of the second-degree manslaughter statute to which the respondent pled guilty, the judge held that this offense represented a "crime of violence" and thus met the definition of an "aggravated felony."

The BIA subsequently rejected the immigration judge's "crime of violence" determination, concluding that the absence of a "substantial risk that physical force would be used in the commission of the crime" foreclosed such a characterization. I question the validity of the Board's reasoning. An individual is guilty of second-degree manslaughter under New York law when he or she "recklessly causes the death of another person." N.Y. Penal Law § 125.15(1) (McKinney 1998). At least two federal judges have squarely held that second-degree manslaughter in New York represents a "crime of violence" for purposes of the INA. *See Gibson v. Ashcroft*, No. 01-Civ-9400, 2002 WL 461579, at *3 (S.D.N.Y. Mar. 26, 2002); *Johnson v. Vomacka*, No. 97-Civ-5687, 2000 WL 1349251, at *4 (S.D.N.Y. Sept. 20, 2000).

 **\*\*10**  Ultimately, however, it is unnecessary for me to resolve whether the respondent's conviction constitutes a "crime of violence" or whether she has otherwise satisfied the eligibility standards for asylum. Even assuming that the respondent not only qualifies as a "refugee," but that her criminal conviction does not preclude her eligibility, she is manifestly unfit for a *discretionary* grant of relief. For the same reasons articulated in the earlier discussion of the respondent's application for adjustment of status, I am highly disinclined to exercise my discretion - except, again, in extraordinary circumstances, such as those involving national security or foreign policy considerations, or cases in which an alien clearly demonstrates that the denial of relief would result in exceptional and extremely unusual hardship - on behalf of dangerous or violent felons seeking asylum. As with applications for adjustment of status, even a showing of exceptional and extremely unusual hardship may be inadequate to justify a grant of asylum, depending on the nature of the alien's crime. The respondent's criminal conduct in connection with the homicide of R-J- is sufficiently severe as to make the conferral of asylum upon her entirely inappropriate. Her claim, therefore, is denied.

### *386  C. Withholding of Removal

Finally, the respondent asserts that she is legally entitled to withholding of removal pursuant to INA § 241(b)(3)(A), a statute prohibiting the Attorney General from returning an alien to a country where the alien's life or freedom would be threatened because of his or her race, religion, nationality, membership in a particular social group, or political opinion. The applicant bears the burden of proving his or her right to such relief, 8 C.F.R. § 208.16(b), and must make the requisite showing by a preponderance of the evidence. *Matter of S-V-*, Interim Decision 3430 (BIA 2000) (citing *Stevic*, 467 U.S. at 429-30).

As was the case with the respondent's asylum claim, the immigration judge and BIA disagreed over the impact of the respondent's criminal conviction on her threshold eligibility for withholding of removal. INA § 241(b)(3)(B) provides that aliens convicted of any "aggravated felony" for which an aggregate term of imprisonment of at least five years was imposed are statutorily ineligible for withholding of removal. [14] Based on the reasoning set forth in the preceding section, I find the Board's determination that second-degree manslaughter in New York is not a "crime of violence" (and thus not an "aggravated felony") to be quite suspect. There is, as noted earlier, on-point authority to the contrary.

Once again, however, it is unnecessary for me to address the proper characterization of the respondent's criminal offense because there are other, clearer grounds for the denial of her claim for relief. In particular, she has failed to prove that her life or freedom would be threatened in Haiti on the basis of race, religion, nationality, membership in a particular social group, or political opinion.

 **\*\*11**  The respondent seeks to avail herself of the regulatory presumption of future persecution. Under this doctrine, if an applicant can demonstrate that he or she "suffered past persecution in the proposed country of removal" on account of one of the five factors enumerated in section 241(b)(3)(A), then "it  *387  shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 208.16(b)(1)(i). [15]  This presumption may be rebutted, however, if the immigration judge finds, by a preponderance of the evidence, that:
(A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

*Id.* § 208.16(b)(1)(i)(A), (B).

The respondent maintains that she is likely to be persecuted by members of the former Haitian Army as well as the Ton Ton Macoutes, a private Haitian death squad first organized by former President François Duvalier. To support this claim, the respondent and her husband testified at the removal hearing that the husband was assaulted and nearly killed in the early 1990s as a result of his work with the Fanmi Lavalas, a political party headed by then-opposition leader Jean-Bertrand Aristide. They further alleged that Haitian soldiers burned the home shared by the respondent and her husband, as well as the homes of many of their relatives. The soldiers also purportedly killed the father and two cousins of the respondent's husband.

Although clearly tragic, these events do not demonstrate that any past persecution was directed at the respondent. As the immigration judge correctly noted, the attacks described at the hearing were all targeted at the respondent's *husband*, not at the respondent *herself*. [16] IJ Decision (May 4, 2000) at 7. The respondent did testify that she was a member of "Committee **\*388** 1991 Haiti," a social group supposedly regarded by the Haitian Army as an opposition political faction. *See* Hr'g Tr. (Feb. 11, 2000) at 92. Yet, she offered no evidence that this affiliation would have been sufficient to make her an independent target of either the Haitian Army or the Ton Ton Macoutes.

Furthermore, even assuming that the respondent could establish a presumption of future persecution based on the events detailed above, she still would be entitled to no relief here. The political climate in Haiti has changed dramatically since the respondent left in 1994, and it is no longer likely that her life or freedom would be threatened there. The respondent asserts that she is likely to suffer a loss of life or freedom at the hands of former Haitian Army soldiers or Ton Ton Macoute rebels if she returns to the country. The record, however, offers no solid basis for such a claim. The State Department's 1998 report on Haiti, which the respondent's counsel explicitly referenced at the removal hearing, documents the significant alteration of the Haitian political landscape since 1994. *See* Bureau of Democracy, Human Rights, and Labor, Dep't of State, *Country Report on Human Rights Practices - Haiti* (Feb. 1999). The Report recounts not only the disbanding of the Haitian Army in 1995, but also the 1997 election of President René Preval, the Fanmi Lavalas candidate who succeeded Jean-Bertrand Aristide in the first peaceful transfer of power between elected administrations in Haiti's post-independence history. It notes that the government, although beset by pockets of corruption, "generally respect[s] the human rights of its citizens." *Id.* at 2. The Haitian National Police force, the country's principal domestic law enforcement agency, is described as a flawed but improving organization. *Id.* Although excessive use of force by the police reportedly resulted in eleven deaths during 1998, the State Department concluded that "these killings generally were not political in character," but were instead largely attributable to poor training and discipline. *Id.* at 3. [17]

**\*\*12** **\*389** Although I am not required to investigate whether State Department publications that the respondent neither cited nor submitted could form the foundation of a claim for relief, I have examined the key publications and find they provide no such support. The Department of State's latest asylum profile on Haiti, published four years ago, describes dramatic human rights improvements in Haiti following the September 1994 international intervention to restore the country's democratically-elected government. *See* Bureau of Democracy, Human Rights, and Labor, Dep't of State, *Profile of Asylum Claims and Country Conditions - Haiti* (Mar. 31, 1998). The report states that "[t]he repression once found in Port-au-Prince and the countryside has been brought to an end, and people are no longer systematically subjected to human rights violations as an instrument of state policy." *Id.* at 5.

The State Department's most recent country report also fails to bolster the respondent's claim. *See* Bureau of Democracy, Human Rights, and Labor, Dep't of State, *Country Report on Human Rights Practices - Haiti* (Mar. 2002). That report points out that members of the former opposition party to which the respondent's husband belonged now occupy most key government positions, including the national law enforcement institutions. Moreover, Aristide was elected to a second term as President in February 2001, and the Fanmi Lavales maintained control of the Haitian Senate in the 2000 elections. In short, the record simply

does not support the respondent's claim that her life or freedom would be threatened if she were returned to Haiti. Accordingly, her application for withholding of removal is denied.

<div align="center">IV.</div>

For the foregoing reasons, the decision of the BIA is reversed and the case is remanded with instructions to dismiss the respondent's appeal.

<div align="center">**Footnotes**</div>

1   In publishing this opinion in its current format, the Attorney General is invoking his discretion pursuant to 8 C.F.R. § 208.6(a) (2002).

2   My review of BIA decisions is *de novo*. *See Deportation Proceedings of Joseph Patrick Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations.").

3   This published decision is binding on the BIA and is intended to overrule any BIA decisions with which it is inconsistent. *See Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"); *see also* 8 C.F.R. § 3.1(g).

4   The opinions of both the immigration judge and the BIA inaccurately characterize the nature of the respondent's entry into the United States. She was neither *paroled* nor *permanently admitted* into the country. Rather, she was *conditionally admitted* as a refugee under INA § 207, which had the effect of deferring her admissibility inspection and examination by federal immigration officials. *See Matter of Garcia-Alzugaray*, 19 I&N Dec. 407, 408-10 (BIA 1986).

5   At the plea colloquy, the respondent also sought to retreat from some of the more damning admissions in her earlier written confession. Without making any factual findings regarding these *post hoc* attacks on the confession, the Monroe County judge, in a not altogether clear discussion, seemingly concluded that New York law permitted him to accept the respondent's guilty plea to second-degree manslaughter as charged in the indictment based on her failure to seek medical help when R-J- stopped breathing.

6   A month earlier, the INS had prematurely initiated removal proceedings against the respondent without affording her an opportunity to seek an adjustment of status under INA § 209. The agency corrected this deficiency by terminating the earlier removal proceeding, adjudicating her application, and commencing a new removal proceeding. *See* Hr'g Tr. (July 21, 1999) at 13-14.

7   Although the immigration judge's reasoning is not entirely clear from his brief oral decision, he appears to have improperly analyzed the respondent's adjustment of status application under INA § 245, 8 U.S.C. § 1255 (1994 & Supp. V 1999), which bars relief to aliens convicted of crimes involving moral turpitude, *see* INA § 245(a)(2) (restricting adjustments of status to aliens who meet INA § 212 standards of admissibility), rather than INA § 209, which contains no such express proscription. As noted in Part III.A., *infra*, individuals like the respondent who have been admitted (or conditionally admitted) into the United States as refugees can seek an adjustment of status only under section 209. With respect to the respondent's INA-based claims for asylum and withholding of removal, the immigration judge obviously grounded his ineligibility determination on statutory provisions precluding the grant of such relief to aliens convicted of "aggravated felonies," *see id*. § 208(b)(2) (asylum), or "particularly serious crimes," *see id*. § 241(b)(3)(B) (withholding of removal). But the rationale for the judge's denial of all relief under the Convention Against Torture is nowhere reflected in the decision. An aggravated felony conviction could not have formed the necessary predicate because an alien's criminal history is irrelevant in examining his or her entitlement to *deferral* of removal under the Convention. *See Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. 270, 279 (A.G. 2002).

8   Having granted the respondent's application for adjustment of status to lawful permanent resident, the BIA did not address her claims for asylum and withholding or deferral of removal.

9    There is a suggestion in the supplemental briefing that the BIA could have asserted jurisdiction over the Convention Against Torture claim via certification pursuant to 8 C.F.R. § 3.1(c). *See* 8 C.F.R. § 3.39 (2002) ( "Except when certified to the Board, the decision of the Immigration Judge becomes final . . . upon expiration of the time to appeal . . . ."). The Board, however, never certified any issue in this case, and such certification cannot be done implicitly. Moreover, while section 3.1(c) allows the Board to certify issues "in its discretion," that discretion is not unbounded. To the contrary, much like discretionary decisions to reopen proceedings *sua sponte* under section 3.2(c), it is limited to "exceptional" circumstances and "is not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations, where enforcing them might result in hardship." *Matter of J-J-*, 21 I&N Dec. 976, 984 (BIA 1997).

10   As an alternative holding, I find that the respondent's Convention Against Torture claim also fails on the merits. For largely the same reasons articulated in the discussion in Part III.C. of the respondent's claim for withholding of removal, I find she has failed to establish that she is more likely than not to endure torture upon return to Haiti. Nor has she demonstrated, as the Convention requires, that the harms she fears would be inflicted by, or with the acquiescence of, government officials acting under color of law. *See Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. at 279. Finally, it is not at all clear that much of the harm to which the respondent alleges she would be exposed is even covered by Article 3 of the Convention. *See Matter of J-E-*, 23 I&N Dec. 291, 297-303 (BIA 2002).

11   In accordance with the governing regulatory scheme, the respondent initially submitted her application for an adjustment of status directly to the INS. *See* 8 C.F.R. § 209.1(b). After she received an adverse decision, she renewed the claim in her removal proceeding before an immigration judge. *See id.* § 209.1(e) ("There is no appeal of the denial of an application [for status adjustment] by the [INS], but such denial will be without prejudice to the alien's right to renew the application in removal proceedings under [INA § 240].").

12   A threshold legal issue in *H-N-*, which was the focus of most of the opinions in that case, involved a jurisdictional issue regarding the authority of immigration judges and the Board to adjudicate waivers of inadmissibility under INA § 209(c). I do not address that issue here.

13   By drafting INA § 209(c) to provide that the Attorney General "*may*" waive certain bars to admission, Congress clearly left this matter to my discretion. *Cf. Lopez v. Davis*, 531 U.S. 230, 238-42 (2001) (statute providing that Bureau of Prisons "may" reduce sentences of inmates completing drug treatment program imposes no obligation to do so and allows for categorical exclusions; application is left to the Bureau's sound discretion).

14   The respondent received an indeterminate two-to-six-year sentence upon her conviction for second-degree manslaughter. Sentences for variable periods of time generally are treated as sentences for the maximum period specified. *See, e.g., United States v. Galicia-Delgado*, 130 F.3d 518, 520-21 (2d Cir. 1997); *People v. Washington*, 191 N.E. 7, 8 (N.Y. 1934). In the immigration context in particular, the courts and the BIA, in applying statutory provisions that categorize crimes by length of incarceration, have found that indeterminate sentences should be treated as sentences for the maximum term imposed. *See, e.g., Picardo v. INS*, 104 F.3d 756, 759 (5th Cir. 1997); *Matter of S-S-*, 21 I&N Dec. 900, 901-03 (BIA 1997).

15   If, on the other hand, an applicant cannot show that the fear of future threat to life or freedom is related to past persecution, then the applicant continues to bear the burden of proof that it is more likely than not he or she would suffer such harm in the future. *See* 8 C.F.R. § 208.16(b)(1)(iii).

16   It bears noting here that the respondent never argued in her removal proceeding that a presumption of persecution could be established through an "imputed political opinion" theory - *i.e.*, that the alleged persecutors put her life or freedom in jeopardy because they attributed the political views of her husband to her. *See, e.g., Lwin v. INS*, 144 F.3d 505, 509-0 (7th Cir. 1998); *Sangha v. INS*, 103 F.3d 1482, 1489-0 (9th Cir. 1997). Even if such a contention had been made, however, its merit would be questionable. Indeed, the record suggests that the violence inflicted upon the respondent's home and non-blood relatives was committed in an effort to *find* the respondent's husband, not on account of political opinions attributed (erroneously or otherwise) to the respondent.

17   The Report references only two instances of potentially politically-motivated violence against critics of the former military regime. The incident cited by the respondent as evidence of a continuing risk to her - *i.e.*, the shooting death of Father Jean Pierre Louis, whom the Report identifies as "an outspoken [critic] of the 1991-94 military regime" - is described as a possible political murder. Country Report at 4. The other incident involved Haitian National Police engaging in warrantless arrests and beatings of members of a political group allied with the Fanmi Lavalas. *Id*. These

events occurred, however, in the aftermath of a riot during which members of the Fanmi Lavalas killed a police commissioner, burned his body, and stormed a prison. *Id*. at 4-5. There is no indication of any systemic threat to the lives or freedom of supporters of the current regime.

23 I. & N. Dec. 373 (U.S.Atty.Gen.), Interim Decision 3472, 2002 WL 968631

---

**End of Document** <span style="float:right">© 2020 Thomson Reuters. No claim to original U.S. Government Works.</span>

23 I. & N. Dec. 912 (U.S.Atty.Gen.), Interim Decision 3532, 2006 WL 1331555

U.S. Department of Justice

Office of the Attorney General

IN RE J-F-F-, RESPONDENT

Decided by Attorney General May 1, 2006

**1   *912   An alien's eligibility for deferral of removal under the Convention Against Torture cannot be established by stringing together a series of suppositions to show that it is more likely than not that torture will result where the evidence does not establish that each step in the hypothetical chain of events is more likely than not to happen.

**FOR RESPONDENT: Pro se**

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**
Tara Naselow-Nahas,
Deputy Chief Counsel

BEFORE THE ATTORNEY GENERAL

(May 1, 2006)

Respondent, a native and a citizen of the Dominican Republic and a permanent resident of the United States, was convicted of rape by force and found removable because his rape conviction qualifies as an aggravated felony under section 101(a)(43)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(43)(A) (2000). The Immigration Judge concluded, however, that it was more likely than not that respondent would be tortured if returned to the Dominican Republic and therefore granted a deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "CAT").

In a brief order, the Board of Immigration Appeals affirmed. [1] On February 10, 2006, pursuant to my authority under 8 C.F.R. § 1003.1(h), I directed the Board to refer to me for review its decision in this matter and   *913   stayed the decision pending my review. Respondent has failed to present and support a valid Convention Against Torture claim. For the reasons set forth below, I disapprove the Board's decision and deny respondent's application for deferral of removal.

I.

I review de novo all aspects of the Board's and Immigration Judge's decisions in this case. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (A.G. 1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). The law vests in the Attorney General much of the authority to make individual immigration determinations. [2] *See generally* section 103(g) of the Act, 8 U.S.C. § 1103(g) (Supp. II 2002); *Matter of D-J-*, 23 I&N Dec. 572, 573-74 & n.2 (A.G. 2003). The Executive Office for Immigration Review, which includes the Board and Immigration Judges, is subject to the direction and regulation of the Attorney General. [3] While Attorneys General have delegated their authority to the Board and Immigration Judges in the first instance, I retain the power to exercise full decisionmaking upon review. *See Matter of D-J-, supra*, at 575 (noting that, unlike the Immigration Judge and the Board, who exercise limited authority dependent upon delegation from the Attorney General, the Attorney General is "authorized to make the determination based on [his] own conclusions on the facts and the law").

**\*914**  II.

A.

**\*\*2**  Respondent was born in the Dominican Republic in 1961, and he was admitted to the United States as a lawful permanent resident in 1970. Although his parents and siblings became naturalized United States citizens, respondent never completed the naturalization process he initiated around 1980.

On January 9, 1986, while living at his parents' home in Los Angeles, respondent raped his 55-year-old neighbor. Having learned that his neighbor was home alone because her husband was in the hospital, respondent tied her up, threatened her at knifepoint, and repeatedly raped and sexually assaulted her over the course of 4 hours. When he was later interviewed about the incident, he explained that he committed the crime because he "was drunk on beer and wine." After serving a 15-year sentence for the rape, respondent was released in November of 2001. While incarcerated, he attacked a fellow inmate on one occasion and threatened to kill a female corrections officer on another.

On December 11, 2003, respondent was issued a notice to appear for removal proceedings charging him with being removable from the United States under section 101(a)(43)(A) of the Act, 8 U.S.C. § 1101(a)(43)(A) (defining aggravated felony). *See also* section 237(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1227(a)(2)(A)(iii) (2000). Respondent admitted at his hearing before the Immigration Judge that he had committed an aggravated felony in the United States and that he was removable. Upon finding that respondent was removable under this provision, the Immigration Judge "[o]rdered that the respondent be removed and deported to the Dominican Republic" and subsequently granted him deferral of removal under the law and regulations implementing the CAT. *See* 8 C.F.R. § 1208.17(a) (2006).

Between March 23 and June 3, 2004, respondent appeared before the Immigration Judge for five hearings in his removal proceedings. In these proceedings, respondent admitted the allegations and the charge of removability; he confirmed that he was a native and citizen of the Dominican Republic and admitted that he had been convicted of rape by force. The Immigration Judge suggested on April 14 that respondent might be eligible for a waiver under former section 212(c) of the Act, 8 U.S.C. § 1182(c) (1994) (repealed and replaced in 1996 by a new section, section 240A(b), 8 U.S.C. § 1229b(b) (2000)), which permits certain categories of permanent residents to be admitted "in the discretion of the Attorney General." Respondent **\*915** refused to allow his mother to testify in support of the waiver, against the Immigration Judge's urging. Acting sua sponte, the Immigration Judge then dismissed the case without prejudice on the ground that this and other behavior showed that respondent was incompetent.

**\*\*3**  The Board reversed the Immigration Judge's termination of proceedings. It first noted that the psychiatric evaluation of respondent in the record and respondent's testimony before the Immigration Judge suggested that respondent was fit for trial. It pointed out that at the Immigration Judge's request, the Government had introduced a psychiatric evaluation, dated February 19, 2004, in which the psychiatrist "cleared [respondent] to stand trial," although this report stated that respondent had schizoaffective and bipolar disorders and observed that respondent had been admitted to various hospitals as a result of his mental illness. It also noted respondent's hearing testimony confirming the psychiatrist's assessment that he fully understood the proceedings and wanted to proceed. The Board then went on to note that the Immigration Judge's principal concern with respect to respondent's competence appeared to be that the alien would be unable effectively to present his claim for section 212(c) relief, but that because respondent's felony forcible rape conviction made him ineligible, this concern was unfounded and the Immigration Judge should not pursue consideration of this claim further. *See* 8 C.F.R. § 1212.3(f)(5) (2006). Finally, the Board reminded the Immigration Judge that regulations provide for removal proceedings against incompetent aliens, with others being allowed to appear on the alien's behalf, *see* section 240(b)(3) of the Act, 8 U.S.C. § 1229a(b)(3) (2000); 8 C.F.R. § 1240.4 (2006), and remanded to the Immigration Judge for further proceedings consistent with its opinion.

On remand, the Immigration Judge introduced the prospect of CAT relief, questioned respondent on the subject until he decided to make the claim, and ultimately granted CAT relief on grounds respondent had not mentioned in his application. When the

AR.04877

Immigration Judge first asked respondent whether he was "afraid of being persecuted or tortured in the Dominican Republic," he responded, "Uh, no, ma'am." Respondent said he was aware that his admission required that the Immigration Judge order him removed and deported to the Dominican Republic. After asking a series of questions to which respondent gave answers that did not support deferral of removal under the CAT, the Immigration Judge asked, "So, what do you wish to do?" He replied, "The reason that I don't wanna get deported [is] because I have nobody in [the] Dominican Republic. All my family's in the United States." The Immigration Judge then presented respondent with his choices: "[T]he Board of Immigration Appeals has determined that you do not qualify for the **\*916** [212(c)] waiver, sir. So, the only option I have left is whether or not you can prove that you would be tortured in the Dominican Republic." Respondent replied, "There's no civil war going on in [the] Dominican Republic. There's a slight disturbance." Trying again, the Immigration Judge asked, "Sir, do you fear returning to the Dominican Republic?" When respondent answered, "Yes, ma'am," she asked, "Do you wish to apply for protection under the Torture Convention?" Respondent said, "Yes."

**\*\*4** Respondent then submitted the Form I-589 (Application for Asylum and Withholding of Removal) necessary to apply for deferral of removal under the Convention Against Torture. Respondent's application for CAT relief did not mention fear of police brutality, nor did his initial testimony at the 1-day hearing. In answer to the Form I-589 question, "Why [do] you believe you would or could be harmed or mistreated," respondent wrote, "They might try to kill me. Communists might try to kill me. They might know me." In answer to the form question, "Why [are] you … afraid and describe the nature of the torture you fear, by whom, and why it would be inflicted," he wrote, "They was after the family who work for the government to kill us." At the hearing, respondent maintained that he feared harm or mistreatment on return to the Dominican Republic at the hands of "[f]ormer people that used to be under the Communists" or "criminals" who "would use a machete to kill people to rob them." The Immigration Judge asked whether he thought the police would "bother" him in the Dominican Republic. Without specifying whether he feared Communists, criminals, the police, or other actors, he agreed that there is "torture in [the] Dominican Republic, they mistreat people over there very bad, especially if you [are] a stranger."

In response to questioning by the Immigration Judge about his mental condition, respondent testified that he takes the medication Xyprexa once a day, which he buys with the aid of state benefits. He admitted that there have been a few times when he has stopped taking his medication—on occasion simply "[t]o see what would happen"—and that when he did stop "[n]othing happened." He said that he had been "perfectly fine" without his medication when he spent 8 months in a county jail. When asked whether "anything happen[s]" when "you're not in jail, and you don't take your medication," he responded, "No." Specifically, the Immigration Judge asked whether respondent was "not taking medication," when he committed the rape. He responded that he was "[t]aking medication" at the time.

The Immigration Judge then asked respondent whether he thought he needed his medication. After stating that "nothing happened" when he was not medicated and agreeing that he was "perfectly fine" without it, respondent finally agreed that he needed his medication to "keep [him] in balance" **\*917** because without medication he got "a little rowdy." The Immigration Judge asked him whether it was under these circumstances that "the police arrest you," to which he responded, "Yeah." According to respondent, the medication that he took is "unavailable in the Dominican Republic" because "they don't have no hospital like they have in United States." He conceded, though, that his basis for this supposition was weak because he did not "know much about [the] Dominican Republic, how they run the government, how they run the social department."

**\*\*5** On the basis of this testimony, and the State Department's Country Report on the Dominican Republic, discussed below, the Immigration Judge granted respondent's application for deferral of removal.

<div align="center">B.</div>

"In considering an application for [deferral] of removal under the Convention Against Torture, the Immigration Judge shall first determine whether the alien is more likely than not to be tortured in the country of removal." 8 C.F.R. § 1208.16(c)(4) (2006). In making this determination, "all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 1208.16(c)(3). To prevail, the respondent must show that "he is more likely than not to suffer intentionally-inflicted cruel and inhuman

treatment that either (1) is not lawfully sanctioned by that country or (2) is lawfully sanctioned by that country, but defeats the object and purpose of CAT." *Nuru v. Gonzales*, 404 F.3d 1207, 1221 (9th Cir. 2005) (emphasis removed). The Government need not prove the opposite: "The burden of proof is on the applicant." 8 C.F.R. § 1208.16(c)(2); *see also, e.g., Kamalthas v. INS*, 251 F.3d 1279 (9th Cir. 2001). If the evidence is inconclusive, the applicant has failed to carry his burden.

In granting respondent deferral of removal under the Convention Against Torture, the Immigration Judge strung together a series of suppositions: that respondent needs medication in order to behave within the bounds of the law; that such medication is not available in the Dominican Republic; that as a result respondent would fail to control himself and become "rowdy"; that this behavior would lead the police to incarcerate him; and that the police would torture him while he was incarcerated. The evidence does not establish that any step in this hypothetical chain of events is more likely than not to happen, **\*918** let alone that the entire chain will come together to result in the probability of torture of respondent. [4]

First, respondent gave contradictory testimony about his behavior when unmedicated. Respondent originally insisted that his behavior does not change when he fails to take his medication, claimed that he had been "perfectly fine" when he had not taken his medication in the past, and confirmed that he had been taking his medication when he committed the violent rape that rendered him removable (suggesting that his "rowdiness" does not depend on lack of medication). Moreover, respondent's testimony reveals that he chooses on occasion to forego medication even when it is available. Only after persistent questioning by the Immigration Judge did respondent indicate that he got "a little rowdy" without his medication. It may be that respondent's behavior worsens when he is unmedicated, but the evidence presented indicates that, if anything, lack of medication is not a good predictor of respondent's violent actions. [5]

**\*\*6** Second, based on respondent's admittedly uninformed guess that he could not procure his medication in the Dominican Republic, and a single sentence about the general shortage there of mental health resources from the State Department's Country Report, the Immigration Judge presumed that respondent would not receive medication while in the Dominican Republic. [6] This is a far cry from proving the point. It may be that state-supplied drug **\*919** care is less extensive in the Dominican Republic than in California, but respondent is not a credible source for this fact. The particular drug he takes may be unavailable there, or it may be available for half the cost. The evidence does not say. After stating that it was "unknown" whether respondent's medication would be available and "unknown" whether his family could pay for the medication, the Immigration Judge concluded that in the absence of evidence that he *could* get his medication, she would presume otherwise. This conclusion flips the burden on its head, inappropriately relieving respondent of his responsibility to prove his case. *See* 8 C.F.R. § 1208.16(c)(2). If one cannot know from the evidence whether he will have access to medication, then respondent has by definition failed to show he is more likely than not to be denied access. Both respondent's uninformed speculation and the Immigration Judge's reference to a vague statement in the Country Report fall far short of proving that he is more likely than not to go without medication.

Third, in concluding that these first two points would lead to respondent's arrest in the Dominican Republic, the Immigration Judge relied on her belief— contrary to respondent's testimony—that respondent "without his medication, has found himself in the hands of the police in this country." In fact, the crime for which the Government seeks to remove him was committed while he was "taking medications." The Immigration Judge speculated that "rowdy" behavior would lead to arrest, but when the Immigration Judge asked respondent "what happens if somebody gets rowdy?", respondent did not reply that rowdy behavior attracted the attention of the authorities. To the contrary, he responded that "they leave them on the streets," and "don't bother them. They let them be in the streets." Again, the evidence presented by respondent is contradictory; he does not show that it is likely—with or without medication—that he would attract the attention of the Dominican police, and therefore cannot show that torture by the police is more likely than not.

Next, there is the central question how police in the Dominican Republic would treat respondent if they had cause to interact with him. Respondent has admitted that the Dominican Government has never tortured either him or, to his knowledge, anyone in his family. [7] Putting aside whether he is more likely than not to find himself in police custody, respondent did not present any direct evidence that the police would more likely than not torture someone in **\*920** his position. When prompted, he was

merely able to state the required claim: that there is "torture in [the] Dominican Republic, they mistreat people over there very bad, especially if you [are] a stranger." Only after his primary testimony had ended, and after hearing the Immigration Judge's explanation of her tentative decision to the Government's lawyer, did respondent point to evidence to support the Immigration Judge's theory. He did so solely by reading a few passages from the Department of State Country Report on the Dominican Republic, and not from personal knowledge.

**7** The only evidence presented therefore came from respondent's brief reading and the Immigration Judge's more complete reading of the Country Report. [8] Based on the Country Report, the Immigration Judge found that "some security forces, primarily mid-level and lower ranking police officers continued to torture, beat, and otherwise physically abuse detainees and prisoners." The report indicates that police and military mistreatment of prisoners has been an ongoing problem in the Dominican Republic, but it also stresses that the Dominican Government takes prohibitions against torture seriously and refers such cases to civilian courts. The Immigration Judge acknowledged that the State Department report established that the Dominican Republic's constitution and laws prohibit torture and other forms of physical abuse, that senior police officials take these requirements seriously by regularly investigating torture and abuse allegations, and that prosecutors had filed charges alleging torture against military and police officials in the past. Both the Immigration Judge and respondent critically failed to address the ultimate question whether this mistreatment is common enough to make it more likely than not that respondent would be so treated. [9]

The United States has embraced important treaty obligations under the CAT that are consistent with our values as a democratic society. The possibility of **\*921** torture is a serious charge that calls for serious consideration. It is "the policy of the United States," within the meaning of United States obligations under the CAT, "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998, Div. G of Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2681-761, 2681-822; *see also* note 2 to section 241 of the Act, 8 U.S.C. § 1231 (2000). But in this case, the Immigration Judge relied upon several irrelevant factors in deciding to grant respondent deferral of removal under the CAT. In her discussion of the likelihood of torture, the Immigration Judge prominently concluded that removing respondent from the United States after so many years would be "cruel." The Immigration Judge also focused on multiple other hardship factors, such as respondent's living arrangements in the Dominican Republic and whether he would be able to hold a job, that would have been relevant in the section 212(c) context, had the Board not already properly concluded that respondent was ineligible for 212(c) relief. But these kinds of hardship considerations are not independently relevant to determining whether he is more likely than not to be tortured upon return. The Immigration Judge in this case may have been moved by these factors and respondent's strong desire to remain in the United States. As officers of the Executive Branch, however, we are bound by law and duty to apply impartially the statutory scheme Congress has established to govern the lawful deportation of permanent residents convicted of an aggravated felony.

III.

**8** At the Immigration Judge's urging, respondent has speculated that he may lack access to appropriate psychiatric medication in the Dominican Republic, that the lack of medication may affect his behavior, that his behavior may cause him to be arrested, and that once arrested he may face mistreatment at the hands of criminals or lower-level police officers. Taken together these speculations do not amount to a likelihood of torture. Because respondent has failed to carry his burden, I disapprove the Board's decision, deny the respondent's application for deferral of removal, and affirm the Immigration Judge's February 3, 2005, order of removal and deportation to the Dominican Republic.

An alien may file a motion seeking to reopen a final order of removal within 90 days pursuant to section 240(c)(7) of the Act, 8 U.S.C. § 1229a(c)(7) (2000), and 8 C.F.R. § 1003.2 (2006). The motion must be **\*922** accompanied by affidavits or other evidentiary material that support new facts. The motion shall not be granted unless it appears that the evidence sought to be offered was not available and could not have been discovered or presented at the former hearing. [10] This case is unusual because both respondent and the Department of Homeland Security were unaware at the final hearing that they would be called upon

to present evidence on the Immigration Judge's theory that respondent would be incarcerated and tortured by police. While respondent did not request additional time to present evidence and did not attempt to supplement the record, the Immigration Judge's active role in the management of respondent's presentation of his own case and her immediate ruling in his favor could have led respondent to believe that no additional evidence was necessary.

It is appropriate for Immigration Judges to aid in the development of the record, and directly question witnesses, particularly where an alien appears pro se and may be unschooled in the deportation process, but the Immigration Judge must not take on the role of advocate. *See* section 240(b)(1) of the Act, 8 U.S.C. § 1229a(b)(1) (2000) (providing that Immigration Judges shall "interrogate, examine, and cross-examine the alien and any witnesses"); 8 C.F.R. § 1240.11(a)(2) (2006) ("The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing."); *see also Agyeman v. INS*, 296 F.3d 871, 884 (9th Cir. 2002) (stating that "the IJ has a duty to fully develop the record when an alien proceeds pro se"). I do not decide whether the Immigration Judge's actions here are sufficient to satisfy the requirement that rehearing be denied if the evidence could have been presented at the prior hearing. *See* 8 C.F.R. § 1003.2(c)(1). A decision on this point will require review of the Immigration Judge's conduct at the original hearing, which went well beyond her obligations, even bearing in mind that respondent was proceeding pro se. Therefore if respondent does move to reopen and the Board grants the motion, I am directing that the case be assigned to another randomly selected Immigration Judge for decision. In light of respondent's continued detention, **\*923** I direct the Board and Immigration Judge to conduct any further proceedings as promptly as possible consistent with a full and fair consideration of the issues.

## Footnotes

1    The Board found "no clear error in the factual findings of the Immigration Judge" and "insufficient reasons to reverse the Immigration Judge's determination that [respondent] should be granted protection under the Convention Against Torture." On December 21, 2005, the Board denied the Department of Homeland Security's ("DHS") motion for reconsideration of its July 7, 2005, order.

2    The Secretary of the DHS has certain authority to enforce and administer the Act and related laws, while the Attorney General retains others, including the decisionmaking authority exercised here. Section 103(a)(1) of the Act, 8 U.S.C. § 1103(a)(1) (Supp. II 2002), charges the Secretary with administration and enforcement "except insofar as this chapter or [relevant] laws relate to the powers, functions, and duties conferred upon the President [and] Attorney General," among others. The "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." *Id.*

3    Homeland Security Act of 2002, Pub. L No. 107-296, § 1101, 116 Stat. 2135, 2273 (codified at 6 U.S.C. § 521 (Supp. II 2002)) (providing for direction and regulation by the Attorney General under section 103(g) of the Act, 8 U.S.C. § 1103(g)).

4    *See Matter of Y-L-*, 23 I&N Dec. 270, 282 & n.16 (A.G. 2002) (string of speculative events in a country with violent incidents but a non-complacent government insufficient for CAT showing). An alien will never be able to show that he faces a more likely than not chance of torture if one link in the chain cannot be shown to be more likely than not to occur. It is the likelihood of all necessary events coming together that must more likely than not lead to torture, and a chain of events cannot be more likely than its least likely link.

5    The psychiatrist's report submitted by the Government, prior to this testimony, did not seek to answer the question whether or under what circumstances respondent behaves badly. While that report described respondent as "carr[ying] the diagnosis of Schizoaffective Disorder versus Bipolar Disorder," the psychiatrist concluded that respondent was fit to participate in the adjudication because "he fully understand[s] what type of court Your Honor presides over, the possible outcomes of the proceedings, and he feels comfortable answering Your Honor's questions and defending himself at trial."

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

6    When asked how he knew he would not be able to obtain medication in the Dominican Republic, he replied: "Because they don't have that kind of program over there, not that I know. I don't know much about the Dominican Republic, how they run the government, how they run the social department."

7    Respondent answered "no" to three questions posed by the Immigration Judge: "Did the Communists ever harm any of your family? Were you ever harmed by the Communists? Have you ever been harmed by the government of Dominican Republic?"

8    A review of the 2004 and 2005 Country Reports on the Dominican Republic indicates that conditions have not relevantly changed from the 2003 report upon which the Immigration Judge relied.

9    The Immigration Judge also noted that "discrimination against persons with mental illness was common," but whether the discrimination takes the active form of beatings or inactive form of government neglect, and again, how likely respondent would be to experience it, the record cannot answer. It was likewise inappropriate for the Immigration Judge to rely upon her conclusion that there are insufficient resources devoted to mental health in the Dominican Republic. A lack of resources is regrettable, but it does not constitute torture under the regulations. *See* 8 C.F.R. § 1208.18(a) (2006).

10    8 C.F.R. § 1003.2(c)(1); *INS v. Doherty*, 502 U.S. 314, 323 (1992) (noting there are "'at least' three independent grounds on which the Board might deny a motion to reopen—failure to establish a prima facie case for the relief sought, failure to introduce previously unavailable, material evidence, and a determination that even if these requirements were satisfied, the movant would not be entitled to the discretionary grant of relief which he sought") (citation omitted).

23 I. & N. Dec. 912 (U.S.Atty.Gen.), Interim Decision 3532, 2006 WL 1331555

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Niang v. Gonzales, 10th Cir., September 8, 2005

21 I. & N. Dec. 357 (BIA), Interim Decision 3278, 1996 WL 379826

United States Department of Justice

Board of Immigration Appeals

IN RE FAUZIYA KASINGA, APPLICANT

File A73 476 695-Elizabeth

Decided June 13, 1996

**1  *357  (1) The practice of female genital mutilation, which results in permanent disfiguration and poses a risk of serious, potentially life-threatening complications, can be the basis for a claim of persecution.

(2) Young women who are members of the Tchamba-Kunsuntu Tribe of northern Togo who have not been subjected to female genital mutilation, as practiced by that tribe, and who oppose the practice, are recognized as members of a "particular social group" within the definition of the term "refugee" under section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1994).

(3) The applicant has met her burden of proving through credible testimony and supporting documentary evidence (1) that a reasonable person in her circumstances would fear country-wide persecution in Togo on account of her membership in a recognized social group and (2) that a favorable exercise of discretion required for a grant of asylum is warranted.

**for applicant**
Karen Musalo, Esquire
Washington, D.C.

**for the Immigration and Naturalization Service**
David A. Martin
General Counsel

Before: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; HOLMES, HURWITZ, VILLAGELIU, COLE, MATHON, and GUENDELSBERGER, Board Members. Concurring Opinions: FILPPU, Board Member, joined by HEILMAN, Board Member; ROSENBERG, Board Member. Dissenting Opinion: VACCA, Board Member.

SCHMIDT, Chairman:

This is a timely appeal by the applicant from a decision of an Immigration Judge dated August 25, 1995. The Immigration Judge found the applicant excludable as an intending immigrant, denied her applications for asylum and withholding of deportation, and ordered her excluded and deported from the United States. Upon reviewing the appellate record anew ("de novo review"), we will sustain the applicant's appeal, grant asylum, and order her admitted to the United States as an asylee.

*358  A fundamental issue before us is whether the practice of female genital mutilation ("FGM") can be the basis for a grant of asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1994). On appeal, the parties agree that FGM can be the basis for a grant of asylum. We find that FGM can be a basis for asylum.

Nevertheless, the parties disagree about 1) the parameters of FGM as a ground for asylum in future cases, and 2) whether the applicant is entitled to asylum on the basis of the record before us. In deciding this case, we decline to speculate on, or establish rules for, cases that are not before us.

We make seven major findings in the applicant's case. Those findings are summarized below.

First, the record before us reflects that the applicant is a credible witness. Second, FGM, as practiced by the Tchamba-Kunsuntu Tribe of Togo and documented in the record, constitutes persecution. Third, the applicant is a member of a social group consisting of young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice. Fourth, the applicant has a well-founded fear of persecution. Fifth, the persecution the applicant fears is "on account of" her social group. Sixth, the applicant's fear of persecution is country-wide. Seventh, and finally, the applicant is eligible for and should be granted asylum in the exercise of discretion. Each finding is explained below.

## I. CREDIBILITY

### A. The Applicant's Testimony

 **\*\*2**  The applicant is a 19-year-old native and citizen of Togo. She attended 2 years of high school. She is a member of the Tchamba-Kunsuntu Tribe of northern Togo. She testified that young women of her tribe normally undergo FGM at age 15. However, she did not because she initially was protected from FGM by her influential, but now deceased, father.

The applicant stated that upon her father's death in 1993, under tribal custom her aunt, her father's sister, became the primary authority figure in the family. The applicant's mother was driven from the family home, left Togo, and went to live with her family in Benin. The applicant testified that she does not currently know her mother's exact whereabouts.

The applicant further testified that her aunt forced her into a polygamous marriage in October 1994, when she was 17. The husband selected by her aunt was 45 years old and had three other wives at the time of marriage. The applicant testified that, under tribal custom, her aunt and her husband planned to force her to submit to FGM before the marriage was consummated.

The applicant testified that she feared imminent mutilation. With the help of her older sister, she fled Togo for Ghana. However, she was afraid that her  **\*359**  aunt and her husband would locate her there. Consequently, using money from her mother, the applicant embarked for Germany by airplane.

Upon arrival in Germany, the applicant testified that she was somewhat disoriented and spent several hours wandering around the airport looking for fellow Africans who might help her. Finally, she struck up a conversation, in English, with a German woman.

After hearing the applicant's story, the woman offered to give the applicant temporary shelter in her home until the applicant decided what to do next. For the next 2 months, the applicant slept in the woman's living room, while performing cooking and cleaning duties.

The applicant further stated that in December 1994, while on her way to a shopping center, she met a young Nigerian man. He was the first person from Africa she had spoken to since arriving in Germany. They struck up a conversation, during which the applicant told the man about her situation. He offered to sell the applicant his sister's British passport so that she could seek asylum in the United States, where she has an aunt, an uncle, and a cousin. The applicant followed the man's suggestion, purchasing the passport and the ticket with money given to her by her sister.

AR.04884

The applicant did not attempt a fraudulent entry into the United States. Rather, upon arrival at Newark International Airport on December 17, 1994, she immediately requested asylum. She remained in detention by the Immigration and Naturalization Service ("INS") until April 1996.

The applicant testified that the Togolese police and the Government of Togo were aware of FGM and would take no steps to protect her from the practice. She further testified that her aunt had reported her to the Togolese police. Upon return, she would be taken back to her husband by the police and forced to undergo FGM. She testified at several points that there would be nobody to protect her from FGM in Togo.

 **3  In her testimony, the applicant referred to letters in the record from her mother (Exh. 3). Those letters confirmed that the Togolese police were looking for the applicant and that the applicant's father's family wanted her to undergo FGM.

The applicant testified that she could not find protection anywhere in Togo. She stated that Togo is a very small country and her husband and aunt, with the help of the police, could locate her anywhere she went. She also stated that her husband is well known in Togo and is a friend of the police. On cross-examination she stated that it would not be possible for her to live with another tribe in Togo.

The applicant also testified that the Togolese police could locate her in Ghana. She indicated that she did not seek asylum in Germany because she could not speak German and therefore could not continue her education there. She stated that she did not have relatives in Germany as she does in the United States.

*360  B. Background Information

1. The Asylum Application

The applicant's written asylum application was filed on April 18, 1995, while she was in INS detention (Exh. 3). That application is consistent with the above testimony in all material respects.

A number of documents are attached to the applicant's asylum application. First, there are copies of two letters, dated December 27, 1994, and December 30, 1994, respectively, signed by the applicant's mother. The letters are in English. One letter confirms that the applicant's father's family wishes to have the applicant marry an older man and be subjected to FGM. That letter further confirms that the applicant's mother gave the applicant money to assist her escape. The other letter confirms that the Togolese police were looking for the applicant following her escape in October 1994.

The applicant testified that 1) her mother cannot write English; 2) the letters were prepared by the applicant's sister, at her mother's request; and 3) the letters are signed by the applicant's mother (Tr. at 62-63).

A translated copy of the applicant's marriage certificate also is appended to the asylum application. That document, dated October 7, 1994, is signed by the applicant's husband, but not by the applicant.

Finally, an untranslated document in French, perhaps from the police in Togo, is attached to the asylum application. The applicant did not rely on the untranslated document at the hearing. The INS trial attorney neither objected to the admission of the untranslated document nor cross-examined the applicant with respect to it. The Immigration Judge did not mention the untranslated document.

2. Applicant's Other Exhibits

The applicant's prior counsel also offered a letter dated August 24, 1995, from Charles Piot, Assistant Professor of Cultural Anthropology at Duke University (Exh. 6). That letter 1) states that it was written at counsel's request, on the basis of information

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

furnished by counsel; 2) briefly describes Professor Piot's qualifications as a cultural anthropologist who spent 3 years doing research in Northern Togo in the 1980s; and 3) offers the opinion that a woman of the Tchamba people probably would be expected by her husband to have undergone a clitoridectomy (a type of FGM) prior to marriage.

 **4  The Immigration Judge admitted the Piot letter into evidence (Tr. at 89). The Immigration Judge noted that the weight given the letter would be affected by the inability of the INS to cross-examine Professor Piot. However, the Immigration Judge also stated that he "would accept the applicant on her word, that the tribe requires the circumcision [FGM] prior to marriage." (Tr. at 89).

 *361  The applicant also submitted pictures of herself in tribal ceremonial dress at the time of her marriage. Those pictures were admitted into evidence (Exh. 5), and the applicant testified to their authenticity (Tr. at 70-71).

### 3. Group Exhibit 4

The applicant's prior counsel also filed a lengthy pre-hearing brief accompanied by extensive documentation. That documentation included information on the practice of FGM, its harmful effects on women, its lack of legitimate justification, and its condemnation by the international community. The documentation also confirmed the generally poor human rights situation in Togo, particularly for women. These background materials are designated "Group Exhibit" 4 in the record.

### 4. Description of FGM

According to the applicant's testimony, the FGM practiced by her tribe, the Tchamba-Kunsuntu, is of an extreme type involving cutting the genitalia with knives, extensive bleeding, and a 40-day recovery period (Tr. 30-31, 41). The background materials confirm that the FGM practiced in some African countries, such as Togo, is of an extreme nature causing permanent damage, and not just a minor form of genital ritual. See, e.g., Nahid Toubia, Female Genital Mutilation: A Call for Global Action 9, 24-25 (Gloria Jacobs ed., Women Ink. 1993).

The record material establishes that FGM in its extreme forms is a practice in which portions of the female genitalia are cut away. In some cases, the vagina is sutured partially closed. This practice clearly inflicts harm or suffering upon the girl or woman who undergoes it.

FGM is extremely painful and at least temporarily incapacitating. It permanently disfigures the female genitalia. FGM exposes the girl or woman to the risk of serious, potentially life-threatening complications. These include, among others, bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. It can result in permanent loss of genital sensation and can adversely affect sexual and erotic functions. See generally Toubia, supra; INS Resource Information Center, Alert Series-Women-Female Genital Mutilation, Ref. No. AL/NGA/94.001 (July 1994) [hereinafter FGM Alert].

The FGM Alert, compiled and distributed by the INS Resource Information Center, notes that "few African countries have officially condemned female genital mutilation and still fewer have enacted legislation against the practice." FGM Alert, supra, at 6. Further, according to the FGM Alert, even in those few African countries where legislative efforts have been made, they are usually ineffective to protect women against FGM. The FGM Alert notes that "it remains practically true that [African] women have little legal recourse and may face threats to their freedom, threats or acts of physical violence, or social ostracization for refusing to undergo this harmful traditional  *362  practice or attempting to protect their female children." Id. at 6-7. Togo is not listed in the FGM Alert as among the African countries that have made even minimal efforts to protect women from FGM.

 **5  The record also contains a May 26, 1995, memorandum from Phyllis Coven, Office of International Affairs, INS, which is addressed to all INS Asylum Officers and sets forth guidelines for adjudicating women's asylum claims. Coven, U.S. Dep't of Justice, Considerations For Asylum Officers Adjudicating Claims From Women (1995). Those guidelines state that "rape ...,

sexual abuse and domestic violence, infanticide and genital mutilation are forms of mistreatment primarily directed at girls and women and they may serve as evidence of past persecution on account of one or more of the five grounds." Coven, supra, at 4.

## 5. State Department Reports on Conditions in Togo

The record also contains two reports compiled by the United States Department of State. The first of these, dated January 31, 1994, 1) confirms that FGM is practiced by some ethnic groups in Togo; 2) notes that while some reports indicate that the practice may be diminishing, an expert indicates that as many as 50% of Togolese females may have been mutilated; and 3) notes that various acts of violence against women occur in Togo with little police intervention. Committees on Foreign Affairs and Foreign Relations, 103d Cong., 2d Sess., Country Report on Human Rights Practices for 1993 (Joint Comm. Print 1994) [hereinafter 1993 Country Reports].

The second Department of State Report on Togo, prepared by the Bureau of Democracy, Human Rights and Labor, is dated April 1995. Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, Togo-Profile of Asylum Claims & Country Conditions (April 1995) [hereinafter Profile]. While not specifically addressing FGM, that report states that the President of Togo has a poor human rights record and confirms that the government's military and security forces have been involved in serious human rights abuses.

At the hearing, the Immigration Judge decided not to include in the record a third State Department Report, the February 1995 Country Reports on Human Rights Practices for 1994, because the information basically duplicated the two reports already submitted. See Committees on Foreign Relations and International Relations, 104th Cong., 1st Sess., Country Reports on Human Rights Practices for 1994 268 (Joint Comm. Print 1995). Neither counsel objected to the Immigration Judge's decision to exclude the February 1995 report.

## C. INS Cross-Examination and Request for Remand

During the hearing before the Immigration Judge, the INS had an opportunity to cross-examine the applicant and to offer documentary evidence of its **\*363** own having a bearing on the case. The INS submitted no documentary evidence.

As discussed below, the INS general attorney's cross-examination of the applicant revealed no meaningful inconsistencies in her testimony. The INS does not claim that the applicant is incredible, nor does the INS argue that the Immigration Judge's adverse credibility determination was correct. Rather, the INS requests that the record be remanded for further examination of the applicant's credibility. The INS cites four specific matters in support of its request.

**\*\*6** First, the INS asserts that the applicant testified in an inconsistent manner because she gave several different answers regarding who performs FGM in her tribe. At one point, the applicant stated that an older man of the tribe performed the procedure (Tr. at 24). At another point, she indicated that an old lady or an official circumcisor performed the operation (Tr. at 31-32).

These are not inconsistencies that undermine credibility. It is understandable that a teenage girl, who has been protected from FGM by her father, and who has never been subjected to the process, might have an imperfect understanding of who actually performs the procedure in her tribe. We also note that the applicant had been attending high school outside Togo, in Ghana, during the time immediately preceding her father's death. The INS does not challenge the applicant's membership in the Tchamba-Kunsuntu Tribe, nor does it contend that the tribe does not practice FGM. When viewed in the context of the entire record, the ambiguous answers as to who performs FGM in the tribe do not undermine the applicant's credibility. See Matter of B-, Interim Decision 3251 (BIA 1995).

We reject the INS's second suggestion that there is a material discrepancy in the applicant's testimony regarding her marital status. The record establishes that the applicant was married against her will to an older man of her tribe, and the marriage was

never consummated. The marriage certificate was not signed by the applicant. She fled the country shortly after the marriage, before she had been delivered to her husband's house. Understandably, in the particular circumstances of this case, the teenage applicant may, in her own mind, be uncertain as to whether she is actually "married" to her husband in Togo. The statement in her asylum application that she "would be forced to marry an old man, and be [circumcised]" is basically consistent with her testimony and the corroborating evidence she presented.

We also reject the INS's third challenge to the applicant's credibility. During oral argument, the General Counsel referred to the need to explore the matter of the "untranslated document" attached to the asylum application (O.A. at 33). However, he acknowledged that the INS had an opportunity to explore this matter below and did not do so (O.A. at 34). The INS is not entitled to another opportunity to try this issue. See Matter of Guevara, 20 I & N Dec. 238, 249 (BIA 1991).

**\*364**  We acknowledge the INS's fourth point--that a number of the applicant's answers on both direct and cross-examination were "inaudible" in the transcript. Nevertheless, there is ample audible testimony from the applicant that supports her asylum application. It is very unlikely that any of the "inaudible" portions of the transcript contained highly relevant material impeaching the applicant's credibility. If that were the case, we certainly would expect the INS to have brought it to our attention through an affidavit or declaration from its general attorney who was present at the hearing below.

**\*\*7**  Finally, the INS has not suggested that it has any newly discovered, previously unavailable documentary evidence relating to conditions in Togo or the likelihood of country-wide persecution.

For the foregoing reasons, a remand is not necessary. This is particularly true in light of the length of time the applicant's asylum application has been pending.

### D. The Applicant's Credibility

We have conducted an independent review of the applicant's credibility. We note that the Immigration Judge's adverse credibility determination was based on a perceived lack of "rationality," "persuasiveness," and "consistency." The Immigration Judge did not rely on the applicant's demeanor. We, like the Immigration Judge, can determine from the record whether the applicant's testimony is "rational, plausible, and consistent."

We find that the applicant's testimony in support of her asylum application is plausible, detailed, and internally consistent. See Matter of B-, supra. It is consistent with her asylum application and with the substantial background information in the record. The latter includes information from the Department of State and the INS Resource Information Center.

The applicant is a 19-year-old woman, who was a 17-year-old high school student at the time the events in question occurred. The applicant's father had died, she was separated from her mother, and she was under the control of an unsympathetic aunt. Her arrival in the United States followed flight from her homeland and a lonely journey of thousands of miles that took her through a strange country. Her testimony followed more than 8 months of continuous INS detention, in several facilities, one of which was closed by a riot.

We specifically reject the Immigration Judge's findings that the applicant's failure to know the present whereabouts of her mother; her claim to have avoided FGM through her father's efforts; the incident involving the German woman; or the incident with the Nigerian man were irrational, unpersuasive, or inconsistent. Each of those matters was adequately and reasonably explained by the applicant during her testimony and each of them reasonably could have happened to a teenage girl in the applicant's situation. Her testimony on these points was not impeached by the INS through cross-examination.

**\*365**  For the foregoing reasons, on the basis of the record before us, we find the applicant to be a credible witness.

### II. FGM AS PERSECUTION

For the purposes of this case, we adopt the description of FGM drawn from the record and summarized in Part I.B.4. of this opinion. We agree with the parties that this level of harm can constitute "persecution" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994).

While a number of descriptions of persecution have been formulated in our past decisions, we have recognized that persecution can consist of the infliction of harm or suffering by a government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim. See Matter of Acosta, 19 I & N Dec. 211, 222-23 (BIA 1985), modified on other grounds, Matter of Mogharrabi, 19 I & N Dec. 439 (BIA 1987). The "seeking to overcome" formulation has its antecedents in concepts of persecution that predate the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. See, e.g., Matter of Diaz, 10 I & N Dec. 199, 204 (BIA 1963).

**8  As observed by the INS, many of our past cases involved actors who had a subjective intent to punish their victims. However, this subjective "punitive" or "malignant" intent is not required for harm to constitute persecution. See Matter of Kulle, 19 I & N Dec. 318 (BIA 1985); Matter of Acosta, supra%u.

Our characterization of FGM as persecution is consistent with our past definitions of that term. We therefore reach the conclusion that FGM can be persecution without passing on the INS's proposed "shocks the conscience" test. We also agree with the parties that this case is not controlled by Matter of Chang, 20 I & N Dec. 38 (BIA 1989) (holding that China's population control policy is not persecution).

### III. SOCIAL GROUP

To be a basis for a grant of asylum, persecution must relate to one of five categories described in section 101(a)(42)(A) of the Act. The parties agree that the relevant category in this case is "particular social group." Each party has advanced several formulations of the "particular social group" at issue in this case. However, each party urges the Board to adopt only that definition of social group necessary to decide this individual case.

In the context of this case, we find the particular social group to be the following: young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice. This is very similar to the formulations suggested by the parties.

The defined social group meets the test we set forth in Matter of Acosta, supra, at 233. See also Matter of H-, Interim Decision 3276 (BIA 1996) (finding that identifiable shared ties of kinship warrant characterization as a social *366 group). It also is consistent with the law of the United States Court of Appeals for the Third Circuit, where this case arose. Fatin v. INS, 12 F.3d 1233, 1241 (3d Cir.1993) (stating that Iranian women who refuse to conform to the Iranian Government's gender-specific laws and social norms may well satisfy the Acosta definition).

In accordance with Acosta, the particular social group is defined by common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities. The characteristics of being a "young woman" and a "member of the Tchamba-Kunsuntu Tribe" cannot be changed. The characteristic of having intact genitalia is one that is so fundamental to the individual identity of a young woman that she should not be required to change it.

### IV. WELL-FOUNDED FEAR

The burden of proof is upon an applicant for asylum to establish that a "reasonable person" in her circumstances would fear persecution upon return to Togo. Matter of Mogharrabi, 19 I & N Dec. 439, 445 (BIA 1987). The applicant has met this burden

through a combination of her credible testimony and the introduction of documentary evidence and background information that supports her claim. See Matter of B-, supra; Matter of Dass, 20 I & N Dec. 120 (BIA 1989).

## V. "ON ACCOUNT OF"

**9** To be eligible for asylum, the applicant must establish that her well-founded fear of persecution is "on account of" one of the five grounds specified in the Act, here, her membership in a "particular social group." See, e.g., Matter of H-, supra (holding that harm or abuse because of clan membership constitutes persecution on account of social group).

Both parties have advanced, and the background materials support, the proposition that there is no legitimate reason for FGM. Group Exhibit 4 contains materials showing that the practice has been condemned by such groups as the United Nations, the International Federation of Gynecology and Obstetrics, the Council on Scientific Affairs, the World Health Organization, the International Medical Association, and the American Medical Association.

Record materials state that FGM "has been used to control woman's sexuality," FGM Alert, supra, at 4. It also is characterized as a form of "sexual oppression" that is "based on the manipulation of women's sexuality in order to assure male dominance and exploitation." Toubia, supra, at 42 (quoting Raqiya Haji Dualeh Abdalla, Somali Women's Democratic Organization). During oral argument before us, the INS General Counsel agreed with the latter characterization. (O.A. at 41). He also stated that the practice is a **367** "severe bodily invasion" that should be regarded as meeting the asylum standard even if done with "subjectively benign intent" (O.A. at 42).

We agree with the parties that, as described and documented in this record, FGM is practiced, at least in some significant part, to overcome sexual characteristics of young women of the tribe who have not been, and do not wish to be, subjected to FGM. We therefore find that the persecution the applicant fears in Togo is "on account of" her status as a member of the defined social group.

## VI. COUNTRY-WIDE PERSECUTION

The INS suggests, in its brief and at oral argument, that a remand is necessary because the applicant has not established that she would be unable to avoid FGM by moving to some other part of Togo. As we found in Part I of our opinion, the applicant presented credible testimony that her husband is a well-known individual who is a friend of the police in Togo. She testified that her aunt and her husband were looking for her and that there could be no refuge for her because Togo is a small country and the police would not protect her (Tr. at 59, 61, 65, 73, 74, 78, 86, 87).

The applicant's testimony is consistent with the background information in the record. That information confirms that 1) FGM is widely practiced in Togo; 2) acts of violence and abuse against women in Togo are tolerated by the police; 3) the Government of Togo has a poor human rights record; and 4) most African women can expect little governmental protection from FGM. See 1993 Country Reports, supra; Profile, supra; FGM Alert, supra, at 6-7. We also take notice that Togo is a small country of approximately 22,000 square miles, slightly smaller than West Virginia.

**10** Neither in its briefs nor at oral argument did the INS raise any claim of "new evidence" that might show changed country conditions. We assume that if the INS had any new documentation showing that the applicant could find safety from FGM elsewhere in Togo, it would have offered that evidence in support of its motion to remand.

For the foregoing reasons, we find that this record adequately supports the applicant's claim that she has a country-wide fear of persecution in Togo.

## VII. DISCRETION

We have determined that the applicant is eligible for asylum because she has a well-founded fear of persecution on account of her membership in a particular social group in Togo. A grant of asylum to an eligible applicant is discretionary. The final issue is whether the applicant merits a favorable exercise of discretion. The danger of persecution will outweigh all but the most egregious adverse factors. Matter of Pula, 19 I & N Dec. 467, 474 (BIA 1987). The type of persecution feared by the applicant is very severe.

 **\*368**  To the extent that the Immigration Judge suggested that the applicant had a legal obligation to seek refuge in Ghana or Germany, the record does not support such a conclusion. The applicant offered credible reasons for not seeking refuge in either of those countries in her particular circumstances.

The applicant purchased someone else's passport and used it to come to the United States. However, upon arrival, she did not attempt to use the false passport to enter. She told the immigration inspector the truth. See Matter of Y-G-, 20 I & N Dec. 794 (BIA 1994).

We have weighed the favorable and adverse factors and are satisfied that discretion should be exercised in favor of the applicant. Therefore, we will grant asylum to the applicant.

## VIII. ANCILLARY MATTERS

In view of our disposition of the applicant's case, we will deny the INS's request to remand. We find it unnecessary to consider the new evidentiary materials submitted by the applicant on appeal. We also do not reach the applicant's alternate claim that she has a well-founded fear of persecution on the basis of a forced polygamous marriage. Moreover, it is unnecessary for us to adjudicate the applicant's application for withholding of deportation.

## IX. SUMMARY AND CONCLUSION

The applicant has a well-founded fear of persecution in the form of FGM if returned to Togo. The persecution she fears is on account of her membership in a particular social group consisting of young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice. Her fear of persecution is country-wide. We exercise our discretion in her favor, and we grant her asylum.

Therefore, we sustain the applicant's appeal, grant her asylum, and order her admitted to the United States. The following orders are entered.

ORDER: The applicant's appeal is sustained. The applicant is granted asylum and admitted to the United States as an asylee.

 **\*\*11**  FURTHER ORDER: The INS's motion to remand is denied.

CONCURRING OPINION: Lauri Steven Filppu, Board Member, joined by Michael J. Heilman, Board Member, joined.

I respectfully concur. I write separately in part to respond more completely to several arguments advanced by the Immigration and Naturalization Service.

## I. INTRODUCTION

The questions necessarily presented to the Board by virtue of the positions advanced by the parties in this case are narrow. The majority resolves the  **\*369**  case on those grounds, and properly declines to address issues raised by the Service that go well beyond those essential to the disposition of this appeal.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

While they offer slightly different theories, the parties agree that female genital mutilation ("FGM") can amount to persecution, that there is a "particular social group" of which the applicant may be a member, and that the serious harm the applicant fears from FGM would be inflicted "on account of" her membership in that social group. The case-specific issues presented by the parties for our resolution concern the need for a remand respecting the credibility of the applicant and the precise arguments for finding FGM to constitute a basis for asylum on this record.

The parties naturally understand that this case may well have implications beyond its facts. But only the Service asks that we adopt a framework of analysis which is specifically intended to address issues, such as past persecution questions, that are <u>not</u> presented by the facts of this case. It is unclear whether there is an <u>immediate</u> need for a more comprehensive analytical framework in which to assess FGM claims. To the extent it is needed to address the concerns raised by the Service, that comprehensive guidance could more appropriately be issued through the legislative or regulatory process, not the Board's case adjudication process.

## II. THE QUESTIONS IN THIS CASE

### A. Credibility and Remand

The Immigration Judge determined the applicant to lack credibility, primarily because he found aspects of her story implausible. Although it is not determinative, the Immigration Judge's assessment is not without some force. Indeed, the Service relies on some of the same aspects of the applicant's claim in requesting a remand. But the Service also seeks a remand to explore aspects of the record that could have been explored when the case was before the Immigration Judge. And, as the Immigration Judge's finding was not based on demeanor, the majority appropriately makes an independent assessment of credibility.

It would have been preferable for the applicant to have offered corroboration of some aspects of her story, particularly in relation to her arrival and stay in Germany, which bear on her overall veracity. But the unresolved questions raised by that portion of her account are not sufficient for an adverse credibility finding on this record. Nor is a remand warranted when the Service's other concerns pertain mainly to suspicions that are raised for the first time on appeal.

### B. The Persecution Issues

**\*\*12**  The parties offer different theories for why FGM can amount to persecution, with the Service offering a novel "shocks the conscience" theory as part **\*370** of its analysis. For purposes of this case, it is sufficient to observe that the level of suffering associated with FGM, as practiced by the applicant's tribe, would be more than enough to constitute persecution if inflicted exclusively on a religious or political minority.

The "on account of" and "particular social group" requirements of the statute are not in dispute here, except to the extent that the applicant's proposed "social group" definition includes an element of personal opposition by the victim which is not included in the Service's proposal. It is not essential to choose between these offerings. In view of the positions taken by the parties, the applicant would qualify for relief under either proffered social group. [1]

I agree with a favorable exercise of discretion on this record. Given the severity of FGM as practiced by the applicant's tribe, the near certainty of its application to her if she were to return to Togo, and the positions taken by the parties on the legal issues, a grant of asylum is in order. See Matter of Pula, 19 I & N Dec. 467 (BIA 1987).

## III. THE SERVICE'S FRAMEWORK

Despite the absence of any major dispute between the parties in this case, the Service requests that we adopt its broad "framework of analysis" for claims of this type. Its suggestion candidly is aimed at addressing issues it sees arising in relation to claims that may be made by women from other "parts of the world where FGM is practiced" and by those "who have been subjected to it in the past." (Brief at 15).

The Board engages in case adjudication. It decides those issues that lead to the resolution of the cases before it. Our published rulings act as precedent under the regulations, 8 C.F.R. § 3.1(g) (1995), and can affect many related cases. But the Board is not well positioned, in the context of a single disposition of a novel issue, to establish comprehensive rules or guidelines for the adjudication of all cases presenting variations on the case at hand. Yet, it is the cases that are not before us that seem to draw much of the Service's attention in its brief.

The Service points out that it is "estimated that over eighty million females have been subjected to FGM." (Brief at 13). It further notes that there is "no indication" that "Congress considered application of [the asylum laws] to broad cultural practices of the type involved here." (Brief at 14). The Service proceeds to argue that "the underlying purposes of the asylum system ... are unavoidably in tension" in both providing protection for those seriously in jeopardy and in maintaining broad overall governmental control over  **371**  immigration (Brief at 14-15). The Service further argues that "the Board's interpretation in this case must assure protection for those most at risk of the harms covered by the statute, but it cannot simply grant asylum to all who might be subjected to a practice deemed objectionable or a violation of a person's human rights." (Brief at 15). It is from these underpinnings that the Service argues that the class of FGM victims who may be eligible for asylum "does not consist of all women who come from the parts of the world where FGM is practiced, nor of all who have been subjected to it in the past." (Brief at 15).

 **13**  The Service then offers its "framework of analysis." That framework includes a new "shocks the conscience" test for persecution. The advantages seen by the Service of this test evidently include: 1) the ability to define FGM as "persecution" notwithstanding any lack of intent to "punish" FGM victims on the part of the victims' parents or tribe members who may well "believe that they are simply performing an important cultural rite that bonds the individual to the society"; 2) the ability to exclude other cultural practices, such as "body scarring," from the definition of persecution as these do not shock the conscience; and 3) the ability to exclude past victims of FGM from asylum eligibility if "they consented" to it or "at least acquiesced," as in the case of a woman who experienced FGM as "a small child," since FGM would not shock the conscience unless inflicted on "an unconsenting or resisting individual." (Brief at 16-18).

With respect to the past persecution question, the Service references 8 C.F.R. § 208.13(b)(1) (1995), and notes "that a woman once circumcised cannot ordinarily be subjected to FGM a second time." (Brief at 18 n.3). The regulation cited by the Service provides in part for a presumption of future persecution that arises from past persecution, and allows only one way of overcoming the presumption, namely, a change in country conditions. As conditions in countries where FGM is practiced may not have changed, it may be anomalous to have a binding presumption of future persecution where the act of persecution will never again take place for the individual past victim. [2]

The Service's broad framework of analysis also seems to have led it to offer a social group definition that in one respect fits the test set forth in Matter of Acosta, 19 I & N Dec. 211 (BIA 1985), modified on other grounds, Matter of Mogharrabi, 19 I & N Dec. 439 (BIA 1987), yet is also defined largely by the harm sought to be included in the concept of persecution (Brief at 19-21). For example, we simply do not know from this record whether the similar social groups proposed by the parties are recognized as groupings for  **372**  any other purposes within Togolese society aside from the serious personal harm at issue here. The record does not disclose whether this group is seen as a distinct body within Togo or within the tribe both before and after the infliction of FGM on its members, or whether it is a group that exists exclusively in relation to the particular offensive practice at issue here. Because the social group definition has not been a real source of dispute between the parties, we are also not well informed as to the degree of affiliation between or the homogeneity among its members. See Sanchez-Trujillo v. INS, 801 F.2d 1571 (9th Cir.1986). [3]

The Service does not offer its new framework of analysis for our consideration as part of an effort to harmonize a line of past rulings, or otherwise to put some order into a series of decisions that have addressed FGM questions in a variety of contexts. Instead, the Service offers its new analysis in the context of a case of first impression for the Board. It sets out what appear to be a variety of policy considerations and potential areas of concern that might arise in related but nevertheless different cases.

It then tries to develop a unifying theory or approach that would support grants of asylum to persons who may prospectively face FGM, but would not routinely make asylum available to persons who have simply previously suffered FGM.

 **14  It may be that the Board will end up with an analysis along the lines proposed by the Service as it confronts various issues involving asylum and FGM in the future. Then again the Board may settle upon a different view, which may be better or worse from the perspective of particular parties. But I am fully in agreement with the majority's decision not to attempt to set forth a comprehensive analytical framework in the context of this one case.

The Board certainly is not oblivious to immigration policy considerations in the disposition of cases falling within our jurisdiction. But we are not fundamentally a policy-making body. There may be some unsettling or unsatisfying aspects to the slower and less predictable development of legal guidelines that inures in the Board's case adjudication system. But there are alternatives if resort to the Board's issuance of precedent is not satisfactory in a particular context. The Service can seek to have the Attorney General issue regulations that comprehensively address competing concerns, or it can work within the Administration for appropriate legislative action by Congress. [4]  The Service should not, however, expect the Board to endorse a significant  **373  new framework for assessing asylum claims in the context of a single novel case, especially when that framework seems intended primarily to address cases that are not in fact before the Board yet.

 **15  CONCURRING OPINION: Lory D. Rosenberg, Board Member

Today, in the specific case before us, this Board decides that a young woman of a particular tribe in Togo, who opposes being subjected to female genital mutilation as practiced by that tribe, is a member of a particular social group, and that on account of that membership, a reasonable person could fear persecution as defined in the Immigration and Nationality Act. I join the majority decision in its entirety.

This is, in some respects, a case of first impression. Given our purpose to interpret the statute and regulations, to provide guidance to a field of some 200 Immigration Judges, countless Immigration and Naturalization Service officers, and the public, and to achieve consistency and uniformity in both the procedure and substance of adjudications, there are three important points with regard to our decision today that I believe require further elaboration.

First, this case involves the respondent's reasonable fear that she faces the possibility of harm or abuse, rising to the level of persecution, inflicted on account of her membership in a particular social group.

This case falls squarely within the formulation adopted by Congress in the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which was enacted in large part to establish compliance with this country's domestic and international humanitarian obligations under the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967 [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268, to which the United States is a signatory country, and which incorporates by reference the 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("Convention"). See sections 208, 243(h) of the Act, 8 U.S.C. §§ 1158, 1243(h) (1994). As I read the record, both the Service and the applicant call upon us, in their briefs and at oral argument, to recognize and articulate a framework to provide a context for our decision in this case. However, unlike the Service, which urges us to consider a new standard and a new framework which exceeds the bounds of this case (Service Brief at 12-15; O.A. at 26), the applicant contends that we should draw on traditional principles of asylum jurisprudence to adopt a framework that is consistent and appropriate with the Refugee Act and international law. (Applicant's Brief at 27-36, Applicant's Reply Brief at 13-15, O.A. at 4). I agree.

In my view, there are three essential elements inherent in our definition of persecution, which, if established, constitute the basis for a discretionary grant of asylum, or a mandatory grant of withholding of deportation, or both. One is the factor of the applicant's genuine, subjective fear of persecution, which must be accompanied by objective evidence rendering the fear reasonable. The next is the factor of harm, abuse, or ill-treatment which rises to the  **374  level of, or amounts to, persecution and includes consideration of the applicant's attitude towards such treatment. The last is the reason for, or cause of, the infliction of

persecution. This is known as the "on account of" factor, which includes consideration of the motives of the agent of persecution and requires a nexus between the infliction of harm which constitutes persecution and one of the five protected grounds or statuses, such as social group membership, set forth by the Act. In Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir.1993), the United States Court of Appeals for the Third Circuit held that to prevail, an applicant claiming social group persecution must identify a cognizable social group, establish her membership in it, and show that persecution is based on that membership.

**16** In this case, I conclude that the applicant's fear is of imminent female genital mutilation, related to being forced to enter an arranged marriage, documented in the record as constituting a mandatory tribal custom. The harm or abuse amounting to persecution is the genital mutilation opposed by the applicant. The reason the persecution would be inflicted, the "on account of" element, is because of the persecutor's intent to overcome her state of being non-mutilated and accordingly, free from male-dominated tribal control, including an arranged marriage.

I see no reason to depart from our existing jurisprudence in order to determine the claim set forth here. In my view, this issue is controlled by our precedent decisions, interpreting the statute and agency regulations, in which, only recently, we have recognized that government-tortured Sri Lankans; imprisoned and beaten Somalia tribesmen; persecuted Afghani Mujahedin fighters; and Haitian women, raped for political retribution, can set forth claims which deserve and warrant protection within our laws. Matter of H-, Interim Decision 3276 (BIA 1996); Matter of D-V-, Interim Decision 3252 (BIA 1993); Matter of B-, Interim Decision 3251 (BIA 1995).

In adjudicating any asylum claim, we use a "reasonableness" standard to determine whether an asylum applicant has established the presence of these essential elements. See INS v. Cardoza-Fonseca, 480 U.S. 421 (1987) (addressing the distinct burdens of proof for asylum, requiring that the applicant's fear be reasonable, and for withholding of deportation, requiring that there be a likelihood or clear probability of persecution). In my view, while Cardoza-Fonseca and its progeny, including our decision in Matter of Mogharrabi, 19 I & N Dec. 439 (BIA 1987), invoked that standard principally to assess the fear of persecution asserted by the applicant, it is equally appropriate to employ that standard in our determinations regarding the "on account of" element.

In this case, the applicant has met her burden of establishing that her fear of female genital mutilation is not only reasonable, but that its infliction on her is probable. In addition, she has shown this practice to be persecution since she has met her burden of establishing that it is both reasonable to believe and probable that the mutilation she faces is on account of her status **375** as a young woman of the tribe, that she opposes the practice of mutilation, and that it will be inflicted in satisfaction of tribal customs or norms because of her status.

Second, a social group definition that takes into account and differentiates the other component elements of the definition of persecution which warrant protection under United States law is critical.

There is nothing about a social group definition based upon gender that requires us to treat it as either an aberration, or as an unanticipated development requiring a new standard. While this is the first time that this Board has addressed the particular type of harm or abuse feared by the respondent--female genital mutilation--it is not the first time that the Board has addressed the "particular social group category," see, e.g., Matter of Sanchez and Escobar, 19 I & N Dec. 276 (BIA 1985); Matter of Acosta, 19 I & N Dec. 211 (BIA 1985), modified on other grounds, Matter of Mogharrabi, supra. Indeed, this Board has specifically addressed the category of particular social group persecution in a recent decision. Matter of H-, Interim Decision 3276 (BIA 1996) (holding that membership in an identifiable subclan of a Somalian tribe constitutes membership in a particular social group and that harm suffered on account of that membership constitutes persecution).

**17** The social group category within the refugee definition incorporated into the Act has been recognized as having deliberately been included as a "catch-all" for individuals not falling into the first four specifically enumerated categories of political opinion, race, religion, or ethnicity. See Kristin E. Kandt, United States Asylum Law: Recognizing Persecution Based on Gender Using Canada as a Comparison, 9 Geo. Immigr. L.J. 137, 145 (1995) (citing T. Alexander Aleinikoff, The Meaning of "Persecution" on United States Asylum Law, 3 Int'l J. Refugee L. 5, 11 (1991); see also Nancy Kelly, Guidelines for Women's

Asylum Claims, 26 Cornell Int'l L.J. 625 (1993); Pamela Goldberg, Anyplace But Home: Asylum in the United States for Women Fleeing Intimate Violence, 26 Cornell Int'l L.J. 565, 591-92 (1993). As Professor Goldberg discusses, the scope of the social group category has been addressed by preeminent international law scholars. For example, Atle Grahl-Madsen considers it to be broader than the other categories and to have been added to the Convention precisely to protect against persecution that would arise from unforeseeable circumstances. In addition, Guy Goodwin Gill asserts that the category allows states to expand it to various classes susceptible to persecution. In her article, Professor Goldberg proposes one definition of a gender-identified social group which would include a group of women characterized by circumstances or similar treatment, not unlike the definition we propose here.

Unlike requests for asylum premised upon political opinion, social group claims, like those involving race, ethnicity, or religion, are status based and do not necessarily require a showing of the presence of an individual's opinions or activities which spurs the persecutor's wrath or otherwise motivates  **\*376**  the harm or persecution. Matter of H-, supra. Rather, such requests involve a determination of whether the shared characteristics are those which motivate an agent of persecution to seek to overcome or otherwise harm the individual. Matter of Acosta, supra. Consequently, while not inaccurate, it is surplusage to define the social group in this case by including as an element the applicant's opposition to the practice of female genital mutilation.

It may be true that sometimes an individual woman's political opinion may overlap or coexist with her membership in a group designated as a particular social group; however, that does not detract from the fact that social group membership is a status-based ground protected under the Act, just as is religion or ethnicity. While it is not impossible that a political or social opinion, either actual or imputed, may be shared by persons whom, as a result, we would characterize as constituting a particular social group within the meaning of the Act, that is not the case here. As I have stated, the applicant's political or social views--her attitude or intent--is not relevant to our definition of the social group to which she belongs, but rather to whether the harm or abuse she faces constitutes persecution.

 **\*\*18**  In Matter of H-, supra, this Board found, without difficulty or the need to qualify, that a man who was a member of a tribe in Somalia whose members were being systematically attacked by other tribes in retribution for the corruption and brutality of former ruler and tribe member, Siad Barre, had established persecution based on his clan membership alone. That his father and brother were killed and that he himself was brutally treated during detention was found to be persecution on account of his membership in a subclan in Somalia, a particular social group. His attitude towards that persecution was neither examined nor relevant.

The only distinguishing characteristic about this case that I can perceive to set it apart from others we already have decided is that it involves a woman. Reliance upon such a distinction to support a separate category for treatment of women's asylum claims, to my mind, would be impermissible. See, e.g., Kandt, supra, at 143-151. Here, the applicant is a member of a group: girls and women of a given tribe, some perhaps of marriageable age, whose members are routinely subjected to the harm which the majority finds to constitute persecution. The applicant's opposition (which happens to be present in this case) or the lack of it, is neither determinative, nor necessary to define the social group in accordance with the statutory language.

Third, it is the role of this Board to interpret and apply the statute in individual cases coming before us for the purpose of establishing a consistent framework for adjudication.

This Board has a significant history and an ongoing role in interpreting the statute and determining the law in cases involving immigrants and refugees. Under 8 C.F.R. § 3.1(g) (1995), our precedent decisions are to be binding on all subsequent adjudications involving the same issue or issues. As the designee of the Attorney General, we serve not only to adjudicate individual,  **\*377**  unrelated cases on their facts, but also to give life to the provisions and terms of the law and establish agency policy through adjudication. See Rust v. Sullivan, 500 U.S. 173 (1991); NLRB v. Bell Aerospace Co., 416 U.S. 267, 294 (1974) (finding that administrative agencies may engage in setting policy both by rulemaking and case adjudication).

Consideration of gender-based, or gender-related, asylum claims within the "membership in a particular social group" construct that exists within the Act is entirely appropriate and consistent with the developing trend of jurisprudence in the United States and Canada as well as with international norms. Fatin v. INS, supra; Cheung v. Canada, 102 D.L.R. 4th 214 (1993); cf. Gomez v. INS, 947 F.2d 660 (2d Cir.1991). Further, the United Nations High Commissioner for Refugees explicitly encourages the use of "particular social group" analysis to extend protection to women asylum seekers who otherwise satisfy the refugee definition. See United Nations High Commissioner for Refugees, Memorandum: Female Genital Mutilation (Geneva, UNHCR, Division of International Protection, May 1994). Our recognition of a particular social group based upon tribal affiliation and gender is also in harmony with the guidelines for adjudicating women's asylum claims issued by the Service, see Coven, U.S. Dep't of Justice, Considerations for Asylum Officers Adjudicating Asylum Claims From Women (1995), and with the Canadian guidelines for women refugees facing gender-related persecution, see Immigration and Refugee Board, Guidelines Issued by the Chairperson Pursuant to Section 65(B) of the Immigration Act: Women Refugee Claimants Fearing Gender-Related Persecution (1993) ("Canadian gender guidelines").

 **19  In an endorsement of the viability of the present statutory structure, the Service itself saw fit to develop gender guidelines to assist in the adjudication of asylum claims brought by women. Coven, supra. Curiously, the position of the Service in this case makes no reference to its published guidance in that regard. However, it is notable that the guidelines recognize the importance of considering gender-based claims in light of international human rights instruments and the framework they provide. Indeed, the Service itself recognizes that gender-based asylum claims are "developments in refugee protection" and that its guidelines are a natural and multifaceted outgrowth of a set of gender guidelines issued by the UNHCR in 1991, the 1993 Canadian gender guidelines and other sources of expertise including the Women's Refugee Project of the Harvard Immigration and Refugee Program.

What we have done here, while we do not explicitly say so, is to posit, by example, the proper framework in which the individual facts of such claims made before the Service and before Immigration Judges should be considered and judged. In sum, we have, in the majority opinion, set forth a road map for analysis appropriate for this case, which may easily be extrapolated and applied in upcoming adjudications, not only of gender-based asylum claims, but in many other asylum applications. Moving from the factual  *378  assertions in the applicant's testimony concerning her fear, and the practice of female genital mutilation in her tribe, we have considered the background information presented, including her application and documentation submitted as other exhibits in support of it. Taking this evidence as a whole, we found the applicant to have testified truthfully, and we rejected both the Immigration Judge's finding that the applicant's claim lacked "rationality" and his reliance on minor inconsistencies pertaining to tangential matters which were reasonably explained and did not, in any event, go to the essence of her claim.

As it was raised by the Service and addressed in our case law, Matter of R-, 20 I & N Dec. 621 (BIA 1992), we looked to whether or not the applicant could reasonably be expected to relocate within the country of Togo, and we found her to have established a country-wide basis for her fear. Finally, in exercising our discretion, we rejected the Immigration Judge's contention that the applicant had an obligation to seek refuge in other countries she passed through while in transit to the United States. We reaffirmed that use of a false passport to travel to this country is outweighed by the danger of persecution, Matter of Pula, 19 I & N Dec. 467 (BIA 1987), and granted asylum. All of this was clearly, coherently, and properly done based on the facts presented in this case and on the existing statute, related policy considerations, and developing legal authorities consistent with the current law.


DISSENTING OPINION: Fred W. Vacca, Board Member

 **20  I respectfully dissent without opinion.

## Footnotes

1    This is not to say we are bound absolutely by the parties' arguments. But we face here an issue of first impression, in relation to FGM claims, and we lack the benefit of either amicus briefing or supplemental briefing on questions we might pose. In the absence of any dispute of consequence between the parties, there is no need to resolve this particular question in order to decide the case.

2    It might also be anomalous if persons facing death in their homelands because of religious or political persecution were denied protection for having "assisted, or otherwise participated in the persecution" of their children simply by virtue of being parents of FGM victims and having followed tribal custom. See section 243(h)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(2)(A) (1994); 8 C.F.R. § 208.13(c).

3    But for the concession of the Service on this point, I would be inclined to remand this case for further development on the "social group" question. The meaning of the phrase "membership in a particular social group" has not been completely explained by our case law. Nevertheless, it is questionable whether the statute was meant to encompass groups that are defined principally in relation to the harm feared by the asylum applicant. See Bastanipour v. INS, 980 F.2d 1129, 1132 (7th Cir.1992); Gomez v. INS, 947 F.2d 660, 663-64 (2d Cir.1991). The record here sheds little light on this question.

4    Indeed, appropriate new legislation might prove to be the better answer if principles of asylum law in fact end up creating the types of anomalies identified by the Service.

21 I. & N. Dec. 357 (BIA), Interim Decision 3278, 1996 WL 379826

                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Robleto-Pastora v. Holder, 9th Cir., January 11, 2010

21 I. & N. Dec. 296 (BIA), Interim Decision 3272, 1996 WL 227774

United States Department of Justice

Board of Immigration Appeals

IN RE JOSE MENDEZ-MORALEZ, RESPONDENT

File A41 940 178-Lincoln

Decided April 12, 1996

**\*\*1** (1) In assessing whether an applicant has met his burden of establishing that a **\*296** grant of a waiver of inadmissibility is warranted in the exercise of discretion under section 212(h)(1)(B) of the Immigration and Nationality Act, 8 U.S.C. 1182(h)(1)(B) (1994), the Immigration Judge must balance the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented on his behalf to determine whether the grant of relief in the exercise of discretion appears to be in the best interests of this country.

(2) Establishing extreme hardship and eligibility for section 212(h)(1)(B) relief does not create any entitlement to that relief; extreme hardship, once established, is but one favorable discretionary factor to be considered.

(3) The equities that the applicant for section 212(h)(1)(B) relief must bring forward to establish that he merits a favorable exercise of administrative discretion will depend in each case on the nature and circumstances of the ground of exclusion sought to be waived and on the presence of any additional adverse matters, and as the negative factors grow more serious, it becomes incumbent upon the applicant to introduce additional offsetting favorable evidence.

(4) Taking responsibility and showing remorse for one's criminal behavior does constitute some evidence of rehabilitation, although an alien who claims innocence and does not express remorse is not precluded from ever presenting persuasive evidence of rehabilitation by other means.

(5) While the lack of persuasive evidence of rehabilitation may not in itself be an adverse factor, the absence of this equity in the alien's favor may ultimately be determinative in a given case concerning the exercise of discretion under section 212(h)(1)(B) of the Act, particularly where an alien has engaged in serious misconduct and there are questions whether the alien will revert to criminal behavior; and conversely, evidence of rehabilitation in some cases may constitute the factor that raises the significance of the alien's equities in total so as to be sufficient to counterbalance the adverse factors in the case and warrant a favorable exercise of discretion.

**for respondent**
Clayton H. Brant, Esquire
Lincoln, Nebraska

**for the Immigration and Naturalization Service**
Paul R. Sctultz
District Counsel

**\*297** Before: Board En Banc: DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, and MATHON, Board Members. Concurring and Dissenting Opinion: SCHMIDT, Chairman, joined by, GUENDELSBERGER, Board Member. Dissenting Opinion: ROSENBERG, Board Member.

VACCA, Board Member:

## I. PROCEDURAL HISTORY

In a decision dated November 22, 1994, an Immigration Judge found the respondent deportable as charged under section 241(a)(2)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2)(A)(i) (1994), as an alien convicted of a crime involving moral turpitude committed within 5 years of entry into the United States. He also denied his application for adjustment of status under section 245(a) of the Act, 8 U.S.C. § 1255(a) (1994), as well as his corresponding application for a waiver of inadmissibility under section 212(h) of the Act, 8 U.S.C. § 1182(h) (1994), and ordered him deported from the United States to Mexico. The respondent has appealed from that decision. The appeal will be dismissed.

## II. ISSUE PRESENTED

**2** The respondent, a 42-year-old native and citizen of Mexico, was first admitted to the United States as a lawful permanent resident on May 2, 1988. He was convicted in a Nebraska court by a jury verdict on November 19, 1992, of first degree sexual assault, in violation of section 28-319(1)(c) of the Nebraska Revised Statutes. For this crime, committed in April or May 1992, the respondent was sentenced on January 5, 1993, to an indeterminate sentence of 2 to 3 years. Reportedly, he was released from prison on parole in January 1995, after having served 1 year of his sentence. The respondent conceded his deportability during the proceedings and has not contested his deportability on appeal. The only issue before us is whether the Immigration Judge properly denied the respondent's application for adjustment of status under section 245 of the Act and, in the exercise of discretion, the corresponding waiver of inadmissibility under section 212(h) of the Act. We find that he did.

## III. ADJUSTMENT OF STATUS UNDER SECTION 245

Section 245 of the Act provides that the Attorney General may in her discretion adjust the status of an alien inspected and admitted or paroled into the United States to that of an alien lawfully admitted for permanent residence if the alien applies for adjustment, the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and an immigrant visa is immediately available. An alien subject to deportation proceedings may also apply for adjustment of status before the Immigration **298** Judge and, if inadmissible under section 212(a) of the Act, may also apply for a waiver of the ground of inadmissibility. See 8 C.F.R. § 242.17(a) (1995).

In the case before us the respondent's application for adjustment of status is based on his February 20, 1987, marriage to a United States citizen and the immediate relative visa petition she filed on his behalf, which was approved by the Immigration and Naturalization Service on November 21, 1994. As such, it appears that the respondent is eligible for an immigrant visa that is immediately available to him. The fact that he is a lawful permanent resident does not preclude him from applying for adjustment of status under section 245. Tibke v. INS, 335 F.2d 42 (2d Cir.1964); Matter of Parodi, 17 I & N Dec. 608 (BIA 1980); Matter of Loo Bing Sun, 15 I & N Dec. 307 (BIA 1975); Matter of Krastman, 11 I & N Dec. 720 (BIA 1966); see also Matter of Gabryelsky, 20 I & N Dec. 750 (BIA 1993).

## IV. WAIVER OF INADMISSIBILITY UNDER SECTION 212(h)

However, the respondent is not admissible to the United States as required for eligibility under section 245. By virtue of his conviction for a crime involving moral turpitude, he is inadmissible under section 212(a)(2)(A)(i)(I) of the Act. An alien who is inadmissible under this section as an alien convicted of a crime involving moral turpitude may seek a waiver of inadmissibility under section 212(h) of the Act. Section 212(h) may be used to waive inadmissibility which would otherwise preclude adjustment of status. See Osuchukwu v. INS, 744 F.2d 1136, 1139 (5th Cir.1984); Matter of Goldeshtein, 20 I & N Dec. 382 (BIA 1991), rev'd on other grounds, 8 F.3d 645 (9th Cir.1993); Matter of Parodi, supra; Matter of Sanchez, 17 I & N Dec. 218 (BIA 1980); Matter of Shaughnessy, 12 I & N Dec. 810 (BIA 1968).

**\*\*3**  Section 212(h) provides:

The Attorney General may, in his discretion, waive the application of subparagraphs (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph (A)(i)(II) of such subsection insofar as it relates to a single offense of simple possession of 30 grams or less of marijuana if -

(1)(A) in the case of any immigrant it is established to the satisfaction of the Attorney General that -

(i) the alien is excludable only under subparagraph (D)(i) or (D)(ii) of such subsection or the activities for which the alien is excludable occurred more than 15 years before the date of the alien's application for a visa, entry, or adjustment of status,

(ii) the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States, and

(iii) the alien has been rehabilitated; or

(B) in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's exclusion would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien; and

**\*299**  (2) the Attorney General, in his discretion, and pursuant to such terms, conditions and procedures as he may by regulations prescribe, has consented to the alien's applying or reapplying for a visa, for admission to the United States, or adjustment of status.

No waiver shall be provided under this subsection in the case of an alien who has been convicted of (or who has admitted committing acts that constitute) murder or criminal acts involving torture.

The amended version of section 212(h) essentially creates two categories of immigrants eligible for section 212(h) relief. The first category includes any immigrant who meets eligibility criteria that largely concern the type of exclusion ground involved or when the excludable activity occurred, as well as issues of the alien's rehabilitation and the national welfare, safety, or security of the United States. The second category includes immigrants who demonstrate the requisite relationship to a United States citizen or lawful permanent resident, and establish that their exclusion would result in extreme hardship to that relative. See Matter of Alarcon, 20 I & N Dec. 557 (BIA 1992). In the case at hand, the respondent, who is assimilated to the position of an immigrant for purposes of seeking adjustment of status, is married to a United States citizen and has three United States citizen children. As such, he may demonstrate eligibility under section 212(h)(1)(B) of the Act by establishing extreme hardship to his United States citizen wife or children if he were excluded.

In his decision the Immigration Judge in fact found that extreme hardship to the wife and children had been established, and that the respondent consequently was eligible for section 212(h) relief. However, he denied the section 212(h) waiver in the exercise of discretion, and accordingly found him ineligible for adjustment of status because of his inadmissibility resulting from his criminal conviction.

### A. Exercise of Discretion Under Section 212(h)(1)(B): Factors Considered

**\*\*4**  On appeal, the respondent has contested the discretionary denial of relief, arguing that he merited a favorable exercise of discretion in light of his equities and the hardship to his family if he were deported. In the respondent's view, the Immigration Judge erred in ruling that he had not demonstrated rehabilitation and in placing too much emphasis on his claim of innocence of the crime of which he was convicted. According to the respondent, the Immigration Judge also erred in requiring that rehabilitation be shown.

As is true for other discretionary forms of relief, the burden is on the applicant to establish that a grant of a waiver of inadmissibility under section 212(h)(1)(B) of the Act is warranted in the exercise of discretion. See Matter of Fernandez, 14 I & N Dec. 24 (BIA 1972). This has been held to be the case for other waivers of inadmissibility. See Matter of Marin, 16 I & N Dec. 581 (BIA 1978) (section 212(c) waiver). As is also true for other waivers of inadmissibility that would allow an alien to be admitted to the United States as a **\*300** lawful permanent resident, the Immigration Judge must balance the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented on his behalf to determine whether the grant of relief in the exercise of discretion appears to be in the best interests of this country. See id.

We find this use of Matter of Marin, supra, as a general guide to be appropriate. For the most part, it is prudent to avoid cross application, as between different types of relief, of particular principles or standards for the exercise of discretion. Id. However, our reference to Matter of Marin, supra, is only for the purpose of the approach taken in that case regarding the balancing of favorable and unfavorable factors within the context of the relief being sought under section 212(h)(1)(B) of the Act. See, e.g., Palmer v. INS, 4 F.3d 482 (7th Cir.1993) (balancing of discretionary factors under section 212(h)). We find this guidance to be helpful and applicable, given that both forms of relief address the question of whether aliens with criminal records should be admitted to the United States and allowed to reside in this country permanently.

What we do not find applicable is the analysis for determining whether adjustment of status under section 245 of the Act is warranted in the exercise of discretion, as set forth in Matter of Arai, 13 I & N Dec. 494 (BIA 1970). There, the Board ruled that generally where there are adverse factors present, favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting a favorable exercise of discretion, and that in the absence of adverse factors, adjustment will be ordinarily granted in discretion. See also Matter of Blas, 15 I & N Dec. 626 (BIA 1974; A.G. 1976). This approach has no application to relief under section 212(h) of the Act. A waiver of inadmissibility under section 212(h) necessarily involves at least one adverse consideration, specifically the criminal conviction or activity constituting the ground of exclusion sought to be waived. See Matter of Marin, supra, at 585. Thus, there can be no presumption that relief is warranted in the exercise of discretion. Further, this criminal conviction or activity would usually be more severe than any adverse factor present in the application for adjustment of status, presuming admissibility and general eligibility for adjustment of status.

**\*\*5** These principles taken from Matter of Marin, supra, are to be applied in the context of the particular considerations that will arise in an application for section 212(h)(1)(B) relief. Section 212(h)(1)(B) relief is its own distinct form of waiver, with the balancing of factors to be undertaken in view of the particular purposes either stated or inherent in the statute. To exemplify, we would emphasize two considerations that do not often arise in an application for section 212(c) relief. First, a section 212(h) applicant seeking to adjust his status need not be, and in most cases is not already, a lawful permanent resident, and those lawful permanent residents that do apply may not necessarily have the length of residency attained by those eligible for section 212(c) **\*301** relief. Secondly, those found eligible for relief under section 212(h)(1)(B) will by definition have already established extreme hardship to qualified family members, which would be a factor favorable to the alien in exercising discretion.

We emphasize that establishing extreme hardship and eligibility for section 212(h)(1)(B) relief does not create any entitlement to that relief. Extreme hardship is a requirement for eligibility, but once established it is but one favorable discretionary factor to be considered. We would note, however, that an application for discretionary relief, including a waiver under section 212(h), may be denied in the exercise of discretion without express rulings on the question of statutory eligibility. Matter of Goldeshtein, supra; see also Silva v. Carter, 326 F.2d 315, 320 (9th Cir.1963), cert. denied, 377 U.S. 917 (1964); cf. INS v. Rios-Pineda, 471 U.S. 444, 449 (1985); INS v. Bagamasbad, 429 U.S. 24, 25 (1976). We also emphasize that the discretionary analysis discussed is specifically applicable only to those aliens applying for relief under subsection (B) of 212(h)(1), subsection (A) having particular eligibility criteria that, if met, will affect the exercise of discretion.

In evaluating whether section 212(h)(1)(B) relief is warranted in the exercise of discretion, the factors adverse to the applicant include the nature and underlying circumstances of the exclusion ground at issue, the presence of additional significant violations

of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident of this country. See e.g., Matter of Marin, supra, and cases cited therein. The favorable considerations include family ties in the United States, residence of long duration in this country (particularly where the alien began his residency at a young age), evidence of hardship to the alien and his family if he is excluded and deported, service in this country's Armed Forces, a history of stable employment, the existence of property or business ties, evidence of value and service to the community, evidence of genuine rehabilitation if a criminal record exists, and other evidence attesting to the alien's good character (e.g., affidavits from family, friends, and responsible community representatives). See, e.g., id., and cases cited therein.

**6**  Upon review of the record as a whole, the Immigration Judge is required to balance the equities and adverse matters to determine whether discretion should be favorably exercised. The basis for the Immigration Judge's decision must be enunciated in his opinion. See, e.g., id. The equities that the applicant for section 212(h)(1)(B) relief must bring forward to establish that he merits a favorable exercise of administrative discretion will depend in each case on the nature and circumstances of the ground of exclusion sought to be waived and on the presence of any additional adverse matters, and as the negative factors grow more serious, it becomes incumbent upon the applicant to introduce additional offsetting favorable evidence. See, e.g., id.

***302**  The underlying significance of the adverse and favorable factors is also to be taken into account. For example, if the alien has relatives in the United States, the quality of their relationship must be considered in determining the weight to be awarded this equity. Further, the equity of a marriage and the weight given to any hardship to the spouse is diminished if the parties married after the commencement of deportation proceedings, with knowledge that the alien might be deported. Ghassan v. INS, 972 F.2d 631 (5th Cir.1992), cert. denied, 507 U.S. 971 (1993). Similarly, if the alien has a history of employment, it is important to consider the type of employment and its length and stability. Further, when looking at the length of the alien's presence in the United States, the nature of his presence during this period must be evaluated. For example, a period of residency marked by a term of imprisonment diminishes the significance of the period of residency. See generally Douglas v. INS, 28 F.3d 241 (2d. Cir.1994) (residency marked by criminal activity).

B. Exercise of Discretion in Respondent's Case

Having reviewed the record and the Immigration Judge's decision, and the contentions made on appeal, we agree with the Immigration Judge that a favorable exercise of discretion is not warranted. The respondent has demonstrated equities that may be characterized as substantial. Although he has only been in this country lawfully for a little more than 7 years, he does have significant family ties, including his United States citizen wife of 8 years. His United States citizen children include a 9-year-old stepson, a 7-year-old daughter, and a 4-year-old son. According to the wife's testimony, the respondent has been a loving father and the children are close to him emotionally. The respondent also has a consistent history of employment as an agricultural worker and mechanic at various ranches, and he has testified that his most recent employer has assured him of a position as a mechanic at $6 an hour upon his release from prison. The record also reflects that the respondent has continuously supported his family financially before his incarceration, except for a period in 1991 when he injured his back. The family began receiving food stamps that year, and since his incarceration they have also received welfare payments and housing assistance as well. The respondent's wife last worked as a cashier for a department store from 1989 to 1991, when she was terminated from her employment because she was pregnant.

**7**  The respondent also has other family ties in the United States, including two lawful permanent resident brothers living in Colorado and Kansas, a sister living in Colorado, and his lawful permanent resident parents, who also live in Colorado and who are self-supporting. The respondent testified that his sister was not a lawful permanent resident, but he did not elaborate as to her specific status in this country. The respondent also testified that he has two children in Mexico, but he has no contact with them and does not know their whereabouts.

***303**  As noted above, the Immigration Judge found that the respondent's departure would cause extreme hardship to his wife and children, as they are dependent upon him financially and are emotionally close to him. The wife testified that if her husband

were deported she would remain in the United States with the children and likely move to Kansas with her adoptive father. She also testified that she was receiving psychiatric treatment for depression, noting that she had attempted to commit suicide in 1992 after the criminal charges were filed against her husband, and observing that she was attempting to obtain disability payments. She also observed that she had a medical condition involving her spine and hips that precluded her from lifting things.

In sum, the respondent has demonstrated substantial equities in his favor, including hardship to his wife and children if he were deported. Some hardship to the respondent is also apparent in view of his ties to this country and the poor economic conditions in Mexico, as documented by news articles submitted by the respondent, although he has not demonstrated that he would be virtually precluded from finding employment in Mexico. However, his equities must be balanced against the adverse factors in his case, particularly the serious crime of which he was convicted. The seriousness of his crime can be seen from a reading of the statute under which he was convicted and the surrounding circumstances. The Nebraska statute in question provides: Sexual assault; first degree; penalty.

(1) Any person who subjects another person to sexual penetration and (a) overcomes the victim by force, threat of force, express or implied, coercion or deception, (b) knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct, or (c) the actor is nineteen years of age or older and the victim is less than sixteen years of age is guilty of sexual assault in the first degree.

2) Sexual assault in the first degree is a Class II felony. The sentencing judge shall consider whether the actor shall have caused serious personal injury to the victim in reaching his decision on the sentence.

(3) Any person who shall be found guilty of sexual assault in the first degree for a second time shall be sentenced to not less than twenty-five years and shall not be eligible for parole.

Neb. Rev. Stat. § 28-319 (1992).

 **8**   The respondent was convicted under section 28-319(1)(c) of sexually penetrating a victim under the age of 16. In fact the record before the Immigration Judge made clear that the respondent's victim was 13 years old at the time of the sexual assault, at a time when he was 40 years of age. [1]  The young girl, who lived in the same apartment building, frequented the respondent's home. Apparently she practically lived there, reportedly because her own mother was mentally disabled to some degree and did not exert much  *304  parental control, and the respondent and his wife were not willing to force her to leave. The respondent has acknowledged that their unwillingness to force her to leave led to situations where the young girl was present when he and his wife were watching sexually explicit movies or engaging in sexual intercourse themselves. He has also admitted soliciting the victim's mentally disabled mother for sex, as repayment for money the mother had borrowed from him. According to the respondent, he did this in order to discourage her from asking to borrow more money. The circumstances of his crime clearly show its egregiousness.

We point out that as a matter of law, a 13-year-old child is incapable of consent where the act is being perpetrated by a grown man 27 years older. Where a statute makes sexual acts with a child under a specified age a crime, without regard to consent, such statutes are construed as fixing the age of consent. The purpose of these statutes is to protect children from illicit acts by rendering them incapable of consenting . See Matter of Dingena, 11 I & N Dec. 723 (BIA 1966).

Given the nature of the respondent's crime, we do not find that his equities are sufficient to counterbalance its seriousness. We find this to be particularly so given that his equities do not include any persuasive evidence of rehabilitation. We do not find his release from prison after 1 year due to his good conduct in following prison rules in a controlled setting to be persuasive evidence of rehabilitation from his criminal act of sexually assaulting a young child. At his hearing, the respondent denied that the sexual assault ever occurred, stated that he had been "falsely accused," and did not express remorse for his crime. In

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

addition, when asked whether he had attempted to get any "sexual offender treatment," he responded, "I believe that I do not have a sexual problem."

The respondent argues on appeal that his assertion of innocence should not be used against him because he is, in fact, innocent and the criminal justice system makes mistakes, and he therefore should not be forced to be dishonest with himself. However, in ascertaining the effect of a criminal conviction, neither the Board nor the Immigration Judge may go beyond the judicial record to determine the guilt or innocence of an alien. See Matter of Edwards, 20 I & N Dec. 191 (BIA 1990); Matter of Khalik, 17 I & N Dec. 518 (BIA 1980). He must be considered guilty of the crime. Taking responsibility and showing remorse for one's criminal behavior does constitute some evidence of rehabilitation. See Gonzalez v. INS, 996 F.2d 804 (6th Cir.1993); Villareal-San Miguel v. INS, 975 F.2d 248 (5th Cir.1992); Akrap v. INS, 966 F.2d 267 (7th Cir.1992). This is not to say that an alien who claims innocence and does not express remorse could never present persuasive evidence of rehabilitation by other means. But the fact remains that in the case before us, there is no evidence of remorse or of acknowledgement of guilt. Moreover, the claim of innocence is inconsistent with the jury verdict and the *305 respondent's own pre-trial admission that he had engaged in sexual intercourse with the victim. [2]

**9 The Board acknowledges the humanitarian concerns in this case, particularly the hardship to the respondent's wife and children, but the Board also has the obligation to consider the welfare and safety of the other citizens and residents of this country in making its discretionary determination. In the case before us, we have an individual who sexually assaulted a 13-year-old girl. After serving a short period of imprisonment, he has not offered any significant evidence that he is rehabilitated from his criminal behavior.

As pointed out by the respondent on appeal, a showing of rehabilitation is not an absolute prerequisite in all cases involving an alien with a criminal record. However, rehabilitation or the lack thereof is a factor to be considered in the exercise of discretion, and it may be ultimately determinative in some cases. See Matter of Edwards, supra. There will be cases where such a showing is necessary before a favorable exercise of discretion is warranted in view of the other aspects of the case. Thus, while the lack of persuasive evidence of rehabilitation may not in itself be an adverse factor, the absence of this equity in the alien's favor may ultimately be determinative in a given case, particularly where an alien has engaged in serious misconduct and there are questions whether the alien will revert to criminal behavior. Conversely, evidence of rehabilitation in some cases may constitute the factor that raises the significance of the alien's equities in total so as to be sufficient to counterbalance the adverse factors in the case and warrant a favorable exercise of discretion.

However, having weighed the respondent's equities in this case, which do not include persuasive evidence of rehabilitation, against the extremely serious nature of his criminal behavior involving a sexual offense against a child, the Board agrees that the respondent has not met his burden of establishing that a grant of section 212(h) relief is warranted in the exercise of discretion. Accordingly, the appeal will be dismissed.

ORDER: The appeal is dismissed.

*306 CONCURRING/DISSENTING OPINION: Paul W. Schmidt, Chairman, in which John Guendelsberger, Board Member, joined

**10 I respectfully concur in part and dissent in part. I concur in the analysis of the general criteria to be applied in exercising discretion under section 212(h) of the Immigration and Nationality Act, 8 U.S.C. 1182(h) (1994), as contained in parts I, II, III, and IV(A) of the majority opinion. However, I dissent from the application of those criteria to the facts of this case, as contained in Part IV(B) of the majority opinion.

As recognized by the majority, the respondent has very substantial family equities in the United States. He has a United States citizen wife of 8 years, two United States citizen children, a 7-year-old daughter and a 4-year-old son, and a 9-year-old United States citizen stepson. His wife suffers from severe depression and other medical conditions. She has not worked in 4 years.

There has been a finding that the respondent's deportation would cause extreme hardship to his wife and children, as they are dependent upon him financially and are emotionally close to him.

The respondent also has other family ties to the United States, including two lawful permanent resident brothers and lawful permanent resident parents. The majority acknowledges that the respondent's economic outlook in Mexico is bleak, thereby inhibiting his ability to contribute to the support of his family in the United States.

It also seems unlikely that his family will be able to afford to visit the respondent in Mexico. The respondent's ability to visit his family in the United States will depend upon the willingness of the United States Department of State to recommend, and the Immigration and Naturalization Service to grant, a waiver of inadmissibility to an inadmissible nonimmigrant. Moreover, from my experience, it is quite possible that, even with a waiver, the respondent would be precluded from future visits as a nonimmigrant because the presence of an immediate family in the United States would be considered evidence of a lack of "proper nonimmigrant intent" on the respondent's part. Therefore, the respondent's deportation is likely to permanently sever the family unit.

The respondent's crime is serious, involving sexual misconduct with a minor. However, the respondent, who is 42 years old with no known prior history of sexual offenses, was required to serve only 1 year of a potential 3-year sentence. That indicates at least some confidence on the part of the State of Nebraska that the respondent's sexual offense was unlikely to be repeated and that its citizens did not need the extra protection from the respondent that a longer sentence might have offered.

As described by the majority, the respondent was convicted under a Nebraska statute that made the element of consent by the minor irrelevant. It appears that the rather unusual interrelationship between the respondent's family and the victim's family, which provided the context for the sexual **\*307** assault on the 13-year-old victim, no longer exists and is unlikely to be replicated. Therefore, although we all admittedly lack clairvoyance, there is some reason, based on this record, to believe that a repetition of the respondent's serious sexual misconduct is unlikely.

**\*\*11** In addition to the nature of the crime, the majority's other primary reasons for denying relief are interrelated and involve the respondent's failure to demonstrate remorsefulness, truthfulness, and rehabilitation when confronted with his crime during the hearing before the Immigration Judge. These interrelated adverse considerations, while serious, do not, in my opinion, warrant a denial of the section 212(h) waiver to the respondent. See Matter of Edwards, 20 I & N Dec. 191 (BIA 1990).

This is admittedly a close case. However, I believe that the extreme hardship that will be suffered by the respondent's United States citizen family, his extensive family ties to the United States, and the evidence of record suggesting a relatively low risk of recidivist behavior outweigh the adverse factors relied upon by my colleagues in the majority. I therefore would grant the respondent a section 212(h) waiver.

Consequently, I respectfully dissent from Part IV(B) of the majority decision which denies the section 212(h) waiver in the exercise of discretion.

DISSENTING OPINION: Lory D. Rosenberg, Board Member

I respectfully dissent.

This case involves an individual who has been convicted of one serious crime of moral turpitude. As a result he has applied for a waiver and demonstrated that he is statutorily qualified for the waiver he needs, as his wife and children will suffer extreme hardship in the event of his deportation. Despite this, the Immigration Judge denied his waiver application and the majority of this Board affirms that denial. At issue in the resolution of this appeal is this Board's interpretation of the statute governing applications for waivers under section 212(h) of the Immigration and Nationality Act, 8 U.S.C. § 1182(h) (1994), and this Board's application of the standard it employs in the exercise of discretion in such cases.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

My quarrel with the reasoning and conclusion adopted by the majority goes beyond a disagreement over the weight to be given the favorable and adverse factors of record and the outcome of that balancing exercise. In my view, the majority makes a fundamental error when it embraces exclusively this Board's articulation of discretionary factors which make up the entirety of a waiver adjudication under section 212(c) of the Act. Matter of Marin, 16 I & N Dec. 581 (BIA 1978). Such an analysis fails to give meaning to the unique statutory language which characterizes a waiver under section 212(h) and distinguishes it from other waivers provided by the Act. While the majority cautions that "it is prudent to avoid cross-application" between different principles or standards for the exercise of discretion, these well-intentioned **\*308** words of caution do not prevent its inevitable descent down this slippery slope.

## I. IMPROPER CONSTRUCTION OF THE STATUTE

The starting point of any interpretation begins with a construction of the statute. Chevron, U.S.A., Inc., v. Natural Resources Defense Council Inc., 467 U.S. 837 (1984). If the statutory language is clear, both the courts and the Board must give effect to the unambiguously expressed intent of Congress. Matter of Farias, Interim Decision 3269 (BIA 1996) (Holmes, Rosenberg, concurring); Matter of Hou, 20 I & N Dec. 513, 519-20 (BIA 1992); see also K Mart v. Cartier, Inc., 486 U.S. 281, 291 (in ascertaining "plain meaning," the Board must look not only to the statutory language at issue, but to the language and design of the statute as a whole).

 **\*\*12**  The text of the particular section at issue here, which provides a discretionary waiver for acts of prostitution and crimes involving moral turpitude, is found in the opinion of the majority. Notably, as most recently amended in 1990, it contains two subsections: one, section 212(h)(1)(A), governs applications by persons who seek a waiver for offenses which occurred more than 15 years before the application and explicitly requires a showing of rehabilitation, but does not require either that certain family relationships exist or that a showing of extreme hardship to those persons be made as a predicate for the exercise of discretion. The other, section 212(h)(1)(B), with which we are concerned here, does require both the existence of specific family relationships and evidence of extreme hardship to those designated persons in the absence of a waiver. There is no statutory requirement either that any particular amount of time must have passed since the offense giving rise to the need for the waiver, or that rehabilitation be demonstrated or that admission be in the national interest.

This Board, acknowledging the principle underlying the Supreme Court's decision in INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987), has stated: "It is a well-established rule of statutory construction that, in cases in which Congress includes particular language in one section of a statute but omits that language in another ..., a presumption arises that the disparate inclusion and exclusion was intentional and purposeful." Matter of Hou, supra. I believe that the reasoning employed and the result reached by the majority in this case depart without reason from this important maxim.

In my opinion, to best effectuate the intent of Congress as expressed by the statutory language of any discretionary waiver within the Act, the equities should be weighed and balanced differently relative to the statutory eligibility factors required. If that is not done in this case, then the statutory language distinct to section 212(h)(1)(B), as compared to other waivers provided by the statute, is rendered meaningless.

### \*309  A. Section 212(h)(1)(B) Explicitly Requires Evidence of Extreme Hardship to Family Members

In a section 212(h)(1)(B) case, the statutory emphasis is on the existence of specified close family members and a showing of extreme hardship to those family members. Close family ties and a compelling level of economic, personal, or professional harm or suffering amounting to extreme hardship are statutory predicates for the exercise of discretion. By contrast, in section 212(c) applications, they are no more than individual considerations, albeit important and arguably primary ones, in the overall exercise of discretion.

While it might constitute a reasonable exercise of discretion to deny a waiver under section 212(c) despite evidence of close family ties and hardship on the basis that these are merely factors on the positive side of the discretionary equation, I cannot

conclude that comparable treatment of the same factors in a section 212(h) waiver case would be appropriate. The majority tends to ignore the statutory distinction between these waiver provisions, and fails to treat the section 212(h) waiver applicant as entering into the discretionary arena already having met a significant mandatory standard which itself necessitates the assembly of impressive favorable factors. Rather, the majority appears to give little if any weight in the subsequent exercise of discretion to the fact that a section 212(h) applicant has already established close family ties and extreme hardship. [1]

**13** Further, I take issue with the conclusion of the majority that the precedent decisions issued by this Board pertaining to adjustment of status under section 245 of the Act are inapposite. A waiver under section 212(h) historically and literally arises in connection with an application for admission, since, to date, this Board has not recognized the availability of this waiver to those within the United States only seeking to avoid deportation. Cf. Yeung v. INS, 76 F.3d 337 (11th Cir. 1996). The typical waiver applicant either is not yet a lawful permanent resident or is a lawful permanent resident seeking that status anew. See Matter of Gabreylsky, 20 I & N Dec. 750 (BIA 1994). [2] While some immigrant visas are provided for those approved in asylee, refugee, or employment-based categories, over two-thirds of immigration to the United States is based upon family relationships, and family reunification is a **310** fundamental purpose underlying the terms of Act. I cannot agree that our decisions concerning the exercise of discretionary factors involving the admission of close family relatives have no applicability here. [3]

### B. Section 212(h)(1)(B) Explicitly Does Not Require Evidence of Rehabilitation

The majority finds not only that the statutory standard has been satisfied but that substantial equities exist. That being the case, one might ask, why then does the majority conclude the waiver is not warranted? The only bases articulated by the majority are the nature of the conviction involved and the issue of rehabilitation in the respondent's case. While these are not improper factors for consideration in the ultimate discretionary equation in either a section 212(c) or a section 212(h) case, it is notable that the factor of rehabilitation specifically is not a statutory prerequisite to the exercise of discretion in a section 212(h) application submitted under section 212(h)(1)(B).

In my view, however, by importing without distinction the established discretionary factors applicable in a section 212(c) adjudication (where rehabilitation is an equity, see Matter of Marin, supra) into a section 212(h) adjudication, the majority has skewed the basis for a reasonable adjudication consistent with the governing statutory section and the fair exercise of discretion. [4] Not only does the majority consider rehabilitation in this case, but it elevates rehabilitation as at least one of two determinative factors in its denial. A reading of the majority decision suggests that the statutorily required elements of close family ties and extreme hardship pale next to the presence or absence of rehabilitation. Moreover, I believe that the emphasis given its finding that rehabilitation is not present (which I dispute) constitutes an improper assessment of rehabilitation contrary to our holdings in both Matter of Arreguin, Interim Decision 3247 (BIA 1995) (stating that absence of one or more favorable factors does not convert such factors into adverse considerations), and Matter of Edwards, 20 I & N Dec. 191 (BIA 1990) (holding that absolute rehabilitation is not required).

### *311  II. IMPROPER BALANCING OF DISCRETIONARY FACTORS

#### A. Undue Emphasis on Admission of Guilt

**14** While rehabilitation is not a statutory requirement, it is not unreasonable to consider this factor in light of the fact that a section 212(h)(1)(B) waiver overcomes excludability based upon either criminal conduct or a conviction. However, in its discretionary determination, the majority follows the course set by the Immigration Judge and treats the absence of an outright admission of guilt by the respondent as dispositive of the absence of rehabilitation. Cf. Matter of Roberts, 20 I & N Dec. 294 (BIA 1991). In my view, this constitutes an impermissible treatment of the rehabilitative element of remorse, contrary to the decisions of this Board and the courts of appeals. See Guillen-Garcia v. INS, 999 F.2d 199 (7th Cir.1993); Matter of Edwards, supra. I am inclined to adopt the reasoning of the United States Court of Appeals for the Seventh Circuit, which was articulated most recently in Canales-Lopez v. INS, No. 95-2113, 1996 WL 21673 (7th Cir.), [5] that reliance on a failure or refusal to acknowledge guilt, no matter how framed, "does not constitute adequate consideration of all the circumstances surrounding

the petitioner's efforts to demonstrate rehabilitation." Id. at 2 (citing Guillen-Garcia v. INS, supra, at 205); see also Guillen-Garcia v. INS, 60 F.3d 340, 344-45 (7th Cir.1995) (upholding BIA on other grounds), cert. denied, 116 S.Ct. 775 (1996).

Elevation of a claim of innocence as dispositive of a lack of rehabilitation actually does what we say we will not do-redetermine guilt or innocence. Cf. Matter of Roberts, supra. Matter of Roberts states clearly that for discretionary purposes we may look behind the conviction-but we may not redetermine guilt or innocence. Id. at 301. If we are allowed to look at mitigating factors (and lack of culpability going to an inability to express remorse for something one has not done would fall into that zone), we should not penalize an alien who testifies to innocence under oath, barring a showing that he has intentionally given false testimony. An individual faces an untenable situation if subsequent discretionary relief-be it sentencing disposition or collateral immigration benefits-is conditioned upon an admission of guilt. As a result, some federal courts have long recognized that even after conviction, when post-conviction options may have been exhausted, it continues to be unfair and unreasonable to require a defendant to admit guilt (contrary to his testimony in the criminal proceedings), as to do so also might be to require him to admit perjury. [6]

**\*312** In this case, the respondent did not plead guilty in his criminal trial but maintained his innocence and was found guilty. In the record before us, the respondent admitted to aspects of the criminal conduct in question and denied the explicit charges underlying his conviction. [7] The Immigration Judge acknowledged that the respondent testified that he recognizes the crime involved to be a serious one, for which someone should be punished. The majority emphasizes the fact of the respondent's responses on the lie detector test administered prior to trial as compared with his testimony before the Immigration Judge. [8] This not only appears to contravene this Board's position in Matter of Roberts, supra, but the majority fails to indicate the ultimate significance of either the respondent's statement or the results of the test. [9] This is particularly so, in light of the fact that the majority itself acknowledges in the same paragraph that one who claims innocence is not categorically foreclosed from establishing that he has taken steps towards rehabilitation. Matter of Edwards, supra%u.

**\*\*15** In assessing rehabilitation, we are making "an estimate or prediction of an individual's future conduct." Palacios-Torres v. INS, 995 F.2d 96, 99 (7th Cir.1993). The respondent and his wife are well aware of the poor judgment and unacceptable conduct which characterized their former living situation. The family has moved away from the area in which the circumstances giving **\*313** rise to the respondent's crime occurred. There is no evidence of any criminal conduct whatsoever by the respondent prior to the situation which underlies the respondent's conviction. Further, there is no evidence of recidivism during the pendency of the criminal charges or since his release for good behavior following a 1-year period of incarceration, an early release from a 3-year sentence. [10]

The majority contends that it is not holding that one who claims innocence and fails to express remorse is precluded from ever showing persuasive evidence of rehabilitation. However, here the respondent has presented his role in his family, his productive employment, and the absence of any other criminal conduct. The majority's failure to articulate any other basis for its rejection of the respondent's claim of rehabilitation, however, renders its treatment of the absence of an admission of guilt as being determinative of an insufficient level of rehabilitation. Canales-Lopez v. INS, supra; cf. Matter of Edwards, supra. I believe that reliance upon the absence of evidence of remorse, coupled only with the serious nature of the single criminal offense giving rise to this respondent's need for a waiver is not a sound basis on which to deny relief in this case.

### B. Undue Weight Given Criminal Offense

This is a waiver we are adjudicating. It presupposes a violation of the immigration laws. An application under section 212(h) comes before us only when there has been either conduct involving prostitution or conviction or admission of a crime involving moral turpitude. No applicant will ever appear before us who has not committed an offense which we consider, in some degree, reprehensible. In my opinion, the result reached by the majority certainly appears to approach an impermissible per se basis in which to deny a discretionary waiver. See Gonzales v. INS, 996 F. 2d 804, 810 (6th Cir.1993); cf. Matter of Burbano, 20 I & N Dec. 872, 877-78 (BIA 1995). But see Yepes-Prado v. INS, 10 F.3d 1363, 1371-72 (9th Cir.1993).

AR.04909

Indeed, I believe we contravene the statute when we so readily engage in the practice of finding the offense to be waived an adequate basis alone on which to deny relief. [11] Moreover, I don't believe that one can read the **\*314** majority opinion without concluding that it has relegated the significant and compelling factors of family ties and extreme hardship to the back burner. I cannot find that dismissing statutory prerequisites or treating them as no more than a threshold for a discretionary adjudication which demands other factors to overcome the adverse factor of the offense giving rise to the need for a waiver is either reasonable in the exercise of discretion or consistent with the statute.

 **\*\*16**  The respondent is in violation of the immigration laws on account of a single, albeit serious, conviction, giving rise to his need for a section 212(h) waiver. His crime, statutory rape of a young teenager, is not to be dismissed lightly and it should be punished—in the criminal justice system, and examined further—in the exercise of our discretion to waive his deportation. Whether it is an offense such that under no circumstances should this man be allowed to remain in the United States with his family as a lawful permanent resident after being released from prison with good conduct reports and when his wife and children want and need him is another story.

The respondent has established, as the majority concedes, substantial equities relating to the statutory qualifications of close family ties and extreme hardship to be suffered by the family members should the respondent be deported. His wife begs us to allow him to remain, and there is ample evidence in the record that she has suffered depression on account of the circumstances and other hardships due to his absence, which will only be exacerbated by his deportation. Further, his deportation would mean not only a loss of financial support to the household and his children's loss of the presence of their father, but the permanent disruption of this family.

In addition to the factors emphasized explicitly by Congress, the record reflects that the respondent has resided in the United States for 13 years and has been a lawful permanent resident since 1987. There is evidence that he is a responsible husband and father who previously was regularly employed and supported his family, and that he has employment to which he will return. While in prison he studied towards receiving his GED. The record also contains enthusiastic commendations of his character and of his being an honest, hardworking individual. Each of these factors individually and cumulatively indicates that he has the character and family base from which he can return to society as a contributor rather than a predator, and that he has taken steps towards rehabilitation from the conduct resulting in his conviction.

With regard to his conviction, I believe he attempted to provide an explanation for his criminal conduct, and while his unwillingness to acknowledge his offense squarely may be the product of shame or denial, I don't find him to be either an outright liar or an unrepentant criminal. Nor do I conclude, as **\*315** apparently the majority does, that his failure to acknowledge culpability to their satisfaction is a reliable indicia of either rehabilitation or future conduct. With the exception of the poor exercise of judgment in condoning the situation which led to his commission of the crime in question, there is no evidence that the respondent lived other than a normal lifestyle. He has no criminal record of any kind other than the offense giving rise to these proceedings. He has no prior immigration violations. He provided evidence of good conduct while in prison.

 **\*\*17**  I note that this crime was an aberration in his otherwise law-abiding history and appeared connected to the unorthodox circumstances of the family's living situation in relation to their former neighbors. That living situation no longer exists. In my opinion there is absolutely no reason to conclude that he would not move on from this incident, which I view as an aberration in an otherwise regular record, and continue to be a provider for his family and a contributing member of our society.

I do not contend that this Board may not or should not address either the offense itself or rehabilitation in the course of adjudicating a waiver application under section 212(h) of the Act. However, in this case, the majority not only fails to address any other aspect of rehabilitation present in the record, but concludes, without citing any evidence of record or other authority, that the nature of the crime for which this applicant already has been convicted and imprisoned is serious enough to make him an undesirable member of our society in the future. I conclude that such a treatment of the record not only constitutes an abuse of our discretion, but does violence to the statutory language.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

### III. CONCLUSION

I believe it is reasonable to look at the statute in a way which gives meaning and reason to its separate provisions overall. In my view the majority's failure to truly distinguish section 212(h) from other waiver provisions according to its statutory components impermissibly skews and distorts the majority's discretionary assessment. I believe that discretionary assessment is flawed further by the majority's over-reliance on an admission of culpability and the specific crime involved in lieu of a fair consideration, on balance, of the overwhelming evidence of strong family ties and the hardship the family faces without the respondent, as well as the respondent's role as a provider, reports of his good conduct, affirmations of his good character, and no evidence of anything other than a good prognosis for the future. I would grant the relief requested in the exercise of discretion.

### Footnotes

1    While the Immigration Judge and this Board may not go beyond the record of conviction to determine the guilt or innocence of the alien, it is proper to look to probative evidence outside the record of conviction in inquiring as to the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted. Matter of Edwards, 20 I & N Dec. 191 (BIA 1990).

2    The respondent underwent a polygraph examination in July 1992. A copy of the polygraph report was admitted into evidence at the deportation hearing without objection. The report reflects that following the questioning of the respondent, he acknowledged to the examiner that he had engaged in a sexual act with the victim. When questioned about this by the Immigration Judge, the respondent acknowledged this admission, but testified that the polygraph examiner kept "moving the needles with his fingers ... and after that [he] was forced to say yes." In his decision, the Immigration Judge found that the respondent's testimony in this regard was not credible. On appeal, the respondent does not challenge, or even reference, this evidence and adverse finding by the Immigration Judge.

1    The majority's citation to INS v. Bagamasbad, 429 U.S. 24, 25 (1976), and Matter of Goldeshtein, 20 I & N Dec. 382 (BIA 1991), rev'd on other grounds, 8 F.3d 645 (9th Cir.1993), for the proposition that an adjudicator need not even address the statutory "extreme hardship" predicate for the exercise of discretion in suspension and section 212(h) adjudications is misleading in the context of this case. While it is true that an adjudicator need not make express rulings concerning statutory eligibility, and may skip ahead to a discretionary denial in appropriate cases, this does not provide the adjudicator with a license to ignore relevant factors in rendering that discretionary determination.

2    The respondent has resided in the United States since 1983 and has held the status of a lawful permanent resident for over 7 years. He is applying for lawful resident status anew, in conjunction with his application for a waiver.

3    It appears that the reason the majority dismisses as inapplicable the discretionary evaluations conducted in Matter of Arai, 13 I & N Dec. 494, 495-96 (BIA 1970), modifying Matter of Ortiz-Prieto, 11 I & N Dec. 317 (BIA 1965) (holding that adjustment of status could be granted only when outstanding equities were present), is that the adverse factor which triggers the need for a section 212(h) waiver is a criminal conviction. Nonetheless, I believe it instructive that we found that Ortiz-Prieto was "too broad in its impact and probably more demanding than necessary," and concluded that factors such as family ties, hardship, and length of residence constitute countervailing factors warranting a favorable exercise of discretion. Matter of Arai, supra, at 495.

4    For example, the majority states that "he has only been in the United States for a little more than 7 years." (Emphasis added.) While this may be relevant in a section 212(c) case, in fact, a waiver under section 212(h) was originally contemplated to provide a means of overcoming excludability for a new immigrant who has not been in the United States at all.

5    While I understand that Canales-Lopez v. INS, supra, is an unpublished decision, it provides a compelling analysis of this Board's consideration of the element of an admission of guilt in the context of establishing rehabilitation as a discretionary equity, one which I adopt for purposes of my dissent in this case.

6    See Thomas v. United States, 368 F.2d 941, 945 (5th Cir.1966), in which the court determined that the defendant was "between the devil and the deep blue sea," when the district court told him to repent or receive a longer sentence. See also Miller v. United States, 589 F.2d 1117, 1138 (1st Cir.1978), cert. denied, 440 U.S. 958 (1979); Scott v. United States, 419 F.2d 264 (D.C.Cir.1969). In fact, the Scott court noted that a glib willingness to admit guilt in order to secure something in return may indicate quite the opposite of repentance.

7    Evidence in the record, contained in the investigating ng officer's report and in a pre-trial polygraph report, reflects that an unorthodox situation had developed in the apartment complex, that the assaulted child was in counseling with a social worker, that she received no parental control or guidance, that rumors of a sexual relationship between the child and the respondent had been circulated by the child throughout the apartment complex, and that a prior investigation had revealed no evidence of such a relationship. The respondent does not deny having improperly touched the child or having allowed her to remain in his family's apartment, and he admits that he wrestled with her and even that he had, in his wife's presence, lain on top of her.

8    The report of the lie detector examination reveals that upon admitting having had sexual intercourse with the complainant, the respondent explained further that the complainant, a neighbor's daughter, approached him in his apartment, and lay down on his bed next to him. While I don't doubt that the alleged sexual contact occurred, I can understand how, in the hearing before the Immigration Judge, the respondent, not being legally trained to understand the concept of a minor's lack of consent, and given the unorthodox situation which preceded this incident, would not think of his conduct necessarily as forcible sex or a sexual assault, as the charge and conviction is worded.

9    Under the circumstances, he could honestly admit the act but deny the charge as entitled in the record of conviction without being inconsistent or incredible. See Canales-Lopez v. INS, supra, at 2 (Board's denial of relief as being on account of lack of credibility rather unacceptable, as relief cannot be denied on this basis alone, and lack of credibility for failing to acknowledge guilt is not a separate ground supporting a denial). See also Guillen-Garcia v. INS, supra, at 205.

10    The record reflects that while in prison the respondent achieved "exemplary unit conduct and observed work performance," and that he had no infractions and conducted himself according the institution's rules and orders.

11    I recognize that we have said consistently in the section 212(c) context that a single factor may be so egregious as to overwhelm any existing equities. Matter of Marin, supra, at 584-85. I do not disagree with that principle nor do I disagree with the majority that we must also consider the safety and well-being of others in our society. I do not foreclose the possibility that, based on concrete evidence of recidivism, a propensity for violence, or actual harm that will be caused by allowing an offender to remain in this country, denial based upon a single underlying offense might not be appropriate. However, I read Matter of Marin to mean that when dealing with the offense to be waived, such a result, while not impermissible, must be the exception rather than the rule. See also Braun v. INS, 992 F.2d 1016, 1020 (9th Cir.1993); Matter of Alonzo, 17 I & N Dec. 292 (Comm.1979) (if underlying offense is considered, a waiver could be denied in every case).

21 I. & N. Dec. 296 (BIA), Interim Decision 3272, 1996 WL 227774

---

**End of Document**                                             © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Overruling Recognized by Bare v. Barr, 9th Cir., September 16, 2020

24 I. & N. Dec. 336 (BIA), Interim Decision 3588, 2007 WL 3114791

U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

IN RE N-A-M-, RESPONDENT

Decided October 24, 2007

**\*\*1  \*336**  (1) In order to be considered a particularly serious crime under section 241(b)(3)(B)(ii) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(B)(ii) (2000), an offense need not be an aggravated felony under section 101(a)(43) of the Act, 8 U.S.C. § 1101(a)(43) (2000 & Supp. IV 2004).

(2) Once the elements of an offense are found to potentially bring it within the ambit of a particularly serious crime, all reliable information may be considered in determining whether the offense constitutes a particularly serious crime, including but not limited to the record of conviction and sentencing information.

**FOR RESPONDENT:**
Laura L. Lichter, Esquire,
Denver, Colorado

**FOR THE DEPARTMENT OF HOMELAND SECURITY:**
Weldon S. Caldbeck,
Assistant Chief Counsel

BEFORE: Board Panel: FILPPU and PAULEY, Board Members; M.C. GRANT, Temporary Board Member
PAULEY, Board Member:

In a decision dated March 13, 2007, an Immigration Judge found the respondent removable and denied the relief of withholding of removal under section 241(b)(3)(B)(ii) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(B)(ii) (2000).[1] The respondent has filed a timely appeal from that decision.[2] The appeal will be dismissed.

**\*337  I. FACTUAL AND PROCEDURAL HISTORY**

The respondent, a native and citizen of El Salvador, was convicted on June 7, 2005, of felony menacing in violation of sections 18-3-206(1)(a) and (b) of the Colorado Revised Statutes and was sentenced to 4 years' deferred judgment. Under section 18-3-206(1) of the Colorado Revised Statutes, a person "commits the crime of menacing if, by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury." Furthermore, the offense of menacing under section 18-3-206(1) is a felony if the crime was committed
(a) By the use of a deadly weapon or any article used or fashioned in a manner to cause a person to reasonably believe that the article is a deadly weapon; or (b) By the person representing verbally or otherwise that he or she is armed with a deadly weapon.

According to a Statement in Support of Warrantless Arrest in the record, the respondent was performing oral sex on a 20-year-old man against his will when the victim awoke. Thereafter, an argument took place, which involved two other persons who

appeared to be the parents of the victim. The respondent allegedly grabbed two knives and threatened to kill the victim and one of the other members of the household.

**\*\*2** The Immigration Judge found that the respondent had experienced past persecution but was ineligible for withholding of removal as a result of the conviction for a particularly serious crime.

## II. ISSUES ON APPEAL

At issue in this case is whether the respondent's offense of felony menacing constitutes a particularly serious crime under the Act. The respondent contends that the Immigration Judge erred in finding that the conviction is for a particularly serious crime. In examining this question, we must address two distinct issues. The first is whether a particularly serious crime must be an aggravated felony under section 101(a)(43) of the Act, 8 U.S.C. § 1101(a)(43) (2000 & Supp. IV 2004), a matter on which there is a conflict among the circuits. The second issue is whether, as one circuit has held, we are limited to certain sources of evidence in determining whether an offense is particularly serious.

We hold that a particularly serious crime need not be an aggravated felony. Furthermore, once the elements of the offense are examined and found to potentially bring the offense within the ambit of a particularly serious crime, **\*338** all reliable information may be considered in making a particularly serious crime determination, including but not limited to the record of conviction and sentencing information.

## III. ANALYSIS

### A. Interplay Between Particularly Serious Crimes and Aggravated Felonies

The Act provides that an alien is ineligible for withholding of removal if "the Attorney General decides that … the alien, having been convicted by a final judgment of a particularly serious crime, is a danger to the community of the United States." Section 241(b)(3)(B)(ii) of the Act. The Act further provides as follows:
For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

Section 241(b)(3)(B) of the Act.

The respondent suggests that the offense of felony menacing should not be considered a particularly serious crime because it is not an aggravated felony. We disagree. A plain reading of the Act indicates that the statute does not require an offense to be an aggravated felony in order for it to be considered a particularly serious crime. *See* section 241(b)(3)(B)(ii) of the Act; *see also Ali v. Achim*, 468 F.3d 462, 470 (7th Cir. 2006), *cert. granted*, 75 USLW 3557, 76 USLW 3018 (U.S. Sept. 25, 2007) (No. 06-1346) (noting that section 241 of the Act "does not state a general rule that only aggravated felonies can be considered" particularly serious crimes). *Contra Alaka v. Att'y Gen.*, 456 F.3d 88, 104-05 (3d Cir. 2006).

**\*\*3** We agree with the United States Court of Appeals for the Seventh Circuit that the "designation of aggravated felonies producing sentences of at least five years' imprisonment as per se 'particularly serious' creates no presumption that the Attorney General may not exercise discretion on a case-by-case basis to decide that other nonaggravated-felony crimes are also 'particularly serious.'" *Ali v. Achim, supra*, at 470. [3] Although we have issued no precedent decision on this question, our consistent practice in numerous **\*339** decisions over the course of the years has reflected an understanding that the classification of an offense as a "particularly serious crime" is not limited to offenses that are aggravated felonies.

Our reading of the Act is supported by the history and background of the particularly serious crime provision, which is set forth in detail in *Matter of L-S-*, 22 I&N Dec. 645, 648-53 (BIA 1999). When Congress enacted the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, it amended the statutory provision for withholding of deportation to provide that such relief should not be available to an alien who, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." Former section 243(h)(2)(B) of the Act, 8 U.S.C. § 1253(h)(2)(B) (Supp. IV 1980). The term aggravated felony had not been incorporated into the Act at that time, and there were no statutory directives regarding the types of crimes that would or would not fall within the "particularly serious crime" category. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70 (adding the term "aggravated felony" to the Immigration and Nationality Act). Even after the enactment of the aggravated felony definition, the question whether an offense was a particularly serious crime was not linked to the definition of an aggravated felony, and for more than a year the Board and Immigration Judges could examine any crimes to determine whether they were particularly serious under the Act.

In 1990, Congress linked particularly serious crimes to aggravated felonies. Congress amended section 243(h)(2) of the Act through the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, to provide that aggravated felonies are to be considered particularly serious crimes for purposes of section 243(h)(2). *See generally Matter of A-A-*, 20 I&N Dec. 492 (BIA 1992). The Immigration Act of 1990 rendered our decision in *Matter of Frentescu*, 18 I&N Dec. 244 (BIA 1982), which set forth the analysis for determining whether a crime was "particularly serious," inapplicable to many cases because certain offenses were automatically deemed to be particularly serious crimes as a result of their classification as aggravated felonies. *See Matter of C-*, 20 I&N Dec. 529 (BIA 1992). However, there was no suggestion that other crimes could not be treated as "particularly serious." As we noted in *Matter of C-*, *supra*, at 535 n.3, there would continue to be situations requiring a particularly serious crime determination under the analysis set forth in *Matter of Frentescu*, *supra*, "where the crime falls outside the definition of aggravated felony."

 **\*\*4** Congress first altered the link between particularly serious crimes and aggravated felonies with the passage of section 413(f) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1269 (enacted Apr. 24, 1996) ("AEDPA"). The AEDPA amended section 243(h) of the Act to give the Attorney General discretionary authority to **\*340** override the categorical bar designating every aggravated felony a particularly serious crime if the Attorney General determined it was "necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." *Id.* (codified at former section 243(h)(3)(B) of the Act). In other words, this change returned some of the authority taken away from the Attorney General in the Immigration Act of 1990 and permitted the Attorney General to find that certain aggravated felonies were not particularly serious crimes.

Shortly thereafter, Congress significantly altered the relationship between particularly serious crimes and aggravated felonies, as applied to withholding of removal, with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"). Section 305(a) of the IIRIRA, 110 Stat. at 3009-602, changed the definition of a "particularly serious crime" by adding the following language to section 241(b) (3) of the Act:
For purposes of clause (ii) [setting forth the bar to withholding of removal for an alien convicted of a particularly serious crime], an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

As we noted in *Matter of L-S-*, *supra*, at 650-52, this most recent revision of the "particularly serious crime" provision accomplished what section 413(f) of the AEDPA had not: it eliminated the categorical exception to withholding of removal for any alien convicted of an aggravated felony. At the same time, while Congress eliminated the statutory presumption that all aggravated felonies are particularly serious crimes for purposes of the withholding provision, it expanded the definition of an aggravated felony. *See, e.g.*, IIRIRA § 321(a), 110 Stat. at 3009-627 (codified at section 101(a)(43) of the Act).[4] Particularly

serious crimes and aggravated felonies are no longer automatically linked for purposes of withholding of removal except for aggravated felonies for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years.

 **5  This brief historical review indicates that Congress intentionally withdrew much of its prior equation of particularly serious crimes with aggravated  *341  felonies in the withholding of removal context in order to allow a more flexible analysis in determining whether an offense is a particularly serious crime. At no time in our history, however, has the concept of a particularly serious crime been confined to the changing categories of aggravated felonies, notwithstanding the tendency toward expansion of the latter.

We recognize that the Third Circuit has held, within the context of precluding an alien from withholding of removal, that an offense must be an aggravated felony to be a particularly serious crime. *Alaka v. Att'y Gen.*, *supra.* However, we respectfully disagree with the Third Circuit's interpretation that section 241(b)(3)(B)(ii) of the Act defines the term "particularly serious crime" as a subset of aggravated felony offenses. That interpretation is not in accord with our original interpretation of the term, which has been in effect for more than a quarter of a century. Nor do we agree with the Third Circuit that such a result is dictated or suggested by the second sentence of section 305(a) of the IIRIRA quoted above. That sentence means only that aggravated felonies for which sentences of less than 5 years' imprisonment were imposed may be found to be "particularly serious crimes," not that *only* aggravated felonies may be found to be such crimes. *See Matter of Anselmo*, 20 I&N Dec. 25, 31 (BIA 1989) (stating that "[w]here we disagree with a court's position on a given issue, we decline to follow it outside the court's circuit"). [5]

Furthermore, we find that Congress did not intend to limit what offenses may be particularly serious crimes to those offenses classified as aggravated felonies. When Congress established categories of aggravated felonies, it frequently referenced other provisions that contain technical requirements, such as crimes of violence under 18 U.S.C. § 16 (2000). Not all very serious offenses will meet all of the technical requirements that go along with classification as an aggravated felony under the Immigration and Nationality Act. Moreover, there may well be offenses that are particularly serious, yet fall totally outside the aggravated felony enumeration in section 101(a)(43) of the Act. [6] We do not read the statute, or the history leading up to the current language, as creating a gap or loophole for particularly serious crimes that happen to escape classification as aggravated felonies. To do so would be inconsistent with the goal of protecting the public, which is at the heart of the "particularly serious crime" bar.

*342  B. Evidence That May Be Used in a Particularly Serious Crime Determination

 **6  Where, as in the instant case, a conviction is not for an aggravated felony for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years, we examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction. *See Matter of L-S-*, *supra*; *Matter of Q-T-M-T-*, 21 I&N Dec. 639 (BIA 1996). On some occasions, we have focused exclusively on the elements of the offense, i.e., the nature of the crime. *See, e.g., Matter of Garcia-Garrocho*, 19 I&N Dec. 423 (BIA 1986) (looking at the elements of the offense of burglary in the first degree and finding that, on its face, such a crime is a particularly serious one); *see also Hamama v. INS*, 78 F.3d 233 (6th Cir. 1996) (noting that the Board may find some crimes to be per se particularly serious, without needing to examine the individual circumstances of the crime). However, we have generally examined a variety of factors and found that the "consideration of the individual facts and circumstances is appropriate." *Matter of L-S-*, *supra*, at 651.

If the elements of the offense do not potentially bring the crime into a category of particularly serious crimes, the individual facts and circumstances of the offense are of no consequence, and the alien would not be barred from a grant of withholding of removal. On the other hand, once the elements of the offense are examined and found to potentially bring the offense within the ambit of a particularly serious crime, all reliable information may be considered in making a particularly serious crime determination, including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction. *Matter of L-S-*, *supra*, at 654-56 (examining in detail the actual circumstances of the crime, well beyond what was disclosed by the elements of the crime, including information from other participants in the crime).

We note that our approach to determining whether a crime is particularly serious has evolved since the issuance of our decision in *Matter of Frentescu*, *supra*, which is cited in the respondent's brief. For example, once an alien is found to have committed a particularly serious crime, we no longer engage in a separate determination to address whether the alien is a danger to the community. As set forth in *Matter of Carballe*, 19 I&N Dec. 357 (BIA 1986), the proper focus for determining whether a crime is particularly serious is on the nature of the crime and not the likelihood of future serious misconduct. *See also Al-Salehi v. INS* 47 F.3d 390 (10th Cir. 1995) (upholding *Matter of Carballe*, *supra*); *Alaka v. Att'y Gen.*, *supra*, at 95 (same, citing unanimous court of appeals authority to this effect); *Matter of Q-T-M-T-*, *supra*, at 645-46. Consequently, we are not persuaded by the argument that the respondent **\*343** allegedly does not pose any future danger to members of the community and therefore was not convicted of a particularly serious crime. [7]

 **\*\*7**  Likewise, in *Matter of Y-L-, A-G-, & R-S-R-*, 23 I&N Dec. 270, 273-74, 277-78 (A.G. 2002), the Attorney General found that the sentence imposed is not a dominant factor in determining whether a conviction is for a particularly serious crime. Factors that are subsequent and unrelated to the commission of the offense, such as cooperation with law enforcement authorities, bear only on sentencing. Similarly, offender characteristics may operate to reduce a sentence but do not diminish the gravity of a crime. Therefore, the sentence imposed is not the most accurate or salient factor to consider in determining the seriousness of an offense. For these reasons, we find no merit to the respondent's argument that the offense is not a particularly serious crime because a sentence to a term of imprisonment was not imposed.

We find that the respondent's offense is a particularly serious crime based solely on its elements, i.e., that the offense by its "nature" is a particularly serious one. In order to be convicted under sections 18-3-206(1)(a) and (b) of the Colorado Revised Statutes, a person must use, or represent that he or she is armed with, a deadly weapon and must knowingly attempt or attempt to place another person in fear of imminent serious bodily injury. Because the statutory provisions under which the respondent was convicted clearly require a serious threat to others, the offense is a crime against a person. We have held that crimes against persons are more likely to be categorized as particularly serious. *See Matter of L-S-*, *supra*, at 649. We therefore find that the respondent was convicted of a particularly serious crime.

Moreover, the evidence in the record relating to the respondent's offense supports our finding that the conviction is for a particularly serious crime. We note that the conviction record indicates that the respondent was required to register as a sex offender. Furthermore, the Statement in Support of Warrantless Arrest indicates that the respondent was performing a nonconsensual sexual act and subsequently threatened the victim with two knives. The respondent contends that the Immigration Judge erred in relying on the Statement in Support of Warrantless Arrest. We disagree. We find that we may examine all reliable information and are not limited to reviewing the record of conviction and sentencing information.

The respondent cites *Morales v. Gonzales*, 478 F.3d 972 (9th Cir. 2007), in which the Ninth Circuit found that an Immigration Judge erred in relying on the **\*344**  facts recited in a Washington State appellate court opinion that were not admitted or established as the circumstances and underlying facts of the conviction. However, the Ninth Circuit's opinion is based entirely on purported deference to our precedent decisions, which we respectfully find that the court misread. The Ninth Circuit quoted our decision in *Matter of L-S-*, *supra*, stating that according to the Board, "it is permissible to 'look to the conviction records and sentencing information … [but] … not [to] engage in a retrial of the alien's criminal case or go behind the record of conviction to redetermine the alien's innocence or guilt.'" *Morales v. Gonzales, supra*, at 981 (quoting *Matter of L-S-*, *supra*, at 651). However, our decision in *Matter of L-S-*, did not prohibit the examination of other evidence or indicate that only conviction records and sentencing information could be used. In fact, as previously noted, we examined in detail the actual circumstances of the crime, well beyond what is disclosed by the elements of the crime, including sentencing information and information from other participants in the crime. *Matter of L-S-*, *supra*, at 654-56.

 **\*\*8**  It has been our practice to allow both parties to explain and introduce evidence as to why a crime is particularly serious or not. We see no reason to exclude otherwise reliable information from consideration in an analysis of a particularly serious crime once the nature of the crime, as measured by its elements, brings it within the range of a "particularly serious" offense. *See Matter of Babaisakov*, 24 I&N Dec. 306 (BIA 2007). Our consistent practice in this regard has also been followed by the Attorney

General. *See Matter of Y-L-, A-G-, & R-S-R-, supra.*[8] Furthermore, we point out that neither *Morales v. Gonzales, supra,* nor any other decision of which we are aware, has ever suggested that the categorical approach, used primarily in determining removability, is applicable to the inherently discretionary determination of whether a conviction is for a particularly serious crime.[9] Nor does the **\*345** respondent raise such a claim. Thus, the formulation wrongly attributed to the Board in *Morales v. Gonzales, supra,* makes no sense because there is no reason to restrict the use of reliable information to that used in sentencing once the strictures of the categorical approach are deemed not to apply.[10]

Lastly, the respondent contends that the Immigration Judge erred in comparing the conviction to that in *Matter of B-*, 20 I&N Dec. 427 (BIA 1991). However, the Immigration Judge only cited *Matter of B-* to set forth the standards for determining what constitutes a particularly serious crime.

Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

## Footnotes

[1]    The respondent did not apply for asylum, conceding that an application would be untimely. Likewise, the respondent did not apply for protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988).

[2]    As noted in the Immigration Judge's decision, the respondent's counsel characterizes the respondent as a preoperative transgendered person. We will therefore not refer to the respondent's gender in this order.

[3]    We find the reasoning of the Seventh Circuit in *Ali v. Achim, supra,* to be persuasive, even though it is not binding in this case, which arises in the Tenth Circuit.

[4]    We noted in *Matter of L-S-, supra,* at 651 n.7, that we apply the relevant factors "to aggravated felonies where the sentence is fewer than 5 years, *as well as to other crimes that do not fall within the aggravated felony definition.*" (Emphasis added.)

[5]    We need not decide here whether to follow *Alaka v. Attorney General, supra,* in the Third Circuit. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967 (2005).

[6]    *See, e.g.,* 18 U.S.C. § 175 (2000 & Supp. IV 2004) (relating to biological weapons); 18 U.S.C. § 1365 (2000 & Supp. IV 2004) (relating to tampering with consumer products).

[7]    The respondent contends that there is no danger to the community because "the context of the crime indicates that [the respondent's] threats were primarily an aggressive defensive response to being physically attacked while being interrupted during a sex act." We note, however, that the sex act was not consensual on the victim's part.

[8]    Insofar as *Matter of L-S-, supra,* at 651, referenced only "conviction records and sentencing information," its phraseology was less than comprehensive. We do not retry the question of guilt as to the elements of an offense. *See* section 101(a)(48)(A) of the Act (defining "conviction" in significant part to require a determination of guilt). However, we do look beyond evidence that identifies only the elements in cases where the elements fit a category of a potentially particularly serious crime. This is most notable, perhaps, as to aggravated felonies that carry imposed sentences of less than 5 years. The elements do not change depending on the length of sentence, but the severity of the crime is not always reflected in the length of the sentence.

[9]    The Supreme Court has applied the categorical approach in the aggravated felony context, where the determination has both criminal and immigration law application. Furthermore, while both we and the courts of appeals have applied the categorical approach to other convictions having only immigration consequences, e.g., the question whether an offense

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

is a crime involving moral turpitude, such categories of crimes may affect both removability and eligibility for relief. In contrast, the "particularly serious crime" determination affects *solely* eligibility for asylum and withholding of removal, on which the alien has the burden of proof, and represents the sort of inherently judgmental calculus, once the elements of the offense have been found to potentially bring it within the parameters of a particularly serious crime, that the categorical approach is unsuited to the determination. *See Navarro-Lopez v. Gonzales*, No. 04-70345, 2007 WL 2713211, at *18 (9th Cir. Sept. 19, 2007) (en banc) (Bea, J., dissenting) (contending that the categorical approach should have no application even to the crime involving moral turpitude question).

10    The respondent also argues that the Statement in Support of Warrantless Arrest was improperly utilized because the Immigration Judge deprived the respondent of an opportunity to testify as to the circumstances of the crime and to cross-examine the author of the Statement. The argument is without merit. The Immigration Judge admitted the Statement in Support of Warrantless Arrest but stated that he would later deal with its contents "if the respondent denies the truthfulness of any of those statements." The respondent, who testified, never did so. Moreover, the Immigration Judge accepted an offer of proof that the respondent's brother would testify that when the respondent lived in his home there were no incidents of violence or improper sexual contact. The Immigration Judge did not err in admitting the Statement in Support of Warrantless Arrest. *See Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 823-24 (9th Cir. 2003); *Bustos-Torres v. INS*, 898 F.2d 1053 (5th Cir. 1990); *Matter of Gomez-Gomez*, 23 I&N Dec. 522 (BIA 2002); *see also Matter of Thomas*, 21 I&N Dec. 20 (BIA 1995).

24 I. & N. Dec. 336 (BIA), Interim Decision 3588, 2007 WL 3114791

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re S-S-, BIA, January 21, 1999

21 I. & N. Dec. 639 (BIA), Interim Decision 3300, 1996 WL 784581

United States Department of Justice

Board of Immigration Appeals

IN RE Q-T-M-T-, Respondent

File A71 458 610 - New York

Decided December 23, 1996

**\*\*1   \*639** (1) Under section 243 (h)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(2) (1994), an alien convicted of an aggravated felony is considered to have committed a particularly serious crime, which bars the alien from applying for withholding of deportation under section 243(h)(1) of the Act ("aggravated felony bar").

(2) Under section 243(h)(3) of the Act (to be codified at 8 U.S.C. § 1253(h)(3)), as enacted by section 413(f) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (enacted Apr. 24, 1996) ("AEDPA") , the Attorney General may apply section 243(h)(1) of the Act to any alien, notwithstanding any other provision of law, if she determines in her discretion that it is necessary to do so "to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees," Jan. 31, 1967, 1968 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol").

(3) Section 243(h)(3) of the Act did not repeal the aggravated felony bar directly or by implication, but amended it to the limited extent necessary to ensure that refoulement of a particular criminal alien would not place compliance with the Protocol in jeopardy.

(4) Under the provisions of section 305(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Division C of the Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act for 1997, Pub. L. No. 104-208, 110 Stat. 3009,___ (effective April 1, 1997) ("IIRIRA"), an alien convicted of one or more aggravated felonies for which the aggregate sentence is at least 5 years is considered to have committed a particularly serious crime, which bars the alien from eligibility for withholding of removal.

(5) In cases governed by the provisions of section 243(h) of the Act, the standards for determining whether the deportation of an alien convicted of an aggravated felony, as defined in the AEDPA, must be withheld under section 243(h)(1) in order to ensure compliance with the Protocol should not be inconsistent with the relevant provisions of the IIRIRA.

(6) For purposes of applying section 243(h) of the Act, an alien who has been convicted of an aggravated felony, as defined in the AEDPA, and sentenced to an aggregate of at least 5 years' imprisonment, is deemed conclusively barred from relief under section 243(h)(1), and such ineligibility is in compliance with the Protocol.

(7) For purposes of applying section 243(h) of the Act, an alien convicted of an aggravated felony, as defined in the AEDPA, who has been sentenced to less than 5 years' imprisonment, is subject to a rebuttable presumption that he or she has been convicted of a particularly serious crime, which bars eligibility for relief under section 243(h)(1) of the Act.

(8) For purposes of applying section 243(h) of the Act, in determining whether or not a particular aggravated felon, as defined in the AEDPA, who has not been sentenced to at least 5 years' imprisonment, has overcome the presumption that he or she has committed a  **\*640** particularly serious crime, consistent with the meaning of that term in the Protocol, the appropriate standard is whether there is any unusual aspect of the alien's particular aggravated felony conviction that convincingly evidences that the crime cannot rationally be deemed "particularly serious" in light of treaty obligations under the Protocol.

**\*\*2** (9) Although the respondent's convictions for "illicit trafficking in firearms" fall within the aggravated felony definition of the AEDPA and he has been sentenced to less than 5 years' imprisonment, the nature and circumstances of the convictions are such that overriding the aggravated felony bar in this case is not necessary to ensure the United States' compliance with the Protocol.

**for respondent**
R. Travis Douglas, Esquire
Fort Smith, Arkansas

**amicus curiae for AILA** [1]
Amy Marmer Nice, Esquire
Washington, D.C.,

**amicus curiae for FAIR** [1]
Timothy J. Cooney, Esquire
Washington, D.C.,

**for the Immigration and Naturalization Service**
Richard J. Averwater
Assistant District Counsel

Before:Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, and GUENDELSBERGER, Board Members. Concurring/Dissenting Opinion: ROSENBERG, Board Member.

HOLMES, Board Member:

In a decision issued on March 6, 1996, an Immigration Judge found the respondent deportable and statutorily ineligible for asylum and withholding of deportation. The respondent, through counsel, has timely appealed from that decision, challenging only the Immigration Judge's determination that his "aggravated felony" conviction necessarily constitutes a conviction for a "particularly serious crime," thus barring the respondent from establishing eligibility for withholding of deportation under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 243(h) (1994). We find that the respondent has been finally convicted of a "particularly serious crime" and is ineligible for withholding of deportation. Accordingly, the appeal will be dismissed.

## I. BACKGROUND

The respondent is a 23-year-old native and citizen of Vietnam who entered the United States as an immigrant on or about March 13, 1991. On September 27, 1994, the respondent was convicted, in the United States District Court for the Northern District of Georgia, of, inter alia, conspiracy to deal in firearms without a license in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A) (1994) and 26 U.S.C. §§ 5812 and 5861(e) (1994). He was sentenced to a term of imprisonment of 36 months for this offense.

**\*641** A. Proceedings Below

Following the March 6, 1996, deportation hearing, the Immigration Judge concluded that the respondent was deportable under section 241(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1251(a)(2)(A)(iii) (1994), as an alien who at any time after entry into the United States has been convicted of an "aggravated felony," as defined in section 101(a)(43) of the Act, 8 U.S.C. § 1101(a)(43) (1994). [2]

The respondent thereupon applied for asylum and withholding of deportation under sections 208(a) and 243(h)(1) of the Act, 8 U.S.C. §§ 1158(a) and 1253(h)(1) (1994).

The Immigration Judge properly held that the respondent, by virtue of his final conviction in the United States of an "aggravated felony," was statutorily ineligible for asylum. See section 208(d) of the Act ("An alien who has been convicted of an aggravated felony . . . may not apply for or be granted asylum."). Further, and more importantly for purposes of this appeal, the Immigration Judge held that under section 243(h)(2) of the Act, the respondent's aggravated felony conviction constituted a conviction for a "particularly serious crime," barring the respondent from establishing eligibility for withholding of deportation.

<p style="text-align: center;">B. Statutory Provisions</p>

**3  At the time of the March 1996 hearing before the Immigration Judge, section 243(h) of the Act provided in pertinent part: (1) The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(4)(D)) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that --

. . .

(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States . . . .

For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.

On April 24, 1996, however, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (enacted Apr. 24, 1996) ("AEDPA"), which contained an array of provisions pertaining to alien terrorists and criminal aliens. Section 413(f) of the AEDPA, 110 Stat. at 1269, amended section 243(h) of the Act to include the following provision:

*642  (3) Notwithstanding any other provision of law, paragraph (1) shall apply to any alien if the Attorney General determines, in the discretion of the Attorney General, that --
(A) such alien's life or freedom would be threatened, in the country to which such alien would be deported or returned, on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) the application of paragraph (1) to such alien is necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees.

(Emphasis added.) In section 413(g) of the AEDPA, 110 Stat. at 1269-70, Congress specified, "The amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date." (Emphasis added.)

Inasmuch as the respondent's application for withholding of deportation has not been finally adjudicated, section 243(h) of the Act, as amended to include section 243(h)(3), applies to his application.

We note that subsequent to the filing of the appeal in this case, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 was enacted as Division C of the Departments of Commerce, Justice, and State, and the Judiciary Appropriations

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Act for 1997, Pub. L. No. 104-208, 110 Stat. 3009,___ ("IIRIRA"). This more recent statute provides that the restrictions on the removal of an alien to a country where the alien's life or freedom would be threatened do not apply to an alien who "having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." Section 305(a) of the IIRIRA (to be codified as section 241(b)(3)(B)(ii) of the Act at 8 U.S.C. § 1251(b)(3)(B)(ii)). It further provides:

**4  For the purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

Id. (Emphasis added). These provisions do not become effective until April 1, 1997, and thus do not govern the respondent's case. See section 309(a) of the IIRIRA, 110 Stat. at ___. However, although not directly applicable to the case at hand, this new law does provide some guidance for our interpretation of the amendment to section 243(h) enacted in the AEDPA.

## II. ISSUES PRESENTED

The principal issues in this case are raised by the amendment of the Immigration and Nationality Act effectuated by section 413(f) of the AEDPA, 110 Stat. at 1269 (to be codified as section 243(h)(3) of the Act at 8 U.S.C. § 1253(h)(3)). The enactment of section 243(h)(3) has again caused to be raised the question whether restrictions by Congress and the Attorney General on eligibility for withholding of the deportation of an alien convicted of an "aggravated felony" comport with the nonrefoulement provisions of *643  Article 33 of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. ("Convention"), to which the United States is bound by its accession in 1968 to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, (1968) 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol").

Thus, we must initially decide whether the enactment of section 243(h)(3) effectively superseded the "aggravated felony" bar to eligibility for withholding of deportation in section 243(h)(2) of the Act. And, we must decide how one determines whether an alien, who has been convicted of an "aggravated felony" and who would otherwise be subject to a statutory bar to withholding under section 243(h)(2) of the Act, nonetheless must have his or her deportation withheld "to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." Section 243(h)(3) of the Act.

## III. PRINCIPAL CONTENTIONS ON APPEAL

To aid our consideration of the novel issues raised in this matter, we requested and received briefs from the respondent and the Immigration and Naturalization Service, as well as amicus curiae briefs from the American Immigration Lawyers Association ("AILA") and the Federation for American Immigration Reform ("FAIR").

The respondent, in his supplementary brief, does not dispute the Immigration Judge's determination that the crime of which he was convicted is an aggravated felony under section 101(a)(43)(C) of the Act. Rather, he essentially argues that section 243(h)(3) effectively supersedes the categorical bar to withholding of deportation for aliens convicted of an aggravated felony. The respondent contends that, under the law as amended by section 413(f) of the AEDPA, 110 Stat. at 1269, he is entitled to an individualized determination as to whether his nonreturn or nonrefoulement to Vietnam "is necessary to ensure compliance with the . . . Protocol." Section 243(h)(3)(B) of the Act.

**5  AILA, in its amicus brief, generally supports this reading of the amendment. AILA maintains that the absolute bar to withholding of deportation for aliens convicted of aggravated felonies is inconsistent with Article 33 of the Convention and, consequently, the Protocol. According to AILA, the plain language of section 243(h)(3) reflects congressional intent to "void" the aggravated felony bar. AILA asserts that, in any case, the new provision would render a continued absolute aggravated felony bar to withholding of deportation inconsistent with the United States' treaty obligations under the Protocol because the Protocol requires individualized determinations of not only the seriousness of and specific circumstances underlying the offense at issue, but also the danger the alien presently poses to the community.

The Service, for its part, states that "(o)n its face," section 243(h)(3) "would appear to provide the Attorney General with authority to void 'any provision of law,' including the aggravated felony bar to withholding of **644** deportation, if she determines that failure to do so would result in a breach of our obligations under the 1967 Protocol." According to the Service, then, "the applicability of section 243(h)(3) to (the) respondent's case turns on an evaluation by the Attorney General of the consistency of the withholding of deportation provisions . . . with (the United States') obligations under the 1967 Protocol."

The Service argues that the relevant aggravated felony bar to withholding of deportation is consistent with the country's obligations under the Protocol, and that Congress, by not expressly repealing the bar, manifested its view that the bar is not contrary to the dictates of the Protocol. In support of this argument, the Service emphasizes that the Attorney General, presumably aware of the United States' obligations under the Protocol, promulgated a regulation in January 1995, 8 C.F.R. § 208.16(c)(2)(ii), applying the language of the aggravated felony bar to withholding of deportation. The Service further maintains that crimes suggested by the UNHCR Handbook "as potentially 'serious' enough to warrant a denial of refugee protection . . . are largely consistent with those identified as aggravated felonies by the United States." See Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva 1992) ("Handbook").

Amicus FAIR generally supports the Service's position. FAIR submits that the aggravated felony bar to withholding of deportation is "not affected" by the new section 243(h)(3) "except under rare and unlikely circumstances." Noting that repeals of statutes by implication are not favored, FAIR argues that the "notwithstanding any other provision of law" language of section 243(h)(3) does not serve to repeal or amend any provision of section 243(h)(2), including the aggravated felony bar. According to FAIR, however, section 243(h)(3) allows for the rare possibility that the Attorney General may determine in her discretion that the deportation or return of a particular alien would run afoul of the Protocol.

## IV. DISCUSSION

**6** It is clear from the varied interpretations proposed by the parties and amici that the intended scope and meaning of section 243(h)(3) are subject to significant dispute. We also note that we have not been directed to any analogous statutory framework involving a seemingly absolute proscription in one section of law, but discretionary authority for an administrative determination that the proscription could result in a violation of this country's treaty obligations.

Before we undertake to construe the specific language of section 243(h)(3), we will first briefly review the origin and legislative and administrative history of the withholding of deportation provisions of the Act.

**\*645** A. Abbreviated Legislative and Administrative History of Section 243(h) Prior to the AEDPA

In 1968, the United States acceded to the United Nations Protocol Relating to the Status of Refugees. The Protocol bound its parties to the substantive provisions of Articles 2 through 34, inclusive, of the United Nations Convention Relating to the Status of Refugees. [3] To bring United States refugee law into conformance with the country's obligations under the Protocol, Congress enacted the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which established the basic framework for current refugee law. See generally INS v. Cardoza-Fonseca, 480 U.S. 429, 436-37 (1987); INS v. Stevic, 467 U.S. 407, 418, 421 (1984); Mosquera-Perez v. INS, 3 F.3d 553, 556-57 (1st Cir. 1993).

In passing the Refugee Act of 1980, Congress incorporated into the Immigration and Nationality Act the nondiscretionary withholding of deportation provisions of section 243(h). These provisions, set forth above, closely parallel the mandatory nonrefoulement obligations of Article 33 of the Convention. Article 33 of the Convention provides:

1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2. The benefit of the present provision may not, however, be claimed by a refugee for whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country.

19 U.S.T. at 6276 (emphasis added).

As is clear from the underscored provisions, the language of section 243(h)(2)(B), which erects a mandatory bar to withholding of deportation, or nonrefoulement, to any "alien (who), having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States," mirrors the language of Article 33.2 of the Convention. Indeed, as AILA notes in its amicus brief, the report of the Joint Conference Committee considering the final bill leading to the Refugee Act of 1980 indicates that the conferees adopted the language of section 243(h)(2)(B) "with the understanding" that it "is based directly upon the language of the Protocol" and that the conferees "intended that the provision be construed consistent with the Protocol." H.R. Conf. Rep. No. 781, 96th Cong., 2d Sess. (1980), reprinted in 1980 U.S.C.C.A.N. 160, 161.

**7   In 1982, this Board first set forth criteria for determining whether a crime was "particularly serious" for purposes of section 243(h)(2)(B) in our decision in Matter of Frentescu, 18 I&N Dec. 244 (BIA 1982), modified, Matter of C-, 20 I&N Dec. 529 (BIA 1992),  *646  Matter of Gonzalez, 19 I&N Dec. 682 (BIA 1988). In doing so, we did not endeavor to establish an exact, conclusive definition of "particularly serious crime," as no such definition was provided in the Protocol or the Act. Rather, we concluded that while certain crimes are inherently "particularly serious crimes," "the record in most proceedings will have to be analyzed on a case-by-case basis." Id. at 247. We stated:
In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community. Crimes against persons are more likely to be categorized as "particularly serious crimes." Nevertheless, we recognize that there may be instances where crimes (or a crime) against property will be considered as such crimes.

Id.; see also Matter of C-, supra, at 533-35 & n.3 (BIA 1992); Matter of B-, 20 I&N Dec. 427 (BIA 1991); Matter of K-, 20 I&N Dec. 418 (BIA 1991), aff'd, Kofa v. INS, 60 F.3d 1084 (4th Cir. 1995); Matter of U-M-, 20 I&N Dec. 327 (BIA 1991), aff'd, Urbina-Mauricio v. INS, 989 F.2d 1085 (9th Cir. 1993), modified, Matter of C-, supra, clarified, Matter of K-, supra; Matter of Carballe, 19 I&N Dec. 357, 360-61 (BIA 1986), modified, Matter of C-, supra, clarified, Matter of K-, supra, modified on other grounds, Matter of Gonzalez, supra.

Subsequent to Matter of Frentescu, supra, in Matter of Carballe, supra, we construed section 243(h)(2)(B) to provide that once an alien's crime is determined to be "particularly serious," it necessarily follows that the alien is a "danger to the community." We held that the language of the statute and Article 33.2 of the Convention did not require "a separate determination of dangerousness focusing on the likelihood of future serious misconduct on the part of the alien." Id. at 360. We also held, in Matter of Rodriguez-Coto, 19 I&N Dec. 208, 209-10 (BIA 1985), modified on other grounds, Matter of Gonzalez, supra, that the statutory language of section 243(h)(2)(B) did not require a balancing of the seriousness of the crime against the nature or severity of the potential persecution the alien might face if returned to his or her country of origin.

Congress, in enacting section 515(a)(2) of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5053 (the "1990 Act"), "obviated the Frentescu analysis for aggravated felonies by appending the following paragraph" to section 243(h)(2):
For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.

**8   Mosquera-Perez v. INS, supra, at 557.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Following the enactment of this "aggravated felony bar" to withholding of deportation, we have continued to construe the provisions of section 243(h)(2) as not requiring a separate determination of danger to the community, irrespective of whether the alien was convicted of an aggravated felony. See Matter of C-, supra; Matter of K-, supra; Matter of U-M-, supra. Our **\*647** construction of section 243(h)(2)(B) and the 1990 "aggravated felony bar" provision has been sustained in every reviewing court faced with the issue. See Hamama v. INS, 78 F.3d 233, 240 (6th Cir. 1996); Ahmetovic v. INS, 62 F.3d 48, 52-53 (2d Cir. 1995); Kofa v. INS, supra, at 1088-91; Al-Salehi v. INS, 47 F.3d 390, 393-96 (10th Cir. 1995); Feroz v. INS, 22 F.3d 225, 227 (9th Cir. 1994); Garcia v. INS, 7 F.3d 1320, 1323-27 (7th Cir. 1993); Mosquera-Perez v. INS, supra, at 558-59; Martins v. INS, 972 F.2d 657, 660-62 (5th Cir. 1992); Ramirez-Ramos v. INS, 814 F.2d 1394, 1397 (9th Cir. 1987); Crespo-Gomez v. Richard, 780 F.2d 932, 934-35 (11th Cir. 1986). DPA1#In the case before us, however, we must ascertain whether the amendments to section 243(h), brought about by section 413(f) of the AEDPA, affect our analysis under section 243(h)(2)(B) as it applies to the respondent and, if so, to what extent. Most importantly for purposes of this appeal, we must initially decide whether the aggravated felony bar to withholding of deportation, in place between the effective date of the AEDPA and the effective date of the IIRIRA, has been effectively "voided" by section 243(h)(3), as the respondent and AILA contend.

### B. Intended Scope and Meaning of Section 243(h)(3)

"In construing statutes, 'we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" INS v. Elias-Zacarias, 502 U.S. 478, 482 (1992) (quoting Richards v. United States, 369 U.S. 1, 9 (1962)); see also INS v. Cardoza-Fonseca, supra, at 432 n.12 (noting that there is a "strong presumption that Congress expresses its intent through the language it chooses"). Here, Congress has introduced section 243(h)(3) with the sweeping phrase, "(n)otwithstanding any other provision of law." Section 243(h)(3) of the Act. Also, on its face, the statute grants the Attorney General broad discretion to determine whether the return or deportation of "any alien" would violate the Protocol. Id.

When interpreting the phrase "notwithstanding any other provision of law," the United States Court of Appeals for the District of Columbia remarked that "'(a) clearer statement is difficult to imagine.'" Liberty Maritime Corp. v. United States, 928 F.2d 413, 416 (D.C. Cir. 1991) (quoting Crowley Caribbean Transport, Inc. v. United States, 865 F.2d 1281, 1283 (D.C. Cir. 1989) (quoting Illinois Nat'l Guard v. Federal Labor Relations Authority, 854 F.2d 1396, 1403 (D.C. Cir. 1988)). But see In Re Glacier Bay, 944 F.2d 577, 582 (9th Cir. 1991) (finding "notwithstanding" phrase not dispositive of whether Congress intended to repeal another statute, particularly where there is manifest legislative intent to the contrary). The markedly broad and sweeping phrases "notwithstanding any other provision of law" and "any alien" indicate that Congress intended the provision to allow the Attorney General to override any statutory bar or other preclusion to the protection afforded by section 243(h)(1) in any case she deems in her discretion **\*648** to warrant such an extraordinary action to ensure compliance with the Protocol.

**\*\*9** On the other hand, Congress did not expressly repeal the aggravated felony bar to withholding of deportation. We cannot conclude that Congress' failure to repeal this provision was unintentional. Moreover, we would not lightly undertake to conclude that Congress impliedly intended to repeal this provision, for it is "'a cardinal principle of statutory construction'" that repeals by implication are not favored. Radzanower v. Touche Ross & Co., 426 U.S. 148, 154 (1976) (quoting United States v. United Continental Tuna Corp., 425 U.S. 164, 168 (1976)); see also Morton v. Mancari, 417 U.S. 535, 549-51 (1974); United States v. Joya-Martinez, 947 F.2d 1141, 1144 (4th Cir. 1991); Patel v. Quality Inn South, 846 F.2d 700, 704 (11th Cir. 1988), cert. denied, 489 U.S. 1011 (1989). As the Supreme Court has stated: "'Repeal is to be regarded as implied only if necessary to make the (later enacted provision) work, and even then only to the minimum extent necessary.'" Radzanower v. Touche Ross & Co., supra, at 155 (quoting Silver v. New York Stock Exchange, 373 U.S. 341, 357 (1963)).

A repeal by implication will be recognized only if there is an "'irreconcilable conflict'" between the earlier and later statutes or "'if the later act covers the whole subject of the earlier one and is clearly intended as a substitute,'" but, in either case, Congress' intention to repeal the earlier law must be "'clear and manifest.'" Radzanower v. Touche Ross & Co., supra, at 154 (quoting Posadas v. National City Bank, 296 U.S. 497, 503 (1936)); see also Rodriguez v. United States, 480 U.S. 522, 524 (1987); Patel v. Quality Inn South, supra. Accordingly, we will seek to construe sections 243(h)(2)(B) and (3) to give effect to each while

preserving the sense and purpose of both provisions. See Morton v. Mancari, supra, at 551 ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

Reviewing what Congress did and did not say in this provision and applying the above-mentioned guidelines for statutory construction, we find it apparent that Congress sought to amend the aggravated felony bar only to the limited extent necessary to ensure that the refoulement of a particular criminal alien would not place our compliance with the Protocol in jeopardy. In our view, the amendment was intended to have a limited effect, rather than to work a wholesale repeal of existing laws governing criminal aliens' eligibility for withholding of deportation. [4]

**\*649**  With this in mind, we turn to the question of how one determines whether an alien, who has been convicted of an "aggravated felony" and who would otherwise be subject to a statutory bar to withholding under section 243(h)(2) of the Act, nonetheless must have his or her deportation withheld "to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." Section 243(h)(3) of the Act.

### C. Exercise of Discretionary Authority Under Section 243(h)(3)

#### 1. Position of Respondent and AILA

**\*\*10**  The respondent concedes that he has been convicted of an aggravated felony. The respondent and AILA argue, however, that the Protocol, incorporating Article 33 of the Convention, mandates an individualized "Frentescu analysis" for each and every crime no matter how serious it is on its face. According to the respondent and AILA, therefore, the effect of section 243(h)(3) must be to proscribe any categorical bar to withholding of deportation, including the aggravated felony bar that has been in place since 1990. We disagree.

As we noted in Matter of Frentescu, supra, neither the Protocol nor the Convention specifically defines or offers guidance as to what constitutes a "particularly serious crime." [5]  Id. at 246. In Frentescu, we also consulted the UNHCR Handbook (Geneva 1979). We concluded, however, that the **\*650**  Handbook offered little counsel on this specific issue. Id.; see also Garcia v. INS, supra (observing that the Handbook's "general statements . . . do not help greatly with the interpretation of Article 33(2)"). Ultimately, as one commentator observed, "what a 'particularly serious crime' is will depend on the interpretation of these words in the various (contracting) states, in accordance with their Criminal Code." N. Robinson, Convention Relating to the Status of Refugees: Its History, Contents and Interpretation 164 n.277 (Institute of Jewish Affairs 1953).

In the absence of guidance from Congress or the international instruments giving rise to the withholding of deportation provisions of the Act, we set forth the "Frentescu analysis," outlined above, for ascertaining whether a crime in question is "particularly serious." Matter of Frentescu, supra. At that time, we specifically held, however, that certain crimes are "particularly serious" on their face, obviating the need for consideration of the various Frentescu factors. Id. See generally Ahmetovic v. INS, supra, at 52 (observing that "(o)nly where there is room for disagreement as to whether the crime in question was 'particularly serious' should the Board resort to examining (the Frentescu factors)").

Indeed, both before and after Congress' enactment of the aggravated felony bar in 1990, a consistent practice of this Board has been to classify certain crimes as per se "particularly serious crimes" on their face without proceeding to an individualized examination of the Frentescu factors. See, e.g., Matter of Gonzalez, supra, at 683-84 (holding that drug trafficking crimes are per se "particularly serious"); Matter of Carballe, supra, at 360-61 (same -- armed robbery and attempted armed robbery); Matter of Garcia-Garrocho, 19 I&N Dec. 423, 425-26 (BIA 1986) (same -- burglary involving a dangerous weapon or resulting in physical injury to a victim). This practice has been upheld by several reviewing courts. See, e.g., Hamama v. INS, supra, at 240 (upholding the Board's determination that felonious assault involving the use of a dangerous weapon is per se "particularly serious" and noting that the Board "has the prerogative to declare a crime particularly serious without examining each and every Frentescu **\*651**  factor"); Ahmetovic v. INS, supra, at 52 (sustaining the Board's determination that first-degree manslaughter

is a "particularly serious crime" per se). But see Beltran-Zavala v. INS, 912 F.2d 1027 (9th Cir. 1990) (questioning, in a case arising prior to enactment of the aggravated felony bar of section 243(h)(2), the Board's authority to delimit classes of per se "particularly serious crimes" in the absence of congressional imprimatur).

**11  In 1990, Congress exercised its plenary authority over immigration law and erected a per se categorical bar to withholding of deportation for any alien convicted of an aggravated felony. Section 243(h)(2) was amended to specifically provide that "an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime." Section 515(a)(2) of the 1990 Act, 104 Stat. at 5053. Neither the Convention nor the Protocol prohibits a contracting state from establishing a category of intrinsically "particularly serious crimes." Moreover, no court has ruled that Congress' categorization of per se "particularly serious crimes" is impermissible under the Protocol or constitutes a tacit abrogation of the treaty. See, e.g., Garcia v. INS, supra, at 1326 (commenting, in dicta, that "Congress' intention (in section 243(h)(2)(B) of the Act) to increase the number of crimes that automatically bar eligibility for relief can scarcely be questioned").

In support of its argument that a categorical bar to withholding of deportation runs afoul of the United States' nonrefoulement obligations under Article 33 of the Convention, AILA has presented an advisory letter from the UNHCR Representative to the United States, Mr. Anne Willem Bijleveld. Mr. Bijleved states: "It is the opinion of UNHCR that a Contracting State which automatically bars an individual convicted of an 'aggravated felony' from withholding of deportation is in violation of the 1967 Protocol relating to the Status of Refugees." AILA urges our reliance upon this opinion. The UNHCR's opinion, however, while meriting serious consideration, does not rise to the level of international law and principally relies upon passages of the Handbook as its foundation.

Moreover, were we to rely upon UNHCR's opinion and therefore accept the respondent's position that a categorical classification of per se "particularly serious crimes" contravenes Article 33 of the Convention, we would be essentially ruling that the United States has been in violation of the Protocol since 1990 when Congress first established the aggravated felony bar of section 243(h)(2) of the Act. In addition, such a ruling would be in conflict with the amendment to the law enacted in the IIRIRA, which categorically bars from withholding relief any alien "convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years." Section 305(a) of the IIRIRA. Thus, we do not accept the position that categorical classifications of crimes as per se "particularly serious crimes" necessarily places the United States out of compliance with the Protocol.

*652  2. Positions of INS and FAIR

The Service agrees that the AEDPA did not intend to or effectively void the aggravated felony provision of section 243(h)(2). The Service notes that the Administration recommended the enactment of section 243(h)(3) in the AEDPA because of the expansion of the categories of crimes within the aggravated felony definition by the AEDPA. Thus, the Service argues in part that only the "expanded" aggravated felony grounds added by the AEDPA should be considered on a case-by-case basis under section 243(h)(3). While this may have been the Administration's intent in recommending the adoption of this provision, there are no implementing regulations to that effect, and the broad language of section 243(h)(3) is not limited to the newly categorized aggravated felonies in the AEDPA.

**12  FAIR submits the following contention:
(T)he Board of Immigration Appeals should rule that the phrase "notwithstanding any other provision of law" in Section 413(f) of the AEDPA does not void the aggravated felony bar to withholding of deportation relief under Section 243(h)(2) (B) of the INA, except in the very unlikely event that the Attorney General has exercised her discretion to examine whether a particular aggravate felony constitutes "a particularly serious crime" within the meaning of Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees and has determined that it does not.

However, while we agree with this general principle, specific guidance is not offered as to the standard to determine whether the treatment of a particular aggravated felony as a particularly serious crime would take this country out of compliance with the Protocol.

### 3. Congressional Guidance

Congress has plenary authority under the Constitution to enact implementing legislation which defines the United States' obligations under a non-self-executing international treaty to which the country is a signatory. See, e.g., INS v. Stevic, 467 U.S. 407, 428 n.22 (1984); United States v. Aguilar, 883 F.2d 662, 680 (9th Cir. 1989), cert. denied, 498 U.S. 1046 (1991); Committee of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 936-39 (D.C. Cir. 1988). Moreover, the United States, acting through the legislative process, committed to Congress and the Executive, has the authority to designate and define crimes that it deems "particularly serious" in view of the domestic problems facing the country. See generally INS v. Chadha, 462 U.S. 919 (1983) (clarifying the separation of powers under the Constitution); Dames & Moore v. Regan, 453 U.S. 654 (1981) (same).

In other words, we do not construe the concept of a "particularly serious crime" to have a fixed meaning in international or domestic law. Absent a binding international meaning to the phrase "particularly serious crime," Congress is free to expand or contract the construction to be given that phrase by United States asylum adjudicators. In this respect, no past or present *653 definition enacted by Congress can be said to have, per se, violated international law. Congress can simply change its approach without such a modification necessarily calling into question the "legality" of its past enactments under international law. Similarly, Congress is also free to entrust, or to delegate, an individual case-by-case determination of what constitutes a "particularly serious crime" to United States officials such as the President or the Attorney General.

Under the AEDPA, Congress seemingly has done some of each. It has enacted its own construction; and it has delegated to the Attorney General the responsibility of making her own discretionary determination regarding compliance with the Protocol in individual cases. Given the authority of Congress to define the phrase "particularly serious crime" and the absence of a binding international meaning to the phrase "particularly serious crime," it is no easy task to find a separate "measuring stick" against which the Attorney General should assess the application of Congress' definition in any given case controlled by the AEDPA.

However, in exercising the broad discretionary authority accorded to the Attorney General by Congress in the AEDPA, we think it appropriate to look for some guidance to the IIRIRA and the intent of Congress reflected therein. We find it a reasonable exercise of discretion to interpret the amendments to the Immigration and Nationality Act enacted in 1996 by the AEDPA in a manner inconsistent with the more recent amendments to the same provisions of law by the IIRIRA.

### D. Standards for Ascertaining Whether the Withholding of a Criminal Alien's Deportation is Necessary to Ensure Compliance with the 1967 Protocol

### 1. Standards

**13 Absent further statutory or regulatory guidance, we conclude that the standards for determining whether the withholding of deportation of an alien convicted of an aggravated felony, as defined in the AEDPA, is necessary to ensure compliance with the 1967 Protocol should not be inconsistent with the relevant provisions of the IIRIRA.

In the IIRIRA, for purposes of restricting the removal of an alien to a country where the alien's life or freedom would be threatened, aliens convicted of an aggravated felony are ineligible for such relief if sentenced to an aggregate of at least 5 years' imprisonment. In view of this recent enactment, we conclude as a matter of discretion, for the purposes of applying section 243(h) (3) of the Act, that any alien convicted of an aggravated felony, if sentenced to an aggregate of at least 5 years' imprisonment, is conclusively barred from relief under section 243(h)(1) and that such ineligibility for withholding is in compliance with the Protocol.

**\*654**  Secondly, considering prior congressional enactments and the considerable body of judicial and administrative precedent construing section 243(h) of the Act and the Protocol, we find that an alien convicted of an aggravated felony, as defined in the AEDPA, who has been sentenced to less than 5 years in prison should be presumed to have been convicted of a particularly serious crime, rendering him or her ineligible for relief under section 243(h)(1). Such a presumption is warranted in view of the fact that section 243(h)(2) of the presently controlling law specifies that such aliens "shall be considered to have committed a particularly serious crime." Section 243(h)(2) of the Act. Moreover, the seriousness with which such crimes are viewed is reflected not only in the appellation "aggravated felony," but also by the fact that such aliens are absolutely barred from most forms of relief from deportation, including for asylum under section 208 of the Act. However, we do not find that this presumption is irrebuttable for aliens who have been convicted of an aggravated felony, but not sentenced to at least 5 years' imprisonment.

For purposes of applying section 243(h), in determining whether or not an alien convicted of an aggravated felony, as defined in the AEDPA, who has not been sentenced to at least 5 years' imprisonment, has overcome the presumption that he or she has committed a particularly serious crime, consistent with the meaning of that term in the Protocol, we find the appropriate standard to be whether there is any unusual aspect of the alien's particular aggravated felony conviction that convincingly evidences that his or her crime cannot rationally be deemed "particularly serious" in light of our treaty obligations under the Protocol. To make this determination, we will look to the conviction records and sentencing information in the alien's case. In this analysis, we do not engage in the retrial of the alien's criminal case or go behind the record of conviction to determine his or her innocence or guilt. We look to the nature and circumstances of the crime to determine whether the alien, having been convicted of that crime, can be said to represent a danger to the community of the United States. See, e.g., Matter of Carballe, supra, at 360-61; Matter of Frentescu, supra. Furthermore, in this examination, one must give significant weight to the decision of Congress to include that particular category of crime in the aggravated felony definition. The domestic problems confronting the United States and the overall level of harm to the community arising from certain forms of criminal conduct are clearly factors within the legislative purview of Congress.

**\*\*14**  The ultimate question under section 243(h)(3) of the Act is whether the aggravated felony bar in section 243(h)(2), as applied in a particular case, is inconsistent with United States' compliance with the Protocol. In this regard, we recognize that certain categories of crime may encompass conduct which varies significantly in gravity, yet supports a conviction. The essential inquiry in our view is whether classifying the alien's aggravated felony conviction as "particularly serious" is clearly and manifestly inconsistent with  **\*655**  our treaty obligations. Doubts on this score should be resolved in favor of the congressional choice reflected in section 243(h)(2) of the Act.

### 2. Application of Guidelines to the Respondent

Applying these guidelines to the matter at hand, we note the respondent's concession that his "illicit trafficking in firearms" falls with the definition of an aggravated felony. See section 101(a)(43)(C) of the Act. As he was not sentenced to at least 5 years' imprisonment, we must further consider the record to determine whether the strong presumption that his crime is particularly serious, thus rendering him ineligible for relief under section 243(h)(1), has been rebutted.

The record of conviction in this case reflects that the respondent was convicted on September 27, 1994, of three separate offenses involving illicit trafficking in firearms: (1) conspiracy to commit offenses against the United States, to wit: to deal in firearms without a license, unlawfully transfer sawed-off shotguns, and traffic in unauthorized access devices (i.e. credit cards), in violation of 18 U.S.C. § 371; (2) dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A); and (3) unlawful transfer of a sawed-off shotgun, in violation of 26 U.S.C. §§ 5812 and 5861(e). He was sentenced to a term of imprisonment of 36 months on each count, to be served concurrently.

The record reflects that the respondent and his co-conspirators, from June to October 1993, conspired to engage in illicit trafficking in numerous firearms, including sawed-off shotguns, and stolen credit cards. In September 1993, the respondent

unlawfully sold a 12-gauge, pump sawed-off shotgun to two undercover F.B.I. agents. He also tried to unlawfully sell a 9-mm., semi-automatic pistol to the agents.

The number and depth of the societal problems stemming from the proliferation of unlicensed firearms in the United States are so manifest as to require little elaboration. Having examined the alarming degree of harm suffered by and the imminent danger to the American public resulting from illicit firearms trafficking, Congress designated certain illicit firearms-trafficking violations "aggravated felonies."

Considering these facts, we do not find that overriding the aggravated felony bar in this case is necessary to ensure the United States' compliance with the Protocol. Accordingly, we find on the record before us that this respondent is ineligible for withholding of deportation.

## V. OTHER ISSUES RAISED

 **15  In its amicus brief, AILA contends that Article 33 of the Convention mandates that a separate determination of the respondent's danger to the community of the United States must be made before it can be concluded that he is barred from eligibility for withholding of deportation under section  *656  243(h)(2)(B) of the Act. This argument forms the central focus of the dissent. However, we have consistently held that neither the Convention and Protocol nor section 243(h)(2)(B) of the Act requires a separate "dangerousness" determination "focusing on the likelihood of future misconduct on the part of the alien." Matter of Carballe, supra, at 360; see also Matter of K-, supra; Matter of U-M-, supra. As we noted previously in this decision, every reviewing court reaching the issue has sustained our prior holding in this regard. See Hamama v. INS, supra; Ahmetovic v. INS, supra; Kofa v. INS, supra; Al-Salehi v. INS, supra; Feroz v. INS, supra; Garcia v. INS, supra; Mosquera-Perez v. INS, supra; Martins v. INS, 972 F.2d 657 (5th Cir. 1992); Ramirez-Ramos v. INS, supra; Crespo-Gomez v. Richard, supra. Indeed, in 1995, the Attorney General issued a regulation adopting this construction of section 243(h)(2)(B). 8 C.F.R. § 208.16(c)(2)(ii) (1995). Moreover, there is nothing in the legislative history of either the AEDPA or the IIRIRA suggesting that Congress had any intent to override this well-settled construction of the law. And, particularly in enacting the IIRIRA, Congress reflected its ability to clearly address and override Board and judicial constructions of the law which it deemed erroneous. Thus, we do not find our ruling on this issue is affected by section 243(h)(3) of the Act.

AILA also submits that the Convention mandates a balancing of the seriousness of the crime with the potential severity of the persecution the alien may face if deported or returned to a particular country before it can be concluded that the alien is barred from eligibility for withholding of deportation under section 243(h)(2)(B). It is now well settled, however, that "(t)he statutory bar to withholding of deportation based on conviction of a particularly serious crime relates only to the nature of the crime and does not vary with the nature of the evidence of persecution." Matter of K-, supra, at 426; see also Ramirez-Ramos v. INS, supra, at 1397-98; Garcia-Mir v. Smith, 766 F.2d 1478, 1487 n.10 (11th Cir. 1985), cert. denied sub nom. Marquez-Medina v. Meese, 475 U.S. 1022 (1986); Matter of Garcia-Garrocho, supra; Matter of Rodriguez-Coto, supra. We do not find our holding in this regard disturbed by section 243(h)(3) of the Act.

## VI. CONCLUSION

Accordingly, for the foregoing reasons, the respondent's appeal will be dismissed.

ORDER: The appeal is dismissed.

### CONCURRING/DISSENTING OPINION: Lory D. Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I concur that in enacting section 243(h)(3) of the Immigration and Nationality Act (to be codified at 8 U.S.C. § 1253(h)(3)), Congress did not intend to  *657  repeal section 243(h)(2)(B) of the Act, 8 U.S.C. § 1253(h)(2)(B)(1994), which codifies

a narrowly defined exception to our international obligation of nonrefoulement under the 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. ("Convention"), and the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, (1968) 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol"), [1] but that Congress was instead amending its application. See section 243(h)(2) of the Act (making an exception for persons who constitute a danger to the community); see also Articles 32 and 33 of the Convention (prohibiting expulsion and return but allowing a signatory state to invoke an exception to this principle based on concerns related to security, public order, or danger to the community of that country).

 **16  In addition, I do not dispute that either Congress or, where Congress has not acted or has delegated its authority, the Attorney General, may determine that certain convictions are for crimes that we consider particularly serious offenses. Certainly, beginning by designating certain types or levels of offenses which we consider to be particularly serious is not necessarily an unreasonable approach.

However, when such a categorical designation is treated as dispositive of whether a refugee poses a danger to the community, thus relieving the United States of our obligation to provide withholding of deportation under section 243(h)(1), it is difficult to see how we satisfy our responsibility to provide individual consideration. I cannot agree that such an interpretation is consistent with an accurate understanding of the terms of either the statute or the international instrument on which it is based.

There is no question that Congress was clearly aware of its international treaty obligations when it first enacted this exception to withholding of deportation. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102; see also H.R. Conf. Rep. No. 781, 96th Cong., 2d Sess. (1980), reprinted in 1980 U.S.C.C.A.N. 160, 161; H.R. Rep. No. 608, 96th Cong., 1st Sess. 1, 6, 17-18 (1979) (stating specifically that Congress' intent was precise compliance with international law as described in the Protocol). Like the majority, I presume that Congress also had no intention of abrogating these obligations when, in the Immigration Act of 1990, Pub. L. No. 100-649, 104 Stat. 4978 ("1990 Act"), it subsequently designated aggravated felonies as being particularly serious crimes, and later expanded the definition of "aggravated felony" to include even a greater number of offenses.

Nonetheless, Congress has significantly amended the statute, and we should account for these changes and reassess our interpretation of the statute  *658  in light of these changes. Indeed, had Congress been satisfied that the current interpretation and application of section 243(h) did comport with our obligations, there would have been little need for any amendments whatsoever. Since Congress has made these changes, not once but twice this calendar year, we should be wary of invoking precedent too quickly.

Congress' most recent amendments of the statute afford us the opportunity to seriously reexamine our interpretation of section 243(h)(2)(B) in relation to the Protocol and our obligations under it. I do not think that the majority has accounted adequately for the fact that the recent revisions emphasize both our international obligations and the Attorney General's discretion. Reading these amendments together, I cannot conclude that a minor adjustment of the status quo either satisfies congressional intent in amending the statute, or is a reasonable interpretation of Congress' overall intent to satisfy our international obligations. Persistence in reading section 243(h)(2)(B) according to our existing construction of the language, despite the statutory changes we are asked to interpret today, might actually place compliance with those treaty obligations at risk.

 **17  I disagree that such a limited scheme reasonably effectuates section 243(h)(3) as introduced by Congress in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214  (enacted Apr. 24, 1996) ("AEDPA"). It simply fails to comport with our international obligations, which are underscored by the express statutory language emphasizing the Attorney General's discretionary role in insuring compliance under domestic law. [2] Consequently I dissent.

## I. STATUTORY AND TREATY INTERPRETATION

Article 32 of the Convention provides that no contracting state may expel a refugee except on grounds of national security or public order. Convention, supra, art. 32.1 Should such expulsion occur, it must be "only in pursuance of a decision reached in accordance with due process of law." Id. art. 32.2.

Article 33 provides:

### Prohibition of expulsion or return ("refoulement")

1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

 **\*659**  2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country. (Emphasis added.)

These provisions have been imported to section 243(h) of the Immigration and Nationality Act, which provides:
(1) The Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that (grounds stated in Article 33.1 exist) . . .

(2) (unless)

. . .

(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

. . .

(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States. (Emphasis added.)

### A. Rules of Statutory Interpretation

It is rudimentary that construction of the statutory language begins with the terms of the statute itself, and that if those terms on their face constitute a plain expression of congressional intent, they must be given effect. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1994). Where Congress' intent is not plainly expressed, then we need to determine a reasonable interpretation of the language, and fill any gap left, implicitly or explicitly, by Congress. Id. at 843; COIT Independent Joint Venture v. Federal Sav. and Loan Ins. Corp. 489 U.S. 561 (1989) (holding that "whole statute" interpretation favors reading statutory sections in harmony to achieve a harmonious whole; see also K Mart Corp. v. Cartier Inc., 486 U.S. 281, 291 (1988) (holding that construction of language which takes into account the design of the statute as a whole is preferred).

 **\*\*18**  In the course of that exercise, we may examine legislative history and employ the panoply of principles of statutory construction, including the principle that in view of the harsh consequences of deportation, ambiguities are to be construed in favor of the alien. INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987); Barber v. Gonzales, 347 U.S. 637, 642 (1954); Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948); Matter of Hou, 20 I&N Dec. 513, 520 (BIA 1992); Matter of Tiwari, 19 I&N Dec. 875, 881 (BIA 1989).

The relevant statutory sections, derived from international law, contain both plain and unquestionably ambiguous language. The majority acknowledges that the meaning of the statutory section has been the subject of "significant dispute." Congress' enactment of section 243(h)(3), and the successor provision to section 243(h) in section 305(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Division C of the Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act for 1997, Pub. L. No. 104-208, 110 Stat. 3009,___ ("IIRIRA") (to be codified as section **660 241(b)(3) of the Act at 8 U.S.C. § 1251(b)(3)), underscore Congress' intent to comply with the Protocol and to delegate to the Attorney General the discretionary authority to do so. This enactment provides a compelling reason to revisit our construction of section 243(h).

## B. Consideration of Treaty Terms

Congress has plenary authority under the Constitution to enact implementing legislation which defines the United States' obligations under a non-self-executing international treaty to which the country is a signatory. See, e.g., INS v. Stevic, 467 U.S. 407, 428 n.22 (1984); United States v. Aguilar, 883 F.2d 662, 680 (9th Cir. 1989), cert. denied, 498 U.S. 1046 (1991); Committee of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 936-39 (D.C. Cir. 1988). It is well settled that the terms of our treaty obligations are of equal force as the terms of domestic statutes. See, e.g., Whitney v. Robertson, 124 U.S. 190, 194 (1888).

Courts must strive to interpret domestic legislation in a way that is consistent with international obligations. See, e.g., Weinburger v. Rossi, 456 U.S. 25, 32 (1982); Murray v. The Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804). This could not be more pertinent a principle than it is in the construction now before us, as, "(i)f one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the (Protocol)." INS v. Cardoza-Fonseca, supra, at 436 (1987). [3]

Domestic law may supersede international obligations only by express abrogation, Chew Heong v. United States, 112 U.S. 536, 538 (1884), or by subsequent legislation that irrevocably conflicts with international obligations, Reid v. Covert, 354 U.S. 1, 18 (1957). However, that principle has no application here. In this instance, Congress has not expressed any intention of reneging on the international obligations assumed through accession to the 1967 Protocol via the Refugee Act of 1980, nor has Congress articulated any desire to curtail refugee protections beyond the limitations set out in the Protocol.

**19  To the contrary, twice in 1996, Congress has addressed the statutory sections which articulate and govern implementation of these obligations and has even literally emphasized its concern that the Attorney General have discretion to act in compliance with the Protocol. Absent any clear and  *661  irrevocable incompatibility, the Act and its subsequent revisions must be read in such a way as to satisfy our nation's obligations under the Protocol.

## II. RATIONAL CONSTRUCTION OF THE STATUTE

The interpretation we adopt here not only construes the language of section 243(h)(3) of the Act, which by its terms is applicable comprehensively to applications for withholding of deportation under section 243(h) pending before, on, or after April 24, 1996. It also involves construction of the section 241(b)(3) withholding provisions of the statute which substitutes for section 243(h) effective April 1, 1997. That section provides specifically that an aggravated felony for which a sentence of 5 years is imposed is considered a particularly serious crime, while imposition of a lesser sentence may or may not result in a determination by the Attorney General that the offense is a particularly serious one. Like section 243(h)(3), this amendment is a modification of section 243(h)(2)(B), which we have read to equate conviction of a particularly serious crime with a refugee constituting a danger to the community.

Indeed, Congress' recent expression in section 243(h)(3) of its concern that, notwithstanding any other provision, discretion is to be exercised in the course of our compliance with the Protocol, may prove to be a critical consideration and should not be overlooked. Had Congress not been so emphatic about the Attorney General's discretion in section 243(h)(3), it may have

been permissible to read the latest enactment, as the majority attempts to do, as a license to continue the Board's construction of section 243(h)(2)(B). In that case, the IIRIRA amendment would be no more than an attempt to alleviate, in the case of offenses resulting in shorter sentences, the harsh consequence of per se refoulement resulting from categorical designation of all aggravated felonies as particularly serious crimes. In essence, in construing AEDPA, the majority borrows from IIRIRA as though there were no AEDPA.

I do not think such a reading passes muster for two reasons. First, as recognized by the majority, notwithstanding the preexisting designation of certain offenses as particularly serious crimes, Congress has expressed a significant concern for compliance with the Protocol which requires individual consideration consistent with due process before a refugee may be expelled by a signatory country. Second, having once emphatically amended section 243(h) to extend ultimate determinative authority to the Attorney General in AEDPA, Congress retained the original language included in section 243(h)(1), "the Attorney General determines," in the amended section enacted in the IIRIRA. Reading these two provisions together, it is difficult to simply ignore their significance as a mandate for exercise of the Attorney General's discretionary authority in individual cases.

### *662  A. Protocol Requirement of Individual Consideration

 **20  Congress stated unequivocally in the Refugee Act of 1980 that it intended to comport precisely with the Protocol. The overreaching principal behind the Protocol is that signatory states may not return a refugee. However, in recognition that there are exceptions to every rule, an exception was carved out for those persons who pose a danger to the host country, either as a security threat or as a danger to the community. This exception is meant to be invoked rarely, for only the most "exceptional" cases. See Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria For Determining Refugee Status para. 154, at 36 (Geneva 1992) ("Handbook"). [4]

It is clear that the Protocol does not require signatory states to tolerate non-nationals who constitute a security risk or a danger to the community. Id. at paras. 148, 151, 154. However, it is equally clear that the Protocol expects signatory states to decide matters of refoulement on a case-by-case basis and not to make blanket determinations of ineligibility.

There is an implicit expectation that individual cases will be decided based on the particular facts of each particular applicant. See id. paras. 29, 195; see also id. paras. 156, 157. In fact, the adjudicator of a refugee claim is obligated to "ensure" that the applicant's case is presented to the fullest extent possible and to "evaluate the evidence." Id. para. 205(b). A categorical bar which requires per se expulsion preempts any consideration of evidence and does not permit the applicant to present his or her case at all. Conceptually, a categorical bar is at direct odds with the intent of the Protocol. A host country need not grant haven to every refugee, but a host country must at least hear out every refugee.

The majority acknowledges that Congress fully intended to comply with the Protocol and that Congress even went so far as to incorporate Protocol language regarding nonrefoulement into the Act. See H.R. Conf. Rep. 781, 96th Cong., 2d Sess. (1980), reprinted in 1980 U.S.C.C.A.N. 160, 161. Despite the obvious parallelism between statute and treaty, the majority nonetheless dismisses available resources for interpreting the Protocol, the UNHCR Handbook and the express opinions of the UNHCR. It baffles me that the majority can bemoan "the absence of guidance from Congress or the international instruments" regarding the withholding of deportation provisions, and then disregard the best available authorities for ascertaining the intent of the Protocol's drafters.

 *663  Even if they are not controlling, the opinions of the UNHCR should not be so readily dismissed. The UNHCR is charged with providing international protection and condemns categorical ineligibility in no uncertain terms: "It is the opinion of UNHCR that a Contracting State which automatically bars an individual convicted of an 'aggravated felony' from withholding of deportation is in violation of the 1967 Protocol Relating to the Status of Refugees." Letter from Anne Willem Bijleveld, UNHCR, to Nadine Wettstein, AILA (May 15, 1996). The UNHCR fully expects any signatory state to hear a withholding claim first before attempting to apply any of the exclusions. Id. (citing Handbook, supra, para. 176). Moreover, the UNHCR reads the Protocol to require a separate determination of dangerousness. Id. (citing Article 33(2) of the Convention); see also

Handbook, supra, paras. 155-157. Individualized, case-by-case determinations are essential to compliance with the Protocol. Letter from Anne Willem Bijleveld, UNHCR, to Senator Orrin G. Hatch, Chairman, Judiciary Committee (March 6, 1996).

 **21  I find it ironic that the majority would sustain an interpretation of the statute that favors a categorical bar when there is clear indication that Congress did not intend such a result. During the formulation of the 1990 Act, where the provision later construed as a per se bar first appeared, the UNHCR expressed its apprehension that this language could be construed in this way and objected because a categorical bar would be incompatible with our commitment to nonrefoulement. Letter from John McCallin, UNHCR, to Senator Alan K. Simpson (May 1, 1990). The UNHCR was promptly reassured that the final language of the 1990 Act would not "deviate from the present system through which the United States conforms to its non-refoulement obligations." Letter from Senator Alan K. Simpson to John McCallin, UNHCR (May 10, 1990).

When, thereafter, this Board and certain courts read the bar into the statute, a principal drafter of the 1990 Act wrote to the Immigration and Naturalization Service and this agency to "clarify" that Congress
deliberately left undisturbed the responsibility of the Attorney General to determine whether such an alien also "constitutes a danger to the community of the United States." Accordingly, it was our expectation that the Attorney General would continue the practice of accepting applications for withholding of deportation from aliens who are aggravated felons, and it would then be his responsibility to determine whether such an alien is a danger to the community and is otherwise qualified for withholding.

Letter from Senator Edward M. Kennedy, Chairman, Subcommittee on Immigration and Refugee Affairs, to Gene McNary, Commissioner, Immigration and Naturalization Service, and David Milhollan, Director, Executive Office for Immigration Review (April 16, 1992).

While it is true that legislative statements have less force than the clear and plain language of the statute, these statements are of assistance when they corroborate and underscore a reasonable interpretation of an ambiguous provision. See, e.g., Weinberger v. Rossi, supra, at 34-35 (1982). However  *664  convenient it might be to dismiss these documents as having de minimis legal weight, the fact remains that Congress did not and does not intend to renege on our obligations under the Protocol. Those obligations, as understood by UNHCR and the drafters of the 1990 Act, include case-by-case determinations.

It is not necessarily unreasonable that the majority has elected to continue in our practice of not weighing the gravity of crime against the gravity of persecution as recommended by the Handbook. See Handbook, supra, para. 156. Indeed, while distinctions can be drawn, all refugees qualifying for nonrefoulement under section 243(h) will be persons facing the clear probability of threats to their lives and safety. INS v. Cardoza-Fonseca, supra; INS v. Stevic, supra. However, it seems to me incorrect, and unreasonable, to interpret the statutory language to permit blanket determinations of ineligibility, where the international instrument on which our statute is modeled contemplates not only an extraordinary exception to a mandatory form of relief, but specifically refers to due process and individual consideration in determining when that exception may be invoked.

 **22  There is no question but that congressional intent is to abide by our obligation of nonrefoulement; we have made a commitment not to return refugees to their countries of persecution except under very limited circumstances. I emphasize that this is our obligation. Indeed when the express language of section 243(h)(3) states that, to insure compliance with the Protocol, the Attorney General may exercise her discretion notwithstanding the presence of a clause designating an aggravated felony as being a particularly serious crime, it implies there is more to be considered before we may treat the fact of a conviction as a basis to deviate from our obligation not to return. This strongly suggests that the inquiry has not ended, despite the fact a particular conviction may be classified as being a particularly serious crime.

### B. Attorney General's Discretion to Determine Endangerment

I believe that the majority's perpetuation of the Board's reference to section 243(h)(2)(B) as the "particularly serious crime bar" is a misnomer. In fact, this basis for precluding a refugee from withholding of deportation should be termed the "danger to the community exception."

### 1. Endangerment

As noted above, section 243(h) is part of the codification into domestic law of language in the Convention which provides a narrow exception to the principle of nonrefoulement when, in essence, the security of a country or the safety of its community would be endangered. Significantly, section 243(h) provides that the Attorney General shall not deport or return any alien to a country where his or her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or  **\*665**  political opinion "if the Attorney General determines" that such a situation is presented. Thus, as our starting point, we are obliged not to return, unless and until the Attorney General determines that an exception is warranted in a given case.

My colleagues would not dispute the principle that no statutory term should be treated as surplusage and that all words must be given legal force. See, e.g., United States v. Menashe, 348 U.S. 528, 538-39 (1955); Allende v. Shultz, 845 F.2d 1111, 1119 (1st Cir. 1988). However, the majority's interpretation of the statute would eviscerate critical statutory language extending to the Attorney General the authority to decide in which individual case she may appropriately invoke the exception.

It has been argued that if Congress intended a conviction of a "particularly serious crime" to mean that the alien is "per se" a danger to the community, and that such a conviction signaled the end to our international obligations, Congress could have simply stated that aggravated felons are a danger to the community and had precisely the same effect. In the 1990 Act, the argument goes on, Congress could have been even more direct and openly declared aggravated felons categorically ineligible for withholding, as it did with asylum. Since Congress did not say either and the rules of statutory construction require this language to mean something, we cannot conclude that the "particularly serious crime" language triggers a statutory bar to withholding.

 **\*\*23**  I find that this argument has gained some currency given the recent amendments to the statute. Precedent has too readily dismissed the impropriety of nullifying the "danger to the community" language. We should read meaning into that language, not out of it. See INS v. Cardoza-Fonseca, supra, at 444 n.28 (suggesting in dicta that section 243(h)(2)(B) is intended to preclude from withholding aliens who have been convicted of serious crimes and who constitute a danger to the community).

Recent legislative amendments serve to highlight the focus on endangerment found in the Protocol. Moreover, despite the fact that Congress has visited this provision three times in the last 6 years and twice in the past year alone, it has yet to enter any outright bar to eligibility. In fact, the only express limitation on eligibility for withholding of deportation has been the pronouncement that an alien convicted of an aggravated felony or felonies is deemed to have committed "a particularly serious crime."

### 2. "Attorney General Determines"

Thus, the actual statutory language speaks directly to what constitutes a particularly serious crime and not to who is ineligible for withholding of deportation. More importantly, Congress has not once receded from the discretionary authority extended to the Attorney General by the express statutory language.

The statute has permitted and continues to permit the Attorney General to remove an alien whom she "determines" is not eligible for withholding  **\*666**  because the alien falls within the purview of section 243(h)(2). To conclude that the conviction of a crime designated as being particularly serious automatically forfeits withholding eligibility precludes any exercise of discretion; that is, there is nothing for the Attorney General to " determine." For this provision to have any meaning, the Attorney General must have some authority to make determinations on a case-by-case basis and not be the rote executor of statute. United States v. Menasche, supra, at 538-39 (stating that we must strive to give effect to every word contained in the statute).

In the AEDPA, Congress clearly stated its concern that international obligations not be abrogated. It accomplished this by amending the statute to supplement existing language stating that aggravated felonies were particularly serious crimes, the very language that supported our existing conclusion that a per se determination without further consideration by the Board was

satisfactory. Notably, this enactment, which we today construe, extends absolute discretion to the Attorney General to make determinations of when the exception will be applied.

Not 6 months after the AEDPA, Congress amended the statute by repealing the outright designation that all aggravated felonies are particularly serious crimes. Notably, Congress did not revert back to the previous statutory language, but instead designated a more limited category of aggravated felonies as particular serious crimes. The language conferring authority for the ultimate determination on the Attorney General remains intact.

**\*\*24** In my view, the IIRIRA does not provide an endorsement of our "per se" practice, particularly when viewed in light of the AEDPA. It is far more reasonable to conclude that what Congress has done in the IIRIRA is to designate certain crimes which on their face are to be considered as particularly serious, while leaving the seriousness of other offenses to be determined in the course of the Attorney General's consideration. This provision extends to the Attorney General the discretion -- not the obligation -- to deny withholding of deportation to aliens convicted of particularly serious crimes. As a practical matter it seems nonsensical for Congress to create an executive fail-safe and then eviscerate it. The statutory language should not be read both to empower the Attorney General to safeguard our compliance with the Protocol and then to strip her of the authority to do so.

### C. Consideration of Past Precedent

I recognize that at first blush, the majority's election to exercise the discretion extended to the Attorney General under section 243(h)(3) of the Act by categorically designating certain aggravated felony convictions as particularly serious crimes may look to be a rational interpretation of the statute. It is one the Board has followed for a number of years, and it appears to further Congress' goal of removing criminal aliens promptly, since it allows speedy determinations without the need for added court time or consideration of individual factors.

**\*667** However, subsequent reenactment does not necessarily constitute Congress' adoption of a construction by the agency which is contrary to the plain statutory language. See Demarest v. Manspeaker, 498 U.S. 184 (1991); see also Brown v. Gardner, 115 S.Ct. 552 (1994), in which the Supreme Court ruled that even a longstanding agency regulation not disturbed by intervening legislation should nonetheless be rejected as being contrary to statutory language. Similarly, judicial affirmance of our prior interpretation is not set in stone.

I believe the majority's reliance on a line of cases that appear to endorse Board precedent is ill-placed. Aside from the significant fact that these cases precede the last two legislative revisions, the majority overstates the extent to which these cases endorse that precedent. While it is true that no case has overruled the Board's interpretation, it is also true that the circuits have not been unanimous in their support, nor exhaustive in their reasoning.

Many courts have simply affirmed our interpretation of an ambiguous provision as being reasonable without assessing it de novo in light of the due process requirement in the Convention or the emphasis on individual consideration in the Handbook. See, e.g., Mosquera-Perez v. INS, 3 F.2d 553, 555-59 (1st Cir. 1993), quoted by the majority. A common failing in most of these cases is that the courts fall into the same trap as the majority and never focus on the actual language of sections 32 and 33 of the Convention, or give appropriate weight to the provisions in the Handbook. Few of these decisions go into any meaningful analysis of the Protocol or the Refugee Act of 1980, or address the language expressly extending to the Attorney General the authority to "determine" our refugee obligations in individual cases. See Kofa v. INS, 60 F.3d 1084, 1093 n.1, 1094-95 (4th Cir. 1995) (Hamilton, J., dissenting).

**\*\*25** In addition, several courts have recognized the need for more satisfactory guidance. See, e.g., Garcia v. INS, 7 F.3d 1320, 1326 n.6 (recognizing international commentators' concerns that due process required some consideration of dangerousness); Al-Salehi v. INS, 47 F.3d 390, 395 (10th Cir. 1995) (stating its acquiescence only in the absence of some reason to take a different approach). Although the most recent circuit to analyze the endangerment exception followed its sister circuits in deferring to our interpretation, the court expressed its concern that the section should be read to effectuate two determinations. Ahmetovic

v. INS, 62 F.3d 48, 52 (2d Cir. 1995) (stating the "BIA's failure to give separate consideration to whether (the refugee) is a 'danger to the community'" was troubling).

To merit deference from the judiciary, our interpretation must be reasonable. It must comport with the language, guided by principles of statutory interpretation, as well as with the terms of treaties which our domestic laws are meant to effectuate. Although we do not decide the constitutionality of the statutes which we interpret, our role is to construe statutes to achieve results which are consistent, rather than in conflict, with constitutional **\*668** protections. See Landon v. Plasencia, 459 U.S. 21, 34-35 (1982); Bridges v. Wixon, 326 U.S. 135, 152-53 (1945); Matter of Cenatice, 16 I&N Dec. 162, 166 (BIA 1977); see also, e.g., Matter of Silva, 16 I&N Dec. 26 (BIA 1976).

In the face of the clarifying amendments that leave the statute in its present form, I would have to conclude that our reasoning in the line of cases including Matter of C, 20 I&N Dec. 529 (BIA 1992), Matter of K, 20 I&N Dec. 418 (BIA 1991), aff'd, Kofa v. INS, supra, and Matter of Carballe, 19 I&N Dec. 357 (BIA 1986), modified, Matter of C-, supra, clarified, Matter of K-, supra, modified on other grounds, Matter of Gonzalez, 19 I&N Dec. 682 (BIA 1988), is flawed. It is flawed because it erroneously curtails the Attorney General's discretion and does not provide a refugee adequate individual consideration before arriving at a conclusion on the fundamental issue of endangerment.

### III. COMPLIANCE WITH THE PROTOCOL UNDER SECTION 243(h)(3)

The language of section 243(h)(3) of the Act indicates that Congress is calling for some additional consideration of an individual refugee in light of his or her having been convicted of a particular crime. Under the statute as amended by section 243(h)(3), a per se determination that an aggravated felony constitutes a particularly serious crime, and that one so convicted is a danger to the community and should be returned, simply is no longer acceptable. Our task now is to determine how to best effectuate that change in order to give the language meaning which comports with the intent of Congress.

The majority concedes that, at a minimum, some further consideration is required by the plain terms of section 243(h)(3). This concession simply cannot be reconciled with the majority's reading of "particularly serious crime" as dispositive. Were that adequate even in some cases, Congress would not have needed to amend the statute to specifically caution that before imposing any preclusion the Attorney General should consider compliance with section 243(h)(1).

#### A. Considerations Related to Compliance

**\*\*26**  In determining which crimes are serious, the signatory state may designate those circumstances or situations of particular concern to it. Handbook, supra, paras. 154, 155. I take no issue with the majority to the extent that they reason that Congress should be free to designate the sorts of offenses which may, consistent with the terms of the Protocol, trigger our invoking that exception to our nonrefoulement obligation.

I believe the majority errs when it imports the statutory designation made in the IIRIRA effective April 1, 1997, not as a framework within which to exercise discretion in individual cases as required, but as a means of determining without further consideration that the applicant constitutes a **\*669**  danger to the community. The fact that the Board began referring to the preclusion under section 243(h)(2)(B) as the particularly serious crime bar, dropping the "constituting a danger to the community" language, is not enough to modify the fact that the Protocol allows refoulement not because someone is a criminal, but only when the safety of the community is endangered.

Originating in 1988, the aggravated felony category developed primarily out of Congress' intent that criminal aliens be expeditiously identified, deported, and barred from reentry. Since 1988, in designating classes of crimes as "aggravated felonies" for purposes of removing criminal aliens from the territory of the United States, Congress was principally responding to domestic concerns. In section 243(h)(3), Congress has manifested its concern that the category of aggravated felony offenses established to give greater priority in deportation, reentry, and other removal-related areas of the law not be conclusive in determining whether international protection should be foreclosed in every case.

Section 243(h)(2)(B) of the Act is not a penalty provision and should not be invoked principally as part of an effort to remove criminal aliens from our country. Indeed, we have pledged to protect all refugees, even those with convictions, unless, in an individual case, that convicted alien constitutes a danger to the community. Handbook, supra, paras. 155-157. Thus, it is not a matter of which convictions Congress or the Attorney General may legitimately designate as being particularly serious offenses.

To comport with our international obligations under the Protocol, implementation of section 243(h)(3) calls for a discretionary determination by the Attorney General consistent with due process to determine whether the security or safety of our country is at risk and whether expulsion is permissible. Consequently, it is eminently more consistent with the Protocol and with congressional intent to read Congress as having set a condition precedent, or perhaps created a presumption that in cases in which a particularly serious crime exists, the preclusion might be appropriate.

### B. Practical Considerations in Compliance

The crime on its face, alone, rarely provides a rational basis for concluding that the individual constitutes a danger to the community by virtue of having been convicted of that offense. There is really no necessary relationship between the crime committed and the impact the individual would have on the community if granted refugee status rather than being returned to face either death or persecution. This is true not only of crimes designated as being particularly serous by virtue of being classified as aggravated felonies, but of convictions for all offenses.

 **27** Countless common sense examples illustrate this interpretation. A one-time embezzler, a thief, a direct mail fraud "artist," or a tax cheat is considered to be an aggravated felon if a sentence imposed is over 1 year and **670** would be completely barred under the majority's analysis without further consideration if the sentence imposed is 5 years. While a person guilty of the aggravated felony of money laundering in connection with narcotics trafficking may pose a serious danger to our community, money laundering is defined so broadly that it also would reach a homeowner who made a false statement to a bank in a loan application. Similarly, although each may be convicted of aggravated assault, a battered wife who committed a crime of violence against her spouse in response to a long pattern of abuse should be treated differently than a mugger who accosted persons making withdrawals from an ATM machine.

Furthermore, the Handbook, supra, para. 157 states that pardon, amnesty, or even mere completion of sentence results in a presumption that "the exclusion clause is no longer applicable." In determining endangerment, it emphasizes that mitigating factors must be part of the equation.

Thus, I believe that the phrase "particularly serious crime" should be read as a condition precedent to a finding of endangerment which would warrant refoulement. Where predesignated by Congress or by the Attorney General, the aspect of an individual determination involving the nature and type of offense need not be revisited. However, whether or not designated, those factors remain only part of an overall equation of determining endangerment which requires individual consideration.

I point out that, while categorical ineligibility is prohibited by the Protocol, we can nonetheless attempt to accommodate the congressional interest in the prompt removal of all criminal elements, while preserving due process. For example, a rebuttable presumption of dangerousness could be imposed in which an alien who has been convicted of a particularly serious crime is presumed to be a danger to the community unless he or she can prove otherwise.

I do not believe the requirement of an individual determination is the administrative burden the majority implicitly fears. I do not read the statute to require a separate hearing on dangerousness; it only requires that dangerousness be assessed and factored into any decision to refouler an alien to a country of probable persecution. I note that such determinations are routinely made in other contexts, such as bond determinations, with little or no evidentiary display or legal argument and, consequently, with little or no delay. A prompt consideration of dangerousness can readily be incorporated into the course of deportation proceedings in which the refugee's claim of persecution is asserted.

In this case, I cannot conclude that the respondent has received a level of individual consideration that could be deemed reasonable. Although he happens to come within the class of persons that the majority, borrowing from the language of the IIRIRA provision, would agree need not be automatically foreclosed from protection as a refugee, he had no way of knowing what construction we would give to section 243(h)(3). Nor has he had any opportunity to set forth his mitigating equities in a manner that allows the Attorney **\*671** General to fairly consider them in determining the impact of his conviction on his request for refugee protection.

## IV. CONCLUSION

**\*\*28** Based on the record before us, I cannot concur that the ultimate result reached by the majority, denying withholding of deportation under section 243(h)(1) to the respondent, is consistent with our international obligations under the Protocol. While the majority and I agree that Congress means to honor our commitment to the Protocol, we part company on what that obligation entails. Congress has significantly modified the statutory language, with a clear eye toward our compliance with the Protocol. Such legislative activity, in my mind, commands reexamination and scrutiny of our prior interpretation of that law.

Viewing the language with greater awareness of the force of our international obligations under the Protocol, I do not believe a per se bar is a reasonable interpretation or is justified either by domestic considerations or administrative concerns. Denying an individual further consideration despite his or her conviction having been classified as particularly serious violates both due process and the Protocol.

## Footnotes

1    The Board acknowledges with appreciation the brief submitted by amicus curiae.

2    The Immigration Judge did not address the additional lodged charge of deportability under section 241(a)(2)(C) of the Act.

3    The United States is not a signatory to the Convention.

4    This construction of section 243(h)(3) is supported by its very sparse legislative history. The legislative history behind section 243(h)(3) is virtually nonexistent because it was added as an amendment to the AEDPA bill at the late Conference stage and, accordingly, was not included in either the House or Senate Reports. However, Senator Edward Kennedy proposed a similar amendment to another immigration bill, S. 1664, 104th Cong., 2d Sess. 159 (1996), that was under consideration by Congress contemporaneously with the AEDPA bill. In introducing the amendment to the Senate Committee on the Judiciary on March 20, 1996, Senator Kennedy stated that the per se aggravated felony bar to withholding of deportation at section 243(h)(2) of the Act "has not been in conflict with our treaty obligations." Immigration Control and Financial Responsibility Act of 1996: Mark-up on S. 1664 before the Senate Committee on the Judiciary, 104th Cong., 2d Sess. 60-61 (1996). Senator Kennedy, however, expressed his concern that the further expansion of the definition of "aggravated felony" included in section 161 of S. 1664 would encompass "fairly minor offenses" he did not consider to be per se "particularly serious crimes." Id.

We are mindful of the Supreme Court's cautionary note that "ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill, let alone a separate but related bill, are not controlling in analyzing legislative history." Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 (1980). In this instance, however, given the dearth of legislative history and the fact that Senator Kennedy's amendment, which was adopted as proposed in S. 1664, is virtually identical to section 243(h)(3), his statements before the Senate Judiciary Committee provide some "reliable indication as to congressional intention." Id. at 118-19.

5    The Handbook provides some guidance as to what constitutes a "serious non-political crime," a distinct term employed in Article 1F of the Convention:

What constitutes a "serious" non-political crime for the purposes of this exclusion clause is difficult to define, especially since the term "crime" has different connotations in different legal systems . . . . In the present context, however, a "serious" crime must be a capital crime or a very grave punishable act. Minor offenses punishable by moderate sentences are not grounds for exclusion under Article 1F(b) even if technically referred to as "crimes" in the penal law of the country concerned.

Handbook, supra, para. 155, at 36 (emphasis added); see also Matter of Frentescu, supra; Matter of Rodriguez-Palma, 17 I&N Dec. 465, 468 (BIA 1980). Article 1(F) of the Convention states in pertinent part: "The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that: . . . (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee . . . ." In any case, the Handbook is advisory in nature and does not have the force of law. See INS v. Cardoza-Fonseca, supra, at 438-39 & n.22 (advising that while the Handbook does not have the force of law, it does provide "significant guidance in construing the Protocol"); Kofa v. INS, supra, at 1090 & n.5; Garcia v. INS, supra, at 1325; Ramirez-Ramos v. INS, supra, at 1397-98.

1    The 1967 Protocol, to which the United States is a signatory, applies Articles 2 through 34 of the 1951 Convention to all refugees without regard to the geographic limitation or the other limitations contained in the Convention as to events occurring before 1951. Protocol, supra, art. 1, para. 1. As used in this opinion "Protocol" and "Convention" refer equally to the Convention obligations assumed by signatories to the Protocol.

2    These obligations, inherent in our original accession to the Protocol, preexisted enactment of section 243(h)(3) in the AEDPA and, as discussed infra, continue to exist after the replacement of section 243(h)(3), effective April 1, 1997, pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Division C of the Departments of Commerce, Justice, and State, and the Judiciary Appropriations Act for 1997, Pub. L. No. 104-208, 110 Stat. 3009,___ ("IIRIRA").

3    See also Evangeline G. Abriel, Presumed Ineligible: The Effect of Criminal Convictions on Applications for Asylum and Withholding of Deportation Under Section 515 of the Immigration Act of 1990, 6 Geo. Immigr. L.J. 27, 35 n.38 (1992) (emphasizing that Congress intended its treatment of refugee applications by aliens with criminal convictions to be consistent with that of the United Nations).

4    The Handbook is a practical guide to interpreting and applying the Convention and Protocol meant to inform government officials concerned with the determination of refugee status in the contracting states. It has been accepted for that purpose by the Board and the courts. See Matter of Rodriguez-Palma, 17 I&N Dec. 465, 468 (BIA 1980); see also Canas-Segovia v. INS, 902 F. 2d 717 (9th Cir. 1990), aff'd on other grounds after remand, 970 F. 2d 599 (9th Cir. 1992); INS v. Cardoza-Fonseca, supra.

21 I. & N. Dec. 639 (BIA), Interim Decision 3300, 1996 WL 784581

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Mubarack v. Holder, 2nd Cir., December 24, 2014

21 I. & N. Dec. 486 (BIA), Interim Decision 3287, 1996 WL 422990

United States Department of Justice

Board of Immigration Appeals

IN RE S-P-, APPLICANT

File A72 971 091- San Francisco

Decided June 18, 1996

**\*\*1  \*486**  (1) Although an applicant for asylum must demonstrate that harm has been or would be inflicted on account of one of the protected grounds specified in the "refugee" definition, persecution for "imputed" reasons can satisfy that definition.

(2) In mixed motive cases, an asylum applicant is not obliged to show conclusively why persecution has occurred or may occur; however, in proving past persecution, the applicant must produce evidence, either direct or circumstantial, from which it is reasonable to believe that the harm was motivated in part by an actual or imputed protected ground.

(3) In situations involving general civil unrest, the motive for harm should be determined by considering the statements or actions of the perpetrators; abuse or punishment out of proportion to nonpolitical ends; treatment of others similarly situated; conformity to procedures for criminal prosecution or military law; the application of antiterrorism laws to suppress political opinion; and the subjection of political opponents to arbitrary arrest, detention, and abuse.

(4) Asylum was granted where the applicant was detained and abused by the Sri Lankan Government, not only to obtain information about the identity of guerrilla members and the location of their camps, but also because of an assumption that his political views were antithetical to those of the Government.

**for applicant**

Judith L. Wood, Esquire

Los Angeles, California

**for Immigration and Naturalization Service**

Andrew R. Arthur, General Attorney

Before: Board En Banc: SCHMIDT, Chairman; HOLMES, HURWITZ, VILLAGELIU, ROSENBERG, MATHON, and GUENDELSBERGER, Board Members. Concurring Opinion: FILPPU, Board Member, joined by DUNNE, Vice Chairman, HEILMAN, and COLE, Board Members. Dissenting Opinion: VACCA, Board Member.

GUENDELSBERGER, Board Member:

In a decision dated April 3, 1995, an Immigration Judge found the applicant to be excludable as alleged and denied his requests for asylum and withholding of deportation pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h)(1994).  **\*487**  The applicant appealed the denial of asylum, arguing in part that the Immigration Judge abused her discretion.

On May 9, 1995, the Immigration and Naturalization Service filed a motion requesting summary dismissal of the appeal on the grounds that the Notice of Appeal lacked the required specificity and that the applicant had failed to file an appellate brief.

Meanwhile, on May 5, 1995, the applicant timely filed an appellate brief which more clearly specified the reasons for his appeal. The Service submitted a late brief on December 4, 1995. The Service's motion for summary dismissal is denied. The applicant's appeal is sustained.

## I. FACTUAL BASIS FOR THE ASYLUM CLAIM

The applicant is a 34-year-old Sri Lankan national of Tamil ethnicity. He was a welder by trade and had his own welding shop for several years. In November 1993, the applicant and his wife relocated to a Red Cross refugee camp near Elali in northern Sri Lanka. The Liberation Tigers of Tamil Eelam ("LTTE" or "Tigers") took the applicant from the refugee camp and forced him to work for them as a welder in one of their base camps near Elali. There were about 30 others in this camp who, like the applicant, were forced to work for the Tigers. These workers were taken to various work sites during the day and brought back to the Tigers' camp in the evening. The applicant testified that he was not mistreated by the Tigers, but that he was watched at all times and believed he would be severely punished were he to attempt an escape.

**\*\*2** In March 1994, the applicant was in the Tigers' camp when it was raided by the Sri Lankan Army. The applicant hid in a bunker during the attack which lasted about 3 hours. When he emerged, he was surrounded by 50 to 60 Sri Lankan soldiers. The soldiers accused him of being a Tiger and took him and 12 other conscripted workers captured with him to the Sri Lankan Army camp in Elali. At that camp, he and the 12 other workers were kicked and beaten with plastic pipes and gun butts.

Two days after he was captured, the applicant and the 12 other workers were taken by ship to Magazine Army Prison in Colombo. In Colombo, the applicant was asked questions and his answers were written down. He then signed a document written in Sinhala, a language he can speak but cannot read.

The applicant was held by the Army in the Colombo prison for 6 months, from March 25 to September 18, 1994, during which time he was mistreated during at least eight sessions. On one occasion, he was placed in a room with burning chilies which caused choking and smoke inhalation. On other occasions, he was threatened with guns by drunken soldiers, tied up, and beaten. On four occasions the barrel of a gun was held to his head and he was told that **\*488** if he did not tell the truth he would be killed. At various times, his head was repeatedly dunked in a bucket of water.

The abuses described above occurred both during periods of interrogation and during periods when no interrogation took place, i.e., after attacks by the Tigers upon army positions, and when army officers had been drinking. During such sessions, the applicant was repeatedly accused of being a Tiger.

On September 18, 1994, the applicant was released after his uncle paid a bribe to a guard. After his release, the applicant went to his uncle's house in Colombo, where he stayed for 8 days. During that 8 days, he only left his uncle's house two times to go to the temple.

On September 26, 1994, three policemen came looking for the applicant at his uncle's house. The applicant's uncle told the policemen that the applicant had returned to his own home. After this incident, the applicant moved to the house of a friend of his uncle, where he remained until leaving Sri Lanka on December 19, 1994. During this time, the applicant contacted a brother who arranged for an agent to meet him in Colombo. The applicant's father-in-law brought him his passport. The applicant gave his passport to his agent at a hotel on October 12 or 13, 1994.

On December 19, 1994, the applicant's agent flew with him to Singapore, where the applicant remained for 6 days. On December 25, 1994, the applicant flew from Singapore to San Francisco, stopping for an hour in Hong Kong. The applicant was detained by Service officers when he arrived at San Francisco because he did not have valid entry documents.

## II. THE IMMIGRATION JUDGE'S DECISION

Although the Immigration Judge found the applicant to be credible, she concluded that the abuse of the applicant by Sri Lankan army personnel "did not rise to the level of persecution contemplated by" the Act. Subsequent portions of the decision indicate that the Immigration Judge, in denying asylum, was not concerned with the level of harm [1] but with the requirement that the motive for the persecution be "on account of" one of the five grounds set forth in the definition of "refugee" in section 101(a) (42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994). The Immigration Judge ultimately concluded that the motive for the abuse inflicted upon the applicant was the "ongoing civil strife in Sri Lanka" and, therefore, was not on account of a ground protected by the asylum law.

**\*489**  III. ISSUE ON APPEAL

 **\*\*3**  The issue is whether the applicant in this case has demonstrated that the physical and mental torture he endured was inflicted because of political views imputed to him after he had been detained as a suspected Tamil Tiger and, therefore, was "persecution ... on account of political opinion" under the definition of "refugee" in section 101(a)(42)(A) of the Act.

IV. ANALYSIS

A. Applicable Standards

An applicant for asylum bears the burden of establishing that he or she meets the "refugee" definition of section 101(a)(42) (A) of the Act. In meeting this burden, an asylum applicant must do more than simply show that he or she was harmed or has a well-founded fear of being harmed. An applicant must demonstrate that the harm was or would be inflicted "on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 101(a)(42)(A) of the Act. Harm arising from general conditions of strife, for example, is not persecution on account of one of the grounds protected under the Act.

Persecution for "imputed" grounds (e.g., where one is erroneously thought to hold particular political opinions or mistakenly believed to be a member of a religious sect) can satisfy the "refugee" definition. Matter of A-G-, 19 I & N Dec. 502, 507 (BIA 1987). Notably, the United Nations Handbook on Refugees recognizes that persecution based on political opinion may include situations in which "such opinions have come to the notice of the authorities or are attributed by them to the applicant." Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees para. 80, at 19 (Geneva 1979) (emphasis added).

Persecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected under the Act and others not. Proving the actual, exact reason for persecution or feared persecution may be impossible in many cases. An asylum applicant is not obliged to show conclusively why persecution has occurred or may occur. Such a rigorous standard would largely render nugatory the Supreme Court's decision in INS v. Cardoza-Fonseca, 480 U.S. 421 (1987), and would be inconsistent with the "well-founded fear" standard embodied in the "refugee" definition.

The Board, recognizing the "well-founded fear" standard and the fact that an applicant for asylum may well face difficulty in showing the exact motivation for an act or feared act of persecution, has held that "an applicant does not bear the unreasonable burden of establishing the exact motivation of a 'persecutor' where different reasons for actions are possible."  **\*490**  Matter of Fuentes, 19 I & N Dec. 658, 662 (BIA 1988). Rather, an asylum applicant "bear [s] the burden of establishing facts on which a reasonable person would fear that the danger arises on account of his race, religion, nationality, membership in a particular social group, or political opinion." Id. Thus, in this case the standard for review is whether the applicant has produced evidence from which it is reasonable to believe that the harm was motivated by a protected ground.

 **\*\*4**  This motivation issue involves questions of fact. The applicant, who bears the burden of proof, must present evidence to meet this element of his or her case. Testimonial evidence may in some instances be sufficient on this point, but the availability

of supporting documents and corroborative background evidence must be taken into account. Matter of Dass, 20 I & N Dec. 120 (BIA 1989). Dependent upon the evidence presented by the applicant, the Service can and should present any available evidence on this issue. Matter of Fuentes, supra%u.

B. Ninth Circuit Precedent

This case arises within the jurisdiction of the United States Court of Appeals for the Ninth Circuit, which has held in numerous decisions that persecution resulting from erroneously imputed political opinion provides a valid basis for asylum in the United States. Singh v. Ilchert, 63 F.3d 1501 (9th Cir.1995); Canas-Segovia v. INS, 970 F.2d 599 (9th Cir.1992); Ramirez Rivas v. INS, 899 F.2d 864 (9th Cir.1990), vacated on other grounds, 502 U.S. 1025 (1992).

Most recently, in Singh v. Ilchert, supra, the Ninth Circuit found persecution on account of political opinion in a situation in which Indian security forces detained, tortured, and interrogated an Indian Sikh suspected of supporting anti-government forces. Harpinder Singh was a 24-year-old male native and citizen of India who lived and worked on his family farm. He was not a member of any political party, but claimed to have supported the movement for formation of an independent Sikh state through peaceful means. In April 1991, militant separatists visited his farm and demanded food and shelter. The next month police security forces raided the farm and detained, beat, and interrogated Singh about the militants. This cycle of pressure from militant separatists and then imprisonment and interrogation by the police security forces was repeated in July and August. Singh sought asylum based on a claim of past persecution and well-founded fear of future persecution on account of mistakenly attributed political opinion.

The Immigration Judge and the Board found that the interrogation and abuse was intended to ferret out information in the course of a legitimate investigation and that the applicant had failed to prove that his mistreatment was motivated by mistakenly attributed political opinion. In reversing the Board, the Ninth Circuit found evidence in the record that the persecution **\*491** was at least partially motivated by political opinions mistakenly attributed to Singh. The facts of the case indicated that the Indian authorities had reason to believe that Singh was associated with anti-government forces.

In Singh v. Ilchert, supra, the Ninth Circuit criticized the Board for "fail [ing] to recognize that persecutory conduct may have more than one motive, and so long as one motive is one of the persecutory grounds, the requirements [as to grounds] have been satisfied." Id. at 1509. The Ninth Circuit referred to the Board's own decision recognizing multiple motives, Matter of Fuentes, 19 I & N Dec. 658 (BIA 1988), and the following criticism of the Board's restrictive approach by the dissenting opinion in Matter of R, 20 I & N Dec. 621 (BIA 1992):

**\*\*5** [T]he majority ... implicitly suggest[s] that an alien must prove a persecutorial motivation anchored upon one of the enumerated grounds to the exclusion of all other possible motivations. Matter of Fuentes, however, recognized that there can be more than one possible basis for a persecutor's actions. The task of the alien is simply to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds.

Singh v. Ilchert, supra (quoting Matter of R-, supra, at 629 (Dunne, concurring in part and dissenting in part)).

In determining that Singh had demonstrated to the court's satisfaction "the reasonableness of a motivation related to one of the enumerated grounds," the court examined the history and context of the Sikh separatist movement and the government reaction to that movement. It found evidence in the record of a set of vague and wide-ranging antiterrorism laws in effect in India along with a history of abusive application and enforcement of these laws "to suppress political dissent and stamp out secessionist ideologies." Singh v. Ilchert, supra, at 1508.

The court also referred to documentary reports of widespread arbitrary arrest and detention and abuse of persons suspected of affiliation with separatists and found that "a review of [the aforementioned] documents reveals that India defines 'terrorism' so broadly and treats those accused of suspected terrorism so harshly, that police 'investigations' of many suspected terrorists are

not legitimate government functions but rather a part of a pattern of political suppression." Id. at 1508. Such evidence, when considered in light of the severity of the abuse and the lack of evidence of any legitimate government criminal prosecution of Singh, demonstrated the reasonableness of his assertion that his persecution was premised upon attributed political opinion, one of the enumerated grounds.

The Ninth Circuit held in Singh v. Ilchert, supra, that "extra-judicial punishment of suspected anti-government guerrillas can constitute persecution on account of imputed political opinion." Id. at 1508. This holding reiterates well-established law in that circuit. See Maldonado-Cruz v. Dept. of Imm. and Naturalization, 883 F.2d 788 (9th Cir.1989); Blanco-Lopez v. INS, 858 F.2d 531 (9th Cir.1988); Hernandez-Ortiz v. INS, 777 F.2d 509 (9th Cir.1985). Under these precedents it is clear that "[i]f there is no evidence of a *492 legitimate prosecutorial purpose for a government's harassment of a person ... there arises a presumption that the motive for harassment is political." Singh v. Ilchert, supra, at 1509 (quoting Hernandez-Ortiz v. INS, supra, at 516).

## C. Proving Motive

As noted above, it is often difficult to determine the exact motive or motives for which harm has been inflicted. There are at least two distinct areas of uncertainty in proving motive. First, in some cases, the events are such that no particular motive is readily ascertainable. For example, an unprovoked attack by unknown assailants may or may not have been for reasons protected by the Act. Without some evidence, either direct or circumstantial, of the reasons for the attack, the applicant will fail to prove eligibility for asylum.

**6 A second area of uncertainty involves the question of motive in situations in which evidence arguably suggests multiple motives. For example, prosecution for an offense may be a pretext for punishing an individual for his political opinion. Similarly, in the instant case, the harm may have been inflicted for reasons related to government intelligence gathering, for political views imputed to the applicant, or for some combination of these reasons.

In adjudicating mixed motive cases, it is important to keep in mind the fundamental humanitarian concerns of asylum law. In enacting the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, Congress sought to bring the Act's definition of "refugee" into conformity with the United Nations Convention and Protocol Relating to the Status of Refugees [2] and, in so doing, give "statutory meaning to our national commitment to human rights and humanitarian concerns." See S. Rep. No. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144. Such an approach is designed to afford a generous standard for protection in cases of doubt.

It is also important to remember that a grant of political asylum is a benefit to an individual under asylum law, not a judgment against the country in question. When the international community was considering the 1967 Refugee Protocol, the U.N. General Assembly made clear that "the grant of asylum by a State is a peaceful and humanitarian act and ... as such, it cannot be regarded as unfriendly by any other state." Declaration on Territorial Asylum, G.A. Res. 2312 (XXII), 22 U.N. GAOR, Supp. No. 16, at 81, U.N. Doc. A/6716 (1967). A decision to grant asylum is not an unfriendly act precisely because it is not a judgment about the country involved, but a judgment about the reasonableness of the applicant's belief that persecution was based on a protected ground. This distinction between the goals of refugee law (which *493 protects individuals) and politics (which manages the relations between political bodies) should not be confused in charting an approach to determining motive. While it is prudent to exercise great caution before condemning acts of another state, this is not a reason for narrowly applying asylum law.

In the context of this case, civil unrest in the form of an armed conflict between the separatist Liberation Tigers of Tamil Elam and government military forces has disrupted normal life in Sri Lanka for well over a decade. While a portion of the Tamil population wages a violent campaign to establish a separate Tamil state, the established government of Sri Lanka seeks to maintain the order and the integrity of the state. The conflict has involved serious human rights violations by both sides. In this struggle, only a small portion of the Tamil population is actively engaged in an armed struggle with the Government. Other Tamils may sympathize with the separatist LTTE but disagree with its use of violent tactics. Some Tamils have joined with the

Government in taking up arms against the LTTE. See Committees on Foreign Affairs and Foreign Relations, 103d Cong., 2d Sess., Country Reports on Human Rights Practices for 1993 1386 (Joint Comm. Print 1994) ("Country Reports").

**\*\*7** In applying asylum law in the context of the Sri Lankan conflict, it is not an easy task to evaluate an asylum applicant's claim that harm was inflicted because of imputed political views rather than a desire to obtain intelligence information. There may have been, in fact, a combination of these motives. Matter of Fuentes, supra. The difficulty of determining motive in situations of general civil unrest should not, however, diminish the protections of asylum for persons who have been punished because of their actual or imputed political views, as opposed to their criminal or violent conduct. As the Court noted in INS v. Cardoza-Fonseca, supra, at 444, "Congress has assigned to the Attorney General and his delegates the task of making these hard individualized decisions." That abuse occurred in the context of ongoing civil strife does not answer the question whether the abuse was on account of political opinion.

In evaluating motive in a case in which prosecution for an offense may be a pretext for punishing an individual for his political opinion, the Board would examine a number of factors including "the nature of the crime and the severity of the punishment," as well as the applicant's political opinion, the motives behind his actions, the nature of the act committed, the nature of the prosecution and its motives, and the nature of the law on which the prosecution is based." Matter of Izatula, 20 I & N Dec. 149, 157 (BIA 1990) (Vacca, concurring). Evidence that punishment for a politically related act would be disproportionate to the crime would indicate persecution on grounds of political opinion rather than prosecution. Id.

In the instant case, there was no prosecution of the applicant. Therefore, the evidence must be evaluated in the context of the ongoing civil conflict to determine whether the motive for the abuse in the particular case was **\*494** directed toward punishing or modifying perceived political views, as opposed to punishment for criminal acts; was part of the violence inherent in an armed conflict (i.e., lawful acts of war); or, was motivated by some other reason unrelated to asylum law. As suggested by the analysis in Singh v. Ilchert, supra, the following elements, among others, may be considered in identifying motive:

1. Indications in the particular case that the abuse was directed toward modifying or punishing opinion rather than conduct (e.g., statements or actions by the perpetrators or abuse out of proportion to nonpolitical ends);

2. Treatment of others in the population who might be confronted by government agents in similar circumstances;

3. Conformity to procedures for criminal prosecution or military law including developing international norms regarding the law of war; [3]

4. The extent to which antiterrorism laws are defined and applied to suppress political opinion as well as illegal conduct (e.g., an act may broadly prohibit "disruptive" activities to permit application to peaceful as well as violent expressions of views);

**\*\*8** 5. The extent to which suspected political opponents are subjected to arbitrary arrest, detention, and abuse.


This is certainly not an exhaustive list of factors to be taken into account in assessing motive. The list merely identifies some of the factors to be considered in the totality of the circumstances.

We pointed out in Matter of Mogharrabi, 19 I & N Dec. 439 (BIA 1987), (in the context of proving a well-founded fear of future persecution) that in addition to establishing the fact that an applicant for asylum has a belief or characteristic offensive to the alleged persecutor, the applicant must prove that the alleged persecutor has the inclination and capacity to punish the alien for that belief or characteristic. Here we must examine the record for direct or circumstantial evidence from which it is reasonable to believe that those who harmed the applicant were in part motivated by an assumption that his political views were antithetical to those of the government.

As indicated in INS v.Elias-Zacarias, 502 U.S. 478 (1992), when the issue is whether persecution is "on account of ... political opinion," an applicant for asylum "cannot be expected to provide direct proof of his persecutors' motives." There the Court specifically stated that "[w]e do not require [direct proof]. But since the statute makes motive critical, [the applicant] must provide some evidence of it, direct or circumstantial." Id. at 482-83.

**\*495** In presenting evidence related to the factors listed above, the alien "does not bear the unreasonable burden of establishing the exact motivation of a 'persecutor' where different reasons for actions are possible." Matter of Fuentes, supra, at 662. The task of the alien is "to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds." Matter of R, supra, at 629 (Dunne, concurring in part and dissenting in part). In some fact situations, the evidence may reasonably suggest mixed motives, at least one or more of which is related to a protected ground. See Osario v. INS, 18 F.3d 1017, 1028 (2d Cir.1994) ("[T]he plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution solely on account of the victim's political opinion.")

D. Motivation in the Instant Case

In analyzing motive in the context of this case we first note that the State Department Country Reports indicate that the Sri Lankan Army operates under a "Prevention of Terrorism Act" (PTA) and Emergency Regulations (ER), which give security forces wide powers such as preventive and incommunicado detention. "Country Reports, supra, at 1389. While noting recent efforts by the Sri Lankan Government to improve its human rights record, the Country Reports indicate that "[m]any Sri Lankans were detained without trial in 1993, though the number continued to decline. Torture and mistreatment of detainees were routinely practiced by both government forces and the LTTE." Id. at 1387.

**\*\*9** In this case, the record includes no indication that the applicant was charged with any crime. Nor was the harm inflicted during the course of or on the heels of an armed conflict. A suspected guerrilla might understandably be interrogated concerning details of the makeup and location of opposing forces. As time passes, however, harm inflicted is less likely associated with reconnaissance motives.

During his detention and interrogation, the applicant was accused of being an LTTE member and was questioned about the identity and location of LTTE members for whom he had worked. However, the harm inflicted upon the applicant in this case went well beyond the bounds of legitimate questioning for intelligence gathering and continued long after questioning for this purpose had ended. In fact, the record here is clear that the applicant was harmed in situations unrelated to intelligence gathering.

In this case, the Department of State's Bureau of Democracy, Human Rights, and Labor, in a publication entitled Sri Lanka: Comments on Country Conditions and Asylum Claims (Jan. 1995), reports that young Tamil males are routinely targeted as suspects in security incidents. This suggests that a young Tamil male captured in an LTTE camp could readily be assumed to have political views antithetical to those of the Government.

Taking into account the context of the Sri Lankan conflict, the information in the State Department Country Reports, and the circumstances, duration **\*496** and extent of the abuse inflicted, we find that the applicant has produced evidence from which it is reasonable to believe that those who harmed him were in part motivated by an assumption that his political views were antithetical to those of the Government. The record indicates that the applicant was detained and abused not only to obtain information about the identity of LTTE members and location of their camps but also because the capture of the applicant in an LTTE camp led Sri Lankan authorities to believe that the applicant was a political opponent. Thus, the applicant has met his burden of proving that he was subjected to past persecution in Sri Lanka.[4]

Matter of B-, Interim Decision 3251 (BIA 1995), is particularly instructive as to the application of the reasonableness standard in a mixed motive case. The applicant in Matter of B- had helped the mujahidin in Afghanistan by posting up mujahidin fliers. The applicant testified that his brother was a member of the mujahidin and that Afghan secret police searched his home to find the brother. Although the brother was away at the time, the authorities found a supply of mujahidin fliers in the home. The agents

beat the applicant and his father with the butts of their guns and asked where the applicant's brother was. The applicant and his father were then arrested and taken to secret police quarters. There the applicant was subjected to further interrogation sessions concerning the location of his brother and the source of the fliers. " [T]he first session began with nonviolent questioning about who gave him the mujahidin fliers, where his brother was, and where the mujahidin who supplied the fliers were. The applicant testified that he responded that he did not know, but his interrogators insisted that he did know about the mujahidin because he was helping them. He stated that the KHAD agents thereafter subjected him to sleep deprivation, beatings, and electric shocks applied to his fingers. He said that he was often rendered unconscious by the abuse and would wake up back in his cell. According to the applicant, the interrogations occurred once or twice a week." Id. at 3. After 3 months, the applicant was transferred to prison where he was no longer interrogated. After 10 months in prison he was sent involuntarily to the army. Id.

**10** The Board had little difficulty in finding that under these facts the applicant in Matter of B-, supra, was subjected to past persecution on account of political opinion. The Board reasoned as follows:

The record indicates that the applicant was arrested in 1988 not only to obtain information from him about his brother, who was a mujahidin member, but also because the discovery of mujahidin fliers in his house led authorities to suspect that the applicant and his father were involved with the mujahidin too. During his interrogation by the [secret police], the **497** applicant was accused of helping the mujahidin and was questioned about the identity and whereabouts of the mujahidin members who supplied the fliers. After 3 months of interrogation and physical abuse at [secret police quarters], he was transferred to a prison, where he remained for 10 more months before being sent to serve in the army. The applicant's detention and imprisonment for his support of the mujahidin constituted persecution on account of political opinion.

Id. at 9.

As in Matter of B-, the applicant in the instant case was interrogated and abused because of his suspected support of a separatist group engaged in a military conflict with the government. Although there was interrogation and an attempt to gain information in each case, an additional underlying reason for the abuse was the belief that the victim held political views opposed to the government. Notably, the Board in Matter of B- did not become entangled in the impossible task of determining whether harm was inflicted because of the applicant's acts or because of his beliefs underlying those acts. See also Matter of Izatula, supra (holding that punishment the Afghan Government might impose on account of support for the mujahidin would be persecution on account of political opinion).

V. CONCLUSION

Having established past persecution, the applicant is presumed to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred, conditions in Sri Lanka have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted were he to return. 8 C.F.R. § 208.13(b)(1)(i) (1995). No such evidence of substantial changes in country conditions has been submitted in this case. Large-scale arrests of young Tamil males and abuse of detainees continue to occur. See Sri Lanka: Comments on Country Conditions and Asylum Claims (Jan. 1995).

There being no adverse factors of record, we will favorably exercise discretion in this case in order to grant the request for asylum. Because the applicant's asylum application will be approved, we need not address his application for withholding of deportation pursuant to section 243(h) of the Act. Matter of Mogharrabi, supra. Accordingly, the following order will be entered.

ORDER: The appeal is sustained. The applicant is granted asylum and admitted to the United States as an asylee.

**11** CONCURRING OPINION: Lauri Steven Filppu, Board Member; in which Mary Maguire Dunne, Vice Chairman, Michael J. Heilman, and Patricia A. Cole, Board Members, joined.

Asylum claims involving persons who have been abused in their homelands during periods of civil strife often raise difficult issues of fact and law. This case is no exception. It is further complicated because it arises within the **\*498** jurisdiction of the United States Court of Appeals for the Ninth Circuit, which has an extensive body of asylum case law that is binding on us.

An alien must be a "refugee" to qualify for asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1994). "Refugee" status requires in part that the past or feared future persecution arise "on account of" a qualifying ground, specifically "race, religion, nationality, membership in a particular social group, or political opinion." Section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1994). It is both the protected characteristic of the victim, and the motivation of the persecutor to harm the victim because of the victim's protected characteristic, that are key to the "on account of" requirement. INS v. Elias-Zacarias, 502 U.S. 478 (1992).

As the majority explains, the applicant was captured by the Sri Lankan Army after an attack on a military camp operated by the Liberation Tigers of Tamil Eelam ("Tigers"). The applicant is of Tamil heritage and was discovered in a Tiger bunker in a Tiger camp at the conclusion of an armed engagement. Not surprisingly, the Sri Lankan Army thought he was a Tiger. The applicant was detained for about 6 months, during which he experienced the torture and other abuses described by the majority. He was not prosecuted.

After a detailed review and analysis of the evidence, the majority concludes that the record in its entirety reasonably shows that those who harmed the applicant were in part motivated by political views they attributed to the applicant. It seems, however, that the applicant likely would be considered to be a "refugee" under Ninth Circuit law in any event. It appears that a presumption of politically motivated persecution arises in the Ninth Circuit when, in a civil war context, government forces torture a suspected guerrilla sympathizer and fail to pursue a legitimate investigation or prosecution. Singh v. Ilchert, 63 F.3d 1501, 1508-09 (9th Cir.1995); Maldonado-Cruz v. Dept. of Imm. & Naturalization, 883 F.2d 788 (9th Cir.1989); Blanco-Lopez v. INS, 858 F.2d 531 (9th Cir.1988); see also Gomez-Saballos v. INS, 79 F.3d 912, 917 (9th Cir.1996). [1] The majority's approach may not be wrong under Ninth Circuit law. Its detailed discussion and application of Singh v. Ilchert, however, seems unnecessary, unless we first identify evidentiary inferences that would overcome this presumption. Consequently, there is no need to engage in, or to adopt, the majority's analysis in order to find the applicant eligible for asylum.

**\*\*12** DISSENTING OPINION: Fred W. Vacca, Board Member

I respectfully dissent.

I am amazed that in a case where credibility is a most crucial factor, neither the decision of the majority nor the concurring opinion address in meaningful terms the plausibility and believability of the applicant's asylum **\*499** claim. In my view, the applicant's testimony is untruthful as to his status at the time he was seized by the Sri Lankan Army. I find this to be determinative of the applicant's asylum claim. Unlike the majority's decision, which contains a terse footnote in which it finds the applicant's testimony credible, and the concurring opinion, which is silent on the subject, I have examined and evaluated the applicant's testimony to determine its veracity. As a starting point, I reviewed the Immigration Judge's decision to determine how she treated the issue of credibility. I note that the applicant is the only witness who gave testimony in these proceedings. In the second full paragraph of page 5 of the Immigration Judge's decision, I find the singular reference to the credibility of the applicant. The Immigration Judge stated as follows:

After carefully observing the demeanor of the Applicant and considering his testimony, the Court believes that what he testified to may have happened the way he says it did and, of course, the Court will not impugn his character in any way. (Emphasis added.)

This finding of the Immigration Judge is ambiguous, tentative, and less than helpful to me in determining the truthfulness of the applicant's testimony. The Immigration Judge gave no reasons, either analytical or specific, for her conclusions and leaves this member wondering what she observed or relied upon in making her findings. The alien submitted copies of various news

clippings and reports of country conditions in Sri Lanka which have been made a part of the record. However, the applicant did not offer the testimony of other witnesses, nor is there specific corroboration of his testimony. Therefore, the applicant's asylum claim rises or falls depending on the truthfulness and materiality of his testimony.

The applicant is a 34-year-old ethnic Tamil male who tells a story of being a married man and a welder by trade who lived and worked near Elali in the northern part of Sri Lanka. He claims that sometime after November of 1993 he was physically taken under duress by members of a guerrilla organization known as the Liberation Tigers of Tamil Eelam ("LTTE" or "Tigers") to a clandestine Tiger camp in a rural area of northern Sri Lanka for the purpose of performing forced labor, i.e., welding, in the service of the guerrillas. He testified that in March of 1994, the Tiger camp was overrun in a military assault by soldiers of the Sri Lankan Army. Because of the incoming shells, presumably mortar, and rifle fire, he stated that he sought protection in one of the bunkers built in the Tiger camp. He informed the Immigration Judge that he was discovered hiding in the bunker by 50 or more soldiers who took him and 12 other young Tamils who also were hiding in bunkers and brought them to an army encampment where they were beaten and interrogated. Interestingly, at least three times during his testimony, he referred to being "caught" by the Sri Lankan soldiers. The applicant further testified that he was later transferred to an army prison in or near Colombo, the capital of Sri Lanka, and further beaten, threatened with rifles, and choked in a room filled with irritating smoke from burning chilis. During the entire period of 6  **\*500**  months he was asked specific questions about his involvement with Tamil Tigers and the Tigers' operations. He claims that he was released from the army's detention after his uncle paid a substantial bribe to one of the soldiers.

 **\*\*13**  Overall, I find that his testimony is lacking in important detail. Absent from his testimony were any details of the daily routine of the Tiger camp, how many Tigers were present in the camp, and what he observed of guerrilla activities and operations. There is little or no information about his alleged fellow captives, i.e. the 12 young Tamils found hidden in the bunkers. There is also no specific information about the identity and behavior of the Tamil Tigers. The applicant was silent as to whether Tigers fled or were caught in the army assault on the camp. He testified that he only saw the other 12 "forced laborers" after the assault. Presumably he was held captive by the Tigers from November 1993, when he was taken from his home, to March of 1994, when the soldiers "caught" him. I know precious little of what happened between these two events.

In the course of his testimony the applicant revealed that this brother was a Tiger from 1983 to 1987. The applicant would have you believe that, despite the compromising circumstances of his presence and capture in a clandestine Tiger camp, he was <u>not</u> a Tiger, but a prisoner of the Tigers: one who was forced by the Tigers to act as a slave for them by performing welding tasks. The applicant would ask you to ignore the fact that in profound ways he meets the exact profile of a Tamil Tiger. He is an ethnic Tamil, a male, and one who fits the age description of a Tiger. Especially noteworthy is the fact that the applicant comes from a region which is heavily concentrated with Tigers. Indeed, the applicant's brother was a Tiger. The applicant testified that his brother terminated his membership in the Tigers in 1987. Would a guerrilla group as violent and as fanatical as the Tigers permit the applicant's brother to unilaterally quit the Tigers? In an area where many young Tamil males, including the applicant's brother, were recruited by the Tigers, one has to ask why the Tigers overlooked recruiting the applicant. According to the applicant's testimony, the Tigers knew of him and where he lived and worked. Why would they take him as a forced laborer and not recruit him as a Tiger. The applicant testified that while in the Tiger camp he was unrestrained and treated well by the Tigers. He testified that he was watched while in the camp to see that he and other slave laborers did not escape. If that is the case, where were the guards at the time of the army assault on the camp? In fact, where were the Tigers? The applicant testified that at the time of the army assault, he was captured along with 12 other slave laborers. He did not mention whether Tigers were in the camp or whether they were captured by the Sri Lankan soldiers. Did the Tigers leave the slave laborers alone in the camp before the assault? Did the Tigers successfully flee the camp at the time of the assault, leaving the laborers to fend for themselves, or were the applicant and the young Tamils who were found hiding in the bunkers of the Tiger camp actually Tigers?

 **\*\*14**   **\*501**  The applicant and the other young Tamils were taken prisoner, interrogated at a local army camp, and then transferred to a central army prison in Colombo. The subject of the ongoing interrogation of the applicant was the Tigers. He was believed to be a Tiger and was treated as one. The army was most interested in knowing the identity of other Tigers and everything that the applicant could tell them about the Tiger organization and its operations.

I have reviewed the transcript of the minutes of the hearing and examined the testimony of the applicant from start to finish. In my view, the applicant's denial that he is a Tiger is highly implausible and not believable. When the elements of his story are examined, it is logical and reasonable to infer that he is indeed a Tiger who was caught by the Sri Lankan Army in the most compromising and compelling circumstances. In such circumstances, the applicant has the burden of coming forward with evidence to show that he is not a Tiger. Apart from his repeated denials, he did not submit evidence that would demonstrate that he is not a Tiger. The applicant's denial is contrary to every aspect of what is known abut the Tigers and their activities.

The Tamil Tigers are an insurgent organization in Sri Lanka that engages in violent terrorist activities. Its targets are military and police personnel and installations in the northern and eastern regions of Sri Lanka. However, it also is responsible for the killing, maiming, and displacing of thousands of Sinhalese and Muslims in the civilian population. These terrorist activities began in 1983. In 1991, two bombings in Colombo left the State Defense Minister and scores of civilians dead. Also during 1991 the bodies of more than 300 police, previously captured by the Tigers in June 1990, were found. The Tigers, with use of anti-personnel mines, caused indiscriminate death or injury to many persons in the northeast. In 1993 a Tiger suicide bomber assassinated the President of Sri Lanka and 23 others at a public rally. The most recent information from the Country Reports published by the Department of State for the Congress reveals that the Tigers continue to kill Sinhalese and Muslims and use torture on a routine basis. See Committees on Foreign and International Relations, 104th Cong., 2d Sess., Country Reports on Human Rights Practices for 1995 1352 (Joint Comm. Print 1996).

Clearly, the Tigers are a terrorist guerrilla organization. They target the Government of Sri Lanka and terrorize and persecute the Sinhalese and Muslims in Sri Lanka as well. The applicant has failed to come forward with evidence to show that he is not a Tiger. Having found the applicant to be a Tiger, I conclude that the applicant is ineligible for asylum and withholding of deportation as one who is a member of a terrorist group that ordered, incited, assisted or otherwise participated in the persecution of persons on account of race, religion, nationality, membership in a particular social group, or political opinion. See section 243(h)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(2)(A) (1994); Fedorenko v. United States, 449 U.S. 490 (1981); Matter of McMullen, 19 I & N Dec. 90, 96 (BIA 1984); Matter of Fedorenko, 19 I & N Dec. 57 (BIA 1984); 8 C.F.R. § 208.13(c) (1995).

**15  *502  Accordingly, I would deny the applications for asylum and withholding of deportation and dismiss the appeal.

## Footnotes

1    We find that the applicant established by way of credible testimony that he suffered harm sufficient to constitute past persecution, to wit, a 6-month detention, beatings, and other physical and mental abuses at the hands of the Sri Lankan Army.

2    United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 1968 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268; United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150.

3    See, e.g., Common article 3 of the Geneva Convention which, in the context of civil wars, prohibits "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture" as well as "outrages upon personal dignity, in particular humiliating and degrading treatment." Although the Board has ruled that violations of the Geneva Conventions do not create an independent basis for asylum, Matter of Medina, 19 I & N Dec. 734 (1988), there may be situations in which the severity of the violations of the Geneva Convention may support an inference that the abuse is grounded in one of the protected grounds under the asylum law.

4    In Matter of T-, 20 I & N Dec. 571, 577 (BIA 1992), we concluded that in order "to prove persecution 'on account of' one of the enumerated grounds, an alien must do more than show mistreatment by the government or a particular group." (Emphasis added.) In this case, the applicant has done so by showing that he suffered mistreatment at the hands

of the Sri Lankan Army "on account of" wrongly attributed political opinion. Accordingly, <u>Matter of T-</u> is not controlling in this case.

1    <u>Singh v. Ilchert</u>, <u>supra</u>, at 1509, indicates that at least this aspect of those earlier decisions has survived the Supreme Court's ruling in <u>INS v. Elias-Zacarias</u>, <u>supra</u>.

<div align="center">21 I. & N. Dec. 486 (BIA), Interim Decision 3287, 1996 WL 422990</div>

---

**End of Document**      <span style="color:gray">© 2020 Thomson Reuters. No claim to original U.S. Government Works.</span>

KeyCite Red Flag - Severe Negative Treatment

Disagreed With by Zheng v. Ashcroft, 9th Cir., June 18, 2003

23 I. & N. Dec. 270 (U.S.Atty.Gen.), Interim Decision 3464, 2002 WL 358818

U.S. Department of Justice

Office of the Attorney General

IN RE Y-L-

IN RE A-G-

IN RE R-S-R-

In Removal Proceedings

Decided March 5, 2002

**\*\*1  \*270**  (1) Aggravated felonies involving unlawful trafficking in controlled substances presumptively constitute "particularly serious crimes" within the meaning of section 241(b)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(B) (2000), and only under the most extenuating circumstances that are both extraordinary and compelling would departure from this interpretation be warranted or permissible. *Matter of S-S-*, Interim Decision 3374 (BIA 1999), overruled.

(2) The respondents are not eligible for deferral of removal under Article 3 of the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment where each failed to establish that the torture feared would be inflicted by or with the acquiescence of a public official or other person acting in an official capacity. *Matter of S-V-*, Interim Decision 3430 (BIA 2000), followed.

By previous Order, I directed the Board of Immigration Appeals ("BIA") to refer the above-captioned cases to me for review pursuant to 8 C.F.R. § 3.1(h)(1)(i) (2001). In three separate opinions, the BIA ordered that the respondents' removal from the United States be withheld under the provisions of section 241 of the Immigration and Nationality Act ("INA"). For the reasons set forth below, I now reverse the decisions of the BIA and hold that the respondents, having each been convicted of a "particularly serious crime" within the meaning of the INA, pose a danger to the community of the United States and are thus ineligible for withholding of removal. [1]  *See* INA § 241(b)(3)(B)(ii), 8 U.S.C. § 1231(b)(3)(B)(ii) (2000). I further conclude that the purported threats of torture claimed by the respondents if removed to  **\*271**  their countries of origin do not satisfy the criteria for granting them deferral of removal. [2]  *See* 8 C.F.R. § 208.17.

I.

The three respondents in this consolidated matter are foreign nationals who bear final judgments of conviction for felony drug trafficking offenses in the United States. Specifically, Y-L- was convicted in the Martin County, Florida Circuit Court of trafficking in cocaine and resisting an officer with violence, in violation of Fla. Stat. Ann. §§ 893.135, 843.01 (West 2000 & Supp. 2002). Although he was sentenced to just 25 months of incarceration, his drug offense was a first-degree felony under Florida law, punishable by up to 30 years' imprisonment. A-G- was convicted in the United States District Court for the District of Delaware on three felony counts involving large quantities of cocaine: two counts of distribution of cocaine, and one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841, 846. He received concurrent sentences of one year and a day on each count. R-S-R- pled guilty in federal court in the District of Puerto Rico to one felony count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. The court sentenced him to 24 months of incarceration.

**\*\*2** As a result of the respondents' aggravated felony convictions,[3] the Immigration and Naturalization Service ("INS") commenced removal proceedings against them. *See* INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii) (any alien convicted of an aggravated felony is deportable); INA § 237(a)(2)(B)(i), 8 U.S.C. § 1227(a)(2)(B)(i) (any alien convicted of a controlled substance offense, other than minimal possession of marijuana for personal use, is deportable). The respondents, claiming that their lives and/or freedom would be severely imperiled upon deportation to their countries of origin, petitioned for withholding of removal under both INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and Article 3 of the Convention Against Torture And Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Convention Against Torture"),[4] 8 C.F.R. § 208.16 *et seq.* The INS opposed **\*272** these requests, arguing that the respondents were statutorily ineligible for such withholding by virtue of their convictions for "particularly serious crimes." *See* INA § 241(b)(3)(B)(ii); 8 C.F.R. § 208.16(d)(2).

Although two of the three respondents were denied all relief by immigration judges,[5] the BIA on appeal held that all three were entitled to withholding of removal under section 241 of the INA. Invoking its decision in *In re S-S-*, Interim Decision 3374, 1999 WL 38822 (BIA Jan. 21, 1999), the BIA in each case held that the aggravated drug trafficking felonies committed by respondents did not constitute "particularly serious crimes" for purposes of INA § 241(b)(3)(B)(ii). In reaching this conclusion, the BIA emphasized such factors as the respondents' cooperation with federal authorities in collateral investigations, their limited criminal history records, and the fact that they were sentenced at the low-end of the applicable sentencing guideline ranges. The BIA also determined that the respondents had each demonstrated a probability of persecution or torture if returned to their countries of origin.

II.

Section 241(b)(3)(A) of the INA dictates that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." This restriction does not apply, however, if "the Attorney General decides that . . . the alien, *having been convicted by a final judgment of a particularly serious crime*, is a danger to the community of the United States." INA § 241(b)(3)(B)(ii) (emphasis added).[6] The resolution of these cases turns on whether each of the respondents was convicted of a "particularly serious crime" within the meaning of section 241(b)(3)(B)(ii).

**\*273** A.

**\*\*3** Although the INA itself does not define the term "particularly serious crime," pertinent textual guidance is found in the final clause of section 241(b)(3), which provides, in relevant part:

For purposes of [section 241(b)(3)(B)(ii)], an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

This provision establishes that aliens convicted of aggravated felonies and sentenced to at least five years of imprisonment are *automatically* deemed to have committed a "particularly serious crime." With respect to aggravated felony convictions for which a lesser sentence has been imposed, however, Congress explicitly empowered the Attorney General to make the relevant determination. Prior to today, the Attorney General has had no occasion to consider which aggravated felonies might amount to "particularly serious crimes" where the prison sentence imposed upon conviction is less than five years. Operating in this void, the BIA has seen fit to employ a case-by-case approach, applying an individualized, and often haphazard, assessment as to the "seriousness" of an alien defendant's crime. *See In re S-S-, supra.* Not surprisingly, this methodology has led to results that are both inconsistent and, as plainly evident here, illogical.

According to the BIA, the 1996 INA amendments in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No.

104-208, 110 Stat. 3009-546 - which eliminated a provision declaring that *all* aggravated felonies are "particularly serious crimes"[7] - reflected Congress' desire to replace classifications based on the "category or type of crime that resulted in the conviction" with classifications "based on the length of sentence imposed." *See In re S-S-, supra.* I do not concur. The BIA's interpretation of these amendments places far too much weight on the first sentence of section 241(b)(3)'s final clause (the mandatory designation) and far too little weight on the final clause's second sentence (the grant of discretionary authority to the Attorney General). The fact that Congress designated as *per se* "particularly serious" every aggravated felony **\*274** resulting in a term of incarceration of at least five years hardly reflects an intent to subordinate the nefarious or harmful *character* of a crime to mere secondary consideration, let alone remove it from the equation. While the imposition of certain harsh sentences may obviate the need to probe the underlying circumstances of a particular crime, the discretionary authority reserved to the Attorney General with respect to offenses from which less severe sentences flow is clearly intended to enable him to emphasize factors *other than* length of sentence.[8]

**\*\*4** Exercising that authority under the INA, it is my considered judgment that aggravated felonies involving unlawful trafficking in controlled substances presumptively constitute "particularly serious crimes" within the meaning of section 241(b)(3)(B)(ii). Only under the most extenuating circumstances that are both extraordinary and compelling would departure from this interpretation be warranted or permissible.[9]

Both the courts and the BIA have long recognized that drug trafficking felonies equate to "particularly serious crimes" in this context. In *Mahini v. INS,* 779 F.2d 1419 (9th Cir. 1986), for example, the Ninth Circuit upheld the BIA's determination that an alien's conviction for possession of heroin with intent to distribute, and aiding and abetting the distribution of heroin, **\*275** constituted a "particularly serious crime" within the meaning of the INA. The court reached that conclusion notwithstanding the fact that the alien had been sentenced to only thirteen months' imprisonment for the crime in question. In so holding, the court noted that from the time the BIA first confronted the contours of "particularly serious crimes" in 1982, "*the Board has continually found convictions for drug possession and trafficking to be particularly serious, and the offenders a danger to the community.*" *Id.* at 1421 (emphasis added) (citations omitted). Similarly, in *Matter of U-M-,* 20 I&N Dec. 327 (BIA 1991), the BIA observed:

We find that the crime of trafficking in drugs is *inherently* a particularly serious crime. The harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes. [citation omitted] Illicit narcotic drugs sold in the United States ruin or destroy the lives of many American citizens each year. Apart from the considerable number of people in this country who die of overdoses of narcotics or who become the victims of homicides related to the unlawful traffic of drugs, many others become disabled by addiction to heroin, cocaine, and other drugs. There are also many in this country who suffer crimes against their persons and property at the hands of drug addicts and criminals who use the proceeds of their crimes to support their drug needs. Additionally, a considerable amount of money is drained from the economy of the United States annually because of the unlawful trafficking in drugs. This unfortunate situation has reached epidemic proportions and it tears the very fabric of American society. *As we find trafficking in drugs to inherently be a particularly serious crime, no further inquiry is required into the nature and circumstances of the respondent's convictions for sale or transportation of marihuana and sale of LSD.*

**\*\*5** *Id.* at 330-31 (emphasis added); *accord Matter of Gonzalez,* 19 I&N Dec. 682, 684 (BIA 1988).

The propriety of the "particularly serious crime" presumption adopted in this opinion is further supported by the long-standing *congressional* recognition that drug trafficking felonies justify the harshest of legal consequences. *See, e.g.,* 8 U.S.C. § 1227(a)(2)(B) (deportation for controlled-substance violations); 8 U.S.C. § 1252(a)(2)(C) (no judicial review where alien's removal is predicated on a drug trafficking felony); 8 U.S.C. § 1228 (expedited removal for aggravated felonies, including drug trafficking felonies); 18 U.S.C. § 3592(c)(12) (conviction for serious federal drug offenses constitutes aggravating factor for purposes of weighing imposition of federal death penalty); 21 U.S.C. § 862 (convicted drug traffickers subject to order of ineligibility for federal benefits). The fact that Congress, as part of the IIRIRA legislation in 1996, chose to jettison a prior INA rule treating *all* aggravated felonies - of which drug trafficking felonies are a subset - as *per se* "particularly serious crimes," should not be

AR.04957

confused with an **\*276** indication that Congress no longer considered *drug trafficking crimes in particular*, to be as serious and pernicious as it had previously viewed them.

The severity of this legislative treatment has a solid foundation. The devastating effects of drug trafficking offenses on the health and general welfare, not to mention national security, of this country are well documented. [10] Because the illegal drug market in the United States is one of the most profitable in the world, it attracts the most ruthless, sophisticated, and aggressive traffickers. Substantial violence is present at all levels of the distribution chain. Indeed, international terrorists increasingly employ drug trafficking as one of their primary sources of funding. [11]

Based on the preceding discussion, I might be well within my discretion to conclude that all drug trafficking offenses are *per se* "particularly serious crimes" under the INA. [12] I do not consider it necessary, however, to exclude entirely the possibility of the very rare case where an alien may be able to demonstrate extraordinary and compelling circumstances that justify treating a particular drug trafficking crime as falling short of that standard. While this opinion does not afford the occasion to define the precise boundaries of what those unusual circumstances would be, they would need to include, at a *minimum*: (1) a very small quantity of controlled substance; (2) a very modest amount of money paid for the drugs in the offending transaction; (3) merely peripheral involvement by the alien in the criminal activity, transaction, or conspiracy; (4) the absence of any violence or threat of violence, implicit or otherwise, associated with the offense; (5) the absence **\*277** of any organized crime or terrorist organization involvement, direct or indirect, in relation to the offending activity; and (6) the absence of any adverse or harmful effect of the activity or transaction on juveniles. Only if *all* of these criteria were demonstrated by an alien would it be appropriate to consider whether other, more unusual circumstances (*e.g.*, the prospective distribution was solely for social purposes, rather than for profit) might justify departure from the default interpretation that drug trafficking felonies are "particularly serious crimes." I emphasize here that such commonplace circumstances as cooperation with law enforcement authorities, limited criminal histories, downward departures at sentencing, and post-arrest (let alone post-conviction) claims of contrition or innocence do not justify such a deviation. [13]

B.

**\*\*6** On review of the records in the cases now before me, it is apparent that none presents the kind of extraordinary and compelling circumstances that might warrant treating the respondents' aggravated drug trafficking felonies as anything other than "particularly serious crimes." Not only have all three respondents failed to demonstrate that the volume or value of controlled substances involved in their offenses was *de minimis* or inconsequential, but each was a direct actor or perpetrator - not merely a peripheral figure - in their respective criminal activities.

Y-L- was convicted of a first-degree drug trafficking felony involving 84 grams of cocaine and, in connection with that offense, was further convicted of resisting a police officer with violence when apprehended. Y-L- BIA Decision at 2; Hr'g Tr. at 30. The BIA declared that these crimes were not "particularly serious" because Y-L- had no criminal history, could have received a much stiffer sentence, and did not use a weapon or inflict personal injuries during the commission of the offenses. *Id*. at 5. The Board's decision has no merit. As noted above, the fact that an alien has no prior convictions is irrelevant to the "particularly serious crime" calculus. The same is true of a trial judge's decision to mete out a sentence at the low-end **\*278** of the guidelines. Furthermore, even assuming the BIA had some basis for believing that no weapons or physical injuries were involved in Y-L-'s crimes - a dubious assumption considering both that the record is entirely silent on this matter, and one of the counts of conviction had physical violence as a core element - the absence of such aggravating factors would not minimize the inherent dangers associated with Y-L-'s direct role in the drug trafficking offense.

A-G- was convicted of three federal drug felony counts, and stipulated that the amount of cocaine attributable to him for sentencing purposes was 1,330 *grams*. A-G- Hr'g Exh. 13, at 3. That is enough cocaine to supply over 100,000 doses of the drug. *See United States v. Denmark*, 124 F.3d 200 (6th Cir. 1997) (Table), 1997 WL 468302. Yet the BIA ruled that the offenses did not rise to the level of "particularly serious crimes" inasmuch as A-G- "placed himself at great risk to obtain information

AR.04958

on behalf of the FBI" and "received a substantially lower sentence because of his efforts." A-G- BIA Decision at 2-3. One does not follow from the other. While A-G-'s post-charge cooperation understandably secured a more lenient sentence, it did not retroactively alter the nature of the underlying offenses. The insidious quality of the crime remained the same.

Finally, R-S-R- pled guilty to participation in a conspiracy to produce cocaine in Puerto Rico and transport it in *multi-kilogram* quantities for subsequent distribution in New York. R-S-R- IJ Oral Decision at 7; Hr'g Tr. at 88-89. Nevertheless, the BIA adjudged his conviction not to be "particularly serious" under INA § 241(b)(3)(B)(ii) because "[h]e provided considerable information to the government," "spoke out at great physical risk to himself and his family," did not "directly or indirectly cause[] physical harm to any individual," and qualified for a "minor participant" sentencing adjustment based on his role as a courier in the conspiracy. R-S-R- BIA Decision at 6; United States' Motion Requesting Downward Departure Pursuant to [U.S.S.G. §] 5K1.1, at 2, *United States v. R-S-R-*, (D.P.R.), Crim. No. 97-290. The Board's reasoning does not survive scrutiny. Not only is R-S-R-'s cooperation with federal authorities irrelevant in the "particularly serious crime" evaluation, but any scheme designed to transport cocaine in such large quantities necessarily exposed numerous individuals to physical harm. As for the sentencing adjustment, I find that a drug "courier" plays more than a sufficiently active part in a distribution conspiracy to render his conviction a "particularly serious crime."

*279   III.

**7   Although the respondents are statutorily ineligible for *withholding* of removal by virtue of their convictions for "particularly serious crimes," the regulations implementing the Convention Against Torture allow them to obtain a *deferral* of removal notwithstanding the prior criminal offenses if they can establish that they are "entitled to protection" under the Convention. *See* 8 C.F.R. § 208.17(a). To secure such relief, the respondents must demonstrate that, if removed to their country of origin, *it is more likely than not* they would be tortured by, or with the acquiescence of, government officials acting under color of law. *Id.* §§ 208.16(c)(2), 208.17(a), 208.18(a)(1). None of the respondents has come close to making such a showing.

*A. Y-L-*

Y-L-, who was paroled into the United States in 1979, maintains that he will be killed if sent back to his native Haiti. [14] He testified at his removal hearing that two months prior to his arrival in America, members of the Ton Ton Macoutes - a private army of Haitian death squads organized by former president François Duvalier and nurtured by his successor, Jean Claude Duvalier - murdered his father and aunt, and broke his cousin's leg as retribution for his father's unspecified criticism of the Duvalier government. Y-L- IJ Oral Decision at 3. Y-L- further insisted that the same group of people responsible for the death of his father killed his cousin in 1998, approximately twenty years after Y-L- initially left the country. *Id.* at 3-4, 8; Y-L- Hr'g Tr. at 11-15.

Y-L-'s claim for relief under the Convention Against Torture fails on at least two different levels. First, as the immigration judge correctly found, Y-L- produced no reliable evidence that he would likely be subjected to torture if returned to Haiti. Y-L- IJ Oral Decision at 8. While voluntarily visiting Haiti on two prior occasions, he was never personally harmed or threatened. *Id.* at 2-3. Although he suggested that his cousin was murdered by the same faction that purportedly killed his father nearly twenty years earlier, the immigration judge found this testimony speculative and *280 unconvincing. [15] *Id.* at 8. Meanwhile, the Department of State's authoritative asylum profile on Haiti, which was introduced at the removal hearing, reveals that the political climate has improved substantially in recent years, and that charges of politically-motivated persecution against individuals who fled during the Duvalier reign have proven to be frequently untrue or grossly exaggerated. *See* Office of Asylum Affairs, Dep't of State, *Profile of Asylum Claims and Country Conditions - Haiti* 18, 21-22 (Mar. 31, 1998) ("Asylum Profile"); *see also Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999) (noting that State Department reports are the best resource for gleaning information on the political situations in foreign nations).

**8   Second, even assuming Y-L-'s various allegations have some basis in fact, and even if his own alleged fears of torture are genuine, he is not entitled to deferral of removal under the Convention Against Torture because he has not established that

*current government officials acting in an official capacity* would be responsible for such abuse. The regulations implementing the Convention allow for relief only if torture would be "inflicted by or at the instigation of or with the consent or acquiescence of *a public official or other person acting in an official capacity.*" 8 C.F.R. § 208.18(a)(1) (emphasis added). Violence committed by individuals over whom the government has no reasonable control does not implicate the treaty. *See In re S-V-, Interim Decision 3430, at 9, 2000 WL 562836 (BIA 2000)* ("To demonstrate 'acquiescence' by [foreign] Government officials, the respondent must do more than show that the officials are aware of the activity constituting torture but are powerless to stop it. He must demonstrate that [the foreign] officials are willfully accepting of the . . . tortuous activities."). The State Department's asylum profile on Haiti underscores that the Ton Ton Macoutes have effectively disbanded and neither play a role in, nor enjoy the tacit support of, the current Haitian government. Asylum Profile at 23. Both Y-L- **\*281** and his counsel conceded this point. Y-L- Hr'g Tr. at 15, 33. If, by some chance - which has certainly not been proven to be more likely than not - former Ton Ton Macoute elements seek revenge on Y-L- because of his relationship to his father, there is no competent evidence in the record indicating that the current Haitian administration would either participate in, or turn a blind eye to, such violence. In short, Y-L- has failed to sustain his burden of establishing entitlement to deferral of removal.

*B. A-G-*

The evidence advanced by A-G- similarly falls far short of what is required to obtain relief under the Convention Against Torture. At some point following his entry into the United States, A-G- decided to supplement his income as a maintenance worker by trafficking in illegal narcotics. His supplier was his long-time friend and roommate, K-C-, who had a drug-dealing base in Jamaica. A-G- Hr'g Tr. at 77-88. As so often happens to those in the drug trade, A-G- was ultimately arrested by the FBI, charged with unlawful distribution of cocaine, and convicted on multiple counts of cocaine trafficking. To minimize his exposure to prison, he agreed to assist federal law enforcement officials by participating in a number of controlled drug purchases designed to implicate K-C-.

During a period in which both K-C- and A-G- were temporarily incarcerated at the same facility, K-C- allegedly delivered a message to A-G- that he would be killed if he returned to Jamaica. In addition, according to A-G-'s brothers and sisters, two or three men came to the family residence in Jamaica in either 1998, 1999, or 2000 - the dates and other key particulars diverged sharply among these witnesses - and inquired as to A-G-'s whereabouts. At least one sibling claimed that these men were armed and made threats that A-G- would be murdered by K-C- or others if he returned to Jamaica. *Id.* at 154, 251.

 **\*\*9** Citing these apparent threats to his life, A-G- seeks to avoid removal pursuant to the Convention Against Torture. The main problem with his claim is that the record is devoid of credible evidence suggesting that the Jamaican government would bear any responsibility - either direct or through passive acquiescence - for physical harm visited upon A-G-. In fact, several of the witnesses candidly acknowledged at the hearing that no one in the family even reported the alleged threats to Jamaican authorities. *Id.* at 154, 174, 195, 245.

 **\*282** In finding some government role in the alleged torture, the presiding immigration judge speculated that the Jamaican "government cannot or will not control those who wish to persecute the respondent." A-G- IJ Oral Decision at 15. The judge's reasoning proceeded as follows: (i) there are major problems with corruption in Jamaica, (ii) local police routinely beat detainees, (iii) major drug traffickers operate in Jamaica with impunity and are cozy with corrupt law enforcement officials, and (iv) as a result of (i)-(iii), drug trade associates of K-C- may well either attack A-G- themselves or arrange for A-G- to be arrested on bogus charges and then encourage the corrupt local police to beat him. *Id.* at 10-17, 21-23. [16] Incredibly, the BIA found this reasoning both "thorough" and correct. I do not agree. To the contrary, the immigration judge's factual findings are clearly erroneous.

Although there are indications that corruption and brutality affect some elements of Jamaican law enforcement, the national government has undertaken substantial efforts at reform. *See* Office of Asylum Affairs, Dep't of State, *Country Reports on Human Rights Practices - Jamaica* 1 (Feb. 2001) ("Country Report"). For example, the Jamaican Parliament passed a major anti-corruption bill in December 2000, and recently ratified the Inter-American Convention Against Corruption. *See* Bureau

for International Narcotics and Law Enforcement Affairs, Dep't of State, *Fact Sheet, Country Program: Jamaica* at 1 (Apr. 16, 2001). It also bolstered the national anti-money laundering laws. *Id.* Notwithstanding the allegations of A-G- and his family to the contrary, the U.S. State Department has found that the policy of the Jamaican government is to investigate all credible reports of police corruption. Bureau for International Narcotics and Law Enforcement Affairs, Dep't of State, *International Narcotics Control Strategy Report* (March 2000). The State Department has further reported that the Jamaican government does not encourage or facilitate the illicit production or distribution of narcotics. *Id.* at 4. While acknowledging that abuses by some members of the security forces occasionally occur, the State Department's 2000 Country Report for Jamaica makes clear that "[c]ivilian authorities generally maintain effective control of the security forces," and "[t]he Government generally respect[s] the human rights of its citizens." Country Report at 1. To be sure, there is room for improvement. But the record does **\*283** not support the extreme, uncorroborated claims made on behalf of A-G- with respect to knowing government acquiescence in prospective acts of torture.

**\*\*10** Ultimately, of course, it is impossible to say with certainty whether A-G- will be exposed to torture by particular individuals upon his return to Jamaica. Those who engage in the illegal drug trade quite commonly expose themselves to the risk of violence; it is an occupational hazard. The relevant inquiry under the Convention Against Torture, however, is whether governmental authorities would approve or "willfully accept" atrocities committed against persons in the respondent's position. *See In re S-V-, supra.* To suggest that this standard can be met by evidence of isolated rogue agents engaging in extrajudicial acts of brutality, which are not only in contravention of the jurisdiction's laws and policies, but are committed despite authorities' best efforts to root out such misconduct, is to empty the Convention's volitional requirement of all rational meaning. As the courts have clearly recognized, relief is available only if the torture would "occur[] in the context of governmental authority," not "as a wholly private act." *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001). There being no such credible evidence in the case at bar, A-G-'s request for deferral must be denied.

*C. R-S-R-*

Turning to R-S-R-, a foreign national from the Dominican Republic who has resided in Puerto Rico continuously since his arrival there in 1985, it is clear that his application for relief under the Convention Against Torture suffers from largely the same maladies as those of the other two respondents.

Beginning no later than March 1997, R-S-R- entered into an elaborate "conspiracy to produce multi-kilogram quantities of cocaine in Puerto Rico which would then be transported to New York, where the cocaine would be sold." Plea and Cooperation Agreement at 13, *United States v. R-S-R-*, (D.P.R.), Crim. No. 97-290. "[M]ultikilo quantities of cocaine" were also sold in Puerto Rico, thereby ensuring substantial profits from the conspiracy. *Id.*; R-S-R-Hr'g Tr. at 88-89. Subsequently, R-S-R- was arrested on federal drug charges. In an effort to reduce his prison sentence, he pled guilty and cooperated with federal authorities by testifying against several of his confederates in this "major cocaine trafficking organization." United States' Motion Requesting Downward Departure Pursuant to [U.S.S.G. §] 5K1.1 at 1-2, *United States v. R-S-R-*, (D.P.R.), Crim. No. 97-290.

Invoking the Convention Against Torture, R-S-R- now seeks deferral of removal on the grounds that he will be subjected to physical cruelties by **\*284** individuals in the Dominican Republic - including two of his co-defendants who he maintains are corrupt law enforcement agents - angered by his decision to cooperate with authorities. He claimed at his removal hearing that these individuals were key members of the conspiracy and were the initial source for the drugs that ultimately flowed into Puerto Rico. He further testified that these individuals called his common-law wife in Puerto Rico and told her they were "waiting for [him]." R-S-R- Hr'g Tr. at 105. He alleged that they also arranged to have a note delivered to him in prison, which was unsigned, stating that they would "be waiting for [him] in Santo Domingo," and that he was "going to pay with [his] life." *Id.* at 108.

**\*\*11** The record indicates that R-S-R-'s testimony is highly suspect. To begin with, as the immigration judge correctly observed in questioning R-S-R-'s credibility, R-S-R- produced no documentation to corroborate his claim that the drug conspiracy originated in the Dominican Republic. R-S-R- IJ Oral Decision at 7-8. Nor do any of the documents suggest even implicitly that Dominican citizens were involved in the operation. *Id.* at 8. To the contrary, the materials introduced at the hearing,

AR.04961

including those offered by the respondent himself, reflect that the conspiracy operated exclusively in Puerto Rico and New York. Although the immigration judge, at various pre-trial hearings, pointedly invited R-S-R- to subpoena (or secure affidavits from) the federal agents and prosecutors to whom he directed his cooperation so as to substantiate his claims, the respondent declined the invitation. *Id.* at 6-7; R-S-R- BIA Decision at 4 n.5.

Corroborative evidence, of course, is not a threshold prerequisite to relief under the Convention Against Torture. INS regulations provide that an applicant's testimony, "*if credible*, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.16(c)(2) (emphasis added). But where, as here, "the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal" to his claim. [17] *Sidhu v. INS*, 220 F.3d 1085, 1090 (9th Cir. 2000). And "the weaker [the] alien's testimony, the greater the need **\*285** for corroborative evidence." *In re Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998).

In any event, even assuming that the tentacles of this drug conspiracy reached into the Dominican Republic, R-S-R-'s allegation that he will be exposed to torture there is wholly unpersuasive. Despite testifying that it is easy to travel between Puerto Rico and the Dominican Republic, he stated emphatically that he felt safe from his former drug-dealing collaborators in Puerto Rico. R-S-R- Hr'g Tr. at 64-68. When the immigration judge asked him why, if travel between the two countries was so simple, the Dominican individuals he fears could not simply smuggle agents into Puerto Rico to seek their retribution against him, he was non-responsive. *See* R-S-R- IJ Oral Decision at 9-10, 16.

Furthermore, even if all of R-S-R-'s testimony was credited as true, he still would not be eligible for deferral of removal because he has not established the requisite governmental involvement in the prospective torture he portrayed. The scope of the Convention is confined to torture that is inflicted under color of law. It extends to neither wholly private acts nor acts inflicted or approved in other than "an official capacity." *Ali*, 237 F.3d at 597; 8 C.F.R. § 208.18(a)(1). While R-S-R- offered colorful testimony describing forms of torture that he "think[s] would happen to cooperating witnesses when they are deported," his testimony and evidence failed to provide a plausible basis for concluding that such practices would be inflicted upon *him* with the consent or approval of *authoritative government officials acting in an official capacity*. R-S-R- Hr'g Tr. at 108-09. If anything, his testimony indicates merely that two corrupt, low-level agents may seek to exact personal vengeance on him for personal reasons. Such private conduct falls far short of what is required to demonstrate the probability of government-sanctioned atrocities under the Convention Against Torture. Accordingly, R-S-R- is not entitled to relief.

IV.

**\*\*12** For all the foregoing reasons, the decisions of the BIA in each of these cases are reversed. The cases are remanded to the BIA for proceedings not inconsistent with this opinion.

## Footnotes

1   My review of these BIA decisions is *de novo. See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ( "[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make *de novo* factual determinations.").

2   This published decision is binding on the BIA and is intended to overrule any BIA decisions with which it is inconsistent. *See Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). *See also* 8 C.F.R. § 3.1(g).

3   The drug trafficking crimes for which respondents were convicted all fall within the INA's definition of "aggravated felony." *See* INA § 101(a)(43)(B), 8 U.S.C. § 1101(a)(43)(B) (2000).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

4    The Convention Against Torture, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 23 I.L.M. 1027 (1984), was approved by the United States Senate on Oct. 28, 1990. *See* 136 Cong. Rec. 36625 (1990). Regulations implementing the Convention were adopted pursuant to a congressional directive in the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761, 2681-822. *See* 64 Fed. Reg. 8478, 8488 (Feb. 19, 1999).

5    In the cases of Y-L- and R-S-R-, the presiding immigration judges denied all requested relief from removal. A-G-, however, was granted withholding of removal in immigration court.

6    The regulations implementing the Convention Against Torture contain an identical exception. *See* 8 C.F.R. § 208.16(d) (2) (2001) ("[A]n application for withholding of removal under . . . the Convention Against Torture shall be denied if the applicant falls within section 241(b)(3)(B) of the [INA].").

7    Prior to 1996, the INA mandated that "an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime." INA § 243(h)(2), 8 U.S.C. § 1253(h)(2) (1994).

8    This understanding is confirmed by the IIRIRA's legislative history. In the Conference Report explaining the current provisions of INA § 241(b)(3), Congress emphasized that "the Attorney General retains the authority to determine other circumstances in which an alien has been convicted of a particularly serious crime, *regardless* of the length of sentence." H.R. Conf. Rep. No. 104-828, at 216 (1996) (emphasis added).

9    Some legal commentators and the BIA itself have intimated that Article 33 of the United Nations Convention Relating to the Status of Refugees ("Convention"), July 28, 1951, 19 U.S.T. 6259, 6276, 189 U.N.T.S. 150, 176, to which the United States is bound by its 1968 accession to the United Nations Protocol Relating to the Status of Refugees ("Protocol"), Jan. 31, 1967, 19 U.S.T. 6223, 6225, 606 U.N.T.S. 267, 268, limits my authority to determine that certain categories of crimes are "particularly serious" under INA § 241(b)(3)(B)(ii). *See In re S-S-, supra*. Because both the Convention and the Protocol are silent as to the meaning of a "particularly serious crime," proponents of this view have relied upon various restrictive statements in the Handbook on Procedures and Criteria for Determining Refugee Status, a document issued by the Office of the United Nations High Commissioner for Refugees ("UNHCR"). The Supreme Court has made clear, however, that the comments contained in the Handbook are in no way binding upon me in my determinations under INA § 241. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 427-28 (1999) (holding that the precatory comments contained in the Handbook are not binding on the Attorney General, the BIA, or United States courts); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987) (same).

10    *See, e.g.*, Office of National Drug Control Policy, Executive Office of the President, *Drug-Related Crime* (Fact Sheets, March 2000); Bureau of Justice Statistics, U.S. Dep't of Justice, *A National Report: Drugs, Crime, and the Justice System* (Dec. 1992).

11    *See, e.g.*, Drug Enforcement Administration, U.S. Dep't of Justice, *Target America: Traffickers, Terrorists & Your Kids - A National Symposium on Narco-Terrorism* (Dec. 4, 2001), *available at* http:// www.usdoj.gov:80/dea/deamuseum/ transcript.doc; *Drug Trade and the Terror Network: Hearing Before the Subcommittee on Criminal Justice, Drug Policy, and Human Resources of the House Committee on Government Reform*, 107th Cong. (Oct. 3, 2001) (statement of Asa Hutchinson, Administrator of Drug Enforcement Administration), *available at* http:// www.usdoj.gov:80/dea/pubs/ cngrtest/ct100301.html.

12    Some federal courts have held that certain crimes may properly be treated as *per se* "particularly serious," regardless of the circumstances of the individual case. *See, e.g., Gjonaj v. INS*, 47 F.3d 824, 825-26 (6th Cir. 1995) (assault with a firearm with intent to murder); *Hamama v. INS*, 78 F.3d 233, 240 (6th Cir. 1996) (felonious assault, possession of a firearm during a felony, and carrying a weapon in a vehicle); *Ahmetovic v. INS*, 62 F.3d 48 (2d Cir. 1995) (first degree manslaughter). Other courts have indicated that the application of "per se" determinations is legally questionable. *See, e.g., Chong v. INS*, 264 F.3d 378, 387-89 (3d Cir. 2001).

13    Although an alien's decision to provide critical information to law enforcement officials has no bearing on whether his offense is characterized as a "particularly serious crime," he may be granted legal status in the United States notwithstanding his criminal acts through the issuance of an "S visa." *See* INA § 101(a)(15)(S), 8 U.S.C. § 1101(a) (15)(S). Indeed, A-G- has sought such a visa, and his application is currently pending before the INS. In the event that the application is ultimately granted, any order of removal against him will be vitiated. However, the discussion in this opinion of the relief erroneously granted him by the immigration judge and BIA will remain unaffected.

AR.04963

14    The BIA did not address Y-L-'s claim for relief under the Convention Against Torture, deeming the issue moot in light of its decision to grant him withholding of removal pursuant to section 241(b)(3) of the INA. *See* Y-L- BIA Decision at 6. Having vacated the Board's ruling on Y-L-'s entitlement to withholding of removal, I must take up the deferral question. In so doing, I ultimately affirm the immigration judge's conclusion that Y-L- has no right to any relief under the Convention.

15    Y-L-'s claims are strikingly similar to those made by another Haitian national whose application for protection under the Convention Against Torture was also denied. *See Merisier v. INS,* No. 00-CIV-0393, 2000 WL 1281243 (S.D.N.Y. Sept. 12, 2000). The alien in that case, Orentz Merisier, alleged that his father (who had worked for the prior Haitian government) had been persecuted, and that his uncle had been assassinated. Because, he contended, "some of the opposition forces are still in hiding in Haiti . . ., [he] ha[d] a genuine fear for his life upon his return." *Id.* at $^*$ 3. Like Y-L-, Merisier did not contend that he personally had been subjected to any past persecution or torture in Haiti. The BIA denied relief, as did a federal district court in a subsequent habeas proceeding. The court stressed that Merisier had "failed to suggest a coherent theory of who might want to torture him or why," and that "Haiti's violent past, and even Merisier's relatives' alleged participation in it, is not, without more, substantial grounds for believing that removing Mersier to Haiti would likely result in his being tortured." *Id.* at $^*$ 12. *Accord Miguel v. Reno,* Civ. No. 00-3291, 2000 WL 1209375 (E.D. Pa. Aug. 25, 2000).

16    The immigration judge explained his determination by stating: "[I]t seems that we have a situation where the drug lords may act on their own and simply pay the police to look the other way or the drug lords may actually get the police involved . . . so that they do the dirty work for them on the basis of a trumped up case. . . . We do not know which it is but one of the two is more likely than not." A-G- IJ Oral Decision at 23.

17    In the case at bar, the immigration judge stated that he was "unable to really separate what is true from what is an exaggeration. The Court cannot really say what is true and what is not true." R-S-R- IJ Oral Decision at 15. The BIA, evaluating only the cold record, apparently disagreed and found that R-S-R-'s "testimony was credible in that it was internally consistent, consistent with his written applications, . . . and sufficiently detailed." R-S-R- BIA Decision at 5. Taking into account the immigration judge's ability to observe the testimony first-hand, and the detailed nature of his observations in this regard, I concur in the substantial reservations he memorialized in his opinion.

23 I. & N. Dec. 270 (U.S.Atty.Gen.), Interim Decision 3464, 2002 WL 358818

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

19 Cal. Daily Op. Serv. 4239, 2019 Daily Journal D.A.R. 3864

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by   Emami v. Nielsen,   N.D.Cal.,   June 5, 2020

924 F.3d 503
United States Court of Appeals, Ninth Circuit.

INNOVATION LAW LAB; Central American
Resource Center of Northern California;
Centro Legal De La Raza; University of San
Francisco School of Law Immigration and
Deportation Defense Clinic; Al Otro Lado;
Tahirih Justice Center, Plaintiffs-Appellees,
v.
Kevin K. MCALEENAN, Acting Secretary of
Homeland Security, in his official capacity;
U.S. Department of Homeland Security; Lee
Francis Cissna, Director, U.S. Citizenship and
Immigration Services, in his official capacity;
John L. Lafferty, Chief of Asylum Division, U.S.
Citizenship and Immigration Services, in his
official capacity; United States Citizenship and
Immigration Services; Todd C. Owen, Executive
Assistant Commissioner, Office of Field Operations,
U.S. Customs and Border Protection, in his
official capacity; U.S. Customs and Border
Protection; Ronald D. Vitiello, Acting Director,
U.S. Immigration and Customs Enforcement,
in his official capacity; U.S. Immigration and
Customs Enforcement, Defendants-Appellants.

No. 19-15716
|
Argued and Submitted April 24,
2019 San Francisco, California
|
MAY 7, 2019

**Synopsis**
**Background:** Aliens, as non-Mexican asylum seekers
who arrived in United States from Mexico without valid
admission documents, and organizations that advocated
on behalf of asylum seekers, brought action against
government officials under Administrative Procedure Act
(APA), challenging Department of Homeland Security's
(DHS) migrant protection protocols (MPP) calling for return
of non-Mexican asylum seekers to Mexico for duration
of their immigration proceedings, rather than detention for

expedited or regular removal proceedings, or issuance of
notices to appear for regular removal proceedings. The United
States District Court for the Northern District of California,
No. 3:19-cv-00807-RS,   Richard Seeborg,   J.,   366 F.Supp.3d
1110,   granted nationwide preliminary injunction. Officials
filed motion for stay pending appeal.

**Holdings:** The Court of Appeals held that:

[1] DHS was likely to prevail on merits of its statutory
interpretation argument concerning applicability of statutory
procedures for expedited removal;

[2] DHS was likely to prevail on merits of its argument
that MPP was not subject to notice-and-comment rulemaking
under APA; and

[3] DHS would suffer irreparable harm in absence of stay.

Motion granted.

Watford, Circuit Judge, filed a concurring opinion.

W. Fletcher, Circuit Judge, filed an opinion concurring only
in the result.

**Procedural Posture(s):** Motion for Stay; Motion for
Preliminary Injunction.

West Headnotes (7)

[1] **Federal Courts** ⬌ **Supersedeas or Stay of
Proceedings**

The equitable discretion of the Court of Appeals
in ruling on a motion to stay the enforcement
of a judgment pending appeal is guided by four
factors: (1) whether the stay applicant has made
a strong showing that he is likely to succeed
on the merits; (2) whether the applicant will be
irreparably injured absent a stay; (3) whether
issuance of the stay will substantially injure the
other parties interested in the proceeding; and (4)
where the public interest lies.

1 Cases that cite this headnote

**[2]    Aliens, Immigration, and Citizenship** 🔑 Administrative Procedure

Aliens "described in" first statutory provision, under which applicants for admission who are not processed for expedited removal are placed in regular removal proceedings, within meaning of second statutory provision giving Attorney General discretion, in the case of aliens described in first provision who arrive on land from a foreign territory contiguous to United States to return the alien to that territory pending a hearing before an immigration judge in a regular removal proceeding, is an alien with the salient identifying features of the individuals subject to the first provision. Immigration and Nationality Act §§ 235(b)(2)(A, C), 240, 🚩 8 U.S.C.A. §§ 1225(b)(2)(A, C), 📙 1229a.

4 Cases that cite this headnote

**[3]    Aliens, Immigration, and Citizenship** 🔑 Stay pending review

Department of Homeland Security (DHS) was likely to prevail on merits of its contention, as element for granting to DHS a stay pending its appeal of nationwide preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings, that only if an alien was actually processed for expedited removal during inspection at border, and not if alien was merely eligible for expedited removal because of fraud, misrepresentation, or lack of documentation, would the statutory procedures for expedited removal be applicable to alien, as statutory exception to regular removal proceedings for aliens seeking admission who were determined by examining immigration officer to not be clearly and beyond a doubt entitled to be admitted, so that Attorney General would not be able to exercise statutory discretion, with respect to aliens who arrived on land from foreign territory contiguous to United States, to return the alien to that territory pending a hearing before immigration judge in regular removal proceeding. Immigration and Nationality Act §§

212(a)(6)(C), (a)(7), 235(b)(1), (b)(2)(A), (b)(2)(B)(ii), (b)(2)(C), 240, 🚩 8 U.S.C.A. §§ 1182(a)(6)(C), 🚩 (a)(7), 🚩 1225(b)(1), 🚩 (b)(2)(A), 🚩 (b)(2)(B)(ii), 🚩 (b)(2)(C), 📙 1229a.

6 Cases that cite this headnote

**[4]    Aliens, Immigration, and Citizenship** 🔑 Stay pending review

Department of Homeland Security (DHS) was likely to prevail on merits of its contention, as element for granting to DHS a stay pending its appeal of preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings, that MPP was a general statement of policy that was exempted from Administrative Procedure Act's (APA) notice-and-comment requirement because immigration officers designated asylum applicants for return on discretionary case-by-case basis. 📙 5 U.S.C.A. § 553(b)(A); Immigration and Nationality Act § 235(b)(2)(C), 240, 🚩 8 U.S.C.A. § 1225(b)(2)(C).

3 Cases that cite this headnote

**[5]    Aliens, Immigration, and Citizenship** 🔑 Stay pending review

Irreparable harm to Department of Homeland Security (DHS) in absence of stay was factor weighing in favor of granting to DHS a stay pending its appeal of nationwide preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings; preliminary injunction took off the table one of the few congressionally authorized measures available to process the approximately 2,000 migrants who were currently arriving at nation's southern border on daily basis.

📙 5 U.S.C.A. § 553(b)(A); Immigration and

Nationality Act § 235(b)(2)(C), 240, 🚩8 U.S.C.A. § 1225(b)(2)(C).

2 Cases that cite this headnote

**[6]    Aliens, Immigration, and Citizenship 🔑 Stay pending review**

Consideration of substantial injury to other interested parties if stay was granted was factor weighing in favor of granting to Department of Homeland Security (DHS) a stay pending its appeal of nationwide preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings; while plaintiff aliens, as non-Mexican asylum seekers who arrived in United States from Mexico without valid admission documents, feared substantial injury upon return to Mexico, likelihood of harm was reduced somewhat by Mexican government's commitment to honor its international-law obligations and to grant humanitarian status and work permits to individuals returned under MPP, and the Court of Appeals was hesitant to disturb that compromise amid ongoing diplomatic negotiations between United States and Mexico. 📁5 U.S.C.A. § 553(b)(A); Immigration and Nationality Act § 235(b)(2)(C), 240, 🚩8 U.S.C.A. § 1225(b)(2)(C).

2 Cases that cite this headnote

**[7]    Aliens, Immigration, and Citizenship 🔑 Stay pending review**

Public interest, which favored efficient administration of immigration laws at the border, was a factor weighing in favor of granting to Department of Homeland Security (DHS) a stay pending its appeal of nationwide preliminary injunction enjoining implementation by DHS of its migrant protection protocols (MPP) calling for return of non-Mexican asylum seekers to Mexico for duration of their immigration proceedings. 📁5 U.S.C.A. § 553(b)(A); Immigration and Nationality Act §

235(b)(2)(C), 240, 🚩8 U.S.C.A. § 1225(b)(2)(C).

4 Cases that cite this headnote

**\*506** Appeal from the United States District Court for the Northern District of California, Richard Seeborg, District Judge, Presiding, D.C. No. 3:19-cv-00807-RS

Before: O'SCANNLAIN, W. FLETCHER, and WATFORD, Circuit Judges.

OPINION

PER CURIAM:

In January 2019, the Department of Homeland Security (DHS) issued the Migrant Protection Protocols (MPP), which initiated a new inspection policy along the southern border. Before the MPP, immigration officers would typically process asylum applicants who lack valid entry documentation for expedited removal. If the applicant passed a credible fear screening, DHS would either detain or parole the individual until her asylum claim could be heard before an immigration judge. The MPP now directs the "return" of asylum applicants who arrive from Mexico as a substitute to the traditional options of detention and parole. Under the MPP, these applicants are processed for standard removal proceedings, instead of expedited removal. They are then made to wait in Mexico until an immigration judge resolves their asylum claims. Immigration officers exercise discretion in returning the applicants they inspect, but the MPP is categorically inapplicable to unaccompanied minors, Mexican nationals, applicants who are processed for expedited removal, and any applicant "who is more likely than not to face persecution or torture in Mexico."

Eleven Central American asylum applicants who were returned to Tijuana, Mexico, and six organizations that provide asylum-related legal services challenged the MPP on several grounds in the district court. After concluding that the MPP lacks a statutory basis and violates the Administrative Procedure Act (APA), the district court enjoined DHS on a nationwide basis "from continuing to implement or expand the [MPP]."

19 Cal. Daily Op. Serv. 4239, 2019 Daily Journal D.A.R. 3864

 **[1]**  DHS has moved for a stay of the preliminary injunction pending its appeal to this court. Our equitable discretion in ruling on a stay motion is guided by four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." 🚩 *Nken v. Holder,* 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (internal quotation marks omitted). We begin with a discussion of the first factor, which turns largely on the plaintiffs' likelihood of success on **\*507** their claim that the MPP lacks statutory authorization.


I

Some background is in order before addressing the merits of the plaintiffs' statutory claim. Congress has established an exhaustive inspection regime for all non-citizens who seek admission into the United States. *See* 🚩 8 U.S.C. § 1225(a)(3). Applicants for admission are processed either through expedited removal proceedings or through regular removal proceedings. 🚩 Section 1225(b)(1) outlines the procedures for expedited removal and specifies the class of non-citizens who are eligible for expedited removal:

> If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

🚩 § 1225(b)(1)(A)(i). Simply put, an applicant is eligible for expedited removal only if the immigration officer determines that the individual is inadmissible on one of two grounds:

fraud or misrepresentation (§ 1182(a)(6)(C)) or lack of documentation (§ 1182(a)(7)).

All applicants for admission who are not processed for expedited removal are placed in regular removal proceedings under 🚩 § 1225(b)(2)(A). That process generally entails a hearing before an immigration judge pursuant to § 1229a. 🚩 Section 1225(b)(2)(B) provides exceptions to 🚩 § 1225(b)(2)(A), while 🚩 § 1225(b)(2)(C) permits applicants processed under 🚩 § 1225(b)(2)(A) to be returned to the contiguous territory from which they arrived for the duration of their removal proceedings. 🚩 Section 1225(b)(2) provides in full:

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien—

> **(i)** who is a crewman,
>
> **(ii)** to whom paragraph (1) applies, or
>
> **(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

 **[2]**  DHS relies on the contiguous-territory provision in subsection (b)(2)(C) as the statutory basis for the MPP. That provision authorizes DHS to return "alien[s] described in subparagraph (A)" to Mexico or Canada. 🚩 § 1225(b)(2)(C). The phrase "described in" refers to the "salient identifying features" of the individuals subject to this

provision. *Nielsen v. Preap,* ––– U.S. ––––, 139 S. Ct. 954, 965, ––– L.Ed.2d –––– (2019) (emphasis and internal quotation marks omitted). Because the plaintiffs in this case are not "clearly and beyond a **\*508** doubt entitled to be admitted," they fit the description in § 1225(b)(2)(A) and thus seem to fall within the sweep of § 1225(b)(2)(C).

As the district court interpreted the statute, however, the contiguous-territory provision may not be applied to applicants for admission who could have been placed in expedited removal under § 1225(b)(1), even if they were placed in regular removal proceedings. The crux of this argument is § 1225(b)(2)(B)(ii), which provides that "[s]ubparagraph (A) shall not apply to an alien ... to whom paragraph (1) applies." So long as the applicant is eligible for expedited removal, the district court reasoned, § 1225(b)(1) "applies" to that individual. On this account, it is immaterial that the plaintiffs were not in fact processed for expedited removal during their inspection at the border.

The primary interpretive question presented by this stay motion is straightforward: Does § 1225(b)(1) "apply" to everyone who is *eligible* for expedited removal, or only to those *actually processed* for expedited removal? The interpretive difficulty arises mainly because the inadmissibility grounds contained in subsections (b)(1) and (b)(2) overlap. A subset of applicants for admission—those inadmissible due to fraud or misrepresentation, § 1182(a)(6)(C), and those who do not possess a valid entry document, § 1182(a)(7)—may be placed in expedited removal. § 1225(b)(1)(A)(i). But as we read the statute, anyone who is "not clearly and beyond a doubt entitled to be admitted" can be processed under § 1225(b)(2)(A). Section 1225(b)(2)(A) is thus a "catchall" provision in the literal sense, and Congress' creation of expedited removal did not impliedly preclude the use of § 1229a removal proceedings for those who could otherwise have been placed in the more streamlined expedited removal process. *See Matter of E-R-M- & L-R-M-,* 25 I. & N. Dec. 520, 522–24 (BIA 2011).

Because the eligibility criteria for subsections (b)(1) and (b)(2) overlap, we can tell which subsection "applies" to an applicant only by virtue of the processing decision made during the inspection process. Take first the procedures for designating an applicant for expedited removal. When the immigration officer "determines" that the applicant "is inadmissible" under § 1182(a)(6)(C) or (a)(7), he "shall order the alien removed from the United States without further hearing" unless the applicant requests asylum or expresses a fear of persecution, in which case the officer "shall refer the alien for an interview by an asylum officer under subparagraph (B)." 8 U.S.C. § 1225(b)(1)(A)(i)–(ii). In other words, the officer decides inadmissibility on the spot without sending the matter to an immigration judge.

DHS's regulations further explain that a § 1225(b)(1) determination entails either the issuance of a Notice and Order of Expedited Removal or the referral of the applicant for a credible fear screening. 8 C.F.R. § 235.3(b)(2)(i), (4); *see also id.* § 208.30. And to "remove any doubt" on the issue, § 1225(b)(2)(B) clarifies that applicants processed in this manner are not entitled to a proceeding under § 1229a. *Ali v. Fed. Bureau of Prisons,* 552 U.S. 214, 226, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008).

In contrast, § 1225(b)(2) is triggered "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Following this determination, the officer will issue a Notice to Appear, which is the first step in a § 1229a proceeding. 8 C.F.R. § 235.6(a)(1)(i); *see also id.* § 208.2(b). A Notice to Appear can charge inadmissibility on *any* ground, including the two that render an individual eligible **\*509** for expedited removal. 8 U.S.C. § 1229a(a)(2). The officer then sets a date for a hearing on the issue before an immigration judge. *See Pereira v. Sessions,* ––– U.S. ––––, 138 S. Ct. 2105, 2111, 201 L.Ed.2d 433 (2018).

The plaintiffs were not processed under § 1225(b)(1). We are doubtful that subsection (b)(1) "applies" to them merely because subsection (b)(1) *could have been* applied. And we think that Congress' purpose was to make return to a contiguous territory available during the pendency of § 1229a removal proceedings, as opposed to being contingent on any particular inadmissibility ground. Indeed, Congress likely believed that the contiguous-territory provision would be altogether unnecessary if an applicant had already been processed for expedited removal. The plaintiffs are properly

subject to the contiguous-territory provision because they were processed in accordance with § 1225(b)(2)(A).

Though the plaintiffs contend otherwise, our approach is consistent with the subsections' headings. Section 1225(b)(1) is titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," and § 1225(b)(2) is labeled "Inspection of other aliens." The plaintiffs interpret § 1225(b) to create two mutually exclusive *pre-inspection* categories of applicants for admission; as explained above, we read the statute to create two mutually exclusive *post-inspection* categories. In our view, those who are not processed for expedited removal under § 1225(b)(1) are the "other aliens" subject to the general rule of § 1225(b)(2).

Our interpretation is also consistent with *Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 200 L.Ed.2d 122 (2018), the principal authority on which the plaintiffs rely. There, the Supreme Court explained that "applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Id.* at 837. As the Court noted, "Section 1225(b)(1) applies to aliens *initially determined* to be inadmissible due to fraud, misrepresentation, or lack of valid documentation." *Id.* (emphasis added). "Section 1225(b)(2) is broader," since it "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." *Id.* We think our interpretation more closely matches the Court's understanding of the mechanics of § 1225(b), as it is attentive to the role of the immigration officer's initial determination under § 1225(b)(1) and to § 1225(b)(2)'s function as a catchall.

[3] For the foregoing reasons, we conclude that DHS is likely to prevail on its contention that § 1225(b)(1) "applies" only to applicants for admission who are processed under its provisions. Under that reading of the statute, § 1225(b)(1) does not apply to an applicant who is processed under § 1225(b)(2)(A), even if that individual is rendered inadmissible by § 1182(a)(6)(C) or (a)(7). As a result, applicants for admission who are placed in regular removal

proceedings under § 1225(b)(2)(A) may be returned to the contiguous territory from which they arrived under § 1225(b)(2)(C).

[4] The plaintiffs have advanced only one other claim that could justify a nationwide injunction halting the implementation of the MPP on a wholesale basis: that the MPP should have gone through the APA's notice-and-comment process. DHS is likely to prevail on this claim as well, since "general statements of policy" are exempted from the notice-and-comment requirement. 5 U.S.C. § 553(b)(A). The MPP qualifies as a general statement of policy because immigration officers designate applicants for return on a discretionary case-by-case basis. *See* **\*510** *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 507 (9th Cir. 2018); *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987).

## II

[5] The remaining factors governing issuance of a stay pending appeal weigh in the government's favor. As to the second factor, DHS is likely to suffer irreparable harm absent a stay because the preliminary injunction takes off the table one of the few congressionally authorized measures available to process the approximately 2,000 migrants who are currently arriving at the Nation's southern border on a daily basis. *See* *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1250–51 (9th Cir. 2018). DHS has therefore made a strong showing on both the first and second factors, which are the "most critical." *Nken*, 556 U.S. at 434, 129 S.Ct. 1749.

[6] [7] The other two factors support the issuance of a stay as well. The plaintiffs fear substantial injury upon return to Mexico, but the likelihood of harm is reduced somewhat by the Mexican government's commitment to honor its international-law obligations and to grant humanitarian status and work permits to individuals returned under the MPP. We are hesitant to disturb this compromise amid ongoing diplomatic negotiations between the United States and Mexico because, as we have explained, the preliminary injunction (at least in its present form) is unlikely to be sustained on appeal. Finally, the public interest favors the "efficient administration of the immigration laws at the

border." *East Bay Sanctuary Covenant*, 909 F.3d at 1255

(quoting *Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982)).

The motion for a stay pending appeal is **GRANTED**.

WATFORD, Circuit Judge, concurring:

I agree that the Department of Homeland Security (DHS) is likely to prevail on the plaintiffs' primary claim, as 8 U.S.C. § 1225(b) appears to authorize DHS's new policy of returning applicants for admission to Mexico while they await the outcome of their removal proceedings. But congressional authorization alone does not ensure that the Migrant Protection Protocols (MPP) are being implemented in a legal manner. As then-Secretary of Homeland Security Kirstjen Nielsen recognized, the MPP must also comply with "applicable domestic and international legal obligations." One of those legal obligations is imposed by Article 33 of the 1951 Convention Relating to the Status of Refugees, which provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

Protocol Relating to the Status of Refugees art. I, Jan. 31, 1967, 19 U.S.T. 6223, 6225, 6276 (binding the United States to comply with Article 33). Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment similarly provides:

> No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988).

DHS's stated goal is to ensure that the MPP is implemented in a manner that **\*511** complies with the *non-refoulement* principles embodied in these treaty provisions. Specifically, Secretary Nielsen's policy guidance on implementation of the MPP declares that "a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion ..., or would more likely than not be tortured, if so returned pending removal proceedings."

In my view, DHS has adopted procedures so ill-suited to achieving that stated goal as to render them arbitrary and capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). Under DHS's current procedures, immigration officers do not ask applicants being returned to Mexico whether they fear persecution or torture in that country. Immigration officers make inquiries into the risk of *refoulement* only if an applicant affirmatively states that he or she fears being returned to Mexico.

DHS's policy is virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations. It seems fair to assume that at least some asylum seekers subjected to the MPP will have a legitimate fear of persecution in Mexico. Some belong to protected groups that face persecution both in their home countries and in Mexico, and many will be vulnerable to persecution in Mexico because they are Central American migrants. It seems equally fair to assume that many of these individuals will be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. If both of those assumptions are accurate, DHS will end up violating the United States' treaty obligations by returning some number of asylum seekers to Mexico who should have been allowed to remain in the United States.

There is, of course, a simple way for DHS to help ensure that the United States lives up to its *non-refoulement* obligations: DHS can ask asylum seekers whether they fear persecution or torture in Mexico. I'm at a loss to understand how

19 Cal. Daily Op. Serv. 4239, 2019 Daily Journal D.A.R. 3864

an agency whose professed goal is to comply with *non-refoulement* principles could rationally decide *not* to ask that question, particularly when immigration officers are already conducting one-on-one interviews with each applicant. This policy of refusing to ask seems particularly irrational when contrasted with how DHS attempts to uphold the United States' *non-refoulement* obligations in expedited removal proceedings. In that context, immigration officers are required to ask applicants whether they fear being removed from the United States and returned to their home countries. *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to use Form I-867B). Since the same *non-refoulement* principles apply to removal and return alike, DHS must explain why it affirmatively asks about fear of persecution in the removal context but refrains from asking that question when applying the MPP.

DHS has not, thus far, offered any rational explanation for this glaring deficiency in its procedures. (One suspects the agency is not asking an important question during the interview process simply because it would prefer not to hear the answer.) As the record stands now, then, it seems likely that the plaintiffs will succeed in establishing that DHS's procedures for implementing the MPP are arbitrary and capricious, at least in the respect discussed above.

**\*512** Success on this claim, however, cannot support issuance of the preliminary injunction granted by the district court. We explained recently that the "scope of the remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Here, the plaintiffs' injury can be fully remedied without enjoining the MPP in its entirety, as the district court's preliminary injunction currently does. I expect that appropriate relief for this arbitrary and capricious aspect of the MPP's implementation will involve (at the very least) an injunction directing DHS to ask applicants for admission whether they fear being returned to Mexico. The precise scope of such relief would need to be fashioned after further proceedings in the district court. In the meantime, the government is entitled to have the much broader preliminary injunction currently in place stayed pending appeal.

W. FLETCHER, Circuit Judge, concurring only in the result: I strongly disagree with my colleagues.

The question of law in this case can be stated simply: The Government relies on 8 U.S.C. § 1225(b)(2)(C) for

authority to promulgate its new Migrant Protection Protocols ("MPP"). If § 1225(b)(2)(C) provides such authority, the MPP is valid. If it does not, the MPP is invalid. The question is thus whether § 1225(b)(2)(C) provides authority for promulgation of the MPP. The answer can also be stated simply: The Government is wrong. Not just arguably wrong, but clearly and flagrantly wrong. Section 1225(b)(2)(C) does not provide authority for the MPP.

\* \* \*

I begin with a short summary of established law. Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), arriving aliens applying for admission into the United States fall into two separate and non-overlapping categories.

First, there are aliens described in 8 U.S.C. § 1225(b)(1). These are alien applicants for admission who are traveling with fraudulent documents or no documents. Immigration officers are required by regulation to ask whether these applicants fear persecution in their home country. If so, they are referred for a "credible fear" interview with an asylum officer. If they are found to have a credible fear of persecution in their home country, and are therefore potentially eligible for asylum, they are placed in a regular removal proceeding under 8 U.S.C. § 1229a. In that proceeding, an Immigration Judge ("IJ") can find them either eligible or ineligible for asylum. Applicants who are referred to regular removal proceedings are entitled to remain in the United States while their eligibility for asylum is determined. Applicants found not to have a credible fear are subject to expedited removal without any formal proceeding.

Second, there are aliens described in 8 U.S.C. § 1225(b)(2). These are all alien applicants for admission not described in § 1225(b)(1). In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Section (b)(2) applicants include aliens who are suspected of being, inter alia, drug addicts, convicted criminals, terrorists, or alien smugglers, and who would therefore be inadmissible. *See* 8 U.S.C. § 1182(a)(1)(A)(iv); (a)(2); (a)(3)(B); (a)(6)(E). Unlike § (b)(1) applicants, § (b)(2) applicants are automatically referred to regular removal proceedings under § 1229a. In those proceedings, an IJ can determine whether the applicants

are, in fact, inadmissible on a ground specified in § 1182(a). Also unlike § (b)(1) applicants, § (b)(2) applicants are not entitled **513** to remain in the United States while their admissibility is determined. At the discretion of the Government, they may be "returned" to a "contiguous territory" pending determination of their admissibility. § 1225(b)(2)(C).

This statutory structure has been well understood ever since the passage of IIRIRA in 1996, and until now the Government has consistently acted on the basis of this understanding. The Government today argues for an entirely new understanding of the statute, based on arguments never before made or even suggested.

* * *

It is undisputed that plaintiffs are bona fide asylum applicants under § (b)(1). Although it has long been established that § (b)(1) applicants are entitled to stay in the United States while their eligibility for asylum is determined, the Government is now sending § (b)(1) applicants back to Mexico. The Government refuses to treat them as § (b)(1) applicants. Instead, the Government improperly treats them under the MPP as § (b)(2) applicants who can be "returned" to Mexico under § 1225(b)(2)(C). The Government's arguments in support of the MPP are not only unprecedented. They are based on an unnatural and forced—indeed, impossible—reading of the statutory text.

The relevant text of 8 U.S.C. § 1225 is as follows:

**(a) Inspection**

**(1) Aliens treated as applicants for admission**

An alien present in the United States who has not been admitted ... shall be deemed for purposes of this chapter an applicant for admission.

...

**(b) Inspection of applicants for admission**

**(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled**

**(A) Screening**

**(i) In general**

If an immigration officer determines that an alien ... who is arriving in the United States ... is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

**(ii) Claims for asylum**

If an immigration officer determines that an alien ... is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

...

**(B) Asylum interviews**

...

**(ii) Referral of certain aliens**

If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution ..., the alien shall be detained for further consideration of the application for asylum.

...

**(2) Inspection of other aliens**

**(A) In general**

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining **514** immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

**(B) Exception**

Subparagraph (A) shall not apply to an alien —

**(i)** who is a crewman

**(ii)** to whom paragraph (1) applies, or

**(iii)** who is a stowaway.

**(C) Treatment of aliens arriving from contiguous territory**

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

The statutory text is unambiguous. There are two categories of "applicants for admission." § 1225(a). First, there are applicants described in § 1225(b)(1). Second, there are applicants described in § 1225(b)(2).

Applicants described in § 1225(b)(1) are those who may be inadmissible under § 1182(a)(6)(C) (applicants traveling with fraudulent documents) or under § 1182(a)(7) (applicants with no valid documents).

Applicants described in § 1225(b)(2) are distinct. In the words of the statute, they are "other aliens." § 1225(b)(2) (heading). Put differently, again in the words of the statute, § (b)(2) applicants are applicants "to whom paragraph [b](1)" does not apply. § 1225(b)(2)(B)(ii). That is, § (b)(1) applicants are those who may be inadmissible on either of the two grounds specified in that subsection. Section (b)(2) applicants are all other potentially inadmissible applicants.

Section (b)(1) applicants are more numerous than § (b)(2) applicants, but § (b)(2) is a broader category in the sense that applicants under § (b)(2) are inadmissible on more grounds than applicants under § (b)(1). Applicants inadmissible under § (b)(2) include, for example, aliens with "a communicable disease of public health significance" or who are "drug abuser[s] or addict[s]" (§ 1182(a)(1)(A)(i), (iv)); aliens who have "committed ... a crime involving moral turpitude" or who have "violat[ed] ... any law or regulation ... relating to a controlled substance" (§ 1182(a)(2)(A)(i)(I)); aliens who

"seek to enter the United States ... to violate any law of the United States relating to espionage or sabotage," or who have "engaged in a terrorist activity" (§ 1182(a)(3)(A), (B)); aliens who are "likely ... to become a public charge" (§ 1182(a)(4)(A)); and aliens who are alien "smugglers" (§ 1182(a)(6)(E)).

Just last year, the Supreme Court distinguished between § (b)(1) and § (b)(2) applicants, stating clearly that they fall into two separate categories:

> [A]pplicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2). Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. ... Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all *applicants for admission not covered* by § 1225(b)(1).

*Jennings v. Rodriguez,* —— U.S. ——, 138 S. Ct. 830, 837, 200 L.Ed.2d 122 (2018) (emphasis added).

**\*515** Less than a month ago, the Attorney General of the United States drew the same distinction and briefly described the procedures applicable to the two categories:

Under section 235 of the Act [8 U.S.C. § 1225], all aliens "arriv[ing] in the United States" or "present in the United States [without having] been admitted" are considered "applicants for admission," who "shall be inspected by immigration officers." INA § 235(a)(1), (3). [8 U.S.C. § 1225(a)(1), (3).] In most cases, those inspections yield one of three outcomes. First, if an alien is "clearly and beyond a doubt entitled to be admitted," he will be permitted to enter, or remain in, the country without further proceedings. *Id.* § 235(b)(2)(A). [8 U.S.C. § 1225(b)(2)(A).] Second, if the alien is not

clearly admissible, then, generally, he will be placed in "proceeding[s] under section 240 [8 U.S.C. § 1229a]" of the Act—that is, full removal proceedings. *Id.* Third, if the alien is inadmissible on one of two specified grounds and meets certain additional criteria, DHS may place him in either expedited or full proceedings. *Id.* § 235(b)(1)(A)(i) [8 U.S.C. § 1225(b)(1)(A)(i)]; *see Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011).

*Matter of M-S-*, 27 I. & N. Dec. 509, 510 (BIA April 16, 2019).

The procedures specific to the two categories of applicants are given in their respective subsections.

To some extent, the statutorily prescribed procedures are the same for both categories. If a § (b)(1) applicant passes his or her credible fear interview he or she will be placed in regular removal proceedings under 8 U.S.C. § 1229a. *See* 8 C.F.R. § 208.30(f). A § (b)(1) applicant may also be placed directly into regular removal proceedings under § 1229a at the discretion of the Government. *See Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520 (BIA 2011). A § (b)(2) applicant who is "not clearly and beyond a doubt entitled to be admitted" will also be placed in removal proceedings under § 1229a. *See* § 1225(b)(2)(A).

Both § (b)(1) and § (b)(2) applicants can thus be placed in regular removal proceedings under § 1229a, though by different routes. But the fact that an applicant is in removal proceedings under § 1229a does not change his or her underlying category. A § (b)(1) applicant does not become a § (b)(2) applicant, or vice versa, by virtue of being placed in a removal proceeding under § 1229a. A homely analogy may help make the point. Dogs and cats can both be placed in the pound. But they still retain their separate identities. Dogs do not become cats, or vice versa.

However, the statutory procedures for the two categories are not identical. Some of the procedures are exclusive to one category or the other. For example, if a § (b)(1) applicant fails to pass his or her credible fear interview, he or she may be removed in an expedited proceeding without a removal proceeding under § 1229a. *See* § 1225(b)(1)(A), (B). There is no comparable procedure for expedited removal of a

§ (b)(2) applicant. Further, in some circumstances a § (b)(2) applicant may be "returned" to a "territory contiguous to the United States" pending his or her removal proceeding under § 1229a. *See* § 1225(b)(2)(C). There is no comparable procedure for a § (b)(1) applicant.

The precise question in this case is whether a § (b)(1) applicant may be "returned" to a contiguous territory under § 1225(b)(2)(C). That is, may a § (b)(1) applicant be subjected to a procedure specified for a § (b)(2) applicant? A plain-meaning reading of § 1225(b)—as well as the Government's longstanding and consistent **\*516** practice— tell us that the answer is "no."

There is nothing in § 1225(b)(1) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Section (b)(1)(A)(i) tells us with respect to § (b)(1) applicants that an "officer shall order the alien removed ... without further hearing or review unless the alien indicates either an intention to apply for asylum ... or a fear of persecution." Section (b)(1)(A)(ii) tells us that § (b)(1) applicants who indicate an intention to apply for asylum or a fear of persecution "shall" be referred by the immigration officer to an "asylum officer" for an interview. The remainder of § 1225(b)(1) specifies what happens to a § (b)(1) applicant depending on the determination of the asylum officer—either expedited removal or detention pending further consideration. § 1225(b)(1)(B)(ii)-(iii). There is nothing in § 1225(b)(1) stating, or even suggesting, that a § (b)(1) applicant is subject to the "return" procedure of § 1225(b)(2)(C).

Nor is there anything in § 1225(b)(2) to indicate that a § (b)(1) applicant may be "returned" under § 1225(b)(2)(C). Taking § 1225(b)(2) subparagraph by subparagraph, it provides as follows. Subparagraph (A) tells us that unless a § (b)(2) applicant is "clearly and beyond a doubt entitled to be admitted," she or he "shall be detained" for a removal proceeding under § 1229a. § 1225(b)(2)(A). Subparagraph (A) is "[s]ubject to subparagraphs (B) and (C)." *Id.* Subparagraph (B) tells us that subparagraph (A) does not apply to three categories of aliens—"crewm[e]n," § (b)(1) applicants, and "stowaway[s]." § 1225(b)(2)(B). Finally, subparagraph (C) tells us that a § (b)(2) applicant who arrives "on land ... from a foreign territory contiguous to the United

AR.04975

States," instead of being "detained" under subparagraph (A) pending his or her removal proceeding under 🚩 § 1229a, may be "returned" to that contiguous territory pending that proceeding. 🚩 § 1225(b)(2)(C). Section (b)(1) applicants are mentioned only once in 🚩 § 1225(b)(2), in subparagraph (B)(ii). That subparagraph specifies that subparagraph (A)—which tells us what happens to § (b)(2) applicants—does not apply to § (b)(1) applicants.

The "return-to-a-contiguous-territory" provision of 🚩 § 1225(b)(2)(C) is available only for § (b)(2) applicants. There is no way to read the statute otherwise. Under a plain-meaning reading of the text, as well as the Government's longstanding and consistent practice, the statutory authority upon which the Government now relies simply does not exist.

\* \* \*

In support of its motion to stay the order of the district court pending appeal, the Government makes several arguments. None is persuasive.

The Government first argues that § (b)(1) applicants are included within the category of § (b)(2) applicants. *See* Govt. Brief at 10. Under the Government's argument, there are two categories of applicants, but the categories are overlapping. There are § (b)(1) applicants, who are defined in § (b)(1), and there are § (b)(2) applicants, who are defined as all applicants, including, but not limited to, § (b)(1) applicants.

For this argument, the Government relies on the phrase "an alien seeking admission" in 🚩 § 1225(b)(2)(A). The Government argues that because § (b)(1) and § (b)(2) applicants are both "aliens seeking admission," subparagraph (A) of § (b)(2) refers to both categories of applicants. Then, because subparagraph (A) is, by its terms, "[s]ubject to subparagraphs (B) and (C)," the Government argues that a § (b)(1) applicant may be "return[ed]" to a "foreign **\*517** territory contiguous to the United States" under subparagraph (C).

The Government's argument ignores the statutory text, the Supreme Court's opinion in 🚩 *Jennings* last year, and the opinion of its own Attorney General in *Matter of M-S-* less than a month ago.

The text of 🚩 § 1225(b) tells us that § (b)(1) and § (b)(2) are separate and non-overlapping categories. 🚩 Section 1225(b) specifies that § (b)(1) applicants are aliens who are inadmissible either under 🚩 § 1182(a)(6)(C) or under 🚩 § 1182(a)(7). Section (b)(2) aliens are "*other* aliens." *See* 🚩 § 1225(b)(2) (heading) ("Inspection of *other* aliens") (emphasis added). That is, § (b)(2) covers applicants "other" than § (b)(1) applicants. In case a reader has missed the significance of the heading of § (b)(2), the statute makes the point again, this time in the body of § (b)(2). Section (b)(2)(B)(ii) specifically provides that subparagraph (A) of § (b)(2) "shall not apply to an alien ... to whom paragraph [b](1) applies."

In 🚩 *Jennings*, the Supreme Court last year told us explicitly that § (b)(1) and § (b)(2) applicants fall into separate and non-overlapping categories. It wrote, "[*A*]*pplicants for admission fall into one of two categories*, those covered by 🚩 § 1225(b)(1) and those covered by 🚩 § 1225(b)(2).... 🚩 Section 1225(b)(2) ... applies to all applicants for admission *not* covered by 🚩 § 1225(b)(1)." 🚩 *Jennings*, 138 S. Ct. at 837 (emphasis added). Finally, in *Matter of M-S-*, the Attorney General wrote on April 16 of this year that an applicant is subject to different procedures depending on whether he or she is a § (b)(1) or § (b)(2) applicant. *Matter of M-S-*, 27 I. & N. Dec. at 510.

The Government's second argument follows from its first. *See* Govt. Brief at 10–13. For its second argument, the Government relies on subparagraph (B)(ii), which provides: "Subparagraph (A) shall not *apply* to an alien ... to whom paragraph [b](1) *applies*." 🚩 § 1225(b)(2)(B)(ii) (emphasis added). The Government argues that subparagraph (B)(ii) allows a government official to perform an act. The act supposedly authorized is to "apply" the expedited removal procedures of § (b)(1) to some of the aliens under § (b)(2), as the Government defines § (b)(2) applicants. (The Government needs to make this argument in order to avoid the consequence of treating all § (b)(1) applicants as § (b)(2) applicants, who are automatically entitled to regular removal proceedings.)

There is a fundamental textual problem with the Government's argument. "Apply" is used twice in the same sentence in § (b)(2)(B)(ii). The first time the word is used, it refers to the application of a statutory section ("Subparagraph (A) shall not apply"). The second time the word is used, it is

used in the same manner, again referring to the application of a statutory section ("to whom paragraph [b][1] applies"). When the word is used the first time, it tells us that subparagraph (A) shall not apply. When the word is used the second time, it tells us to whom subparagraph (A) shall not apply: It does not apply to applicants to whom § (b)(1) applies. Neither time does the word "apply" refer to an act performed by a government official.

The Government's third argument is disingenuous. The Government argues that § (b)(1) applicants are more "culpable" than § (b)(2) applicants, and that they therefore deserve to be forced to wait in Mexico while their asylum applications are being adjudicated. The Government argues that returning § (b)(2), but not § (b)(1), applicants to a contiguous territory would have "the perverse effect of privileging aliens who attempt to obtain entry to the United States by fraud ... over aliens who follow our laws." Govt. Brief at 14. In its **\*518** Reply Brief, the Government compares § (b)(1) and § (b)(2) applicants, characterizing § (b)(2) applicants as "less-culpable arriving aliens." Govt. Reply Brief at 5. The Government has it exactly backwards.

Section (b)(1) applicants are those who are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7)" of Title 8. Section 1182(a)(6)(C), entitled "Misrepresentation," covers, inter alia, aliens using fraudulent documents. That is, it covers aliens who travel under false documents and who, once they arrive at the border or have entered the country, apply for asylum. Section 1182(a)(7), entitled "Documentation requirements," covers aliens traveling without documents. In other words, § (b)(1) applies to bona fide asylum applicants, who commonly have fraudulent documents or no documents. Indeed, for many applicants, fraudulent documents are their only means of fleeing persecution, even death, in their own countries. The structure of § (b)(1), which contains detailed provisions for processing asylum seekers, demonstrates that Congress recognized that § (b)(1) applicants may have valid asylum claims and should therefore receive the procedures specified in § (b)(1).

The history of § 1225(b)(2)(C) confirms that Congress did not have § (b)(1) applicants in mind. Section 1225(b)(2)(C) was added to IIRIRA late in the drafting process, in the

wake of *Matter of Sanchez-Avila*, 21 I. & N. Dec. 444 (BIA 1996). The petitioner in *Sanchez-Avila* was a Mexican national who applied for entry as a "resident alien commuter" but who was charged as inadmissible due to his "involvement with controlled substances." *Id.* at 445. In adding § 1225(b)(2)(C) to what was to become IIRIRA, Congress had in mind § (b)(2) applicants like the petitioner in *Sanchez-Avila*. It did not have in mind bona fide asylum seekers who arrive with fraudulent documents or no documents at all.

Contrary to the Government's argument, § (b)(1) applicants are not more "culpable" than § (b)(2) applicants. Quite the opposite. The § (b)(1) applicants targeted by the MPP are innocent victims fleeing violence, often deadly violence, in Central America. In stark contrast, § (b)(2) applicants include suspected drug addicts, convicted criminals, terrorists, and alien smugglers. *See* § 1182(a)(1)(A)(iv); (a)(2); (a)(3)(B); (a)(6)(E). Section (b)(2) applicants are precisely those applicants who should be "returned" to a "contiguous territory," just as § 1225(b)(2)(C) provides.

* * *

Acting as a motions panel, we are deciding the Government's emergency motion to stay the order of the district court pending appeal. Because it is an emergency motion, plaintiffs and the Government were severely limited in how many words they were allowed. Our panel heard oral argument on an expedited basis, a week after the motion was filed.

I regret that my colleagues on the motions panel have uncritically accepted the Government's arguments. I am hopeful that the regular argument panel that will ultimately hear the appeal, with the benefit of full briefing and regularly scheduled argument, will be able to see the Government's arguments for what they are—baseless arguments in support of an illegal policy that will, if sustained, require bona fide asylum applicants to wait in Mexico for years while their applications are adjudicated.

**All Citations**

924 F.3d 503, 19 Cal. Daily Op. Serv. 4239, 2019 Daily Journal D.A.R. 3864

---

End of Document        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

I.N.S. v. Aguirre-Aguirre, 526 U.S. 415 (1999)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1137 of 1384

119 S.Ct. 1439, 143 L.Ed.2d 590, 67 USLW 4270, 99 Cal. Daily Op. Serv. 3168...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Zivkovic v. Holder, 7th Cir., July 31, 2013

119 S.Ct. 1439
Supreme Court of the United States

IMMIGRATION AND
NATURALIZATION SERVICE, Petitioner,
v.
Juan Anibal AGUIRRE–AGUIRRE.

No. 97–1754.
|
Argued March 3, 1999.
|
Decided May 3, 1999.

**Synopsis**

Alien applied for withholding of deportation and asylum. The immigration judge granted relief, and Immigration and Naturalization Service (INS) appealed. The Board of Immigration Appeals (BIA) reversed, and alien petitioned for review. The United States Court of Appeals for the Ninth Circuit, Noonan, Circuit Judge, 121 F.3d 521, concluded that the BIA had applied an incorrect interpretation of the serious nonpolitical crime provision, and it remanded for further proceedings, and INS petitioned for certiorari. The Supreme Court, Justice Kennedy, held that: (1) statute making alien who has committed serious nonpolitical crime ineligible for withholding of deportation on ground that he would be subject to persecution did not require balancing alien's criminal acts against the risk of persecution he would face if returned to his home country, and (2) BIA was not required to expressly consider the atrociousness of alien's acts in determining whether alien was ineligible for withholding of deportation.

Reversed and remanded.

West Headnotes (8)

**[1]** **Aliens, Immigration, and Citizenship** ⚷ Discretionary or mandatory

As a general rule, withholding of deportation is mandatory if an alien establishes that it is more likely than not that he would be subject to persecution on one of the specified statutory grounds. Immigration and Nationality Act, § 243(h)(1), as amended, 8 U.S.C.A. § 1253(h)(1).

31 Cases that cite this headnote

**[2]** **Aliens, Immigration, and Citizenship** ⚷ Asylum Distinguished from Withholding of Removal or Deportation

Whereas withholding of deportation only bars deporting an alien to a particular country or countries, a grant of asylum permits an alien to remain in the United States and to apply for permanent residency after one year. Immigration and Nationality Act, §§ 208, 241(b)(3), as amended, 8 U.S.C.A. §§ 1158, 1231(b)(3).

30 Cases that cite this headnote

**[3]** **Aliens, Immigration, and Citizenship** ⚷ Discretionary or mandatory

Whereas withholding of deportation is mandatory unless the Attorney General determines one of the exceptions applies, the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion. Immigration and Nationality Act, §§ 208, 241(b)(3), as amended, 8 U.S.C.A. §§ 1158, 1231(b)(3).

23 Cases that cite this headnote

**[4]** **Administrative Law and Procedure** ⚷ Asylum, refugees, and withholding of removal

**Aliens, Immigration, and Citizenship** ⚷ Law questions

Because Court of Appeals, in reviewing determination of Board of Immigration Appeals (BIA) that alien was not entitled to withholding of deportation based on his expressed fear of persecution for earlier political activities in his native Guatemala, confronted questions implicating agency's construction of the statute which it administered, court should have applied the principles of deference described in *Chevron*; thus, court should have asked whether statute

was silent or ambiguous with respect to the specific issue before it, and if so, the question for court was whether agency's answer was based on a permissible construction of the statute. Immigration and Nationality Act, § 243(h)(1), as amended, 8 U.S.C.A. § 1253(h)(1).

544 Cases that cite this headnote

[5]    **Aliens, Immigration, and Citizenship** ⚷ Crimes and Related Grounds

Statute making alien who has committed serious nonpolitical crime ineligible for withholding of deportation on ground that he would be subject to persecution did not require balancing alien's criminal acts against the risk of persecution he would face if returned to his home country. Immigration and Nationality Act, § 243(h)(2)(C), as amended, 8 U.S.C.A. § 1253(h)(2)(C).

12 Cases that cite this headnote

[6]    **Aliens, Immigration, and Citizenship** ⚷ Eligibility; Refugee Status

**Aliens, Immigration, and Citizenship** ⚷ Crimes and Related Grounds

U.N. Handbook may be a useful interpretative aid, but it is not binding on the Attorney General, the Board of Immigration Appeals (BIA), or United States courts in determining whether alien is ineligible for withholding of deportation on ground that he has committed serious nonpolitical crime before entering United States. Immigration and Nationality Act, § 243(h)(2)(C), as amended, 8 U.S.C.A. § 1253(h)(2)(C).

115 Cases that cite this headnote

[7]    **Aliens, Immigration, and Citizenship** ⚷ Crimes and Related Grounds

Board of Immigration Appeals (BIA) was not required to expressly consider the atrociousness of alien's acts in determining whether alien, despite fears of persecution if returned to his home country, was ineligible for withholding of deportation on ground that he had committed serious nonpolitical crime before entering United

States. Immigration and Nationality Act, § 243(h)(2)(C), as amended, 8 U.S.C.A. § 1253(h)(2)(C).

23 Cases that cite this headnote

[8]    **Aliens, Immigration, and Citizenship** ⚷ Crimes and Related Grounds

In determining that alien, despite fears of persecution if returned to his home country, was ineligible for withholding of deportation on ground that he had committed serious nonpolitical crime before entering United States, Board of Immigration Appeals(BIA), which concluded that the violence and destructiveness of alien's crimes, and their impact on civilians, were disproportionate to his acknowledged political objectives, was not required to give more express consideration to the "necessity" and "success" of alien's actions. Immigration and Nationality Act, § 243(h)(2)(C), as amended, 8 U.S.C.A. § 1253(h)(2)(C).

21 Cases that cite this headnote

**\*\*1440** *Syllabus* [*]

The Immigration and Nationality Act (INA) permits withholding of deportation to a country when "the Attorney General determines that [an] alien's life or freedom would be threatened in such country on account of ... political opinion." 8 U.S.C. § 1253(h)(1). In general, withholding is mandatory if an alien establishes that he is more likely than not to "be subject to persecution on [that ground]," *INS v. Stevic,* 467 U.S. 407, 429–430, 104 S.Ct. 2489, 81 L.Ed.2d 321. However, as relevant here, it is not available if the Attorney General finds that the alien committed a "serious nonpolitical crime" before arriving in the United States, § 1253(h)(2)(C). Respondent, a Guatemalan, requested, *inter alia,* withholding of his deportation by the Immigration and Naturalization Service. He testified at an administrative hearing that, in protesting various government policies and actions in Guatemala, he had burned buses, assaulted passengers, and vandalized and destroyed private property. The Immigration Judge granted his request, but the Board of Immigration Appeals (BIA) vacated the order, finding

that it were "serious nonpolitical crime[s]." Applying the weighing test it had **1441 developed in an earlier decision, the BIA concluded that the common-law or criminal character of respondent's acts outweighed their political nature. The Ninth Circuit remanded the case, finding the BIA's analysis deficient in three respects: It should have balanced respondent's admitted offenses against the threat of persecution; it should have considered whether his acts were grossly disproportionate to their alleged objective and were atrocious, especially with reference to Circuit precedent; and it should have considered the political necessity and success of respondent's methods.

*Held:* In ruling that the BIA must supplement its weighing test by examining these additional factors, the Ninth Circuit failed to accord the BIA's interpretation the level of deference required under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694. Pp. 1445–1449.

(a) Because the Ninth Circuit confronted questions implicating "an agency's construction of the statute which it administers," that court should have asked whether "the statute is silent or ambiguous with respect to the specific issue" before it, and, if so, "whether the agency's *416 answer is based on a permissible construction of the statute." *Chevron, supra,* at 843, 104 S.Ct. 2778. It is clear that *Chevron* deference applies to this statutory scheme. The Attorney General is charged with the INA's administration and enforcement, and § 1253(h) expressly makes an alien's entitlement to withholding turn on the Attorney General's determination whether the statutory conditions for withholding have been met. Judicial deference to the Executive Branch is especially appropriate in the immigration context. *INS v. Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90. The BIA, which is vested with the Attorney General's discretion and authority in cases before it, should be accorded *Chevron* deference when it gives ambiguous statutory terms meaning through a process of case-by-case adjudication. *INS v. CardozaFonseca,* 480 U.S. 421, 448–449, 107 S.Ct. 1207, 94 L.Ed.2d 434. Pp. 1445–1446.

(b) The Ninth Circuit's error is clearest with respect to its holding that the BIA must balance respondent's criminal acts against his risk of persecution in Guatemala. The BIA has rejected any such interpretation, and § 1253(h)'s text and structure are consistent with that conclusion. By its terms, the statute requires independent consideration of the

persecution risk facing an alien before granting withholding. It is reasonable to decide, as the BIA has done, that this factor can be considered on its own and not also as a factor in determining whether the crime itself is serious and nonpolitical. A United Nations handbook relied on by the Ninth Circuit is not binding on the Attorney General, the BIA, or the United States courts. Pp. 1446–1447.

(c) The Ninth Circuit erred in finding that the BIA should have considered whether respondent's acts were grossly disproportionate to their alleged objective and atrocious in light of Circuit precedent. The BIA does not dispute that such considerations may be important in applying the serious nonpolitical crime exception. However, the BIA's formulation does not purport to provide a comprehensive definition of the exception, and the standard's full elaboration should await further cases. The BIA's test identifies the general standard whether an offense's political aspect outweighs its common-law character and then provides two specific inquiries that may be used in applying the rule: whether there is a gross disproportion between means and ends, and whether the acts are atrocious. Although an offense involving atrocious acts will result in denial of withholding, an offense's criminal element may outweigh its political aspect even if none of the acts are atrocious. Thus, the BIA did not need to give express consideration to atrociousness before determining that respondent had committed serious nonpolitical crimes. This approach is consistent with the statute, which does not equate every serious nonpolitical crime with atrocious *417 acts. Nor is there any reason to find such equivalence. In common usage, "atrocious" suggests a deed more culpable and aggravated than a serious one. In light of this conclusion, the Court rejects the Ninth Circuit's suggestion that the BIA was required to **1442 compare the facts of this case with Circuit precedent on atrociousness. Pp. 1447–1448.

(d) The Ninth Circuit also erred to the extent it believed the BIA had to give more express consideration to the necessity and success of respondent's actions than it did. Although the Attorney General has suggested that a crime will not be deemed political unless it has a causal link to the alleged political purpose and object, the BIA was required to do no more than find that respondent's acts were not political based on the lack of proportion with his objectives. Even with a clear causal connection, a lack of proportion may render crimes nonpolitical. Moreover, respondent had the burden of proving entitlement to withholding, yet he failed to submit a brief to the BIA and the Immigration Judge did not address this point.

I.N.S. v. Aguirre-Aguirre, 526 U.S. 415 (1999)

119 S.Ct. 1439, 143 L.Ed.2d 590, 67 USLW 4270, 99 Cal. Daily Op. Serv. 3168...

In these circumstances, the BIA's rather cursory discussion does not warrant reversal. Pp. 1448–1449.

(e) The Court does not address respondent's argument, raised at this late stage, that there are errors in the translation and transcription of his testimony. Should the BIA determine modification of the record is necessary, it can decide whether to consider the withholding issue further. P. 1449.

🚩 121 F.3d 521, reversed and remanded.

KENNEDY, J., delivered the opinion for a unanimous Court.

### Attorneys and Law Firms

Patricia A. Millett, Washington, DC, for petitioner.

Nadine K. Wettstein, Takoma Park, MD, for respondent.

### Opinion

**\*418** Justice KENNEDY delivered the opinion of the Court.

We granted certiorari to consider the analysis employed by the Court of Appeals in setting aside a determination of the Board of Immigration Appeals (BIA). The BIA ruled that respondent, a native and citizen of Guatemala, was not entitled to withholding of deportation based on his expressed fear of persecution for earlier political activities in Guatemala. The issue in the case is not whether the persecution is likely to occur, but whether, even assuming it is, respondent is ineligible for withholding because he "committed a serious nonpolitical crime" before his entry into the United States. 8 U.S.C. § 1253(h)(2)(C). The beginning point for the BIA's analysis was its determination that respondent, to protest certain governmental policies in Guatemala, had burned buses, assaulted passengers, and vandalized and destroyed property in private shops, after forcing customers out. These actions, the BIA concluded, were serious nonpolitical crimes. In reaching this conclusion, it relied on a statutory interpretation adopted in one of its earlier decisions, 📙 Matter of McMullen, 19 I. & N. Dec. 90 (BIA 1984), aff'd, 🚩 788 F.2d 591 (C.A.9 1986).

On appeal, the Court of Appeals for the Ninth Circuit concluded the BIA had applied an incorrect interpretation of the serious nonpolitical crime provision, and it remanded for further proceedings. In the Court of Appeals' view, as we understand it, the BIA erred by misconstruing the controlling statute and by employing an analytical framework insufficient to take account of the Court of Appeals' own precedent on this subject. According to the court, the BIA erred in failing to consider certain factors, including "the political necessity and success of Aguirre's methods"; whether his acts were grossly out of proportion to their objective or were atrocious; and the persecution respondent might suffer upon return to Guatemala. 🚩 121 F.3d 521, 524 (1997).

**\*419** We granted certiorari. 525 U.S. 808, 119 S.Ct. 39, 142 L.Ed.2d 30 (1998). We disagree with the Court of Appeals and address each of the three specific areas in which it found the BIA's analysis deficient. We reverse the judgment of the court and remand for further proceedings.

I

[1]  The statutory provision for withholding of deportation that is applicable here **\*\*1443** provides that "[t]he Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1). The provision was added to the Immigration and Nationality Act (INA), 66 Stat. 166, 🚩 8 U.S.C. § 1101 et seq. (1994 ed. and Supp. III), by the Refugee Act of 1980 (Refugee Act), Pub.L. 96–212, 94 Stat. 102. See INS v. Stevic, 467 U.S. 407, 414–416, 421–422, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). As a general rule, withholding is mandatory if an alien "establish[es] that it is more likely than not that [he] would be subject to persecution on one of the specified grounds," id., at 429–430, 104 S.Ct. 2489, but the statute has some specific exceptions. As is relevant here, withholding does not apply, and deportation to the place of risk is authorized, "if the Attorney General determines that"

> "there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." 8 U.S.C. § 1253(h)(2)(C).

[2]  [3]  Under the immigration laws, withholding is distinct from asylum, although the two forms of relief serve similar purposes. Whereas withholding only bars deporting an alien to a particular country or countries, a grant of asylum permits an alien to remain in the United States and to apply for

permanent residency after one year. See *INS v. Cardoza–Fonseca,* 480 U.S. 421, 428–429, n. 6, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) **\*420** In addition, whereas withholding is mandatory unless the Attorney General determines one of the exceptions applies, the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion. *Ibid.* As a consequence, under the law then in force, respondent was able to seek asylum irrespective of his eligibility for withholding.

As an incidental point, we note that in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. 104–208, 110 Stat. 3009–546, Congress revised the withholding and asylum provisions. The withholding provisions are now codified at 8 U.S.C. § 1231(b)(3) (1994 ed., Supp. III), and the asylum provisions at § 1158. Under current law, as enacted by IIRIRA, the Attorney General may not grant asylum if she determines "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." § 1158(b)(2)(A)(iii). The parties agree IIRIRA does not govern respondent's case. See IIRIRA, Tit. III–A, §§ 309(a), (c), 110 Stat. 3009–625; IIRIRA, Div. C, Tit. VI–A, § 604(c), 110 Stat. 3009–692. Prior to IIRIRA, in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, Tit. IV–B, § 413(f), 110 Stat. 1269, Congress granted the Attorney General discretion to withhold deportation when necessary to ensure compliance with the international treaty upon which the Refugee Act was based, see *infra,* at 1446–1447. This provision was made applicable to "applications filed before, on, or after" April 24, 1996, "if final action was not been taken on them before such date." AEDPA § 413(g), 110 Stat. 1269–1270. The BIA's decision constituted final action when rendered on March 5, 1996, 8 C.F.R. § 243.1 (1995), App. to Pet. for Cert. 12a, so AEDPA § 413(f) was not applicable to respondent's case.

**\*421** We turn to the matter before us. In 1994, respondent was charged with deportability by the Immigration and Naturalization Service (INS) for illegal entry into the United States. Respondent conceded deportability but applied for asylum and withholding. At a hearing before an Immigration Judge respondent testified, through an interpreter, that he had been politically active in Guatemala from 1989 to 1992 with a student group called Estudiante Syndicado (ES) and with the National Central Union political party. App. 19–20, 36–37. He testified about threats due to his political activity. The threats, he believed, were from different quarters, including the Guatemalan Government, right-wing government support **\*\*1444** groups, and left-wing guerillas. App. to Pet. for Cert. 23a.

Respondent described activities he and other ES members engaged in to protest various government policies and actions, including the high cost of bus fares and the government's failure to investigate the disappearance or murder of students and others. App. 20–21; App. to Pet. for Cert. 22a–23a. For purposes of our review, we assume that the amount of bus fares is an important political and social issue in Guatemala. We are advised that bus fare represents a significant portion of many Guatemalans' annual living expense, and a rise in fares may impose substantial economic hardship. See Brief for Massachusetts Law Reform Institute et al. as *Amicus Curiae* 18–19. In addition, government involvement with fare increases, and other aspects of the transportation system, has been a focus of political discontent in that country. *Id.,* at 16–21.

According to the official hearing record, respondent testified that he and his fellow members would "strike" by "burning buses, breaking windows or just attacking the police, police cars." App. 20. Respondent estimated that he participated in setting about 10 buses on fire, after dousing them with gasoline. *Id.,* at 46. Before setting fire to the buses, he and his group would order passengers to leave **\*422** the bus. Passengers who refused were stoned, hit with sticks, or bound with ropes. *Id.,* at 46–47. In addition, respondent testified that he and his group "would break the windows of ... stores," "t[ake] the people out of the stores that were there," and "throw everything on the floor." *Id.,* at 48.

The Immigration Judge granted respondent's applications for withholding of deportation and for asylum, finding a likelihood of persecution for his political opinions and activities if he was returned to Guatemala. App. to Pet. for Cert. 31a–32a. The INS appealed to the BIA. Respondent did not file a brief with the BIA, although his request for an extension of time to do so was granted. Brief for Petitioner 10, n. 6; Record 13–15. The BIA sustained the INS's appeal from this decision, vacated the Immigration Judge's order, and ordered respondent deported. App. to Pet. for Cert. 18a. With respect to withholding, the BIA did not decide whether respondent had established the requisite risk of persecution because it determined that, in any event, he had committed a serious nonpolitical crime within the meaning of § 1253(h)(2)(C).

I.N.S. v. Aguirre-Aguirre, 526 U.S. 415 (1999)

119 S.Ct. 1439, 143 L.Ed.2d 590, 67 USLW 4270, 99 Cal. Daily Op. Serv. 3168...

In addressing the definition of a serious nonpolitical crime, the BIA applied the interpretation it first set forth in *Matter of McMullen,* 19 I. & N. Dec., at 97–98, 19 I. & N. Dec. 90: "In evaluating the political nature of a crime, we consider it important that the political aspect of the offense outweigh its common-law character. This would not be the case if the crime is grossly out of proportion to the political objective or if it involves acts of an atrocious nature." In the instant case, the BIA found, "the criminal nature of the respondent's acts outweigh their political nature." App. to Pet. for Cert. 18a. The BIA acknowledged respondent's dissatisfaction with the Guatemalan Government's "seeming inaction in the investigation of student deaths and in its raising of student bus fares." *Ibid.* It said, however: "The ire of the ES manifested itself disproportionately in the destruction of property and **\*423** assaults on civilians. Although the ES had a political agenda, those goals were outweighed by their criminal strategy of strikes...." *Ibid.* The BIA further concluded respondent should not be granted discretionary asylum relief in light of "the nature of his acts against innocent Guatemalans." *Id.,* at 17a.

A divided panel of the Court of Appeals granted respondent's petition for review and remanded to the BIA. 121 F.3d 521 (C.A.9 1997). According to the majority, the BIA's analysis of the serious nonpolitical crime exception was legally deficient in three respects. First, the BIA should have "consider [ed] the persecution that Aguirre might suffer if returned to Guatemala" and "balance[d] his admitted offenses against the danger to him of death." *Id.,* at 524. Second, it should have "considered whether the acts committed were grossly out of proportion to the[ir] alleged objective" and were "of an atrocious nature," especially with reference to Ninth Circuit precedent in this area. **\*\*1445** *Ibid.* (internal quotation marks and citation omitted). Third, the BIA "should have considered the political necessity and success of Aguirre's methods." *Id.,* at 523–524.

Judge Kleinfeld dissented. In his view, "[t]he BIA correctly identified the legal question, whether 'the criminal nature of the respondent's acts outweigh their political nature.' " *Id.,* at 524 (quoting *McMullen v. INS,* 788 F.2d 591, 592 (C.A.9 1986)). Given the violent nature of respondent's acts, and the fact the acts were in large part directed against innocent civilians, the BIA "reasonably conclude[d] that [his] crimes

were disproportionate to his political objectives." 121 F.3d, at 525.

## II

As an initial matter, the Court of Appeals expressed no disagreement with the Attorney General or the BIA that the phrase "serious nonpolitical crime" in § 1253(h)(2)(C) should be applied by weighing "the political nature" of an act against its "common-law" or "criminal" character. See *Matter of McMullen, supra,* at 97–98; **\*424** App. to Pet. for Cert. 18a; *Deportation Proceedings for Doherty,* 13 Op. Off. Legal Counsel 1, 23 (1989) (an act " 'should be considered a serious nonpolitical crime if the act is disproportionate to the objective' ") (quoting *McMullen v. INS, supra,* at 595), rev'd on other grounds, *Doherty v. INS,* 908 F.2d 1108 (C.A.2 1990), rev'd, 502 U.S. 314, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992). Nor does respondent take issue with this basic inquiry.

[4] The Court of Appeals did conclude, however, that the BIA must supplement this weighing test by examining additional factors. In the course of its analysis, the Court of Appeals failed to accord the required level of deference to the interpretation of the serious nonpolitical crime exception adopted by the Attorney General and BIA. Because the Court of Appeals confronted questions implicating "an agency's construction of the statute which it administers," the court should have applied the principles of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, the court should have asked whether "the statute is silent or ambiguous with respect to the specific issue" before it; if so, "the question for the court [was] whether the agency's answer is based on a permissible construction of the statute." *Id.,* at 843, 104 S.Ct. 2778. See also *INS v. Cardoza–Fonseca,* 480 U.S., at 448–449, 107 S.Ct. 1207.

It is clear that principles of *Chevron* deference are applicable to this statutory scheme. The INA provides that "[t]he Attorney General shall be charged with the administration and enforcement" of the statute and that the "determination and ruling by the Attorney General with respect to all questions

AR.04983

I.N.S. v. Aguirre-Aguirre, 526 U.S. 415 (1999)

119 S.Ct. 1439, 143 L.Ed.2d 590, 67 USLW 4270, 99 Cal. Daily Op. Serv. 3168...

of law shall be controlling." 8 U.S.C. § 1103(a)(1) (1994 ed., Supp. III). Section 1253(h), moreover, in express terms confers decisionmaking authority on the Attorney General, making an alien's entitlement to withholding turn on the Attorney General's "determin[ation]" whether the statutory conditions for withholding have been **\*425** met. 8 U.S.C. §§ 1253(h)(1), (2). In addition, we have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials "exercise especially sensitive political functions that implicate questions of foreign relations." INS v. Abudu, 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988). A decision by the Attorney General to deem certain violent offenses committed in another country as political in nature, and to allow the perpetrators to remain in the United States, may affect our relations with that country or its neighbors. The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions.

The Attorney General, while retaining ultimate authority, has vested the BIA with power to exercise the "discretion and authority conferred upon the Attorney General by law" in the course of "considering and determining cases before it." 8 C.F.R. § 3.1(d)(1) (1998). Based on this allocation of authority, we recognized in Cardoza–Fonseca, supra, that the BIA should be accorded Chevron deference as it gives ambiguous statutory terms "concrete meaning through a process of case-by-case adjudication" (though we ultimately **\*\*1446** concluded that the agency's interpretation in that case was not sustainable). 480 U.S., at 448–449, 107 S.Ct. 1207. In the case before us, by failing to follow Chevron principles in its review of the BIA, the Court of Appeals erred.


A

[5] The Court of Appeals' error is clearest with respect to its holding that the BIA was required to balance respondent's criminal acts against the risk of persecution he would face if returned to Guatemala. In Matter of Rodriguez–Cóto, 19 I. & N. Dec. 208, 209–210 (1985), the BIA "reject[ed] any interpretation of the phras[e] ... 'serious nonpolitical crime' in [§ 1253(h)(2)(C) ] which would vary with the nature of evidence of persecution." The text and structure of § 1253(h) are consistent with this conclusion. Indeed, its **\*426** words suggest that the BIA's reading of the statute, not the interpretation adopted by the Court of Appeals, is

the more appropriate one. As a matter of plain language, it is not obvious that an already-completed crime is somehow rendered less serious by considering the further circumstance that the alien may be subject to persecution if returned to his home country. See ibid. ("We find that the modifie[r] ... 'serious' ... relate[s] only to the nature of the crime itself").

It is important, too, as Rodriguez–Coto points out, id., at 209–210, that for aliens to be eligible for withholding at all, the statute requires a finding that their "life or freedom would be threatened in [the country to which deportation is sought] on account of their race, religion, nationality, membership in a particular social group, or political opinion," i.e., that the alien is at risk of persecution in that country. 8 U.S.C. § 1253(h)(1). By its terms, the statute thus requires independent consideration of the risk of persecution facing the alien before granting withholding. It is reasonable to decide, as the BIA has done, that this factor can be considered on its own and not also as a factor in determining whether the crime itself is a serious, nonpolitical crime. Though the BIA in the instant case declined to make findings respecting the risk of persecution facing respondent, App. to Pet. for Cert. 18a, this was because it determined respondent was barred from withholding under the serious nonpolitical crime exception. Ibid. The BIA, in effect, found respondent ineligible for withholding even on the assumption he could establish a threat of persecution. This approach is consistent with the language and purposes of the statute.

In reaching the contrary conclusion and ruling that the risk of persecution should be balanced against the alien's criminal acts, the Court of Appeals relied on a passage from the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979) (U.N. Handbook). **\*427** We agree the U.N. Handbook provides some guidance in construing the provisions added to the INA by the Refugee Act. INS v. Cardoza–Fonseca, 480 U.S., at 438–439, and n. 22, 107 S.Ct. 1207. As we explained in Cardoza–Fonseca, "one of Congress' primary purposes" in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6224, T.I.A.S. No. 6577 (1968), to which the United States acceded in 1968. 480 U.S., at 436–437, 107 S.Ct. 1207. The Protocol incorporates by reference Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951) 189 U.N.T.S. 150 (July 28, 1951), reprinted in 19

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

I.N.S. v. Aguirre-Aguirre, 526 U.S. 415 (1999)

119 S.Ct. 1439, 143 L.Ed.2d 590, 67 USLW 4270, 99 Cal. Daily Op. Serv. 3168...

U.S.T., at 6259, 6264–6276. The basic withholding provision of § 1253(h)(1) parallels Article 33, which provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." *Id.,* at 6276. The Convention, in a part incorporated by the Protocol, also places certain limits on the availability of this form of relief; as pertinent here, the Convention states that its provisions "shall not apply to any person with respect to whom there are serious reasons for considering that ... he has committed a serious non-political crime outside the country of refuge prior to his admission to that **1447 country as a refugee." Convention Art. I(F)(b), 19 U.S.T., at 6263–6264. Paragraph 156 of the U.N. Handbook, the portion relied upon by the Court of Appeals, states that in applying the serious nonpolitical crime provision of Convention Art. I(F)(b), "it is ... necessary to strike a balance between the nature of the offence presumed to have been committed by the applicant and the degree of persecution feared...."

 [6]  The U.N. Handbook may be a useful interpretative aid, but it is not binding on the Attorney General, the BIA, or United States courts. "Indeed, the Handbook itself disclaims *428 such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol ... is incumbent upon the Contracting State in whose territory the refugee finds himself.' " *INS v. Cardoza– Fonseca,* 480 U.S., at 439, n. 22, 107 S.Ct. 1207 (quoting U.N. Handbook ¶ (ii), at 1). See also 480 U.S., at 439, n. 22, 107 S.Ct. 1207 ("We do not suggest, of course, that the explanation in the U.N. Handbook has the force of law or in any way binds the INS ..."). For the reasons given, *supra,* at 1445–1446, we think the BIA's determination that § 1253(h)(2)(C) requires no additional balancing of the risk of persecution rests on a fair and permissible reading of the statute. See also *T. v. Secretary of State for the Home Dept.,* 2 All E.R. 865, 882 (H.L.1996) (Lord Mustill) ("[T]he crime either is or is not political when committed, and its character cannot depend on the consequences which the offender may afterwards suffer if he is returned").

B

 [7]  Also relying on the U.N. Handbook, the Court of Appeals held that the BIA "should have considered whether the acts committed were 'grossly out of proportion to the alleged objective.' ... The political nature of the offenses would be 'more difficult to accept' if they involved 'acts of an atrocious nature.' " 121 F.3d, at 524 (quoting U.N. Handbook ¶ 152, at 36). The court further suggested that the BIA should have considered prior Circuit case law that "cast[s] light on what under the law are acts of [an] atrocious nature." 121 F.3d, at 524. Citing its own opinion affirming the BIA's decision in *Matter of McMullen,* see *McMullen v. INS,* 788 F.2d 591 (C.A.9 1986), the Court of Appeals stated that "[a] comparison of what the *McMullen* court found atrocious with the acts committed by Aguirre suggests a startling degree of difference." 121 F.3d, at 524. It reasoned that while *McMullen* had involved "indiscriminate bombing, murder, torture, [and] the maiming of innocent civilians," respondent's "only acts against innocent Guatemalans were *429 the disruption of some stores and his use of methods that we would all find objectionable if practiced upon us on a bus in the United States but which fall far short of the kind of atrocities attributed to McMullen and his associates." 121 F.3d, at 524.

We do not understand the BIA to dispute that these considerations—gross disproportionality, atrociousness, and comparisons with previous decided cases—may be important in applying the serious nonpolitical crime exception. In fact, by the terms of the BIA's test (which is similar to the language quoted by the Court of Appeals from the U.N. Handbook), gross disproportion and atrociousness are relevant in the determination. According to the BIA: "In evaluating the political nature of a crime, we consider it important that the political aspect of the offense outweigh its common-law character. This would not be the case if the crime is grossly out of proportion to the political objective or if it involves acts of an atrocious nature." *Matter of McMullen,* 19 I. & N. Dec., at 97–98. See also *Deportation Proceedings for Doherty,* 13 Op. Off. Legal Counsel, at 22–26, rev'd on other grounds, *Doherty v. INS,* 908 F.2d 1108 (C.A.2 1990), rev'd, 502 U.S. 314, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992). The BIA's formulation does not purport to provide a comprehensive definition of the § 1253(h)(2)(C) exception, and the full elaboration of that standard should await further cases, consistent with the instruction our legal system always takes from considering discrete factual circumstances over time. See also 13 Op. Off. Legal Counsel, at 23 ("[T]he statute

119 S.Ct. 1439, 143 L.Ed.2d 590, 67 USLW 4270, 99 Cal. Daily Op. Serv. 3168...

recognizes that cases involving alleged political crimes arise in myriad **1448 circumstances, and that what constitutes a 'serious nonpolitical crime' is not susceptible of rigid definition"). Our decision takes into account that the BIA's test identifies a general standard (whether the political aspect of an offense outweighs its common-law character) and then provides two more specific inquiries that may be used in applying the rule: whether there is a gross disproportion between means and *430 ends, and whether atrocious acts are involved. Under this approach, atrocious acts provide a clear indication that an alien's offense is a serious nonpolitical crime. In the BIA's judgment, where an alien has sought to advance his agenda by atrocious means, the political aspect of his offense may not fairly be said to predominate over its criminal character. Commission of the acts, therefore, will result in a denial of withholding. The criminal element of an offense may outweigh its political aspect even if none of the acts are deemed atrocious, however. For this reason, the BIA need not give express consideration to the atrociousness of the alien's acts in every case before determining that an alien has committed a serious nonpolitical crime.

The BIA's approach is consistent with the statute, which does not equate every serious nonpolitical crime with atrocious acts. Cf. 8 U.S.C. § 1253(h)(2)(B) (establishing an exception to withholding for a dangerous alien who has been convicted of a "particularly serious crime," defined to include an "aggravated felony"). Nor is there any reason to find this equivalence under the statute. In common usage, the word "atrocious" suggests a deed more culpable and aggravated than a serious one. See Webster's Third New International Dictionary 139 (1971) (defining "atrocious" as, "marked by or given to extreme wickedness ... [or] extreme brutality or cruelty"; "outrageous: violating the bounds of common decency"; "marked by extreme violence: savagely fierce: murderous"; "utterly revolting: abominable"). As a practical matter, if atrocious acts were deemed a necessary element of all serious nonpolitical crimes, the Attorney General would have severe restrictions upon her power to deport aliens who had engaged in serious, though not atrocious, forms of criminal activity. These restrictions cannot be discerned in the text of § 1253(h), and the Attorney General and BIA are not bound to impose the restrictions on themselves.

*431 In the instant case, the BIA determined that "the criminal nature of the respondent's acts outweigh their political nature" because his group's political dissatisfaction "manifested itself disproportionately in the destruction of property and assaults on civilians" and its political goals

"were outweighed by [the group's] criminal strategy of strikes." App. to Pet. for Cert. 18a. The BIA concluded respondent had committed serious nonpolitical crimes by applying the general standard established in its prior decision, so it had no need to consider whether his acts might also have been atrocious. The Court of Appeals erred in holding otherwise.

We further reject the Court of Appeals' suggestion that reversal was required due to the BIA's failure to compare the facts of this case with those of *McMullen.* The court thought doing so was necessary because of the guidance provided by *McMullen* on the meaning of atrociousness. In light of our holding that the BIA was not required expressly to consider the atrociousness of respondent's acts, the BIA's silence on this point does not provide a ground for reversal.

C

[8]  The third reason given by the Court of Appeals for reversing the BIA was what the court deemed to be the BIA's failure to consider respondent's "offenses in relation to [his] declared political objectives" and to consider "the political necessity and success of [his] methods." 🚩 121 F.3d, at 523–524. As we have discussed, *supra,* at 1444, 1448–1449, the BIA did address the relationship between respondent's political goals and his criminal acts, concluding that the violence and destructiveness of the crimes, and their impact on civilians, were disproportionate to his acknowledged political objectives. To the extent the court believed the BIA was required to give more express consideration to the "necessity" and "success" of respondent's actions, it erred.

**1449 *432 It is true the Attorney General has suggested that a crime will not be deemed political unless there is a " 'close and direct causal link between the crime committed and its alleged political purpose and object.' " *Deportation Proceedings for Doherty,* 13 Op. Off. Legal Counsel, at 23 (quoting 🚩 *McMullen v. INS,* 788 F.2d 591 (C.A.9 1986)). The BIA's analysis, which was quite brief in all events, did not explore this causal link beyond noting the general disproportion between respondent's acts and his political objectives. Whatever independent relevance a causal link inquiry might have in another case, in this case the BIA determined respondent's acts were not political based on the lack of proportion with his objectives. It was not required to do more. Even in a case with a clear causal connection, a

I.N.S. v. Aguirre-Aguirre, 526 U.S. 415 (1999)

119 S.Ct. 1439, 143 L.Ed.2d 590, 67 USLW 4270, 99 Cal. Daily Op. Serv. 3168...

lack of proportion between means and ends may still render a crime nonpolitical. Moreover, it was respondent who bore the burden of proving entitlement to withholding, see 📄 8 C.F.R. § 208.16(c)(3) (1995) ("If the evidence indicates that one or more of the grounds for denial of withholding of deportation ... apply, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply"). He failed to submit a brief on the causal link or any other issue to the BIA, and the decision of the Immigration Judge does not address the point. In these circumstances, the rather cursory nature of the BIA's discussion does not warrant reversal.

### III

Finally, respondent contends the record of his testimony before the Immigration Judge contains errors. He testified in Spanish and now contends there are errors in translation and transcription. Brief for Respondent 11–22. Respondent advanced this argument for the first time in his Brief in Opposition to Certiorari in this Court, see Brief in Opposition 1–5, having failed to raise it before either the BIA or the Court of Appeals. We decline to address the argument at this late stage.

**\*433** Respondent has filed a motion in the BIA for a new hearing in light of the alleged errors. App. to Brief for Respondent 1a–6a. Should the BIA determine modification of the record is necessary, it can determine whether further consideration of the withholding issue is warranted.

\* \* \*

The reasons given by the Court of Appeals for reversing the BIA do not withstand scrutiny. We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

### All Citations

526 U.S. 415, 119 S.Ct. 1439, 143 L.Ed.2d 590, 67 USLW 4270, 99 Cal. Daily Op. Serv. 3168, 1999 Daily Journal D.A.R. 4125, 1999 CJ C.A.R. 2487, 12 Fla. L. Weekly Fed. S 212

---

### Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See 📄 *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

---

**End of Document**     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Not Followed as Dicta Haitian Centers Council, Inc. v. McNary, E.D.N.Y.,
April 6, 1992

107 S.Ct. 1207
Supreme Court of the United States

IMMIGRATION AND
NATURALIZATION SERVICE, Petitioner
v.
Luz Marina CARDOZA–FONSECA.

No. 85–782.
|
Argued Oct. 7, 1986.
|
Decided March 9, 1987.

**Synopsis**

Alien appealed decision of the Board of Immigration Appeals, arguing that she was eligible for consideration for asylum. The United States Court of Appeals for the Ninth Circuit, 767 F.2d 1448, reversed and remanded, and certiorari was granted. The Supreme Court, Justice Stevens, held that, to show "well-founded fear of persecution," alien seeking asylum need not prove that it is "more likely than not" that he or she will be persecuted in his or her own country.

Affirmed.

Justice Blackmun filed a concurring opinion.

Justice Scalia filed an opinion concurring in judgment.

Justice Powell filed dissenting opinion in which Chief Justice Rehnquist and Justice White joined.

**Procedural Posture(s):** On Appeal.

West Headnotes (5)

**[1]** **Aliens, Immigration, and Citizenship** ⚷ Decisions reviewable

Possibility that alien might become permanent resident by invoking new procedures if she was unsuccessful in her pending request for asylum did not render her request moot, where

procedures for administering new act were not in place and alien might have been able to obtain affirmative residence status through asylum procedure sooner than through legalization program. Immigration and Nationality Act, §§ 208(a), 245A(a), as amended, 8 U.S.C.A. §§ 1158(a), 1255A(a).

446 Cases that cite this headnote

**[2]** **Federal Courts** ⚷ Improvident grant of review

New Immigration Reform and Control Act did not make it appropriate for Supreme Court to exercise its discretion to dismiss, as improvidently granted, writ of certiorari raising asylum claim, where question presented would arise in other asylum proceedings brought by aliens who arrived in United States after January 1, 1982, or who were seeking entry as refugees from other countries. Immigration and Nationality Act, § 208(a), as amended, 8 U.S.C.A. § 1158(a).

179 Cases that cite this headnote

**[3]** **Aliens, Immigration, and Citizenship** ⚷ Eligibility; Refugee Status

Finding that alien is a refugee as defined in Refugee Act does no more than establish that alien may be granted asylum in discretion of Attorney General. Immigration and Nationality Act, §§ 101(a)(42), 208(a), as amended, 8 U.S.C.A. §§ 1101(a)(42), 1158(a).

582 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** ⚷ Well Founded Fear of Future Persecution

To show "well-founded fear of persecution," alien seeking asylum need not prove that it is "more likely than not" that he or she will be persecuted in his or her own country. Immigration and Nationality Act, §§ 101(a)(42),

208(a), 243(h), as amended, 🚩 8 U.S.C.A. §§ 1101(a)(42), 📄 1158(a), 1253(h).

1512 Cases that cite this headnote

**[5]** **Administrative Law and Procedure** 🔑 Consistent or longstanding construction

**Administrative Law and Procedure** 🔑 Erroneous or unreasonable construction; conflict with statute

Agency interpretation of statutory provision which conflicts with agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.

815 Cases that cite this headnote

**\*\*1207 \*421 *Syllabus* \***

Section 243(h) of the Immigration and Nationality Act (Act) requires that the Attorney General withhold deportation of an alien who demonstrates that his "life or freedom would be threatened" thereby on account of specified factors. The above-quoted phrase requires a showing that "it is more likely than not that the alien would be subject to persecution" in the country to **\*\*1208** which he would be returned. In contrast, § 208(a) of the Act authorizes the Attorney General, in his discretion, to grant asylum to a "refugee," who, under § 101(a)(42)(A) of the Act, is unable or unwilling to return to his home country because of persecution or "a well founded fear" thereof on account of particular factors. At respondent illegal alien's deportation hearing, the Immigration Judge applied the § 243(h) "more likely than not" proof standard to her § 208(a) asylum claim, holding that she had not established "a clear probability of persecution" and therefore was not entitled to relief. The Board of Immigration Appeals (BIA) affirmed, but the Court of Appeals reversed, holding that § 208(a)'s "well-founded fear" standard is more generous than the § 243(h) standard in that it only requires asylum applicants to show either past persecution or "good reason" to fear future persecution. Accordingly, the asylum claim was remanded so that BIA could evaluate it under the proper legal standard.

*Held:* The § 243(h) "clear probability" standard of proof does not govern asylum applications under § 208(a). Pp. 1211–1222.

(a) The plain meaning of the statutory language indicates a congressional intent that the proof standards under §§ 208(a) and 243(h) should differ. Section 243(h)'s "would be threatened" standard has no subjective component, but, in fact, requires objective evidence that it is more likely than not that the alien will be subject to persecution upon deportation. In contrast, § 208(a)'s reference to "fear" makes the asylum eligibility determination turn to some extent on the alien's subjective mental state, and the fact that the fear must be "well founded" does not transform the standard into a "more likely than not" one. Moreover, the different emphasis of the two standards is highlighted by the fact that, although Congress simultaneously drafted § 208(a)'s new standard and amended § 243(h), it left § 243(h)'s old standard intact. Pp. 1212–1213.

**\*422** (b) The legislative history demonstrates the congressional intent that different standards apply under §§ 208(a) and 243(h). Pp. 1213–1219.

(c) The argument of the Immigration and Naturalization Service (INS) argument that it is anomalous for § 208(a) to have a less stringent eligibility standard than § 243(h) since § 208(a) affords greater benefits than § 243(h) fails because it does not account for the fact that an alien who satisfies the § 208(a) standard must still face a discretionary asylum decision by the Attorney General, while an alien satisfying § 243(h)'s stricter standard is automatically entitled to withholding of deportation. Pp. 1219–1220.

(d) The INS's argument that substantial deference should be accorded BIA's position that the "well-founded fear" and "clear probability" standards are equivalent is unpersuasive, since the narrow legal question of identicality is a pure question of statutory construction within the traditional purview of the courts, and is not a question of case-by-case interpretation of the type traditionally left to administrative agencies. Pp. 1220–1221.

📄 767 F.2d 1448 (CA9 1985), affirmed.

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post,* p. ——. SCALIA, J., filed an opinion concurring in the judgment, *post,* p. ——. POWELL, J., filed a dissenting

107 S.Ct. 1207, 94 L.Ed.2d 434, 55 USLW 4313

opinion, in which REHNQUIST, C.J., and WHITE, J., joined, *post*, p. ——.

**Attorneys and Law Firms**

*Deputy Solicitor General Wallace* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Kuhl, Bruce N. Kuhlik,* and *David V. Bernal.*

*Dana Marks Keener* argued the cause for respondent. With her on the brief were *Kip Steinberg*, Susan M. Lydon, and *Bill Ong Hing.*\*

\* Briefs of *amici curiae* urging affirmance were filed for the United Nations High Commissioner for Refugees by *Ralph G. Steinhardt;* for the American Civil Liberties Union et al. by *Carol Leslie Wolchok, Burt Neuborne, Lucas Guttentag, Jack Novik,* and *Robert N. Weiner;* for the American Immigration Lawyers Association by *Ira J. Kurzban;* for the International Human Rights Law Group et al. by *E. Edward Bruce;* and for the Lawyers Committee for Human Rights et al. by *Richard F. Ziegler, Arthur C. Helton, Samuel Rabinove, Richard T. Foltin, Ruti G. Teitel, Steven M. Freeman,* and *Richard J. Rubin.*

**Opinion**

**\*423** Justice STEVENS delivered the opinion of the Court.

Since 1980, the Immigration and Nationality Act has provided two methods through which an otherwise deportable alien who claims that he will be persecuted **\*\*1209** if deported can seek relief. Section 243(h) of the Act, 8 U.S.C. § 1253(h), requires the Attorney General to withhold deportation of an alien who demonstrates that his "life or freedom would be threatened" on account of one of the listed factors if he is deported. In *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), we held that to qualify for this entitlement to withholding of deportation, an alien must demonstrate that "it is more likely than not that the alien would be subject to persecution" in the country to which he would be returned. *Id.,* at 429–430, 104 S.Ct., at 2501. The Refugee Act of 1980, 94 Stat. 102, also established a second type of broader relief. Section 208(a) of the Act, 8 U.S.C. § 1158(a), authorizes the Attorney General, in his discretion, to grant asylum to an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality,

membership in a particular social group, or political opinion." § 101(a)(42), 8 U.S.C. § 1101(a)(42).

In *Stevic,* we rejected an alien's contention that the § 208(a) "well-founded fear" standard governs applications for withholding of deportation under § 243(h).[1] Similarly, today we reject the Government's contention that the § 243(h) standard, which requires an alien to show that he is more likely than not to be subject to persecution, governs applications for asylum under § 208(a). Congress used different, broader language to define the term "refugee" as used in § 208(a) than it used to describe the class of aliens who have **\*424** a right to withholding of deportation under § 243(h). The Act's establishment of a broad class of refugees who are eligible for a discretionary grant of asylum, and a narrower class of aliens who are given a statutory right not to be deported to the country where they are in danger, mirrors the provisions of the United Nations Protocol Relating to the Status of Refugees, which provided the motivation for the enactment of the Refugee Act of 1980. In addition, the legislative history of the 1980 Act makes it perfectly clear that Congress did not intend the class of aliens who qualify as refugees to be coextensive with the class who qualify for § 243(h) relief.

I

Respondent is a 38–year–old Nicaraguan citizen who entered the United States in 1979 as a visitor. After she remained in the United States longer than permitted, and failed to take advantage of the Immigration and Naturalization Service's (INS) offer of voluntary departure, the INS commenced deportation proceedings against her. Respondent conceded that she was in the country illegally, but requested withholding of deportation pursuant to § 243(h) and asylum as a refugee pursuant to § 208(a).

To support her request under § 243(h), respondent attempted to show that if she were returned to Nicaragua her "life or freedom would be threatened" on account of her political views; to support her request under § 208(a), she attempted to show that she had a "well-founded fear of persecution" upon her return. The evidence supporting both claims related primarily to the activities of respondent's brother who had been tortured and imprisoned because of his political activities in Nicaragua. Both respondent and her brother testified that they believed the Sandinistas knew that the

two of them had fled Nicaragua together and that even though she had not been active politically herself, she would be interrogated about her brother's whereabouts and **\*425** activities. Respondent also testified that because of her brother's status, her own political opposition to the Sandinistas would be brought to **\*\*1210** that government's attention. Based on these facts, respondent claimed that she would be tortured if forced to return.

The Immigration Judge applied the same standard in evaluating respondent's claim for withholding of deportation under § 243(h) as he did in evaluating her application for asylum under § 208(a). He found that she had not established "a clear probability of persecution" and therefore was not entitled to either form of relief. App. to Pet. for Cert. 27a. On appeal, the Board of Immigration Appeals (BIA) agreed that respondent had "failed to establish that she would suffer persecution within the meaning of section 208(a) or 243(h) of the Immigration and Nationality Act." *Id.,* at 21a.

**[1]** **[2]** In the Court of Appeals for the Ninth Circuit, respondent did not challenge the BIA's decision that she was not entitled to withholding of deportation under § 243(h), but argued that she was eligible for consideration for asylum under § 208(a), and contended that the Immigration Judge and BIA erred in applying the "more likely than not" standard of proof from § 243(h) to her § 208(a) asylum claim. Instead, she asserted, they should have applied the "well-founded fear" standard, which she considered to be more generous. The court agreed. Relying on both the text and the structure of the Act, the court held that the "well-founded fear" standard which governs asylum proceedings is different, and in fact more generous, than the "clear probability" standard which governs withholding of deportation proceedings. *767 F.2d 1448, 1452–1453 (CA9 1985).* Agreeing with the Court of Appeals for the Seventh Circuit, the court interpreted the standard to require asylum applicants to present " 'specific facts' through objective evidence to prove either past persecution or 'good reason' to fear future persecution." *Id.,* at 1453 (citing *Carvajal-Munoz v. INS,* 743 F.2d 562, 574 (CA7 1984)). **\*426** The court remanded respondent's asylum claim to the BIA to evaluate under the proper legal standard. We granted certiorari to resolve a Circuit conflict on this important question. [2] *475 U.S. 1009, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986).* [3]

**\*427 \*\*1211 II**

The Refugee Act of 1980 established a new statutory procedure for granting asylum to refugees. [4] The 1980 Act added a new § 208(a) to the Immigration and Nationality Act of 1952, reading as follows:

> "The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of *section 1101(a)(42)(A)* of this title." 94 Stat. 105, *8 U.S.C. § 1158(a).*

**[3]** Under this section, eligibility for asylum depends entirely on the Attorney General's determination that an alien is a **\*428** "refugee," as that term is defined in § 101(a) (42), which was also added to the Act in 1980. That section provides:

> "The term 'refugee' means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 94 Stat. 102, *8 U.S.C. § 1101(a)(42).*

Thus, the "persecution or well-founded fear of persecution" standard governs the Attorney General's determination whether an alien is eligible for asylum. [5]

In addition to establishing a statutory asylum process, the 1980 Act amended the withholding of deportation provision. [6] **\*\*1212 \*429** § 243(h). See *Stevic,* 467 U.S., at 421, n. 15, 104 S.Ct., at 2496, n. 15. Prior to 1968, the Attorney General had discretion whether to grant withholding of deportation to aliens under § 243(h). In 1968, however, the United States agreed to comply with the substantive provisions of Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees. See *19 U.S.T. 6223, 6259–6276, T.I.A.S. No. 6577 (1968);* see

generally *Stevic, supra,* at 416–417, 104 S.Ct., at 2494. Article 33.1 of the Convention, 189 U.N.T.S. 150, 176 (1954) 189 U.N.T.S. 150, 176 (1954), reprinted in 19 U.S.T. 6259, 6276, 19 U.S.T. 6259, 6276, which is the counterpart of § 243(h) of our statute, imposed a mandatory duty on contracting States not to return an alien to a country where his "life or freedom would be threatened" on account of one of the enumerated reasons.[7] See *infra,* at 1217–1218. Thus, although § 243(h) itself did not constrain the Attorney General's discretion after 1968, presumably he honored the dictates of the United Nations Convention.[8] In any event, the 1980 Act removed the Attorney General's discretion in § 243(h) proceedings.[9]

**\*430** In *Stevic* we considered it significant that in enacting the 1980 Act Congress did not amend the standard of eligibility for relief under § 243(h). While the terms "refugee" and hence "well-founded fear" were made an integral part of the § 208(a) procedure, they continued to play no part in § 243(h). Thus we held that the prior consistent construction of § 243(h) that required an applicant for withholding of deportation to demonstrate a "clear probability of persecution" upon deportation remained in force. Of course, this reasoning, based in large part on the plain language of § 243(h), is of no avail here since § 208(a) expressly provides that the "well-founded fear" standard governs eligibility for asylum.

**[4]** The Government argues, however, that even though the "well-founded fear" standard is applicable, there is no difference between it and the "would be threatened" test of § 243(h). It asks us to hold that the only way an applicant can demonstrate a "well-founded fear of persecution" is to prove a "clear probability of persecution." The statutory language does not lend itself to this reading.

To begin with, the language Congress used to describe the two standards conveys very different meanings. The "would be threatened" language of § 243(h) has no subjective component, but instead requires the alien to establish by objective evidence that it is more likely than not that he or she will be subject to persecution upon deportation.[10] See *Stevic, supra.* In contrast, the reference to "fear" in the § 208(a) standard obviously makes the eligibility determination turn to some extent on the subjective mental state of the **\*431** alien.[11] "The linguistic **\*\*1213** difference between the words 'well-founded fear' and 'clear probability' may be as striking as that between a subjective and an objective frame

of reference.... We simply cannot conclude that the standards are identical." *Guevara-Flores v. INS,* 786 F.2d 1242, 1250 (CA5 1986), cert. pending, No. 86–388; see also *Carcamo-Flores v. INS,* 805 F.2d 60, 64 (CA2 1986); 767 F.2d, at 1452 (case below).

That the fear must be "well-founded" does not alter the obvious focus on the individual's subjective beliefs, nor does it transform the standard into a "more likely than not" one. One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place. As one leading authority has pointed out:

"Let us ... presume that it is known that in the applicant's country of origin every tenth adult male person is either put to death or sent to some remote labor camp.... In such a case it would be only too apparent that anyone who has managed to escape from the country in question will have 'well-founded fear of being persecuted' upon his eventual return." 1 A. Grahl-Madsen, The Status of Refugees in International Law 180 (1966).

This ordinary and obvious meaning of the phrase is not to be lightly discounted. See *Russello v. United States,* 464 U.S. 16, 21, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 198–199, 96 S.Ct. 1375, 1383–1384, 47 L.Ed.2d 668 (1976). With regard to this very statutory scheme, we have considered ourselves bound to " 'assume "that the legislative purpose is expressed by the ordinary meaning of the words used." ' " *INS v. Phinpathya,* 464 U.S. 183, 189, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984) (quoting **\*432** *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982), in turn quoting *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)).

The different emphasis of the two standards which is so clear on the face of the statute is significantly highlighted by the fact that the same Congress simultaneously drafted § 208(a) and amended § 243(h). In doing so, Congress chose to maintain the old standard in § 243(h), but to incorporate a different standard in § 208(a). " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States, supra,*

464 U.S., at 23, 104 S.Ct., at 300 (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (CA5 1972)). The contrast between the language used in the two standards, and the fact that Congress used a new standard to define the term "refugee," certainly indicate that Congress intended the two standards to differ.

### III

The message conveyed by the plain language of the Act is confirmed by an examination of its history. [12] Three aspects of that history are particularly compelling: The pre–1980 experience under § 203(a)(7), the only prior statute dealing with asylum; the abundant evidence of an intent to conform the definition of "refugee" and our asylum law to the United Nation's Protocol to which the United States has been bound **\*433 \*\*1214** since 1968; and the fact that Congress declined to enact the Senate version of the bill that would have made a refugee ineligible for asylum unless "his deportation or return would be prohibited by § 243(h)."

*The Practice Under § 203(a)(7).*

The statutory definition of the term "refugee" contained in § 101(a)(42) applies to two asylum provisions within the Immigration and Nationality Act. [13] Section 207, 8 U.S.C. § 1157, governs the admission of refugees who seek admission from foreign countries. Section 208, 8 U.S.C. § 1158, sets out the process by which refugees currently in the United States may be granted asylum. Prior to the 1980 amendments there was no statutory basis for granting asylum to aliens who applied from within the United States. [14] Asylum for aliens applying for admission from foreign countries had, however, been the subject of a previous statutory provision, and Congress' intent with respect to the changes that it sought to create in that statute are instructive in discerning the meaning of the term "well-founded fear."

Section § 203(a)(7) of the pre–1980 statute authorized the Attorney General to permit "conditional entry" to a certain number of refugees fleeing from Communist-dominated areas or the Middle East "because of persecution or fear of persecution on account of race, religion, or political opinion." 79 **\*434** Stat. 913, 8 U.S.C. § 1153(a)(7) (1976 ed.). The standard that was applied to aliens seeking admission pursuant to § 203(a)(7) was unquestionably more lenient

than the "clear probability" standard applied in § 243(h) proceedings. In *Matter of Tan,* 12 I. & N. Dec. 564, 569–570 (1967), for example, the BIA "found no support" for the argument that "an alien deportee is required to do no more than meet the standards applied under section 203(a)(7) of the Act when seeking relief under section 243(h)." Similarly, in *Matter of Adamska,* 12 I. & N. Dec. 201, 202 (1967), the Board held that an alien's inability to satisfy § 243(h) was not determinative of her eligibility under the "substantially broader" standards of § 203(a)(7). One of the differences the Board highlighted between the statutes was that § 243(h) requires a showing that the applicant "would be" subject to persecution, while § 203(a)(7) only required a showing that the applicant was unwilling to return "because of *persecution or fear of persecution.*" 12 I. & N., at 202 (emphasis in original). In sum, it was repeatedly recognized that the standards were significantly different. [15]

At first glance one might conclude that this wide practice under the old § 203(a)(7), which spoke of "fear of persecution," is not probative of the meaning of the term "well-founded fear of persecution" which Congress adopted in 1980. Analysis of the legislative history, however, demonstrates that Congress added the "well-founded" language only because that was the language incorporated by the United Nations Protocol to which Congress sought to conform. See *infra,* at 1215–1216. Congress was told that the extant asylum procedure **\*435** for refugees outside of the **\*\*1215** United States was acceptable under the Protocol, except for the fact that it made various unacceptable geographic and political distinctions. [16] The legislative history indicates that Congress in no way wished to modify the standard that had been used under § 203(a) (7). [17] **\*436** Adoption of the INS's argument that the term "well-founded fear" requires a showing of clear probability of persecution would clearly do violence to Congress' intent that the standard for admission under § 207 be no different than the one previously applied under § 203(a)(7). [18]

*The United Nations Protocol.*

If one thing is clear from the legislative history of the new definition of "refugee," and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance **\*\*1216** with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United

States **437** acceded in 1968.[19] Indeed, the definition of "refugee" that Congress adopted, see *supra,* at 1211, is virtually identical to the one prescribed by Article 1(2) of the Convention which defines a "refugee" as an individual who

"owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it."

Compare 19 U.S.T. 6225 19 U.S.T. 6225 with 19 U.S.T. 6261. 19 U.S.T. 6261. Not only did Congress adopt the Protocol's standard in the statute, but there were also many statements indicating Congress' intent that the new statutory definition of "refugee" be interpreted in conformance with the Protocol's definition. The Conference Committee Report, for example, stated that the definition was accepted "with the understanding that it is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol." S.Rep. No. 96–590, p. 20 (1980) S.Rep. No. 96–590, p. 20 (1980); see also H.R.Rep., at 9. It is thus appropriate to consider what the phrase "well-founded fear" means with relation to the Protocol.

The origin of the Protocol's definition of "refugee" is found in the 1946 Constitution of the International Refugee Organization (IRO). See 62 Stat. 3037. The IRO defined a "refugee" as a person who had a "valid objection" to returning to his country of nationality, and specified that "fear, based on reasonable grounds of persecution because of race, religion, nationality, or political opinions ..." constituted a valid objection. See IRO Constitution, Annex 1, Pt. 1, § C1(a) (i). The term was then incorporated in the United Nations Convention **438** Relating to the Status of Refugees,[20] 189 U.N.T.S. 150 (July 28, 1951) 189 U.N.T.S. 150 (July 28, 1951). The Committee that drafted the provision explained that "[t]he expression 'well-founded fear of being the victim of persecution ...' means that a person has either been actually a victim of persecution or can show good reason why he fears persecution." U.N.Rep., at 39. The 1967 Protocol incorporated the "well-founded fear" test, without modification. The standard, as it has been consistently understood by those who drafted it, as well as those drafting the documents that adopted it, certainly does not require an alien to show that it is more likely than not that he

will be persecuted **1217** in order to be classified as a "refugee."[21]

In interpreting the Protocol's definition of "refugee" we are further guided by the analysis set forth in the Office of the **439** United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979).[22] The Handbook explains that "[i]n general, the applicant's fear should be considered well-founded if he can establish, to a reasonable degree, that his continued stay in his country of origin has become intolerable to him for the reasons stated in the definition, or would for the same reasons be intolerable if he returned there." *Id.,* at Ch. II B(2)(a) § 42; see also *id.,* §§ 37–41.

The High Commissioner's analysis of the United Nations' standard is consistent with our own examination of the origins of the Protocol's definition,[23] as well as the conclusions of **440** many scholars who have studied the matter.[24] There is simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no "well-founded fear" of the event happening. See *supra,* at 1213. As we pointed out in *Stevic,* a moderate interpretation of the "well-founded fear" standard would indicate "that so long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." 467 U.S., at 424–425, 104 S.Ct., at 2498.

In *Stevic,* we dealt with the issue of withholding of deportation, or *nonrefoulement,* under § 243(h). This provision corresponds to Article 33.1 of the Convention.[25] **1218** Significantly though, Article 33.1 does not extend this right to everyone who meets the definition of "refugee." Rather, it provides that "[n]o Contracting State shall expel or return ('refouler') a *refugee* in any manner whatsoever to the frontiers or territories *where his life or freedom would be threatened* on account of his race, religion, nationality, membership or a particular social group or political opinion." 19 U.S.T., at 6276, 189 U.N.T.S., at 176 (emphasis added). Thus, Article 33.1 requires that an applicant satisfy two burdens: first, that he or she be a "refugee," *i.e.,* prove at least a "well-founded **441** fear of persecution"; second, that the "refugee" show that his or her life or freedom "would be threatened" if deported. Section 243(h)'s imposition of a "would be threatened" requirement is entirely consistent with the United States' obligations under the Protocol.

Section 208(a), by contrast, is a discretionary mechanism which gives the Attorney General the *authority* to grant the broader relief of asylum to refugees. As such, it does not correspond to Article 33 of the Convention, but instead corresponds to Article 34. See *Carvajal-Munoz,* 743 F.2d, at 574, n. 15. That Article provides that the contracting States "shall as far as possible facilitate the assimilation and naturalization of refugees...." Like § 208(a), the provision is precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible. Also like § 208(a), an alien must only show that he or she is a "refugee" to establish eligibility for relief. No further showing that he or she "would be" persecuted is required.

Thus, as made binding on the United States through the Protocol, Article 34 provides for a precatory, or discretionary, benefit for the entire class of persons who qualify as "refugees," whereas Article 33.1 provides an entitlement for the subcategory that "would be threatened" with persecution upon their return. This precise distinction between the broad class of refugees and the subcategory entitled to § 243(h) relief is plainly revealed in the 1980 Act. See *Stevic,* 467 U.S., at 428, n. 22, 104 S.Ct., at 2500, n. 22.

*Congress' Rejection of S. 643.*
Both the House bill, H.R. 2816, 96th Cong., 1st Sess. (1979), and the Senate bill, S. 643, 96th Cong., 1st Sess. (1979), provided that an alien must be a "refugee" within the meaning of the Act in order to be eligible for asylum. The two bills differed, however, in that the House bill authorized the Attorney General, in his discretion, to grant asylum to any refugee, whereas the Senate bill imposed the additional **\*442** requirement that a refugee could not obtain asylum unless "his deportation or return would be prohibited under section 243(h)." [26] S.Rep., at 26. Although this restriction, if adopted, would have curtailed the Attorney General's discretion to grant asylum to refugees pursuant to § 208(a), it would not have affected the standard used to determine whether an alien is a "refugee." Thus, the inclusion of this prohibition in the Senate bill indicates that the Senate recognized that there is a difference between the "well-founded fear" standard and the clear probability standard. [27] The **\*\*1219** enactment of the House bill rather than the Senate bill in turn demonstrates that Congress eventually refused to restrict eligibility for asylum only to aliens meeting the stricter standard. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub* **\*443**

*silentio* to enact statutory language that it has earlier discarded in favor of other language." *Nachman Corp. v. Pension Benefit Guaranty Corporation,* 446 U.S. 359, 392–393, 100 S.Ct. 1723, 1741–1742, 64 L.Ed.2d 354 (1980) (Stewart, J., dissenting); cf. *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974); *Russello v. United States,* 464 U.S., at 23, 104 S.Ct., at 300.

IV

The INS makes two major arguments to support its contention that we should reverse the Court of Appeals and hold that an applicant can only show a "well-founded fear of persecution" by proving that it is more likely than not that he or she will be persecuted. We reject both of these arguments: the first ignores the structure of the Act; the second misconstrues the federal courts' role in reviewing an agency's statutory construction.

First, the INS repeatedly argues that the structure of the Act dictates a decision in its favor, since it is anomalous for § 208(a), which affords greater benefits than § 243(h), see n. 6, *supra,* to have a less stringent standard of eligibility. This argument sorely fails because it does not take into account the fact that an alien who satisfies the applicable standard under § 208(a) does not have a *right* to remain in the United States; he or she is simply *eligible* for asylum, if the Attorney General, in his discretion, chooses to grant it. An alien satisfying § 243(h)'s stricter standard, in contrast, is automatically entitled to withholding of deportation. [28]

In *Matter of Salim,* 18 I. & N. Dec. 311 (1982), for example, the Board held that the alien was eligible for both asylum and withholding of deportation, but granted him the more limited remedy only, exercising its discretion to deny him asylum. See also *Walai v. INS,* 552 F.Supp. 998 (SDNY 1982); *Mat* **\*444** *of Shirdel,* Interim Decision No. 2958 (BIA Feb. 21, 1984). We do not consider it at all anomalous that out of the entire class of "refugees," those who can show a clear probability of persecution are *entitled* to mandatory suspension of deportation and *eligible* for discretionary asylum, while those who can only show a well-founded fear of persecution are not *entitled* to anything, but are *eligible* for the discretionary relief of asylum.

There is no basis for the INS's assertion that the discretionary/mandatory distinction has no practical significance. Decisions such as *Matter of Salim, supra,* and *Matter of Shirdel, supra,* clearly demonstrate the practical import of the distinction. Moreover, the 1980 Act amended § 243(h) for the very purpose of changing it from a discretionary to a mandatory provision. See *supra,* at 1211–1212. Congress surely considered the discretionary/mandatory distinction important then, as it did with respect to the very definition of "refugee" involved here. The House Report provides:

"The Committee carefully considered arguments that the new definition might expand the numbers of refugees eligible **1220 to come to the United States and force substantially greater refugee admissions than the country could absorb. However, merely because an individual or group comes within the definition will not guarantee resettlement in the United States." H.R.Rep., at 10.

This vesting of discretion in the Attorney General is quite typical in the immigration area, see, *e.g., INS v. Jong Ha Wang, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981).* If anything is anomalous, it is that the Government now asks us to restrict its discretion to a narrow class of aliens. Congress has assigned to the Attorney General and his delegates the task of making these hard individualized decisions; although Congress could have crafted a narrower definition, it chose to authorize the AttorneyGeneral **445 to determine which, if any, eligible refugees should be denied asylum.

The INS's second principal argument in support of the proposition that the "well founded fear" and "clear probability" standard are equivalent is that the BIA so construes the two standards. The INS argues that the BIA's construction of the Refugee Act of 1980 is entitled to substantial deference, even if we conclude that the Court of Appeals' reading of the statutes is more in keeping with Congress' intent. [29] This argument is unpersuasive.

**1221 *446 [5] The question whether Congress intended the two standards to be identical is a pure question of statutory construction for the courts to decide. Employing traditional tools of statutory construction, we have concluded that Congress did not intend the two standards to be identical. [30] In *447 *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984),* we explained:

"The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional *448 intent. [Citing cases.] If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id., at 843, n. 9, 104 S.Ct., at 2782, n. 9* (citations omitted).

The narrow legal question whether the two standards are the same is, of course, quite different from the question of interpretation that arises in each case in which the agency is required to apply either or both standards to a particular set of facts. There is obviously some ambiguity in a term like "well-founded fear" which can only be given concrete meaning through a process of case-by-case adjudication. In that process of filling " 'any gap left, implicitly or explicitly, by Congress,' " the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program. See *Chevron, supra,* at 843, 104 S.Ct., at 2781–2782, quoting *Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974).* But our task today is much narrower, and is well within the province of the judiciary. We do **1222 not attempt to set forth a detailed description of how the "well-founded fear" test should be applied. [31] Instead, we merely hold that the Immigration Judge and the BIA were incorrect in holding that the two standards are identical. [32]

*449 Our analysis of the plain language of the Act, its symmetry with the United Nations Protocol, and its legislative history, lead inexorably to the conclusion that to show a "well-founded fear of persecution," an alien need not prove that it is more likely than not that he or she will be persecuted in his or her home country. We find these ordinary canons of statutory construction compelling, even without regard to the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien. See *INS v. Errico, 385 U.S. 214, 225, 87 S.Ct. 473, 480, 17 L.Ed.2d 318 (1966); Costello v. INS, 376 U.S. 120, 128, 84 S.Ct. 580, 585, 11 L.Ed.2d 559 (1964); Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948).*

Deportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or

she will be subject to death or persecution if forced to return to his or her home country. In enacting the Refugee Act of 1980 Congress sought to "give the United States sufficient flexibility to respond to situations involving political or religious dissidents and detainees throughout the world." H.R.Rep., at 9. Our holding today increases that flexibility by rejecting the Government's contention that the Attorney General may not even consider granting asylum to one who **\*450** fails to satisfy the strict § 243(h) standard. Whether or not a "refugee" is eventually granted asylum is a matter which Congress has left for the Attorney General to decide. But it is clear that Congress did not intend to restrict eligibility for that relief to those who could prove that it is more likely than not that they will be persecuted if deported.

The judgment of the Court of Appeals is

*Affirmed.*

Justice BLACKMUN, concurring.

I join the Court's opinion and judgment. Thus, I accept its "narrow" conclusion that "the Immigration Judge and the BIA were incorrect in holding that the [standards for withholding of deportation and granting asylum] are identical." *Ante,* at 1222. In accordance with this holding, the Court eschews any attempt to give substance to the term "well-founded fear" and leaves that task to the "process of case-by-case adjudication" by the INS, the agency in charge of administering the immigration laws. **\*\*1223** *Ante,* at 1221. I write separately and briefly to emphasize my understanding that, in its opinion, the Court has directed the INS to the appropriate sources from which the agency should derive the meaning of the "well-founded fear" standard, a meaning that will be refined in later adjudication. This emphasis, I believe, is particularly needed where, as here, an agency's previous interpretation of the statutory term is so strikingly contrary to plain language and legislative history.

Thus, as the Court observes, *ante,* at 1212–1213, the very language of the term "well-founded fear" demands a particular type of analysis—an examination of the subjective feelings of an applicant for asylum coupled with an inquiry into the objective nature of the articulated reasons for the fear. Moreover, in describing how, in the 1980 Act, Congress was attempting to bring this country's refugee laws into conformity with the United Nations Protocol, the Court notes that the Act's definition of refugee, wherein the "well-founded fear" term appears, *ante,* at 1211, tracks the language of the **\*451** Protocol. See *ante,* at 1216. Such language has a rich

history of interpretation in international law and scholarly commentaries. See *ante,* at 1216–1218, and nn. 20, 24. While the INS need not ignore other sources of guidance, the above directions by the Court should be significant in the agency's formulation of the "well-founded fear" standard.

Finally, in my view, the well-reasoned opinions of the Courts of Appeals, that almost uniformly have rejected the INS's misreading of statutory language and legislative history, provide an admirable example of the very "case-by-case adjudication" needed for the development of the standard. Although the Court refers to a conflict among these courts, see *ante,* at 1210, n. 2, with one exception, see *ibid., all* the Courts of Appeals that have addressed this question have concluded that the standards for withholding of deportation and granting asylum are not the same. Rather, differences in opinion have arisen as to the precise formulation of the "well-founded fear" standard. [*] Such differences can arise only when courts or agencies seriously grapple with the problems of developing a standard, whose form is at first given by the statutory language and the intimations of the legislative **\*452** history, but whose final contours are shaped by the application of the standard to the facts of specific cases. The efforts of these courts stand in stark contrast to—but, it is sad to say, alone cannot make up for—the years of seemingly purposeful blindness by the INS, which only now begins its task of developing the standard entrusted to its care.

Justice SCALIA, concurring in the judgment.

I agree with the Court that the plain meaning of "well-founded fear" and the structure of the Immigration and Nationality (Act) clearly demonstrate that the "well-founded fear" standard and the "clear probability" standard are not equivalent. I concur in the judgment rather than join the Court's opinion, however, for two reasons. First, despite having reached the above conclusion, the Court undertakes an exhaustive investigation of the legislative history of the Act. *Ante,* at 1213–1219. It **\*\*1224** attempts to justify this inquiry by relying upon the doctrine that if the legislative history of an enactment reveals a " 'clearly expressed legislative intention' contrary to [the enactment's] language," the Court is required to "question the strong presumption that Congress expresses its intent through the language it chooses." *Ante,* at 1213, n. 12. Although it is true that the Court in recent times has expressed approval of this doctrine, that is to my mind an ill-advised deviation from the venerable principle that if the language of a statute is clear, that language must be given effect—at least in the absence of a patent absurdity. See, *e.g.,* *United States v. Wiltberger,* 18 U.S. (5

AR.04997

Wheat.) 76, 95–96, 5 L.Ed. 37 (1820) (opinion of Marshall, C.J.); *United States v. Hartwell,* 73 U.S. (6 Wall.) 385, 18 L.Ed. 830 (1868); *Bate Refrigerating Co. v. Sulzberger,* 157 U.S. 1, 34, 15 S.Ct. 508, 515, 39 L.Ed. 601 (1895) (opinion of Harlan, J.); *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 492, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947) (opinion of Jackson, J.); *United States v. Sullivan,* 332 U.S. 689, 693, 68 S.Ct. 331, 334, 92 L.Ed. 297 (1948) (opinion of Black, J.); *Unexcelled Chemical Corp. v. United States,* 345 U.S. 59, 64, 73 S.Ct. 580, 583, 97 L.Ed. 821 (1953) (opinion of Douglas, J.). Judges interpret laws rather than reconstruct **\*453** legislators' intentions. Where the language of those laws is clear, we are not free to replace it with an unenacted legislative intent.

Even by its own lights, however, the Court's explication of the legislative history of the Act is excessive. The INS makes a number of specific arguments based upon the legislative history of the Act. It would have sufficed, it seems to me, for the Court to determine whether these specific arguments establish a "clearly expressed legislative intent" that the two standards are equivalent. I think it obvious that they do not, as apparently does the Court. That being so, there is simply no need for the lengthy effort to ascertain the import of the entire legislative history. And that effort is objectionable not only because it is gratuitous. I am concerned that it will be interpreted to suggest that similarly exhaustive analyses are generally appropriate (or, worse yet, required) in cases where the language of the enactment at issue is clear. I also fear that in this case the Court's conduct of that inquiry will be interpreted as a betrayal of its assurance that it does "not attempt to set forth a detailed description of how the well-founded fear test should be applied," *ante,* at 1222. See, *e.g., ante,* at 1217–1218 (appearing to endorse a particular interpretation of "well-founded fear").

I am far more troubled, however, by the Court's discussion of the question whether the INS's interpretation of "well-founded fear" is entitled to deference. Since the Court quite rightly concludes that the INS's interpretation is clearly inconsistent with the plain meaning of that phrase and the structure of the Act, see *ante,* at 1222, 1213, and n. 12, there is simply no need and thus no justification for a discussion of whether the interpretation is entitled to deference. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct.

2778, 2781–2782, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress" (footnote omitted)). Even more **\*454** unjustifiable, however, is the Court's use of this superfluous discussion as the occasion to express controversial, and I believe erroneous, views on the meaning of this Court's decision in *Chevron. Chevron* stated that where there is no "unambiguously expressed intent of Congress," *id.,* at 843, 104 S.Ct., at 2781–2782, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency," *id.,* at 844, 104 S.Ct., at 2782. This Court has consistently interpreted *Chevron*—which has been an extremely important and frequently cited opinion, not only in **\*\*1225** this Court but in the Courts of Appeals —as holding that courts must give effect to a reasonable agency interpretation of a statute unless that interpretation is inconsistent with a clearly expressed congressional intent. See, *e.g., Japan Whaling Assn. v. American Cetacean Soc.,* 478 U.S. 221, 233–234, 106 S.Ct. 2860, 2867–2868, 92 L.Ed.2d 166 (1986); *United States v. Fulton,* 475 U.S. 657, 666–667, 106 S.Ct. 1422, 1427–1428, 89 L.Ed.2d 661 (1986); *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 714, 105 S.Ct. 2371, 2375–2376, 85 L.Ed.2d 714 (1985); *Chemical Manufacturers Assn. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 126, 105 S.Ct. 1102, 1107, 1108, 84 L.Ed.2d 90 (1985). The Court's discussion is flatly inconsistent with this well-established interpretation. The Court first implies that courts may substitute their interpretation of a statute for that of an agency whenever, "[e]mploying traditional tools of statutory construction," they are able to reach a conclusion as to the proper interpretation of the statute. *Ante,* at 1220–1221. But this approach would make deference a doctrine of desperation, authorizing courts to defer only if they would otherwise be unable to construe the enactment at issue. This is not an interpretation but an evisceration of *Chevron.*

The Court also implies that courts may substitute their interpretation of a statute for that of an agency whenever they face "a pure question of statutory construction for the courts to decide," *ante,* at 1220, rather than a "question of interpretation [in which] the agency is required to apply [a legal standard] to a particular set of facts," *ante,* at 1221. **\*455** No support is adduced for this proposition, which is contradicted by the case the Court purports to be interpreting, since in *Chevron*

the Court deferred to the Environmental Protection Agency's abstract interpretation of the phrase "stationary source."

In my view, the Court badly misinterprets *Chevron*. More fundamentally, however, I neither share nor understand the Court's eagerness to refashion important principles of administrative law in a case in which such questions are completely unnecessary to the decision and have not been fully briefed by the parties.

I concur in the judgment.

Justice POWELL, with whom THE CHIEF JUSTICE and Justice WHITE join, dissenting.

Many people come to our country because they fear persecution in their homeland. Congress has provided two forms of relief for such people: asylum, see Immigration and Nationality Act of 1952, § 208(a), as added by 94 Stat. 105, ▮ 8 U.S.C. § 1158(a); and withholding of deportation, see 66 Stat. 212, § 243(h), as amended, 94 Stat. 107, 8 U.S.C. § 1253(h). The Board of Immigration Appeals (BIA) has concluded that there is no practical distinction between the objective proofs an alien must submit to be eligible for these two forms of relief. The Court rejects this conclusion. Because I believe the BIA's interpretation of the statute is reasonable, I dissent.

I

The Court's opinion seems to assume that the BIA has adopted a rigorous mathematical approach to asylum cases, requiring aliens to demonstrate an objectively quantifiable risk of persecution in their homeland that is more than 50%. The Court then argues that such a position is inconsistent with the language and history of the Act. But this has never been the BIA's position. Thus, it is useful to examine the BIA's approach in some detail before evaluating the Court's **\*456** rejection of the BIA's approach. After all, the BIA is the tribunal with the primary responsibility for applying the Act and the greatest experience in doing so.

The BIA's interpretation of the statutory term "well-founded fear" appears in ▮ *Matter of Acosta,* Interim Decision No. 2986 (Mar. 1, 1985). [1] Under the BIA's analysis, **\*\*1226** an immigration judge evaluating an asylum application should begin by determining the underlying historical facts. The

burden of persuasion rests on the applicant, who must establish the truth of these facts by a preponderance of the evidence. See *id.,* at 7 (citing, *inter alia,* 1A C. Gordon & H. Rosenfield, Immigration Law and Procedure § 5.10b, p. 5–121 (rev. ed. 1986)).

Once the immigration judge has decided what historical facts the applicant has demonstrated, he then decides whether those facts meet the definition of "refugee" set forth in § 101(a)(42) (A) of the Act, ▮ 8 U.S.C. § 1101(a)(42)(A). The major point of contention in this case concerns that section's requirement that the fear be "well-founded." [2] In **\*457** *Acosta,* the BIA adhered to the interpretation of that language it had developed in ▮ *Matter of Dunar,* 14 I. & N. Dec. 310 (1973):

" '[T]he requirement that the fear be "well-founded" rules out an apprehension which is purely subjective. ... Some sort of showing must be made and this can ordinarily be done only by objective evidence. The claimant's own testimony as to the facts will sometimes be all that is available; *but the crucial question is whether the testimony, if accepted as true, makes out a realistic likelihood that he will be persecuted.*' " *Acosta, supra,* at 18–19 (quoting *Dunar, supra,* at 319) (emphasis added by *Acosta* Board). The *Acosta* Board went on to caution:

"By use of such words [as 'realistic likelihood'] we do not mean that 'a well-founded fear of persecution' requires an alien to establish to a particular degree of certainty, such as a 'probability' as opposed to a 'possibility,' that he will become a victim of persecution. Rather as a practical matter, what we mean can best be described as follows: the evidence must demonstrate that (1) the alien possesses a belief or characteristic a persecutor seeks to overcome in others by means of punishment of some sort; (2) the persecutor is already aware, or could easily become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and (4) the persecutor has the inclination to punish the alien." *Acosta, supra,* at 22.

Finally, the *Acosta* opinion compared this "realistic likelihood" standard to the "clear probability" standard applied to **\*458** applications for withholding of deportation. The BIA's comments are insightful:

"One might conclude that 'a well-founded fear of persecution,' which requires a showing that persecution

is likely to occur, refers to a standard that is different from 'a clear probability of persecution,' which requires a showing that persecution is 'more likely than not' to occur. As a practical matter, however, the facts in asylum and withholding cases do not produce clear-cut instances in which such fine distinctions can be meaningfully made. Our inquiry in **1227 these cases, after all, is not quantitative, *i.e.,* we do not examine a variety of statistics to discern to some theoretical degree the likelihood of persecution. Rather our inquiry is qualitative: we examine the alien's experiences and other external events to determine if they are of a kind that enable us to conclude the alien is likely to become the victim of persecution. In this context, we find no meaningful distinction between a standard requiring a showing that persecution is likely to occur and a standard requiring a showing that persecution is more likely than not to occur.... Accordingly, we conclude that the standards for asylum and withholding of deportation are not meaningfully different and, in practical application, converge." *Id.,* at 25.

In sum, contrary to the Court's apparent conclusion, the BIA does not contend that both the "well-founded fear" standard and the "clear probability" standard require proof of a 51% chance that the alien will suffer persecution if he is returned to his homeland. The BIA plainly eschews analysis resting on mathematical probabilities. Rather, the BIA has adopted a four-part test requiring proof of facts that demonstrate a realistic likelihood of persecution actually occurring. The heart of the *Acosta* decision is the BIA's empirical conclusion, based on its experience in adjudicating asylum applications, that if the facts establish such a basis for an alien's **459 fear, it rarely will make a difference whether the judge asks if persecution is "likely" to occur or "more likely than not" to occur. If the alien can establish such a basis, he normally will be eligible for relief under either standard.

## II

In Part II of its opinion, the Court examines the language of the Act. Section 243(h) provides that the Attorney General shall grant withholding of deportation to any country where "such alien's life or freedom would be threatened." 8 U.S.C. § 1253(h). Section 208(a) provides that the Attorney General has discretion to grant asylum "if the Attorney General determines that such alien is a refugee." § 1158(a). The crucial language of § 101(a)(42)(A) of the Act, as added by 94 Stat. 102, defines a refugee as a person who has "a well-

founded fear of persecution." § 1101(a)(42)(A). In the Court's view, this language all but disposes of the case. *Ante,* at 1211–1215.

With respect to the issue presented by this case, I find the language far more ambiguous than the Court does. Respondent contends that the BIA has fallen into error by equating the objective showings required under §§ 208(a) and 243(h). The Court notes that the language of § 208(a) differs from the language of § 243(h) in that it contemplates a partially subjective inquiry. From this premise, the Court moves with little explanation to the conclusion that the objective inquiries under the two sections necessarily are different.

In reaching this conclusion, the Court gives short shrift to the words "well-founded," that clearly require some objective basis for the alien's fear. The critical question presented by this case is whether the objective basis required for a fear of persecution to be "well-founded" differs *in practice* from the objective basis required for there to be a "clear probability" of persecution. Because both standards necessarily contemplate some objective basis, I cannot agree with the Court's **460 implicit conclusion that the statute resolves this question on its face. In my view, the character of evidence sufficient to meet these two standards is a question best answered by an entity familiar with the types of evidence and issues that arise in such cases. Congress limited eligibility for asylum to those persons whom "the Attorney General determines" to be refugees. See § 208(a), 8 U.S.C. § 1158(a). The Attorney General has delegated the responsibility for making these determinations to the BIA. That Board has examined more of these cases than any court ever has or ever can. It has made a considered judgment that the difference between the "well- **1228 founded" and the "clear probability" standards is of no practical import: that is, the evidence presented in asylum and withholding of deportation cases rarely, if ever, will meet one of these standards without meeting both. This is just the type of expert judgment—formed by the entity to whom Congress has committed the question—to which we should defer.

The Court ignores the practical realities recognized by the expert agency and instead concentrates on semantic niceties. It posits a hypothetical situation in which a government sought to execute every 10th adult male. In its view, fear of such executions would be "well-founded" even if persecution of a particular individual would not be "more likely than not"

to occur. See *ante,* at 1213. But this hypothetical is irrelevant; it addresses a mathematically demanding interpretation of "well-founded" that has no relation to the BIA's actual treatment of asylum applications. Nor does it address the validity of the BIA's judgment that evidence presenting this distinction will be encountered infrequently, if ever.

Common sense and human experience support the BIA's conclusion. Governments rarely persecute people by the numbers. It is highly unlikely that the evidence presented at an asylum or withholding of deportation hearing will demonstrate the mathematically specific risk of persecution posited by the Court's hypothetical. Taking account of the **\*461** types of evidence normally available in asylum cases, the BIA has chosen to make a *qualitative* evaluation of "realistic likelihoods." As I read the *Acosta* opinion, an individual who fled his country to avoid mass executions might be eligible for both withholding of deportation *and* asylum, whether or not he presented evidence of the numerical reach of the persecution. See *Acosta,* Interim Decision No. 2986, at 18–25. [3] Nowhere does the Court consider whether the BIA's four-element interpretation of "well-founded" is unreasonable. Nor does the Court consider the BIA's view of the types of evidentiary presentations aliens generally make in asylum cases.

In sum, the words Congress has chosen—"well-founded" fear—are ambiguous. They contemplate some objective basis without specifying a particular evidentiary threshold. There is no reason to suppose this formulation is inconsistent with the analysis set forth in *Acosta.* The BIA has concluded that a fear is not "well-founded" unless the fear has an objective basis indicating that there is a "realistic likelihood" that persecution would occur. Based on the text of the Act alone, I cannot conclude that this conclusion is unreasonable.

### III

The Court bolsters its interpretation of the language of the Act by reference to three parts of the legislative history. A closer examination of these materials demonstrates that each of them is ambiguous. Nothing the Court relies on provides a positive basis for arguing that there is a material difference between the two standards.

**\*462** A

First, the Court cites legislative history indicating that Congress wished to preserve some existing standard when it placed the words "well-founded fear" in the Act. The Court concludes that the standard Congress intended to preserve was the BIA's practice under the old § 203(a)(7), 79 Stat. 913 (1965). That section authorized the Attorney General to grant conditional entry to aliens fleeing from Communist countries or the Middle East, so long as they established a "fear of persecution." The Court argues that Congress **\*\*1229** chose the words "well-founded fear" to "preserve" as an asylum standard the prior interpretation of the word "fear" in the standard for conditional entry.

In contrast, the United States argues that Congress chose the words "well-founded fear" to preserve the Attorney General's regulations governing applications for asylum by aliens in the United States. [4] These regulations were substantially in accord with the BIA's view, namely that there is no significant difference between the "well-founded" and "clear probability" standards. Compare 8 CFR §§ 108.3(a) and 236.3(a)(2) (1980) (asylum) with 8 CFR § 242.17(c) (1980) (withholding of deportation). Common sense suggests that the United States has the better of this argument. It is more natural to speak of "preserving" an interpretation that had governed the same form of relief than one that had applied to a different form of relief.

Moreover, the legislative history makes it clear that Congress was referring to the regulations rather than to § 203(a)(7). The Senate Report states that the bill "improve and§ **\*463** clarif[ies] the procedures for determining asylum claims filed by aliens who are physically present in the United States. The substantive standard is not changed." S.Rep. No. 96–256, p. 9 (1979), U.S.Code Cong. & Admin.News 1980, p. 149. As the Court recognizes, *ante,* at 1215, n. 17, this statement unquestionably refers to the informal procedures for aliens in the United States, not the statutory procedures under § 203(a)(7). [5] Similarly, the House Report states that "the new definition does not create a new and expanded means of entry, but instead regularizes and *formalizes* the policies and practices that have been followed in recent years." H.R.Rep. No. 96–608, p. 10 (1979)H.R.Rep. No. 96–608, p. 10 (1979) (emphasis added). Congress hardly would have felt a need to "formalize" the statutory procedures under § 203(a)(7). Indeed, the House Report cites the Attorney

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

General's regulations as the extant procedures to which it was referring. H.R.Rep., at 17.

In my view, the legislative history indicates that Congress' choice of the words "well-founded" fear as the standard of eligibility for asylum was intended to carry forward the practice of the Attorney General in adjudicating asylum applications. The Attorney General had concluded that the standard for asylum was substantially identical to the standard for withholding of deportation. His decision to interpret the language of § 208 in the same way is entirely reasonable.

B

Second, the Court relies on materials interpreting the United Nations Protocol. *Ante,* at 1215–1218. For several reasons, I find these materials to be only marginally relevant.§ **\*464** Both the President and the Senate thought that the Protocol was perfectly consistent with our country's immigration laws. See *INS v. Stevic,* 467 U.S. 407, 417, 104 S.Ct. 2489, 2494, 81 L.Ed.2d 321 (1984) (citing legislative history). We should be reluctant to assume that our country has been violating the Protocol during the 20 years since its adoption. Moreover, as the Court recognizes, statements by the United Nations High Commissioner for Refugees have no binding force, **\*\*1230** because " 'the determination of refugee status under the ... Protocol ... is incumbent upon the Contracting State.' " *Ante,* at 1217, n. 22 (quoting Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status 1 (ii) (Geneva, 1979)).

In any event, the materials discussed by the Court shed little or no light on the question presented by this case. None of them states that the burden of proof for nonrefoulement under Article 33.1 of the United Nations Protocol of 1967—a remedy essentially identical to withholding of deportation under § 243(h) of the Act—is higher than the burden of proof for asylum under Article 34. The only thing the materials tend to establish is that a mathematical approach to the likelihood of persecution in asylum cases is arguably inconsistent with the sense of the drafters of the Protocol. The BIA has declined to adopt such an approach. See *supra,* at 1226–1227. It is simply irrelevant that this approach might be inconsistent with the views of commentators on the Protocol.

C

Finally, the Court places great weight on the changes in the Act made by the Conference Committee. The Court notes that the Senate bill, S. 643, authorized the Attorney General to grant asylum if the applicant "is a refugee within the meaning of section 101(a)(42)(A) and his deportation or return would be prohibited under section 243(h) of this Act." S.Rep. No. 96–256, at 26. The Court conjectures that this language "indicates that the Senate recognized that **\*465** there is a difference between the 'well-founded fear' standard and the clear-probability standard. The enactment of the House bill rather than the Senate bill in turn demonstrates that Congress eventually refused to restrict eligibility for asylum only to aliens meeting the stricter standard." *Ante,* at 1218–1219 (footnote omitted).

Neither the premise of the Court nor its conclusion is justified. The language of the Senate bill does not demonstrate that the Senate recognized a difference between the two standards. The Senate just as easily could have included the language to ensure that the Attorney General held to his position that there was no difference between the standards. Moreover, there is no reason to believe that the changes made by the Conference Committee reflected a considered rejection of this portion of the Senate's definition of refugee. Rather, the Conference Committee Report demonstrates that the Conference thought both bills adopted the same general definition of refugee—the U.N. definition. See H.R.Conf.Rep. No. 96–781, p. 19 (1980). The differences the Conference saw between the bills related to treatment of refugees still in their homeland, and to refugees who have been "firmly resettled" in another country. See *ibid.*

In short, I see no reason to believe that the minor differences in wording between the Senate bill and the Act as passed reflect a rejection of the position that there is no significant difference between the two standards. [6] Thus, I place no weight on the Conference Committee's choice of the language of the House bill.

IV

Even if I agreed with the Court's conclusion that there is a significant difference between the standards for asylum and **\*466** withholding of deportation, I would reverse the decision of the Court of Appeals and uphold the decision of

the BIA *in this case.* [7] A careful reading of the decisions **1231** of the BIA and the Immigration Judge demonstrates that the BIA applied the lower asylum standard to this case.

Respondent's claim for asylum rested solely on testimony that her brother had experienced difficulties with the authorities in Nicaragua. The Immigration Judge rejected respondent's claim because he found "no evidence of any substance in the record other than her brother's claim to asylum." App. to Pet. for Cert. 27a. He further found:

> "None of the evidence indicates that the respondent would be persecuted for political beliefs, whatever they may be, or because she belongs to a particular social group. She has not proven that she or any other members of her family, other than her brother, has [*sic*] been detained, interrogated, arrested and imprisoned, tortured and convicted and sentenced by the regime presently in power in Nicaragua." *Ibid.*

The absence of such evidence was particularly probative, because many of the other members of respondent's family— her parents, two sisters, her brother's wife, and her brother's **467** two children—were still in Nicaragua and thus presumably subject to the persecution respondent feared.

On appeal, the BIA affirmed. It decided this case after the passage of the Act, but before its opinion in *Acosta.* At that time, the BIA was confronted with a number of conflicting decisions by Courts of Appeals as to the correct standard for evaluating asylum applications. The BIA noted three different formulations of the "well-founded fear" standard: the "clear probability" test, see *Rejaie v. INS,* 691 F.2d 139 (CA3 1982); the "good reason" test, see *Stevic v. Sava,* 678 F.2d 401 (CA2 1982), rev'd on other grounds, *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); and the "realistic likelihood" test the BIA had adopted in *Matter of Dunar,* 14 I. & N. Dec. 310 (1973). App. to Pet. for Cert. 21a. See *supra,* at 1226–1227 (discussing *Acosta* ). Reviewing the evidence respondent had submitted to the Immigration Judge, the BIA concluded that respondent could not obtain relief under any of the standards. The BIA focused especially on the fact that respondent

> "has openly admitted that she herself has taken no actions against the Nicaraguan government. She admits that she has never been politically active. She testified that she never assisted her brother in any of his political activities. Moreover, she admits that she has never been singled out

for persecution by the present government." App. to Pet. for Cert. 22a. [8]

Respondent filed a petition for review with the Court of Appeals for the Ninth Circuit. Without examining either the factual or legal basis for the BIA's decision, the court granted the petition, reversed the BIA's decision, and remanded the application to the BIA for further consideration. **468** 767 F.2d 1448 (CA9 1985). The sole basis articulated for this action was a conclusion that the BIA had applied the wrong legal standard. The Court of Appeals repeated its position that the standards for asylum and withholding of deportation are **1232** different. According to that court, an asylum applicant must "present 'specific facts' through objective evidence to prove either past persecution or '*good reason* ' to fear future persecution." *Id.,* at 1453 (quoting *Carvajal-Munoz v. INS,* 743 F.2d 562, 574 (CA7 1984)) (emphasis added). It then noted that the BIA had reached a different conclusion in *Acosta* and stated:

> "[T]he Board appears to feel that it is exempt from the holding of *Marbury v. Madison* [5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) ] ... and not constrained by circuit court opinions.... [T]he Board applied its own construction of the applicant's burden of proof in an asylum case to the claims of both Cardoza-Fonseca and [her copetitioner]. It held that they were required to demonstrate a clear probability of persecution in order to be declared eligible for asylum." 767 F.2d, at 1454 (citation omitted).

This statement is simply inconsistent with the BIA's opinion. As I have explained, the BIA acknowledged the conflicting decisions of the various Courts of Appeals and explicitly tested the application under three different standards. The least burdensome of these—the "good reason" standard— is identical to the court's statement quoted *supra,* at 1215. The Court of Appeals completely ignored the words in which the BIA framed its decision. It failed to examine the factual findings on which the decision rested. At least in this case, it appears that the Court of Appeals, and not the BIA, has misunderstood the proper relation between courts and agencies. That court properly could have considered whether substantial evidence supported the BIA's conclusion that respondent failed to demonstrate a "good reason" to fear persecution, but it should not have assumed that **469** the BIA tested respondent's application by a higher standard than the BIA's own opinion reflects.

V

In my view, the Court misconstrues the Act and misreads its legislative history. Moreover, neither this Court nor the Court of Appeals has identified an error in the decision of the BIA in *this* case. Neither court has examined the factual findings on which the decision rested, or the legal standard the BIA applied to these facts. I would reverse the decision of the Court of Appeals.

**All Citations**

480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434, 55 USLW 4313

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    We explained that the Court of Appeals' decision had rested "on the mistaken premise that every alien who qualifies as a 'refugee' under the statutory definition is also entitled to a withholding of deportation under § 243(h). We find no support for this conclusion in either the language of § 243(h), the structure of the amended Act, or the legislative history." *INS v. Stevic,* 467 U.S., at 428, 104 S.Ct., at 2500.

2    Compare *Carcamo-Flores v. INS,* 805 F.2d 60 (CA2 1986); *Guevara-Flores v. INS,* 786 F.2d 1242 (CA5 1986), cert. pending, No. 86–388; *Cardoza-Fonseca v. INS,* 767 F.2d 1448 (CA9 1985) (case below); *Carvajal-Munoz v. INS,* 743 F.2d 562, 574 (CA7 1984); *Youkhanna v. INS,* 749 F.2d 360, 362 (CA6 1984); with *Sankar v. INS,* 757 F.2d 532, 533 (CA3 1985).

The Third Circuit is the only Circuit to decide since our decision in *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), that the standards remain identical. It reached this conclusion, however, not because post-*Stevic* analysis compelled it, but because it considered itself bound by its pre-*Stevic* decision in *Rejaie v. INS,* 691 F.2d 139 (1982). See *Sankar, supra,* at 533.

3    We have considered whether this case has been rendered moot by the recent enactment of the Immigration Reform and Control Act of 1986. Pub.L. No. 99–603, 100 Stat. 3359. While nothing in that Act affects the statutory provisions related to asylum or withholding of deportation, Title II of the 1986 Act creates a mechanism by which certain aliens may obtain legalization of their status. Section 201(a) of the 1986 Act establishes that, with certain exceptions, an alien who has resided continuously in the United States in an unlawful status since before January 1, 1982, is entitled to have his or her status adjusted to that of an alien lawfully admitted for temporary residence. An alien who obtains this adjustment of status under the new Act is then eligible for a second adjustment to the status of permanent resident after a waiting period of 18 months. See § 245A(a). An alien who obtains permanent residence status through this route is not, however, eligible for all benefits usually available to permanent residents. For example, aliens who obtain permanent residence through this program are not eligible for certain public welfare benefits for five years after the grant of the new status. See § 245A(H).

The record indicates that respondent may well be eligible for eventual adjustment of status if she makes a timely application after the Attorney General establishes the procedures for administering Title II. It would therefore appear that respondent might become a permanent resident by invoking the new procedures even if she is unsuccessful in her pending request for asylum. Nonetheless the possibility of this relief does not render her request for asylum moot. First, the legalization provisions of the 1986 Act are not self-executing, and the procedures for administering the new Act are not yet in place. Even if the benefits were identical,

therefore, there is no way of knowing at this time whether respondent will be able to satisfy whatever burden is placed upon her to demonstrate eligibility. Cf. *INS v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 2777, 77 L.Ed.2d 317 (1983). Second, respondent might be able to obtain permanent residence through the asylum procedure sooner than through the legalization program; if she satisfies certain conditions, she may become eligible for adjustment of status to that of permanent resident 12 months after a grant of asylum. See 8 CFR §§ 209.1– 209.2 (1986). Under Title II of the new Act, by contrast, there is an 18-month waiting period. In light of these factors, we are persuaded that the controversy is not moot.

Nor do we believe that the new Act makes it appropriate to exercise our discretion to dismiss the writ of certiorari as improvidently granted. The question presented in this case will arise, and has arisen, in hosts of other asylum proceedings brought by aliens who arrived in the United States after January 1, 1982, or who are seeking entry as refugees from other countries. The importance of the legal issue makes it appropriate for us to address the merits now.

4    Prior to the amendments, asylum for aliens who were within the United States had been governed by regulations promulgated by the INS, pursuant to the Attorney General's broad parole authority. See n. 14, *infra.* Asylum for applicants who were not within the United States was generally governed by the now-repealed § 203(a)(7) of the Act, 8 U.S.C. § 1153(a)(7) (1976 ed.). See *infra,* at 1214.

5    It is important to note that the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee. Instead, a finding that an alien is a refugee does no more than establish that "the alien *may* be granted asylum *in the discretion of the Attorney General.*" § 208(a) (emphasis added). See *Stevic,* 467 U.S., at 423, n. 18, 104 S.Ct., at 2497, n. 18; see also *infra,* at 1218–1220.

6    Asylum and withholding of deportation are two distinct forms of relief. First, as we have mentioned, there is no entitlement to asylum, it is only granted to eligible refugees pursuant to the Attorney General's discretion. Once granted, however, asylum affords broader benefits. As the BIA explained in the context of an applicant from Afghanistan who was granted § 243(h) relief but was denied asylum:

"Section 243(h) relief is 'country specific' and accordingly, the applicant here would be presently protected from deportation to Afghanistan pursuant to section 243(h). But that section would not prevent his exclusion and deportation to Pakistan or any other hospitable country under section 237(a) if that country will accept him. In contrast, asylum is a greater form of relief. When granted asylum the alien may be eligible for adjustment of status to that of a lawful permanent resident pursuant to section 209 of the Act, 8 U.S.C. § 1159, after residing here one year, subject to numerical limitations and the applicable regulations." *Matter of Salim,* 18 I. & N. Dec. 311, 315 (1982).

See also *Matter of Lam,* 18 I. & N. Dec. 15, 18 (BIA 1981).

7    Article 33.1 of the Convention provides: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 189 U.N.T.S. 150, 176 (1954) 189 U.N.T.S. 150, 176 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968).

8    While the Protocol constrained the Attorney General with respect to § 243(h) between 1968 and 1980, the Protocol does not *require* the granting of asylum to anyone, and hence does not subject the Attorney General to a similar constraint with respect to his discretion under § 208(a). See *infra,* at 1218.

9    As amended, the new § 243(h) provides: "The Attorney General *shall not* deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1) (emphasis added).

10   "The section literally provides for withholding of deportation only if the alien's life or freedom 'would' be threatened in the country to which he would be deported; it does not require withholding if the alien 'might' or 'could' be subject to persecution." *Stevic,* 467 U.S., at 422, 104 S.Ct., at 2497.

11    The BIA agrees that the term "fear," as used in this statute, refers to "a subjective condition, an emotion characterized by the anticipation or awareness of danger." *Matter of Acosta,* Interim Decision No. 2986, p. 14 (Mar. 1, 1985) (citing Webster's Third New International Dictionary 831 (16th ed. 1971)).

12    As we have explained, the plain language of this statute appears to settle the question before us. Therefore, we look to the legislative history to determine only whether there is "clearly expressed legislative intention" contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses. See *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). In this case, far from causing us to question the conclusion that flows from the statutory language, the legislative history adds compelling support to our holding that Congress never intended to restrict eligibility for asylum to aliens who can satisfy § 243(h)'s strict, objective standard.

13    The definition also applies to § 209, 8 U.S.C. § 1159, which governs the adjustment of status of refugees after they have been granted asylum.

14    Such a procedure had been authorized by regulation since 1974, see 8 CFR pt. 108 (1976), but it was administered by INS District Directors rather than the BIA. As we noted in *Stevic,* these "regulations did not explicitly adopt a standard for the exercise of discretion on the application, but did provide that a denial of an asylum application 'shall not preclude the alien, in a subsequent expulsion hearing, from applying for the benefits of section 243(h) of the Act and of Articles 32 and 33 of the Convention Relating to the Status of Refugees.' 8 CFR § 108.2 (1976)." 467 U.S., at 420, n. 13, 104 S.Ct., at 2496, n. 13. In 1979, the regulations were amended to confer jurisdiction over asylum requests on the BIA for the first time. *Ibid.*

15    See also *Matter of Janus and Janek,* 12 I. & N. Dec. 866, 876 (BIA 1968). On the District Director level, where § 203(a)(7) claims were generally processed, see n. 14, *supra,* this distinction was also recognized. In *Matter of Ugricic,* 14 I. & N. Dec. 384 (1972), a District Director articulated the test under § 203(a)(7) as whether the applicant could prove that "he was persecuted or had good reason to fear persecution." *Id.,* at 385–386.

16    See S.Rep. No. 96–256, p. 9 (1979), U.S.Code Cong. & Admin.News 1980, p. 141 (hereafter S.Rep.) (substantive standard for asylum is not changed); H.R.Rep. No. 96–608, p. 9 (1979)H.R.Rep. No. 96–608, p. 9 (1979) (hereafter H.R.Rep.) (discussing geographic limitations); Hearings before the House Subcommittee on International Operations of the Committee on Foreign Affairs on H.R. 2816, 96th Cong., 1st Sess., 72 (1979) (remarks of David Martin).

17    The INS argues that Congress intended to perpetuate the standard being used in the informal parole proceedings under the regulations, see n. 14, *supra,* not the asylum procedure under § 203(a)(7). Until 1979 the regulations provided no standard, but they were amended in 1979 to provide that the applicant has the "burden of satisfying the immigration judge that he would be subject to persecution." 8 CFR § 108.3(a) (1980). This standard was identical to the one that was set forth in the regulations for the treatment of applications for withholding of deportation. See 8 CFR § 242.17(c) (1980).

The argument that Congress intended to adhere to the standard used in the informal parole proceedings cannot be squared with Congress' use of an entirely different formulation of the standard for defining "refugee"—one much closer to § 203(a)(7), than to § 243(h) (the statute which was the focus of the standard developed in the 1980 regulations). Moreover, to the extent that Congress was ambiguous as to which practice it sought to incorporate, it is far more reasonable to conclude that it sought to continue the practice under § 203(a)(7), a statutory provision, than to adhere to the informal parole practices of the Attorney General, a matter in which Congress had no involvement.

The Government relies on the following passage from the Senate Report to support its contention that Congress sought to incorporate the standard from the parole proceedings—not from § 203(a)(7):

"[T]he bill establishes an asylum provision in the Immigration and Nationality Act for the first time by improving and clarifying the procedures for determining asylum claims filed by aliens who are physically present in the United States. The substantive standard is not changed." S.Rep., at 9, U.S.Code Cong. & Admin.News9, U.S.Code Cong. & Admin.News 1980, p. 149.

The bill that the Senate Committee was discussing indeed made no change in the standards to be applied to applications for asylum from aliens within the United States; the Senate version explicitly incorporated the same standard as used in § 243(h). See *infra*, at 1218. But the Senate version was rejected by Congress, and the well-founded fear standard that was adopted mirrored § 203(a)(7), not § 243(h).

Justice POWELL's claim that the House Report also sought to incorporate the informal asylum standard is unfounded. *Post*, at 1228–1229. As the passage he quotes and the context plainly indicate, the House Report referred to "means of entry"—an issue dealt with under § 203(a)(7), not the asylum regulations. See H.R.Rep., at 10. The Committee's reference to the Attorney General's asylum procedures, seven pages later in the text, in a discussion labeled "Asylum," and not even dealing with the definition of "well-founded fear," see *id.,* at 17, certainly does nothing to support Justice POWELL's conclusion.

18 Although this evidence concerns application of the term "refugee" to § 207, not § 208, the term is defined in § 101(a)(42), and obviously can have only one meaning. Justice POWELL suggests that the definition of "well-founded fear" be interpreted as incorporating the standard from the asylum regulations, rather than the standard from § 203(a)(7), because "[i]t is more natural to speak of 'preserving' an interpretation that had governed the *same* form of relief than one that had applied to a *different* form of relief," *post,* at 1229 (emphasis added). Since the definition in § 101(a)(42) applies to all asylum relief—that corresponding to the old § 203(a)(7) as well as that corresponding to the old Attorney General regulations—it is difficult to understand how Justice POWELL reasons that it is likely that Congress preserved the "*same* form of relief" (emphasis added). The question is: the "same" as which? Our answer, based on Congress' choice of language and the legislative history, is that Congress sought to incorporate the "same" standard as that used in § 203(a)(7).

19 See H.R.Conf.Rep. No. 96–781, p. 19 (1980), U.S.Code Cong. & Admin.News 1980, p. 160; H.R.Rep., at 9; S.Rep., at 4.

20 In the Displaced Persons Act of 1948, 62 Stat. 1009 §§ 2(a), (d), Congress adopted the IRO definition of the term "refugee" and thus used the "fear of persecution" standard. This standard was retained in the Refugee Relief Act of 1953, 67 Stat. 400 § 2(a), as well as in the Refugee Escapee Act of 1957, 71 Stat. 643 § 15(c)(1). In 1965, when Congress enacted § 203(a)(7) of the Act, it again used the "fear of persecution" standard. The interpretation afforded to the IRO definition is important in understanding the United Nations' definition since the Committee drafting the United Nations' definition made it clear that it sought to "assure that the new consolidated convention should afford at least as much protection to refugees as had been provided by previous agreements." United Nations Economic and Social Council, Report of the Ad Hoc Committee on Statelessness and Related Problems 37 (Feb. 17, 1950) (U.N.Doc. E/1618, E/AC.32/5 (hereafter U.N.Rep.)). In its Manual for Eligibility Officers, the IRO had stated:

"Fear of persecution is to be regarded as a valid objection whenever an applicant can make plausible that owing to his religious or political convictions or to his race, he is afraid of discrimination, or persecution, on returning home. Reasonable grounds are to be understood as meaning that the applicant can give a plausible and coherent account of why he fears persecution." International Refugee Organization, Manual for Eligibility Officers, No. 175, ch. IV, Annex 1, Pt. 1, § C19, p. 24 (undated, circulated in 1950).

21 Although the United States has never been party to the 1951 Convention, it is a party to the Protocol, which incorporates the Convention's definition in relevant part. See 19 U.S.T. 6225, T.I.A.S. No. 6577 (1968).

22 We do not suggest, of course, that the explanation in the U.N. Handbook has the force of law or in any way binds the INS with reference to the asylum provisions of § 208(a). Indeed, the Handbook itself disclaims such force, explaining that "the determination of refugee status under the 1951 Convention and the 1967 Protocol ... is incumbent upon the Contracting State in whose territory the refugee finds himself." Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status 1 (ii) (Geneva, 1979).

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Nonetheless, the Handbook provides significant guidance in construing the Protocol, to which Congress sought to conform. It has been widely considered useful in giving content to the obligations that the Protocol establishes. See *McMullen v. INS,* 658 F.2d 1312, 1319 (CA9 1981); *Matter of Frentescu,* 18 I. & N. Dec. 244 (BIA 1982); *Matter of Rodriguez-Palma,* 17 I. & N. Dec. 465 (BIA 1980).

23    The Board's decision in *Matter of Dunar,* 14 I. & N. Dec. 310 (1973), is not particularly probative of what the Protocol means and how it interacts with the provisions of the 1980 Act. In *Dunar,* the Board was faced with the question whether the United States' accession to the Protocol modified the standard of proof to be applied under § 243(h). The Board, after elaborating on the principle that treaties are not lightly to be read as superseding prior Acts of Congress, *id.,* at 313–314, found no evidence that Congress sought to modify the § 243(h) standard, and therefore construed the provisions as not inherently inconsistent. Even so, the Board recognized some tension between the standards, but was satisfied that they could "be reconciled on a case-by-case consideration as they arise." *Id.,* at 321.

Whether or not the Board was correct in *Dunar,* its holding based on a presumption that the two provisions were consistent says little about how the Protocol should be interpreted absent such a presumption, and given Congress' amendment of the statute to make it conform with the Protocol. See *Carvajal-Munoz,* 743 F.2d, at 574 (distinguishing pre–1980 "prediction" about the relation of the standards with post–1980 analysis of Congress' actual intent).

24    See 1 A. Grahl-Madsen, The Status of Refugees in International Law 181 (1966) ("If there is a real chance that he will suffer persecution, that is reason good enough, and his 'fear' is 'well-founded' "); G. Goodwin-Gill, The Refugee in International Law 22–24 (1983) (balance of probability test is inappropriate; more appropriate test is "reasonable chance," "substantial grounds for thinking," or "serious possibility"); see generally Cox, "Well-Founded Fear of Being Persecuted": The Sources and Application of a Criterion of Refugee Status, 10 Brooklyn J. Int'l Law 333 (1984).

25    The 1980 Act made withholding of deportation under § 243(h) mandatory in order to comply with Article 33.1. See *supra,* at 1211–1212.

26    Section 207(b)(1) of the Senate bill provided: "The Attorney General shall establish a uniform procedure for an alien physically present in the United States, irrespective of his status, to apply for asylum, and the alien shall be granted asylum if he is a refugee within the meaning of section 101(a)(42)(A) and his deportation or return would be prohibited under section 243(h) of this Act." See S.Rep., at 26.

27    The 1980 Act was the culmination of a decade of legislative proposals for reform in the refugee laws. See generally Anker & Posner, The Forty Year Crisis: A Legislative History of the Refugee Act of 1980, 19 San Diego L.Rev. 9, 20–64 (1981). On a number of occasions during that period, the Government objected to the "well-founded fear" standard, arguing: "[I]t should be limited by providing that it be a 'well-founded fear in the opinion of the Attorney General.' Failure to add 'in the opinion of the Attorney General' would make it extremely difficult to administer this section since it would be entirely subjective." Western Hemisphere Immigration, Hearings on H.R. 981 before Subcommittee No. 1 of the Committee on the Judiciary, 93d Cong., 1st Sess., 95 (1973) (statement of Hon. Francis Kellogg, Special Assistant to the Secretary of State). See also Anker & Posner, *supra,* at 25; Helton, Political Asylum Under the 1980 Refugee Act: An Unfulfilled Promise, 10 Mich.J.L. Ref. 243, 249–252 (1984). In light of this kind of testimony and attention to the issue, it is unrealistic to suggest that Congress did not realize that the "well-founded fear" standard was significantly different from the standard that has continuously been part of § 243(h).

28    There are certain exceptions, not relevant here. See, *e.g.,* § 243(h)(2)(A) (alien himself participated in "the persecution of any person ..."); § 243(h)(2)(B) (alien was convicted of "serious crime" and "constitutes a danger to the community of the United States").

29    In view of the INS's heavy reliance on the principle of deference as described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we set forth the relevant text in its entirety:

AR.05008

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1168 of 1384

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

" 'The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'

*Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

"We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations

" 'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations....

" '... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' *United States v. Shimer,* 367 U.S. 374, 382, 383 [81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908] (1961)."

"Accord, *Capital Cities Cable, Inc. v. Crisp,* [467 U.S. 691, 699–700, 104 S.Ct. 2694, 2700–2701, 81 L.Ed.2d 580 (1984) ].

"In light of these well-settled principles it is clear that the Court of Appeals misconceived the nature of its role in reviewing the regulations at issue. Once it determined, after its own examination of the legislation, that Congress did not actually have an intent regarding the applicability of the bubble concept to the permit program, the question before it was not whether in its view the concept is 'inappropriate' in the general context of a program designed to improve air quality, but whether the Administrator's view that it is appropriate in the context of this particular program is a reasonable one. Based on the examination of the legislation and its history which follows, we agree with the Court of Appeals that Congress did not have a specific intention on the applicability of the bubble concept in these cases, and conclude that the EPA's use of that concept here is a reasonable policy choice for the agency to make." *Id.,* at 842–845, 104 S.Ct., at 2781–2783 (citations and footnotes omitted).

[30]    An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has taken through the years. An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view. *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981); see also *General Electric Co. v. Gilbert,* 429 U.S. 125, 143, 97 S.Ct. 401, 411–412, 50 L.Ed.2d 343 (1976).

The BIA has answered the question of the relationship between the objective § 243(h) standard and the fear-based standard of §§ 203(a)(7), 208, and the United Nations Protocol in at least three different ways.

During the period between 1965, when § 203(a)(7) was enacted, and 1972, the BIA expressly recognized that § 203(a)(7) and § 243(h) prescribed different standards. See *supra,* at 1213–1214. Moreover, although the BIA decided in 1973 that the two standards were not irreconcilably different, see *Matter of Dunar, 14 I. & N. Dec. 310 (1973),* as of 1981 the INS was still instructing its officials to apply a "good reason" test to requests for asylum from aliens not within the United States. See Dept. of Justice, INS Operating Instructions Regulations TM 101, § 208.4, p. 766.9 (Nov. 11, 1981) (explaining that "well-founded fear" is satisfied if applicant "can show good reason why he/she fears persecution"). In 1984, when this case was decided by the BIA, it adhered to the view that the INS now espouses—complete identity of the standards. In 1985, however, the BIA decided to reevaluate its position and issued a comprehensive opinion to explain its latest understanding of the "well-founded fear" standard. *Matter of Acosta,* Interim Decision No. 2986 (Mar. 1, 1985).

In *Acosta,* the BIA noted a number of similarities between the two standards and concluded that in practical application they are "comparable" or "essentially comparable," and that the differences between them are not "meaningful," but the agency never stated that they are identical, equivalent, or interchangeable. On the contrary, the *Acosta* opinion itself establishes that the two standards differ. In describing the objective component of the asylum standard, the BIA concluded that the alien is not required to establish the likelihood of persecution to any "particular degree of certainty." *Id.,* at 22. There must be a "real chance" that the alien will become a victim of persecution, *ibid.,* but it is not necessary to show "that persecution 'is more likely than not' to occur." *Id.,* at 25. The *Acosta* opinion was written after we had decided in *Stevic* that the § 243(h) standard "requires that an application be supported by evidence establishing that it is more likely than not that the alien would be subject to persecution," *467 U.S., at 429–430, 104 S.Ct., at 2501.* The decision in *Acosta* and the long pattern of erratic treatment of this issue make it apparent that the BIA has not consistently agreed, and even today does not completely agree, with the INS's litigation position that the two standards are equivalent.

31 How "meaningful" the differences between the two standards may be is a question that cannot be fully decided in the abstract, but the fact that Congress has prescribed two different standards in the same Act certainly implies that it intended them to have significantly different meanings.

We cannot accept the INS's argument that it is impossible to think about a "well-founded fear" except in "more likely than not" terms. The Board was able to do it for a long time under § 203(a)(7), see *Matter of Tan, 12 I. & N. Dec. 564 (1967); Matter of Adamska, 12 I. & N. Dec. 201 (1967),* and has apparently had little trouble applying the two separate standards in compliance with the recent Courts of Appeals' decisions. See, *e.g., Matter of Sanchez and Escobar,* Interim Decision No. 2996 (Oct. 15, 1985).

32 Justice POWELL argues that the Court of Appeals should be reversed for a different reason—that it misinterpreted the BIA's decision. See *post,* at 1213–1216. This issue was not raised in any of the parties' briefs, and was neither "set forth" nor "fairly included" within the question presented in the petition for certiorari. See this Court's Rule 20.1. The question presented asked:

"Whether an alien's burden of proving eligibility for asylum pursuant to Section 208(a) of the Immigration and Nationality Act of 1952, *8 U.S.C. 1158(a),* is equivalent to his burden of proving eligibility for withholding of deportation pursuant to Section 243(h) of the Act, *8 U.S.C. 1253(h).*" Pet. for Cert. (I).

This question cannot be read as challenging the Court of Appeals' determination that the BIA in fact required respondent "to demonstrate a clear probability of persecution in order to be declared eligible for asylum." *767 F.2d, at 1454.* We therefore decline to address the issue. See *United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 60, n. 2, 101 S.Ct. 1559, 1562–1563, n. 2, 67 L.Ed.2d 732 (1981); Irvine v. California, 347 U.S. 128, 129, 74 S.Ct. 381, 98 L.Ed. 561 (1954).*

\* See, *e.g., Carcamo-Flores v. INS, 805 F.2d 60, 68 (CA2 1986)* ("What is relevant is the fear a reasonable person would have, keeping in mind the context of a reasonable person who is facing the possibility of persecution, perhaps including a loss of freedom or even, in some cases, the loss of life"); *Guevara-Flores*

*v. INS,* 786 F.2d 1242, 1249 (CA5 1986), cert. pending, No. 86–388 ("An alien possesses a well-founded fear of persecution if a reasonable person in her circumstances would fear persecution if she were to be returned to her native country"); *Cardoza-Fonseca v. INS,* 767 F.2d 1448, 1452–1453 (CA9 1985) (case below) ("In contrast, the term 'well-founded fear' requires that (1) the alien have a subjective fear, and (2) that this fear have enough of a basis that it can be considered well-founded"); *Carvajal-Munoz v. INS,* 743 F.2d 562, 574 (CA7 1984) ("The applicant must present *specific* facts establishing that he or she has actually been the victim of persecution or has some other good reason to fear that he or she will be *singled out* for persecution on account of race, religion, nationality, membership in a particular social group, or political opinion") (emphasis in original).

1    The Court suggests that the BIA's interpretation of the "well-founded fear" standard has been "erratic." *Ante,* at 1222, n. 29. An examination of the *relevant* BIA decisions leads to a contrary conclusion. The BIA first addressed the standard in *Matter of Dunar,* 14 I. & N. Dec. 310 (1973). In that case, the BIA considered the meaning of the term "well-founded fear" in the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 6225, T.I.A.S. No. 6577 (1968). When Congress inserted this language in the asylum provisions of the Act in 1980, the BIA interpreted the language to mean exactly the same thing as the language in the Protocol. *Matter of Acosta,* Interim Decision No. 2986 (Mar. 1, 1985). Thus, the BIA's position has never changed. The Court bases its characterization of the BIA's record on decisions applying the more lenient "fear" standard. If anything about these statutes is clear, it is that a "well-founded fear" is something more than a "fear." It is unfair to characterize the BIA's decisions as "erratic" when the agency was in fact interpreting two different standards.

2    The BIA has interpreted the statutory definition to require proof of four elements: (i) the alien must have a "fear" of "persecution"; (ii) the fear must be "well-founded"; (iii) the persecution must be "on account of race, religion, nationality, membership in a particular social group, or political opinion"; and (iv) the alien must be unable or unwilling to return to his homeland because of persecution or his well-founded fear of persecution. See *id.,* at 11.

3    Of course, the applicant would have to meet all four elements of the well-founded fear standards. See *supra,* at 3 (quoting *Acosta,* Interim Decision No. 2986, at 22). Although these requirements restrict grants of relief in some cases, none of them rests on the mathematical considerations that the Court suggests govern current BIA practice. Moreover, the Court's exegesis of the "plain meaning" of the phrase "well-founded" in no way suggests that the BIA's four-part test is a misinterpretation of the statute.

4    Those regulations constituted this country's informal attempt to comply with the exhortation of the Convention Relating to the Status of Refugees to "facilitate the assimilation and naturalization," Art. 34, Jan. 31, 1967, [1968] 19 U.S.T. 6259, 6276, T.I.A.S. No. 6577, of persons who have a "well-founded fear of being persecuted," Art. 1(A)(2), *id.,* at 6261. All parties agree that the Convention's language was the ultimate source of the language Congress placed in the Act.

5    The Court concludes that the Senate Report has no probative force because the Conference Committee adopted the House language rather than the Senate language. But the changes in language made by the Conference Committee do not help the Court's position. As I explain *infra* this page, the House Report indicates that the House Bill also was intended to adopt the standards set forth in the regulations. Moreover, there is no suggestion in the Conference Report that this change in language affected the substantive standard. See *infra,* at 1230.

6    This interpretation is supported by evidence that the House bill, like the Senate bill, was intended to preserve the Attorney General's regulations treating the two standards as substantially identical. See *supra,* at 1229.

7    The Court contends that this question is not before us. *Ante,* at 1221, n. 31. I find this suggestion quite strange. The Immigration and Naturalization Service asked the Court to determine "[w]hether an alien's burden of proving eligibility for asylum ... is equivalent to his burden of proving eligibility for withholding of deportation." Pet. for Cert. (I). The question whether the two standards are equivalent "fairly includes," under this Court's

107 S.Ct. 1207, 94 L.Ed.2d 434, 55 USLW 4313

Rule 21.1(a), the problem of defining the appropriate standard for asylum. And that question can only be answered on the facts of this case. The Court does not sit to answer hypothetical questions of statutory construction. Normally we resolve such questions only by examining the facts of the case before us. In this case, the Court affirms the Court of Appeals' decision that the BIA required an intolerably high burden of proof in this case. Yet, like the Court of Appeals, the Court examines neither the facts of the case before us nor the legal standard the BIA applied. In my view, Rule 21 does not contemplate this result.

8    In terms of the four-element *Acosta* test for well-founded fear, respondent's claim would have failed both the first and the second elements. Respondent failed to show either that she "possesses a belief or characteristic the persecutor seeks to overcome" or that "the persecutor is already aware, or could easily become aware, that [she] possesses this belief or characteristic." *Acosta,* Interim Decision No. 2986, at 22.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

I.N.S. v. Chadha, 462 U.S. 919 (1983)

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

🚩 KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Virginia House of Delegates v. Bethune-Hill, U.S.Va., June 17, 2019

103 S.Ct. 2764
Supreme Court of the United States

IMMIGRATION AND
NATURALIZATION SERVICE, Appellant
v.
Jagdish Rai CHADHA et al.
UNITED STATES HOUSE OF
REPRESENTATIVES, Petitioner
v.
IMMIGRATION AND
NATURALIZATION SERVICE et al.
UNITED STATES SENATE, Petitioner
v.
IMMIGRATION AND
NATURALIZATION SERVICE et al.

Nos. 80–1832, 80–2170 and 80–2171.
|
Argued Feb. 22, 1982.
|
Reargued Oct. 7, 1982.
|
Decided June 23, 1983.

**Synopsis**
Alien whose suspension of deportation had been vetoed by one House of Congress sought review of order of deportation.

The Court of Appeals, Kennedy, Circuit Judge, 🟡 634 F.2d 408, held the section of Immigration and Nationality Act authorizing one-House veto unconstitutional, and certiorari was granted. The Supreme Court, Chief Justice Burger, held that section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch to allow a particular deportable alien to remain in the United States is unconstitutional, because action by House pursuant to that section is essentially legislative and thus subject to the constitutional requirements of passage by a majority of both Houses and presentation to the President.

Affirmed.

Justice Powell, concurred in the judgment and filed opinion.

Justice White dissented and filed an opinion.

Justice Rehnquist dissented and filed an opinion in which Justice White joined.

West Headnotes (20)

**[1]    Federal Courts** 🔑 Particular Cases, Contexts, and Questions

Supreme Court had jurisdiction to entertain Immigration and Naturalization Service's appeal from judgment of Court of Appeals holding unconstitutional the section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch to allow a particular deportable alien to remain in the United States, because Court of Appeals is a "court of the United States" the proceeding below was a "civil action, suit or proceeding," the INS is an agency of the United States and was a party to the proceeding below, and the judgment below held an act of Congress unconstitutional. 🚩 28 U.S.C.A. § 1252.

5 Cases that cite this headnote

**[2]    Federal Courts** 🔑 Persons entitled to seek review or assert arguments;  parties

When agency of United States is a party to a case in which an act of Congress it administers is held unconstitutional, it is an aggrieved party for purposes of taking an appeal under statute providing that any party may appeal to the Supreme Court from a judgment of any court of the United States holding an act of Congress unconstitutional in any civil action, suit or proceeding to which United States or any of its agencies is a party. 🚩 28 U.S.C.A. § 1252.

16 Cases that cite this headnote

**[3]    Statutes** 🔑 Effect of Partial Invalidity; Severability

A statutory provision is presumed severable if what remains after severance is fully operative as law.

53 Cases that cite this headnote

[4]    **Statutes** 🗝 Aliens, immigration, and citizenship

Section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch to allow a particular deportable alien to remain in the United States was severable from the remainder of the section of the Act governing suspension of deportation, because Act provided that if any particular provisions were held invalid, the remainder of Act would not be affected, and presumption of severability which arose therefrom was supported by legislative history and by fact that the remainder of section of Act governing suspension of deportation could survive as a fully operative and workable administrative mechanism without the one-house veto. Immigration and Nationality Act, §§ 244, 244(c)(2), 406, as amended, 🚩 8 U.S.C.A. §§ 1254, 🚩 1254(c)(2), 🚩 1101 note.

110 Cases that cite this headnote

[5]    **Constitutional Law** 🗝 Separation of powers

Alien whose deportation was suspended by the Immigration and Naturalization Service but who was subsequently ordered deported pursuant to House veto of Attorney General's decision to allow him to remain in the United States had standing to challenge constitutionality of section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch, to allow a particular deportable alien to remain in the United States, because he demonstrated injury in fact and a substantial likelihood that judicial relief requested would prevent or redress the claimed injury. Immigration and Nationality Act, § 244(c)(2), as amended, 🚩 8 U.S.C.A. § 1254(c)(2).

130 Cases that cite this headnote

[6]    **Constitutional Law** 🗝 Necessity of Determination

Supreme Court would not decline to decide the constitutionality of section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch to allow a particular deportable alien to remain in the United States merely because alien who challenged the statute may have had other statutory relief available to him, since the other avenues of relief were, at most, speculative. Immigration and Nationality Act, §§ 201(b), 204, 244(c)(2), 245, as amended, 🟡 8 U.S.C.A. §§ 1151(b), 🟡 1154, 🚩 1254(c)(2), 🟡 1255.

28 Cases that cite this headnote

[7]    **Constitutional Law** 🗝 Necessity of Determination

Person threatened with deportation cannot be denied the right to challenge the constitutional validity of the process which led to his status merely on the basis of speculation over the availability of other forms of relief.

1 Cases that cite this headnote

[8]    **Aliens, Immigration, and Citizenship** 🗝 Jurisdiction and venue

Court of Appeals had jurisdiction, under section of Immigration and Nationality Act providing that petition for review in Court of Appeals shall be the sole and exclusive procedure for judicial review of final orders of deportation made against aliens pursuant to administrative proceedings, over alien's suit which challenged section of the Act authorizing one House of Congress to invalidate decision of Executive Branch to allow a particular deportable alien to remain in the United States, because section of Act establishing Court of Appeals' jurisdiction includes all matters on which final deportation order is contingent, rather than only those

determinations made at deportation hearing. Immigration and Nationality Act, §§ 106(a), 242(b), 244(c)(2), as amended, 8 U.S.C.A. §§ 1105a(a), 1252(b), 1254(c)(2).

104 Cases that cite this headnote

**[9]** **Constitutional Law** — Case or controversy requirement

Alien's suit challenging section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch to allow particular deportable alien to remain in the United States presented a genuine controversy, despite fact that Immigration and Naturalization Service agreed with alien's position on the constitutionality of the statutory provision, because INS would have deported alien absent Court of Appeals' judgment invalidating the challenged section, and Congress was a proper party to defend the constitutionality of the challenged section. Immigration and Nationality Act, § 244(c)(2), as amended, 8 U.S.C.A. § 1254(c)(2).

29 Cases that cite this headnote

**[10]** **Constitutional Law** — Judicial Authority and Duty in General

The assent of the Executive Branch to a bill which contains a provision contrary to the Constitution does not shield it from judicial review.

10 Cases that cite this headnote

**[11]** **Constitutional Law** — Political Questions

Alien's suit challenging section of Immigration and Nationality Act authorizing one house of Congress, by resolution, to invalidate decision of Executive Branch to allow a particular deportable alien to remain in United States did not present a nonjusticiable political question on the asserted ground that alien was merely challenging Congress' authority under the naturalization and necessary and proper clauses of the Constitution, because resolution

of litigation challenging constitutional authority of one of the three branches should not be evaded simply because the issues have political implications. Immigration and Nationality Act, § 244(c)(2), as amended, 8 U.S.C.A. § 1254(c)(2); U.S.C.A. Const. Art. 1, § 8, cls. 4, 18; Art. 3, § 1 et seq.

215 Cases that cite this headnote

**[12]** **Constitutional Law** — Wisdom

Wisdom of statute is not the concern of the courts; if a challenged statute does not violate the Constitution, it must be sustained.

19 Cases that cite this headnote

**[13]** **Constitutional Law** — Constitutionality of Statutory Provisions

Fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.

45 Cases that cite this headnote

**[14]** **Constitutional Law** — Separation of Powers

When any branch of government acts, it is presumptively exercising the power the Constitution has delegated to it.

23 Cases that cite this headnote

**[15]** **Statutes** — Concurrence of separate houses of legislature
**Statutes** — Presentation

Not every action taken by either House of Congress is subject to the bicameralism and presentment requirements of Article I. U.S.C.A. Const. Art. 1, § 1; Art. 1, § 7, cls. 2, 3; Art. 2, § 2, cl. 2.

46 Cases that cite this headnote

**[16]** **Constitutional Law** — Nature and scope in general

I.N.S. v. Chadha, 462 U.S. 919 (1983)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1175 of 1384

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

Whether actions taken by either House of Congress are, in law and fact, an exercise of legislative power depends not on their form but upon whether they contain matter which is properly to be regarded as legislative in its character and effect.

43 Cases that cite this headnote

[17]  **Aliens, Immigration, and Citizenship** ⚷ Cancellation of Removal or Suspension of Deportation in General

**Constitutional Law** ⚷ Nature and scope in general

When Attorney General performs his duties pursuant to section of Immigration and Nationality Act governing suspension of deportation, he does not exercise "legislative" power. Immigration and Nationality Act, § 244, as amended, 🚩 8 U.S.C.A. § 1254.

9 Cases that cite this headnote

[18]  **Constitutional Law** ⚷ Encroachment on Executive

**Constitutional Law** ⚷ Judicial encroachment on executive acts taken under statutory authority

**Constitutional Law** ⚷ Nature and scope in general

Executive action under legislatively delegated authority that might resemble "legislative" action in some respect is not subject to the approval of both Houses of Congress and the President for the reason that the Constitution does not so require; that kind of executive action is always subject to check by the terms of the legislation that authorized it, and if that authority is exceeded, it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely. U.S.C.A. Const. Art. 1, §§ 1, 7, cls. 2, 3.

75 Cases that cite this headnote

[19]  **Statutes** ⚷ Constitutional requirements

**Statutes** ⚷ Repeal

Amendment and repeal of statutes, no less than enactment, must conform with Article I. U.S.C.A. Const. Art. 1, § 1 et seq.

10 Cases that cite this headnote

[20]  **Aliens, Immigration, and Citizenship** ⚷ Validity

**United States** ⚷ Orders and resolutions

Section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch to allow a particular deportable alien to remain in the United States is unconstitutional, because action by House pursuant to that section is essentially legislative and thus subject to the constitutional requirements of passage by a majority of both Houses and presentation to the President. Immigration and Nationality Act, § 244(c)(2), as amended, 🚩 8 U.S.C.A. § 1254(c)(2); U.S.C.A. Const. Art. 1, § 1; Art. 1, § 7, cls. 2, 3; Art. 2, § 2, cl. 2.

204 Cases that cite this headnote

**\*919  \*\*2767** *Syllabus* [*]

Section 244(c)(2) of the Immigration and Nationality Act (Act) authorizes either House of Congress, by resolution, to invalidate the decision of the Executive Branch, pursuant to authority delegated by Congress to the Attorney General, to allow a particular deportable alien to remain in the United States. Appellee-respondent Chadha, an alien who had been lawfully admitted to the United States on a nonimmigrant student visa, remained in the United States after his visa had expired and was ordered by the Immigration and Naturalization Service (INS) to show cause why he should not be deported. He then applied for suspension of the deportation, and, after a hearing, an Immigration Judge, acting pursuant to § 244(a)(1) of the Act, which authorizes the Attorney General, in his discretion, to suspend deportation, ordered the suspension, and reported the suspension to Congress as required by § 244(c)(1). Thereafter, the House of Representatives passed a Resolution pursuant to § 244(c)(2) vetoing the suspension, and the Immigration Judge reopened the deportation proceedings. Chadha moved to

terminate the proceedings on the ground that § 244(c)(2) is unconstitutional, but the judge held that he **2768 had no authority to rule on its constitutionality and ordered Chadha deported pursuant to the House Resolution. Chadha's appeal to the Board of Immigration Appeals was dismissed, the Board also holding that it had no power to declare § 244(c)(2) unconstitutional. Chadha then filed a petition for review of the deportation order in the Court of Appeals, and the INS joined him in arguing that § 244(c)(2) is unconstitutional. The Court of Appeals held that § 244(c)(2) violates the constitutional doctrine of separation of powers, and accordingly directed the Attorney General to cease taking any steps to deport Chadha based upon the House Resolution.

*920 *Held:*

1. This Court has jurisdiction to entertain the INS's appeal in No. 80–1832 under 🔴 28 U.S.C. § 1252, which provides that "[a]ny party" may appeal to the Supreme Court from a judgment of "any court of the United States" holding an Act of Congress unconstitutional in "any civil action, suit or proceeding" to which the United States or any of its agencies is a party. A court of appeals is "a court of the United States" for purposes of 🔴 § 1252, the proceeding below was a "civil action, suit or proceeding," the INS is an agency of the United States and was a party to the proceeding below, and the judgment below held an Act of Congress unconstitutional. Moreover, for purposes of deciding whether the INS was "any party" within the grant of appellate jurisdiction in 🔴 § 1252, the INS was sufficiently aggrieved by the Court of Appeals' decision prohibiting it from taking action it would otherwise take. An agency's status as an aggrieved party under 🔴 § 1252 is not altered by the fact that the Executive may agree with the holding that the statute in question is unconstitutional. Pp. 2772 – 2774.

2. Section 244(c)(2) is severable from the remainder of § 244. Section 406 of the Act provides that if any particular provision of the Act is held invalid, the remainder of the Act shall not be affected. This gives rise to a presumption that Congress did not intend the validity of the Act as a whole, or any part thereof, to depend upon whether the veto clause of § 244(c)(2) was invalid. This presumption is supported by § 244's legislative history. Moreover, a provision is further presumed severable if what remains after severance is fully operative as a law. Here, § 244 can survive as a "fully operative" and workable administrative mechanism without the one-house veto. Pp. 2774 – 2776.

3. Chadha has standing to challenge the constitutionality of § 244(c)(2) since he has demonstrated "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." 🔴 *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595. P. 2776.

4. The fact that Chadha may have other statutory relief available to him does not preclude him from challenging the constitutionality of § 244(c)(2), especially where the other avenues of relief are at most speculative. Pp. 2776 – 2777.

5. The Court of Appeals had jurisdiction under § 106(a) of the Act, which provides that a petition for review in a court of appeals "shall be the sole and exclusive procedure for the judicial review of all final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings" under § 242(b) of the Act. Section 106(a) includes all matters on which the final deportation order is contingent, rather than only those determinations made at the deportation *921 hearing. Here, Chadha's deportation stands or falls on the validity of the challenged veto, the final deportation order having been entered only to implement that veto. Pp. 2777 – 2778.

6. A case or controversy is presented by these cases. From the time of the House's formal intervention, there was concrete adverseness, and prior to such intervention, there was adequate Art. III adverseness even though the only parties were the INS and Chadha. The INS's agreement with Chadha's position does not **2769 alter the fact that the INS would have deported him absent the Court of Appeals' judgment. Moreover, Congress is the proper party to defend the validity of a statute when a Government agency, as a defendant charged with enforcing the statute, agrees with plaintiffs that the statute is unconstitutional. P. 2778.

7. These cases do not present a nonjusticiable political question on the asserted ground that Chadha is merely challenging Congress' authority under the Naturalization and Necessary and Proper Clauses of the Constitution. The presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine. Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by the courts simply because the issues have political implications. Pp. 2778 – 2780.

I.N.S. v. Chadha, 462 U.S. 919 (1983)
103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

8. The congressional veto provision in § 244(c)(2) is unconstitutional. Pp. 2780 – 2787.

(a) The prescription for legislative action in Art. I, § 1—requiring all legislative powers to be vested in a Congress consisting of a Senate and a House of Representatives—and § 7—requiring every bill passed by the House and Senate, before becoming law, to be presented to the President, and, if he disapproves, to be repassed by two-thirds of the Senate and House—represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered procedure. This procedure is an integral part of the constitutional design for the separation of powers. Pp. 2780 – 2784.

(b) Here, the action taken by the House pursuant to § 244(c)(2) was essentially legislative in purpose and effect and thus was subject to the procedural requirements of Art. I, § 7, for *legislative* action: passage by a majority of both Houses and presentation to the President. The one-House veto operated to overrule the Attorney General and mandate Chadha's deportation. The veto's legislative character is confirmed by the character of the congressional action it supplants; *i.e.,* absent the veto provision of § 244(c)(2), neither the House nor the Senate, or both acting together, could effectively require the Attorney General to deport an alien once the Attorney General, in the exercise of legislatively **\*922** delegated authority, had determined that the alien should remain in the United States. Without the veto provision, this could have been achieved only by legislation requiring deportation. A veto by one House under § 244(c)(2) cannot be justified as an attempt at amending the standards set out in § 244(a)(1), or as a repeal of § 244 as applied to Chadha. The nature of the decision implemented by the one-House veto further manifests its legislative character. Congress must abide by its delegation of authority to the Attorney General until that delegation is legislatively altered or revoked. Finally, the veto's legislative character is confirmed by the fact that when the Framers intended to authorize either House of Congress to act alone and outside of its prescribed bicameral legislative role, they narrowly and precisely defined the procedure for such action in the Constitution. Pp. 2784 – 2787.

634 F.2d 408, affirmed.

**Attorneys and Law Firms**

*Eugene Gressman* reargued the cause for petitioner in No. 80-2170. With him on the briefs was *Stanley M. Brand.*

*Michael Davidson* reargued the cause for petitioner in No. 80-2171. With him on the briefs were *M. Elizabeth Culbreth* and *Charles Tiefer.*

*Solicitor General Lee* reargued the cause for the Immigration and Naturalization Service in all cases. With him on the briefs were *Assistant Attorney General Olson, Deputy Solicitor General Geller, Deputy Assistant Attorney General Simms, Edwin S. Kneedler, David A. Strauss,* and *Thomas O. Sargentich.*

*Alan B. Morrison* reargued the cause for Jagdish Rai Chadha in all cases. With him on the brief was *John Cary Sims.*†

† *Antonin Scalia, Richard B. Smith,* and *David Ryrie Brink* filed a brief for the American Bar Association as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Robert C. Eckhardt* for Certain Members of the United States House of Representatives; and by *Paul C. Rosenthal* for the Counsel on Administrative Law of the Federal Bar Association.

**Opinion**

**\*923** Chief Justice BURGER delivered the opinion of the Court.

We granted certiorari in Nos. 80–2170 and 80–2171, and postponed consideration of the question of jurisdiction in No. 80–1832. Each presents a challenge to the constitutionality of the provision in § 244(c)(2) of the Immigration and Nationality Act, **\*\*2770** 8 U.S.C. § 1254(c)(2), authorizing one House of Congress, by resolution, to invalidate the decision of the Executive Branch, pursuant to authority delegated by Congress to the Attorney General of the United States, to allow a particular deportable alien to remain in the United States.

I

Chadha is an East Indian who was born in Kenya and holds a British passport. He was lawfully admitted to the United States in 1966 on a nonimmigrant student visa.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

His visa expired on June 30, 1972. On October 11, 1973, the District Director of the Immigration and Naturalization Service ordered Chadha to show cause why he should not be deported for having "remained in the United States for a longer time than permitted." App. 6. Pursuant to § 242(b) of the Immigration and Nationality Act (Act), 8 U.S.C. § 1252(b), a deportation hearing was held before an immigration judge on January 11, 1974. Chadha conceded that he was deportable for overstaying his visa and the hearing was adjourned to enable him to file an application for suspension of deportation under § 244(a)(1) of the Act, 8 U.S.C. § 1254(a)(1). Section 244(a)(1) provides:

"(a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and—

(1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United **\*924** States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." [1]

After Chadha submitted his application for suspension of deportation, the deportation hearing was resumed on February 7, 1974. On the basis of evidence adduced at the hearing, affidavits submitted with the application, and the results of a character investigation conducted by the INS, the immigration judge, on June 25, 1974, ordered that Chadha's deportation be suspended. The immigration judge found that Chadha met the requirements of § 244(a)(1): he had resided continuously in the United States for over seven years, was of good moral character, and would suffer "extreme hardship" if deported.

Pursuant to § 244(c)(1) of the Act, 8 U.S.C. § 1254(c)(1), the immigration judge suspended Chadha's deportation and a report of the suspension was transmitted to Congress. Section 244(c)(1) provides:

"Upon application by any alien who is found by the Attorney General to meet the requirements of subsection (a) of this section the Attorney General may in his discretion suspend deportation of such alien. If the deportation of any alien is suspended under the provisions of this subsection, a complete and detailed statement of the **\*925** facts and pertinent provisions of law in the case shall be reported to the Congress with the reasons for such suspension. Such reports shall be submitted on the first day of each calendar month in which Congress is in session."

Once the Attorney General's recommendation for suspension of Chadha's deportation was conveyed to Congress, Congress **\*\*2771** had the power under § 244(c)(2) of the Act, 8 U.S.C. § 1254(c)(2), to veto [2] the Attorney General's determination that Chadha should not be deported. Section 244(c)(2) provides:

"(2) In the case of an alien specified in paragraph (1) of subsection (a) of this subsection—

if during the session of the Congress at which a case is reported, or prior to the close of the session of the Congress next following the session at which a case is reported, either the Senate or the House of Representatives passes a resolution stating in substance that it does not favor the suspension of such deportation, the Attorney General shall thereupon deport such alien or authorize the alien's voluntary departure at his own expense under the order of deportation in the manner provided by law. If, within the time above specified, neither the Senate nor the House of Representatives shall pass such a resolution, the Attorney General shall cancel deportation proceedings."

**\*926** The June 25, 1974 order of the immigration judge suspending Chadha's deportation remained outstanding as a valid order for a year and a half. For reasons not disclosed by the record, Congress did not exercise the veto authority reserved to it under § 244(c)(2) until the first session of the 94th Congress. This was the final session in which Congress,

pursuant to § 244(c)(2), could act to veto the Attorney General's determination that Chadha should not be deported. The session ended on December 19, 1975. 121 Cong.Rec. 42014, 42277 (1975). Absent Congressional action, Chadha's deportation proceedings would have been cancelled after this date and his status adjusted to that of a permanent resident alien. See 🚩 8 U.S.C. § 1254(d).

On December 12, 1975, Representative Eilberg, Chairman of the Judiciary Subcommittee on Immigration, Citizenship, and International Law, introduced a resolution opposing "the granting of permanent residence in the United States to [six] aliens", including Chadha. H.R.Res. 926, 94th Cong., 1st Sess.; 121 Cong.Rec. 40247 (1975). The resolution was referred to the House Committee on the Judiciary. On December 16, 1975, the resolution was discharged from further consideration by the House Committee on the Judiciary and submitted to the House of Representatives for a vote. 121 Cong.Rec. 40800. The resolution had not been printed and was not made available to other Members of the House prior to or at the time it was voted on. *Ibid.* So far as the record before us shows, the House consideration of the resolution was based on Representative Eilberg's statement from the floor that

"[i]t was the feeling of the committee, after reviewing 340 cases, that the aliens contained in the resolution [Chadha and five others] did not meet these statutory requirements, particularly as it relates to hardship; and it is the opinion of the committee that their deportation should not be suspended." *Ibid.*

**\*927** The resolution was passed without debate or recorded vote. [3] Since the House action **\*\*2772** was pursuant to § 244(c)(2), the resolution was not treated as an Article I legislative act; it was not **\*928** submitted to the Senate or presented to the President for his action.

After the House veto of the Attorney General's decision to allow Chadha to remain in the United States, the immigration judge reopened the deportation proceedings to implement the House order deporting Chadha. Chadha moved to terminate the proceedings on the ground that § 244(c)(2) is unconstitutional. The immigration judge held that he had no authority to rule on the constitutional validity of § 244(c)(2). On November 8, 1976, Chadha was ordered deported pursuant to the House action.

Chadha appealed the deportation order to the Board of Immigration Appeals again contending that § 244(c)(2) is unconstitutional. The Board held that it had "no power to declare unconstitutional an act of Congress" and Chadha's appeal was dismissed. App. 55–56.

Pursuant to § 106(a) of the Act, 🏳 8 U.S.C. § 1105a(a), Chadha filed a petition for review of the deportation order in the United States Court of Appeals for the Ninth Circuit. The Immigration and Naturalization Service agreed with Chadha's position before the Court of Appeals and joined him in arguing that § 244(c)(2) is unconstitutional. In light of the importance of the question, the Court of Appeals invited both the Senate and the House of Representatives to file briefs *amici curiae.*

After full briefing and oral argument, the Court of Appeals held that the House was without constitutional authority to order Chadha's deportation; accordingly it directed the Attorney General "to cease and desist from taking any steps to deport this alien based upon the resolution enacted by the House of Representatives." *Chadha v. INS,* 634 F.2d 408, 436 (CA9 1980). The essence of its holding was that § 244(c)(2) violates the constitutional doctrine of separation of powers.

We granted certiorari in Nos. 80–2170 and 80–2171, and postponed consideration of our jurisdiction over the appeal in No. 80–1832, 454 U.S. 812, 102 S.Ct. 87, 70 L.Ed.2d 80 (1981), and we now affirm.

### \*929 II

Before we address the important question of the constitutionality of the one-House veto provision of § 244(c)(2), we first consider several challenges to the authority of this Court to resolve the issue raised.

### \*\*2773 A

*Appellate Jurisdiction*

[1]  Both Houses of Congress [4] contend that we are without jurisdiction under 28 U.S.C. § 1252 to entertain the INS appeal in No. 80–1832. Section 1252 provides:

> "Any party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam and the District Court of the Virgin Islands and any court of record of Puerto Rico, holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party."

*Parker v. Levy,* 417 U.S. 733, 742, n. 10, 94 S.Ct. 2547, 2555, n. 10, 41 L.Ed.2d 439 (1974), makes clear that a court of appeals is a "court of the United States" for purposes of § 1252. It is likewise clear that the proceeding below was a "civil action, suit or proceeding," that the INS is an agency of the United States and was a party to the proceeding below, and that that proceeding held an Act of Congress —namely, the one-House veto provision in § 244(c)(2)— unconstitutional. The express requisites for an appeal under § 1252, therefore, have been met.

*930 In motions to dismiss the INS appeal, the Congressional parties [5] direct attention, however, to our statement that "[a] party who receives all that he has sought generally is not aggrieved by the judgment affording relief and cannot appeal from it." *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 333, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427 (1980). Here, the INS sought the invalidation of § 244(c)(2) and the Court of Appeals granted that relief. Both Houses contend that the INS has already received what it sought from the Court of Appeals, is not an aggrieved party, and therefore cannot appeal from the decision of the Court of Appeals. We cannot agree.

The INS was ordered by one House of Congress to deport Chadha. As we have set out more fully, *ante* at 2772, the INS concluded that it had no power to rule on the constitutionality of that order and accordingly proceeded to implement it. Chadha's appeal challenged that decision and the INS presented the Executive's views on the constitutionality of the House action to the Court of Appeals. But the INS brief to the Court of Appeals did not alter the agency's decision to comply with the House action ordering deportation of Chadha. The Court of Appeals set aside the deportation proceedings and ordered the Attorney General to cease and desist from taking any steps to deport Chadha; steps that the Attorney General would have taken were it not for that decision.

[2]  At least for purposes of deciding whether the INS is "any party" within the grant of appellate jurisdiction in § 1252, we hold that the INS was sufficiently aggrieved by the Court of Appeals decision prohibiting it from taking action it would otherwise take. It is apparent that Congress intended that *931 this Court take notice of cases that meet the technical prerequisites of § 1252; in other cases where an Act of Congress is held unconstitutional by a federal court, review in this Court is available only by writ of certiorari. When an agency of the United States is a party to a case in which the Act of Congress it administers is held unconstitutional, it is an aggrieved **2774 party for purposes of taking an appeal under § 1252. The agency's status as an aggrieved party under § 1252 is not altered by the fact that the Executive may agree with the holding that the statute in question is unconstitutional. The appeal in No. 80–1832 is therefore properly before us. [6]

B

*Severability*

Congress also contends that the provision for the one-House veto in § 244(c)(2) cannot be severed from § 244. Congress argues that if the provision for the one-House veto is held unconstitutional, all of § 244 must fall. If § 244 in its entirety is violative of the Constitution, it follows that the Attorney General has no authority to suspend Chadha's deportation under § 244(a)(1) and Chadha would be deported. From this, Congress argues that Chadha lacks standing to challenge the constitutionality of the one-House veto provision because he could receive no relief even if his constitutional challenge proves successful. [7]

Only recently this Court reaffirmed that the invalid portions of a statute are to be severed " '[u]nless it is evident that *932 the Legislature would not have enacted those provisions which are within its power, independently of that which is

not.' " *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976), quoting *Champlin Refining Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932). Here, however, we need not embark on that elusive inquiry since Congress itself has provided the answer to the question of severability in § 406 of the Immigration and Nationality Act, 8 U.S.C. § 1101 note, which provides:

> "If *any* particular provision of this Act, or the application thereof to *any* person or circumstance, is held invalid, *the remainder of the Act and the application of such provision to other persons or circumstances shall not be affected thereby.*" (Emphasis added.)

This language is unambiguous and gives rise to a presumption that Congress did not intend the validity of the Act as a whole, or of any part of the Act, to depend upon whether the veto clause of § 244(c)(2) was invalid. The one-House veto provision in § 244(c)(2) is clearly a "particular provision" of the Act as that language is used in the severability clause. Congress clearly intended "the remainder of the Act" to stand if "any particular provision" were held invalid. Congress could not have more plainly authorized the presumption that the provision for a one-House veto in § 244(c)(2) is severable from the remainder of § 244 and the Act of which it is a part. See *Electric Bond & Share Co. v. SEC,* 303 U.S. 419, 434, 58 S.Ct. 678, 683, 82 L.Ed. 936 (1938).

The presumption as to the severability of the one-House veto provision in § 244(c)(2) is supported by the legislative history of § 244. That section and its precursors supplanted the long established pattern of dealing with deportations like Chadha's on a case-by-case basis through private bills. Although it may be that Congress was reluctant to delegate final authority over cancellation of deportations, such reluctance is not sufficient to overcome the presumption of severability raised by § 406.

**\*933** The Immigration Act of 1924, Pub.L. No. 139, § 14, 43 Stat. 153, 162, required the Secretary of Labor to deport any alien who entered or remained in the United States unlawfully. The only means by which a deportable alien **\*\*2775** could lawfully remain in the United States was to have his status altered by a private bill enacted by both Houses

and presented to the President pursuant to the procedures set out in Art. I, § 7 of the Constitution. These private bills were found intolerable by Congress. In the debate on a 1937 bill introduced by Representative Dies to authorize the Secretary to grant permanent residence in "meritorious" cases, Dies stated:

> "It was my original thought that the way to handle all these meritorious cases was through special bills. I am absolutely convinced as a result of what has occurred in this House that it is impossible to deal with the situation through special bills. We had a demonstration of that fact not long ago when 15 special bills were before the House. The House consumed 5 ½ hours considering four bills and made no disposition of any of these bills." 81 Cong.Rec. 5542 (1937).

Representative Dies' bill passed the House, *id.,* at 5574, but did not come to a vote in the Senate. 83 Cong.Rec. 8992–8996 (1938).

Congress first authorized the Attorney General to suspend the deportation of certain aliens in the Alien Registration Act of 1940, ch. 439, § 20, 54 Stat. 671. That Act provided that an alien was to be deported, despite the Attorney General's decision to the contrary, if both Houses, by concurrent resolution, disapproved the suspension.

In 1948, Congress amended the Act to broaden the category of aliens eligible for suspension of deportation. In addition, however, Congress limited the authority of the Attorney General to suspend deportations by providing that the Attorney General could not cancel a deportation unless both Houses affirmatively voted by concurrent resolution to *approve* the Attorney General's action. Act of July 1, 1948, **\*934** ch. 783, 62 Stat. 1206. The provision for approval by concurrent resolution in the 1948 Act proved almost as burdensome as private bills. Just four years later, the House Judiciary Committee, in support of the predecessor to § 244(c)(2), stated in a report:

> "In the light of experience of the last several months, the committee came to the conclusion that the requirements of affirmative action by both Houses of the Congress in many thousands of individual cases which are submitted by the Attorney General every year, is not workable and places upon the Congress and particularly on the Committee on the Judiciary responsibilities which it cannot assume. The new responsibilities placed upon the Committee on the Judiciary [by the concurrent resolution mechanism] are of

administrative nature and they seriously interfere with the legislative work of the Committee on the Judiciary and would, in time, interfere with the legislative work of the House." H.R.Rep. No. 362, 81st Cong., 1st Sess. 2 (1949).

The proposal to permit one House of Congress to veto the Attorney General's suspension of an alien's deportation was incorporated in the Immigration and Nationality Act of 1952, Pub.L. No. 414, 66 Stat. 163, 214. Plainly, Congress' desire to retain a veto in this area cannot be considered in isolation but must be viewed in the context of Congress' irritation with the burden of private immigration bills. This legislative history is not sufficient to rebut the presumption of severability raised by § 406 because there is insufficient evidence that Congress would have continued to subject itself to the onerous burdens of private bills had it known that § 244(c)(2) would be held unconstitutional.

[3] [4] A provision is further presumed severable if what remains after severance "is fully operative as a law."

📄 *Champlin Refining Co. v. Corporation Comm'n, supra,* 286 U.S., at 234, 52 S.Ct., at 565. There can be no doubt that § 244 is "fully operative" and workable administrative machinery without the veto provision in § 244(c)(2). Entirely independent of the one-House veto, the **\*935** administrative process enacted by Congress authorizes the Attorney **\*\*2776** General to suspend an alien's deportation under § 244(a). Congress' oversight of the exercise of this delegated authority is preserved since all such suspensions will continue to be reported to it under § 244(c)(1). Absent the passage of a bill to the contrary, [8] deportation proceedings will be cancelled when the period specified in § 244(c)(2) has expired. [9] Clearly, § 244 survives as a workable administrative mechanism without the one-House veto.

## C

### *Standing*

[5] We must also reject the contention that Chadha lacks standing because a consequence of his prevailing will advance **\*936** the interests of the Executive Branch in a separation of powers dispute with Congress, rather than simply Chadha's private interests. Chadha has demonstrated "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury...."

📄 *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978). If the veto provision violates the Constitution, and is severable, the deportation order against Chadha will be cancelled. Chadha therefore has standing to challenge the order of the Executive mandated by the House veto.

## D

### *Alternative Relief*

[6] [7] It is contended that the Court should decline to decide the constitutional question presented by this case because Chadha may have other statutory relief available to him. It is argued that since Chadha married a United States citizen on August 10, 1980, it is possible that other avenues of relief may be open under §§ 201(b), 204, and 245 of the Act, 📄 8 U.S.C. §§ 1151(b), 📄 1154, 📄 1255. It is true that Chadha may be eligible for classification as an "immediate relative" and, as such, could lawfully be accorded permanent residence. Moreover, in March 1980, just prior to the decision of the Court of Appeals in this case, Congress enacted the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102, under which the Attorney General is authorized to grant asylum, and then permanent residence, to any alien who is unable to return to his country of nationality because of "a well-founded fear of persecution on account of race."

It is urged that these two intervening factors constitute a prudential bar to our consideration of the constitutional question presented in this case. See 📄 *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). If we could perceive merit in this contention we might well seek to avoid **\*\*2777** deciding the constitutional claim advanced. But at most **\*937** these other avenues of relief are speculative. It is by no means certain, for example, that Chadha's classification as an immediate relative would result in the adjustment of Chadha's status from nonimmigrant to permanent resident. See 📄 *Menezes v. INS,* 601 F.2d 1028 (CA9 1979). If Chadha is successful in his present challenge he will not be deported and will automatically become eligible to apply for citizenship. [10] A person threatened with deportation cannot be denied the right to challenge the constitutional validity of the process which led to his status

I.N.S. v. Chadha, 462 U.S. 919 (1983)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1183 of 1384

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

merely on the basis of speculation over the availability of other forms of relief.

E

*Jurisdiction*

**[8]** It is contended that the Court of Appeals lacked jurisdiction under § 106(a) of the Act, 8 U.S.C. § 1105a(a). That section provides that a petition for review in the Court of Appeals "shall be the sole and exclusive procedure for the judicial review of all final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings under section 242(b) of this Act." Congress argues that the one-House veto authorized by § 244(c)(2) takes place outside the administrative proceedings conducted under § 242(b), and that the jurisdictional grant contained in § 106(a) does not encompass Chadha's constitutional challenge.

In *Cheng Fan Kwok v. INS,* 392 U.S. 206, 216, 88 S.Ct. 1970, 1976, 20 L.Ed.2d 1037 (1968), this Court held that "§ 106(a) embrace[s] only those determinations **\*938** made during a proceeding conducted under § 242(b), including those determinations made incident to a motion to reopen such proceedings." It is true that one court has read *Cheng Fan Kwok* to preclude appeals similar to Chadha's. See *Dastmalchi v. INS,* 660 F.2d 880 (CA3 1981). [11] However, we agree with the Court of Appeals in this case that the term "final orders" in § 106(a) "includes all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing." 634 F.2d, at 412. Here, Chadha's deportation stands or falls on the validity of the challenged veto; the final order of deportation was entered against Chadha only to implement the action of the House of Representatives. Although the Attorney General was satisfied that the House action was invalid and that it should not have any effect on his decision to suspend deportation, he appropriately let the controversy take its course through the courts.

This Court's decision in *Cheng Fan Kwok, supra,* does not bar Chadha's appeal. There, after an order of deportation had been entered, the affected alien requested the INS to stay the execution of that order. When that request was denied, the alien sought review in the Court of Appeals under §

106(a). This Court's holding that the Court of Appeals lacked jurisdiction was based on the fact that the alien "did not 'attack the deportation order itself **\*\*2778** but instead [sought] relief not inconsistent with it.' " 392 U.S., at 213, 88 S.Ct., at 1975, quoting **\*939** *Mui v. Esperdy,* 371 F.2d 772, 777 (CA2 1966). Here, in contrast, Chadha directly attacks the deportation order itself and the relief he seeks—cancellation of deportation—is plainly inconsistent with the deportation order. Accordingly, the Court of Appeals had jurisdiction under § 106(a) to decide this case.

F

*Case or Controversy*

**[9]** It is also contended that this is not a genuine controversy but "a friendly, non-adversary, proceeding," *Ashwander v. Tennessee Valley Authority, supra,* 297 U.S., at 346, 56 S.Ct., at 482 (Brandeis, J., concurring), upon which the Court should not pass. This argument rests on the fact that Chadha and the INS take the same position on the constitutionality of the one-House veto. But it would be a curious result if, in the administration of justice, a person could be denied access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the individual.

A case or controversy is presented by this case. First, from the time of Congress' formal intervention, see note 5, *supra,* the concrete adverseness is beyond doubt. Congress is both a proper party to defend the constitutionality of § 244(c)(2) and a proper petitioner under § 1254(1). Second, prior to Congress' intervention, there was adequate Art. III adverseness even though the only parties were the INS and Chadha. We have already held that the INS's agreement with the Court of Appeals' decision that § 244(c)(2) is unconstitutional does not affect that agency's "aggrieved" status for purposes of appealing that decision under 28 U.S.C. § 1252, see *ante,* at 2772 – 2774. For similar reasons, the INS's agreement with Chadha's position does not alter the fact that the INS would have deported Chadha absent the Court of Appeals' judgment. We agree with the Court of Appeals that "Chadha has asserted a concrete controversy, and our decision will have real meaning: if we rule for Chadha, he will not be deported; if we uphold § 244(c)(2),

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**\*940** the INS will execute its order and deport him." 634 F.2d, at 419. [12]

Of course, there may be prudential, as opposed to Art. III, concerns about sanctioning the adjudication of this case in the absence of any participant supporting the validity of § 244(c)(2). The Court of Appeals properly dispelled any such concerns by inviting and accepting briefs from both Houses of Congress. We have long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with plaintiffs that the statute is inapplicable or unconstitutional. See *Cheng Fan Kwok v. INS, supra,* 392 U.S., at 210 n. 9, 88 S.Ct., at 1973 n. 9; *United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946).

G

*Political Question*

It is also argued that this case presents a nonjusticiable political question because Chadha is merely challenging Congress' authority under the Naturalization Clause, U.S. Const. art. I, § 8, cl. 4, and the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18. It is argued that Congress' **\*\*2779** Article I power "To establish a uniform Rule of Naturalization", combined with the Necessary and Proper Clause, grants it unreviewable authority over the regulation of aliens. The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question, but what is **\*941** challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power. As we made clear in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); "Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, *M'Culloch v. Maryland,* 4 Wheat. 316 [4 L.Ed. 579] (1819), so long as the exercise of that authority does not offend some other constitutional restriction." *Id.,* 424 U.S., at 132, 96 S.Ct., at 688.

A brief review of those factors which may indicate the presence of a nonjusticiable political question satisfies us that our assertion of jurisdiction over this case does no violence to the political question doctrine. As identified in *Baker v.*

*Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), a political question may arise when any one of the following circumstances is present:

> "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

**[10]** Congress apparently directs its assertion of nonjusticiability to the first of the *Baker* factors by asserting that Chadha's claim is "an assault on the legislative authority to enact Section 244(c)(2)." Brief for the United States House of Representatives 48. But if this turns the question into a political question virtually every challenge to the constitutionality of a statute would be a political question. Chadha indeed argues that one House of Congress cannot constitutionally veto the Attorney General's decision to allow him to remain in this country. No policy underlying the political question doctrine **\*942** suggests that Congress or the Executive, or both acting in concert and in compliance with Art. I, can decide the constitutionality of a statute; that is a decision for the courts. [13]

Other *Baker* factors are likewise inapplicable to this case. As we discuss more fully below, Art. I provides the "judicially **\*\*2780** discoverable and manageable standards" of *Baker* for resolving the question presented by this case. Those standards forestall reliance by this Court on nonjudicial "policy determinations" or any showing of disrespect for a coordinate branch. Similarly, if Chadha's arguments are accepted, § 244(c)(2) cannot stand, and since

the constitutionality of that statute is for this Court to resolve, there is no possibility of "multifarious pronouncements" on this question.

 **[11]**  It is correct that this controversy may, in a sense, be termed "political." But the presence of constitutional issues with significant political overtones does not automatically invoke **\*943** the political question doctrine. Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications in the sense urged by Congress. *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), was also a "political" case, involving as it did claims under a judicial commission alleged to have been duly signed by the President but not delivered. But "courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker v. Carr, supra,* 369 U.S., at 217, 82 S.Ct., at 710.

In *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), this Court addressed and resolved the question whether

> "a bill signed by the Speaker of the House of Representatives and by the President of the Senate, presented to and approved by the President of the United States, and delivered by the latter to the Secretary of State, as an act passed by Congress, does not become a law of the United States if it had not in fact been passed by Congress.

> ————————————

> We recognize, on one hand, the duty of this court, from the performance of which it may not shrink, to give full effect to the provisions of the Constitution relating to the enactment of laws that are to operate wherever the authority and jurisdiction of the United States extend. On the other hand, we cannot be unmindful of the consequences that must result if this court should feel obliged, in fidelity to the Constitution, to declare that an enrolled bill, on which depend public and private interests of vast magnitude, and which has been ... deposited in the public archives, *as an act of Congress,* ... did not become law." *Id.,* at 669, 670, 12 S.Ct., at 496, 497 (emphasis in original).

### H

The contentions on standing and justiciability have been fully examined and we are satisfied the parties are properly before us. The important issues have been fully briefed and **\*944** twice argued, 454 U.S. 812, 102 S.Ct. 87, 70 L.Ed.2d 80, 81 (1982). The Court's duty in this case, as Chief Justice Marshall declared in *Cohens v. Virginia,* 6 Wheat. 264, 404, 5 L.Ed. 257 (1821), is clear:

> "Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty."

### III

### A

 **[12]**  We turn now to the question whether action of one House of Congress under § 244(c)(2) violates strictures of the Constitution. We begin, of course, with the presumption that the challenged statute is valid. Its wisdom is not the concern of the courts; if a challenged action does not violate the Constitution, it must be sustained.

> "Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 194–195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

**\*\*2781**  **[13]**  By the same token, the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government and our inquiry is sharpened rather than blunted by the fact that Congressional veto provisions are appearing with increasing frequency in statutes which delegate authority to executive and independent agencies:

I.N.S. v. Chadha, 462 U.S. 919 (1983)

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

"Since 1932, when the first veto provision was enacted into law, 295 congressional veto-type procedures have been inserted in 196 different statutes as follows: from 1932 to 1939, five statutes were affected; from 1940–49, nineteen statutes; between 1950–59, thirty-four statutes; and from 1960–69, forty-nine. From the year 1970 through 1975, at least one hundred sixty-three such provisions **\*945** were included in eighty-nine laws." Abourezk, The Congressional Veto: A Contemporary Response to Executive Encroachment on Legislative Prerogatives, 52 Ind.L.Rev. 323, 324 (1977). See also Appendix 1 to Justice WHITE's dissent, *post,* at 2811.

Justice WHITE undertakes to make a case for the proposition that the one-House veto is a useful "political invention," *post,* at 2795, and we need not challenge that assertion. We can even concede this utilitarian argument although the long range political wisdom of this "invention" is arguable. It has been vigorously debated and it is instructive to compare the views of the protagonists. See, e.g., Javits & Klein, Congressional Oversight and the Legislative Veto: A Constitutional Analysis, 52 N.Y.U.L.Rev. 455 (1977), and Martin, The Legislative Veto and the Responsible Exercise of Congressional Power, 68 Va.L.Rev. 253 (1982). But policy arguments supporting even useful "political inventions" are subject to the demands of the Constitution which defines powers and, with respect to this subject, sets out just how those powers are to be exercised.

Explicit and unambiguous provisions of the Constitution prescribe and define the respective functions of the Congress and of the Executive in the legislative process. Since the precise terms of those familiar provisions are critical to the resolution of this case, we set them out verbatim. Art. I provides:

"All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate *and* a House of Representatives." Art. I, § 1. (Emphasis added).

"Every Bill which shall have passed the House of Representatives *and* the Senate, *shall,* before it becomes a Law, be presented to the President of the United States; ..." Art. I, § 7, cl. 2. (Emphasis added).

"*Every* Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment)

**\*946** *shall be* presented to the President of the United States; and before the Same shall take Effect, *shall be* approved by him, or being disapproved by him, *shall be* repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." Art. I, § 7, cl. 3. (Emphasis added).

These provisions of Art. I are integral parts of the constitutional design for the separation of powers. We have recently noted that "[t]he principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the documents that they drafted in Philadelphia in the summer of 1787." Buckley v. Valeo, supra, 424 U.S., at 124, 96 S.Ct., at 684. Just as we relied on the textual provision of Art. II, § 2, cl. 2, to vindicate the principle of separation of powers in *Buckley,* we find that the purposes underlying the Presentment Clauses, Art. I, § 7, cls. 2, 3, and the bicameral requirement of Art. I, § 1 and § 7, cl. 2, guide our resolution of the important question presented in this case. The very structure of the **\*\*2782** articles delegating and separating powers under Arts. I, II, and III exemplify the concept of separation of powers and we now turn to Art. I.

B

*The Presentment Clauses*

The records of the Constitutional Convention reveal that the requirement that all legislation be presented to the President before becoming law was uniformly accepted by the Framers. [14] Presentment to the President and the Presidential **\*947** veto were considered so imperative that the draftsmen took special pains to assure that these requirements could not be circumvented. During the final debate on Art. I, § 7, cl. 2, James Madison expressed concern that it might easily be evaded by the simple expedient of calling a proposed law a "resolution" or "vote" rather than a "bill." 2 M. Farrand, The Records of the Federal Convention of 1787 301–302. As a consequence, Art. I, § 7, cl. 3, *ante,* at 2781, was added. *Id.,* at 304–305.

The decision to provide the President with a limited and qualified power to nullify proposed legislation by veto was based on the profound conviction of the Framers that the powers conferred on Congress were the powers to be most

carefully circumscribed. It is beyond doubt that lawmaking was a power to be shared by both Houses and the President. In The Federalist No. 73 (H. Lodge ed. 1888), Hamilton focused on the President's role in making laws:

> "If even no propensity had ever discovered itself in the legislative body to invade the rights of the Executive, the rules of just reasoning and theoretic propriety would of themselves teach us that the one ought not to be left to the mercy of the other, but ought to possess a constitutional and effectual power of self-defense." *Id.,* at 457–458.

See also The Federalist No. 51. In his Commentaries on the Constitution, Joseph Story makes the same point. 1 J. Story, Commentaries on the Constitution of the United States 614–615 (1858).

The President's role in the lawmaking process also reflects the Framers' careful efforts to check whatever propensity a particular Congress might have to enact oppressive, improvident, **\*948** or ill-considered measures. The President's veto role in the legislative process was described later during public debate on ratification:

> "It establishes a salutary check upon the legislative body, calculated to guard the community against the effects of faction, precipitancy, or of any impulse unfriendly to the public good which may happen to influence a majority of that body.... The primary inducement to conferring the power in question upon the Executive is to enable him to defend himself; the secondary one is to increase the chances in favor of the community against the passing of bad laws through haste, inadvertence, or design." The Federalist No. 73, *supra,* at 458 (A. Hamilton).

See also *The Pocket Veto Case,* 279 U.S. 655, 678, 49 S.Ct. 463, 466, 73 L.Ed. 894 (1929); *Myers v. United States,* 272 U.S. 52, 123, 47 S.Ct. 21, 27, 71 L.Ed. 160 (1926). The Court also has observed that the Presentment Clauses serve the important purpose of assuring that a "national" perspective is grafted on the legislative process:

> **\*\*2783** "The President is a representative of the people just as the members of the Senate and of the House are, and it may be, at some times, on some subjects, that the President elected by all the people is rather more representative of them all than are the members of either body of the Legislature whose constituencies are local and

not countrywide...." *Myers v. United States, supra,* 272 U.S., at 123, 47 S.Ct., at 27.

C

*Bicameralism*

The bicameral requirement of Art. I, §§ 1, 7 was of scarcely less concern to the Framers than was the Presidential veto and indeed the two concepts are interdependent. By providing that no law could take effect without the concurrence of the prescribed majority of the Members of both Houses, the Framers reemphasized their belief, already remarked **\*949** upon in connection with the Presentment Clauses, that legislation should not be enacted unless it has been carefully and fully considered by the Nation's elected officials. In the Constitutional Convention debates on the need for a bicameral legislature, James Wilson, later to become a Justice of this Court, commented:

> "Despotism comes on mankind in different shapes. Sometimes in an Executive, sometimes in a military, one. Is there danger of a Legislative despotism? Theory & practice both proclaim it. If the Legislative authority not restrained, there can be neither liberty nor stability; and it can only be restrained by dividing it within itself, into distinct and independent branches. In a single house there is no check, but the inadequate one, of the virtue & good sense of those who compose it." 1 M. Farrand, *supra,* at 254.

Hamilton argued that a Congress comprised of a single House was antithetical to the very purposes of the Constitution. Were the Nation to adopt a Constitution providing for only one legislative organ, he warned:

> "we shall finally accumulate, in a single body, all the most important prerogatives of sovereignty, and thus entail upon our posterity one of the most execrable forms of government that human infatuation ever contrived. Thus we should create in reality that very tyranny which the adversaries of the new Constitution either are, or affect to be, solicitous to avert." The Federalist No. 22, *supra,* at 135.

This view was rooted in a general skepticism regarding the fallibility of human nature later commented on by Joseph Story:

"Public bodies, like private persons, are occasionally under the dominion of strong passions and excitements; impatient, irritable, and impetuous.... If [a legislature] **\*950** feels no check but its own will, it rarely has the firmness to insist upon holding a question long enough under its own view, to see and mark it in all its bearings and relations to society." 1 J. Story, *supra,* at 383–384.

These observations are consistent with what many of the Framers expressed, none more cogently than Hamilton in pointing up the need to divide and disperse power in order to protect liberty:

"In republican government, the legislative authority necessarily predominates. The remedy for this inconveniency is to divide the legislature into different branches; and to render them, by different modes of election and different principles of action, as little connected with each other as the nature of their common functions and their common dependence on the society will admit." The Federalist No. 51, *supra,* at 324.

See also The Federalist No. 62.

However familiar, it is useful to recall that apart from their fear that special interests could be favored at the expense of public needs, the Framers were also concerned, although not of one mind, over the apprehensions of the smaller states. Those **\*\*2784** states feared a commonality of interest among the larger states would work to their disadvantage; representatives of the larger states, on the other hand, were skeptical of a legislature that could pass laws favoring a minority of the people. See 1 M. Farrand, *supra,* 176–177, 484–491. It need hardly be repeated here that the Great Compromise, under which one House was viewed as representing the people and the other the states, allayed the fears of both the large and small states. [15]

**\*951** We see therefore that the Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions. The President's participation in the legislative process was to protect the Executive Branch from Congress and to protect the whole people from improvident laws. The division of the Congress into two distinctive bodies assures that the legislative power would be exercised only after opportunity for full study and debate in separate settings. The President's unilateral veto power, in turn, was limited by the power of two thirds of both Houses of Congress to overrule a veto

thereby precluding final arbitrary action of one person. See 1 M. Farrand, *supra,* at 99–104. It emerges clearly that the prescription for legislative action in Art. I, §§ 1, 7 represents the Framers' decision that the legislative power of the Federal government be exercised in accord with a single, finely wrought and exhaustively considered, procedure.

IV

The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.

[14]   Although not "hermetically" sealed from one another, 🚩 *Buckley v. Valeo, supra,* 424 U.S., at 121, 96 S.Ct., at 683, the powers delegated to the three Branches are functionally identifiable. When any Branch acts, it is presumptively exercising the power the Constitution has delegated to it. See 📄 *Hampton & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928). When the Executive acts, it presumptively acts in an executive or administrative capacity as defined in Art. II. And when, as here, **\*952** one House of Congress purports to act, it is presumptively acting within its assigned sphere.

[15]   [16]   Beginning with this presumption, we must nevertheless establish that the challenged action under § 244(c)(2) is of the kind to which the procedural requirements of Art. I, § 7 apply. Not every action taken by either House is subject to the bicameralism and presentment requirements of Art. I. See *post,* at 2786. Whether actions taken by either House are, in law and fact, an exercise of legislative power depends not on their form but upon "whether they contain matter which is properly to be regarded as legislative in its character and effect." S.Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897).

Examination of the action taken here by one House pursuant to § 244(c)(2) reveals that it was essentially legislative in purpose and effect. In purporting to exercise power defined in Art. I, § 8, cl. 4 to "establish an uniform Rule of Naturalization," the House took action that had

the purpose and effect of altering the legal rights, duties and relations of persons, including the Attorney General, Executive Branch officials and Chadha, all outside the legislative branch. Section 244(c)(2) purports to authorize one House of Congress to require the Attorney General to deport an individual alien whose deportation otherwise would **2785 be cancelled under § 244. The one-House veto operated in this case to overrule the Attorney General and mandate Chadha's deportation; absent the House action, Chadha would remain in the United States. Congress has *acted* and its action has altered Chadha's status.

[17] [18] [19]    The legislative character of the one-House veto in this case is confirmed by the character of the Congressional action it supplants. Neither the House of Representatives nor the Senate contends that, absent the veto provision in § 244(c)(2), either of them, or both of them acting together, could effectively require the Attorney General to deport an alien once the Attorney General, in the exercise of legislatively *953 delegated authority,[16] had determined the alien should remain in the United States. Without the challenged provision in § 244(c)(2), this could have been achieved, if at all, only *954 by legislation requiring deportation.[17] Similarly, a veto by one House of Congress under § 244(c)(2) cannot be justified as an attempt at amending the standards set out in § 244(a)(1), or as a repeal of § 244 as applied to Chadha. Amendment and repeal of statutes, no less than enactment, must conform with Art. I.[18]

 **2786 [20]    The nature of the decision implemented by the one-House veto in this case further manifests its legislative character. After long experience with the clumsy, time consuming private bill procedure, Congress made a deliberate choice to delegate to the Executive Branch, and specifically to the Attorney General, the authority to allow deportable aliens to remain in this country in certain specified circumstances. It is not disputed that this choice to delegate authority is precisely the kind of decision that can be implemented only in accordance with the procedures set out in Art. I. Disagreement with the Attorney General's decision on Chadha's deportation —that is, Congress' decision to deport Chadha—no less than Congress' original choice to delegate to the Attorney General the authority to make that decision, involves determinations of policy that Congress can implement in only one way; bicameral passage followed by presentment to the *955 President. Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked.[19]

Finally, we see that when the Framers intended to authorize either House of Congress to act alone and outside of its prescribed bicameral legislative role, they narrowly and precisely defined the procedure for such action. There are but four provisions in the Constitution,[20] explicit and unambiguous, by which one House may act alone with the unreviewable force of law, not subject to the President's veto:

(a) The House of Representatives alone was given the power to initiate impeachments. Art. I, § 2, cl. 6;

(b) The Senate alone was given the power to conduct trials following impeachment on charges initiated by the House and to convict following trial. Art. I, § 3, cl. 5;

(c) The Senate alone was given final unreviewable power to approve or to disapprove presidential appointments. Art. II, § 2, cl. 2;

(d) The Senate alone was given unreviewable power to ratify treaties negotiated by the President. Art. II, § 2, cl. 2.

Clearly, when the Draftsmen sought to confer special powers on one House, independent of the other House, or of the President, they did so in explicit, unambiguous terms.[21] *956 These carefully defined exceptions **2787 from presentment and bicameralism underscore the difference between the legislative functions of Congress and other unilateral but important and binding one-House acts provided for in the Constitution. These exceptions are narrow, explicit, and separately justified; none of them authorize the action challenged here. On the contrary, they provide further support for the conclusion that Congressional authority is not to be implied and for the conclusion that the veto provided for in § 244(c)(2) is not authorized by the constitutional design of the powers of the Legislative Branch.

Since it is clear that the action by the House under § 244(c)(2) was not within any of the express constitutional exceptions authorizing one House to act alone, and equally *957 clear that it was an exercise of legislative power, that action was subject to the standards prescribed in Article I.[22] The bicameral requirement, the Presentment Clauses, the President's veto, and Congress' power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps. To preserve those *958 checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be

I.N.S. v. Chadha, 462 U.S. 919 (1983)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1190 of 1384

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

eroded. To accomplish what has been attempted by one House of Congress in this case requires action in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President. [23]

**\*\*2788** The veto authorized by § 244(c)(2) doubtless has been in many respects a convenient shortcut; the "sharing" with the Executive by Congress of its authority over aliens in this manner is, on its face, an appealing compromise. In purely practical terms, it is obviously easier for action to be taken by one House without submission to the President; but it is crystal **\*959** clear from the records of the Convention, contemporaneous writings and debates, that the Framers ranked other values higher than efficiency. The records of the Convention and debates in the States preceding ratification underscore the common desire to define and limit the exercise of the newly created federal powers affecting the states and the people. There is unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.

The choices we discern as having been made in the Constitutional Convention impose burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked. There is no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided, either by the Congress or by the President. See *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.

V

We hold that the Congressional veto provision in § 244(c)(2) is severable from the Act and that it is unconstitutional. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

Justice POWELL, concurring in the judgment.

The Court's decision, based on the Presentment Clauses, Art. I, § 7, cls. 2 and 3, apparently will invalidate every use of the legislative veto. The breadth of this holding gives one pause. Congress has included the veto in literally hundreds **\*960** of statutes, dating back to the 1930s. Congress clearly views this procedure as essential to controlling the delegation of power to administrative agencies. [1] One reasonably may disagree with Congress' assessment **\*\*2789** of the veto's utility, [2] but the respect due its judgment as a coordinate branch of Government cautions that our holding should be no more extensive than necessary to decide this case. In my view, the case may be decided on a narrower ground. When Congress finds that a particular person does not satisfy the statutory criteria for permanent residence in this country it has assumed a judicial function in violation of the principle of separation of powers. Accordingly, I concur only in the judgment.

I

A

The Framers perceived that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 324 (J. Cooke ed. 1961) (J. Madison). Theirs was not a baseless fear. Under British rule, the colonies suffered the abuses of unchecked executive power that were attributed, at least popularly, to an hereditary monarchy. See Levi, Some Aspects of Separation of Powers, 76 Colum.L.Rev. 369, 374 (1976); The Federalist No. 48. During the Confederation, **\*961** the States reacted by removing power from the executive and placing it in the hands of elected legislators. But many legislators proved to be little better than the Crown. "The supremacy of legislatures came to be recognized as the supremacy of faction and the tyranny of shifting majorities. The legislatures confiscated property, erected paper money schemes, [and] suspended the ordinary means of collecting debts." Levi, 76 Colum.L.Rev., at 374–375.

One abuse that was prevalent during the Confederation was the exercise of judicial power by the state legislatures. The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the "tyranny

of shifting majorities." Jefferson observed that members of the General Assembly in his native Virginia had not been prevented from assuming judicial power, and " '[t]hey have accordingly *in many* instances *decided rights* which should have been left to *judiciary controversy.* ' "[3] The Federalist No. 48, p. 336 (J. Cooke ed. 1961) (emphasis in original) (quoting T. Jefferson, Notes on the State of Virginia 196 (London edition 1787)). The same concern also was evident in the reports of the Council of the Censors, a body that was charged with determining whether the Pennsylvania Legislature had complied with the state constitution. The Council found that during this period "[t]he constitutional trial by jury had been violated; and powers assumed, which had not been delegated by the Constitution.... [C]ases belonging **\*962** to the judiciary department, frequently [had been] drawn within legislative cognizance and determination." *Id.,* at 336–337.

It was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches. Their concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person was expressed not only in this general allocation of power, but also in more specific provisions, such as the Bill of Attainder Clause, Art. I, § 9, cl. 3. As the **\*\*2790** Court recognized in *United States v. Brown,* 381 U.S. 437, 442, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965), "the Bill of Attainder Clause was intended not as a narrow, technical ... prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." This Clause, and the separation of powers doctrine generally, reflect the Framers' concern that trial by a legislature lacks the safeguards necessary to prevent the abuse of power.

B

The Constitution does not establish three branches with precisely defined boundaries. See *Buckley v. Valeo,* 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) (*per curiam* ). Rather, as Justice Jackson wrote, "[w]hile the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (concurring

opinion). The Court thus has been mindful that the boundaries between each branch should be fixed "according to common sense and the inherent necessities of the governmental co-ordination." *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928). But where one branch has impaired or sought to assume a power central to another branch, the **\*963** Court has not hesitated to enforce the doctrine. See *Buckley v. Valeo, supra,* 424 U.S., at 123, 96 S.Ct., at 684.

Functionally, the doctrine may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. See *Nixon v. Administrator of General Services,* 433 U.S. 425, 433, 97 S.Ct. 2777, 2785, 53 L.Ed.2d 867 (1977); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another. See *Youngstown Sheet & Tube Co. v. Sawyer, supra,* 343 U.S., at 587, 72 S.Ct., at 866–867 (1952); *Springer v. Philippine Islands,* 277 U.S. 189, 203, 48 S.Ct. 480, 482–483, 72 L.Ed. 845 (1928). This case presents the latter situation.[4]

II

Before considering whether Congress impermissibly assumed a judicial function, it is helpful to recount briefly Congress' actions. Jagdish Rai Chadha, a citizen of Kenya, stayed in this country after his student visa expired. Although he was scheduled to be deported, he requested the Immigration and Naturalization Service to suspend his deportation because he met the statutory criteria for permanent residence in this country. After a hearing,[5] the Service granted Chadha's request and sent—as required by **\*964** the reservation of the veto right—a report of its action to Congress.

In addition to the report on Chadha, Congress had before it the names of 339 other persons whose deportations also had been suspended by the Service. The House **\*\*2791** Committee on the Judiciary decided that six of these persons, including Chadha, should not be allowed to remain in this country. Accordingly, it submitted a resolution to the House, which stated simply that "the House of Representatives does not

I.N.S. v. Chadha, 462 U.S. 919 (1983)

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1192 of 1384

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

approve the granting of permanent residence in the United States to the aliens hereinafter named." 121 Cong.Rec. 40800 (1975). The resolution was not distributed prior to the vote, [6] but the Chairman of the Judiciary Committee explained to the House:

> "It was the feeling of the committee, after reviewing 340 cases, that the aliens contained in the resolution did not meet [the] statutory requirements, particularly as it relates to hardship; and it is the opinion of the committee that their deportation should not be suspended." *Ibid.* (remarks of Rep. Eilberg).

Without further explanation and without a recorded vote, the House rejected the Service's determination that these six people met the statutory criteria.

On its face, the House's action appears clearly adjudicatory. [7] The House did not enact a general rule; rather it **\*965** made its own determination that six specific persons did not comply with certain statutory criteria. It thus undertook the type of decision that traditionally has been left to other branches. Even if the House did not make a *de novo* determination, but simply reviewed the Immigration and Naturalization Service's findings, it still assumed a function ordinarily entrusted to the federal courts. [8] See 5 U.S.C. § 704 (providing generally for judicial review of final agency action); cf. *Foti v. INS,* 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963) (holding that courts of appeals have jurisdiction to review INS decisions denying suspension of deportation). Where, as here, Congress has exercised a power "that cannot possibly be regarded as merely in aid of the legislative function of Congress," **\*966** *Buckley v. Valeo,* 424 U.S., at 138, 96 S.Ct., at 691, **\*\*2792** the decisions of this Court have held that Congress impermissibly assumed a function that the Constitution entrusted to another branch, see *id.,* at 138–141, 96 S.Ct., at 691–693; cf. *Springer v. Philippine Islands,* 277 U.S., at 202, 48 S.Ct., at 482.

The impropriety of the House's assumption of this function is confirmed by the fact that its action raises the very danger the Framers sought to avoid—the exercise of unchecked power. In deciding whether Chadha deserves to be deported, Congress is not subject to any internal constraints that prevent it from arbitrarily depriving him of the right to remain in this country. [9] Unlike the judiciary or an administrative agency, Congress is not bound by established substantive rules. Nor is it subject to the procedural safeguards, such as the right to

counsel and a hearing before an impartial tribunal, that are present when a court or an agency [10] adjudicates individual rights. The only effective constraint on Congress' power is political, but Congress is most accountable politically when it prescribes rules of general applicability. When it decides rights of specific persons, those rights are subject to "the tyranny of a shifting majority."

**\*967** Chief Justice Marshall observed: "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules would seem to be the duty of other departments." *Fletcher v. Peck,* 6 Cranch 87, 136, 3 L.Ed. 162 (1810). In my view, when Congress undertook to apply its rules to Chadha, it exceeded the scope of its constitutionally prescribed authority. I would not reach the broader question whether legislative vetoes are invalid under the Presentment Clauses.

Justice WHITE, dissenting.

Today the Court not only invalidates § 244(c)(2) of the Immigration and Nationality Act, but also sounds the death knell for nearly 200 other statutory provisions in which Congress has reserved a "legislative veto." For this reason, the Court's decision is of surpassing importance. And it is for this reason that the Court would have been well-advised to decide the case, if possible, on the narrower grounds of separation of powers, leaving for full consideration the constitutionality of other congressional review statutes operating on such varied matters as war powers and agency rulemaking, some of which concern the independent regulatory agencies. [1]

The prominence of the legislative veto mechanism in our contemporary political system and its importance to Congress can **\*\*2793** hardly be overstated. It has become a central **\*968** means by which Congress secures the accountability of executive and independent agencies. Without the legislative veto, Congress is faced with a Hobson's choice: either to refrain from delegating the necessary authority, leaving itself with a hopeless task of writing laws with the requisite specificity to cover endless special circumstances across the entire policy landscape, or in the alternative, to abdicate its law-making function to the executive branch and independent agencies. To choose the former leaves major national problems unresolved; to opt for the latter risks unaccountable policymaking by those not elected to fill that role. Accordingly, over the past five decades, the legislative veto has been placed in nearly 200 statutes. [2] The

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

device is known in every field of governmental concern: reorganization, budgets, foreign affairs, war powers, and regulation of trade, safety, energy, the environment and the economy.

I

The legislative veto developed initially in response to the problems of reorganizing the sprawling government structure created in response to the Depression. The Reorganization Acts established the chief model for the legislative veto. When President Hoover requested authority to reorganize the government in 1929, he coupled his request that the "Congress be willing to delegate its authority over the problem (subject to defined principles) to the Executive" with a proposal for legislative **\*969** review. He proposed that the Executive "should act upon approval of a joint committee of Congress or with the reservation of power of revision by Congress within some limited period adequate for its consideration." Pub.Papers 432 (1929). Congress followed President Hoover's suggestion and authorized reorganization subject to legislative review. Act of June 30, 1932, ch. 314, § 407, 47 Stat. 382, 414. Although the reorganization authority reenacted in 1933 did not contain a legislative veto provision, the provision returned during the Roosevelt Administration and has since been renewed numerous times. Over the years, the provision was used extensively. Presidents submitted 115 reorganization plans to Congress of which 23 were disapproved by Congress pursuant to legislative veto provisions. See Brief of U.S. Senate on Reargument, App. A.

Shortly after adoption of the Reorganization Act of 1939, 54 Stat. 561, Congress and the President applied the legislative veto procedure to resolve the delegation problem for national security and foreign affairs. World War II occasioned the need to transfer greater authority to the President in these areas. The legislative veto offered the means by which Congress could confer additional authority while preserving its own constitutional role. During World War II, Congress enacted over thirty statutes conferring powers on the Executive with legislative veto provisions. [3] President Roosevelt accepted the veto as the necessary price for obtaining exceptional authority. [4]

Over the quarter century following World War II, Presidents continued to accept legislative vetoes by one or both Houses as constitutional, while regularly denouncing provisions by which Congressional committees reviewed Executive

activity. [5] **\*\*2794** The legislative veto balanced delegations of **\*970** statutory authority in new areas of governmental involvement: the space program, international agreements on nuclear energy, tariff arrangements, and adjustment of federal pay rates. [6]

During the 1970's the legislative veto was important in resolving a series of major constitutional disputes between the President and Congress over claims of the President to broad impoundment, war, and national emergency powers. The **\*971** key provision of the War Powers Resolution, 50 U.S.C. § 1544(c), authorizes the termination by concurrent resolution of the use of armed forces in hostilities. A similar measure resolved the problem posed by Presidential claims of inherent power to impound appropriations. Congressional Budget and Impoundment Control Act of 1974, 31 U.S.C. § 1403. In conference, a compromise was achieved under which permanent impoundments, termed "rescissions," would require approval through enactment of legislation. In contrast, temporary impoundments, or "deferrals," would become effective unless disapproved by one House. This compromise provided the President with flexibility, while preserving ultimate Congressional control over the budget. [7] Although the War Powers Resolution was enacted over President Nixon's veto, the Impoundment Control Act was enacted with the President's approval. These statutes were followed by others resolving similar problems: the National Emergencies Act, § 202, 90 Stat. 1255, 50 U.S.C. § 1622 (1976), resolving the longstanding problems with unchecked Executive emergency power; the Arms Export Control Act, § 211, 90 Stat. 729, 22 U.S.C. § 2776(b) (1976), resolving the problem of foreign arms sales; and the Nuclear Non-Proliferation Act of 1978, §§ 303, 304(a), 306, 307, 401, 92 Stat. 120, 130, 134, 137, 139, 144–145, 42 U.S.C. §§ 2160(f), 2155(b), 2157(b), 2158, 2153(d) (Supp. IV. 1980), resolving the problem of exports of nuclear technology.

In the energy field, the legislative veto served to balance broad delegations in legislation emerging from the energy crisis of **\*\*2795** the 1970's. [8] In the educational field, it was found **\*972** that fragmented and narrow grant programs "inevitably lead to Executive-Legislative confrontations" because they inaptly limited the Commissioner of Education's authority. S.Rep. No. 763, 93d Cong., 2d Sess. 69 (1974). The response was to grant the Commissioner of Education rulemaking authority, subject to a legislative veto. In the trade regulation area, the veto preserved Congressional authority

over the Federal Trade Commission's broad mandate to make rules to prevent businesses from engaging in "unfair or deceptive acts or practices in commerce." [9]

Even this brief review suffices to demonstrate that the legislative veto is more than "efficient, convenient, and useful." *Ante*, at 2780–2781. It is an important if not indispensable political invention that allows the President and Congress to resolve major constitutional and policy differences, assures the accountability of independent regulatory agencies, and preserves **\*973** Congress' control over lawmaking. Perhaps there are other means of accommodation and accountability, but the increasing reliance of Congress upon the legislative veto suggests that the alternatives to which Congress must now turn are not entirely satisfactory. [10]

**\*974** **\*\*2796** The history of the legislative veto also makes clear that it has not been a sword with which Congress has struck out to aggrandize itself at the expense of the other branches—the concerns of Madison and Hamilton. Rather, the veto has been a means of defense, a reservation of ultimate authority necessary if Congress is to fulfill its designated role under Article I as the nation's lawmaker. While the President has often objected to particular legislative vetoes, generally those left in the hands of congressional committees, the Executive has more often agreed to legislative review as the price for a broad delegation of authority. To be sure, the President may have preferred unrestricted power, but that could be precisely why Congress thought it essential to retain a check on the exercise of delegated authority.

## II

For all these reasons, the apparent sweep of the Court's decision today is regrettable. The Court's Article I analysis appears to invalidate all legislative vetoes irrespective of form or subject. Because the legislative veto is commonly found as a check upon rulemaking by administrative agencies and upon broad-based policy decisions of the Executive Branch, it is particularly unfortunate that the Court reaches its decision in a case involving the exercise of a veto over deportation decisions regarding particular individuals. Courts should always be wary of striking statutes as unconstitutional; to strike an entire class of statutes based on consideration of a somewhat atypical and more-readily indictable exemplar of the class is irresponsible. It was for cases such as this one that Justice Brandeis wrote:

"The Court has frequently called attention to the 'great gravity and delicacy' of its function in passing upon the validity of an act of Congress.... **\*975** The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' *Liverpool, N.Y. & P.S.S. Co. v. Emigration Commissioners, supra* [113 U.S. 33, 5 S.Ct. 352, 28 L.Ed. 899]." *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (concurring opinion).

Unfortunately, today's holding is not so limited. [11]

**\*976** **\*\*2797** If the legislative veto were as plainly unconstitutional as the Court strives to suggest, its broad ruling today would be more comprehensible. But, the constitutionality of the legislative veto is anything but clearcut. The issue divides scholars, [12] courts, [13] attorneys general, [14] and the two other **\*977** branches of the National Government. If the veto devices so flagrantly disregarded the requirements of Article I as the Court today suggests, I find it incomprehensible that Congress, whose members **\*\*2798** are bound by oath to uphold the Constitution, would have placed these mechanisms in nearly 200 separate laws over a period of 50 years.

The reality of the situation is that the constitutional question posed today is one of immense difficulty over which the executive and legislative branches—as well as scholars and judges—have understandably disagreed. That disagreement stems from the silence of the Constitution on the precise question: The Constitution does not directly authorize or prohibit the legislative veto. Thus, our task should be to determine whether the legislative veto is consistent with the purposes of Art. I and the principles of Separation of Powers which are reflected in that Article and throughout the Constitution. **\*978** [15] We should not find the lack of a specific constitutional authorization for the legislative veto surprising, and I would not infer disapproval of the mechanism from its absence. From the summer of 1787 to the present the government of the United States has become an endeavor far beyond the contemplation of the Framers. Only within the last half century has the complexity and size of the Federal Government's responsibilities grown so greatly that the Congress must rely on the legislative veto as the most effective if not the only means to insure their role as the nation's lawmakers. But the wisdom of the Framers was

to anticipate that the nation would grow and new problems of governance would require different solutions. Accordingly, our Federal Government was intentionally chartered with the flexibility to respond to contemporary needs without losing sight of fundamental democratic principles. This was the spirit in which Justice Jackson penned his influential concurrence in the *Steel Seizure Case:*

> "The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952).

This is the perspective from which we should approach the novel constitutional questions presented by the legislative veto. In my view, neither Article I of the Constitution nor the doctrine of separation of powers is violated by this mechanism **\*979** by which our elected representatives preserve their voice in the governance of the nation.

### III

The Court holds that the disapproval of a suspension of deportation by the resolution of one House of Congress is an exercise of legislative power without compliance with the prerequisites for lawmaking set forth in Art. I of the Constitution. Specifically, the Court maintains that the provisions of § 244(c)(2) are inconsistent with the requirement of bicameral approval, implicit in Art. I, § 1, and the requirement that all bills and resolutions that require the concurrence of both Houses be presented to the President, Art. I, § 7, cl. 2 and 3. [16]

**\*\*2799** I do not dispute the Court's truismatic exposition of these clauses. There is no question that a bill does not become a law until it is approved by both the House and the Senate, and presented to the President. Similarly, I would not hesitate to strike an action of Congress in the form of a concurrent resolution which constituted an exercise of original lawmaking authority. I agree with the Court that the President's **\*980** qualified veto power is a critical element in the distribution of powers under the Constitution, widely endorsed among the Framers, and intended to serve the

President as a defense against legislative encroachment and to check the "passing of bad laws through haste, inadvertence, or design." The Federalist No. 73, at 458 (A. Hamilton). The records of the Convention reveal that it is the first purpose which figured most prominently but I acknowledge the vitality of the second. *Id.,* at 443. I also agree that the bicameral approval required by Art. I, §§ 1, 7 "was of scarcely less concern to the Framers than was the Presidential veto," *ante,* at 2783, and that the need to divide and disperse legislative power figures significantly in our scheme of Government. All of this, the Third Part of the Court's opinion, is entirely unexceptionable.

It does not, however, answer the constitutional question before us. The power to exercise a legislative veto is not the power to write new law without bicameral approval or presidential consideration. The veto must be authorized by statute and may only negative what an Executive department or independent agency has proposed. On its face, the legislative veto no more allows one House of Congress to make law than does the presidential veto confer such power upon the President. Accordingly, the Court properly recognizes that it "must establish that the challenged action under § 244(c)(2) is of the kind to which the procedural requirements of Art. I, § 7 apply" and admits that "not every action taken by either House is subject to the bicameralism and presentation requirements of Art. I." *Ante,* at 2784.

### A

The terms of the Presentment Clauses suggest only that bills and their equivalent are subject to the requirements of bicameral passage and presentment to the President. Article I, § 7, cl. 2, stipulates only that "Every Bill which shall have passed the House of Representatives and the Senate, **\*981** shall before it becomes a Law, be presented to the President" for approval or disapproval, his disapproval then subject to being overridden by a two-thirds vote of both houses. Section 7, cl. 3 goes further:

> "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the same shall take Effect,

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1196 of 1384

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

> shall be approved by him, or being
> disapproved by him, shall be repassed
> by two-thirds of the Senate and House
> of Representatives, according to the
> Rules and Limitations prescribed in
> the Case of a Bill."

Although the Clause does not specify the actions for which the concurrence of both Houses is "necessary," the proceedings at the Philadelphia Convention suggest its purpose was to prevent Congress from circumventing the presentation requirement in the making of new legislation. James Madison observed that if the President's veto was confined to bills, it could be evaded by calling a proposed law a "resolution" or "vote" rather than a "bill." Accordingly, he proposed that "or resolve" should be added after "bill" in what is now clause 2 of § 7. 2 M. Farrand, *The Records of the Federal Convention of 1787* 301–302. After a short discussion on the subject, the amendment was rejected. On the following day, however, Randolph renewed **\*\*2800** the proposal in the substantial form as it now appears, and the motion passed. *Id.,* at 304–305; 5 Elliot's Debates 431 (1845). The chosen language, Madison's comment, and the brevity of the Convention's consideration, all suggest a modest role was intended for the Clause and no broad restraint on Congressional authority was contemplated. See Stewart, Constitutionality of the Legislative Veto, 13 Harv.J.Legis. 593, 609–611 (1976). This reading is consistent with the historical background of the Presentation Clause itself which reveals only that the Framers were concerned **\*982** with limiting the methods for enacting new legislation. The Framers were aware of the experience in Pennsylvania where the legislature had evaded the requirements attached to the passing of legislation by the use of "resolves," and the criticisms directed at this practice by the Council of Censors. [17] There is no record that the Convention contemplated, let alone intended, that Article I requirements would someday be invoked to restrain the scope of Congressional authority pursuant to duly-enacted law. [18]

**\*983** **\*\*2801** When the Convention did turn its attention to the scope of Congress' lawmaking power, the Framers were expansive. The Necessary and Proper Clause, Art. I, § 8, cl. 18, vests **\*984** Congress with the power "to make all laws which shall be necessary and proper for carrying into Execution the foregoing Powers [the enumerated powers of § 8], and all other Powers vested by this Constitution in

the government of the United States, or in any Department or Officer thereof." It is long-settled that Congress may "exercise its best judgment in the selection of measures, to carry into execution the constitutional powers of the government," and "avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances."

📖 *McCulloch v. Maryland,* 4 Wheat. 316, 415–416, 420, 4 L.Ed. 579 (1819).

## B

The Court heeded this counsel in approving the modern administrative state. The Court's holding today that all legislative-type action must be enacted through the lawmaking process ignores that legislative authority is routinely delegated to the Executive branch, to the independent regulatory agencies, and to private individuals and groups.

> "The rise of administrative bodies probably has been the most significant legal trend of the last century.... They have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories ..."

📖 *Federal Trade Commission v. Ruberoid Co.,* 343 U.S. 470, 487, 72 S.Ct. 800, 810, 96 L.Ed. 1081 (1952) (Jackson, J. dissenting).

**\*985** This Court's decisions sanctioning such delegations make clear that Article I does not require all action with the effect of legislation to be passed as a law.

Theoretically, agencies and officials were asked only to "fill up the details," and the rule was that "Congress cannot delegate any part of its legislative power except under a limitation of a prescribed standard." *United States v. Chicago, Milwaukee R. Co.,* 282 U.S. 311, 324, 51 S.Ct. 159, 162, 75 L.Ed. 359 (1931). Chief Justice Taft elaborated the standard in 📖 *J.W. Hampton & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928): "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." In practice, however, restrictions on the scope of the power that could be delegated diminished and all but disappeared. In only two instances did the Court find an unconstitutional delegation. 📖 *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935);

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1197 of 1384

I.N.S. v. Chadha, 462 U.S. 919 (1983)

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

*Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). In other **2802 cases, the "intelligible principle" through which agencies have attained enormous control over the economic affairs of the country was held to include such formulations as "just and reasonable," *Tagg Bros. & Moorhead v. United States,* 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524 (1930), "public interest," *New York Central Securities Corp. v. United States,* 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138 (1932), "public convenience, interest, or necessity," *Federal Radio Comm. v. Nelson Bros. Bond & Mortgage Co.,* 289 U.S. 266, 285, 53 S.Ct. 627, 636, 77 L.Ed. 1166 (1933), and "unfair methods of competition." *FTC v. Gratz,* 253 U.S. 421, 40 S.Ct. 572, 64 L.Ed. 993 (1920).

The wisdom and the constitutionality of these broad delegations are matters that still have not been put to rest. But for present purposes, these cases establish that by virtue of congressional delegation, legislative power can be exercised by independent agencies and Executive departments without the passage of new legislation. For some time, the sheer amount of law—the substantive rules that regulate private conduct and direct the operation of government—made by *986 the agencies has far outnumbered the lawmaking engaged in by Congress through the traditional process. There is no question but that agency rulemaking is lawmaking in any functional or realistic sense of the term. The Administrative Procedure Act, 5 U.S.C. § 551(4) provides that a "rule" is an agency statement "designed to implement, interpret, or prescribe law or policy." When agencies are authorized to prescribe law through substantive rulemaking, the administrator's regulation is not only due deference, but is accorded "legislative effect." See, *e.g. Schweiker v. Gray Panthers,* 453 U.S. 34, 43–44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977).[19] These regulations bind courts and officers of the federal government, may pre-empt state law, see, *e.g., Fidelity Federal Savings & Loan Assoc. v. De la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), and grant rights to and impose obligations on the public. In sum, they have the force of law.

If Congress may delegate lawmaking power to independent and executive agencies, it is most difficult to understand Article I as forbidding Congress from also reserving a check on legislative power for itself. Absent the veto, the agencies receiving delegations of legislative or quasi-legislative power may issue regulations having the force of law without bicameral *987 approval and without the President's signature. It is thus not apparent why the reservation of a veto over the exercise of that legislative power must be subject to a more exacting test. In both cases, it is enough that the initial statutory authorizations comply with the Article I requirements.

Nor are there strict limits on the agents that may receive such delegations of legislative authority so that it might be said that the legislature can delegate authority to others but not to itself. While most authority to issue rules and regulations is given to the executive branch and the independent regulatory agencies, statutory delegations to private persons have also passed this Court's scrutiny. In **2803 *Currin v. Wallace,* 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939), the statute provided that restrictions upon the production or marketing of agricultural commodities was to become effective only upon the favorable vote by a prescribed majority of the affected farmers. *United States v. Rock Royal Co-operative,* 307 U.S. 533, 577, 59 S.Ct. 993, 1014, 83 L.Ed. 1446 (1939), upheld an act which gave producers of specified commodities the right to veto marketing orders issued by the Secretary of Agriculture. Assuming *Currin* and *Rock Royal Co-operative* remain sound law, the Court's decision today suggests that Congress may place a "veto" power over suspensions of deportation in private hands or in the hands of an independent agency, but is forbidden from reserving such authority for itself. Perhaps this odd result could be justified on other constitutional grounds, such as the separation of powers, but certainly it cannot be defended as consistent with the Court's view of the Article I presentment and bicameralism commands.[20]

*988 The Court's opinion in the present case comes closest to facing the reality of administrative lawmaking in considering the contention that the Attorney General's action in suspending deportation under § 244 is itself a legislative act. The Court posits that the Attorney General is acting in an Article II enforcement capacity under § 244. This characterization is at odds with *Mahler v. Eby,* 264 U.S. 32, 40, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1924), where the power conferred on the Executive to deport aliens was considered a delegation of legislative power. The Court suggests, however, that the Attorney General acts in an Article II capacity because "[t]he courts when a case or controversy arises, can always

I.N.S. v. Chadha, 462 U.S. 919 (1983)

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

'ascertain whether the will of Congress has been obeyed,' *Yakus v. United States,* 321 U.S. 414, 425 [64 S.Ct. 660, 667–668, 88 L.Ed. 834] (1944), and can enforce adherence to statutory standards." *Ante,* at 2785, n. 16. This assumption is simply wrong, as the Court itself points out: "We are aware of no decision ... where a federal court has reviewed a decision of the Attorney General suspending deportation of an alien pursuant to the standards set out in § 244(a)(1). This is not surprising, given that no party to such action has either the motivation or the right to appeal from it." *Ante,* at 2787, n. 21. It is perhaps on the erroneous premise that judicial review may check abuses of the § 244 power that the Court also submits that "The bicameral process is not necessary as a check on the Executive's administration of the laws because his administrative activity cannot reach beyond the limits of the statute that created it—a statute duly enacted pursuant to Art. I, §§ 1, 7." *Ante,* at 2785, n. 16. On the other hand, the Court's reasoning does persuasively explain why a resolution of disapproval **\*989** under § 244(c)(2) need not again be subject to the bicameral process. Because it serves only to check the Attorney General's exercise of the suspension authority granted by § 244, the disapproval resolution—unlike the Attorney General's action—"cannot reach beyond the limits of the statute that created it—a statute duly enacted pursuant to Article I."

More fundamentally, even if the Court correctly characterizes the Attorney General's authority under § 244 as an Article II Executive power, the Court concedes that certain administrative agency action, such as rulemaking, "may resemble lawmaking" and recognizes that "[t]his Court has referred to agency activity as being 'quasi- **\*\*2804** legislative' in character. *Humphrey's Executor v. United States,* 295 U.S. 602, 628 [55 S.Ct. 869, 874, 79 L.Ed. 1611] (1935)." *Ante,* at 2785, n. 16. Such rules and adjudications by the agencies meet the Court's own definition of legislative action for they "alter[ ] the legal rights, duties, and relations of persons ... outside the legislative branch," *ante,* at 2784, and involve "determinations of policy," *ante,* at 2786. Under the Court's analysis, the Executive Branch and the independent agencies may make rules with the effect of law while Congress, in whom the Framers confided the legislative power, Art. I, § 1, may not exercise a veto which precludes such rules from having operative force. If the effective functioning of a complex modern government requires the delegation of vast authority which, by virtue of its breadth, is legislative or "quasi-legislative" in character, I cannot accept that Article I—which is, after all, the source of the non-

delegation doctrine—should forbid Congress from qualifying that grant with a legislative veto.[21]

## \*990 C

The Court also takes no account of perhaps the most relevant consideration: However resolutions of disapproval under § 244(c)(2) are formally characterized, in reality, a departure from the status quo occurs only upon the concurrence of opinion among the House, Senate, and President. Reservations of legislative authority to be exercised by Congress should be upheld if the exercise of such reserved authority is consistent with the distribution of and limits upon legislative power that Article I provides.

### 1

As its history reveals, § 244(c)(2) withstands this analysis. Until 1917, Congress had never established laws concerning the deportation of aliens. The Immigration Act of 1924 enlarged the categories of **\*991** aliens subject to mandatory deportation, and substantially increased the likelihood of hardships to individuals by abolishing in most cases the previous time limitation of three years within which deportation proceedings had to be commenced. Immigration Act of 1924, ch. 190, 43 Stat. 153 (1924). Thousands of persons, who either had entered the country in more lenient times or had been smuggled in as children, or had overstayed their permits, faced the prospect of deportation. Enforcement of the Act grew more rigorous over the years with the deportation of thousand of aliens without regard to the mitigating circumstances of particular **\*\*2805** cases. See Mansfield, The Legislative Veto and the Deportation of Aliens, 1 Public Administration Review 281 (1940). Congress provided relief in certain cases through the passage of private bills.

In 1933, when deportations reached their zenith, the Secretary of Labor temporarily suspended numerous deportations on grounds of hardship, 78 Cong.Rec. 11783 (1934), and proposed legislation to allow certain deportable aliens to remain in the country. H.R. 9725, 73d Cong., 2d Sess. (1934). The Labor Department bill was opposed, however, as "grant[ing] too much discretionary authority," 78 Cong.Rec. 11790 (remarks of Rep. Dirksen), and it failed decisively. *Id.,* at 11791.

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1199 of 1384

I.N.S. v. Chadha, 462 U.S. 919 (1983)
103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

The following year, the administration proposed bills to authorize an inter-Departmental committee to grant permanent residence to deportable aliens who had lived in the United States for 10 years or who had close relatives here. S. 2969 and H.R. 8163, 74th Cong., 1st Sess. (1935). These bills were also attacked as an "abandonment of congressional control over the deportation of undesirable aliens," H.R.Rep. No. 1110, Part 2, 74th Cong., 1st Sess. 2 (1935), and were not enacted. A similar fate awaited a bill introduced in the 75th Congress that would have authorized the Secretary to grant permanent residence to up to 8,000 deportable aliens. The measure passed the House, but did not come to a vote in the Senate. H.R. 6391, 83 Cong.Rec. 8992–96 (1938).

**\*992** The succeeding Congress again attempted to find a legislative solution to the deportation problem. The initial House bill required congressional action to cancel individual deportations, 84 Cong.Rec. 10455 (1939), but the Senate amended the legislation to provide that deportable aliens should not be deported unless the Congress by Act or resolution rejected the recommendation of the Secretary. H.R. 5138, § 10, as reported with amendments by S.Rep. No. 1721, 76th Cong., 3d Sess. 2 (1940). The compromise solution, the immediate predecessor to § 244(c), allowed the Attorney General to suspend the deportation of qualified aliens. Their deportation would be canceled and permanent residence granted if the House and Senate did not adopt a concurrent resolution of disapproval. S.Rep. No. 1796, 76th Cong., 3rd Sess. 5–6 (1940). The Executive Branch played a major role in fashioning this compromise, see 86 Cong.Rec. 8345 (1940), and President Roosevelt approved the legislation, which became the Alien Registration Act of 1940, P.L. No. 670, 54 Stat. 670.

In 1947, the Department of Justice requested legislation authorizing the Attorney General to cancel deportations without congressional review. H.R. 2933, 80th Cong., 1st Sess. (1947). The purpose of the proposal was to "save time and energy of everyone concerned ..." Regulating Powers of the Attorney General to Suspend Deportation of Aliens: Hearings Before the Subcomm. on Immigration of the House Comm. on the Judiciary, 80th Cong., 1st Sess. 34 (1977). The Senate Judiciary Committee objected, stating that "affirmative action by the Congress in all suspension cases should be required before deportation proceedings may be canceled." S.Rep. No. 1204, 80th Cong., 2d Sess. 4 (1948). See also H.R.Rep. No. 647, 80th Cong., 1st Sess. 2 (1947). Congress not only rejected the Department's request for final authority but amended the Immigration Act to require

that cancellation of deportation be approved **\*993** by a concurrent resolution of the Congress. President Truman signed the bill without objection. Act of July 1, 1948, P.L. No. 863, 62 Stat. 1206.

Practice over the ensuing several years convinced Congress that the requirement of affirmative approval was "not workable ... and would, in time, interfere with the legislative work of the House." House Judiciary Committee, H.R.Rep. No. 362, 81st Cong., 1st Sess. 2 (1949). In preparing the comprehensive Immigration and Nationality Act of 1952, the Senate Judiciary Committee recommended that for certain classes of aliens the adjustment of status **\*\*2806** be subject to the disapproval of either House; but deportation of an alien "who is of the criminal, subversive, or immoral classes or who overstays his period of admission," would be cancelled only upon a concurrent resolution disapproving the deportation. S.Rep. No. 1514, 81st Cong.2d Sess. 610 (1950). Legislation reflecting this change was passed by both Houses, and enacted into law as part of the Immigration and Nationality Act of 1952 over President Truman's veto, which was not predicated on the presence of a legislative veto. Pub.L. No. 414, 66 Stat. 163, 214 (1952). In subsequent years, the Congress refused further requests that the Attorney General be given final authority to grant discretionary relief for specified categories of aliens, and § 244 remained intact to the present.

Section 244(a)(1) authorizes the Attorney General, in his discretion, to suspend the deportation of certain aliens who are otherwise deportable and, upon Congress' approval, to adjust their status to that of aliens lawfully admitted for permanent residence. In order to be eligible for this relief, an alien must have been physically present in the United States for a continuous period of not less than seven years, must prove he is of good moral character, and must prove that he or his immediate family would suffer "extreme hardship" if he is deported. Judicial review of a denial of relief may be sought. Thus, the suspension proceeding "has two phases: a **\*994** determination whether the statutory conditions have been met, which generally involves a question of law, and a determination whether relief shall be granted, which [ultimately] ... is confided to the sound discretion of the Attorney General [and his delegates]." 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 7.9a(5) at 7–134.

There is also a third phase to the process. Under § 244(c)(1) the Attorney General must report all such suspensions, with a detailed statement of facts and reasons, to the Congress.

I.N.S. v. Chadha, 462 U.S. 919 (1983)

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

Either House may then act, in that session or the next, to block the suspension of deportation by passing a resolution of disapproval. § 244(c)(2). Upon Congressional approval of the suspension—by its silence—the alien's permanent status is adjusted to that of a lawful resident alien.

The history of the Immigration Act makes clear that § 244(c)(2) did not alter the division of actual authority between Congress and the Executive. At all times, whether through private bills, or through affirmative concurrent resolutions, or through the present one-House veto, a permanent change in a deportable alien's status could be accomplished only with the agreement of the Attorney General, the House, and the Senate.

2

The central concern of the presentation and bicameralism requirements of Article I is that when a departure from the legal status quo is undertaken, it is done with the approval of the President and both Houses of Congress—or, in the event of a presidential veto, a two-thirds majority in both Houses. This interest is fully satisfied by the operation of § 244(c)(2). The President's approval is found in the Attorney General's action in recommending to Congress that the deportation order for a given alien be suspended. The House and the Senate indicate their approval of the Executive's action by not passing a resolution of disapproval within the statutory period. Thus, a change in the legal status quo— the deportability of the alien—is consummated only with the approval **\*995** of each of the three relevant actors. The disagreement of any one of the three maintains the alien's pre-existing status: the Executive may choose not to recommend suspension; the House and Senate may each veto the recommendation. The effect on the rights and obligations of the affected individuals and upon the legislative system is precisely the same as if a private bill were introduced but failed to receive the necessary approval. "The President and the two Houses enjoy exactly the same say in what the law is to be as would have been true for each without the presence of the one-House **\*\*2807** veto, and nothing in the law is changed absent the concurrence of the President and a majority in each House." *Atkins v. United States,* 556 F.2d 1028, 1064 (Ct. Claims, 1977), cert. denied, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978).

This very construction of the Presentment Clauses which the Executive Branch now rejects was the basis upon which the Executive Branch defended the constitutionality of the Reorganization Act, 5 U.S.C. § 906(a) (1979), which provides that the President's proposed reorganization plans take effect only if not vetoed by either House. When the Department of Justice advised the Senate on the constitutionality of congressional review in reorganization legislation in 1949, it stated: "In this procedure there is no question involved of the Congress taking legislative action beyond its initial passage of the Reorganization Act." S.Rep. No. 232, 81st Cong., 1st Sess. 20 (1949) (Dept. of Justice Memorandum). This also represents the position of the Attorney General more recently. [22]

**\*996** Thus understood, § 244(c)(2) fully effectuates the purposes of the bicameralism and presentation requirements. I now briefly consider possible objections to the analysis.

First, it may be asserted that Chadha's status before legislative disapproval is one of nondeportation and that the exercise of the veto, unlike the failure of a private bill, works a change in the status quo. This position plainly ignores the statutory language. At no place in § 244 has Congress delegated to the Attorney General any final power to determine which aliens shall be allowed to remain in the United States. Congress has retained the ultimate power to pass on such changes in deportable status. By its own terms, § 244(a) states that whatever power the Attorney General has been delegated to suspend deportation and adjust status is to be exercisable only "as hereinafter prescribed in this section." Subsection (c) is part of that section. A grant of "suspension" does not cancel the alien's deportation or adjust the alien's status to that of a permanent resident alien. A suspension order is merely a "deferment of deportation," *McGrath v. Kristensen,* 340 U.S. 162, 168, 71 S.Ct. 224, 228–229, 95 L.Ed. 173 (1950), which can mature into a cancellation of deportation and adjustment of status only upon the approval of Congress—by way of silence—under § 244(c)(2). Only then does the statute authorize the Attorney General to "cancel deportation proceedings" § 244(c)(2), and "record the alien's lawful admission for permanent residence ..." § 244(d). The Immigration and Naturalization Service's action, on behalf of the Attorney General, "cannot become effective without ratification by Congress." 2 Gordon and Rosenfield, Immigration Law **\*997** and Procedure, § 8.14 p. 8–121 (rev. ed. 1979). Until that ratification occurs, the executive's action is simply a recommendation that Congress finalize the suspension—in itself, it works no legal change.

Second, it may be said that this approach leads to the incongruity that the two-House veto is more suspect than

its one-House brother. Although the idea may be initially counter-intuitive, on close analysis, it is not at all unusual that the one-House veto is of more certain constitutionality than the two-House version. If the Attorney General's **2808 action is a proposal for legislation, then the disapproval of but a single House is all that is required to prevent its passage. Because approval is indicated by the failure to veto, the one-House veto satisfies the requirement of bicameral approval. The two-House version may present a different question. The concept that "neither branch of Congress, when acting separately, can lawfully exercise more power than is conferred by the Constitution on the whole body,"

*Kilbourn v. Thompson,* 103 U.S. 168, 182, 26 L.Ed. 377 (1881) is fully observed. [23]

Third, it may be objected that Congress cannot indicate its approval of legislative change by inaction. In the Court of Appeals' view, inaction by Congress "could equally imply endorsement, acquiescence, passivity, indecision or indifference." 634 F.2d, at 435, and the Court appears to echo this concern, *Ante,* at 2788, n. 22. This objection appears more properly directed at the wisdom of the legislative veto than its constitutionality. The Constitution does not and cannot guarantee that legislators will carefully scrutinize legislation and deliberate before acting. In a democracy it is the electorate that holds the legislators accountable for the wisdom of their choices. It is hard to maintain that a private bill receives any greater individualized scrutiny than a resolution *998 of disapproval under § 244(c)(2). Certainly the legislative veto is no more susceptible to this attack than the Court's increasingly common practice of according weight to the failure of Congress to disturb an Executive or independent agency's action. See *supra* at 2795, n. 9. Earlier this Term, the Court found it important that Congress failed to act on bills proposed to overturn the Internal Revenue Service's interpretation of the requirements for tax-exempt status under § 501(c)(3) of the tax code. *Bob Jones University v. United States,* ——U.S. ——, ——, 103 S.Ct. 2017, 2033, 76 L.Ed.2d 157 (1983). If Congress may be said to have ratified the Internal Revenue Service's interpretation without passing new legislation, Congress may also be said to approve a suspension of deportation by the Attorney General when it fails to exercise its veto authority. [24] The requirements of Article I are not compromised by the Congressional scheme.

IV

The Court of Appeals struck § 244(c)(2) as violative of the constitutional principle of separation of powers. It is true that the purpose of separating the authority of government is to prevent unnecessary and dangerous concentration of power in one branch. For that reason, the Framers saw fit to divide and balance the powers of government so that each branch would be checked by the others. Virtually every part of our constitutional system bears the mark of this judgment.

*999 But the history of the separation of powers doctrine is also a history of accommodation and practicality. Apprehensions of an overly powerful branch have not led to undue prophylactic measures that handicap the effective working of the national government as a whole. The Constitution does not contemplate total separation of the three branches of Government. *Buckley v. Valeo,* 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976). "[A] hermetic sealing off of the three branches of Government from one another would preclude **2809 the establishment of a Nation capable of governing itself effectively." *Ibid.* [25]

Our decisions reflect this judgment. As already noted, the Court, recognizing that modern government must address a formidable agenda of complex policy issues, countenanced the delegation of extensive legislative authority to executive and independent agencies. *Hampton & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928). The separation of powers doctrine has heretofore led to the invalidation of government action only when the challenged action violated some express provision in the Constitution. In *Buckley v. Valeo,* 424 U.S. 1, 118–124, 96 S.Ct. 612, 681–685, 46 L.Ed.2d 659 (1976) (per curiam) and *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), congressional action compromised the appointment power of the President. See also *Springer v. Phillipine Islands,* 277 U.S. 189, 200–201, 48 S.Ct. 480, 481–482, 72 L.Ed. 845 (1928). In *United States v. Klein,* 13 Wall. 128, 20 L.Ed. 519 (1871), an Act of Congress was struck for encroaching upon judicial *1000 power, but the Court found that the Act also impinged upon the Executive's exclusive pardon power. Art. II, § 2. Because we must have a workable efficient government, this is as it should be.

AR.05042

This is the teaching of *Nixon v. Administrator of Gen. Servs.,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), which, in rejecting a separation of powers objection to a law requiring that the Administrator take custody of certain presidential papers, set forth a framework for evaluating such claims:

> "[I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States v. Nixon,* 418 U.S. [683] at 711–712 [94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039]. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." 433 U.S., at 443, 97 S.Ct., at 2790.

Section 244(c)(2) survives this test. The legislative veto provision does not "prevent the Executive Branch from accomplishing its constitutionally assigned functions." First, it is clear that the Executive Branch has no "constitutionally assigned" function of suspending the deportation of aliens. " 'Over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972), quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). Nor can it be said that the inherent function of the Executive Branch in executing the law is involved. *The Steel Seizure Case* resolved that the Article II mandate for the President to execute the law is a directive to enforce the law which Congress has written.

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). "The duty of the President to see that the laws are executed is a **\*1001** duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power." *Myers v. United States,* 272 U.S., at 177, 47 S.Ct., at 85 (Holmes, J., dissenting);

**\*\*2810** 272 U.S., at 247, 47 S.Ct., at 69 (Brandeis, J., dissenting). Here, § 244 grants the executive only a qualified suspension authority and it is only that authority which the President is constitutionally authorized to execute.

Moreover, the Court believes that the legislative veto we consider today is best characterized as an exercise of legislative or quasi-legislative authority. Under this characterization, the practice does not, even on the surface, constitute an infringement of executive or judicial prerogative. The Attorney General's suspension of deportation is equivalent to a proposal for legislation. The nature of the Attorney General's role as recommendatory is not altered because § 244 provides for congressional action through disapproval rather than by ratification. In comparison to private bills, which must be initiated in the Congress and which allow a Presidential veto to be overriden by a two-thirds majority in both Houses of Congress, § 244 augments rather than reduces the executive branch's authority. So understood, congressional review does not undermine, as the Court of Appeals thought, the "weight and dignity" that attends the decisions of the Executive Branch.

Nor does § 244 infringe on the judicial power, as Justice POWELL would hold. Section 244 makes clear that Congress has reserved its own judgment as part of the statutory process. Congressional action does not substitute for judicial review of the Attorney General's decisions. The Act provides for judicial review of the refusal of the Attorney General to suspend a deportation and to transmit a recommendation to Congress. *INS v. Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981) (per curiam). But the courts have not been given the authority to review whether an alien should be given permanent status; review is limited to whether the Attorney General has properly **\*1002** applied the statutory standards for essentially denying the alien a recommendation that his deportable status be changed by the Congress. Moreover, there is no constitutional obligation to provide any judicial review whatever for a failure to suspend deportation. "The power of Congress, therefore, to expel, like the power to exclude aliens, or any specified class of aliens, from the country, may be exercised entirely through executive officers; or Congress may call in the aid of the judiciary to ascertain any contested facts on which an alien's right to be in the country has been made by Congress to depend." *Fong Yue Ting v. United States,* 149 U.S. 698, 713–714, 13 S.Ct. 1016, 1022, 37 L.Ed. 905 (1893). See also *Tutun v. United States,* 270 U.S. 568, 576, 46 S.Ct. 425, 426, 70 L.Ed. 738 (1926); *Ludecke v. Watkins,* 335 U.S. 160, 171–172, 68 S.Ct. 1429, 1434–1435, 92 L.Ed. 1881 (1948); *Harisiades v. Shaughnessy,* 342 U.S. 580, 590, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952).

I do not suggest that all legislative vetoes are necessarily consistent with separation of powers principles. A legislative check on an inherently executive function, for example that of initiating prosecutions, poses an entirely different question. But the legislative veto device here—and in many other settings—is far from an instance of legislative tyranny over the Executive. It is a necessary check on the unavoidably expanding power of the agencies, both executive and independent, as they engage in exercising authority delegated by Congress.

V

I regret that I am in disagreement with my colleagues on the fundamental questions that this case presents. But even more I regret the destructive scope of the Court's holding. It reflects a profoundly different conception of the Constitution than that held by the Courts which sanctioned the modern administrative state. Today's decision strikes down in one fell swoop provisions in more laws enacted by Congress than the Court has cumulatively invalidated in its history. I fear it will now be more difficult "to insure that the fundamental policy decisions in our society will be made not **\*1003** by an appointed official but **\*\*2811** by the body immediately responsible to the people," *Arizona v. California,* 373 U.S. 546, 626, 83 S.Ct. 1468, 1511, 10 L.Ed.2d 542 (1963) (Harlan, J., dissenting). I must dissent.

APPENDIX 1

STATUTES WITH PROVISIONS
AUTHORIZING CONGRESSIONAL REVIEW

This compilation, reprinted from the Brief for the United States Senate, identifies and describes briefly current statutory provisions for a legislative veto by one or both Houses of Congress. Statutory provisions for a veto by committees of the Congress and provisions which require legislation (i.e., passage of a joint resolution) are not included. The fifty-six statutes in the compilation (some of which contain more than one provision for legislative review) are divided into six broad categories: foreign affairs and national security, budget, international trade, energy, rulemaking and miscellaneous.

A.

FOREIGN AFFAIRS AND NATIONAL SECURITY

1. Act for International Development of 1961, Pub.L. No. 87–195, § 617, 75 Stat. 424, 444, 22 U.S.C. 2367 (Funds made available for foreign assistance under the Act may be terminated by concurrent resolution).

2. War Powers Resolution, Pub.L. No. 93–148, § 5, 87 Stat. 555, 556–557 (1973), 50 U.S.C. 1544 (Absent declaration of war, President may be directed by concurrent resolution to remove United States armed forces engaged in foreign hostilities.)

3. Department of Defense Appropriation Authorization Act, 1974, Pub.L. No. 93–155, § 807, 87 Stat. 605, 615 (1973), 50 U.S.C. 1431 (National defense contracts obligating the United States for any amount in excess of $25,000,000 may be disapproved by resolution of either House).

**\*1004** 4. Department of Defense Appropriation Authorization Act, 1975, Pub.L. No. 93–365, § 709(c), 88 Stat. 399, 408 (1974), 50 U.S.C. app. 2403–1(c) (Applications for export of defense goods, technology or techniques may be disapproved by concurrent resolution).

5. H.R.J.Res. 683, Pub.L. No. 94–110, § 1, 89 Stat. 572 (1975), 22 U.S.C. 2441 note (Assignment of civilian personnel to Sinai may be disapproved by concurrent resolution).

6. International Development and Food Assistance Act of 1975, Pub.L. No. 94–161, § 310, 89 Stat. 849, 860, 22 U.S.C. 2151n (Foreign assistance to countries not meeting human rights standards may be terminated by concurrent resolution).

7. International Security Assistance and Arms Control Act of 1976, Pub.L. No. 94–329, § 211, 90 Stat. 729, 743, 22 U.S.C. 2776(b) (President's letter of offer to sell major defense equipment may be disapproved by concurrent resolution).

AR.05044

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

8. National Emergencies Act, Pub.L. No. 94–412, § 202, 90 Stat. 1255 (1976), 50 U.S.C. 1622 (Presidentially declared national emergency may be terminated by concurrent resolution).

9. International Navigational Rules Act of 1977, Pub.L. No. 95–75, § 3(d), 91 Stat. 308, 33 U.S.C. 1602(d) (Supp. III 1979) (Presidential proclamation of International Regulations for Preventing Collisions at Sea may be disapproved by concurrent resolution).

10. International Security Assistance Act of 1977, Pub.L. No. 95–92, § 16, 91 Stat. 614, 622, 22 U.S.C. § 2753(d)(2) (Supp. III 1979) (President's proposed transfer of arms to a third country may be disapproved by concurrent resolution).

11. Act of December 8 [28], 1977, Pub.L. No. 95–223, § 207(2)(b), 91 Stat. 1625, 1628, 50 U.S.C. 1706(b) ( **\*\*2812** Supp. III 1979) (Presidentially declared national emergency and exercise of conditional powers may be terminated by concurrent resolution).

**\*1005** 12. Nuclear Non-Proliferation Act of 1978, Pub.L. No. 95–242, §§ 303, 304, 306, 307, 401, 92 Stat. 120, 130, 134, 137–38, 139, 144, 42 U.S.C. §§ 2160(f), 2155(b), 2157(b), 2153(d) (Supp. III 1979) (Cooperative agreements concerning storage and disposition of spent nuclear fuel, proposed export of nuclear facilities, materials or technology and proposed agreements for international cooperation in nuclear reactor development may be disapproved by concurrent resolution).

### B.

### BUDGET

13. Congressional Budget and Impoundment Control Act of 1974, Pub.L. No. 93–344, § 1013, 88 Stat. 297, 334–35, 31 U.S.C. 1403 (The proposed deferral of budget authority provided for a specific project or purpose may be disapproved by an impoundment resolution by either House).

### C.

### INTERNATIONAL TRADE

14. Trade Expansion Act of 1962, Pub.L. No. 87–794, § 351, 76 Stat. 872, 899, 19 U.S.C. 1981(a) (Tariff or duty recommended by Tariff Commission may be imposed by concurrent resolution of approval).

15. Trade Act of 1974, Pub.L. No. 93–618, §§ 203(c), 302(b), 402(d), 407, 88 Stat. 1978, 2016, 2043, 2057–60, 2063–64, 19 U.S.C. 2253(c), 2412(b), 2432, 2434 [2437] (Proposed Presidential actions on import relief and actions concerning certain countries may be disapproved by concurrent resolution; various Presidential proposals for waiver extensions and for extension of nondiscriminatory treatment to products of foreign countries may be disapproved by simple (either House) or concurrent resolutions).

16. Export-Import Bank Amendments of 1974, Pub.L. No. 93–646, § 8, 88 Stat. 2333, 2336, 12 U.S.C. 635e (Presidentially proposed limitation for exports to USSR in **\*1006** excess of $300,000,000 must be approved by concurrent resolution).

### D.

### ENERGY

17. Act of November 16, 1973, Pub.L. No. 93–153, § 101, 87 Stat. 576, 582, 30 U.S.C. 185(u) (Continuation of oil exports being made pursuant to President's finding that such exports are in the national interest may be disapproved by concurrent resolution).

18. Federal Nonnuclear Energy Research and Development Act of 1974, Pub.L. No. 93–577, § 12, 88 Stat. 1878, 1892–1893, 42 U.S.C. 5911 (Rules or orders proposed by the President concerning allocation or acquisition of essential materials may be disapproved by resolution of either House).

19. Energy Policy and Conservation Act, Pub.L. No. 94–163, § 551, 89 Stat. 871, 965 (1975), 42 U.S.C. 6421(c) (Certain Presidentially proposed "energy actions" involving fuel economy and pricing may be disapproved by resolution of either House).

20. Naval Petroleum Reserves Production Act of 1976, Pub.L. No. 94–258, § 201, 90 Stat. 303, 309, 10 U.S.C. 7422(c)(2)(C) (President's extension of production period for naval petroleum reserves may be disapproved by resolution of either House).

21. Energy Conservation and Production Act, Pub.L. No. 94–385, § 305, 90 Stat. 1125, 1148 (1976), 42 U.S.C. 6834 (Proposed sanctions involving federal assistance and the energy conservation performance standards for new buildings must be approved by resolution of both Houses).

22. Department of Energy Act of 1978—Civilian Applications, Pub.L. No. 95–238, §§ 107, 207(b), 92 Stat. 47, 55, 70, 22 U.S.C. 3224a, 42 U.S.C. 5919(m) (Supp. III 1979) (International agreements and expenditures by Secretary of Energy of appropriations for foreign spent nuclear fuel storage must be approved by concurrent resolution, if not consented to by legislation;) (plans for such use of appropriated funds may be disapproved by either House;) (financing in **2813 excess of $50,000,000 for demonstration facilities must be approved by resolution in both Houses).

*1007 23. Outer Continental Shelf Lands Act Amendments of 1978, Pub.L. No. 95–372, §§ 205(a), 208, 92 Stat. 629, 641, 668, 43 U.S.C. §§ 1337(a), 1354(c) (Supp. III 1979) (Establishment by Secretary of Energy of oil and gas lease bidding system may be disapproved by resolution of either House;) (export of oil and gas may be disapproved by concurrent resolution).

24. Natural Gas Policy Act of 1978, Pub.L. No. 95–621, §§ 122(c)(1) and (2), 202(c), 206(d)(2), 507, 92 Stat. 3350, 3370, 3371, 3372, 3380, 3406, 15 U.S.C. 3332, 3342(c), 3346(d)(2), 3417 (Supp. III 1979) (Presidential reimposition of natural gas price controls may be disapproved by concurrent resolution;) (Congress may reimpose natural gas price controls by concurrent resolution;) (Federal Energy Regulatory Commission (FERC) amendment to pass through incremental costs of natural gas, and exemptions therefrom, may be disapproved by resolution of either House;) (procedure for congressional review established).

25. Export Administration Act of 1979, Pub.L. No. 96–72, § 7(d)(B), 7(g)(3), 93 Stat. 503, 518, 520, 50 U.S.C. app. 2406(d)(2)(B), 2406(g)(3) (Supp. III 1979) (President's proposal to domestically produce crude oil must be approved by concurrent resolution;) (action by Secretary of Commerce to prohibit or curtail export of agricultural commodities may be disapproved by concurrent resolution).

26. Energy Security Act, Pub.L. No. 96–294, §§ 104(b)(3), 104(e), 126(d)(2), 126(d)(3), 128, 129, 132(a)(3), 133(a)(3), 137(b)(5), 141(d), 179(a), 803, 94 Stat. 611, 618, 619, 620, 623–26, 628–29, 649, 650–52, 659, 660, 664, 666, 679, 776 (1980) (to be codified in 50 U.S.C. app. 2091–93, 2095, 2096, 2097, 42 U.S.C. 8722, 8724, 8725, 8732, 8733, 8737, 8741, 8779, 6240) (Loan guarantees by Departments of Defense, Energy and Commerce in excess of specified amounts may be disapproved by resolution of either House;) (President's proposal to provide loans or guarantees in excess *1008 of established amounts may be disapproved by resolution of either House;) (proposed award by President of individual contracts for purchase of more than 75,000 barrels per day of crude oil may be disapproved by resolution of either House;) (President's proposals to overcome energy shortage through synthetic fuels development, and individual contracts to purchase more than 75,000 barrels per day, including use of loans or guarantees, may be disapproved by resolution of either House;) (procedures for either House to disapprove proposals made under Act are established;) (request by Synthetic Fuels Corporation (SFC) for additional time to submit its comprehensive strategy may be disapproved by resolution of either House;) (proposed amendment to comprehensive strategy by SFC Board of Directors may be disapproved by concurrent resolution of either House or by failure of both Houses to pass concurrent resolution of approval;) (procedure for either House to disapprove certain proposed actions of SFC is established;) (procedure for both Houses to approve by concurrent resolution or either House to reject concurrent resolution for proposed amendments to comprehensive strategy of SFC is established;) (proposed loans and loan guarantees by SFC may be disapproved by resolution of either House;) (acquisition by SFC of a synthetic fuels project which is receiving financial assistance may be disapproved by resolution of either House;) (SFC contract renegotiations exceeding initial cost estimates by 175% may be disapproved by resolution of either House;) (proposed financial assistance to synthetic fuel projects in Western Hemisphere outside United States may be disapproved by resolution of either House;) (President's request to suspend provisions requiring build up of reserves and limiting sale or

disposal of certain crude oil reserves must be approved by resolution of both Houses).

**2814** E.

RULEMAKING

27. Education Amendments of 1974, Pub.L. No. 93–380, § 509, 88 Stat. 484, 567, 20 U.S.C. 1232(d)(1) **1009** (Department of Education regulations may be disapproved by concurrent resolution).

28. Federal Education Campaign Act Amendments of 1979, Pub.L. No. 96–187, § 109, 93 Stat. 1339, 1364, 2 U.S.C. 438(d)(2) (Supp. III 1979) (Proposed rules and regulations of the Federal Election Commission may be disapproved by resolution of either House).

29. Act of January 2, 1975, Pub.L. No. 93–595, § 2, 88 Stat. 1926, 1948, 28 U.S.C. 2076 (Proposed amendments by Supreme Court of Federal Rules of Evidence may be disapproved by resolution of either House).

30. Act of August 9, 1975, Pub.L. No. 94–88, § 208, 89 Stat. 433, 436–37, 42 U.S.C. 602 note (Social Security standards proposed by Secretary of Health and Human Services may be disapproved by either House).

31. Airline Deregulation Act of 1978, Pub.L. No. 95–504, § 43(f)(3), 92 Stat. 1705, 1752, 49 U.S.C. 1552(f) (Supp. III 1979) (Rules or regulations governing employee protection program may be disapproved by resolution of either House).

32. Education Amendments of 1978, Pub.L. No. 95–561, §§ 1138, 1212, 1409, 92 Stat. 2143, 2327, 2341, 2341, 2369, 25 U.S.C. 2018, 20 U.S.C. [927] 1221–3(e) (Supp. III 1979) (Rules and regulations proposed under the Act may be disapproved by concurrent resolution).

33. Civil Rights of Institutionalized Persons Act, Pub.L. No. 96–247, § 7(b)(1), 94 Stat. 349, 352–355 (1980) (to be codified in 42 U.S.C. 1997e) (Attorney General's proposed standards for resolution of grievances of adults confined in correctional facilities may be disapproved by resolution of either House).

34. Federal Trade Commission Improvements Act of 1980, Pub.L. No. 96–252, § 21(a), 94 Stat. 374, 393 (to be codified in 15 U.S.C. 57a–1) (Federal Trade Commission rules may be disapproved by concurrent resolution).

35. Department of Education Organization Act, Pub.L. No. 96–88, § 414(b), 93 Stat. 668, 685 (1979), 20 U.S.C. 3474 (Supp. III 1979) **1010** (Rules and regulations promulgated with respect to the various functions, programs and responsibilities transferred by this Act, may be disapproved by concurrent resolution).

36. Multiemployer Pension Plan Amendments Act of 1980, Pub.L. No. 96–364, § 102, 94 Stat. 1208, 1213 (to be codified in 29 U.S.C. 1322a) (Schedules proposed by Pension Benefit Guaranty Corporation (PBGC) which requires an increase in premiums must be approved by concurrent resolution;) (revised premium schedules for voluntary supplemental coverage proposed by PBGC may be disapproved by concurrent resolution).

37. Farm Credit Act Amendments of 1980, Pub.L. No. 96–592, § 508, 94 Stat. 3437, 3450 (to be codified in 12 U.S.C. 2121 [2252] ) (Certain Farm Credit Administration regulations or delayed by resolution of either House.)

38. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub.L. No. 96–510, § 305, 94 Stat. 2767, 2809 (to be codified in 42 U.S.C. 9655) (Environmental Protection Agency regulations concerning hazardous substances releases, liability and compensation may be disapproved by concurrent resolution or by the adoption of either House of a concurrent resolution which is not disapproved by the other House).

39. National Historic Preservation Act Amendments of 1980, Pub.L. No. 96–515, § 501, 94 Stat. 2987, 3004 (to be codified in 16 U.S.C. 470w–6) (Regulation proposed by the Secretary of the Interior may be disapproved by concurrent resolution).

**2815** 40. Coastal Zone Management Improvement Act of 1980, Pub.L. No. 96–464, § 12, 94 Stat. 2060, 2067 (to be codified in 16 U.S.C. 1463a) (Rules proposed by the Secretary of Commerce may be disapproved by concurrent resolution).

AR.05047

I.N.S. v. Chadha, 462 U.S. 919 (1983)

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

41. Act of December 17, 1980, Pub.L. No. 96–539, § 4, 94 Stat. 3194, 3195 (to be codified in 7 U.S.C. 136w) (Rules or regulations promulgated by the Administrator of the Environmental **\*1011** Protection Agency under the Federal Insecticide, Fungicide and Rodenticide Act may be disapproved by concurrent resolution).

42. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, §§ 533(a)(2), 1107(d), 1142, 1183(a)(2), 1207, 95 Stat. 357, 453, 626, 654, 659, 695, 718–20 (to be codified in 20 U.S.C. 1089, 23 U.S.C. 402(j), 45 U.S.C. 761, 767, 564(c)(3), 15 U.S.C. 2083, 1276, 1204) (Secretary of Education's schedule of expected family contributions for Pell Grant recipients may be disapproved by resolution of either House;) (rules promulgated by Secretary of Transportation for programs to reduce accidents, injuries and deaths may be disapproved by resolution of either House;) (Secretary of Transportation's plan for the sale of government's common stock in rail system may be disapproved by concurrent resolution;) (Secretary of Transportation's approval of freight transfer agreements may be disapproved by resolution of either House;) (amendments to Amtrak's Route and Service Criteria may be disapproved by resolution of either House;) (Consumer Product Safety Commission regulations may be disapproved by concurrent resolution of both Houses, or by concurrent resolution of disapproval by either House if such resolution is not disapproved by the other House).

F.

MISCELLANEOUS

43. Federal Civil Defense Act of 1950, Pub.L. No. 81–920, § 201, 64 Stat. 1245, 1248, 50 app. U.S.C. 2281(g) (Interstate civil defense compacts may be disapproved by concurrent resolution).

44. National Aeronautics and Space Act of 1958, Pub.L. No. 85–568, § 302c [302c] 72 Stat. 426, 433, 42 U.S.C. 2453 (President's transfer to National Air and Space Administration of functions of other departments and agencies may be disapproved by concurrent resolution).

**\*1012** 45. Federal Pay Comparability Act of 1970, Pub.L. No. 91–656, § 3, 84 Stat. 1946, 1949, 5 U.S.C. 5305 (President's alternative pay plan may be disapproved by resolution of either House).

46. Act of October 19, 1973, Pub.L. No. 93–134, § 5, 87 Stat. 466, 468, 25 U.S.C. 1405 (Plan for use and distribution of funds paid in satisfaction of judgment of Indian Claims Commission or Court of Claims may be disapproved by resolution of either House).

47. Menominee Restoration Act, Pub.L. No. 93–197, § 6, 87 Stat. 770, 773 (1973), 25 U.S.C. 903d(b) (Plan by Secretary of the Interior for assumption of the assets the Menominee Indian corporation may be disapproved by resolution of either House).

48. District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. No. 93–198, §§ 303, 602(c)(1) and (2), 87 Stat. 774, 784, 814 (1973) (District of Columbia Charter amendments ratified by electors must be approved by concurrent resolution;) (acts of District of Columbia Council may be disapproved by concurrent resolution;) (acts of District of Columbia Council under certain titles of D.C.Code may be disapproved by resolution of either House).

49. Act of December 31, 1975, Pub.L. No. 94–200, § 102, 89 Stat. 1124, 12 U.S.C. 461 note (Federal Reserve System Board of Governors may not eliminate or reduce interest rate differentials between banks insured by Federal Deposit Insurance Corporation and associations insured by Federal Savings and Loan Insurance Corporations without concurrent resolution of approval).

50. Veterans' Education and Employment Assistance Act of 1976, **\*\*2816** Pub.L. No. 94–502, § 408, 90 Stat. 2383, 2397–98, 38 U.S.C. 1621 note (President's recommendation for continued enrollment period in Armed Forces educational assistance program may be disapproved by resolution of either House).

**\*1013** 51. Federal Land Policy and Management Act of 1976, Pub.L. No. 94–579, §§ 203(c), 204(c)(1), 90 Stat. 2743, 2750, 2752, 43 U.S.C. 1713(c), 1714 (Sale of public lands in excess of two thousand five hundred acres and withdrawal of public lands aggregating five thousand acres or more may be disapproved by concurrent resolution).

52. Emergency Unemployment Compensation Extension Act of 1977, Pub.L. No. 95–19, § 401, 91 Stat. 39, 45, 2 U.S.C. 359 (Supp. III 1979) (President's recommendations regarding rates of salary payment may be disapproved by resolution of either House).

53. Civil Service Reform Act of 1978, Pub.L. No. 95–454, § 515 [415] 92 Stat. 1111, 1179, 5 U.S.C. 3131 note (Supp. III 1979) (Continuation of Senior Executive Service may be disapproved by concurrent resolution).

54. Full Employment and Balanced Growth Act of 1978, Pub.L. No. 95–523, § 304(b), 92 Stat. 1887, 1906, 31 U.S.C. 1322 (Supp. III 1979) (Presidential timetable for reducing unemployment may be superseded by concurrent resolution).

55. District of Columbia Retirement Reform Act, Pub.L. No. 96–122, § 164, 93 Stat. 866, 891–92 (1979) (Required reports to Congress on the District of Columbia retirement program may be rejected by resolution of either House).

56. Act of August 29, 1980, Pub.L. No. 96–332, § 2, 94 Stat. 1057, 1058 (to be codified in 16 U.S.C. 1432) (Designation of marine sanctuary by the Secretary of Commerce may be disapproved by concurrent resolution).

Justice REHNQUIST, with whom Justice WHITE joins, dissenting.

A severability clause creates a presumption that Congress intended the valid portion of the statute to remain in force when one part is found to be invalid. Carter v. Carter Coal Co., 298 U.S. 238, 312, 56 S.Ct. 855, 873, 80 L.Ed. 1160 (1936); *1014 Champlin Refining Co. v. Corporation Comm'n, 286 U.S. 210, 235, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932). A severability clause does not, however, conclusively resolve the issue. "[T]he determination, in the end, is reached by" asking "[w]hat was the intent of the lawmakers," Carter, supra, 298 U.S., at 312, 56 S.Ct., at 873, and "will rarely turn on the presence or absence of such a clause." United States v. Jackson, 390 U.S. 570, 585, n. 27, 88 S.Ct. 1209, 1218, n. 27, 20 L.Ed.2d 138 (1968). Because I believe that Congress did not intend the one-House veto provision of § 244(c)(2) to be severable, I dissent.

Section 244(c)(2) is an exception to the general rule that an alien's deportation shall be suspended when the Attorney General finds that statutory criteria are met. It is severable only if Congress would have intended to permit the Attorney General to suspend deportations without it. This Court has held several times over the years that exceptions such as this are not severable because

"by rejecting the exceptions intended by the legislature ... the statute is made to enact what confessedly the legislature never meant. It confers upon the statute a positive operation beyond the legislative intent, and beyond what anyone can say it would have enacted in view of the illegality of the exceptions." Spraigue v. Thompson, 118 U.S. 90, 95, 6 S.Ct. 988, 990, 30 L.Ed. 115 (1886).

By severing § 244(c)(2), the Court permits suspension of deportation in a class of cases where Congress never stated that suspension was appropriate. I do not believe we should expand the statute in this way without some clear indication that Congress intended such an expansion. As the Court said in Davis v. Wallace, 257 U.S. 478, 484–485, 42 S.Ct. 164, 166, 66 L.Ed. 325 (1922):

**2817 "Where an excepting provision in a statute is found unconstitutional, courts very generally hold that this does not work an enlargement of the scope or operation of other provisions with which that provision was enacted and which was intended to qualify or restrain. The reasoning on which the decisions proceed is illustrated in State Ex Rel. McNeal v. Dombaugh, 20 Ohio St. 167, 174. In dealing with a contention that a statute *1015 containing an unconstitutional provision should be construed as if the remainder stood alone, the court there said: 'This would be to mutilate the section and garble its meaning. The legislative intention must not be confounded with their power to carry that intention into effect. To refuse to give force and vitality to a provision of law is one thing, and to refuse to read it is a very different thing. It is by a mere figure of speech that we say an unconstitutional provision of a statute is "stricken out." For all the purposes of construction it is to be regarded as part of the act. The meaning of the legislature must be gathered from all that they have said, as well from that which is ineffectual for want of power, as from that which is authorized by law.'

Here the excepting provision was in the statute when it was enacted, and there can be no doubt that the legislature intended that the meaning of the other provisions should be taken as restricted accordingly. Only with that restricted meaning did they receive the legislative sanction which was essential to make them part of the statute law of the

I.N.S. v. Chadha, 462 U.S. 919 (1983)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1209 of 1384

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

State; and no other authority is competent to give them a larger application."

See also *Frost v. Corporation Comm'n,* 278 U.S. 515, 525, 49 S.Ct. 235, 239, 73 L.Ed. 483 (1929).

The Court finds that the legislative history of § 244 shows that Congress intended § 244(c)(2) to be severable because Congress wanted to relieve itself of the burden of private bills. But the history elucidated by the Court shows that Congress was unwilling to give the Executive Branch permission to suspend deportation on its own. Over the years, Congress consistently rejected requests from the Executive for complete discretion in this area. Congress always insisted on retaining ultimate control, whether by concurrent resolution, as in the 1948 Act, or by one-House veto, as in the present Act. Congress has never indicated that it would be willing to permit suspensions of deportation unless it could retain some sort of veto.

**\*1016** It is doubtless true that Congress has the power to provide for suspensions of deportation without a one-House veto. But the Court has failed to identify any evidence that Congress intended to exercise that power. On the contrary, Congress' continued insistence on retaining control of the suspension process indicates that it has never been disposed to give the Executive Branch a free hand. By severing § 244(c)(2) the Court has "confounded" Congress' "intention" to permit suspensions of deportation "with their power to carry that intention into effect." *Davis, supra,* 257 U.S., at 484, 42 S.Ct., at 166, quoting *Dombaugh, supra,* at 174.

Because I do not believe that § 244(c)(2) is severable, I would reverse the judgment of the Court of Appeals.

### All Citations

462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

## Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1  Congress delegated the major responsibilities for enforcement of the Immigration and Nationality Act to the Attorney General. 8 U.S.C. § 1103(a). The Attorney General discharges his responsibilities through the Immigration and Naturalization Service, a division of the Department of Justice. *Ibid.*

2  In constitutional terms, "veto" is used to describe the President's power under Art. I, § 7 of the Constitution. See Black's Law Dictionary 1403 (5th ed. 1979). It appears, however, that Congressional devices of the type authorized by § 244(c)(2) have come to be commonly referred to as a "veto." See, *e.g.,* Martin, The Legislative Veto and the Responsible Exercise of Congressional Power, 68 Va.L.Rev. 253 (1982); Miller and Knapp, The Congressional Veto: Preserving the Constitutional Framework, 52 Ind.L.J. 367 (1977). We refer to the Congressional "resolution" authorized by § 244(c)(2) as a "one-House veto" of the Attorney General's decision to allow a particular deportable alien to remain in the United States.

3  It is not at all clear whether the House generally, or Subcommittee Chairman Eilberg in particular, correctly understood the relationship between H.R.Res. 926 and the Attorney General's decision to suspend Chadha's deportation. Exactly one year previous to the House veto of the Attorney General's decision in this case, Representative Eilberg introduced a similar resolution disapproving the Attorney General's suspension of deportation in the case of six other aliens. H.R.Res. 1518, 93d Cong., 2d Sess. The following colloquy occurred on the floor of the House:

"Mr. WYLIE. Mr. Speaker, further reserving the right to object, is this procedure to expedite the ongoing operations of the Department of Justice, as far as these people are concerned. Is it in any way contrary to whatever action the Attorney General has taken on the question of deportation; does the gentleman know?

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

Mr. EILBERG. Mr. Speaker, the answer is no to the gentleman's final question. These aliens have been found to be deportable and the Special Inquiry Officer's decision denying suspension of deportation has been reversed by the Board of Immigration Appeals. We are complying with the law since all of these decisions have been referred to us for approval or disapproval, and there are hundreds of cases in this category. In these six cases however, we believe it would be grossly improper to allow these people to acquire the status of permanent resident aliens.

Mr. WYLIE. In other words, the gentleman has been working with the Attorney General's office?

Mr. EILBERG. Yes.

Mr. WYLIE. This bill then is in fact a confirmation of what the Attorney General intends to do?

Mr. EILBERG. The gentleman is correct insofar as it relates to the determination of deportability which has been made by the Department of Justice in these cases.

Mr. WYLIE. Mr. Speaker, I withdraw my reservation of objection." 120 Cong.Rec. 41412 (1974).

Clearly, this was an obfuscation of the effect of a veto under § 244(c)(2). Such a veto in no way constitutes "a confirmation of what the Attorney General intends to do." To the contrary, such a resolution was meant to overrule and set aside, or "veto," the Attorney General's determination that, in a particular case, cancellation of deportation would be appropriate under the standards set forth in § 244(a)(1).

4   Nine Members of the House of Representatives disagree with the position taken in the briefs filed by the Senate and the House of Representatives and have filed a brief *amicus curiae* urging that the decision of the Court of Appeals be affirmed in this case.

5   The Senate and House authorized intervention in this case, S.Res. 40 and H.R.Res. 49, 97th Cong., 1st Sess. (1981), and, on February 3, 1981, filed motions to intervene and petitioned for rehearing. The Court of Appeals granted the motions to intervene. Both Houses are therefore proper "parties" within the meaning of that term in 28 U.S.C. § 1254(1). See *Batterton v. Francis,* 432 U.S. 416, 424, n. 7, 97 S.Ct. 2399, 2405, n. 7, 53 L.Ed.2d 448 (1977).

6   In addition to meeting the statutory requisites of § 1252, of course, an appeal must present a justiciable case or controversy under Art. III. Such a controversy clearly exists in No. 80–1832, as in the other two cases, because of the presence of the two Houses of Congress as adverse parties. See *infra,* at 2778; see also *Director, OWCP v. Perini North River Associates,* ——— U.S. ———, ————, 103 S.Ct. 634, 641, 74 L.Ed.2d 465 (1982).

7   In this case we deem it appropriate to address questions of severability first. But see *Buckley v. Valeo,* 424 U.S. 1, 108–109, 96 S.Ct. 612, 677–678, 46 L.Ed.2d 659 (1976); *United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968).

8   Without the provision for one-House veto, Congress would presumably retain the power, during the time allotted in § 244(c)(2), to enact a law, in accordance with the requirements of Article I of the Constitution, mandating a particular alien's deportation, unless, of course, other constitutional principles place substantive limitations on such action. Cf. Attorney General Jackson's attack on H.R. 9766, 76th Cong., 3d Sess. (1940), a bill to require the Attorney General to deport an individual alien. The Attorney General called the bill "an historical departure from an unbroken American practice and tradition. It would be the first time that an act of Congress singled out a named individual for deportation." S.Rep. No. 2031, 76th Cong., 3d Sess. 9 (1940) (reprinting Jackson's letter of June 18, 1940). See n. 17, *infra.*

9   Without the one-House veto, § 244 resembles the "report and wait" provision approved by the Court in *Sibbach v. Wilson,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). The statute examined in *Sibbach* provided that the newly promulgated Federal Rules of Civil Procedure "shall not take effect until they shall have been reported to Congress by the Attorney General at the beginning of a regular session thereof and until after the close of such session." Act of June 19, 1934, ch. 651, § 2, 48 Stat. 1064. This statute did *not* provide that Congress could unilaterally veto the Federal Rules. Rather, it gave Congress the opportunity to review the Rules before they became effective and to pass legislation barring their effectiveness if the Rules

I.N.S. v. Chadha, 462 U.S. 919 (1983)

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1211 of 1384

were found objectionable. This technique was used by Congress when it acted in 1973 to stay, and ultimately to revise, the proposed Rules of Evidence. *Compare* Act of March 30, 1973, Pub.L. No. 93–12, 87 Stat. 9, *with* Act of Jan. 2, 1975, Pub.L. 93–595, 88 Stat. 1926.

10  Depending on how the INS interprets its statutory duty under § 244 apart from the challenged portion of § 244(c)(2), Chadha's status may be retroactively adjusted to that of a permanent resident as of December 19, 1975—the last session in which Congress could have attempted to stop the suspension of Chadha's deportation from ripening into cancellation of deportation. See 8 U.S.C. § 1254(d). In that event, Chadha's five-year waiting period to become a citizen under § 316(a) of the Act, 8 U.S.C. § 1427(a), would have elapsed.

11  Under the Third Circuit's reasoning, judicial review under § 106(a) would not extend to the constitutionality of § 244(c)(2) because that issue could not have been tested during the administrative deportation proceedings conducted under § 242(b). *Dastmalchi v. INS,* 660 F.2d 880 (CA3 1981). The facts in *Dastmalchi* are distinguishable, however. In *Dastmalchi,* Iranian aliens who had entered the United States on nonimmigrant student visas challenged a regulation that required them to report to the District Director of the INS during the Iranian hostage crisis. The aliens reported and were ordered deported after a § 242(b) proceeding. The aliens in *Dastmalchi* could have been deported irrespective of the challenged regulation. Here, in contrast, Chadha's deportation would have been *cancelled* but for § 242(c)(2).

12  A relevant parallel can be found in our recent decision in *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). There, the United States agreed with Bob Jones University and Goldsboro Christian Schools that certain Revenue Rulings denying tax exempt status to schools that discriminated on the basis of race were invalid. Despite its agreement with the schools, however, the United States was complying with a court order enjoining it from granting tax-exempt status to any school that discriminated on the basis of race. Even though the government largely agreed with the opposing party on the merits of the controversy, we found an adequate basis for jurisdiction in the fact that the government intended to enforce the challenged law against that party. See *id.,* at ——— n. 9, 103 S.Ct., at 2025 n. 9.

13  The suggestion is made that § 244(c)(2) is somehow immunized from constitutional scrutiny because the Act containing § 244(c)(2) was passed by Congress and approved by the President. *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), resolved that question. The assent of the Executive to a bill which contains a provision contrary to the Constitution does not shield it from judicial review. See *Smith v. Maryland,* 442 U.S. 735, 740 n. 5, 99 S.Ct. 2577, 2580, n. 5, 61 L.Ed.2d 220 (1979); *National League of Cities v. Usery,* 426 U.S. 833, 841 n. 12, 96 S.Ct. 2465, 2469 n. 12, 49 L.Ed.2d 245 (1976); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). See also n. 22, *infra.* In any event, eleven Presidents, from Mr. Wilson through Mr. Reagan, who have been presented with this issue have gone on record at some point to challenge Congressional vetoes as unconstitutional. See Henry, The Legislative Veto: In Search of Constitutional Limits, 16 Harv.J.Legis. 735, 737–738 n. 7 (1979) (collecting citations to presidential statements). Perhaps the earliest Executive expression on the constitutionality of the Congressional veto is found in Attorney General William D. Mitchell's opinion of January 24, 1933 to President Hoover. 37 Op.Atty.Gen. 56 (1933). Furthermore, it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds. For example, after President Roosevelt signed the Lend-Lease Act of 1941, Attorney General Jackson released a memorandum explaining the President's view that the provision allowing the Act's authorization to be terminated by concurrent resolution was unconstitutional. Jackson, A Presidential Legal Opinion, 66 Harv.L.Rev. 1353 (1953).

14  The widespread approval of the delegates was commented on by Joseph Story:

"In the convention there does not seem to have been much diversity of opinion on the subject of the propriety of giving to the president a negative on the laws. The principal points of discussion seem to have been,

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

whether the negative should be absolute, or qualified; and if the latter, by what number of each house the bill should subsequently be passed, in order to become a law; and whether the negative should in either case be exclusively vested in the president alone, or in him jointly with some other department of government." 1 J. Story, Commentaries on the Constitution of the United States 611 (1858). See 1 M. Farrand, The Records of the Federal Convention of 1787 21, 97–104, 138–140; *id.,* at 73–80, 181, 298, 301–305.

15  The Great Compromise was considered so important by the Framers that they inserted a special provision to ensure that it could not be altered, even by constitutional amendment, except with the consent of the states affected. See U.S. Const. Art. V.

16  Congress protests that affirming the Court of Appeals in this case will sanction "lawmaking by the Attorney General.... Why is the Attorney General exempt from submitting his proposed changes in the law to the full bicameral process?" Brief of the United States House of Representatives 40. To be sure, some administrative agency action—rule making, for example—may resemble "lawmaking." See 5 U.S.C. § 551(4), which defines an agency's "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe *law* or policy...." This Court has referred to agency activity as being "quasi-legislative" in character. *Humphrey's Executor v. United States,* 295 U.S. 602, 628, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935). Clearly, however, "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952). See *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976). When the Attorney General performs his duties pursuant to § 244, he does not exercise "legislative" power. See *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976). The bicameral process is not necessary as a check on the Executive's administration of the laws because his administrative activity cannot reach beyond the limits of the statute that created it—a statute duly enacted pursuant to Art. I, §§ 1, 7. The constitutionality of the Attorney General's execution of the authority delegated to him by § 244 involves only a question of delegation doctrine. The courts, when a case or controversy arises, can always "ascertain whether the will of Congress has been obeyed," *Yakus v. United States,* 321 U.S. 414, 425, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944), and can enforce adherence to statutory standards. See *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 865–866, 96 L.Ed. 1153 (1952); *Ethyl Corp. v. EPA,* 541 F.2d 1, 68 (CADC) (en banc) (separate statement of Leventhal, J.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); L. Jaffe, Judicial Control of Administrative Action 320 (1965). It is clear, therefore, that the Attorney General acts in his presumptively Art. II capacity when he administers the Immigration and Nationality Act. Executive action under legislatively delegated authority that might resemble "legislative" action in some respects is not subject to the approval of both Houses of Congress and the President for the reason that the Constitution does not so require. That kind of Executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely. A one-House veto is clearly legislative in both character and effect and is not so checked; the need for the check provided by Art. I, §§ 1, 7 is therefore clear. Congress' authority to delegate portions of its power to administrative agencies provides no support for the argument that Congress can constitutionally control administration of the laws by way of a Congressional veto.

17  We express no opinion as to whether such legislation would violate any constitutional provision. See note 8, *supra.*

18  During the Convention of 1787, the application of the President's veto to repeals of statutes was addressed and the Framers were apparently content with Madison's comment that "[a]s to the difficulty of repeals, it was probable that in doubtful cases the policy would soon take place of limiting the duration of laws as to require renewal instead of repeal." 2 M. Farrand, *supra,* at 587. See Ginnane, The Control of Federal

I.N.S. v. Chadha, 462 U.S. 919 (1983)

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1213 of 1384

Administration by Congressional Resolutions and Committees, 66 Harv.L.Rev. 569, 587–599 (1953). There is no provision allowing Congress to repeal or amend laws by other than legislative means pursuant to Art. I.

19   This does not mean that Congress is required to capitulate to "the accretion of policy control by forces outside its chambers." Javits and Klein, Congressional Oversight and the Legislative Veto: A Constitutional Analysis, 52 N.Y.U.L.Rev. 455, 462 (1977). The Constitution provides Congress with abundant means to oversee and control its administrative creatures. Beyond the obvious fact that Congress ultimately controls administrative agencies in the legislation that creates them, other means of control, such as durational limits on authorizations and formal reporting requirements, lie well within Congress' constitutional power. See *id.,* at 460–461; Kaiser, Congressional Action to Overturn Agency Rules: Alternatives to the "Legislative Veto", 32 Ad.L.Rev. 667 (1980). See also note 9, *supra.*

20   See also U.S. Const., Art. II, § 1, and Amdt. 120.

21   An exception from the Presentment Clauses was ratified in Hollingsworth v. Virginia, 3 Dall. 378, 1 L.Ed. 644 (1798). There the Court held presidential approval was unnecessary for a proposed constitutional amendment which had passed both Houses of Congress by the requisite two-thirds majority. See U.S. Const. Art. V.

One might also include another "exception" to the rule that Congressional action having the force of law be subject to the bicameral requirement and the Presentment Clauses. Each House has the power to act alone in determining specified internal matters. Art. I, § 7, cls. 2, 3, and § 5, cl. 2. However, this "exception" only empowers Congress to bind itself and is noteworthy only insofar as it further indicates the Framers' intent that Congress not act in any legally binding manner outside a closely circumscribed legislative arena, except in specific and enumerated instances.

Although the bicameral check was not provided for in any of these provisions for independent Congressional action, precautionary alternative checks are evident. For example, Art. II, § 2 requires that two-thirds of the Senators present concur in the Senate's consent to a treaty, rather than the simple majority required for passage of legislation. See The Federalist No. 64 (J. Jay); The Federalist No. 66 (A. Hamilton); The Federalist No. 75 (A. Hamilton). Similarly, the Framers adopted an alternative protection, in the stead of Presidential veto and bicameralism, by requiring the concurrence of two-thirds of the Senators present for a conviction of impeachment. Art. I, § 3. We also note that the Court's holding in *Hollingsworth, supra,* that a resolution proposing an amendment to the Constitution need not be presented to the President, is subject to two alternative protections. First, a constitutional amendment must command the votes of two-thirds of each House. Second, three-fourths of the states must ratify any amendment.

22   Justice POWELL's position is that the one-House veto in this case is a *judicial* act and therefore unconstitutional as beyond the authority vested in Congress by the Constitution. We agree that there is a sense in which one-House action pursuant to § 244(c)(2) has a judicial cast, since it purports to "review" Executive action. In this case, for example, the sponsor of the resolution vetoing the suspension of Chadha's deportation argued that Chadha "did not meet [the] statutory requirements" for suspension of deportation. *Ante,* at 2771. To be sure, it is normally up to the courts to decide whether an agency has complied with its statutory mandate. See note 16, *supra.* But the attempted analogy between judicial action and the one-House veto is less than perfect. Federal courts do not enjoy a roving mandate to correct alleged excesses of administrative agencies; we are limited by Art. III to hearing cases and controversies and no justiciable case or controversy was presented by the Attorney General's decision to allow Chadha to remain in this country. We are aware of no decision, and Justice POWELL has cited none, where a federal court has reviewed a decision of the Attorney General suspending deportation of an alien pursuant to the standards set out in § 244(a)(1). This is not surprising, given that no party to such action has either the motivation or the right to appeal from it. As Justice WHITE correctly notes, *post,* at 2810, "the courts have not been given the authority to review whether an alien should be given permanent status; review is limited to whether the Attorney General has properly applied the statutory standards for" *denying* a request for suspension of deportation. Foti v. INS, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), relied on by Justice POWELL,

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

addressed only "whether a refusal by the Attorney General to grant a suspension of deportation is one of these 'final orders of deportation' of which direct review by Courts of Appeals is authorized under § 106(a) of the Act." *Id., at 221, 84 S.Ct., at 309.* Thus, Justice POWELL's statement that the one-House veto in this case is "clearly adjudicatory," *post,* at 2991, simply is not supported by his accompanying assertion that the House has "assumed a function ordinarily entrusted to the federal courts." *Ibid.* We are satisfied that the one-House veto is legislative in purpose and effect and subject to the procedures set out in Art. I.

23    Neither can we accept the suggestion that the one-House veto provision in § 244(c)(2) either removes or modifies the bicameralism and presentation requirements for the enactment of future legislation affecting aliens. See *Atkins v. United States,* 556 F.2d 1028, 1063–1064 (Ct.Cl.1977), cert. denied, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978); Brief for the United States House of Representatives 40. The explicit prescription for legislative action contained in Art. I cannot be amended by legislation. See n. 13, *supra.*

Justice WHITE suggests that the Attorney General's action under § 244(c)(1) suspending deportation is equivalent to a *proposal* for legislation and that because Congressional approval is indicated "by failure to veto, the one-House veto satisfies the requirement of bicameral approval." *Post,* at 2808. However, as the Court of Appeals noted, that approach "would analogize the effect of the one house disapproval to the failure of one house to vote affirmatively on a private bill." 634 F.2d, at 435. Even if it were clear that Congress entertained such an arcane theory when it enacted § 244(c)(2), which Justice WHITE does not suggest, this would amount to nothing less than an amending of Art. I. The legislative steps outlined in Art. I are not empty formalities; they were designed to assure that both Houses of Congress and the President participate in the exercise of lawmaking authority. This does not mean that legislation must always be preceded by debate; on the contrary, we have said that it is not necessary for a legislative body to "articulate its reasons for enacting a statute." *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). But the steps required by Art. I, §§ 1, 7 make certain that there is an opportunity for deliberation and debate. To allow Congress to evade the strictures of the Constitution and in effect enact Executive proposals into law by mere silence cannot be squared with Art. I.

1    As Justice WHITE's dissenting opinion explains, the legislative veto has been included in a wide variety of statutes, ranging from bills for executive reorganization to the War Powers Resolution. See *post,* at 2793 – 2796. Whether the veto complies with the Presentment Clauses may well turn on the particular context in which it is exercised, and I would be hesitant to conclude that every veto is unconstitutional on the basis of the unusual example presented by this litigation.

2    See Martin, *The Legislative Veto and The Responsible Exercise of Congressional Power,* 68 Va.L.Rev. 253 (1982); *Consumer Energy Council of America v. FERC,* ─── U.S.App.D.C. ────, ────, 673 F.2d 425, 475 (1982).

3    Jefferson later questioned the degree to which the Constitution insulates the judiciary. See D. Malone, Jefferson the President: Second Term, 1805–1809, pp. 304–305 (1974). In response to Chief Justice Marshall's rulings during Aaron Burr's trial, Jefferson stated that the judiciary had favored Burr—whom Jefferson viewed as clearly guilty of treason—at the expense of the country. He predicted that the people "will see and amend the error in our Constitution, which makes any branch independent of the nation." *Id.,* at 305 (quoting Jefferson's letter to William Giles). The very controversy that attended Burr's trial, however, demonstrates the wisdom in providing a neutral forum, removed from political pressure, for the determination of one person's rights.

4    The House and the Senate argue that the legislative veto does not prevent the executive from exercising its constitutionally assigned function. Even assuming this argument is correct, it does not address the concern that the Congress is exercising unchecked judicial power at the expense of individual liberties. It was precisely to prevent such arbitrary action that the Framers adopted the doctrine of separation of powers. See, *e.g., Myers v. United States,* 272 U.S. 52, 293, 47 S.Ct. 21, 84–85, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting).

I.N.S. v. Chadha, 462 U.S. 919 (1983)
103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1215 of 1384

5    The Immigration and Naturalization Service, a division of the Department of Justice, administers the Immigration and Naturalization Act on behalf of the Attorney General, who has primary responsibility for the Act's enforcement. See 8 U.S.C. § 1103. The Act establishes a detailed administrative procedure for determining when a specific person is to be deported, see § 1252(b), and provides for judicial review of this decision, see § 1105a(a); Foti v. INS, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963).

6    Normally the House would have distributed the resolution before acting on it, see 121 Cong.Rec. 40800 (1975), but the statute providing for the legislative veto limits the time in which Congress may veto the Service's determination that deportation should be suspended. See 8 U.S.C. § 1254(c)(2). In this case Congress had Chadha's report before it for approximately a year and a half, but failed to act on it until three days before the end of the limitations period. Accordingly, it was required to abandon its normal procedures for considering resolutions, thereby increasing the danger of arbitrary and ill-considered action.

7    The Court concludes that Congress' action was legislative in character because each branch "presumptively act[s] within its assigned sphere." Ante, at 2784. The Court's presumption provides a useful starting point, but does not conclude the inquiry. Nor does the fact that the House's action alters an individual's legal status indicate, as the Court reasons, see ante, at 2784, that the action is legislative rather than adjudicative in nature. In determining whether one branch unconstitutionally has assumed a power central to another branch, the traditional characterization of the assumed power as legislative, executive, or judicial may provide some guidance. See Springer v. Philippine Islands, 277 U.S. 189, 203, 48 S.Ct. 480, 482–483, 72 L.Ed. 845 (1928). But reasonable minds may disagree over the character of an act and the more helpful inquiry, in my view, is whether the act in question raises the dangers the Framers sought to avoid.

8    The Court reasons in response to this argument that the one-house veto exercised in this case was not judicial in nature because the decision of the Immigration and Naturalization Service did not present a justiciable issue that could have been reviewed by a court on appeal. See ante, at 2787, n. 21. The Court notes that since the administrative agency decided the case in favor of Chadha, there was no aggrieved party who could appeal. Reliance by the Court on this fact misses the point. Even if review of the particular decision to suspend deportation is not committed to the courts, the House of Representatives assumed a function that generally is entrusted to an impartial tribunal. In my view, the legislative branch in effect acted as an appellate court by overruling the Service's application of established law to Chadha. And unlike a court or an administrative agency, it did not provide Chadha with the right to counsel or a hearing before acting. Although the parallel is not entirely complete, the effect on Chadha's personal rights would not have been different in principle had he been acquitted of a federal crime and thereafter found by one House of Congress to have been guilty.

9    When Congress grants particular individuals relief or benefits under its spending power, the danger of oppressive action that the separation of powers was designed to avoid is not implicated. Similarly, Congress may authorize the admission of individual aliens by special acts, but it does not follow that Congress unilaterally may make a judgment that a particular alien has no legal right to remain in this country. See Memorandum Concerning H.R. 9766 Entitled "An Act to Direct the Deportation of Harry Renton Bridges," reprinted in S.Rep. No. 2031, pt. 1, 76th Cong., 3d Sess., 8 (1940). As Attorney General Robert Jackson remarked, such a practice "would be an historical departure from an unbroken American practice and tradition." S.Rep. No. 2031, supra, at 9.

10   We have recognized that independent regulatory agencies and departments of the Executive Branch often exercise authority that is "judicial in nature." Buckley v. Valeo, 424 U.S. 1, 140–141, 96 S.Ct. 612, 692–693, 46 L.Ed.2d 659 (1976). This function, however, forms part of the agencies' execution of public law and is subject to the procedural safeguards, including judicial review, provided by the Administrative Procedure Act, see 5 U.S.C. § 551 et seq. See also n. 5, supra.

1    As Justice POWELL observes in his separate opinion, "the respect due [Congress'] judgment as a coordinate branch of Government cautions that our holding should be no more extensive than necessary to decide the

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

case." *Ante,* at 2789. The Ninth Circuit Court of Appeals also recognized that "We are not here faced with a situation in which the unforeseeability of future circumstances or the broad scope and complexity of the subject matter of an agency's rulemaking authority preclude the articulation of specific criteria in the governing statute itself. Such factors might present considerations different from those we find here, both as to the question of separation of powers and the legitimacy of the unicameral device." 634 F.2d, at 433.

2    A selected list and brief description of these provisions is appended to this opinion.

3    Watson, Congress Steps Out: A Look at Congressional Control of the Executive, 63 Calif.L.Rev. 983, 1089–1090 (1975) (listing statutes).

4    The Roosevelt Administration submitted proposed legislation containing veto provisions and defended their constitutionality. See *e.g.,* General Counsel to the Office of Price Administration, "Statement on Constitutionality of Concurrent Resolution Provision of Proposed Price Control Bill (H.R.5479)", reprinted in Price-Control Bill: Hearings Before the House Comm. on Banking and Currency on H.R.5479, Part 1, 77th Cong., 1st Sess. 983 (1941).

5    Presidential objections to the veto, until the veto by President Nixon of the War Powers Resolution, principally concerned bills authorizing committee vetoes. As the Senate Subcommittee on Separation of Powers found in 1969, "an accommodation was reached years ago on legislative vetoes exercised by the entire Congress or by one House, [while] disputes have continued to arise over the committee form of the veto." S.Rep. No. 549, 91st Cong., 1st Sess., p. 14 (1969). Presidents Kennedy and Johnson proposed enactment of statutes with legislative veto provisions. See National Wilderness Preservation Act: Hearings Before the Senate Comm. on Interior and Insular Affairs on S. 4, 88th Cong., 1st Sess., p. 4 (1963) (President Kennedy's proposals for withdrawal of wilderness areas); President's Message to the Congress Transmitting the Budget for Fiscal Year 1970, 5 Weekly Comp.Pres.Doc. 70, 73 (Jan. 15, 1969) (President Johnson's proposals allowing legislative veto of tax surcharge). The administration of President Kennedy submitted a memorandum supporting the constitutionality of the legislative veto. See General Counsel of the Department of Agriculture, Constitutionality of Title I of H.R.6400, 87th Cong., 1st Session (1961), reprinted in Legislative Policy of the Bureau of the Budget: Hearing Before the Subcomm. on Conservation and Credit of the House Comm. on Agriculture, 89th Cong., 2d Sess. 27, 31–32 (1966). During the administration of President Johnson, the Department of Justice again defended the constitutionality of the legislative veto provision of the Reorganization Act, as contrasted with provisions for a committee veto. See Separation of Powers: Hearings Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 90th Cong. 1st Sess. 206 (1967) (testimony of Frank M. Wozencraft, Assistant Attorney General for the Office of Legal Counsel).

6    National Aeronautics and Space Act of 1958, Pub.L. No. 85–568, § 302, 72 Stat. 426, 433 (space program); Atomic Energy Act Amendment of 1958, Pub.L. No. 85–479, § 4, 72 Stat. 276, 277 (cooperative nuclear agreements); Trade Expansion Act of 1962, Pub.L. No. 87–794, § 351, 76 Stat. 872, 899, 19 U.S.C. § 1981 (tariff recommended by Tariff Commission may be imposed by concurrent resolution of approval); Postal Revenue and Federal Salary Act of 1976, Pub.L. No. 90–206, § 255(i)(1), 81 Stat. 613, 644.

7    The Impoundment Control Act's provision for legislative review has been used extensively. Presidents have submitted hundreds of proposed budget deferrals, of which 65 have been disapproved by resolutions of the House or Senate with no protest by the Executive. See Appendix B to Brief on Reargument of U.S. Senate.

8    The veto appears in a host of broad statutory delegations concerning energy rationing, contingency plans, strategic oil reserves, allocation of energy production materials, oil exports, and naval reserve production. Naval Petroleum Reserves Production Act of 1976, Pub.L. No. 94–258, § 201, 90 Stat. 303, 309, 10 U.S.C. § 7422(c)(2)(C) (naval reserve production); Energy Policy and Conservation Act, Pub.L. No. 94–163, §§ 159, 201, 401(a), and 455, 89 Stat. 871, 886, 890, 941, and 950 (1975), 42 U.S.C. §§ 6239 and 6261, 15 U.S.C. §§ 757 and 760a (strategic oil reserves, rationing and contingency plans, oil price controls and product allocation); Federal Nonnuclear Energy Research and Development Act of 1974, Pub.L. No. 93–577, § 12, 88 Stat. 1878, 1892–93, 42 U.S.C. § 5911 (allocation of energy production materials); Act of November 16, 1973, Pub.L. No. 93–153, § 10, 87 Stat. 576, 582, 30 U.S.C. § 185(u) (oil exports).

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1217 of 1384

I.N.S. v. Chadha, 462 U.S. 919 (1983)
103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

9    Congress found that under the agency's

> "very broad authority to prohibit conduct which is 'unfair or deceptive' ... the [Federal Trade Commission] FTC can regulate virtually every aspect of America's commercial life.... The FTC's rules are not merely narrow interpretations of a tightly drawn statute; instead, they are broad policy pronouncements which Congress has an obligation to study and review."

124 Cong.Rec. 5012 (1978) (statement by Rep. Broyhill). A two-House legislative veto was added to constrain that broad delegation. Federal Trade Commission Improvements Act of 1980, § 21(a), 94 Stat. 374, 393, ⚑ 15 U.S.C. § 57a–1 (Supp. IV 1980). The constitutionality of that provision is presently pending before us. *United States Senate v. Federal Trade Commission,* No. 82–935; *United States House of Representatives v. Federal Trade Commission,* No. 82–1044.

10    While Congress could write certain statutes with greater specificity, it is unlikely that this is a realistic or even desirable substitute for the legislative veto. "Political volatility and the controversy of many issues would prevent Congress from reaching agreement on many major problems if specificity were required in their enactments." Fuchs, Administrative Agencies and the Energy Problem, 47 Ind.L.J. 606, 608 (1972); Stewart, Reformation of American Administrative Law, 88 Harv.L.Rev. 1667, 1695–1696 (1975). For example, in the deportation context, the solution is not for Congress to create more refined categorizations of the deportable aliens whose status should be subject to change. In 1979, the Immigration and Naturalization Service proposed regulations setting forth factors to be considered in the exercise of discretion under numerous provisions of the Act, but not including § 244, to ensure "fair and uniform" adjudication "under appropriate discretionary criteria." 44 Fed.Reg. 36187 (1979). The proposed rule was canceled in 1981, because "[t]here is an inherent failure in any attempt to list those factors which should be considered in the exercise of discretion. It is impossible to list or foresee all of the adverse or favorable factors which may be present in a given set of circumstances." 46 Fed.Reg. 9119 (1981).

Oversight hearings and congressional investigations have their purpose, but unless Congress is to be rendered a think tank or debating society, they are no substitute for the exercise of actual authority. The "laying" procedure approved in ⚐ *Sibbach v. Wilson,* 312 U.S. 1, 15, 61 S.Ct. 422, 427, 85 L.Ed. 479 (1941), while satisfactory for certain measures, has its own shortcomings. Because a new law must be passed to restrain administrative action, Congress must delegate authority without the certain ability of being able to check its exercise.

Finally, the passage of corrective legislation after agency regulations take effect or Executive Branch officials have acted entail the drawbacks endemic to a retroactive response. "Post hoc substantive revision of legislation, the only available corrective mechanism in the absence of post-enactment review could have serious prejudicial consequences; if Congress retroactively tampered with a price control system after prices have been set, the economy could be damaged and private interests seriously impaired; if Congress rescinded the sale of arms to a foreign country, our relations with that Country would be severely strained; and if Congress reshuffled the bureaucracy after a President's reorganization proposal had taken effect, the results could be chaotic." Javits and Klein, Congressional Oversight and the Legislative Veto: A Constitutional Analysis, 52 N.Y.U.L.Rev. 455, 464 (1977).

11    Perhaps I am wrong and the Court remains open to consider whether certain forms of the legislative veto are reconcilable with the Article I requirements. One possibility for the Court and Congress is to accept that a resolution of disapproval cannot be given legal effect in its own right, but may serve as a guide in the interpretation of a delegation of lawmaking authority. The exercise of the veto could be read as a manifestation of legislative intent, which, unless itself contrary to the authorizing statute, serves as the definitive construction of the statute. Therefore, an agency rule vetoed by Congress would not be enforced in the courts because the veto indicates that the agency action departs from the Congressional intent.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

This limited role for a redefined legislative veto follows in the steps of the longstanding practice of giving some weight to subsequent legislative reaction to administrative rulemaking. The silence of Congress after consideration of a practice by the Executive may be equivalent to acquiescence and consent that the practice be continued until the power exercised be revoked. *United States v. Midwest Oil Co.,* 236 U.S. 459, 460, 472–473, 35 S.Ct. 309, 312–313, 59 L.Ed. 673 (1914). See also *Zemel v. Rusk,* 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278–1279, 14 L.Ed.2d 179 (1965) (relying on Congressional failure to repeal administration interpretation); *Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (same); *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (same); *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 384, 102 S.Ct. 1825, 1842, 72 L.Ed.2d 182 (1982) (relying on failure to disturb judicial decision in later revision of law).

Reliance on subsequent legislative reaction has been limited by the fear of overturning the intent of the original Congress and the unreliability of discerning the views of a subsequent Congress. *Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 117–118, 100 S.Ct. 2051, 2060–2061, 64 L.Ed.2d 766 (1980); *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331–332, 4 L.Ed.2d 334 (1960). These concerns are not forceful when the original statute authorizes subsequent legislative review. The presence of the review provision constitutes an express authorization for a subsequent Congress to participate in defining the meaning of the law. Second, the disapproval resolution allows for a reliable determination of Congressional intent. Without the review mechanism, uncertainty over the inferences to draw from subsequent Congressional action is understandable. The refusal to pass an amendment, for example, may indicate opposition to that position but could mean that Congress believes the amendment is redundant with the statute as written. By contrast, the exercise of a legislative veto is an unmistakable indication that the agency or Executive decision at issue is disfavored. This is not to suggest that the failure to pass a veto resolution should be given any weight whatever.

12    For commentary generally favorable to the legislative veto see Abourezk, Congressional Veto: A Contemporary Response to Executive Encroachment on Legislative Prerogative, 52 Ind.L.J. 323 (1977); Cooper & Cooper, The Legislative Veto and the Constitution, 30 Geo.Wash.L.Rev. 467 (1962); Dry, The Congressional Veto and Constitutional Separation of Powers, in the Presidency in the Constitutional Order 195 (J. Bessette & J. Tulis eds.); Javits & Klein, Congressional Oversight and the Legislative Veto: A Constitutional Analysis, 52 N.Y.U.L.Rev. 455 (1977); Miller & Knapp, The Congressional Veto: Preserving the Constitutional Framework, 52 Ind.L.J. 367 (1977); Nathanson, Separation of Powers and Administrative Law: Delegation, The Legislative Veto, and the "Independent" Agencies, 75 Nw.U.L.Rev. 1064 (1981); Newman & Keaton, Congress and the Faithful Execution of Laws—Should Legislators Supervise Administrators?, 41 Calif.L.Rev. 565 (1953); Pearson, Oversight: A Vital Yet Neglected Congressional Function, 23 U.Kan.L.Rev. 277 (1975); Rodino, Congressional Review of Executive Actions, 5 Seton Hall L.Rev. 489 (1974); Schwartz, Legislative Veto and the Constitution—A Reexamination, 46 Geo.Wash.L.Rev. 351 (1978); Schwartz, Legislative Control of Administrative Rules and Regulations: I. The American Experience, 30 N.Y.U.L.Rev. 1031 (1955); Stewart, Constitutionality of the Legislative Veto, 13 Harv.J.Legis. 593 (1976).

For Commentary generally unfavorable to the legislative veto, see J. Bolton, The Legislative Veto: Unseparating the Powers (1977); Bruff & Gellhorn, Congressional Control of Administrative Regulation: A Study of Legislative Vetoes, 90 Harv.L.Rev. 1369 (1977); Dixon, The Congressional Veto and Separation of Powers: The Executive On a Leash?, 56 N.C.L.Rev. 423 (1978); Fitzgerald, Congressional Oversight or Congressional Foresight: Guidelines From the Founding Fathers, 28 Ad.L.Rev. 429 (1976); Ginaane, The Control of Federal Administration by Congressional Resolutions and Committees, 66 Harv.L.Rev. 569 (1953); Henry, The Legislative Veto: In Search of Constitutional Limits, 16 Harv.J.Legis. 735 (1979); Martin, The Legislative Veto and the Responsible Exercise of Congressional Power, 68 Va.L.Rev. 253 (1982); Scalia, The Legislative Veto: A False Remedy For System Overload, Regulation, Nov.-Dec. 1979,

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

at 19; Watson, Congress Steps Out: A Look at Congressional Control of the Executive, 63 Calif.L.Rev. 983 (1975); Comment, Congressional Oversight of Administrative Discretion: Defining the Proper Role of the Legislative Veto, 26 Am.U.L.Rev. 1018 (1977); Note, Congressional Veto of Administrative Action: The Probable Response to a Constitutional Challenge, 1976 Duke L.J. 285; Recent Developments, The Legislative Veto in the Arms Control Act of 1976, 9 Law & Pol'y Int'l Bus. 1029 (1977).

13    Compare *Atkins v. United States,* 556 F.2d 1028 (Ct.Claims 1977), cert. denied, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978), (upholding legislative veto provision in Federal Salary Act, 2 U.S.C. §§ 351 et seq. (1976)) with *Consumer Energy Council of America v. FERC,* 673 F.2d 425 (CA DC 1982), appeals and petitions for cert. pending, Nos. 81–2008, 81–2020, 81–2151, 81–2171, 82–177 and 82–209, (holding unconstitutional the legislative veto provision in the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301–3342 (Supp. III 1979)).

14    See, *e.g.,* 6 Op.Att'y Gen. 680, 683 (1854); Department of Justice, Memorandum re Constitutionality of Provisions in Proposed Reorganization Bills Now Pending in Congress, reprinted in S.Rep. No. 232, 81st Cong., 1st Sess. 19–20 (1949); Jackson, "A Presidential Legal Opinion," 66 Harv.L.Rev. 1353 (1953); 43 Op.Att'y Gen. No. 10, at 2 (1977).

15    I limit my concern here to those legislative vetoes which require either one or both Houses of Congress to pass resolutions of approval or disapproval, and leave aside the questions arising from the exercise of such powers by committees of Congress.

16    I agree with Justice REHNQUIST that Congress did not intend the one-House veto provision of § 244(c)(2) to be severable. Although the general rule is that the presence of a savings clause creates a presumption of divisibility, *Champlin Rfg. Co. v. Commission,* 286 U.S. 210, 235, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1931), I read the savings clause contained in § 406 of the Immigration Act as primarily pertaining to the severability of major parts of the Act from one another, not the divisibility of different provisions within a single section. Surely, Congress would want the naturalization provisions of the Act to be severable from the deportation sections. But this does not support preserving § 244 without the legislative veto any more than a savings provision would justify preserving immigration authority without quota limits.

More relevant is the fact that for forty years Congress has insisted on retaining a voice on individual suspension cases—it has frequently rejected bills which would place final authority in the Executive branch. It is clear that Congress believed its retention crucial. Given this history, the Court's rewriting of the Act flouts the will of Congress.

17    The Pennsylvania Constitution required that all "bills of [a] public nature" had to be printed after being introduced and had to lie over until the following session of the legislature before adoption. Pa. Const. § 15 (1776). These printing and layover requirements applied only to "bills." At the time, measures could also be enacted as a "resolve," which was allowed by the Constitution as "urgent temporary legislation" without such requirements. Pa. Const. § 20 (1776). Using this method the Pennsylvania legislature routinely evaded printing and layover requirements through adoption of resolves. A. Nevins, The American States During and After the Revolution 152 (1969).

A 1784 Report of a committee of the Council of Censors, a state body responsible for periodically reviewing the state government's adherence to its Constitution, charged that the procedures for enacting legislation had been evaded though the adoption of resolves instead of bills. Report of the Committee of the Council of Censors 13 (1784). See Nevins, *supra,* at 190. When three years later the federal Constitutional Convention assembled in Philadelphia, the delegates were reminded, in the course of discussing the President's veto, of the dangers pointed out by the Council of Censors Report. 5 J. Elliot, Debates on the Adoption of the Federal Constitution 430 (1974 ed.). Furthermore, Madison, who made the motion that led to the Presentation Clause, knew of the Council of Censors report, The Federalist No. 50, at 353 (Wright ed. 1974), and was aware of the Pennsylvania experience. See The Federalist No. 48, at 346. We have

I.N.S. v. Chadha, 462 U.S. 919 (1983)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1220 of 1384

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

previously recognized the relevance of the Council of Censors report in interpreting the Constitution. See *Powell v. McCormack,* 395 U.S. 486, 529–530, 89 S.Ct. 1944, 1968–1969, 23 L.Ed.2d 491 (1969).

18    Although the legislative veto was not a feature of Congressional enactments until the twentieth century, the practices of the first Congresses demonstrate that the constraints of Article I were not envisioned as a constitutional straitjacket. The First Congress, for example, began the practice of arming its committees with broad investigatory powers without the passage of legislation. See A. Josephy, On the Hill: A History of the American Congress 81–83 (1975). More directly pertinent is the First Congress' treatment of the Northwest Territories Ordinance of 1787. The ordinance, initially drafted under the Articles of Confederation on July 13, 1787, was the document which governed the territory of the United States northwest of the Ohio River. The ordinance authorized the territories to adopt laws, subject to disapproval in Congress.

"The governor and judges, or a majority of them, shall adopt and publish in the district, such laws of the original states, criminal and civil, as may be necessary and best suited to the circumstances of the district, *and report them to Congress,* from time to time; which laws shall be in force in the district until the organization of the general assembly therein, *unless disapproved of by Congress;* but afterwards the legislature shall have authority to alter them as they shall think fit." (emphasis added)

After the Constitution was enacted, the ordinance was reenacted to conform to the requirements of the Constitution. Act of Aug. 7, 1789, ch. VIII, § 1, 1 Stat. 50–51. Certain provisions, such as one relating to appointment of officials by Congress, were changed because of constitutional concerns, but the language allowing disapproval by Congress was retained. Subsequent provisions for territorial laws contained similar language. See, *e.g.,* 48 U.S.C. § 1478 (1970).

Although at times Congress disapproved of territorial actions by passing legislation, see *e.g.,* Act of March 3, 1807, 4 Laws of the United States, Ch. 99, 117, on at least two occasions one House of Congress passed resolutions to disapprove territorial laws, only to have the other House fail to pass the measure for reasons pertaining to the subject matter of the bills. First, on February 16, 1795, the House of Representatives passed a concurrent resolution disapproving in one sweep all but one of the laws that the governors and judges of the Northwest Territory had passed at a legislative session on August 1, 1792. 4 Annals of Congress 1227. The Senate, however, refused to concur. 4 Annals of Congress 830. See B. Bond, The Civilization of the Old Northwest 70–71 (1934). Second, on May 9, 1800, the House passed a resolution to disapprove of a Mississippi territorial law imposing a license fee on taverns. 3 House Journal 704–706. The Senate unsuccessfully attempted to amend the resolution to strike down all laws of the Mississippi territory enacted since June 30, 1799. Carter, Territorial Papers of the United States Vol. 5—Mississippi, 94–95 (1937). The histories of the territories, the correspondence of the era, and the Congressional reports contain no indication that such resolutions disapproving of territorial laws were to be presented to the President or that the authorization for such a "congressional veto" in the Act of August 7, 1789 was of doubtful constitutionality.

The practices of the First Congress are not so clear as to be dispositive of the constitutional question now before us. But it is surely significant that this body, largely composed of the same men who authored Article I and secured ratification of the Constitution, did not view the Constitution as forbidding a precursor of the modern day legislative veto. See *Hampton v. United States,* 276 U.S. 394, 412, 48 S.Ct. 348, 353, 72 L.Ed. 624 (1928) ("In the first Congress sat many members of the Constitutional Convention of 1787. This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our government and framers of our Constitution were actively participating in public affairs, long acquiesced in, fixed the construction to be given its provisions.")

19    "Legislative, or substantive, regulations are 'issued by an agency pursuant to statutory authority and ... implement the statute, as for example, the proxy rules issue by the Securities and Exchange Commission ... Such rules have the force and effect of law.' U.S.Dept. of Justice, Attorney General's Manual on the Administrative Procedures Act 30 n. 3 (1947)." *Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977).

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

Substantive agency regulations are clearly exercises of lawmaking authority; agency interpretations of their statutes are only arguably so. But as Henry Monaghan has observed, "Judicial deference to agency 'interpretation' of law is simply one way of recognizing a delegation of lawmaking authority to an agency."

H. Monaghan, *Marbury and the Administrative State, 83 Colum.L.Rev. 1, 26 (1983).* See, *e.g.,* ■ *NLRB v. Hearst Publications,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); □ *NLRB v. Hendricks County Rural Electric Membership Corp.,* 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981).

20    As the Court acknowledges, the "provisions of Art. I are integral parts of the constitutional design for the separation of powers." *Ante,* at 2781. But these separation of power concerns are that legislative power be exercised by Congress, executive power by the President, and judicial power by the Courts. A scheme which allows delegation of legislative power to the President and the departments under his control, but forbids a check on its exercise by Congress itself obviously denigrates the separation of power concerns underlying Article I. To be sure, the doctrine of separation of powers is also concerned with checking each branch's exercise of its characteristic authority. Section 244(c)(2) is fully consistent with the need for checks upon Congressional authority, *infra,* at 2783 – 2784, and the legislative veto mechanism, more generally is an important check upon Executive authority, *supra,* at 2793–2796.

21    The Court's other reasons for holding the legislative veto subject to the presentment and bicameral passage requirements require but brief discussion. First, the Court posits that the resolution of disapproval should be considered equivalent to new legislation because absent the veto authority of § 244(c)(2) neither House could, short of legislation, effectively require the Attorney General to deport an alien once the Attorney General has determined that the alien should remain in the United States. *Ante,* at 2787. The statement is neither accurate nor meaningful. The Attorney General's power under the Act is only to "suspend" the order of deportation; the "suspension" does not cancel the deportation or adjust the alien's status to that of a permanent resident alien. Cancellation of deportation and adjustment of status must await favorable action by Congress. More important, the question is whether § 244(c)(2) as written is constitutional and no law is amended or repealed by the resolution of disapproval which is, of course, expressly authorized by that section.

The Court also argues that "the legislative character of the challenged action of one House is confirmed by the fact that when the Framers intended to authorize either House of Congress to act alone and outside of its prescribed bicameral legislative role, they narrowly and precisely defined the procedure for such action." *Ante,* at 2786. Leaving aside again the above-refuted premise that all action with a legislative character requires passage in a law, the short answer is that all of these carefully defined exceptions to the presentment and bicameralism strictures do not involve action of the Congress pursuant to a duly-enacted statute. Indeed, for the most part these powers—those of impeachment, review of appointments, and treaty ratification—are not legislative powers at all. The fact that it was essential for the Constitution to stipulate that Congress has the power to impeach and try the President hardly demonstrates a limit upon Congress' authority to reserve itself a legislative veto, through statutes, over subjects within its lawmaking authority.

22    In his opinion on the constitutionality of the legislative review provisions of the most recent reorganization statute, 5 U.S.C. 906(a) (Supp. III 1979), Attorney General Bell stated that "the statement in Article I, § 7 of the procedural steps to be followed in the enactment of legislation does not exclude other forms of action by the Congress.... The procedures prescribed in Article I § 37, for congressional action are not exclusive." 43 Op.Atty.Gen. No. 10, at 2 (1977). "If the procedures provided in a given statute have no effect on the constitutional distribution of power between the legislature and the executive," then the statute is constitutional. *Id.,* at 3. In the case of the reorganization statute, the power of the President to refuse to submit a plan, combined with the power of either House of Congress to reject a submitted plan suffices under the standard to make the statute constitutional. Although the Attorney General sought to limit his opinion to the reorganization statute, and the Executive opposes the instant statute, I see no Article I basis to distinguish between the two.

23    Of course, when the authorizing legislation requires approval to be expressed by a positive vote, then the two-House veto would clearly comply with the bicameralism requirement under any analysis.

**I.N.S. v. Chadha, 462 U.S. 919 (1983)**

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1222 of 1384

103 S.Ct. 2764, 77 L.Ed.2d 317, 13 Envtl. L. Rep. 20,663

24    The Court's doubts that Congress entertained this "arcane" theory when it enacted § 244(c)(2) disregards the fact that this is the historical basis upon which the legislative vetoes contained in the Reorganization Acts have been defended, *supra* at ——, n. 20, and that the Reorganization Acts then provided the precedent articulated in support of other legislative veto provisions. See, *e.g.* 87 Cong.Rec. 735 (Rep. Dirksen) (citing Reorganization Act in support of proposal to include a legislative veto in Lend-Lease Act), H.R.Rep. No. 658, 93d Cong., 1st Sess. 42 (1973) (citing Reorganization Act as "sufficient precedent" for legislative veto provision for Impoundment Control Act.).

25    Madison emphasized that the principle of separation of powers is primarily violated "where the whole power of one department is exercised by the same hands which possess the whole power of another department." Federalist No. 47, 302–303. Madison noted that, the oracle of the separation doctrine, Montesquieu, in writing that the legislative, executive and judicial powers should not be united "in the same person or body of persons," did not mean "that these departments ought to have no *partial agency* in, or *control* over the acts of each other." The Federalist No. 47, p. 325 (J. Cooke ed. 1961) (emphasis in original). Indeed, according to Montesquieu, the legislature is uniquely fit to exercise an additional function: "to examine in what manner the laws that it has made have been executed." W. Gwyn, The Meaning of Separation of Powers 102 (1965).

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

I.N.S. v. Lopez-Mendoza, 468 U.S. 1032 (1984)
104 S.Ct. 3479, 82 L.Ed.2d 778

KeyCite Yellow Flag - Negative Treatment
Holding Limited by *U.S. v. Verdugo-Urquidez,* U.S.Cal., February 28, 1990

104 S.Ct. 3479
Supreme Court of the United States

IMMIGRATION AND
NATURALIZATION SERVICE, Petitioner

v.

Adan LOPEZ–MENDOZA et al.

No. 83-491.
|
Argued April 18, 1984.
|
Decided July 5, 1984.

**Synopsis**

Aliens petitioned for review of orders of the Board of Immigration Appeals dismissing their appeals from deportation orders. The Court of Appeals, 705 F.2d 1059, reversed one order of deportation and vacated the second order of deportation, ordering latter case remanded. Certiorari was granted. The Supreme Court, Justice O'Connor, held that: (1) mere fact of illegal arrest had no bearing on subsequent deportation proceeding against alien who had objected only to fact that he had been summoned to a deportation hearing following unlawful arrest, but had entered no objection to receipt in evidence of admission, after arrest, of illegal entry into country, and (2) exclusionary rule would not apply in civil deportation hearing to require that admission of illegal entry by alien after allegedly unlawful arrest be excluded from evidence.

Reversed.

Justices Brennan, White, Marshall and Stevens dissented and filed opinions.

West Headnotes (12)

[1]    **Aliens, Immigration, and
       Citizenship** ⛓ Civil proceedings in general

A deportation proceeding is a purely civil action to determine eligibility to remain in country, not to punish unlawful entry, though entering or

remaining unlawfully in country is itself a crime. Immigration and Nationality Act, §§ 262, 266, 275, 8 U.S.C.A. §§ 1302, 1306, 1325.

127 Cases that cite this headnote

[2]    **Aliens, Immigration, and
       Citizenship** ⛓ Hearing
       **Aliens, Immigration, and
       Citizenship** ⛓ Admissibility

Deportation hearing looks prospectively to alien's right to remain in country in future; past conduct is relevant only insofar as it may shed light on alien's right to remain. Immigration and Nationality Act, §§ 241, 242(b), 8 U.S.C.A. §§ 1251, 1252(b).

32 Cases that cite this headnote

[3]    **Aliens, Immigration, and
       Citizenship** ⛓ Civil proceedings in general

Consistent with civil nature of a deportation proceeding, various protections that apply in context of a criminal trial do not apply in a deportation hearing.

175 Cases that cite this headnote

[4]    **Aliens, Immigration, and
       Citizenship** ⛓ Removal or deportation not punishment
       **Aliens, Immigration, and
       Citizenship** ⛓ Hearing

A deportation hearing is intended to provide a streamlined determination of eligibility to remain in country, and nothing more; purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws.

23 Cases that cite this headnote

[5]    **Criminal Law** ⛓ Search or seizure following arrest in general

The "body" or identity of a defendant or respondent in a criminal or civil proceeding is

never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.

256 Cases that cite this headnote

[6]    **Forfeitures** 🗝 Property wrongfully seized or obtained by authorities

Forfeiture proceedings directed against contraband or other forfeitable property are not precluded by fact that seizure may have resulted from an unlawful arrest, search, or interrogation.

87 Cases that cite this headnote

[7]    **Aliens, Immigration, and Citizenship** 🗝 Defenses

Mere fact of illegal arrest had no bearing on subsequent deportation proceeding against alien who had objected only to fact that he had been summoned to a deportation hearing following unlawful arrest, but had entered no objection to receipt in evidence of admission, after arrest, of illegal entry into country.

45 Cases that cite this headnote

[8]    **Criminal Law** 🗝 Search or seizure following arrest in general
    **Criminal Law** 🗝 Attenuation or dissipation purging taint
    **Criminal Law** 🗝 Purging taint in general

General rule in criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if link between evidence and unlawful conduct is not too attenuated.

165 Cases that cite this headnote

[9]    **Aliens, Immigration, and Citizenship** 🗝 Removal or Deportation; Grounds
    **Aliens, Immigration, and Citizenship** 🗝 Admissibility

Since person and identity of alien are not themselves suppressible as fruit of an illegal arrest, Immigration and Naturalization Service must prove only alienage in a deportation proceeding and that will sometimes be possible using evidence gathered independently of, or sufficiently attenuated from, original arrest.

106 Cases that cite this headnote

[10]    **Aliens, Immigration, and Citizenship** 🗝 Admissibility

Exclusionary rule does not apply in civil deportation hearings held by the Immigration and Naturalization Service.

193 Cases that cite this headnote

[11]    **Aliens, Immigration, and Citizenship** 🗝 Admissibility

Exclusionary rule would not apply in civil deportation hearing to require that admission of illegal entry by alien after allegedly unlawful arrest be excluded from evidence.

193 Cases that cite this headnote

[12]    **Aliens, Immigration, and Citizenship** 🗝 Admissibility

Evidence derived from illegal but peaceful arrests by Immigration and Naturalization Service officers need not be suppressed in a civil deportation hearing held by the INS. (Per Justice O'Connor with three Justices concurring.)

49 Cases that cite this headnote

*Syllabus* [a1]

Respondent Mexican citizens were ordered deported by an Immigration Judge. Respondent Lopez–Mendoza unsuccessfully objected to being summoned to the deportation hearing following his allegedly unlawful arrest by an Immigration and Naturalization Service (INS) agent, but he did not object to the receipt in evidence of his admission, after the arrest, of illegal entry into this country. Respondent Sandoval–Sanchez, who also admitted his illegal entry after

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

being arrested by an INS agent, unsuccessfully objected to the evidence of his admission offered at the deportation proceeding, contending that it should have been suppressed as the fruit of an unlawful arrest. The Board of Immigration Appeals (BIA) affirmed the deportation orders. The Court of Appeals reversed respondent Sandoval–Sanchez' deportation order, holding that his detention by INS agents violated the Fourth Amendment, that his admission of illegal entry was the product of this detention, and that the exclusionary rule barred its use in a deportation proceeding. The court vacated respondent Lopez–Mendoza's deportation order and remanded his case to the BIA to determine whether the Fourth Amendment had been violated in the course of his arrest.

Held:

1. A deportation proceeding is a purely civil action to determine a person's eligibility to remain in this country. The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws. Consistent with the civil nature of a deportation proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing. P. 3483.

2. The "body" or identity of a defendant in a criminal or civil proceeding is never itself suppressible as the fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred. On this basis alone, the Court of Appeals' decision as to respondent Lopez–Mendoza must be reversed, since he objected only to being summoned to his deportation hearing after an allegedly unlawful arrest and did not object to the evidence offered against him. The mere fact of an illegal arrest has no bearing on a subsequent deportation hearing. Pp. 3483–3484.

*1033  3. The exclusionary rule does not apply in a deportation proceeding; hence, the rule does not apply so as to require that respondent Sandoval–Sanchez' admission of illegal entry after his allegedly unlawful arrest be excluded from evidence at his deportation hearing. Under the balancing test applied in ⚑ United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046, whereby the likely social benefits of excluding unlawfully obtained evidence are weighed against the likely costs, the balance comes out against applying the exclusionary rule in civil deportation proceedings. Several factors significantly reduce the likely deterrent value of the rule in such proceedings. First, regardless of how the arrest of an illegal alien is effected, deportation will still

be possible when evidence not derived directly from the arrest is sufficient to support deportation. Second, based on statistics indicating that over 97.7 percent of illegal aliens agree to voluntary deportation without a formal hearing, every INS agent knows that it is unlikely that any particular arrestee will end up challenging the lawfulness of his arrest in a formal deportation hearing. Third, the INS has its own comprehensive scheme for deterring Fourth Amendment violations by **3481 its agents. And finally, the deterrent value of the exclusionary rule in deportation proceedings is undermined by the availability of alternative remedies for INS practices that might violate Fourth Amendment rights. As to the social costs of applying the exclusionary rule in deportation proceedings, they would be high. In particular, the application of the rule in cases such as respondent Sandoval–Sanchez' would compel the courts to release from custody persons who would then immediately resume their commission of a crime through their continuing, unlawful presence in this country, and would unduly complicate the INS's deliberately simple deportation hearing system. Pp. 3484–3489.

⚑ 705 F.2d 1059 (CA9 1983), reversed.

**Attorneys and Law Firms**

*Deputy Solicitor General Frey* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Willard, Kathryn A. Oberly, Barbara L. Herwig, Marshall Tamor Golding,* and *Howard S. Scher.*

*1034  *Mary L. Heen* argued the cause for respondents. With her on the brief were *Burt Neuborne, Charles S. Sims, John E. Huerta, Joaquin G. Avila, Morris J. Baller,* and *Charles H. Barr.*

**Opinion**

Justice O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, and IV, and an opinion with respect to Part V, in which Justice BLACKMUN, Justice POWELL, and Justice REHNQUIST joined. [aa1]

This litigation requires us to decide whether an admission of unlawful presence in this country made subsequent to an allegedly unlawful arrest must be excluded as evidence in a

civil deportation hearing. We hold that the exclusionary rule need not be applied in such a proceeding.

I

Respondents Adan Lopez–Mendoza and Elias Sandoval–Sanchez, both citizens of Mexico, were summoned to separate deportation proceedings in California and Washington, and both were ordered deported. They challenged the regularity of those proceedings on grounds related to the lawfulness of their respective arrests by officials of the Immigration and Naturalization Service (INS). On administrative appeal the Board of Immigration Appeals (BIA), an agency of the Department of Justice, affirmed the deportation orders.

The Court of Appeals for the Ninth Circuit, sitting en banc, reversed Sandoval–Sanchez' deportation order and vacated and remanded 🚩 Lopez–Mendoza's deportation order. 705 F.2d 1059 (1983). It ruled that Sandoval–Sanchez' admission of his illegal presence in this country was the fruit of an unlawful arrest, and that the exclusionary rule applied in a deportation proceeding. Lopez–Mendoza's deportation order was vacated and his case remanded to the BIA to *1035 determine whether the Fourth Amendment had been violated in the course of his arrest. We granted certiorari, 464 U.S. 1037, 104 S.Ct. 697, 79 L.Ed.2d 163 (1984).

A

Respondent Lopez–Mendoza was arrested in 1976 by INS agents at his place of employment, a transmission repair shop in San Mateo, Cal. Responding to a tip, INS investigators arrived at the shop shortly before 8 a.m. The agents had not sought a warrant to search the premises or to arrest any of its occupants. The proprietor of the shop firmly refused to allow the agents to interview his employees during working hours. Nevertheless, while one agent engaged the proprietor in conversation another entered the shop and approached Lopez–Mendoza. In response to the agent's questioning, Lopez–Mendoza gave his name and indicated that he was from Mexico with no close family ties in the United States. The agent then placed him under arrest. Lopez–Mendoza underwent further questioning at INS offices, where he admitted he was born in Mexico, was still a citizen of Mexico, and had entered this country without inspection by immigration authorities. Based on his answers, the agents prepared a "Record of Deportable Alien" (Form I–213), and an affidavit which Lopez–Mendoza executed, admitting his Mexican nationality and his illegal entry into this country.

A hearing was held before an Immigration Judge. Lopez–Mendoza's counsel moved to terminate the proceeding on the ground that Lopez–Mendoza had been arrested illegally. The judge ruled that the legality of the arrest was not relevant to the deportation proceeding and therefore declined to rule on the legality of Lopez– **3482 Mendoza's arrest. Matter of Lopez–Mendoza, No. A22 452 208 (INS, Dec. 21, 1977), reprinted in App. to Pet. for Cert. 97a. The Form I–213 and the affidavit executed by Lopez–Mendoza were received into evidence without objection from Lopez–Mendoza. On the basis of this evidence the Immigration Judge found Lopez– *1036 Mendoza deportable. Lopez–Mendoza was granted the option of voluntary departure.

The BIA dismissed Lopez–Mendoza's appeal. It noted that "[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding," In re Lopez–Mendoza, No. A22 452 208 (BIA, Sept. 19, 1979), reprinted in App. to Pet. for Cert. 100a, 102a, and observed that Lopez–Mendoza had not objected to the admission into evidence of Form I–213 and the affidavit he had executed. Id., at 103a. The BIA also noted that the exclusionary rule is not applied to redress the injury to the privacy of the search victim, and that the BIA had previously concluded that application of the rule in deportation proceedings to deter unlawful INS conduct was inappropriate. Matter of Sandoval, 17 I. & N.Dec. 70 (BIA 1979).

The Court of Appeals vacated the order of deportation and remanded for a determination whether Lopez–Mendoza's Fourth Amendment rights had been violated when he was arrested.

B

Respondent Sandoval–Sanchez (who is not the same individual who was involved in Matter of Sandoval, supra) was arrested in 1977 at his place of employment, a potato processing plant in Pasco, Wash. INS Agent Bower and other officers went to the plant, with the permission of its personnel manager, to check for illegal aliens. During a change in shift, officers stationed themselves at the exits while Bower and a uniformed Border Patrol agent entered the plant. They went to the lunchroom and identified themselves as immigration officers. Many people in the room rose and headed for the exits or milled around; others in the plant left their equipment and started running; still others who were entering the plant turned around and started walking back out. The two officers eventually stationed themselves at the

main entrance to the plant and looked for passing employees who averted their heads, avoided eye contact, or tried to hide **\*1037** themselves in a group. Those individuals were addressed with innocuous questions in English. Any who could not respond in English and who otherwise aroused Agent Bower's suspicions were questioned in Spanish as to their right to be in the United States.

Respondent Sandoval–Sanchez was in a line of workers entering the plant. Sandoval–Sanchez testified that he did not realize that immigration officers were checking people entering the plant, but that he did see standing at the plant entrance a man in uniform who appeared to be a police officer. Agent Bower testified that it was probable that he, not his partner, had questioned Sandoval–Sanchez at the plant, but that he could not be absolutely positive. The employee he thought he remembered as Sandoval–Sanchez had been "very evasive," had averted his head, turned around, and walked away when he saw Agent Bower. App. 137, 138. Bower was certain that no one was questioned about his status unless his actions had given the agents reason to believe that he was an undocumented alien.

Thirty-seven employees, including Sandoval–Sanchez, were briefly detained at the plant and then taken to the county jail. About one-third immediately availed themselves of the option of voluntary departure and were put on a bus to Mexico. Sandoval–Sanchez exercised his right to a deportation hearing. Sandoval–Sanchez was then questioned further, and Agent Bower recorded Sandoval–Sanchez' admission of unlawful entry. Sandoval–Sanchez contends he was not aware that he had a right to remain silent.

At his deportation hearing Sandoval–Sanchez contended that the evidence offered by the INS should be suppressed as the fruit of an unlawful arrest. The Immigration Judge considered and rejected Sandoval–Sanchez' claim that he had been illegally arrested, but ruled in the alternative that the legality of the arrest was not relevant to the deportation hearing. Matter of Sandoval–Sanchez, **\*\*3483** **\*1038** No. A22 346 925 (INS, Oct. 7, 1977), reprinted in App. to Pet. for Cert. 104a. Based on the written record of Sandoval–Sanchez' admissions the Immigration Judge found him deportable and granted him voluntary departure. The BIA dismissed Sandoval–Sanchez' appeal. In re Sandoval–Sanchez, No. A22 346 925 (BIA, Feb. 21, 1980). It concluded that the circumstances of the arrest had not affected the voluntariness of his recorded admission, and again declined to invoke the exclusionary rule, relying on its earlier decision in Matter of Sandoval, supra.

On appeal the Court of Appeals concluded that Sandoval–Sanchez' detention by the immigration officers violated the Fourth Amendment, that the statements he made were a product of that detention, and that the exclusionary rule barred their use in a deportation hearing. The deportation order against Sandoval–Sanchez was accordingly reversed.

II

**[1]** **[2]** A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime. 8 U.S.C. §§ 1302, 1306, 1325. The deportation hearing looks prospectively to the respondent's right to remain in this country in the future. Past conduct is relevant only insofar as it may shed light on the respondent's right to remain. See 8 U.S.C. §§ 1251, 1252(b); Bugajewitz v. Adams, 228 U.S. 585, 591, 33 S.Ct. 607, 608, 57 L.Ed. 978 (1913); Fong Yue Ting v. United States, 149 U.S. 698, 730, 13 S.Ct. 1016, 1028, 37 L.Ed. 905 (1893).

**[3]** **[4]** A deportation hearing is held before an immigration judge. The judge's sole power is to order deportation; the judge cannot adjudicate guilt or punish the respondent for any crime related to unlawful entry into or presence in this country. Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing. The respondent must be given "a reasonable opportunity to be present at [the] proceeding," but if the respondent fails to avail himself **\*1039** of that opportunity the hearing may proceed in his absence. 8 U.S.C. § 1252(b). In many deportation cases the INS must show only identity and alienage; the burden then shifts to the respondent to prove the time, place, and manner of his entry. See 8 U.S.C. § 1361; Matter of Sandoval, 17 I. & N.Dec. 70 (BIA 1979). A decision of deportability need be based only on "reasonable, substantial, and probative evidence," 8 U.S.C. § 1252(b)(4). The BIA for its part has required only "clear, unequivocal and convincing" evidence of the respondent's deportability, not proof beyond a reasonable doubt. 8 CFR § 242.14(a) (1984). The Court of Appeals have held, for example that the absence of Miranda warnings does not render an otherwise voluntary statement by the respondent inadmissible in a deportation

case. Navia–Duran v. INS, 568 F.2d 803, 808 (CA1 1977); Avila–Gallegos v. INS, 525 F.2d 666, 667 (CA2 1975); Chavez–Raya v. INS, 519 F.2d 397, 399–401 (CA7 1975). See also Abel v. United States, 362 U.S. 217, 236–237, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960) (search permitted incidental to an arrest pursuant to an administrative warrant issued by the INS); Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954) (Ex Post Facto Clause has no application to deportation); Carlson v. Landon, 342 U.S. 524, 544–546, 72 S.Ct. 525, 536–537, 96 L.Ed. 547 (1952) (Eighth Amendment does not require bail to be granted in certain deportation cases); United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221 (1923) (involuntary confessions admissible at deportation hearing). In short, a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more. The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws.

III

**[5]    [6]**    The "body" or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, **\*\*3484** or interrogation occurred. See **\*1040** Gerstein v. Pugh, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975); Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952); United States ex rel. Bilokumsky v. Tod, supra, 263 U.S., at 158, 44 S.Ct., at 57. A similar rule applies in forfeiture proceedings directed against contraband or forfeitable property. See, e.g., United States v. Eighty–Eight Thousand, Five Hundred Dollars, 671 F.2d 293 (CA8 1982); United States v. One (1) 1971 Harley–Davidson Motorcycle, 508 F.2d 351 (CA9 1974); United States v. One 1965 Buick, 397 F.2d 782 (CA6 1968).

**[7]**    On this basis alone the Court of Appeals' decision as to respondent Lopez–Mendoza must be reversed. At his deportation hearing Lopez–Mendoza objected only to the fact that he had been summoned to a deportation hearing following an unlawful arrest; he entered no objection to the evidence offered against him. The BIA correctly ruled that

"[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding." [1] In re Lopez–Mendoza, No. A22452208 (BIA, Sept. 19, 1979, reprinted in App. to Pet. for Cert. 102a).

IV

**[8]**    Respondent Sandoval–Sanchez has a more substantial claim. He objected not to his compelled presence at a deportation proceeding, but to evidence offered at that proceeding. The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the **\*1041** evidence and the unlawful conduct is not too attenuated. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The reach of the exclusionary rule beyond the context of a criminal prosecution, however, is less clear. Although this Court has once stated in dictum that "[i]t may be assumed that evidence obtained by the [Labor] Department through an illegal search and seizure cannot be made the basis of a finding in deportation proceedings," United States ex rel. Bilokumsky v. Tod, supra, 263 U.S., at 155, 44 S.Ct., at 56, the Court has never squarely addressed the question before. Lower court decisions dealing with this question are sparse. [2]

In United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), this Court set forth a framework for deciding in what types of proceeding application of the exclusionary rule is appropriate. Imprecise as the exercise may be, the Court recognized in Janis that there is no choice but to weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs. On the benefit side of the balance "the 'prime purpose' of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police conduct.' " Id., at 446, 96 S.Ct., at 3028, quoting **\*\*3485** United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). On the cost side there is the loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication that therefore occurs.

At stake in Janis was application of the exclusionary rule in a federal civil tax assessment proceeding following the unlawful seizure of evidence by state, not federal, officials.

The Court noted at the outset that "[i]n the complex and turbulent **\*1042** history of the rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state." 428 U.S., at 447, 96 S.Ct., at 3029 (footnote omitted). Two factors in Janis suggested that the deterrence value of the exclusionary rule in the context of that case was slight. First, the state law enforcement officials were already "punished" by the exclusion of the evidence in the state criminal trial as a result of the same conduct. Id., at 448, 96 S.Ct., at 3029. Second, the evidence was also excludable in any federal criminal trial that might be held. Both factors suggested that further application of the exclusionary rule in the federal civil proceeding would contribute little more to the deterrence of unlawful conduct by state officials. On the cost side of the balance, Janis focused simply on the loss of "concededly relevant and reliable evidence." Id., at 447, 96 S.Ct., at 3029. The Court concluded that, on balance, this cost outweighed the likely social benefits achievable through application of the exclusionary rule in the federal civil proceeding.

While it seems likely that the deterrence value of applying the exclusionary rule in deportation proceedings would be higher than it was in Janis, it is also quite clear that the social costs would be very much greater as well. Applying the Janis balancing test to the benefits and costs of excluding concededly reliable evidence from a deportation proceeding, we therefore reach the same conclusion as in Janis.

The likely deterrence value of the exclusionary rule in deportation proceedings is difficult to assess. On the one hand, a civil deportation proceeding is a civil complement to a possible criminal prosecution, and to this extent it resembles the civil proceeding under review in Janis. The INS does not suggest that the exclusionary rule should not continue to apply in criminal proceedings against an alien who unlawfully enters or remains in this country, and the prospect of losing evidence that might otherwise be used in a criminal prosecution undoubtedly supplies some residual deterrent to unlawful conduct by INS officials. But it must be acknowledged **\*1043** that only a very small percentage of arrests of aliens are intended or expected to lead to criminal prosecutions. Thus the arresting officer's primary objective, in practice, will be to use evidence in the civil deportation proceeding. Moreover, here, in contrast to Janis, the agency officials who effect the unlawful arrest are the same officials who subsequently bring the deportation action. As recognized in Janis, the exclusionary rule is likely to be most effective when applied to such "intrasovereign" violations.

**[9]** Nonetheless, several other factors significantly reduce the likely deterrent value of the exclusionary rule in a civil deportation proceeding. First, regardless of how the arrest is effected, deportation will still be possible when evidence not derived directly from the arrest is sufficient to support deportation. As the BIA has recognized, in many deportation proceedings "the sole matters necessary for the Government to establish are the respondent's identity and alienage—at which point the burden shifts to the respondent to prove the time, place and manner of entry." Matter of Sandoval, 17 I. & N.Dec., at 79. Since the person and identity of the respondent are not themselves suppressible, see supra, at 3485, the INS must prove only alienage, and that will sometimes be possible using evidence gathered independently of, or sufficiently attenuated from, the original arrest. See Matter of Sandoval, supra, at 79; see, e.g., Avila–Gallegos v. INS, 525 F.2d 666 (CA2 1975). The INS's task is simplified in this regard by **\*\*3486** the civil nature of the proceeding. As Justice Brandeis stated: "Silence is often evidence of the most persuasive character.... [T]here is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak.... A person arrested on the preliminary warrant is not protected by a presumption of citizenship comparable to the presumption of innocence in a criminal case. There is no provision which forbids drawing an adverse inference from the fact of standing **\*1044** mute."

United States ex rel. Bilokumsky v. Tod, 263 U.S., at 153–154, 44 S.Ct., at 55–56.

The second factor is a practical one. In the course of a year the average INS agent arrests almost 500 illegal aliens. Brief for Petitioner 38. Over 97.5% apparently agree to voluntary deportation without a formal hearing. 705 F.2d, at 1071, n. 17. Among the remainder who do request a formal hearing (apparently a dozen or so in all, per officer, per year) very few challenge the circumstances of their arrests. As noted by the Court of Appeals, "the BIA was able to find only two reported immigration cases since 1899 in which the [[[exclusionary] rule was applied to bar unlawfully seized evidence, only one other case in which the rule's application was specifically addressed, and fewer than fifty BIA proceedings since 1952 in which a Fourth Amendment challenge to the introduction of evidence was even raised." Id., at 1071. Every INS agent knows, therefore, that it is highly unlikely that any particular arrestee will end up challenging the lawfulness of his arrest in a formal deportation proceeding. When an

occasional challenge is brought, the consequences from the point of view of the officer's overall arrest and deportation record will be trivial. In these circumstances, the arresting officer is most unlikely to shape his conduct in anticipation of the exclusion of evidence at a formal deportation hearing.

Third, and perhaps most important, the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers. Most arrests of illegal aliens away from the border occur during farm, factory, or other workplace surveys. Large numbers of illegal aliens are often arrested at one time, and conditions are understandably chaotic. See Brief for Petitioner in INS v. Delgado, O.T.1983, No. 82–1271, pp. 3–5. To safeguard the rights of those who are lawfully present at inspected workplaces the INS has developed rules restricting stop, interrogation, and arrest practices. Id., at 7, n. 7, 32–40, and n. 25. These **\*1045** regulations require that no one be detained without reasonable suspicion of illegal alienage, and that no one be arrested unless there is an admission of illegal alienage or other strong evidence thereof. New immigration officers receive instruction and examination in Fourth Amendment law, and others receive periodic refresher courses in law. Brief for Petitioner 39–40. Evidence seized through intentionally unlawful conduct is excluded by Department of Justice policy from the proceeding for which it was obtained. See Memorandum from Benjamin R. Civiletti to Heads of Offices, Boards, Bureaus and Divisions, Violations of Search and Seizure Law (Jan. 16, 1981). The INS also has in place a procedure for investigating and punishing immigration officers who commit Fourth Amendment violations. See Office of General Counsel, INS, U.S. Dept. of Justice, The Law of Arrest, Search, and Seizure for Immigration Officers 35 (Jan. 1983). The INS's attention to Fourth Amendment interests cannot guarantee that constitutional violations will not occur, but it does reduce the likely deterrent value of the exclusionary rule. Deterrence must be measured at the margin.

Finally, the deterrent value of the exclusionary rule in deportation proceedings is undermined by the availability of alternative remedies for institutional practices by the INS that might violate Fourth Amendment rights. The INS is a single agency, under central federal control, and engaged in operations of broad scope but highly repetitive character. The possibility of declaratory **\*\*3487** relief against the agency thus offers a means for challenging the validity of INS practices, when standing requirements for bringing such an

action can be met. Cf. INS v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

Respondents contend that retention of the exclusionary rule is necessary to safeguard the Fourth Amendment rights of ethnic Americans, particularly the Hispanic–Americans lawfully in this country. We recognize that respondents raise here legitimate and important concerns. But application of the exclusionary rule to civil deportation proceedings **\*1046** can be justified only if the rule is likely to add significant protection to these Fourth Amendment rights. The exclusionary rule provides no remedy for completed wrongs; those lawfully in this country can be interested in its application only insofar as it may serve as an effective deterrent to future INS misconduct. For the reasons we have discussed we conclude that application of the rule in INS civil deportation proceedings, as in the circumstances discussed in Janis, "is unlikely to provide significant, much less substantial, additional deterrence." 428 U.S., at 458, 96 S.Ct., at 3034. Important as it is to protect the Fourth Amendment rights of all persons, there is no convincing indication that application of the exclusionary rule in civil deportation proceedings will contribute materially to that end.

On the other side of the scale, the social costs of applying the exclusionary rule in deportation proceedings are both unusual and significant. The first cost is one that is unique to continuing violations of the law. Applying the exclusionary rule in proceedings that are intended not to punish past transgressions but to prevent their continuance or renewal would require the courts to close their eyes to ongoing violations of the law. This Court has never before accepted costs of this character in applying the exclusionary rule.

Presumably no one would argue that the exclusionary rule should be invoked to prevent an agency from ordering corrective action at a leaking hazardous waste dump if the evidence underlying the order had been improperly obtained, or to compel police to return contraband explosives or drugs to their owner if the contraband had been unlawfully seized. On the rare occasions that it has considered costs of this type the Court has firmly indicated that the exclusionary rule does not extend this far. See United States v. Jeffers, 342 U.S. 48, 54, 72 S.Ct. 93, 96, 96 L.Ed. 59 (1951); Trupiano v. United States, 334 U.S. 699, 710, 68 S.Ct. 1229, 1234, 92 L.Ed. 1663 (1948). The rationale for these holdings is not difficult to find. "Both Trupiano and Jeffers concerned objects the possession of which, without more, constitutes a

crime. The repossession **\*1047** of such per se contraband by Jeffers and Trupiano would have subjected them to criminal penalties. The return of the contraband would clearly have frustrated the express public policy against the possession of such objects." One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 699, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965) (footnote omitted). Precisely the same can be said here. Sandoval–Sanchez is a person whose unregistered presence in this country, without more, constitutes a crime.[3] His release **\*\*3488** within our borders would immediately subject him to criminal penalties. His release would clearly frustrate the express public policy against an alien's unregistered presence in this country. Even the objective of deterring Fourth Amendment violations should not require such a result. The constable's blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime. When the crime in question involves unlawful presence in this country, the criminal may go free, but he should not go free within our borders.[4]

**\*1048** Other factors also weigh against applying the exclusionary rule in deportation proceedings. The INS currently operates a deliberately simple deportation hearing system, streamlined to permit the quick resolution of very large numbers of deportation actions, and it is against this backdrop that the costs of the exclusionary rule must be assessed. The costs of applying the exclusionary rule, like the benefits, must be measured at the margin.

The average immigration judge handles about six deportation hearings per day. Brief for Petitioner 27, n. 16. Neither the hearing officers nor the attorneys participating in those hearings are likely to be well versed in the intricacies of Fourth Amendment law. The prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of these proceedings. The BIA has described the practical problems as follows:

"Absent the applicability of the exclusionary rule, questions relating to deportability routinely involve simple factual allegations and matters of proof. When Fourth Amendment issues are raised at deportation hearings, the result is a diversion of attention from the main issues which those proceedings were created to resolve, both in terms of the expertise of the administrative decision makers and the structure of the forum to accommodate inquiries into search and seizure questions. The result frequently seems to be a long, confused record in which the issues are not clearly defined and in which there is voluminous testimony.... The

ensuing delays and inordinate amount of time spent on such cases at all levels has an adverse impact on the effective administration **\*1049** of the immigration laws.... This is particularly true in a proceeding where delay may be the only 'defense' available and where problems already exist with the use of dilatory tactics." Matter of Sandoval, 17 I. & N., at 80 (footnote omitted).

This sober assessment of the exclusionary rule's likely costs, by the agency that would have to administer the rule in at least the administrative tiers of its application, cannot be brushed off lightly.

The BIA's concerns are reinforced by the staggering dimension of the problem that the INS confronts. Immigration officers apprehend over one million deportable aliens in this country every year. Id., at 85. A single agent may arrest many illegal aliens every day. Although the investigatory burden does not justify the commission of constitutional violations, the officers cannot be expected to compile elaborate, contemporaneous, written reports detailing the circumstances of every arrest. At present an officer simply completes a "Record of Deportable Alien" that is introduced to prove the INS's case at the deportation hearing; the officer rarely must attend **\*\*3489** the hearing. Fourth Amendment suppression hearings would undoubtedly require considerably more, and the likely burden on the administration of the immigration laws would be correspondingly severe.

Finally, the INS advances the credible argument that applying the exclusionary rule to deportation proceedings might well result in the suppression of large amounts of information that had been obtained entirely lawfully. INS arrests occur in crowded and confused circumstances. Though the INS agents are instructed to follow procedures that adequately protect Fourth Amendment interests, agents will usually be able to testify only to the fact that they followed INS rules. The demand for a precise account of exactly what happened in each particular arrest would plainly preclude mass arrests, even when the INS is confronted, **\*1050** as it often is, with massed numbers of ascertainably illegal aliens, and even when the arrests can be and are conducted in full compliance with all Fourth Amendment requirements.

**[10]    [11]**    In these circumstances we are persuaded that the Janis balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the INS. By all appearances the INS has already taken sensible and reasonable steps to deter Fourth Amendment violations by its officers, and this makes the likely additional

deterrent value of the exclusionary rule small. The costs of applying the exclusionary rule in the context of civil deportation hearings are high. In particular, application of the exclusionary rule in cases such as Sandoval–Sanchez', would compel the courts to release from custody persons who would then immediately resume their commission of a crime through their continuing, unlawful presence in this country. "There comes a point at which courts, consistent with their duty to administer the law, cannot continue to create barriers to law enforcement in the pursuit of a supervisory role that is properly the duty of the Executive and Legislative Branches."

United States v. Janis, 428 U.S., at 459, 96 S.Ct., at 3034. That point has been reached here.

V

**[12]** We do not condone any violations of the Fourth Amendment that may have occurred in the arrests of respondents Lopez–Mendoza or Sandoval–Sanchez. Moreover, no challenge is raised here to the INS's own internal regulations. Cf. INS v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Our conclusions concerning the exclusionary rule's value might change, if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread. Cf.

United States v. Leon, 468 U.S. 897, 928, 104 S.Ct. 3405, 3424, 82 L.Ed.2d 677 (BLACKMUN, J., concurring). Finally, we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine **\*1051** the probative value of the evidence obtained.[5] Cf. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). At issue here is the exclusion of credible evidence gathered in connection with peaceful arrests by INS officers. We hold that evidence derived from such arrests need not be suppressed in an INS civil deportation hearing.

The judgment of the Court of Appeals is therefore

Reversed.

**\*\*3490** Justice BRENNAN, dissenting.

I fully agree with Justice WHITE that under the analysis developed by the Court in such cases as United States v.

Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), and United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the exclusionary rule must apply in civil deportation proceedings. However, for the reasons set forth today in my dissenting opinion in United States v. Leon, ante, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, I believe the basis for the exclusionary rule does not derive from its effectiveness as a deterrent, but is instead found in the requirements of the Fourth Amendment itself. My view of the exclusionary rule would, of course, require affirmance of the Court of Appeals. In this case, federal law enforcement officers arrested respondents Sandoval–Sanchez and Lopez–Mendoza in violation of their Fourth Amendment rights. The subsequent admission of any evidence secured pursuant to these unlawful arrests **\*1052** in civil deportation proceedings would, in my view, also infringe those rights. The Government of the United States bears an obligation to obey the Fourth Amendment; that obligation is not lifted simply because the law enforcement officers were agents of the Immigration and Naturalization Service, nor because the evidence obtained by those officers was to be used in civil deportation proceedings.

Justice WHITE, dissenting.

The Court today holds that the exclusionary rule does not apply in civil deportation proceedings. Because I believe that the conclusion of the majority is based upon an incorrect assessment of the costs and benefits of applying the rule in such proceedings, I respectfully dissent.[1]

The paradigmatic case in which the exclusionary rule is applied is when the prosecutor seeks to use evidence illegally obtained by law enforcement officials in his case-in-chief in a criminal trial. In other classes of cases, the rule is applicable only when the likelihood of deterring the unwanted conduct outweighs the societal costs imposed by exclusion of relevant evidence. United States v. Janis, 428 U.S. 433, 454, 96 S.Ct. 3021, 3032, 49 L.Ed.2d 1046 (1976). Thus, the Court has, in a number of situations, refused to extend the exclusionary rule to proceedings other than the criminal trial itself. For example, in Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Court held that the deterrent effect of the rule would not be reduced by refusing to allow a state prisoner to litigate a Fourth Amendment claim in federal habeas corpus proceedings if he was afforded a full and fair opportunity to litigate it in state court. Similarly, in **\*1053** United States v. Calandra, 414 U.S. 338, 351, 94

S.Ct. 613, 621, 38 L.Ed.2d 561 (1974), we concluded that "[a]ny incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best." And in United States v. Janis, supra, we declined to extend the exclusionary rule to bar the introduction in a federal civil proceeding of evidence unconstitutionally seized by a state law enforcement officer. In all of these cases it was unquestioned that the illegally seized evidence would not be admissible in the case-in-chief of the proceeding for which the evidence was gathered; only its collateral use was permitted.

Civil deportation proceedings are in no sense "collateral." The majority correctly acknowledges that the "primary objective" of the INS agent is "to use evidence in the civil deportation proceeding" and that "the agency officials who effect the unlawful **3491 arrest are the same officials who subsequently bring the deportation action." Ante, at 3485. The Immigration and Naturalization Service likewise concedes that INS agents are "in the business of conducting searches for and seizures of illegal aliens for the purpose of bringing about their deportation." Brief for Petitioner 37. Thus, unlike the the situation in Janis, the conduct challenged here falls within "the offending officer's zone of primary interest." 428 U.S., at 458, 96 S.Ct., at 3034. The majority nonetheless concludes that application of the rule in such proceedings is unlikely to provide significant deterrence. Because INS agents are law enforcement officials whose mission is closely analogous to that of police officers and because civil deportation proceedings are to INS agents what criminal trials are police officers, I cannot agree with that assessment.

The exclusionary rule rests on the Court's belief that exclusion has a sufficient deterrent effect to justify its imposition, and the Court has not abandoned the rule. As long as that is the case, there is no principled basis for distinguishing between the deterrent effect of the rule in criminal cases and in civil deportation proceedings. The majority attempts to justify the distinction by asserting that deportation will still *1054 be possible when evidence not derived from the illegal search or seizure is independently sufficient. Ante, at 3485–3486. However, that is no less true in criminal cases. The suppression of some evidence does not bar prosecution for the crime, and in many cases even though some evidence is suppressed a conviction will nonetheless be obtained.

The majority also suggests that the fact that most aliens elect voluntary departure dilutes the deterrent effect of the exclusionary rule, because the infrequency of challenges to admission of evidence will mean that "the consequences from

the point of view of the officer's overall arrest and deportation record will be trivial." Ante, at 3486. It is true that a majority of apprehended aliens elect voluntary departure, while a lesser number go through civil deportation proceedings and a still smaller number are criminally prosecuted. However, that fact no more diminishes the importance of the exclusionary sanction than the fact that many criminal defendants plead guilty dilutes the rule's deterrent effect in criminal cases. The possibility of exclusion of evidence quite obviously plays a part in the decision whether to contest either civil deportation or criminal prosecution. Moreover, in concentrating on the incentives under which the individual agent operates to the exclusion of the incentives under which the agency as a whole operates neglects the "systemic" deterrent effect that may lead the agency to adopt policies and procedures that conform to Fourth Amendment standards. See, e.g., Dunaway v. New York, 442 U.S. 200, 221, 99 S.Ct. 2248, 2261, 60 L.Ed.2d 824 (1979) (STEVENS, J., concurring).

The majority believes "perhaps most important" the fact that the INS has a "comprehensive scheme" in place for deterring Fourth Amendment violations by punishing agents who commit such violations, but it points to not a single instance in which that scheme has been invoked.[2] *1055 Ante, at 3486. Also, immigration officers are instructed and examined in Fourth Amendment law, and it is suggested that this education is another reason why the exclusionary rule is unnecessary. Ibid. A contrary lesson could be discerned from the existence of these programs, however, when it is recalled that they were instituted **3492 during "a legal regime in which the cases and commentators uniformly sanctioned the invocation of the rule in deportation proceedings." 705 F.2d 1059, 1071 (CA9 1983). Thus, rather than supporting a conclusion that the exclusionary rule is unnecessary, the existence of these programs instead suggests that the exclusionary rule has created incentives for the agency to ensure that its officers follow the dictates of the Constitution. Since the deterrent function of the rule is furthered if it alters either "the behavior of individual law enforcement officers or the policies of their departments," United States v. Leon, 468 U.S., at 918, 104 S.Ct., at 3419, it seems likely that it was the rule's deterrent effect that led to the programs to which the Court now points for its assertion that the rule would have no deterrent effect.

The suggestion that alternative remedies, such as civil suits, provide adequate protection is unrealistic. Contrary to the situation in criminal cases, once the Government has improperly obtained evidence against an illegal alien, he is

removed from the country and is therefore in no position to file civil actions in federal courts. Moreover, those who are legally in the country but are nonetheless subjected to illegal searches and seizures are likely to be poor and uneducated, and many will not speak English. It is doubtful that the threat of civil suits by these persons will strike fear into the hearts of those who enforce the Nation's immigration laws.

It is also my belief that the majority exaggerates the costs associated with applying the exclusionary rule in this context. Evidence obtained through violation of the Fourth Amendment is not automatically suppressed, and any inquiry **\*1056** into the burdens associated with application of the exclusionary rule must take that fact into account. In United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, we have held that the exclusionary rule is not applicable when officers are acting in objective good faith. Thus, if the agents neither knew nor should have known that they were acting contrary to the dictates of the Fourth Amendment, evidence will not be suppressed even if it is held that their conduct was illegal.

As is noted, ante, at 3489, n. 5, the BIA has already held that evidence will be suppressed if it results from egregious violations of constitutional standards. Thus, the mechanism for dealing with suppression motions exists and is utilized, significantly decreasing the force of the majority's predictions of dire consequences flowing from "even occasional invocation of the exclusionary rule." Ante, at 3488. Although the standard currently utilized by the BIA may not be precisely coextensive with the good-faith exception, any incremental increase in the amount of evidence that is suppressed through application of Leon is unlikely to be significant. Likewise, any difference that may exist between the two standards is unlikely to increase significantly the number of suppression motions filed.

Contrary to the view of the majority, it is not the case that Sandoval–Sanchez' "unregistered presence in this country, without more, constitutes a crime." Ante, at 3487. Section 275 of the Immigration and Nationality Act makes it a crime to enter the United States illegally. 8 U.S.C. § 1325.[3] The first offense constitutes a misdemeanor, and subsequent offenses constitute felonies. Ibid. Those few cases that have construed this statute have held that a violation takes **\*1057** place at the time of entry and that the statute does not describe a continuing offense. Gonzales v. City of Peoria, 722 F.2d 468, 473–474 (CA9 1983); **\*\*3493** United States v.

Rincon–Jimenez, 595 F.2d 1192, 1194 (CA9 1979). Although this Court has not construed the statute, it has suggested in dictum that this interpretation is correct, United States v. Cores, 356 U.S. 405, 408, n. 6, 78 S.Ct. 875, 878, n. 6, 2 L.Ed.2d 873 (1958), and it is relatively clear that such an interpretation is most consistent with the statutory language. Therefore, it is simply not the case that suppressing evidence in deportation proceedings will "allo[w] the criminal to continue in the commission of an ongoing crime." Ante, at 3488. It is true that some courts have construed § 276 of the Act, 8 U.S.C. § 1326, which applies to aliens previously deported who enter or are found in the United States, to describe a continuing offense.[4] United States v. Bruno, 328 F.Supp. 815 (WD Mo.1971); United States v. Alvarado–Soto, 120 F.Supp. 848 (SD Cal.1954); United States v. Rincon–Jimenez, supra (dictum). But see United States v. DiSantillo, 615 F.2d 128 (CA3 1980). In such cases, however, the Government will have a record of the prior deportation and will have little need for any evidence that might be suppressed through application of the exclusionary rule. See United States v. Pineda–Chinchilla, 712 F.2d 942 (CA5 1983) (illegality of arrest does not bar introduction of INS records to demonstrate prior deportation) cert. denied, 464 U.S. 964, 104 S.Ct. 402, 78 L.Ed.2d 343 (1983).

Although the majority relies on the registration provisions of 8 U.S.C. §§ 1302 and 1306 for its "continuing crime" argument, those provisions provide little support for the general **\*1058** rule laid down that the exclusionary rule does not apply in civil deportation proceedings. First, § 1302 requires that aliens register within 30 days of entry into the country. Thus, for the first 30 days failure to register is not a crime. Second, § 1306 provides that only willful failure to register is a misdemeanor. Therefore, "unregistered presence in this country, without more," ante, at 3487, does not constitute a crime; rather, unregistered presence plus willfulness must be shown. There is no finding that Sandoval–Sanchez willfully failed to register, which is a necessary predicate to the conclusion that he is engaged in a continuing crime. Third, only aliens 14 years of age or older are required to register; those under 14 years of age are to be registered by their parents or guardian. By the majority's reasoning, therefore, perhaps the exclusionary rule should apply in proceedings to deport children under 14, since their failure to register does not constitute a crime.

Application of the rule, we are told, will also seriously interfere with the "streamlined" nature of deportation hearings because "[n]either the hearing officers nor the attorneys participating in those hearings are likely to be well versed in the intricacies of Fourth Amendment law." Ante, at 3488. Yet the majority deprecates the deterrent benefit of the exclusionary rule in part on the ground that immigration officers receive a thorough education in Fourth Amendment law. Ante, at 3488. The implication that hearing officers should defer to law enforcement officers' superior understanding of constitutional principles is startling indeed.

Prior to the decision of the Board of Immigration Appeals in Matter of Sandoval, 17 I. & N.Dec. 70 (1979), neither the Board nor any court had held that the exclusionary rule did not apply in civil deportation proceedings. 705 F.2d at 1071. The Board in Sandoval noted that there were "fewer than fifty" BIA proceedings since 1952 in which motions had been made to suppress evidence on Fourth Amendment *1059 grounds. This is so despite the **3494 fact that "immigration law practitioners have been informed by the major treatise in their field that the exclusionary rule was available to clients facing deportation. See 1A C. Gordon and H. Rosenfield, Immigration Law and Procedure § 5.2c at 5–31 (rev. ed. 1980)." 705 F.2d, at 1071. The suggestion that "[t]he prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of these proceedings," ante, at 3488, is thus difficult to credit. The simple fact is that prior to 1979 the exclusionary rule was available in civil deportation proceedings, and there is no indication that it significantly interfered with the ability of the INS to function.

Finally, the majority suggests that application of the exclusionary rule might well result in the suppression of large amounts of information legally obtained because of the "crowded and confused circumstances" surrounding mass arrests. Ante, at 3489. The result would be that INS agents would have to keep a "precise account of exactly what happened in each particular arrest," which would be impractical considering the "massed numbers of ascertainably illegal aliens." Ante, at 3489. Rather than constituting a rejection of the application of the exclusionary rule in civil deportation proceedings, however, this argument amounts to a rejection of the application of the Fourth Amendment to the activities of INS agents. If the pandemonium attending immigration arrests is so great that violations of the Fourth Amendment cannot be ascertained for the purpose of applying

the exclusionary rule, there is no reason to think that such violations can be ascertained for purposes of civil suits or internal disciplinary proceedings, both of which are proceedings that the majority suggests provide adequate deterrence against Fourth Amendment violations. The Court may be willing to throw up its hands in dismay because it is administratively inconvenient to determine whether *1060 constitutional rights have been violated, but we neglect our duty when we subordinate constitutional rights to expediency in such a manner. Particularly is this so when, as here, there is but a weak showing that administrative efficiency will be seriously compromised.

In sum, I believe that the costs and benefits of applying the exclusionary rule in civil deportation proceedings do not differ in any significant way from the costs and benefits of applying the rule in ordinary criminal proceedings. Unless the exclusionary rule is to be wholly done away with and the Court's belief that it has deterrent effects abandoned, it should be applied in deportation proceedings when evidence has been obtained by deliberate violations of the Fourth Amendment or by conduct a reasonably competent officer would know is contrary to the Constitution. Accordingly, I dissent.

Justice MARSHALL, dissenting.

I agree with Justice WHITE that application to this case of the mode of analysis embodied in the decisions of the Court in United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), and United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), compels the conclusion that the exclusionary rule should apply in civil deportation proceedings. Ante, at 3490–3491. However, I continue to believe that that mode of analysis fails to reflect the constitutionally mandated character of the exclusionary rule. See United States v. Leon, 468 U.S., at 931–938, 104 S.Ct., at 3431–3435 (BRENNAN, J., joined by MARSHALL, J., dissenting); United States v. Janis, supra, at 460, 96 S.Ct., at 3035 (BRENNAN, J., joined by MARSHALL, J., dissenting). In my view, a sufficient reason for excluding from civil deportation proceedings evidence obtained in violation of the Fourth Amendment is that there is no other way to achieve "the twin goals of enabling the judiciary to avoid the taint of partnership in official lawlessness and of assuring the people—all potential victims of unlawful government conduct—that the government would not **3495 profit from its lawless behavior, thus minimizing the risk of seriously undermining *1061 popular trust in government."

United States v. Calandra, supra, at 357, 94 S.Ct., at 624 (BRENNAN, J., joined by MARSHALL, J., dissenting).

Justice STEVENS, dissenting.

Because the Court has not yet held that the rule of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d

677 has any application to warrantless searches, I do not join the portion of Justice WHITE's opinion that relies on that case. I do, however, agree with the remainder of his dissenting opinion.

**All Citations**

468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778

## Footnotes

a1    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

aa1    THE CHIEF JUSTICE joins all but Part V of this opinion.

1    The Court of Appeals brushed over Lopez–Mendoza's failure to object to the evidence in an apparently unsettled footnote of its decision. The Court of Appeals was initially of the view that a motion to terminate a proceeding on the ground that the arrest of the respondent was unlawful is, "for all practical purposes," the same as a motion to suppress evidence as the fruit of an unlawful arrest. Slip opinion, at 1765, n. 1 (Apr. 25, 1983). In the bound report of its opinion, however, the Court of Appeals takes a somewhat different view, stating in a revised version of the same footnote that "the only reasonable way to interpret the motion to terminate is as one that includes both a motion to suppress and a motion to dismiss." 705 F.2d 1059, 1060, n. 1 (1983).

2    In United States v. Wong Quong Wong, 94 F. 832 (Vt.1899), a District Judge excluded letters seized from the appellant in a civil deportation proceeding. In Ex parte Jackson, 263 F. 110 (Mont.), appeal dism'd sub nom. Andrews v. Jackson, 267 F. 1022 (CA9 1920), another District Judge granted habeas corpus relief on the ground that papers and pamphlets used against the habeas petitioner in a deportation proceeding had been unlawfully seized. Wong Chung Che v. INS, 565 F.2d 166 (CA1 1977), held that papers obtained by INS agents in an unlawful search are inadmissible in deportation proceedings.

3    Sandoval–Sanchez was arrested on June 23, 1977. His deportation hearing was held on October 7, 1977. By that time he was under a duty to apply for registration as an alien. A failure to do so plainly constituted a continuing crime. 8 U.S.C. §§ 1302, 1306. Sandoval–Sanchez was not, of course, prosecuted for this crime, and we do not know whether or not he did make the required application. But it is safe to assume that the exclusionary rule would never be at issue in a deportation proceeding brought against an alien who entered the country unlawfully and then voluntarily admitted to his unlawful presence in an application for registration. Sandoval–Sanchez was also not prosecuted for his initial illegal entry into this country, an independent crime under 8 U.S.C. § 1325. We need not decide whether or not remaining in this country following an illegal entry is a continuing or a completed crime under § 1325. The question is academic, of course, since in either event the unlawful entry remains both punishable and continuing grounds for deportation. See 8 U.S.C. § 1251(a)(2).

4    Similarly, in Sure–Tan, Inc. v. NLRB, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), the Court concluded that an employer can be guilty of an unfair labor practice in his dealings with an alien notwithstanding the alien's illegal presence in this country. Retrospective sanctions against the employer may accordingly be imposed by the National Labor Relations Board to further the public policy against unfair labor practices. But while he maintains the status of an illegal alien, the employee is plainly not entitled to

104 S.Ct. 3479, 82 L.Ed.2d 778

the prospective relief—reinstatement and continued employment—that probably would be granted to other victims of similar unfair labor practices.

5    We note that subsequent to its decision in Matter of Sandoval, 17 I. & N.Dec. 70 (1979), the BIA held that evidence will be excluded if the circumstances surrounding a particular arrest and interrogation would render use of the evidence obtained thereby "fundamentally unfair" and in violation of due process requirements of the Fifth Amendment. Matter of Toro, 17 I. & N.Dec. 340, 343 (1980). See also Matter of Garcia, 17 I. & N.Dec. 319, 321 (BIA 1980) (suppression of admission of alienage obtained after request for counsel had been repeatedly refused); Matter of Ramira–Cordova, No. A21 095 659 (Feb. 21, 1980) (suppression of evidence obtained as a result of a night-time warrantless entry into the aliens' residence).

1    I also question the Court's finding that Lopez–Mendoza failed to object to admission of the evidence. Ante, at 3485, and n. 1. The Court of Appeals held that he had made a proper objection, 705 F.2d 1059, 1060, n. 1 (CA9 1983), and the INS did not seek review of that conclusion. Brief for Petitioner 8, n. 8. Moreover, the fact that changes in an opinion are made between the time of the slip opinion and the bound volume has never before been considered evidence that the holding of a case is "unsettled." See ante, at 3484, n. 1.

2    The INS suggests that its disciplinary rules are "not mere paper procedures" and that over a period of four years 20 officers were suspended or terminated for misconduct toward aliens. Brief for Petitioner 45, n. 28. The INS does not assert, however, that any of these officers were disciplined for Fourth Amendment violations, and it appears that the 11 officers who were terminated were terminated for rape or assault. See Brief for Respondents 60, n. 42.

3    Section 275 provides in part:
"Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation ... shall be guilty of a [crime]...." 8 U.S.C. § 1325.

4    Section 276 provides in part:
"Any alien who—
"(1) has been arrested and deported or excluded and deported, and thereafter

"(2) enters, attempts to enter, or is at any time found in, the United States ... shall be guilty of a felony." 8 U.S.C. § 1326.

---

End of Document        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

104 S.Ct. 2489
Supreme Court of the United States

IMMIGRATION AND
NATURALIZATION SERVICE, Petitioner
v.
Predrag STEVIC.

No. 82-973.
|
Argued Dec. 6, 1983.
|
Decided June 5, 1984.

**Synopsis**

Appeal was taken from an order of the United States District Court for the Southern District of New York, Whitman Knapp, J., denying a petition for writ of habeas corpus and a petition for review of a decision of the Board of Immigration Appeals denying a motion to reopen deportation proceedings.

The Court of Appeals, 678 F.2d 401, affirmed in part, reversed in part and remanded, and certiorari was granted. The Supreme Court, Justice Stevens, held that alien seeking relief from deportation on grounds that he would be subject to persecution in the country to which he would be deported must establish a clear probability of persecution to avoid deportation.

Judgment of the Court of Appeals reversed and cause remanded.

West Headnotes (1)

**[1]      Aliens, Immigration, and
Citizenship**  ⚷  Clear Probability Standard for
Withholding of Removal

Alien seeking relief from deportation on the basis that he would be subject to persecution in country to which he would be deported must establish a clear probability of persecution to avoid deportation. Immigration and Nationality Act, § 243(h), as amended, 8 U.S.C.A. § 1253(h).

1272 Cases that cite this headnote

*Syllabus* [*]

After he was ordered to surrender for deportation, respondent alien in 1977 moved to reopen the deportation proceedings, seeking relief under § 243(h) of the Immigration and Nationality Act of 1952 (INA), which then authorized the Attorney General to withhold deportation of an alien upon a finding that the alien "would be subject to persecution" in the country to which he would be deported. The Immigration Judge denied the motion without a hearing, and was upheld by the Board of Immigration Appeals (BIA), which held that respondent had not met his burden of showing that there was a clear probability of persecution. Respondent did not appeal this decision. Subsequently, in 1981, after receiving another notice to surrender for deportation, respondent filed a second motion to reopen, again seeking relief under § 243(h), which in the meantime had been amended by the Refugee Act of 1980—in conformity with the language of Article 33 of the 1968 United Nations Protocol Relating to the Status of Refugees that had been acceded to by the United States—to provide that the Attorney General shall not deport an alien if the Attorney General determines that the alien's "life or freedom would be threatened" in the country to which he would be deported. This motion was also denied without a hearing under the same standard of proof as was applied in the previous denial. The Court of Appeals reversed and remanded, holding that respondent no longer had the burden of showing "a clear probability of persecution," but instead could avoid deportation by showing a "well-founded fear of persecution," the latter language being contained in a definition of the term "refugee" adopted by the United Nations Protocol. The court concluded that the Refugee Act of 1980 so changed the standard of proof, and that respondent's showing entitled him to a hearing under the new standard.

Held: An alien must establish a clear probability of persecution to avoid deportation under § 243(h). Pp. 2492–2501.

(a) At least before 1968, it was clear that an alien was required to demonstrate a "clear probability of persecution" or a "likelihood of persecution" to be eligible for withholding of deportation under **2490 § 243(h). Relief under § 243(h) was not, however, available to aliens at the border seeking refuge in the United States due to persecution. They could *408 seek admission only under § 203(a)(7) of the INA, and were required to establish a good reason to fear persecution.

The legislative history of the United States' accession to the United Nations Protocol discloses that the President and Senate believed that the Protocol was consistent with existing law. While the Protocol was the source of some controversy with respect to the standard of proof for § 243(h) claims for withholding of deportation, the accession to the Protocol did not appear to raise any questions concerning the standard to be applied for § 203(a)(7) requests for admission, the "good reason to fear persecution" language being employed in such cases. Pp. 2493–2496.

(b) While the text of § 243(h), as amended in 1980, does not specify how great a possibility of persecution must exist to qualify an alien for withholding of deportation, to the extent a standard can be inferred from the bare language, it appears that a likelihood of persecution is required. The section provides for a withholding of deportation only if the alien's life or freedom "would" be threatened, not if he "might" or "could" be subject to persecution. Respondent is seeking relief under § 243(h), not under provisions which, as amended by the Refugee Act, employ the "well-founded fear" standard that now appears in § 201(a)(42)(A) of the INA and that was adopted from the United Nations Protocol's definition of "refugee." Section 243(h) does not refer to § 201(a)(42)(A). Hence, there is no textual basis in the statute for concluding that the well-founded-fear-of-persecution standard is relevant to the withholding of deportation under § 243(h). The 1980 amendment of § 243(h) was recognized by Congress as a mere conforming amendment, added "for the sake of clarity," and was plainly not intended to change the standard for withholding deportation. There is no support in either § 243(h)'s language, the structure of the amended INA, or the legislative history for the Court of Appeals' conclusion that every alien who qualifies as a "refugee" under the statutory definition is also entitled to a withholding of deportation under § 243(h). The Court of Appeals granted respondent relief based on its understanding of a standard which, even if properly understood, does not entitle an alien to withholding of deportation under § 243(h). Pp. 2496–2501.

🚩 678 F.2d 401, reversed and remanded.

## Attorneys and Law Firms

*Deputy Solicitor General Geller* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath,* and *Barbara E. Etkind.*

*409 *Ann L. Ritter* argued the cause and filed a brief for respondent.*

* Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Burt Neuborne, E. Richard Larson,* and *David Carliner;* for the American Immigration Lawyers Association by *Theodore Ruthizer;* for the American Jewish Committee et al. by *Samuel Rabinove;* for Amnesty International USA by *Paul L. Hoffman;* for the Committee on Migration and Refugee Affairs of the American Council of Voluntary Agencies for Foreign Service et al. by *William T. Lake;* for the Lawyers Committee for International Human Rights by *Arthur C. Helton;* for the National Immigration Project of the National Lawyers Guild, Inc., by *Donald L. Ungar;* and for the United Nations High Commissioner for Refugees by *David B. Robinson.*

## Opinion

Justice STEVENS delivered the opinion of the Court.

For over 30 years the Attorney General has possessed statutory authority to withhold the deportation of an alien upon a finding that the alien would be subject to persecution in the country to which he would be deported. The question presented by this case is whether a deportable alien must demonstrate a clear probability of persecution in order to obtain such relief under § 243(h) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1253(h) (1976 ed.), as amended by § 203(e) of the Refugee Act of 1980, Pub.L. 96–212, 94 Stat. 107.

I

Respondent, a Yugoslavian citizen, entered the United States in 1976 to visit his sister, then a permanent resident alien residing in Chicago. Petitioner, the Immigration and Naturalization Service (INS), instituted deportation proceedings against respondent when he overstayed his 6–week period of admission. Respondent admitted that he was deportable and agreed to depart voluntarily by February 1977. In January 1977, however, respondent married a United States citizen who obtained approval of a visa petition on his behalf. Shortly thereafter, respondent's wife died in an automobile accident. The approval of respondent's visa petition was **410 automatically **2491 revoked, and petitioner ordered respondent to surrender for deportation to Yugoslavia.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Respondent moved to reopen the deportation proceedings in August 1977, seeking relief under § 243(h) of the Immigration and Naturalization Act, which then provided:

"The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason." 8 U.S.C. § 1253(h) (1976 ed.).

Respondent's supporting affidavit stated that he had become active in an anti-Communist organization after his marriage in early 1977, that his father-in-law had been imprisoned in Yugoslavia because of membership in that organization, and that he feared imprisonment upon his return to Yugoslavia.

In October 1979, the Immigration Judge denied respondent's motion to reopen without conducting an evidentiary hearing. [1] The Board of Immigration Appeals (BIA) upheld that action, explaining:

"A Motion to reopen based on a section 243(h) claim of persecution must contain prima facie evidence that there is a clear probability of persecution must be directed at the individual respondent. See Cheng Kai Fu v. INS, 386 F.2d 750 (2 Cir.1967), cert. denied, 390 U.S. 1003, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968). Although the applicant here claims to be eligible for withholding of deportation which was not available to him at the time of his deportation hearing, he has not *411 presented any evidence which would indicate that he will be singled out for persecution." App. to Pet. for Cert. 34–35.

Respondent did not seek judicial review of that decision.

After receiving notice to surrender for deportation in February 1981, respondent filed his second motion to reopen. [2] He again sought relief pursuant to § 243(h) which then—because of its amendment in 1980—read as follows:

"The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1).

Although additional written material was submitted in support of the second motion, like the first, it was denied

without a hearing. The Board of Immigration Appeals held that respondent had not shown that the additional evidence was unavailable at the time his first motion had been filed and, further, that he had still failed to submit prima facie evidence that "there is a clear probability of persecution" directed at respondent individually. [3] Thus, the Board **2492 applied the same *412 standard of proof it had applied regarding respondent's first motion to reopen, notwithstanding the intervening amendment of § 243(h) in 1980.

The United States Court of Appeals for the Second Circuit reversed and remanded for a plenary hearing under a different standard of proof. Stevic v. Sava, 678 F.2d 401 (1982). Specifically, it held that respondent no longer had the burden of showing "a clear probability of persecution," but instead could avoid deportation by demonstrating a "well-founded fear of persecution." The latter language is contained in a definition of the term "refugee" adopted by a United Nations Protocol to which the United States has adhered since 1968. The Court of Appeals held that the Refugee Act of 1980 changed the standard of proof that an alien must satisfy to obtain relief under § 243(h), concluding that Congress intended to abandon the "clear probability of persecution" standard and substitute the "well-founded fear of persecution" language of the Protocol as the standard. Other than stating that the Protocol language was "considerably more generous" or "somewhat more generous" to the alien than the former standard, id., at 405, 406, the court did not detail the *413 differences between them and stated that it "would be unwise to attempt a more detailed elaboration of the applicable legal test under the Protocol," id., at 409. The court concluded that respondent's showing entitled him to a hearing under the new standard.

Because of the importance of the question presented, and because of the conflict in the Circuits on the question, [4] we granted certiorari, 460 U.S. 1010, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983). We now reverse and hold that an alien must establish a clear probability of persecution to avoid deportation under § 243(h).

## II

The basic contentions of the parties in this case may be summarized briefly. Petitioner contends that the words "clear probability of persecution" and "well-founded fear of persecution" are not self-explanatory and when read in the light of their usage by courts prior to adoption of the Refugee

Act of 1980, it is obvious that there is no "significant" difference between them. If there is a "significant" difference between them, however, petitioner argues that Congress' clear intent in enacting the Refugee Act of 1980 was to maintain the status quo, which petitioner argues would mean continued application of the clear-probability-of-persecution standard to withholding of deportation claims. In this regard, petitioner maintains that our accession to the United Nations Protocol in 1968 was based on the express "understanding" that it would not alter the "substance" of our immigration laws.

Respondent argues that the standards are not coterminous and that the well-founded-fear-of-persecution standard turns almost entirely on the alien's state of mind. Respondent points out that the well-founded-fear language was adopted in the definition of a refugee contained in the United Nations Protocol adhered to by the United **2493 States since 1968. Respondent *414 basically contends that ever since 1968, the well-founded-fear standard should have applied to withholding of deportation claims, but Congress simply failed to honor the Protocol by failing to enact implementing legislation until adoption of the Refugee Act of 1980, which contains the Protocol definition of refugee.

Each party is plainly correct in one regard: in 1980 Congress intended to adopt a standard for withholding of deportation claims by reference to pre-existing sources of law. We begin our analysis of this case by examining those sources of law.

III

United States Refugee Law prior to 1968

Legislation enacted by the Congress in 1950,[5] 1952,[6] and 1965[7] authorized the Attorney General to withhold deportation of an otherwise deportable alien if the alien would be subject to persecution upon deportation. At least before 1968, it was clear that an alien was required to demonstrate a "clear probability of persecution" or a "likelihood of persecution" in order to be eligible for withholding of deportation *415 under § 243(h) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1253(h) (1964 ed.). E.g., Cheng Kai Fu v. INS, 386 F.2d 750, 753 (CA2 1967), cert. denied, 390 U.S. 1003, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968); Lena v. INS, 379 F.2d 536, 538 (CA7 1967); In re Janus and Janek, 12 I. & N. Dec. 866, 873 (BIA 1968); In re Kojoory, 12 I. & N.Dec. 215, 220 (BIA 1967). With certain exceptions, this relief was available to any alien who was already "within the United States," albeit unlawfully and subject to deportation.

The relief authorized by § 243(h) was not, however, available to aliens at the border seeking refuge in the United States due to persecution. See generally Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). Since 1947, relief to refugees at our borders has taken the form of an "immigration and naturalization policy which granted immigration preferences to 'displaced persons,' 'refugees,' or persons who fled certain areas of the world because of 'persecution or fear of persecution on account of race, religion, or political opinion.' Although the language through which Congress has implemented this policy since 1947 has changed slightly from time to time, the basic policy has remained constant—to provide a haven for homeless refugees and to fulfill American responsibilities in connection with the International Refugee Organization of the United Nations." Rosenberg v. Yee Chien Woo, 402 U.S. 49, 52, 91 S.Ct. 1312, 1314, 28 L.Ed.2d 592 (1971).

Most significantly, the Attorney General was authorized under § 203(a)(7) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1153(a)(7)(A)(i) (1976 ed.), to permit "conditional entry" as immigrants for a number of refugees fleeing from a Communist-dominated area or the Middle East "because of persecution or fear of persecution on account of race, religion, or political opinion." See also § 212(d)(5) of the Act, 8 U.S.C. § 1182(d)(5) (granting Attorney General **2494 discretion to "parole" aliens into the United States temporarily *416 for emergency reasons). An alien seeking admission under § 203(a)(7) was required to establish a good reason to fear persecution. Compare In re Tan, 12 I. & N. Dec. 564, 569–570 (BIA 1967), with In re Ugricic, 14 I. & N. Dec. 384, 385–386 (Dist.Dir.1972).[8]

The United Nations Protocol

In 1968 the United States acceded to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577. The Protocol bound parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951) 189 U.N.T.S. 150 (July 28, 1951)[9] with respect to "refugees" as defined in Article 1.2 of the Protocol.

Article 1.2 of the Protocol defines a "refugee" as an individual who

"owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it." Compare 19 U.S.T. 6225 19 U.S.T. 6225 with 19 U.S.T. 6261 (1968) 19 U.S.T. 6261 (1968).

Two of the substantive provisions of the Convention are germane to the issue before us. Article 33.1 of the Convention *417 provides: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 19 U.S.T., at 6276. Article 34 provides in pertinent part: "The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees...." Ibid. [10]

The President and the Senate believed that the Protocol was largely consistent with existing law. There are many statements to that effect in the legislative history of the accession to the Protocol. E.g., S.Exec.Rep. No. 14, 90th Cong., 2d Sess., 4 (1968) ("refugees in the United States have long enjoyed the protection and the rights which the protocol calls for"); id., at 6, 7 ("the United States already meets the standards of the Protocol"); see also, id., at 2; S.Exec. K, 90th Cong., 2d Sess., III, VII (1968); 114 Cong.Rec. 29391 (1968) (remarks of Sen. Mansfield); id., at 27757 (remarks of Sen. Proxmire). And it was "absolutely clear" that the Protocol would not "requir[e] the United States to admit new categories or numbers of aliens." S.Exec.Rep. No. 14, supra, at 19. It was also believed that apparent differences *418 between the Protocol and existing statutory **2495 law could be reconciled by the Attorney General in administration and did not require any modification of statutory language. See, e.g., S.Exec. K, supra, at VIII.

United States Refugee Law: 1968–1980

Five years after the United States' accession to the Protocol, the Board of Immigration Appeals was confronted with the same basic issue confronting us today in the case of In re Dunar, 14 I. & N. Dec. 310 (1973). The deportee argued that he was entitled to withholding of deportation upon a showing of a well-founded fear of persecution, and essentially maintained that a conjectural possibility of persecution would suffice to make the fear "well founded." The Board rejected that interpretation of "well founded," and stated that a likelihood of persecution was required for the fear to be "well founded." Id., at 319. It observed that neither § 243(h) nor Article 33 used the term "well-founded fear," and stated:

"Article 33 speaks in terms of threat to life or freedom on account of any of the five enumerated reasons. Such threats would also constitute subjection to persecution within the purview of section 243(h). The latter has also been construed to encompass economic sanctions sufficiently harsh to constitute a threat to life or freedom, Dunat v. Hurney, 297 F.2d 744 (3 Cir., 1962); cf. Kovac v. INS, 407 F.2d 102 (9 Cir., 1969). In our estimation, there is no substantial difference in coverage of section 243(h) and Article 33. We are satisfied that distinctions in terminology can be reconciled on a case-by-case consideration as they arise." Id., at 320.

The Board concluded that "Article 33 has effected no substantial changes in the application of section 243(h), either by way of burden of proof, coverage, or manner of arriving at *419 decisions," id., at 323, [11] and stated that Dunar had failed to establish "the likelihood that he would be persecuted.... Even if we apply the nomenclature of Articles 1 and 33, we are satisfied that respondent has failed to show a well-founded fear that his life or freedom will be threatened," id., at 324.

Although before In re Dunar, the Board and the courts had consistently used a clear-probability or likelihood standard under § 243(h), after that case the term "well-founded fear" was employed in some cases. [12] The Court of Appeals for the Seventh Circuit, which had construed § 243(h) as applying *420 only to "cases of clear probability of persecution" in a frequently cited case decided before 1968, Lena v. INS, 379 F.2d 536, 538 (1967), reached the same conclusion in a case decided after the United States' adherence to the Protocol. Kashani v. INS, 547 F.2d 376 (1977). In that opinion Judge Swygert reasoned that the **2496 "well founded fear of persecution" language could "only be satisfied by objective evidence," and that it would "in practice converge" with the "clear probability" standard that the Seventh Circuit had previously "engrafted onto [§] 243(h)." Id., at 379. Other

Courts of Appeals appeared to reach essentially the same conclusion. See e.g., Fleurinor v. INS, 585 F.2d 129, 132, 134 (CA5 1978); Pereira–Diaz v. INS, 551 F.2d 1149, 1154 (CA9 1977); Zamora v. INS, 534 F.2d 1055, 1058, 1063 (CA2 1976).

While the Protocol was the source of some controversy with respect to the standard for § 243(h) claims for withholding of deportation, the United States' accession did not appear to raise any questions concerning the standard to be applied for § 203(a)(7) requests for admission. The "good reason to fear persecution" language was employed in such cases. See, e.g., In re Ugricic, 14 I. & N. Dec., at 385–386.[13]

**\*421** IV

Section 203(e) of the Refugee Act of 1980 amended the language of § 243(h), basically conforming it to the language of Article 33 of the United Nations Protocol.[14] The amendment made three changes in the text of § 243(h), but none of these three changes expressly governs the standard of proof an applicant must satisfy or implicitly changes that standard.[15] The amended § 243(h), like Article 33, makes no mention of a probability of persecution or a well-founded fear of persecution. In short, the text of the statute simply does not specify **\*422** how great a possibility of persecution must exist to qualify the alien for withholding of deportation. To the extent such a standard can be inferred from the bare **\*\*2497** language of the provision, it appears that a likelihood of persecution is required.[16] The section literally provides for withholding of deportation only if the alien's life or freedom "would" be threatened in the country to which he would be deported; it does not require withholding if the alien "might" or "could" be subject to persecution. Finally, § 243(h), both prior to and after amendment, makes no mention of the term "refugee"; rather, any alien within the United States is entitled to withholding if he meets the standard set forth.

Respondent understandably does not rely upon the specific textual changes in § 243(h) in support of his position that a well-founded fear of persecution entitles him to withholding of deportation. Instead, respondent points to the provision of the Refugee Act which eliminated the ideological and geographical restrictions on admission of refugees under § 203(a)(7) and adopted an expanded version of the United Nations Protocol definition of "refugee." This definition contains the well-founded-fear language and now appears under § 101(a)(42)(A) of the Immigration and Nationality

Act,[ ] 8 U.S.C. § 1101(a)(42)(A). Other provisions of the Immigration and Nationality Act, as amended, now provide preferential immigration status, within numerical limits, to those qualifying as refugees under the modified Protocol definition[17] and renders a more limited class of refugees, though **\*423** still a class broader than the Protocol definition, eligible for a discretionary grant of asylum.[18]

Respondent, however, is not seeking discretionary relief under these provisions, which explicitly employ the well-founded-fear standard now appearing in § 101(a)(42)(A). Rather, he claims he is entitled to withholding of deportation under § 243(h) upon establishing a well-founded fear of persecution. Section 243(h), however, does not refer to § 101(a)(42)(A). Hence, there is no textual basis in the statute for concluding that the well-founded-fear-of-persecution **\*424** standard is relevant to a withholding of deportation claim under § 243(h).

**\*\*2498** Before examining the legislative history of the Refugee Act of 1980 in order to ascertain whether Congress nevertheless intended a well-founded-fear standard to be employed under § 243(h), we observe that the Refugee Act itself does not contain any definition of the "well-founded fear of persecution" language contained in § 101(a)(42)(A). The parties vigorously contest whether the well-founded-fear standard is coterminous with the clear-probability-of-persecution standard.

Initially, we do not think there is any serious dispute regarding the meaning of the clear-probability standard under the § 243(h) case law.[19] The question under that standard is whether it is more likely than not that the alien would be subject to persecution. The argument of the parties on this point is whether the well-founded-fear standard is the same as the clear-probability standard as just defined, or whether it is more generous to the alien.

Petitioner argues that persecution must be more likely than not for a fear of persecution to be considered "well founded." The positions of respondent and several amici curiae are somewhat amorphous. Respondent seems to maintain that a fear of persecution is "well founded" if the evidence establishes some objective basis in reality for the fear. This would appear to mean that so long as the fear is not imaginary —i.e., if it is founded in reality at all—it is "well founded." A more moderate position is that so long as an objective situation is established by the evidence, it need not be **\*425**

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1244 of 1384

shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility.

Petitioner and respondent seem to agree that prior to passage of the Refugee Act, the Board and the courts actually used a clear-probability standard for § 243(h) claims. That is, prior to the amendment, § 243(h) relief would be granted if the evidence established that it was more likely than not that the alien would be persecuted in the country to which he was being deported; relief would not be granted merely upon a showing of some basis in reality for the fear, or if there was only a reasonable possibility of persecution falling short of a probability. Petitioner argues that some of the prior case law using the term "well-founded fear" simply used that term interchangeably with the phrase "clear probability." Respondent agrees in substance, but argues that although prior cases employed the term "well-founded fear," they misconstrued the meaning of the term under the United Nations Protocol.

For purposes of our analysis, we may assume, as the Court of Appeals concluded, that the well-founded-fear standard is more generous than the clear-probability-of-persecution standard because we can identify no basis in the legislative history for applying that standard in § 243(h) proceedings or any legislative intent to alter the pre-existing practice.

The principal motivation for the enactment of the Refugee Act of 1980 was a desire to revise and regularize the procedures governing the admission of refugees into the United States. The primary substantive change Congress intended to make under the Refugee Act, and indeed in our view the only substantive change even relevant to this case, was to eliminate the piecemeal approach to admission of refugees previously existing under § 203(a)(7) and § 212(d)(5) of the Immigration and Nationality Act, and § 108 of the regulations, and to establish a systematic scheme for admission and resettlement of refugees. S.Rep. No. 96–256, p. 1 (1979) (S.Rep.); **2499 U.S.Code Cong. & Admin.News 1980, p. 141; H.R.Rep. No. 96–608, pp. 1–5 (1979)H.R.Rep. No. 96–608, pp. 1–5 (1979) (H.R.Rep.). *426 The Act adopted, and indeed, expanded upon, the Protocol definition of "refugee," S.Rep., at 19; H.R.Rep., at 9–10, and intended that the definition would be construed consistently with the Protocol, S.Rep., at 9, 20. It was plainly recognized, however, that "merely because an individual or group of refugees comes within the definition will not guarantee resettlement in the United States. The Committee is of the opinion that the new definition does not create a new and expanded means of entry, but instead regularizes and formalizes the policies and practices that have been followed in recent years." H.R.Rep., at 10. The Congress distinguished between discretionary grants of refugee admission or asylum and the entitlement to a withholding of deportation if the § 243(h) standard was met. See id., at 17–18. [20]

*427 Elimination of the geographic and ideological restrictions under the former § 203(a)(7) was thought to bring the United States' scheme into conformity with its obligations under the Protocol, see S.Rep., at 4, 15–16S.Rep., at 4, 15–16, [21] and in our view these references are to the United States' obligations under Article 34 to facilitate the naturalization of refugees within the definition of the Protocol. There is, as always, some ambiguity in the legislative history—the term "asylum," in particular, seems to be used in various ways, see, e.g., S.Rep., at 9, 16—but that is understandable given that the **2500 same problem with nomenclature has been evident in case law as well. See 🚩 In re Lam, Interim Dec. No. 2857, p. 5 (BIA, Mar. 24, 1981). *428 Going to the substance of the matter, however, it seems clear that Congress understood that refugee status alone did not require withholding of deportation, but rather, the alien had to satisfy the standard under § 243(h), S.Rep., at 16. The amendment of § 243(h)§ 243(h) was explicitly recognized to be a mere conforming amendment, added "for the sake of clarity," and was plainly not intended to change the standard. H.R.Rep., at 17–18.

The Court of Appeals' decision rests on the mistaken premise that every alien who qualifies as a "refugee" under the statutory definition is also entitled to a withholding of deportation under § 243(h). We find no support for this conclusion in either the language of § 243(h), the structure of the amended Act, or the legislative history. [22]

**2501 *429 We have deliberately avoided any attempt to state the governing standard beyond noting that it requires that an application be supported by evidence establishing that it is more *430 likely than not that the alien would be subject to persecution on one of the specified grounds. This standard is a familiar one to immigration authorities and reviewing courts, and Congress did not intend to alter it in 1980. We observe that shortly after adoption of the Refugee Act, the Board explained: "As we have only quite recently acquired jurisdiction over asylum claims, we are only just now beginning to resolve some of the problems caused by this addition to our jurisdiction, including the problem of determining exactly how withholding of deportation and

asylum are to fit together." 🚩 In re Lam, Interim Dec. No. 2857, p. 6, n. 4 (BIA, Mar. 24, 1981). Today we resolve one of those problems by deciding that the "clear probability of persecution" standard remains applicable to § 243(h) withholding of deportation claims. We do not decide the meaning of the phrase "well-founded fear of persecution" which is applicable by the terms of the Act and regulations to requests for discretionary asylum. That issue is not presented by this case.

The Court of Appeals granted respondent relief based on its understanding of a standard which, even if properly understood, does not entitle an alien to withholding of deportation under § 243(h). Our holding does, of course, require the Court of Appeals to reexamine this record to determine whether the evidence submitted by respondent entitles him to a plenary hearing under the proper standard.

The judgment of the Court of Appeals is reversed, and the cause is remanded for further proceedings consistent with this opinion.

It is so ordered.

**All Citations**

467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See 🔖 United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1      The Immigration Judge's decision stated:

"The policy of restricting favorable exercise of discretion to cases of clear probability of persecution of the particular individual has been sanctioned by the courts ( 🔖 Lena v. Immigration and Naturalization Service, 379 F.2d 536[,] 538 (7th Cir.1967). The respondent has submitted no substantial evidence that he would be subjected to persecution as that term is defined by the court." Brief for Respondent 6–7.

2      He did not voluntarily respond to that notice; moreover, after his apprehension, he unsuccessfully tried to escape from custody. These events gave rise to a habeas corpus petition raising separate issues that are not before us now.

3      The opinion of the BIA stated, in part:

"Accordingly, we find that the respondent has failed to comply with the provisions of 8 CFR 3.2 in that there has been no showing that the submitted material was not available nor could not have been discovered or presented at a former hearing.

"In addition, we also conclude that the respondent has failed to make out a prima facie showing that he will be singled out for persecution if deported to Yugoslavia. A motion to reopen based on a section 243(h) claim of persecution must contain prima facie evidence that there is a clear probability of persecution to be directed at the individual respondent. See Cheng Kai Fu v. INS, 386 F.2d 750 (2 Cir.1967), cert. denied, 390 U.S. 1003, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968); Matter of McMullen, Interim Decision 2831 (BIA 1981).

"In the instant case, the many journalistic articles submitted by the respondent are of a general nature, referring to political conditions in Yugoslavia, but not specifically relating to the respondent. The affidavits and petitions contained in the file, while they conclude that the respondent will be imprisoned if he returns to Yugoslavia, do not contain any supporting facts. They express an opinion but provide no direct evidence to link the respondent's activities in this country and the probability of his persecution in Yugoslavia.

"With regard to the respondent's allegation that he will be persecuted by Albanian ethnics in Gnjilane, we find that there is nothing to stop the respondent from going to another town in Yugoslavia should he feel threatened in his hometown. A respondent is deported to country [sic], not a city or province. Lavdas v. Holland, 235 F.2d 955 (3 Cir.1956); Cantisani v. Holton, 248 F.2d 737 (7 Cir.1957)." App. to Pet. for Cert. 30a–31a.

4    Compare Rejaie v. INS, 691 F.2d 139 (CA3 1982), with Reyes v. INS, 693 F.2d 597 (CA6 1982) (relying on decision under review).

5    Section 23 of the Subversive Activities Control Act of 1950 amended § 20 of the Immigration Act of February 5, 1917, to rewrite the deportation provisions and specifically to add a new § 20(a) which provided in part as follows:
     "No alien shall be deported under any provisions of this Act to any country in which the Attorney General shall find that such alien would be subjected to physical persecution." 64 Stat. 1010.

6    Section 243(h) of the Immigration and Nationality Act of 1952 provided as follows:
     "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason." 66 Stat. 214.

7    That amendment read as follows:
     "(f) Section 243(h) is amended by striking out 'physical persecution' and inserting in lieu thereof 'persecution on account of race, religion, or political opinion.' " § 10, 79 Stat. 918.
     The provision as revised in 1965 is quoted in the text, supra, at 2491.

8    Notably, during this period of time, neither immigration judges nor the Board of Immigration Appeals had jurisdiction over asylum claims under § 203(a)(7). While the Board had jurisdiction over § 243(h) requests for withholding of deportation, § 203(a)(7) claims for asylum rested in the jurisdiction of Immigration and Naturalization Service District Directors. See generally In re Lam, Interim Dec. No. 2857, p. 5, n. 4 (BIA, Mar. 24, 1981).

9    The United States is not a signatory to the Convention itself.

10   Article 32.1 of the Convention provides: "The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order." 19 U.S.T., at 6275. It seems plain that respondent could not invoke Article 32, since he was not lawfully in the country when he overstayed his period of admission. United Nations Economic and Social Council, Report of Ad Hoc Committee on Statelessness and Related Problems 47 (Mar. 2, 1950) (U.N.Doc. E/1618/Corr.1; E/AC.32/5/Corr.1) ("The expression 'lawfully within their territory' throughout this draft Convention would exclude a refugee who while lawfully admitted has overstayed the period for which he was admitted or was authorized to stay or who has violated any other condition attached to his admission or stay"); see also United Nations Economic and Social Council, Report of Ad Hoc Committee on Statelessness and Related Problems, Second Session 11, ¶ 20 (Aug. 25, 1950) (U.N.Doc. E/1850; E/AC.32/8). Accord, In re Dunar, 14 I. & N.Dec. 310, 315–318 (BIA 1973) (citing additional authority).

11   The Board observed that the Attorney General had consistently granted withholding under § 243(h) when the required showing was made. Id., at 321–322.

12   See, e.g., Fleurinor v. INS, 585 F.2d 129, 132–134 (CA5 1978) ("well-founded fear" used by Immigration Judge; "likelihood" and "probable persecution" used by court); Martineau v. INS, 556 F.2d 306, 307, and n. 2 (CA5 1977) (" 'clear probability' of persecution" and "likelihood of persecution"); Henry v. INS, 552 F.2d 130, 131–132 (CA5 1977) ("probable persecution," "reason to fear persecution" and "well-grounded fear of political persecution"); Pereira–Diaz v. INS, 551 F.2d 1149, 1154 (CA9 1977) ("well-founded fear"); Coriolan v. INS, 559 F.2d 993, 997, and n. 8 (CA5 1977) ("well-founded fear that ... lives or freedom will be threatened" used by Board); Zamora v. INS, 534 F.2d 1055, 1058 (CA2 1976) ("likelihood of persecution" used by court, "well-founded fear" used by Board); Daniel v. INS, 528 F.2d 1278, 1279 (CA5 1976) ("probability of persecution"); Paul v. INS, 521 F.2d 194, 200, and n. 11 (CA5 1975) ("well-founded fear of political persecution"); Gena v. INS, 424 F.2d 227, 232 (CA5 1970) ("likely to be persecuted"); Kovac v. INS, 407 F.2d 102, 105, 107 (CA9 1969) ("probability of persecution" and "likelihood"); In re Williams, 16 I. & N. Dec. 697, 700–702, 704 (BIA 1979) ("well-founded fear," " 'probable persecution' " and "likelihood of

persecution"); In re Francois, 15 I. & N. Dec. 534, 539 (BIA 1975) ("well-founded fear that ... life or freedom will be threatened"); In re Mladineo, 14 I. & N. Dec. 591, 592 (BIA 1974) ("well-founded ... fear of persecution"); In re Maccaud, 14 I. & N. Dec. 429, 434 (BIA 1973) ("reasonable fear" and "well-founded fear"); In re Bohmwald, 14 I. & N. Dec. 408, 409 (BIA 1973) ("well-founded fear of persecution").

13    The ideological and geographic restrictions of § 203(a)(7) itself were not altered after the United States' accession to the Protocol. The Attorney General continued during this period to use his authority under § 212(d) to parole refugees into the United States. Moreover, in 1974, the Attorney General, acting pursuant to his general authority under 8 U.S.C. § 1103, published regulations permitting applications for asylum to be made to an INS District Director or American consul. 8 CFR § 108.1 (1976). The regulations did not explicitly adopt a standard for the exercise of discretion on the application, but did provide that a denial of an asylum application "shall not preclude the alien, in a subsequent expulsion hearing, from applying for the benefits of section 243(h) of the Act and of Articles 32 and 33 of the Convention Relating to the Status of Refugees." 8 CFR § 108.2 (1976).

In 1979, these regulations were amended to provide that a request for asylum made by an alien after commencement of deportation proceedings, or after completion of deportation proceedings, would be considered as a request for withholding or a request to reopen, respectively, "under section 243(h) of the Act and for the benefits of Articles 32 and 33 of the Convention Relating to the Status of Refugees." 8 CFR §§ 108.3(a) and (b) (1980). This amendment had the effect of conferring jurisdiction over asylum requests on the Board for the first time. See In re Lam, Interim Dec. No. 2857, p. 5, n. 4 (BIA, Mar. 24, 1981). While rejection of an asylum request by an INS District Director or American consul still did not "preclude the alien, in a subsequent expulsion hearing, from applying for the benefits of section 243(h) of the Act and Articles 32 and 33 of the Convention Relating to the Status of Refugees," 8 CFR § 108.2 (1980), it appears that requests for asylum were to be judged by the same likelihood-of-persecution standard applicable to § 243(h) claims. Compare § 108.1 with § 108.3(a), § 108.3(b), and § 242.17(c).

14    Compare supra, at 2491, with supra, at 2495.

15    The amendment (1) substituted mandatory language for what was previously a grant of discretionary authority to the Attorney General to withhold deportation after making the required finding; (2) substituted a requirement that the Attorney General determine that the "alien's life or freedom would be threatened" for the previous requirement that the alien "would be subject to persecution," and (3) broadened the relevant causes of persecution from reasons "of race, religion or political opinion" to encompass "nationality" and "membership in a particular social group" as well.

The removal of the Attorney General's discretion to withhold deportation after persecution was established with the requisite degree of certainty relates to the consequences of meeting the standard, and not to the standard itself.

While it might be argued that the second and third changes in the text altered the substantive grounds one needs to establish to be entitled to withholding of deportation, contra, infra, at 2498–2500, neither indicates any diminution in the degree of certainty with which those grounds must be established.

16    Notwithstanding the amendment of § 243(h), the regulation governing withholding of deportation claims remains substantively the same: in order to be entitled to a withholding of deportation, the alien "has the burden of satisfying the special inquiry officer that he would be subject to persecution ....," 8 CFR § 242.17(c) (1983), and the Board of Immigration Appeals, of course, continues to apply a clear-probability or likelihood-of-persecution standard with respect to such claims, as it did in this case.

17    Under an amended § 207, the Attorney General may, within numerical limits, permit aliens who are overseas to immigrate into the United States on the ground of their status as refugees under § 101(a)(42). 8 U.S.C. § 1157. Refugees admitted under § 207, after one year of residence and successful reinspection, attain permanent resident alien status under § 209 of the amended Act. 8 U.S.C. § 1159.

18   A new § 208(a) directed the Attorney General to establish procedures permitting aliens either in the United States or at our borders to apply for "asylum." 8 U.S.C. § 1158(a). Under § 208(a), in order to be eligible for asylum, an alien must meet the definition of "refugee" contained in § 101(a)(42)(A), a standard that also would qualify an alien seeking to immigrate under § 207. Meeting the definition of "refugee," however, does not entitle the alien to asylum—the decision to grant a particular application rests in the discretion of the Attorney General under § 208(a).

After passage of the Refugee Act, regulations relating to asylum previously contained in 8 CFR § 108 were repealed, and regulations were promulgated under the new § 208 of the Act. Those regulations, like the statute, expressly provide that a "well-founded fear of persecution" renders an alien eligible for a discretionary grant of asylum under § 208. 8 CFR § 208.5 (1983).

We note that when such asylum requests are made after the institution of deportation proceedings, they "shall also be considered as requests" under § 243(h). 8 CFR § 208.3(b) (1983) (emphasis supplied). This does not mean that the well-founded-fear standard is applicable to § 243(h) claims. Section 208.3(b) simply does not speak to the burden of proof issue; rather, it merely eliminates the need for filing a separate request for § 243(h) relief if a § 208 claim has been made. We further note that a § 243(h) request is not automatically also considered as a § 208 request under the regulations. Indeed, the alien may be barred from asserting a § 208 claim while still allowed to invoke § 243(h). See 8 CFR § 208.11 (1983).

19   The term "clear probability" was used interchangeably with "likelihood"; the use of the word "clear" appears to have been surplusage. We think there is no merit to the suggestion that the Board was applying a "clear and convincing" standard to the persecution issue. See generally Addington v. Texas, 441 U.S. 418, 423–425, 99 S.Ct. 1804, 1808–1809, 60 L.Ed.2d 323 (1979). The Board is, of course, quite familiar with the clear-and-convincing standard, since the Government is held to that standard in deportation proceedings. See Woodby v. INS, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966).

20   The House Judiciary Committee Report stated:

"Asylum and Withholding of Deportation

"Since 1968, the United States has been a party to the United States Refugee Protocol which incorporates the substance of the 1951 U.N. Convention of Refugees and which seeks to insure fair and humane treatment for refugees within the territory of the contracting states.

"Article 33 of the Convention, with certain exceptions, prohibits contracting states from expelling or returning a refugee to a territory where his or her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group or political opinion. The Committee Amendment conforms United States statutory law to our obligations under Article 33 in two of its provisions:

"(1) Asylum.—The Committee Amendment establishes for the first time a provision in Federal law specifically relating to asylum....

"Currently, United States asylum procedures are governed by regulations promulgated by the Attorney General under the authority of section 103 of the Immigration and Nationality Act (see 8 CFR 108), which grants the Attorney General authority to administer and enforce laws relating to immigration. No specific statutory basis for United States asylum policy currently exists. The asylum provision of this legislation would provide such a basis.

"The Committee wishes to insure a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law, and feels it is both necessary and desirable that United States domestic law include the asylum provision in the instant legislation....

"(2) Withholding of Deportation.—Related to Article 33 is the implementation of section 243(h) of the Immigration and Nationality Act. That section currently authorizes the Attorney General to withhold the deportation of any alien in the United States to any country where, in his opinion, the alien would be subject to persecution on account of race, religion, or political opinion.

"Although this section has been held by court and administrative decisions to accord to aliens the protection required under Article 33, the Committee feels it is desirable, for the sake of clarity, to conform the language of that section to the Convention. This legislation does so by prohibiting, with certain exceptions, the deportation of an alien to any country if the Attorney General determines that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion....

"As with the asylum provision, the Committee feels that the proposed change in section 243(h) is necessary so that U.S. statutory law clearly reflects our legal obligations under international agreements." H.R.Rep., at 17–18 (emphasis supplied).

21    "As amended by the Committee, the bill establishes an asylum provision in the Immigration and Nationality Act for the first time by improving and clarifying the procedures for determining asylum claims filed by aliens who are physically present in the United States. The substantive standard is not changed; asylum will continue to be granted only to those who qualify under the terms of the United Nations Protocol Relating to the Status of Refugees, to which the United States acceded in November [1968]." S.Rep. 9, U.S.Code Cong. & Admin.News 1980, p. 149.

22    Nor is there any merit to respondent's argument that this construction is inconsistent with the Protocol. Existing domestic statutory law in 1968 was largely consistent with the Protocol. Under the Protocol, however, attaining the status of "refugee" was essential in order for an alien to assert his right under Article 33 to avoid deportation, and then he was protected only against deportation to a territory where his "life or freedom" would be threatened. Under our statutory scheme, on the other hand, no alien in the United States would be deported to a country where he was likely to be "persecuted," a seemingly broader concept than threats to "life or freedom." In addition, the alien would qualify for withholding even if he might not be a "refugee" under the Protocol because, for example, he was not outside his country of nationality owing to a fear of persecution. Cf. 🔖 Rosenberg v. Yee Chien Woo, 402 U.S. 49, 57, 91 S.Ct. 1312, 1316, 28 L.Ed.2d 592 (1971). Moreover, the domestic statute and regulations provided many additional procedural safeguards as well, including a right to be represented by counsel and a right to judicial review.

While refugee status was not essential to avoid withholding of deportation, it was essential under domestic law to qualify for preferential immigration status. Our definition of a "refugee" under § 203(a)(7) was of course consistent with the Protocol. Indeed, the relevant statutory language virtually mirrored the Protocol definition. The geographic and ideological limitations were limits on admission. That was not inconsistent with the Protocol—the Protocol did not require admission at all, nor did it preclude a signatory from exercising judgment among classes of refugees within the Protocol definition in determining whom to admit. Article 34 merely called on nations to facilitate the admission of refugees to the extent possible; the language of Article 34 was precatory and not self-executing. The point is not, however, that the Senate was merely led to believe accession would work no substantial change in the law; the point is that it did not work a substantial change in the law.

There were of course differences between the Protocol and the text of domestic law. The most significant difference was that Article 33 gave the refugee an entitlement to avoid deportation to a country in which his life or freedom would be threatened, whereas domestic law merely provided the Attorney General with discretion to grant withholding of deportation on grounds of persecution. The Attorney General, however, could naturally accommodate the Protocol simply by exercising his discretion to grant such relief in each case in which the required showing was made, and hence no amendment of the existing statutory language was necessary. There were other differences between the Protocol and the text of domestic statutory law in 1968—e.g., the Protocol provides protection for those persecuted on grounds of nationality and membership in social groups, as well as race, religion, or political opinion. Given our existing statutory provisions, and the considerable discretion an administrator such as the Attorney General possesses in interpreting and implementing such statutory provisions, once again, no amendment of the statute was necessary. Finally, the Protocol required a showing that the "refugee's life or freedom would be threatened", while § 243(h) required that the alien would be subject to "persecution." Although one might argue that the concept of "persecution"

is broad enough to encompass matters other than threats to "life or freedom"—deprivations of property, for example—and therefore that the Protocol was narrower than the coverage of the section, we perceive no basis for concluding that the particular mention of the alien's interest in "life or freedom" made the Protocol any more generous than domestic law.

In summary, then, to the extent that domestic law was more generous than the Protocol, the Attorney General would not alter existing practice; to the extent that the Protocol was more generous than the bare text of § 243(h) would necessarily require, the Attorney General would honor the requirements of the Protocol and hence there was no need for modifying the language of § 243(h) itself. As the Secretary of State correctly explained at the time of consideration of the Protocol: "[F]oremost among the rights which the Protocol would guarantee to refugees is the prohibition (under Article 33 of the Convention) against their expulsion or return to any country in which their life or freedom would be threatened. This article is comparable to Section 243(h) of the Immigration and Nationality Act ... and it can be implemented within the administrative discretion provided by existing regulations." S.Exec. K, 90th Cong., 2d Sess., VIII (1968).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

19 Cal. Daily Op. Serv. 1237, 2019 Daily Journal D.A.R. 923

914 F.3d 1249
United States Court of Appeals, Ninth Circuit.

Antonio ISLAS-VELOZ, AKA
Antonio Islas, Petitioner,
v.
Matthew G. WHITAKER, Acting
Attorney General, Respondent.

No. 15-73120
|
Filed February 4, 2019
|
Submitted August 27, 2018 * Seattle, Washington

**Synopsis**
**Background:** Alien filed petition for review of Board of Immigration Appeals' (BIA) order dismissing his appeal of immigration judge's (IJ) order finding him removable.

**Holdings:** The Court of Appeals, McKeown, Circuit Judge, held that:

[1] phrase "crime involving moral turpitude" was not unconstitutionally vague, and

[2] alien's Washington conviction for communicating with minor for immoral purposes was "crime of moral turpitude."

Motion denied.

W. Fletcher, Circuit Judge, concurred and filed opinion.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (2)

[1] **Aliens, Immigration, and Citizenship** ⚖ Validity
**Constitutional Law** ⚖ Admission and exclusion; deportation
Phrase "crime involving moral turpitude," as used in Immigration and Nationality Act (INA) provision making aliens convicted of crimes

involving moral turpitude removable, was not unconstitutionally vague, in violation of due process. U.S. Const. Amend. 5; Immigration and Nationality Act § 237, 📄 8 U.S.C.A. § 1227(a)(2)(A)(i).

8 Cases that cite this headnote

[2] **Aliens, Immigration, and Citizenship** ⚖ Crimes of moral turpitude in general
Alien's Washington conviction for communicating with minor for immoral purposes was "crime of moral turpitude," thus rendering him removable. Immigration and Nationality Act § 237, 📄 8 U.S.C.A. § 1227(a)(2)(A)(i); Wash. Rev. Code Ann. § 9.68A.090.

5 Cases that cite this headnote

**\*1250** On Petition for Review of an Order of the Board of Immigration Appeals, Agency No. AXXX-XX9-672

**Attorneys and Law Firms**

Manuel Rios, Rios & Cruz P.S., Seattle, Washington, for Petitioner.

Laura M.L. Maroldy, Trial Attorney; John S. Hogan, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Before: Michael Daly Hawkins, M. Margaret McKeown, and William A. Fletcher, Circuit Judges.

Concurrence by Judge W. Fletcher

**OPINION**

McKEOWN, Circuit Judge:

Antonio Islas-Veloz petitions for review of a final order of removal following the dismissal of his appeal by the Board of Immigration Appeals ("BIA"). We conclude that Supreme Court and circuit precedents require us to deny the petition.

Islas-Veloz was convicted of communication with a minor for immoral purposes in violation of Revised Code of Washington ("RCW") § 9.68A.090. An immigration judge found that Islas-Veloz's conviction constituted a crime involving moral turpitude committed within five years of admission to the United States and found him removable on that basis. *See* 8 U.S.C. § 1227(a)(2)(A)(i). The BIA dismissed Islas-Veloz's appeal, ruling that communication with a minor for immoral purposes in violation of RCW § 9.68A.090 was categorically a crime involving moral turpitude.

[1] Islas-Veloz argues that the phrase "crime involving moral turpitude" is unconstitutionally vague in light of the Supreme Court's decisions in *Johnson v. United States,* — U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), and *Sessions v. Dimaya,* — U.S. ——, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018). In the alternative, he claims that the crime of "communication with [a] minor for immoral purposes" in violation of RCW § 9.68A.090 is not categorically a crime of moral turpitude, and hence that his final order of removal is invalid.

In assessing the constitutional status of the phrase "crime involving moral turpitude," we remain bound by the Supreme Court's decision in *Jordan v. De George,* 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951). In *De George,* the Court held that the phrase "crime involving moral turpitude" was not unconstitutionally vague. *Id.* at 231–32, 71 S.Ct. 703. The Court's more recent decisions in *Johnson* and *Dimaya* did not reopen inquiry into the constitutionality of the phrase. Notably, *Dimaya* acknowledged that the Court in *De George* had "ultimately uph[e]ld" the phrase "crime involving moral turpitude" against **\*1251** an unconstitutional vagueness attack. *Dimaya,* 138 S.Ct. at 1213.

We have repeatedly echoed the holding that the Supreme Court laid down in *De George.* In *Tseung Chu v. Cornell,* we cited *De George* in ruling that the phrase "crime involving moral turpitude" was constitutional. 247 F.2d 929, 938–39 (9th Cir. 1957). More recently, in *Martinez-*

*De Ryan v. Sessions,* we again held that the phrase is not unconstitutionally vague. 895 F.3d 1191, 1194 (9th Cir. 2018); *see also Olivas-Motta v. Whitaker,* 910 F.3d 1271, 1281 (9th Cir. 2018). *De Ryan* explicitly addressed *Sessions v. Dimaya,* explaining that the Supreme Court's opinion in that case did not change the constitutional status of the phrase. *See* 895 F.3d at 1193–94. As the concurrence acknowledges, our precedent cannot be read differently.

[2] Islas-Veloz's alternate claim that communicating with a minor for immoral purposes is not a crime of moral turpitude is foreclosed by our decision in *Morales v. Gonzales,* 478 F.3d 972 (9th Cir. 2007), *abrogated on other grounds in Anaya-Ortiz v. Holder,* 594 F.3d 673, 677–78 (9th Cir. 2010). In *Morales,* we "conclude[d] that [a] conviction for communication with a minor for immoral purposes" constitutes a crime of moral turpitude. *Id.* at 978. We elaborated: "The full range of conduct prohibited by section 9.68A.090 of the Revised Code of Washington categorically constitutes a crime involving moral turpitude." *Id.*

Apart from any ongoing debate about the degree of ambiguity inherent in the phrase "crime involving moral turpitude," these precedents are directly on point, bind us here, and foreclose Islas-Veloz's arguments.

**PETITION DENIED.**

W. FLETCHER, Circuit Judge, concurring:
We are bound by our court's precedent in *Martinez-De Ryan v. Whitaker,* 909 F.3d 247 (9th Cir. 2018), and I therefore concur in the panel's opinion. However, I write separately because the Supreme Court's recent decisions in *Johnson v. United States,* — U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), and *Sessions v. Dimaya,* — U.S. ——, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018), should lead us, were we not bound, to conclude that the phrase "crime involving moral turpitude" is unconstitutionally vague when used as the basis for removal of a noncitizen. *See* 8 U.S.C. § 1227(a)(2)(A) (i)-(ii).

I. "Moral Turpitude" in Immigration Law

The Immigration and Nationality Act ("INA") imposes severe penalties on noncitizens convicted of a "crime involving moral turpitude" ("CIMT"). *See* 8 U.S.C. §§ 1182(a)(2)(A) (inadmissibility), 1227(a)(2)(A)(i)-(ii) (removal), 1229b(b)(1)(C) (ineligibility for cancellation of removal and adjustment of status). Section 1227(a)(2)(A)(i)–(ii) renders removable any noncitizen who is (a) convicted of a "crime involving moral turpitude" within four years of entry for which a sentence of one year or more is imposed or, (b) convicted of any two "crimes involving moral turpitude" at any time after entry, regardless of sentence length or type. The noncitizen is also ineligible for cancellation of removal. 8 U.S.C. § 1229b(b)(1)(C). "[R]emoval is a virtual certainty" no matter how long an individual may have previously resided in the United States. *Dimaya*, 138 S.Ct. at 1211.

In recent years, the United States has deported many tens of thousands of noncitizens under § 1227(a)(2)(A) after having been convicted of CIMTs. *See* Transactional **\*1252** Records Access Clearinghouse, *Individuals Charged with Moral Turpitude in Immigration Court*, SYRACUSE UNIV. (last accessed Dec. 21, 2018), http://trac.syr.edu/immigration/reports/moral_turp.html (collecting data that shows that from 1996-2006 the United States brought removal proceedings against over 135,000 noncitizens for "crimes involving moral turpitude"); Transactional Records Access Clearinghouse, *Immigration Court Post-Trump Cases: Latest Data*, SYRACUSE UNIV., tbl. 6 (March 21, 2017), http://trac.syr.edu/immigration/reports/462/ (collecting data from 2012 to 2017).

The term "moral turpitude" first appeared in federal immigration law in 1891, when Congress barred entry to persons "who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude." Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084. Sixteen years later, "Congress expanded the class of excluded persons to include individuals who 'admit' to having committed a crime of moral turpitude." *Padilla v. Kentucky*, 559 U.S. 356, 361 n.2, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) (citing Act of Feb. 20, 1907, ch. 1134, § 2, 34 Stat. 899). Ten years later, in the Immigration Act of 1917, Congress "rendered deportable" noncitizens who are "sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years" of entry and "noncitizen recidivists who commit two or more crimes of moral turpitude at any time

after entry." *Id.* at 361, 130 S.Ct. 1473 (citing Immigration Act of 1917, ch. 29, § 19, 39 Stat. 889). The INA, enacted in 1952 and amended thereafter, included these same penalties. In none of those statutes has Congress defined the term "moral turpitude." *Id.*

## II. Void for Vagueness

In two recent cases, the Supreme Court has revitalized the void-for-vagueness doctrine in both criminal and civil cases.

First, in *Johnson v. United States*, —— U.S. ——, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), the Court upheld a vagueness challenge to a provision of the Armed Career Criminal Act ("ACCA"). Federal criminal law prohibits convicted felons from possessing firearms. 18 U.S.C. § 922(g). If a felon convicted under § 922(g) has previously been convicted of three or more "serious drug offenses" or "violent felonies," the ACCA increases the prison term by a minimum of fifteen years and a maximum of life. *Id.* at § 924(e)(1). The ACCA defines "violent felony" as a crime punishable by a term exceeding a year that (i) either has as an element the actual, attempted or threatened use of force or (ii) "is burglary, arson, or extortion, involves the use of explosives, *or otherwise involves conduct that presents a serious risk of physical injury to another*." *Id.* at § 924(e)(2)(B) (emphasis added). The italicized language is the ACCA's "residual clause."

In an opinion by Justice Scalia, the Court held the residual clause unconstitutionally vague. The Court wrote, "Two features of the residual clause conspire to make it unconstitutionally vague." *Johnson*, 135 S.Ct. at 2557. First, the clause "leaves grave uncertainty about how to estimate the risk posed by a crime." *Id.* Second, the clause "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558. The combination produced "more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at 2557.

The Court described, and lamented, four recent cases in which it had reached disparate results under the ACCA residual clause: "[T]his Court's repeated attempts and repeated failures to craft a principled **\*1253** and objective standard out of the residual clause confirm its hopeless indeterminancy." *Id.*

at 2558. The Court pointed out that, in addition to its own disparate results, the residual clause had " 'created numerous splits among the lower federal courts,' where it has proved 'nearly impossible to apply consistently.' " *Id.* at 2559–60 (quoting *Chambers v. United States*, 555 U.S. 122, 133, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009) (Alito, J., concurring in judgment) ). The Court concluded:

> Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise.... Invoking so shapeless a provision to condemn someone to prison for fifteen years to life does not comport with the Constitution's guarantee of due process.

*Id.* at 2560.

Second, in *Sessions v. Dimaya*, ––– U.S. ––––, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018), the Court upheld a vagueness challenge to a provision of the INA. The INA renders deportable (or "removable") a noncitizen convicted of an "aggravated felony" committed after entering the United States. 8 U.S.C. § 1227(a)(2)(A)(iii). The noncitizen is also ineligible, by virtue of the aggravated felony, for cancellation of removal. *See id.* §§ 1229b(a)(3), (b)(1)(C). The INA defines "aggravated felony" to include a felony "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 8 U.S.C. § 16(b). The language just quoted is the INA's "residual clause."

Justice Kagan, writing for the Court, held the INA's residual clause unconstitutionally vague: "Section 16's residual clause violates [the] promise [of the due process clause] in just the same way" as the residual clause of the ACCA held unconstitutional in *Johnson*. *Dimaya*, 138 S.Ct. at 1215. "The result is that § 16(b) produces, just as ACCA's residual clause did, 'more unpredictability and arbitrariness than the Due Process Clause tolerates.' " *Id.* at 1216 (quoting *Johnson*, 135 S.Ct. at 2558).

Writing for a plurality of four, Justice Kagan acknowledged that "removal of an alien is a civil matter." *Id.* at 1213. She nonetheless applied the same test to the INA the Court had applied to the ACCA in *Johnson*. "[W]e long ago held that the most exacting vagueness standard should apply in removal cases." *Id.* (citing *Jordan v. De George*, 341 U.S. 223, 229, 71 S.Ct. 703, 95 L.Ed. 886 (1951) ). She continued, "Nothing in the ensuing years calls that reasoning into question. To the contrary, this Court has reiterated that deportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence.' " *Id.* (quoting *Jae Lee v. United States*, –––– U.S. ––––, 137 S.Ct. 1958, 1968, 198 L.Ed.2d 476 (2017) ). Justice Gorsuch did not join the portion of Justice Kagan's opinion justifying the application of the "most exacting vagueness standard" in removal cases. He wrote separately, agreeing that the "exacting vagueness standard" should apply in removal cases, but indicating he would apply it in civil cases more broadly. *Id.* at 1231 (Gorsuch, J., concurring). Combining Justice Kagan's and Justice Gorsuch's opinions, a majority of the Court concluded that the "exacting vagueness standard" applicable in criminal cases applies, at the very least, in removal cases under the INA.

### III. Vagueness of "Crime Involving Moral Turpitude"

#### A. *Jordan v. De George*

Almost seventy years ago in *Jordan v. De George*, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951), the Supreme Court upheld **\*1254** a deportation order under the Immigration Act of 1917, based on convictions for crimes involving moral turpitude. De George was an Italian citizen who had lived continuously in the United States for twenty-nine years, and who had been twice convicted of fraudulently avoiding federal taxes on "distilled spirits." *De George*, 341 U.S. at 224–25, 71 S.Ct. 703. The Court of Appeals for the Seventh Circuit held that tax fraud was not a CIMT and set aside the deportation order. *Id.* at 226, 71 S.Ct. 703. The Supreme Court reversed, holding that fraud was a CIMT and upholding the deportation.

19 Cal. Daily Op. Serv. 1237, 2019 Daily Journal D.A.R. 923

The Court wrote that "[t]he question of vagueness was not raised by the parties nor argued before this Court," *id.* at 229, 71 S.Ct. 703, but it addressed the question anyway, in response to three dissenting justices. The Court noted that it had previously upheld a deportation order premised on a conviction for a CIMT when the noncitizen had been convicted of counterfeiting with an intent to defraud. *See United States ex rel. Volpe v. Smith,* 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298 (1933). The Court emphasized that the deportation at issue in the case before it, as in *Volpe,* was based on a conviction for fraud:

> Fraud is the touchstone by which this case should be judged. The phrase "crime involving moral turpitude" has without exception been construed to embrace fraudulent conduct. We therefore decide that Congress sufficiently forewarned respondent that the statutory consequence of twice conspiring to defraud the United States is deportation.

*Id.* at 232, 71 S.Ct. 703.

The Court wrote that there might be some "marginal offenses" or "peripheral cases" that might (or might not) be encompassed within the phrase "crimes involving moral turpitude." *Id.* at 231–32, 71 S.Ct. 703. However, "difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness." *Id.* at 231, 71 S.Ct. 703. "Whatever else the phrase 'crime involving moral turpitude' may mean in peripheral cases, the decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude." *Id.* at 232, 71 S.Ct. 703.

Justice Jackson, joined by Justices Black and Frankfurter, dissented. He wrote, "What the Government seeks, and what the Court cannot give, is a basic definition of 'moral turpitude' to guide administrators and lower courts." *Id.* at 233, 71 S.Ct. 703 (Jackson, J., dissenting). He continued:

Congress did not see fit to state what meaning it attributes to the phrase "crime involving moral turpitude." It is not one which has settled significance from being words of art in the profession. If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and moral turpitude seems to mean little more than morally immoral. The Government confesses that it is a "term that is not clearly defined," and says: "The various definitions of moral turpitude provide no exact test by which we can classify the specific offenses here involved.

Except for the Court's opinion, there appears to be universal recognition that we have here an undefined and undefinable standard.

*Id.* at 234–35, 71 S.Ct. 703.

B. Void for Vagueness

1. Questions Today

There are two questions before us today, almost seventy years after the Court's decision in *De George.*

**\*1255** First, the Court in *De George* concluded that the only cases in which the meaning of "crime involving moral turpitude" might have been impermissibly vague were "marginal offenses" or "peripheral cases." Whether at the time *De George* was decided such cases were, in fact, merely "marginal" or "peripheral," I need not consider. The question today is whether non-fraud cases are still so few—so marginal or peripheral—that they need not concern us.

Second, the Court in *De George* did not quarrel with Justice Jackson's conclusion that the definition of "crimes involving moral turpitude" in non-fraud cases was unconstitutionally vague. The question today is whether, in the time since the Court's decision in *De George,* judicial construction has clarified the definition in non-fraud cases.

The answer to both questions is clear. Non-fraud CIMTs today are neither marginal nor peripheral, and the definition of non-fraud CIMTs is as vague today as it was in 1951.

2. The Reality Today

Our circuit acknowledges the distinction between fraud and non-fraud cases, dividing CIMTs into two categories, " 'those involving fraud and those involving grave acts of baseness or depravity.' " *Marmolejo-Campos v. Holder*, 558 F.3d 903, 910 (9th Cir. 2009) (en banc) (quoting *Carty v. Ashcroft*, 395 F.3d 1081, 1083 (9th Cir. 2005) ); *see also, e.g.*, *Menendez v. Whitaker*, 908 F.3d 467, 472–73 (9th Cir. 2018) ("We have traditionally identified two different types of crimes involving moral turpitude: 'those involving fraud and those involving grave acts of baseness or depravity.' " (quoting *Carty*, 395 F.3d at 1083) ); *Mancilla-Delafuente v. Lynch*, 804 F.3d 1262, 1265 (9th Cir. 2015) ("There are two types of possible CIMTs: those involving fraud and those involving grave acts of baseness or depravity." (internal quotation omitted) ); *Robles-Urrea v. Holder*, 678 F.3d 702, 708 (9th Cir. 2012) ("Such crimes are of two types: those involving fraud and those involving grave acts of baseness or depravity.").

Our sister circuits and the Board of Immigration Appeals ("BIA") consistently define moral turpitude as conduct that is "base, vile, and depraved," and recognize that fraud is always a CIMT. *See, e.g.*, *Chiao Fang Ku v. Attorney Gen. United States of Am.*, 912 F.3d 133 (3d Cir. 2019) ("Courts have long treated fraud crimes as 'involving moral turpitude.' " (citing *De George*, 341 U.S. at 232, 71 S.Ct. 703) ); *Pierre v. U.S. Attorney Gen.*, 879 F.3d 1241, 1251 (11th Cir. 2018) ("Whether a crime involves the depravity or fraud necessary to be one of moral turpitude depends upon the inherent nature of the offense...." (internal citations omitted) ); *Guevara-Solorzano v. Sessions*, 891 F.3d 125, 135 (4th Cir. 2018) ("A CIMT is a crime that is 'inherently base, vile, or depraved,' meaning that it involves conduct 'that not only violates a statute but also independently violates a moral norm.' " (citation omitted) ); *Baptiste v. Attorney Gen.*, 841 F.3d 601, 621 (3d Cir. 2016) (defining morally turpitudinous conduct as "inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed other persons" (citation omitted) ); *Arias v. Lynch*, 834 F.3d 823, 826 (7th Cir. 2016) ("The Board has defined a crime involving moral turpitude as 'conduct that shocks the public conscience as being inherently base, vile, or depraved,

and contrary *1256 to the accepted rules of morality and the duties owed between persons or to society in general.' We have adopted definitions substantively in line with the Board's." (internal citation omitted) ); *Mejia v. Holder*, 756 F.3d 64, 68 (1st Cir. 2014) (defining CIMT as "conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general" (citation omitted) ); *Efstathiadis v. Holder*, 752 F.3d 591, 595 (2d Cir. 2014) ("Whether a prior conviction constitutes a CIMT turns on whether the crime is 'inherently base, vile, or depraved.' " (citation omitted) ); *Yeremin v. Holder*, 738 F.3d 708, 714 (6th Cir. 2013) ("The term 'refers generally to conduct that is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.' ... Crimes that involve deception or fraud consistently are held to qualify as crimes involving moral turpitude." (citation omitted) );

*Marin-Rodriguez v. Holder*, 710 F.3d 734, 738 (7th Cir. 2013) ("Crimes entailing an intent to deceive or defraud are unquestionably morally turpitudinous."); *Rodriguez-Heredia v. Holder*, 639 F.3d 1264, 1268 (10th Cir. 2011) ("Although 'crime involving moral turpitude' is not defined by statute, we have said that 'moral turpitude refers to conduct which is inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed between man and man, either one's fellow man or society in general.' Applying this concept, we have followed Supreme Court precedent making it 'plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude.' " (internal citations omitted) ); *Guardado-Garcia v. Holder*, 615 F.3d 900, 902 (8th Cir. 2010) ("Crimes involving moral turpitude have been held to require conduct 'that is inherently base, vile, or depraved, and contrary to accepted rules of morality and the duties owed between persons or to society in general.' 'Crimes involving the intent to deceive or defraud are generally considered to involve moral turpitude.' " (internal citations omitted) ); *Hyder v. Keisler*, 506 F.3d 388, 391 (5th Cir. 2007) (" 'Moral turpitude refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.' ... We have repeatedly emphasized that crimes whose essential elements involve fraud or deception tend to be CIMTs." (internal citations omitted) ); *Matter of Zaragoza-Vaquero*, 26 I. & N. Dec. 814, 815–16 (BIA 2016) ("Moral turpitude refers generally to conduct that shocks the public conscience as being inherently

base, vile, or depraved, and contrary to accepted rules of morality and the duties owed between persons or to society in general. ... Crimes that require intent to defraud are [ ] crimes involving moral turpitude."); *Matter of Flores*, 17 I. & N. Dec. 225, 227–28 (BIA 1980) ("Moral turpitude is a nebulous concept which refers generally to conduct which is inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed between man and man, either one's fellow man or society in general.... The most frequently cited definition of moral turpitude was given by the Supreme Court in *Jordan v. De George*, 341 U.S. 223, 232, 71 S.Ct. 703, 95 L.Ed. 886 (1951), where it was stated: 'Whatever else the phrase crime involving moral turpitude may mean in peripheral cases, the decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude.' "); *Matter of E———*, 2 I. & N. Dec. 134, 140 (BIA 1944) ("[A] crime involves moral turpitude when its nature is such that it manifests upon the part of its perpetrator personal depravity or baseness.").

If CIMTs were restricted to fraud, there would be no constitutional difficulty. But in the decades after *De George* was decided, courts and administrators significantly expanded the conduct that qualifies as "base, vile, or depraved" and, therefore, "morally turpitudinous." Far from being marginal or peripheral, non-fraud cases now comprise **\*1257** the great bulk of CIMTs today. And the definition of non-fraud CIMTs continues to be hopelessly and irredeemably vague.

In a recent law review article, Professor Simon-Kerr provided a number of examples that show both the breadth of the CIMT category and the vagueness of the definition of non-fraud CIMTs. Citing cases, she wrote, "Moral turpitude jurisprudence today suggests that society condemns as immoral the petty thief, but not the person who attacks a police officer." Julia Ann Simon-Kerr, *Moral Turpitude*, 2012 UTAH L. REV. 1001, 1005 (2012). *Compare Michel v. I.N.S.*, 206 F.3d 253, 261 (2d Cir. 2000) (holding that petty theft for stolen bus transfers is a CIMT), *with Zaranska v. U.S. Dep't of Homeland Sec.*, 400 F.Supp.2d 500, 511, 514 (E.D.N.Y. 2005) (holding that second degree assault on police officer is not a CIMT). " '[A]ggravated fleeing' is inherently base, vile, and depraved, while some forms of aggravated assault do not violate community norms of morality." Simon-Kerr, *Moral Turpitude*, *supra*, at 1005. *Compare Mei v. Ashcroft*, 393 F.3d 737, 741–42 (7th Cir. 2004) (aggravated

fleeing), *with Carr v. I.N.S.*, 86 F.3d 949, 950–51 (9th Cir. 1996) (aggravated assault). *See also Alonzo v. Lynch*, 821 F.3d 951, 958 (8th Cir. 2016) ("Assault may or may not involve moral turpitude." (citation omitted) ); *Zaranska*, 400 F.Supp.2d at 514 ("[A]ccording to the BIA, simple assault is not a crime of moral turpitude, but assault with a deadly weapon is; a conviction for misconduct that caused bodily injury is not a crime of moral turpitude, but where the conduct caused serious bodily injury, it is."). "Drunk driving repeatedly is deemed not to involve moral turpitude, but drunk driving with a suspended license is assessed differently." Simon-Kerr, *Moral Turpitude*, *supra*, at 1005. *Compare In re Torres-Varela*, 23 I. & N. Dec. 78, 83–84 (BIA 2001) (en banc) (drunk driving repeatedly), *with Marmolejo-Campos v. Holder*, 558 F.3d 903, 917 (9th Cir. 2009) (en banc) (drunk driving with suspended license).

More examples are easy to find. Some convictions under state hit-and-run statutes are crimes involving moral turpitude while other convictions are not. *See Orosco v. Holder*, 396 Fed. App'x 50, 52–55 (5th Cir. 2010) (failure to report an accident where no injury resulted is not a CIMT); *Latu v. Mukasey*, 547 F.3d 1070, 1073–76 (9th Cir. 2008) (a driver who stops and renders aid but fails to give requisite information to police had not committed a CIMT); *Cerezo v. Mukasey*, 512 F.3d 1163 (9th Cir. 2008) (a conviction under a California hit-and-run statute is not a conviction for a CIMT, but leaving the scene of an accident is a CIMT); *Garcia-Maldonado v. Gonzales*, 491 F.3d 284 (5th Cir. 2007) (a conviction under a Texas hit-and-run statute is a conviction for a CIMT). Citing cases, Kornegay and Professor Lee have provided still more examples. They wrote, "Among the offenses that may or may not be [crimes involving moral turpitude] are manslaughter, fraud, sex offenses against children, child abandonment and child abuse, indecent exposure, assault, misprision of felony, false statements, and driving under the influence." Lindsay M. Kornegay & Evan Tsen Lee, *Why Deporting Immigrants for "Crimes Involving Moral Turpitude" Is Now Unconstitutional*, 13 DUKE J. CONST. L. & PUB. POL'Y 47, 61–63 (2017).

Modern federal courts and the BIA have repeatedly complained that the definition of CIMTs is vague. A sample of such complaints includes *Menendez v. Whitaker*, 908

F.3d 467, 472 (9th Cir. 2018) (stating that "[t]he meaning of the term falls well short of clarity" (citation omitted) ); *Arias v. Lynch*, 834 F.3d 823, 830, 835 (7th Cir. 2016) (Posner, J., concurring) (calling CIMT a "stale, antiquated, and, worse, meaningless phrase," a "vague[ ]" phrase, **\*1258** "rife with contradiction, a fossil, [and] an embarrassment to a modern legal system," and discussing "remarkable dissent by Justice Jackson" in *De George*, which "exposed [the] emptiness" of the moral turpitude concept); *Bobadilla v. Holder*, 679 F.3d 1052, 1053–54 (8th Cir. 2012) (calling it a "murky statutory standard" and stating, "[w]ithout question, the term [CIMT] is ambiguous."); *Marmolejo-Campos*, 558 F.3d at 909 (" 'Moral turpitude' is perhaps the quintessential example of an ambiguous phrase."); *Ali v. Mukasey*, 521 F.3d 737, 739 (7th Cir. 2008) (calling moral turpitude a "notoriously plastic" concept); *Garcia-Meza v. Mukasey*, 516 F.3d 535, 536 (7th Cir. 2008) (calling the standard "notoriously baffling"); *Franklin v. INS*, 72 F.3d 571, 573 (8th Cir. 1995) ("[M]oral turpitude is a nebulous concept and there is ample room for differing definitions of the term.");

*Zaranska*, 400 F.Supp.2d at 513–14 (" 'Moral turpitude' historically has referred to conduct which is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general. In other words, there is no useful definition for the term." (internal quotations omitted) ); *In re Lopez-Meza*, 22 I. & N. Dec. 1188, 1191 (BIA 1999) ("[B]oth the courts and this Board have referred to moral turpitude as a 'nebulous concept' with ample room for differing definitions of the term.... Under this standard, the nature of a crime is measured against contemporary moral standards and may be susceptible to change based on the prevailing views in society."); *Matter of Short*, 20 I. & N. Dec. 136, 139 (BIA 1989) (describing "moral turpitude" as a "nebulous concept"); *Matter of McNaughton*, 16 I. & N. Dec. 569, 574 (BIA 1978) (describing moral turpitude as a "vague" term).

Despite many years of trying, courts and administrators have not been able to establish coherent criteria. *See* *Nunez v. Holder*, 594 F.3d 1124, 1130 (9th Cir. 2010) ("We have previously discussed at some length the inherent ambiguity of the phrase 'moral turpitude' and the consistent failure of either the BIA or our own court to establish any coherent criteria for determining which crimes fall within that classification and which crimes do not."); *Marmolejo-*

*Campos v. Holder*, 558 F.3d 903, 921 (9th Cir. 2009) (en banc) (Berzon, J., dissenting) ("[T]he BIA's precedential case law regarding the meaning of the phrase 'crime involving moral turpitude' ... is a mess of conflicting authority."); *Nicanor-Romero v. Mukasey*, 523 F.3d 992, 997–99 (9th Cir. 2008), *overruled on other grounds by* *Marmolejo-Campos*, 558 F.3d 903 (summarizing Ninth Circuit law on moral turpitude and recognizing that "[w]e have not relied on a consistent or easily applied set of criteria" to identify crimes of moral turpitude); *Partyka v. Attorney General*, 417 F.3d 408, 409 (3d Cir. 2005) (calling moral turpitude jurisprudence an "amorphous morass"); *Mei v. Ashcroft*, 393 F.3d 737, 739–41 (7th Cir. 2004) ("Since Congress did not define 'crime involving moral turpitude' when it inserted the term in the immigration statute, and the term had no settled meaning at the time (and has none still), it is reasonable to suppose ala *Chevron* that Congress contemplated that the agency charged with administering the statute would define the term, and specifically would tailor the definition to the policies embodied in the immigration statutes. The Board of Immigration Appeals has done neither.... [T]he Board hasn't done anything to particularize the meaning of 'crime involving moral turpitude'... The Board should not be blamed too harshly [for widely varying results in what is considered a CIMT]; courts have equally failed to impart a clear meaning to 'moral turpitude.' Time has only confirmed Justice Jackson's powerful dissent in the *De George* case, in which he called 'moral **\*1259** turpitude' an 'undefined and undefinable standard.' The term may well have outlived its usefulness." (internal citation omitted));

*Tseung Chu v. Cornell*, 247 F.2d 929, 933 (9th Cir. 1957) ("We are not unmindful of the myriad decisions sponsoring various concepts of moral turpitude. They offer no well settled criteria."); *see also* *De George*, 341 U.S. at 239–40, 71 S.Ct. 703 (Jackson, J., dissenting) ("No one can read this body of opinions and feel that its application represents a satisfying, rational process. If any consistent pattern of application or consensus of meaning could be distilled from judicial decision, neither the Government nor the Court spells it out. Irrationality is inherent in the task of translating the religious and ethical connotations of the phrase into legal decisions. The lower court cases seem to rest, as we feel this Court's decision does, upon the moral reactions of particular judges to particular offenses.").

AR.05099

Justice Alito, joined by Chief Justice Roberts, recently echoed these complaints in 📄 *Padilla*, arguing that an attorney did not provide ineffective assistance of counsel when he failed to determine whether a particular offense was a CIMT. Justice Alito listed a number offenses that may or may not be crimes involving moral turpitude (citing R. McWhirter, ABA, *The Criminal Lawyer's Guide to Immigration Law: Questions and Answers* 134 (2d ed. 2006) ):

> *See* [McWhirter] at 134 ("Writing bad checks *may or may not* be a CIMT" (emphasis added) ); *ibid.* ("[R]eckless assault coupled with an element of injury, but not serious injury, is *probably* not a CIMT" (emphasis added) ); *id.* at 135 (misdemeanor driving under the influence is generally not a CIMT, but may be a CIMT if the DUI results in injury or if the driver knew that his license had been suspended or revoked); *id.* at 136 ("If there is no element of actual injury, the endangerment offense *may* not be a CIMT" (emphasis added) ); *ibid.* ("Whether [a child abuse] conviction involves moral turpitude *may* depend on the subsection under which the individual is convicted. Child abuse done with criminal negligence *probably* is not a CIMT" (emphasis added) ).

📄 *Padilla*, 559 U.S. at 379, 130 S.Ct. 1473 (Alito, J., concurring).

### 3. Recent Example

A recent decision of our court illustrates Justice Alito's point. Manuel Olivas-Motta was legally present in the United States as a noncitizen lawful permanent resident. *Olivas-Motta v. Whitaker*, 910 F.3d 1271, 1283 (9th Cir. 2018) (Watford, J., dissenting). He had been brought to the United States in 1976 by his parents when he was ten days old. *Id.* He was married to a United States citizen and had two citizen children. *Id.* Most of his extended family lived in the United States as either citizens or lawful permanent residents. *Id.*

Olivas-Motta was charged under Arizona law with aggravated assault and attempted murder. *Id.* If he had been convicted as charged, the conviction would have rendered him removable. *Id.* Olivas-Motta contended that he was innocent of the charges, but he was willing to plead guilty to "reckless endangerment" rather than go to trial if he could be assured that reckless endangerment was not a CIMT. *Id.* Olivas-Motta's attorney consulted with an experienced immigration attorney who advised that in all likelihood

reckless endangerment under Arizona law was not a CIMT. *Id.* The attorney's advice was based on two non-precedential decisions by the BIA that had specifically held that reckless endangerment in Arizona was not a CIMT. Olivas-Motta relied on the immigration attorney's advice, and he pleaded guilty to reckless endangerment. *Id.* at 1284.

**\*1260** Five years after Olivas-Motta's guilty plea, the BIA changed course. In *Matter of Leal*, 26 I. & N. Dec. 20 (BIA 2012), *aff'd sub nom. Leal v. Holder*, 771 F.3d 1140 (9th Cir. 2014), the BIA abandoned the position taken in its two prior decisions, now holding that reckless endangerment under Arizona law is a CIMT. Based on its decision in *Matter of Leal*, the BIA ordered Olivas-Motta removed because he had been convicted of two CIMTs. *Id.* at 1275. Over a dissent by Judge Watford, we denied Olivas-Motta's petition for review. *Id.*

### 4. State Courts' Experience

Use of the phrase "moral turpitude" under state law has increasingly been abandoned or forbidden. Starting in the 19th and 20th centuries, states used the term "moral turpitude" as a criterion to disqualify and impeach witnesses, to decide whether certain language is slanderous, to disenfranchise voters, and to disbar attorneys and revoke medical licenses, among other applications. *See* 📄 *De George*, 341 U.S. at 227, 71 S.Ct. 703 (discussing use of the term in other contexts); Simon-Kerr, *Moral Turpitude*, *supra* (same). Seventy years ago in 📄 *De George*, the majority began its discussion by recognizing this history, stating that "[t]he term 'moral turpitude' has deep roots in the law." *De George*, 341 U.S. at 227, 71 S.Ct. 703. Citing states' use of the phrase in other, non-immigration contexts, the Court reasoned, "In deciding the case before the Court, we look to the manner in which the term 'moral turpitude' has been applied by judicial decision." 📄 *Id.* Finding that, "[w]ithout exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude," the Court went on to hold that fraud was a CIMT. 📄 *Id.*

But in the decades since 📄 *De George*, many states have discontinued use of the phrase "moral turpitude" in various contexts. *See, e.g.,* Simon-Kerr, *Moral Turpitude*, *supra*, at 1040–44. For example, citing the phrase's vagueness and

the resulting inconsistent rulings, the vast majority of states have abandoned use of the phrase "moral turpitude" in the context of witness impeachment. *See* Simon-Kerr, *Moral Turpitude*, *supra*, at 1033–39; *see also, e.g.,* 📑 *State v. Morgan,* 541 S.W.2d 385, 388 (Tenn. 1976) (reasoning that judges faced great "difficulty" in "applying a test that is vague and cannot be explicitly defined," that the dictionary definition of "moral turpitude" had provided no guidance, and that the standard had produced inconsistent rulings);

📑 *Tucker v. Lower,* 200 Kan. 1, 434 P.2d 320, 324 (1967) (noting that CIMT has "a vague and uncertain meaning which plagues the courts"); *Heating Acceptance Corp. v. Patterson,* 152 Conn. 467, 208 A.2d 341, 343–44 (1965) (noting that the "uncertainty" of the term "moral turpitude" had caused "not inconsiderable" difficulties for judges and ultimately deciding to abandon the term); Vt. R. Evid. 609, Reporter's Notes on 1989 Amendment (1989) ("Subdivision (a) is amended to replace 'moral turpitude' with more precise and relevant standards for determining the admissibility of prior convictions for impeachment. Moral turpitude was troublesome because it was at once underinclusive and overinclusive, as well as vague."); Maine U. R. Evid. 609, Advisers' Note to Former M.R. Evid. 609—February 2, 1976 (calling moral turpitude a "troublesome phrase" before switching to a clearer impeachment standard).

In the context of voter disenfranchisement, use of the phrase has been struck down due to discriminatory intent and impact. *See* Simon-Kerr, *Moral Turpitude*, *supra*, at 1040–41; 📑 *Hunter v. Underwood,* 471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (holding that Alabama's constitutional provision disenfranchising **\*1261** citizens convicted of a crime of moral turpitude was unconstitutional). The term's very "fuzziness ... made it well suited to the purpose

of" selective, arbitrary and discriminatory decision making. Simon-Kerr, *Moral Turpitude*, *supra*, at 1040.

Conclusion

Rooted in the Due Process Clause, the void-for-vagueness doctrine serves two primary purposes. It "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes," and it "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." 📑 *Dimaya,* 138 S.Ct. at 1212.

Congress did not define "moral turpitude" when it introduced the term into our immigration law in 1891. Sixty years later, Justice Jackson wrote that "moral turpitude" was still "an undefined and undefinable standard." 📑 *De George,* 341 U.S. at 235, 71 S.Ct. 703 (Jackson, J., dissenting). Now, almost seventy years after 📑 *De George,* "moral turpitude" is as undefined and undefinable as ever.

Justice Scalia wrote of the ACCA's residual clause in 📑 *Johnson,* "Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise." 📑 *Johnson,* 135 S.Ct. at 2560. We have had not just nine years but more than a century of experience with "moral turpitude." It is time to recognize another failed enterprise.

All Citations

914 F.3d 1249, 19 Cal. Daily Op. Serv. 1237, 2019 Daily Journal D.A.R. 923

**Footnotes**

\*        The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

---

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                  AR.05101

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1261 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta Ocol v. Chicago Teachers Union, N.D.Ill., March 26, 2020

138 S.Ct. 2448
Supreme Court of the United States

Mark JANUS, Petitioner

v.

AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 31, et al.

No. 16–1466.
|
Argued Feb. 26, 2018.
|
Decided June 27, 2018.

**Synopsis**

**Background:** Governor of Illinois brought action seeking declaration that Illinois statute authorizing public-sector unions to assess "agency fees," that is, a charge for the proportionate share of union dues attributable to activities germane to the union's duties as collective-bargaining representative, from non-member public employees on whose behalf the union negotiated, violated the First Amendment. The United States District Court for the Northern District of Illinois, No. 15 C 1235, Robert W. Gettleman, J., dismissed the Governor as a plaintiff while simultaneously granting public employee's motion to file his own complaint, and subsequently dismissed the action. Employee appealed. The United States Court of Appeals for the Seventh Circuit, Posner, Circuit Judge, 851 F.3d 746, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Alito, held that:

[1] Illinois' agency-fee scheme violated the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern;

[2] employee had Article III standing;

[3] rational-basis review did not apply to employee's First Amendment challenge to Illinois' agency-fee scheme;

[4] State's interest in labor peace did not justify Illinois' agency-fee scheme;

[5] Illinois' agency-fee scheme could not be justified on ground it was needed to prevent nonmembers from being free riders;

[6] *Pickering* framework for determining whether public employee speech was protected by First Amendment did not apply to analysis of employee's challenge to Illinois' agency-fee scheme;

[7] public-sector agency-shop arrangements violate the First Amendment, overruling *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261; and

[8] stare decisis did not counsel against overruling *Abood*.

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)
211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

Reversed and remanded.

Justice Sotomayor filed a dissenting opinion.

Justice Kagan filed a dissenting opinion, in which Justice Ginsburg, Justice Breyer, and Justice Sotomayor joined.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.


West Headnotes (54)


**[1]**    **Constitutional Law** 🔑 Dues and fees

**Labor and Employment** 🔑 Validity

**Labor and Employment** 🔑 Non-Members; Fair Share

Illinois' agency-fee scheme, under which public employees were forced to subsidize a union, even if they chose not to join and strongly objected to the positions the union took in collective bargaining and related activities, violated the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern. U.S.C.A. Const.Amend. 1; S.H.A. 🏳 5 ILCS 315/3(g), 🚩 315/6(e).

16 Cases that cite this headnote


**[2]**    **Constitutional Law** 🔑 Public employment in general

State employee, who refused to join union representing the employees in his unit because he disagreed with public policy positions it had advocated, had Article III standing to bring action alleging that Illinois law authorizing public-sector unions to collect from nonmembers "agency fees," namely a charge for proportionate share of union dues attributable to union's activities as collective-bargaining representative, was coerced political speech forbidden by First Amendment; employee was injured in fact by Illinois' agency-fee scheme, his injuries could be redressed by favorable court decision, and district court had not granted employee's motion to intervene in Governor's suit challenging the scheme, which the court dismissed for lack of standing, but instead treated employee's complaint as the operative complaint in a new lawsuit. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 1; S.H.A. 🏳 5 ILCS 315/3(g), 🚩 315/6(e).

8 Cases that cite this headnote


**[3]**    **Constitutional Law** 🔑 Freedom of Speech, Expression, and Press

The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech. U.S.C.A. Const.Amends. 1, 14.

12 Cases that cite this headnote


**[4]**    **Constitutional Law** 🔑 Freedom of Speech, Expression, and Press

**Constitutional Law** 🔑 Right to refrain from speaking

Freedom of speech includes both the right to speak freely and the right to refrain from speaking at all. U.S.C.A. Const.Amend. 1.

AR.05103

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

13 Cases that cite this headnote

**[5]**   **Constitutional Law**  Expressive association

The right to eschew association for expressive purposes is protected by the First Amendment. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

**[6]**   **Constitutional Law**  Constitutional Rights in General

**Constitutional Law**  Compelled or forced speech, support, or participation

If there is any fixed star in the constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein, and compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command. U.S.C.A. Const.Amend. 1.

10 Cases that cite this headnote

**[7]**   **Constitutional Law**  Compelled or forced speech, support, or participation

Measures compelling speech are at least as threatening as laws involving restrictions on what can be said. U.S.C.A. Const.Amend. 1.

**[8]**   **Constitutional Law**  Purpose of constitutional protection

**Constitutional Law**  Compelled or forced speech, support, or participation

Free speech serves many ends, as it is essential to the democratic form of government, and it furthers the search for truth, and whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[9]**   **Constitutional Law**  Compelled or forced speech, support, or participation

Compelling a person to subsidize the speech of other private speakers raises First Amendment concerns. U.S.C.A. Const.Amend. 1.

11 Cases that cite this headnote

**[10]**   **Constitutional Law**  Compelled or forced speech, support, or participation

To compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors is sinful and tyrannical. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

**[11]**   **Constitutional Law**  Public Employees and Officials

**Constitutional Law**  Public Employees and Officials

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

A significant impingement on First Amendment rights occurs when public employees are required to provide financial support for a union that takes many positions during collective bargaining that have powerful political and civic consequences. U.S.C.A. Const.Amend. 1.

5 Cases that cite this headnote

**[12]    Constitutional Law**    👈    Compelled or forced speech, support, or participation

Because the compelled subsidization of private speech seriously impinges on First Amendment rights, it cannot be casually allowed. U.S.C.A. Const.Amend. 1.

15 Cases that cite this headnote

**[13]    Constitutional Law**    👈    Expressive association

**Constitutional Law**    👈    Compelled or forced speech, support, or participation

Under exacting scrutiny test for the compulsory subsidization of commercial speech, which is a less demanding test than the strict scrutiny that might be thought to apply outside the commercial sphere, a compelled subsidy must serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms. U.S.C.A. Const.Amend. 1.

8 Cases that cite this headnote

**[14]    Constitutional Law**    👈    Dues and fees

Rational-basis review, a form of minimal scrutiny foreign to Supreme Court's free-speech jurisprudence, did not apply to state employee's claim alleging that Illinois law authorizing public-sector unions to collect from nonmembers "agency fees," namely a charge for proportionate share of union dues attributable to union's activities as collective-bargaining representative, was coerced political speech forbidden by First Amendment. U.S.C.A. Const.Amend. 1; S.H.A. 🏳️ 5 ILCS 315/3(g), 🚩 315/6(e).

6 Cases that cite this headnote

**[15]    Constitutional Law**    👈    Labor organizations;  collective bargaining

**Labor and Employment**    👈    Validity

**Labor and Employment**    👈    Non-Members;  Fair Share

Even if State's interest in "labor peace," meaning the avoidance of conflict and disruption that might occur if state employees in a unit were represented by more than one union, was a compelling interest under First Amendment, it did not justify Illinois' agency-fee scheme, under which public-sector unions could charge nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative; labor peace could readily be achieved through means significantly less restrictive of associational freedoms than assessing agency fees, as shown by fact that federal law did not permit agency fees, yet nearly a million federal employees were union members, and millions of public employees in states prohibiting agency fees were represented by unions that served as exclusive representatives. U.S.C.A. Const.Amend. 1; 5 U.S.C.A. §§ 7102, 7111(a), 7114(a); S.H.A. 🏳️ 5 ILCS 315/3(g), 🚩 315/6(e).

50 Cases that cite this headnote

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

**[16]**    **Constitutional Law**  ⚖  Labor organizations; collective bargaining

     **Labor and Employment**  ⚖  Validity

     **Labor and Employment**  ⚖  Non-Members; Fair Share

Illinois' agency-fee scheme, under which public-sector unions could charge nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative, could not be justified under the First Amendment on ground it was needed to prevent nonmembers from being free riders who enjoyed benefits of union representation without shouldering the costs; benefits to unions of being designated as exclusive representative, including obtaining information about employees and having dues and fees deducted directly from employee wages, greatly outweighed any extra burden imposed by duty of providing fair representation for nonmembers, and any unwanted burden imposed by representing nonmembers in grievance proceedings could be eliminated through means significantly less restrictive of associational freedoms than imposing agency fees. U.S.C.A. Const.Amend. 1; S.H.A. 5 ILCS 315/3(g), 315/6(b–f).

4 Cases that cite this headnote

**[17]**    **Constitutional Law**  ⚖  Compelled or forced speech, support, or participation

Private speech often furthers the interests of nonspeakers, but that does not alone empower the state to compel the speech to be paid for. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[18]**    **Labor and Employment**  ⚖  Union membership

A union's duty of providing fair representation for nonmembers entails an obligation not to act solely in the interests of the union's own members.

1 Cases that cite this headnote

**[19]**    **Labor and Employment**  ⚖  Union membership

Under its duty of providing fair representation for nonmembers, a union may not negotiate a collective-bargaining agreement that discriminates against nonmembers.

2 Cases that cite this headnote

**[20]**    **Labor and Employment**  ⚖  Grievances in general

When a union controls the grievance process, it may, as a practical matter, effectively subordinate the interests of an individual employee to the collective interests of all employees in the bargaining unit.

3 Cases that cite this headnote

**[21]**    **Labor and Employment**  ⚖  Duty to Act Impartially and Without Discrimination; Fair Representation

A union's duty of fair representation of nonmembers is a necessary concomitant of the authority that a union seeks when it chooses to serve as the exclusive representative of all the employees in a unit.

10 Cases that cite this headnote

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

**[22]**   **Constitutional Law**   Dues and fees

      **Labor and Employment**   Validity

      **Labor and Employment**   Non-Members;  Fair Share

First Amendment, as originally understood, did not allow forced subsidies such as those authorized by Illinois' agency-fee scheme, under which public-sector unions could charge nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative; there was no accepted founding-era practice that even remotely resembled the compulsory assessment of agency fees from public-sector employees, and prominent members of the founding generation condemned laws requiring public employees to affirm or support beliefs with which they disagreed. U.S.C.A. Const.Amend. 1; S.H.A. 5 ILCS 315/3(g), 315/6(e).

4 Cases that cite this headnote

**[23]**   **Constitutional Law**   Public or private concern;  speaking as "citizen"

Public employee speech is largely unprotected by the First Amendment if it is part of what the employee is paid to do, or if it involved a matter of only private concern. U.S.C.A. Const.Amend. 1.

3 Cases that cite this headnote

**[24]**   **Constitutional Law**   Efficiency of public services

When a public employee speaks as a citizen on a matter of public concern, the employee's speech is protected by the First Amendment unless the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees outweighs the interests of the employee, as a citizen, in commenting upon matters of public concern. U.S.C.A. Const.Amend. 1.

14 Cases that cite this headnote

**[25]**   **Constitutional Law**   Dues and fees

The *Pickering* framework for determining whether public employee speech was protected by First Amendment did not apply to Supreme Court's analysis of First Amendment challenge to Illinois' agency-fee scheme, under which public-sector unions could charge nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative; *Pickering* was developed for use in a very different context, in cases that involved one employee's speech and its impact on that employee's public responsibilities, while Illinois' scheme involved a blanket requirement that all employees subsidize speech with which they may not agree. U.S.C.A. Const.Amend. 1; S.H.A. 5 ILCS 315/3(g), 315/6(e).

6 Cases that cite this headnote

**[26]**   **Constitutional Law**   Exercise of police power;  relationship to governmental interest or public welfare

A speech-restrictive law with widespread impact gives rise to far more serious concerns than could any single supervisory decision, and thus, when such a law is at issue, the government must shoulder a correspondingly heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights. U.S.C.A. Const.Amend. 1.

3 Cases that cite this headnote

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1267 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

**[27]    Constitutional Law    ☞    Public or private concern;  speaking as "citizen"**

If the speech in question is part of a public employee's official duties, the employer may insist that the employee deliver any lawful message. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote


**[28]    Constitutional Law    ☞    Dues and fees**

Public-sector union speech in collective-bargaining and grievance proceedings funded by the agency fees of nonmember government employees was not part of the official job duties of the union officers who engaged in the speech, and thus, under the First Amendment, such speech would not be treated like the speech of the government employer; when a union negotiated with the government employer or represented employees in disciplinary proceedings, the union spoke for the employees, not the employer. U.S.C.A. Const.Amend. 1.

13 Cases that cite this headnote


**[29]    Constitutional Law    ☞    Public or private concern;  speaking as "citizen"**

In general, when public employees are performing their job duties, their speech may be controlled by their employer. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote


**[30]    Constitutional Law    ☞    Speech by labor organization**

Public-sector union speech in collective bargaining, including speech about wages and benefits, involved matters of great public concern, and thus was subject to First Amendment protections; in addition to affecting how public money was spent, union speech in collective bargaining addressed many other important matters, such as education, child welfare, healthcare, and minority rights. U.S.C.A. Const.Amend. 1.

5 Cases that cite this headnote


**[31]    Constitutional Law    ☞    Speech by labor organization**

Public-sector union speech in the handling of grievances may be of substantial public importance and may be directed at the public square, and thus may be subject to First Amendment protections. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote


**[32]    Constitutional Law    ☞    Dues and fees**
**Labor and Employment    ☞    Validity**
**Labor and Employment    ☞    Non-Members;  Fair Share**

The State's proffered interest in bargaining with an adequately funded exclusive bargaining agent was insufficient to justify the heavy burden on nonmembers' First Amendment interests inflicted by Illinois' agency-fee scheme, under which public-sector unions could charge nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative; the State could not require all employees to support the union irrespective of whether they shared its views. U.S.C.A. Const.Amend. 1; S.H.A. 📙 5 ILCS 315/3(g), 🚩 315/6(e).

11 Cases that cite this headnote

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1268 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

[33]    **Constitutional Law**  🗝  Public Employees and Officials

The State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

[34]    **Constitutional Law**  🗝  Labor organizations;  collective bargaining

The State may require that a union serve as exclusive bargaining agent for its employees, a significant impingement on First Amendment associational freedoms that would not be tolerated in other contexts. U.S.C.A. Const.Amend. 1.

16 Cases that cite this headnote

[35]    **Constitutional Law**  🗝  Public Employees and Officials

Nothing in the *Pickering* line of cases requires Supreme Court to uphold every speech restriction the government imposes as an employer. U.S.C.A. Const.Amend. 1.

[36]    **Constitutional Law**  🗝  Dues and fees

Public-sector agency-shop arrangements, under which public-sector unions charge nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative, violate the First Amendment; overruling 🚩 *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261. U.S.C.A. Const.Amend. 1.

12 Cases that cite this headnote

[37]    **Courts**  🗝  Previous Decisions as Controlling or as Precedents

Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.

12 Cases that cite this headnote

[38]    **Courts**  🗝  Previous Decisions as Controlling or as Precedents

Supreme Court will not overturn a past decision unless there are strong grounds for doing so, but stare decisis is not an inexorable command.

2 Cases that cite this headnote

[39]    **Courts**  🗝  Constitutional questions

The doctrine of stare decisis is at its weakest when Supreme Court interprets the Constitution because the Court's interpretation can be altered only by constitutional amendment or by overruling its prior decisions.

4 Cases that cite this headnote

[40]    **Courts**  🗝  Previous Decisions as Controlling or as Precedents

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1269 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)
211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

Stare decisis applies with perhaps least force of all to decisions that wrongly denied First Amendment rights. U.S.C.A. Const.Amend. 1.

---

**[41]**    **Courts**    Constitutional questions

Supreme Court has not hesitated to overrule past decisions offensive to the First Amendment, a fixed star in the constitutional constellation, if there is one. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

---

**[42]**    **Courts**    Decisions of Same Court or Co-Ordinate Court

Factors that Supreme Court should take into account in deciding whether to overrule a past decision include the quality of the past decision's reasoning, the workability of the rule it established, its consistency with other related decisions, developments since the decision was handed down, and reliance on the decision.

9 Cases that cite this headnote

---

**[43]**    **Courts**    Constitutional questions

Stare decisis did not counsel against overruling ⚑ *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, which wrongly held public-sector agency-shop arrangements, under which public-sector unions charge nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative, did not violate the First Amendment; *Abood* was poorly reasoned, its proponents had abandoned its reasoning, it failed to see that designation of a union as exclusive representative and imposition of agency fees were not inextricably linked, it conflicted with other First Amendment decisions, its line between chargeable and nonchargeable union expenditures had proven to be impossible to draw with precision, and subsequent developments had eroded its underpinnings. U.S.C.A. Const.Amend. 1.

6 Cases that cite this headnote

---

**[44]**    **Courts**    Decisions of Same Court or Co-Ordinate Court

An important factor in determining whether a Supreme Court precedent should be overruled is the quality of its reasoning.

6 Cases that cite this headnote

---

**[45]**    **Courts**    Decisions of Same Court or Co-Ordinate Court

The fact that the rationale of a past decision does not withstand careful analysis is a reason for Supreme Court to overrule it, and that is even truer when the defenders of the precedent do not attempt to defend its actual reasoning.

1 Cases that cite this headnote

---

**[46]**    **Courts**    Previous Decisions as Controlling or as Precedents

A relevant consideration in the stare decisis calculus is the workability of the precedent in question.

7 Cases that cite this headnote

---

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1270 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

**[47]**     **Courts**  👉  Constitutional questions

Public-sector unions' view of agency fee arrangements as an entitlement, under which public-sector unions charge nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative, was an insufficient reliance interest to outweigh the countervailing interest that nonmembers shared in having their constitutional rights fully protected, and thus did not warrant continued adherence to 🚩 *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, which wrongly held that such arrangements did not violate the First Amendment; public-sector unions had been on notice for years regarding Supreme Court's misgivings about *Abood*, which did not provide a clear or easily applicable standard, and unions could protect themselves if an agency-fee provision was crucial to their bargain. U.S.C.A. Const.Amend. 1.

19 Cases that cite this headnote

**[48]**     **Courts**  👉  Previous Decisions as Controlling or as Precedents

In some cases, reliance provides a strong reason for adhering to established precedents.

**[49]**     **Courts**  👉  Constitutional questions

That over 20 States had enacted statutes authorizing agency fee provisions, under which public-sector unions charged nonmembers for proportionate share of union dues attributable to union's activities as collective-bargaining representative, was not a compelling interest for Supreme Court to continue to adhere to 🚩 *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, which wrongly held that such arrangements did not violate the First Amendment, since if it were, then legislative acts could prevent the Court from overruling its own precedents, thereby interfering with its duty to say what the law is, and States could keep their labor-relations systems exactly as they were, only they could not force nonmembers to subsidize public-sector unions. U.S.C.A. Const.Amend. 1.

9 Cases that cite this headnote

**[50]**     **Constitutional Law**  👉  Constitutional Rights in General

Judges should not override citizens' choices or pick the winning side, unless the Constitution commands that they do so.

**[51]**     **Constitutional Law**  👉  Judicial Authority and Duty in General

When a federal or state law violates the Constitution, the American doctrine of judicial review requires Supreme Court to enforce the Constitution.

**[52]**     **Constitutional Law**  👉  First Amendment in General

The very purpose of the First Amendment was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials, and to establish them as legal principles to be applied by the courts. U.S.C.A. Const.Amend. 1.

**[53]**     **Constitutional Law**  👉  Waiver in general
        **Constitutional Law**  👉  Presumptions regarding estoppel or waiver

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1271 of 1384

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

**Labor and Employment**    Non-Members; Fair Share

Neither an agency fee representing proportionate share of union dues attributable to public-sector union's activities as collective-bargaining representative, nor any other payment to the union, may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay; by agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed. U.S.C.A. Const.Amend. 1.

32 Cases that cite this headnote

**[54]**    **Constitutional Law**    Waiver in general

To be effective, a government employee's waiver of First Amendment rights, by agreeing to pay agency fee representing proportionate share of union dues attributable to public-sector union's activities as collective-bargaining representative, must be freely given and shown by clear and compelling evidence; unless employees clearly and affirmatively consent before any money is taken from them, this standard cannot be met. U.S.C.A. Const.Amend. 1.

28 Cases that cite this headnote

**West Codenotes**

**Held Unconstitutional**

S.H.A.   5 ILCS 315/3(g),   315/6(e)

*2455 *Syllabus* [*]

Illinois law permits public employees to unionize. If a majority of the employees in a bargaining unit vote to be represented by a union, that union is designated as the exclusive representative of all the employees, even those who do not join. Only the union may engage in collective **\*2456** bargaining; individual employees may not be represented by another agent or negotiate directly with their employer. Nonmembers are required to pay what is generally called an "agency fee," *i.e.,* a percentage of the full union dues. Under   *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 235–236, 97 S.Ct. 1782, 52 L.Ed.2d 261, this fee may cover union expenditures attributable to those activities "germane" to the union's collective-bargaining activities (chargeable expenditures), but may not cover the union's political and ideological projects (nonchargeable expenditures). The union sets the agency fee annually and then sends nonmembers a notice explaining the basis for the fee and the breakdown of expenditures. Here it was 78.06% of full union dues.

Petitioner Mark Janus is a state employee whose unit is represented by a public-sector union (Union), one of the respondents. He refused to join the Union because he opposes many of its positions, including those taken in collective bargaining. Illinois' Governor, similarly opposed to many of these positions, filed suit challenging the constitutionality of the state law authorizing agency fees. The state attorney general, another respondent, intervened to defend the law, while Janus moved to intervene on the Governor's side. The District Court dismissed the Governor's challenge for lack of standing, but it simultaneously allowed Janus to file his own complaint challenging the constitutionality of agency fees. The District Court granted respondents' motion to dismiss on the ground that the claim was foreclosed by *Abood*. The Seventh Circuit affirmed.

*Held* :

1. The District Court had jurisdiction over petitioner's suit. Petitioner was undisputedly injured in fact by Illinois' agency-fee scheme and his injuries can be redressed by a favorable court decision. For jurisdictional purposes, the court permissibly treated

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1272 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

his amended complaint in intervention as the operative complaint in a new lawsuit. *United States ex rel. Texas Portland Cement Co. v. McCord,* 233 U.S. 157, 34 S.Ct. 550, 58 L.Ed. 893, distinguished. Pp. 2462 – 2463.

2. The State's extraction of agency fees from nonconsenting public-sector employees violates the First Amendment. *Abood* erred in concluding otherwise, and *stare decisis* cannot support it. *Abood* is therefore overruled. Pp. 2463 – 2486.

(a) *Abood* 's holding is inconsistent with standard First Amendment principles. Pp. 2463 – 2469.

(1) Forcing free and independent individuals to endorse ideas they find objectionable raises serious First Amendment concerns. *E.g.,* *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 633, 63 S.Ct. 1178, 87 L.Ed. 1628. That includes compelling a person to subsidize the speech of other private speakers. *E.g.,* *Knox v. Service Employees,* 567 U.S. 298, 309, 132 S.Ct. 2277, 183 L.Ed.2d 281. In *Knox* and *Harris v. Quinn,* 573 U.S. ——, 134 S.Ct. 2618, 189 L.Ed.2d 620, the Court applied an "exacting" scrutiny standard in judging the constitutionality of agency fees rather than the more traditional strict scrutiny. Even under the more permissive standard, Illinois' scheme cannot survive. Pp. 2463 – 2466.

(2) Neither of *Abood* 's two justifications for agency fees passes muster under this standard. First, agency fees cannot be upheld on the ground that they promote an interest in "labor peace." The *Abood* Court's fears of conflict and disruption if employees were represented by more than one union have proved to be unfounded: Exclusive representation of all the employees in a unit and the exaction of agency fees are not inextricably linked. To the **\*2457** contrary, in the Federal Government and the 28 States with laws prohibiting agency fees, millions of public employees are represented by unions that effectively serve as the exclusive representatives of all the employees. Whatever may have been the case 41 years ago when *Abood* was decided, it is thus now undeniable that "labor peace" can readily be achieved through less restrictive means than the assessment of agency fees.

Second, avoiding "the risk of 'free riders,' " *Abood, supra,* at 224, 97 S.Ct. 1782, is not a compelling state interest. Free-rider "arguments ... are generally insufficient to overcome First Amendment objections," *Knox, supra,* at 311, 132 S.Ct. 2277, and the statutory requirement that unions represent members and nonmembers alike does not justify different treatment. As is evident in non-agency-fee jurisdictions, unions are quite willing to represent nonmembers in the absence of agency fees. And their duty of fair representation is a necessary concomitant of the authority that a union seeks when it chooses to be the exclusive representative. In any event, States can avoid free riders through less restrictive means than the imposition of agency fees. Pp. 2466 – 2469.

(b) Respondents' alternative justifications for *Abood* are similarly unavailing. Pp. 2469 – 2474.

(1) The Union claims that *Abood* is supported by the First Amendment's original meaning. But neither founding-era evidence nor dictum in *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708, supports the view that the First Amendment was originally understood to allow States to force public employees to subsidize a private third party. If anything, the opposite is true. Pp. 2469 – 2472.

(2) Nor does *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, provide a basis for *Abood. Abood* was not based on *Pickering,* and for good reasons. First, *Pickering* 's framework was developed for use in cases involving "one employee's speech and its impact on that employee's public responsibilities," *United States v. Treasury Employees,* 513 U.S. 454, 467, 115 S.Ct. 1003, 130 L.Ed.2d 964, while *Abood* and other agency-fee cases involve a blanket requirement that all employees subsidize private speech with which they may not agree. Second, *Pickering* 's framework was designed to determine whether a public employee's speech interferes with the effective operation of a government office, not what happens when the government compels speech or speech subsidies in support of third parties.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1273 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)
211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

Third, the categorization schemes of *Pickering* and *Abood* do not line up. For example, under *Abood,* nonmembers cannot be charged for speech that concerns political or ideological issues; but under *Pickering,* an employee's free speech interests on such issues could be overcome if outweighed by the employer's interests. Pp. 2472 – 2474.

(c) Even under some form of *Pickering,* Illinois' agency-fee arrangement would not survive. Pp. 2473 – 2478.

(1) Respondents compare union speech in collective bargaining and grievance proceedings to speech "pursuant to [an employee's] official duties," *Garcetti v. Ceballos,* 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689, which the State may require of its employees. But in those situations, the employee's words are really the words of the employer, whereas here the union is speaking on behalf of the employees. *Garcetti* therefore does not apply. Pp. 2473 – 2474.

(2) Nor does the union speech at issue cover only matters of private concern, which the State may also generally regulate **\*2458** under *Pickering.* To the contrary, union speech covers critically important and public matters such as the State's budget crisis, taxes, and collective bargaining issues related to education, child welfare, healthcare, and minority rights. Pp. 2474 – 2477.

(3) The government's proffered interests must therefore justify the heavy burden of agency fees on nonmembers' First Amendment interests. They do not. The state interests asserted in *Abood*—promoting "labor peace" and avoiding free riders— clearly do not, as explained earlier. And the new interests asserted in *Harris* and here—bargaining with an adequately funded agent and improving the efficiency of the work force—do not suffice either. Experience shows that unions can be effective even without agency fees. Pp. 2476 – 2478.

(d) *Stare decisis* does not require retention of *Abood.* An analysis of several important factors that should be taken into account in deciding whether to overrule a past decision supports this conclusion. Pp. 2477 – 2486.

(1) *Abood* was poorly reasoned, and those arguing for retaining it have recast its reasoning, which further undermines its stare decisis effect, *e.g.,* *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 363, 130 S.Ct. 876, 175 L.Ed.2d 753. *Abood* relied on *Railway Employes v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112, and *Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141, both of which involved private-sector collective-bargaining agreements where the government merely authorized agency fees. *Abood* did not appreciate the very different First Amendment question that arises when a State *requires* its employees to pay agency fees. *Abood* also judged the constitutionality of public-sector agency fees using *Hanson* 's deferential standard, which is inappropriate in deciding free speech issues. Nor did *Abood* take into account the difference between the effects of agency fees in public- and private-sector collective bargaining, anticipate administrative problems with classifying union expenses as chargeable or nonchargeable, foresee practical problems faced by nonmembers wishing to challenge those decisions, or understand the inherently political nature of public-sector bargaining. Pp. 2479 – 2481.

(2) *Abood* 's lack of workability also weighs against it. Its line between chargeable and nonchargeable expenditures has proved to be impossible to draw with precision, as even respondents recognize. See, *e.g.,* *Lehnert v. Ferris Faculty Assn.,* 500 U.S. 507, 519, 111 S.Ct. 1950, 114 L.Ed.2d 572. What is more, a nonmember objecting to union chargeability determinations will have much trouble determining the accuracy of the union's reported expenditures, which are often expressed in extremely broad and vague terms. Pp. 2480 – 2482.

(3) Developments since *Abood,* both factual and legal, have "eroded" the decision's "underpinnings" and left it an outlier among the Court's First Amendment cases. *United States v. Gaudin,* 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444. *Abood* relied on an assumption that "the principle of exclusive representation in the public sector is dependent on a union or agency shop," *Harris,* 573 U.S., at —— – ——, 134 S.Ct., at 2634, but experience has shown otherwise. It was also decided when public-sector unionism was a relatively new phenomenon. Today, however, public-sector union membership has surpassed that in the private sector, and that ascendency corresponds with a parallel increase in public spending. *Abood* is also an anomaly in the

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

Court's First Amendment jurisprudence, where exacting scrutiny, **\*2459** if not a more demanding standard, generally applies. Overruling *Abood* will also end the oddity of allowing public employers to compel union support (which is not supported by any tradition) but not to compel party support (which is supported by tradition), see, *e.g.,* *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547. Pp. 2482 – 2484.

(4) Reliance on *Abood* does not carry decisive weight. The uncertain status of *Abood,* known to unions for years; the lack of clarity it provides; the short-term nature of collective-bargaining agreements; and the ability of unions to protect themselves if an agency-fee provision was crucial to its bargain undermine the force of reliance. Pp. 2484 – 2486.

3. For these reasons, States and public-sector unions may no longer extract agency fees from nonconsenting employees. The First Amendment is violated when money is taken from nonconsenting employees for a public-sector union; employees must choose to support the union before anything is taken from them. Accordingly, neither an agency fee nor any other form of payment to a public-sector union may be deducted from an employee, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay. Pp. 2486.

851 F.3d 746, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, THOMAS, and, GORSUCH, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion. KAGAN, J., filed a dissenting opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

**Attorneys and Law Firms**

William L. Messenger, Springfield, VA, for Petitioner.

Noel J. Francisco, Solicitor General, for the United States as amicus curiae, by special leave of the Court, supporting the Petitioner.

David L. Franklin, Solicitor General, Chicago, IL, for the State Respondents.

David C. Frederick, Washington, DC, for the Respondent AFSCME Council 31.

Dan K. Webb, Joseph J. Torres, Lawrence R. Desideri, Winston & Strawn LLP, Chicago, IL, Jacob H. Huebert, Jeffrey M. Schwab, Liberty Justice Center, Chicago, IL, William L. Messenger, Aaron B. Solem, c/o National Right to Work Legal Defense Foundation, Inc., Springfield, VA, for Petitioner.

Lisa Madigan, Attorney General, State of Illinois, David L. Franklin, Solicitor General, Counsel of Record, Brett E. Legner, Deputy Solicitor General, Frank H. Bieszczat, Jane Flanagan, Sarah A. Hunger, Richard S. Huszagh, Lindsay Beyer Payne, Andrew Tonelli, Assistant Attorneys General, Chicago, IL, for Respondents Lisa Madigan and Michael Hoffman.

John M. West, Bredhoff & Kaiser, PLLC, Washington, DC, Judith E. Rivlin, Teague P. Paterson, AFSCME, Washington, DC, David C. Frederick, Derek T. Ho, Benjamin S. Softness, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, DC, for Respondent American Federation of State, County, and Municipal Employees, Council 31.

**Opinion**

Justice ALITO delivered the opinion of the Court.

AR.05115

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1275 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

**[1]**    Under Illinois law, public employees are forced to subsidize a union, even if **\*2460**  they choose not to join and strongly object to the positions the union takes in collective bargaining and related activities. We conclude that this arrangement violates the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern.

We upheld a similar law in *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and we recognize the importance of following precedent unless there are strong reasons for not doing so. But there are very strong reasons in this case. Fundamental free speech rights are at stake. *Abood* was poorly reasoned. It has led to practical problems and abuse. It is inconsistent with other First Amendment cases and has been undermined by more recent decisions. Developments since *Abood* was handed down have shed new light on the issue of agency fees, and no reliance interests on the part of public-sector unions are sufficient to justify the perpetuation of the free speech violations that *Abood* has countenanced for the past 41 years. *Abood* is therefore overruled.

I

A

Under the Illinois Public Labor Relations Act (IPLRA), employees of the State and its political subdivisions are permitted to unionize. See Ill. Comp. Stat., ch. 5, § 315/6(a) (West 2016). If a majority of the employees in a bargaining unit vote to be represented by a union, that union is designated as the exclusive representative of all the employees. §§ 315/3(s)(1), 315/6(c), 315/9. Employees in the unit are not obligated to join the union selected by their co-workers, but whether they join or not, that union is deemed to be their sole permitted representative. See §§ 315/6(a), (c).

Once a union is so designated, it is vested with broad authority. Only the union may negotiate with the employer on matters relating to "pay, wages, hours [,] and other conditions of employment." § 315/6(c). And this authority extends to the negotiation of what the IPLRA calls "policy matters," such as merit pay, the size of the work force, layoffs, privatization, promotion methods, and non-discrimination policies. § 315/4; see § 315/6(c); see generally, *e.g., Illinois Dept. of Central Management Servs. v. AFSCME, Council 31,* No. S–CB–16–17 etc., 33 PERI ¶ 67 (ILRB Dec. 13, 2016) (Board Decision).

Designating a union as the employees' exclusive representative substantially restricts the rights of individual employees. Among other things, this designation means that individual employees may not be represented by any agent other than the designated union; nor may individual employees negotiate directly with their employer. §§ 315/6(c)-(d), 315/10(a)(4); see *Matthews v. Chicago Transit Authority,* 2016 IL 117638, 402 Ill.Dec. 1, 51 N.E.3d 753, 782; accord, *Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 683–684, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). Protection of the employees' interests is placed in the hands of the union, and therefore the union is required by law to provide fair representation for all employees in the unit, members and nonmembers alike. § 315/6(d).

Employees who decline to join the union are not assessed full union dues but must instead pay what is generally called an "agency fee," which amounts to a percentage of the union dues. Under *Abood,* nonmembers may be charged for the portion of union dues attributable to activities that are "germane to [the union's] duties as collective-bargaining representative," but nonmembers may not be required to fund **\*2461**  the union's political and ideological projects. 431 U.S., at 235, 97 S.Ct. 1782; see *id.,* at 235–236, 97 S.Ct. 1782. In labor-law parlance, the outlays in the first category are known as "chargeable" expenditures, while those in the latter are labeled "nonchargeable."

Illinois law does not specify in detail which expenditures are chargeable and which are not. The IPLRA provides that an agency fee may compensate a union for the costs incurred in "the collective bargaining process, contract administration[,] and pursuing

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1276 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

matters affecting wages, hours [,] and conditions of employment." § 315/6(e); see also § 315/3(g). Excluded from the agency-fee calculation are union expenditures "related to the election or support of any candidate for political office." § 315/3(g); see § 315/6(e).

Applying this standard, a union categorizes its expenditures as chargeable or nonchargeable and thus determines a nonmember's "proportionate share," § 315/6(e); this determination is then audited; the amount of the "proportionate share" is certified to the employer; and the employer automatically deducts that amount from the nonmembers' wages. See *ibid.*; App. to Pet. for Cert. 37a; see also *Harris v. Quinn,* 573 U.S. ——, —— – ——, 134 S.Ct. 2618, 2633–2634, 189 L.Ed.2d 620 (2014) (describing this process). Nonmembers need not be asked, and they are not required to consent before the fees are deducted.

After the amount of the agency fee is fixed each year, the union must send nonmembers what is known as a *Hudson* notice. See *Teachers v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). This notice is supposed to provide nonmembers with "an adequate explanation of the basis for the [agency] fee." *Id.,* at 310, 106 S.Ct. 1066. If nonmembers "suspect that a union has improperly put certain expenses in the [chargeable] category," they may challenge that determination. *Harris, supra,* at ——, 134 S.Ct., at 2633.

As illustrated by the record in this case, unions charge nonmembers, not just for the cost of collective bargaining *per se,* but also for many other supposedly connected activities. See App. to Pet. for Cert. 28a–39a. Here, the nonmembers were told that they had to pay for "[l]obbying," "[s]ocial and recreational activities," "advertising," "[m]embership meetings and conventions," and "litigation," as well as other unspecified "[s]ervices" that "may ultimately inure to the benefit of the members of the local bargaining unit." *Id.,* at 28a–32a. The total chargeable amount for nonmembers was 78.06% of full union dues. *Id.,* at 34a.

B

Petitioner Mark Janus is employed by the Illinois Department of Healthcare and Family Services as a child support specialist. *Id.,* at 10a. The employees in his unit are among the 35,000 public employees in Illinois who are represented by respondent American Federation of State, County, and Municipal Employees, Council 31 (Union). *Ibid.* Janus refused to join the Union because he opposes "many of the public policy positions that [it] advocates," including the positions it takes in collective bargaining. *Id.,* at 10a, 18a. Janus believes that the Union's "behavior in bargaining does not appreciate the current fiscal crises in Illinois and does not reflect his best interests or the interests of Illinois citizens." *Id.,* at 18a. Therefore, if he had the choice, he "would not pay any fees or otherwise subsidize [the Union]." *Ibid.* Under his unit's collective-bargaining agreement, however, he was required to pay an agency fee of $44.58 per month, *id.,* at 14a—which would amount to about $535 per year.

**\*2462** Janus's concern about Illinois' current financial situation is shared by the Governor of the State, and it was the Governor who initially challenged the statute authorizing the imposition of agency fees. The Governor commenced an action in federal court, asking that the law be declared unconstitutional, and the Illinois attorney general (a respondent here) intervened to defend the law. App. 41. Janus and two other state employees also moved to intervene—but on the Governor's side. *Id.,* at 60.

Respondents moved to dismiss the Governor's challenge for lack of standing, contending that the agency fees did not cause him any personal injury. *E.g., id.,* at 48–49. The District Court agreed that the Governor could not maintain the lawsuit, but it held that petitioner and the other individuals who had moved to intervene had standing because the agency fees unquestionably injured them. Accordingly, "in the interest of judicial economy," the court dismissed the Governor as a plaintiff, while simultaneously allowing petitioner and the other employees to file their own complaint. *Id.,* at 112. They did so, and the case proceeded on the basis of this new complaint.

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

The amended complaint claims that all "nonmember fee deductions are coerced political speech" and that "the First Amendment forbids coercing any money from the nonmembers." App. to Pet. for Cert. 23a. Respondents moved to dismiss the amended complaint, correctly recognizing that the claim it asserted was foreclosed by *Abood*. The District Court granted the motion, *id.,* at 7a, and the Court of Appeals for the Seventh Circuit affirmed, 851 F.3d 746 (2017).

Janus then sought review in this Court, asking us to overrule *Abood* and hold that public-sector agency-fee arrangements are unconstitutional. We granted certiorari to consider this important question. 582 U.S. ——, 138 S.Ct. 54, 198 L.Ed.2d 780 (2017).

II

[2]    Before reaching this question, however, we must consider a threshold issue. Respondents contend that the District Court lacked jurisdiction under Article III of the Constitution because petitioner "moved to intervene in [the Governor's] jurisdictionally defective lawsuit." Union Brief in Opposition 11; see also *id.,* at 13–17; State Brief in Opposition 6; Brief for Union Respondent i, 16–17; Brief for State Respondents 14, n. 1. This argument is clearly wrong.

It rests on the faulty premise that petitioner intervened in the action brought by the Governor, but that is not what happened. The District Court did not grant petitioner's motion to intervene in that lawsuit. Instead, the court essentially treated petitioner's amended complaint as the operative complaint in a new lawsuit. App. 110–112. And when the case is viewed in that way, any Article III issue vanishes. As the District Court recognized—and as respondents concede—petitioner was injured in fact by Illinois' agency-fee scheme, and his injuries can be redressed by a favorable court decision. *Ibid.*; see Record 2312–2313, 2322–2323. Therefore, he clearly has Article III standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). It is true that the District Court docketed petitioner's complaint under the number originally assigned to the Governor's complaint, instead of giving it a new number of its own. But Article III jurisdiction does not turn on such trivialities.

The sole decision on which respondents rely, *United States ex rel. Texas Portland Cement Co. v. McCord,* 233 U.S. 157, 34 S.Ct. 550, 58 L.Ed. 893 (1914), actually    **\*2463**  works against them. That case concerned a statute permitting creditors of a government contractor to bring suit on a bond between 6 and 12 months after the completion of the work. *Id.,* at 162, 34 S.Ct. 550. One creditor filed suit before the 6–month starting date, but another intervened within the 6–to–12–month window. The Court held that the "[t]he intervention [did] not cure th[e] vice in the original [prematurely filed] suit," but the Court also contemplated treating "intervention ... as an original suit" in a case in which the intervenor met the requirements that a plaintiff must satisfy—*e.g.,* filing a separate complaint and properly serving the defendants. *Id.,* at 163–164, 34 S.Ct. 550. Because that is what petitioner did here, we may reach the merits of the question presented.

III

In *Abood,* the Court upheld the constitutionality of an agency-shop arrangement like the one now before us, 431 U.S., at 232, 97 S.Ct. 1782, but in more recent cases we have recognized that this holding is "something of an anomaly," *Knox v. Service Employees,* 567 U.S. 298, 311, 132 S.Ct. 2277, 183 L.Ed.2d 281 (2012), and that *Abood* 's "analysis is questionable on several grounds," *Harris,* 573 U.S., at ——, 134 S.Ct., at 2632; see *id.,* at —— – ——, 134 S.Ct., at 2632–2634 (discussing flaws in *Abood* 's reasoning). We have therefore refused to extend *Abood* to situations where it does not squarely control, see *Harris, supra,* at —— – ——, 134 S.Ct., at 2638–2639, while leaving for another day the question whether

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1278 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

*Abood* should be overruled, *Harris, supra,* at ——, n. 19, 134 S.Ct., at 2638, n. 19; see *Knox, supra,* at 310–311, 132 S.Ct. 2277.

We now address that question. We first consider whether *Abood* 's holding is consistent with standard First Amendment principles.

<div align="center">A</div>

**[3]    [4]    [5]    [6]**    The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech. We have held time and again that freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); see *Riley v. National Federation of Blind of N. C., Inc.,* 487 U.S. 781, 796–797, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 559, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256–257, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); accord, *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.,* 475 U.S. 1, 9, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion). The right to eschew association for expressive purposes is likewise protected. *Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("Freedom of association ... plainly presupposes a freedom not to associate"); see *Pacific Gas & Elec., supra,* at 12, 106 S.Ct. 903 ("[F]orced associations that burden protected speech are impermissible"). As Justice Jackson memorably put it: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein.*" *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (emphasis added).

Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned. Suppose, for example, **\*2464** that the State of Illinois required all residents to sign a document expressing support for a particular set of positions on controversial public issues—say, the platform of one of the major political parties. No one, we trust, would seriously argue that the First Amendment permits this.

**[7]**    Perhaps because such compulsion so plainly violates the Constitution, most of our free speech cases have involved restrictions on what can be said, rather than laws compelling speech. But measures compelling speech are at least as threatening.

**[8]**    Free speech serves many ends. It is essential to our democratic form of government, see, *e.g., Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), and it furthers the search for truth, see, *e.g., Thornhill v. Alabama,* 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends.

When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence. *Barnette, supra,* at 633, 63 S.Ct. 1178; see also *Riley, supra,* at 796–797, 108 S.Ct. 2667 (rejecting "deferential test" for compelled speech claims).

**[9]    [10]    [11]**    Compelling a person to *subsidize* the speech of other private speakers raises similar First Amendment concerns. *Knox, supra,* at 309, 132 S.Ct. 2277; *United States v. United Foods, Inc.,* 533 U.S. 405, 410, 121 S.Ct. 2334, 150

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1279 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

L.Ed.2d 438 (2001); *Abood, supra,* at 222, 234–235, 97 S.Ct. 1782. As Jefferson famously put it, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical." A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950) (emphasis deleted and footnote omitted); see also *Hudson,* 475 U.S., at 305, n. 15, 106 S.Ct. 1066. We have therefore recognized that a " 'significant impingement on First Amendment rights' " occurs when public employees are required to provide financial support for a union that "takes many positions during collective bargaining that have powerful political and civic consequences." *Knox, supra,* at 310–311, 132 S.Ct. 2277 (quoting *Ellis v. Railway Clerks,* 466 U.S. 435, 455, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984) ).

[12]  Because the compelled subsidization of private speech seriously impinges on First Amendment rights, it cannot be casually allowed. Our free speech cases have identified "levels of scrutiny" to be applied in different contexts, and in three recent cases, we have considered the standard that should be used in judging the constitutionality of agency fees. See *Knox, supra* ; *Harris, supra* ; *Friedrichs v. California Teachers Assn.,* 578 U.S. ——, 136 S.Ct. 1083, 194 L.Ed.2d 255 (2016) (*per curiam* ) (affirming decision below by equally divided Court).

[13]  In *Knox,* the first of these cases, we found it sufficient to hold that the conduct in question was unconstitutional under even the test used for the compulsory subsidization of commercial speech. 567 U.S., at 309–310, 321–322, 132 S.Ct. 2277. Even though commercial speech has **\*2465** been thought to enjoy a lesser degree of protection, see, *e.g.,* *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,* 447 U.S. 557, 562–563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), prior precedent in that area, specifically *United Foods, supra,* had applied what we characterized as "exacting" scrutiny, *Knox,* 567 U.S., at 310, 132 S.Ct. 2277, a less demanding test than the "strict" scrutiny that might be thought to apply outside the commercial sphere. Under "exacting" scrutiny, we noted, a compelled subsidy must "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Ibid.* (internal quotation marks and alterations omitted).

In *Harris,* the second of these cases, we again found that an agency-fee requirement failed "exacting scrutiny." 573 U.S., at ——, 134 S.Ct., at 2641. But we questioned whether that test provides sufficient protection for free speech rights, since "it is apparent that the speech compelled" in agency-fee cases "is not commercial speech." *Id.,* at ——, 134 S.Ct., at 2639.

[14]  Picking up that cue, petitioner in the present case contends that the Illinois law at issue should be subjected to "strict scrutiny." Brief for Petitioner 36. The dissent, on the other hand, proposes that we apply what amounts to rational-basis review, that is, that we ask only whether a government employer could reasonably believe that the exaction of agency fees serves its interests. See *post,* at 2489 (KAGAN, J., dissenting) ("A government entity could reasonably conclude that such a clause was needed"). This form of minimal scrutiny is foreign to our free-speech jurisprudence, and we reject it here. At the same time, we again find it unnecessary to decide the issue of strict scrutiny because the Illinois scheme cannot survive under even the more permissive standard applied in *Knox* and *Harris.*

In the remainder of this part of our opinion (Parts III–B and III–C), we will apply this standard to the justifications for agency fees adopted by the Court in *Abood.* Then, in Parts IV and V, we will turn to alternative rationales proffered by respondents and their *amici.*

B

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

**[15]**  In *Abood,* the main defense of the agency-fee arrangement was that it served the State's interest in "labor peace," 431 U.S., at 224, 97 S.Ct. 1782. By "labor peace," the *Abood* Court meant avoidance of the conflict and disruption that it envisioned would occur if the employees in a unit were represented by more than one union. In such a situation, the Court predicted, "inter-union rivalries" would foster "dissension within the work force," and the employer could face "conflicting demands from different unions." *Id.,* at 220–221, 97 S.Ct. 1782. Confusion would ensue if the employer entered into and attempted to "enforce two or more agreements specifying different terms and conditions of employment." *Id.,* at 220, 97 S.Ct. 1782. And a settlement with one union would be "subject to attack from [a] rival labor organizatio [n]." *Id.,* at 221, 97 S.Ct. 1782.

We assume that "labor peace," in this sense of the term, is a compelling state interest, but *Abood* cited no evidence that the pandemonium it imagined would result if agency fees were not allowed, and it is now clear that *Abood* 's fears were unfounded. The *Abood* Court assumed that designation of a union as the exclusive representative of all the employees in a unit and the exaction of agency fees are inextricably linked, but that is simply not true. *Harris, supra,* at ——, 134 S.Ct., at 2640.

***2466**  The federal employment experience is illustrative. Under federal law, a union chosen by majority vote is designated as the exclusive representative of all the employees, but federal law does not permit agency fees. See 5 U.S.C. §§ 7102, 7111(a), 7114(a). Nevertheless, nearly a million federal employees—about 27% of the federal work force—are union members. [1] The situation in the Postal Service is similar. Although permitted to choose an exclusive representative, Postal Service employees are not required to pay an agency fee, 39 U.S.C. §§ 1203(a), 1209(c), and about 400,000 are union members. [2] Likewise, millions of public employees in the 28 States that have laws generally prohibiting agency fees are represented by unions that serve as the exclusive representatives of all the employees. [3] Whatever may have been the case 41 years ago when *Abood* was handed down, it is now undeniable that "labor peace" can readily be achieved "through means significantly less restrictive of associational freedoms" than the assessment of agency fees. *Harris, supra,* at ——, 134 S.Ct., at 2639 (internal quotation marks omitted).

## C

**[16]**  In addition to the promotion of "labor peace," *Abood* cited "the risk of 'free riders' " as justification for agency fees, 431 U.S., at 224, 97 S.Ct. 1782. Respondents and some of their *amici* endorse this reasoning, contending that agency fees are needed to prevent nonmembers from enjoying the benefits of union representation without shouldering the costs. Brief for Union Respondent 34–36; Brief for State Respondents 41–45; see, *e.g.,* Brief for International Brotherhood of Teamsters as *Amicus Curiae* 3–5.

Petitioner strenuously objects to this free-rider label. He argues that he is not a free rider on a bus headed for a destination that he wishes to reach but is more like a person shanghaied for an unwanted voyage.

Whichever description fits the majority of public employees who would not subsidize a union if given the option, avoiding free riders is not a compelling interest. As we have noted, "free-rider arguments ... are generally insufficient to overcome First Amendment objections." *Knox,* 567 U.S., at 311, 132 S.Ct. 2277. To hold otherwise across the board would have startling consequences. Many private groups speak out with the objective of obtaining government action that will have the effect of benefiting nonmembers. May all those who are thought to benefit from such efforts be compelled to subsidize this speech?

**[17]**  Suppose that a particular group lobbies or speaks out on behalf of what it thinks are the needs of senior citizens or veterans or physicians, to take just a few examples. Could the government require that all seniors, veterans, or doctors pay for that service even if they object? It has never been thought that this is permissible. "[P]rivate speech often furthers the interests of

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1281 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)
211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

nonspeakers," but "that does not alone empower the state to compel the **\*2467** speech to be paid for." *Lehnert v. Ferris Faculty Assn.,* 500 U.S. 507, 556, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991) (Scalia, J., concurring in judgment in part and dissenting in part). In simple terms, the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay. [4]

Those supporting agency fees contend that the situation here is different because unions are statutorily required to "represen[t] the interests of all public employees in the unit," whether or not they are union members. § 315/6(d); see, *e.g.,* Brief for State Respondents 40–41, 45; *post,* at 2490 (KAGAN, J., dissenting). Why might this matter?

We can think of two possible arguments. It might be argued that a State has a compelling interest in requiring the payment of agency fees because (1) unions would otherwise be unwilling to represent nonmembers or (2) it would be fundamentally unfair to require unions to provide fair representation for nonmembers if nonmembers were not required to pay. Neither of these arguments is sound.

First, it is simply not true that unions will refuse to serve as the exclusive representative of all employees in the unit if they are not given agency fees. As noted, unions represent millions of public employees in jurisdictions that do not permit agency fees. No union is ever compelled to seek that designation. On the contrary, designation as exclusive representative is avidly sought. [5] Why is this so?

Even without agency fees, designation as the exclusive representative confers many benefits. As noted, that status gives the union a privileged place in negotiations over wages, benefits, and working conditions. See § 315/6(c). Not only is the union given the exclusive right to speak for all the employees in collective bargaining, but the employer is required by state law to listen to and to bargain in good faith with only that union. § 315/7. Designation as exclusive representative thus "results in a tremendous increase in the power" of the union. *American Communications Assn. v. Douds,* 339 U.S. 382, 401, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

In addition, a union designated as exclusive representative is often granted special privileges, such as obtaining information about employees, see § 315/6(c), and having dues and fees deducted directly from employee wages, §§ 315/6(e)-(f). The collective-bargaining agreement in this case guarantees a long list of additional privileges. See App. 138–143.

 [18]    These benefits greatly outweigh any extra burden imposed by the duty of providing fair representation for nonmembers. What this duty entails, in simple terms, is an obligation not to "act solely in the interests of [the union's] own members." **\*2468** Brief for State Respondents 41; see *Cintron v. AFSCME, Council 31,* No. S–CB–16–032, p. 1, 34 PERI ¶ 105 (ILRB Dec. 13, 2017) (union may not intentionally direct "animosity" toward nonmembers based on their "dissident union practices"); accord, *14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 271, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009); *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

 [19]    What does this mean when it comes to the negotiation of a contract? The union may not negotiate a collective-bargaining agreement that discriminates against nonmembers, see *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 202–203, 65 S.Ct. 226, 89 L.Ed. 173 (1944), but the union's bargaining latitude would be little different if state law simply prohibited public employers from entering into agreements that discriminate in that way. And for that matter, it is questionable whether the Constitution would permit a public-sector employer to adopt a collective-bargaining agreement that discriminates against nonmembers. See *id.,* at 198–199, 202, 65 S.Ct. 226 (analogizing a private-sector union's fair-representation duty to the duty "the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates"); cf. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 69, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (recognizing that government may not "impose penalties or withhold benefits based on membership in a disfavored group"

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1282 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

where doing so "ma [kes] group membership less attractive"). To the extent that an employer would be barred from acceding to a discriminatory agreement anyway, the union's duty not to ask for one is superfluous. It is noteworthy that neither respondents nor any of the 39 *amicus* briefs supporting them—nor the dissent—has explained why the duty of fair representation causes public-sector unions to incur significantly greater expenses than they would otherwise bear in negotiating collective-bargaining agreements.

[20]    What about the representation of nonmembers in grievance proceedings? Unions do not undertake this activity solely for the benefit of nonmembers—which is why Illinois law gives a public-sector union the right to send a representative to such proceedings even if the employee declines union representation. § 315/6(b). Representation of nonmembers furthers the union's interest in keeping control of the administration of the collective-bargaining agreement, since the resolution of one employee's grievance can affect others. And when a union controls the grievance process, it may, as a practical matter, effectively subordinate "the interests of [an] individual employee ... to the collective interests of all employees in the bargaining unit."

*Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 58, n. 19, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); see *Stahulak v. Chicago,* 184 Ill.2d 176, 180–181, 234 Ill.Dec. 432, 703 N.E.2d 44, 46–47 (1998); *Mahoney v. Chicago,* 293 Ill.App.3d 69, 73–74, 227 Ill.Dec. 209, 687 N.E.2d 132, 135–137 (1997) (union has " 'discretion to refuse to process' " a grievance, provided it does not act "arbitrar[ily]" or "in bad faith" (emphasis deleted) ).

In any event, whatever unwanted burden is imposed by the representation of nonmembers in disciplinary matters can be eliminated "through means significantly less restrictive of associational freedoms" than the imposition of agency fees. *Harris,* 573 U.S., at ——, 134 S.Ct., at 2639 (internal quotation marks omitted). Individual nonmembers could be required to pay for that service or could be denied   *2469   union representation altogether. [6] Thus, agency fees cannot be sustained on the ground that unions would otherwise be unwilling to represent nonmembers.

[21]    Nor can such fees be justified on the ground that it would otherwise be unfair to require a union to bear the duty of fair representation. That duty is a necessary concomitant of the authority that a union seeks when it chooses to serve as the exclusive representative of all the employees in a unit. As explained, designating a union as the exclusive representative of nonmembers substantially restricts the nonmembers' rights. *Supra,* at 2460 – 2461. Protection of their interests is placed in the hands of the union, and if the union were free to disregard or even work against those interests, these employees would be wholly unprotected. That is why we said many years ago that serious "constitutional questions [would] arise" if the union were *not* subject to the duty to represent all employees fairly. *Steele, supra,* at 198, 65 S.Ct. 226.

In sum, we do not see any reason to treat the free-rider interest any differently in the agency-fee context than in any other First Amendment context. See *Knox,* 567 U.S., at 311, 321, 132 S.Ct. 2277. We therefore hold that agency fees cannot be upheld on free-rider grounds.

IV

Implicitly acknowledging the weakness of *Abood* 's own reasoning, proponents of agency fees have come forward with alternative justifications for the decision, and we now address these arguments.

A

[22]    The most surprising of these new arguments is the Union respondent's originalist defense of *Abood.* According to this argument, *Abood* was correctly decided because the First Amendment was not originally understood to provide *any* protection for the free speech rights of public employees. Brief for Union Respondent 2–3, 17–20.

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

As an initial matter, we doubt that the Union—or its members—actually want us to hold that public employees have "*no* [free speech] rights." *Id.,* at 1. Cf., *e.g.,* Brief for National Treasury Employees Union as *Amicus Curiae* in *Garcetti v. Ceballos,* O.T. 2005, No. 04–473, p. 7 (arguing for "broa[d] public-employee First Amendment rights); Brief for AFL–CIO as *Amicus Curiae* in No. 04–473 (similar).

It is particularly discordant to find this argument in a brief that trumpets the importance of *stare decisis.* See Brief for Union Respondent 47–57. Taking away free speech protection for public employees would mean overturning decades of landmark precedent. Under the Union's theory, *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny would fall. Yet *Pickering,* as we will discuss, is now the foundation for respondents' chief defense of *Abood.* And indeed, *Abood* itself would have to go if public employees have no free speech rights, since *Abood* holds that the First Amendment prohibits the exaction of agency fees for political or ideological purposes.

**\*2470** 431 U.S., at 234–235, 97 S.Ct. 1782 (finding it "clear" that "a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment"). Our political patronage cases would be doomed. See, *e.g.,* *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Also imperiled would be older precedents like *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (loyalty oaths), *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (disclosure of memberships and contributions), and *Keyishian v. Board of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (subversive speech). Respondents presumably want none of this, desiring instead that we apply the Constitution's supposed original meaning only when it suits them—to retain the part of *Abood* that they like. See Tr. of Oral Arg. 56–57. We will not engage in this halfway originalism.

Nor, in any event, does the First Amendment's original meaning support the Union's claim. The Union offers no persuasive founding-era evidence that public employees were understood to lack free speech protections. While it observes that restrictions on federal employees' activities have existed since the First Congress, most of its historical examples involved limitations on public officials' outside business dealings, not on their speech. See *Ex parte Curtis,* 106 U.S. 371, 372–373, 1 S.Ct. 381, 27 L.Ed. 232 (1882). The only early *speech* restrictions the Union identifies are an 1806 statute prohibiting military personnel from using " 'contemptuous or disrespectful words against the President' " and other officials, and an 1801 directive limiting electioneering by top government employees. Brief for Union Respondent 3. But those examples at most show that the government was understood to have power to limit employee speech that threatened important governmental interests (such as maintaining military discipline and preventing corruption)—not that public employees' speech was entirely unprotected. Indeed, more recently this Court has upheld similar restrictions even while recognizing that government employees possess First Amendment rights. See, *e.g.,* *Brown v. Glines,* 444 U.S. 348, 353, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (upholding military restriction on speech that threatened troop readiness); *Civil Service Comm'n v. Letter Carriers,* 413 U.S. 548, 556–557, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding limits on public employees' political activities).

Ultimately, the Union relies, not on founding-era evidence, but on dictum from a 1983 opinion of this Court stating that, "[f]or most of th[e 20th] century, the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708; see Brief for Union Respondent 2, 17. Even on its own terms, this dictum about 20th-century views does not purport to describe how the First Amendment was understood in 1791. And a careful examination of the decisions by this Court that *Connick* cited to support its dictum, see 461 U.S., at 144, 103 S.Ct. 1684, reveals that none of them rested on the facile premise that public employees are unprotected by the First Amendment. Instead, they considered

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1284 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

(much as we do today) whether particular speech restrictions were "necessary to protect" fundamental government interests. *Curtis, supra,* at 374, 1 S.Ct. 381.

 **\*2471** The Union has also failed to show that, even if public employees enjoyed free speech rights, the First Amendment was nonetheless originally understood to allow forced subsidies like those at issue here. We can safely say that, at the time of the adoption of the First Amendment, no one gave any thought to whether public-sector unions could charge nonmembers agency fees. Entities resembling labor unions did not exist at the founding, and public-sector unions did not emerge until the mid–20th century. The idea of public-sector unionization and agency fees would astound those who framed and ratified the Bill of Rights. [7] Thus, the Union cannot point to any accepted founding-era practice that even remotely resembles the compulsory assessment of agency fees from public-sector employees. We do know, however, that prominent members of the founding generation condemned laws requiring public employees to affirm or support beliefs with which they disagreed. As noted, Jefferson denounced compelled support for such beliefs as " 'sinful and tyrannical,' " *supra,* at 2464, and others expressed similar views. [8]

In short, the Union has offered no basis for concluding that *Abood* is supported by the original understanding of the First Amendment.

### B

 **[23]**   **[24]**   The principal defense of *Abood* advanced by respondents and the dissent is based on our decision in *Pickering,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, which held that a school district violated the First Amendment by firing a teacher for writing a letter critical of the school administration. Under *Pickering* and later cases in the same line, employee speech is largely unprotected if it is part of what the employee is paid to do, see *Garcetti v. Ceballos,* 547 U.S. 410, 421–422, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), or if it involved a matter of only private concern, see *Connick, supra,* at 146–149, 103 S.Ct. 1684. On the other hand, when a public employee speaks as a citizen on a matter of public concern, the employee's speech is protected unless " 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees' outweighs 'the interests of the [employee], as a citizen, in commenting upon matters of public concern.' " *Harris,* 573 U.S., at ——, 134 S.Ct., at 2642 (quoting *Pickering, supra,* at 568, 88 S.Ct. 1731). *Pickering* was the centerpiece of the defense of *Abood* in *Harris, see* 573 U.S., at —— – ——, 134 S.Ct., at 2653–2656 (KAGAN, J., dissenting), and we found the argument unpersuasive, see **\*2472** *id.,* at —— – ——, 134 S.Ct., at 2641–2643. The intervening years have not improved its appeal.

### 1

 **[25]**   As we pointed out in *Harris, Abood* was not based on *Pickering.* 573 U.S., at ——, and n. 26, 134 S.Ct., at 2641, and n. 26. The *Abood* majority cited the case exactly once—in a footnote—and then merely to acknowledge that "there may be limits on the extent to which an employee in a sensitive or policymaking position may freely criticize his superiors and the policies they espouse." 431 U.S., at 230, n. 27, 97 S.Ct. 1782. That aside has no bearing on the agency-fee issue here. [9]

Respondents' reliance on *Pickering* is thus "an effort to find a new justification for the decision in *Abood.*" *Harris, supra,* at ——, 134 S.Ct., at 2641. And we have previously taken a dim view of similar attempts to recast problematic First Amendment decisions. See, *e.g., Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 348–349, 363, 130 S.Ct. 876, 175 L.Ed.2d

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

753 (2010)) (rejecting efforts to recast 🔺 *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990)); see also *Citizens United, supra,* at 382–385, 130 S.Ct. 876 (ROBERTS, C.J., concurring). We see no good reason, at this late date, to try to shoehorn *Abood* into the *Pickering* framework.

2

Even if that were attempted, the shoe would be a painful fit for at least three reasons.

[26]    First, the *Pickering* framework was developed for use in a very different context—in cases that involve "one employee's speech and its impact on that employee's public responsibilities." *United States v. Treasury Employees,* 513 U.S. 454, 467, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). This case, by contrast, involves a blanket requirement that all employees subsidize speech with which they may not agree. While we have sometimes looked to *Pickering* in considering general rules that affect broad categories of employees, we have acknowledged that the standard *Pickering* analysis requires modification in that situation. See 513 U.S., at 466–468, and n. 11, 115 S.Ct. 1003. A speech-restrictive law with "widespread impact," we have said, "gives rise to far more serious concerns than could any single supervisory decision." *Id., at* 468, 115 S.Ct. 1003. Therefore, when such a law is at issue, the government must shoulder a correspondingly "heav[ier]" burden, *id., at* 466, 115 S.Ct. 1003, and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights, see *id., at* 475–476, n. 21, 115 S.Ct. 1003; accord, *id., at* 482–483, 115 S.Ct. 1003 (O'Connor, J., concurring in judgment in part and dissenting in part). The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis.

The core collective-bargaining issue of wages and benefits illustrates this point. Suppose that a single employee complains that he or she should have received a 5% raise. This individual complaint would **\*2473** likely constitute a matter of only private concern and would therefore be unprotected under *Pickering.* But a public-sector union's demand for a 5% raise for the many thousands of employees it represents would be another matter entirely. Granting such a raise could have a serious impact on the budget of the government unit in question, and by the same token, denying a raise might have a significant effect on the performance of government services. When a large number of employees speak through their union, the category of speech that is of public concern is greatly enlarged, and the category of speech that is of only private concern is substantially shrunk. By disputing this, *post,* at 2493 – 2494, the dissent denies the obvious.

[27]    Second, the *Pickering* framework fits much less well where the government compels speech or speech subsidies in support of third parties. *Pickering* is based on the insight that the speech of a public-sector employee may interfere with the effective operation of a government office. When a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different. Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message. See *Garcetti,* 547 U.S., at 421–422, 425–426, 126 S.Ct. 1951. Otherwise, however, it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case.

Consider our decision in *Connick.* In that case, we held that an assistant district attorney's complaints about the supervisors in her office were, for the most part, matters of only private concern. *461 U.S., at* 148, 103 S.Ct. 1684. As a result, we held, the district attorney could fire her for making those comments. *Id., at* 154, 103 S.Ct. 1684. Now, suppose that the assistant had not made any critical comments about the supervisors but that the district attorney, out of the blue, demanded that she circulate a memo praising the supervisors. Would her refusal to go along still be a matter of purely private concern? And if not, would

the order be justified on the ground that the effective operation of the office demanded that the assistant voice complimentary sentiments with which she disagreed? If *Pickering* applies at all to compelled speech—a question that we do not decide—it would certainly require adjustment in that context.

Third, although both *Pickering* and *Abood* divided speech into two categories, the cases' categorization schemes do not line up. Superimposing the *Pickering* scheme on *Abood* would significantly change the *Abood* regime.

Let us first look at speech that is not germane to collective bargaining but instead concerns political or ideological issues. Under *Abood,* a public employer is flatly prohibited from permitting nonmembers to be charged for this speech, but under *Pickering,* the employees' free speech interests could be overcome if a court found that the employer's interests outweighed the employees'.

A similar problem arises with respect to speech that *is* germane to collective bargaining. The parties dispute how much of this speech is of public concern, but respondents concede that much of it falls squarely into that category. See Tr. of Oral Arg. 47, 65. Under *Abood,* nonmembers may be required to pay for all this speech, but *Pickering* would permit that practice only if the employer's interests outweighed those of the employees. Thus, recasting *Abood* as an application of *Pickering* **\*2474** would substantially alter the *Abood* scheme.

For all these reasons, *Pickering* is a poor fit indeed.

V

Even if we were to apply some form of *Pickering,* Illinois' agency-fee arrangement would not survive.

A

[28] [29] Respondents begin by suggesting that union speech in collective-bargaining and grievance proceedings should be treated like the employee speech in *Garcetti, i.e.,* as speech "pursuant to [an employee's] official duties," 547 U.S., at 421, 126 S.Ct. 1951. Many employees, in both the public and private sectors, are paid to write or speak for the purpose of furthering the interests of their employers. There are laws that protect public employees from being compelled to say things that they reasonably believe to be untrue or improper, see *id.,* at 425–426, 126 S.Ct. 1951, but in general when public employees are performing their job duties, their speech may be controlled by their employer. Trying to fit union speech into this framework, respondents now suggest that the union speech funded by agency fees forms part of the official duties of the union officers who engage in the speech. Brief for Union Respondent 22–23; see Brief for State Respondents 23–24.

This argument distorts collective bargaining and grievance adjustment beyond recognition. When an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer. The employee is effectively the employer's spokesperson. But when a union negotiates with the employer or represents employees in disciplinary proceedings, the union speaks for the *employees,* not the employer. Otherwise, the employer would be negotiating with itself and disputing its own actions. That is not what anybody understands to be happening.

What is more, if the union's speech is really the employer's speech, then the employer could dictate what the union says. Unions, we trust, would be appalled by such a suggestion. For these reasons, *Garcetti* is totally inapposite here.

B

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1287 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

**[30]**    Since the union speech paid for by agency fees is not controlled by *Garcetti,* we move on to the next step of the *Pickering* framework and ask whether the speech is on a matter of public or only private concern. In *Harris,* the dissent's central argument in defense of *Abood* was that union speech in collective bargaining, including speech about wages and benefits, is basically a matter of only private interest. See 573 U.S., at —— – ——, 134 S.Ct., at 2654–2655 (KAGAN, J., dissenting). We squarely rejected that argument, see *id.,* at —— – ——, 134 S.Ct., at 2642–2643, and the facts of the present case substantiate what we said at that time: "[I]t is impossible to argue that the level of ... state spending for employee benefits ... is not a matter of great public concern," *id.,* at —— – ——, 134 S.Ct., at 2642–2643.

Illinois, like some other States and a number of counties and cities around the country, suffers from severe budget problems. [10] As of 2013, Illinois had nearly **\*2475** \$160 billion in unfunded pension and retiree healthcare liabilities. [11] By 2017, that number had only grown, and the State was grappling with \$15 billion in unpaid bills. [12] We are told that a "quarter of the budget is now devoted to paying down" those liabilities. [13] These problems and others led Moody's and S & P to downgrade Illinois' credit rating to "one step above junk"—the "lowest ranking on record for a U.S. state." [14]

The Governor, on one side, and public-sector unions, on the other, disagree sharply about what to do about these problems. The State claims that its employment-related debt is " 'squeezing core programs in education, public safety, and human services, in addition to limiting [the State's] ability to pay [its] bills.' " Securities Act of 1933 Release No. 9389, 105 S.E.C. Docket 3381 (2013). It therefore "told the Union that it would attempt to address th[e financial] crisis, at least in part, through collective bargaining." Board Decision 12–13. And "the State's desire for savings" in fact "dr[o]ve [its] bargaining" positions on matters such as health-insurance benefits and holiday, overtime, and promotion policies. *Id.,* at 13; *Illinois Dept. of Central Management Servs. v. AFSCME, Council 31,* No. S–CB–16–17 etc., 33 PERI ¶ 67 (ILRB Dec. 13, 2016) (ALJ Decision), pp. 26–28, 63–66, 224. But when the State offered cost-saving proposals on these issues, the Union countered with very different suggestions. Among other things, it advocated wage and tax increases, cutting spending "to Wall Street financial institutions," and reforms to Illinois' pension and tax systems (such as closing "corporate tax loopholes," "[e]xpanding the base of the state sales tax," and "allowing an income tax that is adjusted in accordance with ability to pay"). *Id.,* at 27–28. To suggest that speech on such matters is not of great public concern—or that it is not directed at the "public square," *post,* at 2495 (KAGAN, J., dissenting) —is to deny reality.

In addition to affecting how public money is spent, union speech in collective bargaining addresses many other important matters. As the examples offered by respondents' own *amici* show, unions express views on a wide range of subjects—education, child welfare, healthcare, and minority rights, to name a few. See, *e.g.,* Brief for American Federation of Teachers as *Amicus Curiae* 15–27; Brief for Child Protective Service Workers et al. as *Amici Curiae* 5–13; Brief for Human Rights Campaign et al. as *Amici Curiae* 10–17; Brief for National Women's Law Center et al. as *Amici Curiae* 14–30. What unions have to say on these matters in the context of collective bargaining is of great public importance.

Take the example of education, which was the focus of briefing and argument in **\*2476** *Friedrichs*. The public importance of subsidized union speech is especially apparent in this field, since educators make up by far the largest category of state and local government employees, and education is typically the largest component of state and local government expenditures. [15]

Speech in this area also touches on fundamental questions of education policy. Should teacher pay be based on seniority, the better to retain experienced teachers? Or should schools adopt merit-pay systems to encourage teachers to get the best results out of their students? [16] Should districts transfer more experienced teachers to the lower performing schools that may have the greatest need for their skills, or should those teachers be allowed to stay where they have put down roots? [17] Should teachers be given tenure protection and, if so, under what conditions? On what grounds and pursuant to what procedures should teachers be subject to discipline or dismissal? How should teacher performance and student progress be measured—by standardized tests or other means?

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1288 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

Unions can also speak out in collective bargaining on controversial subjects such as climate change, [18] the Confederacy, [19] sexual orientation and gender identity, [20] evolution, [21] and minority religions. [22] These are sensitive political topics, and they are undoubtedly matters of profound " 'value and concern to the public.' " *Snyder v. Phelps,* 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). We have often recognized that such speech " 'occupies the highest rung of the hierarchy of First Amendment values' " and merits " 'special protection.' " *Id., at 452, 131 S.Ct. 1207.*

What does the dissent say about the prevalence of such issues? The most that it is willing to admit is that "some" issues that arise in collective bargaining "raise important non-budgetary disputes." *Post,* at 2496. Here again, the dissent refuses to recognize what actually occurs in public-sector collective bargaining.

[31]   Even union speech in the handling of grievances may be of substantial public importance and may be directed at the "public square." *Post,* at 2495. For instance, the Union respondent in this case recently filed a grievance seeking to compel Illinois to appropriate $75 million to fund a 2% wage increase. *State v.* **\*2477** *AFSCME Council 31, 2016 IL 118422, 401 Ill.Dec. 907, 51 N.E.3d 738, 740–742, and n. 4.* In short, the union speech at issue in this case is overwhelmingly of substantial public concern.

C

[32]   The only remaining question under *Pickering* is whether the State's proffered interests justify the heavy burden that agency fees inflict on nonmembers' First Amendment interests. We have already addressed the state interests asserted in *Abood*—promoting "labor peace" and avoiding free riders, see *supra,* at 2465 – 2469—and we will not repeat that analysis.

In *Harris* and this case, defenders of *Abood* have asserted a different state interest—in the words of the *Harris* dissent, the State's "interest in bargaining with an adequately funded exclusive bargaining agent." *573 U.S., at ——, 134 S.Ct., at 2648* (KAGAN, J., dissenting); see also *post,* at 2489 – 2490 (KAGAN, J., dissenting). This was not "the interest *Abood* recognized and protected," *Harris, supra,* at ——, *134 S.Ct., at 2648* (KAGAN, J., dissenting), and, in any event, it is insufficient.

Although the dissent would accept without any serious independent evaluation the State's assertion that the absence of agency fees would cripple public-sector unions and thus impair the efficiency of government operations, see *post,* at 2490 – 2491, 2492 - 2493, ample experience, as we have noted, *supra,* at 2465 - 2466, shows that this is questionable.

Especially in light of the more rigorous form of *Pickering* analysis that would apply in this context, see *supra,* at 2472 – 2473, the balance tips decisively in favor of the employees' free speech rights. [23]

[33]   [34]   [35]   We readily acknowledge, as *Pickering* did, that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *391 U.S., at 568, 88 S.Ct. 1731.* Our analysis is consistent with that principle. The exacting scrutiny standard we apply in this case was developed in the context of commercial speech, another area where the government has traditionally enjoyed greater-than-usual power to regulate speech. See **\*2478** *supra,* at 2464 –2465. It is also not disputed that the State may require that a union serve as exclusive bargaining agent for its employees—itself a significant impingement on associational freedoms that would not be tolerated in other contexts. We simply draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views. Nothing in the *Pickering* line of cases requires us to uphold every speech restriction the government imposes as an employer. See *Pickering, supra,*

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1289 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)
211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

at 564–566, 88 S.Ct. 1731 (holding teacher's dismissal for criticizing school board unconstitutional); *Rankin v. McPherson,* 483 U.S. 378, 392, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (holding clerical employee's dismissal for supporting assassination attempt on President unconstitutional); *Treasury Employees,* 513 U.S., at 477, 115 S.Ct. 1003 (holding federal-employee honoraria ban unconstitutional).

## VI

[36]   For the reasons given above, we conclude that public-sector agency-shop arrangements violate the First Amendment, and *Abood* erred in concluding otherwise. There remains the question whether *stare decisis* nonetheless counsels against overruling *Abood*. It does not.

[37]   [38]   "*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). We will not overturn a past decision unless there are strong grounds for doing so. *United States v. International Business Machines Corp.,* 517 U.S. 843, 855–856, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996); *Citizens United,* 558 U.S., at 377, 130 S.Ct. 876 (ROBERTS, C.J., concurring). But as we have often recognized, *stare decisis* is " ' not an inexorable command.' " *Pearson v. Callahan,* 555 U.S. 223, 233, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); see also *Lawrence v. Texas,* 539 U.S. 558, 577, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); *State Oil Co. v. Khan,* 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *Agostini v. Felton,* 521 U.S. 203, 235, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 63, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Payne, supra,* at 828, 111 S.Ct. 2597.

[39]   [40]   [41]   The doctrine "is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Agostini, supra,* at 235, 117 S.Ct. 1997. And *stare decisis* applies with perhaps least force of all to decisions that wrongly denied First Amendment rights: "This Court has not hesitated to overrule decisions offensive to the First Amendment (a fixed star in our constitutional constellation, if there is one)." *Federal Election Comm'n v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 500, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (Scalia, J., concurring in part and concurring in judgment) (internal quotation marks omitted); see also *Citizens United, supra,* at 362–365, 130 S.Ct. 876 (overruling *Austin,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652); *Barnette,* 319 U.S., at 642, 63 S.Ct. 1178 (overruling *Minersville School Dist. v. Gobitis,* 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940) ).

[42]   Our cases identify factors that should be taken into account in deciding whether to overrule a past decision. Five of these are most important here: the quality of *Abood* 's reasoning, the workability of the rule it established, its consistency with other related decisions, developments  **\*2479**  since the decision was handed down, and reliance on the decision. After analyzing these factors, we conclude that *stare decisis* does not require us to retain *Abood*.

## A

[43]   [44]   An important factor in determining whether a precedent should be overruled is the quality of its reasoning, see *Citizens United,* 558 U.S., at 363–364, 130 S.Ct. 876; *id.,* at 382–385, 130 S.Ct. 876 (ROBERTS, C.J., concurring);

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1290 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

*Lawrence,* 539 U.S., at 577–578, 123 S.Ct. 2472, and as we explained in *Harris, Abood* was poorly reasoned, see 573 U.S., at —— – ——, 134 S.Ct., at 2632–2634. We will summarize, but not repeat, *Harris* 's lengthy discussion of the issue.

*Abood* went wrong at the start when it concluded that two prior decisions, *Railway Employes v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), and *Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), "appear[ed] to require validation of the agency-shop agreement before [the Court]." 431 U.S., at 226, 97 S.Ct. 1782. Properly understood, those decisions did no such thing. Both cases involved Congress's "*bare authorization* " of *private-sector* union shops under the Railway Labor Act. *Street, supra,* at 749, 81 S.Ct. 1784 (emphasis added). [24] *Abood* failed to appreciate that a very different First Amendment question arises when a State *requires* its employees to pay agency fees. See *Harris, supra,* at ——, 134 S.Ct., at 2632.

Moreover, neither *Hanson* nor *Street* gave careful consideration to the First Amendment. In *Hanson,* the primary questions were whether Congress exceeded its power under the Commerce Clause or violated substantive due process by authorizing private union-shop arrangements under the Commerce and Due Process Clauses. 351 U.S., at 233–235, 76 S.Ct. 714. After deciding those questions, the Court summarily dismissed what was essentially a facial First Amendment challenge, noting that the record did not substantiate the challengers' claim. *Id.,* at 238, 76 S.Ct. 714; see *Harris, supra,* at ——, 134 S.Ct., at 2632. For its part, *Street* was decided as a matter of statutory construction, and so did not reach any constitutional issue. 367 U.S., at 749–750, 768–769, 81 S.Ct. 1784. *Abood* nevertheless took the view that *Hanson* and *Street* "all but decided" the important free speech issue that was before the Court. *Harris,* 573 U.S., at ——, 134 S.Ct., at 2632. As we said in *Harris,* "[s]urely a First Amendment issue of this importance deserved better treatment." *Ibid.*

*Abood* 's unwarranted reliance on *Hanson* and *Street* appears to have contributed to another mistake: *Abood* judged the constitutionality of public-sector agency **\*2480** fees under a deferential standard that finds no support in our free speech cases. (As noted, *supra,* at 2464 – 2465, today's dissent makes the same fundamental mistake.) *Abood* did not independently evaluate the strength of the government interests that were said to support the challenged agency-fee provision; nor did it ask how well that provision actually promoted those interests or whether they could have been adequately served without impinging so heavily on the free speech rights of nonmembers. Rather, *Abood* followed *Hanson* and *Street,* which it interpreted as having deferred to "*the legislative assessment* of the important contribution of the union shop to the system of labor relations established by Congress." 431 U.S., at 222, 97 S.Ct. 1782 (emphasis added). But *Hanson* deferred to that judgment in deciding the Commerce Clause and substantive due process questions that were the focus of the case. Such deference to legislative judgments is inappropriate in deciding free speech issues.

If *Abood* had considered whether agency fees were actually needed to serve the asserted state interests, it might not have made the serious mistake of assuming that one of those interests—"labor peace"—demanded, not only that a single union be designated as the exclusive representative of all the employees in the relevant unit, but also that nonmembers be required to pay agency fees. Deferring to a perceived legislative judgment, *Abood* failed to see that the designation of a union as exclusive representative and the imposition of agency fees are not inextricably linked. See *supra,* at 2465 – 2466; *Harris, supra,* at 2465 – 2466, 134 S.Ct., at 2640.

*Abood* also did not sufficiently take into account the difference between the effects of agency fees in public- and private-sector collective bargaining. The challengers in *Abood* argued that collective bargaining with a government employer, unlike collective bargaining in the private sector, involves "inherently 'political' " speech. 431 U.S., at 226, 97 S.Ct. 1782. The Court did not dispute that characterization, and in fact conceded that "decisionmaking by a public employer is above all a political process"

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1291 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

driven more by policy concerns than economic ones. *Id., at 228, 97 S.Ct. 1782*; see *id., at 228–231, 97 S.Ct. 1782*. But (again invoking *Hanson* ), the *Abood* Court asserted that public employees do not have "weightier First Amendment interest[s]" against compelled speech than do private employees. *Id., at 229, 97 S.Ct. 1782*. That missed the point. Assuming for the sake of argument that the First Amendment applies at all to private-sector agency-shop arrangements, the individual interests at stake still differ. "In the public sector, core issues such as wages, pensions, and benefits are important political issues, but that is generally not so in the private sector." *Harris, 573 U.S., at ——, 134 S.Ct., at 2632.*

Overlooking the importance of this distinction, "*Abood* failed to appreciate the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends." *Id., at ——, 134 S.Ct., at 2632.* Likewise, "*Abood* does not seem to have anticipated the magnitude of the practical administrative problems that would result in attempting to classify public-sector union expenditures as either 'chargeable' ... or nonchargeable." *Ibid.* Nor did *Abood* "foresee the practical problems that would face objecting nonmembers." *Id., at ——, 134 S.Ct., at 2633.*

[45]    In sum, as detailed in *Harris,* **\*2481** *Abood* was not well reasoned. [25]


                                        B


[46]    Another relevant consideration in the *stare decisis* calculus is the workability of the precedent in question, *Montejo v. Louisiana,* 556 U.S. 778, 792, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009), and that factor also weighs against *Abood*.


                                        1


*Abood* 's line between chargeable and nonchargeable union expenditures has proved to be impossible to draw with precision. We tried to give the line some definition in *Lehnert*. There, a majority of the Court adopted a three-part test requiring that chargeable expenses (1) be " 'germane' " to collective bargaining, (2) be "justified" by the government's labor-peace and free-rider interests, and (3) not add "significantly" to the burden on free speech, 500 U.S., at 519, 111 S.Ct. 1950, but the Court splintered over the application of this test, see *id., at 519–522, 111 S.Ct. 1950* (plurality opinion); *id., at 533–534, 111 S.Ct. 1950* (Marshall, J., concurring in part and dissenting in part). That division was not surprising. As the *Lehnert* dissenters aptly observed, each part of the majority's test "involves a substantial judgment call," *id., at 551, 111 S.Ct. 1950* (opinion of Scalia, J.), rendering the test "altogether malleable" and "no[t] principled," *id., at 563, 111 S.Ct. 1950* (KENNEDY, J., concurring in judgment in part and dissenting in part).

Justice Scalia presciently warned that *Lehnert* 's amorphous standard would invite "perpetua[l] give-it-a-try litigation," *id., at 551, 111 S.Ct. 1950,* and the Court's experience with union lobbying expenses illustrates the point. The *Lehnert* plurality held that money spent on lobbying for increased education funding was not chargeable. *Id., at 519–522, 111 S.Ct. 1950.* But Justice Marshall—applying the same three-prong test—reached precisely the opposite conclusion. *Id., at 533–542, 111 S.Ct. 1950.* And *Lehnert* failed to settle the matter; States and unions have continued to "give it a try" ever since.

In *Knox,* for example, we confronted a union's claim that the costs of lobbying the legislature and the electorate about a ballot measure were chargeable expenses under *Lehnert*. See Brief for Respondent in *Knox v. Service Employees,* O.T. 2011, No. 10–

1121, pp. 48–53. The Court rejected this claim out of hand, 567 U.S., at 320–321, 132 S.Ct. 2277, but the dissent refused to do so, *id., at 336, 132 S.Ct. 2277* (opinion of BREYER, J.). And in the present case, nonmembers are required to pay for unspecified "[l]obbying" expenses and for "[s]ervices" that "may ultimately inure to the benefit of the members of the local bargaining unit." App. to Pet. for Cert. 31a–32a. That formulation is broad enough to encompass just about anything that the union might choose to do.

Respondents agree that *Abood* 's chargeable-nonchargeable line suffers from "a vagueness problem," that it sometimes "allows what it shouldn't allow," and that "a firm[er] line c[ould] be drawn." Tr. of Oral Arg. 47–48. They therefore argue that we should "consider revisiting" this part of *Abood*. Tr. of Oral Arg. 66; see Brief for Union Respondent 46–47; Brief for State Respondents 30. This concession **\*2482** only underscores the reality that *Abood* has proved unworkable: Not even the parties defending agency fees support the line that it has taken this Court over 40 years to draw.

2

Objecting employees also face a daunting and expensive task if they wish to challenge union chargeability determinations. While *Hudson* requires a union to provide nonmembers with "sufficient information to gauge the propriety of the union's fee," 475 U.S., at 306, 106 S.Ct. 1066, the *Hudson* notice in the present case and in others that have come before us do not begin to permit a nonmember to make such a determination.

In this case, the notice lists categories of expenses and sets out the amount in each category that is said to be attributable to chargeable and nonchargeable expenses. Here are some examples regarding the Union respondent's expenditures:

| Category | Total Expense | Chargeable Expense |
|---|---|---|
| Salary and Benefits | $14,718,708 | $11,830,230 |
| Office Printing, Supplies, and Advertising | $148,272 | $127,959 |
| Postage and Freight | $373,509 | $268,107 |
| Telephone | $214,820 | $192,721 |
| Convention Expense | $268,855 | $268,855 |

See App. to Pet. for Cert. 35a–36a.
How could any nonmember determine whether these numbers are even close to the mark without launching a legal challenge and retaining the services of attorneys and accountants? Indeed, even with such services, it would be a laborious and difficult task to check these figures. [26]

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1293 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

The Union respondent argues that challenging its chargeability determinations is not burdensome because the Union pays for the costs of arbitration, see Brief for Union Respondent 10–11, but objectors must still pay for the attorneys and experts needed to mount a serious challenge. And the attorney's fees incurred in such a proceeding can be substantial. See, *e.g., Knox v. Chiang,* 2013 WL 2434606, \*15 (E.D.Cal., June 5, 2013) (attorney's fees in *Knox* exceeded $1 million). The Union respondent's suggestion that an objector could obtain adequate review without even showing up at an arbitration, see App. to Pet. for Cert. 40a–41a, is therefore farfetched.

## C

Developments since *Abood,* both factual and legal, have also "eroded" the decision's "underpinnings" and left it an outlier among our First Amendment cases. *United* **\*2483** *States v. Gaudin,* 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

### 1

*Abood* pinned its result on the "unsupported empirical assumption" that "the principle of exclusive representation in the public sector is dependent on a union or agency shop." *Harris,* 573 U.S., at ——, 134 S.Ct., at 2634; *Abood,* 431 U.S., at 220–222, 97 S.Ct. 1782. But, as already noted, experience has shown otherwise. See *supra,* at 2465 – 2466.

It is also significant that the Court decided *Abood* against a very different legal and economic backdrop. Public-sector unionism was a relatively new phenomenon in 1977. The first State to permit collective bargaining by government employees was Wisconsin in 1959, R. Kearney & P. Mareschal, Labor Relations in the Public Sector 64 (5th ed. 2014), and public-sector union membership remained relatively low until a "spurt" in the late 1960's and early 1970's, shortly before *Abood* was decided, Freeman, Unionism Comes to the Public Sector, 24 J. Econ. Lit. 41, 45 (1986). Since then, public-sector union membership has come to surpass private-sector union membership, even though there are nearly four times as many total private-sector employees as public-sector employees. B. Hirsch & D. Macpherson, Union Membership and Earnings Data Book 9–10, 12, 16 (2013 ed.).

This ascendance of public-sector unions has been marked by a parallel increase in public spending. In 1970, total state and local government expenditures amounted to $646 per capita in nominal terms, or about $4,000 per capita in 2014 dollars. See Dept. of Commerce, Statistical Abstract of the United States: 1972, p. 419; CPI Inflation Calculator, BLS, http://data.bls.gov/cgi-bin/cpicalc.pl. By 2014, that figure had ballooned to approximately $10,238 per capita. ProQuest, Statistical Abstract of the United States: 2018, pp. 17, Table 14, 300, Table 469. Not all that increase can be attributed to public-sector unions, of course, but the mounting costs of public-employee wages, benefits, and pensions undoubtedly played a substantial role. We are told, for example, that Illinois' pension funds are underfunded by $129 billion as a result of generous public-employee retirement packages. Brief for Jason R. Barclay et al. as *Amici Curiae* 9, 14. Unsustainable collective-bargaining agreements have also been blamed for multiple municipal bankruptcies. See Brief for State of Michigan et al. as *Amici Curiae* 10–19. These developments, and the political debate over public spending and debt they have spurred, have given collective-bargaining issues a political valence that *Abood* did not fully appreciate.

### 2

*Abood* is also an "anomaly" in our First Amendment jurisprudence, as we recognized in *Harris* and *Knox. Harris, supra,* at ——, 134 S.Ct., at 2627; *Knox,* 567 U.S., at 311, 132 S.Ct. 2277. This is not an altogether new observation. In *Abood* itself, Justice Powell faulted the Court for failing to perform the " 'exacting scrutiny' " applied in other cases involving significant

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1294 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

impingements on First Amendment rights. 431 U.S., at 259, 97 S.Ct. 1782; see *id.,* at 259–260, and n. 14, 97 S.Ct. 1782. Our later cases involving compelled speech and association have also employed exacting scrutiny, if not a more demanding standard. See, *e.g., Roberts,* 468 U.S., at 623, 104 S.Ct. 3244; *United Foods,* 533 U.S., at 414, 121 S.Ct. 2334. And we have more recently refused, even in agency-fee cases, to extend *Abood* beyond circumstances where it directly controls. See *Knox, supra,* at 314, 132 S.Ct. 2277; *Harris, supra,* at —— – ——, 134 S.Ct., at 2639.

**\*2484** *Abood* particularly sticks out when viewed against our cases holding that public employees generally may not be required to support a political party. See *Elrod,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547; *Branti,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574; *Rutan,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52; *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996). The Court reached that conclusion despite a "long tradition" of political patronage in government. *Rutan, supra,* at 95, 110 S.Ct. 2729 (Scalia, J., dissenting); see also *Elrod,* 427 U.S., at 353, 96 S.Ct. 2673 (plurality opinion); *id.,* at 377–378, 96 S.Ct. 2673 (Powell, J., dissenting). It is an odd feature of our First Amendment cases that political patronage has been deemed largely unconstitutional, while forced subsidization of union speech (which has no such pedigree) has been largely permitted. As Justice Powell observed: "I am at a loss to understand why the State's decision to adopt the agency shop in the public sector should be worthy of *greater* deference, when challenged on First Amendment grounds, than its decision to adhere to the *tradition* of political patronage." *Abood,* *supra,* at 260, n. 14, 97 S.Ct. 1782 (opinion concurring in judgment) (citing *Elrod, supra,* at 376–380, 382–387, 96 S.Ct. 2673 (Powell, J., dissenting); emphasis added). We have no occasion here to reconsider our political patronage decisions, but Justice Powell's observation is sound as far as it goes. By overruling *Abood,* we end the oddity of privileging compelled union support over compelled party support and bring a measure of greater coherence to our First Amendment law.

### D

[47] [48] In some cases, reliance provides a strong reason for adhering to established law, see, *e.g., Hilton v. South Carolina Public Railways Comm'n,* 502 U.S. 197, 202–203, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991), and this is the factor that is stressed most strongly by respondents, their *amici,* and the dissent. They contend that collective-bargaining agreements now in effect were negotiated with agency fees in mind and that unions may have given up other benefits in exchange for provisions granting them such fees. Tr. of Oral Arg. 67–68; see Brief for State Respondents 54; Brief for Union Respondent 50; *post,* at 2498 – 2501 (KAGAN, J., dissenting). In this case, however, reliance does not carry decisive weight.

For one thing, it would be unconscionable to permit free speech rights to be abridged in perpetuity in order to preserve contract provisions that will expire on their own in a few years' time. "The fact that [public-sector unions] may view [agency fees] as an entitlement does not establish the sort of reliance interest that could outweigh the countervailing interest that [nonmembers] share in having their constitutional rights fully protected." *Arizona v. Gant,* 556 U.S. 332, 349, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

For another, *Abood* does not provide "a clear or easily applicable standard, so arguments for reliance based on its clarity are misplaced." *South Dakota v. Wayfair, Inc., ante,* at 20, —— U.S. ——, 138 S.Ct. 2080, —— L.Ed.2d ——, 2018 WL 3058015 (2018); see *supra,* at 2480 – 2482.

This is especially so because public-sector unions have been on notice for years regarding this Court's misgivings about *Abood*. In *Knox,* decided in 2012, we described *Abood* as a First Amendment "anomaly." 567 U.S., at 311, 132 S.Ct. 2277. Two years later in *Harris*, we were asked to overrule *Abood,* and while we found it unnecessary to take that step, we cataloged

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1295 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

*Abood*'s many weaknesses. In **\*2485** 2015, we granted a petition for certiorari asking us to review a decision that sustained an agency-fee arrangement under *Abood*. *Friedrichs v. California Teachers Assn.,* 576 U.S. ——, 136 S.Ct. 2545, 195 L.Ed.2d 880 (2016). After exhaustive briefing and argument on the question whether *Abood* should be overruled, we affirmed the decision below by an equally divided vote. 578 U.S. ——, 136 S.Ct. 1083, 194 L.Ed.2d 255 (2016) (*per curiam* ). During this period of time, any public-sector union seeking an agency-fee provision in a collective-bargaining agreement must have understood that the constitutionality of such a provision was uncertain.

That is certainly true with respect to the collective-bargaining agreement in the present case. That agreement initially ran from July 1, 2012, until June 30, 2015. App. 331. Since then, the agreement has been extended pursuant to a provision providing for automatic renewal for an additional year unless either party gives timely notice that it desires to amend or terminate the contract. *Ibid.* Thus, for the past three years, the Union could not have been confident about the continuation of the agency-fee arrangement for more than a year at a time.

Because public-sector collective-bargaining agreements are generally of rather short duration, a great many of those now in effect probably began or were renewed since *Knox* (2012) or *Harris* (2014). But even if an agreement antedates those decisions, the union was able to protect itself if an agency-fee provision was essential to the overall bargain. A union's attorneys undoubtedly understand that if one provision of a collective-bargaining agreement is found to be unlawful, the remaining provisions are likely to remain in effect. See *NLRB v. Rockaway News Supply Co.,* 345 U.S. 71, 76–79, 73 S.Ct. 519, 97 L.Ed. 832 (1953); see also 8 R. Lord, Williston on Contracts § 19:70 (4th ed. 2010). Any union believing that an agency-fee provision was essential to its bargain could have insisted on a provision giving it greater protection. The agreement in the present case, by contrast, provides expressly that the invalidation of any part of the agreement "shall not invalidate the remaining portions," which "shall remain in full force and effect." App. 328. Such severability clauses ensure that "entire contracts" are not "br[ought] down" by today's ruling. *Post,* at 2499, n. 5 (KAGAN, J., dissenting).

[49]    In short, the uncertain status of *Abood,* the lack of clarity it provides, the short-term nature of collective-bargaining agreements, and the ability of unions to protect themselves if an agency-fee provision was crucial to its bargain all work to undermine the force of reliance as a factor supporting *Abood*. [27]

We recognize that the loss of payments from nonmembers may cause unions to experience unpleasant transition costs in the short term, and may require unions to make adjustments in order to attract and   **\*2486** retain members. But we must weigh these disadvantages against the considerable windfall that unions have received under *Abood* for the past 41 years. It is hard to estimate how many billions of dollars have been taken from nonmembers and transferred to public-sector unions in violation of the First Amendment. Those unconstitutional exactions cannot be allowed to continue indefinitely.

[50]    [51]    [52]    All these reasons—that *Abood* 's proponents have abandoned its reasoning, that the precedent has proved unworkable, that it conflicts with other First Amendment decisions, and that subsequent developments have eroded its underpinnings—provide the " 'special justification[s]' " for overruling *Abood. Post,* at 2497 (KAGAN, J., dissenting) (quoting *Kimble v. Marvel Entertainment, LLC,* 576 U.S. ——, ——, 135 S.Ct. 2401, 2409, 192 L.Ed.2d 463 (2015) ). [28]

VII

For these reasons, States and public-sector unions may no longer extract agency fees from nonconsenting employees. Under Illinois law, if a public-sector collective-bargaining agreement includes an agency-fee provision and the union certifies to the employer the amount of the fee, that amount is automatically deducted from the nonmember's wages. § 315/6(e). No form of employee consent is required.

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1296 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)
211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

[53]    [54]    This procedure violates the First Amendment and cannot continue. Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay. By agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); see also *Knox,* 567 U.S., at 312–313, 132 S.Ct. 2277. Rather, to be effective, the waiver must be freely given and shown by "clear and compelling" evidence. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion); see also *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 680–682, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Unless employees clearly and affirmatively consent before any money is taken from them, this standard cannot be met.

* * *

*Abood* was wrongly decided and is now overruled. The judgment of the United States Court of Appeals for the Seventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**\*2487**  Justice SOTOMAYOR, dissenting.

I join Justice Kagan's dissent in full. Although I joined the majority in *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011), I disagree with the way that this Court has since interpreted and applied that opinion. See, *e.g.,* *National Institute of Family and Life Advocates v. Becerra, ante,* p. ——, —— U.S. ——, 138 S.Ct. 2361, ——L.Ed.2d ——, 2018 WL 3116336 (2018). Having seen the troubling development in First Amendment jurisprudence over the years, both in this Court and in lower courts, I agree fully with Justice KAGAN that *Sorrell*—in the way it has been read by this Court—has allowed courts to "wiel[d] the First Amendment in ... an aggressive way" just as the majority does today. *Post,* at 2501.

Justice KAGAN, with whom Justice GINSBURG, Justice BREYER, and Justice SOTOMAYOR join, dissenting.

For over 40 years, *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), struck a stable balance between public employees' First Amendment rights and government entities' interests in running their workforces as they thought proper. Under that decision, a government entity could require public employees to pay a fair share of the cost that a union incurs when negotiating on their behalf over terms of employment. But no part of that fair-share payment could go to any of the union's political or ideological activities.

That holding fit comfortably with this Court's general framework for evaluating claims that a condition of public employment violates the First Amendment. The Court's decisions have long made plain that government entities have substantial latitude to regulate their employees' speech—especially about terms of employment—in the interest of operating their workplaces effectively. *Abood* allowed governments to do just that. While protecting public employees' expression about non-workplace matters, the decision enabled a government to advance important managerial interests—by ensuring the presence of an exclusive employee representative to bargain with. Far from an "anomaly," *ante,* at 2463, the *Abood* regime was a paradigmatic example of how the government can regulate speech in its capacity as an employer.

Not any longer. Today, the Court succeeds in its 6–year campaign to reverse *Abood*. See *Friedrichs v. California Teachers Assn.,* 578 U.S. ——, 136 S.Ct. 1083, 194 L.Ed.2d 255 (2016) (*per curiam* ); *Harris v. Quinn,* 573 U.S. ——, 134 S.Ct. 2618, 189 L.Ed.2d 620 (2014); *Knox v. Service Employees,* 567 U.S. 298, 132 S.Ct. 2277, 183 L.Ed.2d 281 (2012). Its

decision will have large-scale consequences. Public employee unions will lose a secure source of financial support. State and local governments that thought fair-share provisions furthered their interests will need to find new ways of managing their workforces. Across the country, the relationships of public employees and employers will alter in both predictable and wholly unexpected ways.

Rarely if ever has the Court overruled a decision—let alone one of this import—with so little regard for the usual principles of *stare decisis*. There are no special justifications for reversing *Abood*. It has proved workable. No recent developments have eroded its underpinnings. And it is deeply entrenched, in both the law and the real world. More than 20 States have statutory schemes built on the decision. Those laws underpin thousands of ongoing contracts involving millions of employees. Reliance interests do not come any stronger than those surrounding **\*2488** *Abood*. And likewise, judicial disruption does not get any greater than what the Court does today. I respectfully dissent.

I

I begin with *Abood,* the 41–year–old precedent the majority overrules. That case involved a union that had been certified as the exclusive representative of Detroit's public school teachers. The union's collective-bargaining agreement with the city included an "agency shop" clause, which required teachers who had not joined the union to pay it "a service charge equal to the regular dues required of [u]nion members." *Abood,* 431 U.S., at 212, 97 S.Ct. 1782. A group of non-union members sued over that clause, arguing that it violated the First Amendment.

In considering their challenge, the Court canvassed the purposes of the "agency shop" clause. It was rooted, the Court understood, in the "principle of exclusive union representation"—a "central element" in "industrial relations" since the New Deal. *Id.,* at 220, 97 S.Ct. 1782. Significant benefits, the Court explained, could derive from the "designation of a single [union] representative" for all similarly situated employees in a workplace. *Ibid.* In particular, such arrangements: "avoid[ ] the confusion that would result from attempting to enforce two or more agreements specifying different terms and conditions of employment"; "prevent[ ] inter-union rivalries from creating dissension within the work force"; "free[ ] the employer from the possibility of facing conflicting demands from different unions"; and "permit [ ] the employer and a single union to reach agreements and settlements that are not subject to attack from rival labor organizations." *Id.,* at 220–221, 97 S.Ct. 1782. As proof, the Court pointed to the example of exclusive-representation arrangements in the private-employment sphere: There, Congress had long thought that such schemes would promote "peaceful labor relations" and "labor stability." *Id.,* at 219, 229, 97 S.Ct. 1782. A public employer like Detroit, the Court believed, could reasonably make the same calculation.

But for an exclusive-bargaining arrangement to work, such an employer often thought, the union needed adequate funding. Because the "designation of a union as exclusive representative carries with it great responsibilities," the Court reasoned, it inevitably also entails substantial costs. *Id.,* at 221, 97 S.Ct. 1782. "The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones." *Ibid.* Those activities, the Court noted, require the "expenditure of much time and money"—for example, payment for the "services of lawyers, expert negotiators, economists, and a research staff." *Ibid.* And there is no way to confine the union's services to union members alone (and thus to trim costs) because unions must by law fairly represent all employees in a given bargaining unit—union members and non-members alike. See *ibid.*

With all that in mind, the Court recognized why both a government entity and its union bargaining partner would gravitate toward an agency-fee clause. Those fees, the Court reasoned, "distribute fairly the cost" of collective bargaining "among those who benefit"—that is, *all* employees in the work unit. *Id.,* at 222, 97 S.Ct. 1782. And they "counteract[ ] the incentive that employees might otherwise have to become 'free riders.' " *Ibid.* In other words, an agency-fee provision prevents employees from reaping all the "benefits of union representation"—higher pay, a better retirement plan, and so forth—while **\*2489**

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

leaving it to others to bear the costs. *Ibid.* To the Court, the upshot was clear: A government entity could reasonably conclude that such a clause was needed to maintain the kind of exclusive bargaining arrangement that would facilitate peaceful and stable labor relations.

But the Court acknowledged as well the "First Amendment interests" of dissenting employees. *Ibid.* It recognized that some workers might oppose positions the union takes in collective bargaining, or even "unionism itself." *Ibid.* And still more, it understood that unions often advance "political and ideological" views outside the collective-bargaining context—as when they "contribute to political candidates." *Id.,* at 232, 234, 97 S.Ct. 1782. Employees might well object to the use of their money to support such "ideological causes." *Id.,* at 235, 97 S.Ct. 1782.

So the Court struck a balance, which has governed this area ever since. On the one hand, employees could be required to pay fees to support the union in "collective bargaining, contract administration, and grievance adjustment." *Id.,* at 225–226, 97 S.Ct. 1782. There, the Court held, the "important government interests" in having a stably funded bargaining partner justify "the impingement upon" public employees' expression. *Id.,* at 225, 97 S.Ct. 1782. But on the other hand, employees could not be compelled to fund the union's political and ideological activities. Outside the collective-bargaining sphere, the Court determined, an employee's First Amendment rights defeated any conflicting government interest. See *id.,* at 234–235, 97 S.Ct. 1782.

## II

Unlike the majority, I see nothing "questionable" about *Abood* 's analysis. *Ante,* at 2463 (quoting *Harris,* 573 U.S., at ——, 134 S.Ct., at 2632). The decision's account of why some government entities have a strong interest in agency fees (now often called fair-share fees) is fundamentally sound. And the balance *Abood* struck between public employers' interests and public employees' expression is right at home in First Amendment doctrine.

## A

*Abood* 's reasoning about governmental interests has three connected parts. First, exclusive representation arrangements benefit some government entities because they can facilitate stable labor relations. In particular, such arrangements eliminate the potential for inter-union conflict and streamline the process of negotiating terms of employment. See 431 U.S., at 220–221, 97 S.Ct. 1782. Second, the government may be unable to avail itself of those benefits unless the single union has a secure source of funding. The various tasks involved in representing employees cost money; if the union doesn't have enough, it can't be an effective employee representative and bargaining partner. See *id.,* at 221, 97 S.Ct. 1782. And third, agency fees are often needed to ensure such stable funding. That is because without those fees, employees have every incentive to free ride on the union dues paid by others. See *id.,* at 222, 97 S.Ct. 1782.

The majority does not take issue with the first point. See *ante,* at 2478 (It is "not disputed that the State may require that a union serve as exclusive bargaining agent for its employees" in order to advance the State's "interests as an employer"). The majority claims that the second point never appears in *Abood,* but is willing to assume it for the sake of argument. See *ante,* at 2476 – 2477; but see *Abood,* 431 U.S., at 221, 97 S.Ct. 1782 (The tasks of an exclusive representative "often entail expenditure of much time and money"). So the majority stakes everything on the **\*2490** third point—the conclusion that maintaining an effective system of exclusive representation often entails agency fees. *Ante,* at 2477 – 2478 (It "is simply not true" that exclusive representation and agency fees are "inextricably linked"); see *ante,* at 2467.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1299 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

But basic economic theory shows why a government would think that agency fees are necessary for exclusive representation to work. What ties the two together, as *Abood* recognized, is the likelihood of free-riding when fees are absent. Remember that once a union achieves exclusive-representation status, the law compels it to fairly represent all workers in the bargaining unit, whether or not they join or contribute to the union. See *supra,* at 2488 – 2489. Because of that legal duty, the union cannot give special advantages to its own members. And that in turn creates a collective action problem of nightmarish proportions. Everyone—not just those who oppose the union, but also those who back it—has an economic incentive to withhold dues; only altruism or loyalty—as *against* financial self-interest—can explain why an employee would pay the union for its services. And so emerged *Abood* 's rule allowing fair-share agreements: That rule ensured that a union would receive sufficient funds, despite its legally imposed disability, to effectively carry out its duties as exclusive representative of the government's employees.

The majority's initial response to this reasoning is simply to dismiss it. "[F]ree rider arguments," the majority pronounces, "are generally insufficient to overcome First Amendment objections." *Ante,* at 2466 (quoting *Knox,* 567 U.S., at 311, 132 S.Ct. 2277). "To hold otherwise," it continues, "would have startling consequences" because "[m]any private groups speak out" in ways that will "benefit[ ] nonmembers." *Ante,* at 2466 – 2467. But that disregards the defining characteristic of *this* free-rider argument—that unions, unlike those many other private groups, must serve members and non-members alike. Groups advocating for "senior citizens or veterans" (to use the majority's examples) have no legal duty to provide benefits to all those individuals: They can spur people to pay dues by conferring all kinds of special advantages on their dues-paying members.

Unions are—by law—in a different position, as this Court has long recognized. See, *e.g., Machinists v. Street,* 367 U.S. 740, 762, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). Justice Scalia, responding to the same argument as the majority's, may have put the point best. In a way that is true of no other private group, the "law *requires* the union to carry" non-members—"indeed, requires the union to *go out of its way* to benefit [them], even at the expense of its other interests." *Lehnert v. Ferris Faculty Assn.,* 500 U.S. 507, 556, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991) (opinion concurring in part and dissenting in part). That special feature was what justified *Abood* : "Where the state imposes upon the union a duty to deliver services, it may permit the union to demand reimbursement for them." *500 U.S., at 556, 111 S.Ct. 1950.*

The majority's fallback argument purports to respond to the distinctive position of unions, but still misses *Abood* 's economic insight. Here, the majority delivers a four-page exegesis on why unions will seek to serve as an exclusive bargaining representative even "if they are not given agency fees." *Ante,* at 2467; see *ante,* at 2467 – 2469. The gist of the account is that "designation as the exclusive representative confers many benefits," which outweigh the costs of providing services to non-members. *Ante,* at 2467. But that response avoids the key question, which is whether unions without agency fees will be *able to* (not whether they will *want to* ) carry on as an effective exclusive representative. **\*2491** And as to that question, the majority again fails to reckon with how economically rational actors behave—in public as well as private workplaces. Without a fair-share agreement, the class of union non-members spirals upward. Employees (including those who love the union) realize that they can get the same benefits even if they let their memberships expire. And as more and more stop paying dues, those left must take up the financial slack (and anyway, begin to feel like suckers)—so they too quit the union. See Ichniowski & Zax, Right–to–Work Laws, Free Riders, and Unionization in the Local Public Sector, 9 J. Labor Economics 255, 257 (1991).[1] And when the vicious cycle finally ends, chances are that the union will lack the resources to effectively perform the responsibilities of an exclusive representative—or, in the worst case, to perform them at all. The result is to frustrate the interests of every government entity that thinks a strong exclusive-representation scheme will promote stable labor relations.

Of course, not all public employers will share that view. Some would rather not bargain with an exclusive representative. Others would prefer that representative to be poorly funded—to serve more as a front than an effectual bargaining partner. But as reflected in the number of fair-share statutes and contracts across the Nation, see *supra,* at 2487 – 2488, many government entities think that effective exclusive representation makes for good labor relations—and recognize, just as *Abood* did, that representation of that kind often depends on agency fees. See, *e.g., Harris,* 573 U.S., at ——, 134 S.Ct., at 2656–2658 (Kagan, J., dissenting) (describing why Illinois thought that bargaining with an adequately funded exclusive representative of in-home caregivers would enable the State to better serve its disabled citizens). *Abood* respected that state interest; today's

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1300 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

majority fails even to understand it. Little wonder that the majority's First Amendment analysis, which involves assessing the government's reasons for imposing agency fees, also comes up short.

B

1

In many cases over many decades, this Court has addressed how the First Amendment applies when the government, acting not as sovereign but as employer, limits its workers' speech. Those decisions have granted substantial latitude to the government, in recognition of its significant interests in managing its workforce so as to best serve the public. *Abood* fit neatly with that caselaw, in both reasoning and result. Indeed, its reversal today creates a significant anomaly—an exception, applying to union fees alone, from the usual rules governing public employees' speech.

**\*2492** "Time and again our cases have recognized that the Government has a much freer hand" in dealing with its employees than with "citizens at large." *NASA v. Nelson,* 562 U.S. 134, 148, 131 S.Ct. 746, 178 L.Ed.2d 667 (2011) (internal quotation marks omitted). The government, we have stated, needs to run "as effectively and efficiently as possible." *Engquist v. Oregon Dept. of Agriculture,* 553 U.S. 591, 598, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (internal quotation marks omitted). That means it must be able, much as a private employer is, to manage its workforce as it thinks fit. A public employee thus must submit to "certain limitations on his or her freedom." *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). Government workers, of course, do not wholly "lose their constitutional rights when they accept their positions." *Engquist,* 553 U.S., at 600, 128 S.Ct. 2146. But under our precedent, their rights often yield when weighed "against the realities of the employment context." *Ibid.* If it were otherwise—if every employment decision were to "bec[o]me a constitutional matter"—"the Government could not function." *NASA,* 562 U.S., at 149, 131 S.Ct. 746 (internal quotation marks omitted).

Those principles apply with full force when public employees' expressive rights are at issue. As we have explained: "Government employers, like private employers, need a significant degree of control over their employees' words" in order to "efficient[ly] provi[de] public services." *Garcetti,* 547 U.S., at 418, 126 S.Ct. 1951. Again, significant control does not mean absolute authority. In particular, the Court has guarded against government efforts to "leverage the employment relationship" to shut down its employees' speech as private citizens. *Id.,* at 419, 126 S.Ct. 1951. But when the government imposes speech restrictions relating to workplace operations, of the kind a private employer also would, the Court reliably upholds them. See, *e.g.,* *id.,* at 426, 126 S.Ct. 1951; *Connick v. Myers,* 461 U.S. 138, 154, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

In striking the proper balance between employee speech rights and managerial interests, the Court has long applied a test originating in *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). That case arose out of an individual employment action: the firing of a public school teacher. As we later described the *Pickering* inquiry, the Court first asks whether the employee "spoke as a citizen on a matter of public concern." *Garcetti,* 547 U.S., at 418, 126 S.Ct. 1951. If she did not—but rather spoke as an employee on a workplace matter—she has no "possibility of a First Amendment claim": A public employer can curtail her speech just as a private one could. *Ibid.* But if she did speak as a citizen on a public matter, the public employer must demonstrate "an adequate justification for treating the employee differently from any other member of the general public." *Ibid.* The government, that is, needs to show that legitimate workplace interests lay behind the speech regulation.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1301 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

*Abood* coheres with that framework. The point here is not, as the majority suggests, that *Abood* is an overt, one-to-one "application of *Pickering*." *Ante,* at 2473 – 2474. It is not. *Abood* related to a municipality's labor policy, and so the Court looked to prior cases about unions, not to *Pickering* 's analysis of an employee's dismissal. (And truth be told, *Pickering* was not at that time much to look at: What the Court now thinks of as the two-step *Pickering* test, as the majority's own citations show, really emerged from *Garcetti* and *Connick*—two cases post-dating **\*2493** *Abood*. See *ante,* at 2471 – 2472.) [2] But *Abood* and *Pickering* raised variants of the same basic issue: the extent of the government's authority to make employment decisions affecting expression. And in both, the Court struck the same basic balance, enabling the government to curb speech when—but only when—the regulation was designed to protect its managerial interests. Consider the parallels:

Like *Pickering, Abood* drew the constitutional line by analyzing the connection between the government's managerial interests and different kinds of expression. The Court first discussed the use of agency fees to subsidize the speech involved in "collective bargaining, contract administration, and grievance adjustment." 431 U.S., at 225–226, 97 S.Ct. 1782. It understood that expression (really, who would not?) as intimately tied to the workplace and employment relationship. The speech was about "working conditions, pay, discipline, promotions, leave, vacations, and terminations," *Borough of Duryea v. Guarnieri,* 564 U.S. 379, 391, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011); the speech occurred (almost always) in the workplace; and the speech was directed (at least mainly) to the employer. As noted earlier, *Abood* described the managerial interests of employers in channeling all that speech through a single union. See 431 U.S., at 220–222, 224–226, 97 S.Ct. 1782; *supra,* at 2460. And so *Abood* allowed the government to mandate fees for collective bargaining—just as *Pickering* permits the government to regulate employees' speech on similar workplace matters. But still, *Abood* realized that compulsion could go too far. The Court barred the use of fees for union speech supporting political candidates or "ideological causes." 431 U.S., at 235, 97 S.Ct. 1782. That speech, it understood, was "unrelated to [the union's] duties as exclusive bargaining representative," but instead was directed at the broader public sphere. *Id.,* at 234, 97 S.Ct. 1782. And for that reason, the Court saw no legitimate managerial interests in compelling its subsidization. The employees' First Amendment claims would thus prevail—as, again, they would have under *Pickering*.

*Abood* thus dovetailed with the Court's usual attitude in First Amendment cases toward the regulation of public employees' speech. That attitude is one of respect—even solicitude—for the government's prerogatives as an employer. So long as the government is acting as an employer—rather than exploiting the employment relationship for other ends—it has a wide berth, comparable to that of a private employer. And when the regulated expression concerns the terms and conditions of employment—the very stuff of the employment relationship—the government really cannot lose. There, managerial interests are obvious and strong. And so government employees are ... just employees, even though they work for the government. Except that today the government does lose, in a first for the law. Now, the government can constitutionally adopt all policies regulating core workplace speech in pursuit of managerial goals—save this single one.

2

The majority claims it is not making a special and unjustified exception. It offers two main reasons for declining to apply **\*2494** here our usual deferential approach, as exemplified in *Pickering,* to the regulation of public employee speech. First, the majority says, this case involves a "blanket" policy rather than an individualized employment decision, so *Pickering* is a "painful fit." *Ante,* at 2472. Second, the majority asserts, the regulation here involves compelling rather than restricting speech, so the pain gets sharper still. See *ante,* at 2472 – 2473. And finally, the majority claims that even under the solicitous *Pickering* standard, the government should lose, because the speech here involves a matter of public concern and the government's managerial interests do not justify its regulation. See *ante,* at 2474 – 2477. The majority goes wrong at every turn.

First, this Court has applied the same basic approach whether a public employee challenges a general policy or an individualized decision. Even the majority must concede that "we have sometimes looked to *Pickering* in considering general rules that affect

broad categories of employees." *Ante,* at 2472. In fact, the majority cannot come up with any case in which we have *not* done so. All it can muster is one case in which *while* applying the *Pickering* test to a broad rule—barring any federal employee from accepting any payment for any speech or article on any topic—the Court noted that the policy's breadth would count against the government at the test's second step. See *United States v. Treasury Employees,* 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Which is completely predictable. The inquiry at that stage, after all, is whether the government has an employment-related interest in going however far it has gone—and in *Treasury Employees,* the government had indeed gone far. (The Court ultimately struck down the rule because it applied to speech in which the government had no identifiable managerial interest. See *id.,* at 470, 477, 115 S.Ct. 1003.) Nothing in *Treasury Employees* suggests that the Court defers only to ad hoc actions, and not to general rules, about public employee speech. That would be a perverse regime, given the greater regularity of rulemaking and the lesser danger of its abuse. So I would wager a small fortune that the next time a general rule governing public employee speech comes before us, we will dust off *Pickering*.

Second, the majority's distinction between compelling and restricting speech also lacks force. The majority posits that compelling speech always works a greater injury, and so always requires a greater justification. See *ante,* at 2463 – 2464. But the only case the majority cites for that reading of our precedent is possibly (thankfully) the most exceptional in our First Amendment annals: It involved the state forcing children to swear an oath contrary to their religious beliefs. See *ibid.* (quoting *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)). Regulations challenged as compelling expression do not usually look anything like that—and for that reason, the standard First Amendment rule is that the "difference between compelled speech and compelled silence" is "without constitutional significance." *Riley v. National Federation of Blind of N. C., Inc.,* 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); see *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (referring to "[t]he right to speak and the right to refrain from speaking" as "complementary components" of the First Amendment). And if anything, the First Amendment scales tip the opposite way when (as here) the government is not compelling actual speech, but instead compelling a subsidy that others will use for expression. See Brief for Eugene Volokh et al. as *Amici Curiae* 4–5 (offering many examples to show that the **\*2495** First Amendment "simply do[es] not guarantee that one's hard-earned dollars will never be spent on speech one disapproves of").[3] So when a government mandates a speech subsidy from a public employee—here, we might think of it as levying a tax to support collective bargaining—it should get at least as much deference as when it restricts the employee's speech. As this case shows, the former may advance a managerial interest as well as the latter—in which case the government's "freer hand" in dealing with its employees should apply with equal (if not greater) force. *NASA,* 562 U.S., at 148, 131 S.Ct. 746.

Third and finally, the majority errs in thinking that under the usual deferential approach, the government should lose this case. The majority mainly argues here that, at *Pickering* 's first step, "union speech in collective bargaining" is a "matter of great public concern" because it "affect [s] how public money is spent" and addresses "other important matters" like teacher merit pay or tenure. *Ante,* at 2474, 2476 (internal quotation marks omitted). But to start, the majority misunderstands the threshold inquiry set out in *Pickering* and later cases. The question is not, as the majority seems to think, whether the public is, or should be, interested in a government employee's speech. Instead, the question is whether that speech is about and directed to the workplace—as contrasted with the broader public square. *Treasury Employees* offers the Court's fullest explanation. The Court held there that the government's policy prevented employees from speaking as "citizen[s]" on "matters of public concern." 513 U.S., at 466, 115 S.Ct. 1003 (quoting *Pickering,* 391 U.S., at 568, 88 S.Ct. 1731). Why? Because the speeches and articles "were addressed to a public audience, were made outside the workplace, and involved content largely unrelated to their Government employment." 513 U.S., at 466, 115 S.Ct. 1003; see *id.,* at 465, 470, 115 S.Ct. 1003 (repeating that analysis twice more). The Court could not have cared less whether the speech at issue was "important." *Ante,* at 2475 – 2476. It instead asked whether the speech was truly *of* the workplace—addressed *to* it, made *in* it, and (most of all) *about* it.

Consistent with that focus, speech about the terms and conditions of employment—the essential stuff of collective bargaining—has never survived *Pickering* 's first step. This Court has rejected all attempts by employees to make a "federal constitutional

**Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)**

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

issue" out of basic "employment matters, including working conditions, pay, discipline, promotions, leave, vacations, and terminations." *Guarnieri,* 564 U.S., at 391, 131 S.Ct. 2488; see *Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (stating that public employees' "speech on merely private employment matters is unprotected"). For that reason, even the Justices who originally objected to *Abood* conceded that the use of agency fees for bargaining on "economic issues" like "salaries and pension benefits" would not raise significant First Amendment questions. 431 U.S., at 263, n. 16, 97 S.Ct. 1782 (Powell, J., concurring in judgment). **\*2496** Of course, most of those issues have budgetary consequences: They "affect[ ] how public money is spent." *Ante,* at 2475. And some raise important non-budgetary disputes; teacher merit pay is a good example, see *ante,* at 2476. But arguing about the terms of employment is still arguing about the terms of employment: The workplace remains both the context and the subject matter of the expression. If all that speech really counted as "of public concern," as the majority suggests, the mass of public employees' complaints (about pay and benefits and workplace policy and such) *would* become "federal constitutional issue[s]." *Guarnieri,* 564 U.S., at 391, 131 S.Ct. 2488. And contrary to decades' worth of precedent, government employers would then have far less control over their workforces than private employers do. See *supra,* at 2491 – 2493.

Consider an analogy, not involving union fees: Suppose a government entity disciplines a group of (non-unionized) employees for agitating for a better health plan at various inopportune times and places. The better health plan will of course drive up public spending; so according to the majority's analysis, the employees' speech satisfies *Pickering* 's "public concern" test. Or similarly, suppose a public employer penalizes a group of (non-unionized) teachers who protest merit pay in the school cafeteria. Once again, the majority's logic runs, the speech is of "public concern," so the employees have a plausible First Amendment claim. (And indeed, the majority appears to concede as much, by asserting that the results in these hypotheticals should turn on various "factual detail[s]" relevant to the interest balancing that occurs at the *Pickering* test's *second* step. *Ante,* at 2477, n. 23.) But in fact, this Court has always understood such cases to end at *Pickering* 's *first* step: If an employee's speech is about, in, and directed to the workplace, she has no "possibility of a First Amendment claim." *Garcetti,* 547 U.S., at 418, 126 S.Ct. 1951; see *supra,* at 2492. So take your pick. Either the majority is exposing government entities across the country to increased First Amendment litigation and liability—and thus preventing them from regulating their workforces as private employers could. Or else, when actual cases of this kind come around, we will discover that today's majority has crafted a "unions only" carve-out to our employee-speech law.

What's more, the government should prevail even if the speech involved in collective bargaining satisfies *Pickering* 's first part. Recall that the next question is whether the government has shown "an adequate justification for treating the employee differently from any other member of the general public." *Garcetti,* 547 U.S., at 418, 126 S.Ct. 1951; *supra,* at 2492. That inquiry is itself famously respectful of government interests. This Court has reversed the government only when it has tried to "leverage the employment relationship" to achieve an outcome unrelated to the workplace's "effective functioning." *Garcetti,* 547 U.S., at 419, 126 S.Ct. 1951; *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Nothing like that is true here. As *Abood* described, many government entities have found agency fees the best way to ensure a stable and productive relationship with an exclusive bargaining agent. See 431 U.S., at 220–221, 224–226, 97 S.Ct. 1782; *supra,* at 2488 – 2489. And here, Illinois and many governmental *amici* have explained again how agency fees advance their workplace goals. See Brief for State Respondents 12, 36; Brief for Governor Tom Wolf et al. as *Amici Curiae* 21–33. In no other employee-speech case has this Court dismissed such work-related interests, as the majority does here. See **\*2497** *supra,* at 2489 – 2491 (discussing the majority's refusal to engage with the logic of the State's position). Time and again, the Court has instead respected and acceded to those interests—just as *Abood* did.

The key point about *Abood* is that it fit naturally with this Court's consistent teaching about the permissibility of regulating public employees' speech. The Court allows a government entity to regulate that expression in aid of managing its workforce to effectively provide public services. That is just what a government aims to do when it enforces a fair-share agreement. And

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

so, the key point about today's decision is that it creates an unjustified hole in the law, applicable to union fees alone. This case is *sui generis* among those addressing public employee speech—and will almost surely remain so.

### III

But the worse part of today's opinion is where the majority subverts all known principles of *stare decisis*. The majority makes plain, in the first 33 pages of its decision, that it believes *Abood* was wrong.[4] But even if that were true (which it is not), it is not enough. "Respecting *stare decisis* means sticking to some wrong decisions." *Kimble v. Marvel Entertainment, LLC,* 576 U.S. ——, ——, 135 S.Ct. 2401, 2409, 192 L.Ed.2d 463 (2015). Any departure from settled precedent (so the Court has often stated) demands a "special justification—over and above the belief that the precedent was wrongly decided." *Id.,* at ——, 135 S.Ct., at 2409 (internal quotation marks omitted); see, *e.g., Arizona v. Rumsey,* 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). And the majority does not have anything close. To the contrary: all that is "special" in this case—especially the massive reliance interests at stake—demands retaining *Abood,* beyond even the normal precedent.

Consider first why these principles about precedent are so important. *Stare decisis*—"the idea that today's Court should stand by yesterday's decisions"—is "a foundation stone of the rule of law." *Kimble,* 576 U.S., at ——, 135 S.Ct., at 2409 (quoting *Michigan v. Bay Mills Indian Community,* 572 U.S. ——, ——, 134 S.Ct. 2024, 2036, 188 L.Ed.2d 1071 (2014) ). It "promotes the evenhanded, predictable, and consistent development" of legal doctrine. *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). It fosters respect for and reliance on judicial decisions. See *ibid.* And it "contributes to the actual and perceived integrity of the judicial process," *ibid.,* by ensuring that decisions are "founded in the law rather than in the proclivities of individuals," *Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

And *Abood* is not just any precedent: It is embedded in the law (not to mention, as I'll later address, in the world) in a way not many decisions are. Over four decades, this Court has cited *Abood* favorably many times, and has affirmed and applied its central distinction between the costs of collective bargaining (which the government can charge to all employees) and those of political activities (which it cannot). See, *e.g., Locke v. Karass,* 555 U.S. 207, 213–214, 129 S.Ct. 798, 172 L.Ed.2d 552 (2009); *Lehnert,* 500 U.S., at 519, 111 S.Ct. 1950; *Teachers v. Hudson,* 475 U.S. 292, 301–302, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); **\*2498** *Ellis v. Railway Clerks,* 466 U.S. 435, 455–457, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). Reviewing those decisions not a decade ago, this Court—unanimously—called the *Abood* rule "a general First Amendment principle." *Locke,* 555 U.S., at 213, 129 S.Ct. 798. And indeed, the Court has relied on that rule when deciding cases involving compelled speech subsidies outside the labor sphere—cases today's decision does not question. See, *e.g., Keller v. State Bar of Cal.,* 496 U.S. 1, 9–17, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990) (state bar fees); *Board of Regents of Univ. of Wis. System v. Southworth,* 529 U.S. 217, 230–232, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (public university student fees); *Glickman v. Wileman Brothers & Elliott, Inc.,* 521 U.S. 457, 471–473, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (commercial advertising assessments); see also n. 3, *supra.*

Ignoring our repeated validation of *Abood,* the majority claims it has become "an outlier among our First Amendment cases." *Ante,* at 2482. That claim fails most spectacularly for reasons already discussed: *Abood* coheres with the *Pickering* approach to reviewing regulation of public employees' speech. See *supra,* at 2492 – 2494. Needing to stretch further, the majority suggests that *Abood* conflicts with "our political patronage decisions." *Ante,* at 2484. But in fact those decisions strike a balance much like *Abood*'s. On the one hand, the Court has enabled governments to compel policymakers to support a political party, because that requirement (like fees for collective bargaining) can reasonably be thought to advance the interest in workplace effectiveness.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1305 of 1384

Janus v. American Federation of State, County, and Mun...., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

See ⬛ *Elrod v. Burns,* 427 U.S. 347, 366–367, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); ⬛ *Branti v. Finkel,* 445 U.S. 507, 517, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). On the other hand, the Court has barred governments from extending that rule to non-policymaking employees because that application (like fees for political campaigns) can't be thought to promote that interest, see ⬛ *Elrod,* 427 U.S., at 366, 96 S.Ct. 2673; the government is instead trying to "leverage the employment relationship" to achieve other goals, ⬛ *Garcetti,* 547 U.S., at 419, 126 S.Ct. 1951. So all that the majority has left is *Knox* and *Harris.* See *ante,* at 2483 – 2484. Dicta in those recent decisions indeed began the assault on *Abood* that has culminated today. But neither actually addressed the extent to which a public employer may regulate its own employees' speech. Relying on them is bootstrapping —and mocking *stare decisis.* Don't like a decision? Just throw some gratuitous criticisms into a couple of opinions and a few years later point to them as "special justifications."

The majority is likewise wrong to invoke "workability" as a reason for overruling *Abood. Ante,* at 2480 – 2481. Does *Abood* require drawing a line? Yes, between a union's collective-bargaining activities and its political activities. Is that line perfectly and pristinely "precis[e]," as the majority demands? *Ante,* at 2480 – 2481. Well, not quite that—but as exercises of constitutional linedrawing go, *Abood* stands well above average. In the 40 years since *Abood,* this Court has had to resolve only a handful of cases raising questions about the distinction. To my knowledge, the circuit courts are not divided on any classification issue; neither are they issuing distress signals of the kind that sometimes prompt the Court to reverse a decision. See, *e.g., Johnson v. United States,* 576 U.S. ——, ——S.Ct. ——, —— L.Ed.2d —— (2015)⬛ *Johnson v. United States,* 576 U.S. ——, ——S.Ct. ——, —— L.Ed.2d —— (2015)* (overruling precedent because of frequent splits and mass confusion). And that tranquility is unsurprising: There may be some gray areas (there always are), but in the mine run of cases, everyone knows the difference between politicking and collective bargaining. The majority cites some disagreement in two of the classification cases this Court decided **\*2499** —as if non-unanimity among Justices were something startling. And it notes that a dissenter in one of those cases called the Court's approach "malleable" and "not principled," *ante,* at 2481—as though those weren't stock terms in dissenting vocabulary. See, *e.g.,* ⬛ *Murr v. Wisconsin,* 582 U.S. ——, ——, 137 S.Ct. 1933, 1950–1951, 198 L.Ed.2d 497 (2017) (ROBERTS, C.J., dissenting); ⬛ *Dietz v. Bouldin,* 579 U.S. ——, ——, 136 S.Ct. 1885, 1897, 195 L.Ed.2d 161 (2016) (THOMAS, J., dissenting); ⬛ *Alabama Legislative Black Caucus v. Alabama,* 575 U.S. ——, ——, 135 S.Ct. 1257, 1281, 191 L.Ed.2d 314 (2015) (Scalia, J., dissenting). As I wrote in *Harris* a few Terms ago: "If the kind of hand-wringing about blurry lines that the majority offers were enough to justify breaking with precedent, we might have to discard whole volumes of the ⬛🔺 U.S. Reports." 573 U.S., at ——, 134 S.Ct., at 2652.

And in any event, one *stare decisis* factor—reliance—dominates all others here and demands keeping *Abood. Stare decisis,* this Court has held, "has added force when the legislature, in the public sphere, and citizens, in the private realm, have acted in reliance on a previous decision." ⬛ *Hilton v. South Carolina Public Railways Comm'n,* 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991). That is because overruling a decision would then "require an extensive legislative response" or "dislodge settled rights and expectations." *Ibid.* Both will happen here: The Court today wreaks havoc on entrenched legislative and contractual arrangements.

Over 20 States have by now enacted statutes authorizing fair-share provisions. To be precise, 22 States, the District of Columbia, and Puerto Rico—plus another two States for police and firefighter unions. Many of those States have multiple statutory provisions, with variations for different categories of public employees. See, *e.g.,* Brief for State of California as *Amicus Curiae* 24–25. Every one of them will now need to come up with new ways—elaborated in new statutes—to structure relations between government employers and their workers. The majority responds, in a footnote no less, that this is of no proper concern to the Court. See *ante,* at 2485, n. 27. But in fact, we have weighed heavily against "abandon[ing] our settled jurisprudence" that "[s]tate legislatures have relied upon" it and would have to "reexamine [and amend] their statutes" if it were overruled.

⬛ *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. 768, 785, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992); ⬛ *Hilton,* 502 U.S., at 203, 112 S.Ct. 560.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1306 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

Still more, thousands of current contracts covering millions of workers provide for agency fees. Usually, this Court recognizes that "[c]onsiderations in favor of *stare decisis* are at their acme in cases involving property and contract rights." *Payne, 501 U.S., at 828, 111 S.Ct. 2597.* Not today. The majority undoes bargains reached all over the country. [5] It prevents the parties from fulfilling other commitments they have made based on those agreements. It forces the parties—immediately—to renegotiate once-settled terms and create new tradeoffs. It does so knowing that many of the parties will have to revise (or redo) multiple contracts simultaneously. (New York City, for example, has agreed to agency fees in 144 contracts with 97 public-sector unions. See Brief for New York City Municipal Labor Committee as *Amicus Curiae* 4.) It does **\*2500** so knowing that those renegotiations will occur in an environment of legal uncertainty, as state governments scramble to enact new labor legislation. See *supra,* at 2472. It does so with no real clue of what will happen next—of how its action will alter public-sector labor relations. It does so even though the government services affected—policing, firefighting, teaching, transportation, sanitation (and more)—affect the quality of life of tens of millions of Americans.

The majority asserts that no one should care much because the canceled agreements are "of rather short duration" and would "expire on their own in a few years' time." *Ante,* at 2484, 2485. But to begin with, that response ignores the substantial time and effort that state legislatures will have to devote to revamping their statutory schemes. See *supra,* at 2472. And anyway, it misunderstands the nature of contract negotiations when the parties have a continuing relationship. The parties, in renewing an old collective-bargaining agreement, don't start on an empty page. Instead, various "long-settled" terms—like fair-share provisions—are taken as a given. Brief for Governor Tom Wolf et al. 11; see Brief for New York City Sergeants Benevolent Assn. as *Amicus Curiae* 18. So the majority's ruling does more than advance by a few years a future renegotiation (though even that would be significant). In most cases, it commands new bargaining over how to replace a term that the parties never expected to change. And not just new bargaining; given the interests at stake, complicated and possibly contentious bargaining as well. See Brief for Governor Tom Wolf et al. 11. [6]

The majority, though, offers another reason for not worrying about reliance: The parties, it says, "have been on notice for years regarding this Court's misgivings about *Abood.*" *Ante,* at 2484. Here, the majority proudly lays claim to its 6–year crusade to ban agency fees. In *Knox,* the majority relates, it described *Abood* as an "anomaly." *Ante,* at 2484 (quoting *567 U.S., at 311, 132 S.Ct. 2277*). Then, in *Harris,* it "cataloged *Abood* 's many weaknesses." *Ante,* at 2484. Finally, in *Friedrichs,* "we granted a petition for certiorari asking us to" reverse *Abood,* but found ourselves equally divided. *Ante,* at 2485. "During this period of time," the majority concludes, public-sector unions "must have understood that the constitutionality of [an agency-fee] provision was uncertain." *Ibid.* And so, says the majority, they should have structured their affairs accordingly.

But that argument reflects a radically wrong understanding of how *stare decisis* operates. Justice Scalia once confronted a similar argument for "disregard[ing] reliance interests" and showed how antithetical it was to rule-of-law principles. *Quill Corp. v. North Dakota,* 504 U.S. 298, 320, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (concurring opinion). He noted first what we always tell lower courts: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [they] should follow the case which directly **\*2501** controls, leaving to this Court the prerogative of overruling its own decisions." *Id., at 321, 112 S.Ct. 1904* (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989);* some alterations omitted). That instruction, Justice Scalia explained, was "incompatible" with an expectation that "private parties anticipate our overrulings." *504 U.S., at 320, 112 S.Ct. 1904.* He concluded: "[R]eliance upon a square, unabandoned holding of the Supreme Court is *always* justifiable reliance." *Ibid. Abood* 's holding was square. It was unabandoned before today. It was, in other words, the law—however much some were working overtime to make it not. Parties, both unions and governments, were thus justified in relying on it. And they did rely, to an extent rare among our decisions. To dismiss the overthrowing of their settled expectations as entailing no more than some "adjustments" and "unpleasant transition costs," *ante,* at 2485, is to trivialize *stare decisis.*

IV

There is no sugarcoating today's opinion. The majority overthrows a decision entrenched in this Nation's law—and in its economic life—for over 40 years. As a result, it prevents the American people, acting through their state and local officials, from making important choices about workplace governance. And it does so by weaponizing the First Amendment, in a way that unleashes judges, now and in the future, to intervene in economic and regulatory policy.

Departures from *stare decisis* are supposed to be "exceptional action[s]" demanding "special justification," *Rumsey,* 467 U.S., at 212, 104 S.Ct. 2305—but the majority offers nothing like that here. In contrast to the vigor of its attack on *Abood,* the majority's discussion of *stare decisis* barely limps to the finish line. And no wonder: The standard factors this Court considers when deciding to overrule a decision all cut one way. *Abood* 's legal underpinnings have not eroded over time: *Abood* is now, as it was when issued, consistent with this Court's First Amendment law. *Abood* provided a workable standard for courts to apply. And *Abood* has generated enormous reliance interests. The majority has overruled *Abood* for no exceptional or special reason, but because it never liked the decision. It has overruled *Abood* because it wanted to.

Because, that is, it wanted to pick the winning side in what should be—and until now, has been—an energetic policy debate. Some state and local governments (and the constituents they serve) think that stable unions promote healthy labor relations and thereby improve the provision of services to the public. Other state and local governments (and their constituents) think, to the contrary, that strong unions impose excessive costs and impair those services. Americans have debated the pros and cons for many decades—in large part, by deciding whether to use fair-share arrangements. Yesterday, 22 States were on one side, 28 on the other (ignoring a couple of in-betweeners). Today, that healthy—that democratic—debate ends. The majority has adjudged who should prevail. Indeed, the majority is bursting with pride over what it has accomplished: Now those 22 States, it crows, "can follow the model of the federal government and 28 other States." *Ante,* at 2485, n. 27.

And maybe most alarming, the majority has chosen the winners by turning the First Amendment into a sword, and using it against workaday economic and regulatory policy. Today is not the first time the Court has wielded the First Amendment in such an aggressive way. See, *e.g., National Institute of Family and Life Advocates* **\*2502** *v. Becerra, ante,* p. ——, —— U.S. ——, 138 S.Ct. 2361, 138 L.Ed.2d 2361, 2018 WL 3116336 (2018) (invalidating a law requiring medical and counseling facilities to provide relevant information to users); *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011) (striking down a law that restricted pharmacies from selling various data). And it threatens not to be the last. Speech is everywhere—a part of every human activity (employment, health care, securities trading, you name it). For that reason, almost all economic and regulatory policy affects or touches speech. So the majority's road runs long. And at every stop are black-robed rulers overriding citizens' choices. The First Amendment was meant for better things. It was meant not to undermine but to protect democratic governance—including over the role of public-sector unions.

**All Citations**

138 S.Ct. 2448, 201 L.Ed.2d 924, 211 L.R.R.M. (BNA) 3201, 86 USLW 4663, 168 Lab.Cas. P 61,878, 18 Cal. Daily Op. Serv. 6405, 2018 Daily Journal D.A.R. 6308, 27 Fla. L. Weekly Fed. S 554

**Footnotes**

AR.05148

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1308 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    See Bureau of Labor Statistics (BLS), Labor Force Statistics From the Current Population Survey (Table 42) (2017), https://www.bls.gov/cps/tables.htm (all Internet materials as visited June 26, 2018).

2    See Union Membership and Coverage Database From the Current Population Survey (Jan. 21, 2018), unionstats.com.

3    See National Conference of State Legislatures, Right–to–Work States (2018), http://www.ncsl.org/research/labor-and-employment/right-to-work-laws-and-bills.aspx# chart; see also, *e.g.,* Brief for Mackinac Center for Public Policy as *Amicus Curiae* 27–28, 34–36.

4    The collective-action problem cited by the dissent, *post,* at 2489 – 2490, is not specific to the agency-fee context. And contrary to the dissent's suggestion, it is often not practical for an entity that lobbies or advocates on behalf of the members of a group to tailor its message so that only its members benefit from its efforts. Consider how effective it would be for a group that advocates on behalf of, say, seniors, to argue that a new measure should apply only to its dues-paying members.

5    In order to obtain that status, a union must petition to be recognized and campaign to win majority approval. Ill. Comp. Stat., ch. 5, § 315/9(a) (2016); see, *e.g., County of Du Page v. Illinois Labor Relations Bd.,* 231 Ill.2d 593, 597–600, 326 Ill.Dec. 848, 900 N.E.2d 1095, 1098–1099 (2008). And unions eagerly seek this support. See, *e.g.,* Brief for Employees of the State of Minnesota Court System as *Amici Curiae* 9–17.

6    There is precedent for such arrangements. Some States have laws providing that, if an employee with a religious objection to paying an agency fee "requests the [union] to use the grievance procedure or arbitration procedure on the employee's behalf, the [union] is authorized to charge the employee for the reasonable cost of using such procedure." *E.g.,* Cal. Govt.Code Ann. § 3546.3 (West 2010); cf. Ill. Comp. Stat., ch. 5, § 315/6(g) (2016). This more tailored alternative, if applied to other objectors, would prevent free ridership while imposing a lesser burden on First Amendment rights.

7    Indeed, under common law, "collective bargaining was unlawful," *Teamsters v. Terry,* 494 U.S. 558, 565–566, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (plurality opinion); see N. Citrine, Trade Union Law 4–7, 9–10 (2d ed. 1960); Notes, Legality of Trade Unions at Common Law, 25 Harv. L. Rev. 465, 466 (1912), and into the 20th century, every individual employee had the "liberty of contract" to "sell his labor upon such terms as he deem[ed] proper," *Adair v. United States,* 208 U.S. 161, 174–175, 28 S.Ct. 277, 52 L.Ed. 436 (1908); see R. Morris, Government and Labor in Early America 208, 529 (1946). So even the concept of a private third-party entity with the power to bind employees on the terms of their employment likely would have been foreign to the Founders. We note this only to show the problems inherent in the Union respondent's argument; we are not in any way questioning the foundations of modern labor law.

8    See, *e.g.,* Ellsworth, The Landholder, VII (1787), in Essays on the Constitution of the United States 167–171 (P. Ford ed. 1892); Webster, On Test Laws, Oaths of Allegiance and Abjuration, and Partial Exclusions from Office, in A Collection of Essays and Fugitiv[e] Writings 151–153 (1790).

9    Justice Powell's separate opinion did invoke *Pickering* in a relevant sense, but he did so only to acknowledge the State's relatively greater interest in regulating speech when it acts as employer than when it acts as sovereign. *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 259, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (concurring in judgment). In the very next sentence, he explained that "even in public employment, a significant impairment of First Amendment rights must survive exacting scrutiny." *Ibid.* (internal quotation marks omitted). That is the test we apply today.

10    See Brief for State of Michigan et al. as *Amici Curiae* 9–24. Nationwide, the cost of state and local employees' wages and benefits, for example, is nearly $1.5 trillion—more than half of those jurisdictions' total expenditures. See Dept. of Commerce, Bureau of Economic Analysis, National Data, GDP & Personal Income, Table 6.2D, line 92 (Aug. 3, 2017), and Table 3.3, line 37 (May 30, 2018), https://www.bea.gov/iTable/iTable.cfm?reqid=19&step=2# reqid=19&step=2&isuri=1&1921 =survey. And many States and cities struggle with unfunded pension and retiree healthcare liabilities and other budget issues.

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

11    PEW Charitable Trusts, Fiscal 50: State Trends and Analysis (updated May 17, 2016), http://www.pewtrusts.org/en/research-and-analysis/data-visualizations/2014/fiscal-50# ind4.

12    See Brief for Jason R. Barclay et al. as *Amici Curiae* 9; M. Egan, How Illinois Became America's Most Messed–Up State, CNN Money (July 1, 2017), https://cnnmon.ie/2tp9NX5.

13    Brief for Jason R. Barclay et al. as *Amici Curiae* 9.

14    E. Campbell, S & P, Moody's Downgrade Illinois to Near Junk, Lowest Ever for a U.S. State, Bloomberg (June 1, 2017), https://bloom.bg/2roEJUc.

15    See National Association of State Budget Officers, Summary: Spring 2018 Fiscal Survey of States 2 (June 14, 2018), http://www.nasbo.org; ProQuest Statistical Abstract of the United States: 2018, pp. 306, Table 476, 321, Table 489.

16    See Rogers, School Districts 'Race to the Top' Despite Teacher Dispute, Marin Independent J., June 19, 2010.

17    See Sawchuk, Transferring Top Teachers Has Benefits: Study Probes Moving Talent to Low–Performing Schools, Education Week, Nov. 13, 2013, pp. 1, 13.

18    See Tucker, Textbooks Equivocate on Global Warming: Stanford Study Finds Portrayal 'Dishonest,' San Francisco Chronicle, Nov. 24, 2015, p. C1.

19    See Reagan, Anti–Confederacy Movement Rekindles Texas Textbook Controversy, San Antonio Current, Aug. 4, 2015.

20    See Watanabe, How To Teach Gay Issues in 1st Grade? A New Law Requiring California Schools To Have Lessons About LGBT Americans Raises Tough Questions, L.A. Times, Oct. 16, 2011, p. A1.

21    See Goodstein, A Web of Faith, Law and Science in Evolution Suit, N.Y. Times, Sept. 26, 2005, p. A1.

22    See Golden, Defending the Faith: New Battleground in Textbook Wars: Religion in History, Wall St. J., Jan. 25, 2006, p. A1.

23    Claiming that our decision will hobble government operations, the dissent asserts that it would prevent a government employer from taking action against disruptive non-unionized employees in two carefully constructed hypothetical situations. See *post,* at 2495 – 2497. Both hypotheticals are short on potentially important details, but in any event, neither would be affected by our decision in this case. Rather, both would simply call for the application of the standard *Pickering* test.

In one of the hypotheticals, teachers "protest merit pay in the school cafeteria." *Post,* at 2496. If such a case actually arose, it would be important to know, among other things, whether the teachers involved were supposed to be teaching in their classrooms at the time in question and whether the protest occurred in the presence of students during the student lunch period. If both those conditions were met, the teachers would presumably be violating content-neutral rules regarding their duty to teach at specified times and places, and their conduct might well have a disruptive effect on the educational process. Thus, in the dissent's hypothetical, the school's interests might well outweigh those of the teachers, but in this hypothetical case, as in all *Pickering* cases, the particular facts would be very important.

In the other hypothetical, employees agitate for a better health plan "at various inopportune times and places." *Post,* at 2496. Here, the lack of factual detail makes it impossible to evaluate how the *Pickering* balance would come out. The term "agitat[ion]" can encompass a wide range of conduct, as well as speech. *Post,* at 2496. And the time and place of the agitation would also be important.

24    No First Amendment issue could have properly arisen in those cases unless Congress's enactment of a provision allowing, but not requiring, private parties to enter into union-shop arrangements was sufficient to establish governmental action.

That proposition was debatable when *Abood* was decided, and is even more questionable today. See *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 53, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Compare, *e.g., White v. Communications Workers of Am., AFL–CIO, Local 1300,* 370 F.3d 346, 350 (C.A.3 2004) (no state action), and *Kolinske v. Lubbers,* 712 F.2d 471, 477–478 (C.A.D.C.1983) (same), with *Beck v. Communications Workers of Am.,* 776 F.2d 1187, 1207 (C.A.4 1985) (state action), and *Linscott v. Millers Falls Co.,* 440 F.2d 14, 16, and n. 2 (C.A.1 1971) (same). We reserved decision on this question in *Communications Workers v. Beck,* 487 U.S. 735, 761, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), and do not resolve it here.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1310 of 1384

Janus v. American Federation of State, County, and Mun..., 138 S.Ct. 2448 (2018)

211 L.R.R.M. (BNA) 3201, 201 L.Ed.2d 924, 86 USLW 4663, 168 Lab.Cas. P 61,878...

25    Contrary to the dissent's claim, see *post,* at 2497, and n. 4, the fact that "[t]he rationale of [*Abood* ] does not withstand careful analysis" *is* a reason to overrule it, *e.g., Lawrence v. Texas,* 539 U.S. 558, 577, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). And that is even truer when, as here, the defenders of the precedent do not attempt to "defend [its actual] reasoning." *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 363, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010); *id.,* at 382–385, 130 S.Ct. 876 (ROBERTS, C.J., concurring).

26    For this reason, it is hardly surprising that chargeability issues have not arisen in many Court of Appeals cases. See *post,* at 2498 - 2499 (KAGAN, J., dissenting).

27    The dissent emphasizes another type of reliance, namely, that "[o]ver 20 States have by now enacted statutes authorizing [agency-fee] provisions." *Post,* at 2499. But as we explained in *Citizens United,* "[t]his is not a compelling interest for *stare decisis.* If it were, legislative acts could prevent us from overruling our own precedents, thereby interfering with our duty 'to say what the law is.' " *558 U.S.,* at 365, 130 S.Ct. 876 (quoting *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803)). Nor does our decision " 'require an extensive legislative response.' " *Post,* at 2499. States can keep their labor-relations systems exactly as they are—only they cannot force nonmembers to subsidize public-sector unions. In this way, these States can follow the model of the federal government and 28 other States.

* * *

28    Unfortunately, the dissent sees the need to resort to accusations that we are acting like "black-robed rulers" who have shut down an "energetic policy debate." *Post,* at 2501 – 2502. We certainly agree that judges should not "overrid[e] citizens' choices" or "pick the winning side," *ibid.*—unless the Constitution commands that they do so. But when a federal or state law violates the Constitution, the American doctrine of judicial review requires us to enforce the Constitution. Here, States with agency-fee laws have abridged fundamental free speech rights. In holding that these laws violate the Constitution, we are simply enforcing the First Amendment as properly understood, "[t]he very purpose of [which] was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

1    The majority relies on statistics from the federal workforce (where agency fees are unlawful) to suggest that public employees do not act in accord with economic logic. See *ante,* at 2465. But first, many fewer federal employees pay dues than have voted for a union to represent them, indicating that free-riding in fact pervades the federal sector. See, *e.g.,* R. Kearney & P. Mareschal, Labor Relations in the Public Sector 26 (5th ed. 2014). And second, that sector is not typical of other public workforces. Bargaining in the federal sphere is limited; most notably, it does not extend to wages and benefits. See *Fort Stewart Schools v. FLRA,* 495 U.S. 641, 649, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990). That means union operating expenses are lower than they are elsewhere. And the gap further widens because the federal sector uses large, often national, bargaining units that provide unions with economies of scale. See Brief for International Brotherhood of Teamsters as *Amicus Curiae* 7. For those reasons, the federal workforce is the wrong place to look for meaningful empirical evidence on the issues here.

2    For those reasons, it is not surprising that the "categorization schemes" in *Abood* and *Pickering* are not precisely coterminous. *Ante,* at 2473. The two cases are fraternal rather than identical twins—both standing for the proposition that the government receives great deference when it regulates speech as an employer rather than as a sovereign. See *infra* this page and 2493 – 2494.

3    That's why this Court has blessed the constitutionality of compelled speech subsidies in a variety of cases beyond *Abood,* involving a variety of contexts beyond labor relations. The list includes mandatory fees imposed on state bar members (for professional expression); university students (for campus events); and fruit processors (for generic advertising). See *Keller v. State Bar of Cal.,* 496 U.S. 1, 14, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990); *Board of Regents of Univ. of Wis. System v. Southworth,* 529 U.S. 217, 233, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000); *Glickman v. Wileman Brothers & Elliott, Inc.,* 521 U.S. 457, 474, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997); see also *infra,* at 2497 - 2498.

4    And then, after ostensibly turning to *stare decisis,* the majority spends another four pages insisting that *Abood* was "not well reasoned," which is just more of the same. *Ante,* at 2480 – 2481; see *ante,* at 2479 – 2481.

5    Indeed, some agency-fee provisions, if canceled, could bring down entire contracts because they lack severability clauses. See *ante,* at 2485 (noting that unions could have negotiated for that result); Brief for Governor Tom Wolf et al. as *Amici Curiae* 11.

6    In a single, cryptic sentence, the majority also claims that arguments about reliance "based on [*Abood* 's] clarity are misplaced" because *Abood* did not provide a "clear or easily applicable standard" to separate fees for collective bargaining from those for political activities. *Ante,* at 2484 - 2485. But to begin, the standard for separating those activities was clear and workable, as I have already shown. See *supra,* at 2498 – 2499. And in any event, the reliance *Abood* engendered was based not on the clarity of that line, but on the clarity of its holding that governments and unions could generally agree to fair-share arrangements.

---

End of Document                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Velasco Lopez v. Decker, 2nd Cir.(N.Y.), October 27, 2020

138 S.Ct. 830
Supreme Court of the United States

David JENNINGS et al., Petitioners

v.

Alejandro RODRIGUEZ et al., individually
and on behalf of all others similarly situated.

No. 15–1204.
|
Argued Nov. 30, 2016.
|
Reargued Oct. 3, 2017.
|
Decided Feb. 27, 2018.

**Synopsis**

**Background:** Plaintiff, a Mexican citizen and lawful permanent resident, sought writ of habeas corpus, as well as declaratory and injunctive relief on behalf of himself and class of aliens detained during immigration proceedings for more than six months without bond hearing, asserting constitutional and statutory claims for individualized bond hearings. The United States District Court for the Central District of California, Terry J. Hatter, Jr., Senior District Judge, denied class certification. Plaintiff appealed. The United States Court of Appeals for the Ninth Circuit, Betty B. Fletcher, Senior Circuit Judge, 591 F.3d 1105, reversed and remanded. The District Court, Terry J. Hatter, Jr., Senior District Judge, entered preliminary injunction. Government appealed. The Court of Appeals, Terry J. Hatter, Jr., Senior District Judge, entered preliminary injunction. Government appealed. The Court of Appeals, 715 F.3d 1127, affirmed. The District Court, Terry J. Hatter, Jr., Senior District Judge, 2013 WL 5229795, granted summary judgment to class and entered permanent injunction. Cross-appeals were taken.

The Court of Appeals, Wardlaw, Circuit Judge, 804 F.3d 1060, affirmed in part and reversed in part. Government's petition for certiorari was granted.

**Holdings:** The Supreme Court, Justice Alito, held that:

[1] Immigration and Nationality Act (INA) provisions applicable primarily to detention of aliens seeking entry to United States could not be plausibly interpreted as implicitly placing six-month limit on detention or requiring periodic bond hearings, and

[2] INA provision, carving out narrow conditions under which Attorney General may release on bond aliens detained pending their removal based on criminal offenses or terrorist activities, could not be plausibly interpreted as implicitly placing six-month limit on detention or requiring periodic bond hearings.

Reversed and remanded.

Justices Thomas and Gorsuch joined as to all but Part II.

Justice Sotomayor joined as to Part III-C.

Justice Thomas filed an opinion concurring in part and concurring in the judgment, in which Justice Gorsuch joined except for footnote 6.

Justice Breyer filed a dissenting opinion, in which Justices Ginsburg and Sotomayor joined.

Justice Kagan took no part in the decision of the case.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion to Certify Class; Motion for Declaratory Judgment; Motion for Permanent Injunction.

West Headnotes (12)

[1] **Constitutional Law** ⚖ Avoidance of doubt
**Constitutional Law** ⚖ Judicial rewriting or revision

Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems, but a court relying on that canon still must interpret the statute, not rewrite it.

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

35 Cases that cite this headnote

**[2] Aliens, Immigration, and Citizenship** ⭐ Judicial Review or Intervention

Assuming that actions taken with respect to all aliens in certified class constituted actions taken to remove them from United States, the question of law regarding whether, contrary to decision of Court of Appeals, certain provisions of Immigration and Nationality Act (INA) required detention with a bond hearing did not arise from those actions, as would present statutory bar under INA to Supreme Court's jurisdiction to entertain aliens' claims in absence of final order; aliens were not asking for review of an order of removal, they were not challenging the decision to detain them or to seek their removal, and they were not challenging any part of the process by which their removability would be determined. (Per Justice Alito for a majority of the court.) Immigration and Nationality Act, §§ 235(b)(1, 2), 236(a, c), 242(b)(9), 🚩 8 U.S.C.A. §§ 1225(b)(1, 2), 🚩 1226(a, c), 🚩 1252(b)(9).

106 Cases that cite this headnote

**[3] Aliens, Immigration, and Citizenship** ⭐ Judicial Review or Intervention

Extent of Government's authority to detain aliens was not a matter of discretionary judgment, action, or decision by Attorney General regarding detention or release, as would present statutory bar under Immigration and Nationality Act (INA) to Supreme Court's jurisdiction to entertain aliens' claims that certain INA provisions required detention with a bond hearing; aliens were challenging statutory framework permitting their detention without bail, and if that challenge failed, they were contesting constitutionality of entire statutory scheme under Due Process Clause. (Per Justice Alito for a majority of the court.) U.S.C.A. Const.Amend. 5; Immigration and Nationality

Act, §§ 235(b)(1, 2), 236(a, b, e), 🚩 8 U.S.C.A. §§ 1225(b)(1, 2), 🚩 1226(a, b, e).

263 Cases that cite this headnote

**[4] Constitutional Law** ⭐ Avoidance of doubt

Under the canon of constitutional avoidance, when a serious doubt is raised about the constitutionality of an act of Congress, it is a cardinal principle that the court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.

42 Cases that cite this headnote

**[5] Constitutional Law** ⭐ Avoidance of constitutional questions

The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction, and in the absence of more than one plausible construction, the canon simply has no application.

36 Cases that cite this headnote

**[6] Aliens, Immigration, and Citizenship** ⭐ Time limitations

**Aliens, Immigration, and Citizenship** ⭐ Bond or bail

Immigration and Nationality Act (INA) provisions applicable primarily to aliens seeking entry to United States, stating that certain aliens claiming credible fear of persecution "shall be detained for further consideration of the application for asylum" and that all other aliens seeking entry, with specific exceptions, "shall be detained for a [removal] proceeding," could not be plausibly interpreted as implicitly placing a six-month limit on detention or requiring periodic bond hearings; provisions mandated detention until a certain point and authorized release prior to that point only under limited circumstances. Immigration and Nationality Act,

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1314 of 1384

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

§ 235(b)(1)(B)(ii), (b)(2)(A, B), 8 U.S.C.A. § 1225(b)(1)(B)(ii), (b)(2)(A, B).

115 Cases that cite this headnote

[7]  **Statutes**  Mandatory or directory statutes

Unlike the word "may," which implies discretion, the word "shall" in a statute usually connotes a requirement.

4 Cases that cite this headnote

[8]  **Aliens, Immigration, and Citizenship**  Detention Pending Removal Proceeding

Immigration and Nationality Act (INA) provisions applicable primarily to aliens seeking entry to United States, stating that certain aliens claiming credible fear of persecution shall be detained "for" further consideration of the application for asylum, and that all other aliens seeking entry, with specific exceptions, shall be detained "for" a removal proceeding, authorizes detention throughout the completion of those asylum or removal proceedings, as opposed to ending the detention authority when the asylum or removal proceedings begin. Immigration and Nationality Act, § 235(b)(1)(B)(ii), (b)(2)(A, B), 8 U.S.C.A. § 1225(b)(1)(B)(ii), (b)(2)(A, B).

201 Cases that cite this headnote

[9]  **Statutes**  Similarity or difference

There is no canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing.

3 Cases that cite this headnote

[10]  **Aliens, Immigration, and Citizenship**  Time limitations

**Aliens, Immigration, and Citizenship**  Bond or bail

Immigration and Nationality Act (INA) provision, carving out narrow conditions under which Attorney General may release on bond aliens detained pending their removal based on several enumerated categories involving criminal offenses and terrorist activities, could not be plausibly interpreted as implicitly placing a six-month limit on detention or requiring periodic bond hearings. Immigration and Nationality Act, § 236(a, c), 8 U.S.C.A. § 1226(a, c).

192 Cases that cite this headnote

[11]  **Federal Courts**  Presentation of Questions Below or on Review;  Record;  Waiver

The Supreme Court's role is as a court of review, not of first view.

3 Cases that cite this headnote

[12]  **Constitutional Law**  Factors considered; flexibility and balancing

Due process is flexible, and it calls for such procedural protections as the particular situation demands. U.S.C.A. Const.Amend. 5.

13 Cases that cite this headnote

**West Codenotes**

**Negative Treatment Reconsidered**

8 U.S.C.A. §§ 1225(b),  1226(a, c)

*833  *Syllabus* *

Immigration officials are authorized to detain certain aliens in the course of immigration proceedings while they determine whether those aliens may be lawfully present in the country. For example, § 1225(b) of Title 8 of the U.S.Code authorizes the detention of certain aliens seeking to enter the country. Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation, and to certain other aliens designated by the Attorney General in his

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

discretion. 🚩 Section 1225(b)(2) is a catchall provision that applies to most other applicants for admission not covered by 🚩 § 1225(b)(1). Under 🚩 § 1225(b)(1), aliens are normally ordered removed "without further hearing or review," 🚩 § 1225(b)(1)(A)(i), but an alien indicating either an intention to apply for asylum or a credible fear of persecution, 🚩 § 1225(b)(1)(A)(ii), "shall be detained" while that alien's asylum application is pending, 🚩 § 1225(b)(1)(B)(ii). Aliens covered by 🚩 § 1225(b)(2) in turn "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled" to admission. 🚩 § 1225(b)(2)(A).

The Government is also authorized to detain certain aliens already in the country. 🚩 Section 1226(a)'s default rule permits the Attorney General to issue warrants for the arrest and detention of these aliens pending the outcome of their removal proceedings. The Attorney General "may release" these aliens on bond, "[e]xcept as provided in subsection (c) of this section." 🚩 Section 1226(c) in turn states that the Attorney General "shall take into custody any alien" who falls into one of the enumerated categories involving criminal offenses and terrorist activities, 🚩 § 1226(c)(1), and specifies that the Attorney General "may release" one of those aliens "only if the Attorney General decides" both that doing so is necessary for witness-protection purposes and that the alien will not pose a danger or flight risk, 🚩 § 1226(c)(2).

After a 2004 conviction, respondent Alejandro Rodriguez, a Mexican citizen and a lawful permanent resident of the United States, was detained pursuant to 🚩 § 1226 while the Government sought to remove him. In May 2007, while still litigating his removal, Rodriguez filed a habeas petition, claiming that he was entitled to a bond hearing to determine whether his continued detention was justified. As relevant here, he and the class of aliens he represents allege that 🚩 §§ 1225(b), 1226(a), and 🚩 1226(c) do not authorize "prolonged" detention in the absence of an individualized bond hearing at which the Government proves by clear and convincing evidence that detention remains justified. The District Court entered a permanent injunction, and the Ninth Circuit affirmed. Relying on the canon of constitutional avoidance, the Ninth Circuit construed 🚩 §§ 1225(b) and

🚩 1226(c) as imposing an implicit 6–month time limit on an alien's detention under those sections. After that point, the court held, the Government may continue to detain the alien only under the authority of 🚩 1226(a). The court then construed 🚩 § 1226(a) to mean that an alien must be given a bond hearing every six months and that detention beyond the initial 6–month period is permitted only if the Government proves by clear and convincing evidence that further detention is justified.

**\*834** *Held* : The judgment is reversed, and the case is remanded.

🚩 804 F.3d 1060, reversed and remanded.

Justice ALITO delivered the opinion of the Court, except as to Part II, concluding that 🚩 §§ 1225(b), 1226(a), and 🚩 1226(c) do not give detained aliens the right to periodic bond hearings during the course of their detention. The Ninth Circuit misapplied the canon of constitutional avoidance in holding otherwise. Pp. 841 – 852.

(a) The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one [plausible] construction." 📒 🔺 *Clark v. Martinez,* 543 U.S. 371, 385, 125 S.Ct. 716, 160 L.Ed.2d 734. The Ninth Circuit's interpretations of the provisions at issue, however, are implausible. Pp. 841 – 852.

(b) Read most naturally, 🚩 §§ 1225(b)(1) and (b)(2) mandate detention of applicants for admission until certain proceedings have concluded. Until that point, nothing in the statutory text imposes a limit on the length of detention, and neither provision says anything about bond hearings. Pp. 842 – 846.

(1) Nothing in the text of 🚩 § 1225(b)(1) or 🚩 § 1225(b)(2) hints that those provisions have an implicit 6–month time limit on the length of detention. Respondents must show that this is a plausible reading in order to prevail under the canon of constitutional avoidance, but they simply invoke the canon without making any attempt to defend their reading.

AR.05156

The Ninth Circuit also all but ignored the statutory text, relying instead on *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653, as authority for grafting a time limit onto § 1225(b)'s text. There, this Court invoked the constitutional-avoidance canon, construing § 1231(a)(6)—which provides than an alien subject to a removal order "may be detained" beyond the section's 90–day removal period—to mean that the alien may not be detained beyond "a period reasonably necessary to secure removal," *id.,* at 699, 121 S.Ct. 2491 presumptively six months, *id.,* at 701, 121 S.Ct. 2491. The Court detected ambiguity in the statutory phrase "may be detained" and noted the absence of any explicit statutory limit on the length of permissible detention following the entry of an order of removal.

Several material differences distinguish the provisions at issue in this case from *Zadvydas* 's interpretation of § 1231(a)(6). To start, the provisions here, unlike § 1231(a)(6), mandate detention for a specified period of time: until immigration officers have finished "consider[ing]" the asylum application, § 1225(b)(1)(B)(ii), or until removal proceedings have concluded, § 1225(b)(2)(A). Section 1231(a)(6) also uses the ambiguous "may," while §§ 1225(b)(1) and (b)(2) use the unequivocal mandate "shall be detained." There is also a specific provision authorizing temporary parole from § 1225(b) detention "for urgent humanitarian reasons or significant public benefit," § 1182(d)(5)(A), but no similar release provision applies to § 1231(a)(6). That express exception implies that there are no other circumstances under which aliens detained under § 1225(b) may be released. Pp. 842 – 845.

(2) Respondents also claim that the term "for" in §§ 1225(b)(1) and (b)(2) mandates detention only until the *start* of applicable proceedings. That is inconsistent with the meanings of "for"—"[d]uring [or] throughout," 6 Oxford English Dictionary 26, and "with the object or purpose of," *id.,* at 23—that make sense in the context of the statutory scheme as a whole. Nor does respondents' reading align with the **\*835** historical use of "for" in § 1225. Pp. 845 – 846.

(c) Section 1226(c)'s language is even clearer. By allowing aliens to be released "only if" the Attorney General decides that certain conditions are met, that provision reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute. Together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope *must* continue "pending a decision" on removal. Section 1226(c) is thus not silent as to the length of detention. See *Demore v. Kim,* 538 U.S. 510, 529, 123 S.Ct. 1708, 155 L.Ed.2d 724. The provision, by expressly stating that covered aliens may be released "only if" certain conditions are met, also unequivocally imposes an affirmative *prohibition* on releasing them under any other conditions. Finally, because § 1226(c) and the PATRIOT Act apply to different categories of aliens in different ways, adopting § 1226(c)'s plain meaning will not make any part of the PATRIOT Act, see § 1226a(a)(3), superfluous. Pp. 845 – 847.

(d) Nothing in § 1226(a), which authorizes the Attorney General to arrest and detain an alien "pending a decision" on removal and which permits the Attorney General to release the alien on bond, supports the imposition of periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that continued detention is necessary. Nor does it hint that the length of detention prior to the bond hearing must be considered in determining whether an alien should be released. Pp. 847 – 848.

(e) The Ninth Circuit should consider the merits of respondents' constitutional arguments in the first instance. But before doing so, it should also reexamine whether respondents can continue litigating their claims as a class. Pp. 851 – 852.

ALITO, J., delivered the opinion of the Court, except as to Part II. ROBERTS, C.J., and KENNEDY, J., joined that opinion in full; THOMAS and GORSUCH, JJ., joined as to all but Part II; and SOTOMAYOR, J., joined as to Part III–C. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which GORSUCH, J., joined except for footnote 6. BREYER, J., filed a dissenting opinion, in which GINSBURG and SOTOMAYOR, JJ., joined. KAGAN, J., took no part in the decision of the case.

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

**Attorneys and Law Firms**

Ian H. Gershengorn, Acting Solicitor General, Washington, DC, for Petitioners.

Ahilan T. Arulanantham, Los Angeles, CA, for Respondents.

Ian Heath Gershengorn, Acting Solicitor General, Benjamin C. Mizer, Principal Deputy Assistant, Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Leon Fresco, Deputy Assistant Attorney General, Zachary D. Tripp, Assistant to the Solicitor General, Sarah S. Wilson, Erez R. Reuveni, Attorneys, Joyce R. Branda, Deputy Assistant Attorney General, August E. Flentje, Special Counsel to the Assistant Attorney General, Department of Justice, Washington, DC, for Petitioners.

Mark H. Haddad, Sean A. Commons, Wen W. Shen, Sidley Austin LLP, Los Angeles, CA, Judy Rabinovitz, Michael K.T. Tan, Cecillia D. Wang, Steven R. Shapiro, ACLU Immigrants' Rights Project, New York, NY, Ahilan T. Arulanantham, Counsel of Record, Michael Kaufman, ACLU Foundation of Southern California, Los Angeles, CA, Jayashri Srikantiah, Stanford Law School, Immigrants' **\*836** Rights Clinic, Stanford, CA, David D. Cole, American Civil Liberties Foundation, Washington, DC, for Respondents.

**Opinion**

Justice ALITO delivered the opinion of the Court, except as to Part II. *

Every day, immigration officials must determine whether to admit or remove the many aliens who have arrived at an official "port of entry" (*e.g.*, an international airport or border crossing) or who have been apprehended trying to enter the country at an unauthorized location. Immigration officials must also determine on a daily basis whether there are grounds for removing any of the aliens who are already present inside the country. The vast majority of these determinations are quickly made, but in some cases deciding whether an alien should be admitted or removed is not as easy. As a result, Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings. Detention during those proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made.

In this case we are asked to interpret three provisions of U.S. immigration law that authorize the Government to detain aliens in the course of immigration proceedings. All parties appear to agree that the text of these provisions, when read most naturally, does not give detained aliens the right to periodic bond hearings during the course of their detention. But by relying on the constitutional-avoidance canon of statutory interpretation, the Court of Appeals for the Ninth Circuit held that detained aliens have a statutory right to periodic bond hearings under the provisions at issue.

**[1]** Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems. But a court relying on that canon still must *interpret* the statute, not rewrite it. Because the Court of Appeals in this case adopted implausible constructions of the three immigration provisions at issue, we reverse its judgment and remand for further proceedings.

I

A

To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering.

1

That process of decision generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible. Under 122 Stat. 867, 8 U.S.C. § 1225, an alien who "arrives in the United States," or "is present" in this country but "has not been admitted," is treated as an applicant for admission." § 1225(a)(1). Applicants for admission must "be inspected by immigration officers" to ensure that they may be admitted **\*837** into the country consistent with U.S. immigration law. § 1225(a)(3).

As relevant here, applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those

covered by 🚩 § 1225(b)(2). 🚩 Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. See 🚩 § 1225(b)(1)(A)(i) (citing §§ 1182(a)(6)(C), (a)(7)). 🚩 Section 1225(b)(1) also applies to certain other aliens designated by the Attorney General in his discretion. See 🚩 § 1225(b)(1)(A)(iii). 🚩 Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for admission not covered by 🚩 § 1225(b)(1) (with specific exceptions not relevant here). See 🚩 §§ 1225(b)(2)(A), (B).

Both 🚩 § 1225(b)(1) and 🚩 § 1225(b)(2) authorize the detention of certain aliens. Aliens covered by 🚩 § 1225(b)(1) are normally ordered removed "without further hearing or review" pursuant to an expedited removal process. 🚩 § 1225(b)(1)(A)(i). But if a 🚩 § 1225(b)(1) alien "indicates either an intention to apply for asylum ... or a fear of persecution," then that alien is referred for an asylum interview. 🚩 § 1225(b)(1)(A)(ii). If an immigration officer determines after that interview that the alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum." 🚩 § 1225(b)(1)(B)(ii). Aliens who are instead covered by 🚩 § 1225(b)(2) are detained pursuant to a different process. Those aliens "shall be detained for a [removal] proceeding" if an immigration officer "determines that [they are] not clearly and beyond a doubt entitled to be admitted" into the country. 🚩 § 1225(b)(2)(A).

Regardless of which of those two sections authorizes their detention, applicants for admission may be temporarily released on parole "for urgent humanitarian reasons or significant public benefit." § 1182(d)(5)(A); see also 8 C.F.R §§ 212.5(b), 235.3 (2017). Such parole, however, "shall not be regarded as an admission of the alien." 🟡 8 U.S.C. § 1182(d)(5)(A). Instead, when the purpose of the parole has been served, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Ibid.*

2

Even once inside the United States, aliens do not have an absolute right to remain here. For example, an alien present in the country may still be removed if he or she falls "within one or more ... classes of deportable aliens." § 1227(a). That includes aliens who were inadmissible at the time of entry or who have been convicted of certain criminal offenses since admission. See §§ 1227(a)(1), (2).

🚩 Section 1226 generally governs the process of arresting and detaining that group of aliens pending their removal. As relevant here, 🚩 § 1226 distinguishes between two different categories of aliens. 🚩 Section 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of an alien "pending a decision on whether the alien is to be removed from the United States." 🚩 § 1226(a). "Except as provided in subsection (c) of this section," the Attorney General "may release" an alien detained under 🚩 § 1226(a) "on bond ... or conditional parole." *Ibid.*

🚩 Section 1226(c), however, carves out a statutory category of aliens who may *not* be released under 🚩 § 1226(a). Under 🚩 § 1226(c), the "Attorney General shall take into custody any alien" who falls into one of several enumerated categories involving criminal offenses and terrorist activities. **\*838** 🚩 § 1226(c)(1). The Attorney General may release aliens in those categories "only if the Attorney General decides ... that release of the alien from custody is necessary" for witness-protection purposes and "the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 🚩 § 1226(c)(2). Any release under those narrow conditions "shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." *Ibid.* [1]

In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under 🚩 §§ 1225(b)(1) and 🚩 (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under

*Jennings v. Rodriguez,* 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

§§ 1226(a) and (c). The primary issue is the proper interpretation of §§ 1225(b), 1226(a), and 1226(c).

B

Respondent Alejandro Rodriguez is a Mexican citizen. Since 1987, he has also been a lawful permanent resident of the United States. In April 2004, after Rodriguez was convicted of a drug offense and theft of a vehicle, the Government detained him under § 1226 and sought to remove him from the country. At his removal hearing, Rodriguez argued both that he was not removable and, in the alternative, that he was eligible for relief from removal. In July 2004, an Immigration Judge ordered Rodriguez deported to Mexico. Rodriguez chose to appeal that decision to the Board of Immigration Appeals, but five months later the Board agreed that Rodriguez was subject to mandatory removal. Once again, Rodriguez chose to seek further review, this time petitioning the Court of Appeals for the Ninth Circuit for review of the Board's decision.

In May 2007, while Rodriguez was still litigating his removal in the Court of Appeals, he filed a habeas petition in the District Court for the Central District of California, alleging that he was entitled to a bond hearing to determine whether his continued detention was justified. Rodriguez's case was consolidated with another, similar case brought by Alejandro Garcia, and together they moved for class certification. The District Court denied their motion, but the Court of Appeals for the Ninth Circuit reversed. See *Rodriguez v. Hayes,* 591 F.3d 1105, 1111 (2010). It concluded that the proposed class met the certification requirements of Rule 23 of the Federal Rules of Civil Procedure, and it remanded the case to the District Court. *Id.,* at 1111, 1126.

On remand, the District Court certified the following class:

> "[A]ll non-citizens within the Central District of California who: (1) are or were detained for longer than six months pursuant to one of the general immigration detention statutes pending completion of removal proceedings, including judicial review, (2) are not and have not been detained pursuant to a national security detention statute, and (3) have not been afforded a hearing to determine whether their detention is **\*839** justified."

Class Certification Order in *Rodriguez v. Hayes,* CV 07–03239 (CD Cal., Apr. 5, 2010).

The District Court named Rodriguez as class representative of the newly certified class, *ibid.,* and then organized the class into four subclasses based on the four "general immigration detention statutes" under which it understood the class members to be detained: Sections 1225(b), 1226(a), 1226(c), and 1231(a). See Order Granting Plaintiff's Motion for Class Certification in *Rodriguez v. Holder,* CV 07–03239 (CD Cal., Mar. 8, 2011) (2011 Order); *Rodriguez v. Robbins,* 715 F.3d 1127, 1130–1131 (C.A.9 2013). Each of the four subclasses was certified to pursue declaratory and injunctive relief. 2011 Order. On appeal, the Court of Appeals held that the § 1231(a) subclass had been improperly certified, but it affirmed the certification of the other three subclasses. See *Rodriguez v. Robbins,* 804 F.3d 1060, 1074, 1085–1086 (C.A.9 2015).

In their complaint, Rodriguez and the other respondents argued that the relevant statutory provisions—§§ 1225(b), 1226(a), and 1226(c)—do not authorize "prolonged" detention in the absence of an individualized bond hearing at which the Government proves by clear and convincing evidence that the class member's detention remains justified. Absent such a bond-hearing requirement, respondents continued, those three provisions would violate the Due Process Clause of the Fifth Amendment. In their prayer for relief, respondents thus asked the District Court to require the Government "to provide, after giving notice, individual hearings before an immigration judge for ... each member of the class, at which [the Government] will bear the burden to prove by clear and convincing evidence that no reasonable conditions will ensure the detainee's presence in the event of removal and protect the community from serious danger, despite the prolonged length of detention at issue." Third Amended Complaint in *Rodriguez v. Holder,* CV 07–03239, p. 31 (CD Cal., Oct. 20, 2010). Respondents also sought declaratory relief. *Ibid.*

As relevant here, the District Court entered a permanent injunction in line with the relief sought by respondents, and the Court of Appeals affirmed. See 804 F.3d, at 1065. Relying heavily on the canon of constitutional avoidance, the Court of Appeals construed §§ 1225(b) and 1226(c) as imposing an implicit 6–month time limit on an alien's

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1320 of 1384

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

detention under these sections. *Id., at 1079, 1082.* After that point, the Court of Appeals held, the Government may continue to detain the alien only under the authority of § 1226(a). *Ibid.* The Court of Appeals then construed § 1226(a) to mean that an alien must be given a bond hearing every six months and that detention beyond the initial 6–month period is permitted only if the Government proves by clear and convincing evidence that further detention is justified. *Id., at 1085, 1087.*

The Government petitioned this Court for review of that decision, and we granted certiorari. 579 U.S. ——, 136 S.Ct. 2489, 195 L.Ed.2d 821 (2016).

### II

Before reaching the merits of the lower court's interpretation, we briefly address whether we have jurisdiction to entertain respondents' claims. We discuss two potential obstacles, 8 U.S.C. §§ 1252(b)(9) and 1226(e).

### A

Under § 1252(b)(9):

> "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action **\*840** taken or proceeding brought to remove an alien from the United States under this subchapter [including §§ 1225 and 1226] shall be available only in judicial review of a final order under this section."

**[2]** This provision does not deprive us of jurisdiction. We are required in this case to decide "questions of law," specifically, whether, contrary to the decision of the Court of Appeals, certain statutory provisions require detention without a bond

hearing. We assume for the sake of argument that the actions taken with respect to all the aliens in the certified class constitute "action[s] taken ... to remove [them] from the United States." [2] On that assumption, the applicability of § 1252(b)(9) turns on whether the legal questions that we must decide "aris[e] from" the actions taken to remove these aliens.

It may be argued that this is so in the sense that if those actions had never been taken, the aliens would not be in custody at all. But this expansive interpretation of § 1252(b)(9) would lead to staggering results. Suppose, for example, that a detained alien wishes to assert a claim under *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), based on allegedly inhumane conditions of confinement. See, *e.g., Ziglar v. Abbasi,* 582 U.S. ——, —— – – ——, 137 S.Ct. 1843, 1863–1867, 198 L.Ed.2d 290 (2017). Or suppose that a detained alien brings a state-law claim for assault against a guard or fellow detainee. Or suppose that an alien is injured when a truck hits the bus transporting aliens to a detention facility, and the alien sues the driver or owner of the truck. The "questions of law and fact" in all those cases could be said to "aris[e] from" actions taken to remove the aliens in the sense that the aliens' injuries would never have occurred if they had not been placed in detention. But cramming judicial review of those questions into the review of final removal orders would be absurd.

Interpreting "arising from" in this extreme way would also make claims of prolonged detention effectively unreviewable. By the time a final order of removal was eventually entered, the allegedly excessive detention would have already taken place. And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review.

In past cases, when confronted with capacious phrases like " 'arising from,' " we have eschewed " 'uncritical literalism' " leading to results that " 'no sensible person could have intended.' " *Gobeille v. Liberty Mut. Ins. Co.,* 577 U.S. ——, ——, 136 S.Ct. 936, 943, 194 L.Ed.2d 20 (2016) (interpreting phrase "relate to" in the Employee Retirement Income Security Act of 1974's pre-emption provision). See also, *e.g., FERC v. Electric Power Supply Assn.,* 577 U.S. ——, ——, 136 S.Ct. 760, 773–775, 193 L.Ed.2d 661 (2016) (interpreting term "affecting" in Federal Power Act); *Maracich v. Spears,* 570 U.S. 48, 59–61, 133 S.Ct. 2191,

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

186 L.Ed.2d 275 (2013) (interpreting phrase "in connection with" in Driver's Privacy Protection Act); *Dan's City Used Cars, Inc. v. Pelkey,* 569 U.S. 251, 260–261, 133 S.Ct. 1769, 185 L.Ed.2d 909 (2013) (interpreting phrase "related to" in Federal Aviation Administration Authorization Act); *Celotex Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (interpreting phrase "related to" in Bankruptcy Act). In *Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), we took **\*841** this approach in construing the very phrase that appears in § 1252(b)(9). A neighboring provision of the Immigration and Nationality Act refers to "any cause or claim by or on behalf of any alien *arising from* the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g) (emphasis added). We did not interpret this language to sweep in any claim that can technically be said to "arise from" the three listed actions of the Attorney General. Instead, we read the language to refer to just those three specific actions themselves. *American–Arab Anti–Discrimination Comm., supra,* at 482–483, 119 S.Ct. 936.

The parties in this case have not addressed the scope of § 1252(b)(9), and it is not necessary for us to attempt to provide a comprehensive interpretation. For present purposes, it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar. [3]

### B

**[3]** We likewise hold that § 1226(e) does not bar us from considering respondents' claims.

That provision states:

"The Attorney General's discretionary judgment regarding the application of [ § 1226] shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention

or release of any alien or the grant, revocation, or denial of bond or parole." § 1226(e).

As we have previously explained, § 1226(e) precludes an alien from "challeng[ing] a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release." *Demore v. Kim,* 538 U.S. 510, 516, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). But § 1226(e) does not preclude "challenges [to] the statutory framework that permits [the alien's] detention without bail." *Id.,* at 517, 123 S.Ct. 1708.

Respondents mount that second type of challenge here. First and foremost, they are challenging the extent of the Government's detention authority under the "statutory framework" as a whole. If that challenge fails, they are then contesting the constitutionality of the entire statutory scheme under the Fifth Amendment. Because the extent of the Government's detention authority is not a matter of "discretionary judgment," "action," or "decision," respondents' challenge to "the statutory framework that permits [their] detention without bail," *ibid.,* falls outside of the scope of § 1226(e). We may therefore consider the merits of their claims.

### \*842 III

**[4]** When "a serious doubt" is raised about the constitutionality of an act of Congress, "it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). Relying on this canon of constitutional avoidance, the Court of Appeals construed §§ 1225(b), 1226(a), and 1226(c) to limit the permissible length of an alien's detention without a bond hearing. Without such a construction, the Court of Appeals believed, the " 'prolonged detention without adequate procedural protections' " authorized by the provisions " 'would raise serious constitutional concerns.' " 804 F.3d, at 1077 (quoting *Casas–Castrillon v. DHS,* 535 F.3d 942, 950 (C.A.9 2008)).

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

**[5]** The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Clark v. Martinez,* 543 U.S. 371, 385, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). In the absence of more than one plausible construction, the canon simply " 'has no application.' " *Warger v. Shauers,* 574 U.S. ––––, ––––, 135 S.Ct. 521, 529, 190 L.Ed.2d 422 (2014) (quoting *United States v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 494, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001)).

The Court of Appeals misapplied the canon in this case because its interpretations of the three provisions at issue here are implausible. In Parts III–A and III–B, we hold that, subject only to express exceptions, §§ 1225(b) and 1226(c) authorize detention until the end of applicable proceedings. And in Part III–C, we hold that there is no justification for any of the procedural requirements that the Court of Appeals layered onto § 1226(a) without any arguable statutory foundation.

### A

**[6]** As noted, § 1225(b) applies primarily to aliens seeking entry into the United States ("applicants for admission" in the language of the statute). Section 1225(b) divides these applicants into two categories. First, certain aliens claiming a credible fear of persecution under § 1225(b)(1) "shall be detained for further consideration of the application for asylum." § 1225(b)(1)(B)(ii). Second, aliens falling within the scope of § 1225(b)(2) "shall be detained for a [removal] proceeding." § 1225(b)(2)(A).

Read most naturally, §§ 1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded. Section 1225(b)(1) aliens are detained for "further consideration of the application for asylum," and § 1225(b)(2) aliens are in turn detained for "[removal] proceeding[s]." Once those proceedings end, detention under § 1225(b) must end as well. Until that point, however, nothing in the statutory text imposes any

limit on the length of detention. And neither § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings.

Despite the clear language of §§ 1225(b)(1) and (b)(2), respondents argue—and the Court of Appeals held—that those provisions nevertheless can be construed to contain implicit limitations on the length of detention. But neither of the two limiting interpretations offered by respondents is plausible.

### 1

First, respondents argue that §§ 1225(b)(1) and (b)(2) contain an implicit 6–month limit on the length of detention. Once that 6–month period elapses, respondents contend, aliens previously detained **\*843** under those provisions must instead be detained under the authority of § 1226(a), which allows for bond hearings in certain circumstances.

There are many problems with this interpretation. Nothing in the text of § 1225(b)(1) or § 1225(b)(2) even hints that those provisions restrict detention after six months, but respondents do not engage in any analysis of the text. Instead, they simply cite the canon of constitutional avoidance and urge this Court to use that canon to read a "six-month reasonableness limitation" into § 1225(b). Brief for Respondents 48.

That is not how the canon of constitutional avoidance works. Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to "choos[e] between competing *plausible* interpretations of a statutory text." *Clark, supra,* at 381, 125 S.Ct. 716 (emphasis added). To prevail, respondents must thus show that § 1225(b)'s detention provisions may plausibly be read to contain an implicit 6–month limit. And they do not even attempt to defend that reading of the text.

In much the same manner, the Court of Appeals all but ignored the statutory text. Instead, it read *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), as essentially granting a license to graft a time limit onto the

text of § 1225(b). *Zadvydas,* however, provides no such authority.

*Zadvydas* concerned § 1231(a)(6), which authorizes the detention of aliens who have already been ordered removed from the country. Under this section, when an alien is ordered removed, the Attorney General is directed to complete removal within a period of 90 days, 8 U.S.C. § 1231(a)(1)(A), and the alien must be detained during that period, § 1231(a)(2). After that time elapses, however, § 1231(a)(6) provides only that certain aliens "*may* be detained" while efforts to complete removal continue. (Emphasis added.)

In *Zadvydas,* the Court construed § 1231(a)(6) to mean that an alien who has been ordered removed may not be detained beyond "a period reasonably necessary to secure removal," 533 U.S., at 699, 121 S.Ct. 2491 and it further held that six months is a presumptively reasonable period, *id.,* at 701, 121 S.Ct. 2491. After that, the Court concluded, if the alien "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the Government must either rebut that showing or release the alien. *Ibid.*

The *Zadvydas* Court justified this interpretation by invoking the constitutional-avoidance canon, and the Court defended its resort to that canon on the ground that § 1231(a)(6) is ambiguous. Specifically, the Court detected ambiguity in the statutory phrase "*may* be detained." " ' [M]ay,' " the Court said, "suggests discretion" but not necessarily "unlimited discretion. In that respect the word 'may' is ambiguous." *Id.,* at 697, 121 S.Ct. 2491. The Court also pointed to the absence of any explicit statutory limit on the length of permissible detention following the entry of an order of removal. *Ibid.*

*Zadvydas* represents a notably generous application of the constitutional-avoidance canon, but the Court of Appeals in this case went much further. It failed to address whether *Zadvydas* 's reasoning may fairly be applied in this case despite the many ways in which the provision in question in *Zadvydas,* § 1231(a)(6), differs materially from those at issue here, §§ 1225(b)(1) and (b)(2). Those differences **\*844** preclude the reading adopted by the Court of Appeals.

To start, §§ 1225(b)(1) and (b)(2), unlike § 1231(a)(6), provide for detention for a specified period of time. Section 1225(b)(1) mandates detention "for further consideration of the application for asylum," § 1225(b)(1)(B)(ii), and § 1225(b)(2) requires detention "for a [removal] proceeding," § 1225(b)(2)(A). The plain meaning of those phrases is that detention must continue until immigration officers have finished "consider [ing]" the application for asylum, § 1225(b)(1)(B)(ii), or until removal proceedings have concluded, § 1225(b)(2)(A). By contrast, Congress left the permissible length of detention under § 1231(a)(6) unclear.

[7] Moreover, in *Zadvydas,* the Court saw ambiguity in § 1231(a)(6)'s use of the word "may." Here, by contrast, §§ 1225(b)(1) and (b)(2) do not use the word "may." Instead, they unequivocally mandate that aliens falling within their scope "shall" be detained. "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Technologies, Inc. v. United States,* 579 U.S. ——, ——, 136 S.Ct. 1969, 1977, 195 L.Ed.2d 334 (2016). That requirement of detention precludes a court from finding ambiguity here in the way that *Zadvydas* found ambiguity in § 1231(a)(6).

*Zadvydas* 's reasoning is particularly inapt here because there is a specific provision authorizing release from § 1225(b) detention whereas no similar release provision applies to § 1231(a)(6). With a few exceptions not relevant here, the Attorney General may "for urgent humanitarian reasons or significant public benefit" temporarily parole aliens detained under §§ 1225(b)(1) and (b)(2). 8 U.S.C. § 1182(d)(5)(A). That express exception to detention implies that there are no *other* circumstances under which aliens detained under § 1225(b) may be released. See A. Scalia & B. Garner, Reading Law 107 (2012) ("Negative–Implication Canon[:] The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius* )"). That negative implication precludes the sort of implicit time limit on detention that we found in *Zadvydas.* [4]

In short, a series of textual signals distinguishes the provisions at issue in this case from *Zadvydas*'s interpretation of § 1231(a)(6). While *Zadvydas* found § 1231(a)(6) to be ambiguous, the same cannot be said of §§ 1225(b)(1) and (b)(2): Both provisions mandate detention until a certain point and authorize release prior to that point only under limited circumstances. As a result, neither provision can reasonably be read to limit detention to six months.

2

**[8]** In this Court, respondents advance an interpretation of the language of §§ 1225(b)(1) and (b)(2) that was never made below, namely, that the term "for," which appears in both provisions, mandates detention only until the *start* of applicable proceedings rather than all the way through to their conclusion. Respondents contrast the language of §§ 1225(b)(1) and (b)(2) authorizing detention "for" further proceedings with another **\*845** provision's authorization of detention "pending" further proceedings. See 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien ... shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"). According to respondents, that distinction between "for" and "pending" makes an enormous difference. As they see things, the word "pending" authorizes detention throughout subsequent proceedings, but the term "for" means that detention authority ends once subsequent proceedings begin. As a result, respondents argue, once the applicable proceedings commence, §§ 1225(b)(1) and (b)(2) no longer authorize detention, and the Government must instead look to § 1226(a) for continued detention authority.

That interpretation is inconsistent with ordinary English usage and is incompatible with the rest of the statute. To be sure, "for" can sometimes mean "in preparation for or anticipation of." 6 Oxford English Dictionary 24 (2d ed. 1989). But "for" can also mean "[d]uring [or] throughout," *id.,* at 26, as well as "with the object or purpose of," *id.,* at 23; see also American Heritage Dictionary 709 (3d ed. 1992) ("Used to indicate the object, aim, or purpose of an action or activity"; "Used to indicate amount, extent, or duration"); Random House Dictionary of the English Language 747 (2d ed. 1987) ("with the object or purpose of"; "during the continuance of"); Webster's Third New International

Dictionary 886 (1993) ("with the purpose or object of"; "to the ... duration of"). And here, only that second set of definitions makes sense in the context of the statutory scheme as a whole.

For example, respondents argue that, once detention authority ends under §§ 1225(b)(1) and (b)(2), aliens can be detained only under § 1226(a). But that section authorizes detention only "[o]n a warrant issued" by the Attorney General leading to the alien's arrest. § 1226(a). If respondents' interpretation of § 1225(b) were correct, then the Government could detain an alien without a warrant at the border, but once removal proceedings began, the Attorney General would have to issue an arrest warrant in order to continue detaining the alien. To put it lightly, that makes little sense.

Nor does respondents' interpretation of the word "for" align with the way Congress has historically used that word in § 1225. Consider that section's text prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009–546. Under the older version of § 1225(b), "[e]very alien" within its scope "who may not appear ... to be clearly and beyond a doubt entitled to [entry] shall be detained for further inquiry to be conducted by a special inquiry officer." 8 U.S.C. § 1225(b) (1994 ed.). It would make no sense to read "for further inquiry" as authorizing detention of the alien only until the start of the inquiry; Congress obviously did not mean to allow aliens to feel free to leave once immigration officers asked their first question.

**[9]** In sum, §§ 1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin. Of course, other provisions of the immigration statutes do authorize detention "pending" other proceedings or "until" a certain point. See *post,* at 870 – 871 (BREYER, J., dissenting) (quoting § 1225(b)(1)(B)(iii)(IV)). But there is no "canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing." **\*846** *Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S. 519, 540, 133 S.Ct. 1351, 185 L.Ed.2d 392 (2013). We decline to invent and apply such a canon here.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1325 of 1384

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

B

[10]   While the language of §§ 1225(b)(1) and (b)(2) is quite clear, § 1226(c) is even clearer. As noted, § 1226 applies to aliens already present in the United States. Section 1226(a) creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings. Section 1226(a) also permits the Attorney General to release those aliens on bond, "[e]xcept as provided in subsection (c) of this section." Section 1226(c) in turn states that the Attorney General "shall take into custody any alien" who falls into one of the enumerated categories involving criminal offenses and terrorist activities. 8 U.S.C. § 1226(c)(1). Section 1226(c) then goes on to specify that the Attorney General "may release" one of those aliens "*only if* the Attorney General decides" both that doing so is necessary for witness-protection purposes and that the alien will not pose a danger or flight risk. § 1226(c)(2) (emphasis added).

Like § 1225(b), § 1226(c) does not on its face limit the length of the detention it authorizes. In fact, by allowing aliens to be released "only if" the Attorney General decides that certain conditions are met, § 1226(c) reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute. And together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope *must* continue "pending a decision on whether the alien is to be removed from the United States." § 1226(a).

In a reprise of their interpretation of § 1225(b), respondents argue, and the Court of Appeals held, that § 1226(c) should be interpreted to include an implicit 6–month time limit on the length of mandatory detention. Once again, that interpretation falls far short of a "plausible statutory construction."

In defense of their statutory reading, respondents first argue that § 1226(c)'s "silence" as to the length of detention "cannot be construed to authorize prolonged mandatory detention, because Congress must use 'clearer terms' to authorize 'long-term detention.' " Brief for Respondents 34 (quoting *Zadvydas,* 533 U.S., at 697, 121 S.Ct. 2491). But § 1226(c) is *not* "silent" as to the length of detention. It mandates detention "pending a decision on whether the alien is to be removed from the United States," § 1226(a), and it expressly prohibits release from that detention except for narrow, witness-protection purposes. Even if courts were permitted to fashion 6–month time limits out of statutory silence, they certainly may not transmute existing statutory language into its polar opposite. The constitutional-avoidance canon does not countenance such textual alchemy.

Indeed, we have held as much in connection with § 1226(c) itself. In *Demore v. Kim,* 538 U.S., at 529, 123 S.Ct. 1708 we distinguished § 1226(c) from the statutory provision in *Zadvydas* by pointing out that detention under § 1226(c) has "a definite termination point": the conclusion of removal proceedings. As we made clear there, that "definite termination point"—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c).

Respondents next contend that § 1226(c)'s limited authorization for release for witness-protection purposes does not imply that other forms of release are forbidden, but this argument defies the *847 statutory text. By expressly stating that the covered aliens may be released "only if" certain conditions are met, 8 U.S.C. § 1226(c)(2), the statute expressly and unequivocally imposes an affirmative *prohibition* on releasing detained aliens under any other conditions.

Finally, respondents point to a provision enacted as part of the PATRIOT Act [5] and contend that their reading of § 1226(c) is needed to prevent that provision from being superfluous. That argument, however, misreads both statutory provisions. Although the two provisions overlap in part, they are by no means congruent.

Two differences stand out. First, § 1226(c) and the PATRIOT Act cover different categories of aliens. Both apply to certain terrorist suspects, but only § 1226(c)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1326 of 1384

*Jennings v. Rodriguez*, 138 S.Ct. 830 (2018)
200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

reaches aliens convicted of other more common criminal offenses. See 🚩 §§ 1226(c)(1)(A)-(C) (aliens inadmissible or deportable under 🚩 § 1182(a)(2); §§ 1227(a)(2)(A)(ii), (A)(iii), (B), (C), and (D); and § 1227(a)(2)(A)(i) under certain conditions). For its part, the PATRIOT Act casts a wider net than 🚩 § 1226(c) insofar as it encompasses certain threats to national security not covered by 🚩 § 1226(c). See § 1226a(a)(3) (aliens described in 🚩 § 1182(a)(3)(A)(i), (iii), and 🚩 1227(a)(4)(A)(i), (iii), as well as aliens "engaged in any other activity that endangers the national security of the United States"). In addition, the Government's detention authority under 🚩 § 1226(c) and the PATRIOT Act is not the same. Under 🚩 § 1226(c), the Government must detain an alien until "a decision on *whether* the alien is to be removed" is made. 🚩 § 1226(a) (emphasis added). But, subject to exceptions not relevant here, the PATRIOT Act authorizes the Government to detain an alien "until the alien *is removed*." § 1226a(a)(2) (emphasis added).

Far from being redundant, then, 🚩 § 1226(c) and the PATRIOT Act apply to different categories of aliens in different ways. There is thus no reason to depart from the plain meaning of 🚩 § 1226(c) in order to avoid making the provision superfluous.

We hold that 🚩 § 1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings "only if" the alien is released for witness-protection purposes.

C

Finally, as noted, 🚩 § 1226(a) authorizes the Attorney General to arrest and detain an alien "pending a decision on whether the alien is to be removed from the United States." 🚩 § 1226(a). As long as the detained alien is not covered by 🚩 § 1226(c), the Attorney General "may release" the alien on "bond ... or conditional parole." 🚩 § 1226(a). Federal regulations provide that aliens detained under 🚩 § 1226(a) receive bond hearings at the outset of detention. See 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1).

The Court of Appeals ordered the Government to provide procedural protections that go well beyond the initial bond hearing established by existing regulations—namely, periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that the alien's continued detention is necessary. Nothing in 🚩 § 1226(a)'s text—which says only that the Attorney General "may release" the alien "on ... bond"—even remotely supports the imposition of either of those requirements.

**\*848** Nor does 🚩 § 1226(a)'s text even hint that the length of detention prior to a bond hearing must specifically be considered in determining whether the alien should be released.

IV

For these reasons, the meaning of the relevant statutory provisions is clear—and clearly contrary to the decision of the Court of Appeals. But the dissent is undeterred. It begins by ignoring the statutory language for as long as possible, devoting the first two-thirds of its opinion to a disquisition on the Constitution. Only after a 19–page prologue does the dissent acknowledge the relevant statutory provisions.

The dissent frames the question of interpretation as follows: Can 🚩 §§ 1225(b), 🚩 1226(c), and 🚩 1226(a) be read to require bond hearings every six months "without doing violence to the statutory language," *post,* at 869 – 870 (opinion of BREYER, J.)? According to the dissent, the answer is "yes," but the dissent evidently has a strong stomach when it comes to inflicting linguistic trauma. Thus, when Congress mandated that an "alien shall be detained," 🚩 § 1225(b)(1)(B)(ii), what Congress really meant, the dissent insists, is that the alien may be released from custody provided only that his freedom of movement is restricted in some way, such as by "the imposition of a curfew," *post,* at 870. And when Congress stressed that "[t]he Attorney General may release an alien ... *only if* ... release ... from custody is necessary" to protect the safety of a witness, 🚩 § 1226(c)(2) (emphasis added), what Congress meant, the dissent tells us, is that the Attorney General must release an alien even when no witness is in need of protection—so long as the alien is neither a flight risk nor a danger to the community, see *post,* at 872 – 874. The contortions needed to reach these remarkable conclusions are a sight to behold.

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

Let us start with the simple term "detain." According to the dissent, "detain" means the absence of "unrestrained freedom." *Post,* at 870. An alien who is subject to any one of "numerous restraints"—including "a requirement to obtain medical treatment," "to report at regular intervals," or even simply to comply with "a curfew"—is "detained" in the dissent's eyes, even if that alien is otherwise free to roam the streets. *Ibid.*

This interpretation defies ordinary English usage. The dictionary cited by the dissent, the Oxford English Dictionary (OED), defines "detain" as follows: "[t]o keep in confinement or under restraint; *to keep prisoner.*" 4 OED 543 (2d ed. 1989) (emphasis added); see also OED (3d ed. 2012), http://www.oed.com/view/Entry/51176 (same). Other general-purpose dictionaries provide similar definitions. See, *e.g.,* Webster's Third New International Dictionary 616 (1961) ("to hold or keep in or as if in custody {*ed* by the police for questioning}"); Webster's New International Dictionary 710 (2d ed. 1934) ("[t]o hold or keep as in custody"); American Heritage Dictionary 508 (def.2) (3d ed. 1992) ("To keep in custody or temporary confinement"); Webster's New World College Dictionary 375 (3d ed. 1997) ("to keep in custody; confine"). And legal dictionaries define "detain" the same way. See, *e.g.,* Ballentine's Law Dictionary 343 (3d ed. 1969) ("To hold; to keep in custody; to keep"); Black's Law Dictionary 459 (7th ed. 1999) ("The act or fact of holding a person in custody; confinement or compulsory delay").

How does the dissent attempt to evade the clear meaning of "detain"? It resorts to the legal equivalent of a sleight-of-hand trick. First, the dissent cites a passage in Blackstone stating that arrestees could always **\*849** seek release on bail. *Post,* at 863 – 864. Then, having established the obvious point that a person who is initially detained may later be released from detention, the dissent reasons that this means that a person may still be regarded as detained even after he is released from custody. *Post,* at 870. That, of course, is a nonsequitur. Just because a person who is initially detained may later be released, it does not follow that the person is still "detained" after his period of detention comes to an end.

If there were any doubt about the meaning of the term "detain" in the relevant statutory provisions, the context in which they appear would put that doubt to rest. Title 8 of the United States Code, the title dealing with immigration, is replete with references that distinguish between "detained" aliens and aliens who are free to walk the streets in the way the dissent imagines. Section 1226(a), for instance, distinguishes between the power to "continue to detain the arrested alien" and the power to "release the alien on ... bond." But if the dissent were right, that distinction would make no sense: An "alien released on bond" would *also* be a "detained alien." Here is another example: In § 1226(b), Congress gave the Attorney General the power to "revoke at any time "a bond or parole authorized under subsection (a) of this section, rearrest the alien under the original warrant, and detain the alien." It beggars belief that Congress would have given the Attorney General the power to detain a class of aliens who, under the dissent's reading, are *already* "detained" because they are free on bond. But that is what the dissent would have us believe. Consider, finally, the example of § 1226(c). As noted, that provision obligates the Attorney General to "take into custody" certain aliens whenever they are "released, without regard to whether the alien is released on parole, supervised release, or probation." On the dissent's view, however, even aliens "released on parole, supervised release, or probation" are "in custody"—and so there would be no need for the Attorney General to take them into custody again.[6]

Struggling to prop up its implausible interpretation, the dissent looks to our prior decisions for aid, but that too fails. The best case it can find is *Tod v. Waldman,* 266 U.S. 547, 45 S.Ct. 193, 69 L.Ed. 195 (1925), a grant of a petition for rehearing in which the Court clarified that "[n]othing in [its original] order ... shall prejudice an application for release on bail of the respondents pending compliance with the mandate of this Court." *Id., at* 548, 45 S.Ct. 193. According to the dissent, that two-page decision from almost a century ago supports its reading because the underlying **\*850** immigration statute in that case—like some of the provisions at issue here—mandated that the relevant class of aliens " 'shall be detained' " pending the outcome of an inspection process. See *post,* at 870 – 871 (quoting Act of Feb. 5, 1917, § 16, 39 Stat. 886).

That reads far too much into *Waldman.* To start, the Court did not state that the aliens at issue were entitled to bail or even that bail was available to them. Instead, the Court merely noted that its decision should not "prejudice" any application the aliens might choose to file. That is notable, for in their petition for rehearing the aliens had asked the Court to affirmatively "*authorize* [them] to give bail." Petition for Rehearing in *Tod v. Waldman,* O.T. 1924, No. 95, p. 17

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1328 of 1384

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**
200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

(emphasis added). By refusing to do so, the Court may have been signaling its skepticism about their request. But it is impossible to tell. That is precisely why we, unlike the dissent, choose not to go beyond what the sentence actually says. And *Waldman* says nothing about how the word "detain" should be read in the context of §§ 1225(b), 1226(c), and 1226(a). [7]

Neither does *Zadvydas*. It is true, as the dissent points out, that *Zadvydas* found "that the words ' "may be detained" ' [are] consistent with requiring release from long-term detention," *post,* at 871 (quoting 533 U.S., at 682, 121 S.Ct. 2491), but that is not because there is any ambiguity in the term "detain." As we have explained, the key statutory provision in *Zadvydas* said that the aliens in question "may," not "shall," be detained, and that provision also failed to specify how long detention was to last. Here, the statutory provisions at issue state either that the covered aliens "shall" be detained until specified events take place, see 8 U.S.C. § 1225(b)(1)(B)(ii) ("further consideration of the application for asylum"); § 1225(b)(2)(A) ("a [removal] proceeding"), or provide that the covered aliens may be released "only if" specified conditions are met, § 1226(c)(2). The term that the *Zadvydas* Court found to be ambiguous was "may," not "detain." See 533 U.S., at 697, 121 S.Ct. 2491. And the opinion in that case consistently used the words "detain" and "custody" to refer exclusively to physical confinement and restraint. See *id., at* 690, 121 S.Ct. 2491 (referring to "[f]reedom from imprisonment—from government custody, *detention, or other forms of physical restraint* " (emphasis added)); *id., at* 683, 121 S.Ct. 2491 (contrasting aliens "released on bond" with those "held in custody"). [8]

The dissent offers no plausible interpretation of the §§ 1225(b), 1226(c), and 1226(a). But even if we were to accept the dissent's interpretation and hold that "detained" aliens in the "custody" of the Government include aliens released on bond, that would *still* not justify the dissent's proposed resolution of this case. The Court of Appeals held that aliens detained under the provisions **\*851** at issue must be given *periodic* bond hearings, and the dissent agrees. See *post,* at 859 ("I would interpret the statute as requiring bail hearings, presumptively after six months of confinement"). But the dissent draws that 6–month limitation out of thin air.

However broad its interpretation of the words "detain" and "custody," nothing in *any* of the relevant provisions imposes a 6–month time limit on detention without the possibility of bail. So if the dissent's interpretation is right, then aliens detained under §§ 1225(b), 1226(c), and 1226(a) are entitled to bail hearings as soon as their detention begins rather than six months later. "Detained" does not mean "released on bond," and it *certainly* does not mean "released on bond but only after six months of mandatory physical confinement."

The dissent's utterly implausible interpretation of the statutory language cannot support the decision of the court below.

## V

**[11]**    Because the Court of Appeals erroneously concluded that periodic bond hearings are required under the immigration provisions at issue here, it had no occasion to consider respondents' constitutional arguments on their merits. Consistent with our role as "a court of review, not of first view," *Cutter v. Wilkinson,* 544 U.S. 709, 718, n. 7, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), we do not reach those arguments. Instead, we remand the case to the Court of Appeals to consider them in the first instance.

Before the Court of Appeals addresses those claims, however, it should reexamine whether respondents can continue litigating their claims as a class. When the District Court certified the class under Rule 23(b)(2) of the Federal Rules of Civil Procedure, it had their statutory challenge primarily in mind. Now that we have resolved that challenge, however, new questions emerge.

Specifically, the Court of Appeals should first decide whether it continues to have jurisdiction despite 8 U.S.C. § 1252(f) (1). Under that provision, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [§§ 1221–1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." Section 1252(f)(1) thus "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–123[2]." *American–Arab Anti–Discrimination Comm.,* 525 U.S., at 481, 119 S.Ct. 936. The Court of Appeals held that this provision did not affect its jurisdiction over

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1329 of 1384

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

respondents' *statutory* claims because those claims did not "seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct ... not authorized by the statutes." 591 F.3d, at 1120. This reasoning does not seem to apply to an order granting relief on constitutional grounds, and therefore the Court of Appeals should consider on remand whether it may issue classwide injunctive relief based on respondents' constitutional claims. If not, and if the Court of Appeals concludes that it may issue only declaratory relief, then the Court of Appeals should decide whether that remedy can sustain the class on its own. See, *e.g.,* Rule 23(b)(2) (requiring "that final injunctive relief or *corresponding* declaratory relief [be] appropriate respecting the class as a whole" (emphasis added)).

The Court of Appeals should also consider whether a Rule 23(b)(2) class action continues to be the appropriate vehicle for respondents' claims in light of *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). We **\*852** held in *Dukes* that " Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.,* at 360, 131 S.Ct. 2541. That holding may be relevant on remand because the Court of Appeals has already acknowledged that some members of the certified class may not be entitled to bond hearings as a constitutional matter. See, *e.g.,* 804 F.3d, at 1082, 715 F.3d, at 1139–1141 (citing, *e.g.,* *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). Assuming that is correct, then it may no longer be true that the complained-of " 'conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' " *Dukes, supra,* at 360, 131 S.Ct. 2541 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)).

**[12]**    Similarly, the Court of Appeals should also consider on remand whether a Rule 23(b)(2) class action litigated on common facts is an appropriate way to resolve respondents' Due Process Clause claims. "[D]ue process is flexible," we have stressed repeatedly, and it "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); see also *Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

## VI

We reverse the judgment of the United States Court of Appeals for the Ninth Circuit and remand the case for further proceedings.

*It is so ordered.*

Justice KAGAN took no part in the decision of this case.

Justice THOMAS, with whom Justice GORSUCH joins except for footnote 6, concurring in Part I and Parts III–VI and concurring in the judgment.

In my view, no court has jurisdiction over this case. Congress has prohibited courts from reviewing aliens' claims related to their removal, except in a petition for review from a final removal order or in other circumstances not present here. See 8 U.S.C. § 1252(b)(9). Respondents have not brought their claims in that posture, so § 1252(b)(9) removes jurisdiction over their challenge to their detention. I would therefore vacate the judgment below with instructions to dismiss for lack of jurisdiction. But because a majority of the Court believes we have jurisdiction, and I agree with the Court's resolution of the merits, I join Part I and Parts III–VI of the Court's opinion.

## I

Respondents are a class of aliens whose removal proceedings are ongoing. Respondents allege that the statutes that authorize their detention during removal proceedings do not authorize "prolonged" detention unless they are given an individualized bond hearing at which the Government "prove[s] by clear and convincing evidence" that their detention remains justified. Third Amended Complaint in *Rodriguez v. Holder,* No. CV 07–03239 (C.D.Cal., Oct.22, 2010), pp. 30–31 (Third Amended Complaint). If the statutes do authorize "prolonged" detention, respondents claim that the statutes violate the Due Process Clause of the Fifth Amendment. *Ibid.* In their complaint, respondents sought declaratory and injunctive relief from detention during their removal proceedings. *Id.,* at 31–32. The District Court certified a class of aliens under Federal Rule of Civil Procedure 23(b)(2) who, among other things, "are or were

*Jennings v. Rodriguez,* 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

detained **\*853** for longer than six months pursuant to one of the general immigration detention statutes." Class Certification Order in *Rodriguez v. Holder,* No. CV 07–03239 (C.D.Cal., Apr.5, 2010), p. 2; *Rodriguez v. Hayes,* 591 F.3d 1105, 1122–1126 (C.A.9 2010). After the parties moved for summary judgment, the District Court entered a permanent injunction in favor of the class, which requires the named Government officials [1] to take steps to "timely identify all current and future class members," to update class member lists with the District Court every 90 days, and to provide class members with bond hearings that comply with particular substantive and procedural requirements. Order, Judgment, and Permanent Injunction in *Rodriguez v. Holder,* No. CV 07–03239 (C.D.Cal., Aug.6, 2013), pp. 5–6 (Order, Judgment, and Permanent Injunction).

II

A

Although neither party raises § 1252(b)(9), this Court has an "independent obligation" to assess whether it deprives us and the lower courts of jurisdiction. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). This Court has described § 1252(b)(9) as a " 'zipper' clause." See *Reno v. American–Arab Anti– Discrimination Comm.,* 525 U.S. 471, 483, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (*AADC* ); *INS v. St. Cyr,* 533 U.S. 289, 313, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). That description is apt because, when an alien raises a claim related to his removal, § 1252(b)(9) closes all but two avenues for judicial review:

"**Consolidation of questions for judicial review**

"Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under [ 8 U.S.C. §§ 1151–1382] shall be available *only in judicial review of a final order under this section.* Except *as otherwise provided in this section,* no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law

(statutory or nonstatutory), to review such an order or such questions of law or fact." (Emphasis added.)

The text of this provision is clear. Courts generally lack jurisdiction over "all questions of law and fact," both "constitutional" and "statutory," that "aris[e] from" an "action taken or proceeding brought to remove an alien." If an alien raises a claim arising from such an action or proceeding, courts cannot review it unless they are reviewing "a final order" under § 1252(a)(1) or exercising jurisdiction "otherwise provided" in § 1252. [2] Neither "habeas **\*854** corpus" nor "any other provision of law" can be used to avoid § 1252(b)(9)'s jurisdictional bar. In short, if a claim arises from an action taken to remove an alien, § 1252(b) (9) permits judicial review in only two circumstances: in connection with review of a final removal order and via a specific grant of jurisdiction in § 1252.

Respondents do not argue that any specific grant of jurisdiction applies here, and they do not seek review of a final removal order under § 1252(a)(1). Thus, a court may review respondents' claims only if they can show that § 1252(b)(9)'s jurisdictional bar does not apply in the first place because their claims do not "aris[e] from any action taken or proceeding brought to remove an alien."

Respondents cannot make that showing. Section 1252(b) (9) is a "general jurisdictional limitation" that applies to "all claims arising from deportation proceedings" and the "many ... decisions or actions that may be part of the deportation process." *AADC, supra,* at 482–483, 119 S.Ct. 936. Detaining an alien falls within this definition— indeed, this Court has described detention during removal proceedings as an "aspect of the deportation process." *Demore v. Kim,* 538 U.S. 510, 523, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); see also *Carlson v. Landon,* 342 U.S. 524, 538, 72 S.Ct. 525, 96 L.Ed. 547 (1952) ("Detention is necessarily a part of [the] deportation procedure"). As the Court explains today, Congress either mandates or permits the detention of aliens for the entire duration of their removal proceedings. See *ante,* at 841 – 848. This detention, the Court further explains, is meant to ensure that the Government can ultimately remove them. See *ante,* at 836; accord, *Demore, supra,* at 528, 123 S.Ct. 1708 (explaining that

detention during removal proceedings "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed"). The phrase "any action taken ... to remove an alien from the United States" must at least cover congressionally authorized portions of the deportation process that necessarily serve the purpose of ensuring an alien's removal. Claims challenging detention during removal proceedings thus fall within the heartland of § 1252(b)(9).

B

The plurality, the dissent, and respondents each offer reasons why § 1252(b)(9) does not apply to this case. The plurality reasons that applying § 1252(b)(9) to detention claims requires an overly expansive reading of "arising from." See *ante,* at 840 – 841. The dissent contends that § 1252(b)(9) applies only to challenges to the removal order itself. *Post,* at 875. And respondents argue that, if § 1252(b)(9) applies to their claims, they will have no meaningful way to challenge their detention during their removal proceedings. [3] Tr. of Oral Arg. 36. None of these arguments persuades me.

1

The plurality asserts that § 1252(b)(9) covers respondents' claims only if the **\*855** words "arising from" are given an "expansive interpretation." *Ante,* at 840. I am of a different view. Even if "arising from" is read narrowly, § 1252(b)(9) still covers the claims at issue in this case. That is because detention *is* an "action taken ... to remove" an alien. And even the narrowest reading of "arising from" must cover claims that directly challenge such actions. See *AADC,* 525 U.S., at 482–483, 119 S.Ct. 936.

The main precedent that the plurality cites to support its narrow reading of "arising from" demonstrates that § 1252(b)(9) applies here. See *ante,* at 840 – 841 (citing *AADC,* 525 U.S., at 482–483, 119 S.Ct. 936). In *AADC,* the Court explained that § 1252(b)(9) covers "all claims arising from deportation proceedings" and the "many ... decisions or

actions that may be part of the deportation process." *Ibid.* The Court even listed examples of the type of claims that would be covered, including challenges to the decision "to open an investigation" and the decision "to surveil the suspected [immigration-law] violator." *Id.,* at 482, 119 S.Ct. 936. If surveilling a suspected violator falls under the statute, then the detention of a known violator certainly does as well.

The plurality dismisses my "expansive interpretation" because it would lead to "staggering results," supposedly barring claims that are far afield from removal. See *ante,* at 840 (describing lawsuits challenging inhumane conditions of confinement, assaults, and negligent driving). But that is not the case. Unlike detention during removal proceedings, those actions are neither congressionally authorized nor meant to ensure that an alien can be removed. Thus, my conclusion that § 1252(b)(9) covers an alien's challenge to the *fact* of his detention (an action taken in pursuit of the lawful objective of removal) says nothing about whether it also covers claims about inhumane treatment, assaults, or negligently inflicted injuries suffered *during* detention (actions that go beyond the Government's lawful pursuit of its removal objective). Cf. *Bell v. Wolfish,* 441 U.S. 520, 536–539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (drawing a similar distinction).

2

The dissent takes a different approach. Relying on the prefatory clause to § 1252(b), it asserts that § 1252(b)(9) "by its terms applies only '[w]ith respect to review of an order of removal under [ § 1252(a)(1) ].' " *Post,* at 876 (quoting 8 U.S.C. § 1252(b)). The dissent reads the prefatory clause to mean that § 1252(b)(9) applies only to a "challenge [to] an order of removal." *Post,* at 876. That reading is incorrect.

Section 1252(b)(9) is not restricted to challenges to removal orders. The text refers to review of "*all* questions of law and fact" arising from removal, not just removal orders. (Emphasis added.) And it specifies that § 1252(a)(1) provides the only means for reviewing "such an order *or* such questions of law or fact." *Ibid.* (emphasis added). The term "or" is " 'almost always disjunctive, that is, the words it connects are to be given separate meanings.' " *Loughrin*

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1332 of 1384

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

*v. United States,* 573 U.S. ——, ——, 134 S.Ct. 2384, 2390, 189 L.Ed.2d 411 (2014) (quoting *United States v. Woods,* 571 U.S. 31, 45–46, 134 S.Ct. 557, 187 L.Ed.2d 472 (2013)).

By interpreting § 1252(b)(9) as governing only removal orders, the dissent reads "or such questions of law or fact" out of the statute. It also renders superfluous § 1252(a)(5), which already specifies that the review made available under § 1252(a)(1) "shall be the sole and exclusive means for judicial review of *an order of removal*." This Court typically disfavors such interpretations. **\*856** See *AADC, supra,* at 483, 119 S.Ct. 936.

The prefatory clause of § 1252(b) does not change the meaning of § 1252(b)(9). The prefatory clause states that the subparagraphs of § 1252(b), including § 1252(b)(9), impose requirements "[w]ith respect to review of an order of removal under subsection (a)(1)." The phrase "with respect to" means "referring to," "concerning," or "relating to." Oxford American Dictionary and Language Guide 853 (1999 ed.); accord, Webster's New Universal Unabridged Dictionary 1640 (2003 ed.); American Heritage Dictionary 1485 (4th ed. 2000). Read together, the prefatory clause and § 1252(b)(9) mean that review of all questions arising from removal must occur in connection with review of a final removal order under § 1252(a)(1), which makes sense given that § 1252(b)(9) is meant to "[c]onsolidat[e] ... questions for judicial review." Tellingly, on the two previous occasions when this Court interpreted § 1252(b)(9), it did not understand § 1252(b)(9) as limited to challenges to removal orders. See *AADC, supra,* at 482–483, 119 S.Ct. 936 (stating that § 1252(b)(9) is a "general jurisdictional limitation" that applies to "all claims arising from deportation proceedings" and "the many ... decisions or actions that may be part of the deportation process"); *St. Cyr,* 533 U.S., at 313, n. 37, 121 S.Ct. 2271 (clarifying that § 1252(b)(9) requires "claims that were viewed as being outside of a 'final order' " to be "consolidated in a petition for review and considered by the courts of appeals" in their review of the final removal order under § 1252(a)(1)). Thus, despite the dissent's assertion to the contrary, the prefatory clause plainly does not change the scope of § 1252(b)(9), which

covers "all questions of law or fact" arising from the removal process.

3

At oral argument, respondents asserted that, if § 1252(b)(9) bars their lawsuit, then the only review available would be "a petition for review of [a] final removal order" under § 1252(a)(1), which takes place "after all the detention has already happened."[4] Tr. of Oral Arg. 36. I interpret respondents' argument as a claim that § 1252(b)(9) would be unconstitutional if it precluded meaningful review of their detention. This argument is unpersuasive and foreclosed by precedent.

The Constitution does not guarantee litigants the most effective means of judicial review for every type of claim they want to raise. See *AADC,* 525 U.S., at 487–492, 119 S.Ct. 936 (rejecting a similar argument); *Heikkila v. Barber,* 345 U.S. 229, 237, 73 S.Ct. 603, 97 L.Ed. 972 (1953) (explaining that limitations on judicial review of deportation must be followed "despite [their] apparent inconvenience to the alien"). This is especially true in the context of deportation, where limits on the courts' jurisdiction have existed for almost as long as federal immigration laws, and where this Court has repeatedly affirmed the constitutionality of those limits.[5]

**\*857** Indeed, this Court has already rejected essentially the same argument that respondents raise here. In *AADC,* the Court held that § 1252(g), a provision similar to § 1252(b)(9), barred the aliens' claim that the Government was violating the First Amendment by selectively enforcing the immigration laws against them. 525 U.S., at 487–492, 119 S.Ct. 936. The aliens argued that constitutional avoidance required the Court to interpret § 1252(g) as not applying to their claims because the only remaining avenue for review —a petition for review of a final removal order under § 1252(a)(1)—would be "unavailing" and would "come too late to prevent the 'chilling effect' upon their First Amendment rights." *Id.,* at 487–488, 119 S.Ct. 936. The Court rejected this argument because "an alien unlawfully in this country has no constitutional right to assert selective enforcement as

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1333 of 1384

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

a defense against his deportation." *Id., at 488, 119 S.Ct. 936.* The Court further explained that it had a duty to enforce Congress' limitations on judicial review, except perhaps in "a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations [justifying limited review could] be overcome." *Id., at 491, 119 S.Ct. 936.*

Like in *AADC,* respondents' lack-of-meaningful-review argument does not allow us to ignore the jurisdictional limitations that Congress has imposed. This Court has never held that detention during removal proceedings is unconstitutional. To the contrary, this Court has repeatedly recognized the constitutionality of that practice. See *Demore,* 538 U.S., at 523, 123 S.Ct. 1708 (explaining that detention is "a constitutionally valid aspect of the deportation process"); accord, *Reno v. Flores,* 507 U.S. 292, 305–306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 215, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Carlson,* 342 U.S., at 538, 542, 72 S.Ct. 525. Nor does this lawsuit qualify as the "rare case in which the alleged [executive action] is so outrageous" that it could thwart the jurisdictional limitations in § 1252(b)(9). *AADC, supra,* at 491, 119 S.Ct. 936. The Government's detention of respondents is entirely routine and indistinguishable from the detention that we have repeatedly upheld in the past. Thus, regardless of the inconvenience that § 1252(b)(9) might pose for respondents, this Court must enforce it as written. Respondents must raise their claims in petitions for review of their final removal orders.[6]

*858 III

Because I conclude that § 1252(b)(9) bars jurisdiction to hear respondents' claims, I will also address whether its application to this case violates the Suspension Clause, see Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it"). It does not. Even assuming the Suspension Clause bars Congress from stripping habeas jurisdiction over respondents' claims, but see *St. Cyr,* 533 U.S., at 337–346, 121 S.Ct. 2271 (Scalia, J., dissenting), this case does not involve a habeas petition.

Respondents do not seek habeas relief, as understood by our precedents. Although their complaint references the general habeas statute, see Third Amended Complaint, at 1, it is not a habeas petition. The complaint does not request that the District Court issue any writ. See *id.,* at 31–32. Rather, it seeks a declaration and an injunction that would provide relief for both present and future class members, including future class members not yet detained. *Ibid.* Indeed, respondents obtained class certification under Federal Rule of Civil Procedure 23(b)(2), which applies only when the class seeks "final injunctive relief or corresponding declaratory relief."[7]

Nor did respondents obtain habeas relief. When their case concluded, respondents obtained a classwide permanent injunction. See Order, Judgment, and Permanent Injunction, at 5–6. That classwide injunction looks nothing like a typical writ. It is not styled in the form of a conditional or unconditional release order. Cf. *United States v. Jung Ah Lung,* 124 U.S. 621, 622, 8 S.Ct. 663, 31 L.Ed. 591 (1888) (describing habeas relief as "order[ing] the discharge from custody of the person in whose behalf the writ was sued out"); *Chin Yow v. United States,* 208 U.S. 8, 13, 28 S.Ct. 201, 52 L.Ed. 369 (1908) (awarding habeas relief by ordering the release of the alien if certain conditions were not satisfied). It applies to future class members, including individuals who were not in custody when the injunction was issued. Cf. 28 U.S.C. § 2241(c) (generally precluding issuance of the writ unless the petitioner is "in custody"). And it is directed to at least one individual, the Director for the Executive Office for Immigration Review, who is not a custodian. Cf. *Rumsfeld v. Padilla,* 542 U.S. 426, 434, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004) (explaining that "the proper respondent to a habeas petition is 'the person who has custody over [the petitioner]' " (quoting 28 U.S.C. § 2242)).

Immigration law has long drawn a distinction between the declaratory and injunctive relief that respondents sought here and habeas relief. In *Heikkila,* for instance, this Court distinguished habeas relief from "injunctions, declaratory judgments and other types of relief" that "courts ha[d] consistently rejected" in immigration cases. 345 U.S., at 230, 73 S.Ct. 603. The Court rejected the alien's request for "injunctive and declaratory relief" because Congress had authorized courts to grant relief only in habeas proceedings. *Id.,* at 230, 237, 73 S.Ct. 603. We reaffirmed this

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1334 of 1384

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

distinction in *St. Cyr,* where we noted that the 1961 Immigration and Nationality Act, 75 Stat. 650, withdrew the district courts' "authority to grant declaratory and injunctive relief," but not **\*859** habeas relief. 🚩 533 U.S., at 309– 310, 121 S.Ct. 2271; see also 🟡 *Shaughnessy v. Pedreiro,* 349 U.S. 48, 49, 52–53, 75 S.Ct. 591, 99 L.Ed. 868 (1955) (holding that the Administrative Procedure Act, which authorizes courts to grant declaratory and injunctive relief, authorized "judicial review of deportation orders *other than by habeas corpus* " (emphasis added)). And Congress has confirmed this distinction in its immigration statutes by allowing one form of relief, but not the other, in particular circumstances. Compare, *e.g.,* 🚩 § 1252(e)(1) (prohibiting courts from granting "declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with 🚩 section 1225(b)(1)") with 🚩 § 1252(e)(2) (allowing "judicial review ... in habeas corpus proceedings" of particular "determination [s] made under 🚩 section 1225(b)(1)").

Respondents' suit for declaratory and injunctive relief, in sum, is not a habeas petition. The Suspension Clause protects "[t]he Privilege of the Writ of Habeas Corpus," not requests for injunctive relief. Because respondents have not sought a writ of habeas corpus, applying 🚩 § 1252(b)(9) to bar their suit does not implicate the Suspension Clause.

\* \* \*

Because 🚩 § 1252(b)(9) deprives courts of jurisdiction over respondents' claims, we should have vacated the judgment below and remanded with instructions to dismiss this case for lack of jurisdiction. But a majority of the Court has decided to exercise jurisdiction. Because I agree with the Court's disposition of the merits, I concur in Part I and Parts III–VI of its opinion.

Justice BREYER, with whom Justice GINSBURG and Justice SOTOMAYOR join, dissenting.
This case focuses upon three groups of noncitizens held in confinement. Each of these individuals believes he or she has the right to enter or to remain within the United States. The question is whether several statutory provisions of the Immigration and Nationality Act, 🚩 8 U.S.C. § 1101 *et seq.,* forbid granting them bail.

The noncitizens at issue are asylum seekers, persons who have finished serving a sentence of confinement (for a crime), or individuals who, while lacking a clear entitlement to enter the United States, claim to meet the criteria for admission, see *infra,* at 869, 872 – 873, 874 – 875. The Government has held all the members of the groups before us in confinement for many months, sometimes for years, while it looks into or contests their claims. But ultimately many members of these groups win their claims and the Government allows them to enter or to remain in the United States. Does the statute require members of these groups to receive a bail hearing, after, say, six months of confinement, with the possibility of release on bail into the community *provided* that they do not pose a risk of flight or a threat to the community's safety?

The Court reads the statute as forbidding bail, hence forbidding a bail hearing, for these individuals. In my view, the majority's interpretation of the statute would likely render the statute unconstitutional. Thus, I would follow this Court's longstanding practice of construing a statute "so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." 🟡 *United States v. Jin Fuey Moy,* 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916). And I would interpret the statute as requiring bail hearings, presumptively after six months of confinement. Cf. 🟡 *Zadvydas v. Davis,* 533 U.S. 678, 701, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

**\*860** I

*The Respondents*

Because of their importance to my conclusion, I shall repeat, with references to record support, the key characteristics of the groups of noncitizens who appear before us.

*First,* as I have said, the respondents in this case are members of three special classes of noncitizens, the most important of whom (1) arrive at our borders seeking asylum or (2) have committed crimes but have finished serving their sentences of imprisonment. We also consider those who (3) arrive at our borders believing they are entitled to enter the United

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1335 of 1384

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**
200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

States for reasons other than asylum seeking, but lack a clear entitlement to enter.

*Second, all* members of the first group, the asylum seekers, have been found (by an immigration official) to have a "credible fear of persecution" in their home country should the United States deny them admittance. 🚩 8 U.S.C. § 1225(b)(1)(B)(ii). *All* members of the second group have, as I have said, finished serving their criminal sentences of confinement. 🚩 § 1226(c)(1). *All* members of the third group may have (or may simply believe they have) a strong claim for admittance, but they are neither "clearly and beyond a doubt entitled to be admitted" nor "conclusively determined to be inadmissible by an immigration officer on grounds of fraud or lack of required documentation." 🚩 § 1225(b)(2)(A); see 🚩 §§ 1225(b)(1)(A)(i), 🟨 1182(a)(6)(C), 🟨 (a)(7).

*Third,* members of the first two classes number in the thousands. See Brief for 46 Social Science Researchers and Professors as *Amici Curiae* 6, 8 (identifying, in 2015, 7,500 asylum seekers and 12,220 noncitizens who have finished serving sentences of criminal confinement, a portion of whom are class members detained for more than six months).

*Fourth,* detention is often lengthy. The classes before us consist of people who were detained for at least six months and on average one year. App. 92, 97. The record shows that the Government detained some asylum seekers for 831 days (nearly 2 & half; years), 512 days, 456 days, 421 days, 354 days, 319 days, 318 days, and 274 days—before they won their cases and received asylum. *Id.,* at 97, 228–236. It also shows that the Government detained one noncitizen for nearly four years *after* he had finished serving a criminal sentence, and the Government detained other members of this class for 608 days, 561 days, 446 days, 438 days, 387 days, and 305 days—all before they won their cases and received relief from removal. *Id.,* at 92, 213–220.

*Fifth,* many of those whom the Government detains eventually obtain the relief they seek. Two-thirds of the asylum seekers eventually receive asylum. *Id.,* at 98 (Table 28); *id.,* at 135 (Table 38); App. to Pet. for Cert. 40a. Nearly 40% of those who have served criminal sentences receive relief from removal, because, for example, their earlier conviction involved only a short sentence. See App. 95 (Table 23); *id.,* at 135 (Table 38). See also App. to Pet. for Cert. 34a; App. 210, 216–217, 312–313 (between one-half and two-thirds of the class served sentences less than six

months, *e.g.,* a 2–month sentence for being under the influence of a controlled substance, or an 8–day jail term for a minor firearms offense).

*Sixth,* these very asylum seekers would have received bail hearings had they first been taken into custody within the United States rather than at the border. See 🚩 *In re X–K–,* 23 I. & N. Dec. 731, 734–735 (BIA 2005); 🚩 8 U.S.C. § 1226(a).

*Seventh,* as for those who have finished serving their sentences (for crimes), some ***861** of those who are less dangerous would (on the majority's view) be held without bail the longest, because their claims will take longer to adjudicate. Moreover, those noncitizens would have no opportunity to obtain bail *while they pursue their claims,* but if they *lose* their claims, the Government must release them, typically within six months, if the Government can find no other country willing to take them. See 🟨 *Zadvydas, supra,* at 701, 121 S.Ct. 2491.

*Eighth,* all the respondents are held in detention within the geographical boundaries of the United States, either in facilities controlled by United States Immigration and Customs Enforcement (ICE) or in state or local jails that hold them on ICE's behalf. App. 302–304; see ICE, Detention Facility Locator, online at http://www.ice.gov/detention-facilities (all Internet materials as last visited Feb. 21, 2018).

*Ninth,* the circumstances of their detention are similar, so far as we can tell, to those in many prisons and jails. And in some cases the conditions of their confinement are inappropriately poor. See Dept. of Homeland Security (DHS), Office of Inspector General (OIG), DHS OIG Inspection Cites Concerns With Detainee Treatment and Care at ICE Detention Facilities (2017) (reporting instances of invasive procedures, substandard care, and mistreatment, *e.g.,* indiscriminate strip searches, long waits for medical care and hygiene products, and, in the case of one detainee, a multiday lock down for sharing a cup of coffee with another detainee).

These record-based facts make evident what I said at the outset: The case concerns persons whom immigration authorities believe are not citizens and may not have a right to enter into, or remain within, the United States. Nonetheless they likely have a reasonable claim that they do have such a right. The Government detains them, often for many months while it determines the merits of, or contests, their claims. To repeat the question before us: Does the statute entitle an

individual member of one of these classes to obtain, say, after six months of detention, a bail hearing to decide whether he or she poses a risk of flight or danger to the community and, if not, to receive bail?

II

*The Constitutional Question*

The majority reads the relevant statute as prohibiting bail and hence prohibiting a bail hearing. In my view, the relevant constitutional language, purposes, history, tradition, and case law all make clear that the majority's interpretation at the very least would raise "grave doubts" about the statute's constitutionality. See *Jin Fuey Moy,* 241 U.S., at 401, 36 S.Ct. 658.

A

Consider the relevant constitutional language and the values that language protects. The Fifth Amendment says that "[n]o person shall be ... deprived of life, liberty, or property without due process of law." An alien is a "person." See *Wong Wing v. United States,* 163 U.S. 228, 237–238, 16 S.Ct. 977, 41 L.Ed. 140 (1896). To hold him without bail is to deprive him of bodily "liberty." See *United States v. Salerno,* 481 U.S. 739, 748–751, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). And, where there is no bail proceeding, there has been no bail-related "process" at all. The Due Process Clause— itself reflecting the language of the Magna Carta—prevents arbitrary detention. Indeed, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); see also **\*862** *Demore v. Kim,* 538 U.S. 510, 532, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (KENNEDY, J., concurring); *Zadvydas,* 533 U.S., at 718, 121 S.Ct. 2491 (KENNEDY, J., dissenting).

The Due Process Clause foresees eligibility for bail as part of "due process." See *Salerno, supra,* at 748–751, 107 S.Ct. 2095; *Schilb v. Kuebel,* 404 U.S. 357, 365, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971); *Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 96 L.Ed. 3 (1951). Bail is "basic to our system of law." *Schilb, supra,* at 365, 92 S.Ct. 479. It not only "permits the unhampered preparation of a defense," but also "prevent[s] the infliction of punishment prior to conviction." *Stack, supra,* at 4, 72 S.Ct. 1. It consequently limits the Government's ability to deprive a person of his physical liberty where doing so is not needed to protect the public, see *Salerno, supra,* at 750–751, 107 S.Ct. 2095 or to assure his appearance at, say, a trial or the equivalent, see *Stack, supra,* at 4–5, 72 S.Ct. 1. Why would this constitutional language and its bail-related purposes not apply to members of the classes of detained persons at issue here?

The Eighth Amendment reinforces the view that the Fifth Amendment's Due Process Clause does apply. The Eighth Amendment forbids "[e]xcessive bail." It does so in order to prevent bail being set so high that the level itself (rather than the reasons that might properly forbid release on bail) prevents provisional release. See *Carlson v. Landon,* 342 U.S. 524, 545, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (explaining that the English clause from which the Eighth Amendment was copied was understood "to provide that bail shall not be excessive in those cases where it is proper to grant bail"). That rationale applies *a fortiori* to a refusal to hold any bail hearing at all. Thus, it is not surprising that this Court has held that both the Fifth Amendment's Due Process Clause and the Eighth Amendment's Excessive Bail Clause apply in cases challenging bail procedures. See, *e.g.,* *Salerno, supra,* at 746–755, 107 S.Ct. 2095; *Carlson, supra,* at 537–546, 72 S.Ct. 525.

It is clear that the Fifth Amendment's protections extend to "all persons within the territory of the United States." *Wong Wing, supra,* at 238, 16 S.Ct. 977. But the Government suggests that those protections do not apply to asylum seekers or other arriving aliens because the law treats arriving aliens as if they had never entered the United States; hence they are not held within its territory.

This last-mentioned statement is, of course, false. All of these noncitizens are held within the territory of the United States at an immigration detention facility. Those who enter at JFK airport are held in immigration detention facilities in, *e.g.,* New York; those who arrive in El Paso are held in, *e.g.,* Texas. At most one might say that they are "constructively" held outside the United States: the word "constructive" signaling

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1337 of 1384

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

that we indulge in a "legal fiction," shutting our eyes to the truth. But once we admit to uttering a legal fiction, we highlight, we do not answer, the relevant question: *Why* should we engage in this legal fiction here?

The legal answer to this question is clear. We cannot here engage in this legal fiction. No one can claim, nor since the time of slavery has anyone to my knowledge successfully claimed, that persons held within the United States are totally without constitutional protection. Whatever the fiction, would the Constitution leave the Government free to starve, beat, or lash those held within our boundaries? If not, then, whatever the fiction, how can the Constitution authorize the Government to imprison arbitrarily those who, whatever we might pretend, are in reality right here in the United States? The answer is that the Constitution does not authorize arbitrary **\*863** detention. And the reason that is so is simple: Freedom from arbitrary detention is as ancient and important a right as any found within the Constitution's boundaries. See 🔖 *Zadvydas, supra,* at 720–721, 121 S.Ct. 2491 (KENNEDY, J., dissenting) ("inadmissible aliens" who are "stopped at the border" are "entitled to be free from detention that is arbitrary or capricious").


## B

The Due Process Clause, among other things, protects "those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors," and which were brought by them to this country. 🔖 *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272, 277, 15 L.Ed. 372 (1856). A brief look at Blackstone makes clear that at the time of the American Revolution the right to bail was "settled"—in both civil and criminal cases.

Blackstone tells us that every prisoner (except for a convict serving his sentence) was entitled to seek release on bail. 4 Commentaries on the Laws of England 296–297 (1769). This right applied in every criminal case. *Ibid.* A noncapital defendant could seek bail from a local magistrate; a capital defendant could seek bail at a hearing before the Court of King's Bench. See *ibid.* Although a capital defendant had no right to *obtain* bail, he could always *seek* it, because "the court of king's bench ... may bail for any crime whatsoever, be it treason, murder, or any other offense, according to the circumstances of the case." *Id.,* at 296. And although

King Charles I initially claimed the right to hold a prisoner without bail on secret national security grounds, see *Darnel's Case,* 3 How. St. Tr. 1 (K.B.1627), Parliament responded by extracting from the King (via the 1628 Petition of Right) a promise to cease such detention. See 2 W. Hawkins, A Treatise of the Pleas of the Crown 107–110 (4th ed. 1771). From then on, bail was available even when a prisoner was held on the personal command of the King. *Ibid.* That is why Blackstone says that the King's Bench or its judges "may bail in any Case whatsoever," 4 Analysis of the Laws of England 148 (6th ed. 1771), indeed, in civil cases too, for in Blackstone's time some private civil cases might have begun with an arrest. See 3 Blackstone, Commentaries 290 (1768). And bail was likewise an alternative to detention where a judgment debtor was unable to pay a civil judgment in the era of debtor's prison. See, *e.g.,* 🔖 *Beers v. Haughton,* 9 Pet. 329, 356, 9 L.Ed. 145 (1835) (explaining that under Ohio law, "if a defendant, upon a [writ of] capias, does not give sufficient appearance bail, he shall be committed to prison"); *Hamilton v. Dunklee,* 1 N.H. 172 (1818).

American history makes clear that the settlers brought this practice with them to America. The Judiciary Act of 1789 conferred rights to bail proceedings in all federal criminal cases. § 33, 1 Stat. 91. It said that for a noncapital defendant "bail shall be admitted" and for a capital defendant bail may be admitted in the discretion of a district judge, a circuit judge, or a Justice of the Supreme Court, taking account of "the offence, and of the evidence, and the usages of law." *Ibid.* Congress enacted this law during its debate over the Bill of Rights, which it subsequently sent to the States for ratification. See 1 Annals of Cong. 90 (1789); see also 🔖 *Martin v. Hunter's Lessee,* 1 Wheat. 304, 351, 4 L.Ed. 97 (1816) (Members of the First Congress were "men of great learning and ability, ... who had acted a principal part in framing, supporting, or opposing" the Constitution itself). Colonial law had been similarly, or in some instances even more, protective. See Foote, **\*864** The Coming Constitutional Crisis in Bail: I, 113 U. Pa. L. Rev. 959, 974–977 (1965).

Similar laws have consistently remained part of our legal tradition. In all federal criminal cases federal Acts have provided for bail proceedings. Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*; Bail Reform Act of 1966, 🔖 18 U.S.C. § 3146 *et seq.* (1964 ed., Supp. II). Every State has similar or more generous laws. See Appendix B, *infra.*

Case 3:20-cy-07721-SI    Document 58-4    Filed 11/10/20    Page 1338 of 1384

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**
200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

Standards for granting bail have changed somewhat over time. Initially the sole factor determining the outcome of a bail proceeding was risk of flight. See *Stack,* 342 U.S., at 4–5, 72 S.Ct. 1 (interpreting the 1789 bail law, applied to a noncapital defendant and in light of the Eighth Amendment, to require bail no higher than required to provide "adequate assurance" that the defendant "will stand trial and submit to sentence if found guilty," "based upon standards relevant to the purpose of assuring the presence of that defendant").

Congress gradually added community safety as a bail factor. In 1966, Congress provided that for capital defendants and convicted defendants pursuing appeals, bail would be granted unless the appeal was frivolous or a court had "reason to believe that no one or more conditions of release will reasonably assure that the person will not flee or pose a danger to any other person or to the community." Bail Reform Act of 1966 § 3148. In 1984, Congress modified the bail standard for noncapital defendants by adding concern for community safety. § 3142(e)(1). This Court, applying the Due Process Clause and the Excessive Bail Clause to these changes, found that the 1984 Act passed constitutional muster. See *Salerno,* 481 U.S., at 746–755, 107 S.Ct. 2095. Again, the States typically apply roughly similar or more generous standards. See Appendix B, *infra.*

The cases before us, however, are not criminal cases. Does that fact make a difference? The problem is that there are not many instances of civil confinement (aside from immigration detention, which I address below). Mental illness does sometimes provide an example. Individuals dangerous to themselves or to others may be confined involuntarily to a mental hospital. See, *e.g., United States v. Comstock,* 560 U.S. 126, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010); *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). Those persons normally do not have what we would call "a right to a bail hearing." But they do possess equivalent rights: They have the right to a hearing prior to confinement and the right to review of the circumstances at least annually. See *Comstock, supra,* at 130–131, 130 S.Ct. 1949 (initial hearing followed by review every six months); *Hendricks, supra,* at 353, 117 S.Ct. 2072 (initial hearing followed by yearly review). And the mentally ill persons detained under these schemes are being detained *because* they are dangerous. That being so, there would be no point in providing a bail hearing as well. See *Salerno, supra,* at 748–749, 107 S.Ct.

2095 (analogizing denial of bail to dangerous individuals to the civil commitment of the mentally ill). But there is every reason for providing a bail proceeding to the noncitizens at issue here, because they have received no individualized determination that they pose a risk of flight or present a danger to others, nor is there any evidence that most or all of them do.

This Court has also protected the right to a bail hearing during extradition proceedings. *Wright v. Henkel,* 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903), concerned the arrest and confinement of **\*865** Whitaker Wright, an American citizen, pending extradition for a crime that Wright was accused of having committed in Great Britain. Wright sought bail. *Id., at* 43, 23 S.Ct. 781. Since the federal bail laws applied only to those charged with committing crimes against the United States, they did not cover Wright's confinement. *Id., at* 61–62, 23 S.Ct. 781. The relevant extradition statute said nothing about bail. *Id., at* 62, 23 S.Ct. 781. Its language (stronger than the language at issue here) said that the individual was "to remain" in "the proper jail" until the "surrender shall be made" to the nation seeking extradition; and it added that he was "to remain" in custody "until delivered up"—though after two months he could seek release. Rev. Stat. §§ 5270, 5273.

In an opinion by Chief Justice Fuller, this Court unanimously wrote that, despite the lack of express statutory authorization and the risk of "embarrassment" to the United States if Wright fled, Wright could seek release on bail prior to the expiration of the 2–month period. *Wright,* 190 U.S., at 62–63, 23 S.Ct. 781. Given the universal entitlement to bail under English law, the Court was "unwilling to hold that ... courts may not in any case, and whatever the special circumstances, extend that relief" to prisoners awaiting extradition. *Id., at* 63, 23 S.Ct. 781. It consequently read a *silent* statute as authorizing bail proceedings (though the Court went on to hold that, under applicable standards, Wright's request for bail should be denied). *Ibid.*

The strongest basis for reading the Constitution's bail requirements as extending to these civil, as well as criminal, cases, however, lies in the simple fact that the law treats like cases alike. And reason tells us that the civil confinement at issue here and the pretrial criminal confinement that calls for bail are in every relevant sense identical. There is no difference in respect to the fact of confinement itself. And I can find no relevant difference in respect to bail-related purposes.

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

Which class of persons—criminal defendants or asylum seekers—seems more likely to have acted in a manner that typically warrants confinement? A person charged with a crime cannot be detained at all without a finding of probable cause that he or she committed the crime. And the majority of criminal defendants lose their cases. See Dept. of Justice, Bureau of Justice Statistics, B. Reaves, Felony Defendants in Large Urban Counties, 2009–Statistical Tables, p. 24 (Dec. 2013) (reporting that 66% of felony defendants were convicted). A high percentage of the noncitizens before us, however, ultimately win the right they seek, the right to be in the United States.

Nor am I aware of any evidence indicating that the noncitizens seeking to enter, or to remain within, the United States are more likely than criminal defendants to threaten the safety of the community if released. In any event, this is a matter to be determined, case by case, at bail hearings.

Which group is more likely to present a risk of flight? Again, I can find no evidence suggesting that asylum seekers or other noncitizens generally present a greater risk of flight than persons imprisoned for trial where there is probable cause to believe that the confined person has committed a crime. In any event, this matter too is to be determined, case by case, at bail hearings.

If there is no reasonable basis for treating these confined noncitizens worse than ordinary defendants charged with crimes, 🔖 18 U.S.C. § 3142; worse than convicted criminals appealing their convictions, § 3143(b); worse than civilly committed citizens, *supra,* at 864 – 865; worse than identical noncitizens found elsewhere within **\*866** the United States, *supra,* at 860 –861; and worse than noncitizens who have committed crimes, served their sentences, and been definitively ordered removed (but lack a country willing to take them), *supra,* at 860 –861, their detention without bail is arbitrary. Thus, the constitutional language, purposes, and tradition that require bail in instances of criminal confinement also very likely require bail in these instances of civil confinement. That perhaps is why Blackstone wrote that the law provides for the possibility of "bail in any case whatsoever." 4 Analysis of the Laws of England, at 148.

C

My examination of the cases from this Court that considered detention of noncitizens and bail suggests that this Court, while sometimes denying bail to individuals, generally has not held that bail proceedings are unnecessary. Indeed, it almost always has suggested the contrary.

1. In 1882 Congress enacted two laws that restricted immigration: The first prohibited the entry of "Chinese laborers." The Chinese Exclusion Act, ch. 126, 22 Stat. 58. The second prohibited the entry of "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882, 22 Stat. 214. Neither said a word about bail. But in one instance, an excluded Chinese woman was detained in jail in San Francisco pending her return to China. She sought bail. *In re Ah Moy,* 21 F. 808 (C.C.D.Cal.1884). Justice Field, sitting as a Circuit Judge, wrote that the court lacked the authority to order bail because doing so would allow her to enter the United States—just what the statute forbade. *Id.,* at 809. The other sitting Circuit Judge (Judge Sawyer) disagreed. *Id.,* at 810 (dissenting opinion). He pointed out that the alien would remain "in the custody and control of the law while lawfully on bail." *Ibid.* He added that it "would be a great hardship, not to say a gross violation of her personal rights," to refuse bail for 15 days before her ship arrived as long as she could provide "security satisfactory to the court" that she would indeed depart when it did. *Id.,* at 809–810. Two other Circuit Judges noted their agreement with Judge Sawyer. *Id.,* at 809, n. 1. But they did not participate in the case, *ibid.,* the two participating judges split 1 to 1, and so the views of presiding Justice Field prevailed. The alien appealed to this Court, *Cheong Ah Moy v. United States,* 113 U.S. 216, 5 S.Ct. 431, 28 L.Ed. 983 (1885), but before this Court could decide, the ship departed with Cheong Ah Moy aboard.

2. In 🔖 *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), the Court struck down as unconstitutional a statute that said alien Chinese laborers should be "imprisoned at hard labor" for up to a year before being deported. 🔖 *Id.,* at 235, 16 S.Ct. 977. In doing so, the Court wrote that although a sentence to hard labor was unlawful, "detention, or temporary confinement," was constitutional, because "[d]etention is a usual feature of every case of arrest on a criminal charge, even when an innocent person is wrongfully accused." *Ibid.* But an analogy to criminal detention is an analogy to instances in which bail hearings are required.

Case 3:20-cv-07721-SI Document 58-4 Filed 11/10/20 Page 1340 of 1384

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)
200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

3. In 🚩 *Tod v. Waldman,* 266 U.S. 113, 45 S.Ct. 85, 69 L.Ed. 195 (1924), the Waldman family, like many of the respondents here, challenged their exclusion. They had arrived at Ellis Island fleeing religious persecution in Ukraine. They were detained because the immigration inspector believed the mother illiterate, one of the daughters disabled, and the whole family likely to become public charges. They appealed to the Labor Department, which ordered **\*867** Mrs. Waldman retested for literacy, requiring her to read both Yiddish and Hebrew. She could not. She then petitioned for a writ of habeas corpus on the grounds that (1) as a religious refugee she was exempt from the literacy requirement; (2) in any event, she need read only one language, not two; (3) her daughter was not disabled; and (4) the Department of Labor should have allowed her to appeal administratively. 🚩 *Id.,* at 114–115, 45 S.Ct. 85.

The relevant statutory provisions, just like the present statute, see *infra,* at 869, 874, said that an arriving person, unless "clearly and beyond a doubt entitled" to land, "*shall be detained* for examination ... by a board of special inquiry." Act of Feb. 5, 1917, § 16, 39 Stat. 886 (emphasis added). By the time the case reached this Court, however, the family had been allowed bail. See 🚩 *Waldman,* 266 U.S., at 117, 45 S.Ct. 85. This Court ordered the Department of Labor to provide the family with an administrative appeal. Then, after initially "remand[ing] the petitioners to the custody of immigration authorities" pending the outcome of the appeal, 🚩 *id.,* at 120, 45 S.Ct. 85 the Court clarified in a rehearing order that "[n]othing in the order of this Court shall prejudice an application for release on bail of the respondents pending compliance with the mandate of this Court." *Tod v. Waldman,* 266 U.S. 547, 548, 45 S.Ct. 193, 69 L.Ed. 195 (1925). This statement is inconsistent with the earlier opinion of Justice Field, sitting as a Circuit Judge, because it shows that even an alien challenging her exclusion could be released on bail. *Supra,* at 866.

4. In 🟡 *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), this Court upheld the denial of bail to noncitizen Communists being held pending deportation, despite a statute that permitted bail proceedings. 🟡 *Id.,* at 541–546, 72 S.Ct. 525. It did so because it considered the individuals to be a risk to security. It said nothing to suggest that bail proceedings were unnecessary.

5. In 🚩 *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), the Attorney General had ordered a noncitizen permanently excluded from the United States on the ground that his "entry would be prejudicial to the public interest for security reasons." 🚩 *Id.,* at 208, 73 S.Ct. 625; see Subversive Activities Control Act of 1950, §§ 22–23, 64 Stat. 1006–1012. He "sat on Ellis Island because this country shut him out and others were unwilling to take him in." 🚩 345 U.S., at 209, 73 S.Ct. 625. After 21 months in confinement he filed a petition for a writ of habeas corpus seeking judicial review of the exclusion decision or release on bail until he could be removed to another country. 🚩 *Id.,* at 207, 209, 73 S.Ct. 625. This Court refused to review the exclusion decision on the ground that the security matter fell totally within the President's authority, pursuant to an express congressional delegation of power. 🚩 *Id.,* at 210, 73 S.Ct. 625. The Court also denied Mezei a bail proceeding because in an "exclusion proceeding grounded on danger to the national security ... neither the rationale nor the statutory authority for" release on bail exists. 🚩 *Id.,* at 216, 73 S.Ct. 625. It denied bail, however, *after* the Attorney General had already found, on an individualized basis, not only that Mezei was a security risk and consequently not entitled to either admission or bail, but also that he could be denied a hearing on the matter because the basis for that decision could not be disclosed without harm to national security. 🚩 *Id.,* at 208–209, 73 S.Ct. 625. The respondents in this case have been the subject of no such individualized findings. And unlike Mezei, who was requesting bail after his exclusion proceedings had ended (while the Attorney General searched for a country that would take him—a matter **\*868** that we again confronted in *Zadvydas* ), the respondents here continue to litigate the lawfulness of their exclusion itself. Thus, Mezei, but not the respondents here, was in a sense in the position of a convicted criminal who had lost his appeal, not a criminal awaiting trial (or the results of an appeal).

6. 🟡 *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), concerned a noncitizen who had lawfully resided in this country, committed a serious crime, completed his prison sentence, and was then ordered deported. 🟡 *Id.,* at 684, 121 S.Ct. 2491. Zadvydas sought release on bail during the time the Government searched for a country that would take him. 🟡 *Id.,* at 684–685, 121 S.Ct. 2491. The governing statute said an alien such as Zadvydas "may be detained"

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1341 of 1384

pending his removal to another country. 8 U.S.C. § 1231(a)(6). We interpreted those words as requiring release from detention once it became clear that there was "no significant likelihood of removal in the reasonably foreseeable future"—presumptively after a period of confinement of six months. 533 U.S., at 701, 121 S.Ct. 2491. We read the statute as requiring this release because a "statute permitting indefinite detention of an alien would raise a serious constitutional problem." Id., at 690, 121 S.Ct. 2491.

From a constitutional perspective, this case follows *a fortiori* from *Zadvydas*. Here only a bail hearing is at issue, not release on bail, much less permanent release. And here there has been no final determination that any of the respondents lacks a legal right to stay in the United States—the bail hearing at issue concerns conditional release pending that final determination. It is immaterial that detention here is not literally indefinite, because while the respondents' removal proceedings must end eventually, they last an indeterminate period of at least six months and a year on average, thereby implicating the same constitutional right against prolonged arbitrary detention that we recognized in *Zadvydas*.

7. In *Demore v. Kim,* 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), we held that the Government could constitutionally hold without bail noncitizens who had committed certain crimes, had completed their sentences, and were in removal proceedings. See § 1226(c). But we based our holding on the short-term nature of the confinement necessary to complete proceedings. See *id.,* at 529–530, 123 S.Ct. 1708. The Court wrote that the "detention at stake ... lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.,* at 530, 123 S.Ct. 1708. We added:

"[I]n 85% of the cases in which aliens are detained [ pursuant to the relevant statute], removal proceedings are completed in an average time of 47 days and a median of 30 days. In the remaining 15% of cases, in which the alien appeals the decision of the immigration judge to the Board of Immigration Appeals, appeal takes an average of four months, with a median time that is slightly shorter." *Id.,* at 529, 123 S.Ct. 1708 (citation omitted).

Demore himself, an outlier, was detained for six months. *Id.,* at 530–531, 123 S.Ct. 1708.

The Court then found detention constitutional "during the limited period" necessary to arrange for removal, and we contrasted that period of detention with the detention at issue in *Zadvydas,* referring to the detention in *Demore* as being "of a much shorter duration." 538 U.S., at 526, 528, 123 S.Ct. 1708. Justice KENNEDY stated in a concurrence that the Due Process Clause might require bail hearings "if **\*869** the continued detention became unreasonable or unjustified." *Id., at 532, 123 S.Ct. 1708.* Dissenting, I wrote that, had I believed that Demore "had conceded that he [was] deportable," then, despite *Zadvydas,* "I would conclude that the Government could detain him without bail for the few weeks ordinarily necessary for formal entry of a removal order." 538 U.S., at 576, 123 S.Ct. 1708 (opinion concurring in part and dissenting in part).

The Government now tells us that the statistics it gave to the Court in *Demore* were wrong. Detention normally lasts twice as long as the Government then said it did. And, as I have pointed out, thousands of people here are held for considerably longer than six months without an opportunity to seek bail. See *supra,* at 860. We deal here with prolonged detention, not the short-term detention at issue in *Demore*. Hence *Demore,* itself a deviation from the history and tradition of bail and alien detention, cannot help the Government.

The upshot is the following: The Constitution's language, its basic purposes, the relevant history, our tradition, and many of the relevant cases point in the same interpretive direction. They tell us that an interpretation of the statute before us that would deny bail proceedings where detention is prolonged would likely mean that the statute violates the Constitution. The interpretive principle that flows from this conclusion is clear and longstanding: " '[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.' " *Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (quoting *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (opinion of Holmes, J.)). Moreover, a "statute must be construed, if fairly possible, so as to avoid not only the conclusion

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1342 of 1384

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

that it is unconstitutional, but also grave doubts upon that score." *Jin Fuey Moy,* 241 U.S., at 401, 36 S.Ct. 658. These legal principles reflect a realistic assumption, namely, that Congress—particularly a Congress that did not consider a constitutional matter—would normally have preferred a constitutional interpretation to an interpretation that may render a statute an unconstitutional nullity. And that is so even where the constitutional interpretation departs from the most natural reading of the statute's language. See *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); see also *National Federation of Independent Business v. Sebelius,* 567 U.S. 519, 563, 574–576, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (majority opinion and opinion of ROBERTS, C.J.).

### III

*The Statutory Provisions*

The question remains whether it is possible to read the statute as authorizing bail. As desirable as a constitutional interpretation of a statute may be, we cannot read it to say the opposite of what its language states. The word "animal" does not include minerals, no matter how strongly one might wish that it did. Indeed, where " 'Congress has made its intent in the statute clear, we must give effect to that intent,' " even if doing so requires us to consider the constitutional question, and even if doing so means that we hold the statute unconstitutional. *Zadvydas,* 533 U.S., at 696, 121 S.Ct. 2491 (quoting *Miller v. French,* 530 U.S. 327, 336, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000)). In my view, however, we can, and should, read the relevant statutory provisions to require bail proceedings in instances of prolonged detention without doing **\*870** violence to the statutory language or to the provisions' basic purposes.

### A

*Asylum Seekers*

The relevant provision governing the first class of noncitizens, the asylum seekers, is § 1225(b)(1)(B)(ii). It

says that, if an immigration "officer determines at the time" of an initial interview with an alien seeking to enter the United States "that [the] alien has a credible fear of persecution ..., the alien *shall be detained* for further consideration of the application for asylum." See Appendix A–1, *infra.* I have emphasized the three key words, namely, "shall be detained." Do those words mean that the asylum seeker *must be detained without bail* ?

They do not. *First,* in ordinary English and in light of the history of bail, the word "detain" is ambiguous in respect to the relevant point. The Oxford English Dictionary (OED), surveying the history of the word, notes that Edward Hall, a famous 16th-century legal scholar and author of Hall's Chronicle, wrote: "A traytor ... is apprehended and deteigned in prisone for his offence," a use of the word, as we know from Blackstone, that is consistent with bail. See *supra,* at 863 – 864 OED (3d ed., Dec. 2012), http://www.oed.com/view/ Entry/51176 (annot. to def. 1). David Hume, the famous 18th-century historian and philosopher, writes of being "detained in strict confinement," thereby implying the existence of detention without strict confinement. *Ibid.* A 19th-century novelist writes, " ' Beg your pardon, sir,' said the constable, ... 'I shall be obliged to detain you till this business is settled' "—again a use of "detain" that we know (from Blackstone) is consistent with bail. *Ibid.* And the OED concludes that the primary meaning of "detain" is "[t]o keep in confinement *or under restraint* ; to keep prisoner." *Ibid.* (emphasis added). To grant bail, we know, is not to grant unrestrained freedom. Rather, where the Act elsewhere expressly permits bail, it requires "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General." 8 U.S.C. § 1226(a)(2)(A). Similarly in the criminal context, bail imposes numerous restraints, ranging from the provision of a bond, to restrictions on residences and travel, to the imposition of a curfew, to a requirement to obtain medical treatment, to report at regular intervals, or even to return to custody at specified hours. See 18 U.S.C. § 3142(c)(1)(B) (listing possible conditions for the pretrial release of federal criminal defendants).

At the very least, because the word "detain" in this context refers to a comparatively long period of time, it can readily coexist with a word such as "bail" that refers to a shorter period of conditional release. For instance, there is nothing inconsistent in saying: During his exile, he was permitted to pay short visits to his home country; during the period of active hostilities, the soldiers would lay down their arms and

Case 3:20-cv-07721-SI Document 58-4 Filed 11/10/20 Page 1343 of 1384

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

fraternize on Christmas Day; during his overseas detention, he was allowed home to see his sick mother; or during his detention pending proceedings, he was permitted bail.

*Second,* our precedent treats the statutory word "detain" as consistent with bail. In 🔖 *Waldman,* 266 U.S. 547, 45 S.Ct. 193, 69 L.Ed. 195, we considered an immigration statute that stated (in respect of *arriving* aliens) that "[e]very alien who may not appear to the examining inspector at the port of arrival to be clearly and beyond a doubt entitled to land *shall be detained* for examination in relation thereto by a board of special inquiry." Act of Feb. 5, 1917, § 16, 39 Stat. 886 (emphasis added). The Court indicated that bail was available, **\*871** stating that "[n]othing in the order of this court shall prejudice an application for release on bail." 🔖 266 U.S., at 548, 45 S.Ct. 193. In so stating, the Court was simply following precedent, such as *Wright v. Henkel,* where the Court wrote that bail is available even where not "specifically vested by statute." 🔖 190 U.S., at 63, 23 S.Ct. 781; see *supra,* at 864 – 865. When Congress passed the relevant provisions of the Act in 1996, it legislated against this historical backdrop, at a time when the precise language that it adopted had been interpreted by this Court to permit bail. See 🔖 *Monessen Southwestern R. Co. v. Morgan,* 486 U.S. 330, 338, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) ("Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that 'Congress at least acquiesces in, and apparently affirms, that [interpretation]' " (quoting 🔖 *Cannon v. University of Chicago,* 441 U.S. 677, 703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979))).

*Third,* the Board of Immigration Appeals reads the word "detain" as consistent with bail, for it has held that its regulations, implementing the same statutory provision as is before us, allow bail for asylum seekers who are apprehended inside the United States within 100 miles of the border, rather than at a border crossing. See 🚩 *In re X–K–,* 23 I. & N. Dec., at 732, 734–735 (discussing 🔖 8 C.F.R. § 1003.19(h) (2)(i) (2004)). The same statute, same language applies to the detention of those asylum seekers and the ones before us, so the statute must be consistent with bail in the Board of Immigration Appeals' view.

*Fourth,* in *Zadvydas* we found (to avoid similar constitutional questions) that the words " 'may be detained' " were consistent with requiring release from long-term detention.

🔖 533 U.S., at 682, 121 S.Ct. 2491 (quoting 🔖 8 U.S.C. § 1231(a)(6)). The majority correctly notes that here the language substitutes the word "shall" for the word "may." 🔖 *Ante,* at 866 – 868. But the majority is wrong to distinguish *Zadvydas* on this basis. There the Court did not emphasize the word "detain," for the question at issue was release from detention. And the key word was consequently "may," suggesting discretion. Here the question concerns the right to a bail hearing during detention. And the key linguistic ambiguity concerns the word "detention." Is that word consistent with bail proceedings? The answer, for the reasons I have stated, is "yes."

*Fifth,* the statute does not even mention long-term detention without bail. Whether the statute speaks in terms of discretion ("may," as in *Zadvydas* ) or mandatory action ("shall," as in this case), the Government's argument is wrong for the same reason: Congress does not unambiguously authorize long-term detention without bail by failing to say when detention must end. As we recognized in *Zadvydas,* Congress anticipated long-term detention elsewhere in the Act, providing for review every six months of terrorist aliens detained under 🔖 8 U.S.C. § 1537(b)(2)(C), but it did not do so here. See 🔖 533 U.S., at 697, 121 S.Ct. 2491.

*Sixth,* the Act provides that an asylum applicant whose proceedings last longer than six months may be given work authorization. § 1158(d)(2). The majority would apply this provision to some asylum applicants but not the ones before us. 🔖 *Ante,* at 849, n. 6. Of course, the statute does not contain that limitation. Read most naturally, the provision offers some indication that Congress, in the same statute, did not require asylum seekers to remain confined without bail at the 6–month mark.

*Seventh,* there is a separate statutory provision that purports to do precisely what the majority says this one does, providing **\*872** that certain aliens "shall be detained ... *until removed.*" 🚩 § 1225(b)(1)(B)(iii)(IV) (emphasis added); 🔖 *ante,* at 844 (detention must continue until proceedings "have finished"). The problem for the majority is that this other provision applies only to those who, unlike the respondents, have no credible fear of persecution. The provision that applies here lacks similar language.

Linguistic ambiguity, while necessary, is not sufficient. I would also ask whether the statute's purposes suggest a

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

congressional refusal to permit bail where confinement is prolonged. The answer is "no." There is nothing in the statute or in the legislative history that reveals any such congressional intent. The most likely reason for its absence is that Congress, like the Government when it appeared before us in *Demore,* believed there were no such instances, or at least that there were very few. Indeed, the Act suggests that asylum proceedings ordinarily finish quickly. See § 1158(d)(5)(A) (providing that absent "exceptional circumstances," final administrative adjudication (not including appeal) must be completed "within 180 days," and any appeal must be filed "within 30 days" of the decision. And for those proceedings that last longer than six months, we know that two-thirds of asylum seekers win their cases. Thus, legislative silence suggests not disapproval of bail, but a lack of consideration of the matter. For present purposes that is sufficient. It means that Congress did not intend to forbid bail. An interpretation that permits bail—based upon history, tradition, statutory context, and precedent—is consistent, not inconsistent, with what Congress intended the statutory provision to do.

The majority apparently finds a contrary purpose in the fact that other provisions of the statute permit the Attorney General to release an alien on parole " 'for urgent humanitarian reasons or significant public benefit' " and impose bail-like conditions. *Ante,* at 844 – 845 (discussing 8 U.S.C. § 1182(d)(5)(A)). Yet under the majority's interpretation of "detain," the same argument could have been made in *Zadvydas.* We held that noncitizens presumptively are entitled to release after six months of detention, notwithstanding an available alternative avenue for relief, namely, bail. 533 U.S., at 683, 121 S.Ct. 2491. There is no reason to reach a different result here. While the Government historically used this provision to take account of traditional bail factors (flight risk, safety risk), the President since issued an Executive Order directing parole to be granted "in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit." Exec. Order. No. 13767, 82 Fed. Reg. 8793 (2017). And besides, Congress' provision of parole to permit, for example, release for the purpose of medical care or to testify in a court proceeding—which *adds to* the circumstances under which a noncitizen can be released from confinement—says nothing about whether Congress intended to *cut back on* those circumstances in respect to the meaning of "detain" and the historical understanding that detention permits bail.

## B

### *Criminals Who Have Served Their Sentences*

The relevant statutory provision, § 1226(c), says in paragraph (1) that the "Attorney General shall *take into custody* any alien who ... is deportable [or inadmissible] by reason of having committed [certain crimes] when the alien is released," presumably (or ordinarily) after having served his sentence. It then goes on to say, in paragraph (2), that the "Attorney General *may release [that] alien* **\*873** *... only if* the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness [or to certain related others]." See Appendix A–2, *infra.*

I have emphasized the relevant phrases: "take into custody" in the first paragraph, and "may release [that] alien ... only if" in the second paragraph. We have long interpreted "in custody" as "not requir[ing] that a prisoner be physically confined." *Maleng v. Cook,* 490 U.S. 488, 491, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (*per curiam* ). In the habeas context, we have held that "a person released on bail or on his own recognizance" is " 'in custody' within the meaning of the statute." *Hensley v. Municipal Court, San Jose–Milpitas Judicial Dist., Santa Clara Cty.,* 411 U.S. 345, 349, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 300–301, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (same). The reason is simple, as I already have explained, *supra,* at 870: A person who is released on bail "is subject to restraints 'not shared by the public generally.' " *Hensley, supra,* at 351, 93 S.Ct. 1571 (quoting *Jones v. Cunningham,* 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)); see also *Maleng, supra,* at 491, 109 S.Ct. 1923 ("[A] prisoner who had been placed on parole was still 'in custody' " because his "release from physical confinement ... was not unconditional; instead, it was explicitly conditioned on his reporting regularly to his parole officer, remaining in a particular community, residence, and job, and refraining from certain activities" (citing *Jones, supra,* at 242, 83 S.Ct. 373)).

Moreover, there is no reason to interpret "custody" differently than "detain." The OED defines "custody" as "[t]he state of

Jennings v. Rodriguez, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

being detained," http://www.oed.com/view/Entry/46305 (def. 5). "Detained," as I have previously pointed out, can be read consistently with bail. See *supra*, at 869 – 871. The OED also defines the statutory phrase, "take (a person) into custody," as "to arrest and imprison (a person)," http://www.oed.com/view/Entry/46305 (def. 5). And we know from the history, tradition, case law, and other sources earlier discussed, including Blackstone, that arresting and imprisoning a person is consistent with a bail hearing and a subsequent grant of bail, even where a statute contains words such as "commitment" or "detain." See *supra*, at 861 – 869 (citing, *e.g.,* *Wright,* 190 U.S., at 62, 23 S.Ct. 781 (reading as consistent with a bail proceeding the statutory language " 'shall issue [a] warrant for the commitment ... to the proper jail, there to remain' " until " ' surrender' " for extradition)).

But what about the second phrase, stating that the Attorney General "may release [that] alien ... *only if* the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness"? Does the presence of the words "only if" show that the statute automatically denies bail for any other reason?

It does not. That is because the phrase has nothing to do with bail. It has to do with a special program, the Witness Protection Program, set forth in 18 U.S.C. § 3521. That program allows the Attorney General to relocate the witness, to give him an entirely new identity, to help his family similarly, and to pay him a stipend, among other things. §§ 3521(a)(1), (b)(1). The Attorney General may "take such action as [he] determines to be necessary to protect the person," presumably even free the witness from whatever obligations might require him to report to an immigration or judicial authority. § 3521(b)(1). Accordingly, when the Attorney General **\*874** "release[s]" an alien under 8 U.S.C. § 1226(c)(2), he does not grant bail; he may well do far more, freeing the witness from a host of obligations and restraints, including those many obligations and restraints that accompany bail. See *supra*, at 870.

This understanding of "release" in § 1226(c) is consistent with the OED's definition of "release" as "to free from restraint" or even "to liberate from ... an obligation" (not simply "to free from ... captivity"), http://www.oed.com/view/Entry/161859 (def. 6(a)). And it is consistent with our earlier reading of the word "detain." *Supra*, at 869 – 872. Following the OED's definition of "detain" as "*under*

*restraint,*" we have understood the word "detention" to include the state of being "under" those "restraints" that typically accompany bail. *Supra*, at 869 – 872. That is to say, both the individual on bail and the individual not on bail are "detained"; and the Attorney General, through his Witness Protection Program powers can free the individual from both. To repeat: The provision at issue means that the Attorney General "may release" the detained person from the restraints that accompany detainment—whether that individual has been detained with, or without, bail.

So understood the phrase has nothing to do with the issue before us: whether a confined individual is, or is not, entitled to bail or a bail hearing. It simply means that the Attorney General cannot free that person from all, or most, restraining conditions (including those that accompany bail) unless the alien is placed in the Witness Protection Program. So read, the words "only if" neither favor nor disfavor a reading of the statute consistent with the right to a bail proceeding.

The purpose-related reasons that argue for a bail-favorable reading are also applicable here. Congress did not consider the problem of long-term detention. It wrote the statute with brief detention in mind. See H.R.Rep. No. 104–469, pt. 1, p. 123, and n. 25 (1996) (stating that the "average stay [was] 28 days"). Congress did not know (for apparently the Government did not know in *Demore* ) that the average length of detention for this class would turn out to be about a year. Nor did Congress necessarily know that about 40% of class members eventually obtain the right to remain in the United States.

I should add that reading the statute as denying bail to those whose detention is prolonged is anomalous. Those whose removal is legally or factually questionable could be imprisoned indefinitely while the matter is being decided. Those whose removal is not questionable (for they are under a final removal order) could be further imprisoned for no more than six months. See *supra*, at 860, 868. In fact, even before our decision in *Zadvydas,* the Government gave bail hearings to noncitizens under a final order of removal after six months of detention. See 533 U.S., at 683, 121 S.Ct. 2491.

C

*Other Applicants for Admission*

The statutory provision that governs the third category of noncitizens seeking admission at the border is 🚩 § 1225(b) (2)(A). It says that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." See Appendix A–3, *infra*.

The Government tells us that this miscellaneous category consists of persons who are neither (1) clearly eligible for admission, nor (2) clearly ineligible. Pet. **\*875** for Cert. 3–4. A clearly eligible person is, of course, immediately admitted. A clearly ineligible person—someone who lacks the required documents, or provides fraudulent ones—is "removed ... without further hearing or review." 🚩 § 1225(b)(1)(A)(i); see 📗 §§ 1182(a)(6)(C), 📗 (a)(7). But where the matter is not clear, *i.e.,* where the immigration officer determines that an alien "is not clearly and beyond a doubt entitled to be admitted," he is detained for a removal proceeding. 🚩 § 1225(b)(2)(A). Like all respondents, this class has been detained for at least six months. It may include persons returning to the United States who have work permits or other documents seemingly entitling them to entry, but whom an immigration officer suspects are inadmissible for some other reason, such as because they may have incomplete vaccinations or have committed student visa abuse or a crime of "moral turpitude." See 📗 § 1182(a) (delineating classes of aliens ineligible for admission). For instance, the Federal Register is replete with examples of offenses that immigration authorities have thought are crimes of moral turpitude but that the courts of appeals later determine are not. See, *e.g.,* 📗 *Goldeshtein v. INS,* 8 F.3d 645, 648 (C.A.9 1993) (structuring financial transactions to avoid currency reports); 🚩 *Nunez v. Holder,* 594 F.3d 1124, 1138 (C.A.9 2010) (indecent exposure). It also may include individuals who claim citizenship by virtue of birth or parentage but who lack documents clearly proving their claim.

The critical statutory words are the same as those I have just discussed in the context of the asylum seekers—"shall be detained." There is no more plausible reason here than there was there to believe those words foreclose bail. See *supra,* at 869 – 872. The constitutional considerations, the statutory language, and the purposes underlying the statute are virtually the same. Thus, the result should be the same: Given the

constitutional considerations, we should interpret the statute as permitting bail.

IV

The majority concludes in Part V, *ante,* at 851 – 852, by saying that, before considering bail-related constitutional arguments, the lower courts "should reexamine whether respondents can continue litigating their claims as a class." *Ante,* at 851. Relying on dicta in 📗 *Reno v. American–Arab Anti– Discrimination Comm.,* 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (*AADC* ), it then suggests that the respondents may not be able to continue litigating because the Act says that

"no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation [of the statutory provisions here at issue] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 🚩 8 U.S.C. § 1252(f)(1).

Were the majority's suggestion correct as to this jurisdictional question, it would have shown, at most, that we should decide the constitutional question here and now. We have already asked for and received briefs on that question. But I do not believe the majority is correct. Every member of the classes before us falls within the provision's exception. Every one of them is an "individual alien against whom proceedings under such part have been initiated." *Ibid.* The Court in *AADC* did not consider, and had no reason to consider, the application of 🚩 § 1252(f)(1) to such a class. Regardless, a court could order declaratory relief. 📗 Federal Rule of Civil Procedure 23(b)(2) permits a class action where "final injunctive relief or *corresponding* declaratory relief is appropriate **\*876** respecting the class as a whole." (Emphasis added.) And the Advisory Committee says that declaratory relief can fall within the Rule's term "corresponding" if it "serves as a basis for later injunctive relief." Notes on 📗 Rule 23(b)(2)–1966 Amendment, 28 U.S.C.App., p. 812.

Jurisdiction also is unaffected by 🚩 8 U.S.C. § 1252(b)(9), which by its terms applies only "[w]ith respect to review of an order of removal under [ 🚩 § 1252(a)(1) ]." 🚩 § 1252(b).

Respondents challenge their detention without bail, not an order of removal.

Neither does ⚑ *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), bar these class actions. Every member of each class seeks the same relief (a bail hearing), every member has been denied that relief, and the differences in situation among members of the class are not relevant to their entitlement to a bail hearing.

At a minimum I can find nothing in the statute or in the cases to which the majority refers that would prevent the respondents from pursuing their action, obtaining a declaratory judgment, and then using that judgment to obtain relief, namely, a bail hearing, in an individual case. Thus, I believe the lower courts are free to consider the constitutionality of the relevant statutory provisions as the majority now interprets them.

V

*Conclusion*

The relevant constitutional language, purposes, history, traditions, context, and case law, taken together, make it likely that, where confinement of the noncitizens before us is prolonged (presumptively longer than six months), bail proceedings are constitutionally required. Given this serious constitutional problem, I would interpret the statutory provisions before us as authorizing bail. Their language permits that reading, it furthers their basic purposes, and it is consistent with the history, tradition, and constitutional values associated with bail proceedings. I believe that those bail proceedings should take place in accordance with customary rules of procedure and burdens of proof rather than the special rules that the Ninth Circuit imposed.

The bail questions before us are technical but at heart they are simple. We need only recall the words of the Declaration of Independence, in particular its insistence that *all* men and women have "certain unalienable Rights," and that among them is the right to "Liberty." We need merely remember that the Constitution's Due Process Clause protects each person's liberty from arbitrary deprivation. And we need just keep in mind the fact that, since Blackstone's time and long before, liberty has included the right of a confined person to seek release on bail. It is neither technical nor unusually difficult

to read the words of these statutes as consistent with this basic right. I would find it far more difficult, indeed, I would find it alarming, to believe that Congress wrote these statutory words in order to put thousands of individuals at risk of lengthy confinement all within the United States but all without hope of bail. I would read the statutory words as consistent with, indeed as requiring protection of, the basic right to seek bail.

Because the majority does not do so, with respect, I dissent.

**\*883** APPENDIXES

A

1

*Statute Applicable to Asylum Seekers*

⚑ 8 U.S.C. § 1225. "Inspection by immigration officers; expedited removal of inadmissible **\*877** arriving aliens; referral for hearing

.....

"(b) Inspection of applicants for admission

"(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled

"(A) Screening

"(i) In general

"If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under ⚑ section 1182(a)(6)(C) or ⚑ 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

"(ii) Claims for asylum

"If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or ⚑ 1182(a)(7) of this title

AR.05188

*Jennings v. Rodriguez*, 138 S.Ct. 830 (2018)

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1348 of 1384

and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

.....

"(B) Asylum interviews

"(i) Conduct by asylum officers

"An asylum officer shall conduct interviews of aliens referred under subparagraph (A)(ii), either at a port of entry or at such other place designated by the Attorney General.

"(ii) Referral of certain aliens

"If the officer determines at the time of the interview that an alien has a credible fear of persecution (within the meaning of clause (v)), the alien *shall be detained for further consideration of the application for asylum.*" (Emphasis added.)

2

*Statute Applicable to Criminal Aliens*

🚩 8 U.S.C. § 1226. "Apprehension and detention of aliens

"(a) Arrest, detention, and release
"On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) *bond* of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

"(B) conditional parole;

.....

"(c) Detention of criminal aliens
"(1) Custody

"The Attorney General *shall take into custody* any alien who—

"(A) is inadmissible by reason of having committed any offense covered in 📑 section 1182(a)(2) of this title,

"(B) is deportable by reason of having committed any offense covered in 📑 section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

"(C) is deportable under 📑 section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

**\*878** "(D) is inadmissible under 📑 section 1182(a)(3)(B) of this title or deportable under 📑 section 1227(a)(4)(B) of this title, "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

"(2) Release

"The Attorney General *may release* an alien described in paragraph (1) *only if* the Attorney General decides *pursuant to* section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." (Emphasis added.)

3

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1349 of 1384

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**
200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

*Statute Applicable to Miscellaneous*
*Applicants for Admission*

🚩 8 U.S.C. § 1225. "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing

.....

"(b) Inspection of applicants for admission

.....

"(2) Inspection of other aliens

"(A) In general

"Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title.

"(B) Exception

"Subparagraph (A) shall not apply to an alien—

"(i) who is a crewman,

"(ii) to whom paragraph (1) applies, or

"(iii) who is a stowaway.

"(C) Treatment of aliens arriving from contiguous territory

"In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title." (Emphasis added.)

B

*State Bail Law*

| State | Key Bail Provisions |
|---|---|
| Alabama | Ala. Const., Art. 1, §16; Ala. Code §§15–13–3, 15–13–108, 15–13–190 (2011); Ala. Rule Crim. Proc. 7.2 (Cum. Supp. 2017) |
| Alaska | Alaska Const., Art. 1, §11; Alaska Stat. §§12.30.011, 12.30.040 (2016) |
| Arizona | Ariz. Const., Art. 2, §22; Ariz. Rev. Stat. Ann. §§13–3961 (Cum. Supp. 2017), 13–3961.01 (2010), 13–3962; Ariz. Rule Crim. Proc. 7.2 (Cum. Supp. 2017) |
| Arkansas | Ark. Const., Art. 2, §8; Ark. Code §§16–84–110 (2005), 16–91–110 (Supp. 2017); Ark. Rule App. Crim. Proc. 6 (2017) |
| California | Cal. Const., Art. 1, §12; Cal. Penal Code Ann. §1271 (West 2004) |
| Colorado | Colo. Const., Art. 2, §19; Colo. Rev. Stat. §§16–4–101, 16–4–102, 16–4–201, 16–4–201.5 (2017) |
| Connecticut | Conn. Const., Art. 1, §8; Conn. Gen. Stat. §§54–63f, 54–64a (2017) |
| Delaware | Del. Const., Art. 1, §12; Del. Code Ann., Tit. 11, §§2103, 2104, 2112 (2015) |
| Florida | Fla. Const., Art. 1, §14; Fla. Stat. §§903.046, 903.132, 903.133 (2017) |
| Georgia | Ga. Code Ann. §§17–6–1, 17–6–15 (Supp. 2017) |

| State | Key Bail Provisions |
|---|---|
| Hawaii | Haw. Rev. Stat. §§804–3, 804–4 (2014) |
| Idaho | Idaho Const., Art. 1, §6; Idaho Code Ann. §19–2903 (2017) |
| Illinois | Ill. Const., Art. 1, §9; Ill. Comp. Stat., ch. 725, §§5110–4, 5110–6.2 (West 2016) |
| Indiana | Ind. Const., Art. 1, §17; Ann. Ind. Code §§35–33–8.5–6 (West 2012), 35–33–9–1 (West Cum. Supp. 2017) |
| Iowa | Iowa Const., Art. 1, §12; Iowa Code Ann. §§811.1, 811.5 (West 2015) |
| Kansas | Kan. Const., Bill of Rights §9; Kan. Stat. Ann. §§22–2801, 22–2804 (2007), 22–2802 (2016 Cum. Supp.) |
| Kentucky | Ky. Const., §16; Ky. Rev. Stat. Ann. §431.066 (West Cum. Supp. 2017); Ky. Rules Crim. Proc. 4.02, 4.54, 12.78 (West Cum. Supp. 2017) |
| Louisiana | La. Const., Art. 1, §18; La. Code Crim. Proc., Art. 312, 316 (West 2017) |
| Maine | Me. Const., Art. 1, §10; Me. Rev. Stat. Ann., Tit. 15, §§1003, 1051 (Cum. Supp. 2017), 1026, 1027 (2016) |
| Maryland | Md. Crim. Proc. Code Ann. §§5–101, 5–102 (Supp. 2017), 5–207 (2008); Md. Rules 4–216.1, 4–349 (2018) |
| Massachusetts | Mass. Gen. Laws, ch. 276, §§20D, 42, 42A (2016); Mass. Rule Crim. Proc. 31 (West 2017) |

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1350 of 1384

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

| State | Key Bail Provisions |
|---|---|
| Michigan | Mich. Comp. Laws Ann. §§765.6 (West Supp. 2017), 770.9 (West 2006) |
| Minnesota | Minn. Const., Art. 1, §7; Minn. Stat. §629.16 (2016); Minn. Rules Crim. Proc. 6, 28.02 (2016) |
| Mississippi | Miss. Const., Art. 32, §29; Miss. Code Ann. §§99–5–11, 99–35–3. (2015) |
| Missouri | Mo. Const., Art. 1, §§20, 34; Mo. Ann. Rev. Stat. §§544.455, 544. 671 (Vernon Cum. Supp. 2017), 544.457, 547.170 (Vernon 2002) |
| Montana | Mont. Const., Art. 2, §21; Mont. Code Ann. §§46–9–102, 46–9–107 (2017) |
| Nebraska | Neb. Const., Art. 1, §9; Neb. Rev. Stat. §§29–901 (2017 Supp.), 29–2301 (2016) |
| Nevada | Nev. Const., Art. 1, §7; Nev. Rev. Stat. §§178.484, 178.488 (2015) |
| New Hampshire | N. H. Rev. Stat. Ann. §§597:1 (2001), 597:1–a (Cum. Supp. 2017), 597:1–c, 597:2 |
| New Jersey | N. J. Const., Art. 1, §11; N. J. Stat. Ann. §§2A:162–11 (West 2011), 162–18 (West Cum. Supp. 2017), 2A:162–20; N. J. Rule App. Proc. 2:9–4 (West 2018) |
| New Mexico | N. M. Const., Art. 2, §13; N. M. Dist. Ct. Rules Crim. Proc. 5–401, 5–402 (1992) |

| State | Key Bail Provisions |
|---|---|
| New York | N. Y. Crim. Proc. Law Ann. §§510.20, 530.10 (West 2009), 510.30 (West Cum. Supp. 2018) |
| North Carolina | N. C. Gen. Stat. Ann. §§15A–533, 15A–534 (2017) |
| North Dakota | N. D. Const., Art. 1, §11; N. D. Rule Crim. Proc. 46 (2016–2017) |
| Ohio | Ohio Const., Art. I, §9; Ohio Rev. Code Ann. §§2937.222, 2949.02 (Lexis 2014); Ohio Rule Crim. Proc. 46 (Lexis 2017–2018) |
| Oklahoma | Okla. Const., Art. 2, §8; Okla. Stat., Tit. 22, §§1077, 1101, 1102 (2011) |
| Oregon | Ore. Const., Art. 1, §§14, 43; Ore. Rev. Stat. §§135.240, 138.650 (2015) |
| Pennsylvania | Pa. Const., Art. 1, §14; 42 Pa. Cons. Stat. §5701 (2015); Pa. Rule Crim. Proc. 521 (West 2017) |
| Rhode Island | R. I. Const., Art. 1, §9; R. I. Gen. Laws §§12–13–1, 12–22–12 (2002); R. I. Super. Ct. Rule Crim. Proc. 46 (Supp. 2017) |
| South Carolina | S. C. Const., Art. 1, §15; S. C. Code Ann. §§17–15–10, 22–5–510 (Cum. Supp. 2017), 18–1–90 (2014) |
| South Dakota | S. D. Const., Art. 6, §8; S. D. Codified Laws §§23A–43–2, 23A–43–2.1, 23A–43–16 (2016), 23A–43–3, 23A–43–4 (Cum. Supp. 2017) |
| Tennessee | Tenn. Const., Art. 1, §15; Tenn. Code Ann. §§40–11–102, 40–11–105, 40–11–113 (2012) |

| State | Key Bail Provisions |
|---|---|
| Texas | Tex. Const., Art. 1, §§11, 11a, 11b, 11c; Tex. Code Crim. Proc. Ann., Art. 17.15, 17.40 (Vernon 2015), 44.04 (Vernon Cum. Supp. 2017) |
| Utah | Utah Const., Art. 1, §8; Utah Code §§77–20–1, 77–20–10 (2017) |
| Vermont | Vt. Const., ch. 2, §40; Vt. Stat. Ann., Tit. 13, §§7553, 7574 (2009), 7553a, 7554 (2017 Cum. Supp.) |
| Virginia | Va. Code Ann. §§19.2–120, 19.2–120.1, 19.2–121, 19.2–319 (2015) |
| Washington | Wash. Const., Art. 1, §20; Wash. Rev. Code §§10.21.020, 10.21.030, 10.21.040, 10.73.040 (2016) |
| West Virginia | W. Va. Code Ann. 62–1C–1 (Lexis 2014) |
| Wisconsin | Wis. Const., Art. 1, §8, cl. 2; Wis. Stat. §§969.01, 969.03, 969.035 (2011–2012) |
| Wyoming | Wyo. Const., Art. 1, §14; Wyo. Stat. Ann. §7–10–101 (2015) |

**All Citations**

138 S.Ct. 830, 200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826, 2018 Daily Journal D.A.R. 1764, 27 Fla. L. Weekly Fed. S 78

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1351 of 1384

# Footnotes

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

\*   Justice SOTOMAYOR joins only Part III–C of this opinion.

1    Anyone who believes that he is not covered by § 1226(c) may also ask for what is known as a "*Joseph* hearing." See *Matter of Joseph,* 22 I. & N. Dec. 799 (BIA 1999). At a *Joseph* hearing, that person "may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that the [Government] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention." *Demore v. Kim,* 538 U.S. 510, 514, n. 3, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). Whether respondents are entitled to *Joseph* hearings is not before this Court.

2    It is questionable whether this is true for aliens who are detained under 8 U.S.C. § 1225(b)(1)(B)(ii) for consideration of their asylum applications.

3    The concurrence contends that "detention *is* an 'action taken ... to remove' an alien" and that therefore "even the narrowest reading of 'arising from' must cover" the claims raised by respondents. *Post,* at 855. We do not follow this logic. We will assume for the sake of argument that detention is an action taken "to remove an alien," *i.e.,* for the purpose of removing an alien, rather than simply an action aimed at ensuring that the alien does not flee or commit a crime while his proceedings are pending. But even if we proceed on the basis of that assumption, we do not see what it proves. The question is not whether *detention* is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action. And for the reasons explained above, those legal questions are too remote from the actions taken to fall within the scope of § 1252(b)(9).

4    According to the dissent, we could have applied the *expressio unius* canon in *Zadvydas* as well because there was also an "alternative avenue for relief, namely, bail," available for aliens detained under § 1231(a)(6). *Post,* at 872 (opinion of BREYER, J.). But the dissent overlooks the fact that the provision granting bail was precisely the same provision that the Court purported to be interpreting, so the canon was not applicable. See 533 U.S., at 683, 121 S.Ct. 2491.

5    See Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (PATRIOT Act), 115 Stat. 272.

6    As the dissent notes, § 1158(d)(2) regulates employment authorization for certain "applicant[s] for asylum." Were all asylum applicants detained, the dissent says, that provision would make no sense, because detained aliens do not need work authorizations. *Post,* at 871 – 872. But § 1158(d)(2) applies not only to aliens seeking asylum status "in accordance with ... section 1225(b)" (and thus aliens who are detained), but also to all aliens already "physically present in the United States." § 1158(a)(1). Many of those aliens will be in the country lawfully, and thus they will not be detained and will be able to work pending the outcome of their asylum application. For example, an alien may apply for asylum after being admitted into the country on a short-term visa. While the application is pending, § 1158 may offer a way for that alien to find employment. In response, the dissent accuses us of "apply[ing] this provision to some asylum applicants but not the ones before us." *Post,* at 871 – 872. That is not remotely what we are doing. We do not doubt that § 1158(d)(2) "applies" to all "applicant[s] for asylum" as it says, even if some of those applicants are not as likely to receive an employment authorization (for instance, because they are detained) as others.

7    It should not be surprising by this point that even the aliens in *Waldman* understood "detention" in contradistinction to "bail." See Petition for Rehearing in *Tod v. Waldman,* O.T. 1924, No. 95, pp. 17–18 ("[T]he Court's mandate should authorize relators to give bail, instead of having [them] go to Ellis Island and

remain there *in custody* pending an appeal ... which may involve very long *detention* pending hearing of the appeal ..." (capitalization omitted and emphasis added)).

8    The dissent argues that because "the question at issue [in *Zadvydas* ] was release from detention," "the key word was consequently 'may.' " *Post,* at 871. We agree but fail to see the point. If, as the dissent admits, *Zadvydas* was about "release from detention" and not about what qualifies as "detention," then it is unclear why the dissent thinks that decision supports its unorthodox interpretation of the word "detention."

1    The named Government officials are the Attorney General of the United States, the Secretary of the Department of Homeland Security, the Director of the Executive Office for Immigration Review, the Director and Assistant Director of the Los Angeles District of Immigration and Customs Enforcement, and several directors of jails and detention facilities.

2    Section 1252 provides a few specific grants of jurisdiction beyond § 1252(a)(1)'s general grant of jurisdiction over final removal orders and all other related questions of law and fact. Section 1252(b)(7), for example, allows an alien to challenge the validity of his removal order during criminal proceedings if he is charged with willfully failing to depart the United States. And § 1252(e)(2) allows an alien who is denied admission to the United States and ordered removed to raise certain claims in habeas corpus proceedings.

3    Respondents also asserted at oral argument that the Government "has said repeatedly" that § 1252(b)(9) does not apply to detention claims. Tr. of Oral Arg. 36. But our "independent obligation" to evaluate jurisdiction, *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006), means that we cannot accept the Government's concessions on this point. See *King Bridge Co. v. Otoe County,* 120 U.S. 225, 226, 7 S.Ct. 552, 30 L.Ed. 623 (1887).

4    Contrary to respondents' argument, some of the respondents will get review before "all the detention has already happened." Respondents who successfully petition for review to the Court of Appeals from a final removal order and obtain a remand to the immigration court, like class representative Alejandro Rodriguez did here, will have an opportunity to obtain review of their detention before it is complete. See Third Amended Complaint, at 9–12.

5    See, *e.g.,* Act of Aug. 18, 1884, 28 Stat. 390 ("In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereinafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of Treasury"), upheld in *Lem Moon Sing v. United States,* 158 U.S. 538, 547–550, 15 S.Ct. 967, 39 L.Ed. 1082 (1895); Immigration Act of 1891, § 8, 26 Stat. 1085 ("All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of Treasury"), upheld in *Ekiu v. United States,* 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892); 1917 Immigration Act, § 19, 39 Stat. 890 ("In every case where any person is ordered deported from the United States under the provisions of this Act, or of any law or treaty, the decision of the Secretary of Labor shall be final"), upheld in *Heikkila,* 345 U.S., at 233–235, 237, 73 S.Ct. 603.

6    I take no position on whether some of the respondents will face other jurisdictional hurdles, even on review of their final removal orders. See, *e.g.,* §§ 1252(a)(2)(A), (B). I also continue to agree with Justice O'Connor's concurring opinion in *Demore v. Kim,* 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), which explained that § 1226(e) "unequivocally deprives federal courts of jurisdiction to set aside 'any action or decision' by the Attorney General" regarding detention. *Id.,* at 533, 123 S.Ct. 1708 (opinion concurring in part and concurring in judgment).

AR.05193

**Jennings v. Rodriguez, 138 S.Ct. 830 (2018)**

200 L.Ed.2d 122, 86 USLW 4094, 18 Cal. Daily Op. Serv. 1826...

7    This Court has never addressed whether habeas relief can be pursued in a class action. See *Schall v. Martin,* 467 U.S. 253, 261, n. 10, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (reserving this question). I take no position on that issue here, since I conclude that respondents are not seeking habeas relief in the first place.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1354 of 1384

Jimenez-Morales v. U.S. Atty. Gen., 821 F.3d 1307 (2016)

26 Fla. L. Weekly Fed. C 269

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Perez-Guzman v. Lynch, 9th Cir., August 31, 2016

821 F.3d 1307
United States Court of Appeals,
Eleventh Circuit.

Dino JIMENEZ–MORALES, Petitioner,

v.

U.S. ATTORNEY GENERAL, Respondent.

No. 14–15359.
|
May 2, 2016.

**Synopsis**

**Background:** Alien filed petition for review decision of Department of Homeland Security, No. A093–106–814, to administratively reinstate his order of removal.

**Holdings:** The Court of Appeals, Jordan, Circuit Judge, held that:

[1] conclusion of reasonable fear proceeding made alien's premature petition for review ripen into final decision, and

[2] alien was not eligible for asylum.

Petition denied.

West Headnotes (4)

[1]     **Aliens, Immigration, and Citizenship**   Decisions reviewable

Where alien pursues reasonable fear proceeding following Department of Homeland Security's initial reinstatement of prior order of removal, reinstated removal order does not become final, and thus subject to judicial review, until reasonable fear proceeding is completed. Immigration and Nationality Act, § 242(a)(1),

8 U.S.C.A. § 1252(a)(1).

14 Cases that cite this headnote

[2]     **Aliens, Immigration, and Citizenship**   Decisions reviewable

Conclusion of reasonable fear proceeding made alien's premature petition for review of Department of Homeland Security's initial reinstatement of prior order of removal ripen into final decision over which Court of Appeals had jurisdiction. Immigration and Nationality Act, § 242(a)(1), 8 U.S.C.A. § 1252(a)(1); 8 C.F.R. § 208.31.

12 Cases that cite this headnote

[3]     **Federal Courts**   Premature appeal

Premature notice of appeal is valid if it is filed from order dismissing claim or party, and is followed by subsequent final judgment, even without new notice of appeal being filed, but premature notice of appeal filed from interlocutory order that is not immediately appealable is not cured by subsequent final judgment.

2 Cases that cite this headnote

[4]     **Aliens, Immigration, and Citizenship**   Crimes and Related Grounds

Alien who reentered United States illegally after having previously been removed was not eligible for asylum. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 305(a),

8 U.S.C.A. § 1231(a)(5).

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1307** Georgia Brown Gillett, The Gillett Law Firm, PA, Pembroke Pines, FL, for Petitioner.

John Beadle Holt, Juria L. Jones, U.S. Department of Justice, Washington, DC, OIL, Office of Immigration Litigation, Washington, DC, Michelle Ressler, District Counsel's Office Usice, Miami, FL, for Respondent.

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1355 of 1384

Jimenez-Morales v. U.S. Atty. Gen., 821 F.3d 1307 (2016)

26 Fla. L. Weekly Fed. C 269

Petition for Review of a Decision of the Department of Homeland Security.

Before MARCUS, JORDAN, and WALKER,[*] Circuit Judges.

**Opinion**

JORDAN, Circuit Judge:

In October of 2014, after having been removed to Colombia, Dino Jimenez–Morales **\*1308** unsuccessfully tried to re-enter the United States without authorization near Hidalgo, Texas. The Department of Homeland Security took Mr. Jimenez–Morales into custody and, acting pursuant to 8 U.S.C. § 1231(a)(5), administratively reinstated his 2011 order of removal on November 1, 2014. *See* Supp. A.R. 48. Because Mr. Jimenez–Morales expressed concern that he would be harmed if returned to Colombia, he was placed in a reasonable fear proceeding pursuant to 8 C.F.R. § 208.31. In December of 2014, before the reasonable fear proceeding had concluded, Mr. Jimenez–Morales filed a petition for review in this court.

Prior to oral argument in this case, an asylum officer found that Mr. Jimenez–Morales did not have a reasonable fear of persecution or torture if he were removed to Colombia. *See* Supp. A.R. 44–47. An immigration judge, following a hearing, ratified the asylum officer's finding. The immigration judge found that Mr. Jimenez–Morales did not have a reasonable fear of persecution or torture, that he had no basis for withholding of removal, and that he could not obtain relief under the Convention Against Torture, 8 C.F.R. § 208.18. *See* Supp. A.R. at 1–10. Pursuant to 8 C.F.R. 208.31(g)(1), no further administrative appeal was available to Mr. Jimenez–Morales from the immigration judge's decision.

## I

We first address whether we have jurisdiction to consider the petition. When Mr. Jimenez–Morales filed the petition for review in December of 2014, DHS' reinstatement of the 2011 order of removal was not final because the reasonable fear proceeding was ongoing. That presents a jurisdictional problem because the Immigration and Nationality Act vests circuit courts with jurisdiction to review only "final" orders of removal. *See* 8 U.S.C. § 1252(a)(1); *Avila v. U.S. Att'y Gen.,* 560 F.3d 1281, 1284 (11th Cir.2009).

**[1]**  We agree with the Ninth and Tenth Circuits that, where an alien pursues a reasonable fear proceeding following DHS' initial reinstatement of a prior order of removal, the reinstated removal order does not become final until the reasonable fear proceeding is completed. *See Ortiz–Alfaro v. Holder,* 694 F.3d 955, 958 (9th Cir.2012); *Luna–Garcia v. Holder,* 777 F.3d 1182, 1186 (10th Cir.2015). This is because the reinstated removal order cannot be executed (i.e., carried out) until the reasonable fear proceeding is over. *See Luna–Garcia,* 777 F.3d at 1185. The government is therefore correct that we did not have jurisdiction when Mr. Jimenez–Morales filed his petition for review.

**[2]**  But that is not the end of the matter. As noted, before we heard oral argument, an immigration judge found that Mr. Jimenez–Morales did not have a reasonable fear of persecution or torture, had no basis for withholding of removal, and could not obtain relief under the Convention Against Torture. With that decision, the reasonable fear proceeding came to an end, as no further administrative review was available to Mr. Jimenez–Morales. So the question we must address is whether the conclusion of the reasonable fear proceeding made Mr. Jimenez–Morales' premature 2014 petition for review ripen into one that gave us jurisdiction. The government says no, while Mr. Jimenez–Morales says yes. Exercising plenary review on this jurisdictional question, *see Alexis v. U.S. Att'y Gen.,* 431 F.3d 1291, 1293 (11th Cir.2005), we agree with Mr. Jimenez–Morales.

The government's position finds support in decisions of the Fifth and Sixth Circuits. Those Circuits have ruled that if there is no judicially reviewable order at the time a petition for review is filed, jurisdiction **\*1309** does not exist under 8 U.S.C. § 1252(a)(1), and later events (e.g., the BIA's dismissal of an appeal) cannot cure that jurisdictional defect. *See Moreira v. Mukasey,* 509 F.3d 709, 712–714 (5th Cir.2007); *Jaber v. Gonzales,* 486 F.3d 223, 228–30 (6th Cir.2007).

The Second and Third Circuits, however, have come to a different conclusion. They generally hold that if a petition for review is premature when filed, the petition becomes ripe (and

jurisdiction vests) when subsequent agency action renders the initial ruling final, and the petition can be adjudicated if no action has been taken on the merits and there is no prejudice to the government. *See Herrera–Molina v. Holder,* 597 F.3d 128, 132 (2d Cir.2010); *Khan v. U.S. Att'y Gen.,* 691 F.3d 488, 494 (3d Cir.2012).

**[3]** The question is not an easy one to answer, but we side with the Second and Third Circuits because their approach is consistent with how we have addressed premature appeals in other contexts. In *Robinson v. Tanner,* 798 F.2d 1378 (11th Cir.1986), we harmonized our prior cases dealing with premature appeals and derived two principles from those decisions. We explained that a premature notice of appeal is valid if it is filed from an order dismissing a claim or party, and is followed by a subsequent final judgment, even without a new notice of appeal being filed. *See id.* at 1385 (citing *Jetco Elec. Indus. v. Gardiner,* 473 F.2d 1228, 1231 (5th Cir.1973)). In contrast, a premature notice of appeal filed from an interlocutory order that is not immediately appealable is not cured by a subsequent final judgment. *See Robinson,* 798 F.2d at 1385 (citing *United States v. Taylor,* 632 F.2d 530, 531 (5th Cir.1980)).

The scenario we have here is much closer to the first category of premature appeals described in *Robinson.* We have held, and other circuits agree, that the reinstatement of a prior order of removal is appealable under 8 U.S.C. § 1252. *See Avila,* 560 F.3d at 1284. *See also Anderson v. Napolitano,* 611 F.3d 275, 277–78 (5th Cir.2010); *Ponta–Garcia v. U.S. Att'y Gen.,* 557 F.3d 158, 163 (3d Cir.2009); *Arevalo v. Ashcroft,* 344 F.3d 1, 9 (1st Cir.2003). Had Mr. Jimenez–Morales not alleged a reasonable fear of persecution and torture, he could have obtained immediate judicial review of the reinstatement of his 2011 removal order.

Stated differently, the initial reinstatement order here was not, in and of itself, an interlocutory and unreviewable act on the part of DHS. That order was rendered non-final only because of the ongoing reasonable fear proceeding. So once the immigration judge ruled adversely to Mr. Jimenez–Morales in the reasonable fear proceeding, the reinstatement of the 2011 removal order became final. Given that we have not taken any action on the merits, and that the government has not alleged or shown any prejudice that would result from judicial review, we conclude that we have jurisdiction to consider the petition.

*See Herrera–Molina,* 597 F.3d at 132; *Khan,* 691 F.3d at 494. *Cf. United States v. Curry,* 760 F.2d 1079, 1080 (11th Cir.1985) (premature notice of appeal following jury verdict in criminal case was effective to perfect appeal as of date when defendant was sentenced). The government's motion to dismiss is therefore denied.

**II**

On the merits, Mr. Jimenez–Morales argues that he is entitled to political asylum because he has shown that he suffered persecution in Colombia based on imputed political opinion and membership in two social groups. *See, e.g.,* Petitioner's Initial Br. at 8. The government responds that **\*1310** 8 U.S.C. § 1231(a)(5) renders Mr. Jimenez–Morales ineligible for asylum.

**[4]** The full text of § 1231(a)(5) is as follows:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, *the alien is not eligible and may not apply for any relief under this chapter,* and the alien shall be removed under the prior order at any time after the reentry.

(emphasis added). The meaning and effect of this statutory provision presents a question of law. *See Chandris, Inc. v. Latsis,* 515 U.S. 347, 369, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). As explained below, we conclude that asylum is not available to Mr. Jimenez–Morales.

In relevant part, § 1231(a)(5) provides that an alien whose order of removal is reinstated "is not eligible and may not apply for any relief under this chapter." Both § 1231 and 8 U.S.C. § 1158, the statute governing asylum, are part of Chapter 12 of Title 8 of the U.S.Code. As asylum is a

form of relief from removal, *see* *Morales–Izquierdo v. Gonzales,* 486 F.3d 484, 491 (9th Cir.2007) (en banc) ("[t]he types of relief from removal include ... asylum"), we join the Second and Fifth Circuits in holding that a person like Mr. Jimenez–Morales is not eligible for and cannot seek asylum.

*See* *Ramirez–Mejia v. Lynch,* 794 F.3d 485, 489–90 (5th Cir.2015); *Herrera–Molina,* 597 F.3d at 139.

One final matter warrants discussion. The Supreme Court has written in dicta that, despite § 1231(a)(5)'s "absolute terms in which the bar on relief is stated," an alien whose prior order of removal is reinstated may seek withholding of removal (which it has described as "the possibility of asylum"). *See* *Fernandez–Vargas v. Gonzales,* 548 U.S. 30, 35 n. 4, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). This language from *Fernandez–Vargas,* however, does not mean that asylum is available to someone like Mr. Jimenez–Morales. As

the Second Circuit has explained, the regulations cited by the Supreme Court in *Fernandez–Vargas*—8 C.F.R. §§ 208.31(e) & 241.8(e)—deal only with the withholding of removal and do not address asylum. *See* *Herrera–Molina,* 597 F.3d at 139 n. 8.

### III

Because Mr. Jimenez–Morales is not eligible for asylum, we deny his petition.

**PETITION DENIED.**

**All Citations**

821 F.3d 1307, 26 Fla. L. Weekly Fed. C 269

---

### Footnotes

\*        Honorable John M. Walker, Jr., Circuit Judge for the United States Court of Appeals for the Second Circuit, sitting by designation.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Followed with Reservations by Bedoya-Melendez v. U.S. Atty. Gen., 11th Cir., May 17, 2012

602 F.3d 508
United States Court of Appeals,
Third Circuit.

Wilfred Brentnol JOHNSON, Petitioner

v.

ATTORNEY GENERAL OF the UNITED STATES, Respondent.

No. 07-2820.
|
Submitted Under Third Circuit
LAR 34.1(a) April 12, 2010.
|
Filed April 16, 2010.

**Synopsis**

**Background:** Alien, a native and citizen of Guyana, petitioned for review of the order of the Board of Immigration Appeals (BIA), affirming the decision of Mirlande Tadal, immigration judge (IJ), denying his application for cancellation of removal.

**[Holding:]** The Court of Appeals, Sloviter, Circuit Judge, held that Court of Appeals lacked jurisdiction to review BIA determination that alien had not been battered by his wife or otherwise subjected to extreme cruelty.

Petition dismissed.

West Headnotes (4)

**[1]    Aliens, Immigration, and Citizenship**    ⟶ Jurisdiction and venue

The Court of Appeals lacks jurisdiction to review discretionary decisions regarding the granting or denial of an application for cancellation of removal on ground of extreme hardship. Immigration and Nationality Act, § 240A,

8 U.S.C.A. § 1229b.

4 Cases that cite this headnote

**[2]    Aliens, Immigration, and Citizenship**    ⟶ Jurisdiction and venue

The Court of Appeals lacked jurisdiction to review the determination by the Board of Immigration Appeals (BIA) that alien, a native and citizen of Guyana, had not been battered by his wife or otherwise subjected to extreme cruelty by her, and thus, was not entitled to cancellation of removal on that ground; the BIA's extreme cruelty determination was discretionary, rather than an issue implicating legal or constitutional principles. Immigration and Nationality Act, §§ 240A, 240A(b)(2), 242(a)(2)(D), 8 U.S.C.A. §§ 1229b, 1229b(b)(2), 1252(a)(2)(D); 8 C.F.R. § 204.2(c)(1)(vi).

8 Cases that cite this headnote

**[3]**     **Aliens, Immigration, and Citizenship**     Jurisdiction and venue

An alien may not create subject matter jurisdiction on a petition for review that Congress chose to remove simply by cloaking an argument in constitutional garb. Immigration and Nationality Act, § 242(a)(2)(D), 8 U.S.C.A. § 1252(a)(2)(D).

**[4]**     **Aliens, Immigration, and Citizenship**     Hardship as basis for relief

The elements necessary to demonstrate eligibility for cancellation of removal are conjunctive such that an alien's inability to demonstrate extreme cruelty precludes him from relief under the extreme hardship provision. Immigration and Nationality Act, §§ 240A, 240A(b)(2), 242(a)(2)(D), 8 U.S.C.A. §§ 1229b, 1229b(b)(2), 1252(a)(2)(D); 8 C.F.R. § 204.2(c)(1)(vi).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*509**  Ransford B. McKenzie, Brooklyn, NY, Attorney for Petitioner.

John S. Hogan, Kathleen J. Kelly, Briena L. Strippoli, United States Department of Justice, Office of Immigration Litigation, Civil Division, Washington, DC, Attorneys for Respondent.

Before: SLOVITER, NYGAARD, Circuit Judges, and RESTANI [*], Judge.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Petitioner Wilfred Johnson, a citizen of Guyana, petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the decision by the Immigration Judge ("IJ") to deny his application for cancellation of removal under § 240A(b)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b)(2). We will dismiss for lack of jurisdiction.

**I.**

**BACKGROUND**

Johnson is a native and citizen of Guyana who entered the United States in or about March 1995, without inspection. In February 2003, Johnson married a United States citizen, with whom he has two young children. Johnson's wife filed and obtained approval of an Alien Relative Petition, which permitted his presence in the United States.

After briefly returning to Guyana, Johnson returned and was paroled into the United States in July 2005 as an applicant for legal permanent residence. However, by March 2006, Johnson's marriage began to deteriorate and he left the marital home. Meanwhile, Johnson's wife withdrew the Alien Relative Petition, commenced divorce proceedings, and obtained a restraining order preventing Johnson from visiting his young children.

Based on the allegations made by Johnson's wife in obtaining the restraining order, he was taken into custody by the Bureau of Immigration and Customs Enforcement ("ICE"). While in custody, Johnson was served with a Notice to Appear and charged with removability "in that [he] was not in possession of a valid unexpired immigrant Visa, reentry permit, border crossing card, or valid entry document required by the Immigration and Nationality Act." App. at 44. The IJ deemed Johnson "removable pursuant to the charge set forth in the Notice to Appear." App. at 47.

About one month later, Johnson filed an application in the Immigration Court for cancellation of removal under the Special Rule for Battered Spouses. *See* 8 U.S.C. § 1229b(b)(2). [1] Thereafter, the Immigration **\*510** Court had a hearing at which Johnson testified in support of his application. He testified that his wife mistreated him by making baseless allegations against him and depriving him of access to their two children. Johnson claimed that his wife's actions amounted to extreme cruelty and that if he is subject to removal, his children will suffer.

The IJ denied Johnson's application for cancellation of removal. The BIA affirmed and dismissed Johnson's appeal. Johnson then petitioned this court to review the BIA's order.

## II.

### ANALYSIS

Johnson contends that "[t]he BIA has failed to meet its statutory duty in reviewing the IJ's decision." Pet'r's Br. at 6. The IJ found that Johnson had not established that he was battered by his wife, subjected to extreme cruelty by her, or that his removal would result in extreme hardship to himself, his children, or his wife. The BIA affirmed the IJ on the ground that Johnson "did not establish that he has been battered" by his wife. App. at 2.

 [1]    Before reaching the merits of Johnson's claims, we must have jurisdiction to review the determinations of the IJ and BIA. Our jurisdiction is limited by section 242 of the INA, 8 U.S.C. § 1252(a)(2)(B)(i), which provides that "any judgment regarding the granting of relief under ... [ 8 U.S.C. § 1229b]" is not subject to judicial review. Courts have interpreted a "judgment" as a discretionary decision. [2] It is settled in this circuit that we lack jurisdiction over discretionary decisions regarding the granting of relief under 8 U.S.C. § 1229b. *See Mendez-Moranchel v. Ashcroft,* 338 F.3d 176, 178-79 (3d Cir.2003) (finding that "[t]he determination of whether the alien has established the requisite hardship is a quintessential discretionary judgment" and not reviewable). However, we may review "constitutional claims or questions of law raised upon a petition for review...." 8 U.S.C. § 1252(a)(2)(D).

 [2]    In his brief, the Attorney General focuses on our lack of jurisdiction to review the "inherently subjective and therefore discretionary" decisions as to "extreme cruelty." Resp't's Br. at 5. We have not yet decided whether an IJ's determination that a petitioner was subjected to "extreme cruelty" is a discretionary decision. Four of the five circuits that have addressed this precise question have held **\*511** that the extreme cruelty determination is discretionary and not subject to judicial review. [3] *See Stepanovic v. Filip,* 554 F.3d 673, 680 (7th Cir.2009); *Wilmore v. Gonzales,* 455 F.3d 524, 528 (5th Cir.2006); *Perales-*

*Cumpean v. Gonzales,* 429 F.3d 977, 982 (10th Cir.2005); *but see* *Hernandez v. Ashcroft,* 345 F.3d 824, 833-35 (9th Cir.2003) (holding that the extreme cruelty determination is nondiscretionary and therefore reviewable).

We agree with the majority. Congress has not defined "extreme cruelty"[4] or provided a legal standard for determining its existence for the purposes of § 1229b(b)(2). However, the Department of Homeland Security ("DHS") promulgated a regulation that defines "battery or extreme cruelty" as:

> includ[ing], but ... not limited to, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury. Psychological or sexual abuse or exploitation, including rape, molestation, incest (if the victim is a minor), or forced prostitution shall be considered acts of violence. Other abusive actions may also be acts of violence under certain circumstances, including acts that, in and of themselves, may not initially appear violent but that are a part of an overall pattern of violence.

8 C.F.R. § 204.2(c)(1)(vi) (2006).

In its holding that the determination of extreme cruelty was discretionary, which deprived it of jurisdiction to review a cancellation of removal under § 1229b(b)(2), the Tenth Circuit stated that the definition of "battery or extreme cruelty" requires "consideration of many discretionary factors." *Perales-Cumpean,* 429 F.3d at 984. Of special importance to the Tenth Circuit's analysis was the language in the DHS regulation that "battery or extreme cruelty includes, but is not limited to" and "may ... be acts of violence under certain circumstances," phrases which that court concluded provided "[c]onsiderable discretion." *Id.*

Similarly, the Fifth Circuit found that "[a]lthough the extreme cruelty definition provides some guidance ..., it ... does not remove the discretion afforded by Congress." *Wilmore,* 455 F.3d at 528. Following that line of authority, the Seventh Circuit found the matter discretionary, reasoning that the "IJ must determine the facts of a particular case, make a judgment call as to whether those facts constitute cruelty, and, if so, whether the cruelty rises to ... a level that it can ... be described as extreme." *Stepanovic,* 554 F.3d at 680.

These analyses are persuasive. In this case, the IJ had to determine whether the allegations Johnson's wife made against him in the divorce proceedings and in seeking a restraining order, as well as her deprivation of Johnson's access to his children, amounted to extreme cruelty. There is no objective standard by which this can be determined. "[A]n IJ does not determine extreme cruelty by simply plugging **\*512** facts into a formula or applying an algorithm." *Stepanovic,* 554 F.3d at 680 (citation omitted). We also agree with the Fifth Circuit's conclusion that the term "extreme cruelty" is discretionary because it is "not self-explanatory and ... reasonable men could differ as to its meaning." *Wilmore,* 455 F.3d at 527.

Johnson relies on *Hernandez,* where the Ninth Circuit held that extreme cruelty is nondiscretionary because it is a "measure of domestic violence that can ... be assessed on the basis of objective standards." 345 F.3d at 834. However, that case analyzed an antecedent, albeit similar, statute that Congress has since repealed. One of the factors considered relevant by the Ninth Circuit was that the "extreme hardship" determination (as opposed to the extreme cruelty determination) was "specifically committed to 'the opinion of the Attorney General.' " *Id.* That provision does not appear in the current statute. Ultimately, though, we find the Ninth Circuit's reasoning less persuasive than that of the Tenth, Fifth, and Seventh Circuits.

 **[3]**    Rather than focusing on whether or not "extreme cruelty" is a discretionary determination, Johnson seeks to cast his claims in legal and constitutional terms. As the Seventh Circuit stated, "[a] petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an ... argument in constitutional garb...." *Zamora-Mallari v. Mukasey,* 514 F.3d 679, 694

(7th Cir.2008) (internal quotation marks and citation omitted). That is exactly what Johnson seeks to do. He cites no law that would support his position that the BIA's denial of his motion implicates legal or constitutional principles.

Even were we to assume jurisdiction, we would not be persuaded by Johnson's claim that merely amounts to a disagreement with the IJ's conclusion that his wife's treatment did not amount to extreme cruelty. We find nothing inadequate about the BIA's review of the IJ's decision.

 [4]    Lastly, Johnson contends that the BIA's failure to address the potential hardship to his children raises a "colorable question of law." Pet'r's Br. at 13. This argument lacks merit. As the Attorney General notes, "the elements necessary to demonstrate eligibility for cancellation [of removal] are conjunctive [such that] ... Johnson's inability to demonstrate extreme cruelty precludes him from" relief under the extreme hardship provision. Resp't's Br. at 20 n. 7. Once it found the IJ's extreme cruelty determination to be sound, no further review was warranted by the BIA.


### III.


### CONCLUSION

For the above-stated reasons, we will dismiss the petition for review for lack of jurisdiction.


### All Citations

602 F.3d 508


### Footnotes

\*      Hon. Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

1       Section 1229b(b)(2), titled the "Special rule for battered spouse or child," allows the Attorney General to cancel removal of a deportable alien if the alien meets five threshold requirements:

           (i) the alien has been battered or subjected to extreme cruelty by a spouse or parent who is or was a United States citizen ...;

           (ii) the alien has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application ...;

           (iii) the alien has been a person of good moral character during such period ...;

           (iv) the alien is not inadmissible under paragraph (2) or (3) of section 1182(a) of this title, is not deportable under paragraphs (1)(G) or (2) through (4) of section 1227(a) of this title, subject to paragraph (5), and has not been convicted of an aggravated felony; and

           (v) the removal would result in extreme hardship to the alien, the alien's child, or the alien's parent.

         8 U.S.C. § 1229b(b)(2)(A)(i)-(v) (2006).

2       Some decisions regarding relief are simply objective, factual determinations, e.g., whether "the alien has been physically present in the United States for a continuous period of not less than 3 years," 8 U.S.C. § 1229b(b)(2)(A)(ii), or whether the alien has been "convicted of an aggravated felony," *id.* § 1229b(b)(2)(A)(iv). Courts have determined that these matters are reviewable as they are not *judgments* regarding the granting of relief, i.e., they are nondiscretionary. *See,*

*e.g.,* 🔖 *Iddir v. INS,* 301 F.3d 492, 497 (7th Cir.2002) (holding that 🚩 8 U.S.C. § 1252(a)(2)(B) "only bars review of actual discretionary decisions to grant or deny relief under [ 🔖 § 1229b]"); *see also* 🔖 *Pinho v. Gonzales,* 432 F.3d 193, 204 (3d Cir.2005) ("Non-discretionary actions ... and purely legal determinations ... remain subject to judicial review.").

3    The Sixth Circuit addressed the issue in a non-precedential opinion. *Ramdane v. Mukasey,* 296 Fed.Appx. 440, 442 (6th Cir.2008) (deciding that there is "no reason to believe that extreme cruelty" determinations are reviewable but reaching the merits nonetheless).

4    Although the BIA characterized the IJ's decision as finding that Johnson "did not establish that he has been battered," App. at 2, and did not mention the phrase "extreme cruelty," we focus on "extreme cruelty" because that and "extreme hardship" were the essence of Johnson's contentions in seeking cancellation of removal. He did not allege that his wife "battered" him, as that term is defined under the common law.

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Johnson v. U.S., 576 U.S. 591 (2015)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1364 of 1384

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by United States v. Martin, 11th Cir.(Fla.), July 27, 2017

135 S.Ct. 2551
Supreme Court of the United States

Samuel James JOHNSON, Petitioner

v.

UNITED STATES.

No. 13–7120.
|
Argued Nov. 5, 2014.
|
Reargued April 20, 2015.
|
Decided June 26, 2015.

**Synopsis**

**Background:** Defendant pleaded guilty, pursuant to a plea agreement in the United States District Court for the District of Minnesota, Richard H. Kyle, J., to being an armed career criminal in possession of a firearm. He appealed his sentence. The United States Court of Appeals for the Eighth Circuit, 526 Fed.Appx. 708, affirmed. Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Scalia, held that imposing an increased sentence under the residual clause of the Armed Career Criminal Act (ACCA) violates the Constitution's guarantee of due process, overruling James v. U.S., 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532, and Sykes v. U.S., —— U.S. ——, 131 S.Ct. 2267, 180 L.Ed.2d 60, and abrogating U.S. v. White, 571 F.3d 365, U.S. v. Daye, 571 F.3d 225, and U.S. v. Johnson, 616 F.3d 85.

Reversed and remanded.

Justice Kennedy filed an opinion concurring in the judgment.

Justice Thomas filed an opinion concurring in the judgment.

Justice Alito filed a dissenting opinion.

**West Headnotes (17)**

**[1]** **Weapons** 🔑 Possession After Conviction of Crime

**Weapons** 🔑 Possession by chemically dependent or mentally disabled persons

**Weapons** 🔑 Other individuals prohibited from possession

Federal law forbids certain people, such as convicted felons, persons committed to mental institutions, and drug users, to ship, possess, and receive firearms. 🚩 18 U.S.C.A. § 922(g).

103 Cases that cite this headnote

**[2]** **Sentencing and Punishment** 🔑 Weapons and explosives

**Weapons** 🔑 Possession, use, carrying, or transportation

**Weapons** 🔑 Possession after conviction of crime

Although violation of the ban on the shipment, possession, and receipt of firearms by convicted felons, persons committed to mental institutions, and drug users generally is punished by up to 10 years' imprisonment, if the violator has three or more earlier convictions for a "serious drug offense" or a "violent felony," the Armed Career Criminal Act (ACCA) increases his prison term to a minimum of 15 years and a maximum of life. 🚩 18 U.S.C.A. §§ 922(g), 924(a)(2), 🚩 (e)(1).

472 Cases that cite this headnote

**[3]** **Constitutional Law** 🔑 Vagueness

The government violates the Due Process Clause by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. U.S.C.A. Const.Amend. 5.

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

383 Cases that cite this headnote

**[4]    Constitutional Law** ⚬ Vagueness

Due Process Clause's prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law, and a statute that flouts it violates the first essential of due process. U.S.C.A. Const.Amend. 5.

108 Cases that cite this headnote

**[5]    Constitutional Law** ⚬ Judgment and Sentence

Due Process Clause's prohibition of vagueness in criminal statutes applies not only to statutes defining elements of crimes, but also to statutes fixing sentences. U.S.C.A. Const.Amend. 5.

82 Cases that cite this headnote

**[6]    Sentencing and Punishment** ⚬ Violent or Nonviolent Character of Offense

Armed Career Criminal Act (ACCA) requires courts to use a framework known as the categorical approach when deciding whether an offense is a "violent felony," that is, is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another. 🚩 18 U.S.C. § 924(e)(2)(B).

4719 Cases that cite this headnote

**[7]    Sentencing and Punishment** ⚬ Violent or Nonviolent Character of Offense

Under the categorical approach, a court assesses whether a crime qualifies as a violent felony under the Armed Career Criminal Act (ACCA) in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion. 🚩 18 U.S.C. § 924(e)(2)(B).

1693 Cases that cite this headnote

**[8]    Sentencing and Punishment** ⚬ Violent or Nonviolent Character of Offense

Deciding whether a crime is covered by the residual clause of the Armed Career Criminal Act (ACCA), which provides that a felony that "involves conduct that presents a serious potential risk of physical injury to another" should be treated as a "violent felony," requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury; court's task goes beyond deciding whether creation of risk is an element of the crime, and beyond evaluating the chances that the physical acts that make up the crime will injure someone. 🚩 18 U.S.C. § 924(e)(2)(B).

4166 Cases that cite this headnote

**[9]    Constitutional Law** ⚬ Habitual and career offenders

**Sentencing and Punishment** ⚬ Validity of statute or regulatory provision

Imposing an increased sentence under the residual clause of the Armed Career Criminal Act (ACCA), which provides that a felony that "involves conduct that presents a serious potential risk of physical injury to another" should be treated as a "violent felony," violates the Constitution's guarantee of due process; overruling *James v. U.S.*, 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532, and 🚩 *Sykes v. U.S.*, — U.S. —, 131 S.Ct. 2267, 180 L.Ed.2d 60, and abrogating 🚩 *U.S. v. White*, 571 F.3d 365, *U.S. v. Daye*, 571 F.3d 225, and *U.S. v. Johnson*, 616 F.3d 85. U.S.C.A. Const.Amend. 5; 18 U.S.C. § 924(e)(2)(B).

3774 Cases that cite this headnote

**[10]    Constitutional Law** ⚬ Statutes

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

Failure of courts' persistent efforts to establish a standard may provide evidence of unconstitutional statutory vagueness.

14 Cases that cite this headnote

**[11]    Constitutional Law    Statutes**

Vague statutory provision is not constitutional merely because there is some conduct that clearly falls within the provision's grasp.

63 Cases that cite this headnote

**[12]    Constitutional Law    Vagueness as to Covered Conduct or Standards of Enforcement; Offenses and Penalties**

Laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct generally are not void for vagueness; the law is full of instances where a man's fate depends on his estimating rightly some matter of degree.

110 Cases that cite this headnote

**[13]    Sentencing and Punishment    Offenses Usable for Enhancement**

Armed Career Criminal Act's (ACCA) emphasis on convictions indicates that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions. 18 U.S.C.A. § 924(e)(1).

503 Cases that cite this headnote

**[14]    Courts    Erroneous or injudicious decisions**

Doctrine of stare decisis allows the Supreme Court to revisit an earlier decision where experience with its application reveals that it is unworkable.

9 Cases that cite this headnote

**[15]    Courts    Previous Decisions as Controlling or as Precedents**

Pursuant to the doctrine of stare decisis, even decisions rendered after full adversarial presentation may have to yield to the lessons of subsequent experience.

3 Cases that cite this headnote

**[16]    Courts    Decisions of Same Court or Co-Ordinate Court**

When prior decisions of the Supreme Court have opined about a particular issue without full briefing or argument on that issue, the Court is less constrained to follow precedent.

19 Cases that cite this headnote

**[17]    Courts    Previous Decisions as Controlling or as Precedents**

Although it is a vital rule of judicial self-government, stare decisis does not matter for its own sake; rather, it matters because it promotes the evenhanded, predictable, and consistent development of legal principles.

8 Cases that cite this headnote

**West Codenotes**

**Held Unconstitutional**

18 U.S.C.A. § 924(e)(2)(B)(ii)

**\*\*2553    *Syllabus* \***

**\*591**    After petitioner Johnson pleaded guilty to being a felon in possession of a firearm, see 18 U.S.C. § 922(g), the Government sought an enhanced sentence under the Armed Career Criminal Act, which imposes an increased prison term upon a defendant with three prior convictions for **\*\*2554**    a "violent felony," § 924(e)(1), a term defined by § 924(e)(2)(B)'s residual clause to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." The Government argued that Johnson's prior conviction for unlawful possession of a short-barreled shotgun met this definition, making the third conviction of a violent felony. This Court had previously

Johnson v. U.S., 576 U.S. 591 (2015)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1367 of 1384

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

pronounced upon the meaning of the residual clause in *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532; *Begay v. United States,* 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490; *Chambers v. United States,* 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484; and *Sykes v. United States,* 564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60, and had rejected suggestions by dissenting Justices in both *James* and *Sykes* that the clause is void for vagueness. Here, the District Court held that the residual clause does cover unlawful possession of a short-barreled shotgun, and imposed a 15–year sentence under ACCA. The Eighth Circuit affirmed.

*Held* : Imposing an increased sentence under ACCA's residual clause violates due process. Pp. 2555 - 2563.

(a) The Government violates the Due Process Clause when it takes away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357–358, 103 S.Ct. 1855, 75 L.Ed.2d 903. Courts must use the "categorical approach" when deciding whether an offense is a violent felony, looking "only to the fact that the defendant has been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Taylor v. United States,* 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607. Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. *James, supra,* at 208, 127 S.Ct. 1586. Pp. 2555 – 2557.

(b) Two features of the residual clause conspire to make it unconstitutionally vague. By tying the judicial assessment of risk to a judicially **\*592** imagined "ordinary case" of a crime rather than to real-world facts or statutory elements, the clause leaves grave uncertainty about how to estimate the risk posed by a crime. See *James, supra,* at 211, 127 S.Ct. 1586. At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. Taken together, these uncertainties produce more unpredictability and arbitrariness than the Due Process Clause tolerates. This Court's repeated failure to craft a principled standard out of the residual clause and the lower

courts' persistent inability to apply the clause in a consistent way confirm its hopeless indeterminacy. Pp. 2557 – 2560.

(c) This Court's cases squarely contradict the theory that the residual clause is constitutional merely because some underlying crimes may clearly pose a serious potential risk of physical injury to another. See, *e.g., United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89, 41 S.Ct. 298, 65 L.Ed. 516. Holding the residual clause void for vagueness does not put other criminal laws that use terms such as "substantial risk" in doubt, because those laws generally require gauging the riskiness of an individual's conduct on a particular occasion, not the riskiness of an idealized ordinary case of the crime. Pp. 2560 – 2562.

(d) The doctrine of *stare decisis* does not require continued adherence to *James* **\*\*2555** and *Sykes*. Experience leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause. *James* and *Sykes* opined about vagueness without full briefing or argument. And continued adherence to those decisions would undermine, rather than promote, the goals of evenhandedness, predictability, and consistency served by *stare decisis*. Pp. 2561 – 2563.

526 Fed.Appx. 708, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C.J., and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KENNEDY, J., and THOMAS, J., filed opinions concurring in the judgment. ALITO, J., filed a dissenting opinion.

**Attorneys and Law Firms**

Katherine M. Menendez, Minneapolis, MN, for Petitioner.

John F. Bash, Washington, DC, for Respondent.

Katherian D. Roe, Federal Defender, Katherine M. Menendez, Assistant Federal Defender, Counsel of Record, Douglas H.R. Olson, Assistant Federal Defender, District of Minnesota, Minneapolis, MN, for Petitioner.

Donald B. Verrilli, Jr., Solicitor General, Leslie R. Caldwell, Assistant Attorney General, Michael R. Dreeben, Deputy Solicitor General, John F. Bash, Assistant to the Solicitor General, Counsel of Record, John P. Taddei, Attorney,

Johnson v. U.S., 576 U.S. 591 (2015)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1368 of 1384

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

Department of Justice, Washington, DC, for Respondent United States.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

**\*593** Under the Armed Career Criminal Act of 1984, a defendant convicted of being a felon in possession of a firearm faces more severe punishment if he has three or more previous convictions for a "violent felony," a term defined to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). We must decide whether this part of the definition of a violent felony survives the Constitution's prohibition of vague criminal laws.

I

**[1]** **[2]** Federal law forbids certain people—such as convicted felons, persons committed to mental institutions, and drug users—to ship, possess, and receive firearms. § 922(g). In general, the law punishes violation of this ban by up to 10 years' imprisonment. § 924(a)(2). But if the violator has three or more earlier convictions for a "serious drug offense" or a "violent felony," the Armed Career Criminal Act increases his prison term to a minimum of 15 years and a maximum of life. § 924(e)(1); Johnson v. United States, 559 U.S. 133, 136, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010). The Act defines "violent felony" as follows:

**\*594** "any crime punishable by imprisonment for a term exceeding one year ... that—

"(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

"(ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious* **\*\*2556** *potential risk of physical injury to another*." § 924(e)(2)(B) (emphasis added).

The closing words of this definition, italicized above, have come to be known as the Act's residual clause. Since 2007, this Court has decided four cases attempting to discern its meaning. We have held that the residual clause (1) covers Florida's offense of attempted burglary, James v. United

States, 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007); (2) does *not* cover New Mexico's offense of driving under the influence, Begay v. United States, 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008); (3) does *not* cover Illinois' offense of failure to report to a penal institution, Chambers v. United States, 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009); and (4) does cover Indiana's offense of vehicular flight from a law-enforcement officer, Sykes v. United States, 564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011). In both James and Sykes, the Court rejected suggestions by dissenting Justices that the residual clause violates the Constitution's prohibition of vague criminal laws. Compare James, 550 U.S., at 210, n. 6, 127 S.Ct. 1586, with id., at 230, 127 S.Ct. 1586 (SCALIA, J., dissenting); compare Sykes, 564 U.S., at ——, 131 S.Ct., at 2276–2277, with id., at ——, 131 S.Ct., at 2286–2288 (SCALIA, J., dissenting).

This case involves the application of the residual clause to another crime, Minnesota's offense of unlawful possession of a short-barreled shotgun. Petitioner Samuel Johnson is a felon with a long criminal record. In 2010, the Federal Bureau of Investigation began to monitor him because of his involvement in a white-supremacist organization that the Bureau suspected was planning to commit acts of terrorism. During the investigation, Johnson disclosed to undercover agents that he had manufactured explosives and that he **\*595** planned to attack "the Mexican consulate" in Minnesota, "progressive bookstores," and " 'liberals.' " Revised Presentence Investigation in No. 0:12CR00104–001 (D. Minn.), p. 15, ¶ 16. Johnson showed the agents his AK–47 rifle, several semiautomatic firearms, and over 1,000 rounds of ammunition.

After his eventual arrest, Johnson pleaded guilty to being a felon in possession of a firearm in violation of § 922(g). The Government requested an enhanced sentence under the Armed Career Criminal Act. It argued that three of Johnson's previous offenses—including unlawful possession of a short-barreled shotgun, see Minn.Stat. § 609.67 (2006)—qualified as violent felonies. The District Court agreed and sentenced Johnson to a 15–year prison term under the Act. The Court of Appeals affirmed. 526 Fed.Appx. 708 (C.A.8 2013) (*per curiam* ). We granted certiorari to decide whether Minnesota's offense of unlawful possession of a short-barreled shotgun

Johnson v. U.S., 576 U.S. 591 (2015)
135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1369 of 1384

ranks as a violent felony under the residual clause. 572 U.S. ——, 134 S.Ct. 1871, 188 L.Ed.2d 910 (2014). We later asked the parties to present reargument addressing the compatibility of the residual clause with the Constitution's prohibition of vague criminal laws. 574 U.S. ——, 135 S.Ct. 939, 190 L.Ed.2d 718 (2015).

## II

**[3]** **[4]** **[5]** The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357–358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The prohibition of vagueness **\*\*2557** in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process."

**\*596** *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences. *United States v. Batchelder,* 442 U.S. 114, 123, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

**[6]** **[7]** In *Taylor v. United States,* 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), this Court held that the Armed Career Criminal Act requires courts to use a framework known as the categorical approach when deciding whether an offense "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." Under the categorical approach, a court assesses whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay, supra,* at 141, 128 S.Ct. 1581.

**[8]** Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury.

*James, supra,* at 208, 127 S.Ct. 1586. The court's task goes beyond deciding whether creation of risk is an element of the crime. That is so because, unlike the part of the definition of a violent felony that asks whether the crime "has *as an element* the use ... of physical force," the residual clause asks whether the crime "*involves conduct* " that presents too much risk of physical injury. What is more, the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will injure someone. The act of making an extortionate demand or breaking and entering into someone's home does not, in and of itself, normally cause physical injury. Rather, risk of injury arises because the extortionist might engage in violence *after* making his demand or because the burglar might confront a resident in the home *after* breaking and entering.

**[9]** **\*597** We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges. Increasing a defendant's sentence under the clause denies due process of law.

## A

Two features of the residual clause conspire to make it unconstitutionally vague. In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined "ordinary case" of a crime, not to real-world facts or statutory elements. How does one go about deciding what kind of conduct the "ordinary case" of a crime involves? "A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?" *United States v. Mayer,* 560 F.3d 948, 952 (C.A.9 2009) (Kozinski, C.J., dissenting from denial of rehearing en banc). To take an example, does the ordinary instance of witness tampering involve offering a witness a bribe? Or threatening a witness with violence? Critically, picturing the criminal's behavior is not enough; as we have already discussed, assessing "potential risk" seemingly requires the judge to imagine how the idealized ordinary **\*\*2558** case of the crime subsequently plays out. *James* illustrates how speculative (and how detached from statutory elements) this enterprise can become. Explaining why attempted burglary poses a serious potential risk of physical injury, the Court said: "An armed would-be burglar

Johnson v. U.S., 576 U.S. 591 (2015)
135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1370 of 1384

may be spotted by a police officer, a private security guard, or a participant in a neighborhood watch program. Or a homeowner ... may give chase, and a violent encounter may ensue." 550 U.S., at 211, 127 S.Ct. 1586. The dissent, by contrast, asserted that any confrontation that occurs during an attempted burglary "is likely to consist of nothing more than the occupant's yelling 'Who's there?' from his window, and the burglar's running away." *598 Id., at 226, 127 S.Ct. 1586 (opinion of SCALIA, J.). The residual clause offers no reliable way to choose between these competing accounts of what "ordinary" attempted burglary involves.

At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction. By asking whether the crime *otherwise* involves conduct that presents a serious potential risk," moreover, the residual clause forces courts to interpret "serious potential risk" in light of the four enumerated crimes —burglary, arson, extortion, and crimes involving the use of explosives. These offenses are "far from clear in respect to the degree of risk each poses." Begay, 553 U.S., at 143, 128 S.Ct. 1581. Does the ordinary burglar invade an occupied home by night or an unoccupied home by day? Does the typical extortionist threaten his victim in person with the use of force, or does he threaten his victim by mail with the revelation of embarrassing personal information? By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates.

[10] This Court has acknowledged that the failure of "persistent efforts ... to establish a standard" can provide evidence of vagueness. United States v. L. Cohen Grocery Co., 255 U.S. 81, 91, 41 S.Ct. 298, 65 L.Ed. 516 (1921). Here, this Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy. Three of the Court's previous four decisions about the clause concentrated on the level of risk posed by the crime in question, though in each case we found it necessary to resort to a different ad hoc test to guide our inquiry. In *James,* we asked whether "the risk posed by attempted burglary is comparable to that posed by its closest analog *599 among the enumerated offenses," namely completed burglary; we concluded that it

was. 550 U.S., at 203, 127 S.Ct. 1586. That rule takes care of attempted burglary, but offers no help at all with respect to the vast majority of offenses, which have no apparent analog among the enumerated crimes. "Is, for example, driving under the influence of alcohol more analogous to burglary, arson, extortion, or a crime involving use of explosives?" Id., at 215, 127 S.Ct. 1586 (SCALIA, J., dissenting).

*Chambers,* our next case to focus on risk, relied principally on a statistical report prepared by the Sentencing Commission to conclude that an offender who fails to report to prison is not "significantly more likely than others to attack, or physically to resist, an apprehender, thereby producing a 'serious potential risk of physical **2559 injury.' " 555 U.S., at 128–129, 129 S.Ct. 687. So much for failure to report to prison, but what about the tens of thousands of federal and state crimes for which no comparable reports exist? And even those studies that are available might suffer from methodological flaws, be skewed toward rarer forms of the crime, or paint widely divergent pictures of the riskiness of the conduct that the crime involves. See Sykes, 564 U.S., at ——– ——, 131 S.Ct., at 2285–2287 (SCALIA, J., dissenting); id., at ——, n. 4, 131 S.Ct., at 2291, n. 4 (KAGAN, J., dissenting).

Our most recent case, *Sykes,* also relied on statistics, though only to "confirm the commonsense conclusion that Indiana's vehicular flight crime is a violent felony." Id., at ——, 131 S.Ct., at 2274 (majority opinion). But common sense is a much less useful criterion than it sounds—as *Sykes* itself illustrates. The Indiana statute involved in that case covered everything from provoking a high-speed car chase to merely failing to stop immediately after seeing a police officer's signal. See id., at ——, 131 S.Ct., at 2289–2290 (KAGAN, J., dissenting). How does common sense help a federal court discern where the "ordinary case" of vehicular flight in Indiana lies along this spectrum? Common sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes; there is no reason to expect it to fare any better with *600 respect to thousands of unenumerated crimes. All in all, *James, Chambers,* and *Sykes* failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition.

Johnson v. U.S., 576 U.S. 591 (2015)

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

The remaining case, *Begay,* which preceded *Chambers* and *Sykes,* took an entirely different approach. The Court held that in order to qualify as a violent felony under the residual clause, a crime must resemble the enumerated offenses "in kind as well as in degree of risk posed." 553 U.S., at 143, 128 S.Ct. 1581. The Court deemed drunk driving insufficiently similar to the listed crimes, because it typically does not involve "purposeful, violent, and aggressive conduct." *Id.,* at 144–145, 128 S.Ct. 1581 (internal quotation marks omitted). Alas, *Begay* did not succeed in bringing clarity to the meaning of the residual clause. It did not (and could not) eliminate the need to imagine the kind of conduct typically involved in a crime. In addition, the enumerated crimes are not much more similar to one another in kind than in degree of risk posed, and the concept of "aggressive conduct" is far from clear. *Sykes* criticized the "purposeful, violent, and aggressive" test as an "addition to the statutory text," explained that "levels of risk" would normally be dispositive, and confined *Begay* to "strict liability, negligence, and recklessness crimes." 564 U.S., at ––––, –––––, 131 S.Ct., at 2275–2276.

The present case, our fifth about the meaning of the residual clause, opens a new front of uncertainty. When deciding whether unlawful possession of a short-barreled shotgun is a violent felony, do we confine our attention to the risk that the shotgun will go off by accident while in someone's possession? Or do we also consider the possibility that the person possessing the shotgun will later use it to commit a crime? The inclusion of burglary and extortion among the enumerated offenses suggests that a crime may qualify under the residual clause even if the physical injury is remote from the criminal act. But how remote is too remote? Once again, the residual clause yields no answers.

**\*601** This Court is not the only one that has had trouble making sense of the residual **\*\*2560** clause. The clause has "created numerous splits among the lower federal courts," where it has proved "nearly impossible to apply consistently." *Chambers,* 555 U.S., at 133, 129 S.Ct. 687 (ALITO, J., concurring in judgment). The most telling feature of the lower courts' decisions is not division about whether the residual clause covers this or that crime (even clear laws produce close cases); it is, rather, pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider. Some judges have concluded that deciding whether conspiracy is a violent felony requires evaluating only the dangers posed by the

"simple act of agreeing [to commit a crime]," *United States v. Whitson,* 597 F.3d 1218, 1222 (C.A.11 2010) (*per curiam* ); others have also considered the probability that the agreement will be carried out, *United States v. White,* 571 F.3d 365, 370–371 (C.A.4 2009). Some judges have assumed that the battery of a police officer (defined to include the slightest touching) could "explode into violence and result in physical injury," *United States v. Williams,* 559 F.3d 1143, 1149 (C.A.10 2009); others have felt that it "do[es] a great disservice to law enforcement officers" to assume that they would "explod[e] into violence" rather than "rely on their training and experience to determine the best method of responding," *United States v. Carthorne,* 726 F.3d 503, 514 (C.A.4 2013). Some judges considering whether statutory rape qualifies as a violent felony have concentrated on cases involving a perpetrator much older than the victim, *United States v. Daye,* 571 F.3d 225, 230–231 (C.A.2 2009); others have tried to account for the possibility that "the perpetrator and the victim [might be] close in age," *United States v. McDonald,* 592 F.3d 808, 815 (C.A.7 2010). Disagreements like these go well beyond disputes over matters of degree.

It has been said that the life of the law is experience. Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a **\*602** failed enterprise. Each of the uncertainties in the residual clause may be tolerable in isolation, but "their sum makes a task for us which at best could be only guesswork." *United States v. Evans,* 333 U.S. 483, 495, 68 S.Ct. 634, 92 L.Ed. 823 (1948). Invoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process.

B

The Government and the dissent claim that there will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury to another. See *post,* at 2562 – 2563 (opinion of ALITO, J.). True enough, though we think many of the cases the Government and the dissent deem easy turn out not to be so easy after all. Consider just one of the Government's examples, Connecticut's offense of "rioting at a correctional institution." See *United States v. Johnson,* 616 F.3d 85 (C.A.2 2010). That certainly sounds like a violent felony—

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1372 of 1384

Johnson v. U.S., 576 U.S. 591 (2015)
135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

until one realizes that Connecticut defines this offense to include taking part in "any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations" of the prison. Conn. Gen.Stat. § 53a–179b(a) (2012). Who is to say which the ordinary "disorder" most closely resembles—a full-fledged prison riot, a food-fight in the prison cafeteria, or a "passive and nonviolent [act] such as disregarding an order to move," 🚩 *Johnson,* 616 F.3d, at 95 (Parker, J., dissenting)?

[11]    In all events, although statements in some of our opinions could be read to **2561 suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. 📑 ***603 L. Cohen Grocery Co.,* 255 U.S., at 89, 41 S.Ct. 298.** We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"—even though spitting in someone's face would surely be annoying. 📑 *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). These decisions refute any suggestion that the existence of *some* obviously risky crimes establishes the residual clause's constitutionality.

Resisting the force of these decisions, the dissent insists that "a statute is void for vagueness only if it is vague in all its applications." *Post,* at 2574. It claims that the prohibition of unjust or unreasonable rates in *L. Cohen Grocery* was "vague in all applications," even though one can easily envision rates so high that they are unreasonable by any measure. *Post,* at 2582. It seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality). If the existence of some clearly unreasonable rates would not save the law in *L. Cohen Grocery,* why should the existence of some clearly risky crimes save the residual clause?

[12]    The Government and the dissent next point out that dozens of federal and state criminal laws use terms like "substantial risk," "grave risk," and "unreasonable risk," suggesting that to hold the residual clause unconstitutional is to place these provisions in constitutional doubt. See *post,* at 2558 – 2559. Not at all. Almost none of the cited laws

links a phrase such as "substantial risk" to a confusing list of examples. "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue,* or colors that otherwise involve shades of red' assuredly does so." 🚩 *James,* 550 U.S., at 230, n. 7, 127 S.Ct. 1586 (SCALIA, J., dissenting). More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion.* As a general matter, we do not **604 doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly ... some matter of degree," 📑 *Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). The residual clause, however, requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect," this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts." 📑 *International Harvester Co. of America v. Kentucky,* 234 U.S. 216, 223, 34 S.Ct. 853, 58 L.Ed. 1284 (1914).

[13]    Finally, the dissent urges us to save the residual clause from vagueness by interpreting it to refer to the risk posed by the particular conduct in which the defendant engaged, not the risk posed by the ordinary case of the defendant's crime. **2562 See *post,* at 2578 – 2580. In other words, the dissent suggests that we jettison for the residual clause (though not for the enumerated crimes) the categorical approach adopted in 📑 *Taylor,* see 495 U.S., at 599–602, 110 S.Ct. 2143, and reaffirmed in each of our four residual-clause cases, see 🚩 *James,* 550 U.S., at 202, 127 S.Ct. 1586; 🚩 *Begay,* 553 U.S., at 141, 128 S.Ct. 1581; 🚩 *Chambers,* 555 U.S., at 125, 129 S.Ct. 687; 🚩 *Sykes,* 564 U.S., ——, 131 S.Ct., at 2272–2273. We decline the dissent's invitation. In the first place, the Government has not asked us to abandon the categorical approach in residual-clause cases. In addition, *Taylor* had good reasons to adopt the categorical approach, reasons that apply no less to the residual clause than to the enumerated crimes. *Taylor* explained that the relevant part of the Armed Career Criminal Act "refers to 'a person who ... has three previous convictions' for—not a person who has committed—three previous violent felonies

Johnson v. U.S., 576 U.S. 591 (2015)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1373 of 1384

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

or drug offenses." 495 U.S., at 600, 110 S.Ct. 2143. This emphasis on convictions indicates that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the **\*605** facts underlying the prior convictions." *Ibid. Taylor* also pointed out the utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction. For example, if the original conviction rested on a guilty plea, no record of the underlying facts may be available. "[T]he only plausible interpretation" of the law, therefore, requires use of the categorical approach. *Id.,* at 602, 110 S.Ct. 2143.

### C

That brings us to *stare decisis.* This is the first case in which the Court has received briefing and heard argument from the parties about whether the residual clause is void for vagueness. In *James,* however, the Court stated in a footnote that it was "not persuaded by [the principal dissent's] suggestion ... that the residual provision is unconstitutionally vague." 550 U.S., at 210, n. 6, 127 S.Ct. 1586. In *Sykes,* the Court again rejected a dissenting opinion's claim of vagueness. 564 U.S., at ——— – ———, 131 S.Ct., at 2276–2277.

[14]    The doctrine of *stare decisis* allows us to revisit an earlier decision where experience with its application reveals that it is unworkable. *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Experience is all the more instructive when the decision in question rejected a claim of unconstitutional vagueness. Unlike other judicial mistakes that need correction, the error of having rejected a vagueness challenge manifests itself precisely in subsequent judicial decisions: the inability of later opinions to impart the predictability that the earlier opinion forecast. Here, the experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause. Even after *Sykes* tried to clarify the residual clause's meaning, the provision remains a "judicial morass that defies systemic solution," "a black hole of confusion and uncertainty" that frustrates any effort to impart "some sense of order and direction." *United States v. Vann,* 660 F.3d 771, 787 (C.A.4 2011) (Agee, J., concurring).

[15]    [16]    **\*606** This Court's cases make plain that even decisions rendered after full adversarial presentation may have to yield to the lessons of subsequent experience. See, *e.g., United States v. Dixon,* 509 U.S. 688, 711, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); *Payne,* 501 U.S., at 828–830, 111 S.Ct. 2597 (1991). But *James* and *Sykes* opined about vagueness without full briefing **\*\*2563** or argument on that issue—a circumstance that leaves us "less constrained to follow precedent," *Hohn v. United States,* 524 U.S. 236, 251, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998). The brief discussions of vagueness in *James* and *Sykes* homed in on the imprecision of the phrase "serious potential risk"; neither opinion evaluated the uncertainty introduced by the need to evaluate the riskiness of an abstract ordinary case of a crime. 550 U.S., at 210, n. 6, 127 S.Ct. 1586, 564 U.S., at ——, 131 S.Ct., at 2276–2277. And departing from those decisions does not raise any concerns about upsetting private reliance interests.

[17]    Although it is a vital rule of judicial self-government, *stare decisis* does not matter for its own sake. It matters because it "promotes the evenhanded, predictable, and consistent development of legal principles." *Payne, supra,* at 827, 111 S.Ct. 2597. Decisions under the residual clause have proved to be anything but evenhanded, predictable, or consistent. Standing by *James* and *Sykes* would undermine, rather than promote, the goals that *stare decisis* is meant to serve.

\* \* \*

We hold that imposing an increased sentence under the residual clause of the Armed Career Criminal Act violates the Constitution's guarantee of due process. Our contrary holdings in *James* and *Sykes* are overruled. Today's decision does not call into question application of the Act to the four enumerated offenses, or the remainder of the Act's definition of a violent felony.

We reverse the judgment of the Court of Appeals for the Eighth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice KENNEDY, concurring in the judgment.

**\*607** In my view, and for the reasons well stated by Justice ALITO in dissent, the residual clause of the Armed Career Criminal Act is not unconstitutionally vague under the categorical approach or a record-based approach. On the assumption that the categorical approach ought to still control, and for the reasons given by Justice THOMAS in Part I of his opinion concurring in the judgment, Johnson's conviction for possession of a short-barreled shotgun does not qualify as a violent felony.

For these reasons, I concur in the judgment.

Justice THOMAS, concurring in the judgment.
I agree with the Court that Johnson's sentence cannot stand. But rather than use the Fifth Amendment's Due Process Clause to nullify an Act of Congress, I would resolve this case on more ordinary grounds. Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA).

The majority wants more. Not content to engage in the usual business of interpreting statutes, it holds this clause to be unconstitutionally vague, notwithstanding the fact that on four previous occasions we found it determinate enough for judicial application. As Justice ALITO explains, that decision cannot be reconciled with our precedents concerning the vagueness doctrine. See *post,* at 2580 – 2581 (dissenting opinion). But even if it were a closer case under those decisions, I would be wary of holding the residual clause to be unconstitutionally vague. Although I have joined the Court in applying our modern vagueness **\*\*2564** doctrine in the past, see *FCC v. Fox Television Stations, Inc.,* 567 U.S. ——, —— – ——, 132 S.Ct. 2307, 2319–2320, 183 L.Ed.2d 234 (2012), I have become increasingly concerned about its origins and application. Simply put, our vagueness doctrine shares an uncomfortably similar history with substantive **\*608** due process, a judicially created doctrine lacking any basis in the Constitution.

I

We could have easily disposed of this case without nullifying ACCA's residual clause. Under ordinary principles of statutory interpretation, the crime of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under ACCA. In relevant part, that Act defines a "violent felony" as a "crime punishable by imprisonment for a term exceeding one year" that either

"(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

"(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B).

The offense of unlawfully possessing a short-barreled shotgun neither satisfies the first clause of this definition nor falls within the enumerated offenses in the second. It therefore can constitute a violent felony only if it falls within ACCA's so-called "residual clause"—*i.e.,* if it "involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii).

To determine whether an offense falls within the residual clause, we consider "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James v. United States,* 550 U.S. 192, 208, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007). The specific crimes listed in § 924(e)(2)(B)(ii)—arson, extortion, burglary, and an offense involving the use of explosives—offer a "baseline against which to measure the degree of risk" a crime must present to fall within that clause. *Id.,* at 208, 127 S.Ct. 1586. Those offenses do not provide a high threshold, see *id.,* at 203, 207–208, 127 S.Ct. 1586, but the crime in question must still present a " 'serious **\*609** ' "—a " 'significant' or 'important' "—risk of physical injury to be deemed a violent felony, *Begay v. United States,* 553 U.S. 137, 156, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008) (ALITO, J., dissenting); accord, *Chambers v. United States,* 555 U.S. 122, 128, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009).

To qualify as serious, the risk of injury generally must be closely related to the offense itself. Our precedents provide useful examples of the close relationship that must exist between the conduct of the offense and the risk presented. In *Sykes v. United States,* 564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011), for instance, we held that the offense of intentional vehicular flight constitutes a violent felony because that conduct always triggers a dangerous

Johnson v. U.S., 576 U.S. 591 (2015)

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

confrontation," 🚩 *id., at ——, 131 S.Ct., at 2274.* As we explained, vehicular flights "by definitional necessity occur when police are present" and are done "in defiance of their instructions ... with a vehicle that can be used in a way to cause serious potential risk of physical injury to another." *Ibid.* In *James,* we likewise held that attempted burglary offenses "requir[ing] an overt act directed toward the entry of a structure" are violent felonies because the underlying conduct often results in a dangerous confrontation. 🚩 *550 U.S., at 204, 206, 127 S.Ct. 1586.* But we distinguished those crimes from "the more **\*\*2565** attenuated conduct encompassed by" attempt offenses "that c[an] be satisfied by preparatory conduct that does not pose the same risk of violent confrontation," such as " 'possessing burglary tools.' " 🚩 *Id., at 205, 206, and n. 4, 127 S.Ct. 1586.* At some point, in other words, the risk of injury from the crime may be too attenuated for the conviction to fall within the residual clause, such as when an additional, voluntary act (*e.g.,* the *use* of burglary tools to enter a structure) is necessary to bring about the risk of physical injury to another.

In light of the elements of and reported convictions for the unlawful possession of a short-barreled shotgun, this crime does not "involv[e] conduct that presents a serious potential risk of physical injury to another," § 924(e)(2)(B)(ii). The acts that form the basis of this offense are simply too remote from a risk of physical injury to fall within the residual clause.

**\*610** Standing alone, the elements of this offense—(1) unlawfully (2) possessing (3) a short-barreled shotgun—do not describe inherently dangerous conduct. As a conceptual matter, "simple possession [of a firearm], even by a felon, takes place in a variety of ways (*e.g.,* in a closet, in a storeroom, in a car, in a pocket) many, perhaps most, of which do not involve likely accompanying violence." *United States v. Doe, 960 F.2d 221, 225 (C.A.1 1992).* These weapons also can be stored in a manner posing a danger to no one, such as unloaded, disassembled, or locked away. By themselves, the elements of this offense indicate that the ordinary commission of this crime is far less risky than ACCA's enumerated offenses.

Reported convictions support the conclusion that mere possession of a short-barreled shotgun does not, in the ordinary case, pose a serious risk of injury to others. A few examples suffice. In one case, officers found the sawed-off shotgun locked inside a gun cabinet in an empty home.

*State v. Salyers, 858 N.W.2d 156, 157–158 (Minn.2015).* In another, the firearm was retrieved from the trunk of the defendant's car. *State v. Ellenberger, 543 N.W.2d 673, 674 (Minn.App.1996).* In still another, the weapon was found missing a firing pin. *State v. Johnson, 171 Wis.2d 175, 178, 491 N.W.2d 110, 111 (App.1992).* In these instances and others, the offense threatened no one.

The Government's theory for why this crime should nonetheless qualify as a "violent felony" is unpersuasive. Although it does not dispute that the unlawful possession of a short-barreled shotgun can occur in a nondangerous manner, the Government contends that this offense poses a serious risk of physical injury due to the connection between short-barreled shotguns and other serious crimes. As the Government explains, these firearms are "weapons not typically possessed by law-abiding citizens for lawful purposes," *District of Columbia v. Heller, 554 U.S. 570, 625, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008),* but **\*611** are instead primarily intended for use in criminal activity. In light of that intended use, the Government reasons that the ordinary case of this possession offense will involve the *use* of a short-barreled shotgun in a serious crime, a scenario obviously posing a serious risk of physical injury.

But even assuming that those who unlawfully possess these weapons typically intend to use them in a serious crime, the risk that the Government identifies arises not from the act of possessing the weapon, but from the act of using it. Unlike attempted burglary (at least of the type at issue in *James* ) or intentional vehicular flight—conduct that by itself often or always invites a dangerous confrontation—possession of a short-barreled shotgun poses a threat *only* when an offender decides **\*\*2566** to engage in additional, voluntary conduct that is not included in the elements of the crime. Until this weapon is assembled, loaded, or used, for example, it poses no risk of injury to others in and of itself. The risk of injury to others from mere possession of this firearm is too attenuated to treat this offense as a violent felony. I would reverse the Court of Appeals on that basis.

II

As the foregoing analysis demonstrates, ACCA's residual clause can be applied in a principled manner. One would have thought this proposition well established given that we have already decided four cases addressing this clause.

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1376 of 1384

Johnson v. U.S., 576 U.S. 591 (2015)

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

The majority nonetheless concludes that the operation of this provision violates the Fifth Amendment's Due Process Clause.

Justice ALITO shows why that analysis is wrong under our precedents. See *post,* at 2580 – 2583 (dissenting opinion). But I have some concerns about our modern vagueness doctrine itself. Whether that doctrine is defensible under the original meaning of "due process of law" is a difficult question I leave for the another day, but the doctrine's history should **\*612** prompt us at least to examine its constitutional underpinnings more closely before we use it to nullify yet another duly enacted law.

A

We have become accustomed to using the Due Process Clauses to invalidate laws on the ground of "vagueness." The doctrine we have developed is quite sweeping: "A statute can be impermissibly vague ... if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." 🚩 *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Using this framework, we have nullified a wide range of enactments. We have struck down laws ranging from city ordinances, 🚩 *Papachristou v. Jacksonville,* 405 U.S. 156, 165–171, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), to Acts of Congress, 🚩 *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89–93, 41 S.Ct. 298, 65 L.Ed. 516 (1921). We have struck down laws whether they are penal, 🚩 *Lanzetta v. New Jersey,* 306 U.S. 451, 452, 458, 59 S.Ct. 618, 83 L.Ed. 888 (1939), or not, 🚩 *Keyishian v. Board of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 597–604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).[1] We have struck down laws addressing subjects ranging from abortion, 🚩 *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), and obscenity, 🚩 *Winters v. New York,* 333 U.S. 507, 517–520, 68 S.Ct. 665, 92 L.Ed. 840 (1948), to the minimum wage, 🚩 *Connally v. General Constr. Co.,* 269 U.S. 385, 390–395, 46 S.Ct. 126, 70 L.Ed. 322 (1926), and antitrust, 🚩 **\*613** *Cline v. Frink Dairy Co.,* 274 U.S. 445, 453–465, 47 S.Ct. 681, 71 L.Ed. 1146 (1927). We have even struck down a **\*\*2567** law using a term that has been used

to describe criminal conduct in this country since before the Constitution was ratified. 🚩 *Chicago v. Morales,* 527 U.S. 41, 51, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (invalidating a "loitering" law); see 🚩 *id.,* at 113, and n. 10, 119 S.Ct. 1849 (THOMAS, J., dissenting) (discussing a 1764 Georgia law requiring the apprehension of "all able bodied persons ... who shall be found loitering").

That we have repeatedly used a doctrine to invalidate laws does not make it legitimate. Cf., *e.g.,* 🚩 *Dred Scott v. Sandford,* 19 How. 393, 450–452, 15 L.Ed. 691 (1857) (stating that an Act of Congress prohibiting slavery in certain Federal Territories violated the substantive due process rights of slaveowners and was therefore void). This Court has a history of wielding doctrines purportedly rooted in "due process of law" to achieve its own policy goals, substantive due process being the poster child. See 🚩 *McDonald v. Chicago,* 561 U.S. 742, 811, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment) ("The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not"). Although our vagueness doctrine is distinct from substantive due process, their histories have disquieting parallels.

1

The problem of vague penal statutes is nothing new. The notion that such laws may be void under the Constitution's Due Process Clauses, however, is a more recent development.

Before the end of the 19th century, courts addressed vagueness through a rule of strict construction of penal statutes, not a rule of constitutional law. This rule of construction—better known today as the rule of lenity—first emerged in 16th-century England in reaction to Parliament's practice of making large swaths of crimes capital offenses, **\*614** though it did not gain broad acceptance until the following century. See Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 749–751 (1935); see also 1 L. Radzinowicz, A History of English Criminal Law and Its Administration From 1750, pp. 10–11 (1948) (noting that some of the following crimes triggered the death penalty: "marking the edges of any current coin of the kingdom," "maliciously cutting any hop-binds growing on poles in any

Johnson v. U.S., 576 U.S. 591 (2015)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1377 of 1384

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

plantation of hops," and "being in the company of gypsies"). Courts relied on this rule of construction in refusing to apply vague capital-offense statutes to prosecutions before them. As an example of this rule, William Blackstone described a notable instance in which an English statute imposing the death penalty on anyone convicted of "stealing sheep, *or other cattle* " was "held to extend to nothing but mere sheep" as "th[e] general words, 'or other cattle,' [were] looked upon as much too loose to create a capital offence." 1 Commentaries on the Laws of England 88 (1765). [2]

Vague statutes surfaced on this side of the Atlantic as well. Shortly after the First Congress proposed the Bill of Rights, for instance, it passed a law providing **2568 "[t]hat every person who shall attempt to trade with the Indian tribes, or be found in the Indian country with such merchandise in his possession as are usually vended to the Indians, without a license," must forfeit the offending goods. Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137–138. At first glance, punishing the unlicensed possession of "merchandise ... usually vended to the Indians," *ibid.,* would seem far more likely to "invit[e] *615 arbitrary enforcement," *ante,* at 2557, than does the residual clause.

But rather than strike down arguably vague laws under the Fifth Amendment Due Process Clause, antebellum American courts—like their English predecessors—simply refused to apply them in individual cases under the rule that penal statutes should be construed strictly. See, *e.g., United States v. Sharp,* 27 F.Cas. 1041 (No. 16,264) (C.C.Pa. 1815) (Washington, J.). In *Sharp,* for instance, several defendants charged with violating an Act rendering it a capital offense for "any seaman" to "make a revolt in [a] ship," Act of Apr. 30, 1790, § 8, 1 Stat. 114, objected that "the offence of making a revolt, [wa]s not sufficiently defined by this law, or by any other standard, to which reference could be safely made; to warrant the court in passing a sentence upon [them]." 27 F.Cas., at 1043. Justice Washington, riding circuit, apparently agreed, observing that the common definitions for the phrase "make a revolt" were "so multifarious, and so different" that he could not "avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men, and that too of a capital nature." *Ibid*. Remarking that "[l]aws which create crimes, ought to be so explicit in themselves, or by reference to some other standard, that all men, subject to their penalties, may know what acts it is their duty to avoid," he refused to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." *Ibid*.

Such analysis does not mean that federal courts believed they had the power to invalidate vague penal laws as unconstitutional. Indeed, there is good evidence that courts at the time understood judicial review to consist "of a refusal to give a statute effect as operative law in resolving a case," a notion quite distinct from our modern practice of " 'strik[ing] down' legislation." Walsh, Partial Unconstitutionality, 85 N.Y.U. L. Rev. 738, 756 (2010). The process of refusing *616 to apply such laws appeared to occur on a case-by-case basis. For instance, notwithstanding his doubts expressed in *Sharp,* Justice Washington, writing for this Court, later rejected the argument that lower courts could arrest a judgment under the same ship-revolt statute because it "does not define the offence of endeavouring to make a revolt." *United States v. Kelly,* 11 Wheat. 417, 418, 6 L.Ed. 508 (1826). The Court explained that "it is ... competent to the Court to give a judicial definition" of "the offence of endeavouring to make a revolt," and that such definition "consists in the endeavour of the crew of a vessel, or any one or more of them, to overthrow the legitimate authority of her commander, with intent to remove him from his command, or against his will to take possession of the vessel by assuming the government and navigation of her, or by transferring their obedience from the lawful commander to some other person." *Id.,* at 418–419. In dealing with statutory indeterminacy, federal courts saw themselves engaged in construction, not judicial review as it is now understood. [3]

**2569 2

Although vagueness concerns played a role in the strict construction of penal statutes from early on, there is little *617 indication that anyone before the late 19th century believed that courts had the power under the Due Process Clauses to nullify statutes on that ground. Instead, our modern vagueness doctrine materialized after the rise of substantive due process. Following the ratification of the Fourteenth Amendment, corporations began to use that Amendment's Due Process Clause to challenge state laws that attached penalties to unauthorized commercial conduct. In addition to claiming that these laws violated their substantive due process rights, these litigants began—with some success—to contend that such laws were unconstitutionally indefinite. In one case, a railroad company challenged a Tennessee law authorizing penalties against any railroad that demanded "more than a just and reasonable compensation" or engaged in "unjust and unreasonable discrimination" in setting its rates. *Louisville*

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

*& Nashville R. Co. v. Railroad Comm'n of Tenn.,* 19 F. 679, 690 (C.C.M.D.Tenn.1884) (internal quotation marks deleted). Without specifying the constitutional authority for its holding, the Circuit Court concluded that "[n]o citizen ... can be constitutionally subjected to penalties and despoiled of his property, in a criminal or quasi criminal proceeding, under and by force of such indefinite legislation." *Id.,* at 693 (emphasis deleted).

Justice Brewer—widely recognized as "a leading spokesman for 'substantized' due process," Gamer, Justice Brewer and Substantive Due Process: A Conservative Court Revisited, 18 Vand. L. Rev. 615, 627 (1965)—employed similar reasoning while riding circuit, though he did not identify the constitutional source of judicial authority to nullify vague laws. In reviewing an Iowa law authorizing fines against railroads for charging more than a "reasonable and just" rate, Justice Brewer mentioned in dictum that "no penal law can be sustained unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it." *Chicago & N.W.R. Co. v. Dey,* 35 F. 866, 876 (C.C.S.D.Iowa 1888).

**\*618** Constitutional vagueness challenges in this Court initially met with some resistance. Although the Court appeared to acknowledge the possibility of unconstitutionally indefinite enactments, it repeatedly rejected vagueness challenges to penal laws addressing railroad rates, *Railroad Comm'n Cases,* 116 U.S. 307, 336–337, 6 S.Ct. 1191, 29 L.Ed. 636 (1886), liquor sales, *Ohio ex rel. Lloyd v. Dollison,* 194 U.S. 445, 450–451, 24 S.Ct. 703, 48 L.Ed. 1062 (1904), and anticompetitive conduct, *Nash v. United States,* 229 U.S. 373, 376–378, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); *Waters–Pierce Oil Co. v. Texas (No. 1),* 212 U.S. 86, 108–111, 29 S.Ct. 220, 53 L.Ed. 417 (1909).

**\*\*2570** In 1914, however, the Court nullified a law on vagueness grounds under the Due Process Clause for the first time. In *International Harvester Co. of America v. Kentucky,* 234 U.S. 216, 34 S.Ct. 853, 58 L.Ed. 1284 (1914), a tobacco company brought a Fourteenth Amendment challenge against several Kentucky antitrust laws that had been construed to render unlawful "any combination [made] ... for the purpose or with the effect of fixing a price that was greater or less than the real value of the article," *id.,* at 221, 34 S.Ct. 853. The company argued that by referring to "real value," the laws provided "no standard of

conduct that it is possible to know." *Ibid.* The Court agreed. *Id.,* at 223–224, 34 S.Ct. 853. Although it did not specify in that case which portion of the Fourteenth Amendment served as the basis for its holding, *ibid.,* it explained in a related case that the lack of a knowable standard of conduct in the Kentucky statutes "violated the fundamental principles of justice embraced in the conception of due process of law." *Collins v. Kentucky,* 234 U.S. 634, 638, 34 S.Ct. 924, 58 L.Ed. 1510 (1914).

3

Since that time, the Court's application of its vagueness doctrine has largely mirrored its application of substantive due process. During the *Lochner* era, a period marked by the use of substantive due process to strike down economic regulations, *e.g.,* *Lochner v. New York,* 198 U.S. 45, 57, 25 S.Ct. 539, 49 L.Ed. 937 (1905), the Court frequently used the vagueness doctrine to invalidate economic regulations penalizing commercial activity **\*619** .[4] Among the penal laws it found to be impermissibly vague were a state law regulating the production of crude oil, *Champlin Refining Co. v. Corporation Comm'n of Okla.,* 286 U.S. 210, 242–243, 52 S.Ct. 559, 76 L.Ed. 1062 (1932), a state antitrust law, *Cline,* 274 U.S., at 453–465, 47 S.Ct. 681, a state minimum-wage law, *Connally,* 269 U.S., at 390–395, 46 S.Ct. 126, and a federal price-control statute, *L. Cohen Grocery Co.,* 255 U.S., at 89–93, 41 S.Ct. 298.[5]

**\*\*2571** Around the time the Court began shifting the focus of its substantive due process (and equal protection) jurisprudence from economic interests to "discrete and insular minorities," see **\*620** *United States v. Carolene Products Co.,* 304 U.S. 144, 153, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), the target of its vagueness doctrine changed as well. The Court began to use the vagueness doctrine to invalidate noneconomic regulations, such as state statutes penalizing obscenity, *Winters,* 333 U.S., at 517–520, 68 S.Ct. 665, and membership in a gang, *Lanzetta,* 306 U.S., at 458, 59 S.Ct. 618.

Successful vagueness challenges to regulations penalizing commercial conduct, by contrast, largely fell by the

AR.05219

Johnson v. U.S., 576 U.S. 591 (2015)

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1379 of 1384

wayside. The Court, for instance, upheld a federal regulation punishing the knowing violation of an order instructing drivers transporting dangerous chemicals to " 'avoid, so far as practicable ... driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings,' "

🔖 *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 338–339, 343, 72 S.Ct. 329, 96 L.Ed. 367 (1952). And notwithstanding its earlier conclusion that an Oklahoma law requiring state employees and contractors to be paid " 'not less than the current rate of per diem wages in the locality where the work is performed' " was unconstitutionally vague, 🔖 *Connally, supra,* at 393, 46 S.Ct. 126, the Court found sufficiently definite a federal law forbidding radio broadcasting companies from attempting to compel by threat or duress a licensee to hire " 'persons in excess of the number of employees needed by such licensee to perform actual services,' " 🔖 *United States v. Petrillo,* 332 U.S. 1, 3, 6–7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).

In more recent times, the Court's substantive due process jurisprudence has focused on abortions, and our vagueness doctrine has played a correspondingly significant role. In fact, our vagueness doctrine served as the basis for the first draft of the majority opinion in 🔖 *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), on the theory that laws prohibiting all abortions save for those done "for the purpose of saving the life of the mother" forced abortionists to guess when this exception would apply on penalty of conviction. See B. Schwartz, The Unpublished Opinions of the Burger Court 116–118 (1988) (reprinting first draft of *Roe* ). *Roe,* of course, turned out to be a substantive due process opinion. See 🔖 410 U.S., at 164, 93 S.Ct. 705. **\*621** But since then, the Court has repeatedly deployed the vagueness doctrine to nullify even mild regulations of the abortion industry. See 🚩 *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 451–452, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (nullifying law requiring " 'that the remains of the unborn child [be] disposed of in a humane and sanitary manner' "); 🔖 *Colautti,* 439 U.S., at 381, 99 S.Ct. 675 (nullifying law mandating abortionists adhere to a prescribed standard of care if "there is 'sufficient reason to believe that the fetus may be viable' "). [6]

**\*\*2572** In one of our most recent decisions nullifying a law on vagueness grounds, substantive due process was

again lurking in the background. In *Morales,* a plurality of this Court insisted that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the 🔖 Due Process Clause of the Fourteenth Amendment," 527 U.S., at 53, 119 S.Ct. 1849, a conclusion that colored its analysis that an ordinance prohibiting loitering was unconstitutionally indeterminate, see 🔖 *id.,* at 55, 119 S.Ct. 1849 ("When vagueness permeates the text of" a penal law "infring[ing] on constitutionally protected rights," "it is subject to facial attack").

I find this history unsettling. It has long been understood that one of the problems with holding a statute "void for 'indefiniteness' " is that " 'indefiniteness' ... is itself an indefinite concept," 🔖 *Winters, supra,* at 524, 68 S.Ct. 665 (Frankfurter, J., dissenting), and we as a Court have a bad habit of using indefinite concepts—especially ones rooted in "due process"—to invalidate democratically enacted laws.

### *\*622* B

It is also not clear that our vagueness doctrine can be reconciled with the original understanding of the term "due process of law." Our traditional justification for this doctrine has been the need for notice: "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited." 🔖 *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); accord, *ante,* at 2564. Presumably, that justification rests on the view expressed in 🔖 *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272, 15 L.Ed. 372 (1856), that "due process of law" constrains the legislative branch by guaranteeing "usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country," 🔖 *id.,* at 277. That justification assumes further that providing "a person of ordinary intelligence [with] fair notice of what is prohibited," 🔖 *Williams, supra,* at 304, 128 S.Ct. 1830, is one such usage or mode. [7]

*\*623* To accept the vagueness doctrine as founded in our Constitution, then, one must reject the possibility "that the

Johnson v. U.S., 576 U.S. 591 (2015)

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

Due Process Clause requires only that our Government must proceed according to the 'law of the land'—that is, according to **\*\*2573** written constitutional and statutory provisions," which may be all that the original meaning of this provision demands. 🔖 *Hamdi v. Rumsfeld,* 542 U.S. 507, 589, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (THOMAS, J., dissenting) (some internal quotation marks omitted); accord, 🔖 *Turner v. Rogers,* 564 U.S. ——, ——, 131 S.Ct. 2507, 2521, 180 L.Ed.2d 452 (2011) (THOMAS, J., dissenting). Although 🔖 *Murray's Lessee* stated the contrary, 18 How., at 276, a number of scholars and jurists have concluded that " 'considerable historical evidence supports the position that 'due process of law' was a separation-of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law." D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 272 (1985); see also, *e.g.,* 🔖 *In re Winship,* 397 U.S. 358, 378–382, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Black, J., dissenting). Others have disagreed. See, *e.g.,* Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L.J. 1672, 1679 (2012) (arguing that, as originally understood, "the principle of due process" required, among other things, that "statutes that purported to empower the other branches to deprive persons of rights without adequate procedural guarantees [be] subject to judicial review").

I need not choose between these two understandings of "due process of law" in this case. Justice ALITO explains why the majority's decision is wrong even under our precedents. See *post,* at 2580 – 2583 (dissenting opinion). And more generally, I adhere to the view that " '[i]f any fool would know that a particular category of conduct would be within the reach of the statute, if there is an unmistakable core that a reasonable person would know is forbidden by the law, the enactment is not unconstitutional on its face,' " 🔖 *Morales, supra,* at 112, 119 S.Ct. 1849 (THOMAS, J., dissenting), and there is no question that ACCA's residual clause meets that description, see **\*624** *ante,* at 2568 (agreeing with the Government that "there will be straightforward cases under the residual clause").

\* \* \*

I have no love for our residual clause jurisprudence: As I observed when we first got into this business, the Sixth Amendment problem with allowing district courts to conduct factfinding to determine whether an offense is a "violent felony" made our attempt to construe the residual clause " 'an unnecessary exercise.' " 🔖 *James,* 550 U.S., at 231, 127 S.Ct. 1586 (THOMAS, J., dissenting). But the Court rejected my argument, choosing instead to begin that unnecessary exercise. I see no principled way that, four cases later, the Court can now declare that the residual clause has become too indeterminate to apply. Having damaged the residual clause through our misguided jurisprudence, we have no right to send this provision back to Congress and ask for a new one. I cannot join the Court in using the Due Process Clause to nullify an Act of Congress that contains an unmistakable core of forbidden conduct, and I concur only in its judgment.

Justice ALITO, dissenting.

The Court is tired of the Armed Career Criminal Act of 1984 (ACCA) and in particular its residual clause. Anxious to rid our docket of bothersome residual clause cases, the Court is willing to do what it takes to get the job done. So brushing aside *stare decisis,* the Court holds that the residual clause is unconstitutionally vague even though we have twice rejected that very argument within the last eight years. The canons of interpretation get no greater respect. Inverting the canon that **\*\*2574** a statute should be construed if possible to avoid unconstitutionality, the Court rejects a reasonable construction of the residual clause that would avoid any vagueness problems, preferring an alternative that the Court finds to be unconstitutionally vague. And the Court is not stopped by the well-established rule that a statute is **\*625** void for vagueness only if it is vague in all its applications. While conceding that some applications of the residual clause are straightforward, the Court holds that the clause is now void in its entirety. The Court's determination to be done with residual clause cases, if not its fidelity to legal principles, is impressive.

I

A

Petitioner Samuel Johnson (unlike his famous namesake) has led a life of crime and violence. His presentence investigation report sets out a résumé of petty and serious crimes, beginning when he was 12 years old. Johnson's adult record includes convictions for, among other things, robbery, attempted

Johnson v. U.S., 576 U.S. 591 (2015)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1381 of 1384

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

robbery, illegal possession of a sawed-off shotgun, and a drug offense.

In 2010, the Federal Bureau of Investigation (FBI) began monitoring Johnson because of his involvement with the National Socialist Movement, a white-supremacist organization suspected of plotting acts of terrorism. In June of that year, Johnson left the group and formed his own radical organization, the Aryan Liberation Movement, which he planned to finance by counterfeiting United States currency. In the course of the Government's investigation, Johnson "disclosed to undercover FBI agents that he manufactured napalm, silencers, and other explosives for" his new organization. 526 Fed.Appx. 708, 709 (C.A.8 2013) (*per curiam* ). He also showed the agents an AK–47 rifle, a semiautomatic rifle, a semiautomatic pistol, and a cache of approximately 1,100 rounds of ammunition. Later, Johnson told an undercover agent: "You know I'd love to assassinate some ... hoodrats as much as the next guy, but I think we really got to stick with high priority targets." Revised Presentence Investigation Report (PSR) ¶ 15. Among the top targets that he mentioned were "the Mexican consulate," "progressive bookstores," and individuals he viewed as "liberals." PSR ¶ 16.

**\*626** In April 2012, Johnson was arrested, and he was subsequently indicted on four counts of possession of a firearm by a felon and two counts of possession of ammunition by a felon, in violation of 18 U.S.C. §§ 922(g) and § 924(e). He pleaded guilty to one of the firearms counts, and the District Court sentenced him to the statutory minimum of 15 years' imprisonment under ACCA, based on his prior felony convictions for robbery, attempted robbery, and illegal possession of a sawed-off shotgun.

B

ACCA provides a mandatory minimum sentence for certain violations of § 922(g), which prohibits the shipment, transportation, or possession of firearms or ammunition by convicted felons, persons previously committed to a mental institution, and certain others. Federal law normally provides a maximum sentence of 10 years' imprisonment for such crimes. See § 924(a)(2). Under ACCA, however, if a defendant convicted under § 922(g) has three prior convictions "for a violent felony or a serious drug offense,"

the sentencing court must impose a sentence of at least 15 years' imprisonment. § 924(e)(1).

ACCA's definition of a "violent felony" has three parts. First, a felony qualifies if it "has as an element the use, attempted use, or threatened use of physical force **\*\*2575** against the person of another." § 924(e)(2)(B)(i). Second, the Act specifically names four categories of qualifying felonies: burglary, arson, extortion, and offenses involving the use of explosives. See § 924(e)(2)(B)(ii). Third, the Act contains what we have called a "residual clause," which reaches any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Ibid.*

The present case concerns the residual clause. The sole question raised in Johnson's certiorari petition was whether possession of a sawed-off shotgun under Minnesota law qualifies as a violent felony under that clause. Although Johnson argued in the lower courts that the residual clause is unconstitutionally **\*627** vague, he did not renew that argument here. Nevertheless, after oral argument, the Court raised the question of vagueness on its own. The Court now holds that the residual clause is unconstitutionally vague in all its applications. I cannot agree.

II

I begin with *stare decisis*. Eight years ago in *James v. United States,* 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007), Justice SCALIA, the author of today's opinion for the Court, fired an opening shot at the residual clause. In dissent, he suggested that the residual clause is void for vagueness. *Id.,* at 230, 127 S.Ct. 1586. The Court held otherwise, explaining that the standard in the residual clause "is not so indefinite as to prevent an ordinary person from understanding" its scope. *Id.,* at 210, n. 6, 127 S.Ct. 1586.

Four years later, in *Sykes v. United States,* 564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011), Justice SCALIA fired another round. Dissenting once again, he argued that the residual clause is void for vagueness and rehearsed the same basic arguments that the Court now adopts. See *id., at ––– – –––,* 131 S.Ct., at 2273–2274; see also *Derby v. United States,* 564 U.S. ––––, ––– – –––, 131 S.Ct. 2858, 2859–2860, 180 L.Ed.2d 904 (2011) (SCALIA, J., dissenting

Johnson v. U.S., 576 U.S. 591 (2015)

Case 3:20-cv-07721-SI   Document 58-4   Filed 11/10/20   Page 1382 of 1384

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

from denial of certiorari). As in *James,* the Court rejected his arguments. See *Sykes,* 564 U.S., at ——, 131 S.Ct., at 2276–2277. In fact, Justice SCALIA was the *only* Member of the *Sykes* Court who took the position that the residual clause could not be intelligibly applied to the offense at issue. The opinion of the Court, which five Justices joined, expressly held that the residual clause "states an intelligible principle and provides guidance that allows a person to 'conform his or her conduct to the law.' " *Id.,* at —— – ——, 131 S.Ct., at 2277 (quoting *Chicago v. Morales,* 527 U.S. 41, 58, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion)). Justice THOMAS's concurrence, while disagreeing in part with the Court's interpretation of the residual clause, did not question its constitutionality. See *Sykes,* 564 U.S., at ——, 131 S.Ct., at ——*Sykes,* 564 U.S., at 131 S.Ct., at —— (opinion concurring in judgment). And Justice KAGAN's dissent, which Justice GINSBURG joined, argued that a proper application of the provision required a different result **\*628** . See *id.,* at ——, 131 S.Ct., at ——*id.,* at ——, 131 S.Ct., at ——. Thus, eight Members of the Court found the statute capable of principled application.

It is, of course, true that "[*s* ]*tare decisis* is not an inexorable command." *Payne v. Tennessee,* 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). But neither is it an empty Latin phrase. There must be good reasons for overruling a precedent, and there is none here. Nothing has changed since our decisions in *James* and *Sykes*—nothing, that is, except the Court's weariness with ACCA cases.

Reprising an argument that Justice SCALIA made to no avail in **\*\*2576** *Sykes, supra,* at ——, 131 S.Ct., at 2287 (dissenting opinion), the Court reasons that the residual clause must be unconstitutionally vague because we have had trouble settling on an interpretation. See *ante,* at 2558 – 2559. But disagreement about the meaning and application of the clause is not new. We were divided in *James* and in *Sykes* and in our intervening decisions in *Begay v. United States,* 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), and *Chambers v. United States,* 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009). And that pattern is not unique to ACCA; we have been unable to come to an agreement on many recurring legal questions. The Confrontation Clause is one example that comes readily to mind. See, *e.g.,* *Williams v. Illinois,* 567 U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012); *Bullcoming v. New Mexico,* 564 U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011); *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). Our disagreements about the meaning of that provision do not prove that the Confrontation Clause has no ascertainable meaning. Likewise, our disagreements on the residual clause do not prove that it is unconstitutionally vague.

The Court also points to conflicts in the decisions of the lower courts as proof that the statute is unconstitutional. See *ante,* at 2559 – 2560. The Court overstates the degree of disagreement below. For many crimes, there is no dispute that the residual clause applies. And our certiorari docket provides a skewed picture because the decisions that we are asked to review are usually those involving issues on which there is at least an arguable circuit conflict. But in any **\*629** event, it has never been thought that conflicting interpretations of a statute justify judicial elimination of the statute. One of our chief responsibilities is to resolve those disagreements, see Supreme Court Rule 10, not to strike down the laws that create this work.

The Court may not relish the task of resolving residual clause questions on which the Circuits disagree, but the provision has not placed a crushing burden on our docket. In the eight years since *James,* we have decided all of three cases involving the residual clause. See *Begay, supra* ; *Chambers, supra* ; *Sykes, supra.* Nevertheless, faced with the unappealing prospect of resolving more circuit splits on various residual clause issues, see *ante,* at 2559, six Members of the Court have thrown in the towel. That is not responsible.

III

Even if we put *stare decisis* aside, the Court's decision remains indefensible. The residual clause is not unconstitutionally vague.

A

The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold

Johnson v. U.S., 576 U.S. 591 (2015)

Case 3:20-cv-07721-SI    Document 58-4    Filed 11/10/20    Page 1383 of 1384

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."

*United States v. National Dairy Products Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard."

*United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89, 41 S.Ct. 298, 65 L.Ed. 516 (1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." **2577 *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).

*630 The bar is even higher for sentencing provisions. The fair notice concerns that inform our vagueness doctrine are aimed at ensuring that a " 'person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly.' " *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). The fear is that vague laws will " 'trap the innocent.' " 455 U.S., at 498, 102 S.Ct. 1186. These concerns have less force when it comes to sentencing provisions, which come into play only after the defendant has been found guilty of the crime in question. Due process does not require, as Johnson oddly suggests, that a "prospective criminal" be able to calculate the precise penalty that a conviction would bring. Supp. Brief for Petitioner 5; see *Chapman v. United States,* 500 U.S. 453, 467–468, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (concluding that a vagueness challenge was "particularly" weak "since whatever debate there is would center around the appropriate sentence and not the criminality of the conduct").

B

ACCA's residual clause unquestionably provides an ascertainable standard. It defines "violent felony" to include any offense that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). That language is by no means incomprehensible. Nor is it unusual. There are scores of federal and state laws that employ similar standards. The Solicitor General's brief contains a 99–page appendix setting out some of these laws. See App. to Supp. Brief for United States; see also *James,* *supra,* at 210, n. 6, 127 S.Ct. 1586. If all these laws are unconstitutionally vague, today's decision is not a blast from a sawed-off shotgun; it is a nuclear explosion.

Attempting to avoid such devastation, the Court distinguishes these laws primarily on the ground that almost all of them "require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion.*" *631 *Ante,* at 2561 (emphasis in original). The Court thus admits that, "[a]s a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." *Ibid.* Its complaint is that the residual clause "requires application of the 'serious potential risk' standard to an *idealized ordinary case of the crime.*" *Ibid.* (emphasis added). Thus, according to the Court, ACCA's residual clause is unconstitutionally vague because its standard must be applied to "an idealized ordinary case of the crime" and not, like the vast majority of the laws in the Solicitor General's appendix, to "real-world conduct."

ACCA, however, makes no reference to "an idealized ordinary case of the crime." That requirement was the handiwork of this Court in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). And as I will show, the residual clause can reasonably be interpreted to refer to "real-world conduct." [1]

**2578 C

When a statute's constitutionality is in doubt, we have an obligation to interpret the law, if possible, to avoid the constitutional problem. See, *e.g.,* *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). As one treatise puts it, "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts § 38, p. 247 (2012). This *632 canon applies fully when considering vagueness challenges. In cases like this one, " our task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress,

Johnson v. U.S., 576 U.S. 591 (2015)

135 S.Ct. 2551, 192 L.Ed.2d 569, 83 USLW 4576, 15 Cal. Daily Op. Serv. 6800...

so as to comport with constitutional limitations." *Civil Service Comm'n v. Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); see also *Skilling v. United States,* 561 U.S. 358, 403, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). Indeed, " '[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.' " *Id., at 406, 130 S.Ct. 2896* (quoting *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895); emphasis deleted); see also *Ex parte Randolph,* 20 F.Cas. 242, 254 (No. 11,558) (C.C.Va.1833) (Marshall, C.J.).

The Court all but concedes that the residual clause would be constitutional if it applied to "real-world conduct." Whether that is the *best* interpretation of the residual clause is beside the point. What matters is whether it is a reasonable interpretation of the statute. And it surely is that.

First, this interpretation heeds the pointed distinction that ACCA draws between the "element[s]" of an offense and "conduct." Under § 924(e)(2)(B)(i), a crime qualifies as a "violent felony" if one of its "element [s]" involves "the use, attempted use, or threatened use of physical force against the person of another." But the residual clause, which appears in the very next subsection, § 924(e)(2)(B)(ii), focuses on "conduct"—specifically, "conduct that presents a serious potential risk of physical injury to another." The use of these two different terms in § 924(e) indicates that "conduct" refers to things done during the commission of an offense that are not part of the elements needed for conviction. Because those extra actions vary from case to case, it is natural to interpret "conduct" to mean real-world conduct, not the conduct involved in some Platonic ideal of the offense.

Second, as the Court points out, standards like the one in the residual clause almost always appear in laws that call for application by a trier of fact. This strongly suggests that the residual clause calls for the same sort of application.

**\*633** Third, if the Court is correct that the residual clause is nearly incomprehensible when interpreted as applying to an "idealized ordinary case of the crime," then that is telling evidence that this is not what Congress intended. When another interpretation is ready at hand, why should we assume that Congress gave the clause a meaning that is impossible—or even, exceedingly difficult—to apply?

### D

Not only does the "real-world conduct" interpretation fit the terms of the residual **\*\*2579** clause, but the reasons that persuaded the Court to adopt the categorical approach in *Taylor* either do not apply or have much less force in residual clause cases.

In *Taylor,* the question before the Court concerned the meaning of "burglary," one of ACCA's enumerated offenses. The Court gave three reasons for holding that a judge making an ACCA determination should generally look only at the elements of the offense of conviction and not to other things that the defendant did during the commission of the offense. First, the Court thought that ACCA's use of the term "convictions" pointed to the categorical approach. The Court wrote: "Section 924(e)(1) refers to 'a person who ... has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 495 U.S., at 600, 110 S.Ct. 2143. Second, the Court relied on legislative history, noting that ACCA had previously contained a generic definition of burglary and that "the deletion of [this] definition ... may have been an inadvertent casualty of a complex drafting process." *Id., at 589–590, 601, 110 S.Ct. 2143.* Third, the Court felt that "the practical difficulties and potential unfairness of a factual approach [were] daunting." *Id., at 601, 110 S.Ct. 2143.*

None of these three grounds dictates that the categorical approach must be used in residual clause cases. The second ground, which concerned the deletion of a generic definition **\*634** of burglary, obviously has no application to the residual clause. And the first ground has much less force in residual clause cases. In *Taylor,* the Court reasoned that a defendant has a " conviction" for burglary only if burglary is the offense set out in the judgment of conviction. For instance, if a defendant commits a burglary but pleads guilty, under a plea bargain, to possession of burglar's tools, the *Taylor* Court thought that it would be unnatural to say that the defendant had a *conviction* for burglary. Now consider a case in which a gang member is convicted of illegal possession of a sawed-off shotgun and the evidence shows that he concealed the weapon under his coat, while searching for a rival gang member who had just killed his brother. In that situation, it is not at all unnatural to say that the defendant had a conviction for a

AR.05225